**BLEICHMAR FONTI & AULD LLP**
Lesley Weaver (Cal. Bar No.191305)
Angelica M. Ornelas (Cal. Bar No. 285929)
Joshua D. Samra (Cal. Bar No. 313050)
555 12th Street, Suite 1600
Oakland, CA 994607
Tel.: (415) 445-4003
Fax: (415) 445-4020
*lweaver@bfalaw.com*
*aornelas@bfalaw.com*
*jsamra@bfalaw.com*

**SIMMONS HANLY CONROY LLC**
Mitchell M. Breit (admitted *pro hac vice*)
Jason 'Jay' Barnes (admitted *pro hac vice*)
An Truong (admitted *pro hac vice*)
Eric Johnson (admitted *pro hac vice*)
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
Fax: (212) 213-5949
*mbreit@simmonsfirm.com*
*jaybarnes@simmonsfirm.com*
*atruong@simmonsfirm.com*
*ejohnson@simmonsfirm.com*

**KAPLAN FOX & KILSHEIMER LLP**
David A. Straite (admitted *pro hac vice*)
Aaron L. Schwartz (admitted *pro hac vice*)
850 Third Avenue
New York, NY 10022
Tel.: (212) 687-1980
Fax: (212) 687-7715
*dstraite@kaplanfox.com*
*aschwartz@kaplanfox.com*

**KAPLAN FOX & KILSHEIMER LLP**
Laurence D. King (Cal. Bar No. 206423)
Mario Choi (Cal. Bar No. 243409)
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Tel.:    (415) 772-4700
Fax:    (415) 772-4707
*lking@kaplanfox.com*
*mchoi@kaplanfox.com*

*Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION**

| | |
|---|---|
| PATRICK CALHOUN, ELAINE CRESPO, HADIYAH JACKSON and CLAUDIA KINDLER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GOOGLE LLC,<br><br>Defendant. | Case No. 5:20-cv-5146-LHK-SVK<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO GOOGLE'S MOTION TO DISMISS COMPLAINT**<br><br>Judge: Hon. Lucy H. Koh<br>Hearing Date:  February 18, 2021<br>Hearing Time: 1:30pm<br>Hearing Location: Courtroom 8 – 4th Floor |

**TABLE OF CONTENTS**

Page

I.   SUMMARY OF ARGUMENT AND FACTS .................................................. 1

II.   COUNTER-STATEMENT OF ISSUES TO BE DECIDED ............................. 2

III.   ARGUMENT ......................................................................................... 3

   A.   Google Breached its Contract to Not Collect Un-Synced User PI (Count 8) .......... 3

      1.   The Chrome PN is Contractually Binding .................................... 3

      2.   The Chrome PN Promises Not to Collect PI from Un-Synced Users ......... 4

      3.   Plaintiffs' Agreement to Share Some PI Does Not Waive Their Right to Enforce the Chrome Promises .................................. 7

   B.   Google Breached the Implied Covenant of Good Faith & Fair Dealing (Count 9) ..................................... 7

   C.   Plaintiffs Sufficiently Plead Privacy Claims (Count 2-5, 7, 11) ......................... 8

      1.   Plaintiffs Did Not Consent to Chrome Sending Google Users' PI ............. 8

      2.   Plaintiffs Sufficiently Plead Intrusion Upon Seclusion (Count 7) ............. 10

      3.   Plaintiffs Plead Unauthorized ECS Disclosure (Counts 2 & 4) ................. 11

         a.   Chrome Browser is an ECS ......................................... 12

         b.   An ECS May Not Divulge Communications Without Consent ..... 12

         c.   Google Fails to Meet Its Burden of Showing Website Consent .... 14

      4.   Plaintiffs Sufficiently Plead an SCA (Access) Claim (Count 3) ................. 16

         a.   Google Did Not Have Authorization ............................. 16

         b.   Plaintiffs Sufficiently Allege "Facilities" ....................... 16

         c.   Plaintiffs Sufficiently Allege "Electronic Storage" ................ 17

         d.   Internet Communications Can be in "Storage" and "Transit" ....... 18

      5.   Plaintiffs Sufficiently Plead a CFAA Claim (Count 11) ........................... 18

         a.   Plaintiffs Sufficiently Plead CFAA Damages ................ 18

         b.   Plaintiffs Allege that Google Intentionally Caused Damage ......... 19

         c.   Plaintiffs Allege $5,000 of Loss .................................. 19

   D.   Plaintiffs Sufficiently Plead a Statutory Larceny Claim (Count 13) ............... 20

   E.   Plaintiffs Sufficiently Plead a UCL Claim (Count 14) ......................... 22

**TABLE OF CONTENTS (cont.'d)**

Page

1.    Plaintiffs Allege Lost Money or Property Under the UCL ........................ 22

2.    Plaintiffs Plead an Entitlement to Monetary Damages ............................. 24

3.    Plaintiffs Sufficiently Plead Unlawful, Fraudulent, and Unfair Conduct .. 24

F.    Plaintiffs' Claims Are Timely .................................................................. 25

IV.   CONCLUSION ..................................................................................................... 25

PLFS' MPA IN OPPO. TO GOOGLE'S MOTION TO DISMISS COMPLAINT

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allure Labs, Inc. v. Markushevska*,
  606 B.R. 51 (N.D. Cal. 2019) .............................................................................. 20

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................ 3

*Backhaut v. Apple*,
  74 F. Supp. 3d 1033 (N.D. Cal. 2014) .......................................................... 13, 14

*Baker v. Libbie*,
  210 Mass. 599 (1912) ......................................................................................... 23

*Brodsky v. Apple Inc.*,
  445 F. Supp. 3d 110 (N.D. Cal. 2020) ............................................................... 25

*Campbell v. Facebook, Inc.*,
  77 F. Supp. 3d 836 (N.D. Cal. 2014) ................................................................... 6

*Carpenter v. U.S.*,
  484 U.S. 19 (1987) ............................................................................................. 23

*Chance v. Avenue A, Inc.*,
  165 F. Supp. 2d 1153 (W.D. Wash. 2001) ........................................................ 15

*Creative Computing v. GetLoaded.com LLC*,
  386 F.3d 930 (9th Cir. 2004) ............................................................................. 19

*Crowley v. CyberSource Corp.*,
  166 F. Supp. 2d 1263 (N.D. Cal. 2001) ............................................................ 13

*CTC Real Estate Svcs. v. Lepe*,
  140 Cal. App. 4th 856 (2006) ....................................................................... 20, 22

*Ehrhart v. Bofi Holding, Inc.*,
  2020 WL 1550207 (S.D. Cal., Mar. 31, 2020) .................................................. 22

*Facebook, Inc. v. ConnectU, LLC*,
  489 F. Supp. 2d 1087 (N.D. Cal. 2007) ............................................................ 23

*Folsom v. Marsh*,
  9 F. Cas. 342 (C.C.D. Mass. 1841) ................................................................... 23

*Garcia v. Enterprise Holdings, Inc.*,
  78 F. Supp. 3d 1125 (N.D. Cal. 2015) ............................................................... 10

*Gen. Motors LLC v. Autel US Inc.*,
  2016 WL 1223357 (E.D. Mich. Mar. 29, 2016) ................................................ 19

*Henson v. Turn, Inc.*,
  2018 WL 5281629 (N.D. Cal. Oct. 22, 2018) .................................................... 10

*In re Adobe Sys., Inc. Privacy Litig.*,
  66 F. Supp. 3d 1197 (N.D. Cal. 2014) ............................................................... 25

## TABLE OF AUTHORITIES (cont'd.)

Page(s)

*In re Animation Workers*,
123 F. Supp. 3d 1175 (N.D. Cal. 2015) ........................................................................ 25

*In re Anthem, Inc. Data Breach Litig.*,
162 F. Supp. 3d 953 (N.D. Cal. 2016) .......................................................................... 24

*In re Anthem, Inc. Data Breach Litig.*,
2016 WL 3029783 (N.D. Cal. May 27, 2016) ....................................................... 20, 23

*In re Apple Inc. Device Perf. Litig.*,
347 F. Supp. 3d 434 (N.D. Cal. 2018) .......................................................................... 19

*In re Capital One Consumer Data Security Breach Litig.*,
2020 WL 5629790 (E.D. Va. Sept. 18, 2020) ................................................................ 4

*In re DoubleClick Inc. Privacy Litig.*,
154 F. Supp. 2d 497 (S.D.N.Y. 2001) .................................................................... 11, 15

*In re Easysaver Rewards Litig.*,
737 F. Supp. 2d 1159 (S.D. Cal. 2010) .......................................................................... 7

*In re Facebook Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) ............................................................................... passim

*In re Facebook, Inc. Consumer Privacy User Profile Litig.*,
402 F. Supp. 3d 767 (N.D. Cal. 2019) .................................................................. 4, 7, 10

*In re Google Assistant Privacy Litig.*,
457 F. Supp. 3d 797 (N.D. Cal. 2020) ....................................................... 4, 11, 12, 13

*In re Google Inc. Cookie Placement Consumer Privacy Litig.*,
806 F.3d 125 (3d Cir. 2015) ............................................................................ 10, 11, 15

*In re Google Referrer Header Privacy Litig.*,
2020 WL 3035796 (N.D. Cal. Jun. 5, 2020) ............................................................. 4, 7

*In re Google, Inc. Gmail Litig.*,
2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) .................................................... passim

*In re iPhone App. Litig.*,
844 F. Supp. 2d 1040 (N.D. Cal. 2012) ........................................................................ 16

*In re Marriott Int'l, Inc. Cust. Data Sec. Breach Litig.*,
440 F. Supp. 3d 447 (D. Md. 2020) ...................................................................... 20, 23

*In re Nickelodeon Consumer Privacy Litig.*,
2014 WL 3012873 (D.N.J. July 2, 2014)………………………………………………14
827 F.3d 262 (3d Cir. 2016) ............................................................................ 10, 11, 14

