1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3                         SAN JOSE DIVISION

4

5     PATRICK CALHOUN, ELAINE CRESPO,    )   C-20-05146 LHK
      HADIYAH JACKSON, AND CLAUDIA       )
6     KINDLER, ON BEHALF OF              )   SAN JOSE, CALIFORNIA
      THEMSELVES AND ALL OTHERS          )
7     SIMILARLY SITUATED,                )   FEBRUARY 18, 2021
                                         )
8                    PLAINTIFFS,         )   PAGES 1-71
                                         )
9              VS.                       )
                                         )
10    GOOGLE LLC,                        )
                                         )
11                   DEFENDANT.          )
      _____   )
12

13

14              TRANSCRIPT OF ZOOM PROCEEDINGS
              BEFORE THE HONORABLE LUCY H. KOH
15              UNITED STATES DISTRICT JUDGE

16

17    A P P E A R A N C E S:

18    FOR THE PLAINTIFFS:    SIMMONS HANLY CONROY LLC
                             BY:  JASON "JAY" BARNES
19                           112 MADISON AVENUE, 7TH FLOOR
                             NEW YORK, NEW YORK  10016
20

21              APPEARANCES CONTINUED ON NEXT PAGE

22

23    OFFICIAL COURT REPORTER:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                  CERTIFICATE NUMBER 9595
24

25          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
              TRANSCRIPT PRODUCED WITH COMPUTER

APPEARANCES (CONTINUED)


FOR THE PLAINTIFFS:    KAPLAN FOX & KILSHEIMER LLP
                       BY:  DAVID A. STRAITE
                       850 THIRD AVENUE
                       NEW YORK, NEW YORK  10022


                       BLEICHMAR FONTI & AULD LLP
                       BY:  LESLEY WEAVER
                       555 12TH STREET, SUITE 1600
                       OAKLAND, CALIFORNIA  94607


FOR THE DEFENDANT:     QUINN EMANUEL URQUHART & SULLIVAN
                       BY:  ANDREW H. SCHAPIRO
                       191 N. WACKER DRIVE, SUITE 2700
                       CHICAGO, ILLINOIS  60606


                       BY:  STEPHEN A. BROOME
                            VIOLA TREBICKA
                       865 S. FIGUEROA STREET, 10TH FLOOR
                       LOS ANGELES, CALIFORNIA  90017

```
1    SAN JOSE, CALIFORNIA                        FEBRUARY 18, 2021

2                         P R O C E E D I N G S

3        (ZOOM PROCEEDINGS CONVENED AT 1:38 P.M.)

4            THE CLERK:  GOOD AFTERNOON, YOUR HONOR.

5            THE COURT:  GOOD AFTERNOON.

6            THE CLERK:  GOOD AFTERNOON, EVERYONE.

7        THIS IS UNITED STATES DISTRICT COURT FOR THE NORTHERN

8    DISTRICT OF CALIFORNIA.

9        THIS COURT IS PARTICIPATING IN A PILOT PROGRAM APPROVED BY

10   THE JUDICIAL CONFERENCE TO STUDY THE PRACTICE OF LIVESTREAMING

11   AUDIO OF CIVIL PROCEEDINGS.  UNDER THE PILOT GUIDELINES, WITH

12   THE PARTIES' CONSENT, A JUDGE MAY ALLOW AUDIO OF CERTAIN CIVIL

13   PROCEEDINGS TO BE LIVESTREAMED TO THE COURT'S YOUTUBE CHANNEL,

14   WHERE IT WILL BE ACCESSIBLE TO THE PUBLIC.  THE PARTIES TO THIS

15   PROCEEDING HAVE CONSENTED TO AUDIO OF THE PROCEEDING BEING

16   LIVESTREAMED TO THE COURT'S YOUTUBE CHANNEL.

17       TO HELP ENSURE THAT THE AUDIO IS CLEAR FOR THOSE LISTENING

18   TO THE LIVESTREAM, PLEASE SPEAK INTO YOUR MICROPHONES, MUTE

19   YOUR MICROPHONES WHEN NOT SPEAKING, AND LIMIT BACKGROUND NOISE.

20       THANK YOU.

21       WITH THAT, COURT IS NOW IN SESSION.

22       CALLING CASE 20-5146, CALHOUN, ET AL, VERSUS GOOGLE LLC.

23       COUNSEL, PLEASE STATE YOUR APPEARANCES FOR THE RECORD,

24   STARTING WITH COUNSEL FOR THE PLAINTIFFS.

25           MR. BARNES:  THANK YOU, YOUR HONOR.
```

1          JAY BARNES ON BEHALF OF THE PLAINTIFFS CALHOUN, KINDLER,

2     JACKSON, AND CRESPO.

3          MR. DAVID STRAITE IS ALSO HERE ON BEHALF OF THE

4     PLAINTIFFS, AS IS MS. LESLEY WEAVER.

5          YOUR HONOR, MR. STRAITE AND I HAVE SPLIT THE ORAL

6     ARGUMENT.  HE WILL BE HANDLING IF YOUR HONOR HAS QUESTIONS

7     ABOUT STATUTORY LARCENY, THE UCL CLAIM, THE COMPUTER FRAUD AND

8     ABUSE ACT CLAIM, AND THE STATUTES OF LIMITATION ISSUE.

9               THE COURT:  OKAY.  GOOD AFTERNOON.  WELCOME.

10              MR. STRAITE:  GOOD AFTERNOON, YOUR HONOR.

11         AS MR. BARNES INTRODUCED, I'M DAVID STRAITE FROM

12    KAPLAN FOX & KILSHEIMER LLP FOR THE PLAINTIFFS.

13              MR. SCHAPIRO:  YOUR HONOR, ANDREW -- SORRY,

14    MS. WEAVER.

15              MS. WEAVER:  LESLEY WEAVER OF BLEICHMAR FONTI & AULD

16    FOR THE PLAINTIFFS, YOUR HONOR.  GOOD AFTERNOON.

17              THE COURT:  ALL RIGHT.  GOOD AFTERNOON.  WELCOME TO

18    ALL THREE OF YOU.

19              MR. SCHAPIRO:  YOUR HONOR, FOR THE DEFENDANT, I'M

20    ANDREW SCHAPIRO, SPELLED S-C-H, AND I HAVE TWO COLLEAGUES WITH

21    ME, AND I'LL INVITE THEM TO INTRODUCE THEMSELVES.

22              MR. BROOME:  GOOD AFTERNOON, YOUR HONOR.

23         STEPHEN BROOME FROM QUINN, EMANUEL FOR GOOGLE.

24              MS. TREBICKA:  GOOD AFTERNOON, YOUR HONOR.

25         VIOLA TREBICKA, ALSO WITH QUINN, EMANUEL, FOR GOOGLE.

```
1                 THE COURT:  ALL RIGHT.  GOOD AFTERNOON AND WELCOME TO

2        ALL THREE OF YOU AS WELL.

3                 SO I HAVE SOME SPECIFIC QUESTIONS AND I'LL ADDRESS THEM TO

4        ONE PARTY AND THEN GIVE THE OTHER PARTY AN OPPORTUNITY TO

5        RESPOND.

6                 I'M HOPING THAT WE CAN HAVE A DIALOGUE BECAUSE I'M ASKING

7        QUESTIONS BECAUSE I GENERALLY NEED YOUR HELP IN TRYING TO

8        FIGURE OUT WHAT THE ANSWER IS, AND FROM REVIEWING EVERYTHING

9        THAT'S BEEN FILED, THESE ARE THE ISSUES FOR WHICH I WOULD MOST

10       APPRECIATE YOUR INPUT AND FURTHER GUIDANCE.  I DO APPRECIATE

11       WHAT YOU'VE ALREADY FILED.

12                SO LET ME START WITH MY FIRST QUESTION, AND THAT IS FOR

13       THE PLAINTIFFS.

14                SO IN YOUR OPPOSITION ON PAGES 12 AND 13, YOU DISCUSS THE

15       GOOGLE ASSISTANT LITIGATION.  YOU RAISE THE ORDINARY COURSE OF

16       BUSINESS EXCEPTION.  BUT THAT EXCEPTION ARISES IN THE CONTEXT

17       OF INTERCEPTION CLAIMS AND NOT UNAUTHORIZED DISCLOSURE CLAIMS.

18                SO DO YOU WANT TO ADD ANYTHING ABOUT HOW YOU WOULD RESPOND

19       TO GOOGLE'S ARGUMENT ABOUT UNAUTHORIZED DISCLOSURE CLAIMS?

20                     MR. BARNES:  I DO, YOUR HONOR.

21          CAN YOU HEAR ME OKAY?

22                     THE COURT:  I CAN.

23                     MR. BARNES:  OKAY.

24                     THE COURT:  AND IF ANYONE CAN'T HEAR ME, CAN YOU LET

25        ME KNOW?  BECAUSE SOMETIMES THINGS ARE BOOMING SO LOUD IN THE
```

1    COURTROOM, I HAVE TO LOWER THE VOLUME, AND THEN I FORGET TO

2    TURN IT BACK UP.

3            MR. BARNES:  OKAY.

4        I'M GLAD YOUR HONOR ASKED THAT QUESTION BECAUSE THAT WAS,

5    IN FACT, ONE OF THE THINGS THAT I HAD FLAGGED TO DISCUSS.

6        AND GOOGLE'S ARGUMENT IS ESSENTIALLY THAT THE ECPA

7    PROHIBITS AN ELECTRONIC COMMUNICATION SERVICE FROM DISCLOSING

8    COMMUNICATIONS TO THIRD PARTIES.

9        IN THIS SITUATION, YOUR HONOR, GOOGLE IS A THIRD PARTY.

10    THE FACT THAT IT IS AN ELECTRONIC COMMUNICATION SERVICE DOES

11    NOT MAKE IT A PARTY TO THE COMMUNICATION.

12        AND FOR THAT THIRD PARTY ARGUMENT, THE NINTH CIRCUIT DEALT

13    WITH THAT IN THE FACEBOOK INTERNET CASE AND DECIDED IT IN FAVOR

14    OF THE PLAINTIFFS.

15        THE EXAMPLE YOU CAN SEE FROM OUR COMPLAINT IS IN

16    PARAGRAPHS 185 TO 187.  THIS IS A COMMUNICATION FROM ONE OF THE

17    PLAINTIFFS TO A HEALTH CARE PROVIDER THAT WAS REDIRECTED BY

18    INVISIBLE GOOGLE SOURCE CODE TO GOOGLE.

19        GOOGLE IS NOT A PARTY TO THAT COMMUNICATION, YOUR HONOR.

20        AND THERE ARE EXCEPTIONS -- IT IS TRUE THAT AN ECS CAN

21    DISCLOSE THE CONTENT OF COMMUNICATIONS TO ITSELF IN CERTAIN

22    SITUATIONS.

23        BUT THOSE EXCEPTIONS ARE ACTUALLY SET FORTH IN THE

24    STATUTE.  THEY'RE SET FORTH IN 2511(3)(A), AND THEY'RE --

25    (3)(B), AND 2511(2)(A).

1        AND REALLY WHAT GOOGLE IS ARGUING HERE, YOUR HONOR, IS

2   THAT AN ELECTRONIC COMMUNICATION SERVICE CAN USE THE CONTENT OF

3   A COMMUNICATION CARRIED ON ITS SERVICE FOR ANY PURPOSE

4   WHATSOEVER INTERNALLY.

5        THAT'S JUST NOT THE LAW.  THAT'S NOT THE WAY THE WIRETAP

6   ACT HAS BEEN UNDERSTOOD.

7        AND LET'S PUT IT IN A REAL WORLD CONTEXT.  CONSIDER AT&T.

8   THERE ARE VERY LIKELY GOOGLE EMPLOYEES WHO HAVE AT&T AS A

9   COMMUNICATIONS PROVIDER.  GOOGLE'S ARGUMENT IS THAT AT&T COULD

10  TAKE THE CONTENT OF PHONE CALLS BEING CARRIED ON ITS SERVICE

11  AND VOICEMAILS THAT ARE SAVED IN ITS SERVICES AND USE THE

12  CONTENTS OF THOSE FOR ANY INTERNAL PURPOSE IT WANTED, WHETHER

13  THAT'S COMPETING WITH GOOGLE, WHETHER IT'S SELLING IT TO HEDGE

14  FUNDS FOR STOCK MARKET ITEMS, ANYTHING IT COULD DO.

15       AND THE REASON THIS MAKES NO SENSE, YOUR HONOR, IS YOU

16  LAID IT OUT IN THE MATERA CASE AND THE GMAIL CASE AND THE

17  BACKHAUT CASE.  YOU RULED THREE TIMES THAT AN ECS CAN BE LIABLE

18  FOR AN INTERCEPTION ON ITS OWN SERVICE.

19       THE REASON FOR THAT, AS YOU SAID, THE STATUTE HAS AN

20  EXCEPTION, RIGHT?  THAT WAS IN 2511(3)(B).  BUT THEY DIDN'T

21  FALL UNDER THE EXCEPTION.

22       AND THE SAME THING IS TRUE FOR THE DISCLOSURES.

23       NOW, WE WERE -- ACTUALLY, I WAS A LITTLE BIT SURPRISED ON

24  THEIR REPLY THAT THEY SAID THAT THE MATERA, GMAIL, AND BACKHAUT

25  CASES REALLY DIDN'T MEAN ANYTHING.  IN THOSE CASES YOUR HONOR

1   CITED THE LEGISLATIVE HISTORY TO THE ECPA, AND IF YOU LOOK AT

2   THE SAME LEGISLATIVE HISTORY THAT YOUR HONOR CITED IN THOSE

3   CASES, IT REALLY SHOWS WHAT'S GOING ON HERE, AND THAT CASE --

4   IN THE LEGISLATIVE HISTORY, THE REPORT SAYS THAT IN SITUATIONS

5   WHERE AN ECS ALSO PROVIDES ANOTHER SERVICE, IT'S INTENDED SUCH

6   INSTANCES, QUOTE, "BE ANALYZED AS THOUGH THE COMMUNICATION

7   SERVICES AND THE OTHER SERVICES WERE PROVIDED BY DISTINCT

8   ENTITIES."  THAT'S ON PAGE 37 OF THE SENATE REPORT.

9       AND THEN THEY GO ON TO EXPLAIN ALL OF THE EXCEPTIONS TO

10  THE GENERAL RULE OF NON-DISCLOSURE, WHICH IS WHAT WE'RE TALKING

11  ABOUT HERE.  THERE'S A GENERAL RULE OF NON-DISCLOSURE, AND IT

12  TALKS ABOUT EXCEPTIONS.  FIRST CATEGORY IS EXCEPTIONS THAT ARE

13  AUTHORIZED.  THE SECOND CATEGORY IS DISCLOSURES WHICH ARE

14  NECESSARY FOR THE EFFICIENT OPERATION OF THE COMMUNICATION

15  SYSTEM.

16      SUCH BUSINESS PROCEDURES ARE INCLUDED IN 2511(2)(A) AND

17  INCLUDE THE EXEMPTION FOR SERVICE PROVIDER ACTIVITIES DESIGNED

18  TO PROTECT THE SYSTEM AND PERFORM THE SERVICE.

19      IF -- GOOGLE'S ASKING YOUR HONOR TO CREATE A BLANKET

20  EXCEPTION THAT IS NOT PRESENT IN THE STATUTE, AND IF THE

21  BLANKET EXCEPTION WERE THERE AND WERE A REAL THING, THERE WOULD

22  BE NO NEED FOR THESE EXCEPTIONS FOR AN ECS DISCLOSING TO ITSELF

23  TO PROTECT THE SYSTEM AND PERFORM THE SERVICE.

24      AND TO UNDERSTAND WHY, IT'S HELPFUL TO THINK ABOUT THE

25  HISTORY OF THE ECPA.  THE ECPA DID NOT JUST POP INTO BEING IN

1    1986.  IT WAS PREVIOUSLY THE WIRETAP ACT IN 1968.  PRIOR TO

2    THAT, IT WAS THE COMMUNICATIONS ACT.

3        AND CONGRESS IN ACTING IN 1986, THERE ARE CASES WHERE

4    COURTS CREATED EXCEPTIONS FOR ELECTRONIC COMMUNICATION SERVICE

5    PROVIDERS TO PROTECT THEIR OWN PROPERTY AND INTEREST.  ONE'S

6    FROM THE NINTH CIRCUIT.  IT'S CALLED BUBIS VERSUS

7    UNITED STATES.  I'M SURE I BUTCHERED THAT PRONUNCIATION.  IT'S

8    384 F.2D 643.

