QUINN EMANUEL URQUHART & SULLIVAN, LLP

Andrew H. Schapiro (admitted *pro hac vice*)
andrewschapiro@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Telephone: (312) 705-7400
Facsimile: (312) 705-7401

Josef Ansorge (admitted *pro hac vice*)
josefansorge@quinnemanuel.com
1300 I Street NW, Suite 900
Washington D.C., 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100

Stephen A. Broome (CA Bar No. 314605)
stephenbroome@quinnemanuel.com
Viola Trebicka (CA Bar No. 269526)
violatrebicka@quinnemanuel.com
Alyssa G. Olson (CA Bar No. 305705)
alyolson@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Jonathan Tse (CA Bar No. 305468)
jonathantse@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Jomaire Crawford (admitted *pro hac vice*)
jomairecrawford@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Sara Jenkins (CA Bar No. 230097)
sarajenkins@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

*Attorneys for Defendant Google LLC*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| PATRICK CALHOUN, *et al.*, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>GOOGLE LLC,<br><br>Defendant. | Case No. 5:20-cv-05146-LHK<br><br>**GOOGLE LLC'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT ON GOOGLE'S FIRST AFFIRMATIVE DEFENSE OF CONSENT**<br><br>The Honorable Lucy H. Koh<br>Courtroom 8 – 4th Floor<br>Date:  March 10, 2022<br>Time:    1:30 p.m.<br>Amended Complaint Filed: April 16, 2021<br><br>Trial Date:    None Set |

1

## **NOTICE OF MOTION & MOTION**

2

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3

PLEASE TAKE NOTICE THAT, on March 10, 2022, at 1:30 p.m., before the Honorable

4 Lucy H. Koh of the United States District Court, Northern District of California at the San Jose

5 Courthouse, Courtroom 8, 4th Floor, 280 South 1st Street, San Jose, CA 95113, Defendant Google

6 LLC will and hereby does move for an order entering summary judgment on Google's First

7 Affirmative Defense of Consent, on the basis of Plaintiffs' express consent to the conduct alleged,

8 pursuant to Rule 56 of the Federal Rules of Civil Procedure. Google's motion is based on this Notice

9 of Motion and Motion; the attached Memorandum of Points and Authorities; the accompanying

10 declarations of Stephen A. Broome and Gregory Fair and exhibits attached thereto; the pleadings,

11 papers, and other documents on file in this action; and such other evidence and argument presented

12 to the Court at or prior to any hearing in this matter.

13

Google submits this motion now in the interest of efficiency, and reserves its right to move

14 for summary judgment on other grounds, if necessary, by July 1, 2022, the last day for the parties

15 to file dispositive motions under the Court's Amended Scheduling Order. Dkt. 312. *See Hoffman v.*

16 *Tonnemacher*, 593 F.3d 908, 910-11 (9th Cir. 2010) ("district courts have discretion to entertain

17 successive motions for summary judgment"); *Miller v. California Dep't of Corr. & Rehab.*, 2019

18 WL 3753175, at *1 (N.D. Cal. Aug. 8, 2019) (granting leave to file second motion for summary

19 judgment where "the interests of justice will be best served by permitting the successive motions

20 for summary judgment" because "[s]ubstantial judicial resources and juror time are expended

21 whenever a trial is held; it is not sensible to expend these when it may not necessary to do so");

22 *Peasley v. Spearman*, 2018 WL 4468823, at *9 (N.D. Cal. Sept. 18, 2018) (Koh, J.) (granting motion

23 for leave to file a second motion for summary judgment because it would "encourage the efficient

24 resolution of lawsuits" and "promote[] judicial efficiency"); *In re Capacitors Antitrust Litig.*, 2016

25 WL 5724960, at *2 (N.D. Cal. Sept. 30, 2016) (permitting early summary judgment motion "to

26 resolve the parties' [] disagreements early enough to realize downstream efficiencies and economies

27 in discovery and class certification and other motions").

28

## ISSUE PRESENTED

Whether the Court should grant summary judgment on Google's First Affirmative Defense of Consent and dismiss Plaintiffs' remaining claims with prejudice.

## RELIEF REQUESTED

Google respectfully requests that the Court grant summary judgement on Google's First Affirmative Defense of Consent and dismiss Plaintiffs' remaining claims with prejudice.

DATED:  November 30, 2021          Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By      */s/ Andrew H. Schapiro*
Andrew H. Schapiro (admitted *pro hac vice*)
andrewschapiro@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Telephone: (312) 705-7400
Facsimile: (312) 705-7401

*Attorneys for Defendant Google LLC*

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ..................................................................................................1

II.     STATEMENT OF ISSUE TO BE DECIDED ......................................................3

III.    STATEMENT OF UNDISPUTED FACTS ..........................................................3

        A.     Google's Receipt of Data From Websites Using Its Services Is Unrelated To
               Chrome Sync ..............................................................................................3

        B.     Plaintiffs Expressly Consented to Google's Receipt of the Disputed Data ..............5

               1.     Plaintiffs Agreed to Google's Privacy Policy ...................................6

               2.     Plaintiffs Crespo, Henry, Wilson, and Johnson Affirmatively
                      Consented to the Consent Bump Agreement ....................................6

               3.     Plaintiffs Calhoun, Kindler, Wilson, and Johnson Affirmatively
                      Consented to the New Account Creation Agreement ......................9

        C.     Plaintiffs Did Not Review The Chrome Privacy Notice ...........................12

IV.     ARGUMENT ......................................................................................................14

V.      CONCLUSION ..................................................................................................18

1

## **TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4

*Garcia v. Enterprise Holdings, Inc.*,
  78 F. Supp. 3d 1125 (N.D. Cal. 2015) ..................................................................... 17

5

*Hill v. Nat'l Collegiate Athletic Ass'n*,
  7 Cal. 4th 1 (1994) ................................................................................................... 14

6

*Hoffman v. Tonnemacher*,
  593 F.3d 908 (9th Cir. 2010) ..................................................................................... 1

