1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT

8

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

9

10
PATRICK CALHOUN, *et al.*, on behalf of themselves and all others similarly situated,

11
    Plaintiffs,

12
    v.

13
GOOGLE LLC,

14
    Defendant.

Case No. 5:20-cv-5146-LHK-SVK

**NOTICE OF MOTION AND MOTION TO STRIKE REPORT OF PLAINTIFFS' DAMAGES EXPERT RUSSELL MANGUM, III, PH.D**

The Honorable Lucy H. Koh
Courtroom 8 – 4th Floor
Date:  February 17, 2022
Time: 1:30 p.m.
Amended Complaint Filed:  April 16, 2021

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION TO STRIKE REPORT OF PLAINTIFFS' DAMAGES EXPERT RUSSELL MANGUM, III, PH.D

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE , on February 17, 2022, at 1:30 p.m. or as soon thereafter as this motion may be heard in the above-entitled court, before the Honorable Lucy H. Koh of the United States District Court, Northern District of California at the San Jose Courthouse, Courtroom 8, 4th Floor, 280 South 1st Street, San Jose, CA 95113, Defendant Google LLC ("Google") will and hereby does move the Court to strike the report of Plaintiffs' Damages Expert Russell W. Mangum III, Ph.D. ("Dr. Mangum"). Google's Motion is made pursuant to Federal Rule of Evidence 702, Civil Local Rule 7, and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ("*Daubert*"). Google's Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Viola Trebicka, dated December 22, 2021 ("Trebicka Decl.") and accompanying exhibits, all matters of which the Court may take judicial notice, all pleadings and papers on file in this action, and other written or oral argument that Google may present to the Court.

### ISSUES TO BE DECIDED

1.  Whether Dr. Mangum's restitution opinion should be stricken as unreliable under Federal Rule of Evidence 702 and the standards articulated in *Daubert*.

2.  Whether Dr. Mangum's unjust enrichment opinion should be stricken as unreliable under Federal Rule of Evidence 702 and the standards articulated in *Daubert.*

### RELIEF REQUESTED

Google requests that the Court strike the report of Dr. Mangum as set forth in his October 13, 2021 Expert Report In Support of Plaintiffs' Motion For Class Certification ("Mangum Rep.") and in his deposition testimony because they are 1) irrelevant to the remaining claims in this case, 2) based on flawed assumptions that are contrary to the record, and 3) would not assist a fact finder in arriving at a damages amount to fairly compensate the putative class as a whole and each of the putative class members.

1  DATED:  December 22, 2021                    Respectfully submitted,

2                                                QUINN EMANUEL URQUHART & SULLIVAN,
                                                 LLP
3

4

5                                               By  */s/ Andrew H. Schapiro*

6                                                   Andrew H. Schapiro (admitted *pro hac vice*)
                                                    andrewschapiro@quinnemanuel.com
7                                                   191 N. Wacker Drive, Suite 2700
                                                    Chicago, IL 60606
8                                                   Telephone: (312) 705-7400
                                                    Facsimile: (312) 705-7401
9
                                                    *Attorneys for Defendant Google LLC*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

ISSUES TO BE DECIDED..................................................................................................1

RELIEF REQUESTED ......................................................................................................1

I.     PRELIMINARY STATEMENT ..............................................................................1

II.    STATEMENT OF RELEVANT FACTS ................................................................2

      A.    Dr. Mangum's "Approaches" for Calculating Class-Wide Restitution Damages ........................................................................................................2

           1.    Hann and Krasnova Surveys. ...................................................4

           2.    Consumer Payments for VPNs...................................................5

           3.    Research Company Payments for User Information. ...................6

      B.    Dr. Mangum's Approach to Allocating Unjust Enrichment Damages ....................6

III.   LEGAL STANDARD ..............................................................................................7

IV.   ARGUMENT ...........................................................................................................8

      A.    Dr. Mangum's Opinion Should Be Stricken As Irrelevant Because Neither Unjust Enrichment Nor Restitution Are Available to Plaintiffs ..............................8

           1.    Neither Unjust Enrichment nor Restitution Are Available for CIPA, Statutory Larceny, or Intrusion Upon Seclusion. ...................9

           2.    Dr. Mangum's Damages Opinions Are Inapplicable to Breach of Contract or Good Faith and Fair Dealing. ...............................9

           3.    Unjust Enrichment and Restitution Are Unavailable For UCL Claim.........11

      B.    Dr. Mangum Improperly Assumes That Each Putative Class Member Was Injured and Is Therefore Entitled to Damages ...........................................14

      C.    Dr. Mangum's Restitution Opinion Is Contrary to the Record and Violates *Comcast* ...............................................................................................16

           1.    Dr. Mangum's Conclusion That a Single Restitution Number Can Fairly Compensate Class Members for their "Personal Information" Is Unsupported and Contrary to the Record.................................16

           2.    Dr. Mangum's Restitution "Approaches" Fail Under *Comcast* Because They Do Not Fit The Allegations. .................................18

      D.    Dr. Mangum's Unjust Enrichment Opinion Should be Stricken ...........................20

V.    CONCLUSION ......................................................................................................22

# **TABLE OF AUTHORITIES**

**Page(s)**

## **Cases**

*Adkins v. Facebook, Inc.*,
 2019 WL 3767455 (N.D. Cal. Aug. 9, 2019)........................................................................ 13

*ADT LLC v. Vivint, Inc.*,
 No. 17-cv-80432 (S.D. Fla., Nov. 14, 2017) ........................................................................ 20

*Archer v. United Rentals, Inc.*,
 195 Cal. App. 4th 807 (2011)................................................................................................ 13

*Argush v. LPL Fin., LLC*,
 2017 WL 349378 (D.N.J. Jan. 23, 2017),
 *aff'd*, 759 F. App'x 121 (3d Cir. 2018) ................................................................................. 8

*Bakst v. Cmty. Mem'l Health Sys., Inc.*,
 2011 WL 13214315 (C.D. Cal. Mar. 7, 2011) ................................................................ 15, 18

*Buckeye Tree Lodge & Sequoia Vill. Inn, LLC v. Expedia, Inc.*,
 2019 WL 1170489 (N.D. Cal. Mar. 13, 2019) ...................................................................... 21

*Calhoun v. Google LLC*,
 526 F. Supp. 3d 605 (N.D. Cal. 2021) ............................................................................ 11, 13

*Chowning v. Kohl's Dep't Stores, Inc.*,
 733 F. App'x 404 (9th Cir. 2018) .................................................................................... 11, 15

*City & Cty. of San Francisco v. Trump*,
 897 F.3d 1225 (9th Cir. 2018)................................................................................................. 9

*Comcast Corp. v. Behrend*,
 569 U.S. 27 (2013) ........................................................................................... 8, 16, 18, 20, 22

*Cooper v. Brown*,
 510 F.3d 870 (9th Cir. 2007) .................................................................................................. 7

*Cottle v. Plaid, Inc.*,
 2021 WL 1721177 (N.D. Cal. Apr. 30, 2021) ...................................................................... 13

*Daubert v. Merrell Dow Pharm., Inc.*,
 509 U.S. 579 (1993) ......................................................................................... 1, 8, 15, 18

*Davidson v. Apple, Inc.*,
 2018 WL 2325426 (N.D. Cal. May 8, 2018) ........................................................................ 20

*Ellis v. Costco Wholesale Corp.*,
 657 F.3d 970 (9th Cir. 2011) .................................................................................................. 8

*Folgelstrom v. Lamps Plus, Inc.*,
 195 Cal. App. 4th 986 (2011)................................................................................................ 13

*Gardiner v. Walmart Inc.*,
 2021 WL 2520103 (N.D. Cal. Mar. 5, 2021) ....................................................................... 13

*Glob. Hawk Ins. Co. v. Wesco Ins. Co.*,
 424 F. Supp. 3d 848 (C.D. Cal. 2019).................................................................................... 9

*Gonzales v. Uber Techs., Inc.*,
 305 F. Supp. 3d 1078 (N.D. Cal. 2018) ................................................................................ 13

*Grasshopper House, LLC v. Clean & Sober Media LLC*,
   2019 WL 12074086 (C.D. Cal. July 1, 2019)........................................................... 20

