# EXHIBIT 1
# Redacted Version of Document Sought to be Sealed

```
 1            IN THE UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                    SAN JOSE DIVISION
 4                       ---o0o---
 5   PATRICK CALHOUN, et al.,      )
     on behalf of themselves and   )
 6   all others similarly          )
     situated,                     )
 7                                 )
             Plaintiffs,           )Case No.
 8                                 )5:20-cv-5146-LHK-SVK
     vs.                           )
 9                                 )
     GOOGLE LLC,                   )
10                                 )
             Defendant.            )
11   _____)
12
13                       ---o0o---
14           Videotaped Zoom Deposition of
15              DR. RUSSELL MANGUM
16         CONFIDENTIAL, ATTORNEYS' EYES ONLY
17             Tuesday, December 7, 2021
18                       ---o0o---
19
20
21
22
23   Katy E. Schmidt
24   RPR, RMR, CRR, CSR 13096
25   Veritext Job No.: 4893187
```

Page 1

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Page 2**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2     FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3              SAN JOSE DIVISION
 4               ---o0o---
 5  PATRICK CALHOUN, et al.,   )
    on behalf of themselves and )
 6  all others similarly       )
    situated,                  )
 7                             )
          Plaintiffs,     )Case No.
 8                        )5:20-cv-5146-LHK-SVK
    vs.                   )
 9                        )
    GOOGLE LLC,           )
10                        )
          Defendant.      )
11  _____)
12
13        BE IT REMEMBERED that, pursuant to Notice, and
14  on Tuesday, the 7th day of December, 2021, commencing at
15  the hour of 9:04 a.m., thereof, in Irvine, California,
16  before me, KATY E. SCHMIDT, a Certified Shorthand
17  Reporter in and for the County of Yolo, State of
18  California, there virtually personally appeared
19
               DR. RUSSELL MANGUM
20
21  called as a witness herein, who, being by me first duly
22  sworn, was thereupon examined and interrogated as
23  hereinafter set forth.
24
25
```

**Page 3**

```
 1  APPEARANCES:
 2  For The Plaintiffs:
 3        (Appeared via Zoom)
 4     BLEICHMAR FONTI & AULD LLP
       BY: LESLEY WEAVER, Esq
 5     BY: ANGELICA ORNELAS, Esq
       555 12th Street, Suite 1600
 6     Oakland, California 994607
       415 445 4003
 7     lweaver@bfalaw com
 8     DICELLO LEVITT GUTZLER
       BY: DAVID, STRAITE, Esq  (pro hac vice)
 9     One Grand Central Place
       60 East 42nd Street, Suite 2400
10     New York, New York 10165
       646 933 1000
11     dstraite@dicellolevitt com
12
    For The Defendants:
13
          (Appeared via Zoom)
14
       Quinn Emanuel Urquhart & Sullivan LLP
15     BY: VIOLA TRIBECKA, Esq
       BY: TEUTA FANI, Esq
16     865 S Figueroa Street, 10th Floor
       Los Angeles, California 90017
17     violatrebicka@quinnemanuel com
18  Also present:
19     David West, videographer
20     Bartlett, consultant
21
22          ---o0o---
23
24
25
```

**Page 4**

```
 1           INDEX OF EXAMINATION
 2               ---o0o---
 3                          Page
 4  Examination by Ms. Tribecka        08
 5  Examination by Ms. Weaver         307
 6               ---o0o---
 7
 8     QUESTIONS INSTRUCTED NOT TO ANSWER
 9
10       Page   Line
11       248    13
12
13               ---o0o---
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
 1            INDEX OF EXHIBITS
 2               ---o0o---
 3                          Page
 4  Exhibit 1      Expert Report of Dr. Mangum   06
 5
 6               ---o0o---
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | |
|---|---|
| 1        IRVINE, CALIFORNIA | 1        THE VIDEOGRAPHER:  Okay.  Thank you.        09:07 |
| 2        TUESDAY, DECEMBER 7, 2021; 9:04 A.M. | 2        The court reporter may now swear the witness   09:07 |
| 3            ---o0o--- | 3   in and we will continue.        09:07 |
| 4        (Defendants' Exhibit 1 was | 4            ---o0o---        09:07 |
| 5        premarked for identification.) | 5        RUSSELL MANGUM, Ph.D.,        09:07 |
| 6        THE VIDEOGRAPHER:  Okay.  Good morning.  We   09:04 | 6   called as a witness by the Defendant, who, being first   09:07 |
| 7   are on the record.  The time is 9:05 a.m.  The date     09:04 | 7   duly sworn to tell the truth, the whole truth and     09:07 |
| 8   today is December 7th, 2021.        09:05 | 8   nothing but the truth, was examined and testified as   09:07 |
| 9        Please note the microphones are sensitive and   09:05 | 9   follows:        09:07 |
| 10   may pick up whispering and private conversations.     09:05 | 10        THE VIDEOGRAPHER:  Please continue.        09:07 |
| 11        Audio and video recording will continue to    09:05 | 11        EXAMINATION BY MS. TREBICKA        09:07 |
| 12   take place unless all parties agree to go off the     09:05 | 12   BY MS. TREBICKA:        09:07 |
| 13   record.        09:05 | 13        Q.  Good morning, Dr. Mangum.        09:07 |
| 14        This is Media Unit 1 of the video-recorded     09:05 | 14        A.  Good morning.        09:07 |
| 15   deposition of Dr. Russell Mangum, Ph.D., taken by     09:05 | 15        Q.  Are you a Chrome user yourself?        09:07 |
| 16   counsel for defendant in the matter of Patrick Calhoun,   09:05 | 16        A.  Yes, I am.        09:07 |
| 17   et al. versus Google, LLC, filed in the United States   09:05 | 17        Q.  Do you use sync, the feature sync?        09:07 |
| 18   District Court for the Northern District of California,   09:05 | 18        A.  I don't know for certain.  I think so.        09:07 |
| 19   San Jose division, Case No. 5 colon 20-CV-05146-LHK     09:05 | 19        Q.  You may use it, you may not use it.  You just   09:07 |
| 20   (SVK).        09:05 | 20   don't know?        09:07 |
| 21        The deposition is being conducted using       09:05 | 21        A.  I use Chrome.  I know I use Chrome.  I don't   09:07 |
| 22   Remote Counsel technology, and all participants are    09:05 | 22   remember -- I don't know for certain if I'm synced.  I   09:07 |
| 23   attending remotely.        09:05 | 23   just haven't looked into that.        09:07 |
| 24        My name is David West.  I am the videographer.   09:05 | 24        Q.  Do you understand what the purpose of sync is?   09:07 |
| 25   The court reporter is Kathryn Schmidt.  We represent   09:05 | 25        MS. WEAVER:  Objection.  Vague.        09:07 |
| Page 6 | Page 8 |

| | |
|---|---|
| 1   Veritext Legal Solutions.        09:05 | 1        THE WITNESS:  Yeah.  I think different -- many   09:08 |
| 2        I'm not related to any party in this action,    09:05 | 2   different entities could have many different purposes   09:08 |
| 3   nor am I financially interested in the outcome.        09:06 | 3   for sync.  I don't think there is a purpose for sync, as   09:08 |
| 4        Counsel will now state their appearances and    09:06 | 4   I understand it, a single purpose.        09:08 |
| 5   affiliations for the record.  If there are any        09:06 | 5   BY MS. TREBICKA:        09:08 |
| 6   objections to proceeding, please state them at the time   09:06 | 6        Q.  What is the purpose -- any purpose that you    09:08 |
| 7   of your appearance, beginning with the noticing        09:06 | 7   understand as a user?        09:08 |
| 8   attorney.        09:06 | 8        MS. WEAVER:  Objection.  Vague.        09:08 |
| 9        MS. TREBICKA:  Good morning.  Viola Trebicka   09:06 | 9        Whose purpose?        09:08 |
| 10   with Quinn Emanuel for Google.        09:06 | 10        THE WITNESS:  I don't understand the question   09:08 |
| 11        MS. FANI:  Good morning -- sorry.  Assisting   09:06 | 11   about -- it's the word "purpose" that's...        09:08 |
| 12   Viola Trebicka today with Quinn Emanuel for Google is   09:06 | 12   BY MS. TREBICKA:        09:08 |
| 13   Teuta Fani.        09:06 | 13        Q.  That's tripping you up?        09:08 |
| 14        MS. WEAVER:  Lesley Weaver,        09:06 | 14        A.  Yeah.        09:08 |
| 15   Bleichmar Fonti & Auld for plaintiffs.        09:06 | 15        Q.  Okay.  So do you understand that sync has a    09:08 |
| 16        Angelica Ornelas of my office is with us today   09:06 | 16   particular use?        09:08 |
| 17   virtually, as is David Straite.        09:06 | 17        MS. WEAVER:  Objection.  Vague.        09:08 |
| 18        I also see Hristina Bartlett listed.        09:06 | 18        THE WITNESS:  Yeah.  I -- I'm assuming the use   09:08 |
| 19        Who is that, Counsel?        09:06 | 19   you're -- you're not using the word "functionality" so   09:08 |
| 20        MS. TREBICKA:  Hristina Bartlett is an expert   09:06 | 20   I'm trying to think there's purpose, there's use,        09:08 |
| 21   that is assisting Google in this matter.        09:06 | 21   there's functionality.  I'm just confused about the     09:08 |
| 22        MS. WEAVER:  Great.        09:06 | 22   question.        09:08 |
| 23        MS. TREBICKA:  She is with the firm        09:06 | 23   BY MS. TREBICKA:        09:08 |
| 24   Analysis Group.        09:07 | 24        Q.  Okay.  So you -- sitting here today, you just   09:08 |
| 25        MS. WEAVER:  Thank you.        09:07 | 25   don't have any idea what the use of sync would be,        09:08 |
| Page 7 | Page 9 |

3 (Pages 6 - 9)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 correct, as a Chrome user?                    09:08
2         MS. WEAVER: Objection. Misstates testimony.  09:08
3 Objection. Vague as to use.                   09:09
4         THE WITNESS: That's not my testimony.  09:09
5 BY MS. TREBICKA:                              09:09
6    Q. Okay. What is your testimony then?      09:09
7    A. My testimony was --                      09:09
8         MS. WEAVER: Objection. Vague.          09:09
9         THE WITNESS: I didn't understand your  09:09
10 question, what is my testimony?              09:09
11 BY MS. TREBICKA:                             09:09
12    Q. Okay. So do you understand that the feature  09:09
13 sync is a functionality of Chrome?           09:09
14    A. Yes. I --                               09:09
15         MS. WEAVER: Go ahead, Russ.           09:09
16         THE WITNESS: I understand the word "sync"  09:09
17 generally, and I believe I have an understanding of what  09:09
18 I think of sync in the context of Chrome.    09:09
19 BY MS. TREBICKA:                             09:09
20    Q. And what is your understanding of sync in the  09:09
21 context of Chrome?                           09:09
22    A. I think generally that sync has to do with  09:09
23 connecting information about me and my use of Chrome  09:09
24 beyond one location or one device.           09:09
25    Q. But you also believe that different people  09:09
                                            Page 10

1 could have a different understanding of what sync means?  09:09
2         MS. WEAVER: Objection. Misstates his  09:09
3 testimony.                                    09:09
4         Go ahead, Russ.                        09:10
5         THE WITNESS: Yeah. I didn't say anything  09:10
6 like that today.                              09:10
7 BY MS. TREBICKA:                             09:10
8    Q. You stated that different entities could have  09:10
9 many different purposes for sync.            09:10
10    Is that right?                            09:10
11    A. I think -- I remember commenting about the  09:10
12 word "purpose" of just that people could have different  09:10
13 purposes, and I didn't think there was a single purpose  09:10
14 when you asked what's the purpose of sync. I remember  09:10
15 that.                                        09:10
16    Q. So what are the various purposes of sync that  09:10
17 you're aware?                                09:10
18    A. I don't know what --                    09:10
19         MS. WEAVER: Objection. Vague as to whose  09:10
20 purpose.                                     09:10
21         THE WITNESS: Yeah. I don't know what all  09:10
22 people's purposes of sync would be. I understand -- I  09:10
23 have an understanding about the functionality that I  09:10
24 just described, but I -- I don't know whose purpose  09:10
25 you're talking about and I don't necessarily think -- I  09:10
                                            Page 11

1 don't have an opinion about other types of purposes.  09:10
2 BY MS. TREBICKA:                             09:11
3    Q. Understood.                            09:11
4    Be you as a Chrome user, you believe that sync  09:11
5 means connecting data beyond a specific device; correct?  09:11
6         MS. WEAVER: Objection. Vague.          09:11
7         THE WITNESS: I think what I talked about was  09:11
8 connecting information. As far as -- I was thinking of  09:11
9 the word "sync" generally, even beyond what it might  09:11
10 mean for Chrome, but that's what I think of for sync.  09:11
11 BY MS. TREBICKA:                            09:11
12    Q. Understood.                           09:11
13    What about specific to Chrome; do you have an  09:11
14 understanding of what sync means specific to Chrome?  09:11
15         MS. WEAVER: Objection. Vague. Means to  09:11
16 whom? To Google?                            09:11
17         MS. TREBICKA: That's fair. Let me actually  09:11
18 clarify.                                     09:11
19 BY MS. TREBICKA:                            09:11
20    Q. What about specific to Chrome; do you have an  09:11
21 understanding of what it means to you for sync specific  09:11
22 to Chrome, what sync could mean in Chrome --  09:11
23         MS. WEAVER: Objection.                09:11
24 BY MS. TREBICKA:                            09:11
25    Q. -- specifically according to you?      09:11
                                            Page 12

1         MS. WEAVER: Objection. Vague. Form.     09:11
2         THE WITNESS: I'm sorry. I just don't -- I  09:11
3 don't understand what the word means. So we talked  09:11
4 about purpose, we talked about use, we talked about a  09:12
5 functionality, and now you've added a fourth word of  09:12
6 what it means. And I just don't understand your  09:12
7 question.                                    09:12
8    I'm trying to think how that would be        09:12
9 different than the functionality, of intended  09:12
10 functionality. Like is the use to succeed in the  09:12
11 intended functionality, is that what use is? Is it more  09:12
12 broadly -- I talk in my report about how information is  09:12
13 used by Google to make money, so it gets information to  09:12
14 make money. But I just -- I'm thinking these things and  09:12
15 I can't tie that back to an understanding of your  09:12
16 question.                                    09:12
17 BY MS. TREBICKA:                            09:12
18    Q. So you don't understand what the word "means"  09:12
19 means essentially?                          09:12
20    A. No. I think it's a very vague meaning.    09:12
21 You're asking me to give the definition when there isn't  09:12
22 a definition of "means". It's contextual. And so I  09:12
23 can't answer the question the way you've asked it.  09:12
24    Q. So if I were to ask you what do you as a  09:12
25 Chrome user understand the functionality of Chrome sync  09:13
                                            Page 13

4 (Pages 10 - 13)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 14

1 to be?                                    09:13
2     A.  I've already explained that.  It's about    09:13
3 connecting information about my use of Chrome across   09:13
4 multiple locations or devices.              09:13
5     Q.  Understood.  Thank you.            09:13
6         What do you understand the term "personal   09:13
7 information" to mean in the context of internet    09:13
8 browsing?                                  09:13
9         MS. WEAVER:  Objection.  Vague.    09:13
10        THE WITNESS:  I define in my expert report, I  09:13
11 talk about personal information in the context of this   09:13
12 case.  I reference the Complaint.  The categories that   09:13
13 I'm aware of are things such as unique persistent cookie   09:13
14 identifiers, browsing history, post-communications,   09:13
15 IP address, and -- there's a word -- something --   09:13
16 something dash user; right?                 09:14
17 BY MS. TREBICKA:                          09:14
18    Q.  User agent?                        09:14
19    A.  Yes.  User agent, connection to a device.    09:14
20 There's also an X-Client header Data.  I mean, these are   09:14
21 things that I've seen referenced in materials in this   09:14
22 case.                                      09:14
23        I think I clarified some of those in my report   09:14
24 when I talked about personal information as it relates   09:14
25 to this case.                              09:14

Page 16

1 can be used to identify individuals, which would include  09:15
2 name, but many other things would fall under this    09:15
3 general category of personal information.    09:15
4    Q.  What about e-mail address?          09:15
5    A.  I think that also is something that falls in   09:15
6 the category.  I don't call that out specifically as   09:15
7 part of my opinion, but since you're asking.    09:15
8    Q.  Right.                             09:15
9        So name and e-mail address would be part of   09:15
10 personal information, as you understood it, within the   09:15
11 confines of your report?                   09:15
12    A.  At least in the confines of my report, that's   09:16
13 right.                                     09:16
14    Q.  How many times have you testified in    09:16
15 deposition, Dr. Mangum?                    09:16
16    A.  I think it's over a hundred.  I haven't    09:16
17 counted recently.                          09:16
18    Q.  That's good enough for me.  More than I've   09:16
19 testified in a deposition.                 09:16
20        What about at trial?               09:16
21    A.  I think about 35 or 40, something like that.    09:16
22 I've not counted that recently.            09:16
23    Q.  Understood.                        09:16
24        Do you have any specialized expertise in   09:16
25 privacy?                                   09:16

Page 15

1    Q.  As it relates to this case, is "name" personal   09:14
2 information too?                           09:14
3    A.  I don't have an exhaustive list of all the    09:14
4 things that could be personal information.  I'm aware   09:14
5 that it relates to things that could be used to    09:14
6 reasonably connect someone's identity or something that   09:14
7 related to their identity, associated with their    09:14
8 identity.  Name is -- you know, outside of this context   09:14
9 of this case, it's obviously something that people think   09:14
10 of as an identifier more generally.         09:14
11 BY MS. TREBICKA:                          09:14
12    Q.  What about within the context of this case, do   09:15
13 you -- in your opinion, did you consider name to be   09:15
14 personal information?                      09:15
15        MS. WEAVER:  And I'll just object to the   09:15
16 extent you're asking for a legal conclusion, and I    09:15
17 assume you are limiting the question to his    09:15
18 understanding.                             09:15
19        Is that right, Viola?              09:15
20        MS. TREBICKA:  Yes, Lesley.         09:15
21 BY MS. TREBICKA:                          09:15
22    Q.  Go ahead, Dr. Mangum.              09:15
23    A.  I don't believe I explicitly called out name.   09:15
24 But I think, as I've described the types of information   09:15
25 that will be personal information, I think things that   09:15

Page 17

1    A.  In the context --                  09:16
2        MS. WEAVER:  Objection.  Vague.     09:16
3 You mean his own privacy?                  09:16
4        THE WITNESS:  I don't think of privacy by   09:16
5 itself when I think of the work I've done.  I think what   09:16
6 I've dealt with as far as information and about people   09:16
7 wanting to retain information, not letting it be known   09:16
8 by others or wanting to control where that information   09:17
9 goes, is something I've worked on in various matters.   09:17
10 BY MS. TREBICKA:                          09:17
11    Q.  And by that you mean trade secret matters?    09:17
12    A.  No.                               09:17
13    Q.  What do you mean?                  09:17
14    A.  I don't mean that only.  I'm talking more    09:17
15 broadly.  I think that might be -- that's one category.   09:17
16    Q.  Mm-hm.                            09:17
17        So what other categories of cases have you   09:17
18 worked on that deal with information and wanting to   09:17
19 retain information, not letting it be known by others?   09:17
20    A.  Confidential information generally.  Anything   09:17
21 that might be subject to a nondisclosure agreement.    09:17
22 These are categories.                      09:17
23        Also about -- relate -- related to how    09:17
24 someone's information -- that there may be an approved   09:17
25 way they understand or expected it would be used, and    09:17

5 (Pages 14 - 17)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 they find out it was done something differently.  So   09:17
2 cases like that that people are concerned about where it   09:18
3 goes and where it doesn't go, cases like that.   09:18
4      Q.  Could you state any of the cases that -- by   09:18
5 name that deal with this use of information and wanting   09:18
6 to retain information, not letting it be known by   09:18
7 others?   09:18
8      A.  Yeah.  If I could -- I would have to look at   09:18
9 my CV, and I could look at my list of cases.   09:18
10      Q.  Okay.  Maybe we'll do that later.  Thank you.   09:18
11           So what about personal privacy in particular   09:18
12 on the internet; have you had experience testifying as   09:18
13 an expert either in deposition or even creating an   09:18
14 opinion related to personal privacy on the internet?   09:18
15           MS. WEAVER:  Objection.  Vague as to personal   09:18
16 privacy.  And assumes facts not in evidence about the   09:18
17 context of this case.   09:18
18           THE WITNESS:  I believe the answer is yes,   09:19
19 although the internet is a word that's kind of vague,   09:19
20 and I'm having a hard time thinking of what would all be   09:19
21 included in what you mean the internet.   09:19
22 BY MS. TREBICKA:   09:19
23      Q.  You don't understand what I mean by the word   09:19
24 "internet"?   09:19
25           MS. WEAVER:  Objection.  Vague.   09:19

Page 18

1           THE WITNESS:  No.  I understand.  But it can   09:19
2 mean --   09:19
3           MS. WEAVER:  Misstates testimony.   09:19
4           THE WITNESS:  It can mean many different   09:19
5 things.  And it's a very vague reference that I don't   09:19
6 think can result in a clear answer on my part.  Since   09:19
7 it's so vague, it could mean many different things.   09:19
8 BY MS. TREBICKA:   09:19
9      Q.  If you had to pick one case from your many   09:19
10 cases that is similar to -- or most similar to the case   09:19
11 that we're dealing with here, which one would that be?   09:19
12      A.  I would have to spend time to think about it.   09:19
13 I'd want to be careful and be thoughtful about that, if   09:19
14 I were to have to pick one case.   09:19
15      Q.  You wouldn't be able to pick it right now.   09:19
16 You wouldn't be able to think of something right away   09:19
17 that is most similar to the facts that we're dealing   09:19
18 with here?   09:19
19      A.  That would be hasty, and it would risk being   09:20
20 wrong and incorrect.  And I'd want to be careful and   09:20
21 think about it.  So I wouldn't want to give just my snap   09:20
22 gut reaction to a question like that.   09:20
23      Q.  So you haven't thought about that before?   09:20
24      A.  No.  I haven't -- I haven't asked myself   09:20
25 mentally conceptually to have to come up with just one,   09:20

Page 19

1 the way you phrased the question.  That's not something   09:20
2 I've done.   09:20
3      Q.  Have you asked yourself to come up with two or   09:20
4 a different number?   09:20
5      A.  No.  I've not forced that constraint on myself   09:20
6 to come up with a response under any number.   09:20
7      Q.  So, Dr. Mangum, what is your assignment for   09:20
8 this case?   09:20
9      A.  My assignment is listed in my expert report.   09:20
10 I'll rely on that description.   09:20
11           MS. WEAVER:  And, Viola --   09:20
12           THE WITNESS:  I can go through that now, if   09:20
13 you want.   09:20
14           MS. WEAVER:  You've marked the exhibit; right,   09:20
15 Viola?  We had an off-the-record conversation.   09:20
16 BY MS. TREBICKA:   09:20
17      Q.  Do you -- so your assignment did not go   09:20
18 outside of anything that's listed in your expert report;   09:21
19 correct?   09:21
20           MS. WEAVER:  Okay.  Objection.  Vague.   09:21
21 Assumes facts not in evidence to the extent you're   09:21
22 talking about one assignment.   09:21
23           And, Dr. Mangum, if you'd like to look at your   09:21
24 report.   09:21
25           Why don't we mark that and let him look at it.   09:21

Page 20

1           MS. TREBICKA:  Ms. Weaver, could we keep the   09:21
2 objections to form?  We're dealing with a very   09:21
3 sophisticated witness who has testified more than a   09:21
4 hundred times.  It will be very disruptive throughout   09:21
5 this deposition if your objections continue to be as   09:21
6 intrusive as they've been so far.   09:21
7           So I respectfully ask that you keep your   09:21
8 objections to form.  I think that's a reasonable   09:21
9 request.   09:21
10 BY MS. TREBICKA:   09:21
11      Q.  So Dr. Mangum --   09:21
12           MS. WEAVER:  I would ask that if you're asking   09:21
13 him about an exhibit, you mark it and let him review it.   09:21
14 BY MS. TREBICKA:   09:21
15      Q.  Dr. Mangum, you understand that you prepared   09:21
16 an expert report for purposes of this litigation;   09:21
17 correct?   09:21
18      A.  Correct.   09:22
19      Q.  And the expert report is already marked as   09:22
20 Exhibit 1 to your deposition and it's on Exhibit Share.   09:22
21           Do you have access to it?   09:22
22      A.  Yes.  I can -- yes.   09:22
23      Q.  Okay.  And you recognize it as your expert   09:22
24 report; correct?   09:22
25      A.  I just see the cover right now.  I haven't --   09:22

Page 21

| | |
|---|---|
| 1   Q.  Feel free to scroll --                    09:22 | 1   Q.  Does your unjust enrichment analysis quantify   09:26 |
| 2   A.  I haven't turned to it or looked at it yet.   09:22 | 2  the profits from -- to Google from the alleged privacy   09:26 |
| 3   Q.  You can scroll through it.  I suspect that by   09:22 | 3  allegations about un-synced -- or to un-synced Chrome   09:26 |
| 4  scrolling through it, you'll be able to tell me if this   09:22 | 4  users only?                        09:26 |
| 5  is your expert report.                      09:22 | 5       MS. WEAVER:  Objection.  Vague as to       09:26 |
| 6   A.  I do, too.  I'll take a look at it.        09:22 | 6  un-synced.                        09:26 |
| 7       Yeah.  I've looked through it.  I've scrolled   09:23 | 7       Do you mean not synced?           09:26 |
| 8  through the document here on Exhibit Share in       09:23 | 8       MS. TREBICKA:  Not synced.         09:26 |
| 9  exhibits -- Exhibit 1 GO dash triple 01, and it does   09:23 | 9       THE WITNESS:  I lost the question in there.   09:26 |
| 10  look like a copy of my expert report.  It's got -- when   09:23 | 10  Would you ask it again?              09:26 |
| 11  I think of my expert report, I'm just looking at this   09:24 | 11  BY MS. TREBICKA:                  09:26 |
| 12  and it's got a lot of boxes that have been imposed over   09:24 | 12   Q.  Actually, let me ask a different question.   09:26 |
| 13  various places.  I think it's just boxes.       09:24 | 13       You plan to apportion the unjust enrichment   09:26 |
| 14       Anyway, I'm just noticing that.  The version   09:24 | 14  among the class members; correct?       09:27 |
| 15  I've been looking at and I've been reading recently   09:24 | 15       MS. WEAVER:  Objection.  Assumes facts not in   09:27 |
| 16  doesn't have boxes around any part of it.       09:24 | 16  evidence.                        09:27 |
| 17   Q.  I will represent to you that they denote   09:24 | 17       THE WITNESS:  I'm not sure that's correct.  I   09:27 |
| 18  redactions for the publicly-filed version of your   09:24 | 18  talk about the ability, you know, means by which the   09:27 |
| 19  report.  And your counsel I'm sure will agree.   09:24 | 19  unjust enrichment that I discuss and quantify, how it   09:27 |
| 20       MS. WEAVER:  Are you referring -- I frankly   09:24 | 20  could be apportioned.  I've not been asked yet to do   09:27 |
| 21  don't even know what you're referring to, Dr. Mangum.   09:24 | 21  that, and I might, but it may not be something I do.  It   09:27 |
| 22       Where are the boxes?             09:24 | 22  could be by someone else or at a different phase of this   09:27 |
| 23       THE WITNESS:  The first box would be on page I   09:24 | 23  litigation.                        09:27 |
| 24  in the table of contents, down under section Roman IV,   09:24 | 24  BY MS. TREBICKA:                  09:27 |
| 25  IV.A, IV.A. dot 1, there's a box around the words   09:24 | 25   Q.  So with respect to apportionment, is your   09:27 |
| Page 22 | Page 24 |

| | |
|---|---|
| 1  "Google's Internal Research Demonstrates the Value of   09:24 | 1  opinion limited to this unjust enrichment is able to be   09:27 |
| 2  Behavioral Advertising."  There's gray boxes --   09:24 | 2  apportioned?                      09:27 |
| 3       MS. WEAVER:  Oh, right.           09:24 | 3       MS. WEAVER:  Objection.  Asked and answered.   09:27 |
| 4       THE WITNESS:  -- around it.        09:24 | 4  Misstates his testimony.              09:27 |
| 5       MS. WEAVER:  Yes.  Yes.  That's right.  I   09:25 | 5       THE WITNESS:  Well, my report, hopefully it   09:28 |
| 6  don't know why we don't have one without the -- those   09:25 | 6  will speak for itself.  I talk about apportionment.  I   09:28 |
| 7  are marked for redaction.  I agree with Google's counsel   09:25 | 7  talk about the means by which and the -- what looks like   09:28 |
| 8  on that point.                        09:25 | 8  the apparent availability of mechanisms and data to do   09:28 |
| 9  BY MS. TREBICKA:                    09:25 | 9  that.                            09:28 |
| 10   Q.  Dr. Mangum, looking at your report now, do you   09:25 | 10       Maybe that's the same thing you meant in your   09:28 |
| 11  have any opinions that would go outside of your report   09:25 | 11  question.                        09:28 |
| 12  for this case?                        09:25 | 12  BY MS. TREBICKA:                  09:28 |
| 13   A.  No.  I haven't formed, as of today, any   09:25 | 13   Q.  Is your opinion that apportionment among class   09:28 |
| 14  opinions beyond what's in my report.          09:25 | 14  members is something that can be readily done at this   09:28 |
| 15   Q.  You have an unjust enrichment opinion, is that   09:25 | 15  point of the litigation?              09:28 |
| 16  right, in your report?                    09:25 | 16       MS. WEAVER:  Objection.  Asked and answered.   09:28 |
| 17   A.  Yes.  An opinion involving unjust enrichment,   09:25 | 17  Vague.                          09:28 |
| 18  correct.                          09:25 | 18       THE WITNESS:  Well, when I talk about       09:28 |
| 19   Q.  What unjust enrichment do you purport to   09:25 | 19  apportionment, which essentially means coming from a   09:29 |
| 20  quantify, in your opinion?                  09:25 | 20  large or aggregate number and how would that relate to a   09:29 |
| 21   A.  I believe it's listed in my report.  It   09:25 | 21  class member, and I talk about information that appears   09:29 |
| 22  relates to the unjust enrichment of Google by using   09:25 | 22  exists to be able to do that, so I think it does exist   09:29 |
| 23  information gained from the alleged breach of contract,   09:25 | 23  now to be done.                    09:29 |
| 24  the alleged privacy allegations about using information   09:26 | 24       I'm not sure if that answers your question.   09:29 |
| 25  from Chrome users that were not synced.        09:26 | 25  But it's not about something I'm saying cannot now but   09:29 |
| Page 23 | Page 25 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 maybe in the future -- I think the information exists   09:29
2 now.                                              09:29
3 BY MS. TREBICKA:                                  09:29
4       Q.  But you have not done it because you haven't   09:29
5 been asked to do it?                              09:29
6       A.  That's not totally correct.  I think it would   09:29
7 include that.  I've not been asked to do it.  I was   09:29
8 asked to talk about information and feasibility and what   09:29
9 seems to be existing now to do it.                09:29
10      But I don't see it as something that would   09:29
11 necessarily be part of my role but I might be asked.  It   09:29
12 could be something of claims administration.  So it's   09:29
13 not just because I wasn't asked, but, you know, as a   09:29
14 default, I would.  That's not the case.           09:30
15      Q.  But if you were asked with the information   09:30
16 that you have available to yourself today, your opinion   09:30
17 is that you would be able to do it; correct?      09:30
18      A.  Well, what I identify is information that I   09:30
19 think exists that is apparent from things I've cited in   09:30
20 my report regarding Google information, not limited to   09:30
21 what I've already been given.                     09:30
22      Q.  And when you say that "I think exists," are   09:30
23 you assuming it exists; you've been asked to assume that   09:30
24 it exists?                                        09:30
25      A.  No.  I --                                09:30

Page 26

1       MS. WEAVER:  Objection as to "it."           09:30
2       THE WITNESS:  In my report I point to        09:30
3 information.  I make the argument of what's been stated   09:30
4 which points to -- reveals what exists to be able to use   09:31
5 it, even if it's not been turned over.            09:31
6       So I've not been asked to simply assume that.   09:31
7 I've concluded that based on what I've seen.      09:31
8 BY MS. TREBICKA:                                  09:31
9       Q.  And according to the methodology for      09:31
10 apportionment that you have laid out, would you arrive   09:31
11 at a single dollar amount for each Google account per   09:31
12 month?                                            09:31
13      MS. WEAVER:  Objection.  Vague.              09:31
14      THE WITNESS:  One method of apportionment     09:31
15 could do that.  That isn't necessarily the only way.  I   09:31
16 do talk about data, which appears to be available that   09:31
17 could give up a number of months, but there may be means   09:31
18 beyond that.                                      09:31
19      For example, I believe such as claims of -- in   09:31
20 claims administration, there may be issues of members   09:31
21 beyond those identified by an account, which may be   09:32
22 learned of.                                       09:32
23 BY MS. TREBICKA:                                  09:32
24      Q.  Any other methods of apportionment that you   09:32
25 believe could do that?                            09:32

Page 27

1       You mentioned two so far.                    09:32
2       A.  I don't think that's -- I don't think     09:32
3 apportionment is limited to that way.  There could be   09:32
4 other means that could be used in claims administration.   09:32
5 But those are -- one I mention in any report, another I   09:32
6 mentioned right now.  But I've not been asked -- I've   09:32
7 not been asked and I've not opined on all the possible   09:32
8 means one might apportion.                        09:32
9       Q.  But you've been asked to opine on a mean in   09:32
10 which one could apportion.                        09:32
11      Is that right?                              09:32
12      MS. WEAVER:  Objection.  Vague.  Misstates   09:32
13 testimony and the record.                         09:32
14      THE WITNESS:  I included that in my report.  I   09:33
15 don't remember that being an assignment I was given or I   09:33
16 wasn't asked specifically about that.  But when I wrote   09:33
17 the report and I went through the unjust enrichment, and   09:33
18 then towards the end I came up with the idea of, well,   09:33
19 what would this mean for a class member, I brought up   09:33
20 the data.  I believe it was agreed on that that would be   09:33
21 in my report, but I don't remember being asked   09:33
22 specifically to do that at any point in time.     09:33
23 BY MS. TREBICKA:                                  09:33
24      Q.  So your testimony here today is that       09:33
25 apportionment is not even part of your assignment;   09:33

Page 28

1 correct?  Coming up with a methodology for apportionment   09:33
2 is not even part of your assignment; correct?     09:33
3       MS. WEAVER:  Objection.  Vague.  Misstates   09:33
4 evidence.  Misstates his testimony.               09:33
5       THE WITNESS:  No.  That's not my testimony.   09:33
6 BY MS. TREBICKA:                                  09:33
7       Q.  Okay.  So you were asked to come up with a   09:33
8 methodology for apportionment as part of your   09:33
9 assignment?                                       09:33
10      A.  No.  That's not my testimony.            09:33
11      Q.  So what is your testimony with respect to your   09:33
12 assignment related to apportionment?              09:34
13      MS. WEAVER:  Objection.  Vague.  There's not   09:34
14 just one assignment.                              09:34
15      THE WITNESS:  My assignments are not so       09:34
16 detailed that everything that you would find in my   09:34
17 report must have been specifically called out as my   09:34
18 assignment.                                       09:34
19      My assignment is more general.  So it's not   09:34
20 the case that either it wasn't my assignment or it must   09:34
21 have been clearly laid out to be in my report.  There's   09:34
22 other possibilities which apply in this case.     09:34
23 BY MS. TREBICKA:                                  09:34
24      Q.  And what is that possibility that applies in   09:34
25 this case?                                        09:34

Page 29

8 (Pages 26 - 29)

1    A.  As part of my working in the case, in    09:34
2 conducting my analysis, and coming up with ways to   09:34
3 describe my analysis and connecting that with class   09:34
4 members, I do analysis.  I pull together data; right?  I  09:34
5 put it in a report, and counsel looks at the report and  09:34
6 says, "Thank you.  You've adopted and looked at things  09:34
7 that we generally asked you to do."    09:34
8      MS. WEAVER:  And I'll just caution Dr. Mangum  09:34
9 not to reveal the content of our communications.  That's  09:34
10 not the subject of today's deposition by agreement among  09:35
11 the parties.    09:35
12 BY MS. TREBICKA:    09:35
13    Q.  You also have a value of personal information  09:35
14 opinion; correct?    09:35
15    A.  I do, yes.    09:35
16    Q.  And what is that supposed to quantify, in your  09:35
17 words?    09:35
18      MS. WEAVER:  Objection.  Form.    09:35
19      THE WITNESS:  I think it's self-defining in  09:35
20 the terms.  It quantifies the value.    09:35
21 BY MS. TREBICKA:    09:35
22    Q.  Was that your complete answer?    09:35
23    A.  Yes.  In other words, you gave the topic.  09:35
24 I've given quantities.  And you said what is it meant to  09:35
25 quantify, and it's to quantify the things I labeled it  09:35

Page 30

1 as I described that analysis.    09:35
2    Q.  So this is supposed to quantify the value of  09:35
3 personal information of class members.    09:35
4 Is that correct?    09:35
5      MS. WEAVER:  Objection.  Form.    09:35
6      THE WITNESS:  My report speaks for itself.  I  09:35
7 wouldn't want to limit what's in my report compared to  09:35
8 something I might say.  I might say something that's  09:36
9 applicable but not complete.    09:36
10    I talk about restitution as being part of why  09:36
11 I was looking to the section of my report that follows  09:36
12 beyond unjust enrichment.  And part of getting to that,  09:36
13 I do identify the value.  The value of this information  09:36
14 related to the alleged wrongdoing in this case relates  09:36
15 to the syncing; right?  A dispute regarding whether sync  09:36
16 was -- or class members -- are Chrome users synced or  09:36
17 not; right?  Are they a class member; right?  All in  09:36
18 that context, I do address this issue of, well, what's  09:36
19 the value of that information.    09:36
20    But that's described in my report.  And I  09:36
21 quantify it.  I give several instances of    09:36
22 quantification.    09:36
23 BY MS. TREBICKA:    09:36
24    Q.  And, Dr. Mangum, you realize that we're in a  09:36
25 deposition today.  I have your report.  We have reviewed  09:36

Page 31

1 your report.  But I'm also entitled to ask you certain  09:36
2 questions, and I'm entitled to your best testimony.  09:36
3    Do you understand that?    09:36
4    A.  I do.    09:37
5    Q.  And if you were in a court of law, you would  09:37
6 be answering my questions, not necessarily deferring to  09:37
7 your report.    09:37
8    Do you understand that?    09:37
9    A.  I do.    09:37
10      MS. WEAVER:  Objection.    09:37
11 BY MS. TREBICKA:    09:37
12    Q.  Therefore I ask that you -- when I ask you a  09:37
13 question, I understand that there will be perhaps  09:37
14 additional detail in your report, but I ask that you  09:37
15 answer my question as it is phrased.    09:37
16    Do you understand that?    09:37
17      MS. WEAVER:  Objection.  Misstates the law,  09:37
18 Viola.    09:37
19      THE WITNESS:  I actually am confused because  09:37
20 I've been doing exactly what you said, but it seems like  09:37
21 you're admonishing me for not doing what you've just  09:37
22 described.  But what you've said won't change anything  09:37
23 I've been doing because I've been doing just what you  09:37
24 said.    09:37
25    So I'm confused with your statements just now.  09:37

Page 32

1 BY MS. TREBICKA:    09:37
2    Q.  They were not statements.  They were actually  09:37
3 questions.    09:37
4    I'm trying to get your confirmation that you  09:37
5 will be answering my questions and not just deferring to  09:38
6 your report, Dr. Mangum.    09:38
7      MS. WEAVER:  Viola, we ask that you stop  09:38
8 badgering the witness.  You can't speak to him or  09:38
9 lecture him.  You can ask him questions.    09:38
10 BY MS. TREBICKA:    09:38
11    Q.  Does that make sense, Dr. Mangum?    09:38
12    A.  Well, see, I'm confused again because you just  09:38
13 made a statement, and then it seems like you think by  09:38
14 saying "does that make sense," it makes it not a  09:38
15 statement.  But that's what you're doing a lot.  You  09:38
16 make statements, saying "Is that right?"    09:38
17    So I know you want to label this as a question  09:38
18 but, in fact, they're mostly statements is what you're  09:38
19 making, and I don't always agree with the statements.  09:38
20 BY MS. TREBICKA:    09:38
21    Q.  Let's turn to paragraph 16 of your report,  09:38
22 Dr. Mangum.  Let me know if you're having trouble  09:38
23 finding it.    09:38
24    A.  I'm in paragraph 16.    09:38
25    Q.  Here you write -- and I'm reading it into the  09:38

Page 33

9 (Pages 30 - 33)

1 record so we know what we're talking about.       09:39
2        "According to plaintiffs, the       09:39
3 personal information collected by Google       09:39
4 from Class Members includes, but is not       09:39
5 necessarily limited to, information on       09:39
6 IP addresses, unique cookie identifiers,       09:39
7 browser identifiers, and other internet       09:39
8 browsing history data."       09:39
9        Do you see that?       09:39
10 A.  I do.       09:39
11 Q.  So this is the data that you're trying to       09:39
12 value with your value of personal information opinion?  09:39
13 A.  Generally.  You have to address my report       09:39
14 systematically.  So you can't take one sentence and say,  09:39
15 "That's what you're doing; right?"  Because there may be  09:39
16 other areas in the report that say something slightly  09:39
17 different.       09:39
18        So I won't agree that that one sentence you  09:39
19 read guides everything, but it is a correct statement.  09:39
20 It was included in my report on purpose.       09:39
21 Q.  Do you assume that all the information       09:40
22 collected from a user who is un-synced is personal  09:40
23 information?       09:40
24        MS. WEAVER:  And I'll just have a standing  09:40
25 objection -- I'm sorry.  Can I just --       09:40

Page 34

1        MS. TREBICKA:  Before you object, Lesley, I'll  09:40
2 rephrase, and maybe you will -- your objection will be  09:40
3 moot.       09:40
4        MS. WEAVER:  Okay.       09:40
5 BY MS. TREBICKA:       09:40
6 Q.  Do you assume that all the information that  09:40
7 Google collects from a user who is un-synced is personal  09:40
8 information?       09:40
9        MS. WEAVER:  Okay.  So we'll have a standing  09:40
10 objection and then I won't have to interfere, Viola, to  09:40
11 personal information on the question of whether or not  09:40
12 you're asking him for a legal definition.       09:40
13        Is that fair?       09:40
14        MS. TREBICKA:  Sure.       09:40
15        MS. WEAVER:  Will you agree to that?       09:40
16        MS. TREBICKA:  And I am not.  But you may have  09:40
17 your standing objection.       09:40
18        MS. WEAVER:  Okay.  Great.       09:40
19        MS. TREBICKA:  Do you need the question back?  09:40
20        THE WITNESS:  No, no.  I do not.  Thanks for  09:40
21 asking.       09:40
22        I don't -- I'm not assuming it's all personal  09:40
23 information.       09:40
24 BY MS. TREBICKA:       09:41
25 Q.  Do you make a determination as to whether some  09:41

Page 35

1 information is personal information and some is not  09:41
2 personal information?       09:41
3 A.  I don't have an expert opinion about that, so  09:41
4 I've not made an expert determination.  I've described  09:41
5 what I believe is included in personal information, but  09:41
6 I -- that, I don't have a specific delineation or  09:41
7 section of my report or opinion that categorizes  09:41
8 extensively all the types of information collected.  09:41
9 Q.  Is it fair to assume that -- or is it fair to  09:41
10 say that you are assuming that certain information is  09:41
11 personal information on the basis of what you've been  09:41
12 told by counsel?       09:41
13        MS. WEAVER:  Objection.       09:41
14        I'll instruct you not to answer.       09:41
15 Communications between counsel are not the subject of  09:41
16 discovery.       09:41
17        Rephrase the question, Viola.  You can get it  09:41
18 another way.       09:41
19        MS. TREBICKA:  You will instruct not to answer  09:41
20 that?       09:41
21        MS. WEAVER:  Yeah.  You're asking if he formed  09:41
22 an opinion based on something counsel said to him.  09:41
23 BY MS. TREBICKA:       09:42
24 Q.  So, Dr. Mangum, you stated that you are not  09:42
25 assuming that all information is personal information,  09:42

Page 36

1 all information that Google collects; correct?       09:42
2        Do you recall that?       09:42
3 A.  I do.       09:42
4 Q.  From un-synced users; correct?       09:42
5 A.  Yes.  Correct.       09:42
6 Q.  But you also stated that you did not make a  09:42
7 determination as to whether something is or is not  09:42
8 personal information in your opinion; correct?       09:42
9 A.  Well, I do identify categories of information  09:42
10 but they are not exhaustive.  So I identify categories,  09:42
11 right, that I understand from the allegations in the  09:42
12 case are in the category of personal information.  09:42
13        I just haven't assumed that everything; right?  09:42
14 I give lists; right?  And I describe in this and other  09:42
15 portions of my report what this personal information is,  09:42
16 but I don't assume it's everything.       09:42
17 Q.  When you're valuing the data as part of the  09:43
18 value of the personal information opinion, are you  09:43
19 trying to value the data collected from users while  09:43
20 un-synced or is it data -- all data from users who were  09:43
21 ever un-synced, whether at the time they were un-synced  09:43
22 or not?       09:43
23        MS. WEAVER:  Objection.  Form.       09:43
24        And I apologize, Viola, you are using       09:43
25 un-synced again, which is confusing for the record  09:43

Page 37

Veritext Legal Solutions
866 299-5127

1 because somebody who is un-synced might have been synced 09:43
2 at one point.                                          09:43
3        So do you mean to be asking only about         09:43
4 sometime syncers or do you mean not synced? And it's   09:44
5 important to have clarity on that issue on the record. 09:44
6        MS. TREBICKA: That's fair, Lesley.             09:44
7        Actually, of course, my question was limited   09:44
8 to those who are sometimes synced and sometimes not    09:44
9 synced, but let me make that clear in the question.    09:44
10 BY MS. TREBICKA:                                      09:44
11     Q. So, Dr. Mangum, the question is for users who  09:44
12 have been sometimes synced and had sometimes not synced, 09:44
13 when you're valuing the personal information, the value 09:44
14 of the personal information, does it include data      09:44
15 collected from them while they were synced, or have you 09:44
16 attempted to exclude the data collected while they were 09:44
17 synced?                                                09:44
18     A. I don't think you're giving me all the         09:44
19 possible options. You're wanting to say is it A or B?  09:44
20 And so I'm having difficulty answering your question    09:44
21 because of that.                                       09:44
22     Q. What is another option that exists that I'm    09:45
23 not giving you, Dr. Mangum?                            09:45
24     A. Well, there could be value of information for  09:45
25 people who did sync.                                   09:45
Page 38

1     Q. Are you measuring the value of information for  09:45
2 people who did sync?                                    09:45
3     A. Well, I have different methods that I use for   09:45
4 identifying the value of personal information. And the  09:45
5 methods that I identify do not necessarily apply to the 09:45
6 distinction you're identifying about people who were not 09:45
7 synced or synced.                                       09:45
8     Q. So you identify the value of personal          09:45
9 information without regard to whether someone was synced 09:45
10 or not synced?                                         09:45
11       MS. WEAVER: Objection. Form. Misstates the     09:45
12 record.                                                09:45
13       THE WITNESS: Yeah. I mean, I've -- I           09:46
14 wouldn't say that. I'm looking at evidence of a value.  09:46
15 I think that's different than you saying I valued;      09:46
16 right? To conduct a valuation is different than looking 09:46
17 at evidence of value from other transactions or other  09:46
18 analyses, such as the ones I point out involving survey 09:46
19 data.                                                  09:46
20       I'm just clarifying that what I point to --     09:46
21 what I point to is not something that's limited to an   09:46
22 allegation in this case where someone had decided to    09:46
23 sync or not sync.                                      09:46
24 BY MS. TREBICKA:                                       09:46
25     Q. You also say -- in paragraph 16, you say, in   09:46
Page 39

1 the sentence that we read, that "the personal          09:46
2 information collected by Google from Class Members      09:46
3 includes, but is not necessarily limited to, information 09:47
4 on IP addresses."                                       09:47
5        But you don't say IP addresses.                09:47
6        Is that a qualification of information on      09:47
7 IP addresses supposed to mean something in particular?  09:47
8 It's something other than an IP address?               09:47
9     A. I'm sorry. I didn't understand that question.  09:47
10     Q. So you say here "information on IP addresses." 09:47
11       Do you see the sentence that has that phrase?   09:47
12     A. Yes.                                           09:47
13     Q. And it does not say "IP address." It says     09:47
14 "information on IP addresses"; correct?                09:47
15       MS. WEAVER: Objection. Misstates the record    09:47
16 and misstates the sentence.                            09:47
17       THE WITNESS: I do see the word, you know,      09:47
18 "information on IP" -- the phrase, "information on      09:47
19 IP addresses," yes.                                    09:47
20 BY MS. TREBICKA:                                       09:47
21     Q. Is that the same as just IP addresses or is   09:47
22 it supposed to mean something different than just an    09:47
23 IP address?                                            09:48
24       MS. WEAVER: Objection. The sentence does not   09:48
25 end with IP addresses. It lists a long list of         09:48
Page 40

1 information. So I'll object to the extent these         09:48
2 questions are misstating the record.                    09:48
3       THE WITNESS: I did not want to limit in that    09:48
4 particular phrase just the IP address. That's why I     09:48
5 added "information on."                                 09:48
6 BY MS. TREBICKA:                                        09:48
7     Q. So "information on" includes IP address but    09:48
8 could mean other and pieces of information related to   09:48
9 IP address?                                             09:48
10       I'm just trying to understand why it doesn't    09:48
11 say just "IP address" but instead it says "Information  09:48
12 on IP address."                                         09:48
13     A. The words I included were meant to -- I see    09:48
14 information on IP addresses being more broad than       09:48
15 IP addresses. I did not want to include the restriction 09:48
16 to the IP address.                                      09:48
17     Q. Okay. Does "information on" also qualify the   09:48
18 rest of the pieces of data that you include in that     09:49
19 sentence, "unique cookie identifiers, browser          09:49
20 identifiers," et cetera?                               09:49
21     A. Yes.                                           09:49
22     Q. And you included that so that you could be    09:49
23 broader than just, for example, the unique cookie      09:49
24 identifier; you wanted information on unique cookie     09:49
25 identifiers to be included?                            09:49
Page 41

11 (Pages 38 - 41)

Page 42

1    A.  I didn't want the limitation that I believe   09:49
2  might apply.                                        09:49
3    Q.  So let's assume that -- and I'll give you a   09:49
4  hypothetical now.                                   09:49
5    All right?                                        09:49
6    It relates to the value -- or the information     09:49
7  that you are attempting to value with your opinions,   09:49
8  both in the form of the unjust enrichment to Google, as   09:49
9  well as the value of the personal information.      09:50
10   Are you with me so far?                           09:50
11   MS. WEAVER:  Objection.  Form.                    09:50
12 BY MS. TREBICKA:                                    09:50
13   Q.  I'm just trying to lay the stage so that we're   09:50
14 on the same page, Dr. Mangum.                       09:50
15   A.  Understood.                                   09:50
16   MS. WEAVER:  Same objection.                      09:50
17   THE WITNESS:  Maybe you could --                  09:50
18   MS. WEAVER:  Sorry, Dr. Mangum.  Just give me     09:50
19 two seconds.                                        09:50
20   THE WITNESS:  Yeah.                               09:50
21   MS. WEAVER:  All right.  Objection.  Form.        09:50
22   Go ahead, Dr. Mangum.                             09:50
23   THE WITNESS:  I have lost the question.  I'm      09:50
24 sorry.                                              09:50
25 ///

Page 43

1  BY MS. TREBICKA:                                    09:50
2    Q.  So I am asking about the value of the         09:50
3  information that you are attempting to opine on in your   09:50
4  report, both as to the value of the information as  09:50
5  unjust enrichment to Google, as well as the value of the   09:50
6  information -- of the personal information itself --   09:50
7    MS. WEAVER:  Objection.  Form.                    09:50
8  BY MS. TREBICKA:                                    09:50
9    Q.  -- your second with your restitution opinion.   09:50
10   So let's assume there's a Chrome user who is      09:50
11 signed in but not synced, and that Chrome user is going   09:50
12 to Google dot com.                                  09:50
13   Google receives certain information about the     09:51
14 browsing of that Chrome user.                       09:51
15   Are you attempting to value the information       09:51
16 that Google receives from that user when that user is   09:51
17 going to Google dot com or any other Google-owned   09:51
18 property?                                           09:51
19   MS. WEAVER:  Objection.  Form.                    09:51
20   THE WITNESS:  My -- the analysis that I          09:51
21 describe related, for example, to unjust enrichment does   09:51
22 begin -- is limited to Chrome.  So it's an identifier   09:51
23 of revenue.  And then I take different deductions and   09:51
24 partitions for that.  But it's limited to what's earned   09:51
25 by Chrome.                                          09:51

Page 44

1  BY MS. TREBICKA:                                    09:51
2    Q.  What's earned by Chrome or Google?            09:51
3    A.  Well, I'm -- well, obviously Google is the    09:51
4  large umbrella, if you will.  But what I talk about in   09:51
5  my analysis is I go down to revenue identified as what   09:52
6  is earned by Chrome.                                09:52
7    Q.  So let's stick with unjust enrichment -- did   09:52
8  you finish your answer or did I cut you off?        09:52
9    A.  Yes.  Thank you.                              09:52
10   Q.  So let's stick with unjust enrichment then.   09:52
11   For purposes of my hypothetical, it is a          09:52
12 Chrome user who is browsing, signed in, but not synced,   09:52
13 and goes to Google dot com.                         09:52
14   Do you --                                         09:52
15   MS. WEAVER:  Objection -- I'm sorry, viola.       09:52
16 Are you done?                                       09:52
17   MS. TREBICKA:  No.                                09:52
18 BY MS. TREBICKA:                                    09:52
19   Q.  Do you attempt to value the unjust enrichment   09:52
20 flowing to Google as a result of the information Google   09:52
21 obtains in that scenario?                           09:52
22   MS. WEAVER:  Objection.  Vague.                   09:52
23   Viola, you're conflating issues, unjust          09:52
24 enrichment versus restitution here, and asking him about   09:52
25 the value of user data.  All of those are legal     09:52

Page 45

1  definitions.                                        09:52
2    And I'll just have a standing objection to        09:52
3  this line of questioning where you are conflating   09:52
4  restitution and unjust enrichment.  You're not asking   09:53
5  him for a legal definition I'm sure.                09:53
6    Is that correct?                                  09:53
7    MS. TREBICKA:  You may have a standing            09:53
8  objection.                                          09:53
9    MS. WEAVER:  And you --                           09:53
10   MS. TREBICKA:  You may have a standing            09:53
11 objection.                                          09:53
12   MS. WEAVER:  Okay.  And then vague.               09:53
13   MS. TREBICKA:  That's going to be good.           09:53
14   Okay.                                             09:53
15 BY MS. TREBICKA:                                    09:53
16   Q.  Yes, Dr. Mangum?                              09:53
17   A.  The approach that I have undertaken and       09:53
18 described in my report does not look broadly to Google.   09:53
19 It looks to Chrome.  It looks at what's identified as   09:53
20 money earned by Chrome.                             09:53
21   I think you want to go broader than that and      09:53
22 ask about what if you go outside Chrome to Google   09:53
23 dot com?  And I've looked at -- I've looked at what is   09:53
24 identified in documents by Google that shows revenues   09:53
25 earned by Chrome.                                   09:53

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   Q.  Okay.  So you're -- so the -- any profits that   09:53
2   Google would -- that would flow to Google as a result of   09:53
3   someone -- a Chrome user going to Google dot com and   09:53
4   seeing an ad, for example, as a result of the search,   09:53
5   that would not be -- you would not have included that as   09:54
6   part of your unjust enrichment analysis for this case;   09:54
7   correct?   09:54
8       MS. WEAVER:  Objection.  Misstates the record.   09:54
9   Now you're talking about profits.   09:54
10      THE WITNESS:  What I testified was what I   09:54
11  included.  And I know you want to ask did I include?   09:54
12  I'm trying to address that by telling you what I   09:54
13  included; right?   09:54
14  I've only included Chrome, revenues in Chrome   09:54
15  related to this case.   09:54
16  BY MS. TREBICKA:   09:54
17      Q.  But the user is in Chrome.  Let's assume that   09:54
18  the user is in Chrome and goes to Google dot com.   09:54
19      Is your understanding that revenues or profits   09:54
20  to Google as a result of that transaction would be part   09:54
21  of your unjust enrichment analysis?   09:54
22      MS. WEAVER:  Objection.  Compound.   09:54
23      Go ahead.   09:54
24      THE WITNESS:  I've included revenues earned by   09:54
25  Chrome.  I've not included other Google revenues outside   09:54

Page 46

1   of Chrome or at least the process that I undertook to   09:54
2   look at the U.S. to look at Chrome, et cetera.   09:54
3   BY MS. TREBICKA:   09:54
4       Q.  Let's go to table 2 of your report so that I   09:55
5   can contextualize my question a little better for you.   09:55
6       A.  Sure.   09:55
7       Q.  And that's on page 11.   09:55
8       A.  Yes.   09:55
9       Q.  So here you have "Google Advertising Revenue   09:55
10  by Segment."   09:55
11      Do you see that?   09:55
12      MS. WEAVER:  I apologize.  What paragraph   09:55
13  number?   09:55
14      MS. TREBICKA:  It's Table 2.  It's right above   09:55
15  paragraph 28.  So paragraph 27.   09:55
16      THE WITNESS:  Yes.   09:55
17  BY MS. TREBICKA:   09:55
18      Q.  Okay.  So you have here "Google Advertising   09:55
19  Revenue by Segment"; correct?   09:55
20      A.  Correct.   09:56
21      Q.  And you have three segments listed in your   09:56
22  table: "Google Search and Other, YouTube ads" and   09:56
23  "Third-party Network pages"; correct?   09:56
24      A.  Correct.   09:56
25      Q.  Here you focus your analysis on third-party   09:56

Page 47

1   network pages.   09:56
2       Is that correct?   09:56
3       A.  As one example --   09:56
4       MS. WEAVER:  Objection.  Form.   09:56
5   I'm sorry, Dr. Mangum.  Go ahead.   09:56
6       THE COURT REPORTER:  I'm sorry.  I didn't get   09:56
7   the answer.   09:56
8       THE WITNESS:  As one example in my analysis, I   09:56
9   make a reference to the third-party network pages, yes.   09:56
10  BY MS. TREBICKA:   09:56
11      Q.  Well, it's more than an example for purposes   09:56
12  of your unjust enrichment calculations, isn't it?   09:56
13      A.  Well, I identify that through my methodology;   09:56
14  right?  But my understanding is that discovery is   09:56
15  ongoing.  I have seen much more since my report went out   09:56
16  and it might be with ongoing discovery that it goes   09:56
17  beyond the column labeled "Third-Party Network Pages."   09:56
18      Q.  What about your opinion sitting here today; do   09:56
19  you attempt to quantify the unjust enrichment to Google   09:56
20  as a result of the third-party network pages   09:57
21  advertising?   09:57
22      A.  Well, I don't have any opinions as I sit here   09:57
23  today beyond what's in my report.  And in my report, I   09:57
24  do talk about unjust enrichment.  I talk about   09:57
25  calculations.  And as part of that, I do refer to   09:57

Page 48

1   this -- this third of the three categorical   09:57
2   subcomponents of this advertising; right?  I do refer to   09:57
3   the third-party network pages.   09:57
4       So, yes, as I sit here today, the report -- my   09:57
5   opinion shown in my report does relate to that.   09:57
6       Q.  And what do you understand that to be, the   09:57
7   third-party network pages?   09:57
8       A.  This is revenue earned by Google when Google   09:57
9   places ad on websites -- not Google's but third party's   09:57
10  websites, and they use the various types of advertising   09:58
11  means I talk about in my report.  But they help place   09:58
12  advertisers there, they share revenue on those   09:58
13  third-party sites.   09:58
14      Q.  So this excludes revenue earned from   09:58
15  Google dot com or other Google-owned properties;   09:58
16  correct?   09:58
17      A.  Well, I don't include YouTube as you see   09:58
18  there.  At least that's a different column; right?   09:58
19  Google search and other areas are listed differently.   09:58
20  In the process that I describe in my report, which does   09:58
21  include reference to the third-party network pages   09:58
22  column, I do identify that what I'm bringing in as the   09:58
23  revenue of Chrome in that category, at least in my   09:58
24  opinion thus far, which goes back to the date my report   09:58
25  was issued.   09:58

Page 49

13 (Pages 46 - 49)

1  Q.  So going back to my hypothetical of a Chrome   09:58
2  user going to -- excuse me -- Google dot com and   09:58
3  searching on Google dot com, you do not attempt to   09:58
4  include any revenues to Google from that transaction in   09:59
5  your current unjust enrichment analysis.   09:59
6      Is that correct?   09:59
7      MS. WEAVER:  Objection.  Form.  Misstates the   09:59
8  record and his report and his testimony.   09:59
9      THE WITNESS:  I don't believe that's the case.   09:59
10      But what I'm trying to clarify is I include   09:59
11  the revenue related to Chrome, identified as Chrome in   09:59
12  the documents I point to.   09:59
13      You've identified a path that if that results   09:59
14  in revenue identified under Chrome, that's included of   09:59
15  what I've done.   09:59
16  BY MS. TREBICKA:   09:59
17  Q.  So your understanding of your unjust   09:59
18  enrichment analysis is that if a Chrome user goes to   09:59
19  Google dot com and searches on Google dot com, any   09:59
20  revenues that accrue to Google as a result of that   09:59
21  search would be included in your unjust enrichment   09:59
22  analysis?   09:59
23  A.  No.  That's not my testimony.   09:59
24  Q.  What is your testimony then?   09:59
25  A.  Well, you said that must be out; right?  And I   09:59
Page 50

1  said, no, I don't agree.  It may be in there.   10:00
2      But what I know I've gone to is the Chrome   10:00
3  revenues that are reported by Google.   10:00
4  Q.  It may be in there, it may not be in there.   10:00
5  You don't know?   10:00
6      MS. WEAVER:  Objection.  Vague.  Misstates his   10:00
7  testimony.  Asked and answered.   10:00
8      THE WITNESS:  I know what I've included.  I've   10:00
9  clearly identified the revenue I've included.   10:00
10      You're coming up with a hypothetical that --   10:00
11  and I'm not sure what the implication of that is, of   10:00
12  that hypothetical.  But I have explained to you what   10:00
13  I've done.   10:00
14      I've limited it to Chrome revenues.  And as of   10:00
15  the date of my report, based on the discovery at that   10:00
16  time, what I referenced was this third-party network   10:00
17  pages revenue column for purposes of unjust enrichment.   10:00
18  BY MS. TREBICKA:   10:00
19  Q.  So would that third-party network pages   10:00
20  revenue column include revenue obtained from a Google   10:00
21  Chrome user browsing on Google dot com?   10:00
22  A.  I actually don't understand what revenue you   10:01
23  are talking about just now.  You said someone browses   10:01
24  and there's revenue.  I don't know what you mean.   10:01
25  Q.  So would the third-party network pages and   10:01
Page 51

1  your understanding include revenue that Google obtains   10:01
2  as a result of ads shown to a user -- Chrome user   10:01
3  browsing on Google-owned websites?   10:01
4      MS. WEAVER:  Objection.  Asked and answered.   10:01
5  Form.   10:01
6      THE WITNESS:  The third-party network pages,   10:01
7  the revenue there comes from Google's interaction with   10:01
8  third parties, but -- and includes there -- it includes   10:01
9  revenue on sites, ads on those sites.   10:01
10      My understanding is that's -- that identifies   10:01
11  the third-party revenue from third-party sites.   10:01
12      I think you're asking about non-third party   10:01
13  sites, and I'm trying to tell you if that's what you're   10:01
14  referring to, it's not included in the third-party   10:01
15  network pages.   10:01
16      MS. WEAVER:  And I'll like to just say we've   10:02
17  been going for about an hour and I've had too much   10:02
18  coffee, so if we could take a break at some point, that   10:02
19  would be helpful.   10:02
20      MS. TREBICKA:  We can actually take a break   10:02
21  now, Lesley, if that's okay.   10:02
22      MS. WEAVER:  Okay.  I actually greatly   10:02
23  appreciate it.   10:02
24      MS. TREBICKA:  Yeah.  Sure.   10:02
25      Dr. Mangum, also, to respect your time, I'm   10:02
Page 52

1  happy to keep the breaks short so that we can get you   10:02
2  out of here, but obviously take the time you need.   10:02
3      THE WITNESS:  Okay.   10:02
4      THE VIDEOGRAPHER:  Okay.  Let's go off the   10:02
5  record at 10:02.   10:02
6      (Break taken in proceedings.)   10:11
7      THE VIDEOGRAPHER:  We are back on the record.   10:12
8  The time is 10:12 a.m.   10:12
9  BY MS. TREBICKA:   10:12
10  Q.  Dr. Mangum, earlier in --   10:12
11      MS. WEAVER:  I apologize, Viola.  Are you   10:12
12  going to mark the exhibit?  That's what we just   10:12
13  discussed.  Okay.   10:12
14      MS. TREBICKA:  That's what I was just going to   10:12
15  do.   10:12
16      MS. WEAVER:  Sorry about that.   10:12
17      MS. TREBICKA:  It's all right, Lesley.   10:12
18  BY MS. TREBICKA:   10:12
19  Q.  Dr. Mangum, earlier in your testimony we   10:12
20  referred to your expert report.   10:12
21      Do you recall that?   10:12
22  A.  I do.   10:12
23  Q.  And we have now marked it as Exhibit 1 to your   10:12
24  deposition.   10:12
25  A.  Okay.   10:12
Page 53

14 (Pages 50 - 53)

1 Q. And it's -- I believe it's also published on   10:12
2 the Exhibit Share. And you have access to it; correct?   10:12
3   A. Yes, I do.                              10:12
4   Q. And you also earlier confirmed you had no   10:12
5 reason to believe that was not your expert report;   10:12
6 correct?                                    10:12
7   A. I don't think we actually talked about that   10:12
8 but it's true, other than I think there's boxes on the   10:12
9 report that were related to redaction which is something   10:12
10 that happened after I had submitted it.      10:12
11   Q. Okay. Thank you.                      10:12
12      So let's go back to the marked Exhibit 1.   10:13
13   A. Okay.                                10:13
14   Q. Paragraph 4 where you state -- and I'm reading   10:13
15 from paragraph 4:                           10:13
16      "I understand this case has been         10:13
17      brought against Google on behalf of Chrome   10:13
18      users within the U.S. who did not enable   10:13
19      sync or disabled sync on the Chrome       10:13
20      browser while browsing on the internet    10:13
21      over the relevant time period" open       10:13
22      parentheses "(Class Members)," comma,     10:13
23      excluding browsing in Incognito mode."    10:13
24      Do you see that?                       10:13
25   A. I do.                                10:13

Page 54

1   Q. So your understanding of the class definition   10:13
2 is that it's enough for a user to have used Chrome even   10:13
3 once during the class period without enabling sync to be   10:13
4 included in the class; correct?             10:13
5   A. You know, I think that -- I think that may be   10:14
6 a legal distinction about what qualifies as a class   10:14
7 member.                                     10:14
8      My understanding, as I state at the beginning   10:14
9 of this paragraph, is what class members are. So I   10:14
10 think you've picked an extreme end of that and, you   10:14
11 know, if there's gray area on the edge, I don't have a   10:14
12 legal opinion on that.                      10:14
13      So I'll stand by what I talk about there about   10:14
14 being synced, right, "did not enable sync or disabled   10:14
15 sync." But I don't know the specifics about -- I think   10:14
16 you said just once and then stopped or something like   10:14
17 that. I'm not sure legally what that might mean.   10:14
18   Q. Okay. But for your -- for purposes -- for   10:14
19 purposes of your damages analysis, you have not been   10:14
20 asked to exclude any members on the basis of how often   10:14
21 they were browsing not synced; correct?     10:14
22      MS. WEAVER: Objection. Form.           10:14
23      THE WITNESS: No. Not kind of a complete   10:15
24 exclusion based on what you've suggested.    10:15
25 ///

Page 55

1 BY MS. TREBICKA:                              10:15
2   Q. Let's move to paragraph 18 of your report that   10:15
3 is on page 6. And here I will direct your attention to   10:15
4 the first sentence and in particular, the parentheses at   10:15
5 the end of that first sentence.              10:15
6   A. Okay.                                10:15
7   Q. Where you say "(excluding browsing while in   10:15
8 Incognito mode.)"                           10:15
9      Do you see that?                       10:15
10   A. I do. Give me a second to read this sentence   10:15
11 again.                                      10:15
12   Q. Sure. Of course.                      10:15
13      MS. WEAVER: And I'll just note for the record   10:15
14 that when you read paragraph four into the record, you   10:15
15 excluded that phrase in paragraph 4, Viola.   10:15
16      THE WITNESS: Okay. I've read it. And, yes,   10:16
17 I've noticed that parenthetical at the end of that first   10:16
18 sentence of paragraph 18 of my report.       10:16
19 BY MS. TREBICKA:                              10:16
20   Q. Is your understanding that what's excluded   10:16
21 from the putative class is the browsing in incognito   10:16
22 mode, not necessarily users who are browsing in   10:16
23 incognito mode?                             10:16
24   A. Your question is -- actually, could you ask it   10:16
25 again?                                      10:16

Page 56

1   Q. Sure. I'm ask it a different way.        10:16
2   A. I already forgotten it when I was thinking.   10:16
3   Q. I'll ask it a different way.            10:16
4      Have you been asked to exclude users from the   10:16
5 putative class on the basis of the fact that they've   10:16
6 browsed in incognito mode?                   10:17
7   A. Well, I don't include or exclude class members   10:17
8 at all. I've talked about what I understand the class   10:17
9 is, but I've not been asked to form an opinion of   10:17
10 delineating exactly, you know, on a user-by-user basis   10:17
11 if they're in or out of the class.           10:17
12   Q. So let's talk about your understanding of what   10:17
13 the class is. Those are the words you used.   10:17
14      Is your understanding of the class, that it   10:17
15 excludes users who have ever browsed in incognito mode?   10:17
16      MS. WEAVER: Objection. Asked and answered.   10:17
17 This report speaks for itself.              10:17
18      THE WITNESS: Hm. Well, in reading my report,   10:17
19 I see here what's being talked about is excluding the   10:17
20 browsing, as far as this part of my report.   10:17
21      My opinions don't relate on needing to   10:18
22 identify a number of class members. I come up with   10:18
23 unjust enrichment. That's part of it. I come up with a   10:18
24 valuation. And the steps I take in my analysis of   10:18
25 unjust enrichment explicitly take out things related to   10:18

Page 57

15 (Pages 54 - 57)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 incognito, revenues related to incognito.          10:18
2      So I'm -- I don't think that's an -- that is   10:18
3 absolute exclusion of a person to be a member if they   10:18
4 ever used incognito.  That's not the way I've been      10:18
5 thinking about it.  I state it that way because I didn't   10:18
6 need to know that to do a calculation that I did in my   10:18
7 report.                                          10:18
8 BY MS. TREBICKA:                                 10:18
9      Q.  Just trying to understand.  You say "I stated   10:18
10 it that way because I didn't need to know that to do a   10:18
11 calculation that I did in my report."             10:18
12      What do you mean by that?                    10:18
13      A.  I don't remember saying that.  If I did, I   10:18
14 misspoke.  The phrase you just gave.              10:18
15      Q.  Do you need to know whether someone is      10:19
16 excluded -- let me start over again.              10:19
17      For purposes of your report and your opinion,   10:19
18 do you need to know whether someone who would be a   10:19
19 member of the putative class would be excluded on the   10:19
20 basis of incognito browsing?                      10:19
21      MS. WEAVER:  Objection.  Asked and answered.   10:19
22 Report speaks for itself.                         10:19
23      THE WITNESS:  The analysis I've performed, for   10:19
24 example, one is the unjust enrichment analysis -- unjust   10:19
25 enrichment analysis, does not include a step that I   10:19

Page 58

1 would have to distinguish what you're bringing up.  I   10:19
2 identify what the unjust enrichment is.  I do make the   10:19
3 adjustment, as I state in my report, regarding       10:19
4 incognito, but it doesn't include this distinction   10:19
5 you're bringing up.                               10:19
6 BY MS. TREBICKA:                                 10:19
7      Q.  What about your restitution opinion, loss of   10:19
8 personal value?                                   10:19
9      MS. WEAVER:  Objection.  Vague.  Form.         10:20
10      MS. TREBICKA:  Go ahead.                     10:20
11      MS. WEAVER:  What about...                   10:20
12      THE WITNESS:  Other than my unjust enrichment   10:20
13 opinion, I also have analyses that I look at the value   10:20
14 of personal information.  Again, those numbers that I   10:20
15 identify doesn't require me having to decide on a    10:20
16 person-by-person basis are they in the class or not?   10:20
17 Those numbers are before such a decision would be made,   10:20
18 if you will, this distinction you brought up        10:20
19 specifically about, well, if someone uses incognito   10:20
20 ever, are they out?  It's just not needed for what I   10:20
21 did.                                             10:20
22 BY MS. TREBICKA:                                 10:20
23      Q.  Are you familiar with guest mode on Chrome?   10:20
24      A.  Guest mode...                           10:20
25      Q.  Correct.                                10:20

Page 59

1      A.  I don't think technically I am.           10:20
2      Q.  Are you generally familiar with it?       10:21
3      A.  Well, I've seen reference to it, but I'm   10:21
4 getting outside of my expert opinion now, as far as I -- 10:21
5 you know, in using Chrome, seeing a reference to guest   10:21
6 mode.  But I -- I guess I don't have a technical opinion   10:21
7 or an expert opinion about that.                  10:21
8      Q.  Your understanding of the class is that it   10:21
9 excludes browsing while in incognito mode; correct?   10:21
10      A.  Correct.  We -- well, at least we just talked   10:21
11 about my paragraph 18.  It was also mentioned in      10:21
12 paragraph 4, that I have that parenthetical about the   10:21
13 exclusion of browsing in incognito mode.          10:21
14      Q.  You do not have an understanding as to whether   10:21
15 or not guest mode is excluded from the putative class;   10:21
16 correct?                                          10:21
17      MS. WEAVER:  Objection.  Vague.  Misstates his   10:21
18 testimony.                                        10:21
19      Why don't you define it for him, Viola.       10:22
20 Assumes facts not in evidence.                    10:22
21 BY MS. TREBICKA:                                 10:22
22      Q.  Go ahead, Dr. Mangum.                    10:22
23      A.  I don't know what guest mode is.  So to say -- 10:22
24 you know, to ask me to then go ahead and make a       10:22
25 statement about whether it's in or not, I need to know   10:22

Page 60

1 what it is, what you're talking about.  I might be able   10:22
2 to answer if I know more about it, but by that moniker   10:22
3 alone, I can't answer the question.               10:22
4      Q.  Do you understand that guest mode is a mode on   10:22
5 Chrome, the browser that is the subject of this lawsuit?   10:22
6      MS. WEAVER:  Objection.  Misstates the record.   10:22
7 Misstates testimony.  Misstates the lawsuit.      10:22
8      THE WITNESS:  I presume when you talked about   10:22
9 guest mode, we were talking about being on Chrome as a   10:22
10 browser and the mode of being there, but I don't -- I'm   10:22
11 not sure that matches exactly with what you've just   10:22
12 described.                                        10:22
13 BY MS. TREBICKA:                                 10:23
14      Q.  So what -- your presumption is correct.    10:23
15      When we're talking about guest mode, we are    10:23
16 talking about a browser mode of Chrome.           10:23
17      Do you understand that?                      10:23
18      A.  Well, you just said it, so I don't know if   10:23
19 that amounts to my understanding if I should accept it   10:23
20 or -- I understand what you've said.              10:23
21      Q.  Okay.  Well, do you have an independent       10:23
22 understanding of what guest mode is on the Chrome   10:23
23 browser?                                          10:23
24      A.  No.  I think you've asked me this before.   10:23
25      Q.  You don't have an independent understanding.   10:23

Page 61

16 (Pages 58 - 61)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     And you didn't form one during the forming of   10:23
2 your opinion; correct?                                           10:23
3        MS. WEAVER: Well, objection. Form.        10:23
4        THE WITNESS: I don't have an opinion of many   10:23
5 things that I understand is stated in my report. So I   10:23
6 would not include things like understanding what guest   10:23
7 mode is as being something -- even if I did understand   10:24
8 it, I wouldn't call it my opinion; right?                   10:24
9        So back to your last question, I have not made   10:24
10 a distinction on something that I described as guest   10:24
11 mode in my analysis.                                       10:24
12       MS. TREBICKA: Thank you.                  10:24
13 BY MS. TREBICKA:                                        10:24
14    Q. Let us go to paragraph 15 of your report.      10:24
15       Just let me know when you're there.          10:24
16    A. I am there.                                        10:24
17    Q. Okay. Thank you.                            10:24
18       If you would go to the very last sentence of   10:25
19 that paragraph. Feel free to read the paragraph, you   10:25
20 know, in your mind so that you can contextualize it for   10:25
21 the question.                                             10:25
22       But my question relates to that very last      10:25
23 sentence of the paragraph.                             10:25
24    A. Okay.                                          10:25
25    Q. And I'll read it into the record.             10:25

Page 62

1 a question for the Court, but I don't have a -- I think   10:27
2 entitlement is a legal distinction.                       10:27
3    Q. It's fair.                                        10:27
4       When you calculated unjust enrichment, did you   10:27
5 also include the alleged profits that Google made from   10:27
6 the non-Google account holders?                        10:27
7    A. I did not -- in calculating unjust enrichment   10:27
8 as described in my report to the point where I have a   10:27
9 table -- Table 3, I think -- give me a moment. Table 3,   10:27
10 all right, which is on -- right before my paragraph 61.   10:28
11       As I -- as I go through the computations         10:28
12 mentioned in the text of my report and summarized in   10:28
13 Table 3, I don't make a distinction about account       10:28
14 holders, but that's because all that I do there, I       10:28
15 believe, kind of comes before such a distinction might   10:28
16 be made.                                               10:28
17       I do talk later about data that I believe is    10:28
18 apparently available that could identify account        10:28
19 holders. And so that would be a time, if there was a --   10:28
20 some kind of a decision about being an account holder or   10:28
21 not, whether it was in, maybe claims administration, it   10:28
22 could be applied. But that distinction, given the way   10:28
23 I've addressed unjust enrichment, wasn't needed given   10:28
24 the opinion I formed.                                   10:28
25       MS. WEAVER: And I apologize. I didn't want   10:28

Page 64

1    A. Okay.                                          10:25
2    Q. "Similarly" --                                   10:25
3    A. I'll take your suggestion and read the whole   10:25
4 paragraph and --                                        10:25
5    Q. Okay. That's fine. Yeah. You're a fast      10:25
6 reader.                                                 10:25
7        MS. WEAVER: Assumes facts not in evidence.   10:25
8        THE WITNESS: Okay. I've read the paragraph.   10:26
9 BY MS. TREBICKA:                                        10:26
10    Q. The last sentence says:                        10:26
11       "Similarly, Google allegedly collects          10:26
12 Chrome users' personal information even if          10:26
13 the user does not have a Google account            10:26
14 and uses that information to create                 10:26
15 profiles of users."                                  10:26
16       Do you see that?                              10:26
17    A. I do.                                          10:26
18    Q. Do you understand users who do not have a   10:26
19 Google account to be part of the putative class?     10:26
20    A. I don't believe they are necessarily excluded   10:26
21 by having a nonaccount status, that users.          10:26
22    Q. Do you believe they're entitled to unjust      10:27
23 enrichment damages?                                 10:27
24    A. I don't have an opinion on entitlement. I've   10:27
25 calculated unjust enrichment. And I believe that may be 10:27

Page 63

1 to interrupt but I meant to interpose an objection as to 10:28
2 the word "profits."                                    10:29
3 BY MS. TREBICKA:                                        10:29
4    Q. Let's go to paragraph 17 on that same page.   10:29
5 It's under the section "Plaintiffs and Class Members."   10:29
6    A. Yes.                                           10:29
7    Q. And you state:                                 10:29
8       "Each of the named plaintiffs is an           10:29
9 adult residing in the U.S. and has used            10:29
10 the Chrome browser without enabling the         10:29
11 sync feature or has disabled sync on one         10:29
12 or more occasions."                               10:29
13       The next sentence says:                       10:29
14       "None of the plaintiffs has consented        10:29
15 to Google obtaining his/her personal              10:29
16 information from Chrome in general."              10:29
17       Do you see that?                              10:29
18    A. I do.                                          10:29
19    Q. Is that your own determination or is it an   10:29
20 assumption that you're making as to whether a plaintiff 10:29
21 has consented?                                        10:29
22       MS. WEAVER: And I'll object, Russ.          10:29
23       Object to the extent the question is asking   10:29
24 about consent and a legal conclusion.               10:29
25       THE WITNESS: I've not -- I think I lost the   10:30

Page 65

17 (Pages 62 - 65)

1 question with your objection.  I apologize.          10:30
2        My recollection is I think you've given me two 10:30
3 possibilities and you wanted me to change between --   10:30
4 sorry -- to choose between the two, but --           10:30
5 BY MS. TREBICKA:                                      10:30
6    Q.  How about I ask it again?                      10:30
7    A.  Okay.                          10:30
8    Q.  How about I ask it again?                      10:30
9        Is it your own determination that these users 10:30
10 have not consented?                          10:30
11       MS. WEAVER:  Same objection.          10:30
12       THE WITNESS:  I don't have -- I don't form    10:30
13 opinions on whether someone gave consent or not.  I   10:30
14 think that's a legal -- legal determination my own.   10:30
15 somebody with an expertise outside my own.  So I don't 10:30
16 have that opinion.                          10:30
17 BY MS. TREBICKA:                                      10:30
18    Q.  So you're -- you're assuming for purposes of 10:30
19 your opinion that the plaintiffs have not consented to 10:30
20 Google obtaining his or her personal information.      10:30
21       Is that right?                   10:30
22       MS. WEAVER:  Same objection.          10:31
23       THE WITNESS:  I wouldn't agree to that either. 10:31
24 I think again you're -- maybe you're concluding that  10:31
25 must be the only option left and I think that's       10:31
                                          Page 66

1 incomplete.                          10:31
2 BY MS. TREBICKA:                                      10:31
3    Q.  Okay.  Can you complete it?          10:31
4    A.  Yes.                          10:31
5    Q.  What is the option you're thinking of?    10:31
6    A.  I'm aware of allegations.  I'm aware of     10:31
7 statements; right?  And if I identify those as part of a 10:31
8 background section, like here, before I start my      10:31
9 analysis, that doesn't mean I'm assuming it.  It's what 10:31
10 I understand how something has been explained but it   10:31
11 need not be purely assumed or a determination on my    10:31
12 part.                          10:31
13    Q.  So you're not calling it an assumption or a 10:31
14 determination.                          10:31
15       What would you call it?          10:31
16    A.  It's my understanding.  I understand this is a 10:31
17 position that has been taken based on the -- well, at  10:31
18 least the positions taken by parties in the case and  10:31
19 counsel for parties.                          10:31
20    Q.  And your understanding that plaintiffs have 10:31
21 not consented is based on whatever is included in your 10:31
22 report.                          10:31
23       Is that correct?                   10:31
24       MS. WEAVER:  Objection.  Form.  Misstates the 10:31
25 record.                          10:32
                                          Page 67

1        THE WITNESS:  Well, I certainly didn't have a 10:32
2 basis for understanding that I intentionally withheld as 10:32
3 far as documents that I've identified in my report.    10:32
4 BY MS. TREBICKA:                                      10:32
5    Q.  Does your methodology have a way to exclude  10:32
6 users who may have consented to the data collection?   10:32
7    A.  Well, I believe so, in a way.  But I think   10:32
8 that part of it relates to where what I've done would  10:32
9 fit in the stream of assuming a finding of liability and 10:32
10 there being some type of remuneration to class members. 10:32
11       For example, if there is some query or some  10:32
12 analysis that might be used to differentiate between how 10:32
13 some class members gave consent or not, it -- I don't  10:32
14 believe it logically happens in what I've done, but it 10:32
15 might take what I've done and then require a step during 10:32
16 either further discovery or maybe claims administration 10:33
17 where someone might exclude that.          10:33
18       So I think that can be included.  But that   10:33
19 particular question or distinction you've identified, I 10:33
20 don't think fits in what I've done so far, up to the end 10:33
21 of my opinions to date.                   10:33
22    Q.  You state that "if there is some query or some 10:33
23 analysis that might be used to differentiate between how 10:33
24 some class members gave consent or not."          10:33
25       Are you aware of some such query or analysis  10:33
                                          Page 68

1 that might be used to differentiate how some class     10:33
2 members gave consent or not?                   10:33
3    A.  I don't know what you mean by am I aware.  You 10:33
4 mean am I aware of something in actual existence or    10:33
5 conceptually?                          10:33
6    Q.  Well, let's start with actual existence.     10:33
7    A.  I'm not aware of any --          10:34
8       MS. WEAVER:  I'm just going to object to form 10:34
9 at this point.                          10:34
10       Sorry.  Go ahead, Russ -- Dr. Mangum.     10:34
11       THE WITNESS:  I'm not aware of an existing    10:34
12 analysis or computation that would have come to the   10:34
13 conclusion that you've suggested about whether consent 10:34
14 was given or not.                          10:34
15 BY MS. TREBICKA:                                      10:34
16    Q.  Are you aware of something conceptually that 10:34
17 would have come to the conclusion that -- whether      10:34
18 consent was given or not by a putative class member?   10:34
19    A.  Yes.                          10:34
20    Q.  Tell me about it.                   10:34
21    A.  Hypothetically there may be some web page that 10:34
22 a class member might have seen and the content on that 10:34
23 page might be deemed sufficient to say consent was     10:34
24 given.                          10:34
25       If that's the case, one might say, well, that 10:34
                                          Page 69

1 question will be asked at claims administration. Has   10:34
2 this page been seen?   10:35
3    That would be one way to say, well, yes or no.   10:35
4 That's a way to pull out those individuals based on this   10:35
5 what I presume would have been a Court determination on   10:35
6 a consent differentiation point.   10:35
7    Q.  Anything else that you're aware of   10:35
8 conceptually?   10:35
9    A.  I could keep thinking about other things but   10:35
10 this is hypothetical, as far as what's possible in   10:35
11 claims administration.  So that's not the only thing.   10:35
12 That's one thing.   10:35
13    There could be any number of determinations of   10:35
14 a Court which I couldn't possibly get my mind around it   10:35
15 now that if I was to learn, I could say, well, then   10:35
16 that's a question that could be asked.   10:35
17    If the Court says maybe this happened, great.   10:35
18 That could be asked; right?  Or maybe that information   10:35
19 could be requested in discovery, maybe even posttrial.   10:35
20 It could be asked that I review that, and I help   10:35
21 identify --   10:35
22    I mean, again, I'm being a bit vague because   10:35
23 you said is there any others?  It would depend on what   10:35
24 legal determination might have been found for the   10:35
25 distinguishing -- distinguishing consent or not.   10:35

Page 70

1    MS. WEAVER:  And, again, this was all subject   10:36
2 to the objection that he's not providing a legal opinion   10:36
3 on consent.   10:36
4 BY MS. TREBICKA:   10:36
5    Q.  Let's assume that a particular putative class   10:36
6 member's data was not collected by Google.   10:36
7    Would you have a way to exclude that person   10:36
8 from your analysis?   10:36
9    MS. WEAVER:  Objection.  He's not a technical   10:36
10 expert.  Calls for speculation.   10:36
11 BY MS. TREBICKA:   10:36
12    Q.  Go ahead.   10:36
13    A.  I believe so, but I would have to know more   10:36
14 about the process that was undertaken to make the   10:36
15 conclusion you suggest.   10:36
16    Q.  So sitting here today, you have not been asked   10:36
17 to come up with a methodology to exclude a person whose   10:37
18 data was not collected by Google?   10:37
19    MS. WEAVER:  Objection.  Misstates his   10:37
20 testimony.  Speculation.   10:37
21    THE WITNESS:  Well, my opinion -- the opinions   10:37
22 I've formed have not included an assessment of -- of an   10:37
23 exclusion that you're suggesting.   10:37
24    MS. TREBICKA:  I understand.   10:37
25    THE WITNESS:  Again, I would need to know,   10:37

Page 71

1 well, why?  How was it even determined that such was the   10:37
2 case?  That would be needed first to identify -- to do   10:37
3 that, if you will, if it's possible, whatever you're   10:37
4 suggesting.   10:37
5 BY MS. TREBICKA:   10:37
6    Q.  Let's assume -- sorry.  Let me back up and say   10:37
7 going back to the -- to what we defined as the data that   10:37
8 you have in paragraph 16 of your report.   10:37
9    Do you recall that information on IP   10:38
10 addresses, unique cookie identifiers, browser   10:38
11 identifiers, and other internet browsing history data?   10:38
12    A.  Yes.  I remember that in my report and we   10:38
13 spoke about it today.   10:38
14    Q.  Correct.   10:38
15    And I will refer to that as "The Data," and we   10:38
16 can capitalize it for the record so that I don't have to   10:38
17 rattle off all those pieces of information every time I   10:38
18 ask a question about it.   10:38
19    Would you understand what I mean if I say   10:38
20 The Data?   10:38
21    MS. WEAVER:  I'll object to form.  Depends on   10:39
22 the question.   10:39
23    THE WITNESS:  Well, I can -- I can -- if   10:39
24 you're saying that's what you mean by Data, I understand   10:39
25 that, and I can adopt to that.  But as I said before, I   10:39

Page 72

1 think that's taking a very limited view of what would be   10:39
2 relevant in this case.  You're taking one sentence.   10:39
3    And as I said my whole report needs to be   10:39
4 included, so -- and my answer if I go forward, I might   10:39
5 answer to your data and later object and say, "Well, I'm   10:39
6 only answering about that sentence.  That was an   10:39
7 incomplete explanation from my report.  And if I would   10:39
8 have made a reference to something more broad, I would   10:39
9 have had a different answer."   10:39
10 BY MS. TREBICKA:   10:39
11    Q.  I understand that.  But really paragraph 16,   10:39
12 that sentence is quite broad.  It said "includes but   10:39
13 is not necessarily limited to information on IP   10:39
14 addresses, unique cookie identifiers, browser   10:39
15 identifiers, and other internet browsing history data."   10:39
16    So if I refer to that whole sentence as   10:39
17 The Data, will you agree with me and we can refer to it   10:39
18 as The Data?   10:40
19    MS. WEAVER:  So I'll object to form.  Counsel   10:40
20 is testifying when she says really paragraph 16, that   10:40
21 sentence is quite broad, et cetera.   10:40
22    So we'll move to strike counsel's testimony.   10:40
23    I -- so answer if you can.   10:40
24 BY MS. TREBICKA:   10:40
25    Q.  So, Dr. Mangum, let me make sure I understand.   10:40

Page 73

19 (Pages 70 - 73)

1    You're not even willing in this deposition to   10:40
2   agree with me to use a particular term to mean something   10:40
3   as defined in your report.                10:40
4        Is that right?         10:40
5   A.   Oh --                    10:40
6        MS. WEAVER:   Objection.  Misstates -- hang on.  10:40
7        Objection.  Misstates the record.  And we   10:40
8   don't appreciate the badgering, Viola.        10:40
9        THE WITNESS:   And actually it's incorrect.    10:40
10  You're wanting to boil everything down to one sentence.  10:40
11  And all I'm saying is please use my whole report.  But   10:40
12  you're trying to say, "I want to make a term 'Data'    10:40
13  equal one sentence."              10:41
14       And I'm saying is that's not why I wrote   10:41
15  the report.  You can't take one sentence and say "To the   10:41
16  exclusion of everything else I'm going to define it    10:41
17  differently."                    10:41
18       So you can go forward and I'll try to use it   10:41
19  but I'll use a qualifier saying Data, as you've in a    10:41
20  limited way explained it today, and I'll answer the    10:41
21  question.                    10:41
22       But my report -- my report talks about   10:41
23  personal information in more places, and I want to make   10:41
24  sure we include all of those.         10:41
25  ///
                                    Page 74

1   BY MS. TREBICKA:                 10:41
2   Q.   So your testimony today is that when you   10:41
3   defined The Data in paragraph 16, you defined it in an   10:41
4   incomplete way, and there's other parts of your report   10:41
5   that have additional data that you have valued.      10:41
6        Is that correct?            10:41
7        MS. WEAVER:   So I'll object to form, tone, and   10:41
8   badgering the witness.  Misstates his record and his   10:41
9   testimony.                    10:41
10       THE WITNESS:   No.  That's not what I'm saying.  10:41
11       For example, I don't know why you think   10:41
12  paragraph 16 is something that will be the hallmark of   10:41
13  a line of questioning you're envisioning.      10:42
14       You say I defined it.  I don't know where   10:42
15  you -- this paragraph doesn't say I've defined anything.  10:42
16  I've said according to plaintiffs.  And I've used a   10:42
17  phrase "includes but is not necessarily limited to,"  10:42
18  which is meant to say don't use the statement here to   10:42
19  define anything.               10:42
20       It's a very broad thing.  And I've included   10:42
21  things elsewhere in my report.         10:42
22       So this shouldn't be some pivotal point in my   10:42
23  report to then put a label on it and move forward, at   10:42
24  least if you want all of what's in my report.      10:42
25  ///
                                    Page 75

1   BY MS. TREBICKA:                 10:42
2   Q.   So, Dr. Mangum, let's assume hypothetically   10:42
3   that Google receives some but not all of The Data that   10:42
4   you mention in paragraph 16 of your report.      10:42
5        MS. WEAVER:   Objection.  Vague.  Calls for   10:43
6   speculation.                  10:43
7        MS. TREBICKA:   Lesley, I'm not done with my   10:43
8   question.                    10:43
9        MS. WEAVER:   That was a long pause.  I     10:43
10  apologize.                    10:43
11  BY MS. TREBICKA:                 10:43
12  Q.   Dr. Mangum, let's assume hypothetically that   10:43
13  Google receives some but not all of The Data that you   10:43
14  mention in paragraph 16 of your report.        10:43
15       How would you account for that in your   10:43
16  methodology, if you would account for it at all?    10:43
17       MS. WEAVER:   Are you done, Viola?      10:43
18       MS. TREBICKA:   Yes.         10:43
19       MS. WEAVER:   Okay.  I'll object.  It's vague.  10:43
20  Calls for speculation.  He is not a technical witness.  10:43
21       You may answer.            10:43
22  BY MS. TREBICKA:                 10:43
23  Q.   Go ahead.               10:43
24  A.   I'll talk for a moment about my opinion   10:43
25  relating to unjust enrichment.         10:43
                                    Page 76

1        The analysis of unjust enrichment, which I'm   10:44
2   scrolling down to my Table 3, page 22 of my expert   10:44
3   report.  When -- my opinion about unjust enrichment up   10:44
4   to that point does not rely on or logically include the   10:44
5   distinction you've identified.         10:44
6        It could subsequent to this.  And if there was   10:44
7   some belief that what you suggest might have happened,   10:44
8   I've identified one means to allocate to the class   10:44
9   member level using user account months, avoid allocated.  10:44
10       But, again, the entire -- at least the    10:44
11  aggregate amount of unjust enrichment, right, is    10:44
12  something that does not rely on this question you're   10:45
13  bringing up now.               10:45
14       If it's believed that there was some way to   10:45
15  reasonably show there were differences of uses and data   10:45
16  and if the Court wanted to say, "Well, that's something   10:45
17  I think as opposed to something, it's feasible,"     10:45
18  right, but it isn't logically or necessarily part of my   10:45
19  opinion that I framed here, at least this far in my   10:45
20  report regarding unjust enrichment.        10:45
21       Regarding the value of the user information   10:45
22  that I've identified later, the methods that I've    10:45
23  identified later in my report, those values apply --   10:45
24  what I've pointed to, they don't include further   10:45
25  partitions regarding extent of use.        10:45
                                    Page 77

Veritext Legal Solutions
866 299-5127

1 Those values come without knowing some of the  10:45
2 distinctions that you're identifying. So those would --  10:45
3 those exist for individuals generally related in those  10:45
4 cases so it's not something that -- it's something that  10:46
5 applies across what might be the ex-post understanding  10:46
6 of eventual value to Google, for example, or to whoever  10:46
7 was looking for that information.  10:46
8 Q. So you just testified that if there was some  10:46
9 way to reasonably show there were differences of uses  10:46
10 and data and if the Court wanted to say, "Well, that's  10:46
11 something I think as opposed to user months, it's  10:46
12 feasible," have you -- do you have actually an opinion  10:46
13 as to how it would be feasible to account for the  10:46
14 differences in user data between users?  10:46
15 MS. WEAVER: Objection. Misstates the record.  10:46
16 That misstates his testimony.  10:46
17 You may answer.  10:46
18 THE WITNESS: Yeah. This is your  10:46
19 hypothetical. So I don't think what you've suggested is  10:46
20 appropriate. But you're saying in your mind you want to  10:46
21 make up something, and now it seems like you're saying  10:46
22 "Can you quantify what I made up?"  10:47
23 I would have to know what you made up.  10:47
24 Is there evidence of that?  10:47
25 And I don't know. So, no, I've not already  10:47

Page 78

1 come up with a way to quantify every hypothetical that  10:47
2 you've come up today in the deposition. I'd need to  10:47
3 know more to see if it's even logical, if economically  10:47
4 it makes sense.  10:47
5 BY MS. TREBICKA:  10:47
6 Q. And you haven't looked at whether there is any  10:47
7 evidence of that, the fact that Google may not have  10:47
8 received data of a particular user or may have received  10:47
9 less data of a particular user than another?  10:47
10 MS. WEAVER: Objection. Form. Asked and  10:47
11 answered.  10:47
12 THE WITNESS: Well, my analysis, as I  10:47
13 mentioned, doesn't include that determination. So I've  10:47
14 looked at the -- I've looked at unjust enrichment, which  10:47
15 was an aggregation. It applies to what was used.  10:47
16 You're asking about something further down the  10:47
17 line in thinking about how one dollar amount might get  10:48
18 spread, might there be a method for, say, opposed to  10:48
19 user months, it might be I'd want to know more why, if  10:48
20 it makes economic sense. But it's not part -- it  10:48
21 wouldn't necessarily be part of what I've done this  10:48
22 far --  10:48
23 MS. TREBICKA: Understood.  10:48
24 THE WITNESS: -- as far as my opinion.  10:48
25 MS. TREBICKA: Understood. Thank you for  10:48

Page 79

1 clarifying that.  10:48
2 BY MS. TREBICKA:  10:48
3 Q. Now, are you actually aware that whether  10:48
4 Google in fact receives The Data depends on numerous  10:48
5 factors that have to do with user account and website  10:48
6 setting?  10:48
7 MS. WEAVER: Objection. Form. Assumes facts.  10:48
8 Vague as to Google receiving. Vague as to data. Vague  10:48
9 as to numerous factors. Vague as to user account.  10:48
10 Vague as to website setting. In fact, calls for  10:48
11 speculation.  10:48
12 MS. TREBICKA: Objection to form would have  10:48
13 sufficed, Lesley. Let's keep it to that next time.  10:48
14 Go ahead, Dr. Mangum.  10:48
15 MS. WEAVER: Objection to form.  10:49
16 THE WITNESS: I believe what you're suggesting  10:49
17 are things that are of a technical nature, and I don't  10:49
18 have an expert opinion on those areas.  10:49
19 MS. TREBICKA: Understood.  10:49
20 THE WITNESS: I've seen reference to the  10:49
21 documents about things different users might be doing.  10:49
22 But, again, it goes as far as just me noticing that, I  10:49
23 don't have an opinion on that.  10:49
24 BY MS. TREBICKA:  10:49
25 Q. You haven't analyzed it?  10:49

Page 80

1 MS. WEAVER: Objection. Vague as to "it."  10:49
2 THE WITNESS: Well, I've not attempted to form  10:49
3 expert opinions on an area outside my expertise.  10:49
4 BY MS. TREBICKA:  10:49
5 Q. Well, have you analyzed how cookie blockers  10:49
6 affect Google's data collection?  10:49
7 MS. WEAVER: Objection. Assumes facts not in  10:49
8 evidence.  10:49
9 THE WITNESS: I don't have expert opinions and  10:49
10 I didn't even begin to form expert opinions about that  10:49
11 technical question.  10:49
12 BY MS. TREBICKA:  10:49
13 Q. Have you analyzed whether a cookie-blocking  10:50
14 collection would have an effect on your unjust  10:50
15 enrichment analysis?  10:50
16 MS. WEAVER: Same objection.  10:50
17 THE WITNESS: Well, I believe I've already  10:50
18 talked about it today. In other words, it would not  10:50
19 affect the analysis of an aggregate unjust enrichment  10:50
20 for Google. I think --  10:50
21 BY MS. TREBICKA:  10:50
22 Q. Do you have -- go ahead.  10:50
23 A. And so therefore --  10:50
24 MS. WEAVER: You can finish your answer,  10:50
25 Dr. Mangum.  10:50

Page 81

21 (Pages 78 - 81)

Page 82

1	THE WITNESS: And therefore I don't think it's	10:50
2	proper to bring that up, given the methodology that I've	10:50
3	chosen to bring it up. That might be something that's	10:50
4	an augmentation or something whether it's posttrial or	10:50
5	claims administration or if there's something to	10:50
6	substantiate your hypotheticals or your suggestions of	10:50
7	these things mattering, right, at what stage that might	10:50
8	be used. But I don't see that as something that	10:50
9	logically happens, given the methodology I've chosen.	10:50
10	MS. TREBICKA: I understand.	10:50
11	BY MS. TREBICKA:	10:50
12	Q. Have you analyzed whether the effect of cookie	10:50
13	blocking would -- let me rephrase the question.	10:50
14	Have you analyzed whether how much Google --	10:51
15	let me start over again. Sorry.	10:51
16	Have you analyzed whether how much data Google	10:51
17	collects from a putative class member affects how much	10:51
18	that class member receives in unjust enrichment?	10:51
19	MS. WEAVER: Objection. Asked and answered.	10:51
20	And vague.	10:51
21	THE WITNESS: My analysis of unjust enrichment	10:51
22	does not rely on that. I think it occurs -- what I've	10:51
23	done would be necessary to be done first before what	10:51
24	you're suggesting, if true, if something is manifest as	10:51
25	being relevant. So it's not something that will be done	10:51

Page 83

1	necessarily up front.	10:51
2	I have identified documents that apparently	10:52
3	are available that would identify the allocation by	10:52
4	account months.	10:52
5	You're suggesting, well, could there be	10:52
6	others?	10:52
7	We have talked about that earlier today, and	10:52
8	if data is available, either me or someone else might be	10:52
9	addressing that, but that's not part of my opinion.	10:52
10	BY MS. TREBICKA:	10:52
11	Q. Understood.	10:52
12	A. At least to date, opinions expressed up to	10:52
13	today.	10:52
14	Q. You're aware that some users, including	10:52
15	putative class members, opt out of ads.	10:52
16	Is that correct?	10:52
17	MS. WEAVER: Objection. Misstates the record.	10:52
18	Assumes facts.	10:53
19	THE WITNESS: I'm not -- I don't follow what	10:53
20	you're suggesting. I'm not understanding.	10:53
21	BY MS. TREBICKA:	10:53
22	Q. I'm not suggesting anything.	10:53
23	Well, let's turn to page -- to paragraph 47 of	10:53
24	your report.	10:53
25	A. Okay.	10:53

Page 84

1	Q. It may jog your memory.	10:53
2	Okay. So in paragraph 47 you talk about a	10:53
3	study conducted by Johnson, et al.	10:53
4	Is that correct?	10:53
5	A. Yes. Correct.	10:53
6	Q. Have you read that study?	10:53
7	A. I have.	10:53
8	Q. And you're relying on that here; correct?	10:53
9	A. I do. I'm -- yes. It continues beyond the	10:53
10	paragraph you've identified in my report. Yes.	10:53
11	Q. And in that study, according to your report,	10:54
12	that team was able to utilize transaction data from an	10:54
13	ad exchange and exploiting consumers who opt out of	10:54
14	personalized ads through ad choices.	10:54
15	Do you see that?	10:54
16	A. Yes, I do.	10:54
17	Q. Are you aware that some users opt out of	10:54
18	personalized ads?	10:54
19	A. Well, when you say "some," you mean that I	10:54
20	describe here through this program using AdChoices, I'm	10:54
21	aware of those. I wouldn't just say some. I think	10:54
22	that's vague. I think it's these particular -- this	10:54
23	particular study related to the AdChoices program. And	10:54
24	I do talk about in my report that this analysis related	10:54
25	to looking at those that did and what impact it had on	10:54

Page 85

1	revenue from -- you know, earned from that information	10:54
2	that would -- at least the revenue impact of those	10:54
3	choices, right, of those individuals that want to opt	10:55
4	out of those programs, specifically the program -- the	10:55
5	AdChoices program.	10:55
6	Q. Do you have any reason to believe that no	10:55
7	putative class members opted out of personalized ads	10:55
8	through AdChoices?	10:55
9	MS. WEAVER: Objection. Vague. Misstates	10:55
10	testimony. Calls for speculation. Not a technical	10:55
11	expert.	10:55
12	THE WITNESS: Give me a second.	10:55
13	Well, the class period is roughly middle of	10:56
14	2016, July, to the present. This relates to something	10:56
15	occurring before that.	10:56
16	And what I perceived your question is relating	10:56
17	to is as this study talks about individuals that through	10:56
18	the AdChoices program opted out, are they possibly in	10:56
19	the class?	10:56
20	I see it's a different time period. I don't	10:56
21	know about this dataset or I've not looked into this	10:56
22	program to know how long it lasted, if it would have	10:56
23	overlapped with the possible class.	10:56
24	BY MS. TREBICKA:	10:56
25	Q. So you --	10:56

22 (Pages 82 - 85)

**Page 86**

1   A.  I don't have that information.   10:56
2   Q.  You haven't looked at the opting out of   10:56
3 personalized ads through AdChoices.   10:56
4      Is that correct?   10:56
5      MS. WEAVER:  Objection.  Directly contradicted   10:56
6 by his report.   10:56
7      THE WITNESS:  Yeah.  I've looked   10:57
8 extensively --   10:57
9      MS. WEAVER:  Misstates the record.   10:57
10 BY MS. TREBICKA:   10:57
11   Q.  Go ahead.   10:57
12   A.  I've looked extensively into this study by   10:57
13 Johnson, et al., that use the AdChoices program, made   10:57
14 analysis of the effect on revenue by individual's   10:57
15 choices to, you know, opt out.  So I have looked quite   10:57
16 a bit into it.   10:57
17   Q.  Into the AdChoices program; correct?   10:57
18   A.  I looked -- I looked formally into the report.   10:57
19 Part of the report meant looking into this AdChoices   10:57
20 program, as I write about in my report.   10:57
21   Q.  Right.   10:57
22      And I'm not asking about the report.  I'm   10:57
23 asking about the AdChoices program.   10:57
24      Have you analyzed or looked into the AdChoices   10:57
25 program?   10:57

**Page 87**

1      MS. WEAVER:  Objection.  Assumes facts.  The   10:57
2 question is orthogonal.   10:57
3 BY MS. TREBICKA:   10:57
4   Q.  Go ahead.   10:57
5   A.  I actually talk about the program in my   10:57
6 report.  So, yes, I've looked into the program.   10:57
7   Q.  Thank you.   10:57
8      Do you know whether the program lasted through   10:57
9 the putative class period?   10:57
10   A.  I don't --   10:57
11      MS. WEAVER:  Objection.   10:58
12      Go ahead.   10:58
13      THE WITNESS:  As I sit here today, I don't   10:58
14 remember the timing of the program's end or existence.   10:58
15 BY MS. TREBICKA:   10:58
16   Q.  Did you look into whether users' putative   10:58
17 class members could have availed themselves of the   10:58
18 AdChoices program?   10:58
19      MS. WEAVER:  Objection.  Vague.  Outside the   10:58
20 scope.   10:58
21      THE WITNESS:  As described in my report and in   10:58
22 the Johnson study, a difficulty with the program was   10:58
23 that it was cookie based so individuals who clear   10:58
24 cookies maybe without knowing it disenroll from the   10:58
25 AdChoices program.   10:58

**Page 88**

1      So the issue of -- it's not just being part of   10:58
2 it.  It would be how someone participated.  This relates   10:58
3 to the number of candidates in the study they were able   10:58
4 to utilize when they came to the conclusions that I   10:58
5 discuss.   10:58
6      So it's not just about being part of the   10:58
7 program.   10:59
8      I don't -- so there's a mismatch, I believe,   10:59
9 in what I think is suggested in your question that being   10:59
10 part of the program means not being a class member.   10:59
11 That's what I'm not following up.  You asked is it   10:59
12 possible that they could have availed themselves, these   10:59
13 putative class members?   10:59
14      Maybe I'm reading too much into your question.   10:59
15 But I'm -- I'm just not aware of the -- as I sit here,   10:59
16 the timing of the program or a reason, for example,   10:59
17 where putative class members would not be able to be   10:59
18 part of the AdChoices program.   10:59
19 BY MS. TREBICKA:   10:59
20   Q.  For users who have opted out of personalized   10:59
21 ads, hypothetically, would they be entitled to unjust   10:59
22 enrichment under your analysis?   10:59
23      MS. WEAVER:  Objection.  Calls for   10:59
24 speculation.  Vague as to opting out of personalized   10:59
25 ads.   11:00

**Page 89**

1      THE WITNESS:  As I mentioned a moment ago,   11:00
2 opting out doesn't mean that would be retained.  Opting   11:00
3 out and clearing cookies, as I understand it, basically   11:00
4 resets a user back to where they were.   11:00
5      So there's no connection with opting out and   11:00
6 necessarily not having information shared.   11:00
7      The -- we can see, as I give in my report,   11:00
8 that it's about .23 percent, a very de minimis   11:00
9 percentage of the users there that the author's report,   11:00
10 given the cookie-clearing effects on the program,   11:00
11 et cetera, that this would represent.   11:00
12      But also, as I've described a couple times   11:00
13 today, I think you're talking about something that if it   11:00
14 was to be addressed, it would not be addressed in the   11:00
15 part of my analysis that comes up with an unjust   11:00
16 enrichment in the aggregate.   11:00
17      I identify a method for allocation.  I think   11:00
18 this would suggest at most a modification to that   11:01
19 allocation.  Maybe not at all -- if it couldn't be   11:01
20 substantiated, this idea of participation in AdChoices   11:01
21 or opting out, to be connected with the information   11:01
22 that's actually shared.   11:01
23      But that would happen in a subsequent phase of   11:01
24 what I've done thus far in my opinion.   11:01
25 ///

Page 90

1 BY MS. TREBICKA:                                 11:01
2    Q.  You say "I think this would suggest that most  11:01
3 a modification to that allocation."               11:01
4       You mean the allocation of unjust -- a large  11:01
5 number of unjust enrichment, the big unjust enrichment  11:01
6 number, or allocation --                          11:01
7       MS. WEAVER:  Objection --                    11:01
8 BY MS. TREBICKA:                                   11:01
9    Q.  -- of each user?                            11:01
10       MS. WEAVER:  I apologize.                    11:01
11       Objection.  Misstates his testimony.         11:01
12       THE WITNESS:  The process by which I address  11:01
13 unjust enrichment, as explained in my report, kind of  11:01
14 culminating in my Table 3, looks at revenues.  I take  11:01
15 some partitions for various reasons to identify relevant  11:01
16 revenue.  I address one measure of a profitability.  11:01
17       But in the end of that, I also identify one  11:02
18 method for allocation; right?  That's what I was  11:02
19 referring to.                                      11:02
20       You're asking about, well, what about opting  11:02
21 out of ads through an AdChoices?                   11:02
22       If that's something that was real, that had an  11:02
23 effect on information, that could be included.  But it  11:02
24 wouldn't have been part of the analysis that I did up  11:02
25 to calculating overall unjust enrichment and then  11:02

Page 91

1 identifying one method of allocation.  It might be  11:02
2 another one is what I'm suggesting.                 11:02
3 BY MS. TREBICKA:                                    11:02
4    Q.  Okay.  I understand now.  Thank you.         11:02
5       Can we go back to paragraph 15 in your report?  11:03
6    A.  Yes.                                         11:03
7    Q.  So I'm trying to understand whether -- so here  11:03
8 you say -- let me back up and say, the first sentence of  11:03
9 paragraph 15 states that:                          11:03
10       "Plaintiffs allege the putative Class         11:03
11    Members' relationship with Google is             11:03
12    governed by various contractual                  11:03
13    agreements, such as the Google General           11:03
14    Terms of Service, the Chrome Terms of            11:03
15    Service, and the Chrome Privacy Notice           11:03
16    (collectively the 'Chrome Agreements.')"         11:03
17       Do you see that?                             11:03
18    A.  Yes.                                         11:03
19    Q.  Are you aware of any other documents that form  11:03
20 the agreements between the putative class members and  11:03
21 Google?                                            11:03
22       MS. WEAVER:  Okay.  Objection.  Calls for a   11:03
23 legal conclusion.                                  11:03
24       THE WITNESS:  I see this as a legal opinion   11:04
25 and I don't have -- you're asking me about my awareness  11:04

Page 92

1 of a document which would rise to a legal argument or a  11:04
2 legal conclusion, and I haven't even -- I haven't tried  11:04
3 to make that determination.  So, no, I'm not aware of  11:04
4 documents that would fit under that description you give  11:04
5 legally.                                           11:04
6 BY MS. TREBICKA:                                    11:04
7    Q.  Understood.                                  11:04
8       So then the next sentence says:               11:04
9       "Pursuant to these agreements, Google         11:04
10    was to provide Chrome users with the use          11:04
11    of the browser without Chrome sending or          11:04
12    Google collecting any of their personal           11:04
13    information data unless a user enabled the         11:04
14    sync function."                                   11:04
15       Do you see that?                              11:04
16    A.  I do.                                        11:04
17    Q.  Did you read these agreements to come to that  11:04
18 determination?                                     11:04
19       MS. WEAVER:  Objection.  Calls for a legal     11:04
20 conclusion.                                        11:04
21       THE WITNESS:  Although I've read the           11:04
22 documents, at least portions of them, they're long, no,  11:04
23 it wasn't for the purpose of coming to a determination.  11:04
24       As I stated at the beginning, the heading of   11:04
25 this section is just a summary of the allegations.  I'm  11:05

Page 93

1 giving just some context to what others have claimed  11:05
2 counsel for the putative class have put forward.   11:05
3 BY MS. TREBICKA:                                    11:05
4    Q.  So you have no opinion on what documents make  11:05
5 up the agreement, if any, between putative class members  11:05
6 and Google; correct?                               11:05
7       MS. WEAVER:  Same objection.                   11:05
8       THE WITNESS:  No.  I don't have opinions on     11:05
9 what forms agreements, what documents form agreements  11:05
10 or -- it is or is not part of that set of documents.  11:05
11 BY MS. TREBICKA:                                    11:05
12    Q.  Nor do you have an opinion on what these     11:05
13 agreements say Google was supposed to provide; correct?  11:05
14       MS. WEAVER:  Wait, wait.  Objection.  Vague as  11:05
15 to "these agreements" and calls for a legal conclusion.  11:05
16       THE WITNESS:  I've not formed legal opinions.  11:05
17 I'm not sure how else to state that.  I'm expressing,  11:05
18 for example, in this paragraph what I understand is  11:05
19 alleged, but I'm not meaning to say that this is also or  11:05
20 because of my opinions.                            11:06
21 BY MS. TREBICKA:                                    11:06
22    Q.  Okay.  Thank you.                           11:06
23       Then in paragraph 16, in the second sentence  11:06
24 of paragraph 16 you state:                         11:06
25       "I understand the data Google                 11:06

24 (Pages 90 - 93)

1 collected from Class Members did not 11:06
2 differ from the data it collected from 11:06
3 synced users, except in that Class Members 11:06
4 did not consent to Google's access." 11:06
5 Do you see that? 11:06
6 A. I do. 11:06
7 Q. What do you mean by this, that the data did 11:06
8 not differ from the data collected from synced users? 11:06
9 A. I'm just -- 11:06
10 MS. WEAVER: Objection. Sorry. Objection. 11:06
11 Beyond the scope. Relevance. 11:06
12 BY MS. TREBICKA: 11:06
13 Q. Go ahead. 11:06
14 A. I'm explaining what was said in the complaint. 11:06
15 Q. I understand. 11:06
16 A. I write that down. I cite the Complaint. 11:06
17 So I did not mean to bring my own personal 11:07
18 information in these sentences. I meant to simply 11:07
19 explain what I understand the Complaint said. 11:07
20 So I can't tell you what I meant by these 11:07
21 sentences. I'm only meaning to say this is what I have 11:07
22 seen other people say, right, people who wrote these 11:07
23 documents. 11:07
24 Q. I understand. 11:07
25 So for purposes of your analysis, is it 11:07

Page 94

1 important that the data Google collected from class 11:07
2 members did not differ from the data it collected from 11:07
3 synced users? 11:07
4 MS. WEAVER: Objection. Vague. Scope. 11:07
5 THE WITNESS: I don't think that -- I don't -- 11:07
6 well... 11:07
7 I don't think that distinction would change 11:07
8 the approach I've taken regarding the unjust enrichment. 11:07
9 BY MS. TREBICKA: 11:08
10 Q. So let's assume that Google collected more 11:08
11 data from a synced user than what it collected from a 11:08
12 putative class member. 11:08
13 Your methodology would not need to change is 11:08
14 your opinion? 11:08
15 MS. WEAVER: Objection. Scope. 11:08
16 THE WITNESS: Well, my methodology, as I 11:08
17 explain in my report, relates to changes, to incremental 11:08
18 changes in revenue when personal information is not 11:08
19 available. It does not rely on making an assessment of 11:08
20 the type or quantity of information taken when synced or 11:08
21 not. 11:08
22 BY MS. TREBICKA: 11:08
23 Q. So let's assume that Google collects more data 11:08
24 from a synced user than it collects from a putative 11:08
25 class member. 11:08

Page 95

1 Your methodology would not need to change is 11:08
2 your opinion? 11:08
3 MS. WEAVER: Objection. Assumes -- well, out 11:08
4 of scope as to the class definition and assumes facts. 11:08
5 MS. TREBICKA: Go ahead. 11:09
6 THE WITNESS: I think that was the same 11:09
7 question you just asked. And I'll offer -- 11:09
8 BY MS. TREBICKA: 11:09
9 Q. Can you answer? 11:09
10 A. I did answer. I can -- I answered that 11:09
11 question. 11:09
12 Q. Is it yes or is it no? 11:09
13 A. Something similar to it. 11:09
14 Q. You have not answered my question, Dr. Mangum. 11:09
15 Otherwise I wouldn't have asked it again. I can ask it 11:09
16 again. But I'd appreciate an understanding of what your 11:09
17 opinion is, and that would be best given with a yes or a 11:09
18 no. Because -- 11:09
19 MS. WEAVER: Wait, wait. 11:09
20 MS. TREBICKA: Lesley, let me finish. 11:09
21 BY MS. TREBICKA: 11:09
22 Q. Because then otherwise I'm not sure what it is 11:09
23 that you're methodology really means. 11:09
24 That's why we're having this deposition so 11:09
25 that I can understand whether certain changes in the 11:09

Page 96

1 assumptions would actually have a difference in your 11:09
2 methodology. 11:09
3 So that's why I'm asking a very clear question 11:09
4 that can be answered with yes or no, and you're 11:09
5 refusing. That's why I'm asking it again. 11:10
6 I'm happy to ask it again, and I'd appreciate 11:10
7 a clear answer. So far I'm not getting one. 11:10
8 MS. WEAVER: Okay. So No. 1, object and move 11:10
9 to strike the lecture. 11:10
10 And No. 2, object to the tone. 11:10
11 No. 3, he gave you a very clear answer, quote: 11:10
12 "My methodology, as I explain in my report, relates to 11:10
13 changes, to incremental changes in revenue when personal 11:10
14 information is not available. It does not rely on 11:10
15 making an assessment of the type or quantity of 11:10
16 information taken when synced or not." 11:10
17 So he gave you that answer. 11:10
18 And if the rule in this deposition would be 11:10
19 that you don't ask a question again after you get an 11:10
20 answer, we would wholeheartedly agree with that. 11:10
21 MS. TREBICKA: Lesley, you have to stop with 11:10
22 these lecturing on the record. It's actually -- 11:10
23 MS. WEAVER: You lectured. 11:10
24 MS. TREBICKA: It's actually inhibiting my 11:10
25 ability to take this deposition. 11:10

Page 97

25 (Pages 94 - 97)

BY MS. TREBICKA:                                    11:10

Q.  So, Dr. Mangum, I'm going to ask it again.   11:10

Let's assume Google collected more data from a  11:10
synced user than it would have collected from a putative  11:11
class member.                                    11:11

Your methodology would not need to change if   11:11
that is correct.                                 11:11

Is that right?                                   11:11

MS. WEAVER:  Objection.  Asked and answered.   11:11
Out of scope.                                    11:11

THE WITNESS:  I don't believe a yes-or-no   11:11
question gives my full opinion -- gives my full answer.  11:11
I believe restricting the number of words I'm allowed to  11:11
use to give my opinion would render in something that's  11:11
not my full opinion or my full testimony.        11:11

I have given you the answer as clearly as I   11:11
can, and I would not agree that it's best when people  11:11
use less words to answer questions.              11:11

BY MS. TREBICKA:                                  11:11

Q.  I can see that.                             11:11

So that is the answer you stand by?           11:11

MS. WEAVER:  I'll object to the snarky tone.   11:11

You may answer.                                  11:11

And I think we should take a break.           11:11

///

Page 98

BY MS. TREBICKA:                                  11:11

Q.  Dr. Mangum?                                 11:11

A.  The -- there's no element of my analysis that  11:11
pivots on the distinction you've identified, thus does  11:11
not need to change, because it's not an element -- it's  11:12
not part of the process of my analysis.          11:12

Q.  Thank you.                                  11:12

MS. TREBICKA:  Lesley, did you need a break?   11:12

MS. WEAVER:  I think circumstances would   11:12
recommend it.  Yes.  Let's take a break.         11:12

THE VIDEOGRAPHER:  Off the record at 11:12.   11:12

(Break taken in proceedings.)               11:22

THE VIDEOGRAPHER:  We are back on the record.  11:22
The time is 11:22 a.m.                           11:22

BY MS. TREBICKA:                                  11:22

Q.  Hello, again, Dr. Mangum.                   11:22

A.  Hello.                                       11:22

Q.  So do you understand that some users -- well,  11:22
let me start again.                              11:22

Do you understand that some putative class   11:22
members may get value from their use of Chrome?  11:22

MS. WEAVER:  Objection.  Vague.              11:22

THE WITNESS:  I'm not sure what you mean by do  11:22
I understand.  It sounds like you're referring to some  11:22
well-known fact, and you -- the way you've phrased it is  11:22

Page 99

confusing to me.                                 11:22

BY MS. TREBICKA:                                  11:22

Q.  Do you have an opinion as to whether some   11:22
putative class members may get value from their use of  11:22
Chrome?                                          11:23

MS. WEAVER:  Objection.  Vague.              11:23

THE WITNESS:  I wouldn't say -- I don't think  11:23
that my position on this would rise to the level of an  11:23
opinion.  It's more of a feature on something that may  11:23
be available to people who use the internet.     11:23

I understand Chrome is a browser.  People   11:23
choose to use things, right, if they feel like they   11:23
benefit from the effect they get from using them.  11:23

But that's more generally as an economist when  11:23
I understand how people may use services generally.  11:23

BY MS. TREBICKA:                                  11:23

Q.  Any attempt to qualify -- or quantify, rather,  11:23
any value that a putative class member may get from his  11:23
or her use of Chrome?                            11:23

MS. WEAVER:  Objection.  Vague.              11:23

THE WITNESS:  I don't have a quantification in  11:23
my opinion of the use of Chrome.                 11:23

I will say that that's a very -- that's a very  11:23
vague statement.  I think even if I was to want to do   11:24
that for some reason, I don't think I would call it that  11:24

Page 100

because it would seem so vague and it could mean   11:24
different things.                                11:24

But nonetheless, I don't have a quantification  11:24
of the value of Chrome -- the value to users of Chrome.  11:24

BY MS. TREBICKA:                                  11:24

Q.  You don't think it's necessary to have that   11:24
for purposes of your analysis?                   11:24

A.  No.  The value --                           11:24

MS. WEAVER:  Objection.  Vague.              11:24

Sorry, Russ.                                     11:24

THE WITNESS:  No.  The value of Chrome is not  11:24
an input to the analysis -- analyses that I do.  At   11:24
least explicitly, I'll jut put a qualifier on that,   11:24
again, we're using something -- it's easy to use words  11:24
and say the value of Chrome, that's multifaceted.  And  11:24
so that will -- that does not -- my testimony now   11:24
doesn't extend to all subsets of that.  I feel   11:24
uncomfortable even using the words.  But you've used the  11:24
words "the value of Chrome" so I'm continuing.   11:25

BY MS. TREBICKA:                                  11:25

Q.  You use the term "subsets of that."         11:25

Did you mean subsets of the value of Chrome?  11:25

A.  Well, for example, if someone asked me have  11:25
you calculated the value of travel in the U.S., I might  11:25
very well have the value of your particular travel or   11:25

Page 101

1 my travel, but since you raise it up to the value of   11:25
2 travel, the answer's gotta be no.  That doesn't mean I   11:25
3 don't have other ideas that it would be awkward to ask   11:25
4 the overall value of travel.  Maybe someone might have a   11:25
5 reason.                                        11:25
6        That's the distinction I'm trying to make.   11:25
7   Q.  Understood.                              11:25
8        So have you attempted to quantify the value of   11:25
9 Chrome to any one particular putative class member?   11:25
10   A.  No.                                     11:25
11        MS. WEAVER:  Objection.                  11:25
12        Sorry, Dr. Mangum.  Just give me a moment.   11:25
13        Objection.  Vague.  And out of scope.     11:25
14        THE WITNESS:  No.  Same answer.  I've not   11:26
15 quantified or attempted to quantify the value of Chrome.  11:26
16 BY MS. TREBICKA:                              11:26
17   Q.  Do you agree that some users, including   11:26
18 putative class members, may get some value from Google's  11:26
19 personalized advertising shown to the user?   11:26
20        MS. WEAVER:  Objection.  Vague.  Scope.   11:26
21        THE WITNESS:  Could you repeat the question,   11:26
22 please?                                       11:26
23 BY MS. TREBICKA:                              11:26
24   Q.  Do you agree that some putative class members   11:26
25 may get some value from Google's personalized   11:26
                                         Page 102

1 advertising shown to that putative class member?   11:26
2        MS. WEAVER:  Same objections.             11:26
3        THE WITNESS:  Could you ask your question   11:27
4 again just one more time?                      11:27
5 BY MS. TREBICKA:                              11:27
6   Q.  Do you agree that some putative class members   11:27
7 may get some value from Google's personalized   11:27
8 advertising shown to that putative class member?   11:27
9        MS. WEAVER:  Objection.  Vague.  Calls for   11:27
10 speculation.                                   11:27
11        THE WITNESS:  I'm having a hard time with   11:27
12 something about your question, and it relates to what I   11:27
13 understand about a class member.               11:27
14        If someone has decided that they don't -- that   11:27
15 they don't want to sync, then I presume it's not a   11:27
16 random choice.  It's a choice deciding that they've said   11:27
17 they don't want the things that would come with sync.   11:28
18        So then to say, well, if we give something to   11:28
19 someone, even though they say they don't want it, might   11:28
20 they get value?  I mean, other than maybe someone -- I   11:28
21 would generally say no.  I would say their decision has   11:28
22 shown that after assessing the net -- the possible   11:28
23 upside, the positive downside, that they don't want it.   11:28
24 They don't get value.  Their revealed preference is to   11:28
25 not have it when they choose not to sync.   11:28
                                         Page 103

1 BY MS. TREBICKA:                              11:28
2   Q.  Can we move to paragraph 35 of your report?   11:28
3   A.  Yes.                                   11:28
4   Q.  Give me one second.                      11:29
5        Okay.  So I'll read it into the record.   11:29
6        Are you there?                          11:29
7   A.  I am, yes.  Paragraph 35.  Thanks.   11:29
8   Q.  "As discussed above, the data Google   11:29
9 collected includes information on IP   11:29
10 addresses, unique cookies, and other   11:29
11 browser and device identifiers, and other   11:29
12 internet browsing history data.  These   11:29
13 data constitutes a consumer's online   11:29
14 profile or identity."                          11:29
15        Do you see that?                        11:29
16   A.  I do.                                  11:29
17   Q.  And then immediately after that, you say:   11:29
18        "The personal information data that   11:29
19 Google improperly collected has economic   11:29
20 value to the user, to Google, and in the   11:29
21 marketplace generally."                        11:29
22        Are you assuming that the data improperly   11:29
23 collected by Google from the putative class members is   11:29
24 equal to a user's online profile or identity?   11:30
25        MS. WEAVER:  Objection.  Calls for   11:30
                                         Page 104

1 speculation.                                   11:30
2        THE WITNESS:  No.  I'm not making an equation   11:30
3 in these sentences.                            11:30
4 BY MS. TREBICKA:                              11:30
5   Q.  Do you agree, then, that a user's or   11:30
6 consumer's online -- let me back up.   11:30
7        Do you agree that a putative class member's   11:30
8 online profile or identity is broader than the data that   11:30
9 Google may have improperly collected pursuant to the   11:30
10 allegations?                                   11:30
11        MS. WEAVER:  Objection.  Calls for   11:30
12 speculation.  Assumes facts.                   11:30
13        THE WITNESS:  I don't have an opinion on --   11:30
14 I've described what I understand is alleged in this case   11:30
15 as far as what personal information is.  But I don't   11:30
16 have an opinion on what that is, so I'm not the one to   11:30
17 offer that up.                                 11:30
18        I think your question relates to that, as far   11:31
19 as I think you're asking is the specific boundaries of   11:31
20 an online profile or identity coexistent or greater than   11:31
21 the personal information that's collected?   11:31
22        I believe they're related.  They're in the   11:31
23 same category.  But I haven't made that kind of   11:31
24 comparative distinction.                       11:31
25 ///                                          Page 105

27 (Pages 102 - 105)

1 BY MS. TREBICKA:                              11:31
2       Q.   So it could be smaller or it could be larger   11:31
3 or it could be equal.  You don't have an opinion on       11:31
4 that.                                          11:31
5       Is that correct?                         11:31
6       MS. WEAVER:  Objection.  Asked and answered.   11:31
7 Misstates the record.                          11:31
8       THE WITNESS:  Yeah.  I don't think they're   11:31
9 even necessarily quantifiably comparable.  And I don't   11:31
10 mean monetarily.  But there's a label of the idea of   11:31
11 your online profile and identity.  It's more of a   11:31
12 characteristic or a moniker; right?             11:31
13      So to say, oh, now let's compare that      11:31
14 vis-à-vis size, even the idea that it could be larger,   11:31
15 smaller, just I don't think you can make that comparison   11:31
16 based on what I meant by these words.          11:32
17 BY MS. TREBICKA:                               11:32
18      Q.   So section IV of your report, just in that   11:32
19 same page is titled "Defendant's Unjust Enrichment."   11:32
20      Do you see that?                          11:32
21      A.   Yes.                                  11:32
22      Q.   And what you're measuring here is Google's   11:32
23 profits from serving of personalized advertising to the   11:32
24 putative class, generally speaking; right?     11:32
25      MS. WEAVER:  Objection to the word profits.   11:32

Page 106

1 Vague.                                         11:32
2       THE WITNESS:  Unjust enrichment is the best   11:32
3 title as opposed to calling it profits.  There are many   11:32
4 different things that could all be called profits so   11:32
5 it's confusing to say that, but I will call it unjust   11:32
6 enrichment.  And I've identified revenues, and at least   11:32
7 one measure of profitability I think is relevant to   11:32
8 identify.  But I think it would add more uncertainty to   11:33
9 try to shift to the word "profits."            11:33
10 BY MS. TREBICKA:                              11:33
11      Q.   Let's assume, hypothetically, that Google has   11:33
12 a putative class member's agreement that Google can   11:33
13 use that putative class member's data to deliver   11:33
14 personalized ads on Google services and on sites and   11:33
15 apps that partner with Google.                11:33
16      Do you agree that those class members should   11:33
17 be excluded from your unjust enrichment analysis?   11:33
18      MS. WEAVER:  Objection.  Assumes facts.  Calls   11:33
19 for speculation.  Mis-defines the class.       11:33
20      THE WITNESS:  My analysis is done under the   11:33
21 assumption of liability, so my assumption already   11:33
22 precludes what you suggest.  I think you're saying what   11:34
23 if there wasn't liability?  I'm assuming there's   11:34
24 liability.  I don't have opinions on that.  I'm saying   11:34
25 that we're past that question.                11:34

Page 107

1 BY MS. TREBICKA:                              11:34
2       Q.   Understood.                         11:34
3       So in your answer, you are saying that if a --   11:34
4 if Google has a putative class member's agreement that   11:34
5 Google can use their data to deliver personalized ads,   11:34
6 that means there is no liability; correct?     11:35
7       MS. WEAVER:  Okay.  Well, objection.  His   11:35
8 answer was "I don't have an opinion on that."   11:35
9       So I'll object to the misstatement of his   11:35
10 testimony.  And it's vague.  Calls for a legal   11:35
11 conclusion.  And mis-defines the class.  He's not a   11:35
12 legal scholar.                                 11:35
13      MS. TREBICKA:  Go ahead, Doctor.           11:35
14      MS. WEAVER:  You may answer.              11:35
15      THE WITNESS:  I don't have legal opinions.  I   11:35
16 don't have opinions on liability.  So I certainly   11:35
17 couldn't agree to you saying "What if this exists, do   11:35
18 you now, Dr. Mangum, say liability doesn't exist?"   11:35
19      No, I can't do that.  I don't have opinions   11:35
20 that way.                                      11:35
21      What my prior answer was meant to say is the   11:35
22 questions you're asking now, I'm starting assuming that   11:35
23 they -- that the answer is always no.  No, there's   11:35
24 nothing that took away liability.  It's been decided.   11:35
25      Liability does exist.  Then I've done my   11:35

Page 108

1 analysis.                                      11:35
2       And I know you're trying to say "But what if   11:35
3 it didn't?"  You're wanting to pull back on an   11:35
4 assumption I've made about liability.          11:35
5 BY MS. TREBICKA:                               11:35
6       Q.   Okay.  I understand.                 11:36
7       Do you know what Google Analytics is?     11:36
8       A.   A little bit.                        11:36
9       Q.   Okay.  Well, have you attempted to calculate   11:36
10 any unjust enrichment damages with respect to   11:36
11 Google Analytics in your opinions?            11:36
12      MS. WEAVER:  Objection.  Vague.            11:36
13      Damages from Google Analytics?            11:36
14      THE WITNESS:  I'm not sure what --         11:36
15      MS. WEAVER:  Objection.  Misstates the record   11:36
16 and testimony.  Calls for a legal conclusion.   11:36
17      THE WITNESS:  I don't understand the question.   11:36
18 BY MS. TREBICKA:                              11:36
19      Q.   Okay.  Have you attempted in your analysis   11:36
20 which you have performed to calculate any unjust   11:36
21 enrichment damages flowing as a result of the use of   11:36
22 Google Analytics?                              11:37
23      MS. WEAVER:  Objection.  Misstates facts.   11:37
24 Assumes facts not in evidence.                11:37
25      I think what you're saying is -- I interpret   11:37

Page 109

28 (Pages 106 - 109)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 your question as saying let me identify a subcomponent   11:37
2 of Google, but you're not telling me at all about what   11:37
3 activity, what program, what revenue, or anything in   11:37
4 saying "Just using that moniker, have you looked at   11:37
5 that" -- and I don't understand what you're referring   11:37
6 to.                                                    11:37
7 BY MS. TREBICKA:                                       11:37
8    Q.  So when I say -- sorry.                         11:37
9    A.  So, like, what about Google Analytics?          11:37
10   Q.  Do you know --                                  11:37
11   A.  Its existence?  Is it trademark licensing?      11:37
12       I mean, I can answer by saying I don't          11:37
13 believe -- I don't have anything I label as           11:37
14 Google Analytics damages or Google Analytics unjust   11:37
15 enrichment.                                           11:38
16       I've explained what I've done in my report,     11:38
17 and I've looked at revenue, right, related to Chrome,  11:38
18 relating to a category of advertising I pointed to     11:38
19 specifically; right?  But nowhere in there do I also   11:38
20 have a column that says Google Analytics.             11:38
21   Q.  Do you know what Google font is?                11:38
22   A.  Google font?                                    11:38
23       MS. WEAVER:  Objection.                         11:38
24       MS. TREBICKA:  Correct.                         11:38
25       MS. WEAVER:  Beyond the scope.                  11:38

Page 110

1 BY MS. TREBICKA:                                       11:38
2    Q.  Google fonts.                                   11:38
3    A.  I'm not sure.  I can't -- I can't think of it   11:38
4 right now.                                             11:38
5    Q.  Okay.  Do you know what Google Pro Se is,       11:38
6 P-r-o S-e?                                             11:38
7    A.  I can't recall --                               11:38
8       MS. WEAVER:  Same objection.  Scope.             11:38
9       Go ahead.                                        11:38
10      THE WITNESS:  Not as I sit here, no.             11:38
11 BY MS. TREBICKA:                                       11:38
12   Q.  Do you know what Google embedded maps is?       11:38
13      MS. WEAVER:  Same objection.                     11:38
14      THE WITNESS:  What a Google embedded map is?     11:38
15      I've seen embedded maps when I've looked on      11:38
16 Google, if that's what you mean.  I don't know if you're   11:39
17 referring to an entity title or a business subdivision,   11:39
18 but I --                                               11:39
19 BY MS. TREBICKA:                                       11:39
20   Q.  Do you understand that it's a service that      11:39
21 Google provides to third-party websites, Google embedded   11:39
22 maps?                                                  11:39
23      MS. WEAVER:  Objection.  Assumes facts.  Calls   11:39
24 for technical conclusion.  Beyond the scope.          11:39
25      THE WITNESS:  I am aware that maps by Google     11:39

Page 111

1 show up in various places, in search results on        11:39
2 third-party sites.  I've seen all that.  I've witnessed  11:39
3 that as an internet user.                              11:39
4 BY MS. TREBICKA:                                       11:39
5    Q.  Have you, in your analysis, unjust enrichment   11:39
6 analysis, have you attempted to calculate those unjust  11:39
7 enrichment damages with respect to Google embedded maps?  11:39
8       MS. WEAVER:  Objection.  Assumes facts.  Vague   11:39
9 as to those damages.                                   11:39
10      THE WITNESS:  My analysis relates to the        11:39
11 incremental loss of revenues from using personal      11:39
12 information, as I describe it.                         11:40
13      If that comes from these things you're          11:40
14 mentioning, it's included.  But I have not specifically  11:40
15 identified subcategories I have looked to analysis that  11:40
16 said when we don't have this personal information for  11:40
17 third-party cookies, how much does revenues drop?     11:40
18 BY MS. TREBICKA:                                       11:40
19   Q.  Can we take a look at paragraph 60, please?     11:40
20      If you could turn to paragraph 60 and let me     11:40
21 know when you're there.                               11:40
22   A.  I'm there.                                      11:40
23   Q.  Okay.  And do you recall that you rely on       11:40
24 certain analyses -- what you call Google internal      11:41
25 analyses and independent third-party research that show,  11:41

Page 112

1 according to you, that removing access to consumer      11:41
2 identity information reduces advertising revenue by     11:41
3 52 percent?                                            11:41
4    A.  Yes.  I remember that.                          11:41
5    Q.  And this is in paragraph 60 of your report;     11:41
6 correct?  You have it in front of you?                 11:41
7    A.  It is mentioned in paragraph 60.  It's in      11:41
8 other paragraphs as well.                              11:41
9    Q.  And you're aware that the studies that you're   11:41
10 relying on purport to measure the effect on publisher  11:41
11 revenue; correct?                                     11:41
12   A.  You're talking about third-party publishers?   11:41
13 Other -- other website --                              11:41
14   Q.  Correct.  Yes.                                  11:41
15   A.  -- managers and ads?                            11:41
16   Q.  Correct.                                        11:41
17   A.  Yes.                                            11:41
18   Q.  You're aware of that?                           11:41
19   A.  Yes.                                            11:41
20   Q.  And then you also assume in your analysis that  11:41
21 the revenue not lost to Google would be proportional to  11:41
22 the publisher's revenue loss; correct?               11:42
23   A.  Can you say that again?  I'm sorry.  I didn't   11:42
24 understand the question.                              11:42
25   Q.  Sure.                                           11:42

Page 113

Veritext Legal Solutions
866 299-5127

**Page 114**

1 The 52 percent revenue drop that you mention    11:42
2 in paragraph 60, you understand that the studies that    11:42
3 you're relying on measure the 52 percent drop in the    11:42
4 context of the drop of the publisher's revenue.    11:42
5 You said, yes, you understand that?    11:42
6 A. Well, the analysis relates, as I talk about in    11:42
7 my report, I'm looking at the -- these percentages    11:42
8 relating to the loss of personal information used in    11:42
9 third-party cookies. These third parties are    11:42
10 publishers. These are other websites; right? Part of    11:42
11 the Google network program. That's what I've referred    11:42
12 to.    11:42
13 Q. Correct. So the 52 percent --    11:42
14 Correct. So the 52 percent drop is a drop in    11:43
15 the publisher's revenue, not Google's revenue, according    11:43
16 to these studies that you cite; correct?    11:43
17 MS. WEAVER: Objection. Form. Assumes facts.    11:43
18 THE WITNESS: No. That's where I'm -- I    11:43
19 missed you.    11:43
20 It's the drop in revenue to Google from the    11:43
21 activity with third-party publishers.    11:43
22 BY MS. TREBICKA:    11:43
23 Q. That's your --    11:43
24 A. Now, these third-party publishers, there's a    11:43
25 revenue sharing. So you've got this tied connection.    11:43

**Page 115**

1 It's factored; right? In whatever is made, how much    11:43
2 Google gets, what the publishers keep; right? So these    11:43
3 are connected obviously.    11:43
4 Q. So your understanding of the studies that you    11:43
5 cite is that the 52 percent drop is of Google's revenue.    11:43
6 That's what it's measuring. Not the public -- the    11:43
7 third-party publisher's revenue; correct?    11:43
8 MS. WEAVER: Objection. Asked and answered.    11:43
9 Misstates testimony.    11:43
10 THE WITNESS: As I've stated in my report, the    11:44
11 Google revenue flows as a function of the overall ad    11:44
12 revenue. So if you're thinking about if it drops, it    11:44
13 will drop to the people sharing it on both sides.    11:44
14 It's focusing on the ads that Google is    11:44
15 involved with placing and whatnot on third-party sites,    11:44
16 but what's dropping is a revenue that would apply to    11:44
17 whoever is sharing that revenue.    11:44
18 BY MS. TREBICKA:    11:44
19 Q. So what is your understanding of what the    11:44
20 studies are measuring? Are they measuring the drop in    11:44
21 revenue for the third-party publishers or for Google?    11:44
22 What is your understanding?    11:44
23 MS. WEAVER: Objection. Asked and answered.    11:44
24 THE WITNESS: Since they share, right, it    11:44
25 could be either or both. If the revenue drops -- if a    11:44

**Page 116**

1 sales price on a house drops, you might say, well,    11:44
2 did -- how much was dropped for the real estate agent?    11:44
3 How much has dropped for the home seller? If they're    11:45
4 related, if mathematically it's the same number, it's a    11:45
5 distinction without meaning.    11:45
6 BY MS. TREBICKA:    11:45
7 Q. So you're assuming that the revenue Google    11:45
8 generates from ads is a fixed percentage of publisher's    11:45
9 revenue, correct?    11:45
10 MS. WEAVER: Objection. Asked and answered.    11:45
11 Assumes facts. Misstates his testimony.    11:45
12 Sorry, Dr. Mangum.    11:45
13 THE WITNESS: My understanding -- and there's    11:45
14 different studies I look at. But my understanding is    11:45
15 that without the third -- without the personal    11:45
16 information, the third-party cookies, the revenue    11:45
17 generated from that advertising information drops by the    11:45
18 percentages reported. Some are higher than 52 percent;    11:45
19 right? That affects anyone who is making money from    11:45
20 that area.    11:45
21 Google makes a share. It's my understanding    11:45
22 they make a share; right? So if it drops, their share    11:45
23 drops. It applies also to how they're making the money,    11:45
24 meaning the ad revenue to those third-party publishing    11:46
25 sites.    11:46

**Page 117**

1 BY MS. TREBICKA:    11:46
2 Q. In your analysis, you're assuming that the    11:46
3 revenue Google generates from ads is a fixed percentage    11:46
4 of publisher's revenue, third-party publisher's revenue;    11:46
5 correct?    11:46
6 MS. WEAVER: Okay. So I think you just read    11:46
7 back the question you previously asked and he answered    11:46
8 it. I thought we had a rule that you were going to ask    11:46
9 a question once. But I'll object.    11:46
10 And you can answer that same question again.    11:46
11 MS. TREBICKA: Objection to form would have    11:46
12 been sufficient, Lesley. Let's please keep it at that    11:46
13 because it's getting tiring.    11:46
14 BY MS. TREBICKA:    11:46
15 Q. Go ahead, Dr. Mangum.    11:46
16 A. I think it's the same question. And I'll rely    11:46
17 on my same answer. If I'm wrong, if it was a slightly    11:46
18 different question, if you clarified -- let me know how    11:46
19 because I missed it, if it was actually a different    11:46
20 question.    11:46
21 Q. I'm not getting an answer that I understand,    11:47
22 so I'm going to ask it again. Maybe you can try to    11:47
23 answer it differently.    11:47
24 In your analysis, you are assuming that the    11:47
25 revenue that Google generates from third-party    11:47

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 publishers is a fixed percentage of those publisher's 11:47
2 revenues; correct? 11:47
3      MS. WEAVER: Objection. Assumes facts not in 11:47
4 evidence. Misstates his testimony. And, yes, asked and 11:47
5 answered three times now. 11:47
6      THE WITNESS: You are referring to Google, 11:47
7 which is a huge entity, which is far beyond what I've 11:47
8 looked at in this case. 11:47
9      What I did look in this case, for example, I 11:47
10 relied on my Table 2 where I'm looking at the Google's 11:47
11 network, the third-party network; right? It's my 11:47
12 understanding that in that area of the advertising 11:47
13 display ads, right, it's a sharing relationship that 11:47
14 Google has. 11:47
15 BY MS. TREBICKA:
16  Q.  Do you understand what AdSense is, 11:48
17 Google AdSense A-d-S-e-n-s-e? 11:48
18  A.  I do talk about AdSense and -- to other 11:48
19 ad manager, two others -- maybe one or two others in my 11:48
20 report. I must admit I've not memorized the 11:48
21 differences. It's not in my short-term memory. But I'd 11:48
22 refer back to what I say in my report. I can look, if 11:48
23 you like, but... 11:48
24  Q.  Well, let's just talk about your analysis. 11:48
25      Is it your assumption that the 52 percent 11:48

Page 118

1 communications with Google. I think they're silent on 11:50
2 that in some. But that's off the top of my head right 11:50
3 now. I'd have to look at those. 11:50
4      But if you think you can, with certainty, show 11:50
5 that, and you want me to agree with what you represent 11:50
6 as certainty, I'll look at that. But I'm not going to 11:50
7 agree to that without spending some more time and 11:50
8 looking at those. 11:50
9  Q.  Sitting here today, you just don't know 11:50
10 whether they were global or U.S. focused; correct? 11:50
11 These studies that you relied on? 11:50
12  A.  What I know is -- 11:50
13      MS. WEAVER: Objection. Objection. Assumes 11:50
14 facts. Misstates testimony. 11:50
15 BY MS. TREBICKA: 11:50
16  Q.  Go ahead. 11:50
17  A.  What I know is different from what I remember 11:50
18 right now. I would include what I know is in my report, 11:50
19 even if it's not in my short-term memory. 11:50
20      And I have told you that I believe some were 11:50
21 silent on the issue. 11:50
22      Now, maybe there's some context or surrounding 11:50
23 that could be helpful, but I would need to spend time to 11:50
24 do that. So it's not I don't know. It's that I would 11:50
25 need to spend time to answer your question. And if you 11:50

Page 120

1 revenue decline also applies to revenues from AdSense? 11:48
2  A.  What I've used is the 52 percent, and in my 11:48
3 calculations it relates to that column in my Table 2; 11:48
4 right? It relates to the Google network. I'm going to 11:48
5 get the name wrong. Give me a moment. 11:48
6  Q.  Okay. 11:48
7  A.  Third-party network pages; right? 11:48
8      AdSense -- AdMob or AdMobile, there's other 11:48
9 ways to get things onto the third-party network pages, 11:49
10 and so I don't distinguish by the various -- 11:49
11  Q.  Got it. 11:49
12  A.  -- means, if they overlap or not. I'm 11:49
13 starting from this column on my Table 2. 11:49
14  Q.  Now, are you aware that the Google -- internal 11:49
15 Google analysis, as well as the independent third 11:49
16 research -- third-party research that you reference in 11:49
17 paragraph 60, measure global effect of, as you say here, 11:49
18 "removing access to consumer identity"? 11:49
19      MS. WEAVER: Objection. Assumes facts. 11:49
20 Counsel is testifying. Vague. If there's an internal 11:49
21 analysis, let him look at it. 11:49
22 BY MS. TREBICKA: 11:49
23  Q.  Go ahead. 11:49
24  A.  I don't have these different documents. There 11:49
25 are some analyses. There's some references in 11:49

Page 119

1 want to show me documents, I will be able to answer your 11:51
2 question. My testimony is not I don't know. 11:51
3  Q.  In your analysis you have not done anything to 11:51
4 make the 52 percent applicable to the U.S. only. You 11:51
5 have simply taken the 52 percent. Whether or not it was 11:51
6 global, sitting here today, you don't remember? 11:51
7      MS. WEAVER: Objection. Vague. Misstates the 11:51
8 record. 11:51
9      THE WITNESS: Well, what you just described 11:51
10 does apply the 52 percent to the U.S. 11:51
11      I don't understand your question. You said 11:51
12 I've done nothing to make the global number apply to the 11:51
13 U.S. and I did. I multiplied by the U.S. percentage. 11:51
14      MS. TREBICKA: Understood. 11:51
15 BY MS. TREBICKA: 11:51
16  Q.  That's all you did; correct? 11:51
17      MS. WEAVER: Objection. Vague. Misstates the 11:51
18 record. 11:51
19      THE WITNESS: No. What I state in my answers 11:51
20 to you are not all I did. My report gives me all did. 11:51
21 But I don't want to be limited -- if you ask a certain 11:51
22 question and I answer something and you say, "That's all 11:52
23 you did," I'm always going to say "No." 11:52
24      All I did is in my report. But I am answering 11:52
25 your individual questions about certain things. But my 11:52

Page 121

31 (Pages 118 - 121)



1   report is the only place you can go to to see all that I   11:52

2   did.                                                          11:52

3   BY MS. TREBICKA:                                              11:52

4       Q.   Do you know whether or not revenue decline          11:52

5   based on disabling third-party cookies globally would be   11:52

6   the same as the revenue decline from users in the U.S.     11:52

7   only?                                                       11:52

8       MS. WEAVER: Objection. Calls for                        11:52

9   speculation. Vague as to time. Vague in general.           11:52

10      THE WITNESS: As I sit here -- I'd want to               11:53

11  look more closely. But as I sit here, I don't recall       11:53

12  any suggestion or analysis that would say that they're     11:53

13  different.                                                  11:53

14      When references are being made, U.S. is a huge         11:53

15  portion, obviously, of what Google does. And so I think    11:53

16  arguments from silence can be helpful. If there was a      11:53

17  meaningful difference and it's not listed, it would be     11:53

18  surprising. But I have to look more to see. I don't        11:53

19  remember anything that gives alternative numbers for the   11:53

20  U.S. that I did not use.                                    11:53

21  BY MS. TREBICKA:                                            11:53

22      Q.   Let's turn your attention to paragraph 62 in      11:53

23  the next page.                                              

                                                                11:54

25                                                              11:54

                                                    Page 122

                                                    Page 123

CONFIDENTIAL - ATTORNEYS' EYES ONLY



    6    Q.  Let's turn to paragraph 64 on page 23.        12:01
    7    A.  Yes.                                          12:01
    8    Q.  Is this a summary of your profit allocation   12:01
    9  method that you've expressed?                       12:01
   10       MS. WEAVER:  Objection.  Misstates his report. 12:01
   11       THE WITNESS:  This is one spot.  I think it's  12:01
   12  discussed elsewhere in the report.

   19  BY MS. TREBICKA:                                    12:02
   20    Q.

                                                          12:02
                                                   Page 128

Page 126

    1       MS. WEAVER:

   15  BY MS. TREBICKA:                                    12:03
   16    Q

                                                          12:03
                                                   Page 129

Veritext Legal Solutions
866 299-5127









Page 142

3 BY MS. TREBICKA:                          12:20
4    Q.
7        MS. WEAVER:
10       THE WITNESS:
16 BY MS. TREBICKA:                          12:20
17   Q.
21   A.                                      12:21
22       MS. WEAVER:
25                                           12:21

Page 143

1                                           12:21
2        THE WITNESS:
14 BY MS. TREBICKA:                          12:21
15   Q.  Have you found anything sitting here today to  12:21
16 identify the number of putative class members who do not  12:21
17 have a Google account?                    12:22
18   A.  I've not --                         12:22
19       MS. WEAVER:  I'm sorry.  Just asked and  12:22
20 answered.  It's badgering at this point.  Same  12:22
21 objections.                               12:22
22       You may answer.                     12:22
23 BY MS. TREBICKA:                          12:22
24   Q.  Go ahead.                           12:22
25   A.  I've not issued another report.  I've not  12:22

Page 144

1 formed other opinions.                     12:22
2        So I've seen a lot of information since my  12:22
3 report was issued, but I've not been asked and therefore  12:22
4 I haven't completed any supplemental or additional  12:22
5 opinions.  So I'm not at a spot that I can answer that  12:22
6 question because I've not been asked to prepare an  12:22
7 opinion that may be different than what existed at the  12:22
8 time of my report.                         12:22
9        I'm here today to talk about that opinion.  12:22
10 But I've not been asked to form or assess at some point  12:22
11 in time how would I change my opinion or not?  I just  12:22
12 haven't done that.                         12:22
13   Q.  Okay.  Have you seen any information since  12:22
14 your report was issued that would identify the number of  12:22
15 putative class members who may not have had a Google  12:22
16 account?                                   12:22
17       MS. WEAVER:  Same objections.       12:22
18       THE WITNESS:  I have seen information, and  12:23
19 some of it is related, but I haven't come to the point  12:23
20 of deciding its sufficient for an opinion to be  12:23
21 rendered, so I can't answer that.  I haven't come to the  12:23
22 conclusion that what we found would be enough to put a  12:23
23 number that would be my opinion, right, behind it, not  12:23
24 as of today.                               12:23
25 ///

Page 145

1 BY MS. TREBICKA:                          12:23
2    Q.  What kind of information have you seen?  12:23
3    A.  References --                       12:23
4        MS. WEAVER:  Objection.  Vague.     12:23
5        Just give me a second, Dr. Mangum.  12:23
6        Objection.  Vague.                  12:23
7        THE WITNESS:  References to users, but it  12:23
8 wasn't clear what category that might have been.  And  12:23
9 overall user account doesn't really apply to non-synced  12:23
10 so we're looking for that.  But, you know, and some of  12:23
11 these were simply comments in lines, right, or articles  12:23
12 or things we find, maybe third parties on the internet  12:23
13 writing about users.  And it's not clear what they  12:23
14 meant.  Maybe it meant account holders.  12:23
15       That type of stuff we've seen, but nothing  12:23
16 definitive.                               12:23
17       MS. TREBICKA:  It's about lunchtime.  How  12:24
18 would you feel about taking a lunch break now?  And we  12:24
19 can keep it as long or short as you would like.  12:24
20       Dr. Mangum?                          12:24
21       THE WITNESS:  That's fine.  I could -- now is  12:24
22 fine.  If you wanted an hour I'd be okay with that too.  12:24
23 But, you know, now is fine as well.  I'm in that area --  12:24
24       MS. TREBICKA:  Okay.  Let's do it.  Let's get  12:24
25 off the record.                           12:24

37 (Pages 142 - 145)

| | |
|---|---|
| 1    Assuming Ms. Weaver agrees.          12:24 | 1    A.  I do.                          01:16 |
| 2    MS. WEAVER:  Yes.  That's fine.       12:24 | 2    Q.  From your report?              01:16 |
| 3    THE VIDEOGRAPHER:  Okay.  We're off the record 12:24 | 3    A.  Yes, I do.                     01:16 |
| 4 at 12:24 p.m.                         12:24 | 4    Q.  And you also state in your report that    01:16 |
| 5    (Lunch recess.)                    01:11 | 5 about -- well, you cite an article that says that about 01:16 |
| 6    THE VIDEOGRAPHER:  We are back on the record.  01:14 | 6 31 of internet users worldwide will use a VPN.       01:16 |
| 7 The time is 1:14 p.m.                 01:14 | 7    To you generally recall that?      01:16 |
| 8 BY MS. TREBICKA:                      01:14 | 8    MS. WEAVER:  Objection.            01:16 |
| 9    Q.  Dr. Mangum, I trust you had a nice lunch?    01:14 | 9    THE WITNESS:  It sounded like --   01:16 |
| 10    A.  I did.  Thank you.              01:14 | 10    MS. WEAVER:  Go ahead.             01:16 |
| 11    Q.  Good.                          01:14 | 11    THE WITNESS:  It sounded like you said 31.  I  01:16 |
| 12    Before we broke, we -- for break, before we    01:14 | 12 don't know what that -- maybe you could point me to my    01:16 |
| 13 took the break, we were speaking about your unjust    01:14 | 13 report.                              01:16 |
| 14 enrichment analysis.                  01:14 | 14 BY MS. TREBICKA:                      01:16 |
| 15    Do you recall that?                01:14 | 15    Q.  Well, we'll get to it later.    01:16 |
| 16    A.  I do.                          01:14 | 16    But generally speaking, you recall that you    01:16 |
| 17    Q.  So with respect to your unjust enrichment    01:14 | 17 mention a percentage, whatever it is the report will    01:16 |
| 18 analysis, you also stated that you did propose an    01:14 | 18 show, of users worldwide who use VPNs; correct?    01:16 |
| 19 allocation of that unjust enrichment to putative class    01:14 | 19    A.  I have to go back to my report.    01:16 |
| 20 members.                             01:14 | 20    Q.  Well, let's go to page -- or rather    01:16 |
| 21    Do you recall that?                01:14 | 21 paragraph 88 of your report?           01:16 |
| 22    A.  Correct.  Yes.  We were talking --    01:14 | 22    A.  Yes.                           01:17 |
| 23    MS. WEAVER:  Go ahead.             01:14 | 23    Q.  And you see where you say:      01:17 |
| 24    THE WITNESS:  Yeah.  We were talking about my  01:14 | 24    "VPNs are increasingly common, and    01:17 |
| 25 paragraph 64, for example, in my report.    01:14 | 25    with 31 percent of internet users    01:17 |
| Page 146 | Page 148 |

| | |
|---|---|
| 1 BY MS. TREBICKA:                      01:14 | 1    worldwide having used a VPN, the VPN       01:17 |
| 2    Q.  Do you -- would you exclude from the    01:14 | 2    industry is expected to reach             01:17 |
| 3 allocation users who used ad-blocking mechanisms in    01:15 | 3    $31.1 billion in 2021."                   01:17 |
| 4 their browsing?                       01:15 | 4    Do you see that?                    01:17 |
| 5    MS. WEAVER:  Objection.  Vague.  Out of scope  01:15 | 5    A.  Yes.                           01:17 |
| 6 as to technical testimony.             01:15 | 6    Q.  Do you have any reason to doubt that some    01:17 |
| 7    THE WITNESS:  No.  I -- no.  I wouldn't    01:15 | 7 putative class members may have used VPNs during the    01:17 |
| 8 exclude them.  I mean, I don't know to what effect ad    01:15 | 8 putative class period?                 01:17 |
| 9 blocking -- this is a technical question about what that    01:15 | 9    MS. WEAVER:  Objection.  Calls for    01:17 |
| 10 means, what it actually does?           01:15 | 10 speculation.                          01:17 |
| 11    So I don't believe that would be in my place    01:15 | 11    THE WITNESS:  If you're asking do I believe    01:17 |
| 12 to try to make an assessment to evaluate that blocking.    01:15 | 12 it's -- that it's not the case that any class member    01:17 |
| 13 BY MS. TREBICKA:                      01:15 | 13 ever used a VPN?  Is that what you mean by I doubt that  01:17 |
| 14    Q.  And you have not evaluated ad blocking.    01:15 | 14 they did?                             01:17 |
| 15    Is that correct?                   01:15 | 15 BY MS. TREBICKA:                      01:17 |
| 16    A.  I don't have any --             01:15 | 16    Q.  Yes.  Let's start with that.    01:17 |
| 17    MS. WEAVER:  Objection.  Vague.       01:15 | 17    A.  No.  I've not formed the opinion or concluded  01:17 |
| 18    THE WITNESS:  I don't have any technical    01:15 | 18 that that's never happened.            01:17 |
| 19 opinions related to, for example, ad blocking, as far as  01:15 | 19    Q.  And by that you mean you haven't formed an    01:17 |
| 20 what it is, when it was applied, whether it worked.    01:15 | 20 opinion or concluded that no putative class member has    01:18 |
| 21 Right.                               01:15 | 21 never used the VPN during the class period?    01:18 |
| 22 BY MS. TREBICKA:                      01:15 | 22    A.  That -- did you say --          01:18 |
| 23    Q.  You also -- later in your opinion, you also    01:15 | 23    MS. WEAVER:  Objection.  Form.       01:18 |
| 24 talk about the use of virtual private networks, VPNs.    01:16 | 24    THE WITNESS:  It sounded like you said "no    01:18 |
| 25    Do you recall that?                01:16 | 25    class member has never."             01:18 |
| Page 147 | Page 149 |

38 (Pages 146 - 149)



Page 150

1    MS. TREBICKA:  You are correct, I did use a    01:18
2  double negative.  So let me try to clean that up.    01:18
3    MS. WEAVER:  And I objected to form.    01:18
4  BY MS. TREBICKA:    01:18
5    Q.  Dr. Mangum, you mean that you haven't formed    01:18
6  an opinion or concluded that at no point in time did a    01:18
7  putative class member use a VPN during the class period?    01:18
8    MS. WEAVER:  Objection. Form.    01:18
9    THE WITNESS:  I believe that's correct because    01:18
10  I haven't formed an opinion generally about VPN usage of    01:18
11  class members.    01:18
12  BY MS. TREBICKA:    01:19
13    Q.  For purposes of your unjust enrichment damages    01:19
14  allocation, would you exclude VPN users from the    01:19
15  putative class?    01:19
16    MS. WEAVER:  Objection. Misstates the report    01:19
17  and testimony.    01:19
18    THE WITNESS:  I would not for a couple    01:19
19  reasons.  I don't identify the class so I'm not going to    01:19
20  be the one who will exclude or include.  I've looked at    01:19
21  who was in it, but I'm not the one who's deciding who's    01:19
22  in the class.    01:19
23    On top of that, the work that I've done, if    01:19
24  there may be something of claims administration that    01:19
25  might happen.  I'm aware of certain things that have    01:19

Page 151

1  happened beyond the work I've done in cases.  But as far    01:19
2  as the analysis that I've done, it doesn't require an    01:19
3  adjustment, for example, for VPN usage.    01:19
4  BY MS. TREBICKA:    01:20
5    Q.  You don't identify the class, that's your    01:20
6  opinion, correct, in your report?    01:20
7    MS. WEAVER:  Objection. Form.    01:20
8    THE WITNESS:  I talk about the class as it's    01:20
9  been argued and a motion proposing for it, but I'm not    01:20
10  the one that said Russell Mangum will define the class.    01:20
11  By identifying, I mean that.  I'm not the one saying    01:20
12  it's my opinion.  I guess you could say I identified it    01:20
13  by talking about it, but I'm talking about what others    01:20
14  have said, right, what has been moved for a class for    01:20
15  certification.    01:20
16  BY MS. TREBICKA:    01:20
17    Q.  Do your opinions extend to identifying which    01:20
18  putative class members will be allocated damages for    01:20
19  unjust enrichment?    01:20
20    A.  I've --    01:20
21    MS. WEAVER:  Objection. Objection. Form.    01:20
22    Sorry.  Just give me a second.    01:20
23    THE WITNESS:  Yeah.    01:20
24    MS. WEAVER:  Okay.  Go ahead.    01:20
25    THE WITNESS:  Sorry.    01:20

Page 152

1    I've not been asked yet and I typically am not    01:20
2  involved in claims administration, as far as figuring    01:20
3  out, okay, who now receives payment?  I understand there    01:20
4  are methods that are used, but so far I've not been    01:21
5  asked to participate in that process.    01:21
6  BY MS. TREBICKA:    01:21
7    Q.

22  BY MS. TREBICKA:    01:22
23    Q.

Page 153

4    MS. WEAVER:

7    THE WITNESS:

24  BY MS. TREBICKA:    01:23
25    Q



[redacted]

Page 158

[redacted]. 01:30

Page 159

[redacted] 01:31
MS. WEAVER: [redacted]
[redacted] 01:31
THE WITNESS: [redacted] 01:31
BY MS. TREBICKA: 01:31
Q. [redacted] 01:31
A. [redacted] 01:32
Q. [redacted] 01:32

Page 160

[redacted] 01:32
MS. WEAVER: [redacted] 01:32
BY MS. TREBICKA: 01:32
Q. [redacted] 01:33
MS. WEAVER: [redacted] 01:33
[redacted] 01:33
THE WITNESS: [redacted] 01:33
BY MS. TREBICKA: 01:33
Q. [redacted] 01:33
A. [redacted] 01:33
Q. [redacted] 01:33
MS. WEAVER: [redacted] 01:33
BY MS. TREBICKA: 01:33
Q. [redacted] 01:33

Page 161



Page 162

Page 163

Page 164

Page 165

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 166

1 BY MS. TREBICKA:                                01:40
2    Q.  Okay.  So let's move on to paragraph 65, which  01:40
3 is the "Restitution of Value of Personal Information."  01:40
4      So this is the second main opinion in your    01:40
5 report, the restitution of value of personal        01:41
6 information; correct?                            01:41
7    A.  Yes.  Give me a second to review right where  01:41
8 we're at in my report.                          01:41
9      Correct.  Yes.  It follows right after the    01:41
10 paragraph 64 we've been talking about, about the unjust  01:41
11 enrichment.                                    01:41
12    Q.  Right.                                  01:41
13    A.  Yes.                                     01:41
14    Q.  Right.                                  01:41
15      So you have the unjust enrichment analysis and  01:41
16 then separately you have an analysis of the restitution  01:41
17 of value of personal information.                 01:41
18      Do you propose that each user is awarded     01:41
19 damages on both the unjust enrichment analysis as well  01:41
20 as the restitution of value of personal information?   01:41
21      MS. WEAVER:  Objection to the extent that    01:41
22 calls for a legal conclusion or interferes with the   01:41
23 purview of the Court.                          01:41
24      THE WITNESS:  I don't propose that.  I mean,  01:42
25 the Court will have to decide, lawyers will argue.  But  01:42

Page 168

1 I'm doing the analysis such that the quantification is  01:42
2 available for those who will decide that.          01:42
3      I understand both -- two avenues, two        01:42
4 methodologies, unjust enrichment and restitution may  01:42
5 relate, so I've done those analyses.              01:42
6 BY MS. TREBICKA:                                01:42
7    Q.  They relate to what?  Do you mean by "may   01:42
8 relate"?                                        01:42
9    A.  May relate to a question the Court will have  01:42
10 assuming liability is found.  They may both -- one or  01:42
11 the other or both may be relevant, and if someone says,  01:42
12 okay, is there an opinion about restitution?  I feel  01:42
13 like that's where I fit in.  But I'm not saying it    01:42
14 should or I'm not proposing they be awarded.       01:42
15      I think counsel for the class will -- might   01:42
16 make those proposals.  I'm doing the analysis so that --  01:42
17    Q.  Yeah.  In your opinion --                 01:42
18      MS. WEAVER:  Hey, could you allow him to     01:42
19 finish his answer, please?                       01:42
20      MS. TREBICKA:  I just did.                  01:42
21      MS. WEAVER:  No.  You interrupted him.       01:42
22      Were you done?                            01:42
23      THE WITNESS:  I wasn't done.  But I sometimes  01:43
24 pause when I'm thinking mainly because I talk really   01:43
25 fast and at some point in time someone suggested I give  01:43

Page 169

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 pauses in the middle, if for no one else than a      01:43
2 court reporter.                        01:43
3         I don't propose that any type of remedy be      01:43
4 applied. I have an understanding of what may be and      01:43
5 I've worked on cases in the past, but I focus on the      01:43
6 analysis such that if it's needed, it's already been      01:43
7 done and it could be used. I do understand there's two      01:43
8 possible types of damages or remedial measures that      01:43
9 might be taken, unjust enrichment and restitution, so I      01:43
10 could do both.                        01:43
11 BY MS. TREBICKA:                    01:43
12    Q.  So from your perspective, does it make      01:43
13 economic sense to award a putative class member both      01:43
14 unjust enrichment damages and restitution damages?      01:43
15        MS. WEAVER: Objection to the extent it calls      01:43
16 for a legal conclusion. Asked and answered.      01:43
17        THE WITNESS: I don't think there's economic      01:43
18 sense that necessarily trumps anything or overlaps what      01:44
19 might be allowed legally.                01:44
20        I think there are times where two different      01:44
21 awards are both allowed. There's times where they might      01:44
22 be deemed double counting. And if double counting is      01:44
23 something the law wants to avoid, I understand that's      01:44
24 been the case in the past.                01:44
25        I don't personally have a feel or an opinion      01:44
                                    Page 170

1 about what applies here. It would not surprise me if      01:44
2 someone says, well, it's either/or, but I just -- I      01:44
3 don't have an opinion on that and I have not looked into      01:44
4 it.                            01:44
5 BY MS. TREBICKA:                    01:44
6    Q.  So in paragraph 65, you say, the third      01:44
7 sentence in this section:                01:44
8        "I discuss the reduction in value of      01:44
9        browsing services received by Chrome      01:44
10        users, as well as the value of personal      01:44
11        information improperly obtained by      01:44
12        Google."                    01:45
13        Do you see that?                01:45
14    A.  Yes.                        01:45
15    Q.  What do you mean by "the reduction in value of      01:45
16 browsing services received by Chrome users"?      01:45
17    A.  It's described further in my report but it      01:45
18 relates to the idea of what members got, in fact, as      01:45
19 alleged compared to what the agreements had explained      01:45
20 about what that browsing experience would have been,      01:45
21 what they were getting, what they were giving,      01:45
22 difference -- that's what I'm talking about.      01:45
23    Q.  And you say "I discuss the reduction in value      01:45
24 of browsing services."                01:45
25        Do you arrive at an opinion on the reduction      01:45
                                    Page 171

1 of value of browsing services received by the putative      01:45
2 class members?                        01:45
3    A.  I do, in the sense that I offer up multiple      01:45
4 measures, multiple quantifications of that in the      01:45
5 subsequent sections of the report.            01:45
6    Q.  The next phrase is "As well as the value of      01:46
7 the personal information improperly obtained by Google."  01:46
8        Is that different from a reduction in value of      01:46
9 the browsing services?                01:46
10    A.  It's different ways to quantify this concept.  01:46
11    Q.  And by "this concept," what do you mean?      01:46
12    A.  Well, here we're talking about restitution of   01:46
13 the value of personal information. That's the title      01:46
14 head there, section V, so I'm talking about value of      01:46
15 this personal information. There's a couple of      01:46
16 approaches that I discuss below that economists use to   01:46
17 come up with value.                    01:46
18    Q.  And in your opinion, is -- which is superior,   01:46
19 analyzing the reduction in value of browsing services or  01:46
20 analyzing the value of the personal information      01:47
21 improperly obtained by Google?            01:47
22        MS. WEAVER: Objection. Assumes facts.      01:47
23        THE WITNESS: It would depend. I don't have      01:47
24 an opinion so I don't rank these as best, second, or      01:47
25 third. I think they all provide information. They can      01:47
                                    Page 172

1 be helpful, I think, to the trier of fact.      01:47
2        Some of the approaches that are discussed      01:47
3 below don't directly assess the value, but they      01:47
4 indirectly assess it by looking at what people spend to   01:47
5 try to keep a bad thing from happening or undesirable    01:47
6 thing from happening.                01:47
7        And so these indirect methods are oftentimes    01:47
8 only a partial quantification. It's better to have a     01:47
9 partial if you can't get a full measure but of course I   01:47
10 would think that a full measure, if available, would be  01:47
11 preferred to a partial. Sometimes all you can do is an   01:47
12 indirect partial measure.                01:47
13 BY MS. TREBICKA:                    01:47
14    Q.  When you say they indirectly assess it --      01:48
15 assess it by looking at what people would spend to try   01:48
16 to keep a bad thing from happening, are you specifically  01:48
17 referring to your conclusions or discussions about VPN   01:48
18 services?                        01:48
19        MS. WEAVER: Objection. Assumes facts.      01:48
20        THE WITNESS: That would be one example. I      01:48
21 wasn't -- I was trying specifically to be more broad      01:48
22 than that. That's why I use the words I did in my      01:48
23 answer.                        01:48
24        But if, for example -- let me shift gears for  01:48
25 a minute.                        01:48
                                    Page 173

44 (Pages 170 - 173)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  If you're wondering in an environmental   01:48
2  damages case if a beach was closed because of, say, an   01:48
3  oil spill and you're wondering, well, people who should   01:48
4  have been able to use the beach couldn't, but yet the   01:48
5  beach is free, how do you come up with an idea, well,   01:48
6  you might say, well, we can at least estimate how much   01:48
7  they spend to get to the beach. Because the value must   01:48
8  be more than they spend. But that's not a holistic.   01:48
9  It's kind of like at least this; right? So that is   01:48
10 maybe all you get. That might be the best way you could   01:48
11 estimate it.   01:49
12  But if someone says, oh, I also have a way to   01:49
13 actually get the full value of the beach, I would say   01:49
14 that's preferred.   01:49
15  That's what I mean by this indirect approach   01:49
16 or a way that you can say, well, we can look at revealed   01:49
17 actions sometimes to at least partially address the   01:49
18 question.   01:49
19 BY MS. TREBICKA:
20  Q. So the indirect approach would be attempting   01:49
21 to arrive at how much people get -- spend to get at the   01:49
22 beach, and the direct approach would be to actually   01:49
23 value how much people desire the beach; right?   01:49
24  A. Well, indirect approaches are numerous so I   01:49
25 wouldn't the label this as the indirect approach.   01:49

Page 174

1  Q. Got it.   01:49
2  A. I offer up multiple approaches. Some are   01:49
3  indirect. Things people have spent to try to get to   01:49
4  privacy; right? That's one thing I've identified.   01:49
5  But I've also looked at methods where we   01:49
6  looked more directly at, you know, how much firms pay   01:49
7  individuals, right, for access to their information, as   01:49
8  well as survey data.   01:49
9  Q. As far as indirect approaches, have you   01:50
10 identified any other than VPNs in your report?   01:50
11  A. I'd have to go through my measures again and   01:50
12 go through my report, see if I put that label on it.   01:50
13  Q. You don't recall sitting here today?   01:50
14  MS. WEAVER: Objection. Misstates his   01:50
15 testimony.   01:50
16  THE WITNESS: I've got my report. I just   01:50
17 haven't committed it all to my memory, to my short-term   01:50
18 memory, so I'd want to review it to give you an   01:50
19 appropriate full answer.   01:50
20 BY MS. TREBICKA:   01:50
21  Q. So in paragraph 66, you say:   01:50
22  "The economic value of Class Members'   01:50
23 personal information collected by Google   01:50
24 can be analyzed from two angles:   01:50
25 Estimating the value Class Members place   01:50

Page 175

1  on privacy protections; and 2) assessing   01:50
2  the value of Class Members' personal   01:50
3  information itself."   01:50
4  Q. Do you see that?   01:50
5  A. Yes.   01:50
6  Q. How do these two relate to the direct and   01:50
7  indirect angles that you were -- or approaches that you   01:50
8  were talking about in your answer just now?   01:51
9  MS. WEAVER: Objection. Form.   01:51
10  THE WITNESS: I'd have to look further. Those   01:51
11 don't necessarily map directly what you're proposing.   01:51
12 BY MS. TREBICKA:   01:51
13  Q. Okay. So when you say "estimating the value   01:51
14 Class Members place on privacy protections," what do you   01:51
15 mean by that in the context of your report?   01:51
16  A. Well, it's an overall description of things I   01:51
17 talk about later in this report, where, you know, we   01:51
18 look at evidence of what the members, right, what -- if   01:51
19 they're communicating through statistical ways and   01:51
20 others about the value, right, we're talking about that.   01:51
21  Q. And what about No. 2, "assessing the value of   01:51
22 Class Members' personal information itself," what do you   01:51
23 mean by that?   01:51
24  A. That means using other methods which might   01:51
25 reveal, ah, here's another way to think about the value,   01:51

Page 176

1  right, that's revealed -- it's an approach that goes to   01:51
2  value directly as opposed to, you know, for example   01:52
3  asking in a survey. That would be one example.   01:52
4  Q. That would be one example of approach No. 2?   01:52
5  A. True. But to answer your question completely,   01:52
6  I have to look at my report.   01:52
7  Q. Did you look at your report in preparation for   01:52
8  this deposition?   01:52
9  A. I did.   01:52
10  Q. Did you read it?   01:52
11  A. I did.   01:52
12  Q. And you still are unable to answer certain   01:52
13 questions with reference to the report? It's just a   01:52
14 little surprising. That's all.   01:52
15  MS. WEAVER: Objection. Form and badgering.   01:52
16 BY MS. TREBICKA:   01:52
17  Q. In your report under the section "Restitution   01:52
18 of Value of Personal Information," do you actually   01:52
19 arrive at a number that you propose the Court or fact   01:52
20 finder use to value the personal information of each   01:52
21 putative class member?   01:53
22  A. I identify many numbers, not just a numbers   01:53
23 but many numbers in this section.   01:53
24  Q. And do you -- and do you have an opinion that   01:53
25 sets one number apart from the rest as more reliable to   01:53

Page 177

45 (Pages 174 - 177)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 use as a proxy for the value of personal information   01:53
2 among the many numbers?   01:53
3    A. I think they're all valuable and they're all   01:53
4 reliable and I don't pick one.   01:53
5    At this stage in assessing class   01:53
6 certification, I did not choose to say, well, I have to   01:53
7 eliminate some, pick one only, and put that in the   01:53
8 report. I wanted to give all the information for the   01:53
9 Court to see as far as the indications and evidence of   01:53
10 value related to restitution.   01:53
11    Q. Do you plan to do that at some other point to   01:53
12 arrive at a single number that will be the number for   01:53
13 restitution of value of personal information for each   01:54
14 putative class member?   01:54
15    A. I don't have plans, I don't have specific   01:54
16 instructions to do anything else right now.   01:54
17    Q. Do you believe, in your opinion, is it   01:54
18 possible to have a single number that will fairly   01:54
19 compensate through restitutionary means each class   01:54
20 member for the value of their -- of his or her personal   01:54
21 information?   01:54
22    MS. WEAVER: Objection. Vague. Calls for   01:54
23 speculation.   01:54
24    THE WITNESS: When you say is it feasible to   01:54
25 have a single number -- you might not have used the word   01:54

Page 178

1 "feasible." I'm trying to remember but --   01:54
2 BY MS. TREBICKA:   01:54
3    Q. I said possible, but...   01:54
4    A. Possible.   01:54
5    I think it's certainly feasible, possible,   01:54
6 that one number can be reached to apply to them all.   01:55
7 But I don't know if you mean for an expert to have or   01:55
8 for a jury to decide.   01:55
9    In my experience, I oftentimes give multiple   01:55
10 scenarios, and a jury will decide, but I don't think I   01:55
11 would say, well, it's different for each one. It will   01:55
12 be a number for all the class members. It could be --   01:55
13 like I've talked about before -- partitioned by months,   01:55
14 let's say. But I'm giving different approaches. I've   01:55
15 described the approaches that might be used to say then   01:55
16 we will pick one and that will be the one used for all   01:55
17 the class members.   01:55
18    Q. But the intention -- your intention is that   01:55
19 there will be one approach that's picked to apply to   01:55
20 each class member equally; correct?   01:55
21    A. Are you asking my intention about my own   01:55
22 opinion or my intention about a jury?   01:55
23    Q. What will you propose should it get there,   01:55
24 should it get to a jury to a fact finder? Will you   01:56
25 propose that the jury pick one number among the many   01:56

Page 179

1 that you have put in your report or will you propose   01:56
2 that there should be multiple numbers that apply in   01:56
3 different scenarios?   01:56
4    MS. WEAVER: Objection. Calls for   01:56
5 speculation.   01:56
6    THE WITNESS: I already testified that I don't   01:56
7 have a plan right now. I've not been asked to do   01:56
8 something. And now you're asking again what I will   01:56
9 propose, but I've already testified I'm not to that   01:56
10 level of what I would do if I imagine this being at a   01:56
11 trial and I'm testifying there.   01:56
12 BY MS. TREBICKA:   01:56
13    Q. So you don't know is the short answer. You   01:56
14 don't know whether it would be one number that would   01:56
15 apply across class members or whether it would have to   01:56
16 be different numbers?   01:56
17    MS. WEAVER: Objection. Vague. Misstates   01:56
18 testimony.   01:56
19    THE WITNESS: I don't think I would say --   01:56
20    MS. WEAVER: Calls for speculation.   01:56
21    THE WITNESS: I don't think I would say I   01:56
22 don't know. At least in my mind, I think saying I don't   01:56
23 know means something is determined and knowable. I just   01:56
24 don't know it. I wouldn't say that. I don't think   01:57
25 anyone knows it right now. It's simply that decision,   01:57

Page 180

1 that point, is uncertain that there is no answer that   01:57
2 we're -- that exists yet.   01:57
3 BY MS. TREBICKA:   01:57
4    Q. From an economic standpoint, if Google were to   01:57
5 pay the proposed class members the value of their   01:57
6 information, Google will then be free to use that data   01:57
7 to generate profits from personalized ads; correct?   01:57
8    MS. WEAVER: Objection. Misstates testimony.   01:57
9 It calls for a legal conclusion.   01:57
10    THE WITNESS: I'm trying to think of the   01:58
11 ramifications of the question.   01:58
12    If you're talking about payment for the value   01:58
13 that -- at least in my mind, there's the question of the   01:58
14 payment for the past versus the future.   01:58
15    Are you -- so you might say, well, you've paid   01:58
16 for the past but that doesn't automatically give you   01:58
17 rights to the future. There's that question.   01:58
18    So I think part of that might be -- it could   01:58
19 differ depending on that presumption about what you mean   01:58
20 by can they make profits?   01:58
21    In a legal sense, let's just think about going   01:58
22 backwards, is the remedy, if it's executed -- does it   01:58
23 mean it's kind of made all good? We've now, you know,   01:58
24 moved forward and so it's legitimized? Maybe. I think   01:58
25 this gets to a legal philosophy, maybe, if not a legal   01:58

Page 181

46 (Pages 178 - 181)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 determination. But with unjust enrichment it's only the   01:58
2 past. I don't think that would include anything about   01:59
3 the future.   01:59
4       There's also the issue of if someone took   01:59
5 information and it wasn't intended -- if it wasn't   01:59
6 desirous that that information be possessed to pay for   01:59
7 it and then say, oh, but I automatically now get to   01:59
8 override your future desires, I would hesitate to answer   01:59
9 in that context either because I think that also might   01:59
10 be taking advantage of someone who -- I'm assuming   01:59
11 liability, somebody who had been wronged.   01:59
12       So I think maybe there might be a -- that   01:59
13 might be a legal question about what courts feel like   01:59
14 they do to get what's deemed justice. But I don't have   01:59
15 an opinion about that. I don't think it's an economic   01:59
16 point.   01:59
17 BY MS. TREBICKA:
18    Q.  Among other things, you have pieces of   01:59
19 information that you understand Google improperly   01:59
20 collected, such as IP address, user agent, cookie value,   01:59
21 et cetera.   02:00
22       Is that right?   02:00
23       That's paragraph 16 in your opinion.   02:00
24       MS. WEAVER: Objection. Form.   02:00
25       THE WITNESS: Yeah. I'm sorry, I was trying   02:00

Page 182

1 to follow your items, but I forgot the context of your   02:00
2 question.   02:00
3       Could you ask --   02:00
4 BY MS. TREBICKA:   02:00
5    Q.  So there are pieces of information that you   02:00
6 understand plaintiffs allege Google improperly   02:00
7 collected, such as IP address, user agent, cookie   02:00
8 values.   02:00
9       Does that ring a bell?   02:00
10    A.  Well, yeah. This whole discussion today has   02:00
11 been about this personal information, and we've talked   02:00
12 several times about it.   02:00
13       Yeah. I remember. That's what we're talking   02:00
14 about Google having that allegedly they shouldn't have.   02:00
15    Q.  Right.   02:00
16       So now is it your opinion that all -- each of   02:00
17 these pieces of data is valuable as personal -- has   02:00
18 value?   02:00
19       MS. WEAVER: Objection. Vague. Form.   02:00
20       THE WITNESS: It's not always known when   02:01
21 information is gathered whether or not that information   02:01
22 will be, in fact, used to generate revenue, whether it   02:01
23 be used directly or indirectly.   02:01
24       Having information to then be able to go seek   02:01
25 revenue is value, even if the pool that's obtained is   02:01

Page 183

1 larger than what was actually used. I think there's   02:01
2 value in what Google collects. There may be subsets   02:01
3 that are directly used and could change over time,   02:01
4 depending on what an advertiser wants, when ads are   02:01
5 sold, et cetera.   02:01
6       But I don't see this question of value being   02:01
7 necessarily something that can be pieced out under each   02:01
8 element or category.   02:01
9 BY MS. TREBICKA:
10    Q.  Let's assume the fact finder determines that   02:01
11 the IP address, for example, is not information that   02:01
12 Google improperly collected in this case.   02:02
13       Do you have any way to exclude this piece of   02:02
14 information, IP address, from the methodology that you   02:02
15 put forth to assign a value to the person -- to the   02:02
16 user's information?   02:02
17       MS. WEAVER: Objection. Form. Calls for   02:02
18 speculation.   02:02
19       THE WITNESS: I haven't taken in my   02:02
20 calculation of unjust enrichment -- that's not a   02:02
21 summation. That doesn't start from individually   02:02
22 identifying values and adding them up. It's not a   02:02
23 bottom-up approach like that. It's a top-down approach.   02:02
24 I look at the revenue that was earned.   02:02
25       So I don't have something, for example, that   02:02

Page 184

1 relates to an IP address.   02:02
2       I don't understand technologically exactly   02:02
3 what that would mean. I'd want to know much more. You   02:02
4 wanted me to assume a Court said something. I want to   02:03
5 read the words, and I'd want to maybe check with a   02:03
6 technical expert about the implications.   02:03
7       I think without knowing more about that, I   02:03
8 couldn't answer now.   02:03
9 BY MS. TREBICKA:   02:03
10    Q.  Let me ask the question again but this is not   02:03
11 in the context of unjust enrichment, which I think -- I   02:03
12 believe you answered in the context of unjust   02:03
13 enrichment. Now I'm in the context of your restitution   02:03
14 opinion.   02:03
15       In the context of your restitution opinion   02:03
16 where you assign various hypothetical values to personal   02:03
17 information of putative class members, let's assume that   02:03
18 a fact finder determines that IP address was not   02:03
19 improperly collected and therefore should not be valued   02:03
20 as part of this restitutionary value.   02:03
21       Do you have a methodology to allow for the   02:03
22 exclusion of the value of IP address?   02:03
23    A.  Well, so as I said, I don't have a   02:03
24 disaggregation of some set of hypothetical elements.   02:04
25       But what I will say is that the methods that   02:04

Page 185

47 (Pages 182 - 185)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  I've looked at, they don't specify any particular      02:04
2  component. So I don't have a reason to believe that if  02:04
3  somehow IP address was not in there, then the numbers   02:04
4  that I point to are different -- would be different.     02:04
5  That's what would be required economically is to say,   02:04
6  oh, if we pulled that out, do those numbers that come up 02:04
7  change?      02:04
8       And as I know the studies and the things I         02:04
9  have pointed to, I don't have a reason to believe any of 02:04
10 those would change based on your hypothetical.          02:04
11     Q. Let me ask you this: This is again in the        02:05
12 context of the restitution opinion.      02:05
13     Do you assume that the value of the class           02:05
14 members' personal information was somehow reduced by the 02:05
15 alleged wrongdoing?      02:05
16     MS. WEAVER: I'll object. Form. Vague.      02:06
17     THE WITNESS: I'd want to go back and check.      02:06
18 But best I recall, the methodologies that I use to come  02:06
19 up with value or restitution are all time based.         02:06
20     So whether this be -- if people were going to       02:06
21 be -- one of the surveys talks about if -- you know, how 02:06
22 much -- how much -- you know, certain aspects of data    02:06
23 protection, access, or, you know, unauthorized use,      02:06
24 right, you know, what's the, you know, value related to  02:06
25 that?      02:06

Page 186

1  necessarily in a stream. But I think of the value of   02:08
2  information is be something that kind of, to some       02:08
3  extent, stays the same, to some extent, may be augmented 02:08
4  over time. So any diminishment would have happened in a 02:08
5  period of time, and it did happen in that period of time 02:08
6  if it wasn't paid for. But not necessarily for the      02:08
7  future. The effect wouldn't necessarily happen.         02:08
8       So if this -- if the allegations, all of the      02:08
9  alleged wrongdoing stops in the future, well, that's     02:08
10 different information that would be created, potentially 02:08
11 shared or not shared in the future.      02:08
12 BY MS. TREBICKA:      02:08
13     Q. Your opinion is not that because of Google's     02:08
14 alleged wrongdoing, users were somehow -- putative class 02:08
15 members were somehow unable to profit from their         02:09
16 information in other ways, for example, by selling it in 02:09
17 these various markets that you purport to include in     02:09
18 your report?      02:09
19     MS. WEAVER: Objection. Vague.      02:09
20     THE WITNESS: Well, what has been lost in the        02:09
21 concept of restitution is that they did lose it          02:09
22 vis-à-vis Google.      02:09
23 BY MS. TREBICKA:      02:09
24     Q. Understood.      02:09
25     A. That's gone. Google took it, didn't pay.      02:09

Page 188

1  The idea isn't that because it was used      02:06
2  without permission, collected without permission, that   02:07
3  it somehow dropped in value. It's that if it had value   02:07
4  and Google didn't pay, the restitution means pay for     02:07
5  that, but that was only for that period.      02:07
6       The data by the way changes over time, so as       02:07
7  we go over lengthier periods of time, there's more       02:07
8  browsing, some browsing becomes more current, some       02:07
9  information is retained. Somebody might have the         02:07
10 same -- the same computer. Other information about them  02:07
11 might retain -- retained, gender, you know, maybe their  02:07
12 browsing practices seem similar.      02:07
13     I don't think I've made any presumption      02:07
14 that -- that the value as we move through time is        02:07
15 somehow dropped. But if somebody had something of value  02:07
16 but it was taken without being paid, for that time       02:07
17 period, they got no value for it.      02:07
18     So in that sense, the value dropped to zero        02:07
19 for those -- for Google who used it. That's what this    02:07
20 restitution is about. That doesn't mean it's      02:07
21 necessarily gone forever, but yet in the future, to be   02:08
22 used again, would need to be payment again. The market   02:08
23 value would be paid somehow, whether it's Google or      02:08
24 someone else.      02:08
25     So it isn't really about a permanent decline      02:08

Page 187

1  That is gone.      02:09
2       I've not meant to imply or I haven't either       02:09
3  assumed or at least implied that there was damage to     02:09
4  that. That wasn't the basis for damages. Somehow there   02:09
5  was a decrease in value to others potentially.      02:09
6       But I focused on, at least in the unjust          02:09
7  enrichment for Google's use, right, in the restitution,  02:09
8  I've still been focusing on, well, is there value        02:09
9  that -- to people for this information? Different        02:09
10 methods about the value I talk about.      02:09
11     And since we're talking about Google using         02:10
12 something without value, that's been the focus, not      02:10
13 necessarily that something has been destroyed, so to     02:10
14 speak.      02:10
15     Q. In paragraph 71, you speak of survey data.      02:10
16 And I'm reading the first sentence which says:      02:10
17     "Use of survey data is a recognized      02:10
18     approach for economic impact assessments,      02:10
19     including analyzing the demand for a      02:10
20     particular feature of a product or      02:10
21     service."      02:10
22     Do you see that?      02:10
23     A. Yeah.      02:10
24     Q. And the example that you quote is that "a      02:10
25 survey could evaluate the desirability of a new feature  02:10

Page 189

48 (Pages 186 - 189)

1 for a product and the premium that consumers will pay   02:10
2 for it."                                    02:10
3        Do you see that?                     02:10
4    A.  Yeah.                                02:10
5    Q.  Now, in fact, here, we don't need to measure   02:10
6 the -- or how much a consumer would pay for a Chrome   02:10
7 browser that plaintiffs claim is privacy; correct --   02:11
8 privacy protective; correct?  That's not what you're   02:11
9 attempting to measure with your opinion?     02:11
10       MS. WEAVER:  Objection. Form. Assumes facts.  02:11
11 Vague.                                      02:11
12       THE WITNESS:  Could you state that again?  I   02:11
13 just lost what you just said.  Not paying for a Chrome   02:11
14 browser that's privacy protected?           02:11
15 BY MS. TREBICKA:                            02:11
16   Q.  Right.                               02:11
17       So in other words, you're -- using surveys,   02:11
18 what you establish in paragraph 31 is that use of survey  02:11
19 data may be used to evaluate the desirability of a new   02:11
20 feature for a product.                      02:11
21       In other words, it's measuring demand --   02:11
22   A.  Yeah.                                02:11
23   Q.  -- is that correct?                   02:11
24   A.  Well, that one --                     02:11
25       MS. WEAVER:  Objection. Form.          02:11
                                          Page 190

1 BY MS. TREBICKA:                            02:11
2    Q.  That's what you're referencing there; correct?  02:11
3    A.  Well, I'm not referencing it.  I'm quoting a   02:11
4 book.                                       02:12
5    Q.  Correct.  And you're quoting --        02:12
6    A.  It was based on the reference manual on   02:12
7 scientific evidence.                         02:12
8    Q.  Because you're relying on it, I'm assuming?   02:12
9    A.  Well, I'm pointing to one thing that people   02:12
10 have said about the surveys; right?  About the use of   02:12
11 surveys; right?                             02:12
12       But it relates still to the idea that   02:12
13 different elements, different components of the   02:12
14 characteristics of a product or service can have   02:12
15 separate independent value that surveys can get at.   02:12
16   Q.  Right.                               02:12
17       And in particular, you say here "analyzing the  02:12
18 demand for a particular feature of a product or   02:12
19 service."                                   02:12
20       That's sentence 1 in paragraph 71.      02:12
21   A.  Sentence 1, "including analyzing the demand."   02:12
22 Not only.                                   02:12
23   Q.  Okay.                                02:12
24   A.  Including.  Yeah.                      02:12
25   Q.  Okay.  Now, is your understanding -- you don't  02:12
                                          Page 191

1 mention supply here in this paragraph.      02:12
2        MS. WEAVER:  Objection. Form.          02:12
3 BY MS. TREBICKA:                            02:12
4    Q.  Correct.                             02:12
5    A.  No.  The word "supply" is not in the   02:12
6 paragraph.                                  02:13
7    Q.  Okay.  So, in other words, the use of survey   02:13
8 data, at least as you've laid it out here, doesn't   02:13
9 measure or analyze whether Google or any other company  02:13
10 would actually supply a browser that plaintiffs claim is  02:13
11 the type of browser Google promised with Chrome not   02:13
12 synced?                                     02:13
13   A.  I think that's incorrect.             02:13
14       MS. WEAVER:  Objection. Form.          02:13
15       Dr. Mangum, just give me -- you've got to give  02:13
16 me a beat.  You're beating me to the answer and that's   02:13
17 the wrong order.                            02:13
18       So objection. Form.                   02:13
19       THE WITNESS:  I think that's incorrect.   02:13
20 BY MS. TREBICKA:                            02:13
21   Q.  What is --                           02:13
22   A.  Under the allegations, Google already has   02:13
23 decided to offer that.  Holding them to the contract as  02:13
24 alleged, they've already supplied that.  We know the   02:13
25 supply answer.  They were going to give the aspects of  02:13
                                          Page 192

1 Chrome and all that it is and not collect information,  02:14
2 right, and share it.                        02:14
3        So it's not a question of would they?  They   02:14
4 did.  The only issue is they didn't deliver what the   02:14
5 contract said they would.                    02:14
6    Q.  So your opinion is that the issue of supply is  02:14
7 not even at issue.  We know that companies will supply   02:14
8 such a browser that plaintiffs in this case claim Google  02:14
9 promised?                                   02:14
10   A.  No, not will.  Did.  Under the allegations,   02:14
11 assuming liability -- they did supply it for years now.  02:14
12 It's just that they didn't give consumers what they   02:14
13 said.                                       02:14
14       So we're only asking how do we make amends?  02:14
15 Because they did decide and have contracts that say what  02:14
16 they'll do, but they didn't do what they said in their  02:14
17 agreements.                                 02:14
18       So we're simply looking at you didn't deliver  02:14
19 all the value.  What was left out?  What part was left   02:14
20 out of something that was already decided to be given?  02:15
21 Again, I'm assuming liability; right?  The contract   02:15
22 says -- as allegedly interpreted.           02:15
23   Q.  Well, it was already decided to be given but  02:15
24 if I understand plaintiffs' allegations correctly was   02:15
25 not given, was not supplied; correct?       02:15
                                          Page 193

49 (Pages 190 - 193)

1    A.  Well, what is alleged is that --        02:15
2        MS. WEAVER:  I'm sorry.  Objection.  Form.    02:15
3        Go ahead.                02:15
4        THE WITNESS:  The allegation is that what was  02:15
5  actually done was wrongful, illegal.  The allegation is  02:15
6  that there's a contract, an obligation, right, to do  02:15
7  something else.                02:15
8        So there's not a question of would Google?    02:15
9  It's past that.  Under liability, I'm looking at a time  02:15
10  where that is what we now say is what was guaranteed and  02:15
11  it did exist in the marketplace.            02:15
12  BY MS. TREBICKA:                02:15
13    Q.  So you're assuming it is what was promised and  02:15
14  now you're looking at whether it existed in the    02:15
15  marketplace?                02:16
16        MS. WEAVER:  Objection.  Assumes facts not in  02:16
17  evidence.  Form.                02:16
18        THE WITNESS:  No.  Under my assumption of    02:16
19  liability, Google has come to the market and said this  02:16
20  is what we give and what we get in this exchange; right?  02:16
21        What I'm asking, my query, has to do with even  02:16
22  though they said that, that was an actual market    02:16
23  offering, they actually didn't comply with all they    02:16
24  said.  And the way they didn't comply can be quantified  02:16
25  as what they kept.  They kept something back that they  02:16
                                Page 194

1  under liability should have given.            02:16
2        What's the value of that?            02:16
3        The question isn't, well, let's ask Google if  02:16
4  they want to go back in time and not make this contract.  02:16
5  They did.  You know, it's under liability, finding of    02:16
6  liability, they did it.  They can't ask that question    02:16
7  again.  It's just how much wasn't delivered to class    02:16
8  members?  What portion of value?            02:16
9  BY MS. TREBICKA:                02:16
10    Q.  And you -- and then what you quantify is the  02:16
11  portion that was not delivered to class members    02:17
12  allegedly; correct?                02:17
13    A.  Correct.  The restitution means the difference  02:17
14  between what was received and what was in the contract.  02:17
15        But the supply question -- we can actually    02:17
16  look; right?  The idea is there are a number of class  02:17
17  members, right, there are a number of people using    02:17
18  Chrome.  That's the supply question.  We don't revisit  02:17
19  that.                02:17
20        The only issue is what was delivered -- the    02:17
21  individuals didn't get the benefit of the bargain;    02:17
22  right?                02:17
23        And so we need to look at how much were they  02:17
24  cut short; right?  How much was delivered less than    02:17
25  under assumption of liability, than what the contract    02:17
                                Page 195

1  said?                02:17
2    Q.  And the restitution is the difference between  02:17
3  what was received and what was in the contract, and you  02:17
4  proposed to value that by looking at market -- or by    02:17
5  looking at survey data to assess economic impact --    02:18
6        MS. WEAVER:  Objection.  Form.        02:18
7  BY MS. TREBICKA:                02:18
8    Q.  -- of that difference; correct?        02:18
9        MS. WEAVER:  Objection.  Form.        02:18
10        THE WITNESS:  One of the things I talk about  02:18
11  is survey, survey-type statistics and analysis.    02:18
12        I talk about others as well.  But, yes, they  02:18
13  all fall under this --                02:18
14        MS. TREBICKA:  Right.            02:18
15        THE WITNESS:  -- how might we get at    02:18
16  quantification of the difference between what the    02:18
17  contract said what happened and what was delivered?    02:18
18        And so I look at multiple measures of that.    02:18
19  One is survey data and survey analysis.        02:18
20  BY MS. TREBICKA:                02:18
21    Q.  Yeah.                02:18
22        And I'm limiting my questions now to survey    02:18
23  analysis.  I'm trying to take things in steps so -- in  02:18
24  steps so that it's easier for you, as well as cleaner  02:18
25  for the record.                02:18
                                Page 196

1        So right now I was limiting my questions to    02:18
2  this use of survey data that is -- that you discuss in  02:18
3  paragraph 71.                02:18
4        And with respect to the survey data, what I    02:19
5  understand is that you're attempting to use -- or that  02:19
6  your opinion is that survey data can be used to arrive  02:19
7  at some sort of a market price for what users would be  02:19
8  willing to sell their personal information for.    02:19
9        MS. WEAVER:  Objection.  Form.        02:19
10        THE WITNESS:  No.  I don't think that's a    02:19
11  proper characterization of the survey analysis that I  02:19
12  point to.                02:19
13        MS. TREBICKA:  Okay.            02:19
14        THE WITNESS:  So I'll leave it there.  You've  02:19
15  not described it correctly.            02:19
16  BY MS. TREBICKA:                02:19
17    Q.  Okay.  Can you describe it correctly for me?  02:19
18    A.  Well, back to the idea that the contract said  02:19
19  something would be -- let's say a contract says    02:19
20  something will be delivered.  And given a finding of    02:19
21  liability, if we say, well, less was delivered, or let's  02:20
22  just say something different was delivered.        02:20
23        So the question would be could we come up with  02:20
24  the difference between what was -- would have been    02:20
25  received and what was actually received?        02:20
                                Page 197

                                50 (Pages 194 - 197)

1	And the idea is this isn't about a new market.	02:20
2	This isn't about deciding a new market price.	02:20
3	We say, no, we already know what should have	02:20
4	happened.  We just need to say what wasn't given that	02:20
5	should have been.  And the idea is ask customers.	02:20
6	What's their value?  That is the question to ask.  Not	02:20
7	about a whole new supply demand model.  That's not the	02:20
8	question.  It's, no, we already know what was supposed	02:20
9	to be given.  We know what the price should have been.	02:20
10	Let's just say what's the value of how much consumers	02:20
11	got less than what the contract said they would have	02:20
12	got?	02:20
13	Q.  Do you propose to do your own conjoined	02:20
14	analysis for this case?	02:20
15	A.  I don't propose that in my report.  Not for	02:21
16	the purposes of this class certification stage.	02:21
17	Q.  But you do rely on two conjoint analysis that	02:21
18	were done -- or two analyses that were done -- I don't	02:21
19	know if they're both conjoint -- the Hann 2007 analysis	02:21
20	and the Krasnova 2009 analysis.	02:21
21	Is that right?	02:21
22	A.  Correct.  Yes.  There are -- well, I mention	02:21
23	them in my report.  Right.  The -- I talk about survey	02:21
24	analysis and I talk about the conjoint analysis and I	02:21
25	describe different things in my report.  Right.  Not	02:21

Page 198

1	just one but a couple of them I think you said.	02:21
2	Q.  Yeah.  Well, Hann 2007 papers, and the	02:21
3	Krasnova 2009 papers.	02:21
4	Does that sound right to you?	02:21
5	A.  Yeah.  It's in the pages right after what	02:21
6	we're talking about here.  Right.	02:21
7	Q.  Correct.	02:21
8	So why don't you think that it's necessary to	02:21
9	do a -- or perform a conjoint analysis that would fit	02:21
10	the facts of this case?	02:22
11	A.  Well, I think the ones I found actually do	02:22
12	give us valuable information about the topic at hand,	02:22
13	about both separately access, separately use; right?	02:22
14	It's addressing these questions.	02:22
15	So I think I found studies that have already	02:22
16	looked at questions that are relevant for the issue of	02:22
17	restitution here.	02:22
18	Q.  So did you look at the types of personal	02:22
19	information that the Hann study analyzes to confirm that	02:22
20	it is the same types of personal information that's at	02:22
21	issue in this case?	02:22
22	MS. WEAVER:  Objection.  Form.  Vague.	02:22
23	THE WITNESS:  I did look at the report.  I	02:22
24	read it.  I looked at what they were asking and how they	02:22
25	described when they said, "Here this type of thing that	02:22

Page 199

1	may or may not happen.  How do you feel about that?"	02:22
2	And I think it had to do with the issue of	02:22
3	access, unauthorized access; right?  And then the idea	02:22
4	of use; right?  Use that's not intended.  And the idea	02:22
5	of, well, what would be the value of having those issues	02:23
6	go away?	02:23
7	BY MS. TREBICKA:	02:23
8	Q.  Yeah.  But my answer is -- my question,	02:23
9	rather, is different, Dr. Mangum.	02:23
10	I'm asking whether you actually looked at the	02:23
11	personal information that the study, the Hann study in	02:23
12	particular, analyzes and whether you compared it to the	02:23
13	data that's at issue in this case to determine that it	02:23
14	is comparable?	02:23
15	A.  I did look at it.	02:23
16	MS. WEAVER:  Objection.  Vague.  Form.	02:23
17	BY MS. TREBICKA:	02:23
18	Q.  And you determined that it is comparable?	02:23
19	A.  I did look at that and I do think that it's --	02:23
20	it does relate to the same type -- it's personal	02:23
21	information.  The topics were access and usage.  I think	02:23
22	that is related for the purposes of this report, for	02:23
23	class certification, to demonstrate there are tools out	02:23
24	here and here's results of what happens when you use the	02:23
25	tools, that they were comparable.	02:24

Page 200

1	Q.  You mentioned the two categories in the Hann	02:24
2	report.	02:24
3	Let's turn to paragraph 81 and Table 4.	02:24
4	A.  Yes.	02:24
5	Q.  Is it paragraph -- well, let's look at	02:24
6	Table 4, which is flowing from paragraph 80 where you	02:24
7	say, at the very last sentence of paragraph 80, "Hann,	02:24
8	et al., provides this breakdown for the three privacy	02:24
9	dimensions we created below."	02:24
10	Do you see that?	02:24
11	A.  Yes.	02:24
12	Q.  And then the table has "Website Privacy	02:24
13	Policy," the large category, and then "Review for Error"	02:24
14	is one.  The next is "Restriction Against Improper	02:24
15	Access."  And the third is "Secondary Use Not Allowed."	02:24
16	Do you see that?	02:24
17	A.  Yes.	02:24
18	Q.  And you -- in your analysis, you total the	02:25
19	values from the last two privacy dimensions, as you call	02:25
20	them, restriction against improper access and secondary	02:25
21	use not allowed.	02:25
22	Is that right?	02:25
23	A.  Correct.	02:25
24	Q.  And why do you total those two numbers, the	02:25
25	restriction against improper access and secondary use	02:25

Page 201

51 (Pages 198 - 201)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 not allowed?                                      02:25
2    A.  I believe they both relate to the issues of    02:25
3 this case about the personal information.  It relates to  02:25
4 who had access based on not syncing; right?  And also   02:25
5 what is that used for; right?  As opposed to access is   02:25
6 also secondary use.  I'm looking at the Google's      02:25
7 third-party publishing sites.  That's where this was    02:25
8 used; right?  Used by Google, used in context with that.  02:25
9       So I thought those related to what's at issue   02:25
10 in this case.                                  02:25
11    Q.  So -- and then you come up with two values.   02:26
12 You say "Totaling these values" -- and I'm not reading   02:26
13 the whole sentence, but essentially it -- the --      02:26
14       MS. WEAVER:  I'm sorry, Viola.  Which      02:26
15 paragraph are you in?                           02:26
16       MS. TREBICKA:  81.                      02:26
17       MS. WEAVER:  Okay.  Thank you.            02:26
18 BY MS. TREBICKA:                             02:26
19    Q.  So it's the sentence that starts with:        02:26
20       "Totaling these values we can               02:26
21    conclude that, among U.S. subjects,            02:26
22    protection against improper access and          02:26
23    secondary use of personal information is        02:26
24    worth between $19.31 rents and $28.26."         02:26
25       Do you see that?                         02:26
                                              Page 202

1    A.  Yes.                                   02:26
2    Q.  And then you adjust from 2007 dollars to     02:26
3 2016 dollars for a range of $22.48 to $32.90.         02:26
4       Do you see that?                         02:26
5    A.  Yes.                                   02:26
6    Q.  So is your opinion that these values that I    02:26
7 just quoted would be reasonable values for personal   02:26
8 information for the jury to use?                    02:26
9    A.  Well, at this point it's my understanding this  02:27
10 will be before a judge.  Class certification is for a    02:27
11 judge.                                        02:27
12       MS. WEAVER:  I'm sorry.  I just need to get an  02:27
13 objection to form.  It misstates the record there.      02:27
14    Sorry.  Go ahead.                          02:27
15       THE WITNESS:  One moment here.            02:27
16       It's not my understanding that if this trial     02:27
17 gets to jury, that the jury will be thinking about       02:27
18 issues of class certification.                      02:27
19       It's my understanding that's not a jury issue;   02:27
20 that that's a judge issue.                         02:27
21       And I understand at this point in time we are   02:27
22 in the class certification.                         02:27
23       So some of the things that I was -- that means  02:27
24 that things that go in a class certification report      02:27
25 aren't necessarily the things that would go into a      02:27
                                              Page 203

1 merits report for a jury.  So it's not necessarily my   02:27
2 intention of what would go to a jury at this point.      02:27
3       I wanted to identify methods that are able to   02:27
4 address the question.  And I wanted to identify what the  02:27
5 quantification of restitution would be using those      02:27
6 methods.                                      02:28
7       But at this point, it was meant to be in this    02:28
8 report for the class certification issue for the judge    02:28
9 in this case.                                    02:28
10 BY MS. TREBICKA:                            02:28
11    Q.  You also understand that the Hann report     02:28
12 includes users both -- that are residents of the         02:28
13 United States and then separately users who are        02:28
14 residents of Singapore; correct?  Do you have that in   02:28
15 Table 4?                                       02:28
16    A.  I do.  I see that, yeah.                   02:28
17    Q.  Do you know that the Hann report relies only  02:28
18 on 84 respondents from the United States?            02:28
19    A.  That sounds about --                      02:28
20       MS. WEAVER:  Objection.  Assumes facts not in  02:28
21 evidence.                                      02:28
22       THE WITNESS:  I don't remember specifically.   02:28
23 It doesn't sound incorrect but...                    02:28
24 BY MS. TREBICKA:                            02:28
25    Q.  And do you think that a sample of 85         02:28
                                              Page 204

1 respondents is large enough to evaluate the feasibility  02:28
2 of this -- or the reliability of this number for a class  02:29
3 of the proportion of this case?                     02:29
4       MS. WEAVER:  Objection.  You said 85.  You     02:29
5 said 84 earlier.  Assumes facts not in evidence.        02:29
6       MS. TREBICKA:  Let me rephrase that.  You're   02:29
7 right, Lesley.  We should make sure the record is clear.  02:29
8 BY MS. TREBICKA:                             02:29
9    Q.  Do you believe that a sample of 84 respondents  02:29
10 is reliable enough to evaluate the visibility of this    02:29
11 number for a class of the proportion of this case?      02:29
12       MS. WEAVER:  Objection.  Form.             02:29
13       THE WITNESS:  When you say the proportion of   02:29
14 this case, are you talking about -- I don't know what    02:29
15 magnitude you're referring to.  You used the word       02:29
16 "proportion."                                   02:29
17 BY MS. TREBICKA:                            02:29
18    Q.  Do you have a rough understanding of how many  02:29
19 putative class members there are in this case?         02:29
20    A.  Not at my fingertips.                      02:30
21    Q.  Okay.  Do you understand that it's more than a  02:30
22 million?                                       02:30
23       MS. WEAVER:  Objection.  Form.             02:30
24    Go ahead.                                 02:30
25       THE WITNESS:  Yes.  I -- well, I don't have a   02:30
                                              Page 205

52 (Pages 202 - 205)

1 number. So when I say I don't have a number, when you   02:30
2 just say, you know, is that number bigger than that   02:30
3 number, it's somewhat of a non sequitur because I don't   02:30
4 know what the number is.   02:30
5      But I know generally about Google size and I   02:30
6 know about Chrome --   02:30
7 BY MS. TREBICKA:   02:30
8   Q. Okay.   02:30
9   A. -- and I know about the individuals in the   02:30
10 U.S. and about percentages that I state that, you know,   02:30
11 Chrome has as the browser percentage. So obviously it   02:30
12 seems to me it's more than a million, but I don't have   02:30
13 the number of class members. There's an issue of   02:30
14 syncing versus not syncing. I haven't followed it   02:30
15 through down to that.   02:30
16      But obviously Chrome serves, you know, dozens,   02:30
17 hundreds of millions, I believe, but generally I'd   02:30
18 have -- I don't have the specific number in mind.   02:30
19   Q. So you don't even have a sense of how large   02:30
20 the putative class is.   02:30
21      Is that right, Dr. Mangum?   02:30
22      MS. WEAVER: Objection. Form.   02:30
23      THE WITNESS: No. I think I just exactly gave   02:31
24 you a sense. I just now testified as that sense. I   02:31
25 gave market share. I gave population in the U.S. I   02:31

Page 206

1 think I just gave you that thing you just asked.   02:31
2      So you don't know that thing that I just gave   02:31
3 you.   02:31
4 BY MS. TREBICKA:   02:31
5   Q. So you do have a sense for how large this   02:31
6 putative class is?   02:31
7   A. So now I'm confused --   02:31
8      MS. WEAVER: Objection. Wait. Objection.   02:31
9 Form.   02:31
10      THE WITNESS: So you want me to agree I don't   02:31
11 have a sense, and then you're saying, "Oh, so you do."   02:31
12 BY MS. TREBICKA:   02:31
13   Q. This is going to play so nicely to the jury.   02:31
14      So let me ask you then my question, which is:   02:31
15 Given the sense that you have of the size of the   02:31
16 putative class, do you believe that a sample of 84   02:31
17 respondents is large enough to reliably evaluate the   02:31
18 feasibility of the Hann methodology or numbers for a   02:32
19 class of the proportion of this class, for this putative   02:32
20 class?   02:32
21   A. I believe I --   02:32
22      MS. WEAVER: Objection. Form.   02:32
23      Hey, Dr. Mangum.   02:32
24      Objection. Form. Vague. Calls for   02:32
25 speculation. Outside the scope.   02:32

Page 207

1      THE WITNESS: I do. I'm relying on published   02:32
2 literature; right? And also my experience in doing   02:32
3 statistics and sample sizes.   02:32
4      And I also am not aware of a -- the number of   02:32
5 class members being imposed on published literature for   02:32
6 the results to be deemed reliable or not. Rather, it's   02:32
7 magnitude of members, magnitude of dollars. That isn't   02:32
8 part of the analysis of the dispersion and the estimates   02:32
9 and the statistical significance.   02:32
10 BY MS. TREBICKA:   02:33
11   Q. Okay. Let's talk about the Krasnova study.   02:33
12      Do you recall that study?   02:33
13      You relied on it in your report.   02:33
14   A. Yes.   02:33
15   Q. And the Krasnova study was done in 2009.   02:33
16      Is that right?   02:33
17   A. I think so. Although I'm double-checking as I   02:33
18 scroll through here.   02:33
19   Q. Sure.   02:33
20      MS. WEAVER: I believe it's note 114.   02:33
21 BY MS. TREBICKA:   02:33
22   Q. This is paragraph 82 of your report.   02:33
23   A. Yes, I see. Krasnova, et al., yep.   02:33
24   Q. So how do you plan to use the values proposed   02:33
25 in this paper?   02:34

Page 208

1   A. Well, I use them the way I have. So I've   02:34
2 explained my opinion and I've laid it out exactly as I   02:34
3 would expect to communicate it to the judge, that,   02:34
4 again, another example of using this methodology, which   02:34
5 I believe can be used to assess value, can be and has   02:34
6 been used to assess something reasonably similar,   02:34
7 comparable, in the sense of personal information and the   02:34
8 value that we can get from analyses like this that deals   02:34
9 with the value of that personal information and where it   02:34
10 goes, how it's shared, et cetera.   02:34
11   Q. Are you aware that the respondents in the   02:34
12 Krasnova study were based in Europe?   02:34
13   A. Yes, I am.   02:34
14   Q. And do you believe that there is some -- some   02:34
15 sort of assessment that needs to be done to confirm that   02:34
16 the privacy valuations of personal information -- or the   02:34
17 valuation of personal information from respondents in   02:35
18 Europe is the same as respondents -- or the same as   02:35
19 putative class members in the U.S. from a different time   02:35
20 period?   02:35
21      MS. WEAVER: Objection. Form. Vague. Calls   02:35
22 for speculation.   02:35
23      THE WITNESS: I think the value of the study,   02:35
24 even though it relates to a different region, is   02:35
25 demonstration of a methodology, demonstration that a   02:35

Page 209

53 (Pages 206 - 209)

1 methodology can focus on a topic relevant for this case,   02:35
2 and comes up with numbers on a per-year basis which are   02:35
3 relatively close.   02:35
4 I think if I was, you know, pressed to say,   02:35
5 well, if you had to pick one, the commonality of   02:35
6 geography, one did relate to the U.S. and I used the   02:35
7 U.S. component of that study.  But to say that, well, I   02:35
8 should ignore or somehow disregard what I saw in another   02:35
9 similar study, I think that would be incorrect as well.   02:35
10 That's why I included this as part of my opinion in my   02:35
11 report.   02:36
12 BY MS. TREBICKA:   02:36
13   Q.  If you were to conduct a study with users in   02:36
14 the U.S., do you have any -- what is your -- do you   02:36
15 believe that the values -- the dollar values that   02:36
16 would -- that you would find would be comparable to the   02:36
17 dollar values in the Hann and Krasnova studies?   02:36
18   MS. WEAVER:  Objection.  Form.  Calls for   02:36
19 speculation.  Beyond the scope.   02:36
20   THE WITNESS:  Well, I've got two things I'm   02:36
21 looking at that already come up with somewhat comparable   02:36
22 numbers.   02:36
23   We have the Hann study, which gives U.S.   02:36
24 specific numbers.  We come up with, you know, 22.50   02:36
25 basically to $33.  A bit more than the 18.75 to $23,   02:36

Page 210

1 right, in Krasnova, slightly different periods of time.   02:36
2   So these are not super close as if they're   02:36
3 only a nickel apart, but in the general area, they're   02:36
4 fairly close.   02:36
5   I think if another study was done for the   02:36
6 U.S., I think it would be in this range, but I don't   02:37
7 know until it's -- until it would be done.  I would look   02:37
8 at the results.  But at least I've got these numbers and   02:37
9 it wasn't that one was 10 times larger or one was only   02:37
10 five percent of the other.   02:37
11 BY MS. TREBICKA:   02:37
12   Q.  Have you considered other studies that get at   02:37
13 the same types of valuations of personal information?   02:37
14   MS. WEAVER:  Objection.  Vague.  Form.   02:37
15   THE WITNESS:  I do talk.  I -- when you say   02:37
16 studies, I don't know if you mean very broadly or if you   02:37
17 mean, no, you want to narrow it to surveys and conjoint.   02:37
18 BY MS. TREBICKA:   02:37
19   Q.  Let's start narrow first.  Let's narrow it to   02:37
20 surveys and conjoints.   02:37
21   Are you -- or have you considered in your --   02:38
22 in forming your opinion, other studies that get at the   02:38
23 same types of valuations limited here to survey --   02:38
24 surveys and conjoint analyses?   02:38
25   A.  Yes.  We looked -- we found the -- we looked   02:38

Page 211

1 for these type of studies.  What I talked about here is   02:38
2 the results of our search, of our research.   02:38
3   Q.  Did you look at other types of survey or   02:38
4 conjoint analyses that you decided not to include in   02:38
5 your research?   02:38
6   A.  No, not that I recall.   02:38
7   Q.  I'm sorry.   02:38
8   Did you look at other types of surveys or   02:38
9 conjoint analysis that you decided not to include in   02:38
10 your report?   02:38
11   A.  No.  Not that I remember.  That sounds like   02:38
12 the same question, but the answer is the same.  Not that   02:38
13 I recall.   02:38
14   MS. WEAVER:  Viola, do you think we can take a   02:38
15 break?  We've been going about an hour and 28 minutes.   02:38
16   MS. TREBICKA:  That's -- that's okay.   02:38
17   THE VIDEOGRAPHER:  Okay.  Let's go off the   02:38
18 record at 2:39 p.m.   02:39
19   (Break taken in proceedings.)   02:39
20   THE VIDEOGRAPHER:  We are back on the record.   02:57
21 The time is 2:57 p.m.   02:57
22 BY MS. TREBICKA:   02:57
23   Q.  Dr. Mangum, before we took a break, we were   02:57
24 talking about your discussion of peer-reviewed research   02:57
25 on the value of data privacy, section V.A.1 of your   02:57

Page 212

1 report on page 26.   02:57
2   Do you recall that?   02:57
3   A.  I do.   02:57
4   Q.  Now, moving on to section V.A.2 of your report   02:57
5 on page 30, and the title of that section is "Consumer   02:57
6 Payments to Protect Personal Information."   02:57
7   Do you see that?   02:57
8   A.  I do.   02:57
9   Q.  And we briefly spoke about it at the beginning   02:57
10 of our discussion of your restitution opinion as well.   02:57
11   This section concerns payments that users make   02:57
12 to virtual private networks.   02:58
13   Is that right?   02:58
14   A.  Yes.   02:58
15   Q.  And if you -- if I can direct your attention   02:58
16 to paragraph 84, on page 31, so the third full sentence:   02:58
17   "VPNs" open parentheses "(Virtual   02:58
18 Private Networks)" close parentheses   02:58
19 "provide a real market example of internet   02:58
20 users' willingness to pay for online   02:58
21 privacy."   02:58
22   Do you see that?   02:58
23   A.  Yes.   02:58
24   Q.  What do you mean here by "online privacy"?   02:58
25   A.  The idea is it's a mechanism such that when   02:58

Page 213

54 (Pages 210 - 213)

1 they're connecting to the internet by using a VPN,     02:58
2 right, generally, right, that VPN is -- it provides a     02:58
3 mechanism such that the same information is not gathered 02:58
4 and shared as it would be without a VPN is the concept.     02:58
5 At least that's what they report to try to help with.     02:59
6     Q.  And how does the online privacy that, in your     02:59
7 understanding, is provided by the VPN compare to the     02:59
8 personal information in this case that you are     02:59
9 attempting to value?                    02:59
10     MS. WEAVER:  Objection.  Misstates testimony.  02:59
11 He didn't have a technical opinion about what the VPN     02:59
12 can do.                    02:59
13     THE WITNESS:  This section of my report     02:59
14 relates to one -- at least a method that falls under the 02:59
15 category of indirect evidence where we look at, well, if 02:59
16 there's something that people don't want to happen,     02:59
17 lets -- you know, can we look at what people will spend 02:59
18 in attempts to keep it from happening?     02:59
19     So it's somewhat of a -- it's a type of a     02:59
20 revealed type of measure.  So in other words, the     03:00
21 concept is, well, if people only valued what they get     03:00
22 from a VPN by a dollar, they wouldn't pay $5 for it.  So 03:00
23 they're looking at the value of being at least what they 03:00
24 would pay.                    03:00
25     So it's not a measure.  It's not -- it's a     03:00

Page 214

1 direct measure of VPN services, but it's an indirect     03:00
2 measure of the value of privacy protection.     03:00
3     And so I wanted to bring that up because it is 03:00
4 a different methodology.  It's not a survey methodology. 03:00
5 It uses actual market outcomes, albeit for a service     03:00
6 that's not directly applicable to what we're going to     03:00
7 ask about, that is, this personal information.     03:00
8 BY MS. TREBICKA:                    03:00
9     Q.  When you say directly -- "not directly     03:00
10 applicable to what we're going to ask about," what do     03:00
11 you mean by that?  You plan to ask about it when?     03:00
12     MS. WEAVER:  Objection.  Form.     03:00
13     THE WITNESS:  The query of this case is about 03:00
14 sync and the not syncing, and the information that     03:00
15 allegedly was collected and shared that shouldn't have     03:01
16 been.  That's what I mean.  That's this query.  That's     03:01
17 the topic of this case.                    03:01
18     So what looking at VPN markets gives is not a 03:01
19 market outcome of this personal information, but it's a     03:01
20 market outcome about steps people take.  One of the     03:01
21 things people look -- one of the big things people look 03:01
22 to VPNs, at least these consumer kind of retail     03:01
23 available VPNs, is this personal information.     03:01
24     So it's not direct.  It's not a perfect fit.  03:01
25 I believe it falls short of the value of the     03:01

Page 215

1 information.  But we're saying at least here's what     03:01
2 people pay to try to get at protection of this other     03:01
3 thing that we're really interested in.                    03:01
4 BY MS. TREBICKA:                    03:01
5     Q.  So is your opinion that the value that people 03:01
6 pay for VPN is less than the query of this case, which     03:01
7 is the information that Google improperly obtained on     03:02
8 the basis of plaintiffs' allegations here?     03:02
9     MS. WEAVER:  Objection.  Form.  Misstates the 03:02
10 record.                    03:02
11     THE WITNESS:  The values I give regarding VPN 03:02
12 services, right, reflect those services that are -- I     03:02
13 don't believe they reflect the value of what those     03:02
14 services are protecting.  I believe that the idea that     03:02
15 somebody would say, well, I have something to protect,     03:02
16 I'm willing to go spend money to protect it; right?     03:02
17 That's like a second best idea.  I think people would     03:02
18 rather have to not go buy a service to protect it but as 03:02
19 a response, they could buy a VPN.     03:02
20     I think it would be improper to assume that     03:02
21 they've somehow found a service that what they pay for     03:02
22 the service is the exact value of what they're     03:02
23 protecting because there would be no gain.  There would 03:02
24 be no advantage; right?  To spend a dollar to save a     03:02
25 dollar, you're no better off; right?     03:03

Page 216

1     Although that's feasible to think that that's     03:03
2 what people are doing I think is not a good conclusion     03:03
3 economically.                    03:03
4     I can't quantify how much more the value of     03:03
5 personal information is, but at least this gives a     03:03
6 measure of what people spend towards protecting it,     03:03
7 protecting this other thing of value to them.     03:03
8 BY MS. TREBICKA:                    03:03
9     Q.  So your opinion is that people -- that the     03:03
10 value of personal information in this case is more than 03:03
11 what people are spending on VPN services?     03:03
12     A.  Yes.  I believe it is larger than the money     03:03
13 people spend in reaction to try to take -- to try to     03:03
14 keep their information private.     03:03
15     Q.  How much larger is it, in your opinion?     03:03
16     A.  I don't have a quantification.  That's an     03:03
17 issue with this indirect approach.  You use a market --     03:03
18 market evidence for something that's different because     03:03
19 you don't have a precise calculation -- if you have --     03:03
20 if you could look directly, you would.  And I've talked 03:03
21 about other methods that try to do that through survey     03:04
22 evidence.                    03:04
23     But this is, you know, a different market.     03:04
24 It's a market for these VPN services.     03:04
25     Q.  So in your opinion, what protections does a 03:04

Page 217

55 (Pages 214 - 217)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 VPN service provide?                                03:04
2     A.  It's explained in my report.  One thing they   03:04
3 offer is the idea of an intermediary, of an intermediary   03:04
4 step in the communication, such that when you go through   03:04
5 a VPN, right, you're not open to what you would get with   03:04
6 direct communication let's say from your house to       03:04
7 Chrome, for example.                                03:04
8     Q.  Anything else that they offer --           03:04
9         MS. WEAVER:  Objection.  Form.            03:04
10 BY MS. TREBICKA:                                   03:04
11    Q.  -- other than the intermediary?             03:04
12        MS. WEAVER:  Objection.  Form.  Vague.  Calls   03:04
13 for technical expertise.                            03:04
14        THE WITNESS:  I don't have an understanding   03:04
15 technically of all that happened so I'm looking kind of   03:04
16 at outcomes.  And so there's this issue of being able to   03:04
17 identify communications that are not at, you know, your   03:04
18 location directly accessible to where you're going, so    03:04
19 you end up -- they oftentimes give alternative locations   03:05
20 where you might confuse what location you want the       03:05
21 connection to be in.                                03:05
22 BY MS. TREBICKA:                                   03:05
23    Q.  Is that the function of the VPN that makes it   03:05
24 comparable to the privacy at issue in this case?      03:05
25        MS. WEAVER:  Objection.  Vague.  Form.  Calls   03:05

1 for technical -- to the extent that it calls for a      03:05
2 technical opinion.                                  03:05
3        THE WITNESS:  Well, I want to be -- I'd like   03:05
4 to be careful about the word you just used,          03:05
5 "comparable."                                       03:05
6        I think I already talked about that this is    03:05
7 different.  It's not the same.  This is less than.  I'm   03:05
8 purposefully using something that's less than the value   03:05
9 because I at least have a direct market measure.  So I   03:05
10 can look at prices in a marketplace, even though I know   03:05
11 I'm not saying this is essentially the same as personal   03:05
12 information value.  It's not.  It's what people would    03:05
13 spend to protect something else of value, personal      03:05
14 information, for example.                            03:05
15 BY MS. TREBICKA:                                   03:05
16    Q.  So do you understand that VPNs provide       03:05
17 functionalities other than protecting the personal      03:06
18 information, for example?                            03:06
19        MS. WEAVER:  Objection.  Form.  To the extent   03:06
20 it calls for technical expertise.                    03:06
21        THE WITNESS:  I won't be able to say         03:06
22 technically.  There might be some technical things that   03:06
23 are beyond me.                                      03:06
24        But I think a main thing they offer is this   03:06
25 break, if you will, this third location connection when   03:06

1 someone is on the internet that breaks the path that    03:06
2 could exist to keep things private, to protect          03:06
3 information.                                         03:06
4        It gives the option of individuals if they     03:06
5 want to connect through a certain location such that     03:06
6 they're able to access certain, you know, websites,     03:06
7 right, in a way that's different from if they didn't use   03:06
8 the VPN.                                            03:06
9 BY MS. TREBICKA:                                   03:06
10    Q.  Is your understanding that this breaking of   03:06
11 the path that you're testifying about is useful only to   03:06
12 protect privacy?                                    03:06
13        MS. WEAVER:  Objection.  Vague.  Far beyond   03:07
14 the scope.  This is calling for technical expertise and   03:07
15 speculation.                                        03:07
16        What people will pay for privacy is different   03:07
17 than a technical expose of these VPNs, Viola.  You      03:07
18 should get off this.                                03:07
19        THE WITNESS:  It's not a breaking of the link.   03:07
20 I just mean -- I think I mentioned an intermediate or   03:07
21 intermediary.  So it's another connection point in the   03:07
22 middle that then can be used to interfere with what     03:07
23 transfers -- is transferred; right?  What is          03:07
24 communicated across one point to another.            03:07
25        I don't know all the technical things that    03:07

1 might be of value.  There may be other things that are   03:07
2 beyond me.  I don't know that.                       03:07
3        But I know this idea of offering a VPN, you    03:07
4 can choose a location where you have this intermediary   03:07
5 spot.  That may have some value for someone to identify   03:07
6 where they're looking, where they're connecting from.   03:07
7        And to clarify it, the things I've identified   03:07
8 here are these kind of consumer-facing VPNs because VPN   03:07
9 is also a generic term that's been used for decades to   03:08
10 mean other things.                                  03:08
11        The ones I've identified, these entities are   03:08
12 the consumer-facing services that are offered up and    03:08
13 prominently identify, well, it's your privacy.  You can   03:08
14 get in control of what's connecting between you and    03:08
15 where you want to go with this intermediary.         03:08
16 BY MS. TREBICKA:                                   03:08
17    Q.  Have you done any study or analysis to       03:08
18 understand which kinds of users use VPNs in the        03:08
19 United States?                                      03:08
20        MS. WEAVER:  Objection.  Vague.             03:08
21        THE WITNESS:  No.  I mean, I've talked about   03:08
22 VPNs.  I've explained with some cites to some documents   03:08
23 about what they offer, but my analysis is, you know,    03:08
24 what I've reported in my report.                     03:08
25 ///

56 (Pages 218 - 221)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 222

1 BY MS. TREBICKA:                           03:08
2    Q.  Let's assume that users of VPN use it for   03:09
3 reasons that are unrelated to privacy.        03:09
4       How would that affect your use of the VPN   03:09
5 market price for purposes of arriving at restitutionary   03:09
6 value in this case?                         03:09
7       MS. WEAVER:  Objection.  Form.         03:09
8       THE WITNESS:  Such as what?  What are these   03:09
9 other things?                              03:09
10 BY MS. TREBICKA:                          03:09
11   Q.  Let's assume, for example, that a user in   03:09
12 China is using a VPN service to access news that the   03:09
13 Chinese regime does not want the users in China to be   03:09
14 able to access.                           03:09
15      MS. WEAVER:  Objection.  Form.         03:09
16      THE WITNESS:  Well, I'm not looking at Chinese   03:09
17 users of VPNs.  I'm looking at U.S. users.    03:09
18 BY MS. TREBICKA:                          03:10
19   Q.  So let's assume then -- so is your       03:10
20 understanding that that VPN -- that user would appear as   03:10
21 a user in China or a user in the U.S.?        03:10
22      Do you have an understanding of that?    03:10
23      MS. WEAVER:  Objection.  Form.         03:10
24      THE WITNESS:  Your example was a Chinese user   03:10
25 under a regime that doesn't want certain news used, that   03:10

Page 223

1 would mean you're in China and therefore you want a VPN   03:10
2 to get you out of China.                    03:10
3       I'm not looking at people in China.  I'm   03:10
4 looking at the U.S.                        03:10
5       So I don't think your example applies to U.S.   03:10
6 putative class members.                     03:10
7 BY MS. TREBICKA:                          03:10
8    Q.  So in your understanding or opinion, there are   03:10
9 no non-privacy reasons that a user in the U.S. would   03:10
10 want to use the VPN service?                03:10
11   A.  You know --                         03:10
12      MS. WEAVER:  Objection.  Misstates the record.  03:10
13 Form.                                    03:10
14      THE WITNESS:  I've cited what VPNs are about,   03:10
15 how they describe themselves.  I think privacy is a big   03:10
16 part.  I just -- you want me to assume there was one and   03:11
17 I'm -- you might think it's non-privacy when you explain   03:11
18 it to me.  I can say I think you're wrong.  That's why   03:11
19 I want -- as opposed to a hypothetical that maybe isn't   03:11
20 a real one, I'd like information because I might say,   03:11
21 you know, you're getting that wrong.          03:11
22 BY MS. TREBICKA:                          03:11
23   Q.  So in your understanding then, there are no   03:11
24 non-privacy reasons that a user in the U.S. would want   03:11
25 to use VPN service?                        03:11

Page 224

1       MS. WEAVER:  No.  Objection.          03:11
2       Wait, wait.                          03:11
3       Asked and answered.  Form.            03:11
4       We're back to the thing where she repeats the   03:11
5 question, so you may answer.               03:11
6       THE WITNESS:  I've talked about and given   03:11
7 explanation as to why privacy is one of -- is a main   03:11
8 feature of value.  What I believe is that although you   03:11
9 wanted me to hypothesize non-privacy, you can't come up   03:11
10 with one.                                03:11
11      So what I can say is you've not been able to   03:11
12 come up with one that I would say that's not privacy.   03:11
13 You know, I have identified privacy.  And the idea of is   03:12
14 someone at the other end going to know where I'm at?   03:12
15 For example, there's one element of personal           03:12
16 information.  Or can I break that?  That's a privacy   03:12
17 issue; right?                            03:12
18      But -- so I'm not sure what you're referring   03:12
19 to as far as what would fall under non-privacy.   03:12
20 BY MS. TREBICKA:                          03:12
21   Q.  Let's assume --                     03:12
22   A.  There may be technical things.  I'm sorry.  I   03:12
23 said that already.  That I don't know.  I don't know all   03:12
24 the --                                   03:12
25   Q.  We understand the technical --         03:12

Page 225

1    A.  Maybe efficiency or speed.  I'm making it up   03:12
2 because I don't have an opinion on technical reasons.   03:12
3    Q.  But have you looked at what other purposes   03:12
4 there could exist for U.S. users to use VPN services?   03:12
5       MS. WEAVER:  Objection.  Form.  Asked and   03:12
6 answered.                                03:12
7       THE WITNESS:  I have.  And I discussed them.   03:12
8 And, for example, wanting to be able to connect       03:12
9 somewhere that if I couldn't hide where I'm at, I   03:12
10 couldn't connect, being able to do that, that's a   03:12
11 privacy issue.  That's another issue of saying I don't   03:12
12 want that information being shared; right?  I'm aware of   03:12
13 those things.                            03:12
14      That's partially why people like it, whether   03:12
15 it's -- you know, what will be sent out, right, to be   03:13
16 made available, what might be shared, all that fits   03:13
17 under what I think the personal information slash   03:13
18 privacy question.                        03:13
19 BY MS. TREBICKA:                          03:13
20   Q.  So let's assume there's a U.S. user who is   03:13
21 traveling abroad, and wants to use his or her Netflix   03:13
22 subscription and would have to use a VPN to connect to   03:13
23 the -- to show a U.S. IP address to access his or her   03:13
24 Netflix account.                         03:13
25      Would you consider that a privacy use of a   03:13

57 (Pages 222 - 225)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 VPN?                                            03:13
2        MS. WEAVER: I'll object. Assumes facts not   03:13
3 in evidence.  And I'm not even sure you can use Netflix   03:13
4 abroad, having tried.                            03:13
5        THE WITNESS:  Well, for one thing, I'm not   03:13
6 looking to actions that occur outside the U.S. in this   03:13
7 case.  So your example wouldn't fit into this.   03:13
8        But also what you've just described is   03:13
9 somebody wants it to be private, that they're in Europe.  03:13
10       So what you just described is a privacy issue.   03:13
11 They don't want Netflix to know they're in Europe.  It's  03:13
12 definitely a privacy thing.  They want that to be none   03:14
13 of the business of the person who's calling, and maybe   03:14
14 redirect it.  They want the chance to not give away   03:14
15 where they're at and use some other mechanism.   03:14
16 BY MS. TREBICKA:                                 03:14
17    Q.  So I've reviewed your VPN prices in this   03:14
18 section V.A.2, "Consumer Payments," to protect personal   03:14
19 information.  And it appears that there is significant   03:14
20 variability in the VPN prices.                   03:14
21       Have you analyzed the reason for the   03:14
22 differences between these VPN service prices?    03:14
23    A.  Well, one big reason that that becomes pretty  03:14
24 clear, I think it's clear in my report is if you're   03:14
25 wanting to commit for a long period of time, then the   03:14

Page 226

1 prices per some time period, you know, drop for some --   03:15
2 per month, per year, something like that.        03:15
3       I think the reason for that is that you're   03:15
4 prepaying; right?  Someone is going to get a payment up   03:15
5 front for you.  I'm aware market shares move quite a bit   03:15
6 and so when people prepay if they change something, ah,   03:15
7 the money is gone.                               03:15
8       So I think that's why if someone can get you   03:15
9 to pay for something that you're maybe not using but --   03:15
10 that seems to be one of the main reasons.        03:15
11       Competition has occurred, right, as more   03:15
12 technology becomes available.                    03:15
13       So you're right there are prices that are --   03:15
14 if they're isolated for a month, for maybe a one-time   03:15
15 user or a one-time trier, right, prices are different.   03:15
16 But I do see that dropoff quite a bit over longer   03:15
17 periods of time.                                 03:15
18    Q.  Anything else?                           03:15
19    A.  That's what comes to mind right now that I   03:15
20 recall from looking at these prices and seeing the   03:15
21 spread that's apparent when you look at the numbers I   03:15
22 give in my report.                               03:15
23    Q.  Given the difference between these prices,   03:16
24 what -- how would you propose that these prices be used   03:16
25 to help arrive at a valuation of personal information in   03:16

Page 227

1 this case?                                       03:16
2    A.  Well, in this case, primarily I'm identifying   03:16
3 a methodology.  I'm identifying a methodology that would   03:16
4 apply to all the class members.  And whether it be one   03:16
5 of the higher prices or whether it be one of the lower   03:16
6 prices it's set on, right, it still applies to all class   03:16
7 members.                                         03:16
8       So a big part of my goal was to make sure I   03:16
9 could identify another way -- I've identified separate,   03:16
10 but here's an indirect way of what people are willing to   03:16
11 pay related to privacy and personal information.  And I   03:16
12 think I have shown methodology and I have shown values,   03:16
13 and that it would be something that would be applicable   03:16
14 across all class members.                        03:16
15       So I think that's the prominent part that I   03:16
16 pull from this.  It is the wide range of numbers.  If   03:17
17 the Court might decide, well, because there is a wide   03:17
18 range, I'm going to pick one of them, maybe at the lower   03:17
19 end.  That could be the purview of the Court.    03:17
20       But they couldn't do that unless I presented   03:17
21 this information first and I gathered this market   03:17
22 evidence for the Court.                          03:17
23    Q.  Among these different numbers, do you propose   03:17
24 one in particular to be used to help arrive at a   03:17
25 valuation of personal information in this case?   03:17

Page 228

1        MS. WEAVER:  Objection.  Vague.  Form.     03:17
2        THE WITNESS:  Are you asking if in my report   03:17
3 I somehow disregard some and I settle on one, or do you   03:17
4 mean above and beyond my report, am I now ready to   03:17
5 propose one?                                     03:17
6        I don't know what you mean by propose unless   03:17
7 you mean is it in your report?  And then I can look, and   03:17
8 it's not in my report.                           03:17
9 BY MS. TREBICKA:                                 03:17
10    Q.  So it's not in your report.              03:17
11       Then sitting here today, among these different  03:17
12 numbers, are you ready and willing to propose one number  03:17
13 in particular to be used to help arrive at a valuation   03:18
14 of personal information in this case?            03:18
15       MS. WEAVER:  Objection.  Vague.  Form.     03:18
16       THE WITNESS:  I have not formed any new or   03:18
17 modified opinions since I issued my report.      03:18
18       And also at this stage, with discovery       03:18
19 ongoing, and at the class certification stage, I   03:18
20 wouldn't want to narrow this.  I think the Court   03:18
21 benefits from seeing all of this information without me   03:18
22 somehow saying, well, disregard some portion and let me   03:18
23 pick one.                                        03:18
24 BY MS. TREBICKA:                                 03:18
25    Q.  Comparing the -- your opinion related to   03:18

Page 229

58 (Pages 226 - 229)

Page 230

1 consumer payments to protect personal information,    03:18
2 Section V.A.2, and your opinion related to peer-reviewed   03:18
3 research on the value of data privacy, Section V.A.1,   03:18
4 which one do you believe is more reliable for the Court   03:18
5 to use to arrive at a valuation of the personal   03:19
6 information?   03:19
7     MS. WEAVER: Objection. Form.   03:19
8     THE WITNESS: I think they are both reliable   03:19
9 methods. But as I've talked about before, they address   03:19
10 different questions. I think that the -- the survey   03:19
11 data-based information does ask directly and it does   03:19
12 address directly the value of the information; right?   03:19
13     The VPN information isn't direct in that   03:19
14 sense. It's using an indirect method to try to glean   03:19
15 from at least what people pay to protect this other   03:19
16 thing of value, right, privacy information, personal   03:19
17 information. So I would look at that as a secondary   03:19
18 source.   03:19
19     But there's competing elements. The VPN is   03:19
20 actual market evidence, whereas the survey evidence,   03:19
21 right, its nature. It's survey -- it's survey   03:19
22 individuals as opposed to serving a market.   03:19
23     So there's pluses and minuses on both ends.   03:19
24 That's why I included both of them.   03:19
25 ///

Page 231

1 BY MS. TREBICKA:   03:20
2     Q. Let's turn to Section V.B of your report,   03:20
3 "The Economic Value of Personal Information" that starts   03:20
4 on page 33.   03:20
5     A. Yes.   03:20
6     Q. So you say here on paragraph 89, the last   03:20
7 sentence:   03:20
8     "In this section I discuss the   03:20
9 economic value of personal information as   03:20
10 depicted by actual marketplace examples."   03:20
11     Do you see that?   03:20
12     A. Yes.   03:20
13     Q. So marketplace examples is also how you   03:20
14 describe the VPN services, you know, services of what   03:20
15 users are actually able to pay -- or are actually   03:20
16 willing to pay for their -- protection of their personal   03:21
17 information. And I know I'm paraphrasing.   03:21
18     But I'm trying to understand what the   03:21
19 differences in your mind between your opinion V.A.2 and   03:21
20 your opinion V.B, in particular as to which one is more   03:21
21 applicable in the context of this case.   03:21
22     A. Understood.   03:21
23     MS. WEAVER: Objection. Form. Vague.   03:21
24     THE WITNESS: V.A.2, the section relating   03:21
25 to -- entitled "Consumer Payments to Protect Personal   03:21

Page 232

1 Information," the information there that I've identified   03:21
2 is market data in the sense of I didn't call VPN   03:21
3 companies and ask them, "What's the value? You know,   03:21
4 what do you think?" Or I didn't take a survey of   03:21
5 individuals that these are actual prices out there in   03:21
6 the marketplace that are trading.   03:21
7     That is also true about what I discuss in   03:22
8 section Roman V.B.   03:22
9     So they're both marketplace -- because these   03:22
10 are what's being paid; right? They differ -- they're   03:22
11 both applicable. I think they're both reliable for what   03:22
12 they address. But they're asking different things.   03:22
13     V.A.2 relates to market observations of   03:22
14 efforts to protect another thing; right? Whereas V.B   03:22
15 is market information about the thing. The thing being   03:22
16 personal information, et cetera, that we described.   03:22
17     So they're both market, but they're   03:22
18 different -- different markets, if you will.   03:22
19 BY MS. TREBICKA:   03:23
20     Q. Let's take a look at paragraph 90. The first   03:23
21 sentence says:   03:23
22     "The value of personal information   03:23
23 and online behavior is apparent in the way   03:23
24 that research companies pay users for the   03:23
25 collection of their online data."   03:23

Page 233

1     Do you see that?   03:23
2     A. Yes.   03:23
3     Q. And then further, the second sentence says:   03:23
4     "The willingness of these companies   03:23
5 to provide direct payment to users   03:23
6 demonstrates the monetary value companies   03:23
7 place on online behavior and personal   03:23
8 data."   03:23
9     And then that last sentence says:   03:23
10     "There are many examples of research   03:23
11 companies that pay users to download   03:23
12 software that collects data on the users'   03:23
13 ongoing online activity."   03:23
14     So in each of these sentences, you use three   03:23
15 different terms. The first sentence uses the term   03:23
16 "online data." The second sentence uses the terms   03:23
17 "online behavior and personal data." And the third   03:23
18 sentence uses the term "ongoing online activity."   03:24
19     Do you mean the same thing by these three   03:24
20 different terms?   03:24
21     MS. WEAVER: Objection. Form.   03:24
22     THE WITNESS: Yes. I mean there's different   03:24
23 context, but they relate to the same thing.   03:24
24     Ongoing activity just talks about the idea   03:24
25 that you begin it and something happens after that for   03:24

59 (Pages 230 - 233)

1 ongoing; right?                              03:24
2       I think online data, I mention at the end of  03:24
3 the first sentence. Also online behavior is mentioned  03:24
4 at the beginning of the first sentence; right? They're  03:24
5 related. So behavior, the only way that could be  03:24
6 captured is by data on that behavior so that's what's  03:24
7 been there.                                  03:24
8       But I'm not meaning to distinguish three, you  03:24
9 know, distinct things or three different things.  03:24
10 BY MS. TREBICKA:                            03:24
11      Q.  And what you are talking about here, is  03:24
12 online data or online behavior or ongoing online  03:24
13 activity, how does that relate to the personal  03:25
14 information at issue in this case that you are  03:25
15 attempting to value?                         03:25
16      A.  Well, the section was included because it is  03:25
17 one in which I could look at actual market transactions  03:25
18 where firms are paying for collecting personal  03:25
19 information. So -- and not in the way that's alleged  03:25
20 by Google with a contract, with alleged breach, but, you  03:25
21 know, up front, "Hey, we would like your permission up  03:25
22 front to get something. We'll pay you. Consumers agree  03:25
23 to give that up."                            03:25
24      So I was -- I thought it was helpful to have  03:25
25 examples in this of actual market measures directly of  03:25
                                          Page 234

1 a subset.                                    03:26
2      Q.  Which is a --                       03:27
3         MS. WEAVER: I'm sorry. I was on mute there.  03:27
4 Objection. Vague.                           03:27
5      I apologize. I want to object to the last  03:27
6 question.                                   03:27
7         Objection. Vague. Form.              03:27
8         Go ahead.                          03:27
9 BY MS. TREBICKA:                            03:27
10      Q.  If you could just explain which one is the  03:27
11 subset of which, that would be helpful.       03:27
12      A.  Yeah --                          03:27
13         MS. WEAVER: Objection. Form.          03:27
14         THE WITNESS: They're not co-existent; right?  03:27
15 There's overlap. And I believe maybe subset is not the  03:27
16 exact way to phrase it. But I think that -- depending  03:27
17 on the program I mentioned at the end under section V.B,  03:27
18 I believe not as much is being agreed to be shared in  03:27
19 these programs as what is available from at least what  03:27
20 is captured, allegedly wrongfully captured by Chrome.  03:27
21 BY MS. TREBICKA:                            03:27
22      Q.  So I'd like to go through each of these  03:27
23 programs -- you're calling them programs.     03:27
24      So, for example, SavvyConnect, Ipsos,      03:27
25 et cetera; right? When you say programs, that's what  03:27
                                          Page 236

1 what is at issue here of the information.     03:25
2      I included various types, different things I  03:25
3 mention here. But that was why I included it; right?  03:25
4      I'm not claiming that these are specifically  03:25
5 programs that relate to the sync or not sync question.  03:25
6 We're not getting it that precise, right, as far as the  03:26
7 Chrome browser. But I wanted to find something where we  03:26
8 could see that individuals had a chance to agree or not  03:26
9 agree to provide personal information about online  03:26
10 activity. That's why this section is here.    03:26
11      Q.  Let's turn to paragraph 16 of your report,  03:26
12 which is page 5.                            03:26
13      A.  Yeah.                            03:26
14      Q.  You say here:                     03:26
15      "According to plaintiffs, the             03:26
16 personal information collected by Google      03:26
17 from class members includes but is not       03:26
18 necessarily limited to information on IP      03:26
19 addresses, unique cookie identifiers,        03:26
20 browser identifiers, and other internet      03:26
21 browsing history data."                     03:26
22      Is what you describe here, that's according to  03:26
23 plaintiffs, the same as what you describe here as online  03:26
24 behavior or online data?                    03:26
25      A.  I don't think it's co-existent. I think it's  03:26
                                          Page 235

1 you're referring to?                         03:28
2      A.  Yes. Although I wasn't necessarily meaning  03:28
3 computer program, although that's related. I meant more  03:28
4 of arrangement.                             03:28
5      Q.  Right.                           03:28
6      A.  Yeah.                            03:28
7      Q.  Right.                           03:28
8      So if -- so now let's switch back to         03:28
9 section V.B, which is page 33 of your report.  03:28
10      A.  Okay. Back to paragraph 33.          03:28
11      Q.  No. Page 33. Let's say paragraph 90.    03:28
12      A.  Okay. Got it.                     03:28
13      Q.  So you mention -- paragraph 91, actually, you  03:28
14 mention one example of these what you call actual  03:28
15 marketplace examples, which is SavvyConnect.  03:28
16      Do you see that?                       03:28
17      A.  Yes.                            03:28
18      Q.  And it's -- you call it "a desktop        03:28
19 application launched in 2009 by                03:28
20 SurveySavvy, an online survey platform to     03:28
21 conduct behavioral market research while      03:28
22 users browse the internet."                  03:28
23      Do you see that?                       03:28
24      A.  Yes.                            03:28
25      Q.  So in your opinion, is the data that Google  03:28
                                          Page 237

60 (Pages 234 - 237)

1 improperly -- is alleged to improperly collect smaller   03:29
2 in volume than the data collected by -- that users   03:29
3 agreed to have collected by SavvyConnect or larger?   03:29
4        MS. WEAVER: Objection. Form. Vague.   03:29
5        THE WITNESS: I don't have a technical opinion   03:29
6 about everything that's collected, but I understand that   03:29
7 the way that Google, through collecting data, what it's   03:29
8 able to collect, how it can also look at trends and do   03:29
9 relationships between one user's data and find   03:29
10 algorithms where they seem similar to other ones, these   03:29
11 information I don't believe is available through   03:29
12 SavvyConnect the same way that information is used.   03:29
13        It is about collecting online behavior, right,   03:29
14 about browsing behavior, but I don't believe it includes   03:29
15 all of what Google has.   03:29
16 BY MS. TREBICKA:   03:29
17    Q.  What about Ipsos, 9 -- paragraph 92.   03:30
18        You write here:   03:30
19        "Google launched a similar study of   03:30
20 online behavior.  Ipsos, a large global   03:30
21 market research company, conducted a   03:30
22 consumer research study for Google."   03:30
23        And you provide here additional information   03:30
24 about how much users were allegedly paid.   03:30
25        Is your opinion that the data that Google   03:30

Page 238

1 allegedly improperly collects is co-existent with the   03:30
2 data that's described here users provided to Ipsos in   03:30
3 paragraph 92?   03:30
4        MS. WEAVER: Objection. Form.   03:30
5        THE WITNESS: Again, without a technical   03:30
6 opinion about everything that's collected, which I don't   03:30
7 have, I believe there is overlap.  There's, you know,   03:30
8 browsing, you know, online behavior I think is uncommon.   03:30
9 But I don't think the way it was described in this   03:30
10 service, that it also has the ability to do what Google   03:30
11 has in relating data across multiple users.   03:31
12        I believe what Google has got and that   03:31
13 information on the use is larger.   03:31
14        I will say I don't fully understand -- I think   03:31
15 it's a technical question.  I don't fully understand   03:31
16 what's gained in this program, in the Ipsos program, by   03:31
17 adding the wifi router.  Just technically I don't   03:31
18 know -- I don't know what why that would be necessarily   03:31
19 beneficial and what they gain for that, but they pay   03:31
20 more for that.  And so that's one part I don't know.   03:31
21 BY MS. TREBICKA:   03:31
22    Q.  So you haven't arrived at an opinion as to   03:31
23 whether the data that Google is allegedly improperly   03:31
24 collecting is comparable to the data that is at issue   03:31
25 in -- or that is allegedly collected in what you   03:31

Page 239

1 describe in paragraph 92?   03:31
2        MS. WEAVER: Objection. Form. Misstates the   03:31
3 record.   03:31
4        THE WITNESS:  As I stated, I do believe this   03:32
5 both relates to personal information and both relates to   03:32
6 information that can be gained why someone is online   03:32
7 browsing.  That's the nature of this Chrome data   03:32
8 dispute.  There's that commonality.   03:32
9        What I understand about what can happen with   03:32
10 Google Chrome and Google in pulling in information, I   03:32
11 think it's more than what is allowed by these programs.   03:32
12 I did mention with regard to Ipsos.  I don't know about   03:32
13 the wifi router part.  I believe it, but, you know, I'm   03:32
14 treating them as well -- they're essentially the same   03:32
15 for at least the numbers I've come up with because it   03:32
16 relates to this personal information, right, about   03:32
17 online activity, which is the essence of what is also   03:32
18 related to the Chrome dispute here.   03:32
19 BY MS. TREBICKA:   03:32
20    Q.  You say that you understand that the   03:32
21 information at issue in this case is more than what is   03:32
22 collected, for example, by Ipsos, as explained in   03:32
23 paragraph 92.   03:32
24        What do you base that understanding on?   03:32
25    A.  Things I've reviewed in this case.  Documents   03:33

Page 240

1 that I've looked at.  We've got the -- I can't remember   03:33
2 the term -- the X-Client header I think is something   03:33
3 involved in the Google data, which I have not seen a   03:33
4 reference to that type of thing in these other programs.   03:33
5        But, again, these are getting into technical   03:33
6 areas that I could be incorrect about.   03:33
7        Just from what I've read, I've seen a lot of   03:33
8 information that seems more than what I could see from   03:33
9 looking into these programs.  I've treated them as   03:33
10 essentially co-existent for the purposes of showing a   03:33
11 methodology that could be used across all class members   03:33
12 and can show that there is market evidence of value;   03:33
13 right?   03:33
14        Beyond what Google's value is, you know, the   03:33
15 idea of in a marketplace what consumers could get but --   03:33
16 and I don't have technical opinions, but I just know a   03:33
17 lot more about the Google Chrome, which doesn't seem to   03:33
18 be applicable to these instances.   03:33
19    Q.  You also have two more marketplace examples,   03:33
20 "BrandTotal" in paragraph 93 and "Nielsen" in   03:34
21 paragraph 94.   03:34
22        Do you recall that?   03:34
23    A.  I do.   03:34
24    Q.  Is your understanding that the information   03:34
25 that users supply to BrandTotal and Nielsen -- let me   03:34

Page 241

61 (Pages 238 - 241)

1 just take it one by one.                        03:34
2        Is your understanding that the information        03:34
3 that users supply to BrandTotal is larger than the    03:34
4 information that Google allegedly improperly collects in 03:34
5 this case?                                        03:34
6        MS. WEAVER: Objection. Form. Vague. And to 03:34
7 the extent it seeks a technical conclusion.        03:34
8        THE WITNESS: I don't, as I said before --   03:34
9        MS. WEAVER: Vague as to larger. Anyway...   03:34
10        THE WITNESS: I don't understand the technical 03:34
11 nature of what's being collected.                 03:34
12        But with BrandTotal, for example, what I was  03:34
13 able to learn about those, it -- it involves an     03:34
14 agreement with individuals for payment where it uses 03:35
15 personal information, collects -- you know, pays the  03:35
16 users to collect their data up front about advertising 03:35
17 and research.                                     03:35
18        But it doesn't seem to be as extensive in what 03:35
19 it's collecting. For example, whatever it has, it pays 03:35
20 more if they decide to visit particular sites. I think 03:35
21 Google from the get-go gets all sites, right, wherever 03:35
22 someone is.                                       03:35
23        And so in looking at this one, there's      03:35
24 something about, you know, Facebook and Twitter and  03:35
25 YouTube, there's extra elements that are paid.     03:35

Page 242

1        So I see these differences. I just don't know 03:35
2 enough technically to know what the overlap is. But it 03:35
3 doesn't appear, like with the other two companies we  03:35
4 mentioned, that the extensiveness of what could be   03:35
5 collected and used by these entities in Section V.B of 03:35
6 my report is the same as what is -- at least the    03:35
7 magnitude of what Google Chrome data can be used for 03:35
8 when shared with Google.                           03:35
9 BY MS. TREBICKA:                                  03:35
10        Q. So in your understanding, the data that the -- 03:35
11 that Google collects, improperly allegedly in this case, 03:36
12 is more extensive than the data that these -- each of 03:36
13 these marketplace examples collect.               03:36
14        Is that right?                            03:36
15        A. It seems --                            03:36
16        MS. WEAVER: Objection. Form. Vague. Calls 03:36
17 for speculation.                                  03:36
18        THE WITNESS: From what I discussed and what 03:36
19 I've seen, it seems to be the case. I've not treated it 03:36
20 as such for the purposes of offering up values, and I 03:36
21 have not done any type of a multiplier or anything like 03:36
22 that. But it certainly indicates that, but because I 03:36
23 haven't gotten the technical nature, the ability to  03:36
24 quantify what it appears, the extensiveness, I've -- I'm 03:36
25 using these numbers as ones that can be used as a   03:36

Page 243

1 measure of personal information for the use of is there 03:36
2 a methodology; right? Is it common to the class,   03:36
3 et cetera? Those questions for this case.          03:36
4 BY MS. TREBICKA:                                  03:36
5        Q. Well, let's assume that what Google collects 03:36
6 as -- allegedly improperly for purposes of this case, is 03:36
7 not as extensive as what each of these marketplace   03:37
8 examples collect from users.                       03:37
9        How would you account for that in your     03:37
10 methodology?                                      03:37
11        MS. WEAVER: Objection. Form.               03:37
12        THE WITNESS: I would need --               03:37
13        MS. WEAVER: Speculation.                    03:37
14        THE WITNESS: I would need some reason to    03:37
15 believe what you suggested. I'd need to know the    03:37
16 details. It's not just a flag. I need to know what  03:37
17 you're talking about.                             03:37
18 BY MS. TREBICKA:                                  03:37
19        Q. So your understanding is that -- I'm just 03:37
20 trying to understand what your opinion is and also the 03:37
21 basis for your opinion.                           03:37
22        Standing here today -- or sitting here today, 03:37
23 your understanding is that Google indeed collects more 03:37
24 extensive information, improperly allegedly, than each 03:37
25 of these marketplace examples; correct?            03:37

Page 244

1        MS. WEAVER: Objection. Form. Speculation. 03:37
2        THE WITNESS: Actually, what I said is I've  03:37
3 treated them as the same. That's my most important   03:37
4 point.                                            03:38
5        What I'm telling you is I'm aware of        03:38
6 information that I think I'm shortchanging it a bit, if 03:38
7 you will, because other things seem to indicate, even 03:38
8 the, you know, collection across multiple locations,  03:38
9 I've not seen an indication that happens in any of these 03:38
10 programs.                                         03:38
11        So there's indications that it's larger with 03:38
12 Google Chrome connection, but I've not treated it as 03:38
13 such as I've identified these values in my report.   03:38
14 BY MS. TREBICKA:                                  03:38
15        Q. So these indications that it's larger with, in 03:38
16 your words, Google Chrome connections, they're based on 03:38
17 what?                                             03:38
18        A. Well, what I understand from the documents -- 03:38
19        MS. WEAVER: Objection. I'm sorry. Objection 03:38
20 to form. Speculation.                             03:38
21        Go ahead.                                 03:38
22        THE WITNESS: Understanding things as I do as 03:38
23 a nontechnical person about the addition of things like, 03:38
24 you know, X-Client header Data or using information  03:38
25 across multiple locations, right, assigning it to the 03:38

Page 245

62 (Pages 242 - 245)

1  same person, using algorithms and tying them with other  03:38
2  collected information across other Chrome users, which  03:39
3  is more broad, just the ability to run algorithms and  03:39
4  correlations with other people is more broad the size of  03:39
5  Google compared to these programs.  03:39
6      So I read those things and I think this does  03:39
7  not look like it's the same extent of data. It's those  03:39
8  indications I'm talking about, which suggest to me that  03:39
9  what's being collected here is less, even though I don't  03:39
10 treat it as such for the purposes of the numerical  03:39
11 quantification.  03:39
12 BY MS. TREBICKA:  03:39
13     Q. So I'd like to understand each of those things  03:39
14 you said a little better so I'll ask you about each of  03:39
15 them one by one.  03:39
16     So you said the X-Client Data header, for  03:39
17 example, is one where -- you know, it's one of the bases  03:39
18 on which you understand that Google's collection is more  03:39
19 extensive than each of these collections.  03:39
20     Is that right?  03:39
21     A. Yes. That was one example.  03:39
22     Q. Yeah.  03:39
23     So do you have an understanding of what the  03:39
24 X-Client-Data header is used for?  03:39
25     A. Well, this data or the --  03:40
                                          Page 246

1      MS. WEAVER: Objection. Calls for  03:40
2  speculation. Form. Beyond expertise and scope.  03:40
3      THE WITNESS: The -- as I understand it as a  03:40
4  nontechnical person, as a nontechnical expert, the  03:40
5  X-Client-Data information or the Chrome variations it's  03:40
6  referred to has to do with experimenting, trying new  03:40
7  things, putting headers on the communications back and  03:40
8  forth with Chrome users. This type of information, as I  03:40
9  understand it; right? I've not seen reference to this  03:40
10 happening in these other locations -- these other  03:40
11 programs I've identified.  03:40
12 BY MS. TREBICKA:  03:40
13     Q. So for purposes of the X-Client-Data header,  03:40
14 do you know whether or not that is used to serve ads?  03:40
15     MS. WEAVER: Objection. Form. Speculation.  03:40
16 Technical expertise. Beyond scope.  03:40
17     THE WITNESS: It's my understanding that's  03:40
18 part of what's collected but the value to Google isn't  03:40
19 only that isolated. It's in connection with other  03:40
20 information they already have. And part of the value is  03:41
21 what might be in something like X-Client-Data header,  03:41
22 when you then link it with other information it gathers,  03:41
23 that's what becomes valuable. It's the aggregation of  03:41
24 various types.  03:41
25     So it's not proper, as I understand it, to  03:41
                                          Page 247

1  ever think about just one element as having isolated  03:41
2  value of the information. It's how it's used with other  03:41
3  information.  03:41
4  BY MS. TREBICKA:  03:41
5      Q. Okay. And do you know anything about how the  03:41
6  X-Client-Data header is used in connection with other  03:41
7  information?  03:41
8      MS. WEAVER: Same objections.  03:41
9      THE WITNESS: No. Not technically. It's my  03:41
10 understanding that the collection of this data helps  03:41
11 with the identification itself.  03:41
12 BY MS. TREBICKA:  03:41
13     Q. Have you spoken to someone who has technical  03:41
14 knowledge to be able to understand that?  03:41
15     MS. WEAVER: Objection.  03:41
16     And I will instruct you not to reveal the  03:41
17 contents of any attorney–client communications or  03:41
18 attorney work product.  03:41
19     If you cannot answer without revealing  03:41
20 attorney work product or analysis, then do not answer.  03:41
21     THE WITNESS: I have nothing -- I don't have  03:42
22 anything I can say, given that admonition and  03:42
23 instruction by counsel.  03:42
24 BY MS. TREBICKA:  03:42
25     Q. You also mentioned that one of the reasons  03:42
                                          Page 248

1  that you believe that the data collection -- alleged  03:42
2  improper data collection by Google is more extensive is  03:42
3  because Google can use algorithms and ties them together  03:42
4  with other information collected across other Chrome  03:42
5  users.  03:42
6      Do you recall that?  03:42
7      MS. WEAVER: Objection. Form. Misstates  03:42
8  testimony.  03:42
9      THE WITNESS: I generally remember -- not  03:42
10 those specific words, but I remember that section of my  03:42
11 testimony earlier.  03:42
12 BY MS. TREBICKA:  03:42
13     Q. You remember speaking specifically about  03:42
14 algorithms.  03:42
15     Do you remember that?  03:42
16     A. I do remember the word "algorithms," yes.  03:42
17     Q. So where have you -- what is your  03:42
18 understanding of this based on, the fact that Google  03:42
19 uses algorithms to tie them together with other  03:43
20 collected information across other Chrome users? What  03:43
21 is that --  03:43
22     MS. WEAVER: Objection -- I'm sorry.  03:43
23 Objection. Form. Misstates testimony. Beyond the  03:43
24 scope. He's not a technical expert.  03:43
25     THE WITNESS: By algorithms, I simply mean  03:43
                                          Page 249

63 (Pages 246 - 249)

1 mathematical means, you know, with program statistics.   03:43
2 In other words, using the data, like Data Analytics.   03:43
3 It's what I've seen in documents I've reviewed in this   03:43
4 case and what I've read and learned about, you know,   03:43
5 what Google does with the data.  As opposed to setting   03:43
6 up individual data in silos that never interacts with   03:43
7 anyone else, it's the opposite.   03:43
8       I'm not technical.  I'm not telling you   03:43
9 exactly how that happens or what -- you know, the means   03:43
10 by which they do it.  But that's what I was referring to   03:43
11 is just the information isn't siloed, if you will, by a   03:43
12 person.                          03:43
13 BY MS. TREBICKA:                 03:44
14    Q.  By a person.              03:44
15       So your understanding is that part of the   03:44
16 reason that Google is -- Google's alleged improper data   03:44
17 collection is broader is because it connects the data   03:44
18 across users?                    03:44
19       MS. WEAVER:  Objection.  Misstates his   03:44
20 testimony.  Beyond the scope.  Calls for speculation.   03:44
21       THE WITNESS:  Yeah.  I don't remember saying   03:44
22 anything about connecting the data across users.   03:44
23 BY MS. TREBICKA:                 03:44
24    Q.  Okay.  I'm just trying to understand.  Because   03:44
25 on the one hand you're saying that you're not technical,   03:44

Page 250

1 on the other hand you're also offering an opinion that   03:44
2 the value of the information that Google allegedly   03:44
3 improperly collects for purposes of this lawsuit is   03:44
4 larger than, more extensive than the information that   03:44
5 these real life marketplace examples that you cite in   03:44
6 Section V.B of your report collect.   03:44
7       I'm trying to understand why -- the basis   03:44
8 of your opinion, given that you're also unable to   03:45
9 provide the technical understanding of how the data is   03:45
10 different.                        03:45
11       MS. WEAVER:  Objection.  Misstates testimony.   03:45
12 Misstates the record.  He's got citations.   03:45
13       Why don't you show him a document, Viola.   03:45
14 Beyond scope.                    03:45
15       You may answer.            03:45
16       THE WITNESS:  Your last bit of talking there   03:45
17 was a statement.  You didn't ask me a question.  And I   03:45
18 think you're incorrect, and you've not said what I   03:45
19 testified to.  You've added something in your mind.  So   03:45
20 I don't quite know what to do because it's not true,   03:45
21 what you just said.              03:45
22       So maybe I'll start by saying that's not true.   03:45
23 BY MS. TREBICKA:                 03:45
24    Q.  So you're -- is there any place in your report   03:45
25 where you compare the information that Google allegedly   03:45

Page 251

1 improperly collects with the information that these   03:45
2 market -- real life marketplace examples, as you call   03:45
3 them, in Section V.B of your report collect?   03:45
4    A.  Well, I --                 03:46
5       MS. WEAVER:  Objection.  Form.  Vague.   03:46
6       You may answer.            03:46
7       THE WITNESS:  You asked is there a part of my   03:46
8 report that compares some things?   03:46
9 BY MS. TREBICKA:                 03:46
10    Q.  Is there a place in your report where you   03:46
11 compare the information that Google allegedly improperly   03:46
12 collects with the information that these marketplace   03:46
13 examples you cite in section V.B of your report collect?   03:46
14    A.  Well, I talk about these other programs in   03:46
15 V.B.  I also talk elsewhere about Google and what I   03:46
16 understand about the allegations and about the nature of   03:46
17 personal data.  So by listing those both in my report,   03:46
18 I'm comparing.                   03:47
19       I don't have a contrast point where I create   03:47
20 another page or a table and I have a red X or a green   03:47
21 checkmark or something like that.  I think it's not in   03:47
22 my report.  It's clear.          03:47
23       So when you're asking is something there, my   03:47
24 report speaks for itself.  And what's in there is what   03:47
25 we've been talking about.  But I do talk about these   03:47

Page 252

1 programs and I talk about the Google Chrome data   03:47
2 collection in many other places.   03:47
3    Q.  Don't you think it would be appropriate to   03:47
4 compare the information that Google allegedly improperly   03:47
5 collects to the information that these marketplace   03:47
6 examples collect from users?     03:47
7       MS. WEAVER:  Objection.  Vague.  Form.   03:47
8       THE WITNESS:  I'm not understanding, I think,   03:47
9 what you mean by compare.        03:47
10       I've been looking for cars recently and   03:47
11 comparing just means I read that set of specs and I read   03:48
12 that set of specs.  I'm done.  I compared them.   03:48
13       I think you mean like I done a cross-match   03:48
14 table with contrasting or -- I think you mean something   03:48
15 else but if -- I compare.  I talk about these programs   03:48
16 and the details.  I talk about what Google is.   03:48
17       So -- but we may be using a different   03:48
18 definition of the word "compare."   03:48
19 BY MS. TREBICKA:                 03:48
20    Q.  Well, so, for example, SavvyConnect --   03:48
21 paragraph 91, it states here that:   03:48
22       "SavvyConnect pays $5 per device per   03:48
23 month to install and activate the software   03:48
24 on a computer, phone, or tablet to collect   03:48
25 data from users' devices."       03:48

Page 253

64 (Pages 250 - 253)

1      Do you see that?                    03:48
2    A.  Yes.                              03:48
3    Q.  So SavvyConnect, is your understanding that   03:48
4  this is a separate desktop application that it requires   03:48
5  users to -- to install?                 03:49
6        MS. WEAVER: Objection. Form. Assumes facts   03:49
7  not in evidence. Beyond scope.           03:49
8        THE WITNESS: What I understand are the words   03:49
9  you just read. I state here there's a -- and I cite to   03:49
10  the location where I get this information; right?   03:49
11      So SavvyConnect, if you're part of that   03:49
12  program, you have an application, right, a desktop   03:49
13  application; right? And it collects -- I'm reading   03:49
14  here, "to conduct behavioral market research while users   03:49
15  browse the internet"; right?            03:49
16      I mean, I've explained there in the report   03:49
17  what I understand about it, including what I cite to the   03:49
18  SavvyConnect websites down below.        03:49
19  BY MS. TREBICKA:                       03:49
20    Q.  Did you attempt to install the desktop   03:49
21  application from SavvyConnect?           03:49
22        MS. WEAVER: Objection. Form. Beyond scope.   03:49
23        THE WITNESS: I did not.           03:49
24  BY MS. TREBICKA:                       03:49
25    Q.  Are you aware that to be able to use   03:49
                                          Page 254

1  SavvyConnect, users are required to complete an online   03:49
2  user profile and a portrait?            03:49
3        MS. WEAVER: Objection. Same objections.   03:50
4        THE WITNESS: I'm familiar with that. I'm not   03:50
5  sure I remember for each one of these programs if I can   03:50
6  distinguish between the two. But, you know, these   03:50
7  programs sign up for you give them information to get   03:50
8  your payment, information about yourself, yes, I   03:50
9  remember that being part of these programs.   03:50
10  BY MS. TREBICKA:                       03:50
11    Q.  Do you know what information goes into that   03:50
12  profile that SavvyConnect requires?      03:50
13        MS. WEAVER: Same objection.        03:50
14        THE WITNESS: Not with SavvyConnect   03:50
15  specifically without going back and checking.   03:50
16  BY MS. TREBICKA:                       03:50
17    Q.  And you haven't compared what that information   03:50
18  that SavvyConnect requires -- or let me start over.   03:50
19      And you haven't compared the information that   03:50
20  SavvyConnect -- SavvyConnect requires to the information   03:50
21  that Google allegedly improperly collects.   03:50
22      Is that right?                    03:50
23    A.  I think I have --                03:50
24        MS. WEAVER: Objection. Same objections.   03:50
25  Assumes facts not in evidence.          03:50
                                          Page 255

1        THE WITNESS: I talk a lot in detail of the   03:51
2  extensive information that Google collects elsewhere.   03:51
3  I'm aware of that. That's discussed in my report.   03:51
4        I'm not aware that same existence, the same   03:51
5  extent, can be collected by what SavvyConnect is doing.   03:51
6  That's what I'm telling you. I've not done anything   03:51
7  with it. It's not part of my opinion that then I   03:51
8  leveraged to come to a conclusion.       03:51
9        You asked me about it and I'm telling you what   03:51
10  I was able to see. I treated these as both personal   03:51
11  information about behavior on the internet, as far as   03:51
12  these programs, comparing it to Google.   03:51
13      But that's the extent that I used them to   03:51
14  compare them, at least for coming up with a   03:51
15  quantification that I think will be helpful in this   03:51
16  case.                                03:51
17  BY MS. TREBICKA:                       03:51
18    Q.  Are you also aware that SavvyConnect collects   03:51
19  user data through supplementally surveys?   03:51
20        MS. WEAVER: Objection. Assumes facts not in   03:51
21  evidence.                            03:51
22        THE WITNESS: I don't remember specifically   03:51
23  about SavvyConnect. I remember reading about these   03:51
24  and --                               03:51
25  ///
                                          Page 256

1  BY MS. TREBICKA:                       03:51
2    Q.  Have you arrived at a conclusion as to whether   03:51
3  this information that's collected through supplementary   03:52
4  surveys is more or less extensive than the information   03:52
5  that Google allegedly collects?          03:52
6        MS. WEAVER: Objection. Calls for speculation   03:52
7  on facts not in evidence.               03:52
8        Go ahead.                       03:52
9        THE WITNESS: As I said before, the detail   03:52
10  that when I know about what Google collects, I still am   03:52
11  not convinced that SavvyConnect with periodic surveys   03:52
12  compares to the constant collection of all the   03:52
13  information across devices and locations that Chrome   03:52
14  does.                                03:52
15        MS. TREBICKA: Lesley, I ask that you please   03:52
16  don't laugh when you make your objections to my   03:52
17  questions. It has been happening a lot and I have been   03:52
18  patient, but it's actually very disrespectful on a lot   03:52
19  of levels, including a personal level, and a -- it's   03:52
20  very distracting for myself and likely for the witness   03:53
21  and others on the video as well.         03:53
22        So please refrain from doing that.   03:53
23        MS. WEAVER: I object to the characterization.   03:53
24  I have not been laughing. The video will show it.   03:53
25        I do think there's some exasperation to the   03:53
                                          Page 257

65 (Pages 254 - 257)

1 testifying that you are doing about facts that are not   03:53
2 in his report.  You assume them to be true, and then you   03:53
3 ask him to speculate about comparing other facts that   03:53
4 are not in evidence.   03:53
5       So if -- and if we were in a court of law,   03:53
6 your questions would not be allowed.   03:53
7       We have been very patient as you introduce   03:53
8 facts like this into the record.  You could put a   03:53
9 document in front of him.  You could show him something   03:53
10 and then you could take proper evidence.   03:53
11       But when you just make a statement about facts   03:53
12 that don't exist and ask him to respond, that's   03:53
13 improper.  We have been very patient.   03:53
14       MR. STRAITE:  I need to state --   03:53
15       MS. TREBICKA:  It has to stop.   03:53
16       MR. STRAITE:  -- for the record --   03:53
17       MS. TREBICKA:  Lesley, it has to so stop.   03:53
18       MR. STRAITE:  This is David Straite.   03:53
19       MS. TREBICKA:  David, I'm not sure I   03:54
20 appreciate your jumping in right now but --   03:54
21       MR. STRAITE:  Yeah.  I'm not here to be   03:54
22 appreciated.  I'm here to correct the record.   03:54
23       I'm an observer, and I don't know the extent   03:54
24 to which someone will see the video.  If they're only   03:54
25 looking at the written transcript, it's very important.   03:54

Page 258

1 Yes, Lesley has been smiling.  I think it looks polite   03:54
2 because I can see the exasperation.  I've not seen any   03:54
3 laughter.  I've seen exasperation and a polite smile to   03:54
4 hide the exasperation.   03:54
5       So I think it's improper to call it laughing.   03:54
6 And I don't think it's been disruptive.  I have been   03:54
7 watching all of this and not seeing anything that looks   03:54
8 distracting.  I think she's been very polite and biting   03:54
9 her tongue.   03:54
10       But I actually think that's important in case   03:54
11 someone is not seeing the video.   03:54
12       MS. TREBICKA:  Yeah.  I'd like to go off the   03:54
13 record.   03:54
14       Will you agree?   03:54
15       MS. WEAVER:  Sure.   03:54
16       MR. STRAITE:  Always.   03:54
17       MS. TREBICKA:  Okay.   03:54
18       THE VIDEOGRAPHER:  Okay.  We are going off the   03:54
19 record at 3:54 p.m.   03:54
20       (Break taken in proceedings.)  (Break taken in   03:56
21       proceedings.)
22       MS. WEAVER:  Before we continue, Viola, I   04:08
23 would like to apologize.   04:08
24       THE VIDEOGRAPHER:  Wait, wait, wait.   04:08
25       We're back on the record at 4:08 p.m.   04:08

Page 259

1       Go ahead.   04:08
2       MS. WEAVER:  Before we continue, Viola, I   04:08
3 would like to apologize.  I have high professional   04:08
4 regard for you and respect, and I did not mean to impede   04:08
5 any of your testimony.  I certainly did not mean to be   04:08
6 laughing.  I really was just trying to deal with some of   04:08
7 the reactions to the repeated questions.   04:08
8       But I do apologize, and hope that we can   04:08
9 continue in this proceeding without further issues on   04:08
10 both sides.   04:08
11       MS. TREBICKA:  Thank you, Lesley.  I   04:08
12 appreciate that.   04:08
13 BY MS. TREBICKA:   04:08
14    Q.  Dr. Mangum, before we took the break, we were   04:08
15 talking about your opinions related to the economic   04:08
16 value of personal information.   04:08
17       Do you recall that?   04:08
18    A.  Yes.   04:08
19    Q.  So I'd like to move on to -- and that was   04:08
20 opinion V.B -- or under Section V.B rather.   04:09
21    A.  Yes.  The V.B section of my report, correct.   04:09
22    Q.  Moving on to section V.C of your report, the   04:09
23 title of which is "Damages Can be Calculated Using   04:09
24 Methods Common to the Class."   04:09
25       Do you see that?   04:09

Page 260

1    A.  I do.   04:09
2    Q.  So this is -- let me read the second sentence   04:09
3 of your -- of the paragraph 96 here.  You say:   04:09
4       "Similarly, the payments and offers   04:09
5       made and accepted for access to user   04:09
6       online personal information provide   04:09
7       further support for the value of user   04:09
8       personal information."   04:09
9       You see that?   04:09
10    A.  I do.   04:09
11    Q.  And this is referring to the payments and   04:09
12 offers that we were discussing in Section V.B of your   04:09
13 report?   04:10
14    A.  Give me a second.   04:10
15       Yes.  That's correct.   04:10
16    Q.  And then the first sentence says:   04:10
17       "The value Chrome users place on the   04:10
18       protection of their personal information   04:10
19       is indicative of the amount by which each   04:10
20       Class Member was damaged due to the breach   04:10
21       in the Chrome Agreements."   04:10
22       Do you see that?   04:10
23    A.  Yes.   04:10
24    Q.  And this is related to your opinion related to   04:10
25 the user payments for VPN services.   04:10

Page 261

66 (Pages 258 - 261)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Is that right?                              04:10
2    A.  Yes.  That's what the reference is to, is the   04:10
3 payments for protection, right.                04:10
4    Q.  Now, you say it --                      04:10
5       "I describe above methods and market     04:10
6 measures that can be used to reliably          04:11
7 estimate this value, which can then be         04:11
8 multiplied by the number of Class Member       04:11
9 accounts to calculate the total damages        04:11
10 for the class."                               04:11
11      Do you see that?                         04:11
12   A.  Yes.                                    04:11
13   Q.  So these are methods and market measures that   04:11
14 your opinion is can be used to reliably estimate this   04:11
15 value; correct?                               04:11
16      MS. WEAVER:  Objection.                  04:11
17      THE WITNESS:  Yes.                       04:11
18      MS. WEAVER:  Vague.                      04:11
19 BY MS. TREBICKA:                              04:11
20   Q.  And what do you mean by "this value"?   04:11
21   A.  In the end of the prior sentence, we say "the   04:11
22 value of user personal information."  I also refer to   04:11
23 value in the beginning of the paragraph.  So I've talked   04:11
24 about value twice on that -- looks like the sixth line   04:11
25 or the seventh line wrapping to the -- sorry -- the   04:11

Page 262

1 fifth line wrapping to the sixth line, "this value"   04:11
2 refers to earlier up in that paragraph.       04:11
3    Q.  To "user online personal information"?   04:12
4    A.  Well, it's starts off by saying "the value   04:12
5 Chrome users place on the protection."  That's one   04:12
6 reference to value.  That's the beginning of the   04:12
7 paragraph.                                     04:12
8    Q.  Mm-hm.                                  04:12
9    A.  And then there's also "value of user personal   04:12
10 information" another time, right.             04:12
11   Q.  Okay.  And how would you use the methods and   04:12
12 market measures you describe above to reliably estimate   04:12
13 this value?                                   04:12
14   A.  Well, the numbers I provide, at times -- it's   04:12
15 related to something like per year, which could be   04:12
16 brought down and divided to get, you know, a value per   04:12
17 month; right?                                 04:12
18      But whatever the time period connection is to   04:12
19 the payment, the idea is that what that is is   04:12
20 attributable, or at least it could be used for all the   04:12
21 class members; right?                         04:12
22      So you would multiply it.  This is -- as   04:12
23 opposed to -- and I know it's a different type of   04:12
24 calculation, but as opposed to the unjust enrichment,   04:12
25 which is a bit of a top-down approach, right, we   04:13

Page 263

1 estimate the unjust enrichment then as an idea of, well,   04:13
2 how do you allocate it by dividing?           04:13
3       This kind of goes the opposite.  This comes to   04:13
4 the direct values, and then you would range up to   04:13
5 damages by multiplying.                       04:13
6       So it's just explaining that these are kind of   04:13
7 different directions of calculation.          04:13
8    Q.  So this would be a bottom-up approach, whereas   04:13
9 the unjust enrichment is sort of a bottom -- top-down   04:13
10 approach?                                     04:13
11   A.  Yeah.  Those phrases are used a lot, so I   04:13
12 should be careful what people mean.  But at least in my   04:13
13 way of thinking, you could think of a top down versus a   04:13
14 bottom up.                                    04:13
15      But they both include focusing on a total   04:13
16 damage, and then also thinking about what is the amount   04:13
17 of remuneration or remedy per class member?   04:13
18   Q.  So you would estimate -- you believe that the   04:13
19 methods and market measures you've described can be used   04:13
20 to reliably estimate one value that will apply to each   04:13
21 putative class member; correct?              04:14
22      MS. WEAVER:  Objection.  Misstates the record.   04:14
23      THE WITNESS:  I have multiple measures I use   04:14
24 that I identify; right?  Different companies.  As far as   04:14
25 the payments for personal information there in   04:14

Page 264

1 Section V.B, I have multiple numbers that I come up   04:14
2 with when I talk about the VPNs.             04:14
3       The point is I offer those up.  But the method   04:14
4 by which one said, okay, well, what will the decision   04:14
5 be, whoever the decision maker is, if they pick one they   04:14
6 feel is the preferred one; right?  If you have that, you   04:14
7 would have what you would get per class member.   04:14
8       If you then say, well, but what's total   04:14
9 damages, well, then you multiply by class members.  So   04:14
10 it's that reverse direction compared to the unjust   04:14
11 enrichment calculation.                       04:14
12 BY MS. TREBICKA:                              04:14
13   Q.  And would you propose to apply this value of   04:14
14 personal information per month, per year, or a single   04:14
15 lifetime value?  How are you thinking about this?   04:15
16      MS. WEAVER:  Objection.  Misstates the record   04:15
17 with regard to value.                         04:15
18      THE WITNESS:  Yeah.  The -- the reason that I   04:15
19 identified particular -- well, clearly for Section V.B,   04:15
20 I wanted to identify that there were market measures;   04:15
21 that looking at the market is one method to identify a   04:15
22 value of personal information in the marketplace.   04:15
23      So part of the purpose wasn't necessarily to   04:15
24 come to the damage which is what would be presented to a   04:15
25 jury, but at this stage of class certification, that it   04:15

Page 265

67 (Pages 262 - 265)

1 applies classwide. I give multiple measures, multiple   04:15
2 indications of what that would be. That's one of the   04:15
3 purposes.   04:15
4     I don't necessarily have a plan -- I don't   04:15
5 have in my report a decision of, well, this is the one   04:15
6 number. Here is the multiplication. And I don't yet   04:15
7 have an assignment or a plan or a proposal for what this   04:16
8 would look like at the merit stage of this case.   04:16
9 BY MS. TREBICKA:
10     Q.  Do you believe -- is it your opinion that   04:16
11 there can be one number that can be multiplied by the   04:16
12 putative class number -- class members?   04:16
13     MS. WEAVER: Objection. Vague.   04:16
14     THE WITNESS: Yeah. I think I know what you   04:16
15 mean.   04:16
16     MS. TREBICKA: I'll say it again.   04:16
17     THE WITNESS: I do believe --   04:16
18 BY MS. TREBICKA:
19     Q.  I'll say it again.   04:16
20     Is it your opinion that there can be one   04:16
21 number that can then be multiplied by the number of   04:16
22 putative class members?   04:16
23     A.  I don't expect that would be the case, because   04:16
24 I believe we would want to meter for the time period   04:16
25 that someone is a class member. And what you've   04:16

Page 266

1 suggested would not do that.   04:16
2     But I do think the common methodology would be   04:16
3 to come up with something like per month or per year;   04:16
4 right? But at least you want to differentiate across   04:16
5 class members in that time aspect, but you would still   04:16
6 have the same approach -- it would be a function of   04:16
7 time, for example -- that would be the same across class   04:16
8 members.   04:17
9     But, yeah, so there would be that one number,   04:17
10 let's say per month, that would be applied to all class   04:17
11 members. You would have to meter or account for their   04:17
12 months, let's say, of being in the class.   04:17
13     Q.  In paragraph 96, you also further describe a   04:17
14 methodology for applying this number to putative class   04:17
15 members. And I'll read this into the record. You say:   04:17
16     "I describe above methods and market   04:17
17     measures that can be used to reliably   04:17
18     estimate the value, which can then be   04:17
19     multiplied by the number of Class Member   04:17
20     accounts to calculate the total damages   04:17
21     for the class. According to Google,   04:17
22     around 50 percent of their users had more   04:17
23     than one personal Google account. To the   04:17
24     extent that Class Members have multiple   04:17
25     global accounts at issue, the calculation   04:17

Page 267

1 can factor in multiple sets of consumer   04:17
2 data by way of multiple accounts."   04:18
3     Do you see that?   04:18
4     A.  I do.   04:18
5     Q.  So is this how you would propose that we   04:18
6 arrive at a -- or, you know, the fact finder arrive at a   04:18
7 number of restitution damage for each class member?   04:18
8     A.  Well, I use --   04:18
9     MS. WEAVER: Objection. Form.   04:18
10     THE WITNESS: I use the word "can" in my   04:18
11 second to last sentence there. "The calculation can   04:18
12 factor in." I don't say "must" or "should."   04:18
13     I'm trying to cover that if the Court thinks,   04:18
14 you know, "Let's just use that monthly value by class   04:18
15 member," I'm good. Great. We can do that. But if the   04:18
16 Court says, "Wait a minute, I'm troubled because there's   04:18
17 multiple accounts," I can do that, too.   04:18
18     So that's not a hindrance to completing this.   04:18
19 That's what I wanted to communicate.   04:18
20 BY MS. TREBICKA:   04:18
21     Q.  Other than accounting for time, is there any   04:18
22 other variation that you would account for in the   04:19
23 difference of the restitution damage for each class   04:19
24 member? I should say other than accounting for time and   04:19
25 multiple accounts, I suppose.   04:19

Page 268

1     Are there any other variables that you would   04:19
2 use to account for differences between class members?   04:19
3     MS. WEAVER: Objection. Form. Vague.   04:19
4     THE WITNESS: Given the analysis that I've   04:19
5 performed and the information that I've used to come up   04:19
6 with my restitution, I'm -- I see in those methods they   04:19
7 don't differentiate in what they come up with.   04:19
8     So the survey data, for example, the payments   04:19
9 for VPN, the amount people get paid to be part of the   04:19
10 programs to share personal information, it's the same   04:19
11 for everyone. They don't say, "Well, we'll get back to   04:19
12 you and let you know how much we" -- no. It's paid   04:19
13 ex-ante, it's identified ex-ante for participation.   04:19
14     Therefore, given this information, I don't   04:19
15 think there would be another dimension that would flow   04:20
16 to coming up with damages in this kind of second part,   04:20
17 this restitution portion of my report.   04:20
18 BY MS. TREBICKA:
19     Q.  You note here that "According to Google,   04:20
20 around 50 percent of their users have more than one   04:20
21 personal Google account."   04:20
22     Do you propose a method for identifying how -- 04:20
23 these users who have multiple Google accounts?   04:20
24     MS. WEAVER: Objection. Form.   04:20
25     THE WITNESS: If I had a document where Google   04:20

Page 269

68 (Pages 266 - 269)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 was saying a percent like this, that might be a method.  04:20
2 I would think that -- if Google can communicate this, as  04:20
3 I cite, I would think that through discovery, we could  04:20
4 say, well, what is that method, to maybe be a little  04:20
5 more precise than just around 50 percent.  04:20
6        But if need be, if this is what the  04:20
7 communication has been from Google, that's one method.  04:20
8 BY MS. TREBICKA:  04:21
9    Q.  So under the methodology that you propose,  04:21
10 users with two accounts would be paid twice because each  04:21
11 account would be paid once; correct?  04:21
12        MS. WEAVER:  Objection.  Assumes facts.  Form.  04:21
13        THE WITNESS:  I don't propose it.  I don't  04:21
14 propose a method.  I identify what can be done.  I want  04:21
15 to make sure the Court doesn't believe we're somehow  04:21
16 locked into a, oh, we get to somewhere we can't move  04:21
17 forward.  We don't know how to handle it.  We can.  04:21
18        This relates to handling the issue of multiple  04:21
19 accounts.  And if the Court decides, you know, there are  04:21
20 multiple accounts, I believe that class members, we  04:21
21 should make that determination.  I'm simply saying we  04:21
22 can.  I'm not suggesting we should.  I'm not proposing  04:21
23 that's the best.  I'm simply saying it can be done.  04:21
24        It might be that the Court believes, "You know  04:21
25 what, I don't know enough about these different  04:21

Page 270

1 accounts.  It's going to be just based each class member  04:22
2 gets this monthly value," for example.  04:22
3        I would say, great, that's one of the things I  04:22
4 identified in my report.  04:22
5 BY MS. TREBICKA:  04:22
6    Q.  Do you have a method for identifying those  04:22
7 users who may be using a single household account?  04:22
8        MS. WEAVER:  Objection.  Form.  04:22
9        THE WITNESS:  I think what you're suggesting  04:22
10 but you didn't say it is what if there's more than one  04:22
11 person using an account?  04:22
12        I can -- so maybe that's implied in your  04:22
13 description of a household account, that that means  04:22
14 there's more than one person.  I'm not sure.  I'm not  04:22
15 sure what you mean by that, so I don't understand your  04:22
16 question.  04:22
17 BY MS. TREBICKA:  04:22
18    Q.  Are you aware that certain users may be  04:22
19 sharing a single account, maybe two or more individuals  04:22
20 who share a single Google account?  04:22
21    A.  I'm aware --  04:23
22        MS. WEAVER:  Objection.  Vague.  Assumes  04:23
23 facts.  04:23
24        THE WITNESS:  I'm aware that's possible, only  04:23
25 from personal experience.  04:23

Page 271

1 BY MS. TREBICKA:  04:23
2    Q.  Okay.  But you haven't looked into that for  04:23
3 purposes of your opinion.  04:23
4        Is that right?  04:23
5        MS. WEAVER:  Objection.  Misstates testimony.  04:23
6        THE WITNESS:  I've looked into it in the sense  04:23
7 that I understand that it's possible.  I haven't seen  04:23
8 information that would give me information.  I think a  04:23
9 lot of that is latent information, as far as how many  04:23
10 are using an account.  04:23
11        But if -- the work I've done is kind of  04:23
12 looking at an account on an account basis.  That's where  04:23
13 I end up primarily in each of my methods.  And then I  04:23
14 say, well, it could be that there's multiple accounts.  04:23
15        I'm not aware of data that would tell me,  04:23
16 well, what do we do with users if they share -- sorry --  04:23
17 class members of sharing an account?  04:23
18        I think what I know -- at least what I knew at  04:23
19 the time of my report, the methodology would be to use  04:24
20 an account, lacking other information to say more about  04:24
21 it.  04:24
22        But this is also something which could clearly  04:24
23 be, in my experience, handle the claims administration  04:24
24 with a question.  How many people?  That will be the  04:24
25 time it would come up.  04:24

Page 272

1        So even if it's not something I would do, I  04:24
2 would say this is something to decide, if that's  04:24
3 important.  If the Court decides it, that's one line to  04:24
4 fill out or one box to fill out on an online claims  04:24
5 administration form.  04:24
6 BY MS. TREBICKA:  04:24
7    Q.  Do you believe that then it -- let's assume  04:24
8 there are two users to a Google account.  04:24
9        Do you believe they should be paid twice as  04:24
10 much or would they have to share whatever is allocated  04:24
11 to a Google account?  04:24
12        MS. WEAVER:  Objection.  Form.  04:24
13        THE WITNESS:  I think one allocation would be  04:24
14 to share, but it -- if the idea is that every class  04:24
15 member deserves a share, that could be used as well.  04:24
16        I'm not aware of data which would indicate or  04:25
17 would suggest the appropriateness, as I sit here today,  04:25
18 or at least when I issue my report, of which -- when  04:25
19 that is.  04:25
20 BY MS. TREBICKA:  04:25
21    Q.  What about as you sit here today, I guess,  04:25
22 because you said "At least when I issued my report, I'm  04:25
23 not aware of the data."  04:25
24        Have you looked into whether there is such  04:25
25 data to be able to answer that question?  04:25

Page 273

69 (Pages 270 - 273)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    MS. WEAVER:  Well, objection.  Beyond the    04:25
2 scope.  Form.                                  04:25
3    THE WITNESS:  I've formed no additional or   04:25
4 modified opinions since submitting my report.  04:25
5    So whatever I've seen or looked at, it's been 04:25
6 informative, but I have not yet coalesced that to being 04:25
7 an opinion that may or may not change or be augmented or 04:25
8 modified or just supported relative to my initial report 04:25
9 or the report we're talking about today.       04:26
10 BY MS. TREBICKA:                               04:26
11    Q.  Thank you for your testimony because I  04:26
12 actually was asking -- I was going to ask you a similar 04:26
13 question, but maybe I'll ask it again, just in the -- 04:26
14 for completeness.                              04:26
15    But since you've submitted your report, you 04:26
16 have not formed any additional or modified opinions. 04:26
17    Is that correct?                           04:26
18    A.  Correct.  Or I should say I haven't attempted 04:26
19 to so -- and of course I haven't succeeded, things I 04:26
20 didn't try to do.  So I've not looked at the information 04:26
21 and concluded that there are no changes.  I just haven't 04:26
22 attempted to evaluate the additional discovery to assess 04:26
23 if there were any changes in my opinion.       04:26
24    Q.  Well, we're nearing six hours and change of 04:26
25 testimony.                                     04:27

Page 274

1    Anything that we've discussed today has     04:27
2 prompted you to either add or modify any of the opinions 04:27
3 that you've submitted in your report?          04:27
4    A.  Not that I can recall right now.  But we have 04:27
5 covered a lot.  Maybe when I go through my deposition 04:27
6 errata, something might come to mind, but nothing I can 04:27
7 think of right now.                            04:27
8    Q.  You work at Cirque Analytics; right?    04:27
9    A.  Yes.                                    04:27
10    Q.  What is your role there?               04:27
11    A.  I'm an executive vice president.        04:27
12    Q.  How much of your professional time is consumed 04:28
13 by assisting parties in litigation?            04:28
14    A.  Probably 70 percent.  Maybe 60 percent. 04:28
15 Something like that.                           04:28
16    Q.  And what is the rest of your time spent on, 04:28
17 professional time?                             04:28
18    A.  A small percent, which admittedly is sometimes 04:28
19 zero, depending on the month or quarter, I will be 04:28
20 involved in some consulting for businesses that's not in 04:28
21 the -- not in the context of litigation or disputes. 04:28
22 But that is a bit itinerate.  The vast majority of the 04:28
23 remainder of my time, above 60 to 70 percent, is my time 04:28
24 as a professor.                               04:28
25    Q.  When you consult for businesses, what is the 04:29

Page 275

1 subject, I guess, of consultation?            04:29
2    A.  We oftentimes call them a market analysis. 04:29
3 They want help just identifying who's in the   04:29
4 marketplace, what seems to be new trends, what seem to 04:29
5 be the cost or demand drivers, you know, potential for 04:29
6 entry, maybe evaluation of assets or companies.  It 04:29
7 could be all over the map.                     04:29
8    Q.  Mm-hm.                                  04:29
9    A.  Evaluation of maybe legislative changes or 04:29
10 regulation changes by the government.          04:29
11    Q.  Let's turn to your CV, which I understand is 04:29
12 Appendix 1 of your report, but let me confirm. 04:29
13    It is.  So it is immediately after the      04:30
14 conclusion in your report.                     04:30
15    A.  Yes.                                    04:30
16    Q.  Okay.  Remember in -- so -- actually, let 04:30
17 me --                                          04:30
18    A.  Yeah.  By the way, the last time I was   04:30
19 deposed, the opposing counsel commented that my picture 04:30
20 was taken quite a few years ago.  And while I'm not 04:30
21 disputing that, I appreciate you, Viola, did not make 04:30
22 any comment about that.                        04:30
23    Q.  I am a kind soul.                       04:30
24    A.  I probably need an updated picture.     04:30
25 ///

Page 276

1    Q.  Remember in the beginning of your testimony, 04:30
2 we spoke about the types of cases that you've testified 04:30
3 on.  And I asked you -- or in.  And I've asked you to 04:30
4 think back to the case that you believe is the closest 04:31
5 in nature or subject matter to this.           04:31
6    And you said that you could do that, except 04:31
7 you may need the help of your case list.        04:31
8    Here we are now with your CV in hand where you 04:31
9 have listed "Professional Experience" with several 04:31
10 subject matters, as well as on page 8 of your CV, a 04:31
11 section that says "Expert witness experience since 04:31
12 2016."                                         04:31
13    So with this at hand, would you be able to   04:31
14 point out to me the case that has the closest  04:31
15 relationship subject matterwise to your opinions in this 04:31
16 case here, which is the evaluation of personal 04:31
17 information?                                   04:31
18    A.  Okay.  I don't remember saying I could find 04:32
19 the one that's most likely.  I remember saying that I 04:32
20 didn't have one.                               04:32
21    And I think you said, "Well, did you find the 04:32
22 three or four or five that maybe did?"          04:32
23    And I think I said, "No, I haven't come up   04:32
24 with any number."                              04:32
25    So I don't know that I'd be able to come up  04:32

Page 277

70 (Pages 274 - 277)

1 with one. I'm not sure I want to come up with one. I'm   04:32
2 not sure I have to, just because you want to know it.   04:32
3 Maybe I do. But I haven't done that before. But I   04:32
4 could look at cases that have elements of this issue of   04:32
5 information, protecting information and the value of   04:32
6 information.   04:32
7   Q. Any of the cases that you have mentioned here   04:32
8 as expert witness experience, do they relate to   04:32
9 valuation of individuals' personal information?   04:32
10   MS. WEAVER: Objection. Misstates the record   04:32
11 of his assignment. Form.   04:32
12 BY MS. TREBICKA:   04:32
13   Q. So just directing your attention to page 8 of   04:32
14 your CV.   04:32
15   A. Yes.   04:33
16   MS. WEAVER: Same objections.   04:33
17   THE WITNESS: I think -- although other cases   04:34
18 relate to confidential or private information, what you   04:34
19 just asked was about personal information. And I think   04:34
20 in the cases going back for these four years or so, I   04:34
21 think the one I can think of now in reading the titles   04:34
22 that has to do with personal information is the fourth   04:34
23 case listed Williams and Stewart v. Apple.   04:34
24 BY MS. TREBICKA:   04:34
25   Q. Okay.   04:34

Page 278

1   A. And I don't know if any of the others, if the   04:34
2 information was personal as opposed to private,   04:34
3 confidential, but not for, you know, individual people.   04:34
4   Q. Okay. Have your opinions ever been excluded   04:34
5 by the Court?   04:34
6   A. Yes.   04:34
7   Q. Have you ever been -- has your testimony ever   04:34
8 been excluded? In other words, have you been forbidden   04:34
9 from testifying by a Court?   04:35
10   A. Yes. That's what I thought you were asking.   04:35
11   Q. Yeah. I think it's very similar but -- okay.   04:35
12   How many times has that happened?   04:35
13   A. One time.   04:35
14   Q. Which case was that?   04:35
15   A. E Plus versus Lawson, I believe.   04:35
16   Q. Okay. E Plus versus Lawson, your opinion was   04:35
17 excluded by the Court?   04:35
18   A. I was not allowed to testify.   04:35
19   Q. Okay.   04:35
20   A. And, I mean -- well, one precluded the other.   04:35
21   Q. Right. Right.   04:35
22   A. Or preceded the other, rather.   04:35
23   Q. Okay. Are you aware of the case   04:35
24 Grasshopper House versus Clean & Sober Medua, LLC?   04:35
25   A. I am.   04:35

Page 279

1   Q. I'm trying to find it in your list of cases.   04:35
2 I'm not sure I can.   04:35
3   A. Second one on page 11 of my CV.   04:35
4   Q. And is that a case where your opinion was   04:36
5 excluded by the Court in 2019?   04:36
6   A. Well, I testified in deposition and trial in   04:36
7 that case. There were portions of the case where the   04:36
8 judge didn't agree with the legality, as I understand,   04:36
9 of the method, so I didn't testify about everything I   04:36
10 had put in my reports.   04:36
11   Q. Is there -- are there other cases, other than   04:36
12 this one that you testified about, E Plus v. Lawson,   04:36
13 where your testimony was included in part by the Court?   04:36
14   A. There was a case -- well, I had a supplemental   04:36
15 report that it used a couple of documents, and there was   04:36
16 a motion that those documents should not have been   04:36
17 allowed because it was after a discovery deadline.   04:37
18 Because that motion was granted, I was not allowed to   04:37
19 use those documents. So in other words, my opinion,   04:37
20 which it didn't change my opinion, but I wasn't able to   04:37
21 talk about those documents, so that's one instance.   04:37
22   Q. Any other instances you can think of?   04:37
23   MS. WEAVER: And I just want to caution   04:37
24 Dr. Mangum, I'm sure that you're mindful of this, but   04:37
25 you shouldn't be revealing anything that was   04:37

Page 280

1 confidential in any of those actions.   04:37
2   THE WITNESS: Thank you.   04:37
3   MS. WEAVER: Yeah.   04:37
4   THE WITNESS: There was a -- let's see if I   04:37
5 can recall what kind of case it was. There was a   04:37
6 trademark case I think it was involving -- and it had   04:37
7 damages opinions, and I had commented on one of the   04:37
8 outcomes or one of the results of a survey expert   04:37
9 working for the opposing side. But I had not been --   04:38
10 but the side I was working for had a survey expert. I   04:38
11 had not been designated as the survey expert. So the   04:38
12 judge said, "Well, Mangum should not be talking about   04:38
13 the survey" -- "the opposing survey expert," given you   04:38
14 know, how he was designated, his background, et cetera,   04:38
15 so...   04:38
16 BY MS. TREBICKA:   04:38
17   Q. Which case is that?   04:38
18   A. It's more than four years ago and I can't   04:38
19 remember -- let me make sure it wasn't at the very end   04:38
20 here.   04:38
21   No. It's been more than four years. I don't   04:38
22 remember the name.   04:38
23   Q. Well, in the Grasshopper, LLC v.   04:38
24 Clean & Sober Medua, LLC case that I mentioned earlier,   04:38
25 is it your understanding that at least in part, your   04:38

Page 281

71 (Pages 278 - 281)

1 testimony was excluded on the basis that it was not   04:38
2 based on sufficient facts or data?   04:38
3    A.  I don't believe that was the case.  That's not   04:39
4 my recollection.   04:39
5    Q.  Okay.  And is it consistent with your   04:39
6 recollection that the Court stated that your opinion on   04:39
7 the counter-defendant's lost profits was deficient and   04:39
8 that your expert opinion would not be helpful to the   04:39
9 jury and would not be admissible in that case?   04:39
10    A.  I don't have any specific opinion -- I mean   04:39
11 recollection.   04:39
12    Q.  It could have said that; you just don't   04:39
13 recall?   04:39
14    A.  Well, it's a bit confusing if I heard you   04:39
15 because I was allowed to testify about the opposing   04:39
16 expert's disgorgement analysis before the judge.  And   04:39
17 the judge took my opinion and therefore did not accept   04:39
18 the testimony of the opposing expert.  So I'm a little   04:39
19 bit confused by what you've read.   04:39
20    Q.  So you think I may have it wrong and you were   04:39
21 actually not -- part of your opinion was not excluded?   04:39
22    MS. WEAVER:  Objection.  Misstates testimony.   04:39
23    THE WITNESS:  I'm just stating I'm confused   04:40
24 because I did testify before the judge in rebuttal about   04:40
25 the opposing expert's disgorgement analysis.   04:40

Page 282

1 BY MS. TREBICKA:   04:40
2    Q.  And for the Grasshopper case in 2019, do you   04:40
3 understand that part of your opinion was excluded?   04:40
4    A.  Yes.   04:40
5    Q.  Do you recall an ADT, LLC versus Vivant, Inc.   04:40
6 case in 2017?   04:40
7    A.  I do.   04:40
8    Q.  And I realize that there are a couple of   04:40
9 ADT, LLC cases that you have been part of.  But you   04:40
10 recall this one versus Vivant, Inc.?   04:40
11    A.  Correct.  Vivant, yeah.   04:40
12    Q.  Vivant.  Okay.   04:40
13    And my understanding is that your opinion was   04:40
14 excluded in part by the Court in 2017 on the basis that   04:40
15 your sweeping damages calculation did not reflect   04:40
16 damages actually attributable to defendants' alleged   04:40
17 misconduct.   04:40
18    Does that ring a bell?   04:40
19    MS. WEAVER:  Objection.  Form.  Counsel is   04:41
20 testifying.   04:41
21    THE WITNESS:  No, it doesn't.  What I remember   04:41
22 about that case is that I didn't have such an opinion.   04:41
23 Opposing side had speculated that what I might be saying   04:41
24 in trial and moved that they didn't want me saying   04:41
25 something.  And the judge said, "Well, I hereby say   04:41

Page 283

1 Mangum cannot say that because if he did," dot, dot,   04:41
2 dot, but it actually wasn't part of my opinion.   04:41
3 BY MS. TREBICKA:   04:41
4    Q.  So in your understanding, you were not   04:41
5 excluded in -- part of your opinion was not excluded in   04:41
6 ADT versus Vivant, Inc.?   04:41
7    MS. WEAVER:  Objection.  Misstates testimony.   04:41
8 Form.   04:41
9    THE WITNESS:  Yeah.  I wouldn't say that   04:41
10 because I think the judge did say "Given the proposition   04:41
11 that Mangum might try to do that, I will exclude it.   04:41
12 I'm here pre-excluding it."   04:41
13    But that's not the same thing as saying I had   04:41
14 an opinion I rendered and then someone looks at it and   04:41
15 says, "Ah, we don't want Mangum to do that."   04:41
16    I never proposed to say that.   04:42
17 BY MS. TREBICKA:   04:42
18    Q.  Do you recall the case Trustees of   04:42
19 Boston University versus Everlight Electrics Company?   04:42
20    A.  I do.   04:42
21    Q.  Back in 2015?   04:42
22    A.  I do.   04:42
23    Q.  Okay.  And is that -- that is a case where   04:42
24 your testimony was stricken in part in 2015 on the basis   04:42
25 that it violated the hearsay rule.   04:42

Page 284

1    Do you recall that?   04:42
2    A.  I don't.  I don't.  I testified in that case   04:42
3 and I don't -- I don't remember being limited in that   04:42
4 case.   04:42
5    Q.  Okay.  So your recollection is that there was   04:42
6 no limitation, your testimony was not stricken in part   04:42
7 in that case; correct?   04:42
8    MS. WEAVER:  Objection.  Misstates testimony.   04:42
9 Form.   04:42
10    THE WITNESS:  I'm not stating that.   04:42
11    What I'm saying is that I'm surprised to hear   04:42
12 that.  Maybe something like this happened and no one   04:42
13 ever told me.  But the opinions that I formed in my   04:42
14 report and I testified to at deposition, those are the   04:42
15 opinions that I gave that I recall.   04:43
16    There might have been one supporting argument   04:43
17 that -- because it referred to something that was   04:43
18 hearsay, I'm guessing here.  The idea was, no, that   04:43
19 can't be part of it.  But it didn't change my opinions.   04:43
20 Maybe I didn't talk about that.  But I don't remember   04:43
21 that, to be honest.  So I just don't remember any change   04:43
22 to my opinions from my reports to my trial testimony.   04:43
23 BY MS. TREBICKA:   04:43
24    Q.  Do you recall the case Fujitsu, Limited versus   04:43
25 Belkin International, Inc. in 2012?   04:43

Page 285

72 (Pages 282 - 285)

**Page 286**

1  A. Zyxel?                                          04:43
2  Q. Fujitsu.                                       04:43
3  A. Oh, Fujitsu. Yes.                              04:43
4  Q. Was any part of your testimony excluded in     04:43
5  that case?                                        04:43
6  A. That's the one that I spoke about earlier      04:43
7  about a supplemental report and some of the documents   04:43
8  that I had used. It was moved that those were produced   04:44
9  untimely or something like that, and so those documents   04:44
10 were not allowed to be part of my opinion.        04:44
11 Q. Is it your testimony that part of your opinion   04:44
12 was excluded or do you understand that part of your --   04:44
13 that no part of your testimony was excluded?      04:44
14 A. No. I -- what I testified to is that I had a   04:44
15 supplemental report -- I was asked to look at a couple   04:44
16 new documents that became available and I was asked,   04:44
17 "Look, look at these things. What would that mean?"   04:44
18 And I did file a supplemental report about that.   04:44
19 But I remember the judge said, "Well, those       04:44
20 came in after a deadline and so they can't be used."   04:44
21 So therefore that supplemental report -- I        04:44
22 can't recall if it was the whole supplemental report or   04:44
23 part of it because of these documents. I think it was   04:44
24 all of it. It just wasn't allowed as we went to trial.   04:45
25 Q. So the supplemental report was excluded?       04:45

**Page 287**

1  A. Is that a question or a statement?             04:45
2  Q. I'm trying to understand what you're saying.   04:45
3  So your -- your recollection is that the          04:45
4  supplemental report was excluded?                 04:45
5  A. That's what I tried to just explain. I do not   04:45
6  remember.                                         04:45
7  My recollection is it had to do with this         04:45
8  supplemental report and it had to do with additional   04:45
9  documents that I didn't have in an initial report. And   04:45
10 it was the timeliness of discovery vis-à-vis these   04:45
11 documents that related to the exclusion.          04:45
12 I just don't remember if that was all of the      04:45
13 second -- of a supplemental report or if it was part of   04:45
14 it.                                               04:45
15 Q. Do you recall Inventio AG versus Otis          04:45
16 Elevator?                                         04:45
17 A. I do.                                          04:45
18 Q. A 2011 case?                                   04:45
19 A. Yes.                                           04:45
20 Q. And there do you recall any part of your       04:45
21 testimony being excluded?                         04:45
22 A. I testified in that case that -- there was an   04:45
23 exclusion before trial. This is the Southern District   04:46
24 of New York. But then the trial was bifurcated and the   04:46
25 judge allowed a hearing during the trial. And based on   04:46

**Page 288**

1  those hearings, the judge changed her mind and I was   04:46
2  allowed to testify.                               04:46
3  But given the judge's ruling about what the       04:46
4  royalty base would be, counsel for a company I was   04:46
5  working for, Inventio, decided not to present a damages   04:46
6  argument, and the second stage of the trial after a   04:46
7  finding of liability. They wanted to go to appeal   04:46
8  directly.                                         04:46
9  Q. So initially the judge excluded your opinion,   04:46
10 but then changed her mind and did allow you to testify.   04:46
11 Is that your testimony?                           04:46
12 A. Yes. Or at least there were hearings -- these   04:46
13 were in the evenings, right, when the -- during this   04:46
14 bifurcated trial, there was liability going, and in the   04:46
15 evenings I was able to explain more about what I did.   04:47
16 And the judge said, "Well, I will allow Mangum   04:47
17 to testify," but she made a ruling about what the   04:47
18 royalty base would be based on a legal finding.   04:47
19 And so based on that, we waited. There was a      04:47
20 finding of liability. But plaintiffs' counsel decided   04:47
21 to not present a damages argument with the small royalty   04:47
22 base and to go to appeal instead.                 04:47
23 Q. Could you please turn to page 22 of your       04:47
24 report? That's Table 3, "Google's Revenue Premium   04:47
25 Calculation."                                     04:47

**Page 289**

1  A. Yes.                                           04:47
2  Q. So we're back to your unjust enrichment        04:47
3  opinion.                                          04:47
4  A. Okay.                                          04:47
5  Q. This is Table 3. And I'd like to ask you a     04:47
6  few questions about Table 3 in particular.        04:47
7  A. Okay.                                          04:47
8                                                    04:48

Page 286
Page 287
Page 288
Page 289

CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 290

Page 292

Page 291

Page 293

74 (Pages 290 - 293)

CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 294

Page 296

Page 295

04:58

Page 297

Veritext Legal Solutions
866 299-5127



1     MS. TREBICKA:  Why don't we take a break now   05:04
2 so that I can have some time to look through my notes   05:04
3 and see what other questions I may have of you,   05:04
4 Dr. Mangum.   05:04
5     THE WITNESS:  Okay.   05:04
6     THE VIDEOGRAPHER:  Okay.  We're off the record   05:04
7 5:04 p.m.   05:04
8     (Break taken in proceedings.)   05:04
9     THE VIDEOGRAPHER:  We are back on the record.   05:29
10 The time is 5:29 p.m.   05:29
11 BY MS. TREBICKA:   05:29
12   Q.  Dr. Mangum, could you turn your attention to   05:29
13 paragraph 17 of your report?  Just let me know when   05:29
14 you're there.   05:29
15   A.  I am there.   05:29
16 BY MS. TREBICKA:   05:29
17   Q.  So in paragraph 17 of your report, this is   05:29
18 under Section II.B, "Plaintiffs and Class Members Data."   05:30
19     Is this a summary of the allegations, as you   05:30
20 understand them?   05:30
21   A.  Yes.  You can see the heading there of that   05:30
22 Section II.B has a footnote on itself actually there,   05:30
23 footnote 10 after the word "Members."  And so I'm citing   05:30
24 to the Complaint there.  And when I say there, in   05:30
25 paragraphs 17 and 18.   05:30

Page 302

1   Q.  You say in the last sentence of paragraph 17,   05:31
2 you say:   05:31
3     "However, Google received Plaintiffs'   05:31
4     personal information from Chrome,   05:31
5     including the content of communications."   05:31
6     Do you see that?   05:31
7   A.  I do.   05:31
8   Q.  Does that have a particular significance for   05:31
9 your opinions, the content of communications?   05:31
10   A.  Any particular significance, it's what I   05:31
11 understand is alleged.  Although, I don't -- that   05:31
12 doesn't jump out to me as something that I needed a   05:31
13 different table or a different calculation or some kind   05:31
14 of special treatment.   05:31
15   Q.  What data do you consider content?   05:31
16   A.  What data --   05:31
17   Q.  Yeah.  Let me say that again.   05:31
18     For purposes of your opinions, do you consider   05:31
19 certain of the data improperly collected to be content   05:31
20 and other data not to be content?   05:31
21     Do you make that distinction?   05:32
22   A.  I don't --   05:32
23     MS. WEAVER:  Objection.  Vague.  Calls for a   05:32
24 technical opinion.  Out of scope.   05:32
25     THE WITNESS:  The analysis that I've done   05:32

Page 303

1 doesn't give anything -- doesn't give any use of the   05:32
2 word "content" besides simply what's contained in a   05:32
3 collection of information, the content, what's contained   05:32
4 there.   05:32
5 BY MS. TREBICKA:   05:32
6   Q.  Actually, could we switch back to Table 3?   05:32
7   A.  Yeah.   05:32
8   Q.  That is page 20 of your report -- oh, sorry.   05:32
9 Page 22.   05:32
10   A.  22.  Okay.   05:32
11   Q.  All right.  So you -- in the last item of the   05:32
12 description before "Google's revenue premium as a   05:33
13 portion of total display ad revenue," the one right   05:33
14 before that, you say "Proportion of ad revenues directly   05:33
15 attributable to cookies."   05:33
16     Do you see that?   05:33
17   A.  Correct.   05:33
18   Q.  Is your assumption that all information   05:33
19 associated with these cookies is improperly obtained by   05:33
20 Google?   05:33
21   A.  It's -- well, one clarification, it's not the   05:33
22 cookies themselves.  It's related to the revenue from   05:33
23 the advertising; right?  It's using third-party cookies   05:33
24 in advertising; that is, the advertising placed on   05:33
25 third-party sites that are part of the Google network,   05:33

Page 304

1 that's what we're referring to.   05:33
2     And my understanding is that it's the personal   05:33
3 information at issue in this case which includes more   05:33
4 than just the cookies, the persistent unique cookies,   05:33
5 but it does include those persistent third-party cookies   05:34
6 that's at issue of, if that goes away, what happens to   05:34
7 advertising?   05:34
8   Q.  So from your perspective, all information   05:34
9 associated with third-party cookies that Google obtains   05:34
10 from these putative class members, is part of the   05:34
11 information that you are attempting to quantify the   05:34
12 Google's unjust enrichment from?   05:34
13     MS. WEAVER:  Objection.  Form.   05:34
14     THE WITNESS:  Well, I don't define that myself   05:34
15 first and then go and impose this on the documents I'm   05:34
16 reading.  They've looked at this in the context of   05:34
17 losing third-party cookies used in advertising relates   05:34
18 to the context of these documents, talks about losing   05:34
19 the personal information.  The things they're thinking   05:34
20 about, what happens if we lose that personal   05:34
21 information?  It means cookies.   05:34
22     I think it might mean more.  And I think when   05:34
23 the references to the 52 percent, when they talk about   05:35
24 third-party cookies, I think they mean more generally.   05:35
25 If they don't mean more generally, I think I'm   05:35

Page 305

77 (Pages 302 - 305)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 underestimating the effect of this dispute in this case  05:35
2 because there's more information than just the  05:35
3 third-party cookies, as we've talked about before. But  05:35
4 I think they use that as a reference to this personal  05:35
5 information. When it's gone, they lose at least the  05:35
6 third-party cookies.  05:35
7    But it's connected to what happens to using  05:35
8 those when the personal information is not available.  05:35
9 BY MS. TREBICKA:
10    Q. If the fact finder were to find that certain  05:35
11 information associated with third-party cookies was not  05:36
12 improperly obtained, would you have a way to exclude  05:36
13 the revenue associated with some of these third-party  05:36
14 cookies?  05:36
15    MS. WEAVER: Objection. Assumes facts. Calls  05:36
16 for speculation.  05:36
17    THE WITNESS: I would need to know details  05:36
18 about what some third-party -- what some fact finder  05:36
19 would say.  05:36
20    MS. TREBICKA: Okay. Those are all my  05:37
21 questions for today.  05:37
22    MS. WEAVER: Okay. We will have -- we'll take  05:37
23 a break here and come back in a little bit. We might  05:37
24 have a few questions.  05:37
25    MS. TREBICKA: Okay.  05:37
                                               Page 306

1    THE VIDEOGRAPHER: Off the record at 5:37 p.m.  05:37
2       (Break taken in proceedings.)  05:37
3    THE VIDEOGRAPHER: We are back on the record  05:51
4 at 5:51 p.m.  05:51
5       EXAMINATION BY MS. WEAVER  05:51
6 BY MS. WEAVER:  05:51
7    Q. Dr. Mangum, you testified earlier regarding  05:51
8 consent.  05:51
9    Do you recall that?  05:51
10    A. I do.  05:52
11    Q. And what do you recall about what you  05:52
12 testified about how a website might gain consent?  05:52
13    MS. TREBICKA: Objection. Form.  05:52
14    THE WITNESS: I remember some questions about  05:52
15 the -- a hypothetical or a possibility that consent was  05:52
16 given, and I was asked whether or not that could be  05:52
17 adjusted for or accounted for.  05:52
18    And I remember offering up a hypothetical that  05:52
19 I thought was a step of claims administration where  05:52
20 something like that could be addressed. And I  05:52
21 identified the hypothetical that a website, maybe if it  05:52
22 was proposed that website was seen by a class member,  05:52
23 that might be deemed consent.  05:52
24    And I simply said, well, if that's the case, a  05:52
25 question could be asked if that website was seen, and  05:52
                                               Page 307

1 therefore we could take care of that and identify the  05:52
2 number of members at that claims administration stage.  05:52
3    Q. But you're not offering a legal opinion about  05:52
4 consent, are you?  05:52
5    MS. TREBICKA: Objection. Form.  05:52
6    THE WITNESS: No. I have no liability  05:53
7 opinions. I assume liability -- I see consent as one of  05:53
8 the elements of liability in this case.  05:53
9 BY MS. WEAVER:  05:53
10    Q. And when you were discussing that, were you  05:53
11 assuming consent?  05:53
12    MS. TREBICKA: Objection. Form.  05:53
13    THE WITNESS: It's my assumption --  05:53
14    MS. TREBICKA: So, Dr. Mangum, just give me a  05:53
15 beat to object, too.  05:53
16    MS. WEAVER: You see the problem, Viola.  05:53
17    THE WITNESS: My opinions are all under the  05:53
18 assumption of liability, which includes the area of  05:53
19 consent. So, yes, I assume that, and I've then done a  05:53
20 calculation, assuming that's already been settled, so to  05:53
21 speak, by the Court.  05:53
22 BY MS. WEAVER:
23    Q. And you're not opining here whether any  05:53
24 particular Chrome users are or are not class members.  05:53
25    Is that right?  05:53
                                               Page 308

1    MS. TREBICKA: Objection. Form.  05:53
2    THE WITNESS: Correct. I don't form opinions  05:53
3 about whether an individual is a class member or not.  05:53
4 BY MS. WEAVER:  05:53
5    Q. So if Google did obtain lawful consent to  05:53
6 collection of some data, does that impact your approach  05:54
7 and methodology in any way?  05:54
8    A. It would not. My methodology applies given  05:54
9 consent or -- I'm sorry -- given liability, which would  05:54
10 include consent.  05:54
11    So wherever that applies, then my methodology  05:54
12 I believe is appropriate, again, because I have assumed  05:54
13 that liability, all elements including consent.  05:54
14    Q. In your unjust enrichment analysis, do you  05:54
15 recall referring to cookies?  05:54
16    A. I do. Third-party cookies, the revenue earned  05:54
17 by third-party cookies, I think.  05:54
18    Q. Okay. What did you mean when you were  05:54
19 referring to cookies in general? Was that advertising  05:54
20 based on cookies?  05:54
21    MS. TREBICKA: Objection. Form.  05:54
22    THE WITNESS: The -- there's a certain row in  05:54
23 my Table 3 that identifies the proportion of ad revenue  05:54
24 directly attributable to cookies. Cookies -- there was  05:54
25 a shorthand for third-party cookies. That adjustment  05:55
                                               Page 309

78 (Pages 306 - 309)

1 that I make relates to an adjustment to revenue from ads 05:55
2 on third-party websites, right, based on the personal    05:55
3 information, such as that found in -- or used in    05:55
4 third-party cookies.    05:55
5 BY MS. WEAVER:    05:55
6    Q.  How many times has a Court excluded your work 05:55
7 based on its reliability?    05:55
8    A.  As far as I know, the one time we talked    05:55
9 about, the E Plus versus Lawson case earlier today.    05:55
10    Q.  And how many times have you submitted reports 05:55
11 that Courts accepted?    05:55
12    A.  A hundred, hundred and 50, something like    05:55
13 that.    05:55
14    MS. WEAVER:  Great.    05:55
15    No further questions at this time.    05:55
16    MS. TREBICKA:  None here either.    05:55
17    MS. WEAVER:  Great.  Thank you very much.    05:55
18    MS. TREBICKA:  Dr. Mangum, thank you for your    05:55
19 time.    05:55
20    THE WITNESS:  You're welcome.    05:55
21    MS. WEAVER:  Bye, guys.  Have a good night.    05:55
22    Same order, Katy.  Thank you very much.    05:55
23    THE VIDEOGRAPHER:  Okay.  Let me close it out, 05:56
24 please.    05:56
25    This will conclude the deposition of    05:56

Page 310

1 Dr. Russell Mangum, Ph.D.  The total number of media    05:56
2 units used in today's deposition was eight and will be    05:56
3 retained by Veritext Legal Solutions.    05:56
4    We are off the record.  The time is 5:56 p.m.  05:56
5    Thank you.    05:56
6    (Whereupon, the deposition adjourned at 5:56 p.m.)
7    ---o0o---
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 311

REPORTER'S CERTIFICATE
2    ---o0o---
3 STATE OF CALIFORNIA   )
   ) ss.
4 COUNTY OF YOLO    )
5    I, KATY E. SCHMIDT, a Certified Shorthand
6 Reporter in and for the State of California, duly
7 commissioned and a disinterested person, certify:
8    That the foregoing deposition was taken before me
9 at the time and place herein set forth;
10    That DR. RUSSELL MANGUM, the deponent herein, was
11 put on oath by me;
12    That the testimony of the witness and all
13 objections made at the time of the examination were
14 recorded stenographically by me to the best of my
15 ability and thereafter transcribed into typewriting;
16    That the foregoing deposition is a record of the
17 testimony of the examination.
18    IN WITNESS WHEREOF, I subscribe my name on this
19 10th day of December, 2021.
20
21
   Katy E. Schmidt, RPR, KMR, CRR, CSR 13096
22    Certified Shorthand Reporter
   in and for the
23    County of Sacramento,
   State of California
24
25 Ref. No. 4893187 KES

Page 312

1 VIOLA TRIBECKA, Esq.
2 violatrebicka@quinnemanuel.com
3    December 10, 2021
4 RE: CALHOUN, et al. vs. GOOGLE, LLC
5 December 7, 2021, DR. RUSSELL MANGUM, JOB NO. 4893187
6 The above-referenced transcript has been
7 completed by Veritext Legal Solutions and
8 review of the transcript is being handled as follows:
9 __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext
10    to schedule a time to review the original transcript at
11    a Veritext office.
12 __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF
13    Transcript - The witness should review the transcript and
14    make any necessary corrections on the errata pages included
15    below, notating the page and line number of the corrections.
16    The witness should then sign and date the errata and penalty
17    of perjury pages and return the completed pages to all
18    appearing counsel within the period of time determined at
19    the deposition or provided by the Code of Civil Procedure.
20 __ Waiving the CA Code of Civil Procedure per Stipulation of
21    Counsel - Original transcript to be released for signature
22    as determined at the deposition.
23 __ Signature Waived – Reading & Signature was waived at the
24    time of the deposition.
25

Page 313

79 (Pages 310 - 313)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 __ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF
2 Transcript - The witness should review the transcript and
3 make any necessary corrections on the errata pages included
4 below, noting the page and line number of the corrections.
5 The witness should then sign and date the errata and penalty
6 of perjury pages and return the completed pages to all
7 appearing counsel within the period of time determined at
8 the deposition or provided by the Federal Rules.
9 _x_ Federal R&S Not Requested - Reading & Signature was not
10 requested before the completion of the deposition.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 314

1 CALHOUN, et al. vs. GOOGLE, LLC
2 DR. RUSSELL MANGUM (#4893187)
3       E R R A T A  S H E E T
4 PAGE_____ LINE_____ CHANGE_____
5 _____
6 REASON_____
7 PAGE_____ LINE_____ CHANGE_____
8 _____
9 REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 WITNESS              Date
25

Page 315

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.