# EXHIBIT 5
# Redacted Version of Document Sought to be Sealed

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

|  |  |
|---|---|
| PATRICK CALHOUN, et al., | |
| Plaintiffs, | |
| *v*. | Case No. 20-CV-05146-LHK |
| GOOGLE LLC, | |
| Defendant. | |

**EXPERT REPORT OF BRUCE A. STROMBOM**

**December 22, 2021**

# EXPERT REPORT OF BRUCE A. STROMBOM

## TABLE OF CONTENTS

Page

I.     INTRODUCTION ................................................................................................ 1

    A.    Qualifications ............................................................................................ 1

    B.    Assignment .............................................................................................. 1

    C.    Materials Relied Upon .............................................................................. 3

II.    SUMMARY OF OPINIONS ............................................................................... 3

III.    BACKGROUND ................................................................................................. 8

    A.    Summary of Plaintiffs' Allegations ........................................................... 8

    B.    Google's Receipt of the At-Issue Data ..................................................... 12

    C.    Explanation of How Google Makes Money Through Advertising ............... 14

IV.    REBUTTAL TO DR. MANGUM'S PROPOSED METHODOLOGIES FOR CALCULATING CLASS-WIDE DAMAGES ............................................ 17

    A.    Summary of Dr. Mangum's Proposed Methodologies for Calculating Class-Wide Damages ............................................................. 17

        1.    Summary of Dr. Mangum's Opinion Related to Calculating Unjust Enrichment ........................................................................ 18

        2.    Summary of Dr. Mangum's Opinion Related to Calculating Class-Wide Damages for Restitution of Value of "Personal Information" ......... 20

    B.    Dr. Mangum's Unjust Enrichment and Restitution Opinions Fail to Account for Uninjured Class Members and Provide No Way to Reliably Exclude Them From His Damages Analysis ................................. 22

        1.    Dr. Mangum's Approaches for Calculating Class-wide Damages Does Not Explain If and How Proposed Class Members Who May Have Explicitly And/or Implicitly Consented to the Alleged Wrongful Data Collection Can be Identified and Excluded ............... 23

        2.    Dr. Mangum Does Not Consider That Some Users May Not Have Been Injured Because They Exercised Options to Control the Data That Google Receives from Them in a Way That Prevented Google from Realizing Any Benefit from the At-Issue Data ................... 30

        3.    Dr. Mangum's Opinions Ignore That Certain At-Issue Data Received by Google May Not Be Considered "Personal Information" and Therefore Certain Proposed Class Members Would Be Uninjured ..................................................................... 33

        4.    Dr. Mangum Ignores That the Proposed Class Includes Users Who Derive More Value from Google's Personalization than Their Data Is Worth and Are Therefore Uninjured ..................................... 34

C.      Dr. Mangum Has Not Offered a Reliable, Non-speculative Methodology
        to Calculate Unjust Enrichment, and Offers No Opinion on a Methodology
        to Allocate Google's "Excess Profits" to Class Members ....................................39

        1.      Dr. Mangum Has Not Proposed a Reliable Class-Wide
                Methodology for Identifying the Portion of Google's Profits That
                May Be Attributable to the Alleged Wrongful Conduct...........................39

                a.      Dr. Mangum's assumption that Google earns as much
                        revenue from Chrome users who sync as from those who
                        do not sync is speculative ......................................................40

                b.      Dr. Mangum's assumption that the estimated revenue loss
                        to customers of one Google Display Ads product from
                        removing access to third party cookies is proportional to
                        the Display Ad revenue Google would have lost is
                        speculative..............................................................................41

                c.      Dr. Mangum's methodology for calculating class-wide
                        unjust enrichment is unreliable because it does not identify
                        a way to exclude profits Google may have earned from
                        users who are uninjured for various reasons, including
                        because they may have consented to Google's data receipt ..........43

                d.      Even assuming Dr. Mangum has proposed a reliable class-
                        wide approach, his calculation of unjust enrichment
                        remains unreliable and overstated for other reasons....................43

        2.      Dr. Mangum Has Not Proposed a Reliable Class-Wide
                Methodology for Calculating the Number of Users or the Unjust
                Enrichment per User ................................................................................46

                a.      Dr. Mangum has not proposed a methodology to identify
                        non-Google account holders who are part of the Proposed
                        Class.......................................................................................47

                b.      Dr. Mangum has not proposed a reliable methodology for
                        allocating Google's "excess profit" that accounts for the
                        variability that exists in the amount and type of data Google
                        received from users and degree to which Google was able
                        to monetize each user's data ...................................................47

                        i.      Differences in user reliance on user controls....................50

                        ii.     Differences in value of users on the basis of users'
                                characteristics.................................................................51

                        iii.    Differences in the number of ads users view ....................51

                c.      Dr. Mangum has not proposed a methodology to identify
                        and exclude Google accounts of users who are excluded
                        from the class ..........................................................................52

*Expert Report of Bruce A. Strombom*

D.     Dr. Mangum Does Not Offer a Valid Methodology to Calculate Class-wide Restitution Damages and His Opinion on Class-Wide Restitution Damages Is Unreliable and Speculative Because It Relies on Prior Research That Is Not Applicable to The Data At Issue or Circumstances of This Case ................................................................................................. 53

1.     None of the Methods Dr. Mangum Proposes as Indicative of the Value of the At-Issue Data Are Applicable to the Data and Facts of This Case ................................................................................................. 56

    a.     The two studies that Dr. Mangum uses for his survey-based method are not applicable to the facts in this case ........................ 56

        i.     The studies that Dr. Mangum proposes to use do not provide the market value of the At-Issue Data because they fail to account for critical supply-side factors ................................................................................. 58

        ii.     The studies that Dr. Mangum uses as estimates of the value of the At-Issue Data are not applicable to the facts in this case ....................................................... 59

    b.     Dr. Mangum's use of consumer payments for VPNs as a measure to value the At-Issue Data is irrelevant because the price paid for a VPN is not indicative of the value of the At-Issue Data, which Dr. Mangum also admitted ........................ 64

    c.     Dr. Mangum's "marketplace examples" payments from "research companies" for user information are not applicable because they do not measure the value of the At-Issue Data ................................................................................. 66

2.     Dr. Mangum's Suggested Approach to Calculating Class-wide Restitution Damages Is Unreliable Because It Is Based on the Assumption that Damages Are Associated Only With Google Accounts and that Each Google Accountholder Should Receive the Same Damages Per Period Despite Variation in User Preferences for Privacy and the Amount and Type of Data Google Received from Each Google Accountholder ............................................................. 67

    a.     Dr. Mangum's Methodology for Calculating Class-wide Damages from Loss of Value of the At-Issue Data Fails to Account for Variation in the Value Users Place on Protection of Their At-Issue Data .................................................. 68

    b.     Dr. Mangum's Methodology for Calculating Class-wide Restitution Damages Fails to Account for Variation in the Data that Google Receives from Different Users ........................ 70

    c.     Dr. Mangum's Methodology for Calculating Class-wide Restitution Damages Fails to Account for Issues Implicit in Using Google Accounts to Calculate and Allocate Class-Wide Damages Because Not All Proposed Class Members

*Expert Report of Bruce A. Strombom*

Have Google Accounts, and Even If They Did, There Is
Significant Variation in the Number and Use of Google
Accounts ........................................................................................71

**V.      REBUTTAL TO PLAINTIFFS' STATUTORY DAMAGES CLAIMS ....................73**

*Expert Report of Bruce A. Strombom*

## EXPERT REPORT OF BRUCE A. STROMBOM

## I.      INTRODUCTION

### A.      Qualifications

1.      My name is Bruce A. Strombom.  I am a Managing Principal in the Los Angeles office of Analysis Group, Inc., an international economic, financial, and strategy consulting firm with ten offices throughout North America, three in Europe, and one in Asia.  Analysis Group employs over 1,000 staff, many with advanced degrees in economics, management, or statistics. I hold a Ph.D. in economics from the University of California, Irvine and a B.A. in economics from San Jose State University.  My areas of specialization include applied microeconomics, industrial organization, and finance.

2.      For the past 28 years I have been employed as an economist and have served as a consulting and testifying expert in public policy matters and commercial litigation.  Previously, I was Executive Vice President of Business Valuation for a middle market merger and acquisition firm and Manager in the Financial Advisory Services group of the public accounting firm Price Waterhouse.  I have testified on topics involving economics, statistics and econometrics, among others, in numerous federal and state courts and in arbitrations.  In testimony, I have addressed issues related to class certification, liability, loss causation, and damages.  I have conducted economic analyses related to the appropriateness of class treatment in approximately four dozen cases involving a range of products and markets.  A copy of my curriculum vitae, including *inter alia* a list of my testimony in the past four years and a list of all publications I have authored in the past ten years, is attached as **Appendix A**.

### B.      Assignment

3.      In the above-captioned matter, Patrick Calhoun, et al. (collectively "Plaintiffs") allege that Google, LLC ("Google") "intentionally and unlawfully" causes its web browser Chrome to "record and send users' personal information to Google" regardless of whether the

user has enabled Sync mode on Chrome or even has a Google account.[1]  Plaintiffs filed this action on behalf of "Google Chrome users who chose not to 'Sync'" their browsers with their Google accounts while browsing the web from July 27, 2016 to the present.[2]  As a result of Google's alleged misconduct, Plaintiffs claim that they, and other proposed class members, have suffered "privacy harm and economic harm" and bring claims against Google "for money damages, restitution, disgorgement, punitive damages and injunctive relief."[3]

4.      I have been retained by counsel for Google to provide expert testimony in the above-captioned matter.  I have been asked to evaluate and respond to analyses, opinions, and conclusions provided by Plaintiffs' expert Dr. Russell Mangum.[4]  In particular, I have been asked to opine on the following questions:

- Assuming liability, have Plaintiffs provided a method common to the proposed class capable of reliably showing that all members of the proposed class were in fact damaged by Google's purported conduct?

- Assuming liability, have Plaintiffs provided a method common to the proposed class that would be capable of reliably showing that Google profited from the purported violations with respect to the proposed class, and if so, by how much?

- Assuming liability, have Plaintiffs provided a method common to the proposed class capable of reliably assessing the value of the "personal information" Google allegedly improperly collected?

5.      I have also been asked to evaluate, from an economic perspective, whether it is feasible for Plaintiffs to calculate statutory damages in this matter on a class-wide basis.

---

[1] *See* First Amended Class Action Complaint in Re: *Patrick Calhoun, et al. v. Google LLC*, Case No. 5:20-cv-05146-LHK-SVK, filed April 16, 2021 (ECF No. 163) ("FAC"), ¶¶ 2–3.

[2] FAC, ¶ 1.

[3] FAC, ¶ 13.

[4] Expert Report of Russell W. Mangum III, Ph.D. in Support of Plaintiffs' Motion for Class Certification, October 13, 2021 ("Mangum Report").

*Expert Report of Bruce A. Strombom*

6.      Analysis Group is compensated at a rate of $850 per hour for the time I spend on this matter; the rates for other Analysis Group staff members assigned to this case range from $350 to $850 per hour.  Neither my nor Analysis Group's compensation is dependent on the nature of my conclusions or the outcome of this matter.

### C.      Materials Relied Upon

7.      In forming my opinions, I have reviewed materials, data, and information provided to me by counsel for Defendant or obtained from public sources.  These materials include, among others, the Complaint, the expert report of Dr. Russell Mangum, documents the parties produced in the case, deposition testimony and various data and publications from publicly available sources.  The facts and data I have relied upon in forming my opinions are identified in this report, accompanying exhibits and/or **Appendix B**.

8.      I understand that discovery is ongoing.  I reserve the right to adjust or supplement my opinions as appropriate should additional relevant documents or data become available.

## II.      SUMMARY OF OPINIONS

9.      For the reasons below, in my opinion, Dr. Mangum has not proposed a feasible or reliable methodology for calculating damages that apply class-wide in this case.

### Dr. Mangum's Unjust Enrichment and Restitution Opinions Fail to Take Into Account Variability Among Users

10.      Dr. Mangum's opinions relate to two types of remedies: unjust enrichment and restitution.  Dr. Mangum offers no valid methodology to calculate class-wide restitution or unjust enrichment.  He has not designed or conducted an empirical analysis to estimate how much Plaintiffs were damaged from the alleged improper receipt of data, claiming that it was not part of his assignment.  Nor has he offered a reliable, non-speculative methodology to calculate or apportion unjust enrichment to class members.

11.      Dr. Mangum opines that it is *possible* to calculate per-class member damages on the basis of either of those remedies, and that each class member is entitled to the same amount of damages per period, but his opinion ignores that there is significant variation among class members, along at least the following dimensions:  (a) whether personal information was

allegedly improperly taken, (b) the value of the data at issue in this case to the class member, to Google or in the market, (c) whether Google receives data, and if so, the type and volume of the data that Google allegedly improperly collects from each proposed class member, (d) whether, and if so, how, Google uses the allegedly improperly collected information, and/or (e) whether the value from personalized advertising class members may receive on the basis of the data at issue outweighs the purported value of the data.

12.     This failure to consider variation across the proposed class members is a flaw that permeates Dr. Mangum's opinions related to unjust enrichment and restitution.  As to unjust enrichment, Google declarations I have reviewed have established that, although Google does not track profits by class member, its profits from the user data vary tremendously on the basis of characteristics that vary from user to user.  Similarly, I understand there is a wide variation in the amount of data Google collects from different users.  As to restitution, publicly available sources and the studies Dr. Mangum relies on acknowledge wide variation in (a) user preferences for privacy, (b) user preferences for advertising personalized using the data at issue, and (c) value of their information depending on the type and extent.  Even the studies Dr. Mangum cites, while not applicable, do not report a single estimate of value but rather multiple ranges that vary in part by the privacy preferences of individual users.

### Dr. Mangum's Unjust Enrichment and Restitution Opinions Fail to Take into Account Uninjured Class Members and Have No Way to Reliably Exclude Them from His Damages Analysis

13.     Dr. Mangum assumes that each and every one of the millions of Chrome users in the U.S. who browsed the web while not synced and while not in Incognito mode were injured. Dr. Mangum's assumption that *all* members of the proposed class were injured would significantly inflate class-wide damages if it is shown that some class members were not injured. Further, because he does not propose a methodology to identify and exclude from his analysis and damages numbers those members of the proposed class who may not have been injured, his class-wide damages would result in a material number of uninjured class members being compensated for alleged injuries that they did not sustain.

*Expert Report of Bruce A. Strombom*

14.     To identify and exclude those uninjured class members would require a myriad of individualized inquiries, which is inconsistent with a class-wide model.  Further, the results of such individualized inquiries would affect the class-wide damages amount.  Specifically:

- Individualized inquiry would be required to identify and exclude from Dr. Mangum's analysis users who implicitly consented, including those class members who used Google's services despite understanding from various disclosures that Google collected the data at issue.

- I understand that what data Google received from a particular class member and/or whether Google profited from that data depends on many factors, including (a) features and settings enabled by the user in Chrome or in the user's Google Account settings, and (b) use of third-party software by the user.  I also understand that individualized inquiry would be required to identify and exclude these users from Dr. Mangum's damages analysis.

- I understand individualized inquiry is required to identify and exclude from the analysis those proposed class members for whom Google did not collect data that is "personal information" because when a Chrome user is not signed-in to a Google Account, the data is associated only with a pseudonymous and delete-able cookie (if cookies are not blocked), not with an Account or any information that personally identifies the user.  At the very least, individualized inquiry would be required to identify users without Google accounts.

- Because users have varying preferences for personalized ads and there is variability in the degree to which individual users are willing to provide their data for the benefit of getting personalized ads, individualized inquiry would be required to identify and exclude from the analysis those class members who derived more value from Google's personalized ads than their data is worth (to them, to Google, or in the market).

### Dr. Mangum's Restitution Opinion Is Unreliable and Speculative Because It Relies on Research That Is Not Applicable to the At-Issue Data or Circumstances of This Case

15.     Dr. Mangum opines that there are "methods common to the class" to arrive at class-wide restitution damages, but all three "methods" he offers are speculative and unreliable because they are not pertinent to the facts of this case.

16.     First, the two studies that Dr. Mangum uses for his survey-based method are not applicable to the facts of this case. In fact, Dr. Mangum admitted that he does not know whether the same results would hold if he were to conduct a study using the facts of this case.

*Expert Report of Bruce A. Strombom*

- The studies Dr. Mangum uses are outdated (one was conducted in 2007 and the other in 2009) and analyze different, and irrelevant, types of data than the data at issue in this matter (*e.g.*, one of them attempts to value financial and healthcare data, among others).

- They are based on respondents that are not representative of the class (*e.g.*, one is based on 84 undergraduate students in the U.S., and the other is based on 168 undergraduate students in Europe). The authors of one of the studies (based on a European population) specifically cautioned against extrapolating the results to U.S. users because U.S. users have different valuations of privacy and personal information.

- They are based on conjoint analyses that do not estimate market values because they only measure the demand side of the market (*i.e.*, consumers' willingness to pay for a certain product feature) and not the "supply side" of the market, which is critical to determining the equilibrium (a.k.a. market) price of the data.

17.     Second, Dr. Mangum also proposes the prices paid for VPN services as "real market" examples of what users will pay to protect their privacy. However, the prices paid for VPNs are not indicative of the value of the data at issue, which Dr. Mangum also admitted. This is because VPNs offer many functionalities that are unrelated to privacy, and, in any event, there are free VPN services which, based on Dr. Mangum's view, would suggest that the value of the At-Issue Data is zero.

18.     Last, the examples of market payments from "research companies" for user information are not applicable because they do not measure the value of the data at issue in this case.

**Dr. Mangum's Proposed Methodology for Calculating Unjust Enrichment Is Speculative And Does Not Reliably Identify The Portion Of Google's Profits That May Be Attributable To The Alleged Wrongful Conduct**

19.     Dr. Mangum incorrectly assumes that, on average, Google earns the same amount of revenue from a synced user as it does from a non-synced user, and therefore incorrectly equates the proportion of users who are synced with the proportion of Google revenue attributable to synced users. Documents Google has produced in this litigation indicate that synced users are heavier users of Google services (meaning that the proportion of users is not equivalent to proportion of internet traffic).

20.     Dr. Mangum's unsupported assumption that Google's revenue per user from synced and non-synced users is the same causes his damages to be speculative and I understand that Google does not track revenue or profits by user.  For this reason alone, Dr. Mangum has not proposed a reliable methodology for calculating unjust enrichment, and if his methodology is adopted, it would erroneously distribute profits that Google earned from users who are excluded from the proposed class to users who are included.

21.     In addition, the statistic that Dr. Mangum uses to calculate the "[p]roportion of ad revenues directly attributable to cookies" is not applicable because it does not measure what he intends to measure.  Dr. Mangum makes the unsupported and flawed assumption that the *decrease in* Google's Display Ad revenue in the U.S. from disabling third-party cookies would have been proportional to the decrease in revenue that Google estimated would have been experienced by global publishers who use the programmatic arm of Google Ad Manager's serving system.  A significant share of Google's Display Ad revenue is not from the programmatic arm of Google Ad Manager.  Google earns Display Ad revenue from other sources, including, for example, AdSense and the non-programmatic arm of Google Ad Manager.

22.     Even assuming Dr. Mangum's assumptions above were correct, his damages remain unreliable and overstated for other reasons.

- He overstates the "Proportion of Display Ad traffic attributable to Chrome" by approximately 13 percent because he uses a statistic that pertains to Chrome traffic as a percentage of overall ad traffic (███████████) rather than Chrome traffic as a percentage of Display Ad traffic ███████████).

- He understates the percentage of Google users in the U.S. who are synced by up to ███████ because he ignores that the percentage of users who are synced ███████████████████████████████████████.

- He proposes to calculate Google's "excess profit" using its enterprise-wide gross profit margin, which is significantly higher than Google's gross profit margin from Display Ads and excludes important costs such as costs related to improving and maintaining the products and infrastructure Google used to generate the alleged "excess profits" from Display Ads.

7

**CIPA Damages Cannot Be Determined on a Class-Wide Basis**

23.    Plaintiffs have provided no evidence that statutory damages under CIPA can be determined on a class-wide basis and none of Plaintiffs' experts have proposed a class-wide methodology for calculating statutory damages.

- To calculate any statutory damages per violation, Plaintiffs need to propose a reliable way of calculating the number of CIPA violations, if any, for each proposed class member and for the class as a whole.  However, Plaintiffs have not provided such a methodology.

- Plaintiffs also fail to consider that, from an economic perspective, there is a reasonable purpose for the alleged violation, namely that Google's receipt of user data allows Google to improve the user experience and provide browsing services at no cost to Plaintiffs and proposed class members.

## III.    BACKGROUND

### A.    Summary of Plaintiffs' Allegations

24.    As described above, Plaintiffs allege that Google "intentionally and unlawfully" causes its web browser Chrome to "record and send users' personal information to Google" regardless of whether the user has enabled Sync mode on Chrome or even has a Google account.[5]

25.    I understand that Chrome can be used in one of several modes.[6]  In the period before September 2018, Chrome could be used in Basic mode, Signed-In Chrome mode (which enabled Sync mode), Guest mode, and Incognito mode.  In the period after September 2018, Chrome could be used in Basic mode, Signed-In (non-synced) mode, Sync mode, Guest mode, and Incognito mode.[7]  Plaintiffs' claims are based on information Google received from Chrome

---

[5] *See* FAC, ¶¶ 2–3.

[6] Google, "Google Chrome Privacy Notice," September 23, 2021.

[7] I understand that, while Guest mode is very similar to Incognito mode, a user browsing in Incognito mode still has access to their profile.  This means, for example, that a user browsing in Incognito mode can access their saved passwords and get suggestions based on their browsing history.  In contrast, a user browsing in Guest mode will not see information based on any existing profiles. Declaration of Abdelkarim Mardini in Support of Google's Opposition to Plaintiffs' Motion for Class Certification, December 16, 2021 ("Mardini Decl."), ¶15.

*Expert Report of Bruce A. Strombom*

users in any mode other than Sync mode (or Signed-In Chrome mode, prior to September 2018) and Incognito mode.

26.     Plaintiffs allege that Google unlawfully collected the following data from so-called "Un-Synced Chrome users," which Plaintiffs allege constitute their personal property:[8]

- Users' unique, persistent cookie identifiers;

- Users' browsing history in the form of the users' GET requests and information relating to the substance, purpose, or meaning of the website's portion of the communication with users;

- "In many cases," the contents of the users' POST communications;

- Users' IP addresses and User-Agent information about their devices; and

- Users' x-client-data identifiers.

Plaintiffs allege that "[e]ach *category* of personal information that Chrome sends to Google is a *separate* violation of Chrome's Terms of Service and an invasion of users' privacy."[9]

27.     I understand that Plaintiffs contend that their claims apply to data Google receives through *any* of its third-party web services, including Google Analytics, Google Ad Manager, "maps.googleapis.com, storage.googleapis.com, fonts.googleapis.com, translate.googleapis.com, cse.google.com, google.com, googletagmanager.com, pagead2.googlesyndication.com, the Chrome omnibar and any other property through which Google receives data from Chrome users in an non-synced state."[10]  Thus, I understand that Plaintiffs contend that each time Google receives an IP address from a Chrome user in Basic mode (*e.g.*, when a user visits a website that uses Google Fonts, or Embed Maps, or the Programmable Search Engine) constitutes a breach of contract, wiretapping, larceny, a violation of the California Unfair Competition Law ("UCL"),

---

[8] FAC, ¶¶ 1, 141.

[9] FAC, ¶ 142 (emphasis added).

[10] Jay Barnes, Re: Calhoun v. Google LLC, No. 5:20-cv-05146-LHK-SVK (N.D. Cal.) Follow-Up to July 26, 2021 Meet-and-Confer, July 27, 2021.

*Expert Report of Bruce A. Strombom*

and an invasion of privacy.  If Google also receives an x-client data header through the same service, that is a separate breach/violation/act of larceny.[11]

28.     Plaintiffs seek to certify a class consisting of "[a]ll Google Chrome users in the United States who did not enable 'Sync' while browsing the web using Chrome… or who disabled 'Sync' while browsing using Chrome…, at any time between July 27, 2016 to the present (the 'Class Period')" (collectively, the "Proposed Class").[12]  Excluded from the Proposed Class are users "[b]rowsing using the Chrome browser in Incognito mode."[13]  I understand that Plaintiffs have not excluded users browsing in Guest mode.  I define the "At-Issue Data" to be the data that Plaintiffs allege Google wrongfully collected from the members of the Proposed Class, and which I describe above.

29.     The crux of Plaintiffs' claims is that Google uses information improperly collected from users to deliver targeted advertisements to users across Google's services and across users' devices, and that the delivery of targeted advertisements leads to more engagement with the advertisements, allowing Google to sell the advertisements at a higher price. Specifically, Plaintiffs claim that Google ties Plaintiffs' "personal information" to other data it has about them to "draw a more complete picture" of users that had not opted-in to tracking in order to profit from the targeted ads to those users.[14]  Plaintiffs make several claims about how Google profited from the At-Issue Data.  Plaintiffs claim that Google's breach of its privacy promises to non-synced Chrome Users led to increased user engagement and revenue.[15]

---

[11] FAC, ¶¶ 3-4.

[12] Plaintiffs' Notice of Motion and Motion for Class Certification and Appointment of Class Representatives and Class Counsel; Memorandum of Law in Support Thereof, dated October 14, 2021, filed in Patrick Calhoun, et al. v. Google, LLC, Case No. 5:20-cv-05146-LHK-SVK, In the United States District Court, Northern District of California - San Jose Division ("Plaintiffs' Class Cert. Motion"), p. 1.

[13] Plaintiffs' Class Cert. Motion, p. 1.

[14] FAC, ¶ 110-111; see also ¶ 174 ("Google combined Plaintiff Calhoun's personal information that it obtained when he was not logged-in to Google Sync with other data it has about him, and will use that data to place Calhoun in advertising categories from which Google will profit from targeted advertising to him based on data that it did not have the right to obtain"); ¶ 180 ("Google combined Plaintiff Crespo's PI that it obtained when she was not logged-in to Google Sync with other data it has about her, and will use that data to place her in advertising categories from which Google will profit from targeted advertising to her based on data that it did not have the right to obtain.").

[15] See FAC, ¶ 97.  See also, Mangum Report, ¶¶ 16, 69.

*Expert Report of Bruce A. Strombom*

Specifically, Plaintiffs allege that by targeting advertising at users who have a higher amount of "tracked" engagement, Google can increase the profits it makes from gathering that data.[16] Additionally, Plaintiffs allege that promising a user that she is free from tracking induces a user to engage more actively and more intimately under the belief that she is untracked, exposing her as relevant for further categories of valuable advertising.[17]   Finally, Plaintiffs present a number of allegations regarding Google's increase in revenue in the relevant time period and how that increase relates to the value of users' "personal information."[18]

30.    Plaintiffs claim that they suffered economic injury when Google took their data and exerted exclusive control over it, collecting it without users' knowledge.  Plaintiffs claim they have a right to disgorgement and/or restitution damages for the value of the "stolen data."[19] The Amended Complaint also states that Plaintiffs have "suffered benefit of the bargain damages, in that Google took more data than the parties agreed would be exchanged."[20] According to Plaintiffs, those benefit of the bargain damages include: "(i) loss of the promised benefits of their Chrome experience; (ii) out-of-pocket costs; and (iii) loss of control over property which has marketable value."[21]   Plaintiffs further claim that Google denied users "the benefit of a Chrome experience where they were promised the right to determine the terms and

---

[16] FAC, ¶ 107-108 ("An 'untracked' user may only be shown generic ads. Such ads, in turn, tend to yield a lower engagement rate and therefore generate less profit for Google. A 'tracked' user's browsing, in contrast, yields greater data for Google to target and is also a more lucrative target in its own right. The more active a user is, the more vulnerable to targeting she is, and more valuable as well."). *See also,* Mangum Report, ¶ 39.

[17] FAC, ¶ 109.  *See also,* Mangum Report, ¶ 69.

[18] *See e.g.* FAC, ¶ 249, 251–252. ("The value of Chrome users' personal information to Google is demonstrated in part by Google's advertisement revenue during the relevant time period. Google reported $134.8 billion in advertising revenue in 2019, $116.4 billion in 2018, $95.5 billion in 2017, and $79.3 billion in 2016.36 This translates to 83% of Google's total revenue in 2019, 85% in 2018, 86% in 2017 and 87% in 2016. While not all of that value is unjustly derived from the specific information collected by Google here, some portion of it is. … Google's increased revenue is driven in part by the increased engagement by users, which Google quantifies as "paid clicks" across Google properties, including Chrome. According to Google's annual reports, Google has increased the number of its paid clicks by 23% in 2019, 62% in 2018, 70.5% in 2017, and 70.9% in 2016. … In addition to these metrics, estimates of Google average revenue per monthly active user from advertising on its sites is $6.70 in the fourth quarter of 2016.  Other estimates of the average revenue per user per year for Google place the value at $256.  And at $55 for digital revenue per member."). *See also,* Mangum Report, ¶¶ 40–44.

[19] FAC, ¶227.

[20] FAC, ¶ 228.

[21] FAC, ¶ 228.

*Expert Report of Bruce A. Strombom*

scope of their content and personal information sharing."[22]  The Amended Complaint goes on to say that Google's lack of transparency and warning prevented and still prevents Plaintiffs' ability to mitigate injury by taking steps to avoid exposing their information on Chrome.[23]  In addition, Plaintiffs allege they were also injured when Google took their own "personal information," property which has both personal and economic value to them.[24]

### B.  Google's Receipt of the At-Issue Data

31.       I am informed that the data flow at issue is not triggered by, and has little to do with, any unique feature of Chrome (as compared to other browsers).[25]  Chrome sends data to the third-party web services installed on a website—including Google web services—in the same way that any other browser would.[26]  The data Google receives from non-synced (and synced) Chrome users that visit websites using Google web-services is generally the same data that Google would receive from users that visit the same websites using Google web-services in Firefox or other browsers.[27]

32.       The amount of data at issue depends on how often users browsed in a non-synced state, which varies among users.[28]  For example, some Proposed Class members may have synced for only a few days, if at all, over an entire year.  Therefore, most of their browsing would be in a non-synced state.  At the other extreme, for those Proposed Class members who browse mostly in a synced state, the allegedly wrongful data collection at issue (which only occurs when users are non-synced) is very limited.

