1  QUINN EMANUEL URQUHART & SULLIVAN, LLP

2  Andrew H. Schapiro (admitted *pro hac vice*)  Josef Ansorge (admitted *pro hac vice*)
   andrewschapiro@quinnemanuel.com              josefansorge@quinnemanuel.com
3  191 N. Wacker Drive, Suite 2700              1300 I Street N.W., Suite 900
   Chicago, IL 60606                            Washington D.C., 20005
4  Telephone: (312) 705-7400                    Telephone: (202) 538-8000
   Facsimile: (312) 705-7401                    Facsimile: (202) 538-8100
5

6  Stephen A. Broome (CA Bar No. 314605)        Jonathan Tse (CA Bar No. 305468)
   stephenbroome@quinnemanuel.com               jonathantse@quinnemanuel.com
7  Viola Trebicka (CA Bar No. 269526)           50 California Street, 22nd Floor
   violatrebicka@quinnemanuel.com               San Francisco, CA 94111
8  Alyssa G. Olson (CA Bar No. 305705)          Telephone: (415) 875-6600
   alyolson@quinnemanuel.com                    Facsimile: (415) 875-6700
9  865 S. Figueroa Street, 10th Floor
10 Los Angeles, CA 90017
   Telephone: (213) 443-3000
11 Facsimile: (213) 443-3100

12 Jomaire Crawford (admitted *pro hac vice*)    Sara Jenkins (CA Bar No. 230097)
   jomairecrawford@quinnemanuel.com             sarajenkins@quinnemanuel.com
13 51 Madison Avenue, 22nd Floor                555 Twin Dolphin Drive, 5th Floor
   New York, NY 10010                           Redwood Shores, CA 94065
14 Telephone: (212) 849-7000                    Telephone: (650) 801-5000
   Facsimile: (212) 849-7100                    Facsimile: (650) 801-5100
15

16

17 *Attorneys for Defendant Google LLC*

   UNITED STATES DISTRICT COURT
18
   NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION
19

20

21 PATRICK CALHOUN, *et al.*, on behalf of      Case No. 5:20-cv-05146-LHK
   themselves and all others similarly situated,
22                                              **GOOGLE LLC'S OPPOSITION TO**
               Plaintiffs,                      **PLAINTIFFS' MOTION FOR CLASS**
23                                              **CERTIFICATION**
          vs.
24                                              The Honorable Lucy H. Koh
   GOOGLE LLC,                                  Courtroom 8 – 4th Floor
25                                              Date: February 17, 2022
               Defendant.                       Time: 1:30 p.m.
26                                              Amended Complaint Filed: April 16, 2021

27                                              Trial Date: None Set

28

# TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT ................................................................................................1

II.  RELEVANT FACTUAL BACKGROUND .......................................................................3

    A.  Plaintiffs Fail to Show the Alleged Interpretation of the CPN Was Shared
        By A Single Chrome User—Including Themselves ...................................................3

    B.  The Data Google Receives Through the Services Is Unrelated to Sync ...................4

    C.  Plaintiffs and Millions of Class Members Expressly Consented to Google's
        Receipt of the Data .................................................................................................5

    D.  Google Account Holders Could Review and Delete the Data on Their My
        Activity Pages Throughout the Class Period—and Millions of Them Did...............6

    E.  Google's Privacy Policy and Many Other Disclosures Explain Google
        Receives the Data ...................................................................................................7

    F.  Prof. Erdem's Report Confirms Class Members Generally Understand
        Google Receives the Data .......................................................................................8

    G.  Many Factors Affect Whether Google's Services Receive the Data and How
        the Data Is Used .....................................................................................................8

    H.  Many Class Members Cannot Be Identified Because the Data Is Not
        Associated with their Identities ..............................................................................9

III.  ARGUMENT ....................................................................................................................10

    A.  Express Consent Is Outcome-Determinative and Not Common Across the
        Class—Defeating Typicality and Predominance ...................................................10

    B.  Implied Consent Implicates Myriad Individual Issues That Defeat
        Predominance, Typicality, and Superiority ...........................................................11

    C.  Plaintiffs' Six Causes of Action Require Even More Individualized
        Inquiries ...............................................................................................................12

        1.  Breach of Contract ...................................................................................13

        2.  Good Faith and Fair Dealing.....................................................................14

        3.  Intrusion Upon Seclusion .........................................................................15

        4.  CIPA........................................................................................................17

        5.  Statutory Larceny and UCL ......................................................................19

    D.  Plaintiffs Fail to Proffer a Viable Classwide Damages Model ...............................20

    E.  Plaintiffs Fail to Satisfy Rule 23(b)(3)'s Superiority Requirement ........................23

    F.  Plaintiffs Fail to Provide a Workable Trial Plan—Because None Is Possible.........24

IV.  CONCLUSION .................................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page**

**Cases**

*Am. Ex. Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013) .................................................................................................... 10

*Backhaut v. Apple Inc.*,
2015 WL 4776427 (N.D. Cal. Aug. 13, 2015) ...................................................... 11, 19

*Badella v. Deniro Mkt'g LLC*,
2011 WL 5358400 (N.D. Cal. Nov. 4, 2011) ............................................................. 25

*Berger v. Home Depot USA, Inc.*,
741 F.3d 1061 (9th Cir. 2014) .................................................................................... 19

*Brazil v. Dole Packaged Foods, LLC*,
No. 2014 WL 5794873 (N.D. Cal. Nov. 6, 2014) ................................................. 20, 22

*Briseno v. ConAgra Foods, Inc.*,
844 F.3d 1121 (9th Cir. 2017) .................................................................................... 23

*Brodsky* v. *Apple Inc.*,
445 F. Supp. 3d 110 (N.D. Cal 2020) ......................................................................... 18

*Buckeye Tree Lodge & Sequoia Vill. Inn, LLC v. Expedia, Inc.*,
2019 WL 1170489 (N.D. Cal. Mar. 13, 2019) ........................................................... 20

*Campbell v. Facebook Inc.*,
315 F.R.D. 250 (N.D. Cal. 2016) ........................................................................... 12, 22

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ...................................................................................................... 20

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011) .................................................................................................... 12

*Gardiner v. Walmart Inc.*,
2021 WL 2520103 (N.D. Cal. Mar. 5, 2021) ............................................................... 9

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) .................................................................................................... 10

*Hanon v. Dataproducts Corp.*,
976 F.2d 497 (9th Cir. 1992) ...................................................................................... 10

*Heeger v. Facebook, Inc.*,
509 F. Supp. 3d 1182 (N.D. Cal. 2020) ...................................................................... 16

*Herskowitz v. Apple, Inc.*,
301 F.R.D. 460 (N.D. Cal. 2014) ................................................................................ 22

*Huynh v. Quora, Inc.*,
2019 WL 11502875 (N.D. Cal. Dec. 19, 2019) .......................................................... 21

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) ............................................................... 14, 15, 16, 17, 18

*In re Flash Memory Antitrust Litig.*,
2010 WL 2332081 (N.D. Cal. June 9, 2010) .............................................................. 22

*In re Google Assistant Priv. Litig.*,
457 F. Supp. 3d 797 (N.D. Cal. 2020) ........................................................................ 17

*In re Google Inc. Gmail Litig.*,
  2014 WL 1102660 (N.D. Cal. 2014) ............................................................................. 11, 12

*In re Hulu Priv. Litig.*,
  2014 WL 2758598 (N.D. Cal. June 17, 2014) ..................................................................... 24

*In re Paxil Litig.*,
  212 F.R.D. 539 (C.D. Cal. 2003) ...................................................................................... 25

*In re Snap Inc. Sec. Litig.*,
  2019 WL 2223800 (C.D. Cal. Apr. 1, 2019) ....................................................................... 10

*In re Zynga Privacy Litig.*,
  750 F.3d 1098 (9th Cir. 2014) ..................................................................................... 17, 18

*Kremen v. Cohen*,
  337 F.3d 1024 (9th Cir. 2003) ........................................................................................ 19

*Marlo v. United Parcel Serv., Inc.*,
  251 F.R.D. 476 (C.D. Cal. 2008) ..................................................................................... 25

*Mazza v. Am. Honda Motor Co., Inc.*,
  666 F.3d 581 (9th Cir. 2012) ......................................................................................... 20

*McCoy v. Alphabet, Inc.*,
  2021 WL 405816 (N.D. Cal. Feb. 2, 2021) ........................................................................ 18

*Moreno v. San Francisco Bay Area Rapid Transit Dist.*,
  2017 WL 6387764 (N.D. Cal. Dec. 14, 2017) ..................................................................... 17

*Opperman v. Path, Inc.*,
  84 F. Supp. 3d 962 (N.D. Cal. 2015) ...................................................................... 19, 20, 21

*People v. Williams*,
  57 Cal. 4th 776 (2013) ................................................................................................. 19

*Pfizer Inc. v. Sup. Ct.*,
  182 Cal. App. 4th 622 (2010) ......................................................................................... 19

*Pierce v. Cnty. of Orange*,
  526 F.3d 1190 (9th Cir. 2008) ....................................................................................... 23

*Pollack v. Foto Fantasy, Inc.*,
  2010 WL 11595486 (C.D. Cal. July 15, 2010) .................................................................... 17

*Roley v. Google LLC*,
  2020 WL 8675968 (N.D. Cal. July 20, 2020) ................................................................ 14, 23

*Smith v. Facebook, Inc.*,
  745 F. App'x 8 (9th Cir. 2018) ................................................................................... 10, 11

