**BLEICHMAR FONTI & AULD LLP**
Lesley Weaver (Cal. Bar No.191305)
Angelica M. Ornelas (Cal. Bar No. 285929)
Joshua D. Samra (Cal. Bar No. 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
*lweaver@bfalaw.com*
*aornelas@bfalaw.com*
*jsamra@bfalaw.com*

**SIMMONS HANLY CONROY LLC**
Jason 'Jay' Barnes (admitted *pro hac vice*)
An Truong (admitted *pro hac vice*)
Eric Johnson (admitted *pro hac vice*)
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
Fax: (212) 213-5949
*jaybarnes@simmonsfirm.com*
*atruong@simmonsfirm.com*
*ejohnson@simmonsfirm.com*

*Counsel for Plaintiffs*

**DiCELLO LEVITT GUTZLER LLC**
David A. Straite (admitted *pro hac vice*)
One Grand Central Place
69 East 42nd Street, Suite 2400
New York, NY 10165
Tel.: (646) 933-1000
*dstraite@dicellolevitt.com*

Amy Keller (admitted *pro hac vice*)
Adam Prom (admitted *pro hac vice*)
Sharon Cruz (admitted *pro hac vice*)
Ten North Dearborn Street, Sixth Floor
Chicago, IL 60602
Tel.: (312) 214-7900
*akeller@dicellolevitt.com*
*aprom@dicellolevitt.com*
*scruz@dicellolevitt.com*

### IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

| | |
|---|---|
| PATRICK CALHOUN, ET AL., *on behalf of themselves and all others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>GOOGLE, LLC,<br><br>Defendant. | CASE NO.: 5:20-cv-05146-LHK-SVK<br><br>**PLAINTIFFS' OPPOSITION TO GOOGLE'S MOTION FOR SUMMARY JUDGMENT ON GOOGLE'S FIRST AFFIRMATIVE DEFENSE (CONSENT); OBJECTIONS PER CIVIL L.R. 7-3(a)**<br><br>Hearing Date: Mar. 10, 2022<br>Time: 1:30PM<br>Courtroom: 8, 4th Floor<br><br>Hon. Lucy H. Koh |

**PUBLIC REDACTED VERSION OF DOCUMENT**

1

## TABLE OF CONTENTS

2   I.     Introduction and Summary of Argument ...............................................................1

3   II.    Plaintiffs' Counter Statment of Issues to be Decided Pursuant

4        to Civil L.R. 7-4(a)(3) ....................................................................................5

5   III.   Factual Background...........................................................................................5

6      A.  Google Ignores Its Own Express Promises .......................................5

7      B.  Googles's Data Collection and Use of it Violates Its Promises and

8           Grossly Exceeds Its Disclosures to Users ......................................9

9         1.  Chrome Requires Users to Provide PI, Which Chrome
              Then Sends to Google ...............................................9

10        2.  Chrome Sends Users' PI to Google Regardless of Sync Status.............9

11        3.  Chrome Sends More Personal Information to Google

12            Than Other Browsers ...............................................10

13        4.  Google Syncs Chrome Data Regardless of Sync Status .......................10

14        5.  Google Does Not Anonymize Not-Synced Chrome Data ...................11

15        6.  Google Creates ███████████████████

16            ██████████████████ ...............................................11

17        7.  Google ████████████████████

18            ██████ ...............................................12

19     C.  Google Internally Admits Its "Consent" Process is Broken........................12

20        1.  Google Internally Admits that ████████████

21            ███████████████ ...............................................12

22

23        2.  Google Admits That ███████████████
              ██████ ...............................................13

24        3.  Google Internally Admits ██████████████

25            ██████ ...............................................14

26        4.  Google Internally Admits ██████████████

27            ███████ ...............................................15

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IV.    Legal Argument – Google has Failed to Affirmatively Demonstrate
       that is Obtained Consent for Its Conduct ........................................................17

A.     Standard for Summary Judgment ....................................................................17

B.     The Law of Consent and Contract ...................................................................17

C.     The Evidence Overwhelming Shows that █████████████
       █████████████████████ █████ .........................................19

D.     Google is Bound by the Tems of Its Contract with Plaintiffs,
       Regardless of Whether Named Plaintiffs Read the Contract .........................20

E.     Google's Tortured Reading of "Chrome Browsing History"
       is Irrelevant and Misplaced .............................................................................21

F.     Google's ████████████ Negate any Purposed Consent...................22

V.     Plaintiffs' Objections Pursuant to Civil Local Rule 7-3(a) ............................23

VI.    Conclusion.........................................................................................................25

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4

*In re Facebook, Inc. Cons. Privacy User Profile Litig.*,
   402 F.Supp.3d 767 (N.D. Cal. 2019) ........................................................................20

5

*In re Facebook, Inc. Internet Tracking Litig.*,
   956 F.3d 589 (9th Cir. 2020) ............................................................5, 10, 18, 21

6

7

*Fresno Motors v. Mercedes Benz USA*,
   771 F.3d 1119 (9th Cir. 2014) .........................................................................17

8

*Gallagher v. San Diego Unified Port Dist.*,
   14 F. Supp. 3d 1380 (S.D. Cal. 2014),

9

   *aff'd* 668 Fed. Appx. 786 (9th Cir. 2016) ..................................................................1

10

*Garcia v. Enterprise Holdings, Inc.*,
   78 F.Supp.3d 1125 (N.D. Cal. 2015) ....................................................................20

11

12

*Hayter Trucking Inc. v. Shell Western E & P, Inc.*,
   18 Cal. App. 4th 1 (1993) ...............................................................................22

13

*Hexcel Corp. v. Ineos Polymers, Inc.*,
   681 F.3d 1055 (9th Cir. 2012) ..........................................................................23

14

15

*Hill v. NCAA*,
   26 Cal.Rptr.2d 834 (1994) ..............................................................................23

16

17

*Int'l Brotherhood of Teamsters v. NASA Services, Inc.*,
   957 F.3d 1038 (9th Cir. 2020) ..........................................................................18

18

19

*Int'l Union of Bricklayers & Allied Craftsman Local Union No. 20, AFL-CIO v.*
   *Martin Jaska, Inc.*,

20

   752 F.2d 1401 (9th Cir. 1985) ..........................................................................17

21

*Javier v. Assurance IQ, LLC*,
   2021 WL 940319 (N.D. Cal. Mar. 9, 2021)...............................................................20

22

23

*Johnson v. Jones*,
   344 P.3d 89 (Ore. Ct. App. 2015) .......................................................................23

24

*Lane v. Landmark Theatre Corp.*,
   2020 WL 1976420 (N.D. Cal. Apr. 24, 2020) .............................................................17

25

26

*Lightbourne v. Printroom, Inc.*,
   122 F.Supp.3d 942 (C.D. Cal. 2015) .....................................................................20

27

28

*Maghen v. Quicken Loans Inc.*,
   680 F.App'x 554 (9th Cir. 2017) (unpublished) ........................................................................20

*Nevarez v. Forty-Niners Football Co., LLC*,
   2017 WL 3492110 (Aug. 15, 2017) (Koh, J.).......................................................................20

*Norman-Bloodsaw v. Lawrence Berkeley Lab.*,
   135 F.3d 1260 (9th Cir. 1998) ..........................................................................................18

*Penthouse Intern., Ltd. v. Barnes*,
   792 F.2d 943 (9th Cir. 1986) ............................................................................................18

*Perkins v. LinkedIn Corp.*,
   53 F.Supp.3d 1190 (N.D. Cal. 2014) ................................................................................20

*In re Pharmatrak*,
   329 F.3d 9 (1st Cir. 2003) .................................................................................................21

*Register.com, Inc. v. Verio, Inc.*,
   356 F.3d 393 (2d Cir. 2004).............................................................................................18

*Riley v. California*,
   573 U.S. 373 (2014)....................................................................................................5, 21

*Sanchez-Scott v. Alza Pharms.*,
   86 Cal. App. 4th 365 (2001) ............................................................................................23

*Silver v. Stripe, Inc.*,
   2021 WL 3191752 (N.D. Cal. Jul. 28, 2021).............................................................18, 19

*Smith v. Facebook*,
   745 F.App'x 8 (9th Cir. 2018) (unpublished) ...................................................................19

*Theofel v. Farey-Jones*,
   359 F.3d 1066 (9th Cir. 2004) ....................................................................................22, 23

