# Exhibit 25

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

|  |  |
|---|---|
| PATRICK CALHOUN, et al., *on behalf of themselves and all others similarly situated*, <br><br> Plaintiffs, <br><br> v. <br><br> GOOGLE LLC, <br><br> Defendant. | Case No. 5:20-cv-05146-LHK-SVK |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

*Calhoun v. Google*
Report of Prof. Zubair Shafiq
Page **1** of **26**

# REPORT OF ZUBAIR SHAFIQ, PH.D.

## I.   MY QUALIFICATIONS

1.  I am an Associate Professor of Computer Science at the University of California, Davis. My lab's research and education efforts broadly focus on online security and privacy. Our research over the last several years has aimed to uncover personal data collection and misuse by tech companies.

2.  I received my Ph.D. from Michigan State University in 2014.

3.  I am co-leading the National Science Foundation (NSF) Secure and Trustworthy Cyberspace (SaTC) Frontier Center on Protecting Personal Data Flow on the Internet (ProperData: 2020-2025). As part of this effort, my research group is building state-of-the-art instrumentation systems and measurement frameworks to investigate personal data collection and exfiltration on the Web, Mobile, and Internet-of-Things (IoT) ecosystems.

4.  I have received several awards and distinctions for my research. Notably, I was the co-recipient of the 2018 Andreas Pfitzmann Award at the flagship Privacy Enhancing Technologies Symposium for my research on a system to detect tracking on Android devices. I also received the 2017 Best Paper Award for my research on exposing a security vulnerability and studying its abuse in Facebook's Graph API that supports 3rd party applications. I am also a recipient of the Dean's Scholar Award (2020), National Science Foundation (NSF) Faculty Early Career Development (CAREER) Award (2018), and Fitch-Beach Outstanding Graduate Research Award (2013).

5.  I have been retained by counsel for Plaintiffs as an expert in this matter and I submit this Report in support of Plaintiffs' Motion for Class Certification. My hourly rate is $500.

6.  In preparation for this Report, I reviewed materials identified in Exhibit B and performed large-scale tests of the Chrome browser and the prevalence of Google source code across the Web.

7.  I understand that Plaintiffs allege that when Chrome users browse the Web without Sync, Chrome sends PII to Google just as it does when Chrome users are Synced. Plaintiffs also claim that Chrome and Google engage in this behavior with respect to all users because that is how Chrome's code and Google's infrastructure is designed. My tests confirm both allegations.

8.  I reserve the right to supplement and amend this Report based on additional materials made available to me.

9.  My curriculum vitae, which includes a complete list of the cases in which I testified as an expert witness at trial or by deposition, together with a list of my research publications, conference papers, patents, and grant support, is attached as Exhibit A.

10. The list of materials received, reviewed and relied upon is set forth in Exhibit B.

11. I was also asked to record First Run Experiences in the Chrome browser. A separate report on that topic is attached as <u>Exhibit C</u>. I have also attached screenshots of the sync consent screen provided by Google that are identical or substantially similar to the screens in the FRE report. GOOG-CABR-04664032, GOOG-CABR-04664043, GOOG-CABR-04664045, and GOOG-CABR-04664030.

12. Google documents and excerpts of depositions that I have cited to in this report are attached as <u>Exhibit D</u>.

## II.   <u>MY ASSIGNMENTS</u>

13. I was asked by counsel to perform the following analyses:

   a. Explain the concept of entropy, its relationship to the meaning of personally identifiable information, and whether the data Chrome sends to Google is personally identifiable.

   b. Determine whether Chrome is uniformly designed to and, in fact, does send personal information to Google even without Sync.

   c. Explain the timing of Chrome transmissions of personal information to Google to determine whether the exchanges are contemporaneous.

   d. Determine the extent to which a Chrome user who has not enabled Sync, or who has disabled it, might be able to avoid Google source code on non-Google websites.

   e. Record the First Run Experience on the current and prior versions of the Chrome browser.

   f. Explain how not synced Chrome users can be identified using Google's systems.

## III.   <u>MY CONCLUSIONS</u>

14. Chrome is uniformly designed and does, in fact, send personal information to Google about users who are not synced and who have disabled it.

