# EXHIBIT DDD
## Redacted Version of Document Sought to be Sealed

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION**

|  |  |
|---|---|
| PATRICK CALHOUN, et al., *Plaintiffs*, v. GOOGLE LLC, *Defendant*. | C.A. No. 20-CV-05146-YGR |

**EXPERT REBUTTAL REPORT OF RUSSELL W. MANGUM III, PH.D.
IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION**

**February 15, 2022**

Highly Confidential — Attorneys' Eyes Only

Patrick Calhoun, et al. v. Google LLC

# Table of Contents

I.   INTRODUCTION ................................................................................................1

   I.A. Executive Summary ...................................................................................1

   I.B. Qualifications ...........................................................................................2

   I.C. Documents Reviewed ...............................................................................3

   I.D. Overview Of Mangum Report ..................................................................3

      I.D.1. Defendant's Unjust Enrichment...................................................3

      I.D.2. Restitution of Value of Personal Information ...............................5

   I.E. Overview Of Strombom Report And Erdem Report Relevant For My Rebuttal..........7

      I.E.1. Strombom Report...........................................................................7

      I.E.2. Erdem Report ................................................................................7

   I.F. Summary of Conclusions...........................................................................8

II.  ANALYSIS AND DISCUSSION OF NEW INFORMATION RECEIVED AND REVIEWED SINCE THE MANGUM REPORT..........................................12

   II.A. Unjust Enrichment Analysis in the Mangum Report is Based on Sound Economics and Consistent with Google's Own Internal Analyses............12

      II.A.1. Mangum Report Unjust Enrichment Analysis Guided by Established Academic and Industry Research Together with Metrics Determined by Google in the Ordinary Course of Business ........................12

      II.A.2. Google Itself Analyzes Revenue Impact from Loss of Personalization Using an Aggregate "Class-wide" Type of Model................13

      II.A.3. Google's Own Method of Analyzing Ad Revenue Premium Based on Personalization is Comparable to the Mangum Report Analysis, Both in Form and Effective Computed Impact ......................14

      II.A.4. Mangum Analysis Computes Google Profit Portion Consistent with Financial Disclosures and Approach Applied by Google as Part of Its Own Internal Analyses........................................20

      II.A.5. Strombom's Analysis Regarding Unjust Enrichment Runs Counter to Google's Own Practices........................................21

      II.A.6. Additional New Information for Identifying Google's Unjust Enrichment .....22

   II.B. Apportionment of the Unjust Enrichment is Available Through Feasible Methods..23

   II.C. Restitution Analysis in the Mangum Report is Based on Sound Economics and Consistent with Google's Position Regarding the Value of User Data .......................25

      II.C.1. The Peer-reviewed Research Cited in the Mangum Report Is Consistent with the Conclusion Users Place Value on the Protection and Privacy of Their Data ........................................26

      II.C.2. Google Has Determined the Market Value of Users' Data which is Common Across Users........................................27

   II.D. Google Calculates Revenue by User .......................................................33

Patrick Calhoun, et al. v. Google LLC

# I.      INTRODUCTION

This Rebuttal Report responds to, and is limited to, specific criticisms of my opening report setting forth damages methodologies for the Plaintiffs in this case.

## I.A. Executive Summary

1.   On October 13, 2021, I submitted an expert report regarding class certification in the above captioned matter ("Mangum Report").[1] Other experts also submitted expert reports on October 13, 2021.[2] I was also deposed in this matter on December 7, 2021.[3] Throughout this rebuttal report I utilize the same definitions and understanding of the industry and background information as I did in the Mangum Report, with additional information as needed. Similarly, for the purposes of my analysis, I maintain the assumption Defendant is liable as alleged.

2.   Since submitting the Mangum Report I have received additional materials. Examples of the new materials include new documents produced by Google, various legal documents, opposing expert reports, and deposition testimony. On December 22, 2021, Defendant filed several expert reports in opposition to class certification. Dr. Bruce Strombom filed a report ("Strombom Report") in response to the Mangum Report.[4] Dr. Tülin Erdem also filed a report ("Erdem Report") that responds to some portions of the Mangum Report.[5] Other experts filed technical reports.[6] These Defendant experts as well as Google fact witnesses have also been deposed recently.[7] New documents produced by Google include various

---

[1]   Expert Report of Russell W. Mangum III, Ph.D. in Support of Plaintiffs' Motion for Class Certification, Oct. 13, 2021 ("Mangum Report").

[2]   Declaration of Leslie K. John, Oct. 13, 2021 ("John Report"); Report of Prof. Zubair Shafiq, Oct. 13, 2021 "(Shafiq Report"); Expert Report of Professor Joseph Turow, Oct. 13, 2021 ("Turow Report"); Expert Report of Richard M. Smith in Support of Plaintiffs' Motion for Class Certification, Oct. 14, 2021 ("Smith Report").

[3]   Deposition of Dr. Russell Mangum, Dec. 7, 2021.

[4]   Expert Report of Bruce Strombom, Dec. 22, 2021 ("Strombom Report").

[5]   Expert Report of Tülin Erdem, Ph.D., Dec. 22, 2021 ("Erdem Report").

[6]   Expert Report of Professor Paul Schwartz in Support of Google LLC's Opposition to Plaintiffs' Motion for Class Certification, Dec. 22, 2021; Expert Report of Georgios Zervas, PhD, Dec. 22, 2021; Expert Report of Yiling Chen, Ph.D., Dec. 22, 2021.

[7]   Including, for example, Deposition of Bruce Strombom, Jan. 31, 2022; Deposition of Tülin Erdem, Feb. 4, 2022; Deposition of Deepak Ravichandran, Jan. 7, 2022; Deposition of Huei-Hung (Chris) Liao, Dec. 2, 2021; Deposition of Tim Schumann, Jan. 13, 2022. Additional deposition excerpts were included as exhibits to Defendant's motion opposition.

---

internal communications, presentations, and analyses prepared in the ordinary course of business. I have been asked to evaluate and analyze these new materials and comment on how, if at all, these materials impact my analysis regarding assessment of economic impact in the context of class certification for this matter.

3.   Rebuttal Opinion #1: As discussed in the sections below, after review and consideration of the materials received since submitting my initial report, I maintain, and in fact reinforce, the opinions and conclusions outlined in the Mangum Report. Excess profits can be calculated in this case using methodologies consistent with approaches used by Google internally.

4.   Rebuttal Opinion #2:  As discussed in the sections below, after review and consideration of the materials received since submitting my initial report, I maintain, and in fact reinforce, the opinions and conclusions outlined in the Mangum Report. Google pays users to collect and track the very kinds of information at issue in this case. From an economic perspective, these market measures are a strong foundation to calculate a restitutionary damages analysis.

5.   Rebuttal Opinion #3: Dr. Strombom's critique of my work is misguided in large part because he reaches beyond his field of expertise to opine about how the personal information is collected, how cookie blockers work, etc. As made clear in my opening report, I am not a technical expert, nor is he. I assume liability based on the claims alleged by Plaintiffs, and I also rely on the work of Professor Shafiq and Mr. Smith, as well as Google's own documents, to assume that all users who are not synced can be identified. I then perform damages calculations based on the assumptions together with inputs retrieved from Google documents.

## I.B. Qualifications

6.   I detail my qualifications in the Mangum Report.

7.   Cirque Analytics currently charges $700 per hour for my work in this matter. Professional staff members employed by Cirque Analytics also assist me. Neither my compensation nor Cirque Analytics' is contingent upon the outcome of this case.

8.     My curriculum vitae has been updated since the Mangum Report and is attached to this declaration as **Appendix 1**. Also included in **Appendix 1** is a list of the matters in which I have testified at deposition or trial in the past four years, along with a list of my publications for at least the past ten years.

## I.C. Documents Reviewed

9.     The set of additional materials I received and considered since the Mangum Report include opposing reports, legal filings, declarations, additional and in some instances newly produced documents, and deposition testimony.[8] These additional materials are listed in this report and **Appendix 2**.

## I.D. Overview Of Mangum Report

10.    For ease of reference, here I provide a brief overview and reiteration of the economic analysis contained in the Mangum Report. Outlined in the Mangum Report is my opinion that assessment of economic impact due to the alleged wrongdoing is feasible given the available evidence, and the relevant data and methodology regarding assessment and computation of the economic impact is common to the class.[9] I further opine in the Mangum Report that, assuming liability, Google wrongly obtained Class Members' valuable user data, which has enabled Google to earn additional profits. The Mangum Report includes economic analysis relating to two forms of economic remedy: (i) unjust enrichment; and (ii) restitution.

### I.D.1. Defendant's Unjust Enrichment[10]

11.    Plaintiffs have claimed that Google was unjustly enriched as a result of the alleged misconduct. Plaintiffs make this claim due to the plethora of evidence that demonstrates having access to a user's personal information[11] allows for more targeted advertising

---

[8]   To the extent the Court seeks review of any cited document, I will coordinate with counsel to ensure that they are provided.

[9]   Mangum Report, ¶ 14.

[10]  The discussion in this subsection represents a summary of the Mangum Report, Section IV.

[11]  As discussed above, I continue to rely on the assumptions and definitions outlined in the Mangum Report, including the assumption of liability. The liability assumption includes reference to what qualifies as personal information. *See, e.g.,*

Patrick Calhoun, et al. v. Google LLC

through behavioral advertising that is valuable to the advertiser and therefore to Google. The personal information about Class Members that Chrome sent to Google in breach of the Chrome Agreements translates to additional profits that Google would not have received absent the alleged misconduct.

12.     Such additional profits may require a disgorgement of those profits that Google derived from Chrome due to the personal information improperly sent about Class Members from Chrome to Google and that Google would not have otherwise received had it not violated the Chrome Agreements.

13.     Google's internal research along with peer-reviewed public research demonstrates the value of behavioral advertising to Google.

14.     After establishing this value of behavioral advertising, I next walk through a methodology that demonstrates how Google's unjust enrichment can be calculated using methods common to the class based upon reliable indicia of market pricing. This analysis relied on Google's own documents along with publicly available information.  I began with an exhibit

_____

Mangum Report, ¶ 16. I understand Google defines personally identifiable information (PII) internally to include, for example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and further notes ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (GOOG-CABR-04604487–516 at 507) (Bindra Ex. 48).

████████████████████████████████████████████ Table 3 of the
Mangum Report, reproduced below in Rebuttal Table 1, shows these steps.



15.    This accounts for the <u>revenue premium</u>. An additional step can be taken to account for the costs that Google incurred related to the additional revenue. Deducting the cost leads to the profit premium percentage that results from the alleged conduct. The last step would be to multiply the resultant profit premium percentage by the revenues Google received as a result of its alleged conduct.

16.    Once the dollar profit premium is computed, the amount may be allocated to the Class Members. In the Mangum Report I discussed evidence relating to methods of the apportionment.

### I.D.2. Restitution of Value of Personal Information[12]

17.    The personal information data that Chrome improperly sent and Google improperly used has economic value to the user in addition to value to third parties. Thus, the economic impact assessment can also consist of an analysis of the value of the user data and user data

---

[12]   The discussion in this subsection represents a summary of the Mangum Report, Section V.

Patrick Calhoun, et al. v. Google LLC

protection. Through direct and indirect evidence, I am able to demonstrate there are a number of market measures and a body of evidence revealing the value of users' data and the protection of personal information. This analytical framework ultimately takes the form of damages related to the restitution of value of personal information.

18.    There were two approaches that I took to analyze the Class Members' personal information collected by Google. In one approach I estimated the value Class Members place on privacy protections, representing service Google did not provide to Class Members. In the second approach I assessed the value of Class Members' personal information based on the market for data.

19.    For the first, I studied the economic value of preventing data collection on the internet through the use of per-reviewed, reliable survey data. The survey data I identified, and as confirmed through Google's own findings in the ordinary course of business, demonstrates that surveys can be utilized for the valuation of personal information protection. In addition to surveys and Google's analysis, I identified as an example, evidence showing that consumers are willing to make payments to protect their personal information. The purchase of privacy services (e.g., VPNs or ad blockers) provide real market examples of willingness to pay for privacy. These benchmark payments demonstrate pricing is uniform within a given service being offered.

20.    The second approach looks at the value of personal information that companies are willing to pay for access to that data. These direct payments to users show how companies value the collection and utilization of personal information. Google paid users who became members of its Screenwise Panels for the information collected. SavvyConnect, BrandTotal, and Nielsen also collect personal information in exchange for payments to users. Annual payments from Google and these other companies range from $50–192.

21.    These two approaches make it clear that damages can be assessed from a restitution approach using methods common to the putative class. Damages could be assessed on a monthly basis that controls for a Chrome user being synced or not.

