# EXHIBIT EEE
## Unredacted Version of Document Sought to be Sealed

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

Case No. 4:20-cv-05146-YGR-SVK

PATRICK CALHOUN, et al., *on behalf of themselves and all others similarly situated*,

Plaintiffs,

v.

GOOGLE LLC,

Defendant.

**REBUTTAL REPORT OF PROFESSOR ZUBAIR SHAFIQ**

**February 15, 2022**

**TABLE OF CONTENTS**

I.     SUMMARY OF OPINIONS PROFFERED ..................................................... 5

II.    QUALIFICATIONS AND ASSIGNMENT ................................................... 8

III.   REBUTTAL TO GLENN BERNTSON'S DECLARATION ............................. 9

    A.   Google's Internal Documents Demonstrate that the ████████████ Can Map Different Identifiers ........................................................ 9

    B.   The ████████████ Can Be Used to Identify Chrome Users Who Were Not Signed-In Or Users Who Do Not Have a Google Account ............................. 11

    C.   Testing Shows that Chrome in Fact Transmits More Information to Google Ad Manager Than Other Browsers ................................................... 12

    D.   Testing Shows That My Activity Provides Incomplete Information of Websites From Which Google Received Data ........................................ 13

    E.   Google Does Map Analytics First-Party Cookie to Third-Party Cookie ................ 14

    F.   Google Does Not Segregate ██████ and Gaia Keyed Data at the Server Side ....... 15

    G.   Conclusions as to the Bernston Declaration ........................................... 16

IV.   REBUTTAL TO TIM SCHUMANN'S DECLARATION ............................... 16

    A.   Chrome Sync Indicators Can Be Present for Users Who Never Enabled Sync....... 16

        1.   ██████ Can Be Used to Query Chrome Sync Signals to Identify Class Members. ........................................................................ 17

        2.   The Schumann Declaration Provides No Support For Its Assertions Regarding Google Takeout........................................................... 18

        3.   Google Documents Related to ██████████ Conflict with the Conclusions in the Schumann Declaration. ........................................ 18

        4.   Google Documents Related to █████ Conflict with the Conclusions in the Schumann Declaration. ........................................................ 19

    B.   Conclusions as to the Schumann Declaration ......................................... 19

V.    REBUTTAL TO DAVID MONSEES'S DECLARATION ............................. 20

    A.   Google Can Reasonably Link "Unauthenticated" and "Authenticated" Data ........... 20

    B.   Conclusions as to the Monsees Declaration........................................... 21

VI.   REBUTTAL TO RYAN CASSIDY DECLARATION .................................. 21

    A.   The Cassidy Declaration Fails to Acknowledge the Full Extent of Chrome Transmissions By Google Maps API to Google ...................................... 21

        1.   Mr. Cassidy omits the fact that Google Maps causes Chrome to transmit the X-client-data header to Google. .................................................... 22

        2.   Mr. Cassidy omits the fact that Google Maps causes Chrome to transmit cookies to Google. ..................................................................... 22

B.  Mr. Cassidy fails to Demonstrate an Understanding of Chrome Data Transmissions, and Their Storage and Use By Google .................................................................... 23

C.  Conclusions as to Cassidy Declaration ........................................................................ 25

VII.  REBUTTAL TO YILING CHEN REPORT ........................................................................ 25

A.  Transmissions of Data to Google in Other Browsers Are Not the Same as Compared to Those Made in Chrome ............................................................................................. 25

B.  The Chen Report Incorrectly Asserts that Website Optimization is Not Unique to Chrome ........................................................................................................................... 29

C.  Conclusions as to the Chen Report ............................................................................... 29

VIII.  REBUTTAL TO GEORGIOS ZERVAS REPORT ........................................................... 30

A.  The Zervas Report Incorrectly Asserts that Different Browsers Function Similarly to Chrome ....................................................................................................................... 30

B.  The Zervas Report Incorrectly Asserts that I Did Not Analyze the Nature of Transmissions by Chrome to Google in My Report .................................................... 31

C.  The zervas Report Incorrectly Asserts that I Did Not Analyze the Frequency and Alternatives of Websites that Work in Chrome ........................................................... 33

D.  The Zervas Report Incorrectly Asserts that My Method to Infer Chrome Sync Usage is Inaccurate ....................................................................................................... 36

E.  The Zervas Report Incorrectly Asserts that the ███████████████████ Does Not Map Gaia to ███████ or ███████ identifiers ............................................... 37

F.  The Zervas Report Incorrectly Asserts that My "Alternative Approach" is Inadequate and Infeasible .............................................................................................. 37

G.  The Zervas Report Incorrectly Asserts that the X-client-data header Cannot Accurately Identify Incognito Users ............................................................................. 38

H.  The Zervas Report Incorrectly Asserts that My Description of Entropy is Flawed Because it Assumes Independence Amongst Different Elements of Data ................. 39

I.  The Zervas Report Incorrectly Asserts that Google Retains Significantly Less Information that It Receives Due to Policies and Guidelines .................................... 39

J.  Conclusions as to the Zervas Report ............................................................................ 40

IX.  REBUTTAL TO PAUL SCHWARTZ REPORT ............................................................... 41

A.  The Schwartz Report's Determination of PII is Based on Cherry-Picked Subset of Google's Policies and Practices .................................................................................... 41

B.  Dr. Schwartz's Definition of PII Contradicts with the FTC and Google's Definition of PII ............................................................................................................................... 42

C.  Dr. Schwartz is Unaware that Entropy is Used as a Metric by Computer Scientists and Google to Assess Identifiability of Information ................................................... 43

D.  Conclusions as to the Schwartz Report ........................................................................ 44

X.      REBUTTAL TO BRUCE STROMBOM REPORT ......................................................... 44

        A.     Google Can Identify Class Members Who Have and Do Not Have Google Accounts ................................................................................................................. 45

        B.     Google Can Use Its Ad Serving Systems to Identify How Much Data It Has in Easily Accessible Storage That It Collected from Them While Not Synced .......... 46

        C.     Google Maintains Revenue Logs from Which It Can Calculate Not Synced Revenue on an Individual User Basis ..................................................................................... 49

        D.     Google Can Also Devise Efficient Methods to Make These Computations ........... 54

        E.     Google Could Have Easily Created and Stored a Not Synced Flag to Track Such Information ............................................................................................................. 55

        F.     Google Screenwise Uses the Same Identifiers as Chrome ..................................... 55

        G.     Conclusions as to the Strombom Report.................................................................. 60

XI.     CALIFORNIA DETERMINATION ............................................................................. 60

XII.    CONTENT DETERMINATION ................................................................................... 61

I.   **SUMMARY OF OPINIONS PROFFERED**

1.   <u>Rebuttal Opinion No. 1</u>: With respect to the Berntson Declaration:

   A.   The Berntson Declaration's criticisms regarding my conclusions about the feasibility of two of the three proposed approaches that rely on the ███████ ████████ to identify class members is unsupported, and in fact contradicted, by Google's own documents. Based on my review of Google documents, my conclusions remain unchanged.

   B.   The Berntson Declaration's explanation of the data Google Ad Manager receives from Chrome as compared to other brands of browsers is flawed and incorrect, as demonstrated by my testing.

   C.   The Berntson Declaration's claims about the data Google receives and stores in its various server-side logs, and whether that information can be linked and associated, are incorrect, as demonstrated by Google's own documents and the data produced by Google as part of the discovery process administered by Special Master Brush.

2.   <u>Rebuttal Opinion No. 2</u>: With respect to the Schumann Declaration, the Schumann Declaration's criticisms regarding my conclusions about the reliability of one of my three proposed approaches (the "top-down" approach) to identify class members is unsupported, and in fact contradicted, by Google's own documents and Mr. Schumann's testimony. My conclusions about the reliability of ███████ ████████████ to identify class members are based on Google documents and remain unchanged.

3.   <u>Rebuttal Opinion No. 3</u>: With respect to the Monsees Declaration, based on my review of Google documents, the assertions made regarding the policies and practices to prevent the linking of authenticated and unauthenticated identifiers are undermined by Google's own documentation. Likewise, his statements about an "anti-fingerprinting policy" seem to be directly contradicted by logs recently produced by Google. Thus, my conclusions about Chrome's transmission and Google's storage of user data that can be used to "fingerprint" and "track user behavior" remain unchanged. If anything, the documents recently disclosed by Google (after the submission of my original report) reinforce my findings.

4.   <u>Rebuttal Opinion No. 4</u>: With respect to the Cassidy Declaration, based on my review of Google documents and my own testing, it is my opinion that the conclusions in the Cassidy Declaration fail to acknowledge the full extent of Chrome transmissions of at-issue data to Google due to the Google Maps API source code on non-Google websites.

5.   <u>Rebuttal Opinion No. 5</u>: With respect to the Chen Report:

   A.   Based on my review of the Chen Report and underlying testing, the Chen Report's claims about transmissions from Chrome to Google as compared to other browsers are incorrect because they are based on faulty experimental design and analysis techniques. My tests show that Chrome by far transmits more types of personal information (IP address, User-Agent information,

cookie and device identifiers, X-client data headers, browsing history, and other data used to derive profile information) more frequently (i.e., total number of transmissions) as compared to other web browsers when tested in their respective default configurations. My tests also show that there remains a significant difference in the transmission of personal information in Chrome as compared to Firefox, Edge, and Safari when tested using the default configuration for Chrome and non-default configuration for other browsers. Thus, Dr. Chen's conclusions contradict the data even when using her own prescribed (flawed) methodology.

B. Based on my review of the Chen Report, the criticisms regarding my conclusions about website optimization for Chrome are based on cherry-picked anecdotes and fail to holistically take into account tens of thousands of such cases. Thus, my conclusion about website optimization for Chrome remains unchanged.

6. <u>Rebuttal Opinion No. 6</u>: With respect to the Zervas Report:

A. Based on my review of the Zervas Report and underlying testing, as well as my own testing, the Zervas Report's assertion about Chrome's transmissions to Google as compared to other browsers is flawed and incorrect. Contrary to his opinion, my tests of Chrome, Firefox, Edge, and Safari show that Chrome transmits personal information to Google far more than other browsers. My additional analysis of the previously collected data using Dr. Zervas's prescribed methodology establish the non-functional nature of Chrome transmissions to Google. Peer-reviewed research methods continue to support my conclusion. Thus, my conclusion about Chrome transmissions to Google remains unchanged.

B. The Zervas Report's claims about the frequency of website optimization for Chrome and alternatives contradict my tests. My report cites tens of thousands of documented issues where website features do not work on Firefox but work on Chrome. While Chrome is always a suggested alternative to Firefox-incompatible websites, other browsers such as Safari or Edge are not always offered as alternatives. Thus, my conclusion about website optimization for Chrome remains unchanged.

C. The Zervas Report's claims about the accuracy of one of my three proposed approaches (the "top-down" approach) to identify class members are not grounded by any original analysis. His analysis simply reiterates the faulty claims in the Schumann and Bernston Declarations, which I have refuted.

D. The Zervas Report's claims about the adequacy of one of my three proposed approaches (the "alternative" approach) to identify class members are based on flawed assumption about how ███ histograms are locally stored. To counter his concern about the feasibility of the "alternative" approach, I point to an existing Google project that pushes an update to Chrome to identify a subset of Chrome users who are eligible for a promotion. Thus, my conclusion about the adequacy and feasibility of my "alternative" approach remains

unchanged. In fact, new evidence further strengthens the feasibility of the proposed approach.

E. The Zervas Report's claims about the accuracy of using X-client-data header to identify Incognito users are based on faulty logic. Thus, my conclusion about identification of Incognito users remains unchanged.

F. The Zervas Report criticizes my approach to entropy on the basis that it assumes that adding bits of data will equal the sum of its parts. This is incorrect. My analysis considers "joint entropy," which takes into account the lack of independence between different data elements. My opinions about Chrome's transmission of highly identifying personal information to Google based on entropy analysis remain unchanged.

G. The Zervas Report's claims about Google's retention of information due to its policies and guidelines are contradicted by Google's own documents. Thus, my conclusion about the transmission of PII by Chrome to Google remains unchanged.

7. <u>Rebuttal Opinion No. 7</u>: With respect to the Schwartz Report:

A. Based on my review of Google documents, the Schwartz Report's determination of PII is based on an incomplete assessment of Google's policies and practices. Contradictory evidence, which was not consider by Dr. Schwartz, suggests that the personal information sent from Chrome to Google is PII even based on Dr. Schwartz's own criteria.

B. The Schwartz Report's definition of PII, i.e., the personal information sent from Chrome to Google is PII only when Google associates it with an identified individual Account, is based on an outdated FTC guidance. Based on my review, the FTC's updated guidance considers all persistent identifiers as PII and even Google's internal definition conflicts with that of the Schwartz Report.

C. Based on my experience and review of Google documents, the Schwartz Report fails to recognize that entropy is a widely recognized metric in the computer science community, including Google itself, to assess identifiability of information.

8. <u>Rebuttal Opinion No. 8</u>: With respect to the Strombom Report:

A. Based on my review of Google documents, the Strombom Report's critique about identification of not-signed-in Chrome users who do not have a Google account can be addressed using Google's internal logs and systems. That is, they can be identified.

B. Based on my review of Google documents, the Strombom Report's critique about accounting for variability across users in terms of data collection can be addressed using ███████████████. That is, it is possible to identify class members using the tools available in that data source.

C. Based on my review of Google documents, the Strombom Report's critique about accounting for the degree to which Google is able to monetize data of

class members can be addressed using revenue information that Google stores in its internal logs such as █████████ and backend logs associated with ███████████     That is, ███████ and ███████ logs will permit identification of revenue per class member in systems that can be checked by a computer program.

    D.   Based on my review of available documents, Dr. Strombom's claim that consumer data for which companies pay consumer directly via programs like Screenwise are not comparable to Chrome is incorrect because both collect the same set of identifiers and run as an application on a device.

9.  <u>Rebuttal Opinion No. 9</u>: Based on my review of documents produced by Google, it is my opinion that Google routinely identifies the location of both users and the servers for the websites with which they interact and stores that information in logs in which it keeps Not Synced Chrome user communications.

10.  <u>Rebuttal Opinion No. 10</u>: Based on my review of documents produced by Google, it is my opinion that Chrome discloses to Google "information relating to the substance, purport, or meaning" of Not Synced Chrome user communications.

## II.   <u>QUALIFICATIONS AND ASSIGNMENT</u>

11.  I have been retained by counsel for Plaintiffs as an expert in this matter. I previously submitted a report in support of Plaintiffs' Motion for Class Certification, dated October 14, 2021 (the "Shafiq Report"), which sets my expert conclusions in this matter and my expert qualifications.[1]

12.  On December 22, 2021, Google submitted a response to Plaintiffs' Motion for Class Certification, which included declarations and documents that addressed issues raised in my report.

13.  I submit this rebuttal report to address some of the issues raised in Google's response. Specifically, I respond to assertions made in the declarations of Mr. Glenn Berntson, Mr. Tim Schumann, Mr. David Monsees, and Mr. David Cassidy; the expert reports of Dr. Yiling Chen, Dr. Georgios Zervas, Dr. Paul Schwartz, and Dr. Bruce Strombom; as well as reviewing additional Google documents related to the issue of (1) whether Google can identify the location of both Not Synced Chrome users and servers for the websites with which they interact and store information; and (2) whether Google acquired any "information related to the substance, purport, or meaning" (i.e. "content") of Not Synced Chrome user communications.

14.  I reserve the right to supplement and amend this rebuttal report based on additional materials and information that become available to me.

15.  In addition to the items identified in my October 14, 2021 report, a list of materials received, reviewed and relied upon for this rebuttal report are set forth in <u>Exhibit A</u>.[2]

---

[1] *Calhoun, et al. v. Google, LLC*, Shafiq Report, dated October 14, 2021. Dkt. 340-19.
[2] It is my understanding that Google was provided access to all referenced materials and testing for this rebuttal report. Should the Court require review of any referenced document in this report, I will coordinate with counsel to ensure that they are provided.

### III.   REBUTTAL TO GLENN BERNTSON'S DECLARATION

16. After considering Googler Glen Berntson's declaration, including various facts and opinions he asserts, the conclusions in my report are unchanged. I discuss the flaws in the Berntson declaration in more detail below. I note that Glen Berntson is not being proffered as an expert and he does not assert that he conducted tests or experiments which form the basis for his conclusions.

### A. GOOGLE'S INTERNAL DOCUMENTS DEMONSTRATE THAT THE ████████████████████ CAN MAP DIFFERENT IDENTIFIERS

17. The Berntson declaration opines that two of the approaches proposed in my report will fail to accurately identify a subset of class members, which correspond to Chrome users who do not have a Google Account or were not logged into their Google Accounts while using the Chrome browser. Specifically, Mr. Berntson asserts that the proposed approaches incorrectly assume that the ████████████████ ████ can be used by Google to map ████ and other identifiers (Berntson ¶¶ 31, 33, 35). Mr. Berntson specifically claims that "Google does not use ████ to map ██████ and other device non-GAIA identifiers to GAIA identifiers" (Berntson ¶ 35). Therefore, Mr. Berntson concludes that two of the proposed approaches will not accurately work since they rely on obtaining this mapping from the ████████████ ████.

18. But these assertions are contradicted by multiple documents produced by Google that explain the innerworkings of the ████████████████ [GOOG-CALH-00030031, GOOG-CALH-00062153, GOOG-CABR-03666182]. As discussed in more detail below, these documents clearly demonstrate that one of the main purposes of ██████████ is to map (or link) different Gaia and non-Gaia identifiers.[3]

19. GOOG-CABR-03666182 is a document produced by Google that provides ██ ████████████████████████████████████████████ For the sake of illustration, I have highlighted two cells with red-colored boxes in Figure 1 entitled: ████████████████ and ████████████████ As these names clearly indicate, and additional documentation provided by Google further corroborates, 



[GOOG-CABR-03666194], ████████████████████████████████ Thus, Mr. Berntson's assertions (Berntson ¶¶ 31, 33, 35) are incorrect because they disagree with Google's own documentation of ████████████████████.

