**BLEICHMAR FONTI & AULD LLP**
Lesley Weaver (Cal. Bar No.191305)
Angelica M. Ornelas (Cal. Bar No. 285929)
Joshua D. Samra (Cal. Bar No. 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
*lweaver@bfalaw.com*
*aornelas@bfalaw.com*
*jsamra@bfalaw.com*

**SIMMONS HANLY CONROY LLC**
Jason 'Jay' Barnes (admitted *pro hac vice*)
An Truong (admitted *pro hac vice*)
Eric Johnson (admitted *pro hac vice*)
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
Fax: (212) 213-5949
*jaybarnes@simmonsfirm.com*
*atruong@simmonsfirm.com*
*ejohnson@simmonsfirm.com*

*Counsel for Plaintiffs*

**DICELLO LEVITT GUTZLER LLC**
David A. Straite (admitted *pro hac vice*)
One Grand Central Place
60 East 42nd Street, Suite 2400
New York, New York 10165
Tel.: (646) 933-1000
*dstraite@dicellolevitt.com*

Amy E. Keller (admitted *pro hac vice*)
Adam Prom (admitted *pro hac vice*)
Sharon Cruz (admitted *pro hac vice*)
Ten North Dearborn Street, 6th Fl.
Chicago, Illinois 60602
Tel.: (312) 214-7900
*akeller@dicellolevitt.com*
*aprom@dicellolevitt.com*
*scruz@dicellolevitt.com*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

PATRICK CALHOUN, *et al*., on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

GOOGLE LLC,

Defendant.

Case No. 4:20-cv-5146-YGR-SVK

**PLAINTIFFS' OPPOSITION TO GOOGLE'S MOTION TO STRIKE REPORT OF RUSSELL MANGUM, III, PH.D.**

Mot. Date: May 31, 2022
Time: 2:00PM PT
Courtroom: 1, 4th Floor

Hon. Yvonne Gonzalez-Rogers

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES………………………………………………………...……i

I.     PRELIMINARY STATEMENT .........................................................................1

I.     COUNTER STATEMENT OF ISSUE TO BE DECIDED ..................................2

II.    COUNTER STATEMENT OF RELEVANT FACTS...........................................2

    A.    Plaintiffs' Theory of Liability ................................................................2

    B.    Dr. Mangum's Methodologies Match Plaintiffs' Theory of Liability .....................4

        1.    Dr. Mangum's Methodology to Calculate Unjust Enrichment ....................5

        2.    Dr. Mangum's Methodology to Calculate Restitution Damages .................6

III.   LEGAL STANDARD .........................................................................................8

IV.   ARGUMENT .....................................................................................................8

    A.    Dr. Mangum's Opinions are Relevant to the Issue of Class Wide Damages............9

        1.    Unjust Enrichment, Restitution, and Disgorgement Are Available for Intrusion Upon Seclusion, CIPA, and Statutory Larceny......................9

        2.    Dr. Mangum's Measures Apply to Breach of Contract and Good Faith and Fair Dealing Claims ......................................................10

        3.    Restitutionary Disgorgement, i.e., the Google Screenwise Calculation, is Available Under the UCL ...........................................11

    B.    Dr. Mangum's Proposed Methodology Applies to All Putative Class Members........................................................................................13

    C.    Dr. Mangum Presents A Reliable Methodology to Calculate Restitution Damages .......................................................................................19

        1.    Dr. Mangum's Methodology for Restitution Can Fairly Compensate Class Members .............................................................19

        2.    Dr. Mangum's Methodology Fits Plaintiffs' Theory of Liability ...............21

    D.    Dr. Mangum Presents A Reliable Methodology to Calculate Excess Profits for Disgorgment Damages ...................................................................23

V.    CONCLUSION ................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*American Master Lease LLC v. Idanta Partners, Ltd.*,
225 Cal. App. 4th 1451 (2014) ............................................................................. 9

*Brainard v. Cohn*,
8 F.2d 13 (9th Cir. 1925) ..................................................................................... 25

*Briseno v. ConAgra Foods, Inc.*,
844 F.3d 1121 (9th Cir. 2017) ............................................................................ 14

*Brown v. Google LLC*,
No. 5:20-cv-03664-LHK, 2021 WL 6064009 (N.D. Cal. Dec. 22, 2021) .......... 7, 11, 12, 13

*Contour IP Holding, LLC v. GoPro, Inc.*,
No. 3:17-cv-04738, 2020 WL 5106845 (N.D. Cal. Aug. 31, 2020) .................... 22

*Cottle v. Plaid, Inc.*,
536 F. Supp. 3d 461 (N.D. Cal. 2021) ........................................................... 12, 13

*CTC Real Estate Servs. v. Lepe*,
140 Cal. App. 4th 856 (Cal. App. 2006) ............................................................. 9

*Cty. of San Bernardino v. Walsh*,
158 Cal. App. 4th 533 (Cal. App. 2007) ............................................................. 9

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ...................................................................................... *passim*

*Day v. AT&T, Corp.*,
63 Cal.App.4th 325 (1998) ................................................................................. 13

*DSU Med. Corp. v. JMS Co.*,
296 F. Supp. 2d 1140 (N.D. Cal. 2003), *aff'd*, 471 F.3d 1293 (Fed. Cir. 2006) ...... 1, 14, 15

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) ............................................................................... 8

*Ericcson, Inc. v. D-Link Systems, Inc.*,
773 F.3d 1201 (Fed. Cir. 2014) .......................................................................... 22

*Fields v. Michael*,
91 Cal. App. 2d 443 (1949) ................................................................................. 12

*Hart v. TWC Prod. & Tech. LLC*,
526 F. Supp. 3d 592 (N.D. Cal. 2021) ........................................................... 12, 13

*Hartley v. Dillard's, Inc.*,
    310 F.3d 1054 (8th Cir. 2002) ............................................................................. 8

*Hill v. NCAA*,
    7 Cal. 4th 1 (Cal. 1994) ..................................................................................... 18

*In re Facebook Privacy Litig.*,
    572 Fed. Appx. 494 (9th Cir. 2014) ................................................................... 11

*In re Facebook, Inc. Internet Tracking Litig.*,
    956 F.3d 589 (9th Cir. 2020) ................................................................................ 9

*In re Facebook, Inc., Consumer Privacy User Profile Litig.*,
    402 F. Supp. 3d 767 (N.D. Cal. 2019) ............................................................... 10

*In re High-Tech Emp. Antitrust Litig.*,
    No. 11–CV–02509, 2014 WL 1351040 (N.D. Cal. Apr. 4, 2014) ......................... 8

*Kansas v. Nebraska*,
    547 U.S. 445, 461 (2015) ................................................................................... 11

*Klein v. Facebook, Inc.*,
    No. 20-CV-08570, 2022 WL 141561 (N.D. Cal. Jan. 14, 2022) ........................ 12

*Korea Supply Co. v Lockheed Martin Corp.*,
    29 Cal. 4th 1134 (Cal. 2003) ............................................................................. 11

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999) ...................................................................................... 8, 22

*Lightner Mining Co. v. Lane*,
    161 Cal. 689 (1911) ........................................................................................... 25

*Marriott Int'l, Inc. Data Sec. Breach Litig.*,
    440 F. Supp. 3d 447 (D. Md. 2020) ................................................................... 12

*Marsu B.V. v. Walt Disney Co.*,
    185 F.3d 939 (9th Cir. 1999) .............................................................................. 19

*Meister v. Mensinger*,
    230 Cal.App.4th 381 (2014) ............................................................................... 24

*Messick v. Novartis Pharm. Corp.*,
    747 F.3d 1193 (9th Cir. 2014) .............................................................................. 8

*Messner v. Northshore Univ. HealthSystem*,
    669 F.3d 802 (7th Cir. 2012) .............................................................................. 14

*Micro Lithography Inc. v. Inko Indus. Inc.*,
    No. H006294, 1991 WL 332053 (Cal. App. 1991).................................................... 25

*Obrey v. Johnson*,
    400 F.3d 691 (9th Cir. 2005)...................................................................................... 1

*Open Text S.A. v. Box, Inc.*,
    No. 13–cv–04910, 2015 WL 349197 (N.D. Cal. Jan. 23, 2015) ................................ 22

*Opperman v. Path*,
    No. 13-cv-00453, 2016 WL 3844326 (N.D. Cal. Jul 15, 2016)................................. 20

*Opticurrent, LLC v. Power Integrations, LLC*,
    No. 17-cv-03597, 2019 WL 2389150 (N.D. Cal. Jun. 5, 2019) ................................ 22

*People v. Kozlowski*,
    96 Cal. App. 4th 853 (2002)..................................................................................... 12

*People v. Prosser*,
    157 Cal. App.4th 682 (2007).................................................................................... 25

*Pulaski & Middleman, LLC v. Google, Inc.*,
    802 F.3d 979 (9th Cir. 2015)............................................................................ *passim*

*Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*,
    752 F.3d 807 (9th Cir. 2014).................................................................................... 14

*Richards v. Dept. of Building Insp. of City and County of San Francisco*,
    No. 20-cv-01242, 2021 WL 5415254 (N.D. Cal. Nov. 19, 2021) ............................ 22

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) ................................................................................................ 14

*U.S. v. Prime*,
    431 F.3d 1147 (9th Cir. 2004).................................................................................... 8

*Uzyel v. Kadisha*,
    188 Cal. App.4th 866 (2010).................................................................................... 24

*Ward v. Taggart*,
    51 Cal.2d 736 (1959)................................................................................................. 9

*Westinghouse Elec. and Manuf. Co. v. Wagner Elec. and Manuf. Co.*,
    225 U.S. 604, 621 (1912) ........................................................................................ 25

*Wolfe v. C.R. Bard*,

No. 2:19-cv-07768, 2021 WL 2980222 (C.D. Cal. Mar. 31, 2021)................................... 14

**OTHER AUTHORITIES**

Restatement (Second) of Torts § 652H ............................................................................. 9

**RULES**

Fed. R. Evid. 702......................................................................................... *passim*

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2      Plaintiffs submit this memorandum of points and authorities in support of their Opposition to

3  Google's Motion to Strike the report of Plaintiffs' damages expert, Russell Mangum, III, Ph.D.

4  **I.    PRELIMINARY STATEMENT**

5      Google challenges Dr. Mangum's opinions on the basis of relevance and reliability. Google

6  is wrong on both counts. First, Judge Koh's prior rulings make clear that restitution and unjust

7  enrichment are available remedies, and that the data at issue in this case constitutes property. *See* Dkt.

