# Redacted Version of Document Sought to be Sealed

**BLEICHMAR FONTI & AULD LLP**
Lesley Weaver (Cal. Bar No.191305)
Angelica M. Ornelas (Cal. Bar No. 285929)
Joshua D. Samra (Cal. Bar No. 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
*lweaver@bfalaw.com*
*aornelas@bfalaw.com*
*jsamra@bfalaw.com*

**SIMMONS HANLY CONROY LLC**
Jason 'Jay' Barnes (admitted *pro hac vice*)
An Truong (admitted *pro hac vice*)
Eric Johnson (admitted *pro hac vice*)
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
Fax: (212) 213-5949
*jaybarnes@simmonsfirm.com*
*atruong@simmonsfirm.com*
*ejohnson@simmonsfirm.com*

**DICELLO LEVITT GUTZLER LLC**
David A. Straite (admitted *pro hac vice*)
One Grand Central Place
60 East 42nd Street, Suite 2400
New York, New York 10165
Tel.: (646) 933-1000
*dstraite@dicellolevitt.com*

Amy E. Keller (admitted *pro hac vice*)
Adam Prom (admitted *pro hac vice*)
Sharon Cruz (admitted *pro hac vice*)
Ten North Dearborn Street, 6th Fl.
Chicago, Illinois 60602
Tel.: (312) 214-7900
*akeller@dicellolevitt.com*
*aprom@dicellolevitt.com*
*scruz@dicellolevitt.com*

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| PATRICK CALHOUN, *et al.*, on behalf of themselves and all others similarly situated, | Case No. 4:20-cv-5146-YGR-SVK |
| Plaintiffs, | **PLAINTIFFS' OPPOSITION TO GOOGLE'S MOTION TO STRIKE REPORT OF RUSSELL MANGUM, III, PH.D.** |
| v. | Mot. Date: May 31, 2022 |
| GOOGLE LLC, | Time: 2:00PM PT |
| Defendant. | Courtroom: 1, 4th Floor |
| | Hon. Yvonne Gonzalez-Rogers |

## UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**<u>TABLE OF CONTENTS</u>**

TABLE OF AUTHORITIES…………………………………………………………………i

I. PRELIMINARY STATEMENT ........................................................................1

I. COUNTER STATEMENT OF ISSUE TO BE DECIDED ..................................2

II. COUNTER STATEMENT OF RELEVANT FACTS...........................................2

 A. Plaintiffs' Theory of Liability ...................................................2

 B. Dr. Mangum's Methodologies Match Plaintiffs' Theory of Liability .....................4

  1. Dr. Mangum's Methodology to Calculate Unjust Enrichment ....................5

  2. Dr. Mangum's Methodology to Calculate Restitution Damages .................6

III. LEGAL STANDARD .......................................................................8

IV. ARGUMENT ...............................................................................8

 A. Dr. Mangum's Opinions are Relevant to the Issue of Class Wide Damages............9

  1. Unjust Enrichment, Restitution, and Disgorgement Are Available
   for Intrusion Upon Seclusion, CIPA, and Statutory Larceny......................9

  2. Dr. Mangum's Measures Apply to Breach of Contract and Good
   Faith and Fair Dealing Claims ...............................................10

  3. Restitutionary Disgorgement, i.e., the Google Screenwise
   Calculation, is Available Under the UCL ......................................11

 B. Dr. Mangum's Proposed Methodology Applies to All Putative Class
  Members.......................................................................13

 C. Dr. Mangum Presents A Reliable Methodology to Calculate Restitution
  Damages .......................................................................19

  1. Dr. Mangum's Methodology for Restitution Can Fairly Compensate
   Class Members ...............................................................19

  2. Dr. Mangum's Methodology Fits Plaintiffs' Theory of Liability ...............21

 D. Dr. Mangum Presents A Reliable Methodology to Calculate Excess Profits
  for Disgorgment Damages .......................................................23

V. CONCLUSION ............................................................................25

# TABLE OF AUTHORITIES

## CASES

*American Master Lease LLC v. Idanta Partners, Ltd.*,
  225 Cal. App. 4th 1451 (2014) ........................................................ 9

*Brainard v. Cohn*,
  8 F.2d 13 (9th Cir. 1925) .............................................................. 25

*Briseno v. ConAgra Foods, Inc.*,
  844 F.3d 1121 (9th Cir. 2017) ....................................................... 14

*Brown v. Google LLC*,
  No. 5:20-cv-03664-LHK, 2021 WL 6064009 (N.D. Cal. Dec. 22, 2021) .......... 7, 11, 12, 13

*Contour IP Holding, LLC v. GoPro, Inc.*,
  No. 3:17-cv-04738, 2020 WL 5106845 (N.D. Cal. Aug. 31, 2020) .................... 22

*Cottle v. Plaid, Inc.*,
  536 F. Supp. 3d 461 (N.D. Cal. 2021) ........................................ 12, 13

*CTC Real Estate Servs. v. Lepe*,
  140 Cal. App. 4th 856 (Cal. App. 2006) ............................................... 9

*Cty. of San Bernardino v. Walsh*,
  158 Cal. App. 4th 533 (Cal. App. 2007) ............................................... 9

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) ....................................................... *passim*

*Day v. AT&T, Corp.*,
  63 Cal.App.4th 325 (1998) ........................................................... 13

*DSU Med. Corp. v. JMS Co.*,
  296 F. Supp. 2d 1140 (N.D. Cal. 2003), *aff'd*, 471 F.3d 1293 (Fed. Cir. 2006) ...... 1, 14, 15

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ........................................................... 8

*Ericcson, Inc. v. D-Link Systems, Inc.*,
  773 F.3d 1201 (Fed. Cir. 2014) ..................................................... 22

*Fields v. Michael*,
  91 Cal. App. 2d 443 (1949) .......................................................... 12

*Hart v. TWC Prod. & Tech. LLC*,
  526 F. Supp. 3d 592 (N.D. Cal. 2021) ......................................... 12, 13

*Hartley v. Dillard's, Inc.*,
   310 F.3d 1054 (8th Cir. 2002) ........................................................................ 8

*Hill v. NCAA*,
   7 Cal. 4th 1 (Cal. 1994) ................................................................................ 18

*In re Facebook Privacy Litig.*,
   572 Fed. Appx. 494 (9th Cir. 2014) .............................................................. 11

*In re Facebook, Inc. Internet Tracking Litig.*,
   956 F.3d 589 (9th Cir. 2020) .......................................................................... 9

*In re Facebook, Inc., Consumer Privacy User Profile Litig.*,
   402 F. Supp. 3d 767 (N.D. Cal. 2019) .......................................................... 10

*In re High-Tech Emp. Antitrust Litig.*,
   No. 11–CV–02509, 2014 WL 1351040 (N.D. Cal. Apr. 4, 2014) ...................... 8

*Kansas v. Nebraska*,
   547 U.S. 445, 461 (2015) .............................................................................. 11

*Klein v. Facebook, Inc.*,
   No. 20-CV-08570, 2022 WL 141561 (N.D. Cal. Jan. 14, 2022) ...................... 12

*Korea Supply Co. v Lockheed Martin Corp.*,
   29 Cal. 4th 1134 (Cal. 2003) ........................................................................ 11

*Kumho Tire Co., Ltd. v. Carmichael*,
   526 U.S. 137 (1999) .................................................................................. 8, 22

*Lightner Mining Co. v. Lane*,
   161 Cal. 689 (1911) ...................................................................................... 25

*Marriott Int'l, Inc. Data Sec. Breach Litig.*,
   440 F. Supp. 3d 447 (D. Md. 2020) .............................................................. 12

*Marsu B.V. v. Walt Disney Co.*,
   185 F.3d 939 (9th Cir. 1999) ........................................................................ 19

*Meister v. Mensinger*,
   230 Cal.App.4th 381 (2014) .......................................................................... 24

*Messick v. Novartis Pharm. Corp.*,
   747 F.3d 1193 (9th Cir. 2014) ........................................................................ 8

*Messner v. Northshore Univ. HealthSystem*,
   669 F.3d 802 (7th Cir. 2012) ........................................................................ 14

*Micro Lithography Inc. v. Inko Indus. Inc.*,
　　No. H006294, 1991 WL 332053 (Cal. App. 1991) ............................................. 25

*Obrey v. Johnson*,
　　400 F.3d 691 (9th Cir. 2005) ................................................................................. 1

*Open Text S.A. v. Box, Inc.*,
　　No. 13–cv–04910, 2015 WL 349197 (N.D. Cal. Jan. 23, 2015) ....................... 22

*Opperman v. Path*,
　　No. 13-cv-00453, 2016 WL 3844326 (N.D. Cal. Jul 15, 2016) ....................... 20

*Opticurrent, LLC v. Power Integrations, LLC*,
　　No. 17-cv-03597, 2019 WL 2389150 (N.D. Cal. Jun. 5, 2019) ....................... 22

*People v. Kozlowski*,
　　96 Cal. App. 4th 853 (2002) ................................................................................ 12

*People v. Prosser*,
　　157 Cal. App.4th 682 (2007) ............................................................................... 25

*Pulaski & Middleman, LLC v. Google, Inc.*,
　　802 F.3d 979 (9th Cir. 2015) ........................................................................ *passim*

*Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*,
　　752 F.3d 807 (9th Cir. 2014) ............................................................................... 14

*Richards v. Dept. of Building Insp. of City and County of San Francisco*,
　　No. 20-cv-01242, 2021 WL 5415254 (N.D. Cal. Nov. 19, 2021) ................... 22

*Tyson Foods, Inc. v. Bouaphakeo*,
　　577 U.S. 442 (2016) ............................................................................................. 14

*U.S. v. Prime*,
　　431 F.3d 1147 (9th Cir. 2004) ............................................................................... 8

*Uzyel v. Kadisha*,
　　188 Cal. App.4th 866 (2010) ............................................................................... 24

*Ward v. Taggart*,
　　51 Cal.2d 736 (1959) ............................................................................................. 9

*Westinghouse Elec. and Manuf. Co. v. Wagner Elec. and Manuf. Co.*,
　　225 U.S. 604, 621 (1912) ..................................................................................... 25

*Wolfe v. C.R. Bard*,

No. 2:19-cv-07768, 2021 WL 2980222 (C.D. Cal. Mar. 31, 2021)................................... 14

**OTHER AUTHORITIES**

Restatement (Second) of Torts § 652H ............................................................................. 9

**RULES**

Fed. R. Evid. 702........................................................................................... *passim*

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiffs submit this memorandum of points and authorities in support of their Opposition to Google's Motion to Strike the report of Plaintiffs' damages expert, Russell Mangum, III, Ph.D.

## I.   PRELIMINARY STATEMENT

Google challenges Dr. Mangum's opinions on the basis of relevance and reliability. Google is wrong on both counts. First, Judge Koh's prior rulings make clear that restitution and unjust enrichment are available remedies, and that the data at issue in this case constitutes property. *See* Dkt. 142, Order Granting in Part and Denying in Part Motion to Dismiss ("MTD Order"), at 12-17, 31-32 (Mar. 17, 2021) (J. Koh) (holding that personal information is property and under the UCL "Plaintiffs may seek restitution"). Second, as to reliability, Google places merits questions about whether the class can be ascertained on Dr. Mangum's shoulders, and then incorrectly concludes that his excess profit analysis cannot exclusively identify revenues derived from data taken from not synced users without consent. These factual assertions are refuted by Plaintiffs' experts' reports. Google is perfectly capable of identifying not-synced revenue, which can be used by Dr. Mangum's simple methodology to estimate excess profits, during the Class Period.  Similarly, as to restitution, Google itself has paid users at least $20 for the right to track their data through a program called Screenwise. Thus, Dr. Mangum's calculations do not rest on a survey; they rely on Google's own data.

In any event, a *Daubert* Motion is not the proper vehicle for resolution of these disputes. *See DSU Med. Corp. v. JMS Co.*, 296 F. Supp. 2d 1140, 1147 (N.D. Cal. 2003), *aff'd*, 471 F.3d 1293 (Fed. Cir. 2006") (noting that "the district court is not to make ultimate conclusions as to the persuasiveness of the proffered evidence..., nor is it to transform a *Daubert* hearing into a trial on the merits") (internal quotations and citations omitted). Google's arguments ignore the abundant case law confirming that these types of disputes go to weight, not admissibility. *Obrey v. Johnson*, 400 F.3d 691, 695 (9th Cir. 2005) ("[O]bjections to a study's completeness generally go to the weight, not the admissibility of the statistical evidence and should be addressed by rebuttal, not exclusion") (internal citations and quotations omitted). The arguments raised simply do not warrant exclusion of Dr. Mangum's opinions. Google's motion to strike should be denied.

1    **I.      COUNTER STATEMENT OF ISSUE TO BE DECIDED**

2        Whether Dr. Mangum's relevant and reliable opinions are subject to exclusion under Fed. R.

3    Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ("*Daubert*").

4    **II.     COUNTER STATEMENT OF RELEVANT FACTS**

5        **A.      PLAINTIFFS' THEORY OF LIABILITY**

6        This case is about simple, contractually binding promises that Google makes to all users of

7    its Chrome web browser—specifically, promises related to use of the Chrome sync feature.[1] The

8    Chrome Privacy Notice promises Chrome users that, unless they enable sync, Chrome will not send

9    personal information from the Chrome browser on the user's own computing device to Google's

10   servers that are located elsewhere and outside the user's control. The promises are made expressly

11   and implicitly in the Chrome Privacy Notice and the Chrome user interface.

12       The Chrome contract expressly promises that the price of the service does not require currency

13   or personal information. The specific express promises include: (1) "[y]ou don't need to provide any

14   personal information to use Chrome[,]" (2) "[t]he personal information that Chrome stores [including

15   "browsing history information" and "cookies" won't be sent to Google unless you choose to store

16   that data in your Google Account by turning on sync[,]" (3) "the fact that you use Chrome to access

17   Google services … does not cause Google to receive any additional personally identifying

18   information about you;" (4) "Sync is only enabled if you choose;" (5) if a user does not enable sync

19   and "allow[] your Chrome history to be included in your Google Web & App Activity," then "Google

20   will only use your Chrome data after its anonymized and aggregated with data from other users[,]"

21   (6) sync controls whether "Google may use your browsing history to personalize Search, ads, and

22   other Google services[;]" and (7) "[y]ou can always choose what to sync in settings." Dkt. 462, Pls'

23   Opp. to Google's Mot. for Summ. J. on Affirmative Defense of Consent ("MSJ Opp."), 3-4 (citing

24   Chrome Privacy Notice); *see also* Dkt. 430-3, Declaration of Gregory Fair in Support of Google's

25   Opp. to Pls.' Mot. for Class Cert. ("Fair Decl. ISO MCC Opp.") ¶¶ 9, 11-14.

26   _____

27   [1] Although Google's motion papers sometimes capitalize Sync, in its public facing documents,
     Google refers to sync with a lower-case s except where it is used to start a sentence or in a header.

28   *See* Chrome Privacy Notice (22 total instances, 20 of which are sync and 2 of which are Sync);
     Chrome user interface ("Turn on sync").

The implied promise is exposed to users in the top right corner of Chrome and includes a bright blue button to "Turn on sync…" Fair Decl. ISO MCC Opp. at ¶¶ 7-8. Plaintiffs and Googlers testified in this case that, in common parlance, to sync means "to bring together." MSJ Opp. at 3, n.4 (identifying sample testimony from Plaintiffs regarding their understanding that "sync" meant to share, collect, join or link information with Google) *compare* Ex. A,[2] Deposition of Sam Heft-Luthy at 166:4-9 (testifying that "sync" means "meeting"); Ex. B, Deposition of AbdelKarim Mardini at 182:2-14 (testifying that "sync" in common parlance refers to a meeting to discuss and share information), Ex. C, Deposition of Chetna Bindra ("Bindra Dep.") at 68:16-25 (joining information from users' devices).

Despite these promises, Chrome routinely sends not synced users' information from their personal computing devices to Google's server. In turn, Google associates that information with, among other things, existing user profiles and then monetizes it. *See, e.g.*, Dkt. 429, Google's Opp. to Pls' Mot. for Class Cert. ("MCC Opp.") at 4-5[3];  Ex. G, GOOG-CALH-00027419 ██████████

██████████████████████████████████████████████████████

The "personal information" Google takes, without consent, includes IP addresses, User-Agent information, cookie and device identifiers, browsing history information, X-client data identifiers, and contents of Chrome user communications with non-Google websites. MTD Order at 15-16 ("This data falls within the definition of personal information under California law, which governs Google's Terms of Service… As Google's counsel conceded at the hearing … the data at issue … falls within these broad definitions of personal information"). Internally, Google agrees. *See* Ex. C, Bindra Dep. Ex. 48. at -506-07 ("IP addresses, unique cookie or device ID and unique account identifiers … are

---

[2] Unless otherwise indicated, all "Ex.__" citations refer to the exhibits attached to the declaration of Jay Barnes submitted in support of this Opposition to Google's Motion to Strike Dr. Mangum.

[3] *See also* Dkt. 395, Google' Mot. for Summ. J. on Affirmative Defense of Consent ("MSJ"), at 8 (admitting "Google's receipt of data from websites using its services is unrelated to Chrome Sync"); Dkt. 430-1 at Ex. 1, Report of Google's Technical Expert Yiling Chen ISO MCC Opp. ("Chen Rpt.") at ¶ 10 ("[w]hether Google receives the data at issue has nothing to do with whether [S]ync is enabled or disabled…"); Dkt. 430-1 at Ex. 5, Report of Google's Technical Expert Georgios Zervas  ISO MCC Opp. ("Zervas Rpt.") at ¶ 13; *see also* Dkt. 340-16, Report of Pls' Technical Expert Richard Smith Rpt. ISO MCC ("Smith Report"), at ¶ 12; Dkt. 340-19, Report of Pls' Technical Expert Zubair Shafiq ISO MCC ("Shafiq Rpt."), at ¶¶ 14, 16.

classified as PII by default" at Google "until reclassified[,]" and "[p]ersonal information … is a broader term [than PII] … and "includes … IP addresses, cookies, AdID, [and device identifiers].")[4] Google then uses that data to create detailed user profiles used to target them with ads. *See* MCC at 7; MSJ Opp. at 11-12.

## B.   DR. MANGUM'S METHODOLOGIES MATCH PLAINTIFFS' THEORY OF LIABILITY

Plaintiffs' Motion for Class Certification seeks to certify a class of:

All Google Chrome users in the United States who did not enable "Sync" while browsing the web using Chrome ("Not Synced Chrome Users") or who disabled "Sync" while browsing using Chrome ("Unsynced Users"), at any time between July 27, 2016 to the present (the "Class Period"). Browsing using the Chrome browser in Incognito mode is excluded from the Class.

MCC at 8. In support of that motion, Dr. Mangum described methodologies for calculation of unjust enrichment and restitution damages on a class-wide basis. *See* Dkt. 340-18, Report of Dr. Russell Mangum ("Mangum Rpt."). Consistent with Plaintiffs' allegations, and supported by the facts adduced thus far (*see* above summary), Plaintiffs' theory of liability is that Chrome sends data taken from Not Synced[5] Chrome User's to Google without users' consent (e.g., in violation of its express promises in, *inter alia*, the Chrome Privacy Notice) and that Google profits are increased, and users are economically damaged, as a result. Dr. Mangum's economic damages calculations match that theory, and he proposes methods to calculate classwide unjust enrichment and restitution damages. Mangum Rpt. ¶ 24 ("center[ing] on [] claim that Google wrongly collected personal data from Class members [e.g., Not Synced Chrome Users], financially gained from use of the data, and failed to provide Class Members with a browser product that adhered to the privacy policies as agreed to").[6]

---

[4] In the same document, Google states that "data excluded from Google's interpretation of PII may still be considered … personal information under the California Consumer Privacy Act (CCPA)."

[5] "Unsynced" users might be construed to mean users who synced once, and then disabled sync, excluding "never syncers." For clarity, Plaintiffs use "not synced" as a comprehensive term.

[6] In response to Dr. Mangum's report, Google presented the report of Bruce Strombom ("Strombom Rpt."). *See* Dkt. 430-1 at Ex. 4. However, Dr. Strombom's critiques are based on a flawed understanding of Plaintiffs' case and incorrect assumptions of fact. For example, Dr. Strombom incorrectly believes that the case centers only on data taken from users who are signed in. *See* Ex. E, Deposition of Bruce Strombom ("Strombom Dep.") at 120:19-121:1 (acknowledging that opinions are based on assumption that signed-out users are not part of Plaintiffs' theory of liability) *compare*

**1.      Dr. Mangum's Methodology to Calculate Unjust Enrichment**

To measure unjust enrichment, Dr. Mangum's opening report proposes:

> First, Google's revenue associated with Chrome is identified. Next, the increase in Chrome-related revenue attributed to the personal information gained from Class Members is computed to isolate the revenue premium. Lastly, costs are accounted for to determine the profits on the revenue premium. The calculation outlined below is *based on available evidence*, including internal Google documents, as well as publicly available information.

Mangum Rpt. ¶ 56. Based on Google's own documents produced and reviewed by October 13, 2021 (when Dr. Mangum's opening report was filed), Dr. Mangum proposed a methodology that simply requires the correct inputs:  first, determine Chrome's revenue share for Google; second, determine the percentage of users in a not synced state, excluding Incognito mode; and third, apply Google's internal analysis of revenue decline as a result of "losing identity," the way Google expresses the inability to track users across the internet and observe their behavior in a way that allows Google to market it to publishers and advertisers. Mangum Rep. § IV.B.

