# Plaintiffs' Opposition to Google's Motion to Strike the Reports of Plaintiffs' Experts  Professors Joseprh Turow and Leslie John

# Redacted Version of Document Sought to be Sealed

**BLEICHMAR FONTI & AULD LLP**
Lesley Weaver (Cal. Bar No.191305)
Angelica M. Ornelas (Cal. Bar No. 285929)
Joshua D. Samra (Cal. Bar No. 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
*lweaver@bfalaw.com*
*aornelas@bfalaw.com*
*jsamra@bfalaw.com*

**SIMMONS HANLY CONROY LLC**
Jason 'Jay' Barnes (admitted *pro hac vice*)
An Truong (admitted *pro hac vice*)
Eric Johnson (admitted *pro hac vice*)
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
Fax: (212) 213-5949
*jaybarnes@simmonsfirm.com*
*atruong@simmonsfirm.com*
*ejohnson@simmonsfirm.com*

*Counsel for Plaintiffs*

**DiCELLO LEVITT GUTZLER LLC**
David A. Straite (admitted *pro hac vice*)
One Grand Central Place
69 East 42nd Street, Suite 2400
New York, NY 10165
Tel.: (646) 933-1000
*dstraite@dicellolevitt.com*

Amy Keller (admitted *pro hac vice*)
Adam Prom (admitted *pro hac vice*)
Sharon Cruz (admitted *pro hac vice*)
Ten North Dearborn Street, Sixth Floor
Chicago, IL 60602
Tel.: (312) 214-7900
*akeller@dicellolevitt.com*
*aprom@dicellolevitt.com*
*scruz@dicellolevitt.com*

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA – OAKLAND DIVISION

| | |
|---|---|
| PATRICK CALHOUN, ET AL., *on behalf of themselves and all others similarly situated*,<br><br>        Plaintiffs,<br><br>v.<br><br>GOOGLE, LLC,<br><br>        Defendant. | CASE NO.: 4:20-cv-05146-YGR-SVK<br><br>**PLAINTIFFS' OPPOSITION TO GOOGLE'S MOTION TO STRIKE THE REPORTS OF PLAINTIFFS' EXPERTS PROFESSORS JOSEPH TUROW AND LESLIE JOHN**<br><br>Hearing Date: May 31, 2022<br>Time: 2:00PM<br>Courtroom: 1, 4th Floor<br><br>Hon. Yvonne Gonzalez Rogers |

**UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

TABLE OF CONTENTS

I.     INTRODUCTION AND SUMMARY OF ARGUMENT ...................................................1

II.    PLAINTIFFS' COUNTER-STATEMENT OF ISSUES TO BE
       DECIDED PURSUANT TO CIVIL L.R. 7-4(a)(3) ............................................................1

III.   BACKGROUND ....................................................................................................................2

       A.     SUMMARY OF PROFESSOR JOSEPH TUROW'S OPINIONS                          2

       B.     SUMMARY OF PROFESSOR LESLIE JOHN'S OPINIONS                           4

IV.    LEGAL ARGUMENT – PROFESSORS TUROW AND JOHN
       OFFER RELEVANT AND RELIABLE OPINIONS THAT WILL
       ASSIST THE TRIER OF FACT................................................................................................7

       A.     LEGAL STANDARD                                                           7

       B.     PROFESSORS TUROW AND JOHN'S OPINIONS ARE
              RELEVANT AND WILL ASSIST THE TRIER OF FACT                           8

       C.     PROFESSORS TUROW AND JOHN'S OPINIONS ARE RELIABLE               10

              1.     No Consumer Study is Needed; Applying Experience and
                     Expertise is a Reliable Methodology. ...........................................................10

              2.     Professors Turow and John's Opinions are Neither Subjective
                     Nor *Ipse Dixit*........................................................................................................15

              3.     Google Internally Agrees with Turow and John.........................................18

              4.     Google's Other Arguments Provide No Basis to Strike
                     Professors Turow and John ....................................................................................20

V.     CONCLUSION.....................................................................................................................24

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*,
   738 F.3d 960 (9th Cir. 2013) ...................................................8

*In re Arris Cable Modem Consumer Litig.*,
   327 F.R.D. 334 (N.D. Cal. 2018)...............................................13

*Bailey v. Rite Aid Corp.*,
   338 F.R.D. 390 (N.D. Cal. 2021) (Gonzalez Rogers, J.) ....................10, 11

*Berman v. Freedom Fin. Network, LLC*,
   400 F. Supp. 3d 964 (N.D. Cal. 2019) (Gonzalez Rogers, J.) ...............11, 15

*Brighton Collectible, LLC v. Believe Prod., Inc.*,
   No. 215CV00579CASASX, 2017 WL 440255 (C.D. Cal. Jan. 30, 2017) ...........13

*Brophy v. Almanzar*,
   2020 WL 8175605 (C.D. Cal. Dec. 4, 2020) .................................13

*Cabrera v. Cordis Corp.*,
   134 F.3d 1418 (9th Cir. 1998) ...............................................16

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   MDL No. 1917, 2013 WL 5428139 (N.D. Cal. June 20, 2013) ...................7

*Chamberlan v. Ford Motor Co.*,
   369 F. Supp. 2d 1138 (N.D. Cal. 2005) ......................................21

*ChromaDex, Inc. v. Elysium Health, Inc.*,
   No. SACV1602277CJCDFMX, 2020 WL 1279236 (C.D. Cal. Jan. 16, 2020) ........13

*City of Pomona v. SQM North America Corp.*,
   750 F.3d 1036 (9th Cir. 2014) ...............................................8

*Claar v. Burlington N. R. Co.*,
   29 F.3d 499 (9th Cir. 1994) .................................................16

*Congdon v. Uber*,
   291 F.Supp.3d 1012 (2018) ...................................................1

*Cover v. Windsor Surry Co.*,
   2017 WL 9837932 (N.D. Cal. July 24, 2017)................................20, 21

*Daubert v. Merrell Dow Pharmaceuticals, Inc.* (*Daubert II*),
  43 F.3d 1311 (9th Cir. 1995) ...................................................................................8

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)...........................................................................................1, 2, 7

*Domingo ex rel. Domingo v. T.K.*,
  289 F.3d 600 (9th Cir. 2002) ................................................................................16

*Finjan, Inc. v. Sophos, Inc.*,
  No. 14-CV-01197-WHO, 2016 WL 4560071 (N.D. Cal. Aug. 22, 2016) .............................17

*GPNE Corp. v. Apple, Inc.*,
  12-CV-02885-LHK, 2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) ........................................16

*In re High-Tech Emp. Antitrust Litig.*,
  No. 11-cv-02509-LHK, 2014 WL 1351040 (N.D. Cal. Apr. 4, 2014) .................................7, 8

*Kennedy v. Collagen Corporation*,
  161 F.3d 1226 (9th Cir.1998) ..................................................................................8

*Krommenhock v. Post Foods, LLC*,
  334 F.R.D. 552 (N.D. Cal. 2020).......................................................................11, 12, 13, 16

*Lord Abbett Mun. Income Fund, Inc. v. Asami*,
  No. C-12-03694 DMR, 2014 WL 3417941 (N.D. Cal. July 11, 2014), *aff'd*, 653 F.
  App'x 553 (9th Cir. 2016) ...................................................................................17

*Mann v. Punchkick Interactive, Inc.*,
  2016 WL 1701778 (N.D. Cal. Apr. 28, 2016) (Gonzalez Rogers, J.) .....................................12

*Messick v. Novartis Pharm. Corp.*,
  747 F.3d 1193 (9th Cir. 2014) ........................................................................7, 8, 10, 18

*Monroe v. United States*,
  No. 3:12-CV-92 CAR, 2014 WL 1315242, at *9 (M.D. Ga. Mar. 31, 2014)........................24

*Open Text S.A. v. Box, Inc.*,
  No. 13-CV-04910-JD, 2015 WL 349197 (N.D. Cal. Jan. 23, 2015) ......................................17

*Rodriguez v. Google*,
  2022 WL 214552 (N.D. Cal. Jan. 25, 2022) ......................................................................12

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
  No. 13-MD-2445, 2020 WL 6887885 (E.D. Pa. Nov. 24, 2020) .........................................13

*Synopsys, Inc. v. Mentor Graphics Corp.*,
  No. C 12-6467 MMC, 2014 WL 6735460 (N.D. Cal. Nov. 26, 2014).....................................17

*In re Viagra (Sildenafil Citrate) & Cialis (Tadalafil) Prod. Liab. Litig.*,
    424 F. Supp. 3d 781 (N.D. Cal. 2020) ........................................................................13

*Wendell v. GlaxoSmithKline LLC*,
    858 F.3d 1227 (9th Cir. 2017) ........................................................... *passim*

**Other Authorities**

Fed. R. Evid. 702 .............................................................................1, 2, 7, 8

## I.     INTRODUCTION AND SUMMARY OF ARGUMENT

Google's Motion to Strike the Reports of Plaintiffs' Experts Professors Joseph Turow and Leslie John (the "Motion," Dkt. 425) has no basis in law or fact and should be denied.  Professors Turow and John express modest opinions well within the scope of their expertise that easily satisfy the relevance and reliability standards of the Federal Rules and will also aid a factfinder in viewing the operative contract language in a context of what a reasonable user might understand from them.

Google does not question the Professors' qualifications and hardly challenges relevance. Instead, Google's main criticism is that the Professors' reports are not reliable because they did not conduct consumer surveys on the contract language at issue in this case or Google's privacy policies, thereby rendering their opinions merely subjective and *ipse dixit*.  But that criticism misses the mark twice over.  It's wrong on the facts, because—as explained in detail below—Professors Turow and John base their opinions not on their "say so" but instead on their decades of experience and their and others' research in their relevant fields as well as Google's own documents (including a multitude not considered at all by Google's own experts).  That expertise and research, along with their review of Google and Plaintiffs-related materials in this case, support their opinions.  They had no need to survey consumers.  And Google's criticism is wrong on the law. Contract interpretation is not the proper subject of a consumer survey (see *Congdon v. Uber*, 291 F.Supp.3d 1012 (2018)) and there is no requirement that experts conduct a survey to opine on consumer expectations, as this Court has previously recognized. It is an acceptable methodology to apply one's experience and expertise, just as Professors Turow and John did here.  The Ninth Circuit follows the liberal thrust of Rule 702 favoring admission of expert testimony, and Google's Motion proffers no valid reason to overcome that approach.  The Motion should be denied.

## II.    PLAINTIFFS' COUNTER-STATEMENT OF ISSUES TO BE DECIDED PURSUANT TO CIVIL L.R. 7-4(a)(3)

1.     Whether Professor Turow's relevant and reliable opinions are subject to exclusion under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ("*Daubert*").

2.     Whether Professor John's relevant and reliable opinions are subject to exclusion under

Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ("*Daubert*").

## III.    BACKGROUND

### A.      SUMMARY OF PROFESSOR JOSEPH TUROW'S OPINIONS

Professor Turow's research focuses on digital industries, especially at the intersection of the internet, marketing, and society, as well as studies on media and privacy.   Turow Rpt. ¶ 1. Publications, including the New York Times, have referred to him as a privacy pioneer with expertise in media and digital privacy issues.  *Id.* at ¶ 2.  He has written numerous books and articles on mass media industries and the digital age, and he teaches courses on data collection, privacy policies, and media and society.  *Id.* at ¶¶ 3-4.  Professor Turow's research lies at the intersection of marketing, digital media, and society by learning what Americans know and understand about the changing marketing world and what they think about issues related to marketing surveillance and privacy.  *Id.* at ¶ 11.  His extensive research suggests that there are key "through lines" about "reasonable people" when it comes to the relationship between Americans and the digital-media-and-marketing system, namely, that reasonable people know little, and are confused, about the data-extraction regimes that surround them, at least partly because the companies they deal with go out of their way to make it difficult to understand their data-extraction activities so that people won't be concerned.  *Id.* at ¶ 12.

In this case, Professor Turow's assignment was—based on his experience discussed above—to determine what a reasonable person would understand Chrome's disclosures and terms of service to convey to a person signing up for Chrome with regard to the Sync function.  *Id.*  Professor Turow's overarching opinion is that a "reasonable person" would interpret Google's disclosures to mean that Chrome does not take personal information unless the user elects to "sync" the browser with a Google Account.  He broke down that opinion into four specific parts:

1.  A reasonable person reading the Chrome Sync Setup Windows would understand that Google will only personalize its services if sync is enabled;

2.  A reasonable person who read the Chrome Privacy Notice would understand that Chrome does not send personal information to Google unless a person enables Sync;

3.  A reasonable person who read Google's General Privacy Policy would understand that Google receives personal information from Chrome only if sync is enabled; and

4. Reasonable consumers wrongly believe that the label "privacy policy" means their privacy is protected and are unable to comprehend the legalese in privacy policies.

*Id.* at ¶¶ 13-30.   Professor Turow reached those opinions by using his experience to analyze the language used by Google in the Chrome Sync Setup Windows, Chrome Privacy Notice, and Google's General Privacy Policy.   In particular, his methodology was (1) applying his extensive background in understanding the nature of the technology; (2) reading Google's materials very closely; and (3) trying to understand the plain language of Google's materials as stated and compared to the privacy policies he studies.   Cruz Decl. Ex. 1 at 15:6-15; *see also* Turow Rebuttal Report ("Turow Reb. Rpt.") at 11 (he has vast experience interpreting and opining on privacy policies for reports, peer-reviewed journal articles, and government meetings by using systematic discourse analysis from the long tradition of academic privacy experts).[1]   He applied his expertise in marketing, digital media, and privacy policies to Google's materials at issue in this case (*i.e.*, "bringing my knowledge and interpretive ability to the situation").   Cruz Decl. Ex. 1 at 19:10-20.   There is a tradition within communication search of rhetoric to look at language and try to understand the meaning that communicators (*e.g.* Google) provide in their language, going all the way back to Socrates.   *Id.* at 20:24-21:17.   Professor Turow felt comfortable analyzing Google's materials due to his 30 plus years of work in the areas of digital technologies, advertising, and society, along with reviewing and teaching about hundreds of privacy policies and learning how reasonable people understand them.   *Id.* at 353:5-354:1; *see also* Turow Reb. Rpt. at ¶ 9 (he draws his specialized method and scientific method from analyzing the media industry, conducting large-scale population surveys, teaching classes and receiving feedback from people over decades, and analyzing industry discourse including privacy policies).   He brought all of his expertise to bear for purposes of his assignment in this case, including speaking to people over decades, teaching classes, and hearing feedback about what people pay attention to or not for purposes of parsing information.   Turow Dep. 354:9-355:1, 373:20-374:2.

Regarding Professor Turow's first opinion above, he found that the upon download of Chrome

---

[1] His opinions are based on the methodologies and techniques applied in his field of study.   Turow Reb. Rpt. at 9.

and upon subsequently syncing, Google uses words that clearly create the impression that it will use people's data for personalization *only* when they sync with Chrome.  Turow Rpt. ¶¶ 14-15.  Regarding his second opinion, Professor Turow found that the Chrome Privacy Notice's language "[y]ou don't need to provide any personal information to use Chrome" gives users the clear impression that there is a way to use Chrome without giving up personal information to Google.  *Id*. at ¶¶ 16-18.  And additional language, in particular "the personal information that Chrome stores won't be sent to Google unless you choose to store that data in your Google account by turning on sync…,"[2] means that when a person chooses not to sync on Chrome, Google won't receive information from Chrome about that person.  *Id*. at ¶¶ 19-22.  For Professor Turow's third opinion, he concluded that a reasonable person would understand Google's Privacy Policy like the Chrome Privacy Notice, because it discloses that "activity information" Google collects "may include: Chrome browsing history you've synced with your Google Account" and links to a disclosure where Google represents, "Your Chrome browsing history is only saved to your account if you've enabled Chrome synchronization with your Google Account." *Id*. at ¶¶ 23-27.  Regarding his fourth opinion, Professor Turow's experience and research leads to the conclusion that it is unlikely that people would carefully understand privacy policies and misunderstand the very label "privacy policy," because the policies are complex and typically long, and reasonable people mistakenly believe that the existence of the privacy policy means a website will not collect or share data about them without their permission.  *Id*. at ¶¶ 28-29. Those conclusions support Professor Turow's opinion that a reasonable user encountering the sync screens above, or the Chrome "Privacy Notice" or the Google general Privacy Policy would conclude that Chrome does not share browsing history with Google unless the user chooses to sync.  *Id*.

## B.    SUMMARY OF PROFESSOR LESLIE JOHN'S OPINIONS

Professor John has expertise in behavioral decision research (often referred to as behavioral economics) that deals with how people reason and decide.  John Rpt. at p. 1.  Professor John has

---

[2] Also, "Sync is only enabled if you choose" and in the section about how Chrome handled synced information "If you don't use your Chrome data to personalize your experience outside of Chrome, Google will only use your Chrome data after it's anonymized and aggregated with data from other users."

conducted research in this field for 15 years and been published widely. *Id.* Her primary focus is on privacy, specifically understanding when and why people reveal or conceal sensitive personal information and their reactions and expectations to firms' collections and use of their information. *Id.*; John Rebuttal Report ("John Reb. Rept.") at ¶4. In this case, Professor John provides four opinions:

1. A common methodology can be applied to answering questions about consumer expectations and actions and would not require individual questioning of all consumers;

2. Consumers care about their privacy on the internet;

3. It is reasonable for a consumer to use Chrome in the not-synced state and believe that Chrome will not send their personal information to Google. This is true for consumers who read Google's privacy policies and for consumers who do not; and

4. The Plaintiffs' experiences mentioned in their depositions are typical of reasonable consumers.

Professor John bases her opinions on scholarly research, including her own, and reviewing case documents such as Google's own internal research and Plaintiffs' statements. Cruz Decl. Ex.3 at 105:9-106:15, 117:4-25, 125:5-25. Her opinions are fundamentally based on research because there have been so many studies that speak to her four opinions; "it was so overwhelming" what the research conclusions have pointed to that she did *not* need to collect more data, such as a survey. *Id.* at 78:4-11, 80:16-81:5. For example, she has done research that looks at what is an invasion of privacy and assessing people's expectations of privacy with respect to behaviorally targeted ads. *Id.* at 81:17-82:25. Also, there is a lot of research that looks at privacy policies and how people understand or misunderstand them, and people in her field draw conclusions from that research and make generalizations based on the available evidence (*e.g.* that privacy policies are not typically written in a way that people really understand what they mean). *Id.* at 125:20-126:12; Turow Reb. Rpt. at ¶11 (discussing that it is standard practice to form conclusions about human behavior without surveying every single human; Professor John has done this in every single one of her publications).

Professor John further explains her methodology by making clear that scholars in her field conduct research in two basic steps: (1) secondary research – i.e. reviewing and synthesizing prior scholarly work; and (2) primary research – collecting new empirical data. Turow Reb. Rpt. at ¶13-

18.  Step one is necessary and often sufficient to answer a given research question; step two is only conducted if step one is inconclusive.  *Id.* at ¶7 (explaining that a typical literature review in step one encompasses 50+ scholarly articles; here, she relied on 62 articles in forming her opinions).  Professor John formed her opinions after finding sufficient support in step one, thereby making step two unnecessary.

Regarding her second opinion—that consumers care about their privacy on the internet—Professor John also bases it on empirical research that speaks to the question and converges, regardless of a variety of research methods, on the conclusion that consumers do fundamentally care about online privacy.  John Rpt. at 3.  For her third opinion, Professor John also bases it on research she and others did that found people's expectations of eavesdropping offline or third-party tracking online is that they are unacceptable.  *Id.* at 3-4.  She then applies such research findings to the context of Chrome in this case to support her conclusion that it is reasonable for a consumer who uses Chrome in the not-synced state to believe that Chrome won't send her personal information to Google, regardless of whether that person read the Chrome Privacy Notice or Google's privacy policies.  *Id.*  Moreover, Professor John looked to a body of research pointing to how difficult it is to understand privacy policies and that most people do not understand them to support her conclusion that if a reasonable person read the Chrome Privacy Notice and Google's privacy policies, it is reasonable for her to use Chrome in the not-synced state and believe that Chrome will not send her personal information to Google.  *Id.* at 5.  Professor John further based that opinion on several express statements in the Chrome Privacy Notice, including:

- "You don't need to provide any personal information to use Chrome."

- "The personal information that Chrome stores won't be sent to Google unless you choose to store that data in your Google Account by turning on sync."

- "In general, the fact that you use Chrome to access Google services, such as Gmail, does not cause Google to receive any additional personally identifying information about you."

*Id.*  And she based it on several relatively straight-forward statements in the Google Privacy Policy, such as "Your Chrome browsing history is only saved to your account if you've enabled Chrome synchronization with your Google Account."  *Id.* at 6.  Finally, for Professor John's fourth opinion, she concludes that the Plaintiffs are typical of the reasonable consumer, because they did not read

Chrome or Google's policies in great detail or at all, like the majority of U.S. consumers, and they expressed concern about Chrome sending their information to Google without being synced. *Id.* at 7. Professor John bases that opinion on the Plaintiffs' deposition testimony and her expertise with research on such questions. *Id.* at 7-8.

For purposes of her methodology, Professor John made clear that assessing and understanding consumer expectations is not limited to surveys necessarily. John Dep. 69:6-9, 74:5-15.  That is because in her field, "[y]ou can make generalizations based on research that has been done," and you don't need to survey every single consumer to come to conclusions about consumer expectations. *Id.* at 65:12-25.  Professor John explained further that it was unnecessary to conduct a survey for purposes of her work in this case, because "[t]here is so much evidence to support the conclusions that I've drawn that it was not – I deemed it not necessary to run an additional survey. And that's because there is a lot of research that has already been done that answers questions, you know – the assignment questions . . . there's so much research that has been done …including my own, that is directly relevant here …" *Id.* at 84:22-85:13. She did not need to conduct consumer surveys to reach her opinions due to the significant bodies of research already conducted, along with the application of her knowledge of such research to the facts here based on her review of evidence.  Turow Reb. Rpt.  at 8.

**IV.    LEGAL ARGUMENT – PROFESSORS TUROW AND JOHN OFFER RELEVANT AND RELIABLE OPINIONS THAT WILL ASSIST THE TRIER OF FACT**

**A.    LEGAL STANDARD**

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the standard in *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579 (1993).  Rule 702 sets forth criteria for the district court's consideration, but the *Daubert* inquiry is "flexible," *Daubert*, 509 U.S. at 588, and "Rule 702 should be applied with a 'liberal thrust' favoring admission." *Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014); *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017).[3]  Consistent with this liberal view of admissibility, a "review of the caselaw after

---

[3] *See also In re High-Tech Emp. Antitrust Litig.*, No. 11-cv-02509-LHK, 2014 WL 1351040, at *2 (N.D. Cal. Apr. 4, 2014) (holding "Rule 702 mandates a liberal standard for the admissibility of expert testimony"); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, 2013 WL 5428139, at

*Daubert* shows that the rejection of expert testimony is the exception rather than the rule."  Fed. R. Evid. 702, advisory committee notes (2000).  Although it requires that expert testimony be both relevant and reliable, the relevancy bar is low (only that it logically advances a material aspect of the case) and reliability requires a basis in the knowledge and experience of the relevant discipline. *Messick*, 747 F.3d at 1196-97.

The *Daubert* inquiry gives the district court the discretion needed to preclude "junk science" while admitting reliable expert testimony that will assist the trier of fact.  *Id*. at 1199.  Judges should not exclude expert testimony simply because they disagree with the conclusions of the expert; the test is whether or not the reasoning is scientific and will assist the jury and then it is a matter for the finder of fact to decide what weight to accord the expert's testimony.  *Kennedy v. Collagen Corporation,* 161 F.3d 1226, 1230–31 (9th Cir.1998).  The task is to analyze not what the experts say, but the basis they have for saying it.  *Wendell*, 858 F.3d at 1232.  The Ninth Circuit has emphasized that the gatekeeping function is meant to "screen the jury from unreliable nonsense opinions, but not to exclude opinions merely because they are impeachable."  *Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*, 738 F.3d 960, 969 (9th Cir. 2013); *In re High-Tech Emp. Antitrust Litig.*, No. 11-CV-02509-LHK, 2014 WL 1351040, at *22 (N.D. Cal. Apr. 4, 2014) (noting that exclusion is justified only if opinion is so fundamentally unsupported that it can offer no assistance to the jury) (citing *Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1061 (8th Cir. 2002))·

### B.     PROFESSORS TUROW AND JOHN'S OPINIONS ARE RELEVANT AND WILL ASSIST THE TRIER OF FACT

"Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry."  *City of Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014). (citation omitted).  In other words, the expert testimony must "fit" the question the jury must answer.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (*Daubert II*), 43 F.3d 1311, 1321 n.17 (9th Cir. 1995).  Google makes a half-hearted attempt to argue that the opinions of Professors Turow and John are irrelevant; therefore, the main question, as discussed in depth below, is whether their opinions

---

*2 (N.D. Cal. June 20, 2013) (noting district courts should "adhere to the 'liberal policy of admissibility' that favors admission of any evidence that may assist the trier of fact").

are reliable (they are).  *Wendell*, 858 F.3d at 1232.

The only specific squabbles Google makes regarding relevance are about: (1) Professor John's opinion that consumers care about their privacy on the internet (Mot. at 1); and (2) Professor John's opinion that Plaintiffs are typical, reasonable consumers (Mot. at 10).  Google also vaguely argues without analysis that their testimony would confuse the jury and offer little, if any, probative value regarding any issue to be tried.  Mot. at 14-15.  Professor John explained that there is abundant evidence that consumers care about privacy on the internet, and her report provides examples of valid concerns about privacy.  Cruz Decl. Ex. 3 at 110:4-17.  The abundant empirical evidence and research she has seen reveals "a commonality [] that people care about their privacy."  *Id*. at 111:15-24.  That opinion is clearly relevant in this case, which at its core is about Chrome's unauthorized transmission of personal, sensitive information from people online and involves multiple privacy-related claims such as violation of the California Invasion of Privacy Act ("CIPA") and intrusion upon seclusion. *See, e.g.*, FAC (Dkt. 163) pp. 49-51 (alleging serious and highly offensive invasion of privacy).

Professor John's opinion that Plaintiffs are typical, reasonable consumers is also plainly relevant, because it is connected to her other opinions, which Google does not challenge under relevancy.  Indeed, Professor John ties her fourth opinion to the others by specifying that Plaintiffs' testimony demonstrates they are typical of reasonable consumers discussed in her other opinions because: (1) Plaintiffs did not read Google's policies or terms of service in great detail or at all ("similar to the majority of U.S. consumers…"); and (2) Plaintiffs expressed concern upon learning that Chrome sends their information to Google when they are not synced.  *Cf.* John Rept. at 3, 6 (discussing how people do not generally expect their personal information to be transmitted to third parties without their knowledge or explicit consent; citing research finding that an overwhelming majority of internet users do not read privacy policies).  Moreover, the similarity of Plaintiffs to a reasonable consumer in Professor John's research and experience is directly relevant to this case.  *See, e.g.*, FAC (Dkt. 163) pp. 73-75 (Invasion of Privacy and Intrusion Upon Seclusion claims, which include allegations regarding a reasonable expectation of privacy and intrusion in a manner highly offensive to a reasonable person).

In sum, Professor John's second and fourth opinions "fit" questions the jury must answer, and they will assist the trier of fact, namely, because they are based on her extensive experience and research in the field of privacy, specifically understanding when and why people reveal or conceal sensitive personal information and their reactions to firms' collections and use of their information. Her second and fourth opinions clear the low bar of relevancy, and because Google makes no meaningful challenge to the relevancy of her other opinions (or Professor Turow's) so do those. *Messick*, 747 F.3d at 1196-97.

### C.    PROFESSORS TUROW AND JOHN'S OPINIONS ARE RELIABLE

Google proffers several reasons why it believes the Court should forego Rule 702's liberal thrust favoring admission of expert testimony, none of which is a valid reason to do so.  Google contends that Professors Turow and John's opinions are unreliable because they contain subjective methodology, lay opinion, and are mere *ipse dixit*.  Boiled down, Google's arguments are about one main criticism: that Professors Turow and John did not conduct a consumer survey specifically on Google's policies.  No such survey was needed here, as the Professors explained, and case law further makes clear that surveys are not required.  Professor Turow and John offer opinions based on their decades of experience and research and applying that vast expertise to the facts of this case is a well-accepted methodology that renders their opinions reliable.

#### 1.  No Consumer Study is Needed; Applying Experience and Expertise is a Reliable Methodology.

Professors Turow and John had no need to conduct a consumer study, and no such study is required by the law.  Despite those realities, Google tries to make a mountain out of a molehill by criticizing them for not doing primary research and/or a survey specifically into Google's policies or products.  Mot. at 14.  Google's criticisms are misplaced and provide no basis for striking Professors Turow and John.

Courts, including this one, have rejected Google's contention that a consumer study is required and that experts should be stricken for not conducting one.  This Court found in *Bailey v. Rite Aid Corp.*, 338 F.R.D. 390, 401 (N.D. Cal. 2021) (Gonzalez Rogers, J.), that "an expert who offers

testimony on the question of whether a reasonable consumer is likely to be deceived by an allegedly misleading statement, or whether a reasonable consumer would find such a statement to be material, is not required to conduct a consumer survey if his or her testimony is otherwise reliable." This Court further explained that the expert's experience in marketing-communication allowed him to reliably and persuasively opine, because he had, among other things, interviewed many consumers over the course of his career. *Id.* Therefore, the failure to conduct a consumer study "does not negatively impact the reliability or persuasiveness of his opinions." *Id.*; *see also Berman v. Freedom Fin. Network, LLC*, 400 F. Supp. 3d 964, 971-72 (N.D. Cal. 2019) (this Court denied a motion to strike opinions from a web developer regarding "whether the design of the Fluent website would be likely to mislead or confuse a *typical* user" because he has experience with the design of websites that solicit a user's consent to receive marketing communications, along with training on user-experience design related to whether users understand how their personal information will be used and disclosed when interacting with a web page) (Gonzalez Rogers, J.).[4]

Likewise, in *Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 579–80 (N.D. Cal. 2020), the defendant made the same argument that Google does here, but the court found that "[defendant's] argument that Silverman's opinions must be excluded because he did not conduct any focus group or other consumer testing is misplaced." Google's argument is wrong, because:

> As Judge Koh explained in *Hadley I*, "California courts have explicitly 'reject[ed] [the] view that a plaintiff must produce' extrinsic evidence 'such as expert testimony or consumer surveys' in order 'to prevail on a claim that the public is likely to be misled by a representation' under the FAL, CLRA, or UCL."