*In re Pharmatrak, Inc.*,
329 F.3d 9 (1st Cir. 2003) ................................................................................. 8, 14, 15

*In re Yahoo Mail Litig.*,
7 F. Supp. 3d 1016 (N.D. Cal. 2014) ........................................................................... 13

**TABLE OF AUTHORITIES (cont'd.)**

Page(s)

*In re Yahoo! Inc. Customer Data Security Breach Litig.*,
   2017 WL 3727318 (N.D. Cal. Aug. 30, 2017)..................................................... 4, 7, 23, 24

*Kwikset Corp. v. Super. Ct.*,
   51 Cal. 4th 310 (2011) ................................................................................................. 22

*Low v. LinkedIn Corp.*,
   900 F. Supp. 2d 1010 (N.D. Cal. 2012) ....................................................................... 22

*Manzarek v. St. Paul Fire & Mar. Ins. Co.*,
   519 F.3d 1025 (9th Cir. 2008)......................................................................................... 3

*Matera v. Google*,
   2016 WL 8200619 (N.D. Cal. Aug. 12, 2016)........................................................ 13, 14

*Microsoft v. Does 1-8*,
   2015 WL 4937441 (E.D. Va. Aug. 17, 2015) ............................................................... 12

*NetApp, Inc. v. Nimble Storage, Inc.*,
   2015 WL 400251 (N.D. Cal. Jan. 29, 2015) ................................................................. 19

*People v. Gopal*,
   171 Cal. App. 3d 524 (1985)......................................................................................... 21

*People v. Kozlowski*,
   96 Cal. App. 4th 853 (2002) ......................................................................................... 20

*People v. Kwok*,
   63 Cal. App. 4th 1236 (1998) ................................................................................. 20, 21

*People v. Parke*r,
   217 Cal. App. 2d 422 (1963).......................................................................................... 21

*Planned Parenthood Federation of Am., Inc. v. Ctr. for Med. Progress*,
   735 F. App'x. 241 (9th Cir. 2018) ................................................................................. 9

*San Miguel v. HP Inc.*,
   317 F. Supp. 3d. 1075 (N.D. Cal. 2018) ....................................................................... 19

*Scott v. Kuhlmann*,
   746 F.2d 1377 (9th Cir. 1984)....................................................................................... 14

*Smith v. Facebook, Inc.*,
   745 F. App'x. 8 (9th Cir. 2018) .................................................................................... 10

*Svenson v. Google Inc.*,
   2015 WL 1503429 (N.D. Cal. Apr. 1, 2015) ................................................................. 4

*Theofel v. Farey-Jones*,
   359 F.3d 1066 (9th Cir. 2004)................................................................................. 15, 16

*U.S. v. Hutchins,*
    361 F. Supp. 3d 779 (E.D. Wis. 2019)................................................ 19

*U.S. v. Keys,*
    703 F. App'x. 472 (9th Cir. 2017) ...................................................... 19

*U.S. v. Oliva,*
    705 F.3d 390 (9th Cir. 2012)............................................................... 16

*U.S. v. Szymuszkiewicz,*
    622 F.3d 701 (7th Cir. 2010)............................................................... 18

*Van Patten v. Vertical Fitness Group, LLC,*
    847 F.3d 1037 (9th Cir. 2017)............................................................. 14

*Walling v. Beverly Enter.,*
    476 F.2d 393 (9th Cir. 1973)................................................................. 8

*Welco Electronics, Inc. v. Mora,*
    223 Cal. App. 4th 202 (2014) ............................................................. 22

*Williams v. Superior Court,*
    81 Cal. App. 3d 330 (1978)................................................................. 21

*Winet v. Price,*
    4 Cal. App. 4th 1159 (1992) ................................................................. 6

**Statutes**

United States Constituion
    Article III............................................................................................ 22

18 U.S.C.
    § 1030(e)(8) ........................................................................................ 18
    § 2510(15) ........................................................................................... 12
    § 2510(17) ........................................................................................... 17
    § 2511(2)(a)(i) ..................................................................................... 13
    § 2511(3)(a)................................................................................... 11, 12
    § 2511(3)(b)(ii) ................................................................................... 14
    § 2511(b)(i) ......................................................................................... 13
    § 2701(a)(1) ......................................................................................... 16
    § 2701(c)(1) ......................................................................................... 16
    § 2702(a)(1) ................................................................................... 11, 12
    § 2702(b)(3) ......................................................................................... 14
    § 2702(b)(5) ......................................................................................... 13
    § 2711(a) .............................................................................................. 16

California Business & Professions Code
    §§ 17200, *et seq.* ............................................................................... 22

California Civil Code
    § 654.................................................................................................... 20
    §§ 1798.100, *et seq.* .......................................................................... 20

## TABLE OF AUTHORITIES (cont'd.)

**Page(s)**

California Penal Code
  § 484 .................................................................................................................. 19, 20
  § 496 ........................................................................................................................ 20
  § 502 ........................................................................................................................ 21

## Rules

Federal Rules of Civil Procedure
  Rule 12(b)(6) ........................................................................................................... 10

## Treatises

Restatement (Second) of Torts
  § 852A(3) ................................................................................................................. 15
  § 892B(2) ................................................................................................................. 15

## Other Authorities

Makena Kelly, "Andrew Yang is Pushing Big Tech to Pay Users for Data,"
  The Verge (Jun. 22, 2020) ....................................................................................... 21

PLFS' MPA IN OPPO. TO GOOGLE'S MOTION TO DISMISS COMPLAINT

## I.  SUMMARY OF ARGUMENT AND FACTS

The Google Chrome Privacy Notice ("Chrome PN") promises Chrome users that they do not need to provide any personal information ("PI") to use Chrome, and that Chrome will not send users' PI to Google unless a user turns on Google Sync ("Sync"). ¶¶ 2, 37.[1] But with the use of web-developer tools, Plaintiffs were able to show that Chrome breaks this promise every time a user uses Chrome's basic browser or signed-in modes – without syncing. In fact, Chrome routinely and secretly sends four types of PI[2] from Un-Synced Chrome Users to Google without consent.

Google does not dispute the results of Plaintiffs' investigation, does not deny that it tracks Un-Synced Chrome users in this manner, and does not deny that the collected data qualifies as PI. Google instead claims that the Chrome PN is not a binding contract and, even if it is, it must be interpreted in the "context" of Google's Privacy Policy (the "Google PP"). Under Google's theory, the clear and express promise to not disclose PI means the opposite "in context":

| What the Chrome PN Expressly Says | What Google Says It Means "In Context" of the Google PP |
|---|---|
| "You don't need to provide any personal information to use Chrome." ¶¶ 2, 37. | Every time you use Chrome, it sends your personal information to Google. |
| "The personal information that Chrome stores won't be sent to Google unless you choose to store that data in your Google Account by turning on Sync." ¶¶ 2, 38. | The personal information that Chrome stores will be sent to Google even if you are not Synced. |

Google's arguments defy common sense and ignore binding case law. Google concedes that the Terms of Service ("TOS," Exs. 2-5) governs and argues that the Google PP is "incorporated" into the TOS (offering no reason why the Chrome PN would not be incorporated). Mot. at 9. But as Google well knows, the TOS *excludes* the Google PP, explicitly stating that as of March 31, 2020 the Google PP is no longer "a part of these terms." Ex. 4 at 1. More importantly, the Google PP affirms the privacy promises made in the Chrome PN, for example disclosing collection of browsing history but only when "you've synced with your Google Account." *See* Ex. 16, "Your

---

[1] Unless otherwise noted, "¶" refers to paragraphs in the Complaint; "Mot." refers to Google's Motion to Dismiss; and "Ex." refers to exhibits annexed to the Complaint.

[2] IP Address + User Agent; tracking cookies including the Client ID; X-Client Data Headers; and browsing history, including websites visited and communications with those sites. ¶ 4.

Activity." The bottom line is that Plaintiffs' claims are predicated on straightforward contract provisions, and Google's attempt to manufacture ambiguity through the Google PP is baseless.

For the non-contract claims, Google seeks dismissal on a theory of consent. But consent is a fact-intensive inquiry, generally inappropriate for resolution on a motion to dismiss, especially in a case like this which relies on a direct misrepresentation as opposed to only an omission theory. Even if one were to entertain the argument, general disclosures that Google "may" obtain PI do not negate the explicit promise that it would not. Simply put, the Google PP does not come close to disclosing what is at issue here: that Chrome sends users' PI to Google even when users are not synced and that promises to the contrary are false.

Google's remaining arguments are equally unavailing, the majority being inconsistent with binding case law. For example, the Ninth Circuit has ruled that a plaintiff alleging non-consensual web tracking has pled "highly offensive" behavior and a violation of "reasonable expectations of privacy." *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 603-04 (9th Cir. 2020) ("*FB Tracking*"). Google acknowledges the decision but asks for an exemption for Google's services, a distinction with no basis in the Ninth Circuit's analysis. Mot. at 18-19. Indeed, Plaintiffs here plead an even more serious privacy violation than in *FB Tracking*, involving Google's new and controversial "X-Client Data Header," ¶¶ 69-86, and disguising tracking cookies as first-party cookies. ¶¶ 62-68. Google also asks this Court to find that PI is not "property" under the California larceny statute, or, alternatively, that there is no theft if the PI is merely copied. Mot. at 22-23. Again, Google ignores the Ninth Circuit's ruling that similar non-consensual collection of PI under the exact same larceny statute establishes *economic* injury. *FB Tracking*, 956 F.3d at 600. For the same reason, Plaintiffs have pled a UCL claim because Google's argument that PI is not property is no longer good law. Plaintiffs' remaining statutory claims are also plead with the specificity required. Plaintiffs respectfully request that Google's Motion be denied in its entirety.