9        THAT'S A CASE THAT GOES BACK TO 1967, AND WHAT THE COURT

10   DOES THERE IS IT SAYS, LOOK, THERE'S NO EXCEPTION IN THIS

11   PREDECESSOR TO THE ECPA FOR DISCLOSURES TO ITSELF, SO WE'RE

12   GOING TO CREATE ONE FOR PROTECTION OF PROPERTY.

13       BUT GOOGLE IS NOT SAYING IT'S PROTECTING PROPERTY HERE.

14   IT'S USING IT FOR ADVERTISING SERVICES.  THAT HAS NOTHING TO DO

15   WITH THE PROVISION OF THE ELECTRONIC COMMUNICATION SERVICE, AND

16   THE PURPOSE OF THE ECPA WAS TO PROTECT THE CONTENT OF USER

17   COMMUNICATIONS IN THAT SERVICE, KEEP IT TO THE INDIVIDUALS WHO

18   WERE PARTIES TO THE COMMUNICATION, NOT LET IT BE DIVERTED TO

19   SOME OTHER ENTITY, INCLUDING THE ECS ITSELF.

20       AND SO, YOUR HONOR, WE THINK THE LOGIC OF MATERA, THE

21   GMAIL CASE, AND BACKHAUT APPLY.

22       IN FACT, THE EXCEPTION THAT YOUR HONOR ANALYZED IN THAT

23   CASE IS THE SAME EXCEPTION THAT IS REFERENCED IN THE ECS

24   DISCLOSURE CLAIMS.

25       AND THERE'S TWO OF THEM, YOUR HONOR, RIGHT?  THERE'S ONE

1    FOR THE WIRETAP ACT AND THERE'S ONE FOR THE STORED

2    COMMUNICATIONS ACT.  BUT THEY BOTH REFER BACK TO THE VERY SAME

3    EXCEPTION THAT YOUR HONOR ANALYZED IN MATERA, GMAIL, AND

4    BACKHAUT.

5         AND IN ADDITION, SO IT'S WHETHER THERE'S A BUSINESS --

6    WHETHER IT'S NECESSARY FOR THE RENDITION OF SERVICE; OR WHETHER

7    IT'S NECESSARY TO PROTECT THE PROPERTY OR RIGHTS OF THE

8    SERVICE.  THOSE ARE THE ONLY EXCEPTIONS.

9         GOOGLE ASKS YOU TO MAKE A BLANKET EXCEPTION, AND THAT'S

10   WHY THEY'RE WRONG AND THEIR READING OF THE STATUTE IS WRONG.

11             THE COURT:  ALL RIGHT.  THANK YOU.

12   LET ME HEAR FROM DEFENDANTS.  I'M NOT SURE WHICH COUNSEL

13   WISHES TO ADDRESS THIS PARTICULAR POINT, BUT GO AHEAD, PLEASE.

14             MR. BROOME:  GOOD AFTERNOON, YOUR HONOR.

15   THIS IS STEPHEN BROOME.  I'LL ADDRESS THIS POINT.

16        I THINK THAT BOTH OF THE DISCLOSURE CLAIMS AT ISSUE HERE,

17   BOTH UNDER THE WIRETAP ACT AND THE SCA, SUFFER FROM A SQUARE

18   PEG, ROUND HOLE PROBLEM.

19        THE MECHANISM OF DISCLOSURE THAT IS ALLEGED IN THE

20   COMPLAINT IS THAT THE WEBSITES THAT WANT TO USE GOOGLE'S ADS

21   AND ANALYTIC SERVICES INSTALL CODE THAT IS SUPPLIED BY GOOGLE

22   THAT THEN CAUSES USERS' BROWSERS TO SIMULTANEOUSLY REDIRECT GET

23   REQUESTS TO GOOGLE.

24        AND THIS IS HAPPENING, BY THE WAY, REGARDLESS OF WHICH

25   BROWSER IS BEING USED.  IT'S NOT A CHROME-SPECIFIC ISSUE.  THIS

1    IS THE RESULT OF HOW GOOGLE'S ADS AND ANALYTICS SERVICES THAT

2    ARE INSTALLED ON THIRD PARTY WEBSITES, HOW THEY FUNCTION.

3        SO THE ONLY DISCLOSURE THAT'S REALLY HAPPENING HERE IS

4    BETWEEN -- IS THE WEBSITES DISCLOSING TO GOOGLE.  GOOGLE IS

5    ONLY GETTING THIS DATA IF THE WEBSITES WANT GOOGLE TO HAVE IT,

6    AND I DON'T THINK THAT IS GENUINELY DISPUTED.  IF A CHROME USER

7    VISITS A WEBSITE THAT DOES NOT USE GOOGLE'S ADS OR ANALYTIC

8    SERVICES, GOOGLE IS NOT GOING TO GET THE DATA.

9        BUT, OF COURSE, PLAINTIFFS AREN'T SUING THE WEBSITES HERE

10   FOR UNLAWFUL DISCLOSURE, THEY'RE SUING GOOGLE.

11       SO HERE WE GET TO THE SORT OF SQUARE PEG, ROUND HOLE

12   PROBLEM.  PLAINTIFFS, THEY ACTUALLY DON'T ALLEGE THAT GOOGLE

13   HAS DONE THE DISCLOSING.  PLAINTIFFS ALLEGE THAT CHROME IS

14   DOING THE DISCLOSING TO GOOGLE.  THAT'S AT PARAGRAPH 290 --

15   PARAGRAPHS 290 AND 317 OF THE COMPLAINT.

16       BUT, OF COURSE, THAT DOESN'T WORK, EITHER, BECAUSE CHROME

17   IS JUST DOWNLOADABLE SOFTWARE.  IT'S NOT A SUBSIDIARY OF

18   GOOGLE, AS THEY ARGUE IN THEIR BRIEF.  IT'S NOT AN ENTITY

19   PROVIDING AN ECS TO THE PUBLIC, WHICH IS THE STATUTORY

20   REQUIREMENT.  AND IT'S NOT CAPABLE -- OBVIOUSLY NOT CAPABLE OF

21   ACTING WITH THE REQUISITE INTENT.  SIMPLY PUT, YOUR HONOR,

22   CHROME IS NOT A DEFENDANT.

23       AND WE'D ARGUE THAT THAT REALLY SHOULD BE THE END OF THE

24   INQUIRY BECAUSE PLAINTIFFS' BURDEN AT THIS STAGE IS TO

25   PLAUSIBLY ALLEGE THAT THE DEFENDANT UNLAWFULLY DISCLOSED THEIR

1    DATA TO SOMEONE ELSE.  BUT THEY'RE NOT ALLEGING THAT.

2         NOW, AS TO WHETHER GOOGLE COULD BE LIABLE FOR DISCLOSING

3    IT INTERNALLY, I DON'T THINK THE STATUTE ALLOWS THAT.  A

4    DISCLOSURE, JUST AS A MATTER OF COMMON UNDERSTANDING, REQUIRES

5    BOTH A DISCLOSER AND A DISCLOSEE.  THEY CAN'T BE ONE AND THE

6    SAME -- EXCUSE ME -- AS JUDGE FREEMAN EXPRESSLY HELD IN THE

7    GOOGLE ASSISTANT CASE.

8         I ALSO THINK IT'S WORTH NOTING, YOUR HONOR, THAT UNDER

9    2701(C) OF THE SCA, THAT PROVISION PROVIDES -- SAYS THAT AN ECS

10   PROVIDER HAS AUTHORITY TO PERMIT ACCESS TO STORED

11   COMMUNICATIONS.

12        WELL, AN INTERNAL DISCLOSURE IS REALLY THE SAME AS

13   INTERNAL ACCESS, AND YOUR HONOR HELD IN THE YAHOO! MAIL CASE

14   THAT UNAUTHORIZED DISCLOSURE CLAIMS REQUIRE A DISCLOSURE TO

15   THIRD PARTIES, AND YOU NOTED THAT THE SCA GRANTS IMMUNITY TO

16   ECS PROVIDERS FOR ACCESSING CONTENT ON THEIR OWN SERVERS.

17        IT FOLLOWS, YOUR HONOR, THAT AN ECS PROVIDER MUST BE

18   IMMUNE FOR DIVULGING COMMUNICATIONS IF THAT DIVULGENCE IS ONLY

19   INTERNAL SINCE THAT REALLY IS THE SAME AS ACCESSING CONTENT ON

20   YOUR OWN SERVERS.

21        NOW, AS FOR THE, THE -- MR. BARNES'S POINT ABOUT THAT ECS

22   PROVIDER CAN BE LIABLE FOR INTERCEPTING COMMUNICATIONS ON ITS

23   OWN SYSTEMS, WE'RE NOT DISPUTING THAT HERE TODAY.

24        BUT WE WOULD SAY THAT THAT'S IRRELEVANT BECAUSE WHAT'S --

25   IT'S -- IF PLAINTIFFS' THEORY IS THAT GOOGLE DESIGNED CHROME TO

```
1    IMPROPERLY SEND DATA IN TRANSMISSION ON CHROME TO BE CAPTURED

2    ON GOOGLE'S SERVERS, THAT IS, AT BEST, AN INTERCEPTION.  IT'S

3    NOT A DIVULGENCE BECAUSE YOU CAN'T DIVULGE SOMETHING TO

4    YOURSELF.

5         WITH RESPECT TO THE NECESSARY INCIDENT EXCEPTIONS THAT

6    MR. BARNES REFERENCED, SECTION 2511(2)(A)(1) UNDER THAT WIRETAP

7    ACT, AND 2702(B)(5) UNDER THE SCA, RESPECTFULLY THOSE -- I

8    THINK -- WE'RE NOT RELYING ON THOSE EXCEPTIONS, SO THAT'S

9    REALLY A RED HERRING.

10        BOTH OF THOSE EXCEPTIONS ALLOW DISCLOSURE OF

11   COMMUNICATIONS EXTERNALLY TO THIRD PARTIES UNDER CERTAIN

12   CIRCUMSTANCES.

13        NEITHER OF THOSE PROVISIONS SUGGESTS THAT AN ECS PROVIDER

14   CAN BE LIABLE FOR DISCLOSING COMMUNICATIONS INTERNALLY.

15             THE COURT:  ALL RIGHT.  THANK YOU.

16        I'M GOING TO GIVE MR. BARNES VERY SHORT, VERY BRIEF

17   OPPORTUNITY TO RESPOND, AND THEN WE'LL GO ON TO MY NEXT

18   QUESTION.

19             MR. BARNES:  THANK YOU, YOUR HONOR.

20        MR. BROOME MOVED INTO THE ACCESS CLAIM WHEN HE TALKED

21   ABOUT 2701(C), AND I THINK IT'S IMPORTANT FOR YOUR HONOR TO

22   UNDERSTAND THE ENORMITY OF GOOGLE'S ARGUMENT HERE.

23        THERE ARE EXCEPTIONS IN THE STATUTE FOR ECS DISCLOSURES TO

24   ITSELF.  GOOGLE IS ASKING THE COURT TO CREATE ANOTHER EXCEPTION

25   THAT IS NOT PRESENT IN THE STATUTE, AND IF THE COURT CREATES
```

```
 1     THE EXCEPTION, ANY ELECTRONIC COMMUNICATION SERVICE IN THIS

 2     COUNTRY WILL HAVE UNFETTERED LICENSE TO USE THE CONTENT OF ITS

 3     USERS' COMMUNICATIONS FOR ANY PURPOSE WHATSOEVER INTERNALLY.

 4          AND THE COMMUNICATIONS WE SHOWED, THAT -- WE SHOW THEM

 5     GOING TO GOOGLE DOUBLECLICK AND GOOGLE ANALYTICS.

 6     GOOGLE DOUBLECLICK AND GOOGLE ANALYTICS ARE NOT THE

 7     COMMUNICATION SERVICE.  THEY HAVE NOTHING TO DO WITH CHROME

 8     NEEDING -- BEING ABLE TO USE CHROME TO SEND OR RECEIVE

 9     COMMUNICATIONS.

10          AND MR. BROOME SAID THIS IS STUFF THAT THE WEBSITES

11     DISCLOSE.

12          NO, IT'S NOT, YOUR HONOR.  GOOGLE DESIGNED THE SOURCE

13     CODE.  GOOGLE DESIGNED THE BROWSER.  IT IS ON BOTH SIDES OF

14     THIS.  IT BOTH HAS THE WORLD'S LARGEST BROWSER, AND IT IS THE

15     WORLD'S LARGEST TRACKING COMPANY.

16          AND IT IS SAYING, IN THAT ROLE AS AN ECS, IT CAN DO

17     WHATEVER IT WANTS WITH USER COMMUNICATIONS, NO MATTER WHAT IT

18     PUTS IN ITS PRIVACY POLICY.

19          THAT'S JUST WRONG AND IT GOES AGAINST THE ENTIRE LANGUAGE

20     AND PURPOSE OF THE ECPA.

21          THE COURT:  ALL RIGHT.  THANK YOU.

22          I'D LIKE TO GO TO MY NEXT QUESTION.  THIS IS ALSO TO THE

23     PLAINTIFFS.  I HAVE TWO MORE FOR THE PLAINTIFF AND THEN I'LL GO

24     TO THE DEFENSE QUESTIONS, AND THEN I HAVE QUESTIONS THAT I WANT

25     TO ADDRESS TO BOTH SIDES IN THE FIRST INSTANCE.
```

1        SO ALSO ON PAGE 16 OF YOUR OPPOSITION, YOU ARGUE THAT THE

2   EXCEPTION TO STORED COMMUNICATIONS ACT LIABILITY CONTAINED IN

3   SECTION 2701(C)(1) SHOULDN'T APPLY HERE BECAUSE COURTS HAVE TO

4   INTERPRET FEDERAL STATUTES IN LIGHT OF THE COMMON LAW.

5        WHAT CASES HAVE COME OUT THE SAME WAY AS WHAT YOU'RE

6   ARGUING?

7        MR. BARNES:  IT SEEMS MY -- GOING --  THAT MY LAST

8   ANSWER WAS GETTING AHEAD OF MYSELF, BECAUSE THIS IS EXACTLY THE

9   QUESTION YOU HAD NEXT.

10       THEOFEL VS. FAREY-JONES IS A NINTH CIRCUIT CASE WHERE --

11   AND IT IS A STORED COMMUNICATIONS ACT CASE -- WHERE THE

12   DEFENDANT IN THAT CASE MADE FALSE STATEMENTS AND

13   MISREPRESENTATIONS TO THE ELECTRONIC COMMUNICATION SERVICE

14   PROVIDER.  THE ECS PROVIDED THE RELEVANT DOCUMENTS; PLAINTIFFS

15   SUED; DEFENDANT SAID, HEY, LOOK, THE ECS AUTHORIZED THIS; AND

16   THE NINTH CIRCUIT SAID, NO, WE'RE NOT GOING TO GRANT REFUGE TO

17   A DEFENDANT WHO GAINS THEIR AUTHORIZATION THROUGH SUBTERFUGE.

18       AND SO OUR COMPARISON IS THEOFEL IS A FRAUD ON THE ECS,

19   AND THIS CASE IS SLIGHTLY DIFFERENT.  IT IS A FRAUD WITH THE

20   ECS.

21       GOOGLE KNOWS -- WHAT WE ARE SAYING IS THAT, LIKE YOUR

22   HONOR SAID IN THE APPLE IPHONE CASE NEARLY A DECADE AGO, AN

23   ECPA DEFENDANT CANNOT CREATE THEIR OWN EXEMPTION TO THE

24   STATUTE.

25       WHERE GOOGLE IS ACCESSING COMMUNICATIONS THAT IT KNOWS IT

```
 1    DOES NOT HAVE THE AUTHORITY TO ACCESS BECAUSE OF ITS OWN

 2    CONTRACT WITH CONSUMERS, THAT DOESN'T LET IT OFF THE HOOK UNDER

 3    2701(C).

 4         AND, YOUR HONOR, WE CONCEDE IN OUR BRIEFS, OBVIOUSLY

 5    THAT'S IN THE STATUTE.  THERE IS STATUTORY SUPPORT FOR GOOGLE'S

 6    DEFENSE IN THAT CASE.

 7         WE THINK, HOWEVER, THAT THEOFEL SAYS YOU'VE GOT TO

 8    INTERPRET THAT IN THE LIGHT OF COMMON LAW, BASICALLY AN UNCLEAN

 9    HANDS ARGUMENT, AND WE THINK IN LIGHT OF YOUR HONOR'S PRIOR

10    ORDER IN THAT APPLE IPHONE CASE, THIS IS ONE OF THOSE

11    SITUATIONS.

12         THE COURT:  ALL RIGHT.  THANK YOU.

13         MR. BROOME, DO YOU WANT TO RESPOND?

14         MR. BROOME:  SURE, JUST VERY BRIEFLY, YOUR HONOR.

15         WE THINK THEOFEL IS A VERY DIFFERENT CASE.  THERE THE

16    COURT REJECTED APPLICATION OF 2701(C)(1) TO INDIVIDUAL

17    DEFENDANTS, NOT AN ECS PROVIDER.  AND IN THAT CASE THEY HAD

18    ACTED IN BAD FAITH AND WITH GROSS NEGLIGENCE IN DRAFTING WHAT

19    THE COURT FOUND TO BE A FACIALLY OVERBROAD SUBPOENA ON AN ISP,

20    AN ECS PROVIDER, TO OBTAIN THE PLAINTIFF'S STORED E-MAILS.

21         AND THE NINTH CIRCUIT BASICALLY HELD THAT THE ISP'S

22    RESPONSE TO THAT INVALID SUBPOENA DID NOT CONSTITUTE THE

23    REQUISITE AUTHORIZATION UNDER 2701(C).

24         BUT, OF COURSE, THE ISP WASN'T THE DEFENDANT THERE AND THE

25    COURT DID NOT HOLD THAT THE ECS PROVIDER CAN BE LIABLE FOR
```

```
 1   ACCESSING COMMUNICATIONS ON ITS OWN SYSTEM THAT -- ON ITS OWN

 2   SYSTEMS THAT IT ITSELF AUTHORIZED.

 3        SO THIS IS A VERY DIFFERENT CASE.  HERE THE ALLEGED ECS

 4   PROVIDER IS GOOGLE AND THE STATUTE VERY CLEARLY SAYS THAT THE

 5   ECS PROVIDER CAN AUTHORIZE ACCESS TO STORED COMMUNICATIONS.

 6        THE COURT:  ALL RIGHT.  THANK YOU.

 7        LET'S GO TO MY NEXT QUESTION.

 8        AS FAR AS THE LOSS REQUIREMENT UNDER THE CFAA, I DO THINK

 9   THE NINTH CIRCUIT'S ANDREWS VERSUS SIRIUS XM RADIO CASE CUTS

10   AGAINST THE PLAINTIFFS, AND YOU DIDN'T ADDRESS THAT CASE IN

11   YOUR OPPOSITION, SO I WANTED TO ASK HOW YOU DISTINGUISH THAT

12   CASE OR GIVE YOU AN OPPORTUNITY TO ADDRESS IT DURING THIS

13   HEARING.

14        MR. STRAITE:  THANK YOU, YOUR HONOR.

15        THIS IS DAVID STRAITE FOR PLAINTIFFS.

16        CERTAINLY IN THE CFAA CLAIM, WE BELIEVE THAT THE COMPLAINT

17   DID PLEAD SUFFICIENT LOSS HERE.  SO WE HAVE A QUESTION NOT ONLY

18   ON THE AMOUNT OF THE LOSS, BUT ALSO THE QUESTION OF WHETHER

19   THE, THE COPYING OF INFORMATION ITSELF COULD BE LOSS, COULD BE

20   DAMAGE ACTUALLY TO THE COMPUTER.

21        SO I THINK IT'S IMPORTANT UNDER THE CFAA FIRST TO

22   DISTINGUISH BETWEEN DAMAGES AND LOSS THE WAY THOSE TWO TERMS

23   ARE USED.

24        LOSS HERE, WE DO HAVE A JURISDICTIONAL THRESHOLD

25   REQUIREMENT OF $5,000.
```

1            BUT IN THE NINTH CIRCUIT, WE CAN AGGREGATE LOSS AMONG --

2      IN THE CLASS TO REACH THE $5,000 THRESHOLD.

3            IN THE COMPLAINT, AS WE NOTED IN OUR OPPOSITION, WE DID

4      NOT HAVE AN ALLEGATION SPECIFICALLY SAYING THAT LOSSES WOULD

5      EXCEED $5,000.

6            WE DID, HOWEVER, HAVE CLAIMS FOR NOMINAL DAMAGES AND A

7      CLASS DEFINITION THAT WOULD AGGREGATE -- EVEN THE MINIMUM

8      NOMINAL DAMAGES OF A PENNY WOULD EXCEED $5,000.

9            IT'S SOMETHING THAT WE COULD ADDRESS IN AN AMENDMENT OR

10     EVEN IN A SUPPLEMENT.  THERE IS NO SENTENCE IN THE COMPLAINT,

11     WHICH WE ACKNOWLEDGE, THAT SAYS THAT -- THAT ALLEGES THAT

12     LOSSES EXCEED $5,000.

13            THE COURT:  SO DO YOU WANT TO JUST STIPULATE TO

14     DISMISSAL ON THAT BASIS WITH LEAVE TO AMEND?  OR --

15            MR. STRAITE:  IF THAT WOULD BE MORE CONVENIENT FOR

16     YOUR HONOR IF YOU DON'T BELIEVE THAT OUR ONE PENNY NOMINAL

17     DAMAGES PER CLASS MEMBER TIMES THE SIZE OF THE CLASS ALLEGED IS

18     SUFFICIENT.

19     WE DO RECOGNIZE THAT WE OMITTED THE SENTENCE WHICH ALLEGED

20     $5,000 LOSS.  WE THOUGHT IT WAS APPARENT FROM THE COMPLAINT.