7

8

*In re Capacitors Antitrust Litig.*,
  2016 WL 5724960 (N.D. Cal. Sept. 30, 2016) ........................................................... 1

9

*In re Facebook, Inc. Internet Tracking Litig.*,
  956 F.3d 589 (9th Cir. 2020) ................................................................................... 15

10

*Javier v. Assurance IQ, LLC*,
  2021 WL 940319 (N.D. Cal. Mar. 9, 2021) .............................................................. 17

11

*Lightbourne v. Printroom Inc.*,
  122 F. Supp. 3d 942 (C.D. Cal. 2015) ...................................................................... 17

12

13

*Maghen v. Quicken Loans Inc.*,
  680 F. App'x 554 (9th Cir. 2017) ............................................................................. 16

14

*Miller v. California Dep't of Corr. & Rehab.*,
  2019 WL 3753175 (N.D. Cal. Aug. 8, 2019) .............................................................. 1

15

*Peasley v. Spearman*,
  2018 WL 4468823 (N.D. Cal. Sept. 18, 2018) ............................................................ 1

16

*Perkins v. LinkedIn Corp.*,
  53 F. Supp. 3d 1190 (N.D. Cal. 2014) ...................................................................... 17

17

18

*Silver v. Stripe Inc.*,
  2021 WL 3191752 (N.D. Cal. July 28, 2021) ........................................................... 16

19

*Smith v. Facebook, Inc.*,
  262 F. Supp. 3d 943 (N.D. Cal. 2017) ...................................................................... 15

20

*Smith v. Facebook, Inc.*,
  745 F. App'x 8 (9th Cir. 2018) ............................................................................. 2, 15

21

**Statutes**

22

Cal. Civ. Code § 3516 .................................................................................................. 1, 14

23

24

25

26

27

28

## I.   **INTRODUCTION**

The Court has correctly held that consent is a complete defense to Plaintiffs' remaining claims. Dkt. 142 ("MTD Order") at 12 & n.3; *see also* Cal. Civ. Code § 3516 ("He who consents to an act is not wronged by it."). At the pleading stage, the Court found that Plaintiffs' consent to Google's Privacy Policy—which discloses the data collection at issue—did not defeat their claims "for two reasons": (1) "a reasonable user consenting to Google's Terms of Service on or after March 31, 2020 might have concluded that she was not consenting to Google's Privacy Policy" because "as of March 31, 2020, Google's Terms of Service explicitly excluded Google's Privacy Policy,"[1] and (2) Google's separate "Chrome Privacy Notice makes specific representations that could suggest to a reasonable user that Google would not engage in the alleged data collection" described in the Privacy Policy. MTD Order at 14.

Discovery has now confirmed, however, that Plaintiffs each expressly consented to the exact data collection at issue and that their allegations are otherwise fatally flawed. Specifically, each plaintiff (1) affirmatively consented to Account Holder Agreements[2] (which the Court did not previously have an opportunity to consider) that expressly disclose the data collection at issue; (2) signed up for Google Accounts and consented to Google's Privacy Policy *before* March 31, 2020; and (3) never even read the Chrome Privacy Notice on which all of their claims are based. Google is entitled to Summary Judgment on its First Affirmative Defense (Consent) and Plaintiffs' claims should be dismissed with prejudice.[3]

---

[1]   Even after March 31, 2020, Google's Terms of Service provided a link to the Privacy Policy, and stated "we encourage you to read it to better understand how you can update, mange, export, and delete your information." *See* https://policies.google.com/terms.

[2]   The Account Holder Agreements include the "Consent Bump Agreement" that was sent to users with existing Google Accounts as of June 2016, and a revised account holder agreement to which new users were required to agree to create Google Accounts after June 2016 ("New Account Creation Agreement") (collectively, the "Account Holder Agreements").

[3] This Motion resolves all of Plaintiffs' claims—active and dormant. Of the ten claims selected by the parties pursuant to Court order (Dkt. 54), the Court previously dismissed four (MTD Order at 39) and Plaintiffs did not seek to amend. Six of Plaintiffs' claims are currently being litigated and should be dismissed with prejudice for the reasons explained herein. Those claims are: (1) California Invasion of Privacy Act (Count 5); (2) intrusion upon seclusion (Count 7); (3) breach of contract (Count 8); (4) breach of the implied covenant of good faith and fair dealing (Count 9); (5) statutory larceny (Count 13); and (6) UCL (Count 14). Six more claims are in abeyance until after trial pursuant to the Court's

*First*, each Plaintiff was shown—and affirmatively consented to—Google Account Holder Agreements that state in plain and concise terms that Google receives the disputed data[4] when users visit websites that use Google's services (*e.g.*, Google's advertising services) and that Google may use that data to personalize ads. The specificity in Plaintiffs' agreements with Google far exceeds that which the Ninth Circuit held is sufficient to obtain express consent under similar circumstances in *Smith v. Facebook, Inc.*, 745 F. App'x 8 (9th Cir. 2018). Discovery has also confirmed that each Plaintiff selected the "I AGREE" button at the bottom of their respective Account Holder Agreement(s), manifesting their express consent to Google's collection and use of the disputed data. *See* Declaration of Google's Gregory Fair ("Fair Decl."), at ¶¶ 28-31, 46-49.

*Second*, all Plaintiffs signed up for Google Accounts before March 31, 2020, and agreed to Google's Privacy Policy, which similarly describes Google's collection of the disputed data. Although one Plaintiff—Claudia Kindler—created an additional account in May 2020, her Account Holder Agreement for that account expressly stated that Google would process her data in accordance with Google's Privacy Policy. Kindler selected "I AGREE." *See id.* ¶ 47.