*Hale Bros. Inv. Co., LLC v. StudentsFirst Inst.*,
   2018 WL 784325 (E.D. Cal. Feb. 8, 2018) .......................................................... 9, 10

*Hart v. TWC Prod. & Tech. LLC*,
   2021 WL 1032354 (N.D. Cal. Mar. 17, 2021) ................................................... 13, 14

*Herskowitz v. Apple, Inc.*,
   301 F.R.D. 460 (N.D. Cal. 2014) ........................................................................... 12

*Huynh v. Quora, Inc.*,
   2019 WL 11502875 (N.D. Cal. Dec. 19, 2019) ...................................................... 10

*In re Anthem, Inc. Data Breach Litig.*,
   2016 WL 3029783 (N.D. Cal. May 27, 2016) ......................................................... 11

*In re ConAgra Foods, Inc.*,
   302 F.R.D. 537 (C.D. Cal. 2014) ............................................................... 16, 20, 22

*In re Facebook Priv. Litig.*,
   572 F. App'x 494 (9th Cir. 2014) ..................................................................... 11, 13

*In re Facebook, Inc. Internet Tracking Litig.*,
   956 F.3d 589 (9th Cir. 2020) ................................................................................. 11

*In re Hulu Priv. Litig.*,
   2014 WL 2758598 (N.D. Cal. June 17, 2014) ........................................................ 16

*In re iPhone Application Litigation*,
   844 F. Supp. 2d 1040 (N.D. Cal. 2012) ................................................................. 12

*In re TFT-LCD Antitrust Litig.*,
   637 F. App'x 981 (9th Cir. 2016)........................................................................... 11

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
   2017 WL 3727318 (N.D. Cal. Aug. 30, 2017)........................................................ 11

*In re Zynga Privacy Litig.*,
   2011 WL 7479170 (N.D. Cal. June 15, 2011),
   *aff'd*, 750 F.3d 1098 (9th Cir. 2014) ..................................................................... 13

*Johnson v. Napa Valley Wine Train, Inc.*,
   2016 WL 493229 (N.D. Cal. Feb. 9, 2016) ............................................................ 10

*Kremen v. Cohen*,
   337 F.3d 1024 (9th Cir. 2003) ............................................................................... 12

*Leyva v. Medline Industries Inc.*,
   716 F.3d 510 (9th Cir. 2013) ............................................................................. 8, 22

*Mariscal v. Graco, Inc.*,
   2014 WL 4245949 (N.D. Cal. Aug. 27, 2014)................................................... 14, 20

*Matthews v. Specialized Loan Servicing, LLC*,
   2020 WL 1889043 (C.D. Cal. Apr. 15, 2020) ........................................................ 10

*Opperman v. Kong Techs., Inc.*,
   2017 WL 3149295 (N.D. Cal. July 25, 2017) ........................................................ 17, 19

*Opperman v. Path, Inc.*,
   2016 WL 3844326 (N.D. Cal. July 15, 2016) ................................................ 8, 16, 18, 21, 22

*Parino v. BidRack, Inc.*,
   838 F. Supp. 2d 900 (N.D. Cal. 2011) ................................................................... 10

NOTICE OF MOTION AND MOTION TO STRIKE REPORT OF PLAINTIFFS' DAMAGES EXPERT RUSSELL
MANGUM, III, PH.D

*Pulaski & Middleman, LLC v. Google, Inc.*,
    802 F.3d 979 (9th Cir. 2015) ..................................................................................... 10

*Smith v. Arthur Andersen LLP*,
    421 F.3d 989 (9th Cir. 2005) ..................................................................................... 11

*Svenson v. Google Inc.*,
    65 F. Supp. 3d 717 (N.D. Cal. 2014) ......................................................................... 10

*Turnier v. Bed Bath & Beyond Inc.*,
    2021 WL 4209473 (S.D. Cal. Sept. 16, 2021) ........................................................... 10

*Two Jinn, Inc. v. Gov't Payment Serv., Inc.*,
    233 Cal. App. 4th 1321 (2015) .................................................................................. 11

*Walmart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011) .............................................................................................. 22

*Wesch v. Yodlee, Inc.*,
    2021 WL 1399291 (N.D. Cal. Feb. 16, 2021) ........................................................... 13

*Yahoo! Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
    859 F. App'x 168 (9th Cir. 2021) ................................................................................ 9

**Statutory Authorities**

Cal. Bus. & Prof. Code § 17204 ........................................................................................ 11

Cal. Civ. Code § 3358 ......................................................................................................... 9

Cal. Penal Code § 496 ......................................................................................................... 9

Cal. Penal Code § 637.2 ...................................................................................................... 9

**Rules and Regulations**

Fed. R. Civ. Pro. 23 ....................................................................................................... 8, 12

Fed. R. Evid. 702 ....................................................................................................... 1, 8, 18

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     PRELIMINARY STATEMENT

In seeking certification of their class, Plaintiffs rely solely on Dr. Mangum's opinion to argue that their purported "economic damages" are susceptible to class-wide calculation based on restitution of the value of their "personal information" or unjust enrichment to Google. For the reasons below, Dr. Mangum fails to present any relevant, reliable, non-speculative class-wide methodology for calculating damages that passes muster under *Daubert* and Rule 702.

*First*, Dr. Mangum's opinions on restitution and unjust enrichment damages are irrelevant because neither are available remedies for Plaintiffs' claims.

*Second*, for both restitution and unjust enrichment, Dr. Mangum *assumes* that every putative class member was injured by Google's alleged misconduct.  However, the record is replete with instances where class members were *not* harmed because they consented, because Google did not obtain or use the data at issue, or because the benefit they derived from personalization far outweighed the alleged value of their data or the alleged harm.  These users should be excluded, but Dr. Mangum admits his methodology has no way to do so.

*Third*, Dr. Mangum's restitution opinions are woefully incomplete and contrary to the record. Dr. Mangum opines that the same dollar-amount for restitution can apply to every member of the putative class to compensate for the value of their "personal information." This ignores the undisputed record, including testimony from Plaintiffs' other experts, that different class members place wildly different values on their personal information. Dr. Mangum does not himself provide (or even sketch out) an empirical analysis to arrive at what the value should be. Instead, he offers three "approaches," a total of 16 different numbers ranging from $1.11 to $26 monthly, solely as "information" for the Court to consider. That falls far short of the reliable methodology to feasibly calculate class-wide damages that is required at the class certification stage.

*Last*, Dr. Mangum's unjust enrichment opinion fails to provide a path to class-wide damages. Although he arrives at an (inflated and unreliable) number he claims are Google's "excess profits," his approach for allocation of that number to the class is deficient and unreliable. Dr. Mangum's approach would fail to compensate the millions of class members without a Google Account, and

would severely overcompensate some, while undercompensating other Google Account holders in the class.

For these reasons, the Court should strike Dr. Mangum's report.

## II.   STATEMENT OF RELEVANT FACTS

Dr. Mangum has filed an expert report in support of Plaintiffs' Motion for Class Certification. Dkt. No. 339-19.[1] Assuming liability, Dr. Mangum opines on two types of damages: (1) restitution, and (2) unjust enrichment. Trebicka Decl. Ex. 1, Transcript of December 7, 2021 Deposition of Dr. Mangum ("Mangum Dep.") 169:3-5; 170:12-171:4.

### A.   Dr. Mangum's "Approaches" for Calculating Class-Wide Restitution Damages

To determine restitution damages, Dr. Mangum purports to assess "the harm incurred by Class Members due to Chrome's violation of the privacy terms in the Chrome Agreements" Mangum Rep. ¶ 65. He purports to use "different ways to quantify this concept . . . of restitution of the value of personal information" (Mangum Dep. 172: 10-17), which he claims "can be analyzed" from two angles: 1) estimating the value class members place on protecting their personal information, and 2) assessing the value of class members' personal information itself. Mangum Rep. ¶ 66. Dr. Mangum testified that the amount of restitution damages for the value of personal information "will be [the same] number for all the class members." Mangum Dep. 179:9-17.