---

[22] FAC, ¶ 233.

[23] FAC, ¶ 235.

[24] FAC, ¶¶ 241–243.

[25] Expert Repot of Yiling Chen, December 22, 2022 ("Chen Report"), ¶ 10.a.

[26] *See* Chen Report, ¶¶ 46-54.

[27] *See* Chen Report, ¶¶ 61-69.

[28] ██████████████████████████████████████████████████████
██████   *See*, Dkt. No. 225-9, Transcript of ██████ Town Hall, p. 64.

*Expert Report of Bruce A. Strombom*

33.     Whether Google received data, and if so, the amount and type of data received also depends on the user activity *and* the Google service used by the website visited.[29]  For example, I understand that ███████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████.[30] ███████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████.[31]

34.     Moreover, I am informed that the type and amount of data different Google products, such as Google Ad Manager and Google Analytics, receive from the Proposed Class members vary widely across users based on actions taken by the websites they visit.[32]  Whether these Google entities receive data from any particular users who are not synced and who visit a website that uses Google services, and if so, which types of data these Google entities receive, depends on a variety of factors that are influenced by the host website's settings.  For example, for Google Ad Manager to receive any of the At-Issue Data, the website a particular user visits must have Google Ad Manager "tags" installed.[33]  Websites can also opt out of delivering personalized ads, in which case Google Ad Manager will not use cookies for personalized ads.[34]

35.     Further, users can influence what type of data is received and how it is used through a variety of settings and controls, including, among others: (1) blocking all cookies or third-party cookies in their Chrome browser settings or installing ad-blocking extensions, (2) disabling JavaScript in Chrome settings, (3) disabling or opting out of personalized ads, or (4)

---

[29] Declaration of Glenn Berntson Regarding Google Ad Manager in Opposition to Plaintiffs' Motion for Class Certification, December 21, 2021 ("Berntson Decl."), ¶¶ 18-26; Declaration of Steve Ganem Regarding Google Analytics in Opposition to Plaintiffs' Motion for Class Certification, December 16, 2021, ("Ganem Decl."), ¶¶11, 23.

[30] Berntson Decl., ¶¶ 6, 8; Ganem Decl., ¶¶ 4, 7; Declaration of David Crossland Regarding Google Fonts API in Opposition to Plaintiffs' Motion for Class Certification, December 15, 2021 ("Crossland Decl."), ¶ 10.

[31] Expert Report of Georgios Zervas, PhD, December 22, 2021 ("Zervas Report"), ¶ 107.

[32] Berntson Decl., ¶ 14-17; Ganem Decl., ¶¶ 11–22.

[33] Berntson Decl., ¶ 2.

[34] Berntson Decl., ¶ 16.

*Expert Report of Bruce A. Strombom*

browsing in Incognito or Guest Mode, which I understand deletes cookies after each Incognito or Guest Mode session ends.[35]

36.　　　Finally, users can utilize a number of optional software products, including ad-blockers, or firewall, that influence whether and how data is collected, stored, and used by different Google products, including Ad Manager and Google Analytics.[36]

### C.　　Explanation of How Google Makes Money Through Advertising

37.　　　Google[37] generates revenue from providing advertising services, infrastructure and data analytics platforms, collaboration tools and other services for enterprise customers, selling apps and in-app purchases, YouTube subscriptions and other services, and selling other products and services.[38]

38.　　　Google's revenue from advertising services consists of revenue generated through (i) Google search and owned-and-operated ("O&O") properties,[39] (ii) YouTube,[40] and (iii) Google Network Members' properties participating in AdMob, AdSense, and Google Ad Manager.[41]　In 2020, approximately 80 percent of Google's total revenue came from advertising services in general, and only 13 percent of Google's total revenue came from advertising services provided through Google Network Members' properties.　Google derives almost half of its revenue from its U.S. operations. *See* **Exhibit 1**.

---

[35] Berntson Decl., ¶¶ 18-26.

[36] Berntson Decl., ¶¶ 18-26; Ganem Decl., ¶ 33.

[37] For purposes of this report, I rely on Alphabet's SEC Form 10-K for information on Google's revenue.

[38] Alphabet, Inc., SEC Form 10-K for the period ending December 31, 2020, pp. 33–34.

[39] This category pertains to the Google Search & Other revenue category, which includes "revenue generated on Google search properties (including revenue from traffic generated by search distribution partners who use Google.com as their default search in browsers, toolbars, etc.) and other Google owned and operated properties like Gmail, Google Maps, and Google Play." *See* Alphabet, Inc., SEC Form 10-K for the period ending December 31, 2020, p. 34.

[40] Google's revenue category "YouTube Ads" includes revenue generated on YouTube Properties. *See* Alphabet, Inc., SEC Form 10-K for the period ending December 31, 2020, p. 34.

[41] Alphabet, Inc., SEC Form 10-K for the period ending December 31, 2020, p. 34.  I understand "Google Network Members' properties" pertains to properties of advertisers and publishers who use the Google Network products mentioned above, such as AdMob, AdSense, and Google Ad Manager.

*Expert Report of Bruce A. Strombom*

39.     Google's data reception through Google search and O&O properties and YouTube are not at issue in this case.[42]  Plaintiffs seek unjust enrichment based on Google's allegedly ill-gotten profits from Google Display Ads, which is Google's advertising platform that allows advertisers to place ads on third-party websites, mobile apps, and videos that use Google services.[43]  Dr. Mangum has opined that the revenue category Google describes as Google Network Member properties captures the revenue that Google has obtained from display ads.[44]

40.     In general, the term "display ads" pertains to "third-party ads" that exist on websites and apps.[45]  Display ads typically consist of embedded images or videos on a website or app, similar to traditional print ads in magazines or newspapers.[46]  As Dr. Mangum summarizes in his report, Google targets ads based on the website the user is viewing or on specific user behavior.[47]  For example, display ads may be targeted to users based on general information about user interests.[48]  Display ads could also be targeted based on the content of the webpage that the user is viewing, a category of advertising which Dr. Mangum agrees is not at issue in this case.[49]

41.     At a high level, Google offers various "advertising networks" that facilitate the market for display ads by connecting publishers who have "inventory" (*i.e.*, empty rectangles on

---

[42] Mangum Report, Exhibit 1, note 3; Mangum Report, Table 2; Mangum Report, ¶ 63. I understand that AdMob is also not at issue in this case because it relates to advertisements shown on mobile applications (not on a browser, including the Chrome browser). Google AdMob, "Earn more revenue with your apps." available at https://admob.google.com/home/.

[43] Mangum Report, ¶ 63.  *See also,* Alphabet, Inc., SEC Form 10-K for the period ending December 31, 2020, p. 34. According to Google's 10-K, Google's revenue from Display Ads "consist of revenue generated on Google Network Members' properties participating in AdMob, AdSense, and Google Ad Manager."

[44] Mangum Report, ¶¶ 61, 63.

[45] Google, "Chrome ▮▮▮▮▮▮▮▮" GOOG-CABR-00373424-459 at 428.

[46] Google, "How Chrome makes money for Google," November 21, 2017, GOOG-CALH-00133389-391 at 389; Google, "Chrome ▮▮▮▮▮▮ GOOG-CABR-00373424-459 at 429; Google Ads Help, "About Display ads and the Google Display Network," available at https://support.google.com/google-ads/answer/2404190?hl=en.

[47] Mangum Report, ¶¶ 28-29.

[48] Mangum Report, ¶¶ 23, 28-29.

[49] Mangum Report, ¶¶ 28-29.

*Expert Report of Bruce A. Strombom*

a webpage in which an ad can be placed) with advertisers who have ads to fill the inventory.[50]
Publishers produce web pages that users visit, and advertisers bid for the inventory on the
publisher's website so that they can populate that inventory with an ad or message.[51]  Google
connects the publishers who are selling their inventory to advertisers who are buying ad slots in
which to show their ads.

42.     Google has two primary products for website publishers: Google Ad Manager and
AdSense.  Google Ad Manager is an ad management platform that consists of both "ad server"
and "ad exchange" functionalities.  An "ad server" hosts and serves advertisements, whereas an
"ad exchange" facilitates the selling and buying of ad inventory.[52]  AdSense is an advertising
network generally used by smaller publishers and provides more automated and simplified
functionalities than Google Ad Manager.[53]

43.     Google earns revenues from its advertising networks based on fee structures that
vary depending on which product or combination of products each customer uses.[54]  Google Ad
Manager charges a "cost per mille" ("CPM," meaning "Cost per thousand impressions") fee for
ad server functionality.[55]  In the CPM model, the payment for ads is based on the number of
viewable impressions irrespective of how much users engage with the ads, and ███████████
████████████████████████████████████████████████████████████████
██████████.[56]  Google Ad Manager's revenue from ad exchange functionality is based on
revenue sharing agreements with publishers that generally ████████████████████████
████████████████████████████████████████████████████████████████

---

[50] Google, "Chrome ███████ GOOG-CABR-00373424-459 at 430, 454.

[51] Google, "Chrome ███████ GOOG-CABR-00373424-459 at 430-431.

[52] Declaration of George Levitte Regarding Google Ad Manager Profits in Opposition to Plaintiffs' Motion for Class Certification, December 17, 2021 ("Levitte Decl."), ¶ 6.

[53] Levitte Decl., ¶ 7.

[54] Google, "Manage placements. Schedule and pricing," available at https://support.google.com/campaignmanager/answer/2829254?hl=en#zippy=%2Ccost-structure; *See also,* Levitte Decl., ¶¶ 10, 11.

[55] Levitte Decl., ¶ 10.

[56] Levitte Decl., ¶ 10.

*Expert Report of Bruce A. Strombom*

██████████ .[57, 58]  Google also generates revenue from display ads on a fixed fee basis that do not depend on the price of the ad.[59]

44.     The bidding price for advertising space and the resulting revenue to publishers depends on numerous variables, including the ad space at issue, user browsing and shopping behaviors, and the month or season during which the bidding occurs.[60]  For example, "Google Ad Manager may derive more value from a user located in Lower Manhattan than a user located in a rural region of Alabama because advertisers may bid more to show ads to the user in Lower Manhattan."[61]

## IV.   REBUTTAL TO DR. MANGUM'S PROPOSED METHODOLOGIES FOR CALCULATING CLASS-WIDE DAMAGES

### A.    Summary of Dr. Mangum's Proposed Methodologies for Calculating Class-Wide Damages

45.     Dr. Mangum opines on the feasibility of ascertaining and calculating class-wide damages and evaluating appropriate approaches by which the magnitude of class-wide damages can be determined.[62]

46.     In his report dated October 13, 2021, Dr. Mangum sets forth two opinions related to calculating class-wide remedies.  The first opinion pertains to calculating class-wide unjust

---

[57] The revenue sharing percentages ██████████████████████ Google Ad Manager supports several transaction types, such as Open Auction, Private Auction, Preferred Deals, Programmatic Guaranteed, and Open Bidding.  Open Auction is the most basic transaction type, and typically has a ██████████████████ of the auction clearing price.  Open Auction is the only transaction type available through AdSense, and charges a similar fee.  Google Ad Manager also supports the other transaction types which have a standard fee ██████████████████ of the auction clearing price.  ████████████████████████████████████████ ██████████████████████████████████████████ .  Levitte Decl., ¶ 11.

[58] ████████████████████████████████████████ ██████████████████ Levitte Decl., ¶ 10.

[59] Levitte Decl., ¶ 15.

[60] Levitte Decl., ¶ 20.

[61] Levitte Decl., ¶ 20.

[62] Mangum Report, ¶ 1.

*Expert Report of Bruce A. Strombom*

enrichment from Google's alleged wrongful conduct.[63]  The second opinion pertains to calculating class-wide damages based on "the value of the data collected inappropriately by Google."[64]  Dr. Mangum bases both of his opinions on the assumption that "Google wrongly collected personal data from Class Members, financially gained from use of the data, and failed to provide Class Members with a browser  that adhered to the privacy policies as agreed to in the Chrome Agreements."[65]  He concludes that the "[a]ssessment of economic damages attributed to Google's alleged wrongdoing is feasible based on the available evidence and data."[66]

### 1.   Summary of Dr. Mangum's Opinion Related to Calculating Unjust Enrichment

47.    To calculate class-wide unjust enrichment, Dr. Mangum purports to calculate the "excess profits" Google derived from Chrome "and would not have otherwise received had Google not violated the Chrome Agreements."[67]

48.    Using information from Google's internal and publicly available documents, Dr. Mangum makes a number of assumptions in an attempt to estimate the share of Google's Display Ad revenue that Google derived as a result of the alleged misconduct.[68]

- Dr. Mangum begins by estimating the share of Google's global Display Ad traffic that is attributable to Chrome browsing in the US, ███████████████ ████████████████████████ and that Google's US revenue accounts for ██████████████████████████████[69]

- Next, Dr. Mangum claims that ████████████████████████████████ ██████████████████████████[70]

---

[63] Mangum Report, ¶ 36.

[64] Mangum Report, ¶ 37.

[65] Mangum Report, ¶ 34.

[66] Mangum Report, ¶ 14.

[67] Mangum Report, ¶¶ 36, 38.

[68] Mangum Report, Table 3; Mangum Report, ¶ 60.

[69] Mangum Report, ¶ 57.

[70] Mangum Report, ¶ 58.

*Expert Report of Bruce A. Strombom*

- Dr. Mangum then estimates [71]

- Finally, Dr. Mangum estimates that ▆▆▆ of Google's "ad revenue" is "directly attributable to cookies."[72]

- Multiplying each of these percentages, Dr. Mangum concludes that ▆▆▆ of Google's worldwide Display Ad revenue was generated using third-party cookies from U.S. Chrome users who are not synced and did not browse in Incognito mode.[73]

49.     Dr. Mangum proposes that Google's "excess profits" from the wrongful acts can be calculated on a class-wide basis by multiplying three figures: (1) his ▆▆▆ estimate of revenue attributable to the alleged misconduct for the Proposed Class members; (2) Google's total Display Ad Revenue[74]; and (3) Google's gross profit margin of 56 percent (meant to "account[] for the costs Google incurred").[75]  Dr. Mangum's measure of Display Ad Revenue is revenue from what he calls "third-party network" pages, which include Google's revenue from AdMob, AdSense and Ad Manager.[76]

50.     Dr. Mangum then proposes an approach to distributing the damages from Google's alleged unjust enrichment to individual class members.[77]  He claims that the "excess profits" can be allocated based on "the number of [non-synced] Google account months," which he claims can be calculated by subtracting the "monthly data on the US Google accounts that had sync enabled" (produced by Google) from the "monthly data on the total number of Google

---

[71] Mangum Report, ¶¶ 58-59.

[72] Mangum Report, ¶ 60.

[73] Mangum Report, ¶ 60.

[74] Mangum Report, Table 2.

[75] Mangum Report, ¶ 62.  *See also,* Deposition of Russell Mangum, December 7, 2021 ("Mangum Deposition"), 125.  Dr. Mangum explained in deposition that he is not testifying that the gross profit margin is the appropriate margin for unjust enrichment ("I'm not saying that's what's appropriate. … but I'm stopping there not because I'm saying there can't be any more, but that it will be a combination of a legal standard and a substantiation standard by the defendant.")

[76] Mangum Report, ¶ 61; Alphabet 10-K, 2020, pp. 33–34.

[77] Mangum Report, ¶ 64.

*Expert Report of Bruce A. Strombom*

accounts" (not produced by Google).[78]  The following is a formulaic depiction of the approach to profit premium allocation Dr. Mangum outlines in his Report:

$$\begin{array}{c} \text{Google Profit Premium} \\ \text{per Google Account Month} \end{array} = \frac{\text{Google Profit Premium}}{\begin{array}{c}\text{U.S. Google}\\\text{Account Months}\end{array} - \begin{array}{c}\text{U.S. Google Account Months}\\\text{with Sync Enabled}\end{array}}$$

### 2. Summary of Dr. Mangum's Opinion Related to Calculating Class-Wide Damages for Restitution of Value of "Personal Information"

51.    Dr. Mangum claims that the members of the Proposed Class were injured because "Chrome's violation of the privacy terms in the Chrome Agreements" caused a "reduction in the value of browsing services received by Chrome users as well as the value of personal information improperly obtained by Google."[79]  He claims that the "economic value of the Class Members' personal information collected by Google can be analyzed from two angles": (1) by "estimating the value Class members place on privacy," and (2) by "assessing the value of Class Members' personal information itself."[80]  In his opinion, neither approach is superior to the other.

52.    Dr. Mangum claims that the economic value of privacy can be estimated using surveys and conjoint analysis.[81]  Neither he nor any of the other Plaintiffs' experts designed or conducted a survey or conjoint analysis to measure the economic value of the At-Issue Data. Instead, Dr. Mangum relied on the findings of two studies published prior to 2010 to claim that the value of privacy ranges from $18.75 to $32.90 per year.[82]  Dr. Mangum also claims that the value users place on privacy is demonstrated by how much some users pay for Virtual Private Networks (VPNs), which he claims provides a "real market example of internet users'

---

[78] Mangum Report, ¶ 64.

[79] Mangum Report, ¶ 65.

[80] Mangum Report, ¶ 66.

[81] Mangum Report, ¶ 77.

[82] Mangum Report, ¶¶ 81–82.

willingness to pay for online privacy,"[83] and concluded that these payments range from $13.32 to $155.88 per year.[84]

53.     Further, Dr. Mangum proposes that the economic value of "personal information" is "apparent in the way that research companies pay users for the collection of their online data."[85]  He then looks at how much four online survey platforms and market research companies (SavvyConnect, Ipsos Screenwise, BrandTotal and Nielsen) pay individuals for obtaining information through survey responses and other data collection methods.[86]  He finds that these firms pay users between $50 to $312 per year for the users' data.[87]

54.     Dr. Mangum does not suggest which one of the values that he lists represents the value of any given Proposed Class member's "personal information."  He testified in deposition that, no matter which of his three approaches is used to derive the value of the data at issue, he believes the data of each user is worth the same amount for a certain period of time.[88]  This is a fundamental assumption underlying his restitution opinion.  Dr. Mangum claims that class-wide damages for restitution of the value of "personal information" can be calculated by multiplying (1) the value of the At-Issue Data, which he proposes is one amount applicable to all members of the Proposed Class, by (2) "the number of Class Member accounts," which he proposes to obtain from data he expects Google to produce.[89]

---

[83] Mangum Report, ¶ 84.

[84] The lowest price quoted by Dr. Mangum is: "Fastest VPN offering a three-year subscription for $39.95 triennially" ($39.95 ÷ 3 = $13.32 per year).  The highest price quoted by Dr. Mangum is: "CyberGhost costs $12.99 a month" ($12.99 * 12 = $155.88 per year). (*See* Mangum Report, ¶¶ 86–87.)

[85] Mangum Report, ¶ 90.

[86] Mangum Report, ¶¶ 91-95.

[87] Dr. Mangum writes that: "Participants can earn $20 for participating in the study, an additional $100 value if they join and install a special WiFi router, and up to $16 per month for each household member (aged 13 or older) who joins with their device." (*See* Mangum Report, ¶ 92) I calculate $312 as follows: $16 per month for each member x 12 months + $20 participation fee + $100 for joining and installing a special WiFi router.  *See also*, Mangum Report, ¶ 94.

[88] Mangum Deposition, pp. 227–232.

[89] Mangum Report, ¶ 96.

*Expert Report of Bruce A. Strombom*

**B.** **Dr. Mangum's Unjust Enrichment and Restitution Opinions Fail to Account for Uninjured Class Members and Provide No Way to Reliably Exclude Them From His Damages Analysis**

55.     Dr. Mangum assumes that none of the members of the Proposed Class consented to Google's collection of the At-Issue data.[90]  He further assumes that *each one* of the many millions of Chrome users who browsed while they were not synced (excluding browsing in Incognito mode) were damaged.[91]  To the extent that some users provided consent or were not injured, Dr. Mangum does not propose a methodology to identify and exclude these users from his analysis and damages.  He explained in his deposition testimony that identifying and excluding these Proposed Class members would "require a step during either further discovery or maybe claims administration where someone might exclude" them.[92]

56.     Dr. Mangum's assumption that all members of the Proposed Class did not consent and were damaged ignores many critical aspects of the user experience that would result in uninjured users receiving damages in his approach.  For example, based on my understanding of the facts in this case, members of the Proposed Class may not have been injured for numerous reasons, including because: (1) various Proposed Class members may have consented (implicitly or explicitly) to Google's receipt of the At-Issue Data in ways that are not applicable to the class as a whole; (2) various Proposed Class members exercised user controls that prevented Google from receiving and/or benefitting from their data; (3) Google did not receive data that is considered "personal information" from them; and/or (4) the value they derived from Google ads personalized using their data exceeded the value of their data.  I understand that individualized

---

[90] Mangum Report, ¶ 17.

[91] I understand that Plaintiffs have not presented class-wide proof showing that all Proposed Class members were injured by Google's purported conduct.

[92] Mangum Deposition, p. 68. ("Q: Does your methodology have a way to exclude users who may have consented to the data collection?  A. Well, I believe so in a way, but I think that part of it relates to where what I've done would fit in the stream of assuming a finding of liability and there being some type of re-numeration to class members. For example, if there is some query or some analysis that might be used to differentiate between how some class members gave consent or not, it -- I don't believe it logically happens in what I've done, but it might take what I've done and then require a step during either further discovery or maybe claims administration where someone might exclude that. So I think that can be included, but that particular question or distinction you've identified I don't think fits in what I've come so far up to the end of my opinions to date.")

*Expert Report of Bruce A. Strombom*

inquiry would be required to identify and exclude the uninjured users from Dr. Mangum's damages analysis.

57.     The existence of these uninjured Proposed Class members, which Dr. Mangum ignores, and Dr. Mangum's lack of methodology to identify and exclude them from his analysis and damages means that Dr. Mangum's opinions that it is possible to calculate class-wide unjust enrichment and restitution damages are speculative and unreliable.

> **1.     Dr. Mangum's Approaches for Calculating Class-wide Damages Does Not Explain If and How Proposed Class Members Who May Have Explicitly And/or Implicitly Consented to the Alleged Wrongful Data Collection Can be Identified and Excluded**

58.     I understand that some Proposed Class members would not have been injured because they consented to the alleged wrongful data collection explicitly (for example, by affirmatively agreeing to Google's disclosures about data receipt and use).  For example, in 2016, Google showed the Consent Bump Agreement to ▆▆▆▆ of users with existing Google accounts, including to Plaintiffs Crespo, Henry, Johnson, and Wilson.[93]  The Consent Bump Agreement stated:

> When you use Google services like Search and YouTube, you generate data — things like what you've searched for and videos you've watched. You can find and control that data in My Account under the Web & App Activity setting.
>
> With this change, this setting may also include browsing data from Chrome _**and**_ _**activity from sites and apps that partner with Google, including those that show ads from Google**_.[94]

The Consent Bump Agreement also linked to a page with Frequently Asked Questions that explained:

> Many websites and apps use Google services to improve their content and keep it free. When they integrate our services, these sites and apps share information with Google. For example, when

---

[93] Declaration of Gregory Fair Regarding Google's Disclosures in Support of Google's Opposition to Plaintiffs' Motion for Class Certification, December 17, 2021, ("Fair Decl."), ¶¶ 27-32, 39–43.

[94] Fair Decl., ¶ 23 (emphasis in original).

_Expert Report of Bruce A. Strombom_

you visit a website that uses advertising services like AdSense, including analytics tools like Google Analytics, or embeds video content from YouTube, your web browser automatically sends certain information to Google. This includes the URL of the page you're visiting and your IP address. We may also set cookies on your browser or read cookies that are already there. Apps that use Google advertising services also share information with Google, such as the name of the app and a unique identifier for advertising.[95]

59.     The Consent Bump Agreement informed Google account holders that "Google will use this information to make ads across the web more relevant to you."[96]  Several Plaintiffs, and the holders of more than ███████████ U.S. Google Accounts, reviewed this agreement and selected "I AGREE."[97]  I understand that Google did not show the Consent Bump Agreement to certain Google account holders, and millions more declined to consent.[98]  Moreover, as of January 2017, ██████████████████████████████████████████████████████████ ████████████.[99]

60.     I also understand that Google showed similar disclosures about Google's receipt of data to users who created new Google accounts after June 2016 by showing them the New Account Creation Agreement.  For example, Plaintiffs Calhoun, Kindler, Johnson, and Wilson were among the users who saw the New Account Creation Agreement.[100]  This agreement explains that Google processes information about users' activity, "including information like the… device IDs, IP address, cookie data, and location[,] … when [the users] use[s] apps or sites that use Google services like ads, Analytics, and the YouTube video player."[101]  The agreement

---

[95] Google Privacy and Terms, "How Google Uses Information from Sites or Apps that Use our Services," available at https://policies.google.com/technologies/partner-sites.

[96] Fair Decl., ¶ 23.

[97] Fair Decl., ¶¶ 34, 39.

[98] Fair Decl., ¶¶ 32–38.

[99] As of January 2017, ████████████████████████████████████████████████ ████████████████████████████████████████████████████ January 19, 2017, GOOG-CABR-04067825-867 at 864.

[100] Fair Decl., ¶¶ 57–61.

[101] Fair Decl., ¶ 48.

*Expert Report of Bruce A. Strombom*

also specifies that Google may use this information to "[d]eliver personalized ads, both on Google services and on sites and apps that partner with Google."[102]  Several plaintiffs, and the holders of more than 922 million U.S. Google Accounts, reviewed this agreement and selected "I AGREE."[103]

61.     Further, it is reasonable to assume that some Proposed Class members would have been aware of Google's data collection, which I am informed may be considered implicit consent.  For example, the Consent Bump and the New Account Creation Agreement directed Google Account holders to their "My Activity" pages to review and manage data associated with their Accounts.[104]  Numerous other Google disclosures did too.[105]  Further, I understand Google routinely sends Account holders "Privacy Reminder" emails directing them to their "My Activity" pages and that Plaintiffs received multiple such emails.[106]

62.     I understand that the "My Activity" page allows the user to manage and delete information associated with their Google account, as well as enable or disable many features that affect how Google stores and uses their data and whether Google could show the user personalized ads.[107]  On the "My Activity" page, Google account holders who enabled Web & App Activity ("WAA") and agreed to include "activity from sites, apps, and devices that use Google services"—as all of the Plaintiffs did—are able to review the information Google associated with their Accounts, including a list of third-party websites from which Google received data when the user visited those sites.[108]  I understand that, on average, approximately

---

[102] Fair Decl., ¶ 46.

[103] Fair Decl., ¶¶ 57, 62.

[104] Fair Decl., ¶ 76.

[105] See, e.g., Fair Decl., ¶ 86.

[106] Fair Decl., ¶¶ 103–104.

[107] Fair Decl., ¶¶ 76–77.

[108] Fair Decl., ¶¶ 76, 83-85.

*Expert Report of Bruce A. Strombom*

170 million Google Account holders visited their My Activity pages every week over the time period between July 20, 2020 and September 13, 2021.[109]

63.     There are also various Google support and other publicly available pages that inform users of what data Google used to serve them ads.  For example, Google is a member of industry groups such as Digital Advertising Alliance (DAA) and Network Advertising Initiative (NAI) that create and follow disclosure standards in online advertising.[110]  When users see ads on non-Google websites, the ads are accompanied by an "AdChoices" icon that, when clicked, shows users that the ad is served through Google Ads.[111]  The "AdChoices" icon also allows users to click on an icon titled "Why this ad?" that provides information on what type of data Google used to serve the ad.[112]

64.     Proposed Class members could have also learned of Google's collection of data from various media sources, as public media sources discussed Google's collection of data as far back as 2007.  **Exhibit 2** shows examples of over 35 articles discussing Google's collection of data.  None of these articles indicate that the "sync" status of the Chrome browser would inhibit the data collection or is even relevant to it.  For example:

- A 2007 Slate article stated that "Google will be able to inform advertisers what sites your browser has visited, what ads have been clicked on, what search terms have been used."[113]

---

[109] Fair Decl., ¶ 85.

[110] "Why you're seeing an ad," available at https://support.google.com/ads/answer/1634057?hl=en.

[111] Google, "AdChoices for the Google Display Network – Google Ad Manager Help," available at https://support.google.com/admanager/answer/2695279?hl=en.

[112] Berntson Decl., ¶ 19; Ads Help, "Why you're seeing an ad," available at https://support.google.com/ads/answer/1634057?hl=en. Based on Google's "Why you're seeing an ad" support page, there are many explanations that may appear as reasons why a user may see an ad, including: (1) User info in the user's Google account, "like age range and gender," and the user's general location; (2) User activity, like "[y]our current search query," "[p]revious search activity," "[y]our activity while you were signed in to Google;" "[y]our previous interactions with ads," and "[t]ypes of websites you visit," and "[y]our activity on another device"; and (3) other info, such as "[i]nfo you gave to an advertiser, like if you signed up for a newsletter with your email address." The AdChoices icon also allows users to learn when information about their interests may be received or used, and gives users control over how their data is received and used for ads.

[113] Michael Agger, "Google's Evil Eye, Does the Big G know too much about us?" *Slate*, October 10, 2007, available at https://slate.com/technology/2007/10/does-google-know-too-much-about-us.html.

*Expert Report of Bruce A. Strombom*

- A 2017 Daily News Record article explains that "[c]ookies are shared from site to site, so that is why you see advertisements for things you have been looking for."[114]

- A 2018 USA Today article explains that "[m]ost of the eyes watching you on the Web sit on other sites, in the form of ads and widgets that let Facebook, Google and other ad networks monitor your activity outside their own realms."[115] The USA Today article goes on to provide readers with methods to curtail online tracking, by using browsers that constrain cross-site tracking or changing Google settings.

65.     In addition, members of the Proposed Class could have known about Google's data collection by virtue of being employed in the computer technology industry. Over four million people in the U.S. work in "Computer Occupations," which is a Bureau of Labor Statistics occupation group that includes computer system analysts, information security analysts, computer programmers, and software and web developers.[116] It is reasonable to assume that at least some of the workers in Computer Occupations would have known that Google receives the At-Issue Data.