*Svenson v. Google Inc.*,
  65 F. Supp. 3d 717 (N.D. Cal. 2014) ................................................................................ 21

*Torres v. Nutrisystem, Inc.*,
  289 F.R.D. 587 (C.D. Cal. 2013) ..................................................................................... 12

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021) ........................................................................................ 20, 22, 24

*United States v. Forrester*,
  512 F.3d 500 (9th Cir. 2008) ......................................................................................... 16

*Valentino v. Carter-Wallace, Inc.*,
  97 F.3d 1227 (9th Cir. 1996) ......................................................................................... 24

*Vizcarra v. Unilever U.S., Inc.*,
    2021 WL 5370754 (N.D. Cal. Oct. 27, 2021) ........................................................................ 14

*Walker v. Life Ins. Co. of the Sw.*,
    953 F.3d 624 (9th Cir. 2020) ................................................................................... 12, 19

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ........................................................................................ 10, 22, 24

*Williams v. Apple*,
    338 F.R.D. 629 (N. D. Cal. 2021) ......................................................................... 13, 14, 15

*Woods v. Google, Inc.*,
    2017 WL 4310765 (N.D. Cal. Sept. 28, 2017) ...................................................................... 20

*Zakaria v. Gerber Prod. Co.*,
    755 F. App'x 623 (9th Cir. 2018) ................................................................................. 22

*Zinser v. Accufix Research Inst., Inc.*,
    253 F.3d 1180 (9th Cir. 2001) ................................................................................... 24

**Statutes**

Cal Civ. Code §§ 1798.140(v))(1) .................................................................................. 9

Cal Civ. Code §§ 1798.81.5(d)(1) .................................................................................. 9

**Rules**

Fed. R. Civ. P. 23(b)(3) .......................................................................................... 23

Fed. R. Civ. P. 23(b)(3)(A) ....................................................................................... 23

Fed. R. Civ. P. 23(b)(3)(B) ....................................................................................... 23

Fed. R. Civ. P. 23(b)(3)(C) ....................................................................................... 23

Fed. R. Civ. P. 23(b)(3)(D) ....................................................................................... 23

## I.    **PRELIMINARY STATEMENT**

Plaintiffs seek to certify a historic class of over 100 million Chrome users to recover billions in "unjust profits" from data Plaintiffs allege Google improperly collected. But no mass "injustice"—nor any cognizable harm—occurred. The record confirms that most Chrome users understand this routine data collection and are fine with it. The data collection is not a "secret": Google discloses it in many ways before and after collection, and the practice is a frequent topic of public discourse. The hopelessly diverse proposed class—which includes millions of users who cannot even be identified—is subject to varying proof and defenses. It includes users (like Plaintiffs) who expressly consented to the data collection through Account Holder Agreements, and those who did not; users who read the Chrome Privacy Notice ("CPN") that is the basis for all claims, and those (like Plaintiffs) who did not; users who were aware of the data collection because they reviewed Google's many disclosures, and those who did not; users who enabled privacy tools that blocked the data collection, and those who did not; and users for whom the data was associated with their personal identities, and those for whom it was not. A group trial could never accord due process to absent class members or to Google.

*First*, express consent is a defense to all claims but is not capable of class resolution. Millions of class members—including Plaintiffs—expressly consented to Account Holder Agreements that authorized the data collection. *See* Dkt. 395 ("Consent MSJ"). But millions of other class members did not, precluding resolution of this defense on a class basis. Plaintiffs try to evade the Account Holder Agreements by claiming the CPN represented that Chrome would prevent the data collection by default, but they admit they never read the CPN. Their claims thus suffer core vulnerabilities not shared by other class members. Express consent defeats typicality and predominance.

*Second*, implied consent defeats all claims, but also requires individualized resolution. Google publishes a Privacy Policy and other disclosures that describe the disputed data collection. Many third-party disclosures do the same. And for Google Account holders who choose to enable Web & App Activity—like Plaintiffs—Google associated the data with their Accounts, where they could review and delete it on their My Activity pages at any time. Google Account holders visit My Activity over ***170 million times*** every week. Class members who did so know that using Chrome without Sync does

GOOGLE'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

not prevent the disputed data collection. Indeed, there are so many disclosures informing users of the data collection that Plaintiffs in the related *Brown* case contend "it is common knowledge."[1]

*Third*, Plaintiffs' six disparate causes of action each involve elements and defenses that cannot be proven class-wide, thus demanding individualized inquiries beyond consent.

*Fourth*, Plaintiffs identify no damages theory that will reliably and fairly calculate damages classwide. Plaintiffs' claims do not entitle them to the disgorgement of profits, restitution, or benefit of the bargain damages they seek. Even if such damages were available, it is impossible to arrive at a classwide methodology that will not over- and under-compensate class members, and avoid compensating uninjured class members, because Google does not profit from class members equally (nor does it track profits by class member), and users do not value their data equally.

*Fifth*, a class action is not superior to other means of litigating the case—it would create an administrative nightmare. For example, the proposed class includes millions of people who used Chrome only in Basic mode—which means the data is associated at most with a pseudonymous ID set in a delete-able cookie, not with users' identities. Plaintiffs want Google to violate its strict policies **against** identifying such users, but even if that were feasible—and appropriate in a case about privacy—it would not identify the millions of class members whose identities Google simply does not know because they do not have Google Accounts.

*Finally*, Plaintiffs offer no trial plan for claims on behalf of such a vast and sprawling class that includes users who reviewed claim-defeating disclosures from varying sources and whose data was collected (if at all) under an array of materially different circumstances. The Ninth Circuit has cautioned that failure to propose a workable trial plan alone justifies denying certification.

---

[1] *See Brown v. Google*, No. 5:20-cv-03664-LHK-SVK, Dkt. 136-1 ("*Brown* SAC") ¶ 163 ("It is common knowledge that Google collects information about the web-browsing activity of users who are <u>not</u> in 'private browsing mode.'"). The two cases challenge the same data collection process. *Compare Brown* SAC ¶¶ 63-83 *with* Dkt. 163 ("*Calhoun* FAC") ¶¶ 113-142. But the *Calhoun* Plaintiffs' theory—that using Chrome in ***any*** mode other than Sync mode (even Chrome's default "Basic" mode) would prevent the challenged data collection—is contradicted by the *Brown* Plaintiffs' theory—that one must use Chrome's Incognito mode or another browser's "private mode" to prevent the same data collection. Moreover, Incognito mode and Guest mode function identically in all respects relevant here. Mardini Decl. ¶ 15. The *Calhoun* Plaintiffs' excision of Incognito mode browsing from the case, while keeping in Guest mode browsing, is illogical.

## II.   RELEVANT FACTUAL BACKGROUND

### A.   Plaintiffs Fail to Show the Alleged Interpretation of the CPN Was Shared By A Single Chrome User—Including Themselves

Plaintiffs' entire case requires interpreting two sentences in the CPN to mean that using Chrome in any mode other than Sync[2] somehow prevents Google from receiving data[3] that Google receives when users visit third-party websites that use Google's web-services (*e.g.*, Analytics, Ads, embedded Maps, Fonts) (the "Services"). The Services receive the Data to enable Google to provide the web-service requested by the site. Fair Decl. § A. Essentially, Plaintiffs aver a belief that Google designed Chrome to block all Data transmissions to Google unless browsing in Sync mode. That makes no sense. If true, the useful Services that people use every day on third-party websites would not function in Chrome. Ex. 1[4] (Chen Rep.) ¶¶ 82-86; Mardini Decl. § B.

At the pleading stage, the Court found that "the Chrome Privacy Notice makes specific representations that ***could*** suggest to a reasonable user that Google would not engage in the alleged data collection." Dkt. 142, at 14 (emphasis added). Plaintiffs bear the burden at certification to show this interpretation was shared by the putative class, but they offer no evidence on this issue. Plaintiffs concede they never read the CPN or Google's other disclosures[5]—rather, their alleged expectations were based on their "gut."[6] Their experts conducted no surveys on actual Chrome users' interpretation of the CPN or other relevant disclosures. Ex. 23 (Turow Tr.) at 35:7-12; Ex. 24 (John Tr.) at 84:17-18. And Plaintiffs' expert Prof. John admits that "if consumers did read the [CPN], they would not

---

[2] Chrome has five modes: (1) Basic; (2) Sign-In; (3) Sync; (4) Guest; and (5) Incognito. *See* Dkt. 340-15 at Ex. 33 ("CPN"). "Unsynced" and "Not Synced" are terms contrived by Plaintiffs. Dkt. 340 ("Mot.") at 1. These terms are not referenced in Google's disclosures. Fair Decl. ¶ 4.

[3] Google allegedly misappropriated data consisting of: (1) "cookie identifiers"; (2) "GET requests"; (3) "POST communications"; (4) "IP address and User-Agent information"; and (5) "x-client-data identifier[s]" (hereafter, the "Data"). FAC ¶ 141.

[4] All citations to "Ex." refer to the Exhibits attached to the Declaration of Stephen A. Broome.

[5] *See* Ex. 6, at Response to Interrogatory 1 and 6; Ex. 8, at Response to Interrogatory 6; Ex. 10 at Responses to Interrogatories 1 and 6; Ex. 17 (Kindler Tr.) at 26:16-17, 31:14-32:4, 37:25-38:5, 48:24-49:16, 99:23-100:1, 226:23-227:5-9, 314:20-315:17; Ex. 18 (Crespo Tr.) at 31:12-25, 33:12-34:23, 84:24-86:24; Ex. 19 (Calhoun Tr.) at 20:14-21:4, 22:11-26:16, 65:22-66:24, 75:5-6; Ex. 20 (Henry Tr.) at 25:13-27:18, 32:19-33:5, 93:9-22, 119:20-121:22; Ex. 21 (Wilson Tr.) at 156:11-16, 206:2-8, 210:6-11, 281:10-282:13; Ex. 22 (Johnson Tr.) at 63:8-64:10, 67:1-16, 73:6-19.