*Tsao v. Desert Palace, Inc.*,
   698 F.3d 1128 (9th Cir. 2012) ..........................................................................................17

*Upton v. Tribilcock*,
   91 U.S. 45 (1875).......................................................................................................5, 20

*Weil v. Citizens Tel. Servs. Co, LLC*,
   922 F.3d 993 (9th Cir. 2019) ............................................................................................17

*In Re: Zoom Video Communications Inc. Privacy Litig.*,
   525 F. Supp. 3d 1017 (N.D. Cal. 2021) (Koh, J) .......................................................3, 23, 25

**Statutes**

Cal. Civ. Code § 1654 ........................................................................................................18

**Other Authorities**

Fed. R. Civ. P. 56(a) ...........................................................................................................17

Fed. R. Civ. P. 56(c)(4) .......................................................................................................23

Restatement (Second) of Contracts § 206 ...........................................................................18

Restatement (Second) of Torts § 852A(3), cmt. 3 ..............................................................22

# I.      INTRODUCTION AND SUMMARY OF ARGUMENT

Google's Motion for Summary Judgment (the "Motion," Dkt. 395) has no basis in law or fact and should be denied. The Motion takes a second run at an argument the Court has already rejected: that Plaintiffs consented to Chrome sending their personal information ("PI") to Google even though the Chrome Privacy Notice ("Chrome PN") and other Google documents expressly promise the opposite.   Specifically, Google argues that its general Privacy Policy ("PP") (and ephemeral documents relating to it) eliminated express contractual promises made to Chrome users. This Court did not agree, establishing the law of the case on this point:

> [N]either Google's Privacy Policy nor any other disclosure to which Google points states that Google engages in the alleged data collection while users are using Chrome without sync. … To the contrary, Google's disclosures state that the data will not be sent to Google when users use Chrome without sync.
>
> Specifically, the Chrome Privacy Notice states: "*The personal information that Chrome stores won't be sent to Google unless you choose to store that data in your Google account by turning on sync.*" … The Chrome Privacy Notice also states, "*You don't need to provide any personal information to use Chrome*[.]

Dkt. 142, MTD Order at 18-19 (internal citations omitted) (emphasis in original, citing those two promises 19 times). Under the "law of the case" doctrine, a court is generally precluded from reconsidering an issue already decided by the same court in the same case. *Gallagher v. San Diego Unified Port Dist.,* 14 F. Supp. 3d 1380 (S.D. Cal. 2014), *aff'd* 668 Fed. Appx. 786 (9th Cir. 2016).

Even if the Court had not already ruled against Google, the Motion still must fail. Google now concedes that Chrome sends user PI to Google regardless of whether users have enabled Sync on their Chrome browser, and even after users have disabled it.[1] Faced with this admission, Google now points to ephemeral documents that do not contradict the promises at issue; expressly incorporate the Chrome PN; and which Google internally admits are ████████████ and ██████████████ Putting aside, momentarily, the myriad questions of fact and significant evidentiary issues with Google's Motion (discussed below), Google's argument fails for simple reasons consistent with this Court's earlier ruling: (1) the new ephemeral documents do not disclose the conduct at issue and do not address

---

[1] The Motion admits (1) a Chrome user's action to "turn[] Sync off (or never enable it in the first place) does not prevent [Google] from receiving the data to Google." Mot. at 4-5.

the express promises at issue; (2) the extent and scope of Google's actual collection and use ███; ███████████████████████████████████████████████████████ ; and (3) Google internally admits that ██████████████████████████████████████████████ .

To determine whether Google obtained "actual" consent, the Court must view the disclosures in context with the governing contracts. But the Motion omits the Google Terms of Service ("TOS"), Chrome PN, and any discussion of the Court's prior discussion of them. For example, Google claims that some Plaintiffs' "Web & App Activity" ("WAA") settings establish consent – but the disclosures governing WAA expressly represent that ***Chrome browsing history won't be saved unless the user enables Sync*** – just as the Chrome PN does. The nation's leading expert on privacy policies (Prof. Joseph Turow at the University of Pennsylvania) testified in that this WAA sync "carve out" means the WAA disclosures support *Plaintiffs*, not Google (see Dkt. 430-4, Ex. 23 (sealed)) which alone creates a question of fact precluding the Motion. Similarly, the New Account Creation flow, referred to within Google as ████████████," ██████ also incorporates the TOS and PP in its first two sentences - but both documents expressly state that the Chrome PN governs in the event of conflict.

Internally, Google admits ██████████████████████████████ . The "owner" of the Google PP told colleagues Google needed to ██████████████████ and, speaking directly about the ephemeral "consents" at issue here, admitted (internally at least) that Google's ████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████ Barnes Decl. Ex. 61.[2] In short, he admitted Google's consent model ██ ██████████ Barnes Decl. Ex. 24. Another Googler admitted Chrome's sync disclosure ██████████████████████████████████████████████ ██████████ Barnes Decl. Ex. 21 at -335. Yet another group of Chrome employees admitted that ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████ Barnes Decl. Ex. 55 at -807.

---

[2] For Exhibits, see Declaration of Jay Barnes dated January 10, 2022 (the "Barnes Declaration").

1  ██████████████████████████████████████████.” *Id*.; *see also* Barnes Decl. Ex. 15

2  ████████████████████████████████████████████████████████.

3  Discovery has revealed that the extent and scope of Google's actual collection practices

4  ███████████████████████████████████████████.[3] As one Google engineer

5  candidly admitted, users would ██████████████████████████████████ after

6  signing out. Barnes Decl. Ex. 52 at 265-66. Google's head of Chrome Trust & Safety admitted last

7  month under oath ██████████████████████████, (Barnes Decl. Ex. 1

8  at 47:22-53:4; 54:2-8) – so how can average Americans be deemed to consent as a matter of law?

9  Google's internal admissions are also consistent with the testimony of the Named Plaintiffs.[4]

10  Additionally, although Google's motion ignores its actual practices, this Court cannot because

11  there is no consent without full and truthful disclosure of the data use. In considering the motion, the

12  Court should directly compare Chrome's promises versus its actual practices. The following chart

13  briefly summarizes key issues that Google's motion ignores:

| What Google Says Publicly | What Google Does Internally | |
|---|---|---|
| "You don't need to provide any personal information to use Chrome." Chrome PN, FAC Ex.33 at 1. | ███████████████████████████████ Google CEO Sundar Pichai.   Barnes Decl. Ex. 16 at 438). | |

---

[3] Google's Motion rests almost all its factual assertions on the declaration of Greg Fair. Dkt. 395-1. Because Mr. Fair lacks personal knowledge of the facts he asserts and the documents he attaches, and because the documents he attaches do not accurately represent the disclosures on any device, but rather are PDF excerpts of selected electronic disclosures over time, *see* Barnes Decl. Ex. 2, Mr. Fair's declaration must be stricken in its entirety. *In Re: Zoom Video Communications Inc. Privacy Litig.*, 525 F. Supp. 3d 1017, 1042 (N.D. Cal. 2021) (Koh, J); *see also* Section V (Objections), *infra*.

[4] *See, e.g.* Barnes Decl. Ex. 9 ("Calhoun Dep.") 21:2-4 ("I assumed and understood [Sync] to mean that my information would not be sent to anyone unless I pressed that button"); Ex. 13 ("Crespo Dep.") 55:17-19 ("if I'm not syncing, I expect that information to not be collected and shared"); Ex. 65 ("Henry Dep.") 30:18-24 (understood that "if you used Chrome without enabling sync, then Chrome would not send any data to Google"); Ex. 12 ("Johnson Dep.") 60:8-22 (did not activate Sync which he understood would cause Chrome to share some or all information with Google); Ex. 10 ("Kindler Dep.") 27:17-20 (understood that enabling Sync would "join or link Chrome and Google" and she did not want that happen); Ex. 11 ("Wilson Dep.") 102:19-22 ("if I do not turn [Sync] on, my information would not be stored or shred").