15. Chrome transmits not-Synced users' personal information to Google contemporaneously with the communications that are being exchanged between the users and the non-Google websites with which they are communicating.

16. It is practically impossible for any normal Internet user to avoid Google source code that causes Chrome to send personal information to Google. Based on peer-reviewed research methods about how people typically browse the Web, there is a 100 percent chance that the average person will encounter a website where Google source code is present that causes Chrome to transmit data to Google. In addition, users are often forced to use Chrome for government and other important web pages.

17. Google's existing systems and records can be queried to accurately identify Chrome users who have used the browser without having enabled Sync or having chosen to disable Sync.

## IV. CHROME UNIFORMALLY SENDS USER PERSONALLY IDENTIFIABLE INFORMATION TO GOOGLE REGARDLESS OF SYNC STATUS

18. To determine whether Chrome is uniformly designed and does send personally identifiable information ("PII") to Google about users have not enabled or who have disabled sync, I analyzed network transmissions by the Chrome web browser to Google-owned domains[1] when loading the following webpage on the Chrome browser: https://www.mercurynews.com/2020/05/24/qa-mental-health-tips-for-handling-the-pandemic/ ("Q&A: Mental health tips for handling the pandemic" published by The Mercury News).

19. I tested three different browser configurations: (1) not logged-in; (2) logged-in, not synced; and (3) synced.[2] Also, to mimic a user who has enabled the third-party cookie blocking feature in Chrome, I tested the state where a user is not logged-in and enables the 3rd-party cookie blocking feature (i.e. not logged-in, 3rd-party cookie blocking). For each configuration, I cleared all cookies and other local browser state before crawling the webpage to mimic a "fresh" browser.

20. I found that, regardless of whether a Chrome user has enabled Sync, and in all testing scenarios, the Chrome browser transmitted the following data elements to Google: (1) timestamp, (2) remote server's name, (3) URL including identifiers in query strings, (4) remote server's IP address, (5) user agent, (6) X-client-data header, and (7) cookies.

21. I was also asked if the identifiers I observed Chrome sending and Google collecting can be used to specifically identify each Chrome user through an analysis of the PII collected. My conclusion is yes, for the reasons set forth below.

22. Data scientists understand that PII requires strong and specific protections. Most data may only permissibly be collected if it is anonymized. Thus, the question of whether the data sent from Chrome to Google is PII is important. To answer this question, we must first start with an explanation of key topics.

23. What is Personal Identifiable Information (PII)? When data scientists speak about whether information is personally identifiable, they use the term "entropy" to refer to the amount of information in any data transmission, which is a way to disguise the ability to identify a particular person through his data. Entropy is measured in terms of the number of bits. The minimum amount of information required to uniquely identify a person in a population of size N is $\log_2(N)$. Given that Earth's population is approximately 8 billion, the number of required bits is $\log_2(8 \text{ billion}) = 32.897 \approx 33$ bits. Given that the number of Internet users on Earth is $\approx 4$ billion, the number of required bits is $\log_2(4 \text{ billion}) = 31.897 \approx 32$

---

[1] https://github.com/duckduckgo/tracker-radar/blog/main/entities/Google&20LLC.json
[2] https://support.google.com/chrome/answer/185277

bits.  In summary, the term PII typically refers to information (or multiple pieces of information put together) that reaches or exceeds this 32-bit threshold. This is widely accepted amongst data scientists – and by Google, which has publicly discussed imposing a "privacy budget" on websites that would cap the amount of information to around 32 bits.[3]

24. Managing entropy is critical to maintaining the anonymity of people whose data is being collected.  The more that entropy bits are revealed, the easier it is to pair it with other identifiable information and uniquely identify a person associated with the data. To determine whether Chrome sends Google personally identifiable information regardless of the browser state, we must first understand that amount of entropy in various data parameters that Chrome sends to Google.

25. <u>How many bits of entropy are in IP address?</u> There are two prevalent IP protocols: IPv4 and IPv6. The length of IPv4 address is 32 bits (i.e., ≈4 billion possible IPv4 addresses). Note that IPv4 addresses are sometimes reused or shared across users (e.g., using a mechanism called Network Address Translation [NAT]). The new IPv6 protocol is now used by approximately one-third of Internet users in the United States.[4]  The length of IPv6 address is 128 bits (i.e., ≈340 trillion-trillion-trillion IP addresses possible IPv6 addresses). Thus, IP address, especially the newer IPv6 variant, is considered PII.