## I.E. Overview Of Strombom Report And Erdem Report Relevant For My Rebuttal

### I.E.1. Strombom Report

22.    Dr. Strombom's rebuttal report is largely limited to the Mangum Report and an issue related to Plaintiffs' statutory damages claims; it does not address other Plaintiff expert opinions.[13] Dr. Strombom has three primary opinions with respect to the Mangum Report: (i) he claims I have failed to account for uninjured class members and have provided no way to reliably exclude them from my analysis;[14] (ii) he claims I have not offered a reliable methodology to calculate unjust enrichment, and that I have not offered an opinion on a methodology to allocate Google's "excess profits" to class members;[15] and (iii) he claims I have not offered a valid methodology to calculate class-wide restitution damages.[16]

### I.E.2. Erdem Report

23.    Professor Erdem's report contains a number of elements unrelated to the Mangum Report, which are thus not relevant for this particular rebuttal. Professor Erdem does, however, critique one aspect of the Mangum Report. In Section XII of the Erdem Report, Professor Erdem states that "conjoint analysis is ill-equipped to accurately measure the value of privacy in this matter."[17]

24.    She also claims I have failed to identify: the product or its attributes; how to design a conjoint that represents respondents' real-world experience; how to note the difference between stated preference and revealed preference for privacy; and that the two studies that I cite are not applicable in this matter.[18]

---

[13]    The exception is Dr. Strombom's opinion regarding the calculation of certain statutory damages, which I do not address.
[14]    Strombom Report, Section IV.B.
[15]    Strombom Report, Section IV.C.
[16]    Strombom Report, Section IV.D.
[17]    Erdem Report, Section XII.
[18]    Erdem Report, Section XII.

---

### I.F. Summary of Conclusions

25.  After collective review of the newly received materials, the opinions and conclusions as set forth in the Mangum Report remain unchanged. For reference, the original opinions remain as follows: (i) assessment of economic damages attributed to Google's alleged wrongdoing is feasible based on the available evidence and data; (ii) the data and methodology relevant to the assessment and computation of the economic impact is common to the class; and (iii) as a result of the alleged wrongdoing, Google obtained Class Members' valuable data and personal information. Given the data collection, Google earned additional profits, and thereby was unjustly enriched.[19]

26.  Regarding unjust enrichment, Google's use of personal user data retrieved from Class Members enables targeted advertising that yields increased revenue. As shown in Rebuttal Table 1 (Mangum Report Table 3) above, there is a methodology that can be used to calculate Google's overall excess profits.  For example, ███████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████████████ █████████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████ (see Rebuttal Table 1). The methodology used to assess unjust enrichment is based on the combination of Google's internal metrics and peer-reviewed published research relating to the various input parameters outlined above. Apportionment of the computed unjust enrichment may be based on not synced user months according to Google's account and profile data.

---

[19]  Mangum Report, ¶ 14.

Patrick Calhoun, et al. v. Google LLC

27.     Regarding restitution of value of personal information, direct and indirect evidence suggests a market price for users' sale of tracking based on the kinds of information at issue in this case. Direct evidence includes what Google itself has paid for users' browsing history and other personal information, by paying users directly through Screenwise. Additional direct evidence shows online users' data has market value and research companies are willing to pay for such data. Numerous companies, including Google, pay users for access to online user data. In each instance, the pricing structure is uniform across users. Indirect evidence includes survey analyses in particular conjoint analyses (indirect evidence). Indeed, Google pays third parties to create panels for tracking users. The market evidence indicates for each data protection product, and thus value for the protection of such data, the pricing structure is uniform across all users. Since Class Members did not receive certain data privacy and protections, they received a reduced value of browsing services.

28.     Regarding unjust enrichment, evidence produced since October 13, 2021 (the time of filing my original report) show Google's own internal analyses using a similar methodology assessing its additional advertising gains from use of user data, performed in the ordinary course of business, follow a methodology that is consistent with the analysis in the Mangum Report. For example, ███████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████ (see Rebuttal Table 1 and Rebuttal Table 3) In addition, when computing profits on the revenue impact, Google applies a ██ percent universal profit margin. Furthermore, Google's own internal analyses confirm that ██████████████████████████████████████████████ ██████████████████████████████████████████████ ███████████████████████████████████ ████████████████████████████ The magnitude of the impact is consistent with the Mangum Report analysis.

29.     Google's data systems and records provide information available for apportionment of
        Google's unjust enrichment to Class Members. Multiple apportionment approaches may be
        considered, including based on each Class Member's (a) share of not synced traffic signals
        sent from Chrome to Google; (b) level of not synced browsing history data stored in
        Google's ██████ data system; or (c) share of revenue associated with the user ID stored in
        Google's data logs.

30.     ████████████████████████████████████████████████████████████████
        ██████████████████████████████████████████████████████
        ███████████████████████████████████████████████████████████
        ███████████████████████████████████████████

31.     The comments on my analysis from Google's experts Dr. Strombom and Professor Erdem
        do not change my opinions and conclusions outlined above, in this report, and in the
        Mangum Report. The opinions from Dr. Strombom and Professor Erdem are flawed,
        misleading, and at times based on different underlying incorrect assumptions, and thus do
        not undermine the opinions and conclusions set forth in the Mangum Report and this report.
        For reasons set forth in this report, my opinions and conclusions remain unchanged and
        instead are further supported by newly received in formation. The following paragraphs
        summarize notable comments on the opinions of Dr. Strombom and Professor Erdem.

32.     Dr. Strombom assumes some Class Members are uninjured. This is largely based on the
        premise that only signed in users or users who did not implement cookie blocking
        applications were harmed. This is an assumption he was asked to make. This is not an
        assumption I have made given the claims in this are case such that all not synced Chrome
        users have their personal information user data improperly sent from Chrome to Google.
        This appears to be consistent with the testing of Plaintiffs' experts, consistent with public
        commentary cited by Dr. Strombom, which shows that cookie blocking is not effective.  To
        the extent that cookie blockers prevented data collection from users, Google received no
        revenue from them, and thus the model does not overcompensate in aggregate.
        Nevertheless, to the extent there is a determination that certain users should be removed
        from the class for this or other reasons, my model and analysis framework can account for

Patrick Calhoun, et al. v. Google LLC

that. For example, as discussed in the Mangum Report and this report, Google's data systems allow for apportionment and user identification based on users not synced signals as well as logs on user revenue. In addition, the information is available for signed in and not signed in users, including ones without a Google account. Based on this type of information, to the extent there is a determination certain members should be removed from the class, that can be accounted for using my analytical framework.

33.   Dr. Strombom suggests calculation of Google's unjust enrichment should follow individualized treatment; this is incorrect. As discussed in this report, among other reasons, the analysis in the Mangum Report is consistent with the aggregate "class-wide" framework and specific metrics Google utilizes in the ordinary course of business with assessing the impact to advertising revenue due to a loss of cookies and personalization.

34.   Dr. Strombom further suggests that the unjust enrichment analysis computed impact on revenue focused on publisher revenue and does not necessarily flow through to an impact to Google's profit given various pricing structures. This assertion is incomplete, misleading, and runs counter to Google's own business practices. For example, Dr. Strombom asserts some advertising pricing is based on fixed fees, thus an impact to that type of publisher revenue would not impact Google revenue. However, fixed fee arrangements are associated with advertising that does not rely on user data and my analytical framework removes such advertising revenue. In addition, Dr. Strombom's assertions again run counter to Google's own practices. For example, ███████████████████████████████████ ███████████████████████████████████████ The profit margin is comparable, both in form and magnitude, with the ████████ net profit margin computed in the Mangum Report.

35.   Regarding restitution damages and the value of user data, Dr. Strombom incorrectly concludes that the Mangum Report market measures (where companies pay for data) relate to data that is dissimilar to the data at issue in this case. Dr. Strombom provides no reasonable basis for reaching this conclusion. Not only are the market measures comparable, but Dr. Strombom appears to ignore, or at least fails to acknowledge, that Google itself pays users for data in the ordinary course of business, with a payment structure uniform across

users, for what Google has determined to be the fair market value for browsing history information collected in association with the same cookie identifiers at issue in this case.

36.    Dr. Strombom and Professor Erdem comment incorrectly on the Mangum Report references to surveys, conjoint analyses, and VPN market measures in the Mangum Report. The point of the references is to show that users value their data and privacy and are willing to pay for data privacy and protection; in addition, the pricing structures for each privacy and protection service is uniform across users (rather than individually customized based on data collected and used). This is what the conjoint studies and market measures show. In addition, I understand Professor John holds the opinion that consumers care about online privacy.

## II.    ANALYSIS AND DISCUSSION OF NEW INFORMATION RECEIVED AND REVIEWED SINCE THE MANGUM REPORT

37.    This section includes discussion, analysis, and comments in response to the newly received materials. Based on the information and analysis presented below, I have determined the opinions and conclusions of the Mangum Report are further supported by the materials and generally remain unchanged.

### II.A. Unjust Enrichment Analysis in the Mangum Report is Based on Sound Economics and Consistent with Google's Own Internal Analyses

#### II.A.1. Mangum Report Unjust Enrichment Analysis Guided by Established Academic and Industry Research Together with Metrics Determined by Google in the Ordinary Course of Business

38.    As discussed above, the methodology in the Mangum Report used for computing the Google unjust enrichment figure includes the following categories of steps: ███████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

Patrick Calhoun, et al. v. Google LLC

██████████████████████████████████████████████████████
██████████████████████████████████████████████

39.   For steps (i) and (ii) (computing the revenue premium), the methodology utilizes various input parameters that are based on internal Google metrics determined in the ordinary course of business, as well as established peer-reviewed literature. For example, information on Chrome market share, Chrome revenue utilizing user data, and Incognito and sync proportions are all based on Google analysis documents available in this matter. The proportion of relevant ad revenue due to personalization is based on the combination of internal Google research and third-party published studies.

40.   Given the construction of the Google revenue premium percentage, the proper application is multiplying the percentage by Google's aggregate advertising revenue figure. As discussed above, the Mangum Report outlines this process for ████████████████████████ ██████████████████████████████ Google publishes aggregate advertising revenue for each advertising category, including Google Search, YouTube ads, and Third-party network pages.[20] The next section shows how Google itself also follows an aggregate impact model when assessing its revenue premium due to ad personalization, or conversely the revenue it would lose without the personalization.

**II.A.2. Google Itself Analyzes Revenue Impact from Loss of Personalization Using an Aggregate "Class-wide" Type of Model**

41.   Newly received and reviewed documents indicate that Google internally investigates the impact of loss of personalization. In doing so, Google applies models following an aggregate "class-wide" type of approach as opposed to a user individualized approach, consistent with my methodology in my opening report.

42.   For example, ████████████████████████████████████████████████ ███████████████████████████████████████████████████████████.[21]

---

[20]   *See also* Mangum Report, Exhibit 2.
[21]   ████████████████████████ (GOOG-CABR-05279094–256 at 100–103) (Liao Ex. 11). I understand this document was produced Nov. 27, 2021.

Patrick Calhoun, et al. v. Google LLC

███████████████████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████ [22]

In reaching the revenue impact conclusions, Google did not perform any individualized user analysis.

43.   Similarly, Google has used a formulaic approach to estimate the revenue impact of losing access to identity across all browser states of Chrome ████████████████ and testimony indicates Google created █████████████████████████████ To date, I understand Google has not produced the documents created by ████████████████████ █████ [23]

44.   In the next section, I show how Google's own analysis of the impact of personalization on advertising revenue not only follows a method nearly identical to the analysis in the Mangum Report, but also returns a computed impact consistent with my analysis.

**II.A.3. Google's Own Method of Analyzing Ad Revenue Premium Based on Personalization is Comparable to the Mangum Report Analysis, Both in Form and Effective Computed Impact**

*II.A.3.a. Google Unjust Enrichment Revenue Premium Percentage*

45.   This section discusses in more detail how the newly received documents further support the reasonableness and appropriateness of the Mangum Report unjust enrichment model. As shown below, the impact analysis contained within the "███████████████████████████" ███████████████████████████████████████████████████████████

---

[22] ████████████████████████████████ n.d. (GOOG-CABR-05279094–256 at 102–103) (Liao Ex. 11).

[23] █████████████████████████ July 17, 2019 (GOOG-CABR-05292934–936) (Liao Ex. 9). I understand this document was produced Nov. 27, 2021.

Highly Confidential — Attorneys' Eyes Only

███████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████ the quantitative outcome is very similar to my original

conclusion in the Mangum Report.

46.    Mangum Report and internal Google advertising revenue premium models follow a similar

multi-step process. The models both include the following steps: ████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ For reference, the unjust enrichment

revenue premium percentage calculation from the Mangum Report Table 3 is reinserted

below.