---

[3] A glossary of key terms, including definitions for these IDs, was provided in the Shafiq Report at ¶¶ 64 *et seq.*



████ Excerpt from [GOOG-CABR-03666182]

20. GOOG-CALH-00030031 is a document produced by Google that provides further details of how the ████████████████████████████ One of the key use cases implemented in the ██████████████████████████████ ████████████████ [GOOG-CALH-00030046].

21. GOOG-CALH-00062153 is a document produced by Google that also states in no uncertain terms that the ████████████████████████████████ For the sake of illustration, I have highlighted two red-colored boxes in Figure 2 that clearly show that ████████████████████████████████ Thus, we can conclude that the ██████████ can and already does map different identifiers.

## CID Generation

- UIS producer that encodes CID:

  //depot/google3/contentads/identity/uis/producers/encode-cid-producer.h

UIS encodes the following Unified Identifiers in CID:

```
Biscotti
Device ID
PPID mapped Biscotti
GFP Cookie
```

UIS encodes the following Google Unified Identifiers in CID:

```
Gaia
Zwieback
```

████████   Excerpt from [GOOG-CALH-00062153]

22. In conclusion, Mr. Berntson's statement that "Google does not use ██ to map ████ and other device non-GAIA identifiers to GAIA identifiers" (Berntson ¶35) is therefore incorrect as it is contradicted by multiple documents produced by Google explaining the ████████████████ design and innerworkings.

**B.  THE ████████████████████████ CAN BE USED TO IDENTIFY CHROME USERS WHO WERE NOT SIGNED-IN OR USERS WHO DO NOT HAVE A GOOGLE ACCOUNT**

23. Mr. Berntson opines that one of the three approaches proposed in my report incorrectly assumes that ████████ IDs that cannot be mapped to Gaia IDs come from not-signed-in users (Berntson ¶ 34). Mr. Berntson further states that "unmappable ████ and ████ IDs may come from signed in users". However, Mr. Berntson's declaration fails to provide any citation to Google's internal documentation or logical explanation to support the claim. If the ████████ ████ can map Gaia and non-Gaia (e.g., ████████) IDs, as has been established above, then the ████████ IDs that cannot be mapped to a Gaia ID indeed should belong to Chrome users who do not have Google Accounts or were not logged into their Google Accounts while using the Chrome browser – and were, by definition, Not Synced at the time.

24. The Berntson declaration further states that "the existence of a ████ or ████ ID in Google's systems does not indicate that the data comes from a user who does not have a Google Account" but incorrectly implies that one of the three proposed approaches does not consider this statement (Berntson ¶ 34). My approach is cognizant of the fact that signed-in users will be assigned both Gaia and ████████ IDs and that not-signed-in users will be assigned only ████ IDs. In fact, the main goal of mapping non-Gaia IDs to Gaia IDs is to identify and exclude signed-in users. Thus, the ████ and ████ IDs that cannot be mapped to Gaia IDs can be inferred to belong to Chrome users who do not have Google Account or were not logged into their Google Accounts while using the Chrome browser – and were, by definition, Not Synced at the time. Mr. Berntson has failed to cite any evidence or explanation to the contrary.

## C. TESTING SHOWS THAT CHROME IN FACT TRANSMITS MORE INFORMATION TO GOOGLE AD MANAGER THAN OTHER BROWSERS

25. The Berntson Declaration asserts that "the categories of data that Google receives from a Chrome browser visiting a website that uses Google Ad Manager services are the same as the categories of data Google receives from another brand of browser visiting the same website" (Berntson ¶ 7). But the Berntson Declaration does not provide any evidence to support this claim. As demonstrated by my comparative testing of transmissions to Google from different browsers (i.e., Chrome, Firefox, Edge, and Safari), only Chrome transmits cookies to Google Ad Manager (formerly known as DoubleClick for Publishers and/or Google DoubleClick AdX service[4]) domains such as doubleclick.net.

26. To evaluate this claim, I conducted testing on the Mercury News webpage that was included in the Plaintiff's complaint and uses Google Ad Manager services: https://www.mercurynews.com/2020/05/24/qa-mental-health-tips-for-handling-the-pandemic/. In summary, my testing shows that Mr. Berntson's claim is incorrect. In fact, the categories of data that Chrome sends to Google when a user visits a website where Google Ad Manager source code is present are significantly different (and much more) than any of the other browsers such as Firefox, Edge, and Safari.

27. To conduct this test, I opened the Mercury News webpage in Chrome, Firefox, Edge, and Safari. All four web browsers were used in their default configuration, which is their most common setting.[5] All browsing data such as cache and cookies was cleared before loading the web page. Therefore, all browsers correspond to the not-signed-in (to Google Account) setting.

28. The following table reports the number of different categories of transmissions to doubleclick.net, a Google Ad Manager domain, from the four different browsers. The results clearly show that Chrome transmissions to Google when visiting a website where Google Ad Manager source code appears far exceed the three other tested browsers. There is a reduction in total number of transmissions to doubleclick.net by 70% (Firefox), 54% (Edge), and 68% (Safari) as compared to Chrome. There is a **100% reduction** in cookie transmissions (i.e., IDE ▮▮▮▮ cookie set by doubleclick.net) in all other browsers as compared to Chrome.

29. In addition, Mr. Berntson acknowledged that *only* Chrome transmits X-client-data header to Google (Berntson ¶ 7). My tests confirm this. There is a **100% reduction** in X-client-data transmissions to doubleclick.net in all other browsers as compared to Chrome. Mr. Bernston further states that "Google Ad Manager does not use the X-Client-Data Header". But he fails to acknowledge the fact that Chrome sends the X-client-data header to Google Ad Manager as it does for several other Google domains. He does not provide any explanation as to why Chrome transmits a user's X-client-data header to doubleclick.net when "Google Ad Manager does not use it" given that Chrome is capable of not transmitting X-client-data header to a subset of Google

---

[4] https://www.google.com/intl/en_us/doubleclick/publishers/dfpadx/terms/
[5] Chrome 96.0, Firefox 95.0, Edge 96.0, Safari 15.1

domains (e.g., google-analytics.com).

|  | **Chrome** | **Firefox** | **Edge** | **Safari** |
|---|---|---|---|---|
| Transmissions ("HTTP requests") | 114 | 34 | 52 | 36 |
| Cookie Transmissions | 47 | 0 | 0 | 0 |
| X-client-data Transmissions | 38 | 0 | 0 | 0 |

**Table 1:** Number of transmissions from Chrome, Firefox, Edge, and Safari web browsers to doubleclick.net (a domain used by Google Ad Manager)

## D.   TESTING SHOWS THAT MY ACTIVITY PROVIDES INCOMPLETE INFORMATION OF WEBSITES FROM WHICH GOOGLE RECEIVED DATA

30. The Berntson declaration asserts that the My Activity page "lists websites that use certain Google Services from which Google received data when the user visited those sites, searches conducted, and other activity saved by Google based on a user's interaction with Google Services" (Berntson ¶ 27). However, my testing shows that My Activity does not list all of the data transmissions that are sent from Chrome to Google on non-Google websites. Specifically, My Activity provides an incomplete list of the websites for which Chrome sent and Google received and stored data in its internal logs for a signed-in user.

31. I tested the accuracy of information in My Activity by comparing the following:

   A. List of non-Google websites listed in My Activity, and

   B. List of non-Google websites listed in Gaia and ███████ logs produced by Google.

32. The existence of websites in the latter list that are absent in the former list demonstrates the falsifiability of Google's claims about My Activity. Specifically, it shows that My Activity does not show all of the data that Chrome sent and Google received and stored in its various Gaia and ███████ logs.

33. I did this comparison for a test account which I created after approval of Special Master Brush in this case to attempt to account for expired identifiers for the Named Plaintiffs which Google apparently did not preserve. I created a test account dubbed "Ned Stark," registered in November 2021, with the express purpose of evaluating the accuracy of data disclosures by Google. The "Ned Stark" test account was used to sign-in to a Chrome browser but Sync was not enabled to reflect a subset of class members. The Chrome browser instance of "Ned Stark" mimicked the browsing behavior of a typical user who visits popular websites of different categories as described in ¶¶ 48-51 of my original report.

34. My Activity logs of "Ned Stark" Google account were downloaded from https://takeout.google.com in January 2022. My Activity logs contained information from various Google products such as Ads and Google Analytics.

35. I provided Google Gaia and non-Gaia identifiers of the "Ned Stark" test account. Special Master Brush instructed Google to produce data from various internal logs for this account. Google produced data for this account between January 2022 and February 2022.

36. The following websites visited by the "Ned Stark" test account were present in Google's internal logs but absent in My Activity logs. Note that, for purposes of this report, this is a partial list to simply illustrate point. A more comprehensive analysis is expected to return many more such websites.

   A. www.bungie.net was listed in GOOG-CALH-01134336 "personal-DisplayAdQueries" (searched using Gaia ID of "Ned Stark") but absent in the My Activity log.

   B. cnbc.com was listed in GOOG-CALH-01134336 "personal-DisplayAdQueries" (searched using Gaia ID of "Ned Stark") but absent in the My Activity log.

   C. lego.com was listed in GOOG-CALH-01134354 "personal-DisplayAdQueries" (searched using ████ ID of "Ned Stark") but absent in the My Activity log.

   D. lufthansa.com was listed in GOOG-CALH-01134354 "personal-DisplayAdQueries" (searched using ████ ID of "Ned Stark") but absent in the My Activity log.

   E. www.merriam-webster.com was listed in GOOG-CALH-01134353 "JoinedAdViews" (searched using ████ ID of "Ned Stark") but absent in the My Activity log.

   F. www.realtor.com was listed in GOOG-CALH-01134353 "JoinedAdViews" (searched using ████ ID of "Ned Stark") but absent in the My Activity log.

**E.   GOOGLE DOES MAP ANALYTICS FIRST-PARTY COOKIE TO THIRD-PARTY COOKIE**

37. The Berntson Declaration asserts that "Google does not perform any mapping of Google Analytics first-party cookie values to third-party cookies such as ████ (Berntson ¶ 39). However, Google's internal documentation shows that it has specific mechanisms to map Client ID stored in Google Analytics cookies to ████ ID as well as ████ and Gaia IDs.

38. GOOG-CABR-04080254 describes ████ – a mechanism to map CID URL parameter (sent in HTTP requests initiated by Google Analytics source code on non-Google websites to google-analytics.com, which contains the Client ID [CID] that is also stored in the Google Analytics _ga cookie[6]) to ████ as well as ████ and Gaia IDs. I have highlighted two specific cases in Figure 3.

---

[6] "analytics.js uses a single, first-party cookie named _ga to store the Client ID"
https://developers.google.com/analytics/devguides/collection/analyticsjs/cookies-user-id#getting_the_client_id_from_the_cookie
See also https://gaconnector.com/docs/how-to-save-google-analytics-client-id-cookie-to-salesforce/

39. GOOG-CABR-04080255 further describes various types of logs that store these identifiers. Specifically, (1) CID and ███████ IDs are stored in "g████" for ██ days; (2) CID, ██████ and ██████ IDs are stored in "██████" for ██ days; and (3) CID and Gaia IDs are stored in "████ for ██ days.

40. In summary, in contrast to Mr. Berntson's assertion, Google does indeed map the client identifier stored in Google Analytics' first-party cookie (_ga set by Google Analytics source code) to the third-party ██████ ID (IDE cookie on doubleclick.net Display Ads domain).



██████ Excerpt from [GOOG-CABR-04080255]

## F.   GOOGLE DOES NOT SEGREGATE ██████ AND GAIA KEYED DATA AT THE SERVER SIDE

41. The Berntson Declaration asserts that Google "maintains strict server-side segregation between these two types of data." (Berntson ¶ 9). However, my investigation of Google's server-side logs shows that ██████ and Gaia keyed data is combined at multiple server-side logs.

42. The logs produced by Google as part of the Special Master administered discovery process demonstrate that Google stores ██████ and Gaia identifiers together in multiple server-side logs. Thus, in contrast to Mr. Berntson's assertion, I conclude that Google does not maintain server-side segregation between ██████ and Gaia keyed data. For example, the logs entitled "██████████████" and "██████████████" contain both "██████████" and "██████████████" (██████ ID). For the "Ned Stark" test account, Google was able to search and extract information using both the Gaia ID (see GOOG-CALH-01134336 and GOOG-CALH-01134338) as well as corresponding ██████ IDs (see GOOG-CALH-01134348 and GOOG-CALH-01134350). The production of "Ned Stark" account data from the same log using both Gaia and ██████ IDs clearly demonstrates that Google does not segregate ██████ and Gaia keyed data at the server-side.

43. Mr. Bernston also omits the key fact that Google combines ███████ and Gaia information for attribution. As explained in an internal presentation, ███████

███████████████████████████████████████████████████████████████████

" Monsees Dep. Ex. 45.

## G.   CONCLUSIONS AS TO THE BERNSTON DECLARATION

44. The Berntson Declaration's criticisms regarding my conclusions about the feasibility of two of the three proposed approaches that rely on the ███████████ to identify class members is unsupported, and in fact contradicted, by Google's own documents.[7] My conclusions remain unchanged.

45. The Berntson Declaration's explanation of the data Google Ad Manager receives from Chrome as compared to other brands of browsers is flawed and incorrect, as demonstrated by the testing described above.

46. The Berntson Declaration's claims about the data Google receives and stores in its various server-side logs are incorrect, as demonstrated by Google's own documents and the data produced by Google as part of the discovery process administered by Special Master Brush.

## IV.   REBUTTAL TO TIM SCHUMANN'S DECLARATION

47. After considering Googler Tim Schumann's declaration, including various facts and opinions he asserts, the conclusions in my report are unchanged. I discuss the flaws in the Schumann Declaration in more detail below.

## A.   CHROME SYNC INDICATORS CAN BE PRESENT FOR USERS WHO NEVER ENABLED SYNC

48. Mr. Schumann opines that one of the three approaches (the "top-down" approach) proposed in my report will fail to accurately identify a subset of class members, which correspond to Chrome users who did not enable Sync ("Not Synced Chrome Users") or who disabled Sync ("Unsynced Users"). Specifically, Mr. Schumann asserts that the proposed approach relies on indicators of Chrome Sync that "can be present for users who never enabled sync" (Schumann ¶ 4). Thus, he claims that the proposed approach will fail to accurately identify Chrome users who did not enable Sync or who disabled Sync.

49. But this claim conflicts with multiple documents produced by Google about various projects to analyze Chrome Sync usage [GOOG-CALH-00077056, GOOG-CALH-00081141, GOOG-CALH-00028232]. Furthermore, Mr. Schumann's declaration fails

---

[7] Mr. Berntson does not challenge my third approach (the "top-down" approach) to identifying class members.

to consider the ████████ data produced by Google [GOOG-CALH-00651647] that shows how exactly Chrome Sync activity is recorded in ██████████

50. As set forth below, the Schumann Declaration's conclusions regarding ██████████ ████████████████████████████████████ either conflict with Google's internal documents or are otherwise unsupported by any documentation.

**1.     ████████     Can Be Used to Query Chrome Sync Signals to Identify Class Members.**

51. Mr. Schumann opines that the presence of ████████████ in the ████████ ████████████████ field in the ████████████ table in ████████ cannot be used to accurately infer Chrome Sync usage (Schumann ¶ 5). Specifically, he states that the "████████████ value in ████████████ will also be present for a user who signed into the Chrome browser on their desktop and signed into a Google site (like Gmail) but did not have sync enabled". The Schumann Declaration does not provide any logical explanation or evidence to support this claim.

52. GOOG-CALH-00077055 is a document produced by Google that describes ████ ████████████████████████████████████████ The document specifically states that ████████████████████ ████████████████████████ The document states that ████████████ ████████████████████████████". The document clearly states that "████████████████████████".

53. As part of the Plaintiff data discovery process administered by Special Master Brush, Google has recently produced ████████ data of Plaintiffs [GOOG-CALH-00651647] that provides new details about how Chrome Sync activity is recorded in ██████████ Specifically, ████████ contains a "████████████████████ that includes "████████████████". Mr. Schumann testified that this field contains ████████████ that tracks signed-in but not synced users as ████████████ [GOOG-CALH-00081809] and signed-in and synced users as ████████████.

54. The ████████ users are members of the class because they are signed-in but not consented for sync. Thus, based on this new information, these ████ signals can be used to directly identify class members in the signed in but not consented for sync mode.

55. My "top-down" approach still works despite this new information about a recent change in how ████████████ product information is logged in ████████ More specifically, it is trivial to include a condition that ████████████████████ is "████████████" in addition to the presence of ████████████████ ████████████ to identify a signed-in and synced user. Conversely, it is trivial to include a condition that "████████████████████ is ████████ in addition to the presence of ████████████████████████ to identify a signed-in but not-synced user.

56. In summary, my "top-down" approach still works. For NEVER-SYNCERS, all Chrome Sync ███████ records are expected to have ███████████ set to ██████████. For SOMETIMES-SYNCERS, a subset of Chrome Sync records have ██████████" set to ███████████ and another subset of Chrome Sync ████████ records have ████████████ set to ██████████. All Chrome Sync ████████ records have ███████████ set to ██████ for ALWAYS-SYNCERS.

**2.      The Schumann Declaration Provides No Support For Its Assertions Regarding ██████████.**

57. Mr. Schumann opines that the presence of ███████████ in ██████████ field in ████████████ table in ██████████ cannot be used to accurately infer Chrome Sync usage (Schumann ¶ 6). Specifically, he states that "the "███████████" record can exist for a user who signed into the Chrome browser on their desktop and signed into a Google site (like Gmail) but never enabled sync". But the Schumann Declaration does not provide any logical explanation or evidence to support this potential issue. If there are any issues, they can be addressed using the methodology explained in ¶¶ 52-55 of this rebuttal.