8  142, Order Granting in Part and Denying in Part Motion to Dismiss ("MTD Order"), at 12-17, 31-32

9  (Mar. 17, 2021) (J. Koh)  (holding that personal information is property and under the UCL "Plaintiffs

10  may seek restitution"). Second, as to reliability, Google places merits questions about whether the

11  class can be ascertained on Dr. Mangum's shoulders, and then incorrectly concludes that his excess

12  profit analysis cannot exclusively identify revenues derived from data taken from not synced users

13  without consent. These factual assertions are refuted by Plaintiffs' experts' reports. Google is

14  perfectly capable of identifying not-synced revenue, which can be used by Dr. Mangum's simple

15  methodology to estimate excess profits, during the Class Period.  Similarly, as to restitution, Google

16  itself has paid users at least $20 for the right to track their data through a program called Screenwise.

17  Thus, Dr. Mangum's calculations do not rest on a survey; they rely on Google's own data.

18      In any event, a *Daubert* Motion is not the proper vehicle for resolution of these disputes. *See*

19  *DSU Med. Corp. v. JMS Co.*, 296 F. Supp. 2d 1140, 1147 (N.D. Cal. 2003), *aff'd*, 471 F.3d 1293

20  (Fed. Cir. 2006") (noting that "the district court is not to make ultimate conclusions as to the

21  persuasiveness of the proffered evidence..., nor is it to transform a *Daubert* hearing into a trial on the

22  merits") (internal quotations and citations omitted). Google's arguments ignore the abundant case

23  law confirming that these types of disputes go to weight, not admissibility. *Obrey v. Johnson*, 400

24  F.3d 691, 695 (9th Cir. 2005) ("[O]bjections to a study's completeness generally go to the weight,

25  not the admissibility of the statistical evidence and should be addressed by rebuttal, not exclusion")

26  (internal citations and quotations omitted). The arguments raised simply do not warrant exclusion of

27  Dr. Mangum's opinions. Google's motion to strike should be denied.

28

1  **I.      COUNTER STATEMENT OF ISSUE TO BE DECIDED**

2          Whether Dr. Mangum's relevant and reliable opinions are subject to exclusion under Fed. R.

3  Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ("*Daubert*").

4  **II.     COUNTER STATEMENT OF RELEVANT FACTS**

5          **A.      PLAINTIFFS' THEORY OF LIABILITY**

6          This case is about simple, contractually binding promises that Google makes to all users of

7  its Chrome web browser—specifically, promises related to use of the Chrome sync feature.[1]  The

8  Chrome Privacy Notice promises Chrome users that, unless they enable sync, Chrome will not send

9  personal information from the Chrome browser on the user's own computing device to Google's

10 servers that are located elsewhere and outside the user's control. The promises are made expressly

11 and implicitly in the Chrome Privacy Notice and the Chrome user interface.

12         The Chrome contract expressly promises that the price of the service does not require currency

13 or personal information. The specific express promises include: (1) "[y]ou don't need to provide any

14 personal information to use Chrome[,]" (2) "[t]he personal information that Chrome stores [including

15 "browsing history information" and "cookies" won't be sent to Google unless you choose to store

16 that data in your Google Account by turning on sync[,]" (3) "the fact that you use Chrome to access

17 Google services … does not cause Google to receive any additional personally identifying

18 information about you;" (4) "Sync is only enabled if you choose;" (5) if a user does not enable sync

19 and "allow[] your Chrome history to be included in your Google Web & App Activity," then "Google

20 will only use your Chrome data after its anonymized and aggregated with data from other users[,]"

21 (6) sync controls whether "Google may use your browsing history to personalize Search, ads, and

22 other Google services[;]" and (7) "[y]ou can always choose what to sync in settings." Dkt. 462, Pls'

23 Opp. to Google's Mot. for Summ. J. on Affirmative Defense of Consent ("MSJ Opp."), 3-4 (citing

24 Chrome Privacy Notice); *see also* Dkt. 430-3, Declaration of Gregory Fair in Support of Google's

25 Opp. to Pls.' Mot. for Class Cert. ("Fair Decl. ISO MCC Opp.") ¶¶ 9, 11-14.

26

27 [1] Although Google's motion papers sometimes capitalize Sync, in its public facing documents,
   Google refers to sync with a lower-case s except where it is used to start a sentence or in a header.
28 *See* Chrome Privacy Notice (22 total instances, 20 of which are sync and 2 of which are Sync);
   Chrome user interface ("Turn on sync").

The implied promise is exposed to users in the top right corner of Chrome and includes a bright blue button to "Turn on sync…" Fair Decl. ISO MCC Opp. at ¶¶ 7-8. Plaintiffs and Googlers testified in this case that, in common parlance, to sync means "to bring together." MSJ Opp. at 3, n.4 (identifying sample testimony from Plaintiffs regarding their understanding that "sync" meant to share, collect, join or link information with Google) *compare* Ex. A,[2] Deposition of Sam Heft-Luthy at 166:4-9 (███████████████████████); Ex. B, Deposition of AbdelKarim Mardini at 182:2-14 (█████████████████████████████████████████████████████████████████████████ ██████████), Ex. C, Deposition of Chetna Bindra ("Bindra Dep.") at 68:16-25 (████████████ ██████████████).

Despite these promises, Chrome routinely sends not synced users' information from their personal computing devices to Google's server. In turn, Google associates that information with, among other things, existing user profiles and then monetizes it. *See, e.g.*, Dkt. 429, Google's Opp. to Pls' Mot. for Class Cert. ("MCC Opp.") at 4-5[3]; Ex. G, GOOG-CALH-00027419 (██████████ █████████████████████████████████████████████████████████████████████████████). The "personal information" Google takes, without consent, includes IP addresses, User-Agent information, cookie and device identifiers, browsing history information, X-client data identifiers, and contents of Chrome user communications with non-Google websites. MTD Order at 15-16 ("This data falls within the definition of personal information under California law, which governs Google's Terms of Service… As Google's counsel conceded at the hearing … the data at issue … falls within these broad definitions of personal information"). Internally, Google agrees. *See* Ex. C, Bindra Dep. Ex. 48. at -506-07 ("████████████████████████████████████████████████████████████

---

[2] Unless otherwise indicated, all "Ex.__" citations refer to the exhibits attached to the declaration of Jay Barnes submitted in support of this Opposition to Google's Motion to Strike Dr. Mangum.

[3] *See also* Dkt. 395, Google' Mot. for Summ. J. on Affirmative Defense of Consent ("MSJ"), at 8 (admitting "Google's receipt of data from websites using its services is unrelated to Chrome Sync"); Dkt. 430-1 at Ex. 1, Report of Google's Technical Expert Yiling Chen ISO MCC Opp. ("Chen Rpt.") at ¶ 10 ("[w]hether Google receives the data at issue has nothing to do with whether [S]ync is enabled or disabled…"); Dkt. 430-1 at Ex. 5, Report of Google's Technical Expert Georgios Zervas  ISO MCC Opp. ("Zervas Rpt.") at ¶ 13; *see also* Dkt. 340-16, Report of Pls' Technical Expert Richard Smith Rpt. ISO MCC ("Smith Report"), at ¶ 12; Dkt. 340-19, Report of Pls' Technical Expert Zubair Shafiq Rpt. ISO MCC ("Shafiq Rpt."), at ¶¶ 14, 16.

1  ████████████████████████████████████████████████████████████████

2  ████████████████████████████████████████████████████████████████")[4]

3  Google then uses that data to create detailed user profiles used to target them with ads. *See* MCC at

4  7; MSJ Opp. at 11-12.

5  **B.   DR. MANGUM'S METHODOLOGIES MATCH PLAINTIFFS' THEORY OF LIABILITY**

6  Plaintiffs' Motion for Class Certification seeks to certify a class of:

7

8  All Google Chrome users in the United States who did not enable "Sync" while browsing the web using Chrome ("Not Synced Chrome Users") or who disabled "Sync" while browsing using Chrome ("Unsynced Users"), at any time between July 27, 2016 to the present (the "Class Period"). Browsing using the Chrome browser in Incognito mode is excluded from the Class.