Dr. Mangum's rebuttal report (*see* Weaver Decl. ISO Reply MCC Ex. EEE ("Mangum Rebuttal Rpt.")) affirms the methodology and relies on different inputs derived from documents produced by Google *after* the completion of Dr. Mangum's initial report. These documents, produced after October 13, 2021, reveal that Google routinely calculates the revenue impact of changing data collection practices. For example, ███████████████████████████████████████ ████████████████████████████████████████████████████████████ Mangum Rebuttal Rpt. ¶¶ 47, 78. The formula Google used is strikingly similar to that proposed by Dr. Mangum. An analysis of Google's revenue calculations, and how it aligns with Dr. Mangum's proposed methodology is set forth in Dr. Mangum's rebuttal report. *See* Mangum Rebuttal Rpt. at II.A.2 and II.A.3. Notably, Dr. Mangum explains that Google internally investigated ██████████

---

MCC, *supra* (proposing a class of Not Synced Chrome Users, which includes users who are signed-in and synced, signed-in and not synced, signed-out, and those without Google accounts). Dr. Strombom also strays far afield from his own expertise in asserting opinions (often incorrectly) about the manner in which data flows and operates, e.g. issues in the field of computer science, of which he admits he has no expertise. *See* Strombom Dep. at 25:1-3 (acknowledging he is "not here as a technical expert") *but see* Strombom Rpt.¶ 168 (opining, erroneously, that Strombom Ex. 4 is about the effect of "user controls on Google's ability to show and/or personalize ads"). Given these flaws and inaccuracies, the Strombom Report provided little to no persuasive value.

---

1   ████████████████████████ in manner consistent with his proposal, described above. *Id.*

2   at ¶ 41. Google applied models following an aggregate "class-wide" type of approach as opposed to

3   a user individualized approach. *Id*. For example, ████████████████████████████

4   ████████████████████████████████████████████████

5   ████████████████████████████████████████████████

6   ████████████████████████████████████████████████

7   ████████████████████████████████████████████████

8   ████████████████████████████████████████████████

9   *Id.* at ¶ 43. This straightforward calculation does not require a conjoint analysis or survey (*see id.* at

10  ¶¶73-74); it is simple math.

11              **2.      Dr. Mangum's Methodology to Calculate Restitution Damages**

12              Dr. Mangum's calculation of how to restore damages to users is similarly straightforward.

13  Mangum Rpt. § V. For this calculation, Dr. Mangum establishes market prices by looking to, among

14  other things, real world data. *Id.* at § V.B. Here, there can be no better example of market value than

15  what Google itself has paid people ████████████████████████████████████

16  Ex. H, GOOG-CABR-04312372 at -372; *see also* Mangum Rebuttal Rpt. ¶¶ 79-82 (based on review

17  of Google documents, GOOG-CABR-04312372, *supra*, relates to Google ███████████████

18  ██████████████████████████████████████████████ Ex. I,

19  GOOG-CABR-04704939 at -948 (explaining that ██████████████████████████

20  ████████. The identifiers Google pays panel users to track associated with their browsing history

21  information are the same identifiers at issue in this case, that are used to track users' browsing history

22  (Gaia, Zwieback, Biscotti and others). *See* Weaver Decl. ISO Reply MCC Ex. EEE, Rebuttal Report

23  of Pls' Technical Expert Zubair Shafiq ("Shafiq Rebuttal Rpt.") ¶¶ 195-197.Google notes that

24  ████████████████████ (*see* Ex. H, *supra*), and Dr. Mangum's research shows that panelists were

25  paid at least $20/month.[7] (*see* Mangum Rpt. ¶ 92; Mangum Rebuttal Rpt. ¶ 79). Google pays

26  participants for Screenwise tracking through Chrome. Ex. J, GOOG-CABR-04704597, at -615 and -

27

28  _____

    [7] Further discovery on this issue is pending.

1    635 (explaining that Screenwise tracking in U.S. is done for ███████████████

2    ████████████████████████████████████████████████████████

3    ████████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████████

5    ███████ for market research and analysis. *See* Mangum Rebuttal Rpt. ¶¶ 27, 78. Outside of Google,

6    entities such as SavvyConnect (an app that pays $5 per month per device to track users' data);

7    BrandTotal ($5 signing bonus at least $75 in the first year); and Nielson (up to $50 per year for

8    providing name, address, email, and web activity) all pay users to track them through their data. *See*

9    Mangum Rpt. ¶¶ 89-95;[8] Mangum Rebuttal Rpt. ¶ 20. These are reliable market factors that a jury

10   can fairly consider when presented with a damages analysis.

11        Upon calculating the market value of personal information, Dr. Mangum will then multiply

12   this by the number of Class Members' Google accounts. *See* Mangum Rpt. ¶ 96. To the extent Class

13   Members have multiple Google accounts, the calculation can factor in multiple sets of consumer data

14   by way of Google's own unique Google account identifiers. *See id.* "For example, a Class Member

15   may have two Google accounts, one for family and health related items, and one for leisure shopping.

16   Each account may have its own set of consumer identification data." Mangum Rpt. ¶ 96 and n.147;

17   *see also* Shafiq Rpt. at ¶ 66 (Google assigns unique identifiers, Gaia, to individual Google accounts).

18   For non-Google Account holders, Dr. Mangum relies on the technical expertise of Professor Shafiq,

19   who opines that existing Google systems can be used to query for and identify this subset of putative

20   Class Members. *See* Mangum Rebuttal Rpt. ¶¶ 5, 65-67, 93; Shafiq Rpt. § V; Shafiq Rebuttal Rpt. ¶¶

21   157-164.

22        Dr. Mangum then proposes a pro-rata distribution of unjust enrichment to Not Synced Chrome

23   Users based on the number of months in which they exchanged not synced communications using the

24   Chrome browser. *See* Mangum Rpt. ¶ 97. While Google argues that Dr. Mangum should somehow

25

26   ────────────────

27   [8] In the related *Brown* case, the Court ruled that the existence of Screenwise and similar programs
     cited by Plaintiffs here "establish at least two cognizable theories of economic injury. … Indeed, in

28   *Calhoun*, this Court found economic injury in almost identical circumstances." *Brown v. Google LLC*,
     2021 WL 6064009, at *15 (N.D. Cal. Dec. 22, 2021).

1  include how users feel about their data in this allocation, this is simply contrary to economic principle.

2  No one asks Google how it feels about users' data when paying them. It is equally irrelevant to paying

3  users themselves, where market prices are available, as is the case here.

4  **III.**  **LEGAL STANDARD**

5  Federal Rule of Evidence 702 tasks trial courts with a "basic gatekeeping obligation" to reject

6  expert testimony that is not relevant and reliable. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S.

7  137, 147 (1999) (citing *Daubert*, 509 U.S. at 589).[9] Pursuant to that rule, expert evidence must "assist

8  the trier of fact" either "to understand the evidence" or "to determine a fact in issue," and the witness

9  has to be sufficiently qualified to render the opinion. Rule 702 "should be applied with a 'liberal

10  thrust' favoring admission." *Messick v. Novartis Pharm. Corp.,* 747 F.3d 1193, 1196 (9th Cir. 2014)

11  (quoting *Daubert*, 509 U.S. at 588). Consistent with this liberal view of admissibility, a "review of

12  the case law after *Daubert* indicates that the rejection of expert testimony is the exception rather than

13  the rule." Fed. R. Evid. 702, advisory committee notes (2000). Indeed, the Ninth Circuit has explained

14  that the Supreme Court intended "a flexible inquiry" and "[a]s long as the [expert's] process is

15  generally reliable, any potential error can be brought to the attention of the jury through cross-

16  examination and the testimony of other experts." *U.S. v. Prime*, 431 F.3d 1147, 1153 (9th Cir. 2004);

17  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (stating that court's gatekeeping

18  function is to exclude "junk science"); *In re High-Tech Emp. Antitrust Litig.*, No. 11–CV–02509,

19  2014 WL 1351040, at *22 (N.D. Cal. Apr. 4, 2014) (noting that exclusion is justified only if opinion

20  is so fundamentally unsupported that it can offer no assistance to the jury) (citing *Hartley v. Dillard's,

21  Inc.*, 310 F.3d 1054, 1061 (8th Cir. 2002).

22  **IV.**  **ARGUMENT**

23  Dr. Mangum's straightforward opinions and testimony will advance a material aspect of the

24  case by proposing an understandable methodology of damages. His opinions are relevant and reliable

25  and Google's motion to strike should be rejected in its entirety.

26

27

---

28  [9] Google does not dispute Dr. Mangum's qualifications, which are varied and significant. *See* Mangum Rpt. ¶¶ 7-12, App'x 1; Mangum Rebuttal Rept. § I.B., App'x 1.

---

### A.   DR. MANGUM'S OPINIONS ARE RELEVANT TO THE ISSUE OF CLASS WIDE DAMAGES

#### 1.   Unjust Enrichment, Restitution, and Disgorgement Are Available for Intrusion Upon Seclusion, CIPA, and Statutory Larceny

Google's argument that users are not entitled to seek unjust enrichment damages is contrary to law and prior ruling in this case. The Ninth Circuit and California courts have explained that "*California law requires disgorgement of unjustly earned profits* regardless of whether a defendant's actions caused a plaintiff to directly expend his or her own financial resources or whether a defendant's actions directly caused the plaintiff's property to become less valuable." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 600 (9th Cir. 2020) (emphasis added) (citing *CTC Real Estate Servs. v. Lepe*, 140 Cal. App. 4th 856, 860-61 (Cal. App. 2006)); *Ward v. Taggart*, 51 Cal.2d 736, 742-43 (1959)  ("The public policy of this state does not permit one to 'take advantage of his own wrong' regardless of whether the other party suffers actual damages."). Further, "it is not essential that money be paid directly to the recipient by the party seeking restitution" because "[t]he emphasis is on the wrongdoer's enrichment, not the victim's loss." *Cty. of San Bernardino v. Walsh*, 158 Cal. App. 4th 533, 542 (Cal. App. 2007). Indeed, "a person acting in conscious disregard for the rights of another should be required to disgorge all profit because disgorgement benefits the injured parties and deters the perpetrator from committing the same unlawful acts again." *Id*. Thus, "[d]isgorgement may include a restitutionary element, but it may [also] compel a defendant to surrender all money obtained through an unfair business practice … regardless of whether those profits represent money taken directly from persons who were victims of the unfair practice. Without this result there would be an insufficient deterrent to improper conduct that is more profitable than lawful conduct." *Id*. at 543. Google cites no law that disgorgement is unavailable as a damages remedy for these claims. To the contrary, the Restatement (Second) of Torts expressly states that restitution is an available remedy for intrusion upon seclusion. Restatement (Second) of Torts § 652H, cmt. e, adopting by reference Restatement of Restitution § 136 ("A person who has tortiously used a trade name, trade secret, … or other similar interest of another, is under a duty of restitution for the value of the benefit thereby received.").

Broadly speaking, "[t]here are two types of disgorgement: restitutionary disgorgement, which

focuses on the plaintiff's loss, and nonrestitutionary disgorgement, which focuses on the defendant's unjust enrichment." *American Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 1482 (2014). Here, Dr. Mangum has proposed measures for both. For restitutionary disgorgement, because the gravamen of Plaintiffs' case is that, without valid authorization, Chrome sent their personal information (in the form of browsing history information plus identifiers) to Google, Dr. Mangum's restitutionary disgorgement calculation measures Plaintiffs' loss by looking to market prices for that user data. For nonrestitutionary disgorgement, Dr. Mangum proposes to measure Google's unearned profits, relying on Google's own revenue calculations. Both are appropriate for Intrusion Upon Seclusion, CIPA, and statutory larceny.

### 2. Dr. Mangum's Measures Apply to Breach of Contract and Good Faith and Fair Dealing Claims

Google next argues that a theory of excess profits cannot apply to the contract claim or breach of good faith and fair dealing, because users did not pay currency to use Chrome. This ignores a primary construct of contract law: the question is consideration, as any first-year law student can recite. Thus, Google is wrong to assert that Chrome is "free." Google is not a charity; it obtains considerable consideration in exchange for asking people to agree to its contract prior to using Chrome. Rather than paying with money, Chrome requires users to agree to pay for it with their attention, agreement to use the browser, and use of personal information subject to terms of services and policies that Chrome imposes upon them. *See* Dkt. 163, First Am. Compl. ("FAC") ¶ 45 (promising "you don't need to provide any personal information to use Chrome" and "the [PI] that Chrome stores won't be sent to Google" unless you sync, except that Chrome sends IP address and cookies to Google "when you visit our sites," i.e., Google.com or YouTube) (citing Chrome Privacy Notice). Google's purported legal "expert," once a privacy advocate, explained decades ago that "[p]ersonal information is an important currency in the new millennium." Paul M. Schwartz, Property, Privacy, and Personal Data, 117 Harv. L. Rev. 2055, 2056 (2004). Plaintiffs agree. Here, by exceeding the scope of consideration agreed to, Chrome charged more than the contract provided. To assess damages, Dr. Mangum looks to applicable market prices. Screenwise as a damages model is a perfect fit for "benefit-of-the-bargain" damages; it is Google's own valuation of the fair market

1    value (in currency) of the overcharge that occurred here.

2         Second, and contrary to Google's assertions, Dr. Mangum's second measure (return of

3    Google's profits) would be available for breach of contract under the theories asserted by Plaintiffs.

4    *See In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767 (N.D. Cal. 2019)

5    (holding "plaintiffs can seek damages for the detriment caused by the breach [on contract claim]").

6    The Restatement (Third) of Restitution § 39 (2010) states that "[i]f a deliberate breach of contract

7    results in profit to the defaulting promisor and the available damage remedy affords inadequate

8    protection to the promisee's contractual entitlement, the promisee has a claim to restitution of the

9    profit realized by the promisor as a result of the breach."  This came about through "a consensus that

10   it is appropriate (in some circumstances, at least) to treat a deliberate and profitable breach of contract

11   by analogy to an intentional and profitable interference with other legally protected interests." *Id.* at

12   cmt. a. In *Kansas v. Nebraska*, the Supreme Court adopted the rule, requiring Nebraska to pay Kansas

13   for Nebraska's gain in a breach of contract with Kansas that exceeded Kansas' loss. *See* 547 U.S.

14   445, 461 (2015). The rule would be equally appropriate here.

15           **3.**     **Restitutionary Disgorgement, i.e., the Google Screenwise Calculation, is Available Under the UCL**

16        Google's attack on Plaintiffs' UCL theory of damages is a transparent attempt to relitigate

17   matters previously decided in this case. Specifically, Google argues that restitution and unjust

18   enrichment are not an available under the UCL because Plaintiffs have not demonstrated "lost money

19   or property as a result of the alleged wrongful conduct." Mot. at 18-19 (quotations omitted).  Judge

20   Koh rejected this argument. In her March 2021 MTD Order, Judge Koh held that "Plaintiffs may seek

21   restitution [under the UCL]." MTD Order at 38; *see also Pulaski & Middleman, LLC v. Google, Inc.*,

22   802 F.3d 979, 985–86 (9th Cir. 2015) (discussing availability of restitution with UCL claim); *In re*

23   *Facebook Privacy Litig.*, 572 Fed. Appx. 494 (9th Cir. 2014) (plaintiffs and putative Class Members

24   are entitled to the lost value of their personal information that was misappropriated by Facebook); *In*

25   *re Facebook, Inc. Internet Tracking Litig.,* 956 F.3d 589, 600 (9th Cir. 2020) (noting that "[u]nder

26   California law, this stake in unjustly earned profits exists regardless of whether an individual planned

27   to sell his or her data or whether the individual's data is made less valuable"); *Korea Supply Co. v*

28

1   *Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144 (Cal. 2003) (reiterating that plaintiffs may seek

2   disgorgement of profits unjustly earned under the UCL).

3   In the March 2021 MTD Order, the Court also held that "plaintiffs who suffered a loss of their

4   personal information suffered economic injury [i.e., loss of money or property] and had standing."

5   MTD Order at 37-38 (citing, *inter alia*, *In re Facebook Privacy Litig.*, *supra*). Google sought

6   reconsideration—which was denied. Dkts. 150, 152. In December 2021, Google failed again in the

7   related *Brown* case. *Brown*, 2021 WL 6064009 at *17 (re-affirming *Calhoun* order on basis of

8   "Google Screenwise" and other fair market measures for personal information). Despite these failed

9   attempts, and current law of the case, Google boldly states that Judge Koh's prior ruling that personal

10  information is property "was incorrect and contrary to a consistent line of precedent in the Ninth

11  Circuit[.]" Mot. at 20. Google thus seeks reconsideration of a Court order under the guise of a *Daubert*

12  Motion. This is procedurally improper, and the request should be denied. *See* L.R. 7-9 (setting forth

13  the procedure to seek reconsideration of a Court order; a *Daubert* motion is not one of them).

14  To the extent the Court is inclined to reconsider merits arguments on this *Daubert* motion,

15  Plaintiffs respectfully incorporate their Opposition to Google's Motion to Dismiss (Dkt. 67) by

16  reference. Further, Google's motion does not grapple with the fact that, under California law,

17  "property" is "all-embracing, including every intangible benefit and prerogative susceptible of

18  possession and dispossession" and "any valuable right or interest protected by law." *People v.*

19  *Kozlowski*, 96 Cal. App. 4th 853, 866 (2002); *Fields v. Michael*, 91 Cal. App. 2d 443, 449 (1949).

20  Thus, property includes not just tangible property itself, but the right or interest to use or control

21  tangible or intangible property. The Supreme Court has recognized that deprivation of "money or

22  property" under federal criminal statutes is satisfied where a victim has "been deprived of its right to

23  exclusive use of … information, for exclusivity is an important aspect of confidential business

24  information and most private property for that matter." *Carpenter v. U.S.*, 484 U.S. 19, 26-27 (1987).

25  The two cases cited by Google, *Cottle v. Plaid, Inc.*, 536 F. Supp. 3d 461 (N.D. Cal. 2021)

26  and *Hart v. TWC Prod. & Tech. LLC*, 526 F. Supp. 3d 592 (N.D. Cal. 2021) stand in stark contrast to

27  the "growing trend across courts that have considered this issue [and] recognize[d] the lost property

28  value of this information." MTD Order at 38 (quoting *Marriott Int'l, Inc. Data Sec. Breach Litig.*,

440 F. Supp. 3d 447, 461 (D. Md. 2020)); *see also Brown*, 2021 WL 6064009 at *17 (rejecting Google's arguments as to *Cottle* and restating *Calhoun* holding that personal information is property); *Klein v. Facebook, Inc.*, No. 20-CV-08570, 2022 WL 141561, at *29 (N.D. Cal. Jan. 14, 2022) (agreeing with *Calhoun* and *Brown* that personal information is property). Accordingly, the outlier views in *Cottle* and *Hart* do not warrant reconsideration of this Court's prior ruling.[10] To the contrary, Judge Koh was correct the first, second, and third times that she rejected Google's argument.

Here, the proper measure of UCL damages is the Google Screenwise payment amount or other similar market measures. Under the UCL, a plaintiff may recover "those measurable amounts which are wrongfully taken by means of an unfair business practice." *Day v. AT&T, Corp.*, 63 Cal.App.4th 325, 338 (1998). As explained in *Brown*, economic injury under the UCL is established where the plaintiffs "(1) surrender[s] in a transaction more … than he or she otherwise would have; (2) has[s] a present … property interest diminished; [or] (3) be deprived of money or property to which he or she has a cognizable claim[.]" *Brown*, 2021 WL 6064009 at *15. The "more" here is the additional personal information that Google did not bargain for in the contract, the fair market value of which is established by Google itself via the Screenwise program and the property interest from which Plaintiffs were deprived is the right to control the personal information.

## B.   DR. MANGUM'S PROPOSED METHODOLOGY APPLIES TO ALL PUTATIVE CLASS MEMBERS

Google challenges Dr. Mangum's opinions on the basis that his assumption of class-wide injury is unsupported and unsound. Mot. at 21. According to Google, "millions of users who are encompassed by Plaintiffs' broadly-defined class may not have been injured for numerous reasons."

---

[10] Both cases are also factually distinguishable. *First*, *Hart* and *Cottle* involve a much less pervasive data collection than what Google has committed (and continues to commit) in this case. *See Hart,* 526 F. Supp. 3d at 596-97 (collection of geolocation data); *Cottle*, 536 F. Supp. 3d at 470-71 (collection of bank login credentials) *compare* FAC ¶¶ 1-13 (collection of Chrome user information, including browsing history relating to sensitive categories of information of sexual orientation, medical history, political affiliation, and religion, identifiers, IP address, User-Agent, contents of communication, which, in turn, is associated, aggregated, and inferred to form extensive user Profiles for advertising). *Second*, unlike the instant action, neither the *Hart* nor *Cottle* plaintiffs alleged the existence of a private market for the type of data collected by defendants. *Cf.* FAC ¶¶ 197-261 (alleging Google's valuation and profiting from personal information collected from Not Synced users and Profiles).

*Id.* Google identifies five such reasons, each of which rest on Google's mischaracterizations of fact and disregard for contrary evidence in the record. At its core, these are not legitimate attacks on Dr. Mangum's methodology, but improper attempts to obtain merits determinations. A *Daubert* Motion is not the proper vehicle for resolution of these factual disputes. *See DSU Med. Corp.*, 296 F. Supp. 2d at 1147.

Dr. Mangum's assumption of class-wide injury is grounded in supporting expert testimony from Plaintiffs' experts, Google's experts, and Google's own internal documentation and admissions. It is also consistent with Plaintiffs' proposed class definition and theory of liability.[11]   At best, Google's attacks go to the weight of the evidence, not its admissibility. *See Wolfe v. C.R. Bard*, No. 2:19-cv-07768, 2021 WL 2980222, at *3 (C.D. Cal. Mar. 31, 2021) (cautioning that "'a district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to the jury'") (quoting *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 814 (9th Cir. 2014)). Further, even if "some class members' claims will fail on the merits if and when damages are decided" that is "generally irrelevant to the district court's decision on class certification." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 823 (7th Cir. 2012); *see also Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 452 (2016) (endorsing propriety of certification "even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members") (citation omitted); *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1131 (9th Cir. 2017) (Rule 23 "specifically contemplates the need for such individualized claim determinations after a finding of liability") (citing Fed. R. Civ. 23(b)(3) advisory committee's note to 1966 amendment).