*Id.*[5] Equally wrong is Google's contention that Professors Turow and John have offered no valid

---

[4] This Court cautioned that the expert may not testify as to whether a particular user or group of users was confused or misled *without a factual basis* (for example, survey data). *Id.* However, neither Professor Turow nor Professor John have attempted to do so. And Professor John's fourth opinion regarding Plaintiffs' experiences being typical of reasonable consumers is largely based on the facts from their own testimony. John Rpt. 7-8. Ultimately, the question of whether Google's promises were false is for the jury and is not the proper subject of a survey or expert opinion.

[5] Quoting *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1115 (N.D. Cal. 2018), which further stated "To the extent Kellogg argues that Plaintiff's expert testimony is weak or that Plaintiff lacks consumer survey evidence, *see* Opp. at 32 ('As indicated in Kellogg's *Daubert* motion, Mr. Silverman did not a survey or interview a *single* consumer to determine if the challenged statements are material.'), that argument is without merit."

methodology due to the lack of a consumer study.  The *Krommenhock* court also rejected that argument:

> Also without merit is Post's assertion that Silverman needed to have but had no methodology to support his analysis of meaning and materiality. As Judge Koh explained in *Hadley II*, because "Silverman's opinions are based on his many years of marketing experience and his review of Kellogg's own internal consumer research and other documents," the motion to exclude was denied. *Hadley II*, 2019 WL 3804661, at *24 (N.D. Cal. Aug. 13, 2019).

*Id*. at 580, citing *Hadley v. Kellogg Sales Co*., No. 16-CV-04955-LHK, 2019 WL 3804661, at *24 (N.D. Cal. Aug. 13, 2019).  The *Krommenhock* court found that the expert's in-depth experience in the field qualified him to opine, and the defendant's challenges to his methodology, such as not considering specific issues similar to those here (i.e. other phrases on the packaging), "go to weight, not admissibility" because the jury will consider the context of the challenged statements and relevant defendant documents to determine whether a reasonable consumer would attach importance to it.  *Id*. Here, Google makes the same argument that goes to weight, not admissibility.  *See* Mot. at 5-6, 10 (criticizing Professors Turow and John for not considering Google's Account Holder Agreements or Chrome users' MyActivity or Web & App Activity pages).[6]

  *Bailey*, *Berman*, *Krommenhock*, and Judge Koh's two *Hadley* decisions are not alone in rejecting Google's argument. *See Wendell*, 858 F.3d at 1236 ("The district court also wrongfully required that the experts' opinions rely on animal or epidemiological studies. Neither are necessary for an expert's testimony to be found reliable and admissible"; accepting experts' reliance on other

---

[6] Google's reliance on MyActivity and Web & App Activity is ironic. First, the Google employee in charge of the systems that run these pages has internally admitted, "we know that terms like 'web & app activity' mean zero to a user" and the "owner" of the Google Privacy Policy has said that the purported WAA "consent" is "contradictory" and "simply doesn't make sense." Cruz Decl. Ex. 5, at -798; Cruz Decl. Ex. 6 at 293; Cruz Decl. Ex. 7. Second, in *Rodriguez v. Google*, 2022 WL 214552 (N.D. Cal. Jan. 25, 2022), Google argued that Web & App Activity was not part of any consumer agreement with Google. Judge Seeborg agreed, and expressly ruled that "Plaintiffs created a contract with Google by agreeing to its Terms of Service," the "Terms of Service govern this subject matter— Google's services[,]" and "WAA was not incorporated into the Terms of Service, and was not a standalone contract." *Id*. at *3-4. Accordingly, the doctrine of judicial estoppel should apply here to Google's purported WAA defense and criticisms. See *Mann v. Punchkick Interactive, Inc*., 2016 WL 1701778, at *3 (N.D. Cal. Apr. 28, 2016) (Gonzalez Rogers, J.) ("Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, particularly where the change of position prejudices the other party.")

published studies, articles, and their own wealth of experience); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, No. 13-MD-2445, 2020 WL 6887885, at *29 (E.D. Pa. Nov. 24, 2020) ("Repeatedly, courts have permitted experts to rely solely on their experience to opine on how a reasonable individual within the same industry would react"; collecting cases, including *Krommenhock*); *In re Viagra (Sildenafil Citrate) & Cialis (Tadalafil) Prod. Liab. Litig.*, 424 F. Supp. 3d 781, 792 (N.D. Cal. 2020) (Doctors' methodology was to apply their education, training, and experience to a comprehensive review of the available medical literature on the topic—"[s]uch an approach is appropriate."); *Brighton Collectible, LLC v. Believe Prod., Inc.*, No. 215CV00579CASASX, 2017 WL 440255, at *9 (C.D. Cal. Jan. 30, 2017) (expert's application of her expertise to the facts of this case would be both relevant and helpful to the jury; "To the extent that defendant objects to [the expert's] failure to conduct a consumer study consistent with practice in the field of marketing, said decision does not undermine the reliability of [the expert's] opinion."); *In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 363 (N.D. Cal. 2018) ("nothing requires that an expert conduct independent testing in every case"). Google's cited authority does not change the foregoing, and it is inapposite to this case.[7]

Professors Turow and John both appropriately based their opinions on their extensive experience, personal research, and the research and findings of others in their field. As discussed in depth above, Professor Turow brought all of his expertise to bear for purposes of his assignment in this case, including speaking to people over decades, teaching classes, and hearing feedback about what people pay attention to or not for purposes of parsing information. Turow Dep. at 354:9-355:1, 373:20-374:2; Turow Reb. Rpt. at 9. He was able to review and try to understand the plain language of Google's materials in this case based on his 30-plus years of work in the areas of digital technologies, advertising, and society, along with reviewing and teaching about hundreds of privacy

---

[7] *Brophy v. Almanzar*, 2020 WL 8175605, at *6 (C.D. Cal. Dec. 4, 2020) (rejecting expert's conclusion as "pure fantasy" because he could not provide any support for his opinion that cover art is the *sole* driver of the decision of what music to listen to); *ChromaDex, Inc. v. Elysium Health, Inc.*, No. SACV1602277CJCDFMX, 2020 WL 1279236, at *8 (C.D. Cal. Jan. 16, 2020) (testimony on damages was insufficient to show lost profits with reasonable certainty, because Dr. Cockburn had to make a number of assumptions based on "no data whatsoever," including that the proportion of sales to practitioners versus direct-to-consumer were half and half).

policies and learning how reasonable people understand them. *Id*. at 353:5-354:1. He testified that that methodology is a tradition going back to the time of Socrates. *Id*. at 20:24-21:17; Turow Reb. Rpt. at 4-8 (testifying to vast experience interpreting and opining on privacy policies for reports, peer-reviewed journal articles, and government meetings by using systematic discourse analysis from the long tradition of academic privacy experts). Professor Turow explains that he did not need to conduct a consumer survey in this case, because the facts of this case are amenable to textual analysis and the plain meaning of the text at issue would not be in doubt to a reasonable person who spent the time necessary to fully read and understand the policies; he felt comfortable analyzing Google's materials in the context of his decades of experience reviewing hundreds of privacy policies and learning how reasonable people interpret them. Turow Reb. Rpt. at 17.

Similarly, Professor John bases her opinions on scholarly research, including her own, and reviewing case documents such as Google's own internal research and Plaintiffs' statements. John Dep. 105:9-106:15, 117:4-25, 125:5-25. Her opinions are fundamentally based on research because there have been so many studies that speak to her four opinions; "it was so overwhelming" what the research conclusions have pointed to that she did *not* need to collect more data, such as a survey. *Id*. at 78:4-11, 80:16-81:5. For example, she has done research that looks at what is an invasion of privacy and assessing people's expectations of privacy, and she is aware of significant research that looks at privacy policies and how people understand or misunderstand them. *Id*. at 81:17-82:25, 125:20-126:12. In her field of behavioral economics, she and others can make generalizations based on research that has been done, and they don't need to survey every single consumer to come to conclusions about consumer expectations. *Id*. at 65:12-25. She did not need to conduct consumer surveys to reach her opinions due to the significant bodies of research already conducted, along with the application of her knowledge of such research to the facts here based on her review of evidence. Turow Reb. Rpt. at 2.

For these reasons, the Court should reject Google's contention that Professors Turow and John should have conducted consumer surveys. The Professors' expertise in their privacy- and consumer-related fields, as applied to the facts here, makes their methodologies and opinions reliable. Like the

web developer that this Court concluded could opine on whether the design of a website would be likely to mislead or confuse a *typical* user, Professors Turow and John are unchallenged leaders in their fields, and they offer opinions on how *reasonable* consumers view privacy on the internet and would interpret Chrome's privacy disclosures.  *Berman*, 400 F. Supp. 3d at 971-72.

### 2.    Professors Turow and John's Opinions are Neither Subjective Nor *Ipse Dixit*

As a corollary to Google's argument that they should have conducted a consumer study, Google labels Professors Turow and John's opinions as subjective and merely *ipse dixit*.  They are neither.  Even a cursory review of the Professors' reports and deposition testimony reveals that their opinions are not based on their own personal beliefs and supposed "say so"; instead, their opinions are based on vast research—their own and others' in their field—and extensive experience with central issues in this case such as privacy policies and consumer expectations regarding privacy.  *See, e.g.*, Turow Rpt. at ¶ 12 (his extensive research shows key "through lines" about "reasonable people," namely, that reasonable people know little, and are confused, about the data-extraction regimes that surround them); Turow Dep. at 353:5-354:1 (he felt comfortable analyzing Google's materials due to his 30 plus years of work in the areas of digital technologies, advertising, and society, along with reviewing and teaching about hundreds of privacy policies and learning how reasonable people understand them); John Rpt. at 3-4 (her and others' empirical research converges on the conclusion that consumers do fundamentally care about online privacy); John Dep. at 78:4-11, 80:16-81:5, 81:17-82:25, 105:9-106:15, 117:4-25, 125:5-126:12 (there is overwhelming research that speak to her four opinions, including privacy policies and how people understand or misunderstand them).

Google falsely says that Professors Turow and John's opinions are based on nothing but *ipse dixit*, without citation to evidence or application of scientific principles.  Mot. at 11.  Both Professors' Reports cite to scholarly publications and articles.  *See, e.g.*, Turow Rpt. at ¶¶ 24, 28-30 (citing research, including surveys and studies, finding that people suspect they are being tracked by marketers but don't understand how, that it is unrealistic to believe people read privacy policies with care, and that majorities of Americans misunderstand the very label "privacy policy"); John Rpt. at pp. 3-7 (citing empirical research, studies, surveys, and polls finding that, among other things,

consumers care about online privacy, what users deem reasonable use of the personal data online, that an overwhelming majority of internet users don't read privacy policies, and how difficult it is to understand privacy policies).[8]  Additionally, Google tries to manufacture an inconsistency in Professor John's cited publications and articles where none exists.  She explained in her report that her third opinion includes her conclusion that although consumers would not come to one singular interpretation of what Google's privacy notices mean (because a body of research points to how most people do not understand them), a common—and perhaps even the most common—understanding would be to conclude that not syncing means that Google would not collect their personal information.  John Rpt. at 5.  That common understanding is supported by several express statements in the Chrome Privacy Notice and the Google Privacy Policy.  *Id*. at 5-6.  And it is further supported by abundant research and her review of evidence.  Turow Reb. Rpt.  at 2.[9]

Google cites inapposite case law that does not render Professors Turow and John's opinions subjective, *ipse dixit*.  In *Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1422-23 (9th Cir. 1998)—unlike here—the Doctor could not identify any peer-reviewed research or scientific method embraced by at least some others in his field that would justify his conclusion.  In *Claar v. Burlington N. R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994)—unlike here—the Doctors formed their opinions *before* reading the relevant literature and admitted that they were not sufficiently familiar with the field to diagnose the causes of plaintiffs' injuries without first reviewing that literature.  Google also relies on *GPNE Corp. v. Apple, Inc.*, 12-CV-02885-LHK, 2014 WL 1494247, at *5 (N.D. Cal. Apr. 16, 2014), but that case is distinguishable and not persuasive, as noted by the *Krommenhock* court.  334 F.R.D. at 580 n.23.[10]  Google's other cited cases are equally inapposite.[11]

---

[8] Google tries to undermine these objective sources by saying they are dated. Mot. at 2.  Not so - both Professors cite older and more recent sources, including from 2014, 2015, 2018, 2020, and 2021.

[9] Google ignores that its own privacy employees' assertions cited in note 6 above, who have also internally agreed with

[10] Indeed, in *GPNE Corp.*, 2014 WL 1494247, at *6, the expert's analysis about a royalty was "a black box" that appeared to be plucked out of thin air without a methodology, apportionment analysis, or explanation of why apportionment would or wouldn't be inappropriate.  That situation is a far cry from the extensive experience and research Professors Turow and John have that they explained and applied to the facts here.

[11] *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 606-07 (9th Cir. 2002) (Doctor did not establish

Further, Google's motion skillfully evades key facts. Google criticizes Prof. John for only offering opinions about the Chrome Privacy Notice and the Google Privacy Policy. Mot. 9:19-21. But the documents Google insists she must opine upon are not part of a binding contract with consumers and thus are not relevant to this case. See n. 6, *supra*. Likewise, Google's attack on Prof. John's acknowledgement that some consumers are "generally aware" that firms track Internet behavior has no merit. Mot. 9:15-18. This case is not about Internet tracking generally – or even Google tracking generally. It is solely about the Chrome browser – and express promises that Chrome made to users in a binding contract. Those promises are simple, straight-forward, and set out in Prof. John's Report:

(1) "You don't need to provide any personal information to use Chrome."

(2) "The personal information that Chrome stores [including "browsing history information" and "cookies or data from websites you visit"] won't be sent to Google unless you choose to store that data in your Google Account by turning on sync."

(3) In general, the fact that you use Chrome to access Google services, such as Gmail, does not cause Google to receive any additional personally identifying information about you."

(4) "Sync is only enabled if you choose."

(5) If you don't enable Sync and allow "your Chrome data to personalize your Google experience outside of Chrome, Google will only use your Chrome data after it's anonymized and aggregated with data from other sources."

John Rep. at 5. Per the Google Terms of Service, as a "service-specific additional service," the promises made to Chrome users in the Chrome Privacy Notice govern the relationship between Chrome and its users – and, to the extent any other document conflicts with the Chrome Privacy

that the animal studies he uses to support his causation theory are applicable to human operations, and court found that his conclusion "simply did not follow from his analysis"); *Lord Abbett Mun. Income Fund, Inc. v. Asami*, No. C-12-03694 DMR, 2014 WL 3417941, at *13 n.8 (N.D. Cal. July 11, 2014), *aff'd*, 653 F. App'x 553 (9th Cir. 2016) (was not clear that proposed expert has expertise in the relevant area of municipal finance, and her opinion "is not clearly grounded in any expertise at all"); *Synopsys, Inc. v. Mentor Graphics Corp.*, No. C 12-6467 MMC, 2014 WL 6735460, at *1 (N.D. Cal. Nov. 26, 2014) (testimony about an opinion as to the date of an asserted offer to sell is not a proper subject of expert opinion); *Open Text S.A. v. Box, Inc.*, No. 13-CV-04910-JD, 2015 WL 349197, at *6 (N.D. Cal. Jan. 23, 2015) (the link between inputs and proposed expert's final royalty "is written in invisible ink" because she did not spell out the steps from the data to the royalty rate opinion); *but see Finjan, Inc. v. Sophos, Inc.*, No. 14-CV-01197-WHO, 2016 WL 4560071, at *4 (N.D. Cal. Aug. 22, 2016) (distinguishing *Open Text*, because expert presented and explained his process and defendant can cross-examine him on any deficiencies in his calculation).

1  Notice, the CPN prevails. Incredibly, Google's survey presented in opposition to Turow and John

2  showed respondents the wrong documents, mislabeling them as the terms of service, and did not ask

3  a single question about the actual contract promises at issue in this case.

4          Rather than look to Google's cases that precluded expert testimony for specific circumstances

5  (most of which deal with failures—unlike here—to have any support and/or explanation of opinions

6  whatsoever), this Court should instead follow the Ninth Circuit's liberal thrust favoring admission of

7  expert testimony.  *Messick*, 747 F.3d at 1196 (9th Cir. 2014); *Wendell*, 858 F.3d at 1237–38 ("Where,

8  as here, two doctors who stand at or near the top of their field and have extensive clinical experience

9  with the rare disease or class of disease at issue, are prepared to give expert opinions supporting

10  causation, we conclude that *Daubert* poses no bar based on their principles and methodology.").  In

11  other words, Professors Turow and John's opinions are not the "junk science" Rule 702 was meant to

12  exclude; instead, they are based on the Professors' and others' decades of experience and research into

13  the relevant privacy and consumer-related fields.  Rather than strike Professors Turow and John, the

14  interests of justice favor leaving difficult issues in the hands of the jury and relying on safeguards of

15  the adversary system, such as cross-examination.  *Wendell*, 858 F.3d at 1237–38.

16              **3.  Google Internally Agrees with Turow and John**

17          Despite Google's criticisms here, discovery has revealed internal agreement with Turow and

18  John's conclusions. For example:

19      ●  ████████████████████████████████████████████████████████████████
20         ████████████████████████████████ Cruz Decl. Ex. 8, at -720.

21      ●  Google admits that "track[ing] users across the web" does not "meet[] users'
22         expectations of privacy." Cruz Decl. Ex. 9 at -512; Ex. 10 at -287.

23      ●  A March 2019 presentation to Google CEO Sundar Pichai explained that
           users "do not expect their data to be shared or sold without their consent"
24         and "don't know how their data is being used by they're pretty
           uncomfortable with certain behaviors" like "businesses … following them
25         all over the web." Cruz Decl. Ex. 11 at -401, -428.

26      ●  ████████████████████████████████████████████████████████ Cruz Decl.
27         Ex. 12, at -160.

28

1 · ███████████████████████████████████████
  ███████████████████████████████████ Cruz Decl. Ex. 13

2 at -318.

3     The "owner" of Google's Privacy Policy (Sam Heft-Luthy) admitted "[i]t's difficult for people

4 to fully / meaningfully give permission [because] much of the language intended to be comprehensive

5 feels vague and hard-to-parse[.]" Cruz Decl. Ex. 14. As a result, users "struggle … to grasp … how

6 their data will be used[.]" *Id*. at -161. Overall, people are left "feeling unequipped to make informed

7 decisions, or even questioning whether they have a genuine choice." *Id*. Users simply "don't have the

8 time or capacity to absorb all the information we're putting in front of them, let alone understand the

9 precise impact their choices might have on the services they use." Cruz Decl. Ex. 15 at -629.

10     Specific to the Chrome Privacy Notice, Chrome employees have noted that sync "doesn't

11 communicate the big picture well to users" because "browsing history [is] collected in the account

12 when Sync is off." John Reb. Rept., at -335. In addition, although the Chrome Privacy Notice promises

13 otherwise, Chrome employees internally admit "there's no real difference" between synced and signed

14 in but not consented for sync "for users who'd prefer not to store their data with Google." Cruz Decl.

15 Ex. 16. In documents brainstorming on how to make Chrome became a privacy-first browser, Chrome

16 employees admitted that Chrome does not "allow users to turn off data collection in a simple way"

17 because the sign in and sync "controls are not simple and the mental model is confusing." Cruz Decl.

18 Ex. 17. The same document admits that, even though Chrome promises that browsing history is not

19 sent to Google, "Ads does collect your browsing history … via cookies[.]" Id.

20     Chrome's lead for Trust & Safety proposed that, for Chrome to become a privacy-first browser,

21 Chrome would "like to be able to make" the statements in the left side of the chart below, but that

22 Chrome was "not in a position to make all of the[m]." Cruz Decl. Ex. 18. The problem with the

23 proposal was that the Chrome Privacy Notice was already making all of them:

| Aspirations for Privacy-First Chrome that Chrome T&S Admits Are Not True | Promises Already Made in Chrome PN |
|---|---|
| Your browsing history is never used to show you ads in a way that compromises your privacy (or uniquely identifies you). | Unless you enabled sync and turn on WAA, "Google will only use your data after its anonymized and aggregated with data from other users." See, e.g. FAC Ex. 33 at 7. |
| Your browsing data is never shared with others, including other applications in Google, unless | "The personal information that Chrome stores [including '*browsing history information*' and |

28

| | |
|---|---|
| you explicitly give another application permission. | '*cookies or data from websites that you visit*'] won't be sent to Google unless you choose to store that data in your Google Account by turning on sync[.]" FAC Ex. 33 at 2. |
| You are in full control over what data is collected and sent to Google. | "You don't need to provide any personal information to use Chrome." FAC Ex. 33 at 1. |
| We always ask before sending anything to Google. | "Chrome … does not cause Google to receive any additional personally identifying information about you." FAC, Ex. 33 at 2. |
| Tracking is off by default. You don't need to 'opt-in' to get more privacy. | Sync is only enabled if you choose. FAC Ex. 33 at 7. |

### 4. Google's Other Arguments Provide No Basis to Strike Professors Turow and John

Google also requests that the Court strike Professors Turow and John for supposedly not offering any expertise and for supposedly not defining terms used in their opinions. Neither argument is a reason to strike their opinions. Indeed, Google does not challenge their qualifications as experts.

First, Google misconstrues Professor Turow's deposition testimony in order to contend that he somehow conceded that his expertise is not necessary to reach his opinion. Mot. at 15-16. He did no such thing.[12] His methodology was (1) using his strong background in understanding the nature of the technology; (2) reading Google's materials very closely; and (3) trying to understand the plain language of Google's materials as stated and compared to the privacy policies he studies. Turow Dep. 15:6-15. He applied his expertise in marketing, digital media, and privacy policies to Google's materials at issue in this case (*i.e.*, "bringing my knowledge and interpretive ability to the situation"). *Id*. at 19:10-20. Similarly, Professors John applied her expertise in privacy, specifically understanding when and why people reveal or conceal sensitive personal information and their reactions to firms' collections and use of their information. John Rpt. at 1.

Google cites *Cover v. Windsor Surry Co.*, 2017 WL 9837932 (N.D. Cal. July 24, 2017) to argue that Professors Turow and John are no better than the jury at interpreting its documents. That

---

[12] Google says that the only expertise Professor Turow brings to the table is time. Wrong. Rather, Professor Turow testified that he brings his knowledge, expertise, and interpretative ability to this case, and although he does not act as an expert witness as an everyday party of his work, he has rendered an expert opinion before in a different case, where he was asked to read Vizio's policies, try to discern their plain meaning, and opine on what reasonable people think. Turow Dep. 19:15-20:23. And when asked if he brings expertise to this case compared to somebody who does not have his experience, he said, "My answer is yes, sir" based on his understanding of the material, making comparisons across documents, and suggesting meaning. *Id*. at 115:20-117:22.

argument is wrong on the facts – because both Professors make clear that reasonable people struggle understanding privacy policies and how companies like Google extract data from them.  Turow Rpt. at ¶¶ 12, 28-29; John Rpt. at 5.  And Google's argument is wrong on the law because *Cover* actually generally supports *Plaintiffs*.  There, one of the experts had years of experience working as a contractor, was an expert in construction diagnostics, had experience installing pine trim, and had taken some classes on wood science.  *Cover*, 2017 WL 9837932, at *11.  The court found his opinions regarding the suitability of an exterior product sufficiently reliable under Rule 702, based on his general knowledge of wood and expertise in building diagnostics; furthermore, based on the same expertise, the court concluded that he could testify about the value of an adhesive warranty even though he was not qualified to opine as that what the warranty promises.  *Id*. at *11-12.  Also, although the court found unreliable a second wood science expert's opinions interpreting defendant's marketing materials, the court acknowledged that even non-marketing experts may offer opinions relevant to consumer expectations if rooted in their expertise.  *Id*. at *17.[13]  And the court noted that the wood science expert could have offered a general opinion regarding consumer expectations for wood products, based on his experience and conversations with people in the industry.  *Id*.

Here, Professors Turow and John are doing precisely what the *Cover* acknowledged is appropriate: offering opinions regarding consumer expectations based on their vast experience and expertise in relevant fields, including their own research, studying the research of others, and interactions with consumers.  *See, e.g.*, Turow Dep. at 354:9-355:1, 373:20-374:2 (he brought all of his expertise to bear for purposes of his opinions, including speaking to people over decades, teaching classes, and hearing feedback about what people pay attention to or not for purposes of parsing information); John Rpt. at 3-4 (Professor John has done research that found people's expectations of eavesdropping offline or third-party tracking online is that they are unacceptable); Turow Reb. Rpt. at 10 (she did not need to conduct consumer surveys to reach her opinions due to the significant bodies

---

[13] The court cited *Chamberlan v. Ford Motor Co.*, 369 F. Supp. 2d 1138, 1145 n.3 (N.D. Cal. 2005), where an auto mechanic was permitted to offer an opinion "regarding consumer expectations about which auto parts will fail and which will not" because it was based in the mechanic's experience working directly with consumers and learning what they expect and anticipate in terms of vehicle maintenance.

of research already conducted, along with the application of her knowledge of such research to the facts here based on her review of evidence).  Moreover, Professors Turow and John are experts in marketing, digital media, privacy policies, and behavioral economics regarding privacy.  Therefore, if the non-marketing experts could offer opinions on consumer expectations in *Cover* and *Chamberlan*, then surely Professors Turow and John can offer such opinions in this case.

Further, if Turow and John must be excluded because they are "no better situated to interpret [Google's] marketing language than the jury," then so too must any survey be excluded. For example, here, Google had one if its experts conduct a flawed survey that presented respondents with the wrong documents, at the wrong times, and with purposefully confusing language. But even if a survey got all of those things right, the sheer length of Google's documents and complexities of its backend systems that create highly detailed profiles from not synced data are such that there is no conceivable way to design an efficient survey.

For example, on the front end of the question, "what does Chrome disclose?": in his deposition, Mr. Heft-Luthy, the "owner" of the Google Privacy Policy, required 17 minutes to read it before he was ready to answer any questions about it – and even then admitted that he had not made it through the complete document. Cruz Decl. Ex. 19 at 277:9-278:21. After that, he still was not able to answer specific questions about where the Privacy Policy identified certain practices at issue here. *Id.* at 281:10-289:4. And this did not include requesting Mr. Heft-Luthy to also read the documents that actually govern here (the Chrome Privacy Notice and the Google Terms of Service) or examining the Chrome user interface and its various express and implied promises. To have added those documents – and then asked Mr. Heft-Luthy to compare them against each other – would have taken a much longer period of time and an amount of attention that simply cannot reasonably be expected from a randomly selected survey respondent.

On the backend of the question, "do Chrome [and Google] act consistent with the Chrome Privacy Notice disclosures?": even top Google employees admit that they do not understand Google's data practices. Several of Google's privacy employees deposed in this case (including Mr. Heft-Luthy) had never even heard of many of Google's backend systems and their capabilities. *Id.* at 232:12-241:5;

2434:1-251:9. One Google employee internally admitted that, "apart from David [Monsees], nobody can answer" the question of what "data is being collected (or not)" by Google. Turow Reb. Rept. Another explained, "We collect data in a huge bucket and allow it to flow wherever and whenever" so that "even we can't trace it" and "people can't follow how / whether sharing the data translates to value for them." Cruz Decl. Ex. 10 at 288.   Here, Google has only been able to produce just a fraction of the data extracted from just six not synced Chrome users – arguing there is so much data spread across so many locations that to do so would be an unduly massive burden. Given this, the only proper survey in this case is a jury trial.

Second, Google criticizes Professors Turow and John for supposedly not defining terms, such as "personal information" and "privacy on the internet" that they use in their opinions. Mot. at 15.  In doing so, Google again misconstrues their opinions and testimony.  Professor Turow explained that he used "personal information" in his report because Google uses that term, his definition of it is the same as Google's, and it involves identifying an individual within and potentially across devices. Turow Dep. at 120:6-124:17; Turow Reb. Rpt. at 12-16; *see also* John Dep. at 31:20-32:23 (personal information is that pertaining to the self - it's so visceral what it means that it's hard to think of a synonym; sensitive personal information is that which makes a person feel vulnerable especially if revealed, and Plaintiffs' declarations and allegations regarding what has been taken from them are consistent with how she as a scholar thinks of sensitive personal information).[14]  Regarding Professor John's use of "privacy on the internet," she explained that she means exactly what is written with those words, and her report provides examples of what it means to have your sense of privacy invaded upon. John Dep. at 109:16-110:17; *see also* John Rpt. at 3 (consumers find third-party data sharing and making inferences about a person (even if they are accurate) to be privacy-invasive in the context of online behavioral advertising).[15]  Additionally, the sole case that Google cites in support of its criticism

---

[14]John Reb. Rept. at 12 (discussing how her definition of personal information is consistent with how other scholars in her field define it and with Google's own researchers).

[15] Professor John made clear that although privacy is a concept, it has an accepted definition in her field – scholars like her think about it in terms of concern over one's personal information.  John Dep. at 164:1-25; John Reb. Rept. at 12-13 (specifying that the definition comes from scholarly articles in her field).

is easily distinguishable.  *Monroe v. United States*, No. 3:12-CV-92 CAR, 2014 WL 1315242, at *9 (M.D. Ga. Mar. 31, 2014) (Doctor opined on general hypothetical terms like "average pedestrian strike" and "average motor vehicle accident" but did not point to anything in the record suggesting that the collisions at issue fit within those terms).

In sum, neither of Google's remaining criticisms amount to a reason to strike Professors Turow and John.  If anything, they go to weight, not admissibility.

**V.      CONCLUSION**

Professors Turow and John's opinions are relevant, reliable, and will assist the trier of fact. They should be admitted under Rule 702.  None of Google's attacks on Professors Turow and John is a reason to strike them, particularly Google's incorrect argument that they should have conducted a consumer survey (the law is clear that they need not, as previously found by this Court).  The Motion should be denied.

Respectfully submitted and dated this 16th day of February 2022.