## II.   COUNTER-STATEMENT OF ISSUES TO BE DECIDED

Whether Plaintiffs' allegations, taken as true on a motion to dismiss, state plausible claims for relief based on Google's violation of the promise that "[PI] that Chrome stores won't be sent to Google unless you choose to store that data in your Google Account by turning on sync."

1    **III.    ARGUMENT**

2        Plaintiffs "plead[] factual content that allows the court to draw the reasonable inference that

3    the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

4    This facial plausibility standard is not a "probability requirement;" it only requires "more than a

5    sheer possibility that a defendant has acted unlawfully." *Id.* At this stage, courts "accept factual

6    allegations in the complaint as true and construe the pleadings in the light most favorable to

7    [plaintiffs]." *Manzarek v. St. Paul Fire & Mar. Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

8        **A.    Google Breached its Contract to Not Collect Un-Synced User PI (Count 8)**

9        In July 2020, Plaintiffs' contract with Google consisted of three documents: the TOS dated

10   March 31, 2020 (Ex. 4), and two documents explicitly incorporated by reference and hyperlinked

11   in the TOS: the Chrome Terms of Service dated March 31, 2020 (Ex. 6), and the Chrome PN dated

12   May 20, 2020 (Ex. 33). The Google PP is not part of the contract. It was expressly excluded as of

13   March 31, 2020. Ex. 4 at 1 ("[W]e also publish a Privacy Policy … it's not part of these terms[.]").

14   The Chrome PN expressly promises users (1) "You don't need to provide any PI to use Chrome,"

15   and (2) "The PI that Chrome stores won't be sent to Google unless you choose to store that data in

16   your Google Account by turning on Sync[.]" ¶ 2. But, in fact, Chrome shares user PI with Google,

17   regardless of whether a user turns on Sync. Google does not dispute these key facts, nor does it

18   challenge Plaintiffs' characterization of the data as PI. Instead, Google argues that the Chrome PN

19   is not contractually binding; that the Google PP discloses broad data collection; and Plaintiffs

20   consented to the challenged conduct by pleading damages. Each argument is disposed of below.

21           **1.  The Chrome PN is Contractually Binding**

22       After years of taking the position that its various terms of services and hyperlinked policies

23   are a binding contract, Google now argues that the Chrome PN is not part of a contract because

24   there is no "exchange for a promise" in the Chrome PN itself, standing alone. Mot. at 20. But

25   Plaintiffs do not allege that the Chrome PN is a stand-alone contract. Instead, Plaintiffs allege that

26   Google incorporated the Chrome PN into the TOS by explicitly referencing and hyperlinking to it

27   fifteen separate times, ¶¶ 28-30, an allegation Google never disputes. In addition, the TOS notes

28   that additional terms and policies—including the Chrome PN—"define our relationship and mutual

expectations as you use these services." ¶ 28. On similar facts, courts find privacy notices to be incorporated into consumer contracts and commitments therein contractually binding. *See, e.g.*, *In re Google Referrer Header Privacy Litig.*, 2020 WL 3035796 (N.D. Cal. Jun. 5, 2020); *In re Capital One Consumer Data Security Breach Litig.*, 2020 WL 5629790 (E.D. Va. Sept. 18, 2020); *In re Yahoo! Inc. Customer Data Security Breach Litig.*, 2017 WL 3727318 (N.D. Cal. Aug. 30, 2017) ("*Yahoo!*"); *In re Facebook, Inc. Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767 (N.D. Cal. 2019) ("*FB Consumer Profile*"). When it suits its purposes, Google agrees. *See Svenson v. Google Inc.*, 2015 WL 1503429, at *3 (N.D. Cal. Apr. 1, 2015) (arguing that "Wallet transactions are governed by Wallet Terms of Service, which incorporate terms of the Google Wallet Privacy Policy"); *In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797, 831 (N.D. Cal. 2020) (conceding that the TOS and linked documents were binding) ("*Google Assistant*"). The Chrome PN is a part of Google's contract with users and it is disingenuous for Google to argue otherwise.

## 2. The Chrome PN Promises Not to Collect PI from Un-Synced Users

Because Google cannot deny that Chrome sends Un-Synced user PI to Google in violation of contract terms, Google argues that its promises not to collect PI are just "snippets" taken out of context. Mot. at 1. But Google does not and cannot point to any language to the contrary. Rather, Google cobbles together a mishmash of vague terms from a different document disclosing some data collection that cannot reasonably be read to contradict Chrome's express promises.

Contrary to Google's argument that Plaintiffs took two "snippets" out of context, Google's disclosures repeatedly and unambiguously describe settings that give Chrome users the right to decide whether to allow Google tracking. First, the Chrome PN says it is the place to learn "how to control the information that's collected, stored and shared when you use the Google Chrome browser." Ex. 33 at 1. The Chrome PN explains to users:

> You don't need to provide any personal information to use Chrome, but Chrome has different modes that you can use to change or improve your browsing experience. Privacy practices are different depending on the mode that you're using.

¶ 37, Ex. 33 at 1. There are four "modes," three of which are relevant to this discussion: basic browser, signed-in, and synced modes. The Chrome PN assures users that in basic browser and signed-in modes (i.e., not synced), the "browser stores information **locally on your system,**"

including browsing history and cookies or data from websites that you visit. Ex. 33 at 1-2 (emphasis added). Chrome then assures users, "You can delete your browsing history information" and "manage or delete stored browsing data." *Id.* at 2. Chrome further promises, "[t]he personal information that Chrome stores won't be sent to Google unless you choose to store that data in your Google Account by turning on sync[.]" *Id.* The Chrome PN then describes how Chrome "handles" the information, with no mention of data collection by Google, reiterating that "the fact that you use Chrome to access Google services, such as Gmail, does not cause Google to receive any additional personally identifying information about you." *Id.* Chrome's promises are not just two "snippets" but rather comprehensive assurances that PI remains locally stored if users do not sync.

In contrast, when a user *chooses* to sync with a Google Account ("Synced mode"), the Chrome PN describes very different data management. In Synced mode, "your [PI] is saved in your Google Account on Google's servers" and "will be used and protected in accordance with the Google [PP]." Ex. 33 at 6. The Chrome PN only references the Google PP only in the context of Synced accounts and only in relation to the Synced user's PI being "saved in your Google Account on Google's servers so *you* may access it when you sign in…." *Id.* "[PI] that is provided to Google or stored in your Google account will be protected in accordance with the Google [PP]." *Id.* The Chrome PN then specifically mentions "browsing history" as PI that is sent to Google in Synced mode. *Id.* at 6-7. In basic browser or signed-in modes, by contrast, the Chrome PN promises that "browsing history information" will be stored in Chrome, but *not* transmitted to Google. *Id.* at 2. In further contrast, only in Synced mode will Google use "your browsing data to improve and personalize your experience within Chrome." *Id.* at 7. The intentional distinction between modes and delineation between how information is obtained and used conveys the clear message that Chrome only sends PI, including browsing history, to Google when users are Synced. Contentions to the contrary are facially unreasonable.

The only way that Google can refute the clear language of the Chrome PN is to manufacture ambiguity through the Google PP—a document that Google expressly *disclaims*, stating that "it's not part of these terms[.]" Ex. 4 at 1. But parol evidence is "admissible only to prove a meaning to which the language is 'reasonably susceptible' and 'not to flatly contract the express terms of the

agreement.'" *Winet v. Price*, 4 Cal. App. 4th 1159, 1167 (1992). Even if admissible, the Google PP actually reinforces the actionable promise. For example, the Google PP plainly promises users that they can control their privacy, stating, "across our services, you can adjust your privacy settings to control what we collect" and that "[t]he information Google collects…depends on how you use our services and how you manage your privacy controls." Ex. 16 at 1-2 *compare with* the Chrome PN, Ex. 33 at 1-2 (promising users that they do not have to provide PI to use Chrome and that the PI Chrome stores "won't be sent to Google unless you choose to…[S]ync").[3]

Google never discloses the data practices at issue here. In the "Your Activity" section, Google only vaguely mentions data collection related to "activity on third-party sites," and even then only says Google "*may* collect" the data. Ex. 16 at 3-4. But courts routinely find that disclosing what "may" be collected is not specific enough; the defendant must disclose what it *will* collect. *Campbell v. Facebook, Inc.,* 77 F. Supp. 3d 836, 847 (N.D. Cal. 2014) (no consent when Facebook only disclosed that it "may use the information we receive about you for data analysis"). This Court has also already held that Google's disclosure that it "may collect information about the services that you use" was too vague to get consent to Gmail scanning. *In re Google, Inc. Gmail Litig*., 2013 WL 5423918, at *14 (N.D. Cal. Sept. 26, 2013) ("*Gmail Litig.*"). The same is true here.

Further, the Google PP makes no mention of the X-Client Data Header or cross-site tracking via cookie syncing, which are violations alleged in the Complaint, ¶¶ 55-86, and indeed reinforces the promise of user control over the sharing and collection of Chrome browsing history, which is only collected if *"you've synced with your Google Account.*" Ex. 16 at 3 (emphasis added). This is the same privacy protection promised in the Chrome PN. In short, nowhere does the Google PP contradict the Chrome PN's express promises.[4]

---

[3] Congressional investigators apparently also interpret the Google PP in the same way as Plaintiffs. Recently, the Majority Staff of the House Judiciary Committee released a report, "Investigation of Competition in Digital Markets" (October 6, 2020) (the "House Report"), Ex. A to Plaintiffs' RJN accompanying this brief.  The report suggests that the investigators, *citing the Google PP,* House Report at 223 n.1336, understood that only when synced would Google then be able to "build more detailed user profiles by connecting activity data to the users' Google Account."  *Id.* at 223.

[4] Further, by Google's own terms, any ambiguity must be resolved in favor of the Chrome PN; the Google Terms of Use ("TOS") expressly provides that "service-specific additional terms," *e.g.*, the Chrome PN, govern where there is a conflict. ¶ 33.