21     BUT IT ABSOLUTELY IS TRUE THAT THAT SENTENCE IS MISSING.

22     SO IF THAT'S MORE CONVENIENT FOR YOUR HONOR, WE CAN

23     STIPULATE TO THAT AND ADD IT LATER, HOWEVER THE COURT WANTS TO

24     PROCEED.

25            THE COURT:  ALL RIGHT.  BUT THERE'S NOTHING ELSE YOU

```
1        WANT TO ADD ON ANDREWS; CORRECT?
2                MR. STRAITE:  CORRECT.
3                THE COURT:  ALL RIGHT.
4        DID ANYONE FROM GOOGLE WANT TO ADDRESS THIS?  OR SHOULD WE
5    MOVE ON?
6                MR. SCHAPIRO:  WELL, I'LL -- EXCUSE ME.  IS THERE
7    FEEDBACK?  CAN YOU HEAR ME NOW?
8                THE COURT:  YES.  AND JUST FOR THE RECORD, SINCE
9    WE'RE ON AUDIO STREAM, IF YOU WOULD JUST STATE YOUR NAME FIRST.
10               MR. SCHAPIRO:  OF COURSE, SURE.
11       IT'S ANDREW SCHAPIRO.
12       I DON'T KNOW IF THERE'S A WHOLE LOT TO ADD OTHER THAN TO
13   SUGGEST THAT AMENDMENT MIGHT BE FUTILE IN THIS CASE BECAUSE WE
14   AGREE WITH YOUR HONOR, THE DECISIONING IN ANDREWS VERSUS SIRIUS
15   ESSENTIALLY, IN OUR VIEW, SAYS THAT ALLEGED LOSS OF PERSONAL
16   INFORMATION ISN'T SUFFICIENT.
17       AND EVEN IF THERE ARE A MILLION PEOPLE, AS MR. STRAITE
18   SAYS, A MILLION TIMES ZERO IS STILL ZERO.  IT'S NOT A MILLION
19   TIMES A PENNY.  SO YOU'RE NOT GOING TO GET TO THE $5,000.
20       AND EVEN -- AS YOU, YOUR HONOR, SAID IN THE IPHONE CASE AS
21   WELL, EVEN WHERE AGGREGATION IS APPROPRIATE -- OR AGGREGATION
22   IS APPROPRIATE ONLY WHERE THE VIOLATION CAN BE DESCRIBED AS ONE
23   ACT, AND WE THINK THEY'RE GOING TO HAVE A HARD TIME PROVING
24   THAT NOW AS WELL.
25       BUT, YOU KNOW, IF THEY'RE STIPULATING TO DISMISS, I'LL
```

1    QUIT WHILE WE'RE AHEAD.

2         BUT I WOULD FORESHADOW THAT WE MIGHT ARGUE THAT, EVEN WITH

3    AN AMENDMENT, THEY'RE NOT GOING TO BE ABLE TO SATISFY THE

4    JURISDICTIONAL REQUIREMENT.

5         THE COURT:  ALL RIGHT.  THANK YOU.

6         ALL RIGHT.  LET ME GO TO GOOGLE NOW.

7         SO THE GOOGLE TERMS OF SERVICE FROM APRIL 14, 2014 TO

8    OCTOBER 25 OF 2017, AND FROM OCTOBER 25, 2017 TO MARCH 31, 2020

9    SAY THE FOLLOWING, AND I'M JUST GOING TO QUOTE IT.  QUOTE, "YOU

10   CAN FIND MORE INFORMATION ABOUT HOW GOOGLE USES AND STORES

11   CONTENT IN THE PRIVACY POLICY OR ADDITIONAL TERMS FOR

12   PARTICULAR SERVICES," END QUOTE.

13        WHY DOES THIS LANGUAGE DEMONSTRATE THAT USERS WHO AGREE TO

14   THE TERMS OF SERVICE ALSO AGREE TO THE PRIVACY POLICY?  AND

15   CITE ME SOME CASES THAT SUPPORT YOUR THEORY.

16        MR. SCHAPIRO:  SURE, YOUR HONOR.

17        AND IF I CAN BACK UP FOR A MOMENT AND JUST PULL THE CAMERA

18   OUT AND LOOK AT THE PLAINTIFFS' OVERALL THEORY HERE, THE IDEA

19   IS THAT SOMEHOW THE CHROME PRIVACY NOTICE OVERRIDES THE PRIVACY

20   POLICY.

21        BUT THE PRIVACY POLICY IN THIS CASE EXPRESSLY DESCRIBES

22   THE TYPE OF DATA THAT IS COLLECTED BY GOOGLE'S THIRD PARTY

23   SERVICES, AD MANAGER AND GOOGLE ANALYTICS.

24        AND THE CHROME PRIVACY NOTICE ITSELF, IN ITS SECOND -- IN

25   THE VERY SECOND LINE DIRECTS THE USER TO LOOK AT THE PRIVACY

1    POLICY FOR A DESCRIPTION OF HOW DATA IS TREATED.

2         SO THE -- IF YOUR QUESTION, ON THE OTHER HAND -- SO FIRST

3    OF ALL, I WOULD ARGUE THAT THIS IS A CASE ABOUT THE PRIVACY

4    POLICY AND GOVERNED BY THE PRIVACY POLICY.

5         IF YOUR QUESTION IS, HOW DO WE KNOW THAT THE PLAINTIFFS

6    ARE BOUND BY THE PRIVACY POLICY, THEY THEMSELVES HAVE ALLEGED

7    THAT.

8         SO THEY -- THEY ALLEGE IN EXHIBIT 1 TO THEIR COMPLAINT

9    THAT THE PRIVACY POLICIES ARE PART OF WHAT THEY CALL THEIR

10   CONTRACT IN THIS CASE, AND INDEED, THEY GO ON TO SAY LATER THAT

11   THEY HAD ACTUALLY AGREED TO PROVIDE THIS DATA -- THIS IS IN

12   PARAGRAPH 356 AND AGAIN IN 366 OF THEIR COMPLAINT -- THEY

13   AGREED TO PROVIDE THIS DATA AS PART OF THAT SUPPOSED CONTRACT.

14        SO I DON'T THINK THERE'S ANY QUESTION THAT THEY -- THAT

15   THEY ACCEPTED THE PRIVACY POLICY, AND I DON'T READ THEM TO BE

16   SAYING IN THEIR BRIEFS ANYWHERE THAT THERE WAS SOMETHING

17   DEFECTIVE ABOUT THE WAY THEY WERE PUT ON NOTICE OF THE PRIVACY

18   POLICY.

19        THE ARGUMENT INSTEAD IS THAT SOMEHOW THE CHROME PRIVACY

20   NOTICE SENT THEM IN A DIFFERENT DIRECTION, AND FOR THE REASONS

21   WE OUTLINED IN OUR BRIEFS OR THAT I'D BE HAPPY TO EXPLAIN AS

22   WELL, THAT JUST DOESN'T HOLD UP.  THOSE TWO SENTENCES IN THE

23   CHROME PRIVACY NOTICE DON'T OVERRIDE THE GENERAL PRIVACY

24   POLICY.

25             THE COURT:  I STILL DON'T THINK I'M HEARING AN ANSWER

1       TO MY QUESTION.

2           IF WE LOOK AT THE MARCH 31, 2020 GOOGLE TERMS OF SERVICE,

3       IT EXPLICITLY EXCLUDES THE GOOGLE PRIVACY POLICY.  IT

4       SPECIFICALLY SAYS, "BESIDES" -- AND I'M QUOTING -- "BESIDES

5       THESE TERMS, WE ALSO PUBLISH A PRIVACY POLICY.  ALTHOUGH IT'S

6       NOT PART OF THESE TERMS, WE ENCOURAGE YOU TO READ IT TO BETTER

7       UNDERSTAND HOW YOU CAN UPDATE, MANAGE, EXPORT, AND DELETE YOUR

8       INFORMATION."

9               MR. SCHAPIRO:  I SEE.  I MISUNDERSTOOD YOUR HONOR.

10              THE COURT:  I -- I'M NOT HEARING -- YOU'RE ARGUING

11      THAT PLAINTIFFS CONSENTED TO THE TERMS OF SERVICE WHICH

12      INCORPORATES THE PRIVACY POLICY, BUT I'M JUST NOT SEEING THAT

13      THE PRIVACY POLICY IS INCORPORATED IN THE TERMS OF SERVICE.

14      IT'S SPECIFICALLY EXCLUDED AS OF MARCH 31, 2020.

15          AND PRIOR TO THAT IN THE DATES THAT I JUST STATED IN MY

16      QUESTION EARLIER, IT JUST SAYS, LOOK, HEY, IF YOU WANT SOME

17      ADDITIONAL INFORMATION, GO GET IT.

18          BUT IT NEVER SAYS, THIS IS INCORPORATED AND PART OF THE

19      TERMS OF SERVICE.

20          SO THAT'S REALLY WHAT MY QUESTION IS.

21              MR. SCHAPIRO:  WELL, YOUR HONOR, IF -- FIRST OF ALL,

22      I WOULD SAY IF THE PRIVACY POLICY ITSELF IS NOT INCLUDED IN THE

23      TERMS OF SERVICE, THEN THE CHROME PRIVACY NOTICE AS WELL, WHICH

24      THE PLAINTIFFS ARE INVOKING, IS EXCLUDED.

25              BUT I GUESS I WOULD FALL BACK ON MY FIRST ANSWER ABOUT THE

```
1     PERIOD BEFORE MARCH 2020, WHICH IS THAT THE PLAINTIFFS

2     THEMSELVES SAY THAT THEY WERE AWARE OF AND CLAIM TO HAVE BEEN

3     BOUND BY THE PRIVACY POLICY.

4          AND SO, YOU KNOW, THERE ARE TWO PIECES TO OUR ARGUMENT

5     ABOUT THE PRIVACY POLICY.  ONE IS A SIMPLE DISCLOSURE POINT AND

6     WHAT SORT OF EXPECTATIONS THEY WOULD HAVE HAD, AND BASED ON

7     BOTH WHAT THEY CONCEDE AND THE STATEMENT IN THE TERMS OF

8     SERVICE, I DON'T THINK THE PLAINTIFFS CAN PLAUSIBLY ARGUE THAT

9     THEY WERE CAUGHT BY SURPRISE OR UNAWARE OF ANYTHING THAT WAS IN

10    THE PRIVACY POLICY.

11         THE QUESTION OF WHETHER IT'S PART OF A CONTRACT, WAS PART

12    OF A CONTRACT, IS ONE WHERE WE'RE WILLING TO CONCEDE THEIR

13    ARGUMENT THAT ALL OF THESE WERE PART OF THEIR CONTRACT UNTIL

14    MARCH OF 2020.

15         WE THINK WHAT HAPPENED AFTER MARCH OF 2020 IS, A, LARGELY

16    IRRELEVANT BECAUSE ALL OF THESE USERS SIGNED UP FOR GOOGLE

17    ACCOUNTS BEFORE 2016 OR IN 2016; BUT SECONDLY, DOESN'T IN ANY

18    WAY UNDERMINE THE POINT, WHICH IS THEY WERE ON NOTICE OF THESE

19    TERMS.  THEY ADMITTED THAT THEY ARE, AND THEY ARE INVOKING

20    THEM.

21         SO WHATEVER ONE MIGHT DESCRIBE AS THEIR CONTRACT, THEY

22    STILL FALL INTO THE PROBLEM OF HAVING CONSENTED TO OR

23    ACKNOWLEDGED THE PRIVACY POLICY.

24             THE COURT:  SO ISN'T THERE A -- I CAN'T FIND IT IN

25     FRONT OF ME AT THE MOMENT, BUT DON'T GOOGLE'S TERMS OF SERVICE
```

```
1        SAY THAT IF THERE'S EVER A CONFLICT WITH THE TERMS OF SERVICE,

2        THE SERVICE-SPECIFIC TERMS GOVERN, AND IN THE CASE OF CHROME,

3        THAT WOULD BE CHROME'S PRIVACY NOTICE?

4               MR. SCHAPIRO:  SO, AGAIN, OUR -- AND THAT'S A

5        FOOTNOTE IN THE PLAINTIFFS' BRIEF.

6               BUT OUR POINT THROUGHOUT OUR BRIEFS -- I THINK THIS IS

7        CORRECT -- IS THAT THERE'S NOT A CONFLICT BETWEEN THE CHROME

8        PRIVACY NOTICE AND THE PRIVACY POLICY.  IN FACT, IF ONE LOOKS

9        AT THE SECOND LINE OF THE CHROME PRIVACY POLICY -- I CAN

10       PROVIDE A CITE IF YOUR HONOR WANTS, IT IS EXHIBIT 17, IT'S

11       ACTUALLY MULTIPLE EXHIBITS BECAUSE THERE ARE VARIOUS FORMS OF

12       THIS -- THE VERY SECOND LINE OF THE CHROME PRIVACY POLICY SAYS,

13       "ANY PERSONAL INFORMATION THAT IS PROVIDED TO GOOGLE OR STORED

14       IN YOUR GOOGLE ACCOUNT WILL BE USED AND PROTECTED IN ACCORDANCE

15       WITH THE GOOGLE PRIVACY POLICY."

16              SO THERE'S -- THERE'S NO BASIS TO FALL BACK ON A SUPPOSED

17       CONFLICT BETWEEN THE TWO TERMS AND SAY, WELL, WHICH ONE SHOULD

18       GOVERN OVER THE OTHER WHEN THE SECOND LINE OF THE CHROME

19       PRIVACY NOTICE SAYS THE PRIVACY POLICY WITH REGARD TO CHROME IS

20       GOVERNED BY THE CHROME -- THE GOOGLE PRIVACY POLICY.

21              THE COURT:  WHAT ARE THE BEST CASES THAT SUPPORT YOUR

22       THEORY THAT BEFORE MARCH OF 2020, GOOGLE'S TERMS OF SERVICE

23       INCORPORATED THE PRIVACY POLICY?

24              MR. SCHAPIRO:  AS I STAND HERE, I DON'T HAVE A CASE

25       ONE WAY OR ANOTHER ABOUT WHETHER THE TERMS OF SERVICE
```

```
 1        INCORPORATED OR DID NOT INCORPORATE THE PRIVACY POLICY.

 2               MR. BROOME:  YOUR HONOR, IF I MAY HELP MY COLLEAGUE

 3        WITH AN ASSIST HERE?

 4           I THINK A FACEBOOK NINTH CIRCUIT DECISION, THE COURT

 5        HELD --

 6               THE COURT:  SORRY.

 7               MR. BROOME:  -- TO PROPERLY INCORPORATE ANOTHER

 8        DOCUMENT --

 9               THE CLERK:  YOUR HONOR, WE CAN'T HEAR YOU.  DID YOU

10        MEAN TO SAY SOMETHING?

11               THE COURT:  YEAH, I JUST WANT EVERY SPEAKER TO PLEASE

12        IDENTIFY HIMSELF BECAUSE THIS IS BEING AUDIO STREAMED.

13               MR. BROOME:  I'M SORRY, YOUR HONOR.  I APOLOGIZE.

14           STEPHEN BROOME --

15           (PAUSE IN PROCEEDINGS, COURT REPORTER DISCONNECTION.)

16               THE COURT:  SORRY, MR. BROOME.  CAN YOU GO BACK AND

17        REPEAT YOUR FACEBOOK ANSWER?

18               MR. BROOME:  MY BRILLIANT POINT?  YES, YOUR HONOR.

19        NO PROBLEM AT ALL.

20           I WAS GOING TO SAY THAT IN THE NINTH CIRCUIT FACEBOOK

21        DECISION, THE COURT HELD THAT TO PROPERLY INCORPORATE ANOTHER

22        DOCUMENT, THE DOCUMENT NEED NOT RECITE THAT IT INCORPORATES

23        ANOTHER DOCUMENT, SO LONG AS IT GUIDES THE READER TO THE

24        INCORPORATED DOCUMENT, AND I SAID THAT WE THINK THAT THAT IS

25        SUFFICIENTLY SUFFICIENT TO INCORPORATE THE GOOGLE PRIVACY
```

```
 1        POLICY WITHIN THE TERMS OF SERVICE.

 2             THE COURT:  ALL RIGHT.  THANK YOU TO MR. SCHAPIRO AND

 3        YOU.

 4        LET'S GO TO THE PLAINTIFF NOW IF YOU WANT TO MAKE ANY

 5        COMMENT.

 6             MR. BARNES:  YES.  JAY BARNES, YOUR HONOR.

 7        YOUR HONOR ASKED ABOUT WHERE THE CONFLICTS LANGUAGE WAS.

 8        THAT'S IN EXHIBIT 4 AT PAGE 14.

 9             MR. SCHAPIRO SAID THAT THE CHROME PRIVACY NOTICE, WHICH IS

10        PART OF THE CONTRACT -- AGAIN, THE TERMS OF SERVICE REFERENCE

11        THE SERVICE-SPECIFIC ADDITIONAL TERMS 15 SEPARATE TIMES AND

12        INCORPORATE THEM BY REFERENCE.

13             GOOGLE'S ARGUMENT IS THAT THE CHROME PRIVACY NOTICE

14        INCORPORATES THE PRIVACY POLICY, BUT LET'S LOOK AT THE ACTUAL

15        SENTENCE IN WHICH THEY MAKE THAT ARGUMENT.  IT SAYS, "ALTHOUGH

16        THIS POLICY DESCRIBES FEATURES SPECIFIC TO CHROME, ANY PERSONAL

17        INFORMATION THAT IS PROVIDED TO GOOGLE OR STORED IN YOUR GOOGLE

18        ACCOUNT WILL BE USED AND PROTECTED IN ACCORDANCE WITH THE

19        GOOGLE PRIVACY POLICY."

20        SO IN ORDER FOR THAT SENTENCE TO APPLY, IT HAS TO BE

21        INFORMATION THAT IS PROVIDED TO GOOGLE OR STORED IN YOUR GOOGLE

22        ACCOUNT.

23        AND THEN, AS THE BRIEFING GOES INTO GREAT DETAIL, THE

24        CONTRACT GOES ON TO SAY, YOU DON'T NEED TO PROVIDE ANY PERSONAL

25        INFORMATION TO USE CHROME.
```