*Third*, Plaintiffs all have now admitted that ***they never read*** the Chrome Privacy Notice that is the keystone of their claims.[5] Accordingly, their allegation that the document led them to believe the data collection described in their Account Holder Agreements and the Privacy Policy would ***not*** occur if Plaintiffs simply used Chrome without enabling its Sync feature is unequivocally false. The Chrome

---

September 18, 2020 order. *See* Dkt. 51. Because consent is a defense to the claims in abeyance as well, any effort by Plaintiffs to pursue those claims would be futile.

[4] Plaintiffs allege the disputed data consists of five categories of information that Google receives when users (in any browser, not just Chrome) visit websites that use certain Google services: (1) "[t]he user's unique, persistent cookie identifiers"; (2) "the user's browsing history in the form of the users' GET requests and information relating to the substance, purport, or meaning of the website's portion of the communication with the user"; (3) "[i]n many cases, the contents of the users' POST communications"; (4) "[t]he user's IP address and User-Agent information about their device"; and (5) "[t]he user's x-client-data identifier." Dkt. 163 (FAC) ¶ 141.

[5] Plaintiffs maintain that their "case … relies on a direct misrepresentation [in the Chrome Privacy Notice] as opposed to only an omission theory." Dkt. 67 (MTD Opp.), at 2; *see also* FAC ¶¶ 1-2. The Court relied on Plaintiffs' allegations regarding the Chrome Privacy Notice in denying Google's Motion to Dismiss. *See* MTD Order at 16-17 ("[T]he Court concludes that a reasonable user could read Google's representations [in the Chrome Privacy Notice] to mean that, if the user was not synced, his or her browsing history, cookies, and site data would not be sent to Google.").

Privacy Notice cannot negate Plaintiffs' express consent to the data collection described in the Account Holder Agreements and Privacy Policy if they never read the Chrome Privacy Notice.

Plaintiffs' claims should be dismissed with prejudice.

## II.   STATEMENT OF ISSUE TO BE DECIDED

Whether the Court should grant summary judgment on Google's First Affirmative Defense of Consent and dismiss Plaintiffs' remaining claims with prejudice.

## III.   STATEMENT OF UNDISPUTED FACTS

### A.   Google's Receipt of Data From Websites Using Its Services Is Unrelated To Chrome Sync

Plaintiffs are Google Account holders and Chrome-browser users who allege that Google "causes Chrome to record and send users' personal information to Google regardless of whether a user elects to Sync or even has a Google account." FAC ¶ 3. The "personal information" allegedly sent to Google consists of five categories of information transmitted to Google when a user visits a third-party website choosing to use certain Google services (*e.g.*, Google's advertising or analytics services) (the "Services"). *See supra* n.3 (citing FAC ¶ 141). Although Plaintiffs frame their case in terms of Chrome's Sync feature, that framing is a red herring. The data collection foundational to their claims has nothing to do with Sync. And with one exception,[6] it is also wholly unrelated to the Chrome browser—as opposed to other browsers.

Sync is an optional personalization feature of the Chrome browser.[7] As the name implies, Sync allows a user to have the same personalized browsing experience, and access to the same bookmarks, tabs, passwords, settings and other information, across their Synced devices. Fair Decl. ¶ 6. Google's disclosures explain that Sync allows Chrome users to choose to save certain information stored locally on their browsers in their Google Accounts so that they can access the same settings and information

---

[6]   The lone exception is the X-client data header, which is sent only in Chrome and is used to test new Chrome features before rolling them out to all users. *See* Broome Decl. Ex. 12 (Svitkine Dep. Tr.) at 89:6-18. Because the X-client data header is not uniquely identifying and is not used to track users, it is irrelevant here. *See id.* 21:12-17, 22:3-18, 90:20-91:5, 92:8-19, 226:19-227:1.

[7]   "Un-Synced Chrome" mode is a term contrived by Plaintiffs. FAC ¶ 1. "Un-Sync" is not a browser mode, and "Un-Synced Chrome" is never referenced in Google's disclosures. Fair Decl. ¶ 3.

when they "sign in and sync to Chrome on other computers and devices." *Id*. This is not disputed. Plaintiffs admit that Sync is disclosed only as a way for a Chrome user to "'access [synced information] when you sign in and sync to Chrome on other computers and devices.'" Broome Decl. Ex. 4 (Plaintiffs' Amended Responses and Objections to Amended Interrogatory No. 7), at 8:24-26.

Chrome Sync state is wholly irrelevant to the disputed data collection. Plaintiffs admit—as they must—that Google receives the data when a user (using any web browser) visits a third-party website that has chosen to install Google scripts on its site to make use of certain Google Services. *See* FAC ¶¶ 129-130, 140, 148. Those scripts cause the user's browser to send a resource request including a copy of the user's GET or POST request to Google servers that respond by providing the requested Google Service. *Id*.

That transmission is the interception at the center of each claim. *Id*. ¶¶ 149, 328-332, 345-351, 355, 364-368, 401-405, 411-415. And, while Plaintiffs suggest this transmission is unique to Chrome, it indisputably is not. *See* Fair Decl. ¶ 5. The Google Services are browser-agnostic—*i.e.*, they are designed to receive the same data categories from all website visitors, regardless of a user's browser.[8] *Id*. Nor does Chrome's Sync feature affect whether Google's Services receive the data at issue. *Id*. at ¶ 6. Turning Sync **on** does not cause the Services to receive the user's IP address, user-agent information, cookies, X-Client Data Headers, or GET and POST requests. *See id*. ¶¶ 7, 9-10. Conversely, turning Sync **off** (or never enabling it in the first place) does not prevent the Services from receiving such data. *Id*.

---

[8] Google Services generally receive the disputed data regardless of browser brand or whether a Chrome browser user has enabled Sync. There are a number of user-enabled features and settings in Chrome and other browsers that can block certain categories of the disputed data from being transmitted to and/or used by Google's Services (and other similar third-party web-services), such as cookie-blockers, browser plug-ins, opt-out features, and virtual private networks. Websites using Google's Services can also enable or disable settings that affect whether Google receives certain categories of data. But those features are not what Plaintiffs base their complaint on. Rather, Plaintiffs allege they believed simply using Chrome in its default state—without enabling any privacy features—would block all transmissions of the disputed data to Google.