Dr. Mangum broadly describes the information he attempts to value as "constitut[ing] a consumer's online profile or identity." *Id.* ¶ 35. Dr. Mangum admitted that he has not compared the boundary of an "online profile or identity" and could not "make [the] comparison" as to whether or not it is coextensive with the data alleged to be improperly collected. Mangum Dep. 105:5-106:16. Dr. Mangum understands that "name and e-mail address would be part of [the] personal information" that he purports to value. *See id.* 16:9-13. By contrast, Plaintiffs have explicitly excluded name and email address from the data they allege was improperly collected, claiming they voluntarily provided Google certain information, including "name, email address, or other personal

---

[1]  Additional relevant facts of the case and Plaintiffs' allegations are set forth in Google's opposition to Plaintiffs' class certification motion which Google incorporates by reference.

NOTICE OF MOTION AND MOTION TO STRIKE REPORT OF PLAINTIFFS' DAMAGES EXPERT RUSSELL MANGUM, III, PH.D

1  information associated with their Google Accounts," as consideration for the purported contract.

2  Trebicka Decl. Exs. 2, 3, Plfs' Responses to Interrogatory No. 8.

3        Dr. Mangum claims that a conjoint analysis "can be used" to estimate the value users place

4  on "personal information protection." Mangum Rep. ¶¶ 73, 77. But he has not conducted, designed,

5  or even ideated such a quantitative assessment. *See, e.g.*, Mangum Dep. 198:13-16.  Dr. Mangum

6  does not specify the fundamental elements of a conjoint analysis, which include the product(s),

7  attributes, or levels to be used. *See* Trebicka Decl. Ex. 4, Report of **Tülin Erdem, Ph.D**, dated

8  **December 22, 2021** ("Erdem Rep.") § XII. For example, Dr. Mangum states that "the product is

9  Chrome's browsing services" (Mangum Rep. ¶ 73) but fails to specify (1) the mode or version of

10 Chrome would be included in a conjoint analysis; (2) the "personal information protection" to be

11 measured; or (3) how it could be included in a conjoint survey in a succinct, accurate, and realistic

12 manner.  Erdem Rep. § XII.

13       Dr. Mangum describes three "*approaches* that *might* be used" to arrive at a value for the

14 restitution due to class members, and states "then we will pick one and that will be the one used for

15 all the class members." Mangum Dep. 179:9-17 (emphasis added).   The three approaches

16 collectively provide sixteen disparate values, ranging from $1.11 to $26 per month (*see* ¶¶ 80-82,

17 85-87, 91-95).  Dr. Mangum has no opinion as to which approach is "superior": "It would depend.

18 I don't have an opinion so I don't rank these as best, second, or third. I think they all provide

19 information." Mangum Dep. 172:18-25.  Dr. Mangum proposes that a to-be-determined value "can

20 then be multiplied by the number of class member accounts to calculate the total damages for the

21 class." Mangum Rep. ¶ 96. He does not conduct any calculation, nor does he know the number of

22 class member accounts. *See* Mangum Rep. ¶ 97.  According to Dr. Mangum:

23         So part of the purpose wasn't necessarily to come to the damage which is what would
           be presented to a jury, but at this stage of class certification that it applies class wide.
24         I give multiple measures, multiple indications of what that would be.  That's one of
           the purposes. I don't necessarily have a plan -- I don't have in my report a decision
25         of, well, this is the one number.  Here is the multiplication. And I don't yet have an
           assignment or plan or a proposal for what this would look like at the merit stage of
26         this case.

27 *Id.* at 265:23-266:8.  Each of the "approaches" is summarized below.

28

## 1.     <u>Hann and Krasnova Surveys.</u>

Rather than proposing to conduct an independent survey or conjoint analysis, Dr. Mangum identifies a 2007 survey (the "Hann Survey") and a 2009 survey (the "Krasnova Survey").[2] Mangum Rep. ¶¶ 78-82.  He claims that these old surveys "can be used to assess value" that class members would place on protecting the data at issue.  Mangum Dep. 209:5-10; 199:8-14. He admitted, however, that if a survey of U.S. participants was done today, he could not say whether or not the results would arrive at the same values as Hann and Krasnova.  *Id.* 210:13-17; 211:5-10.

The Hann and Krasnova survey participants and the data at issue in those surveys are vastly different from the class members and data at issue in this case. The 2007 Hann Survey involved 84 undergraduate students from the United States and 184 from Singapore. Hann Survey at 23-24, 32. It purported to determine the value respondents placed on restrictions against unauthorized access to and secondary use of personal information. Mangum Rep. ¶ 80; *see generally* Hann Survey. The "personal information" at issue in the Hann Survey did not include any of the data at issue here; rather, it included name, home address, phone number, e-mail address, credit card information, and some industry-specific information, such as frequent flyer numbers, medical history, or investment portfolios.  Hann Survey at 23. The results of the Hann Survey revealed a group of respondents called "convenience seekers" who were found to have "little regard for…privacy policies" and were "much more accepting of cookies."  *Id.* at 32 (contrasting with those called "privacy guardians," who "attach a relatively high value to information privacy").

The Krasnova Survey, conducted in 2009, involved 168 *European* students,[3] and purported to determine a range that respondents would be willing to spend per year to participate in a social

---

[2]  Il-Horn Hann, Kai-Lung Hui, Sang-Yong Tom Lee and Ivan P. L. Png, "Overcoming Online Information Privacy Concerns: An Information-Processing Theory Approach," Journal of Management Information Systems 24, no. 2, 2007, available at https://www.comp.nus.edu.sg/~ipng/research/2007_conjoint.pdf; Hanna Krasnova, Thomas Hildebrand, and Oliver Guenther, "Investigating the Value of Privacy in Online Social Networks: Conjoint Analysis," ICIS 2009 Proceedings, paper 173, 2009, available at https://boris.unibe.ch/47455/1/Boris3.pdf.

[3]  The overall gross sample consisted of 214 responses, but the authors deleted 43 incomplete responses and three that had "low correlation between final and calibrated utilities," leaving a final net sample of 168. Krasnova Survey at 7.

Case No. 5:20-cv-5146-LHK-SVK

NOTICE OF MOTION AND MOTION TO STRIKE REPORT OF PLAINTIFFS' DAMAGES EXPERT RUSSELL MANGUM, III, PH.D

network that refrained from using the demographic information provided by users for personalized advertising. Krasnova Survey at 7. The data the survey purported to value was "Demographics Information," such as age, gender, city, study major, and "Personal Information," such as work, hobbies, personal interests, religion, political orientation, groups, relationship status, sexual orientation, photos, videos. *Id.* 5-6. The results of the Krasnova Survey revealed that almost 30 percent of the survey respondents were "unconcerned socializers," who "tend to be less concerned about [online social network]-related privacy issues" and who "[i]n their core, [] are oriented to extract a maximum interaction value from the network at the lowest cost and without accounting for long-term privacy risks." *Id.* at 12, 15 (contrasting with "'Privacy-Concerned' users [who] are very concerned about how their information is used by the [online social network] provider…and participate significantly less in [online social network]").

## 2.    Consumer Payments for VPNs.

Dr. Mangum claims that consumer payments for VPNs, which disguise a user's IP address, provide a "real market example of internet users' willingness to pay for online privacy." Mangum Rep. ¶ 84. However, he admitted that VPNs are not "a perfect fit" for the value of personal information alleged to be improperly collected in this case. *See* Mangum Dep. 215:18-216:1. He also admitted that he "can't quantify" the difference between the value of personal information at issue in this case and the VPN service. *Id.* 217:4-5. "That's an issue with this indirect approach." *Id.* 217:9-22.

Dr. Mangum lists eight different VPN providers with costs between $1.11 to $12.99 per month, but does not pick one to apply here. *See* Mangum Rep. ¶¶ 85-87; Mangum Dep. 172:18-173:1. He does not address the plethora of non-privacy reasons users may want to purchase VPNs, including to circumvent geo-restrictions and surpass censorship when travelling to foreign countries (*see* Trebicka Decl. Ex. 5, Expert Report of Bruce A. Strombom ("Strombom Rep.") ¶ 127), or how those non-privacy reasons may affect the price of VPNs. Dr. Magnum maintained that even such uses for VPNs "fit under what [he] think[s of as] the personal information slash privacy question." Mangum Dep. 225:3-18.