66.     Finally, Proposed Class members could have learned of Google's receipt of data from privacy policy disclosures on websites they visit. Most websites have privacy policies, and in many cases the privacy policies explicitly state that they share data from a user's visit of the website with third parties like Google. Among the 25 Google Ad Manager domains with the highest website traffic, all 25 have a privacy policy stating that user data is shared with third parties, and 19 specifically mention that data is shared with Google.[117] For example, when users visit USAToday.com[118] for the first time, they are shown a cookie pop-up that states:

---

[114] Ron Doyle, "Secret Surfing (Part One)," *Daily News Record*, March 14, 2017, available at https://www.dnronline.com/features/secret-surfing-part-one/article_11028c0c-0809-11e7-9809-9f8832dcc78d html.

[115] Rob Pegoraro, "Curb how Facebook, Google and Amazon use your personal data in a quick privacy clean-up," *USA Today*, January 3, 2018, available at https://www.usatoday.com/story/tech/news/2018/01/03/curb-how-facebook-google-and-amazon-use-your-personal-data-quick-privacy-clean-up/991219001/.

[116] Bureau of Labor Statistics, Occupational Employment and Wage Statistics, May 2020 data, available at https://www.bls.gov/oes/.

[117] **Exhibit 3.**

[118] USAToday.com is among the 25 highest traffic domains using Google Ad Manager. Defendant's Supplemental Response and Objections to Plaintiffs Interrogatory No. 5, pp. 5-6.

> We use cookies to personalize content and ads, provide social media features, improve our site and analyze our traffic. We may share information about your use of our site with our advertising, social and analytics providers. By clicking "Accept All Cookies" you agree to the use of these cookies as further described in our Privacy Policy.[119]

The cookie-pop up provides a link to USAToday.com's privacy policy, which explicitly mentions that the website uses cookies: "In general, we and our third party providers and advertisers, use cookies … to provide users with interest-based content or advertising based upon their browsing activities and interests."  The privacy policy also specifically mentions Google Analytics and provides a link to Google's Google Analytics opt-out browser extension.[120]

67.    Even studies cited by Dr. Mangum indicate that it is widely known that Google uses third party cookies to provide users with personalized ads, and there are methods users can employ to control their data if they so desire.  For example, Dr. Mangum cites to a study showing that 67% of internet users take action to change or not accept cookies.[121]  Another study cited by Dr. Mangum (and published by Forbes) states that "consumers [are] becoming more aware of how companies are using their data.[122]

68.    I understand that Dr. Tülin Erdem's survey results are consistent with the above. They show that the average respondent believes that Google receives their IP addresses, referrer URLs, and cookies while browsing the internet in *both* synced mode and non-synced mode.[123] Dr. Erdem's findings are also consistent with a 2018 Salesforce Research survey which found that more than half of those surveyed understand that companies use their data to deliver more

---

[119] "USA Today: Latest World and USNews – USATODAY.com," available at https://usatoday.com.

[120] USA Today, "Gannett Privacy Policy," November 23, 2021, available at https://cm.usatoday.com/privacy.

[121] SAS, "Data Privacy: Are You Concerned," available at https://www.sas.com/en/whitepapers/data-privacy-110027.html., p. 5

[122] Swish Goswami, "The Rising Concern Around Consumer Data And Privacy," Forbes, Dec. 14, 2020, available at https://www.forbes.com/sites/forbestechcouncil/2020/12/14/the-rising-concern-around-consumer-data-and-privacy/?sh=58f73487487e, p. 4.

[123] Erdem Report, ¶¶ 36–38.

personalized experiences,[124] and a 2016 survey from digital performance marketing agency Adlucent which concluded that consumers understand targeted advertising is based on their user data.[125]  The results of Dr. Tulin's survey analysis and these other publicly available studies further indicate that at least some users were aware that Google received data and implicitly consented by using Google's services despite understanding that Google received the At-Issue Data.

69.    Neither Plaintiffs nor Dr. Mangum offer any way to identify and exclude on a class-wide basis the class members who consented—either explicitly or implicitly—to Google receiving their data and thus are uninjured.  Rather, Plaintiffs and Dr. Mangum simply assume that *not one* of the millions of non-synced Chrome users would have understood that Google received their data through its web-services, and thus that *all* non-synced Chrome users have been injured.[126]  Their assumption would result in uninjured class members being compensated for alleged injuries that they did not, in fact, incur.

70.    I understand that individualized inquiry would be required to identify and exclude from Dr. Mangum's analysis those class members who implicitly consented to the allegedly wrongful data collection by using Google's services despite understanding from various disclosures that Google received the data at issue.

---

[124] Salesforce Research, "Trends in Customer Trust," Research Brief, available at https://c1.sfdcstatic.com/content/dam/web/en_us/www/documents/briefs/customer-trust-trends-salesforce-research.pdf, p. 7.

[125] Specifically, 87% of the surveyed consumers "believe personalized advertising means unique content, based on their previous purchases or shopping behavior and delivered at a time when they are looking to buy a product." Holly Pauzer, "71% of Customers Prefer Personalized Ads," Adlucent, available at https://www.adlucent.com/resources/blog/71-of-consumers-prefer-personalized-ads/.

[126] In his deposition, Dr. Mangum stated that users who consented can be identified through further discovery or claims administration.  However, one cannot reliably calculate class-wide damage without knowing how many users consented, or even whether this could be reliably determined at a later stage.  ("Q. Does your methodology have a way to exclude users who may have consented to the data collection? A. Well, I believe so, in a way. But I think that part of it relates to where what I've done would fit in the stream of assuming a finding of liability and there being some type of remuneration to class members. For example, if there is some query or some analysis that might be used to differentiate between how some class members gave consent or not, it -- I don't believe it logically happens in what I've done, but *it might take what I've done and then require a step during either further discovery or maybe claims administration where someone might exclude that*. So I think that can be included. But that particular question or distinction you've identified, I don't think fits in what I've done so far, up to the end of my opinions to date."  Mangum Deposition, p. 68. Emphasis added.)

*Expert Report of Bruce A. Strombom*

2. *Dr. Mangum Does Not Consider That Some Users May Not Have Been Injured Because They Exercised Options to Control the Data That Google Receives from Them in a Way That Prevented Google from Realizing Any Benefit from the At-Issue Data*

71.     There are controls available to Proposed Class members that would have prevented Google from realizing Display Ad revenue from the At-Issue data.  For example, users could use an ad blocking browser extension or stand-alone ad blocker program that prevents Chrome from displaying ads.[127]  With ad blockers, ads are not shown to users[128] and Google does not receive Display Ad revenue.[129]  For example, the Chrome Web Store provides users with access to numerous free browser extensions, including Adblock and Ghostery, that can block advertisements.  Adblock Plus for Chrome is an ad blocker extension for Google Chrome that has been available since 2011 and has over 10 million users.[130]  And Ghostery, which has over 2 million Chrome users and has been available since 2009, is a "privacy ad blocker" that can block ads, "block trackers on websites you browse to control who collects your data," and "anonymize[] your data to further protect your privacy."[131]

72.     In addition, I understand that, during the Class Period, Google Chrome users have had a myriad of other options to limit the amount and type of data that Google received from

---

[127] Berntson Decl., ¶ 26.

[128] See **Exhibit 4**.

[129] See, e.g., Berntson Decl., ¶ 19.e; "Adblock Plus – free ad blocker – Chrome Web Store," available at https://chrome.google.com/webstore/detail/adblock-plus-free-ad-bloc/cfhdojbkjhnklbpkdaibdccddilifddb?hl=en-US.

[130] "Adblock Plus – free ad blocker – Chrome Web Store," available at https://chrome.google.com/webstore/detail/adblock-plus-free-ad-bloc/cfhdojbkjhnklbpkdaibdccddilifddb?hl=en-US; Adblock Plus, "About Adblock Plus," available at https://adblockplus.org/en/about.  Adblock is another popular ad blocker that has been available since 2009 and has been downloaded over 350 million time by over 60 million users.  See, AdBlock, "Surf the web without annoying pop ups and ads," available at https://getadblock.com/en/; Chrome Web Store, "AdBlock - best ad blocker - Chrome Web Store," available at https://chrome.google.com/webstore/detail/adblock-%E2%80%94-best-ad-blocker/gighmmpiobklfepjocnamgkkbiglidom.

[131] Ghostery, "Why Ghostery," available at https://www.ghostery.com/why-ghostery; Chrome Web Store, "Ghostery - Privacy Ad Blocker - Chrome Web Store," available at https://chrome.google.com/webstore/detail/ghostery-%E2%80%93-privacy-ad-blo/mlomiejdfkolichcflejclcbmpeaniij.  UBlock Origin is another popular privacy extension that has over 10 million users.  Chrome Web Store, "uBlock Origin – Chrome Web Store," available at https://chrome.google.com/webstore/detail/ublock-origin/cjpalhdlnbpafiamejdnhcphjbkeiagm?hl=en.

them, as well as to restrict Google from serving them personalized ads.[132]  For example, with respect to tools that affect Google ability to earn Google Ad Manager revenue as it relates to the At-Issue Data,[133] I understand that a user could: (1) turn "off" ad personalization in their Google Account Settings or opt out of ad personalization in their Ad Settings;[134] (2) block cookies or enable "clear cookies and site data when you close all windows" within their Chrome browser settings";[135] (3) disable JavaScript in the Chrome browser settings;[136] and/or (4) use the Network Advertising Initiative's personalized advertising opt-out.[137]  Users also could install a firewall that can be configured to block *any* transmissions from the Chrome browser to Google Ad Manager or any other Google domain.[138]

73.     During the Class Period, any particular user may have selected several of the tools available to them or none at all, and those users who employ user controls may have varied in many important ways, including which user controls they employed, and the extent to which they used each user control.

74.     Users who employed user controls that would have prevented Google from monetizing the At-Issue Data would not be entitled to any unjust enrichment.  Allocating unjust

---

[132] Berntson Decl., ¶¶ 18-26.

[133] Many of these controls similarly restrict the data Google Analytics receives and how the data is used.  For example, users can use the Google Analytics opt-out browser extension to prevents Google Analytics and its affiliates from receiving data. Ganem Decl. ¶ 23; Google, "Google Analytics Opt-out Browser Add-on Download Page," available at https://tools.google.com/dlpage/gaoptout. The options described under points (1) through (3) come from Google, while the option described under (4) come from third parties.

[134] If a user turns off ad personalization in their Google Ad Settings, Google will no longer use their information to personalize ads.  The user's ads may still be targeted with info like their general location or the content of the website they are visiting.  Berntson Decl., ¶¶ 19-25; Google, "Ad Settings," available at https://adssettings.google.com/; Google, "Control the ads you see – Computer – Ads Help," available at https://support.google.com/ads/answer/2662856.  Users can also opt out of personalized ads if they are signed-out using the same options available at adsettings.google.com.  Berntson Decl., ¶ 18.f.

[135] See, e.g., Berntson Decl., ¶¶ 18.a-18.c; Michael Crider, "How to Block Cookies (Except for Sites You Use) in Any Browser," How-To Geek, October 30, 2017, available at https://www howtogeek.com/63721/how-to-block-all-cookies-except-for-sites-you-use/. See also, **Exhibit 4**.

[136] Berntson Decl., ¶ 18.d.

[137] Berntson Decl., ¶ 18 f.  The Network Advertising Initiative's Opt-Out page allows a user to turn off personalized ads from Google, which prevents Google Ad Manager from using a user's cookie value for personalized advertising.

[138] Berntson Decl., ¶ 26.

*Expert Report of Bruce A. Strombom*

enrichment to these users would cause them to be allocated "excess profits" even though Google has not profited from their At-Issue Data, and would cause users from whom Google profited to be undercompensated.

75.     Dr. Mangum also acknowledges that there are users who have opted out of personalized ads and that Google may not earn revenue from the At-Issue data of these users.  In his report, he states:

> AdChoices launched in October 2010. The basics of the AdChoices program are that internet users are able to opt-out of personalized advertisements through a cookie. The user clicks on an icon and the user is then directed to a website with the option of opting out of personalized advertisements. Certain users are automatically excluded from the analysis: ad-blocking users because their browser extensions prevent the ad request from being sent to the ad exchange.[139]

In addition, in his deposition, Dr. Mangum testified:

> Q. For users who have opted out of personalized ads, hypothetically, would they be entitled to unjust enrichment under your analysis?
>
> A ...I think you're talking about something that if it was to be addressed, it would not be addressed in the part of my analysis that comes up with an unjust enrichment in the aggregate.  I identify a method for allocation.  I think this would suggest at most a modification to that allocation.  Maybe not at all — if it couldn't be substantiated, this idea of participation in AdChoices or opting out, to be connected with the information that's actually shared.  But that would happen in a subsequent phase of what I've done thus far in my opinion.[140]

76.     Despite acknowledging that some users may not have been injured, he does not propose a methodology to identify and exclude these users from his calculation of unjust enrichment.  Individualized inquiry would be required to determine which of the proposed class

---

[139] Mangum Report, ¶ 48.

[140] Mangum Deposition, pp. 88-89.

*Expert Report of Bruce A. Strombom*

members may have been injured because they employed user controls that prevented Google from benefiting from the At-Issue Data.[141]

### 3. Dr. Mangum's Opinions Ignore That Certain At-Issue Data Received by Google May Not Be Considered "Personal Information" and Therefore Certain Proposed Class Members Would Be Uninjured

77.     As explained in **Section III.A** above, Plaintiffs' definition of the Proposed Class is limited to U.S. residents who "used Google's Chrome browser on or after July 27, 2016 without choosing to sync with any Google account *and whose personal information* was collected by Google."[142]  Dr. Mangum's methodology ignores that the At-Issue Data Google received from some Proposed Class members may not be considered "personal information."  To the extent that some At-Issue Data does not constitute personal information, this flaw renders Dr. Mangum's calculation of damages unreliable because he is attempting, at least in part, to calculate the value of data whose collection does not constitute injury to Proposed Class members.

78.     I am informed that data is "personal information" only if it can be reasonably linked to the identity of an individual.[143]  I also understand that, when a Chrome user is not signed-in to a Google Account or does not have a Google Account, any At-Issue Data received is associated only with a pseudonymous and delete-able cookie (if cookies are not blocked), not with an Account or any information that personally identifies the user.[144]  In fact, I understand that Google has processes and protocols in place to ensure that At-Issue Data received from such users cannot be reasonably linked to information that would personally identify them.[145]  Therefore, the At-Issue Data Google receives from signed-out users and non-Google Account

---

[141] Dr. Mangum proposes that users who may have opted out of ads can be identified at a subsequent stage. However, one cannot reliably calculate the per-user remedy without not knowing how many users opted out of ads, or even whether this number could be reliably determined at a later stage, prevents one from reliably calculating class-wide damages.

[142] FAC, ¶ 262 (emphasis added).

[143] Monsees Decl., ¶ 6.

[144] Monsees Decl., ¶ 8.

[145] Monsees Decl., ¶ 9.

*Expert Report of Bruce A. Strombom*

holders may not be considered "personal information."  As a result, I have been asked to assume that only data related to signed-in sessions of Chrome constitutes "personal information."

79.     Based on this understanding, Proposed Class members who did not have a Google account, or who were Google account holders but browsed only in signed-out state would not be entitled to damages because their "personal information" was not taken.  Dr. Mangum has not proposed a methodology to identify and exclude these Proposed Class members.  Individualized inquiry is required to identify and exclude from the calculation of class-wide damages those uninjured Proposed Class members for whom Google did not receive data that constitutes "personal information."

> ### 4.     Dr. Mangum Ignores That the Proposed Class Includes Users Who Derive More Value from Google's Personalization than Their Data Is Worth and Are Therefore Uninjured

80.     Despite the evidence showing that many users prefer personalized ads, Dr. Mangum has not undertaken any analysis to test or control for the fact that different users place different value on personalized advertisements and digital service, have different thresholds of privacy, and have preferences for sharing data in exchange for personalization of their online experiences.  The value that some Proposed Class members may have derived from personalized advertising on the basis of the At-Issue data may outweigh the purported value of the data improperly taken or the purported economic injury as a result of the alleged taking.

81.     While Dr. Mangum acknowledges that "users are willing to give up some of their privacy for economic incentives" and that consumers place different value on "different dimensions of privacy,"[146] the approach he proposes for calculating economic injury on class-wide basis does not make any specific provisions to account for these differences in consumer preference.  Similarly, Dr. Mangum claims that "[h]ow the Class Member's data is utilized contributes to the value the user places on Chrome's browsing service, and when that threshold of privacy that was agreed upon and expected is not met, the Class Member is injured by the economic value of that difference in service."[147]  However, Dr. Mangum does not offer

---

[146] Mangum Report, ¶ 80.

[147] Mangum Report, ¶ 69.

*Expert Report of Bruce A. Strombom*

any proposed analysis, calculation, or methodology to evaluate whether the "threshold of privacy" he discusses actually exceeds the value of the personalized browsing experience made possible by the receipt of the At-Issue Data, either for individual Class Members or the Proposed Class as a whole.

82.     The studies that Dr. Mangum relies on when proposing a class-wide approach for calculating the restitution of value of "personal information" recognize that some people value personalization more than they value privacy.  For example, the Hann et al. (2007) study that Dr. Mangum is using, and which I describe in more detail in **Section V.D.1** below, groups respondents into three clusters: (i) privacy guardians, (ii) information sellers, and (iii) convenience seekers.[148]  The authors describe the users in the "convenience seekers" group as only caring about time savings when visiting websites and having little regard for privacy policies[149] and as being "much more accepting of cookies."[150]  The authors classify six out of their 78 U.S. respondents (7.7%) as convenience seekers.[151]

83.     Similarly, the second study upon which Dr. Mangum relies (*that is*, Krasnova et al. (2009)) finds that, "when making a decision, individuals are consciously weighting costs (e.g. giving up privacy) and benefits… of their actions" and "*[w]hat choice users make depends on their preferences*."[152]  Recognizing that there might be "systematic differences between various user subgroups within [their] sample study" with respect to their value of privacy, among other things, Krasnova et al. use a technique called Cluster Analysis to identify groups of users with similar preferences.  They conclude that their respondents can be divided into three clusters: (1) "Unconcerned Socializers"; (2) "Control-conscious Socializers"; and (3) "Privacy Concerned" users.[153]  They describe the "Unconcerned Socializers" as follows:

---

[148] Hann et al. (2007), p. 16.

[149] Hann et al. (2007), pp. 30–32.

[150] Hann et al. (2007), p. 32.

[151] Hann et al. (2007), p. 31, Table 4.  Although there are 84 US respondents, the authors are unable to classify six of them in a bucket.

[152] Krasnova et al. (2009), p. 3.

[153] Krasnova et al. (2009), p. 15.

*Expert Report of Bruce A. Strombom*

> Offering these users not to use their information for personalized advertising is by far not enough to make them pay for OSN services… In their core, they are oriented to extract a maximum interaction value from the network at the lowest cost and without accounting for long-term privacy risks.[154]

84.     The fact that this and other studies below have put at over 20 percent the proportion of users who are unconcerned about their privacy and place higher value on the benefits that come from their data being collected indicates that it is possible that a large fraction of Proposed Class members would have been worse off had the At-Issue Data not been received and used by Google.[155]

85.     Other surveys and research demonstrate that users have different sensitivities to collection of their data and derive different benefits from personalization.  For example, a 2018 Salesforce Research survey finds that the "majority of customers are willing to share personal information if it is used to power personalized offers and engagements" and more than half understand how companies use their data to deliver more personalized experiences.[156]  In addition, a 2016 survey from digital performance marketing agency Adlucent concluded that consumers understand targeted advertising is based on their user data[157] and many customers are willing to share data to get more personalized advertising.  Specifically, the survey found that 71 percent of consumers prefer personalized ads, tailored to their interest and shopping habits.[158] The survey also found that 44% of respondents were willing to give up information including name, address or email address in order to get more personalized advertising, and many "[c]onsumers are eager to share what products they're interested in" (with 50 percent of the

---

[154] Krasnova et al. (2009), pp. 10-11.

[155] Krasnova et al. (2009), p. 11.  Krasnova et al. also note that different groups of users "tend to address their privacy concern in two different ways."  Namely, "'Control-conscious Socializers' rely on privacy settings, whereas 'Privacy-Concerned' prefer contractual agreements specifying how their information can be used."  Krasnova et al. (2009), p. 13.

[156] Salesforce Research, "Trends in Customer Trust," Research Brief, available at https://c1.sfdcstatic.com/content/dam/web/en_us/www/documents/briefs/customer-trust-trends-salesforce-research.pdf, p. 7.

[157] Specifically, 87% of the surveyed consumers "believe personalized advertising means unique content, based on their previous purchases or shopping behavior and delivered at a time when they are looking to buy a product."

[158] Adlucent, "71% of Consumers Prefer Personalized Ads." Available at https://www.adlucent.com/resources/blog/71-of-consumers-prefer-personalized-ads/

*Expert Report of Bruce A. Strombom*

respondents indicating that they would provide product category preferences, 8 percent indicating that they would provide information on major life events like marriage or the birth of a child, and 3 percent indicating that they would provide home address).[159]  The survey identified the following as the greatest benefits to personalization: (i) Reduction in irrelevant ads (46 percent), (ii) a way to discover new products (25 percent); and (iii) making online searching and shopping faster and easier (19 percent).

86.     There are other surveys that reach similar conclusions.  For example:

- An Infosys survey of U.S. consumers and retailers shows that 86 percent of the 1,000 surveyed customers "said that personalization has at least some impact on what they purchase," and 59 percent stated personalization has "a noticeable influence" on their purchase and 58 percent discover new products through advertising.[160]  Among the potential benefits of personalization, the study mentions that the majority of consumers who have experienced personalization "are highly in favor of personalized coupons," personalized offers, and promotions or product recommendations based on previous experiences.[161]

- A 2017 survey by Segment shows that 71 percent of consumers "express some level of frustration when their experience is impersonal" and that consumers value personalization not just while online shopping but also at brick-and-mortar stores.[162]  The survey shows that personalization makes it more likely that a customer will be a repeat buyer and leave a positive online review of the retailer.[163]  In fact, 31 percent of respondents state that they expect to be served personalized online ads within an hour of identifying themselves to a retailer. [164]

---

[159] Adlucent, "71% of Consumers Prefer Personalized Ads." Available at https://www.adlucent.com/resources/blog/71-of-consumers-prefer-personalized-ads/

[160] Infosys, "Rethinking Retail. Insights from consumers and retailers into an omni-channel shopping experience," 2013, pp. 2, 4, available at https://www.infosys.com/newsroom/press-releases/Documents/genome-research-report.pdf.

[161] Infosys, "Rethinking Retail. Insights from consumers and retailers into an omni-channel shopping experience," 2013, p. 3, available at https://www.infosys.com/newsroom/press-releases/Documents/genome-research-report.pdf.

[162] Segment, "The 2017 State of Personalization Report," pp. 2–6, available at http://grow.segment.com/Segment-2017-Personalization-Report.pdf.

[163] Segment, "The 2017 State of Personalization Report," p. 6, available at http://grow.segment.com/Segment-2017-Personalization-Report.pdf.

[164] Segment, "The 2017 State of Personalization Report," p. 7, available at http://grow.segment.com/Segment-2017-Personalization-Report.pdf.

*Expert Report of Bruce A. Strombom*

- A 2016 Salesforce survey shows that "[s]ixty-three percent of Millennial consumers and 58% of GenX consumers are willing to share data with companies in exchange for personalized offers and discounts."[165]  Even among "Baby Boomers" or "Traditionalist" customers, the fraction who strongly agree or agree with sharing personal data in exchange for personalized discounts, personalized shopping experiences, or product recommendations is above 40 percent.  The authors even titled the report in which they summarized their survey results "Please Take My Data: Why Consumers Want More Personalized Marketing."[166]

- A Pew Research Center survey about attitudes on privacy shows that a third of respondents would accept websites using their data to deliver targeted advertisements.[167]

87.     Dr. Mangum does not do any analysis to test or control for the fact that value from personalized advertising that Proposed Class members may receive on the basis of the At-Issue data may outweigh the purported value of the At-Issue Data or the alleged injury they suffered from Googles alleged wrongful conduct.  Because users have varying preferences for personalized ads and there is variability in the degree to which individual users are willing to provide their data for the benefit of getting personalized ads, individualized inquiry would be required to identify and exclude from the analysis those Proposed Class members who derived more value from Google's personalized ads than their data is worth to them or the alleged economic injury they suffered.[168]

88.     As a result, Dr. Mangum's methodology is likely to calculate damages for many uninjured Proposed Class members.

---

[165] McGinnis, D., "Please Take My Data: Why Consumers Want More Personalized Marketing," Salesforce, December 2, 2016, available at https://www.salesforce.com/blog/consumers-want-more-personalized-marketing/.

[166] McGinnis, D., "Please Take My Data: Why Consumers Want More Personalized Marketing," Salesforce, December 2, 2016, available at https://www.salesforce.com/blog/consumers-want-more-personalized-marketing/.

[167] Edmonds, R., "People Don't Want to Trade Privacy for Targeted Ads," Poynter, January 14, 2016, available at https://www.poynter.org/business-work/2016/people-dont-want-to-trade-privacy-for-targeted-ads/.

[168] The fact of injury cannot be established without a reliable estimate of the value Proposed Class members derive from personalized advertising.  Further, the results of the individualized inquiry to establish the fact of injury will affect the amount of estimated class-wide damages.

**C.    Dr. Mangum Has Not Offered a Reliable, Non-speculative Methodology to Calculate Unjust Enrichment, and Offers No Opinion on a Methodology to Allocate Google's "Excess Profits" to Class Members**

89.     Dr. Mangum's methodology to identify the portion of Google's profits that may be attributable to the alleged misconduct is speculative and unreliable because it is based upon several erroneous and unsupported assumptions.  In addition, Dr. Mangum confirmed in his deposition that he proposed an approach for allocating profits based on available data, but that he is not providing an opinion on whether his proposed approach is appropriate.[169]  Thus, Dr. Mangum has not opined on a methodology to apportion unjust enrichment to Proposed Class members.

90.     Dr. Mangum opines that it is possible to calculate unjust enrichment for each class member, and that each class member is entitled to the same allocation of "excess profits" for any given browsing period.  However, his opinion ignores that there is significant variation among Class Members, including along the following dimensions: (a) whether personal information was allegedly improperly taken, (b) whether the data that Google allegedly received improperly is considered "personal information," (c) the type and volume of the data that Google allegedly improperly received from each Proposed Class member, and (c) whether, and if so, how, Google used the allegedly improperly received data to generate revenue and profits.  I understand there is a wide variation in the amount of data Google receives from different users, and Google declarations I have reviewed have established that Google's profits from the user data vary greatly from user to user.

**1.    *Dr. Mangum Has Not Proposed a Reliable Class-Wide Methodology for Identifying the Portion of Google's Profits That May Be Attributable to the Alleged Wrongful Conduct***

91.     Dr. Mangum's proposed methodology for calculating Google's unjust enrichment is speculative because Dr. Mangum makes two unsupported assumptions: (a) that Google earns as much revenue from Chrome users who sync as from those who do not sync, and (b) the estimated revenue loss to customers of one Google Display Ads product from removing access to third party cookies would be the same for other Google Display Ads products.  Dr. Mangum's

---

[169] Mangum Deposition, pp. 152–153.

*Expert Report of Bruce A. Strombom*

methodology for calculating class-wide unjust enrichment is also unreliable because it does not identify a way to exclude profits Google may have earned from users who are uninjured for various reasons, including because they may have consented to Google receiving their data.

> a.   *Dr. Mangum's assumption that Google earns as much revenue from Chrome users who sync as from those who do not sync is speculative*

92.     To estimate the share of Google's Display Ad revenue attributable to U.S. non-synced Chrome users, Dr. Mangum relies on an estimate of the proportion of *users* that are non-synced globally (65%).[170]  Dr. Mangum equates the *proportion of users* with *proportion of revenue*, thereby assuming (without support) that the average per-user revenue from both synced and non-synced users is the same.  Dr. Mangum's assumption is speculative.

93.     I have reviewed documents produced by Google, which indicate that it is incorrect to assume that the proportion of users who are synced is equal to the proportion of traffic that Google generates from synced users.  A Chrome Analysis Team presentation stated that "[n]o matter what metric you care about, syncing and non-syncing users are likely to be meaningfully different" and that "[s]yncing users are usually more engaged with Chrome than non-syncing users (but that's not true in all locales or for all definitions of engagement)."[171]  Another Google presentation, titled "Comparison of syncing vs. non-syncing user metrics," showed that:

- ██████████████████████████████████████████████████████ ████████████████████████████████████████████

- ██████████████████████████████████████████████████ ████████████████████████████████

- ██████████████████████████████████████████████████████ ███████████████████████████████.[172]

---

[170] Mangum Report, ¶ 59.

[171] Chrome Analysis Team, "Chrome Staples," May 2019, GOOG-CALH-00031131-160 at 155.

[172] Google, "Comparison of Syncing vs Non-syncing User Metrics," Q1 2019, GOOG-CALH-00081472-499 at 485-486; Chrome Analysis Team, "Chrome Staples," May 2019, GOOG-CALH-00031131-160 at 155.

*Expert Report of Bruce A. Strombom*

94.     If synced users spend more time browsing, load more pages, and are active for more days, then Google may earn more revenue from synced users who are excluded from the Proposed Class than non-synced users who comprise the Proposed Class.