[6] Ex. 17 (Kindler Tr.) at 31:14-32:4, 226:23-227:9; Ex. 20 (Henry Tr.) at 26:9:24, 32:19-22.

come to one singular interpretation of what these notices mean." Dkt. 340-17 (John Rep.) at 5.

**B.      The Data Google Receives Through the Services Is Unrelated to Sync**

In basing their claims on Chrome's Sync mode, Plaintiffs mix apples and oranges. The Data Google receives to provide the Services (*i.e.*, the Data collection Plaintiffs challenge), and the information sent to a user's Google Account when she enables Sync mode, differ in nature, purpose, and process. Fair Decl. § A; Mardini Decl. § D; Chen Rep. ¶¶ 58-59. Sync mode allows a Chrome user to save information stored locally on her browser—*e.g.*, bookmarks, tabs, passwords, history, auto-fill information—in a Google Account "so you may access it when you sign in and sync to Chrome on other computers and devices." CPN; *see also* Mardini Decl. ¶ 17; Fair Decl § A.

The Services Plaintiffs challenge do not receive the information affected by Sync. *See* Ganem Decl. ¶ 6; Berntson Decl. ¶ 8; Crossland Decl. ¶ 8; Chen Rep. §§ V.B.2, VII.A. Rather, Google receives the Data at issue when a user—***in any browser***—visits a third-party website that uses Google scripts to enable the Services. Chen Rep. § V; Fair Decl. ¶ 5. Those scripts cause the user's browser to send a resource request including a copy of the user's GET or POST request to Google servers that respond by providing the requested Service. FAC ¶ 129; Chen Rep. ¶¶ 48-50. But the Services are browser-agnostic—*i.e.*, they operate identically whether the user is in Chrome or another browser. Nor are they impacted by whether a Chrome user is in Sync mode. The Services are designed to function the same way, irrespective of the browser used. Chen Rep. § V; Fair Decl. ¶ 5. Even Plaintiffs' expert admits this. Ex. 25 (Smith Tr.) at 60:12-62:21.



Case No. 5:20-cv-05146-LHK

GOOGLE'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

The process at issue—directing resource requests to third-party web-service providers—has been ubiquitous on the internet for well over a decade. Chen Report § IV. Most popular websites use multiple third-party web services that employ the same process. *Id.* ¶ 50. Indeed, Plaintiffs' counsels' law firms use such Google Services on their own websites. *Id.* ¶ 71; *see also* Exs. 47-48.

### C.    Plaintiffs and Millions of Class Members Expressly Consented to Google's Receipt of the Data

Each Plaintiff expressly consented to collection of the Data. *See* Consent MSJ. Tens of millions of other class members did too. For example, eligible existing Account holders as of June 2016—including Plaintiffs Crespo, Henry, Wilson, and Johnson—were shown the Consent Bump Agreement. Fair Decl. § B.1. The Consent Bump Agreement is less than two pages long and explains:

> When you use Google services like Search and YouTube, you generate data — things like what you've searched for and videos you've watched. You can find and control that data in My Account under the Web & App Activity setting.
>
> With this change, this setting may also include browsing data from Chrome **and activity from sites and apps that partner with Google, including those that show ads from Google**.

*Id.* ¶ 23 (emphasis added). The Consent Bump Agreement also linked to a FAQ page that states:

> Many websites and apps use Google technologies to improve their content and services. For example, a website might use our advertising services (like AdSense) or analytics tools (like partners who use Google Analytics to improve the ads they show).
>
> **As you use these sites, your web browser may send certain information to Google that may include the web address of the page that you're visiting, your IP address, or cookies previously set by the site or Google....**

*Id.* ¶ 30 (emphasis added). The Consent Bump Agreement further discloses that "Google will use this information to make ads across the web more relevant to you." *Id.* ¶ 23. Several plaintiffs, and millions of Google Account holders, reviewed this agreement and selected "I AGREE." *Id.* ¶¶ 32-34, 39-43. Millions of other Google Account holders did not see the Consent Bump Agreement because they were not eligible, and millions more did not consent. *Id.* ¶¶ 32-38. Plaintiffs' class definition sweeps in all these differently situated users.

Users creating new accounts after June 2016—including Plaintiffs Calhoun, Kindler, Johnson, and Wilson—were shown a New Account Creation Agreement that similarly disclosed Google's

collection of the Data. *Id.* § B.2. The agreement is less than two pages and explains that Google processes information about users' activity, "including information like the video you watched, device IDs, IP address, cookie data, and location[,] … when you use apps or sites that use Google services like ads, Analytics, and the YouTube video player." *Id.* The agreement also specifies that Google may use this information to "[d]eliver personalized ads … both on Google services and on sites and apps that partner with Google." *Id.* ¶ 49. Several plaintiffs, and millions of Google Account holders, reviewed this agreement and selected "I AGREE." *Id.* § B.2.

Neither Account Holder Agreement suggests that using Chrome without Sync mode enabled prevents Google from receiving the Data—because the Data collection is not affected by Sync. *Id.* § A. Chrome users without Google Accounts are included in the broad putative class but did not see the Account Holder Agreements.

### D. Google Account Holders Could Review and Delete the Data on Their My Activity Pages Throughout the Class Period—and Millions of Them Did

The Account Holder Agreements directed Google Account holders to their My Activity pages to review and manage the Data associated with their Accounts. *Id.* § D. Many other Google disclosures do too. *Id.* In addition to these initial disclosures, Google routinely advises Account holders by email to review their My Activity pages and conduct a "Privacy Checkup" that explains the information associated with their Accounts. *Id.* ¶¶ 103-12. Plaintiffs received such reminder emails. Exs. 28-43.

On My Activity, Account holders who enabled Web & App Activity and agreed to include "activity from sites, apps, and devices that use Google services"—as Plaintiffs did—can review and delete information associated with their Google Accounts. Fair Decl. § D. That information includes Data Google received when Account holders visited third-party websites using Google Services.[7] My Activity is a prominent tool that dispels any misconception that using Chrome without Sync prevents Google's Services from receiving the Data. On average, Google Account holders—including millions of putative class members—visit My Activity 170 million times every week. *Id.* ¶ 85.

---

[7] Excerpts from Plaintiffs' Web & App Activity are attached to the Fair Declaration as Exs. 89-99.

**E.      Google's Privacy Policy and Many Other Disclosures Explain Google Receives the Data**

Not all Chrome users are Google Account holders (and not all Google Account holders use Chrome). But there are many Google and third-party disclosures notifying non-Account holders that Google receives the Data. *Id.* §§ C-F; Exs. 44-72. Google's Privacy Policy, which has been viewed hundreds of millions of times, discloses the Data collection. Fair Decl. § C. Plaintiffs admit they "were legally deemed to have agreed" to the Privacy Policy upon establishing their Accounts. Ex. 11, at Request 1B. But many Chrome users without Google Accounts would have reviewed it too.

Throughout the Class Period, the Privacy Policy disclosed that Google receives the Data. For example, the operative Privacy Policy when Plaintiffs filed suit explained that Google receives the precise categories of Data at issue through "[p]roducts that are integrated into third-party apps and sites, like ads and embedded Google Maps." Fair Decl. § C. The Privacy Policy also explained that Google collects information about users' "[a]ctivity on third-party sites and apps that use our services," and distinguishes such Data from "Chrome browsing history you've synced with your Google Account." *Id.* The Privacy Policy states that Google may use the Data to deliver "personalized ads" or "more relevant…ads." *Id.*

Google also provides an online Help Center containing articles that (1) explain Google receives the Data when users (in any browser) visit websites that use the Services, and (2) distinguish that Data collection from the information Google receives when a Chrome user enables Sync. *Id.* ¶¶ 93-101. Indeed, the CPN links to one such article, which received nearly 35 million views from U.S. Internet users during the Class Period. *Id.* ¶ 98. In addition, Google requires websites using its Services to provide a privacy policy that discloses their use of the Services. *Id.* § E. Many websites comply by linking to a page titled "HOW GOOGLE USES INFORMATION FROM SITES OR APPS THAT USE OUR SERVICES." *Id.* ¶¶ 68, 114, 117. That page discloses the Data collection too:

> [W]hen you visit a website that uses advertising services like AdSense, including analytics tools like Google Analytics, or embeds video content from YouTube, your web browser automatically sends certain information to Google. This includes the URL of the page you're visiting and your IP address. We may also set cookies on your browser or read cookies that are already there.

*Id.* ¶ 68. This page has also been viewed millions of times. *Id.* ¶ 75.

These are the most prominent disclosures, but there are others. Google even included a tool in Chrome that allows users to view the third-party domains—including Google domains—receiving Data on the websites they visit. *Id.* § F; Chen Rep. § VI. And myriad news articles discuss Google's data collection practices. Exs. 49-72. None of these disclosures, sources, or articles in any way suggest that using Chrome without Sync prevents the Data collection.