| What Google Says Publicly | What Google Does Internally |
|---|---|
| "The personal information that Chrome stores [including browsing history information and cookies] won't be sent to Google unless you choose to store that data in your Google Account by turning on Sync[.]" Chrome PN, FAC Ex. 33 at 2. | ██████████████████████████████████ |
| "Chrome … does not cause Google to receive any additional personally identifying information about you." Chrome PN, FAC Ex. 33 at 2. | The X-client data header, ███████████ ██████████ Barnes Decl., Ex. 18. |
| "Sync is only enabled if you choose." Chrome PN, FAC Ex. 33 at 7. | Google maintains a backend system ████████████████████████████████████ ██████████████████. Barnes Decl., Ex. 20 (emphasis added). |
| If a user does not enable Sync and WAA, "Google will only use your Chrome data after its anonymized and aggregated with data from other sources." Chrome PN, FAC Ex. 33 at 7. | █████████████████████████████████ ██████████████████████████." Barnes Decl., Ex. 38 at -031 and 39-40. |
| "Your Chrome browsing history is only saved to your account if you've enabled Chrome synchronization with your Google Account." Chrome PN, FAC Ex. 33 at 7. | █████████ Barnes Decl., Ex. 21 at 335. ████████████████████████████████████ |
| "For Chrome history to be sent to Google, both WAA and Sync must be enabled." Fair Decl. ¶ 42.[5] | Google ██████████████████████████. Barnes Decl., Ex. 57 (emphasis added). |
| "Google does not sell your personal information to anyone." Fair. Decl., Ex. 3 at GOOG-CABR-04067836. | Google internally admits ████████████ ████████████████████████████████████ ███████ Barnes Decl., Ex. 57. |
| Google does not disclose whether it creates sensitive user profiles in any Chrome disclosures; in this case, Google denied they exist. Barnes Decl., Ex. 14 ("We don't really have user profiles"). | ████████████████████████████████████ ███████████████████ Barnes Decl., Ex. 44. |

---

[5] "Fair Declaration" refers to the Declaration of former Google employee Greg Fair dated Nov. 29, 2021 filed by Google in support of the Motion and found at Dkt No. 393-4.

Finally, Google's Motion suffers from two legal errors that, if adopted by this Court, would run afoul of decades of precedent on Internet privacy law and a century of contract law. Google argues it should prevail on consent with respect to the privacy torts because the Named Plaintiffs did not read the Chrome PN.[6] But it is the law of this Circuit that Internet users have a reasonable expectation of privacy in their web browsing <u>as a matter of law</u>, not because they read a TOS. *In re Facebook, Inc. Internet Tracking Litig*., 956 F.3d 589 (9th Cir. 2020); *accord*, *Riley v. California,* 573 U.S. 373 (2014) (Fourth Amendment context). Google also argues that it cannot be held to its contract unless and until the Named Plaintiffs can prove they read and relied on it. Google's position has never been the law of any State. As the Supreme Court put it nearly 150 years ago, "If this were permitted, contracts would not be worth the paper on which they are written. But such is not the law. A contractor must stand by the words of his contract[.]" *Upton v. Tribilcock*, 91 U.S. 45, 50 (1875). This is particularly true here, where Google is the unilateral and sole author of the contract that it forces upon users, including and especially the "consent bump," ██████ and updates of their ilk.

Google's early motion is unsound in fact and law, and this Court should deny it in entirety.

## II.   PLAINTIFFS' COUNTER-STATEMENT OF ISSUES TO BE DECIDED PURSUANT TO CIVIL L.R. 7-4(a)(3)

1.      Whether Google has met its burden to establish no genuine issue of material fact regarding Plaintiffs' consent to Chrome's data disclosures and Google's subsequent use of that data.

2.      Whether, as a matter of law, the express promises in the Chrome PN are overridden by ephemeral documents that Google admits are contradictory and insufficient to establish actual consent.

## III.   FACTUAL BACKGROUND

### A.      GOOGLE IGNORES ITS OWN EXPRESS PROMISES

The law requires the Court to consider the totality of a defendant's promises to the plaintiff.

---

[6] As noted by Plaintiffs' privacy experts in support of Plaintiffs' Motion for Class Certification (Prof. Turow at Penn, and Prof. John at Harvard), this is typical of the average user and well documented in privacy literature. *See, generally,* Barnes Decl. Ex. 63 ("John Decl."); Barnes Decl. Ex. 66 ("Turow Rpt."). Indeed, the argument has been made that Google designs its policies so as to discourage users from reading them.  *See, e.g.* Dkt. 430-1 at Ex. 24 ("John Dep.") at 188:23-189:5 (noting that Google's sign-in and "consent" procedures are "overwhelmingly [] designed to get people to 'consent'…without actually knowing what they're consenting to").

Because Google's motion omits relevant promises and omissions, Plaintiffs provide them here:

        1.      The **Google TOS** provides (1) California law applies; (2) "service-specific additional terms" for a specific product (e.g. the Chrome PN) govern over general terms; and (3) any changes to the TOS are only effective if posted to the Terms.  Barnes Decl. Ex. 32.

        2.      The **Chrome Privacy Notice** makes at least five relevant express promises:

(1) "You don't need to provide any personal information to use Chrome";

(2) "The personal information that Chrome stores won't be sent to Google unless you choose to store that data in your Google Account by turning on Sync";

(3) "In general, the fact that you use Chrome to access Google services, such as Gmail, does not cause Google to receive any additional personally identifying information about you";

(4) "Sync is only enabled if you choose"; and,

(5) Under the heading, "How Chrome handles your synced information," Chrome promises that if a user does not enable Sync and WAA, "Google will only use your Chrome data after its anonymized and aggregated with data from other users."

Barnes Decl. Ex. 33.  Google's motion ignores these promises.

        3.      The **Google PP** makes three promises to reinforce the Chrome PN. First, Chrome users are assured that the Chrome browsing history "activity information" that Google collects is limited to "Chrome browsing history you've synced with your Google Account." Barnes Decl. Ex. 34. Second, "synced with your Google Account" is hyperlinked and, when a user clicks on it, Google promises, "Your Chrome browsing history is only saved to your account if you've enabled Chrome synchronization with your Google Account." *Id.* Third,, the PP expressly incorporates and refers users to the Chrome PN for "additional information about" privacy when using Chrome specifically.[7] *Id.*

        4.      The uniform **Chrome User Interface** ("Chrome UI") also makes express and

---

[7] Google's Motion ignores promises (2) and (4). With respect to promise (3), based on Google's arguments, one would expect the so-called "My Activity" page to show users all of their "activity on third-party sites and apps that use Google's" purported services. But that is not what happens. My Activity does not show users any data created when they are on third-party sites and apps that use Google's services, *e.g.*, a website that utilizes Google source code for purposes of advertising. Nor does it show profiles or identify which websites are tracking users through Google code. Rather, the My Activity view for consumers is limited to user's activity directly on Google owned-and-operated websites (such as Google.com, YouTube, and Gmail) and links that the users click from those sites. It is thus a completely misleading picture of Google's surveillance.

implied privacy promises. The Chrome "First Run Experience" ("FRE") gives users the option to sign-in the first-time they use the browser. This option asks users if they want to "Turn on Sync?" Barnes Decl. Ex. 35. Directly under this language, the Chrome UI states that, by turning on Sync, Google will sync their data across devices and that "Google may use your history to personalize Search and other Google services." *Id.* The UI gives users the option to click "Yes, I'm in" for personalization via Sync. Barnes Decl. Ex. *Id.* After the FRE, Chrome exposes a Sync toggle on the top right of the browser to all users. When a Chrome user is not synced, Chrome presents an option to "Turn on Sync" in a large blue button. Shafiq Rpt., Dkt. 340-19. When a user clicks the button, Chrome presents the same process as the FRE, including same statement that Sync controls whether Google can "use your history to personalize Search and other Google services." *Id.* All users are exposed to this UI.[8]

   5.   The **New Account Creation** (████████) agreement, alternatively referred to as ████████ cited in the Motion expressly incorporates the TOS, PP, and through those documents, the Chrome PN, in its first two sentences. Fair Decl., Ex. 3. The first sentence states, "By choosing 'I agree' below you agree to Google's Terms of Service." *Id.* The second sentence states, "You also agree to our Privacy Policy." *Id.* As explained above, both the TOS and PP expressly incorporate the Chrome PN and the promises set forth above. There is no language in ████, Terms, or PP to support Google's assertion that ████ overrides the express terms of the Chrome PN for Google Accountholders while they are using Chrome. To the contrary, Google expressly promises that the Chrome PN governs use of Chrome in both the TOS and PP. Further, with ████, WAA is hidden from view. *See* Barnes Decl. Ex. 55 at -806 ("default on, behind a few clicks").