26. <u>How many bits of entropy are in User-Agent?</u> There are approximately 10 bits of entropy in user-agent. More specifically, 10.000 according to this EFF study[5] and 9.779 bits according to this AmIUnique study[6], with the exact number depending on the size of the dataset used to compute the entropy.

27. <u>How many bits of entropy are in Cookies?</u> Since arbitrary information can be stored in cookies, there is really no limit as to how many bits of entropy (identifying information) can be stored in cookies.  Take for example the NID cookie that is set and transmitted by Google.  Its length is 88 characters. Assuming each character encodes 8 bits of information using the standard ASCII encoding, the total entropy for NID alone would be 704 bits.  I identified a total of 6 such cookies in my analysis: NID (704 bits), AID (464 bits), IDE (536 bits), Secure-3PSIDCC (568 bits), Secure-3PAPISID (272 bits), and Secure-3PSID (568 bits). Together these 6 cookies alone have the ability to encode 3112 bits. The Chrome source code that causes this to happen is the same for all users.

28. <u>How many bits of entropy are in the X-client data header?</u> According to Google employee

---

[3]    Introducing    the    Privacy    Budget,    Chrome    Dev    Summit    2020: https://www.youtube.com/watch?v=0STgfjSA6T8

[4] https://www.google.com/intl/en/ipv6/statistics.html

[5] Peter Eckersley. How unique is your web browser? International Symposium on Privacy Enhancing Technologies Symposium, pages 1–18. Springer, 2010.

[6] Pierre Laperdrix, Walter Rudametkin, and Benoit Baudry. Beauty and the beast: Diverting modern web browsers to build unique browser fingerprints. IEEE Symposium on Security and Privacy, pages 878–894. 2016.

Alexei Svitkine, there are ■ bits of entropy in the X-client-data header[7].Thus, the X-client-data alone gets Chrome to ■ percent of the threshold of 32 bits needed for the PII threshold.

29. How many bits of entropy are in Other Information that Chrome sends to Google about users who did not enable or have disabled sync? Other information that Chrome sent to Google accompanying the X-client-data includes HTTP header fields such as accept-encoding (1.534 bits), accept-language (5.918 bits), and accept-header accept (1.383 bits).

30. Is the data that Chrome sends to Google PII? – Yes, the X-client-data header alone is ■ percent of the 32 bits necessary. The other data parameters that always accompany the X-client-data header put the information well over the 32-bit threshold for PII. The Chrome source code that causes this to happen is the same for all users. Thus, the X-client-data is a significant source of information that can enable Google to identify individual users when combined with other data parameters sent by Chrome to Google.

31. Chrome sends the PII to Google while it is still in the process of exchanging data between the not-synced user and the website with which they are communicating

32. To analyze whether Chrome sends PII to Google, I recorded logs of the various transmissions when loading the aforementioned webpage on The Mercury News.

33. Each log that I captured includes a total of approximately one thousand transmissions by Chrome over the duration of approximately 30 seconds. Of these approximately one thousand transmissions for each log, there are approximately 100 transmissions to Google-owned domains that are designed to and do frequently occur at the same time as other transmissions by Chrome.

34. By design, all relevant transmissions of data from Chrome to Google occur while the user's communication channel with the website is still open and data is still flowing between the user and the website.

---

[7] Attachment D-2: Svitkine Dep. 21:14-17.

35. As illustrated below, the logs capture the contemporaneous nature of transmissions concerning IP addresses, User-Agent, X-client-data header, cookies, and other information from Chrome to Google-owned domains during a user's communication with the example news webpage.



Figure 1. Timeseries illustration of network transmissions by Chrome. Red lines indicate transmissions to Google-owned domains and blue lines indicate transmissions to non-Google domains.

36. I understand that Google may argue that Chrome does not transmit PII when users browse non-Google websites when Sync is not enabled.

37. To evaluate this argument, I designed two experiments to determine the likelihood that this could occur and then separately examined websites that require users to use the Chrome browser.