47.    The internal Google study focused on assessing the impact of ████████
████████████████████████████████████████████████████████
████ [24] ████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████ [25] ████████████████████

48.    Rebuttal Table 3 below includes a summary of the steps in Google's analysis ██████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████████████ [26]
██████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████



---

[24] ████████████████████████████ (GOOG-CABR-05279094–256 at 100–103) (Liao Ex. 11).
[25] ████████████████████████████ (GOOG-CABR-05279094–256 at 100–103) (Liao Ex. 11).
[26] ████████████████████████████ (GOOG-CABR-05279094–256 at 102–103) (Liao Ex. 11).

49.     Steps from Google's own analysis outlined in Rebuttal Table 3 are in many aspects
        consistent with the steps of the independent analysis in the Mangum Report outlined in
        Rebuttal Table 2 above. Notably, Google applies ████████████████████████████
        ████████████████████████████████[27]████████████████████████████████
        ████████████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████████
        ████████████████████████.[28]

50.     To further illustrate the consistency between my unjust enrichment analysis and Google's
        internal analysis ████████████████████████████████████, I have
        performed an alternative analysis that starts with Google's model and then makes the
        selected adjustments to focus on the same categories at-issue in this case. This alternative
        includes ████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████████
        ████████████████████████ This augmented version of Google's internal analysis is
        summarized in Rebuttal Table 4 below. As shown below, the computed revenue premium
        due to personalization, is ████ percent compared with the ████ percent unjust enrichment
        analysis revenue premium included in the Mangum Report (see Rebuttal Table 2 above).

[27] A subset of Google advertising revenue is based on a fixed fee relationship; however, this type of advertising is not based on user data. Declaration of George Levitte, Dec. 17, 2021, ¶ 15. Furthermore, the Mangum Report analysis focuses on revenue based on cookies.

[28] The Mangum Report analysis isolates the revenue from not synced users by applying the proportion of users that are not synced. According to a ████ internal Google presentation, ████████████████████████████████████ ██████████████████████████ (GOOG-CALH-00083131–166 at 143). If it is determined that the ratio of synced rates and synced traffic is different, the methodology remains the same with simply a factor applied to the synced rate parameter. For example, if it is determined that page loads represent an appropriate traffic metric and the ratio for synced users differs for not synced users, the synced input parameter in the analysis may be simply adjusted by a factor, thereby maintaining the overall framework on the analysis. ████████████████████ (GOOG-CALH-00081472–499). I have not received traffic data to compute the synced percentage of Chrome traffic, but such a calculation may be done upon receiving such information. If, in the alternative, I receive additional information summarizing the synced percentage of Chrome traffic, the not synced percentage may be applied in the model, which again, maintains the overall methodology and at most adjusts a single input parameter by a factor. It is my understanding that Google maintains records in the regular course of business that may be used to identify the various percentages of data it receives from users in the different Chrome browser "states" (see, e.g., Rebuttal Report of Professor Zubair Shafiq, Feb. 15, 2022 ("Shafiq Rebuttal Report"), ¶¶ 164-165).



51. Again, following Google's own internal analysis framework, the unjust enrichment revenue premium is ▮ percent compared with the ▮ percent result from the Mangum Report. The difference is largely due to ███████████████████████████████████████████



---

29 ████████████████████████████████ (GOOG-CABR-05279094–256 at 102) (Liao Ex. 11).

Patrick Calhoun, et al. v. Google LLC

52.    Importantly, the internal Google analysis follows an approach consistent with an aggregate class-wide model framework as opposed to an individualized analysis.[30] Furthermore, the formula applied by Google is ███████████████████████████. As with the Mangum Report analysis, Google's analysis ████████████████████████████ ████████████████████████████████████████ ██████ Ultimately, the Mangum Report unjust enrichment revenue calculation follows a framework that new documents discussed here reveal is *nearly identical to Google's own analysis method* for computing such a premium.

*II.A.3.b. Google's Total Unjust Enrichment Revenue Premium*

53.    Additional newly received documents show Google has also analyzed the impact of ████ ████████████████████████████████████████████ ███████████████.[31] Furthermore, as I will show, the magnitude of the Google analysis is consistent with the Mangum Report, thus further supporting my unjust enrichment calculations.

54.    As shown in the alternative internal Google study, in testing the impact ███████████ ███████████████████████████████████████████ ████████████████████████"[32] ████████████████████ ███ ███ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████[34] ██████████████████████████████ ██████████████████████████████████████[35] I understand plaintiffs

---

[30]   In addition, as part of an internal discussion and analysis regarding revenue impact for an individual representative user, Google determines the revenue impact factor due to ██████████████████████████ (GOOG-CABR-03611417–428 at 417) (Bindra Ex. 28).

[31]   ████████████████████████████████ (GOOG-CABR-05292934–936) (Liao Ex. 9).

[32]   ████████████████████████████████ (GOOG-CABR-05292934–936) (Liao Ex. 9).

[33]   Deposition of Huei-Hung (Chris) Liao, Dec. 2, 2021, p. 171.

[34]   For an overview of various identifiers, see the Shafiq Report. Shafiq Report, pp. 12–14.

[35]   Deposition of Huei-Hung (Chris) Liao, Dec. 2, 2021, pp. 168–169.

---

Highly Confidential — Attorneys' Eyes Only

have requested discovery related to these specific projects, however, documents have not yet been provided in response to the request.[36]

55.   For illustration, the Mangum Report computes a ▮▮ percent premium for ▮▮▮▮▮▮ revenue due to personalization and applying the premium to Google's total ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[37] ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

### II.A.4. Mangum Analysis Computes Google Profit Portion Consistent with Financial Disclosures and Approach Applied by Google as Part of Its Own Internal Analyses

56.   To account for additional costs Google incurred associated with earning the computed revenue premium, the Mangum Report computes a profit margin to apply to the revenue premium. The profit margin is based on Google's financial records filed with the SEC. The Mangum Report computes and presents both the gross profit margin and the net profit margin.[38] For example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮

57.   Application of the Google profit margin to the aggregate revenue impact is consistent with Google's own internal methods and analysis for assessing ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[36]   It is also my understanding that the ▮▮▮▮▮▮ referenced by Mr. Liao is one of the Google identifiers that Plaintiffs allege was improperly sent from Chrome to Google and is associated with Google Ads (i.e., google.com or Search Ads).

[37]   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (GOOG-CALH-00160127–137 at 128) (Liao Ex. 10).

[38]   Mangum Report, ¶ 62 and Exhibit 3.

████████. For example, based on an internal analysis, when computing ████████
██████████████████████████████████████████████████████████████████
████████████████████████████████████████[39] Two takeaways
are worth noting. First, according to Google's own analysis, it applies ████████
██████████████████████████████████████████████
Second, the ████████████████████████████ is comparable to the ████████
margin computed in the Magnum Report.

### II.A.5. Strombom's Analysis Regarding Unjust Enrichment Runs Counter to Google's Own Practices

58.   As outlined above, the Mangum Report presents a methodology for computing Google's
      profit premium due to the alleged wrongdoing consistent with Google's own methods of
      analyzing a similar inquiry. The impacts are analyzed at an aggregate level starting with total
      advertising revenue and applying the properly computed revenue percentage premium to
      compute the revenue premium. Profits are then computed by applying the Google profit
      margin to the revenue premium. In other words, Google, in the ordinary course of business,
      also looks into the type of impact questions we are investigating and follows a macro
      approach with a series of steps consistent with the analysis in the Mangum Report, as
      opposed to an individualized approach.

59.   Claims in the Strombom Report to divert from the unjust enrichment analytical framework
      in the Mangum Report run counter to Google's own business practices.[40] Although there are
      multiple examples of Google running analyses consistent with the Mangum Report,
      Dr. Strombom has failed to identify any real-world examples supported by Google's, or
      anyone else's, actual business practices that support assessing the unjust enrichment through
      user-based individualized inquiry. In doing so, Dr. Strombom has failed to provide any

---

[39]  ██████████████████████████████████████████████ (GOOG-CALH-
      00030603–606 at 603).

[40]  For example, according to Dr. Strombom, the unjust enrichment analysis is speculative because it is based on an
      unsupported assumption that the ██████████████████████████████████████
      ██████████████████████████████████████████████ Strombom Report,
      ¶ 91. However, as shown in this report, the framework in the Mangum Report is consistent with the framework Google
      follows when assessing the impact of ████████████████████ and Google applies a uniform
      revenue loss percentage across all ████████ revenue.

support to justify shifting to his proposed methods of analysis that are in direct conflict of Google's internal analyses and methods for computing the revenue and profit premium due to the alleged inappropriate collection of user data.

### II.A.6. Additional New Information for Identifying Google's Unjust Enrichment

60.   Additional materials received since submitting the Mangum Report include information relating to Google remarketing revenue. In general, I understand remarketing relates to customizing ads for users that have previously visited particular sites.

61.   For example, Google also maintains ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████[41]

62.   Google employee Steve Ganem testified that he used this ████████ to determine that the ████████████████████████████████████████████ ████████████████████████[42] These revenues are the result of ████████████████ ████████████████████████████████████████ ████████ that are the product of tracking on non-Google websites. I understand all of this remarketing revenue is due to personal information based tracking. Following the same general methodology outlined in the Mangum Report,[43] the remarketing revenue proportion related to personal information that Chrome sends to Google about non synced users can be calculated by multiplying the following: ████████████████████████████████ ████████████████████████████████████████████████ ████████.[44]



---

[41]   Deposition of Steve Ganem, Feb. 11, 2022, p. 96.
[42]   Deposition of Steve Ganem, Feb. 11, 2022, p. 93.
[43]   ████████████████████████████████████████████████████
[44]   ████████████████████████████████████████████████ (GOOG-CALH-00160127–137 at 132-133) (Liao Ex. 10).

Patrick Calhoun, et al. v. Google LLC

### II.B. Apportionment of the Unjust Enrichment is Available Through Feasible Methods

63.   The Mangum Report outlines a proposed method of allocation of Google's unjust enrichment following a pro-rata approach based on account months.[45] The discussion includes reference to data potentially available, including user data organized within Google's internal systems and programs. For example, the allocation discussion in the Mangum Report references account data indicating account months need not be limited to signed in users. ███████████████████████████████████ ██████████████████████████████████████████████[46] In addition, the Mangum Report apportionment discussion references ████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████[47] The discussion also references Google data for identifying devices with sync on versus sync off.[48] Lastly, the discussion in the Mangum Report references Google information relating to identifying synced users as well as synced traffic logs.[49] As outlined below, I understand this information, together with newly produced information, allow for various methods of apportioning Google's unjust enrichment to class members.

64.   As explained by Plaintiffs' expert Professor Shafiq, Google has the data, systems, and thus ability to confirm Google can identify Class Members, including those without a Google

---

[45]   Mangum Report, ¶¶ 64 and 97.

[46]   The Mangum Report, at ¶ 64, fn. 96, referencing Deposition of David Monsees, June 11, 2021 (volume 2), pp. 452 and 456–457, which notes ██████████████████████████████████████████████████████

[47]   Mangum Report, ¶ 64 and fn. 96; █████████████████████████ (GOOG-CALH-00292922–956 at 935); Shafiq Report, ¶ 98.

[48]   The Mangum Report, at ¶ 64, fn. 95, referencing Deposition of David Monsees, Apr. 9, 2021 (volume 1), pp. 211–212, which notes ██████████████████████████████████████████████████████████████████████████████████████

[49]   The Mangum Report, at ¶ 64, fn. 95, referencing Deposition of David Monsees, Apr. 9, 2021 (volume 1), Exhibit 11. *See also* ████████████████████ (GOOG-CALH-00028489–532 at 519–522) (a Google presentation highlighting sync history logs).

Patrick Calhoun, et al. v. Google LLC

account.[50] Furthermore, the steps discussed below may be applied to apportion Google's unjust enrichment to all Class Members.

65.    I understand Google has data on signals received for users that are not synced, including users labeled as ███████████████████████ (as categorized internally in reference to Google's █████ program) and users who are ███████████[51] The data represent online sessions where users have used Chrome and Google collected user information while not synced.[52] The records include ███████████████████████████████████████ ████████████████████████████████████ Based on this information, the share of total not synced months for each user may be computed. Each share for each Class Member may be used to apportion the unjust enrichment amount.

66.    An alternative apportionment approach is available based on Google's data on user browsing history counts.[53] The data are compiled based on the total number of user communications in Google storage relating to advertisements. According to technical expert Professor Shafiq and newly received documents, Google maintains user browsing data in its storage system referred to as █████████ I understand the history data are available by user and the association of the data with whether the user is synced or not synced is identifiable. I further understand Google's █████ systems includes the browsing history data for non-Google account holders as well. Based on these data from the █████ system, apportionment may be applied using the data for all not synced users by computing each user's share of the total not synced data.