**3.      Google Documents Related to ██████████ Conflict with the Conclusions in the Schumann Declaration.**

58. Mr. Schumann opines that the ██████████████████████ cannot be used to accurately infer Chrome Sync usage (Schumann ¶ 7). Specifically, he states that "██████████ also returns true for a user who signed into the Chrome browser on their desktop and signed into a Google site (like Gmail) but never enabled sync". The Schumann Declaration does not provide any logical explanation or evidence to support this potential issue.

59. GOOG-CALH-00081141 is a document produced by Google that describes ██████████████████████████████. The document explains that an approach to find "██████████" that are all necessarily also Sync users. Figure 3 shows that the approach relies on "██████████████", which returns true or false based on "██████████". The document describes that the approach will only work for accounts who are a member of the "████████████████████" group, but does not list any issues that would lead the "██████████████" to incorrectly return true for signed-in but not synced users. If there are any issues, they can be addressed using the methodology explained in ¶¶ 52-55 of this rebuttal.



 Excerpt from [GOOG-CALH-00081142] describing the use of  to identify Sync users

### 4.   Google Documents Related to █████ Conflict with the Conclusions in the Schumann Declaration.

60. Mr. Schumann opines that ███████ cannot be used to accurately infer Chrome Sync usage (Schumann ¶ 6). Specifically, he states that the "███████" record can exist for a user who signed into the Chrome browser on their desktop and signed into a Google site (like Gmail) but never enabled sync". Mr. Schumann does not provide any logical explanation or evidence to support this claim.

61. GOOG-CALH-00028232 is a document produced by Google that describes ███████ database. ███████ has various ███████ that are dependent on their Sync status. A ███████ exists for signed-in and synced Chrome users. The document does not list any issues that would lead the ███████ to exist for a signed-in but not synced user. If there are any issues, they can be addressed using the methodology explained in ¶¶ 52-55 of this rebuttal.

## B.   CONCLUSIONS AS TO THE SCHUMANN DECLARATION

62. The Schumann Declaration's criticisms regarding my conclusions about the reliability of one of the three proposed approaches (the "top-down" approach) to identify class members is unsupported, and in fact contradicted, by Google's own documents and Mr. Schumann's testimony.[8] My conclusions about the reliability of ███████ ███████ to identify class members are unchanged.

---

[8] Mr. Schumann does not challenge two of my three approaches proposed to identifying class members.

## V.   REBUTTAL TO DAVID MONSEES'S DECLARATION

63. After considering Googler David Monsees's declaration, including various facts and opinions he asserts, the conclusions in my report are unchanged. I discuss the flaws in the Monsees Declaration in more detail below.

### A. GOOGLE CAN REASONABLY LINK "UNAUTHENTICATED" AND "AUTHENTICATED" DATA

64. Mr. Monsees states that "Google has implemented policies, protocols, processes, and protections to ensure that unauthenticated (or pseudonymous) data…cannot 'be reasonably linked by Google to' authenticated user data" (Monsees ¶ 8). He further explains that this includes "avoiding logging specific IDs to prevent an indirect and inadvertent join between Google Account-keyed data and pseudonymous-keyed data" (Monsees ¶ 10).

65. As I have explained above in my extensive rebuttal to Mr. Berntson ¶¶ 17-22; 41-43, Mr. Monsees's declaration contradicts and does not even consider several Google internal documents that establish that Google has the ability to map unauthenticated (e.g., █████) and authenticated (e.g., Gaia) IDs and data using its ████████. The documents produced by Google demonstrate that the █████ can and already does map or link different identifiers such as █████ and Gaia IDs [GOOG-CALH-00030031, GOOG-CALH-00062153, GOOG-CABR-03666182]. The most obvious example of this is in Figure 1 where the █████ ████████ is used to literally "████████████████".

66. Mr. Monsees acknowledged in his deposition that Google combines signed-in (authenticated) and signed-out (unauthenticated) for measurement, attribution, and forecasting. Mr. Monsees also acknowledged in this deposition that server-side logs (e.g., ████████████) contain both Gaia (authenticated) and █████ (unauthenticated) IDs. This is also corroborated by the logs produced by Google as part of the Special Master administered discovery process demonstrate that Google stores █████ and Gaia identifiers together in multiple server-side logs.

### B. THE MONSEES DECLARATION INCORRECTLY ASSERTS THAT GOOGLERS ARE PROHIBITED FROM USING GET/POST REQUESTS, IP ADDRESS, USER-AGENT, AND X-CLIENT-DATA TO TRACK USER BEHAVIOR

67. Mr. Monsees describes Google's "anti-fingerprinting policy" that "prohibits the use of "unique or probabilistically unique combinations of one or more device, network, or app/browser attributes to identify a device, app, browser, or user across distinct transactions". Mr. Monsees also explains that Googlers are prohibited from using categories of information such as IP address, User-Agent, and X-Client-Data header to "track user behavior" (Monsees ¶ 9).

68. But the logs recently disclosed by Google establish that Google indeed collects and concurrently stores several of the aforementioned categories of information in several logs. For example, the logs entitled "████████████" and ████████████



69. Thus, despite Mr. Monsees' asserted "anti-fingerprinting policy", the ingredients of a fingerprint in fact co-exist in many Google logs and can be readily used for fingerprinting.

## B.   CONCLUSIONS AS TO THE MONSEES DECLARATION

70. The assertions made by Mr. Monsees regarding the policies and practices to prevent the linking authenticated and unauthenticated identifiers are undermined by Google's own documentation. Likewise, his statements about an "anti-fingerprinting policy" seem to be directly contradicted by logs recently produced by Google. Thus, my conclusions about Chrome's transmission and Google's storage of user data that can be used to "fingerprint" and "track user behavior" remain unchanged. If anything, the documents recently disclosed by Google (after the submission of my original report) reinforce my findings.

## VI.   REBUTTAL TO RYAN CASSIDY DECLARATION

71. I have reviewed the Declaration of Googler Ryan Cassidy regarding Google Maps Embed API in support of Google's Opposition to Plaintiffs' Motion for Class Certification and, based on that review, as well as my review of Mr. Cassidy's deposition, Google documents, and my own testing, I reach the following conclusions:

## A.   THE CASSIDY DECLARATION FAILS TO ACKNOWLEDGE THE FULL EXTENT OF CHROME TRANSMISSIONS BY GOOGLE MAPS API TO GOOGLE

72. The Cassidy Declaration admits that "The Maps Embed API code snippet may cause the user's browser to send the user's IP address, the user-agent, URL and referrer URL to maps.googleapis.com." (Cassidy ¶ 5). However, as I describe below, Mr.

---

[9] TLS Fingerprinting with JA3 and JA3S https://engineering.salesforce.com/tls-fingerprinting-with-ja3-and-ja3s-24736855967

[10] It is my understanding that the production of these logs is an ongoing process that is being overseen by Special Master Brush. Thus, I anticipate that additional logs and information will be produced by Google, which may further support my conclusions here.

Cassidy fails to acknowledge the full extent of Chrome transmissions of personal information (e.g., HTTP requests including IP address and User-Agent, cookies, X-client-data) to Google due to the Google Maps API source code on non-Google websites.

73. To test Mr. Cassidy's claims, I recorded Chrome's transmissions to Google on two non-Google websites that embed Google Maps API.

   A. https://www.embedgooglemap.net/, which includes the Google Maps Embed API that is available for free to publishers

   B. https://www.fedex.com/locate/index.html?locale=en_US, which includes the Google Maps JavaScript API that is available at a charge for large publishers (Cassidy Dep. Tr. At 38:16-18; 40:11-17; 47:12-22)

74. Mr. Cassidy testified that the Google Maps Embed API has "          been adopted by "          of websites but █████████████████████████ *Id.* at 67:19-68: 5. However, the JavaScript API has been ████████ by █████████" different non-Google websites (*Id.* at 68:13-17) and sees █████████████ (*Id.* at 69:13-15).

   **1.  Mr. Cassidy omits the fact that Google Maps API causes Chrome to transmit the X-client-data header to Google.**

75. My testing on both of the aforementioned websites shows that Chrome transmits the X-client-data header to maps.googleapis.com and maps.google.com, just as it does with most other Google domains. However, Mr. Cassidy omits this important fact in his declaration. He does not provide any explanation as to why Google Maps API source code causes Chrome to transmit the X-client-data header to maps.googleapis.com and maps.google.com.

76.  In his deposition, when asked about whether the source code of Google Maps API causes a Chrome user's browser to send the X-client-data header, Mr. Cassidy responded ██████████████████████ *Id.* at 46:23-24. He failed to demonstrate even basic understanding of X-client-data header at his deposition. He said ███████████████████████ when asked about what is X-client-data header. *Id.* at 47:10-11.

   **2.  Mr. Cassidy omits the fact that Google Maps API causes Chrome to transmit cookies to Google.**

77. My testing on both of the aforementioned websites further shows that Chrome transmits the user's cookies to maps.google.com. Specifically, Chrome transmits authenticated (e.g., Gaia cookies) and unauthenticated (e.g., █████ NID cookie) cookies to maps.google.com. However, Mr. Cassidy omits this important fact in his declaration. He does not provide any explanation as to why Google Maps API source code causes Chrome to transmit cookies to maps.google.com.

78. Regardless of whether it is the Maps Embed API or Maps JavaScript API, as shown in Figure 4, the Google Maps API source code is designed in a way to cause Chrome to send third-party cookies to Google including the cookies that are used by Google for advertising. It is noteworthy that Google acknowledges the use of these cookies, such as the NID ▮▮▮▮▮ cookie [GOOG-CALH-00374408, GOOG-CABR-00891712, GOOG-CABR-00891714, GOOG-CABR-03664149], in its advertising products[11] such as AdSense for Search and Google Ads.

79. Mr. Cassidy fails to acknowledge the fact that Google Maps API causes Chrome to transmit these advertising-related cookies to maps.google.com.



**Figure 4:** Screenshot of the webpage cited in footnote 1 of the Cassidy Declaration (https://developers.google.com/maps/documentation/embed/get-started). The documentation shows the Google Maps API source code snippet that causes transmissions to google.com.

## B.    MR. CASSIDY FAILS TO DEMONSTRATE AN UNDERSTANDING OF CHROME DATA TRANSMISSIONS, AND THEIR STORAGE AND USE BY GOOGLE

80. Mr. Cassidy asserts that the information Chrome sends to Google on a website that uses the Embed Maps API source code is not "(1) shared for use by other Google services; (2) stored in or associated with a Google Account holder's Account; (3) used to create or enhance profiles on users; (4) used to "fingerprint" or identify users; or (5) for advertising purposes." (Cassidy Decl. ¶ 8). He fails to provide any reasonable explanation or cite any Google public or internal documentation to substantiate his claim.

---

[11] https://business.safety.google/adscookies/

81. In his deposition, Mr. Cassidy did not know any technical details about the Google Maps JavaScript API such as the data flow his declaration described about the Embed API for which he was also the product manager. Other Google Maps APIs he identified are the static map API (Cassidy Dep. Tr. 82:23-83:1), geocoding API (85:7-9), text search API (85:10-13; auto-complete API (85:14-20); reverse geo-coding API (85:21-23); geo-location API ████████████████████; (85:24-25); Places API (86:21); Routes API (86:22); distance-matrix API (88:5-8). However, Mr. Cassidy testified that he did not know anything about data flow relating to these. *Id.* at 88:15-92:6.

82. In the absence of knowledge about the storage systems and policies for the data sent by Chrome to Google due to Google Maps API source code, it is not possible for someone, including Mr. Cassidy, to claim personal knowledge that the data is not shared with other Google services, stored in or associated with a Google Account holder's Account, used to create or enhance profiles on users; used to "fingerprint" or identify users; or used for advertising purposes. Note that Mr. Cassidy testified:

   A. He does not know the log services used by Google maps. *Id.* at 66:8-10.

   B. Although he has ████████████████████████████████ he has never reviewed log information relating to the Maps Embed API. *Id.* at 66:18-24.

   C. He does not know where the ██████████████████████████ at issue in his declaration. *Id.* at 76:4-10.

   D. He does not know where user data that is ████████████████ via the JavaScript API is stored at Google. *Id.* at 69:23-71-10.

   E. He does not know the retention period of the user data in question. *Id.* at 74:10-75:7.

   F. He does not know what is in Google Maps storage logs. *Id.* at 78:3-5.

   G. He does not know what additional information is added to the data in the logs. *Id.* at 78:14-20.

   H. He does not know if there ██████████████████████████████ ██████████████████████████████████ *Id.* at 78:21-79:13.

4.4.1 *Data Use and Retention*. To provide the Services through the Customer Application(s), Google collects and receives data from Customer and End Users (and End Users' End Users, if any), including search terms, IP addresses, and latitude/longitude coordinates. Customer acknowledges and agrees that Google and its Affiliates may use and retain this data to provide and improve Google products and services, subject to the Google Privacy Policy at https://www.google.com/policies/privacy/.

**Figure 5:** Screenshot of the relevant excerpt in Google Maps Platform Terms of Service at https://cloud.google.com/maps-platform/terms/

83. Given the aforementioned highlighted disclosure in the Google Maps Platform Terms of Service (see Figure 5) and the transmission of NID and other advertising-related

cookies shown in my tests, in my opinion, the data transmitted by Chrome to Google due to Google Maps source code is potentially being shared with other Google services, stored in or associated with a Google Account holder's Account, used to create or enhance profiles on users, or used for advertising purposes.

84. In contrast to Google's "anti-fingerprinting" policy, Google admits internally that it uses ████████████████████████████████████████████ [GOOG-CABR-04604502]. In fact, Google's backend logs maintain more than sufficient information from which to derive a fingerprint. Thus, in my opinion, the data transmitted by Chrome to Google due to Google Maps API source code is also potentially being used by fingerprinting.

### C.   CONCLUSIONS AS TO CASSIDY DECLARATION

85. Based on my review of Google documents and my own testing, it is my opinion that the conclusions in the Cassidy Declaration fail to acknowledge the full extent of Chrome transmissions of personal information to Google due to the Google Maps API source code on non-Google websites.

## VII.   REBUTTAL TO YILING CHEN REPORT

86. After considering Dr. Yiling Chen's report, including various facts and opinions she asserts, the conclusions in my report are unchanged. I discuss the flaws in the Chen Report in more detail below.

### A.   TRANSMISSIONS OF DATA TO GOOGLE IN OTHER BROWSERS ARE NOT THE SAME AS COMPARED TO THOSE MADE IN CHROME

87. Dr. Chen opines that "[t]he way Chrome operates is typical of other browsers with respect to the issues relevant to this case". Dr. Chen further concludes that "Google receives similar categories of data from an Edge or Firefox user visiting a website that uses Google services as it would receive from an Un-Synced or Synced Chrome user that visits the same website" (Chen ¶ 10). To support this opinion, Dr. Chen tested five websites identified by Plaintiffs and concluded that "the Firefox and Edge browsers had a similar flow of data as Chrome" and that "I do not find anything unique about how Google designed Chrome that affects the data collection and process at issue here" (Chen ¶ 69). As I discuss below, the conclusions in Dr. Chen's declaration are flawed because they are based on misleading design and analysis of the tests to compare Chrome and other browsers.

88. The tests conducted by Dr. Chen to compare different browsers (i.e., Chrome, Edge, and Firefox) follow a misleading design and analysis methods.

> A.   First, the tests were not conducted using the default settings of the tested browsers. Specifically, the tests on Edge and Firefox were conducted "by adjusting each browser's configuration to allow all cookies" (Chen ¶ 65). For example, as described in Chen Exhibit 1, "enhanced tracking protection" was turned off in Firefox, which is not the default configuration of Firefox browser. Dr. Chen acknowledged in her deposition that it is uncommon for users (including herself) to change the default configuration of their

browsers.[12] This major oversight renders Dr. Chen's comparison of Chrome to other browsers scientifically invalid.

B. Second, the analysis of the test results was incomplete because it did not consider the **frequency of transmissions** of different types of data (e.g., HTTP requests including IP address and User-Agent, cookies, X-client-data).

89. To address the first issue of faulty design, I repeated the tests performed by Dr. Chen using the methodology as described in Chen Exhibit 1 with the only difference being the use of default browser configurations for all tested browsers. I also included Apple's Safari browser in the tests because it is the second most popular browser after Chrome.[13] The details of my findings are provided next. In summary, my tests show that there is a significant difference in the frequency of transmission of different types of data in Chrome as compared to Firefox, Edge, and Safari.

90. Table 2 reports the number of different categories of transmissions to Google-owned domains[14] from the four tested browsers for one the websites identified by Plaintiffs: https://www.mercurynews.com/2020/05/24/qa-mental-health-tips-for-handling-the-pandemic/. The results clearly show that Chrome transmits far more data to Google than the other three tested browsers. Overall, there is 37% (Firefox), 28% (Edge), and 54% (Safari) reduction in the total number of transmissions to Google as compared to Chrome. Most notably, there is a **100% reduction** in the number of cookies and X-client-data header transmissions to Google in all other browsers as compared to Chrome.

|  | **Chrome** | **Firefox** | **Edge** | **Safari** |
|---|---|---|---|---|
| Transmissions (aka "HTTP requests") | 324 | 204 | 232 | 150 |
| Cookie transmissions | 47 | 0 | 0 | 0 |
| X-client-data Transmissions | 90 | 0 | 0 | 0 |

**Table 2:** Number of transmissions from Chrome, Firefox, Edge, and Safari web browsers to Google-owned domains in their default configurations

91. Thus, I conclude that Dr. Chen's tests would have led to a different conclusion had they been conducted using the standard default configuration of the tested browsers. Specifically, Dr. Chen's main conclusion that "I find that all three browsers (i.e., Chrome, Edge, Firefox) transmit similar data to Google when a user visits a given site using Google services. Edge and Firefox browsers send Google the same HTTP header components, and often the same cookies and same number of transmissions" (Chen ¶ 67) does not hold true. As shown in Table 2, the number of total

---

[12] "Barnes: I believe it's likely to be the default setting […] Barnes: Okay. And on the iPad, is it also likely to be the default settings on the iPad? Chen: I think so. […] Barnes: Okay, you have default settings on in Chrome, correct? Chen: That's correct. […] Barnes: And is Edge in its default setting? Chen: Yes, it is." [Chen Deposition]
[13] Browser Market Share Worldwide Nov 2020 - Dec 2021 https://gs.statcounter.com/browser-market-share
[14] https://github.com/duckduckgo/tracker-radar/blob/main/entities/Google%20LLC.json

transmissions as well as cookies are clearly different in Firefox, Edge, and Safari as compared to Chrome in their respective default browser configurations.