9

10

11  MCC at 8. In support of that motion, Dr. Mangum described methodologies for calculation of unjust

12  enrichment and restitution damages on a class-wide basis. *See* Dkt. 340-18, Report of Dr. Russell

13  Mangum ("Mangum Rpt."). Consistent with Plaintiffs' allegations, and supported by the facts

14  adduced thus far (*see* above summary), Plaintiffs' theory of liability is that Chrome sends data taken

15  from Not Synced[5] Chrome User's to Google without users' consent (e.g., in violation of its express

16  promises in, *inter alia*, the Chrome Privacy Notice) and that Google profits are increased, and users

17  are economically damaged, as a result. Dr. Mangum's economic damages calculations match that

18  theory, and he proposes methods to calculate classwide unjust enrichment and restitution damages.

19  Mangum Rpt. ¶ 24 ("center[ing] on [] claim that Google wrongly collected personal data from Class

20  members [e.g., Not Synced Chrome Users], financially gained from use of the data, and failed to

21  provide Class Members with a browser product that adhered to the privacy policies as agreed to").[6]

22

---

23  [4] In the same document, Google states that ████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████ )."

24  [5] "Unsynced" users might be construed to mean users who synced once, and then disabled sync, excluding "never syncers." For clarity, Plaintiffs use "not synced" as a comprehensive term.

25

26  [6] In response to Dr. Mangum's report, Google presented the report of Bruce Strombom ("Strombom Rpt."). *See* Dkt. 430-1 at Ex. 4. However, Dr. Strombom's critiques are based on a flawed understanding of Plaintiffs' case and incorrect assumptions of fact. For example, Dr. Strombom incorrectly believes that the case centers only on data taken from users who are signed in. *See* Ex. E, Deposition of Bruce Strombom ("Strombom Dep.") at 120:19-121:1 (████████████████████████ *compare* 

---

1.     **Dr. Mangum's Methodology to Calculate Unjust Enrichment**

To measure unjust enrichment, Dr. Mangum's opening report proposes:

> First, Google's revenue associated with Chrome is identified. Next, the increase in Chrome-related revenue attributed to the personal information gained from Class Members is computed to isolate the revenue premium. Lastly, costs are accounted for to determine the profits on the revenue premium. The calculation outlined below is *based on available evidence*, including internal Google documents, as well as publicly available information.

Mangum Rpt. ¶ 56. Based on Google's own documents produced and reviewed by October 13, 2021 (when Dr. Mangum's opening report was filed), Dr. Mangum proposed a methodology that simply requires the correct inputs:  first, determine Chrome's revenue share for Google; second, determine the percentage of users in a not synced state, excluding Incognito mode; and third, apply Google's internal analysis of revenue decline as a result of "losing identity," the way Google expresses the inability to track users across the internet and observe their behavior in a way that allows Google to market it to publishers and advertisers. Mangum Rep. § IV.B.

Dr. Mangum's rebuttal report (*see* Weaver Decl. ISO Reply MCC Ex. EEE ("Mangum Rebuttal Rpt.")) affirms the methodology and relies on different inputs derived from documents produced by Google *after* the completion of Dr. Mangum's initial report. These documents, produced after October 13, 2021, reveal that Google routinely calculates the revenue impact of changing data collection practices. For example, ██████████████████████████████████████ ████████████████████████████████████████████████████. Mangum Rebuttal Rpt. ¶¶ 47, 78. The formula Google used is strikingly similar to that proposed by Dr. Mangum. An analysis of Google's revenue calculations, and how it aligns with Dr. Mangum's proposed methodology is set forth in Dr. Mangum's rebuttal report. *See* Mangum Rebuttal Rpt. at II.A.2 and II.A.3. Notably, Dr. Mangum explains that Google internally investigated ███████████

---

MCC, *supra* (proposing a class of Not Synced Chrome Users, which includes users who are signed-in and synced, signed-in and not synced, signed-out, and those without Google accounts). Dr. Strombom also strays far afield from his own expertise in asserting opinions (often incorrectly) about the manner in which data flows and operates, e.g. issues in the field of computer science, of which he admits he has no expertise. *See* Strombom Dep. at 25:1-3 (████████████████████████████ █████████████") *but see* Strombom Rpt.¶ 168 (opining, erroneously, that Strombom Ex. 4 is about the effect of "user controls on Google's ability to show and/or personalize ads"). Given these flaws and inaccuracies, the Strombom Report provided little to no persuasive value.

---

1     ██████████████████████████ in manner consistent with his proposal, described above. *Id.*

2 at ¶ 41. Google applied models following an aggregate "class-wide" type of approach as opposed to

3 a user individualized approach. *Id*. For example, ████████████████████████████

4 ████████████████████████████████████████████████

5 ████████████████████████████████████████████████

6 ████████████████████████████████████████████████

7 ████████████████████████████████████████████████

8 ████████████████████████████████████████████████ .

9 *Id.* at ¶ 43. This straightforward calculation does not require a conjoint analysis or survey (*see id.* at

10 ¶¶73-74); it is simple math.

11       **2.**      **Dr. Mangum's Methodology to Calculate Restitution Damages**

12        Dr. Mangum's calculation of how to restore damages to users is similarly straightforward.

13 Mangum Rpt. § V. For this calculation, Dr. Mangum establishes market prices by looking to, among

14 other things, real world data. *Id.* at § V.B. Here, there can be no better example of market value than

15 what Google itself has paid people "██████████████████████████████████."

16 Ex. H, GOOG-CABR-04312372 at -372; *see also* Mangum Rebuttal Rpt. ¶¶ 79-82 (based on review

17 of Google documents, GOOG-CABR-04312372, *supra*, relates to Google ████████████

18 ████████████████████████████████████████████); Ex. I,

19 GOOG-CABR-04704939 at -948 (explaining that ██████████████████████████████

20 █████"). The identifiers Google pays panel users to track associated with their browsing history

21 information are the same identifiers at issue in this case, that are used to track users' browsing history

22 ██████████████████████████. *See* Weaver Decl. ISO Reply MCC Ex. EEE, Rebuttal Report

23 of Pls' Technical Expert Zubair Shafiq ("Shafiq Rebuttal Rpt.") ¶¶ 195-197.Google notes that

24 ████████████████████" (*see* Ex. H, *supra*), and Dr. Mangum's research shows that panelists were

25 paid at least $20/month.[7] (*see* Mangum Rpt. ¶ 92; Mangum Rebuttal Rpt. ¶ 79). Google pays

26 participants for Screenwise tracking through Chrome. Ex. J, GOOG-CABR-04704597, at -615 and -

27

28 ————————————————

[7] Further discovery on this issue is pending.

1    635 (explaining that Screenwise tracking in U.S. is done for ████████████████████

2    ████████████████████████████████████████████████████████████████████████████████

3    ███████ by a █████████████████████████████████████████████

4    ████████████████). In addition to Screenwise, Google pays other third parties to pull together

5    "██████ for market research and analysis. *See* Mangum Rebuttal Rpt. ¶¶ 27, 78. Outside of Google,

6    entities such as SavvyConnect (an app that pays $5 per month per device to track users' data);

7    BrandTotal ($5 signing bonus at least $75 in the first year); and Nielson (up to $50 per year for

8    providing name, address, email, and web activity) all pay users to track them through their data. *See*

9    Mangum Rpt. ¶¶ 89-95;[8] Mangum Rebuttal Rpt. ¶ 20. These are reliable market factors that a jury

10   can fairly consider when presented with a damages analysis.

11           Upon calculating the market value of personal information, Dr. Mangum will then multiply

12   this by the number of Class Members' Google accounts. *See* Mangum Rpt. ¶ 96. To the extent Class

13   Members have multiple Google accounts, the calculation can factor in multiple sets of consumer data

14   by way of ███████████████████████████. *See id.* "For example, a Class Member

15   may have two Google accounts, one for family and health related items, and one for leisure shopping.

16   Each account may have its own set of consumer identification data." Mangum Rpt. ¶ 96 and n.147;

17   *see also* Shafiq Rpt. at ¶ 66 (████████████████████████████████████████████).

18   For non-Google Account holders, Dr. Mangum relies on the technical expertise of Professor Shafiq,

19   who opines that existing Google systems can be used to query for and identify this subset of putative

20   Class Members. *See* Mangum Rebuttal Rpt. ¶¶ 5, 65-67, 93; Shafiq Rpt. § V; Shafiq Rebuttal Rpt. ¶¶

21   157-164.

22           Dr. Mangum then proposes a pro-rata distribution of unjust enrichment to Not Synced Chrome

23   Users based on the number of months in which they exchanged not synced communications using the

24   Chrome browser. *See* Mangum Rpt. ¶ 97. While Google argues that Dr. Mangum should somehow

25

26   _____

27   [8] In the related *Brown* case, the Court ruled that the existence of Screenwise and similar programs
     cited by Plaintiffs here "establish at least two cognizable theories of economic injury. … Indeed, in
     *Calhoun*, this Court found economic injury in almost identical circumstances." *Brown v. Google LLC*,

28   2021 WL 6064009, at *15 (N.D. Cal. Dec. 22, 2021).

include how users feel about their data in this allocation, this is simply contrary to economic principle. No one asks Google how it feels about users' data when paying them. It is equally irrelevant to paying users themselves, where market prices are available, as is the case here.