**Class Members Did Not Consent to Google's Conduct**: Google argues that Dr. Mangum's methodology fails to account for putative class members who consented (implicitly or explicitly) to the collection of the data and are thus "uninjured class members." *Id.* at 14. But this "consent" argument is a mischaracterization of Plaintiffs' proposed class and theory of liability. The proposed

---

[11] Strikingly, Google's economic expert did not read or examine the opinions of Plaintiffs' technical experts or consider Google's internal documents, even when Dr. Mangum relied on and cited to them. *See* Strombom Dep. at 70:3-71:15, 133:23-135; Strombom Rpt., App'x B (materials relied upon).

Class of Not Synced Chrome Users are *all injured* class members, *e.g.,* by virtue of *not* syncing they did not consent to Chrome's transmission of their personal information to Google. While Google may dispute the legal issue of consent, and indeed, extensive briefings are currently before the Court on this very issue, the fact remains that Plaintiffs' theory of the case asserts liability by Google to all Not Synced Chrome Users.[12] Dr. Mangum's methodology properly looks to that proposed Class. Indeed, the phrase "uninjured class members" is not applicable here. Google cannot reframe Plaintiffs' case, and it cannot make an end-run around the pending briefings by seeking a factual determination here, on a *Daubert* motion, that its varied theories of consent are legally valid. *See DSU Med. Corp.*, 296 F. Supp. 3d at 1147.

**Google Associates Personal Information with Chrome Users' in Basic Browser Mode**: Google asserts it "would not have received 'personal information' from … purported class members … in the default 'Basic mode.'" Mot. at 14. This is not true, and yet another attempt to shoehorn a merits issue into a *Daubert* motion and make another inappropriate request for re-consideration. *See* Opp. MSJ at 3-4, 9-12; MTD Order at 15-16. The record is clear that Chrome sends IP address, User-Agent information, persistent cookies, browsing history information, X-client data headers, and device identifiers to Google when users are not synced, which includes "Basic" or Signed-Out mode. *See* § II.A. This is "personal information" as already determined by the Court and conceded by Google. *See* MTD Order at 15-16; *see also* MCC at 7 (citing to Google document for admission that "the idea that users [in Basic browser mode]…[are] not identifiable if one were to use all of the data we have available is laughable"); Ex. K, GOOG-CABR-04604487, ("personal information" includes "IP addresses, cookies, and [mobile device identifiers]").

██████████████████████████████████████████████

██████████████████████████████████████████████

                    *See, e.g.,* MSJ Opp. at 10 (quoting Google documents regarding █████████████

████████████████████████████████████████ Weaver Decl. ISO MCC at Ex. X,

663:17-664:8 (Google 30(b)(6) deponent testified that Google █████████████████

---

[12] *See, e.g.,* MCC at 3-5 (disputing consent); MCC Opp. at 5-6, 10-12 (arguing consent defense); MSJ (arguing consent defense); MSJ Opp. (disputing Google's consent defense).

1 █████████████████████████████████████████████████████████████

2 █████████████████████████████████████████████████████████████

3 ██████      MSJ Opp. at 11 (quoting Google documents regarding the ██████████████

4 █████████████████████████████████████████████████████████████

5 █████████████████████████████████████████████████████████████

6 ██████      Ex. L, GOOG-CABR-04695653 at -657, (explaining that Google's ████████

7 █████████████████████████████████████████████████████████████

8 Thus, Google's assertion that it does not "associate" personal information with users in Basic Browser

9 Mode is contradicted by the evidence adduced thus far, and Google's correlating proposition that

10 Plaintiffs' expert should be excluded based on this misstatement of fact has no support in law or fact.

11 **Options to Limit Data Collection Do Not Stop the Transmission of Personal Information**

12 **from Chrome to Google**: Google contends that "Chrome users had myriad options to limit the

13 amount and type of data that Google received from their browsing" (e.g., mitigation defense) and that

14 "[t]hese controls may have protected users from sustaining any alleged economic harm." Mot. at 15.

15 According to Google, Dr. Mangum should have considered this subset of people and assessed how

16 each of them felt about their data being collected to boot. But Google misstates the facts: it is not

17 possible for users who do not sync to prevent Chrome from sending personal information to Google,

18 even using cookie browsers or other methods. As explained by Professor Shafiq, Google's ubiquitous

19 presence on the Internet makes it "practically impossible" for a typical Chrome user to avoid third-

20 party network transmissions to Google-owned domains. Shafiq Rpt. ¶ 16. Each of the items

21 enumerated in support of Google's mitigation defense (Mot. at 15) have been debunked by both

22 Plaintiffs' *and Google's* experts.

23 *First*, turning off Ads Personalization does not prevent all transmissions of a Chrome user's

24 personal information from Chrome to Google. *See* Weaver Decl. ISO Reply MCC Ex. FFF, Rebuttal

25 Report of Pls' Technical Expert Richard Smith ("Smith Rebuttal Rpt.") ¶¶ 113-135.

26 *Second*, blocking all cookies effectively breaks the browser (making it impossible to remain

27 signed-in to websites) (*see* Smith Rebuttal Rpt. ¶¶ 32-36) and third-party cookie blockers do not work

28 because Chrome sends personal information to Google other than cookies, and Google engages in

link-decoration to circumvent such blocks by causing Chrome to send its own Google Analytics cookie identifiers to Google Analytics, Doubleclick, and Google.com anyway. *See* Ex. D, Deposition of Alexei Svitkine, at 301:20-302:1 (X-client data header is not blocked by a third-party cookie blocker); Smith Rpt. ¶¶ 68-73 (transmissions of tracking pixels), ¶¶ 74-76 (IP addresses), ¶¶ 77-83 (Google's Cookie-Synching on Chrome is workaround to third-party cookie blockers), and ¶¶ 84-89 (no method to stop transmission of X-client data header); *see also*, Ex. M, GOOG-CABR-04263403,

███████████████████████████████████████████████████████████████

*Third*, ad blockers do not work to stop all transmissions. *See* Smith Rebuttal Rpt. ¶¶ 58-70. Even when default settings were adjusted to give Chrome an advantage in testing (*see* Zervas Rpt. ¶ 46; Smith Rebuttal Rpt. ¶ 63) the biased test results still showed that ad blockers did not block all transmissions at issue (*see, e.g.*, Ex. F, Deposition of Google's Technical Expert Georgios Zervas ("Zervas Dep."), at 199:2-21 (agreeing that even under the settings used AdBlock Plus "would [not] block transmissions to Google"); Smith Rebuttal Rpt. ¶ 63);[13]

*Fourth*, according to Google, only 0.01 percent of users disable Javascript—and, even so, disabling Javascript makes it impossible to use many websites, including Gmail and Google.com. *See* Smith Rebuttal Rpt. ¶¶ 38-44. Even for those who do disable Javascript, Google's technical expert agrees that it does not even prevent all transmissions of at issue data from Chrome to Google. *See, e.g.*, Zervas Dep. at 126:14-22, 127:11-16 (acknowledging that disabling JavaScript does not prevent all transmissions of personal information, *e.g.,* tracking cookies, from Chrome to Google); Smith Rebuttal Rpt. ¶¶ 45-48.

*Fifth*, the Network Advertising Initiative's personalized advertising opt-out does not prevent at-issue transmissions from being sent from Chrome to Google, and, in fact, requires cookies to be enabled to work. *See* Smith Rebuttal Rpt. ¶¶ 124-130.

*Finally*, in the event that any particular blocker actually stopped the transmissions from occurring, Professor Shafiq has explained how Google's systems can be used to determine precisely

---

[13] Even the "experiment" that Google's economic expert, Dr. Strombom, attempted to run (far beyond his expertise) proved that a Google tracking cookie, DSID, was not turned off by AdBlocker. *See* Strombom Dep. at 153:17-154:7, 157:11-160:5.

how much information Google has in its possession for each class member that was sent from Chrome to Google while the user was in a not synced state. *See* Shafiq Rpt. § V (discussing identification of Class Members); Shafiq Rebuttal Rpt. ¶¶ 165-175 (discussing existing Google systems that can link Class Members to the personal information that Google collected on them). Thus, Google's own systems can be used to eliminate any purported uninjured class members from the class.

**Plaintiffs Did Not Derive Benefit From Google's Unlawful Taking of Their Personal Information**: Google asserts, with no economic data supporting the argument, that "the value some class members may have derived from personalized advertising may outweigh the purported value of the data alleged to be improperly taken or the benefit of any such to Google[.]" Mot. at 15. Of course, if Google did provide data, Dr. Mangum could account for it in his methodology. Nor is there any legal support for the proposition that if a victim of a theft derives alleged "benefit" from the unlawful taking they are precluded from seeking relief. The argument defies reason and runs contrary to California law, which recognizes that a damages calculation for unjust enrichment "need not account for benefits received after purchase because the focus is on the value of the service at the time of purchase." *Pulaski*, 802 F.3d at 989. Google's argument is also inconsistent with Art. I, section 1 of the California Constitution, the "principal focus" of which is to prevent "business conduct in collecting and stockpiling unnecessary information … and misusing information gathered for one purpose in order to serve other purposes," such as creating "computer stored and generated 'dossiers' and 'cradle-to-grave profiles on every American.'" *Hill v. NCAA*, 7 Cal.4th 1, 21 (Cal. 1994). Google's argument here is to say that the California Privacy Amendment means nothing if a business claims its tracking and creation of a cradle-to-grave profile without consent was good for the victim. Here, the record is clear that Plaintiffs did not obtain benefit from "personalized advertising." Rather, Plaintiffs found the concept of "personalized advertising" to be "annoying" and "creepy." *See, e.g.*, MCC at 11 (citing Plaintiff Crespo's Declaration at ¶ 5, describing Google's misconduct as "annoying and creepy"); Weaver Decl. ISO MCC at Ex. H (declaration of Plaintiff Kindler at ¶ 7, stating the conduct was "creepy").

### C.   DR. MANGUM PRESENTS A RELIABLE METHODOLOGY TO CALCULATE RESTITUTION DAMAGES

In calculating restitution damages, California law "requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation." *Pulaski,* 802 F.3d at 989. "The fact that the amount of damage may not be susceptible of exact proof or may be uncertain, contingent or difficult of ascertainment does not bar recovery." *Marsu B.V. v. Walt Disney Co*., 185 F.3d 939, 939 (9th Cir. 1999). "Where a defendant has wrongfully obtained a plaintiff's property, 'the measure of recovery for the benefit received … is the value of the property at the time of its improper acquisition … or a higher value if this is required to avoid injustice where the property has changed in value.'" *Pulaski*, 802 F.3d at 988-89.

#### 1.   Dr. Mangum's Methodology for Restitution Can Fairly Compensate Class Members

Google argues that Dr. Mangum's proposal to rely on a conjoint analysis proposal is flawed because it "does not identify which product (s), attributes, or levels he plans to include[.]" Mot. at 16. However, as Dr. Mangum explains:

> A conjoint analysis may not be necessary when the product or service at issue is, in and of itself, the subject of market transactions. In such cases, an economist does not need to engage in alternative mechanisms and consider indirect evidence, such as conjoint analysis, to measure the value. Instead, an economist may look to the price of the product in the real-world (i.e. direct evidence). The Mangum Report discusses both the consideration of such direct and indirect evidence.

Mangum Rebuttal Rpt. ¶ 74. Here, the need for a conjoint analysis has been mooted by discovery. The Google Screenwise program establishes that Google has set "the 'market rate' and 'fair market value' of collecting browsing history information with the same identifiers at-issue in this case" at "$20 per month." Mangum Rebuttal Rpt. ¶ 79.[14]

Next, Google argues that a single restitution number cannot fairly compensate each Class Member because: (1) users value personal information differently; and (2) there is significant variability in whether, and if so, how much personal information Google collects from a particular

---

[14] Despite the fact that Dr. Mangum referenced Screenwise in his opening report, Google's expert, Dr. Strombom, failed to consider Screenwise or even to investigate whether Google had any internal practices or market valuation of the personal information at issue. Dr. Strombom admitted that he did not know about Screenwise, and he did not even inquire of Google whether it "ever pays users for their data like the data at issue in this case." Strombom Dep. at 133:23-25; 134:12-21.

class member. Dr. Mangum explains why both critiques are incorrect.

The critique that Dr. Mangum cannot identify users' personal feelings about privacy is not relevant to economic damages arising primarily from a breach of contractual promises. Plaintiffs have not made a claim here for mental anguish – and no class members' personal feelings about the value of their data is relevant to its actual market value.  Rather, their injury arises from expectations set by Google in the terms of service and policies it wrote. Dr. Mangum explains:

> [A]ny individual variations in 'value' that [users] place on privacy is not relevant where there is a direct market price for the item in question. For example, for sentimental reasons, the owner of a family home may place a different 'value' on their own home than the market would bear. But the fair market value of the home is the amount that would result from an arms-length sale on the open market. It is no different with the Internet browsing history information and identifiers at issue in this case. Regardless of any specific user's feelings about privacy and the value of such data, the economic value of the data can be determined by reference to specific marketplace transactions.

Mangum Rebuttal Rpt. ¶ 75. Google's reliance on *Opperman v. Path* is misplaced. In *Opperman*, the data at issue were user address books. *Opperman v. Path*, No. 13-cv-00453, 2016 WL 3844326, at *1 (N.D. Cal. Jul 15, 2016). Plaintiffs are not aware of any market for such information, and the *Opperman* Plaintiffs did not present any such evidence.[15] Here, however, Dr. Mangum's Report identifies Screenwise and other programs as establishing fair market values for the personal information at issue in this case. Mangum Rpt. ¶¶ 89-95; Mangum Rebuttal Rpt. § 11.C.2..

With respect to Google's argument on variability of amount and type of data collected, this can quickly be disposed of by Google's recent production of documents, which show that Google's existing systems can identify revenue on a per user basis, thus accounting for any purported variations. Google maintains a database called ████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████ including Google Ads and YouTube. *See* Ex. N, GOOG-CALH-00700912. ████████████████████████████████ ██████████████████████ Professor Shafiq has explained how Google can write a computer program to calculate unjust enrichment for each class member using the same systems Google uses

---

[15] Plaintiffs note that the Court certified an intrusion upon seclusion class in *Opperman*.

1  to serve ████████████████ and take credit for it with advertisers. *See* Shafiq Rebuttal

2  Rpt. ¶¶ 189-194. Further, even in the absence of revenue information, Professor Shafiq explains how

3  Google can use its ad-serving technology to identify class members and how much information it has

4  in its possession for each class member as a result of Chrome sending personal information to Google

5  while they were not synced. *Id.* at ¶¶ 157-188.

6             **2.      Dr. Mangum's Methodology Fits Plaintiffs' Theory of Liability**

7             Plaintiffs' theory of the case is simple: (1) Chrome promised users (among other things) that

8  it would not send their browsing history information and other personal information to Google unless

9  they enabled sync, and (2) Chrome broke that promise by sending user personal information from the

10  user's personal computing device to Google regardless of whether the user enabled sync. For their

11  economic damages model, Plaintiffs seek (1) return of the fair market value of the additional personal

12  information that Chrome sent to Google from their devices without their authorization; and (2) return

13  of excess profits that Google received as a result of its misconduct—which is exactly what Dr.

14  Mangum's Report captures.

15            In the absence of any analysis, Google argues that Dr. Mangum's approach does not match

16  the theory of the case. Google asserts that the Hann and Krasnova surveys are not an accurate model.

17  But Hann and Krasnova support Dr. Mangum's conclusion that "surveys can be utilized for the

18  valuation of personal information protection." Mangum Rebuttal Rpt. ¶ 19. Google next argues that

19  VPN payments are not reliable and Dr. Mangum admitted that VPN payments are "not a perfect fit"

20  for "the value of the information." Mot. at 19. Yet, this is a strawman argument. Dr. Mangum does

21  not offer VPN payments as the market value of the data at issue, but instead to show that "consumers

22  are willing to make payments to protect their personal information" and VPNs "provide real market

23  examples of willingness to pay for privacy." Mangum Rebuttal Rpt. ¶ 19.

24            Finally, Google argues that "[t]he amount research companies pay users for certain data" is a

25  "mismatch between the information Dr. Mangum attempts to value and the data at issue in this

26  case[.]" Mot. at 19. But Google ignores Screenwise, its own program through which it pays

27  consumers for the right to track their Internet behavior (including ads behaviors) using Chrome itself

28

and the very same identifiers at issue in this case: Gaia, Zwieback, Biscotti, IDFA, and RDID. *See* Shafiq Rebuttal Rpt. ¶¶ 195-197; Ex. J, GOOG-CABR-04704597, at -615 and -635.

Google attempts to distinguish Screenwise by claiming that it involves name and email address. But this ignores that Google also tracks users by ████████████████ and that, in Plaintiffs' liability case, Google links ████████████████████████████████ ████████ To the extent Google argues that Screenwise paid for something different, that is an issue that goes to the weight of the evidence, not its admissibility. The Reference Manual on Scientific Evidence (Third) explains that Dr. Mangum's approach is common:

> An expert can sometimes measure damages as of the time of wrongdoing directly from market prices or values. For example, if the defendant's negligence caused the total destruction of the plaintiff's cargo of wheat, worth $17 million at the current market price, damages are simply that amount. The only task for the expert is to restate the damages as the economic equivalent at the tie of trial[.] …In many cases, the expert does not take a market price and apply it directly. The price of the product or an object at issue may not itself be known from a market, but the expert can approximate the market value from the prices of similar products or objects.

Reference Manual on Scientific Evidence: Third Edition (2011) at 444-45. Dr. Mangum's fair market value approach to the personal information at issue in this case is nothing more than a simple appraisal method of calculating economic damages.

Further, the Supreme Court has acknowledged that there are many kinds of expertise for which "the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire Co., Ltd.*, 526 U.S. at 150   (citing "land valuation" and "attorney's fee valuation" as examples). In the case of property appraisals, concerns about comparable properties chosen and "whether [the expert] gathered enough information about other properties that he considered—are potentially valid, but go to weight rather than admissibility. The jury is capable of understanding and assessing both sides' arguments on these points." *Richards v. Dept. of Building Insp. of City and County of San Francisco*, No. 20-cv-01242, 2021 WL 5415254, at *17 (N.D. Cal. Nov. 19, 2021). Likewise, in patent litigation involving calculations of the fair market value for intellectual property, it is well-established that, when the market value of a different license is used as a comparison, "the fact that a license is not perfectly analogous generally goes to the weight of

the evidence, not its admissibility." *Ericcson, Inc. v. D-Link Systems, Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014); *see also Contour IP Holding, LLC v. GoPro, Inc.*, No. 3:17-cv-04738, 2020 WL 5106845, at *9 (N.D. Cal. Aug. 31, 2020) (Orrick, J.); *Opticurrent, LLC v. Power Integrations, LLC*, No. 17-cv-03597, 2019 WL 2389150, at *13 (N.D. Cal. Jun. 5, 2019) (Chen, J.); *Open Text S.A. v. Box, Inc.*, No. 13–cv–04910, 2015 WL 349197, at *4 (N.D. Cal. Jan. 23, 2015) (Donato, J.).

It is no different here. Evidence produced by Google demonstrates that Google Screenwise is a near perfect match to assess the fair market value of the personal information that Chrome sent from class members' devices to Google's servers without authorization. Google challenges go only to the weight of such evidence, not its admissibility.

### D.    DR. MANGUM PRESENTS A RELIABLE METHODOLOGY TO CALCULATE EXCESS PROFITS FOR DISGORGEMENT DAMAGES

Google next argues that Mangum's formula for calculating Google's total profit premium from Chrome sending not synced user personal information to Google without authorization is unreliable and leads to an "inflated damages estimate." Mot. at 20. But Google ignores that late-produced evidence demonstrates that Mangum's model is substantially similar to how Google calculated the exact same item: how much revenue Google would lose if it lost access to personal information of Chrome users. *See* Mangum Rebuttal Rpt. §§ II.A.2, II.A.3.

As an initial matter, Google's general criticism of Dr. Mangum's per user, per month proposal is misplaced. This calculation is sufficient for certification of a class with restitution damages. *See Pulaski,* 802 F.3d 979. Google challenges Dr. Mangum's unjust enrichment methodology on the basis that his allocation proposal would (1) apportion no damages to Class Members who did not have a Google Account, and (2) that the approach does not account for "wide differences" in what Google obtained from *each* class member.[16] As discussed above, Google's argument on variability of amount and type of data collected is misplaced because Google has existing systems that can identify revenue and personal information on a per user basis, thus accounting for the purported variations. This,

---

[16] Google also references the report of its expert, Bruce Strombom, to assert that Dr. Mangum's unjust enrichment proposal makes a number of "faulty assumptions." Mot. at 20 (citing Strombom Report § IV.C). But Dr. Strombom's critiques do not go to Dr. Mangum's methodologies, but rather, are based on skewed, if not entirely, inaccurate interpretation of the facts. Thus, the challenges go to weight, not admissibility.

1    coupled with Google's existing identifiers that distinguish between Google Account holders and

2    Signed-Out Chrome Users (and, by process of deduction and elimination, non-Google Account

3    holders), will enable Plaintiffs to refine the already appropriate theory of allocation provided by Dr.

4    Mangum. *See* Shafiq Rpt. ¶¶ 78-82 (identifying three approaches to identify Class Members); *see*

5    Shafiq Rebuttal Rpt. ¶¶ 157-164 (confirming that proposed methodologies would identify non-

6    Google Account Holders).

7         Further, at the time Dr. Mangum submitted his initial report, Google maintained that it did not

8    track revenues on an individual user basis in any of its databases. In its Opposition to Class

9    Certification, Google doubled down on the claim, submitting the Declaration of George Levitte

10   claiming that "Google does not calculate advertising *profits* on a per-individual-user basis" and that

11   it "would be impossible to calculate Google's advertising *profits* for each Putative Class Member."