**BLEICHMAR FONTI & AULD LLP**

By: */s/ Lesley E. Weaver*
Lesley Weaver (Cal. Bar No. 191305)
Angelica M. Ornelas (Cal. Bar No. 285929)
Joshua D. Samra (Cal. Bar No. 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
*lweaver@bfalaw.com*
*aornelas@bfalaw.com*
*jsamra@bfalaw.com*

**SIMMONS HANLY CONROY LLC**

By: */s/ Jay Barnes*
Jason 'Jay' Barnes (admitted *pro hac vice*)
An Truong (admitted *pro hac vice*)
Eric Johnson (admitted *pro hac vice*)
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
Fax: (212) 213-5949
*jaybarnes@simmonsfirm.com*
*atruong@simmonsfirm.com*
*ejohnson@simmonsfirm.com*

**DICELLO LEVITT GUTZLER LLC**

By: */s/ David Straite*
David A. Straite (admitted *pro hac vice*)
One Grand Central Place
60 E. 42nd Street, Suite 2400
New York, NY 10165
Tel.: (646) 993-1000
*dstraite@dicellolevitt.com*

Amy Keller (admitted *pro hac vice*)
Adam Levitt (admitted *pro hac vice*)
Adam Prom (admitted *pro hac vice*)
Sharon Cruz (admitted *pro hac vice*)
Ten North Dearborn St., 6th Floor
Chicago, IL 60602
Tel.: (312) 214-7900
*akeller@dicellolevitt.com*
*alevitt@dicellolevitt.com*
*aprom@dicellolevitt.com*
*scruz@dicellolevitt.com*

*Counsel for Plaintiffs*

1

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

2

3      I, Sharon D. Cruz, attest that concurrence in the filing of this document has been obtained

4  from the other signatories. I declare under penalty of perjury that the foregoing is true and correct.

5      Executed this 16th day of February, 2022, at Indianapolis, Indiana.

6

7

8                                      */s/ Sharon D. Cruz*
                                        Sharon D. Cruz

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2

3       I, Sharon D. Cruz, hereby certify that on February 16, 2022, I electronically filed the

4  foregoing document with the Clerk of the United States District Court for the Northern District of

5  California using the CM/ECF system, which will send electronic notification to all counsel of record.

6  I also caused a copy of the under seal filings to be delivered to counsel for Defendant Google LLC

7  via electronic mail.

8
                                                    */s/ Sharon D. Cruz*
9                                                    Sharon D. Cruz

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 2

Redacted Version of
Document Sought to be Sealed

Message

| | |
|---|---|
| **From:** | David Monsees [davidmonsees@google.com] |
| **Sent:** | 7/16/2018 5:25:41 AM |
| **To:** | Arne de Booij [adebooij@google.com] |
| **CC:** | Robert Brauer [robertbrauer@google.com]; Sammit Adhya [sadhya@google.com]; Sam Heft-Luthy [heftluthy@google.com]; David Warren [dwarren@google.com] |
| **Subject:** | Re: PDPO Product Review |

FYI, this Monday's PDPO PM meeting was canceled, so adding Arne to next Monday's meeting!

On Tue, Jul 10, 2018 at 7:21 AM Arne de Booij <adebooij@google.com> wrote:
Hi Robert,

I don't think we expect people to know what data exactly is being collected but I hope people can understand that we are still collecting data within an app if they say 'no' to the cross-product consent (because of lit interest) and that we are also collecting data in all other apps.

We normally ask questions like "what data will be collected, if any, if you select 'no' on this consent? Or 'yes'?" to gauge people's comprehension - we could add more detailed follow-ups like, when in maps, "if no => would we collect and store your location? what you search for in maps"

thanks
Arne


On Tue, Jul 10, 2018 at 4:05 PM Robert Brauer <robertbrauer@google.com> wrote:
Looks good to me. Then we have our next themes for ▇▇▇▇

I still struggle with some of the questions we set ourselves...

E.g. "*Do they understand what data is being collected (or not)?*". My hypothesis is that apart from David, nobody can answer this accurately.

Should we prepare a few yes/no statements to ask post task completion to set the bar for comprehension? And should we ask the same set of questions after each ▇▇▇▇

On Tue, 10 Jul 2018 at 09:22 Arne de Booij <adebooij@google.com> wrote:
yes. I did a quick prioritization of the questions, assigned pri 0 to those that I think we need to focus on - feel free to update that based on your perspective.



On Mon, Jul 9, 2018 at 9:09 PM Robert Brauer <robertbrauer@google.com> wrote:
On Mon, 9 Jul 2018 at 18:53 Arne de Booij <adebooij@google.com> wrote:
Hi David,

I am flying to Dublin on Monday and will probably still be en route during that time so doubtful that i can make it.

CONFIDENTIAL

Thanks Arne. We'll represent then...

In terms of next important questions to answer, I was wondering if the document you shared recently on UDC2 questions would be a good indicator. Which of the questions you outlined are the (next) most important to iron out?

As far as plans go - the current list of topics is on go/████████ but we're missing a lot of detail from the teams (you;)

- From UDC 2 perspective, you should define what research question we want to answer and how much time we think we need

- for Privacy Advisor, Sam & team need to define the research questions they want to do focus on and

- for signed-out, Sammit should determine what he wants to look for.

There is also a potential to get input for ████ but depending on the three topics above, it might not fit.

Does Eric have any specific question regarding the plan?

thanks
Arne

On Mon, Jul 9, 2018 at 6:28 PM David Monsees <davidmonsees@google.com> wrote:

Hi Arne,

Eric wanted to spend some time in next week's PDPO meeting to discuss the research plan for Hamburg. Can you join this meeting next week?

Dave

**PDPO Product Review**
Weekly review of PDPO product work: Ads Consent, Copacabana, Consent Infra, Escurel, GDPR campaigns, Policies Site, Privacy Checkup / PPR, UDC 2.0.
Mon Jul 16, 2018 9am – 9:50am

MTV-GWC4-2-Thompson Falls (8) [GVC, No External Guests], MTV-SB55-1-Daisy (5) [GVC, No External Guests, Phone], MUC-ARP-1-Oide Sogga (5) [GVC] (map)

███████████████████████████████████████████████

- Eric Miraglia
- Jieun Lee
- Sammit Adhya
- Robert Brauer
- Jan-Philipp Weber
- Stephan Micklitz
- Arne de Booij
- Vinay Goel
- Sam Heft-Luthy
- Greg Fair
- pdpo-pm
- Amanda Conway
- David Monsees

--

**Arne de Booij**
UX Researcher
adebooij@google.com

Google Germany GmbH
Erika-Mann-Straße 33
80636 München

--

**Arne de Booij**
UX Researcher
adebooij@google.com

Google Germany GmbH
Erika-Mann-Straße 33
80636 München

--

**Arne de Booij**
UX Researcher
adebooij@google.com

GOOG-CABR-04509890

Google Germany GmbH
Erika-Mann-Straße 33
80636 München

--
**Google Inc., product mgmt.**
mail: davidmonsees@google.com
visit: 1600 Amphitheater Parkway, Mountain View, CA 94043
call: 443.610.4008

# EXHIBIT 4

## REDACTED IN ITS ENTIRETY

# EXHIBIT 5
## Redacted Version of Document Sought to be Sealed

Message

| | |
|---|---|
| **From:** | Karen Saville [karensaville@google.com] |
| **Sent:** | 4/26/2018 3:09:39 PM |
| **To:** | Martin Lukasiewycz [martinluka@google.com] |
| **CC:** | Branimir Dolički [branimir@google.com]; David Monsees [davidmonsees@google.com]; Rajni Posner [rajnip@google.com]; Greg Fair [gregfair@google.com]; Arne de Booij [adebooij@google.com]; Jens Mueller [muellerj@google.com] |
| **Subject:** | Re: Replacing 'Activity' with 'History' |

We did not make this change UDC GDPR updates.

I will likely be incorporating it into the next version of UDC and updating internal UXW style guides to reflect "history" as best practice, unless anyone here objects.

Thanks,
Karen

On Thu, Apr 26, 2018 at 7:52 AM Martin Lukasiewycz <martinluka@google.com> wrote:
Hi Branimir,
As I currently do not see this change in go/udc-uxw-master, I would assume that this change is not happening.

Best,
Martin

On Thu, Apr 26, 2018 at 5:12 PM, Branimir Dolicki <branimir@google.com> wrote:
Thanks Martin,

When exactly is "activity" going to be replaced with "history" in UDC?

Thanks!

-- B

On Thu, Apr 26, 2018 at 4:06 PM Martin Lukasiewycz <martinluka@google.com> wrote:
Hi Branimir,
Following up a little bit delayed on this topic: In go/udc-uxw-master you can have a look at proposed changes. At the current state, its still ... Activity instead of ... History.

# Redacted - Privilege

Best,
Martin

On Tue, Apr 10, 2018 at 6:17 PM, Branimir Dolicki <branimir@google.com> wrote:
On Tue, Apr 10, 2018 at 7:12 AM David Monsees <davidmonsees@google.com> wrote:
Before GDPR. Most of those strings were "finalized" weeks ago but small edits keep coming in.

+Martin Lukasiewycz +Jens Mueller

CONFIDENTIAL

We need to make this change for ████ as well. It's a bit unfortunate that we just finished LQA and legal reviews. How do we do this in go/████-uxw in an orderly fashion?

Greetings,

-- Branimir

On Mon, Apr 9, 2018, 9:57 PM Rajni Posner <rajnip@google.com> wrote:
Really helpful to see where you are landing on the UI language & definitely ties to the related "personalization" & "data" terminology discussion in flight.

When will this UDC language be updated?

On Mon, Apr 9, 2018 at 8:43 PM, David Monsees <davidmonsees@google.com> wrote:
Sorry for never following up on this!

In the updated UDC language, we're just focusing everything on "data" and not changing any of the setting names. Granted, we know that terms like "web & app activity" mean zero to a user, but at least we've improved the descriptions.

FYI that all the proposed language for UDC settings and the setting UI are in Column E of go/udc-uxw-master.

On Mon, Mar 12, 2018 at 2:42 PM Rajni Posner <rajnip@google.com> wrote:
Dave -

Yes, thanks for re-raising.

Few questions to help determine next steps / get a decision:
- Would we change name of Activity Controls to History Controls or just the descriptive copy?
- What is the proposed new name fo WAA?
- Can you share a few examples of proposed language & how it would read?
- Have you received approval on this reco from Eric & Mark already to make this change?

This does not feel like a Lorraine-level decision is needed here.   Instead, we could push for a decision via Tamar and her leads - which includes Marketing (Cassidy) and Product (Eric & Mark).   There is a meeting this Thursday, and we could get on the agenda, if you are able to join David to speak to it directly from a Product POV and I could join from a PMM POV.

Rajni

On Mon, Mar 12, 2018 at 8:43 AM, David Monsees <davidmonsees@google.com> wrote:
Hi Rajni,

GOOG-CABR-04994798

TL;DR, what is process for approving the term "history" to describe UDC? If this needs a Loraine review, what's the right format for that?

After years of saying/writing the word "activity", my brain has become totally comfortable with that term; however, we still believe it confuses users. The clearer/simple our terminology, the less likely users will misassume what data is saved ("activity must mean fitness data") and how that data is used ("this all sounds like it's for ads"). I want to remove any terminology shackles and use the terms that make the most sense for users.

We also don't seem to be that invested in the term "activity" -- 'Activity Controls' and WAA/VAA are the only uses of the term in a sea of "history" settings (Chrome History, YouTube History, Location History, Assistant History, etc.). Assistant History is a great example of one of the most external/branded projects at Google deciding to use the clear/generic term -- the Assistant gets the spotlight, not the information that comes from it or is consumed by it.

I know we've talked about this before, but now UXW/UXR could use a decision.

Dave

---
**Google Inc., product mgmt.**
mail: davidmonsees@google.com
chat: davidmonsees@google.com @ Google Hangouts
visit: 1600 Amphitheater Parkway, Mountain View, CA 94043
talk: **443.610.4008** @ mobile or **650.479.4008** @ office


--
Rajni Posner Brand Strategist, User Trust Marketing **Google Brand Studio**


---
**Google Inc., product mgmt.**
mail: davidmonsees@google.com
chat: davidmonsees@google.com @ Google Hangouts
visit: 1600 Amphitheater Parkway, Mountain View, CA 94043
talk: 443.610.4008 @ mobile or 650.479.4008 @ office


--
Rajni Posner Brand Strategist, User Trust Marketing **Google Brand Studio**

GOOG-CABR-04994799

# Exhibit 6

Redacted Version of
Document Sought to be Sealed

Privileged and Confidential | Reflects advice of TU Outside Counsel

# All new content moved over to the Perspective draft

## go/pn-perspective-draft

## Tl;dr

This document details the foundation upon which we will craft the **PDPO's 5-year user privacy experience vision** — by which we mean the way we want people to feel about their privacy when they engage with Google in the future.

Advancements in technology, cultural shifts, and increases in regulation will intensify many of the factors that shape the privacy landscape today, but none of this will change our core challenge. Our **broad and contradictory consent** approach leads to people not understanding how we're collecting or using data — which means they're not actually making informed decisions about how they engage with Google.

As we set out to get privacy right, we need to shift the locus of responsibility back to Google. We need to **build technology and systems** that allow our products to learn from our users — and deliver value to our partners — without users feeling exploited. And with that foundation, we will redesign the Google user experience across all products to **enable users to have agency over how data is used in order to deliver individual value to them**.

To deliver on this, we see that the **PDPO's role at Google** needs to evolve — shifting from investing in retroactive privacy-management experiences to being accountable for enabling product teams with a complete vertical solution to deliver on the new experience.

## Who we want to be

1

GOOG-CABR-04754292

Privileged and Confidential | Reflects advice of EU Outside Counsel

In 1998, we endeavored to help people find information. In 2020 we are integral to the way people learn, work and communicate. In 2025 we aspire to be even more helpful: providing unprecedented assistance, brokering third-party transactions, and delivering exceptional value — all whilst keeping our users safer than ever before, and contributing to a better world.

Between now and then we anticipate notions of privacy and personal boundaries to continually evolve. Smart hardware and wearable devices will enable the collection of ever-more sensitive data, in increasingly undetectable ways, while the "one-user, one-device" model will further erode. Enhanced privacy-preserving techniques like data minimization and anonymization will meaningfully elevate expectations and practices across the industry with regards to how user data is collected and treated. While Regulation — already a moving goalpost,  will only intensify as we become even more ubiquitous, and our role in the world expands.

All of these advancements in technology, cultural shifts, and increases in regulation will intensify many of the factors that shape the privacy landscape today, **but none of this will change our core challenge.**

## What we're solving for

While privacy itself is a complex concept, as it relates to Google the equation is fairly simple: people turn to us for help and convenience, and it's our responsibility to make sure they don't get hurt.

- They don't want their personal information to be used against them or their loved ones
- They don't want the things that belong to them to be stolen or abused
- They want to have control over their identity, and decide who knows what about them

It's important to remember that we are not just an *internet company*; we've become an essential part of people's lives. They entrust us with their precious family photos, their passwords, information about the places they go and the things they buy. We have a tremendous responsibility to protect our users (especially those most vulnerable) and ensure they feel safe and in-control — whilst helping them to make the most of their lives.

Unfortunately, our current approach to data collection and usage is fundamentally problematic, and at the **core of the privacy challenges** we face today.

When we ask people to turn on a setting like Web & App Activity or Ads Personalization, we highlight *enhanced functionality* and *personalization*. The reality, though, is we're relying on that data for many purposes, including improving our products and fueling our ads-based revenue — neither of which benefit individual users directly, yet both of which fall under this **broad and contradictory consent**.

2

Privileged and Confidential | Reflects advice of EU Outside Counsel

What's more, our *one vast interconnected ecosystem* premise doesn't align with how people actually engage with Google; **most use fewer than 6 services, and the connections between them range from subtle to non-existent**. So while we communicate that *data in = value out*, depending on the configuration of someone's *individual* Google ecosystem, they might not experience any benefit at all as a result of turning on WAA.

These tensions force us to use abstract language, and **prevent us from making specific promises** to our users about the value data provides to their experience. This also means people struggle to gauge the potential service implications of deleting data or denying consent.

When people consent without knowing *what* exactly they're agreeing to share with Google — and what's "in it" for them — they "set and forget" the toggle — then are often negatively surprised by unexpected personalization down the line. After all, the things Google knows about them are like dark matter in the universe. People may understand that *something* is there, but don't really know what, or why, or how that might impact their lives.



To people who aren't sure what Google collects, it can feel like a black hole sucking in data

In that void, **the suspicion that we leverage user data primarily to serve our own interests** thrives. Although most people understand that advertising is key to keeping Google free (and even prefer personalized ads to generic ads) the extent to which they feel "followed across the web" triggers concerns about being profiled, surveilled, and manipulated. Or worse, the fear Google has sold their information and prioritized profits over their privacy.

This narrative — reinforced in the media and strengthened by the perception that we're collecting data under false pretenses — is a recipe for fractured trust, too complex a knot to

3

                                            GOOG-CABR-04754294

Privileged and Confidential | Reflects advice of EU Outside Counsel

untangle with marketing campaigns or retroactive privacy management, and will continue to significantly taint attitudes toward Google going forward.

# How this should feel

We want people to be **delighted** with the specific and individual value they get from their data being collected and used by Google. We want them to feel in **control** of their privacy experience and **confident** their data is safe, and rest assured that we're actively protecting them. While our products are all unique, our creative spirit and profound respect for our users will be the glue of our brand.

In the future — much like today — our apps and services will *just work*; with one seamless log in, people will have access to anything they choose to save to their account across all their devices.

The key difference is that they'll always get the best possible experience requiring the least amount of data — and won't be asked to consent to any data being collected unless absolutely necessary. Of course, when someone creates a new account, we'll still need to know they're old enough to use Google safely — and people who use Gmail, Photos or Calendar will have to entrust Google with personal content by definition. If additional functionality is available, people will be asked, in context, whether they'd like to unlock it — as well as for permission to access any data required to do so. *Want face grouping? Smart reply?* Unless someone decides they do, we won't scan their photos or analyse their writing style.

People who use Search, YouTube or Maps will get delightful experiences right out of the box — making the first-time-use feel extra convenient and magical. Again, only if someone opts-in to additional functionality (*Want to base directions on your current location, or navigate home more quickly?*) will they be prompted for permission to collect their data.

These decisions won't feel like work, or even like "Privacy Management" — just an awesome product engaging in a meaningful, ongoing dialogue with its users. Because this conversation happens in context, woven into the experience itself, people will be able to easily understand the benefits and trade-offs.

People's mental model of the Google ecosystem will expand, gradually and organically, as they try new Google services — and, optionally, enable explicit connections between them. *Want this hotel reservation from your Gmail to show up in Calendar? How about Maps?* People will no longer have to read one-size-fits-all explanations about how things work, or struggle to understand how a facet of the ecosystem applies to their experience.

If someone changes their mind about something, or wants to delete some data, there will be simple pathways to do so.

4

**Commented [1]:** Deleted outline:
It should feel good to use our products, the respect and protection we represent should be the thread throughout

For all our products,
People will still be able to log in once — no extra burden / friction
People will always be offered functionality in context before any data is collected

People will be able to have the best experience possible that doesn't require personal information, although what that looks like will vary — and products will offer additional functionality in-context, connected with permission for any data required to power it
For gmail, calendar and photos, people will be asked to entrust us with some sensitive stuff right away — this is why trust will always matter
Want face grouping? Smart reply? Until you decide you do, we won't scan your photos / analyse your writing style / etc. ←this shouldn't feel like Privacy Management — just an awesome product offering amazing features, in an embedded respectful way.
For search, youtube, maps they'll get delightful experiences without being asked to consent to any personal info being collected
Want us to base directions on your location or help you navigate home more quickly? Only if you decide you do will we collect your location / address
Ads will work the same way
Gsuite etc. will feature an adjusted experience, appropriate to that context

People's mental model of the Google ecosystem will expand, gradually and organically, as they enable explicit connections between the products they use
Want this / all your Gmail events to show up in Calendar? On Maps?

If someone changes their mind, they'll be able to revisit — and revoke — their choices easily.

People — and KOFs — will appreciate and amplify Google's pro-privacy features — from incognito mode to password manager

People will trust and rely on Google to handle their connections to other apps, saving them the hassle of creating separate logins for every website they visit and making only select information visible to 3rd parties

**Commented [2]:** positive space metaphor

GOOG-CABR-04754295

Privileged and Confidential | Reflects advice of TU Outside Counsel

Similarly, people will understand that Google ads will never leverage or have access to their personal data by default; they'll be sure — unless they've specifically opted-in — that no profile about them exists, or is used to target ads.

Whenever sensitive data is involved, people will experience increased rigor to make sure they're making the choices that are right for them.

G Suite and other managed users will be subject to a modified experience — with the collection and usage of their data mostly dictated by the terms of their organization.

In the future, our users — and KOFs — will deeply appreciate and amplify Google's innovative privacy and security features. From powerful phishing filters in Gmail, to the Password Checkup, to Incognito Mode, people will trust Google to watch out for them and provide meaningful ways to control who has access to their information — including Google itself, strangers online, and people who share their devices.

People will trust and rely on Google to handle their connections to other apps, saving them the hassle of creating separate logins for every website they visit and making only select information visible to 3rd parties.



Image caption TBD (Placeholder graphic)

## How we'll get there

Delivering an experience that XXXXXX means investing in two major efforts over the next five years:

**Commented [3]:** What is this a placeholder for?

**Commented [4]:** would bring in language from above

**Commented [5]:** What about building on top of the text Elyse had here earlier?

We want people to consistently feel confident that they understand what they're being asked to share with Google, how their experience will be improved as a result, and which choices are right for them.

At the same time, we want to empower our PAs to deliver brilliant, innovative and increasingly personalized experiences without over-burdening their users with Privacy Management — or worse, having to worry that they might inadvertently put their users at risk.

Achieving these goals will require a fundamental rewiring of our cross-Google infrastructure, with a renewed focus on coherent, auditable systems that enable us to trace personal data from collection to use — and map that data to the experiences it powers.

We need to commit to a model of data storage and processing that reflects our distributed, interconnected, modular network of services, and supports the deliberate and explicit flow of data between them.

5

GOOG-CABR-04754296

Privileged and Confidential | Reflects advice of DOJ Outside Counsel

- **Build our services on a private foundation, powered by technology**, allowing great functionality without sharing data

- Redesign the Google user experience across all products to enable users to have agency over **how data is used in order to deliver individual value to them**

## Private foundation, powered by technology

**Google must invest in a revolution in private computing over the next five years.** We will build our services on a foundation of **provably private technology** that enables a rich product experience without requiring permission.

YouTube will show people videos we think they'll like, Chrome will be a fast and safe portal to the web, and Gmail will help people stay in touch. And our products will still be able to learn from users in aggregate and help measure the effect of our ads business — all without needing users to agree to share any personal info with Google.

There are a variety of private computing efforts underway at Google and across the industry, including on-device learning, cryptographic approaches, and a new identity model proposed by ██████████. Some of these are even specific to the ads business, including industry initiatives like SPARROW and Google initiatives like the Privacy Sandbox and project TURTLEDOVE.

What matters is that we must transform the **good idea** of private computing applied around the edges into a **necessity** to unlock a model for permission that makes sense for users and for our business.

## A user-defined ecosystem

> **Commented [6]:** anyone concerned that we lose the "break up waa" gut-punch?
>
> **Commented [7]:** No - because WAA is only part of the problem and we don't want to push a Google-wide approach into a smaller box

Placeholder for a visual representing the conceptual replacement for WAA

6

CONFIDENTIAL

GOOG-CABR-04754297

Privileged and Confidential | Reflects advice of EU Outside Counsel

Going beyond what our products can do out-of-the-box is where people will need to make choices for themselves. The choices we offer users must be based on the principle of **providing individual value** — and **we must only put a choice before a user when we are truly comfortable with them saying "no".**

Our products will embrace the significance of asking for permission — putting **weight on the moment of consent**, and using **regular reminders** to make sure users still understand the implication of the choices they've made.

Placeholder for a visual representing asking for permission and reminding over time

Our aim is to give our users maximum value and a sense of agency, making them feel confident about the trade-offs they've assessed and comfortable with their decisions. For this, we'll need to establish a permissioning model and cadence as nuanced as our ecosystem itself, relying on a system of mechanisms for engaging with our users depending on e.g. the service, subject, data type, impact, and context.

Investing in a coherent system of controls and primitives for permission interactions will tangibly demonstrate integrity, and inspire trust as a result. Each and every one of these interactions will be an opportunity to prove to our users that we respect them and their individual needs. Because the engagement is value-based to begin with, we see these moments as having the potential to delight rather than be sources of annoyance.

What this all points to is an ecosystem of products in which "privacy" is a far more tractable problem than it is today. A user's privacy state will just be an outcome of them choosing how our products work with their data. And all those purposes of collection that don't benefit individual users, like aggregate learning and ads measurement, will gradually become less and less of the set of things we expect users to reckon with as they use our products.

# The PDPO's future

7

GOOG-CABR-04754298

Privileged and Confidential | Reflects advice of TU Outside Counsel



Image caption TBD (Placeholder graphic)

To deliver on the new user privacy experience, we see that the **PDPO's role in the organization** needs to evolve — shifting from investing in retroactive privacy-management experiences to being accountable for enabling product teams with a complete vertical solution to deliver on the new experience. We need to evolve our steering wheel and brakes so our spaceship can reach warp speed — and install seat belts, so our teams feel safe to experiment.



8

GOOG-CABR-04754299

Privileged and Confidential | Reflects advice of EU Outside Counsel

# Previous
# version below

## Our core challenge



**Human
nature**



**People's
context**



**Complexity of
technology**

Image caption TBD (Placeholder graphic)

9

GOOG-CABR-04754300

Privileged and Confidential | Reflects advice of [U Outside Counsel

There are many given and well-known factors influencing our users' privacy experience today, which we have to consider as we develop solutions. These include **human nature** (privacy is personal and subjective), **varying contexts** (cultural, personal, situational etc.) and **the overall complexity and intangibility of technology**. But these realities simply define the environment in which we operate; **they are the conditions for a change at Google but not the basis of it**. For this, we must look at our own practices.

Based on our analysis of a large body of existing research and work trust and privacy, additional cross functional research, and a large number of stakeholder interviews across PAs, our conclusion is that Google's core experience challenge is **our broad and contradictory consent approach**. With it, we impose a particular vision of the Google ecosystem on our users, and ask them to agree to parts of the system which fundamentally don't provide direct and tangible value to them.

## Contradictory consents

Today we ask users to agree with two fundamentally different purposes of data collection at the same moment. We collect data to (1) make our products more useful for **you**, and (2) make our products more useful for **everyone**, which, to many users, really just means for Google.

**That tension is core to our advertising business as well**. While we believe personalized ads provide value to our users, our ads *measurement* practices (necessary to deliver value to our partners, and therefore core to our business) do not.

The effect of this contradictory collection purpose is a permission model which isn't built purely from a foundation of helping the user. Sure, we use the value of personalization to sell our data collection, but if our ability to improve our products is impacted significantly when enough users say "no", then we can't put a choice in front of people that really speaks to their personal needs.

## Broad permission model

For years, we've been investing in the idea of one vast, unified Google, magically delivering value to our users within and across products. All based on giving Google very broad consent over using personal data. This has created a take-it-or-leave-it model for a very complex, and increasingly more complex system.

> **Commented [8]:** maybe something about "which don't feel meaningful" instead of "don't care", since my understanding is the abstract nature / incomprehensibility is the problem, moreso than a lack of interest
>
> **Commented [9]:** I added "don't provide direct and tangible value to them"
>
> **Commented [10]:** I'm not sure about this statement. When I read "make our products more useful for everyone" I picture Photos releasing new features in the future, not Google making money
>
> **Commented [11]:** I think that's "for Google" when you get down to it - we use it to be more powerful and people feel weird about it. I think something like this is really useful since it points at the sort of "not really for me" aspect of data collection, but suggested an addition of "to MANY users"
>
> **Commented [12]:** Using the user lens here
>
> **Commented [13]:** @kallebu@google.com @ohelyse@google.com

10

GOOG-CABR-04754301

Privileged and Confidential | Reflects advice of EU Outside Counsel



Image caption TBD (Placeholder graphic)

Commented [14]: Should we include like Machine Learning / AI as one of the Text items in this diagram?

Commented [15]: We can, can you elaborate? How do people experience ML directly?

Commented [16]: Their data is used for ML models and "knowing" this is the case makes users feel uneasy. See like Clearview AI or whatever - users don't "experience" Clearview AI but it's part of what they think about as they put their face on the web.

Image caption TBD (Placeholder graphic)

The nature of our systems (e.g. WAA, Location History) makes it very difficult for us to understand — let alone explain — precisely what role a given piece of user data plays across Google. As a result,

## Our path forward

Over the **next five years**, Google should aim to achieve a **180° turnaround**, investing in a relationship with our users

11

Privileged and Confidential | Reflects advice of EU Outside Counsel

**Formatted:** Heading 2

**Our future lies in increasing our helpfulness, not hiding it.** Our goal line must be moved beyond a minimum-viable relationship (legal consent) to a user-valued relationship (meaningful utility and agency). We need to establish cohesive practices and experiences to decrease risk and actively demonstrate our integrity throughout the user experience.

**Commented [17]:** From Micah (Magic to Meaning) — let's make sure to reference that here.

We believe that the future of the Google user privacy experience will lie in giving shape to two major, years-long efforts that Google must undertake:

- **Redesign the Google user experience** across all products to enable users to have agency over how data is used in order to deliver **individual value** to them

The changes we are talking about are not a shift in communication or positioning, nor a repackaging of our current approach and systems; we don't need to tell the same old story differently — we need a different story. Our path forward requires a fundamentally repatterning of our relationship with our users and shift in how we handle data.



# Google 180



Image caption TBD (Placeholder graphic)

12

GOOG-CABR-04754303

Privileged and Confidential | Reflects advice of [U Outside Counsel]

Private by default

~~We must build our services on a strong "private by default" technical foundation. Increasing the scope of **provably-private technology** will reduce the burden of understanding and decision-making we put on our users while maintaining our ability to deliver helpful products that get better over time.~~

**1. Private technology can reduce the scope of our data collection while still allowing for robust personalization and helpfulness.**

For example, on-device learning can make it possible for YouTube to help show you useful videos (and ads) based on your interests without needing to keep a record of your watch history on a central server tied to your identity. Then for repeat YouTube visitors, we can use the value of a consistent YouTube History to demonstrate the value of connecting to the broader Google ecosystem.