### 3. Plaintiffs' Agreement to Share Some PI Does Not Waive Their Right to Enforce the Chrome Promises

Google argues that Plaintiffs concede consent by alleging that they provided consideration by agreeing to exchange *some* PI for the use of Chrome. Mot. at 20 (citing ¶ 356). But the core claim is that the Chrome PN set limitations upon what PI it would collect and send to Google for Un-Synced users. That Plaintiffs might have agreed to provide some PI (for instance, when signing up for Chrome) does not forfeit all privacy rights thereafter. *Gmail Litig.*, 2013 WL 5423918, at *14 (consumers may consent to some data collection and reject others); *FB Consumer Profile,* 402 F.Supp.3d at 782-83 (holding consent is not an "all or nothing proposition" and that an agreement to share some data does not waive all privacy protections). Google's argument is akin to stating that because a consumer agreed to pay $100 for a service, defendant can later take $1,000.[5]

### B. Google Breached the Implied Covenant of Good Faith & Fair Dealing (Count 9)

Under California law, "[e]very contract imposes on each party a duty of good faith and fair dealing . . . that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Yahoo!,* 2017 WL 3727318 at *48 (quotations omitted). Google argues that Plaintiffs' implied covenant claim simply repeats the contract claim. This is incorrect. Plaintiffs plead a contractual duty not to collect PI from Un-Synced Chrome users, which is the same duty for both claims, but the implied covenant claim gives added protection when an *additional* bad faith action frustrates the purpose of the contract. *See, e.g.*, *FB Consumer Profile*, 402 F. Supp. 3d at 802 (noting that breach of contract and breach of implied covenant may both lie where defendant makes a material modification to the contract without notice); *In re Easysaver Rewards Litig.*, 737 F. Supp. 2d 1159, 1174 (S.D. Cal. 2010) (denying motion to dismiss breach of implied covenant claim where defendant frustrated the purpose of the contract (confidentiality) by sharing consumer information). Similarly, Plaintiffs plead more than mere breach of contract.

Plaintiffs specifically allege bad faith acts that frustrated the privacy purposes of the contract. Plaintiffs detail Google's new and controversial practice of "cookie syncing," where

---

[5] If instead Google is arguing no contract formation for lack of consideration in the absence of consent to provide PI, Google is wrong. Plaintiffs plead that they used Chrome, agreed to abide by the TOS, and are not in breach themselves. ¶ 354. This is sufficient to plead consideration for the free software even if Google never collects any PI. *In re Google Referrer Header Privacy Litig.*, 2020 WL 3035796 at *9 (agreeing to Google TOS is sufficient consideration for contract).

Google does not just collect PI, but creates new PI in the form of tracking cookies disguised as first-party cookies. ¶¶ 62-68. Plaintiffs allege that Google's "*cid*" cookie (the "Client ID") qualifies as PI, ¶ 66, and is unlawfully written as a first-party cookie, facilitating web tracking in circumvention of cookie blockers. ¶¶ 62-67. Disguising a tracking cookie as a first-party cookie to circumvent cookie blockers is a deceptive practice that violates Google's 2012 consent agreement with the FTC approved by this Court. ¶¶ 9, 67, 412. Specifically, the FTC informed Google in 2012 that setting a third-party tracking cookie as a first-party cookie is a deceptive practice in its own right and violates yet another consent agreement with the FTC from 2011. *See U.S. v. Google, Inc*., 12-cv-4177-SI (N.D. Cal.), complaint dated Aug. 8, 2012, at ¶¶ 46-47 (Plaintiffs' RJN, Ex. A); *In the Matter of Google, Inc*., FTC Case No. C-4336, Order dated Oct. 13, 2011, at 3 (Google "shall not misrepresent…the extent to which consumers may exercise control over the collection, use or disclosure of covered information") (Plaintiffs' RJN, Ex. B). Likewise, Google's controversial use of the X-Client Data Identifier is designed in bad faith to track Chrome users' PI through a technology (referrer headers) that cannot be blocked by cookie blockers. ¶¶ 69-86. Even if a fact-finder later concludes that these acts do not technically violate contract terms, they are certainly designed to frustrate the contract provisions intended to give users control over their PI.

### C.   Plaintiffs Sufficiently Plead Privacy Claims (Count 2-5, 7, 11)

#### 1.   Plaintiffs Did Not Consent to Chrome Sending Google Users' PI

Google mischaracterizes the facts and misstates the law on consent. The Chrome PN expressly promised that "the personal information that Chrome stores won't be sent to Google unless you choose to store that data in your Google Account by turning on sync." ¶ 38. Plaintiffs did not Sync their accounts, and thus did not consent to the disclosure of their PI to Google. *See, e.g., In re Pharmatrak, Inc*., 329 F.3d 9, 19 (1st Cir. 2003) (consent cannot be found where the service was "explicitly conditioned" on "the fact that [defendant] would not collect such information"). Instead of confronting this express promise, Google's Motion mischaracterizes the pleadings, selectively quoting allegations out of context.[6] But Plaintiffs clearly allege that Google

---

[6] Google's mischaracterizations should be disregarded, as reasonable inferences and ambiguities must be resolved in Plaintiffs' favor at the pleading stage. *Walling v. Beverly Enter.*, 476 F.2d 393, 396 (9th Cir. 1973).

1  exceeded the scope of the promises by collecting the PI of Un-Synced users. There is no basis, at

2  the pleading stage, to find express consent. *See Planned Parenthood Federation of Am., Inc. v. Ctr.*

3  *for Med. Progress*, 735 F. App'x. 241, 247 (9th Cir. 2018) (consent and its alleged scope is usually

4  a question of fact inappropriate for review on motion to dismiss); *Gmail Litig.*, 2013 WL 5423918

5  at *12 ("[c]onsent may be explicit or implied, but it must be actual consent rather than constructive

6  consent"). At most, whether the disclosures in the Google PP override a clear and express promise

7  is a matter for a reasonable juror to decide, not one ripe for adjudication on a motion to dismiss.[7]

8      Google's implied consent is similarly unavailing. As explained in *Gmail Litig.*,

9      [I]mplied consent applies only in a narrow set of cases. The critical
10     question with respect to implied consent is whether the parties whose
       communications were intercepted had adequate notice of the
       interception. That the person communicating knows that the
11     interceptor has the *capacity* to monitor the communication is
       insufficient to establish implied consent. Moreover, consent is not an
12     all-or-nothing proposition. Rather, a party may consent to the
       interception of only part of the communication or to the interception
13     of only a subset of its communications."

14  2013 WL 5423918 at *12 (internal brackets, quotations and citation omitted).

15     Implied consent does not exist here. The lynchpin of Google's consent argument is that the

16  Google PP provided users with general notice of data collection, and this general disclosure should

17  override the specific promises of the Chrome PN.  But Google removed the Google PP from the

18  Chrome PN in March 2020. As importantly, Google does not identify a single sentence disclosing

19  that Chrome will in fact sent PI to Google when you are not Synced, and as noted above, the "Your

20  Activity" section limits collection of web browsing history to Synced users. Further, while the

21  Google PP discussed myriad ways in which properly obtained PI *may* be used and disclosed, notice

22  of *capacity* alone is not enough. *Gmail Litig.,* 2013 WL 5423918 at *12.

23  ---
    [7] Google's arguments about consent are wildly inconsistent with what it is saying publicly to the
24  developer community. Just three months ago, Google began beta-testing a new "consent mode"
    feature that will allow websites to obtain consumer consent and adjust the collection of PI and
25  transmission to Google. *See* Plaintiffs' RJN Ex. D-F.  These documents post-date the Complaint,
    but it is extraordinary for Google to argue blanket consent in this Court while tacitly
    admitting to developers that the current system does not align with user consent.  *See, e.g*.,
26  Plaintiffs' RJN Ex. E ("Consent mode allows you to adjust how your Google tags behave based on
    the consent status of your users. You can indicate whether consent has been granted for analytics
27  and ads cookies. Google's tags will dynamically adapt, only utilizing cookies for the specified
    purposes when consent has been given by the user").  At a minimum, consent is a question of fact.
28

PLFS' MPA IN OPPO. TO GOOGLE'S MOTION TO DISMISS COMPLAINT

To the extent there is any ambiguity between the Chrome PN and the Google PP, it must be resolved in Plaintiffs' favor at the pleading stage. First, the Google TOS mandates that the Chrome PN governs in the event of a conflict, ¶ 33; Ex. 4 at 14, and in any event, if the "contract language at issue is reasonably susceptible to more than one interpretation, with one of those interpretations suggesting consent and another belying it, the Court cannot decide the issue in [defendant's] favor at the motion to dismiss stage[.]" *FB Consumer Profile*, 402 F. Supp. 3d at 789. The cases cited by Google, *Smith v. Facebook, Inc.,* 745 F. App'x. 8 (Mem), 8-9 (9th Cir. 2018) and *Garcia v. Enterprise Holdings, Inc.*, 78 F. Supp. 3d 1125, 1126 (N.D. Cal. 2015), do not warrant a contrary conclusion. Neither case dealt with the issue of consent where a defendant, as Google did here, expressly promised that it would not share user PI unless users engaged in some affirmative act, *e.g.*, syncing. As Plaintiffs' above-cited cases demonstrate, the inherent conflicts in contractual terms negates a finding of consent, either express or implied, at the pleading stage.[8]

## 2.  Plaintiffs Sufficiently Plead Intrusion Upon Seclusion (Count 7)

Google challenges the intrusion upon seclusion claim on the grounds that Plaintiffs failed to plausibly allege (1) a reasonable expectation of privacy in PI vis-à-vis Google, and (2) Google's conduct was not highly offensive. But every Circuit Court to have addressed this question (including the Ninth Circuit) rejected Google's view. Just this year, the Ninth Circuit held that alleging non-consensual surveillance of web-browser communications adequately pleads an intrusion claim where defendant makes an express promise to the contrary. *See FB Tracking*, 956 F.3d at 603 (finding an expectation of privacy based on Facebook's "allegedly surreptitious and unseen data collection" and noting that the "critical fact" in *Google Cookie* and *Nickelodeon* "was that the online entity represented to the plaintiffs that their information would not be collected, but then proceeded to collect it anyway.").[9] In *FB Tracking*, Facebook violated the promise that it

---

[8] In a footnote, Google also seeks dismissal of the CIPA claim (Count 5) on the same "consent" argument.  Mot. at 8, n.6.  If this Court rejects Google's user-consent defense at the 12(b)(6) stage, the CIPA claim should stand because Google raises no other challenge.