1              OF COURSE THAT'S NOT TRUE.

2              AND IT SAYS THE PERSONAL INFORMATION THAT CHROME STORES

3      WON'T BE SENT TO GOOGLE UNLESS YOU CHOOSE TO STORE THAT DATA IN

4      YOUR GOOGLE ACCOUNT BY TURNING ON SYNC.

5              AND SO BY THE VERY LANGUAGE OF SENTENCE TWO THAT GOOGLE

6      RELIES UPON, THE PRIVACY POLICY DOES NOT APPLY UNLESS A PERSON

7      HAS SYNCED, WHICH GOES TO THE VERY HEART OF THIS CASE.

8              AND FOR WHAT IT'S WORTH, YOUR HONOR, WE DON'T THINK -- WE

9      THINK IT'S SOMEWHAT OF AN ACADEMIC QUESTION OF WHETHER THE

10     PRIVACY POLICY APPLIES OR NOT, BECAUSE THE PRIVACY POLICY

11     REITERATES AND SUPPORTS THE PLAINTIFFS' POSITION AND THE

12     PROMISES THAT ARE MADE IN THE CONTRACT ITSELF.

13              THE COURT:  SO YOU THINK THEN IT'S WRONG TO FOCUS ON

14     WHETHER THE GOOGLE -- WHETHER USERS WHO AGREE TO THE GOOGLE

15     TERMS OF SERVICE HAVE AGREED TO THE PRIVACY POLICY?  IS THAT

16     THE WAY YOU THINK ABOUT IT?

17              MR. BARNES:  NO, I DON'T THINK IT'S WRONG.  I THINK

18     IT'S CORRECT TO FOCUS ON IT.

19              BUT WHAT I'M SAYING IS EVEN IF YOUR HONOR WERE TO COME OUT

20     THE OTHER WAY, I DON'T THINK IT CHANGES THE RESULT FOR ANY OF

21     THE CLAIMS BECAUSE THE PRIVACY POLICY REITERATES AND REENFORCES

22     THE PROMISES THAT ARE IN THE CONTRACT.

23              THE COURT:  I SEE.  AND IS YOUR UNDERSTANDING -- AND

24     MAYBE I'M MISSING IT -- THAT THE DEFENDANTS ARE ARGUING THAT

25     THE PRIVACY POLICY -- THAT USERS AGREE TO THE PRIVACY POLICY

1      THROUGH THE CHROME PRIVACY NOTICE AND NOT THROUGH THE GOOGLE

2      TERMS OF SERVICE?  OR YOU THINK THEIR ARGUMENT GOES BOTH WAYS?

3              MR. BARNES:  WELL, I THINK THEY'RE ARGUING IT BOTH

4      WAYS.  I DON'T THINK I HEARD MR. SCHAPIRO'S ARGUMENT IN THE

5      BRIEFS THEMSELVES, AND I WOULD -- I WOULD NOTE, YOUR HONOR,

6      THAT GOOGLE HAS -- WE THINK GOOGLE EFFECTIVELY CONCEDED THE

7      CONTRACT CLAIM ON ITS REPLY.

8          IN ITS REPLY BRIEF, GOOGLE SAID THAT THE NOTICE, QUOTE,

9      "APPLIES ONLY TO THE PRODUCTS IN THE CHROME FAMILY," AND,

10     QUOTE, "IS SILENT AS TO WHAT DATA OTHER GOOGLE SERVICES RECEIVE

11     WHEN GOOGLE ACCOUNT HOLDERS VISIT WEBSITES THAT USE THE THIRD

12     PARTY SERVICES."

13         NOW, WHY THAT'S DISPOSITIVE TO THE CONTRACT CLAIM IS

14     BECAUSE POST-MARCH 31ST, 2020, THERE'S ABSOLUTELY NO ARGUMENT

15     GOOGLE CAN MAKE THAT THE PRIVACY POLICY IS PART OF THE

16     CONTRACT.  A DEFENDANT CANNOT DEFEAT A BREACH OF CONTRACT

17     PROMISE WITH A STATEMENT FROM AN EXTRACONTRACTUAL DOCUMENT THAT

18     IT EXPRESSLY DISAVOWED IN THE CONTRACT ITSELF.

19         SO -- AND THEN THE SECOND POINT IS WE DON'T THINK IT

20     MATTERS WHAT -- WHETHER, WHEN PLAINTIFFS AGREED TO THE

21     CONTRACT, GOOGLE'S TERMS OF SERVICE INCORPORATED IT BY

22     REFERENCE OR NOT BECAUSE THE SAME TERMS OF SERVICE, THE 2014

23     TERMS THAT YOU REFERENCED AND THE 2017 TERMS YOU REFERENCED,

24     GRANTS GOOGLE THE UNILATERAL RIGHT TO REVISE THE TERMS AND

25     PROVIDES THAT THOSE REVISIONS ARE EFFECTIVE EITHER IMMEDIATELY

1    OR 14 DAYS AFTER POSTED.

2           SO EXHIBIT 3, PAGE 4, IS WHERE THEY SAY THAT IN THE 2017

3    VERSION.  EXHIBIT 2, PAGE 3, IS WHERE THEY SAY THAT IN THE 2014

4    VERSION.

5           AND BY THOSE EXPRESS TERMS, PLAINTIFFS' ALLEGED CONSENT TO

6    THE PRIVACY POLICY WAS EXTINGUISHED ON MARCH 31ST, 2020, UNLESS

7    THEY CLAIM THAT IT WAS 14 DAYS LATER, WHICH WOULD BE

8    APRIL 14TH, 2020.

9           EITHER WAY, GOOGLE SET THIS CONTRACT UP SO THAT ANY

10   CONSENT TO THE PRIVACY POLICY WAS EXTINGUISHED AS A MATTER OF

11   CONTRACT ON THOSE DATES.

12              MR. SCHAPIRO:  SO IF I MAY?

13              THE COURT:  GO AHEAD, PLEASE.  AND THIS IS

14    MR. SCHAPIRO.

15              MR. SCHAPIRO:  YES, ANDY SCHAPIRO.

16          SO I BELIEVE I HEARD MR. BARNES ARGUING THAT THE REASON

17   THAT THE CLEAR STATEMENT IN THE SECOND SENTENCE OF THE CHROME

18   PRIVACY NOTICE IS NOT DISPOSITIVE, OR AT LEAST A PROBLEM FOR

19   THEM, IS THAT IN HIS VIEW, IT DOESN'T ADEQUATELY -- IT DOESN'T

20   TALK ABOUT PROVIDING PERSONAL INFORMATION TO USE CHROME OR

21   INFORMATION THAT CHROME STORES.  SO HE'S FALLING BACK ON THE

22   TWO SENTENCES IN THE CHROME PRIVACY NOTICE THAT THE PLAINTIFFS

23   HAVE POINTED TO AND BASICALLY BUILT THEIR COMPLAINT ON AND HE

24   SAYS, WELL, THIS DOESN'T APPLY BECAUSE THOSE STATEMENTS ARE

25   MISSTATEMENTS.

1        BUT THAT'S PUTTING THE CART BEFORE THE HORSE.  LET'S TAKE

2    THOSE TWO SENTENCES IN TURN.  YOU DON'T NEED TO PROVIDE ANY

3    PERSONAL INFORMATION TO PROVIDE CHROME -- EXCUSE ME -- TO USE

4    CHROME.  THAT IS ENTIRELY TRUE.  A USER CAN SET UP AN ACCOUNT,

5    SIGN INTO CHROME BY PROVIDING PERSONAL INFORMATION IF HE OR SHE

6    WANTS TO, LIKE NAME AND E-MAIL ADDRESS.

7        BUT A USER IS NOT REQUIRED TO SET UP AN ACCOUNT OR PROVIDE

8    PERSONAL INFORMATION TO USE CHROME.  YOU CAN DOWNLOAD THE

9    SOFTWARE AND START USING IT WITHOUT AN ACCOUNT OR PROVIDING

10   PERSONAL INFORMATION.  YOU CAN DOWNLOAD IT TODAY STRAIGHT OUT

11   OF THE BOX AND START USING IT.

12       AND THEN THE SECOND SENTENCE THAT HE POINTED TO, "THE

13   PERSONAL INFORMATION THAT CHROME STORES WON'T BE SENT TO GOOGLE

14   UNLESS YOU CHOOSE TO STORE THAT DATA IN YOUR GOOGLE ACCOUNT BY

15   TURNING ON SYNC," THE LANGUAGE IS CLEAR, "THE PERSONAL

16   INFORMATION THAT CHROME STORES."

17       AND ONE CANNOT REASONABLY INTERPRET THAT TO MEAN THAT THE

18   INFORMATION FROM WEBSITES USING AD MANAGER OR ANALYTICS WON'T

19   BE SENT TO GOOGLE, ESPECIALLY SINCE THE PRIVACY POLICY, WHICH I

20   THINK HE'S NOW AGREEING THEY HAD AGREED TO, EXPRESSLY SAYS THAT

21   IT WILL.

22       I WANT TO GET BACK TO A POINT THAT MY COLLEAGUE,

23   MR. BROOME, MADE A MOMENT AGO, THAT THE DATA COLLECTION IN THIS

24   CASE IS NOT SOMETHING THAT IS CAUSED BY OR SPECIFIC TO CHROME.

25   IT'S NOT AN ACTION OF CHROME AND IT HAS NOTHING TO DO WITH

1    SYNC.

2         IT IS DATA COLLECTED BY SERVICES THAT WEBSITES USE OR

3    DON'T USE TO GAIN A BETTER UNDERSTANDING OF THEIR VISITORS OR

4    TO SERVE RELEVANT ADS.

5         BUT IF YOU VISIT WITH FIREFOX, A WEBSITE THAT USES

6    GOOGLE'S ANALYTICS, DATA WILL BE SENT.  AND IF YOU USE CHROME

7    AND DON'T GO TO A WEBSITE THAT USES GOOGLE'S ANALYTICS, IT

8    WON'T BE SENT.

9         SO THIS IS IN NO WAY DATA THAT CHROME STORES BEING SENT

10   FROM YOUR, YOUR COMPUTER TO GOOGLE.

11        AND, AGAIN, BEFORE YOU EVEN GET TO THOSE TWO SENTENCES,

12   THE CHROME PRIVACY NOTICE AFFIRMATIVELY DIRECTS USERS TO THE

13   PRIVACY POLICY.

14        JUST A WORD ON THE MARCH 2020 POINT HERE.  EVERY PLAINTIFF

15   IN THIS CASE SIGNED UP FOR HIS OR HER GOOGLE ACCOUNT IN OR

16   AROUND 2016, AND OUR POINT STANDS REGARDLESS OF WHAT MR. BARNES

17   WANTS TO DESCRIBE AS THE CONTRACT ON A GIVEN DAY.  OUR POINT

18   STANDS THAT EACH ONE OF THOSE PEOPLE ACKNOWLEDGED AND WAS AWARE

19   OF A POLICY THAT SPECIFICALLY SAID THE DATA THEY'RE COMPLAINING

20   ABOUT BEING COLLECTED NOW WOULD BE COLLECTED.

21             THE COURT:  ALL RIGHT.

22        MR. BARNES, I'M GOING TO GIVE YOU AN OPPORTUNITY TO

23    RESPOND.

24             MR. BARNES:  YES, YOUR HONOR.

25        SO JAY BARNES ON BEHALF OF THE PLAINTIFFS FOR WHAT YOU

1    SAID EARLIER.

2         NUMBER ONE, MR. SCHAPIRO OFFERS A DEFINITION OF PERSONAL

3    INFORMATION THAT IS INCONSISTENT WITH HOW GOOGLE ITSELF DEFINES

4    IT AND INCONSISTENT WITH CALIFORNIA LAW.  IN THE SAME GOOGLE

5    CONTRACT, IN THE SYNC SECTION ON PAGE 6 OF THE CHROME PRIVACY

6    NOTICE, GOOGLE DEFINES PERSONAL INFORMATION TO INCLUDE BROWSING

7    HISTORY.

8         WE ALLEGE, IN PARAGRAPH 43, WE SET FORTH THE ELEMENTS OF

9    WHAT IS PERSONAL INFORMATION UNDER CALIFORNIA LAW, AND THEN WE

10    PROVIDED, IN PARAGRAPH 44 OF OUR COMPLAINT, HOW GOOGLE DEFINES

11    PERSONAL INFORMATION.

12         AND UNDER ALL OF THOSE DIFFERENT THINGS, THE FOUR TYPES OF

13    PERSONAL INFORMATION AT ISSUE HERE ARE BOTH STORED BY CHROME

14    AND SENT BY CHROME TO GOOGLE REGARDLESS OF WHETHER A USER HAS

15    SYNCED OR NOT.  THOSE FOUR FORMS ARE I.P. ADDRESS, COOKIE

16    IDENTIFIERS, THE X-CLIENT DATA IDENTIFIER, AND BROWSING

17    HISTORY.

18         GOOGLE CANNOT -- WHAT THEY WANT TO DO IS THEY WANT TO

19    DEFINE PERSONAL INFORMATION TO MEAN ONE THING HERE AND ANOTHER

20    THING HERE AND ANOTHER THING HERE AND ANOTHER THING HERE.

21         BUT GOOGLE HAS ITS OWN DEFINITION OF PERSONAL INFORMATION,

22    AND IT'S CONSISTENT WITH CALIFORNIA LAW.  CALIFORNIA LAW HAS

23    ITS OWN DEFINITION OF PERSONAL INFORMATION, AND GOOGLE CANNOT

24    REWRITE THE LAW AND THEY CAN'T MAKE A CONFUSION IN THIS

25    CONTRACT.

```
1          SO THAT GOES TO -- THAT ALSO GOES TO THE GOOD FAITH AND

2    FAIR DEALING CLAIM, YOUR HONOR, BECAUSE ONE ELEMENT OF THE GOOD

3    FAITH AND FAIR DEALING CLAIM IS A DEFENDANT'S ABUSE OF THE

4    POWER TO DEFINE TERMS.

5          MR. SCHAPIRO, IN HIS ARGUMENT, IS DEFINING PERSONAL

6    INFORMATION IN A WAY THAT'S INCONSISTENT WITH WHERE GOOGLE

7    DEFINES IT ELSEWHERE AND THAT IS ENTIRELY INCONSISTENT WITH

8    CALIFORNIA LAW.  IT CANNOT HAVE A SPECIALIZED MEANING WITHIN

9    THE CHROME CONTRACT AND SOME DIFFERENT MEANING SOMEWHERE ELSE.

10          THE SECOND ISSUE AS IT RELATES TO THE OTHER WEB BROWSERS

11   IS -- I HOPE YOUR HONOR APPRECIATES WHAT'S GOING ON IN THIS

12   CASE, RIGHT?  WE MENTIONED IT EARLIER.  GOOGLE OWNS THE BIGGEST

13   TRACKING COMPANY IN THE WORLD AND IT OWNS THE BIGGEST BROWSER,

14   AND IT PROMISES USERS OF THE BROWSER THAT IT GIVES THEM

15   CONTROLS ON HOW TO PROTECT THEIR PRIVACY.

16          AND YET AT THE SAME TIME, GOOGLE'S ADVERTISING ARM HAS

17   DEVELOPED AND DEPLOYED UNBLOCKABLE TECHNOLOGIES TO HACK AROUND

18   ANYTHING THAT USERS DO TO STOP ITS TRACKING.

19          THAT'S ONE OF THE PURPOSES OF CHROME.  GOOGLE DOESN'T

20   SHARE THAT WITH CONSUMERS, BUT GOOGLE WANTS CHROME TO BE ABLE

21   TO GIVE IT UNFETTERED ACCESS TO CONSUMER DATA BECAUSE IT KNOWS

22   IT WILL ALWAYS BE ABLE TO HACK AROUND THOSE PRIVACY SETTINGS.

23          IN OUR COMPLAINT, THE DETAILED ALLEGATIONS ABOUT THOSE

24   HACKS THAT GO BEYOND THE CONTRACT CLAIM ARE THE CREATION OF

25   COOKIE SYNCING TECHNOLOGIES, I BELIEVE THAT'S IN PARAGRAPH 69
```

1    TO 85, AND ALLEGATIONS ABOUT THE CREATION OF THE X-CLIENT DATA

2    IDENTIFIER, WHICH IS A TRACKER WHICH, COMBINED WITH I.P.

3    ADDRESS AND USER AGENT INFORMATION, CAN BE AS IDENTIFIABLE AS

4    ANY COOKIE.

5        AND THOSE ARE THINGS THAT -- SORRY, I -- I SORT OF

6    BROADENED THE QUESTION, YOUR HONOR, BUT THIS IS -- THIS IS

7    BIGGER THAN JUST THE BREACH OF CONTRACT.  THERE'S ALSO A GOOD

8    FAITH AND FAIR DEALING ISSUE HERE.

9        THE COURT:  I HAVE A QUESTION ABOUT THE WEBSITE'S

10    CONSENT.  SO PLAINTIFFS ARE ALLEGING THAT GOOGLE IS BREAKING

11    ITS PRIVACY PROMISE TO CHROME USERS WHO USE THESE THIRD PARTY

12    WEBSITES.  SO HOW CAN THIRD PARTY WEBSITES CONSENT TO GOOGLE'S

13    ALLEGED BREAKING OF ITS PRIVACY PROMISES TO CHROME USERS?

14        MR. BROOME:  SURE, YOUR HONOR.

15        STEPHEN BROOME.

16        I'M HAPPY TO ADDRESS THAT.

17        SO THE WEBSITE'S CONSENT COMES UP IN THE CONTEXT OF THE

18    UNAUTHORIZED DISCLOSURE CLAIMS.  YOU KNOW, OF COURSE CONSENT

19    TO EITHER OF THOSE CLAIMS UNDER THE WIRETAP ACT OR THE SCA, YOU

20    ONLY NEED THE CONSENT OF ONE PARTY, AND WE'VE ARGUED THAT

21    PLAINTIFFS CONSENTED.  WE'VE ALSO ARGUED THAT THE WEBSITES

22    CONSENTED.

23        I THINK IT'S UNDISPUTED THAT THE WEBSITES -- THAT WEBSITES

24    CHOOSE TO INSTALL GOOGLE'S CODE FOR THE PURPOSES -- FOR THE

25    VERY PURPOSE OF TRANSMITTING THE DATA TO GOOGLE, AND I THINK

1    THAT'S AT LEAST TACITLY ACKNOWLEDGED BY THE PLAINTIFFS.

2         AND THEIR ARGUMENT IS THEN, WELL, THE CONSENT WAS VITIATED

3    BY FRAUD OR MISTAKE.

4         WELL, RESPECTFULLY, PLAINTIFFS LACK STANDING TO ARGUE THAT

5    CONSENT GRANTED BY MILLIONS OF WEBSITES THAT USE GOOGLE'S

6    SERVICES WAS OBTAINED BY FRAUD OR MISTAKE.

7         WE WOULD ARGUE IT'S FACIALLY IMPLAUSIBLE, AND THERE'S

8    CERTAINLY NO WELL PLEADED ALLEGATIONS THAT GIVE RISE TO AN

9    INFERENCE THAT GOOGLE DEFRAUDED ALL OF ITS WEB SERVICES

10   CLIENTS.

11        AS FOR THE ARGUMENT THAT THE WEBSITES DID NOT CONSENT TO

12   GOOGLE BREAKING ITS EXPRESS PRIVACY PROMISES TO CHROME USERS, I

13   DON'T THINK THAT'S THE ISSUE UNDER THE WIRETAP ACT OR THE SCA.

14        THE ISSUE IS WHETHER THE WEBSITES CONSENTED TO SENDING

15   THAT DATA TO GOOGLE FOR THE PURPOSE, PURPOSES OF OBTAINING ITS

16   SERVICES, AND, AGAIN, I DON'T THINK THAT IS GENUINELY DISPUTED.

17        THAT'S THE PURPOSE OF INSTALLING THIS CODE ON THE WEBSITES

18   IS TO SEND THAT DATA TO GOOGLE, AND I DON'T THINK WE NEED TO

19   SHOW THAT THE WEBSITES CONSENTED IN THE SPECIFIC CIRCUMSTANCE

20   WHERE USERS ARE IN CHROME WITHOUT SYNC.  THAT CREATES A VERY

21   SORT OF NUANCED AND HYPERTECHNICAL APPROACH TO CONSENT WHICH I

22   DON'T THINK IS WORKABLE.

23             THE COURT:  ALL RIGHT.  THANK YOU.

24             MR. BROOME:  FOR --

25             THE COURT:  OH, GO AHEAD.

```
 1              MR. BROOME:  NO, SORRY.  I WAS GOING TO ADD ONE

 2      POINT.

 3              THE WEBSITES UNDERSTAND WHAT'S GOING ON, YOUR HONOR.

 4      WE'VE ATTACHED GOOGLE'S PUBLIC, PUBLICLY AVAILABLE SERVICE

 5      AGREEMENTS, WHICH ARE EXHIBITS 24 AND 25, AND THOSE AGREEMENTS

 6      EXPLAIN GOOGLE'S PRACTICES AND THEY ACTUALLY REQUIRE THE

 7      WEBSITES TO DISCLOSE GOOGLE'S PRACTICES.  THEY REQUIRE THE

 8      WEBSITES TO DISCLOSE TO THEIR OWN USERS IN THEIR -- IN THE

 9      WEBSITE'S OWN PRIVACY POLICY THAT THEIR DATA IS BEING SENT TO

10      GOOGLE.

11              AND THOSE, THOSE SERVICE AGREEMENTS, THEY DON'T CONTAIN

12      ANY CARVEOUTS FOR USERS DEPENDING ON, YOU KNOW, WHETHER THEY'RE

13      USING CHROME OR SOME OTHER BROWSER OR WHETHER THEY'RE USING

14      SYNC OR SOME OTHER MODE.  THAT'S JUST NOT HOW THEY WORK.

15              YOU KNOW, I THINK, AGAIN, CONSENT COMES DOWN TO, DID THE

16      WEBSITES CONSENT TO SENDING THIS DATA TO GOOGLE?

17              WELL, OF COURSE THEY DID.  THAT -- THEY WANT THE DATA TO

18      BE SENT TO GOOGLE SO THAT THEY CAN GET ANALYTICS -- ANALYTIC

19      SERVICES SO THAT THEY CAN UNDERSTAND WHAT'S HAPPENING ON THEIR

20      WEBSITES AND SO THAT THEY CAN SERVE THE ADS THAT PAY FOR THEIR

21      CONTENT.

22              THE COURT:  ALL RIGHT.  THANK YOU.

23      DO YOU WANT TO RESPOND, MR. BARNES?

24              MR. BARNES:  YES, YOUR HONOR.

25      JAY BARNES FOR THE PLAINTIFFS.
```

```
 1          FIRST, THE BURDEN -- OUR FIRST ARGUMENT ON THIS IS THE

 2     BURDEN IS ON GOOGLE TO PROVE WEBSITE CONSENT.  IN THE YAHOO!

 3     MAIL CASE, YOUR HONOR RULED, "AS THE PARTY SEEKING THE BENEFIT

 4     OF THE EXCEPTION, THE BURDEN IS ON YAHOO! TO PROVE IT OBTAINED

 5     CONSENT."

 6          SO WE DON'T HAVE TO PLEAD IT, YOUR HONOR, AND WE DIDN'T

 7     PLEAD IT WITH SPECIFICITY BECAUSE WE DON'T HAVE TO PLEAD IT.

 8          AND THE SECOND THING IS THAT IN PHARMATRAK, THE FIRST

 9     CIRCUIT EXPLAINED THAT THERE'S NOT ANY RULE UNDER THE ECPA THAT

10     A PERSON WHO USES THE SERVICE HAS AUTOMATICALLY CONSENTED TO

11     TRACKING THROUGH THE SERVICE.

12          HERE GOOGLE HAS NOT PROVIDED ANY EVIDENCE OF WEBSITE

13     CONSENT.  THE MERE FACT THAT THEY USE GOOGLE SERVICES IS NOT

14     ENOUGH.  GOOGLE HAS TO PRODUCE THE AGREEMENTS.

15          NOW, MR. BROOME REFERENCED EXHIBITS 24 AND 25.  THOSE

16     EXHIBITS WERE NOT PRESENTED TO THE COURT IN THIS CASE.  THEY

17     WERE PRESENTED TO THE COURT IN BROWN, THE RELATED CASE.

18          AND WE WERE SOMEWHAT DISAPPOINTED THAT WE DIDN'T GET THEM

19     IN THIS CASE BECAUSE WE THINK THOSE AGREEMENTS PROVE OUR POINT.

20     THEY DESTROY GOOGLE'S ARGUMENT THAT THE WEBSITES CONSENTED TO

21     THE CONDUCT.

22          NOW, WHY?  BECAUSE THERE'S ONE SENTENCE THAT I BELIEVE IS

23     IN THERE, IT'S -- AND AGAIN, WE'RE BEYOND THE COMPLAINT.  WE'RE

24     BEYOND WHAT WE HAVE TO DO.  BUT GOOGLE PROMISES WEBSITES THAT

25     IT WILL, QUOTE, "OBTAIN ALL RIGHTS NECESSARY TO PROVIDE SUCH
```