Chrome users enabling Sync may choose to associate their Chrome browsing history with their account on Google's servers to sync that history to their other Synced devices.[9] But that transmission is separate and distinct from the alleged interception by Google Services at the foundation of each claim. Plaintiffs artfully allege that Google receives "browsing history *in the form of user's GET requests*" directed by users to third-party websites that use Google Services. FAC ¶ 141 (emphasis added). Such GET requests are not Chrome browsing history. Fair Decl. ¶ 10. The Google Services receive GET requests regardless of whether a user is browsing in Chrome, and regardless of whether a Chrome user has enabled Sync. *Id.* ¶¶ 5-6, 10.

## B.    Plaintiffs Expressly Consented to Google's Receipt of the Disputed Data

Each Plaintiff expressly consented to the collection of the disputed data. Plaintiffs "admit that at the time they signed up for their Google Accounts the relevant contract to which they were legally deemed to have agreed consisted of [*inter alia*] … the Google Privacy Policy."[10] Broome Decl. Ex. 5 (Plaintiffs' Responses and Objections to Defendant's Amended First Set of Requests for Admissions), at Response to Amended Request for Admission No. 1B. All versions of the Privacy Policy in effect when Plaintiffs signed up for their Accounts through today clearly disclose that Google receives the disputed data through the Google Services. Fair Decl. ¶¶ 50-61. In addition, beginning in June 2016, approximately one month before the beginning of the Class Period, Google launched a new consent process for existing Google Account holders and new users seeking to create Google Accounts that clearly and succinctly disclosed that Google receives the disputed data and asked whether the users agreed to the data being associated with their Accounts and used to

---

[9] To be clear, this is the user's choice. Chrome users can adjust their Sync settings to sync only certain settings and information. For example, a user can choose to sync bookmarks and auto-fill information, but not Chrome browsing history. *See* Fair Decl ¶¶ 7-8 & Ex. 1.

[10] One Plaintiff—Kindler—purportedly "denies that she ever agreed to any Google Privacy Policy." Broome Decl. Ex. 5, at Response 1B. She offers no explanation as to why she is differently situated from the other Plaintiffs, who admit that they were "legally deemed to have agreed" to the Privacy Policy upon creating their accounts. Consent to the Privacy Policy is required to create an Account, as the other Plaintiffs acknowledge. Indeed, as demonstrated below in Section B.3, when Kindler created a new account in May 2020, she was shown a page that stated that Google would "process [her] information as described in our Privacy Policy," and asked whether she agreed. Kindler selected "I AGREE." Fair Decl. ¶ 47 & Exs. 31-33.

personalize ads. *Id.* ¶ 13. Each Plaintiff was shown one or more of these Account Holder Agreements and selected "I AGREE." *Id.* ¶¶ 27-31, 45-49.

### 1. Plaintiffs Agreed to Google's Privacy Policy

Discovery has established that Plaintiffs agreed to Google's Privacy Policy when they signed up for their Google Accounts. *See* Fair Decl. ¶¶ 34-35 & nn.3-4; Broome Decl. Ex. 5, at Response 1B. The Privacy Policy explains that Google collects the data when users visit websites that use Google Services. It further identifies Chrome browsing history and "activity on third-party sites and apps that use our services" as separate data sources from which Google may receive information. *See* Fair Decl. ¶¶ 51-61. For example, the Privacy Policy in effect when Plaintiffs' filed suit stated in relevant part:

> ***Our services include***: Google apps, sites, and devices, like Search, YouTube, and Google Home[;] Platforms like the Chrome browser and Android operating system[; and] ***Products that are integrated into third-party apps and sites, like ads and embedded Google Maps***….

> We collect information about the apps, browsers, and devices you use to access Google services…. The information we collect includes unique identifiers, browser type and setting, device type and settings, operating system…. We also collect information about the interaction of your apps, browsers, and devices with our services, including IP address, crash reports, system activity, and the date, time, and referrer URL of your request.

> We collect information about your activity in our services…. ***The activity information we collect may include: …. Activity on third-party sites and apps that use our services [and] Chrome browsing history you've synced with your Google Account***.

> We use the information we collect to customize our services for you, including providing recommendations, personalized content, and customized search results…. Depending on your settings, we may also show you personalized ads based on your interests.

Fair Decl. ¶¶ 56-58.

### 2. Plaintiffs Crespo, Henry, Wilson, and Johnson Affirmatively Consented to the Consent Bump Agreement

Google Account holders as of June 2016—including Plaintiffs Crespo, Henry, Wilson, and Johnson—were shown the Consent Bump Agreement upon logging into their accounts:

/ / /

/ / /

/ / /

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



### Some new features for your Google Account

We've introduced some optional features for your account, giving you more control over the data Google collects and how it's used, while allowing Google to show you more relevant ads.

What changes if you turn on these new features?

1. More information will be available in your *Google Account*, making it easier for you to review and control



When you use Google services like Search and YouTube, you generate data — things like what you've searched for and videos you've watched. You can find and control that data in *My Account* under the **Web & App Activity** setting.

With this change, this setting may also include browsing data from Chrome and activity from sites and apps that partner with Google, including those that show ads from Google.

You have Chrome browsing history stored in your *Google Account*. Learn more about how turning on this setting affects how this data is used for personalization.

2. Google will use this information to make ads across the web more relevant for you



In *My Account*, the **Ads Personalization** setting currently lets Google use data in your account to tailor ads that appear in Google products.

With this change, this setting will also let Google use data in your account to improve the relevance of ads on websites and apps that partner with Google.

These settings apply across all of your signed-in devices and across all Google services. You can change them any time in *My Account*. Learn more about these features, including how they affect shared devices.

What's still the same?