### 3.    Research Company Payments for User Information.

Dr. Mangum's report states that "[t]he value of personal information and online behavior is apparent in the way that research companies pay users for the collection of their online data." Mangum Rep. ¶ 90. He lists three different companies, which pay users between $50 to $312 annually for certain data depending on the type of information collected and other features. *See Id.* ¶¶ 91-95. Dr. Magnum does not pick one value for this case, and admitted he doesn't "have a technical opinion about everything that's collected," and doesn't "fully understand what's gained in [these] program[s]" by the various features they have and the requirements they put on the users. Mangum Dep. 238:5-6; 239:14-20. Indeed, these programs collected a different, broader set of data than what is at issue here. *See, e.g.*, Brandtotal Website, FAQ Page, available at https://www.joinupvoice.com/faq (stating "we collect your name, email address and basic demographic information...[,] . . . general demographic information (such as: age, gender, location and interests) and the ads you are exposed to while using Facebook, Twitter, YouTube, LinkedIn, and Amazon[,]" and additional information from "research surveys" available to users).

Regardless, he "believe[s]" Google collects the data above *and more*. Mangum Dep. 239:5-15; 242:23-243:8. Yet, he admitted he did not do a side-by-side comparison of the data to arrive at that conclusion, but rather compared them as he would compare two cars when car shopping: "I read that set of specs [sic] and I read that set of specs. I'm done[.] I compared them….I talk about these programs and the details. I talk about what Google is." *Id*. 253:10-16.

### B.    Dr. Mangum's Approach to Allocating Unjust Enrichment Damages

To determine unjust enrichment damages, Dr. Mangum purports to calculate the "excess profits" Google derived from Chrome "and would not have otherwise received had Google not violated the Chrome Agreements." Mangum Rep. ¶ 34. Dr. Mangum goes through a series of steps summarized in Table 3 of his report designed to arrive at "Google's profit premium due to the collection of the consumer identity data from class members vis-à-vis Chrome." *Id.* ¶ 60. However, Dr. Mangum does not purport to allocate the unjust enrichment damages among the putative class members. Moreover, Google does not calculate its third party network advertising profits on a per-

1    individual-user basis, nor could it.  Declaration of George Levitte, dated December 17, 2021. ¶¶ 5,

2    18.

3        Dr. Mangum identifies a single approach that he claims "can be" used to allocate unjust

4    enrichment damages: allocating the profit premium he computed based on the "number of Google

5    account months." Mangum Rep. ¶ 64. Based on the fact that Google has provided monthly data on

6    the US Google accounts that had sync enabled, Dr. Mangum assumes Google is able to provide

7    monthly data on the total number of Google accounts and therefore that the number of non-synced

8    Google accounts on a monthly basis can then be estimated. *Id.*  Dr. Mangum would divide the unjust

9    enrichment number by the total number of non-synced Google account months to arrive at a single

10   value. Mangum Dep. 131:23-25-132:1-2. He would then compensate a user according to the number

11   of "Google Account months."  Mangum Rep. ¶ 64.  Someone with multiple accounts per month

12   would receive a multiple of that number. Mangum Dep. 140:2-14.

13       Critically, Dr. Mangum admitted that this approach fails to allocate *any* profit to class

14   members who are not Google Account holders, despite the fact that alleged unjust enrichment

15   number he arrives at includes profits from non-Google Account holders. Mangum Dep. 132:1-5;

16   144:13-24.  He admitted that this "approach" does not account for multiple class members sharing

17   one Google Account, and offered that whether those users would get the same profits as the rest of

18   the class members or half could be "handled [at] claims administration."  *Id.* at 272:11-273:5.

19       At deposition, "claims administration" was Dr. Mangum's solution for *all* variances between

20   different class members -- among others, whether an individual gave consent could be ascertained

21   in claims administration (*Id.* at 307:14-23), the extent to which settings that block third party cookies

22   (and therefore a large part of the data allegedly improperly collected) has an effect on his unjust

23   enrichment analysis (*Id.* at 82:1-9), and whether users who have opted out of personalized ads would

24   be entitled to unjust enrichment damages (*Id.* at 89:17-24).

25   **III.    LEGAL STANDARD**

26       "It is the proponent of the expert who has the burden of proving admissibility." *Cooper v.*

27   *Brown*, 510 F.3d 870, 942 (9th Cir. 2007) (internal quotation marks and citations omitted). Expert

28   testimony is admissible only if (i) the expert's specialized knowledge will help the trier of fact

understand the evidence or determine a fact in issue; (ii) the testimony is based on sufficient facts or data; (iii) the testimony is the product of reliable principles and methods; and (iv) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993). At the class certification stage, a plaintiff must introduce evidence, including expert testimony, to show by a preponderance of the evidence that damages are susceptible to be awarded on a class-wide basis in order to meet the "demanding" predominance criterion of Rule 23(b)(3). *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013).

A court's gate-keeping function under *Daubert* is equally necessary in assessing a motion for class certification as it is before a trial. *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (holding that same evaluation of the expert's opinion takes place at the class certification stage as it would before trial). In considering a damages theory at this stage, the court must conduct a "rigorous analysis" to determine whether it is consistent with the plaintiffs' theory of liability. *Comcast,* 569 U.S. at 35 (internal quotation marks omitted).. A court must also "ensure" that class-wide damages can 'feasibly and efficiently be calculated once the common liability questions are adjudicated.'" *Opperman v. Path, Inc.*, 2016 WL 3844326, at *15 (N.D. Cal. July 15, 2016) (quoting *Leyva v. Medline Industries Inc.*, 716 F.3d 510, 514 (9th Cir. 2013)). Dr. Mangum's opinions fall far short of this exacting standard.

## IV.    ARGUMENT

### A.    Dr. Mangum's Opinion Should Be Stricken As Irrelevant Because Neither Unjust Enrichment Nor Restitution Are Available to Plaintiffs

District courts must play a critical "gatekeeping" role regarding expert testimony and "ensur[e] that an expert's testimony both rests on a reliable foundation and is *relevant to the task at hand.*" *Daubert*, 509 U.S. at 597 (emphasis added); *Argush v. LPL Fin., LLC*, 2017 WL 349378, at *2 (D.N.J. Jan. 23, 2017) (striking portions of expert reports as irrelevant because they opined on damages that could not be recovered as a matter of law), *aff'd*, 759 F. App'x 121 (3d Cir. 2018). Dr. Mangum opines on only two damages remedies: unjust enrichment and restitution. Mangum

Dep. 169:3-5. Neither remedy is available to Plaintiffs in this case. Therefore, his opinions are irrelevant and should be stricken.

### 1.     Neither Unjust Enrichment nor Restitution Are Available for CIPA, Statutory Larceny, or Intrusion Upon Seclusion.

Neither unjust` enrichment nor restitution are available for CIPA or statutory larceny because both statutes enumerate the specific remedies available and neither includes unjust enrichment, disgorgement of profits, or restitution.  *See* Cal. Penal Code § 637.2 (West) (remedy limited to statutory damages or three times the amount of actual damages); Cal. Penal Code § 496 (available remedies for statutory larceny limited to "three times the amount of actual damages, if any, sustained by the plaintiff, costs of suit, and reasonable attorney's fees"); *see also City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1239 (9th Cir. 2018) ("Under the doctrine of inclusio unius est exclusio alterius (the inclusion of one is the exclusion of the other), when a statute limits a thing to be done in a particular mode, it includes a negative of any other mode.") (internal quotation marks omitted). Nor are these types of damages available for intrusion upon seclusion. Google is aware of no decision awarding unjust enrichment or restitution for an intrusion upon seclusion claim, and Plaintiffs cite none.