> b.     *Dr. Mangum's assumption that the estimated revenue loss to customers of one Google Display Ads product from removing access to third party cookies is proportional to the Display Ad revenue Google would have lost is speculative*

95.     Dr. Mangum claims that "both Google's internal analyses and independent third-party research show that removing access to *consumer identity information* reduced advertising revenue by 52 percent."[173]  He obtains this percentage from a Google study involving a "randomized controlled experiment on [the top 500 global] publishers who use the *programmatic arm of Google Ad Manager's serving system*" in which "Google disabled access to cookies for a small fraction of randomly selected users" to "empirically quantify the effect that disabling access to third-party cookies would have on the programmatic ad revenue of web publishers."[174] Dr. Mangum then used the experiment's "primary finding… that average revenue for publishers decreased by 52 percent" to suggest the same percentage would be the "portion of [Google's Display Ad] revenue that can be attributed to the information improperly received from Class Members."[175]

---

[173] Mangum Report, ¶ 60. Emphasis added. Dr. Mangum also suggests the 52 percent reduction in revenue allegedly attributable to disabling third party cookies is comparable to Goldfarb and Tucker's 65 percent reduction in banner ad effectiveness caused by EU privacy regulations.  Mangum Report, ¶ 54.  However, the Goldfarb and Tucker study that Dr. Mangum cites describes this 65% figure as the reduction in banner ad "effectiveness ... in terms of changing stated purchase intent" following the introduction of new privacy laws in the EU.  Avi Goldfarb and Catherine Tucker, "Privacy Regulation and Online Advertising," Management Science, January 2011, Vol. 57, No. 1, p.57.  In making this claim of comparability, Dr. Mangum is improperly equating a change in the "intent to purchase" from users who see display ads to a change in the revenue for an advertising platform like Google.

[174] GOOG-CALH-00040905–907 at 905; Mangum Report, ¶ 40. Emphasis added.  This study was also published to Semantic Scholar.  See, Ravichandran, D. and Korula, N., "Effect of disabling third-party cookies on publisher revenue," *Semantic Scholar,* August 27, 2019, available at https://www.semanticscholar.org/paper/Effect-of-disabling-third-party-cookies-on-revenue-Ravichandran-Korula/e570d982e9c6aa072dfdf0b4106fc4b1d86cdb23.

[175] Mangum Report, ¶¶ 40, 60. Emphasis added.

41

96.     The statistic that Dr. Mangum uses to calculate the "[p]roportion of ad revenues directly attributable to cookies" is not appropriate for that purpose because it does not measure the effect of disabling third-party cookies on Google's Display Ad revenue.

**97.**     Dr. Mangum makes the unsupported and flawed assumption that the decrease in Google's Display Ad revenue in the U.S. from disabling third-party cookies would have been proportional to the decrease in revenue that Google estimated would have been experienced by global publishers who use the programmatic arm of Google Ad Manager's serving system.  This assumption is flawed for at least two reasons.  First, I understand that a significant share of Google's Display Ad revenue is not from the programmatic arm of Google Ad Manager.  For example, Google generates Display Ad revenue from customers of AdSense, which is not part of the "Ad Manager's serving system."[176]  In addition, Google generates Display Ad revenue from the non-programmatic arm of Google Ad Manager, which is different than the part of Google Ad Manager on which the study was focused.[177]

98.     Second, Google's decrease in Display Ad revenue if third party cookies were disabled would not be proportional to the decrease in revenue to publishers because Google generates Display Ad revenue using different fee structures, some of which are related to publisher revenue and some of which are not.  Specifically, while Google Ad Manager's revenue from the ad exchange functionality is based on revenue share agreements with publishers, Google Ad Manager's revenue from publishers who use only the ad server functionality is based on a ██████████████████████████ per thousand impressions and is not proportional to publishers' revenue.[178]  Google also generates Display Ad revenue based on fixed fee arrangements with publishers that do not depend on the publishers' revenue.[179]

99.     Thus, Dr. Mangum's measure of the revenue loss that Google would have experienced if it could not rely on third-party cookies from the Proposed Class members is

---

[176] Levitte Decl., ¶¶ 6, 7.

[177] Levitte Decl., ¶ 12.

[178] Levitte Decl., ¶¶ 10-11.

[179] Levitte Decl., ¶ 15.

*Expert Report of Bruce A. Strombom*

speculative, and may cause Dr. Mangum's class-wide unjust enrichment to be understated or overstated.

> c. *Dr. Mangum's methodology for calculating class-wide unjust enrichment is unreliable because it does not identify a way to exclude profits Google may have earned from users who are uninjured for various reasons, including because they may have consented to Google's data receipt*

100.    Dr. Mangum assumes that all non-synced users were injured.  However, as discussed in **Section IV.B** above, some share of the users from whom Google earned profits either consented to Google's data receipt or utilized user controls that prevented Google from benefiting from their data.

101.    Dr. Mangum's proposed methodology for calculating unjust enrichment incorrectly includes profits from users who may be uninjured.  As I discuss in **Section IV.B** above, to identify and exclude uninjured Class Members would require a myriad of individualized inquiries, which is inconsistent with a class-wide model.  Dr. Mangum has not proposed a class-wide methodology for identifying and excluding Google's profits associated with any uninjured users from the calculation of unjust enrichment.

> d. *Even assuming Dr. Mangum has proposed a reliable class-wide approach, his calculation of unjust enrichment remains unreliable and overstated for other reasons*

102.    Even if Dr. Mangum's assumptions were correct, his calculation of unjust enrichment remains unreliable because the statistics that he is using overstate his class-wide "excess profits."

103.    First, Dr. Mangum overstates the "Proportion of Display Ad traffic attributable to Chrome" because he uses a statistic that pertains to Chrome traffic as a percentage of overall ad traffic ████████████)[180] rather than Chrome traffic as a percentage of Display Ad traffic (██ ██████, which is what he should be measuring.[181]  Correcting only this input in

---

[180] Mangum Report, Table 3, ¶ 57, fn. 84.

[181] Google, "Ads Impact from 'ChromeGuard' and 'SameSite & Secure' Launches," May, 7, 2019, GOOG-CALH-00303689-698 at 691.

*Expert Report of Bruce A. Strombom*

Dr. Mangum's model and calculations and leaving everything else unchanged decreases his class-wide unjust enrichment by ████████████████████.

104.     Second, Dr. Mangum also understates the percentage of Google users who are synced because he uses the percentage of users who are synced at a fixed point in time ████ ████,[182] ignoring that the percentage of users who are synced in 2018 is higher ████ ████████████████████████).[183]  Adjusting only this input in Dr. Mangum's model and calculations and leaving everything else unchanged decreases his class-wide unjust enrichment by up to ████████████.

105.     Finally, Dr. Mangum proposes to use Google's enterprise-wide gross profit margin[184] of 56 percent to calculate its "excess profit,"[185] which is much higher than Google's gross profit margin from Display Ads and excludes important costs such as costs related to improving and maintaining the products and infrastructure Google used to generate the alleged "excess profits" from Display Ads.[186]

---

[182] Mangum Report, ¶ 59; Google, "Chrome Desktop Users," GOOG-CALH-00037701-703 at 701.

[183] Google, "Chrome Staples," GOOG-CALH-00031076-160 at 087, 102.

[184] In general, gross profit margin is the profit that a company earns *after* paying for the direct costs incurred to generate the revenue (commonly known as cost of revenue or cost of goods sold) but *before* paying for operating costs such as sales and marketing costs, general and administrative costs, and research and development costs (R&D) associated with running the business and improving the infrastructure.  In a simplified example, if a company makes $10 in revenue from the sale of a widget, and it costs $4 to make the widget, then the cost of revenue would equal $4, while the gross profit would equal $6 (or $10 revenue less $4 cost of revenue).  The company's R&D costs associated with improving the functionalities of the widget and making it more desirable or the salaries of the people who sold the widget are not included in the cost of revenue.  Assuming that the R&D and sales costs were $2 per widget, the true (operating) profit associated with each widget is $4 per widget.

[185] Mangum Report, ¶ 62.

[186] In Google's case, the enterprise-wide cost of revenue includes traffic acquisition costs, content acquisition costs, expenses associated with data centers, and inventory-related costs for hardware Google sells.  Alphabet 10-K, 2020, pp. 60–61.  According to Google's annual report filed with the SEC, traffic acquisition costs are the amounts Google pays to distribution partners such as browser providers, mobile carriers, original equipment manufacturers, and software developers to make Google's search access points and services available to their respective customers or users, as well as and amounts paid to Google Network Members primarily for ads displayed on their properties.  Content acquisition costs primarily consist of payments to content providers from whom Google licenses video and other content for distribution on YouTube, subscription services, and Google Play.  Google's cost of revenue does not include expenses related to sales commissions, software development costs for software that is marketed to external customers and software that is used internally by Google, advertising and promotional expenses, and costs of property and equipment.  Alphabet 10-K, 2020, pp. 60–64.

106.    Google has indicated in its annual report filed with the Securities and Exchange Commission that its gross profit margin from Display Ads is lower than its enterprise-wide gross profit margin.  Specifically, Google's annual report states that "[t]he cost of revenues as a percentage of revenues generated from [third-party display ads] a*re significantly higher* than the cost of revenues as a percentage of revenues generated from ads placed on Google properties (which includes Google Search & other and YouTube ads), because most of the advertiser revenues from ads served on Google Network Members' properties are paid as TAC to our Google Network Members."[187]   Higher cost of revenue translates to lower gross profit margin.

107.    Separate from the fact that Google's gross profit margin from Display Ads is significantly lower than the value Dr. Mangum proposes to use, using the gross profit margin to calculate unjust enrichment in this case is not appropriate because it does not account for (i) costs that are not related to sales but may pertain solely or principally to the Display Ads segment, or (ii) Google firm-wide costs that support the Display Ads segment among others.[188]   Google notes in its annual reports that it "continue[s] to invest in [its] advertising programs and make significant upgrades."[189]   These improvements contribute to Google's ability to generate revenue and profits, and it is reasonable for them to be excluded from Google's profits when calculating Google's alleged wrongful enrichment from the At-Issue Data.

---

[187] Alphabet Form 10-K, 2020, p. 38. Emphasis added.  Per Table 2 and Exhibit 1 in Dr. Mangum's report, Google's revenue from Display Ads represents approximately 17 percent of Google's total advertising revenue, and Google's total advertising revenue represents nearly 84 percent of Google's total revenue.  The statement in Google's annual report and data Dr. Mangum has included in his report are directly at odds with his statement that Google's enterprise-wide gross profit margin is "likely understated" for purposes of his calculations.

[188] One example of such costs is the cost of maintaining Chrome.  As **Exhibit 5** shows, ███████████ ████████████████████████████████████████████████████████████████ Dr. Mangum is attempting to calculate Google's Display Ad profit premium attributable to Chrome.  Google would not have been able to earn the profit premium without Chrome, and part of the costs associated with operating, maintaining, and improving Chrome should be excluded from the profit premium Dr. Mangum calculates.

[189] Alphabet, Inc., SEC Form 10-K for the period ending December 31, 2020, p. 6.

*Expert Report of Bruce A. Strombom*

> ### 2. *Dr. Mangum Has Not Proposed a Reliable Class-Wide Methodology for Calculating the Number of Users or the Unjust Enrichment per User*

108.     Dr. Mangum outlined in his report "one proposed method" for allocating Google's alleged unjust enrichment.[190]  Dr. Mangum explained in deposition that he simply identified "what could be done" with the documents and data available to date, and that there might be other approaches.[191]  He testified further that he has not seen documents or data that would support another class-wide approach.[192]  Dr. Mangum appears to believe that it is not necessary to provide a methodology for allocating the alleged unjust enrichment at this stage of the litigation.[193]

109.     The approach for allocating class-wide unjust enrichment that Dr. Mangum outlined in his report is severely flawed and unreliable for multiple reasons, including because it: (a) fails to allocate unjust enrichment to Proposed Class members without Google accounts; (b) fails to test or account for the variability that exists in the amount and type of data Google receives from users and the degree to which Google was able to monetize each user's data, which may over- or undercompensate members of the Proposed Class to whom his approach allocates "excess profits"; (c) would allocate "excess profits" to users who Plaintiffs claim are excluded from the class; and (d) would allocate "excess profits" to Proposed Class members who may not be entitled to an allocation because Google did not profit from their data.

---

[190] Mangum Deposition, p. 153.

[191] Mangum Deposition, p. 153.

[192] Mangum Deposition, pp. 153–154.

[193] Mangum Deposition, p. 68.  ("Q: Does your methodology have a way to exclude users who may have consented to the data collection?  A. Well, I believe so, in a way. But I think that part of it relates to where what I've done would fit in the stream of assuming a finding of liability and there being some type of renumeration to class members. For example, if there is some query or some analysis that might be used to differentiate between how some class members gave consent or not, it -- I don't believe it logically happens in what I've done, but it might take what I've done and then require a step during either further discovery or maybe claims administration where someone might exclude that. So I think that can be included. But that particular question or distinction you've identified, I don't think fits in what I've done so far, up to the end of my opinions to date.")

*Expert Report of Bruce A. Strombom*

> a.   *Dr. Mangum has not proposed a methodology to identify non-Google account holders who are part of the Proposed Class*

110.    Dr. Mangum proposes to allocate profits Google may have earned from users without Google accounts to users with Google accounts.  Dr. Mangum's alleged unjust enrichment includes Google's "excess profits" from serving display ads to users *with and without* a Google account.  However, the profit allocation approach outlined in Dr. Mangum's report allocates Google's unjust enrichment *from all* Proposed Class members *to a subset* of the Proposed Class members (*i.e.*, those with Google accounts).[194]

111.    In his deposition, Dr. Mangum explained that the approach outlined in his report "doesn't include non-accounts" even though users without Google accounts are included in the Proposed Class and Google presumably earned excess profits from some of these users.  He added:

> It might be desirable at claims administration to ask questions about have you used Chrome and not synced and did not have an account? There may be another number which is added to the denominator in the division.[195]

Dr. Mangum testified that he and his team attempted to identify how many non-Google account holders there might be, but that they have not found any data in the document production that would cause Dr. Mangum to supplement his opinions.[196]

112.    Dr. Mangum's outlined approach would cause Proposed Class members without Google accounts to receive <u>no</u> distribution of Google's unjust enrichment even if Google profited from their data.  Moreover, Dr. Mangum's approach would overcompensate Proposed Class members with Google accounts because it would allocate to them the profits Google earned from Proposed Class members without Google accounts.

> b.   *Dr. Mangum has not proposed a reliable methodology for allocating Google's "excess profit" that accounts for the*

---

[194] Mangum Report, ¶ 64.

[195] Mangum Deposition, p. 132.

[196] Mangum Deposition, p. 144.

*Expert Report of Bruce A. Strombom*

> *variability that exists in the amount and type of data Google*
> *received from users and degree to which Google was able to*
> *monetize each user's data*

113.     Dr. Mangum assumes that all Google accounts are equally valuable to Google and that all proposed class members with Google accounts were injured equally.  In other words, Dr. Mangum assumes that two members of the Proposed Class who each have one Google account would be entitled to the same quantum of unjust enrichment so long as they both used Chrome in at-issue modes over time periods of the same duration.  And if one member of the Proposed Class has five Google accounts, that member would be entitled to five times more "excess profits" than a class member with one Google account no matter how much or little the member used each account.  The only explanation Dr. Mangum has provided for why this is appropriate is a hypothetical example in which a "Class Member may have two Google accounts, one for family and health related items, and one for leisure shopping," and "[e]ach account may have its own set of consumer identification data."[197]  He, however, does not explain why this Class member should receive twice the amount that a member who used one account for all three types of browsing activities would receive.

114.     Google declarations have established that Google's profits from the user data vary from user to user.  This is because Google's ability to monetize each user's data can vary significantly depending on the browsing and shopping behavior of the individual members of the Proposed Class and the type of data received from each.  Differences in user reliance on user controls that enable some users to limit or block Google's ability to earn advertising revenue from them and differences in user reliance on personalized ads in general are two examples of factors that can cause significant differences in the profit that Google may earn for each user.  For example, Google may derive different profits from users who have disabled personalized advertisements or have never clicked on an online advertisement, than from users who rely on targeted online advertisements to learn about products and streamline their online shopping experience, even when Google may have exactly the same level of data available for both users.

---

[197] Mangum Report, ¶ 96.

*Expert Report of Bruce A. Strombom*

115.     In addition, Dr. Mangum's proposed approach does not properly account for users with multiple Google accounts.  The proportion of Proposed Class members with multiple accounts is significant; Google found that ███████████████████████████████

███████████████████████████████████████████████████████[198]

There is no economic basis to award the same quantum of "excess profits" to each Google account without evidence that Google profited from each Google account equally.

116.     Dr. Mangum's proposed approach also does not adequately deal with users who shared a Google account.  Based on Plaintiffs' definition of the Proposed Class, all users who shared a Google account would be included in the Class.  Yet, any profit allocation that is based on Google accounts at best would only apportion "excess profits" to the account owner, but not other users who browsed using the same account.  Moreover, when multiple users browsed using the same account, Google may have profited from all, none, or some of the users.[199]  Under Dr. Mangum's approach, "excess profits" would be awarded to the Google account holder without any method for identifying how to allocate the "excess profits" award across all users who browsed under the same account and from whom Google may have profited.  Dr. Mangum testified in deposition that he is unaware of data that would tell him whether a Google account is shared and that this could be determined at the claims administration stage through an "online claims administration form."[200]

117.     Although Google's profits may vary significantly from user to user, Dr. Mangum has proposed no method to calculate Google's unjust enrichment from each user.  Further, I understand that Google's profits from each user cannot be calculated based on a common method using the information available in this case.[201]  Consequently, Dr. Mangum's model is not

---

[198] Google, "Chrome Desktop Users," GOOG-CALH-00037701-703 at 703.

[199] For example, as I discuss in Section IV.B.3, Google may not have been able to serve ads to certain users because of ad blocking software.

[200] Mangum Deposition, pp. 272–273. ("I'm not aware of data that would tell me, well, what do we do with … class members [] sharing an account…[T]his is also something which could clearly be, in my experience, handled [at] claims administration with a question…that's one line to fill out or one box to fill out on an online claims administration form.")

[201] Levitte Decl., ¶¶ 5, 18.

economically reliable, and individualized inquiry is necessary to ascertain the amount of alleged unjust enrichment attributable to each proposed class member.

### i.   Differences in user reliance on user controls

118.     Dr. Mangum acknowledges that Google does not generate the same revenue from all users of Chrome in non-synced modes.  Specifically, Dr. Mangum claims that (1) "users who do not want personalized ads may regularly" clean the cookies in their browser, (2) some users use the AdChoices program to opt out of targeted ads, and (3) some users use "browser extensions [that] prevent the ad request from being sent to the ad exchange."[202]  These and other controls enable users to limit or eliminate Google's ability to profit from their data.[203]

119.     There is evidence that the number of people who use one or multiple methods of opting out of or blocking personalized ads or display ads in general is material.  For example, Dr. Mangum states that "[c]ertain users are automatically excluded from the analysis [in a paper he cites]: ad-blocking users because their browser extensions prevent the ad request from being sent to the ad exchange."[204]   As discussed above in **Section IV.B.2**, over 10 million users use Adblock Plus for Chrome,[205] over 10 million Chrome users use uBlock Origin,[206] and millions of Chrome users use AdBlock.[207]

120.     Although Dr. Mangum makes it clear in his report that some users employ user controls to limit Google's receipt of certain At-Issue Data or its ability to use such data for

---

[202] Mangum Report, ¶¶ 48-49.

[203] Berntson Decl., ¶¶ 18-26; *supra* **Section IV.B.2**.

[204] Mangum Report, ¶ 49. Emphasis added.

[205] "Adblock Plus – free ad blocker – Chrome Web Store," available at https://chrome.google.com/webstore/detail/adblock-plus-free-ad-bloc/cfhdojbkjhnklbpkdaibdccddilifddb?hl=en-US; Adblock Plus, "About Adblock Plus," available at https://adblockplus.org/en/about.

[206] UBlock Origin is another popular privacy extension that has over 10 million users.  Chrome Web Store, "uBlock Origin – Chrome Web Store," available at https://chrome.google.com/webstore/detail/ublock-origin/cjpalhdlnbpafiamejdnhcphjbkeiagm?hl=en.

[207] AdBlock is another popular ad blocker that has been available since 2009 and has been downloaded over 350 million time by over 60 million users. See, AdBlock, "Surf the web without annoying pop ups and ads," available at https://getadblock.com/en/; Chrome Web Store, "AdBlock - best ad blocker - Chrome Web Store," available at https://chrome.google.com/webstore/detail/adblock-%E2%80%94-best-ad-blocker/gighmmpiobklfepjocnamgkkbiglidom.

*Expert Report of Bruce A. Strombom*

advertising purposes, while others don't, he assumes that all Proposed Class members contributed equally to Google's alleged unjust enrichment and proposes no method that would account for class members that utilized these features.

> ii.  Differences in value of users on the basis of users' characteristics

121.    I understand that advertisers are not willing to pay the same amount of money for the same ad to be shown to every user.  Specifically, the characteristics of the specific user to whom an ad may be targeted affects how much an advertiser may be willing to pay.  For example, an advertiser may bid more to show ads to an iOS user than an Android device user, all else equal, because they expect to derive more value from a user browsing on an iOS device.[208] Similarly, depending on the specific ad space, an advertiser may be willing to pay more or less based on the user's browsing and shopping behaviors, the month or season during which the bidding for ad space occurs, or the user's location.[209]  This impacts the programmatic advertising revenue of Google Ad Manager and AdSense, which get a percentage of the auction clearing price paid by the advertiser to the publisher that hosts the ad.[210]

122.    Dr. Mangum ignores that user characteristics materially affect the revenue Google earns from different users' data.  Other things equal, Dr. Mangum's approach would award the same amount of unjust enrichment to a Proposed Class member whose data allowed Google to earn relatively large amounts of revenue as it would to others from whose data Google earned relatively little revenue.  Dr. Mangum's proposed approach would overcompensate some Proposed Class members at the expense of others.

> iii.  Differences in the number of ads users view

123.    Any revenue that Google earns as a result of the alleged misconduct would vary by Proposed Class member depending on how much time a user spends on the internet, how many sites a user visits when browsing on Google Chrome and how much a user engages with

---

[208] Levitte Decl., ¶ 20.

[209] Levitte Decl., ¶ 20.

[210] Levitte Decl., ¶ 13.

*Expert Report of Bruce A. Strombom*

personalized ads.  Google typically earns more Display Ad revenue from a user who visits more websites because more ads are shown to the user.  In addition, Google typically earns more Display Ad revenue when users engage with ads more.[211]

124.     For example, assume that User A views one hundred personalized ads, while User B views thousands of personalized ads.  Because Google earns revenue in part based on the number of user impressions,[212] Google would earn more Display Ad revenue from User B than from User A (all else equal).  Yet Dr. Mangum's proposed allocation of "excess profits" ignores this fact: both User A and User B would receive the same proportion of the total unjust enrichment.

125.     Dr. Mangum has not proposed any reliable methodology to determine the unjust enrichment per user, which would vary from user-to-user and require individualized inquiry.

> c.     *Dr. Mangum has not proposed a methodology to identify and exclude Google accounts of users who are excluded from the class*

126.     There are several issues with Dr. Mangum's proposed allocation approach that would result in "excess profits" being allocated to Google accounts of users who are excluded from the class.

127.     Dr. Mangum's proposed approach would allocate unjust enrichment to Google users who are outside of the U.S., which is not appropriate because these users are excluded from the Proposed Class.  The monthly data on the number of Google accounts in the U.S. that Dr. Mangum proposes to use includes users who appear to be in the U.S. (because they are using a VPN with a U.S. based server) even though they are located outside the U.S.[213]  VPNs can alter a

---

[211] Google, "Partner finance reports," GOOG-CALH-00014551-552 at 551.  An impression is recorded each time a "creative" (an ad) is downloaded to the user's device a click is recorded each time a user clicks on an ad.  Google, "Counting impressions and clicks," GOOG-CALH-00016479-480 at 479; Google, "Counting impressions and clicks," GOOG-CALH-00016479-480 at 479; Google, "How Chrome makes money for Google," November 21, 2017, GOOG-CALH-00133389-391 at 389-390.

[212] Google, "How Chrome makes money for Google," November 21, 2017, GOOG-CALH-00133389-391 at 389-390.

[213] Zervas Report, ¶¶ 52–54.

*Expert Report of Bruce A. Strombom*

user's true IP address and make it appear as if the user is in the U.S.[214]  For these reasons, users outside of the U.S. use VPNs to access content that may be blocked in the countries where they are located.[215]  Indeed, when examining Chrome on Android usage in China, Google noted that "[i]f they're on VPN all the time they would also appear to be outside of China."[216]

128.     In addition, Dr. Mangum's proposed approach would allocate profits to Incognito users who are excluded from the class even though the revenue Google may earn from these users is excluded from the "excess profits" Dr. Mangum calculates.  This is because Dr. Mangum has not proposed any methodology to identify which non-synced Google accounts belong to users who browsed solely in Incognito mode.

129.     Dr. Mangum's proposed approach does not include any way to identify and account for Google accounts of Proposed Class members who appear to be in the U.S. when they are not or who only used Incognito mode.

> **D.     Dr. Mangum Does Not Offer a Valid Methodology to Calculate Class-wide Restitution Damages and His Opinion on Class-Wide Restitution Damages Is Unreliable and Speculative Because It Relies on Prior Research That Is Not Applicable to The Data At Issue or Circumstances of This Case**

130.     As described above, Dr. Mangum claims that the members of the Proposed Class were injured because Google's alleged misconduct caused a "reduction in economic value received by consumers" and that this reduction is the "difference in economic value between the services agreed upon [*i.e.*, Google would not collect the At-Issue Data] and those received [*i.e.*, Google collected the At-Issue Data]."[217]

131.     Dr. Mangum proposes to quantify damages for "restitution of [the] value of personal information" that Google received from members of the Proposed Class by: (a) estimating the economic value of proposed class members' "personal information" collected by

---

[214]   Zervas Report, ¶ 52.

[215]   Zervas Report, ¶ 53. *See also,* Websafetytips.com, "How to Bypass Geo-Restriction with a VPN" (October 1. 2020), available at https://www.websafetytips.com/how-to-bypass-geo-restriction/.

[216]   "Clank Leads Weekly Notes," GOOG-CALH00032221-405 at 346.

[217]   *See* **Section IV.A.2**.  Mangum Report, ¶ 68, 69.

Google; and (b) multiplying this value by "the number of Class Member accounts to calculate the total damages for the class."[218]  Dr. Mangum identifies three different approaches that "can be used" to calculate the economic value of the At-Issue Data collected by Google: (1) value of privacy as indicated in two academic studies that used surveys and conjoint analysis to estimate the value; (2)  consumer payments for VPN services; and (3) payments from research companies for customer data.  Dr. Mangum proposes to estimate the number of Google accounts associated with the Proposed Class members from data he expects Google to produce.[219]

132.    Dr. Mangum testified in deposition that, no matter which of his three methods is used to derive the value of the data at issue, he believes the data of all users is worth the same amount.  This is a fundamental assumption to his methodology for calculating class-wide restitution damages.[220]  He also testified he does not opine on what that value should be, but instead gives several different ranges of values for the trier of fact to pick from at a later stage.[221]

133.    Dr. Mangum claims that it would be possible to come up with a single dollar amount indicative of the value of "personal information"[222] even though Plaintiffs' expert, Dr. Leslie John, has publicly acknowledged that "[b]ecause privacy is an abstract concept, *the economic value can't be pinpointed*."[223]  During her deposition, Dr. John referred to privacy as an "abstract" and "ethereal" concept comparable to "love."[224]

134.    Dr. Mangum's proposed methodology is flawed and inapplicable to the quantification of the value of the data at issue in this case.  As an initial matter, Dr. Mangum's

---

[218] Mangum Report, ¶ 96.

[219] Mangum Report, ¶¶ 96, 97.

[220] Mangum Deposition, pp. 227–232.

[221] Mangum Deposition, pp. 227–230.

[222] Mangum Deposition, pp. 178–179.

[223] Rowland Manthorpe, "Ever suffered from selfie regret? Why some people share when they shouldn't," *Wired*, April 11, 2016, available at https://www.wired.co.uk/article/leslie-john-harvard-irrational-decision-making. (Emphasis added.)

[224] Deposition of Leslie John, November 16, 2021, pp. 163–164.

*Expert Report of Bruce A. Strombom*

three approaches result in possible values of the At-Issue Data that range from approximately $13 to $312 per user per year.[225]  He offers no opinion on which of his three approaches is superior or what value within this range is the appropriate measure of the value of the At-Issue Data.  In and of itself, this wide range and the imprecision it implies calls into question the reliability of Dr. Mangum's method.

135.    The two academic studies that Dr. Mangum uses are not suitable for valuing the At-Issue Data because, among other things, they attempt to measure the value of data that is not directly comparable to the At-Issue Data, measure only consumers' willingness to pay (*i.e.*, only the demand side of the market and not the market equilibrium price based on both demand and supply), are outdated, and are based on responses of survey participants who are not representative of the class.  Dr. Mangum did not conduct a survey or conjoint analysis to measure the value of the At-Issue Data, indicating that it was not part of his assignment;  he testified that if such a study was conducted, he "think[s] it would be in this range, but [he w]on't know until […] it would be done."[226]  Yet, he does not plan or propose to conduct such a study.[227]

136.    As to Dr. Mangum's use of the amounts consumers pay for VPN services and the amounts market research firms' pay to survey respondents as proxies for the value of the At-Issue Data, his approach is also flawed.  Dr. Mangum admitted that payments for VPNs are "not directly applicable" to the value of the data at issue.[228]  The prices of VPNs are not indicative of the value of the data at issue in part because VPNs offer many functionalities that are unrelated to the privacy.[229]  Payments by market research firms are not applicable, in part, because they compensate consumers for data that is not comparable to the At-Issue Data.

---

[225] *See* **Section IV.A.2.**

[226] Mangum Deposition, p. 211.

[227] Mangum Deposition, pp. 198–199.

[228] Mangum Deposition, pp. 214–216.

[229] Zervas Report, ¶ 53.

*Expert Report of Bruce A. Strombom*

137.     Dr. Mangum's proposed approach for calculating restitution damages suffers from additional flaws as well.  First, it ignores the variation in both user preferences for privacy and the value of the data received from different users.  Second, it fails to consider and account for variation across Proposed Class members as to whether Google received data, and if so, the type and volume of that data.  Third, Dr. Mangum's reliance on the number of Google accounts as the building block to calculating and allocating class-wide damages means that, if his proposed methodology were adopted, then: (a) there is no mechanism by which users without Google accounts would receive damages; and (b) users with multiple Google accounts will likely be overcompensated.  Finally, Dr. Mangum has not proposed a methodology for identifying and excluding any Proposed Class members who were uninjured.