### F.    Prof. Erdem's Report Confirms Class Members Generally Understand Google Receives the Data

Unlike Plaintiffs' consumer expectations experts—who conducted no surveys or research—Google's expert, Prof. Tulin Erdem, surveyed actual Chrome users and confirmed the following:

- Chrome users *believe and understand* Google receives their IP addresses, referrer URLs, and cookies while browsing the Internet and this expectation is not affected by Sync being on or off, or whether users were presented with relevant privacy policies (Ex. 2 (Erdem Rep.) § VI);

- Chrome users are *extremely likely* to continue using Chrome after being presented with the CPN and Privacy Policy, and modifications to those disclosures to address Plaintiffs' alleged interpretations had no material impact (*id.* § VII); and

- Chrome users *strongly believe* that Google *definitely* receives the Data from websites that partner with Google after reviewing the Account Holder Agreements (*id.* § VIII).

These survey results confirm that most class members already understand that Google receives the Data (regardless of Sync mode), are fine with it, and would not change their use of Chrome.

### G.    Many Factors Affect Whether Google's Services Receive the Data and How the Data Is Used

Although the Services are browser-agnostic and thus unaffected by whether the user is in Chrome (or has Sync enabled), whether a Google Service receives a given category of Data depends on many other factors and varies across class members. Ex. 5 (Zervas Rep.) § III.A.1. For example, Analytics and Ad Manager each offer features that the website can enable to prevent Google from collecting or using certain categories of the Data. Bernston Decl. § B.1; Ganem Decl. § B.1. In addition, Chrome users can enable settings and tools that prevent Google from receiving certain categories of the Data. Ganem Decl. §§ B.2-3; Berntson Decl. § B.2; Zervas Rep. § III.A.1. These include enabling cookie blockers,[8] disabling Ads Personalization, using an Analytics Opt-Out

---

[8] Plaintiffs assert that the "Court noted in its MTD Order, [that] Google acted in bad faith, including by circumventing cookie blockers." Mot. at 13. At the motion to dismiss stage, the Court "noted" only

extension, or using ad blockers or VPNs. *Id.* Plaintiffs' expert admits that "31% of internet users" use VPNs, and "popular ad blockers provide the same services: hiding the user's IP address." Dkt. 340-18 (Mangum Rep.) ¶¶ 84-88. In addition, some widely used Services do not receive certain categories of the Data (*e.g.*, cookies, X-Client-Data headers). Crossland Decl. ¶ 10; Ganem Decl. ¶ 9.

Google's use of the Data it receives also varies by Service. Certain Services receive the Data solely to provide the Service. Crossland Decl. ¶¶ 11, 13; Cassidy Decl. ¶¶ 6, 8. These Services do not (i) associate the Data with an individual's Account or identity, (ii) share the Data with other Services, or (iii) use the Data for advertising. *Id.* Thus, whether Google collected the Data from a class member or used it for profit—the predicates for liability and damages—depends on which Services the user interacted with, and the tools and features enabled by the user and the websites using the Services.

### H.   Many Class Members Cannot Be Identified Because the Data Is Not Associated with their Identities

For Chrome users in the default "Basic" mode—*e.g.*, non-Google Account holders or users who browse the internet while signed-out of their Google Accounts—Google does not link the Data to their Accounts or information that "personally identifies" a user.[9] Monsees Decl. §§ A-B. To the contrary, Google implements protocols and processes to ensure such users are *not* identified and that the Data *cannot* be "reasonably linked" to information that "personally identifies" a user. *Id.* Further, Google does not even possess information that could be used to identify Chrome users who do not have Google Accounts. This means such users cannot be identified to confirm class membership. *Id.*;

---

Plaintiffs' *allegation*, which their experts now admit is false. *See, e.g.*, Ex. 24 (Shafiq Tr.) at 16:15-19 (admitting that Chrome's third-party cookie blocker feature blocks third-party cookies).

[9] Google's Privacy Policy defines "Personal Information" as "information that you provide to us which personally identifies you, such as your name, email address, or billing information, or other data that can be reasonably linked to such information by Google, such as information we associate with your Google Account." Monsees Decl. ¶ 5. At the motion to dismiss stage, the Court relied on a CCPA definition of "Personal Information" in interpreting the Privacy Policy and CPN. Dkt. 142, at 15. Respectfully, that was error. The CCPA uses two definitions of "Personal Information," but makes clear these definitions apply solely "[f]or purposes of" the respective title or section, not for purposes of all California law and privacy policies governed by California law. Cal. Civ. Code §§ 1798.81.5(d)(1), 1798.140(v)(l). Moreover, the CCPA "does not contain an express retroactivity provision." *Gardiner v. Walmart Inc.*, 2021 WL 2520103, at *2 (N.D. Cal. Mar. 5, 2021). The personal information definition in Google's Privacy Policy existed years before the CCPA's 2020 effective date. *See, e.g.*, Dkt. 340-15 at Ex. 7 (June 28, 2016 Privacy Policy). The CCPA requires Google to include CCPA disclosures in its Privacy Policy, but the statute does not replace Google's definitions. Ex. 3 (Schwartz Rep.) ¶ 47.

Zervas Rep. §§ III.A.4, III.B.2. It also means the Data Google receives when these class members use Chrome to visit sites that use the Services is not "personal information." Schwartz Rep. § V.B. Plaintiffs' proposed method to identify signed-in users is not reliable either. Schumann Decl. ¶¶ 2-8; Zervas Rep. § III.B.2.a.

## III. ARGUMENT

A plaintiff must "actually prove—not simply plead—that his putative class satisfies each requirement of Rule 23." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014). Rule 23 does not "establish an entitlement to class proceedings" but "imposes stringent requirements for certification that in practice excludes most claims." *Am. Ex. Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013). The Court must conduct a "rigorous analysis" of the Rule 23 prerequisites. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011).

### A. Express Consent Is Outcome-Determinative and Not Common Across the Class—Defeating Typicality and Predominance

The Court has recognized that consent is a defense to all claims. Dkt. 142, at 12 & n.3. Plaintiffs' claims are not typical of the broader class because, as shown in the Consent MSJ and Section II.C above, Plaintiffs expressly consented to Account Holder Agreements that disclose the Data collection in terms that exceed the specificity the Ninth Circuit found sufficient to obtain consent under substantively identical circumstances. *See Smith v. Facebook, Inc.*, 745 F. App'x 8, 9 (9th Cir. 2018). But this defense cannot be resolved for the class because the arguments advanced in the Consent MSJ do not apply to every class member. The Account Holder Agreements are not a defense to claims by: (1) the millions of non-Account holders who were never shown those agreements; (2) the millions of class members with Accounts as of June 2016 who were never shown the Consent Bump Agreement because they were not eligible for it (*e.g.*, because they had already enabled the settings); and (3) the millions of class members who were shown the Consent Bump Agreement and did not consent. *See* Fair Decl. ¶¶ 34-38.

"[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992); *see also In re Snap Inc. Sec. Litig.*, 2019 WL 2223800, at *2 (C.D. Cal.

Apr. 1, 2019) ("[T]here is no requirement at this early stage to prove a defense, only to show a degree of likelihood that a unique defense might play a significant role at trial."). Even if the Court were to find Google's Consent MSJ presented fact disputes for trial, Plaintiffs' express consent to the Account Holder Agreements—and their ability to review on their My Activity pages the very information they allege Google "secretly" intercepted—is a defense that will be a central focus of the litigation, to the detriment of class members not subject to the defense. This defeats typicality and predominance.

The CPN cannot not override Plaintiffs' and other class members' express consent to the Account Holder Agreements because Plaintiffs admit they never read the CPN, and their experts conclude that most Chrome users would not have either.[10] Turow Rep. ¶ 28; John Rep. at 6-7.[11]

### B. Implied Consent Implicates Myriad Individual Issues That Defeat Predominance, Typicality, and Superiority

"Individual issues regarding [implied] consent are likely to overwhelmingly predominate over common issues" where "there is a panoply of sources from which [] users could have learned of Google's interceptions." *In re Google Inc. Gmail Litig.*, 2014 WL 1102660, at *17 (N.D. Cal. 2014); *see also Backhaut v. Apple Inc.*, 2015 WL 4776427, at *14 (N.D. Cal. Aug. 13, 2015) (individualized issues of implied consent predominated where "numerous sources of information, including disclosures by Defendant, … could have put some proposed class members and senders of 'intercepted' communications on notice of the alleged interceptions… The court would therefore have to determine, for each individual class member, the circumstances under which the proposed class member … was or was not exposed to these various sources of information.").

Here, a "panoply of sources" provided Chrome users with notice of the Data collection: (1) the Account Holder Agreements;[12] (2) Google Account holders' My Activity pages; (3) the Privacy

---

[10] Plaintiffs argue (Mot. at 1) that the agreements do not "override" their alleged interpretation of the CPN that "[t]he *default* is that Chrome will not send and Google is not permitted to collect users' personal information unless the user finds the Sync toggle and enables it." It would not make sense for Google to address Sync in these agreements because Sync does not affect the disputed Data collection, and Google's agreements would be unwieldy and incomprehensible if they undertook to identify all browsers, modes, or settings that do ***not*** affect Google's collection of the Data.

[11] *See also* Ex. 24 (John Tr.) at 120:19-121:12, 122:3-6, 125:11-19, 126:13-17, 250:7-9, 258:13-15, 278:24-279:3; Ex. 23 (Turow Tr.) at 305:4-11, 305:25-306:6.