   6.   The **"Bump"** is an ephemeral document that Google pressed upon Account holders in the middle of another task and which expressly promises that (1) "Google does not sell your personal information to anyone;" and (2) "[y]ou control the types of information we collect and

---

[8] Plaintiff Calhoun explained that the uniform exposure of the Sync button has an impact, "Typically, when you see the word sync, it means that if you press it, then things would be brought to meet, sent over, transferred, brought to the same page. So if that button is there, then I would press it if I wanted that. I did not want that, so therefore I did not press it." Calhoun Dep. 24:12-17. All Named Plaintiffs testified to similar beliefs about the uniformly exposed Sync button. *See* Kindler Dep. 32:15-33:2; Crespo Dep. 72:14-23, 119:7-8, 142:5-9; Henry Dep. 24:11-26:20, 149:24-150:2; Wilson Dep. 72:22-73:2, 76:2-17, 102:12-22; Johnson Dep. 60:1-64:25.

use[.]"[9] However, as explained below, neither of these are true. The omissions in these documents are also significant. First, the Bump does not even give users the option to say NO. Second, the Bump does not state that it overrides express promises made to Chrome users when they are using Chrome. Third, the Bump did not even garner consent for non-Chrome users because it does not state that it automatically results in Google collecting more information. Instead, it begins with the statement that Google has "introduced some optional features." It then states that "[m]ore information will be available in your Google Account, making it easier for you to review and control" and explains that, with the change, "[y]ou can find and control… Search and YouTube … data – things like what you've searched for and videos you've watched" in My Account. In a separate paragraph, it then states that the setting "*may* also include browsing data from Chrome and activity from sites and apps that partner with Google[.]" (Emphasis added). Thus, the language of the Bump does not disclose that "browsing data from Chrome and activity from sites and apps that partner with Google" is automatically turned on. In contrast to the immediately preceding sentence and the Bump's opening sentence that Google is providing "optional features," it suggests that something else would have to happen for those to be included. In fact, the Bump is currently the subject of litigation in which the Australian equivalent of the FTC alleges that the Bump was not sufficient for Google to gain consent to "collect and combine … Account Holders' internet activity" in any context, let alone the not-synced Chrome users here to whom Google makes express promises to the contrary. Barnes Decl., Ex. 75. Fourth, and related, for Chrome users, Google concedes that it promises users that "for Chrome history to be included in a user's Web and App Activity, two options must be on: (i) the Web and App activity option *and* (ii) Chrome Sync." Fair Decl. ¶¶ 41-42. Fifth, by separating "browsing data from Chrome" and "activity from sites and apps," Google impliedly promises that "browsing data from Chrome" is treated differently than the other category. Finally, Google internal studies demonstrate that users exposed to WAA do not even know "what type of data Web and App Activity actually mean[s]." Barnes Decl. Ex. 67 at -138.

---

[9] To Plaintiffs' knowledge, the "Bump" is not available anywhere online for users to review and none of the Plaintiffs here recalled having seen or "agreed" to it.

**B.     GOOGLE'S DATA COLLECTION AND USE OF IT VIOLATES ITS PROMISES AND GROSSLY EXCEEDS ITS DISCLOSURES TO USERS**

For consent to be valid, Google's practices must be fully and clearly disclosed. To rule in Google's favor, the Court must compare Google's disclosures to its actual practices. The undisputed record here shows that Google's practices violate its promises to users and ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮, including by engaging in practices Google does not disclose at all and has actively denied in public forums, including before this Court.

**1.     Chrome Requires Users to Provide PI, Which Chrome Then Sends to Google**

Chrome promises that "you don't need to provide any personal information to use Chrome," but Google CEO Sundar Pichai internally remarked that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Barnes Decl. Ex. 16 at -438. In fact, Chrome automatically creates, accesses, and uses the following pieces of personal information for every Chrome user and sends it to Google: IP address, X-client data header, User-Agent, cookies, and browsing history information, including the content of Internet communications. Barnes Decl. Ex. 4 at 234:15-261:14. The Court already found that these data points are personal information as a matter of law. *See* Dkt. 142 at 15-16. Alone, and in combination, they are also personally identifi-*able* as a matter of fact. *See* Barnes Decl. Ex. 25 at ¶¶ 18-30; Barnes Decl. Ex. 70. Even Google admits as much. *See* Barnes Decl. Ex. 26; Barnes Decl. Ex. 27 at -049.

**2.     Chrome Sends Users' PI to Google Regardless of Sync Status**

Chrome transmits users' PI to Google anytime a user (1) types into the Chrome toolbar; or (2) exchanges a communication with a website where Google source code is present. Barnes Decl. Ex. 25 at ¶¶ 14, 18-20; Barnes Decl. Ex. 17 at ¶¶ 12, 90-109; Barnes Decl. Ex. 28 at Nos. 1, 4. Google's Motion concedes these transmissions occur regardless of Sync status. Mot. at 3:16-17; 4:5. Google then connects the PI to specific users – and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Barnes Decl. Ex. 28 at Nos. 28-29; *see* Barnes Decl. Ex. 29 ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Barnes Decl. Ex. 30 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ While discovery of all data associated with the Plaintiffs and held at Google is still ongoing, ▮▮▮▮▮▮▮▮▮

1    ██████████████. *See, e.g.* ██████████████████████, Barnes Decl. Ex. 31.[10]

2            **3.    Chrome Sends More Personal Information to Google Than Other Browsers**

3    Curiously, Google attempts to bootstrap additional facts into its Motion by claiming that other

4    browsers do what Chrome does, as if this were relevant to user consent here. The claim is also, as it

5    turns out, false. Chrome sends significantly more personal information to Google than other browsers.

6    First, Chrome creates and routinely transmits the X-client data identifier to Google that Googlers have

7    internally described as ████████████████████████████████████████

8    ████████████████████████ Barnes Decl. Exs. 18, 36, 37. Further, the X-Client Data

9    Header's inventor admitted ████████████████████████████████████████

10   ████████████████ Barnes Decl. Ex. 4 at 258:20-259:16. Second, even in the absence of the

11   X-Client, Chrome sends more personal information to Google than other browsers. Google internally

12   admits that ████████████████████████████████████████████████

13   ████████████████████████████. *See* Barnes Decl. Ex. 19 at -719; Barnes Decl. Ex.

14   71 ████████████████████); *accord,* Barnes Decl. Ex. 72, 73; Barnes Decl. Ex. 5 at 210:3-

15   211-8. Chrome provides Google more identifiers than any other browser.

16           **4.    Google Syncs Chrome Data Regardless of Sync Status**

17   Google ████████████████████████████████████████████████. For

18   example, Google admits that a platform called ████████████████████████████

19   ████████████████████████ Barnes Decl. Ex. 20 (emphasis added). This occurs by default

20   regardless of whether a user enabled Sync. Google also sends ████████████████████████

21   ████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████[.]" Barnes

23   Decl. Ex. 38 at 39-40. Through the ████████████████████████████████████

24   ████████████████████████████████████████████████████████████

25   _____

26   [10] The scope of even this sample set of data collected is staggering and defeats any purported consent.
     *See* Dkt. 142 (consent is judged from a reasonable person perspective); *In re Facebook Internet*

27   *Tracking Litig.*, 956 F.3d 589, 603 (9th Cir. 2020) ("*Facebook Tracking*") (finding reasonable
     expectation of privacy where Facebook allegedly acquired "an enormous amount of individualized

28   data" to compile a "vast repository of personal data").

1    ██████████████████████████████████████ Barnes Decl. Ex. 74. A related

2    system called █████████████████████████████████████████████

3    ████████████████████████████████████████████████████████████████

4    ████████ Barnes Decl. Ex. 5 at 27:9-20; *see also* Barnes Decl. Ex. 39 at -353.

5           **5.     Google Does Not Anonymize Not-Synced Chrome Data**

6           Chrome promises users that, unless they Sync *and* turn on WAA, "Google will only use your

7    Chrome data *after its anonymized and aggregated with data from other users*." (emphasis added).

8    ████████. *See, e.g.* Barnes Decl. Ex. 40 ████████████████████████████

9    ████████████ Instead, ████████████████████████████████████████████

10   █████████████████████████ *See* Barnes Decl. Ex. 31.