**Test 1: Top 100,000 Websites**

38. First, I used a program to crawl the top-100,000 websites using not-synced and not signed-in Chrome browser to analyze the percentage of non-Google websites that result in third-party network transmissions to Google-owned domains.

39. To determine the top 100,000 websites, I used the open-source Tranco list, which uses a peer-reviewed method[8] that combines website ranking information from multiple sources including Alexa, Cisco, and Majestic to harden against manipulation.

40. To mimic the experience of a typical Chrome user, I also configured the list to only include domains in the Chrome User Experience Report as well as to exclude those flagged as dangerous by Google Safe Browsing.

41. Since the goal was to analyze third-party network transmissions to Google-owned domains (i.e., when a user is visiting non-Google websites), I further excluded first-party websites that are owned by Google.

42. To crawl top-100,00 websites, I programmatically controlled Chrome using Google's Puppeteer software.

43. The crawl was stateless, i.e., it cleared all cookies and other local browser states before crawling each website to mimic a "fresh" not-synced and not signed-in Chrome browser.

44. Through this analysis, I determined:

    a. the percentage of websites with at least one third-party network transmission to a Google-owned domain was 75.9 percent;  and

    b. there were 15 third-party network transmissions to a Google-owned domain per-website on average.

45. The results corroborate the findings reported in prior peer-reviewed research that Google is by far the largest third-party tracker on the web.[9]

---

[8] Victor Le Pochat, Tom Van Goethem, Samaneh Tajalizadehkhoob, Maciej Korczyn'ski, and Wouter Joosen. Tranco: A research-oriented top sites ranking hardened against ma- nipulation. In Proceedings of the 26th Annual Network and Distributed System Security Symposium, pages 1–15. Internet Society, 2019.

[9] Steven Englehardt and Arvind Narayanan. Online tracking: A 1-million-site measure- ment and analysis. In Proceedings of the 2016 ACM SIGSAC conference on computer and communications security, 2016.

Georg Merzdovnik, Markus Huber, Damjan Buhov, Nick Nikiforakis, Sebastian Neuner, Martin Schmiedecker, and Edgar Weippl. Block me if you can: A large-scale study of tracker-blocking tools. In 2017 IEEE European Symposium on Security and Privacy (EuroS&P), 2017.

46. However, the 75.9 percent figure is a lower bound of a user's browsing history that Chrome sends to Google. There are two reasons for this:

    a. The combination of the Google source code and the design of the Chrome browser is such that Google receives information about communications even with websites on which Google source code is not present. These transmissions occur through the "referer" header in many situations, such as when a user navigates from a website without Google source code to one with Google source code.

    b. Chrome transmits information to Google as a user starts typing a URL for a website that does not have Google source code into the toolbar of the Chrome browser [Rfa-toolbar.zip].[10]

47. Thus, the 75.9 percent number is actually lower than the percentage of communications that Google source code and the Chrome browser cause to be sent from Chrome to Google for not-synced users.

**Test 2: Consumer Profile Testing**

48. To determine whether transmission to Google are avoidable, I used a program to crawl websites to mimic a user who starts off with a fresh browser and then visits top-50 websites of a particular category[11] such as news, recreation, shopping, sports, etc.

49. This category-based crawling methodology follows well-established, peer-reviewed research.[12]

50. I configured the crawl similar as above with main difference being that the analysis is aggregated to include all 50 websites for each category.

---

Adam Lerner, Anna Kornfeld Simpson, Tadayoshi Kohno, and Franziska Roesner. Internet jones and the raiders of the lost trackers: An archaeological study of web tracking from 1996 to 2016. In 25th USENIX Security Symposium, 2016.

[10] Available on request.

[11] https://www.alexa.com/topsites/category

[12] Claude Castelluccia, Lukasz Olejnik, and Tran Minh-Dung. Selling off privacy at auction. In Network and Distributed System Security Symposium (NDSS), 2014.

John Cook, Rishab Nithyanand, and Zubair Shafiq. Inferring tracker-advertiser relation- ships in the online advertising ecosystem using header bidding. In Privacy Enhancing Technologies Symposium (PETS), 2020.