67.    Newly received information support a second alternative approach to allocate the profit premium earned by Google. I understand, per Professor Shafiq (and newly produced documents), the user centric data that Google has also includes ███████████████████ ████████████████████████.[54] ████████████████████████

---

[50]   Shafiq Report, ¶¶ 78–82; Shafiq Rebuttal Report, ¶¶ 157–164 and 189–194.

[51]   Deposition of Tim Schumann, Jan. 13, 2022, pp. 34–50; Plaintiffs' Fourth Request for Production of Documents, Aug. 24, 2021, Exhibit B (Schumann Ex. 2); Shafiq Rebuttal Report, ¶¶ 53 and 165–175.

[52]   Shafiq Rebuttal Report, ¶¶ 543 and 165–175. *See also* Smith Report, Section XIV; Shafiq Report, Section V.

[53]   Shafiq Rebuttal Report, ¶¶ 157–175; Shafiq Report, Section V.

[54]   Shafiq Rebuttal Report, ¶¶ 8, 157–164 and 176–188.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████ [55] For example, I understand the logs include entries on revenue associated with advertisement and user identifier combinations. Based on this information, allocation to Class Members may be performed. This allocation may be done starting with the aggregate unjust enrichment and then allocating using a user revenue-based allocation, where each user is apportioned a share based on his or her not synced associated revenue as a portion of the total logged revenue for all not synced users.

### II.C. Restitution Analysis in the Mangum Report is Based on Sound Economics and Consistent with Google's Position Regarding the Value of User Data

68.    The Mangum Report restitution analysis shows the following: (i) Chrome users value their data and privacy, and given the data allegedly wrongfully collected, Class Members received a reduced value of browsing services; (ii) there is a market for Class Members' user data; and (iii) market measures indicate the market values user data in a manner that is uniform across users.

69.    Browser users value their data and privacy as shown through direct and indirect evidence. This evidence includes peer-reviewed studies, including survey and conjoint analysis, together with market measures. For example, the data protection market measures (e.g., VPNs) show consumers are charged and pay amounts based on pricing uniform across users.

70.    In terms of the data itself, additional market measures show companies, including Google, offer and pay users for access to and collection of their personal online data. As with the data protection market measures, the data acquisition market measures follow a uniform pricing structure where each company pays for data based on pricing scales that apply to all users.

71.    Newly received documents provide additional information regarding Google's practices of paying users for permission to track their Internet activity using the same identifiers at-issue

---

[55] ████████████████████████████████████████████████████
(GOOG-CALH-00042297–340 at 300).

in this case. As discussed in more detail below, Google itself has confirmed its uniform pricing structure reflects the fair market value of user data.

### II.C.1. The Peer-reviewed Research Cited in the Mangum Report Is Consistent with the Conclusion Users Place Value on the Protection and Privacy of Their Data

72.     Professor John opined in her original report that consumers care about privacy on the internet.[56] Professor John explains in her rebuttal report that despite the comments from Professor Erdem, she continues to hold this position regarding users placing value on online privacy.[57]

73.     As far as whether consumers value online privacy, the purpose of a conjoint analysis is to measure the value that consumers place on certain features of a product or service and it is typically employed when there is no adequate market measure that isolates the value of the specific product or feature in question. For example, a car company may engage in a conjoint analysis to determine the value and importance of fuel efficiency compared with other features of the car.

74.     A conjoint analysis may not be necessary when the product or service at issue is, in and of itself, the subject of market transactions. In such cases, an economist does not need to engage in alternative mechanisms and/or consider indirect evidence, such as conjoint analysis, to measure the value. Instead, an economist may look to the price of the product in the real-world (i.e., direct evidence). The Mangum Report discusses both the consideration of such direct and indirect evidence.[58]

75.     Similarly, the Strombom Report asserts that the Mangum Report "fails to account for variation in the value users place on protection of their at-issue data" because, in Dr. Strombom's estimation, "different users . . . have different willingness to disclose their data, and value privacy differently."[59] However, individual variations in "value" that they

---

[56]   Expert Rebuttal Report of Leslie John, Ph.D. Feb. 15, 2022 ("John Rebuttal Report"), ¶ 1.

[57]   John Rebuttal Report, ¶ 2.

[58]   Mangum Report, ¶¶ 37 and 66, and Section V.A.

[59]   Strombom Report, ¶ 163.

place on privacy is not inconsistent with an established market value when there is a direct market price for the item in question. For example, for sentimental reasons, the owner of a family home may place a different "value" on their own home than the market would bear. But the fair market value of the home is the amount that would result from an arms-length sale on the open market. It is no different with the Internet browsing history information and identifiers at-issue in this case. Regardless of any specific user's feelings about privacy and the value of such data, the economic value of the data can be determined by reference to specific marketplace transactions.

### II.C.2. Google Has Determined the Market Value of Users' Data which is Common Across Users

76.    In the Mangum Report, as part of the market measure analysis I discussed the Ipsos Screenwise Panel that Google utilizes to study online behavior.[60] Since the Mangum Report was filed, I have received additional discovery from Google related to ██████████ and specifically the Ipsos Screenwise Panel. This subsection will review the additional information that I have learned, combined with additional publicly available research I performed.

77.    Regarding Google's motivation for running the Screenwise panels, an internal Google panel proposal noted that "███████████████████████" Googles's modeling assumptions.[61] Google further noted ████████████████████████████████████████ ██████████████████████[62]██████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████[63] By way of example, ████████████████████████████████████████ ████████████████████████████████████████████

---

[60]   Mangum Report, ¶ 92.

[61]   ████████████████████████████████████  (GOOG-CABR-04704939–989 at 944).

[62]   ████████████████████████████████████  (GOOG-CABR-04704939–989 at 945).

[63]   ████████████████████████████████████  (GOOG-CABR-04704939–989 at 944).

Patrick Calhoun, et al. v. Google LLC



████████████████████████████████████████████████████████
███████████████████████████████.[64]

78.   The importance of Google's ability to personalize advertising to Google's revenue model
has been made clear as a result of ███████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████[65]████████████████
██████████████████████████████████

79.   Google's own internal documents establish that it believes the ██████████ and ██████
██████████████ of collecting the browsing history information connected to what I understand
to be the same primary identifiers at-issue in this case; this value is ████ per month.[66]

80.   ████████████████████████████████████████████████████
████████████████████████[67] One Google memo notes "████████████████████
████████████████████████████████████████████████████"[68]
████████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████.[69] According to Dr. Ravichandran, a Google
Principal Engineer, ████████████████████████████████████████████████

---

[64] ████████████████████████████ (GOOG-CABR-04704939–989 at 946).
[65] ████████████████████████████████████ (GOOG-CABR-04704939–989).
[66] ████████████████████████████ (GOOG-CABR-04704597–645 at 636); ████████████
████ (GOOG-CABR-04077296–397 at 298); ████████████████████ (GOOG-CABR-04312372)
████████████████; Shafiq Report, pp. 12–14; Ipsos, "Google Panel Privacy Policy," accessed Feb. 2, 2022,
https://screenwisepanel.com/google-panel-privacy-policy ("Google collects data through its meters, including for
example . . . web pages you've visited. . . . Cookies and device information."); Shafiq Rebuttal Report, ¶¶ 195–198 and
202.
[67] ████████████████████████████ (GOOG-CABR-04312372–373).
[68] ████████████████████████████ (GOOG-CABR-04312372–373 at 372).
[69] *See, e.g.,* ████████████ (GOOG-CABR-04077296–307); ████████████████████
████████████████ (GOOG-CABR-04312372–373); ████████████ (GOOG-CABR-04120134–167 at 135).

████████████████████████████████████████████.[70] The approach of Google Panels allows Google to obtain an understanding of what it takes ████████ ██████████████[71] The data are used for a "████████████████████████ ████████████████████████."[72] I understand that it may have been around ████ when Google started using panels.[73]

81. The Screenwise Panel is Google's ████████████████"[74] and its primary purpose "██████████████████████████████"[75] To do so, it ████████████████████ █████████████████████████████████████████████████████████████ ████████████████"[76]

82. ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████"[77] █████████████████████████████████████████████████ ██████████████[78] It is my understanding that this list includes the same identifiers that Chrome sends to Google without authorization in this case—and that Google uses the unauthorized identifiers for the same purposes in this case as it does in the Screenwise Panel.[79]

83. There are several specific panels performed by Ipsos and other companies (on behalf of Google) that Google's discovery has provided details on since the Mangum Report.

---

[70] Deposition of Deepak Ravichandran, Jan. 7, 2022, pp. 194–195.

[71] Deposition of Deepak Ravichandran, Jan. 7, 2022, p. 196.

[72] GOOG-CALH-00721187, ████████████ F95.

[73] Deposition of Deepak Ravichandran, Jan. 7, 2022, p. 203.

[74] ████████████████████████████ (GOOG-CABR-04312372–373).

[75] Ipsos, "Ipsos Screenwise Panel Privacy Policy," accessed Feb. 2, 2022, https://screenwisepanel.com/ipsos-Sow-privacy-policy.

[76] Ipsos, "Ipsos Screenwise Panel Privacy Policy," accessed Feb. 2, 2022, https://screenwisepanel.com/ipsos-Sow-privacy-policy.

[77] ████████████████████████ (GOOG-CABR-04312372–373); ██████████████████████████ (GOOG-CABR-04077296–307 at 301). *See also* ████████████████████████ (GOOG-CALH-00700433–453 at 446).

[78] ██████████████████████ (GOOG-CABR-04312372–373); G████████████████████ ██████████ (GOOG-CALH-00700433–453 at 446).

[79] Shafiq Report, pp. 12–14; Shafiq Rebuttal Report, ¶¶ 195–198 and 202.





84. For instance, the [redacted][80] [redacted][81] [redacted][82] [redacted][83]

85. [redacted][84] [redacted][85]

86. [redacted][86] [redacted][87] [redacted]"[88] [redacted]

[80] [redacted] (GOOG-CABR-04766037–6072 at 6038).

[redacted] (GOOG-CABR-04312372–373).

[81] [redacted] (GOOG-CABR-04766037–6072 at 6041).

[82] [redacted] (GOOG-CABR-04766037–6072 at 6041).

[83] [redacted] (GOOG-CABR-04766037–6072 at 6041). [redacted] (GOOG-CABR-04766037–6072 at 6056).

[redacted] (GOOG-CABR-04704597–645 at 636).

[84] [redacted]. (GOOG-CABR-04704597–645 at 636); [redacted] (GOOG-CABR-04077296–397 at 298).

[85] [redacted] (GOOG-CABR-04766037–6072 at 6056–6057). ("[redacted].")

[86] [redacted] (GOOG-CABR-04704597–645 at 614 and 642–643).

[87] [redacted] (GOOG-CABR-04704939–989 at 967).

[88] [redacted] (GOOG-CABR-04077296–307 at 302). *See also* GOOG-CALH-00721187, [redacted] A95.

87.

88.   As shown through various examples, participants are compensated monthly for participation in Google Screenwise panel studies, which grants Google access to ongoing user data. Participation may include collection of user data through various options, such as a meter browser extension or a mobile app.[92] According to the Screenwise webpage, participation may also include installing a specialized router as an alternative means to track user data in the home.[93] If panelists opt to have the Screenwise router installed, they are compensated an additional $100.[94] Google may also collect additional information from panelists through panel surveys (e.g., name, address, panel ID, demographic information, and information to verify and authenticate panelist participation).[95] In addition to the monthly compensation and potential supplemental router installation compensation, panelists can earn an extra $20 compensation for qualifying for the study.[96]

89.   Google clearly recognizes that the expense related to panels has a tremendous return and benefit for Google as it combines the data collected with other stored Google information. For instance, Ipsos notes Google "may combine your panel data with information in your

89   ███████████████████████████████ (GOOG-CALH-00700433–453 at 442).

90   GOOG-CABR-04618719–722.

91   ███████████████████████████████ (GOOG-CALH-00700433–453 at 437).

92   Google, "Set up the Screenwise Meter browser extension on your computer," accessed Feb. 10, 2022, https://support.google.com/screenwise-meter/answer/9721772?hl=en; Google, "Set up the Screenwise Meter app on your phone or tablet," accessed Feb. 10, 2022, https://support.google.com/screenwise-meter/answer/9721770?hl=en.

93   Ipsos, "Ipsos Screenwise Panel," accessed Feb. 10, 2022, https://screenwisepanel.com.

94   Ipsos, "Ipsos Screenwise Panel," accessed Feb. 10, 2022, https://screenwisepanel.com.

95   Google, "Google Panel Privacy Policy [June 2021]," June 1, 2021, accessed Feb. 10, 2022, https://support.google.com/screenwise-meter/answer/9744317?hl=en.