92. To address the second issue of incomplete analysis, I first attempted to analyze the HAR files for different browser tests reported in the Chen Report. However, as shown in Figure 5, multiple of these HAR files were faulty and resulted in syntax errors when I attempted to open them in any of the available HAR analysis software including Chrome's DevTools. Upon further analysis of the faulty HAR files, as shown in Figure 6, it was clear that the HAR files were incomplete. This issue of faulty HAR files was communicated to Google. Dr. Chen did not dispute the issue of faulty HAR files in her deposition and acknowledged that she did not herself collect these HAR files and she randomly checked only a few of the HAR files.



**Figure 5:** Syntax error shown by Chrome DevTools when faulty Chen HAR files are loaded



**Figure 6:** Ending of GOOG_CHEN_00000007.har showing missing quotation mark, comma, and closing curly brackets expected in the standard JSON format of HAR files.

93. After Google's Counsel was notified of the issue, replacement HAR files were produced on January 14, 2022. Upon analysis of replacement HAR files, I found that the new replacement HAR files were collected on January 13, 2022, about a month after the HAR files were collected for the Chen Report on December 16.

94. After Google's Counsel was notified of this issue, they sent us the "repaired" HAR files on January 20, 2022. An analysis of the "repaired" HAR files showed that they are in fact truncated versions of the original files (see Figure 7). The repaired files basically threw away evidence of additional network transmissions.



**Original**                                        **Repaired**

**Figure 7:** A side-by-side comparison of original and "repaired" HAR files. The ending of "repaired" GOOG_CHEN_00000007.har shows that it is in fact a truncated version of the originally produced HAR file.

95. Due to these issues with the submitted HAR files, I repeated the tests performed by Dr. Chen using the same methodology as described in Exhibit 1 of the Chen Report. Specifically, I disabled "Enhanced Tracking Protection" in Firefox and "Tracking Prevention" in Edge. In the same vein, I also disabled "Prevent cross-site tracking" in Safari. Note that these were all default configurations in Firefox, Edge, and Safari and should ideally be kept as-is as I have explained earlier in ¶ 88. However, I did these modifications to replicate the exact same methodology as in Dr. Chen's tests and evaluate the validity of her findings.

96. Table 3 reports the number of different categories of transmissions to Google-owned domains[15] from the four tested browsers for the webpage https://www.mercurynews.com/2020/05/24/qa-mental-health-tips-for-handling-the-pandemic/. While the results in Table 3 (using non-default browser configurations) are different as compared to Table 2 (using the default browser configurations), they still clearly show that Chrome transmits far more data to Google than the other three tested browsers – even under the Chen Report's flawed methodology. Overall, there is 27% (Firefox), 9% (Edge), and 40% (Safari) reduction in the total number of transmissions to Google as compared to Chrome. There is still a **100% reduction** in the number of X-client-data header transmissions to Google in all browsers as compared to Chrome. Finally, there is a 58% reduction in the number of cookie transmissions from Chrome to Google as compared to Safari. The number of cookie transmissions is the same for Firefox and 72% more for Edge as compared to Chrome.

---

[15] https://github.com/duckduckgo/tracker-radar/blob/main/entities/Google%20LLC.json

|  | **Chrome** | **Firefox** | **Edge** | **Safari** |
|---|---|---|---|---|
| Transmissions (aka "HTTP requests") | 290 | 212 | 264 | 174 |
| Cookie transmissions | 43 | 43 | 74 | 18 |
| X-client-data Transmissions | 78 | 0 | 0 | 0 |

**Table 3:** Number of transmissions from Chrome, Firefox, Edge, and Safari web browsers to Google-owned domains. Chrome is used in its default configuration but Firefox, Edge, and Safari are not (their default tracking protection features are disabled) as in Dr. Chen's tests.

97.     Thus, I conclude that Dr. Chen's tests, despite their faulty design, still do not support her conclusion that "Edge and Firefox browsers send Google the same HTTP header components, and often the same cookies and same number of transmissions" (Chen ¶ 67). As shown in Table 3, the number of total transmissions of data are clearly more in Chrome than in Firefox, Edge, and Safari, even when the default tracking protection features are disabled in Firefox, Edge, and Safari.

## B.   THE CHEN REPORT INCORRECTLY ASSERTS THAT WEBSITE OPTIMIZATION IS NOT UNIQUE TO CHROME

98.     Dr. Chen claims that "website optimization is not unique to Chrome" (Chen ¶ 79). To support this claim, one cherry-picked anecdote is provided in the face of tens of thousands of examples of websites that work in Chrome but do not work in Firefox[16]. The sheer number of such cases (approximately 100 thousand at the time of writing[17]) demonstrates that this problem of website optimization is overwhelmingly unique to Chrome.

99.     Dr. Chen argues that "web developers and browser developers are responsive to fixing compatibility issues when reported" (Chen ¶ 79) in support of her claim that website optimization is not unique to Chrome. Dr. Chen does not conduct any testing to evaluate how frequent or infrequent these cases are. More importantly, this argument misses the larger point that developers mainly test their websites for compatibility with Chrome, and *sometimes* (not always) fix them for other browsers only *after* they are notified of the issue.

100.    The bottom line is that there is enough friction for the users of non-Chrome browsers that they have to install and use Chrome if they want to access a large number of websites that are primarily optimized to work on Chrome.

## C.   CONCLUSIONS AS TO THE CHEN REPORT

101.    The Chen Report's claims about transmissions from Chrome to Google as compared to other browsers are incorrect because they are based on faulty experimental design and analysis techniques. My tests show that Chrome by far transmits more frequently (i.e., total number of transmissions) and more types of data (e.g., cookies) as compared to other web browsers when tested in their default configurations. My tests also show that there remains a significant difference in the

---

[16] https://webcompat.com/
[17] https://webcompat.com/issues?page=1&per_page=50&state=open&stage=all&sort=created&direction=desc

transmission of data in Chrome as compared to Firefox, Edge, and Safari when tested using the default configuration for Chrome and non-default configuration for other browsers. Thus, Dr. Chen's conclusions contradict the data even when using its own prescribed (flawed) methodology.

102.     The Chen Report's criticisms regarding my conclusions about website optimization for Chrome are based on cherry-picked anecdotes and fail to holistically take into account tens of thousands of such cases. Thus, my conclusion about website optimization for Chrome remains unchanged.

## VIII.    REBUTTAL TO GEORGIOS ZERVAS REPORT

103.     After considering Dr. Georgios Zervas's Report, including various facts and opinions he asserts, the conclusions in my report are unchanged. I discuss the flaws in the Zervas Report in more detail below.

### A.  THE ZERVAS REPORT INCORRECTLY ASSERTS THAT DIFFERENT BROWSERS FUNCTION SIMILARLY TO CHROME

104.     Dr. Zervas opines that "In my opinion, based on my professional experience, similar testing performed on a different browser such as Firefox or Edge would confirm that those browsers function similarly to Chrome, and the data transmissions that are the subject of Plaintiffs' allegations are primarily caused by functionality of the websites being visited, not the browser used" (Zervas ¶ 70). Dr. Zervas also claims that "the percentage of websites that make transmissions to Google servers would be similar across other web browsers such that these transmissions are not unique to Chrome" (Zervas ¶ 70).

105.     Dr. Zervas fails to provide any logical explanation or evidence to support his opinion, instead relying solely on Dr. Chen's faulty tests (Chen ¶ 69). Dr. Zervas acknowledged in his deposition that he did not conduct any test on Firefox or Edge to support his statements (Zervas ¶ 70).[18]

106.     As I have extensively explained in my rebuttal to Dr. Chen's report, Chrome's transmissions to Google are markedly different as compared to other browsers such as Firefox, Edge, and Safari. My tests show that other browsers have built-in, default-on features that result in a significant reduction (or even complete removal of some categories of data) of transmissions to Google as compared to Chrome. My tests further show that even when these features are disabled, the total number of transmissions to Google by other browsers are significantly less as compared to Chrome. In summary, my tests provide concrete evidence to refute Dr. Zervas's unsupported claim that "other browsers function similarly to Chrome".

---

18 ███████████████████████████████████████████████████████
██████████████████████████ [Zervas Deposition]

## B. THE ZERVAS REPORT INCORRECTLY ASSERTS THAT I DID NOT ANALYZE THE NATURE OF TRANSMISSIONS BY CHROME TO GOOGLE IN MY REPORT

107.    Dr. Zervas opines that my report did not "analyze what, if any, personal information was being sent to Google in these transmissions or the extent to which these transmissions even contained the data at issue" (Zervas ¶ 68). But, in fact, I have done this analysis. I discuss the transmission of different types of personal information in ¶¶ 18-35 of my original report.[19] Specifically, I document the transmission of IP addresses, User-Agent, X-client-data header, and cookies from Chrome to Google-owned domains for the Mercury News webpage.

108.    Dr. Zervas opines that my report did not consider "the content and context of the transmissions" (Zervas ¶ 69). He points out my recently published research[20] that classified network transmissions from Chrome as functional or tracking to ascertain the nature of Chrome transmissions to Google. He opines that "presenting only this percentage, without considering the content and context of the transmissions, is misleading" (Zervas ¶ 69). Based on this critique, I revisited my analysis of Chrome transmissions to Google. However, as I explain in detail below, I reached the same conclusions as in my original report.

109.    I used the peer-reviewed research methodology pointed by Dr. Zervas to classify networking transmissions from Chrome as tracking or functional. The details are provided in the cited research paper.[21] If a Chrome network transmission matches the rules in EasyList or EasyPrivacy,[22] it is classified as tracking. Otherwise, it is classified as functional.

110.    I reproduced Table 2 from my original report with the additional breakdown of Chrome transmissions to Google as tracking or functional. The results still show that Chrome always makes one or more third-party tracking transmissions to a Google-owned domain in a browsing session when a user visits a series of 50 popular websites of any website category. Overall, more than two-thirds (67%) of all transmissions to Google from the top-50 websites across all categories are classified are tracking.

| Category | Count | Tracking Transmissions | Functional Transmissions |
|---|---|---|---|
| Kids | 1193 | 905 (76%) | 288 (24%) |
| Arts | 572 | 372 (65%) | 200 (35%) |
| Home | 427 | 325 (76%) | 102 (24%) |
| Health | 366 | 226 (62%) | 140 (38%) |
| News | 335 | 254 (76%) | 81 (24%) |

---

[19] *Calhoun, et al. v. Google, LLC*, Shafiq Report, dated October 14, 2021. Dkt. 340-19.

[20] A.H. Amjad, D. Saleem, F. Zaffar, M. A. Gulzar, Z Shafiq. TrackerSift: Untangling Mixed Tracking and Functional Web Resources. ACM Internet Measurement Conference, November 2021.

[21] A.H. Amjad, D. Saleem, F. Zaffar, M. A. Gulzar, Z Shafiq. TrackerSift: Untangling Mixed Tracking and Functional Web Resources. ACM Internet Measurement Conference, November 2021.

[22] https://easylist.to

| | | | |
|---|---|---|---|
| Society | 305 | 180 (59%) | 125 (41%) |
| Computers | 240 | 113 (47%) | 127 (53%) |
| Sports | 204 | 146 (72%) | 58 (28%) |
| Games | 177 | 87 (49%) | 90 (51%) |
| Regional | 163 | 53 (32%) | 110 (68%) |
| Business | 160 | 125 (78%) | 35 (22%) |
| Reference | 130 | 88 (68%) | 42 (32%) |
| Shopping | 117 | 96 (82%) | 21 (18%) |
| Recreation | 86 | 67 (78%) | 19 (22%) |
| Science | 37 | 13 (35%) | 24 (65%) |
| **Average (weighted)** | **301** | **203 (67%)** | **98 (33%)** |

**Table 4:** Frequency of Chrome transmissions to Google across different website categories (top-50 websites per category). The transmissions are further broken down as *tracking* or *functional*.

111.   The category of "functional transmissions" is also misleading because it implies that the transmissions are necessary for a browser to function. However, browsers can function without any of these "functional transmissions." In addition, it is possible for Google to render the "services" associated with the "functional transmissions" without all such transmissions. For example, Googler Ryan Cassidy, who is "a Product Manager at Google" who works on the embed Maps API submitted a declaration explaining that the "additional media" associated with the transmissions labeled as "function" "may be located on the same server that hosts the website, or on a server belonging to a third-party entity that provides services to the website." (Cassidy ¶ 3). When the service is "located on the same server that hosts the website," the data transmissions from Chrome to Google at this case would not happen. Google could design its "functional" APIs like Maps, Fonts, and Storage to work in this way. It could also design the Chrome browser to mask a user's IP address and User-Agent and not send the X-client-data header through the "functional" transmissions. However, Google has not chosen to do so.

112.   Recent peer-reviewed research,[23] at the USENIX Security Symposium 2022 (one of the most prestigious computer security venues) also supports my conclusions about how Chrome's transmissions to Google on non-Google websites are unavoidable for consumers.[24] Using data collected from 250 thousand real users (38% of whom are in the United States), the researchers found that Google directly tracks users on 72.33% of the websites and tracks 99.76% of all users in their study (see Table 3 in the paper). These results corroborate the findings in my report.

113.   I found in my report that Chrome sends third-party network transmissions to Google on 75.9% of top-100K websites. This result matches the result of 72.33% reported by these independent researchers for 250 thousand real users. I found in my

---

[23] Savino Dambra, Iskander Sanchez-Rola, Leyla Bilge, Davide Balzarotti. When Sally Met Trackers: Web Tracking From the Users' Perspective, USENIX Security Symposium 2022 (in press; https://www.usenix.org/system/files/sec22summer_dambra.pdf).

[24] Note that the research is independently conducted by academic and industry researchers. I did not partake in the peer-review of this research paper.

report that Chrome sends third-party network transmissions to Google for 100% of different website categories. This result matches the result of 99.76% reported by these independent researchers for 250 thousand real users. Thus, this independently conducted peer-reviewed research also supports my conclusions.

114.    Dr. Zervas's own peer-reviewed research[25] corroborates my findings. Specifically, he states in his research paper that "70% of popular health websites leak sensitive information—such as specific conditions, treatments and diseases—to third-party trackers and other firms with which the individual has never directly interacted." His research paper further goes on to state that "the largest trackers have access to browsing behavior across nearly all popular websites". The citation[26] provided by Dr. Zervas to support his conclusion confirms that Google is in fact "the largest tracker." Specifically, the cited paper states that "Google is the elephant in the room." In more detail, the paper states that "78% of pages analyzed included elements that were owned by Google" and "Regardless of the type of services provided, in some way all of these HTTP requests funnel information back to Google. This means a single company has the ability to record the Web activity of a huge number of individuals seeking sensitive health-related information without their knowledge or consent." Thus, the conclusion of Dr. Zervas's own peer-reviewed research (78%) match the results in my original report (75.9%) as to the percentage of websites with network transmissions to Google.

115.    Dr. Zervas acknowledged in his deposition that he did not review any of the Google's internal documents that report the prevalence of Google's source code on top websites.[27] For example, GOOG-CABR-05404848, a Google internal document about Google Analytics (GA), reports that ██████████████████████████ ████████

116.    In summary, there is overwhelming evidence (independent, Dr. Zervas's own research, and Google's internal documents) to support the claim in my original report that "it is practically impossible for a typical Chrome user to avoid third-party network transmissions to Google-owned domains."

## C.    THE ZERVAS REPORT INCORRECTLY ASSERTS THAT I DID NOT ANALYZE THE FREQUENCY AND ALTERNATIVES OF WEBSITES THAT WORK IN CHROME

117.    Dr. Zervas opines that my report does not provide "evidence that websites that work in Chrome are "quite common," and users have "no choice."" First, Dr. Zervas ignores almost 100 thousand issues reported on https://webcompat.com (also cited in my report).  Second, to support his assertions, Dr. Zervas included screen shots of five example websites. However, his testing fails to take into account the device type and the operating system for which the issue was originally reported.

---

[25] Ceren Budak, Sharad Goel, Justin Rao, Georgios Zervas, "Understanding Emerging Threats to Online Advertising", Proceedings of the 2016 ACM Conference on Economics and Computation.

[26] Libert, T. 2015. Privacy implications of health information seeking on the web. Commun. ACM 58, 3, 68–77

[27] "this is not something I studied, and I presume people who work on the Google Analytics product for Google know a lot more than I do about how Google Analytics works."

118.    Below are the screenshots of the five example web pages as reported by the users. The exact device and operating system configuration are included in the respective bug reports. Note that the compatibility results are also sensitive to the time and location.

A.  CDC's COVID Data Tracker (https://covid.cdc.gov/covid-data-tracker) does not show user the county map of pandemic vulnerability on Firefox. It suggests the user to download Chrome instead.