## III.   LEGAL STANDARD

Federal Rule of Evidence 702 tasks trial courts with a "basic gatekeeping obligation" to reject expert testimony that is not relevant and reliable. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (citing *Daubert*, 509 U.S. at 589).[9] Pursuant to that rule, expert evidence must "assist the trier of fact" either "to understand the evidence" or "to determine a fact in issue," and the witness has to be sufficiently qualified to render the opinion. Rule 702 "should be applied with a 'liberal thrust' favoring admission." *Messick v. Novartis Pharm. Corp.,* 747 F.3d 1193, 1196 (9th Cir. 2014) (quoting *Daubert*, 509 U.S. at 588). Consistent with this liberal view of admissibility, a "review of the case law after *Daubert* indicates that the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, advisory committee notes (2000). Indeed, the Ninth Circuit has explained that the Supreme Court intended "a flexible inquiry" and "[a]s long as the [expert's] process is generally reliable, any potential error can be brought to the attention of the jury through cross-examination and the testimony of other experts." *U.S. v. Prime*, 431 F.3d 1147, 1153 (9th Cir. 2004); *Ellis v. Costco Wholesale Corp*., 657 F.3d 970, 982 (9th Cir. 2011) (stating that court's gatekeeping function is to exclude "junk science"); *In re High-Tech Emp. Antitrust Litig.*, No. 11–CV–02509, 2014 WL 1351040, at *22 (N.D. Cal. Apr. 4, 2014) (noting that exclusion is justified only if opinion is so fundamentally unsupported that it can offer no assistance to the jury) (citing *Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1061 (8th Cir. 2002).

## IV.   ARGUMENT

Dr. Mangum's straightforward opinions and testimony will advance a material aspect of the case by proposing an understandable methodology of damages. His opinions are relevant and reliable and Google's motion to strike should be rejected in its entirety.

---

[9] Google does not dispute Dr. Mangum's qualifications, which are varied and significant. *See* Mangum Rpt. ¶¶ 7-12, App'x 1; Mangum Rebuttal Rept. § I.B., App'x 1.

---

### A.    DR. MANGUM'S OPINIONS ARE RELEVANT TO THE ISSUE OF CLASS WIDE DAMAGES

#### 1.    Unjust Enrichment, Restitution, and Disgorgement Are Available for Intrusion Upon Seclusion, CIPA, and Statutory Larceny

Google's argument that users are not entitled to seek unjust enrichment damages is contrary to law and prior ruling in this case. The Ninth Circuit and California courts have explained that "*California law requires disgorgement of unjustly earned profits* regardless of whether a defendant's actions caused a plaintiff to directly expend his or her own financial resources or whether a defendant's actions directly caused the plaintiff's property to become less valuable." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 600 (9th Cir. 2020) (emphasis added) (citing *CTC Real Estate Servs. v. Lepe*, 140 Cal. App. 4th 856, 860-61 (Cal. App. 2006)); *Ward v. Taggart*, 51 Cal.2d 736, 742-43 (1959)  ("The public policy of this state does not permit one to 'take advantage of his own wrong' regardless of whether the other party suffers actual damages."). Further, "it is not essential that money be paid directly to the recipient by the party seeking restitution" because "[t]he emphasis is on the wrongdoer's enrichment, not the victim's loss." *Cty. of San Bernardino v. Walsh*, 158 Cal. App. 4th 533, 542 (Cal. App. 2007). Indeed, "a person acting in conscious disregard for the rights of another should be required to disgorge all profit because disgorgement benefits the injured parties and deters the perpetrator from committing the same unlawful acts again." *Id*. Thus, "[d]isgorgement may include a restitutionary element, but it may [also] compel a defendant to surrender all money obtained through an unfair business practice … regardless of whether those profits represent money taken directly from persons who were victims of the unfair practice. Without this result there would be an insufficient deterrent to improper conduct that is more profitable than lawful conduct." *Id*. at 543. Google cites no law that disgorgement is unavailable as a damages remedy for these claims. To the contrary, the Restatement (Second) of Torts expressly states that restitution is an available remedy for intrusion upon seclusion. Restatement (Second) of Torts § 652H, cmt. e, adopting by reference Restatement of Restitution § 136 ("A person who has tortiously used a trade name, trade secret, … or other similar interest of another, is under a duty of restitution for the value of the benefit thereby received.").

Broadly speaking, "[t]here are two types of disgorgement: restitutionary disgorgement, which

focuses on the plaintiff's loss, and nonrestitutionary disgorgement, which focuses on the defendant's unjust enrichment." *American Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 1482 (2014). Here, Dr. Mangum has proposed measures for both. For restitutionary disgorgement, because the gravamen of Plaintiffs' case is that, without valid authorization, Chrome sent their personal information (in the form of browsing history information plus identifiers) to Google, Dr. Mangum's restitutionary disgorgement calculation measures Plaintiffs' loss by looking to market prices for that user data. For nonrestitutionary disgorgement, Dr. Mangum proposes to measure Google's unearned profits, relying on Google's own revenue calculations. Both are appropriate for Intrusion Upon Seclusion, CIPA, and statutory larceny.

### 2. Dr. Mangum's Measures Apply to Breach of Contract and Good Faith and Fair Dealing Claims

Google next argues that a theory of excess profits cannot apply to the contract claim or breach of good faith and fair dealing, because users did not pay currency to use Chrome. This ignores a primary construct of contract law: the question is consideration, as any first-year law student can recite. Thus, Google is wrong to assert that Chrome is "free." Google is not a charity; it obtains considerable consideration in exchange for asking people to agree to its contract prior to using Chrome. Rather than paying with money, Chrome requires users to agree to pay for it with their attention, agreement to use the browser, and use of personal information subject to terms of services and policies that Chrome imposes upon them. *See* Dkt. 163, First Am. Compl. ("FAC") ¶ 45 (promising "you don't need to provide any personal information to use Chrome" and "the [PI] that Chrome stores won't be sent to Google" unless you sync, except that Chrome sends IP address and cookies to Google "when you visit our sites," i.e., Google.com or YouTube) (citing Chrome Privacy Notice). Google's purported legal "expert," once a privacy advocate, explained decades ago that "[p]ersonal information is an important currency in the new millennium." Paul M. Schwartz, Property, Privacy, and Personal Data, 117 Harv. L. Rev. 2055, 2056 (2004). Plaintiffs agree. Here, by exceeding the scope of consideration agreed to, Chrome charged more than the contract provided. To assess damages, Dr. Mangum looks to applicable market prices. Screenwise as a damages model is a perfect fit for "benefit-of-the-bargain" damages; it is Google's own valuation of the fair market

value (in currency) of the overcharge that occurred here.

Second, and contrary to Google's assertions, Dr. Mangum's second measure (return of Google's profits) would be available for breach of contract under the theories asserted by Plaintiffs. *See In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767 (N.D. Cal. 2019) (holding "plaintiffs can seek damages for the detriment caused by the breach [on contract claim]"). The Restatement (Third) of Restitution § 39 (2010) states that "[i]f a deliberate breach of contract results in profit to the defaulting promisor and the available damage remedy affords inadequate protection to the promisee's contractual entitlement, the promisee has a claim to restitution of the profit realized by the promisor as a result of the breach."  This came about through "a consensus that it is appropriate (in some circumstances, at least) to treat a deliberate and profitable breach of contract by analogy to an intentional and profitable interference with other legally protected interests." *Id*. at cmt. a. In *Kansas v. Nebraska*, the Supreme Court adopted the rule, requiring Nebraska to pay Kansas for Nebraska's gain in a breach of contract with Kansas that exceeded Kansas' loss. *See* 547 U.S. 445, 461 (2015). The rule would be equally appropriate here.

### 3.   Restitutionary Disgorgement, i.e., the Google Screenwise Calculation, is Available Under the UCL

Google's attack on Plaintiffs' UCL theory of damages is a transparent attempt to relitigate matters previously decided in this case. Specifically, Google argues that restitution and unjust enrichment are not an available under the UCL because Plaintiffs have not demonstrated "lost money or property as a result of the alleged wrongful conduct." Mot. at 18-19 (quotations omitted).  Judge Koh rejected this argument. In her March 2021 MTD Order, Judge Koh held that "Plaintiffs may seek restitution [under the UCL]." MTD Order at 38; *see also Pulaski & Middleman, LLC v. Google, Inc*., 802 F.3d 979, 985–86 (9th Cir. 2015) (discussing availability of restitution with UCL claim); *In re Facebook Privacy Litig.*, 572 Fed. Appx. 494 (9th Cir. 2014) (plaintiffs and putative Class Members are entitled to the lost value of their personal information that was misappropriated by Facebook); *In re Facebook, Inc. Internet Tracking Litig.,* 956 F.3d 589, 600 (9th Cir. 2020) (noting that "[u]nder California law, this stake in unjustly earned profits exists regardless of whether an individual planned to sell his or her data or whether the individual's data is made less valuable"); *Korea Supply Co. v*

1  *Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144 (Cal. 2003) (reiterating that plaintiffs may seek

2  disgorgement of profits unjustly earned under the UCL).