12   Dkt. 430-15, Declaration of George Levitte in Support of Google's Opp. to Class Cert., ¶ 5. The

13   Levitte Declaration is misleading. While it may be true that Google does not track or calculate

14   advertising *profits* on an individual user basis,  Google maintains logs where it does track revenue on

15   an individual user basis. *See* Shafiq Rebuttal Rpt. ¶¶ 176-188. Professor Shafiq's Rebuttal Report

16   explains how these, and other revenue logs, can be used together with Google's back-end systems to

17   apportion damages via automated computer program according to how much personal information

18   data Chrome sent and/or how much revenue Google earned from such class member. *See* Shafiq

19   Rebuttal Rpt. ¶¶ 165-194.

20        Finally, as applied to the facts of this case, Google's attempt to impose on Plaintiffs the burden

21   of disaggregating Google's wrongful from its rightful profits is contrary to black letter law on unjust

22   enrichment and restitution. In calculating such damages, "California law requires only that some

23   reasonable basis of computation be used, and the damages may be computed even if the result reached

24   is an approximation." *Pulaski*, 802 F.3d at 989 (9th Cir. 2015). "In measuring the amount of the

25   defendant's unjust enrichment, the plaintiff may present evidence of the total or gross amount of the

26   benefit, or a reasonable approximation thereof, and then the defendant may present evidence of costs,

27   expenses, and other deductions to show the actual or net benefit the defendant received." *Meister v.*

28   *Mensinger*, 230 Cal.App.4th 381, 399 (2014). Upon "producing evidence permitting at least a

reasonable approximation of the wrongful gain," the "[r]esidual risk of uncertainty in calculating net profits is assigned to the defendant." *Id*. (citing *Uzyel v. Kadisha*, 188 Cal. App.4th 866, 894 (2010)); *see also* Restatement (Third) of Restitution and Unjust Enrichment § 51(5)(d).

Perhaps even more salient, where a defendant has commingled unauthorized property or profits with lawfully obtained property or profits, the burden is on the defendant to disentangle the two. In such cases, the "burden of loss … shall rest upon the wrongdoer, who has so confused his own with that of another that neither can be distinguished" and "[t]he proper remedy" is that "all the inconvenience of the confusion is thrown upon the party who produced it, and it is for him to distinguish his own property or lose it." *Westinghouse Elec. and Manuf. Co. v. Wagner Elec. and Manuf. Co*., 225 U.S. 604, 621 (1912). California courts have applied this rule across different areas of law for more than a century and into modern times. *See Lightner Mining Co. v. Lane*, 161 Cal. 689, 708 (1911); *Brainard v. Cohn*, 8 F.2d 13 (9th Cir. 1925); *Micro Lithography Inc. v. Inko Indus. Inc.*, No. H006294, 1991 WL 332053 (Cal. App. 1991); *People v. Prosser*, 157 Cal. App.4th 682 (2007).

Regardless of the evidence now in Google's possession, Professor Shafiq has identified methods to distinguish between the information that was wrongfully sent from Chrome to Google versus that which was not. *See* Shafiq Rebuttal Rpt. ¶¶ 164-195. In addition, both he and Mr. Smith have submitted evidence that it would have been easy for Google to create a not synced signal at any time before or during this litigation to easily distinguish between synced versus not synced communications in its possession. *See* Shafiq Rpt. § V; Shafiq Rebuttal Rpt. ¶¶ 191-194; Smith Rpt. § XIV. Having failed to do so, Google cannot now force Plaintiffs to do the work Google should have done at the outset. The law, in fact, requires the opposite. Plaintiffs are confident that, given Google's proven abilities to categorize and analyze data, it will have no problem coming up with its own disaggregation plan upon being ordered to do so by this Court.

## V.   **CONCLUSION**

For the reasons stated above, Plaintiffs respectfully request that the Court deny Google's motion to strike the expert report of Russell Mangum, III, Ph.D.

1    Respectfully submitted this 16th Day of February 2022.

2    **BLEICHMAR FONTI & AULD LLP**          **DICELLO LEVITT GUTZLER LLC**

3    */s/ Lesley Weaver*                      */s/ David Straite*

4    Lesley Weaver (Cal. Bar No.191305)       David A. Straite (admitted *pro hac vice*)
     Angelica M. Ornelas (Cal. Bar No. 285929) One Grand Central Place
5    Joshua D. Samra (Cal. Bar No. 313050)    60 East 42nd Street, Suite 2400
     555 12th Street, Suite 1600              New York, New York 10165
6    Oakland, CA 94607                        Tel.: (646) 933-1000
     Tel.: (415) 445-4003                     *dstraite@dicellolevitt.com*
7    Fax: (415) 445-4020

8    *lweaver@bfalaw.com*                      Amy E. Keller (admitted *pro hac vice*)
     *aornelas@bfalaw.com*                     Adam Prom (admitted *pro hac vice*)
9    *jsamra@bfalaw.com*                       Sharon Cruz (admitted *pro hac vice*)
                                               Ten North Dearborn Street, 6th Fl.
10   **SIMMONS HANLY CONROY LLC**             Chicago, Illinois 60602
                                               Tel.: (312) 214-7900
11   */s/ Jay Ba*                             *akeller@dicellolevitt.com*

12   Jason 'Jay' Barnes (admitted *pro hac vice*)  *aprom@dicellolevitt.com*
     An Truong (admitted *pro hac vice*)      *scruz@dicellolevitt.com*
13   Eric Johnson (admitted *pro hac vice*)
     112 Madison Avenue, 7th Floor
14   New York, NY 10016
     Tel.: (212) 784-6400
15   Fax: (212) 213-5949

16   *jaybarnes@simmonsfirm.com*
     *atruong@simmonsfirm.com*
17   *ejohnson@simmonsfirm.com*

18   *Counsel for Plaintiffs*

19

20

21

22

23

24

25

26

27

28

## <u>ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(h)(3)</u>

I hereby attest that concurrence in the filing of this document has been obtained from the other signatories. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 16th day of February 2022, at Jefferson City, Missouri.

<u>/s/ Jay Barnes</u>
Jay Barnes
Simmons Hanly Conroy

*Counsel for Plaintiffs*

1

## <u>CERTIFICATE OF SERVICE</u>

2      I hereby certify that on February 16, 2022, I caused the foregoing document to be

3  electronically filed with the Clerk of the Court using the Court's CM/ECF system, which will send a

4  notice of electronic filing to all CM/ECF participants.

5      Executed this 16th day of February, 2022, at Jefferson City, Missouri.

6

7                                              <u>*/s/ Jay Barnes*</u>
                                                Jay Barnes
                                                Simmons Hanly Conroy

8
                                                *Counsel for Plaintiffs*
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

**REDACTED VERSION OF
DOCUMENT SOUGHT TO BE SEALED**

```
 1                UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3                     SAN JOSE DIVISION

 4

 5    PATRICK CALHOUN, ET AL., ON

 6    BEHALF OF THEMSELVES AND ALL

 7    OTHERS SIMILARLY SITUATED,

 8          PLAINTIFFS,

 9       vs.                      NO. 5:20-CV-05146-LHK-SVK

10    GOOGLE LLC,

11          DEFENDANT.

12    _____/

13

14                      *CONFIDENTIAL*

15        VIDEOTAPED DEPOSITION OF SAM HEFT-LUTHY

16         *VIA REMOTE COUNSEL VIDEOCONFERENCE*

17            MONDAY, DECEMBER 20, 2021

18                      VOLUME I

19

20

21

22    STENOGRAPHICALLY REPORTED BY:

23    MEGAN F. ALVAREZ, RPR, CSR No. 12470

24    JOB NO. 4974193

25    PAGES 1 - 331
```

CONFIDENTIAL

| | |
|---|---|
| 1      UNITED STATES DISTRICT COURT | 1  APPEARANCES:  (CONTINUED) |
| 2      NORTHERN DISTRICT OF CALIFORNIA | 2 |
| 3      SAN JOSE DIVISION | 3  FOR DEFENDANTS: |
| 4 | 4      BY:  CARL SPILLY, ESQ. |
| 5  PATRICK CALHOUN, ET AL., ON | 5          JOMAIRE CRAWFORD, ESQ. |
| 6  BEHALF OF THEMSELVES AND ALL | 6      QUINN EMANUEL URQUHART & SULLIVAN LLP |
| 7  OTHERS SIMILARLY SITUATED, | 7      51 MADISON AVENUE, 22ND FLOOR |
| 8          PLAINTIFFS, | 8      NEW YORK, NEW YORK 10010 |
| 9      vs.          NO. 5:20-CV-05146-LHK-SVK | 9      212.849.7000 |
| 10  GOOGLE LLC, | 10      JOMAIRECRAWFORD@QUINNEMANUEL.COM |
| 11          DEFENDANT. | 11      CARLSPILLY@QUINNEMANUEL.COM |
| 12  _____/ | 12 |
| 13 | 13  ALSO PRESENT: |
| 14 | 14      TONI BAKER, GOOGLE IN-HOUSE COUNSEL |
| 15 | 15 |
| 16      Videotaped Videoconference Deposition of | 16  THE VIDEO OPERATOR: |
| 17  SAM HEFT-LUTHY, Volume I, taken on behalf of Plaintiffs, | 17      DAVID WEST, VERITEXT |
| 18  VIA REMOTE COUNSEL.  Deponent testifying from | 18 |
| 19  San Francisco, California, beginning at 9:06 a.m. and | 19 |
| 20  ending at 6:35 p.m. on Monday, December 20, 2021, before | 20 |
| 21  Megan F. Alvarez, RPR, Certified Shorthand Reporter | 21 |
| 22  No. 12470. | 22 |
| 23 | 23 |
| 24 | 24 |
| 25 | 25 |
| Page 2 | Page 4 |

| | |
|---|---|
| 1  APPEARANCES: (ALL PARTIES APPEARING VIA VIDEOCONFERENCE) | 1          INDEX |
| 2 | 2  WITNESS                    EXAMINATION |
| 3  FOR PLAINTIFFS: | 3  SAM HEFT-LUTHY |
| 4      BY:  JASON "JAY" BARNES, ESQ | 4  VOLUME I |
| 5          AN V  TRUONG, ESQ | 5      BY MR. BARNES            21 |
| 6      SIMMONS HANLY CONROY | 6 |
| 7      ONE COURT STREET | 7          --o0o-- |
| 8      ALTON, ILLINOIS 62002 | 8 |
| 9      618 693 3104 | 9 |
| 10      JAYBARNES@SIMMONSFIRM COM | 10 |
| 11  AND | 11 |
| 12      BY:  LESLEY WEAVER, ESQ | 12 |
| 13      BLEICHMAR FONTI & AULD LLP | 13 |
| 14      555 12TH STREET, SUITE 1600 | 14 |
| 15      OAKLAND, CALIFORNIA 94607 | 15 |
| 16      415 445 4003 | 16 |
| 17      LWEAVER@BFALAW COM | 17 |
| 18  AND | 18 |
| 19      BY:  DAVID A  STRAITE, ESQ | 19 |
| 20      DICELLO LEVITT GUTZLER | 20 |
| 21      ONE GRAND CENTRAL PLACE | 21 |
| 22      60 EAST 42ND STREET, SUITE 2400 | 22 |
| 23      NEW YORK, NEW YORK 10165 | 23 |
| 24      646 933 1000 | 24 |
| 25      DSTRAITE@DICELLOLEVITT COM | 25 |
| Page 3 | Page 5 |

2 (Pages 2 - 5)

1 identify opportunities for improved transparency and   13:37:15
2 measurement related to some of the goals we'd set   13:37:20
3 for the project.   13:37:23
4    Q. So "sync" in the parlance of this e-mail   13:37:26
5 is just a meeting?   13:37:27
6       MR. SPILLY: Object to the form.   13:37:29
7       THE WITNESS: In Google parlance, sync   13:37:34
8 refers to a meeting of a relatively casual   13:37:37
9 character.   13:37:40
10 BY MR. BARNES:   13:37:40
11    Q. Okay. What does -- what does xPA refer   13:37:41
12 to?   13:37:44
13    A. In Google parlance, xPA is often used to   13:37:49
14 refer to cross-product area.   13:37:54
15    Q. Ah-hah. Thank you for that.   13:37:57
16       Can we go to the third page of this,   13:37:58
17 please?   13:38:01
18       MR. BARNES: And, Ms. Truong, if you could   13:38:02
19 show this on the screen.   13:38:04
20 BY MR. BARNES:   13:38:05
21    Q. Were you responsible for notes that went   13:38:05
22 out to the -- relating to the ███████ xPA Sync?   13:38:12
23       MR. SPILLY: Objection. Vague.   13:38:18
24       THE WITNESS: Define "responsible" here.   13:38:19
25 ///
                                        Page 166

1 BY MR. BARNES:   13:38:21
2    Q. Well, let me ask this: Who is   13:38:22
3 Raquel Ruiz?   13:38:26
4    A. Raquel Ruiz is a program manager who was a   13:38:31
5 partner of mine on the project.   13:38:34
6    Q. Okay. And what exactly is Exhibit 14?   13:38:39
7       MR. SPILLY: Objection. Form. Vague.   13:38:46
8       THE WITNESS: I can speak to some of the   13:38:54
9 formatting clues here. Like I said, I haven't -- I   13:38:57
10 didn't produce these documents, so it's hard for me   13:38:59
11 to speculate in detail.   13:39:02
12 BY MR. BARNES:   13:39:04
13    Q. Right.   13:39:04
14       So tell me from your review of the   13:39:05
15 document what Exhibit 14 is.   13:39:08
16    A. It's delivered in a format that seems very   13:39:18
17 similar to recreation of a e-mail thread. There is   13:39:22
18 "From," "Sent," "To" at the top and subject line   13:39:26
19 with content below.   13:39:30
20    Q. Does anyone else have access to your   13:39:32
21 e-mail account?   13:39:34
22       MR. SPILLY: Objection. Vague.   13:39:36
23 BY MR. BARNES:   13:39:38
24    Q. At Google.   13:39:39
25    A. Define what you mean by "access."   13:39:40
                                        Page 167

1    Q. When this says it's to   13:39:44
2 heftluthy@google com, are you heftluthy@google com?   13:39:47
3    A. That is my internal e-mail address, yes   13:39:53
4    Q. Okay And are these types of e-mails sent   13:39:56
5 amongst various teams relating to projects,   13:40:03
6 Mr Heft-Luthy?   13:40:07
7       MR. SPILLY: Object to the form   13:40:11
8       THE WITNESS: I'm not sure what you mean   13:40:15
9 by "these types of e-mails "   13:40:17
10       Can you be -- can you be more specific   13:40:19
11 about --   13:40:21
12 BY MR BARNES   13:40:21
13    Q Is this e-mail a summary of a meeting that   13:40:22
14 was held on June 8, 2021?   13:40:24
15       MR SPILLY Objection Foundation   13:40:31
16       THE WITNESS: As said before, I can't   13:40:38
17 speculate to the content of this document and what   13:40:40
18 it does or doesn't refer to   13:40:44
19       As I said before, it is in the format of a   13:40:48
20 reproduction of an e-mail   13:40:51
21 BY MR BARNES   13:40:52
22    Q Mr Heft-Luthy, I'm sorry, you do   13:40:53
23 understand you are under oath, right?   13:40:56
24       MR SPILLY: Objection Argumentative   13:41:01
25       THE WITNESS: Yes   13:41:03
                                        Page 168

1 BY MR. BARNES:   13:41:03
2    Q. Do you understand you're under oath?   13:41:03
3       And when you rose your hand, you promised   13:41:06
4 to tell the truth, the whole truth, and nothing but   13:41:09
5 the truth.   13:41:12
6       Do you recall that?   13:41:12
7       MR. SPILLY: Same objection.   13:41:13
8       THE WITNESS: Yes, I do recall that.   13:41:14
9 BY MR. BARNES:   13:41:16
10    Q. Do you know what "the whole truth" part of   13:41:16
11 that refers to?   13:41:18
12       MR. SPILLY: Object as argumentative.   13:41:21
13       THE WITNESS: Are you asking me to speak   13:41:27
14 on my personal understanding of the oath that I   13:41:29
15 delivered?   13:41:31
16 BY MR. BARNES:   13:41:32
17    Q. Sure. Does it -- Mr. Heft-Luthy, why --   13:41:32
18 why can't we just talk about this e-mail of the team   13:41:36
19 for which you were the product manager without   13:41:39
20 playing games about what it describes?   13:41:41
21       MR. SPILLY: Objection. Argumentative. I   13:41:46
22 think we should move on from this line of questions.   13:41:49
23 BY MR. BARNES:   13:41:52
24    Q. Mr. Heft-Luthy, you agree -- you were the   13:41:53
25 product manager on June 8, 2021, correct?   13:41:54
                                        Page 169

43 (Pages 166 - 169)

**Page 326**

```
1       MR. BARNES:  Thank you, Mr. Spilly.  Your       18:34:59
2 objection to keeping the deposition open is noted.    18:35:01
3       MR. SPILLY:  Thank you.            18:35:07
4       MR. BARNES:  Let's go off the record.      18:35:11
5       THE VIDEO OPERATOR:  Okay.  This will end    18:35:14
6 today's deposition of Sam Heft-Luthy.  The total      18:35:15
7 number of media units used in the deposition today    18:35:19
8 was 12 and will be retained by Veritext Legal         18:35:22
9 Solutions.  We are off the record at 6:35 p.m.         18:35:24
10 Pacific Time.  Thank you.               18:35:27
11       (TIME NOTED: 6:35 p.m.)
12           * * * * *
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 328**

```
1       CERTIFICATE OF REPORTER
2       I, the undersigned, a Certified Shorthand
3 Reporter of the State of California, do hereby
4 certify:
5       That the foregoing proceedings were taken
6 before me at the time and place herein set forth;
7 that any witnesses in the foregoing proceedings,
8 prior to testifying, were administered an oath; that
9 a verbatim record of the proceedings was made by me
10 using machine shorthand, which was thereafter
11 transcribed under my direction; and that the
12 foregoing is an accurate transcription thereof.
13       Further, that if the foregoing pertains to
14 the original transcript of a deposition in a federal
15 case, before completion of the proceedings, review
16 of the transcript [ ] was [X] was not requested.
17       I further certify that I am neither
18 financially interested in the action, nor a relative
19 or employee of any attorney of any party to this
20 action.
21       IN WITNESS WHEREOF, I have this date
22 subscribed my name.
23 DATED: Dec_____ 30, 2021
24
                    MEGAN F. ALVAREZ
25                  CSR No. 12470, RPR
```

**Page 327**

```
1
2
3
4
5
6       I, SAM HEFT-LUTHY, do hereby declare
7 under penalty of perjury that I have read the
8 foregoing transcript; that I have made any
9 corrections as appear noted, in ink, initialed by
10 me, or attached hereto; that my testimony as
11 contained herein, as corrected, is true and correct.
12
14
15
16      Sam Heft-Luthy
17      —3C2A6612A5EF4C7...
        SAM HEFT-LUTHY
18      1/26/2022
19
20      DATE
21      VOLUME I
22
23
24
25
```

**Page 329**

```
1 JASON "JAY" BARNES, ESQ.
2 jaybarnes@simmonsfirm.com
3       December 30, 2021
4 RE: CALHOUN VS. GOOGLE LLC
5 DECEMBER 20, 2021, SAM HEFT-LUTHY, JOB NO. 4974193
6 The above-referenced transcript has been
7 completed by Veritext Legal Solutions and
8 review of the transcript is being handled as follows:
9 __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext
10    to schedule a time to review the original transcript at
11    a Veritext office.
12 __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF
13    Transcript - The witness should review the transcript and
14    make any necessary corrections on the errata pages included
15    below, notating the page and line number of the corrections.
16    The witness should then sign and date the errata and penalty
17    of perjury pages and return the completed pages to all
18    appearing counsel within the period of time determined at
19    the deposition or provided by the Code of Civil Procedure.
20 __ Waiving the CA Code of Civil Procedure per Stipulation of
21    Counsel - Original transcript to be released for signature
22    as determined at the deposition.
23 __ Signature Waived – Reading & Signature was waived at the
24    time of the deposition.
25
```

83 (Pages 326 - 329)

# EXHIBIT B

**REDACTED VERSION OF
DOCUMENT SOUGHT TO BE SEALED**

CONFIDENTIAL

```
 1   ** C O N F I D E N T I A L **

 2   UNITED STATES DISTRICT COURT

 3   NORTHERN DISTRICT OF CALIFORNIA

 4   SAN JOSE DIVISION

 5   Case No. 5:20-cv-5146-LHK

 6   ----------------------------------x

     PATRICK CALHOUN, ELAINE CRESPO,

 7   HADIYAH JACKSON and CLAUDIA

     KINDLER, on behalf of all

 8   others similarly situated,

 9           Plaintiffs,

10

11      - against -

12

13   GOOGLE LLC,

14           Defendant.

     ----------------------------------x

15               (Caption Continued)

16               Tuesday, November 23, 2021

                 9:18 a.m.

17

18      Videotaped Deposition of ABDELKARIM

19   MARDINI, taken by Plaintiffs, pursuant to

20   Notice, held via Zoom videoconference,

21   before Todd DeSimone, a Registered

22   Professional Reporter and Notary Public of

23   the States of New York and New Jersey.