**2. Private technology can provide an answer to the "contradictory consent" challenge.**

The fact remains that we do a bunch of stuff that doesn't benefit any given user — measurement and analytics, aggregate learning, and all sorts of ways we deliver value for Google or our partners that have only a cursory impact on any single user's experience. **We need to find ways to let our business grow without expecting users to opt-in.**

In order to achieve this, we must pose a major challenge to Google:

> *How can we build world-class technology that uses anonymized and provably private technology to measure and improve our systems without asking users to reckon with data collection that doesn't actually benefit them?*

Image caption TBD (Placeholder graphic)

Building services on a foundation of provably private technology doesn't mean giving up the ability to evolve our services and innovate by learning from our users, nor **abandoning core elements of our business model.** Delivering value to our advertising partners by helping them

**Commented [18]:** @heffluthy@google.com Bigger rewrite to make sure everything we talk about is focused on the experience, not so much on systems — which are "just" the enabler of the experience.

**Commented [19]:** Generally reasonable in the body (though I think we still need to cut some) - but I think having technology in the title is necessary since I think a major undertaking Google needs to engage in

**Commented [20]:** 1. Private by default for not overburdening the user not needing to react in every way

2. Private by default for measurement / analytics

**Commented [21]:** Elyse: engenders a sense of security; if we don't have the data, we can't be vulnerable to leaking the data or having a breach it's a signal that we're "disarming" ourselves in a powerful way

it could combat conspiracy theories (if people believe we don't have the data, we can't be misusing it)

13

GOOG-CABR-04754304

Privileged and Confidential | Reflects advice of EU Outside Counsel

understand how their ads perform will still be a major revenue driver, and Gmail will still find ways to learn about the contents of your inbox to help you be more productive.

**But this does mean fundamentally transforming how we achieve some of those business objectives over the next five years**, leveraging developments in technology like distributed identity models or new approaches like ███ differential privacy, federated learning, on-device learning, and other means of analysis to improve our systems without identifying individual users.

This shift to private-by-default services will require a major investment in the technology and product design needed to make products that work without sharing data. It will also involve major work representing our activities externally in order to influence KOFs; Google must establish itself as a leader in provably-private technology, sharing the innovations we develop in order to make them ubiquitous and move the industry forward.

A user-defined ecosystem

Building on a private foundation, we will still have parts of our data collection practice that we do ask users to reckon with as they navigate the inherent trade-offs of digital technology.

Instead of imposing an all-encompassing (and thus highly-complex) construct of our ecosystem on our users by default, our future privacy experience should reflect our **distributed, interconnected, modular network of services in a way that puts users in charge**.

Any collection or use of personal information is scoped to value we can deliver to each individual user in their personal context.

14

GOOG-CABR-04754305

Privileged and Confidential | Reflects advice of EU Outside Counsel



Image caption TBD (Placeholder graphic)

A few points that will guide us as we scope out what this will look like:

## Nuanced permissions system

Our aim is to give our users maximum value and a sense of agency, making them feel confident about the trade-offs they've assessed and comfortable with their decisions. For this, we'll need to establish a permissioning model and cadence as nuanced as our ecosystem itself, relying on a very nuanced system of mechanisms for engaging with our users depending on e.g. the service, subject, data type, impact, and context.

Investing in a coherent system of controls and primitives for permission interactions will tangibly demonstrate integrity, and inspire trust as a result. Each and every one of these interactions will be an opportunity to prove to our users that we respect them and their individual needs. Because the engagement is value-based to begin with, we see these moments as having the potential to *delight* rather than be sources of annoyance.

The mechanisms included in the permissions system will include options for the user to give permission:

15

GOOG-CABR-04754306

Privileged and Confidential | Reflects advice of 1U Outside Counsel

•

Further options for users to give permission will likely be added as we learn how to best engage with the user and needs in specific contexts. The user might also be offered different options at the same time to choose the most appropriate for them.

Creating this permission model and establishing trust with our users should be the foundation for further innovation and helping our users to then offload more of the privacy management back to us. Platforms such as Chrome, Android or the Assistant could offer the user to manage permissions for them, based on standards and usage analytics.

Image caption TBD (Placeholder graphic)

The nuanced permission approach will influence and change how 1P products work and interact with each other. Any concerns regarding this impact, need to consider the actual usage reality for the majority of our users vs. power users and G Suit users such as Googlers.

The approach described above is very much focused on private usage of Google products and services. We see that in professional contexts, e.g. for G Suit and Google Classroom users, a different approach might be needed, justifiable and beneficial for the user (i.e. having more features across services enabled by default).

Ongoing conversation

Today, Google's privacy experience is defined by a pattern of set-and-forget.

16

Privileged and Confidential | Reflects advice of TU Outside Counsel

**Creepy moments**



Image caption TBD (Placeholder graphic)

In contrast, the future user privacy experience, being private by default and engaging with users regarding specific value and data usage, should rather be an ongoing conversation. A relationship that is being built up over time, establishing trust with every interaction. This will give people a feeling of control and reinforce that Google is only acting on the user's behalf.

**Commented [22]:** *reassurance

**Value based engagement**



**Reassurement & re-engagement**

Image caption TBD (Placeholder graphic)

The conversation for users new to our ecosystem will very likely still start with agreeing to our ToS and Privacy Policy, but shouldn't involve consenting to any additional personal data usage at that point. As much as possible, initial functionality should be provided on a basis of legitimate interest and contractual agreement with our users, as well as through private technology to reduce the amount of data required for this basic functionality.

**Commented [23]:** Added a note on private technology here

17

GOOG-CABR-04754308

Privileged and Confidential | Reflects advice of EU Outside Counsel

These and other solutions should give users a feeling or safety, and be proof points of Google actively protecting the user's privacy.

## Delivering tangible value

In order to make users feel in control, confident and safe in this new world, we need to tangibly deliver on the premise that data is only being collected, used and shared for explicit value.

Image caption TBD (Placeholder graphic)

As WAA and other overarching data models and their respective controls will not exist in the proposed system, current data review and control products (e.g. My Activity) and surfaces (Activity Controls) need to be rethought.

**Commented [24]:** Are we not already rethinking them? https://myactivity.google.com/item?restrict=search is their most visited page. The control it represents is stuck in the past, sure, but we're already moving in a product direction

Besides the product specific experiences, the Google Account settings destination needs to evolve to reinforce the future model of our ecosystem as a distributed, interconnected, modular network of services. While the main data and privacy relationship of the user might be with their apps and services, the account, while being itself a service, might become the central place for the user to understand and manipulate the interconnections of their services.

## Active show and tell

Till today, Google has rather been focusing on magic behind the scenes, and proactively automating product and system behavior for the benefit of the user. This again is leading in some cases to "creepy moments" for the user, or results in a disbelief that Google is actually doing what we are saying (e.g. deleting your data).

18

GOOG-CABR-04754309

Privileged and Confidential | Reflects advice of EU Outside Counsel

To reassure the user, give them a feeling of safety, and to demonstrate our intentions and integrity, the future user privacy experience should actively inform the user about what is happening, what we or them should pay attention to, or how we are acting on their behalf.

# The role of the PDPO



Value/Data

CONFIDENTIAL

GOOG-CABR-04754310

Privileged and Confidential | Reflects advice of EU Outside Counsel

# Addenda

### A path for existing users

While we believe it's necessary to redefine the nature of our relationships with our users and our identity / presence in the industry as a whole, we realize that means both engaging with *new users* differently, and repatterning our *existing* relationships with our billions of users.

Both of these experiences will be further investigated as part of the following PrivacyNative vision work. The transitional experience for existing users needs to accomplish that the

### Privacy as a feature

To reinforce Google's future privacy positioning, leaning towards more actively protecting the users from risks. Google should further and increasingly invest into novel privacy protection focused services, products and features, such as Incognito and ▮▮▮▮

At best, these proof points go always beyond what people and the industry demand or would expect and clearly support the message that Google actively projects mine and others privacy.

**Formatted:** Normal

Image caption TBD (Placeholder graphic)

20

GOOG-CABR-04754311

Privileged and Confidential | Reflects advice of EU Outside Counsel

Ads as a product

~~As such, ads and ad supporting systems and services (such as real time bidding and~~
~~measurement) need to become private by default. We are confident that this change can~~
~~happen within the next five years as there are already industry initiatives on their way (e.g.~~
~~SPARROW), but also at Google with the Privacy Sandbox and project TURTLEDOVE.~~

# Measuring success

Success metrics

**Commented [25]:** How do we want to incorporate this into the story

**Commented [26]:** @mseg@google.com Any further ideas so far reg measurement?

# Next steps

**Commented [27]:** How will you be able to make progress in 2021 when so many people have already defined their annual OKRs.

1. Some of those 2021 OKRs are already. moving in the direction we want
2. The early work we've shared so far has already informed PDPO planning

### Engaging stakeholders (Q4 2020)

In September and October we will review this perspective with the ▮▮▮▮▮▮ leads, steerco
and other stakeholders within core and other PAs to gather feedback.

### Refining our perspective (Q4 2020)

Based on the feedback form the stakeholder engagement, we will refine the perspective and
publish it more widely within Google.

### Building out the ▮▮▮▮▮▮ Vision (Q4 2020)

In parallel to the activities above, we will start to prepare for building out the ▮▮▮▮▮▮
Vision, and illustration of the future Google user privacy experience. As part of this we will
engage with privacy teams within different PAs to collaborate with them on the vision.

### Creating the ▮▮▮▮▮▮ Strategy Playbook (Q4 2020)

Based on the refined perspective and the vision, we will create a Strategy Playbook to inform
product roadmap and organization planning in the PDPO and inform other workstreams. The
Strategy Playbook is planned to be used to get further buy-in from Google leadership until end
of 2020.

21

GOOG-CABR-04754312

Privileged and Confidential | Reflects advice of EU Outside Counsel

Creating the ▮▮▮▮▮ Roadmap (Q1 2021)

In the beginning of next year, we will refine the Strategy Playbook and build out a roadmap to inform the execution of the Vision over the next quarters and years.

# APPENDIX

| Checklist | Topic to hit |
|-----------|--------------|
| | Security vs privacy |
| | Privacy Principles |
| | Data security as a foundation |
| | Assistant + shared devices |
| | Our consents aren't just hard to understand, they reflect the incomprehensibility of our systems |
| | Proactive to protect the users |
| | Coherence across Google |
| | Consent as a communication issue |
| | Elyse's favorite Yooki takeaways |

## References

We reviewed and synthesized tons of internal documentation, talked to stakeholders across PAs, and assembled a cross-functional core team to ensure we were incorporating diverse perspectives and leveraging the enormous body of research on privacy already done at Google; our UXRs shared external perspectives as well.

## Other materials

TBD

**Commented [28]:** Finalize checklist,
do some broad edits
intro
send out

**Commented [29]:** Checklist. Do we talk about …

… security and privacy being the same for people?

… data security being fundamental?

… the assistant and shared devices?

**Commented [30]:** … refer to or strongly reflect the privacy principles (work)?

**Commented [31]:** … focusing on the details and providing a coherent experience proving our integrity?

**Commented [32]:** … being proactive to protect the user?

**Commented [33]:** … how all of this impacts our relationship and position reg. regulation and regulators?

**Commented [34]:** … lacking coherence across Google?

**Commented [35]:** … people not understanding consent as a communication issue?

**Commented [36]:** Should we add a note here to make sure that everything we talk about in this chapter is long-term and not immediate? Something like:

Note: There is no immediate diff — this will take time. Delivering a ▮▮▮▮▮ user experience is a long-term and ongoing process. To be ready for the future experiences to come, we propose that Google aims at creating a solid foundation within the next five years, and encourage all of us to collaborate and achieve this goal earlier.

**Commented [37]:** @ohelyse@google.com What do you think about adding a disclaimer in the intro, similar to what Yooki and team did in their deck?

**Commented [38]:** 1. We want to get to a place where we can be proud, and open and honest about how we make money

2. People do not understand what we're doing. So they're actually making uninformed decisions about how they engage with us

The million dollar question: if people DID understand everything we're doing, would they still trust us? Love us?

That's where we want to get.

3. Shift the locus of ownership / responsibility from users to Google.

4. Don't lose sight of our core mission. We want to make the world better, not just provide free email.

**Commented [39]:** Placeholder

22

GOOG-CABR-04754313

Privileged and Confidential | Reflects advice of EU Outside Counsel

FAQ

**Do users want this? Do they want to define their own ecosystem and have this granular control? Don't they actually want just a single switch and then everything works well?**

They're already doing it. Look at [        ]. Look at all the research showing people struggle to grasp the value of Google-with-a-capital-G, but love and are loyal to the services they use. We're not simply imposing a new construct, we're meeting people where they are.

**Isn't this loading the user with a lot of work and complexity?**
Actually, we expect things will get simpler. Most people use less than 10 products, and the # of p13n options and interconnections is surprisingly low. Plus, we won't show people a list of toggles or pages of consent text and ask them to make decisions in the abstract; we're shifting to a world where privacy-relevant decisions are made in real-time, in familiar product contexts, where trade-offs are clear and value is immediate.

**Aren't we overemphasizing privacy with this approach too much and make people even more worried?**

Au contraire! In fact, we could probably lead a user through an experience wherein they could define who can see what about them, how much data is shared with Google and for how long — without ever using the "P" word.

**Don't people just want to get to the content and don't care anymore about apps in the future? Just using the assistant? Does this then still work?**

Of course. In fact, the Assistant may facilitate the most frictionless privacy-native experience of all.

**How will ads measurement work with this?**
That's a great question, but it's not ours to answer. We have indications from [stakeholder interview] that Ads is already moving in this direction, and innovating around exactly this space. We need to apply a value-based approach to our ads p13n model just as we apply it to our other PAs.

23

GOOG-CABR-04754314

Privileged and Confidential | Reflects advice of [U Outside Counsel

**What are the alternatives to this approach?**

We've specifically defined this proposal to work in harmony with other key initiatives across Google, including Hanko, _____. etc. Rather than thinking of our proposal as an *alternative* to other solutions, we see it as a key step in enabling other forward-looking initiatives to make progress and succeed.

**Have you thought about different scenarios and where this breaks?**

Our proposal won't solve everything; how a privacy-first approach to the future will play out in all scenarios, across all PAs is still to be determined; but the *foundation* of what we need to address will determine the success of everything we build on top.

**Commented [40]:** [Copied from intro]

Elyse:

24

# EXHIBIT 7
# Redacted Version of Document Sought to be Sealed

## Mission

This workstream aims to define an overarching vision and strategy for PDPO to inform the
Google privacy experience across products and services according to a 5-year time horizon.

## Core team

adebooij@, heftluthy@, justchen@, jwoll@, kallebu@, mediha@, mimosal@, mseg@, ohelyse@,
shudi@, yingsi@...

## Related resources

P.N definition of privacy
P.N research synthesis

**Commented [1]:** @heftluthy@google.com
@adebooij@google.com @mimosal@google.com
@kallebu@google.com began a sort of "workbench
2.0" doc for us to capture our somewhat refined
challenge landscape

Will continue to add to this next week and pull in the
insights from our synthesis workshop; hopefully it can
serve as a concise & consolidated reference as we
move forward.

**Commented [2]:** @mimosal@google.com #halp
_Assigned to Mimosa Lynch_

**Commented [3]:** do you want them all listed out?

**Commented [4]:** Did I miss anyone from the core
team? Or are we all listed out somewhere I could
reference?

# Key experience challenges

What prevents people from feeling comfortable and in-control of their privacy

GOOG-CABR-04754160

# 1. Broad permissions

It's difficult for people to fully / meaningfully give permission

Not only are the implications of WAA extremely broad and varied, but people use Google in such diverse ways — much of the language intended to be comprehensive feels vague and hard-to-parse for non-engineers / lawyers, and our examples are not universally resonant

- We have a few permissions covering a broad scope of activity, info & data collection and use
- The lack of clarity around what specific role people's data plays in their experience of our services — and the fact that everyone uses a different constellation of services — means many struggle to grasp,
  - the value their collected data enables
  - how their data will be used (and by extension, whether it could make them vulnerable to privacy issues)
  - the service implications of denying Google access to their data
  - what will happen with data after it's collected; it's very difficult for users (and us) to assess long-term risk
- This can result in people feeling unequipped to make informed decisions, or even questioning whether they have a genuine choice if they want to enjoy Google services.
- When consent is given despite an inaccurate or incomplete understanding of the above, people experience negative surprises / trigger moments (encountering unexpected personalization) eroding their trust in Google.

...so people struggle to know what exactly they're sharing, and to see what's "in it" for them.

**Commented [5]:** IMO this is a symptom of the problem, which is more point #2. We can only have broad permissions when our reasons for data collection are actually themselves broad.

**Commented [6]:** interesting point.
@ohelyse@google.com
@kallebu@google.com
@yingsil@google.com

If we started with broad permissions, our benefits statement will be broad as a consequence. If we started with broad benefits, permissions would have to follow.

Looking back, Google might have started with 'broad benefits' as permissions were introduced down the line.

**Commented [7]:** Very much agree, broad permissions/consent is a symptom itself, but it is the first and most tangible part of the experience we can tackle. From there we need to drive change upwards and into the organization as well as downwards through the products to the user.

The core challenge is our (outdated) company mindset/vision of how we deliver value and engage with users.

GOOG-CABR-04754161

## 2. Lack of benefits

When permission is given, most people don't experience enough (or *any*) of the value that their own data purportedly adds to the products they use

Meanwhile, we espouse (and internally ascribe to) the idea that our users *primarily* benefit from giving access to their data — and Google's revenue is a happy side-effect

- People think about Google in terms of the services they use
- Depending on which Google services a given person uses most, they may or may not receive any tangible benefits from sharing their personal information and activity data with Google
- When people don't directly experience utility or otherwise benefit as a result of giving access to their personal information they suspect Google is profiting disproportionately from their data
  - ○ Often targeted ads are the most ready reference people have when thinking about personalization online
- This perceived asymmetry can undermine privacy or trust initiatives predicated on the assumption that personalization is generally understood and appreciated, and that we demonstrably put users first
- While internally we have a shared sense of the power (or at least the potential) of personalization to meaningfully improve product experiences
  - ○ and many users have a vague understanding that Google uses aggregated user data to evolve and improve services over time
- Unfortunately it's not obvious to everyone when or how their data is working to enhance their experience of the Google services they use — either individually or in constellation with other Google products
- This disconnect deepens confusion (...why was I asked to grant access to my location?)
  - ○ and can feed into the perception that Google has an insatiable appetite for user data to further its own interests / make money.

Commented [8]: In addition to "value that their own data purportedly adds" I think we need to include that lack of benefits FOR YOU are inherently part of this.

Google, and internet technology in general, focuses on "users" but doesn't focus on "the user" and as a result our PURPOSES are vague.

Commented [9]: Similar comments here to what I said below

Commented [10]: @jamarlow@google.com Hi Jenn! Wanted to follow-up on your comments in the slide deck here, your thoughts are so appreciated!

The connection we've been exploring is the idea that the perception of a fundamental asymmetry (my data benefits Google more than Google having my data benefits me) contributes to and reinforces existing narratives around ads p13n and Big Tech's exploitation of users. This has come up both in our executive interviews and user research.

Slides like this one

[black redaction bar]

seem to point to the perception that the _purpose_ of Google requesting access to user data is for Google to earn money (rather than primarily to personalize product experiences) thereby allowing Google to provide free services (which "exist" ultimately to collect data — and around and around we go)

Does that interpretation seem off to you? Do you rather think that providing free services is itself the problem, and thereby only solvable by charging for products? @adebooij@google.com @kallebu@google.com _Assigned to Jennifer Marlow_

Commented [11]: I think it's more that people acknowledge (and mostly) accept that the benefit to them is being able to use free products and services, and the "cost" is "paying" with their data. (Often they don't want to pay, so this is seen as an acceptable tradeoff). People seem to be more angry/feel more exploited when (they believe) a company like Google sells/gives their data to third parties or other outside entities -- in this case, Google is "profiting" off their data

Commented [12]: How does this conversation change when we position ads as a product and apply the same expectations to it, including providing tangible and clear benefits?

Commented [13]: I believe that people, when asked, often understand that they are getting a free product in return for seeing ads and that data somehow plays a role in this but also think this isn't top of mind.

Agree that parties other than google getting their data is the biggest concern for people. And in many cases, seeing an ad might make people believe that this is [...]

Commented [14]: Exactly, so what we are saying is that we need to make it very explicit what we use the data for and what not, and for whatever data we us we need to provide very tangible benefits so that this issue described above is resolved.

Commented [15]: agreed, but people might still believe that to provide you "value from ads personalization" (however we frame this), we can do that without giving your data away.

GOOG-CABR-04754162

## 3. Unclear role of personalized ads

Personalized ads trigger mistrust, reinforcing misconceptions and feelings of exploitation

While most people understand and accept that advertising plays an important role in keeping Google free — and may even prefer personalized ads to generic ads — many feel their data is the "price they pay" to use Google, and that p13n = ads

- Ads themselves are not necessarily the problem — but are seen as a symbol of how their data is used

- The extent to which people feel seen (and often followed) by advertisers triggers concerns about being profiled, surveilled, and even manipulated; intentionally or otherwise.

- It's unclear to people <u>what</u> information about them is shared with our advertising partners & websites (3P), and what role our users play in our revenue model

- When people see their data at work in the products they use (*I allowed my location to be collected so now Maps can give me driving directions*) a key purpose of collecting their data is seen as obvious, justified; user data in, functionality/value out.

    - People who don't directly experience their data at work in the products they use (*I allowed my location to be collected so now Gmail can... and YouTube can... um)* are likely to suspect the <u>sole</u> purpose of collecting their data to be ads p13n — user data in, money for Google out — for lack of any other demonstrable purpose.

**Commented [16]:** I'd like to see us making the point about Ads as a product - if we can get users to think of ads as a product, it doesn't SOLVE ads but it reduces complexity in general and gives a clearer path forward for Ads to get in line rather than being its own special thing

**Commented [17]:** I see that this could be part of us describing the solution space, not the challenge.

GOOG-CABR-04754163

## ///sam scratchpad

## 1. Google collects data for two core and contradictory reasons.

We have stated that Google collects personal data for two reasons:

1. To improve products for *you*
2. To improve products for *everyone*.

(Ads are just a product, and should be considered part of this rather than a third reason!)

Our incentives for opt-in on the first reason (for *you*) are aligned with the user, but misaligned for the second reason (for *everyone*).

- Some products, like YouTube, require user data for personalization in order to be anywhere near as good as we want them to be. Some products, like Search, mostly require user data for *aggregate improvements* – personalization with user data is only a small part of the ranking algorithm, but the ranking algorithm itself is hugely based on trends within user data.

- Ads themselves are not necessarily the problem — but are seen as a symbol of how their data is used

- The extent to which people feel seen (and often followed) by advertisers triggers concerns about being profiled, surveilled, and even manipulated; intentionally or otherwise.

- When people see their data at work in the products they use (*I allowed my location to be collected so now Maps can give me driving directions*) a key purpose of collecting their data is seen as obvious, justified; user data in, functionality/value out.

  - People who don't directly experience their data at work in the products they use (*I allowed my location to be collected so now Gmail can... and YouTube can... um*) are likely to suspect the sole purpose of collecting their data to be ads p13n — user data in, money for Google out — for lack of any other demonstrable purpose.

CONFIDENTIAL

GOOG-CABR-04754164

## 2. As a result, the value of opting-in for data collection isn't clear — to us or to users.

Since users are opting in for both personal and collective benefits, the permissions structure we've built around those benefits is, by necessity, incredibly broad.

When permission is given, most people don't experience enough (or *any*) of the value that their own data purportedly adds to the products they use. But *Google still has an incentive to get them to accept!*

- People think about Google in terms of the services they use
- Depending on which Google services a given person uses most, they may or may not receive any tangible benefits from sharing their personal information and activity data with Google
- When people don't directly experience utility or otherwise benefit as a result of giving access to their personal information they suspect Google is profiting disproportionately from their data

## 3. The result is a system that we think is good for *users* (plural), but isn't good for *the user (singular)*.

We cannot empower a given user to be *in control of their privacy* (*"who knows what about me for what purpose"*) *if everyone doing that to the full extent they want would cripple our products.*

- We operate in a competitive environment that requires proof of value delivery — e.g. for creators on YouTube, advertisers and publishers on 3P sites, and businesses on Google Maps.
- Users have no stake in that relationship, and as such being asked to consent for something that doesn't benefit them simply doesn't make sense

### Additional challenges
Priority TBD

CONFIDENTIAL

Experience

- Strong conflation of ads and product p13n (Making product and ads benefits tangible to users explicit/separately)
- Display ads experience/perception (1P & 3P)
- Lack of privacy-specific products/features (e.g. Password Manager, Incognito)
- Lack of observable proof / people don't believe us (ads & product)

Organizational

- Resistance of PAs
    - How to encourage compliance
    - How to actually excite and inspire
    - How to help and empower
- How to make privacy cool (vs. make something cool that improves privacy — technical challenge, emotionalize)

# Solution requirements

## Known | Present

- ...

## Anticipated | Future

GOOG-CABR-04754166

# Potential levers

# Appendix

Still-unprocessed notes

- Our permissions structure may be the crux / keystone, but we're under no illusion this is strictly a consent challenge

- Google has done a lot of research that points to this challenge space as critical, but until now have not reexamined our foundational approach / relationship with user data as a result

- We are not suggesting we want to increase complexity by turning 3 controls into 300 — we are suggesting transforming the experience (and our mindset) from "tuning privacy" to "making the products you use work right for you, one at a time"

- "All politics are local" → modularity, immediacy, meaning

- Privacy as the enabler

GOOG-CABR-04754167

# EXHIBIT 8

## REDACTED IN ITS ENTIRETY

# Exhibit 10

## Redacted Version of Document Sought to be Sealed



Owner: kallebu
Collaborators: heftluthy, mimosal

CONFIDENTIAL

GOOG-CABR-04754257

Objective

Develop a **privacy experience vision** aimed at a five-year time horizon to articulate PDPO's position and **drive transformation across Google**.

Sam

CONFIDENTIAL

Today

**Align** on the key aspects of our perspective and the path forward — **no solutions yet**.

We are looking forward to your feedback.

CONFIDENTIAL

GOOG-CABR-04754259



Our challenge is to **create a relationship** in which people feel safe, respected and in control, while **catering to many non-actionable factors.**

Arne's words:

To develop our perspective, we reviewed body of work on trust & privacy research (mkt, uxr, academic papers), looked at future trends and interviewed internal stakeholders
We decided that there are many well-known factors which we have to consider. Core for our work are:
Human nature: privacy is personal and subjective, not a primary goal but part of many things people do
People's Context: privacy needs differ based on (cultural, personal, sitational, technological, political) context and won't have the same effect on every person
We also know that one of the biggest challenges is
the overall complexity and intangibility of technology: systems are complex and won't become less complex - hard to understand for people
While these are all important aspects, we came to the conclusion that they are not actionable for creating a better user privacy experience
Based on this, we believe our main challenge can be defined as create a relationship in which people feel safe, respected and in control while catering to the the above factors

---

To develop our perspective we have reviewed and analysed more than 150 documents representing 5+ years of trust & privacy research across Google and beyond, conducted stakeholder interviews and created xfn POVs on the topic.

There are many well-known factors which we have to consider, such as human nature and the personal context of our users.

We also clearly heard from users as well as from our stakeholders, that one of the biggest challenges users have with regards to privacy is the overall complexity and intangibility of technology.

While these are all important aspects, we came to the conclusion that they are not actionable for creating a better user privacy experience.

Our challenge is to create a relationship with the user, in which people feel safe, respected and in control — while of course catering to these and other factors.

————— old text below —————

Based on our analysis of research, xfn POVs and stakeholder interviews

GOOG-CABR-04754260

We need to have a solution that caters to many factors, many of which are not actionable

Human nature
Personal context
Complexity of technology

The main challenge is to have a relationship where people feel safe, respected and in control.




—————————
We know there are realities that we have to account for in our solution that we cannot change directly
Human nature: privacy is personal and subjective, not a primary goal but part of many things people do
Context: privacy needs differ based on (cultural, personal, sitational, technological, political) context and won't have the same effect on every person
We distilled these high level core needs we would need to satisfy with our solution
Feel safe: psychologically, financially, physically. Being able to trust Google to do the right thing.
Feel respected - not duped or exploited
Feel in control - need to be able to decide who knows what about me
Feeling secure - knowing my information is safe and risk for personal repercussions is low

Point to our research - complexity is a huge issue, main reason for not feeling safe and able to trust - consider the human nature and contextual aspects of our users - enable us to deliver on the insights

Are respect, control and security also human nature?


Building on top of existing knowledge, grounded in what has happened before
3 main things that are clear - we need to work with human nature, not against it, context is making privacy complicated, complexity is one of the key issues
To deal with these things, what do we need to deal with - broad consent is a thing that is exploding complexity

system/tech will remain complex

----all tech is complex----

Why do we care if people trust us? So they will engage with us.

----

Cater to human nature and context (product context) - cannot change directly but have to take into account
Generally, people have a need to feel we respect them and their data: provide them security and control

Don't feel they have agency or can trust the system because they don't understand it

Underlying problem is that the system is complex



---> next slide ----

Change systems so it is easier to discern that they have agency and are secure, which we aim to do through focusing on permissions

Lots of things we have considered but one thing is really actionable


----

We need to have a solution that caters to the human nature, context, complexity and give people feeling of safety and control

CONFIDENTIAL

GOOG-CABR-04754261

Core challenge is the broad permission/consent

GOOG-CABR-04754262



The solution context is **complex and will intensify** over the next 5 years, but will not change the core challenge — nor the solution space.

While we are focusing on a very specific core challenge and solution space, we are very aware of the complexity of the solution context, and that the design of the solution needs be very nuanced to cater to different products and contexts such as shared devices, kids and family, biometrics etc..

We have also gained an initial understanding of the main influencing factors changing the solution context over the next five years. We still need to describe how the solution context might look like in five years from now, but we can clearly say that a lot of the factors will intensify.

Technology will become an even bigger part of our lives, expectations from people towards technology companies will increase, and we will see technology becoming a more regulated industry.

That being said, we think that both, the solution context and the changes over the next years do not change our core challenge and do not strongly influence the solution space.

A good example for this are other ongoing efforts such as data minimization and anonymization. While we see both of these as fundamental and given for the ▇▇▇▇▇▇ vision, we don't think that they themselves will have a big impact on the user experience.