[9] *See also Nickelodeon*, 827 F.3d at 294 ("[R]easonable factfinder could conclude that [] promise not to collect "ANY personal information"…created an expectation of privacy with respect to browsing activity..."); *Google Cookie*, 806 F.3d at 150-51 (internet users have reasonable expectation of privacy in web browsing where Google obtained data through "deceit and disregard"); *accord, Henson v. Turn, Inc.*, 2018 WL 5281629, at *8 (N.D. Cal. Oct. 22, 2018)

would only receive a user ID "if you are logged in to Facebook." *Id.* at 602; *see also In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125, 132 (3d Cir. 2015) (Apple "Safari [browser] is set by default to block all third party cookies," and Google falsely stating that it would respect that default setting) (interpreting California law) ("*Google Cookie*"); *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 269 (3d Cir. 2016) (falsely stating, "HEY GROWN-UPS: We don't collect ANY personal information about your kids. Which means we couldn't share it even if we wanted to!") ("*Nickelodeon*").

The cases Google relies on support Plaintiffs, not Google. In *Google Assistant*, the court determined that "a reasonable person could find Defendants' alleged conduct [i.e., recording private conversations without authorization] to be 'highly offensive.'" 457 F. Supp. 3d at 830. The court emphasized that the fact-intensive inquiry required for a finding of "highly offensive" conduct was not suitable at the motion to dismiss stage. *Id.* In *DoubleClick,* no intrusion upon seclusion claim was even at issue; the language Google cites was relevant to the court's analysis of the plaintiffs' failure to plead a criminal or tortious purpose as required by the Federal Wiretap Act. *In re DoubleClick Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 503, 519 (S.D.N.Y. 2001) ("*DoubleClick*"). In *Nickelodeon*, the Third Circuit recognized that not every violation of a company's terms will support a claim for intrusion upon seclusion, but nonetheless concluded that a jury could find "collecting information using duplicitous tactics" highly offensive. 827 F.3d at 295. "Duplicitous tactics" exactly describes what Google has done here.

### 3. Plaintiffs Plead Unauthorized ECS Disclosure (Counts 2 & 4)

The ECPA provides that "a person or entity providing an electronic communication service ["ECS"] to the public shall not" either (1) "intentionally divulge the contents of any communication … while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication…" 18 U.S.C. § 2511(3)(a) (Wiretap divulgence); or (2) "knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service." 18 U.S.C. § 2702(a)(1) (SCA divulgence). Plaintiffs

---

("requiring the plaintiffs to produce their full browsing history presents significant privacy concerns") (citing *Riley v. California*, 573 U.S. 373, 395-96 (2014)).

have adequately pled claims under both prongs of the ECPA.

### a.   Chrome Browser is an ECS

An ECS is any "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15). The Complaint alleges that "Chrome is an ECS because it provides to users thereof the ability to send or receive electronic communications." ¶ 287. Chrome's capacity to facilitate electronic communications cannot be credibly disputed, as Chrome publicly touts itself as a service wherein users can "search, chat, email,…shop, bank, read news, and keep in touch with friends." [10] Google emphasizes that Chrome as "merely software application," Mot. at 11, but Courts have recognized that a web browser or software application can be an ECS. *See, e.g. Microsoft v. Does 1-8*, 2015 WL 4937441, at *10 (E.D. Va. Aug. 17, 2015) ("Microsoft's servers, Windows® operating system, *and* [the web browser] Internet Explorer® software are facilities through which [ECS] are provided); *see also Google Assistant*, 457 F. Supp. 3d at 818 (noting that software, such as Google Assistant, "could …be seen as providing an [ECS]"). Google cites no authority to the contrary.

### b.   An ECS May Not Divulge Communications Without Consent

Google argues it cannot be liable because "Google cannot 'divulge' information to itself." Mot. at 17. That sweeping statement is legally incorrect. The statute prohibits an ECS from divulging the contents of user communications to "*any* person or entity." 18 U.S.C. § 2511(3)(a) (Wiretap Act); 18 U.S.C. § 2702(a)(1) (SCA) (emphasis added). Here, Chrome is an ECS, and it divulged the content of communications that it promised to store locally to its parent company for reasons unrelated to the rendition of Chrome's services. The very promise at issue here—that Chrome will not send PI to Google—distinguishes Chrome from Google and strongly implies that sending the data to Google is not necessary for Chrome to function. If Google's argument were correct, then companies can use all data collected in any subsidiary for any purpose. This is exactly what the ECS is meant to prohibit.

Because the challenged data sharing is not necessary for Chrome to function, the ECS

---

[10] Google's Official blog, https://googleblog.blogspot.com/2008/09/fresh-take-on-browser.html (last accessed 11.8.20).

exceptions do not apply. An ECS may divulge contents "in the normal course…[as] *a necessary incident to the rendition of…service* or to protect[]the rights or property of the provider of that service[.]" 18 U.S.C. § 2511(2)(a)(i), referenced in 18 U.S.C. § 2511(b)(i) (emphasis added). Likewise, under the SCA, an ECS may divulge contents "as may be *necessarily incident to the rendition of the service* or to the protection of the rights or property of the provider of that service." 18 U.S.C. § 2702(b)(5) (emphasis added). Google does not argue that this divulgence was necessary for Chrome to function, because it plainly is not.

As this Court has explained to Google multiple times, the "ordinary course of business" exception applies only "where an ECS provider's interception facilitates the transmission of the communication at issue or is incidental to the transmission of such communication." *Matera v. Google*, 2016 WL 8200619, at *6 (N.D. Cal. Aug. 12, 2016). In *Gmail Litig.*, this Court held that Google could be liable for intercepting communications for advertising purposes without authorization on Google's own ECS when the interception was undertaken by that very ECS (Gmail). 2013 WL 5423918 at *11. To qualify for the exception, the defendant must present a "nexus between the need to engage in the alleged interception and…the ability to provide the underlying service or good." *Id*. at *11. Similarly, in *Backhaut v. Apple*, this Court held that an ECS can be liable for its own internal unauthorized interception of communications exchanged on its own ECS services. 74 F. Supp. 3d 1033, 1042 (N.D. Cal. 2014) ("The fact that Apples provides an [ECS] does not preclude Plaintiff's allegation that Apple also…intercept[s] messages on its own systems"). If an ECS can be liable for unauthorized interception on its own systems, the reciprocal must also be true: an ECS can also be liable for unauthorized divulgence of the contents exchanged on its ECS services. To find otherwise would be to render superfluous the exceptions for ECS divulgences "in the normal course" that are "a necessary incident to the rendition of the service or to the protection of the rights or property of the provider of that service."

Google's citations to *In re Yahoo Mail Litig.*, 7 F. Supp. 3d 1016 (N.D. Cal. 2014) and *Crowley v. CyberSource Corp.*, 166 F. Supp. 2d 1263 (N.D. Cal. 2001) are inapposite. Both involved claims for unauthorized access, not divulgence. And while *Google Assistant* accepted Google's argument, it incongruously rejected Google's ECPA "ordinary course of business

1    exception" argument. 457 F. Supp. 3d at 817-824. The opinion thus conflicts with itself and with

2    this Court's better-reasoned conclusions in *Gmail Litig.*, *Matera,* and *Backhaut*.

3                 **c.    Google Fails to Meet Its Burden of Showing Website Consent**

4           An exception to liability exists for an ECS to divulge contents with the "*lawful* consent" of

5    "the originator or an addressee or intended recipient of such communication." 18 U.S.C.

6    § 2511(3)(b)(ii) (Wiretap Act); 18 U.S.C. § 2702(b)(3) (SCA) (emphasis added). Because this is an

7    affirmative defense under both relevant provisions of the ECPA, Plaintiffs need not plead the

8    absence of website consent; the burden of proof is on Google. *Pharmatrak*, 329 F.3d at 19; *see also*

9    *Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037, 1044, n.4 (9th Cir. 2017) (noting

10   consent is "an affirmative defense for which defendant bears the burden of proof" under TCPA, a

11   statute structured like ECPA). Further, affirmative defenses generally may not be raised on a motion

12   to dismiss. *Scott v. Kuhlmann*, 746 F.2d 1377, 1378 (9th Cir. 1984).

13          Here, Google has *no evidence* of website consent and cannot meet its burden of

14   demonstrating this affirmative defense. And, while not required, Plaintiffs have pled lack of first-

15   party consent, alleging that Google does not disclose that it collects personally identifiable data

16   about Chrome users in violation of its own express privacy promises not to do so. ¶ 279.

17          Google's website consent argument is specious. "Consent may be explicit or implied, but it

18   must be actual consent rather than constructive consent." *Gmail Litig.*, 2013 WL 5423918 at *12.

19   There is no evidence that websites consent to Google breaking its express privacy promises to

20   Chrome users. Google's citation to *Nickelodeon*, a decision that was reversed by the Third Circuit,

21   is off-base. In *Nickelodeon*, plaintiffs alleged that the website "affirmatively authorized" Google's

22   specific behavior. *In re Nickelodeon Consumer Privacy, Litig.*, 2014 WL 3012873, at *1-2 (D.N.J.