1    SERVICES UNDER THE AGREEMENT."

2         WELL, IF IT HASN'T OBTAINED CONSENT FROM CHROME USERS, IT

3    HAS NOT OBTAINED THE RIGHTS NECESSARY TO PROVIDE THE SERVICES

4    TO THE WEBSITE.

5         IT ALSO PROMISES THAT GOOGLE WILL, QUOTE, "ACT IN

6    COMPLIANCE WITH ALL APPLICABLE PRIVACY LAWS, RULES, AND

7    REGULATIONS, INCLUDING APPLICABLE INTERNET ADVERTISING INDUSTRY

8    GUIDELINES FROM THE N.A.I., THE INTERACTIVE ADVERTISING BUREAU,

9    AND THE DIGITAL ADVERTISING ALLIANCE."

10        THIS IS A SUBJECT FOR ANOTHER BRIEFING AT ANOTHER TIME,

11   BECAUSE THE BURDEN IS NOT ON THE PLAINTIFFS IN THE PLEADING

12   STAGE ON CONSENT.

13        BUT GOOGLE'S AGREEMENTS WITH THE WEBSITES DO NOT HELP ITS

14   CAUSE.  IT MAKES OUR -- THEY MAKE OUR POINT.

15        AND FINALLY, TO THE QUESTION YOUR HONOR ASKED MR. BROOME,

16   WE AGREE -- I HAVE THE HYPOTHETICAL QUESTION WRITTEN DOWN

17   HERE -- WHAT AUTHORITY DO THE WEBSITES HAVE TO AUTHORIZE A

18   REDIRECTION FROM MY BROWSER ON MY COMPUTER IN CONTRAVENTION OF

19   THE EXPRESS PROMISES OF THE ELECTRONIC COMMUNICATION SERVICE

20   PROVIDER THAT'S PROVIDING THE SERVICES?

21        I DON'T -- I DON'T KNOW WHAT AUTHORIZATION A WEBSITE COULD

22   HAVE, BECAUSE THE DATA DOES NOT FLOW FROM THE WEBSITE SERVER TO

23   GOOGLE.  IT IS REDIRECTED THROUGH THE USER'S INDIVIDUAL

24   COMPUTER, A COMPUTER AND THROUGH A SERVICE THAT GOOGLE PROMISES

25   PERSONAL INFORMATION WON'T BE SENT TO GOOGLE UNLESS THEY SYNC,

1    BUT NONETHELESS, GOOGLE DISCLOSES IT ANYWAY, OR CHROME

2    DISCLOSES IT TO GOOGLE ANYWAY.

3              MR. BROOME:  MAY I BE HEARD VERY BRIEFLY, YOUR HONOR?

4              THE COURT:  YES, VERY BRIEFLY.

5              MR. BROOME:  AGAIN, STEPHEN BROOME.

6         JUST TWO POINTS VERY QUICKLY, THREE POINTS.

7         ONE, I HAD THOUGHT WE HAD ATTACHED THOSE AGREEMENTS.

8    MR. BARNES MAY BE CORRECT THAT THAT WAS IN BROWN, AND IF SO, I

9    APOLOGIZE.  BUT I DON'T THINK YOU NEED, YOU NEED TO GET THERE

10   ANYWAY.

11        SECOND POINT IS IN TERMS OF WHOSE BURDEN IS IT AT THE

12   PLEADING STAGE, WELL, I THINK BECAUSE UNDER THE -- WE WERE

13   TALKING ABOUT THE WIRETAP ACT AND THE SCA, AND BOTH HAVE

14   STATUTORY EXCEPTIONS FOR CONSENT, THAT THE BURDEN IS INDEED ON

15   PLAINTIFFS.

16        AND THEY DID MAKE AN EFFORT TO PLEAD THAT THERE WAS LACK

17   OF CONSENT HERE.  THEY DID THAT BY ARGUING THAT THE CONSENT WAS

18   OBTAINED BY FRAUD OR MISTAKE.

19        BUT BECAUSE THOSE ARE -- CONSENT IS A STATUTORY EXCEPTION

20   UNDER BOTH STATUTES, WE THINK THEY NEED TO PLEAD PLAUSIBLY THAT

21   THE WEBSITES DID NOT CONSENT.

22        AND FINALLY, IN TERMS OF, YOU KNOW, IF IT WERE OTHERWISE,

23   IF IT WERE GOOGLE'S BURDEN TO PROVE THAT THE WEBSITES

24   CONSENTED, THAT'S AN IMPOSSIBLE BURDEN, I WOULD THINK, BECAUSE

25   WE'RE TALKING ABOUT, YOU KNOW, POTENTIALLY MILLIONS OF WEBSITES

1    AND GETTING INTO AN ANALYSIS OF, YOU KNOW, WHAT THEY UNDERSTOOD

2    AND WHAT THEY BELIEVED.

3         I THINK THAT WOULD BE VERY CHALLENGING AND I DON'T THINK

4    IT'S NECESSARY HERE BECAUSE IT'S SELF-EVIDENT, RIGHT?  THEIR

5    CONSENT IS SELF-EVIDENT BECAUSE THEY HAVE CHOSEN TO INSTALL

6    THIS CODE FOR THE PURPOSE OF SENDING THIS DATA TO GOOGLE SO

7    THAT THEY CAN OBTAIN THE SERVICES.

8         THE COURT:  LET ME ASK YOU, YOU'VE RAISED THE

9    STANDING ARGUMENT, THAT PLAINTIFFS LACK STANDING TO, YOU KNOW,

10   MAKE ARGUMENTS THAT ONLY THE WEBSITES HAVE AN ARGUMENT TO MAKE.

11        WHY DO PLAINTIFFS HAVE TO HAVE STANDING TO MAKE THESE

12   ARGUMENTS?

13        MR. BROOME:  I --

14        THE COURT:  THEY MAKE THE CLAIM.  SO GO AHEAD,

15   PLEASE.

16        MR. BROOME:  WELL, TO MAKE THE ARGUMENT THAT THE

17   WEBSITES WERE DEFRAUDED OR WERE OPERATING UNDER MISTAKE OF

18   FACT, RIGHT, I THINK THEIR POINT IS THAT THE WEBSITES DIDN'T

19   KNOW THAT GOOGLE WAS GOING TO BE SENDING THIS DATA FOR CHROME

20   USERS WHO ARE IN BASIC MODE, RIGHT?  CHROME WITHOUT SYNC.

21        THAT -- FIRST OF ALL, I DON'T THINK THAT'S PLAUSIBLE,

22   RIGHT?  CHROME IS ONE OF THE MOST COMMONLY USED BROWSERS, AND

23   IT'S NOT PLAUSIBLE TO THINK THAT WEBSITES UNDERSTOOD THAT, THAT

24   GOOGLE'S SERVICES THAT THESE WEBSITES ARE CONTRACTING FOR, THE

25   ANALYTICS AND AD SERVICES, ARE NOT GOING TO WORK FOR THE

```
 1      MILLIONS OF PEOPLE WHO USE THE CHROME BROWSER WITHOUT ENABLING

 2      ANY PRIVACY SETTINGS, WITHOUT ENABLING SYNC.  JUST LITERALLY

 3      USING CHROME RIGHT OUT OF THE BOX, IT'S NOT PLAUSIBLE TO

 4      BELIEVE THE WEBSITES THOUGHT THAT THEY WEREN'T GOING TO BE ABLE

 5      TO SERVE ADS TO THOSE PEOPLE OR ANALYZE THEIR INTERACTIONS WITH

 6      THEIR WEBSITE.

 7           BUT CERTAINLY TO -- COMING BACK TO THE STANDING POINT,

 8      THEY WOULD NEED TO, YOU KNOW -- FOR EXAMPLE, FOR FRAUD, THEY

 9      WOULD NEED TO PLAUSIBLY ALLEGE THAT THESE WEBSITES WERE

10      DEFRAUDED, AND I DON'T THINK PLAINTIFFS CAN COME IN AND SAY

11      THAT ALL OF THE MILLIONS OF WEBSITES THAT USE GOOGLE'S SERVICES

12      HAVE BEEN DEFRAUDED.

13             THE COURT:  LET ME ASK YOU, WITH YOUR WEBSITES

14      CONSENT ARGUMENT, YOU RELY ON TWO 20 YEAR OLD CASES, ONE A

15      DISTRICT COURT IN WASHINGTON AND ANOTHER DISTRICT COURT IN

16      NEW YORK.

17           OBVIOUSLY THE TECHNOLOGY HAS DEVELOPED AND THE CASE LAW

18      HAS REALLY DEVELOPED IN THE LAST 20 YEARS.  DO YOU HAVE

19      ANYTHING MORE RECENT TO SUPPORT YOUR CONSENT ARGUMENT, OTHER

20      THAN CHANCE VERSUS AVENUE A AND IN RE: DOUBLECLICK PRIVACY

21      LITIGATION?

22             MR. BROOME:  I -- YOU KNOW, NOTHING BEYOND -- I

23      DON'T -- STANDING HERE TODAY, I DON'T THINK I COULD CITE AN

24      ADDITIONAL CASE THAT'S NOT CITED IN OUR BRIEFS, YOUR HONOR.

25             THE COURT:  OKAY.
```

```
 1            MR. BROOME:  BUT I WOULD SUBMIT THAT THIS DOESN'T

 2     COME UP VERY OFTEN BECAUSE, AGAIN, I THINK IT'S SELF-EVIDENT

 3     THAT WHEN WEBSITES CHOOSE TO INSTALL CODE FOR THE PURPOSE OF

 4     SENDING THE DATA TO GOOGLE, THEY'VE CONSENTED TO THAT

 5     TRANSMISSION.

 6            THE COURT:  LET ME ASK THE PLAINTIFFS IF YOU WANTED

 7     TO ADD ANYTHING ON THE SORT OF IN RE: DOUBLECLICK PRIVACY

 8     LITIGATION AND CHANCE VERSUS AVENUE A.

 9            MR. BARNES:  I DO.

10            FIRST, YOUR HONOR, THE GOOGLE PRIVACY POLICY IS NOT THE

11     DECLARATION OF INDEPENDENCE.  IT IS -- THESE DOCUMENTS ARE

12     ANYTHING BUT SELF-EVIDENT.

13            AS FAR AS DOUBLECLICK AND AVENUE A, YOUR HONOR IS RIGHT,

14     THE LAW HAS DEVELOPED A LOT IN 20 YEARS.

15            IN PHARMATRAK, THE FIRST CIRCUIT REJECTED THE LOGIC THAT

16     GOOGLE IS PRESSING HERE, WHICH IS JUST, HEY, IF YOU USE ANY OF

17     THESE SERVICES, YOU CONSENTED TO WHATEVER HAPPENED.  AND

18     PHARMATRAK HAS A REALLY GOOD DISCUSSION ABOUT HOW ABSURD THAT

19     LOGIC IS BECAUSE IT WOULD ALLOW A COMPANY LIKE GOOGLE TO MAKE

20     PROMISES FOR THE PURPOSES OF INDUCING PEOPLE TO USE ITS

21     SERVICES AND THEN BREAK THOSE PROMISES AND SAY, HEY, YOU'RE ON

22     THE INTERNET, ALL'S FAIR ON THE INTERNET, WHICH IS ESSENTIALLY

23     WHAT GOOGLE'S ARGUMENT HERE IS, THAT IF A WEBSITE USES THE

24     INTERNET AND TOOLS, THEY CONSENT TO WHATEVER GOOGLE DOES WITH

25     THE MATERIAL.
```

1           BUT, AGAIN, YOUR HONOR -- AND I THINK THIS IS A SUBJECT

2     FOR LATER BRIEFING -- WE THINK THE CONTRACTS WITH THE WEBSITES

3     EXPRESSLY PROMISE THAT GOOGLE WON'T ENGAGE IN THIS BEHAVIOR.

4     SO --

5           MR. STRAITE:  YOUR HONOR, MAY I ALSO JUMP IN?

6     THIS IS DAVID STRAITE FOR PLAINTIFFS.

7           YOU ASKED THE QUESTION ABOUT DOUBLECLICK IN PARTICULAR AND

8     IS THERE SOMETHING MORE RECENT.

9           YOU KNOW, THE STATEMENT WAS MADE BY MR. BROOME THAT THIS

10    DOESN'T COME UP THAT OFTEN.

11          BUT IT HAS COME UP MORE FREQUENTLY MORE RECENTLY.  SO, FOR

12    EXAMPLE, IN THE THIRD CIRCUIT'S DECISION IN GOOGLE COOKIE

13    PLACEMENT, WHICH INVOLVED A VERY SIMILAR IF NOT THE SAME SET OF

14    DISCLOSURES FROM THE SAME DEFENDANT, GOOGLE, GOOGLE RAISED

15    DOUBLECLICK IN ITS BRIEFING AND SAID, HEY, THIS HAS ALREADY

16    BEEN RESOLVED BACK 20 YEARS AGO IN NEW YORK.

17          AND THE THIRD CIRCUIT SAID, NO, EVEN THOUGH YOU HAVE

18    GENERAL DISCLOSURES OF THE DATA COLLECTION, EVEN THOUGH THERE

19    ARE THESE MILLIONS OF WEBSITES, YOU DID SAY THAT YOU WOULD

20    RESPECT CERTAIN THIRD PARTY COOKIE BLOCKERS AND YOU DIDN'T, AND

21    THAT STATEMENT OVERRIDES THE GENERAL DISCLOSURE OF DATA

22    COLLECTION.

23          SO DOUBLECLICK WAS ADDRESSED BY THE THIRD CIRCUIT APPLYING

24    CALIFORNIA LAW AGAINST THE SAME DEFENDANT.  SAME ISSUE --

25          MR. BARNES:  AND YOUR HONOR, IF I COULD JUMP IN, THE

```
 1        OTHER CASE IS --
 2                THE COURT:  STATE YOUR NAME JUST FOR THE RECORD.
 3                MR. BARNES:  JAY BARNES ON BEHALF OF THE PLAINTIFFS.
 4        THE OTHER CASE IS THE FACEBOOK INTERNET TRACKING CASE --
 5                MR. STRAITE:  IT'S THE SAME THING, YOUR HONOR.
 6                MR. BARNES:  -- WHICH IS ENTIRELY INCONSISTENT WITH
 7        THE ARGUMENT GOOGLE IS MAKING HERE.
 8            AND I THINK IT WOULD BE INSTRUCTIVE FOR THE COURT TO
 9        COMPARE THE PROMISES AT ISSUE IN THOSE CASES WITH THE PROMISES
10        HERE.
11            SO IN FACEBOOK INTERNET, FACEBOOK HAD A PRIVACY POLICY
12        THAT DISCLOSED THAT IT RECEIVED INFORMATION WHEN USERS WERE
13        OUTSIDE OF FACEBOOK.  THIS IS ON PAGE 601 OF THE OPINION.
14        FACEBOOK'S PRIVACY POLICY DISCLOSED, "WE RECEIVE DATA WHENEVER
15        YOU VISIT A GAME, APP, OR WEBSITE THAT USES OUR SERVICES."
16        THEN IT SAYS, "THIS MAY INCLUDE THE DATE AND TIME YOU VISIT THE
17        SITE, THE URL YOU'RE ON, TECHNICAL INFORMATION ABOUT I.P.
18        ADDRESS, BROWSER, AND OPERATING SYSTEM YOU USE, AND, IF YOU ARE
19        LOGGED INTO FACEBOOK, YOUR USER I.D."
20            AND THEN LATER, IN THE HELP CENTER, FACEBOOK SAID, "IF YOU
21        LOG OUT OF FACEBOOK, WE WILL NOT RECEIVE THIS INFORMATION ABOUT
22        PARTNER WEBSITES," MEANING USER I.D.
23            FACEBOOK HAD A PRIVACY POLICY THAT BROADLY DISCLOSED DATA
24        COLLECTION, AND THE NINTH CIRCUIT IN FACEBOOK INTERNET SAID
25        THAT'S NOT ENOUGH BECAUSE YOU MADE THESE SPECIFIC PROMISES.
```

1           AND, YOUR HONOR, EVEN IN THE PRIVACY POLICY HERE, THERE

2    ARE DIRECT COROLLARIES.  FIRST, IN FACEBOOK INTERNET, THERE WAS

3    NO CONTRACT CLAIM.  THERE WERE NO CONTRACTUAL PROMISES.  THE

4    NINTH CIRCUIT KICKED THE CONTRACT CLAIM OUT.

5           HERE, THERE'S A CONTRACT CLAIM AND THERE'S A CLEAR PROMISE

6    IN THE CONTRACT.

7           IN ADDITION TO THAT, IN THE PRIVACY POLICY ON PAGE 3 THAT

8    THEY RELY ON -- THIS IS THEIR BEST EVIDENCE -- BUT THEIR BEST

9    EVIDENCE IS DEVASTATING FOR THEM.  IT KILLS THEIR DEFENSE

10    BECAUSE THE SENTENCE THEY RELY UPON IN THE PRIVACY POLICY SAYS,

11    "WE COLLECT INFORMATION ABOUT YOUR ACTIVITY AND OUR SERVICES."