- Google does not sell your personal information to anyone
- You control the types of information we collect and use at *My Account* (myaccount.google.com)

**Choose I AGREE to turn these features on or MORE OPTIONS for more choices.**

MORE OPTIONS    I AGREE

1   Fair Decl. ¶¶ 18-31 & Ex. 3 at GOOG-CABR-04067836.[11]

2          The Consent Bump Agreement explained that Google introduced "[s]ome new features for

3   your Google Account," and provided Account holders the option to turn the features on, adjust them,

4   or leave them off. The Consent Bump Agreement explained: "1. More information will be available

5   in your *Google Account*, making it easier for you to review and control," and "2. Google will use this

6   information to make ads across the web more relevant for you." The Consent Bump Agreement further

7   explained:

8          When you use Google services like Search and YouTube, you generate data — things like
       what you've searched for and videos you've watched. You can find and control that data in
9          My Account under the Web & App Activity setting.

10         With this change, this setting may also include ***browsing data from Chrome and activity from
       sites and apps that partner with Google, including those that show ads from Google***.
11

12  *Id.* ¶¶ 19-22 & Ex. 3 at GOOG-CABR-04067836 (emphasis added). The Consent Bump Agreement

13  plainly distinguishes between "browsing data from Chrome" (*i.e.*, the Chrome browsing history

14  Google stores in a user's account when the user enables Sync) and "activity from sites and apps that

15  partner with Google" (*i.e.*, the information Google receives when a user visits websites that use

16  Google Services, at issue here), as separate sources from which Google receives information. *Id.*

17         The Consent Bump Agreement also explained that the data stored in users' Google Accounts

18  would be used to personalize ads unless that setting was disabled:

19         In My Account, the Ads Personalization setting currently lets Google use data in your account
       to tailor ads that appear in Google products.
20

21         With this change, this setting will also let Google use data in your account to improve the
       relevance of ads on websites and apps that partner with Google.
22

23  *Id.*

24  _____

25  [11] The sentence next to the Chrome icon—"You have Chrome browsing history stored in your Google
    Account. Learn more about how turning on this setting affects how this data is used for
26  personalization"—was shown only to users who had Chrome browsing history stored in their accounts
    already because they had affirmatively enabled Sync at some earlier point. Fair Decl. ¶ 20. Discovery
27  has confirmed that this sentence was shown to Plaintiffs Henry and Johnson, who had enabled Sync.
    *Id.* ¶¶ 29, 31.

28

The Consent Bump Agreement invited users to "change these [settings] anytime in My Account" and included a "Learn more" link that brought the user to a Frequently Asked Questions ("FAQ") page. *Id.* ¶ 23. The FAQ states in relevant part:

> What do we mean by "websites and apps that partner with Google"?
>
> Many websites and apps use Google technologies to improve their content and services. For example, a website might use our advertising services (like AdSense) or analytics tools (like partners who use Google Analytics to improve the ads they show).
>
> ***As you use these sites, your web browser may send certain information to Google that may include the web address of the page that you're visiting, your IP address, or cookies previously set by the site or Google....***

*Id.* ¶¶ 25-26 & Ex. 3 at GOOG-CABR-04067841 (emphasis added).

The Consent Bump Agreement presented Account holders with the choice to select "I AGREE" or to view "MORE OPTIONS." *Id.* ¶ 24. If a user selected the "MORE OPTIONS" button, she was presented with three options: (1) "No changes - continue on your way"; (2) "No changes - review key privacy settings more fully"; or (3) "Yes, I'm in - turn on these new features." *Id.* Users could also select "Learn more about these features." If they selected "Learn more," they were taken to the same FAQ page described above. *Id.* ¶ 25.

Plaintiffs Crespo, Henry, Wilson, and Johnson had existing Google Accounts when Google launched the Consent Bump Agreement in June 2016. *Id.* ¶¶ 27-31. Each of these Plaintiffs was presented the Consent Bump Agreement and selected "I AGREE." *Id.* ¶¶ 27-31 & Exs. 4-21.

### 3.    Plaintiffs Calhoun, Kindler, Wilson, and Johnson Affirmatively Consented to the New Account Creation Agreement

Users creating a new Google Account after June 2016 were shown a New Account Creation Agreement that required the user's affirmative consent to create a Google Account. Fair Decl. ¶ 32. Between June 2016 and May 2018, the New Account Creation Agreement appeared as follows:

/ / /

/ / /

/ / /

/ / /

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

27

*Id.* ¶ 34 & Ex. 3 at GOOG-CABR-04067829-830.

28

1
2
3
4
5

The New Account Creation Agreement states at the top: "By choosing 'I agree' below you agree to Google's Terms of Service. You also agree to our Privacy Policy, which describes how we process your information, including these key points…." The New Account Creation Agreement linked to the then-current versions of Google's Terms of Service and Privacy Policy—which detailed the relevant Google data collection. Fair Decl. ¶ 35; *see supra* at III.B.I.

6
7

The New Account Creation Agreement also disclosed the "Data we process when you use Google." The screen specifically explained that Google processes the data at issue here:

8
9

> When you search for a restaurant on Google Maps or watch a video on YouTube, for example, we process information about that activity—***including information like the video you watched, device IDs, IP address, cookie data, and location***.

10
11

> ***We also process the kinds of information described above when you use apps or sites that use Google services like ads, Analytics, and the YouTube video player***.

12
13

> Depending on your account settings, some of this data may be associated with your Google Account and we treat this data as personal information. You can control how we collect and use this data at My Account (myaccount.google.com).

14
15
16

Fair Decl. ¶¶ 34, 36 & Ex. 3 at GOOG-CABR-04067829  (emphasis added). It further explained that Google uses the data for a variety of purposes, including to "[d]eliver personalized ads ... both on Google services and on sites and apps that partner with Google." *Id.* ¶¶ 34, 43.

17
18
19

Plaintiff Calhoun was shown this disclosure and selected "I AGREE"  when creating a Google Account. *Id.* ¶ 46 & Exs. 26, 28, 30.  He did so again in creating a second Google Account. *Id.* ¶ 46 & Exs. 25, 27, 29.