### 2.     Dr. Mangum's Damages Opinions Are Inapplicable to Breach of Contract or Good Faith and Fair Dealing.

Unjust enrichment is not available for breach of contract or good faith and fair dealing claims because California Civil Code § 3358 limits contract damages to an amount no "greater ... than [the plaintiff] could have gained by the full performance [of the contract] on both sides." Cal. Civ. Code § 3358; *see also Yahoo! Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 859 F. App'x 168, 168 (9th Cir. 2021) ("[N]o person can recover a greater amount in damages for the breach of an obligation, than he could have gained by the full performance thereof….") (quoting Cal. Civ. Code § 3358); *Glob. Hawk Ins. Co. v. Wesco Ins. Co.*, 424 F. Supp. 3d 848, 854 (C.D. Cal. 2019) ("In California, contract damages are "the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom."); *Hale Bros. Inv. Co., LLC v. StudentsFirst Inst.*, 2018 WL 784325,

at *2 (E.D. Cal. Feb. 8, 2018)("The damages awarded should, insofar as possible, place the injured party in the same position it would have held had the contract properly been performed, but such damage may not exceed the benefit which it would have received had the promisor performed."). Plaintiffs do not allege (much less show) that they could have recovered the amount of Google's profits had Google not allegedly breached its contract.

Further, restitution "does not lie when an enforceable, binding agreement exists" and is only awarded "in lieu of breach of contract damages." *Parino v. BidRack, Inc.*, 838 F. Supp. 2d 900, 908 (N.D. Cal. 2011); *see also Johnson v. Napa Valley Wine Train, Inc.*, 2016 WL 493229, at *12 (N.D. Cal. Feb. 9, 2016)("Current California law maintains that damages for the breach of the covenant of good faith and fair dealing are limited to contract rather than tort remedies, with an exception for bad faith in insurance contracts.").

Dr. Mangum's opinion rests on a misunderstanding of the legal remedy of restitution.  Dr. Mangum testified that "restitution means the difference between what was received and what was in the contract." Mangum Dep. 195:13-14, 197:23-25.  What he articulates is the calculation of benefit of the bargain damages – not restitution.  *Compare Matthews v. Specialized Loan Servicing*, LLC, 2020 WL 1889043, at *3 (C.D. Cal. Apr. 15, 2020) (describing benefit of the bargain damages as "placing [party] in the same position he would have been in had the promisor performed the contract"); *with Turnier v. Bed Bath & Beyond Inc.*, 2021 WL 4209473, at *2 (S.D. Cal. Sept. 16, 2021) ("[R]estitution is the return of the excess of what the plaintiff gave the defendant over the value of what the plaintiff received.") (quoting *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 988 (9th Cir. 2015)). To the extent Plaintiffs will argue that they actually seek the "benefit of the bargain" damages for their breach of contract claim, they cannot as a matter of law where they paid nothing to use the (free) Chrome browser. *Huynh v. Quora, Inc.*, 2019 WL 11502875, at *10 (N.D. Cal. Dec. 19, 2019) ("[T]he lost benefit of the bargain is not sufficient to allege damages because Plaintiffs have not shown that they paid anything for the asserted privacy protections"); *Svenson v. Google Inc.*, 65 F. Supp. 3d 717, 724 (N.D. Cal. 2014) (benefit of bargain theory of damages defective because defendant's services were free).

NOTICE OF MOTION AND MOTION TO STRIKE REPORT OF PLAINTIFFS' DAMAGES EXPERT RUSSELL MANGUM, III, PH.D

Plaintiffs cite no case holding otherwise. Instead of addressing this issue head-on, they cite inapposite cases finding that allegations regarding taking of personal information is sufficient to establish Article III standing or injury for purposes of pleading injury for a breach of contract claim--not that unjust enrichment or restitution are available remedies for breach of contract.[4] These cases are inapplicable to determining whether Plaintiffs have properly established the availability of a monetary remedy at the class certification stage. *See In re TFT-LCD Antitrust Litig.*, 637 F. App'x 981, 985 (9th Cir. 2016) (declining to consider cases that "concerned standing rather than the measure of damages" when determining availability of monetary remedy); *Smith v. Arthur Andersen LLP*, 421 F.3d 989, 1005 (9th Cir. 2005) (distinguishing question of sufficiency of allegation of injury from question of "how to measure the extent of that injury").

### 3.    Unjust Enrichment and Restitution Are Unavailable For UCL Claim.

"The only monetary remedy available in a private action under the unfair competition law [UCL] is restitution." *Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 636 (N.D. Cal. 2021); *see also Chowning v. Kohl's Dep't Stores, Inc.*, 733 F. App'x 404, 406 (9th Cir. 2018) ("Nonrestitutionary disgorgement is unavailable in UCL actions"). To obtain restitution damages under the UCL, Plaintiffs must demonstrate that they "lost money or property" as a result of the alleged wrongful conduct. *Two Jinn, Inc. v. Gov't Payment Serv., Inc.*, 233 Cal. App. 4th 1321, 1331 (2015); Cal. Bus. & Prof. Code § 17204. Plaintiffs have failed to do so. Chrome is a free product so Plaintiffs paid nothing for it. Some (but not all)[5] Plaintiffs identified varying "out of pocket" costs -- as diverse

---

[4] *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 600 (9th Cir. 2020) (holding plaintiffs adequately pleaded entitlement to Facebook's profits from users' personal data sufficient to confer Article III standing); *In re Facebook Priv. Litig.*, 572 F. App'x 494, 494 (9th Cir. 2014) (holding allegations that plaintiffs "were harmed both by the dissemination of their personal information and by losing the sales value of that information" were sufficient to plead element of damages for breach of contract claim); *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 2017 WL 3727318, at *46 (N.D. Cal. Aug. 30, 2017) (Koh, J.) (dismissing express and implied contract claims in part and noting that the court will address whether "remaining claims for damages seek direct damages…at a later stage of the proceedings when the issue has been properly presented"); *In re Anthem, Inc. Data Breach Litig.*, 2016 WL 3029783, at *15 (N.D. Cal. May 27, 2016)(granting in part defendants' motions to dismiss and finding plaintiffs plausibly alleged injury for breach of contract).

[5] *See* Trebicka Decl. Ex. 6, Claudia Kindler Dep. Tr. 21:25-22:6 ( no out-of-pocket costs); Trebicka Decl. Ex. 7, Elaine Crespo Dep. Tr. 136:6-24 (no out-of-pocket costs); Trebicka Decl. Ex. 8, Michael Henry Dep. Tr. 113:10-16 (not sure if any out-of-pocket costs).

as "time spent on this case, using other browsers, and buying new computers and laptops" (Trebicka Decl. Ex. 9, Corinice Wilson Dep. Tr. 170:15-175:6) and (oddly) "a school district misusing information [] sen[t] [] via Gmail" (Trebicka Decl. Ex. 10, Rodney Johnson Dep. Tr. 125:13-127:19). Plaintiffs don't (and can't) claim this purportedly lost "money" is the basis on which class certification should be granted: the individualized inquiry required to make that determination on such a record is entirely inconsistent with Rule 23. *Herskowitz v. Apple, Inc.*, 301 F.R.D. 460, 476 (N.D. Cal. 2014) (denying class certification in part because determining harm under the UCL would require "individualized inquiries").

Nor have Plaintiffs shown they can establish by class-wide proof that they lost "property." Plaintiffs vaguely allege that they lost property in the form of "diminution of the value of their private and personally identifiable data and content" and "the unauthorized disclosure and taking of their personal information which has value as demonstrated by its use and sale by Google."[6] Dkt. No. 162-2, First Amended Complaint ("FAC") ¶ 416. The Ninth Circuit and courts in this District have held that such information is *not* personal property and its alleged misappropriation fails to satisfy the UCL's heightened standing requirement.  Therefore, Dr. Mangum's opinion that this information is equally valuable to each one of the millions of class members -- even if reliable -- is entirely beside the point. The categories of data that Google allegedly received are not property because they are not capable of "exclusive possession or control" by Putative class members. *Kremen v. Cohen*, 337 F.3d 1024, 1030 (9th Cir. 2003) ("[f]irst, there must be an interest capable of precise definition; second, it must be capable of exclusive possession and control; and third, the owner must have established a legitimate claim to exclusivity."); *In re iPhone Application Litigation*, 844 F. Supp. 2d 1040, 1074 (N.D. Cal. 2012) (Koh, J.) (similar user information is not property because "it is difficult to see how this broad category of information is capable of exclusive possession or control.").