### 1.     *None of the Methods Dr. Mangum Proposes as Indicative of the Value of the At-Issue Data Are Applicable to the Data and Facts of This Case*

#### a.     *The two studies that Dr. Mangum uses for his survey-based method are not applicable to the facts in this case*

138.     Dr. Mangum claims that "conjoint analysis can be used to estimate the reduction in market value, if any, due to Chrome violating its Chrome Agreements and sharing with Google the personal information of Chrome users that did not enable sync."[230]  However, neither Dr. Mangum nor any of Plaintiffs' other experts have designed or conducted, or even explained how they would design or conduct, a conjoint analysis to measure the value of the At-Issue Data. Nor has Dr. Mangum established that such an analysis would be feasible or arrive at an accurate value for restitution based on the facts of this case.[231]

139.     Instead of conducting his own conjoint analysis, Dr. Mangum uses some of the findings of two academic studies that purportedly estimate "the value of data privacy."[232]  Specifically, Dr. Mangum uses findings described in the Hann et al. (2007) study as a basis for his opinion that the "protection against improper access and secondary use of personal

---

[230] Mangum Report, ¶ 77.

[231] Dr. Tülin Erdem explains that a conjoint analysis is ill-equipped to accurately measure the value of privacy in this matter.  *See* Erdem Report, Section XII.

[232] Mangum Report, Section V.A.1.

*Expert Report of Bruce A. Strombom*

information is worth" between $22.48 and $32.90 in 2016 dollars.[233]  Dr. Mangum also uses findings described in the Krasnova et al (2009) study as a basis for his opinion that "an average user [of an online social network] would be willing to spend between … $18.75 and $22.84 per year if the [online social network] provider refrained from using the demographic information provided for personalized advertising."[234]  Dr. Mangum suggests that either of the estimates from the two studies "can then be multiplied by the number of Class Member accounts to calculate the total damages for the class."[235]

140.    The methodologies used in the Hann et al. (2007) and Krasnova et al. (2009) studies do not estimate the "*market value*" of the At-Issue Data, which, according to Dr. Mangum, is what he intends to measure.[236]  The estimates of value presented in both of these studies are based on respondents' own valuation of privacy/personal information in hypothetical scenarios.[237]  Willingness to pay is the maximum price a consumer is willing to pay for a product or service and, as such, is a measure of demand. [238]  However, the market value for a good or service is a function of both the prices buyers are willing to pay and the prices sellers are willing to receive in exchange for a good or service.  Because these studies ignore one side in the supply-demand equilibrium through which market values are determined, the value estimates they provide are not representative of the market values of the data or services they are trying to measure.  Even if the methodologies on which the two studies rely did provide estimates of market values (which they do not), the studies are not applicable to the facts in this case: they

---

[233] Mangum Report, ¶ 81.

[234] Mangum Report, ¶ 82.

[235] Mangum Report, ¶ 96.

[236] Mangum Report, ¶ 77.  In his deposition, Dr. Mangum testified that he does not think the market value of the At-Issue Data dropped as a result of Google's alleged misconduct.  *See* Mangum Deposition, p. 187. ("The idea isn't that because it was used without permission, collected without permission, that it somehow dropped in value. … I don't think I've made any presumption that … the value as we move through time is somehow dropped. But if somebody had something of value but it was taken without being paid for that time period, they got no value for it.")

[237] Krasnova et al. (2009) measure user willingness to pay. Hann et al. (2007) asks participants about their willingness to accept a payment in exchange of their data, as opposed to their willingness to make a payment for the protection of their data. In both instances, the relevant issue for the purposes of measuring the market value of the At-Issue Data is that both studies only ask consumers for their hypothetical preferences without measuring the market response from suppliers. In my report, for simplicity, I refer to both as "willingness to pay."

[238] R. G. Hubbard and A. P. O'Brien, "Microeconomics," Seventh Edition, Pearson, 2019, pp. 74 – 75.

*Expert Report of Bruce A. Strombom*

attempt to measure the value of data using a small and homogenous group of respondents who are not representative of the members of the proposed class, and at least one of them attempts to measure the value of data that may be more private (*e.g.*, credit card and health care information) than the At-Issue Data.[239]

        i.   The studies that Dr. Mangum proposes to use do not provide the market value of the At-Issue Data because they fail to account for critical supply-side factors

141.     The Hann et al. (2007) and Krasnova et al. (2009) studies that Dr. Mangum proposes to use (instead of conducting his own conjoint analysis based on the facts of this case) do not estimate a market price for the At-Issue Data because they do not consider the effect of the supply side of the market on equilibrium market values.[240]

142.     Conjoint analysis measures (at best) consumers' "willingness-to-pay" for a particular feature (*i.e.*, consumer demand), not the feature's market price, which requires an analysis of both consumers' demand and producers' supply in the marketplace.[241]  Willingness-to-pay for a particular product attribute (here the security of the At-Issue Data) can be measured by the difference between consumers' willingness-to-pay for a product with the attribute and their willingness-to-pay for an otherwise-identical product without the attribute.  The change in willingness-to-pay tells us about consumers' valuation of the attribute of interest and thus reflects only how demand for the product would change if the attribute were added to or removed from the product.  It does not determine how the market price for the product would change and thus does not tell us the market price of the product attribute of interest.  This is because a change in demand does not, by itself, tell us how the market price of the product would change due to a change in product features.

143.     According to basic economic theory, the equilibrium price of a product, or the "market value," to use Dr. Mangum's terminology, is determined by the interaction between both

---

[239] Hann, et al. (2007), p. 23.

[240] Neither of these studies conduct a conjoint analysis in the context of the internet browser market.  The Hann et al. (2007) study evaluates company websites from different industries and the Krasnova et al. (2009) study evaluates online social networks.

[241] Bryan K. Orme (2014), Getting Started with Conjoint Analysis, 3rd Edition, Research Publishers LLC, p. 88.

*Expert Report of Bruce A. Strombom*

demand and supply.[242]  Without accounting for both demand and supply, it is not possible to determine how the presence or absence of a product attribute will affect the price of a product.

144.    The supply side must be considered in the context of a conjoint analysis, and the two studies that Dr. Mangum uses do not consider any supply side effects on the value of the data they attempt to measure.  Without this supply side information, it is not possible to determine the counterfactual outcome in the market.[243]  If consumers were willing to pay significantly more for one of the product features than it costs to provide that product feature, then competition will likely cause that product feature to be offered.  Alternatively, if the cost of adding a certain feature to the product is greater than the price consumers are willing to pay for it, then sellers will not offer that feature because it would not be profitable to do so.  These factors represent reactions from both consumers and suppliers of the product, the interaction of which determines the equilibrium price and quantity in the market.[244]

ii.   The studies that Dr. Mangum uses as estimates of the value of the At-Issue Data are not applicable to the facts in this case

a.   Hann et al. (2007)

145.    In the Hann et al. (2007) study, the authors conduct an experiment with 184 undergraduate students from Singapore and 84 undergraduate students from the U.S. about their

---

[242] R. G. Hubbard and A. P. O'Brien, "Microeconomics," Seventh Edition, Pearson, pp. 86 – 88.

[243] *See e.g.*, Allenby, G. M., J. Brazell, J.R. Howell, and P.E. Rossi (2014), "Valuation of Patented Product Features," *Journal of Law and Economics*, Vol. 57, No. 3: 629-663, at pp. 630-631 ("However, a conjoint survey, in and of itself, is not adequate to form the basis for equilibrium firm profit calculations. Not only must we calibrate demand for products, but we must also compute industry equilibria. This requires measures of costs, a demand system not only for the focal product but also for the major competing products, and an equilibrium concept. […] To compute equilibrium outcomes, we will have to make assumptions about cost, the nature of competition, and the set of competitive offers.").

[244] In a typical market, a change in a product's features could change consumers' willingness to pay for the product. For example, if a seller removed a feature that consumers value, then the whole product could become less desirable to consumers.  In economic terms, there would be a decrease in demand for the product.

Other things equal, basic principles of economics indicate that a decrease in demand would cause both the equilibrium quantity and the equilibrium price, which are determined jointly by the interaction of demand and supply, to decline.  In a typical market, a shift in demand would result in a new equilibrium quantity supplied because as a product's price declines suppliers will maximize profits by supplying less of the product.  If one were to ignore the supply side of the market, and incorrectly assuming that quantity supplied would remain unchanged regardless of changes in demand and price, then the estimated change in equilibrium price caused by removing the desired product feature would be overstated.

*Expert Report of Bruce A. Strombom*

willingness to register with and use certain websites, such as financial services and healthcare websites. The experiment offered a monetary benefit of either $5, $10, or $20, and asked each participant to consider a hypothetical convenience benefit from registering to the portal in terms of future time savings.[245] At the same time, the experiment warned some participants that the website may use their information "for other purposes, such as revealing [their] web usage preferences" (which the study calls "unauthorized secondary use").[246] Similarly, the experiment warned some participants that "protections against deliberate and accidental errors in personal data [handling would be] inadequate" (which the study calls "error").[247] Lastly, the experiment warned some participants that their information may be "readily available to personnel not properly authorized to view or work with this data" (which the study calls "improper access").[248] The experiment offered each participant a specific combination of two rewards—financial promotion and hypothetical time savings—and the three risks described above. Based on the participants' decisions on whether or not to register on the portal given their offered risks and rewards, the study calculated the average valuations that participants had for each risk.

146.    The Hann et al. (2007) study is not relevant to this case because the values measured in the study are not applicable to the facts and data at issue in this matter for several reasons. First, the data whose value Hann et al. attempt to measure is not comparable to the At-Issue Data. Specifically, the definition of personal information in Hann et al. (2007) includes "name, home address, phone number, e-mail address, credit card information, and some industry-specific information. In particular, travel Web sites requested the person's occupation, travel purpose, destination, and frequency of travel, as well as frequent flyer numbers; healthcare Web sites asked for medical history, drug allergies, and prescription record; and financial Web sites asked for household income, stock portfolio, and previous stock trading experience."[249] The data to which Hann et al. assign value (*e.g.*, payment card information, medical histories, or

---

[245] Hann et al. (2007), p. 40.

[246] Hann et al. (2007), pp. 19, 41.

[247] Hann et al. (2007), pp. 19, 41.

[248] Hann et al. (2007), pp. 19, 41.

[249] Hann et al. (2007), p. 23.

*Expert Report of Bruce A. Strombom*

information on an individual's investment portfolios) are far different from, and potentially more sensitive than, the data that Google is alleged to have received in this case.

147.     In general, all user data is not created equal when it comes to value.  Evidence suggests that certain private information, such as financial records and healthcare information, are relatively more valuable data than some other types of information.  Similarly, studies show that users may have different valuations for different types of data.  For example:

- In an article that discussed the value of consumer data, the Financial Times reported that "[b]asic age, gender and location information sells for as little as $0.0005 per person," but that personal data indicative of the individual's health ailments can be worth between $0.14 and $0.26 per person.[250]

- According to the Trustwave 2017 Value of Data report, while basic personally identifiable information is only worth $0.03 per record, the price at which healthcare records and credit card data were sold on the black market were much higher, ranging from $5 to $1,000 for healthcare data and $0.05 to $18 for credit card data.[251]

- A Reuters article indicates that "medical information is worth 10 times more than… credit card number[s] on the black market,"[252] and "[s]tolen health credentials can go for $10 each, about 10 or 20 times the value of a U.S. credit card number."[253]

- The study by Krasnova et al. that Dr. Mangum cites shows that respondent's valuation of the information disclosed in a social network is significantly higher when it includes information such as "work, hobbies, personal interests, religion,

---

[250] Steel, Emily, "Companies scramble for consumer data," *Financial Times*, June 12, 2013. Available at https://www.ft.com/content/f0b6edc0-d342-11e2-b3ff-00144feab7de.

[251] While the Trustwave report does not specifically define what "basic PII" includes, it seems to refer to personally identifiable information such as full names, emails, and addresses, but exclude more compromising data such as corporate emails, payment card information, data protected by intellectual property, financial records, or healthcare records. *See* Trustwave (2017), "The Value of Data." Available at https://www2.trustwave.com/rs/815-RFM-693/images/TV_Value_of_Data_Report_Final_PDF.pdf, p. 9.

[252] Caroline Humer, and Jim Finkle, "Your Medical Record Is Worth More to Hackers than Your Credit Card," *Reuters,* September 24, 2014. Available at https://www.reuters.com/article/us-cybersecurity-hospitals/your-medical-record-is-worth-more-to-hackers-than-your-credit-card-idUSKCN0HJ21I20140924.

[253] *See Id.* "Health credentials" refers to information that an attacker can use to fraudulently impersonate an individual and obtain health services, medications, or medical equipment.

*Expert Report of Bruce A. Strombom*

political orientation, groups, relationship status, sexual orientation, photos, [and] videos," compared to when it only includes basic demographic information.[254]

148.    Second, the small sample size used in the Hann et al. (2007) study and relatively homogenous respondent population severely limit the applicability and relevance of this study for a case with tens of millions of proposed class members with varying demographic profiles and preferences that are likely to be heterogeneous.  The Hann et al. (2007) study results are based on the stated responses of 268 survey participants, only 84 of which are from the U.S.[255] Moreover, all of the study respondents were undergraduate students.  Hann et al. note that this is one of the "limitations" of their experiment, since undergraduate students "are younger and probably more familiar with the Internet and e-commerce than the general population."[256]  This specific cohort is unlikely to be representative of the Proposed Class, which contains millions of members with varying ages, educational backgrounds, and technical knowledge and acumen.[257] Thus, making conclusions about how the members of the Proposed Class may value privacy or the At-Issue Data based on the responses of these 84 respondents is not justified and is at odds with fundamental principles of statistical sampling.

149.    In summary, the Hann et al. (2007) study is not a reliable source for the value of the At-Issue Data because it estimates the value of substantially different personal information (such as medical histories and credit card information), and it considers a small sample of subjects unlikely to be representative of the Proposed Class (84 U.S. undergraduate students) at a point in time nearly a decade before the beginning of the proposed Class Period.

b.    Krasnova et al. (2009)

150.    The goal of the Krasnova et al. (2009) study was to test whether privacy was important to users and to help users and online social networks ("OSNs") come out of a "deadlock" in which providers of free online social networks "have little choice but to generate

---

[254] Krasnova et al. (2009), pp. 8–9.

[255] Hann et al. (2007), p. 24, Table 1.

[256] Hann et al. (2007), p. 34.

[257] Statistical inference requires defining a population of interest and drawing a sample from that specific population.   *See, e.g.,* David M. Diez, Christopher D. Barr, and Mine Cetinkaya-Rundel, "OpenIntro Statistics," Third Edition, pp. 15–18.

*Expert Report of Bruce A. Strombom*

revenue through personalized advertising to remain financially viable" and users who are sensitive to privacy have no other option for paid online social network services. The authors attempt to "assess the value of privacy in monetary terms" for purposes of generating "insights into how social network providers can capitalize on different user preferences by specifically addressing the needs of distinct groups in the form of various premium accounts."[258]

151.     In this study, the authors surveyed 168 European participants (from France, Germany, Russia and the United Kingdom), and asked them to assume they were not members of any online social networks but were considering joining one that suited their privacy preferences best.[259] Starting from that hypothetical, the survey asked participants to choose between different fictional social networks that varied along five attributes: (i) price (either free, or charging a €3 or €6 monthly subscription); (ii) popularity; (iii) customizability; (iv) privacy control (*i.e.,* whether the user could limit their profile to be shared only with friends or not); and (v) whether the provider could use their information to provide personalized display ads.[260] Each respondent was offered a different menu of alternatives involving each of these attributes. The authors calculated a valuation of each attribute or feature based on the correlations between the respondents' choices and prices they faced.[261]

152.     The results of this study cannot be reliably used to draw inferences about the Proposed Class members in this case. The study predates the Proposed Class period and was based on a small sample of non-U.S. respondents who were predominantly students. The authors specifically caution against using the results of the study as a measure of attitudes in the U.S:

> "[M]ost respondents… have European origin, which limits the scope of our study to European user base. Krasnova and Veltri (2010)… show that German and US users exhibit different

---

[258] Krasnova et al. (2009), p. 1.

[259] Krasnova et al. (2009), p. 5.

[260] Krasnova et al. (2009), p. 5.

[261] Krasnova et al. (2009), pp. 11, 14.

*Expert Report of Bruce A. Strombom*

attitudes when it comes to their level of privacy concerns on OSNs, trust in the OSN provider and legal assurances."[262, 263]

I note that 4 out of 10 respondents in the Krasnova et al. (2009) study used by Dr. Mangum were from Germany.[264]  In addition, the authors acknowledge that another limitation of the study is that "a large part of [the] respondents were students" and advise that "further research should validate our findings with other population groups."[265]

> b.   *Dr. Mangum's use of consumer payments for VPNs as a measure to value the At-Issue Data is irrelevant because the price paid for a VPN is not indicative of the value of the At-Issue Data, which Dr. Mangum also admitted*

153.    Dr. Mangum claims that "VPNs (Virtual Private Networks) provide a real market example of internet users' willingness to pay for online privacy" because VPNs keep users' "online activity anonymous and private."  He goes on to assert that the prices "of popular VPNs [can] serve as benchmarks for the prices that individuals are willing to pay for their online security and protection of personal data."[266]

154.    Dr. Mangum's claims are unfounded.  Prices of VPNs are not an appropriate benchmark to measure internet users' willingness to pay for online privacy in general, but particularly in this case, because many of the features that affect the demand and pricing for VPNs have no relevance to Google's alleged misconduct.[267]  Dr. Zervas indicated in his report that VPNs offer many features and functionalities, only some of which are related to privacy. For example, VPNs allow nationals of countries governed by oppressive regimes to skirt state-

---

[262] Krasnova et al. (2009), p. 15.

[263] In the Krasnova and Veltri (2010) study itself, the authors conclude that U.S. Facebook users disclose more of their private information than their German counterparts because they show a higher level of trust in the platform and obtain bigger benefits from its use. Krasnova, H, and N. Veltri, "Privacy Calculus on Social Networking Sites: Explorative Evidence from Germany and USA." *Proceedings of the 43rd Hawaii International Conference on System Sciences*, 2010.

[264] Krasnova et al. (2009), p. 7.

[265] Krasnova et al. (2009), p. 15.

[266] Mangum Report, ¶ 84.

[267] T. Švenčionis, "What is a VPN and how does it work?" Cybernews, accessed on November 11, 2021, available at https://cybernews.com/what-is-vpn/.

*Expert Report of Bruce A. Strombom*

imposed restrictions on internet browsing, and nationals of other countries to skirt restrictions on particular activities, such as gambling.  Similarly, VPNs allow users to change their apparent location to circumvent geolocation restrictions from content providers like Netflix and HBO Max that may only allow users in certain countries to view certain content (*e.g.*, HBO Max may restrict people outside the U.S. from viewing content with a U.S.-based subscription).  All of these features (and more) affect the demand and pricing for VPNs, however, none has any relevance to Google's alleged misconduct.[268]

155.    As for privacy considerations, VPNs disguise a device's IP address, which allows a user to hide their location from websites they visit.[269]  VPNs, however, do not restrict websites from placing cookies on users' browsers and targeting ads across websites based on third-party cookies.[270]  Moreover, I understand that users can get the purported privacy-related benefit that VPNs offer for free by using free VPN extensions available on the Chrome Webstore.[271]  Therefore, one could argue that the privacy-related benefit of a VPN is actually worth no money at all given that it is available for free.

156.    Dr. Mangum admitted in deposition that VPNs are not applicable to the facts of this case:

> [VPNs are] a service that's not directly applicable to what we're going to ask about, that is, personal information. … The query of this case is about sync and the not syncing, and the information that allegedly was collected and shared that shouldn't have been….So what looking at VPN markets gives is not a market

---

[268] T. Švenčionis, "What is a VPN and how does it work?" Cybernews, accessed on November 11, available at https://cybernews.com/what-is-vpn/; *See also*, Zervas Report, ¶¶ 52–54.

[269] Zervas Report, ¶53.

[270] "VPNs cannot, however, prevent search engines like Google and Bing from monitoring your search history. If you're logged on to Chrome, Google can still track user behavior connected to your account. Depending on your VPN server, it might assume you're in a different location but that's about it."  See Osman, "What Does a VPN Hide," ExpressVPN, March 10, 2021, available at https://www.expressvpn.com/blog/what-does-a-vpn-hide/.  See also, Thorin Klosowski, "The Biggest Misconceptions About VONs," April 5, 2017, Lifehacker, available at https://lifehacker.com/the-biggest-misconceptions-about-vpns-1794038237

[271] For example, ZenMate Free VPN is a free VPN that is used by over 4 million Chrome users.  *See* Google, "Chrome Web Store, ZenMate Free VPN – Best VPN for Chrome – Chrome Web Store," available at https://chrome.google.com/webstore/detail/zenmate-free-vpn%E2%80%93best-vpn/fdcgdnkidjaadafnichfpabhfomcebme.

outcome of this personal information, but it's a market outcome
about steps people take…So it's not direct.  It's not a perfect fit.[272]

Dr. Mangum also admitted that he does not know all the other, non-privacy-related
protections that a VPN service may provide.[273]

157.     Thus, the price paid for a VPN is <u>not</u> indicative of the price Proposed Class
members would pay for the privacy Plaintiffs seek.

158.     Even if one accepted the use of the price of a VPN subscription as a measure of
the value of online privacy, there is significant variation in VPN prices—Dr. Mangum quotes
prices ranging from $13.32 to $155.88 annually and, as discussed above, I understand users can
get the purported privacy benefits of VPNs for free[274]—and Dr. Mangum has not provided a
methodology for determining which of those prices represents the most reasonable proxy for the
value of privacy or the At-Issue Data in this case.[275]

> c.     *Dr. Mangum's "marketplace examples" payments from "research
> companies" for user information are not applicable because they
> do not measure the value of the At-Issue Data*

159.     Dr. Mangum claims that "[t]he value of personal information and online behavior
is apparent in the way that research companies pay users for the collection of their online
data."[276]

160.     The examples of market payments from "research companies" for user
information are not applicable because they do not measure the value of the data at issue in this
case.  At least some of the companies Dr. Mangum references compensate users for (i) collecting
their name, gender and other personally identifiable data, (ii) collecting their data while they

---

[272] Mangum Deposition, p. 215.

[273] Mangum Deposition, p. 219.

[274] *See* **Section IV.A.2**.

[275] *See, e.g.,* S.Shelton and B.Colburn, "Best VPNs of 2021." September 24, 2021, available at
https://www.usnews.com/360-reviews/vpn.

[276] Mangum Report, ¶ 90.

*Expert Report of Bruce A. Strombom*

browse the internet *and* fill out online profiles, installing additional apps on their devices,[277] and filling out additional surveys that may reveal sensitive information beyond the scope of the At-Issue Data.  For example, in addition to collecting the user's home postal address, and "behavior" data such as how frequently a participant uses their computer or watches TV, Nielsen collects "health or medical conditions, biometric or genetic data, sexual orientation or sexual life, political opinions/views, race/ethnic origin, religious and philosophical beliefs and trade-union membership."[278]  And BrandTotal collects the user's date of birth, gender, relationship status, and mobile telephone, among other pieces of data, and tracks users across various social sites like Facebook, Twitter, YouTube, LinkedIn, and Amazon.[279]

> **2.      Dr. Mangum's Suggested Approach to Calculating Class-wide Restitution Damages Is Unreliable Because It Is Based on the Assumption that Damages Are Associated Only With Google Accounts and that Each Google Accountholder Should Receive the Same Damages Per Period Despite Variation in User Preferences for Privacy and the Amount and Type of Data Google Received from Each Google Accountholder**

161.      Dr. Mangum proposes to "calculate the total damages for the class" by multiplying the "value that users place on protection of their personal information" by "the number of Class Member accounts."[280]  This approach proposes that the building block of the damages model is a Google Account and associates a static dollar amount for a fixed period of time as damages for a Google Account, no matter the various differences among users and data associated with Google Accounts, or even whether the users had a Google account.[281]

---

[277] The website Dr. Mangum cites to states: "Download our safe and secure Nielsen app or computer software on your qualified devices. … Answer our registration questions to tell us more about you, your household, and the devices you use." *See* Nielsen Computer and Mobile Panel, available at https://computermobilepanel.nielsen.com/ui/US/en/sdp/landing?SourceId=195&PID=15877&PID2=1023b2824bbb

[278] *See* Nielsen Computed & Mobile Panel, "Privacy & Cookie Notice," January 2020. Available at: https://computermobilepanel.nielsen.com/ui/US/en/privacypolicyen html#whatinfocollect.  *See also*, Super Savvy, "How it Works," available at https://www.surveysavvy.com/how_it_works.

[279] *See* UpVoice, "How can we help you," accessed December 20, 2021, available at https://www.joinupvoice.com/faq.

[280] Mangum Report, ¶ 96.

[281] This is consistent with Plaintiffs claim that "Contract damages will be the same for every Chrome user, subject only to formulaic adjustments." Class Cert Motion, p. 3.

162.    Dr. Mangum's approach for calculating class-wide restitution damages is unreliable because it fails to account for the significant variation across Proposed Class members in: (1) the value users place on the protection of the At-Issue Data; (2) whether Google receives data, and if so, the type and volume of the data that Google allegedly improperly receives from each Proposed Class member; and (3) the way each individual uses their Google account, their multiple Google accounts, or even whether they have a Google account at all.

>    *a.*    *Dr. Mangum's Methodology for Calculating Class-wide Damages from Loss of Value of the At-Issue Data Fails to Account for Variation in the Value Users Place on Protection of Their At-Issue Data*

163.    Dr. Mangum acknowledges that there is variation among users and user preferences along dimensions that would affect the amount of damages from the alleged misconduct.  There are numerous statements in his report that speak to the fact that different users place different values on Chrome's browsing service, have different willingness to disclose their data, and value privacy differently. For example:

- Dr. Mangum states that "[t]he value Chrome users place on the protection of their personal information is indicative of the amount by which each Class Member was damaged due to the breach in the Chrome Agreements" and then he shows significant variation in users' willingness to pay for privacy or protection of their information.[282]

- Dr. Mangum claims that users who opt-out of personalized ads "tend to be more technologically sophisticated and that opt-out rates tend to be higher in older and wealthier American cities," and that "people who choose to opt out have a greater valuation of privacy."[283]

- Dr. Mangum states that "[d]etermining the economic value of th[e] difference in service as a result of Chrome's breach in contract comes down to assessing the value that browser users place on their privacy and control of their own personal information."[284]

---

[282] Mangum Report, ¶ 96.  *See also,*  Mangum Report, ¶¶ 81–82.

[283] Mangum Report, ¶ 47.

[284] Mangum Report, ¶ 70.

*Expert Report of Bruce A. Strombom*

164.     The Hann et al. (2007) and Krasnova et al. (2009) studies upon which Dr. Mangum relies for "support for the value of user personal information" also describe significant variability across users with respect to the value that they place on their privacy and control of their data, which is exactly what Dr. Mangum is trying to measure.[285]  For example, Hann et al. state they "found strong support for the[ir] Privacy Diversity hypothesis" that "[i]ndividuals have systematic differences in privacy preferences," and that they "observed very different attitudes toward benefits and privacy."[286]  They elaborate that there are different types of users:

- "[P]eople who attach a relatively high value to information privacy, many of [whom] even configure[] their browsers to reject all cookies,"

- "[P]eople who prefer convenience with little regard for money or Web site privacy policies… [and who] were much more accepting of cookies," and

- People who "tend to 'sell' personal information with little regard for convenience … or Web site privacy policies."[287]

In addition, Krasnova et al. find that, "when making a decision, individuals are consciously weighing costs (*e.g.*, giving up privacy) and benefits… of their actions.  Hence, users face certain trade-offs.  *What choice users make depends on their preferences*."[288]  As discussed in **Section IV.D.1.a** above, the authors describe significant variation in the amount that different groups of users might be willing to pay for an OSN in exchange for the OSN not to use their information.  They also point to significant variation in the value that different users place on privacy, and describe a group of people who, "[i]n their core, …are oriented to extract a maximum interaction value from the network at the lowest cost and without accounting for long-term privacy risks."[289]

---

[285] This is consistent with other studies, which show that users value their data along a spectrum, and how much users value data depends on multiple factors specific to the individual consumer.  *See* **Section IV.D.1.**

[286] Hann et al. (2007), pp. 21, 30.

[287] Hann et al. (2007), pp. 30, 32.

[288] Krasnova et al. (2009), p. 3 (emphasis added).

[289] Krasnova et al. (2009), p. 11.

*Expert Report of Bruce A. Strombom*

165.     Hann et al. and Krasnova et al.'s findings indicate that different users would have been damaged by different amounts.  The conclusions in the Hann et al. (2007) and Krasnova et al. (2009) studies that Dr. Mangum uses in his report as benchmarks for the amount of damages suffered by Proposed Class members are ranges based on averages.[290]  This is inconsistent with Dr. Mangum's claim that class-wide damages can be calculated by multiplying a single dollar value by the number of Google accounts.  Dr. Mangum has not proposed a method for transforming the wide ranges provided by the studies he relies upon into a single value that would be applicable to each Google account associated with Proposed Class members.

> b.     *Dr. Mangum's Methodology for Calculating Class-wide Restitution Damages Fails to Account for Variation in the Data that Google Receives from Different Users*

166.     Dr. Mangum's approach for calculating restitution damages per user, which assumes the data collected form all users is of equal value, is inconsistent with the fact that the amount and type of data that Google collects varies across users.

167.     Putting the differences in value users place on privacy aside, two users should not be entitled to the same amount of restitution if Google received materially more data from one user than from the other.  Dr. Mangum purports to establish the "value of the personal information improperly obtained by Google"[291] but this value cannot be established without consideration of the amount and type of information Google collected on a user-by-user basis.  Class-wide damages from the loss of value of the At-Issue Data cannot be calculated if there is no reliable method for measuring differences in the type and amount of data received from users.