[12] Plaintiffs may argue that the Account Holder Agreements cannot obtain express consent. They testified in deposition that, to obtain consent, Google should have called them on the phone or

Policy; (4) Help Center articles and other pages linked to the Privacy Policy; (5) Chrome's Developer Tools; (6) third-party disclosures (including on sites Plaintiffs visited); (7) news articles; and (8) "common knowledge." Fair Decl. §§ B-F; Exs. 6, 10, 28-77; *Brown* SAC ¶ 163. Google's disclosures have been reviewed millions of times. Fair Decl. ¶¶ 75, 85, 98, 101. And Prof. Erdem's report confirms a majority of Chrome users understand Google receives the Data and that it is not affected by using Chrome without Sync. Erdem Rep. §§ VI, VIII. The CPN cannot override implied consent—neither the named Plaintiffs nor most class members ever read it.

Thus, as the Court reasoned in denying class certification under similar circumstances: "A fact-finder, in determining whether Class members impliedly consented, would have to evaluate to which of the various sources each individual user had been exposed and whether each individual 'knew about and consented to the interception' based on the sources to which she was exposed…. This fact-intensive inquiry will require individual inquiries into the knowledge of individual users." *Gmail*, 2014 WL 1102660, at *18; *see also Campbell v. Facebook Inc.*, 315 F.R.D. 250, 266 (N.D. Cal. 2016) ("individual issues of implied consent do predominate … due to the media reports on the practice" because "[e]ven if Facebook hid its practice, as long as users heard about it from somewhere and continued to use the relevant features, that can be enough to establish implied consent."); *Torres v. Nutrisystem, Inc.*, 289 F.R.D. 587, 594-95 (C.D. Cal. 2013) (denying certification because "[t]he issue of whether class members consented … would also require a detailed factual inquiry for each class member" where some putative class members may have "expected the calls to be recorded").

### C.   Plaintiffs' Six Causes of Action Require Even More Individualized Inquiries

The predominance inquiry "begins ... with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). "The focus of the inquiry ...

---

advertised on TV. Ex. 21 (Wilson Tr.) at 280:8-14; Ex. 22 (Johnson Tr.) at 275:12-276:11. That is not the law. *See Smith*, 745 F. App'x at 8-9 (holding similar disclosures sufficient to obtain consent to similar data collection and use). In any event, Plaintiffs cannot credibly deny that the agreements would at minimum place many class members **on notice** of the disputed data collection such that they impliedly consented. Plaintiffs testified they would only read a disclosure that described the data collection if it was concise. *See, e.g.*, Ex. 17 (Kindler Tr.) at 315:18-316:8; Ex. 18 (Crespo Tr.) at 123:13-25; Ex. 19 (Calhoun Tr.) 71:14-19, 101:6-24. For precisely that reason, the Account Holder Agreements are no more than two pages and describe the disputed Data collection in succinct terms understandable to the average user.

varies depending on the nature of the underlying claims." *Walker v. Life Ins. Co. of the Sw.*, 953 F.3d 624, 630 (9th Cir. 2020).

### 1.   **Breach of Contract**

Plaintiffs' contract claim cannot be certified for two more reasons. *First*, Plaintiffs fail to show "common proof" that Google breached a uniform contract. Unlike in *Williams v. Apple*, where the breach turned on one sentence of a single document stating, "your content will be automatically sent to and stored by Apple," 338 F.R.D. 629, 634 (N. D. Cal. 2021), here Google's agreements with class members include several documents and statements about the Data collection that are not uniform for all class members and evolved throughout the Class Period.

Plaintiffs focus on only one piece of their alleged contract with Google—the CPN they never read—to contend "common proof" of breach exists. But that alleged breach turns on the meaning of the term "personal information" as used in the CPN. *See* FAC ¶¶ 355-56. There Google explained the term in a way ordinary consumers would understand—information used "to help you fill out forms or sign into sites you visit." None of the Data at issue fits that definition. Plaintiffs argue (Mot. 6) the term should be construed consistent with one of the two definitions in the CCPA. There is no basis for that approach. Schwartz Rep. § IV.B.3. Plaintiffs' experts admit the CCPA definitions are ***not*** how most users would understand the term, and that "users would not come to one singular interpretation."[13] Plaintiffs even admit ***they*** do not understand the term "personal information" to encompass the Data at issue. To the contrary, they understand the term in its ordinary sense—*i.e.*, information that uniquely identifies them as individuals, such as social security numbers, EIN numbers, email addresses, or tax information.[14] Thus, even assuming the task at hand is to "seek to

---

[13] Ex. 23 (Turow Tr.), at 149:11-150:24; Ex. 24 (John Tr.), at 251:21-252:6; Dkt. 340-17 (John Rep.) at 5.

[14] Ex. 22 (Johnson Tr.) 227:1-16 ("PI associated with [your] Google Account" means "e-mail addresses, tax information, EIN numbers. I talked with a lot of contractors and send communications with a lot of contractors. So a lot of communications include very sensitive information. So that's other PI associated."); Ex. 17(Kindler Tr.) at 311:15-312:7 ("[t]he question that I...typed in the search bar" and her IP address were not "personal information"); Ex. 18 (Crespo Tr.) at 29:18-30:3 ("Personal information to me is anything that identifies, you know, like preferences or personal habits or sensitive information. … So anything that could be traced back to me I consider personal information."); Ex. 20 (Henry Tr.) at 23:1-6 (personal information is "addresses, browser history, and

effectuate the reasonable expectations of the ***average member of the public*** who accepts" the CPN and Google's other disclosures, *Williams*, 338 F.R.D. at 638 (emphasis added), Plaintiffs offer ***no proof***—let alone common proof—that the "average member of the public" would adopt their interpretation of "personal information" in the CPN.[15] Plaintiffs therefore cannot show a uniform breach. *Cf. Vizcarra v. Unilever U.S., Inc.*, 2021 WL 5370754, at * 12 (N.D. Cal. Oct. 27, 2021) (denying class certification where plaintiff "pointed to no common evidence showing that consumers understood" the term at issue as plaintiffs alleged, and plaintiff's survey expert "did not test the effect of" the term on consumers' expectations).

 *Second*, even if the CPN's reference to "personal information" were construed to include any Data "reasonably linkable" to a user's identity, Plaintiffs still fail to show a "uniform breach." Plaintiffs' expert Dr. Shafiq admitted that individualized fact-intensive inquiries are required to determine whether any particular piece of data Google receives—*e.g.*, IP address, cookies—is "personally identifiable information."[16] *See also* Zervas Rep. § III.B.3. As explained in Section II.H, when a Chrome user is not signed-in to a Google Account, the Data is linked to a pseudonymous and delete-able cookie, not with information that identifies the user. Monsees Decl. §§ A-B. And some Services—*e.g.*, Fonts—do not even associate the Data with cookies. Crossland Decl. ¶ 10. In these scenarios, the Data is not "personal information." Schwartz Rep. § V.B. And Google's receipt of it cannot breach the alleged contract. Individualized issues thus pervade the breach of contract claim.

## 2. <u>Good Faith and Fair Dealing</u>

 Good faith and fair dealing claims are duplicative unless they "go beyond the breach of

---

those types of things"); Ex. 21 (Wilson Tr.) at 35:12-18 ("identifying markers" include "their Social Security number, their name, their address.").

[15] For this reason, Plaintiffs misplace reliance (Mot. 12-13) on *Roley v. Google LLC*, 2020 WL 8675968 (N.D. Cal. July 20, 2020). There the court found that "common evidence will inform interpretation of the alleged contract's terms" because "[b]y necessity, ***all class members will have been exposed to the same statements*** made in the Photo Impact Email" sent to all class members. *Roley*, 2020 WL 8675968, at *10 (emphasis added). Not so here, where Plaintiffs admit they and many class members were ***not*** exposed to the CPN.

[16] Ex. 26 (Shafiq Tr.) 149:9-150:17 (IP address is not PII if multiple users share the same IP address or IP address is for an internet cafe); *id.* 161:14-162:4 (whether cookie is PII depends on whether cookie value changes and "whether Google servers maintain a mapping of the changed cookie").

contract theories." Dkt. 142, at 34 (quoting *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 611 (9th Cir. 2020)). The Court permitted this claim only based on Plaintiffs' allegation that "Google acted in bad faith, such as by circumventing cookie blockers."[17] *Id.* This allegation is unsupported by evidence.[18] But even if it were, Plaintiffs cannot show cookie blocker usage is common to the expansive class. The sole plaintiff who claimed to have used cookie blockers has been dismissed. *See* FAC ¶¶ 189-191 (Randolph); Dkt. 285. The remaining Plaintiffs admit they did *not* use cookie blockers. *See* Exs. 12-13, at Request 13; Ex. 14, at Interrogatory 17. As a result: (1) there is no class representative for this claim,[19] and (2) even if there were, individualized issues would predominate because determining which class members used cookie blockers, and whether cookie blockers were in fact circumvented, would require mini-trials. *Cf. Williams*, 338 F.R.D. at 641 ("Plaintiffs have failed to meet their burden to show by 'a preponderance of the evidence' that … the number of uninjured class members would be '*de minimis*.'").

### 3.   <u>Intrusion Upon Seclusion</u>

In considering an intrusion claim, "courts generally 'ask whether: (1) there exists a reasonable expectation of privacy, and (2) the intrusion was highly offensive." Dkt. 142, at 26 (citing *Facebook Tracking*, 956 F.3d at 601). Even assessed from the perspective of "an objectively reasonable person" (Mot. 14), this claim cannot be certified given the diversity of users in the broad proposed class.