11          **6.   Google Creates** ████████████████████████████████████████

12          Nowhere do Google's TOS, PP, or Chrome PN disclose the creation of user profiles. While

13   Google originally denied the existence of user profiles in this litigation, *see* Barnes Decl. Ex. 14 at

14   27:17-20 (claiming "[w]e don't really have user profiles"), ████████████████████. In his

15   deposition, lifetime Googler Deepak Ravichandran extensively describes Google's ██████████

16   ████████████████████████████████████████████████████████████████

17   including through programs with creepy names like ████████████████ Barnes Decl. Ex. 41

18   at -626. Google has also instituted a ████████████████████████████████████████

19   ██████████████████████████████████, with the goal of ██████████████████

20   ████████. Barnes Decl. Ex. 42 at 613; Barnes Decl. Ex. 3 (Tr. 147:18-152:7).

21          Google even has a secret ██████████████████████████████████████████

22   ████████████████████████████████████████████████████████████████

23   ████████ Barnes Decl. Ex. 3 (Tr. 170:1-175:12). Google even ██████████████

24   ████████████████████████████████████ Barnes Decl. Ex. 43.

25   Google's ████████████████████████████████████████████████████████████

26   ████████████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████████████

28

1 ████████████. *See* Barnes Decl. Ex. 44 (detailing ██████████████

2 ████████████████████████. In this case, Google has admitted that ████

3 ████████████████████ *See* Barnes Decl. Ex. 6 at 260:7-

4 261:7. Google has not yet completed its production of the Named Plaintiffs' profiles and data (a

5 complicated process being overseen by a Special Discovery Master), but what has been produced has

6 been shocking, including Google's placement of two of them into ████████████████

7 ███████████ Barnes Decl. Ex. 45; Barnes Decl. Ex. 44. With this as backdrop, it is

8 outrageous and false for Google to claim it has fully disclosed its practices.

9 **7.    Google** █████████████████████

10 The "Bump" relies on the promise that "Google does not sell your personal information to

11 anyone." However, during an internal review, ██████████████████████████

12 ████████████████████████████████████████

13 ████████████████████████████████████████

14 ███████" with Google's express promises. Barnes Decl. Ex. 46 at -822.

**C.  GOOGLE INTERNALLY ADMITS ITS "CONSENT" PROCESS IS BROKEN**

16 **1.    Google Internally Admits that** ██████████████████

17 Discovery has revealed that █████████████████████████, including

18 the Bump and NAC. The "owner" of Google's Privacy Policy explains:

19 
20 | When we ask people to turn on a setting like Web & App Activity or Ads Personalization, we highlight *enhanced functionality* and *personalization*. The reality, though, is we're relying on that data for many purposes, including improving our products and fueling our ads-based revenue — neither of which benefit individual users directly, yet both of which fall under this **broad and contradictory consent**. |
21 
22 

23 Barnes Decl. Ex. 47 at 293 (emphasis in original). Indeed, the exhibits to Google's Motion reflect the

24 understanding that the Bump and ██████ were based on classic "dark patterns," i.e. a user interface

25 that is crafted to manipulate users into a certain action or to discourage behavior. The Bump does not

26 give the user the choice to say NO. Similarly, ██████ turns WAA on by default but does not expose

27 WAA settings to the user. ██████████. Internal Google research reveals that ██████████

28



1 ████████████████████████████████████████████

2 ████████████████████████████████████████████

3 ████████████████████████████.” Barnes Decl. Ex. 48 at -379. Rather than

4 giving users an honest choice, Google hides the controls behind a button ████████████

5 ███. Even then, for users who click the button and follow the "Learn more" process, Google presents

6 false assurances that WAA will only collect their Chrome browsing history *if Sync is turned on*. Fair

7 Decl. ¶ 41-42; Fair Decl. Ex. 24. Internally Google admits ██████████████████

8 ████████████████████████████████████████████

9 █████████████████████████ Barnes Decl. Ex. 24 (emphasis added).

10 **2.    Google Admits That** ████████████████████

11 The problem is broader than the Bump and ██████. Google's Motion asserts that reasonable

12 consumers understand Internet data flows and that the language Google cites apprises users about

13 Google's practices. But Google ███████████████████ The "owner" of Google's PP admits

14 that ███████████████████████████████████████████

15 ████████████████████████████████████████ Barnes

16 Decl. Ex. 24.[11] As a result, it is a ████████████████████████████████

17 ████████████████████████████████████████████

18 █████████████████████████ and people are left ████████████

19 ████████████████████████████████████████████

20 ████████ *Id.* at -161. Users simply █████████████████

21 ████████████████████████████████████████████

22 ███████████████ Barnes Decl. Ex. 49 at -629; *see also* Barnes Decl. Ex. 50 at -270.

23 Top Google employees ████████████████████████████████. For

24 example, several Google privacy employees ████████████████████████████

25 █████████████. Barnes Decl. Ex. 1 at ████████████████████ Barnes Decl. Ex.

26

---

27 [11] ████████████████████████████████████████████

28 ████████████████████████████. Barnes Decl. Ex. 69 at -318.

7 at ████████████████ Barnes Decl. Ex. 8 at 368:3-14. Internally, one Google privacy

employee admitted, ████████████████████████████████████████████

████████████████ Barnes Decl. Ex. 51.[12] Another explained:

█████████████████████████████████████████████████████████

████████████████████████████████ Barnes Decl. Ex. 50 at 288.

Indeed, even with the assistance of a Special Discovery Master, Google has thus far been unable to

produce all the data it has compiled and used for just *six people* – arguing that ████████████

██████████████████████████████████████

### 3.   Google Internally Admits ████████████████████

Google's admissions about ████████████████████ specifically apply to Chrome

users who are not synced. For signed-out users, Googlers internally admit such users would ██

████████████████████████████ Barnes Decl. Ex. 52 at -265-66. For

signed-in users, Googlers internally admit that ████████████████████████████

██████████████████████████████████." Barnes Decl.

Ex. 53. Similarly, Google internally admits that Sync ██████████████████████

████████████████████████ Barnes Decl. Ex. 21

at 335. In another document, Googlers admit that ██████████████████████

█████████████████████████████████████████████

███████████████████████ Barnes Decl. Ex. 55 at -807. But,

██████████████████████████████████████ *Id*.

Internal documents from the Chrome Trust & Safety team also concede that Chrome ███████

█████████ Since at least 2018, Chrome has been involved ████████████████████

─────────────

[12] In 2021, ████████████████████████████████████████████████

████. Barnes Decl. Ex. 54. As it turns out, ██████████████████████████ and Plaintiffs do
not have clear answers or discovery on why.

1    ███████ .[13] In June 2019, Google CEO Sundar Pichai asked the Chrome team to ████████

2    ████████████████████████████████████████████████████████ Barnes Decl. Ex. 56

3    at 629. The result was ████████████████████████████████████

4    First, Chrome's Director of Marketing ████████████████████████████████

5    ████████████ " Barnes Decl. Ex. 57 (emphasis added). More specifically, the document

6    concedes that, on Chrome, ████████████████████████████████████████████

7    ████████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████

9    ████████████████████████████ *Id.*

10   Second, Chrome Trust & Safety lead Mardini proposed that, ████████████████

11   ████████████████████████████████████████████████████████████

12   ████████████████████████████████████ Barnes Decl. Ex. 58. The problem with

13   Mardini's proposal was that ████████████████████████████████

| Aspirations for Privacy-First Chrome that Chrome T&S Admits are Not True | Promises Already Made |
|---|---|
| Your browsing history is never used to show you ads in a way that compromises your privacy (or uniquely identifies you). | Unless you enable Sync and turn on WAA, "Google will only use your data after its anonymized and aggregated with data from other users." *See, e.g.* FAC Ex. 33 at 7. |
| Your browsing data is never shared with others, including other applications in Google, unless you explicitly give another application permission. | "The personal information that Chrome stores [including '*browsing history information*' and *cookies or data from websites that you visit*] won't be sent to Google unless you choose to store that data in your Google Account by turning on Sync[.]" FAC Ex. 33 at 2. |
| You are in full control over what data is collected and sent to Google. | "You don't need to provide any personal information to use Chrome." FAC Ex.33 at 1. |
| We always ask before sending anything to Google. | "Chrome … does not cause Google to receive any additional personally identifying information about you." *See, e.g.* FAC Ex. 33 at 2. |
| Tracking is off by default. You don't need to 'opt-in to get more privacy. | "Sync is only enabled if you choose." *See, e.g.* FAC Ex. 33 at 7. |

24    **4.   Google Internally Admits** ████████████████████████

25    Google internally admits that " ████████████████████████████████████

26

---

[13] ████████████████████████████████████████ is an admission. The Chrome PN

27    promises that one can use Chrome "without providing any personal information to Google." If that

28    were true, Chrome would not need to ██████████████████████ .