51. The website categories tested included children's websites, arts, home, health, news, society, computers, sports, games, regional, business, reference, shopping, recreation, and science.

52. For each category tested, the percentage of websites with at least one third-party network transmission to a Google-owned domain in the series of 50 website crawls was 100.0 percent. Put simply, when a user visits 50 popular websites of a particular category, Chrome always makes one or more third-party network transmissions to a Google-owned domain.

   Table 2 provides a detailed breakdown of the number of third-party network transmissions to Google-owned domains across different website categories. It is noteworthy that the top-5 categories include potentially sensitive categories such as kids (including websites such as pbskids.org, nintendo.com, and abcya.com) and health (including websites such as cdc.gov, plannedparenthood.org, and webmd.com).

| Category | Count |
|---|---|
| Kids | 1193 |
| Arts | 572 |
| Home | 427 |
| Health | 366 |
| News | 335 |
| Society | 305 |
| Computers | 240 |
| Sports | 204 |
| Games | 177 |
| Regional | 163 |
| Business | 160 |
| Reference | 130 |
| Shopping | 117 |
| Recreation | 86 |
| Science | 37 |

**Table 2: Chrome Transmissions to Google by Category**

53. These results demonstrate that it is practically impossible for a typical Chrome user to avoid third-party network transmissions to Google-owned domains, even when browsing potentially sensitive content related to kids and health.

### Test 3: Websites that Require Chrome

54. I understand that one of the Plaintiffs testified that she had to use Chrome to ███████ ████████████████████. Attachment D-1: Deposition of Claudia Kindler dated July 5, 2021, 112:9-15. Her experience is not unusual.

55. Many websites are optimized and tested on Chrome. Thus, it is unfortunately quite common for websites to work on Chrome but not on other web browsers. This leaves users with no choice but to switch to Chrome to use such websites.

56. To investigate this issue, I conducted a comparative visual analysis of websites as they are loaded on Chrome and Firefox web browsers.

57. I used Mozilla's Firefox for two main reasons.

   a. First, it is in the second tier of web browsers with approximately 10% of the Desktop browser market share.

   b. Second, it is one of the few web browsers that does not share Chrome's underlying Blink browser engine.

58. I also relied on an open crowd-sourced Web Compatibility project that allows users to report website breakage. There are hundreds of such reports submitted by users in recent weeks, with more than 87,000 issues reported over last 7 years.

59. The following is a list of five representative examples where the websites do not work on Firefox and often suggest the user to use Chrome browser instead.

    a. The CDC's COVID Data Tracker (https://covid.cdc.gov/covid-data-tracker/) does not show user the county map of pandemic vulnerability on Firefox. It suggests the user to download Chrome instead.

    b. The State of Texas benefit portal (https://www.yourtexasbenefits.com/Learn/Home) that is used for SNAP food benefits and other social services does not work on Firefox from Windows 8 onwards. It works on Chrome on all Windows versions.

    c. AT&T DirectTV's video streaming feature (https://stream.directv.com) is not supported on Firefox. The user is suggested to download Chrome instead.

    d. DISH TV's video streaming video streaming feature (https://www.dishanywhere.com/franchise/dark_matter_e4379537) is not supported on Firefox. The user is suggested to download Chrome instead.

    e. Google Duo's group call feature (https://duo.google.com/) does not work on Firefox. It only works on Chrome.

60. Based on my experience, I can say with a high degree of confidence that these are not isolated examples. Website optimization for Chrome is a frequent occurrence, leaving users with no choice if they want to use certain websites – including government websites – to use the Chrome browser.

## V.    IDENTIFYING NOT-SYNCED CHROME USAGE

61. My assignment is to determine whether Google can identify Chrome users who did not enable sync or who disabled sync. My conclusion is that there are several accurate methods to do so using Google's own systems and databases that already exist.

62. First, however, Google has admitted that "if a Chrome user is signed in to a Chrome browser, and signs in to a Google website, and did not have sync enabled on the Chrome browser, then Chrome may send a bit, which depending on the circumstances, may indicate to Google that sync is not enabled on that Chrome browser at that time." Google also admits that Chrome sync logs contain data that indicates that Chrome users had sync enabled for one or more categories of data."[13] These existing Signals could have easily been used by Google at any time to identify Chrome users about whom Chrome sent personal information to Google while they were signed-in but not consented for sync. If Google has and had saved this data, all signed-in but not consented for sync Chrome users could be easily identified for whatever time frame Google decided to retain the data.