96   Ipsos, "Ipsos Screenwise Panel," accessed Feb. 10, 2022, https://screenwisepanel.com.

Patrick Calhoun, et al. v. Google LLC

Google Account(s) (e.g., which ads you viewed), or with anonymous or pseudonymous identifiers (such as cookies or unique device identifiers) used by Google products and services."[97] It also notes that "Google may combine Panel Data, Third-Party Data, or Google Account data (including personal information) with advertising cookies like the DoubleClick cookie."[98] And that "Overall, your participation in this Panel changes the way Google will use information it collects from you whenever you're using Google, including the combination of the DoubleClick cookie with personal information."[99] Finally, Ipsos notes that by Google:

> combining Panel Data or Third-Party Data with non-personally-identifiable information collected from third parties (e.g., anonymous cookies), such anonymous information may become personally identifiable and used to identify you. (For example, this type of combined data could be used to help measure the effectiveness of digital advertising among consumers.)[100]

90. As this discussion makes clear, Google values this panel data, is willing to pay money to participants for the data, pays the same amount per month regardless of the user (just "activity" is required), and Google considers this payment amount to be a fair market value.

91. The Strombom Report does not mention Google Panels or Screenwise. Instead, Dr. Strombom asserts that the citations of market measures in the Mangum Report are not relevant because they pay users for different and additional things. For example, Dr. Strombom claims that these programs also require users to "fill out online profiles," "install[] additional apps on their devices," and "fill[] out additional surveys that may reveal sensitive information beyond the scope of the At-Issue Data" such as "behavior" data showing "how frequently a participant uses their computer" or "health or medical conditions, . . . sexual orientation or sexual life, political opinions/views, race/ethnic origin, religious and philosophical beliefs, and trade-union membership."[101]

---

[97]  Ipsos, "Google Panel Privacy Policy," accessed Feb. 2, 2022, https://screenwisepanel.com/google-panel-privacy-policy.
[98]  *Id.*
[99]  *Id.*
[100]  *Id.*
[101]  Strombom Report, ¶ 160.

92.     However, Dr. Strombom is incorrect by stating that the market values cited are not
        sufficiently similar to the conduct here. First, Chrome itself is an app that is installed on the
        user's device. Second, it is my understanding that Google creates detailed online profiles
        based on the data that Chrome improperly sends to Google and these profiles include all of
        the information the Strombom Report says would not be present in what he describes as the
        "At-Issue Data."[102] Thus, while Chrome users may not "fill out online profiles" or
        knowingly "reveal[] sensitive information" via Chrome, Chrome still sends information to
        Google to create the detailed online profiles that the Strombom Report claims are not
        present here. For example, Google assigns "verticals" to users that include all of the
        "sensitive" information categories the Strombom Report claims are not present in this
        case.[103] I am also informed that Chrome sent information to Google in this case about
        certain Plaintiffs' medical interests (including sending Google the exact time of an
        appointment that the Plaintiff was setting up), sexual orientation, specific sexual interests,
        political interests and views, banking information, and education information amongst tens
        of thousands of other instances of Chrome sending the Plaintiffs' data to Google without
        authorization.[104]

### II.D. Google Calculates Revenue by User

93.     From reviewing documents in this matter, it appears Google does, or at least can, compute
        revenue per user. For example, as discussed above, Google's ▮▮▮▮▮▮ system looks at user
        activity and user revenue, including a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"[105] In addition to
        ▮▮▮▮▮, Google identified several data "logs" in January 2022 that contain revenue
        information that is keyed to identifiers for both users with a Google Account and those who

---

[102]  Strombom Report, ¶ 28; GOOG-CALH-00061965; Google, "type Vertical (v201809)," accessed Feb. 7, 2022,
       https://developers.google.com/adwords/api/docs/reference/v201809/CampaignCriterionService.Vertical (noting a
       sample of criteria used for targeting, include, for example, "Vertical," "Age_Range," "Gender," "Parent," and
       "Income_Range," etc., as well as a link to a "complete list of available vertical categories," which is a publicly available
       version of the Google Verticals list, which appears to be a subset of the highly confidential Verticals list produced in this
       matter with more detailed categories); Google, "Verticals," accessed Feb. 7, 2022,
       https://developers.google.com/adwords/api/docs/appendix/verticals. *See also* Shafiq Rebuttal Report, ¶ 202.

[103]  See fn. 102, *supra*.

[104]  Complaint, ¶ 193; Plaintiff's Opposition to Google's Motion for Summary Judgment on Google's First Affirmative
       Defense (Consent), Jan. 10, 2022, pp. 11-12.

[105]  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (GOOG-CALH-00292922–956 at 935).

Patrick Calhoun, et al. v. Google LLC

do not have a Google account.[106] As discussed above, I understand that after consideration of newly received materials, technical expert Professor Shafiq has reached the conclusion that Google's systems and data allow the identification of revenue earned per specific user.[107] This serves as the basis for the third unjust enrichment apportionment approach discussed above.

Russell W. Mangum III

February 15, 2022

---

[106]  Shafiq Rebuttal Report, ¶¶ 157–164 and 176–190.
[107]  Shafiq Rebuttal Report, ¶¶ 157–164 and 176–190.

# Appendix 1



# RUSSELL W. MANGUM III



4 Park Plaza                    T (949) 594-1601
Suite 1930                      mangum@cirqueanalytics.com
Irvine, CA 92614

## CURRENT POSITIONS

Executive Vice President, Cirque Analytics, LLC; 2021- present

Professor, Concordia Univ Irvine, Sch of Business and Economics; 2013 - present

## EDUCATION

Ph.D., economics, University of Southern California, 1995

M.A., economics, University of Southern California, 1992

B.A., economics (hons), Calif. State University, Fullerton, 1988

## SPECIALIZED EXPERIENCE, RESEARCH, OR INTEREST

Antitrust; Commercial Disputes; Intellectual Property; Statistics and Econometrics, Valuation

## PAST POSITIONS

| | | |
|---|---|---|
| 2021 | Visiting Researcher, Univ of Winchester, Sch of Bus, Law, and Tech | Winchester, UK |
| 2007-2021 | Sr. Vice President, Nathan Associates, Inc. | Irvine, CA |
| 2002–2012 | Associate Adjunct Professor, USC, Dept. of Economics | Los Angeles, CA |
| 2001–2007 | Vice President, Analysis Group, Inc. | Los Angeles, CA |
| 2001 | Manager, PricewaterhouseCoopers, Financial Advisory Svcs. | Los Angeles, CA |
| 1998–2001 | Managing Associate, Nathan Associates Inc. | Arlington, VA |
| 1998–2000 | Adjunct Professor, John Hopkins University, Krieger School | Washington, DC |
| 1995–1998 | Economist, U.S. Federal Trade Commission | Washington, DC |

## COURSES TAUGHT

- Principles of Micro/Macroeconomics, Interm. Micro/Macroeconomics, Managerial Economics, Statistics and Econometrics, Finance, Money and Financial Markets, Economics of Sin, Environmental Economics, Business Information Technology, Advanced Topics in Economics

## EXPERIENCE SUMMARY

Dr. Mangum has over 25 years of experience in economic analysis, research, and teaching. His consulting practice centers on economic analysis and damages quantification in matters related to intellectual property and technology, antitrust, class certification, statistical analysis, and complex commercial disputes. Dr. Mangum's experience as an economic expert is extensive, with testimony in over 100 matters before local, state, and federal courts. Dr. Mangum has taught graduate and undergraduate courses in economics, statistics, finance, and econometrics. He is currently an Associate Professor of Economics in the School of Business and Economics at Concordia University Irvine, and has previously taught at Johns Hopkins University, The University of Southern California, and Pepperdine University. Dr. Mangum previously worked at Nathan Associates, Inc., PricewaterhouseCoopers, and The United States Federal Trade Commission, Bureau of Economics.

## PROFESSIONAL EXPERIENCE

### *Intellectual Property*

Dr. Mangum has substantial experience in the area of intellectual property damages, including claims related to infringement of patents; FRAND licensing commitments; patent pools; copyrights; and trademarks; as well as theft of trade secrets; false designation of origin; and false advertising. The case contexts in which Dr. Mangum has performed these analyses include:

- Patent infringement related to:
  - Computer, electronics, and telecommunication industry:
    - Cellular communication network technology;
    - Modem communication devices;
    - Wireless communication network devices (routers, cards, including under FRAND licensing committments);
    - Handheld device navigation applications;
    - NIC hardware and chipsets;
    - Semiconductors;
    - Webswitching and IP router network hardware;
    - Wired and wireless portable electronic temperature sensor devices;
    - Electronic eReader devices;
    - Digital TV Tuners under FRAND licensing commitments;
    - Automated lipsinc animation used in video games;
    - Data encryption devices.
    - VoIP network telephony services.
  - Medical devices:
    - Artificial vertebral disc implants;
    - Trocar seals for laparoscopic surgery;
    - Spinal fusion implants;
    - Breast biopsy devices;
    - Remote medical information monitoring technology.
  - Energy
    - Specialized valves used in oil refining;
    - Electric utility management systems;
    - Wide-area real time phasor measurement and monitoring.
  - Food and agriculture:
    - Additive-infused candy;
    - Nutritional supplements;
    - New variety of late ripening white grapes;

- Structures and methods utilized in the growing of grapes and raisins.
- Business software
  - eProcurement;
  - Business intelligence;
  - Design and simulation;
  - Call routing software;
  - Computer tracking;
  - Program and application management;
- Clothing and clothing design
  - Padded athletic shirits/pants; shoes; headwear; accessories;
- Miscellaneous
  - Electronic nicotine delivery systems (NDS)
  - Personal watercraft devices and accessories
  - Consumer advertising design via use of digital media
  - Automated stapling machines used in bed manufacturing
  - Specialized hardware and control systems used in high-rise elevators
  - Electronic exchange systems for trading of commodities futures contracts
  - Electronic data management system used in public transportation projects
  - Document and print inspection systems
- <u>Trademark, trade dress, or copyright infringement related to:</u>
  - Sponsorship with motorsports, automotive repair tools and devices, beverages and snacks, and apparel;
  - Real estate property aquizition services;
  - Online dining reservation and payment services;
  - Internet search engine terms related to retail sales of food and arranged food products;
  - Enterprise Resource Plannning (ERP) software;
  - Veterinary Teleradiology (online/internet) Services;
  - Devices and software for online mobile device data extraction and IT network devices;
  - Clothing, shoes, and jewelry;
  - Advertising and marketing through wireless mobile communications;
  - Motion picture trademarks in the manufacture of clothing;
  - Furniture products (mechanized and non-mechanized);
  - Portable combustion engines;
  - Infant care products;
  - Homeopathic products;

- Postal measuring products;

- Scented candle products;

- Children's toys;

- Art and art exhibits

- Design plans for a theme amusement park.

- Theft of trade secrets related to:

  - Cold extraction coffee processes

  - Electronic mechanisms for payment processing;

  - Techical documents, Product features, customer data, and marketing methods/models related to Systems for General Floor Hospital Monitiring of patient vital statistics;

  - Training methods, pricing models, and customer status databases related to Enterprise Resourve Plannning (ERP) software;

  - Customer data and information, and pricing models related to employee pension and benefits insurance brokerage services;

  - Government contracted research into laser vibrometry;

  - Devices and software for mobile device data extraction;

  - IT system design and implementation for the US defense industry;

  - Electronic engineering and CAD packages used in US naval warcraft architecture;

  - Methods for mathematical simulations for the pricing of mortgage backed securities;

  - Soy coffee alternative products;

  - Design, development, marketing, and manufacturing of toys;

  - Computer game accessories.

- False advertising, false designation of orgin, or unauthorized use of likeness related to:

  - Chemical dependence treatment services;

  - Real estate property aquizition services;

  - Security monitoring systems and services;

  - Consumer appliances;

  - High Availability Disaster Recovery (HA/DR) business software;

  - Medical data printer systems;

  - Furniture products;

  - Composed music and lyrics used in television commercials;

  - Restaurant meals and shopping services;

  - Internet advertising services via advertorial placement on publishers' websites;

  - Nutritional supplements and beverages.

- Inventorship disputes related to:

  - Cold extraction coffee processes

- Spinal fusion implant systems;
- Interarterial guidewire and embolic filter devices.

## *Competition/Antitrust*

Dr. Mangum has substantial experience in the area of competition and antitrust, including analyses of relevant product and geographic markets, market power, monopolization, and likelihood of monopolization from impending events. These analyses usually include statistical and econometric analysis of market data to identify the extent of competition, and the magnitude of competition. The case contexts in which Dr. Mangum has performed these analyses include:

- Evaluated common impact and estimated damages, for direct and indirect purchasers, from price fixing and other conspiracies in the markets for commercial tissue paper, bulk vitamins, high-end automobiles, ready mix concrete, consumer apparel, Korean noodles, packaged seafood, meat products, interior molded doors, airline travel, and pharmaceuticals.