**Chrome**                          **Firefox**

B.  The State of Texas benefit portal (https://www.yourtexasbenefits.com/Learn/Home) that is used for SNAP food benefits and other social services does not work an Firefox from Windows 8 onwards. It works on Chrome on all Windows versions.



**Chrome**



**Firefox**

C. AT&T DirectTV's video streaming feature (https://stream.directv.com) is not supported on Firefox. The user is suggested to download Chrome or Safari instead.



**Chrome**                                    **Firefox**

D. DISH TV's video streaming video streaming feature (https://www.dishanywhere.com/franchise/dark_matter_e12582) is not supported on Firefox. The user is suggested to download Chrome or Safari instead.



**Chrome**                                    **Firefox**

E.  Google Duo's ([https://duo.google.com](https://duo.google.com)) group call feature does not work on Firefox. It only works on Chrome.



**Chrome**                                    **Firefox**

119.   As shown above, the examples (a) and (e) only offered Chrome as an alternative at the time of testing. Furthermore, it is also noteworthy that Chrome is always offered as an alternative while other browsers such as Safari or Edge may or may not always be offered as an alternative. This trend holds true for a vast majority of other bugs reported on [https://webcompat.com](https://webcompat.com). This demonstrates that for many websites users indeed have "no choice" other than Chrome to use the website.

**D.   THE ZERVAS REPORT INCORRECTLY ASSERTS THAT MY METHOD TO INFER CHROME SYNC USAGE IS INACCURATE**

120.   Dr. Zervas opines that one of the three approaches (the "top-down approach") proposed in my report to identify class members is inaccurate (Zervas ¶¶ 78-84). Dr. Zervas cites to Mr. Schumann's declaration to support his opinion and fails to provide any independent logical explanation or evidence to that end. However, as I explained earlier, the opinions expressed in Mr. Schumann's declaration are not supported by any documents produced by Google, but are rather contradicted by Google's own documents.

### E. THE ZERVAS REPORT INCORRECTLY ASSERTS THAT THE ████████ ████████ DOES NOT MAP GAIA TO ████████ OR IDENTIFIERS

121.    Dr. Zervas opines that one of the approaches proposed in my report is based on an incorrect assumption that ████████████ can map unauthenticated identifiers (e.g., ████████████) to authenticated identifiers (e.g., Gaia) (Zervas ¶¶ 85-89). Dr. Zervas cites Mr. Berntson's declaration to support this opinion and fails to provide any independent logical explanation or evidence. However, as I have already explained in my rebuttal to the Berntson Declaration, the opinions expressed by Mr. Berntson do not consider and in fact are contradicted by multiple documents produced by Google about the ████████████ design and innerworkings. Dr. Zervas acknowledged in his deposition that he did not review any documents describing ████████████, even the diagrams and documents cited in my report. For example, when asked about GOOG-CABR-03666182 discussed on page 19 of my original report, he stated that ████████████ and that ████████ ████████████████████████████████████.

### F. THE ZERVAS REPORT INCORRECTLY ASSERTS THAT MY "ALTERNATIVE APPROACH" IS INADEQUATE AND INFEASIBLE

122.    Dr. Zervas opines about the adequacy of one of the three approaches ("Alternative Approach") proposed in my report (Zervas ¶¶ 92-93). He states that the "Alternative Approach" is "inadequate because it would not include users who opted out of ████ data" (Zervas ¶ 93). However, Dr. Zervas fails to recognize that the ████████████ histograms are simply not sent to Google servers when a user opts-out of ████.[28] ████ histograms may be locally available in the Chrome browser even in that case. Since the proposed approach relies on the update that will be locally executed in users' Chrome browsers, Dr. Zervas's opinion about the inadequacy of the proposed approach is incorrect.

123.    Dr. Zervas further opines that my "Alternative Approach" has "not identified evidence sufficient to conclude that such an update is possible" (Zervas ¶¶ 92-93). First, it is noteworthy that Dr. Zervas does not offer any opinion about the infeasibility of the proposed approach. Second, it is well-known that Chrome regularly pushes an update every four weeks, thus including this update as part of the routine release cycle will be trivial.[29] Third, as discussed below, Googlers have relied on a similar update approach to deploy new features.

124.    GOOG-CALH-00081141 describes a Google project entitled ████████ to find eligible users for a promotion. This promotion was to be deployed by ████████████ ████████ and ████ ████████████████████████████████████████████.

---

[28] "If the histogram data is visible in about:histograms, it will be sent by an official Chrome build to ████ assuming the user has opted into metrics collection." https://chromium.googlesource.com/chromiumos/platform/metrics/+/d1c2a8b907dab254ef7a63c7ab4345309efb6ec6/README

[29] https://chromium.googlesource.com/chromium/src/+/refs/heads/main/docs/process/release_cycle.md

███████ .” Simply put, Google can (1) push a similar update to Chrome's ████████ implementation to locally compute the ratio of two histograms as described in my report and then (2) use the outcome of the computation (e.g., if the Chrome instance is eligible to be a class member) to decide whether to show the user of a Chrome instance the notification about class membership. This implementation of the proposed Alternative Approach is in fact simpler than the ██████ project because there is no server-side computation and both steps (████ histogram computation and notification to eligible users) are executed locally by the updated Chrome client code.

## G. THE ZERVAS REPORT INCORRECTLY ASSERTS THAT THE X-CLIENT-DATA HEADER CANNOT ACCURATELY IDENTIFY INCOGNITO USERS

125.     Dr. Zervas opines that my approach based on the X-client-data header will not accurately identify Incognito Chrome users (Zervas ¶ 94). Based on Mr. Berntson's declaration (Berntson ¶ 6 footnote 2), Dr. Zervas lists 4 scenarios where the X-client-data header will not be transmitted by Chrome to Google even if the user is not in Incognito mode (Zervas ¶ 94). As I discuss below, these four scenarios are inapplicable or will have a negligible impact on the accuracy of our approach.

126.     Citing Mr. Berntson's declaration, Dr. Zervas claims that the X-client-data header will be absent even when the browser is not in Incognito mode for "(i) a new browser instance" and when "(ii) the browser has not been used for 30 days or more" (Zervas ¶ 94). But Dr. Zervas fails to recognize that as soon as the user starts using the Chrome browser (new or returning after 30 or more days) the browser will be immediately re-assigned an X-client-data header. Thus, our approach will be able to accurately identify these browser instances as not Incognito as soon as the browser is in active use.

127.     Citing Mr. Berntson's declaration, Dr. Zervas claims that the X-client-data header will be absent even when the browser is not in Incognito mode because "(iii) the Chrome server sends too many variation IDs to the Chrome browser thereby causing the Chrome browser to delete the header to keep it from becoming too large" (Zervas ¶ 94). But Dr. Zervas fails to acknowledge that the Chrome browser is designed to reassign a new X-client-data header soon after the deletion of the previous header. Thus, our approach will be able to accurately identify these browser instances as not Incognito as soon as the browser is reassigned a new X-client-data header.

128.     Citing Mr. Berntson's declaration, Dr. Zervas claims that the X-client-data header will be absent even when the browser is not in Incognito mode because "(iv) a firewall prevents Chrome from receiving the variation IDs that are used to populate the X-Client- Data Header" (Zervas ¶ 94). But Dr. Zervas fails to acknowledge that Chrome receives variation IDs that are used to populate the X-client-data header over an encrypted HTTPS channel. Thus, normal firewalls cannot intercept and modify the X-client-data header without launching a full-blown man-in-the-middle (MITM) attack, which is not possible unless the user agrees to install the root certificate provided by firewall provider.[30]

---

[30] https://www.zdnet.com/article/apple-google-microsoft-and-mozilla-ban-kazakhstans-mitm-https-certificate/

## H. THE ZERVAS REPORT INCORRECTLY ASSERTS THAT MY DESCRIPTION OF ENTROPY IS FLAWED BECAUSE IT ASSUMES INDEPENDENCE AMONGST DIFFERENT ELEMENTS OF DATA

129.   Dr. Zervas claims that my "description of entropy is misleading because [I] suggest that adding the bits of entropy of various elements of data at issue together will equal the sum of the parts" (Zervas ¶ 98). Dr. Zervas fails to recognize that the entropy values in my report are cited from external references that consider the "joint entropy". The computation of joint entropy takes into account the lack of independence between different data elements. This issue is addressed in the EFF reference (¶ 5 in my original report). It is also noteworthy that EFF's fingerprint analysis method (https://panopticlick.eff.org) reports both the entropy of individual elements of data as well as the joint entropy while considering correlations between various data elements.

## I. THE ZERVAS REPORT INCORRECTLY ASSERTS THAT GOOGLE RETAINS SIGNIFICANTLY LESS INFORMATION THAN IT RECEIVES DUE TO POLICIES AND GUIDELINES

130.   Dr. Zervas opines based on his review of several Google policies and guidelines that "the amount of information retained by Google is significantly less than the amount it receives" (Zervas ¶¶ 101-102). For example, he cites scrubbing policies that ███████████████████████████████████████████████████████████ But his declaration fails to account for some key issues.

131.   The Zervas Report fails to acknowledge that multiple server-side logs maintained by Google concurrently store the information Chrome transmits to Google and connects it to even more information about the user. Specifically, several Google logs concurrently store several of the high-entropy data elements. For example, the logs entitled "████████████████" and "████████████████████" contain fields such as "████████████████████████████████████████████████████████████████ in the same log. As another example, the log entitled "██████████████████" contains fields such as ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████



131).[32] As another example, the log entitled ██████████ contains a field entitled ████████████

132.    The Zervas Report fails to provide any evidence as to whether the information stored by Google after "████████ is no longer personal information or personally identifiable information (Zervas ¶ 101). In fact, it seems that the Google retains significant information that can still well exceed the 32-bit entropy threshold. For example, Dr. Zervas states that Google retains ██ bits of ████████████ ████████. The entropy of these ██ bits alone could exceed the 32-bit threshold especially when combined with other redacted data elements.

## J.    CONCLUSIONS AS TO THE ZERVAS REPORT

133.    The Zervas Report's assertion about Chrome's transmissions to Google as compared to other browsers is flawed and incorrect. Contrary to his opinion, my tests of Chrome, Firefox, Edge, and Safari show that Chrome transmits data to Google far more than other browsers.

134.    My additional analysis of the previously collected data using Dr. Zervas's prescribed methodology establish the non-functional nature of Chrome transmissions to Google. Peer-reviewed research methods continue to support my conclusion. Thus, my conclusion about Chrome transmissions to Google remains unchanged.

135.    The Zervas Report's claims about the frequency of website optimization for Chrome and alternatives contradict my tests. My report cites tens of thousands of documented issues where website features do not work on Firefox but work on Chrome. While Chrome is always a suggested alternative to Firefox-incompatible websites, other browsers such as Safari or Edge are not always offered as alternatives. Thus, my conclusion about website optimization for Chrome remains unchanged.

136.    The Zervas Report's claims about the accuracy of one of my three proposed approaches (the "top-down" approach) to identify class members are not grounded by any original analysis. His analysis simply reiterates the faulty claims in the Schumann and Bernston Declarations, which I have refuted.

137.    The Zervas Report's claims about the adequacy of one of my three proposed approaches (the "alternative" approach) to identify class members are based on flawed assumption about how ██████ histograms are locally stored. To counter his concern about the feasibility of the "alternative" approach, I point an existing Google project that pushes an update to Chrome to identify a subset of Chrome users who are eligible for a promotion. Thus, my conclusion about the adequacy and feasibility of

---

[31] TLS Fingerprinting with JA3 and JA3S https://engineering.salesforce.com/tls-fingerprinting-with-ja3-and-ja3s-24736285967

[32] It is my understanding that the production of these logs is an ongoing process that is being overseen by Special Master Brush. To the extent that additional logs and information will be produced by Google, those may further support my conclusions here.

my "alternative" approach remains unchanged. In fact, new evidence further strengthens the feasibility of the proposed approach.

138.    The Zervas Report's claims about the accuracy of using X-client-data header to identify Incognito users are based on faulty logic. Thus, my conclusion about identification of Incognito users remains unchanged.

139.    The Zervas Report criticizes my approach to entropy on the basis that it assumes that adding bits of data will equal the sum of its parts. This is incorrect. My analysis considers "joint entropy" and takes into account the lack of independence between different data elements. My opinions on entropy remain unchanged.

140.    The Zervas Report's claims about Google's retention of information due to its policies and guidelines are contradicted by Google's own documents. Thus, my conclusion about the transmission of PII by Chrome to Google remains unchanged.

## IX.   REBUTTAL TO PAUL SCHWARTZ REPORT

141.    After considering Dr. Paul Schwartz's Report, including various facts and opinions he asserts, the conclusions in my report are unchanged. I discuss the flaws in the Schwartz Report in more detail below.

### A.  THE SCHWARTZ REPORT'S DETERMINATION OF PII IS BASED ON CHERRY-PICKED SUBSET OF GOOGLE'S POLICIES AND PRACTICES

142.    Dr. Schwartz opines that "Google's existing policies and guidelines support the conclusion that the data at issue is neither PII nor PI when Google does not link it to a Google Account and takes steps to ensure it is not associated with an identified individual." (Schwartz ¶ 67). He also opines that "Google has implemented policies and taken certain steps to ensure that information that is not associated with a user's Google Account is not linked nor reasonably linkable to a specific individual by Google." (Schwartz ¶ 68). Dr. Schwartz further explains that Google has policies in place that "identifiers such as ██████ or ██████ must never be stored with personally-identifying information (PII) such as GAIA IDs [Google Account IDs]." (Schwartz ¶ 79). However, Dr. Schwartz did not conduct any independent investigation or review any Google documentation, and ignores abundant contradictory evidence cited in my original report as well as new evidence produced as part of the Special Master administered discovery process.

143.    Google's ██████████████████ [GOOG-CALH-00030031, GOOG-CALH-00062153, GOOG-CABR-03666182] discussed at length in my original report allows Google to map non-GAIA IDs to GAIA IDs. For example, Figure 1 in this rebuttal (also included in page 19 of my original report) clearly shows that ████████████████████████ has specific mechanisms to literally ████████████████ and ██████████ [GOOG-CABR-03666182]. As another example, ██████████████████ encodes "████████ "██████", "Gaia", and "██████ identifiers together in the CID parameter [GOOG-CALH-00062153]. As another example, Google has pipelines that combine ████ and Gaia information for ██████████████████ [Monsees Dep. Ex. 45]. As yet another example, Google stores CID, ████████ and ██████ IDs in ██████ for █ days [GOOG-CABR-04080255]. The list goes on. In summary, Dr. Schwartz is unaware

of the fact that Google indeed routinely maps information that is not associated with a user's Google Account

144.    Dr. Schwartz is unaware of the existence of various server-side logs at Google that indeed store GAIA IDs alongside ███████ IDs. The logs produced by Google as part of the Special Master administered discovery process demonstrate that Google stores ███████ and Gaia identifiers together in multiple server-side logs. For example, the logs entitled ███████████████" and ███████████████ contain both GAIA ID and ███████ ID. For the "Ned Stark" test account, Google was able to search and extract information using both the Gaia ID (see GOOG-CALH-01134336 and GOOG-CALH-01134338) as well as corresponding ███████ IDs (see GOOG-CALH-01134348 and GOOG-CALH-01134350). The production of "Ned Stark" test account data from the same log using both Gaia and ███████ IDs clearly demonstrates that Google does not segregate ███████ and Gaia keyed data at the server-side.

145.    In summary, even when considering Dr. Schwartz's definition of PII based on whether pseudonymous identifiers such as ███████ and ███████ IDs are linked to Google Account identifiers such as GAIA ID, I conclude that Google receives and records PI and PII for Not Synced Chrome users.

## B.    DR. SCHWARTZ'S DEFINITION OF PII CONTRADICTS WITH THE FTC AND GOOGLE'S DEFINITION OF PII

146.    Dr. Schwartz relies on FTC's guidance and definition of PII. While this appears to me to be a legal opinion, Schwartz explains that "The FTC used this authority to add the following element to the statute's definition of PII: a "persistent identifier, such as a customer number held in a cookie or a processor serial number, where such identifier is associated with individually identifiable information."" (Schwartz ¶ 44). However, Dr. Schwartz has relied on an outdated 2011 guidance from the FTC here. The FTC issued an update to its guidance in 2013 that specifically removed the requirement that the persistent identifiers in its guidance need to be associated with individually identifiable information about an individual.

147.    It is noteworthy that the FTC defines persistent identifiers as follows: "Such persistent identifier includes, but is not limited to, a customer number held in a cookie, an Internet Protocol (IP) address, a processor or device serial number, or unique device identifier."  Thus, the FTC's definition of PII includes IP address and unique device identifiers such as those stored in ███████ and ███████ cookies. The FTC's definition contradicts Dr. Schwartz's assertion that only unique account identifiers such as GAIA IDs are PII (Schwartz ¶ 72) but not ███████ and ███████ IDs.

148.    Since FTC classifies IP address as a persistent identifier, the FTC's classification of IP address as PII conflicts with Dr. Schwartz's assertion that "fact-intensive considerations are required to determine whether a given IP address is PII" (Schwartz ¶ 61). In fact, Dr. Schwartz's definition of PII conflicts with Google's own definition of PII. GOOG-CALH-00027770 is a document produced by Google, which states that examples of "███████████████████████████████████ Finally, Dr. Schwartz's opinion also contradicts his own published research where he states that "An IP address is a unique identifier that is assigned to every computer connected

to the Internet." and that "The identification of a seemingly anonymous Internet user can easily follow from an IP address".