3        In the March 2021 MTD Order, the Court also held that "plaintiffs who suffered a loss of their

4  personal information suffered economic injury [i.e., loss of money or property] and had standing."

5  MTD Order at 37-38 (citing, *inter alia*, *In re Facebook Privacy Litig.*, *supra*). Google sought

6  reconsideration—which was denied. Dkts. 150, 152. In December 2021, Google failed again in the

7  related *Brown* case. *Brown*, 2021 WL 6064009 at *17 (re-affirming *Calhoun* order on basis of

8  "Google Screenwise" and other fair market measures for personal information). Despite these failed

9  attempts, and current law of the case, Google boldly states that Judge Koh's prior ruling that personal

10  information is property "was incorrect and contrary to a consistent line of precedent in the Ninth

11  Circuit[.]" Mot. at 20. Google thus seeks reconsideration of a Court order under the guise of a *Daubert*

12  Motion. This is procedurally improper, and the request should be denied. *See* L.R. 7-9 (setting forth

13  the procedure to seek reconsideration of a Court order; a *Daubert* motion is not one of them).

14        To the extent the Court is inclined to reconsider merits arguments on this *Daubert* motion,

15  Plaintiffs respectfully incorporate their Opposition to Google's Motion to Dismiss (Dkt. 67) by

16  reference. Further, Google's motion does not grapple with the fact that, under California law,

17  "property" is "all-embracing, including every intangible benefit and prerogative susceptible of

18  possession and dispossession" and "any valuable right or interest protected by law." *People v.*

19  *Kozlowski*, 96 Cal. App. 4th 853, 866 (2002); *Fields v. Michael*, 91 Cal. App. 2d 443, 449 (1949).

20  Thus, property includes not just tangible property itself, but the right or interest to use or control

21  tangible or intangible property. The Supreme Court has recognized that deprivation of "money or

22  property" under federal criminal statutes is satisfied where a victim has "been deprived of its right to

23  exclusive use of … information, for exclusivity is an important aspect of confidential business

24  information and most private property for that matter." *Carpenter v. U.S.*, 484 U.S. 19, 26-27 (1987).

25        The two cases cited by Google, *Cottle v. Plaid, Inc.*, 536 F. Supp. 3d 461 (N.D. Cal. 2021)

26  and *Hart v. TWC Prod. & Tech. LLC*, 526 F. Supp. 3d 592 (N.D. Cal. 2021) stand in stark contrast to

27  the "growing trend across courts that have considered this issue [and] recognize[d] the lost property

28  value of this information." MTD Order at 38 (quoting *Marriott Int'l, Inc. Data Sec. Breach Litig.*,

440 F. Supp. 3d 447, 461 (D. Md. 2020)); *see also Brown*, 2021 WL 6064009 at *17 (rejecting Google's arguments as to *Cottle* and restating *Calhoun* holding that personal information is property); *Klein v. Facebook, Inc.*, No. 20-CV-08570, 2022 WL 141561, at *29 (N.D. Cal. Jan. 14, 2022) (agreeing with *Calhoun* and *Brown* that personal information is property). Accordingly, the outlier views in *Cottle* and *Hart* do not warrant reconsideration of this Court's prior ruling.[10] To the contrary, Judge Koh was correct the first, second, and third times that she rejected Google's argument.

Here, the proper measure of UCL damages is the Google Screenwise payment amount or other similar market measures. Under the UCL, a plaintiff may recover "those measurable amounts which are wrongfully taken by means of an unfair business practice." *Day v. AT&T, Corp.*, 63 Cal.App.4th 325, 338 (1998). As explained in *Brown*, economic injury under the UCL is established where the plaintiffs "(1) surrender[s] in a transaction more … than he or she otherwise would have; (2) has[s] a present … property interest diminished; [or] (3) be deprived of money or property to which he or she has a cognizable claim[.]" *Brown*, 2021 WL 6064009 at *15. The "more" here is the additional personal information that Google did not bargain for in the contract, the fair market value of which is established by Google itself via the Screenwise program and the property interest from which Plaintiffs were deprived is the right to control the personal information.

**B.    DR. MANGUM'S PROPOSED METHODOLOGY APPLIES TO ALL PUTATIVE CLASS MEMBERS**

Google challenges Dr. Mangum's opinions on the basis that his assumption of class-wide injury is unsupported and unsound. Mot. at 21. According to Google, "millions of users who are encompassed by Plaintiffs' broadly-defined class may not have been injured for numerous reasons."

---

[10] Both cases are also factually distinguishable. *First*, *Hart* and *Cottl*e involve a much less pervasive data collection than what Google has committed (and continues to commit) in this case. *See Hart*, 526 F. Supp. 3d at 596-97 (collection of geolocation data); *Cottle*, 536 F. Supp. 3d at 470-71 (collection of bank login credentials) *compare* FAC ¶¶ 1-13 (collection of Chrome user information, including browsing history relating to sensitive categories of information of sexual orientation, medical history, political affiliation, and religion, identifiers, IP address, User-Agent, contents of communication, which, in turn, is associated, aggregated, and inferred to form extensive user Profiles for advertising). *Second*, unlike the instant action, neither the *Hart* nor *Cottle* plaintiffs alleged the existence of a private market for the type of data collected by defendants. *Cf.* FAC ¶¶ 197-261 (alleging Google's valuation and profiting from personal information collected from Not Synced users and Profiles).

1   *Id.* Google identifies five such reasons, each of which rest on Google's mischaracterizations of fact

2   and disregard for contrary evidence in the record. At its core, these are not legitimate attacks on Dr.

3   Mangum's methodology, but improper attempts to obtain merits determinations. A *Daubert* Motion

4   is not the proper vehicle for resolution of these factual disputes. *See DSU Med. Corp.*, 296 F. Supp.

5   2d at 1147.

6          Dr. Mangum's assumption of class-wide injury is grounded in supporting expert testimony

7   from Plaintiffs' experts, Google's experts, and Google's own internal documentation and admissions.

8   It is also consistent with Plaintiffs' proposed class definition and theory of liability.[11] At best,

9   Google's attacks go to the weight of the evidence, not its admissibility. *See Wolfe v. C.R. Bard*, No.

10  2:19-cv-07768, 2021 WL 2980222, at *3 (C.D. Cal. Mar. 31, 2021) (cautioning that "'a district court

11  is not tasked with deciding whether the expert is right or wrong, just whether his testimony has

12  substance such that it would be helpful to the jury'") (quoting *Pyramid Techs., Inc. v. Hartford Cas.

13  Ins. Co.*, 752 F.3d 807, 814 (9th Cir. 2014)). Further, even if "some class members' claims will fail

14  on the merits if and when damages are decided" that is "generally irrelevant to the district court's

15  decision on class certification." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 823 (7th

16  Cir. 2012); *see also Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 452 (2016) (endorsing propriety

17  of certification "even though other important matters will have to be tried separately, such as damages

18  or some affirmative defenses peculiar to some individual class members") (citation omitted); *Briseno

19  v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1131 (9th Cir. 2017) (Rule 23 "specifically contemplates the

20  need for such individualized claim determinations after a finding of liability") (citing Fed. R. Civ.

21  23(b)(3) advisory committee's note to 1966 amendment).

22          **Class Members Did Not Consent to Google's Conduct**: Google argues that Dr. Mangum's

23  methodology fails to account for putative class members who consented (implicitly or explicitly) to

24  the collection of the data and are thus "uninjured class members." *Id.* at 14. But this "consent"

25  argument is a mischaracterization of Plaintiffs' proposed class and theory of liability. The proposed

26

27  [11] Strikingly, Google's economic expert did not read or examine the opinions of Plaintiffs' technical
28  experts or consider Google's internal documents, even when Dr. Mangum relied on and cited to them.
    *See* Strombom Dep. at 70:3-71:15, 133:23-135; Strombom Rpt., App'x B (materials relied upon).

Class of Not Synced Chrome Users are *all injured* class members, *e.g.,* by virtue of *not* syncing they did not consent to Chrome's transmission of their personal information to Google. While Google may dispute the legal issue of consent, and indeed, extensive briefings are currently before the Court on this very issue, the fact remains that Plaintiffs' theory of the case asserts liability by Google to all Not Synced Chrome Users.[12] Dr. Mangum's methodology properly looks to that proposed Class. Indeed, the phrase "uninjured class members" is not applicable here. Google cannot reframe Plaintiffs' case, and it cannot make an end-run around the pending briefings by seeking a factual determination here, on a *Daubert* motion, that its varied theories of consent are legally valid. *See DSU Med. Corp.*, 296 F. Supp. 2d at 1147.

**Google Associates Personal Information with Chrome Users' in Basic Browser Mode**: Google asserts it "would not have received 'personal information' from … purported class members … in the default 'Basic mode.'" Mot. at 14. This is not true, and yet another attempt to shoehorn a merits issue into a *Daubert* motion and make another inappropriate request for re-consideration. *See* Opp. MSJ at 3-4, 9-12; MTD Order at 15-16. The record is clear that Chrome sends IP address, User-Agent information, persistent cookies, browsing history information, X-client data headers, and device identifiers to Google when users are not synced, which includes "Basic" or Signed-Out mode. *See* § II.A. This is "personal information" as already determined by the Court and conceded by Google. *See* MTD Order at 15-16; *see also* MCC at 7 (citing to Google document for admission that ████████████████████████████████████████████"); Ex. K, GOOG-CABR-04604487, ("████████████████████████████████████████████████").