24   Job no. 4957896

25   Pages 1 -
```

Page 1

**Page 2**

```
 1  UNITED STATES DISTRICT COURT
 2  NORTHERN DISTRICT OF CALIFORNIA
 3  SAN JOSE DIVISION
 4  Case No. 5:20-cv-03664-LHK
 5  ----------------------------------x
      CHASOM BROWN, WILLIAM BYATT,
 6  JEREMY DAVIS, CHRISTOPHER
      CASTILLO and MONIQUE TRUJILLO,
 7  individually and on behalf of all
      others similarly situated,
 8
          Plaintiffs,
 9
10
      - against -
11
12
      GOOGLE LLC,
13
          Defendant.
14  ----------------------------------x
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1  A P P E A R A N C E S: (Continued)
 2  BOIES SCHILLER FLEXNER LLP
      44 Montgomery Street
 3  41st Floor
      San Francisco, California 94104
 4      Attorneys for Plaintiffs in
          Brown Case
 5  BY:  BEKO O. REBLITZ-RICHARDSON, ESQ.
          brichardson@bsfllp.com
 6      ERIKA NYBORG-BURCH, ESQ.
          enyborg-burch@bsfllp.com
 7      HSIAO (MARK) C. MAO, ESQ.
          mmao@bsfllp.com
 8
 9
10  QUINN EMANUEL URQUHART & SULLIVAN LLP
      191 North Wacker Drive
11  Suite 2700
      Chicago, Illinois 60606
12      Attorneys for Defendant
      BY:  ANDREW H. SCHAPIRO, ESQ.
13      andrewschapiro@quinnemanuel.com
      TEUTA FANI, ESQ.
14      teutafani@quinnemanuel.com
15
16
17  ALSO PRESENT:
18  JUSTIN COHEN, Google LLC
19  MARCO SOZIO, Videographer
20
21
22
23
24
25
```

**Page 3**

```
 1  A P P E A R A N C E S:
 2  BLEICHMAR FONTI & AULD LLP
      555 12th Street
 3  Suite 1600
      Oakland, California 94607
 4      Attorneys for Plaintiffs
          in Calhoun case
 5  BY:  LESLEY E  WEAVER, ESQ
          lweaver@bfalaw.com
 6
 7
 8  DICELLO LEVITT GUTZLER LLC
      One Grand Central Place
 9  60 East 42nd Street
      Suite 2400
10  New York, New York 10165
      Attorneys for Plaintiffs
11      in Calhoun case
      BY:  DAVID A  STRAITE, ESQ
12      dstraite@dicellolevitt.com
13
14
15  SIMMONS HANLY CONROY LLC
      112 Madison Avenue
16  7th Floor
      New York, New York 10016
17      Attorneys for Plaintiffs
          in Calhoun case
18  BY:  JASON "JAY" BARNES, ESQ
          jaybarnes@simmonsfirm.com
19      AN TRUONG, ESQ
          atruong@simmonsfirm.com
20
21
22
23
24
25
```

**Page 5**

```
 1          THE VIDEOGRAPHER: Good morning.
 2  We are going on the record at 9:18 a.m. on
 3  November 23rd, 2021.
 4          This is media unit one of the
 5  video-recorded deposition of AbdelKarim
 6  Mardini taken by counsel for the plaintiffs
 7  in the matter of Patrick Calhoun, et al.,
 8  versus Google LLC, and Chasom Brown, et
 9  al., versus Google LLC, filed in the United
10  States District Court for the Northern
11  District of California, San Jose Division,
12  case number 5:20-CV-05146-LHK-SVK and case
13  number 5:20-CV-03664-LHK.  This deposition
14  is being held remote virtual Zoom located
15  at 51 Madison Avenue, 22nd floor, New York,
16  New York 10010.
17          My name is Marco Sozio from the
18  firm Veritext San Francisco and I am the
19  videographer.  The court reporter is Todd
20  DeSimone from the firm Veritext San
21  Francisco.  I am not authorized to
22  administer an oath, I'm not related to any
23  party in this action, nor am I financially
24  interested in the outcome.
25          Everyone attending remotely
```

2 (Pages 2 - 5)

CONFIDENTIAL

1 under the Ads Privacy organization.
2    Q.    Okay.  And what is sync here?
3    A.    It means like when two teams
4 sync with each other, like chat, like let's
5 sync up tomorrow so we see where we are.  I
6 mean, it should be disaggregated from
7 anything related to IPC.  "I synced with
8 Mardini and Rory," I'm not sure who wrote
9 this, but that's like the intent.
10    Q.    Yeah.  I mean, what is meant by
11 like "I synced with Mardini"?
12    A.    I met with them.  I met with
13 them and discussed.
14    Q.    It is just a meeting?
15    A.    Yeah.
16    Q.    It's not a permanent thing,
17 right?
18    A.    What do you mean by "a
19 permanent thing"?
20    Q.    Okay, that makes sense.
21        MR. BARNES:  Let me go --
22 Ms. Truong, can you share Exhibit C18.
23        MS. TRUONG:  Yes, one moment.
24 Exhibit 14 is up.
25        (Mardini Exhibit 14 marked for

Page 182

1 View?
2    A.    I think it was too early in
3 Mountain View.  It was 8:30 a.m. in
4 Mountain View.  I might have attended.
5 When was that?  2019.
6    Q.    Browser - ██████ sync, this
7 just refers to a meeting?
8    A.    Yes, exactly.
9    Q.    Okay.  So "sync" is slang at
10 Google for having that connection between
11 the two teams?
12    A.    That's correct, yes.  It just
13 means like, you know, like let's meet to
14 sync up, to just exchange information,
15 maybe I'll tell you what's our status, you
16 tell me what's your status, or you will
17 tell me like what you think about this
18 project, so just to ensure that teams are
19 communicating.  So yeah, I mean, you can
20 remove the word "sync" and put instead
21 Browser - ██████ "meetup" or "meeting."
22    Q.    Okay.
23        MR. BARNES:  Ms. Truong, can
24 you publish Exhibit C2, please.  Actually,
25 before you do that, can we take a break,

Page 184

1 identification.)
2    Q.    Mr. Mardini, what is this?
3    A.    It still hasn't loaded on my
4 end yet.
5    Q.    Oh, I got it.
6    A.    I can see it now.
7    Q.    Okay.  What is this?
8    A.    It is another meeting invite.
9    Q.    And what is this meeting
10 called?
11    A.    It is called Browser - ██████
12 sync.
13    Q.    And were you part of these
14 meetings?
15    A.    I don't think I was.
16    Q.    Well, you're on the list, the
17 third bullet point.
18    A.    Yeah, yeah, but I don't think I
19 attended these Browser - ██████ sync.  As
20 you can see, "Someone mentioned you're in
21 MTV.  I see you're a yes but wanted to
22 confirm whether you're able to join given
23 the early time for this meeting and lack of
24 any other Chrome folks joining."
25    Q.    Is that supposed to be Mountain

Page 183

1 please.  Let's go off.
2        MR. SCHAPIRO:  I have no
3 objection to going off the record.
4        THE VIDEOGRAPHER:  Okay, stand
5 by, please.  This is the end of media unit
6 number four.  We are now off the record at
7 2:43 p.m. for break.
8        (Recess taken.)
9        THE VIDEOGRAPHER:  This is the
10 beginning of media unit number five.  We
11 are now back on the record at 2:57 p.m.,
12 back from break.
13 BY MR. BARNES:
14    Q.    Thank you, Mr. Mardini.  Who is
15 Brad Bender?
16    A.    Brad Bender?  Brad Bender was
17 in Ads, as a CM person in Ads.  I think he
18 was a VP in the Ads world, one of the many
19 VPs in Ads world.
20    Q.    Where is he now; do you know?
21    A.    I honestly don't know.  I don't
22 hear of him anymore.  He might have moved
23 on to another team.
24        MR. BARNES:  Ms. Truong, can
25 you publish C2, please.

Page 185

47 (Pages 182 - 185)

**Page 238**

1    CERTIFICATION

2

3    I, TODD DeSIMONE, a Notary Public for

4  and within the State of New York, do hereby

5  certify:

6    That the witness whose testimony as

7  herein set forth, was duly sworn by me; and

8  that the within transcript is a true record

9  of the testimony given by said witness.

10   I further certify that I am not related

11  to any of the parties to this action by

12  blood or marriage, and that I am in no way

13  interested in the outcome of this matter.

14   IN WITNESS WHEREOF, I have hereunto set

15  my hand this 30th day of November, 2021.

16

17

18   TODD DESIMONE

19

20      *    *    *

21

22

23

24

25

**Page 240**

1  __ Federal R&S Requested (FRCP 30(e)(1)(B)) - Locked .PDF

2    Transcript - The witness should review the transcript and

3    make any necessary corrections on the errata pages included

4    below, noting the page and line number of the corrections.

5    The witness should then sign and date the errata and penalty

6    of perjury pages and return the completed pages to all

7    appearing counsel within the period of time determined at

8    the deposition or provided by the Federal Rules.

9  _x_ Federal R&S Not Requested - Reading & Signature was not

10   requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 239**

1  LESLEY E. WEAVER, ESQ.

2  lweaver@bfalaw.com

3              November 30, 2021

4  RE: PATRICK CALHOUN vs. GOOGLE LLC

5  11/23/2021, ABDELKARIM MARDINI, JOB NO. 4957896

6  The above-referenced transcript has been

7  completed by Veritext Legal Solutions and

8  review of the transcript is being handled as follows:

9  __ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

10   to schedule a time to review the original transcript at

11   a Veritext office.

12  __ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

13   Transcript - The witness should review the transcript and

14   make any necessary corrections on the errata pages included

15   below, noting the page and line number of the corrections.

16   The witness should then sign and date the errata and penalty

17   of perjury pages and return the completed pages to all

18   appearing counsel within the period of time determined at

19   the deposition or provided by the Code of Civil Procedure.

20  __ Waiving the CA Code of Civil Procedure per Stipulation of

21   Counsel - Original transcript to be released for signature

22   as determined at the deposition.

23  __ Signature Waived - Reading & Signature was waived at the

24   time of the deposition.

25

**Page 241**

1  PATRICK CALHOUN vs. GOOGLE LLC

2  ABDELKARIM MARDINI (JOB NO. 4957896)

3        E R R A T A   S H E E T

4  PAGE_____ LINE_____ CHANGE_____

5  _____

6  REASON_____

7  PAGE_____ LINE_____ CHANGE_____

8  _____

9  REASON_____

10 PAGE_____ LINE_____ CHANGE_____

11 _____

12 REASON_____

13 PAGE_____ LINE_____ CHANGE_____

14 _____

15 REASON_____

16 PAGE_____ LINE_____ CHANGE_____

17 _____

18 REASON_____

19 PAGE_____ LINE_____ CHANGE_____

20 _____

21 REASON_____

22

23 _____   _____

24 WITNESS                 Date

25

**Deposition Errata**
**Case: *Brown, et al. v. Google LLC; Calhoun, et al. v. Google LLC***
**Deponent: AbdelKarim Mardini**
**Date of Deposition: November 23-24, 2021**

| Pg. and Ln. | Now reads | Should read | Reason |
|---|---|---|---|
| 24:17 | sign in, sync | sign in or sync | Missing Word |
| 138:10 | It probably | It is probably | Missing Word |
| 146:7 | user have not used | user has not used | Transcription Error |
| 149:21-22 | this is in the context of ad serving is irrelevant | this, in the context of ad serving, is irrelevant | Transcription Error |
| 180:7 | not default | not a default | Missing Word |
| 181:24 | the high level | a high level | Transcription Error |
| 182:6-7 | it should be disaggregated from anything related to IPC | it should be disaggregated from anything related to a PC | Transcription Error |
| 183:19 | these | this | Transcription Error |
| 185:17 | as | was | Transcription Error |
| 185:19 | in Ads world | in the Ads world | Missing Word |
| 189:9 | have very | have a very | Missing Word |
| 189:13 | have close | have a close | Missing Word |
| 192:20 | that time | the time | Transcription Error |
| 197:17-18 | doing incognito | doing in incognito | Missing Word |
| 217:14 | access the information | allowing access to information | Transcription Error |
| 219:24 | item | team | Transcription Error |
| 220:11 | make | making | Transcription Error |
| 227:7 | that the | that. The | Transcription Error |
| 228:25 | be a one | be one | Transcription Error |
| 229:3-4 | have for | have one for | Missing Word |
| 230:13 | of the | of | Transcription Error |
| 232:10 | use it for | use it, | Transcription Error |

1/7/2022

ABDELKARIM MARDINI                              DATE

# EXHIBIT C

**REDACTED VERSION OF
DOCUMENT SOUGHT TO BE SEALED**

CONFIDENTIAL

1                 IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                        SAN JOSE DIVISION

4      _____

5      PATRICK CALHOUN, et al., on  )

6      behalf of themselves and all )

7      others similarly situated,   )

8               Plaintiff,          )

9         vs.                       )Case No.

10     GOOGLE, LLC,                 )5:20-cv-05146-LHK-

11              Defendant.          )SVK

12     _____)

13                 ** TRANSCRIPT CONFIDENTIAL **

14

15              ZOOM VIDEOTAPED DEPOSITION OF

16                      CHETNA BINDRA

17                     Parker, Colorado

18                Tuesday, February 8, 2022

19                         Volume I

20

21     Reported by:

22     LORI M. BARKLEY, CSR No. 6426

23     Job No. 5066214

24

25     PAGES 1 - 341

                                          Page 1

CONFIDENTIAL

```
 1                IN THE UNITED STATES DISTRICT COURT

 2              FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                        SAN JOSE DIVISION

 4

 5     _____

 6     PATRICK CALHOUN, et al., on  )

 7     behalf of themselves and all )

 8     others similarly situated,   )

 9             Plaintiff,           )

10        vs.                       )Case No.

11     GOOGLE, LLC,                 )5:20-cv-05146-LHK-

12             Defendant.           )SVK

13     _____)

14

15

16

17            Zoom Videotaped deposition of CHETNA BINDRA,

18     Volume I, taken on behalf of Plaintiffs, at Parker,

19     Colorado, beginning at 11:10 a.m., and ending at

20     8:58 p.m., Mountain Standard Time, on Tuesday,

21     February 8, 2022, before LORI M. BARKLEY, Certified

22     Shorthand Reporter No. 6426.

23

24

25
```

Page 2

CONFIDENTIAL

```
 1    APPEARANCES:

 2

 3    FOR THE PLAINTIFFS:

 4       BLEICHMAR FONTI & AULD

 5       BY:  LESLEY E. WEAVER

 6       BY:  ANNE DAVIS

 7       Attorneys at Law

 8       555 12th Street, Suite 1600

 9       Oakland, California 94607

10       (415) 445-4003

11       Lweaver@bfalaw.com

12       Aornelas@bfalaw.com

13

14    FOR THE CALHOUN PLAINTIFFS:

15       SIMMONS HANLY CONROY

16       BY:  JASON BARNES

17       Attorney at Law

18       112 Madison Avenue, 7th Floor

19       New York, New York 10016-7416

20       (212) 784-6276

21       Jaybarnes@simmonsfirm.com

22

23

24

25
```

```
 1    APPEARANCES (CONTINUED)