Yet the opposite is true, as the solution context intensifies, the privacy experience will suffer more and more if we don't take care of the our core challenge.

GOOG-CABR-04754263



CONFIDENTIAL

GOOG-CABR-04754264



GOOG-CABR-04754265



CONFIDENTIAL

GOOG-CABR-04754266



CONFIDENTIAL

GOOG-CABR-04754267



CONFIDENTIAL



CONFIDENTIAL

GOOG-CABR-04754269



We ask users to reckon with many interlocking and contradictory purposes
— **often in a single moment of engagement**.

Our permissions structure (distilling all of the complexity of how Google collects and uses data down to WAA and ▮
is based on the premise that our users understand — and are on board with — our ecosystem
Asks for trust (give us your data so we can do something good with it later, don't worry about the details) before building it
Is itself a symptom of our unclear view on how data is used to help any given user. Represents the underlying complexity of our
tech stack, which reflects our mindset historically

Because people DON'T understand the ecosystem and instead think of Google as the products they personally use, the value
we do promise is abstract and often doesn't actually manifest within their experience

This calls our integrity / intentions into question

Which reinforces confusion/suspicion about creepy ads / tracking, external narratives about big tech overreach, etc.

CONFIDENTIAL



Our solution needs to establish a relationship with our users that provides **tangible benefits** and **scopes data collection and usage accordingly.**

In reality, people assemble their Google ecosystem modularly, by engaging with a selection of our services in constellation

We should embrace that reality

And illuminate each person's ecosystem configuration; meeting them where they are, and establish connections only as they map to tangible value

Prsent the trade-offs clearly and in-context

Dialogue / permissions-based system
Giving people agency over data usage and product and ecosystem behavior

CONFIDENTIAL

GOOG-CABR-04754271



To drive transformation xGoogle, we need to focus on using data to deliver meaningful utility and agency, directly to our users.

In our stakeholder interviews and conversations with partners in other PAs we have clearly heard that we need to excite and enable PAs to be part of the transformation.

To accomplish this, and considering the main experience challenge and solution space, we see that going forward the PDPO should increasingly focus on enabling PAs to deliver tangible value and giving people agency over their data. Basically providing real-time privacy controls.

Actually in the last weeks alone, we seen many PAs, such as ads, search, YT and Gmail starting to investigate how they can have a more contextual permission and consent conversation with the user, and we as PDPO are already engaged in those conversations.

We think that privacy as an enabler to deliver value is very exciting and repositions the conversation with the PAs.

In addition to this, the PDPO should engage with PAs to work with them to create privacy focused products and solutions that go beyond the basics.

CONFIDENTIAL



First off, I want to step back and take time to recognize all of the people that have done work to create this perspective happen. You have heard from on a small number of us here today, but this group represented on the slide and even more have been critical to getting us to where we are.

Our planned next steps are...
Firstly, to incorporate feedback from today alongside the feedback that we continue to gather from others.
Build out robust perspective deck until mid September
Continue stakeholder interviews
How do we plan to prove our solution might work?

In terms of next steps - What we want to understand today is -
Are we on the right track?
Do these challenges seem like the crux which, if addressed, will redefine privacy for Google?
What are we missing?

Which we will have time to discuss herer.

Next steps
Incorporate feedback from today
Build out robust perspective deck until mid September
Continue stakeholder interviews
How do we plan to prove our solution might work?

— who added the below? —

A key metric might be 'perception of value the get in return for their data' (benefits - cost)
Strategic Insights (Search Trust) - When asked about why google collects data, reasons that benefit google are rising while reasons that benefit the consumer are going down
PDPO UX Wave 6 Privacy Survey summary | May 2020
Harmful vs beneficial of tech company using data about you
Loblolly
21/34 participants think their data has more value than the free or improved services they get in exchange
In general, the services for which they feel their data is more valuable, coincide with the ones they use the most
Participants think their data has much more value than free services because their personal info is worth a lot
Sylvestre
28/38 of the participants consider their data to be more valuable than the free services they might receive

GOOG-CABR-04754273

Account value lit review
Nissenbaum, Helen. Privacy in Context: Technology, Policy and the Integrity of Social Life. Stanford Law Books, 2010
Medium
Helen Nissenbaum describes contextual integrity — what comparable scenario, with established rules or guidelines, best applies to the transaction at hand?
Instagram presents a challenge to contextual integrity. Social media is a new frontier brought about in the digital revolution and as such, it is difficult to identify a comparable context and leverage pre-determined social norms about information-sharing. Even after reading Instagram's privacy policy, users may be largely unaware of exactly what they are giving up in exchange for the ability to share photos online. Due to the lack of a well-established context, Instagram wields most of the power to set standards in the value exchange. This may lead to issues because the motivation of the business to profit off user data may overpower its responsibility to protect identifiable information.
This book claims that what people really care about when they complain and protest that privacy has been violated is not the act of sharing information itself—most people understand that this is crucial to social life —but the inappropriate, improper sharing of information.

CONFIDENTIAL

GOOG-CABR-04754274



CONFIDENTIAL

GOOG-CABR-04754275



Sam

GOOG-CABR-04754276



GOOG-CABR-04754277



GOOG-CABR-04754278

we need lots of
your data

to potentially offer
you some value

GOOG-CABR-04754279



this value is available
if you want it

we'll need this data
to make it work

CONFIDENTIAL

GOOG-CABR-04754280



CONFIDENTIAL

GOOG-CABR-04754281



--Arne's thought on what we want to say---

Ref
go/prinascrapa
Straw man
UX
Mkt


Three key messages we want the audience to take away

We did our homework - reviewed and analyzed internal and external research reviewed (incl. UXR, Marketing research)
We know there are realities that we have to account for in our solution that we cannot change directly
Human nature: privacy is personal and subjective, not a primary goal but part of many things people do
Context: privacy needs differ based on (cultural, personal, sitational, technological, political) context and won't have the same effect on every person
We distilled these high level core needs we would need to satisfy with our solution
Feel safe: psychologically, financially, physically
Feel respected - not duped or exploited
Feel in control - need to be able to decide who knows what about me
Feeling secure - knowing my information is safe and risk for personal repercussions is low
Desire technology to make my life better and easier
High quality services that are reliable and free - but doesn't always depend on having large volume of my personal data to be made possible

In our analysis, we have identified 3 key challenges that prevent us from satisfying these high level needs


------


How we arrived at the proposed focus we're here to discuss

We did our homework
Explored definitions of privacy, scoped to our users + Google
Reviewed tons of research

Extracted patterns in user issues
Coalesced around key challenge areas
Identified relationships between key challenges

CONFIDENTIAL

GOOG-CABR-04754283



We know there are realities that we have to account for in our solution that we cannot change directly
Human nature: privacy is personal and subjective, not a primary goal but part of many things people do
Context: privacy needs differ based on (cultural, personal, sitational, technological, political) context and won't have the same effect on every person
We distilled these high level core needs we would need to satisfy with our solution
Feel safe: psychologically, financially, physically. Being able to trust Google to do the right thing.
Feel respected - not duped or exploited
Feel in control - need to be able to decide who knows what about me
Feeling secure - knowing my information is safe and risk for personal repercussions is low

Point to our research - complexity is a huge issue, main reason for not feeling safe and able to trust - consider the human nature and contextual aspects of our users - enable us to deliver on the insights

Are respect, control and security also human nature?


Building on top of existing knowledge, grounded in what has happened before
3 main things that are clear - we need to work with human nature, not against it, context is making privacy complicated, complexity is one of the key issues
To deal with these things, what do we need to deal with - broad consent is a thing that is exploding complexity

system/tech will remain complex

----all tech is complex----

Why do we care if people trust us? So they will engage with us.

Implicit - can't

GOOG-CABR-04754284

CONFIDENTIAL

GOOG-CABR-04754285



# Keep in mind | Context also plays a significant role
We have to ensure our solutions include the privacy needs of people in diverse situations

- Cultural and personal context
  - NIU / NBU
  - Kids & Families
  - At-risk circumstances
  - Key Opinion Formers (KOFs) (including the news media and word-of-mouth)

- Technology context
  - Developments like IoT increase the number of devices that can create and exchange information about people
  - Products (e.g. YouTube, Search) and platforms (e.g. Android, Chrome)

Sources: [91] Privacy UX Truths (2019) go/atlink [92] An A-Z Encyclopedia: Dissecting the UI Pain Points of New Internet Users (2020) go/que-work1

25

---

NBU: face unique challenges and have unique use cases (e.g. device sharing)

Kids & families: For adults, digital privacy is already a complicated and ambiguous concept to understand and evaluate. For children, it's even more difficult. We need to ensure that children understand our privacy terms and their consequences for the products they use.

At-risk: Anyone can experience events that threaten their privacy or security, but at-risk users face life circumstances that may put them at unusually higher risk. At-risk users may be targeted because of who they are, what they do, where they are, or who they are. They include survivors of intimate partner abuse, media activists, people who are homeless, or anyone who may be targeted because of personal characteristics (including age, gender, ethnicity, income level, education, and many others) at any point in their lives.

KOF: Key opinion formers (decision makers, amplifiers and Experts & Advocates) are a key channel through which users form an opinion of Google but most KOFs are not favorable towards Google when it comes to how we are respecting our users' privacy' and how we're preventing manipulation. While we shouldn't design our approach for KOFs and focus on creating a privacy experience for users, we need to be aware that they play a key role in influencing public perception and can help us achieve our goal.

Product (e.g. YouTube, Search) and platform (e.g. Android, Chrome): needs will differ based on which product a person is using, the platform it is being used on.

CONFIDENTIAL

GOOG-CABR-04754286



One insight remains universally true:

What we're set
up to meet

Users want high quality services that are reliable
and free... that don't always depend on access to
their personal data in order to work.

What we're NOT set
up to meet

Desire technology to make my life better and easier
High quality services that are reliable and free - but doesn't always depend on having large volume of my personal data to be made possible

CONFIDENTIAL

GOOG-CABR-04754287



Measurement being integrated into data consent. (We didn't decide by ourselves that we have broad permissions, we have it because of our dual usage of the data we are collecting).


Kalle: We have to say what we take for granted.


From the synthesis workshop
Broad permission structure/ecosystem experience complexity (WAA etc.)
Lack of (actual) tangible (p13n) benefits in products/across products (for majority of user, increase benefit)
Strong connection of ads and product p13n (Making product and ads benefits tangible to users explicit/separately)
Display ads experience/perception (1P & 3P)
Lack of privacy-specific products/features
Lack of observable proof (ads & product)

GOOG-CABR-04754288



## Distilled privacy experience challenges
What's preventing people from feeling comfortable and in-control of their privacy

**Broad permissions structure**

Our current approach to data collection & usage can feel incomprehensible & overwhelming

**Mystifying ad personalization**

Personalized ads can creep people out and trigger concern the data we collect is sold or improperly used

28

We have a few permissions covering a broad scope of activity, info & data collection and use
The lack of clarity around what specific role people's data plays in their experience of our services — means many struggle to understand,
the value their collected data enables
how their data will be used (and by extension, whether it could make them vulnerable to privacy issues)
the service implications of denying Google access to their data
users don't feel like they know what will happen with data after it's shared / it's very difficult for users (and us) to assess long-term risk
this can result in people feeling unequipped to make informed decisions,
or even questioning whether they have a genuine choice if they want to enjoy Google services.
If consent is given despite an inaccurate or incomplete understanding of the above, people can experience negative surprises (encountering unexpected personalization) eroding their trust in Google.

When people don't directly experience utility or otherwise benefit as a result of giving access to their personal information they can suspect Google is profiting disproportionately from their data
and as long as targeted ads are the most ready reference people have when thinking about personalization online, it's difficult to convince them otherwise.
This perceived asymmetry can undermine privacy or trust initiatives predicated on the assumption that personalization is generally understood and appreciated, and that we demonstrably put users first.
While internally we have a shared sense of the power (or at least the potential) of personalization to meaningfully improve product experiences
and many users have a vague understanding that Google uses aggregated user data to evolve and improve services
unfortunately it's not obvious to everyone when or how their data is working to enhance their experience of the Google services they use — either individually or in constellation.
This disconnect deepens confusion (...why was I asked to grant access to my location?)
and can feed into the perception that Google has an insatiable appetite for user data to further its own interests / make money.

While most people understand that advertising plays a role in keeping Google free
and ultimately prefer personalized ads to generic ads
the extent to which people feel seen (and often followed) by advertisers triggers concerns about being profiled, surveilled, and even manipulated; intentionally or otherwise.
It's unclear to people what information about them is shared with our advertising partners & websites (3P)
and what role our users play in our revenue model.

CONFIDENTIAL



Our core experience challenge is the broad permission approach we impose on our users today. And that structure is itself a symptom of our unclear view on how data is used to help any given user.

We impose a particular vision of the Google ecosystem on our users — which our broad permissions presume they understand and appreciate.

Our core experience challenge is to simplify the path between the value we offer and the data we need to collect to enable it — so people can actually make sense of the trade-offs.

We impose a particular vision of our ecosystem on our users — and our broad permissions reflect the presupposition that they understand (and are on board) with this vision.

We impose a particular vision of the Google ecosystem on our users; one our broad permissions structure presumes they understand, and are on-board with.

Let's instead embrace and illuminate the ecosystem each user assembles for themselves as they engage with Google services — and offer compelling value with a clear "price tag" attached.

We should embrace and illuminate the ecosystem each user assembles for themselves as they engage with Google services, offering compelling value with a clear "price tag" attached.

Rather than imposing our vision of the Google Ecosystem on our users,


------

We need to repattern our relationship with our user that scopes our data collection and usage to tangible user benefits.


Offer specific and meaningful value, scope data collection — and usage — to delivering that value.

CONFIDENTIAL

GOOG-CABR-04754290

Let's instead embrace and illuminate the ecosystem each user assembles for themselves as they engage with Google — and let users define their relationship with our products on their own terms.

GOOG-CABR-04754291

# EXHIBIT 11

## REDACTED IN ITS ENTIRETY

# EXHIBIT 12

## REDACTED IN ITS ENTIRETY

# Exhibit 13

Redacted Version of
Document Sought to be Sealed



CONFIDENTIAL

GOOG-CABR-03683283



Welcome!
Introduce members of our team here today: Gretchen and Lauren who led our PDPO
and Identity research teams and will be sharing or insights, and Tal who leads Privacy
design. Today we'll be more focused on what we know about trust from a research
POV and how that's causing us to change our approach and hope in future
conversations we can go deeper on design.

CONFIDENTIAL



CONFIDENTIAL

GOOG-CABR-03683285



CONFIDENTIAL



This is summarizing what we'll talk about today - we'll go into deeper

Why do we care about trust?  Because it's critical to a strong long lasting relationship - and that's what we want to build with our users.

To be clear changes in trust don't happen overnight but we need to start now.

CONFIDENTIAL



Consent is not a moment in time - we need to be constantly ensuring our users are comfortable with us having their data.  Don't rush the relationship, ask for just what you need, when it matters.

As for the data you need to provide clear value for that purpose - don't over-lean.

CUJ's to a relationship approach to trust

Big bang to ongoing contextual dialogue

Disparate messaging to consistent brand

Privacy & Security focus to understanding value to users

Independent PA solutions to xGoogle scale

Building a trusting relationship requires a view of the entire customer lifecycle, recognising that our users are with us for a lifetime (however long that might be). Think beyond the moment of agreement (consent), build an ongoing relationship, with multiple nuanced touchpoints that reassure and build permission.  Taking this approach allows us to repetitively build on a positive feedback loop, where users clearly see value in what data they share and how their experience builds, making it an easier decision each time.  Supported with consistent product design, interactions and messaging, we leave no doubt in the users mind that we've got their back.

Shift from reactive to proactive and from regulatory-led to user-led

--

CONFIDENTIAL

GOOG-CABR-03683288

From slide 49
Relationship-based experiences
Contextual consent moments
Cohesive, holistic messaging across products
What users need to know
Solutions that work for all of Google

GOOG-CABR-03683289



CONFIDENTIAL



Users are engaging with more devices, and sharing more data, than ever before

We used to have few devices and share little data - most data was local.

CONFIDENTIAL



But devices are now omnipresent - creating much more helpful experience and new dependency on technology,  but users' ability to keep up with the complexity has not.

GOOG-CABR-03683292



There is much more to understand and control… for users and for us.

GOOG-CABR-03683293



Data protection laws and enforcement have increased dramatically globally. You have probably heard about GDPR, ePrivacy, Schrems 2.0 judgment invalidating Privacy Shield (likely pushing DPAs to increase enforcement actions), CCPA (CA Consumer Privacy Act) and related follow-up laws, CPRA (CA ballot initiative), Washington State Privacy Act (3d try to pass similar regime), multiple pending Privacy laws in NY State. That's just a small sample.

CONFIDENTIAL



So perhaps it's no surprise that less than ▮ % of Consumers and KOFs in major markets around the world trust Google (▮▮▮▮▮▮▮▮▮ The US continues to ▮▮▮▮ EMEA is ▮▮▮▮▮▮▮ - and we do think that regulation is helping with user trust (Slide), and APAC remains a bit ▮▮▮ with Japan as an ▮▮▮ with a solid ▮▮▮ (Slide credit to Kevin Taylor, Brand Insights)

There is much more information Kevin and his team can share and I recommend that Kevin be the next speaker on our agenda.

(Note: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ .)

GOOG-CABR-03683295



In sum, we're in the thick of a storm and we need to do more than what we've been doing, and change our approach.

GOOG-CABR-03683296



We all need to be pulling in the same direction to make change.  In 2021 one of our top company OKR's will again be trust.  Language is in development but expect something similar to 2020's OKR: Trust: Provide the most trusted experiences for our users.  In 2020 we developed a Trust Steering Committee (Rahul Kristie, Kristin, Royal,) and for 2021 we have detailed Trust-specific goals that we'll be driving against.  You'll recognize some of the key ideas.

Reference: 2020's OKR: Trust: Provide the most trusted experiences for our users.  KR1: Deliver industry-leading privacy, safety, security and reliability to our users and customers.  KR2: Deliver more exceptional content experiences while reducing exposure to low quality content, spam, and abuse.

As part of the 2021 planning process we're coordinating efforts across Google to focus on these trust efforts

CONFIDENTIAL



In addition to the "what" we're also working on the how. For example, we are working to land Google-wide internal privacy principles that drive toward a user-centered north star, rather than how we've operated in the past which is more reactive, responsive to regulatory pressure. Here on this slide are the highest level principles we've developed which are deeply steeped in user research. We're currently working to land detailed statements below each that will guide our approach. We've been connecting with senior leaders across PA and aim to get Sundar/Google leads level backing by end of year.

GOOG-CABR-03683298



It's very clear from talking to all of you and other UX leaders across Google that we're all working hard to improve Trust.  It's a top priority for all of us.

CONFIDENTIAL



We need to come together across PAs, to share insight, and identify the places where we build and break trust in our products and our company, and identify ways we can work together to move the needle. As we do so we need to evolve what we're doing, and try new approaches -we'll share some areas we see as big opportunities later in this conversation.

I am going to turn it over to Lauren to first ground us on the challenges from a user POV and then we'll talk about 5 ideas for a new approach.

To be clear we are already coming together - for example, APaS - presented last time in the forum - and many of us are already collaborating ( for example on ████ where ████ and PDPO are looking at how to best measure and impact trust related to consent). But there's much more opportunity to look at the overall Trust experience, across the journey, and work to make improvements.



Lauren to speak to this section

"What do we need to solve for - problems to address"

GOOG-CABR-03683301

Trust is the **willingness to take a risk**
based on the **expectation of a benefit.**[*]

[*] inspired by Mayer, Davis and Schoorman (1995)

Googlewide, we have settled on a standard definition of trust.  Trust is the willingness to take a risk in expectation of a benefit.  In order to achieve "trust" we need to understand what it takes to get customers to take that risk.

CONFIDENTIAL



In our teams, we research security and privacy (among other things…). Our research tells us that security and privacy, along with information safety, form the bedrock for trust.  They are the required building blocks on which once in place, we can continue to build on.

These are things we just have to get right, for our customers and regulators, to become more trustworthy - so let's understand more about what we already know in these areas...

CONFIDENTIAL



CONFIDENTIAL

GOOG-CABR-03683304

| Id | Date | Text |
|----|------|------|
| 1 | 12/01/2020 23:42:09 | @aknight@google.com<br>_Assigned to Andrea Knight Dolan_ |

CONFIDENTIAL

GOOG-CABR-03683305



Security is the digital equivalent of kale - everyone knows they should do it, but they don't actively engage. In many cases convenience trumps security and it's hard to get users motivated to care, check in and take the right steps... however, when we don't and users feel let down by Google, it further errodes trust.

More on convenience over security: Prioritize convenience over security

GOOG-CABR-03683306



However, we also get a paradox, much like with privacy, where despite Google being one of the most secure tech companies in the world, only ███ of our users think ████████████████████████████████████████████████████

Which in turn sets up an interesting tension, whereby users only engage with us when there's a problem.  For example, security concerns come to users attention through: Communications from Google or others // Suspicious activity on or off of Google // Physical security concerns (e.g., device lost or stolen) // Targeted by a known entity (e.g.,, spouse)

In these cases, there is a lot of anxiety and concern over security, sometimes suddenly, and this is a hard place to meet user expectations.

We need to get better at helping users FEEL safe, as safe as they actually are.  We know we have them protected, but we need to build their confidence in this.

GOOG-CABR-03683307



Early on in our research we also see that users continue to conflate security and privacy - from their own beliefs, to messaging to products. This means both security and privacy are in the frame when talking about these areas, as one heavily influences the other. This is a theme we'll see more than once in this presentation today!

CONFIDENTIAL



So do our products help our users feel safe?  Research tells us users' awareness of security checkup and privacy checkup were able to drive security sentiment up. However, awareness of all other features did not.

However, USAGE of features such as new device notification, Google Play Protect, and Location History do drive security sentiment, so our focus needs to be on saying and doing - getting users to engage with these tools to improve sentiment.

CONFIDENTIAL

GOOG-CABR-03683309



Finally, we need to recognize that users expect Google to keep their data
secure beyond just 1P experience, but through to 3Ps:
Minimize data use AND don't share information between 3Ps
Vet 3Ps and hold them accountable
Give users control and be proactive, transparent & concise

In this example, we can see how this expectation can be set - where in the
Google Account a user is able to review 3P access and details...

More: Consider security to be Google's responsibility

GOOG-CABR-03683310



This means that our trust promise wrt. Security doesn't end on Google properties.
User concerns about 3rd party data selling and sharing continue. Users cite that what
was once not even a consideration, has now become an significant ongoing concern.
It's this that brings us to our next topic, user concerns around privacy....

GOOG-CABR-03683311



Before we move on, let's summarise, we know the following challenges to be true... and we recognize the Security Paradox is at play

GOOG-CABR-03683312



CONFIDENTIAL

GOOG-CABR-03683313

I am in <u>control</u> of
<u>who</u> knows <u>what</u> about me
(and for <u>what</u> purpose).

Shifting to privacy….

In this slide, we define privacy from the users perspective as: I am in CONTROL of WHO knows WHAT about me, and for WHAT purpose.

CONFIDENTIAL

GOOG-CABR-03683314



The following slides illustrate images drawn by real users in response to the prompt "draw your greatest fear" around privacy. In this example we can see the user has all their info "floating" in the ether, and "up for grabs". The look of (what is it… shock?!) tell us this is something they are uncomfortable with.

The result of this is that there is a ton of data "out there" about every one of us. And that makes people uncomfortable. Our research has indicated that our users have growing concerns about the amount of data that is out there about them, and what little control they have over it… what is being done with that data, who has access to it, and how it is being used.

CONFIDENTIAL

GOOG-CABR-03683315



Further, users are increasingly concerned that they are becoming "the product". While many users understand that there is a trade-off for getting products and services for free, they do not want to feel like the product or that they are the currency being used to facilitate business transactions. In this image we see the "evil" tech company eying the personal data of a user for financial gain.

CONFIDENTIAL



And that their data is shared or sold to third parties

"Me having my thoughts read, words listened to and keystrokes and clicks recorded and the info being sold to advertisers who then target me."

— BII.£6. OH

Finally – similarly to the security point above, users also worry about their data being shared and/or sold to 3rd parties – that it doesn't stay in Google.

Users also don't believe it even when we tell them we don't sell their data ▮▮▮ disagreed with the statement that Google doesn't sell their information in the Consumer Brandgeist – EOY 2019

And after reading [the excerpt from the "How Our Business Works" site] 10/17 participants, while positive about the sentiment, ▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Another quote:
I don't see why Amazon would do this because I don't see like the CEO of Amazon and the CEO of Facebook hanging out under the sun as best friends smiling… so there's got to be a reason… the biggest lubricant I ever come across is money, or at least some kind of gain of some sorts
Source: Yao et al. "Folk models of online behavioral advertising." CSCW. 2017.

GOOG-CABR-03683317



So let's talk about when we think we are setting expectations with our customers about data use - unfortunately our current approach to rely heavily on consent to engage with our users does not resolve users' fears over time ...

While consent serves a specific purpose in the moment of consent, it is not suitable for building trust over time, in a sustained way over the entire user experience lifecycle

Research shows that users often don't spend time on consent because consent is perceived as both too much text and as a speed bump for a person's actual goal.  And despite extensive efforts to improve comprehension, it has not increased significantly.

██████ of users ████████████ on consent and ████████████ engages with the "learn more" option

GOOG-CABR-03683318



In summary, here are the key challenges we are trying to address with respect to privacy.

And as we said in security, we know that security needs to be in place for privacy to exist - this moves us on to the next and final topic in this section...

——— Kalle ———

Google is seen as a black whole succing in data, and people feel they can't do anything to avoid it.

This, combined with a lack of tangible benefits from the data we collect, fuels the feeling that people are product and that we are using their data mostly for our own gains.

We see that the root cause for all of this is in our monolithic consent and data model. Imposing our idea of what Google is on our users, vs. embracing their service centric experience.

GOOG-CABR-03683319



The interrelationship between security and privacy.  As you've seen the connection between security and privacy is strong

Last week you heard from the ▮▮▮ team about their trust framework for ads…  here I'm going to give you a very brief, high level overview of some of the first results from our own tracking study, our Sentiment Survey.  The Sentiment Survey has been designed to track security and privacy sentiment over time.  Our hope is to be able to track changes, and pin point which aspects of our product experiences might be increasing or decreasing sentiment, and ultimately trust.

CONFIDENTIAL



In our sentiment survey, Security, Privacy and Information Safety explain
MOST of the variance in Trust. [Orient the chart]
■% explanation through S,P & Info Safety
Caveat: US DATA ONLY - Other countries coming
The model may change as we add more variables, and we did not include
content safety this round.

Information safety was included initially as our hypothesis was it was a
mediating factor towards trust - but our analysis showed there was no affect as
a mediating factor, and we pulled it out separately.  We didn't do the same
level of analysis on info safety, and in line with our caveat above, will be
investigating further in our next round



Let me orient you on the framework here: the drivers are here on the left, and
we're demonstrating the impact on the overall sentiment here on the right.
How significantly the driver impact is on the sentiment is signified by the yellow
dots...

Biggest drivers to Security are: Transparency, Benevolence, and Competence.
Transparency (strongest driver of Security): Believing that we would be
transparency about any security risks and incidents is key to security
sentiment. Users take cues from how we handle incidents, our
communications, and the controls we provide to assess our "transparency"
Benevolence: Genuinely caring about users means we commit to protecting
the data they entrust us with, even beyond just their experience with Google
(i.e., when they are not using our products).
Competence: A narrative that focuses on the "deterrent" aspect of our security
approach should help promote Competence the most; in addition, it boosts
users' assessment on our Competence if our security works without needing
them to do much.
Environmental factors also has a sizable effect (similar to Competence) - we'll
touch on this more shortly.

GOOG-CABR-03683322

| Id | Date | Text |
|----|------|------|
| 2 | 12/01/2020 23:41:52 | @aknight@google.com<br>_Assigned to Andrea Knight Dolan_ |

GOOG-CABR-03683323



**Benevolence is the strongest driver of Privacy perceptions; how we convey Benevolence (i.e., that we care about our users) is collecting only essential data, transparency on how we use users' data, and providing controls so users can manage what data is collected and used.**
**Benevolence: It helps improve assessed Benevolence if users believe we collect their data to provide better services to them. This is an even stronger driver that believing that we do not sell their personal data.**
**Aligned Interest: Users trust us more if they think it is also in our own interest to protect their data privacy (even just because there's a lot at stake for us).**
**Value: Users evaluate Privacy as a trade-off; if they think the data they give out results in them getting better or more personalized services, it significantly boost their privacy perception**

GOOG-CABR-03683324



**Sentiment drivers overall:**
Benevolence is a common strong driver of both Privacy and Security perceptions; how we convey Benevolence (that we care about our users) is through transparent and effective communications, handling user issues well, and providing helpful and easy-to-use user controls.
Transparency about security risks and breaches is the biggest driver to user's security perception. Showing that we care about their data security (Benevolence) is the second strongest.
Aside from Benevolence, ensuring users understand that our interest aligns with theirs, and that we collect their data to provide better services (Value) is critical to improve their privacy perceptions.
Environmental factors (ex: media exposure) have a notable influence on both security and privacy sentiments on top of our identified pillars, and is a particularly strong driver for privacy perception
Positive news is particularly effective on boosting security perceptions
Negative news on the other hand significantly hurts privacy perceptions

| Id | Date | Text |
|---|---|---|
| 1 | 01/23/2021 19:09:04 | Thank you!<br>@ggelke@google.com I remember yesterday we wanted surface 3 of them. Should I pick top 3? (transparency, Benevolence, Control)? |
| 3 | 01/25/2021 05:57:07 | Chuan to confirm, however, those 3 make sense to me |
| 1 | 01/25/2021 19:42:01 | This is the update on the Privacy model (slide 41 is the old one for comparison) based on the revamped Privacy sentiment questions.<br>I noted "preliminary" because we were going to wait for Jan. data to redo the full modeling (our 'Refresher driver analysis' is scheduled late Jan.) and this is an initial exploration with just Nov. and Dec data.<br><br>The security model also changed, but top 2 are still Benev and Transp (and top 3 the same). If needed, I can validate the data and add in the security changes on Monday.<br>@ggelke@google.com<br>@shudi@google.com<br>_Reassigned to Gretchen Gelke_ |
| 2 | 01/25/2021 19:42:01 | Yes - unless we see very different results after the Jan round (which I doubt), I'd agree to use these 3 as they are the strongest privacy drivers. If there's a way, let's not show the specific numbers because that will almost definitely change? |

GOOG-CABR-03683326



**Sentiment drivers overall:**
**Benevolence is a common strong driver of both Privacy and Security**
**perceptions; how we convey Benevolence (that we care about our users)**
**is through transparent and effective communications, handling user**
**issues well, and providing helpful and easy-to-use user controls.**
**Transparency about security risks and breaches is the biggest driver to**
**user's security perception. Showing that we care about their data**
**security (Benevolence) is the second strongest.**
**Aside from Benevolence, ensuring users understand that our interest**
**aligns with theirs, and that we collect their data to provide better**
**services (Value) is critical to improve their privacy perceptions.**
**Environmental factors (ex: media exposure) have a notable influence on**
**both security and privacy sentiments on top of our identified pillars, and**
**is a particularly strong driver for privacy perception**
**Positive news is particularly effective on boosting security perceptions**
**Negative news on the other hand significantly hurts privacy perceptions**

GOOG-CABR-03683327



Security, Privacy, and Safety are in fact highly intercorrelated.  Changes, up or down, in one, will influence the others.