23   July 2, 2014). In contrast, Plaintiffs have not alleged that any website knowingly authorized Google

24   to break its express promises to users, nor does Google even raise that argument. Rather, Google

25   argues that by using Google's web codes the first-party websites have given Google a blank check

26   to disclose and use associated data in any way Google wants. Mot. at 9-10 (citing *Doubleclick*, 154

27

28

1   F. Supp. 2d at 503, 510 and *Chance v. Avenue A, Inc*., 165 F. Supp. 2d 1153, 1162 (W.D. Wash.

2   2001)).[11] Such assertions are beyond the four corners of the Complaint. Moreover, federal Circuit

3   courts have rejected this argument. "*DoubleClick* and *Avenue A* do not set up a rule … that consent

4   to interception can be inferred from the mere purchase of a service, regardless of circumstance."

5   *Pharmatrak*, 329 F.3d at 20. Instead, where a company promises that it will not engage in specific

6   conduct, and then engages in the conduct anyway, there is no consent. *Id*. at 15; *see also FB*

7   *Tracking*, 956 F.3d at 607-08; *Google Cookie*, 806 F.3d at 143-46. Google's contention that a

8   privacy plaintiff "lacks standing to claim that websites that use Google's services were defrauded

9   or mistaken" is of no relevance. Plaintiffs bring suit on behalf of themselves, and raise these

10  arguments to refute Google's baseless affirmative defense of consent.

11       Finally, Google's argument that "there is no statutory or other exception to consent based

12  on fraud or mistake of fact under the Wiretap Act or SCA" misstates the law. The Ninth Circuit

13  grants "no refuge" to ECPA defendants who gain consent through mistake that defendant knew or,

14  in the exercise of reasonable care, ought to have known about and that relate to the "essential

15  nature" of the claim. *Theofel v. Farey-Jones*, 359 F.3d 1066, 1073 (9th Cir. 2004). Even "overt

16  manifestation[s] of assent" are not effective "if the defendant knew or probably if he ought to have

17  known in the exercise of reasonable care, that the plaintiff was mistaken as to the nature and quality

18  of the invasion intended." *Id*. Where "the mistake is known" to defendant or "induced

19  by…misrepresentation, the consent is not effective[.]" Restatement (Second) of Torts § 892B(2);

20  *see also* cmt. h. ("[t]he mistake having been produced by the misrepresentation of the actor, he will

21  normally be aware of its existence, but his knowledge of the mistake is not necessary"). The rule

22  goes beyond fraud and misrepresentation: the law imposes a reasonableness requirement on the

23  affirmative defense of consent. "Even when no restriction is specified the reasonable interpretation

24  of consent may limited to acts at a reasonable time or place, or those reasonable in other respects."

25  Restatement (Second) of Torts § 852A(3), cmt. g. Here, it is not reasonable for Google to assert

26  that websites agreed to Google's breach of its express privacy promises to Chrome users when

27

28

---

[11] Neither *DoubleClick* nor *Avenue A* addressed whether first-party consent could be implied where, as here, a defendant was violating express contractual promises made to users.

Google never disclosed that it would violate those promises.

### 4. Plaintiffs Sufficiently Plead an SCA (Access) Claim (Count 3)

The SCA prohibits unauthorized access or access which exceeds authorization to "a facility through which an electronic communication service is provided." 18 U.S.C. § 2701(a)(1).

#### a. Google Did Not Have Authorization

Google argues that its conduct was "authorized" by users, websites, or the ECS in question—Chrome. This defense fails for two reasons. First, as argued above, Plaintiffs did not consent to Chrome's conduct and it is fanciful (and beyond the pleadings) to assert that first-party websites somehow consented to Google's breach of contract. Second, the exception to SCA liability contained in § 2701(c)(1) for conduct authorized by an ECS should not apply because federal courts must "interpret federal statutes in light of the common law." *Theofel*, 359 F.3d at 1072. *Theofel* explains that the SCA protects electronic communications in the same way that the "trespass protects those who rent space from a commercial storage facility to hold sensitive documents." *Id.* In that respect, "[p]ermission to access a stored communication does not constitute valid authorization if it would not defeat a trespass claim in analogous circumstances." *Id.* at 1073. Applying that reasoning here, Google can find no refuge in "authorized access" where the purported authorization by the ECS (Chrome) was done in violation of express contractual promises made to Plaintiffs. Granting "authorization" where no authority to do so existed in the first instance is clearly a trespass. This comports perfectly with this Court's logic in the *In re iPhone App. Litig.*, when it explained that a defendant "cannot manufacture a statutory exception [to the ECPA] through its own accused conduct[.]" 844 F. Supp. 2d 1040, 1062 (N.D. Cal. 2012) ("*iPhone App.*"). Google did not have valid authorization to access Plaintiffs' PI.

#### b. Plaintiffs Sufficiently Allege "Facilities"

The Ninth Circuit has broadly interpreted "facilities" under the ECPA. *U.S. v. Oliva*, 705 F.3d 390, 395, n.4 (9th Cir. 2012) (broadly interpreting "facilities" to include cellphones).[12] This is consistent with the plain language of the statute and legislative intent that "facilities" includes cell

---

[12] As part of the ECPA (a unified statutory scheme to protect electronic communications), the Wiretap and Stored Communications Acts share definitions. *See* 18 U.S.C. § 2711(a).

phones, Internet communication devices and account information because "such functions are commonly performed today by software instead of physical mechanisms." H. Rep. 107-236 at 52-53. Personal computers and software programs logically fall within the ECPA's broad view of "facilities." To that precise point, Microsoft has successfully invoked the ECPA to protect its web browser, Internet Explorer, and the Windows operating systems on users' personal computers from hackers. *See, e.g. Microsoft v. Does 1-2*, No. 1:16-cv-00993-LO-TCB, Dkt. No. 59 (E.D. Va. Aug. 1, 2017) (hacking groups "violat[d] the ECPA because [they] br[oke] into [personal] computing devices").[13] Plaintiffs' personal computing devices, web-browsers, and browser-managed files are thus "facilities" under the SCA portion of the ECPA.

### c.   Plaintiffs Sufficiently Allege "Electronic Storage"

Under the SCA, "electronic storage" is defined as either "(A) any temporary, intermediate storage of a[n] … electronic communication incidental to the electronic transmission thereof; and (B) any storage of such communication by an [ECS] for purposes of backup protection of such communication." 18 U.S.C. § 2510(17). Relying on *FB Tracking,* Google argues that the communications at issue here were not "in storage." But *FB Tracking* is distinguishable. There, plaintiffs alleged that defendant gained unauthorized access to the content of communications that were stored in "the toolbar during the split-second that it takes to complete a search" and in browsing history for "backup purposes." 956 F.3d at 608-09. The Ninth Circuit held that the toolbar was not storage and that the browsing histories, as alleged in that case, were "not composed of the actual communications" but instead a record of the full URLs visited. *Id.*

In contrast, here, Plaintiffs allege "electronic storage" for "purposes of backup protection so that if the browser inadvertently shuts down, the user can be presented with the option to restore previous communications." ¶¶ 118, 312. This includes storage of contents of user communications, including GET and POST requests, search queries, button-click text, form submissions, and data that is "a general summary" of communications that non-Google websites send back to users in response to search queries and requests for information. ¶ 273. Unlike the "split-second data" held

---

[13] *See also Microsoft v. Does 1-8*, No. 14-cv-00811-LO-IDD, Dkt. No. 57 at 15 (E.D. Va. Jul. 2015); *Microsoft v. Does 1-27*, No. 10-cv-00156 (E.D. Va. 2010); *Microsoft v. Piatti*, No. 11-cv-01017 (E.D. Va. 2011); *Microsoft v. Does 1-39*, No. 12-cv-01335 (E.D.N.Y. 2012).

in a toolbar or browsing history, Plaintiffs allege that the back-up storage protection stores the above user information in short-term memory and contains the *actual* communications exchanged by a user so that the user can "return to their last communications prior to the browser's crash." ¶ 118. This is "content" under the ECPA—*i.e.*, "any information relating to the substance, purport, or meaning" of the subject communication. *See FB Tracking,* 956 F.3d at 609 (noting that "[t]he communications in question [are] the GET requests themselves."). Further, the Chrome PN itself concedes that "the basic browser mode stores information locally on your system." Ex. 33 at 1.

### d.    Internet Communications Can be in "Storage" and "Transit"

When a Chrome user sends a communication, Chrome immediately and simultaneously (1) "places the contents of the GET or POST request in storage in the browser's web-browsing history and short-term memory; and (2) connects to and begins a back-and-forth two-way communication exchange between the user and the website." ¶ 117. The transmission between *browser* and *server* "involves a series of rapid, continuing, simultaneous data exchanges between Chrome and the website server with data flowing both ways throughout the process" via "dozens, hundreds, or even thousands of different paths." ¶ 125; *U.S. v. Szymuszkiewicz*, 622 F.3d 701, 704-06 (7th Cir. 2010) (explaining packet-switching). "At the same time that the transmission and content exchange of the communication is happening…the contents of the communication…are re-directed" to Google. ¶ 127. This results in the seemingly paradoxical fact that an electronic communication can be both in storage and still in transit simultaneously. If it were otherwise, the SCA's definition of "electronic storage" to include "temporary, intermediate storage…incidental to the electronic transmission thereof" would make no sense. The reality of internet communications is therefore not "fatal," Mot. at 16, to Plaintiffs' claim for unauthorized access under the SCA.

### 5.   Plaintiffs Sufficiently Plead a CFAA Claim (Count 11)

Contrary to Google's contention, Plaintiffs have plausibly alleged damages, intentionally caused by Google, and $5,000 of loss in support of their CFAA claim.