12           THAT'S A DIRECT COROLLARY TO FACEBOOK'S STATEMENT, "WE

13    RECEIVE DATA WHEN YOU VISIT A GAME, APP, OR WEBSITE THAT USES

14    OUR SERVICES."

15           IT SAYS THEN, GOOGLE'S POLICY SAYS, "ACTIVITY ON THIRD

16    PARTY SITES AND APPS THAT USE OUR SERVICES AND CHROME BROWSING

17    HISTORY YOU'VE SYNCED WITH YOUR GOOGLE ACCOUNT."

18           COMPARE THAT TO THE FACEBOOK PROMISE.  "AND, IF YOU'RE

19    LOGGED INTO FACEBOOK, YOUR USER I.D."

20           THE SPECIFIC SUBORDINATES THE GENERAL.  AND THE SPECIFIC

21    PROMISE IN FACEBOOK INTERNET SUBORDINATED ANY GENERAL

22    DISCLOSURES FACEBOOK HAD MADE.

23           THE SAME THING IS TRUE HERE.  THE SPECIFIC PROMISES IN THE

24    CONTRACT GOVERN.

25           AND THERE'S AN INTERESTING QUESTION ABOUT EVEN IF GOOGLE

1    HAD DISCLOSED IT ADEQUATELY IN THE PRIVACY POLICY, WHETHER THAT

2    COULD OVERCOME THE PRIVACY -- THE CONTRACT PROMISES.

3        BUT WHAT WE'RE SAYING IS -- AND WE THINK THE RIGHT ANSWER

4    TO THAT IS NO, THE CONTRACT PROMISES TAKE PRECEDENCE BECAUSE

5    THAT'S WHAT THE CONTRACT SAYS.

6        BUT WHAT WE'RE ALSO SAYING IS IT DOESN'T MATTER BECAUSE

7    THE PRIVACY POLICY IS ENTIRELY CONSISTENT WITH WHAT THE NINTH

8    CIRCUIT FOUND ACTIONABLE IN THE FACEBOOK INTERNET CASE.

9        AND THEN THERE'S THE GOOGLE COOKIE DECISION, YOUR HONOR,

10   WHERE IN GOOGLE COOKIE, WHICH WAS A CASE IN 2015 THAT HAS

11   TREMENDOUS OVERLAP WITH THE COOKIE SYNCING ALLEGATIONS HERE,

12   BUT IN THAT CASE, GOOGLE ALSO HAD A PRIVACY POLICY THAT BROADLY

13   DISCLOSED TRACKING BEHAVIOR ACROSS THE INTERNET IN MUCH THE

14   SAME WAY THAT GOOGLE WOULD POINT TO NOW.

15       BUT IT HAD ONE NON-CONTRACTUAL PROMISE ON A HELP CENTER

16   PAGE, WHICH WAS THAT SAFARI IS SET BY DEFAULT TO BLOCK THIRD

17   PARTY COOKIES.  IF YOU'VE NOT CHANGED THOSE SETTINGS, THIS

18   OPTION ESSENTIALLY ACCOMPLISHES THE SAME THING AS SETTING THE

19   OPT OUT COOKIE.

20       THERE'S A DIRECT COROLLARY HERE, YOUR HONOR.  IN THE

21   CONTRACT, GOOGLE PROMISES SYNC IS ONLY ENABLED IF YOU CHOOSE.

22       THAT'S NOT TRUE, AND IT'S A DIRECT COROLLARY TO GOOGLE

23   COOKIE.

24       AND THEN FINALLY, YOUR HONOR, A GOOD CASE FOR THE COURT TO

25   LOOK AT IS THE NICKELODEON CASE FROM THE THIRD CIRCUIT.  AND,

1  AGAIN, JUST LIKE FACEBOOK INTERNET, JUST LIKE GOOGLE COOKIE,

2  NICKELODEON HAD A PRIVACY POLICY THAT MADE BROAD DISCLOSURES

3  THAT SAID, WE MAY COLLECT INFORMATION WHEN, WE MAY DO THIS, WE

4  MAY DO THAT.

5       BUT IT HAD A NON-CONTRACTUAL PROMISE THAT SAID, HEY

6  GROWNUPS, WE DON'T COLLECT ANY PERSONAL INFORMATION ABOUT YOUR

7  KIDS, WHICH MEANS WE COULDN'T SHARE IT EVEN IF WE WANTED TO.

8       THE COROLLARY HERE IS GOOGLE'S PROMISE, YOU DON'T NEED TO

9  PROVIDE ANY PERSONAL INFORMATION TO USE CHROME.  EVEN THOUGH

10  NICKELODEON HAD OTHER PROMISES THAT IT MADE, THOSE -- OR OTHER

11  DISCLOSURES THAT IT HAD MADE, THE SPECIFIC SUBORDINATED THE

12  GENERAL.

13       WHEN A WEBSITE OR A MASSIVE DATA COMPANY LIKE THIS MAKES A

14  SPECIFIC PRIVACY PROMISE AND THEY BREAK IT, THEY CAN BE HELD

15  ACCOUNTABLE.  THERE IS NO CONSENT WHEN THAT HAPPENS.

16            MR. BROOME:  YOUR HONOR, COULD I BRIEFLY RESPOND, IF

17  I MAY?

18            THE COURT:  YES.  STATE YOUR NAME FIRST.

19            MR. SCHAPIRO:  I -- SORRY.

20            MR. BROOME:  YEAH, STEPHEN BROOME.

21       SORRY, ANDREW, JUST LET ME --

22       I THOUGHT WE WERE ADDRESSING WEBSITE CONSENT, AND WE SEEM

23  TO HAVE SORT OF STRAYED OFF COURSE BECAUSE THE TWO CASES THAT

24  MR. BARNES WAS JUST DISCUSSING, GOOGLE COOKIE AND FACEBOOK, DO

25  NOT ADDRESS THE ISSUE OF WEBSITE CONSENT.

```
 1              IN FACEBOOK, THE QUESTION WAS WHETHER FACEBOOK WAS AN

 2     INTENDED RECIPIENT OF REDIRECTED GET REQUESTS SUCH THAT IT WAS

 3     A PARTY TO THE COMMUNICATIONS AND THEREFORE HAD AUTHORITY TO

 4     CONSENT ITSELF.

 5              THAT'S NOT WHAT WE'RE ARGUING HERE TODAY.  WE'RE ARGUING

 6     THAT THE WEBSITES CONSENTED, AND THAT'S A SEPARATE STATUTORY

 7     PROVISION.

 8              AND THAT WAS ALSO TRUE IN GOOGLE COOKIE.  AGAIN, THE ISSUE

 9     OF WEBSITE CONSENT WAS NOT ADDRESSED.

10              AND JUST VERY BRIEFLY ON PHARMATRAK, THAT'S A DIFFERENT

11     CASE BECAUSE THERE THE ALLEGATION -- SORRY.  THERE THE THIRD

12     PARTY -- THE ENTITY THAT WAS COLLECTING THE DATA, THE WEBSITES

13     HAD SPECIFICALLY INSISTED THAT THERE BE NO COLLECTION OF

14     PERSONALIZED -- OF PERSONAL DATA.

15              THAT'S OBVIOUSLY DIFFERENT HERE WHERE THE WEBSITES ARE

16     CONTRACTING WITH GOOGLE.  THEY'RE CONTRACTING WITH GOOGLE SO

17     THAT GOOGLE CAN ANALYZE THEIR DATA.

18              SO, AGAIN, VERY DIFFERENT, DISTINGUISHABLE CASES.

19              THE COURT:  CAN I ASK YOU ABOUT DOUBLECLICK?  IN

20     DOUBLECLICK, THE DEFENDANT COMPANIES PURCHASED DOUBLECLICK FOR

21     THE EXPLICIT PURPOSE OF GATHERING USER INFORMATION FOR

22     ADVERTISING PURPOSES.

23              HOW IS INSTALLING GOOGLE'S CODE SIMILAR?

24              MR. BROOME:  WELL, IT'S -- I THINK IT'S EXACTLY THE

25     SAME, YOUR HONOR.  I MEAN, THEY ARE CONTRACTING WITH GOOGLE FOR
```

```
1    GOOGLE TO DO TWO THINGS:  ONE, IN ANALYTICS, TO ANALYZE WEBSITE

2    UTILIZATION, AND THAT DATA THAT GOOGLE GETS IS BEING STORED ON

3    THE WEBSITE'S BEHALF.  THEY -- THE WEBSITES INSTALL THE CODE TO

4    ACCOMPLISH THAT OBJECTIVE.

5         IT'S A VERY SIMILAR PROCESS FOR GOOGLE ADS.  THE WEBSITES

6    WANT TO BE ABLE TO SERVE ADS SO THAT THEY -- YOU KNOW, ADS THAT

7    PAY FOR CONTENT ON THEIR SITE, AND THEY CONTRACT WITH GOOGLE

8    TO, TO ANALYZE THE DATA AND SERVE THE ADS ON THEIR SITE.  THEY

9    INSTALL THE CODE TO ACCOMPLISH THAT OBJECTIVE.

10        SO I THINK IT'S PERFECTLY IN LINE WITH DOUBLECLICK.

11             MR. SCHAPIRO:  AND, YOUR HONOR, ANDREW SCHAPIRO.

12        I DON'T WANT TO DERAIL THINGS, BUT TO THE EXTENT THAT

13   MR. BARNES WAS SPEAKING MORE GENERALLY AND NOT JUST ABOUT

14   WEBSITE CONSENT -- I HEARD HIM TO BE TALKING ABOUT THEIR

15   ALLEGATIONS MORE BROADLY -- I JUST FELT COMPELLED TO ANSWER

16   BECAUSE THE FACEBOOK CASE THAT MOST CLOSELY TRACKS THIS ONE IS

17   NOT THE FACEBOOK INTERNET TRACKING CASE.  IT'S THE SMITH VERSUS

18   FACEBOOK CASE FROM THE NINTH CIRCUIT FROM 2018.

19        AND IN THAT CASE, THE NINTH CIRCUIT -- IN THAT CASE, THE

20   DISCLOSURES AT ISSUE WERE FACEBOOK'S TERMS AND POLICIES STATING

21   IN NUMEROUS WAYS, "WE COLLECT INFORMATION WHEN YOU VISIT OR USE

22   THIRD PARTY WEBSITES AND APPS THAT USE OUR SERVICES.  THIS

23   INCLUDES INFORMATION ABOUT THE WEBSITES AND APPS YOU VISIT," ET

24   CETERA, ET CETERA.

25        AND THE COURT CONCLUDED A REASONABLE PERSON VIEWING THOSE
```

1    DISCLOSURES WOULD UNDERSTAND THAT FACEBOOK MAINTAINS THE

2    PRACTICES OF, A, COLLECTING ITS USERS' DATA FROM THIRD PARTY

3    SITES; AND, B, LATER USING DATA FOR ADVERTISING PURPOSES.

4        IN THE FACEBOOK INTERNET CASE, FACEBOOK EXPRESSLY SAID, IF

5    YOU LOG OUT, WE WON'T DO THIS, AND THE ALLEGATION WAS, WELL,

6    YOU BROKE THAT EXPRESS, THAT EXPRESS PROMISE.

7        AND WHAT'S HAPPENING HERE IS THAT EACH TIME THE PLAINTIFFS

8    RUN INTO A DIFFICULTY WITH THE CASE, THEY FALL BACK ON THESE

9    TWO SENTENCES THAT THEY SAY WERE A PROMISE OR A

10   MISREPRESENTATION THAT WAS BROKEN.

11       THERE IS NOTHING EQUIVALENT TO THE FACEBOOK "IF YOU ARE

12   LOGGED OUT, WE WON'T TRACK YOU" CLAIM IN THIS CASE.  AS MANY

13   TIMES AS THEY SAY IT IS, FOR THE REASONS I MENTIONED EARLIER,

14   THAT THE STATEMENT ABOUT NOT HAVING TO PROVIDE PERSONAL

15   INFORMATION TO USE CHROME CANNOT PLAUSIBLY BE UNDERSTOOD TO

16   MEAN THAT USING CHROME IN ITS BASIC BROWSER MODE SOMEHOW GIVES

17   YOU -- THAT CHROME ITSELF IS A PRIVACY TOOL.

18       AND THE ARGUMENT ABOUT SYNCING ENTIRELY MISUNDERSTANDS

19   WHAT SYNCING IS AND WHAT THE DATA FLOW IS AT ISSUE HERE.

20       SYNCING IS SIMPLY A WAY THAT A PERSON CAN MOVE PASSWORDS,

21   BOOKMARKS, AUTO FILL INFORMATION FROM ONE DEVICE TO ANOTHER.

22   SO IF I HAVE BOOKMARKS UP ON MY COMPUTER HERE AT WORK AND I ADD

23   ONE WHEN I GO HOME, IF I CHOOSE TO SYNC, THAT INFORMATION --

24   THOSE BOOKMARKS ARE ALSO ON MY LAPTOP AT HOME OR ON MY PHONE.

25       BUT THE STATEMENT -- THE STATEMENTS TO WHICH THE

51

```
1    PLAINTIFFS ARE POINTING IN THE CHROME PRIVACY NOTICE, CHROME

2    STORES -- THAT "DATA THAT CHROME STORES WON'T BE SENT TO GOOGLE

3    UNLESS YOU CHOOSE TO STORE THAT DATA IN YOUR GOOGLE ACCOUNT BY

4    TURNING ON SYNC" CLEARLY REFERS TO THE PERSONAL INFORMATION

5    THAT CHROME STORES, THE INFORMATION THAT CHROME STORES.

6        THIS IS NOT THE INFORMATION THAT CHROME STORES.  IT MAY BE

7    THAT IN SOME INSTANCES THERE'S A SIMILAR DATA FLOW, AND SO

8    SOMETIMES INFORMATION THAT CHROME MIGHT STORE OVERLAPS WITH

9    INFORMATION WHEN YOU VISIT A WEBSITE.

10       BUT IT IS NOT THE INFORMATION THAT CHROME STORES, AND THAT

11   IS A CRUCIAL DISTINCTION IN THIS CASE THAT SHOULD NOT BE

12   BLURRED.  AND IT'S WHY THIS CASE IS FACEBOOK -- IS SMITH VERSUS

13   FACEBOOK, NOT FACEBOOK INTERNET TRACKING.

14       THE COURT:  SO YOU MENTIONED PERSONAL INFORMATION.

15   GOOGLE DEFINES PERSONAL INFORMATION AS -- AND I'M JUST GOING TO

16   QUOTE IT -- "INFORMATION THAT YOU PROVIDE TO US WHICH

17   PERSONALLY IDENTIFIES YOU, OR OTHER DATA THAT CAN REASONABLY BE

18   LINKED TO SUCH INFORMATION BY GOOGLE, SUCH AS INFORMATION WE

19   ASSOCIATE WITH YOUR GOOGLE ACCOUNT," END QUOTE.

20       SO DO YOU CONCEDE THAT I.P. ADDRESSES LINKED TO USER

21   AGENTS, UNIQUE COOKIE IDENTIFIERS, UNIQUE BROWSER IDENTIFIERS,

22   AND BROWSING HISTORY WOULD FALL IN THIS DEFINITION OF PERSONAL

23   INFORMATION?

24       MR. SCHAPIRO:  FOR THE PURPOSES AT LEAST OF THIS

25   ARGUMENT, OR THIS MOTION, YES, WE WON'T CONTEST -- I MEAN,
```

1    THERE ARE SOME MORE SPECIFICS TO IT.

2        BUT WE'RE NOT -- OUR DEFENSE -- AND THE REASON THE

3    COMPLAINT FAILS -- IS NOT BECAUSE THERE'S SOME UNBRIDGEABLE GAP

4    ABOUT WHAT IS OR ISN'T PERSONAL INFORMATION.  I MEAN, GOOGLE'S

5    POSITION IS THAT COOKIES, FOR EXAMPLE, OR INDIVIDUAL URL'S THAT

6    YOU MIGHT HAVE ON YOUR COMPUTER OR THAT MIGHT BE DISCERNIBLE,

7    THAT UNLESS THEY ARE SOMETHING THAT CAN BE LINKED TO YOU, FOR

8    EXAMPLE, IF YOU ARE SYNCED OR IF YOU ARE LOGGED INTO YOUR

9    ACCOUNT, IN GENERAL, THOSE MIGHT NOT BE.  BUT WE TREAT THEM --

10   WE TREAT IT AS PERSONALLY IDENTIFIABLE INFORMATION IF YOU'RE --

11   IF IT'S LINKABLE IN THAT WAY.

12       SO OUR DEFENSE DOESN'T RISE OR FALL, AND THE COMPLAINT

13   DOESN'T SURVIVE, REGARDLESS OF HOW BROAD OR NARROW THAT

14   DEFINITION OF PERSONAL INFORMATION IS.

15           THE COURT:  ALL RIGHT.  I UNDERSTAND THAT YOUR

16   DEFENSES DON'T RELY ON IT, BUT YOU CONCEDE THAT IT DOES FALL

17   WITHIN THE DEFINITION OF PERSONAL INFORMATION AS DEFINED BY

18   GOOGLE.  IS THAT RIGHT?  THAT'S A YES?

19           MR. SCHAPIRO:  YES.

20           MR. BROOME:  CAN I MAKE ONE POINT OF CLARIFICATION,

21   YOUR HONOR?

22           THE COURT:  I HAVE ONE LAST QUESTION FOR THE

23   DEFENDANTS, AND THEN I HAVE A FEW LAST QUESTIONS FOR PLAINTIFFS

24   AND I WAS HOPING TO WRAP THIS UP.

25           BUT, OKAY, IF YOU CAN KEEP IT EXTREMELY BRIEF.

```
1              MR. BROOME:  YES.  I THINK JUST -- SORT OF

2    MR. SCHAPIRO CUT OUT THERE FOR A SECOND, AT LEAST IN MY HEADSET

3    I COULDN'T HEAR EVERYTHING, BUT I JUST WANT TO MAKE ONE POINT

4    CLEAR, WHICH IS THAT INFORMATION -- THE GOOGLE PRIVACY POLICY

5    DESCRIBES THAT INFORMATION THAT DOES NOT NECESSARILY PERSONALLY

6    IDENTIFY YOU, BUT THE CATEGORIES OF INFORMATION THAT ARE

7    ALLEGED IN THE COMPLAINT, I.P. ADDRESS PLUS USER AGENT,

8    COOKIES, THAT SORT OF THING, IF THAT IS SENT TO GOOGLE'S

9    SERVERS AND STORED ALONG WITH INFORMATION THAT PERSONALLY

10   IDENTIFIES YOU, SUCH AS, LIKE, IF IT'S STORED IN YOUR GOOGLE

11   ACCOUNT, WHICH IS THE CASE WITH SYNC, YES, GOOGLE WILL TREAT

12   THAT INFORMATION AS PERSONAL INFORMATION BECAUSE IT IS, INDEED,

13   LINKED TO INFORMATION THAT PERSONALLY IDENTIFIES YOU.

14        ON THE OTHER HAND, IF YOU'RE TALKING ABOUT CHROME WITHOUT

15   SYNC, JUST CHROME BASIC, IN BASIC MODE, AND THE INFORMATION,

16   THAT SORT OF INFORMATION IS NOT LINKED TO YOUR GOOGLE ACCOUNT,

17   THEN, NO, IT WOULD NOT BE PERSONAL INFORMATION.

18        AND THAT'S -- AND THAT'S THE SITUATION THAT WE'RE TALKING

19   ABOUT HERE.  WE'RE TALKING ABOUT CHROME WITHOUT SYNC.

20              THE COURT:  SO YOU WANT TO ARGUE NOW THAT AN I.P.

21   ADDRESS LINKED TO USER AGENTS IS NOT PERSONAL INFORMATION?

22              MR. BROOME:  NOT IF IT'S NOT LINKED TO PERSONALLY

23   IDENTIFIABLE INFORMATION THAT GOOGLE HAS, THAT IS STORED IN

24   THEIR ACCOUNT.

25              MR. STRAITE:  YOUR HONOR, THIS IS DAVID STRAITE FOR
```