20
21
22
23

From May 2018 to the present, users signing up for a Google Account were shown a  modified version of the New Account Creation Agreement. The modified version included the same text displayed above, but added some additional information and options for users to adjust their settings. *Id.* ¶¶ 37-44 & Exs. 22-23.

24
25
26

Plaintiffs Kindler, Wilson, and Johnson were shown the modified version of the New Account Creation Agreement, and selected "I AGREE" when they created their Google Accounts. *Id.* ¶¶ 47-49 & Exs. 31-39.

27

*     *     *     *     *

28

Contrary to Plaintiffs' allegation that Google collected the disputed data in "secret," it was not hidden from them. Discovery has confirmed that in addition to describing the data collection in the Account Holder Agreements, the Privacy Policy, and numerous other disclosures, Google repeatedly advised Account holders to view and personalize their Web & App Activity by visiting their My Activity (f.k.a. My Account) pages. *Id.* ¶¶ 63-64. The My Activity page allows users to review, manage, and delete the information Google associates with their Google Accounts, including the searches they conducted and a list of third-party websites from which Google received the disputed data when users visited those sites (*i.e.*, the very information Plaintiffs allege Google "secretly" misappropriated). *Id.* ¶ 65; FAC ¶ 5.[12]

These My Activity controls are ubiquitous. On average, approximately 170 million Google Account Holders visit their My Activity pages every week. Fair Decl. ¶ 69. Excerpts of Plaintiffs' Web & App Activity pages (filtered to reflect the Data Google received through the Ads and Analytics Services at issue) are attached to the Fair Declaration as Exhibits 40 through 50. *Id.* ¶ 70. Plaintiffs could view their Web & App Activity throughout the Class Period. *Id.* Moreover, Google repeatedly reminded them to do so by direct emails, in the Account Holder Agreements, the Privacy Policy and pages linked to the Privacy Policy, Help Center articles, and in the Chrome Privacy Notice. *Id.* ¶¶ 63-68; Broome Decl. Exs. 13-28. Plaintiff Johnson visited his My Activity page on March 10, 2019. Fair Decl. ¶ 71 & Ex. 51.

### C.    Plaintiffs Did Not Review The Chrome Privacy Notice

Plaintiffs each have admitted in written discovery and sworn testimony that they did not review the Chrome Privacy Notice and it was ***not*** a basis for their alleged expectation that using Chrome without Sync would prevent Google from receiving the disputed data.[13] They further admit that they

---

[12] On My Activity, users can also enable auto-delete features and enable or disable numerous other settings. Fair Decl. ¶ 65. For example, users can choose to turn Ads Personalization off, which prevents the use of information in the user's Account for advertising. *Id.*

[13] *See* Broome Decl. Ex. 1 (Plaintiffs' Amended Responses and Objections to Defendant's First Set of Interrogatories), at Response to Interrogatory No. 1; *id.* Ex. 2 (Plaintiffs' Amended Responses and Objections to Defendants' Second Set of Interrogatories), at Response to Interrogatory No. 6; *id.* Ex. 3 (Plaintiffs' Responses and Objections to Defendant's First and Second Set of Interrogatories to Plaintiffs Added in First Amended Complaint), at Responses to Interrogatory Nos. 1 and 6; *id.* Ex. 6 (Kindler Dep.) at 26:16-17, 37:25-38:5, 99:23-100:1, 226:23-227:5, 315:9-17; *id.* Ex. 7 (Calhoun

did not review or rely on any other statements in Google's disclosures about Sync or the data collection at issue.[14]

Plaintiffs' admissions negate their alleged reliance on the document at the core of the Complaint. FAC ¶ 2 ("Google ***expressly promises*** Chrome users [in the Chrome Privacy Notice] that they 'don't need to provide any personal information to use Chrome' and that '[t]he personal information that Chrome stores won't be sent to Google unless you choose to store that data in your Google Account by turning on sync'" (emphasis added)). They also debunk attorney argument in Plaintiffs' opposition to Google's motion to dismiss. MTD Opp'n at 2 (This "case … relies on a ***direct misrepresentation*** [in the Chrome Privacy Notice] as opposed to only an omission theory" (emphasis added)). In reliance on these assertions, the Court denied Google's consent-based arguments because "the ***Chrome Privacy Notice*** makes specific representations ***that could suggest to a reasonable user*** that Google would not engage in the alleged data collection." MTD Order at 14 (emphasis added).

In an abrupt pivot, Plaintiffs now contend they believed using Chrome without enabling Sync would prevent Google from receiving data because "Google's use of the word Sync [on the Sync button] leads users to believe that their personal information stored by Chrome will not be sent to Google unless they choose to sync their Account." Broome Decl. Ex. 4 (Plaintiffs' Amended Responses and Objections to Defendant's Amended Interrogatory No. 7), at 4:28-5:02. Plaintiffs' newfound theory that the mere existence of the word "Sync" on a button—without any further context or explanation—implies that ***not*** enabling Sync somehow blocks all Google data collection is not mentioned in their Complaint. And it is facially implausible, particularly given that the button for

---

Dep.) at 65:22-66:24, 75:5-6; *id.* Ex. 8 (Crespo Dep.) at 84:24-86:24; *id.* Ex. 9 (Henry Dep.) at 93:9-22; *id.* Ex. 10 (Johnson Dep.) at 63:25-64:10; *id.* Ex. 11 (Wilson Dep.) at 156:11-16, 206:2-8, 210:6-11, 281:10-282:13.

[14] *See* Broome Decl. Ex. 6 (Kindler Dep.) at 31:14-32:4, 48:24-49:16, 227:7-9, 314:20-315:7; *id.* Ex. 7 (Calhoun Dep.) at 20:14-21:4, 22:11-26:16; *id.* Ex. 8 (Crespo Dep.) at 31:12-25, 33:12-34:23; *id.* Ex. 9 (Henry Dep.) at 25:13-27:18, 32:19-33:5, 119:20-121:22; *id.* Ex. 10 (Johnson Dep.) at 63:8-24, 67:1-16, 73:6-19.

users without sync enabled says "Sync **and personalize Chrome across your devices**." Fair Decl. ¶¶ 72-73 (emphasis added).