---

[6]  Plaintiffs offer no evidence that Google sold their data. Dr. Mangum confirmed that he does not understand that Google's alleged conduct prevented class members from selling their personal information in the market (Mangum Dep. 188:13-189:5), or that Google diminished the value of their personal information (*id.* 186:13-187:5).

Case No. 5:20-cv-5146-LHK-SVK

NOTICE OF MOTION AND MOTION TO STRIKE REPORT OF PLAINTIFFS' DAMAGES EXPERT RUSSELL MANGUM, III, PH.D

Google acknowledges that this Court held otherwise at the motion to dismiss stage. Dkt. No. 142 at 37-39. Google respectfully submits that decision was incorrect and contrary to a consistent line of precedent in the Ninth Circuit and this district holding that the type of "personal information" at issue here is not "property" under the UCL.[7]  For example, in *Facebook Privacy Litigation*, where the plaintiffs alleged "that they were harmed both by [Facebook's] dissemination of their personal information and by losing the sales value of that information," the Ninth Circuit "affirm[ed] the district court's dismissal of the plaintiffs' UCL claim because plaintiffs failed to allege that they 'lost money *or property* as a result of the unfair competition.'" 572 F. App'x at 494 (citing *Folgelstrom v. Lamps Plus, Inc.*, 195 Cal. App. 4th 986 (2011) (emphasis added)).

Indeed, since the Court's Motion to Dismiss decision, two additional courts in this District have concluded that the alleged misappropriation of data exchanged on the Internet does not satisfy the UCL's "lost money or property" standing requirement. *See Cottle v. Plaid, Inc.*, 2021 WL 1721177, at *14 & n.8 (N.D. Cal. Apr. 30, 2021) ("disagree[ing] with the holding in *Calhoun*" and holding that defendant's alleged misappropriation of the plaintiffs' personal banking information did not satisfy the UCL's "lost money or property" standing requirement); *Hart v. TWC Prod. &*

---

[7] *See, e.g.*, *Gardiner v. Walmart Inc.*, 2021 WL 2520103, at *8 (N.D. Cal. Mar. 5, 2021) ("[C]ourts have widely held that 'personal information' does not constitute money or property under the UCL"); *Wesch v. Yodlee, Inc.*, 2021 WL 1399291, at *6 (N.D. Cal. Feb. 16, 2021) (rejecting argument that plaintiffs suffered loss because "they would not have used Yodlee if they knew the truth of its practices . . . because Plaintiffs have not paid []any money and have not alleged that they paid PayPal any money for use of its service"); *Adkins v. Facebook, Inc.*, 2019 WL 3767455, at *3 (N.D. Cal. Aug. 9, 2019) (noting that the Ninth Circuit rejected the theory that the "lost value of [the plaintiff's] personal information" establishes standing under the UCL in *In re Facebook Privacy Litigation* and denying leave to amend based on that theory); *Gonzales v. Uber Techs., Inc.*, 305 F. Supp. 3d 1078, 1093 (N.D. Cal. 2018) ("[T]he sharing of names, user IDs, location and other personal information does not constitute lost money or property for UCL standing purposes."); *Archer v. United Rentals, Inc.*, 195 Cal. App. 4th 807, 816 (2011) (dismissing UCL claim based on alleged "unlawful collection and recordation of [plaintiffs'] personal identification information" because "plaintiffs have failed to demonstrate how such privacy violation translates into a loss of money or property," which is "fatal" to a UCL claim); *In re Zynga Privacy Litig.*, 2011 WL 7479170, at *2 (N.D. Cal. June 15, 2011), *aff'd*, 750 F.3d 1098 (9th Cir. 2014) (allegation "that Defendant unlawfully shared their 'personally identifiable information' with third-party advertisers" failed under the UCL because "personal information does not constitute property for purposes of a UCL claim"); *In re iPhone Application Litig.*, 2011 WL 4403963, at *14 (N.D. Cal. Sept. 20, 2011) (Koh, J.) ("[A] plaintiff's 'personal information' does not constitute money or property under the UCL.").

Case No. 5:20-cv-5146-LHK-SVK

NOTICE OF MOTION AND MOTION TO STRIKE REPORT OF PLAINTIFFS' DAMAGES EXPERT RUSSELL MANGUM, III, PH.D

1    *Tech. LLC*, 2021 WL 1032354, at *7-8 (N.D. Cal. Mar. 17, 2021) (dismissing plaintiff's UCL claim

2    for lack of statutory standing because misappropriation of "private geolocation data" does not

3    constitute "lost money or property required to state an economic injury under the UCL").

4        Because neither unjust enrichment/disgorgement of profits nor restitution is an available

5    remedy for the claims Plaintiffs seek to certify, Dr. Mangum's testimony regarding these damages

6    theories is irrelevant and should be stricken.

7        **B.    Dr. Mangum Improperly Assumes That Each Putative Class Member Was Injured and Is Therefore Entitled to Damages**

8

9        Dr. Mangum assumes class-wide injury. *See e.g.* Mangum Dep. 63:24-25; 169:11-14;

10   265:23-266:1. Dr. Mangum's flawed assumption, which underlies both his opinion on unjust

11   enrichment and restitution, is contrary to the record in this case.  "[I]t is a proper exercise of the

12   Court's discretion to exclude witness testimony that is based on unsupported assumptions and

13   unsound extrapolation." *Mariscal v. Graco, Inc.*, 2014 WL 4245949, at *7 (N.D. Cal. Aug. 27, 2014)

14   (internal quotation marks omitted). The record demonstrates that millions of users who are

15   encompassed by Plaintiffs' broadly-defined class may not have been injured for numerous reasons.

16       *First,* various class members consented (implicitly or explicitly) to the collection of the data

17   in ways that are not applicable to the class as a whole. *See* Google's Memorandum of Points and

18   Authorities in Opposition to Plaintiffs' Motion for Class Certification ("Class Cert. Opp.") at §§ II.

19   C-F, III. A-B . Just as an example, some (but not all) Google Account holders expressly consented

20   to Google storing the data at issue in their Accounts, where they could review, manage, and delete

21   it on their My Activity pages. *Id*. at § III. D. Google Account holders visit their My Activity pages

22   over 170 million times every week.  *Id.* Class members who did so would know that using Chrome

23   without Sync does not prevent Google from receiving the disputed data -- and consented to this

24   conduct because they continued using Chrome without Sync. *Id.* Users who consented are not

25   injured because their data is not alleged to have been improperly collected.

26       *Second*, Google would not have received "personal information" from many purported class

27   members. That is because when Chrome users are in the default "Basic" mode—if they do not have

28   Accounts, or they are not signed-in to their Accounts—Google does not associate their data with

-14-

NOTICE OF MOTION AND MOTION TO STRIKE REPORT OF PLAINTIFFS' DAMAGES EXPERT RUSSELL MANGUM, III, PH.D

information that personally identifies them, nor can it reasonably do so. Declaration of David Monsees, dated December 20, 2021 §§ A-B.  Whether data is "personal information" depends on whether it is associated with a user's Google Account or any information that "personally identifies" that user.  Class Cert. Opp. at § II. H. This means the data Google receives from these particular class members who browsed exclusively in Chrome's "Basic" mode is not "personal information" in any relevant sense. *Id.*

*Third*, during the class period, Google Chrome users had myriad options to limit the amount and type of data that Google received from their browsing. For example, a user could: (1) turn "off" Ad Personalization in their Google Account settings or opt out of ad personalization in their Ad settings; (2) use cookie blockers within their Chrome browser settings; (3) use a privacy or ad blocker browser extension that stops websites from tracking users and prevents display ads from loading on the user's browser; (4) disable JavaScript in the Chrome browser settings; or (5) use the Network Advertising Initiative's personalized advertising opt-out. Declaration of Glenn Berntson, dated December 21, 2021 § B. These controls may have protected users from sustaining any alleged economic harm.  *See* Strombom Rep. ¶ 118-120.

*Fourth*, the value some class members may have derived from personalized advertising may outweigh the purported value of the data alleged to be improperly taken or the benefit of any such to Google, such that these class members derived a benefit from rather than incurred harm from the alleged misconduct.  *See Id.* § IV. B.4; *Chowning*, 733 F. App'x at 406 ("Restitution requires that the value of what the plaintiff received was less than what the plaintiff paid. Without evidence of the value received, that calculation is impossible.") (internal quotation marks and citations omitted).