168.     I have reviewed declarations of Google representatives which indicate that Google does not receive the same type or amount of data from every user or user account.[292]

---

[290] Mangum Report, ¶¶ 80–81.  For example, the conclusion of the Krasnova study states: "[O]n average a user would be ready to pay between € 14.14 and € 17.24 a year… if the OSN provider refrained from using his or her demographic information for personalized advertising." (Emphasis added.) Krasnova et al. (2009), p. 15.  *See also*, Mangum Report, ¶ 82.

[291] Mangum Report, ¶ 65.

[292] *See generally* Ganem Decl., ¶¶ 23–36 (discussing various user controls that impact the type of data Google Analytics receives, if any, and how that data is used); Berntson Decl., ¶¶ 8, 19-26 (discussing various user controls that impact the type of data Google Ad Manager receives, if any, anyhow that data is used).

Differences in the Chrome browsing mode that users selected for browsing sessions, as well as differences in the controls (*e.g.*, browser extensions, cookie blockers, firewall, etc.) that users employ, affect the data that Google is able to collect from each user.  Even the Krasnova et al. (2009) study that Dr. Mangum relies upon notes that many people "configure[] their browsers to reject all cookies."[293]  **Exhibit 4** illustrates how user controls affect the data Google may receive from a browsing session.

169.     Evidence in this case indicates that there is significant variability in the amount of data Google received from each Google account.  For example, in its responses to Plaintiffs' first set of interrogatories, Google provided the number of "Google accounts that had sync enabled and appeared to be in the United States."[294]  On average, over ███████████████████ ████████████████████████████████████████████ ████████████████████ Further, about ████████████████████ █████████████████████████████████████████████ ██████████████"[295]  By contrast, users without a Google Account were browsing 100 percent of their time in Basic mode (non-synced).  This indicates that differences in user browsing habits cause differences in the user data Google may receive.  Thus, it is inappropriate and inconsistent with the evidence in the case for Dr. Mangum to assume that each Google account or user suffered the same amount of damages per period.

> c.     *Dr. Mangum's Methodology for Calculating Class-wide Restitution Damages Fails to Account for Issues Implicit in Using Google Accounts to Calculate and Allocate Class-Wide Damages Because Not All Proposed Class Members Have Google Accounts, and Even If They Did, There Is Significant Variation in the Number and Use of Google Accounts*

170.     As explained above, Dr. Mangum's proposed methodology for calculating class-wide restitution damages uses a Google account as a building block and associates a static dollar amount of damages for each Google account, regardless of whether a user has multiple accounts,

---

[293] Krasnova et al. (2009), p. 32.

[294] Defendants Responses and Objections to Plaintiffs' First Set of Interrogatories (Nos. 1-7), pp. 9–11.

[295] Defendants Responses and Objections to Plaintiffs' First Set of Interrogatories (Nos. 1-7), pp. 9–11.

*Expert Report of Bruce A. Strombom*

whether those accounts have a personal or business purpose, or whether Proposed Class members even have a Google account.

171.    Dr. Mangum notes that, "[t]o the extent that Class Members have multiple Google accounts at issue, the calculation can factor in multiple sets of consumer data by way of multiple accounts" such that a Proposed Class member with multiple Google accounts would receive damages for *each* account:

> "[A] Class Member may have two Google accounts, one for family and health related items, and one for leisure shopping. Each account may have its own set of consumer identification data."[296]

In other words, Dr. Mangum claims that a Proposed Class member with two accounts should get two times the damages from restitution that a Proposed Class member with one account would receive, and that this is justifiable because each user account "may have" its own set of consumer identification data.  However, he has not proposed a method for testing whether two or more accounts indeed have different sets of consumer identification data, or if they do not, how he would account for that on a class-wide basis.

172.    Moreover, this methodology would produce the counterintuitive outcome of awarding certain Proposed Class members multiple times the damages of another Proposed Class member simply because they split their activity across multiple Google Accounts.  For example, suppose two hypothetical Proposed Class members, A and B, performed the exact same online activity under the same modes on Chrome but user A did it while logged in to their only Google account while user B split this activity across three different Google accounts.  The alleged injury these two Proposed Class members suffered, if any, is arguably the same.  However, Dr. Mangum's methodology would award Proposed Class member B three times the damages that it would award Proposed Class member A.

173.    Even further, suppose Proposed Class member B only used each of these three Google accounts for a small amount of time, while Proposed Class member A was an avid Chrome user throughout the Proposed Class period and spent a large amount of time browsing.

---

[296] Mangum Report, ¶ 96.

*Expert Report of Bruce A. Strombom*

Now, the alleged damages that user A suffered would arguably be much larger than any damages suffered by user B.  However, user B would still receive three times more damages than user A under Dr. Mangum's methodology.

174.     This is not a minor issue with Dr. Mangum's approach.  Dr. Mangum notes that "[a]ccording to Google, around ████████████████████████████ ████████"[297] which illustrates that how Dr. Mangum proposes to deal with users who may have multiple personal Google accounts would have significant ramifications to the class-wide and per-user restitution damages.

175.     Similarly, Dr. Mangum ignores that certain Google Accounts may in fact be business accounts.  As discussed in **Section IV.B.3** above, I understand that data is "personal information" only if can be reasonably linked to the identity of an *individual*, and that damages should not be awarded on the basis of business accounts.  However, Dr. Mangum's methodology does not provide a way to distinguish personal Google accounts from business accounts so that they could be excluded from calculating class-wide damages in the event the trier of fact determines that they should not be included in the Proposed Class.

176.     Finally, by calculating damages based on the number of Google Accounts, Dr. Mangum ignores that, as discussed in **Section IV.B.3** above, the Proposed Class encompasses users who are not Google account holders.  As a result, Dr. Mangum's proposed methodology to calculate damages would be deficient in that it would award no damages to Class members without Google accounts if the trier of fact determines that these Class members were injured according to Plaintiffs.

## V.     REBUTTAL TO PLAINTIFFS' STATUTORY DAMAGES CLAIMS

177.     Plaintiffs also seek statutory damages.[298]  They allege that Google intercepted the "contents" of their "communications" with websites, and that each time Google received their

---

[297] Mangum Report, ¶ 96 (emphasis added).

[298] Plaintiffs' Notice of Motion And Motion for Class Certification And Appointment of Class Representatives and Class Counsel; Memorandum of Law in Support Thereof *Patrick Calhoun, et al v. Google, LLC,* Case No. 5:20-cv-05146-LHK-SVK,, October 14, 2021 (Dkt 340) ("Plaintiffs' Motion to Certify Class"), p. 3.  *See also* Amended Complaint, ¶ 334.

*Expert Report of Bruce A. Strombom*

data through one of its services, a separate violation occurred.[299]  Plaintiffs claim that the statutory damages under CIPA will be "the same for every Chrome user," and seem to suggest that "the largest statutory recovery … available under the CIPA" is $5,000.[300]

178.    I understand that statutory damages under CIPA need not be awarded "mechanically" in matters such as this one, and that courts may exercise discretion based on certain criteria.[301]

179.    I have been asked by counsel for Google to evaluate, from an economic perspective, whether it is feasible for Plaintiffs to calculate statutory damages in this matter on a class-wide basis.  I have also been asked to evaluate, from an economic perspective, whether there was any reasonable purpose for Google's alleged violation of CIPA.  Further, I have been asked to assume that, for purposes of evaluating Plaintiffs' alleged statutory damages under CIPA, there is a violation—and damages—only if a Google service received a "search term or similar communication made by the user" to the website, such as a POST request that includes "content."[302]  In other words, Google's mere receipt of a GET request, IP address, user agent information, x-client-data header and/or cookies, would not violate CIPA since there was no content exchanged.

180.    Plaintiffs have neither proposed a class-wide methodology for calculating statutory damages nor provided any evidence that such statutory damages can be determined on a class-wide basis.

181.    To calculate statutory damages per violation, Plaintiffs need to propose a reliable way of calculating the number of CIPA violations for each Proposed Class member and for the class as a whole, which I understand Plaintiffs have not done.  Plaintiffs claim that Google has

---

[299] Amended Complaint ¶ 149.

[300] Plaintiffs' Motion to Certify Class, p. 3, 24.

[301] Order Granting in Part and Denying in Part Motion for Class Certification, in Re: *Matthew Campbell, et al., v. Facebook Inc.,* Case No. 13-cv-5996-PJH (Dkt 192), filed May 18, 2016, pp. 25–27.

[302] Amended Complaint, ¶¶ 121–124.  I understand the Ninth Circuit has held that "content" for purposes of CIPA refers to the "substance, purport or meaning' of a communication." *See* Nancy Walther Graf et al., v. Zynga Game Network, Inc., United States Court of Appeals For The Ninth Circuit, May 8, 2014, p.18.

*Expert Report of Bruce A. Strombom*

committed a separate violation every time it received a proposed class member's "content," as defined above.  However, as discussed throughout my report, I understand that the amount of "content" Google may have received will vary among class members.  I also understand that the number of violations experienced by each Class member will vary significantly depending on: (1) whether the user visited a website that uses a Google Service that receives POST requests; (2) how many times the user visited such a website; and (3) whether (and how many times) the user made a POST request on that site containing information that qualifies as "content," which is not automatic, as I understand that some POST requests contain only information that courts hold is not "content."[303]

182.      Additionally, neither Plaintiffs nor Dr. Mangum have proposed a feasible and reliable methodology to calculate "actual damages" under CIPA.  As I discuss in **Section IV.D** above, the "actual damages" per class member (if any) will vary substantially for various reasons, including due to variation in the data, if any, that Google received from them.  As a result, even in the case of those Proposed Class members who have suffered "actual damages," individualized inquiry would be required to determine the amount of damages they would be entitled to.  Moreover, if, for example, the trier of fact finds that Class members who consented implicitly or explicitly to Google's receipt of the At-Issue Data and/or from whom Google did not receive information that is considered "personal information" were not injured, Plaintiffs have proposed no way to identify and exclude these members from the calculation of class-wide statutory damages.  As I discuss in **Section IV.B**, individualized inquiry would be required to identify users who consented implicitly to Google's data receipt or whose data would not be considered "personal information."

183.      Finally, Plaintiffs fail to consider that there is a reasonable economic purpose for the alleged violation, namely that Google's receipt of user data allows Google to improve the user experience and provide services at no cost to Plaintiffs and Proposed Class members.  I understand that Google's receipt of the At-Issue Data improves the user's experience when browsing the web.  For example, I understand Dr. Yiling Chen's report shows how Chrome uses the At-Issue Data to improve the user's online experience by displaying Google Fonts as

---

[303] Zervas Report, ¶¶ 104–107.

*Expert Report of Bruce A. Strombom*

intended by the website, and integrating Search or Maps features into websites.[304]  In addition, the At-Issue Data helps non-Google entities and Google provide more relevant content to users. As discussed in Section IV.B.4 above, the benefits that consumers receive from the personalization of their online experiences include personalized ads, which provide value to at least some users by improving their online shopping experiences, as well as personalized online content, customization of services, and personalized coupons, offers, and discounts.

184.    Google is able to provide these benefits to Chrome users at no monetary cost, at least in part, because of its ability to monetize the At-Issue Data.  Although there is variability among users in the benefits they receive from the various improvements to their browsing experience enabled by Google's receipt of data, these items can be considered reasonable purposes for the receipt of the At-Issue Data.

185.    In summary, calculating any relevant statutory damages would still require a class-wide methodology that takes into consideration the issues described above.  However, neither Plaintiffs nor Dr. Mangum have outlined or discussed such a methodology.

Signed on the 22nd day of December, 2021, at Calistoga, California.

Bruce A. Strombom

---

[304] Chen Report, ¶¶ 51–53.

**Exhibit 1**
**Alphabet Inc.**
**Consolidated Statements of Income ($ in Millions)**

| | 2016 | | 2017 | | 2018 | | 2019 | | 2020 | | 2021[1] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Amount | % of Revenue | Amount | % of Revenue | Amount | % of Revenue | Amount | % of Revenue | Amount | % of Revenue | Amount | % of Revenue |
| Revenue | | | | | | | | | | | | |
| Google Search & Other[2] | $63,785 | 70.7% | $69,811 | 63.0% | $85,296 | 62.3% | $98,115 | 60.6% | $104,062 | 57.0% | $152,360 | 57.5% |
| YouTube Ads[2] | N/A | N/A | $8,150 | 7.4% | $11,155 | 8.2% | $15,149 | 9.4% | $19,772 | 10.8% | $31,010 | 11.7% |
| Google Network Members Properties | $15,598 | 17.3% | $17,616 | 15.9% | $20,010 | 14.6% | $21,547 | 13.3% | $23,090 | 12.7% | $32,982 | 12.4% |
| Google Advertising | $79,383 | 87.9% | $95,577 | 86.2% | $116,461 | 85.1% | $134,811 | 83.3% | $146,924 | 80.5% | $216,352 | 81.6% |
| Google Other | $10,601 | 11.7% | $10,914 | 9.8% | $14,063 | 10.3% | $17,014 | 10.5% | $21,711 | 11.9% | $28,691 | 10.8% |
| Google Services Total | $89,984 | 99.7% | $106,491 | 96.1% | $130,524 | 95.4% | $151,825 | 93.8% | $168,635 | 92.4% | $245,043 | 92.4% |
| Google Cloud | N/A | N/A | $4,056 | 3.7% | $5,838 | 4.3% | $8,918 | 5.5% | $13,059 | 7.2% | $19,338 | 7.3% |
| Other Bets | $288 | 0.3% | $477 | 0.4% | $595 | 0.4% | $659 | 0.4% | $657 | 0.4% | $815 | 0.3% |
| Hedging Gains (Losses) | N/A | N/A | -$169 | -0.2% | -$138 | -0.1% | $455 | 0.3% | $176 | 0.1% | -$53 | 0.0% |
| Total Revenue | $90,272 | 100.0% | $110,855 | 100.0% | $136,819 | 100.0% | $161,857 | 100.0% | $182,527 | 100.0% | $265,143 | 100.0% |
| Costs and Expenses: | | | | | | | | | | | | |
| Cost of Revenue | $35,138 | 38.9% | $45,583 | 41.1% | $59,549 | 43.5% | $71,896 | 44.4% | $84,732 | 46.4% | $112,612 | 42.5% |
| Research and Development | $13,948 | 15.5% | $16,625 | 15.0% | $21,419 | 15.7% | $26,018 | 16.1% | $27,573 | 15.1% | $30,663 | 11.6% |
| Sales and Marketing | $10,485 | 11.6% | $12,893 | 11.6% | $16,333 | 11.9% | $18,464 | 11.4% | $17,946 | 9.8% | $21,748 | 8.2% |
| General and Administrative | $6,985 | 7.7% | $6,840 | 6.2% | $6,923 | 5.1% | $9,551 | 5.9% | $11,052 | 6.1% | $12,597 | 4.8% |
| European Commission Fines | $0 | 0.0% | $2,736 | 2.5% | $5,071 | 3.7% | $1,697 | 1.0% | $0 | 0.0% | $0 | 0.0% |
| Total Costs and Expenses | $66,556 | 73.7% | $84,677 | 76.4% | $109,295 | 79.9% | $127,626 | 78.9% | $141,303 | 77.4% | $177,620 | 67.0% |
| Income from Operations | $23,716 | 26.3% | $26,178 | 23.6% | $27,524 | 20.1% | $34,231 | 21.1% | $41,224 | 22.6% | $87,523 | 33.0% |
| Other Income (Expenses), Net | $434 | 0.5% | $1,015 | 0.9% | $7,389 | 5.4% | $5,394 | 3.3% | $6,858 | 3.8% | $17,061 | 6.4% |
| Income before Income Taxes | $24,150 | 26.8% | $27,193 | 24.5% | $34,913 | 25.5% | $39,625 | 24.5% | $48,082 | 26.3% | $104,584 | 39.4% |
| Provision for Income Taxes | $4,672 | 5.2% | $14,531 | 13.1% | $4,177 | 3.1% | $5,282 | 3.3% | $7,813 | 4.3% | $19,647 | 7.4% |
| Net Income | $19,478 | 21.6% | $12,662 | 11.4% | $30,736 | 22.5% | $34,343 | 21.2% | $40,269 | 22.1% | $84,937 | 32.0% |

**Notes:**

[1] 2021 values are calculated as (A) values for the nine months ending September 30, 2021 multiplied by the ratio of (B) values for the twelve months ending December 31, 2020 and (C) values for the nine months ending September 30, 2020. All other values are for the twelve months ending December 31.

[2] In 2016 Google Search & Other and YouTube Ads fall under the category of Google Properties.

**Sources:**

Alphabet Inc. Form 10-K, 2018 - 2020; Alphabet Inc. Form 10-Q, 2020 Q3 and 2021 Q3.

**Exhibit 2**
**Publicly Available Articles Discussing Google's Collection of Data**

| Count | Date | Source | Title | Quotes |
|---|---|---|---|---|
| 1 | 10/10/2007 | Slate | Google's Evil Eye, Does the Big G Know Too Much About Us? | "Google's fingerprints aren't just on your e-mail. Last week, the Senate held hearings regarding Google's proposed acquisition of Doubleclick. Google dominates the micro-end of Internet advertising with its text ads. Doubleclick is the leading provider of banner ads.... **A combined Googleclick would be a force in Internet advertising**—Google makes 99 percent of its profits from ads—**and have an awesome ability to track your online behavior. Google will be able to inform advertisers what sites your browser has visited, what ads have been clicked on, what search terms have been used. The company can also get a good idea of your physical location from your computer's IP address.**" |
| 2 | 8/3/2011 | CMP TechWeb | Using Incognito Windows in Google Chrome | "**Incognito** destroys any cookies you create the instant you close your browser window, **limiting the tracking other websites can do.**" |
| 3 | 9/24/2013 | Slate | C Is for Cookie, That's Not Good Enough for Google | "**Most browsers enable third-party cookies by default; some, like Google's Android browser, don't even give you the choice.**" [...] "[N]**early every computer or smartphone is set up so that multiple companies can and will track your activities across large numbers of websites that they don't own.**" [...] Research "indicated that **more than 88 percent of websites inform Google of your visit for advertising, analytics, or some other purpose.**" |
| 4 | 1/19/2016 | The Irish Times | Internet Cookies and Privacy Should Come With Health Warning | "**[W]ith Google, Facebook and a host of powerful search engines, aided by the ubiquitous cookies, you may not even be aware you are leaving an online health trail.** Specifically, **browser cookies** - small text files saved to your computer that can be used to identify and correlate your visits to many websites - **operate in the background quietly sending information about your browsing habits to third parties.**" |
| 5 | 7/1/2016 | Slate | Now You Can See Everything Google Knows About You and Delete the Embarrassing Stuff | "Google has worked to provide transparency features so you can keep track of old searches and even delete entries." [...] Google "**launched a new tool that combines data history from all of its services** (search, YouTube, Chrome, etc.) **in one place.** 'My Activity' allows you to delete entries individually using custom date ranges, topics, or sorting by service. It also makes it easier to see other **things Google knows about you, like devices associated with your Google account and location data.**" [...] "The feature also includes **a new option for Google's ad tracking. If enabled, it uses all this information from your Google account–search, Chrome, YouTube, the works– to improve the ads you see around the web. Google already uses this data to tailor the ads it shows within its own services, like Gmail, but now it would expand into your wider browsing on any site that uses Google's ubiquitous AdSense service.**" [...] "[T]he company chose to make this version of its ad tracking opt-in, so users will only have it enabled if they actually chose to turn it on." |
| 6 | 12/19/2016 | Dow Jones | Privacy Groups Seek Regulatory Review Of Google Privacy Policy | "The complaint, which Consumer Watchdog and Privacy Rights Clearinghouse filed with the Federal Trade Commission, centers on **Google's request in June that users opt-in to new privacy settings that enable Google to combine their browsing histories with their search histories to show more personalized ads.** The privacy groups claim the move violated deceptive-practices law and a previous FTC order." |

**Exhibit 2**
**Publicly Available Articles Discussing Google's Collection of Data**

| Count | Date | Source | Title | Quotes |
|---|---|---|---|---|
| 7 | 3/14/2017 | Daily News | Secret Surfing (Part One) | "[P]retend you are shopping online for a gift for your significant other, or someone else who may use your computer occasionally. **You search** for a 'Thingamajig 123' in the regular browsing window. You find it and read all about it. Well, **cookies from that site will be saved to your browser**. When the other person opens that browser minutes, hours or days later and searches in Google, guess what? Ads for a 'Thingamajig 123' will appear in Google, so you are given away. **Cookies are shared from site to site, so that is why you see advertisements for things you have been looking for. It seems spooky until you realize why.**" |
| 8 | 4/1/2017 | Financial Times | Digital Privacy Is More Than Just Opting In or Out; For Most Internet Users, Clicking Their Approval Became a Mere Reflex | "The US looks like a Wild West for personal data. **Information gathered by companies - most prominently Google and Facebook - trades at lightning speed on advertising markets that most users do not even know exist.**" |
| 9 | 8/1/2017 | Slate | Google Is Matching Your Offline Buying With Its Online Ads, but It Isn't Sharing How | "[T]he only way for a Google user to prevent his or her offline purchasing history from being linked to their web browsing is to opt out of Google's web and app tracking entirely, which could make it nigh-impossible to use other Google services." [...] "**Google** says not to worry about that information seeping out, since it **'does not learn what was actually purchased by any individual person (either the product or the amount). [It] just learn[s] the number of transactions and total value of all purchases in a time period,** aggregated to protect privacy.'" |
| 10 | 1/3/2018 | USA Today | Curb How Facebook, Google and Amazon Use Your Personal Data in a Quick Privacy Clean-Up | "**Most of the eyes watching you on the Web sit on other sites, in the form of ads and widgets that let Facebook, Google and other ad networks monitor your activity outside their own realms.**" |
| 11 | 4/11/2018 | The Washington Post | Facebook Is Now in the Data-Privacy Spotlight. Could Google Be Next? | "But **Google** holds a major advantage over Facebook, because it **fleshes out a user's profile with data from all the sites that person uses**: Instead of just the interactions people would share with their family and friends, **Google knows a person's private searches**, travel schedule and YouTube views**. That system of digital bread crumbs is often why a product someone searched for on one website can end up following them around the Internet in ads." |
| 12 | 4/22/2018 | The Wall Street Journal | Who Has More of Your Personal Data Than Facebook?  Try Google | "**If the concern is that companies might be collecting some personal data without our knowledge or explicit consent, Alphabet Inc.'s Google is a far bigger threat by many measures: the volume of the information it gathers, the reach of its tracking and the time people spend on its sites and apps.**" [...] "**[G]iven the choice, many people might even be fine with the trade-off of personal data for services.** Still, to date few of us realize the extent to which our data is being collected and used." [...] "**Google uses, among other things, our browsing and search history**, apps we've installed, demographics such as age and gender and, from its own analytics and other sources, where we've shopped in the real world." |

**Exhibit 2**
**Publicly Available Articles Discussing Google's Collection of Data**

| Count | Date | Source | Title | Quotes |
|---|---|---|---|---|
| 13 | 5/30/2018 | FastCompany | Bye, Chrome: Why I'm Switching to Firefox and You Should Too | **"You're probably sick of hearing about data and privacy by now**–especially because, if you live in the United States, **you might feel like there's very little you can do to protect yourself from giant corporations feeding off your time, interests, and personal information**." [...] "But why should I continue to use the company's browser, which acts as literally the window through which I experience much of the internet, when its incentives–to learn a lot about me so it can sell advertisements–don't align with mine?" [...] "Contrast that to **Chrome's privacy policy**, which **states that it stores your browsing data locally unless you are signed in to your Google account, which enables the browser to send that information back to Google. The policy also states that Chrome allows third-party websites to access your IP address and any information that site has tracked using cookies. If you care about privacy at all, you should ditch the browser that supports a company using data to sell advertisements and enabling other companies to track your online movements for one that does not use your data at all.**" [...] "The browser's [Firefox's] Tracking Protection feature automatically blocks a list of common trackers in private browsing mode and can be enabled to run all the time, something you need a specific, third-party browser extension to do on Chrome." [...] **"Chrome does give you many privacy controls, but the default for most of them is to allow Google to collect the greatest amount of information about you as possible. For instance, Google Chrome gives users the option to tell every website you go to not to track you, but it's not automatically turned on."** [...] "Because **Chrome settings that don't encourage privacy are the default**, users are encouraged to leave them as they are from the get-go, and likely don't understand what data Google vacuums up. Even if you do care, reading through Google Chrome's 13,500-word privacy white paper, which uses a lot of technical jargon and obfuscates exactly what data the browser is tracking, isn't helpful either. When I reached out to Google with questions about what data Chrome tracks, the company sent me that white paper but didn't answer any of my specific questions." [...] "One downside to using Firefox is that many browser extensions are built primarily for Chrome–my password manager luckily has a Firefox extension but it often causes the browser to crash." [...] "The nonprofit also has a mobile-only browser called **Firefox Focus that basically turns Firefox's private browsing mode** (akin to **incognito browsing on Chrome, but with much less data leakage**) into a full-fledged browser on its own." [...] "Firefox doesn't always work better than Chrome–sometimes it'll freeze on my older work computer, and I do need to clear my history more frequently so the browser doesn't get too slow." |
| 14 | 6/19/2018 | Consumer Reports | What Your Web Browser's Incognito Mode Really Does | "'Private browsing mode does some useful things, but you're absolutely not anonymous, you're not 'incognito,' and your secrets are not necessarily safe' from hackers or marketers" |

**Exhibit 2**
**Publicly Available Articles Discussing Google's Collection of Data**

| Count | Date | Source | Title | Quotes |
|---|---|---|---|---|
| 15 | 7/12/2018 | CNBC | There Are a Lot of Misconceptions About Browsing the Web in 'Incognito' Mode, Researchers Say | "Google's Chrome web browser, for example, says that it doesn't save your browsing history, cookies and site data or information entered into forms. **This doesn't mean that data — such as the websites you visit — isn't available to your school, employer or internet provider.** Google warns as much when you start using incognito mode." [...] "If anything, the research shows that there are a lot of misconceptions about what's logged and what isn't when you're using incognito or private mode on a browser." |
| 16 | 8/15/2018 | Digital Content Next; Professor Douglas C. Schmidt, Vanderbilt University | Google Data Collection | "**Google collects user data in a variety of ways.** The most obvious are 'active,' with the user directly and consciously communicating information to Google, as for example by signing in to any of its widely used applications such as YouTube, Gmail, Search etc. **Less obvious ways for Google to collect data are 'passive' means, whereby an application is instrumented to gather information while it's running, possibly without the user's knowledge. Google's passive data gathering methods arise from platforms (e.g. Android and Chrome),** applications (e.g. Search, YouTube, Maps), publisher tools (e.g. Google Analytics, AdSense) and advertiser tools (e.g. AdMob, AdWords). The extent and magnitude of Google's passive data collection has largely been overlooked by past studies on this topic." […] "**The Chrome browser helps Google collect user data from both mobile and desktop devices,** with over 2 billion active installs worldwide. **The Chrome browser collects personal information (e.g. when a user completes online forms) and sends it to Google as part of the data synchronization process. It also tracks webpage visits and sends user location coordinates to Google. Both Android and Chrome send data to Google even in the absence of any user interaction.**" [...] "While Chrome does not mandate sharing additional personal information gathered from users, it does have the capability to capture such information. For example, Chrome collects a range of personal information via its form 'autofill' feature, and such form fields typically include user name, address, phone number, login name, and passwords. **Chrome stores form fill information on a user's local drive, however, if the user logs in to Chrome using Google Account and enables its 'Sync' feature, this information gets sent to and stored on Google servers.** Chrome could also learn about the language(s) a person speaks during their interactions with its translate feature, which is enabled by default." |
| 17 | 8/21/2018 | Digital Content Next | Google Data Collection Research | "A dormant, stationary Android phone (with the Chrome browser active in the background) communicated location information to Google 340 times during a 24-hour period." [...] "Android and **Chrome platform**s are **critical vehicle**s for Google's data collection." [...] "**Google has the ability to associate anonymous data collected through passive means with the personal information of the user.**" [...] "[T]he DoubleClick cookie ID—which tracks a user's activity on the third-party webpages—is another purportedly 'user anonymous' identifier that Google can associate to a user's Google account. It works when a user accesses a Google application in the same browser in which a third-party webpage was accessed previously.** A major part of Google's data collection occurs while a user is not directly engaged with any of its products." |

**Exhibit 2**
**Publicly Available Articles Discussing Google's Collection of Data**

| Count | Date | Source | Title | Quotes |
|---|---|---|---|---|
| 18 | 8/22/2018 | The Independent | Google Chrome's Private Incognito Mode Leaks Way More Personal Data Than You Might Think | **"Google could continue to collect personal data from users, even if they use the incognito mode in the Chrome web browser,** a study has found." [...] **"Google claims that it will not save browsing history, cookie, site data or information entered in forms, however it warns that browsing activity may still be visible to websites, internet service providers, or the school or employer that controls the network."** [...] "Google utilizes the tremendous reach of its products **to collect detailed information about people's online and real-world behaviors, which it then uses to target them with paid advertising."** [...] "There are a number of different ways that Google may use location to improve people's experience, including: Location, History, Web and App Activity, and through device-level Location Services." [...] "Google has since updated the 'help section' on its website to make it clear that **some data is still collected even when the location history feature is switched off."** |
| 19 | 08/22/2018 | The Sun | Google's Incognito Mode Isn't as Private as You Thought | **"Google can still record the websites you browse while in Incognito Mode on the Chrome browser and link them to your identity."**[...]"If you log back into Google before leaving Incognito Mode, Google will be able to retroactively link your browsing data to your account." |
| 20 | 9/15/2018 | The Hartford Courant | Apple, Firefox Aim to Thwart Web Use Tracking; Facebook, Google Harvest Data to Make Better Targeted Ads, but There Are Tools to Prevent It; Online Privacy | "Facebook, **Google Harvest Data To Make Better Targeted Ads,** But There Are Tools To Prevent It" [...] "Facebook and other companies **routinely track your online surfing habits to better target ads at you."** [...] "To get the protections, you'll have to break your habit of using Google's Chrome browser, which by some estimates has more than half of the worldwide browser usage." [...] **"Cookies and other trackers can be used by companies to keep track of who you are as you move from website to website. The companies can build a digital profile** as you, say, read about Democratic or Republican viewpoints, buy a particular brand of pet food or indulge in the entire season of "Keeping Up With The Kardashians. **News, video and other third-party sites use Google** and Facebook **cookies to customize ads to your hobbies and interests."** [...] "Safari is also attacking a technique developed to circumvent cookie deletions. **Through 'fingerprinting,' a company can identify you through your computer's characteristics, such as browser type and fonts installed. Your new cookie can then be tied to your old profile."** |
| 21 | 4/4/2019 | The Australian | Keeping an Eye on You | "Oracle says **data can be collected through Google Analytics even if a consumer doesn't have a Google account.** It says Google tends to be more open about these practices in the material it sends to advertisers. **Google tells advertisers that when users aren't signed into a Google account, it can estimate their demographic information using a cookie."** [...] **"Then there's 'incognito mode' in Chrome. Google says Chrome won't save your browsing history, cookies and site data. However Oracle says Google still tracks the consumer.** It cites a letter to the US House of Representatives judiciary committee from Google chief executive Sundar Pichai." |