<u>Reasonable Expectation of Privacy</u>. Plaintiffs argue that "[i]n *Facebook [] Tracking*, the Ninth Circuit explained that the 'critical fact was that the online entity *represented to the plaintiffs that*

---

[17] Plaintiffs for the first time contend Google also breached the implied duty by "creating profiles used to target users with behavioral advertising." Mot. 13. This theory fails because it is coextensive with their breach of contract theories. And as explained in Google's pending Consent MSJ, Plaintiffs expressly consented to Google's use of their activity to "make ads across the web more relevant for you" and to "[d]eliver personalized ads, ...both on Google services and on sites and apps that partner with Google." Dkt. 395-1 (MSJ Fair Decl.) ¶¶ 19, 43.

[18] Plaintiffs contend (Mot. 13) their experts "performed tests showing that cookie blockers did not work in Chrome." But Mr. Smith and Prof. Shafiq state only that when users enabled the *third-party* cookie blocking feature, Google continued to receive *first-party* cookies. Ex. 26 (Shafiq Tr.) 116:15-19; Dkt. 340-16 (Smith Rep.) ¶ 77. That operation is not cookie blocker circumvention. *See* Zervas Rep. § III.A.2.

[19] Even if Plaintiffs succeed in belatedly adding new proposed plaintiffs who allege they utilized cookie blockers, Dkt. 302-4 (PSAC) ¶¶ 182-184, 188-191, individualized issues would still predominate this claim because the existing Plaintiffs (and untold numbers of class members) did not.

*their information would not be collected*, but then proceeded to collect it anyway," and "[h]ere, Google has taken data that it promised it would not collect." Mot. 14; *see also* Dkt. 142 (MTD Order), at 28 ("Plaintiffs … could have reasonably assumed that Google would not receive their data while they were using Chrome without sync *based on Google's representations*" in the CPN) (emphasis added). But Plaintiffs never read the CPN, and their experts opined most class members did not either. Such class members could not have harbored the alleged expectation of privacy—a conclusion confirmed by Prof. Erdem's report.[20] Erdem Rep. § VI.

Plaintiffs' assertion (Mot. 14) that their "experts Joseph Turow and Leslie John propose peer-reviewed methodologies to explain to the jury that reasonable consumer expectations" can be "calculated through general surveys" is baseless. Neither expert conducted a survey or any research for this case—in fact, they rejected the idea. Turow testified "I don't think a survey would be useful" and John testified that a survey is not "necessary." Ex. 24 (Turow Tr.) 35:7-21; Ex. 24 (John Tr.), at 84:17-18, 135:16-136:25; *see also* Google's Motion to Strike Profs. John and Turow's Reports.

<u>Highly Offensive</u>. "Determining whether a defendant's actions were 'highly offensive to a reasonable person' requires a holistic consideration of factors such as the likelihood of serious harm to the victim, the degree and setting of the intrusion, the intruder's motives and objectives, and whether countervailing interests or social norms render the intrusion inoffensive." *Facebook Tracking*, 956 F.3d at 606. These individualized factors cannot be assessed for the class *en masse*, which includes the following diverse groups of users:

- The millions of class members who were aware of the data collection in light of the disclosures and tools described above and in the Fair Declaration.

- The millions of Google Account holders who visit their My Activity pages, where they can *see* that Google obtains records of their activity when they visit third-party sites that use Google's Services *notwithstanding* the fact that they have not enabled Sync.

- The millions of Chrome users who, according to the *Brown* Plaintiffs, allegedly believed it

---

[20] For certain categories of Data at issue—*e.g.*, IP address—the law is clear there is no privacy interest. *See Heeger v. Facebook, Inc.*, 509 F. Supp. 3d 1182, 1189 (N.D. Cal. 2020) ("there is no legally protected privacy interest in IP addresses"); *United States v. Forrester*, 512 F.3d 500, 503 (9th Cir. 2008) ("IP addresses are not merely passively conveyed through third party equipment, but rather are voluntarily turned over in order to direct the third party's servers.").

was necessary to use Incognito mode to prevent the exact same Data collection process.

- The millions of Google Account holders who turned Ads Personalization off, such that Google did not use the Data for advertising purposes.

- The millions of Chrome users who enable Chrome's cookie blockers to prevent tracking.

- The millions of Chrome users who use VPNs or other privacy tools that prevent their full IP addresses and similar information from being sent to Google (and other service providers).

- The millions of Chrome users who used Basic mode such that the Data Google received was associated at most with a cookie (if cookies were not blocked) and not their identities.[21]

- The millions of Chrome users who used Guest mode, such that the Data Google received was associated only with a cookie that was deleted immediately upon closing the session. *See* Mardini Decl. ¶¶ 15-16.

Thus, the "degree and setting of the intrusion," among other factors relevant to this element, varies significantly across the class and cannot be adjudicated for the class as a whole. *Cf. Pollack v. Foto Fantasy, Inc.*, 2010 WL 11595486, at *4 (C.D. Cal. July 15, 2010) (denying certification in part because the "highly offensive" element would require the Court "to ascertain each customer's actual activities and behavior…, evaluate the personal or intimate nature of this behavior, and consider each customer's individual expectation of privacy.... The jury would then have to consider similar factual issues to determine the amount of damages due to each putative class member").

Moreover, Plaintiffs Crespo, Henry, Johnson, and Wilson admit they continue to use Chrome—and not just for work—fully aware of the Data collection.[22] They cannot credibly contend that conduct to which they knowingly and voluntarily subjected themselves is "highly offensive."

### 4.   CIPA

Plaintiffs ignore essential elements of CIPA that involve individualized inquiries. *First*, Plaintiffs fail to show Google uniformly intercepted the "contents" of communications. CIPA § 631. Plaintiffs allege Google intercepted IP addresses, GET requests that reflect URLs (*i.e.*, referrer

---

[21] *See Facebook Tracking*, 956 F.3d at 603 ("Plaintiffs allege Facebook obtained a comprehensive browsing history ***of an individual***.") (emphasis added); *In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 831 (N.D. Cal. 2020) ("relevant factors [in assessing offensiveness of the privacy intrusion] include . . . the degree to which the recordings are anonymized"); *Moreno v. San Francisco Bay Area Rapid Transit Dist.*, 2017 WL 6387764, at *8 (N.D. Cal. Dec. 14, 2017) (sharing plaintiffs' "anonymous client id … and location" is not "highly offensive").

[22] *See, e.g.*, Ex. 18 (Crespo Tr.) 49:13-16, 51:21-23; Ex.20 (Henry Tr.) 22:7-17; Ex. 21 (Wilson Tr.) at 56:18-21; Ex. 22 (Johnson Tr.) 44:11-45:10, 131:20-134:13.

headers), cookies, and other information they claim could be used to identify them. FAC ¶¶ 141. The Ninth Circuit has held such information is not "content" for purposes of a wiretapping claim. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1102, 1107 (9th Cir. 2014).[23] In *Zynga*, the Ninth Circuit held that IP addresses and "referer header information … [that] included the user's Facebook ID and the address of the webpage from which the user's HTTP [] request was sent … does not meet the definition of 'contents' because these pieces of information are not the 'substance, purport or meaning' of a communication.[24] *Id.* at 1107.

Although Plaintiffs also allege that, "in many cases," Google intercepted "the contents of users' POST communications" FAC ¶141(c)—which theoretically could include search terms or messages—Plaintiffs do not and cannot show Google received such information classwide. Whether Google received POST requests containing "content" from class members requires individualized inquiries into whether: (1) the user visited a website that uses a Service that collects POST requests; (2) the user made a POST request (which is not automatic) on that site; and (3) the particular POST request contains information that qualifies as "content." *See* Zervas Rep. § IV; *see also Brodsky*, 445 F. Supp. 3d at 127; *McCoy v. Alphabet, Inc.*, 2021 WL 405816, at *14 (N.D. Cal. Feb. 2, 2021).

*Second*, Plaintiffs fail to show that, for the entire putative nationwide class, the alleged interceptions occurred while the communications were "in transit ... within this state." CIPA § 631. None of the Google servers that receive the Data at issue are in California. *See* Ex. 14. Whether the interception occurred "within this state" would require individualized inquiries, such as, at a minimum, whether the user was in California at the time of the alleged communication.

---

[23] In *Facebook Tracking*, the Ninth Circuit did not "opine whether the Plaintiffs adequately pleaded the other requisite elements of" their CIPA claim—such as whether the information Facebook allegedly intercepted was "content"—"as those issues are not presented on appeal." 956 F.3d at 608. Moreover, in analyzing the intrusion claim, the Ninth Circuit distinguished the ordinary URLs at issue in *Zynga*—and here—from the information at issue there: "Unlike the URLs in *Zynga*, which revealed only that a Facebook user had clicked on a link to a gaming website, Plaintiffs allege that the URLs in the instant case could emanate ***from search terms inputted*** into a third-party search engine." *Id.* at 605 (emphasis added). Such search term inquiries are not at issue, and would not apply classwide.

[24] *See also Zynga*, 750 F.3d at 1107 (rejecting argument that IP address and browsing history information are "content"); *Brodsky* v. *Apple Inc.*, 445 F. Supp. 3d 110, 127 (N.D. Cal 2020) ("name, address, and subscriber number or identity of a subscriber or customer," and "user names, passwords, and geographic location information are not contents").