1                                           Barnes Decl. Ex. 59 at -512; *see also* Barnes Decl. Ex. 50 at -287. A March

2 2019 presentation to Google CEO Sundar Pichai explained that users

3                                          and

4                                                        Barnes

5 Decl. Ex. 60 at -401, -428. Despite this, Google continues

6          To help solve this problem, the "owner" of the PP told colleagues Google needed to

7                              and admitted that Google's

8

9                                                  *See* Barnes Decl. Ex. 61;

10 Barnes Decl. Ex. 49 (emphasis in original); *see also* Ex. 69 at -288. Google then began working on a

11 solution called                , which is described as an effort to

12

13                         Barnes Decl. Ex. 47 (emphasis in original).

14          As part of its            analysis, a Google privacy employee acknowledged that it was

15                                                                 ."

16 Barnes Decl. Ex. 62 at -016. Yet another acknowledged that Google's approach to privacy is

17

18                                              .]" *Id.* at -032.

19                proposed that Google

20

21                                . Barnes Decl. Ex. 50 at -271. To do this,

22 Google would need to

23                                                         *Id.* For

24 reasons not yet discovered, Google executives                   . Barnes Decl. Ex. 7 at 54:3-56:9.[14]

25          Over and over again, discovery reveals a broken consent model and a privacy approach out-

26

---

27 [14] Google's internal documents are supported by the expert reports and deposition testimony of Dr. Leslie John and Dr. Joseph Turow. *See* Barnes Decl. Ex. 63 (John Rpt.), Barnes Decl. Ex. 66 (Turow Rpt.), Dkt. 430-4 at Ex. 23 (Turow Tr.), 430-4 at Ex. 24 (John Tr.).

28

of-step with user expectations. Defendants cannot establish consent as a matter of law.

## IV.    LEGAL ARGUMENT – GOOGLE HAS FAILED TO AFFIRMATIVELY DEMONSTRATE THAT IT OBTAINED CONSENT FOR ITS CONDUCT

### A.    STANDARD FOR SUMMARY JUDGMENT

To prevail on a motion for summary judgment, the movant must show "there is no genuine dispute as to any material fact" and it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where, as here, the movant has the burden of proof at trial, it must "'affirmatively demonstrate' that no reasonable trier of fact could find other than for the moving party." *Lane v. Landmark Theatre Corp.*, 2020 WL 1976420, at *6 (N.D. Cal. Apr. 24, 2020). In reviewing the evidence, the Court must "view the facts and draw reasonable inferences in the light most favorable to the non-moving party." *Weil v. Citizens Tel. Servs. Co, LLC*, 922 F.3d 993, 1002 (9th Cir. 2019). Thus, summary judgment is not proper "where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors v. Mercedes Benz USA*, 771 F.3d 1119, 1125 (9th Cir. 2014) (quotations omitted). "Even where the basic facts are stipulated, if the parties dispute what inferences should be drawn from them, summary judgment is improper." *Int'l Union of Bricklayers & Allied Craftsman Local Union No. 20, AFL-CIO v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985). Here, Google has failed to affirmatively demonstrate there is no triable issue of fact as to the issue of consent.

### B.    THE LAW OF CONSENT AND CONTRACT

Google bears the burden to establish consent, which "must be actual," meaning that Google "must explicitly notify users of the practice at issue" and there must be "only one plausible interpretation" – that being in favor of Google – to justify "a finding of consent." Dkt. 142 at 12-13. "Moreover, consent is not an all-or-nothing proposition. Rather, a party may consent to the interception of only part of a communication or to the interception of only a subset of its communications." *Id*. at 17-18. "Thus, 'a reviewing court must inquire into the dimensions of the consent and then ascertain whether the interception exceeded those boundaries.'" *Id.* at 18. As explained by the Ninth Circuit, "to be effective, consent must be … to the particular conduct, or substantially the same conduct." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1149 (9th Cir. 2012). The "particular conduct" test includes disclosure of the specific conduct at issue and its scope. *Id.*

("The precise scope of the consent is normally for the trier of fact to determine.").

For example, in *Norman-Bloodsaw v. Lawrence Berkeley Lab*., 135 F.3d 1260, 1264-65 (9th Cir. 1998), plaintiffs who expressly consented to periodic health examinations that included the taking of blood and urine samples and specific questions about venereal disease, sickle cell anemia, and menstruation were held to have not consented to testing those same blood samples for STDs, sickle cell trait, or pregnancy. Similarly, in *Facebook Internet Tracking*, 956 F.3d 589, 603 (9th Cir. 2020) ("FB Internet"), the Court found that a privacy interest would be invaded where a defendant engages in undisclosed collection of "an enormous amount of individualized data" to compile a "vast repository of personal data." *See also Silver v. Stripe, Inc*., 2021 WL 3191752, *6 (N.D. Cal. Jul. 28, 2021) ("[N]ature and volume" of "collected information" is important in consent determination.). In the Internet context, "consent" is often determined by reference to consumer contracts of adhesion. *Id.* At *3 ("Internet users can form online contract[s], and therefore consent, in a variety of ways."). Further, "[w]hile new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed principles of contract." *Register.com, Inc. v. Verio, Inc*., 356 F.3d 393, 403 (2d Cir. 2004). When interpreting a contract, "the whole of the contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." *Int'l Brotherhood of Teamsters v. NASA Services, Inc*., 957 F.3d 1038, 1042 (9th Cir. 2020) (*citing* Cal. Civ. Code § 1641).

Here, Google ignores four long-standing principles of consumer contract law. First, Google ignores that the Court must review the entire contract, not a snippet. Second, Google argues that a consumer must read a contract before its terms can be enforced. But this is not the law and never has been. Second, Google asks the Court to consider the Bump and NAC in isolation – making no mention of the express promises in the Chrome PN. Again, this is not the law and never has been. Third, Google ignores that, when viewing the contract as a whole, "[a]ny uncertainty … is to be construed most strongly against the party who caused the uncertainty." *Penthouse Intern., Ltd. v. Barnes*, 792 F.2d 943, 948 (9th Cir. 1986), *citing* Cal. Civ. Code § 1654; *see also*, Restatement (Second) of Contracts § 206.  Put simply, under the common law rule and applicable California statutes, the Court is to

determine consent by the whole of the parties' contract and must compare the entirety of what the Defendant disclosed and promised against the Defendant's actual practices. Where the disclosures do not adequately inform of the actual practices or are ambiguous, there is no consent. Accordingly, Google must affirmatively demonstrate (1) what Google disclosed and how it was disclosed, and (2) whether Google's subsequent actions match those disclosures. Google's motion fails in both respects.

## C.  THE EVIDENCE OVERWHELMINGLY SHOWS THAT ███████

Here, the Court has already ruled—and Google must concede—that the Chrome PN is part of the contract. The ███ documents on which Google relies for consent begin by expressly incorporating the TOS and PP, each of which expressly state that (1) the Chrome PN is part of the agreement; and (2) is the controlling document in the event of any conflict of terms. Def. Ex. 3; Pl. Ex. 1, TOS ("If these terms conflict with the service-specific additional terms, the additional terms will govern for that service," with hyperlink to list including Chrome PN); Pl. Ex. 2, Chrome PN; Pl. Ex. 3, PP ("The following privacy notice provide additional information about some Google services: Chrome & the Chrome Operating System," with hyperlink to Chrome PN.) By ignoring the Chrome PN, Google runs afoul of this basic rule of contract interpretation.

The cases cited by Google support Plaintiffs and stand for the same proposition. In *Smith v. Facebook,* 745 F. App'x 8 (9th Cir. 2018) (unpublished), the panel explained that a court must look to the disclosures "considered as a whole[.]" In the context of Internet privacy and contract law, "considered as a whole" requires the Court to examine the entirety of a defendant's express contractual promises and its actions. The *Smith* panel found consent where Facebook made a disclosure that was not contradicted by any other promise made by Facebook. Here, Google has not presented any disclosure that, read in context of the entire agreement, contradicts the express contractual promises contained in the binding TOS, Chrome PN, and Google PP. Moreover, even if Google had, the new documents cannot displace the express promises of the Chrome PN, which Google says governs in the event of a conflict. Google's motion ignores the express promises in the binding contract.