---

[13] Google Response to Plaintiffs' Requests for Admissions 15-18, 20-22

63. Google could just as easily have designed Chrome to send a separate signal indicating that a user was signed-out and not synced. Again, if Google has or had saved this data, all signed-out Chrome users could be easily identified for whatever time frame Google decided to retain the data. However, as discussed below, based on documents Google has produced so far, it appears that ███████ logs accomplish the same task.

**Key Terms and Systems**

64. The following terms are key to understanding how not-synced Chrome users can be identified.

65. 

69. ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████

70. **Takeout** [https://takeout.google.com] is a data source through which Google permits users to download (or "takeout") some of the information that Google has about them.

71. ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████

████████████████████████████████████████████
███████████████████

████████████████████████████████████████████
████████████████████████████████████████████
███████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
███████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████

77. ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████

## VI. HIGH-LEVEL OVERVIEW

78. To identify Chrome users who did not enable sync or who disabled sync, I propose several approaches that leverage data from certain data commands, repositories, and systems that Google uses, maintains or processes data about users, including ████████, Takeout, ████████████████████████████.[14] Here is a high-level overview of three proposed approaches:

### 1. TOP-DOWN APPROACH
(using ████ IDs)

79. ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████

### 2. BOTTOM-UP APPROACH
(using non-████ IDs)

80. ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████.

### 3. ALTERNATE APPROACH
(no reliance on ████/non-████ IDs)

81. ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

---

[14] Note that there seems to be some redundancy across various systems so the proposed approach can potentially be implemented using other systems as well.

██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████████████.

82. Next, I describe these three approaches in more detail. Note that these approaches are not mutually exclusive and can be combined to identify as many Chrome users who did not enable sync or disabled sync as possible.

### 1. TOP-DOWN APPROACH

83. ██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████

█████████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████

█████████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████



**Figure 1: Excerpt from GOOG-CALH-00077056 describing the information collected by MagicEye.**

86. We can use these fields to place Chrome users into the following three categories:

a. **ALWAYS-SYNCERS –** 

b. **NEVER-SYNCERS –**

c. **SOMETIMES-SYNCERS –**

87.

## Google Takeout

88. When a user exports their data from Takeout, one of the products available is called "Access Log Activity." The downloaded Takeout file contains a folder named "Access Log Activity", which in turn contains a file named "Activities - A list of Google services accessed by.csv". The table in this Activities file contains the following fields [bolded fields are relevant to the proposed method].

1) ███ **ID**
2) **Activity Timestamp**
3) IP Address
4) Proxiedhost IP Address
5) Is Non-routable IP Address
6) Activity Country
7) Activity Region
8) Activity City
9) **User Agent String**
10) **Product Name**
11) Sub-Product Name
12) Referer Product Name
13) Referer Sub-Product Name
14) Activity Type
15) Gmail Access Channel
16) Android Webview Package Name

89. It is noteworthy that the activity timestamp is available at the second-level granularity. Similar ███████ ████████, the **User Agent String** field can identify Chrome browser usage.[15] Similar to ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

90. We can use these fields to place Chrome users into the following three categories:

   d. **ALWAYS-SYNCERS** – ████████████████████████
   ████████████████████████████████████
   ████████████████████████████████████
   ████████████████████████████████████
   ████████████████████████████████████
   ████████████████████

   e. **NEVER-SYNCERS** – ████████████████████████
   ████████████████████████████████████
   ████████████████████████████████████
   ████████████████████████████████████
   ████████████████████████████████████

---

[15] User agents (e.g., "Chrome MAC 92.0.4515.159 (0185b8a19c88c5dfd3e6c0da6686d799e9bc3b52-refs/branch-heads/4515@{#2052}) channel(stable),gzip(gfe)") are not human readable but can be programmatically mapped to a particular Chrome browser version. There are external services such as https://developers.whatismybrowser.com/useragents/parse but Google likely has an internal service that can more reliably map them.