- Evaluation of alleged competitive foreclosure in the market for sleep apnea products, including relevant markets, market power, and lost profits damages.

- Evaluation of alleged price discrimination across dealers of hardscape building materials.

- Evaluation of antitrust claims and affirmative defenses of patent misuse related to required terms in patent license programs for flash memory semiconductors and systems.

- Evaluation of market segments, market channels, and cost pass-through in the market for DRAM-containing products and NFL brand apparel.

- Estimation of damages related to:

  - A conspiracy to boycott developments in DRAM packaging;

  - Foreclosure of competition in market for footware insoles and inserts.

- Evaluation of competitive effects of exclusive dealing clause in a franchise agreement.

- Evaluated the competitive effects of exclusive dealing policies regarding:

  - Acute care hospital and physician services;

  - Customer purchase data exchange related to direct mail advertising and sales;

  - Free standing insert advertising (coupon) services;

  - Replacement parts for 3-piece body welder systems;

  - Interconnect agreements between internet backbone communication services;

  - Supply of biological inputs used in creating generic biologic therapeutic treatments;

  - Professional sports branded athletic apparel;

  - Durable medical equipment;

  - Pharmaceuticals.

- Analyzed the competitive effects from wrongful patent application and issuance (fraud on the patent office) related to processes and mechanisms for food preparation and processing.

- Analyzed the likely competitive effects of proposed mergers in various industries, including hospital services, physician services, pharmaceuticals, medical insurance, construction aggregates, supermarkets, auto parts, cable systems and programming, industrial refractories, and computer game software.

### _Commercial Disputes_

- Evaluated damages related to alleged breach of contract involving collection and retention of personalized information connected ot web browsing activity.

- Evaluated damages related to alleged breach of contract involving online storage agreements.

- Evaluated claims of damages related to attempted sale of cold extraction coffee company and the discovery of patents allegedly based on confidential information.

- Evaluated claims of damages related to failure to close a sale for multiple solar energy production peoperties/companies.

- Estimated damages in the form of lost profits from breach of contract in a services joint venture involving use of indexes and associated data for creation and analysis of international financial securitied and derivatives.

- Estimated damages in the form of disgorgement and lost company value related to brokerage services involving employee pension and benefit programs.

- Evaluated claims of replacement cost and lost profits damages related to alleged interference in the market for femtocell wireless communication products.

- Evaluated claims of damages in the form of lost profits and disgorgement of compensation and benefit from alleged unauthorized use of confidential materials in the market for government contracts for research into laser vibrometry.

- Estimated damages from employee theft of HDD computer memory products from s research/testing facility. Calculated value based on historical in-channel market price and on historical costs of manufacturing and sales.

- Evaluated claims of lost profits damages arising from alleged professional malpractice related to commercial development and land use.

- Provided statistical and data analysis of invoices for disaster recovery and construction services. Estimated lost profits related to alleged fraud, breach of contract, and tortious interference.

- Estimated damages related to alleged breaches of contract, including:

  - Contract involving the development and sale of solar power generation projects;

  - Contract involving the supply of active incredients in nutriceuticals;

  - Non-solicitation agreement between government defense contracting companies;

  - Contract for concession services at amusement parks;

  - Contract for creation and promotion of credit reporting services;

  - Contract for supply of MLB jerseys used in creation of sports memorabilia;

  - Contract for blending and supply contracts for specialized non-dairy beverages;

  - Non-compete clauses (restaurant lease, franchising, structural steel fabrication);

  - Contract for earning and redeeming of frequent flyer miles;

  - Contract for purchase of television airtime on a local over-the-air station;

  - Contract for representation and sale of television programming;

  - Royalty contract regarding design and functionality elements use in toys;

  - Contract for technology and support from software conference bridge systems;

Jackson Hole, WY                Irvine, CA                Los Angeles, CA                Washington, DC

- Contract for conference calling services and long distance calls connection services.

- Estimated damages from defamation related to the launch of a clinic for medical disorders.

- Evaluated claims by the CA Coastal Commission related to lost recreational value from proposed coastal bluff seawall construction.

- Evaluated concepts and methods for calculating proceeds from from a Qi Tam suit related to improper medical lab billing practices.

- Estimated damages related to Quantum Meruit claims involving use of software to manage viewing and storage of electronic medical images.

### *Employment and Labor*

- Estimated damages related to lost profits; lost company value, employee training and hiring expense, and/or disgorgement of defendant's profits in multiple cases related to the alleged breach of non-solicitation agreements and unauthorized use of confidential information by departing employees the insurance and MLM health and wellness industries.

- Estimated lost profits damages and/or disgorgement of defendant's profits in multiple cases related to the alleged breach of non-solicitation agreements and unauthorized use of confidential information involving government defense contracting companies.

- Estimated plaintiff's lost profits and disgorgement of defendant's profits related to the theft of trade secrets by departing employees in the automated emergency/disaster response industry.

- Estimated disgorgement of defendant's profits related to the theft of trade secrets by departing employees in the naval engineering industry.

- Provided statistical analysis of employee time card and pay data to estimate instances of underpayment or missed breaks.

- Estimated lost earnings and compensation damages related to an alleged wrongful termination of an employee; evaluated lost wages/earnings, lost retirement benefits, and lost compensation through stock options.

- Estimated damages to an employee/inventor related to exclusion as an inventor from PCT applications following termination from a start-up medical devices company; evaluated the plaintiff's claims of lost share of proceeds from technology share.

### *Statistical and Econometric Analysis*

- Performed regression analysis to evaluate class-wide damages related to class certification in the context of alleged conspiracy on the prices of interior molded doors.

- Performed regression analysis to evaluate class-wide damages related to class certification in the context of alleged conspiracy on the prices of packaged seafood.

- Performed regression analysis to evaluate class-wide damages related to class certification in the context of alleged conspiracy on the prices of transatlantic air travel.

- Performed regression analysis to evaluate class-wide damages related to class certification in the context of alleged conspiracy on the prices of Korean noodle products.

- Evaluated regression and statistical analysis offered in support of damages related to an alleged breach of non-solicitation agreements and unauthorized use of confidential information by departing employees the insurance and MLM health and wellness industries.

- Evaluated regression and statistical analysis offered in support of damages and common impact in an indirect purchaser class action related to alleged false advertising for nutritional supplement beverages.

- Performed regression analysis to evaluate class-wide damages related to class certification in the context of alleged conspiracy and exclusive agreement between professional sports teams and an apparel manufacture.

- Performed regression analysis to estimate class-wide damages related to class certification in the context of alleged price fixing in markets for ready mix concrete.

- Performed regression analysis to estimate pass-through of anticompetitive price increases in the manufacturing and sale of DRAM and DRAM containing devices.

- Provided statistical analysis of employee time card and pay data to estimate instances of underpayment or missed breaks.

- Provided sampling techniques and statistical analysis of customer service database to estimate the extent of use of an allegedly infringing feature in a commercial router.

- Evaluated sampling techniques and extrapolation estimates related to allegedly improper medical billing practices and in the context of damages related to construction defects.

- Provided statistical and econometric analysis of survivorship related to consumer membership attrition in credit reporting programs.

- Provided statistical and econometric analysis of the correlation between purchase of infringing products and consequential purchase of related services.

- Provided statiscal analysis and estimate of medical product sales in the absence of data from third party sales force.

- Provided statiscal and econometric analysis of conference calling minutes related to alleged intentional interference and unfair competition.

- Conducted statistical analysis of incremental costs in support of lost profits calculations.

## EXPERT WITNESS EXPERIENCE (SINCE 2017)

- *In Re Broiler Chicken Antitrust Litigation,* United States District Court, Northern District of Illinois (2022). Provided deposition testimony on behalf of plaintiffs related to the economic effects of an alleged conspiracy to constrain capacity in the broiler chicken industry.

- *VRtoysone, LLC, et al v. Disney Interactive Studios, Inc.,* United States District Court, Central District of California, Western Division (2022). Submitted an expert report on behalf of Defendant involving damages related to alleged patent infringement involving video games.

- *Lauren Adele Oliver v. Meow Wolf Inc., et al.,* United States District Court for the District of New Mexico (2022). Submitted an expert report on behalf of plaintiff involving damages related to alleged copyright infringement involving art and art exhibits.

- *Patrick Calhoun, et al. v. Google LLC,* United States District Court, Northern District of California (2021). Submitted an expert report on behalf of plaintiff class involving damages and common impact related to alleged breach of contract involving the collection and retention of personalized information connected to web browsing activity.

- *CPI Security Systems Inc. v. Vivint Smart Home Inc. et al.,* United States District Court, Western District of North Carolina, Charlotte Division (2021). Provided deposition testimony on behalf of plaintiff involving unjust enrichment and royalty damages related to alleged false advertising and unfair competition related to security monitoring systems and services.

- *Martifer-Silverado Fund I, LLC and Silverado Power LLC v. Talesun Solar USA, Ltd.,* Superior Court of California, San Francisco County (2021). Provided trial and depsition testimony on behalf of Defendant, related to alleged breach of contract involving solar energy projects.

- *Javo Beverage Co., Inc., v. Stephen Corey,* American Arbitration Association (2021). Provided trial (arbitration) and deposition testimony on behalf of respondent related to breach of contract and misappropriation of confidential information and technology in the market for coffee extracts.

- *Andrea Wlliams and James Stewart (class reps) v. Apple Inc.,* United States District Court, Northern District of California (2021). Submitted an expert report on behalf of plaintiffs related to damages involving alleged breach of contract regarding provision of electronic file storage.

- *QC Manufacturing, Inc., v. Solatube International, Inc. and Brighter Concepts, Inc. dba Solatube Home Daylight,* JAMS Arbitration, Los Angeles, CA (2020). Provided trial (arbitration) testimony on behalf of complainant related to a breach of contract (litigation settlement agreement) involving whole house fans.

- *Sprint Communications Company LP v. Cequel Communications, LLC, et al.,* United States District Court, District of Delaware (2020). Provided deposition testimony on behalf of plaintiff related to lost profits and royalty damages from alleged patent infringement involving VoIP telephony network services.

- *In Re Domestic Airline Travel Antitrust Litigation,* United States District Court, District of Columbia (2020). Provided deposition testimony on behalf of plaintiff class related to the economic effects of an alleged conspiracy to constrain capacity in the domestic airline travel industry.

- *RV Skincare Brands LLC v. Digby investments Ltd.., Quickbox LLC, et al.,* United States District Court, Southern District of New York (2020). Submitted an expert report on behalf of certain defendant related to damages from alleged counterfeit sales and trademark infringement involving fulfillment of skincare product commerce.

- *Cisco Systems Inc. et al. v. Zahid Hassan Sheikh et al.,* United States District Court, Northern District of California (2020). Provided deposition testimony on behalf of certain defendants related to damages from alleged counterfeit sales and trademark infringement involving transceiver and switching IT network equipment.

- *San Diego Country Credit Union v. Citizens Equity First Credit Union,* United States District Court, Southern District of California (2020). Provided deposition testimony on behalf of plaintiff related to damages flowing from fraudulent declaration in the registration of a trademark involving credit unions.

- *Sprint Communications Company LP v. Atlantic Broadband Finance LLC, et al.,* United States District Court, District of Delaware (2020). Provided deposition testimony on behalf of plaintiff related to lost profits royalty damages from alleged patent infringement involving VoIP telephony network services.

- *Sprint Communications Company LP v. Charter Communications Inc. et al.,* United States District Court, District of Delaware (2020). Provided deposition testimony on behalf of plaintiff related to lost profits and royalty damages from alleged patent infringement involving VoIP telephony network services.

- *Sprint Communications Company LP v. Mediacom Communications Corp.*, United States District Court, District of Delaware (2020). Provided deposition testimony on behalf of plaintiff related to lost profits and royalty damages from alleged patent infringement involving VoIP telephony network services.

- *Sprint Communications Company LP v. TPC Global LLC et al.*, United States District Court, District of Delaware (2020). Provided deposition testimony on behalf of plaintiff related to lost profits and royalty damages from alleged patent infringement involving VoIP telephony network services.

- *Sprint Communications Company LP v. Wideopenwest Inc. et al.*, United States District Court, District of Delaware (2020). Provided deposition testimony on behalf of plaintiff related to lost profits and royalty damages from alleged patent infringement involving VoIP telephony network services.