149.    Internal documents from Google also conflict with Schwartz' opinion. GOOG-CALH-00027768 states that "████████████████████" includes "███████████████████" Another document (GOOG-CABR-04604487) explains that "████████████████" is a subset of "██████████████████████████" and includes "████████████████████████████████" The same document states that "████████████████████████████████████████████████████" "██████████████████████████ is defined to include █████████████████████ and "████████████████████████████████████████████████"

C.   **DR. SCHWARTZ IS UNAWARE THAT ENTROPY IS USED AS A METRIC BY COMPUTER SCIENTISTS AND GOOGLE TO ASSESS IDENTIFIABILITY OF INFORMATION**

150.    Dr. Schwartz is unaware of the computer science community's (including Google's own) adoption of entropy as a metric to assess the risk of identifiability. He acknowledges in his deposition that "███████████████████████" as to "█████████████████████████████████████",[33]

151.    Recall that the FTC defines persistent identifiers to include "unique device identifier".[34] In service of this definition, entropy is used by computer scientists to measure whether a device identifier is unique. As I explain in my original report (Shafiq ¶ 23), the 32 bits threshold is typically determined to be the amount of entropy required to uniquely identify a user or device on the Internet.



**Figure 8:** Googler Maud Nalpas describes that the 32 bit identifiability threshold is enough to uniquely identify a user

152.    Dr. Schwartz acknowledges the existence of metrics developed by computer scientists to assess the risk of identifiability of information in his peer-reviewed published research. Specifically, he states that "Practical tools also exist for assessing the risk of identification. In fact, computer scientists have developed metrics for

---

[33] Deposition of Paul Schwartz at p. 98
[34] 16 CFR Part 312 Children's Online Privacy Protection Rule; Final Rule
https://www.ftc.gov/system/files/documents/federal_register_notices/2013/01/2012-31341.pdf

assessing the risk of identifiability of information"[35] Unfortunately, he seems to be unaware of the state-of-the-art in computer science -- he is unaware of the widespread use of entropy in computer science research and practice (including by Google). For example, GOOG-CALH-000278768 is a Google document that states the use of "████████ for "██████████████████". As another example, as shown in Figure 8, Googlers are planning to use the 32 bits as the identifiability threshold in calculating its "Privacy Budget".[36]  As another example, as shown in Figure 9, the FAQ page of Google's Privacy Budget project justifies the use of the 32 bit threshold for Privacy Budget.[37] Finally, outside of Google, EFF[38] and Mozilla[39] have also used entropy as a metric to assess identifiability of information.

**Is the privacy budget feasible?**

This proposal is at an early stage and exact privacy budget limits are to be determined. But there are reasons to think that a privacy budget is feasible: it takes about **32 bits of entropy** to uniquely identify people on the web.

About these numbers:

• There are about 4.6 billion of web users. So it takes log2(4.6 billion) = about 32 bits of entropy to uniquely identify people on the web.
• Mobile web users make up most of web users.

Read more about entropy.

*FAQ Contributors: maudnals, jensenpaul, asankah, bslassey, rowan-m.*

**Figure 9:** Googlers justify the 32-bit threshold for privacy budget

### D.    CONCLUSIONS AS TO THE SCHWARTZ REPORT

153.    The Schwartz Report's determination of PII is based on incomplete assessment of Google's policies and practices. Contradictory evidence, which was not considered by Dr. Schwartz, suggests that the data transmitted by Chrome to Google is PII even based on Dr. Schwartz's own criteria.

154.    The Schwartz Report's definition of PII, i.e., the data transmitted by Chrome to Google is PII only when Google associates it with an identified individual account, is based on an outdated FTC guidance. The FTC's updated guidance considers all persistent identifiers as PII and even Google's internal definition conflicts with Schwartz.

155.    The Schwartz Report fails to recognize that entropy is a widely recognized metric in the computer science community, including Google itself, to assess identifiability of information.

### X.    REBUTTAL TO BRUCE STROMBOM REPORT

---

[35] Paul M. Schwartz, Daniel J. Solove. "The PII Problem: Privacy and a New Concept of Personally Identifiable Information". New York University Law Review, Vol. 86, p. 1814, 2011
[36] Introducing the Privacy Budget https://www.youtube.com/watch?v=0STgfjSA6T8
[37] FAQ: Privacy Budget https://github.com/bslassey/privacy-budget/blob/4e5f78adde92bd622dafeceae78682fc0823c0eb/faq.md
[38] A Primer on Information Theory and Privacy https://www.eff.org/deeplinks/2010/01/primer-information-theory-and-privacy
[39] Technical Comments on Privacy Budget https://mozilla.github.io/ppa-docs/privacy-budget.pdf

156.    I understand that Google has submitted a report by Dr. Bruce Strombom in opposition to the Plaintiffs' Motion to Class Certification. Relevant to my area of expertise, Dr. Strombom criticized Plaintiffs' damages expert Dr. Mangum's declaration because:

    A.  Dr. Mangum "fails to allocate unjust enrichment to Proposed Class members without Google Accounts" (Strombom ¶ 109). As I describe next, Google's internal systems can be used to identify class members who do not have a Google account, and thus can be allocated unjust enrichments.

    B.  Dr. Mangum "fails to test or account for the variability that exists in the amount and type of data Google receives from users and the degree to which Google was able to monetize each user's data, which may over- or undercompensate members of the Proposed Class" (Strombom ¶ 109). As I describe next, Google's internal systems can be used to measure variability that exists in the amount and type of data Google receives and monetizes from Not Synced users.

## A.  GOOGLE CAN IDENTIFY CLASS MEMBERS WHO HAVE AND DO NOT HAVE GOOGLE ACCOUNTS

157.    Using any of the approaches described in my original report, Google has the ability to identify class members who do not have Google accounts and use Chrome in the not-signed-in mode.

158.    Plaintiffs' allegations include all Chrome users who used the Chrome browser in a Not Synced state, which Plaintiffs describe in their motion for class certification as users who were in the following modes: (a) signed-in but not consented for sync; and (b) not-signed-in. Google maintains storage systems, such as ████ [GOOG-CALH-00027787], where it keeps data relating to Chrome users in these browser states.

159.    ████ contains Gaia-keyed data, which relates to users who are signed-in. Each Gaia identifier maps to a unique to a Google accountholder. Note that while Gaia-keyed data includes both when a user is Synced and not consented for Sync, I described several approaches in my original report that can be used to distinguish between them. I further describe approaches that Google could easily deploy to measure Not Synced usage in subsection E below.

160.    ████ also contains ████-keyed and ████-keyed data, which relates to users who are not-signed-in. Each ████ and ████ identifier maps to a unique Chrome browser. Note that since a Chrome user cannot enable Sync unless they are signed in, by definition, all not-signed-in Chrome users are Not Synced.

161.    For signed-in users, as described in my original report and explained further in my rebuttal to the Berntson Declaration in Section III, above, Google maintains logs and systems through which it is capable of identifying Gaia identifiers associated with a specific ████ or ████ identifier.

162.    For not-signed-in users, Google is able to is able to identify a Chrome browser instance using its ████ or ████ identifier. Note that ████ and ████

identifiers that do not map to a Gaia identifier correspond to Chrome user who do not have a Google account.

163.    Google is able to identify Not Synced users as part of its routine process of serving ads at the rate of almost a million times per second. Specifically, GOOG-CABR-00893711 is a Google document entitled "█████████████████████" that explains the process of how Google serves targeted advertising. The document describes that, ████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████." Google then "████████████
████████████████████" Google chooses the ad by first querying for the information it has on the user. For example, if the user has shown an interest in a particular topic that is recorded in █████ that information might be used in the choice of the ad to show that user**.**



[GOOG-CABR-00893713]

164.    To process an ad request, Google essentially identifies the user based on identifiers such as Gaia and ███████ Using the ad request workflow described above in Figure 9, Google can identify Not Synced users including not-signed-in users without a Google account.

**B.    GOOGLE CAN USE ITS AD SERVING SYSTEMS TO IDENTIFY HOW MUCH DATA IT HAS IN EASILY ACCESSIBLE STORAGE THAT IT COLLECTED FROM THEM WHILE NOT SYNCED**

165.    Google can also use █████ (and the associated █████████████████████) to identify how much data it has in its possession for Not Synced users. This can be achieved, for example, by subtracting the count of data entries in Synced mode from the total count of data entries on a per-user basis. As I describe below, Google has the ability to identify the data entries in █████ for Synced users. The same approach can be easily extended to identify the data entries in ██████ for Not Synced users.

166.    Googler Tim Schumann explained that, when a user is Signed In and goes to chrome.google.com/sync, Google will automatically query ▇▇▇ to determine how much data it has in Sync storage in ▇▇▇ and display that information instantaneously to the user. As shown in Figure 10, Exhibit 18 to the Schumann Deposition illustrates the point.



**Figure 10:** Google's interface that shows Chrome data for Synced Users. The data shown here is populated from Kansas.

167.    Schumann testified that this data is "▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇" Schumann Depo. 232:24-233:9. It populates the screen through ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Schumann Depo. 235:7-17. He then explained that

Chrome has an  that ███████████████ ████████ Schumann Depo. 237:3-12.

168.    Schumann then testified that a ███████████████ ████████████████ Schumann Depo. 242:16-243:2.

169.    GOOG-CALH-00293211 is a separate document produced by Google, which explains that Google has a project called ███████████ that █████████ ██████████

170.    For a not-signed-in and Not Synced user, Google can identify how much information Chrome has sent about by performing a simple count of browsing history information in its storage system, including ██████████ that are associated with the persistent and unique ████████ and/or ████████ identifier that Google has placed on the user's Chrome browser. Thus, this will not only identify the fact that the user is a class member because Google has not-signed-in mode activity from the Chrome browser in its storage, it will also identify the raw amount of such personal information.

171.    For a signed-in but Not Synced user, Google can identify how much information it received while that user was signed-in but not consented for Sync in the Chrome browser by performing the same calculation and comparing that to a similar calculation identifying how much information is stored in Sync storage at chrome.google.com/sync. For users who have more browsing history information in Google's general storage than in Sync storage, the difference between the two will be the amount of Chrome data sent to Google while the user was signed-in but Not Synced.

172.    I understand that Dr. Zervas performed similar operations for his published paper entitled "Understanding Emerging Threats to Online Advertising." Zervas Ex. 2. For example, he "analyze[d] the web browsing histories of 13.6 million users for the 12 months between June 1, 2013 and May 31, 2014" using Microsoft systems. *Id.* at 3. In the process, he identified "321 million visits to the 10,000 most popular e-commerce sites" and reviewed that data at an individual user level to determine the percent of "loyal users" who "visit [a] site at least 10 times per month." *Id.* at 4. To determine the 10,000 most popular websites with such a large database, Dr. Zervas testified, ████████████████████████████████████ ████████████ *Id.* at 52. He testified that he would not do so by ████ Zervas Depo. 52:5-53:3.

173.    In the process, Dr. Zervas explained that they used ████████████
███████ which he described as ████████████ Zervas Dep. 55:18-20. As described by Dr. Zervas'
paper, these ███████████████████████ are based on identifiers associated with
a browser plug-in, which is effectively the same as the ███████ and ███████
identifiers here.

174.    Dr. Zervas then explained, ████████████████████████████████████
█████████████████████████████████████████ Zervas Depo. 56:21-
25. Dr. Zervas explained, ████████████
███████████████████████████████████████████
" Zervas Depo. 57:5-12. Dr. Zervas then testified that, ████████
███████████████. Zervas 57:20-58:11.

175.    This explanation of how to use Google's databases in response to Dr. Strombom's
criticism is essentially the same operation that Dr. Zervas used in his peer-reviewed
published research paper – for both signed-in and signed-out users. Just as Dr. Zervas
was capable of using Microsoft's databases to identify how many times specific users
visited specific websites through access to ██████████████████, so too can
Google's systems be used to perform the same calculations to compare data in
Google's possession in Synced and Not Synced modes.

### C.   GOOGLE MAINTAINS REVENUE LOGS FROM WHICH IT CAN CALCULATE NOT SYNCED REVENUE ON AN INDIVIDUAL USER BASIS

176.    Google maintains per-user revenue logs in ████████ [GOOG-CALH-00077056]
for Google Ads (Google.com), YouTube (YouTube.com), and more etc.

A.   Google routinely uses ███████████ to ████████████████████ via
██████████ to calculate product performance and
████████████████████████████████████████ GOOG-CABR-
04081599].

B.   ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
█████████████ [GOOG-CALH-00292922].

177.    In 2020, Google made an extensive effort to migrate more detailed Chrome usage
data into ████████ for the purpose of "████████████████████████████
██████" Schumann Dep. Ex. 10 [GOOG-CABR-03939059]. Google then created a
pipeline from the Sync server logs to ████████ to "████████████████
" of ██████████████████████ [GOOG-CABR-03939059]. This pipeline

sends specific Gaia-keyed Not Synced signals to ███████ for the financial value analysis of such users. *See* Schumann Dep. Exs. 5-6, 11, 16 (Not Synced signal labeled as "███████ identifies users who are Signed-In But Not Consented for Sync).[40]

178.    ███████ also contains Gaia-keyed data identifying Chrome usage and revenue associated with that usage. For example, █████████ contains a █████████ table that includes

████████████████████████████████████████
[GOOG-CALH-00077055] and a "████████████████████████
████████████ [GOOG-CALH-00700912].

179.    In addition to ███████ Google maintains numerous backend logs that contain revenue information keyed to specific users who are signed in but not consented for Sync as well as not-signed-in related to a logging system called ██████ Through the Special Master process, Google has identified at least ██ logs that contain specific revenue and ads information keyed to specific user identifiers. The following is

████████████████████████████████████████████████████
████████████████████████████████████

████████████████████████████
██████████████████████████████████████
████████████████████████████
██████████████████████████████████████
██████████████████████████████████
████████████████████████████████████████

180.    It is my understanding that Plaintiffs have requested through the Special Master process that Google provide explanations for all the revenue-related fields that appear in these logs but that Google refused to do so in a letter dated February 9, 2022. It is also my understanding that that Plaintiffs have been told there are additional logs with revenue information that they requested Google to identify through the Special Master process but Google has refused to do so.

181.    An exemplar produced by Google as GOOG-CALH-01134367 shows ████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

---

[40] Google previously expressly denied the existence of Not Synced signals to the Court and the Special Master. For example, Google told Judge van Keulen, "If a user has not enabled Sync, then the Sync traffic logs will not show data for that user who has not enabled Sync." Mar. 5 Hearing Tr. at 14:15-17.



182.    The following are examples of data in GOOG-CALH-01134367, an ▮▮▮▮▮▮ example:







Rows from GOOG-CABR-01134367

183.    The following are examples of data in GOOG-CALH-01134341, a
⬛⬛⬛ example:





184.    GOOG-CALH-01134322, which was labeled as an ███████ log example by Google contains ████████████████████████████████████████████████



185.    I understand that Google has produced documents indicating it has analyzed the negative revenue impact that would result if Chrome no longer sent personal information to Google on non-Google websites and that, in addition to negatively impacting Display Ads revenue, it would also negatively impact revenue from Search and YouTube.

186.    Knowing that ████████ contains user-keyed revenue information for Search and YouTube (and the process that Chrome created to send Not Synced signal information to ██████████ it is highly likely that Google keeps logs with revenue information for the other programs from which it derives revenue from tracking users on non-Google websites. Such logs would be necessary to populate the revenue information in ████████ that Google documents state exist. It is my understanding that Plaintiffs have requested information about such logs but Google has refused to produce them.

187.    Through these logs, Google could write a program to implement a formula to calculate revenue or revenue proportions on a per-user basis for Gaia-, ██████ and ████████ -keyed ads information.

188.    In summary, Google can identify Not Synced users in the ████████████ table of ████████████ and in backend logs that contain revenue information to calculate unjust enrichment with a computer program that analyzes the data in these logs.

**D.    GOOGLE CAN ALSO DEVISE EFFICIENT METHODS TO MAKE THESE COMPUTATIONS**

189.   I am confident that, given full access to Google systems, I could likely design even more efficient methods to identify Not Synced users, how much data Google has in its possession that was sent from Not Synced Chrome users, and how much revenue Google obtained as a result.

190.   I am also confident that Googlers, with a much more detailed knowledge of Google's internal systems, could relatively easily design their own methods for this purpose if ordered to do so by the Court.

### E.   GOOGLE COULD HAVE EASILY CREATED AND STORED A NOT SYNCED FLAG TO TRACK SUCH INFORMATION

191.   Based on new evidence that I have reviewed, I can confidently opine that Google can add a "Not Synced" signal to Ads, Display Ads, Google Analytics, and other transmissions from Chrome to Google. The signal can be easily stored in � ▇▇▇▇ (or other similar storage systems) alongside other data such as revenue logs to easily distinguish between Synced and Not Synced Chrome traffic. I list three reasons to support my opinion.

192.   Chrome already transmits a signal called "▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ that is stored by Google in its internal logs (e.g., "▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Thus, it will be trivial for Google to do the same for a "Not Synced" signal.

193.   GOOG-CABR-05469056 describes ▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇ Specifically, GOOG-CABR-05469096 lists the ▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

194.   Mr. Schuman also acknowledged in his deposition[41] that Chrome browser
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

### F.   GOOGLE SCREENWISE USES THE SAME IDENTIFIERS AS CHROME

195.   I understand that Dr. Strombom criticized the comparison of the information associated with a program called Google Screenwise to the personal information that Chrome sends to Google. My conclusion is that, like the information at issue in this case, in the Google Screenwise program, consumers are paid to agree to have their browsing history information sent to Google and associated with the same cookie and device identifiers at issue in this case: Gaia, ▇▇▇▇▇▇▇▇, and device identifiers.

---

[41] Schumann deposition: ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

196.    I reach this conclusion from GOOG-CABR-04312372, which explains that ███████████████████████████████████████████████████████████ as shown in Figure 11, Google ████████████████████████████████████



Screenshot of GOOG-CABR-04312372

197.    Screenwise has a public facing website at <u>screenwisepanel.com</u>. Figures 12, 13, and 14 include some relevant screenshots.