Google has multiple internal systems, including the "█████████████," "██████████ and "██████ which enable Google to ████████████████████████. *See, e.g.,* MSJ Opp. at 10 (quoting Google documents regarding ████████████████████████); Weaver Decl. ISO MCC at Ex. X, 663:17-664:8 (Google 30(b)(6) deponent testified that Google "██████████████

[12] *See, e.g.,* MCC at 3-5 (disputing consent); MCC Opp. at 5-6, 10-12 (arguing consent defense); MSJ (arguing consent defense); MSJ Opp. (disputing Google's consent defense).

PLS' OPP. TO MOT. TO STRIKE R. MANGUM          - 15 -          Case No. 4:20-cv-05146-YGR-SVK

1  █████████████████████████████████████████████████████

2  █████████████████████████████████████████████████████

3  ██████ MSJ Opp. at 11 (quoting Google documents regarding the ████████ program, which

4  provides "████████████████████████████████████████████████████

5  █████████████████████████████████████████████████████

6  ██████); Ex. L, GOOG-CABR-04695653 at -657, (explaining that Google's █████ program ████

7  ████████████████████████████████████████████████████)).

8  Thus, Google's assertion that it does not "associate" personal information with users in Basic Browser

9  Mode is contradicted by the evidence adduced thus far, and Google's correlating proposition that

10  Plaintiffs' expert should be excluded based on this misstatement of fact has no support in law or fact.

11  **Options to Limit Data Collection Do Not Stop the Transmission of Personal Information**

12  **from Chrome to Google**: Google contends that "Chrome users had myriad options to limit the

13  amount and type of data that Google received from their browsing" (e.g., mitigation defense) and that

14  "[t]hese controls may have protected users from sustaining any alleged economic harm." Mot. at 15.

15  According to Google, Dr. Mangum should have considered this subset of people and assessed how

16  each of them felt about their data being collected to boot. But Google misstates the facts: it is not

17  possible for users who do not sync to prevent Chrome from sending personal information to Google,

18  even using cookie browsers or other methods. As explained by Professor Shafiq, Google's ubiquitous

19  presence on the Internet makes it "practically impossible" for a typical Chrome user to avoid third-

20  party network transmissions to Google-owned domains. Shafiq Rpt. ¶ 16. Each of the items

21  enumerated in support of Google's mitigation defense (Mot. at 15) have been debunked by both

22  Plaintiffs' *and Google's* experts.

23      *First*, turning off Ads Personalization does not prevent all transmissions of a Chrome user's

24  personal information from Chrome to Google. *See* Weaver Decl. ISO Reply MCC Ex. FFF, Rebuttal

25  Report of Pls' Technical Expert Richard Smith ("Smith Rebuttal Rpt.") ¶¶ 113-135.

26      *Second*, blocking all cookies effectively breaks the browser (making it impossible to remain

27  signed-in to websites) (*see* Smith Rebuttal Rpt. ¶¶ 32-36) and third-party cookie blockers do not work

28  because Chrome sends personal information to Google other than cookies, and Google engages in

link-decoration to circumvent such blocks by causing Chrome to send its own Google Analytics cookie identifiers to Google Analytics, Doubleclick, and Google.com anyway. *See* Ex. D, Deposition of Alexei Svitkine, at 301:20-302:1 (███████████████████████████████████████ ███████; Smith Rpt. ¶¶ 68-73 (transmissions of tracking pixels), ¶¶ 74-76 (IP addresses), ¶¶ 77-83 (Google's Cookie-Synching on Chrome is workaround to third-party cookie blockers), and ¶¶ 84-89 (no method to stop transmission of X-client data header); *see also*, Ex. M, GOOG-CABR-04263403, ████████████████████████████████████████████████████.

*Third*, ad blockers do not work to stop all transmissions. *See* Smith Rebuttal Rpt. ¶¶ 58-70. Even when default settings were adjusted to give Chrome an advantage in testing (*see* Zervas Rpt. ¶ 46; Smith Rebuttal Rpt. ¶ 63) the biased test results still showed that ad blockers did not block all transmissions at issue (*see, e.g.*, Ex. F, Deposition of Google's Technical Expert Georgios Zervas ("Zervas Dep."), at 199:2-21 (agreeing that even under the settings used AdBlock Plus "█████████ ████████████████████████"); Smith Rebuttal Rpt. ¶ 63);[13]

*Fourth*, according to Google, only 0.01 percent of users disable Javascript—and, even so, disabling Javascript makes it impossible to use many websites, including Gmail and Google.com. *See* Smith Rebuttal Rpt. ¶¶ 38-44. Even for those who do disable Javascript, Google's technical expert agrees that it does not even prevent all transmissions of at issue data from Chrome to Google. *See, e.g.*, Zervas Dep. at 126:14-22, 127:11-16 (██████████████████████████████████████████ ██████████████████████████████████████████████████████████████████); Smith Rebuttal Rpt. ¶¶ 45-48.

*Fifth*, the Network Advertising Initiative's personalized advertising opt-out does not prevent at-issue transmissions from being sent from Chrome to Google, and, in fact, requires cookies to be enabled to work. *See* Smith Rebuttal Rpt. ¶¶ 124-130.

*Finally*, in the event that any particular blocker actually stopped the transmissions from occurring, Professor Shafiq has explained how Google's systems can be used to determine precisely

---

[13] Even the "experiment" that Google's economic expert, Dr. Strombom, attempted to run (far beyond his expertise) proved that a Google tracking cookie, DSID, was not turned off by AdBlocker. *See* Strombom Dep. at 153:17-154:7, 157:11-160:5.

1  how much information Google has in its possession for each class member that was sent from Chrome

2  to Google while the user was in a not synced state. *See* Shafiq Rpt. § V (discussing identification of

3  Class Members); Shafiq Rebuttal Rpt. ¶¶ 165-175  (discussing existing Google systems that can link

4  Class Members to the personal information that Google collected on them). Thus, Google's own

5  systems can be used to eliminate any purported uninjured class members from the class.

6        **Plaintiffs Did Not Derive Benefit From Google's Unlawful Taking of Their Personal**

7  **Information**: Google asserts, with no economic data supporting the argument, that "the value some

8  class members may have derived from personalized advertising may outweigh the purported value of

9  the data alleged to be improperly taken or the benefit of any such to Google[.]" Mot. at 15. Of course,

10  if Google did provide data, Dr. Mangum could account for it in his methodology. Nor is there any

11  legal support for the proposition that if a victim of a theft derives alleged "benefit" from the unlawful

12  taking they are precluded from seeking relief. The argument defies reason and runs contrary to

13  California law, which recognizes that a damages calculation for unjust enrichment "need not account

14  for benefits received after purchase because the focus is on the value of the service at the time of

15  purchase." *Pulaski*, 802 F.3d at 989. Google's argument is also inconsistent with Art. I, section 1 of

16  the California Constitution, the "principal focus" of which is to prevent "business conduct in

17  collecting and stockpiling unnecessary information … and misusing information gathered for one

18  purpose in order to serve other purposes," such as creating "computer stored and generated 'dossiers'

19  and 'cradle-to-grave profiles on every American.'" *Hill v. NCAA*, 7 Cal.4th 1, 21 (Cal. 1994).

20  Google's argument here is to say that the California Privacy Amendment means nothing if a business

21  claims its tracking and creation of a cradle-to-grave profile without consent was good for the victim.

22  Here, the record is clear that Plaintiffs did not obtain benefit from "personalized advertising." Rather,

23  Plaintiffs found the concept of "personalized advertising" to be "annoying" and "creepy." *See, e.g.*,

24  MCC at 11 (citing Plaintiff Crespo's Declaration at ¶ 5, describing Google's misconduct as "annoying

25  and creepy"); Weaver Decl. ISO MCC at Ex. H (declaration of Plaintiff Kindler at ¶ 7, stating the

26  conduct was "creepy").

27

28

**C.   DR. MANGUM PRESENTS A RELIABLE METHODOLOGY TO CALCULATE RESTITUTION DAMAGES**

In calculating restitution damages, California law "requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation." *Pulaski,* 802 F.3d at 989. "The fact that the amount of damage may not be susceptible of exact proof or may be uncertain, contingent or difficult of ascertainment does not bar recovery." *Marsu B.V. v. Walt Disney Co*., 185 F.3d 939, 939 (9th Cir. 1999). "Where a defendant has wrongfully obtained a plaintiff's property, 'the measure of recovery for the benefit received … is the value of the property at the time of its improper acquisition … or a higher value if this is required to avoid injustice where the property has changed in value.'" *Pulaski*, 802 F.3d at 988-89.

**1.   Dr. Mangum's Methodology for Restitution Can Fairly Compensate Class Members**

Google argues that Dr. Mangum's proposal to rely on a conjoint analysis proposal is flawed because it "does not identify which product (s), attributes, or levels he plans to include[.]" Mot. at 16. However, as Dr. Mangum explains:

> A conjoint analysis may not be necessary when the product or service at issue is, in and of itself, the subject of market transactions. In such cases, an economist does not need to engage in alternative mechanisms and consider indirect evidence, such as conjoint analysis, to measure the value. Instead, an economist may look to the price of the product in the real-world (i.e. direct evidence). The Mangum Report discusses both the consideration of such direct and indirect evidence.