 2

 3    FOR GOOGLE, LLC, AND THE WITNESS:

 4        QUINN EMANUEL URQUHART & SULLIVAN LLP

 5        BY:  VIOLA TREBICKA

 6        Attorney at Law

 7        865 South Figueroa Street, 10th Floor

 8        Los Angeles, California 90017

 9        Violatrebicka@quinnemanuel.com

10            - and -

11        BY:  TEUTA FANI

12        Attorney at Law

13        1300 I Street NW, Suite 900

14        Washington, DC 20005

15        Teutafani@quinnemanuel.com

16

17

18    Also Present: Beko Reblitz-Richardson

19                  Torryn Taylor

20

21    Videographer:  Cassia Leet

22

23

24

25

                                      Page  4
```

```
 1    details of that.                                    11:31:14

 2           Sounds like it was probably a high level     11:31:15

 3    update on the ███ project and what some of the goals  11:31:17

 4    were that I described earlier.                       11:31:23

 5    Q.    And do you see the words Chrome sync,          11:31:24

 6    question that was raised -- I'm sorry.  Fair enough. 11:31:27

 7           Question that was raised, do we really want   11:31:32

 8    to use any web traversal data from Chrome sync.      11:31:34

 9           Do you see those words?                       11:31:37

10    A.    I do.                                          11:31:38

11    Q.    What is Chrome Sync?                           11:31:39

12    A.    In this particular context, it isn't clear     11:31:50

13    to me what exactly the question is about.  At a high 11:31:52

14    level, certainly Chrome Sync is the ability for users 11:31:57

15    to sync their data across devices.                   11:32:00

16    Q.    And when you say sync their data, what do      11:32:05

17    you mean?                                            11:32:10

18    A.    It means if you're -- again, I'm going to      11:32:10

19    describe this at a very high level because I'm not a 11:32:14

20    Chrome person, but at a very high level it means if  11:32:17

21    you are on a desktop and you are on particular       11:32:19

22    websites and if you're on a cell phone and if you're 11:32:23

23    on particular websites, you know, you're able to go  11:32:26

24    to the same ones very easily from device to device.  11:32:28

25    Q.    Okay.  And then it says web transversal        11:32:32
```

Page 68

CONFIDENTIAL

1   STATE OF CALIFORNIA        ) ss.

2   COUNTY OF LOS ANGELES      )

3

4        I, Lori M. Barkley, CSR No. 6426, do hereby

5   certify:

6        That the foregoing deposition testimony

7   taken before me at the time and place therein set

8   forth and at which time the witness was administered

9   the oath;

10        That the testimony of the witness and all

11   objections made by counsel at the time of the

12   examination were recorded stenographically by me, and

13   were thereafter transcribed under my direction and

14   supervision, and that the foregoing pages contain a

15   full, true and accurate record of all proceedings and

16   testimony to the best of my skill and ability.

17        I further certify that I am neither counsel

18   for any party to said action, nor am I related to any

19   party to said action, nor am I in any way interested

20   in the outcome thereof.

21        IN WITNESS WHEREOF, I have subscribed my

22   name this 9th day of February, 2022.

23

24

25        LORI M. BARKLEY, CSR No. 6426

Page 337

# Google Factbase: Ads Data Policies and Statements

Last updated July 2020

**Purpose**

The purpose of this document is to provide a central repository / fact base for all of the things Google has stated externally with regard to data collection, use and policies, cross-site tracking and definitions of PII, primarily as it relates to ads.

Almost all of the content included is verbatim from our external resources, approved external talking points or materials that have been externally shared. All resources are linked / cited at the beginning of the corresponding section.

The only exceptions to this are:

1. Anywhere it is explicitly stated that a resource is internal
   a. In a few sections, internal resources were cited to clarify what the internally stated position or policy is where external statements may have been less definitive
2. The TL:DR portion of each section which summarizes the content in each section.

While this document isn't intended for broad distribution in its entirety, most of the content is external and can be shared to answer specific questions.

**Contact**

Reach out to ekarp@ with any questions, feedback or suggestions on additional sections or materials to include

# Table of Contents

First Party Data
  GDPR Questionnaires
    GDA Data Collection & Use
    DV360 Data Collection & Use
    Platforms Personal Advertising Program Policy
    Conversion Tracking, Remarketing and Customer Match Data Collection & Use
  Google Help Center
    How Google uses Customer Match data
    How Google Uses Remarketing Data
    How Google Uses Conversion Event Data
  CCPA - Data Collection and Use
  Supported Use Case of 1P Data

3P Data
  Chrome Announcement
  Platforms Interest Based Advertising Program Policy

EU User Consent Policy

Cross-Site Tracking
  Chromium Blog posts
  Chromium.org - Privacy Sandbox
  Chrome Privacy Engagement Script and Email Template

Fingerprinting, Data Joining & Alternative Tracking Tactics
  Chrome Announcement
  Archived Privacy Policy with updated language around data sharing and joining
  Platforms Program Policy
  Alternative Tracking Tactics Talking Points
  Ads & Commerce Blog: Updates on our work to improve user privacy in digital advertising
  INTERNAL RESOURCE - Fingerprinting Policy
  INTERNAL RESOURCE - Data Joining
  Android AdID Data Joining Policy
  Customer Match Data Policy

Personal, PII and SPII Data
  What Google considers PII
  INTERNAL RESOURCE - Identifiable Information - PII and SPII

General Google Data Policies
  General Data Collection Policy
  General Data Use Policy
  General Data Sharing Policy
  Google Advertising Technology Policy

Additional Resources / Links

**TL:DR**

|  | **Data Collection** | **Data Use** |
|---|---|---|
| **GDA (General)** Controller | Typically a cookie ID and an IP address. Depending on a user's settings, may use | Ad selection, placement, pricing, and format of ads may be modified using per-user information |

GOOG-CABR-04604488

| | | |
|---|---|---|
| | location data or Google account information. May be other identifiers used depending on product | Almost all of the data will be used to make improvements in the product, including for quality and targeting purposes |
| **Remarketing**<br>Controller | AdWords collects data related to the device/browser, IP address, and the on-site/app activities, including page and referral URLs. Data is collected against identifiers like IDFA/ADID, DoubleClick ID, Google unauthenticated cookies, and Google authenticated cookies, which are stored and used in different ways.<br><br>In Google Ads, we will disable adding to or updating remarketing lists using data to which restricted data processing applies. This doesn't apply in DV360 | Data is used to allow AdWords advertisers to target, bid differently, and show customized ads to certain sets of users<br><br>Google uses aggregated and anonymized remarketing data for the benefit of all advertisers, including, for example, improving similar audiences.<br><br>Remarketing lists won't be shared with any third party or other advertisers without permission |
| **Customer Match**<br>Processor | Advertisers may directly upload different sets of customer "keys" that are used to match to Google users and populate in remarketing lists defined by the advertiser. Advertisers may also upload a set of Device IDs (AdID / IDFA)<br><br>Google does not collect this information on behalf of the advertiser | Data is used to allow AdWords advertisers to target, bid differently, and show customized ads to certain sets of users<br><br>We won't use the fact that a Google user is in your Customer Match audiences to build or enhance profiles about that user, and we won't share that a Google user is in your Customer Match audiences with any third party, including other advertisers. When generating your similar audiences, we may compare the profiles of the Google users in your Customer Match audience with the profiles of other Google user |
| **Conversion Tracking**<br>Controller | We may store and read cookies on Google domains as well as the DoubleClick domain. For app-based conversions, we store click id, IDFA (for iOS) and AdId (Android). For imported click conversions we store the click IDs sent to us by the advertisers. When people interact with an ad in a browser, AdWords stores a cookie on a Google domain that contains information about the interaction. When someone converts on the advertiser's website, the conversion tracking tag they installed reads this cookie and sends it back to AdWords with the conversion information. | We uses conversion event data for <u>campaign</u> performance reporting in your account, as an input for features such as <u>Target CPA</u>,<br><br>Unless we have an advertiser's permission, we don't share advertiser-specific conversion event data with other advertisers.<br><br>Google uses aggregated conversion event data for the overall benefit of advertisers. Google may also publish conversion event statistics aggregated across many advertisers as a resource for the overall benefit of advertisers |
| **DV360 (General)**<br>Processor | For each ad request, the types of information can include, but are not limited to:<br><br>● IP addresses (and geographical locations derived from IP addresses)<br>● Cookie IDs<br>● User agent<br>● Page referrer URL<br>● Time of ad request | Using info derived from the visitor's IP address and browser, such as the visitor's location or OS, DV360 matches the request with the best ad to serve and provides reporting and verification<br><br>Targeting based on specific IP addresses is **not** available |

GOOG-CABR-04604489

| | ● Ad request URL (and DCM identifiers included in the URL)<br>　● Publisher click-tracker URL<br>　● Publisher- defined custom values<br>　● Advertiser -defined custom values<br>　● Additional configurations and overrides<br>　　● Device identification<br>　　● Mobile app identification<br><br>We no longer populate encrypted UserID and PartnerID fields in Data Transfer for events associated with EEA users recorded in Campaign Manager and Display & Video 360. UserID and PartnerID will be redacted for all global events on March 31, 2021. | |
|---|---|---|

Under CCPA, when restricted data processing mode is enabled using the network control or when a restricted data processing signal is passed in the tag, the following happens for programmatic transactions:

- Ads that serve do not use information based on the user's past behavior.
- Google does not record information against user identifiers for the purposes of personalized ads measurement or targeting.
- No ads serve using interest-based audience targeting (including demographic targeting and remarketing list targeting).
- Ads served via Google Ads and Display & Video 360 will only use contextual and placement targeting. These ads may use IP address for very coarse level geo-targeting (city-level) and to prevent invalid activity. These ads also use cookies and/or IDFA and AdIDs for frequency capping, aggregated ad reporting, and to combat fraud and abuse.
- Restricted data processing mode does not support third-party buyers or third-party ad tracking. As a result, no RTB callouts will be made to 3rd party fe Authorized Buyers or Open Bidders.

# GDPR Questionnaires

## GDA Data Collection & Use

source: GDPR Data Questionnaire - **go/gdn-gdpr**

### Data Collection - Which personal data do you collect and process?

When AdWords operates across Display, it uses e.g. IP addresses and cookie IDs and, depending on a user's settings, may use location data or Google account information. Depending on the product in use there may be other identifiers used (e.g. Customer Match). More details:

GOOG-CABR-04604490

- Customer match; and
- Cookies, conversion tracking and remarketing

When a user interacts with a site or app that uses our products — such as AdSense, DFP or AdMob — then certain user data is shared with Google, typically a cookie ID and an IP address. Under the GDPR, such data is treated as personal data. Such data is also shared with Google when an AdWords customer has for example conversion tracking or remarketing tags on its pages.

**Data Use**

The data is used to determine which, if any, AdWords Display ads serve and how those ads look. The data is also used for personalization of AdWords Display ads (if user hasn't opted out). Ad selection, placement, pricing, and format of ads may be modified using per-user information, as long as that user has not opted out of ads personalization.

Our website conversion tracking feature of AdWords uses cookies to identify previous impressions and clicks that led to a conversion event. This helps advertisers track sales and other conversions from their AdWords Display ads. It's Google's policy to restrict access to conversion event data, both inside and outside Google. Please refer to this external help center article to understand how Google uses conversion event data.

For remarketing and customer match, the data is used to allow AdWords advertisers to target, bid differently, and show customized ads to certain sets of users.

Almost all of the data will be used to make improvements in the product, including for quality and targeting purposes. In addition, this information is also used for fraud detection and anti-spam purposes. These uses are specified in Google's privacy policy and users cannot opt out of them.

## DV360 Data Collection & Use

### Source: DV360 GDPR Data Questionnaire

#### Data Collection - Which personal data do you collect and process?

DV360 records several types of information from each ad request in order to select the best ad and provide reporting and verification. For each ad request, the types of information can include, but are not limited to:

- IP addresses (and geographical locations derived from IP addresses)
- Cookie IDs
- User agent
- Page referrer URL
- Time of ad request
- Ad request URL (and DCM identifiers included in the URL)
- Publisher click-tracker URL
- Publisher- defined custom values
- Advertiser -defined custom values
- Additional configurations and overrides
- Device identification
- Mobile app identification

DV360 gives advertisers and publishers the flexibility to use HTML, JavaScript, and other tools to pass additional data, including key -values and identifiers. Not all of these additional data formats are known and defined by DV360. Instead, DV360 provides a framework to collect, aggregate, and report on these custom forms of data.

Google is considered the data processor.

GOOG-CABR-04604491

**Data Use**

DV360 servers deliver advertising to websites, including the mobile web, and to mobile apps. When someone visits a site or app that includes DV360 ad tags, the tags make a call to an ad server. Using information derived from the visitor's IP address and browser, such as the visitor's location or operating system, DV360 matches the request with the best ad to serve. Once the right ad is identified, DV360 sends the creative to the webpage or app, then counts an impression for that ad. DV360 reports on impressions, clicks, rich media metrics, and conversions are based on ad server logs.

Source: https://support.google.com/displayvideo/answer/9006418

> As part of our ongoing commitment to user privacy we are in the process of making important changes to our  Data Transfer feature in Display & Video 360 and Campaign Manager (formerly DoubleClick Bid Manager and DoubleClick Campaign Manager).

>> Google Marketing Platform: We no longer populate encrypted UserID and PartnerID fields in Data Transfer for events associated with EEA users recorded in Campaign Manager and Display & Video 360.  UserID and PartnerID will be redacted for all global events on March 31, 2021.

Source: https://support.google.com/displayvideo/answer/2949929?hl=en

> Targeting based on specific IP addresses is not available in Display & Video 360.

## Platforms Personal Advertising Program Policy

Source: https://support.google.com/platformspolicy/answer/3013851

> You must not pass any information to Google:

- that Google could use or recognize as personally-identifiable information; or
- that permanently identifies a particular device (such as a mobile phone's unique device identifier if such an identifier cannot be reset).

## Conversion Tracking, Remarketing and Customer Match Data Collection & Use

### Source: GDPR Data Questionnaire - Conversion Tracking, Remarketing and Customer Match

**Data Collection - Which personal data do you collect and process?**

- Cookies: There are two types of cookies used - one is if the user is signed in to their Google Account and a different one is used if the user is not signed in
- Conversion tracking
  - For conversion tracking purposes we may store and read cookies on Google domains as well as the DoubleClick domain. For app-based conversions, we store click id, IDFA (for

GOOG-CABR-04604492

         iOS) and AdId (Android). For imported click conversions we store the click IDs sent to us by the advertisers.

- ○ When people interact with an ad in a browser, AdWords stores a cookie on a Google domain that contains information about the interaction. When someone converts on the advertiser's website, the conversion tracking tag they installed reads this cookie and sends it back to AdWords with the conversion information.
- ○ If the advertiser is using the new global site tag from their AdWords account or has a Google Analytics tag installed on their landing page or is using the conversion linker tag in GTM, those solutions will also store a cookie on their domain that contains information about the last ad click.
- ○ If no same-device click information is available, but the user is signed-in with Google, we read the sign-in information from cookies on Google domains and send it to Google along with the conversion information. If there was a search click from the same signed-in user on another device or in another browser we can attribute the conversion to it as a cross-device conversion.

- Remarking
  - ○ For Remarketing Lists for Search Ads (RLSA) as well as remarketing on the Display network, advertisers may use the AdWords remarketing / conversion tag or the Google Analytics tag to associate different users with one or multiple remarketing lists.
    - ■ AdWords collects data related to the device/browser, IP address, and the on-site/app activities, including page and referral URLs. Data is collected against identifiers like IDFA/ADID, DoubleClick ID, Google unauthenticated cookies, and Google authenticated cookies, which are stored and used in different ways.
  - ○ For Customer Match (CM), advertisers may directly upload different sets of customer "keys" that are used to match to Google users and populate in remarketing lists defined by the advertiser. Advertisers may also upload a set of Device IDs (AdID / IDFA). Customer Match FAQ

  - ○ Google does not collect this information on behalf of the advertiser.

# Google Help Center

## How Google uses Customer Match data

Source: https://support.google.com/google-ads/answer/6334160

How we handle your data

The data files you upload will only be used to match your customers to Google accounts and to ensure your Google Ads Customer Match campaigns comply with our policies. We'll keep your data confidential and secure using the same industry-leading standards we use to protect our own users' data.

More specifically, here is how we treat the data files you upload:

- Limited data use. We won't use your data files for any purpose other than to create your Customer Match audiences and ensure compliance with our policies. We won't use your data files to build or enhance profiles of your customers.

GOOG-CABR-04604493

- Limited data access. We won't share your data files with other Google teams other than to create your Customer Match audiences and ensure compliance with our policies. We use employee access controls to protect your data files from unauthorized access.
- Limited data sharing. We won't share your data files with any third party, including other advertisers. We may share this data to meet any applicable law, regulation, legal process or enforceable governmental request.
- Limited data retention. We won't retain your data files for any longer than necessary to create your Customer Match audiences and ensure compliance with our policies. Once those processes are complete, we'll promptly delete the data files you uploaded via the Google Ads interface or the API.

We won't use the fact that a Google user is in your Customer Match audiences to build or enhance profiles about that user, and we won't share that a Google user is in your Customer Match audiences with any third party, including other advertisers. When generating your similar audiences, we may compare the profiles of the Google users in your Customer Match audience with the profiles of other Google users. As with other Google advertising products, we may use information derived from impressions or clicks on Customer Match ads to improve Google Ads and other Google products and services.

## How Google Uses Remarketing Data
### Source: **https://support.google.com/google-ads/answer/7664943**

Remarketing data is used to match your users to Google accounts, add users to remarketing lists, generate similar audiences, show dynamic ads, and to ensure your Google Ads remarketing campaigns comply with Google's policies. In addition, reports containing audience data are available in your Google Ads account and any other accounts you've shared your audiences with.

Google may also use remarketing data to improve your campaign performance. Google might also use your remarketing data to identify other relevant audiences for you and to provide certain insights about the composition of your remarketing lists. Google also uses aggregated and anonymized remarketing data for the benefit of all advertisers, including, for example, improving similar audiences.

Finally, your remarketing lists won't be shared with any third party or other advertisers without your permission, and Google won't use your remarketing lists to advertise its own products.

## How Google handles your data
Google keeps your remarketing data confidential and secure, using the same industry-leading standards used to protect the data of Google users.

Here's how Google handles your remarketing data:

Access: Google uses employee access controls to protect your data from unauthorized access.
Sharing: Google won't share your remarketing lists with any third party, including other advertisers, without your explicit consent. Google may share this data to meet any applicable law, regulation, legal process, or enforceable governmental request.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GOOG-CABR-04604494

## How Google Uses Conversion Event Data
**Source: [https://support.google.com/google-ads/answer/93148](https://support.google.com/google-ads/answer/93148)**

Google uses conversion event data for **campaign** performance reporting in your account, as an input for features such as **Target CPA**, and other conversion-based automated bid strategies, and in aggregate for the benefit of advertisers. It's Google's policy to restrict access to conversion event data, both inside and outside Google. Unless we have an advertiser's permission, we don't share advertiser-specific conversion event data with other advertisers.

Google uses aggregated conversion event data for the overall benefit of advertisers. For example, features such as automated bidding and smart pricing rely on aggregate advertiser conversion event data to improve their overall quality and accuracy. If you're tracking conversions and your competitors are benefiting from some of these features, it's possible that your use of **conversion tracking** is indirectly affecting the cost of your **clicks**. Google may also publish conversion event statistics aggregated across many advertisers as a resource for the overall benefit of advertisers.

# CCPA - Data Collection and Use
**Source**: **CCPA / Restricted Data Processing**

CCPA requires giving residents the right to opt out of the "sale" of their "personal information" (as the law defines those terms), with the opt-out offered via a prominent "Do Not Sell My Personal Information" link on the "selling" party's homepage. CCPA does recognize certain exceptions to the definition of "sale," such that not all transfers of personal information are "sales." For example, transferring personal information to a "service provider" under the law is not a sale.

Restricted data processing is intended to help advertisers, publishers, and partners meet their CCPA compliance needs. With restricted data processing, Google restricts how it uses certain unique identifiers, and other data processed in the provision of services to you, to only undertake certain business purposes. With respect to data to which restricted data processing applies, these business purposes include ad delivery, reporting and measurement, security and fraud detection, debugging, and improving and developing features for the products we offer you.

## Ad Manager, Ad Manager 360, AdMob, AdSense
When Ad Manager, Ad Manager 360, AdMob, or AdSense operate under restricted data processing, Google will restrict how it uses certain unique identifiers and other data processed in the provision of services. For example, Google will not create or update profiles for ads personalization or use existing profiles to serve personalized ads relating to data to which restricted data processing

GOOG-CABR-04604495

applies. Under restricted data processing, programmatic ads won't be served if they utilize third-party ad tracking or third-party ad serving and bid requests will not be sent to third-party programmatic buyers.

See the product help centers (Ad Manager, AdMob, AdSense) for more information, including how to enable restricted data processing for these products.

## Google Ads

When Google Ads operates under restricted data processing, Google will restrict how it uses certain unique identifiers and other data processed in the provision of services. For example, Google will disable adding to or updating remarketing lists using data to which restricted data processing applies. Ads with third-party ad tracking or third-party ad serving will continue to serve under certain circumstances as detailed in the Google Ads help center. Third-party click tracking will continue to operate as usual, with no changes when restricted data processing is enabled. Additionally, conversion tracking will continue to operate when restricted data processing is enabled.

## Restricted data processing for programmatic

When restricted data processing mode is enabled using the network control or when a restricted data processing signal is passed in the tag, the following happens for programmatic transactions: *

- Ads that serve do not use information based on the user's past behavior.
- Google does not record information against user identifiers for the purposes of personalized ads measurement or targeting.
- No ads serve using interest-based audience targeting (including demographic targeting and remarketing list targeting).
- Ads served via Google Ads and Display & Video 360 will only use contextual and placement targeting. These ads may use IP address for very coarse level geo-targeting (city-level) and to prevent invalid activity. These ads also use cookies and/or IDFA and AdIDs for frequency capping, aggregated ad reporting, and to combat fraud and abuse.
- Restricted data processing mode does not support third-party buyers or third-party ad tracking. As a result, no RTB callouts will be made to 3rd party Authorized Buyers or Open Bidders.

* "Programmatic transactions" are transactions from Open Auctions, Private Auctions, First Look, Preferred Deals, and Programmatic Guaranteed.

go/ccpa-comms

Many of our ad products **already limit how they use data**. Processor like SA360 and DV360 are only permitted to process data on the customer's behalf, according to the customer's instructions. This is why in those products, no additional action is required to enable Restricted Data Processing.

**Summary table for Key Advertiser features:**
***Note: certain features, such as ad delivery, reporting and measurement, will continue to function in RDP***

GOOG-CABR-04604496

| Features | Where it doesn't work | Where it works | What actions to take to continue functionality |
|---|---|---|---|
| **Google reporting and measurement** | | Everywhere | Review updated contract. No additional action needed |
| **Third-party measurement** | **Showcase Shopping Ads & Local Inventory Ads:** By EOY; SA360, Kenshoo, Marin will lose impression tracking support for Google-hosted pages. Notification to follow. | Everywhere else **(but not covered by RDP terms)** | None; impression-tracking will no longer be available via 3P trackers on Google-hosted pages. |
| **Adding users to remarketing lists** | **Google Ads** (when RDP is passed on a per-user basis or set for all CA users out) | Everywhere else (incl. DV360) | None; when RDP is enabled, users cannot be added to remarketing lists in Google Ads |
| **Other ad targeting i.e.: contextual, automated, Google Audiences** | | Everywhere | Review updated contract. No additional action needed |

## Supported Use Case of 1P Data

Source: Ads & Commerce Blog: Updates on our work to improve user privacy in digital advertising