What does this mean?

In users' mind, these constructs are intertwined and boundaries are blurry
If we work to effectively improve one of the metrics, the others will likely increase too, even if we do nothing about them (vice versa - if one drops the other two will suffer).

As we think about our roadmaps for trust, we should be thinking about these efforts together.



Let's take a look at another indicative example of this overlap - [Orient the chart]

Here we see here, that users awareness and use of either security OR privacy features, can influence the "non related" sentiment, demonstrating how closely connected these constructs are in users minds.  Here, as many, if not more "security" features, are having a strong effect on privacy sentiment overall.

I'll now hand over to Gretchen to share how we're taking ALL this information, and doing something with it...

GOOG-CABR-03683329



Gretchen to speak to this section

I will use the next few minutes to talk a bit about our approach for solving the security and privacy challenges we just spoke about

Next slide please

GOOG-CABR-03683330



Ultimately, we want to start by increasing users understand the value they get for their data

As part of the Trigger moments research, researchers plotted user sentiment for transparency and perceived benefit for data collection and use to understand the impact of low versus high transparency and perceived benefit

Ultimately, we realized that it is critical that we increase user's understanding for what we're doing with their data and and the resulting benefit they receive as a result.

The bottom left - labeled creepy, is where users neither understand not perceive benefit from having shared their data

The bottom right - labeled magic, is where users feel a benefit but don't understand how they receive it

For people in the bottom half of this diagram, we want to move them from a world where things span from creepy to magical to the top half of the diagram where their baseline is that things are ok and range to a well understood benefit that is "cool" to our users

GOOG-CABR-03683331

Next Slide please

CONFIDENTIAL



We will do this by shifting our approach

In order to move people from the bottom to the top half of the diagram on the prior slide, we need to become a more integral part of people's lives, we need to significantly change the data-relationship with our users.

We do this by moving away from asking for broad access to data in exchange for potential value, to a model where we are offering specific value and asking permission to use only the necessary data to deliver that value.

Next Slide please

Google is built on the idea of organizing the world's information and we provide so much value in doing so.  Our perspective has been roughly "collect data and build something useful from it". But the

GOOG-CABR-03683333

type of data that's available has grown and become more personal
and user expectations have changed so we need to evolve our
approach to data to be more purposeful.

---

Context - not talking points
Because Change is constant in this space in every dimension - we
must constantly innovate and adapt (need help on visual from Dd)
New model: where we collect a general data for potential value to a
model where we focus on collecting only necessary data for
specific value - in order to bring balance to our relationship with
users

CONFIDENTIAL                                                                    GOOG-CABR-03683334



We need to build trust across the entire user experience lifecycle, not just once they become a user

We have kicked off a number of UX efforts to to understand how to engage with our users throughout each stage of the lifecycle – where privacy, security, safety and trust come into play – and how we might best engage with our users to address and mitigate pain points related to these topics

Next Slide please

---------------------

Context – not speaker notes
** Doing some journey research to understand where to engage with users about Privacy – beyond consent
What are the points in the journey where it is most effective to

GOOG-CABR-03683335

talk about privacy and security specifically

Privacy One, Account Value
Security journey (███████
Privacy user experience journey

GOOG-CABR-03683336



Trust develops over time through continuous evaluation of perceived and expected risks & benefits - so it is what we do over time - throughout our relationship with our users, that makes the difference

By establishing more relevant and meaningful touchpoints, we are creating more opportunities to build trust with our users

Next slide please

_____

Bringing these two points together, we believe that building a trusting relationship requires a view of the entire user experience lifecycle, recognising that our users are with us for a lifetime (however long that might be) - so we want to continue to invest in moments to increase their trust in us over time, not just at the

beginning.

Trust is the outcome of the accumulation of moments

GOOG-CABR-03683338



When users do not understand what data is being collected and how it is being used, unexpected instances of personalization can become negative product experiences.

Next Slide please

GOOG-CABR-03683339



We can address this by asking only for the data needed, when needed (not more)
improving users understanding of what data is being collected and how that data is being used

(top right of the diagram - where things are "cool")

Next slide please


———— Kalle ————

By embracing our user's service centric experience, we allow users to assess privacy choices and trade-offs in context.

Only asking users to allows us to capture and use data on their behalf to deliver them a specific benefit.



Further, by helping users connect the dots between the data they share, and the value they get from helpful Google experiences - we will be able to increase trust in their experiences beyond individual products, spanning the entire Google ecosystem, leveraging the account as a unifying factor driving this experience

Next Slide Please

---

Context - not speaker notes

In our Google Account Value research, users understood the value of their data, but did not see how we were making it work for them.

Even when they do see value in a product, they attribute it to the product they're using e.g. maps - not the ecosystem, their account, or Google as a whole -

Users to question Google's motives for collecting the data in the first place.

In our recent account value research we heard from users that they often understand how much data we might have, and look to us to show them how this helps them have better experiences across the ecosystem.  Currently we ask for a lot of data in a series of often disconnected moments,



Today, users primary place to understand what data is being collected and how it is being used, lies within a single consent moment at the beginning of their experience using our products. This serves a specific purpose and is effective. However, we must do more to ensure continued understanding of data usage throughout users experiences with our products. Users may forget what they consented to, which leads to potentially negative experiences downstream.

The address this we need to do more than just the big, upfront moments - we need to invest in smaller, more meaningful contextual moments

Next Slide Please



Create user understanding through contextual information and control throughout the user experience lifecycle

To address this we need to do more than just the big, upfront moments - we need to invest in smaller, more meaningful contextual moments

We can increase user understanding and recall for what data is being collected and how it is being used by asking them for consent at relevant moments in time - when the choice is meaningful and memorable to the user

By making privacy and security more contextual, we are ultimately building them in by default

CONFIDENTIAL



As you know, we go to great lengths to keep users' accounts secure. But a users' security state hasn't always been well communicated in day to day contexts.

Historically, entry points have relied on notification, email, and visits to Google Account. These are still critical to protecting accounts, but don't proactively communicate safety in a way that you see everyday.

As a result, we're pivoting toward a more proactive stance and starting to integrate things like critical security alerts into surfaces that users encounter every day, not just when a significant security related moment occurs.

Next Slide Please

CONFIDENTIAL



A new approach to building trust

Build trust **throughout the user lifecycle** — not just a single consent moment

Ask only for the **data you need, when you need it** — not more

Help users **connect the dots** between the data they share and helpful Google experiences

Create user understanding through **contextual** information and control

Ensure users **are safe** and **feel safe** — let users know we protect their data

In sum, we are advocating for a new approach to building trust with our users.

We need to invest in a long term relationship with our users. One in which we can build trust over time.

We need to think beyond the moment of agreement (consent) to the entire user experience lifecycle, and build an ongoing relationship, with multiple nuanced touchpoints that reassure and build permission with the user.

Taking this approach allows us to repetitively build on a positive feedback loop, where users clearly see value in what data they share and how their experience builds, making it an easier decision each time.

By ensuring our users are safe, and feel safe, we make privacy and security native to users experiences.  Supported with consistent product design, interaction,s and messaging across the ecosystem, we leave no doubt in the users mind that we've got their back.

GOOG-CABR-03683346

I'll hand you back to Sarah

---

Context - no speaker notes
Lifecycle
Only the data we need
Value
Reassure
Security

Consent is not a moment in time - we need to be constantly ensuring our users are comfortable with us having their data. Don't rush the relationship, ask for just what you need, when it matters.
As for the data you need to provide clear value for that purpose - don't over-lean.
CUJ's to a relationship approach to trust
Big bang to ongoing contextual dialogue
Disparate messaging to consistent brand
Privacy & Security focus to understanding value to users
Independent PA solutions to xGoogle scale

Building a trusting relationship requires a view of the entire customer lifecycle, recognising that our users are with us for a lifetime (however long that might be). Think beyond the moment of agreement (consent), build an ongoing relationship, with multiple nuanced touchpoints that reassure and build permission. Taking this approach allows us to repetitively build on a positive feedback loop, where users clearly see value in what data they share and how their experience builds, making it an easier decision each time. Supported with consistent product design, interactions and messaging, we leave no doubt in the users mind that we've got their back.
Shift from reactive to proactive and from regulatory-led to user-led
--
From slide 49
Relationship-based experiences
Contextual consent moments

GOOG-CABR-03683347

Cohesive, holistic messaging across products
What users need to know
Solutions that work for all of Google

GOOG-CABR-03683348



Sarah to speak to this section

GOOG-CABR-03683349



As I mentioned at the top trust is a challenging space and we're all working hard we need to build stronger partnerships to tackle Trust at Google scale and make progress.

CONFIDENTIAL



As of October, 2020 Privacy UX has grown to ▮▮▮ members and we have workgroups working on areas of shared priority including research, children's privacy, privacy patterns and privacy language. We also sponsor forums for information sharing, work critique, and knowledge sharing

CONFIDENTIAL

Leadership Forum

Forum for UX PA Leads across Google to disseminate information
(e.g.,          IDFA), drive alignment, increase efficiency, escalate issues,
and steer the direction of Privacy UX-related topics across the company.

Priscila and I see an opportunity to expand Privacy UX to include a Leadership Forum as well. This will ensure that you are up to date on Trust topics. We'd also like to get your thoughts on whether there is energy around Privacy in particular, or Trust more broadly, including Security and Content Safety as other areas of focus. We would love to hear from you what areas are "hot" from your perspective so we can pull together a great agenda series.

GOOG-CABR-03683352



Culturally we're working to drive a longer view and to think further out so we can help inform the technology changes to make possible where we need to go.  Within PDPO we have a program called ▮▮▮▮▮▮▮ where we are working toward a 5 year vision for Privacy Experience.  We've interviewed a number of folks on the call today and will be sharing our thinking along the journey and will come back to this forum along the way.

CONFIDENTIAL



That was a survey of how we're thinking about trust.  If nothing else I hope you remember that this is a space where we must work together to create change.  Would love to answer questions and get your thoughts on the idea of the Leadership forum and other ways that we can connect on Trust.

CONFIDENTIAL



CONFIDENTIAL

GOOG-CABR-03683355

| | |
|---|---|
| DocID: GOOG-CABR-03683283 | |
| BegDoc: GOOG-CABR-03683283 | |
| EndDoc: GOOG-CABR-03683355 | |
| DocID_BEGATT: | |
| DocID_ENDATT: | |
| Parent_Attachment: | |
| PRODUCTION VOLUME: CROSS-PROD014 | |
| Folder Name: CROSS-PROD014 | |
| Custodian: Sam Heft-Luthy | |
| CONFIDENTIALITY: Confidential | |
| OWNER: ggelke@google.com | |
| Author: | |
| From: | |
| Recipients: | |
| CC: | |
| BCC: | |
| Title: [Sharable] User & PDPO Trust Conversation with UX Collective | |
| MasterDate: | |
| Sent Date: | |
| Creation Date: | |
| Date Created: 10/14/2020 | |
| Last Modified Date: | |
| Application Name: | |
| Page Count: 73 | |
| Location: | |
| File Name: -Sharable- User & PDPO Trust Conversatio_1dtjd7FuOBbRG0nxxXzH6nAA8YOBk9MwKFfl_ciP5AOw.pptx | |
| File Extension: pptx | |
| File Size: | |
| Redaction: | |
| ███████████████████████ | |
| Hidden Data: | |

# Exhibit 14

Redacted Version of
Document Sought to be Sealed

███████████

**Commented [1]:** @heftluthy@google.com @adebooij@google.com @mimosal@google.com @kallebu@google.com began a sort of "workbench 2.0" doc for us to capture our somewhat refined challenge landscape

Will continue to add to this next week and pull in the insights from our synthesis workshop; hopefully it can serve as a concise & consolidated reference as we move forward.

## Mission

This workstream aims to define an overarching vision and strategy for PDPO to inform the
Google privacy experience across products and services according to a 5-year time horizon.

## Core team

**Commented [2]:** @mimosal@google.com #halp _Assigned to Mimosa Lynch_

**Commented [3]:** do you want them all listed out?

**Commented [4]:** Did I miss anyone from the core team? Or are we all listed out somewhere I could reference?

adebooij@, heftluthy@, justchen@, jwoll@, kallebu@, mediha@, mimosal@, mseg@, ohelyse@,
shudi@, yingsi@...

## Related resources

P.N definition of privacy
P.N research synthesis

# Key experience challenges

What prevents people from feeling comfortable and in-control of their privacy

GOOG-CABR-04754160

# 1. Broad permissions

It's difficult for people to fully / meaningfully give permission

Not only are the implications of WAA extremely broad and varied, but people use Google in such diverse ways — much of the language intended to be comprehensive feels vague and hard-to-parse for non-engineers / lawyers, and our examples are not universally resonant

- We have a few permissions covering a broad scope of activity, info & data collection and use
- The lack of clarity around what specific role people's data plays in their experience of our services — and the fact that everyone uses a different constellation of services — means many struggle to grasp,
  - the value their collected data enables
  - how their data will be used (and by extension, whether it could make them vulnerable to privacy issues)
  - the service implications of denying Google access to their data
  - what will happen with data after it's collected; it's very difficult for users (and us) to assess long-term risk
- This can result in people feeling unequipped to make informed decisions, or even questioning whether they have a genuine choice if they want to enjoy Google services.
- When consent is given despite an inaccurate or incomplete understanding of the above, people experience negative surprises / trigger moments (encountering unexpected personalization) eroding their trust in Google.

...so people struggle to know what exactly they're sharing, and to see what's "in it" for them.

**Commented [5]:** IMO this is a symptom of the problem, which is more point #2. We can only have broad permissions when our reasons for data collection are actually themselves broad.

**Commented [6]:** interesting point.
@ohelyse@google.com
@kallebu@google.com
@yingsi@google.com

If we started with broad permissions, our benefits statement will be broad as a consequence. If we started with broad benefits, permissions would have to follow.

Looking back, Google might have started with 'broad benefits' as permissions were introduced down the line.

**Commented [7]:** Very much agree, broad permissions/consent is a symptom itself, but it is the first and most tangible part of the experience we can tackle. From there we need to drive change upwards and into the organization as well as downwards through the products to the user.

The core challenge is our (outdated) company mindset/vision of how we deliver value and engage with users.

GOOG-CABR-04754161

## 2. Lack of benefits

When permission is given, most people don't experience enough (or *any*) of the value that their own data purportedly adds to the products they use

Meanwhile, we espouse (and internally ascribe to) the idea that our users *primarily* benefit from giving access to their data — and Google's revenue is a happy side-effect

- People think about Google in terms of the services they use

- Depending on which Google services a given person uses most, they may or may not receive any tangible benefits from sharing their personal information and activity data with Google

- When people don't directly experience utility or otherwise benefit as a result of giving access to their personal information they suspect Google is profiting disproportionately from their data

  - Often targeted ads are the most ready reference people have when thinking about personalization online

- This perceived asymmetry can undermine privacy or trust initiatives predicated on the assumption that personalization is generally understood and appreciated, and that we demonstrably put users first

- While internally we have a shared sense of the power (or at least the potential) of personalization to meaningfully improve product experiences

  - and many users have a vague understanding that Google uses aggregated user data to evolve and improve services over time

- Unfortunately it's not obvious to everyone when or how their data is working to enhance their experience of the Google services they use — either individually or in constellation with other Google products

- This disconnect deepens confusion (...why was I asked to grant access to my location?)

  - and can feed into the perception that Google has an insatiable appetite for user data to further its own interests / make money.

**Commented [8]:** In addition to "value that their own data purportedly adds" I think we need to include that lack of benefits FOR YOU are inherently part of this.

Google, and internet technology in general, focuses on "users" but doesn't focus on "the user" and as a result our PURPOSES are vague.

**Commented [9]:** Similar comments here to what I said below

**Commented [10]:** @jamarlow@google.com Hi Jenn! Wanted to follow-up on your comments in the slide deck here, your thoughts are so appreciated!

The connection we've been exploring is the idea that the perception of a fundamental asymmetry (my data benefits Google more than Google having my data benefits me) contributes to and reinforces existing narratives around ads p13n and Big Tech's exploitation of users. This has come up both in our executive interviews and user research.

Slides like this one

seem to point to the perception that the _purpose_ of Google requesting access to user data is for Google to earn money (rather than primarily to personalize product experiences) thereby allowing Google to provide free services (which "exist" ultimately to collect data — and around and around we go)

Does that interpretation seem off to you? Do you rather think that providing free services is itself the problem, and thereby only solvable by charging for products? @adebooij@google.com @kallebu@google.com Assigned to Jennifer Marlow

**Commented [11]:** I think it's more that people acknowledge (and mostly) accept that the benefit to them is being able to use free products and services, and the "cost" is "paying" with their data. (Often they don't want to pay, so this is seen as an acceptable tradeoff) People seem to be more angry/feel more exploited when (they believe) a company like Google sells/gives their data to third parties or other outside entities — in this case, Google is "profiting" off their data

**Commented [12]:** How does this conversation change when we position ads as a product and apply the same expectations to it, including providing tangible and clear benefits?

**Commented [13]:** I believe that people, when asked, often understand that they are getting a free product in return for seeing ads and that data somehow plays a role in this but also think this isn't top of mind.

Agree that parties other than google getting their data is the biggest concern for people. And in many cases, seeing an ad might make people believe that this is [...]

**Commented [14]:** Exactly, so what we are saying is that we need to make it very explicit what we use the data for and what not, and for whatever data we us we need to provide very tangible benefits so that this issue described above is resolved.

**Commented [15]:** agreed. but people might still believe that to provide you "value from ads personalization" (however we frame this), we can do that without giving your data away.

## 3. Unclear role of personalized ads

Personalized ads trigger mistrust, reinforcing misconceptions and feelings of exploitation

While most people understand and accept that advertising plays an important role in keeping Google free — and may even prefer personalized ads to generic ads — many feel their data is the "price they pay" to use Google, and that p13n = ads

- Ads themselves are not necessarily the problem — but are seen as a symbol of how their data is used

- The extent to which people feel seen (and often followed) by advertisers triggers concerns about being profiled, surveilled, and even manipulated; intentionally or otherwise.

- It's unclear to people what information about them is shared with our advertising partners & websites (3P), and what role our users play in our revenue model

- When people see their data at work in the products they use (*I allowed my location to be collected so now Maps can give me driving directions*) a key purpose of collecting their data is seen as obvious, justified; user data in, functionality/value out.

  - People who don't directly experience their data at work in the products they use (*I allowed my location to be collected so now Gmail can... and YouTube can... um*) are likely to suspect the sole purpose of collecting their data to be ads p13n — user data in, money for Google out — for lack of any other demonstrable purpose.

**Commented [16]:** I'd like to see us making the point about Ads as a product - if we can get users to think of ads as a product, it doesn't SOLVE ads but it reduces complexity in general and gives a clearer path forward for Ads to get in line rather than being its own special thing

**Commented [17]:** I see that this could be part of us describing the solution space, not the challenge.

GOOG-CABR-04754163

## ///sam scratchpad

## 1. Google collects data for two core and contradictory reasons.

We have stated that Google collects personal data for two reasons:

1. To improve products for *you*
2. To improve products for *everyone*.

(Ads are just a product, and should be considered part of this rather than a third reason!)

Our incentives for opt-in on the first reason (for *you*) are aligned with the user, but misaligned for the second reason (for *everyone*).

- Some products, like YouTube, require user data for personalization in order to be anywhere near as good as we want them to be. Some products, like Search, mostly require user data for *aggregate improvements* – personalization with user data is only a small part of the ranking algorithm, but the ranking algorithm itself is hugely based on trends within user data.

- Ads themselves are not necessarily the problem — but are seen as a symbol of how their data is used

- The extent to which people feel seen (and often followed) by advertisers triggers concerns about being profiled, surveilled, and even manipulated; intentionally or otherwise.

- When people see their data at work in the products they use (*I allowed my location to be collected so now Maps can give me driving directions*) a key purpose of collecting their data is seen as obvious, justified; user data in, functionality/value out.

  - People who don't directly experience their data at work in the products they use (*I allowed my location to be collected so now Gmail can... and YouTube can... um*) are likely to suspect the <u>sole</u> purpose of collecting their data to be ads p13n — user data in, money for Google out — for lack of any other demonstrable purpose.

GOOG-CABR-04754164

## 2. As a result, the value of opting-in for data collection isn't clear — to us or to users.

Since users are opting in for both personal and collective benefits, the permissions structure we've built around those benefits is, by necessity, incredibly broad.

When permission is given, most people don't experience enough (or *any*) of the value that their own data purportedly adds to the products they use. But *Google still has an incentive to get them to accept!*

- People think about Google in terms of the services they use
- Depending on which Google services a given person uses most, they may or may not receive any tangible benefits from sharing their personal information and activity data with Google
- When people don't directly experience utility or otherwise benefit as a result of giving access to their personal information they suspect Google is profiting disproportionately from their data

## 3. The result is a system that we think is good for *users* (plural), but isn't good for *the user (singular).*

We cannot empower a given user to be *in control of their privacy ("who knows what about me for what purpose") if everyone doing that to the full extent they want would cripple our products.*

- We operate in a competitive environment that requires proof of value delivery — e.g. for creators on YouTube, advertisers and publishers on 3P sites, and businesses on Google Maps.
- Users have no stake in that relationship, and as such being asked to consent for something that doesn't benefit them simply doesn't make sense

### Additional challenges

Priority TBD

GOOG-CABR-04754165

Experience

- Strong conflation of ads and product p13n (Making product and ads benefits tangible to users explicit/separately)
- Display ads experience/perception (1P & 3P)
- Lack of privacy-specific products/features (e.g. Password Manager, Incognito)
- Lack of observable proof / people don't believe us (ads & product)

Organizational

- Resistance of PAs
    - How to encourage compliance
    - How to actually excite and inspire
    - How to help and empower
- How to make privacy cool (vs. make something cool that improves privacy — technical challenge, emotionalize)

# Solution requirements

## Known | Present

- ...

## Anticipated | Future

GOOG-CABR-04754166

# Potential levers

# Appendix

### Still-unprocessed notes

- Our permissions structure may be the crux / keystone, but we're under no illusion this is strictly a consent challenge

- Google has done a lot of research that points to this challenge space as critical, but until now have not reexamined our foundational approach / relationship with user data as a result

- We are not suggesting we want to increase complexity by turning 3 controls into 300 — we are suggesting transforming the experience (and our mindset) from "tuning privacy" to "making the products you use work right for you, one at a time"

- "All politics are local" → modularity, immediacy, meaning

- Privacy as the enabler

CONFIDENTIAL

# EXHIBIT 15

## REDACTED IN ITS ENTIRETY

# Exhibit 16

Redacted Version of
Document Sought to be Sealed

Message

---

**From:** Sabine Borsay [sabineb@google.com]
**Sent:** 11/26/2020 7:30:10 PM
**To:** Matt Waddell [mwaddell@google.com]
**CC:** AbdelKarim Mardini [mardini@google.com]
**Subject:** Re: Do we actually want Sync longer term?

Hi Matt,

Thanks for going down the pretty deep and convoluted rabbit hole on all things Sync and Sign in! This is how I described this rabbit hole in a lightning talk that I gave a while ago. :) And thanks for sharing your thoughts! Much appreciated.

I'm looking forward to picking up the discussion after these launches are out the door.

Enjoy Thanksgiving!

| Sabine Borsay | Product Manager | **sabineb@google.com** | +491726757387 |
|---|---|---|---|

On Tue, Nov 24, 2020 at 6:49 PM Matt Waddell <mwaddell@google.com> wrote:

Mardini and Sabine,

I've been going down the rabbit hole on all things Sync/Sign-in this week, in preparation for the upcoming ▮▮▮▮▮ launch (thanks Sabine!)... and I'm left wondering... is there really a need for Sync in the longer term?

- We're actively moving more functionality into the signed-in state (Exhibit A: ▮▮▮▮ Which makes sense: the "membership benefits" of signing in to Chrome should be meaningful.

- Sign-in is already the majority state relative to sync (▮▮▮ vs. ▮▮%), and I'd expect that difference to grow, not shrink, over time

- Both Sign-in and Sync are tied to one's Google account, so there's no real difference there for users who'd prefer not to store data with Google

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Finally, I consider this important, but definitely not urgent. And I know @Sabine you're working on the much more time-sensitive launch for next week! Afterwards, I'd welcome a discussion.

With gratitude,
Matt

GOOG-CABR-00833007

# Exhibit 17

Redacted Version of
Document Sought to be Sealed

**Chrome + Privacy Marketing strategy**

**Author: JC**

Exec summary

Privacy First at Google

A Privacy-Focused Chrome
    Product assessment
    Comms and Marketing plan

Appendix 1: Known critiques of Google's approach to Privacy first

Appendix 2 - Deep dive on comms and marketing plan
    1) A personalized browser is helpful
        Audiences and goals:
        Initiatives / Channels: (with examples)
    2) We collect the minimum amount of data, you're in control, and we never share it
        Audiences and goals:
        Initiatives / Channels: (with examples)
    3) We do care about privacy. You should believe us because Chrome is run by humans
        Initiatives / Channels: (with examples)

# Exec summary

Google is not "privacy first", in a way that most commentators would understand, as we believe we need user data to make our products helpful. Instead, I believe we are "privacy focused", striking the right balance between user-first, helpful products, and giving users control over how their data is used.

Key messages for Chrome are: 1) a personalized browser is helpful 2) we collect the minimum amount of data, we never share it, and you're in control, and 3) We do care about privacy, and you should believe us because Chrome is run by human-beings. We need to focus on both key opinion formers, privacy-conscious users, but also avoid scaring the majority of users who are not very concerned about privacy, so our communication channels should be quite targeted.

CONFIDENTIAL

Chrome does not stack up very well today on Google's privacy focused principles, Our roadmap is better, but still not great. It will be hard to land Chrome's privacy benefits with present roadmap. Furthermore, there are some difficult critiques of Google's principles. Chrome should consider some more radical product changes if we want to land our key messages, potentially being even stricter than Google's privacy policy.

## Privacy First at Google

Via the common definition of the term, Chrome is not a "privacy first" browser, nor should it be. It is increasingly clear that key opinion formers and privacy conscious users see "privacy first" as "shares little or no data". This is not a game we can win, and so it is a game we should not play.

Google's needs user data to make our product more helpful, and fulfil our mission to make the world's information universally accessible and useful. Personalized advertising needs data to ensure information is still accessible, and Google's products need individual data to personalize the product experience making them useful and helpful.

For browsers, this is especially true. In an increasingly commoditized product space, Chrome's points of differentiation will increasingly be that we are the browser from *Google*.

Google's browser will be uniquely able to make the open web's content more helpful. We need data to do this – both to personalize our app experience and to ensure the content on the open web continues to have a viable business model. Instead of being privacy first, we should be helpful first, while also being a private as possible.

In a New York Times Op Ed, Sundar laid our position on how to ensure our products are both useful, but also as private as possible.

He laid out **3 ways we make our product more helpful with user data**

- A. Personalize the product experience to make it more helpful
- B. Improving experience for everyone via aggregate data
- C. Personalized advertising to keep the web free and open.

He also articulated **3 principles we follow on user data:**

1) We only collect the info we absolutely need to be more helpful (creating user value)
2) We never sell your data with anyone else (on purpose or by accident, through security breaches)
3) We always allow users to turn off collection of their data in a simple way (but we are comfortable defaulting people into data sharing)

**Commented [1]:** My suspicion is that platform teams (Chrome, Android) have an extra tricky job to do w.r.t privacy because of the need to serve both end-users and developers even when their respective needs/wants/fears are not aligned.

**Commented [2]:** This is a good point. I have not addressed advertiser or developer comms or positioning at all in this document actually.

**Commented [3]:** "Google will never "sell" any personal information to third parties." I think that's an important differentiation from "we never share."

**Commented [4]:** Fair. I will adjust. The philosophical objection is that making money via targeting ads based on data is effectively selling your data.

GOOG-CABR-00111821

To distinguish from the common definition of "privacy first", I will call this approach "privacy-focused".

> **Commented [5]:** MS: If we were to be privacy first, this is what we would be saying. E.g. apple

# A Privacy-Focused Chrome

## Product assessment

A privacy-focused Chrome is one that lives up to Google's **privacy principles.**

Here's my POV on how we stack up against them:

> **Commented [6]:** JC to update this - Chrome does not collect and share data with other Google products. Ads does collect your browsing history, but via cookies not via the browser back ends.

> **Commented [7]:** We share data with eg search for personalization of the feed, just not with ads

1. **Only collect info we absolutely need**
   a. **Status today: Red.** We do not yet minimize the amount of info Google collects for personalized advertising, or with other Google services. ~~We collect things today which we do not even use (for instance, data shared with ads team).~~
   b. **Future roadmap:**       Some plans to reduce data shared with other Google product unnecessarily.
      ). It will all be slow though.

> **Commented [8]:** You mean the data "Chrome collects for personalized advertising"? Chrome doesn't share data (navigation history) today for personalized advertising. Data is shared, however, to personalize product experiences.
> +eisinger@google.com

> **Commented [9]:** Ok, great. So no chrome activity ends up in ads except that which is tracked by cookies?