### a.   Plaintiffs Sufficiently Plead CFAA Damages

The Computer Fraud and Abuse defines damage as "any impairment to the integrity or

availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). Here, Google introduced computer code intentionally designed to remove Plaintiffs' ability to exchange Internet communications without being tracked (third-party cookies disguised as first-party cookies and the x-client data identifier), circumventing cookie blockers. ¶¶ 62-86, 153. Removing a function of a protected computer, *even through a voluntary download of software* (contra Mot. at 21), is "impairment" squarely within the "intentional damage" prong of CFAA. *See, e.g., In re Apple Inc. Device Perf. Litig.*, 347 F. Supp. 3d 434, 452 (N.D. Cal. 2018) (capping peak processor speeds via voluntary software download is CFAA "impairment"); *San Miguel v. HP Inc.*, 317 F. Supp. 3d. 1075, 1085-86 (N.D. Cal. 2018) (voluntary software download made HP printers incompatible with non-HP cartridges; deemed "impairment"). Introducing computer code that facilitates the *later unauthorized access and copying* of data is also an impairment even if the mere copying of data is not. *See NetApp, Inc. v. Nimble Storage, Inc.*, 2015 WL 400251, at *14 (N.D. Cal. Jan. 29, 2015); *see also U.S. v. Keys*, 703 F. App'x. 472 (9th Cir. 2017); *Gen. Motors LLC v. Autel US Inc.*, 2016 WL 1223357 (E.D. Mich. Mar. 29, 2016); *U.S. v. Hutchins*, 361 F. Supp. 3d 779 (E.D. Wis. 2019).

### b. Plaintiffs Allege that Google Intentionally Caused Damage

Plaintiffs clearly allege intentional conduct: Google "intentionally and unlawfully caused Chrome to record and send users' [PI] to Google," ¶ 3; "intended" to encourage user engagement, ¶¶ 226, 258; "intentionally" intercepted and divulged communications, ¶¶ 270, 290; "intentionally" violated privacy, property and statutory rights, ¶¶ 342, 368; "intentionally caused injury," ¶ 421; and "intentionally misrepresented the privacy settings of Chrome." ¶ 422.

### c. Plaintiffs Allege $5,000 of Loss

A plaintiff in a CFAA class action may aggregate losses from multiple violations over the one-year period to meet the $5,000 threshold. *Creative Computing v. GetLoaded.com LLC*, 386 F.3d 930 (9th Cir. 2004). Plaintiffs allege impairment to the browser when Google surreptitiously removed Plaintiffs' ability to exchange Internet communications without being tracked. This impairment affected millions. Even if the value were only one cent per user, Plaintiffs have alleged sufficient facts to meet the jurisdictional threshold in the aggregate.

### D.   Plaintiffs Sufficiently Plead a Statutory Larceny Claim (Count 13)

California Pen. Code § 484 forbids property theft. Google argues that Plaintiffs' PI is not "property." Mot. at 23.[14] But property under § 484 is defined broadly to be "all-embracing, including every intangible benefit and prerogative susceptible of possession and disposition" and "any valuable right or interest protected by law." *People v. Kozlowski*, 96 Cal. App. 4th 853, 866 (2002); *accord People v. Kwok*, 63 Cal. App. 4th 1236, 1250 (1998) (adopting Cal. Civ. Code § 654: "ownership of a thing is the right of one or more persons to possess and use it to the exclusion of others … the thing of which there may be ownership is called property.").

Plaintiffs have a property interest in their PI, not just a privacy interest, as California courts have explicitly so held. *See CTC Real Estate Svcs. v. Lepe*, 140 Cal. App. 4th 856, 860 (2006) ("[a] person's identifying information is a valuable asset"). The Ninth Circuit recently agreed. *FB Tracking*, 956 F.3d at 600 (citing *Lepe* and finding economic injury after misappropriation of web-browsing history and related PI). Google ignores this binding authority, and the many other cases recognizing property rights in PI. *See, e.g. In re Marriott Int'l, Inc. Cust. Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 461 (D. Md. 2020) ("growing trend across courts that have considered this issue is to recognize the lost property value" of PI in data cases) ("*Marriott Data Breach*"); *see also In re Anthem, Inc. Data Breach Litig.*, 2016 WL 3029783, at *43 (N.D. Cal. May 27, 2016) ("*Anthem I*"); *Yahoo!*, 2017 WL 3727318 at *13.

Google also created a limited property interest in the categories of PI it contractually promised not to collect unless and until authorized by the Plaintiffs (by syncing Chrome with another Google Account). Because Plaintiffs have the right to exclude Google from using the PI under the contract, it qualifies as property under Civil Code Section 654, as noted above. Similarly, because California courts define "property" broadly as "any valuable right protected by law," Plaintiffs' PI is also "property" under at least three California statutes and the federal statutes cited herein that protect it from unauthorized disclosure, acquisition, or use. The California Consumer Privacy Act, Cal. Civil Code §§ 1798.100, *et seq*. ("CCPA") forbids the collection of certain

---

[14] Google's argument that there is no private right of action under § 484 ignores that § 496 expressly provides such an action against those who receive stolen property as defined in § 484, including an action against the thief himself. *Allure Labs, Inc. v. Markushevska*, 606 B.R. 51, 58 (N.D. Cal. 2019). Plaintiffs plead both sections.

categories of PI without consent and also forbids Google's later sale of that PI without consent, recognizing and strengthening pre-existing privacy and property rights. Indeed, new non-profit companies have been created to use collective-bargaining techniques to leverage the CCPA's new protections, level the playing field, and demand payment for the collection and use of PI—efforts that only work because PI is property. *See, e.g.*, Makena Kelly, "Andrew Yang is Pushing Big Tech to Pay Users for Data," <u>The Verge</u> (Jun. 22, 2020). Likewise, where, as here, the PI is found on a computer, ¶ 118, consent is always required before collecting it, *see* Cal. Penal Code § 502, and California courts consider a § 502 violation to be statutory theft of *property*. *Kwok*, 63 Cal. App. 4th at 1251 & n.8 ("Making an unauthorized copy of computer data is a form of theft prohibited by section 502…"). Google erroneously argues that it obtained consent to collect the PI (*see* above), but whether consent was obtained or not is immaterial to the initial question of whether the protected PI is property. Further, the content of Plaintiffs' electronic communications are protected by CIPA and the ECPA, and their computers are protected by the CFAA.

Google also argues that, even if PI is property under the larceny statute, Google only copied the data and thus did not "steal" it. Mot. at 23. But California courts long ago rejected the idea that copying cannot be theft. Any data unlawfully copied from a computer in violation of Cal. Pen. Code § 502 is theft (PI or not). *Kwok*, 63 Cal. App. 4th at 1251 & n.8. Even if not taken from a computer, an illegal copy is still theft. *Kwok*, upheld a larceny conviction for the mere copying of a house key, explaining that "although the owner may retain possession of the original property, there has been nevertheless a deprivation of property when a copy is made." *Id.* at 1249-50. Similarly, illicit copying of customer lists, files, or trade secrets is larceny even where the victim retains the original. *People v. Parke*r, 217 Cal. App. 2d 422 (1963); *Williams v. Superior Court*, 81 Cal. App. 3d 330 (1978); *People v. Gopal*, 171 Cal. App. 3d 524 (1985); *see also FB Tracking*, 956 F.3d at 600 (economic injury "regardless of whether an individual planned to sell his or her data or whether the individual's data is made less valuable").

Finally, Google notes that this Court has already excluded PI from the definition of "property" in the tort of conversion, Mot. at 22, and asks this Court to extend the tort definition to the larceny statute. But "property" has a broader definition under the larceny statute that cannot be

reconciled with a narrow tort definition. Also, one of the reasons for excluding PI from the tort of conversion was the failure of past plaintiffs to allege control or exclusivity over the PI. *See Low v. LinkedIn Corp*., 900 F. Supp. 2d 1010, 1030 (N.D. Cal. 2012). Here, Plaintiffs pled the contractual and statutory rights to control the PI. ¶¶ 43-45. Google also ignores more recent federal authority concluding that California courts now include the theft of PI in the tort of conversion. *See Ehrhart v. Bofi Holding, Inc*., 2020 WL 1550207, at *41 (S.D. Cal., Mar. 31, 2020).[15]

### E.    Plaintiffs Sufficiently Plead a UCL Claim (Count 14)

California's Unfair Competition Law ("UCL") provides a private right of action to recover money or property lost as a result of unlawful, unfair or fraudulent business practices. Cal. Bus. & Prof. Code §§ 17200, *et seq*. The language is purposefully "sweeping" and intended to give the courts "broad equitable powers to remedy violations." *Kwikset Corp. v. Super. Ct*., 51 Cal. 4th 310, 323 (2011). Google argues Plaintiffs failed to allege lost money or property, entitlement to monetary damages, and "unlawful," "unfair" or "fraudulent" conduct. Each is addressed in turn.

#### 1.    Plaintiffs Allege Lost Money or Property Under the UCL

Google cites to cases holding that theft of data is not "loss of money or property" under the UCL, including decisions by this Court. Mot. at 23-24. Respectfully, these decisions are no longer good law. In 2011, the California Supreme Court held that to satisfy the "loss of money or property" element of the UCL, a plaintiff need only suffer "economic injury" as defined by the *federal* courts for Article III standing purposes. *Kwikset*, 51 Cal. 4th at 321-22. The Court explicitly held that the definition of "injury in fact" under the UCL is *co-extensive* with the Article III "economic injury" analysis, and even an "identifiable trifle" of economic injury will do. *Id*. at 324. Until recently, federal courts sometimes found that illicit web tracking and the associated theft of related personal

---

[15] Plaintiffs also respectfully submit that *Low* and earlier cases cited therein no longer accurately reflect the current law of conversion. In 2014, after *Low* was decided, the California Court of Appeal adopted the broader definition of property from the larceny statute, citing the earlier *Lepe* Court's ruling that "one's personal identifying information 'is a valuable asset.'" *Welco Electronics, Inc. v. Mora*, 223 Cal. App. 4th 202, 211 (2014) (quoting *Lepe*, 140 Cal. App. 4th at 860). Earlier this year, the S.D. Cal. noted the change: "The tort of conversion was traditionally limited to tangible personal property, but the tort has since 'expanded well beyond its original boundaries.'" *Ehrhart*, 2020 WL 15502027 at *41 (quoting *Mora*, 223 Cal. App. 4th at 210).

information was "privacy injury" but not necessarily "economic injury" for standing purposes. Thus, the older cases cited by Google correctly aligned their UCL analysis with Article III standing jurisprudence *at the time*. But more recently, "the growing trend across courts that have considered this issue," including this one, "is to recognize the lost property value" of PI in data cases. *Marriott Data Breach*, 440 F. Supp. 3d at 460-461; *Anthem I*, 2016 WL 3029783 at *43; *Yahoo!,* 2017 WL 3727318, at *13.[16] A few months ago, in April 2020, the Ninth Circuit made this "growing trend" the law of this circuit.  *FB Tracking*, 956 F.3d at 599-600 (misappropriation of PI associated with unauthorized Internet surveillance caused both privacy and economic injury).