1       PLAINTIFFS.

2              I WOULD JUST LIKE TO POINT OUT THAT AS OF JANUARY 1ST OF

3       LAST YEAR, UNDER CALIFORNIA LAW, THE EFFECTIVE DATE OF THE

4       CCPA, I.P. ADDRESSES ARE PERSONAL INFORMATION AS A MATTER OF

5       CALIFORNIA LAW, REGARDLESS OF WHAT GOOGLE THINKS.

6              MR. BROOME:  I'M SORRY, THAT'S NOT CORRECT.  IF IT'S

7       REASONABLY LINKED TO AN INDIVIDUAL.

8              MR. STRAITE:  REASONABLY CAN BE LINKED.

9              THE COURT:  YOU'RE SAYING GOOGLE CANNOT LINK AN I.P.

10      ADDRESS TO AN INDIVIDUAL?

11             MR. BROOME:  IT CAN UNDER CERTAIN CIRCUMSTANCES.

12      NOT -- IT DOES NOT IN THE CIRCUMSTANCES ALLEGED HERE.

13             THE COURT:  DO YOU WANT TO RESPOND TO THAT?

14             MR. STRAITE:  THIS IS SOMETHING, YOUR HONOR, WE'D BE

15      INTERESTED IN EXPLORING IN DISCOVERY.  BUT AS THE COMPLAINT

16      ALLEGES, THE I.P. ADDRESSES LINKED TO USER AGENT, THEY ARE

17      PERSONAL INFORMATION.  THIS SOUNDS LIKE A FACTUAL DEFENSE.

18             MR. BARNES:  AND ONE THAT IS WRONG, YOUR HONOR.

19             THE COURT:  DO YOU WANT TO ELABORATE?

20             MR. BARNES:  JAY BARNES ON BEHALF OF PLAINTIFFS.

21             YOUR HONOR, YES, GOOGLE ASSOCIATES I.P. ADDRESSES WITH

22      INDIVIDUAL INTERNET USERS.  IF AN INDIVIDUAL INTERNET USER WERE

23      SIGNED INTO A GMAIL ACCOUNT, FOR EXAMPLE, THEY HAVE AN I.P.

24      ADDRESS PLUS A USER AGENT, THEY LATER ARE IN A BROWSER, BASIC

25      BROWSER MODE, IT'S GOING TO BE THE SAME I.P. ADDRESS AND USER

1    AGENT AS IT WAS BEFORE.

2         NOW GOOGLE HAS ALSO CREATED THIS X-CLIENT DATA IDENTIFIER

3    THAT IS -- PROVIDES EVEN MORE -- MAKES IT EVEN MORE PERSONALLY

4    IDENTIFIABLE BECAUSE IT IS SOMETHING THAT IS UNIQUE TO THE

5    BROWSER THAT IS DISCHARGED OR DISCLOSED TO GOOGLE NO MATTER

6    WHETHER THE PLAINTIFF, OR WHETHER A PERSON HAS BLOCKED,

7    ATTEMPTED TO BLOCK OFF COOKIES, WHETHER THEY'RE SYNCED, WHETHER

8    THEY'RE NOT.

9         GOOGLE HAS CREATED THIS SYSTEM WHERE IT'S GOING TO GET

10   PERSONAL INFORMATION NO MATTER WHAT THE USER DOES IN CHROME,

11   ALL THE WHILE PROMISING USERS THAT THEY HAVE SOME CONTROL OVER

12   THEIR PRIVACY IN CHROME.

13        IT'S -- IT'S LIKE GOOGLE IS THE LOCKSMITH THAT HAS

14   PROVIDED ITSELF A KEY WITHOUT TELLING THE HOME OWNER.

15             MR. SCHAPIRO:  ANDY SCHAPIRO HERE.

16        THAT LAST PHRASE, "WITHOUT TELLING THE HOME OWNER," I

17   THINK IS THE CRITICAL ONE HERE BECAUSE WHILE, YES, WE WANT THE

18   RECORD TO BE CLEAR ABOUT WHAT GOOGLE DOES OR DOESN'T CONSIDER

19   PERSONAL INFORMATION, AGAIN, FOR THE REASONS I'VE SAID, FOR

20   TODAY'S PURPOSES, THAT'S NEITHER HERE NOR THERE BECAUSE THE

21   ISSUE IS THAT THE CONDUCT COMPLAINED OF, AS IN CASES SUCH AS

22   SMITH V. FACEBOOK, IS PLAINLY DISCLOSED.

23        MR. BARNES WAS JUST SPEAKING ABOUT THE X-CLIENT HEADER,

24   WHICH THEY REFER TO IN THEIR BRIEFS AS THE CONTROVERSIAL

25   X-CLIENT HEADER AND MAKE IT SOUND AS IF IT'S SOME SECRET OR

1    NEFARIOUS THING.

2         WELL, THEY ALLEGE -- INCORRECTLY, BUT IT DOESN'T REALLY

3    MATTER -- THAT IT IS A UNIQUE BROWSER IDENTIFIER AND THAT ITS

4    COLLECTION IS NOT DISCLOSED.  THIS IS IN THEIR COMPLAINT AT

5    PARAGRAPHS 4, 69, AND 80.

6         BUT EVEN IF WE ACCEPT THAT ALLEGATION AS TRUE, GOOGLE DOES

7    DISCLOSE -- THE PRIVACY POLICY EXPRESSLY STATES, GOOGLE

8    COLLECTS UNIQUE IDENTIFIERS.  THIS IS EXHIBIT 7, OR ACTUALLY

9    IT'S IN ALL OF THE EXHIBITS OF THE PRIVACY POLICY BECAUSE IT'S

10   IN PRETTY MUCH EVERY ITERATION.  "WE COLLECT DEVICE-SPECIFIC

11   INFORMATION, SUCH AS YOUR HARDWARE MODEL, OPERATING SYSTEM

12   VERSION, UNIQUE DEVICE IDENTIFIERS, AND MOBILE NETWORK

13   INFORMATION, INCLUDING PHONE NUMBER.  GOOGLE MAY ASSOCIATE YOUR

14   DEVICE IDENTIFIERS OR PHONE NUMBER WITH YOUR GOOGLE ACCOUNT."

15   IT'S DISCLOSED.

16        AND SO THE QUESTION COMES BACK AGAIN TO, IS THERE

17   SOMETHING HERE IN THOSE TWO SENTENCES FROM THE CHROME PRIVACY

18   NOTICE THAT OVERRIDE OR NEGATE THAT DISCLOSURE?  AND THE ANSWER

19   IS THERE IS NOT.

20             THE COURT:  I'M ACTUALLY MORE DISTURBED BY GOOGLE'S

21   ANSWER.  ACCORDING TO MR. BROOME, WE'RE ONLY GOING TO, AS A

22   COMPANY, PROTECT YOUR PERSONAL INFORMATION, SUCH AS I.P.

23   ADDRESSES LINKED TO USER AGENTS, IN CERTAIN CIRCUMSTANCES, BUT

24   NOT OTHERS, BECAUSE IN CERTAIN CIRCUMSTANCES, WE THINK IT'S

25   PERSONAL INFORMATION, AND IN OTHERS WE DON'T.

```
 1          I FIND THAT SLICING THE BOLOGNA THAT THIN IS VERY

 2    DISTURBING.

 3          LET'S GO TO THE REST -- THE LAST QUESTION I HAVE IS THE

 4    MOST RECENT VERSION OF GOOGLE'S TERMS OF SERVICE -- AND THIS IS

 5    WHAT I MENTIONED EARLIER ABOUT THE SERVICE-SPECIFIC ADDITIONAL

 6    TERMS, AND I UNDERSTAND YOUR POSITION IS THERE'S NO CONFLICT

 7    BETWEEN THE TERMS OF SERVICE AND THE CHROME PRIVACY NOTICE OR

 8    ANY SERVICE-SPECIFIC ADDITIONAL TERMS.

 9          BUT IS IT YOUR POSITION THAT THE CHROME PRIVACY NOTICE IS

10    NOT A SERVICE-SPECIFIC ADDITIONAL TERM?  I UNDERSTAND YOU'RE

11    SAYING THERE'S NO CONFLICT.  BUT IS IT YOUR POSITION THAT THE

12    CHROME PRIVACY NOTICE IS OR IS NOT A SERVICE-SPECIFIC

13    ADDITIONAL TERM?

14          MR. SCHAPIRO:  I THINK IT'S -- AND I'M GOING TO WATCH

15     THE CHAT IN CASE PEOPLE TELL ME OTHERWISE, BUT I THINK IT'S

16     FAIR TO SAY THAT IT IS.  IT'S SERVICE-SPECIFIC, AND IT'S A

17     PIECE OF SOME TERMS.

18          SO, YES, THAT WOULD -- THE SHORT ANSWER IS YES, YOUR

19    HONOR.

20          THE COURT:  OKAY.  WHAT ABOUT THE CHROME TERMS OF

21     SERVICE?  IS THAT A SERVICE-SPECIFIC ADDITIONAL TERM?

22          MR. SCHAPIRO:  YES, CHROME IS -- CHROME IS THE

23     SERVICE OR THE PRODUCT THERE.

24          THE COURT:  OKAY.  THANK YOU.

25          I HAVE THREE ADDITIONAL QUESTIONS FOR THE PLAINTIFF AND
```

```
 1    THEN I'D LIKE TO WRAP THIS UP.  AND THIS IS A QUESTION -- I'M

 2    SORRY, I SHOULD HAVE LOOPED IT BACK WHEN WE HAD THIS

 3    DISCUSSION.  I DON'T WANT TO REOPEN THE WHOLE DISCUSSION, I

 4    JUST HAVE ONE SPECIFIC QUESTION FOR YOU, AND THAT'S GOING BACK

 5    TO MY ORIGINAL QUESTION TO GOOGLE ABOUT THE TERMS OF SERVICE

 6    FROM APRIL OF 2014 TO OCTOBER OF 2017 AND FROM OCTOBER OF 2017

 7    TO MARCH 31, 2020 NOT INCORPORATING THE GOOGLE PRIVACY POLICY.

 8    WHAT IS THE BEST CASE FOR YOU ON THAT POINT?  OR IS IT YOUR

 9    POSITION THAT IT DOESN'T MATTER BECAUSE EVEN IF IT'S

10    INCORPORATED, WE STILL THINK THE PRIVACY POLICY HELPS OUR CASE?

11            MR. SCHAPIRO:  I THINK THIS IS THE ONE WHERE MY

12    COLLEAGUE --

13            THE COURT:  I'M SORRY.  THAT'S NOT TO YOU.  THAT'S TO

14    THE PLAINTIFFS.

15            MR. SCHAPIRO:  OH, SORRY.

16            THE COURT:  YEAH.

17            MR. BARNES:  JAY BARNES ON BEHALF OF THE PLAINTIFFS,

18    YOUR HONOR.

19        PRIOR TO MARCH 31ST, 2020, AS WE ALLEGED IN THE COMPLAINT,

20    WE HAVE SAID THAT THE PRIVACY POLICY WAS PART OF THE CONTRACT.

21            THE COURT:  OKAY.

22            MR. BARNES:  BUT AS WE'VE DISCUSSED EARLIER, WE DON'T

23    THINK IT MATTERS BECAUSE THE PRIVACY POLICY REITERATES AND

24    REENFORCES THE PROMISES.

25        AND I WOULD NOTE, YOUR HONOR, IT'S NOT JUST TWO PROMISES
```

1    WE'RE TALKING ABOUT HERE.  THERE ARE MULTIPLE PROMISES THAT

2    GOOGLE BREAKS.  THERE ARE TWO THAT ARE THE PRIMARY FOCUS OF THE

3    BRIEFING, BUT THERE ARE ALSO OTHERS.

4            THE COURT:  OKAY.  SO YOUR POSITION IS PRIOR TO THE

5    EXPLICIT EXCLUSION OF THE PRIVACY POLICY FROM THE TERMS OF

6    SERVICE, WHICH HAPPENED IN MARCH OF 2020, PRIOR TO THAT, YOU'RE

7    SAYING IT WAS INCORPORATED, THE PRIVACY POLICY WAS?

8            MR. BARNES:  YES.  AS WE'VE PLED IT, YES, WE'VE PLED

9    THAT IT WAS INCLUDED.

10           AND THE REASON WE'VE PLED THAT IT WAS INCLUDED, WE WANTED

11   TO BE CLEAR WITH THE COURT -- YOU KNOW, WE ATTACHED 33

12   EXHIBITS, AND WE ATTACHED 33 EXHIBITS BECAUSE WE DON'T THINK

13   THERE'S ANYTHING IN ANY OF THOSE EXHIBITS -- FIRST OF ALL, WE

14   HAVE TO BE FORTHRIGHT.  THERE IS NOTHING IN ANY OF THESE

15   EXHIBITS THAT SHOWS THAT GOOGLE CAN CONSENT.  THE PRIVACY

16   POLICIES SUPPORT US.

17           THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

18           ON ONE ISSUE, I WANT TO GIVE YOU AN OPPORTUNITY -- THIS IS

19   ABOUT THE -- WELL, MAYBE WE'VE ALREADY HANDLED IT ENOUGH.

20           WELL, I'M GOING TO ASK IT.  IF YOU COULD PLEASE BE BRIEF.

21           IN JUDGE FREEMAN'S DECISION THAT MR. BROOME MENTIONED

22   EARLIER, AND OTHER CASES, THEY SAY A DEVICE IS A USER AND NOT A

23   PROVIDER.

24           WHAT'S YOUR SPECIFIC RESPONSE TO THAT?

25           MR. BARNES:  DOES THIS GO TO THE, TO THE FACILITY

```
 1        ISSUE, YOUR HONOR?

 2                THE COURT:  YES.  YES.

 3                MR. BARNES:  OKAY.

 4                THE COURT:  YES, THE FACILITY EXCLUDING USER'S

 5        PERSONAL DEVICES ISSUE.

 6                MR. BARNES:  OKAY.  WELL, WE THINK THE NINTH CIRCUIT

 7        HAS SPOKEN, AND SO THE CASE WE CITE IN OUR BRIEF IS U.S. VERSUS

 8        OLIVA, WHICH IS A 2012 CASE IN WHICH THE NINTH CIRCUIT HELD

 9        THAT A CELL PHONE WAS A FACILITY.

10            WE WERE REALLY SURPRISED ON GOOGLE'S REPLY WHEN IT ARGUED

11        THAT OLIVA WAS INAPPOSITE BECAUSE IT INTERPRETS -- AND THIS IS

12        WHAT THEY SAY -- TITLE 3 OF THE OMNIBUS CRIME CONTROL AND SAFE

13        STREETS ACT OF 1968.

14            YOUR HONOR, THAT'S TRUE.  BUT THE OMNIBUS CRIME CONTROL

15        AND SAFE STREETS ACT OF 1968 IS THE WIRETAP ACT, AND IT WAS

16        RECODIFIED IN THE ELECTRONIC COMMUNICATIONS PRIVACY ACT IN 1986

17        WITH -- AT THE SAME TIME AS THE STORED COMMUNICATIONS ACT.

18            AND THE ECPA WORKS AS A WHOLE.  THE STORED COMMUNICATIONS

19        ACT, IN 18 U.S.C. 2711, SPECIFICALLY PROVIDES THAT THE TERMS

20        USED IN THE STORED COMMUNICATIONS ACT MEAN THE SAME THING AS

21        TERMS USED IN THE WIRETAP ACT.

22            JUDGE FREEMAN'S DECISION -- ALL OF THE OTHER DECISIONS

23        GOING THE OTHER WAY DON'T GRAPPLE WITH THE RELATIONSHIP BETWEEN

24        THE WIRETAP ACT AND THE SCA.

25            NOW, THERE ARE SOME CASES INVOLVING MICROSOFT -- I THINK
```