Indeed, the "Sync" button did not even exist when most of the Plaintiffs began using Chrome. *See id.* ¶¶ 74-75; Broome Decl. Exs. 1 (Plaintiffs' Amended Responses and Objections to Defendant's First Set of Interrogatories) and 3 (Plaintiffs' Responses and Objections to Defendant's First and Second Set of Interrogatories ), at Response to Interrogatory No. 2. Rather, the "Sync" button was added for some users in June 2018 and for all users by August 2018, Fair Decl. ¶ 74—years after most Plaintiffs began using Chrome. Prior to the summer of 2018, Chrome offered a "Signed-In Chrome mode" that enabled Chrome's synchronization feature, but there was no "Sync" button. *Id.* ¶¶ 74-75. It was not until August 2018 that Google separated Signed-In and Sync modes for all Chrome users, and added a "Sync" button within the browser. *Id.* ¶¶ 3, 74. By then, Plaintiffs had been using Chrome for years.

## IV.    ARGUMENT

At the motion to dismiss stage, the Court correctly held that "[c]onsent is a defense to Plaintiffs' claims." MTD Order at 12 & n.3; *see also* Cal. Civ. Code § 3516 ("He who consents to an act is not wronged by it."); *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 26 (1994) ("[T]he plaintiff in an invasion of privacy case must have conducted himself or herself in a manner consistent with an actual expectation of privacy, i.e., he or she must not have manifested by his or her conduct a voluntary consent to the invasive actions of defendant.").

As demonstrated above in section III, the Privacy Policy and the Google Account Holder Agreements specifically disclosed that Google: (1) receives data reflecting users' activity on websites that use Google's Services (*i.e.*, the data at issue here); (2) stores that information in users' Google Accounts (with their consent); and (3) uses the information in their Accounts to personalize ads. Plaintiffs admit they were "legally deemed to have agreed" to the Privacy Policy upon signing up for their Accounts. Broome Decl. Ex. 5, at Response 1B; *see also* Fair Decl. ¶¶ 34-35 & nn.3-4.  Further, each Plaintiff selected the "I AGREE" button on their respective Account Holder Agreement(s). In

doing so, each Plaintiff expressly consented to Google collecting the data at issue here, associating it with his/her Account(s), and using it to personalize ads. *See* Fair Decl. ¶¶ 27-31, 45-49.

The Ninth Circuit's *Smith* decision is directly on point. There the plaintiffs alleged that Facebook violated the Wiretap Act, the California Invasion of Privacy Act, and the plaintiffs' rights to privacy under the California Constitution because the scripts for Facebook services installed on third-party websites (for example, the Facebook "Like" and "Share" buttons) caused users' browsers to send GET requests to Facebook's servers, which "respond[] with code that makes the button appear on the page." *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 948 (N.D. Cal. 2017). Indeed, the alleged data collection and technological processes at issue are virtually identical in this case and *Smith*.[15]

The district court (Davila, J) dismissed the Plaintiffs' statutory and common law claims based on their consent to Facebook's Terms of Use and Data Policy. *Id.* at 955-56. The Ninth Circuit affirmed, explaining that the plaintiffs "consented to Facebook's data tracking and collection practices":

> [Facebook's] Terms and Policies contain numerous disclosures related to information collection on third-party websites, including: "We collect information when you visit or use third-party websites and apps that use our Services.... This includes information about the websites and apps you visit, your use of our Services on those websites and apps, as well as information the developer or publisher of the app or website provides to you or us," and "we use all of the information we have about you to show you relevant ads." ***A reasonable person viewing those disclosures would understand that Facebook maintains the practices of (a) collecting its users' data from third-party sites and (b) later using the data for advertising purposes.***

*Smith*, 745 F. App'x at 8-9 (emphasis added).[16]

---

[15] The district court in *Smith* explained that the GET requests at issue there included the same data at issue here: the URL of the page visited; IP addresses; cookies; and user-agent information. *Id.*; *see also id.* at 954 ("requests to Facebook's servers can include several types of information about the user, including browser settings, language, operating system, IP address, [] the contents of cookies that Facebook has set … [and] the referer header, which contains the URL of the page where the Facebook button is embedded").

[16] Plaintiffs may seek to analogize this case to *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020), but the case is inapposite. There the Court found, at the motion to dismiss stage, that: "Plaintiffs have plausibly alleged that, ***upon reading Facebook's statements in the applicable Data Use Policy***, a user might assume that only logged-in user data would be collected." *Id.* at 602. Here, Plaintiffs admit they did not read any of Google's disclosures. Moreover, unlike *In re Facebook Internet Tracking*, where the alleged data collection was "surreptitious and unseen," *id.* at 603, here, Google expressly disclosed the data collection—in Account Holder Agreements to which Plaintiffs affirmatively selected "I AGREE"—and then associated the data with Plaintiffs' accounts so they

Google's disclosures exceed the specificity that the Ninth Circuit held is sufficient to obtain consent to the collection of the disputed data from third-party websites that use a defendants' web-services. The Consent Bump Agreement plainly disclosed to Plaintiffs that enabling Web & App Activity causes "***activity from sites and apps that partner with Google***" to be stored in their Accounts and that "Google will use this information to make ads across the web more relevant for you." Fair Decl. ¶ 19 & Ex. 3 (emphasis added). The New Account Creation Agreement likewise disclosed that Google receives and processes the disputed data "when you use apps or sites that use Google services like ads, Analytics, and the YouTube video player," in part to "[d]eliver personalized ads ... both on Google services and on sites and apps that partner with Google." *Id.* ¶¶ 34-37, 43. And the Privacy Policy to which Plaintiffs admit they "were legally deemed to have agreed" also makes clear that Google collects users' "[a]ctivity on third-party sites and apps that use our services," including Google's advertising and analytics services.  *Id.* ¶ 56.