Dr. Mangum's analysis ignores each of these well-supported factual scenarios. This flaw renders Dr. Mangum's calculation of both restitution and unjust enrichment damages unreliable. *Bakst v. Cmty. Mem'l Health Sys., Inc.*, 2011 WL 13214315, at *20 (C.D. Cal. Mar. 7, 2011) (finding expert's damages calculation failed to meet *Daubert*'s standards where it was "based on factual assumptions that are entirely unsupported in the record"). Because Dr. Mangum admits that his approach has no tools to exclude these unharmed class members and they would have to be addressed for tens of millions of class members at the "claims administration" stage (*see, e.g.*,

Mangum Dep. 68: 5-17) his opinion cannot be salvaged. *See Opperman*, 2016 WL 3844326, at *15 (rejecting damages model that "contemplate[d] sending each class member a questionnaire, having them complete it, and having someone read and analyze it to determine the appropriate damage award for each class member" because plaintiffs failed to demonstrate it was administratively feasible); *see also In re Hulu Priv. Litig.*, 2014 WL 2758598, at *16-23 (N.D. Cal. June 17, 2014) (rejecting use of self-reporting where issue of whether a user's personal information was transmitted to Facebook turned on factors such as "whether the user remained logged into Facebook, cleared cookies, or used ad-blocking software," because asking users to confirm such details would be "prone to subjective memory problems" and damages amount would "create incentives for claimants.").

**C.    Dr. Mangum's Restitution Opinion Is Contrary to the Record and Violates *Comcast***

**1.    Dr. Mangum's Conclusion That a Single Restitution Number Can Fairly Compensate Class Members for their "Personal Information" Is Unsupported and Contrary to the Record.**

Dr. Mangum conclusorily asserts that "conjoint analysis *can be* used to estimate the reduction in market value, *if any*," in the service they received but he has not conducted, designed, or determined the feasibility of such a quantitative assessment, or any empirical analysis, to determine the value putative class members place on the data alleged to be improperly collected. *See, e.g.*, Mangum Dep. 198:13-16. Courts routinely exclude expert reports that are "so incomplete as to be inadmissible as irrelevant." *In re ConAgra Foods*, *Inc.*, 302 F.R.D. 537, 552--53 (C.D. Cal. 2014) (striking damages expert report and denying class certification because expert failed to provide the actual damages model) (internal quotation marks omitted).

In fact, as outlined in the expert report of Dr. Erdem, such a  methodology is ill-equipped to accurately measure the value of the "personal information" in this case, particularly where Dr. Mangum does not identify which product(s), attributes, or levels he plans to include in his hypothetical conjoint analysis or consider existing alternatives to the Chrome browser.[8] *See* Erdem

---

[8]    As Dr. Erdem explains, a conjoint analysis would only measure survey respondents' stated preference: "although conjoint analysis relies on a choice, the results still can bear no relationship

NOTICE OF MOTION AND MOTION TO STRIKE REPORT OF PLAINTIFFS' DAMAGES EXPERT RUSSELL MANGUM, III, PH.D

Rtp. § XII.  This is also fatal to his opinion. *See Opperman v. Kong Techs., Inc.,* 2017 WL 3149295, at *11-12 (N.D. Cal. July 25, 2017) (denying certification and holding that "failure to identify the specific attributes to be used in a conjoint survey prevents the Court from finding that it will adequately measure damages").

Further, Dr. Mangum's opinion that a single restitution number can fairly compensate for the value each class member assigned to the data at issue is contrary to the undisputed record in this case that shows that: (1) users value their personal information differently; and (2) there is significant variability in whether, and if so, how much "personal information" Google collects from a particular class member.

Surveys on which Dr. Mangum relies, despite their limited and demographically homogeneous participant pools, demonstrate that different users value privacy very differently. (*See* § II. A.) Plaintiffs' other experts also admit that "people don't feel exactly the same way about privacy" and that "even the same person can feel differently [about privacy] at different moments in time and in different contexts." Trebicka Decl. Ex. 11, Leslie John Dep. Tr. 169:16-25; *see also id.* 172:9-18 ("How much [one is] concerned about [their] privacy and even the extent to which [they] are thinking about it, which it's top of mind, can vary."); *id.* 184:15-18, 22 (There are "fluctuations" in how different people value privacy based on "different times and different contexts"); *id.* 184:15-18 (There are "are 'differences in the degree of privacy concern'"); *id.* 163:3-24 (admitting that privacy is "abstract" and "ethereal";  "because privacy is an abstract concept, the economic value can't be pinpointed" and "[privacy] is kind of like love. Like how do you define love?").

Multiple other surveys, including several compiled and described in the Strombom Report, reach similar conclusions. Strombom Rep. ¶ 86.

---

to consumers' revealed preferences in the actual marketplace," where few consumers choose browsers with additional privacy protection features despite the fact that those browsers are free. Erdem Rtp. § XII.

NOTICE OF MOTION AND MOTION TO STRIKE REPORT OF PLAINTIFFS' DAMAGES EXPERT RUSSELL MANGUM, III, PH.D

The court in *Opperman* rejected an approach to valuing privacy almost identical to Dr. Mangum's:

> The chief problem with this analysis is that because consumers do not have identical preferences, each class member will place a very different value on the protection of — or misappropriation of — their contacts.  And while some of those differences may be attributable to observable characteristics such as age, gender, income, and education, some of them will be attributable to variation across individuals concerning their attitude toward and willingness to protect their privacy. No damages number arising from this model will apply to all class members, particularly since some of the class members, by this measure, will not have been injured at all — i.e., they would have not have required any premium to allow [defendants] to access their contacts, because they don't attach any value to them.

2016 WL 3844326 at *14–15 (internal quotation marks omitted).

For the same reasons, Dr. Mangum's one-size-fits all approach to restitution fails to account for the value each putative class member places on the data. His opinion should be excluded as contrary to the record and unhelpful. *Daubert*, 509 U.S. at 592-93 (stating that Rule 702 requires expert testimony to be both reliable and helpful to trier of fact); *Bakst*, 2011 WL 13214315 at *20 (holding that expert's damages calculation failed to meet *Daubert*'s standards where it was "based on factual assumptions that are entirely unsupported in the record, it fails").

## 2. Dr. Mangum's Restitution "Approaches" Fail Under *Comcast* Because They Do Not Fit The Allegations.

An expert's opinion on potential damages must ensure that the proposed damages model compensates only for damages caused by the alleged wrongdoing. *Comcast*, 569 U.S. at 34-35. "If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.* Dr. Mangum's opinion overstates Plaintiffs' damages because he does not attempt to limit his analysis to the data at issue.

Dr. Mangum incorrectly assumes that the data at issue here includes name and email address, although Plaintiffs have alleged that they voluntarily provided Google their names and email address as part of their "consideration" for the alleged contract. *See* § II.A. Dr. Mangum testified that his analysis does not allow for removing a particular piece, which demonstrates that his approach cannot be modified to isolate the value of the data at issue and arrive at a reliable measure of damages. Mangum Dep. 185:15-186:7.

In fact, each of the three approaches he proposes for a restitution analysis include a slew of data and variables that are not at issue in this case:

*The Hann and Krasnova Surveys*, which are more than a decade old, attempt to value data that is very different from the data at issue here and include name and email address. *See* § II.A. Dr. Mangum admitted that he does not know whether or not these same numbers would hold for a study done in the U.S. today. Mangum Dep. 211:5-10.

*VPN Payments* do not provide a reliable measure of the value class members place on their personal information because the amount people are willing to pay for VPNs varies dramatically and users have many non-privacy related reasons for purchasing VPN services, including to circumvent geo-restrictions and surpass censorship when travelling to foreign countries (*see* Strombom Rep. ¶ 127), that may affect the price of those services. Dr. Mangum admitted that payment for VPN is "not a perfect fit" for "the value of the information" at issue in this case. Mangum Dep. 215:18-25; *see also id.* 216:11-14; 20-23.