**Exhibit 2**
**Publicly Available Articles Discussing Google's Collection of Data**

| Count | Date | Source | Title | Quotes |
|---|---|---|---|---|
| 22 | 5/8/2019 | Associated Press | Google's Privacy Push Gets a Mixed Reception | **"Google also revealed plans to overhaul Chrome to let users rein in so-called tracking cookies, which are bits of software that follow people around on the web.** The move, which could have major repercussions for the digital advertising industry, would require companies to identify cookies used by third-party websites and advertisers to track users." |
| 23 | 6/21/2019 | The Washington Post | Goodbye, Chrome: Google's Web Browser Has Become Spy Software | "Over a recent week of Web surfing, **I peered under the hood of Google Chrome and found it brought along a few thousand friends. Shopping, news and even government sites quietly tagged my browser to let ad and data companies ride shotgun while I clicked around the Web."** [...] It made me decide to ditch Chrome for a new version of nonprofit Mozilla's Firefox, which has default privacy protections. Switching involved less inconvenience than you might imagine." [...] "In a week of Web surfing on my desktop, **I discovered 11,189 requests for tracker 'cookies' that Chrome would have ushered right onto my computer but were automatically blocked by Firefox. These little files are the hooks that data firms, including Google itself, use to follow what websites you visit so they can build profiles of your interests, income and personality."** [...] **"I felt hoodwinked when Google quietly began signing Gmail users into Chrome last fall. Google says the Chrome shift didn't cause anybody's browsing history to be 'synced' unless they specifically opted in — but I found mine was being sent to Google and don't recall ever asking for extra surveillance.** (You can turn off the Gmail auto-login by searching 'Gmail' in Chrome settings and switching off 'Allow Chrome sign-in.') After the sign-in shift, Johns Hopkins associate professor Matthew Green made waves in the computer science world when he blogged he was done with Chrome. "I lost faith," he told me. "It only takes a few tiny changes to make it very privacy unfriendly." |
| 24 | 7/15/2019 | The New York Times | A Feisty Google Adversary Tests How Much People Care About Privacy | "The Firefox and Brave browsers are more focused on privacy than Chrome." [...] "DuckDuckGo is also up against another hard reality of the online world: **If you call up DuckDuckGo on the Chrome browser, for example, Google is still logging your search queries."** |
| 25 | 7/28/2019 | The Washington Post | 'Never-Googlers' Trade Convenience for Privacy | "People such as Kelly are trying to build barriers to Google and other tech giants largely because of increasing concerns about the company's massive data collection. **Privacy scandals showing how these companies collect and use consumer data have raised alarm bells for many people about how much they've traded for customization and targeted ads. For example, a Washington Post investigation last month found more than 11,000 requests for tracking cookies in just one week of Web use on Google's Chrome browser."** |
| 26 | 9/14/2019 | Wired | 6 Reasons to Ditch Chrome for the Vivaldi Browser on Android | "Getting some healthy distance between you and Google goes beyond avoiding its search engine, of course. **When you're using Chrome, by default the browser will log your search requests, and your browsing history, and link everything back to your Google account for further ad targeting".** |

**Exhibit 2**
**Publicly Available Articles Discussing Google's Collection of Data**

| Count | Date | Source | Title | Quotes |
|---|---|---|---|---|
| 27 | 11/21/2019 | TechTalks; TheNextWeb | Google Chrome Privacy: Can You Trust the Incognito Window?; Don't Trust Google Chrome's Incognito Mode | "Incognito window provides a measure of privacy if you're browsing on a shared computer." […] "Unfortunately, **many people don't understand the privacy implications of Google's Incognito window and end up trusting it more than they should. According to a study by researchers at the University of Chicago and Leibniz University of Hannover, many users wrongly think Google's Incognito mode and other private browsing windows will protect them against** malware, **advertising, tracking codes and the monitoring by connection gateways.**" […] "**Interestingly, Google clearly spells out everything you can expect from Incognito mode when you open a new private window**. According to Google, 'Now you can browse privately, and other people won't see your activity. What does activity mean?" [...] "Google Chrome keeps track of the webpages you visit to make it easier for you to return to those pages in the future.'" […] "Moreover, if you've synced your Chrome browser with your Google account, every page you visit will be registered in your online browsing history. This means that if you go to another computer and sync your Google account on a new Chrome browser, your browsing history will be transferred over. The Incognito window will not log your browsing history and will delete traces of the webpages you visit after you close it. The privacy benefit you get is that the next person who sits behind your computer won't be able to look at your browsing history." […] "When you fire up a new Incognito window, none of your cookies are carried over." […] "The privacy benefit of Incognito window is that you will be able to browse to different pages without traceable cookies (there's a caveat to this that I will mention later)." […] "Therefore, the next person who sits behind the computer won't be able to access the accounts you were using when in Incognito mode, even if you had forgotten to log out before closing the window." […] "The Incognito window deletes all information you entered in forms when you close it, which gives you better privacy on shared computers." |
| 28 | 11/29/2019; 12/3/2019 | The Sydney Morning Herald | Care About Your Privacy? Use These Web Services | Google "**business models revolve around collecting as much personal data as possible**, and using it to sell targeted ads. **They are advertising companies first and foremost. We are the product they sell**, and the business is very lucrative." [...] "However, **unlike Google [DuckDuckGo] doesn't track what you search for, collect IP addresses, or sell users' personal information to advertisers.  It also minimizes cookie use so people aren't tracked as they move around the web.**" [...] Google Chrome "**store[s] your browsing data.**" |

**Exhibit 2**
**Publicly Available Articles Discussing Google's Collection of Data**

| Count | Date | Source | Title | Quotes |
|---|---|---|---|---|
| 29 | 6/28/2020 | CNET | Google Collects a Frightening Amount of Data About You. You Can Find and Delete It Now | "Google might collect far **more personal data about its users than you might even realize."** [...] "[I]f you're among the 1.5 billion people on Gmail or the 2.5 billion people using Android already, your account is **set to hold onto your private data forever unless you tell Google otherwise**." [...] "**Google knows your name, your face, your birthday, gender, other email addresses you use, your password and phone number."** [...] "Of all the personal data that Google tracks, your YouTube search and watch history is probably the most innocuous." [...] "Google has admitted it can track your physical location even if you turn off location services using information gathered from Wi-Fi and other wireless signals near your phone." [...] **"Google doesn't even need you to be signed in to track you."** [...] **"The point is, it's ultimately up to you to protect yourself from invasive data practices."** [...] "If your goal is to exert more control over your data but you still want Google services like search and maps to personalize your results, we recommend setting your data to auto-delete after three months. Otherwise, feel free to delete all your data and set Google to stop tracking you. For most of the day-to-day things you do with Google you won't even notice the difference. ... **If you want Google to stop tracking just your Chrome browser history and activity from sites you sign into with your Google account**, uncheck the first box." |
| 30 | 7/12/2020 | The Wall Street Journal | Quit Chrome. Safari and Edge Are Just Better Browsers for You and Your Computer. Switch From Google's Browser to One From Apple or Microsoft, and You'll Notice Immediate Improvements in Performance, Battery and Privacy | "This is the year, people. It's the year I challenge you to pack up your bookmarks and wave bye-bye to Google's browser, and pick one that cares more about performance and personal data." [...] **"In Chrome, you need to disable cookie tracking in settings and install a third-party privacy extension for deeper controls.** Google is working on some longer-term Chrome privacy plans." |

**Exhibit 2**
**Publicly Available Articles Discussing Google's Collection of Data**

| Count | Date | Source | Title | Quotes |
|-------|------|--------|-------|--------|
| 31 | 10/12/2020 | FastCompany | Switching From Chrome to Firefox Can Supercharge Your Privacy in Minutes | **"You can learn a lot about someone from what happens in their browser, and dozens of companies do just that with cookies and other tracking technology that build up advertising profiles."** [...] "Google's Chrome browser is fast and efficient. But Chrome has conflicting loyalties between its users and a parent company that is the world's largest advertising firm." [...] **"Chrome has yet to disable third-party tracking cookies."** [...] "Yet for all the new features Firefox brings, the transition from Chrome (or another browser) is a cinch. In minutes, you can be up and running with a new browser that offers all the conveniences of Chrome, along with better privacy." [...] "Firefox offers the speed and convenience of Chrome--and protects you from prying eyes." [...] "Switching from Chrome to Firefox doesn't completely free you from Google, as it's the default search engine for Firefox. **Even with Firefox's Enhanced Tracking Protection, Google can still track you through your IP address and through cookies that Google places when you use its search engine.** (Firefox doesn't block the 'first-party cookies' placed by the web site you are visiting, only third-party cookies placed by outside advertisers.) But you can change the default search engine to DuckDuckGo, which doesn't track your activity over time to build advertising profiles." |
| 32 | 11/27/2020 | Business Insider | How to Stop Google From Tracking You on Any Device | **"Google has worked its way into virtually every aspect of your life, and the search giant's network of interrelated apps and services capture, share, and rely on a great deal of personal information about you. Google tracks your search history**, for example, as well as your mobile device's location, the ads you view, the videos you watch, and more. **If you prefer, you can configure Google to stop tracking you — at least, for the most part — though if you do, you'll lose the benefit of all of Google's personalization features."** [...] "In addition to web activity and location tracking, Google tracks other data as well, in particular your YouTube viewing history and details about you that inform the ads you see online." |
| 33 | 2/12/2021 | Reader's Digest | How to See (And Delete) All of Your Google Activity | **"[Google] is constantly collecting information about where we go both online and in real life, what we do when we get there, and what sorts of questions we are asking the Internet**. Google knows how often you go to the grocery store, and when your birthday is. It knows you're thinking of buying a new houseplant, and it probably knows your political views." [...] "Google may also track your location, which gives them additional data about our interests, frequented places, and careers. All of this information makes it easy for Google to analyze what products we're most likely to be intrigued by, and therefore which advertisements we are most likely to click. **Cookies also connect to targeted advertising."** |

**Exhibit 2**
**Publicly Available Articles Discussing Google's Collection of Data**

| Count | Date | Source | Title | Quotes |
|---|---|---|---|---|
| 34 | 3/3/2021 | Associated Press | Google Ends Sale of Ads Using Individual Web Tracking Data | **"The digital giant already said it would remove so-called third party cookies from Chrome. Those are snippets of code used by advertisers to record users' web-browsing histories in order to target personalized ads. Third-party cookies** have long been a key tool for marketers to deliver targeted ads, but they've also been a source of privacy concerns since they **trace users across the Internet in ways they might not be aware of.** On Wednesday, the company said it won't replace those cookies with another way of tracking individuals. Instead, Google proposes grouping together web users with similar interests and keeping web histories private on user devices. Google can still track users through its own services like Search or Maps." |
| 35 | 4/28/2021 | Reader's Digest | 14 Creepy Things Google May Know About You | **"Google doesn't only collect data about you with their own browser, search engine, and other services, but also by tracking you on other websites,"**[…] **"Google is the largest operator of third-party tracking scripts."** |
| 36 | 6/24/2021 | The New York Times | Google Delays a Privacy Change to Its Chrome Web Browser. | "In a blog post on Thursday, **Google said it intended to start gradually blocking trackers, or cookies, from its Chrome web browser in mid-2023 and eliminate them altogether later that year.** Previously, Google had said it planned to begin stripping cookies from Chrome in January 2022 … **The fear was that Google's dominance**, already evident through its stranglehold on advertising, search and web browsing, **would be further entrenched by removing a tool used by many rival online marketers to target ads.**" |
| 37 | 7/20/2021 | Reader's Digest | The Hidden Truth Behind Google's Incognito Mode | "The study analyzed how Google collected data across an array of devices such as Androids and Chromebooks and services like YouTube or Google. The authors discovered that **Google can still link your identity to the websites you browsed despite being undercover in Incognito Mode.**" [...] <br>**"While other people using the device may not be able to view your browsing history, it is possible for your browsing history to be linked to your Google Account while using Google's Incognito Mode.** The study on Google Data Collection showed that for this to happen while incognito, you would first have to visit a third-party website that uses Google's advertising and publisher products, and then log into your personal account on 'a widely used Google service,' like Gmail. When you visit the third-party website, it sets a browser cookie that is not originally associated with your Google Account but is stored on your local mass storage. Then, by logging into your personal Google Account after visiting the third-party website, Google can connect these stored cookies (and thus, your browsing history) with the personal information in your account." |

**Exhibit 3**
**Summary of Findings From Research Into Cookie Disclosures**

| | Company | Website | Cookie Pop-up? | Specificity of Cookie Pop-up | Specificity of Disclosures in Privacy Policy/Terms of Service |
|---|---|---|---|---|---|
| **Google Ad Manager: 25 Top-Level Domains with Highest Website Traffic Listed in Google's Response to Plaintiffs' Interrogatories** | | | | | |
| **1** | ██████ | ██████ | **Yes** | Generic | **Mentions Google** |
| 2 | ██ | ██ | No | n.a. | Mentions third-parties |
| **3** | ████ | ██████ | **Yes** | **Mentions third-parties** | **Mentions Google** |
| 4 | ███ | ████ | No | n.a. | Mentions Google |
| 5 | ███ | ███ | No | n.a. | Mentions Google |
| 6 | ███ | ███ | No | n.a. | Mentions Google |
| 7 | ██ | ███ | No | n.a. | Mentions Google |
| **8** | ████ | ██████ | **Yes** | **Mentions third-parties** | **Mentions Google** |
| 9 | ██ | ███ | No | n.a. | Mentions third-parties |
| 10 | ███ | ████ | No | n.a. | Mentions Google |
| 11 | ███ | ████ | No | n.a. | Mentions third-parties |
| 12 | ██ | ███ | No | n.a. | Mentions third-parties |
| 13 | █████ | ████ | No | n.a. | Mentions Google |
| 14 | ██████ | ████ | No | n.a. | Mentions Google |

**Exhibit 3**
**Summary of Findings From Research Into Cookie Disclosures**

| | Company | Website | Cookie Pop-up? | Specificity of Cookie Pop-up | Specificity of Disclosures in Privacy Policy/Terms of Service |
|---|---|---|---|---|---|
| **15** | ███████████████ | ██████ | Yes | **Mentions third-parties** | **Mentions Google** |
| **16** | █████ | █████████ | Yes | **Generic** | **Mentions Google** |
| 17 | █████ | █████████ | No | n.a. | Mentions Google |
| 18 | ████ | █████████ | No | n.a. | Mentions Google |
| 19 | ████ | █████████ | No | n.a. | Mentions Google |
| **20** | ███████ | ██████████ | Yes | **Mentions third-parties** | **Mentions Google** |
| 21 | ██████████ | █████████████ | No | n.a. | Mentions third-parties |
| **22** | ████████████████ | ████████ | Yes | **Generic** | **Mentions third-parties** |
| **23** | ██████ | █████████ | Yes | **Generic** | **Mentions Google** |
| 24 | ██████ | █████████ | No | n.a. | Mentions Google |
| 25 | █████ | █████████ | No | n.a. | Mentions Google |

**Exhibit 3**
**Summary of Findings From Research Into Cookie Disclosures**

| | Company | Website | Cookie Pop-up? | Specificity of Cookie Pop-up | Specificity of Disclosures in Privacy Policy/Terms of Service |
|---|---|---|---|---|---|
| | **Google Analytics: 25 Top-Level Domains with Highest Website Traffic in Response to Plaintiffs' Interrogatories** | | | | |
| **1** | ███████ | ████████ | Yes | Generic | Mentions Google |
| **2** | ████████ | ██████████ | Yes | Generic | Mentions Google |
| 3 | █████ | ██████ | No | n.a. | Mentions Google |
| 4 | █████ | ███████ | No | n.a. | Mentions third-parties |
| **5** | ██████ | ███████ | Yes | Mentions third-parties | Mentions third-parties |
| **6** | ███████ | █████████████ | Yes | Mentions third-parties | Mentions third-parties |
| 7 | ████ | ██████████ | No | n.a. | Mentions Google |
| 8 | ██████ | ███████ | No | n.a. | Mentions third-parties |
| 9 | ███ | ██████ | No | n.a. | Mentions Google |
| 10 | ████████████ | ███████ | No | n.a. | Mentions Google |
| **11** | ████ | ███████ | Yes | Mentions third-parties | Mentions Google |
| 12 | █████ | ███████ | No | n.a. | Mentions third-parties |
| **13** | █████████ | ██████████ | Yes | Generic | Mentions Google |
| **14** | ████ | ██████ | Yes | Mentions third-parties | Mentions third-parties |

**Exhibit 3**
**Summary of Findings From Research Into Cookie Disclosures**

| | Company | Website | Cookie Pop-up? | Specificity of Cookie Pop-up | Specificity of Disclosures in Privacy Policy/Terms of Service |
|---|---|---|---|---|---|
| 15 | █████████ | ███████ | No | n.a. | Mentions Google |
| **16** | ███ | ███████ | **Yes** | **Generic** | **Mentions third-parties** |
| 17 | ████ | ███████ | No | n.a. | Mentions Google |
| 18 | ██ | ██████ | No | n.a. | Mentions Google |
| 19 | ███ | ██████ | No | n.a. | Mentions Google |
| **20** | █████████ | █████████ | **Yes** | **Mentions third-parties** | **Mentions Google** |
| 21 | ██████ | ███████ | No | n.a. | Mentions Google |
| 22 | ████ | ████ | No | n.a. | Mentions third-parties |
| 23 | █████████ | █████████ | No | n.a. | Mentions third-parties |
| 24 | ████ | ████████████ | No | n.a. | Mentions Google |
| **25** | ███████ | █████████ | **Yes** | **Generic** | **Mentions Google** |

**Exhibit 4**

**Examples of the Effect of Employing User Controls on Google's Ability to Show and/or Personalize Ads**



On the NYT Website, signed-out user is shown personalized Bombas Ad.

**Exhibit 4**

**Examples of the Effect of Employing User Controls on Google's Ability to Show and/or Personalize Ads**



**Exhibit 4**

**Examples of the Effect of Employing User Controls on Google's Ability to Show and/or Personalize Ads**



Google knows the websites visited based on Doubleclick cookie, with ▮▮▮▮ starting in "2yPsty..."

**Exhibit 4**

**Examples of the Effect of Employing User Controls on Google's Ability to Show and/or Personalize Ads**



Similarly, on Britannica's website, signed-out user is shown TopCrate ad.

**Exhibit 4**

**Examples of the Effect of Employing User Controls on Google's Ability to Show and/or Personalize Ads**



**Exhibit 4**

**Examples of the Effect of Employing User Controls on Google's Ability to Show and/or Personalize Ads**



**Exhibit 4**

**Examples of the Effect of Employing User Controls on Google's Ability to Show and/or Personalize Ads**



If the signed-out user uses Adblock Plus ad blocker, the Bombas ad is removed from the page.

In total, Adblock Plus blocks 11 ads from the NYT home page (as noted with the number 11 in the icon above).

**Exhibit 4**

**Examples of the Effect of Employing User Controls on Google's Ability to Show and/or Personalize Ads**



With Adblock Plus, Google knows the websites visited based on Doubleclick cookie, with ▇▇ starting in "2yPsty...", but the user is not served any ads.

**Exhibit 4**

**Examples of the Effect of Employing User Controls on Google's Ability to Show and/or Personalize Ads**



**Exhibit 4**

**Examples of the Effect of Employing User Controls on Google's Ability to Show and/or Personalize Ads**



**Exhibit 4**

**Examples of the Effect of Employing User Controls on Google's Ability to Show and/or Personalize Ads**



**Exhibit 4**

**Examples of the Effect of Employing User Controls on Google's Ability to Show and/or Personalize Ads**



**Exhibit 4**

**Examples of the Effect of Employing User Controls on Google's Ability to Show and/or Personalize Ads**



Disabling these user controls and visiting CNN.com, the signed-out user is shown a Kayak ad.

**Exhibit 4**

**Examples of the Effect of Employing User Controls on Google's Ability to Show and/or Personalize Ads**



**Exhibit 4**

**Examples of the Effect of Employing User Controls on Google's Ability to Show and/or Personalize Ads**



**Exhibit 4**

**Examples of the Effect of Employing User Controls on Google's Ability to Show and/or Personalize Ads**



**Exhibit 4**

**Examples of the Effect of Employing User Controls on Google's Ability to Show and/or Personalize Ads**



With Google Ad Personalization turned "OFF", the Kayak ad is now an Omaha Steaks ad.

**Exhibit 4**

**Examples of the Effect of Employing User Controls on Google's Ability to Show and/or Personalize Ads**



**Exhibit 4**

**Examples of the Effect of Employing User Controls on Google's Ability to Show and/or Personalize Ads**



**Exhibit 4**

**Examples of the Effect of Employing User Controls on Google's Ability to Show and/or Personalize Ads**



With GAP turned "OFF", ads on CNN.com not served by Google may be personalized based on the user's browsing activity, such as this Volkswagen ad served by Amazon's Sizmek.

**Exhibit 5**
**Google Chrome**
**Profit and Loss Statements ($ in Millions)**

|                              | 2016 | 2017 | 2018 | 2019 | 2020 |
|------------------------------|------|------|------|------|------|
| Revenues                     | ■    | ■    | ■    | ■    | ■    |
| Costs of Sales:              |      |      |      |      |      |
|   Traffic Acquisition Costs  | ■    | ■    | ■    | ■    | ■    |
|   Total Other Cost of Sales  | ■    | ■    | ■    | ■    | ■    |
| Total Costs of Sales         | ■    | ■    | ■    | ■    | ■    |
| Gross Margin                 | ■    | ■    | ■    | ■    | ■    |
| Operating Expenses:          |      |      |      |      |      |
|   R&D Related Payroll+SBC    | ■    | ■    | ■    | ■    | ■    |
|   Direct Non HC Opex         | ■    | ■    | ■    | ■    | ■    |
|   Advertising & Promotions   | ■    | ■    | ■    | ■    | ■    |
|   Other Allocated Opex       | ■    | ■    | ■    | ■    | ■    |
| Total Operating Expenses     | ■    | ■    | ■    | ■    | ■    |
| Operating Profit             | ■    | ■    | ■    | ■    | ■    |

**Source:**
Copy for OC - Chrome Browser Financials for Oct 2021 request xlsx.

## BRUCE A. STROMBOM, Ph.D.
### Managing Principal

Phone: (213) 896-4520
Fax: (213) 623-4112
bruce.strombom@analysisgroup.com

333 S. Hope Street
Suite 2700
Los Angeles, CA  90071

Bruce Strombom is an expert in applied microeconomics, finance, and quantitative and statistical analysis.  He provides assistance to attorneys in all phases of pretrial and trial practice, prepares economic and financial models, and provides expert testimony in litigation and public policy matters.  Dr. Strombom has conducted assessments of class certification, liability, and damages issues in cases involving antitrust, breach of contract, ERISA, false advertising, intellectual property, labor and employment, product liability, securities, and general commercial disputes.

Prior to joining Analysis Group, Dr. Strombom was Executive Vice President of a middle-market merger and acquisition firm, where he managed a financial and market research organization that provided valuation and consulting services to over 500 privately held companies annually.  Previously, he was Consulting Manager at Price Waterhouse, where he provided litigation support and value enhancement consulting services, and Senior Financial Analyst at the Tribune Company, where he evaluated capital projects and acquisition candidates.  Dr. Strombom holds a Ph.D. in economics from the University of California, Irvine, and a B.A. in economics from San Jose State University.

## EDUCATION

Ph.D.             Economics, University of California, Irvine
                  Fields: Finance and Industrial Organization
                  Thesis: Switching Cost, Price Sensitivity and Health Plan Choice

B.A.              Economics, San Jose State University, San Jose, CA

## PROFESSIONAL EXPERIENCE

2004 – Present    Managing Principal, Analysis Group, Inc., Los Angeles, CA

1993 – 2004       Senior Associate and Vice President, Analysis Group, Inc., Los Angeles, CA

1992              Regional General Manager, Prodata, Inc., Sacramento, CA

1985 – 1991       Executive Vice President, Geneva Business Research Corp., Irvine, CA

1983 – 1985       Manager of Consulting Services, Price Waterhouse, Newport Beach, CA

1981 – 1983       Senior Financial Analyst, Tribune Newspapers West, Woodland Hills, CA

**TESTIMONY AT DEPOSITION AND TRIAL IN THE LAST FOUR YEARS**

<u>General Commercial Litigation</u>

- **Taqueria El Primo LLC, et al. v. Farmers Group, Inc., et al.**
  *United States District Court, District of Minnesota*
  Examine economic issues related to alleged harm to consumers who purchased no-fault automobile insurance caused by "no-bill" agreements with certain health care providers (declarations, expert report and deposition).

- **Eric Fishon, et al. V. Peloton Interactive, Inc.**
  *United States District Court, Southern District of New York*
  Evaluate whether the methodologies proposed by plaintiffs can be used to calculate damages on a class-wide basis using evidence common to proposed class members (expert report and deposition).

- **Sherris Minor, et al. v. Baker Mills, Inc. and Kodiak Cakes, LLC**
  *United States District Court, Northern District of California*
  Assess whether the methodologies proposed by plaintiffs can be used to calculate damages on a class-wide basis using evidence common to proposed class members (expert report and deposition).

- **Byron Jackson, et al. v. Anheuser-Busch Companies, LLC, et al.**
  *United States District Court, Southern District of Florida, Miami Division*
  Evaluate whether marketplace evidence indicates a price premium associated alleged false advertising and whether any price premium is common to the proposed class (expert report and deposition).

- **John Nypl, et al. v. JPMorgan Chase & Co., et al.**
  *United States District Court, Southern District of New York*
  Evaluate whether plaintiffs can determine, using class-wide proof, the fact of antitrust injury and the amount of damages to members of a proposed class of retail foreign exchange customers caused by alleged manipulation of spot rates by a cartel of traders in interbank foreign currency markets (expert report and deposition).

- **In re: Brinker Data Incident Litigation**
  *United States District Court, Middle District of Florida*
  Evaluate whether plaintiffs demonstrated common impact across putative class members and whether the proposed methodologies for calculating class-wide damages related to an alleged data breach are reliable (expert declaration and deposition).

- **RCS Creditor Trust v. Nicholas S. Schorsch, et al.**
  *The Court of Chancery of the State of Delaware*
  Evaluate economic evidence related to the level of compensation paid to broker-dealers of non-traded REITs (expert report, deposition and testimony at trial).

- **Camille Cabrera, et al. v. Bayer Healthcare LLC and Bayer Corporation**
  *United States District Court, Central District of California*
  Evaluate whether data on transaction prices and volumes support claims of a price premium associated with an allegedly false label claim and whether the proposed methodology can be used to calculate damages to consumers of childrens' vitamins on a classwide basis (expert reports and deposition).

- **Stanley F. Frompovicz, et al. v. Niagara Bottling, LLC, et al.**
  *United States District Court, Eastern District of Pennsylvania*
  Examine economic issues related to class certification and determine whether econmic impact and damages to spring water extractors and bottlers can be determined on a classwide basis (expert report and deposition).

- **Dikla Gavrieli v. Kfir Gavrieli**
  *Superior Court of the State of California, County of Los Angeles*
  Determine the value of a digital native vertical retailer at various dates and rebut plaintiff's damages calculation (depositions and testimony at trial).

- **Debbie Krommenhock, et al. v. Post Foods LLC**
  *United States District Court, Northern District of California*
  Assess whether plaintiffs' proposed use of conjoint analysis provides a reliable method of calculating class-wide damages in this matter involving alleged misleading health claims on boxes of Post cereal (expert reports and deposition).

- **Iconlab Inc., et al. v. Valeant Pharmaceuticals International, Inc., et al.**
  *United States District Court, Central District of California, Southern Division*
  Evaluate lost profits and unjust enrichment in this matter involving alleged misappropriation of trade secrets related to the sale of intraocular lenses in Turkey and India (expert report and deposition).

- **Denis Marc Audet, et al. v. Stuart A. Fraser, et al.**
  *United States District Court, District of Connecticut*
  Review economic evidence related to class certification in this matter involving the sale of virtual currency mining equipment and cloud-hosted mining and the inital coin offering of the cryptocurrency Paycoin (expert reports and depositions).

- **Gregory Greene, et al. v. Mizuho Bank and Mark Karpeles**
  *United States District Court, Northern District of Illinois, Eastern Division*
  Evaluate economic issues related to class certification in this matter involving the bankruptcy of the bitcoin exchange Mt. Gox (expert report and deposition).

- **Strategic Partners, Inc. v. Vestagen Protective Technologies, Inc.**
  *United States District Court, Central District of California - Western Division*
  Evaluate damages from alleged false advertising under the Lanham Act and unfair business practices in the market for protective medical garments (expert report, deposition and testimony at trial).

- **Carlos McClatchy v. Gary B. Pruitt, et al.**
  *Superior Court of the State of California, City and County of San Francisco*
  Calculate damages to a trust beneficiary from the alleged failure to properly diversify the trust's holdings (deposition and testimony at trial).

- **Benjamin Michael Merryman, et al. v. Citigroup, Inc., et al.**
  *United States District Court, Southern District of New York*
  Evaluate the feasibility of calculating damages on a class-wide basis and rebut plaintiffs' damages calculation in this case involving foreign exchange transactions associated with American Depository Receipts (ADRs) (expert declaration and deposition).