### 5.    **Statutory Larceny and UCL**

Plaintiffs' larceny and UCL claims cannot be certified because there is no evidence of reliance on Google's alleged misrepresentations in the CPN. Plaintiffs' larceny claim is premised on Google's alleged "theft" of "property 'by false … representation or pretense.'" Mot. 17. That claim "requires [] that (1) the defendant made a false pretense or representation to the owner of property; (2) with the intent to defraud the owner of that property; and (3) the owner transferred the property to the defendant *in reliance on the representation*." *People v. Williams*, 57 Cal. 4th 776, 787 (2013) (emphasis added).[25] Plaintiffs' UCL claim is similarly based on Google's alleged "misrepresentations" in the CPN. FAC ¶¶ 414-15. "The California Supreme Court has interpreted [the UCL] to mean that named plaintiffs, but not absent ones, ***must show proof of 'actual reliance' at the certification stage***." *See Walker*, 953 F.3d at 630 (emphasis added).[26] This is true "under all three prongs of the UCL where such claims are premised on misrepresentations." *Backhaut*, 74 F. Supp. 3d at 1047-48.

There is no reliance here. Plaintiffs admit they did not review the CPN or rely on any other Google disclosures.[27] And Plaintiffs' experts opine that most Chrome users would not review these sources either.[28] These admissions foreclose Plaintiffs' ability to satisfy the typicality and

---

[25] The remaining elements of this claim fundamentally contradict the core theory of the complaint. The claim requires evidence of a "consensual transfer," *Williams*, 57 Cal. 4th at 788, while Plaintiffs allege Google collected the Data "without [their] consent," FAC ¶ 403; and the claim requires that Plaintiffs knowingly transferred "title" to the alleged "property" to Google. The Data is not "property" because it is not "capable of exclusive possession or control." *Kremen v. Cohen*, 337 F.3d 1024, 1030 (9th Cir. 2003).

[26] *See also Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1069-70 (9th Cir. 2014) (affirming denial of certification of UCL claim where the plaintiff "has not alleged that each individual was exposed to the same misrepresentations and deceptions"); *Pfizer Inc. v. Sup. Ct*., 182 Cal. App. 4th 622, 632, (2010) (rejecting "proposition that a consumer who was never exposed to an alleged false or misleading advertising or promotional campaign is entitled to restitution"); *Opperman v. Path, Inc.*, 84 F. Supp. 3d 962, 976 (N.D. Cal. 2015) ("a [UCL] plaintiff must allege that she actually saw or heard the defendant's advertising campaign").

[27] *See supra* note 5. The only Google statements that Plaintiffs claim "all Class members are exposed to" are those in the "First Run Experience" screens and the "Turn on Sync" button. Mot. 4-5. Screenshots are included in the Mardini Decl. § E. The screenshots neither contain misrepresentations nor suggest that *not* enabling Sync prevents all data transmissions to Google.

[28] Dkt. 340-17 (John Rep.) at 6-7; Dkt. 340-28 ¶ 28; Ex. 23 (Turow Tr.) at 303:4-11, 305:4-306:6; Ex. 24 (John Tr.) at 121:19-121:12, 122:3-6, 125:11-19, 126:13-17, 250:7-9, 258:13-15, 278:24-279:3.

1  predominance requirements for their Larceny[29] and UCL claims.[30]

2      **D.**    **Plaintiffs Fail to Proffer a Viable Classwide Damages Model**

3      Plaintiffs bear the burden to (1) proffer a damages model that "identifies the damages that are

4  the result of the wrong," (2) "establish that damages are susceptible of measurement across the entire

5  class," and (3) show that "[q]uestions of individual damage calculations" will not "overwhelm

6  questions common to the class." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34-7 (2013).[31] As explained

7  in Google's Motion to Strike Dr. Mangum's Opinions ("Mangum *Daubert*"), and in the Expert Report

8  of Bruce Strombom (attached as Ex. 4), Plaintiffs fail to meet this burden. Further, Plaintiffs' proffered

9  damages methodology would compensate millions of class members who are uninjured because they

10  either consented to, or were not subject to, the Data collection. This would run against Supreme Court

11  precedent requiring that "[e]very class member must have Article III standing in order to recover

12  individual damages." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021).

13      <u>Unjust Enrichment/Disgorgement</u>. These remedies are not available for any claim at issue. *See*

14  Mangum *Daubert* § IV.A. Certification cannot be justified under an inapplicable theory of recovery.

15  In all events, Dr. Mangum does not offer a reliable method to calculate such damages on a classwide

---

16  [29] Plaintiffs seek certification of a Rule 23(c)(4) issues class for their larceny claim, contending that
17  liability can be determined class wide while acknowledging that damages would have to be addressed
individually. Mot. 17. But, as shown above, liability also raises individualized issues—such as
18  whether class members expressly or impliedly consented, and whether class members relied on the
CPN statements on which Plaintiffs' larceny by false pretense claim is based.

19  [30] Plaintiffs incorrectly assert (Mot. 18) that "[i]ndividualized proof of deception, reliance, and injury
is not required" for a UCL claim. Although courts sometimes apply a presumption of reliance by
20  ***absent*** class members, the ***named plaintiffs*** must prove they "actually saw or heard Google's
advertising campaign." *Woods v. Google, Inc.*, 2017 WL 4310765, at *3 (N.D. Cal. Sept. 28, 2017).
21  Nor does the presumption apply where, as here, "many class members were never exposed to the
allegedly misleading statements" or where "class members were exposed to quite disparate
22  information." *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 595-96 (9th Cir. 2012) ("[C]ommon
questions of fact do not predominate where an individualized case must be made for each member
23  showing reliance."). "[T]he relevant class must be defined in such a way as to include only members
who were exposed to advertising that is alleged to be materially misleading." *Id.* at 596.

24  [31] *See also Buckeye Tree Lodge & Sequoia Vill. Inn, LLC v. Expedia, Inc.*, 2019 WL 1170489, at *5
25  (N.D. Cal. Mar. 13, 2019) (denying certification where "plaintiffs failed to proffer a model or a
legitimate theory for how those damages would be estimated, let alone disseminated among class
26  members") (citing *Comcast*); *Opperman*, 2016 WL 3844326, at *14-15 (declining to certify class
where "[n]o damages number arising from [expert's] model will apply to all class members); *Brazil*
27  *v. Dole Packaged Foods, LLC*, No. 2014 WL 5794873, at *14 (N.D. Cal. Nov. 6, 2014) ("damages
model fails to provide a means of showing damages on a class-wide basis through common proof").

28

basis. Using certain improper assumptions, *see* Strombom Rep. § IV.C, Dr. Mangum arrives at a "revenue premium" allegedly attributable to Google's Data collection across the entire class. Mangum Rep. ¶ 60. Dr. Mangum maintains a single unjust enrichment amount can then be calculated to compensate a given class member. Mangum Rep. ¶ 64. But Dr. Mangum's only proposed method is to compensate class members based on "Google [A]ccount months," which (1) fails to compensate the millions of non-Google Account holder class members, (2) would over or under compensate any given Google Account holder because Google's profits vary widely based on diverse user characteristics and tools they may have used to prohibit Google's collection or use of Data, and (3) would compensate uninjured class members (*e.g.*, those who consented). Mangum *Daubert* §§ IV.B, D; *see also* § II.G, *supra*. Dr. Mangum acknowledges the variability, but claims it can be addressed at the "claims administration" stage with questionnaires. Ex. 27 (Mangum Tr.) 82:1-9; 272:11-273:5; 307:14-23. It cannot. Merely "sending each class member a questionnaire, having them complete it, and having someone read and analyze it to determine the appropriate damage award for each class member" fails to show that classwide damages can "feasibly and efficiently be calculated." *Opperman*, 2016 WL 3844326, at *15.

<u>Restitution</u>.[32] Restitution is unavailable where, as here, Plaintiffs admit they paid no money to Google, the Data is not their property, and even if it were, it could not be reliably valued for all class members. *See* Mangum *Daubert* §§ IV.A, C. Plaintiffs contend (Mot. 22) that restitution "can be quantified through common accounting practices, including Google's own," but neither they nor their experts identify ***any*** such practice. Dr. Mangum concludes that a single monthly restitution amount (anywhere from $1.11 to $26) can apply to any given Google Account, but these amounts are untethered to any particular class member's experience and derived from data not comparable to the circumstances here. Strombom Rep. § IV.D; Mangum *Daubert* § IV.C. The opinion that a single

---

[32] To the extent that Plaintiffs seek "benefit of the bargain" damages, such damages are unavailable because Plaintiffs paid nothing to use the (free) Chrome browser. *Huynh v. Quora, Inc.*, 2019 WL 11502875, at *10 (N.D. Cal. Dec. 19, 2019) ("[T]he lost benefit of the bargain is not sufficient to allege damages because Plaintiffs have not shown that they paid anything for the asserted privacy protections"); *Svenson v. Google Inc.*, 65 F. Supp. 3d 717, 724 (N.D. Cal. 2014) (benefit of bargain theory of damages defective because defendant's services were free). *See* Mangum *Daubert* at 10-11.

restitution amount can apply also goes against the record because it ignores that the type and amount of Data Google allegedly received widely varies among users and that, as Plaintiffs' consumer expectations experts admit, users do not value their privacy equally. In *Opperman*, the court rejected this approach because "consumers do not have identical preferences, each class member will place a very different value on the protection of" the data. 2016 WL 3844326, at *14-15.

Statutory Damages Under CIPA. CIPA "statutory damages are not to be awarded mechanically." *Campbell*, 315 F.R.D. at 268. Rather, for each class member, an appropriate award must consider the number and severity of the violations, the extent of any intrusion into an individual's privacy, and whether there was actual damage. *Id.* Such inquiries must be individualized because class members used many different tools that affect the categories and amount of Data Google receives. *See* § II.G, *supra*. Whether any of the Data Google received from a class member is "content" under CIPA also varies. *See* § III.C.4, *supra*. Therefore, the number of alleged "violations" and the extent of the alleged intrusion into each user's privacy varies considerably from user to user. *See Campbell,* 315 F.R.D. at 268-69. Moreover, as in *Campbell*, here many class members, such as those who infrequently use Chrome, or who mainly use Chrome in Sync mode, have suffered little, if any harm, and thus a statutory damages award would be a disproportionate penalty. *See id.* Plaintiffs offer no method for assessing a CIPA award that would fairly compensate each class member for only the "violations" he/she experienced. *See* Strombom Rep. § V.