In *Silver v. Stripe*, 2021 WL 3191752 (N.D. Cal. Jul. 28, 2021), the Court explained that "a binding contract is created if a plaintiff is provided with an opportunity to review the terms of service

on the form of a hyperlink[.]" Accordingly, after reviewing the entirety of the contract at issue, the Court found that the Plaintiffs adequately alleged privacy claims for conduct that was not disclosed. *Id*. at *6. Here, Google did not disclose its activity to users but instead expressly promised that it would not engage in the conduct complained of.[15]

### D.   GOOGLE IS BOUND BY THE TERMS OF ITS CONTRACT WITH PLAINTIFFS, REGARDLESS OF WHETHER NAMED PLAINTIFFS READ THE CONTRACT

Google's argument that Plaintiffs consented to its conduct by not reading the Chrome Privacy Notice has not merit.[16] Google cites no case in support, because no such case exists. To the contrary, "California law requires the Court to pretend the users actually read [Defendant's] contractual language before clicking their acceptance, even though we all know virtually none of them did." *In re Facebook, Inc. Cons. Privacy User Profile Litig.*, 402 F.Supp.3d 767, 789 (N.D. Cal. 2019); *Garcia v. Enterprise Holdings, Inc.*, 78 F.Supp.3d 1125, 1137 (N.D. Cal. 2015) (cited by Google) (in Internet context, "the terms of the agreement are binding, even if the user did not actually review the agreement, provided that the user had actual knowledge of the agreement or the website put 'a reasonably prudent user on notice of the terms of the contract.") This has been the law of contract for more than 150 years. *See Upton v. Tribilcock*, 91 U.S. 45 (1875).[17]

The more salient point is that Google attempts to flip the law on its head: it is Google's burden to establish consent, not Plaintiffs' to rebut. Plaintiffs' failure to read an Internet contract does not amount to waiver of constitutional, statutory, or common law rights of contract or privacy. Moreover,

---

[15] Google's other cases do not help Google either. *Maghen v. Quicken Loans Inc.*, 680 F.App'x 554 (9th Cir. 2017) (unpublished) (consent via oral notice on recorded phone call and binding Internet Terms of Service); *Javier v. Assurance IQ, LLC*, 2021 WL 940319 (N.D. Cal. Mar. 9, 2021) (consent after review of Terms and Privacy Policy as a whole, not taking separate document out of context); *Perkins v. LinkedIn Corp.*, 53 F.Supp.3d 1190, 1212 (N.D. Cal. 2014) (consent after reciting test – whether "a reasonable user who viewed [defendants'] disclosures [would] have understood" that the defendant was engaged in the conduct at issue.); *Lightbourne v. Printroom, Inc.*, 122 F.Supp.3d 942, 948 (C.D. Cal. 2015) (Consent via hard-copy contract with no promise of privacy).

[16] Reliance is not a necessary element of any claim. For the California UCL, Plaintiffs have made claims under the "unlawful" and "unfair" prongs of the Act. FAC ¶¶ 411, 413.

[17] Corporations routinely use this rule as a sword to send cases to arbitration. *See, e.g.*, *Nevarez v. Forty-Niners Football Co., LLC*, 2017 WL 3492110, at *8-9 (Aug. 15, 2017) (Koh, J.).

Google's argument that Plaintiffs could not have formed an expectation that Chrome would not send their personal information to Google because they did not read the Chrome PN is wrong as a matter of law and fact. "Consent to interception" cannot "be inferred from the mere purchase of a service, regardless of circumstances." *In re Pharmatrak*, 329 F.3d 9, 20 (1st Cir. 2003). More importantly, the Supreme Court and Ninth Circuit have made clear that Americans have a reasonable expectation of privacy in their Internet communications. *Riley v. California,* 573 U.S. 373 (2014); *In re Facebook, Inc. Internet Tracking Litig*., 956 F.3d 589 (9th Cir. 2020). In addition, here, Professor John offers uncontroverted evidence to the contrary.  She explains that users' default expectations are no data collection will occur. Barnes Decl. Ex. 63 at 3-5. Further, the Named Plaintiffs' uniform expectations were created by seeing the "sync" button, or their basic understanding of what it means to "sync." Calhoun Dep. 24:12-17; Kindler Dep. 32:15-33:2; Crespo Dep. 72:14-23, 119:7-8, 142:5-9; Henry Dep. 24:11-26:20, 149:24-150:2; Wilson Dep. 72:22-73:2, 76:2-17, 102:12-22; Johnson Dep. 60:1-64:25. Finally, the consent question here is not limited to the question of syncing – it also turns on Google's failure to disclose its practices regarding profiling, verticals and massive online surveillance in general.  Whether a reasonable user would have expected Google to engage in these specific collection and user practices is disputed and therefore a question for the jury.

## E. GOOGLE'S TORTURED READING OF "CHROME BROWSING HISTORY" IS IRRELEVANT AND MISPLACED

Google asks this Court to rule that "Chrome browsing history" does not include your browsing on Chrome, incredibly arguing that "GET requests are not Chrome browsing history." Motion 5:6, citing Fair Decl. ¶ 10 (arguing that "Chrome browsing history" is limited to a list of all of the webpages (URLs) visited within the last 90 days … and the time when they are visited.")[18]  Google's artificial distinction between "Chrome browsing history" and browsing you do on Chrome is silly and should be rejected for several reasons.  First, the distinction is irrelevant because the Chrome PN broadly

---

[18] The ubiquity of Google's source code on non-Google websites is such that Google's irrational definition of "Chrome browsing history" is a distinction without a difference. Plaintiffs' expert Dr. Shafiq explained that "it is practically impossible for any normal Internet user to avoid Google source code that causes Chrome to send personal information to Google," including browsing history information. Barnes Decl., Ex. 29, Shafiq Rep. ¶ 16, 38-53 (75.9 percent of top 100,000 websites represents the "lower bound of a user's browsing history that Chrome sends to Google.").

promises that Chrome will not send "browsing history information" or un-anonymized "Chrome data" to Google in addition to "Chrome browsing history." Second, Plaintiffs' experts have shown that Chrome sends more than GET requests, but also URLs **and the time of the exchange**. Third, "[w]ords in a contract are to be construed according to their plain, ordinary, popular, or legal meaning, as the case may be." *Hayter Trucking Inc. v. Shell Western E & P, Inc.*, 18 Cal. App. 4th 1, 15 (1993). Even Googlers do not make meaningful distinctions between "Chrome browsing history" and "browsing" and instead admit that ████████████████████████ and █████ ████████████████████████ from Chrome. Barnes Decl. Ex. 57 (emphasis added). Mr. Fair ███████████████████████ in his deposition. Barnes Decl. Ex. 2. In fact, when the Bump rolled-out, Google engineers explained that ████████████████████ ████████████████ Barnes Decl. Ex. 64. The document further explained ████ ██████████████████████ **which is exactly what Chrome sends to Google** regardless of a user's sync state – ████████████████████.

**F. GOOGLE'S ███████████████ NEGATE ANY PURPORTED CONSENT**

The Ninth Circuit has cautioned that it will grant "no refuge" to a defendant who gains consent through mistake that the defendant knew, or, in the exercise of reasonable care, should have known about that relate to the nature and quality of the invasion intended. *Theofel v. Farey-Jones*, 359 F.3d 1066, 1073 (9th Cir. 2004). Accordingly, even purported express consent is invalid where the defendant knowingly invites a mistake about "the essential character of the act itself," i.e., "that which makes it harmful or offensive." *Id*. Determining whether something goes to the "essential nature of the invasion" turns "on the extent to which the intrusion" impacts the specific interests that the claim seeks to protect. *Id*. "Even when no restriction is specified, the reasonable interpretation of consent may limit to acts at a reasonable time and place, or those reasonable in other respects." Restatement (Second) of Torts § 852A(3), cmt. 3. Prosser & Keeton (cited extensively by *Theofel*) explain: a boxer "consent[s] to the defendant's striking at him" even "if death unexpectedly results" but does not "consent to being hit with brass knuckles, which is the same invasion by an act of a different character." Keeton, supra, § 18, at 118. Similarly, "[c]onsent produced by material nondisclosures is

no consent at all." *Johnson v. Jones*, 344 P.3d 89, 95 (Ore. Ct. App. 2015); *see also Sanchez-Scott v. Alza Pharms.*, 86 Cal. App. 4th 365 (2001). Put simply, consent is not valid where the defendant knows their "consent" process █████████████████████████████████

   Here, Google knows full well that ████████████████████████████████████████ ██████. But Google ███████████████████ because, as the "owner" of the Google PP put it, Google ████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ Barnes Decl. Ex. 24. Moreover, it is not reasonable to interpret any of the documents Google has placed before the Court as permitting Google to acquire so much information about Plaintiffs that Google does not know where it goes or how it is used, cannot re-produce it for just six users without a "massive burden," and uses it ████████████████████████████. The creation of █████ ████████████ alone goes directly to the interests that the privacy torts at issue seek to protect; and the unauthorized acquisition of the contents of a user's Internet communications goes straight to the heart of the ECPA. *See Hill v. NCAA*, 26 Cal.Rptr.2d 834, 843 (1994) (Describing privacy tort as "to prevent[] business interests from collecting and stockpiling ... a dossier [or] an informational profile[.]"); *see also Theofel*, 359 F.3d 1066 (9th Cir. 2004). Thus, to the extent that any of Google's disclosures even hint at the conduct at issue, any consent is vitiated, based on Google's conduct alone, by common law expressed in *Theofel*.

## V.   PLAINTIFFS' OBJECTIONS PURSUANT TO CIVIL LOCAL RULE 7-3(a)

   The Fair Declaration (Dkt. No. 393-4) is facially inadmissible and should be stricken because "[d]eclarations not based on personal knowledge are inadmissible and cannot raise a genuine issue of material fact." *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1063 (9th Cir. 2012); Fed. R. Civ. P. 56(c)(4). Further, when made in part on personal knowledge and in part on information and belief, the entire declaration should be disregarded. *In Re: Zoom Video,* 525 F. Supp. 3d at 1042.

   The Fair Declaration, just like the stricken *Zoom* declaration, was made mostly on information on belief. On many separate occasions, Mr. Fair admits in the document that he is merely "informed" of certain facts, without saying who informed him.  Fair Decl. ¶¶ 2, 3, 28-31, 46-49, 64, 71; Barnes

1  Decl. Ex. 2 at 418:23-419:9, 421:22-422:9, 432:17-434:9, 437:7-438:20, 506:15-22 ███████

2  ███████████████████████████████████████████████████████████████████████ *id*.

3  at 507:1-18 ███████████████████████████████████ Other paragraphs ███████████████

4  ████████. *Id*. at 453:10-18. With regard to the critical issue of the "purpose" of the sync feature, Mr.

5  Fair admitted ███████████████████████████████████████████████████████████████

6  ████████████████████████████████████████. *Id*. at 502:11-16.  Mr. Fair even admitted that

7  ███████████████████████████████████████████████████████. *Id*. at 515:3-24.

8  This is the clearest possible admission from a declarant that a declaration is unreliable hearsay.

9  Without a declaration from ██████████████████████████████████████████ (and an

10 opportunity to depose him or her), the Declaration must be stricken.

11          More critically, the screenshots of the various privacy policies and consent flows in the

12 declaration must be stricken because Mr. Fair admitted █████████████████████████████

13 ██████████████████████. First, the images were ██████████████████████████████

14 ██████████████████████ When Mr. Fair was asked at deposition about ████████████

15 ████████████████████████████████████████████████████████████████████████████

16 █████████████████████████████████████████████████████████ *Id*. at 523:7-

17 524:1. Likewise, Fair admitted that ████████████████████████████████████████████

18 █████████████████████████████████████████████████. When asked if t████████████

19 ████████████████████████████████ he admitted:

20 Q.    AND THE CONTROL BAR THAT APPEARS IN THE MIDDLE WOULD THE
21 PLAINTIFFS HAVE SEEN THE SCROLL BAR IN THE MIDDLE OR TO THE RIGHT DOES
   THIS REPRESENT WHAT IT LOOKED LIKE ON THEIR COMPUTERS?

22
23 A. ████████████████████████████████████████████████████████████████████████
24 ████████████████████████████████████████████████████████████████████████████
25 ████████████████████████████████████████████████████████████████████████████
26 ████████████████████████████████████████████████████████████████████████████
27 ███████████████████████████████.

28



1   Q.      WHEN PREPARING THIS DECLARATION DID YOU INVESTIGATE WHICH DEVICES
THE PLAINTIFFS USED WHEN VIEWING THESE VARIOUS PAGES?

2   A.      ███████████████████████████████████████████████████████████.

3

4   *Id*. at 526:22-527:21; *see also* Ex. 76 ██████████████████████████████████████████

5   ████████████████████████████████████████████████████████████████████████████

6   Because Mr. Fair cannot ████████████████████████████; admitted ███████████████

7   ███████████████████████████████████████████; and admitted that ████████████████

8   ███████████████████████████████████████████████████ the Declaration is

9   not admissible to prove what the Plaintiffs themselves actually viewed – and thus not admissible at

10  all. *See Zoom Privacy Litig*., 525 F. Supp. 3d at 1042 (declaration failed to meet burden to demonstrate

11  that terms were "conspicuous" on actual devices used by Plaintiffs).

12  **VI.     CONCLUSION**

13          The uncontroverted evidence shows that Google knows its consent model ███████████

14  ███████████ Barnes Decl. Ex. 15, and the ephemeral ███████ documents it relies upon here are

15  ████████ such "██████████████████████████████████████[.]" Barnes Decl. Ex.

16  61. Some employees hope Google can "get to a place where we can be … open and honest about how

17  we make money," but, as presently designed, ███████████████████████████████████████

18  ███████████████████████████████████████." *Id*. Even if the consent flow

19  were clear, the only evidence of whether and how the Named Plaintiffs engaged in them comes from

20  a declarant (Mr. Fair) who admitted ████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████████████████████

22  ████████████████████████████. The Motion should be denied.

23

24

25

26

27

28

1   RESPECTFULLY SUBMITTED AND DATED this 10th day of January 2022.

2

3   **BLEICHMAR FONTI & AULD LLP**          **DICELLO LEVITT GUTZLER LLC**

4   By:    */s/ Lesley E. Weaver*                By:    */s/ David Straite*
    Lesley Weaver (Cal. Bar No. 191305)        David A. Straite (admitted *pro hac vice*)
5   Angelica M. Ornelas (Cal. Bar No. 285929)  One Grand Central Place
    Joshua D. Samra (Cal. Bar No. 313050)      60 E. 42nd Street, Suite 2400
6   555 12th Street, Suite 1600                New York, NY 10165
    Oakland, CA 94607                          Tel.: (646) 993-1000
7   Tel.: (415) 445-4003                       *dstraite@dicellolevitt.com*
    Fax: (415) 445-4020
8   *lweaver@bfalaw.com*                        Amy Keller (admitted *pro hac vice*)
    *aornelas@bfalaw.com*                       Adam Levitt (admitted *pro hac vice*)
9   *jsamra@bfalaw.com*                         Adam Prom (admitted *pro hac vice*)
                                                Ten North Dearborn St., 6th Floor
10                                              Chicago, IL 60602
    **SIMMONS HANLY CONROY LLC**               Tel.: (312) 214-7900
11                                              *akeller@dicellolevitt.com*
    By:    */s/ Jay Barnes*                      *alevitt@dicellolevitt.com*
12  Jason 'Jay' Barnes (admitted *pro hac vice*) *aprom@dicellolevitt.com*
    An Truong (admitted *pro hac vice*)
13  Eric Johnson (admitted *pro hac vice*)
    112 Madison Avenue, 7th Floor
14  New York, NY 10016
    Tel.: (212) 784-6400
15  Fax: (212) 213-5949
    *jaybarnes@simmonsfirm.com*
16  *atruong@simmonsfirm.com*
    *ejohnson@simmonsfirm.com*
17

18

19

20

21

22

23

24

25

26

27

28

1

## ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)

2

3       I, David A. Straite, attest that concurrence in the filing of this document has been obtained

4   from the other signatories. I declare under penalty of perjury that the foregoing is true and correct.

5       Executed this 10th day of January, 2022, at New York, New York

6

7
                                        */s/ David A. Straite*
8                                       David A. Straite

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2

3      I, David A. Straite, hereby certify that on January 10, 2022, I electronically filed the

4 foregoing document with the Clerk of the United States District Court for the Northern District of

5 California using the CM/ECF system, which will send electronic notification to all counsel of record.

6 I also caused a copy of the under seal filings to be delivered to counsel for Defendant Google LLC

7 via electronic mail.

8

9                                        */s/ David A. Straite*
                                        David A. Straite

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28