████████████████████████████████████
██.

   f.  **SOMETIMES-SYNCERS** – ████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████

91. The classification logic for Takeout logs is the same as described above for ████████████.
The second-level granularity available in Takeout logs helps us identify a subset of users
who seemed to always sync at the ████████████████████ to sometimes syncers.

████████████████████ <strong>to Identify Not-Synced Users</strong>

92. ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████

████████████████████████████████████
███ ██ ██ ████ █████ ██ ████ ██ ████
████████████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
███████████

████████ <strong>to Identify Not-Synced Chrome Browsers</strong>

95. ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████

████████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████



GOOG-CABR-03666182 at 1.



## 2. BOTTOM-UP APPROACH

100.    **Overview:** We use non-███████████████████████ to identify not-signed-in users. Next, I separately describe the approach for ███████ ███ logs.

███

101.    Google already uses ███████████████████████████████

██████████████████████████████████████████████████

██████████████████████

██    ████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████



GOOG-CABR-03666182 at 18

103. ███████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
███████████████



GOOG-CALH-00045185 ████████████████████████
████████████████████

104. ███████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████

███   █████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████

███████

███   █████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
██████████████████████████████████.



Screenshot from [GOOG-CALH-00027787]

107.    It is my understanding that Google has refused to provide Plaintiffs with full discovery regarding Chrome transmissions on non-Google websites to Google.com. However, based on documents produced, ███████████████████████████████████ ██████████████████████████████████.

108.    If additional information provided by Google is consistent with what has already been provided, it is likely that ██████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████.

109.    Based on the documents Google has produced, ████████ logs are likely the best source to identify Chrome signed-out users for the following reasons:

        a.  As described in the following excerpt, ████████████████████████ ████████████████████████████:



GOOG-CABR-00125420 at 1.

    b.    ████████ cookies are personally identifiable:



GOOG-CABR-00125420 at 1.

    c.    ████████████████████████████████████████
████████████████████████████████████████:



GOOG-CABR-03664145 at 2.



110. Based on my general knowledge and the fact that Google ███████████████ ██████████████████████████████████" I can state with a reasonable degree of certainty that Google can use a similar process as described above for ██████ IDs to identify class members through ███████████ data in Google's possession.

111. Similar to the description of the ████████████████) above, Google could use its already existing infrastructure to identify corresponding Google Accountholders and all the information it has collected, derived, or associated with the ██████ ID in question.

112. In the process, Google will identify class members, and the who, what, when, and where of the personal information that Chrome transmitted via ████████ID when the user was not signed-in to a Google Account.

113. These ████████████ IDs correspond to signed-out Chrome users that are either NEVER-SYNCERS and SOMETIMES-SYNCERS (i.e., users who did not enable sync or who disabled sync). Since this approach is geared towards not-signed-in users, it is not guaranteed to identify corresponding Google Accountholders (i.e., ██████ IDs). I recommend to use the first top-down approach to that end.

### 3. ALTERNATE APPROACH

> -- Session.TotalDuration
> -- Session.TotalDuration.WithoutAccount
> -- Session.TotalDuration.WithAccount
> -- Session.TotalDuration.OptedInToSyncWithAccount
> -- Session.TotalDuration.NotOptedInToSyncWithAccount
> -- Session.TotalDuration.NotOptedInToSyncWithoutAccount
> -- Session.TotalDuration.OptedInToSyncWithoutAccount

GOOG-CALH-00114301 at 2.

116.



**Incognito**

118.     The aforementioned approaches can also exclude users and devices that use Incognito by the lack of an X-client-data header in the transmission from Chrome to the Google server. ███████████████████████████████████████████████████████ ████████████████████████████████████ This simple approach will accurately identify all Incognito Chrome users, which can be excluded from the analysis.

119.     In addition, the bottom-up approaches will naturally exclude all Incognito sessions for which a user did not sign-in to a Google Account during the session. The reason for this is that, according to Google, ████████████████████████████████████████████ █████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ ████████████████████████████████████████████████.

## Other Methods

120.      I reserve the right to amend this report based on further information provided by Google, including the right to include additional methods that Google can identify not synced Chrome users.

***

Dated: October 14, 2021

*Zubair*

/s/ _____

Zubair Shafiq, Ph.D