- *S&P Dow Jones Indices LLC and SPDJ Singapore Pte Ltd. v. BSE Ltd.,* United States District Court, Northern District of California (2020). Provided trial (tribunal) testimony on behalf of claimants and counterrespondants for an arbitration concerning damages from breach of contract in a service joint venture related to the use of indexes and associated data for creation and analysis of international financial securitied and derivatives.

- *In Re: Molded Doors Indirect Purchaser Antitrust Litigation*, United States District Court, Eastern District of Virginia, Richmond Division (2020). Provided deposition testimony related to class certification and the merits phase of an antitrust case on behalf of an indirect purchaser plaintiff class related to the evaluation of common impact, pass-through, and class wide damages involving alleged collusion on the prices for interior molded doors.

- *Citcon USA LLC v. Riverpay Inc. et al.,* United States District Court, Northern District of California (2019). Provided trial and deposition testifimony on behalf of defendant/counterplaintiff concerning damages from alleged tortious intereference and breach of contract involving electronic payment processing network services.

- *3G Licensing, et al., v. Lenovo Group Ltd., et al.,* United States District Court, District of Delaware (2019). Submitted an expert report on behalf of defendants Lenovo and Motorola Mobility related to reasonable royalty damages for patent infringement involving cellular phone network technologies.

- *Inteliquent, Inc. v. Free Conferencing Corporation, et al.,* United States District Court, Northern District of Illinois, Eastern Division (2019). Provided deposition testimony on behalf of Counterclaim Plaintiffs, related to alleged breach of contract, intentional interference, and unfair competition involving conference calling services and long-distance calls connection network services.

- *In Re: Packaged Seafood Products Litigation*, United States District Court, Southern District of California (2019). Provided deposition testimony related to the merits phase of the case and also testfied at a bench trial (evidentiary hearing) on behalf of direct purchaser plaintiff class related to class certification and estimation of class wide damages in an antitrust case involving alleged collusion on the prices for packaged seafood. Also issued initial and reply reports regarding class certification and initial and reply reports related to antitrust effects and damages.

- *T.R.P. Company, Inc., v. Similasan AG and Similasan Corporation,* United States District Court, District of Nevada (2019). Provided deposition testimony on behalf of plaintiff/counter-defendant involving unjust enrichment and lost profits related to trademark infringement of certain homeopathic products.

- *Advanced Digital Solutions International, Inc., v. Rahi Systems, Inc., et al.,* Superior Court for the State of California, County of Alameda (2019). Provided deposition testimony on behalf of plaintiff concerning disgorgement damages related to trade secret misappropriation involving the theft of customer lists.

• *ADT LLC and ADT US Holdings v. Alder Holdings LLC, et al.,* United States District Court, Southern District of Florida, Palm Beach Division (2019). Provided trial and deposition testimony on behalf of plaintiff involving unjust enrichment and royalty damages related to alleged false advertising and unfair competition, and contempt of injunction related to security monitoring systems and services.

• *ADT LLC v. Security Networks LLC et al.,* United States District Court, Southern District of Florida, Palm Beach Division (2019). Submitted an expert report on behalf of plaintiff involving unjust enrichment and royalty damages related to alleged false advertising and unfair competition, and contempt of injunction related to security monitoring systems and services.

• *ADT LLC & ADT US Holdings, Inc. v. Northstart Alarm Services LLC et al.,* United States District Court, Southern District of Florida (2019). Submitted an expert report on behalf of plaintiff involving unjust enrichment and royalty damages related to alleged false advertising and unfair competition, and contempt of injunction related to security monitoring systems and services.

• *Grasshopper House LLC. V. Clean & Sober Medua LLC., et al.,* and *Cliffside Malibu, et al. v. Grasshopper House LLC, et al.* United States District Court, Central District of California, Western Division (2019). Provided trial and deposition testimony on behalf of counterclaim plaintiffs involving damages from alledged false advertising related to treatment services for chemical dependence.

• *In Re Korean Ramen Antitrust Litigation,* United States District Court, Northern District of California, San Francisco Division (2018). Provided trial and deposition testimony on behalf of a class of purchasers of Korean Noodles related to damages from an alledged antitrust price fixing conspiracy.

• *Monster Energy Company v. Integradted Supply Network LLC,* United States District Court, Central District of California (2018). Provided trial testimony on behalf of plaintiff related to damages from alleged trademark and trade dress infringement involving beverages and snacks, tools, and clothing, motorsports and sponsorship and promotion.

• *Soteria Encryption LLC v. Apricorn Inc., et al.,* United States District Court, Central District of California, Western Division (2018). Submitted an expert report on behalf of defendants Apricorn and Lenovo related to reasonable royalty damages for patent infringement involving data encryption network devices.

• *McRO Inc. v. Bandai Nameco Games America Inc., et al.,* United States District Court, Central District of California, Western Division (2018). Provided deposition testimony on behalf of certain defendants related to damages from alleged patent infringement involving automated lipsinc animation used in video games.

• *In Re: Transpacific Passenger Air Transportation Antitrust Litigation,* United States District Court, Northern District of California San Francisco Division (2018). Provided deposition testimony on behalf of direct purchaser plaintiff class related to class certification and estimation of class wide damages in an antitrust case involving alleged collusion on the prices for transatlantic air travel.

• *Express Homebuyers USA, LLC, v. WBH Marketing Inc.,* United States District Court, Eastern District of Virgina, Alexandria Division (2018). Provided deposition testimony on behalf of defendant/counterplaintiff related to damages from alleged trademark infringement and trade libel involving real estate propery acquisition services.

## RESEARCH PAPERS AND PUBLICATIONS

- "FRAND Commitments and Royalties for Standard Essential Patents", with S. Bosworth and E. Matolo, in <u>Complications and Quandaries in the ICT Sector</u>, Bharadwaj, Gupta, and Devaiah eds., Ch. 2, Springer Open, ISBN 978-981-10-449570, 2018.

- "Corrective Advertising in Lanham Act Damages: The Use and Misuse of Past Advertising Expenditures" with S. Bosworth and E. Matolo, *The Trademark Reporter*, May-June Volume, 2017.

- "The Case for Admitting Settlement License Agreements in a Reasonable Royalty Analysis," with S. Conroy and R. Knudsen, 2011, *Les Nouvelles,* Volume XLVI No. 4, 2012.

- "Cost Analysis," with J. Kinrich and A. Meister, in <u>Intellectual Property Damages, Guidelines and Analysis,</u> 2004 supplement, M. Glick, L. Reymann, and R. Hoffman, eds., Chapter 14a, Wiley: New York.

- "Analysis and Measurement of Damages in Patent Infringement Actions," with J. Kinrich, 2003, proceedings of Practicing Law Institute.


## PAST OR PRESENT AWARDS, PROFESSIONAL MEMBERSHIPS

Outstanding Antitrust Litigation Achievement in Economics, American Antitrust Institute, 2019

American Antitrust Institute, advisory board member

American Bar Association, member

American Economic Association, member

Licensing Executives Society, member, chapter chair

Los Angeles County Bar Association, member

Los Angeles Intellectual Property Law Association, member

Orange County Bar Association, member

Orange County Patent Law Association, member

Patrick Calhoun, et al. v. Google LLC

# Appendix 2
# Additional Materials Received

### Legal documents

- [Proposed] Order Denying Plaintiffs' Motion for Class Certification, Dec. 22, 2021
- [Proposed] Order Granting Class Action Certification, Oct. 14, 2021
- [Proposed] Order Granting Google's Motion to Strike Report of Plaintiffs' Damages Expert Russell Mangum, III, Ph.D, Dec. 22, 2021
- [Proposed] Order Granting Plaintiffs' Administrative Motion to Seal, Oct. 14, 2021
- [Proposed] Order Granting Plaintiffs' Request for Judicial Notice in Support of Motion for Class Certification, Oct. 14, 2021
- *Chasom Brown, et al. v. Google LLC,* Order Denying Motion to Dismiss, Case No. 20-CV-03664-LHK, Dec. 22, 2021
- Declaration of Abdelkarim Mardini in support of Google's Opposition to Plaintiffs' Motion for Class Certification, Dec. 22, 2021
- Declaration of Adam Prom in Support of Plaintiffs' Administrative Motion to Seal, Oct. 14, 2021
- Declaration of David Crossland Regarding Google Fonts API in Opposition to Plaintiffs' Motion for Class Certification, Dec. 22, 2021
- Declaration of David Monsees Regarding Signed-In and Signed-out User Data in Support of Google's Opposition to Plaintiffs' Motion for Class Certification, Dec. 22, 2021
- Declaration of George Levitte, Dec. 17, 2021
- Declaration of George Levitte, Regarding Google Ad Manager Profits in Opposition to Plaintiffs' Motion for Class Certification, Dec. 22, 2021
- Declaration of Glenn Berntson Regarding Google Ad Manager in Opposition to Plaintiffs' Motion for Class Certification, Dec. 22, 2021
- Declaration of Gregory Fair Regarding Google's Disclosures in Support of Google's Opposition to Plaintiffs' Motion for Class Certification, Dec. 22, 2021
- Declaration of Jay Barnes in Support of Plaintiffs' Opposition to Google's Motion for Summary Judgment on Google's First Affirmative Defense (Consent); Objections Per Civil L.R. 7-3(a), Jan. 10, 2022
- Declaration of Lesley E. Weaver in Support Plaintiffs' Motion for Class Certification, Oct. 14, 2021
- Declaration of Ryan Cassidy Regarding Google Maps Embed API in Support of Google's Opposition to Plaintiffs' Motion for Class Certification, Dec. 22, 2021
- Declaration of Stephen A. Broome in Support of Google's Opposition to Plaintiffs' Motion for Class Certification, Dec. 22, 2021
- Declaration of Steve Ganem Regarding Google Analytics In Opposition to Plaintiffs' Motion for Class Certification, Dec. 22, 2021
- Declaration of Tim Schumann in Support of Google's Opposition to Plaintiffs' Motion for Class Certification, Dec. 22, 2021
- Declaration of Viola Trebicka in Support of Google's Motion to Strike Report of Plaintiffs' Damages Expert Russell Mangum, III, Ph.D, Dec. 22, 2021
- Google's Opposition to Plaintiff's Motion for Class Certification, Dec. 22, 2021
- Notice of Motion and Motion to Strike Report of Plaintiffs' Damages Expert Russell Mangum, III, Ph.D, Dec. 22, 2021
- Plaintiffs' Administrative Motion to Seal, Oct. 14, 2021
- Plaintiffs' Notice of Motion and Motion for Class Certification and Appointment of Class Representatives and Class Counsel; Memorandum of Law in Support Thereof, Oct. 14, 2021

Confidential – Attorneys' Eyes Only

# Appendix 2
# Additional Materials Received

- Plaintiffs' Opposition to Google's Motion for Summary Judgment on Google's First Affirmative Defense (Consent); Objections Per Civil L.R. 7-3(a), Jan. 10, 2022
- Plaintiffs' Request for Judicial Notice in Support of Motion for Class Certification, Oct. 14, 2021

### Expert reports

- Declaration of Leslie K. John, Oct. 13, 2021
- Errata to Expert Report of Bruce A. Strombom filed December 22, 2021, Jan. 30, 2022
- Expert Rebuttal Report of Leslie John, Ph.D., Feb. 15, 2022
- Expert Rebuttal Report of Richard M. Smith in Support of Plaintiffs' Motion for Class Certifcation, Feb. 15, 2022
- Expert Report of Bruce Strombom, Dec. 22, 2021
- Expert Report of Georgios Zervas, PhD, Dec. 22, 2021
- Expert Report of Professor Joseph Turow, Oct. 13, 2021
- Expert Report of Professor Paul Schwartz in Support of Google LLC's Opposition to Plaintiffs' Motion for Class Certification, Dec. 22, 2021
- Expert Report of Richard M. Smith in Support of Plaintiffs' Motion for Class Certification, Oct. 14, 2021
- Expert Report of Russell W. Mangum III, Ph.D. in Support of Plaintiffs' Motion for Class Certification, Oct. 13, 2021
- Expert Report of Tülin Erdem, Ph.D., Dec. 22, 2021
- Expert Report of Yiling Chen, Ph.D., Dec. 22, 2021
- Rebuttal Report of Professor Zubair Shafiq, Feb. 15, 2022
- Report of Prof. Zubair Shafiq, Oct. 13, 2021

### Depositions (and exhibits)

- Deposition of Abdelkarim Mardini, Nov. 23, 2021
- Deposition of Alexei Svitkine, Oct. 4, 2021
- Deposition of Bruce Strombom, Jan. 31, 2022
- Deposition of Chetna Bindra, Feb. 8, 2022
- Deposition of Curt Harting, Aug. 4, 2021
- Deposition of David Monsees, Apr. 9, 2021
- Deposition of David Monsees, June 11, 2021
- Deposition of Deepak Ravichandran, Jan. 7, 2022
- Deposition of Gregory Lon Fair, Jan. 6, 2022
- Deposition of Huei-Hung (Chris) Liao, Dec. 2, 2021
- Deposition of Justin Schuh, Jan. 7, 2022
- Deposition of Leslie John, Nov. 16, 2021
- Deposition of Russell Mangum, Dec. 7, 2021
- Deposition of Sam Heft-Luthy, Dec. 20, 2021
- Deposition of Steve Ganem, Feb. 11, 2022
- Deposition of Tim Schumann, Jan. 13, 2022
- Deposition of Tülin Erdem, Feb. 4, 2022

Confidential – Attorneys' Eyes Only

Patrick Calhoun, et al. v. Google LLC

# Appendix 2
# Additional Materials Received

**Publicly available materials**

- Google, "Google Panel Privacy Policy [June 2021]," June 1, 2021, accessed Feb. 10, 2022, https://support.google.com/screenwise-meter/answer/9744317?hl=en
- Google, "Set up the Screenwise Meter app on your phone or tablet," accessed Feb. 10, 2022, https://support.google.com/screenwise-meter/answer/9721770?hl=en
- Google, "Set up the Screenwise Meter browser extension on your computer," accessed Feb. 10, 2022, https://support.google.com/screenwise-meter/answer/9721772?hl=en
- Google, "type Vertical (v201809)," accessed Feb. 7, 2022, https://developers.google.com/adwords/api/docs/reference/v201809/CampaignCriterionService.Vertical
- Google, "Verticals," accessed Feb. 7, 2022, https://developers.google.com/adwords/api/docs/appendix/verticals
- Ipsos, "Google Panel Privacy Policy," accessed Feb. 2, 2022, https://screenwisepanel.com/google-panel-privacy-policy
- Ipsos, "Ipsos Screenwise Panel Privacy Policy," accessed Feb. 2, 2022, https://screenwisepanel.com/ipsos-Sow-privacy-policy
- Ipsos, "Ipsos Screenwise Panel," accessed Feb. 10, 2022, https://screenwisepanel.com
- Patience Haggin, "Personal Data is Worth Billions. These Startups Want You to Get a Cut," *Wall Street Journal*, Dec. 4, 2021

**Bates documents on following pages**

Patrick Calhoun, et al. v. Google LLC

# Appendix 2
# Additional Materials Received

| | | | |
|---|---|---|---|
| GOOG_ERDEM_00000001 | GOOG-CABR-00394001 | GOOG-CABR-03746369 | GOOG-CABR-04143481 |
| GOOG_ERDEM_00000002 | GOOG-CABR-00422093 | GOOG-CABR-03755838 | GOOG-CABR-04178546 |
| GOOG_ERDEM_00000003 | GOOG-CABR-00803929 | GOOG-CABR-03796439 | GOOG-CABR-04262548 |
| GOOG_ERDEM_00000004 | GOOG-CABR-00833007 | GOOG-CABR-03797938 | GOOG-CABR-04262597 |
| GOOG_ERDEM_00000005 | GOOG-CABR-00891712 | GOOG-CABR-03806268 | GOOG-CABR-04295215 |
| GOOG_ERDEM_00000006 | GOOG-CABR-00891714 | GOOG-CABR-03810239 | GOOG-CABR-04307445 |
| GOOG_ERDEM_00000007 | GOOG-CABR-00891788 | GOOG-CABR-03839059 | GOOG-CABR-04307792 |
| GOOG_ERDEM_00000008 | GOOG-CABR-00892126 | GOOG-CABR-03910118 | GOOG-CABR-04312372 |
| GOOG_ERDEM_00000009 | GOOG-CABR-00892310 | GOOG-CABR-03922042 | GOOG-CABR-04320250 |
| GOOG_ERDEM_00000010 | GOOG-CABR-03609861 | GOOG-CABR-03958381 | GOOG-CABR-04323412 |
| GOOG_ERDEM_00000011 | GOOG-CABR-03611417 | GOOG-CABR-03958737 | GOOG-CABR-04332048 |
| GOOG-BRWN-00439740 | GOOG-CABR-03612539 | GOOG-CABR-03958868 | GOOG-CABR-04334587 |
| GOOG-CABR- 04335703 | GOOG-CABR-03662816 | GOOG-CABR-03958888 | GOOG-CABR-04334904 |
| GOOG-CABR-00056828 | GOOG-CABR-03664145 | GOOG-CABR-03959107 | GOOG-CABR-04335409 |
| GOOG-CABR-00058823 | GOOG-CABR-03666182 | GOOG-CABR-03959638 | GOOG-CABR-04335703 |
| GOOG-CABR-00058854 | GOOG-CABR-03667673 | GOOG-CABR-03987333 | GOOG-CABR-04343377 |
| GOOG-CABR-00059481 | GOOG-CABR-03678402 | GOOG-CABR-03987411 | GOOG-CABR-04400013 |
| GOOG-CABR-00078787 | GOOG-CABR-03679627 | GOOG-CABR-03987555 | GOOG-CABR-04401542 |
| GOOG-CABR-00078857 | GOOG-CABR-03681262 | GOOG-CABR-03987609 | GOOG-CABR-04408702 |
| GOOG-CABR-00086613 | GOOG-CABR-03681278 | GOOG-CABR-03987813 | GOOG-CABR-04424333 |
| GOOG-CABR-00111801 | GOOG-CABR-03683283 | GOOG-CABR-04016378 | GOOG-CABR-04426037 |
| GOOG-CABR-00111820 | GOOG-CABR-03731352 | GOOG-CABR-04026136 | GOOG-CABR-04426147 |
| GOOG-CABR-00114794 | GOOG-CABR-03734748 | GOOG-CABR-04067825 | GOOG-CABR-04426723 |
| GOOG-CABR-00119247 | GOOG-CABR-03736640 | GOOG-CABR-04073287 | GOOG-CABR-04427115 |
| GOOG-CABR-00125420 | GOOG-CABR-03738851 | GOOG-CABR-04077296 | GOOG-CABR-04427847 |
| GOOG-CABR-00138089 | GOOG-CABR-03739850 | GOOG-CABR-04081453 | GOOG-CABR-04450050 |
| GOOG-CABR-00139647 | GOOG-CABR-03739924 | GOOG-CABR-04120134 | GOOG-CABR-04455208 |
| GOOG-CABR-00180970 | GOOG-CABR-03740087 | GOOG-CABR-04122413 | GOOG-CABR-04468818 |
| GOOG-CABR-00186134 | GOOG-CABR-03740938 | GOOG-CABR-04123091 | GOOG-CABR-04484450 |
| GOOG-CABR-00373424 | GOOG-CABR-03743823 | GOOG-CABR-04142644 | GOOG-CABR-04509888 |

Confidential – Attorneys' Eyes Only

Patrick Calhoun, et al. v. Google LLC

# Appendix 2
# Additional Materials Received

| | | | |
|---|---|---|---|
| GOOG-CABR-04510445 | GOOG-CABR-04683191 | GOOG-CABR-05126022 | GOOG-CALH-00031076 |
| GOOG-CABR-04512322 | GOOG-CABR-04692764 | GOOG-CABR-05155125 | GOOG-CALH-00031094 |
| GOOG-CABR-04514040 | GOOG-CABR-04696282 | GOOG-CABR-05156497 | GOOG-CALH-00031109 |
| GOOG-CABR-04514284 | GOOG-CABR-04696440 | GOOG-CABR-05169276 | GOOG-CALH-00031131 |
| GOOG-CABR-04521270 | GOOG-CABR-04704298 | GOOG-CABR-05269357 | GOOG-CALH-00042297 |
| GOOG-CABR-04595346 | GOOG-CABR-04704597 | GOOG-CABR-05269991 | GOOG-CALH-00044423 |
| GOOG-CABR-04599629 | GOOG-CABR-04704939 | GOOG-CABR-05279094 | GOOG-CALH-00045185 |
| GOOG-CABR-04600026 | GOOG-CABR-04705374 | GOOG-CABR-05280150 | GOOG-CALH-00050667 |
| GOOG-CABR-04600066 | GOOG-CABR-04706522 | GOOG-CABR-05292934 | GOOG-CALH-00053196 |
| GOOG-CABR-04602308 | GOOG-CABR-04729652 | GOOG-CABR-05295318 | GOOG-CALH-00054260 |
| GOOG-CABR-04602313 | GOOG-CABR-04754160 | GOOG-CABR-05306148 | GOOG-CALH-00061979 |
| GOOG-CABR-04603156 | GOOG-CABR-04754257 | GOOG-CABR-05319084 | GOOG-CALH-00062049 |
| GOOG-CABR-04604487 | GOOG-CABR-04754292 | GOOG-CABR-05321391 | GOOG-CALH-00062056 |
| GOOG-CABR-04604674 | GOOG-CABR-04754627 | GOOG-CABR-05325406 | GOOG-CALH-00062072 |
| GOOG-CABR-04604856 | GOOG-CABR-04755505 | GOOG-CABR-05326398 | GOOG-CALH-00062153 |
| GOOG-CABR-04604960 | GOOG-CABR-04766037 | GOOG-CABR-05444894 | GOOG-CALH-00062169 |
| GOOG-CABR-04608552 | GOOG-CABR-04767842 | GOOG-CABR-05460640 | GOOG-CALH-00072868 |
| GOOG-CABR-04611530 | GOOG-CABR-04771601 | GOOG-CABR-05558892 | GOOG-CALH-00081141 |
| GOOG-CABR-04612662 | GOOG-CABR-04803103 | GOOG-CALH-00014551 | GOOG-CALH-00081472 |
| GOOG-CABR-04613197 | GOOG-CABR-04818291 | GOOG-CALH-00016479 | GOOG-CALH-00081943 |
| GOOG-CABR-04614532 | GOOG-CABR-04819502 | GOOG-CALH-00027147 | GOOG-CALH-00083131 |
| GOOG-CABR-04615105 | GOOG-CABR-04822887 | GOOG-CALH-00027149 | GOOG-CALH-00097369 |
| GOOG-CABR-04615202 | GOOG-CABR-04828296 | GOOG-CALH-00027208 | GOOG-CALH-00124281 |
| GOOG-CABR-04618443 | GOOG-CABR-04829712 | GOOG-CALH-00027419 | GOOG-CALH-00133389 |
| GOOG-CABR-04618719 | GOOG-CABR-04830053 | GOOG-CALH-00027787 | GOOG-CALH-00154787 |
| GOOG-CABR-04619593 | GOOG-CABR-04843194 | GOOG-CALH-00028232 | GOOG-CALH-00160127 |
| GOOG-CABR-04624698 | GOOG-CABR-04866597 | GOOG-CALH-00028489 | GOOG-CALH-00160141 |
| GOOG-CABR-04631240 | GOOG-CABR-04947628 | GOOG-CALH-00030031 | GOOG-CALH-00296320 |
| GOOG-CABR-04643783 | GOOG-CABR-04963047 | GOOG-CALH-00030550 | GOOG-CALH-00297189 |
| GOOG-CABR-04665924 | GOOG-CABR-04981562 | GOOG-CALH-00030824 | GOOG-CALH-00298016 |

Confidential – Attorneys' Eyes Only

Patrick Calhoun, et al. v. Google LLC

# Appendix 2
# Additional Materials Received

| | |
|---|---|
| GOOG-CALH-00374314 | GOOG-CALH-01134341 |
| GOOG-CALH-00422646 | John_Calhoun_000000059 |
| GOOG-CALH-00423329 | John_Calhoun_000000931 |
| GOOG-CALH-00424010 | |
| GOOG-CALH-00424283 | |
| GOOG-CALH-00431131 | |
| GOOG-CALH-00431210 | |
| GOOG-CALH-00478206 | |
| GOOG-CALH-00478640 | |
| GOOG-CALH-00490456 | |
| GOOG-CALH-00492852 | |
| GOOG-CALH-00542378 | |
| GOOG-CALH-00545833 | |
| GOOG-CALH-00547684 | |
| GOOG-CALH-00601892 | |
| GOOG-CALH-00630126 | |
| GOOG-CALH-00634248 | |
| GOOG-CALH-00635963 | |
| GOOG-CALH-00639698 | |
| GOOG-CALH-00647901 | |
| GOOG-CALH-00700433 | |
| GOOG-CALH-00721187 | |
| GOOG-CALH-00850527 | |
| GOOG-CALH-00890236 | |
| GOOG-CALH-00913745 | |
| GOOG-CALH-00913746 | |
| GOOG-CALH-01016578 | |
| GOOG-CALH-01134322 | |
| GOOG-CALH-01134324 | |
| GOOG-CALH-01134326 | |

Confidential – Attorneys' Eyes Only