**Figure 12:** Screenshot of [screenwisepanel.com](screenwisepanel.com)



## About the Ipsos Screenwise Panel

Help us improve products for everyone, by learning how people use the internet, mobile apps, and TVs.



- A free **high-speed wifi router** and special meters collect info on how you use the Internet
- Your privacy comes first: all info we collect is **confidential**
- **Everyone 13 and older** can participate with parent or guaurdian consent
- Each participant can **earn money every week**

**Figure 13:** Screenshot of screenwisepanel.com



**Figure 14:** Screenshot of [screenwisepanel.com](screenwisepanel.com)

198.     I also understand Dr. Strombom claimed that programs such as Screenwise are
much different that Chrome sending personal information to Google because other
programs may involve installation of a device or application. Dr. Strombom fails to
justify his claim as to how the data collection by Screenwise is materially different
from Chrome. In my opinion, they are essentially similar in effect. The Chrome
browser is itself an "application" or "app" that a user must have installed on a
computing device to work.

### G.     CONCLUSIONS AS TO THE STROMBOM REPORT

199.     The Strombom Report's critique about identification of not-signed-in Chrome
users who do not have a Google account can be addressed using Google's internal
logs and systems.

200.     The Strombom Report's critique about accounting for variability across users in
terms of data collection can be addressed using ▮▮▮▮▮▮▮▮▮▮▮

201.     The Strombom Report's critique about accounting for the degree to which Google
is able to monetize data of class members can be addressed using revenue information
that Google stores in its internal logs such as ▮▮▮▮▮▮▮

202.     Dr. Strombom's claim that consumer data for which companies pay consumer
directly via programs like Screenwise are not comparable to Chrome is incorrect
because both collect the same set of identifiers and run as an application on a device.

## XI.   CALIFORNIA DETERMINATION

203.     I was asked by Counsel to determine whether Google is capable of identifying
communications taken from Not Synced Chrome users where either the user or the
website with which they were communicating are located in California.

204.     The answer to the question is yes. Google routinely identifies the location of both
users and the servers for the websites with which they interact and stores that
information in logs in which it keeps Not Synced Chrome user communications.

205.     GOOG-CALH-00011022 is a Google document that describes ▮▮▮▮▮▮

   GOOG-CABR-05283865 also explains that Google ▮▮▮▮▮
▮▮▮▮▮▮▮.

206.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Google can use these IP addresses to identify communications where either party to
the communication were present in California. This process is not difficult to conduct,
can be done without human intervention beyond the writing of source code to identify
specific communications, and is routinely done.

207.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. For
example, in GOOG-CALH-00039102, the Google log identifies that ▮▮▮▮▮▮
▮" As another example, in GOOG-CALH-01134339, the Google
log contains precise ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

██████████████████████████

## XII.   CONTENT DETERMINATION

208.   I have been informed that:

A.   Plaintiffs' claims under the Electronic Communications Privacy Act (18 U.S.C. § 2510, et. seq.) ("ECPA") and the California Invasion of Privacy Act (Cal. Pen. Code § 631) ("CIPA") require showing that Google acquired "contents" of the Plaintiffs' communications;

B.   "Contents," is defined under the ECPA "when used with respect to any … electronic communication to include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8);

C.   CIPA refers to "contents or meaning" and courts interpreting CIPA generally look to the ECPA to define the meaning of terms that are common to both laws; and

D.   Federal appellate courts have explained that information contained within URLs contain "contents" where they contain information that is more than the parties to the communication.

E.   Google previously argued in this case that Wiretap "content" includes "browsing histories or site activity data." Dkt. 152 at 6:6-11.

F.   The Ninth Circuit has explained that URLs which contain "search term[s] or similar communication[s] made by the user" qualify as content. *In re Zynga Privacy Litigation*, 750 F.3d 1098, 1109 (9th Cir. 2014). Similarly, in an ECPA case against Facebook, the Ninth Circuit explained that "a full-string detailed URL, which contains the name of a website, folder and sub-folders on the web server, and the name of the precise file request" is "distinct from IP addresses collected in Forrester, as well as the URLs collected in Zynga[.]" *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 605-06 (9th Cir. 2020); and

G.   Other courts have reached similar conclusion. In a different case against Google, the Third Circuit explained that post-domain name portions of the URL are designed to communicate to the visited website which webpage content to send the user" and, therefore, would "qualify as content" under the ECPA. *In re Google Cookie Placement Litig.*, 806 F.3d 125, 139 (3d Cir. 2015). In a case involving the National Security Agency, the Foreign Intelligence Surveillance Court explained that URLs contain content and DRAS (dialing, routing, addressing, and signaling) information.[42] In another case, a federal district court in Massachusetts exclaimed that "contents" of communications under the ECPA "includes subject lines, application commands, search queries, requested file names, and file paths." *In re*

---

[42] https://www.dni.gov/files/documents/1118/CLEANEDPRTT%202.pdf

*Application of the United States for an Order Authorizing Use of a Pen Register and Trap*, 396 F.Supp.2d 45, 49 (D. Mass. 2005).

H. The PATRIOT Act amended the ECPA and the legislative history to the PATRIOT Act included the following explanation of "content" under the ECPA. "[O]rders for the installation of a pen register and trap and trace devices may obtain any non-content information—'dialing, routing, addressing, and signaling information'—utilized in the processing or transmitting of wire and electronic communications. Just as today, such an order could not be used to intercept the contents of communications protected by the wiretap statute. The amendments reinforce the statutorily prescribed line between a communication's contents and non-content information, a line identical to the constitutional distinction drawn by the U.S. Supreme Court in *Smith v. Maryland*, 442 U.S. 735, 741-43 (1979). Thus, for example, an order under the statute … could not be used to collect information other than 'dialing, routing, addressing, and signaling' information, such as the portion of a URL (Uniform Resource Locator) specifying Web search terms or the name of a requested file or article." H.R. Rep. No. 107-236 at 53.[43]

I. In committee hearings on the bill, committee members clarified that the ECPA protected "content" that included "movement around the Internet to different websites and so on," such as "the second and third and below level URLs, which are the indications of, once you visit a Web site, what exactly you are looking at on the Web site." H.R. Rep. No. 107-236 at 294. "If someone were able to follow somebody as they surfed the Internet and saw every single page they looked at, they could write quite a convincing dossier about that individual without ever having obtained any court order to obtain that level of information." H.R. Rep. No. 107-236 at 294. The Chairman of the committee agreed that this "states what the intent of the [PATRIOT Act] is precisely, and that is that the pen register and trap and trace provisions are not to get into content of these types of electronic communications but merely where they have come from and where they go to." H.R. Rep. No. 107-236 at 295. Congresswoman Zoe Lofgren, representing San Jose and Santa Clara County, noted that everyone involved in the drafting of the PATRIOT Act agreed, "in the discussions that we had at a staff level, and Members as well, with the Justice Department and the White House, they made it very clear that they agreed with this, and this is not an argument. It is just a clarification, and I think that is important for the public to know[.]" H.R. Rep. No. 107-236 at 295.

209.    Based on this information, I have reviewed Google documents to determine whether Plaintiffs can prove by common evidence whether Google acquires "any information relating to the substance, purport, or meaning" of Not Synced user communications. The answer to this question is yes.

---

[43] https://www.congress.gov/107/crpt/hrpt236/CRPT-107hrpt236.pdf

210.	Google internal documents reveal that it acquires the "contents" of communications for Not Synced Chrome users:

A.	Google's internal ███████████████████████████████████████ [GOOG-CALH-00047741]

B.	The information at issue here includes ████████████████████████████ [GOOG-CABR-00119247]

C.	In its ████████████████████████████████████████████████ [GOOG-CABR-00893713]. ███████████████████████ [GOOG-CABR-00893714]. ███████████████ [GOOG-CABR-00893714] Google then explains ████████████ as follows:

███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ [GOOG-CABR-00893714]

211.	████████████████████████████████████████████████████████



212.

[GOOG-CALH-00039106]. [GOOG-CALH-00039111].

***

Dated: February 15, 2022

*/s/*

Zubair Shafiq, Ph. D.

# EXHIBIT A
## to Shafiq Rebuttal Report

# Exhibit A to Rebuttal Report of Z. Shafiq Materials Reviewed

## Legal Documents

- Plaintiffs' Motion for Class Certification and supporting documents
- Google's Opposition to Plaintiffs' Motion for Class Certification and supporting documents
- Google's Responses and Objections to Plaintiffs' Request for Admission No. 14
- Plaintiffs' Fourth Set of Request for Production, Exhibit B

## Depositions

- Deposition of Dr. Rodney Johnson, October 23, 2021
- Deposition of Dr. Corinice Wilson, October 25, 2021
- Deposition of Chris Liao, December 2, 2021
- Deposition of Glenn Berntson, June 16, 2021
- Deposition of Deepak Ravichandran, January 7, 2022
- Deposition of Chetna Bindra, February 4, 2022
- Deposition of Georgios Zervas, January 26, 2022
- Deposition of Yiling Chen, February 2, 2022
- Deposition of Bruce Strombom, January 31, 2022
- Deposition of Steve Ganem, February 11, 2022
- Deposition of Ryan Cassidy, February 11, 2022

## Google Expert Productions

- GOOG_ZERVAS_00000001-00000103
- GOOG_CHEN_00000001-00000192
- GOOG_CHEN_00000007 and 23 reproduced versions
- GOOG_CHEN_00000007.A and 23.A
- February 1, 2022 Chen Errata and attachments
- GOOG_ERDEM_00000001-00000011

## Testing and Related Documents

- Ned Stark
  - MyActivity
    - Youtube – MyActivity.html
    - Takeout – MyActivity.html
    - Search – MyActivity.html
    - Maps – MyActivity.html
    - Google Analytics – MyActivity.html
    - Ads – MyActivity.html

- mercury-har-files
  - default-configuration

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- safari_mercurynews.har
- firefox_mercurynews.har
- edge_mercurynews.har
- chrome_mercurynews.har
  - o chen-configuration
    - safari_www.mercurynews.com.har
    - firefox_www.mercurynews.com.har
    - edge_www.marcurynews.com.har
    - chrome_www.mercurynews.com.har

- map-har-files
  - o [www.fedex.com.har](www.fedex.com.har)
  - o [www.embedgooglemap.net.har](www.embedgooglemap.net.har)

## Other Case Materials

- Calhoun v Google SCA Authorization Template
- 2021.11.30 - Original Doc Names and Bates Numbers for Dr. Shafiq Production.pdf
- arstechnica.com-Google paying users to track 100 of their Web usage via little black box
- eff.org-Google Screenwise An Unwise Trade of All Your Privacy for Cash
- themarkup.org-Theres a Multibillion-Dollar Market for Your Phones LocationData
- theverge.com-Google Screenwise pays opt-in users for expanded web tracking
- PLAINTIFFS00027745

## Google Produced Documents

- AEO 2021-09-17 – Calhoun v Google - Google Submission
- AEO 2021-09-27 – Calhoun v Google – Google Submission
- Google LLC'S Responses and Objections to Special Master's Report and Orders on Referred Discovery Issues
- 2021-11-16 Calhoun v. Google -Special Master Submission in Response to Nov. 12 Order 5.1-5.3
- 2021-11-18 Brown & Calhoun - Special Master Submission in Response to Nov. 12 Order.pdf
- 2021-11-18 Calhoun Omnibus Sheet - Working
- 2021-11-18 Declaration [dckt 383_0]
- 2021-11-18 Documentation on Data Sources and Tools
- Calhoun - Exhibit A - REDACTED COPY
- Calhoun - Exhibit A - UNREDACTED COPY
- Calhoun - Exhibit B - REDACTED COPY
- Calhoun - Exhibit B - UNREDACTED COPY
- Exh. B to Google's November 18, 2021, disclosures

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed



# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed



# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed



- GOOG-CALH-00014551
- GOOG-CALH-00016479
- GOOG-CALH-00027208
- GOOG-CALH-00027278
- GOOG-CALH-00027458

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- GOOG-CALH-00027476
- GOOG-CALH-00027477
- GOOG-CALH-00027546
- GOOG-CALH-00027547
- GOOG-CALH-00027549
- GOOG-CALH-00027550
- GOOG-CALH-00027551
- GOOG-CALH-00027552
- GOOG-CALH-00027554
- GOOG-CALH-00027555
- GOOG-CALH-00027567
- GOOG-CALH-00027568
- GOOG-CALH-00027599
- GOOG-CALH-00027682
- GOOG-CALH-00027683
- GOOG-CALH-00027692
- GOOG-CALH-00027693
- GOOG-CALH-00027716
- GOOG-CALH-00027717
- GOOG-CALH-00027718
- GOOG-CALH-00027719
- GOOG-CALH-00027792
- GOOG-CALH-00027793
- GOOG-CALH-00027802
- GOOG-CALH-00027803
- GOOG-CALH-00027821
- GOOG-CALH-00028183
- GOOG-CALH-00028232
- GOOG-CALH-00030031
- GOOG-CALH-00031076
- GOOG-CALH-00031131
- GOOG-CALH-00032221
- GOOG-CALH-00037701
- GOOG-CALH-00039102
- GOOG-CALH-00039102
- GOOG-CALH-00039120
- GOOG-CALH-00039125
- GOOG-CALH-00039126

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- GOOG-CALH-00039127
- GOOG-CALH-00039128
- GOOG-CALH-00039129
- GOOG-CALH-00039130
- GOOG-CALH-00040905
- GOOG-CALH-00045178
- GOOG-CALH-00047632
- GOOG-CALH-00047633
- GOOG-CALH-00047634
- GOOG-CALH-00047635
- GOOG-CALH-00047636
- GOOG-CALH-00047637
- GOOG-CALH-00047638
- GOOG-CALH-00047639
- GOOG-CALH-00047640
- GOOG-CALH-00047641
- GOOG-CALH-00047642
- GOOG-CALH-00047643
- GOOG-CALH-00047644
- GOOG-CALH-00047645
- GOOG-CALH-00047646
- GOOG-CALH-00047647
- GOOG-CALH-00047648
- GOOG-CALH-00047649
- GOOG-CALH-00047650
- GOOG-CALH-00047651
- GOOG-CALH-00047652
- GOOG-CALH-00047653
- GOOG-CALH-00047654
- GOOG-CALH-00047655
- GOOG-CALH-00047656
- GOOG-CALH-00047657
- GOOG-CALH-00047658
- GOOG-CALH-00047659
- GOOG-CALH-00047660
- GOOG-CALH-00047661
- GOOG-CALH-00047662
- GOOG-CALH-00047663

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- GOOG-CALH-00047664
- GOOG-CALH-00047665
- GOOG-CALH-00047666
- GOOG-CALH-00047667
- GOOG-CALH-00047668
- GOOG-CALH-00047669
- GOOG-CALH-00047670
- GOOG-CALH-00047671
- GOOG-CALH-00047672
- GOOG-CALH-00047673
- GOOG-CALH-00047674
- GOOG-CALH-00047675
- GOOG-CALH-00047676
- GOOG-CALH-00047677
- GOOG-CALH-00047678
- GOOG-CALH-00047679
- GOOG-CALH-00047680
- GOOG-CALH-00047681
- GOOG-CALH-00047682
- GOOG-CALH-00047683
- GOOG-CALH-00047684
- GOOG-CALH-00047685
- GOOG-CALH-00047686
- GOOG-CALH-00047687
- GOOG-CALH-00047688
- GOOG-CALH-00047689
- GOOG-CALH-00047690
- GOOG-CALH-00047691
- GOOG-CALH-00047692
- GOOG-CALH-00047693
- GOOG-CALH-00047694
- GOOG-CALH-00047695
- GOOG-CALH-00047696
- GOOG-CALH-00047697
- GOOG-CALH-00047698
- GOOG-CALH-00047699
- GOOG-CALH-00047700
- GOOG-CALH-00047701

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- GOOG-CALH-00050256
- GOOG-CALH-00050264
- GOOG-CALH-00050659
- GOOG-CALH-00050661
- GOOG-CALH-00050662
- GOOG-CALH-00050663
- GOOG-CALH-00050665
- GOOG-CALH-00050666
- GOOG-CALH-00050667
- GOOG-CALH-00050669
- GOOG-CALH-00050670
- GOOG-CALH-00050671
- GOOG-CALH-00050672
- GOOG-CALH-00050673
- GOOG-CALH-00050675
- GOOG-CALH-00050676
- GOOG-CALH-00050678
- GOOG-CALH-00050680
- GOOG-CALH-00050681
- GOOG-CALH-00050682
- GOOG-CALH-00050683
- GOOG-CALH-00050684
- GOOG-CALH-00050685
- GOOG-CALH-00050690
- GOOG-CALH-00050692
- GOOG-CALH-00050705
- GOOG-CALH-00050706
- GOOG-CALH-00050709
- GOOG-CALH-00050710
- GOOG-CALH-00050711
- GOOG-CALH-00050712
- GOOG-CALH-00050713
- GOOG-CALH-00050714
- GOOG-CALH-00050741
- GOOG-CALH-00050742
- GOOG-CALH-00050743
- GOOG-CALH-00050745
- GOOG-CALH-00050746

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- GOOG-CALH-00050761
- GOOG-CALH-00050777
- GOOG-CALH-00050780
- GOOG-CALH-00050781
- GOOG-CALH-00050782
- GOOG-CALH-00050786
- GOOG-CALH-00050787
- GOOG-CALH-00050788
- GOOG-CALH-00050789
- GOOG-CALH-00050790
- GOOG-CALH-00050811
- GOOG-CALH-00050813
- GOOG-CALH-00050814
- GOOG-CALH-00050816
- GOOG-CALH-00050817
- GOOG-CALH-00050822
- GOOG-CALH-00050824
- GOOG-CALH-00050825
- GOOG-CALH-00052088
- GOOG-CALH-00052089
- GOOG-CALH-00052092
- GOOG-CALH-00052093
- GOOG-CALH-00052094
- GOOG-CALH-00052096
- GOOG-CALH-00052097
- GOOG-CALH-00052099
- GOOG-CALH-00052100
- GOOG-CALH-00052101
- GOOG-CALH-00054260
- GOOG-CALH-00061534
- GOOG-CALH-00061943
- GOOG-CALH-00061944
- GOOG-CALH-00061946
- GOOG-CALH-00061947
- GOOG-CALH-00061948
- GOOG-CALH-00061951
- GOOG-CALH-00061952
- GOOG-CALH-00061953

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- GOOG-CALH-00061954
- GOOG-CALH-00061960
- GOOG-CALH-00061963
- GOOG-CALH-00061965
- GOOG-CALH-00061966
- GOOG-CALH-00061969
- GOOG-CALH-00061971
- GOOG-CALH-00061973
- GOOG-CALH-00061975
- GOOG-CALH-00061977
- GOOG-CALH-00061978
- GOOG-CALH-00062037
- GOOG-CALH-00062049
- GOOG-CALH-00062056
- GOOG-CALH-00062072
- GOOG-CALH-00062153
- GOOG-CALH-00062169
- GOOG-CALH-00072863
- GOOG-CALH-00072865
- GOOG-CALH-00072867
- GOOG-CALH-00072868
- GOOG-CALH-00072870
- GOOG-CALH-00072871
- GOOG-CALH-00072872
- GOOG-CALH-00072873
- GOOG-CALH-00072874
- GOOG-CALH-00072875
- GOOG-CALH-00072876
- GOOG-CALH-00072877
- GOOG-CALH-00072879
- GOOG-CALH-00072880
- GOOG-CALH-00072881
- GOOG-CALH-00072882
- GOOG-CALH-00072884
- GOOG-CALH-00072885
- GOOG-CALH-00072886
- GOOG-CALH-00072887
- GOOG-CALH-00072888

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- GOOG-CALH-00072891
- GOOG-CALH-00072899
- GOOG-CALH-00072900
- GOOG-CALH-00072901
- GOOG-CALH-00072902
- GOOG-CALH-00072903
- GOOG-CALH-00072941
- GOOG-CALH-00072948
- GOOG-CALH-00072949
- GOOG-CALH-00072951
- GOOG-CALH-00072958
- GOOG-CALH-00072960
- GOOG-CALH-00072961
- GOOG-CALH-00072962
- GOOG-CALH-00072963
- GOOG-CALH-00072985
- GOOG-CALH-00072986
- GOOG-CALH-00081472
- GOOG-CALH-00129119
- GOOG-CALH-00133389
- GOOG-CALH-00160127
- GOOG-CALH-00160141
- GOOG-CALH-00292090
- GOOG-CALH-00293211
- GOOG-CALH-00303689
- GOOG-CALH-00374314
- GOOG-CALH-00430027
- GOOG-CALH-00430028
- GOOG-CALH-00430029
- GOOG-CALH-00430030
- GOOG-CALH-00430031
- GOOG-CALH-00430032
- GOOG-CALH-00430033
- GOOG-CALH-00430034
- GOOG-CALH-00430035
- GOOG-CALH-00490674
- GOOG-CALH-00492265
- GOOG-CALH-00492266

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- GOOG-CALH-00492267
- GOOG-CALH-00492268
- GOOG-CALH-00492789
- GOOG-CALH-00492831
- GOOG-CALH-00492833
- GOOG-CALH-00492834
- GOOG-CALH-00492836
- GOOG-CALH-00492838
- GOOG-CALH-00492842
- GOOG-CALH-00492843
- GOOG-CALH-00492851
- GOOG-CALH-00492852
- GOOG-CALH-00552139
- GOOG-CALH-00552160
- GOOG-CALH-00552367
- GOOG-CALH-00552369
- GOOG-CALH-00552934
- GOOG-CALH-00552947
- GOOG-CALH-00592132
- GOOG-CALH-00592133
- GOOG-CALH-00592134
- GOOG-CALH-00592135
- GOOG-CALH-00592136
- GOOG-CALH-00592137
- GOOG-CALH-00592138
- GOOG-CALH-00592156
- GOOG-CALH-00592164
- GOOG-CALH-00592171
- GOOG-CALH-00592188
- GOOG-CALH-00592206
- GOOG-CALH-00592214
- GOOG-CALH-00592232
- GOOG-CALH-00592249
- GOOG-CALH-00592267
- GOOG-CALH-00592275
- GOOG-CALH-00592276
- GOOG-CALH-00592277
- GOOG-CALH-00592279

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- GOOG-CALH-00648520
- GOOG-CALH-00648521
- GOOG-CALH-00648522
- GOOG-CALH-00650721
- GOOG-CALH-00651604
- GOOG-CALH-00651613
- GOOG-CALH-00651617
- GOOG-CALH-00651620
- GOOG-CALH-00651623
- GOOG-CALH-00651624
- GOOG-CALH-00651625
- GOOG-CALH-00651626
- GOOG-CALH-00651627
- GOOG-CALH-00651628
- GOOG-CALH-00651631
- GOOG-CALH-00651634
- GOOG-CALH-00651636
- GOOG-CALH-00651646
- GOOG-CALH-00651647
- GOOG-CALH-00651648
- GOOG-CALH-00651649
- GOOG-CALH-00651650
- GOOG-CALH-00651652
- GOOG-CALH-00651653
- GOOG-CALH-00651654
- GOOG-CALH-00651655
- GOOG-CALH-00651656
- GOOG-CALH-00651985
- GOOG-CALH-00652193
- GOOG-CALH-00652194
- GOOG-CALH-00652195
- GOOG-CALH-00652197
- GOOG-CALH-00652200
- GOOG-CALH-00652201
- GOOG-CALH-00652203
- GOOG-CALH-00652207
- GOOG-CALH-00652213
- GOOG-CALH-00652219

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- GOOG-CALH-00652221
- GOOG-CALH-00652223
- GOOG-CALH-00652224
- GOOG-CALH-00652225
- GOOG-CALH-00652226
- GOOG-CALH-00652228
- GOOG-CALH-00652229
- GOOG-CALH-00652238
- GOOG-CALH-00652241
- GOOG-CALH-00652243
- GOOG-CALH-00652245
- GOOG-CALH-00652246
- GOOG-CALH-00652247
- GOOG-CALH-00652248
- GOOG-CALH-00652249
- GOOG-CALH-00652251
- GOOG-CALH-00652254
- GOOG-CALH-00652256
- GOOG-CALH-00652258
- GOOG-CALH-00652259
- GOOG-CALH-00652279
- GOOG-CALH-00652280
- GOOG-CALH-00652281
- GOOG-CALH-00652282
- GOOG-CALH-00652282
- GOOG-CALH-00652283
- GOOG-CALH-00652284
- GOOG-CALH-00652285
- GOOG-CALH-00660110
- GOOG-CALH-00660115
- GOOG-CALH-00700912
- GOOG-CALH-00721187
- GOOG-CALH-00790618
- GOOG-CALH-00792525
- GOOG-CALH-00797544
- GOOG-CALH-00797545
- GOOG-CALH-00797546
- GOOG-CALH-00797547

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- GOOG-CALH-00797958
- GOOG-CALH-00798394
- GOOG-CALH-00798788
- GOOG-CALH-00799283
- GOOG-CALH-00799715
- GOOG-CALH-00799994
- GOOG-CALH-00800399
- GOOG-CALH-00800746
- GOOG-CALH-00800827
- GOOG-CALH-00800874
- GOOG-CALH-00801264
- GOOG-CALH-00801654
- GOOG-CALH-00802061
- GOOG-CALH-00802468
- GOOG-CALH-00802645
- GOOG-CALH-00802822
- GOOG-CALH-00802903
- GOOG-CALH-00803303
- GOOG-CALH-00803710
- GOOG-CALH-00803868
- GOOG-CALH-00804097
- GOOG-CALH-00804098
- GOOG-CALH-00804163
- GOOG-CALH-00804164
- GOOG-CALH-00804512
- GOOG-CALH-00804513
- GOOG-CALH-00804514
- GOOG-CALH-00804904
- GOOG-CALH-00804905
- GOOG-CALH-00908508
- GOOG-CALH-00908511
- GOOG-CALH-00909335
- GOOG-CALH-00909392
- GOOG-CALH-00909409
- GOOG-CALH-00909536
- GOOG-CALH-00909539
- GOOG-CALH-00909540
- GOOG-CALH-00909541

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- GOOG-CALH-00909544
- GOOG-CALH-00909545
- GOOG-CALH-00910152
- GOOG-CALH-00910153
- GOOG-CALH-00910308
- GOOG-CALH-00910309
- GOOG-CALH-00910312
- GOOG-CALH-00910313
- GOOG-CALH-00910405
- GOOG-CALH-00910523
- GOOG-CALH-00910524
- GOOG-CALH-00910597
- GOOG-CALH-00910598
- GOOG-CALH-00910599
- GOOG-CALH-00910600
- GOOG-CALH-00910601
- GOOG-CALH-00910604
- GOOG-CALH-00910605
- GOOG-CALH-00910703
- GOOG-CALH-00910704
- GOOG-CALH-00910705
- GOOG-CALH-00910798
- GOOG-CALH-00910799
- GOOG-CALH-00910800
- GOOG-CALH-00910801
- GOOG-CALH-00910802
- GOOG-CALH-00910805
- GOOG-CALH-00910806
- GOOG-CALH-00910807
- GOOG-CALH-00910808
- GOOG-CALH-00910809
- GOOG-CALH-00910810
- GOOG-CALH-00910824
- GOOG-CALH-00911385
- GOOG-CALH-00911505
- GOOG-CALH-00911506
- GOOG-CALH-00911526
- GOOG-CALH-00911527

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- GOOG-CALH-00911528
- GOOG-CALH-00911529
- GOOG-CALH-00911553
- GOOG-CALH-00912261
- GOOG-CALH-00912262
- GOOG-CALH-00912492
- GOOG-CALH-00912493
- GOOG-CALH-00912494
- GOOG-CALH-00912495
- GOOG-CALH-00912496
- GOOG-CALH-00912497
- GOOG-CALH-00912498
- GOOG-CALH-00912499
- GOOG-CALH-00912500
- GOOG-CALH-00912501
- GOOG-CALH-00912502
- GOOG-CALH-00912503
- GOOG-CALH-00912504
- GOOG-CALH-00912505
- GOOG-CALH-00912506
- GOOG-CALH-00912507
- GOOG-CALH-00912508
- GOOG-CALH-00912509
- GOOG-CALH-00912510
- GOOG-CALH-00912511
- GOOG-CALH-00912512
- GOOG-CALH-00912513
- GOOG-CALH-00912514
- GOOG-CALH-00912515
- GOOG-CALH-00912516
- GOOG-CALH-00912517
- GOOG-CALH-00912518
- GOOG-CALH-00912519
- GOOG-CALH-00912520
- GOOG-CALH-00912521
- GOOG-CALH-00912522
- GOOG-CALH-00912523
- GOOG-CALH-00912524

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- GOOG-CALH-00912525
- GOOG-CALH-00912526
- GOOG-CALH-00912527
- GOOG-CALH-00912528
- GOOG-CALH-00912529
- GOOG-CALH-00912530
- GOOG-CALH-00912531
- GOOG-CALH-00912532
- GOOG-CALH-00912533
- GOOG-CALH-00912534
- GOOG-CALH-00912535
- GOOG-CALH-00912536
- GOOG-CALH-00912537
- GOOG-CALH-00912538
- GOOG-CALH-00912539
- GOOG-CALH-00912540
- GOOG-CALH-00912541
- GOOG-CALH-00912542
- GOOG-CALH-00912543
- GOOG-CALH-00912544
- GOOG-CALH-00912545
- GOOG-CALH-00912546
- GOOG-CALH-00912547
- GOOG-CALH-00912548
- GOOG-CALH-00912549
- GOOG-CALH-00912550
- GOOG-CALH-00912551
- GOOG-CALH-00912552
- GOOG-CALH-00912553
- GOOG-CALH-00912554
- GOOG-CALH-00912555
- GOOG-CALH-00912556
- GOOG-CALH-00912557
- GOOG-CALH-00912558
- GOOG-CALH-00912559
- GOOG-CALH-00912560
- GOOG-CALH-00912561
- GOOG-CALH-00912562

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- GOOG-CALH-00912563
- GOOG-CALH-00912564
- GOOG-CALH-00912565
- GOOG-CALH-00912566
- GOOG-CALH-00912567
- GOOG-CALH-00912568
- GOOG-CALH-00912569
- GOOG-CALH-00912570
- GOOG-CALH-00912571
- GOOG-CALH-00912572
- GOOG-CALH-00912573
- GOOG-CALH-00912574
- GOOG-CALH-00912575
- GOOG-CALH-00912576
- GOOG-CALH-00912577
- GOOG-CALH-00912578
- GOOG-CALH-00912579
- GOOG-CALH-00912580
- GOOG-CALH-00912581
- GOOG-CALH-00912582
- GOOG-CALH-00912583
- GOOG-CALH-00912584
- GOOG-CALH-00912585
- GOOG-CALH-00912586
- GOOG-CALH-00912587
- GOOG-CALH-00912588
- GOOG-CALH-00912589
- GOOG-CALH-00912590
- GOOG-CALH-00912591
- GOOG-CALH-00912592
- GOOG-CALH-00912593
- GOOG-CALH-00912594
- GOOG-CALH-00912595
- GOOG-CALH-00912596
- GOOG-CALH-00912597
- GOOG-CALH-00912598
- GOOG-CALH-00912599
- GOOG-CALH-00912600

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- GOOG-CALH-00912601
- GOOG-CALH-00912602
- GOOG-CALH-00912603
- GOOG-CALH-00912604
- GOOG-CALH-00912605
- GOOG-CALH-00912606
- GOOG-CALH-00912607
- GOOG-CALH-00912608
- GOOG-CALH-00912609
- GOOG-CALH-00912610
- GOOG-CALH-00912611
- GOOG-CALH-00912612
- GOOG-CALH-00912613
- GOOG-CALH-00912614
- GOOG-CALH-00912615
- GOOG-CALH-00912616
- GOOG-CALH-00912617
- GOOG-CALH-00912618
- GOOG-CALH-00912619
- GOOG-CALH-00912620
- GOOG-CALH-00912621
- GOOG-CALH-00912622
- GOOG-CALH-00912623
- GOOG-CALH-00912624
- GOOG-CALH-00912625
- GOOG-CALH-00912626
- GOOG-CALH-00912627
- GOOG-CALH-00912628
- GOOG-CALH-00912629
- GOOG-CALH-00912754
- GOOG-CALH-00912786
- GOOG-CALH-00912788
- GOOG-CALH-00912810
- GOOG-CALH-00912817
- GOOG-CALH-00912830
- GOOG-CALH-00912833
- GOOG-CALH-00912837
- GOOG-CALH-00912980

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- GOOG-CALH-00912984
- GOOG-CALH-00913143
- GOOG-CALH-00913147
- GOOG-CALH-00913221
- GOOG-CALH-00913223
- GOOG-CALH-00913227
- GOOG-CALH-00913250
- GOOG-CALH-00913417
- GOOG-CALH-00913420
- GOOG-CALH-00913715
- GOOG-CALH-00913719
- GOOG-CALH-00913720
- GOOG-CALH-00913721
- GOOG-CALH-00913722
- GOOG-CALH-00913723
- GOOG-CALH-00913724
- GOOG-CALH-00913725
- GOOG-CALH-00913726
- GOOG-CALH-00913727
- GOOG-CALH-00913745
- GOOG-CALH-00913746
- GOOG-CALH-00925361
- GOOG-CALH-01016578
- GOOG-CABR-00059481
- GOOG-CABR-00086613
- GOOG-CABR-00103636
- GOOG-CABR-00115917
- GOOG-CABR-00125420
- GOOG-CABR-00130197
- GOOG-CABR-00190185
- GOOG-CABR-00373424
- GOOG-CABR-00422093
- GOOG-CABR-00422093
- GOOG-CABR-00832000
- GOOG-CABR-00892126
- GOOG-CABR-00892310
- GOOG-CABR-03609925
- GOOG-CABR-03653208

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- GOOG-CABR-03655773
- GOOG-CABR-03663124
- GOOG-CABR-03664145
- GOOG-CABR-03666182
- GOOG-CABR-03723402
- GOOG-CABR-03744846
- GOOG-CABR-03839059
- GOOG-CABR-04026136
- GOOG-CABR-04033448
- GOOG-CABR-04067825
- GOOG-CABR-04073287
- GOOG-CABR-04084881
- GOOG-CABR-04119164
- GOOG-CABR-04176215
- GOOG-CABR-04205014
- GOOG-CABR-04206765
- GOOG-CABR-04295215
- GOOG-CABR-04312372
- GOOG-CABR-04334587
- GOOG-CABR-04400013
- GOOG-CABR-04604487
- GOOG-CABR-04605135
- GOOG-CABR-04616357
- GOOG-CABR-04696440
- GOOG-CABR-04742957
- GOOG-CABR-04866841
- GOOG-CABR-05156497
- GOOG-CABR-05278287
- GOOG-CABR-05279094
- GOOG-CABR-05280150
- GOOG-CABR-05290317
- GOOG-CABR-05292934
- GOOG-CABR-05292947
- GOOG-CABR-05294314
- GOOG-CABR-05295318
- GOOG-CABR-05295553
- GOOG-CABR-05296460
- GOOG-CABR-05298779

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- GOOG-CABR-05299944
- GOOG-CABR-05302330
- GOOG-CABR-05303296
- GOOG-CABR-05401162
- GOOG-CABR-05401180
- GOOG-CABR-05401181
- GOOG-CABR-05424604
- GOOG-CABR-05424604
- GOOG-CABR-05469056