Mangum Rebuttal Rpt. ¶ 74. Here, the need for a conjoint analysis has been mooted by discovery. The Google Screenwise program establishes that Google has set "the 'market rate' and 'fair market value' of collecting browsing history information with the same identifiers at-issue in this case" at "$20 per month." Mangum Rebuttal Rpt. ¶ 79.[14]

Next, Google argues that a single restitution number cannot fairly compensate each Class Member because: (1) users value personal information differently; and (2) there is significant variability in whether, and if so, how much personal information Google collects from a particular

---

[14] Despite the fact that Dr. Mangum referenced Screenwise in his opening report, Google's expert, Dr. Strombom, failed to consider Screenwise or even to investigate whether Google had any internal practices or market valuation of the personal information at issue. Dr. Strombom admitted that he did not know about Screenwise, and he did not even inquire of Google whether it ███████████ ████████████████████." Strombom Dep. at 133:23-25; 134:12-21.

---

class member. Dr. Mangum explains why both critiques are incorrect.

The critique that Dr. Mangum cannot identify users' personal feelings about privacy is not relevant to economic damages arising primarily from a breach of contractual promises. Plaintiffs have not made a claim here for mental anguish – and no class members' personal feelings about the value of their data is relevant to its actual market value. Rather, their injury arises from expectations set by Google in the terms of service and policies it wrote. Dr. Mangum explains:

> [A]ny individual variations in 'value' that [users] place on privacy is not relevant where there is a direct market price for the item in question. For example, for sentimental reasons, the owner of a family home may place a different 'value' on their own home than the market would bear. But the fair market value of the home is the amount that would result from an arms-length sale on the open market. It is no different with the Internet browsing history information and identifiers at issue in this case. Regardless of any specific user's feelings about privacy and the value of such data, the economic value of the data can be determined by reference to specific marketplace transactions.

Mangum Rebuttal Rpt. ¶ 75. Google's reliance on *Opperman v. Path* is misplaced. In *Opperman*, the data at issue were user address books. *Opperman v. Path*, No. 13-cv-00453, 2016 WL 3844326, at *1 (N.D. Cal. Jul 15, 2016). Plaintiffs are not aware of any market for such information, and the *Opperman* Plaintiffs did not present any such evidence.[15] Here, however, Dr. Mangum's Report identifies Screenwise and other programs as establishing fair market values for the personal information at issue in this case. Mangum Rpt. ¶¶ 89-95; Mangum Rebuttal Rpt. § 11.C.2..

With respect to Google's argument on variability of amount and type of data collected, this can quickly be disposed of by Google's recent production of documents, which show that Google's existing systems can identify revenue on a per user basis, thus accounting for any purported variations. Google maintains a database called ███████ which it uses to "███████████████████████████████" and includes a "████████████████████████████████████████████████████████████████████" including Google Ads and YouTube. *See* Ex. N, GOOG-CALH-00700912. Google also stores ████████████████████████████████████ Professor Shafiq has explained how Google can write a computer program to calculate unjust enrichment for each class member using the same systems Google uses

---

[15] Plaintiffs note that the Court certified an intrusion upon seclusion class in *Opperman*.

1   to ███████████████████████████████████. *See* Shafiq Rebuttal

2   Rpt. ¶¶ 189-194. Further, even in the absence of revenue information, Professor Shafiq explains how

3   Google can use its ad-serving technology to identify class members and how much information it has

4   in its possession for each class member as a result of Chrome sending personal information to Google

5   while they were not synced. *Id.* at ¶¶ 157-188.

                    **2.      Dr. Mangum's Methodology Fits Plaintiffs' Theory of Liability**

6

7         Plaintiffs' theory of the case is simple: (1) Chrome promised users (among other things) that

8   it would not send their browsing history information and other personal information to Google unless

9   they enabled sync, and (2) Chrome broke that promise by sending user personal information from the

10  user's personal computing device to Google regardless of whether the user enabled sync. For their

11  economic damages model, Plaintiffs seek (1) return of the fair market value of the additional personal

12  information that Chrome sent to Google from their devices without their authorization; and (2) return

13  of excess profits that Google received as a result of its misconduct—which is exactly what Dr.

14  Mangum's Report captures.

15        In the absence of any analysis, Google argues that Dr. Mangum's approach does not match

16  the theory of the case. Google asserts that the Hann and Krasnova surveys are not an accurate model.

17  But Hann and Krasnova support Dr. Mangum's conclusion that "surveys can be utilized for the

18  valuation of personal information protection." Mangum Rebuttal Rpt. ¶ 19. Google next argues that

19  VPN payments are not reliable and Dr. Mangum admitted that VPN payments are "not a perfect fit"

20  for "the value of the information." Mot. at 19. Yet, this is a strawman argument. Dr. Mangum does

21  not offer VPN payments as the market value of the data at issue, but instead to show that "consumers

22  are willing to make payments to protect their personal information" and VPNs "provide real market

23  examples of willingness to pay for privacy." Mangum Rebuttal Rpt. ¶ 19.

24        Finally, Google argues that "[t]he amount research companies pay users for certain data" is a

25  "mismatch between the information Dr. Mangum attempts to value and the data at issue in this

26  case[.]" Mot. at 19. But Google ignores Screenwise, its own program through which it pays

27  consumers for the right to track their Internet behavior (including ads behaviors) using Chrome itself

28

1   and the very same identifiers at issue in this case: ████████████████████████. *See*

2   Shafiq Rebuttal Rpt. ¶¶ 195-197; Ex. J, GOOG-CABR-04704597, at -615 and -635.

3        Google attempts to distinguish Screenwise by claiming that it involves name and email

4   address. But this ignores that Google also tracks users by ██████████████████ and that,

5   in Plaintiffs' liability case, Google links ████████████████████████████████████

6   ████████   To the extent Google argues that Screenwise paid for something different, that is an issue

7   that goes to the weight of the evidence, not its admissibility. The Reference Manual on Scientific

8   Evidence (Third) explains that Dr. Mangum's approach is common:

9   > An expert can sometimes measure damages as of the time of wrongdoing directly
10  > from market prices or values. For example, if the defendant's negligence caused
    > the total destruction of the plaintiff's cargo of wheat, worth $17 million at the
    > current market price, damages are simply that amount. The only task for the expert
11  > is to restate the damages as the economic equivalent at the tie of trial[.] …In many
    > cases, the expert does not take a market price and apply it directly. The price of the
12  > product or an object at issue may not itself be known from a market, but the expert
    > can approximate the market value from the prices of similar products or objects.

13  Reference Manual on Scientific Evidence: Third Edition (2011) at 444-45. Dr. Mangum's fair

14  market value approach to the personal information at issue in this case is nothing more than a simple

15  appraisal method of calculating economic damages.

16       Further, the Supreme Court has acknowledged that there are many kinds of expertise for

17  which "the factors identified in *Daubert* may or may not be pertinent in assessing reliability,

18  depending on the nature of the issue, the expert's particular expertise, and the subject of his

19  testimony." *Kumho Tire Co., Ltd.*, 526 U.S. at 150   (citing "land valuation" and "attorney's fee

20  valuation" as examples). In the case of property appraisals, concerns about comparable properties

21  chosen and "whether [the expert] gathered enough information about other properties that he

22  considered—are potentially valid, but go to weight rather than admissibility. The jury is capable of

23  understanding and assessing both sides' arguments on these points." *Richards v. Dept. of Building

24  Insp. of City and County of San Francisco*, No. 20-cv-01242, 2021 WL 5415254, at *17 (N.D. Cal.

25  Nov. 19, 2021). Likewise, in patent litigation involving calculations of the fair market value for

26  intellectual property, it is well-established that, when the market value of a different license is used

27  as a comparison, "the fact that a license is not perfectly analogous generally goes to the weight of

28

1   the evidence, not its admissibility." *Ericcson, Inc. v. D-Link Systems, Inc.*, 773 F.3d 1201, 1227 (Fed.

2   Cir. 2014); *see also Contour IP Holding, LLC v. GoPro, Inc.*, No. 3:17-cv-04738, 2020 WL

3   5106845, at *9 (N.D. Cal. Aug. 31, 2020) (Orrick, J.); *Opticurrent, LLC v. Power Integrations, LLC*,

4   No. 17-cv-03597, 2019 WL 2389150, at *13 (N.D. Cal. Jun. 5, 2019) (Chen, J.); *Open Text S.A. v.*

5   *Box, Inc.*, No. 13–cv–04910, 2015 WL 349197, at *4 (N.D. Cal. Jan. 23, 2015) (Donato, J.).

6          It is no different here. Evidence produced by Google demonstrates that Google Screenwise

7   is a near perfect match to assess the fair market value of the personal information that Chrome sent

8   from class members' devices to Google's servers without authorization. Google challenges go only

9   to the weight of such evidence, not its admissibility.

10         **D.     DR. MANGUM PRESENTS A RELIABLE METHODOLOGY TO CALCULATE EXCESS PROFITS FOR DISGORGEMENT DAMAGES**

11         Google next argues that Mangum's formula for calculating Google's total profit premium

12   from Chrome sending not synced user personal information to Google without authorization is

13   unreliable and leads to an "inflated damages estimate." Mot. at 20. But Google ignores that late-

14   produced evidence demonstrates that Mangum's model is substantially similar to how Google

15   calculated the exact same item: how much revenue Google would lose if it lost access to personal

16   information of Chrome users. *See* Mangum Rebuttal Rpt. §§ II.A.2, II.A.3.

17         As an initial matter, Google's general criticism of Dr. Mangum's per user, per month proposal

18   is misplaced. This calculation is sufficient for certification of a class with restitution damages. *See*

19   *Pulaski,* 802 F.3d 979. Google challenges Dr. Mangum's unjust enrichment methodology on the basis

20   that his allocation proposal would (1) apportion no damages to Class Members who did not have a

21   Google Account, and (2) that the approach does not account for "wide differences" in what Google

22   obtained from *each* class member.[16] As discussed above, Google's argument on variability of amount

23   and type of data collected is misplaced because Google has existing systems that can identify revenue

24   and personal information on a per user basis, thus accounting for the purported variations. This,

25

26   ───────────────
    [16] Google also references the report of its expert, Bruce Strombom, to assert that Dr. Mangum's unjust
27   enrichment proposal makes a number of "faulty assumptions." Mot. at 20 (citing Strombom Report
    § IV.C). But Dr. Strombom's critiques do not go to Dr. Mangum's methodologies, but rather, are
28   based on skewed, if not entirely, inaccurate interpretation of the facts. Thus, the challenges go to
    weight, not admissibility.

───────────────

1   coupled with Google's ███████████████████████████████████████████

2   ██████████████████████████████████████████████████████████████████

3   ████, will enable Plaintiffs to refine the already appropriate theory of allocation provided by Dr.

4   Mangum. *See* Shafiq Rpt. ¶¶ 78-82 (identifying three approaches to identify Class Members); *see*

5   Shafiq Rebuttal Rpt. *¶¶* 157-164 (confirming that proposed methodologies would identify non-

6   Google Account Holders).

7           Further, at the time Dr. Mangum submitted his initial report, Google maintained that it did not

8   track revenues on an individual user basis in any of its databases. In its Opposition to Class

9   Certification, Google doubled down on the claim, submitting the Declaration of George Levitte

10  claiming that "Google does not calculate advertising *profits* on a per-individual-user basis" and that

11  it "would be impossible to calculate Google's advertising *profits* for each Putative Class Member."

12  Dkt. 430-15, Declaration of George Levitte in Support of Google's Opp. to Class Cert., ¶ 5. The

13  Levitte Declaration is misleading. While it may be true that Google does not track or calculate

14  advertising *profits* on an individual user basis,  Google maintains logs where it does track revenue on

15  an individual user basis. *See* Shafiq Rebuttal Rpt. ¶¶ 176-188. Professor Shafiq's Rebuttal Report

16  explains how these, and other revenue logs, can be used together with Google's back-end systems to

17  apportion damages via automated computer program according to how much personal information

18  data Chrome sent and/or how much revenue Google earned from such class member. *See* Shafiq

19  Rebuttal Rpt. *¶¶* 165-194.

20          Finally, as applied to the facts of this case, Google's attempt to impose on Plaintiffs the burden

21  of disaggregating Google's wrongful from its rightful profits is contrary to black letter law on unjust

22  enrichment and restitution. In calculating such damages, "California law requires only that some

23  reasonable basis of computation be used, and the damages may be computed even if the result reached

24  is an approximation." *Pulaski*, 802 F.3d at 989 (9th Cir. 2015). "In measuring the amount of the

25  defendant's unjust enrichment, the plaintiff may present evidence of the total or gross amount of the

26  benefit, or a reasonable approximation thereof, and then the defendant may present evidence of costs,

27  expenses, and other deductions to show the actual or net benefit the defendant received." *Meister v.*

28  *Mensinger*, 230 Cal.App.4th 381, 399 (2014). Upon "producing evidence permitting at least a

1  reasonable approximation of the wrongful gain," the "[r]esidual risk of uncertainty in calculating net

2  profits is assigned to the defendant." *Id*. (citing *Uzyel v. Kadisha*, 188 Cal. App.4th 866, 894 (2010));

3  *see also* Restatement (Third) of Restitution and Unjust Enrichment § 51(5)(d).

4        Perhaps even more salient, where a defendant has commingled unauthorized property or

5  profits with lawfully obtained property or profits, the burden is on the defendant to disentangle the

6  two. In such cases, the "burden of loss … shall rest upon the wrongdoer, who has so confused his

7  own with that of another that neither can be distinguished" and "[t]he proper remedy" is that "all the

8  inconvenience of the confusion is thrown upon the party who produced it, and it is for him to

9  distinguish his own property or lose it." *Westinghouse Elec. and Manuf. Co. v. Wagner Elec. and*

10  *Manuf. Co*., 225 U.S. 604, 621 (1912). California courts have applied this rule across different areas

11  of law for more than a century and into modern times. *See Lightner Mining Co. v. Lane*, 161 Cal.

12  689, 708 (1911); *Brainard v. Cohn*, 8 F.2d 13 (9th Cir. 1925); *Micro Lithography Inc. v. Inko Indus.*

13  *Inc.*, No. H006294, 1991 WL 332053 (Cal. App. 1991); *People v. Prosser*, 157 Cal. App.4th 682

14  (2007).

15        Regardless of the evidence now in Google's possession, Professor Shafiq has identified

16  methods to distinguish between the information that was wrongfully sent from Chrome to Google

17  versus that which was not. *See* Shafiq Rebuttal Rpt. ¶¶ 164-195. In addition, both he and Mr. Smith

18  have submitted evidence that it would have been easy for Google to create a not synced signal at any

19  time before or during this litigation to easily distinguish between synced versus not synced

20  communications in its possession. *See* Shafiq Rpt. § V; Shafiq Rebuttal Rpt. ¶¶ 191-194; Smith Rpt.

21  § XIV. Having failed to do so, Google cannot now force Plaintiffs to do the work Google should have

22  done at the outset. The law, in fact, requires the opposite. Plaintiffs are confident that, given Google's

23  proven abilities to categorize and analyze data, it will have no problem coming up with its own

24  disaggregation plan upon being ordered to do so by this Court.

25  **V.**    **CONCLUSION**

26        For the reasons stated above, Plaintiffs respectfully request that the Court deny Google's

27  motion to strike the expert report of Russell Mangum, III, Ph.D.

28

1       Respectfully submitted this 16th Day of February 2022.

2 **BLEICHMAR FONTI & AULD LLP**        **DICELLO LEVITT GUTZLER LLC**

3 */s/ Lesley Weaver*        */s/ David Straite*

4 Lesley Weaver (Cal. Bar No.191305)      David A. Straite (admitted *pro hac vice*)
Angelica M. Ornelas (Cal. Bar No. 285929)    One Grand Central Place

5 Joshua D. Samra (Cal. Bar No. 313050)     60 East 42nd Street, Suite 2400
555 12th Street, Suite 1600        New York, New York 10165

6 Oakland, CA 94607        Tel.: (646) 933-1000
Tel.: (415) 445-4003        dstraite@dicellolevitt.com

7 Fax: (415) 445-4020

8 lweaver@bfalaw.com        Amy E. Keller (admitted *pro hac vice*)
aornelas@bfalaw.com        Adam Prom (admitted *pro hac vice*)

9 jsamra@bfalaw.com        Sharon Cruz (admitted *pro hac vice*)
       Ten North Dearborn Street, 6th Fl.

10 **SIMMONS HANLY CONROY LLC**      Chicago, Illinois 60602
       Tel.: (312) 214-7900

11 */s/ Jay Ba*        akeller@dicellolevitt.com

12 Jason 'Jay' Barnes (admitted *pro hac vice*)    aprom@dicellolevitt.com
An Truong (admitted *pro hac vice*)      scruz@dicellolevitt.com

13 Eric Johnson (admitted *pro hac vice*)
112 Madison Avenue, 7th Floor

14 New York, NY 10016
Tel.: (212) 784-6400

15 Fax: (212) 213-5949

16 jaybarnes@simmonsfirm.com
atruong@simmonsfirm.com

17 ejohnson@simmonsfirm.com

18 *Counsel for Plaintiffs*

19

20

21

22

23

24

25

26

27

28

## ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(h)(3)

I hereby attest that concurrence in the filing of this document has been obtained from the other signatories. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 16th day of February 2022, at Jefferson City, Missouri.

*/s/ Jay Barnes*
Jay Barnes
Simmons Hanly Conroy

*Counsel for Plaintiffs*

1

## **<u>CERTIFICATE OF SERVICE</u>**

2      I hereby certify that on February 16, 2022, I caused the foregoing document to be

3  electronically filed with  the Clerk of the Court using the Court's CM/ECF system, which will send a

4  notice of electronic  filing to all CM/ECF participants.

5      Executed this 16th day of February, 2022, at Jefferson City, Missouri.

6

7                                                                */s/ Jay Barnes*
                                                                 Jay Barnes

8                                                                Simmons Hanly Conroy

9                                                                *Counsel for Plaintiffs*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28