For example, we support the use of advertiser and publisher first-party data (based on direct interactions with customers they have relationships with) to deliver more relevant and helpful experiences—as long as users have transparency and control over the use of that data.

GOOG-CABR-04604497

**TL:DR**
- Chrome intends to phase out support for third party cookies, believing privacy-protecting alternatives could be available in the next two years
  - No current plans to stop supporting 1P cookies
- "We will aggressively combat the current techniques for non-cookie based cross-site tracking, such as fingerprinting, cache inspection, link decoration, network tracking and Personally Identifying Information (PII) joins"
- Policies around 3P Data
  - Platforms Interest Based Advertising Policy
    - "you must have all rights necessary to use audience data such as cookie lists."
    - "advertisers must attach notices to advertisements to make clear that they are interest-based"
  - EU User Consent Policy
    - If personal data of end users of a third party property is shared with Google due to your use of, or integration with, a Google product, then you must use commercially reasonable efforts to ensure the operator of the third party property complies with the above duties (re: consent).

# Chrome Announcement

**Source: go/ChromePrivacyJan2020**
- Chrome is taking a different approach from other browsers: Chrome believes that the right path forward is to develop new alternatives that protect user privacy coupled with *anti-fingerprinting measures*. This path can enable a *web that respects users privacy and thrives in a future without 3P cookies.*
- Chrome **will support 3P cookies until new alternatives have addressed the needs of users, publishers, and advertisers.**
- Chrome intends to develop these alternatives alongside the broader ecosystem within two years, and when these alternatives are ready, begin **phasing out support for third party cookies** in Chrome. (No current plans to stop supporting 1P cookies)

Source: https://www.chromium.org/Home/chromium-privacy/privacy-sandbox

The Privacy Sandbox project's mission is to "Create a thriving web ecosystem that is respectful of users and private by default." The main challenge to overcome in that mission is the pervasive cross-site tracking that has become the norm on the web and on top of which much of the web's ability to deliver and monetize content has been built.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

As that functionality becomes available we will place more and more restrictions on the use of third party cookies, which are the most common mechanism for cross-site tracking today and eventually deprecate them entirely. In parallel to that we will aggressively combat the current techniques for non-cookie based cross-site tracking, such as fingerprinting, cache inspection, link decoration, network tracking and Personally Identifying Information (PII) joins.

As we're removing the ability to do cross-site tracking with cookies, we need to ensure that developers take the well-lit path of the new functionality rather than attempt to track users through some other means.

Source; https://blog.google/products/ads-commerce/improving-user-privacy-in-digital-advertising/

Chrome continues to explore more privacy-forward ways for the web browser to support digital ads with the Privacy Sandbox open standards initiative. As part of the Privacy Sandbox, several proposals have been published for new APIs that would solve for use cases like ad selection, conversion measurement, and fraud protection in a way that doesn't reveal identifying information about individual users. One of the proposed APIs, for trust tokens that could combat ad fraud by distinguishing between bots and real users, is now available for testing by developers, and more will move to live testing soon.

Once these approaches have addressed the needs of users, publishers and advertisers, Chrome plans to phase out support for third-party cookies. These proposals are being actively discussed in forums like the W3C. Our ads team is actively contributing to this dialog—as we encourage any interested party to do—and we expect to incorporate the new solutions into our products in the years ahead.

# Platforms Interest Based Advertising Program Policy

Source: https://support.google.com/platformspolicy/answer/3013851

If you use Google's platform products for interest-based advertising:

> you must have all rights necessary to use audience data such as cookie lists.
> advertisers must attach notices to advertisements to make clear that they are interest-based (e.g. by using an "Ad Choices" icon); and
> all parties must comply with applicable Internet advertising industry guidelines (e.g. the Self-Regulatory Principles for Online Behavioral Advertising of the Digital Advertising Alliance, or IAB Europe's EU Framework for Online Behavioral Advertising).

# EU User Consent Policy

Source: **EU User Consent Policy**

- Properties under a third party's control
  > If personal data of end users of a third party property is shared with Google due to your use of, or integration with, a Google product, then you must use commercially reasonable efforts to ensure the operator of the third party property

GOOG-CABR-04604499

complies with the above duties. A third party property is a site, app or other property that is not under your, your affiliate's or your client's control and whose operator is not already using a Google product that incorporates this policy.

**TL:DR**

This section lays out what we've explicitly said regarding our intentions with regard to cross-site tracking and replacing its functionality

# Chromium Blog posts

*Chromium Blog - August 2019 - Potential Uses for the Privacy Sandbox*

- *These proposals are a first step in exploring how to address the measurement needs of the advertiser without letting the advertiser track a specific user across sites.*

*Chromium Blog - January 2020*

- *We are confident that with continued iteration and feedback, privacy-preserving and open-standard mechanisms like the Privacy Sandbox can sustain a healthy, ad-supported web in a way that will render third-party cookies obsolete.*
- *Once these approaches have addressed the needs of users, publishers, and advertisers, and we have developed the tools to mitigate workarounds, we plan to phase out support for third-party cookies in Chrome.*
- *As we previously announced, Chrome will limit insecure cross-site tracking starting in February, by treating cookies that don't include a SameSite label as first-party only, and require cookies labeled for third-party use to be accessed over HTTPS.*

# Chromium.org - Privacy Sandbox

*Privacy Sandbox Page*

- *We plan to introduce new functionality to serve the use cases that are part of a healthy web that are currently accomplished through cross-site tracking (or methods that are indistinguishable from cross-site tracking).*
- *As that functionality becomes available we will place more and more restrictions on the use of third party cookies, which are the most common mechanism for cross-site tracking today and eventually deprecate them entirely.*

- *In parallel to that we will aggressively combat the current techniques for non-cookie based cross-site tracking, such as fingerprinting, cache inspection, link decoration, network tracking and Personally Identifying Information (PII) joins.*
- *Building Privacy Sandbox - We see three distinct tracks:*
  - *Replacing Functionality Served by Cross-site Tracking*
  - *Turning Down Third-Party Cookies*
  - *Mitigating workarounds*
- *In the ideal end state, from a user's perspective, there won't be any difference between how the web of today and the web in a post-Privacy Sandbox world work, except that they will be able to feel confident that the browser is working on their behalf to protect their privacy and when they ask questions about how things work they will like the answers they find. In addition, if a given user is either uncomfortable with or just doesn't like personalized advertising, they will have the ability to turn it off without any degradation of their experience on the web.*

Privacy Model for the Web explainer (Linked off of the Privacy Sandbox Page)

- *This document describes a way the web could potentially work that would not require cross-site tracking, but would still let publishers support themselves with effective advertising.*
- *"A per-first-party identity can only be associated with small amounts of cross-site information"*
- *The fuzziness of "small amounts of information" recognizes the balancing act that browsers need to perform between user privacy and web platform usability. Potential use cases must respect the invariant that it remain hard to join identity across first parties, but subject to that limit, there is room to allow sufficiently useful information to flow in a privacy-respecting way. Both "sufficiently useful" and "privacy-respecting" must be evaluated on a case-by-case basis.*
- *It may be OK to associate a user's per-first-party identity with cross-site-derived information, provided that information is not too personal or too identifying*

# Chrome Privacy Engagement Script and Email Template

Chrome Privacy Engagement Script & Email Template (go/chromeprivacyengagement-doc)
(from the 'Companion Email' that was to be sent out after the deck was presented)

- This includes the development of new privacy-preserving solutions to support important use cases and business models without identifying users across sites.  Once the new solutions are in place and meeting the needs of users and the web ecosystem, Chrome intends to end support for third-party cookies.

https://web.dev/digging-into-the-privacy-sandbox/

- The Privacy Sandbox is a series of proposals to satisfy third-party use cases without third-party cookies or other tracking mechanisms.

- Rather than working with limited tools and protections, the APIs enable the user's browser to act on the user's behalf to ensure that data is never shared without their knowledge and consent. The APIs enable use cases such as ad targeting and conversion measurement, but without revealing individual private and personal information.

**TL:DR**

## Fingerprinting Positions / Statements

- Device fingerprinting to collect data for advertising doesn't allow reasonable user control and transparency, and so Google's ads systems don't use it. Nor do we let others bring fingerprinting data into our advertising products
  - Any mechanism to track users for purposes of targeting an ad without adequate transparency and control (e.g. user opt-out) is bad for user privacy.
  - Apart from specific uses for security & fraud prevention, Google does not undertake or permit fingerprinting.
- Chrome plans to more aggressively restrict fingerprinting across the web.
- We will aggressively combat the current techniques for non-cookie based cross-site tracking, such as fingerprinting, cache inspection, link decoration, network tracking and Personally Identifying Information (PII) joins.

## Data Joining Policy

Data joining policies for external users / marketers explicitly call out the prohibition of this except in cases of user consent.  Googles Privacy Policy language was softened in 2016 from 'explicitly having opt-in consent' to 'depending on your account settings'.  Internal policy and design principles states data joining should only be done where necessary for the identified purpose, and where appropriate legal grounds to do so have been identified.

### Privacy External Policy Update (from 2016)

- Previously, Google's privacy policy read: "We will not combine DoubleClick cookie information with personally identifiable information unless we have your opt-in consent."
  - That was replaced with: "Depending on your account settings, your activity on other sites and apps may be associated with your personal information in order to improve Google's services and the ads delivered by Google."

 GOOG-CABR-04604502

**Internal Privacy Policy**
- Minimize data joining: Only join the data with other User Data or Google products where necessary for the identified purpose, and where appropriate legal grounds to do so have been identified. Before doing so, ensure there are no restrictions prohibiting joining a user's data, and be aware joining data may cause otherwise non-identifiable data to become identifiable.

**Platforms Program Policy**
- You must not use Google's platform products to identify users or facilitate the merging of personally-identifiable information with information previously collected as non-personally identifiable information without robust notice of, and the user's prior affirmative (i.e. opt-in) consent

**Android AdID Policy**
- The advertising identifier must not be connected to personally-identifiable information or associated with any persistent device identifier (for example: SSAID, MAC address, IMEI, etc.) without explicit consent of the user.

# Chrome Announcement

**Source: go/ChromePrivacyJan2020**

**Protections against tracking work arounds like fingerprinting**
- Because fingerprinting is neither transparent nor under the user's control, it results in tracking that doesn't respect user choice. This is why Chrome plans to more aggressively restrict fingerprinting across the web.

**Source**: https://www.chromium.org/Home/chromium-privacy/privacy-sandbox

The Privacy Sandbox project's mission is to "Create a thriving web ecosystem that is respectful of users and private by default." The main challenge to overcome in that mission is the pervasive cross-site tracking that has become the norm on the web and on top of which much of the web's ability to deliver and monetize content has been built.

As that functionality becomes available we will place more and more restrictions on the use of third party cookies, which are the most common mechanism for cross-site tracking today and eventually deprecate them entirely. In parallel to that we will aggressively combat the current techniques for non-cookie based cross-site tracking, such as fingerprinting, cache inspection, link decoration, network tracking and Personally Identifying Information (PII) joins.

As we're removing the ability to do cross-site tracking with cookies, we need to ensure that developers take the well-lit path of the new functionality rather than attempt to track users through some other means.

GOOG-CABR-04604503

# Archived Privacy Policy with updated language around data sharing and joining

Source: Updated Privacy Policy (2019)

We may combine personal information from one service with information, including personal information, from other Google services – for example to make it easier to share things with people you know. ~~We will not combine DoubleClick cookie information with personally identifiable information unless we have your opt-in consent.~~ Depending on your account settings, your activity on other sites and apps may be associated with your personal information in order to improve Google's services and the ads delivered by Google.

We will ask for your consent before using information for a purpose other than those that are set out in this Privacy Policy.

# Platforms Program Policy

Source: https://support.google.com/platformspolicy/answer/3013851

You must not use Google's platform products to identify users or facilitate the merging of personally-identifiable information with information previously collected as non-personally identifiable information without robust notice of, and the user's prior affirmative (i.e. opt-in) consent to, that identification or merger. Irrespective of users' consent, you must not attempt to disaggregate data that Google reports in aggregate.

# Alternative Tracking Tactics Talking Points

**Source: GBO Background:  Alternative Tracking Tactics - INTERNAL ONLY**
**General external talking points / POV**
- Any mechanism to track users for purposes of targeting an ad without adequate transparency and control (e.g. user opt-out) is bad for user privacy.
- Apart from specific uses for security & fraud prevention, Google does not undertake or permit fingerprinting.
- Device fingerprinting to collect data for advertising doesn't allow reasonable user control and transparency, and so Google's ads systems don't use it. Nor do we let others bring fingerprinting data into our advertising products. This principle can be traced back to our long-standing 3PAS certification eligibility criteria, which has always blocked 3rd party ad tracking pixels from running on our media and systems if the 3rd party is known to engage in fingerprinting.

**What is Device Fingerprinting and how does it work?**

GOOG-CABR-04604504

A: Device fingerprinting is using characteristics of a device (or app, or browser) to try to identify a specific device across sessions. Such characteristics can include, but are not limited to:

- IP address
- Browser / user-agent / platform
- Installed fonts
- Screen resolution
- Location & time zone & language
- Whether or not cookies are enabled
- Whether or not Do Not Track is enabled

**Does Google allow fingerprinting?**
A: Apart from specific uses for security & fraud, Google does not undertake or permit fingerprinting.

Device fingerprinting to collect data for advertising doesn't allow reasonable user control and transparency, and so Google's ads systems don't use it. Nor do we let others bring fingerprinting data into our advertising products

# Ads & Commerce Blog: Updates on our work to improve user privacy in digital advertising

Source: https://blog.google/products/ads-commerce/improving-user-privacy-in-digital-advertising/
For example, we support the use of advertiser and publisher first-party data (based on direct interactions with customers they have relationships with) to deliver more relevant and helpful experiences—as long as users have transparency and control over the use of that data. What is not acceptable is the use of opaque or hidden techniques that transfer data about individual users and allow them to be tracked in a covert manner, such as fingerprinting. We believe that any attempts to track people or obtain information that could identify them, without their knowledge and permission, should be blocked. We'll continue to take a strong position against these practices.

# INTERNAL RESOURCE - Fingerprinting Policy

Source:

Prohibited Uses
⬚ Device/App/Browser Fingerprinting or Immutable Identifiers must not be used by any Google products or services for the purposes of:

- Tracking user behavior, including:
    - Ad measurement and prediction
    - Ad targeting
- Recording preferences

Permitted Uses

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

⬚ In order to use Device/App/Browser Fingerprinting or Immutable Identifiers,
- You must ensure compliance with internal policies and external commitments to users (such as Google's stated principles of transparency and control,
- Privacy and Legal review (for example, Product Counsel and PWG review) must determine no alternative solution is available, and
- The Director of Privacy must approve the specific use.

# INTERNAL RESOURCE - Data Joining

Source: Basic Internal Privacy Policy

Google's Privacy & Security Design Principles

> **Minimize data joining:** Only join the data with other User Data or Google products where necessary for the identified purpose, and where appropriate legal grounds to do so have been identified. Before doing so, ensure there are no restrictions prohibiting joining a user's data, and be aware joining data may cause otherwise non-identifiable data to become identifiable.

# Android AdID Data Joining Policy

**Source**: https://support.google.com/googleplay/android-developer/answer/9857753

Usage of Android Advertising ID
**Association with personally-identifiable information or other identifiers**. The advertising identifier must not be connected to personally-identifiable information or associated with any persistent device identifier (for example: SSAID, MAC address, IMEI, etc.) without explicit consent of the user.

# Customer Match Data Policy

**Source:** Customer Match Policies

### Collecting customer data

When using Customer Match, you may only upload customer information that you collected in the first-party context—i.e., information you collected from your websites, apps, physical stores, or other situations where customers shared their information directly with you.

### You are prohibited from:

Using a customer list that targets an overly narrow or specific audience. For example, you can't combine a customer list with other targeting criteria (such as geographic limitations) if it results in an ad targeted to a relatively small number of users;

GOOG-CABR-04604506

**TL:DR**

It's important to understand the difference between PII data (personally identifiable information) and personal information or personal data. As a reminder, PII is information that could be used on its own to directly identify, contact, or precisely locate an individual (e.g., name, email address, home address, or phone number).  PII is highly sensitive from a privacy perspective and clients generally are contractually prohibited from sending us such information.  Personal information or personal data, on the other hand, is a broader term. It includes PII but also includes information that reasonably can be linked to a specific person (e.g., IP addresses, cookies, AdID, or IDFA). Google has very clear policies, public facing help centers and contracts on the use of specific data.


This section calls out Googles definition of PII and SPII



Source:https://support.google.com/google-ads/answer/7686480?hl=enhttps://support.google.com/displayvideo/answer/7686480?hl=en

# What Google considers PII

Google interprets PII as information that could be used on its own to directly identify, contact, or precisely locate an individual. This includes:

> email addresses
> mailing addresses
> phone numbers
> precise locations (such as GPS coordinates - but see the note below)
> full names or usernames

For example, if you're a publisher whose contract prohibits you from passing PII to Google, the URLs of pages on your website that display ads by Google must not include email addresses, because those URLs would be passed to Google in any ad request. Google has long interpreted its PII prohibition in this way.

Note: Certain product's help centers and policies set out the limited means by which certain forms of PII may be sent to Google. For avoidance of doubt, this article does not amend such provisions. So, for example, certain products allow approximate location data to be sent to Google, provided the requirements of the applicable policies are met.

Google interprets PII to exclude, for example:

> pseudonymous cookie IDs
> pseudonymous advertising IDs
> IP addresses

GOOG-CABR-04604507

other pseudonymous end user identifiers

For instance, if an IP address is sent with an ad request (which will be the case with almost any ad request as a consequence of internet protocols), that transmission will not breach any prohibition on sending PII to Google.

Note that data excluded from Google's interpretation of PII may still be considered personal data under the GDPR, or personal information under the California Consumer Privacy Act (CCPA).

# INTERNAL RESOURCE - Identifiable Information - PII and SPII

Source:https://g3doc.corp.google.com/company/teams/security-privacy/policies/security/guidelines/data-classification.md?cl=head#PII or go/pii

There are two types of Identifiable information: Personally Identifiable Information (PII) and Sensitive Personally Identifiable Information (SPII).

*Personally Identifiable Information (PII)*

PII is information that personally identifies an individual and any other data that can be reasonably linked to such information by Google. The following basic guidelines apply to classifying data as PII:

- An individual's name, email address, mailing address, or telephone number, either alone or in combination, are examples of data that are considered PII.
- PII includes any information that is combined with PII or can be linked to PII with a reasonable level of confidence based on information available to Google.
- If there is any doubt about whether the information is PII, Googlers should treat the data as PII until the data is reclassified in accordance with guidance from Privacy's anonymization team.
- Solely for the purposes of classifying data internally at Google, the following types of data are classified as PII by default until reclassified: IP addresses, unique cookie or device ID and unique account identifiers (such as account or customer ID, GAIA ID, project ID or screen name).
- Data categorized as PII under these Guidelines may differ from data defined as "personal information," "personal data" or "personally identifiable information" in Google's external statements or applicable laws.

*Sensitive Personally Identifiable Information (SPII)*

SPII is a subset of PII that is subject to heightened legal requirements or presents a significant risk of harm to an individual if it is compromised or misused. Sometimes even anonymizing SPII may not eliminate this risk of harm. Here are some examples of data that are considered SPII:

- Account Credentials: nonpublic information used to log in, authenticate, or authorize activity as a particular individual, which may include the following:
  - Passwords, passphrases, and PINs
  - Cryptographic keys or authentication code

GOOG-CABR-04604508

- ○ Data that would permit account access or recovery (e.g., user-selected secret questions and answers, account creation date)
  - ○ Biometrics or DNA data
  - ○ Session cookies (when used for authentication)
- Government Identification Numbers: All government identification numbers should have the default classification of SPII, including (but not limited to) any state or national identification number, including Social Security Number (SSN), passport number, or driver's license number. Exceptions may be made, in consultation with Legal, for government identification numbers that do not present a material risk of harm because the government issuing the identification number designed them to be publicly available.
- Cardholder Data (CHD): Information associated with a specific payment card account (including credit cards, debit cards, or any other payment card), including:
  - ○ Primary Account Number (PAN): The account digits on the front of a payment card. The first six (6) digits of the card number, if stored or processed in isolation, are not considered SPII. Any other subset of a PAN is considered SPII.
  - ○ Other data used as proof of a user's identity, such as the last four digits of a credit card or a partial government identification number
  - ○ Card Verification Value (CVV2/CVC2/CID/CAV2/CSC): The 3 or 4 digit security code on the front or back of the payment card, used for card-not-present transactions.
  - ○ Magnetic Stripe Data: Information extracted from the magnetic stripe on the back of a payment card.
  - ○ Expiration Date (if stored in conjunction with PAN): The expiration date on the card.
  - ○ Cardholder Name (if stored in conjunction with PAN): The name on the card.
- Financial Account Data: Information about a specific financial transaction, including financial account numbers (including any Cardholder Data) and the details about the financial transaction (such as the amount of the transaction, what was purchased, the identity of the merchant, and the date of the transaction).
- Healthcare Information: details about an individual's past, present, or future physical or mental health or condition.
- Sensitive Background Information: any information relating to an identifiable individual's ethnicity, political affiliation, sexual orientation, transgender status, or religious affiliation.

Data categorized as SPII may differ from data defined as "sensitive personal data" in Google's external statements or applicable laws.

Pseudonymous Information

Information is pseudonymous when it can be attributed to an identified individual only in conjunction with other data, and when any linking to PII or attribution to an identified individual is (a) effectively controlled through technical and administrative measures, such as access control and anonymization techniques; and (b) performed only for specifically approved purposes, such as appending information to the pseudonymous data set. Typical examples include data sets keyed by user identifiers that are not ordinarily joined to PII, such as Zwieback.

For purposes of compliance with internal privacy policies, Pseudonymous Information should continue to be treated as PII and protected in a manner similar to the personal data to which it could be linked. Given the pseudonymity of the information, exceptions from certain obligations might be

granted, e.g., compliance with user rights of access, export, objection, or rectification where user authentication may be required. Any exceptions are subject to a PWG and legal review.

Classifying data sets as pseudonymous requires review and approval of technical and administrative measures by pwg-anonymization. These measures will generally include anonymization techniques, access control, and auditing.

Note that pseudonymization techniques can be applied to PII in order to guarantee certain security properties. This does not automatically change the classification of the data sets that have been subject to pseudonymization.

**TL:DR**

When you're signed in, we also collect information that we store with your Google Account, which we treat as personal information.

**Ads Personalization**

- We never use sensitive information to personalize ads
- If ad personalization is off, Google will not collect or use your information to create an ad profile or personalize the ads Google shows to you.

**Data Sharing**

- We do not sell your personal information to anyone.
  We do not share your personal information with companies, organizations, or individuals outside of Google except in the following cases:
  - With your consent
  - With domain administrators
  - For external processing
  - For legal reasons

- We do not allow sharing personally identifiable information (PII) with Google through remarketing tags, conversion tracking tags, or through any product data feeds that might be associated with ad

**Ad Serving**

- To serve ads in services where cookie technology may not be available (for example, in mobile applications), we may use technologies that perform similar functions to cookies.
- Ads can be served based on your general location. This can include location derived from the device's IP address

# General Data Collection Policy

Source:  Policies - Information Google Collects

When you're not signed in to a Google Account, we store the information we collect with unique identifiers tied to the browser, application, or device you're using. This helps us do things like maintain your language preferences across browsing sessions.

When you're signed in, we also collect information that we store with your Google Account, which we treat as personal information.

The information we collect includes unique identifiers, browser type and settings, device type and settings, operating system, mobile network information including carrier name and phone number, and application version number. We also collect information about the interaction of your apps, browsers, and devices with our services, including IP address, crash reports, system activity, and the date, time, and referrer URL of your request.

In some circumstances, Google also collects information about you from publicly accessible sources. For example, if your name appears in your local newspaper, Google's Search engine may index that article and display it to other people if they search for your name. We may also collect information about you from trusted partners, including marketing partners who provide us with information about potential customers of our business services, and security partners who provide us with information to protect against abuse. We also receive information from advertisers to provide advertising and research services on their behalf.

We use various technologies to collect and store information, including cookies, pixel tags, local storage, such as browser web storage or application data caches, databases, and server logs.

# General Data Use Policy

Source: https://privacy.google.com/businesses/rdp/

- Per our Personalized advertising policy, we never use sensitive information to personalize ads

**Source:** https://policies.google.com/privacy?hl=en-US

Depending on your settings, we may also show you personalized ads based on your interests. You can control what information we use to show you ads by visiting your ad settings.
- We don't show you personalized ads based on sensitive categories, such as race, religion, sexual orientation, or health.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- We don't share information that personally identifies you with advertisers, such as your name or email, unless you ask us to.

**Source**: https://policies.google.com/technologies/partner-sites

- If ad personalization is turned on, Google will use your information to make your ads more useful for you.
- If ad personalization is off, Google will not collect or use your information to create an ad profile or personalize the ads Google shows to you. You will still see ads, but they may not be as useful. Ads may still be based on the topic of the website or app you're looking at, your current search terms, or on your general location, but not on your interests, search history, or browsing history. Your information can still be used for the other purposes mentioned above, such as to measure the effectiveness of advertising and protect against fraud and abuse.

# General Data Sharing Policy

**Source:** https://safety.google/privacy/ads-and-data/
We do not sell your personal information to anyone. We use data to serve you relevant ads in Google products, on partner websites, and in mobile apps. While these ads help fund our services and make them free for everyone, your personal information is not for sale. And we also provide you powerful ad settings so you can better control what ads you see.

**Source**: https://policies.google.com/privacy?hl=en#infosharing
**When Google shares your information**
We do not share your personal information with companies, organizations, or individuals outside of Google except in the following cases:

- With your consent
- With domain administrators
- For external processing
- For legal reasons

We may share non-personally identifiable information publicly and with our partners — like publishers, advertisers, developers, or rights holders. For example, we share information publicly to show trends about the general use of our services. We also allow specific partners to collect information from your browser or device for advertising and measurement purposes using their own cookies or similar technologies.

Source:
https://support.google.com/admanager/answer/6281539?hl=en#how_segments_can_be_shared

The following are the general rules and guidelines for sharing first-party audience segments:

1. If the SAME COMPANY uses any two Google products, they are able to share their first-party segments between these products whenever technically possible. (An example of a technical limitation might be the inability to share a given identifier across products.) This includes sharing between Ad Manager, Google Display Network (GDA), Display & Video 360, Campaign Manager, Google Marketing Platform, Ad Exchange, and other products.
2. A CLIENT can share first-party lists with an AGENT provided both companies are operating on the SAME side (the two sides being BUYER and SELLER) of the media transaction. An agency acting on behalf of an advertiser is the approved use case.
3. If a BUYER and SELLER want to share first-party segments via a Google platform, they would need to do so via express consent in the UI.
4. Companies not acting as the BUYER or SELLER can license audience data via designated platforms.

Source: https://support.google.com/adspolicy/answer/6020956

The following is not allowed: Sharing personally identifiable information (PII) with Google through remarketing tags, conversion tracking tags, or through any product data feeds that might be associated with ads

Example: Sharing user's email addresses through URLs that have remarketing tags

Note: This requirement does not apply to Google services subject to the Google Ads Data Processing Terms.

# Google Advertising Technology Policy

Source; https://policies.google.com/technologies/ads

### Location
Google's ad products may receive or infer information about your location from a variety of sources. For example, we may use the IP address to identify your general location; we may receive precise location from your mobile device; we may infer your location from your search queries; and websites or apps that you use may send information about your location to us. Google uses location information in our ads products to infer demographic information, to improve the relevance of the ads you see, to measure ad performance and to report aggregate statistics to advertisers.

### Advertising identifiers for mobile apps
To serve ads in services where cookie technology may not be available (for example, in mobile applications), we may use technologies that perform similar functions to cookies. Sometimes Google links the identifier used for advertising on mobile applications to an

GOOG-CABR-04604513

advertising cookie on the same device in order to coordinate ads across your mobile apps and mobile browser.

Source; https://policies.google.com/technologies/location-data?hl=en-US

**Web & App Activity**

If Web & App Activity is enabled, your searches and activity from a number of other Google services are saved to your Google Account. The activity saved to Web & App Activity may also include location information. As an example, if you type in "weather" in Search and get weather results based on where you are, this activity, including the location used to provide this result, is saved to your Web & App Activity. The location used and stored with your Web & App Activity can come from signals like the device's IP address, your past activity, or from your device, if you've chosen to turn on your device's location settings.

**How is location used to show ads?**

Ads can be served based on your general location. This can include location derived from the device's IP address. Depending on your ads personalization settings, you may also see ads based on your activity in your Google Account. This includes activity stored in your Web & App Activity, which can be used for more useful ads. Another example is if you have enabled Location History and regularly frequent ski resorts, you might later see an ad for ski equipment when watching a video on YouTube. Google also uses Location History in an anonymized and aggregated manner, for users who have chosen to opt-in to it, to help advertisers measure how often an online ad campaign helps drive traffic to physical stores or properties. We do not share Location History or any other identifying information with advertisers.

# Additional Resources / Links

- Businesses and Data | Google protects your data and put your business in control
- Personalized Advertising Policies
- AdWords Policies for Data Collection and Use
- Chrome Browser – Privacy Policy
- Platform Program Policies

Google Ads Data Protection Terms: Service Information - Controller vs Data Processor

Google Ads Controller-Controller Data Protection Terms

Google Ads Data Processing Terms

- Customers who have already accepted the online GDPR (Processor or Controller-Controller) terms will be automatically covered by the new CCPA addendum. No action is required.

EU User Consent Policy

GDPR Resources
go/GDN-gdpr
DBM-GDPR

**Useful Help Center articles explaining data use:**
- How Google uses Google Marketing Platform advertising product data
- How Google uses Customer Match data
- How Google uses remarketing data
- How Google uses conversion event data


- EU User Consent Policy

General Data & Privacy Resources (on go/adsprivacy)

**Blogs**
- July 31, 2020 Updates on our work to improve user privacy in digital advertising - Mike Schulman
- Jan 28, 2020 - Data Privacy Day: seven ways we protect your privacy - Rahul Roy-Chowdhury (Keyword blog post)
- Jan 14, 2020 - Building a more private web: A path towards making third party cookies obsolete. (Chrome).
- December, 2019 - Putting you in control: our work in privacy this year - Rahul Roy-Chowdhury (Keyword blog post)
- December, 2019 - Inside Google Marketing: How we navigate today's privacy environment.
- August 22, 2019 - Next steps to ensure transparency, choice and control in digital advertising (Ads)
- August 22, 2019 - Building a more private web (Chrome)
- August 22, 2019 - Potential uses for the Privacy Sandbox (Chrome)
- May 7, 2019 - Raising the bar on transparency, choice and control in digital advertising (Ads)
- May 7, 2019 - Improving privacy and security on the web (Chrome)

**Internal Privacy Policies**


**External Source - How GDPR defines personal data -** Source: https://gdpr-info.eu/issues/personal-

data/#:~:text=The%20term%20'personal%20data'%20is,General%20Data%20Protection%20Regulatio
n%20applies.&text=Personal%20data%20are%20any%20information,identified%20or%20identifiable
%20natural%20person.

Personal data are any information which are related to an identified or identifiable natural person.

The data subjects are identifiable if they can be directly or indirectly identified, especially by
reference to an identifier such as a name, an identification number, location data, an online identifier
or one of several special characteristics, which expresses the physical, physiological, genetic,
mental, commercial, cultural or social identity of these natural persons. In practice, these also
include all data which are or can be assigned to a person in any kind of way. For example, the
telephone, credit card or personnel number of a person, account data, number plate, appearance,
customer number or address are all personal data.

GOOG-CABR-04604516

DocID :                         GOOG-CABR-04604487

BegDoc :                        GOOG-CABR-04604487

EndDoc :                        GOOG-CABR-04604516

DocID_BEGATT :

DocID_ENDATT :

Parent_Attachment :

Folder Name :                   CROSS-PROD022

Custodian :                     Chetna Bindra

CONFIDENTIALITY :               HIGHLY CONFIDENTIAL —
                                ATTORNEYS' EYES ONLY

OWNER :                         ekarp@google.com

Author :

From :

Recipients :

CC :

BCC :

Title :                         Google Ads Fact Base – Ads
                                Data Policies and Statements

MasterDate :

Sent Date :

Creation Date :

Date Created :                  6/17/2020

Last Modified Date :

Application Name :

Page Count :                    30

Location :

File Name :                     Google Ads Fact Base – Ads
                                Data Policies
                                a_17e0gJkngDvTloxTvfL776S2
                                A3URyCOSopvgyDq4emRE.docx

File Extension :                docx

Due to size limitations, not all document information was included on this page.

# EXHIBIT D

**REDACTED VERSION OF
DOCUMENT SOUGHT TO BE SEALED**

CONFIDENTIAL

1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3    SAN JOSE DIVISION

4    ---------------------------------------x

5    PATRICK CALHOUN, ELAINE CRESPO,

6    HADIYAH JACKSON and CLAUDIA KINDLER,

7    on behalf of all others similarly

8    situated,

9                           Plaintiffs,

10   -against-

11   GOOGLE LLC,

12                           Defendant.

13   CASE NO.: 5:20-cv-5146-LHK

14   ------------------------------------------ x

15               Monday, October 4, 2021

                 10:02 a.m.

16

17          ***CONFIDENTIAL***

18     VIDEO-RECORDED DEPOSITION (via Zoom) of

19   ALEXEI SVITKINE, taken pursuant to Notice,

20   before Fran Insley, a Notary Public of the

21   States of New York and New Jersey.

22

23

24   Job no. 4812690

25   Pages 1 - 324

                                        Page 1

| | |
|---|---|
| 1  A P P E A R A N C E S: | 1  ----------------- I N D E X -------------------- |
| 2    SIMMONS HANLY CONROY LLC | 2  WITNESS        EXAMINATION BY        PAGE |
| 3      Attorneys for Plaintiffs | 3  ALEXEI SVITKINE   MR. BARNES           9 |
| 4      112 Madison Avenue, 7th Floor | 4 |
| 5      New York, New York  10016 | 5  -------------- E X H I B I T S -------------- |
| 6    BY:  JASON BARNES, ESQ. | 6  DEPOSITION      DESCRIPTION          PAGE |
| 7      AN TRUONG, ESQ. | 7  EXHIBIT 1   Mr. Svitkine's presentation    19 |
| 8      ERIC JOHNSON, ESQ. | 8      in Q3 2019 |
| 9      Phone:  (618) 693-3104 | 9  EXHIBIT 2   Caitlin Sadowski's document,    36 |
| 10      jaybarnes@simmonsfirm.com | 10      created December 4, 2018 |
| 11 | 11  EXHIBIT 3   Document related to          80 |
| 12 | 12      Chrome://version |
| 13    QUINN EMANUEL URQUHART & SULLIVAN | 13  EXHIBIT 4   Document related to          98 |
| 14    Attorneys for Defendant | 14      Chrome://local-state |
| 15      191 North Wacker Drive | 15  EXHIBIT 5   Document related to ▮▮▮▮      113 |
| 16      Suite 2700 | 16  EXHIBIT 6   Document related to Project   127 |
| 17      Chicago, Illinois 60606 | 17 |
| 18    BY: JOSEF ANSORGE, ESQ. | 18  EXHIBIT 7   Exhibit Omaha 1           132 |
| 19      CARL SPILLY, ESQ. | 19  EXHIBIT 8   Things to cover in privacy    135 |
| 20      Phone: (202) 538-8000 | 20      meeting, February 4, 2019 |
| 21      josefansorge@quinnemanuel.com | 21  EXHIBIT 9   E-mail thread to Mr. Svitkine  142 |
| 22 | 22      related to Tron |
| 23 | 23  EXHIBIT 10  E-mail thread discussing     152 |
| 24 | 24      different metrics relating |
| 25                          Page 2 | 25      to Sync                    Page 4 |

| | |
|---|---|
| 1  A P P E A R A N C E S (Continued): | 1  -------------- E X H I B I T S -------------- |
| 2    BLEICHMAR FONTI & AULD LLP | 2  DEPOSITION      DESCRIPTION          PAGE |
| 3    Attorneys for Plaintiffs | 3  EXHIBIT 11  Answers to First Set of     163 |
| 4      555 12th Street - Suite1600 | 4      Interrogatories |
| 5      Oakland, California 94607 | 5  EXHIBIT 12  Verifications         163 |
| 6    BY: LESLEY E. WEAVER, ESQ. | 6  EXHIBIT 13  Document prepared by       172 |
| 7      Phone: (415) 445-4003 | 7      Chrome Analysis team about |
| 8      lweaver@bfalaw.com | 8      sync and cross-device usage |
| 9 | 9  EXHIBIT 14  Technical document explaining  183 |
| 10  ALSO PRESENT: | 10      infrastructure at Google |
| 11  PETER COOPER, Videographer | 11  EXHIBIT 15  Study authored by John Azose,  190 |
| 12  PROFESSOR SHAFIQ, Expert | 12      member of Chrome Analysis team |
| 13  MATTHEW GUBIOTTI, ESQ., Google | 13  EXHIBIT 16  Document about Chrome desktop  196 |
| 14          oOo | 14      usage |
| 15 | 15  EXHIBIT 17  Presentation by Florian Euunk  201 |
| 16 | 16  EXHIBIT 18  Video              211 |
| 17 | 17  EXHIBIT 19  E-mail thread related to a    208 |
| 18 | 18      change to Chrome |
| 19 | 19  EXHIBIT 20  X-Client-Data header patent   221 |
| 20 | 20  EXHIBIT 21  E-mail to Mr. Svitkine      227 |
| 21 | 21  EXHIBIT 22  Exhibit 40, Monsee deposition  233 |
| 22 | 22  EXHIBIT 23  Chat transcript between      263 |
| 23 | 23      Mr. Svitkine and Ms. Sadowski |
| 24 | 24  EXHIBIT 24  Document relating to Google   265 |
| 25                          Page 3 | 25      Search app              Page 5 |

DocuSign Envelope ID: 986D6A00-5521-4A8C-B0C7-4EFA8E1E2ADA

CONFIDENTIAL

1    Q.   Could you pack X-Client-Data header
2    information into existing cookies?
3         MR. ANSORGE:   Objection, vague.
4    A.   I'm not familiar with existing
5    cookies. I think you're referring to the
6    different cookies that maybe Google uses and
7    I'm not a subject area expert there. I think
8    there's a technical challenge there, is that if
9    Chrome is trying to add -- like if we implement
10   X-Client-Data in this way instead, where Chrome
11   would take existing cookies, add extra
12   information to them with the content of
13   X-Client-Data header, then this would be a very
14   fragile system. It would mean that Google
15   server side systems cannot change the format of
16   their cookies without breaking this connection,
17   because now Chrome has a dependency on how
18   those exact cookies are formulated, and so from
19   a technical point of view this would not be a
20   good solution.
21   Q.   Could Google include a new cookie
22   that would included the X-Client-Data headers?
23        MR. ANSORGE:   Objection, vague,
24   form.
25   A.   I think that would be more -- or

Page 298

1    certainly maybe we could try to do it and like
2    it would cause some breakages and then we can
3    work through that. But that whole system is --
4    Q.   Does Zwieback break the internet?
5         MR. ANSORGE:   Objection, foundation,
6    form.
7    A.   So the difference between a cookie
8    like Zwieback is that cookie is actually set by
9    Google scripts, and so it is -- it is part of
10   the Google code base that it is responsible for
11   it, whereas Chrome is a different code base and
12   is not --
13   Q.   Okay, that helps. Then why couldn't
14   Google scripts set the X-Client-Data header as
15   a cookie so that Google.com could use a cookie
16   to track the experiments on Google.com?
17        MR. ANSORGE:   Objection, form,
18   foundation.
19   A.   I mean, I think -- your line of
20   questioning makes it sound like you're trying
21   to get me to design some new system that does
22   not exist, and this is very hard to do in the
23   context of, you know, a very short time frame.
24   I think systems need research and understanding
25   to design. And so I do not have -- I think --

Page 300

1    less challenging technically than the previous
2    proposal. However, I do not think it -- it
3    still has many down sides, and the primary
4    downside is a website that is looking at the
5    cookies that are set for it may behave in
6    unexpected ways and may break if it sees a
7    cookie that it is not expecting to be there.
8    The main issue is that this information would
9    be very accessible to JavaScript code that is
10   looking at cookies and therefore it means that
11   that -- you know, depending on how that code is
12   created, like it may cause that code to do
13   unexpected things when there's a --
14   Q.   But if it's a cookie set to the
15   Google.com domain, it's only going to be
16   available to Google.com, correct?
17   A.   That's correct. So it would mean
18   that, for instance, Google.com scripts, which
19   are many different JavaScripts, because, you
20   know, Maps runs on Google.com, Docs runs on
21   Google.com. There's many, many different
22   Google teams and, you know, it's not clear that
23   we can a make a change to cookies, like to
24   introduce some other cookie that Chrome sends
25   for them without breaking web page. I mean,

Page 299

1    I could think of different challenges related
2    to that. For instance, if the scripts on
3    Google.com would set such a cookie like they
4    would need to get information somehow to put
5    into that cookie, and right now the only way to
6    get that information is through the
7    X-Client-Data header. So like we would need a
8    third -- yet another mechanism by which this
9    information would be available. It could be a
10   JavaScript, yeah, but now we're like actually
11   making a much more complicated system.
12   Q.   By designing it this way it also has
13   the benefit of not being capable of being
14   blocked by third-party cookie blockers,
15   correct?
16        MR. ANSORGE:   Objection,
17   argumentative.
18   A.   I'm sorry. Can you repeat the
19   question?
20   Q.   By designing it the way that it is
21   designed, it's not capable of being blocked by
22   third party cookie blockers, correct?
23   A.   Yes. However, I do not recall that
24   being a design consideration when the header
25   was introduced. I believe it is a side effect

Page 301

76 (Pages 298 - 301)

1  of the implementation.
2      Q.   If you could pull up Exhibit 28,
3  please.
4          (Whereupon Exhibit 28 was marked for
5      identification.)
6      Q.   I really want to focus on -- with
7  this e-mail on two things.  One is the "Hey
8  Googlers" message, but the second is the e-mail
9  that you actually sent, which starts on page 4.
10 So if you could read the bottom of page 3 and
11 the then top of your E4, your e-mail.
12     A.   Can you identify the page number?
13     Q.   Good question.  GOOG-CABR-0048515
14 and then GOOG-CABR-484516.  I can read the
15 first one.  It says, "Hey Googlers,
16 Discussions/tensions have heated up today
17 thanks to a viral comment on GitHub about," I'm
18 going to paraphrase, X-Client-Data header.  It
19 appears to be an e-mail from "We at 9to5 Google
20 would like to publish a piece," and they're
21 looking for information.  Do you see it in the
22 next page down is an e-mail from you to the
23 group?
24     A.   Yes, I see the next e-mail.  Just to
25 be clear, the next e-mail is actually an older

Page 302

1  users.  Variations sent in X-Client-Data header
2  are based on a 13-bit number (8,000 unique
3  values)."  We established today it's actually
4  7999, correct?
5      A.   Sorry, it is 8,000 unique values.
6  The number ranges from zero, which with zero it
7  makes it 8,000.
8      Q.   Okay.  Thank you for the correction.
9  "The idea is that since there are much more
10 users than 8,000, a given user could not be
11 identified by this header."  Can you read the
12 next sentence after that?
13     A.   The next sentence is, "Although
14 there is a valid concern that this could be
15 combined with other information to get to
16 something that is more than 13 bits."
17     Q.   Why is it, in your words, a valid
18 concern that this could be combined with other
19 information to get to something that is more
20 than 13 bits?
21     A.   By nature of combining different
22 information together it is possible to increase
23 the entropy available.  I think the video that
24 we saw also touches on that subject.
25     Q.   Can you go down to page 5 of 9?

Page 304

1  e-mail.  The one at the top is a later reply.
2      Q.   Correct.  Sorry.  So the e-mail I'm
3  focused on is Tuesday, February 4, 2020, at
4  11:39 a m. from Asvitkine@Google.com.  Do you
5  see that?
6      A.   Yes.
7      Q.   And you're asked to give an
8  explanation?
9      A.   Yes.
10     Q.   You talk about the white paper.  Do
11 you see that?
12     A.   Yes.
13     Q.   How many Chrome users read the white
14 paper?
15     A.   I'm not aware.
16         MR. ANSORGE:  Objection, form.
17     A.   I'm not aware of that information.
18 I don't know.
19     Q.   Do you think it's a lot of people or
20 a little amount?
21     A.   I suspect most Chrome users do not
22 read the white paper.
23     Q.   Then there's a paragraph that says,
24 "There is a mechanism in place to actually
25 guard against this header being used to track

Page 303

1  This is another e-mail in which you're
2  mentioned.  It's GOOG-CABR-00484517.
3      A.   Yes.
4      Q.   And that's from Mr. Sramek.  Am I
5  pronouncing his name correctly?
6      A.   I'm actually not sure how his last
7  name is pronounced.
8      Q.   Do you recall receiving this e-mail?
9      A.   I recall the thread.  I don't -- my
10 memory is not so good to recall every e-mail in
11 this thread.
12     Q.   Mr Sramek says at the bottom, "One
13 naive solution is to remove 13 bits of privacy
14 budget from sites that receive this header."
15 Do you see that?
16     A.   I see that.
17     Q.   Did Google remove 13 bits of privacy
18 budget for sites that receive that header?
19     A.   I'm not aware -- I think the privacy
20 budget that it is referring to is part of the
21 ▇▇▇▇▇▇▇  project.  I'm not specifically aware
22 of the status of that project, so I'm not sure.
23     Q.   Why is it called ▇▇▇▇▇▇▇
24     A.   I'm not sure.
25     Q.   When Google implements the privacy

Page 305

77 (Pages 302 - 305)

1   a member of her team, but not her directly.
2     Q.  Because some of this is in ▮▮▮▮ who
3   would have done it in ▮▮▮▮
4     A.  The Chrome Analysis team is able to
5   get data out of ▮▮▮▮  So it was still someone
6   at Chrome Analysis team.  Again, I don't know
7   who exactly for this specific site.
8     Q.  What is a sync rate?
9       MR. ANSORGE:  Objection, form,
10   foundation.
11     A.  It's not a term that my team is
12   responsible for, but I suspect it's referring
13   to percent of clients that are syncing.
14     Q.  And that's measured here by
15   Ms. Sadowski's team for this quarterly report,
16   correct?
17     A.  Yes.
18     Q.  Do you know a Douglas Leith,
19   L-E-I-T-H?
20       MR. ANSORGE:  Objection, foundation.
21     A.  I have not -- I am not familiar with
22   that name.  It does not ring a bell.
23       MR. ANSORGE:  And, Mr. Barnes,
24   aren't we up with your two minutes now?
25   Or does that run different in your part...

Page 318

---

1       MR. BARNES:  It might.  Mr. Cooper,
2   what's the...?
3       THE VIDEOGRAPHER:  Official time
4   will be over seven hours at this point.
5       MR. BARNES:  Are you cutting me off,
6   Mr. Ansorge?
7       MR. ANSORGE:  No, I'd like you to
8   finish your question.  But I think you've
9   had more than enough time with
10   Mr. Svitkine.  He's been very patient and
11   we'd like to respect his energy levels and
12   time as well.
13       MR. BARNES:  I think we can be
14   finished.
15       THE VIDEOGRAPHER:  We are off the
16   record at 6:49 p.m.  This concludes today
17   testimony given by Alexei Svitkine.  The
18   total number of media used was five and
19   will be retained by Veritext Legal
20   Solutions.
21     (Time noted: 6:49 p.m.)
22
23
24
25

Page 319

---

A C K N O W L E D G M E N T

1
2
3        :
4
5
6     I, ALEXEI SVITKINE, hereby certify
7   that I have read the transcript of my testimony
8   taken under oath in my deposition on the 4th
9   day of October, 2021; that the transcript is a
10   true, complete record of my testimony and that
11   the answers on the record as given by me are
12   true and correct.
13
14          _Alexei Svitkine_____
15       AL___4CF706E23B58435...
16
17
18
19     11/22/2021 _____
20
21
22
23
24
25

Page 320

---

1       C E R T I F I C A T E
2
3     I, FRAN INSLEY, hereby certify that the
4   Deposition of ALEXEI SVITKINE was held before
5   me on the 4th day of October, 2021; that said
6   witness was duly sworn before the commencement
7   of testimony; that the testimony was taken
8   stenographically by myself and then transcribed
9   by myself; that the party was represented by
10   counsel as appears herein;
11     That the within transcript is a true
12   record of the Deposition of said witness;
13     That I am not connected by blood or
14   marriage with any of the parties; that I am not
15   interested directly or indirectly in the
16   outcome of this matter; that I am not in the
17   employ of any of the counsel.
18     IN WITNESS WHEREOF, I have hereunto set
19   my hand this 8th day of October, 2021.
20
21
22
23
24     FRAN INSLEY
25

Page 321

81 (Pages 318 - 321)

# EXHIBIT G

## REDACTED IN ITS ENTIRETY

# EXHIBIT H

## REDACTED IN ITS ENTIRETY

# EXHIBIT I

## REDACTED IN ITS ENTIRETY

# EXHIBIT J

## REDACTED IN ITS ENTIRETY

# EXHIBIT L

**REDACTED IN ITS ENTIRETY**

# EXHIBIT M

## REDACTED IN ITS ENTIRETY

# EXHIBIT N

## REDACTED IN ITS ENTIRETY