> **Commented [10]:** Even if you are signed in and syncing?

2. **Never sell your data to anyone else**
   a. **Status today: Red.** While Chrome has industry-leading security (which protect data from hackers), and doesn't actively share your info with 3Ps directly, we allow 3Ps to collect your data very actively through Chrome through cookies, and extensions, and we make lots of money from ads – that sounds like selling data to many people. It is hard to reconcile this with a commitment not to share user-data, independent of how strong our story is on security.
   b. **Future roadmap:**       Our security will continue to be world-leading, although our differentiation will erode as Edge and other browsers adopt Chromium. We will get rid of cookies completely and replace with local personalization of ads which share very limited data with 3Ps - but some data is still shared, and we make money from it. Will be hard to argue that nothing is sold, even if it's just very high-level info about your interests. But this is going to be slow - 3 yrs to kill cookies.

> **Commented [11]:** Correct. Jochen to confirm (and I apologize for the drive-by comments on this great doc while I'm OOO but given the aggressive schedule for this exercise I found myself checking in. Will restrain myself :)).
>
> I agree in general with your point about "privacy first Chrome" being a tough sell when (1) all other browsers are saying they are privacy first and (2) our power is in the value we provide (based on data).

> **Commented [12]:** OK, got it. Thanks. I would be glad to be wrong on data-sharing. I feel like we might be a "unconvincing green" if this is the case/roadmap, in that we ACTUALLY don't share data but certain privacy advocates will never believe us because we have such incentive to share it, and they don't feel they have a way to audit us.

> **Commented [13]:** And I have no issue with drive-bys. Quick feedback is great.

3. **Allow users to turn off data collection in simple way**
   a. **Status today:**       . Users can opt-out from local data collection easily with incognito. It is possible to control how data is shared with 3Ps via cookie, and with Google (via sign in and sync) but controls are not simple and mental model is confusing.
   b. **Future roadmap:**       . *ChromeGuard* will allow users to simply control how info is shared with 3Ps via cookies, and sign-in and sync will be much clearer. We will continue to allow simple user control of local sharing via Incognito.

> **Commented [14]:** right. we currently do not share chrome history with ads, but they only use information tracked via cookies.
>
> Unfortunately, that's not the story we tell our users, as we do collect a consent for sharing the data.

> **Commented [15]:** Ok - got it. I will adjust this.

*Collectively, I therefore think, with my understanding of the present roadmap,  it's a pretty hard sell to persuade people that Chrome is privacy-focused, let alone privacy-first.*

## Comms and Marketing plan

Key messages:

1) **A personalized browser is helpful.** It is helpful directly (in-product), and indirectly (open web benefits, powered by ads)

2) **We collect the minimum amount of data, we never sell it, and you're in control.**

3) **We do care about privacy. You should believe us because Chrome is run by humans.**

We have two key audiences. We need to reduce the cynicism by providing an alternate narrative for key opinion formers and privacy conscious users, while also inoculating ourselves against future negative sentiment among the "majority users" who do not yet have major concerns about Chrome privacy. And the key thing is not to scare this majority.

**Based on present assessment of product and roadmap, I am very concerned about our ability to land #2 as we have insufficient proof points.**

# Deep dive on comms and marketing plan

## 1) A personalized browser is helpful

*Audiences and goals:*

- **Majority users:** raise awareness and usage of personalized features.
- **KOFs are privacy conscious users:** Increase understanding of user benefits of personalization and position of responsibility we have in the ecosystem.

*Initiatives / Channels: (with examples)*

- **Chrome is helpful to you because of personalization**
  - ○ Actively promote usefulness and launches of features via PR/blog posts (for KOFs and privacy focussed uses) and also directly to all users in-product.
  - ○ Key features:
    - ■ Password manager improvements

**Commented [16]:** Can you help me understand the benefit of this message? Playing devil's advocate, I could imagine naysayers finishing this sentence with "...humans who make a bunch of money on ads based on my private information." And with such a strong Google focus on machine learning, emphasizing humans seems counter-intuitive.

**Commented [17]:** This includes the ideas in the document titled "privacy-first Chrome" ? (e.g. Chrome Guard on by default, hence 3p cookie blocking is on by default).

If not, are there other ideas which, if implemented, would make landing #2 easier?

**Commented [18]:** No, I've not assessed the new ideas, which indeed make things much more convincing. If those are really in-play, then I will call them out as potential solves.

**Commented [19]:** Great. We tried to go wide and assess impact / feasibility based on the dimensions in the table. If something could have a super positive PR impact at the expense of the bottom line or the web ecosystem, I would like to show it to Chrome's leadership and get their thoughts.

- - Credit card auto-complete across devices and apps
    - History sharing across devices

- **Chrome's aggregate data is helpful**
  - Highlight malware and phishing detection to press, KOFs, and to power users via PR and social.

- **Personalized advertising is helpful**
  - Release research publicly showing that users like personalized ads.
  - Show the real impact a withdrawal of personalized advertising would have on publishers and small businesses.
    - E.g. Show which of the top 1000 sites would shutter
    - Get spokespeople from these sites to speak publicly.

### 2) We collect the minimum amount of data, you're in control, and we never sell it

*Audiences and goals:*
- **Majority users:** Increase awareness of privacy control features. Non-goal: increase adoption of controls.
- **KOFs and privacy conscious users:** Educate about complexities of the problem, and our future plans for innovation.

*Initiatives / Channels: (with examples)*
- **Create clear branding around Chrome's privacy features** (name, positioning, iconography, in-product presence):
  - *Option A: Branding of ChromeGuard only*
    - *E.g. Chrome Cookie Controller*
  - *Option B: Rebrand all privacy features under ChromeGuard. **[Recommended]***
    - *E.g. Chrome Control*
  - *Option C: Rebrand all privacy and (some) security features under Chromeguard.*
    - *E.g. Chrome Protect*
  *Launch new brand together with ChromeGuard in H2/2019 (or later when we are ready), and promote it via PR outreach, owned & operated channels, in-product messaging and available marketing channels (e.g. social or even paid media). Given the attention to this topic, we could expect pick up by mainstream media.*
  ***Note: In branding decision we should make call about how ChromeGuard and Incognito differ, or if we can brand together.***

- **Positive and negative trigger moments in product explained.**

- **Website education about existing and new features.**

- **Owned and operated Google promos for new features**

- **[Considered, Not recommended for now]: Paid media campaign promoting ChromeGuard.**
  - We need to earn credibility among KOFs on privacy before we publicly promote privacy benefits at huge scale of ATL, so not recommended for the time-being.
  - Furthermore, our goal is not necessarily to increase adoption of ChromeGuard at this point (only awareness).

- **Tell the story of privacy-preserving APIs**
  - Share the vision with the launch of ▊▊▊▊ (Name to be changed before launch)
    - E.g. Federated Personalized Advertising, "Private Advertising Model", Incognito ads, etc.
    - ▊
  - Have advocates talk about the importance of personalized advertising to the web ecosystem.

- **Increase awareness of the threats from hackers, and what Chrome does to protect user security.**
  - **Plans to be fleshed out by JC**

## 3) We do care about privacy. You should believe us because Chrome is run by humans

*Audiences and goals:*
- Audience is exclusively focussed on KOFs and privacy conscious users – majority users do not care.
- Combat the cynicism about Google's motives and incentives, therefore, throughout all, we must show we are more human, and more than a big faceless company.

*Initiatives / Channels: (with examples)*
- **Blog post & proactive press outreach for new launches, speaking opportunities** (e.g. SXSW etc.)
  - *Key moments/proof points:*
    - *ChromeGuard: "New privacy controls give you option to turn off 3rd party tracking without breaking your browsing experience".*
    - *Privacy APIs: "XY% users prefer personalized advertising. We are innovating in this space so they don't have to compromise on their privacy"*
    - *Incognito:*
  - *AMA on Reddit with Chrome Web Platform team about Privacy*

**Commented [20]:** Humans aren't very reliable :\ so I think we need to consider other arguments here. Idea: We care about privacy, but we also care about simplicity and reducing cognitive load on users. For example, Chrome has had cookie controls for years, but we believed that "most" users aren't going want to delve into that complexity, so we put them in Settings - where no one can find them.

Most users want more privacy, but the level of "control" that, say, ▊▊▊▊ provides is mind-numbing. Our position could be that we want to balance control with ease of use and simplicity. But we hear you, KOFs and privacy-conscious users! And so we're doing <things listed in the doc> to address your concerns.

**Commented [21]:** Thanks - useful feedback. I would bundle this under "we give you control", in point 2, and your framing is useful for narrative there.

**Commented [22]:** e.g. "When you want to use any Google product and leave no trace, whether on-device or on Google's servers, use Chrome's hardened incognito"

This is about Sin Rastro's "no-history mode" integration with chrome.
+elsinger@google.com could explain further

- ○ *SXSW panel: The future of open web, and what should key players' do now to keep it alive.*

- **Social media series:** *Under the hood of Chrome for real fans*
    - ○ *Interview with Justin S.: "5 biggest myths about how Chrome collects and uses data"*
    - ○ *Interview with Ben G.: "Ok, so what exactly is the 'open web'?"*
    - ○ *The day with Emily Schechter, main security bugs catcher.*
    - ○ *Interview with Alex A. "How Incognito icon was created" and explanation how Incognito actually protects you.*
    - ○ *Interview with Jochen: "Greetings from Germany. We just got recertified as the secure browser by German ministry of Something"*

- **Chrome Privacy Advisory Council:** XY opinion formers (privacy advocates, other browser vendors etc.) discuss the future of web standards in privacy space, with the goal to a) explain our position and b) **gain advocates within the community.**
    - ○ *Chrome organizes first browser privacy summit ever. XY guests from the industry discuss open-source standards in privacy space.*
    - ○ *XY KOFs are invited to MTV to have a sneak peek into the roadmap to get their feedback and ideas under NDA.*

- **Privacy experiments:**
    - ○ *"Chrome without Google" app*
    - ○ *How many websites will get broken if you turn off cookies.*
    - ○ *How many types will you have to type your password if you turn off cookies.*

CONFIDENTIAL

# Appendix 1: Known critiques of Google's approach to Privacy

There are both philosophical and practical criticism of Google's approach:

Philosophical objections:
- We default people into data sharing - privacy hawks will always argue we should ask users to explicitly opt into data sharing.
- Using data for ads personalization is effectively "selling your data" (we would argue we are selling access to your eyeballs, targeted based on your data...).
- While improving experience for everyone is important on aggregate, individually there is no reason a user would do this...the rationale and self-interested user should free-ride on everyone else's data.

> **Commented [23]:** MS: response: need to focus on aggregate and annonymized.

Practical objections:
- Critics can also point to many examples where it looks like we don't follow our own principles. For instance, it's hard to see why some of our products need to poll user-location every 10 mins.
- For many of our products, the trade-off between privacy and helpfulness is just not there.
- Fundamentally, Google is highly incentivized to break these rules for profit, and there is no way to check if we are really doing it.

Chrome largely follows Google's approach to privacy, and therefore we will continue to be subject to the same kind of criticism as those targeted at Google - and we have no hope of changing this.

Importantly, the press is actively using the term "Privacy first" as a short-hand for "Doesn't collect data", which is not something we are planning on doing. Therefore it is unlikely we will realistically get rid of headlines like "leave chrome and switch to a privacy first browser".

> **Commented [24]:** There might also be something about the power of "defaults" in framing related to "privacy first" - Apple's positioning for the iPhone (in those recent ads) says to my ears: privacy, you deserve it, you get it by default, buy an iphone. So it's harder to land something that says "privacy, you deserve it, here's a thing you can turn on in settings ... because we turned it off by default". (Enamel's HTTPS work  was more similar to Apple's).

GOOG-CABR-00111827

# EXHIBIT 18

## REDACTED IN ITS ENTIRETY

# Exhibit 19
Redacted Version of
Document Sought to be Sealed

CONFIDENTIAL

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                  SAN JOSE DIVISION

4

5    PATRICK CALHOUN, ET AL., ON

6    BEHALF OF THEMSELVES AND ALL

7    OTHERS SIMILARLY SITUATED,

8          PLAINTIFFS,

9       vs.                    NO. 5:20-CV-05146-LHK-SVK

10   GOOGLE LLC,

11         DEFENDANT.

12   _____/

13

14                  *CONFIDENTIAL*

15       VIDEOTAPED DEPOSITION OF SAM HEFT-LUTHY

16       *VIA REMOTE COUNSEL VIDEOCONFERENCE*

17          MONDAY, DECEMBER 20, 2021

18                  VOLUME I

19

20

21

22   STENOGRAPHICALLY REPORTED BY:

23   MEGAN F. ALVAREZ, RPR, CSR No. 12470

24   JOB NO. 4974193

25   PAGES 1 - 331

                                        Page 1

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3              SAN JOSE DIVISION

4

5  PATRICK CALHOUN, ET AL., ON

6  BEHALF OF THEMSELVES AND ALL

7  OTHERS SIMILARLY SITUATED,

8          PLAINTIFFS,

9     vs.                    NO. 5:20-CV-05146-LHK-SVK

10  GOOGLE LLC,

11          DEFENDANT.

12  _____/

13

14

15

16          Videotaped Videoconference Deposition of

17  SAM HEFT-LUTHY, Volume I, taken on behalf of Plaintiffs,

18  VIA REMOTE COUNSEL.  Deponent testifying from

19  San Francisco, California, beginning at 9:06 a.m. and

20  ending at 6:35 p.m. on Monday, December 20, 2021, before

21  Megan F. Alvarez, RPR, Certified Shorthand Reporter

22  No. 12470.

23

24

25

                                        Page  2

CONFIDENTIAL

```
1   APPEARANCES: (ALL PARTIES APPEARING VIA VIDEOCONFERENCE)

2

3   FOR PLAINTIFFS:

4           BY:  JASON "JAY" BARNES, ESQ.

5                AN V. TRUONG, ESQ.

6           SIMMONS HANLY CONROY

7           ONE COURT STREET

8           ALTON, ILLINOIS 62002

9           618.693.3104

10          JAYBARNES@SIMMONSFIRM.COM

11  AND

12          BY:  LESLEY WEAVER, ESQ.

13          BLEICHMAR FONTI & AULD LLP

14          555 12TH STREET, SUITE 1600

15          OAKLAND, CALIFORNIA 94607

16          415.445.4003

17          LWEAVER@BFALAW.COM

18  AND

19          BY:  DAVID A. STRAITE, ESQ.

20          DICELLO LEVITT GUTZLER

21          ONE GRAND CENTRAL PLACE

22          60 EAST 42ND STREET, SUITE 2400

23          NEW YORK, NEW YORK 10165

24          646.933.1000

25          DSTRAITE@DICELLOLEVITT.COM
```

Page 3

CONFIDENTIAL

1    APPEARANCES:  (CONTINUED)

2

3    FOR DEFENDANTS:

4              BY:  CARL SPILLY, ESQ.

5                   JOMAIRE CRAWFORD, ESQ.

6              QUINN EMANUEL URQUHART & SULLIVAN LLP

7              51 MADISON AVENUE, 22ND FLOOR

8              NEW YORK, NEW YORK 10010

9              212.849.7000

10             JOMAIRECRAWFORD@QUINNEMANUEL.COM

11             CARLSPILLY@QUINNEMANUEL.COM

12

13   ALSO PRESENT:

14             TONI BAKER, GOOGLE IN-HOUSE COUNSEL

15

16   THE VIDEO OPERATOR:

17             DAVID WEST, VERITEXT

18

19

20

21

22

23

24

25

                                        Page  4

| | | |
|---|---|---|
| 1 | (Reporter request for clarification.) | 15:23:06 |
| 2 | BY MR. BARNES: | 15:23:07 |
| 3 | Q.   What is meant by "browsing history" in | 15:23:07 |
| 4 | that first sentence? | 15:23:09 |
| 5 | MR. SPILLY:  Objection.  Calls for | 15:23:11 |
| 6 | speculation.  Lacks foundation. | 15:23:11 |
| 7 | THE WITNESS:  Given that we're not | 15:23:15 |
| 8 | discussing a document that I recall contributing to, | 15:23:16 |
| 9 | it's not something that I'd be able to speculate its | 15:23:21 |
| 10 | implications in this context. | 15:23:24 |
| 11 | BY MR. BARNES: | 15:23:26 |
| 12 | Q.   Okay.  So the next sentence says:  "We | 15:23:26 |
| 13 | retain this information, and it may inform the | 15:23:29 |
| 14 | user's signed-in ads profile until a user deletes | 15:23:31 |
| 15 | it." | 15:23:36 |
| 16 | Does Google maintain signed-in ads | 15:23:37 |
| 17 | profiles? | 15:23:40 |
| 18 | MR. SPILLY:  Objection.  Vague. | 15:23:43 |
| 19 | THE WITNESS:  Going to have to ask for a | 15:23:50 |
| 20 | definition on what you mean by "a signed-in ads | 15:23:51 |
| 21 | profile" specifically. | 15:23:54 |
| 22 | BY MR. BARNES: | 15:23:55 |
| 23 | Q.   Okay.  Down below are -- if you don't | 15:23:56 |
| 24 | answer want to answer the question -- are you | 15:23:59 |
| 25 | doubting that -- that this -- are you -- does Google | 15:24:02 |

Page 232

```
 1   maintain signed-in ads profiles or no,              15:24:04

 2   Mr. Heft-Luthy?                                      15:24:08

 3           MR. SPILLY:  Objection.  Same -- same as    15:24:10

 4   before.                                             15:24:12

 5           THE WITNESS:  Given that it's my            15:24:14

 6   obligation to be able to answer questions to the    15:24:15

 7   best of my knowledge, I'm going to be asking        15:24:19

 8   questions to inform the answers that I give.  I'm   15:24:22

 9   happy to answer a question about this, but I need   15:24:25

10   more information as to what's meant by "signed-in   15:24:29

11   ads profile."                                       15:24:31

12   BY MR. BARNES:                                      15:24:32

13       Q.   Okay.  Do you see the last full paragraph 15:24:33

14   there:  "User profile information associated with  15:24:35

15   advertising cookies and advertising IDs"?           15:24:37

16           Does Google maintain user profile          15:24:48

17   information associated with advertising cookies and 15:24:48

18   advertising IDs?                                    15:24:48

19           MR. SPILLY:  Objection.  Lacks foundation.  15:24:49

20           THE WITNESS:  Again, given that I'm not     15:24:59

21   familiar with the context of this specific document,15:25:01

22   there's a lot of terms being used here that might   15:25:04

23   have different implications given different context,15:25:08

24   so it's hard for me to speculate.                   15:25:11

25   ///
```

Page 233

```
 1    BY MR. BARNES:                                    15:25:13

 2         Q.   Okay.  Mr. Heft-Luthy, what is  ██████      ████████

 █      ████?                                            15:25:16

 4              MR. SPILLY:  Objection.  Vague.         15:25:21

 5              THE WITNESS:  And what -- and what is this  15:25:22

 6    a reference to?                                   15:25:27

 7    BY MR. BARNES:                                    15:25:27

 8         Q.   In the context of Google and           15:25:28

 9    interest-based advertising, what is  ██████████ ?  15:25:30

10              MR. SPILLY:  Same objections.          15:25:36

11              THE WITNESS:  That's not a term that I'm  15:25:39

12    familiar with.                                    15:25:40

13    BY MR. BARNES:                                    15:25:41

14         Q.   How many different user profile categories  15:25:43

15    does Google maintain in its  ████████  list?     15:25:46

16              MR. SPILLY:  Objection.  Lacks foundation.  15:25:51

17    Vague.  Calls for speculation.                    15:25:53

18              THE WITNESS:  That's asking a question I  15:25:59

19    don't know the answer to about a product that I'm  15:26:01

20    not familiar with.                                15:26:04

21              MR. BARNES:  Ms. Truong, can you publish  15:26:13

22    Exhibits K8 and K9?                               15:26:14

23              MS. TRUONG:  Yes, one moment.           15:26:16

24    BY MR. BARNES:                                    15:26:21

25         Q.   How many different categories might Google  15:26:22
```

Page 234

| | | |
|---|---|---|
| 1 | place a user into, Mr. Heft-Luthy? | 15:26:25 |
| 2 | MR. SPILLY:  Objection.  Vague. | 15:26:33 |
| 3 | THE WITNESS:  In what context are you | 15:26:34 |
| 4 | meaning categories here? | 15:26:36 |
| 5 | BY MR. BARNES: | 15:26:38 |
| 6 | Q.   In the context of an interest associated | 15:26:38 |
| 7 | with a user, how many different categories does | 15:26:41 |
| 8 | Google maintain? | 15:26:44 |
| 9 | MR. SPILLY:  Same objection. | 15:26:46 |
| 10 | THE WITNESS:  That's a question that's | 15:26:51 |
| 11 | going to be incredibly contingent on the product | 15:26:52 |
| 12 | surface we're talking about, what data source we're | 15:26:55 |
| 13 | referring to, how it's implemented.  Hard for me to | 15:26:59 |
| 14 | answer without specifics, though I probably still | 15:27:02 |
| 15 | wouldn't be able to give definitive answers on lists | 15:27:05 |
| 16 | of categories with my knowledge of systems. | 15:27:09 |
| 17 | BY MR. BARNES: | 15:27:11 |
| 18 | Q.   Google ads, how many different categories | 15:27:11 |
| 19 | does Google ads place consumers into? | 15:27:15 |
| 20 | MR. SPILLY:  Objection.  Assumes facts. | 15:27:18 |
| 21 | Lack of foundation. | 15:27:20 |
| 22 | THE WITNESS:  Again, the -- the term | 15:27:24 |
| 23 | "Google ads places users into categories" is hard | 15:27:26 |
| 24 | for me to give a specific answer to.  That could | 15:27:31 |
| 25 | refer to a variety of different systems and | 15:27:33 |

Page 235

```
 1    implementations, many or most of which would be hard      15:27:37

 2    for me to answer any detail on, including                 15:27:45

 3    speculating on the specifics to your question.            15:27:50

 4              MR. BARNES:  Can you pull up Exhibit 26,         15:27:52

 5    please?                                                   15:27:54

 6              (Whereupon Exhibit 26 was marked for            15:27:54

 7               identification.)                               15:27:54

 8              (Whereupon Exhibit 27 was marked for            10:50:14

 9               identification.)                               10:50:14

10              THE WITNESS:  Okay.  I have it up.              15:28:28

11    BY MR. BARNES:                                            15:28:29

12         Q.   Have you ever seen this document before,        15:28:29

13    Mr. Heft-Luthy?                                           15:28:31

14         A.   Not that I recall.                              15:28:39

15         Q.   How many different rows are there in this       15:28:44

16    ██████████████ document, Mr. Heft-Luthy?                  15:28:46

17              MR. SPILLY:  Objection.  Mischaracterizes       15:28:54

18    the document.                                             15:28:57

19              THE WITNESS:  So, as said, I can't speak        15:28:58

20    to the semantic implications of these rows.  You          15:29:05

21    used the term "████████ to refer to them.  I can't       15:29:10

22    confirm or deny that relationship to these rows           15:29:15

23    meaning anything in that context.                         15:29:19

24              If you're asking me the question of how         15:29:21

25    many rows this document has, it looks, based on my        15:29:24
```

Page 236

| | | |
|---|---|---|
| 1 | screen, that this document has a total of 1,702 | 15:29:28 |
| 2 | rows. | 15:29:33 |
| 3 | BY MR. BARNES: | 15:29:37 |
| 4 | Q.   You've never seen this document before? | 15:29:44 |
| 5 | MR. SPILLY:  Objection.  Asked and | 15:29:47 |
| 6 | answered. | 15:29:47 |
| 7 | THE WITNESS:  Not to my recollection, no. | 15:29:53 |
| 8 | BY MR. BARNES: | 15:29:54 |
| 9 | Q.   You've never heard of ███████ | 15:29:55 |
| 10 | before? | 15:29:57 |
| 11 | MR. SPILLY:  Same objection. | 15:29:59 |
| 12 | THE WITNESS:  I believe I've already said | 15:30:04 |
| 13 | that it's not a term familiar to me, no. | 15:30:05 |
| 14 | BY MR. BARNES: | 15:30:07 |
| 15 | Q.   You've never heard of the ██████   ██████ | 15:30:04 |
| ██ | ████████ before -- ███████ before? | 15:30:10 |
| 17 | A.   To my recollection, no. | 15:30:19 |
| 18 | MR. SPILLY:  Sorry, Sam.  Same objection. | 15:30:21 |
| 19 | BY MR. BARNES: | 15:30:23 |
| 20 | Q.   Does Google connect signed-out user data | 15:30:29 |
| 21 | across devices? | 15:30:33 |
| 22 | MR. SPILLY:  Objection.  Vague. | 15:30:35 |
| 23 | THE WITNESS:  Again, in what context are | 15:30:37 |
| 24 | you referring to this specifically here? | 15:30:39 |
| 25 | /// | |

Page 237

```
 1    BY MR. BARNES:                                    15:30:41

 2        Q.   Does Google have systems through which it   15:30:50

 3    connects the actions that a user takes in the Google  15:30:53

 4    Chrome browser while not synced on one device with   15:30:56

 5    the actions that that user would take on another     15:31:00

 6    device while signed out?                             15:31:03

 7            MR. SPILLY:  Objection.  Vague.              15:31:07

 8            THE WITNESS:  I don't have knowledge of      15:31:16

 9    systems that perform the action you're speaking, but  15:31:18

10    I also don't have knowledge of specific context to   15:31:20

11    make a negative claim in the other direction.        15:31:24

12    BY MR. BARNES:                                       15:31:27

13        Q.   You don't know one way or the other is      15:31:27

14    what your testimony is?                              15:31:29

15            MR. SPILLY:  Objection.  Mischaracterizes    15:31:32

16    the witness's testimony.                             15:31:34

17            THE WITNESS:  As I said, that's something    15:31:37

18    that's going to have a lot of different caveats.  If  15:31:39

19    you're asking for specific types of tying, specific  15:31:42

20    types of information, I can give my understanding of  15:31:46

21    policies and processes that are in place.  We can --  15:31:49

22    we can go into that.  But I can't -- I can't say      15:31:53

23    without more detail if that is a specific broad       15:31:56

24    practice that does or doesn't happen to -- to my --   15:32:01

25    to my personal knowledge.                            15:32:04
```

Page 238

CONFIDENTIAL

```
 1   BY MR. BARNES:                                    15:32:06

 2        ███  ██████████████████████████      ████████

 █   ███████████████████████████████              15:32:10

 4        MR. SPILLY:  Objection.  Lacks foundation    15:32:14

 5   and vague.                                        15:32:23

 6        THE WITNESS:  I'd -- I'd have to see more     15:32:24

 7   detail about in what context that's being used for. 15:32:26

 8   I've personally been involved in two projects which 15:32:31

 9   have that title, ██████████████ so I'd love some   15:32:35

10   disambiguation to be able to reference.           15:32:38

11   BY MR. BARNES:                                    15:32:42

12        Q.   What is the back -- what is the         15:32:42

13   ████████████████████████                          15:32:42

14        MR. SPILLY:  Objection.  Lacks foundation.   15:32:53

15        THE WITNESS:  That is going to, again,       15:32:58

16   depend on the specific product we're discussing,  15:32:58

17   implementation of a given ████████████████   ████████

 █   █████████  ███████████████████████████   ████████

 █   ██████████████████████████████████████   ████████

 █   ████████████████████████  But it's -- again,      15:33:14

21   without more detail, it's hard for me to speculate 15:33:19

22   on what we're referring to.                       15:33:21

23   BY MR. BARNES:                                    15:33:22

24        Q.   I never used the term "████████   I'm    15:33:22

25   asking the question about a very specific thing.  15:33:25

                                                   Page 239
```



15:34:18

19        Q.   Does Google have a program that provides        15:34:22

20    it a single view of a user on the same device and        15:34:25

21    across different devices, even when they are signed      15:34:30

22    out?                                                     15:34:33

23             MR. SPILLY:  Objection.  Vague.                 15:34:35

24             THE WITNESS:  I am not aware of the             15:34:46

25    existence of any such service, to my knowledge.         15:34:48

Page 240

| | | |
|---|---|---|
| 1 | But, again, hard for me to speculate on the overall | 15:34:50 |
| 2 | existence or nonexistence of such thing. | 15:34:54 |
| 3 | BY MR. BARNES: | 15:34:57 |
| 4 | Q.   What is an ███████████████? | 15:35:00 |
| 5 | A.   Not a term I'm familiar with. | 15:35:11 |
| 6 | Q.   What is a GAIA ID? | 15:35:14 |
| 7 | MR. SPILLY:  Same objection. | 15:35:16 |
| 8 | THE WITNESS:  GAIA ID is a term used | 15:35:22 |
| 9 | within Google to refer in various context either to | 15:35:24 |
| 10 | a number identifier or e-mail address associated | 15:35:29 |
| 11 | with a particular user. | 15:35:33 |
| 12 | BY MR. BARNES: | 15:35:35 |
| 13 | Q.   What is a Biscotti ID? | 15:35:35 |
| 14 | MR. SPILLY:  Objection.  Vague. | 15:35:39 |
| 15 | THE WITNESS:  I am not actually familiar | 15:35:46 |
| 16 | with implementation or context of Biscotti to be | 15:35:48 |
| 17 | able to speak on what it actually is. | 15:35:51 |
| 18 | BY MR. BARNES: | 15:35:55 |
| 19 | Q.   Do you understand that Display ads has | 15:35:58 |
| 20 | unauthenticated identifiers? | 15:36:00 |
| 21 | MR. SPILLY:  Object to the form. | 15:36:03 |
| 22 | THE WITNESS:  I understand that depending | 15:36:07 |
| 23 | on users and platforms, some identifiers used by the | 15:36:09 |
| 24 | ads' ecosystem may not be GAIA ID.  That's about the | 15:36:14 |
| 25 | extent of my understanding. | 15:36:20 |

Page 241

```
 1        Q.   Does Google map authenticated data to      15:37:31

 2   authenticated identifiers to unauthenticated         15:37:36

 3   identifiers?                                          15:37:40

 4        MR. SPILLY:  Object to the form and lacks        15:37:42

 5   foundation.                                           15:37:44

 6        THE WITNESS:  I'm not familiar enough with       15:37:47

 7   individual implementations of identifiers to speak    15:37:48

 8   to that question.                                     15:37:52

 9   BY MR. BARNES:                                        15:37:52

10        Q.   Does Google connect -- let's -- I'm going   15:37:53

11   to use the term "signed in" versus "signed out."     15:37:56

12        Does Google connect signed-out activity          15:37:59

13   with signed-in activity?                              15:38:02

14        MR. SPILLY:  Object to the form.  Lacks          15:38:05

15   foundation.                                           15:38:05

16        THE WITNESS:  Again, that's going to             15:38:08

17   require specific context, speaking about specific     15:38:09

18   products, specific implementations.  Even then, I     15:38:13

19   probably wouldn't be able to offer much in the way    15:38:16

20   of specificity from my knowledge.                     15:38:20

21   BY MR. BARNES:                                        15:38:22

22        Q.   Are there any specific circumstances you    15:38:22

23   can explain where Google connects authenticated and  15:38:24

24   unauthenticated identifiers?                          15:38:31

25        MR. SPILLY:  Object to the form.  Lacks          15:38:33
```

Page 243

```
1    foundation.                                          15:38:34

2           THE WITNESS:  There are no specific           15:38:39

3    examples that come to mind.  Though, again, I -- I   15:38:41

4    want to be clear.  My knowledge of the               15:38:44

5    unauthenticated ecosystem is relatively limited      15:38:45

6    compared to the work that I've done on authenticated 15:38:51

7    data.                                                15:38:54

8    BY MR. BARNES:                                        15:38:55

9       Q.   Is Google able to combine signed-in and     15:38:55

10   signed-out user impressions?                          15:38:59

11          MR. SPILLY:  Objection.  Vague.  Lacks        15:39:02

12   foundation.  Form.                                    15:39:04

13          THE WITNESS:  Once again, you're asking me    15:39:10

14   to speculate on something that I don't have           15:39:11

15   knowledge of.                                         15:39:14

16          MR. BARNES:  Ms. Truong, can you play         15:39:17

17   Exhibit K12, please?                                  15:39:20

18          MS. TRUONG:  Yes, one moment.                 15:39:24

19          (Reporter request for clarification.)         15:40:05

20          MR. BARNES:  Ms. Truong, can you share        15:40:12

21   your screen and hit the play button?                  15:40:13

22          MS. TRUONG:  I will try.  One second.         15:40:18

23          Okay.  Just let me know if anyone has         15:40:34

24   volume issues.  This should play, though.             15:40:34

25          (Video playing.)                              15:40:35
```

Page 244

```
 1          (Video transcribed as follows:        15:40:35

 2       "Okay.  I guess -- let me take another    15:40:35

 3       one from the Dory.  Could you discuss     15:40:36

 4       the principles of signed-in versus        15:40:38

 5       signed-out data as it relates to          15:40:39

 6       measurement?                              15:40:42

 7           So what we've done in the case        15:40:43

 8       of -- as you remember the principles      15:40:44

 9       that we won't use Google signed-in data   15:40:46

10       collected while you're signed in to       15:40:49

11       target you when you're signed out, but    15:40:51

12       it says targeting; it didn't say          15:40:53

13       measurement.                              15:40:55

14       ███████████████████            ██████

 █       ████████████████████████████   ██████

 █       ████████████████████████████   ██████

 █       ████████████████████████████   ██████

 █       ████████████    ████████████   ██████

 █       ████████████████████████████   ██████

 █       ███████████████████            ██████

 █       ███████████████████            ██████

 █        █████████████████             ██████

 █       ████████████████████████       ██████

 █       ████████████████████████       ██████

 █        █████████████████             15:41:25
```



15:42:15

BY MR. BARNES:                                              15:42:19

     Q.   Mr. Heft-Luthy, were you aware that Google        15:42:25

combines signed-in and signed-out impressions?              15:42:27

Page 246

| | | |
|---|---|---|
| 1 | MR. SPILLY:  Objection.  Mischaracterizes | 15:42:31 |
| 2 | the video. | 15:42:40 |
| 3 | THE WITNESS:  There's a lot of language | 15:42:42 |
| 4 | and reference to systems that I'm not familiar with | 15:42:43 |
| 5 | in the video that was just shown.  It's not a video | 15:42:45 |
| 6 | that I recall ever watching, so it's hard for me to | 15:42:48 |
| 7 | speculate on the answer to that question pursuant to | 15:42:51 |
| 8 | the video we watched, or, as I said before, pursuant | 15:42:55 |
| 9 | to overall processing. | 15:42:58 |
| 10 | BY MR. BARNES: | 15:43:00 |
| 11 | Q.   Thank you. | 15:43:01 |
| 12 | MR. BARNES:  Ms. Truong, can you publish | 15:43:01 |
| 13 | K13, please? | 15:43:04 |
| 14 | MS. TRUONG:  Yes.  One moment. | 15:43:11 |
| 15 | (Whereupon Exhibit 28 was marked for | 15:43:13 |
| 16 | identification.) | 15:43:13 |
| 17 | MR. BARNES:  Let me know when you have it. | 15:43:20 |
| 18 | This is a lengthy document, Mr. Heft-Luthy. | 15:43:22 |
| 19 | (Whereupon Exhibit 29 was marked for | 15:43:29 |
| 20 | identification.) | 15:43:29 |
| 21 | MR. SPILLY:  While we wait, a quick point | 15:43:38 |
| 22 | of order -- maybe go off the record to talk about | 15:43:40 |
| 23 | that.  I don't know if we want to talk about when to | 15:43:43 |
| 24 | break. | 15:43:45 |
| 25 | MR. BARNES:  Why don't we go off the | 15:43:46 |

Page 247

| | | |
|---|---|---|
| 1 | record.  Do you want to take a break, | 15:43:47 |
| 2 | Mr. Heft-Luthy? | 15:43:48 |
| 3 | THE WITNESS:  I'm okay to go for another | 15:43:59 |
| 4 | 20, 30 minutes. | 15:44:00 |
| 5 | MR. BARNES:  Okay.  Let's do that and then | 15:44:05 |
| 6 | we will break. | 15:44:05 |
| 7 | THE WITNESS:  20 minutes and break? | 15:44:05 |
| 8 | MR. BARNES:  Yeah. | 15:44:05 |
| 9 | THE WITNESS:  If any counsel need to go | 15:44:05 |
| 10 | quicker than that, I am happy to oblige, but I am | 15:44:05 |
| 11 | stating my current ability. | 15:44:05 |
| 12 | MR. BARNES:  Okay. | 15:44:06 |
| 13 | MS. TRUONG:  Exhibit 29 should be up. | 15:44:08 |
| 14 | BY MR. BARNES: | 15:44:09 |
| 15 | Q.  I think I know the answer, but I have to | 15:44:31 |
| 16 | ask:  Do you recognize this document? | 15:44:34 |
| 17 | A.  No, I do not. | 15:45:06 |
| 18 | Q.  And I'm not -- this is not going to be | 15:45:07 |
| 19 | some long pop quiz on a 170-page slide show -- slide | 15:45:09 |
| 20 | deck you've never seen.  But you might be curious, | 15:45:16 |
| 21 | and you have an important job at Google, so if we | 15:45:18 |
| 22 | could turn -- | 15:45:21 |
| 23 | MR. BARNES:  Ms. Truong, can you show the | 15:45:21 |
| 24 | document on the screen, Ms. Truong?  If you could | 15:45:23 |
| 25 | turn to page 322, which is page 8. | 15:45:31 |

Page 248

| 1 | THE WITNESS:  I have it up. | 15:45:53 |
| 2 | BY MR. BARNES: | 15:45:54 |
| 3 | Q.   Mr. Heft-Luthy, during your time as the | 15:45:57 |
| 4 | owner of the privacy policy, did anyone at Google | 15:45:58 |
| 5 | inform you that there was this thing called the | 15:46:02 |
| 6 | ████████████████████████████████████ ██████ | |
| | ████████████████████████████████ ██████ | |
| | ██████████████████████████████████ ██████ | |
| | ████████████████████████████████████ ██████ | |
| | █████ ██████ | |
| | ███████ █████ ████████ ██████ | |
| | ██████████████ | 15:46:26 |
| 13 | ███████ ████████████ ██████ | |
| | ████████████████████████████ ██████ | |
| | █████████████ | 15:46:41 |
| 16 | And the counsel which I received as part | 15:46:44 |
| 17 | of the privacy policy, I'm not going to be able to | 15:46:51 |
| 18 | go into given that it's conversation with counsel. | 15:46:55 |
| 19 | BY MR. BARNES: | 15:46:57 |
| 20 | Q.   Okay.  And, Mr. Heft-Luthy, you think it's | 15:46:58 |
| 21 | important in your role as the owner of the privacy | 15:47:01 |
| 22 | policy to have an understanding about how Google's | 15:47:03 |
| 23 | back-end systems extract, authenticate, map, link, | 15:47:09 |
| 24 | issue, and apply privacy restrictions to | 15:47:13 |
| 25 | authenticated and unauthenticated identifiers? | 15:47:18 |

Page 249

CONFIDENTIAL

```
 1            MR. SPILLY:  Objection.  Vague.  Calls for      15:47:22

 2    speculation.                                             15:47:23

 3            THE WITNESS:  As the product management          15:47:30

 4    contact for the privacy policy, it's important to        15:47:32

 5    have a working understanding pursuant to the             15:47:35

 6    language that we choose with regards to any              15:47:39

 7    representation we make in the privacy policy.  And      15:47:42

 8    to that extent, I think that it's important to          15:47:45

 9    understand the implications of language that we         15:47:51

10    choose and -- and follow both guidance from counsel    15:47:54

11    and our understanding of the systems to achieve the    15:47:57

12    desired objectives.                                     15:48:02

13            MR. BARNES:  Ms. Truong, if we could turn       15:48:08

14    to -- oh, gosh, somehow I lost my note here on what     15:48:10

15    page -- what page this is.  I'm looking for the         15:48:16

16    ██████████  page.  It is --                             15:48:20

17            THE WITNESS:  Is it the same document?          15:48:22

18    BY MR. BARNES:                                          15:48:34

19        Q.  It's the same document.  I'm going to find     15:48:35

20    it for you again because I asked you the question.      15:48:37

21    You've never heard of ██████████  I just want to        15:48:40

22    show you the slide.  It's 352 -- 352 which is          15:48:43

23    page 38.                                                15:48:57

24        A.  Yes.                                            15:49:07

25            MR. BARNES:  And if you could go the next       15:49:07
```

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | slide, Ms. Truong. | 15:49:08 |
| 2 | BY MR. BARNES: | 15:49:12 |
| 3 | Q.   Does this -- does reviewing this slide | 15:49:12 |
| 4 | refresh your recollection about whether you've ever | 15:49:14 |
| 5 | heard of ███████████ | 15:49:17 |
| 6 | A.   Reviewing this context, I can confirm that | 15:49:34 |
| 7 | the two projects I worked on with the title | 15:49:38 |
| 8 | █████████  are neither of these, and this is not | 15:49:41 |
| 9 | a serving system I'm familiar with. | 15:49:45 |
| 10 | MR. BARNES:   Okay.   Ms. Truong, can you | 15:49:50 |
| 11 | publish Exhibit S2 and we can be done with the dense | 15:49:52 |
| 12 | back-end explanation that is Exhibit 29. | 15:49:57 |
| 13 | BY MR. BARNES: | 15:50:03 |
| 14 | Q.   Do you know who Chris Lau is, | 15:50:03 |
| 15 | Mr. Heft-Luthy?  Chris -- I'm sorry -- Chris Liao? | 15:50:05 |
| 16 | A.   I don't recognize that name, no. | 15:50:11 |
| 17 | Q.   You should try to contact him, | 15:50:15 |
| 18 | Mr. Heft-Luthy.  He's someone who's in PDPO. | 15:50:17 |
| 19 | MR. BARNES:   Let me know when Exhibit 30 | 15:50:25 |
| 20 | is up, please. | 15:50:26 |
| 21 | MS. TRUONG:   Should be up now. | 15:50:28 |
| 22 | (Whereupon Exhibit 30 was marked for | 15:50:35 |
| 23 | identification.) | 15:50:35 |
| 24 | BY MR. BARNES: | 15:50:36 |
| 25 | Q.   Mr. Heft-Luthy, what is ██████ | 15:50:38 |

Page 251

| | | |
|---|---|---|
| 1 | "profiles" again. | 16:44:22 |
| 2 | THE WITNESS:  Again, I am going to have to | 16:44:29 |
| 3 | offer the same caveats I offered before, which is | 16:44:30 |
| 4 | it's been a while since I was a participant or | 16:44:33 |
| 5 | responsible party in the authoring of this document. | 16:44:36 |
| 6 | I don't recall specifics in either direction here, | 16:44:39 |
| 7 | and I'm -- I'm not going to be able to speculate | 16:44:41 |
| 8 | without that. | 16:44:45 |
| 9 | BY MR. BARNES: | 16:44:45 |
| 10 | Q.  Mr. Heft-Luthy, take your time to review | 16:44:46 |
| 11 | the document. | 16:44:48 |
| 12 | (Witness reviewing document.) | 16:44:48 |
| 13 | BY MR. BARNES: | 16:44:48 |
| 14 | Q.  When you have an answer to my question, | 16:47:04 |
| 15 | you can obviously supply it, Mr. Heft-Luthy. | 16:47:06 |
| 16 | MR. SPILLY:  I will object to that | 16:47:35 |
| 17 | commentary as argumentative. | 16:47:37 |
| 18 | (Witness reviewing document.) | 16:47:39 |
| 19 | BY MR. BARNES: | 16:54:50 |
| 20 | Q.  Mr. Heft-Luthy, I think it's been nine or | 16:54:52 |
| 21 | ten minutes.  Have you had an opportunity to review | 16:54:54 |
| 22 | the document? | 16:54:56 |
| 23 | A.  So I'm in the process of reviewing the | 16:54:57 |
| 24 | document.  I -- I don't mean -- by how long you want | 16:55:00 |
| 25 | to look through.  Yes, I am -- I am currently in the | 16:55:04 |

Page 277

| | | |
|---|---|---|
| 1 | process of reviewing the document. | 16:55:06 |
| 2 | Q.   Just checking your progress. | 16:55:08 |
| 3 | (Witness reviewing document.) | 16:55:10 |
| 4 | THE WITNESS:  To make sure we're aligned, | 16:55:23 |
| 5 | given you asked me to read the entire -- read the | 16:55:24 |
| 6 | document and ensure that I can answer questions | 16:55:27 |
| 7 | about recollection of a full document, so I want to | 16:55:30 |
| 8 | make sure that I've -- | 16:55:34 |
| 9 | BY MR. BARNES: | 16:55:35 |
| 10 | Q.   Understand. | 16:55:36 |
| 11 | A.   -- gone over the whole document.  Thanks. | 16:55:37 |
| 12 | (Witness reviewing document.) | 16:55:44 |
| 13 | BY MR. BARNES: | 16:58:38 |
| 14 | Q.   Are we about ready, Mr. Heft-Luthy? | 16:58:38 |
| 15 | A.   I am currently on the "Key Terms" section, | 16:58:41 |
| 16 | so about two-thirds of the way down. | 16:58:45 |
| 17 | (Witness reviewing document.) | 16:58:48 |
| 18 | BY MR. BARNES: | 17:00:52 |
| 19 | Q.   Are we ready, Mr. Heft-Luthy? | 17:00:53 |
| 20 | A.   Again, given you asked me to read through | 17:00:55 |
| 21 | the entire document, I'm at page 25 of 33. | 17:00:58 |
| 22 | Q.   Okay.  You're the -- you are the owner of | 17:01:02 |
| 23 | this document, correct, Mr. Heft-Luthy? | 17:01:05 |
| 24 | MR. SPILLY:  Objection.  Form.  Vague. | 17:01:09 |
| 25 | THE WITNESS:  Given we have previously -- | 17:01:12 |

Page 278

```
 1    mentioned earlier.                              17:03:43

 2          Regards to user profiles, I am speaking of   17:03:47

 3    information that Google maintains and uses about   17:03:51

 4    users that is based, in whole or in part, on    17:03:56

 5    information it receives from the Chrome browser   17:04:01

 6    while a user is using the Chrome browser while they  17:04:04

 7    are not synced.                                 17:04:09

 8          MR. SPILLY:  Objection.                   17:04:11

 9    BY MR. BARNES:                                   17:04:14

10       Q.   What language -- what language in the    17:04:15

11    privacy policy apprises users that Google creates  17:04:17

12    and uses user profiles, including based on       17:04:21

13    information from the Chrome browser, while they're  17:04:25

14    using it having not enabled sync?               17:04:28

15          MR. SPILLY:  Objection.  Vague as to "user   17:04:33

16    profiles."  Calls for a legal conclusion.        17:04:35

17          THE WITNESS:  So, again, I'm not going to   17:04:42

18    be able to speculate with regards to, like,     17:04:43

19    obligations for apprisal in -- given legal context  17:04:49

20    and circumstances.                              17:04:54

21          What it sounds like you're asking for is   17:04:56

22    a -- what can Google point to with regards to    17:04:59

23    transparency obligations that it has in different  17:05:03

24    markets or legal regimes.  To that question, I'm not  17:05:05

25    going to be able to speculate given that I'm not a  17:05:09
```

| | | |
|---|---|---|
| 1 | lawyer. | 17:05:12 |
| 2 | BY MR. BARNES: | 17:05:12 |
| 3 |    Q.  I'm not asking you legally.  I'm asking | 17:05:13 |
| 4 | you what language in this document would -- says | 17:05:18 |
| 5 | anything about Google creating and using user | 17:05:22 |
| 6 | profiles based on information received from the | 17:05:25 |
| 7 | Chrome browser while a user has not enabled sync? | 17:05:29 |
| 8 |      MR. SPILLY:  Objection.  Vague as to "user | 17:05:35 |
| 9 | profiles" still. | 17:05:37 |
| 10 |      THE WITNESS:  Again, just to be clear, | 17:05:42 |
| 11 | "user profiles" is not a term of art that I'm | 17:05:43 |
| 12 | familiar with.  If you're -- if we're going to be | 17:05:47 |
| 13 | asking about specific data collection practices, I'm | 17:05:52 |
| 14 | happy to answer those questions.  I'm not going to | 17:05:54 |
| 15 | be able to speculate about a term of art that I | 17:05:57 |
| 16 | don't use. | 17:05:59 |
| 17 | BY MR. BARNES: | 17:06:00 |
| 18 |    Q.  Can you identify any language in this | 17:06:01 |
| 19 | privacy policy that says anything about creating and | 17:06:04 |
| 20 | using user profiles based on information collected | 17:06:08 |
| 21 | from the Chrome browser from users who are using the | 17:06:11 |
| 22 | Chrome browser while not synced? | 17:06:15 |
| 23 |      MR. SPILLY:  Objection.  Vague as to "user | 17:06:18 |
| 24 | profiles" still.  Vague as to "from the Chrome | 17:06:21 |
| 25 | browser." | 17:06:26 |

Veritext Legal Solutions
866 299-5127

```
 1            THE WITNESS:  It seems to me as if a        17:06:27

 2    version of the same question has been asked.  Can   17:06:37

 3    you help me understand how --                       17:06:39

 4    BY MR. BARNES:                                       17:06:40

 5        Q.   Mr. Heft-Luthy, I'm asking you to identify 17:06:40

 6    any language in this privacy policy that gets       17:06:42

 7    anywhere close to saying anything about the creation 17:06:44

 8    of user profiles based on information Google        17:06:48

 9    receives from Chrome users who are using the browser 17:06:52

10    while they're not synced.                           17:06:59

11            MR. SPILLY:  Objection.  Asked and          17:07:02

12    answered many, many, many times.                    17:07:02

13            THE WITNESS:  Again, there's a lot of       17:07:06

14    contingent language here.  We're speculating -- it  17:07:08

15    seems as if we're speculating on a legal analysis in 17:07:12

16    this context.  I'm adding another caveat with       17:07:14

17    regards to "anywhere close."  There's a lot of      17:07:18

18    things that I have given my oath, obligation to not  17:07:22

19    speak incorrectly on any answers that -- or any     17:07:26

20    questions that are offered to me.  I -- I don't feel 17:07:31

21    comfortable speculating in the absence of further   17:07:34

22    specification.                                       17:07:37

23    BY MR. BARNES:                                       17:07:37

24        Q.   This is the last opportunity for you to    17:07:38

25    identify language in this policy.  This is the last  17:07:40
```

Page 283

| | | |
|---|---|---|
| 1 | time I'm going to ask it.  If you can't -- if you | 17:07:42 |
| 2 | can't identify any language, Mr. Heft-Luthy, that's | 17:07:44 |
| 3 | fine. | 17:07:47 |
| 4 | What language would you point to if your | 17:07:49 |
| 5 | mother asked you, said, "I don't understand, Sam?" | 17:07:51 |
| 6 | That's a bad impression.  "I don't understand. | 17:07:56 |
| 7 | What's this about user profiles?  Where is that in | 17:08:01 |
| 8 | the privacy policy?" | 17:08:04 |
| 9 | Where would you point to in the privacy | 17:08:05 |
| 10 | policy, Mr. Heft-Luthy? | 17:08:07 |
| 11 | MR. SPILLY:  Objection to the form.  Also | 17:08:08 |
| 12 | asked and answered even more times now. | 17:08:10 |
| 13 | THE WITNESS:  You're also now asking me to | 17:08:14 |
| 14 | speculate on a further hypothetical with regards to | 17:08:16 |
| 15 | my mother's asking me a question about user | 17:08:19 |
| 16 | profiles.  That -- I would have to ask her a bunch | 17:08:23 |
| 17 | of questions as to -- | 17:08:26 |
| 18 | BY MR. BARNES: | 17:08:27 |
| 19 | Q.   A consumer. | 17:08:28 |
| 20 | A.   -- as to what she saw related to user | 17:08:28 |
| 21 | profiles.  Is she referencing a news story?  There | 17:08:32 |
| 22 | would be a bunch of questions, some of which I've | 17:08:36 |
| 23 | already offered.  I'm going to need in order to be | 17:08:39 |
| 24 | able to provide an answer. | 17:08:41 |
| 25 | We've added further questions that I would | 17:08:43 |

Page 284

```
 1    have to be able to answer in order to answer this        17:08:45

 2    last question that you proffered.  So I'm -- I'm         17:08:48

 3    sorry to say, in absence of further specification,       17:08:52

 4    I'm not going to be able to speculate.                   17:08:55

 5        Q.   Mr. Heft-Luthy, where does the Google           17:08:58

 6    privacy policy state that Google has a back-end          17:09:00

 7    program where Google extracts, authenticates, maps       17:09:04

 8    and links signed-in and signed-out identifiers?          17:09:08

 9            MR. SPILLY:  Objection.  Vague.                   17:09:14

10    Mischaracterizes the record.  And form.                  17:09:14

11            THE WITNESS:  Again, it seems like we're,         17:09:23

12    one, asking me to speculate on a system that I don't     17:09:25

13    have knowledge of.  So I would need to understand        17:09:31

14    further knowledge of the system.                         17:09:33

15            Again, also not comfortable speculating on       17:09:36

16    legal implications of -- of a statement.  It             17:09:40

17    implying something is entirely wrapped up in the         17:09:45

18    legal context in which it operates, the market           17:09:48

19    context in which it operates.  The question -- the       17:09:52

20    answer to that question is going to be highly            17:09:54

21    contingent on a variety of further information that      17:09:57

22    I don't feel comfortable speculating in the absence      17:10:00

23    of.                                                      17:10:03

24    BY MR. BARNES:                                           17:10:03

25        Q.   Okay.  Where does the Google privacy            17:10:04
```

Page 285

| | | |
|---|---|---|
| 1 | policy say anything about a back-end program where | 17:10:06 |
| 2 | Google maintains a single view of a user on the same | 17:10:11 |
| 3 | device and across devices, including when they are | 17:10:16 |
| 4 | signed out? | 17:10:20 |
| 5 | MR. SPILLY:  Objection to form.  Vague. | 17:10:24 |
| 6 | Mischaracterizes the record. | 17:10:25 |
| 7 | THE WITNESS:  Again, in the absence of | 17:10:31 |
| 8 | further information about what a sufficient -- like | 17:10:34 |
| 9 | sufficiency judgment to this question, the legal | 17:10:37 |
| 10 | context in which we're operating, or firsthand -- | 17:10:40 |
| 11 | lack of firsthand knowledge of the system which | 17:10:45 |
| 12 | we're talking about, I'm not going to be able to | 17:10:48 |
| 13 | speculate further. | 17:10:50 |
| 14 | BY MR. BARNES: | 17:10:50 |
| 15 | Q.   You're unable to identify any language in | 17:10:51 |
| 16 | the policy to that effect? | 17:10:53 |
| 17 | MR. SPILLY:  Objection.  Asked and | 17:10:55 |
| 18 | answered. | 17:10:55 |
| 19 | THE WITNESS:  What I stated is that in the | 17:11:00 |
| 20 | absence of further specification, I don't feel | 17:11:01 |
| 21 | comfortable speculating on an answer to your | 17:11:05 |
| 22 | question. | 17:11:08 |
| 23 | BY MR. BARNES: | 17:11:08 |
| 24 | Q.   Okay.  Where in the privacy policy does it | 17:11:09 |
| 25 | say anything about signed-out identifiers not being | 17:11:12 |

Page 286

| | | |
|---|---|---|
| 1 | anonymous in any meaningful sense of the word? | 17:11:18 |
| 2 | MR. SPILLY:  Same objections as to the | 17:11:23 |
| 3 | last question. | 17:11:25 |
| 4 | THE WITNESS:  Again, without understanding | 17:11:30 |
| 5 | the context in which there are obligations to make | 17:11:33 |
| 6 | certain statements visible as part of our privacy | 17:11:37 |
| 7 | policy, it's not something that I can speculate on | 17:11:40 |
| 8 | the answer to. | 17:11:42 |
| 9 | BY MR. BARNES: | 17:11:43 |
| 10 | Q.   Where in the privacy policy does Google | 17:11:44 |
| 11 | disclose that it maintains attribution pipelines | 17:11:46 |
| 12 | through which it looks at and links signed-in and | 17:11:52 |
| 13 | signed-out data about users? | 17:11:55 |
| 14 | MR. SPILLY:  Objection.  Misstates the | 17:11:59 |
| 15 | record.  Vague.  Form. | 17:12:01 |
| 16 | THE WITNESS:  Without further | 17:12:08 |
| 17 | understanding of the context in which we're | 17:12:09 |
| 18 | discussing this, the obligations that Google's under | 17:12:12 |
| 19 | in different markets, also with the implications | 17:12:16 |
| 20 | that these are all legal analysis questions for | 17:12:19 |
| 21 | which I'm not a lawyer, I'm not comfortable | 17:12:22 |
| 22 | speculating about the presence or absence of a | 17:12:26 |
| 23 | statement like that. | 17:12:28 |
| 24 | BY MR. BARNES: | 17:12:29 |
| 25 | Q.   Where in the Google privacy policy that | 17:12:30 |

Page 287

| | | |
|---|---|---|
| 1 | you can point to does Google state that the Chrome | 17:12:32 |
| 2 | browser will send a data parameter to Google when a | 17:12:36 |
| 3 | user is not synced and that data parameter includes | 17:12:43 |
| 4 | both signed-in and signed-out identifiers? | 17:12:49 |
| 5 | MR. SPILLY:  Objection.  Assumes facts not | 17:12:52 |
| 6 | in evidence.  Misstates the record.  Vague and form. | 17:12:53 |
| 7 | THE WITNESS:  So the same caveats that I | 17:12:58 |
| 8 | provided to previous questions regarding my analysis | 17:12:58 |
| 9 | of mapping statements that you're making onto | 17:13:07 |
| 10 | existing statements in the privacy policy.  I'm also | 17:13:11 |
| 11 | going to throw in that I'm not -- there are some | 17:13:13 |
| 12 | terms that you used that I'm not familiar with.  So | 17:13:16 |
| 13 | I am even further uncomfortable speculating on an | 17:13:19 |
| 14 | answer to that question. | 17:13:22 |
| 15 | BY MR. BARNES: | 17:13:23 |
| 16 | Q.   Where in the Google privacy policy does | 17:13:23 |
| 17 | Google disclose that it maintains a back-end system | 17:13:26 |
| 18 | where it syncs data collected about users, including | 17:13:31 |
| 19 | when they are using the Chrome browser while not | 17:13:38 |
| 20 | synced? | 17:13:42 |
| 21 | MR. SPILLY:  Same objections. | 17:13:47 |
| 22 | THE WITNESS:  Without further | 17:13:53 |
| 23 | understanding of the specific system we're referring | 17:13:54 |
| 24 | to, with the context that I'm not a lawyer and can't | 17:13:57 |
| 25 | speculate on legal obligations, and -- with those | 17:14:02 |

Page 288

| | | |
|---|---|---|
| 1 | parameters in mind and given the lack of knowledge | 17:14:07 |
| 2 | of specific systems that you're referring to, I'm | 17:14:10 |
| 3 | not able to speculate on the answer to that | 17:14:12 |
| 4 | question. | 17:14:14 |
| 5 | How many privacy policies -- how many | 17:14:20 |
| 6 | general privacy policies are there at Google? | 17:14:22 |
| 7 | MR. SPILLY:  Object to the form. | 17:14:25 |
| 8 | BY MR. BARNES: | 17:14:25 |
| 9 | Q.   That's a bad question. | 17:14:26 |
| 10 | Is this the Google privacy policy?  When | 17:14:27 |
| 11 | we talk about the Google privacy policy, is this the | 17:14:31 |
| 12 | Google privacy policy? | 17:14:35 |
| 13 | MR. SPILLY:  Object.  Vague. | 17:14:37 |
| 14 | THE WITNESS:  So I want to just note, | 17:14:48 |
| 15 | given what's going to appear in the transcript, you | 17:14:48 |
| 16 | are putting emphasis on the word "the," particularly | 17:14:48 |
| 17 | when we are talking about a special nature of Google | 17:14:51 |
| 18 | privacy policy. | 17:14:56 |
| 19 | Is that a correct analysis of your | 17:14:56 |
| 20 | question? | 17:14:58 |
| 21 | BY MR. BARNES: | 17:14:59 |
| 22 | Q.   This is the general privacy policy, | 17:14:59 |
| 23 | correct? | 17:15:00 |
| 24 | MR. SPILLY:  Same objection.  Vague. | 17:15:02 |
| 25 | /// | |

Page 289