Specifically, *FB Tracking* held that privacy plaintiffs sufficiently pled that their browsing histories have financial value; that the plaintiffs have equitable disgorgement rights following the misappropriation of that data; and, thus, plaintiffs adequately pled economic injury for standing purposes. *Id*. at 600-01. Importantly, the *FB* plaintiffs pled economic injury "regardless of whether an individual planned to sell his or her data or whether the individual's data is made less valuable." *Id*. at 600. The Ninth Circuit's holding reiterates what this Court has previously explained: to plead economic damages through loss of value of personal identification information ("PII"), a plaintiff need only allege that there was "either an economic market for their PII or that it would be harder to sell their own PII, not both." *Anthem I*, 2016 WL 3029783 at *15.

Here, as in *FB Tracking*, Plaintiffs pled a misappropriation of PI associated with web browsing, pled that the PI has value, and pled an equitable right to disgorgement. As to whether that data has value, Google does not, and really cannot, dispute that there is an economic market for it, including to users. ¶¶ 209-20. Personal data is generally accepted as a form of currency, and

---

[16] Though recognition may seem recent, the underlying principles have both ancient and modern precedents. Courts have long recognized that unauthorized disclosure of communications without consent is actionable under theories of property. *See Folsom v. Marsh*, 9 F. Cas. 342, 346 (C.C.D. Mass. 1841); *Baker v. Libbie*, 210 Mass. 599, 602 (1912) (citing *Denis v. LeClerc*, 1 Mart. (La.) 297 (1811) (tracing property rights in communications back to the Roman Empire)). The Supreme Court has recognized that deprivation of "money or property" is satisfied where the victim is "deprived of its right to exclusive use of…information, for exclusivity is an important aspect of…most private property[.]" *Carpenter v. U.S.*, 484 U.S. 19, 26-27 (1987). Likewise, courts have recognized that misappropriation of business data is actionable. There can be no doubt that Google would suffer a loss of property if a different data company somehow copied the exact same data from Google. *See Facebook, Inc. v. ConnectU, LLC*, 489 F. Supp. 2d 1087, 1092-93 (N.D. Cal. 2007) (misappropriation claim for unauthorized taking of user PI). Plaintiffs property rights should not be any less than Google's.

a robust market for this data undergirds the tech economy. ¶¶ 210-11. In fact, Google once paid users for the data it now improperly harvests from Chrome. ¶ 218. In addition, a private market exists for users' PI, with an individual's online identity, including hacked financial accounts, going for $1,200 on the dark web. ¶ 220. And now entities such as the Dividend Data Project negotiate data protections and pay people dividends for sharing such data.

### 2. Plaintiffs Plead an Entitlement to Monetary Damages

Google incorrectly argues Plaintiffs' UCL claim should be limited to injunctive relief. Mot. at 24. Plaintiffs allege they "suffered harm" in "diminution of the value of their private and personally identifiable data and content," and "damage to and loss of Plaintiffs' property right to control the dissemination and use of their [PI] and communications" ¶¶ 413-14. Plaintiffs "seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Google's unfair, unlawful, and fraudulent business practices." ¶ 417. Recovery for "diminution in value" and damage and loss of property rights is not disgorgement or restitution. Regarding restitution, the Ninth Circuit recently clarified: "California law requires disgorgement of unjustly earned profits regardless of whether a defendant's actions caused a plaintiff to directly expend his or her own financial resources or whether a defendant's actions directly caused the plaintiff's property to become less valuable." *FB Tracking*, 956 F.3d at 599-600.

### 3. Plaintiffs Sufficiently Plead Unlawful, Fraudulent, and Unfair Conduct

Plaintiffs adequately plead unlawful conduct based on statutory and common law violations. ¶¶ 408-09. Plaintiffs adequately plead fraudulent conduct based on the misrepresentations and omissions in the Chrome PN which assured consumers that their PI would not be sent to Google while Un-Synced,[17] which were material to reasonable consumers, which were intended to, were likely to, and did deceive reasonable consumers such as Plaintiffs, and which caused injury to consumers. ¶¶ 226-240, 398, 412, 415; *See Yahoo!*, 2017 WL 3727318 at *23 (fraud under the UCL requires a "showing that members of the public are likely to be deceived by the alleged fraudulent business practice"); *In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d

---

[17] Google also misrepresented its privacy practices by disguising third-party tracking cookies as first-party tracking cookies. ¶ 412.

953, 990-91 (N.D. Cal. 2016) (*"Anthem II"*) ("Defendants represented to Plaintiffs that they would do one thing, but ended up doing another…[S]uch allegations constitute a misrepresentation in the most classic sense."). Finally, Plaintiffs adequately plead unfair conduct based on Google's violation of express privacy promises in order to benefit its own business interests at the expense of Plaintiffs' fundamental privacy interests. ¶ 411; *see In re Adobe Sys., Inc. Privacy Litig*., 66 F. Supp. 3d 1197, 1226-1227 (N.D. Cal. 2014) ("… the UCL creates a cause of action for a business practice that is unfair even if not proscribed by some other law") (citation omitted).

### F.    Plaintiffs' Claims Are Timely

In July 2020, Plaintiffs (with expert assistance) ran tests using sophisticated debugging tools to reveal the HTTP traffic among their browsers, first-party websites, and Google. ¶¶ 154-93. These tests revealed that Google was improperly tracking Plaintiffs in similar ways. *Eight days later*, this action was filed. Google does not allege a one-week statute of limitations, and its assertion that Plaintiffs' claims are time-barred is without merit. Google argues (without supporting authority) that Plaintiffs are precluded from bringing one-week old claims because they did not also allege when Google first committed similar acts in the past. By this logic, a thief may enter your home with impunity tomorrow if you failed to discover trespassing in the distant past.

Google does not (and logically cannot) cite case law to support its arguments. Instead, Google cites *Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 136 (N.D. Cal. 2020), where Plaintiffs failed to identify the date of the alleged wrongdoing.  Here, Plaintiffs allege the exact dates of the violations (all in July 2020) and *Brodsky* is inapplicable. Plaintiffs did propose a four-year class period, ¶¶ 37, 259, but did not allege any instances of wrongdoing prior to July 2020. Google alone is in possession of facts regarding when it *first* began collecting Plaintiffs' PI and cannot assert limitations defenses based on secret facts not known to Plaintiffs and not appearing in the complaint. *See In re Animation Workers*, 123 F. Supp. 3d 1175, 1194 (N.D. Cal. 2015).

## IV.    CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that the Court deny the Motion.

1

Dated: November 9, 2020

2

**BLEICHMAR FONTI & AULD LLP**

3

By: _/s/ Lesley E. Weaver_

Lesley Weaver (Cal. Bar No. 191305)
Angelica M. Ornelas (Cal. Bar No. 285929)

4

Joshua D. Samra (Cal. Bar No. 313050)
555 12th Street, Suite 1600

5

Oakland, CA 994607
Tel.: (415) 445-4003

6

Fax: (415) 445-4020
_lweaver@bfalaw.com_

7

_aornelas@bfalaw.com_
_jsamra@bfalaw.com_

8

9

**SIMMONS HANLY CONROY LLC**

10

By: _/s/ Jay Barnes_

Mitchell M. Breit (admitted _pro hac vice_)

11

Jason 'Jay' Barnes (admitted _pro hac vice_)
An Truong (admitted _pro hac vice_)

12

Eric Johnson (admitted _pro hac vice_)
112 Madison Avenue, 7th Floor

13

New York, NY 10016
Tel.: (212) 784-6400

14

Fax: (212) 213-5949
_mbreit@simmonsfirm.com_

15

_jaybarnes@simmonsfirm.com_
_atruong@simmonsfirm.com_

16

_ejohnson@simmonsfirm.com_

17

_Counsel for Plaintiffs_

**KAPLAN FOX & KILSHEIMER LLP**

By: _/s/ David A. Straite_

David A. Straite (admitted _pro hac vice_)
Aaron L. Schwartz (admitted _pro hac vice_)
850 Third Avenue
New York, NY 10022
Tel.: (212) 687-1980
Fax: (212) 687-7715
_dstraite@kaplanfox.com_
_aschwartz@kaplanfox.com_

**KAPLAN FOX & KILSHEIMER LLP**
Laurence D. King (State Bar No. 206423)
Mario Choi (State Bar No. 243409)
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Tel.:   (415) 772-4700
Fax:   (415) 772-4707
_lking@kaplanfox.com_
_mchoi@kaplanfox.com_

18

19

20

21

22

23

24

25

26

27

28

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

I, Lesley E. Weaver, attest that concurrence in the filing of this document has been obtained from the other signatories. I declare under penalty of perjury that the foregoing is true and correct. Executed this 9th day of November, 2020, at Oakland, California.

*/s/ Lesley E. Weaver*
Lesley E. Weaver

1

**CERTIFICATE OF SERVICE**

2

      I hereby certify that on November 9, 2020, I electronically filed the foregoing document

3

using the CM/ECF system, which will send notification of such filing to all counsel of record

registered in the CM/ECF system.

4

5

                                     */s/ Lesley E. Weaver*
                                     Lesley E. Weaver

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28