1    THERE'S EIGHT OF THEM TOTAL, WE CITED FIVE OF THEM -- WHERE

2    MICROSOFT INVOKED THE STORED COMMUNICATIONS ACT TO PROTECT

3    THEIR END USERS' COMPUTERS AND INTERNET EXPLORER WEB BROWSERS

4    AND WERE SUCCESSFUL IN DOING SO.

5         THE IMPORTANCE OF THIS RELATIONSHIP BETWEEN THE WIRETAP

6    ACT AND THE STORED COMMUNICATIONS ACT IS WHEN CONGRESS ENACTED

7    THE ECPA, IT INTENDED THE TWO ACTS TO WORK TOGETHER.  THAT'S

8    WHY IN 2711, THEY DIDN'T SAY, OH, THE STORED COMMUNICATIONS ACT

9    HAS ALL OF THESE DIFFERENT DEFINITIONS.

10        AGAIN, IF YOU LOOK AT THE SENATE REPORT, WHICH YOUR HONOR

11   HAS CITED IN FIVE SEPARATE WIRETAP CASES YOU'VE DECIDED, ON

12   PAGE 14 OF THE SENATE REPORT, IT EXPLAINS THE DEFINITION OF AN

13   ELECTRONIC COMMUNICATION SYSTEM AS ENCOMPASSING ANY WIRE,

14   RADIO, OR PHOTO ELECTRONIC FACILITIES FOR THE TRANSMISSION OF

15   ELECTRONIC COMMUNICATIONS, AS WELL AS ANY COMPUTER FACILITIES,

16   AND IT SAYS AN ELECTRONIC COMMUNICATION SERVICE IS ANY SERVICE

17   THAT PROVIDES TO USERS THE ABILITY TO SEND OR RECEIVE WIRE

18   ELECTRONIC COMMUNICATIONS.

19        THEN IT SAYS, SUCH SERVICES CAN BE PROVIDED THROUGH THE

20   SAME FACILITIES.  EXISTING TELEPHONE COMPANIES AND E-MAIL

21   COMPANIES ARE PROVIDERS OF ECS.

22        IT MAKES NO SENSE THAT IN OLIVA AND IN ALL WIRETAP CASES

23   FOR 40 YEARS, UP UNTIL -- UP UNTIL AND INCLUDING TODAY -- A

24   CELL PHONE IS A FACILITY.  PHONES ARE FACILITIES UNDER THE

25   ECPA.

1          THE CASES INTERPRETING THE STORED COMMUNICATIONS ACT NEVER

2    GO DOWN THAT PATH.  THEY NEVER ASK, WELL, HOW DOES THIS RELATE

3    TO WHAT WE'RE DOING IN OTHER SITUATIONS?

4          THE SENATE REPORT ALSO MENTIONS PHONES AS AN EXAMPLE OF

5    FACILITY I BELIEVE ON PAGE 32.  IT LISTS MAGNETIC TAPE OR DISCS

6    AS FACILITIES ON PAGE 16.

7          AND SO OUR POINT IS THE COURT NEEDS TO LOOK AT THE

8    RELATIONSHIP BETWEEN THE STORED COMMUNICATIONS ACT AND THE

9    WIRETAP ACT, AND IN DOING SO, IT HAS TO INTERPRET THE ACT AS A

10   WHOLE, AND THERE FACILITIES CLEARLY INCLUDES PHONE.

11         AND ONE MORE SMALL BIT --

12             THE COURT:  OKAY.

13             MR. BARNES:  SORRY, YOUR HONOR.

14             THE COURT:  SO OTHER THAN OLIVA, WHAT ARE YOUR BEST

15   CASES SUPPORTING YOUR DEFINITION OF FACILITIES UNDER THE SCA,

16   WHICH YOU HAVE MORE THAN JUST PERSONAL COMPUTING DEVICES.  YOU

17   HAVE OTHER THINGS.  THERE'S CHROME BROWSERS AND --

18             MR. BARNES:  THE MICROSOFT CASES, YOUR HONOR, AND IF

19   YOUR HONOR WOULD GRANT US LEAVE TO DO SO, MY BET IS WE COULD

20   COME UP WITH MORE THAN A DOZEN WIRETAP ORDERS AUTHORIZING A

21   WIRETAP ON A CELL PHONE.

22         THE DEPARTMENT OF JUSTICE PUBLISHES A LIST OF TYPES OF

23   DEVICES FOR WHICH ORDERS ARE ENTERED EVERY YEAR.  I LOOKED AT

24   IT LAST WEEK.  I THINK THERE WERE 20 -- WELL, I -- THERE WERE

25   MORE THAN ONE IN CALIFORNIA INVOLVING COMPUTERS OR PHONES.

 1          THE COURT:  SO LET ME ASK ONE LAST QUESTION.  ON THE

 2     POINT ABOUT PERSONAL INFORMATION CONSTITUTING PROPERTY, A

 3     NUMBER OF THE CASES THAT YOU CITED WERE REALLY MAKING FINDINGS

 4     IN THE CONTEXT OF ARTICLE III STANDING.

 5          WHY WOULD THOSE CASES APPLY TO STATUTORY LARCENY?

 6          MR. STRAITE:  THANK YOU, YOUR HONOR.

 7          THE FIRST AND MOST IMPORTANT CASE WE CITED IS FACEBOOK

 8     INTERNET TRACKING FROM THE NINTH CIRCUIT, AND THAT WAS GOOGLE'S

 9     PRIMARY RESPONSE ON REPLY IS, HEY, THIS IS A QUESTION OF

10     STANDING, NOT A QUESTION OF THE MERITS.

11          BUT THE TWO ARE INSEPARABLE.  SO FACEBOOK INTERNET

12     TRACKING, THE NINTH CIRCUIT LAST YEAR EXPLICITLY FOUND THAT THE

13     MISAPPROPRIATION OF THE PII RAISES ECONOMIC INJURY.  IT PLEADS

14     ECONOMIC INJURY, NOT JUST PRIVACY INJURY.  THAT'S AN ANALYSIS

15     THAT'S INSEPARABLE FROM A 12(B)(6) ANALYSIS.

16          AND TO UNDERSCORE THE POINT, THE NINTH CIRCUIT SAID IN

17     FOOTNOTE 4 TO FACEBOOK INTERNET TRACKING THAT DAMAGES ARE AN

18     INHERENT ELEMENT OF LARCENY.

19          IN FACT, THERE WERE THREE OTHER PROPERTY CLAIMS IN THAT

20     CASE WHERE THE COURT MADE THE SAME POINT IN FOOTNOTE 4.  IT'S

21     NOT JUST A QUESTION OF, HAVE YOU SATISFIED THE ELEMENTS, PLUS

22     DO YOU HAVE ECONOMIC INJURY?  ECONOMIC INJURY IS REQUIRED TO

23     PROCEED.

24          AND THEN THE COURT REINSTATED THE LARCENY CLAIM IN

25     FACEBOOK INTERNET TRACKING.

1        SO BECAUSE IT'S A QUESTION OF ECONOMIC INJURY, NOT JUST

2   PRIVACY INJURY, THAT'S WHY IT UNDERSCORES WHY -- IT'S NOT

3   APPROPRIATE TO SIMPLY SAY, WELL, THE COURT STOPPED AT ARTICLE

4   III INJURY.  IT IS AN ELEMENT OF THE CLAIM.

5        AND THAT'S WHY THE SAME IS TRUE ALSO OF YOUR HONOR'S

6   DECISIONS IN ANTHEM DATA BREACH.

7            THE COURT:  ALL RIGHT.  THANK YOU.

8        SO I WOULD LIKE TO WRAP THIS UP.  I'M GOING TO GIVE EACH

9    SIDE A MINUTE IF THERE'S ANY SORT OF LAST POINT YOU'D LIKE TO

10   MAKE OR ANYTHING YOU'D LIKE TO HIGHLIGHT OR EMPHASIZE.

11       BUT I DO APPRECIATE YOUR PATIENCE AND I DO APPRECIATE ALL

12   OF YOUR EFFORTS AND VERY HELPFUL ANSWERS TO MY QUESTIONS.

13       SO, YOU KNOW, THIS IS GOOGLE'S MOTION TO DISMISS, SO I'M

14   GOING TO LET THEM GO LAST.

15       SO LET ME SEE IF THE PLAINTIFFS, IF YOU WANT TO JUST HAVE

16   ONE LAST MINUTE TO MAKE ANY FINAL STATEMENT AND THEN WE'LL WRAP

17   UP HERE.

18            MR. BARNES:  SURE, BRIEFLY.  THANK YOU FOR YOUR

19    PATIENCE, YOUR HONOR, AND HAVING THE HEARING.

20       THIS CASE IS REALLY IMPORTANT, YOUR HONOR, BECAUSE GOOGLE

21   HAS TOLD ITS USERS THAT IT WILL RESPECT ITS PRIVACY -- RESPECT

22   THEIR PRIVACY IF THEY DO CERTAIN THINGS.  SO LONG AS THEY DON'T

23   SYNC, THEIR PERSONAL INFORMATION WON'T BE SENT TO GOOGLE, AND

24   GOOGLE BREAKS THAT PROMISE ROUTINELY EVERY SINGLE DAY.

25       AND THE REASON THIS IS DIFFERENT AND MORE IMPORTANT, WE

1    WOULD ARGUE, THAN OTHER PRIVACY CASES IS BECAUSE OF THE SETUP

2    GOOGLE HAS CREATED HERE WHERE THEY ARE BOTH THE BROWSER

3    PROVIDER AND THE TRACKER, AND THEY ARE PROMISING CONSUMERS IN

4    THEIR BROWSER THAT THEIR BROWSER IS A SAFE PLACE TO GO WHERE

5    CONSUMER PRIVACY WILL BE RESPECTED.

6         BUT THEN THEIR, AT THE VERY SAME TIME, THEIR ADVERTISING

7    DIVISIONS ARE HACKING THEIR WAY AROUND THE PROMISES THAT ARE

8    MADE IN THE CHROME CONTRACT.

9         AND, YOUR HONOR, AS WE WOULD -- AS WE'VE SAID MANY TIMES,

10   AND IN THE PRIVACY POLICY.

11        THANK YOU, YOUR HONOR.

12             THE COURT:  ALL RIGHT.  THANK YOU.

13             MR. SCHAPIRO:  THANK YOU, YOUR HONOR.  THANK YOU FOR

14    TAKING THE TIME WITH US TODAY.

15        YOU KNOW, THIS IS ULTIMATELY, IN OUR VIEW, A

16   STRAIGHTFORWARD CASE.  IT IS NOT COMPLICATED.  THERE IS NO NEED

17   FOR SPECIAL WEB DEVELOPER TOOLS TO RUN EXPERIMENTS AND SEE

18   WHAT'S HAPPENING WITH ONE HEADER OR ANOTHER, AND IT'S EMINENTLY

19   SUITABLE FOR A DECISION UNDER RULE 12(B)(6).

20        I THINK THE FRAMEWORK IS THE SAME AS WE'VE LAID IT OUT IN

21   OUR BRIEFING, AND I DON'T THINK WE'VE HEARD ANYTHING TODAY THAT

22   CHANGES THAT.

23        THERE'S A PRIVACY POLICY, WHICH I THINK WE'RE IN GENERAL

24   AGREEMENT WITH THE OTHER SIDE THAT YOUR HONOR CAN LOOK TO THAT.

25   I DON'T THINK THEY'RE TRYING TO SAY THAT THEY'RE NOT -- THAT

1    THEY DIDN'T ACKNOWLEDGE AND WEREN'T EXPOSED TO THE PRIVACY

2    POLICY.

3         THE PRIVACY POLICY REVEALS THE DISCLOSURE OF -- EXCUSE

4    ME -- REVEALS THE COLLECTION OF SPECIFIC INFORMATION, AND WE

5    HAVE A DIFFERENCE ABOUT WHETHER THE DISCLOSURE IS ADEQUATE

6    HERE.

7         I WOULD JUST REFER YOU TO OUR BRIEFS ON THAT BECAUSE ITEM

8    BY ITEM, EVERYTHING THEY COMPLAIN WAS COLLECTED IS ALSO

9    DISCLOSED IN THE PRIVACY POLICY.

10        SO IT STILL COMES BACK TO WHETHER THERE'S ANYTHING IN THE

11   CHROME PRIVACY NOTICE THAT NEGATES THAT.

12        AND ALTHOUGH MR. BARNES A MOMENT AGO ALERTED TO, OH, WELL,

13   WE HAVE LOTS OF OTHER PROMISES THAT ARE BROKEN, THE ONLY TWO

14   THAT THEY POINT TO, AT LEAST THAT I CAN RECALL IN THE COMPLAINT

15   AND IN THEIR BRIEFING, ARE THE TWO THAT WE'VE IDENTIFIED,

16   NEITHER OF WHICH COMES REMOTELY CLOSE TO SAYING THAT WHEN YOU

17   USE CHROME IN ITS BASIC BROWSER MODE AND YOU GO OUT AND SURF

18   THE WEB, JUST AS YOU MIGHT WITH MOZILLA OR SOME OTHER BROWSER,

19   AD MANAGER OR ANALYTICS WON'T ALSO COLLECT THE DATA THAT THE

20   PRIVACY POLICY SAYS IT DOESN'T THAT MAKES THEM WORK.

21        I'LL LEAVE YOU WITH ONE OTHER ITEM JUST BECAUSE I THINK

22   IT'S WORTH THE COURT'S ATTENTION JUST BRIEFLY WHEN YOU'RE

23   CRAFTING YOUR DECISION ON THIS, AND THAT IS THE PROBLEM WITH

24   THE PLAINTIFFS' THEORY THAT I MENTIONED EARLIER IN OUR

25   DISCUSSION TODAY ABOUT THE ALLEGATIONS IN PARAGRAPHS 356 AND

1    366 OF THE COMPLAINT WHERE I THINK THEY PLEADED THEMSELVES INTO

2    A BIT OF A BIND.

3         THE VERY PERSONAL INFORMATION THAT THEY SAY IS IMPROPERLY

4    COLLECTED IS EXACTLY WHAT THEY SAY THEY HAVE AGREED TO SHARE.

5              THE COURT:  I'M SORRY, CAN YOU REPEAT THOSE

6    PARAGRAPHS?

7              MR. SCHAPIRO:  SURE.  356 AND 366.

8              THE COURT:  I HAVE THE COMPLAINT IN FRONT OF ME, SO I

9    JUST WANT TO TAKE A LOOK AT IT.

10             MR. SCHAPIRO:  OKAY.

11             THE COURT:  356 -- 355 AND 356?

12             MR. SCHAPIRO:  SORRY, NO.  356, AND THEN VERY

13   SIMILARLY IN 366.  BUT YOU CAN JUST LOOK AT ONE OF THEM BECAUSE

14   THEY ARE, FOR THESE PURPOSES, FUNCTIONALLY IDENTICAL.  356.

15             THE COURT:  OKAY.  ONE MOMENT.

16        (PAUSE IN PROCEEDINGS.)

17             MR. SCHAPIRO:  SO THE STATEMENT HERE, THEY SAY THEY

18   PAID VALUABLE CONSIDERATION IN THE FORM OF THE P.I. THEY AGREED

19   TO SHARE.

20        NOW, IN THEIR OPPOSITION BRIEF, THE PLAINTIFFS SAY, WELL,

21   RIGHT, BUT WE DON'T ACTUALLY MEAN THE PERSONAL INFORMATION

22   THAT'S AT ISSUE IN THIS COMPLAINT.  WE MEAN, YOU KNOW, PERHAPS

23   SOME OTHER PERSONAL INFORMATION, OR MAYBE WE AGREED TO SHARE

24   SOME, BUT NOT ALL.

25        BUT LOOK CAREFULLY AT THAT ALLEGATION, THE P.I. THEY

1    AGREED TO SHARE WHICH, AS ALLEGED ABOVE, HAS ASCERTAINABLE

2    VALUE TO BE PROVEN AT TRIAL.

3         THEY'RE REFERRING BACK TO THE ONLY PERSONAL INFORMATION

4    THAT IS DISCUSSED IN THIS COMPLAINT, AND THAT IS THE PERSONAL

5    INFORMATION THAT THEY SAY WAS IMPROPERLY COLLECTED.

6         SO THEY'RE TRYING TO HAVE THEIR CAKE AND EAT IT, TOO, A

7    CONTRACT CLAIM AND TO SHOW THAT THERE WAS NO CONSENT.  THEY

8    ACTUALLY UNDERMINE THEIR OWN ARGUMENTS, AND I WOULD JUST ASK

9    THE COURT TO CONSIDER THAT IN CRAFTING YOUR DECISION.

10        THANK YOU.

11             THE COURT:  ALL RIGHT.  THANK YOU.

12             MR. BARNES:  YOUR HONOR, CAN I --

13             THE COURT:  WE HAD -- OH, GO AHEAD, VERY BRIEFLY.

14             MR. BARNES:  YOUR HONOR, THEY RAISED A NEW POINT THAT

15   WASN'T RAISED BEFORE, AND THIS IS -- YOUR HONOR HAS RULED AND

16   COURTS HAVE RULED TIME AND TIME AGAIN THAT CONSENT IS NOT AN

17   ALL OR NOTHING PROPOSITION.

18        THESE USERS ALSO HAVE GMAIL ACCOUNTS.  THERE ARE ALSO

19   CERTAIN CIRCUMSTANCES IN WHICH THEIR PERSONAL INFORMATION WOULD

20   BE SHARED.

21        AND THE ALLEGATIONS HERE ARE DIFFERENT.  IT'S BROWSING

22   HISTORY WHEN THEY'RE NOT SYNCED, WHICH GOOGLE SPECIFICALLY

23   PROMISED NOT, OR WHICH CHROME -- IN THE CONTRACT CHROME

24   PROMISED SPECIFICALLY NOT TO SEND THAT TO GOOGLE.  THAT IS NOT

25   PERSONAL INFORMATION THEY AGREED TO SHARE BECAUSE THE CONTRACT

```
1        SPECIFICALLY SAYS CHROME WON'T DO THAT.

2            SO -- AND THE OTHER ANALOGY IS IF I GO AND AGREE TO BUY A

3    SERVICE FOR A DOLLAR WITH A CREDIT CARD AND THE SERVICE

4    PROVIDER THEN CHARGES TEN DOLLARS TO MY CREDIT CARD, HE CAN'T

5    COME IN AND SAY, WELL, YOUR HONOR, HE AGREED TO PAY ME A

6    DOLLAR, SO THEREFORE, I GET TO TAKE WHATEVER I WANT.

7            AND THAT'S THE -- A DIRECT ANALOGY TO WHAT'S GOING ON

8    HERE.  PLAINTIFFS HAVE AGREED THAT IN CERTAIN CIRCUMSTANCES,

9    PERSONAL INFORMATION CAN BE PROVIDED.  BUT GOOGLE HAS GONE

10   BEYOND THAT DOLLAR AND TAKEN TEN.

11           THE COURT:  ALL RIGHT.  WE HAVE TWO COUNSEL WHO ARE

12   JOINING US TODAY WHO HAVEN'T BEEN ABLE TO MAKE ANY STATEMENT.

13   I JUST WANTED TO SEE IF MS. WEAVER OR MS. TREBICKA WANTED TO

14   ADD ANYTHING.

15           MS. WEAVER:  THANK YOU, YOUR HONOR.  LESLEY WEAVER

16   FOR PLAINTIFFS.

17       I JUST WANTED TO THANK THE COURT DURING A PANDEMIC FOR

18   REALLY PAYING CAREFUL ATTENTION AND LETTING US HAVE THIS

19   INTELLECTUAL DEBATE.  SOME OF THESE ISSUES ARE NEW AND THEY'RE

20   COMPLEX.

21           AND SO IT'S BEEN A PLEASURE.  THANK YOU.

22           THE COURT:  THANK YOU VERY MUCH.

23       WHAT ABOUT MS. TREBICKA?

24           MS. TREBICKA:  THANK YOU, YOUR HONOR.  VIOLA TREBICKA

25   ON BEHALF OF GOOGLE WITH QUINN, EMANUEL.
```

```
 1          NOTHING TO ADD, BUT I WANTED TO SAY IT'S A PLEASURE TO

 2    APPEAR BEFORE YOU, YOUR HONOR, AND I HOPE THAT GOOGLE WILL HAVE

 3    AN OPPORTUNITY TO ENGAGE MORE IN FURTHER HEARINGS.

 4          THE COURT:  ALL RIGHT.

 5          WELL, THANK YOU ALL VERY MUCH.  THIS HAS BEEN INCREDIBLY

 6    HELPFUL.  MS. WEAVER IS CORRECT, THESE ARE REALLY COMPLICATED

 7    AND SUBTLE AND NUANCED ISSUES, AND AS WE'VE ALL SAID, THE LAW

 8    IS DEVELOPING, SO IT'S -- IT'S ALWAYS A CHALLENGING FIELD.

 9          BUT I REALLY APPRECIATE ALL OF YOUR VERY, VERY HELPFUL

10    ANSWERS, INSIGHTS, GUIDANCE.  WE'RE TAKING EVERYTHING THAT YOU

11    HAVE PROVIDED TO US INTO ACCOUNT AND TRYING TO GIVE IT FULL

12    CONSIDERATION.

13          SO THANK YOU ALL.

14          I BELIEVE WE PROBABLY HAVE A CMC ON ANOTHER DAY.  IS THAT

15    CORRECT?  WE DON'T NEED TO HANDLE THAT TODAY?

16          MR. SCHAPIRO:  COULD I ASK ONE HOUSEKEEPING QUESTION,

17    YOUR HONOR?  YOU MIGHT NOT KNOW OFFHAND, BUT WE HAVE, AT LEAST

18    ON THE CALENDAR, AN ARGUMENT IN THE -- IN ANOTHER CASE WE HAVE

19    IN FRONT OF YOU, RELATED, THE BROWN CASE, AND THAT'S FOR, I

20    THINK, A WEEK FROM TODAY.  BUT I KNOW THAT SOMETIMES YOUR HONOR

21    HOLDS ORAL ARGUMENT AND SOMETIMES DECIDES WITHOUT ORAL

22    ARGUMENT.

23          DO YOU KNOW, OR DOES THE COURTROOM DEPUTY KNOW, AT THIS

24    STAGE WHETHER WE SHOULD BE READY TO ARGUE ON THAT DAY?

25          THE COURT:  I'M REALLY SORRY, I DO NOT HAVE AN ANSWER
```

1      FOR YOU AT THIS TIME.

2              MR. SCHAPIRO:  WE'LL GET READY.

3              THE COURT:  SO WE'LL -- YOU KNOW, TO AVOID YOU HAVING

4      TO DO A LOT OF UNNECESSARY PREPARATION IN THE EVENT THAT WE

5      DON'T HAVE A HEARING, I WILL TRY TO LET YOU KNOW AS SOON AS

6      POSSIBLE.

7              MR. SCHAPIRO:  THANK YOU.

8              THE COURT:  WE HAVE SO MANY HEARINGS EVERY WEEK THAT

9      WE OFTEN DON'T DECIDE UNTIL QUITE LATE WHICH ONES WE'RE GOING

10     TO HEAR.  I MEAN, THERE'S SOME OBVIOUSLY WE KNOW FAR IN ADVANCE

11     ARE NOT LIKELY TO BE HEARD, BUT SOME OF THESE MORE COMPLICATED

12     ONES WE REALLY NEED TO SORT OF DIG DEEPER INTO THE BRIEFS

13     BEFORE WE MAKE THAT CALL.

14             MR. SCHAPIRO:  WE APPRECIATE THAT, YOUR HONOR.

15             MR. BROOME:  THANK YOU, YOUR HONOR.

16             THE COURT:  OKAY.  THANK YOU.  THANK YOU VERY MUCH.

17     BE WELL.

18             MR. BARNES:  THANK YOU, YOUR HONOR.

19             MR. SCHAPIRO:  THANK YOU, YOUR HONOR.

20             MR. BROOME:  THANK YOU, YOUR HONOR.

21             THE CLERK:  THANK YOU.  COURT'S ADJOURNED.

22         (THE PROCEEDINGS WERE CONCLUDED AT 3:19 P.M.)

23

24

25

1

2

3                        CERTIFICATE OF REPORTER

4

5

6

7        I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8    STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9    280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10   CERTIFY:

11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16   _____
     LEE-ANNE SHORTRIDGE, CSR, CRR
17   CERTIFICATE NUMBER 9595

18           DATED:  FEBRUARY 19, 2021

19

20

21

22

23

24

25