Courts routinely dismiss privacy claims where, as here, the plaintiff consented to the defendant's collection of the data or information. For example, in *Maghen v. Quicken Loans Inc.*, 680 F. App'x 554 (9th Cir. 2017), the Ninth Circuit affirmed the district court's grant of summary judgment on plaintiffs' CIPA claim because the plaintiff "did consent to having Quicken Loans record the calls" when he agreed to the Terms of Use which stated that "one of LendingTree's '200 Network Lenders' may contact him by phone on a recorded line." *Id.* at 555.

In *Silver v. Stripe Inc.*, 2021 WL 3191752 (N.D. Cal. July 28, 2021), the plaintiffs alleged that "Stripe violated various privacy laws by secretly tracking, collecting, and storing the personal data and web activity of visitors to merchants' website." *Id.*at *1. The district court dismissed state and federal wiretap claims "based on plaintiffs' consent to the collection of the data" where the privacy policy disclosed that Instacart, a merchant that integrated Stripe's payment platform, and its "partners" would "use various technologies" to "collect information about your online activity over time and across different websites or online services." *Id.* at *5.

---

could review the searches and list of websites from which Google received information on their My Activity page. *See* Fair Decl. ¶¶ 27-31, 45-49, 63-71.

In *Javier v. Assurance IQ, LLC*, 2021 WL 940319 (N.D. Cal. Mar. 9, 2021), the plaintiff claimed that the defendant collected his sensitive information, monitored his website activity, and shared his data with a third party without his consent. *Id.* at \*3. The district court dismissed CIPA and invasion of privacy claims because "the privacy policy to which Javier agreed disclosed the specific conduct at issue here" and noted that "policy as a whole is only two pages long, which means that none of the terms are buried or obscured." *Id.* at \*4. Here, too, the Account Holder Agreements are no more than two pages long and disclose the specific conduct at issue, *i.e.* Google's receipt of the data through users' activity on sites and apps that use Google's Services.[17]

Plaintiffs may argue that neither the Account Holder Agreements nor the Privacy Policy explicitly state that Google will collect the disputed data through its Services from Chrome users without Sync enabled. That argument is nonsensical, and would establish an unworkable legal standard.  As described above, Chrome Sync is a browser feature wholly unrelated to the collection of the data at issue here. And, because the Google Services are browser-agnostic, it would be misleading to have disclosures specific to Chrome.

Google is not required to try to list every browser, mode, and setting that does ***not*** affect whether Google receives the disputed data in order to obtain consent. In any event, the only basis for Plaintiffs' alleged belief that using Chrome without Sync would prevent Google from collecting the data through the Services—aside from their belated and specious "Sync button" theory (which is not alleged in the FAC)—is the Chrome Privacy Notice. But in stark contrast with the Account Holder Agreements that Plaintiffs indisputably were shown and to which they selected "I AGREE," Plaintiffs admit they never saw the Chrome Privacy Notice, so it is wholly irrelevant to the question of their consent to Google's receipt of the data at issue.

---

[17]  *See also Lightbourne v. Printroom Inc.*, 122 F. Supp. 3d 942, 948 (C.D. Cal. 2015) (granting summary judgment where there was "no genuine dispute of material fact as to whether [the plaintiff] expressly consented to [the challenged conduct]"); *Garcia v. Enterprise Holdings, Inc.*, 78 F. Supp. 3d 1125, 1135-37 (N.D. Cal. 2015) (dismissing CIPA claims where Privacy Policy provisions "contradict Plaintiff's claim that he was unaware of and did not consent to the transfer of his personal information"); *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1213 (N.D. Cal. 2014) (Koh, J.) (dismissing Wiretap Act claim where "Plaintiffs were explicitly alerted to the fact that thousands of contacts had been selected").

Plaintiffs may also argue that the Chrome Privacy Notice is a "service-specific" contract that "supersedes any conflicting term[s]" in the Account Holder Agreements and Privacy Policy, and that whether they read the Chrome Privacy Notice is irrelevant to their breach of contract claim. *See* FAC ¶¶ 35-41. That argument fails too. The Chrome Privacy Notice is limited by its terms to "features that are *specific to Chrome*." Fair Decl. ¶ 6 (emphasis added). Because Google's receipt of the data through the Services—which are browser-agnostic—is not "specific to Chrome," the Chrome Privacy Notice does not apply. By contrast, the Account Holder Agreements and Privacy Policy do describe Google's collection of the data through the Services, and thus are the relevant agreements.

Because Plaintiffs expressly consented to Google's receipt of the disputed data, each of their claims fails. The Court should grant summary judgment on Google's First Affirmative Defense of Consent, and dismiss Plaintiffs' claims with prejudice.

## V.   **CONCLUSION**

Google respectfully requests that Google's motion for summary judgment be granted and Plaintiffs' remaining claims dismissed with prejudice.

DATED:  November 30, 2021                    Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP


By     */s/ Andrew H. Schapiro*
Andrew H. Schapiro (admitted *pro hac vice*)
andrewschapiro@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Telephone: (312) 705-7400
Facsimile: (312) 705-7401

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Stephen A. Broome (CA Bar No. 314605)
stephenbroome@quinnemanuel.com
Viola Trebicka (CA Bar No. 269526)
violatrebicka@quinnemanuel.com
Alyssa G. Olson (CA Bar No. 305705)
alyolson@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Jomaire A. Crawford (admitted *pro hac vice*)
jomairecrawford@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Josef Ansorge (admitted *pro hac vice*)
josefansorge@quinnemanuel.com
1300 I. Street, N.W., Suite 900
Washington, D.C. 20005
Telephone: 202-538-8000
Facsimile: 202-538-8100

Jonathan Tse (CA Bar No. 305468)
jonathantse@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Sara Jenkins (CA Bar No. 230097)
sarajenkins@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

*Attorneys for Defendant Google LLC*