*The amount research companies pay users for certain data* include payment for data that includes name and email address, and other information not at issue here (for example, social network activity). *See* § II.A. Dr. Mangum admitted he performed ***no*** meaningful comparison between the data alleged to be improperly collected and the wide variety of data the various research companies he identified collect. Mangum Dep. 243:10-244-3; 252:10-22. He likened the comparison he did to shopping for a car: "I read that set of specs [sic] and I read that set of specs. I'm done[.]" Mangum Dep. 253:10-16. This is particularly troubling because Dr. Mangum admitted he does not understand the extent of the data these various companies pay for because he lacks the technical expertise. *Id.* 239:14-20.

The mismatch between the information Dr. Mangum attempts to value and the data at issue in this case -- and the inability to remove data from his analysis -- is fatal to his opinions. In *Opperman v. Kong Techs., Inc.*, the court rejected a damages model that sought to "measure the value to consumers of privacy generally," noting that "'privacy' encompasses a variety of concepts that are not at issue in th[e] case." 2017 WL 3149295 at *12. The court concluded that the "proposed methodology would overstate Plaintiffs' damages" and the resulting damages model "fails

*Comcast*'s requirement that Plaintiff's method of proving damages is tied to their theory of liability." *Id*; *see also Davidson v. Apple, Inc.*, 2018 WL 2325426, at *23 (N.D. Cal. May 8, 2018) (Koh, J.) (rejecting damages model involving survey that "only asked respondents about a generic defect instead of one specifically affecting the phone's touchscreen…because it unmoors Plaintiffs' damages from the specific touchscreen defect alleged to have harmed them."). Indeed, Dr. Mangum's testimony was recently excluded in *Grasshopper House, LLC v. Clean & Sober Media LLC* on a similar basis, in that his damages analysis was "not based on sufficient facts or data" and "would not be helpful to the jury...[or] be admissible." 2019 WL 12074086, at *4 (C.D. Cal. July 1, 2019; *see also ADT LLC v. Vivint, Inc.*, No. 17-cv-80432, at 6 (S.D. Fla., Nov. 14, 2017), Dkt. 170 (excluding Dr. Mangum's opinion in part because his "sweeping damages calculation [did] not reflect[] damages actually attributable to [defendant]'s alleged misconduct").

Given the above, it is unsurprising that Dr. Mangum refused to endorse any one of those to calculate restitution damages: "I don't necessarily have a plan -- I don't have in my report a decision of well this is the one number." Mangum Dep. 265:23-266:8. These opinions are too unconnected to the allegations in this case to be of any use, and should be stricken. *Comcast*, 569 U.S. at 34-35; *see also In re ConAgra Foods, Inc.*, 302 F.R.D. at 552-53 (striking damages expert report and denying class certification because expert failed to provide the actual damages model).

**D.    Dr. Mangum's Unjust Enrichment Opinion Should be Stricken**

Dr. Mangum devotes three and a half pages of his Report to arriving at unjust enrichment damages, making a number of faulty assumptions that lead to an unreliable and inflated damages estimate. These deficiencies are outlined in the Strombom Report (§ IV.C). For the reasons outlined there, Dr. Mangum's opinion on the overall unjust enrichment number should therefore be stricken as unreliable and speculative. *Comcast*, 569 U.S. at 34-35; *see also Mariscal,* 2014 WL 4245949 at *7 ("[I]t is a proper exercise of the Court's discretion to exclude witness testimony that is based on 'unsupported assumptions and unsound extrapolation.'").

Worse, the ***single*** paragraph he devotes to allocating the (unsupported and speculative) excess profit to the Class does not even deserve the label "methodology." Mangum Rep. ¶ 64. Dr. Mangum claims that the "excess profits" can be allocated based on "the number of [non-synced]

NOTICE OF MOTION AND MOTION TO STRIKE REPORT OF PLAINTIFFS' DAMAGES EXPERT RUSSELL MANGUM, III, PH.D

1    Google account months," which he states can be calculated by subtracting the "monthly data on the

2    US Google accounts that had sync enabled" (produced by Google) from the "monthly data on the

3    total number of Google accounts" (not produced by Google). *Id.*[9] This opinion is facially insufficient

4    to meet the *Daubert* standard of relevance and reliability.

5         *First*, Dr. Mangum's approach would apportion *no* compensation to a large number of class

6    members--those without a Google Account. *See* Mangum Dep. 131:25-132:5.   Similarly, Dr.

7    Mangum has not proposed an approach to class members who share a Google Account -- he had no

8    opinion on whether each of those class members should be given half or double of the unique

9    number he would assign to a Google Account per month. *See, e.g.*, *id*. 272:11-273:5; 273: 7-15;

10   270:18-23. By contrast, Dr. Mangum would give a multiple of that value to a user with multiple

11   accounts. *Id.* 140:2-14.  He cites nothing to show that just because a user has multiple accounts, her

12   personal information is worth more than a user who has only one account.

13        Second, Dr. Mangum's approach does not even attempt to address the wide differences in

14   the purported "unjust enrichment" Google obtained from each class member.  As outlined above, (§

15   IV. B), the amount, type, and use of data Google received from putative class members differs

16   drastically based on a number of factors. The amount, type, and use of data Google received also

17   depends on the frequency class members browse on Chrome and the websites they visit and the

18   different settings of those websites. *See id.*; Strombom Rep. §§ C, D. Equalizing the variances to

19   one single number would lead to severely overcompensating some and undercompensating others.

20   *See Opperman*, 2016 WL 3844326 at *14–15 (rejecting damages model that was likely to

21   "overcompensate some class members, while undercompensating others") (internal quotation marks

22   omitted); *Buckeye Tree Lodge & Sequoia Vill. Inn, LLC v. Expedia, Inc.*, 2019 WL 1170489, at *5

23   (N.D. Cal. Mar. 13, 2019) (rejecting damages model in part because plaintiffs failed to proffer a

24   model or a legitimate theory for how damages would be... disseminated among class members and

25

26

27   _____

     [9]  For this approach, Dr. Mangum assumes that Google can "provide monthly data on the total

28   number of Google accounts and therefore the number of non-synced Google accounts on a monthly
     basis can then be estimated." ¶¶ 64; 97.

Case No. 5:20-cv-5146-LHK-SVK
     NOTICE OF MOTION AND MOTION TO STRIKE REPORT OF PLAINTIFFS' DAMAGES EXPERT RUSSELL
     MANGUM, III, PH.D

1    "it [wa]s inevitable that individual questions of damages will 'overwhelm questions common to the

2    class'") (citing *Comcast*, 569 U.S. 27 at 34).

3        Dr. Mangum's approach to allocation does not take into account any of these wide variations

4    among class members (Mangum Dep. 131:23-25-132:1-2; 140:2-14) and does not have a way to

5    finetune allocation on the basis of the variations. *Id.* 144:13-24; 185:15-186:7; 272:11-273:5. His

6    only response: these issues can be resolved at "claims administration." *Id.* 82:1-9; 89:17-24; 307:14-

7    23. That is insufficient. By punting these critical questions to the claims administration process,

8    without analyzing how such a process could or would address them, Dr. Mangum's approach fails

9    to establish that damages can "feasibly and efficiently be calculated." *See Opperman*, 2016 WL

10   3844326, at 15 ("Plaintiffs have not shown that the damages model is administratively feasible"

11   where they merely "contemplate sending each class member a questionnaire, having them complete

12   it, and having someone read and analyze it to determine the appropriate damage award for each class

13   member"); *In re ConAgra Foods, Inc.*, 302 F.R.D. at 552-53 (striking damages expert report and

14   denying class certification because expert failed to provide the actual damages model). His opinion

15   is unreliable and utterly unhelpful to the Court's "rigorous analysis" required to certify the Class.

16   *Leyva*, 716 F.3d at 514; *Walmart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).

17       For these reasons, Dr. Mangum's unjust enrichment opinion should be stricken.

18   **V.    CONCLUSION**

19       The Court should grant Google's Motion and strike Dr. Mangum's report and opinions in

20   their entirety.

21

22

23

24

25

26

27

28

NOTICE OF MOTION AND MOTION TO STRIKE REPORT OF PLAINTIFFS' DAMAGES EXPERT RUSSELL
MANGUM, III, PH.D