*Bruce A. Strombom, page 4*

- **Ronald McAllister, et al. v. The St. Louis Rams, LLC**
  *United States District Court, Eastern District of Missouri, Eastern Division*
  Identify data related to personal seat licenses available to the Rams and evaluate whether those data are suitable for identifying members of the proposed classes, establishing liability and calculating damages on a class-wide basis without individualized inquiry (expert report and deposition).

- **Maricopa County v. Office Depot, Inc.**
  *United States District Court, District of Arizona*
  Calculate damages from the alleged failure to comply with the terms of a contract that guaranteed the plaintiff the lowest prices offered by the defendant (expert report and deposition).

## ERISA

- **Kevin Moitoso, et al. v. FMR LLC, et al.**
  *United States District Court, District of Massachusetts*
  Evaluate whether a defined contribution retirement plan and its members incurred economic losses attributable to alleged breaches of fiduciary duty under ERISA (expert reports, declarations and deposition).

- **Theresa Brown, et al. v. Nationwide Life Insurance Company, et al.**
  *United States District Court, Southern District of Ohio Eastern Division at Columbus*
  Assess, from an economic perspective, whether claims that Nationwide charged unreasonable asset-based fees for the provision of recordkeeping and other administrative service can be evaluated on a class-wide basis (expert report and deposition).

- **Steve Wildman, et al. v. American Century Services, LLC, et al.**
  *United States District Court, Western District of Missouri*
  In this ERISA class action involving claims that a 401(k) plan sponsor breached fiduciary duties, plan fees were excessive and investment options were imprudent, evaluate whether liability and damages can be determined on a class-wide basis without individualized inquiry and evaluate plaintiffs' damages estimate (expert reports, deposition and testimony at trial).

## Health Care and Health Insurance

- **In re Ranbaxy Generic Drug Application Antitrust Litigation**
  *United States District Court, District of Massachusetts*
  Evaluate economic issues related to certification of a class of third party payors and calculate damages from the alleged wrongfully obtained first-to-file exclusivity for generic versions of Diovan, Valcyte and Nexium (expert report and deposition).

- **In re Glumetza Antitrust Litigation**
  *United States District Court, Northern District of California*
  Evaluate whether antitrust injury to each putative class member can be proven with common evidence and whether the proposed method for calculating aggregate overcharges through common evidence is reliable (expert reports and depositions).

- **In re Zetia (Ezetimibe) Antitrust Litigation**
  *United States District Court, Eastern District of Virginia, Norfolk Division*
  Examine economic issues related to the certification of a class of direct purchasers (expert reports and deposition).

- **The Hospital Authority of Metropolitan Government of Nashville and Davidson County Tennessee, et al. v. Momenta Pharmaceuticals, Inc., et al.**
  *United States District Court, Middle District of Tennessee, Nashville Division*
  Evaluate the proposed method of calculating class-wide damages to end-payors from the alleged manipulation of the generic approval process and resulting delay of generic entry and determine to what extent increased prices at the manufacturer level impact prices paid by end-payors (expert report and deposition).

- **In re Loestrin 24 FE Antitrust Litigation**
  *United States District Court, District of Rhode Island*
  Evaluate availability of an administratively feasible method for ascertaining the members of a proposed end-payor class and the economic role of PBMs in retail prescription drug transactions (expert report, deposition and testimony at hearing).

- **In re Asacol Antitrust Litigation**
  *United States District Court, District of Massachusetts*
  Evaluate economic issues related to the ascertainability of the class and evidence that defendant's actions caused class-wide harm and evaluate plaintiffs' damages claims (expert report and deposition).

- **Francis Fenwick, et al. v. Ranbaxy Pharmaceuticals, et al.**
  *United States District Court, District of New Jersey*
  Evaluate plaintiffs' proposed methodology for identifying class members and calculating damages on a class-wide basis to consumers who purchased generic atorvastatin that may have contained a foreign material (expert report and deposition).

- **In re Wellbutrin XL Antitrust Litigation**
  *United States District Court, Eastern District of Pennsylvania*
  Evaluate the ascertainability of members of a class of indirect purchasers given risk-sharing arrangements in the distribution of pharmaceuticals and the "pass-on" of health care costs by health plans in the form of higher premiums (expert reports and deposition).

- **New Mexico Oncology and Hematology Consultants v. Presbyterian Healthcare Services, et al.**
  *United States District Court, District of New Mexico*
  Evaluate damages to a medical specialty group from alleged unlawful maintenance of monopoly power in the markets for private health insurance and inpatient services and attempted monopolization of the market for a speciality medical service by an integrated health insurer and provider organization (expert reports and depositions).

## Title Insurance

- **In The Matter of First American Title Insurance Company Market Conduct Examination**
  *Before the Indiana Commissioner of Insurance*
  Review and evaluate the methods of statistical sampling, extrapolation and calculation of alleged overcharges and premium tax underpayments used in the Department of Insurance's Market Conduct Examination (expert report, deposition and testimony at hearing).

- **Cynthia A. Patterson, et al. v. Fidelity National Title Insurance Company, et al.**
  *Court of Common Pleas of Allegheny County, Commonwealth of Pennsylvania, Civil Division*
  Assess the accuracy of certian data stored in Fidelity's database systems related to real estate transactions (expert report and deposition).

- **Sjobring v. First American Title Co.**
  *Superior Court of the State of California, County of Los Angeles*
  Assess the feasibility of using defendant's electronic data to prove, on a class-wide basis, whether charges exceeded rates filed with the California Department of Insurance (declaration and deposition).

**Automotive**

- **Barry Rebuk v. Ford Motor Company of Canada, et al.**
  *Ontario (Canada) Superior Court of Justice*
  Evaluate whether represnstations of fuel consumption ratings based on an older 2-cycle Testing Method resulted in overcharges for Ford vehciles sold in Canada (expert reports and cross examination).

- **Ronald Garcia, et al. v. Harley Davidson Motor Company Group, LLC**
  *United States District Court, Northern District of California*
  Evaluate economic issues related to class certification including plainitffs' proposed use of the cost to repair an alleged defect in ABS as a measure of benefit of the bargain damages (expert report and deposition).

- **Biljana Capic, et al. v. Ford Motor Company of Australia Limited**
  *Federal Court of Australia, District Registry: New South Wales*
  Evaluate the plaintiffs' method of calculating excess depreciation, diminution in value at the point of initial purchase and other harm resulting from allegedly defective transmission in certain Ford vehicles (expert reports and testimony at trial).

- **Shawn Alger, et al. v. FCA US LLC**
  *United States District Court, Eastern District of California*
  Evaluate plaintiffs' proposed use of replacement cost as a measure of classwide damages caused by allegedly defective active head restraint systems (expert report and deposition).

- **In re: FCA US LLC Monostable Electronic Gearshift Litigation**
  *United States District Court, Eastern District of Michigan, Southern Division*
  Analyze used car prices for evidence of diminution of value resulting from alleged defects in electronic gearshifts (expert reports and depositions).

- **Tom Kondash, et al. v. Kia Motors America and Kia Motors Corp.**
  *United States District Court, Southern District of Ohio*
  Evaluate the plaintiffs' proposed method of calculating class-wide damages resulting from alleged defects in panoramic sunroofs (expert report and deposition).

- **Billy Glenn, et al. v. Hyundai Motor America, et al.**
  *United States District Court, Central District of California*
  Evaluate the plaintiffs' proposed method of calculating class-wide damages and conduct a statistical analysis of the fracture rates of conventional and panoramic sunroofs (expert report and deposition).

- **Margie Daniel, et al. v. Ford Motor Company**
  *United States District Court, Eastern District of California*
  Evaluate repair costs for fleet vehicles for evidence of excess tire wear and review prices of used car transactions for evidence of excess depreciation in the Ford Focus (expert report, deposition and testimony at trial).

## PAPERS AND PRESENTATIONS

"Product Liability Litigation Involving Pharmaceuticals and Medical Devices: How Has It Changed in the Big Data/Social Media Era?" Law and Economics Symposium, MIT Sloan, Samberg Center, May 6 2019, Cambridge, MA.

"Using Cash Flows Versus Accrual Net Income," (co-author), *Calculation of Lost Profits Damages – Theory and Practice*, 1st ed., Everett and Kinrich, eds., Valuation Products and Services LLC, 2017.

"Competition in Title Insurance Markets Since the Great Recession," presented at the National Conference of Insurance Legislators, Summer Meeting, July 11, 2013, Philadelphia, PA.

"Use The Right Model For Auto Defect Suits," Law360, July 09, 2013.

"Class Certification and Damages Theories: Consumers' Valuation of Un-priced Product Attributes," presented at a Webinar continuing legal education forum sponsored by Ballard Spahr, May 16, 2012.

"Statistical Analyses in Proactive Audits and Employment Litigation," presented at a Webinar continuing legal education forum for attorneys sponsored by Analysis Group, Inc. May 20, 2009.

"The Subprime Mortgage Crisis and Disclosures: What Went Wrong?" presented at a Webinar continuing legal education forum for attorneys sponsored by Analysis Group, Inc., July 29, 2008

"The Subprime Mortgage Crisis and Disclosures: What Went Wrong?" presented at a continuing education forum for attorneys sponsored by Analysis Group, Inc., June 24, 2008, San Francisco, CA.

"Subprime Litigation: A Survival Guide," presented at Institutional Investor Legal Forum Summer Roundtable, June 18, 2008, Santa Monica, CA.

"Subprime Lending Litigation," Program Co-chair at a continuing education forum for attorneys sponsored by CLE International, May 8 and 9, 2008, Los Angeles, CA.

"Reductions in Force: Strategies to Minimize Litigation Risk in Downsizing," presented at a continuing education forum for attorneys sponsored by K&L Gates, January 17, 2008, New York, NY.

"Investigation of Racial Profiling by the LAPD – Pedestrian and Motor Vehicle Post-Stop Data Analysis Report," City of Los Angeles, July 2006.

"An Assessment of Competition in California Title Insurance and Escrow Markets," with Bruce Stangle, report prepared for First American Title Insurance Company, August 30, 2006.

"Evaluation of Proposed Regulations for the California Title Insurance and Escrow Industry," with Bruce Stangle, report prepared for First American Title Insurance Company, August 30, 2006.

"Competition and Title Insurance Rates in California," with Bruce Stangle, report prepared for First American Title Insurance Company, January 23, 2006.

"Competition and Title Insurance Prices in California," report and presentation to the National Association of Insurance Commissioners (NAIC), Title Insurance Working Group, June 2006, Washington DC.

"Switching Cost, Price Sensitivity and Health Plan Choice," *Journal of Health Economics* 21, January 2002, p. 89-116.

"Risk Selection Caused by the Correlation of Health Status and Sensitivity to Price," Research in Health Care Financial Management Symposium, August 2001, Best Research Paper Award.

**Appendix B**
**Materials Relied Upon**

**Expert Reports**

Expert Report of Tülin Erdem, December 22, 2022

Expert Report of Russell W. Mangum III, Ph.D. in Support of Plaintiffs' Motion for Class Certification, October 13, 2021

Expert Report of Georgios Zervas, December 22, 2022

Expert Repot of Yiling Chen, December 22, 2022

**Legal and Related Documents**

Transcript of ▮▮▮▮ Town Hall, Dkt. No. 225-9

Nancy Walther Graf et al., v. Zynga Game Network, Inc., United States Court of Appeals For The Ninth Circuit, May 8, 2014

Order Granting in Part and Denying in Part Motion for Class Certification, Matthew Campbell, et al., v. Facebook Inc., Case No. 13-cv-5996-PJH, May 18, 2016

First Amended Class Action Complaint in Re: Patrick Calhoun, et al. v. Google LLC, Case No. 5:20-cv-05146-LHK-SVK, filed April 16, 2021

Jay Barnes, Re: Calhoun v. Google LLC, No. 5:20-cv-05146-LHK-SVK (N.D. Cal.)

Follow-Up to July 26, 2021 Meet-and-Confer, July 27, 2021

Patrick Calhoun, et al. v. Google LLC, Order Granting in Part and Denying in Part Motion to Dismiss with Leave to Amend, March 17, 2021

Patrick Calhoun, et al., on behalf of themselves and all others similarly situated, v. Google LLC, Plaintiffs' Memorandum of Points and Authorities in Opposition to Google's Motion to Dismiss Complaint, Case No. 5:20-cv-05146-LHK-SVK, November 9, 2020

Plaintiffs' Notice of Motion and Motion for Class Certification and Appointment of Class Representatives and Class Counsel; Memorandum of Law in Support Thereof, dated October 14, 2021, filed in Patrick Calhoun, et al. v. Google, LLC, Case No. 5:20-cv-05146-LHK-SVK, In the United States District Court, Northern District of California - San Jose Division

Patrick Calhoun, et al., v. Google LLC, Defendants Responses and Objections to Plaintiffs' First Set of Interrogatories (Nos. 1-7), September 30, 2020

**Depositions**

Deposition Transcript of Claudia Kindler, July 5, 2021, and exhibits thereto

Deposition Transcript of Elaine Crespo, July 22, 2021, and exhibits thereto

Deposition Transcript of Leslie John, November 16, 2021, and exhibits thereto

Deposition Transcript of Michael Henry, August 9, 2021, and exhibits thereto

Deposition Transcript of Partrick Calhoun, July 19, 2021, and exhibits thereto

Deposition Transcript of Russell Mangum, December 7, 2021, and exhibits thereto

**Declaration**

Declaration of Abdelkarim Mardini in Support of Google's Opposition to Plaintiffs' Motion for Class Certification, December 16, 2021

Declaration of Glenn Berntson Regarding Google Ad Manager in Opposition to Plaintiffs' Motion for Class Certification

Declaration of David Crossland Regarding Google Fonts API in Opposition to Plaintiffs' Motion for Class Certification, December 15, 2021

Declaration of David Monsees Regarding Signed-in and Signed-out User Data in Support of Google's Opposition to Plaintiffs' Motion for Class Certification, December 20, 2021

Declaration of George Levitte Regarding Google Ad Manager Profits in Support of Google's Opposition to Plaintiffs' Motion for Class Certification, December 17, 2021

Declaration of Gregory Fair Regarding Google's Disclosures in Support of Google's Opposition to Plaintiffs' Motion for Class Certification, December 17, 2021

Declaration of Steve Ganem Regarding Google Analytics in Opposition to Plaintiffs' Motion for Class Certification, December 16, 2021

**SEC Filings**

Alphabet, Inc., SEC Form 10-K, December 31, 2018

Alphabet, Inc., SEC Form 10-K, December 31, 2019

Alphabet, Inc., SEC Form 10-K, December 31, 2020

Alphabet, Inc., SEC Form 10-Q, September 30, 2020

Alphabet, Inc., SEC Form 10-Q, September 30, 2021

| Case Documents | Bates Start | Bates End |
|---|---|---|
| "Effect of disabling third-party cookies on publisher revenue," Aug. 27, 2019 | GOOG-CALH-00040905 | GOOG-CALH-00040907 |
| Chrome Analysis Team, "Chrome ▮▮▮▮" May 2019 | GOOG-CALH-00031131 | GOOG-CALH-00031160 |

**Appendix B**
**Materials Relied Upon**

| | | |
|---|---|---|
| Copy for OC - Chrome Browser Financials for Oct 2021 request.xlsx | | |
| Copy for OC - P&C Ad Manager + GA Data 2016-2020.xlsx | | |
| Google, "Ads Impact from 'ChromeGuard' and 'SameSite & Secure' Launches," May, 7, 2019 | GOOG-CALH-00303689 | GOOG-CALH-00303698 |
| Google, "Chrome▮▮▮▮" | GOOG-CALH-00031076 | GOOG-CALH-00031160 |
| Clank Leads Weekly Notes" | GOOG-CALH00032221 | GOOG-CALH00032405 |
| Google, "Chrome Desktop Users" | GOOG-CALH-00037701 | GOOG-CALH-00037703 |
| Google, "Chrome▮▮▮▮" | GOOG-CABR-00373424 | GOOG-CABR-00373459 |
| Google, "Comparison of Syncing vs Non-syncing User Metrics," Q1 2019. | GOOG-CALH-00081472 | GOOG-CALH-00081499 |
| Google, "Counting impressions and clicks" | GOOG-CALH-00016479 | GOOG-CALH-00016480 |
| Google, "Partner finance reports" | GOOG-CALH-00014551 | GOOG-CALH-00014552 |
| Google, "How Chrome makes money for Google," November 21, 2017 | GOOG-CALH-00133389 | GOOG-CALH-00133391 |
| Google, "Consent Bump 2.0 for▮▮▮▮: LAUNHCED UX," January 19, 2017 | GOOG-CABR-04067825 | GOOG-CABR-04067867 |

**Academic Articles**

Allenby, G. M., J. Brazell, J.R. Howell, and P.E. Rossi, "Valuation of Patented Product Features," Journal of Law and Economics, Vol. 57, No. 3, 2014

Avi Goldfarb and Catherine Tucker, "Privacy Regulation and Online Advertising," Management Science, January 2011, Vol. 57, No. 1

Il-Horn Hann et al., "Overcoming Online Information Privacy Concerns: An Information-Processing Theory Approach," 2007

Krasnova, H, and N. Veltri, "Privacy Calculus on Social Networking Sites: Explorative Evidence from Germany and USA." Proceedings of the 43rd Hawaii International Conference on System Sciences, 2010

**Publicly Available Documents**

"Adblock Plus – free ad blocker – Chrome Web Store," available at https://chrome.google.com/webstore/detail/adblock-plus-free-ad-bloc/cfhdojbkjhnklbpkdaibdccddilifddb?hl=en-US

Adblock Plus, "About Adblock Plus," available at https://adblockplus.org/en/about

AdBlock, "Surf the web without annoying pop ups and ads," available at https://getadblock.com/en/

"USA Today: Latest World and USNews – USATODAY.com," available at https://usatoday.com

Ads Help, "Why you're seeing an ad," available at https://support.google.com/ads/answer/1634057?hl=en

USA Today, "Gannett Privacy Policy," November 23, 2021, available at https://cm.usatoday.com/privacy

Adlucent, "71% of Consumers Prefer Personalized Ads," available at https://www.adlucent.com/resources/blog/71-of-consumers-prefer-personalized-ads/

Bryan K. Orme, "Getting Started with Conjoint Analysis," 3rd Edition, Research Publishers LLC, 2014

Chrome Web Store, "AdBlock - best ad blocker - Chrome Web Store," available at https://chrome.google.com/webstore/detail/adblock-%E2%80%94-best-ad-blocker/gighmmpiobklfepjocnamgkkbiglidom

Chrome Web Store, "Ghostery - Privacy Ad Blocker - Chrome Web Store," available at https://chrome.google.com/webstore/detail/ghostery-%E2%80%93-privacy-ad-blo/mlomiejdfkolichcflejclcbmpeaniij

Chrome Web Store, "uBlock Origin – Chrome Web Store," available at https://chrome.google.com/webstore/detail/ublock-origin/cjpalhdlnbpafiamejdnhcphjbkeiagm?hl=en

Chrome Web Store at https://chrome.google.com/webstore/search/vpn

Chrome Web Store, "ZenMate Free VPN – Best VPN for Chrome – Chrome Web Store," available at https://chrome.google.com/webstore/detail/zenmate-free-vpn%E2%80%93best-vpn/fdcgdnkidjaadafnichfpabhfomcebme

Google Ad Manager Help, "Ad manager and Ad Exchange program policies, AdChoices for the Google Display Network" available at https://support.google.com/admanager/answer/2695279?hl=en

Ghostery, "Why Ghostery," available at https://www.ghostery.com/why-ghostery

Edmonds, R. "People don't want to trade privacy for targeted ads." Poynter. January 14, 2016 available at https://www.poynter.org/business-work/2016/people-dont-want-to-trade-privacy-for-targeted-ads/

Google Ads Help, "About Display ads and the Google Display Network," available at https://support.google.com/google-ads/answer/2404190?hl=en

Google AdMob, "Earn more revenue with your apps." available at https://admob.google.com/home/

Google Ads, "How it works," available at https://ads.google.com/home/how-it-works/

Google, "Ad Settings," available at https://adssettings.google.com/

Google, "Control the ads you see – Computer – Ads Help," available at https://support.google.com/ads/answer/2662856

Google, "Google Analytics Opt-out Browser Add-on Download Page," available at https://tools.google.com/dlpage/gaoptout

Google, "Google Chrome Privacy Notice," September 23, 2021

Google, "Manage placements. Schedule and pricing," available at https://support.google.com/campaignmanager/answer/2829254?hl=en#zippy=%2Ccost-structure

**Appendix B**
**Materials Relied Upon**

Google Privacy and Terms, "How Google Uses Information from Sites or Apps that Use our Services," available at https://policies.google.com/technologies/partner-sites

R. G. Hubbard and A. P. O'Brien, "Microeconomics," Seventh Edition, Pearson

Caroline Humer, and Jim Finkle, "Your Medical Record Is Worth More to Hackers than Your Credit Card," Reuters.com US Edition 24, 2014, available at https://www.reuters.com/article/us-cybersecurity-hospitals/your-medical-record-is-worth-more-to-hackers-than-your-credit-card-idUSKCN0HJ21J20140924

Holly Pauzer, "71% of Customers Prefer Personalized Ads," Adlucent, available at https://www.adlucent.com/resources/blog/71-of-consumers-prefer-personalized-ads/

Infosys, "Rethinking Retail. Insights from consumers and retailers into an omnichannel shopping experience," 2013, available at https://www.infosys.com/newsroom/press-releases/Documents/genome-research-report.pdf

M.Chinula, "VPNs aren't perfect, here are some alternatives." December 2, 2019, available at https://ijnet.org/en/story/vpns-arent-perfect-here-are-some-alternatives

McGinnis, D., "Please Take My Data: Why Consumers Want More Personalized Marketing," Salesforce, December 2, 2016 available at https://www.salesforce.com/blog/consumers-want-more-personalized-marketing/

Michael Agger, "Google's Evil Eye, Does the Big G know too much about us?" Slate, October 10, 2007, available at https://slate.com/technology/2007/10/does-google-know-too-much-about-us.html

Michael Crider, "How to Block Cookies (Except for Sites You Use) in Any Browser," How-To Geek, October 30, 2017, available at https://www.howtogeek.com/63721/how-to-block-all-cookies-except-for-sites-you-use/

Nielsen Computer and Mobile Panel, available at https://computermobilepanel.nielsen.com/ui/US/en/sdp/landing?SourceId=195&PID=15877&PID2=1023b2824bbb

Nielsen Computed & Mobile Panel, "Privacy & Cookie Notice," January 2020. Available at: https://computermobilepanel.nielsen.com/ui/US/en/privacypolicyen.html#whatinfocollect

Osman, "What Does a VPN Hide," ExpressVPN, March 10, 2021, available at https://www.expressvpn.com/blog/what-does-a-vpn-hide/.  See also, https://lifehacker.com/the-biggest-misconceptions-about-vpns-1794038237

Ravichandran, D. and Korula, N., "Effect of disabling third-party cookies on publisher revenue," Semantic Scholar, August 27, 2019, available at https://www.semanticscholar.org/paper/Effect-of-disabling-third-party-cookies-on-revenue-Ravichandran-Korula/e570d982e9c6aa072dfdf0b4106fc4b1d86cdb23

Rob Pegoraro, "Curb how Facebook, Google and Amazon use your personal data in a quick privacy clean-up," USA Today, January 3, 2018 available at https://www.usatoday.com/story/tech/news/2018/01/03/curb-how-facebook-google-and-amazon-use-your-personal-data-quick-privacy-clean-up/991219001/

Ron Doyle, "Secret Surfing (Part One)," Daily News-Record, March 14, 2017 available at https://www.dnronline.com/features/secret-surfing-part-one/article_11028c0c-0809-11e7-9809-9f8832dcc78d.html

Rowland Manthorpe, "Ever suffered from selfie regret? Why some people share when they shouldn't," Wired, April 11, 2016, available at https://www.wired.co.uk/article/leslie-john-harvard-irrational-decision-making

SAS, "Data Privacy: Are You Concerned," available at https://www.sas.com/en/whitepapers/data-privacy-110027.html

S.Shelton and B.Colburn, "Best VPNs of 2021." September 24, 2021, available at https://www.usnews.com/360-reviews/vpn

Salesforce Research, "Trends in Customer Trust," Research Brief, available at https://c1.sfdcstatic.com/content/dam/web/en_us/www/documents/briefs/customer-trust-trends-salesforce-research.pdf

Segment, "The 2017 State of Personalization Report,"  available at http://grow.segment.com/Segment-2017-Personalization-Report.pdf

Statcounter, available at https://gs.statcounter.com

Steel, Emily, "Companies scramble for consumer data," Financial Times, June 12, 2013. available at https://www.ft.com/content/f0b6edc0-d342-11e2-b3ff-00144feab7de

Super Savvy, "How it Works," available at https://www.surveysavvy.com/how_it_works

Tadas Švenčionis, "What is a VPN and how does it work?" Cybernews, accessed on November 11, 2021, available at https://cybernews.com/what-is-vpn/

Bureau of Labor Statistics, Occupational Employment and Wage Statistics, May 2020 data, available at https://www.bls.gov/oes/

Thorin Klosowski, "The Biggest Misconceptions About VONs," April 5, 2017, Lifehacker, available at https://lifehacker.com/the-biggest-misconceptions-about-vpns-1794038237

Swish Goswami, "The Rising Concern Around Consumer Data And Privacy," Forbes, Dec. 14, 2020, available at https://www.forbes.com/sites/forbestechcouncil/2020/12/14/the-rising-concern-around-consumer-data-and-privacy/?sh=58f73487487e

Trustwave, "The Value of Data," 2017, available at https://www2.trustwave.com/rs/815-RFM-693/images/TV_Value_of_Data_Report_Final_PDF.pdf

David M. Diez, Christopher D. Barr, and Mine Cetinkaya-Rundel, "OpenIntro Statistics," Third Edition

UpVoice, "How can we help you," accessed December 20, 2021, available at https://www.joinupvoice.com/faq

"How to Bypass Geo-Restriction with a VPN" (October 1. 2020), available at https://www.websafetytips.com/how-to-bypass-geo-restriction/

"Using Incognito Windows in Google Chrome, CMP TechWeb," August 3, 2011

"C Is for Cookie, That's Not Good Enough for Google," Slate, September 24, 2013

"Internet Cookies and Privacy Should Come With Health Warning," The Irish Times, January 19, 2016

## Appendix B
## Materials Relied Upon

"Now You Can See Everything Google Knows About You and Delete the Embarrassing Stuff," Slate, July 1, 2016

"Privacy Groups Seek Regulatory Review Of Google Privacy Policy," Dow Jones, December 19, 2016

"Digital Privacy Is More Than Just Opting In or Out; For Most Internet Users, Clicking Their Approval Became a Mere Reflex," Financial Times, April 1, 2017

"Google Is Matching Your Offline Buying With Its Online Ads, but It Isn't Sharing How," Slate, August 1, 2017

"Curb How Facebook, Google and Amazon Use Your Personal Data in a Quick Privacy Clean-Up," USA Today, January 3, 2018

"Facebook Is Now in the Data-Privacy Spotlight. Could Google Be Next?," The Washington Post, April 11, 2018

"Who Has More of Your Personal Data Than Facebook? Try Google," The Wall Street Journal, April 22, 2018

"Bye, Chrome: Why I'm Switching to Firefox and You Should Too," FastCompany, May 30, 2018

"What Your Web Browser's Incognito Mode Really Does," Consumer Reports, June 19, 2018

"There Are a Lot of Misconceptions About Browsing the Web in 'Incognito' Mode, Researchers Say," CNBC, July 12, 2018

Professor Douglas C. Schmidt, Vanderbilt University, "Google Data Collection," Digital Content Next, August 15, 2018

"Google Data Collection Research," Digital Content Next, August 21, 2018

"Google Chrome's Private Incognito Mode Leaks Way More Personal Data Than You Might Think," The Independent, August 22, 2018

"Google's Incognito Mode Isn't as Private as You Thought," The Sun, August 22, 2018

"Apple, Firefox Aim to Thwart Web Use Tracking; Facebook, Google Harvest Data to Make Better Targeted Ads, but There Are Tools to Prevent It; Online Privacy," The Hartford Courant, September 15, 2018

"Keeping an Eye on You," The Australian, April 4, 2019

"Google's Privacy Push Gets a Mixed Reception," Associated Press, May 8, 2019

"Goodbye, Chrome: Google's Web Browser Has Become Spy Software," The Washington Post, June 21, 2019

"A Feisty Google Adversary Tests How Much People Care About Privacy," The New York Times, July 15, 2019

"'Never-Googlers' Trade Convenience for Privacy," The Washington Post, July 28, 2019

"6 Reasons to Ditch Chrome for the Vivaldi Browser on Android," Wired, September 14, 2019

"Google Chrome Privacy: Can You Trust the Incognito Window?; Don't Trust Google Chrome's Incognito Mode," TechTalks, November 21, 2019

"Care About Your Privacy? Use These Web Services," The Sydney Morning Herald, November 29, 2019

"Google Collects a Frightening Amount of Data About You. You Can Find and Delete It Now," CNET, June 28, 2020

"Quit Chrome. Safari and Edge Are Just Better Browsers for You and Your Computer. Switch From Google's Browser to One From Apple or Microsoft, and You'll Notice Immediate Improvements in Performance, Battery and Privacy," The Wall Street Journal, July 12, 2020

"Switching From Chrome to Firefox Can Supercharge Your Privacy in Minutes," FastCompany, October 12, 2020

"How to Stop Google From Tracking You on Any Device," Business Insider, November 27, 2020

"How to See (And Delete) All of Your Google Activity," Reader's Digest, February 12, 2021

"Google Ends Sale of Ads Using Individual Web Tracking Data," Associated Press, March 3, 2021

"14 Creepy Things Google May Know About You," Reader's Digest, April 28, 2021

"Google Delays a Privacy Change to Its Chrome Web Browser," The New York Times, June 24, 2021

"The Hidden Truth Behind Google's Incognito Mode," Reader's Digest, July 20, 2021