Nominal, General, and Punitive Damages. These types of damages are only available for Plaintiffs' intrusion upon seclusion claim. In any event, none of these damages could be fairly imposed on a group basis here, where Plaintiffs' class is so broadly-defined that it would sweep in millions of uninjured Chrome users—such as those who consented (*see supra* §II.C-E.) and those whose "personal information" was not received (*see supra* § II.G.). *See* Mangum *Daubert* § IV.B; *TransUnion*, 141 S. Ct. at 2200 (reversing class damages award where only some of the class members had standing); *Zakaria v. Gerber Prod. Co.*, 755 F. App'x 623, 625 (9th Cir. 2018) ("It is a well-settled rule that there can be no award of punitive damages without a finding of actual damages."); *Brazil*, 2014 WL 5794873, at *14 ("no authority to suggest that a damages class should remain

certified solely because nominal damages may be available").[33]

### E.    Plaintiffs Fail to Satisfy Rule 23(b)(3)'s Superiority Requirement

Rule 23(b)(3) requires that class treatment be a superior way to resolve the dispute. A court's considerations should include "the difficulties likely to be encountered in the management of a class action." Fed. R. Civ. P. 23(b)(3)(A)-(D). Manageability is "by [] far the most critical concern" in determining superiority. 2 Newberg on Class Actions § 4:72 (5th ed.) (citing cases).

A class action is not superior here because much of the class cannot be identified. *See* Fed. R. Civ. P. 23(b)(3); *see also Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1128 (9th Cir. 2017) (ascertainability of class members should be addressed as an issue of manageability).[34] Millions of Chrome users operate in the default "Basic" mode and are not signed into a Google Account (if they even have one) while browsing. The Data Google receives when these users visit the Services is associated at most with a pseudonymous ID set in a delete-able cookie.[35] Monsees Decl. §§ A-B. Google cannot identify them. *Id.*; Berntson Decl. ¶¶ 27-32; Zervas Rep. §§ III.A.4, III.B.2. Indeed, Google has no information that could be used to identify Chrome users who do not have Google Accounts—they have not provided Google their name, email address, or other contact information. And as for Google Account holders who used Chrome while signed out of their Accounts, Google designed its systems to ensure these users are ***not*** identified. Monsees Decl. §§ A-B. Plaintiffs' assertion that their expert Mr. Smith can identify them is false—Smith admitted his methods would

---

[33] Plaintiffs' request for an injunctive relief class should be denied as no more than an excuse to seek punitive money damages. Certification under Rule 23(b)(2) is inappropriate where the "primary intent in this litigation is to recover damages for past conduct." *In re Flash Memory Antitrust Litig.*, 2010 WL 2332081, at *7 (N.D. Cal. June 9, 2010); *Wal-Mart*, 564 U.S. at 360. The Court need look no further than the FAC to determine that it is injunctive relief, not monetary damages, which is "incidental" in this case. *See Herskowitz v. Apple, Inc.*, 301 F.R.D. 460, 481 (N.D. Cal. 2014) (Rule 23(b)(2) certification not appropriate unless monetary relief sought is incidental to injunctive relief). Nor does the Motion specify the injunctive relief Plaintiffs seek, and the complaint seeks relief that either does not redress the alleged harm or is too vague to enforce. *See* FAC § VIII.C.

[34] *See also Pierce v. Cnty. of Orange*, 526 F.3d 1190, 1200 (9th Cir. 2008) (no abuse of discretion in decertifying class; "Rule 23(b)(3) would not offer a superior method for fair and efficient adjudication in light of expected difficulties identifying class members"); *Roley*, 2020 WL 8675698, at *5 ("the class definition [must] be definite enough so that it is administratively feasible for the court to ascertain whether an individual is a member before trial, and by reference to objective criteria").

[35] Some services do not even associate the Data with cookies. *See, e.g.*, Crossland Decl. ¶ 10.

apply only to users signed-*in* to their browser. Ex. 25 (Smith Tr.) at 116:16-118:20. And Mr. Shafiq has conceded that his methodology for identifying class members is speculative and depends on "gather[ing] more knowledge" about Google "source code." *Id.* Ex. 26 (Shafiq Tr.) at 218:6-11. The Court has ruled that source code will not be produced in this case. Dkt. 377 at 2-3.

Self-reporting through claims forms or affidavits is no solution because Google has no system or information that could be used to confirm an individual's membership in the class and users have incentives to make false claims. *See In re Hulu Priv. Litig.*, 2014 WL 2758598, at *14-23 (N.D. Cal. June 17, 2014) (rejecting self-reporting in case alleging improper transmission of personal data to Facebook because claims turned on factors such as "whether the user remained logged into Facebook, cleared cookies, or used ad-blocking software," and asking users to confirm such details would be "prone to subjective memory problems" and damages of $2,500 per class member would "create incentives for claimants.").

A class action also is not superior because Plaintiffs do not proffer a method to excise uninjured class members—those who expressly or impliedly consented, and those who used privacy tools to prevent the harms alleged—from the broad putative class. *See TransUnion*, 141 S. Ct. at 2208.

**F.     Plaintiffs Fail to Provide a Workable Trial Plan—Because None Is Possible**

The premise of class treatment is that the claims and defenses are sufficiently fungible that named plaintiffs can stand as fair proxies for all class members—both in that absent class members' interests will not be impinged by vulnerabilities of the named plaintiffs, and that trial of the named plaintiffs' claims allows the defendant to assert and offer evidence supporting all defenses that apply to absent class members' claims. *Wal-Mart*, 564 U.S. at 350-51.

The Ninth Circuit has emphasized the import of a viable trial plan when assessing certification. *See Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001) (affirming denial of certification because "there was no manageable trial plan adequate to deal with individualized issues"); *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) (certification without a "showing by Plaintiffs of how the class trial could be conducted" is abuse of discretion).

A fair "trial by proxy" is impossible here given how trial of the named Plaintiffs' claims would

proceed if the Court denies summary judgment. A jury could conclude the Plaintiffs' claims fail because they selected "I AGREE" on the Account Holder Agreements, or because they did not read the CPN on which their claims are based. Many absent class members are not subject to those same vulnerabilities—*e.g.*, Chrome users who were ***not*** shown the Account Holder Agreements, or who ***did*** review the CPN. In addition, millions of absent class members have Google Accounts, and millions do not. For those that do, if they consented, the Data was associated with their Accounts—where they could review it and see that using Chrome without Sync does not prevent the challenged Data collection. For those that did not consent, or do not have Accounts, the Data was associated at most with a pseudonymous ID set in a delete-able cookie (not their identities), and Google took steps to ensure the Data was not linked to their identities. Further, many Google Account holders turned Ads Personalization off and thus do not have a claim for the allegedly "unjust profits" Plaintiffs seek. And as Plaintiffs' experts concede, many Chrome users used third-party cookie blockers that prevent cross-site tracking, VPNs that conceal IP addresses, and other privacy tools that prevent the Data collection. These various groups are differently situated from each other, and subject to different arguments and defenses, depending on the claim.

Plaintiffs neither offer a trial plan that grapples with these issues nor explain how a class verdict could be rendered that satisfies due process to absent class members and to Google. *See, e.g.*, *Badella v. Deniro Mkt'g LLC*, 2011 WL 5358400, at *13 (N.D. Cal. Nov. 4, 2011) (denying class certification in part because of "Plaintiff's lack of any suggestions, much less a plan, as to how the Court should manage this large proposed nationwide class action"); *Marlo v. United Parcel Serv., Inc.*, 251 F.R.D. 476, 487 (C.D. Cal. 2008) (decertifying a class and finding that a party has a "responsibilit[y] to articulate a clear trial plan when requested"); *In re Paxil Litig.*, 212 F.R.D. 539, 544 (C.D. Cal. 2003) (plaintiffs "failed to demonstrate that a manageable trial plan exist[ed] that would make a class action lawsuit feasible"). In short, the putative class is simply too broad, too diverse, and comprised of members with too many conflicting interests, to be certified.

## IV.    **CONCLUSION**

Class certification should be denied.

DATED:  December 22, 2021

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP


By     /s/ Andrew H. Schapiro

Andrew H. Schapiro (admitted *pro hac vice*)
andrewschapiro@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Telephone: (312) 705-7400
Facsimile: (312) 705-7401

Stephen A. Broome (CA Bar No. 314605)
stephenbroome@quinnemanuel.com
Viola Trebicka (CA Bar No. 269526)
violatrebicka@quinnemanuel.com
Alyssa G. Olson (CA Bar No. 305705)
alyolson@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Jomaire A. Crawford (admitted pro hac vice)
jomairecrawford@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Josef Ansorge (admitted pro hac vice)
josefansorge@quinnemanuel.com
1300 I. Street, N.W., Suite 900
Washington, D.C. 20005
Telephone: 202-538-8000
Facsimile: 202-538-8100

Jonathan Tse (CA Bar No. 305468)
jonathantse@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Sara Jenkins (CA Bar No. 230097)
sarajenkins@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

*Attorneys for Defendant Google LLC*

GOOGLE'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION