# EXHIBIT BBB
## Redacted Version of Document Sought to be Sealed

**BLEICHMAR FONTI & AULD LLP**
Lesley Weaver (Cal. Bar No. 191305)
Angelica M. Ornelas (Cal. Bar No. 285929)
Joshua D. Samra (Cal. Bar No. 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
*lweaver@bfalaw.com*
*aornelas@bfalaw.com*
*jsamra@bfalaw.com*

**SIMMONS HANLY CONROY LLC**
Jason 'Jay' Barnes (admitted *pro hac vice*)
An Truong (admitted *pro hac vice*)
Eric Johnson (admitted *pro hac vice*)
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
Fax: (212) 213-5949
*jaybarnes@simmonsfirm.com*
*atruong@simmonsfirm.com*
*ejohnson@simmonsfirm.com*

**DICELLO LEVITT GUTZLER LLC**
David A. Straite (admitted *pro hac vice*)
One Grand Central Place
60 E. 42nd Street, Suite 2400
New York, NY 10165
Tel.: (646) 993-1000
*dstraite@dicellolevitt.com*

**DICELLO LEVITT GUTZLER LLC**
Amy E. Keller (admitted *pro hac vice*)
Adam Prom (admitted *pro hac vice*)
Sharon Cruz (admitted *pro hac vice*)
Ten North Dearborn Street, Sixth Floor
Chicago, IL 60602
Tel.: (312) 214-7900
*akeller@dicellolevitt.com*
*aprom@dicellolevitt.com*
*scruz@dicellolevitt.com*

## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

PATRICK CALHOUN, et al., on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

GOOGLE LLC,

Defendant.

Case No. 4:20-cv-05146-YGR-SVK

**PLAINTIFFS' PROPOSED TRIAL PLAN**

## I.    INTRODUCTION

Plaintiffs respectfully submit this preliminary proposed trial plan in support of the pending motion for class certification. Plaintiffs seek certification of six claims,[1] all governed by California law:[2]

1.    breach of contract (Count 8), ¶¶ 353-59;[3]

2.    breach of the implied covenant of good faith and fair dealing (Count 9), ¶¶ 360-69;

3.    intrusion upon seclusion (Count 7), ¶¶ 343-52;

4.    statutory larceny, Cal. Penal Code §§ 484 and 496, (Count 13), ¶¶ 397-406;

5.    violation of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*, (Count 14), ¶¶ 407-419; and

6.    violation of the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 631, (Count 5), ¶¶ 322-34.

Given that significant discovery remains ongoing, the universe of certified claims is to be decided, and the parties are unable to confer regarding potential trial coordination with the related *Brown* matter in light of their later class certification filing deadline, Plaintiffs reserve the right to submit a revised proposed trial plan at a later date.

## II.    SCOPE AND LENGTH OF TRIAL

Plaintiffs propose that all issues, including damages, be tried in a single proceeding. Plaintiffs estimate that trial can be completed in approximately 20 court days, excluding jury selection. Plaintiffs anticipate presenting evidence over 10 days, with a similar length of time to be allocated to Google's presentation of evidence. Subject to the Court's availability, Plaintiffs are prepared to proceed to trial as early as September, 2022. Plaintiffs propose that jury and non-jury

---

[1] Judge Koh ordered the parties to prioritize ten claims out of the sixteen pled in the FAC, and only those ten would be permitted to be litigated through trial. Dkt. No. 51. This trial plan assumes that Judge's Koh's order still operates, and therefore six de-prioritized claims are still "live," but not included in this trial plan. Plaintiffs stand ready to address the six de-prioritized claims if the Court prefers a different approach.

[2] *See* Order Granting in Part and Denying in Part Motion to Dismiss with Leave to Amend at 15-16, 32, Dkt. No. 142.

[3] "¶¶" as used herein refers to paragraph numbers in Plaintiffs' First Amended Class Action Complaint ("FAC"), Dkt. No. 162-3.

1  claims be tried together.

2  **III.    STIPULATED FACTS**

3      Plaintiffs will seek to reach agreement with Defendant on certain stipulated facts in advance

4  of trial, including:

5          1.    The documents comprising the relevant contract between Chrome and

6                Chrome users, including Plaintiffs;

7          2.    The data Chrome sends from a user's computing device to Google's

8                servers when a Chrome user is exchanging communications at non-Google

9                websites, including in the Chrome toolbar, while using Chrome without

10               having enabled sync;

11         3.    The prevalence of Google source code on non-Google websites that

12               instructs the Chrome browser to send data to Google's servers;

13         4.    What Google does with the data that Chrome sends to Google's servers

14               from the computing devices of users who have not enabled sync;

15         5.    ███████████████████████████████████████████████

16               ███████████████████████████████████████████████

17               ██████  and

18         6.    The amount of revenues and profit Google estimates it has derived from its

19               use of data that Chrome sent to Google for Not Synced users during the

20               Class Period.

21      Plaintiffs believe the use of stipulated facts will streamline the presentation of evidence,

22  minimize unnecessary disputes and interruptions and make the proceedings as efficient as possible

23  for the parties, this Court, and members of the jury.

24  **IV.    COMMON ISSUES TO BE TRIED**

25      As set forth more fully in Plaintiffs' Memorandum of Law in Support of Motion for Class

26  Certification dated October 14, 2021, Dkt. No. 339-4, and Plaintiffs' Reply Memorandum filed

27  contemporaneously herewith, common issues of law and fact will predominate at trial. These

28

include:

1. Whether Google breached the uniform promises in the contract between the Chrome browser and Chrome users who did not enable sync or chose to disable sync;

2. Whether Google acted in bad faith, ███████████████████████ ██████████████████████████████, or using Plaintiffs' information in way far afield from those disclosed in the contract;

3. Whether the contractual promises made to Chrome users in the Chrome Privacy Notice for use of the Chrome browser establish consent to Chrome and Google's actual conduct;

4. Whether Google intentionally intruded upon Plaintiffs' seclusion in a manner that would be highly offensive to a reasonable person;

5. Whether it was an unfair business practice for Chrome to send the data in question from the Chrome browser on user's personal computers to Google's servers regardless of whether a Chrome user has enabled sync;

6. Whether Google unlawfully intercepted the contents of Plaintiffs' internet communications with non-Google websites while they were using Chrome without having enabled or having disabled sync, ████████████████████████ ██████████████████████ and

7. Damages flowing from Google's conduct.

## V.    COMMON EVIDENCE

Plaintiffs will present common class-wide evidence to prove Google's conduct violated Federal statutes, California statutes common law and equity. The following is a non-exhaustive list of potential trial exhibits and witnesses:

### A.    Potential Trial Exhibits

1. The documents comprising the relevant contract between Plaintiffs (Chrome users) and Google (via the service-specific Chrome Privacy Notice);

2. Evidence regarding the Chrome browser and the data transmissions that occur between the Chrome browser on user's computing devices and Google's servers when users have not enabled or have disabled sync, including exemplars for the named Plaintiffs and log files showing that the same information is sent from Chrome to Google for all users of the Chrome browser who have not enabled sync or disabled sync;

3. Evidence regarding how Google connects, i.e. syncs signed-in and signed-out Chrome data across user's personal computing devices and within the same device, regardless of whether the user enabled sync or disabled sync;

4. Evidence regarding Google's knowledge that it had not obtained consent;

5. Evidence regarding the ███████████████████████████████████████ ██████████████████████████████████████████ ███████████████████████;

6. Evidence regarding how ███████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████;

7. Evidence regarding ████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ███████; and

8. Evidence regarding Google's profits derived from the fact that Chrome sends Chrome user personal information to Google for users who have not enabled sync or have disabled sync.

**B.    Potential Witnesses For Plaintiffs' Case in Chief**

<u>Class Representatives</u>

1.  Patrick Calhoun

2.  Elaine Crespo

3.  Michael Henry

4.  Dr. Rodney Johnson

5.  Dr. Claudia Kindler

6.  Dr. Corinice Wilson

Adverse

1.  Chetna Bindra

2.  Sabine Borsay

3.  Jochen Eisinger

4.  Huei-Hung "Chris" Liao

5.  Sam Heft-Luthy

6.  AbdelKarim Mardini

7.  David Monsees

8.  Adrienne Porter Felt

9.  Justin Schuh

10. Alexei Svitkine

11. Tim Schumann

12. Deepak Ravichandran

13.  Sundar Pichai

Third-Party Percipient Witnesses

1.  Greg Fair

2.  Michael Shelton

3.  Rory McClelland

Experts

1.  Prof. Leslie John, Ph.D.

2.  Russell Mangum, Ph.D.

3.  Prof. Zubair Shafiq, Ph.D.

4.   Richard Smith

5.   Prof. Joseph Turow, Ph.D.

## VI.   PROCEDURES TO SIMPLIFY PRESENTATION OF EVIDENCE

In accordance with this Court's Standing Order Re: Pretrial Instructions on Civil Cases, Plaintiffs will seek to reach agreement with Defendant on a variety of issues affecting the conduct of trial. This will likely include matters such as the authenticity of documents produced by either party to the litigation,[4] joint proposed jury instructions, a joint proposed verdict form, and a joint preliminary statement of the case.

## VII.   POST-JUDGMENT DISTRIBUTION/CLAIMS PROCEEDINGS

Using Google's own internal records, Plaintiffs will employ a generally applicable, class-wide methodology to divide any aggregate damages award proportionally among class members. The jury will not be asked to determine that allocation. Rather, Plaintiffs will present a claims administration protocol for Court approval that will govern the submission, processing, and resolution of individual claims, with the goal of (1) making class-wide recovery simple and straightforward, and (2) maximizing class member participation. That proposal will include nominees for a Claims Administrator and/or Special Master as appropriate.

Dated: February 16, 2022

Respectfully submitted,

**BLEICHMAR FONTI & AULD LLP**

By:   */s/ Lesley E. Weaver*
Lesley Weaver (Cal. Bar No. 191305)
Angelica M. Ornelas (Cal. Bar No. 285929)
Joshua D. Samra (Cal. Bar No. 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
*lweaver@bfalaw.com*
*aornelas@bfalaw.com*
*jsamra@bfalaw.com*

**SIMMONS HANLY CONROY LLC**

**DICELLO LEVITT GUTZLER LLC**

By:   */s/ David A. Straite*
David A. Straite (admitted *pro hac vice*)
One Grand Central Place
60 E. 42nd Street, Suite 2400
New York, NY 10165
Tel.: (646) 993-1000
*dstraite@dicellolevitt.com*

Amy E. Keller (admitted *pro hac vice*)
Adam Prom (admitted *pro hac vice*)
Sharon Cruz (admitted *pro hac vice*)
Ten North Dearborn Street, Sixth Floor
Chicago, IL 60602

---

[4] Plaintiffs proposed a stipulation regarding the authenticity of documents produced in litigation in 2020. To date, Google has not agreed to the stipulation proposed. Plaintiffs, however, remain optimistic that this is one of many areas where the parties will reach resolution before trial.

By:      */s/ Jay Barnes*

Jason 'Jay' Barnes (admitted *pro hac vice*)
An Truong (admitted *pro hac vice*)
Eric Johnson (admitted *pro hac vice*)
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
Fax: (212) 213-5949
*jaybarnes@simmonsfirm.com*
*atruong@simmonsfirm.com*
*ejohnson@simmonsfirm.com*

Tel.: (312) 214-7900
*akeller@dicellolevitt.com*
*aprom@dicellolevitt.com*
*scruz@dicellolevitt.com*

1

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(h)(3)**

2

      I, Lesley E. Weaver, attest that concurrence in the filing of this document has been obtained

3

from the other signatories. I declare under penalty of perjury that the foregoing is true and correct.

4

5

Dated:  February 16, 2022                        */s/ Lesley E. Weaver*
                                                Lesley E. Weaver

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

I, Lesley E. Weaver, hereby certify that on February 16, 2022, I electronically filed the foregoing document with the Clerk of the United States District Court for the Northern District of California using the CM/ECF system, which will send electronic notification to all counsel of record. I also caused a copy of the under seal filings to be delivered to counsel for Defendant Google LLC via electronic mail.

Dated:  February 16, 2022                    /s/ *Lesley E. Weaver*
                                             Lesley E. Weaver

# EXHIBIT CCC
## Redacted Version of
## Document Sought to be Sealed

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

PATRICK CALHOUN, et al., *on behalf of themselves and all others similarly situated*,

Plaintiffs,

*v.*

GOOGLE LLC,

Defendant.

Case No. 4:20-cv-05146-YGR-SVK

**EXPERT REBUTTAL REPORT OF LESLIE JOHN, Ph.D.**

## TABLE OF CONTENTS

I.     EXECUTIVE SUMMARY ...................................................................4

II.    FOUNDATION FOR MY OPINIONS ............................................7

    A.    Methodology used to answer questions in my field of study.................8

    B.    I formed my opinions using methodologies accepted in my field. ........10

III.   PROFESSOR ERDEM'S REPORT ................................................30

    A.    The Consumer Expectations Survey .............................................30

         i.    The methodologies that Professor Erdem uses, including the questions she asks and how she asks them, lead consumers to "agree." ..................................................................30

         ii.   The survey does not test respondents' actual knowledge or understanding. ...........................................................33

         iii.  Professor Erdem overstates agreement. ...................................34

         iv.  The survey is not a fair test of whether sync status matters.....................38

         v.   The survey is not a fair test of whether the PP/CPN is misleading. ..........41

         vi.  Other arguments that Professor Erdem uses to support her claim VI. "Chrome users understand that Google receives their at issue data including IP address, referrer URL, and cookies" are also flawed.....................................................43

    B.    Materiality Survey ...................................................................44

         i.    The survey is irrelevant to this case. ..........................................44

         ii.   The survey is not a fair test of whether users would continue to use Chrome even if disclosures were changed to address Plaintiffs' concerns. ..................................................................44

         iii.  Professor Erdem overstates results. ...........................................45

         iv.  Other arguments that Professor Erdem uses to support her claim VII. "users value Chrome and would continue to use it even if certain disclosures were changed to address Plaintiffs' alleged concerns" are also flawed. ........................................46

    C.    Scenario Survey .....................................................................47

Expert Rebuttal Report of Leslie John, Ph.D.
4:20-cv-05146-YGR-SVK

i.    The survey addresses a question that is irrelevant to the case. ..................47

ii.   The survey does not assess understanding and is heavily biased in favor of the results Google would want.....................................................48

iii.  Professor Erdem overstates the results. ....................................................48

D.   Flaws Common to All Three Surveys.....................................................................49

i.    The studies were not pre-registered. ........................................................49

ii.   Inadequate pre-testing. ............................................................................50

iii.  Respondents were not asked whether they sync. ......................................50

iv.   An unusually high number of respondents were terminated or excluded from analysis. ..........................................................................51

IV.   CONCLUSION................................................................................................................51

Expert Rebuttal Report of Leslie John, Ph.D.
4:20-cv-05146-YGR-SVK

## EXPERT REBUTTAL REPORT OF LESLIE JOHN, Ph.D.

## I.   EECUTIVE SUMMARY

1.     I submit this report in rebuttal to criticisms of the four opinions I expressed in this matter in my report dated October 13, 2021. As I stated in that report, my assignment was to provide an opinion on the following four questions.

    a.    Question #1:  Could reasonable consumer expectations of internet privacy be determined class-wide by studying a sample of the proposed class?

        i.    Opinion #1: A common methodology can be applied to answering questions about consumer expectations and actions and would not require individual questioning of all consumers.

    b.    Question #2: Does the reasonable consumer care about their privacy on the internet?

        i.    Opinion #2:  Consumers care about privacy on the internet.

    c.    Question #3:   Are Plaintiffs' allegations of invasion of privacy on Chrome consistent with reasonable consumer expectations?

        i.    Opinion #3:  It is reasonable for a consumer to use Chrome in the not-synced state and believe that Chrome will not send their personal information to Google. This is true for consumers who read Google's privacy policies and for consumers who do not.

        ii.    Opinion #3A: Without having read Google's privacy policies, it is reasonable for a consumer to use Chrome in the not-synced state and believe that Chrome will not send her personal information to Google.

iii.   <u>Opinion #3B</u>:  If a reasonable consumer were to read Google's privacy policies, it is reasonable for her to use Chrome in the not-synced state and believe that Chrome will not send her personal information to Google.

d.   <u>Question #4</u>:  Are Plaintiffs' personal experiences typical of the reasonable consumer?

i.   <u>Opinion #4</u>:  The Named Plaintiffs' experiences are typical of consumers' online interactions.

2.   As set forth more fully in part two of this report, I respond to Professor Erdem's criticisms of these opinions as follows. I did not need to conduct surveys to reach these conclusions, as they rely on significant bodies of research already conducted, and/or the application of my knowledge of these bodies of works to the facts at hand based upon my review of evidence in this case. Specifically:

a.   <u>Rebuttal Opinion #1</u>:  Question #1 of my assignment only required me to articulate a fundamental premise of the scientific enterprise (i.e., the common practice of making generalizations from samples of observations).

b.   <u>Rebuttal Opinion #2</u>:  With respect to Question #2 of my assignment, I concluded that it was not necessary to conduct additional primary research by conducting a new survey because I had sufficient evidence to reach by opinion.

c.   <u>Rebuttal Opinion #3</u>:  As with Question #2 of my assignment, I likewise concluded for Question #3 that it was not necessary to conduct additional primary research by conducting a new survey because I had sufficient evidence to reach by opinion.

        d.     <u>Rebuttal Opinion #4</u>:  Question #4 of my assignment only required me to make a similarity call based on my professional expertise and judgment.

3.     In part three of this report, I evaluate the work and opinions of Professor Tülin Erdem submitted in this case.  In general, I conclude that none of the three surveys Professor Erdem conducted in this case would survive peer review in the field of study in which I practice, for the following reasons:

        a.     The methodologies that Professor Erdem uses, including the questions she asks and how she asks them, undermine confidence in the validity of her results. For example, the "expectations" survey leads consumers to "agree" and does not test respondents' actual knowledge or understanding in a way consistent that would be accepted by peer-review.  In summarizing her conclusions, Professor Erdem incorrectly reports that she has tested respondents' knowledge.

        b.     Professor Erdem misinterprets her data and overstates her findings in Google's favor. For example, she inappropriately excludes from analysis respondents who indicate that they do not understand, which inflates the results in Google's favor. She also draws inappropriate conclusions based on the lack of differences (i.e., "null effects") between experimental groups. For example, in the "expectations survey," she concludes that because "agreement" rates are high and statistically equivalent as a function of whether participants imagine they are synced versus not synced, it means that users understand that Chrome sends users' personal information to Google even when users are not synced. Such conclusions are scientifically

unsound.

c.      Professor Erdem does not focus her surveys on the personal information
disclosed by Chrome to Google when users are not synced.  The data that
she does focus on is not a fair representation of what Chrome sends to
Google from users' devices and how Google uses it so that her surveys are
not testing the question asked. For example, the six pieces of information
inquired about in the "expectations survey," such as users' names, do not
convey in a way that is readily comprehensible to respondents the scope of
what Chrome is actually sending to Google or how Google uses it.
Similarly, the survey is not a fair test of whether the Google Privacy Policy
(PP) and Chrome Privacy Notice (CPN) contain misleading text, because
the text is presented in such a way that it is implausible that respondents
actually read it (let alone viewed it) in the context of what is being collected.

## II.      FOUNDATION FOR MY OPINIONS

4.      I obtained my PhD in 2011 from Carnegie Mellon University. My field of study is
behavioral decision-making, which is at the intersection of psychology and economics; it deals
with how people reason and decide, and how their decisions can be at odds with classical
economics' "rational actor" model of decision-making. My specialty is in privacy decision-
making—in understanding what drives people to share or withhold personal information, as well
as their expectations about firms' collection and use of their personal information. I have been
conducting research in this field for the past 15 years and regularly publish in the top peer-reviewed
academic journals. In addition to conducting scientific research, I also evaluate it, by serving on
the editorial review boards of top journals in my discipline. I have also served as a peer-reviewer

Expert Rebuttal Report of Leslie John, Ph.D.
4:20-cv-05146-YGR-SVK

for over 35 scholarly journals; I review about 25 manuscripts per year.

5.    Obtaining a PhD in my field of study typically takes at least five years and requires:

    a.    foundational courses in psychology, microeconomics, applied statistics, public policy and research methods;

    b.    specialized coursework in privacy and decision-making;

    c.    passing two multi-day comprehensive exams;

    d.    a teaching requirement (I taught research methods);

    e.    a research apprenticeship;

    f.    making novel scientific discoveries via original research;

    g.    writing and defending a report (i.e., dissertation) that describes the novel discoveries and the scientifically-accepted methods used to uncover them.

**A.**    **Methodology used to answer questions in my field of study.**

6.    Scholars in my field conduct research in two basic steps, described below. Step 1 is necessary and often sufficient to answer a given research question; step 2 is only conducted if step 1 is inconclusive. Whereas each of my 47 peer-reviewed publications forms conclusions from existing scholarly research (step 1), not every article contains primary data (step 2).[1]

7.    Step 1: Secondary research. Scholars in my field conduct literature reviews to assess what, if any, research already addresses the given question or topic. A typical literature review encompasses 50+ scholarly articles. (Accordingly, I relied on 62 articles in forming my opinions, **Exhibit B** of my report).[2] This method, of forming an opinion by reviewing and

---

[1] Most of my publications do contain primary data (step 2), and that is because there is a bias towards answering novel research questions. In contrast, my assignment questions were not novel research questions; as I explain, there is an abundance of prior scholarly work that already answers them.

[2] A fuller list of my qualifications is set forth in my October 13, 2021 report. As stated therein, I have not testified at deposition or trial as an expert in the last four years. A list of the materials I have reviewed since completing my October 13, 2021 report is attached hereto as **Exhibit A**. Upon the Court's request, I will provide any materials cited in this report.

Expert Rebuttal Report of Leslie John, Ph.D.
4:20-cv-05146-YGR-SVK

synthesizing prior scholarly work is a widely accepted method that scholars in my field use to make evidence-based claims. For example, in 2015, the leading peer-reviewed scientific journal, aptly named *Science*, published such an article pertaining to privacy ("Privacy and human behavior in the age of information," which I cite in my report).[3] I have also published such articles, [4, 5, 6, 7] as has Google's expert, Professor Tülin Erdem.[8]

8.      Step 2: Primary research. When existing research is insufficient to answer a given question, scholars in my field collect new empirical data to address it. There are many methodologies that can be used; the appropriate method or methods depend on the research question. Two methodologies commonly used in my field are surveys and survey-based experiments. Primary research in particular is more credible if it has undergone peer-review.

9.      A critical part of the scientific process is careful evaluation of the evidence. To reach evidence-based conclusions, scholars in my field assess the quantity, quality, and consistency of evidence. They also recognize that no single academic article or study is "perfect;" even the strongest contributions have weaknesses. This is why scientists in my field look at the body of evidence as a whole, assessing if it is of sufficient quantity, quality, and consistency to

---

[3] Acquisti, A., Brandimarte, L., & Loewenstein, a. G. (2015). Privacy and human behavior in the age of information. *Science, 347*(6221), 509-514.

[4] John, L. K. (2015). The Consumer Psychology of Online Privacy: Insights and Opportunities from Behavioral Decision Theory. M. I. Norton & D. D. R. a. C. L. Rucker (Eds.), *The Cambridge Handbook of Consumer Psychology*. Cambridge University Press.

[5] Kim, T., Barasz, K., John, L.K.  (2020). Consumer Disclosure, Consumer Psychology Review, 1-11.

[6] Thomadsen, R., Rooderkerk, R., Amir, O., Arora, N., Bollinger, B., Hansen, K., John, L.K., Liu, W., Sela, A., Singh, V., Sudhir, K., Wood, W.  (2018).  How Context Affects Choice, Customer Needs and Solutions, 5(1), 3-14.

[7] Rogers, T., Milkman, K.L., John, L.K.  & Norton, M.I.  (2015).  Beyond Good Intentions:  Prompting People to Make Plans Improves Follow-through on Important Tasks, Behavioral Science & Policy, 1(2), 33-41.

[8] Erdem, Tülin, Joffre Swait, Susan Broniarczyk, Dipankar Chakravarti, Jean-Noel Kapferer, Michael Keane, John Roberts, Jan-Benedict Steenkamp and Florian Zettelmeyer (1999), "Brand Equity, Consumer Learning and Choice," *Marketing Letters*, 10 (3) 301-318.

Expert Rebuttal Report of Leslie John, Ph.D.
4:20-cv-05146-YGR-SVK

support a given conclusion. For example, scientists in my field are typically wary of drawing strong conclusions from single studies that have not undergone peer-review and that have not been published in reputable outlets (i.e., what Google's expert Professor Erdem seems to have primarily relied upon in forming her opinions).

10.     I followed this methodology to answer assignment questions #2 and #3 as set forth in my report. In both cases, I concluded that it was not necessary to conduct additional primary research—i.e., to perform Step 2 above, for example, by conducting a new survey. As I explained in my deposition, "I had enough evidence that I didn't need to initiate an additional survey." Dep. Tr. 80:24-25.  This is true because the opinions expressed are foundational to my field of study. For example, it is undisputed that people care about their privacy on the internet.  I did not claim that running a new study "would not be 'helpful'" to my opinions, as Google inaccurately asserts (Google Motion to Strike, p. 1); rather, "I deemed it wasn't necessary," explaining that "if I had had different assignment questions, maybe I would have chosen to." Dep. Tr. 81:1-2. With respect to the other two questions: question #1 only required me to articulate a fundamental premise of the scientific enterprise (i.e., the common practice of making generalizations from samples of observations) and question #4 only required me to make a similarity call based on my professional expertise and judgment.

### B.     I formed my opinions using methodologies accepted in my field.

#### (1)     <u>Opinion #1: A common methodology can be applied to answering questions about consumer expectations and actions and would not require individual questioning of all consumers.</u>

11.     As I stated in my report, "the bedrock principle in my field of study is observing consumer behavior for the purpose of reaching general conclusions about consumers" (p. 2). And as I described above, these conclusions can be drawn by applying observed facts in this case to

Expert Rebuttal Report of Leslie John, Ph.D.
4:20-cv-05146-YGR-SVK

secondary research alone, or by supplementing secondary research with primary research. Either way, it is common practice in my field to draw general conclusions from specific findings. As a result, scholars in my field form conclusions about human behavior without surveying every single human. This is standard practice; I have done this in every single one of my publications. Professor Erdem implicitly agrees because she herself uses a common methodology—surveys—and applies answers from ~2000 people to hundreds of millions of class members. In addition, as I mentioned in my report, Google also implicitly agrees; ███████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████ (p. 2). Google's arguments about Web and App Activity (WAA) and New Account Creation (NAC) also make this clear—Google seeks to apply those provisions across a group of hundreds of millions of users. Google is not saying the inquiry involves asking each user individually what they think.

### (2)   Opinion #2: Consumers care about their privacy on the internet.

12.      Google does not challenge this opinion. Instead, Google inaccurately asserts that I am "unable to define" (Google's Motion to Strike, p. 13) the construct of privacy. My opinion relies on the definition of consumer information privacy concern as "concern over the safety and control over one's personal information" (p. 909).[9] This is consistent with how scholars in my field

---

[9] Kim, T., Barasz, K. & John, L.K. (2019). Why Am I Seeing this Ad? The Effect of Ad Transparency on Ad Effectiveness, *Journal of Consumer Research*, 45(5), 906-932.

define this concept.[10, 11, 12, 13]

13.    In forming my opinion, first, I reviewed scholarly empirical work, which has assessed consumers care about their privacy by assessing behavior (do people act like they care about privacy?). Studies in which participants essentially choose between privacy or money indicate that people can be willing to pay to protect their privacy. In one study for example, participants who earned close to minimum wage were offered a monetary bonus payment of $2.50 to share their Facebook data with the researchers; most rejected this offer.[14] Another study indicated that people are willing to pay a modest premium to buy a privacy-sensitive product (i.e., a vibrator) on a privacy-protective website as opposed to a less privacy-protective website.[15]

14.    As I also cited in my report, privacy research has documented that people's privacy attitudes can be seemingly disconnected from their privacy behaviors.[16, 17, 18, 19] People say they care about their privacy, yet sometimes behave as if they do not, a discrepancy referred to as the

[10] Malhotra, N. K., Kim, S. S., & Agarwal, J. (2004). Internet Users' Information Privacy Concerns (IUIPC): The Construct, the Scale, and a Causal Model. *Information systems research*, *15*(4), 336-355.

[11] Milne, G. R., & Gordon, M. E. (1993). Direct mail privacy-efficiency trade-offs within an implied social contract framework. *Journal of Public Policy & Marketing*, *12*(2), 206-215.

[12] Phelps, J., Nowak, G., & Ferrell, E. (2000). Privacy concerns and consumer willingness to provide personal information. *Journal of public policy & marketing*, *19*(1), 27-41.

[13] Smith, H. J., Milburg, S. J., & Burke, S. J. (1996). Information Privacy: Measuring Individuals' Concerns about Organizational Practices. *MIS quarterly*, *20*(2), 167-196.

[14] Svirsky, D. (2019). Three Experiments about Human Behavior and Legal Regulation.

[15] Tsai, J. Y., Egelman, S., Cranor, L., & Acquisti, A. (2011). The Effect of Online Privacy Information on Purchasing Behavior: An Experimental Study. *Information Systems Research*, *22*(2), 254-268.

[16] Spiekermann, S., Grossklags, J., & Berendt, B. (2001). *E-privacy in 2nd generation Ecommerce: privacy preferences versus actual behavior* Proceedings of the 3rd ACM conference on Electronic Commerce, Tampa, Florida, USA.

[17] Jensen, C., Potts, C., & Jensen, C. (2005). Privacy practices of Internet users: Self-reports versus observed behavior. *International Journal of Human-Computer Studies*, *63*(1), 203-227.

[18] Norberg, P. A., Horne, D. R., & Horne, D. A. (2007). The Privacy Paradox: Personal Information Disclosure Intentions versus Behaviors. *Journal of Consumer Affairs*, *41*(1), 100-126.

[19] Beresford, A. R., Kübler, D., & Preibusch, S. (2012). Unwillingness to pay for privacy: A field experiment. *Economics letters*, *117*(1), 25-27.

Expert Rebuttal Report of Leslie John, Ph.D.
4:20-cv-05146-YGR-SVK

"privacy paradox." As I explained, an important conclusion from privacy research is that this paradox "cannot be taken as evidence that [people] therefore do not care about their privacy" (p. 3). Rather, consumers may act in non-privacy-protective ways despite truly caring about their privacy for a host of valid reasons, including that they are not aware that the particular behavior erodes privacy or that they feel as though they have no choice but to reveal their personal information (despite not wanting to).[20, 21, 22, 23, 24, 25, 26]

15.    In forming my opinion #2, I also reviewed other scholars' reviews of the empirical literature. This review also pointed to the conclusion that people care about their privacy. For example:

- After reviewing over 130 articles, Acquisti et al., (2020) conclude:[27] "among Americans, the evidence for elevated privacy concerns has been ample and enduring" (p. 737); and "Contrary to depictions of online sharing behaviors as careless, we show how consumers fundamentally care about online privacy, and present evidence of numerous actions they take to protect it" (p. 736).

- After reviewing over 95 articles, Acquisti et al. (2015) note:[28] "Scholars have uncovered evidence of privacy-seeking behaviors across peoples and cultures

---

[20] John, L. K., Slepian, M. L., & Tamir, D. (2020). Editorial overview: Tales of two motives: disclosure and concealment. *Current Opinion in Psychology*, *31*, iv-vii.

[21] Acquisti, A., John, L.K. & Loewenstein, G. (2013). What is Privacy Worth? *Journal of Legal Studies*, 42(2), 249-274.

[22] Acquisti, A., & Grossklags, J. (2005). Privacy and rationality in individual decision making. *IEEE security & privacy*, *3*(1), 26-33.

[23] Acquisti, A., Brandimarte, L., & Loewenstein, a. G. (2015). Privacy and human behavior in the age of information. Science, 347(6221), 509-514.

[24] John, L. K. (2015). The Consumer Psychology of Online Privacy: Insights and Opportunities from Behavioral Decision Theory. M. I. Norton & D. D. R. a. C. L. Rucker (Eds.), The Cambridge Handbook of Consumer Psychology. Cambridge University Press.

[25] Athey, S., Catalini, C., & Tucker, C. (2017). The digital privacy paradox: Small money, small costs, small talk.

[26] John, L. K. (2018). Uninformed Consent, Harvard Business Review, Lead Article in "The Surveillance Economy," The Big Idea Series.

[27] Acquisti, A., Brandimarte, L., & Loewenstein, G. (2020). Secrets and Likes: The Drive for Privacy and the Difficulty of Achieving It in the Digital Age. *Journal of consumer psychology*, *30*(4), 736-758.

[28] Acquisti, A., Brandimarte, L., & Loewenstein, a. G. (2015). Privacy and human behavior in the age of information. *Science*, *347*(6221), 509-514.

Expert Rebuttal Report of Leslie John, Ph.D.
4:20-cv-05146-YGR-SVK

separated by time and space: from ancient Rome and Greece to pre-industrialized Javanese, Balinese, and Tuareg societies" (p. 512) and that "Much evidence suggests that privacy is a universal human need" (p. 511).

16.    I also reviewed the Plaintiffs' testimony, as well as Google's internal studies, to see if they were consistent with this relevant scholarly work.

17.    Plaintiffs' testimony pointed to the conclusion that people care about their privacy; for example:

- Dr. Kindler expresses privacy concern in her declaration, explaining "I temporarily stopped using Chrome on my personal laptop because I was concerned about Google collecting and adding all of my information" (Declaration of Claudia Kindler In Support of Plaintiffs' Motion for Class Certification, para. 8).

- Crespo expresses concern in her declaration when she says: "I feel like I have lost control of my privacy and my information at this point" (Declaration of Elaine Crespo In Support of Plaintiffs' Motion for Class Certification, para. 6).

18.    ███████████████████████████████ with the scholarly work, indicating that people care about their privacy; for example:

- ████████████████████████ conducted by Dr. Alan Westin; Google has categorized its own users into Westin's privacy types. In one survey of US users for example (document # GOOG-CABR-00553475, at 553492), Google categorized ██% as Unconcerned, ██% as Pragmatists, and ██% as Fundamentalists.[29]

- ████████████████████████████████████████████████████████████████████████████████." (document # GOOG-CABR-00111932, at 111934).

- ████████████████████████████████████████████████████████████████████████ (document # GOOG-CABR-00108711, at 108712).

---

[29] Though Google refers to the "fundamentalist" category as "████████████████," I prefer to use Westin's term for this category – fundamentalists – as he considers pragmatists to also be concerned about privacy, albeit less strongly than fundamentalists. Referring to this group as ████████████████████████████████████, which is why I prefer to use Westin's terminology.

**(3)** **Opinion #3: It is reasonable for a consumer to use Chrome in the not-synced state and believe that Chrome will not send their personal information to Google. This is true for consumers who read Google's privacy policies and for consumers who do not.**

19.     My opinion relies on the definition of "personal information" as "information pertaining to the self." (Dep. Tr. 31:2-6)—consistent with how other scholars in my field define it. For example, Nissenbaum (2004)[30] defined personal information as "the general sense of information about a person" (p. 124). This definition is implicit in the categories of information that scholars count as "personal information." For example, Leon et al. (2013, Table 3) assessed people's willingness to share different pieces of "personal information," which included: browsing information, demographics, location information, email address and name, height and weight, and IP address.[31] Google's own researchers also implicitly agree, referring to information "such as email address, ZIP code of their home, age, gender, interests, trace of GPS position over the last week and browsing history" all as "types of personal information" (p. 5218).[32] ███████████ ████████████████████████████████████████████████████████████████

███████████████████████████████████ (Bindra Deposition Exhibit 48, at GOOG-CABR-04604508-509) ██████████████████████████████. ████████████████

████████████ ███████████ ███ ██ ████████ ████████████ █████████████

██████████.[33] ██████████████████████████████████████████████

██████████████████████████████████."

[30] Nissenbaum, H. (2004). Privacy as contextual integrity. *Washington law review*, 79(1), 119.

[31] Leon, P., Ur, B., Wang, Y., Sleeper, M., Balebako, R., Shay, R., . . . Cranor, L. (2013). *What Matters to Users? Factors that Affect Users' Willingness to Share Information with Online Advertisers*.

[32] Bilogrevic, I., & Ortlieb, M. (2016). "If You Put All The Pieces Together..." Attitudes Towards Data Combination and Sharing Across Services and Companies. Proceedings of the 2016 CHI Conference on Human Factors in Computing Systems.

[33] GOOG-CABR-04604487

Expert Rebuttal Report of Leslie John, Ph.D.
4:20-cv-05146-YGR-SVK

███████████████████████████████████████████████████████████

████████████.″  Bindra Deposition Exhibit 48, at GOOG-CABR-04604508-509. Thus an analysis

of what constitutes personal information in this case must include these identifiers.

20.    My opinion also relies on the definition of "sensitive personal information" as

"personal information that makes you feel vulnerable in some way or could make you feel

vulnerable in some way if it's revealed" (Dep. Tr. 32:20-23). This construct applies generally to

most people and is "consistent with how other scholars think about what sensitive personal

information is" (Dep. Tr. 33:5-7).[34] ██████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████" (Bindra Deposition Exhibit 48, at GOOG-

CABR-04604508-509). █████████████████████████████████████████:

"██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████  ██████  ██  ████  ██████████  ██████  ██████  ████████  ████

██████████████████████████████.″  Relatedly, although the sensitivity of

personal information can depend on context, as I explained at my deposition ████████████

████████████████████████), there are "categories [of personal information] that

tend to consistently fall into sensitive personal information […] for example, information about

one's sexual preferences and habits. Another example would be health information. Another

example would be financial information. Those tend to be more sensitive." (Dep. Tr. 33:25-34:6.)

Indeed, in prior work, I have assessed the general sensitivity of different pieces of personal

---

[34] For example, and cited in my report, Moon, Y. (2000). Intimate Exchanges: Using Computers to Elicit Self-Disclosure From Consumers. *The Journal of consumer research*, *26*(4), 323-339.

information (John et al., 2011)—sensitivity that tends to span across contexts. Google's own researchers also acknowledge this point—that although sensitivity can vary by context, some information is always sensitive.[35] Moreover, my opinion does not require sensitivity to be stable across all contexts (nor is that what this case is about—it's about the taking of personal information, whether that information is deemed sensitive or not).

> i.  <u>In forming my opinion, I first considered whether people actually read privacy policies.</u>

21.  I concluded the evidence to overwhelmingly indicate that people do not typically read privacy policies.

22.  I considered research indicating that it is not feasible to read privacy policies. One study[36] estimated how long it would take the average person to read every privacy policy they encounter; as I summarized in my report, "it would take a person 244 hours per year" to do so—and "the aggregate opportunity cost of this time to US consumers as a whole was estimated to be $781 billion per year" (p. 7).

23.  I also reviewed empirical studies assessing whether people actually read privacy policies. These studies indicate that they do not:

24.  <u>In polls,</u> people report that they do not typically read privacy policies. For example, one nationally representative poll from 2019 asked Americans: "When you are asked to agree to a company's privacy policy, how often do you read it before agreeing to it?" The response options were: "always," "often," "sometimes," "never" and "no answer."[7] Thirty-six percent said that they never read privacy policies, and 38% said that they only sometimes read privacy policies. Only

---

[35] Ortlieb, M., & Garner, R. (2016). Sensitivity of personal data items in different online contexts. *it-Information Technology*, *58*(5), 217-228.

[36] McDonald, A. M., & Cranor, L. F. (2008). The cost of reading privacy policies. *I/S: A Journal of Law and Policy for the Information Society*, *4*, 543.

Expert Rebuttal Report of Leslie John, Ph.D.
4:20-cv-05146-YGR-SVK

13% said that they often read them, and fewer still—9%—reported always reading them.[37]

25.      It is also evident from people's <u>behavior</u> that they do not read privacy policies. For example, one study measured whether people clicked on the link to view a privacy policy; only 26% did so (and it is unclear whether these participants actually read the policy).[38] Moreover, the authors noted that this 26% is likely an overestimate: "we believe that the policy consultation numbers are inflated because subjects knew they were being observed, and what the purpose of the experiment was. They therefore likely took more care and were more thorough in their decision-making process than they normally would" (p. 215).

26.      I also reviewed other scholars' reviews of the literature. A review article summarizing the evidence on whether people read privacy policies concluded that "an overwhelming majority of Internet users do not read privacy policies" (p. 513).[39]

27.      I also reviewed the plaintiffs' testimony and found it to be consistent with this relevant scholarly work; for example:

      a.    <u>Calhoun</u>: "I didn't read those documents because they were - - they were large, they were confusing . . . I assumed that Google would act in accordance with the law and ethics." Calhoun Dep Tr. 101:8-101:12.

      b.    <u>Dr. Kindler</u>: At deposition, Dr. Kindler was asked whether she had attempted to read the terms of service. She responded: "Initially a long time ago, I would skim the terms -- whatever was in front of me, terms of service or privacy, I would skim it. But I really didn't understand what it was saying, so I then just went to scrolling down and accepting.  Because if I didn't accept, I wouldn't be able to get to the next step of doing what I need to do." Kindler Dep. Tr. 38:21-39:2.

        • Similarly, at deposition, she said, of not reading privacy policies:

---

[37] Auxier, B.; Rainie, L., Anderson, M.; Perrin, A. & M. a. E. T. Kumar (2019). Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information. Pew Research Center.

[38] Jensen, C., Potts, C., & Jensen, C. (2005). Privacy practices of Internet users: Self-reports versus observed behavior. *International Journal of Human-Computer Studies*, *63*(1), 203-227.

[39] Acquisti, A., Brandimarte, L., & Loewenstein, a. G. (2015). Privacy and human behavior in the age of information. *Science*, *347*(6221), 509-514.

Expert Rebuttal Report of Leslie John, Ph.D.
4:20-cv-05146-YGR-SVK

"They're too long, they're too confusing, and not easy to understand" Kindler Dep. Tr. 315:24-25.

    c.    <u>Crespo</u>: At deposition, Crespo was asked: "Do you generally read the privacy policies of websites you visit to make sure you understand what information they are […] collecting?" She answered: "I don't." Crespo Dep. Tr. 44:8-14.

28.    Finally, I also reviewed Google's documents, ███████████████

███████████████████████████████████████████████████

████████████████████████████████" (GOOG-CABR-00111383)

states: ████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████" (GOOG-CABR-00111383, at 111383.) The

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████."

(GOOG-CABR-00111383, at 111383.)

29.    Moreover, Professor Erdem's surveys by design, implicitly acknowledge this point: she requires respondents to certain screens and documents (including a help page) for minimum time periods and only lets them move on after this period has been reached—but this time period is a mere 15-30 seconds.  The short time periods allocated for such complicated documents is a tacit admission that no one allots very much time to reviewing them at all.

30.    Therefore, in forming Opinion #3, I considered both the case of the user who: a) <u>does not</u> read Google's privacy disclosures (Opinion 3A); and b) <u>does</u> read Google's privacy

Expert Rebuttal Report of Leslie John, Ph.D.
4:20-cv-05146-YGR-SVK

disclosures, as courts presume (Opinion 3B). Below, I describe the methodology and evidence for each of these opinions.

    ii.    <u>#3A: Without having read Google's privacy policies, it is reasonable for a consumer to use Chrome in the not-synced state and believe that Chrome will not send her personal information to Google.</u>

31.    I formed this opinion in response to the question: "Are Plaintiffs' allegations of invasion of privacy on Chrome consistent with reasonable consumer expectations?" Therefore, I formed my opinion in part by reviewing the Plaintiffs' declarations and testimony. They expressed that the personal information that Chrome was sending to Google ran counter to their expectations.

    a.    <u>Calhoun</u>: "I feel like my personal data has been taken and sent to places that I did not consent, against my will. It's tantamount to stalking, in my opinion." (Declaration of Patrick Calhoun in Support of Plaintiffs' Motion for Class Certification, para. 7).

    b.    <u>Crespo</u>: "if you are not synced, then my understanding is that my information is not being collected and shared." Crespo Dep. Tr. 72:9-73:4.

- "Never in my head did I think that my information would be collected and sent elsewhere of everything that I do." Crespo Dep. Tr. 125:1-8.

    c.    <u>Henry</u>: "I just feel like it's crazy that you all know[] everything . . . without me knowing." Henry Dep. Tr. 105:8-106:1.

32.    I also considered scholarly work, which, taken together, supports the conclusion that expectation violation is a key element of privacy invasions.[40, 41, 42, 43, 44, 45, 46] Although people

---

[40] Kim, T., Barasz, K. & John, L.K. (2019). Why Am I Seeing this Ad? The Effect of Ad Transparency on Ad Effectiveness, *Journal of Consumer Research*, 45(5), 906-932.

[41] Nissenbaum, H. (2004). Privacy as contextual integrity. *Washington law review*, 79(1), 119.

[42] Nissenbaum, H. (2011). A Contextual Approach to Privacy Online. *Daedalus*, 140(4), 32–48.

[43] Moon, Y. (2000). Intimate Exchanges: Using Computers to Elicit Self-Disclosure From Consumers. *The Journal of consumer research*, *26*(4), 323-339.

[44] Schwarz, N. (1999). Self-reports: How the questions shape the answers. *American psychologist*, *54*(2), 93.

[45] Grice, P. (1975). "Logic and conversation". Cole, P.; Morgan, J. (eds.). In: *Syntax and semantics*. 3: Speech acts. New York: Academic Press. pp. 41–58.

[46] Rao, A., Schaub, F., Sadeh, N., Acquisti, A., & Kang, R. (2016). Expecting the unexpected: Understanding mismatched privacy expectations online. Twelfth Symposium on Usable Privacy and Security ({SOUPS} 2016).

can be aware, in a vague and general sense, that companies collect data on them, they also have a set of expectations around how their personal information "ought" to flow between parties. People "expect the services with which they interact—in this case, Google Chrome—to only collect the information relevant to the given "interaction" with Google. This means that they would not expect Google to share their data with third parties" (p. 4).[47]

33.     This body of research suggests that, for example, when a person is booking an appointment on her doctor's website, she would probably expect the doctor's website to collect information about her. However, she would probably not expect that her device would send to Google her identifiers with the fact that she booked an appointment, or for what and when, or for Google to be "listening in" on that interaction. I understand, based on the Fiddler files and relying upon the expert work of Profs. Shafiq and Smith as well as documents Google has produced, this information is sent to Google (██████████████████████████████████████

████████████████████). For example, one study of Fitbit users indicated that while most users expected Fitbit to collect information on their step counts, heart rate, and stairs climbed[48]—information plausibly central to why people use Fitbits in the first place—most did not expect Fitbit to collect information orthogonal or secondary to its core function, such as their physical location. Similarly, another study found that users' expectations of what information a website

---

[47] Google tries to dismiss Kim et al. (2019)—the study in which we assessed whether people's expectations about how information ought to flow between parties, and their sense of whether those have been violated, are a basis of privacy invasions. Specifically, Google says: "That study is limited to assessing the categories of information consumers believe should be used for personalized advertising, see John Rep. at 3-5, and does not address the question at issue here: whether Chrome users believe that not enabling Chrome's sync feature prevents Google from receiving the data at issue." (Google Motion to Strike, p. 8.) In contrast to Google's assertion, expectations are relevant here because, in the absence of clear disclosures that contradict or "correct" people's expectations, expectations can guide beliefs. (Indeed, Google's expert Professor Tülin Erdem seems to treat beliefs and expectations interchangeably in her report).

[48] Gluck, J., Schaub, F., Friedman, A., Habib, H., Sadeh, N., Cranor, L. F., & Agarwal, Y. (2016). How short is too short? Implications of length and framing on the effectiveness of privacy notices. Twelfth Symposium on Usable Privacy and Security ({SOUPS} 2016).

Expert Rebuttal Report of Leslie John, Ph.D.
4:20-cv-05146-YGR-SVK

collects depends on the core purpose of that site; users "expect only financial websites to collect financial data and health websites to collect health data. A financial website collecting health data would lead to a mismatch in expectations" (p. 84).[49] Accordingly, another study assessed users' consent to having their personal information, including their browsing history, collected for use in behaviorally targeted advertising;[50] more than half of respondents were not willing to permit such data collection—and they were especially unwilling when their information would be shared across websites (i.e., beyond the site on which it was obtained). Similarly, in a nationally representative survey of US internet users, 68% of respondents would "definitely would not allow" companies to track their online behavior, even anonymously, for the purpose of tailored advertising; 19% would "probably not allow" it. Moreover, respondents were particularly disapproving of cross-website tracking.[51]

34.    I concluded the Plaintiffs' testimony to be consistent with this relevant scholarly work. Plaintiffs describe that they do not expect nor do they consent to having their personal information sent to third parties (here, Google) when it is superfluous to the given salient interaction they are having—as my and others' work indicates, this constitutes a privacy invasion. For example, at her deposition, Dr. Wilson described her shock when she saw with her own eyes (via the Fiddler software) what information is sent to Google when she was using Chrome to access her healthcare provider's website. Specifically, she said: "when I search Blue Cross and Blue Shield for a ██████████ I do not expect for that information to be shared. And when I went on –

---

[49] Rao, A., Schaub, F., Sadeh, N., Acquisti, A., & Kang, R. (2016). Expecting the unexpected: Understanding mismatched privacy expectations online. Twelfth Symposium on Usable Privacy and Security ({SOUPS} 2016).

[50] Leon, P., Ur, B., Wang, Y., Sleeper, M., Balebako, R., Shay, R., . . . Cranor, L. (2013). *What Matters to Users? Factors that Affect Users' Willingness to Share Information with Online Advertisers*.

[51] Turow, J., King, J., Hoofnagle, C. J., Bleakley, A., & Hennessy, M. (2009). Americans Reject Tailored Advertising and Three Activities that Enable It. *SSRN Electronic Journal*.

Expert Rebuttal Report of Leslie John, Ph.D.
4:20-cv-05146-YGR-SVK

did the Fiddler test with an IT specialist that information was shared [with Google] through code. That is very private, and as a woman of my age going to the ▮▮▮▮▮▮▮ for the conditions that I was going for, it was shocking." Wilson Dep. Tr. 78:16-23. Similarly, at deposition, Calhoun was asked: "Did you intend to allow Google to use your name and your e-mail address in some way, and if so, how?" He responded: "insofar as they need to keep that name and e-mail address in maybe a database of what they have, the users that they have, yes. But not to use for any other reason, like marketing or anything like that." Calhoun Dep. Tr. 40:22-41:1.

35.    Finally, I also reviewed Google's own research, which was also consistent with my opinions. For example, consistent with the academic literature described above (and again, all of which is cited in **Exhibit B** of my report), Google's own research points to people's discomfort with having their personal information shared for reasons other than their core purpose for interacting with a given website. One study found that the vast majority of respondents indicated that they were "not at all comfortable" with third-party sharing of their personal information between independent companies.[52, 53] The study also assessed respondents' comfort with third-party sharing between companies owned by the same parent company (e.g., comfort with a social networking site sharing their personal information with an online shopping site owned by the same parent company). Although participants expressed greater comfort with such sharing relative to the case of unrelated companies, still, overall, most expressed that they were also "not at all comfortable" with such sharing. Another study co-authored by a Google employee stated that

---

[52] Bilogrevic, I., & Ortlieb, M. (2016). "If You Put All The Pieces Together..." Attitudes Towards Data Combination and Sharing Across Services and Companies. Proceedings of the 2016 CHI Conference on Human Factors in Computing Systems.

[53] These findings are particularly striking given that the response scale may have led participants to *overstate* their comfort. Respondents rated their comfort with a variety of data sharing practices on a scale from 1 to 5, labelled: 1 = "not at all," 2 = "slightly," 3 = "moderately," 4 = "very," and 5 = "extremely comfortable").

"internet users are reluctant to share personal data items if it is not consciously perceived to be necessary to the primary function of the service" (p. 226).[54]

36.    Internal Google documents are also consistent with how Google's receipt of the Plaintiffs' personal information runs counter to expectations. One document answers the question (Bindra Deposition Exhibit 37, at GOOG-CABR-04602308): "Why do we need privacy norms for online advertising?" by explaining: "Users can tell advertisers information about themselves in a few ways. First, they can tell advertisers directly. A user can sign up for a newsletter at their favorite shoe brand's website and thereby give that advertiser their email address. If they make a purchase, they can also tell that same shoe brand their shoe size, their gender, their physical address (for shipping), and their credit card information (to purchase). **There are some implicit norms here - - while shoe store customers expect to receive fliers with sales to their physical address (that they provided for shipping […]), they would be uncomfortable if that shoe store turned around and sold a mailing list of everyone who had bought a basketball** shoe **to the NBA to send direct mail advertising […]**" (emphasis added). Similarly, another document (Bindra Deposition Exhibit 11, at GOOG-CABR-03987413) talks about how ███████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████." As one final example, the notes from an internal presentation state (GOOG-CABR-03610307, at 03610353): "███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[54] Ortlieb, M., & Garner, R. (2016). Sensitivity of personal data items in different online contexts. *it-Information Technology*, *58*(5), 217-228.

Expert Rebuttal Report of Leslie John, Ph.D.
4:20-cv-05146-YGR-SVK

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████.” ██████████████

████████  ████████████████████████████████

████████████████████████████ These documents also implicitly support my Opinion #1—here, Google is making generalizations based on observations, as opposed to by surveying every single user.

37.     I therefore concluded that yes, it is reasonable for a consumer to use Chrome in the not synced state and believe that Chrome will not send her personal information to Google. This is because, as I understand it, the personal data that Chrome sends to Google often spans well beyond collecting the personal information that is necessary for the given function being performed for the user. For example, the prior work I draw on would suggest that while Chrome users are likely to deem it reasonable for the search terms they input onto Google.com to be sent to Google (because, intuitively, Google would need this information in order to perform the function the user is requesting –i.e., return search results based on that term); that same consumer would probably not deem it reasonable ████████████████████████████████ ████████████████████████████, for example.

    iii.    #3B: If a reasonable consumer were to read Google's privacy policies, it is reasonable for her to use Chrome in the not-synced state and believe that Chrome will not send her personal information to Google.

38.     I formed my opinion in part by considering whether Google's disclosures clearly explain, in a way that is readily comprehensible to consumers, what is actually happening with their personal information. I concluded that they do not. Moreover, as I wrote in my report, "there are several express statements in the Chrome Privacy Notice that, assuming that the user reads it,

Expert Rebuttal Report of Leslie John, Ph.D.
4:20-cv-05146-YGR-SVK

could lead reasonable consumers to believe that Google does not collect their personal information if they are not synced" (p. 5). In other words, the disclosures Chrome provides are contradictory at best.

39.    The contradictory statements, by logic alone, support my opinion. However, following the methodology used in my field to answer research questions, I also considered scholarly work on whether consumers understand privacy notices. This work overwhelmingly points to the conclusion that even when consumers are forced to read privacy notices, they typically do <u>not</u> demonstrate widespread accurate understanding of what the notices mean. Examples of the scholarly work I relied upon include:

- In an article entitled "Disagreeable Privacy Policies: Mismatches Between Meaning and Users' Understanding,"[55] participants were shown privacy policies from a sample of the top US commercial websites and quizzed on their understanding of what those policies said. As the authors summarized: "These findings suggest that privacy policies are written ambiguously and in a way that leads both knowledgeable users and crowd workers to misapprehend websites' data practices" (p. 35). Moreover, the study also found that even privacy experts often disagreed on the meaning of the policies.

- In another article,[56] participants were presented with privacy policies of major US companies and quizzed on their comprehension. The authors included both easier-to-read and harder-to-read privacy policies; and tested various different ways of formatting the policies. They found that "participants were not able to reliably understand companies' privacy practices with any of the formats" (p. 1).

- Similarly, in a set of usability studies,[57] participants were presented with privacy policies resembling those of popular e-commerce websites and given a comprehension test on them. In the first study, the average score was 6.83

[55] Reidenberg, J. R., Beaux, T., Cranor, L. F., French, B., Grannis, A., Graves, J. T., . . . Schaub, F. (2015). Disagreeable Privacy Policies: Mismatches Between Meaning and Users' Understanding. Berkeley technology law journal, 30(1), 39-88.

[56] McDonald, A. M., Reeder, R. W., Kelley, P. G., & Cranor, L. F. (2009). A Comparative Study of Online Privacy Policies and Formats. In I. Goldberg & M. J. Atallah, Privacy Enhancing Technologies Berlin, Heidelberg

[57] Kelley, P. G. (2013). Designing Privacy Notices: Supporting User Understanding and Control.

Expert Rebuttal Report of Leslie John, Ph.D.
4:20-cv-05146-YGR-SVK

out of 12 (no better than chance).[58] Moreover, when applying a method to correct for guessing, this average score decreases to 1.66.[59] A second study also suggested that users do not understand privacy policies; on average, participants answered correctly less than half of the time.[60]

- Another study,[61] which sought to improve privacy notice understanding by shortening them (removing practices that people would expect the company to engage in, and only retaining the unexpected ones) found that participants presented with the standard-length privacy policy (i.e., the situation most similar to that of Chrome users being shown the Chrome Privacy Notice) performed poorly; on average, they only correctly answered 9.54 out of 20 questions.[62]

- Moreover, another study found that people tend to overstate their understanding of privacy-relevant concepts. Only about 25% of respondents who claimed understanding of privacy-relevant technology (e.g., cookies, P3P) passed a comprehension test about those technologies (and the authors even note that it was an easy test).[63]

40.    In drawing conclusions from evidence such as that above, I considered the applicability to Chrome's disclosures—I considered whether the conclusions from these studies generalize to the case at hand. I concluded that yes, they do. I based this conclusion on the

---

[58] This study also tested whether an alternative way of formatting privacy policies – in a tabular format – would produce higher comprehension scores. The new format did increase scores, from 6.83 to 10.13. However, here, the relevant score is 6.83 as it represents comprehension of privacy policies as they commonly appear on websites (i.e., without the formatting enhancements). Even still, a score of 10.13 out of 12, when the probability of getting it correct by chance is 50%, is not indicative of solid understanding—when correcting for guessing the score of 10.13 goes down to 8.26 (Diamond & Evans, 1973).

[59] Each question had only two response options; therefore, respondents had a 50% chance of getting each answer correct simply by guessing. When I apply Diamond and Evans (1973) correction for guessing, the average score decreases substantially.

[60] This study also tested whether presenting privacy policies in different formats could improve comprehension. However, these novel formats are highly atypical in the marketplace. Therefore, here, I focus on the accuracy rates for the policies when they are presented naturalistically (i.e., as they appear in the marketplace).

[61] Gluck, J., Schaub, F., Friedman, A., Habib, H., Sadeh, N., Cranor, L. F., & Agarwal, Y. (2016). How short is too short? Implications of length and framing on the effectiveness of privacy notices. Twelfth Symposium on Usable Privacy and Security ({SOUPS} 2016), Grice, P. (1975). "Logic and conversation". Cole, P.; Morgan, J. (eds.). In: *Syntax and semantics*. 3: Speech acts. New York: Academic Press. pp. 41–58.

[62] Responses were scored as follows: +1 for a correct answer, -1 for an incorrect answer, and 0 for an unsure answer.

[63] Jensen, C., Potts, C., & Jensen, C. (2005). Privacy practices of Internet users: Self-reports versus observed behavior. *International Journal of Human-Computer Studies*, *63*(1), 203-227.

following:

    i)    <u>Consistency</u>. There is remarkable consistency across studies—using different samples of participants, different privacy policies, and different ways of measuring comprehension—suggesting that the results are robust to many variations.

    ii)    <u>Similarity</u> to the case at hand. The study participants were typically US internet users, and hence, reasonably similar to the population of interest here; the privacy policies tested were naturalistic—typically the studies used real privacy policies of major US companies. I consider Chrome's disclosures to be reasonably similar to those tested in these studies. It is worth noting however, that Chrome's disclosures are written at a lower reading level relative to many of the privacy policies tested in the work I cite. However, even still, Chrome's disclosures are not easily readable: for example, the Chrome Privacy Notice, according to the Flesch-Kincaid index (a measure of readability), falls into the category of "fairly difficult to read;" it is written at the 10th to 12th grade level—higher than the recommendation that materials be written at an 8th grade level.[64, 65]

Moreover, word length and sentence length (the basis of Flesch-Kincaid scores) are not the only factors contributing to whether people comprehend privacy policies; another is whether the policies are described in plain language. ███████████████████████████████
███████████████████████████████████████████████████████████
████████████████████████████████████." GOOG-CABR-04754292 at 04754301.

The Plaintiffs' testimony also speaks to this point; for example, as Dr. Kindler explained when asked to read an excerpt from the Google Privacy Policy at her deposition: "Okay. I'm going to read a paragraph that I'm going to say I don't really understand this. 'Google uses the information shared by sites and apps to deliver our services, maintain and improve them, develop new services, measure the effectiveness of advertising, protect against fraud and abuse, and personalize content and ads you see on Google and on our partners' sites and apps.'  I really have no idea what that means. So those are all words that I understand the meaning of, but when they're all linked together like that, I have no idea what is really happening there." (Dep. Tr. 190:4-17.) Also note that Dr. Kindler has far more than a 12th grade education (a Doctor of Chiropractic). Similarly, with respect to whether privacy policies are clear, Crespo testified: The terms should be "more clear and easier to

---

[64] https://goodcalculators.com/flesch-kincaid-calculator/

[65] My Byline Media. The Flesch reading ease readability formula. http://www.readabilityformulas.com/flesch-reading-ease-readability-formula.php

Expert Rebuttal Report of Leslie John, Ph.D.
4:20-cv-05146-YGR-SVK

understand." Crespo Dep. Tr. 123:13-25.

iii)   <u>Whether these prior studies are conservative or liberal estimates of understanding</u>. I concluded that these studies are generally liberal estimates—they are more likely to overstate understanding than to understate it. This is because they present respondents with fairly easy comprehension tests: the tests were essentially "open-book" tests (the policies were readily visible to participants as they answered); the questions used the same words as shown in the policies (as opposed to synonyms that require participants to understand the words—the authors McDonald et al. (2009) themselves note that this made their test easier). Put differently, if respondents had scored high on these tests, I would not necessarily conclude users to be grasping what these privacy policies actually mean. To do so, I would want to see how they perform on more difficult tests—for example, by testing whether, in the course of day-to-day routine interactions on the website, they understand what information flows and to which parties.

41.     As a result, the logical conclusion of the abundant research described above is: if users were to read these disclosures, there would not be a single "shared reality" as to what these disclosures mean.  Chrome's sharing of personal information with Google is inconsistent with reasonable expectations.

42.     The existence of the WAA, NAC and "Consent Bump" do not change my opinions. They do not clearly express what Chrome is sending to Google when they are not synced.

### (4)   Opinion #4:  The plaintiffs' experiences mentioned in their depositions are typical of reasonable consumers.

43.     This assignment question asked me to make a judgment call—a judgment call that my experience in this field qualify me to make. In my thorough reading of the Plaintiffs' declarations and depositions, their experiences were, in my expert opinion, very much consistent with the portrait of human privacy decision-making that I have spent the past 15 years documenting. In my report, I gave specific examples of how their statements are typical of the reasonable consumer; in this new report, I have provided additional examples. I note that, as is typical, the Plaintiffs care about their privacy; and, as is typical, they did not all read the Google

Privacy Policy or Chrome Privacy Notice. In their critique of this opinion, Google seems to be attempting to call into question the very-well established finding that people, by and large, do not read privacy policies. Specifically, Google notes that "Google's Privacy Policy has been reviewed hundreds of millions of times by US-based users" (Google's Motion to Strike, p. 10)—as if this indicates that people do read privacy policies (it does not—for starters, Google does not define what "reviewed" means—does scrolling through and clicking "agree" mean "reviewed?" Notably, Google stopped short of saying that people "read" the policy, just as it stopped short of saying people "understand" the policy). Again, like many of their claims, not only is it inaccurate, but it also does not invalidate my opinion.

44.    Curiously, none of Google's experts read all of the Plaintiff depositions, which are in-depth studies under adversarial questioning for hours.  They are rich qualitative data that a scholar in my field would find informative and pertinent to the questions posed.

## III.    PROFESSOR ERDEM'S REPORT

### A.  The Consumer Expectations Survey

   i.    <u>The methodologies that Professor Erdem uses, including the questions she asks and how she asks them, lead consumers to "agree."</u>

45.    In six focal questions, respondents are asked how strongly they agree or disagree that Google receives each of six types of personal information. Professor Erdem concludes from the agreement rates she observes, that respondents therefore actually understand that Google receives this information. This conclusion is unwarranted.

46.    First, the brand name "Google" is featured very prominently in the survey, and is frequently paired alongside Chrome, encouraging respondents to equate, and potentially conflate,

Expert Rebuttal Report of Leslie John, Ph.D.
4:20-cv-05146-YGR-SVK

the two.[66] For example, one of the first screens of the survey says: "You have been selected to answer questions about <u>Chrome</u>, which is a browser from a company named <u>Google</u>" (Professor Erdem report, Appendix N.1-9). Such conflation is problematic because it could artifactually produce "agreement"—the focal questions technically ask about Google, but given the prominent pairing of Google alongside Chrome, respondents may be effectively answering the question of whether <u>Chrome</u> collects the given information.

47.     Moreover, the screen shot on which respondents are shown their sync status (i.e., whether they are to imagine they are synced or not) appears alongside the Google home page (Professor Erdem report, Appendix N.1-11, and then again on the pages on which the questions appear), reinforcing the association between Chrome and Google. Professor Erdem could have selected <u>any</u> website to display; had any site other than Google been featured, Professor Erdem may well have gotten very different results. For example, if the sync status had been juxtaposed on top of the Wall Street Journal home page, it is plausible that respondents would have been much less likely to agree that Google receives their personal information. This is because, from the user perspective, the interaction is between themselves, Chrome, and the Wall Street journal; Google is an irrelevant third party here, and therefore, users would not expect Google to be "listening in."

48.     Second, the agreement levels that Professor Erdem observes could be a product of acquiescence bias alone. This bias refers to "the tendency to endorse any assertion made in a question, regardless of its content" (p. 552).[67] Professor Erdem could have controlled for this bias by including negatively-framed questions (e.g. "How strongly do you agree or disagree that

---

[66] Google researchers themselves have avoided invoking specific brand names (as opposed to generic ones) in their surveys (Bilogrevic & Ortlieb, 2016). Scholars often use generic brand names, or experimentally manipulate brand names (and seeing what consistent results emerge across brands).

[67] Krosnick, J. A. (1999). Survey research. *Annual review of psychology*, *50*(1), 537-567

Expert Rebuttal Report of Leslie John, Ph.D.
4:20-cv-05146-YGR-SVK

Google does <u>NOT</u> receive your [data type] while browsing the internet?"), but she did not.[68] She could have also inquired about information that Google does not actually receive.

49.    Third, by potentially selecting for tech-savvy respondents, Professor Erdem's recruitment method may inflate agreement. The survey was advertised as follows to prospective participants:[69]



50.    This recruitment message is notable in that the *only* thing potential respondents are told about the survey topic is that it is about "technology." As a result, the survey could be attracting people who have an interest in, and therefore, are more likely relative to the general

---

[68] Kuru, O., & Pasek, J. (2016). Improving social media measurement in surveys: Avoiding acquiescence bias in Facebook research. *Computers in Human Behavior*, *57*, 82-92

[69] Note: I am assuming that this is an accurate replica of what prospective participants actually saw; (Professor Erdem's report notes that an actual screen shot of what participants saw was "unavailable" "due to system limitations at the survey provider" (Professor Erdem report, Appendix M.1, footnote 1).

Expert Rebuttal Report of Leslie John, Ph.D.
4:20-cv-05146-YGR-SVK

population of US Chrome users to be tech-savvy.

    ii.   <u>The survey does not test respondents' actual knowledge or
understanding.</u>

51.    The survey asks respondents for their *opinion*—i.e., to indicate their agreement versus disagreement; this is not a measure of understanding. To measure understanding, the survey would have had to have tested participants on their <u>knowledge</u>—via, for example, quiz questions on Google's practices—as is common practice in this field.[70] And, for high scores on such a test to be convincing—i.e., indicative of true understanding—the test would need to be sufficiently difficult. The question wording and response format would also need to be such that it would be hard for respondents to get the questions correct simply by guessing. Here for example, if respondents had been asked to describe in their own words what data are and are not collected and shared, I suspect the results would have been much different. Indeed, in such a survey, only 17% correctly indicated that they had shared their IP address, and only 14% correctly indicated that they had shared their browsing history.[71]

52.    Relatedly, Professor Erdem's surveys ask respondents whether they can correctly identify whether Google receives their IP address, cookies through other means, including not even using Chrome, , and so does not assess whether they understand what information *Chrome* sends to Google when users are not synced. The six pieces of information that Professor Erdem asks about do not encompass, nor do they convey in a way that is readily comprehensible, the scope of what Chrome sends to Google. I suspect you would get very different results if the survey had asked users (amid distractor questions) whether, by using Chrome when not synced, they are

---

[70] Reidenberg, J. R., Breaux, T., Cranor, L. F., French, B., Grannis, A., Graves, J. T., ... & Ramanath, R. (2015). Disagreeable privacy policies: Mismatches between meaning and users' understanding. *Berkeley Tech. LJ*, *30*, 39.

[71] Morey, T., Forbath, T., & Schoop, A. (2015). Customer Data: Designing for Trust, *Harvard Business Review*.

Expert Rebuttal Report of Leslie John, Ph.D.
4:20-cv-05146-YGR-SVK

consenting to allow Chrome to send keystrokes and web addresses from their devices to Google's servers, for example:



   iii.   <u>Professor Erdem overstates agreement.</u>

    53.    The above issues, on their own, render the survey uninformative. But Professor Erdem also overclaims from her results.

//

//

//

//

//

Expert Rebuttal Report of Leslie John, Ph.D.
4:20-cv-05146-YGR-SVK

54.     First, the conclusion that respondents actually agreed is a rhetorical overstatement. Professor Erdem calculates the average agreement on the 1 to 5 scale for each of six pieces of information (separately for each of her four experimental groups):

### Exhibit 2. Chrome Users' Average Expectation of Google Receiving At-Issue and Other Data While Browsing the Internet

"<u>Based on the sync settings [and documents] you just viewed</u>, how strongly do you agree or disagree that Google receives your [data type] while browsing the internet?" (1 = "Strongly disagree" 5 = "Strongly agree")

| | Group A Sync Off No Policies (n = 250) | Group B Sync On No Policies (n = 250) | Group C Sync Off All Policies (n = 252) | Group D Sync On All Policies (n = 252) |
|---|---|---|---|---|
| IP Address | 4.04 | 3.99 | 4.00 | 4.02 |
| Referrer URLs | 3.86 | 3.95 | 3.89 | 3.89 |
| Cookies | 3.97 | 4.03 | 4.08 | 4.00 |
| Name | 3.97 | 3.94 | 3.90 | 3.67 |
| Passwords and Login Information for Websites | 3.67 | 3.85 | 3.76 | 3.64 |
| Payment Information | 3.48 | 3.49 | 3.46 | 3.40 |

Source: Appendix O.1.

Professor Erdem report, p. 20.

55.     Most (75%, i.e., 18 out of 24) of these averages fall between "3," which corresponds to "neither agree nor disagree" and "4," which corresponds to "agree." In other words, the average response does not even reach the "agree" threshold. Thus, these data, even when taken at face value, do not warrant the conclusion that "it is clear that the average respondent believes and understands that Google receives" the at-issue data (Professor Erdem report, p. 18, paragraph 36).

//

//

56.     Second, the calculation of "agreement" is flawed. The averages that Professor Erdem reports are inflated. She inappropriately omits respondents who explicitly indicate that they do not understand—i.e., participants who checked the "Don't Know / Unsure" box:



Professor Erdem report, Appendix N.1-18

When I re-analyzed Professor Erdem's data to include these respondents, agreement is lower. I did this for both of Professor Erdem's analyses: 1) the average response on the 1-5 response scale; and 2) the percent of respondents who give either a 4 (i.e., "agree") or 5 (i.e., "strongly agree") response. In the tables below, the first column is the result Professor Erdem reports; the second column is the corrected result.

//

//

//

//

//

Expert Rebuttal Report of Leslie John, Ph.D.
4:20-cv-05146-YGR-SVK

Approach #1: average responses, from 1 (strongly disagree) to 5 (strongly agree)

| Data type | Excluding "Don't know / Unsure" (Professor Erdem's approach) | Including "Don't know / Unsure"[72] |
|---|---|---|
| IP address | 4.04 | 3.93 |
| Referrer URL | 3.86 | 3.70 |
| Cookies | 3.97 | 3.85 |
| Name | 3.97 | 3.87 |
| Passwords and login | 3.67 | 3.58 |
| Payment info | 3.48 | 3.39 |

Table above: average responses in Group A[73] to the question: "[b]ased on the sync settings [and documents] you just viewed, how strongly do you agree or disagree that Google receives your [data type] while browsing the internet?" Note: response scale is 1 = strongly disagree; 2 = disagree; 3 = neither agree nor disagree; 4 = agree; 5 = strongly agree.

Approach #2: % of respondents who gave either a 4 (agree) or 5 (strongly agree)

| Data type | Excluding "Don't know / Unsure" (Professor Erdem's approach) | Including "Don't know / Unsure"[74] |
|---|---|---|
| IP address | 76% | 68% |
| Referrer URL | 69% | 57% |
| Cookies | 75% | 66% |
| Name | 75% | 67% |
| Passwords and login | 63% | 54% |
| Payment info | 55% | 44% |

Table above: % of respondents in Group A[75] who respond "agree" or "strongly agree" to the question: "[b]ased on the sync settings [and documents] you just viewed, how strongly do you agree or disagree that Google receives your [data type] while browsing the internet?" Note: response scale is 1 = strongly disagree; 2 = disagree; 3 = neither agree nor disagree; 4 = agree; 5 = strongly agree.

---

[72] I internalized the "Don't know / Unsure" responses into the data set by imputing a value of 3 – i.e., any respondent who checked off the "Don't know / Unsure" response option was, for this correction, counted as having responded neutrally to the question – i.e., a 3 "neither agree nor disagree."

[73] Note that I focus on Group A—this was the focal group in Professor Erdem's survey. However, results are comparable with the other groups (not surprisingly, as the results Professor Erdem reported were statistically equivalent).

[74] I internalized the "Don't know / Unsure" responses into the data set simply by including them in the denominator – i.e., by counting them as not having responded with either a 4 or a 5.

[75] Note that I focus on Group A—this was the focal group in Professor Erdem's survey. However, results are comparable with the other groups (not surprisingly, as the results Professor Erdem reported were statistically equivalent).

Expert Rebuttal Report of Leslie John, Ph.D.
4:20-cv-05146-YGR-SVK

57.     Moreover, the corrected percentages may still overstate agreement because people may be embarrassed to admit lack of understanding; some people who do not actually understand probably answered the question (and, given acquiescence bias, likely answered neutrally or with mild agreement).

iv.     The survey is not a fair test of whether sync status matters.

58.     A question at-issue is whether Chrome users understand what personal information Chrome sends to Google differs as a function of sync status. Professor Erdem finds no difference in agreement rates as a function of whether respondents are assigned to imagine they are versus are not synced. She therefore concludes that Chrome users, *including those who are not synced,* understand what Google is possesses, without asking about what Chrome sends to Google. This conclusion is unwarranted.  Professor Erdem does not ask about any of the promises at issue in this case, which I identified in my opening report, including that the information Chrome stores will not be sent to Google unless users enable sync.  Opening Report at p. 5.  She does not ask whether users understand whether the specific personal information at issue in this case will be sent from users' devices (where users have some sense of control over it) to Google's servers (where they may lose control of it).

//

//

//

//

//

Expert Rebuttal Report of Leslie John, Ph.D.
4:20-cv-05146-YGR-SVK

59.     First, the survey design is such that it is implausible that respondents internalized the sync status to which they had been assigned. Professor Erdem did not show the key screens that describe sync, and which falsely imply that if you do not sync (i.e., click "Cancel"), Google will not receive your data:



Source: Shafiq report, Exhibit C.[76]

---

[76] These screens vary slightly over the class period; however, they commonly imply that when you are not synced, Google will not collect your data (i.e., personalize ads).

Expert Rebuttal Report of Leslie John, Ph.D.
4:20-cv-05146-YGR-SVK

60.    Instead, Professor Erdem asked people to imagine sync status by showing them one of two screen shots (these screens are blurry and it is impossible to know, based on what we were given to review, if what respondents saw was clearer):



Professor Erdem report, Appendix K.1-1

Expert Rebuttal Report of Leslie John, Ph.D.
4:20-cv-05146-YGR-SVK

61.     But displaying the relevant screens is just "table stakes." Professor Erdem would also have had to have shown that respondents in the sync group actually realized and understood that they were synced. She offers no proof of such understanding. Such proof would be one of several conditions necessary to conclude the lack of a difference (i.e., a "null effect") to be meaningful.[77, 78] Without such proof, the lack of a difference here is probably just because respondents did not notice or understand what sync status meant.

<div style="text-align:center">v.     <u>The survey is not a fair test of whether the PP/CPN is misleading.</u></div>

62.     There is text in the CPN and PP that explicitly says that Chrome will not send personal information, including browsing history information and cookies, to Google when you are synced—despite the fact that, as I understand it, Chrome actually does send this information to Google, regardless of sync status. For example, the CPN says: "The personal information that Chrome stores won't be sent to Google unless you choose to store that data in your Google Account by turning on sync."  Professor Erdem concludes that because agreement rates do not differ as a function of presentation of the PP, CPN and WAA help screen, that the text is therefore not misleading. This conclusion is unwarranted.

//

//

//

63.    First, the survey design is such that it is highly implausible that respondents who were shown these notices actually read them, let alone read the key misleading text. These notices were presented in a small box; only the top portion of the notice was visible; respondents had to use the small scroller on the right to see the whole notice:



Professor Erdem report, Appendix N.1-12

---

[77] Oppenheimer, D. M., Meyvis, T., & Davidenko, N. (2009). Instructional manipulation checks: Detecting satisficing to increase statistical power. *Journal of Experimental Social Psychology, 45*(4), 867-872.

[78] Harms, C., & Lakens, D. (2018). Making 'null effects' informative: statistical techniques and inferential frameworks. *Journal of Clinical and Translational Research, 3*(Suppl 2), 382. For an example of steps taken to conclude a lack of a difference (i.e.., "null effect") to be informative, see John, L.K., Emrich, O., Gupta, S. & Norton, M.I. (2017).  Does "Liking" Lead to Loving? The Impact of Joining a Brand's Social Network on Marketing Outcomes, Journal of Marketing Research, 54(1), 144-155. p. 146, "Analytical Approach."

Expert Rebuttal Report of Leslie John, Ph.D.
4:20-cv-05146-YGR-SVK

It is unlikely that participants read these, even if they were required to scroll down to advance. In fact, respondents were *discouraged* from reading the notices: a 15-30 second countdown appeared, informing respondents that the "The "Continue" button will appear after X seconds." Then, the PP and CPN were presented *again,* this time with portions highlighted. Although some misleading text was highlighted, additional, extraneous text, was also highlighted. And, some misleading text was *de*-emphasized.[79] And, in addition to not uniquely drawing attention to the key misleading text, the re-presentation of these screens is a strange survey flow; respondents may have wondered why they were being shown the same information again, making them even less likely to pay attention to it. Finally, the presentation of the WAA screen is extraneous; as I understand it, it is not part of the user contract (and, Professor Erdem presented only the help screen, at that).

64. Second, Professor Erdem would also have had to have shown that respondents shown the PP/CPN actually noticed the key information. Again, she offers no proof of such understanding. For example, she does not tell us how long respondents spent on these pages. The lack of a difference between groups is simply indicative of how people do not read privacy notices.

      vi.   <u>Other arguments that Professor Erdem uses to support her claim VI. "Chrome users understand that Google receives their at issue data including IP address, referrer URL, and cookies" are also flawed.</u>

65. First, she cites the high percent of users who have effectively "enabled" WAA and Ads personalization. She does not address whether these were set by default. Moreover, this says

---

[79] Specifically, in the PP, the final bullet point under "The activity information we collect may include:" says: "Chrome browsing history you've <u>synced with your Google account</u>." [Professor Erdem report, Appendix D.2] In the actual PP, when a user clicks on the underlined portion, the following text pops up: "synced with your Google Account Your Chrome browsing history is only saved to your account if you've enabled Chrome synchronization with your Google Account. <u>Learn more</u>"—this text misleadingly implies that if you are not synced, then Google will not receive your information. However, in Professor Erdem's presentation, the hyperlinks were disabled. As a result, she placed this text at the end of the PP, where it was much less conspicuous relative to how users would have actually experienced it.

nothing of whether users expect the personal information at issue to be collected and shared. Rather, if the default settings are to have WAA enabled and Ads personalized, then these high percentages could simply be a reflection of the power of defaults—users by and large stick to the default option. Second, she inaccurately claims the expectations survey to be consistent with academic literature. For example, she inappropriately concludes, based on polls suggesting that people are aware, in the *general sense*, that companies can track them online, that this means therefore means users understand and expect Chrome to be sending data to Google. At the same time, she does not rely on a wealth of evidence, which I cited in my report, on how the information Google receives well exceeds people's expectations. Finally, Professor Erdem also cites academic work showing that people do sometimes take privacy-protective measures. This is true, but again, it does not speak to what is at issue here: whether users expect and understand Chrome sends, what Google derives from it, and how Google uses it well exceeds people's reasonable expectations.

## B.     Materiality Survey

### i.     The survey is irrelevant to this case.

66.     The goal of this survey is to test whether adding "clarifying" language to the CPN affects respondents' self-reported likelihood of continuing to use Chrome. This case is not about whether reading Google's disclosures encourages users to continue using Chrome. Moreover, the survey makes no distinction between synced versus not synced—which <u>is</u> the core question in this case.

### ii.     The survey is not a fair test of whether users would continue to use Chrome even if disclosures were changed to address Plaintiffs' concerns.

67.     Professor Erdem finds that the modified text had no effect on respondents' self-reported likelihood of continuing to use Chrome, and therefore concludes that users would

continue to use Chrome even if the disclosures were changed to address their concerns. This conclusion is unwarranted.

68.     First, the survey presumes that the "clarifying text" actually addresses the Plaintiffs' concerns. Professor Erdem offers no evidence that it actually addresses their concerns.

69.     Second, as in the expectations survey, Professor Erdem draws unwarranted conclusions from a lack of a difference between experimental groups; she inappropriately concludes it to mean that users would continue to use Chrome even if "clarifying text" was added. Instead, there is no difference probably because respondents simply did not notice or understand the "clarifying text." This is likely given that a) people do not typically read privacy notices, and b) the "clarifying language" was inconspicuous. We cannot be sure whether respondents read the "clarifying language:" it was embedded within the Chrome Privacy Notice, which itself appeared in a small window (as in the "expectations survey;" see screen shot above); respondents had to scroll down to see the "clarifying language."

70.     Fourth, the survey forces respondents to engage in a hypothetical—how they would behave if—people are often not very good at predicting their behavior, especially when given hypotheticals divorced from reality, as in this survey.

                    iii.     Professor Erdem overstates results.

71.     The above issues, on their own, render the survey uninformative. But Professor Erdem also overclaims from her results. The conclusion that "the average respondent is **extremely likely** to continue using Chrome after being presented with the CPN and PP" (Professor Erdem report, paragraph 21b, emphasis added) is not even true if you take her results at face value. The key question asked respondents: "How likely or unlikely are you to continue using Google Chrome?"; respondents answered on a scale labelled: 1=extremely unlikely; 2=unlikely; 3=neither

likely nor unlikely; 4=likely; 5=extremely likely. (As in the "expectations survey," respondents could alternatively check a box labelled "Don't Know/Unsure.") Professor Erdem reports an average response of 4.19 in Group A and 4.17 in Group B—i.e., closer to "likely" than "extremely likely."

72.     Again, as with the "expectations survey," Professor Erdem inappropriately excludes any respondent that answers "Don't Know/Unsure." When I add these people in, counting them as neutral (3), the averages are 4.13 in Group A and 4.09 in Group B.  Finally, and also as in the "expectations survey," the corrected averages may still overstate agreement because of an apprehension to admit that one does not understand; and acquiescence bias could have also artifactually increased the averages.

> iv.     Other arguments that Professor Erdem uses to support her claim VII.
> "users value Chrome and would continue to use it even if certain
> disclosures were changed to address Plaintiffs' alleged concerns" are
> also flawed.

73.     First, as I explained in my report, the mere fact that people continue to use Chrome despite greater public discussion over privacy in general does not necessarily mean that they do not care about their privacy, or that they approve of Chrome sending the personal information to Google that is at issue here when they are not synced. Relatedly, Professor Erdem points to research showing that people often readily give up their personal information in exchange for small or trivial rewards. The conclusion of this research is not, as Professor Erdem implies, that people have concluded that the "benefit" of giving up their information outweighs the costs (and therefore, that people do not value their personal information or privacy). Rather, these cited papers are illustrations of the privacy paradox—how people's genuine concern for their privacy is not always reflected in their behavior (and there are lots of reasons for this, which I and others have written about extensively). Relatedly, the fact that one of the Plaintiffs continued to use Chrome despite a

certain knowledge that Google was using her personal information for targeted advertising does not mean that she approves of this practice. Similarly, Professor Erdem misinterprets the research she cites on context-dependence, including some of my own. In contrast to her characterization, the conclusion is that consumers are vulnerable to being unduly manipulated into giving up their personal information—*in spite of their privacy concerns*—by entities (firms) that have enormous financial incentive to obtain it.

### C.    Scenario Survey

#### i.    The survey addresses a question that is irrelevant to the case.

74.    The survey attempts to assess whether, when shown the new account creation agreement and consent bump agreement, users understand that Google is receiving the at-issue information, without clarifying its source or even the correct personal information that is discussed in this case. However, the survey inaccurately labels these documents as the "terms of service." In fact, the Google Terms of Service are a separate document that is subordinate to the Chrome Privacy Notice.  Further, the documents Professor Erdem shows users are not agreements at all in a true sense – I understand that they are not part of the contract between Google and users, and therefore are not relevant to the case. Furthermore, the survey does not ask about the key information at the heart of the case:  whether Chrome sends users' personal information, including browsing history, from their devices to Google even when they have not enabled, or have disabled, sync.  Instead, this survey inquires about "activity from sites and apps that partner with Google." This language does not appear anywhere in the Chrome Privacy Notice.  It also does not appear in the Google Privacy Policy.  The reason this is important is that Google Privacy Policy provisions explaining that Google may collect activity on third party sites and apps says right above it "Your Chrome browsing history is only saved to your account if you've enabled Chrome synchronization

Expert Rebuttal Report of Leslie John, Ph.D.
4:20-cv-05146-YGR-SVK

with your account."  Instead of showing respondents this language, Professor Erdem selected a provision from the emails that Google purportedly sends to users and tells users that these are the "terms of service."  This selective presentation of information is misleading and is not an earnest representation of the relevant facts they would need to decide.

ii.   The survey does not assess understanding and is heavily biased in favor of the results Google would want.

75.      The survey does not assess understanding; it does not follow survey design principles that prior scholars have used in order to assess understanding, which I described in my critique of the "expectations survey." Moreover, the "comprehension" question is extremely heavy-handed; it is presented directly below the scenario, which saliently features the phrase "Sofia recently agreed to terms of service related to saving her web and app activity." Then, respondents are immediately shown a question that uses very similar wording—i.e., whether Google receives "Sofia's activity from sites and apps that partner with Google." Essentially this amounts to a simple, and easy, recognition test—i.e., whether people recognize that the text in the scenario resembles the text in the question (see screen shot below of the screen respondents saw). Accordingly, there is little variance in responses; as Professor Erdem notes, "Close to 90 percent of respondents answered with a value of 4 or 5" (Professor Erdem report, p. 37).[80] Also as in the "expectations survey," the scenario survey tightly associates Google with Chrome, which very plausibly biases respondents to indicate "agreement" with the focal questions.

iii.   Professor Erdem overstates the results.

76.      Again, as with the "expectations survey" and "materiality survey," Professor Erdem overstates the results. She inappropriately omits respondents who endorse the "Don't know /

---

[80] Professor Erdem takes this as evidence in support of her contention that users understand that Google collects their information; I take it as indicative that the question presupposes its answer.

Unsure" response option; when I correct for this, the results are less supportive of Professor Erdem's conclusions.[81] Among respondents shown the "new account creation" agreement, the average responses decrease from 4.48 to 4.32 for question 1 (which inquires about "Sophia" or "Victor") and from 4.38 to 4.24 for question 2 (which asked respondents to predict others' responses). For the "consent bump," the average responses decrease from 4.44 to 4.32 for question 1 and 4.32 to 4.18 for question 2, respectively. Finally, response acquiescence bias could also further bias the results in Google's favor here as well.

### D.    Flaws Common to All Three Surveys

77.    Finally, there are several other problematic elements, common to all of Professor Erdem's surveys, casting further doubt on the credibility of the findings.

#### i.    The studies were not pre-registered.

78.    It is becoming standard in my field to, prior to any data collection, post a time stamped, unalterable record of key aspects of the study (including what measures will be collected, exclusion criteria, the primary outcome measure). Doing so prevents researchers from cherry-picking from their data—i.e., from selectively presenting only the analyses and outcome measures

---

[81] I internalized the "Don't know / Unsure" responses into the data set by imputing a value of 3 – i.e., any respondent who checked the "Don't know / Unsure" response option was, for this correction, counted as having responded neutrally to the question – i.e., a 3.

Expert Rebuttal Report of Leslie John, Ph.D.
4:20-cv-05146-YGR-SVK

that are most supportive of their findings.[82, 83, 84, 85, 86] Pre-registration is particularly important when, as is presumably the case here, the researcher has a strong interest in "finding" a certain result.  The failure to pre-register undermines the credibility of the work.

ii.    Inadequate pre-testing.

79.    Professor Erdem did not pre-test critical aspects of her stimuli on which her conclusions are premised. For example, in the "expectations survey," she did not pre-test her provision of privacy notices—i.e., whether the mode of presentation actually lead respondents to read and process the key information. Similarly, in the "scenario survey," she did not pre-test whether respondents read the agreements they were presented with. In the "materiality survey," she did not pre-test whether her "clarifying text" was, in fact, clear.

iii.    Respondents were not asked whether they sync.

80.    Professor Erdem did not ask and control for whether respondents, in their daily use of Chrome, typically sync. This would be important as respondents may be answering the questions by simply drawing on their own daily experiences. Respondents' own sync experiences could also bias the results toward greater awareness of Google's practices and perhaps bias toward allowing data collection.

---

[82] John, L. K., Loewenstein, G., & Prelec, D. (2012). Measuring the prevalence of questionable research practices with incentives for truth telling. *Psychological science*, *23*(5), 524-532.

[83] Simmons, J. P., Nelson, L. D., & Simonsohn, U. (2011). False-positive psychology: Undisclosed flexibility in data collection and analysis allows presenting anything as significant. *Psychological science*, *22*(11), 1359-1366.

[84] LeBel, E. P., & John, L. K. (2017). Toward transparent reporting of psychological science. *Psychological science under scrutiny: Recent challenges and proposed solutions*, 73-84.

[85] Van't Veer, A. E., & Giner-Sorolla, R. (2016). Pre-registration in social psychology—A discussion and suggested template. *Journal of experimental social psychology*, *67*, 2-12.

[86] Wagenmakers, E. J., Wetzels, R., Borsboom, D., van der Maas, H. L., & Kievit, R. A. (2012). An agenda for purely confirmatory research. *Perspectives on Psychological Science*, *7*(6), 632-638.

Expert Rebuttal Report of Leslie John, Ph.D.
4:20-cv-05146-YGR-SVK

<div style="text-align: center">iv.   <u>An unusually high number of respondents were terminated or excluded from analysis.</u></div>

81.    Of the people who started each survey, the percent who completed it and were included in the data analysis was, for each study: about 35% in the "expectations survey;" about 29% in the "materiality survey;" and about 34% in the "scenario survey" (Professor Erdem report, Appendix I, Tables I.3.A, I.3.B, and I.3.C). Although some termination and exclusion decisions seem defensible, others may be less defensible. Moreover, these high screen-out rates are particularly worrisome given that the exclusion criteria were not pre-registered.

## IV.    CONCLUSION

82.    As I explain in this report, I formed the four opinions in my report dated October 13, 2021 by relying on methodology accepted in my field. My opinions are overwhelmingly supported by significant bodies of research already conducted, as well as the Plaintiffs' testimony and Google's own research and internal documents. I also evaluated the work and opinions of Professor Tülin Erdem and conclude them to have serious rhetorical, logical, and methodological flaws.

<div style="text-align: center">***</div>

Dated: February 15, 2022

<div style="text-align: center">Leslie K. John<br>Managing Partner, Behavioral Science Consulting LLC</div>

# EXHIBIT A
## to John Rebuttal Report

<u>MATERIALS RELIED UPON</u>

## Academic Articles

Acquisti, A., & Grossklags, J. (2005). Privacy and rationality in individual decision making. *IEEE security & privacy*, *3*(1), 26-33.

Acquisti, A., Brandimarte, L., & Loewenstein, a. G. (2015). Privacy and human behavior in the age of information. *Science*, *347*(6221), 509-514.

Acquisti, A., Brandimarte, L., & Loewenstein, G. (2020). Secrets and Likes: The Drive for Privacy and the Difficulty of Achieving It in the Digital Age. *Journal of consumer psychology*, *30*(4), 736-758.

Acquisti, A., John, L.K. & Loewenstein, G. (2013). What is Privacy Worth? *Journal of Legal Studies*, 42(2), 249-274.

Athey, S., Catalini, C., & Tucker, C. (2017). *The digital privacy paradox: Small money, small costs, small talk*.

Auxier, B.; Rainie, L., Anderson, M.; Perrin, A. & M. a. E. T. Kumar (2019). Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information. Pew Research Center.

Beresford, A. R., Kübler, D., & Preibusch, S. (2012). Unwillingness to pay for privacy: A field experiment. *Economics letters*, *117*(1), 25-27.

Bilogrevic, I., & Ortlieb, M. (2016). "If You Put All The Pieces Together..." Attitudes Towards Data Combination and Sharing Across Services and Companies. Proceedings of the 2016 CHI Conference on Human Factors in Computing Systems.

Diamond, J., & Evans, W. (1973). The correction for guessing. *Review of educational research*, *43*(2), 181-191.

Erdem, Tülin, Joffre Swait, Susan Broniarczyk, Dipankar Chakravarti, Jean-Noel Kapferer, Michael Keane, John Roberts, Jan-Benedict Steenkamp and Florian Zettelmeyer (1999), "Brand Equity, Consumer Learning and Choice," *Marketing Letters,* 10 (3) 301-318.

Gluck, J., Schaub, F., Friedman, A., Habib, H., Sadeh, N., Cranor, L. F., & Agarwal, Y. (2016). How short is too short? Implications of length and framing on the effectiveness of privacy notices. Twelfth Symposium on Usable Privacy and Security ({SOUPS} 2016),

Grice, P. (1975). "Logic and conversation". Cole, P.; Morgan, J. (eds.). In: *Syntax and semantics*. 3: Speech acts. New York: Academic Press. pp. 41–58.

Harms, C., & Lakens, D. (2018). Making 'null effects' informative: statistical techniques and inferential frameworks. *Journal of Clinical and Translational Research*, *3*(Suppl 2), 382.

Jensen, C., Potts, C., & Jensen, C. (2005). Privacy practices of Internet users: Self-reports versus observed behavior. *International Journal of Human-Computer Studies*, *63*(1), 203-227.

John, L. K. (2015). The Consumer Psychology of Online Privacy: Insights and Opportunities from Behavioral Decision Theory. M. I. Norton & D. D. R. a. C. L. Rucker (Eds.), *The Cambridge Handbook of Consumer Psychology*. Cambridge University Press.

John, L. K. (2018). Uninformed Consent, *Harvard Business Review*, Lead Article in "The Surveillance Economy," The Big Idea Series.

John, L. K., Loewenstein, G., & Prelec, D. (2012). Measuring the prevalence of questionable research practices with incentives for truth telling. *Psychological science*, *23*(5), 524-532.

John, L. K., Slepian, M. L., & Tamir, D. (2020). Editorial overview: Tales of two motives: disclosure and concealment. *Current Opinion in Psychology*, *31*, iv-vii.

John, L.K., Emrich, O., Gupta, S. & Norton, M.I. (2017).  Does "Liking" Lead to Loving? The Impact of Joining a Brand's Social Network on Marketing Outcomes, Journal of Marketing Research, 54(1), 144-155.

## MATERIALS RELIED UPON

Kelley, P. G. (2013). Designing Privacy Notices: Supporting User Understanding and Control. (Doctoral dissertation, Carnegie Mellon University).

Kim, T., Barasz, K. & John, L.K. (2019). Why Am I Seeing this Ad? The Effect of Ad Transparency on Ad Effectiveness, *Journal of Consumer Research*, 45(5), 906-932.

Kim, T., Barasz, K., John, L.K. (2020). Consumer Disclosure, *Consumer Psychology Review*, 1-11.

Krosnick, J. A. (1999). Survey research. *Annual review of psychology*, *50*(1), 537-567

Kuru, O., & Pasek, J. (2016). Improving social media measurement in surveys: Avoiding acquiescence bias in Facebook research. *Computers in Human Behavior*, *57*, 82-92.

LeBel, E. P., & John, L. K. (2017). Toward transparent reporting of psychological science. *Psychological science under scrutiny: Recent challenges and proposed solutions*, 73-84.

Leon, P., Ur, B., Wang, Y., Sleeper, M., Balebako, R., Shay, R., . . . Cranor, L. (2013). *What Matters to Users? Factors that Affect Users' Willingness to Share Information with Online Advertisers*.

Malhotra, N. K., Kim, S. S., & Agarwal, J. (2004). Internet Users' Information Privacy Concerns (IUIPC): The Construct, the Scale, and a Causal Model. *Information systems research*, *15*(4), 336-355.

McDonald, A. M., & Cranor, L. F. (2008). The cost of reading privacy policies. *I/S: A Journal of Law and Policy for the Information Society*, *4*, 543.

McDonald, A. M., Reeder, R. W., Kelley, P. G., & Cranor, L. F. (2009). A Comparative Study of Online Privacy Policies and Formats. In I. Goldberg & M. J. Atallah, *Privacy Enhancing Technologies* Berlin, Heidelberg.

Milne, G. R., & Gordon, M. E. (1993). Direct mail privacy-efficiency trade-offs within an implied social contract framework. *Journal of Public Policy & Marketing*, *12*(2), 206-215.

Moon, Y. (2000). Intimate Exchanges: Using Computers to Elicit Self-Disclosure From Consumers. *The Journal of consumer research*, *26*(4), 323-339.

Morey, T., Forbath, T., & Schoop, A. (2015). Customer Data: Designing for Trust, *Harvard Business Review.*

Nissenbaum, H. (2004). Privacy as contextual integrity. *Washington law review*, 79(1), 119.

Nissenbaum, H. (2011). A Contextual Approach to Privacy Online. *Daedalus*, 140(4), 32–48.

Norberg, P. A., Horne, D. R., & Horne, D. A. (2007). The Privacy Paradox: Personal Information Disclosure Intentions versus Behaviors. *Journal of Consumer Affairs*, *41*(1), 100-126.

Oppenheimer, D. M., Meyvis, T., & Davidenko, N. (2009). Instructional manipulation checks: Detecting satisficing to increase statistical power. *Journal of experimental social psychology*, *45*(4), 867-872.

Ortlieb, M., & Garner, R. (2016). Sensitivity of personal data items in different online contexts. *it-Information Technology*, *58*(5), 217-228.

Phelps, J., Nowak, G., & Ferrell, E. (2000). Privacy concerns and consumer willingness to provide personal information. *Journal of public policy & marketing*, *19*(1), 27-41.

Rao, A., Schaub, F., Sadeh, N., Acquisti, A., & Kang, R. (2016). Expecting the unexpected: Understanding mismatched privacy expectations online. Twelfth Symposium on Usable Privacy and Security ({SOUPS} 2016).

MATERIALS RELIED UPON

Reidenberg, J. R., Beaux, T., Cranor, L. F., French, B., Grannis, A., Graves, J. T., . . . Schaub, F. (2015). Disagreeable Privacy Policies: Mismatches Between Meaning and Users' Understanding. *Berkeley technology law journal*, *30*(1), 39-88.

Rogers, T., Milkman, K.L., John, L.K. & Norton, M.I. (2015). Beyond Good Intentions: Prompting People to Make Plans Improves Follow-through on Important Tasks, *Behavioral Science & Policy*, 1(2), 33-41.

Schwarz, N. (1999). Self-reports: How the questions shape the answers. *American psychologist*, *54*(2), 93.

Simmons, J. P., Nelson, L. D., & Simonsohn, U. (2011). False-positive psychology: Undisclosed flexibility in data collection and analysis allows presenting anything as significant. *Psychological science*, *22*(11), 1359-1366.

Smith, H. J., Milburg, S. J., & Burke, S. J. (1996). Information Privacy: Measuring Individuals' Concerns about Organizational Practices. *MIS quarterly*, *20*(2), 167-196.

Spiekermann, S., Grossklags, J., & Berendt, B. (2001). *E-privacy in 2nd generation Ecommerce: privacy preferences versus actual behavior* Proceedings of the 3rd ACM conference on Electronic Commerce, Tampa, Florida, USA.

Svirsky, D. (2019). Three experiments about human behavior and legal regulation (Doctoral dissertation, Harvard University).

Thomadsen, R., Rooderkerk, R., Amir, O., Arora, N., Bollinger, B., Hansen, K., John, L.K., Liu, W., Sela, A., Singh, V., Sudhir, K., Wood, W. (2018). How Context Affects Choice, *Customer Needs and Solutions*, 5(1), 3-14.

Tsai, J. Y., Egelman, S., Cranor, L., & Acquisti, A. (2011). The Effect of Online Privacy Information on Purchasing Behavior: An Experimental Study. *Information Systems Research*, *22*(2), 254-268.

Turow, J., King, J., Hoofnagle, C. J., Bleakley, A., & Hennessy, M. (2009). Americans Reject Tailored Advertising and Three Activities that Enable It. *SSRN Electronic Journal*.

Van't Veer, A. E., & Giner-Sorolla, R. (2016). Pre-registration in social psychology—A discussion and suggested template. *Journal of experimental social psychology*, *67*, 2-12.

Wagenmakers, E. J., Wetzels, R., Borsboom, D., van der Maas, H. L., & Kievit, R. A. (2012). An agenda for purely confirmatory research. *Perspectives on Psychological Science*, *7*(6), 632-638.

Case Documents

| |
|---|
| Dkt 339 Plaintiffs' Administrative Motion to Seal |
| Dkt 339-1 Declaration of Adam Prom iso Plaintiffs' Administrative Motion to Seal |
| Dkt 339-2 [Proposed] Order Granting Plaintiffs' Administrative Motion to Seal |
| Dkt 339-4 Plaintiffs' Notice of Motion and Motion for Class Certification and Appointment of Class Representatives and Class Counsel; Memorandum of Law in Support Thereof |
| Dkt 339-6 Declaration of Patrick Calhoun iso Plaintiffs' Motion for Class Certification |
| Dkt 339-8 Declaration of Michael Henry iso Plaintiffs' Motion for Class Certification |
| Dkt 339-10 Declaration of Claudia Kindler iso Plaintiffs' Motion for Class Certification |
| Dkt 339-12 Video Deposition of Elaine Crespo, Thursday, July 22, 2021 |
| Dkt 339-14 Expert Report of Richard M. Smith iso Plaintiffs' Motion for Class Certification |
| Dkt 339-16 Expert Report of Leslie K. John iso Plaintiffs' Motion for Class Certification |

## MATERIALS RELIED UPON

| |
|---|
| Dkt 339-18 Expert Report of Russell W. Mangum III, Ph.D iso Plaintiffs' Motion for Class Certification |
| Dkt 339-20 Expert Report of Zubair Shafiq, Ph.D. iso Plaintiffs' Motion for Class Certification |
| Dkt 339-22 Expert Report of Joseph Turow iso Plaintiffs' Motion for Class Certification |
| Dkt 339-24 DEFENDANT'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES (NOS. 1–7) |
| Dkt 339-25 Exhs DD-KK; Plaintiffs' Motion for Class Certification, Plaintiffs' Administrative Motion to Seal |
| Dkt 339-26 Exhs LL-TT; Plaintiffs' Motion for Class Certification, Plaintiffs' Administrative Motion to Seal |
| Dkt 339-27 Exhs UU-ZZ; Plaintiffs' Motion for Class Certification, Plaintiffs' Administrative Motion to Seal |
| Dkt 339-28 Exhs W-CC; Plaintiffs' Motion for Class Certification, Plaintiffs' Administrative Motion to Seal |
| Dkt 340  Plaintiffs' Notice of Motion and Motion for Class Certification and Appointment of Class Representatives and Class Counsel; Memorandum of Law in Support Thereof (Redacted) |
| Dkt 340-1 Declaration of Lesley E. Weaver iso Plaintiffs' Motion for Class Certification |
| Dkt 340-2 (BFA Firm Resume) Plaintiffs' Motion for Class Certification |
| Dkt 340-3 Declaration of Jason "Jay" Barnes iso Plaintiffs' Motion for Class Certification |
| Dkt 340-4 Declaration of David A. Straite iso Plaintiffs' Motion for Class Certification; Appoint of Class Representatives and Class Counsel |
| Dkt 340-6 Declaration of Elaine Crespo iso Plaintiffs' Motion for Class Certification |
| Dkt 340-8 Declaration of Dr. Rodney Johnson iso Plaintiffs' Motion for Class Certification |
| Dkt 340-10 Declaration of Dr. Corinice Wilson iso Plaintiffs' Motion for Class Certification |
| Dkt 340-11 Deposition of Patrick Calhoun, Monday, July 19, 2021 |
| Dkt 340-13 Deposition of Michael Henry, August 9, 2021 |
| Dkt 340-14 Deposition of Claudia Kindler, Monday, July 5, 2021 |
| Dkt 340-15 (Exhs 2-33 to Plaintiffs' Initial Complaint) Plaintiffs' Motion for Class Certification, Plaintiffs' Administrative Motion to Seal |
| Dkt 340-21 DEFENDANT'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' THIRD SET OF INTERROGATORIES (NOS. 13-20) |
| Dkt 340-23 DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION (NOS. 1-45) |
| Dkt 340-24 Plaintiffs' Amended Responses and Objections to Defendant's Amended Interrogatory No. 7 |
| Dkt 340-25 [Proposed] Order Granting Class Action Certification |
| Dkt 341 Plaintiffs' Request for Judicial Notice iso Motion for Class Certification |
| Dkt 341-1 [Proposed] Order Granting Plaintiffs' Request for Judicial Notice iso Motion for Class Certification |
| Dkt 427 NOTICE OF MOTION AND MOTION TO STRIKE REPORT OF PLAINTIFFS' DAMAGES EXPERT RUSSELL MANGUM, III, PH.D |

**MATERIALS RELIED UPON**

| |
|---|
| Dkt 427-1 DECLARATION OF VIOLA TREBICKA IN SUPPORT OF GOOGLE'S MOTION TO STRIKE REPORT OF PLAINTIFFS' DAMAGES EXPERT RUSSELL MANGUM, III, PH.D |
| Dkt 427-2 [PROPOSED] ORDER GRANTING DEFENDANT GOOGLE LLC'S MOTION TO STRIKE REPORT OF PLAINTIFFS' DAMAGES EXPERT RUSSELL MANGUM, III, PH.D |
| Dkt 427-3 EXHIBIT 1 Unredacted Version of Document Sought to be Sealed - Videotaped Zoom Deposition of DR. RUSSELL MANGUM, Tuesday, December 7, 2021 |
| Dkt 427-4 EXHIBIT 2 - PLAINTIFFS' RESPONSES AND OBJECTIONS TO DEFENDANT'S SECOND SET OF INTERROGATORIES (NOS. 6-9) |
| Dkt 427-5 EXHIBIT 3 Unredacted Version of Document Sought to be Sealed - Plaintiffs' Responses and Objections to Defendant's First and Second Set of Interrogatories to Plaintiffs Added in First Amended Complaint Filed April 16, 2021 (Nos. 1-9) |
| Dkt 427-6 EXHIBIT 4 Unredacted Version of Document Sought to be Sealed - EXPERT REPORT OF TÜLIN ERDEM, PH.D. December 22, 2021 |
| Dkt 427-7 EXHIBIT 5 Unredacted Version of Document Sought to be Sealed - EXPERT REPORT OF BRUCE A. STROMBOM December 22, 2021 |
| Dkt 427-8 EXHIBIT 6 - Videotaped Zoom Deposition of DR. CLAUDIA KINDLER, Monday, July 5, 2021 |
| Dkt 427-9 EXHIBIT 7 - REMOTE VIDEO DEPOSITION OF ELAINE CRESPO, Thursday, July 22, 2021 |
| Dkt 427-10 EXHIBIT 8 - videotaped videoconference deposition via Zoom of MICHAEL HENRY, August 9, 2021 |
| Dkt 427-11 EXHIBIT 9 - VIRTUAL VIDEOCONFERENCE DEPOSITION OF DR. CORINICE WILSON, OCTOBER 25, 2021 |
| Dkt 427-12 EXHIBIT 10 - REMOTE VIDEOTAPED ORAL DEPOSITION OF DR. RODNEY JOHNSON, OCTOBER 23, 2021 |
| Dkt 427-13 EXHIBIT 11 Unredacted Version of Document Sought to be Sealed - VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED DEPOSITION OF LESLIE JOHN, PH.D., Tuesday, November 16, 2021 |
| Google's Opposition to Pls' Class Cert. Motion |
| [Proposed] Order |
| 430 - Decl. of S. Broome ISO Google's Opp to Class Cert |
| 430-1 - Exhs. 1-50 to Broome Decl |
| 430-2 - Exhs. 51-77 to Broome Decl |
| 430-3 - Decl. of G. Fair SEALED |
| 430-4 - Exhs. 1-25 to Fair Decl |
| 430-5 - Exhs. 26-50 to Fair Decl |
| 430-6 - Exhs. 51-84 to Fair Decl |
| 430-7 - Exhs. 85-117 to Fair Decl |
| 430-8 - Decl. of G. Bernston SEALED |

**MATERIALS RELIED UPON**

| |
|---|
| 430-9 - Decl. of S. Ganem ISO Google's Opp to Class Cert |
| 430-10 - Decl. of D. Crossland ISO Google's Opp to Class Cert |
| 430-11 - Decl. of R. Cassidy ISO Google's Opp to Class Cert |
| 430-12 - Decl. of A. Mardini SEALED |
| 430-13 - Exhs. 1-17 to Mardini Decl |
| 430-14 - Decl. of D. Monsees SEALED |
| 430-15 - Decl. of G. Levitte SEALED |
| 430-16 - Decl. of T. Schumann SEALED |
| Plaintiffs' Opposition to Google's MSJ (on Consent), Objections Per Civil L.R. 7-3(a) - Unredacted (00719032.PDF;1) |
| 462-1 - Barnes Decl ISO Pls' Opp to Google's MSJ |
| Exhibit 1 |
| Exhibit 2 |
| Exhibit 3 |
| Exhibit 4 |
| Exhibit 5 |
| Exhibit 6 |
| Exhibit 7 |
| Exhibit 8 |
| Exhibit 15 |
| Exhibit 16 |
| Exhibit 18 |
| Exhibit 19 |
| Exhibit 20 |
| Exhibit 21 |
| Exhibit 22 |
| Exhibit 23 |
| Exhibit 24 |
| Exhibit 26 |
| Exhibit 27 |
| Exhibit 29 |
| Exhibit 30 |
| Exhibit 31 |
| Exhibit 35 |
| Exhibit 36 |
| Exhibit 37 |
| Exhibit 38 |
| Exhibit 39 |
| Exhibit 40 |
| Exhibit 41 |
| Exhibit 42 |

**MATERIALS RELIED UPON**

| |
|---|
| Exhibit 43 |
| Exhibit 44 |
| Exhibit 45 |
| Exhibit 46 |
| Exhibit 47 |
| Exhibit 48 |
| Exhibit 49 |
| Exhibit 50 |
| Exhibit 51 |
| Exhibit 52 |
| Exhibit 53 |
| Exhibit 54 |
| Exhibit 55 |
| Exhibit 56 |
| Exhibit 57 |
| Exhibit 58 |
| Exhibit 59 |
| Exhibit 60 |
| Exhibit 61 |
| Exhibit 62 |
| Exhibit 64 |
| Exhibit 67 |
| Exhibit 68 |
| Exhibit 69 |
| Exhibit 70 |
| Exhibit 71 |
| Exhibit 72 |
| Exhibit 73 |
| Exhibit 74 |
| 2021-10-23 Johnson, Rodney (Full) |
| 2021-10-25 Wilson, Cornice (Full Linked) |
| 2022-01-07 Ravichandran, Deepak Transcript (Cond) |
| Ravichandran Exhibit 0001 |
| Ravichandran Exhibit 0002 |
| Ravichandran Exhibit 0003 |
| Ravichandran Exhibit 0004 |
| Ravichandran Exhibit 0005 |
| Ravichandran Exhibit 0006 |
| Ravichandran Exhibit 0007 |
| Ravichandran Exhibit 0008 |
| Ravichandran Exhibit 0009 |

**MATERIALS RELIED UPON**

| |
|---|
| Ravichandran Exhibit 0010 |
| Ravichandran Exhibit 0011 |
| Ravichandran Exhibit 0012 |
| Ravichandran Exhibit 0013 |
| Ravichandran Exhibit 0014 |
| Ravichandran Exhibit 0015 |
| Ravichandran Exhibit 0016 |
| Ravichandran Exhibit 0017 |
| Ravichandran Exhibit 0018 |
| Ravichandran Exhibit 0019 |
| Ravichandran Exhibit 0020 |
| Ravichandran Exhibit 0021 |
| Ravichandran Exhibit 0022 |
| Ravichandran Exhibit 0023 |
| Ravichandran Exhibit 0024 |
| Ravichandran Exhibit 0025 |
| ChetnaBindra.txt |
| ChetnaBindra_COND |
| ChetnaBindra_LinkPDF |
| ChetnaBindra_PDFTran |
| ChetnaBindra_RAndS |
| ChetnaBindra_1 |
| ChetnaBindra_2 |
| ChetnaBindra_3 |
| ChetnaBindra_4 |
| ChetnaBindra_5 |
| ChetnaBindra_6 |
| ChetnaBindra_7 |
| ChetnaBindra_8 |
| ChetnaBindra_9 |
| ChetnaBindra_10 |
| ChetnaBindra_11 |
| ChetnaBindra_12 |
| ChetnaBindra_13 |
| ChetnaBindra_14 |
| ChetnaBindra_15 |
| ChetnaBindra_16 |
| ChetnaBindra_17 |
| ChetnaBindra_18 |
| ChetnaBindra_19 |
| ChetnaBindra_20 |

**MATERIALS RELIED UPON**

| |
|---|
| ChetnaBindra_21 |
| ChetnaBindra_22 |
| ChetnaBindra_23 |
| ChetnaBindra_24 |
| ChetnaBindra_25 |
| ChetnaBindra_26 |
| ChetnaBindra_27 |
| ChetnaBindra_28 |
| ChetnaBindra_29 |
| ChetnaBindra_30 |
| ChetnaBindra_31 |
| ChetnaBindra_32 |
| ChetnaBindra_33 |
| ChetnaBindra_34 |
| ChetnaBindra_35 |
| ChetnaBindra_36 |
| ChetnaBindra_37 |
| ChetnaBindra_38 |
| ChetnaBindra_39 |
| ChetnaBindra_40 |
| ChetnaBindra_41 |
| ChetnaBindra_42 |
| ChetnaBindra_43 |
| ChetnaBindra_44 |
| ChetnaBindra_45 |
| ChetnaBindra_46 |
| ChetnaBindra_47 |
| ChetnaBindra_48 |
| ChetnaBindra_49 |
| ChetnaBindra_50 |
| ChetnaBindra_51 |
| R. Smith Expert Report iso Motion for Class Certification |
| Z. Shafiq Expert Report iso Motion for Class Certification |
| J. Turow Expert Report iso Motion for Class Certification |
| R. Mangum Expert Report iso Motion for Class Certification |
| Shafiq Expert Report iso objections to special master's order |
| 2021.11.16 John, Leslie Depo (Full Transcript) |
| 2021.11.16 John, Leslie Depo Exh. 1 |
| 2021.11.16 John, Leslie Depo Exh. 2 |
| 2021.11.16 John, Leslie Depo Exh. 3 |
| 2021.11.16 John, Leslie Depo Exh. 4 |

John Rebuttal Report – Exhibit A

**MATERIALS RELIED UPON**

| |
|---|
| 2021.11.16 John, Leslie Depo Exh. 5 |
| 2021.11.16 John, Leslie Depo Exh. 6 |
| 2021.11.16 John, Leslie Depo Exh. 7 |
| 2021.11.16 John, Leslie Depo Exh. 8 |
| 2021.11.16 John, Leslie Depo Exh. 9 |
| 2021.11.16 John, Leslie Depo Exh. 10 |
| 2021.11.16 John, Leslie Depo Exh. 11 |
| 2021.11.16 John, Leslie Depo Exh. 12 |
| Expert Report of Bruce A. Strombom |
| Expert Report of Georgios Zervas |
| Expert Report of Paul Schwartz |
| Expert Report of Tulin Erdem |
| Expert Report of Yiling Chen |
| 2022.2.4 - Tulin Erdem Depo - Rough Transcript |
| TulinErdemPhD.txt |
| TulinErdemPhD_COND |
| TulinErdemPhD_LinkPDF |
| TulinErdemPhD_PDFTran |
| TulinErdemPhD_RAndS |
| TulinErdemPhD_1 |
| TulinErdemPhD_2 |
| TulinErdemPhD_3 |
| TulinErdemPhD_4 |
| TulinErdemPhD_5 |
| TulinErdemPhD_6 |
| TulinErdemPhD_7 |
| TulinErdemPhD_8 |
| TulinErdemPhD_9 |
| TulinErdemPhD_10 |
| TulinErdemPhD_11 |
| TulinErdemPhD_12 |
| TulinErdemPhD_13 |
| TulinErdemPhD_14 |
| TulinErdemPhD_15 |
| TulinErdemPhD_16 |
| TulinErdemPhD_17 |
| TulinErdemPhD_18 |
| TulinErdemPhD_19 |
| TulinErdemPhD_20 |
| TulinErdemPhD_21 |
| TulinErdemPhD_22 |

MATERIALS RELIED UPON

| |
|---|
| TulinErdemPhD_23 |
| TulinErdemPhD_24 |
| TulinErdemPhD_25 |
| TulinErdemPhD_26 |
| TulinErdemPhD_27 |
| TulinErdemPhD_28 |
| TulinErdemPhD_29 |
| TulinErdemPhD_30 |
| TulinErdemPhD_31 |
| TulinErdemPhD_32 |
| TulinErdemPhD_33 |
| TulinErdemPhD_34 |
| TulinErdemPhD_35 |
| TulinErdemPhD_36 |
| TulinErdemPhD_37 |
| TulinErdemPhD_38 |
| TulinErdemPhD_39 |
| TulinErdemPhD_40 |
| TulinErdemPhD_41 |
| TulinErdemPhD_42 |
| TulinErdemPhD_43 |
| TulinErdemPhD_44 |
| TulinErdemPhD_45 |
| TulinErdemPhD_46 |
| TulinErdemPhD_47 |
| TulinErdemPhD_48 |
| TulinErdemPhD_49 |
| TulinErdemPhD_50 |
| TulinErdemPhD_51 |
| TulinErdemPhD_52 |
| TulinErdemPhD_53 |
| TulinErdemPhD_54 |
| TulinErdemPhD_55 |
| DC v. Google(1-24-22) |
| theverge.com-Google sued by DC and three states for deceptive Android location tracking |
| Fiddler file for Plaintiff Kindler (bankofamerica.saz) |
| Fiddler file for Plaintiff Calhoun (PCalhoun7_17_20ChromeData.saz) |
| Plaintiff Kindler's Google Ads data from 5.17.2020-2.7.2021 (GOOG-CALH-00027599) |
| Exhibit GO-0001 to Joseph Turow, Depo V1, 11.8.2021 - GOOG-CABR-04067825 |
| Exhibit GO-0005 to Joseph Turow, Depo V1, 11.8.2021 - 'Find & control your Web & App Activity' |

11

MATERIALS RELIED UPON

| |
|---|
| GOOG-CALH-00014551 |
| GOOG-CALH-00016479 |
| GOOG-CALH-00031076 |
| GOOG-CALH-00031131 |
| GOOG-CALH-00032221 |
| GOOG-CALH-00037701 |
| GOOG-CALH-00040905 |
| GOOG-CALH-00061946 |
| GOOG-CALH-00061951 Decoded |
| GOOG-CALH-00061953 |
| GOOG-CALH-00061965 |
| GOOG-CALH-00061966 Decoded |
| GOOG-CALH-00061971 Decoded |
| GOOG-CALH-00070800 |
| GOOG-CALH-00070804 |
| GOOG-CALH-00072865 Decoded Table.docx |
| GOOG-CALH-00072865 Decoded |
| GOOG-CALH-00072868 Decoded |
| GOOG-CALH-00072871 Decoded |
| GOOG-CALH-00072872 Decoded |
| GOOG-CALH-00072874 Decoded |
| GOOG-CALH-00072877 Decoded |
| GOOG-CALH-00072880 Decoded |
| GOOG-CALH-00072881 Decoded |
| GOOG-CALH-00072884 Decoded |
| GOOG-CALH-00072886 Decoded |
| GOOG-CALH-00072887 |
| GOOG-CALH-00072891 Decoded |
| GOOG-CALH-00072900 Decoded |
| GOOG-CALH-00072903 Decoded |
| GOOG-CALH-00072961 |
| GOOG-CALH-00081472 |
| GOOG-CALH-00133389 |
| GOOG-CALH-00303689 |
| GOOG-CABR-00111801 |
| GOOG-CABR-00373424 |
| GOOG-CABR-00422093 |
| GOOG-CABR-04067825 |
| GOOG-CABR-04754160 |
| GOOG-CABR-04754257 |
| GOOG-CABR-04754292 |

MATERIALS RELIED UPON

| |
|---|
| GOOG-CABR-04754627 |
| GOOG-CABR-04834261 |
| GOOG-CABR-04981577 |
| GOOG-CABR-05156497 |
| GOOG-CABR-05424604 |
| GOOG_ERDEM_00000001 |
| GOOG_ERDEM_00000002 |
| GOOG_ERDEM_00000003 |
| GOOG_ERDEM_00000004 |
| GOOG_ERDEM_00000005 |
| GOOG_ERDEM_00000006 |
| GOOG_ERDEM_00000007 |
| GOOG_ERDEM_00000008 |
| GOOG_ERDEM_00000009 |
| GOOG_ERDEM_00000010 |
| GOOG_ERDEM_00000011 |

# EXHIBIT DDD
## Redacted Version of Document Sought to be Sealed

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA
# OAKLAND DIVISION

PATRICK CALHOUN, et al.,
*Plaintiffs*,

v.

GOOGLE LLC,
*Defendant*.

C.A. No. 20-CV-05146-YGR

# EXPERT REBUTTAL REPORT OF RUSSELL W. MANGUM III, PH.D. IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# February 15, 2022

Highly Confidential — Attorneys' Eyes Only

Patrick Calhoun, et al. v. Google LLC

# Table of Contents

I.   INTRODUCTION ..............................................................................................1

I.A. Executive Summary .......................................................................................1

I.B. Qualifications ................................................................................................2

I.C. Documents Reviewed .....................................................................................3

I.D. Overview Of Mangum Report ........................................................................3

   I.D.1. Defendant's Unjust Enrichment ...............................................................3
   I.D.2. Restitution of Value of Personal Information ...........................................5

I.E. Overview Of Strombom Report And Erdem Report Relevant For My Rebuttal ..........7

   I.E.1. Strombom Report ....................................................................................7
   I.E.2. Erdem Report ..........................................................................................7

I.F. Summary of Conclusions ...............................................................................8

II.  ANALYSIS AND DISCUSSION OF NEW INFORMATION RECEIVED AND
     REVIEWED SINCE THE MANGUM REPORT ...........................................12

II.A. Unjust Enrichment Analysis in the Mangum Report is Based on Sound
     Economics and Consistent with Google's Own Internal Analyses ............................12

   II.A.1. Mangum Report Unjust Enrichment Analysis Guided by Established
          Academic and Industry Research Together with Metrics Determined by
          Google in the Ordinary Course of Business .........................................................12
   II.A.2. Google Itself Analyzes Revenue Impact from Loss of Personalization
          Using an Aggregate "Class-wide" Type of Model...............................................13
   II.A.3. Google's Own Method of Analyzing Ad Revenue Premium Based on
          Personalization is Comparable to the Mangum Report Analysis, Both in Form
          and Effective Computed Impact ...............................................................14
   II.A.4. Mangum Analysis Computes Google Profit Portion Consistent with
          Financial Disclosures and Approach Applied by Google as Part of Its Own
          Internal Analyses...............................................................20
   II.A.5. Strombom's Analysis Regarding Unjust Enrichment Runs Counter to
          Google's Own Practices............................................................21
   II.A.6. Additional New Information for Identifying Google's Unjust Enrichment .....22

II.B. Apportionment of the Unjust Enrichment is Available Through Feasible Methods..23

II.C. Restitution Analysis in the Mangum Report is Based on Sound Economics and
     Consistent with Google's Position Regarding the Value of User Data ........................25

   II.C.1. The Peer-reviewed Research Cited in the Mangum Report Is Consistent
          with the Conclusion Users Place Value on the Protection and Privacy of Their
          Data ...............................................................26
   II.C.2. Google Has Determined the Market Value of Users' Data which is
          Common Across Users............................................................27

II.D. Google Calculates Revenue by User ........................................................33

Patrick Calhoun, et al. v. Google LLC

# I.    INTRODUCTION

This Rebuttal Report responds to, and is limited to, specific criticisms of my opening report setting forth damages methodologies for the Plaintiffs in this case.

## I.A. Executive Summary

1.    On October 13, 2021, I submitted an expert report regarding class certification in the above captioned matter ("Mangum Report").[1] Other experts also submitted expert reports on October 13, 2021.[2] I was also deposed in this matter on December 7, 2021.[3] Throughout this rebuttal report I utilize the same definitions and understanding of the industry and background information as I did in the Mangum Report, with additional information as needed. Similarly, for the purposes of my analysis, I maintain the assumption Defendant is liable as alleged.

2.    Since submitting the Mangum Report I have received additional materials. Examples of the new materials include new documents produced by Google, various legal documents, opposing expert reports, and deposition testimony. On December 22, 2021, Defendant filed several expert reports in opposition to class certification. Dr. Bruce Strombom filed a report ("Strombom Report") in response to the Mangum Report.[4] Dr. Tülin Erdem also filed a report ("Erdem Report") that responds to some portions of the Mangum Report.[5] Other experts filed technical reports.[6] These Defendant experts as well as Google fact witnesses have also been deposed recently.[7] New documents produced by Google include various

---

[1]    Expert Report of Russell W. Mangum III, Ph.D. in Support of Plaintiffs' Motion for Class Certification, Oct. 13, 2021 ("Mangum Report").

[2]    Declaration of Leslie K. John, Oct. 13, 2021 ("John Report"); Report of Prof. Zubair Shafiq, Oct. 13, 2021 "(Shafiq Report"); Expert Report of Professor Joseph Turow, Oct. 13, 2021 ("Turow Report"); Expert Report of Richard M. Smith in Support of Plaintiffs' Motion for Class Certification, Oct. 14, 2021 ("Smith Report").

[3]    Deposition of Dr. Russell Mangum, Dec. 7, 2021.

[4]    Expert Report of Bruce Strombom, Dec. 22, 2021 ("Strombom Report").

[5]    Expert Report of Tülin Erdem, Ph.D., Dec. 22, 2021 ("Erdem Report").

[6]    Expert Report of Professor Paul Schwartz in Support of Google LLC's Opposition to Plaintiffs' Motion for Class Certification, Dec. 22, 2021; Expert Report of Georgios Zervas, PhD, Dec. 22, 2021; Expert Report of Yiling Chen, Ph.D., Dec. 22, 2021.

[7]    Including, for example, Deposition of Bruce Strombom, Jan. 31, 2022; Deposition of Tülin Erdem, Feb. 4, 2022; Deposition of Deepak Ravichandran, Jan. 7, 2022; Deposition of Huei-Hung (Chris) Liao, Dec. 2, 2021; Deposition of Tim Schumann, Jan. 13, 2022. Additional deposition excerpts were included as exhibits to Defendant's motion opposition.

---

internal communications, presentations, and analyses prepared in the ordinary course of business. I have been asked to evaluate and analyze these new materials and comment on how, if at all, these materials impact my analysis regarding assessment of economic impact in the context of class certification for this matter.

3.    Rebuttal Opinion #1: As discussed in the sections below, after review and consideration of the materials received since submitting my initial report, I maintain, and in fact reinforce, the opinions and conclusions outlined in the Mangum Report. Excess profits can be calculated in this case using methodologies consistent with approaches used by Google internally.

4.    Rebuttal Opinion #2:  As discussed in the sections below, after review and consideration of the materials received since submitting my initial report, I maintain, and in fact reinforce, the opinions and conclusions outlined in the Mangum Report. Google pays users to collect and track the very kinds of information at issue in this case. From an economic perspective, these market measures are a strong foundation to calculate a restitutionary damages analysis.

5.    Rebuttal Opinion #3: Dr. Strombom's critique of my work is misguided in large part because he reaches beyond his field of expertise to opine about how the personal information is collected, how cookie blockers work, etc. As made clear in my opening report, I am not a technical expert, nor is he. I assume liability based on the claims alleged by Plaintiffs, and I also rely on the work of Professor Shafiq and Mr. Smith, as well as Google's own documents, to assume that all users who are not synced can be identified. I then perform damages calculations based on the assumptions together with inputs retrieved from Google documents.

## I.B. Qualifications

6.    I detail my qualifications in the Mangum Report.

7.    Cirque Analytics currently charges $700 per hour for my work in this matter. Professional staff members employed by Cirque Analytics also assist me. Neither my compensation nor Cirque Analytics' is contingent upon the outcome of this case.

Patrick Calhoun, et al. v. Google LLC

8.    My curriculum vitae has been updated since the Mangum Report and is attached to this declaration as **Appendix 1**. Also included in **Appendix 1** is a list of the matters in which I have testified at deposition or trial in the past four years, along with a list of my publications for at least the past ten years.

## I.C. Documents Reviewed

9.    The set of additional materials I received and considered since the Mangum Report include opposing reports, legal filings, declarations, additional and in some instances newly produced documents, and deposition testimony.[8] These additional materials are listed in this report and **Appendix 2**.

## I.D. Overview Of Mangum Report

10.    For ease of reference, here I provide a brief overview and reiteration of the economic analysis contained in the Mangum Report. Outlined in the Mangum Report is my opinion that assessment of economic impact due to the alleged wrongdoing is feasible given the available evidence, and the relevant data and methodology regarding assessment and computation of the economic impact is common to the class.[9] I further opine in the Mangum Report that, assuming liability, Google wrongly obtained Class Members' valuable user data, which has enabled Google to earn additional profits. The Mangum Report includes economic analysis relating to two forms of economic remedy: (i) unjust enrichment; and (ii) restitution.

### I.D.1. Defendant's Unjust Enrichment[10]

11.    Plaintiffs have claimed that Google was unjustly enriched as a result of the alleged misconduct. Plaintiffs make this claim due to the plethora of evidence that demonstrates having access to a user's personal information[11] allows for more targeted advertising

---

[8]    To the extent the Court seeks review of any cited document, I will coordinate with counsel to ensure that they are provided.

[9]    Mangum Report, ¶ 14.

[10]    The discussion in this subsection represents a summary of the Mangum Report, Section IV.

[11]    As discussed above, I continue to rely on the assumptions and definitions outlined in the Mangum Report, including the assumption of liability. The liability assumption includes reference to what qualifies as personal information. *See, e.g.,*

---

Patrick Calhoun, et al. v. Google LLC

through behavioral advertising that is valuable to the advertiser and therefore to Google. The personal information about Class Members that Chrome sent to Google in breach of the Chrome Agreements translates to additional profits that Google would not have received absent the alleged misconduct.

12. Such additional profits may require a disgorgement of those profits that Google derived from Chrome due to the personal information improperly sent about Class Members from Chrome to Google and that Google would not have otherwise received had it not violated the Chrome Agreements.

13. Google's internal research along with peer-reviewed public research demonstrates the value of behavioral advertising to Google.

14. After establishing this value of behavioral advertising, I next walk through a methodology that demonstrates how Google's unjust enrichment can be calculated using methods common to the class based upon reliable indicia of market pricing. This analysis relied on Google's own documents along with publicly available information.  I began with an exhibit

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

---

Mangum Report, ¶ 16. I understand Google defines personally identifiable information (PII) internally to include, for example, "████████████████████████████████████████████████████" and further notes "████

████████████████████████████████████████████████████ (GOOG-CABR-04604487–516 at 507) (Bindra Ex. 48).

Patrick Calhoun, et al. v. Google LLC

██████████████████████████████████████. Table 3 of the Mangum Report, reproduced below in Rebuttal Table 1, shows these steps.



15.   This accounts for the <u>revenue premium</u>. An additional step can be taken to account for the costs that Google incurred related to the additional revenue. Deducting the cost leads to the profit premium percentage that results from the alleged conduct. The last step would be to multiply the resultant profit premium percentage by the revenues Google received as a result of its alleged conduct.

16.   Once the dollar profit premium is computed, the amount may be allocated to the Class Members. In the Mangum Report I discussed evidence relating to methods of the apportionment.

### I.D.2. Restitution of Value of Personal Information[12]

17.   The personal information data that Chrome improperly sent and Google improperly used has economic value to the user in addition to value to third parties. Thus, the economic impact assessment can also consist of an analysis of the value of the user data and user data

---

[12]   The discussion in this subsection represents a summary of the Mangum Report, Section V.

Patrick Calhoun, et al. v. Google LLC

protection. Through direct and indirect evidence, I am able to demonstrate there are a number of market measures and a body of evidence revealing the value of users' data and the protection of personal information. This analytical framework ultimately takes the form of damages related to the restitution of value of personal information.

18. There were two approaches that I took to analyze the Class Members' personal information collected by Google. In one approach I estimated the value Class Members place on privacy protections, representing service Google did not provide to Class Members. In the second approach I assessed the value of Class Members' personal information based on the market for data.

19. For the first, I studied the economic value of preventing data collection on the internet through the use of per-reviewed, reliable survey data. The survey data I identified, and as confirmed through Google's own findings in the ordinary course of business, demonstrates that surveys can be utilized for the valuation of personal information protection. In addition to surveys and Google's analysis, I identified as an example, evidence showing that consumers are willing to make payments to protect their personal information. The purchase of privacy services (e.g., VPNs or ad blockers) provide real market examples of willingness to pay for privacy. These benchmark payments demonstrate pricing is uniform within a given service being offered.

20. The second approach looks at the value of personal information that companies are willing to pay for access to that data. These direct payments to users show how companies value the collection and utilization of personal information. Google paid users who became members of its Screenwise Panels for the information collected. SavvyConnect, BrandTotal, and Nielsen also collect personal information in exchange for payments to users. Annual payments from Google and these other companies range from $50–192.

21. These two approaches make it clear that damages can be assessed from a restitution approach using methods common to the putative class. Damages could be assessed on a monthly basis that controls for a Chrome user being synced or not.

Patrick Calhoun, et al. v. Google LLC

## I.E. Overview Of Strombom Report And Erdem Report Relevant For My Rebuttal

### I.E.1. Strombom Report

22.    Dr. Strombom's rebuttal report is largely limited to the Mangum Report and an issue related to Plaintiffs' statutory damages claims; it does not address other Plaintiff expert opinions.[13] Dr. Strombom has three primary opinions with respect to the Mangum Report: (i) he claims I have failed to account for uninjured class members and have provided no way to reliably exclude them from my analysis;[14] (ii) he claims I have not offered a reliable methodology to calculate unjust enrichment, and that I have not offered an opinion on a methodology to allocate Google's "excess profits" to class members;[15] and (iii) he claims I have not offered a valid methodology to calculate class-wide restitution damages.[16]

### I.E.2. Erdem Report

23.    Professor Erdem's report contains a number of elements unrelated to the Mangum Report, which are thus not relevant for this particular rebuttal. Professor Erdem does, however, critique one aspect of the Mangum Report. In Section XII of the Erdem Report, Professor Erdem states that "conjoint analysis is ill-equipped to accurately measure the value of privacy in this matter."[17]

24.    She also claims I have failed to identify: the product or its attributes; how to design a conjoint that represents respondents' real-world experience; how to note the difference between stated preference and revealed preference for privacy; and that the two studies that I cite are not applicable in this matter.[18]

---

[13]    The exception is Dr. Strombom's opinion regarding the calculation of certain statutory damages, which I do not address.
[14]    Strombom Report, Section IV.B.
[15]    Strombom Report, Section IV.C.
[16]    Strombom Report, Section IV.D.
[17]    Erdem Report, Section XII.
[18]    Erdem Report, Section XII.

---

Highly Confidential — Attorneys' Eyes Only

Patrick Calhoun, et al. v. Google LLC

## I.F. Summary of Conclusions

25.   After collective review of the newly received materials, the opinions and conclusions as set forth in the Mangum Report remain unchanged. For reference, the original opinions remain as follows: (i) assessment of economic damages attributed to Google's alleged wrongdoing is feasible based on the available evidence and data; (ii) the data and methodology relevant to the assessment and computation of the economic impact is common to the class; and (iii) as a result of the alleged wrongdoing, Google obtained Class Members' valuable data and personal information. Given the data collection, Google earned additional profits, and thereby was unjustly enriched.[19]

26.   Regarding unjust enrichment, Google's use of personal user data retrieved from Class Members enables targeted advertising that yields increased revenue. As shown in Rebuttal Table 1 (Mangum Report Table 3) above, there is a methodology that can be used to calculate Google's overall excess profits.  For example. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. (see Rebuttal Table 1). The methodology used to assess unjust enrichment is based on the combination of Google's internal metrics and peer-reviewed published research relating to the various input parameters outlined above. Apportionment of the computed unjust enrichment may be based on not synced user months according to Google's account and profile data.

---

[19]   Mangum Report, ¶ 14.

Patrick Calhoun, et al. v. Google LLC

27.    Regarding restitution of value of personal information, direct and indirect evidence suggests a market price for users' sale of tracking based on the kinds of information at issue in this case. Direct evidence includes what Google itself has paid for users' browsing history and other personal information, by paying users directly through Screenwise. Additional direct evidence shows online users' data has market value and research companies are willing to pay for such data. Numerous companies, including Google, pay users for access to online user data. In each instance, the pricing structure is uniform across users. Indirect evidence includes survey analyses in particular conjoint analyses (indirect evidence). Indeed, Google pays third parties to create panels for tracking users. The market evidence indicates for each data protection product, and thus value for the protection of such data, the pricing structure is uniform across all users. Since Class Members did not receive certain data privacy and protections, they received a reduced value of browsing services.

28.    Regarding unjust enrichment, evidence produced since October 13, 2021 (the time of filing my original report) show Google's own internal analyses using a similar methodology assessing its additional advertising gains from use of user data, performed in the ordinary course of business, follow a methodology that is consistent with the analysis in the Mangum Report. For example, ██████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████. (see Rebuttal Table 1 and Rebuttal Table 3) In addition, when computing profits on the revenue impact, Google applies a ██ percent universal profit margin. Furthermore, Google's own internal analyses confirm that ██████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████ The magnitude of the impact is consistent with the Mangum Report analysis.

---

Highly Confidential — Attorneys' Eyes Only

Patrick Calhoun, et al. v. Google LLC

29.     Google's data systems and records provide information available for apportionment of
        Google's unjust enrichment to Class Members. Multiple apportionment approaches may be
        considered, including based on each Class Member's (a) share of not synced traffic signals
        sent from Chrome to Google; (b) level of not synced browsing history data stored in
        Google's "████████ data system; or (c) share of revenue associated with the user ID stored in
        Google's data logs.

30.     ███████████████████████████████████████████, ████████████████████████████████
        ███████████████████████████████████████████████████████████████
        ███████████████████████████████████████████████████████████
        ██████████████████████████████████████████████.

31.     The comments on my analysis from Google's experts Dr. Strombom and Professor Erdem
        do not change my opinions and conclusions outlined above, in this report, and in the
        Mangum Report. The opinions from Dr. Strombom and Professor Erdem are flawed,
        misleading, and at times based on different underlying incorrect assumptions, and thus do
        not undermine the opinions and conclusions set forth in the Mangum Report and this report.
        For reasons set forth in this report, my opinions and conclusions remain unchanged and
        instead are further supported by newly received in formation. The following paragraphs
        summarize notable comments on the opinions of Dr. Strombom and Professor Erdem.

32.     Dr. Strombom assumes some Class Members are uninjured. This is largely based on the
        premise that only signed in users or users who did not implement cookie blocking
        applications were harmed. This is an assumption he was asked to make. This is not an
        assumption I have made given the claims in this are case such that all not synced Chrome
        users have their personal information user data improperly sent from Chrome to Google.
        This appears to be consistent with the testing of Plaintiffs' experts, consistent with public
        commentary cited by Dr. Strombom, which shows that cookie blocking is not effective.  To
        the extent that cookie blockers prevented data collection from users, Google received no
        revenue from them, and thus the model does not overcompensate in aggregate.
        Nevertheless, to the extent there is a determination that certain users should be removed
        from the class for this or other reasons, my model and analysis framework can account for

Patrick Calhoun, et al. v. Google LLC

that. For example, as discussed in the Mangum Report and this report, Google's data systems allow for apportionment and user identification based on users not synced signals as well as logs on user revenue. In addition, the information is available for signed in and not signed in users, including ones without a Google account. Based on this type of information, to the extent there is a determination certain members should be removed from the class, that can be accounted for using my analytical framework.

33.   Dr. Strombom suggests calculation of Google's unjust enrichment should follow individualized treatment; this is incorrect. As discussed in this report, among other reasons, the analysis in the Mangum Report is consistent with the aggregate "class-wide" framework and specific metrics Google utilizes in the ordinary course of business with assessing the impact to advertising revenue due to a loss of cookies and personalization.

34.   Dr. Strombom further suggests that the unjust enrichment analysis computed impact on revenue focused on publisher revenue and does not necessarily flow through to an impact to Google's profit given various pricing structures. This assertion is incomplete, misleading, and runs counter to Google's own business practices. For example, Dr. Strombom asserts some advertising pricing is based on fixed fees, thus an impact to that type of publisher revenue would not impact Google revenue. However, fixed fee arrangements are associated with advertising that does not rely on user data and my analytical framework removes such advertising revenue. In addition, Dr. Strombom's assertions again run counter to Google's own practices. For example, ██████████████████████████████████ ████████████████████████████████████████. The profit margin is comparable, both in form and magnitude, with the 23 percent net profit margin computed in the Mangum Report.

35.   Regarding restitution damages and the value of user data, Dr. Strombom incorrectly concludes that the Mangum Report market measures (where companies pay for data) relate to data that is dissimilar to the data at issue in this case. Dr. Strombom provides no reasonable basis for reaching this conclusion. Not only are the market measures comparable, but Dr. Strombom appears to ignore, or at least fails to acknowledge, that Google itself pays users for data in the ordinary course of business, with a payment structure uniform across

Patrick Calhoun, et al. v. Google LLC

users, for what Google has determined to be the fair market value for browsing history information collected in association with the same cookie identifiers at issue in this case.

36. Dr. Strombom and Professor Erdem comment incorrectly on the Mangum Report references to surveys, conjoint analyses, and VPN market measures in the Mangum Report. The point of the references is to show that users value their data and privacy and are willing to pay for data privacy and protection; in addition, the pricing structures for each privacy and protection service is uniform across users (rather than individually customized based on data collected and used). This is what the conjoint studies and market measures show. In addition, I understand Professor John holds the opinion that consumers care about online privacy.

## II.    ANALYSIS AND DISCUSSION OF NEW INFORMATION RECEIVED AND REVIEWED SINCE THE MANGUM REPORT

37. This section includes discussion, analysis, and comments in response to the newly received materials. Based on the information and analysis presented below, I have determined the opinions and conclusions of the Mangum Report are further supported by the materials and generally remain unchanged.

### II.A. Unjust Enrichment Analysis in the Mangum Report is Based on Sound Economics and Consistent with Google's Own Internal Analyses

#### II.A.1. Mangum Report Unjust Enrichment Analysis Guided by Established Academic and Industry Research Together with Metrics Determined by Google in the Ordinary Course of Business

38. As discussed above, the methodology in the Mangum Report used for computing the Google unjust enrichment figure includes the following categories of steps: ███████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

Patrick Calhoun, et al. v. Google LLC

████████████████████████████████████████████████████████

████████████████████████████████████████████

39.  For steps (i) and (ii) (computing the revenue premium), the methodology utilizes various input parameters that are based on internal Google metrics determined in the ordinary course of business, as well as established peer-reviewed literature. For example, information on Chrome market share, Chrome revenue utilizing user data, and Incognito and sync proportions are all based on Google analysis documents available in this matter. The proportion of relevant ad revenue due to personalization is based on the combination of internal Google research and third-party published studies.

40.  Given the construction of the Google revenue premium percentage, the proper application is multiplying the percentage by Google's aggregate advertising revenue figure. As discussed above, the Mangum Report outlines this process for ████████████████████████ ████████████████████████████. Google publishes aggregate advertising revenue for each advertising category, including Google Search, YouTube ads, and Third-party network pages.[20] The next section shows how Google itself also follows an aggregate impact model when assessing its revenue premium due to ad personalization, or conversely the revenue it would lose without the personalization.

**II.A.2. Google Itself Analyzes Revenue Impact from Loss of Personalization Using an Aggregate "Class-wide" Type of Model**

41.  Newly received and reviewed documents indicate that Google internally investigates the impact of loss of personalization. In doing so, Google applies models following an aggregate "class-wide" type of approach as opposed to a user individualized approach, consistent with my methodology in my opening report.

42.  For example, ████████████████████████████████████████
█████████████████████████████████████████████████████████.[21]

---

[20]  *See also* Mangum Report, Exhibit 2.

[21]  ████████████████████ (GOOG-CABR-05279094–256 at 100–103) (Liao Ex. 11). I understand this document was produced Nov. 27, 2021.

Patrick Calhoun, et al. v. Google LLC

███████████████████████████████████████████████████

████████████████████████████████████████[22]

In reaching the revenue impact conclusions, Google did not perform any individualized user analysis.

43.    Similarly, Google has used a formulaic approach to estimate the revenue impact of losing access to identity across all browser states of Chrome ████████████████ and testimony indicates Google created ████████████████████████████. To date, I understand Google has not produced the documents created by ████████████████ ████.[23]

44.    In the next section, I show how Google's own analysis of the impact of personalization on advertising revenue not only follows a method nearly identical to the analysis in the Mangum Report, but also returns a computed impact consistent with my analysis.

**II.A.3. Google's Own Method of Analyzing Ad Revenue Premium Based on Personalization is Comparable to the Mangum Report Analysis, Both in Form and Effective Computed Impact**

*II.A.3.a. Google Unjust Enrichment Revenue Premium Percentage*

45.    This section discusses in more detail how the newly received documents further support the reasonableness and appropriateness of the Mangum Report unjust enrichment model. As shown below, the impact analysis contained within the "█████████████████████ ██████████████████████████████████████████████████

---

[22] ███████████████████████ (GOOG-CABR-05279094–256 at 102–103) (Liao Ex. 11).

[23] ██████████████████, "████████████████████████████████" July 17, 2019 (GOOG-CABR-05292934–936) (Liao Ex. 9). I understand this document was produced Nov. 27, 2021.

Patrick Calhoun, et al. v. Google LLC

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████, the quantitative outcome is very similar to my original

conclusion in the Mangum Report.

46.     Mangum Report and internal Google advertising revenue premium models follow a similar

multi-step process. The models both include the following steps: ██████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████ For reference, the unjust enrichment

revenue premium percentage calculation from the Mangum Report Table 3 is reinserted

below.

Patrick Calhoun, et al. v. Google LLC

47.     The internal Google study focused on assessing the impact of ███████████████ ██████████████████████████████████████████████ ██████▌██████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████▌████████████████████████████.

48.     Rebuttal Table 3 below includes a summary of the steps in Google's analysis ███████ ██████████████████████████████████ ██████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████ ██████████████████████████████████████▌ ██████████████████████████████ ███████████████████████████████████ ███████████████████





24  ███████████████████████▌  (GOOG-CABR-05279094–256 at 100–103) (Liao Ex. 11).
25  ███████████████████████▌  (GOOG-CABR-05279094–256 at 100–103) (Liao Ex. 11).
26  ███████████████████████▌  (GOOG-CABR-05279094–256 at 102–103) (Liao Ex. 11).

Patrick Calhoun, et al. v. Google LLC

49.  Steps from Google's own analysis outlined in Rebuttal Table 3 are in many aspects consistent with the steps of the independent analysis in the Mangum Report outlined in Rebuttal Table 2 above. Notably, Google applies ████████████████████ ████████████████████████████████ ████████████ ████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████.[28]

50.  To further illustrate the consistency between my unjust enrichment analysis and Google's internal analysis ██████████████████████████████████, I have performed an alternative analysis that starts with Google's model and then makes the selected adjustments to focus on the same categories at-issue in this case. This alternative includes ██████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████. This augmented version of Google's internal analysis is summarized in Rebuttal Table 4 below. As shown below, the computed revenue premium due to personalization, is ████ percent compared with the ███ percent unjust enrichment analysis revenue premium included in the Mangum Report (see Rebuttal Table 2 above).

---

[27]  A subset of Google advertising revenue is based on a fixed fee relationship; however, this type of advertising is not based on user data. Declaration of George Levitte, Dec. 17, 2021, ¶ 15. Furthermore, the Mangum Report analysis focuses on revenue based on cookies.

[28]  The Mangum Report analysis isolates the revenue from not synced users by applying the proportion of users that are not synced. According to a ██████ internal Google presentation, ████████████████████████████████ ████████████████████████████████████ (GOOG-CALH-00083131–166 at 143). If it is determined that the ratio of synced rates and synced traffic is different, the methodology remains the same with simply a factor applied to the synced rate parameter. For example, if it is determined that page loads represent an appropriate traffic metric and the ratio for synced users differs for not synced users, the synced input parameter in the analysis may be simply adjusted by a factor, thereby maintaining the overall framework on the analysis. ██████████████████ ████████████████████████████ (GOOG-CALH-00081472–499). I have not received traffic data to compute the synced percentage of Chrome traffic, but such a calculation may be done upon receiving such information. If, in the alternative, I receive additional information summarizing the synced percentage of Chrome traffic, the not synced percentage may be applied in the model, which again, maintains the overall methodology and at most adjusts a single input parameter by a factor. It is my understanding that Google maintains records in the regular course of business that may be used to identify the various percentages of data it receives from users in the different Chrome browser "states" (see, e.g., Rebuttal Report of Professor Zubair Shafiq, Feb. 15, 2022 ("Shafiq Rebuttal Report"), ¶¶ 164-165).

---

Patrick Calhoun, et al. v. Google LLC



51.     Again, following Google's own internal analysis framework, the unjust enrichment revenue
        premium is ■ percent compared with the ■ percent result from the Mangum Report. The
        difference is largely due to ███████████████████████████████████████████
        ████████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████████████
        ███████████████████████████████████████████████████████████
        ███████████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████████
        ██████████████████████████████████

---

[29] ████████████████████████████ █ (GOOG-CABR-05279094–256 at 102) (Liao Ex. 11).

Patrick Calhoun, et al. v. Google LLC

52. Importantly, the internal Google analysis follows an approach consistent with an aggregate class-wide model framework as opposed to an individualized analysis.[30] Furthermore, the formula applied by Google is ████████████████████████. As with the Mangum Report analysis, Google's analysis ████████████████████████ ████████████████████████ ████. Ultimately, the Mangum Report unjust enrichment revenue calculation follows a framework that new documents discussed here reveal is *nearly identical to Google's own analysis method* for computing such a premium.

*II.A.3.b. Google's Total Unjust Enrichment Revenue Premium*

53. Additional newly received documents show Google has also analyzed the impact of ████ ████████████████████████ ████████████████.[31] Furthermore, as I will show, the magnitude of the Google analysis is consistent with the Mangum Report, thus further supporting my unjust enrichment calculations.

54. As shown in the alternative internal Google study, in testing the impact ███████████ ████████████████████████ ████████████████████████"[32] ████████████████████,[33] ████████████████████████ ████████████████████████ ████████,[34] ████████████████████████ ████████████████████.[35] I understand plaintiffs

---

[30] In addition, as part of an internal discussion and analysis regarding revenue impact for an individual representative user, Google determines the revenue impact factor due to ████████████████████ (GOOG-CABR-03611417–428 at 417) (Bindra Ex. 28).

[31] ████████████████████████████ (GOOG-CABR-05292934–936) (Liao Ex. 9).

[32] ████████████████████████████ (GOOG-CABR-05292934–936) (Liao Ex. 9).

[33] Deposition of Huei-Hung (Chris) Liao, Dec. 2, 2021, p. 171.

[34] For an overview of various identifiers, see the Shafiq Report. Shafiq Report, pp. 12–14.

[35] Deposition of Huei-Hung (Chris) Liao, Dec. 2, 2021, pp. 168–169.

Patrick Calhoun, et al. v. Google LLC

have requested discovery related to these specific projects, however, documents have not yet been provided in response to the request.[36]

55.     For illustration, the Mangum Report computes a ▇▇ percent premium for ▇▇▇▇▇▇ revenue due to personalization and applying the premium to Google's total ▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇[37] ▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇

**II.A.4. Mangum Analysis Computes Google Profit Portion Consistent with Financial Disclosures and Approach Applied by Google as Part of Its Own Internal Analyses**

56.     To account for additional costs Google incurred associated with earning the computed revenue premium, the Mangum Report computes a profit margin to apply to the revenue premium. The profit margin is based on Google's financial records filed with the SEC. The Mangum Report computes and presents both the gross profit margin and the net profit margin.[38] For example, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇ .

57.     Application of the Google profit margin to the aggregate revenue impact is consistent with Google's own internal methods and analysis for assessing ▇▇▇▇▇▇▇▇▇▇▇▇▇▇

---

[36]   It is also my understanding that the "Zwieback" referenced by Mr. Liao is one of the Google identifiers that Plaintiffs allege was improperly sent from Chrome to Google and is associated with Google Ads (i.e., google.com or Search Ads).

[37]   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (GOOG-CALH-00160127–137 at 128) (Liao Ex. 10).

[38]   Mangum Report, ¶ 62 and Exhibit 3.

Patrick Calhoun, et al. v. Google LLC

█████. For example, based on an internal analysis, when computing ████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████.[39] Two takeaways are worth noting. First, according to Google's own analysis, it applies ████████ ████████████████████████████████████████████████████. Second, the ████████████████████████████████ is comparable to the ████████████ margin computed in the Magnum Report.

### II.A.5. Strombom's Analysis Regarding Unjust Enrichment Runs Counter to Google's Own Practices

58.   As outlined above, the Mangum Report presents a methodology for computing Google's profit premium due to the alleged wrongdoing consistent with Google's own methods of analyzing a similar inquiry. The impacts are analyzed at an aggregate level starting with total advertising revenue and applying the properly computed revenue percentage premium to compute the revenue premium. Profits are then computed by applying the Google profit margin to the revenue premium. In other words, Google, in the ordinary course of business, also looks into the type of impact questions we are investigating and follows a macro approach with a series of steps consistent with the analysis in the Mangum Report, as opposed to an individualized approach.

59.   Claims in the Strombom Report to divert from the unjust enrichment analytical framework in the Mangum Report run counter to Google's own business practices.[40] Although there are multiple examples of Google running analyses consistent with the Mangum Report, Dr. Strombom has failed to identify any real-world examples supported by Google's, or anyone else's, actual business practices that support assessing the unjust enrichment through user-based individualized inquiry. In doing so, Dr. Strombom has failed to provide any

---

[39]  ████████████████████████████████████████████████ (GOOG-CALH-00030603–606 at 603).

[40]  For example, according to Dr. Strombom, the unjust enrichment analysis is speculative because it is based on an unsupported assumption that the ████████████████████████████████████████████ ██████████████████████████████████████████████████████." Strombom Report, ¶ 91. However, as shown in this report, the framework in the Mangum Report is consistent with the framework Google follows when assessing the impact of ████████████████ and Google applies a uniform revenue loss percentage across all ████████ revenue.

support to justify shifting to his proposed methods of analysis that are in direct conflict of Google's internal analyses and methods for computing the revenue and profit premium due to the alleged inappropriate collection of user data.

### II.A.6. Additional New Information for Identifying Google's Unjust Enrichment

60.    Additional materials received since submitting the Mangum Report include information relating to Google remarketing revenue. In general, I understand remarketing relates to customizing ads for users that have previously visited particular sites.

61.    For example, Google also maintains █████████████████████████ ████████████████████████████████ ██████████████████████████.[41]

62.    Google employee Steve Ganem testified that he used this ████████ to determine that the ███████████████████████████████ ██████████████.[42] These revenues are the result of ████████████ ███████████████████████ ████████" that are the product of tracking on non-Google websites. I understand all of this remarketing revenue is due to personal information based tracking. Following the same general methodology outlined in the Mangum Report,[43] the remarketing revenue proportion related to personal information that Chrome sends to Google about non synced users can be calculated by multiplying the following: ████████████████ ███████████████████████████ ████.[44]



---

[41]  Deposition of Steve Ganem, Feb. 11, 2022, p. 96.

[42]  Deposition of Steve Ganem, Feb. 11, 2022, p. 93.

[43]  ████████████████████████████████████.

[44]  ██████████████████████████████ (GOOG-CALH-00160127–137 at 132-133) (Liao Ex. 10).

---

Patrick Calhoun, et al. v. Google LLC

### II.B. Apportionment of the Unjust Enrichment is Available Through Feasible Methods

63.   The Mangum Report outlines a proposed method of allocation of Google's unjust enrichment following a pro-rata approach based on account months.[45] The discussion includes reference to data potentially available, including user data organized within Google's internal systems and programs. For example, the allocation discussion in the Mangum Report references account data indicating account months need not be limited to signed in users. ███████████████████████████████████████████ ████████████████████████████████████████.[46] In addition, the Mangum Report apportionment discussion references ██████████████████ ████████████████████████████████████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████.[47] The discussion also references Google data for identifying devices with sync on versus sync off.[48] Lastly, the discussion in the Mangum Report references Google information relating to identifying synced users as well as synced traffic logs.[49] As outlined below, I understand this information, together with newly produced information, allow for various methods of apportioning Google's unjust enrichment to class members.

64.   As explained by Plaintiffs' expert Professor Shafiq, Google has the data, systems, and thus ability to confirm Google can identify Class Members, including those without a Google

---

[45]   Mangum Report, ¶¶ 64 and 97.

[46]   The Mangum Report, at ¶ 64, fn. 96, referencing Deposition of David Monsees, June 11, 2021 (volume 2), pp. 452 and 456–457, which notes ████████████████████████████████████████████████████████████████"

[47]   Mangum Report, ¶ 64 and fn. 96; ████████████████████████████ (GOOG-CALH-00292922–956 at 935); Shafiq Report, ¶ 98.

[48]   The Mangum Report, at ¶ 64, fn. 95, referencing Deposition of David Monsees, Apr. 9, 2021 (volume 1), pp. 211–212, which notes ████████████████████████████████████████████████████████████████████████████████████

[49]   The Mangum Report, at ¶ 64, fn. 95, referencing Deposition of David Monsees, Apr. 9, 2021 (volume 1), Exhibit 11. *See also* ████████████████████████████ (GOOG-CALH-00028489–532 at 519–522) (a Google presentation highlighting sync history logs).

---

Highly Confidential — Attorneys' Eyes Only                                                   23

Patrick Calhoun, et al. v. Google LLC

account.[50] Furthermore, the steps discussed below may be applied to apportion Google's unjust enrichment to all Class Members.

65.    I understand Google has data on signals received for users that are not synced, including users labeled as "████████████████████████" (as categorized internally in reference to Google's ██████ program) and users who are "████████████[51] The data represent online sessions where users have used Chrome and Google collected user information while not synced.[52] The records include ███████████████████████████████████████ ██████████████████████████████████████. Based on this information, the share of total not synced months for each user may be computed. Each share for each Class Member may be used to apportion the unjust enrichment amount.

66.    An alternative apportionment approach is available based on Google's data on user browsing history counts.[53] The data are compiled based on the total number of user communications in Google storage relating to advertisements. According to technical expert Professor Shafiq and newly received documents, Google maintains user browsing data in its storage system referred to as "██████ I understand the history data are available by user and the association of the data with whether the user is synced or not synced is identifiable. I further understand Google's ██████ systems includes the browsing history data for non-Google account holders as well. Based on these data from the ██████ system, apportionment may be applied using the data for all not synced users by computing each user's share of the total not synced data.

67.    Newly received information support a second alternative approach to allocate the profit premium earned by Google. I understand, per Professor Shafiq (and newly produced documents), the user centric data that Google has also includes ████████████████████ ██████████████████████████████.[54] ████████████████████████████

---

[50]  Shafiq Report, ¶¶ 78–82; Shafiq Rebuttal Report, ¶¶ 157–164 and 189–194.

[51]  Deposition of Tim Schumann, Jan. 13, 2022, pp. 34–50; Plaintiffs' Fourth Request for Production of Documents, Aug. 24, 2021, Exhibit B (Schumann Ex. 2); Shafiq Rebuttal Report, ¶¶ 53 and 165–175.

[52]  Shafiq Rebuttal Report, ¶¶ 543 and 165–175. *See also* Smith Report, Section XIV; Shafiq Report, Section V.

[53]  Shafiq Rebuttal Report, ¶¶ 157–175; Shafiq Report, Section V.

[54]  Shafiq Rebuttal Report, ¶¶ 8, 157–164 and 176–188.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████.[55] For example, I understand the logs include entries on revenue associated with advertisement and user identifier combinations. Based on this information, allocation to Class Members may be performed. This allocation may be done starting with the aggregate unjust enrichment and then allocating using a user revenue-based allocation, where each user is apportioned a share based on his or her not synced associated revenue as a portion of the total logged revenue for all not synced users.

### II.C. Restitution Analysis in the Mangum Report is Based on Sound Economics and Consistent with Google's Position Regarding the Value of User Data

68.   The Mangum Report restitution analysis shows the following: (i) Chrome users value their data and privacy, and given the data allegedly wrongfully collected, Class Members received a reduced value of browsing services; (ii) there is a market for Class Members' user data; and (iii) market measures indicate the market values user data in a manner that is uniform across users.

69.   Browser users value their data and privacy as shown through direct and indirect evidence. This evidence includes peer-reviewed studies, including survey and conjoint analysis, together with market measures. For example, the data protection market measures (e.g., VPNs) show consumers are charged and pay amounts based on pricing uniform across users.

70.   In terms of the data itself, additional market measures show companies, including Google, offer and pay users for access to and collection of their personal online data. As with the data protection market measures, the data acquisition market measures follow a uniform pricing structure where each company pays for data based on pricing scales that apply to all users.

71.   Newly received documents provide additional information regarding Google's practices of paying users for permission to track their Internet activity using the same identifiers at-issue

---

[55] ███████████████████████████████████████████████████████████ (GOOG-CALH-00042297–340 at 300).

in this case. As discussed in more detail below, Google itself has confirmed its uniform pricing structure reflects the fair market value of user data.

### II.C.1. The Peer-reviewed Research Cited in the Mangum Report Is Consistent with the Conclusion Users Place Value on the Protection and Privacy of Their Data

72.   Professor John opined in her original report that consumers care about privacy on the internet.[56] Professor John explains in her rebuttal report that despite the comments from Professor Erdem, she continues to hold this position regarding users placing value on online privacy.[57]

73.   As far as whether consumers value online privacy, the purpose of a conjoint analysis is to measure the value that consumers place on certain features of a product or service and it is typically employed when there is no adequate market measure that isolates the value of the specific product or feature in question. For example, a car company may engage in a conjoint analysis to determine the value and importance of fuel efficiency compared with other features of the car.

74.   A conjoint analysis may not be necessary when the product or service at issue is, in and of itself, the subject of market transactions. In such cases, an economist does not need to engage in alternative mechanisms and/or consider indirect evidence, such as conjoint analysis, to measure the value. Instead, an economist may look to the price of the product in the real-world (i.e., direct evidence). The Mangum Report discusses both the consideration of such direct and indirect evidence.[58]

75.   Similarly, the Strombom Report asserts that the Mangum Report "fails to account for variation in the value users place on protection of their at-issue data" because, in Dr. Strombom's estimation, "different users . . . have different willingness to disclose their data, and value privacy differently."[59] However, individual variations in "value" that they

---

[56]   Expert Rebuttal Report of Leslie John, Ph.D. Feb. 15, 2022 ("John Rebuttal Report"), ¶ 1.

[57]   John Rebuttal Report, ¶ 2.

[58]   Mangum Report, ¶¶ 37 and 66, and Section V.A.

[59]   Strombom Report, ¶ 163.

Patrick Calhoun, et al. v. Google LLC

place on privacy is not inconsistent with an established market value when there is a direct market price for the item in question. For example, for sentimental reasons, the owner of a family home may place a different "value" on their own home than the market would bear. But the fair market value of the home is the amount that would result from an arms-length sale on the open market. It is no different with the Internet browsing history information and identifiers at-issue in this case. Regardless of any specific user's feelings about privacy and the value of such data, the economic value of the data can be determined by reference to specific marketplace transactions.

### II.C.2. Google Has Determined the Market Value of Users' Data which is Common Across Users

76.  In the Mangum Report, as part of the market measure analysis I discussed the Ipsos Screenwise Panel that Google utilizes to study online behavior.[60] Since the Mangum Report was filed, I have received additional discovery from Google related to "████████████" and specifically the Ipsos Screenwise Panel. This subsection will review the additional information that I have learned, combined with additional publicly available research I performed.

77.  Regarding Google's motivation for running the Screenwise panels, an internal Google panel proposal noted that "████████████████████" Googles's modeling assumptions.[61] Google further noted ████████████████████████████████ ██████████████████"[62] ██████████████████████ █████████████████████████████████████████ █████████████████████████████████.[63] By way of example, ████████████████████████████ ████████████████████████████████████

---

[60]  Mangum Report, ¶ 92.

[61]  ████████████████████ (GOOG-CABR-04704939–989 at 944).

[62]  ████████████████████ (GOOG-CABR-04704939–989 at 945).

[63]  ████████████████████ (GOOG-CABR-04704939–989 at 944).

Patrick Calhoun, et al. v. Google LLC

████████████████████████████████████████████████████████

████████████████████████. [64]

78.    The importance of Google's ability to personalize advertising to Google's revenue model has been made clear as a result of ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████. [65] ████████████████

████████████████████████████.

79.    Google's own internal documents establish that it believes the "████████" and "████

████████" of collecting the browsing history information connected to what I understand to be the same primary identifiers at-issue in this case; this value is ████ per month. [66]

80.    ████████████████████████████████████████████████

████████████████. [67] One Google memo notes "'████████████████████████

████████████████████████████████████████████."[68]

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████. n. [69] According to Dr. Ravichandran, a Google

Principal Engineer, ████████████████████████████████████

████████████████████████

---

[64] ████████████████████████████ (GOOG-CABR-04704939–989 at 946).

[65] *See, e.g.,* ████████████████████████████████ (GOOG-CABR-04704939–989).

[66] ████████████.d. (GOOG-CABR-04704597–645 at 636); ████████████ n.d. (GOOG-CABR-04077296–397 at 298); "████████████████████████ (GOOG-CABR-04312372) ████████████████████████; Shafiq Report, pp. 12–14; Ipsos, "Google Panel Privacy Policy," accessed Feb. 2, 2022, https://screenwisepanel.com/google-panel-privacy-policy ("Google  collects data through its meters, including for example . . . web pages you've visited. . . . Cookies and device information."); Shafiq Rebuttal Report, ¶¶ 195–198 and 202.

[67] *See, e.g.,* ████████████████████████ (GOOG-CABR-04312372–373).

[68] ████████████████████ (GOOG-CABR-04312372–373 at 372).

[69] *See, e.g.,* ████████████████████ (GOOG-CABR-04077296–307); ████████████████████" n.d. (GOOG-CABR-04312372–373); ████████████████████████ (GOOG-CABR-04120134–167 at 135).

---

Highly Confidential — Attorneys' Eyes Only

 [70] The approach of Google Panels allows Google to obtain an understanding of what it takes "███████████"[71] The data are used for a "█████████████████████████████████[72] I understand that it may have been around ████ when Google started using panels.[73]

81.  The Screenwise Panel is Google's "███████████████"[74] and its primary purpose "███████████████████████."[75] To do so, it █████████████████████████████████████████████████████████████"[76]

82.  █████████████████████████████████████████████████████████████████████"[77] █████████████[78] It is my understanding that this list includes the same identifiers that Chrome sends to Google without authorization in this case—and that Google uses the unauthorized identifiers for the same purposes in this case as it does in the Screenwise Panel.[79]

83.  There are several specific panels performed by Ipsos and other companies (on behalf of Google) that Google's discovery has provided details on since the Mangum Report.

---

[70]  Deposition of Deepak Ravichandran, Jan. 7, 2022, pp. 194–195.

[71]  Deposition of Deepak Ravichandran, Jan. 7, 2022, p. 196.

[72]  GOOG-CALH-00721187, ███████████ F95.

[73]  Deposition of Deepak Ravichandran, Jan. 7, 2022, p. 203.

[74]  ████████████████████████ (GOOG-CABR-04312372–373).

[75]  Ipsos, "Ipsos Screenwise Panel Privacy Policy," accessed Feb. 2, 2022, https://screenwisepanel.com/ipsos-Sow-privacy-policy.

[76]  Ipsos, "Ipsos Screenwise Panel Privacy Policy," accessed Feb. 2, 2022, https://screenwisepanel.com/ipsos-Sow-privacy-policy.

[77]  ████████████████████ (GOOG-CABR-04312372–373); ██████████ (GOOG-CABR-04077296–307 at 301). *See also* █████████████████ (GOOG-CALH-00700433–453 at 446).

[78]  ████████████████ (GOOG-CABR-04312372–373); ████████████ (GOOG-CALH-00700433–453 at 446).

[79]  Shafiq Report, pp. 12–14; Shafiq Rebuttal Report, ¶¶ 195–198 and 202.

84.   For instance, the ████████████████████████████████████████
████████████████████████ [80] ████████████████████████████████
███████████████████████████████████████ [81] ████████████████████
████████████████████████████████████████████████████████████████
████████████████████ . [82] ████████████████████████████████████
██████████████████████████████████████ . [83]

85.   ████████████████████████████████████████████████████████████
████████████████████ . [84] ██████████████████████████████████████
████████████████████ [85]

86.   ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████ . [86] ██████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████████ . [87] ███████████████████████████████████
████████████████ ." [88]



---

[80] ████████████████████████████████████████████ (GOOG-CABR-04766037–6072 at 6038).

████████████████████████████████████████████████████████ (GOOG-CABR-04312372–373).
[81] ████████████████████████ (GOOG-CABR-04766037–6072 at 6041).
[82] ██████████████████████ (GOOG-CABR-04766037–6072 at 6041).
[83] ████████████████████████████████ (GOOG-CABR-04766037–6072 at 6041). ████████████████████████ (GOOG-CABR-04766037–6072 at 6056).
██████████████████ (GOOG-CABR-04704597–645 at 636).
[84] ████████████████████ (GOOG-CABR-04704597–645 at 636); (GOOG-CABR-04077296–397 at 298).
[85] ██████████████████████████████████████ (GOOG-CABR-04766037–6072 at 6056–6057). ████████████████████████████████████ ." )
[86] (GOOG-CABR-04704597–645 at 614 and 642–643).
[87] ████████████████████████ (GOOG-CABR-04704939–989 at 967).
[88] ████████████████████ (GOOG-CABR-04077296–307 at 302). *See also* GOOG-CALH-00721187, A95.

Patrick Calhoun, et al. v. Google LLC



88. As shown through various examples, participants are compensated monthly for participation in Google Screenwise panel studies, which grants Google access to ongoing user data. Participation may include collection of user data through various options, such as a meter browser extension or a mobile app.[92] According to the Screenwise webpage, participation may also include installing a specialized router as an alternative means to track user data in the home.[93] If panelists opt to have the Screenwise router installed, they are compensated an additional $100.[94] Google may also collect additional information from panelists through panel surveys (e.g., name, address, panel ID, demographic information, and information to verify and authenticate panelist participation).[95] In addition to the monthly compensation and potential supplemental router installation compensation, panelists can earn an extra $20 compensation for qualifying for the study.[96]

89. Google clearly recognizes that the expense related to panels has a tremendous return and benefit for Google as it combines the data collected with other stored Google information. For instance, Ipsos notes Google "may combine your panel data with information in your

---

89 ████████████████████████████ (GOOG-CALH-00700433–453 at 442).

90 GOOG-CABR-04618719–722.

91 ████████████████████████████ (GOOG-CALH-00700433–453 at 437).

92 Google, "Set up the Screenwise Meter browser extension on your computer," accessed Feb. 10, 2022, https://support.google.com/screenwise-meter/answer/9721772?hl=en; Google, "Set up the Screenwise Meter app on your phone or tablet," accessed Feb. 10, 2022, https://support.google.com/screenwise-meter/answer/9721770?hl=en.

93 Ipsos, "Ipsos Screenwise Panel," accessed Feb. 10, 2022, https://screenwisepanel.com.

94 Ipsos, "Ipsos Screenwise Panel," accessed Feb. 10, 2022, https://screenwisepanel.com.

95 Google, "Google Panel Privacy Policy [June 2021]," June 1, 2021, accessed Feb. 10, 2022, https://support.google.com/screenwise-meter/answer/9744317?hl=en.

96 Ipsos, "Ipsos Screenwise Panel," accessed Feb. 10, 2022, https://screenwisepanel.com.

---

Patrick Calhoun, et al. v. Google LLC

Google Account(s) (e.g., which ads you viewed), or with anonymous or pseudonymous identifiers (such as cookies or unique device identifiers) used by Google products and services."[97] It also notes that "Google may combine Panel Data, Third-Party Data, or Google Account data (including personal information) with advertising cookies like the DoubleClick cookie."[98] And that "Overall, your participation in this Panel changes the way Google will use information it collects from you whenever you're using Google, including the combination of the DoubleClick cookie with personal information."[99] Finally, Ipsos notes that by Google:

> combining Panel Data or Third-Party Data with non-personally-identifiable information collected from third parties (e.g., anonymous cookies), such anonymous information may become personally identifiable and used to identify you. (For example, this type of combined data could be used to help measure the effectiveness of digital advertising among consumers.)[100]

90. As this discussion makes clear, Google values this panel data, is willing to pay money to participants for the data, pays the same amount per month regardless of the user (just "activity" is required), and Google considers this payment amount to be a fair market value.

91. The Strombom Report does not mention Google Panels or Screenwise. Instead, Dr. Strombom asserts that the citations of market measures in the Mangum Report are not relevant because they pay users for different and additional things. For example, Dr. Strombom claims that these programs also require users to "fill out online profiles," "install[] additional apps on their devices," and "fill[] out additional surveys that may reveal sensitive information beyond the scope of the At-Issue Data" such as "behavior" data showing "how frequently a participant uses their computer" or "health or medical conditions, . . . sexual orientation or sexual life, political opinions/views, race/ethnic origin, religious and philosophical beliefs, and trade-union membership."[101]

---

[97]   Ipsos, "Google Panel Privacy Policy," accessed Feb. 2, 2022, https://screenwisepanel.com/google-panel-privacy-policy.
[98]   *Id.*
[99]   *Id.*
[100]   *Id.*
[101]   Strombom Report, ¶ 160.

92.     However, Dr. Strombom is incorrect by stating that the market values cited are not
sufficiently similar to the conduct here. First, Chrome itself is an app that is installed on the
user's device. Second, it is my understanding that Google creates detailed online profiles
based on the data that Chrome improperly sends to Google and these profiles include all of
the information the Strombom Report says would not be present in what he describes as the
"At-Issue Data."[102] Thus, while Chrome users may not "fill out online profiles" or
knowingly "reveal[] sensitive information" via Chrome, Chrome still sends information to
Google to create the detailed online profiles that the Strombom Report claims are not
present here. For example, Google assigns "verticals" to users that include all of the
"sensitive" information categories the Strombom Report claims are not present in this
case.[103] I am also informed that Chrome sent information to Google in this case about
certain Plaintiffs' medical interests (including sending Google the exact time of an
appointment that the Plaintiff was setting up), sexual orientation, specific sexual interests,
political interests and views, banking information, and education information amongst tens
of thousands of other instances of Chrome sending the Plaintiffs' data to Google without
authorization.[104]

## II.D. Google Calculates Revenue by User

93.     From reviewing documents in this matter, it appears Google does, or at least can, compute
revenue per user. For example, as discussed above, Google's ███████ system looks at user
activity and user revenue, including a "███████████████████."[105] In addition to
█████████, Google identified several ███████████████████████████████████████



---

[102]   Strombom Report, ¶ 28; GOOG-CALH-00061965; Google, "type Vertical (v201809)," accessed Feb. 7, 2022,
https://developers.google.com/adwords/api/docs/reference/v201809/CampaignCriterionService.Vertical (noting a
sample of criteria used for targeting, include, for example, "Vertical," "Age_Range," "Gender," "Parent," and
"Income_Range," etc., as well as a link to a "complete list of available vertical categories," which is a publicly available
version of the Google Verticals list, which appears to be a subset of the highly confidential Verticals list produced in this
matter with more detailed categories); Google, "Verticals," accessed Feb. 7, 2022,
https://developers.google.com/adwords/api/docs/appendix/verticals. *See also* Shafiq Rebuttal Report, ¶ 202.

[103]   See fn. 102, *supra*.

[104]   Complaint, ¶ 193; Plaintiff's Opposition to Google's Motion for Summary Judgment on Google's First Affirmative
Defense (Consent), Jan. 10, 2022, pp. 11-12.

[105]   ████████████████████████████████   (GOOG-CALH-00292922–956 at 935).

████████████████████ [106] As discussed above, I understand that after consideration of newly received materials, technical expert Professor Shafiq has reached the conclusion that Google's systems and data allow the identification of revenue earned per specific user.[107] This serves as the basis for the third unjust enrichment apportionment approach discussed above.

Russell W. Mangum III

February 15, 2022

---

[106]  Shafiq Rebuttal Report, ¶¶ 157–164 and 176–190.

[107]  Shafiq Rebuttal Report, ¶¶ 157–164 and 176–190.

# Appendix 1

# RUSSELL W. MANGUM III



4 Park Plaza
Suite 1930
Irvine, CA 92614

T (949) 594-1601
mangum@cirqueanalytics.com

## CURRENT POSITIONS

Executive Vice President, Cirque Analytics, LLC; 2021- present
Professor, Concordia Univ Irvine, Sch of Business and Economics; 2013 - present

## EDUCATION

Ph.D., economics, University of Southern California, 1995
M.A., economics, University of Southern California, 1992
B.A., economics (hons), Calif. State University, Fullerton, 1988

## SPECIALIZED EXPERIENCE, RESEARCH, OR INTEREST

Antitrust; Commercial Disputes; Intellectual Property; Statistics and Econometrics, Valuation

## PAST POSITIONS

| | | |
|---|---|---|
| 2021 | Visiting Researcher, Univ of Winchester, Sch of Bus, Law, and Tech | Winchester, UK |
| 2007-2021 | Sr. Vice President, Nathan Associates, Inc. | Irvine, CA |
| 2002–2012 | Associate Adjunct Professor, USC, Dept. of Economics | Los Angeles, CA |
| 2001–2007 | Vice President, Analysis Group, Inc. | Los Angeles, CA |
| 2001 | Manager, PricewaterhouseCoopers, Financial Advisory Svcs. | Los Angeles, CA |
| 1998–2001 | Managing Associate, Nathan Associates Inc. | Arlington, VA |
| 1998–2000 | Adjunct Professor, John Hopkins University, Krieger School | Washington, DC |
| 1995–1998 | Economist, U.S. Federal Trade Commission | Washington, DC |

## COURSES TAUGHT

- Principles of Micro/Macroeconomics, Interm. Micro/Macroeconomics, Managerial Economics, Statistics and Econometrics, Finance, Money and Financial Markets, Economics of Sin, Environmental Economics, Business Information Technology, Advanced Topics in Economics

## EXPERIENCE SUMMARY

Dr. Mangum has over 25 years of experience in economic analysis, research, and teaching. His consulting practice centers on economic analysis and damages quantification in matters related to intellectual property and technology, antitrust, class certification, statistical analysis, and complex commercial disputes. Dr. Mangum's experience as an economic expert is extensive, with testimony in over 100 matters before local, state, and federal courts. Dr. Mangum has taught graduate and undergraduate courses in economics, statistics, finance, and econometrics. He is currently an Associate Professor of Economics in the School of Business and Economics at Concordia University Irvine, and has previously taught at Johns Hopkins University, The University of Southern California, and Pepperdine University. Dr. Mangum previously worked at Nathan Associates, Inc., PricewaterhouseCoopers, and The United States Federal Trade Commission, Bureau of Economics.

## PROFESSIONAL EXPERIENCE

### *Intellectual Property*

Dr. Mangum has substantial experience in the area of intellectual property damages, including claims related to infringement of patents; FRAND licensing commitments; patent pools; copyrights; and trademarks; as well as theft of trade secrets; false designation of origin; and false advertising. The case contexts in which Dr. Mangum has performed these analyses include:

- Patent infringement related to:
  - Computer, electronics, and telecommunication industry:
    - Cellular communication network technology;
    - Modem communication devices;
    - Wireless communication network devices (routers, cards, including under FRAND licensing committments);
    - Handheld device navigation applications;
    - NIC hardware and chipsets;
    - Semiconductors;
    - Webswitching and IP router network hardware;
    - Wired and wireless portable electronic temperature sensor devices;
    - Electronic eReader devices;
    - Digital TV Tuners under FRAND licensing commitments;
    - Automated lipsinc animation used in video games;
    - Data encryption devices.
    - VoIP network telephony services.
  - Medical devices:
    - Artificial vertebral disc implants;
    - Trocar seals for laparoscopic surgery;
    - Spinal fusion implants;
    - Breast biopsy devices;
    - Remote medical information monitoring technology.
  - Energy
    - Specialized valves used in oil refining;
    - Electric utility management systems;
    - Wide-area real time phasor measurement and monitoring.
  - Food and agriculture:
    - Additive-infused candy;
    - Nutritional supplements;
    - New variety of late ripening white grapes;

- Structures and methods utilized in the growing of grapes and raisins.
- Business software
  - eProcurement;
  - Business intelligence;
  - Design and simulation;
  - Call routing software;
  - Computer tracking;
  - Program and application management;
- Clothing and clothing design
  - Padded athletic shirits/pants; shoes; headwear; accessories;
- Miscellaneous
  - Electronic nicotine delivery systems (NDS)
  - Personal watercraft devices and accessories
  - Consumer advertising design via use of digital media
  - Automated stapling machines used in bed manufacturing
  - Specialized hardware and control systems used in high-rise elevators
  - Electronic exchange systems for trading of commodities futures contracts
  - Electronic data management system used in public transportation projects
  - Document and print inspection systems
- <u>Trademark, trade dress, or copyright infringement related to:</u>
  - Sponsorship with motorsports, automotive repair tools and devices, beverages and snacks, and apparel;
  - Real estate property aquizition services;
  - Online dining reservation and payment services;
  - Internet search engine terms related to retail sales of food and arranged food products;
  - Enterprise Resource Plannning (ERP) software;
  - Veterinary Teleradiology (online/internet) Services;
  - Devices and software for online mobile device data extraction and IT network devices;
  - Clothing, shoes, and jewelry;
  - Advertising and marketing through wireless mobile communications;
  - Motion picture trademarks in the manufacture of clothing;
  - Furniture products (mechanized and non-mechanized);
  - Portable combustion engines;
  - Infant care products;
  - Homeopathic products;

- Postal measuring products;

- Scented candle products;

- Children's toys;

- Art and art exhibits

- Design plans for a theme amusement park.

- <u>Theft of trade secrets related to:</u>

  - Cold extraction coffee processes

  - Electronic mechanisms for payment processing;

  - Techical documents, Product features, customer data, and marketing methods/models related to Systems for General Floor Hospital Monitiring of patient vital statistics;

  - Training methods, pricing models, and customer status databases related to Enterprise Resourve Plannning (ERP) software;

  - Customer data and information, and pricing models related to employee pension and benefits insurance brokerage services;

  - Government contracted research into laser vibrometry;

  - Devices and software for mobile device data extraction;

  - IT system design and implementation for the US defense industry;

  - Electronic engineering and CAD packages used in US naval warcraft architecture;

  - Methods for mathematical simulations for the pricing of mortgage backed securities;

  - Soy coffee alternative products;

  - Design, development, marketing, and manufacturing of toys;

  - Computer game accessories.

- <u>False advertising, false designation of orgin, or unauthorized use of likeness related to:</u>

  - Chemical dependence treatment services;

  - Real estate property aquizition services;

  - Security monitoring systems and services;

  - Consumer appliances;

  - High Availability Disaster Recovery (HA/DR) business software;

  - Medical data printer systems;

  - Furniture products;

  - Composed music and lyrics used in television commercials;

  - Restaurant meals and shopping services;

  - Internet advertising services via advertorial placement on publishers' websites;

  - Nutritional supplements and beverages.

- <u>Inventorship disputes related to:</u>

  - Cold extraction coffee processes

- Spinal fusion implant systems;
- Interarterial guidewire and embolic filter devices.

## *Competition/Antitrust*

Dr. Mangum has substantial experience in the area of competition and antitrust, including analyses of relevant product and geographic markets, market power, monopolization, and likelihood of monopolization from impending events. These analyses usually include statistical and econometric analysis of market data to identify the extent of competition, and the magnitude of competition. The case contexts in which Dr. Mangum has performed these analyses include:

- Evaluated common impact and estimated damages, for direct and indirect purchasers, from price fixing and other conspiracies in the markets for commercial tissue paper, bulk vitamins, high-end automobiles, ready mix concrete, consumer apparel, Korean noodles, packaged seafood, meat products, interior molded doors, airline travel, and pharmaceuticals.

- Evaluation of alleged competitive foreclosure in the market for sleep apnea products, including relevant markets, market power, and lost profits damages.

- Evaluation of alleged price discrimination across dealers of hardscape building materials.

- Evaluation of antitrust claims and affirmative defenses of patent misuse related to required terms in patent license programs for flash memory semiconductors and systems.

- Evaluation of market segments, market channels, and cost pass-through in the market for DRAM-containing products and NFL brand apparel.

- Estimation of damages related to:
  - A conspiracy to boycott developments in DRAM packaging;
  - Foreclosure of competition in market for footware insoles and inserts.

- Evaluation of competitive effects of exclusive dealing clause in a franchise agreement.

- Evaluated the competitive effects of exclusive dealing policies regarding:
  - Acute care hospital and physician services;
  - Customer purchase data exchange related to direct mail advertising and sales;
  - Free standing insert advertising (coupon) services;
  - Replacement parts for 3-piece body welder systems;
  - Interconnect agreements between internet backbone communication services;
  - Supply of biological inputs used in creating generic biologic therapeutic treatments;
  - Professional sports branded athletic apparel;
  - Durable medical equipment;
  - Pharmaceuticals.

- Analyzed the competitive effects from wrongful patent application and issuance (fraud on the patent office) related to processes and mechanisms for food preparation and processing.

- Analyzed the likely competitive effects of proposed mergers in various industries, including hospital services, physician services, pharmaceuticals, medical insurance, construction aggregates, supermarkets, auto parts, cable systems and programming, industrial refractories, and computer game software.

*Commercial Disputes*

- Evaluated damages related to alleged breach of contract involving collection and retention of personalized information connected ot web browsing activity.

- Evaluated damages related to alleged breach of contract involving online storage agreements.

- Evaluated claims of damages related to attempted sale of cold extraction coffee company and the discovery of patents allegedly based on confidential information.

- Evaluated claims of damages related to failure to close a sale for multiple solar energy production peoperties/companies.

- Estimated damages in the form of lost profits from breach of contract in a services joint venture involving use of indexes and associated data for creation and analysis of international financial securitied and derivatives.

- Estimated damages in the form of disgorgement and lost company value related to brokerage services involving employee pension and benefit programs.

- Evaluated claims of replacement cost and lost profits damages related to alleged interference in the market for femtocell wireless communication products.

- Evaluated claims of damages in the form of lost profits and disgorgement of compensation and benefit from alleged unauthorized use of confidential materials in the market for government contracts for research into laser vibrometry.

- Estimated damages from employee theft of HDD computer memory products from s research/testing facility. Calculated value based on historical in-channel market price and on historical costs of manufacturing and sales.

- Evaluated claims of lost profits damages arising from alleged professional malpractice related to commercial development and land use.

- Provided statistical and data analysis of invoices for disaster recovery and construction services. Estimated lost profits related to alleged fraud, breach of contract, and tortious interference.

- Estimated damages related to alleged breaches of contract, including:

  - Contract involving the development and sale of solar power generation projects;

  - Contract involving the supply of active incredients in nutricuticals;

  - Non-solicitation agreement between government defense contracting companies;

  - Contract for concession services at amusement parks;

  - Contract for creation and promotion of credit reporting services;

  - Contract for supply of MLB jerseys used in creation of sports memorabilia;

  - Contract for blending and supply contracts for specialized non-dairy beverages;

  - Non-compete clauses (restaurant lease, franchising, structural steel fabrication);

  - Contract for earning and redeeming of frequent flyer miles;

  - Contract for purchase of television airtime on a local over-the-air station;

  - Contract for representation and sale of television programming;

  - Royalty contract regarding design and functionality elements use in toys;

  - Contract for technology and support from software conference bridge systems;

- Contract for conference calling services and long distance calls connection services.
- Estimated damages from defamation related to the launch of a clinic for medical disorders.
- Evaluated claims by the CA Coastal Commission related to lost recreational value from proposed coastal bluff seawall construction.
- Evaluated concepts and methods for calculating proceeds from from a Qi Tam suit related to improper medical lab billing practices.
- Estimated damages related to Quantum Meruit claims involving use of software to manage viewing and storage of electronic medical images.

### *Employment and Labor*

- Estimated damages related to lost profits; lost company value, employee training and hiring expense, and/or disgorgement of defendant's profits in multiple cases related to the alleged breach of non-solicitation agreements and unauthorized use of confidential information by departing employees the insurance and MLM health and wellness industries.
- Estimated lost profits damages and/or disgorgement of defendant's profits in multiple cases related to the alleged breach of non-solicitation agreements and unauthorized use of confidential information involving government defense contracting companies.
- Estimated plaintiff's lost profits and disgorgement of defendant's profits related to the theft of trade secrets by departing employees in the automated emergency/disaster response industry.
- Estimated disgorgement of defendant's profits related to the theft of trade secrets by departing employees in the naval engineering industry.
- Provided statistical analysis of employee time card and pay data to estimate instances of underpayment or missed breaks.
- Estimated lost earnings and compensation damages related to an alleged wrongful termination of an employee; evaluated lost wages/earnings, lost retirement benefits, and lost compensation through stock options.
- Estimated damages to an employee/inventor related to exclusion as an inventor from PCT applications following termination from a start-up medical devices company; evaluated the plaintiff's claims of lost share of proceeds from technology share.

### *Statistical and Econometric Analysis*

- Performed regression analysis to evaluate class-wide damages related to class certification in the context of alleged conspiracy on the prices of interior molded doors.
- Performed regression analysis to evaluate class-wide damages related to class certification in the context of alleged conspiracy on the prices of packaged seafood.
- Performed regression analysis to evaluate class-wide damages related to class certification in the context of alleged conspiracy on the prices of transatlantic air travel.
- Performed regression analysis to evaluate class-wide damages related to class certification in the context of alleged conspiracy on the prices of Korean noodle products.
- Evaluated regression and statistical analysis offered in support of damages related to an alleged breach of non-solicitation agreements and unauthorized use of confidential information by departing employees the insurance and MLM health and wellness industries.

Jackson Hole, WY              Irvine, CA              Los Angeles, CA              Washington, DC

- Evaluated regression and statistical analysis offered in support of damages and common impact in an indirect purchaser class action related to alleged false advertising for nutritional supplement beverages.

- Performed regression analysis to evaluate class-wide damages related to class certification in the context of alleged conspiracy and exclusive agreement between professional sports teams and an apparel manufacture.

- Performed regression analysis to estimate class-wide damages related to class certification in the context of alleged price fixing in markets for ready mix concrete.

- Performed regression analysis to estimate pass-through of anticompetitive price increases in the manufacturing and sale of DRAM and DRAM containing devices.

- Provided statistical analysis of employee time card and pay data to estimate instances of underpayment or missed breaks.

- Provided sampling techniques and statistical analysis of customer service database to estimate the extent of use of an allegedly infringing feature in a commercial router.

- Evaluated sampling techniques and extrapolation estimates related to allegedly improper medical billing practices and in the context of damages related to construction defects.

- Provided statistical and econometric analysis of survivorship related to consumer membership attrition in credit reporting programs.

- Provided statistical and econometric analysis of the correlation between purchase of infringing products and consequential purchase of related services.

- Provided statiscal analysis and estimate of medical product sales in the absence of data from third party sales force.

- Provided statiscal and econometric analysis of conference calling minutes related to alleged intentional interference and unfair competition.

- Conducted statistical analysis of incremental costs in support of lost profits calculations.

## EXPERT WITNESS EXPERIENCE (SINCE 2017)

- *In Re Broiler Chicken Antitrust Litigation,* United States District Court, Northern District of Illinois (2022). Provided deposition testimony on behalf of plaintiffs related to the economic effects of an alleged conspiracy to constrain capacity in the broiler chicken industry.

- *VRtoysone, LLC, et al v. Disney Interactive Studios, Inc.,* United States District Court, Central District of California, Western Division (2022). Submitted an expert report on behalf of Defendant involving damages related to alleged patent infringement involving video games.

- *Lauren Adele Oliver v. Meow Wolf Inc., et al.,* United States District Court for the District of New Mexico (2022). Submitted an expert report on behalf of plaintiff involving damages related to alleged copyright infringement involving art and art exhibits.

- *Patrick Calhoun, et al. v. Google LLC,* United States District Court, Northern District of California (2021). Submitted an expert report on behalf of plaintiff class involving damages and common impact related to alleged breach of contract involving the collection and retention of personalized information connected to web browsing activity.

RUSSELL W. MANGUM III                                                                           9

- *CPI Security Systems Inc. v. Vivint Smart Home Inc. et al.,* United States District Court, Western District of North Carolina, Charlotte Division (2021). Provided deposition testimony on behalf of plaintiff involving unjust enrichment and royalty damages related to alleged false advertising and unfair competition related to security monitoring systems and services.

- *Martifer-Silverado Fund I, LLC and Silverado Power LLC v. Talesun Solar USA, Ltd.,* Superior Court of California, San Francisco County (2021). Provided trial and depsition testimony on behalf of Defendant, related to alleged breach of contract involving solar energy projects.

- *Javo Beverage Co., Inc., v. Stephen Corey,* American Arbitration Association (2021). Provided trial (arbitration) and deposition testimony on behalf of respondent related to breach of contract and misappropriation of confidential information and technology in the market for coffee extracts.

- *Andrea Wlliams and James Stewart (class reps) v. Apple Inc.,* United States District Court, Northern District of California (2021). Submitted an expert report on behalf of plaintiffs related to damages involving alleged breach of contract regarding provision of electronic file storage.

- *QC Manufacturing, Inc., v. Solatube International, Inc. and Brighter Concepts, Inc. dba Solatube Home Daylight,* JAMS Arbitration, Los Angeles, CA (2020). Provided trial (arbitration) testimony on behalf of complainant related to a breach of contract (litigation settlement agreement) involving whole house fans.

- *Sprint Communications Company LP v. Cequel Communications, LLC, et al.,* United States District Court, District of Delaware (2020). Provided deposition testimony on behalf of plaintiff related to lost profits and royalty damages from alleged patent infringement involving VoIP telephony network services.

- *In Re Domestic Airline Travel Antitrust Litigation,* United States District Court, District of Columbia (2020). Provided deposition testimony on behalf of plaintiff class related to the economic effects of an alleged conspiracy to constrain capacity in the domestic airline travel industry.

- *RV Skincare Brands LLC v. Digby investments Ltd.., Quickbox LLC, et al.,* United States District Court, Southern District of New York (2020). Submitted an expert report on behalf of certain defendant related to damages from alleged counterfeit sales and trademark infringement involving fulfillment of skincare product commerce.

- *Cisco Systems Inc. et al. v. Zahid Hassan Sheikh et al.,* United States District Court, Northern District of California (2020). Provided deposition testimony on behalf of certain defendants related to damages from alleged counterfeit sales and trademark infringement involving transceiver and switching IT network equipment.

- *San Diego Country Credit Union v. Citizens Equity First Credit Union,* United States District Court, Southern District of California (2020). Provided deposition testimony on behalf of plaintiff related to damages flowing from fraudulent declaration in the registration of a trademark involving credit unions.

- *Sprint Communications Company LP v. Atlantic Broadband Finance LLC, et al.,* United States District Court, District of Delaware (2020). Provided deposition testimony on behalf of plaintiff related to lost profits royalty damages from alleged patent infringement involving VoIP telephony network services.

- *Sprint Communications Company LP v. Charter Communications Inc. et al.,* United States District Court, District of Delaware (2020). Provided deposition testimony on behalf of plaintiff related to lost profits and royalty damages from alleged patent infringement involving VoIP telephony network services.

- *Sprint Communications Company LP v. Mediacom Communications Corp.*, United States District Court, District of Delaware (2020). Provided deposition testimony on behalf of plaintiff related to lost profits and royalty damages from alleged patent infringement involving VoIP telephony network services.

- *Sprint Communications Company LP v. TPC Global LLC et al.*, United States District Court, District of Delaware (2020). Provided deposition testimony on behalf of plaintiff related to lost profits and royalty damages from alleged patent infringement involving VoIP telephony network services.

- *Sprint Communications Company LP v. Wideopenwest Inc. et al.*, United States District Court, District of Delaware (2020). Provided deposition testimony on behalf of plaintiff related to lost profits and royalty damages from alleged patent infringement involving VoIP telephony network services.

- *S&P Dow Jones Indices LLC and SPDJ Singapore Pte Ltd. v. BSE Ltd.,* United States District Court, Northern District of California (2020). Provided trial (tribunal) testimony on behalf of claimants and counterrespondants for an arbitration concerning damages from breach of contract in a service joint venture related to the use of indexes and associated data for creation and analysis of international financial securitied and derivatives.

- *In Re: Molded Doors Indirect Purchaser Antitrust Litigation*, United States District Court, Eastern District of Virginia, Richmond Division (2020). Provided deposition testimony related to class certification and the merits phase of an antitrust case on behalf of an indirect purchaser plaintiff class related to the evaluation of common impact, pass-through, and class wide damages involving alleged collusion on the prices for interior molded doors.

- *Citcon USA LLC v. Riverpay Inc. et al.,* United States District Court, Northern District of California (2019). Provided trial and deposition testifimony on behalf of defendant/counterplaintiff concerning damages from alleged tortious intereference and breach of contract involving electronic payment processing network services.

- *3G Licensing, et al., v. Lenovo Group Ltd., et al.,* United States District Court, District of Delaware (2019). Submitted an expert report on behalf of defendants Lenovo and Motorola Mobility related to reasonable royalty damages for patent infringement involving cellular phone network technologies.

- *Inteliquent, Inc. v. Free Conferencing Corporation, et al.,* United States District Court, Northern District of Illinois, Eastern Division (2019). Provided deposition testimony on behalf of Counterclaim Plaintiffs, related to alleged breach of contract, intentional interference, and unfair competition involving conference calling services and long-distance calls connection network services.

- *In Re: Packaged Seafood Products Litigation*, United States District Court, Southern District of California (2019). Provided deposition testimony related to the merits phase of the case and also testfied at a bench trial (evidentiary hearing) on behalf of direct purchaser plaintiff class related to class certification and estimation of class wide damages in an antitrust case involving alleged collusion on the prices for packaged seafood. Also issued initial and reply reports regarding class certification and initial and reply reports related to antitrust effects and damages.

- *T.R.P. Company, Inc., v. Similasan AG and Similasan Corporation,* United States District Court, District of Nevada (2019). Provided deposition testimony on behalf of plaintiff/counter-defendant involving unjust enrichment and lost profits related to trademark infringement of certain homeopathic products.

- *Advanced Digital Solutions International, Inc., v. Rahi Systems, Inc., et al.,* Superior Court for the State of California, County of Alameda (2019). Provided deposition testimony on behalf of plaintiff concerning disgorgement damages related to trade secret misappropriation involving the theft of customer lists.

• *ADT LLC and ADT* US *Holdings v. Alder Holdings LLC, et al.,* United States District Court, Southern District of Florida, Palm Beach Division (2019). Provided trial and deposition testimony on behalf of plaintiff involving unjust enrichment and royalty damages related to alleged false advertising and unfair competition, and contempt of injunction related to security monitoring systems and services.

• *ADT LLC v. Security Networks LLC et al.,* United States District Court, Southern District of Florida, Palm Beach Division (2019). Submitted an expert report on behalf of plaintiff involving unjust enrichment and royalty damages related to alleged false advertising and unfair competition, and contempt of injunction related to security monitoring systems and services.

• *ADT LLC & ADT US Holdings, Inc. v. Northstart Alarm Services LLC et al.,* United States District Court, Southern District of Florida (2019). Submitted an expert report on behalf of plaintiff involving unjust enrichment and royalty damages related to alleged false advertising and unfair competition, and contempt of injunction related to security monitoring systems and services.

• *Grasshopper House LLC. V. Clean & Sober Medua LLC., et al.,* and *Cliffside Malibu, et al. v. Grasshopper House LLC, et al.* United States District Court, Central District of California, Western Division (2019). Provided trial and deposition testimony on behalf of counterclaim plaintiffs involving damages from alledged false advertising related to treatment services for chemical dependence.

• *In Re Korean Ramen Antitrust Litigation,* United States District Court, Northern District of California, San Francisco Division (2018). Provided trial and deposition testimony on behalf of a class of purchasers of Korean Noodles related to damages from an alledged antitrust price fixing conspiracy.

• *Monster Energy Company v. Integradted Supply Network LLC,* United States District Court, Central District of California (2018). Provided trial testimony on behalf of plaintiff related to damages from alleged trademark and trade dress infringement involving beverages and snacks, tools, and clothing, motorsports and sponsorship and promotion.

• *Soteria Encryption LLC v. Apricorn Inc., et al.,* United States District Court, Central District of California, Western Division (2018). Submitted an expert report on behalf of defendants Apricorn and Lenovo related to reasonable royalty damages for patent infringement involving data encryption network devices.

• *McRO Inc. v. Bandai Nameco Games America Inc., et al.,* United States District Court, Central District of California, Western Division (2018). Provided deposition testimony on behalf of certain defendants related to damages from alleged patent infringement involving automated lipsinc animation used in video games.

• *In Re: Transpacific Passenger Air Transportation Antitrust Litigation,* United States District Court, Northern District of California San Francisco Division (2018). Provided deposition testimony on behalf of direct purchaser plaintiff class related to class certification and estimation of class wide damages in an antitrust case involving alleged collusion on the prices for transatlantic air travel.

• *Express Homebuyers USA, LLC, v. WBH Marketing Inc.,* United States District Court, Eastern District of Virgina, Alexandria Division (2018). Provided deposition testimony on behalf of defendant/counterplaintiff related to damages from alleged trademark infringement and trade libel involving real estate propery acquisition services.

## RESEARCH PAPERS AND PUBLICATIONS

- "FRAND Commitments and Royalties for Standard Essential Patents", with S. Bosworth and E. Matolo, in Complications and Quandaries in the ICT Sector, Bharadwaj, Gupta, and Devaiah eds., Ch. 2, Springer Open, ISBN 978-981-10-449570, 2018.

- "Corrective Advertising in Lanham Act Damages: The Use and Misuse of Past Advertising Expenditures" with S. Bosworth and E. Matolo, *The Trademark Reporter*, May-June Volume, 2017.

- "The Case for Admitting Settlement License Agreements in a Reasonable Royalty Analysis," with S. Conroy and R. Knudsen, 2011, *Les Nouvelles,* Volume XLVI No. 4, 2012.

- "Cost Analysis," with J. Kinrich and A. Meister, in Intellectual Property Damages, Guidelines and Analysis, 2004 supplement, M. Glick, L. Reymann, and R. Hoffman, eds., Chapter 14a, Wiley: New York.

- "Analysis and Measurement of Damages in Patent Infringement Actions," with J. Kinrich, 2003, proceedings of Practicing Law Institute.


## PAST OR PRESENT AWARDS, PROFESSIONAL MEMBERSHIPS

Outstanding Antitrust Litigation Achievement in Economics, American Antitrust Institute, 2019

American Antitrust Institute, advisory board member

American Bar Association, member

American Economic Association, member

Licensing Executives Society, member, chapter chair

Los Angeles County Bar Association, member

Los Angeles Intellectual Property Law Association, member

Orange County Bar Association, member

Orange County Patent Law Association, member

Patrick Calhoun, et al. v. Google LLC

# Appendix 2
# Additional Materials Received

### Legal documents

- [Proposed] Order Denying Plaintiffs' Motion for Class Certification, Dec. 22, 2021
- [Proposed] Order Granting Class Action Certification, Oct. 14, 2021
- [Proposed] Order Granting Google's Motion to Strike Report of Plaintiffs' Damages Expert Russell Mangum, III, Ph.D, Dec. 22, 2021
- [Proposed] Order Granting Plaintiffs' Administrative Motion to Seal, Oct. 14, 2021
- [Proposed] Order Granting Plaintiffs' Request for Judicial Notice in Support of Motion for Class Certification, Oct. 14, 2021
- *Chasom Brown, et al. v. Google LLC,*  Order Denying Motion to Dismiss, Case No. 20-CV-03664-LHK, Dec. 22, 2021
- Declaration of Abdelkarim Mardini in support of Google's Opposition to Plaintiffs' Motion for Class Certification, Dec. 22, 2021
- Declaration of Adam Prom in Support of Plaintiffs' Administrative Motion to Seal, Oct. 14, 2021
- Declaration of David Crossland Regarding Google Fonts API in Opposition to Plaintiffs' Motion for Class Certification, Dec. 22, 2021
- Declaration of David Monsees Regarding Signed-In and Signed-out User Data in Support of Google's Opposition to Plaintiffs' Motion for Class Certification, Dec. 22, 2021
- Declaration of George Levitte, Dec. 17, 2021
- Declaration of George Levitte, Regarding Google Ad Manager Profits in Opposition to Plaintiffs' Motion for Class Certification, Dec. 22, 2021
- Declaration of Glenn Berntson Regarding Google Ad Manager in Opposition to Plaintiffs' Motion for Class Certification, Dec. 22, 2021
- Declaration of Gregory Fair Regarding Google's Disclosures in Support of Google's Opposition to Plaintiffs' Motion for Class Certification, Dec. 22, 2021
- Declaration of Jay Barnes in Support of Plaintiffs' Opposition to Google's Motion for Summary Judgment on Google's First Affirmative Defense (Consent); Objections Per Civil L.R. 7-3(a), Jan. 10, 2022
- Declaration of Lesley E. Weaver in Support Plaintiffs' Motion for Class Certification, Oct. 14, 2021
- Declaration of Ryan Cassidy Regarding Google Maps Embed API in Support of Google's Opposition to Plaintiffs' Motion for Class Certification, Dec. 22, 2021
- Declaration of Stephen A. Broome in Support of Google's Opposition to Plaintiffs' Motion for Class Certification, Dec. 22, 2021
- Declaration of Steve Ganem Regarding Google Analytics In Opposition to Plaintiffs' Motion for Class Certification, Dec. 22, 2021
- Declaration of Tim Schumann in Support of Google's Opposition to Plaintiffs' Motion for Class Certification, Dec. 22, 2021
- Declaration of Viola Trebicka in Support of Google's Motion to Strike Report of Plaintiffs' Damages Expert Russell Mangum, III, Ph.D, Dec. 22, 2021
- Google's Opposition to Plaintiff's Motion for Class Certification, Dec. 22, 2021
- Notice of Motion and Motion to Strike Report of Plaintiffs' Damages Expert Russell Mangum, III, Ph.D, Dec. 22, 2021
- Plaintiffs' Administrative Motion to Seal, Oct. 14, 2021
- Plaintiffs' Notice of Motion and Motion for Class Certification and Appointment of Class Representatives and Class Counsel; Memorandum of Law in Support Thereof, Oct. 14, 2021

Confidential – Attorneys' Eyes Only

Patrick Calhoun, et al. v. Google LLC

# Appendix 2
# Additional Materials Received

- Plaintiffs' Opposition to Google's Motion for Summary Judgment on Google's First Affirmative Defense (Consent); Objections Per Civil L.R. 7-3(a), Jan. 10, 2022
- Plaintiffs' Request for Judicial Notice in Support of Motion for Class Certification, Oct. 14, 2021

### Expert reports

- Declaration of Leslie K. John, Oct. 13, 2021
- Errata to Expert Report of Bruce A. Strombom filed December 22, 2021, Jan. 30, 2022
- Expert Rebuttal Report of Leslie John, Ph.D., Feb. 15, 2022
- Expert Rebuttal Report of Richard M. Smith in Support of Plaintiffs' Motion for Class Certifcation, Feb. 15, 2022
- Expert Report of Bruce Strombom, Dec. 22, 2021
- Expert Report of Georgios Zervas, PhD, Dec. 22, 2021
- Expert Report of Professor Joseph Turow, Oct. 13, 2021
- Expert Report of Professor Paul Schwartz in Support of Google LLC's Opposition to Plaintiffs' Motion for Class Certification, Dec. 22, 2021
- Expert Report of Richard M. Smith in Support of Plaintiffs' Motion for Class Certification, Oct. 14, 2021
- Expert Report of Russell W. Mangum III, Ph.D. in Support of Plaintiffs' Motion for Class Certification, Oct. 13, 2021
- Expert Report of Tülin Erdem, Ph.D., Dec. 22, 2021
- Expert Report of Yiling Chen, Ph.D., Dec. 22, 2021
- Rebuttal Report of Professor Zubair Shafiq, Feb. 15, 2022
- Report of Prof. Zubair Shafiq, Oct. 13, 2021

### Depositions (and exhibits)

- Deposition of Abdelkarim Mardini, Nov. 23, 2021
- Deposition of Alexei Svitkine, Oct. 4, 2021
- Deposition of Bruce Strombom, Jan. 31, 2022
- Deposition of Chetna Bindra, Feb. 8, 2022
- Deposition of Curt Harting, Aug. 4, 2021
- Deposition of David Monsees, Apr. 9, 2021
- Deposition of David Monsees, June 11, 2021
- Deposition of Deepak Ravichandran, Jan. 7, 2022
- Deposition of Gregory Lon Fair, Jan. 6, 2022
- Deposition of Huei-Hung (Chris) Liao, Dec. 2, 2021
- Deposition of Justin Schuh, Jan. 7, 2022
- Deposition of Leslie John, Nov. 16, 2021
- Deposition of Russell Mangum, Dec. 7, 2021
- Deposition of Sam Heft-Luthy, Dec. 20, 2021
- Deposition of Steve Ganem, Feb. 11, 2022
- Deposition of Tim Schumann, Jan. 13, 2022
- Deposition of Tülin Erdem, Feb. 4, 2022

Confidential – Attorneys' Eyes Only

Patrick Calhoun, et al. v. Google LLC

# Appendix 2
# Additional Materials Received

**Publicly available materials**

- Google, "Google Panel Privacy Policy [June 2021]," June 1, 2021, accessed Feb. 10, 2022, https://support.google.com/screenwise-meter/answer/9744317?hl=en
- Google, "Set up the Screenwise Meter app on your phone or tablet," accessed Feb. 10, 2022, https://support.google.com/screenwise-meter/answer/9721770?hl=en
- Google, "Set up the Screenwise Meter browser extension on your computer," accessed Feb. 10, 2022, https://support.google.com/screenwise-meter/answer/9721772?hl=en
- Google, "type Vertical (v201809)," accessed Feb. 7, 2022, https://developers.google.com/adwords/api/docs/reference/v201809/CampaignCriterionService.Vertical
- Google, "Verticals," accessed Feb. 7, 2022, https://developers.google.com/adwords/api/docs/appendix/verticals
- Ipsos, "Google Panel Privacy Policy," accessed Feb. 2, 2022, https://screenwisepanel.com/google-panel-privacy-policy
- Ipsos, "Ipsos Screenwise Panel Privacy Policy," accessed Feb. 2, 2022, https://screenwisepanel.com/ipsos-Sow-privacy-policy
- Ipsos, "Ipsos Screenwise Panel," accessed Feb. 10, 2022, https://screenwisepanel.com
- Patience Haggin, "Personal Data is Worth Billions. These Startups Want You to Get a Cut," *Wall Street Journal*, Dec. 4, 2021

**Bates documents on following pages**

Confidential – Attorneys' Eyes Only

Patrick Calhoun, et al. v. Google LLC

# Appendix 2
# Additional Materials Received

| | | | |
|---|---|---|---|
| GOOG_ERDEM_00000001 | GOOG-CABR-00394001 | GOOG-CABR-03746369 | GOOG-CABR-04143481 |
| GOOG_ERDEM_00000002 | GOOG-CABR-00422093 | GOOG-CABR-03755838 | GOOG-CABR-04178546 |
| GOOG_ERDEM_00000003 | GOOG-CABR-00803929 | GOOG-CABR-03796439 | GOOG-CABR-04262548 |
| GOOG_ERDEM_00000004 | GOOG-CABR-00833007 | GOOG-CABR-03797938 | GOOG-CABR-04262597 |
| GOOG_ERDEM_00000005 | GOOG-CABR-00891712 | GOOG-CABR-03806268 | GOOG-CABR-04295215 |
| GOOG_ERDEM_00000006 | GOOG-CABR-00891714 | GOOG-CABR-03810239 | GOOG-CABR-04307445 |
| GOOG_ERDEM_00000007 | GOOG-CABR-00891788 | GOOG-CABR-03839059 | GOOG-CABR-04307792 |
| GOOG_ERDEM_00000008 | GOOG-CABR-00892126 | GOOG-CABR-03910118 | GOOG-CABR-04312372 |
| GOOG_ERDEM_00000009 | GOOG-CABR-00892310 | GOOG-CABR-03922042 | GOOG-CABR-04320250 |
| GOOG_ERDEM_00000010 | GOOG-CABR-03609861 | GOOG-CABR-03958381 | GOOG-CABR-04323412 |
| GOOG_ERDEM_00000011 | GOOG-CABR-03611417 | GOOG-CABR-03958737 | GOOG-CABR-04332048 |
| GOOG-BRWN-00439740 | GOOG-CABR-03612539 | GOOG-CABR-03958868 | GOOG-CABR-04334587 |
| GOOG-CABR- 04335703 | GOOG-CABR-03662816 | GOOG-CABR-03958888 | GOOG-CABR-04334904 |
| GOOG-CABR-00056828 | GOOG-CABR-03664145 | GOOG-CABR-03959107 | GOOG-CABR-04335409 |
| GOOG-CABR-00058823 | GOOG-CABR-03666182 | GOOG-CABR-03959638 | GOOG-CABR-04335703 |
| GOOG-CABR-00058854 | GOOG-CABR-03667673 | GOOG-CABR-03987333 | GOOG-CABR-04343377 |
| GOOG-CABR-00059481 | GOOG-CABR-03678402 | GOOG-CABR-03987411 | GOOG-CABR-04400013 |
| GOOG-CABR-00078787 | GOOG-CABR-03679627 | GOOG-CABR-03987555 | GOOG-CABR-04401542 |
| GOOG-CABR-00078857 | GOOG-CABR-03681262 | GOOG-CABR-03987609 | GOOG-CABR-04408702 |
| GOOG-CABR-00086613 | GOOG-CABR-03681278 | GOOG-CABR-03987813 | GOOG-CABR-04424333 |
| GOOG-CABR-00111801 | GOOG-CABR-03683283 | GOOG-CABR-04016378 | GOOG-CABR-04426037 |
| GOOG-CABR-00111820 | GOOG-CABR-03731352 | GOOG-CABR-04026136 | GOOG-CABR-04426147 |
| GOOG-CABR-00114794 | GOOG-CABR-03734748 | GOOG-CABR-04067825 | GOOG-CABR-04426723 |
| GOOG-CABR-00119247 | GOOG-CABR-03736640 | GOOG-CABR-04073287 | GOOG-CABR-04427115 |
| GOOG-CABR-00125420 | GOOG-CABR-03738851 | GOOG-CABR-04077296 | GOOG-CABR-04427847 |
| GOOG-CABR-00138089 | GOOG-CABR-03739850 | GOOG-CABR-04081453 | GOOG-CABR-04450050 |
| GOOG-CABR-00139647 | GOOG-CABR-03739924 | GOOG-CABR-04120134 | GOOG-CABR-04455208 |
| GOOG-CABR-00180970 | GOOG-CABR-03740087 | GOOG-CABR-04122413 | GOOG-CABR-04468818 |
| GOOG-CABR-00186134 | GOOG-CABR-03740938 | GOOG-CABR-04123091 | GOOG-CABR-04484450 |
| GOOG-CABR-00373424 | GOOG-CABR-03743823 | GOOG-CABR-04142644 | GOOG-CABR-04509888 |

Confidential – Attorneys' Eyes Only

Patrick Calhoun, et al. v. Google LLC

# Appendix 2
# Additional Materials Received

| | | | |
|---|---|---|---|
| GOOG-CABR-04510445 | GOOG-CABR-04683191 | GOOG-CABR-05126022 | GOOG-CALH-00031076 |
| GOOG-CABR-04512322 | GOOG-CABR-04692764 | GOOG-CABR-05155125 | GOOG-CALH-00031094 |
| GOOG-CABR-04514040 | GOOG-CABR-04696282 | GOOG-CABR-05156497 | GOOG-CALH-00031109 |
| GOOG-CABR-04514284 | GOOG-CABR-04696440 | GOOG-CABR-05169276 | GOOG-CALH-00031131 |
| GOOG-CABR-04521270 | GOOG-CABR-04704298 | GOOG-CABR-05269357 | GOOG-CALH-00042297 |
| GOOG-CABR-04595346 | GOOG-CABR-04704597 | GOOG-CABR-05269991 | GOOG-CALH-00044423 |
| GOOG-CABR-04599629 | GOOG-CABR-04704939 | GOOG-CABR-05279094 | GOOG-CALH-00045185 |
| GOOG-CABR-04600026 | GOOG-CABR-04705374 | GOOG-CABR-05280150 | GOOG-CALH-00050667 |
| GOOG-CABR-04600066 | GOOG-CABR-04706522 | GOOG-CABR-05292934 | GOOG-CALH-00053196 |
| GOOG-CABR-04602308 | GOOG-CABR-04729652 | GOOG-CABR-05295318 | GOOG-CALH-00054260 |
| GOOG-CABR-04602313 | GOOG-CABR-04754160 | GOOG-CABR-05306148 | GOOG-CALH-00061979 |
| GOOG-CABR-04603156 | GOOG-CABR-04754257 | GOOG-CABR-05319084 | GOOG-CALH-00062049 |
| GOOG-CABR-04604487 | GOOG-CABR-04754292 | GOOG-CABR-05321391 | GOOG-CALH-00062056 |
| GOOG-CABR-04604674 | GOOG-CABR-04754627 | GOOG-CABR-05325406 | GOOG-CALH-00062072 |
| GOOG-CABR-04604856 | GOOG-CABR-04755505 | GOOG-CABR-05326398 | GOOG-CALH-00062153 |
| GOOG-CABR-04604960 | GOOG-CABR-04766037 | GOOG-CABR-05444894 | GOOG-CALH-00062169 |
| GOOG-CABR-04608552 | GOOG-CABR-04767842 | GOOG-CABR-05460640 | GOOG-CALH-00072868 |
| GOOG-CABR-04611530 | GOOG-CABR-04771601 | GOOG-CABR-05558892 | GOOG-CALH-00081141 |
| GOOG-CABR-04612662 | GOOG-CABR-04803103 | GOOG-CALH-00014551 | GOOG-CALH-00081472 |
| GOOG-CABR-04613197 | GOOG-CABR-04818291 | GOOG-CALH-00016479 | GOOG-CALH-00081943 |
| GOOG-CABR-04614532 | GOOG-CABR-04819502 | GOOG-CALH-00027147 | GOOG-CALH-00083131 |
| GOOG-CABR-04615105 | GOOG-CABR-04822887 | GOOG-CALH-00027149 | GOOG-CALH-00097369 |
| GOOG-CABR-04615202 | GOOG-CABR-04828296 | GOOG-CALH-00027208 | GOOG-CALH-00124281 |
| GOOG-CABR-04618443 | GOOG-CABR-04829712 | GOOG-CALH-00027419 | GOOG-CALH-00133389 |
| GOOG-CABR-04618719 | GOOG-CABR-04830053 | GOOG-CALH-00027787 | GOOG-CALH-00154787 |
| GOOG-CABR-04619593 | GOOG-CABR-04843194 | GOOG-CALH-00028232 | GOOG-CALH-00160127 |
| GOOG-CABR-04624698 | GOOG-CABR-04866597 | GOOG-CALH-00028489 | GOOG-CALH-00160141 |
| GOOG-CABR-04631240 | GOOG-CABR-04947628 | GOOG-CALH-00030031 | GOOG-CALH-00296320 |
| GOOG-CABR-04643783 | GOOG-CABR-04963047 | GOOG-CALH-00030550 | GOOG-CALH-00297189 |
| GOOG-CABR-04665924 | GOOG-CABR-04981562 | GOOG-CALH-00030824 | GOOG-CALH-00298016 |

Confidential – Attorneys' Eyes Only

Patrick Calhoun, et al. v. Google LLC

# Appendix 2
# Additional Materials Received

GOOG-CALH-00374314          GOOG-CALH-01134341

GOOG-CALH-00422646          John_Calhoun_000000059

GOOG-CALH-00423329          John_Calhoun_000000931

GOOG-CALH-00424010

GOOG-CALH-00424283

GOOG-CALH-00431131

GOOG-CALH-00431210

GOOG-CALH-00478206

GOOG-CALH-00478640

GOOG-CALH-00490456

GOOG-CALH-00492852

GOOG-CALH-00542378

GOOG-CALH-00545833

GOOG-CALH-00547684

GOOG-CALH-00601892

GOOG-CALH-00630126

GOOG-CALH-00634248

GOOG-CALH-00635963

GOOG-CALH-00639698

GOOG-CALH-00647901

GOOG-CALH-00700433

GOOG-CALH-00721187

GOOG-CALH-00850527

GOOG-CALH-00890236

GOOG-CALH-00913745

GOOG-CALH-00913746

GOOG-CALH-01016578

GOOG-CALH-01134322

GOOG-CALH-01134324

GOOG-CALH-01134326

Confidential – Attorneys' Eyes Only

# EXHIBIT EEE
## Redacted Version of Document Sought to be Sealed

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| PATRICK CALHOUN, et al., *on behalf of themselves and all others similarly situated*,<br><br>    Plaintiffs,<br><br>  v.<br><br>GOOGLE LLC,<br><br>    Defendant. | Case No. 4:20-cv-05146-YGR-SVK |

**REBUTTAL REPORT OF PROFESSOR ZUBAIR SHAFIQ**

**February 15, 2022**

## TABLE OF CONTENTS

I.      SUMMARY OF OPINIONS PROFFERED .................................................................. 5

II.     QUALIFICATIONS AND ASSIGNMENT.................................................................. 8

III.    REBUTTAL TO GLENN BERNTSON'S DECLARATION............................................ 9

        A.      Google's Internal Documents Demonstrate that the ▉▉▉▉▉▉▉▉▉▉▉ Can
                Map Different Identifiers ..................................................................... 9

        B.      The ▉▉▉▉▉▉▉▉▉▉▉ Can Be Used to Identify Chrome Users Who Were
                Not Signed-In Or Users Who Do Not Have a Google Account ............................. 11

        C.      Testing Shows that Chrome in Fact Transmits More Information to Google Ad
                Manager Than Other Browsers................................................................. 12

        D.      Testing Shows That My Activity Provides Incomplete Information of Websites
                From Which Google Received Data ........................................................... 13

        E.      Google Does Map Analytics First-Party Cookie to Third-Party Cookie................. 14

        F.      Google Does Not Segregate Biscotti and Gaia Keyed Data at the Server Side....... 15

        G.      Conclusions as to the Bernstson Declaration ............................................... 16

IV.     REBUTTAL TO TIM SCHUMANN'S DECLARATION ............................................. 16

        A.      Chrome Sync Indicators Can Be Present for Users Who Never Enabled Sync....... 16

                1.      ▉▉▉▉▉▉▉ Can Be Used to Query Chrome Sync Signals to Identify Class
                        Members. ................................................................................... 17

                2.      The Schumann Declaration Provides No Support For Its Assertions Regarding
                        Google Takeout............................................................................ 18

                3.      Google Documents Related to ▉▉▉▉▉▉▉▉▉ Conflict with the
                        Conclusions in the Schumann Declaration. .......................................... 18

                4.      Google Documents Related to ▉▉▉▉ Conflict with the Conclusions in the
                        Schumann Declaration. ................................................................. 19

        B.      Conclusions as to the Schumann Declaration............................................... 19

V.      REBUTTAL TO DAVID MONSEES'S DECLARATION............................................ 20

        A.      Google Can Reasonably Link "Unauthenticated" and "Authenticated" Data........... 20

        B.      Conclusions as to the Monsees Declaration................................................. 21

VI.     REBUTTAL TO RYAN CASSIDY DECLARATION ................................................. 21

        A.      The Cassidy Declaration Fails to Acknowledge the Full Extent of Chrome
                Transmissions By Google Maps API to Google........................................... 21

                1.      Mr. Cassidy omits the fact that Google Maps causes Chrome to transmit the
                        X-client-data header to Google......................................................... 22

                2.      Mr. Cassidy omits the fact that Google Maps causes Chrome to transmit
                        cookies to Google. ....................................................................... 22

B.    Mr. Cassidy fails to Demonstrate an Understanding of Chrome Data Transmissions, and Their Storage and Use By Google ....................................................................... 23

C.    Conclusions as to Cassidy Declaration ........................................................................ 25

VII.    REBUTTAL TO YILING CHEN REPORT ............................................................... 25

A.    Transmissions of Data to Google in Other Browsers Are Not the Same as Compared to Those Made in Chrome ............................................................................................ 25

B.    The Chen Report Incorrectly Asserts that Website Optimization is Not Unique to Chrome .......................................................................................................................... 29

C.    Conclusions as to the Chen Report .............................................................................. 29

VIII.    REBUTTAL TO GEORGIOS ZERVAS REPORT ..................................................... 30

A.    The Zervas Report Incorrectly Asserts that Different Browsers Function Similarly to Chrome .......................................................................................................................... 30

B.    The Zervas Report Incorrectly Asserts that I Did Not Analyze the Nature of Transmissions by Chrome to Google in My Report ...................................................... 31

C.    The zervas Report Incorrectly Asserts that I Did Not Analyze the Frequency and Alternatives of Websites that Work in Chrome .......................................................... 33

D.    The Zervas Report Incorrectly Asserts that My Method to Infer Chrome Sync Usage is Inaccurate ..................................................................................................... 36

E.    The Zervas Report Incorrectly Asserts that the ▮▮▮▮▮▮▮▮▮▮▮▮▮ Does Not Map Gaia to Biscotti or Zwieback identifiers ...................................................... 37

F.    The Zervas Report Incorrectly Asserts that My "Alternative Approach" is Inadequate and Infeasible ........................................................................................... 37

G.    The Zervas Report Incorrectly Asserts that the X-client-data header Cannot Accurately Identify Incognito Users ........................................................................... 38

H.    The Zervas Report Incorrectly Asserts that My Description of Entropy is Flawed Because it Assumes Independence Amongst Different Elements of Data .............. 39

I.    The Zervas Report Incorrectly Asserts that Google Retains Significantly Less Information that It Receives Due to Policies and Guidelines ................................... 39

J.    Conclusions as to the Zervas Report .......................................................................... 40

IX.    REBUTTAL TO PAUL SCHWARTZ REPORT ......................................................... 41

A.    The Schwartz Report's Determination of PII is Based on Cherry-Picked Subset of Google's Policies and Practices ................................................................................. 41

B.    Dr. Schwartz's Definition of PII Contradicts with the FTC and Google's Definition of PII .......................................................................................................................... 42

C.    Dr. Schwartz is Unaware that Entropy is Used as a Metric by Computer Scientists and Google to Assess Identifiability of Information ................................................. 43

D.    Conclusions as to the Schwartz Report ..................................................................... 44

X.      REBUTTAL TO BRUCE STROMBOM REPORT ........................................................... 44

    A.    Google Can Identify Class Members Who Have and Do Not Have Google Accounts ............................................................................................................................ 45

    B.    Google Can Use Its Ad Serving Systems to Identify How Much Data It Has in Easily Accessible Storage That It Collected from Them While Not Synced .......... 46

    C.    Google Maintains Revenue Logs from Which It Can Calculate Not Synced Revenue on an Individual User Basis ...................................................................................... 49

    D.    Google Can Also Devise Efficient Methods to Make These Computations ........... 54

    E.    Google Could Have Easily Created and Stored a Not Synced Flag to Track Such Information ........................................................................................................... 55

    F.    Google Screenwise Uses the Same Identifiers as Chrome ..................................... 55

    G.    Conclusions as to the Strombom Report .................................................................. 60

XI.     CALIFORNIA DETERMINATION ........................................................................... 60

XII.    CONTENT DETERMINATION ................................................................................. 61

I. **SUMMARY OF OPINIONS PROFFERED**

1. Rebuttal Opinion No. 1: With respect to the Berntson Declaration:

    A. The Berntson Declaration's criticisms regarding my conclusions about the feasibility of two of the three proposed approaches that rely on the ███████ ███████████ to identify class members is unsupported, and in fact contradicted, by Google's own documents. Based on my review of Google documents, my conclusions remain unchanged.

    B. The Berntson Declaration's explanation of the data Google Ad Manager receives from Chrome as compared to other brands of browsers is flawed and incorrect, as demonstrated by my testing.

    C. The Berntson Declaration's claims about the data Google receives and stores in its various server-side logs, and whether that information can be linked and associated, are incorrect, as demonstrated by Google's own documents and the data produced by Google as part of the discovery process administered by Special Master Brush.

2. Rebuttal Opinion No. 2: With respect to the Schumann Declaration, the Schumann Declaration's criticisms regarding my conclusions about the reliability of one of my three proposed approaches (the "top-down" approach) to identify class members is unsupported, and in fact contradicted, by Google's own documents and Mr. Schumann's testimony. My conclusions about the reliability of ███████████ ████████████████████████ to identify class members are based on Google documents and remain unchanged.

3. Rebuttal Opinion No. 3: With respect to the Monsees Declaration, based on my review of Google documents, the assertions made regarding the policies and practices to prevent the linking of authenticated and unauthenticated identifiers are undermined by Google's own documentation. Likewise, his statements about an "anti-fingerprinting policy" seem to be directly contradicted by logs recently produced by Google. Thus, my conclusions about Chrome's transmission and Google's storage of user data that can be used to "fingerprint" and "track user behavior" remain unchanged. If anything, the documents recently disclosed by Google (after the submission of my original report) reinforce my findings.

4. Rebuttal Opinion No. 4: With respect to the Cassidy Declaration, based on my review of Google documents and my own testing, it is my opinion that the conclusions in the Cassidy Declaration fail to acknowledge the full extent of Chrome transmissions of at-issue data to Google due to the Google Maps API source code on non-Google websites.

5. Rebuttal Opinion No. 5: With respect to the Chen Report:

    A. Based on my review of the Chen Report and underlying testing, the Chen Report's claims about transmissions from Chrome to Google as compared to other browsers are incorrect because they are based on faulty experimental design and analysis techniques. My tests show that Chrome by far transmits more types of personal information (IP address, User-Agent information,

cookie and device identifiers, X-client data headers, browsing history, and other data used to derive profile information) more frequently (i.e., total number of transmissions) as compared to other web browsers when tested in their respective default configurations. My tests also show that there remains a significant difference in the transmission of personal information in Chrome as compared to Firefox, Edge, and Safari when tested using the default configuration for Chrome and non-default configuration for other browsers. Thus, Dr. Chen's conclusions contradict the data even when using her own prescribed (flawed) methodology.

B. Based on my review of the Chen Report, the criticisms regarding my conclusions about website optimization for Chrome are based on cherry-picked anecdotes and fail to holistically take into account tens of thousands of such cases. Thus, my conclusion about website optimization for Chrome remains unchanged.

6. <u>Rebuttal Opinion No. 6</u>: With respect to the Zervas Report:

A. Based on my review of the Zervas Report and underlying testing, as well as my own testing, the Zervas Report's assertion about Chrome's transmissions to Google as compared to other browsers is flawed and incorrect. Contrary to his opinion, my tests of Chrome, Firefox, Edge, and Safari show that Chrome transmits personal information to Google far more than other browsers. My additional analysis of the previously collected data using Dr. Zervas's prescribed methodology establish the non-functional nature of Chrome transmissions to Google. Peer-reviewed research methods continue to support my conclusion. Thus, my conclusion about Chrome transmissions to Google remains unchanged.

B. The Zervas Report's claims about the frequency of website optimization for Chrome and alternatives contradict my tests. My report cites tens of thousands of documented issues where website features do not work on Firefox but work on Chrome. While Chrome is always a suggested alternative to Firefox-incompatible websites, other browsers such as Safari or Edge are not always offered as alternatives. Thus, my conclusion about website optimization for Chrome remains unchanged.

C. The Zervas Report's claims about the accuracy of one of my three proposed approaches (the "top-down" approach) to identify class members are not grounded by any original analysis. His analysis simply reiterates the faulty claims in the Schumann and Bernston Declarations, which I have refuted.

D. The Zervas Report's claims about the adequacy of one of my three proposed approaches (the "alternative" approach) to identify class members are based on flawed assumption about how ▮▮▮▮ histograms are locally stored. To counter his concern about the feasibility of the "alternative" approach, I point to an existing Google project that pushes an update to Chrome to identify a subset of Chrome users who are eligible for a promotion. Thus, my conclusion about the adequacy and feasibility of my "alternative" approach remains

unchanged. In fact, new evidence further strengthens the feasibility of the proposed approach.

E. The Zervas Report's claims about the accuracy of using X-client-data header to identify Incognito users are based on faulty logic. Thus, my conclusion about identification of Incognito users remains unchanged.

F. The Zervas Report criticizes my approach to entropy on the basis that it assumes that adding bits of data will equal the sum of its parts. This is incorrect. My analysis considers "joint entropy," which takes into account the lack of independence between different data elements. My opinions about Chrome's transmission of highly identifying personal information to Google based on entropy analysis remain unchanged.

G. The Zervas Report's claims about Google's retention of information due to its policies and guidelines are contradicted by Google's own documents. Thus, my conclusion about the transmission of PII by Chrome to Google remains unchanged.

7. <u>Rebuttal Opinion No. 7</u>: With respect to the Schwartz Report:

A. Based on my review of Google documents, the Schwartz Report's determination of PII is based on an incomplete assessment of Google's policies and practices. Contradictory evidence, which was not consider by Dr. Schwartz, suggests that the personal information sent from Chrome to Google is PII even based on Dr. Schwartz's own criteria.

B. The Schwartz Report's definition of PII, i.e., the personal information sent from Chrome to Google is PII only when Google associates it with an identified individual Account, is based on an outdated FTC guidance. Based on my review, the FTC's updated guidance considers all persistent identifiers as PII and even Google's internal definition conflicts with that of the Schwartz Report.

C. Based on my experience and review of Google documents, the Schwartz Report fails to recognize that entropy is a widely recognized metric in the computer science community, including Google itself, to assess identifiability of information.

8. <u>Rebuttal Opinion No. 8</u>: With respect to the Strombom Report:

A. Based on my review of Google documents, the Strombom Report's critique about identification of not-signed-in Chrome users who do not have a Google account can be addressed using Google's internal logs and systems. That is, they can be identified.

B. Based on my review of Google documents, the Strombom Report's critique about accounting for variability across users in terms of data collection can be addressed using ███████████. That is, it is possible to identify class members using the tools available in that data source.

C. Based on my review of Google documents, the Strombom Report's critique about accounting for the degree to which Google is able to monetize data of

class members can be addressed using revenue information that Google stores in its internal logs such as ████████ and backend logs associated with ████████.    That is, ████████ and ████████ logs will permit identification of revenue per class member in systems that can be checked by a computer program.

    D. Based on my review of available documents, Dr. Strombom's claim that consumer data for which companies pay consumer directly via programs like Screenwise are not comparable to Chrome is incorrect because both collect the same set of identifiers and run as an application on a device.

9. <u>Rebuttal Opinion No. 9</u>: Based on my review of documents produced by Google, it is my opinion that Google routinely identifies the location of both users and the servers for the websites with which they interact and stores that information in logs in which it keeps Not Synced Chrome user communications.

10. <u>Rebuttal Opinion No. 10</u>: Based on my review of documents produced by Google, it is my opinion that Chrome discloses to Google "information relating to the substance, purport, or meaning" of Not Synced Chrome user communications.

## II.  QUALIFICATIONS AND ASSIGNMENT

11. I have been retained by counsel for Plaintiffs as an expert in this matter. I previously submitted a report in support of Plaintiffs' Motion for Class Certification, dated October 14, 2021 (the "Shafiq Report"), which sets my expert conclusions in this matter and my expert qualifications.[1]

12. On December 22, 2021, Google submitted a response to Plaintiffs' Motion for Class Certification, which included declarations and documents that addressed issues raised in my report.

13. I submit this rebuttal report to address some of the issues raised in Google's response. Specifically, I respond to assertions made in the declarations of Mr. Glenn Berntson, Mr. Tim Schumann, Mr. David Monsees, and Mr. David Cassidy; the expert reports of Dr. Yiling Chen, Dr. Georgios Zervas, Dr. Paul Schwartz, and Dr. Bruce Strombom; as well as reviewing additional Google documents related to the issue of (1) whether Google can identify the location of both Not Synced Chrome users and servers for the websites with which they interact and store information; and (2) whether Google acquired any "information related to the substance, purport, or meaning" (i.e. "content") of Not Synced Chrome user communications.

14. I reserve the right to supplement and amend this rebuttal report based on additional materials and information that become available to me.

15. In addition to the items identified in my October 14, 2021 report, a list of materials received, reviewed and relied upon for this rebuttal report are set forth in <u>Exhibit A</u>.[2]

---

[1] *Calhoun, et al. v. Google, LLC*, Shafiq Report, dated October 14, 2021. Dkt. 340-19.
[2] It is my understanding that Google was provided access to all referenced materials and testing for this rebuttal report. Should the Court require review of any referenced document in this report, I will coordinate with counsel to ensure that they are provided.

## III.   <u>REBUTTAL TO GLENN BERNTSON'S DECLARATION</u>

16. After considering Googler Glen Berntson's declaration, including various facts and opinions he asserts, the conclusions in my report are unchanged. I discuss the flaws in the Berntson declaration in more detail below. I note that Glen Berntson is not being proffered as an expert and he does not assert that he conducted tests or experiments which form the basis for his conclusions.

### A. GOOGLE'S INTERNAL DOCUMENTS DEMONSTRATE THAT THE ███████████████████████ CAN MAP DIFFERENT IDENTIFIERS

17. The Berntson declaration opines that two of the approaches proposed in my report will fail to accurately identify a subset of class members, which correspond to Chrome users who do not have a Google Account or were not logged into their Google Accounts while using the Chrome browser. Specifically, Mr. Berntson asserts that the proposed approaches incorrectly assume that the ███████████████ (███ can be used by Google to map Biscotti and other identifiers (Berntson ¶¶ 31, 33, 35). Mr. Berntson specifically claims that "Google does not use ███ to map Biscotti and other device non-GAIA identifiers to GAIA identifiers" (Berntson ¶ 35). Therefore, Mr. Berntson concludes that two of the proposed approaches will not accurately work since they rely on obtaining this mapping from the ███████████████ ██████.

18. But these assertions are contradicted by multiple documents produced by Google that explain the innerworkings of the ████████████████ [GOOG-CALH-00030031, GOOG-CALH-00062153, GOOG-CABR-03666182]. As discussed in more detail below, these documents clearly demonstrate that one of the main purposes of ████████████ is to map (or link) different Gaia and non-Gaia identifiers.[3]

19. GOOG-CABR-03666182 is a document produced by Google that provides ████████████████████████████████████████████ For the sake of illustration, I have highlighted two cells with red-colored boxes in Figure 1 entitled: "██████████████████████" and ██████████████████████ As these names clearly indicate, and additional documentation provided by Google further corroborates, ████████████████████████████████████████████ ████████████████████████████████ [GOOG-CABR-03666194], ██████████████████████████████. Thus, Mr. Berntson's assertions (Berntson ¶¶ 31, 33, 35) are incorrect because they disagree with Google's own documentation of ██████████████████.



---

[3] A glossary of key terms, including definitions for these IDs, was provided in the Shafiq Report at ¶¶ 64 *et seq.*



**Figure 1:** Excerpt from [GOOG-CABR-03666182]

20. GOOG-CALH-00030031 is a document produced by Google that provides further details of how the ███████████████████████████████████. One of the key use cases implemented in the ████████████████████████████████████



████████████ [GOOG-CALH-00030046]. █████████████████████

21. GOOG-CALH-00062153 is a document produced by Google that also states in no uncertain terms that the ████████████████████████████████████████ For the sake of illustration, I have highlighted two red-colored boxes in Figure 2 that clearly show that ████████████████████████████████████ Thus, we can conclude that the ███████████████ can and already does map different identifiers.



**Figure 2:** Excerpt from [GOOG-CALH-00062153]

22. In conclusion, Mr. Berntson's statement that "Google does not use ▆▆ to map Biscotti and other device non-GAIA identifiers to GAIA identifiers" (Berntson ¶35) is therefore incorrect as it is contradicted by multiple documents produced by Google explaining the ▆▆▆▆▆▆▆▆▆▆ design and innerworkings.

**B.   THE ▆▆▆▆▆▆▆▆▆ CAN BE USED TO IDENTIFY CHROME USERS WHO WERE NOT SIGNED-IN OR USERS WHO DO NOT HAVE A GOOGLE ACCOUNT**

23. Mr. Berntson opines that one of the three approaches proposed in my report incorrectly assumes that Zwieback/Biscotti IDs that cannot be mapped to Gaia IDs come from not-signed-in users (Berntson ¶ 34). Mr. Berntson further states that "unmappable Biscotti and Zwieback IDs may come from signed in users". However, Mr. Berntson's declaration fails to provide any citation to Google's internal documentation or logical explanation to support the claim. If the ▆▆▆▆▆▆▆▆ ▆▆▆▆ can map Gaia and non-Gaia (e.g., Biscotti, Zwieback) IDs, as has been established above, then the Biscotti or Zwieback IDs that cannot be mapped to a Gaia ID indeed should belong to Chrome users who do not have Google Accounts or were not logged into their Google Accounts while using the Chrome browser – and were, by definition, Not Synced at the time.

24. The Berntson declaration further states that "the existence of a Biscotti or Zwieback ID in Google's systems does not indicate that the data comes from a user who does not have a Google Account" but incorrectly implies that one of the three proposed approaches does not consider this statement (Berntson ¶ 34). My approach is cognizant of the fact that signed-in users will be assigned both Gaia and Biscotti/Zwieback IDs and that not-signed-in users will be assigned only Biscotti/Zwieback IDs. In fact, the main goal of mapping non-Gaia IDs to Gaia IDs is to identify and exclude signed-in users. Thus, the Biscotti and Zwieback IDs that cannot be mapped to Gaia IDs can be inferred to belong to Chrome users who do not have Google Account or were not logged into their Google Accounts while using the Chrome browser – and were, by definition, Not Synced at the time. Mr. Berntson has failed to cite any evidence or explanation to the contrary.

### C.    TESTING SHOWS THAT CHROME IN FACT TRANSMITS MORE INFORMATION TO GOOGLE AD MANAGER THAN OTHER BROWSERS

25. The Berntson Declaration asserts that "the categories of data that Google receives from a Chrome browser visiting a website that uses Google Ad Manager services are the same as the categories of data Google receives from another brand of browser visiting the same website" (Berntson ¶ 7). But the Berntson Declaration does not provide any evidence to support this claim. As demonstrated by my comparative testing of transmissions to Google from different browsers (i.e., Chrome, Firefox, Edge, and Safari), only Chrome transmits cookies to Google Ad Manager (formerly known as DoubleClick for Publishers and/or Google DoubleClick AdX service[4]) domains such as doubleclick.net.

26. To evaluate this claim, I conducted testing on the Mercury News webpage that was included in the Plaintiff's complaint and uses Google Ad Manager services: https://www.mercurynews.com/2020/05/24/qa-mental-health-tips-for-handling-the-pandemic/. In summary, my testing shows that Mr. Berntson's claim is incorrect. In fact, the categories of data that Chrome sends to Google when a user visits a website where Google Ad Manager source code is present are significantly different (and much more) than any of the other browsers such as Firefox, Edge, and Safari.

27. To conduct this test, I opened the Mercury News webpage in Chrome, Firefox, Edge, and Safari. All four web browsers were used in their default configuration, which is their most common setting.[5] All browsing data such as cache and cookies was cleared before loading the web page. Therefore, all browsers correspond to the not-signed-in (to Google Account) setting.

28. The following table reports the number of different categories of transmissions to doubleclick.net, a Google Ad Manager domain, from the four different browsers. The results clearly show that Chrome transmissions to Google when visiting a website where Google Ad Manager source code appears far exceed the three other tested browsers. There is a reduction in total number of transmissions to doubleclick.net by 70% (Firefox), 54% (Edge), and 68% (Safari) as compared to Chrome. There is a **100% reduction** in cookie transmissions (i.e., IDE Biscotti cookie set by doubleclick.net) in all other browsers as compared to Chrome.

29. In addition, Mr. Berntson acknowledged that *only* Chrome transmits X-client-data header to Google (Berntson ¶ 7). My tests confirm this. There is a **100% reduction** in X-client-data transmissions to doubleclick.net in all other browsers as compared to Chrome. Mr. Bernston further states that "Google Ad Manager does not use the X-Client-Data Header". But he fails to acknowledge the fact that Chrome sends the X-client-data header to Google Ad Manager as it does for several other Google domains. He does not provide any explanation as to why Chrome transmits a user's X-client-data header to doubleclick.net when "Google Ad Manager does not use it" given that Chrome is capable of not transmitting X-client-data header to a subset of Google

---

[4] https://www.google.com/intl/en_us/doubleclick/publishers/dfpadx/terms/
[5] Chrome 96.0, Firefox 95.0, Edge 96.0, Safari 15.1

domains (e.g., google-analytics.com).

|  | **Chrome** | **Firefox** | **Edge** | **Safari** |
|---|---|---|---|---|
| Transmissions ("HTTP requests") | 114 | 34 | 52 | 36 |
| Cookie Transmissions | 47 | 0 | 0 | 0 |
| X-client-data Transmissions | 38 | 0 | 0 | 0 |

**Table 1:** Number of transmissions from Chrome, Firefox, Edge, and Safari web browsers to doubleclick.net (a domain used by Google Ad Manager)

### D.    TESTING SHOWS THAT MY ACTIVITY PROVIDES INCOMPLETE INFORMATION OF WEBSITES FROM WHICH GOOGLE RECEIVED DATA

30. The Berntson declaration asserts that the My Activity page "lists websites that use certain Google Services from which Google received data when the user visited those sites, searches conducted, and other activity saved by Google based on a user's interaction with Google Services" (Berntson ¶ 27). However, my testing shows that My Activity does not list all of the data transmissions that are sent from Chrome to Google on non-Google websites. Specifically, My Activity provides an incomplete list of the websites for which Chrome sent and Google received and stored data in its internal logs for a signed-in user.

31. I tested the accuracy of information in My Activity by comparing the following:

   A. List of non-Google websites listed in My Activity, and

   B. List of non-Google websites listed in Gaia and Biscotti logs produced by Google.

32. The existence of websites in the latter list that are absent in the former list demonstrates the falsifiability of Google's claims about My Activity. Specifically, it shows that My Activity does not show all of the data that Chrome sent and Google received and stored in its various Gaia and Biscotti logs.

33. I did this comparison for a test Google account which I created after approval of Special Master Brush in this case to attempt to account for expired identifiers for the Named Plaintiffs which Google apparently did not preserve.  I created a test account dubbed "Ned Stark," registered in November 2021, with the express purpose of evaluating the accuracy of data disclosures by Google. The "Ned Stark" test account was used to sign-in to a Chrome browser but Sync was not enabled to reflect a subset of class members. The Chrome browser instance of "Ned Stark" mimicked the browsing behavior of a typical user who visits popular websites of different categories as described in ¶¶ 48-51 of my original report.

34. My Activity logs of "Ned Stark" Google account were downloaded from https://takeout.google.com in January 2022. My Activity logs contained information from various Google products such as Ads and Google Analytics.

35. I provided Google Gaia and non-Gaia identifiers of the "Ned Stark" test account. Special Master Brush instructed Google to produce data from various internal logs for this account. Google produced data for this account between January 2022 and February 2022.

36. The following websites visited by the "Ned Stark" test account were present in Google's internal logs but absent in My Activity logs. Note that, for purposes of this report, this is a partial list to simply illustrate point. A more comprehensive analysis is expected to return many more such websites.

    A. www.bungie.net was listed in GOOG-CALH-01134336 "personal-DisplayAdQueries" (searched using Gaia ID of "Ned Stark") but absent in the My Activity log.

    B. cnbc.com was listed in GOOG-CALH-01134336 "personal-DisplayAdQueries" (searched using Gaia ID of "Ned Stark") but absent in the My Activity log.

    C. lego.com was listed in GOOG-CALH-01134354 "personal-DisplayAdQueries" (searched using Biscotti ID of "Ned Stark") but absent in the My Activity log.

    D. lufthansa.com was listed in GOOG-CALH-01134354 "personal-DisplayAdQueries" (searched using Biscotti ID of "Ned Stark") but absent in the My Activity log.

    E. www.merriam-webster.com was listed in GOOG-CALH-01134353 "JoinedAdViews" (searched using Biscotti ID of "Ned Stark") but absent in the My Activity log.

    F. www.realtor.com was listed in GOOG-CALH-01134353 "JoinedAdViews" (searched using Biscotti ID of "Ned Stark") but absent in the My Activity log.

**E.   GOOGLE DOES MAP ANALYTICS FIRST-PARTY COOKIE TO THIRD-PARTY COOKIE**

37. The Berntson Declaration asserts that "Google does not perform any mapping of Google Analytics first-party cookie values to third-party cookies such as Biscotti" (Berntson ¶ 39). However, Google's internal documentation shows that it has specific mechanisms to map Client ID stored in Google Analytics cookies to Biscotti ID as well as Zwieback and Gaia IDs.

38. GOOG-CABR-04080254 describes "█████ – a mechanism to map CID URL parameter (sent in HTTP requests initiated by Google Analytics source code on non-Google websites to google-analytics.com, which contains the Client ID [CID] that is also stored in the Google Analytics _ga cookie[6]) to Biscotti as well as Zwieback and Gaia IDs. I have highlighted two specific cases in Figure 3.

---

[6] "analytics.js uses a single, first-party cookie named _ga to store the Client ID" https://developers.google.com/analytics/devguides/collection/analyticsjs/cookies-user-id#getting_the_client_id_from_the_cookie
See also https://gaconnector.com/docs/how-to-save-google-analytics-client-id-cookie-to-salesforce/

39. GOOG-CABR-04080255 further describes various types of logs that store these identifiers. Specifically, (1) CID and Zwieback IDs are stored in █████████" for ███ days; (2) CID, Zwieback, and Biscotti IDs are stored in '█████████" for ███ days; and (3) CID and Gaia IDs are stored in "██████ for ███ days.

40. In summary, in contrast to Mr. Berntson's assertion, Google does indeed map the client identifier stored in Google Analytics' first-party cookie (_ga set by Google Analytics source code) to the third-party Biscotti ID (IDE cookie on doubleclick.net Display Ads domain).



**Figure 3:** Excerpt from [GOOG-CABR-04080255]

## F. GOOGLE DOES NOT SEGREGATE BISCOTTI AND GAIA KEYED DATA AT THE SERVER SIDE

41. The Berntson Declaration asserts that Google "maintains strict server-side segregation between these two types of data." (Berntson ¶ 9). However, my investigation of Google's server-side logs shows that Biscotti and Gaia keyed data is combined at multiple server-side logs.

42. The logs produced by Google as part of the Special Master administered discovery process demonstrate that Google stores Biscotti and Gaia identifiers together in multiple server-side logs. Thus, in contrast to Mr. Berntson's assertion, I conclude that Google does not maintain server-side segregation between Biscotti and Gaia keyed data. For example, the logs entitled ████████████████████" and "████████████████" contain both █████████" and "████████████████" (Biscotti ID). For the "Ned Stark" test account, Google was able to search and extract information using both the Gaia ID (see GOOG-CALH-01134336 and GOOG-CALH-01134338) as well as corresponding Biscotti IDs (see GOOG-CALH-01134348 and GOOG-CALH-01134350). The production of "Ned Stark" account data from the same log using both Gaia and Biscotti IDs clearly demonstrates that Google does not segregate Biscotti and Gaia keyed data at the server-side.

43. Mr. Bernston also omits the key fact that Google combines Biscotti and Gaia information for attribution. As explained in an internal presentation,

Monsees Dep. Ex. 45.

### G.   CONCLUSIONS AS TO THE BERNSTON DECLARATION

44. The Berntson Declaration's criticisms regarding my conclusions about the feasibility of two of the three proposed approaches that rely on the ▇▇▇▇▇▇▇▇▇ to identify class members is unsupported, and in fact contradicted, by Google's own documents.[7] My conclusions remain unchanged.

45. The Berntson Declaration's explanation of the data Google Ad Manager receives from Chrome as compared to other brands of browsers is flawed and incorrect, as demonstrated by the testing described above.

46. The Berntson Declaration's claims about the data Google receives and stores in its various server-side logs are incorrect, as demonstrated by Google's own documents and the data produced by Google as part of the discovery process administered by Special Master Brush.

## IV.   REBUTTAL TO TIM SCHUMANN'S DECLARATION

47. After considering Googler Tim Schumann's declaration, including various facts and opinions he asserts, the conclusions in my report are unchanged. I discuss the flaws in the Schumann Declaration in more detail below.

### A. CHROME SYNC INDICATORS CAN BE PRESENT FOR USERS WHO NEVER ENABLED SYNC

48. Mr. Schumann opines that one of the three approaches (the "top-down" approach) proposed in my report will fail to accurately identify a subset of class members, which correspond to Chrome users who did not enable Sync ("Not Synced Chrome Users") or who disabled Sync ("Unsynced Users"). Specifically, Mr. Schumann asserts that the proposed approach relies on indicators of Chrome Sync that "can be present for users who never enabled sync" (Schumann ¶ 4). Thus, he claims that the proposed approach will fail to accurately identify Chrome users who did not enable Sync or who disabled Sync.

49. But this claim conflicts with multiple documents produced by Google about various projects to analyze Chrome Sync usage [GOOG-CALH-00077056, GOOG-CALH-00081141, GOOG-CALH-00028232]. Furthermore, Mr. Schumann's declaration fails

---

[7] Mr. Berntson does not challenge my third approach (the "top-down" approach) to identifying class members.

to consider the ████████ data produced by Google [GOOG-CALH-00651647] that shows how exactly Chrome Sync activity is recorded in ████████.

50. As set forth below, the Schumann Declaration's conclusions regarding ████████, ████████████████████████████████ either conflict with Google's internal documents or are otherwise unsupported by any documentation.

> **1.** ████████ **Can Be Used to Query Chrome Sync Signals to Identify Class Members.**

51. Mr. Schumann opines that the presence of ████████████ in the ████████████ field in the ████████████ table in ████████ cannot be used to accurately infer Chrome Sync usage (Schumann ¶ 5). Specifically, he states that the "████████████ value in ████████████ will also be present for a user who signed into the Chrome browser on their desktop and signed into a Google site (like Gmail) but did not have sync enabled". The Schumann Declaration does not provide any logical explanation or evidence to support this claim.

52. GOOG-CALH-00077055 is a document produced by Google that describes ████████████████. The document specifically states that ████████████████████████████ ████████████████████████████ " The document states that ████████████████ ████████████████████████████. The document clearly states that "████████████████"".

53. As part of the Plaintiff data discovery process administered by Special Master Brush, Google has recently produced ████████ data of Plaintiffs [GOOG-CALH-00651647] that provides new details about how Chrome Sync activity is recorded in ████████. Specifically, ████████ contains a "████████████████████████ that includes ████████████████". Mr. Schumann testified that this field contains "████████████████" that tracks signed-in but not synced users as "████████████ [GOOG-CALH-00081809] and signed-in and synced users as "████████████".

54. The "████████ users are members of the class because they are signed-in but not consented for sync. Thus, based on this new information, these ████ signals can be used to directly identify class members in the signed in but not consented for sync mode.

55. My "top-down" approach still works despite this new information about a recent change in how ████████████ product information is logged in ████████ More specifically, it is trivial to include a condition that "████████████████ is "████████████" in addition to the presence of "████████████ ████████████ to identify a signed-in and synced user. Conversely, it is trivial to include a condition that "████████████████████ is "████████ in addition to the presence of "████████████████████████ to identify a signed-in but not-synced user.

56. In summary, my "top-down" approach still works. For NEVER-SYNCERS, all Chrome Sync ███████ records are expected to have "████████████" set to "██████████ For SOMETIMES-SYNCERS, a subset of Chrome Sync records have ████████████" set to "██████████ and another subset of Chrome Sync ███████ records have "████████████" set to "████████████". All Chrome Sync ████████████ records have "████████████" set to "██████████" for ALWAYS-SYNCERS.

   2.   **The Schumann Declaration Provides No Support For Its Assertions Regarding ████████████.**

57. Mr. Schumann opines that the presence of "████████████" in ████████████" field in "████████████████████" table in ████████████ cannot be used to accurately infer Chrome Sync usage (Schumann ¶ 6). Specifically, he states that "the "████████████" record can exist for a user who signed into the Chrome browser on their desktop and signed into a Google site (like Gmail) but never enabled sync". But the Schumann Declaration does not provide any logical explanation or evidence to support this potential issue. If there are any issues, they can be addressed using the methodology explained in ¶¶ 52-55 of this rebuttal.

   3.   **Google Documents Related to "████████████" Conflict with the Conclusions in the Schumann Declaration.**

58. Mr. Schumann opines that the ████████████████████████████████ cannot be used to accurately infer Chrome Sync usage (Schumann ¶ 7). Specifically, he states that "████████████ also returns true for a user who signed into the Chrome browser on their desktop and signed into a Google site (like Gmail) but never enabled sync". The Schumann Declaration does not provide any logical explanation or evidence to support this potential issue.

59. GOOG-CALH-00081141 is a document produced by Google that describes ████ ████████████████████████. The document explains that an approach to find "████████████" that are all necessarily also Sync users. Figure 3 shows that the approach relies on "████████████, which returns true or false based on "████████████". The document describes that the approach will only work for accounts who are a member of the "████████████ ████████████████████████r" group, but does not list any issues that would lead the ████████████" to incorrectly return true for signed-in but not synced users. If there are any issues, they can be addressed using the methodology explained in ¶¶ 52-55 of this rebuttal.



**Figure 3:** Excerpt from [GOOG-CALH-00081142] describing the use of ███████████ to identify Sync users

    **4.**    **Google Documents Related to** ██████ **Conflict with the Conclusions in the Schumann Declaration.**

60. Mr. Schumann opines that ██████ cannot be used to accurately infer Chrome Sync usage (Schumann ¶ 6). Specifically, he states that the "████████" record can exist for a user who signed into the Chrome browser on their desktop and signed into a Google site (like Gmail) but never enabled sync". Mr. Schumann does not provide any logical explanation or evidence to support this claim.

61. GOOG-CALH-00028232 is a document produced by Google that describes ██████ database. ██████ has various ██████ that are dependent on their Sync status. A ██████ exists for signed-in and synced Chrome users. The document does not list any issues that would lead the ██████ to exist for a signed-in but not synced user. If there are any issues, they can be addressed using the methodology explained in ¶¶ 52-55 of this rebuttal.

**B.**    **CONCLUSIONS AS TO THE SCHUMANN DECLARATION**

62. The Schumann Declaration's criticisms regarding my conclusions about the reliability of one of the three proposed approaches (the "top-down" approach) to identify class members is unsupported, and in fact contradicted, by Google's own documents and Mr. Schumann's testimony.[8] My conclusions about the reliability of ██████ ██████████████████████████████████ to identify class members are unchanged.

---

[8] Mr. Schumann does not challenge two of my three approaches proposed to identifying class members.

## V.   REBUTTAL TO DAVID MONSEES'S DECLARATION

63. After considering Googler David Monsees's declaration, including various facts and opinions he asserts, the conclusions in my report are unchanged. I discuss the flaws in the Monsees Declaration in more detail below.

### A.   GOOGLE CAN REASONABLY LINK "UNAUTHENTICATED" AND "AUTHENTICATED" DATA

64. Mr. Monsees states that "Google has implemented policies, protocols, processes, and protections to ensure that unauthenticated (or pseudonymous) data…cannot 'be reasonably linked by Google to' authenticated user data" (Monsees ¶ 8). He further explains that this includes "avoiding logging specific IDs to prevent an indirect and inadvertent join between Google Account-keyed data and pseudonymous-keyed data" (Monsees ¶ 10).

65. As I have explained above in my extensive rebuttal to Mr. Berntson ¶¶ 17-22; 41-43, Mr. Monsees's declaration contradicts and does not even consider several Google internal documents that establish that Google has the ability to map unauthenticated (e.g., Biscotti) and authenticated (e.g., Gaia) IDs and data using its ███████████. The documents produced by Google demonstrate that the █████████ can and already does map or link different identifiers such as Biscotti and Gaia IDs [GOOG-CALH-00030031, GOOG-CALH-00062153, GOOG-CABR-03666182]. The most obvious example of this is in Figure 1 where the ███████ ████████████ is used to literally "████████████████████".

66. Mr. Monsees acknowledged in his deposition that Google combines signed-in (authenticated) and signed-out (unauthenticated) for measurement, attribution, and forecasting. Mr. Monsees also acknowledged in this deposition that server-side logs (e.g., "████████████████") contain both Gaia (authenticated) and Biscotti (unauthenticated) IDs. This is also corroborated by the logs produced by Google as part of the Special Master administered discovery process demonstrate that Google stores Biscotti and Gaia identifiers together in multiple server-side logs.

### B.   THE MONSEES DECLARATION INCORRECTLY ASSERTS THAT GOOGLERS ARE PROHIBITED FROM USING GET/POST REQUESTS, IP ADDRESS, USER-AGENT, AND X-CLIENT-DATA TO TRACK USER BEHAVIOR

67. Mr. Monsees describes Google's "anti-fingerprinting policy" that "prohibits the use of "unique or probabilistically unique combinations of one or more device, network, or app/browser attributes to identify a device, app, browser, or user across distinct transactions". Mr. Monsees also explains that Googlers are prohibited from using categories of information such as IP address, User-Agent, and X-Client-Data header to "track user behavior" (Monsees ¶ 9).

68. But the logs recently disclosed by Google establish that Google indeed collects and concurrently stores several of the aforementioned categories of information in several logs. For example, the logs entitled "████████████" and "███████


" contain fields such as "

in the same log. As another example, the log entitled

contains fields such as "

).[10] As another example, the log entitled

" contains a field entitled

69. Thus, despite Mr. Monsees' asserted "anti-fingerprinting policy", the ingredients of a fingerprint in fact co-exist in many Google logs and can be readily used for fingerprinting.

## B.   CONCLUSIONS AS TO THE MONSEES DECLARATION

70. The assertions made by Mr. Monsees regarding the policies and practices to prevent the linking authenticated and unauthenticated identifiers are undermined by Google's own documentation. Likewise, his statements about an "anti-fingerprinting policy" seem to be directly contradicted by logs recently produced by Google. Thus, my conclusions about Chrome's transmission and Google's storage of user data that can be used to "fingerprint" and "track user behavior" remain unchanged. If anything, the documents recently disclosed by Google (after the submission of my original report) reinforce my findings.

## VI.   REBUTTAL TO RYAN CASSIDY DECLARATION

71. I have reviewed the Declaration of Googler Ryan Cassidy regarding Google Maps Embed API in support of Google's Opposition to Plaintiffs' Motion for Class Certification and, based on that review, as well as my review of Mr. Cassidy's deposition, Google documents, and my own testing, I reach the following conclusions:

## A.   THE CASSIDY DECLARATION FAILS TO ACKNOWLEDGE THE FULL EXTENT OF CHROME TRANSMISSIONS BY GOOGLE MAPS API TO GOOGLE

72. The Cassidy Declaration admits that "The Maps Embed API code snippet may cause the user's browser to send the user's IP address, the user-agent, URL and referrer URL to maps.googleapis.com." (Cassidy ¶ 5). However, as I describe below, Mr.

---

[9] TLS Fingerprinting with JA3 and JA3S https://engineering.salesforce.com/tls-fingerprinting-with-ja3-and-ja3s-24736285596z

[10] It is my understanding that the production of these logs is an ongoing process that is being overseen by Special Master Brush. Thus, I anticipate that additional logs and information will be produced by Google, which may further support my conclusions here.

Cassidy fails to acknowledge the full extent of Chrome transmissions of personal information (e.g., HTTP requests including IP address and User-Agent, cookies, X-client-data) to Google due to the Google Maps API source code on non-Google websites.

73. To test Mr. Cassidy's claims, I recorded Chrome's transmissions to Google on two non-Google websites that embed Google Maps API.

    A. https://www.embedgooglemap.net/, which includes the Google Maps Embed API that is available for free to publishers

    B. https://www.fedex.com/locate/index.html?locale=en_US, which includes the Google Maps JavaScript API that is available at a charge for large publishers (Cassidy Dep. Tr. At 38:16-18; 40:11-17; 47:12-22)

74. Mr. Cassidy testified that the Google Maps Embed API has " ███████ been adopted by " ███████ of websites but ███████████████████████████████████ *Id.* at 67:19-68: 5. However, the JavaScript API has been " ███████ by " ██████████████ " different non-Google websites (*Id.* at 68:13-17) and sees ██████████████████████ " (*Id.* at 69:13-15).

    **1.    Mr. Cassidy omits the fact that Google Maps API causes Chrome to transmit the X-client-data header to Google.**

75. My testing on both of the aforementioned websites shows that Chrome transmits the X-client-data header to maps.googleapis.com and maps.google.com, just as it does with most other Google domains. However, Mr. Cassidy omits this important fact in his declaration. He does not provide any explanation as to why Google Maps API source code causes Chrome to transmit the X-client-data header to maps.googleapis.com and maps.google.com.

76. In his deposition, when asked about whether the source code of Google Maps API causes a Chrome user's browser to send the X-client-data header, Mr. Cassidy responded " ████████████████ ." *Id.* at 46:23-24. He failed to demonstrate even basic understanding of X-client-data header at his deposition. He said ██████████████████████████ " when asked about what is X-client-data header. *Id.* at 47:10-11.

    **2.    Mr. Cassidy omits the fact that Google Maps API causes Chrome to transmit cookies to Google.**

77. My testing on both of the aforementioned websites further shows that Chrome transmits the user's cookies to maps.google.com. Specifically, Chrome transmits authenticated (e.g., Gaia cookies) and unauthenticated (e.g., Zwieback NID cookie) cookies to maps.google.com. However, Mr. Cassidy omits this important fact in his declaration. He does not provide any explanation as to why Google Maps API source code causes Chrome to transmit cookies to maps.google.com.

78. Regardless of whether it is the Maps Embed API or Maps JavaScript API, as shown in Figure 4, the Google Maps API source code is designed in a way to cause Chrome to send third-party cookies to Google including the cookies that are used by Google for advertising. It is noteworthy that Google acknowledges the use of these cookies, such as the NID Zwieback cookie [GOOG-CALH-00374408, GOOG-CABR-00891712, GOOG-CABR- 00891714, GOOG-CABR-03664149], in its advertising products[11] such as AdSense for Search and Google Ads.

79. Mr. Cassidy fails to acknowledge the fact that Google Maps API causes Chrome to transmit these advertising-related cookies to maps.google.com.



**Figure 4:** Screenshot of the webpage cited in footnote 1 of the Cassidy Declaration (https://developers.google.com/maps/documentation/embed/get-started). The documentation shows the Google Maps API source code snippet that causes transmissions to google.com.

### B.   MR. CASSIDY FAILS TO DEMONSTRATE AN UNDERSTANDING OF CHROME DATA TRANSMISSIONS, AND THEIR STORAGE AND USE BY GOOGLE

80. Mr. Cassidy asserts that the information Chrome sends to Google on a website that uses the Embed Maps API source code is not "(1) shared for use by other Google services; (2) stored in or associated with a Google Account holder's Account; (3) used to create or enhance profiles on users; (4) used to "fingerprint" or identify users; or (5) for advertising purposes." (Cassidy Decl. ¶ 8). He fails to provide any reasonable explanation or cite any Google public or internal documentation to substantiate his claim.

---

[11] https://business.safety.google/adscookies/

81. In his deposition, Mr. Cassidy did not know any technical details about the Google Maps JavaScript API such as the data flow his declaration described about the Embed API for which he was also the product manager. Other Google Maps APIs he identified are the static map API (Cassidy Dep. Tr. 82:23-83:1), geocoding API (85:7-9), text search API (85:10-13); auto-complete API (85:14-20); reverse geo-coding API (85:21-23); geo-location API "███████████████████████████"; (85:24-25); Places API (86:21); Routes API (86:22); distance-matrix API (88:5-8). However, Mr. Cassidy testified that he did not know anything about data flow relating to these. *Id.* at 88:15-92:6.

82. In the absence of knowledge about the storage systems and policies for the data sent by Chrome to Google due to Google Maps API source code, it is not possible for someone, including Mr. Cassidy, to claim personal knowledge that the data is not shared with other Google services, stored in or associated with a Google Account holder's Account, used to create or enhance profiles on users; used to "fingerprint" or identify users; or used for advertising purposes. Note that Mr. Cassidy testified:

    A. He does not know the log services used by Google maps. *Id.* at 66:8-10.

    B. Although he has ████████████████████████████████████████ ," he has never reviewed log information relating to the Maps Embed API. *Id.* at 66:18-24.

    C. He does not know where the "████████████████████████████████ ██" at issue in his declaration. *Id.* at 76:4-10.

    D. He does not know where user data that is "████████████████████ ██████" via the JavaScript API is stored at Google. *Id.* at 69:23-71-10.

    E. He does not know the retention period of the user data in question. *Id.* at 74:10-75:7.

    F. He does not know what is in Google Maps storage logs. *Id.* at 78:3-5.

    G. He does not know what additional information is added to the data in the logs. *Id.* at 78:14-20.

    H. He does not know if there ████████████████████████████████████ ████████████████████████████████████" *Id.* at 78:21-79:13.

4.4.1 *Data Use and Retention.* To provide the Services through the Customer Application(s), Google collects and receives data from Customer and End Users (and End Users' End Users, if any), including search terms, IP addresses, and latitude/longitude coordinates. Customer acknowledges and agrees that Google and its Affiliates may use and retain this data to provide and improve Google products and services, subject to the Google Privacy Policy at https://www.google.com/policies/privacy/.

**Figure 5:** Screenshot of the relevant excerpt in Google Maps Platform Terms of Service at https://cloud.google.com/maps-platform/terms/

83. Given the aforementioned highlighted disclosure in the Google Maps Platform Terms of Service (see Figure 5) and the transmission of NID and other advertising-related

cookies shown in my tests, in my opinion, the data transmitted by Chrome to Google due to Google Maps source code is potentially being shared with other Google services, stored in or associated with a Google Account holder's Account, used to create or enhance profiles on users, or used for advertising purposes.

84. In contrast to Google's "anti-fingerprinting" policy, Google admits internally that it uses "████████████████████████████████████████." [GOOG-CABR-04604502]. In fact, Google's backend logs maintain more than sufficient information from which to derive a fingerprint. Thus, in my opinion, the data transmitted by Chrome to Google due to Google Maps API source code is also potentially being used by fingerprinting.

## C.   CONCLUSIONS AS TO CASSIDY DECLARATION

85. Based on my review of Google documents and my own testing, it is my opinion that the conclusions in the Cassidy Declaration fail to acknowledge the full extent of Chrome transmissions of personal information to Google due to the Google Maps API source code on non-Google websites.

# VII.   REBUTTAL TO YILING CHEN REPORT

86. After considering Dr. Yiling Chen's report, including various facts and opinions she asserts, the conclusions in my report are unchanged. I discuss the flaws in the Chen Report in more detail below.

## A.   TRANSMISSIONS OF DATA TO GOOGLE IN OTHER BROWSERS ARE NOT THE SAME AS COMPARED TO THOSE MADE IN CHROME

87. Dr. Chen opines that "[t]he way Chrome operates is typical of other browsers with respect to the issues relevant to this case". Dr. Chen further concludes that "Google receives similar categories of data from an Edge or Firefox user visiting a website that uses Google services as it would receive from an Un-Synced or Synced Chrome user that visits the same website" (Chen ¶ 10). To support this opinion, Dr. Chen tested five websites identified by Plaintiffs and concluded that "the Firefox and Edge browsers had a similar flow of data as Chrome" and that "I do not find anything unique about how Google designed Chrome that affects the data collection and process at issue here" (Chen ¶ 69). As I discuss below, the conclusions in Dr. Chen's declaration are flawed because they are based on misleading design and analysis of the tests to compare Chrome and other browsers.

88. The tests conducted by Dr. Chen to compare different browsers (i.e., Chrome, Edge, and Firefox) follow a misleading design and analysis methods.

   A.   First, the tests were not conducted using the default settings of the tested browsers. Specifically, the tests on Edge and Firefox were conducted "by adjusting each browser's configuration to allow all cookies" (Chen ¶ 65). For example, as described in Chen Exhibit 1, "enhanced tracking protection" was turned off in Firefox, which is not the default configuration of Firefox browser. Dr. Chen acknowledged in her deposition that it is uncommon for users (including herself) to change the default configuration of their

browsers.[12] This major oversight renders Dr. Chen's comparison of Chrome to other browsers scientifically invalid.

B. Second, the analysis of the test results was incomplete because it did not consider the **frequency of transmissions** of different types of data (e.g., HTTP requests including IP address and User-Agent, cookies, X-client-data).

89. To address the first issue of faulty design, I repeated the tests performed by Dr. Chen using the methodology as described in Chen Exhibit 1 with the only difference being the use of default browser configurations for all tested browsers. I also included Apple's Safari browser in the tests because it is the second most popular browser after Chrome.[13] The details of my findings are provided next. In summary, my tests show that there is a significant difference in the frequency of transmission of different types of data in Chrome as compared to Firefox, Edge, and Safari.

90. Table 2 reports the number of different categories of transmissions to Google-owned domains[14] from the four tested browsers for one the websites identified by Plaintiffs: https://www.mercurynews.com/2020/05/24/qa-mental-health-tips-for-handling-the-pandemic/. The results clearly show that Chrome transmits far more data to Google than the other three tested browsers. Overall, there is 37% (Firefox), 28% (Edge), and 54% (Safari) reduction in the total number of transmissions to Google as compared to Chrome. Most notably, there is a **100% reduction** in the number of cookies and X-client-data header transmissions to Google in all other browsers as compared to Chrome.

|  | **Chrome** | **Firefox** | **Edge** | **Safari** |
|---|---|---|---|---|
| Transmissions (aka "HTTP requests") | 324 | 204 | 232 | 150 |
| Cookie transmissions | 47 | 0 | 0 | 0 |
| X-client-data Transmissions | 90 | 0 | 0 | 0 |

**Table 2:** Number of transmissions from Chrome, Firefox, Edge, and Safari web browsers to Google-owned domains in their default configurations

91. Thus, I conclude that Dr. Chen's tests would have led to a different conclusion had they been conducted using the standard default configuration of the tested browsers. Specifically, Dr. Chen's main conclusion that "I find that all three browsers (i.e., Chrome, Edge, Firefox) transmit similar data to Google when a user visits a given site using Google services. Edge and Firefox browsers send Google the same HTTP header components, and often the same cookies and same number of transmissions" (Chen ¶ 67) does not hold true. As shown in Table 2, the number of total

---

[12] "Barnes: I believe it's likely to be the default setting […] Barnes: Okay. And on the iPad, is it also likely to be the default settings on the iPad? Chen: I think so. […] Barnes: Okay, you have default settings on in Chrome, correct? Chen: That's correct. […] Barnes: And is Edge in its default setting? Chen: Yes, it is." [Chen Deposition]
[13] Browser Market Share Worldwide Nov 2020 - Dec 2021 https://gs.statcounter.com/browser-market-share
[14] https://github.com/duckduckgo/tracker-radar/blob/main/entities/Google%20LLC.json

transmissions as well as cookies are clearly different in Firefox, Edge, and Safari as compared to Chrome in their respective default browser configurations.

92. To address the second issue of incomplete analysis, I first attempted to analyze the HAR files for different browser tests reported in the Chen Report. However, as shown in Figure 5, multiple of these HAR files were faulty and resulted in syntax errors when I attempted to open them in any of the available HAR analysis software including Chrome's DevTools. Upon further analysis of the faulty HAR files, as shown in Figure 6, it was clear that the HAR files were incomplete. This issue of faulty HAR files was communicated to Google. Dr. Chen did not dispute the issue of faulty HAR files in her deposition and acknowledged that she did not herself collect these HAR files and she randomly checked only a few of the HAR files.



**Figure 5:** Syntax error shown by Chrome DevTools when faulty Chen HAR files are loaded



**Figure 6:** Ending of GOOG_CHEN_00000007.har showing missing quotation mark, comma, and closing curly brackets expected in the standard JSON format of HAR files.

93. After Google's Counsel was notified of the issue, replacement HAR files were produced on January 14, 2022. Upon analysis of replacement HAR files, I found that the new replacement HAR files were collected on January 13, 2022, about a month after the HAR files were collected for the Chen Report on December 16.

94. After Google's Counsel was notified of this issue, they sent us the "repaired" HAR files on January 20, 2022. An analysis of the "repaired" HAR files showed that they are in fact truncated versions of the original files (see Figure 7). The repaired files basically threw away evidence of additional network transmissions.



**Original**                                              **Repaired**

**Figure 7:** A side-by-side comparison of original and "repaired" HAR files. The ending of "repaired" GOOG_CHEN_00000007.har shows that it is in fact a truncated version of the originally produced HAR file.

95. Due to these issues with the submitted HAR files, I repeated the tests performed by Dr. Chen using the same methodology as described in Exhibit 1 of the Chen Report. Specifically, I disabled "Enhanced Tracking Protection" in Firefox and "Tracking Prevention" in Edge. In the same vein, I also disabled "Prevent cross-site tracking" in Safari. Note that these were all default configurations in Firefox, Edge, and Safari and should ideally be kept as-is as I have explained earlier in ¶ 88. However, I did these modifications to replicate the exact same methodology as in Dr. Chen's tests and evaluate the validity of her findings.

96. Table 3 reports the number of different categories of transmissions to Google-owned domains[15] from the four tested browsers for the webpage https://www.mercurynews.com/2020/05/24/qa-mental-health-tips-for-handling-the-pandemic/. While the results in Table 3 (using non-default browser configurations) are different as compared to Table 2 (using the default browser configurations), they still clearly show that Chrome transmits far more data to Google than the other three tested browsers – even under the Chen Report's flawed methodology. Overall, there is 27% (Firefox), 9% (Edge), and 40% (Safari) reduction in the total number of transmissions to Google as compared to Chrome. There is still a **100% reduction** in the number of X-client-data header transmissions to Google in all browsers as compared to Chrome. Finally, there is a 58% reduction in the number of cookie transmissions from Chrome to Google as compared to Safari. The number of cookie transmissions is the same for Firefox and 72% more for Edge as compared to Chrome.

---

[15] https://github.com/duckduckgo/tracker-radar/blob/main/entities/Google%20LLC.json

|  | **Chrome** | **Firefox** | **Edge** | **Safari** |
|---|---|---|---|---|
| Transmissions (aka "HTTP requests") | 290 | 212 | 264 | 174 |
| Cookie transmissions | 43 | 43 | 74 | 18 |
| X-client-data Transmissions | 78 | 0 | 0 | 0 |

**Table 3:** Number of transmissions from Chrome, Firefox, Edge, and Safari web browsers to Google-owned domains. Chrome is used in its default configuration but Firefox, Edge, and Safari are not (their default tracking protection features are disabled) as in Dr. Chen's tests.

97. Thus, I conclude that Dr. Chen's tests, despite their faulty design, still do not support her conclusion that "Edge and Firefox browsers send Google the same HTTP header components, and often the same cookies and same number of transmissions" (Chen ¶ 67). As shown in Table 3, the number of total transmissions of data are clearly more in Chrome than in Firefox, Edge, and Safari, even when the default tracking protection features are disabled in Firefox, Edge, and Safari.

## B.   THE CHEN REPORT INCORRECTLY ASSERTS THAT WEBSITE OPTIMIZATION IS NOT UNIQUE TO CHROME

98. Dr. Chen claims that "website optimization is not unique to Chrome" (Chen ¶ 79). To support this claim, one cherry-picked anecdote is provided in the face of tens of thousands of examples of websites that work in Chrome but do not work in Firefox[16]. The sheer number of such cases (approximately 100 thousand at the time of writing[17]) demonstrates that this problem of website optimization is overwhelmingly unique to Chrome.

99. Dr. Chen argues that "web developers and browser developers are responsive to fixing compatibility issues when reported" (Chen ¶ 79) in support of her claim that website optimization is not unique to Chrome. Dr. Chen does not conduct any testing to evaluate how frequent or infrequent these cases are. More importantly, this argument misses the larger point that developers mainly test their websites for compatibility with Chrome, and *sometimes* (not always) fix them for other browsers only *after* they are notified of the issue.

100.   The bottom line is that there is enough friction for the users of non-Chrome browsers that they have to install and use Chrome if they want to access a large number of websites that are primarily optimized to work on Chrome.

## C.   CONCLUSIONS AS TO THE CHEN REPORT

101.   The Chen Report's claims about transmissions from Chrome to Google as compared to other browsers are incorrect because they are based on faulty experimental design and analysis techniques. My tests show that Chrome by far transmits more frequently (i.e., total number of transmissions) and more types of data (e.g., cookies) as compared to other web browsers when tested in their default configurations. My tests also show that there remains a significant difference in the

---

[16] https://webcompat.com/
[17] https://webcompat.com/issues?page=1&per_page=50&state=open&stage=all&sort=created&direction=desc

transmission of data in Chrome as compared to Firefox, Edge, and Safari when tested using the default configuration for Chrome and non-default configuration for other browsers. Thus, Dr. Chen's conclusions contradict the data even when using its own prescribed (flawed) methodology.

102.    The Chen Report's criticisms regarding my conclusions about website optimization for Chrome are based on cherry-picked anecdotes and fail to holistically take into account tens of thousands of such cases. Thus, my conclusion about website optimization for Chrome remains unchanged.

## VIII.    REBUTTAL TO GEORGIOS ZERVAS REPORT

103.    After considering Dr. Georgios Zervas's Report, including various facts and opinions he asserts, the conclusions in my report are unchanged. I discuss the flaws in the Zervas Report in more detail below.

### A. THE ZERVAS REPORT INCORRECTLY ASSERTS THAT DIFFERENT BROWSERS FUNCTION SIMILARLY TO CHROME

104.    Dr. Zervas opines that "In my opinion, based on my professional experience, similar testing performed on a different browser such as Firefox or Edge would confirm that those browsers function similarly to Chrome, and the data transmissions that are the subject of Plaintiffs' allegations are primarily caused by functionality of the websites being visited, not the browser used" (Zervas ¶ 70). Dr. Zervas also claims that "the percentage of websites that make transmissions to Google servers would be similar across other web browsers such that these transmissions are not unique to Chrome" (Zervas ¶ 70).

105.    Dr. Zervas fails to provide any logical explanation or evidence to support his opinion, instead relying solely on Dr. Chen's faulty tests (Chen ¶ 69). Dr. Zervas acknowledged in his deposition that he did not conduct any test on Firefox or Edge to support his statements (Zervas ¶ 70).[18]

106.    As I have extensively explained in my rebuttal to Dr. Chen's report, Chrome's transmissions to Google are markedly different as compared to other browsers such as Firefox, Edge, and Safari. My tests show that other browsers have built-in, default-on features that result in a significant reduction (or even complete removal of some categories of data) of transmissions to Google as compared to Chrome. My tests further show that even when these features are disabled, the total number of transmissions to Google by other browsers are significantly less as compared to Chrome. In summary, my tests provide concrete evidence to refute Dr. Zervas's unsupported claim that "other browsers function similarly to Chrome".

---

[18] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." [Zervas Deposition]

### B. THE ZERVAS REPORT INCORRECTLY ASSERTS THAT I DID NOT ANALYZE THE NATURE OF TRANSMISSIONS BY CHROME TO GOOGLE IN MY REPORT

107.    Dr. Zervas opines that my report did not "analyze what, if any, personal information was being sent to Google in these transmissions or the extent to which these transmissions even contained the data at issue" (Zervas ¶ 68). But, in fact, I have done this analysis. I discuss the transmission of different types of personal information in ¶¶ 18-35 of my original report.[19] Specifically, I document the transmission of IP addresses, User-Agent, X-client-data header, and cookies from Chrome to Google-owned domains for the Mercury News webpage.

108.    Dr. Zervas opines that my report did not consider "the content and context of the transmissions" (Zervas ¶ 69). He points out my recently published research[20] that classified network transmissions from Chrome as functional or tracking to ascertain the nature of Chrome transmissions to Google. He opines that "presenting only this percentage, without considering the content and context of the transmissions, is misleading" (Zervas ¶ 69). Based on this critique, I revisited my analysis of Chrome transmissions to Google. However, as I explain in detail below, I reached the same conclusions as in my original report.

109.    I used the peer-reviewed research methodology pointed by Dr. Zervas to classify networking transmissions from Chrome as tracking or functional. The details are provided in the cited research paper.[21] If a Chrome network transmission matches the rules in EasyList or EasyPrivacy,[22] it is classified as tracking. Otherwise, it is classified as functional.

110.    I reproduced Table 2 from my original report with the additional breakdown of Chrome transmissions to Google as tracking or functional. The results still show that Chrome always makes one or more third-party tracking transmissions to a Google-owned domain in a browsing session when a user visits a series of 50 popular websites of any website category. Overall, more than two-thirds (67%) of all transmissions to Google from the top-50 websites across all categories are classified are tracking.

| Category | Count | Tracking Transmissions | Functional Transmissions |
|---|---|---|---|
| Kids | 1193 | 905 (76%) | 288 (24%) |
| Arts | 572 | 372 (65%) | 200 (35%) |
| Home | 427 | 325 (76%) | 102 (24%) |
| Health | 366 | 226 (62%) | 140 (38%) |
| News | 335 | 254 (76%) | 81 (24%) |

---

[19] *Calhoun, et al. v. Google, LLC*, Shafiq Report, dated October 14, 2021. Dkt. 340-19.

[20] A.H. Amjad, D. Saleem, F. Zaffar, M. A. Gulzar, Z Shafiq. TrackerSift: Untangling Mixed Tracking and Functional Web Resources. ACM Internet Measurement Conference, November 2021.

[21] A.H. Amjad, D. Saleem, F. Zaffar, M. A. Gulzar, Z Shafiq. TrackerSift: Untangling Mixed Tracking and Functional Web Resources. ACM Internet Measurement Conference, November 2021.

[22] https://easylist.to

| | | | |
|---|---|---|---|
| Society | 305 | 180 (59%) | 125 (41%) |
| Computers | 240 | 113 (47%) | 127 (53%) |
| Sports | 204 | 146 (72%) | 58 (28%) |
| Games | 177 | 87 (49%) | 90 (51%) |
| Regional | 163 | 53 (32%) | 110 (68%) |
| Business | 160 | 125 (78%) | 35 (22%) |
| Reference | 130 | 88 (68%) | 42 (32%) |
| Shopping | 117 | 96 (82%) | 21 (18%) |
| Recreation | 86 | 67 (78%) | 19 (22%) |
| Science | 37 | 13 (35%) | 24 (65%) |
| **Average (weighted)** | **301** | **203 (67%)** | **98 (33%)** |

**Table 4:** Frequency of Chrome transmissions to Google across different website categories (top-50 websites per category). The transmissions are further broken down as *tracking* or *functional*.

111.  The category of "functional transmissions" is also misleading because it implies that the transmissions are necessary for a browser to function. However, browsers can function without any of these "functional transmissions." In addition, it is possible for Google to render the "services" associated with the "functional transmissions" without all such transmissions. For example, Googler Ryan Cassidy, who is "a Product Manager at Google" who works on the embed Maps API submitted a declaration explaining that the "additional media" associated with the transmissions labeled as "function" "may be located on the same server that hosts the website, or on a server belonging to a third-party entity that provides services to the website." (Cassidy ¶ 3). When the service is "located on the same server that hosts the website," the data transmissions from Chrome to Google at this case would not happen. Google could design its "functional" APIs like Maps, Fonts, and Storage to work in this way. It could also design the Chrome browser to mask a user's IP address and User-Agent and not send the X-client-data header through the "functional" transmissions. However, Google has not chosen to do so.

112.  Recent peer-reviewed research,[23] at the USENIX Security Symposium 2022 (one of the most prestigious computer security venues) also supports my conclusions about how Chrome's transmissions to Google on non-Google websites are unavoidable for consumers.[24] Using data collected from 250 thousand real users (38% of whom are in the United States), the researchers found that Google directly tracks users on 72.33% of the websites and tracks 99.76% of all users in their study (see Table 3 in the paper). These results corroborate the findings in my report.

113.  I found in my report that Chrome sends third-party network transmissions to Google on 75.9% of top-100K websites. This result matches the result of 72.33% reported by these independent researchers for 250 thousand real users. I found in my

---

[23] Savino Dambra, Iskander Sanchez-Rola, Leyla Bilge, Davide Balzarotti. When Sally Met Trackers: Web Tracking From the Users' Perspective, USENIX Security Symposium 2022 (in press; https://www.usenix.org/system/files/sec22summer_dambra.pdf).
[24] Note that the research is independently conducted by academic and industry researchers. I did not partake in the peer-review of this research paper.

report that Chrome sends third-party network transmissions to Google for 100% of different website categories. This result matches the result of 99.76% reported by these independent researchers for 250 thousand real users. Thus, this independently conducted peer-reviewed research also supports my conclusions.

114.    Dr. Zervas's own peer-reviewed research[25] corroborates my findings. Specifically, he states in his research paper that "70% of popular health websites leak sensitive information—such as specific conditions, treatments and diseases—to third-party trackers and other firms with which the individual has never directly interacted." His research paper further goes on to state that "the largest trackers have access to browsing behavior across nearly all popular websites". The citation[26] provided by Dr. Zervas to support his conclusion confirms that Google is in fact "the largest tracker." Specifically, the cited paper states that "Google is the elephant in the room." In more detail, the paper states that "78% of pages analyzed included elements that were owned by Google" and "Regardless of the type of services provided, in some way all of these HTTP requests funnel information back to Google. This means a single company has the ability to record the Web activity of a huge number of individuals seeking sensitive health-related information without their knowledge or consent." Thus, the conclusion of Dr. Zervas's own peer-reviewed research (78%) match the results in my original report (75.9%) as to the percentage of websites with network transmissions to Google.

115.    Dr. Zervas acknowledged in his deposition that he did not review any of the Google's internal documents that report the prevalence of Google's source code on top websites.[27] For example, GOOG-CABR-05404848, a Google internal document about Google Analytics (GA), reports that ███████████████████████ ██████."

116.    In summary, there is overwhelming evidence (independent, Dr. Zervas's own research, and Google's internal documents) to support the claim in my original report that "it is practically impossible for a typical Chrome user to avoid third-party network transmissions to Google-owned domains."

## C.   THE ZERVAS REPORT INCORRECTLY ASSERTS THAT I DID NOT ANALYZE THE FREQUENCY AND ALTERNATIVES OF WEBSITES THAT WORK IN CHROME

117.    Dr. Zervas opines that my report does not provide "evidence that websites that work in Chrome are "quite common," and users have "no choice."" First, Dr. Zervas ignores almost 100 thousand issues reported on https://webcompat.com (also cited in my report).  Second, to support his assertions, Dr. Zervas included screen shots of five example websites. However, his testing fails to take into account the device type and the operating system for which the issue was originally reported.

---

[25] Ceren Budak, Sharad Goel, Justin Rao, Georgios Zervas, "Understanding Emerging Threats to Online Advertising", Proceedings of the 2016 ACM Conference on Economics and Computation.
[26] Libert, T. 2015. Privacy implications of health information seeking on the web. Commun. ACM 58, 3, 68–77
[27] "this is not something I studied, and I presume people who work on the Google Analytics product for Google know a lot more than I do about how Google Analytics works."

118.   Below are the screenshots of the five example web pages as reported by the users. The exact device and operating system configuration are included in the respective bug reports. Note that the compatibility results are also sensitive to the time and location.

A.  CDC's COVID Data Tracker (https://covid.cdc.gov/covid-data-tracker) does not show user the county map of pandemic vulnerability on Firefox. It suggests the user to download Chrome instead.




**Chrome**                                        **Firefox**

B.  The State of Texas benefit portal (https://www.yourtexasbenefits.com/Learn/Home) that is used for SNAP food benefits and other social services does not work an Firefox from Windows 8 onwards. It works on Chrome on all Windows versions.

 

**Chrome**                                    **Firefox**

C. AT&T DirectTV's video streaming feature (https://stream.directv.com) is not supported on Firefox. The user is suggested to download Chrome or Safari instead.



**Chrome**                                    **Firefox**

D. DISH TV's video streaming video streaming feature (https://www.dishanywhere.com/franchise/dark_matter_e12582) is not supported on Firefox. The user is suggested to download Chrome or Safari instead.



| Chrome | Firefox |
|---|---|

    E.  Google Duo's (https://duo.google.com) group call feature does not work on Firefox. It only works on Chrome.



| Chrome | Firefox |
|---|---|

119.    As shown above, the examples (a) and (e) only offered Chrome as an alternative at the time of testing. Furthermore, it is also noteworthy that Chrome is always offered as an alternative while other browsers such as Safari or Edge may or may not always be offered as an alternative. This trend holds true for a vast majority of other bugs reported on https://webcompat.com. This demonstrates that for many websites users indeed have "no choice" other than Chrome to use the website.

### D.   THE ZERVAS REPORT INCORRECTLY ASSERTS THAT MY METHOD TO INFER CHROME SYNC USAGE IS INACCURATE

120.    Dr. Zervas opines that one of the three approaches (the "top-down approach") proposed in my report to identify class members is inaccurate (Zervas ¶¶ 78-84). Dr. Zervas cites to Mr. Schumann's declaration to support his opinion and fails to provide any independent logical explanation or evidence to that end. However, as I explained earlier, the opinions expressed in Mr. Schumann's declaration are not supported by any documents produced by Google, but are rather contradicted by Google's own documents.

**E.   THE ZERVAS REPORT INCORRECTLY ASSERTS THAT THE ███████ ████████████████████ DOES NOT MAP GAIA TO BISCOTTI OR ZWIEBACK IDENTIFIERS**

121.   Dr. Zervas opines that one of the approaches proposed in my report is based on an incorrect assumption that ███████████████ can map unauthenticated identifiers (e.g., Biscotti, Zwieback) to authenticated identifiers (e.g., Gaia) (Zervas ¶¶ 85-89). Dr. Zervas cites Mr. Berntson's declaration to support this opinion and fails to provide any independent logical explanation or evidence. However, as I have already explained in my rebuttal to the Berntson Declaration, the opinions expressed by Mr. Berntson do not consider and in fact are contradicted by multiple documents produced by Google about the ████████████ design and innerworkings. Dr. Zervas acknowledged in his deposition that he did not review any documents describing ████████████, even the diagrams and documents cited in my report. For example, when asked about GOOG-CABR-03666182 discussed on page 19 of my original report, he stated that ██████████████" and that "████████ ███████████████████████████████"

**F.   THE ZERVAS REPORT INCORRECTLY ASSERTS THAT MY "ALTERNATIVE APPROACH" IS INADEQUATE AND INFEASIBLE**

122.   Dr. Zervas opines about the adequacy of one of the three approaches ("Alternative Approach") proposed in my report (Zervas ¶¶ 92-93). He states that the "Alternative Approach" is "inadequate because it would not include users who opted out of ████ data" (Zervas ¶ 93). However, Dr. Zervas fails to recognize that the ████████ histograms are simply not sent to Google servers when a user opts-out of █████.[28] █████ histograms may be locally available in the Chrome browser even in that case. Since the proposed approach relies on the update that will be locally executed in users' Chrome browsers, Dr. Zervas's opinion about the inadequacy of the proposed approach is incorrect.

123.   Dr. Zervas further opines that my "Alternative Approach" has "not identified evidence sufficient to conclude that such an update is possible" (Zervas ¶¶ 92-93). First, it is noteworthy that Dr. Zervas does not offer any opinion about the infeasibility of the proposed approach. Second, it is well-known that Chrome regularly pushes an update every four weeks, thus including this update as part of the routine release cycle will be trivial.[29] Third, as discussed below, Googlers have relied on a similar update approach to deploy new features.

124.   GOOG-CALH-00081141 describes a Google project entitled "█████ to find eligible users for a promotion. This promotion was to be deployed by ████████████ ████████████████████████████████████████████ and "████████████████████████████████████████████████████

---

[28] "If the histogram data is visible in about:histograms, it will be sent by an official Chrome build to ████ assuming the user has opted into metrics collection."
https://chromium.googlesource.com/chromiumos/platform/metrics/+/d1c2a8b907dab254ef7a63c7ab4345309efb6ec6/README

[29] https://chromium.googlesource.com/chromium/src/+/refs/heads/main/docs/process/release_cycle.md

██████████ .” Simply put, Google can (1) push a similar update to Chrome's ██████ implementation to locally compute the ratio of two histograms as described in my report and then (2) use the outcome of the computation (e.g., if the Chrome instance is eligible to be a class member) to decide whether to show the user of a Chrome instance the notification about class membership. This implementation of the proposed Alternative Approach is in fact simpler than the ██████ project because there is no server-side computation and both steps (██████ histogram computation and notification to eligible users) are executed locally by the updated Chrome client code.

## G. THE ZERVAS REPORT INCORRECTLY ASSERTS THAT THE X-CLIENT-DATA HEADER CANNOT ACCURATELY IDENTIFY INCOGNITO USERS

125.    Dr. Zervas opines that my approach based on the X-client-data header will not accurately identify Incognito Chrome users (Zervas ¶ 94). Based on Mr. Berntson's declaration (Berntson ¶ 6 footnote 2), Dr. Zervas lists 4 scenarios where the X-client-data header will not be transmitted by Chrome to Google even if the user is not in Incognito mode (Zervas ¶ 94). As I discuss below, these four scenarios are inapplicable or will have a negligible impact on the accuracy of our approach.

126.    Citing Mr. Berntson's declaration, Dr. Zervas claims that the X-client-data header will be absent even when the browser is not in Incognito mode for "(i) a new browser instance" and when "(ii) the browser has not been used for 30 days or more" (Zervas ¶ 94). But Dr. Zervas fails to recognize that as soon as the user starts using the Chrome browser (new or returning after 30 or more days) the browser will be immediately re-assigned an X-client-data header. Thus, our approach will be able to accurately identify these browser instances as not Incognito as soon as the browser is in active use.

127.    Citing Mr. Berntson's declaration, Dr. Zervas claims that the X-client-data header will be absent even when the browser is not in Incognito mode because "(iii) the Chrome server sends too many variation IDs to the Chrome browser thereby causing the Chrome browser to delete the header to keep it from becoming too large" (Zervas ¶ 94). But Dr. Zervas fails to acknowledge that the Chrome browser is designed to reassign a new X-client-data header soon after the deletion of the previous header. Thus, our approach will be able to accurately identify these browser instances as not Incognito as soon as the browser is reassigned a new X-client-data header.

128.    Citing Mr. Berntson's declaration, Dr. Zervas claims that the X-client-data header will be absent even when the browser is not in Incognito mode because "(iv) a firewall prevents Chrome from receiving the variation IDs that are used to populate the X-Client- Data Header" (Zervas ¶ 94). But Dr. Zervas fails to acknowledge that Chrome receives variation IDs that are used to populate the X-client-data header over an encrypted HTTPS channel. Thus, normal firewalls cannot intercept and modify the X-client-data header without launching a full-blown man-in-the-middle (MITM) attack, which is not possible unless the user agrees to install the root certificate provided by firewall provider.[30]

---

[30] https://www.zdnet.com/article/apple-google-microsoft-and-mozilla-ban-kazakhstans-mitm-https-certificate/

### H. THE ZERVAS REPORT INCORRECTLY ASSERTS THAT MY DESCRIPTION OF ENTROPY IS FLAWED BECAUSE IT ASSUMES INDEPENDENCE AMONGST DIFFERENT ELEMENTS OF DATA

129.    Dr. Zervas claims that my "description of entropy is misleading because [I] suggest that adding the bits of entropy of various elements of data at issue together will equal the sum of the parts" (Zervas ¶ 98). Dr. Zervas fails to recognize that the entropy values in my report are cited from external references that consider the "joint entropy". The computation of joint entropy takes into account the lack of independence between different data elements. This issue is addressed in the EFF reference (¶ 5 in my original report). It is also noteworthy that EFF's fingerprint analysis method (https://panopticlick.eff.org) reports both the entropy of individual elements of data as well as the joint entropy while considering correlations between various data elements.

### I. THE ZERVAS REPORT INCORRECTLY ASSERTS THAT GOOGLE RETAINS SIGNIFICANTLY LESS INFORMATION THAN IT RECEIVES DUE TO POLICIES AND GUIDELINES

130.    Dr. Zervas opines based on his review of several Google policies and guidelines that "the amount of information retained by Google is significantly less than the amount it receives" (Zervas ¶¶ 101-102). For example, he cites scrubbing policies that ███████████████████████████████████████████████████████ But his declaration fails to account for some key issues.

131.    The Zervas Report fails to acknowledge that multiple server-side logs maintained by Google concurrently store the information Chrome transmits to Google and connects it to even more information about the user. Specifically, several Google logs concurrently store several of the high-entropy data elements. For example, the logs entitled ███████████████" and "█████████████████" contain fields such as "████████████████████████████████████████████████ the same log. As another example, the log entitled "██████████████" contains fields such as ████████████████████████████████████████████████████████████████████████████████████████████████████████



[31]).[32] As another example, the log entitled "███████" contains a field entitled

132.    The Zervas Report fails to provide any evidence as to whether the information stored by Google after "████" is no longer personal information or personally identifiable information (Zervas ¶ 101). In fact, it seems that the Google retains significant information that can still well exceed the 32-bit entropy threshold. For example, Dr. Zervas states that Google retains █ bits of ████████ ████. The entropy of these █ bits alone could exceed the 32-bit threshold especially when combined with other redacted data elements.

## J.    CONCLUSIONS AS TO THE ZERVAS REPORT

133.    The Zervas Report's assertion about Chrome's transmissions to Google as compared to other browsers is flawed and incorrect. Contrary to his opinion, my tests of Chrome, Firefox, Edge, and Safari show that Chrome transmits data to Google far more than other browsers.

134.    My additional analysis of the previously collected data using Dr. Zervas's prescribed methodology establish the non-functional nature of Chrome transmissions to Google. Peer-reviewed research methods continue to support my conclusion. Thus, my conclusion about Chrome transmissions to Google remains unchanged.

135.    The Zervas Report's claims about the frequency of website optimization for Chrome and alternatives contradict my tests. My report cites tens of thousands of documented issues where website features do not work on Firefox but work on Chrome. While Chrome is always a suggested alternative to Firefox-incompatible websites, other browsers such as Safari or Edge are not always offered as alternatives. Thus, my conclusion about website optimization for Chrome remains unchanged.

136.    The Zervas Report's claims about the accuracy of one of my three proposed approaches (the "top-down" approach) to identify class members are not grounded by any original analysis. His analysis simply reiterates the faulty claims in the Schumann and Bernston Declarations, which I have refuted.

137.    The Zervas Report's claims about the adequacy of one of my three proposed approaches (the "alternative" approach) to identify class members are based on flawed assumption about how █████ histograms are locally stored. To counter his concern about the feasibility of the "alternative" approach, I point an existing Google project that pushes an update to Chrome to identify a subset of Chrome users who are eligible for a promotion. Thus, my conclusion about the adequacy and feasibility of

---

[31] TLS Fingerprinting with JA3 and JA3S https://engineering.salesforce.com/tls-fingerprinting-with-ja3-and-ja3s-247362855967

[32] It is my understanding that the production of these logs is an ongoing process that is being overseen by Special Master Brush. To the extent that additional logs and information will be produced by Google, those may further support my conclusions here.

my "alternative" approach remains unchanged. In fact, new evidence further strengthens the feasibility of the proposed approach.

138.     The Zervas Report's claims about the accuracy of using X-client-data header to identify Incognito users are based on faulty logic. Thus, my conclusion about identification of Incognio users remains unchanged.

139.     The Zervas Report criticizes my approach to entropy on the basis that it assumes that adding bits of data will equal the sum of its parts. This is incorrect. My analysis considers "joint entropy" and takes into account the lack of independence between different data elements. My opinions on entropy remain unchanged.

140.     The Zervas Report's claims about Google's retention of information due to its policies and guidelines are contradicted by Google's own documents. Thus, my conclusion about the transmission of PII by Chrome to Google remains unchanged.

## IX.   REBUTTAL TO PAUL SCHWARTZ REPORT

141.     After considering Dr. Paul Schwartz's Report, including various facts and opinions he asserts, the conclusions in my report are unchanged. I discuss the flaws in the Schwartz Report in more detail below.

### A.   THE SCHWARTZ REPORT'S DETERMINATION OF PII IS BASED ON CHERRY-PICKED SUBSET OF GOOGLE'S POLICIES AND PRACTICES

142.     Dr. Schwartz opines that "Google's existing policies and guidelines support the conclusion that the data at issue is neither PII nor PI when Google does not link it to a Google Account and takes steps to ensure it is not associated with an identified individual." (Schwartz ¶ 67). He also opines that "Google has implemented policies and taken certain steps to ensure that information that is not associated with a user's Google Account is not linked nor reasonably linkable to a specific individual by Google." (Schwartz ¶ 68). Dr. Schwartz further explains that Google has policies in place that "identifiers such as Biscotti or Zwieback must never be stored with personally-identifying information (PII) such as GAIA IDs [Google Account IDs]." (Schwartz ¶ 79). However, Dr. Schwartz did not conduct any independent investigation or review any Google documentation, and ignores abundant contradictory evidence cited in my original report as well as new evidence produced as part of the Special Master administered discovery process.

143.     Google's ███████████████ [GOOG-CALH-00030031, GOOG-CALH-00062153, GOOG-CABR-03666182] discussed at length in my original report allows Google to map non-GAIA IDs to GAIA IDs. For example, Figure 1 in this rebuttal (also included in page 19 of my original report) clearly shows that ██████████████████ has specific mechanisms to literally '████████████████" and '█████████████████ [GOOG-CABR-03666182]. As another example, ████████████████████ encodes "██████ "████████", "Gaia", and "█████████ identifiers together in the CID parameter [GOOG-CALH-00062153]. As another example, Google has pipelines that combine Biscotti and Gaia information for ██████████████████ [Monsees Dep. Ex. 45]. As yet another example, Google stores CID, Zwieback, and Biscotti IDs in "██████" for ██ days [GOOG-CABR-04080255]. The list goes on. In summary, Dr. Schwartz is unaware

of the fact that Google indeed routinely maps information that is not associated with a user's Google Account

144.    Dr. Schwartz is unaware of the existence of various server-side logs at Google that indeed store GAIA IDs alongside Biscotti IDs. The logs produced by Google as part of the Special Master administered discovery process demonstrate that Google stores Biscotti and Gaia identifiers together in multiple server-side logs. For example, the logs entitled "████████████████" and "████████████████████" contain both GAIA ID and Biscotti ID. For the "Ned Stark" test account, Google was able to search and extract information using both the Gaia ID (see GOOG-CALH-01134336 and GOOG-CALH-01134338) as well as corresponding Biscotti IDs (see GOOG-CALH-01134348 and GOOG-CALH-01134350). The production of "Ned Stark" test account data from the same log using both Gaia and Biscotti IDs clearly demonstrates that Google does not segregate Biscotti and Gaia keyed data at the server-side.

145.    In summary, even when considering Dr. Schwartz's definition of PII based on whether pseudonymous identifiers such as Biscotti and Zwieback IDs are linked to Google Account identifiers such as GAIA ID, I conclude that Google receives and records PI and PII for Not Synced Chrome users.

## B.   DR. SCHWARTZ'S DEFINITION OF PII CONTRADICTS WITH THE FTC AND GOOGLE'S DEFINITION OF PII

146.    Dr. Schwartz relies on FTC's guidance and definition of PII. While this appears to me to be a legal opinion, Schwartz explains that "The FTC used this authority to add the following element to the statute's definition of PII: a "persistent identifier, such as a customer number held in a cookie or a processor serial number, where such identifier is associated with individually identifiable information."" (Schwartz ¶ 44). However, Dr. Schwartz has relied on an outdated 2011 guidance from the FTC here. The FTC issued an update to its guidance in 2013 that specifically removed the requirement that the persistent identifiers in its guidance need to be associated with individually identifiable information about an individual.

147.    It is noteworthy that the FTC defines persistent identifiers as follows: "Such persistent identifier includes, but is not limited to, a customer number held in a cookie, an Internet Protocol (IP) address, a processor or device serial number, or unique device identifier." Thus, the FTC's definition of PII includes IP address and unique device identifiers such as those stored in Biscotti and Zwieback cookies. The FTC's definition contradicts Dr. Schwartz's assertion that only unique account identifiers such as GAIA IDs are PII (Schwartz ¶ 72) but not Biscotti and Zwieback IDs.

148.    Since FTC classifies IP address as a persistent identifier, the FTC's classification of IP address as PII conflicts with Dr. Schwartz's assertion that "fact-intensive considerations are required to determine whether a given IP address is PII" (Schwartz ¶ 61). In fact, Dr. Schwartz's definition of PII conflicts with Google's own definition of PII. GOOG-CALH-00027770 is a document produced by Google, which states that examples of "████████████████████████████". Finally, Dr. Schwartz's opinion also contradicts his own published research where he states that "An IP address is a unique identifier that is assigned to every computer connected

to the Internet." and that "The identification of a seemingly anonymous Internet user can easily follow from an IP address".

149.    Internal documents from Google also conflict with Schwartz' opinion. GOOG-CALH-00027768 states that "███████████████████" includes "███████████" Another document (GOOG-CABR-04604487) explains that "████████████" is a subset of "██████████████████████" and includes "███████████████████████████" The same document states that "█████████████████████████████████████████████████████████████ is defined to include '███████████████████████████████████████ " and ████████████████████████████████████████████████████████████ion."

## C.   DR. SCHWARTZ IS UNAWARE THAT ENTROPY IS USED AS A METRIC BY COMPUTER SCIENTISTS AND GOOGLE TO ASSESS IDENTIFIABILITY OF INFORMATION

150.    Dr. Schwartz is unaware of the computer science community's (including Google's own) adoption of entropy as a metric to assess the risk of identifiability. He acknowledges in his deposition that "█████████████" as to "████████████ ████████████?" [33]

151.    Recall that the FTC defines persistent identifiers to include "unique device identifier". [34] In service of this definition, entropy is used by computer scientists to measure whether a device identifier is unique. As I explain in my original report (Shafiq ¶ 23), the 32 bits threshold is typically determined to be the amount of entropy required to uniquely identify a user or device on the Internet.



**Figure 8:** Googler Maud Nalpas describes that the 32 bit identifiability threshold is enough to uniquely identify a user

152.    Dr. Schwartz acknowledges the existence of metrics developed by computer scientists to assess the risk of identifiability of information in his peer-reviewed published research. Specifically, he states that "Practical tools also exist for assessing the risk of identification. In fact, computer scientists have developed metrics for

---

[33] Deposition of Paul Schwartz at p. 98
[34] 16 CFR Part 312 Children's Online Privacy Protection Rule; Final Rule
https://www.ftc.gov/system/files/documents/federal_register_notices/2013/01/2012-31341.pdf

assessing the risk of identifiability of information"[35] Unfortunately, he seems to be unaware of the state-of-the-art in computer science -- he is unaware of the widespread use of entropy in computer science research and practice (including by Google). For example, GOOG-CALH-000278768 is a Google document that states the use of "███████" for "██████████████████". As another example, as shown in Figure 8, Googlers are planning to use the 32 bits as the identifiability threshold in calculating its "Privacy Budget".[36]  As another example, as shown in Figure 9, the FAQ page of Google's Privacy Budget project justifies the use of the 32 bit threshold for Privacy Budget.[37] Finally, outside of Google, EFF[38] and Mozilla[39] have also used entropy as a metric to assess identifiability of information.



**Is the privacy budget feasible?**

This proposal is at an early stage and exact privacy budget limits are to be determined. But there are reasons to think that a privacy budget is feasible: it takes about **32 bits of entropy** to uniquely identify people on the web.

About these numbers:

- There are about 4.6 billion of web users. So it takes log2(4.6 billion) = about 32 bits of entropy to uniquely identify people on the web.
- Mobile web users make up most of web users.

Read more about entropy.

*FAQ Contributors: maudnals, jensenpaul, asankah, bslassey, rowan-m.*

**Figure 9:** Googlers justify the 32-bit threshold for privacy budget

## D.    CONCLUSIONS AS TO THE SCHWARTZ REPORT

153.    The Schwartz Report's determination of PII is based on incomplete assessment of Google's policies and practices. Contradictory evidence, which was not considered by Dr. Schwartz, suggests that the data transmitted by Chrome to Google is PII even based on Dr. Schwartz's own criteria.

154.    The Schwartz Report's definition of PII, i.e., the data transmitted by Chrome to Google is PII only when Google associates it with an identified individual account, is based on an outdated FTC guidance. The FTC's updated guidance considers all persistent identifiers as PII and even Google's internal definition conflicts with Schwartz.

155.    The Schwartz Report fails to recognize that entropy is a widely recognized metric in the computer science community, including Google itself, to assess identifiability of information.

## X.    **REBUTTAL TO BRUCE STROMBOM REPORT**

---

[35] Paul M. Schwartz, Daniel J. Solove. "The PII Problem: Privacy and a New Concept of Personally Identifiable Information". New York University Law Review, Vol. 86, p. 1814, 2011
[36] Introducing the Privacy Budget https://www.youtube.com/watch?v=0STgfjSA6T8
[37] FAQ: Privacy Budget https://github.com/bslassey/privacy-budget/blob/4e5f78adde92bd622dafeceae78682fc0823c0eb/faq.md
[38] A Primer on Information Theory and Privacy https://www.eff.org/deeplinks/2010/01/primer-information-theory-and-privacy
[39] Technical Comments on Privacy Budget https://mozilla.github.io/ppa-docs/privacy-budget.pdf

156.   I understand that Google has submitted a report by Dr. Bruce Strombom in opposition to the Plaintiffs' Motion to Class Certification. Relevant to my area of expertise, Dr. Strombom criticized Plaintiffs' damages expert Dr. Mangum's declaration because:

    A.  Dr. Mangum "fails to allocate unjust enrichment to Proposed Class members without Google Accounts" (Strombom ¶ 109). As I describe next, Google's internal systems can be used to identify class members who do not have a Google account, and thus can be allocated unjust enrichments.

    B.  Dr. Mangum "fails to test or account for the variability that exists in the amount and type of data Google receives from users and the degree to which Google was able to monetize each user's data, which may over- or undercompensate members of the Proposed Class" (Strombom ¶ 109). As I describe next, Google's internal systems can be used to measure variability that exists in the amount and type of data Google receives and monetizes from Not Synced users.

## A.  GOOGLE CAN IDENTIFY CLASS MEMBERS WHO HAVE AND DO NOT HAVE GOOGLE ACCOUNTS

157.   Using any of the approaches described in my original report, Google has the ability to identify class members who do not have Google accounts and use Chrome in the not-signed-in mode.

158.   Plaintiffs' allegations include all Chrome users who used the Chrome browser in a Not Synced state, which Plaintiffs describe in their motion for class certification as users who were in the following modes: (a) signed-in but not consented for sync; and (b) not-signed-in. Google maintains storage systems, such as ▮▮▮▮ [GOOG-CALH-00027787], where it keeps data relating to Chrome users in these browser states.

159.   ▮▮▮▮ contains Gaia-keyed data, which relates to users who are signed-in. Each Gaia identifier maps to a unique to a Google accountholder. Note that while Gaia-keyed data includes both when a user is Synced and not consented for Sync, I described several approaches in my original report that can be used to distinguish between them. I further describe approaches that Google could easily deploy to measure Not Synced usage in subsection E below.

160.   ▮▮▮▮ also contains Biscotti-keyed and Zwieback-keyed data, which relates to users who are not-signed-in. Each Biscotti and Zwieback identifier maps to a unique Chrome browser. Note that since a Chrome user cannot enable Sync unless they are signed in, by definition, all not-signed-in Chrome users are Not Synced.

161.   For signed-in users, as described in my original report and explained further in my rebuttal to the Berntson Declaration in Section III, above, Google maintains logs and systems through which it is capable of identifying Gaia identifiers associated with a specific Biscotti or Zwieback identifier.

162.   For not-signed-in users, Google is able to is able to identify a Chrome browser instance using its Biscotti or Zwieback identifier. Note that Biscotti and Zwieback

identifiers that do not map to a Gaia identifier correspond to Chrome user who do not have a Google account.

163.    Google is able to identify Not Synced users as part of its routine process of serving ads at the rate of almost a million times per second. Specifically, GOOG-CABR-00893711 is a Google document entitled "███████████████" that explains the process of how Google serves targeted advertising. The document describes that, ███████████████████████████████████████ ██████████████████████████ ." Google then ' ████████████████ ████████████ Google chooses the ad by first querying for the information it has on the user. For example, if the user has shown an interest in a particular topic that is recorded in ██████ that information might be used in the choice of the ad to show that user.



**Figure 9:** ████████████████████████████████████████    [GOOG-CABR-00893713]

164.    To process an ad request, Google essentially identifies the user based on identifiers such as Gaia and Biscotti. Using the ad request workflow described above in Figure 9, Google can identify Not Synced users including not-signed-in users without a Google account.

**B.    GOOGLE CAN USE ITS AD SERVING SYSTEMS TO IDENTIFY HOW MUCH DATA IT HAS IN EASILY ACCESSIBLE STORAGE THAT IT COLLECTED FROM THEM WHILE NOT SYNCED**

165.    Google can also use ██████ (and the associated ████████████████████) to identify how much data it has in its possession for Not Synced users. This can be achieved, for example, by subtracting the count of data entries in Synced mode from the total count of data entries on a per-user basis. As I describe below, Google has the ability to identify the data entries in ██████ for Synced users. The same approach can be easily extended to identify the data entries in ██████ for Not Synced users.

166.    Googler Tim Schumann explained that, when a user is Signed In and goes to chrome.google.com/sync, Google will automatically query ███ to determine how much data it has in Sync storage in ████ and display that information instantaneously to the user. As shown in Figure 10, Exhibit 18 to the Schumann Deposition illustrates the point.



**Figure 10:** Google's interface that shows Chrome data for Synced Users. The data shown here is populated from Kansas.

167.    Schumann testified that this data is "█████████████████████████████████████████████████████████████████" Schumann Depo. 232:24-233:9. It populates the screen through ███████

Schumann Depo. 235:7-17. He then explained that



." Schumann Depo. 237:3-12.

168.    Schumann then testified that a ██████████████████████████████████████████████████████" Schumann Depo. 242:16-243:2.

169.    GOOG-CALH-00293211 is a separate document produced by Google, which explains that Google has a project called "████████████████" that ████████████████████████████████.

170.    For a not-signed-in and Not Synced user, Google can identify how much information Chrome has sent about by performing a simple count of browsing history information in its storage system, including ████████ that are associated with the persistent and unique Biscotti and/or Zwieback identifier that Google has placed on the user's Chrome browser. Thus, this will not only identify the fact that the user is a class member because Google has not-signed-in mode activity from the Chrome browser in its storage, it will also identify the raw amount of such personal information.

171.    For a signed-in but Not Synced user, Google can identify how much information it received while that user was signed-in but not consented for Sync in the Chrome browser by performing the same calculation and comparing that to a similar calculation identifying how much information is stored in Sync storage at chrome.google.com/sync. For users who have more browsing history information in Google's general storage than in Sync storage, the difference between the two will be the amount of Chrome data sent to Google while the user was signed-in but Not Synced.

172.    I understand that Dr. Zervas performed similar operations for his published paper entitled "Understanding Emerging Threats to Online Advertising." Zervas Ex. 2. For example, he "analyze[d] the web browsing histories of 13.6 million users for the 12 months between June 1, 2013 and May 31, 2014" using Microsoft systems. *Id.* at 3. In the process, he identified "321 million visits to the 10,000 most popular e-commerce sites" and reviewed that data at an individual user level to determine the percent of "loyal users" who "visit [a] site at least 10 times per month." *Id.* at 4. To determine the 10,000 most popular websites with such a large database, Dr. Zervas testified, "████████████████████████████████████████████████████████████████████████" *Id.* at 52. He testified that he would not do so by "████████████████████████████████████████████████████" Zervas Depo. 52:5-53:3.

173.    In the process, Dr. Zervas explained that they used "█████████████ ████████████ which he described as "██████████████████ ██████████████████████" Zervas Dep. 55:18-20. As described by Dr. Zervas' paper, these ██████████████████ are based on identifiers associated with a browser plug-in, which is effectively the same as the Biscotti and Zwieback identifiers here.

174.    Dr. Zervas then explained, ████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████." Zervas Depo. 56:21-25. Dr. Zervas explained, "████████████████████████████ ████████████████████████████████████████ ████████████████████." Zervas Depo. 57:5-12. Dr. Zervas then testified that, ████████████████████████ Zervas 57:20-58:11.

175.    This explanation of how to use Google's databases in response to Dr. Strombom's criticism is essentially the same operation that Dr. Zervas used in his peer-reviewed published research paper – for both signed-in and signed-out users. Just as Dr. Zervas was capable of using Microsoft's databases to identify how many times specific users visited specific websites through access to "████████████████████", so too can Google's systems be used to perform the same calculations to compare data in Google's possession in Synced and Not Synced modes.

## C.    GOOGLE MAINTAINS REVENUE LOGS FROM WHICH IT CAN CALCULATE NOT SYNCED REVENUE ON AN INDIVIDUAL USER BASIS

176.    Google maintains per-user revenue logs in ████████ [GOOG-CALH-00077056] for Google Ads (Google.com), YouTube (YouTube.com), and more etc.

    A.  Google routinely uses ████████████ to ████████████████████████" via ████████████████████" to calculate product performance and "█████████████████████████████████████ ████████████████████████" [GOOG-CABR-04081599].

    B.  "█████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████" [GOOG-CALH-00292922].

177.    In 2020, Google made an extensive effort to migrate more detailed Chrome usage data into ████████ for the purpose of ████████████████████ ████]" Schumann Dep. Ex. 10 [GOOG-CABR-03939059]. Google then created a pipeline from the Sync server logs to ████████ to "████████████████ ████████" of "████████████████████." [GOOG-CABR-03939059]. This pipeline

sends specific Gaia-keyed Not Synced signals to ▮▮▮▮▮ for the financial value analysis of such users. *See* Schumann Dep. Exs. 5-6, 11, 16 (Not Synced signal labeled as "▮▮▮▮ identifies users who are Signed-In But Not Consented for Sync).[40]

178.    ▮▮▮▮▮ also contains Gaia-keyed data identifying Chrome usage and revenue associated with that usage. For example, ▮▮▮▮▮ contains a ▮▮▮▮▮ table that includes ▮▮▮▮▮

[GOOG-CALH-00077055] and a "▮▮▮▮▮

▮▮▮▮▮ [GOOG-CALH-00700912].

179.    In addition to ▮▮▮▮▮ Google maintains numerous ▮▮▮▮▮ Through the Special Master process, Google has identified at least ▮▮▮▮▮ a▮



180.    It is my understanding that Plaintiffs have requested through the Special Master process that Google provide explanations for all the ▮▮▮▮▮ but that Google refused to do so in a letter dated February 9, 2022. It is also my understanding that that Plaintiffs have been told there are ▮▮▮▮▮ that they requested Google to identify through the Special Master process but Google has refused to do so.

181.    An exemplar produced by Google as GOOG-CALH-01134367 shows ▮▮▮▮▮

---

[40] Google previously expressly denied the existence of Not Synced signals to the Court and the Special Master. For example, Google told Judge van Keulen, "If a user has not enabled Sync, then the Sync traffic logs will not show data for that user who has not enabled Sync." Mar. 5 Hearing Tr. at 14:15-17.



182.    The following are examples of data in GOOG-CALH-01134367, an ▮▮▮▮▮▮▮▮▮▮ example:





Rows from GOOG-CABR-01134367

183.    The following are examples of data in GOOG-CALH-01134341, a  example:



184.    GOOG-CALH-01134322, which was labeled as an ███████████ log example by Google contains ████████████████████████████████████████████████:



185.    I understand that Google has produced documents indicating it has analyzed the negative revenue impact that would result if Chrome no longer sent personal information to Google on non-Google websites and that, in addition to negatively impacting Display Ads revenue, it would also negatively impact revenue from Search and YouTube.

186.    Knowing that ████████ contains user-keyed revenue information for Search and YouTube (and the process that Chrome created to send Not Synced signal information to ████████), it is highly likely that Google keeps logs with revenue information for the other programs from which it derives revenue from tracking users on non-Google websites. Such logs would be necessary to populate the revenue information in ████████ that Google documents state exist. It is my understanding that Plaintiffs have requested information about such logs but Google has refused to produce them.

187.    Through these logs, Google could write a program to implement a formula to calculate revenue or revenue proportions on a per-user basis for Gaia-, Biscotti-, and Zwieback-keyed ads information.

188.    In summary, Google can identify Not Synced users in the ████████████ table of ████████████ and in ████████████████████████████ to calculate unjust enrichment with a computer program that analyzes the data in these logs.

**D.    GOOGLE CAN ALSO DEVISE EFFICIENT METHODS TO MAKE THESE COMPUTATIONS**

189.    I am confident that, given full access to Google systems, I could likely design even more efficient methods to identify Not Synced users, how much data Google has in its possession that was sent from Not Synced Chrome users, and how much revenue Google obtained as a result.

190.    I am also confident that Googlers, with a much more detailed knowledge of Google's internal systems, could relatively easily design their own methods for this purpose if ordered to do so by the Court.

### E.    GOOGLE COULD HAVE EASILY CREATED AND STORED A NOT SYNCED FLAG TO TRACK SUCH INFORMATION

191.    Based on new evidence that I have reviewed, I can confidently opine that Google can add a "Not Synced" signal to Ads, Display Ads, Google Analytics, and other transmissions from Chrome to Google. The signal can be easily stored in ▮▮▮▮ (or other similar storage systems) alongside other data such as revenue logs to easily distinguish between Synced and Not Synced Chrome traffic. I list three reasons to support my opinion.

192.    Chrome already transmits a signal called "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" that is stored by Google in its internal logs (e.g., "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"). Thus, it will be trivial for Google to do the same for a "Not Synced" signal.

193.    GOOG-CABR-05469056 describes "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Specifically, GOOG-CABR-05469096 lists the ▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."

194.    Mr. Schuman also acknowledged in his deposition[41] that Chrome browser

▮▮▮▮▮▮▮▮▮▮▮."

### F.    GOOGLE SCREENWISE USES THE SAME IDENTIFIERS AS CHROME

195.    I understand that Dr. Strombom criticized the comparison of the information associated with a program called Google Screenwise to the personal information that Chrome sends to Google. My conclusion is that, like the information at issue in this case, in the Google Screenwise program, consumers are paid to agree to have their browsing history information sent to Google and associated with the same cookie and device identifiers at issue in this case: Gaia, Biscotti, Zwieback, and device identifiers.

---

[41] Schumann deposition: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

196.    I reach this conclusion from GOOG-CABR-04312372, which explains that

                                                      as shown in Figure 11, Google "                  ."



**Figure 11:** Screenshot of GOOG-CABR-04312372

197.    Screenwise has a public facing website at [screenwisepanel.com](screenwisepanel.com). Figures 12, 13, and 14 include some relevant screenshots.



**Figure 12:** Screenshot of screenwisepanel.com





**Figure 13:** Screenshot of screenwisepanel.com



**Figure 14:** Screenshot of screenwisepanel.com

198.    I also understand Dr. Strombom claimed that programs such as Screenwise are much different that Chrome sending personal information to Google because other programs may involve installation of a device or application. Dr. Strombom fails to justify his claim as to how the data collection by Screenwise is materially different from Chrome. In my opinion, they are essentially similar in effect. The Chrome browser is itself an "application" or "app" that a user must have installed on a computing device to work.

## G.    CONCLUSIONS AS TO THE STROMBOM REPORT

199.    The Strombom Report's critique about identification of not-signed-in Chrome users who do not have a Google account can be addressed using Google's internal logs and systems.

200.    The Strombom Report's critique about accounting for variability across users in terms of data collection can be addressed using ▮▮▮▮▮▮▮▮.

201.    The Strombom Report's critique about accounting for the degree to which Google is able to monetize data of class members can be addressed using revenue information that Google stores in its internal logs such as ▮▮▮▮▮.

202.    Dr. Strombom's claim that consumer data for which companies pay consumer directly via programs like Screenwise are not comparable to Chrome is incorrect because both collect the same set of identifiers and run as an application on a device.

## XI.    CALIFORNIA DETERMINATION

203.    I was asked by Counsel to determine whether Google is capable of identifying communications taken from Not Synced Chrome users where either the user or the website with which they were communicating are located in California.

204.    The answer to the question is yes. Google routinely identifies the location of both users and the servers for the websites with which they interact and stores that information in logs in which it keeps Not Synced Chrome user communications.

205.    GOOG-CALH-00011022 is a Google document that describes ▮▮▮▮▮

GOOG-CABR-05283865 also explains that Google ▮▮▮▮▮▮▮▮▮".

206. ▮▮▮▮▮▮▮▮▮

Google can use these IP addresses to identify communications where either party to the communication were present in California. This process is not difficult to conduct, can be done without human intervention beyond the writing of source code to identify specific communications, and is routinely done.

207. ▮▮▮▮▮▮▮▮▮. For example, in GOOG-CALH-00039102, the Google log identifies that ▮▮▮▮▮▮" As another example, in GOOG-CALH-01134339, the Google log contains precise ▮▮▮▮▮▮▮▮

████████████████████████████████████████████.

## XII.   CONTENT DETERMINATION

208.   I have been informed that:

A.   Plaintiffs' claims under the Electronic Communications Privacy Act (18 U.S.C. § 2510, et. seq.) ("ECPA") and the California Invasion of Privacy Act (Cal. Pen. Code § 631) ("CIPA") require showing that Google acquired "contents" of the Plaintiffs' communications;

B.   "Contents," is defined under the ECPA "when used with respect to any … electronic communication to include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8);

C.   CIPA refers to "contents or meaning" and courts interpreting CIPA generally look to the ECPA to define the meaning of terms that are common to both laws; and

D.   Federal appellate courts have explained that information contained within URLs contain "contents" where they contain information that is more than the parties to the communication.

E.   Google previously argued in this case that Wiretap "content" includes "browsing histories or site activity data." Dkt. 152 at 6:6-11.

F.   The Ninth Circuit has explained that URLs which contain "search term[s] or similar communication[s] made by the user" qualify as content. *In re Zynga Privacy Litigation*, 750 F.3d 1098, 1109 (9th Cir. 2014). Similarly, in an ECPA case against Facebook, the Ninth Circuit explained that "a full-string detailed URL, which contains the name of a website, folder and sub-folders on the web server, and the name of the precise file request" is "distinct from IP addresses collected in Forrester, as well as the URLs collected in Zynga[.]" *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 605-06 (9th Cir. 2020); and

G.   Other courts have reached similar conclusion. In a different case against Google, the Third Circuit explained that post-domain name portions of the URL are designed to communicate to the visited website which webpage content to send the user" and, therefore, would "qualify as content" under the ECPA. *In re Google Cookie Placement Litig.*, 806 F.3d 125, 139 (3d Cir. 2015). In a case involving the National Security Agency, the Foreign Intelligence Surveillance Court explained that URLs contain content and DRAS (dialing, routing, addressing, and signaling) information.[42] In another case, a federal district court in Massachusetts exclaimed that "contents" of communications under the ECPA "includes subject lines, application commands, search queries, requested file names, and file paths." *In re*

---

[42] https://www.dni.gov/files/documents/1118/CLEANEDPRTT%202.pdf

*Application of the United States for an Order Authorizing Use of a Pen Register and Trap*, 396 F.Supp.2d 45, 49 (D. Mass. 2005).

H. The PATRIOT Act amended the ECPA and the legislative history to the PATRIOT Act included the following explanation of "content" under the ECPA. "[O]rders for the installation of a pen register and trap and trace devices may obtain any non-content information—'dialing, routing, addressing, and signaling information'—utilized in the processing or transmitting of wire and electronic communications. Just as today, such an order could not be used to intercept the contents of communications protected by the wiretap statute. The amendments reinforce the statutorily prescribed line between a communication's contents and non-content information, a line identical to the constitutional distinction drawn by the U.S. Supreme Court in *Smith v. Maryland*, 442 U.S. 735, 741-43 (1979). Thus, for example, an order under the statute … could not be used to collect information other than 'dialing, routing, addressing, and signaling' information, such as the portion of a URL (Uniform Resource Locator) specifying Web search terms or the name of a requested file or article." H.R. Rep. No. 107-236 at 53.[43]

I. In committee hearings on the bill, committee members clarified that the ECPA protected "content" that included "movement around the Internet to different websites and so on," such as "the second and third and below level URLs, which are the indications of, once you visit a Web site, what exactly you are looking at on the Web site." H.R. Rep. No. 107-236 at 294. "If someone were able to follow somebody as they surfed the Internet and saw every single page they looked at, they could write quite a convincing dossier about that individual without ever having obtained any court order to obtain that level of information." H.R. Rep. No. 107-236 at 294. The Chairman of the committee agreed that this "states what the intent of the [PATRIOT Act] is precisely, and that is that the pen register and trap and trace provisions are not to get into content of these types of electronic communications but merely where they have come from and where they go to." H.R. Rep. No. 107-236 at 295. Congresswoman Zoe Lofgren, representing San Jose and Santa Clara County, noted that everyone involved in the drafting of the PATRIOT Act agreed, "in the discussions that we had at a staff level, and Members as well, with the Justice Department and the White House, they made it very clear that they agreed with this, and this is not an argument. It is just a clarification, and I think that is important for the public to know[.]" H.R. Rep. No. 107-236 at 295.

209.    Based on this information, I have reviewed Google documents to determine whether Plaintiffs can prove by common evidence whether Google acquires "any information relating to the substance, purport, or meaning" of Not Synced user communications. The answer to this question is yes.

---

[43] https://www.congress.gov/107/crpt/hrpt236/CRPT-107hrpt236.pdf

210.   Google internal documents reveal that it acquires the "contents" of
       communications for Not Synced Chrome users:

   A.   Google's internal ███████████████████████████
        ███████████████████████████ [GOOG-CALH-00047741]

   B.   The information at issue here includes ███████████████████
        ███████████████████████████████████████ " [GOOG-CABR-
        00119247]

   C.   In its ████████████████████████████████████████████
        ███████████████████████████████████████████████
        ████████████████ [GOOG-CABR-00893713]. ███████
        ████████████████████████████████████████ ." [GOOG-
        CABR-00893714]. ██████████████████████
        ████████████████████████████████ [GOOG-CABR-
        00893714] Google then explains "████████████████" as follows:



**Figure 15:** ████████████████████████████ [GOOG-CABR-00893714]

211.   ████████████████████████████████████████████████
       ████████████████████████████████████████████████



212.

[GOOG-CALH-00039106].   [GOOG-CALH-00039111].

\*\*\*

Dated: February 15, 2022                    /s/ _____
                                             Zubair Shafiq, Ph. D.

# EXHIBIT A
## to Shafiq Rebuttal Report

# Exhibit A to Rebuttal Report of Z. Shafiq Materials Reviewed

## Legal Documents

- Plaintiffs' Motion for Class Certification and supporting documents
- Google's Opposition to Plaintiffs' Motion for Class Certification and supporting documents
- Google's Responses and Objections to Plaintiffs' Request for Admission No. 14
- Plaintiffs' Fourth Set of Request for Production, Exhibit B

## Depositions

- Deposition of Dr. Rodney Johnson, October 23, 2021
- Deposition of Dr. Corinice Wilson, October 25, 2021
- Deposition of Chris Liao, December 2, 2021
- Deposition of Glenn Berntson, June 16, 2021
- Deposition of Deepak Ravichandran, January 7, 2022
- Deposition of Chetna Bindra, February 4, 2022
- Deposition of Georgios Zervas, January 26, 2022
- Deposition of Yiling Chen, February 2, 2022
- Deposition of Bruce Strombom, January 31, 2022
- Deposition of Steve Ganem, February 11, 2022
- Deposition of Ryan Cassidy, February 11, 2022

## Google Expert Productions

- GOOG_ZERVAS_00000001-00000103
- GOOG_CHEN_00000001-00000192
- GOOG_CHEN_00000007 and 23 reproduced versions
- GOOG_CHEN_00000007.A and 23.A
- February 1, 2022 Chen Errata and attachments
- GOOG_ERDEM_00000001-00000011

## Testing and Related Documents

- Ned Stark
  - MyActivity
    - Youtube – MyActivity.html
    - Takeout – MyActivity.html
    - Search – MyActivity.html
    - Maps – MyActivity.html
    - Google Analytics – MyActivity.html
    - Ads – MyActivity.html

- mercury-har-files
  - default-configuration

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- safari_mercurynews.har
- firefox_mercurynews.har
- edge_mercurynews.har
- chrome_mercurynews.har
  - o chen-configuration
    - safari_www.mercurynews.com.har
    - firefox_www.mercurynews.com.har
    - edge_www.marcurynews.com.har
    - chrome_www.mercurynews.com.har

- map-har-files
  - o [www.fedex.com.har](www.fedex.com.har)
  - o [www.embedgooglemap.net.har](www.embedgooglemap.net.har)

## Other Case Materials

- Calhoun v Google SCA Authorization Template
- 2021.11.30 - Original Doc Names and Bates Numbers for Dr. Shafiq Production.pdf
- arstechnica.com-Google paying users to track 100 of their Web usage via little black box
- eff.org-Google Screenwise An Unwise Trade of All Your Privacy for Cash
- themarkup.org-Theres a Multibillion-Dollar Market for Your Phones LocationData
- theverge.com-Google Screenwise pays opt-in users for expanded web tracking
- PLAINTIFFS00027745

## Google Produced Documents

- AEO 2021-09-17 – Calhoun v Google - Google Submission
- AEO 2021-09-27 – Calhoun v Google – Google Submission
- Google LLC'S Responses and Objections to Special Master's Report and Orders on Referred Discovery Issues
- 2021-11-16 Calhoun v. Google -Special Master Submission in Response to Nov. 12 Order 5.1-5.3
- 2021-11-18 Brown & Calhoun - Special Master Submission in Response to Nov. 12 Order.pdf
- 2021-11-18 Calhoun Omnibus Sheet - Working
- 2021-11-18 Declaration [dckt 383_0]
- 2021-11-18 Documentation on Data Sources and Tools
- Calhoun - Exhibit A - REDACTED COPY
- Calhoun - Exhibit A - UNREDACTED COPY
- Calhoun - Exhibit B - REDACTED COPY
- Calhoun - Exhibit B - UNREDACTED COPY
- Exh. B to Google's November 18, 2021, disclosures

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed



# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed



# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed



- GOOG-CALH-00014551
- GOOG-CALH-00016479
- GOOG-CALH-00027208
- GOOG-CALH-00027278
- GOOG-CALH-00027458

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- GOOG-CALH-00027476
- GOOG-CALH-00027477
- GOOG-CALH-00027546
- GOOG-CALH-00027547
- GOOG-CALH-00027549
- GOOG-CALH-00027550
- GOOG-CALH-00027551
- GOOG-CALH-00027552
- GOOG-CALH-00027554
- GOOG-CALH-00027555
- GOOG-CALH-00027567
- GOOG-CALH-00027568
- GOOG-CALH-00027599
- GOOG-CALH-00027682
- GOOG-CALH-00027683
- GOOG-CALH-00027692
- GOOG-CALH-00027693
- GOOG-CALH-00027716
- GOOG-CALH-00027717
- GOOG-CALH-00027718
- GOOG-CALH-00027719
- GOOG-CALH-00027792
- GOOG-CALH-00027793
- GOOG-CALH-00027802
- GOOG-CALH-00027803
- GOOG-CALH-00027821
- GOOG-CALH-00028183
- GOOG-CALH-00028232
- GOOG-CALH-00030031
- GOOG-CALH-00031076
- GOOG-CALH-00031131
- GOOG-CALH-00032221
- GOOG-CALH-00037701
- GOOG-CALH-00039102
- GOOG-CALH-00039102
- GOOG-CALH-00039120
- GOOG-CALH-00039125
- GOOG-CALH-00039126

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- GOOG-CALH-00039127
- GOOG-CALH-00039128
- GOOG-CALH-00039129
- GOOG-CALH-00039130
- GOOG-CALH-00040905
- GOOG-CALH-00045178
- GOOG-CALH-00047632
- GOOG-CALH-00047633
- GOOG-CALH-00047634
- GOOG-CALH-00047635
- GOOG-CALH-00047636
- GOOG-CALH-00047637
- GOOG-CALH-00047638
- GOOG-CALH-00047639
- GOOG-CALH-00047640
- GOOG-CALH-00047641
- GOOG-CALH-00047642
- GOOG-CALH-00047643
- GOOG-CALH-00047644
- GOOG-CALH-00047645
- GOOG-CALH-00047646
- GOOG-CALH-00047647
- GOOG-CALH-00047648
- GOOG-CALH-00047649
- GOOG-CALH-00047650
- GOOG-CALH-00047651
- GOOG-CALH-00047652
- GOOG-CALH-00047653
- GOOG-CALH-00047654
- GOOG-CALH-00047655
- GOOG-CALH-00047656
- GOOG-CALH-00047657
- GOOG-CALH-00047658
- GOOG-CALH-00047659
- GOOG-CALH-00047660
- GOOG-CALH-00047661
- GOOG-CALH-00047662
- GOOG-CALH-00047663

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- GOOG-CALH-00047664
- GOOG-CALH-00047665
- GOOG-CALH-00047666
- GOOG-CALH-00047667
- GOOG-CALH-00047668
- GOOG-CALH-00047669
- GOOG-CALH-00047670
- GOOG-CALH-00047671
- GOOG-CALH-00047672
- GOOG-CALH-00047673
- GOOG-CALH-00047674
- GOOG-CALH-00047675
- GOOG-CALH-00047676
- GOOG-CALH-00047677
- GOOG-CALH-00047678
- GOOG-CALH-00047679
- GOOG-CALH-00047680
- GOOG-CALH-00047681
- GOOG-CALH-00047682
- GOOG-CALH-00047683
- GOOG-CALH-00047684
- GOOG-CALH-00047685
- GOOG-CALH-00047686
- GOOG-CALH-00047687
- GOOG-CALH-00047688
- GOOG-CALH-00047689
- GOOG-CALH-00047690
- GOOG-CALH-00047691
- GOOG-CALH-00047692
- GOOG-CALH-00047693
- GOOG-CALH-00047694
- GOOG-CALH-00047695
- GOOG-CALH-00047696
- GOOG-CALH-00047697
- GOOG-CALH-00047698
- GOOG-CALH-00047699
- GOOG-CALH-00047700
- GOOG-CALH-00047701

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- GOOG-CALH-00050256
- GOOG-CALH-00050264
- GOOG-CALH-00050659
- GOOG-CALH-00050661
- GOOG-CALH-00050662
- GOOG-CALH-00050663
- GOOG-CALH-00050665
- GOOG-CALH-00050666
- GOOG-CALH-00050667
- GOOG-CALH-00050669
- GOOG-CALH-00050670
- GOOG-CALH-00050671
- GOOG-CALH-00050672
- GOOG-CALH-00050673
- GOOG-CALH-00050675
- GOOG-CALH-00050676
- GOOG-CALH-00050678
- GOOG-CALH-00050680
- GOOG-CALH-00050681
- GOOG-CALH-00050682
- GOOG-CALH-00050683
- GOOG-CALH-00050684
- GOOG-CALH-00050685
- GOOG-CALH-00050690
- GOOG-CALH-00050692
- GOOG-CALH-00050705
- GOOG-CALH-00050706
- GOOG-CALH-00050709
- GOOG-CALH-00050710
- GOOG-CALH-00050711
- GOOG-CALH-00050712
- GOOG-CALH-00050713
- GOOG-CALH-00050714
- GOOG-CALH-00050741
- GOOG-CALH-00050742
- GOOG-CALH-00050743
- GOOG-CALH-00050745
- GOOG-CALH-00050746

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- GOOG-CALH-00050761
- GOOG-CALH-00050777
- GOOG-CALH-00050780
- GOOG-CALH-00050781
- GOOG-CALH-00050782
- GOOG-CALH-00050786
- GOOG-CALH-00050787
- GOOG-CALH-00050788
- GOOG-CALH-00050789
- GOOG-CALH-00050790
- GOOG-CALH-00050811
- GOOG-CALH-00050813
- GOOG-CALH-00050814
- GOOG-CALH-00050816
- GOOG-CALH-00050817
- GOOG-CALH-00050822
- GOOG-CALH-00050824
- GOOG-CALH-00050825
- GOOG-CALH-00052088
- GOOG-CALH-00052089
- GOOG-CALH-00052092
- GOOG-CALH-00052093
- GOOG-CALH-00052094
- GOOG-CALH-00052096
- GOOG-CALH-00052097
- GOOG-CALH-00052099
- GOOG-CALH-00052100
- GOOG-CALH-00052101
- GOOG-CALH-00054260
- GOOG-CALH-00061534
- GOOG-CALH-00061943
- GOOG-CALH-00061944
- GOOG-CALH-00061946
- GOOG-CALH-00061947
- GOOG-CALH-00061948
- GOOG-CALH-00061951
- GOOG-CALH-00061952
- GOOG-CALH-00061953

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- GOOG-CALH-00061954
- GOOG-CALH-00061960
- GOOG-CALH-00061963
- GOOG-CALH-00061965
- GOOG-CALH-00061966
- GOOG-CALH-00061969
- GOOG-CALH-00061971
- GOOG-CALH-00061973
- GOOG-CALH-00061975
- GOOG-CALH-00061977
- GOOG-CALH-00061978
- GOOG-CALH-00062037
- GOOG-CALH-00062049
- GOOG-CALH-00062056
- GOOG-CALH-00062072
- GOOG-CALH-00062153
- GOOG-CALH-00062169
- GOOG-CALH-00072863
- GOOG-CALH-00072865
- GOOG-CALH-00072867
- GOOG-CALH-00072868
- GOOG-CALH-00072870
- GOOG-CALH-00072871
- GOOG-CALH-00072872
- GOOG-CALH-00072873
- GOOG-CALH-00072874
- GOOG-CALH-00072875
- GOOG-CALH-00072876
- GOOG-CALH-00072877
- GOOG-CALH-00072879
- GOOG-CALH-00072880
- GOOG-CALH-00072881
- GOOG-CALH-00072882
- GOOG-CALH-00072884
- GOOG-CALH-00072885
- GOOG-CALH-00072886
- GOOG-CALH-00072887
- GOOG-CALH-00072888

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- GOOG-CALH-00072891
- GOOG-CALH-00072899
- GOOG-CALH-00072900
- GOOG-CALH-00072901
- GOOG-CALH-00072902
- GOOG-CALH-00072903
- GOOG-CALH-00072941
- GOOG-CALH-00072948
- GOOG-CALH-00072949
- GOOG-CALH-00072951
- GOOG-CALH-00072958
- GOOG-CALH-00072960
- GOOG-CALH-00072961
- GOOG-CALH-00072962
- GOOG-CALH-00072963
- GOOG-CALH-00072985
- GOOG-CALH-00072986
- GOOG-CALH-00081472
- GOOG-CALH-00129119
- GOOG-CALH-00133389
- GOOG-CALH-00160127
- GOOG-CALH-00160141
- GOOG-CALH-00292090
- GOOG-CALH-00293211
- GOOG-CALH-00303689
- GOOG-CALH-00374314
- GOOG-CALH-00430027
- GOOG-CALH-00430028
- GOOG-CALH-00430029
- GOOG-CALH-00430030
- GOOG-CALH-00430031
- GOOG-CALH-00430032
- GOOG-CALH-00430033
- GOOG-CALH-00430034
- GOOG-CALH-00430035
- GOOG-CALH-00490674
- GOOG-CALH-00492265
- GOOG-CALH-00492266

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- GOOG-CALH-00492267
- GOOG-CALH-00492268
- GOOG-CALH-00492789
- GOOG-CALH-00492831
- GOOG-CALH-00492833
- GOOG-CALH-00492834
- GOOG-CALH-00492836
- GOOG-CALH-00492838
- GOOG-CALH-00492842
- GOOG-CALH-00492843
- GOOG-CALH-00492851
- GOOG-CALH-00492852
- GOOG-CALH-00552139
- GOOG-CALH-00552160
- GOOG-CALH-00552367
- GOOG-CALH-00552369
- GOOG-CALH-00552934
- GOOG-CALH-00552947
- GOOG-CALH-00592132
- GOOG-CALH-00592133
- GOOG-CALH-00592134
- GOOG-CALH-00592135
- GOOG-CALH-00592136
- GOOG-CALH-00592137
- GOOG-CALH-00592138
- GOOG-CALH-00592156
- GOOG-CALH-00592164
- GOOG-CALH-00592171
- GOOG-CALH-00592188
- GOOG-CALH-00592206
- GOOG-CALH-00592214
- GOOG-CALH-00592232
- GOOG-CALH-00592249
- GOOG-CALH-00592267
- GOOG-CALH-00592275
- GOOG-CALH-00592276
- GOOG-CALH-00592277
- GOOG-CALH-00592279

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- GOOG-CALH-00648520
- GOOG-CALH-00648521
- GOOG-CALH-00648522
- GOOG-CALH-00650721
- GOOG-CALH-00651604
- GOOG-CALH-00651613
- GOOG-CALH-00651617
- GOOG-CALH-00651620
- GOOG-CALH-00651623
- GOOG-CALH-00651624
- GOOG-CALH-00651625
- GOOG-CALH-00651626
- GOOG-CALH-00651627
- GOOG-CALH-00651628
- GOOG-CALH-00651631
- GOOG-CALH-00651634
- GOOG-CALH-00651636
- GOOG-CALH-00651646
- GOOG-CALH-00651647
- GOOG-CALH-00651648
- GOOG-CALH-00651649
- GOOG-CALH-00651650
- GOOG-CALH-00651652
- GOOG-CALH-00651653
- GOOG-CALH-00651654
- GOOG-CALH-00651655
- GOOG-CALH-00651656
- GOOG-CALH-00651985
- GOOG-CALH-00652193
- GOOG-CALH-00652194
- GOOG-CALH-00652195
- GOOG-CALH-00652197
- GOOG-CALH-00652200
- GOOG-CALH-00652201
- GOOG-CALH-00652203
- GOOG-CALH-00652207
- GOOG-CALH-00652213
- GOOG-CALH-00652219

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- GOOG-CALH-00652221
- GOOG-CALH-00652223
- GOOG-CALH-00652224
- GOOG-CALH-00652225
- GOOG-CALH-00652226
- GOOG-CALH-00652228
- GOOG-CALH-00652229
- GOOG-CALH-00652238
- GOOG-CALH-00652241
- GOOG-CALH-00652243
- GOOG-CALH-00652245
- GOOG-CALH-00652246
- GOOG-CALH-00652247
- GOOG-CALH-00652248
- GOOG-CALH-00652249
- GOOG-CALH-00652251
- GOOG-CALH-00652254
- GOOG-CALH-00652256
- GOOG-CALH-00652258
- GOOG-CALH-00652259
- GOOG-CALH-00652279
- GOOG-CALH-00652280
- GOOG-CALH-00652281
- GOOG-CALH-00652282
- GOOG-CALH-00652282
- GOOG-CALH-00652283
- GOOG-CALH-00652284
- GOOG-CALH-00652285
- GOOG-CALH-00660110
- GOOG-CALH-00660115
- GOOG-CALH-00700912
- GOOG-CALH-00721187
- GOOG-CALH-00790618
- GOOG-CALH-00792525
- GOOG-CALH-00797544
- GOOG-CALH-00797545
- GOOG-CALH-00797546
- GOOG-CALH-00797547

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- GOOG-CALH-00797958
- GOOG-CALH-00798394
- GOOG-CALH-00798788
- GOOG-CALH-00799283
- GOOG-CALH-00799715
- GOOG-CALH-00799994
- GOOG-CALH-00800399
- GOOG-CALH-00800746
- GOOG-CALH-00800827
- GOOG-CALH-00800874
- GOOG-CALH-00801264
- GOOG-CALH-00801654
- GOOG-CALH-00802061
- GOOG-CALH-00802468
- GOOG-CALH-00802645
- GOOG-CALH-00802822
- GOOG-CALH-00802903
- GOOG-CALH-00803303
- GOOG-CALH-00803710
- GOOG-CALH-00803868
- GOOG-CALH-00804097
- GOOG-CALH-00804098
- GOOG-CALH-00804163
- GOOG-CALH-00804164
- GOOG-CALH-00804512
- GOOG-CALH-00804513
- GOOG-CALH-00804514
- GOOG-CALH-00804904
- GOOG-CALH-00804905
- GOOG-CALH-00908508
- GOOG-CALH-00908511
- GOOG-CALH-00909335
- GOOG-CALH-00909392
- GOOG-CALH-00909409
- GOOG-CALH-00909536
- GOOG-CALH-00909539
- GOOG-CALH-00909540
- GOOG-CALH-00909541

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- GOOG-CALH-00909544
- GOOG-CALH-00909545
- GOOG-CALH-00910152
- GOOG-CALH-00910153
- GOOG-CALH-00910308
- GOOG-CALH-00910309
- GOOG-CALH-00910312
- GOOG-CALH-00910313
- GOOG-CALH-00910405
- GOOG-CALH-00910523
- GOOG-CALH-00910524
- GOOG-CALH-00910597
- GOOG-CALH-00910598
- GOOG-CALH-00910599
- GOOG-CALH-00910600
- GOOG-CALH-00910601
- GOOG-CALH-00910604
- GOOG-CALH-00910605
- GOOG-CALH-00910703
- GOOG-CALH-00910704
- GOOG-CALH-00910705
- GOOG-CALH-00910798
- GOOG-CALH-00910799
- GOOG-CALH-00910800
- GOOG-CALH-00910801
- GOOG-CALH-00910802
- GOOG-CALH-00910805
- GOOG-CALH-00910806
- GOOG-CALH-00910807
- GOOG-CALH-00910808
- GOOG-CALH-00910809
- GOOG-CALH-00910810
- GOOG-CALH-00910824
- GOOG-CALH-00911385
- GOOG-CALH-00911505
- GOOG-CALH-00911506
- GOOG-CALH-00911526
- GOOG-CALH-00911527

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- GOOG-CALH-00911528
- GOOG-CALH-00911529
- GOOG-CALH-00911553
- GOOG-CALH-00912261
- GOOG-CALH-00912262
- GOOG-CALH-00912492
- GOOG-CALH-00912493
- GOOG-CALH-00912494
- GOOG-CALH-00912495
- GOOG-CALH-00912496
- GOOG-CALH-00912497
- GOOG-CALH-00912498
- GOOG-CALH-00912499
- GOOG-CALH-00912500
- GOOG-CALH-00912501
- GOOG-CALH-00912502
- GOOG-CALH-00912503
- GOOG-CALH-00912504
- GOOG-CALH-00912505
- GOOG-CALH-00912506
- GOOG-CALH-00912507
- GOOG-CALH-00912508
- GOOG-CALH-00912509
- GOOG-CALH-00912510
- GOOG-CALH-00912511
- GOOG-CALH-00912512
- GOOG-CALH-00912513
- GOOG-CALH-00912514
- GOOG-CALH-00912515
- GOOG-CALH-00912516
- GOOG-CALH-00912517
- GOOG-CALH-00912518
- GOOG-CALH-00912519
- GOOG-CALH-00912520
- GOOG-CALH-00912521
- GOOG-CALH-00912522
- GOOG-CALH-00912523
- GOOG-CALH-00912524

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- GOOG-CALH-00912525
- GOOG-CALH-00912526
- GOOG-CALH-00912527
- GOOG-CALH-00912528
- GOOG-CALH-00912529
- GOOG-CALH-00912530
- GOOG-CALH-00912531
- GOOG-CALH-00912532
- GOOG-CALH-00912533
- GOOG-CALH-00912534
- GOOG-CALH-00912535
- GOOG-CALH-00912536
- GOOG-CALH-00912537
- GOOG-CALH-00912538
- GOOG-CALH-00912539
- GOOG-CALH-00912540
- GOOG-CALH-00912541
- GOOG-CALH-00912542
- GOOG-CALH-00912543
- GOOG-CALH-00912544
- GOOG-CALH-00912545
- GOOG-CALH-00912546
- GOOG-CALH-00912547
- GOOG-CALH-00912548
- GOOG-CALH-00912549
- GOOG-CALH-00912550
- GOOG-CALH-00912551
- GOOG-CALH-00912552
- GOOG-CALH-00912553
- GOOG-CALH-00912554
- GOOG-CALH-00912555
- GOOG-CALH-00912556
- GOOG-CALH-00912557
- GOOG-CALH-00912558
- GOOG-CALH-00912559
- GOOG-CALH-00912560
- GOOG-CALH-00912561
- GOOG-CALH-00912562

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- GOOG-CALH-00912563
- GOOG-CALH-00912564
- GOOG-CALH-00912565
- GOOG-CALH-00912566
- GOOG-CALH-00912567
- GOOG-CALH-00912568
- GOOG-CALH-00912569
- GOOG-CALH-00912570
- GOOG-CALH-00912571
- GOOG-CALH-00912572
- GOOG-CALH-00912573
- GOOG-CALH-00912574
- GOOG-CALH-00912575
- GOOG-CALH-00912576
- GOOG-CALH-00912577
- GOOG-CALH-00912578
- GOOG-CALH-00912579
- GOOG-CALH-00912580
- GOOG-CALH-00912581
- GOOG-CALH-00912582
- GOOG-CALH-00912583
- GOOG-CALH-00912584
- GOOG-CALH-00912585
- GOOG-CALH-00912586
- GOOG-CALH-00912587
- GOOG-CALH-00912588
- GOOG-CALH-00912589
- GOOG-CALH-00912590
- GOOG-CALH-00912591
- GOOG-CALH-00912592
- GOOG-CALH-00912593
- GOOG-CALH-00912594
- GOOG-CALH-00912595
- GOOG-CALH-00912596
- GOOG-CALH-00912597
- GOOG-CALH-00912598
- GOOG-CALH-00912599
- GOOG-CALH-00912600

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- GOOG-CALH-00912601
- GOOG-CALH-00912602
- GOOG-CALH-00912603
- GOOG-CALH-00912604
- GOOG-CALH-00912605
- GOOG-CALH-00912606
- GOOG-CALH-00912607
- GOOG-CALH-00912608
- GOOG-CALH-00912609
- GOOG-CALH-00912610
- GOOG-CALH-00912611
- GOOG-CALH-00912612
- GOOG-CALH-00912613
- GOOG-CALH-00912614
- GOOG-CALH-00912615
- GOOG-CALH-00912616
- GOOG-CALH-00912617
- GOOG-CALH-00912618
- GOOG-CALH-00912619
- GOOG-CALH-00912620
- GOOG-CALH-00912621
- GOOG-CALH-00912622
- GOOG-CALH-00912623
- GOOG-CALH-00912624
- GOOG-CALH-00912625
- GOOG-CALH-00912626
- GOOG-CALH-00912627
- GOOG-CALH-00912628
- GOOG-CALH-00912629
- GOOG-CALH-00912754
- GOOG-CALH-00912786
- GOOG-CALH-00912788
- GOOG-CALH-00912810
- GOOG-CALH-00912817
- GOOG-CALH-00912830
- GOOG-CALH-00912833
- GOOG-CALH-00912837
- GOOG-CALH-00912980

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- GOOG-CALH-00912984
- GOOG-CALH-00913143
- GOOG-CALH-00913147
- GOOG-CALH-00913221
- GOOG-CALH-00913223
- GOOG-CALH-00913227
- GOOG-CALH-00913250
- GOOG-CALH-00913417
- GOOG-CALH-00913420
- GOOG-CALH-00913715
- GOOG-CALH-00913719
- GOOG-CALH-00913720
- GOOG-CALH-00913721
- GOOG-CALH-00913722
- GOOG-CALH-00913723
- GOOG-CALH-00913724
- GOOG-CALH-00913725
- GOOG-CALH-00913726
- GOOG-CALH-00913727
- GOOG-CALH-00913745
- GOOG-CALH-00913746
- GOOG-CALH-00925361
- GOOG-CALH-01016578
- GOOG-CABR-00059481
- GOOG-CABR-00086613
- GOOG-CABR-00103636
- GOOG-CABR-00115917
- GOOG-CABR-00125420
- GOOG-CABR-00130197
- GOOG-CABR-00190185
- GOOG-CABR-00373424
- GOOG-CABR-00422093
- GOOG-CABR-00422093
- GOOG-CABR-00832000
- GOOG-CABR-00892126
- GOOG-CABR-00892310
- GOOG-CABR-03609925
- GOOG-CABR-03653208

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- GOOG-CABR-03655773
- GOOG-CABR-03663124
- GOOG-CABR-03664145
- GOOG-CABR-03666182
- GOOG-CABR-03723402
- GOOG-CABR-03744846
- GOOG-CABR-03839059
- GOOG-CABR-04026136
- GOOG-CABR-04033448
- GOOG-CABR-04067825
- GOOG-CABR-04073287
- GOOG-CABR-04084881
- GOOG-CABR-04119164
- GOOG-CABR-04176215
- GOOG-CABR-04205014
- GOOG-CABR-04206765
- GOOG-CABR-04295215
- GOOG-CABR-04312372
- GOOG-CABR-04334587
- GOOG-CABR-04400013
- GOOG-CABR-04604487
- GOOG-CABR-04605135
- GOOG-CABR-04616357
- GOOG-CABR-04696440
- GOOG-CABR-04742957
- GOOG-CABR-04866841
- GOOG-CABR-05156497
- GOOG-CABR-05278287
- GOOG-CABR-05279094
- GOOG-CABR-05280150
- GOOG-CABR-05290317
- GOOG-CABR-05292934
- GOOG-CABR-05292947
- GOOG-CABR-05294314
- GOOG-CABR-05295318
- GOOG-CABR-05295553
- GOOG-CABR-05296460
- GOOG-CABR-05298779

# Exhibit A to Rebuttal Report of Z. Shafiq
# Materials Reviewed

- GOOG-CABR-05299944
- GOOG-CABR-05302330
- GOOG-CABR-05303296
- GOOG-CABR-05401162
- GOOG-CABR-05401180
- GOOG-CABR-05401181
- GOOG-CABR-05424604
- GOOG-CABR-05424604
- GOOG-CABR-05469056

# EXHIBIT FFF
## Redacted Version of Document Sought to be Sealed

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

Case No. 4:20-cv-05146-YGR-SVK

PATRICK CALHOUN, et al., *on behalf of themselves and all others similarly situated*,

                    Plaintiffs,

     v.

GOOGLE LLC,

                    Defendant.

# EXPERT REBUTTAL REPORT OF RICHARD M. SMITH IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## February 15, 2022

## TABLE OF CONTENTS

I.      EXECUTIVE SUMMARY OF OPINIONS PROFFERED ................................................2

II.     QUALIFICATIONS AND BACKGROUND ................................................................4

III.    BLOCKING METHODS PROPOSED IN THE ZERVAS REPORT WILL NOT STOP ALL DATA TRANSMISSIONS TO GOOGLE AND WILL CAUSED WEB SITES TO FAIL.................................................................................................5

        A.      Cookie Blocking .................................................................................6

        B.      Disabling JavaScript ..........................................................................12

        C.      The Google Analytics Opt-out............................................................16

        D.      The AdBlock Add-on Extension.........................................................22

        E.      The Use of a VPN Does Not Prevent Data Transmissions to Google ..................29

IV.     THE CHEN REPORT'S CONCLUSIONS ABOUT TRANSMISSIONS FROM CHROME TO GOOGLE, AS COMPARED TO OTHER BROWSERS, IS INCORRECT AND BASED ON A FLAWED METHODOLOGY...............................31

V.      CHROME DEVELOPMENT TOOLS ARE NOT A RELIABLE METHOD OF CAPTURING NETWORK TRAFFIC FROM THE CHROME BROWSER..................36

VI.     BLOCKING METHODS PROPOSED IN THE BERSTON DECLARATION WILL NOT STOP ALL DATA TRANSMISSIONS TO GOOGLE AND WILL CAUSE WEB SITES TO FAIL.................................................................................................41

        A.      The "Clear Cookies and Site Data" Option Does Not Stop Transmissions...........42

        B.      "Opting Out of Personalized Ads" Relies on Cookies and Does Not Stop All Transmissions ..................................................................43

        C.      The NAI Opt-Out Relies on Cookies and Does Not Stop All Transmissions .......50

        D.      The IBA Opt-out Relies on Cookies and Does Not Block All Transmissions ......52

        E.      Firewalls.............................................................................................55

        F.      Standalone ad block programs ............................................................55

VII.    GOOGLE TRACKS BLOCKING METHODS .......................................................55

VIII.   GOOGLE ENGAGES IN COOKIE-SYNCING WHICH CIRCUMVENTS BLOCKING METHODS.................................................................................60

## EXPERT REBUTTAL REPORT OF RICHARD M. SMITH

**I.    EXECUTIVE SUMMARY OF OPINIONS PROFFERED**

1.    As I will explain in the remainder of this report, I believe the Zervas Report, the Chen Report, and the Bernston Declaration all provide incorrect and misleading information about: the operation of the Chrome browser and its transmission of personal information to Google servers; methods which claim to block the transmission of personal information to Google servers; the mapping of data between Google servers; and, the operation of the Chrome browser compared to other browsers such as Firefox and Edge.

2.    As used in this report, "personal information" includes IP addresses, User-Agent information, browsing history information, the Chrome X-client data header, cookie identifiers, device identifiers, and the content of communications the users exchange on non-Google websites. I also understand Google uses the personal information that Chrome sends to it for purposes of creating consumer profiles, that is sometimes referred to as derived data. Neither my initial nor this rebuttal report covers derived data or its use.

3.    <u>Rebuttal Opinion No. 1</u>: Based on my experience in the field, it is my opinion that both the Zervas and Chen Report used flawed methods to test transmissions that Chrome sends from user's computing devices to Google's servers. Because of these flaws, neither Report reaches an accurate conclusion regarding the transmission of flowing at start up from Chrome to Google. My report identifies multiple additional transmissions that the Zervas and Chen Reports omit.

       a.    Both reports used the Chrome Developer tools (created by Google) rather than Fiddler. Unlike Fiddler, the Chrome Developer tools do not capture all data transmissions that are sent to Google.

       b.    Both reports do not turn the Chrome Developer tools recording systems on until after the Chrome browser had been opened and communications had started. This excludes certain transmissions that Chrome sends to Google immediately upon start-up.

c.   The Zervas Report criticizes the fact that I only tested six websites. However, Dr. Zervas ignores that he himself has had a peer-reviewed paper published that extrapolates the results of testing a single website to a broader industry. More importantly, the reason the transmissions occur is the combination of how the Chrome browser is designed and how Google's source code operates. The tests I performed is less about specific websites than it is about the operation of Google's source code relating to the various properties to which it causes Chrome to send transmissions. The results for Google Analytics, Google Ads (google.com), Google DoubleClick, and Google APIs source code would be the same across millions of different websites. I chose six as exemplars rather than burden the Court with a report that ran thousands of pages long to report the same things over and over again.

d.   The Zervas Report also criticizes that I did not test prior versions of the Chrome browser. Although prior versions are available for his own testing, Dr. Zervas did not perform any such tests. The reason is that the Chrome browser has not substantially changed in the functions I described in my opening report. Regardless of the version of Chrome, it was designed to follow the instructions of Google source code that command the Chrome browser to transmit the data at issue from the user's personal computing devices to Google's servers even when they were not present at a Google website.

e.   Finally, the Chen Report tested Chrome in its default settings but manually changed the settings in the other browsers tested to make them less privacy protective and hence, more like Chrome. Based on my experience, this is not a valid way to test comparative products because the Chen Report changed features of the other browsers.

4.   <u>Rebuttal Opinion No. 2</u>: The Zervas Report claims that "Chrome does not function the same way for all users" and lists a series of alleged steps a user could take to stop Chrome from

sending their personal information to Google. However, my testing shows that none of the purported blocking methods offered in the Zervas report stop all data transmissions of personal information from a user's Chrome browser to Google servers. Most of the blocking solutions offered negatively impact the operation of the Chrome browser and some cause many Web sites to fail and are expressly "not recommended" by Google (such as blocking JavaScript or all cookies).

5.      <u>Rebuttal Opinion No. 3</u>: The Zervas Report incorrectly claims that mappings of data received from Chrome browsers is expressly prohibited by Google's internal policies. However, the underlying data associated with the Zervas Report (called HAR files) show that the Chrome browser sent information to Google servers which is mapped by cookie values. Further, an internal Google Analytics presentation describes the mapping as involving the mapping of such information that I described in my opening report and which was confirmed in the Zervas HAR files. Moreover, Google's public Web sites describe the integration of Google offerings such as Google Analytics.

6.      <u>Rebuttal Opinion No. 4</u>: The Chen Report claims that Chrome sends no more personal information to Google's servers than any other web browser.  This is not true. My testing and Google documents show that the X-Client-Data header is unique to Chrome and Chrome transmits more third-party cookies to Google in its default settings than Firefox, Edge, and Safari.

## II.      QUALIFICATIONS AND BACKGROUND

7.      I am the owner of Boston Software Forensics LLC of Boston, Massachusetts. For approximately the last 15 years, I have been providing consulting services to the legal industry, primarily involving the analysis of software systems to understand how they operate.

8.      I have been retained by counsel for Plaintiffs as an expert in this matter. I previously submitted a report in support of Plaintiffs' Motion for Class Certification, dated October 14, 2021, which sets my expert qualifications.[1]

---

[1] *Calhoun, et al. v. Google, LLC*, Smith Report, dated October 14, 2021. at ¶¶ 1-2, Exs. A and B.

9.      On December 22, 2021, Google submitted a response to Plaintiffs' Motion for Class Certification, which included declarations and documents which addressed issues raised in my report.

10.      I submit this rebuttal report to address issues raised in Google's response; the reports of Prof. Georgios Zervas ("Zervas Report") and Prof. Yiling Chen ("Chen Report"); and the declaration of the Google employee Glenn Bernston ("Bernston Declaration").

11.      I reserve the right to supplement and amend this rebuttal report based on additional materials and information made available to me.

12.      In addition to the items identified in Exhibit C of my October 14, 2021 report, a list of materials received, reviewed and relied upon for this rebuttal report is set forth in attached **Exhibit A.**[2]

## III.   BLOCKING METHODS PROPOSED IN THE ZERVAS REPORT WILL NOT STOP ALL DATA TRANSMISSIONS TO GOOGLE AND WILL CAUSED WEB SITES TO FAIL

13.      The Zervas Report claims there are a variety of methods which purport to block data transmissions from the Chrome browser to Google servers. These "solutions" are:

    a.   Cookie blocking

    b.   Disabling JavaScript

    c.   The Google Analytics Chrome opt-out extension

    d.   The AdBlock Chrome extension

    e.   Guest and Incognito modes

    f.   Use of a Virtual Private Network or "VPN."

14.      As described below, none of these offered-up blocking methods work completely to block all data transmissions of personal information from the Chrome browser (located on user's devices) to Google servers.

---

[2] It is my understanding that counsel for Google has been provided access to all my underlying testing and reliance documents. To the extent the Court seeks review of any cited documents or testing in this report, I will coordinate with counsel to ensure that they are produced.

15.     As described below, most of the blocking methods can cause Web sites to fail or block access.

16.     In many cases, Web sites do not tell a user the source of the failure caused by a blocking method and how to correct a problem.

17.     As described below, Google recommends users to not turn off JavaScript or block all cookies because Web sites will become unusable.

**A.      Cookie Blocking**

18.     Paragraphs 31-34 of the Zervas Report describe cookie settings of the Chrome browser and some limited testing that was done with these settings.

19.     Paragraph 32 of the Zervas Report states that the following Cookie settings were tested:

      a.   Allow all cookies

      b.   Block third-party cookies

      c.   Block all cookies

20.     The Chrome browser also has a 4th setting "Block third-party cookies in Incognito" which in my testing allows all cookies when not in Incognito or Guest mode.  This option appears now to be the default cookie option in Chrome.

21.     The Chrome browser presents these 4 cookies options as following in Settings:



Source: Chrome browser settings

22.     The Zervas Report offers no opinion on how many users change the default cookie setting in Chrome to another setting. However, Google's own analysis concluded that ███ of users block third party cookies. GOOG-CABR-04263403.

23.     Paragraph 32 of the Zervas Report, states that the "IDE cookie was not sent to domains associated with Google" when third-party cookies were being blocked in Chrome because IDE is a third-party cookie.

24.     However, paragraph 32 is both incorrect and misleading about Chrome's ability to block **all** third-party cookies.

25.     As I stated in my original report, Google Analytics cookies such as the _ga and _gid cookies can be created and stored by JavaScript as first-party cookie and then sent to third-party servers as URL parameters.

26.     Both the Chen and Zervas Reports define these JavaScript cookies created by third-party JavaScript code as third-party cookies, stating "third-party cookies are created by entities other than the website is visiting".

27.     Indeed, the underlying data for the Zervas Report shows the _ga and _gid cookie values being sent as URL parameters to Google servers **when Chrome has been configured to block third-party cookies**:

---

Request #135

POST
https://a869.mercurynews.com/DG/DEFAULT/rest/rpc/651?referer=https%3A%2F%2Fwww.mercurynews.com%2F2020%2F05%2F24%2Fqa-mental-health-tips-for-handling-the-
pandemic%2F&bcsessionid=&bctempid=&overruleReferrer=&time=2021-12-14T15%3A28%3A14-05%3A00&ts=1639513694975 http/2.0
content-length: 112
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="96", "Google Chrome";v="96"
sec-ch-ua-mobile: ?0
user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/96.0.4664.93 Safari/537.36
sec-ch-ua-platform: "Windows"
content-type: text/plain
accept: */*
origin: https://www.mercurynews.com
sec-fetch-site: same-site
sec-fetch-mode: cors
sec-fetch-dest: empty
referer: https://www.mercurynews.com/
accept-encoding: gzip, deflate, br

---

accept-language: en-US,en;q=0.9
cookie: BCSessionID=4fff4624-e5f1-4180-843c-ffacf4cd01fa; bc_tstgrp=10;
_pnvl=false; pushly.user_puuid=U4UEosv6QJAcG8F9xxQotXcXuvWstbPH;
_pndnt=; _pnss=none;
_parsely_session={%22sid%22:1%2C%22surl%22:%22https://www.mercurynews.co
m/2020/05/24/qa-mental-health-tips-for-handling-the-
pandemic/%22%2C%22sref%22:%22%22%2C%22sts%22:1639513692574%2C%22s
lts%22:0};
_parsely_visitor={%22id%22:%22pid=b23d76467464bf11fe976f3ec8aad1f3%22%2C
%22session_count%22:1%2C%22last_session_ts%22:1639513692574};
_li_dcdm_c=.mercurynews.com; _lc2_fpi=f107d3ac6b63--
01fpxa36t1vj444namv5hntkx0; RT="z=1&dm=mercurynews.com&si=31feaed6-ff3c-
4de4-b90a-
f8d0bf962a9e&ss=kx6k4as3&sl=0&tt=0&bcn=%2F%2F17de4c0f.akstat.io%2F";
AWSALB=YFV51xaETmhDKPb7BwT+Nj3qItV33asKlXjb13gKvwJ6mR8pzp+gWG
Tjk/3kHz8tcZ5AUwBAYu1VE0kH1wYqSD72+NUmjbRoSrKYhbIo7ygEHyBR5s6J
TmD4R+kV;
AWSALBCORS=YFV51xaETmhDKPb7BwT+Nj3qItV33asKlXjb13gKvwJ6mR8pzp
+gWGTjk/3kHz8tcZ5AUwBAYu1VE0kH1wYqSD72+NUmjbRoSrKYhbIo7ygEHyB
R5s6JTmD4R+kV; ==ga=GA1.2.1549923150.1639513695==;
==_gid=GA1.2.536743444.1639513695==

Request #214

POST https://www.google-
analytics.com/j/collect?v=1&_v=j96&a=1638395647&t=pageview&_s=1&dl=https%3
A%2F%2Fwww.mercurynews.com%2F2020%2F05%2F24%2Fqa-mental-health-tips-
for-handling-the-pandemic%2F&dr=&dp=%2F2020%2F05%2F24%2Fqa-mental-
health-tips-for-handling-the-pandemic%2F&ul=en-us&de=UTF-
8&dt=Mental%20health%20tips%20for%20handling%20the%20pandemic&sd=24-
bit&sr=1536x864&vp=887x754&je=0&_u=aChACEAjBAAAAC~&jid=2143195337
&gjid=405223959&==cid=1549923150.1639513695==&tid=UA-61435456-
5&==_gid=536743444.1639513695==&_r=1&gtm=2wgc10TLFP4R&cd2=mercurynews.co
m&cd3=mercurynews.com&cd4=&cd5=2020-05-24T07%3A00%3A20-
07%3A00&cd6=2020-05-24T07%3A00%3A20-07%3A00&cd7=2020-05-
27T04%3A27%3A51-
07%3A00&cd8=unknown&cd9=no&cd10=Business&cd11=5.8.2&cd12=&cd13=WP
&cd14=Business&cd15=Business&cd16=&cd17=&cd18=&cd19=&cd20=&cd21=http
s%3A%2F%2Fwww.mercurynews.com%2F2020%2F05%2F24%2Fqa-mental-health-
tips-for-handling-the-pandemic%2F&cd22=qa-mental-health-tips-for-handling-the-
pandemic&cd23=7158259&cd24=article&cd25=BANG&cd26=Louis%20Hansen&cd
27=Q%26amp%3BA%3A%20Mental%20health%20tips%20for%20handling%20the%
20pandemic&cd28=https%3A%2F%2Fwww.mercurynews.com%2F2020%2F05%2F2
4%2Fqa-mental-health-tips-for-handling-the-
pandemic%2F&cd29=Q%26amp%3BA%3A%20Mental%20health%20tips%20for%2
0handling%20the%20pandemic&cd30=&cd32=p-

---

4ctCQwtnNBNs2&cd33=BayAreaNewsGroup&cd34=true&cd35=coronavirus%2C%20mental%20health%2C%20tips%2C%20surviving%2C%20exercise%2C%20Santa%20Clara%20University%2C%20psychology%2C%20health%2C%20COVID-19%2C%20Silicon%20Valley%2C%20stress%2C&cd36=5242&cd37=840&cd38=Louis%20Hansen&cd49=true&cd50=Mozilla%2F5.0%20(Windows%20NT%2010.0%3B%20Win64%3B%20x64)%20AppleWebKit%2F537.36%20(KHTML%2C%20like%20Gecko)%20Chrome%2F96.0.4664.93%20Safari%2F537.36&cd51=&cd54=lhansen%40bayareanewsgroup.com&cd55=Bay%20Area%20News%20Group&cd62=metered&cd53=1549923150.1639513695&z=416929332

Request #220

POST
https://stats.g.doubleclick.net/j/collect?t=dc&aip=1&_r=3&v=1&_v=j96&tid=UA-61435456-5&cid=1549923150.1639513695&jid=2143195337&gjid=405223959&_gid=536743444.1639513695&_u=aChACEAiBAAAAC~&z=1153635142 http/2.0
content-length: 0
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="96", "Google Chrome";v="96"
sec-ch-ua-mobile: ?0
user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/96.0.4664.93 Safari/537.36
sec-ch-ua-platform: "Windows"
content-type: text/plain
accept: */*
origin: https://www.mercurynews.com
x-client-data: CIS2yQEIpbbJAQjEtskBCKmdygEI3tHKAQie+csBCOeEzAEItYXMAQjLicwBCNKPzAEI1pLMARiOnssB
sec-fetch-site: cross-site
sec-fetch-mode: cors
sec-fetch-dest: empty
referer: https://www.mercurynews.com/
accept-encoding: gzip, deflate, br
accept-language: en-US,en;q=0.9

Source: GOOG_ZERVAS_00000042.har (mercury_TPcookies.har)

---

28.    I discuss data transmissions involving _ga, _gid cookies and the cid and _gid URL parameters in further detail below.

29.     Paragraph 31 of the Zervas Report also offers up the option of blocking all cookies to prevent transmissions to Google but concedes that cookie blocking "may interfere with the functionality of certain website features".

30.     The Zervas Report offers no explanation of what this "interference" includes or the types of website features that might not function.

31.     The Zervas Report also fails to provide any statistics on how common these failures would be and whether a user is notified of the problem.

32.     Blocking all cookies is not a realistic option because it will interfere with most Web site login functionality—even on Google owned and operated web properties.

33.     The following screen shot shows Google's Gmail service failing when a user attempts to log into Gmail with all cookies blocked:



Source: https://accounts.google.com

34.     Google informs a user they must turn on cookies to use the Gmail service.

35.     Likewise, Wells Fargo's Website requires users to enable cookies in order to log into their online bank account:



Source: https://connect.secure.wellafargo.com

36.     I do not have any internal documents or knowledge of how many users block all cookies. However, because blocking all cookies harms the functionality of the browser and is expressly "not recommended" by Google in Chrome settings, the percentage of users who do so is likely very small.

### B.     Disabling JavaScript

37.     Paragraphs 35-40 of the Zervas Report offers up disabling JavaScript in the Chrome browser as another method to prevent data transmissions from the Chrome browser to the Google servers.

38.     Google's own analysis indicates that, as of 2018, only 0.1% of users were disabling JavaScript. Zervas Ex. 5 at 2 ("Chances are, JavaScript is already enabled in your browser; it helps power lots of the websites people use every day. But, because it may save bandwidth or help pages load more quickly, a tiny minority of our users (0.1%) choose to keep it off.")

39.     While paragraph 38 of the Zervas Reports admits that "many web pages do use certain JavaScript-dependent features," it offers no evidence regarding how common it is for Web pages to require JavaScript to be enabled in Chrome in order to function properly.

40.     Nor does the Zervas Reports offer any opinion about how users would be informed that JavaScript must be enabled in order to use a Web site.

41.     Dr. Zervas admitted during his deposition that he did not test the usability of Gmail with JavaScript disabled, Zervas Tr. at 139:19-25. However, Google's own Gmail service is one such Web site which requires JavaScript to be enabled in Chrome.

42.     If a user attempts to login into Gmail with JavaScript disabled, Google displays the following error message recommending the user "signing in on a browser that has JavaScript turned on":



Source: https://accounts.google.com

43.     Google Maps also provides an error message informing a Chrome user that they must turn on JavaScript in order to use the Web site:



Source: https://google.com/maps

44.     However, not all Web sites explicitly inform users the page failed because JavaScript is disabled. The Wells Fargo online banking login simply shows a blank page without informing a user that they must turn on JavaScript:



Source: https://connect.secure.wellsfargo.com

45.     In addition, the underlying data for the Zervas Report shows that not all data transmissions from the Chrome browser to Google servers are stopped by disabling JavaScript. For example, the following HTTP GET requests from the Zervas data shows such transmission still occur:

---

Request #8
GET https://www.googletagmanager.com/ns.html?id=GTM-TLFP4R http/2.0
upgrade-insecure-requests: 1
user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36
(KHTML, like Gecko) Chrome/96.0.4664.110 Safari/537.36
accept:
text/html,application/xhtml+xml,application/xml;q=0.9,image/avif,image/webp,image/
apng,*/*;q=0.8,application/signed-exchange;v=b3;q=0.9
sec-fetch-site: cross-site
sec-fetch-mode: navigate
sec-fetch-dest: iframe
referer: https://www.mercurynews.com/
accept-encoding: gzip, deflate, br
accept-language: en-US,en;q=0.9

Request #13

GET https://fonts.googleapis.com/css?family=Open+Sans:400,600,700&display=swap
http/2.0
user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36
(KHTML, like Gecko) Chrome/96.0.4664.110 Safari/537.36
accept: text/css,*/*;q=0.1
x-client-data:
CIS2yQEIpbbJAQjEtskBCKmdygEI3tHKAQie+csBCOeEzAEItYXMAQjLicwBCN
KPzAEI1pLMARiOnssB
sec-fetch-site: cross-site
sec-fetch-mode: no-cors
sec-fetch-dest: style
referer: https://www.mercurynews.com/
accept-encoding: gzip, deflate, br
accept-language: en-US,en;q=0.9

Source: GOOG_ZERVAS_00000041.har (mercury_JS.har)

---

46.     In   fact,   Request   #8   from   above   is   only   transmitted   to   the www.googletagmanager.com server when scripting has been ***disabled*** as the following HTML code from the Mercury News home page shows:

```
<!-- Google Tag Manager (noscript) -->
<noscript><iframe src='https://www.googletagmanager.com/ns.html?id=GTM-
TLFP4R' height='0' width='0'
style='display:none;visibility:hidden'></iframe></noscript>
<!-- End Google Tag Manager (noscript) -->

Source: GOOG_ZERVAS_00000041.har (mercury_JS.har)
```

47.     Request #13 above also shows that turning off JavaScript does not block the transmission   of   the   User-Agent   or   the   X-Client-data   header   to   the   Google   server fonts.googleapis.com. In addition to these, the user's IP address would be sent from Chrome to Google.

48.     In addition, Dr. Zervas admitted that blocking JavaScript would not prevent transmissions to Google, agreeing that, " ███████████████████████████████ ███████████████████████████████████████████████ and explaining (1) " ████████████████████████████████████████ " or " ████████████████████ ." Zervas Tr. at 126:14-21; 128:2-3; *see also Id.* at 136:10-12 (" ██ ███████████████████████████████████████████████ ███████████████ ")

C.      **The Google Analytics Opt-out**

49.     Paragraphs 41-44 of the Zervas Report offer up another blocking method, the Google Analytics Opt-out Add-on extension, to stop transmissions between the Chrome browser and Google servers.

50.      According to the description of the Google Analytics Opt-Out extension in the Chrome Web Store, enabling the add-on affects Google Analytics-related data transmissions:



Source: https://chrome.google.com/webstore/detail/google-analytics-opt-out/fllaojicojecljbmefodhfapmkghcbnh.

51.      However, based on my review of the GOOG_ZERVAS_00000039.har data file, I found that Google Analytics Opt-out Add-on does not stop all data transmissions related to Google Analytics from being made by the Chrome browser.

52.      Even with this Google Analytics Opt-out Add-on installed, a Chrome browser will still contact a Google server to fetch a Google Analytics JavaScript file as shown in the following HTTP GET request from the GOOG_ZERVAS_00000039.har file:

---

Request #129

GET https://www.google-analytics.com/analytics.js h3
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="96", "Google Chrome";v="96"
sec-ch-ua-mobile: ?0
user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36
(KHTML, like Gecko) Chrome/96.0.4664.110 Safari/537.36

---

> sec-ch-ua-platform: "Windows"
> accept: */*
> sec-fetch-site: cross-site
> sec-fetch-mode: no-cors
> sec-fetch-dest: script
> referer: https://www.mercurynews.com/
> accept-encoding: gzip, deflate, br
> accept-language: en-US,en;q=0.9
>
> Source: GOOG_ZERVAS_00000039.har (mercury_analytics.har)

53.    The Google Analytics JavaScript file still executes in the Chrome browser with the Google Analytics Opt-out add-on installed.

54.    The Google Analytics JavaScript file also continues to create the `_ga` and `_gid` cookie values with the add-on installed as shown in the following HTTP GET request from the same GOOG_ZERVAS_00000039.har file:

> Request #459
>
> GET https://www.mercurynews.com/wp-content/uploads/2021/07/SJM-L-DTSJ-x-12.jpg?w=1024&h=732 http/2.0
> sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="96", "Google Chrome";v="96"
> sec-ch-ua-mobile: ?0
> user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/96.0.4664.110 Safari/537.36
> sec-ch-ua-platform: "Windows"
> accept: image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
> sec-fetch-site: same-origin
> sec-fetch-mode: no-cors
> sec-fetch-dest: image
> referer: https://www.mercurynews.com/2020/05/24/qa-mental-health-tips-for-handling-the-pandemic/
> accept-encoding: gzip, deflate, br
> accept-language: en-US,en;q=0.9
> cookie: bc_tstgrp=5; _pnvl=false;
> pushly.user_puuid=td5n0fG9eVfRcwkjf1LqQeAxKy07wRvq; _pndnt=; _pnss=none;
> ai_user=1g9x3|2021-12-16T20:07:13.123Z;
> _parsely_session={%22sid%22:1%2C%22surl%22:%22https://www.mercurynews.co
> m/2020/05/24/qa-mental-health-tips-for-handling-the-
> pandemic/%22%2C%22sref%22:%22%22%2C%22sts%22:1639685234190%2C%22s
> lts%22:0};
>   _parsely_visitor={%22id%22:%22pid=771ae75da6c85428248e9122cf43d954%22%2

C%22session_count%22:1%2C%22last_session_ts%22:1639685234190};
_li_dcdm_c=.mercurynews.com; _lc2_fpi=f107d3ac6b63--
01fq2dp7yp557eycwnxgh2zkyj; RT="z=1&dm=mercurynews.com&si=79a04ca2-
328c-4ce9-bf54-
5c7df3d56b30&ss=kx9e91an&sl=0&tt=0&bcn=%2F%2F68794907.akstat.io%2F";
_lr_geo_location=US; __qca=P0-1037288684-1639685236540; _pnlspid=10402;
anonDeviceId=1adbcdc629755962b25b94a3c4c38168;
_vfz=www%2Emercurynews%2Ecom.00000000-0000-4000-8000-
c86bf0725f23.1639685240.1.medium=direct|source=|sharer_uuid=|terms=;
_vfa=www%2Emercurynews%2Ecom.00000000-0000-4000-8000-
c86bf0725f23.7ebdba1f-e07d-4088-9441-
a2b75c820588.1639685240.1639685240.1639685240.1;
osano_consentmanager_uuid=84dec289-c823-40d5-8b27-1c3d2da92dcb;
osano_consentmanager=hz-
cYsCKKENBUKREbUcq6vPe3wGy5xdRFy9J2XWXTdeywKbvkCyIc7Tf9uZuyH50
ECRvA7PNbOWv0VIquDhAjPm0JKpRWu7YKoBB2NNoyeXLLrcaRztHEJfZU9kB
MWsm8H5Dz8AZM7GO2HeYPnEdJNh40ucchPMupdaCIT399_weXgRB6aCtKhJF
Mw2s0bAK4FRl2YCNlT7G9scMQo8XJ1WEucETb2smdhjbnjNwtG4ibpsTiCdjjD1k
NlKfqjvDGaNWUMr8FnQ_IpJs9x2w3nNlze7g7ewG2xJf3qKn70QRpT_RWamNFaN
RKs4uWoAAUjKaOa38rNbpbY6CYLKer69VCapE5krOQRQvN4C4YKh7GpYxFhE
T-
aqGXlWt6RZnYmNsFjTAwaX8UpSqEsc6BxQtLV6vNfuzKbWw9osAk8jqtb_SWAn
u1gS2t_gdRCITPtC3DihFMoypHdpiiKFp1W-
l81G59qDzL9usyxT_7fI7yw3D50JL3hzK5x2BoeHSnhqIsK8-
ZP5vzwypWgI3tn7MzlBbOvwjuRT6DlVElScDV9s7Ru1HO5a_fFvEuSJDaKQSlFako
rq4SFapJ-SF-
n3mEBhZfrEXVtEwdHIklGwJRWr0PuOywvhK0DjjGXD9p28VKlf_iqoOJybunPcM
MyYOuoq--_x9OU2VhwpYSdW3v35qKrP7q1j_6StugPBv-
2qZICNsaKuOzARC9Q5P4MX8Fw9aa_VlzR9hd4QkDngNu83JcqlAuQpBxnTU-
JchL_iHb5yA_0M=; BCTempID=e5dce137-5828-4f12-ae51-e8634347214f;
BCSessionID=e5dce137-5828-4f12-ae51-e8634347214f;
_vfb=www%2Emercurynews%2Ecom.00000000-0000-4000-8000-
c86bf0725f23.1.10.1639685240....; ABTestCookie=A;
ai_session=PRpcil|1639685240689.7|1639685240689.7; ntv_as_us_privacy=1YNY;
_ga=GA1.2.1094589372.1639685242; _gid=GA1.2.1561224651.1639685242;
_fbp=fb.1.1639685242192.566748168; _ntv_uid=86d8338a-5cdb-406b-8cf6-
2d54a526770a; OB-USER-TOKEN=ed60826f-4abd-45d0-8fb0-8b6c48e1b74c;
sub_nxt_upd_ac_DFM_BANGWPPRODWAB_PROD=1;
__idcontext=eyJjb29raWVRCI6Ilo3R0FPS1FQSUdCRkE0RTNaM05ORFgyTFRKR
klFVUlLNlQ1SVE3U1o2QVFBPT09PSIsImRldmljZUlEIjoiWjdHQU9LUVBJQ0xS
V1NORTNMRk1MNlJWN0UzS0E0QUU3SE0yVzdETVpJV1E9PT09IiwiaXYiOiJB
WENKNFIyV0U1UVBUQzZHSjY1WlhUUQ1IRUT09PT09PSIsInYiOjF9;
sub_nxt_DFM_BANGWPPRODWAB_PROD={%222%22:{%22104000%22:{%22ac
%22:1%2C%22ac_d%22:1%2C%22s%22:%222021-12-
16T20:07:24.130Z%22}%2C%22_ac_d%22:1%2C%22_ac%22:1%2C%22_acnv%22:
104000}};

bounceClientVisit3993v=N4IgNgDiBcIBYBcEQM4FIDMBBNAmAYnvgO6kB0Atg
KYBOAxgK40CeAdlcSmXQPYVVG4ADEKKCArAIAsRAI4BDALTVWCOWAVwq
ahHAUIAlqgUAzHjQ1zWAEzD7WAcz2aFES1aoV9dIiAA0IGhgQPxAUKnsYAG0
AXQBfIA

Source: GOOG_ZERVAS_00000039.har (mercury_analytics.har)

55.     The _ga cookie value also continues to be sent from the Chrome browser on the
user's device to a Google DoubleClick ad server as a ga_cid URL parameter with the Google
Analytics Opt-out add-on installed and enabled.

Request #1114

GET
https://securepubads.g.doubleclick.net/gampad/ads?gdfp_req=1&pvsid=338687732813
4305&correlator=1641590950113027&output=ldjh&impl=fifs&eid=31060978%2C31
061029%2C21067496%2C31062930&vrg=2021120601&ptt=17&gdpr_consent=CPR
VB3FPRVB3FEXABAENBgCwAP_AAH_AACiQGggBIAJEQABAIAAEAIAEAA
AAQBgAAEAgAAAAAAAAAAABAgAAAAAAAAAAAAAAAAAAAAAA
AAAAAAAAAAAAAAAAAAAAAAAAAAACAAAAAAAAAAAAEAAAA
AAAAAAAgAAAAIAAAAAgXmAAAAkQAAEAAAAAAAAQAAABAEA
AAAAAAAAAAAAAAAAECAAAAAAAAAAAAAAAAAAAAAAAAAAAA
AAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAA
AAAACAA.YAAAAAAAAAA&gdpr=0&us_privacy=1YNY&sc=1&sfv=1-0-
38&ecs=20211216&iu_parts=8013%2Cmercurynews.com%2Cbusiness%2CSponsors
hip_1&enc_prev_ius=%2F0%2F1%2F2%2F3&prev_iu_szs=300x50&ris=31&rcs=1&
prev_scp=POS%3DSponsorship_1%26zeus_rendercount%3D2%26zeus_slot%3Dzeus
_Sponsorship_1.ref.dsk%26amznbid%3D2%26amznp%3D2&eri=1&cust_params=zeu
s%3Dapplied%26zeus_8013%3Dwww.mercurynews.com%26kv%3Dbusiness%252Cc
oronavirus%252Ccoronavirus-tips%252Cpm-report%252Cqa%252Clouis-
hansen%26page%3Darticle%26content%3D%26RPN%3D258499450601%26rurl%3D
%26articleid%3D7158259%26zeus_insights%3Dcmg%252Cios%252Cihp%252Cdpr
%252Cq8t%252Cwug%252C3bu%252Ckh5%252Cec4%252Cphj%252Caw9%252Ct
bj%252Cki0%252Cv3s%252Cuib%252Cpgg%252Cbs0&bc=31&abxe=1&lmt=16396
85267&dt=1639685267797&dlt=1639685230866&idt=3208&frm=20&biw=1271&bi
h=952&oid=2&adxs=1111&adys=17&adks=3262223218&ucis=1&ifi=5&u_his=6&u
_h=1080&u_w=1920&u_ah=1040&u_aw=1920&u_cd=24&u_sd=1&u_tz=-
300&flash=0&url=https%3A%2F%2Fwww.mercurynews.com%2F2020%2F05%2F24
%2Fqa-mental-health-tips-for-handling-the-
pandemic%2F&vis=1&dmc=8&scr_x=0&scr_y=0&psz=300x50&msz=1x0&psts=AG
kb-H8pgFk5N6XOcVypXLZo5AXp5hLk5Cs3i_RQ0Ri8-
RUUuUCieJtzkHXheeUFEYZz4e7uGuIlDRKyPcMh_JnQcWjEcA%2CAGkb-
H8uQqLLMXEQ95L0Jta8V3gA7SnTTqtFLvqV4cgwtQrEUXuGsORQxRWdEVu_v2
mfWMvweB8jXox10zc%2CAGkb-H_XqMQMCpYHJkh7skJuXlimd-

---

DkT69bhfqe6k80h25sXTg-o67AFTVJAsjKiJUjcv8-
iLW8JPaIoXUdC3qJNg&ga_vid=549979856.1639685236&ga_sid=1639685236&ga_
hid=2056970610&ga_fc=true&ga_cid=1094589372.1639685242&fws=128&ohw=0&
btvi=0&uach=WyJXaW5kb3dzIiwiMTAuMC4wIiwieDg2IiwiIiwiOTYuMC40NjY0L
jExMCIsW10sbnVsbCxudWxsLCI2NCJd&nvt=1 h3
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="96", "Google Chrome";v="96"
sec-ch-ua-mobile: ?0
user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36
(KHTML, like Gecko) Chrome/96.0.4664.110 Safari/537.36
sec-ch-ua-platform: "Windows"
accept: */*
origin: https://www.mercurynews.com
x-client-data:
CIS2yQEIpbbJAQjEtskBCKmdygEI3tHKAQie+csBCOeEzAEItYXMAQjLicwBCN
KPzAEI1pLMARiOnssB
sec-fetch-site: cross-site
sec-fetch-mode: cors
sec-fetch-dest: empty
referer: https://www.mercurynews.com/
accept-encoding: gzip, deflate, br
accept-language: en-US,en;q=0.9
cookie:
IDE=AHWqTUnMV1rZtJqLDZsx6queuHD6WU7OKh2F3AiFx1J5y6GgyQQynZjNy
yEgDVlVDJE

Source: GOOG_ZERVAS_00000039.har (mercury_analytics.har)

---

56.     Dr. Zervas confirmed my finding in his deposition. Zervas Tr. at ("███████████. But I can tell you that the g -- the underscore ga cookie here is being sent to Mercury News. It would be what we call a first-party cookie. So this is a transmission of the cookie from the Chrome browser to the party that sent it, which is Mercury News in this case. This is what's happening."); *see also Id.* at 168:17-169:1 ("███████████

███████████████████████████████████████████████████

████.")

57.     Both the Zervas Report and the description of the Google Analytics Opt-out add-on extension are silent about the continued use of Google Analytics JavaScript code and cookies when the Google Analytics Opt-out add-on extension is installed and enabled in Chrome.

**D.    The AdBlock Add-on Extension**

58.     Paragraphs 45-48 of the Zervas Report offer up another blocking method, the AdBlock Add-on extension, to stop transmissions from the Chrome browser on user's computing devices to Google servers.

59.     Without explaining for what purpose, the Zervas Report states that he tested the AdBlock Add-on extension using a *manual configuration* rather than the default configuration. *See also* Zervas Tr. at 185:23-25.

60.     The Zervas Report did not provide any testing results from running the AdBlock Add-on extension in its default configuration. In his deposition, Dr. Zervas explained that "██

██████████████████████████████████████████████████

████████████████████████████████." Zervas Tr. 186:-7. He

then explained that "███████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████." Zervas Tr.

187:17-188:3. Zervas testified that he did not know if Google as one of those

61.     The Zervas Report also does not provide any statistics about the usage of the AdBlock Add-on extension among users in various configurations, including those used in the report. Zervas Tr. at 186:18-21.

62.     It is not intuitive to users how to change the settings of the AdBlock Add-on extension. For example, there is no easy button to click in order to access the settings and the

settings are not shown during the initial setup process. In addition, in the process of installing the AdBlock browser extension, Chrome tells users that "It can: Read and change all your data on all websites." Zervas Ex. 10:



Source: Zervas Ex. 10

63.    Regardless, the underlying Zervas testing data shows that not all data transmissions from the Chrome browser to Google servers are blocked by the AdBlock Add-on extension – even with the changed configurations that Zervas made to the extension:

Request #4

GET
https://fonts.googleapis.com/css?family=Droid+Sans%3A400%2C700%7CDroid+Seri
f%3A400%2C400i%2C700%2C700i%7CArvo%3A400%2C400i%2C700%2C700i&v
er=5.8.2 http/2.0
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="96", "Google Chrome";v="96"
origin: https://www.mercurynews.com
sec-ch-ua-mobile: ?0
user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36
(KHTML, like Gecko) Chrome/96.0.4664.110 Safari/537.36
sec-ch-ua-platform: "Windows"
accept: text/css,*/*;q=0.1

x-client-data:
CIS2yQEIpbbJAQjEtskBCKmdygEI3tHKAQie+csBCOeEzAEItYXMAQjLicwBCN
KPzAEI1pLMARiOnssB
sec-fetch-site: cross-site
sec-fetch-mode: cors
sec-fetch-dest: style
referer: https://www.mercurynews.com/
accept-encoding: gzip, deflate, br
accept-language: en-US,en;q=0.9

Source: GOOG_ZERVAS_00000037.har (mercury_adblock.har)

---

Request #13

GET
https://maps.googleapis.com/maps/api/js?key=AIzaSyB0TOv46pgshuLhvImI1q7cJnS
bYu3yHNU&ver=5.8.2 http/2.0
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="96", "Google Chrome";v="96"
sec-ch-ua-mobile: ?0
user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36
(KHTML, like Gecko) Chrome/96.0.4664.110 Safari/537.36
sec-ch-ua-platform: "Windows"
accept: */*
x-client-data:
CIS2yQEIpbbJAQjEtskBCKmdygEI3tHKAQie+csBCOeEzAEItYXMAQjLicwBCN
KPzAEI1pLMARiOnssB
sec-fetch-site: cross-site
sec-fetch-mode: no-cors
sec-fetch-dest: script
referer: https://www.mercurynews.com/
accept-encoding: gzip, deflate, br
accept-language: en-US,en;q=0.9

Source: GOOG_ZERVAS_00000037.har (mercury_adblock.har)

---

Request #13

GET https://www.google.com/coop/cse/brand?form=cse-search-box&lang=en h3
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="96", "Google Chrome";v="96"
sec-ch-ua-mobile: ?0
user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36
(KHTML, like Gecko) Chrome/96.0.4664.110 Safari/537.36

```
sec-ch-ua-platform: "Windows"
accept: */*
x-client-data:
CIS2yQEIpbbJAQjEtskBCKmdygEI3tHKAQie+csBCOeEzAEItYXMAQjLicwBCN
KPzAEI1pLMARiOnssB
sec-fetch-site: cross-site
sec-fetch-mode: no-cors
sec-fetch-dest: script
referer: https://www.myflorida.com/
accept-encoding: gzip, deflate, br
accept-language: en-US,en;q=0.9
cookie:   Secure-3PSID=FAhnaS5iwTHPfE  ojpiJ4K-Y-
tOaGoo89ZmrnzXgN0pUfHdyG5rpmVYpi-eGeR2lgk7MnQ.;  __Secure-
3PAPISID=EMqnQ2B5TlqT3SeG/A3N2yldnUMrp3  28Z;
NID=511=HbqdAunsnk2FToR1EPfeCyc1sq-KO861SVNOaS7cLtkCbmb-
ZGV8znEGrG-iXszj3VsdGMzpNfDyJ0-
JCFGpexJyJIMX9ytXgOi5OmN7kUPQ9V1o3ZN1XU3fJOAcdNYqKj11StvBlW3RL
-qHUkRqHQ  Joi49Y9xZc5hvzclquIIO3bjfe1mmxbpiBd8;   Secure-
3PSIDCC=AJi4QfH4AHhBHe0EUWPhvr62l99w6KR9FW9BEi_cJ8XiHIVvdw5IPpb
luoQ4QrhdapxnUFSh
```

Source: GOOG_ZERVAS_00000043.har (myfl_adblock.har)

64.     In these HTTP requests, Google Cookies are marked in blue and X-Client-Data headers are marked in green.

65.     When the default configuration of the AdBlock Add-on extension is used, additional data transmissions are made from the Chrome browser to Google servers as shown in the following HTTP requests:

```
Request #233

GET https://www.google-analytics.com/analytics.js HTTP/1.1
Host: www.google-analytics.com
Connection: keep-alive
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="98", "Google Chrome";v="98"
sec-ch-ua-mobile: ?0
User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36
(KHTML, like Gecko) Chrome/98.0.4758.82 Safari/537.36
sec-ch-ua-platform: "Windows"
Accept: */*
Sec-Fetch-Site: cross-site
Sec-Fetch-Mode: no-cors
```

Sec-Fetch-Dest: script
Referer: https://www.mercurynews.com/
Accept-Encoding: gzip, deflate, br
Accept-Language: en-US,en;q=0.9

Source: AdBlock.saz

---

Request #255

POST https://www.google-analytics.com/j/collect?v=1&_v=j96&a=1665037967&t=pageview&_s=1&dl=https%3A%2F%2Fwww.mercurynews.com%2F&dr=&dp=%2F&ul=en-us&de=UTF-8&dt=The%20Mercury%20News%20-%20Bay%20Area%20news%2C%20sports%2C%20business%2C%20entertainment%2C%20lifestyle%20and%20commentary&sd=24-bit&sr=2560x1440&vp=1075x479&je=0&_u=aGBACEAjBAAAAC~&jid=1236348908&gjid=2078037628&cid=2019070894.1644240378&tid=UA-61435456-5&_gid=1554273546.1644240378&_r=1&gtm=2wg220TLFP4R&cd2=mercurynews.com&cd3=mercurynews.com&cd8=unknown&cd9=no&cd10=home&cd11=5.9&cd12=&cd13=WP&cd14=Home&cd15=&cd16=&cd17=&cd18=&cd19=&cd21=https%3A%2F%2Fwww.mercurynews.com%2F&cd24=home&cd25=BANG&cd27=Home&cd28=https%3A%2F%2Fwww.mercurynews.com%2F&cd29=Home&cd30=&cd32=p-4ctCQwtnNBNs2&cd33=BayAreaNewsGroup&cd34=true&cd35=&cd50=Mozilla%2F5.0%20(Windows%20NT%2010.0%3B%20Win64%3B%20x64)%20AppleWebKit%2F537.36%20(KHTML%2C%20like%20Gecko)%20Chrome%2F98.0.4758.82%20Safari%2F537.36&cd51=&cd61=Not%20Set&cd53=2019070894.1644240378&z=263010949 HTTP/1.1
Host: www.google-analytics.com
Connection: keep-alive
Content-Length: 0
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="98", "Google Chrome";v="98"
sec-ch-ua-mobile: ?0
User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/98.0.4758.82 Safari/537.36
sec-ch-ua-platform: "Windows"
Content-Type: text/plain
Accept: */*
Origin: https://www.mercurynews.com
Sec-Fetch-Site: cross-site
Sec-Fetch-Mode: cors
Sec-Fetch-Dest: empty
Referer: https://www.mercurynews.com/
Accept-Encoding: gzip, deflate, br
Accept-Language: en-US,en;q=0.9

Source: AdBlock.saz

Request #281

POST
https://stats.g.doubleclick.net/j/collect?t=dc&aip=1&_r=3&v=1&_v=j96&tid=UA-61435456-5&cid=2019070894.1644240378&jid=1236348908&gjid=2078037628&_gid=1554273546.1644240378&_u=aGBACEAiBAAAAC~&z=752769869 HTTP/1.1
Host: stats.g.doubleclick.net
Connection: keep-alive
Content-Length: 0
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="98", "Google Chrome";v="98"
sec-ch-ua-mobile: ?0
User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/98.0.4758.82 Safari/537.36
sec-ch-ua-platform: "Windows"
Content-Type: text/plain
Accept: */*
Origin: https://www.mercurynews.com
X-Client-Data: CKy1yQEIkbbJAQimtskBCMS2yQEIqZ3KAQie+csBCOeEzAEIwpfMAQ==
Sec-Fetch-Site: cross-site
Sec-Fetch-Mode: cors
Sec-Fetch-Dest: empty
Referer: https://www.mercurynews.com/
Accept-Encoding: gzip, deflate, br
Accept-Language: en-US,en;q=0.9

Source: AdBlock.saz

---

Request #283

GET https://www.google.com/ads/ga-audiences?t=sr&aip=1&_r=4&slf_rd=1&v=1&_v=j96&tid=UA-61435456-5&cid=2019070894.1644240378&jid=1236348908&_u=aGBACEAiBAAAAC~&z=1229534268 HTTP/1.1
Host: www.google.com
Connection: keep-alive
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="98", "Google Chrome";v="98"
sec-ch-ua-mobile: ?0
User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/98.0.4758.82 Safari/537.36
sec-ch-ua-platform: "Windows"
Accept: image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8

X-Client-Data:
CKy1yQEIkbbJAQimtskBCMS2yQEIqZ3KAQie+csBCOeEzAEIwpfMAQ==
Sec-Fetch-Site: cross-site
Sec-Fetch-Mode: no-cors
Sec-Fetch-Dest: image
Referer: https://www.mercurynews.com/
Accept-Encoding: gzip, deflate, br
Accept-Language: en-US,en;q=0.9

Source: AdBlock.saz

66.     In these HTTP requests, Google Analytics cookie values sent as URL parameters are marked in blue and X-Client-Data headers are marked in green.

67.     The Zervas Report is also silent on the fact that users are prohibited from accessing certain Web sites if they are using an ad blocker such as AdBlock.

68.     In such cases, a Web site may require a user to turn off an ad blocker, provide an exception for the Web site to the ad blocker, or pay a subscription fee in order to access the Web site.

69.     One such Web site is the Mercury News Web site as shown in the following screen shot:



Source: https://mercurynews.com

70.    The AdBlock Web site provides instructions on how to temporarily or permanently disable AdBlock on specific Web sites:



## How to disable AdBlock on specific sites

**AdBlock Support**
Modified on: Sat, Jul 24, 2021 at 3:47 PM

Are you trying to watch a video or read an article on a site that doesn't allow ad blockers? Do you want to support a site you love by allowing it to show you ads? Use the steps below to pause AdBlock temporarily or add a site to your allowlist to see ads every time you visit.

**Note:** The methods described below work in desktop browsers on Chrome, Firefox and Edge. There are similar steps for the Mac app. You can also pause AdBlock on your mobile device or add websites to your allowlist on your iPhone or iPad.

⌃  **Allow Ads On a Domain (Website)**

To allow ads to show on the site you're currently visiting, click the AdBlock toolbar icon to open the AdBlock menu. Under **Pause on this site**, select **Once** to temporarily pause AdBlock on that site or **Always** to add the site to your allowlist.

When paused once, AdBlock will automatically start blocking ads again when you leave the site. If paused always, the site will be added to your allowlist ensuring that ads will continue to show every time you visit the site.

To start blocking ads on a site again, click the AdBlock toolbar icon and select **Unpause AdBlock**. You can also manually remove the site from your allowlist:

1. Click the AdBlock toolbar icon and select the **gear symbol**.
2. On the Customize tab next to "Manually edit your filters," click **Edit**.
3. Delete any line containing the name of the website.
4. Click **Save**.
5. Go back to the page you were viewing and reload it.

Source:        https://help.getadblock.com/support/solutions/articles/6000055743-how-to-disable-adblock-on-specific-sites

**E.    The Use of a VPN Does Not Prevent Data Transmissions to Google**

71.    Paragraphs 52-54 of the Zervas Report offer the use of a VPN as a method of masking an IP address used by the Chrome browser when communicating with a Google server.

72. The Zervas Report provides no statistics on how common the use of VPNs is among Chrome users.

73. Even when a user is using a VPN, the Chrome browser will send User-Agent headers, cookie values, URL parameters, X-Client-Data headers, browsing history information, and the content of user communications on non-Google websites to Google. However, the Zervas Report is silent on this.

74. The Zervas Report is also silent on the fact that some Web sites, for security reasons, block access if they determine a user is using a VPN.

75. One such Web site is Hulu which rejects login attempts from a Chrome browser using a VPN as shown in the following screen shot:



Source: https://hulu.com/welcome

76. Other Web sites, such as Disney Plus, silently fail when the Chrome browser is used with a VPN as the following screen shot shows with a blank login page at Disney Plus:



Source: https://disneyplus.com/en-gb/login

## IV.   THE CHEN REPORT'S CONCLUSIONS ABOUT TRANSMISSIONS FROM CHROME TO GOOGLE, AS COMPARED TO OTHER BROWSERS, IS INCORRECT AND BASED ON A FLAWED METHODOLOGY

77.     The Chen Report states the following opinion in Paragraph 10a:

"The way that Chrome operates is typical of other browsers with respect to the issues relevant to this case. Chrome responds to third-party scripts in the same way that other popular browsers do. Thus, there is nothing unique about how Google designed Chrome that affects the data collection and processes at issue here."

78.     This conclusion is misleading and incorrect.

79.     According to Paragraph 63 of the Chen Report, browser settings were "adjusted" to "allow all cookies" before testing was done with the Firefox and Edge browsers.

80.     These "adjustments" made for purposes of the Chen Report are what caused the Firefox and Edge browsers to send third-party cookies in a manner similar to Chrome. *See e.g.* Chen Tr. at 147:9-13 (**Q.** Okay. And why did you turn enhanced tracking protection on Firefox

off? **A.** Because I want my experiments to compare what data was transmitted when nothing was blocked, all third-party cookies can possibly be passed."); *Id.* at 147:22-25 (regarding Edge).

81.     Had the Chen Report not made "adjustments" to the Firefox and Edge browser settings, the Firefox and Edge browsers would not have responded to the Google-supplied scripts in the same manner as the Chrome browser.

82.     Therefore, the Chrome browser, in it is default configuration, makes transmissions to Google servers that would not occur with Firefox and Edge in their respective default configurations.

83.     Unlike the Chrome browser, the Firefox and Edge browsers also do not send the X-Client-Data header in HTTP requests to specific Google servers.

84.     The Firefox browser offers a feature called Enhanced Tracking Protection which "blocks many of these trackers" as shown in the following screen shot from Firefox settings:



Source: Firefox browser settings

85.    In the latest version of Firefox, "Standard" blocking is ***turned on by default*** with Enhanced Tracking Protection.

86.     However, Exhibit 1 to the Chen Report makes clear that the "adjustments" to Firefox go beyond just turning on all cookies, but also ***turning off all tracking protections*** including making sure "enhanced tracking protection" is turned "'Off' for each website".

87.     The Chen Report also ignores that the Chrome browser does not have an equivalent feature to Firefox's enhanced tracking protection.

88.     It is my opinion that the "adjustments" to the Firefox browser settings makes the Chen Firefox tests flawed and any conclusions or opinions drawn from them are equally flawed and unreliable.

89.     The Edge browser also contains a Tracking prevention feature which is described in Edge settings as follows:



Source: Edge browser settings

90.     As shown above, "Balanced" is the default setting.

91.     The Chen Report does not state whether she "adjusted" the Edge Tracking prevention settings for the Edge tests but Exhibit 1 indicates she "Toggle[d] "Block third-party cookies" off".

92.     The Chen Report did not test Apple's Safari browser, but it also has a tracking protection feature called "Intelligent Tracking Prevention" (ITP).

93.     The Safari ITP feature is described in a Nov. 2019 Apple White Paper as follows:

## Protection from cross-site tracking

In the years since the web was created, technology has been developed to track user behavior across websites for advertising purposes. Users experience this tracking in action when they look at a product online and then ads for that product seem to follow them around the web. Tracking is pervasive; some websites include 100 or more trackers from different companies on a single page.

Because tracking uses web technology that also provides features required for the proper operation of websites, simply blocking all of the functionality used for tracking can cause issues, including not being able to save sign-in information or remember items in a shopping cart.

In iOS 11 and macOS High Sierra, Safari added a feature called Intelligent Tracking Prevention to address this problem. The goal of ITP is to limit tracking while still enabling websites to function normally. ITP works by learning which domains are used to track a user and then immediately isolating and purging the tracking data that they attempt to store on the user's device. The process of learning about domains uses machine learning and happens on device, so it doesn't share the user's browsing history information with Apple. This on-device approach applies the same high standard to every website that is visited. And because ITP is turned on by default, there is no need to change anything in Settings or Safari preferences to receive tracking protection.

Source: https://www.apple.com/safari/docs/Safari_White_Paper_Nov_2019.pdf

94.     The browser comparison methodology used for the Chen Report is also fundamentally flawed for three additional reasons.

    a.  The Chen Report used the Chrome Developer tools (created by Google) for her report rather than Fiddler. Unlike Fiddler, the Chrome Developer tools do not capture all data transmissions that are sent to Google.

    b.  The Chen Report did not gather data until well after the Chrome browser had been opened and communications had started.

c.   The Chen Report cleared all data from the browser before each test, rendering the process not a valid test of real-world conditions, which both Dr. Chen and Dr. Zervas acknowledged based on the fact that neither of them typically clear their information before using a browser.

## V.   CHROME DEVELOPMENT TOOLS ARE NOT A RELIABLE METHOD OF CAPTURING NETWORK TRAFFIC FROM THE CHROME BROWSER

95.     Both the Zervas Report and Chen Report state that the Chrome Developer Tools were used to capture network traffic to and from the Chrome Browser and Web servers including Google servers.  See paragraph 29 of the Zervas Report and paragraph 65 of the Chen Report. This is an issue because both reports reflect many fewer transmissions to Google sites.

My analysis has revealed that the Chrome Developer Tools do not capture all transmissions.  Thus the conclusions of both reports on this point are incorrect.

96.     In my testing of the Chrome Developer Tools, I found that Chrome Developer Tools do not include all HTTP requests and responses made by the Chrome browser.

97.     In particular, the Chrome Browser does not put the following kinds of HTTP requests and responses in a HAR file:

a.   HTTP requests and responses related to Chrome Sync

b.   HTTP requests and responses for the Chrome Omnibox

c.   A percentage of HTTP requests and responses for unknown reasons

98.     In addition, I found no method of using the Chrome Developer Tools to record the start-up process of the Chrome browser which makes HTTP requests to Google servers.

99.     In addition, I found that the HAR files include entries for cached files which do not result in actual network requests.

100.    The Fiddler debugging tool has none of these same limitations as the Chrome Developer Tools.  The Fiddler tool begins recording transmissions immediately upon start up.

101.    To illustrate the limitations of the Chrome Developer Tools, I recorded a Chrome session with both the Chrome Developer Tools (in Chrome-Sync-On-and-Off.har) and Fiddler (in Chrome-Sync-On-and-Off.saz) at the same time.

102.    The following are examples of HTTP requests from the Chrome browser to Google servers which Fiddler was able to capture, but the Chrome Developer Tools were not:

Request #1720

GET
https://ade.googlesyndication.com/ddm/activity/dc_oe=ChMI6MGlhNv69QIV
UKafCh0Slgm_EAAYACCllLNKQhMI3Oiog9v69QIVDwpoCB2nhQER;met
=1;&timestamp=1644687712058;eid1=2;ecn1=0;etm1=13; HTTP/1.1
Host: ade.googlesyndication.com
Connection: keep-alive
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="98", "Google
Chrome";v="98"
Cache-Control: max-age=0
sec-ch-ua-mobile: ?0
User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64)
AppleWebKit/537.36 (KHTML, like Gecko) Chrome/98.0.4758.82
Safari/537.36
sec-ch-ua-platform: "Windows"
Accept: */*
X-Client-Data:
CKy1yQEIkbbJAQimtskBCMS2yQEIqZ3KAQie+csBCOeEzAEI04/MAQjCl8
wB
Sec-Fetch-Site: same-site
Sec-Fetch-Mode: no-cors
Sec-Fetch-Dest: empty
Referer:
https://74ea71965d02ba4f930f5dcccff2f917.safeframe.googlesyndication.com/
Accept-Encoding: gzip, deflate, br
Accept-Language: en-US,en;q=0.9


Request #158

POST https://clients4.google.com/chrome-
sync/command/?client=Google+Chrome&client_id=p9zUlOK5fvuwDZEIHFn
5dA%3D%3D HTTP/1.1
Host: clients4.google.com
Connection: keep-alive
Content-Length: 742
Pragma: no-cache
Cache-Control: no-cache

Authorization: Bearer
ya29.A0ARrdaM_3IusLSHv1pRgEPYhu4ZCGDdjhb82EpkMDK3YyvNCDn4
nnXuwHPPruIMDaQhhYIAssl7lk3OzrlHQYM5gwXgjhGgiJFQyvuDjjmV1Cs
f_UsxcMSFf3OcX1fWJrBPOYYOeFqVu_5o6fpgJnj-CMuQZapTzbGPs-
KTjTlMLqezA5Dex_Pq0sKfqmpqafsjr57LQ1Kx7pkq-
m0jDwQ7jQgUygodmpvU1ahjaDAYL3JxSp7mIEluGR0mvExTg3F8m5jiw
User-Agent: Chrome WIN 98.0.4758.82
(7f0488e8ba0d8e019187c6325a16c29d9b7f4989-refs/branch-
heads/4758@{#972}) channel(stable)
Content-Type: application/octet-stream
X-Client-Data:
CKy1yQEIkbbJAQimtskBCMS2yQEIqZ3KAQi0gcsBCOryywEInvnLAQjnh
MwBCNOPzAEImpHMAQjCl8wBCOKXzAEI5pfMAQ==
Sec-Fetch-Site: none
Sec-Fetch-Mode: no-cors
Sec-Fetch-Dest: empty
Accept-Encoding: gzip, deflate, br
Accept-Language: en-US,en;q=0.9


Request #4272


GET https://accounts.google.com/Logout HTTP/1.1
Host: accounts.google.com
Connection: keep-alive
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="98", "Google
Chrome";v="98"
sec-ch-ua-mobile: ?0
sec-ch-ua-platform: "Windows"
Upgrade-Insecure-Requests: 1
User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64)
AppleWebKit/537.36 (KHTML, like Gecko) Chrome/98.0.4758.82
Safari/537.36
Accept:
text/html,application/xhtml+xml,application/xml;q=0.9,image/avif,image/webp
,image/apng,*/*;q=0.8,application/signed-exchange;v=b3;q=0.9
X-Chrome-ID-Consistency-Request:
version=1,client_id=77185425430.apps.googleusercontent.com,device_id=b0e
8eb3a-3302-4885-a048-
44a10add4811,sync_account_id=106136058950774396990,signin_mode=all_a
ccounts,signout_mode=show_confirmation
X-Client-Data:
CKy1yQEIkbbJAQimtskBCMS2yQEIqZ3KAQi0gcsBCOryywEInvnLAQjnh
MwBCNOPzAEImpHMAQjCl8wBCOKXzAEI5pfMAQ==
Sec-Fetch-Site: none
Sec-Fetch-Mode: navigate
Sec-Fetch-User: ?1

Sec-Fetch-Dest: document
Accept-Encoding: gzip, deflate, br
Accept-Language: en-US,en;q=0.9
Cookie:
ACCOUNT_CHOOSER=AFx_qI6J2fb6jS2i_EjwzVt0wCPQ0ZE81AV2rVuT
2BjSj9xIKuB0Ec0TKgTVN-
HqesT570l4RqciAHrQRJU6_P7WD8O1jcEJKhAbv7iCNVIJdZkhySxunQbpfi
BjC64MGgnfW-NT4LzQGFlHxUeA7pG3UVeomNIrtw;
SEARCH_SAMESITE=CgQI2JQB; SID=HAiwiKOOOZO2j6qy-P4-
2KfYGpZvuRdM_ZNnBVp3R5Rm_tabsQd6c-jHiI7ctYF5gWizmA.;
__Secure-1PSID=HAiwiKOOOZO2j6qy-P4-
2KfYGpZvuRdM_ZNnBVp3R5Rm_tabUUThzmTaGy8zr_wqez-JiQ.;
__Secure-3PSID=HAiwiKOOOZO2j6qy-P4-
2KfYGpZvuRdM_ZNnBVp3R5Rm_tabdICuGnVw2MzvRqZGU6hznQ.;
HSID=ABPDcJt-op2e4FiA8; SSID=AAisyX-XogFJIS3hj;
APISID=KBYyyBq9cy0ruVwQ/A-4m4vj3lWaUhpPce;
SAPISID=fWpqo4BI_taqDUB4/A9hRVD5f3dw3i-c24; __Secure-
1PAPISID=fWpqo4BI_taqDUB4/A9hRVD5f3dw3i-c24; __Secure-
3PAPISID=fWpqo4BI_taqDUB4/A9hRVD5f3dw3i-c24;
NID=511=t4uL_6csGN9lRnucckHNQupPTik_uXqGt_tkikVX1xhtIk1CShNsG
wZqfSD4m6FhoFhYYIfFbNDowLIDcLpyVhTJpW9gk-
_XyRcNAuGHidUcFR9hSQK9GNK2r7VxZJoswtl7CYr7Aji_VXocN_zvjIogJ
rwsEckq7xsWtnFqwS0lRQSyjW5vo4XFbNM0Gn0v615ff1OhhZHmq6ke29C
wU5yPchCo2-YlJvtLmIxSr0kkrs55uao; 1P_JAR=2022-02-12-17;
LSID=o.chat.google.com|o.mail.google.com|s.youtube:HAiwiHIRXxOqTlDHs
E_y_rnh1Bu1RVMPhNnzNUT1Y5cHaSiO003n__TxzSkMDh7uaw90Bw.;
__Host-
1PLSID=o.chat.google.com|o.mail.google.com|s.youtube:HAiwiHIRXxOqTlD
HsE_y_rnh1Bu1RVMPhNnzNUT1Y5cHaSiOhByro7_MZRlupnVlwr7bCw.;
__Host-
3PLSID=o.chat.google.com|o.mail.google.com|s.youtube:HAiwiHIRXxOqTlD
HsE_y_rnh1Bu1RVMPhNnzNUT1Y5cHaSiOVOUUDfu80hpEwWzet8L2vQ.;
__Host-GAPS=1:T37I49ZdKm-M-
A3AcutGdGPVfuyCGakt4wQ_TSp2AvQDiMYyQsQ2r5870LZH3V83k_OIC
S6XUiTIoFnSDjLNg42Zd7O3qQ:HxoJSGxAlZFnuFu-;
SIDCC=AJi4QfFGHO2Z3Me4jqJbuW_hXV71rR00rSpJOjeM76naM8zo7iDx
9wtiD03Fx85gJzgCVGSJ; __Secure-3PSIDCC=AJi4QfG-
zw79gT7ZnNaYZuSjyYrVYt8jdmiw-
J_T3dWAJTD0vRE4kJf28q0ggMa2gwnXpUs2LQ

Request #4303

GET
https://googleads.g.doubleclick.net/pagead/drt/so?r=4353139998551929972
HTTP/1.1
Host: googleads.g.doubleclick.net

Connection: keep-alive
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="98", "Google Chrome";v="98"
sec-ch-ua-mobile: ?0
User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/98.0.4758.82 Safari/537.36
sec-ch-ua-platform: "Windows"
Accept: image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
X-Client-Data: CKy1yQEIkbbJAQimtskBCMS2yQEIqZ3KAQi0gcsBCOryywEInvnLAQjnhMwBCNOPzAEImpHMAQjCl8wBCOKXzAEI5pfMAQ==
Sec-Fetch-Site: cross-site
Sec-Fetch-Mode: no-cors
Sec-Fetch-Dest: image
Referer: https://accounts.google.com/
Accept-Encoding: gzip, deflate, br
Accept-Language: en-US,en;q=0.9
Cookie: IDE=AHWqTUnT2-sOK5C6nz7QgrUWT4Iq1vsdTBM4j4PiKp9j7fEzSMUu-b3un5reuVfpqqo


Request #22

POST
https://update.googleapis.com/service/update2/json?cup2key=11:Dajro3s7Q2aPjg9FSef_q30jmczpFda-rXmqC4Atxeg&cup2hreq=9705ae1d1d391e4d90ea1f32dc8560a1d90f58c021ffcb208443e69000765a98 HTTP/1.1
Host: update.googleapis.com
Connection: keep-alive
Content-Length: 2768
X-Goog-Update-AppId:
aapocclcgogkmnckokdopfmhonfmgoek,aohghmighlieiainnegkcijnfilokake,apdfllckaahabafndbhieahigkjlhalf,blpcfgokakmgnkcojhhkbfbldkacnbeo,felcaaldnbdncclmgdcncolpebgiejap,ghbmnnjooekpmoecnnnilnnbdlolhkhi,nmmhkkegccagdldgiimedpiccmgmieda,pjkljhegncpnkpknbcohdijeoejaedia
X-Goog-Update-Interactivity: bg
X-Goog-Update-Updater: chromecrx-98.0.4758.82
Content-Type: application/json
Sec-Fetch-Site: none
Sec-Fetch-Mode: no-cors
Sec-Fetch-Dest: empty
User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/98.0.4758.82 Safari/537.36
Accept-Encoding: gzip, deflate, br

Accept-Language: en-US,en;q=0.9

Request #78

GET https://www.google.com/complete/search?client=chrome-omni&gs_ri=chrome-ext-ansg&xssi=t&q=dev+tools&oit=4&cp=9&pgcl=7&gs_rn=42&psi=1LDQzL6ab3abVVSB&sugkey=AIzaSyBOti4mM-6x9WDnZIjIeyEU21OpBXqWBgw HTTP/1.1
Host: www.google.com
Connection: keep-alive
X-Client-Data: CKy1yQEIkbbJAQimtskBCMS2yQEIqZ3KAQi0gcsBCOryywEInvnLAQjnhMwBCNOPzAEImpHMAQjCl8wBCOKXzAEI5pfMAQ==
Sec-Fetch-Site: none
Sec-Fetch-Mode: no-cors
Sec-Fetch-Dest: empty
User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/98.0.4758.82 Safari/537.36
Accept-Encoding: gzip, deflate, br
Accept-Language: en-US,en;q=0.9
Cookie: __Secure-3PSID=HAiwiKOOOZO2j6qy-P4-2KfYGpZvuRdM_ZNnBVp3R5Rm_tabdICuGnVw2MzvRqZGU6hznQ.; __Secure-3PAPISID=fWpqo4BI_taqDUB4/A9hRVD5f3dw3i-c24; NID=511=t4uL_6csGN9lRnucckHNQupPTik_uXqGt_tkikVX1xhtIk1CShNsGwZqfSD4m6FhoFhYYIfFbNDowLIDcLpyVhTJpW9gk-_XyRcNAuGHidUcFR9hSQK9GNK2r7VxZJoswtl7CYr7Aji_VXocN_zvjIogJrwsEckq7xsWtnFqwS0lRQSyjW5vo4XFbNM0Gn0v615ff1OhhZHmq6ke29CwU5yPchCo2-YlJvtLmIxSr0kkrs55uao; 1P_JAR=2022-02-12-17; __Secure-3PSIDCC=AJi4QfGwdgz_AsABIHyjl2Wqach8105XtG4IiwbFl_JZr2fKuB05mOIU5O5RabxSetzi_Uw2Fw

Source: Chrome-Sync-On-and-Off.saz

103.   It is not possible to say after the fact with any certainty what all of the HTTP requests were not recorded in the Zervas and Chen HAR files by the Chrome Developer Tools.

## VI.   BLOCKING METHODS PROPOSED IN THE BERSTON DECLARATION WILL NOT STOP ALL DATA TRANSMISSIONS TO GOOGLE AND WILL CAUSE WEB SITES TO FAIL

104.   Glenn Berntson, the Engineering Director and a Lead of the Google Ad Manager team at Google, provided a declaration in this case which I was asked to review.

105.    The Berntson Declaration offers up many of the same blocking methods as the Zervas Report which he claims will block data transmissions from the Chrome browser to Google servers.

106.    These same claimed blocking methods are:

    a.  Cookie blocking

    b.  Disabling JavaScript

    c.  Google Analytics Chrome opt-out extension

    d.  AdBlock Chrome extension

    e.  Guest and Incognito modes

    f.  VPN

107.    I have covered these claimed blocking methods above in my analysis of the Zervas Report and that analysis applies also to the Bernston Declaration.  That is, the Berntson Declaration is in error to the extent it makes these assertions.

108.    The Bernston Declaration also offers the following additional blocking methods:

    a.  Enabling "clear cookies and site data when you close all windows" in Chrome settings

    b.  Opting Out of Personalized Ads (for users not signed into a Google Account)

    c.  Interest-Based Ads (IBA) Opt-out Add-on

    d.  The Network Advertising Initiative's ("NAI's") Opt-Out page

    e.  Turning off Ad Personalization

    f.  Using a firewall

    g.  Using a standalone ad blocker program

### A.    The "Clear Cookies and Site Data" Option Does Not Stop Transmissions

109.    Paragraph 19(c) of the Bernston Declaration suggests that, if a user enables the "clear cookies and site data when you close all windows" option of the Chrome browser, then enabled "Google Ad Manager will not receive any cookies set in a prior session".

110.    This description of the "clear cookies and site data when you close all windows" option is incomplete and misleading.

111.    The option does not affect the transmission of a new cookie values, IP address, and X-Client-Data headers in a new Chrome session.

112.    The Bernston Declaration is also silent about what happens with the restoration and/or correlation of Google cookies when a user logs into their Google account in both a prior session and a new session in the Chrome browser

**B.    "Opting Out of Personalized Ads" Relies on Cookies and Does Not Stop All Transmissions**

113.    Paragraph 19(f) of the Bernston Declaration offers up the option of Opting out of Personalized Ads in the Chrome browser.  A user does this opting-out on the Web page at the URL https://adssettings.google.com/whythisad as shown in paragraph 19(f).

114.    The Web page allows users to opt out both of Google search ads and Web ads by selecting the appropriate tab.

115.    The Web page also has a tab for YouTube, but the tab has no opt-out option.

116.    The following screen shots show the three tabs in their default state:





Source: https://adssettings.google.com/anonymous?hl=en

117.    The following screen shot shows ad personalization being turned off:



Source: https://adssettings.google.com/anonymous?hl=en&tb=web

118.    However, with ad personalization turned off, data transmissions with unique cookie values continue to be sent from the Chrome browser to Google servers.

119.    For example, with ad personalization turned off, the value of the Google Analytic _ga cookie is sent to a doubeclick.net server as the URL parameter ga_vid is shown below in the following HTTP GET request:

Request #3891

GET
https://securepubads.g.doubleclick.net/gampad/ads?gdfp_req=1&pvsid=4099953460911827&correlator=3262105034908821&output=ldjh&impl=fifs&adsid=ChAIgMaIkAYQnZOH2K2Vx4NfEhoAlsWo0250-IIabSVjtw4cSraVsaT4PH7RNQ&jar=2022-02-08-16&eid=31064681&vrg=2022020301&ptt=17&gdpr_consent=CPZqbKwPZqbKwEXABAENBgCwAP_AAH_AACiQGggBIAJEQABAIAAEAIAEAAAAQBgAAEAgAAAAAAAAAABAgAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAACAAAAAAAAAAAEAAAAAAAAAAgAAAAIAAAAAgXmAAAAkQAAEAAAAAAAAQAAABAEAAAAAAAAAAAAAAAAECAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAACAA.YAAAAAAAAAA&gdpr=0&us_privacy=1YNY&sc=1&sfv=1-0-

38&ecs=20220527&iu_parts=8013%2Cmercurynews.com%2Cbusiness%2CO
utstream_Video&enc_prev_ius=%2F0%2F1%2F2%2F3&prev_iu_szs=480x36
0&prev_scp=POS%3DOutstream_Video%26zeus_rendercount%3D1%26zeus_
slot%3Dzeus_Outstream_Video.init.dsk&eri=1&cust_params=zeus%3Dapplie
d%26zeus_8013%3Dwww.mercurynews.com%26kv%3Dbusiness%252Ccoron
avirus%252Ccoronavirus-tips%252Cpm-report%252Cqa%252Clouis-
hansen%26page%3Darticle%26content%3D%26RPN%3D333703734067%26r
url%3D%26articleid%3D7158259%26blueconic%3Dnon-
subscribers%26zeus_insights%3Dcmg%252Cios%252Cihp%252Cdpr%252Cq
8t%252Cwug%252C3bu%252Ckh5%252Cec4%252Cphj%252Caw9%252Ctbj
%252Cki0%252Cv3s%252Cuib%252Cpgg%252Cbs0%26title%3DMental-
health-tips-for-handlin%26full_title%3DMental-health-tips-for-handling-the-
pandemic&cookie_enabled=1&bc=31&abxe=1&dt=1653667908843&lmt=165
3667908&dlt=1653667853786&idt=3695&frm=20&biw=1075&bih=495&oid
=2&adxs=371&adys=1732&adks=1286466235&ucis=4&ifi=5&u_his=7&u_h
=1440&u_w=2560&u_ah=1400&u_aw=2560&u_cd=24&u_sd=1.5&u_tz=-
240&flash=0&dmc=8&url=https%3A%2F%2Fwww.mercurynews.com%2F20
20%2F05%2F24%2Fqa-mental-health-tips-for-handling-the-
pandemic%2F&vis=1&scr_x=0&scr_y=1061&psz=609x0&msz=1x0&psts=A
Gkb-
H814S525aAu3potkuMCyb8sYizBsMsBz5lCNKNNBeNZwuU0pgRwrODoX
BNLvYatYUmjuvX1btcs8PY0pEcYCZIemw%2CAGkb-
H9Vcdgbs4cJUR_V0wNoMVBpxKrMgBOsEa7X7yQErIM-
3VjEhK7YqIlog5aviSKPjnvjFXoRiWrXtZd78Vvu39eXGw%2CAGkb-H-
MUIiGw6N6Ayd2Pt1hNalxQLe440j9YLW76izy6isCQodVZz7zMsUxRfzZvZ
InjJtNfdy6I9vPlZhVP2fLNMNQIg&ga_vid=504353525.1653667771&ga_sid=
1653667861&ga_hid=214099166&ga_fc=true&fws=0&ohw=0&btvi=1&uach
=WyJXaW5kb3dzIiwiMTAuMC4wIiwieDg2IiwiIiwiOTguMC40NzU4LjgyIix
bXSxudWxsLG51bGwsIjY0Iixb WyIgTm90IEE7QnJhbmQiLCI5OS4wLjAuM
CJdLFsiQ2hyb21pdW0iLCI5OC4wLjQ3NTguODIiXSxbIkdvb2dsZSBDaHJv
bWUiLCI5OC4wLjQ3NTguODIiXV1d&a3p=Eh4KDmVzcC5jcml0ZW8uY2
9tEgAY0KCkspAwRQAAAAA%3D&nvt=3 HTTP/1.1
Host: securepubads.g.doubleclick.net
Connection: keep-alive
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="98", "Google
Chrome";v="98"
sec-ch-ua-mobile: ?0
User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64)
AppleWebKit/537.36 (KHTML, like Gecko) Chrome/98.0.4758.82
Safari/537.36
sec-ch-ua-platform: "Windows"
Accept: */*
Origin: https://www.mercurynews.com
X-Client-Data:
CKy1yQEIkbbJAQimtskBCMS2yQEIqZ3KAQie+csBCOeEzAEIwpfMAQ==
Sec-Fetch-Site: cross-site

```
Sec-Fetch-Mode: cors
Sec-Fetch-Dest: empty
Referer: https://www.mercurynews.com/
Accept-Encoding: gzip, deflate, br
Accept-Language: en-US,en;q=0.9
Cookie: id=OPT_OUT


Source: google-ad-settings.saz
```

120.     This same _ga cookie value was previously sent to the same doubleclick.net server

before opting-out of Google ad personalization as shown in the following HTTP GET request:

Request #379

GET
https://securepubads.g.doubleclick.net/gampad/ads?gdfp_req=1&pvsid=365900
5191221823&correlator=2749793251569343&output=ldjh&impl=fifs&vrg=20
22020301&ptt=17&gdpr_consent=CPZqa1lPZqa1lEXABAENBgCwAAFAA
H_AACiQGggBIAJEQABAIAAEAIAEAAAAQBAAAEAgAAAAAAAAA
AABAgAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAA
AAAAAAAAAAAAAACAAAAAAAAAAAAAAAAAAAAAAAAAAAAgA
AAAAIAAAAAgXmAAAAkQAAEAAAAAAAQAAABAEAAAAAAA
AAAAAAAAAAAECAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAA
AAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAA
AAAAAACAA.YAAAAAAAAAAA&gdpr=0&us_privacy=1Y-
Y&npa=1&sc=1&sfv=1-0-
38&ecs=20220527&iu_parts=8013%2Cmercurynews.com%2Cbusiness%2CC
ube1_RRail_ATF&enc_prev_ius=%2F0%2F1%2F2%2F3&prev_iu_szs=300x2
50%7C300x600%7C300x1050%7C160x600&prev_scp=POS%3DCube1_RRai
l_ATF%26zeus_rendercount%3D1%26zeus_slot%3Dzeus_Cube1_RRail_ATF
.init.dsk%26amznbid%3Dxz9csg%26amznp%3D1oynv9c%26amzniid%3DIuE
Yw-hFZcy8Yfb4m2bEGxEAAAF-
2hVARQEAAA0_ARuPb80%26amznsz%3D300x250%26crt_pb%3D0.31%26
crt_bidid%3Dmnimkd%26zeus_appnexus%3D12%26zeus_auctionid_appnexus
%3D8275784190156156546&eri=1&cust_params=zeus%3Dapplied%26zeus_
8013%3Dwww.mercurynews.com%26kv%3Dbusiness%252Ccoronavirus%25
2Ccoronavirus-tips%252Cpm-report%252Cqa%252Clouis-
hansen%26page%3Darticle%26content%3D%26RPN%3D333703734067%26r
url%3D%26articleid%3D7158259%26zeus_insights%3Dcmg%252Cios%252C
ihp%252Cdpr%252Cq8t%252Cwug%252C3bu%252Ckh5%252Cec4%252Cph
j%252Caw9%252Ctbj%252Cki0%252Cv3s%252Cuib%252Cpgg%252Cbs0&
bc=31&abxe=1&dt=1653667773396&lmt=1653667773&dlt=1653667763916
&idt=4243&frm=20&biw=1075&bih=495&oid=2&adxs=909&adys=746&adk
s=3094759181&ucis=4&ifi=4&u_his=2&u_h=1440&u_w=2560&u_ah=1400

```
&u_aw=2560&u_cd=24&u_sd=1.5&u_tz=-
240&flash=0&dmc=8&url=https%3A%2F%2Fwww.mercurynews.com%2F20
20%2F05%2F24%2Fqa-mental-health-tips-for-handling-the-
pandemic%2F&vis=1&scr_x=0&scr_y=100&psz=310x600&msz=1x0&psts=A
Gkb-H9awlplzm3R5rYar7qljqzk%2CAGkb-H-
L8kvTgXxqjkPz1ppxHq3VQiEf08As6EuvB8ZhmZLLnOESIEVRoAkY5Et4U
R2CFV0f4z8vCvCebXsy6jn-0oJlUQ%2CAGkb-
H_nA29_9odEWIXLLupGl3OOKoxrMw6Nto7oQTKh5kQ88NRl1em-
6lf5Hb63YfSN9q30k31TxZr2CUCLCA&ga_vid=504353525.1653667771&ga
_sid=1653667771&ga_hid=279644202&ga_fc=true&fws=0&ohw=0&btvi=1&
uach=WyJXaW5kb3dzIiwiMTAuMC4wIiwieDg2IiwiIiwiOTguMC40NzU4Lj
gyIixbXSxudWxsLG51bGwsIjY0IixbWyIgTm90IEE7QnJhbmQiLCI5OS4wLj
AuMCJdLFsiQ2hyb21pdW0iLCI5OC4wLjQ3NTguODIiXSxbIkdvb2dsZSBD
aHJvbWUiLCI5OC4wLjQ3NTguODIiXV1d&nvt=1 HTTP/1.1
Host: securepubads.g.doubleclick.net
Connection: keep-alive
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="98", "Google
Chrome";v="98"
sec-ch-ua-mobile: ?0
User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64)
AppleWebKit/537.36 (KHTML, like Gecko) Chrome/98.0.4758.82
Safari/537.36
sec-ch-ua-platform: "Windows"
Accept: */*
Origin: https://www.mercurynews.com
X-Client-Data:
CKy1yQEIkbbJAQimtskBCMS2yQEIqZ3KAQie+csBCOeEzAEIwpfMAQ==
Sec-Fetch-Site: cross-site
Sec-Fetch-Mode: cors
Sec-Fetch-Dest: empty
Referer: https://www.mercurynews.com/
Accept-Encoding: gzip, deflate, br
Accept-Language: en-US,en;q=0.9
Cookie:
IDE=AHWqTUnT3KnMsSyTpTsSuB8vmm1XUwwNud1XhhY41WzH_sT7T
WHaRUPt473y4_H4p44

Source: google-ad-settings.saz
```

121.    The opting-out process did delete the DoubleClick IDE cookie and replace it with

a "id=OPT_OUT" cookie, but the opting-out process had no effect on the _ga cookie value being

transmitted to Google's DoubleClick server.

122.    I also found that clearing cookies in the Chrome browser removed the search and Web ad personalization opt-outs as shown in the following screen shots:



Source: https://adssettings.google.com/anonymous?hl=en

123.    This problem with the Google ad personalization opt-outs being quietly cancelled when clearing cookies is due to a flawed implementation of the opt-outs relying on cookies.

### C.     The NAI Opt-Out Relies on Cookies and Does Not Stop All Transmissions

124.    Paragraph 22 of the Bernston Declaration offers up the Network Advertising Initiative's (NAI) Opt-Out as another option for opt-outing out of personalized advertising by Google.

125.    Paragraph 22 goes on to say that the NAI Opt-out page works in a similar manner to the Google's Ad personalization settings page.

126.    Indeed, the NAI Opt-out page suffers from the same problems as Google's Ad personalization settings page: it does not block _ga cookie values being sent to Google DoubleClick servers and an NAI opt-out is silently cancelled when cookies are cleared in the Chrome browser.

127.    The following HTTP Request from the Chrome browser shows the _ga cookie still being sent to a Google DoubleClick server as a ga_vid URL parameter after opting out at the NAI opt-out page:

Request #2662

GET
https://securepubads.g.doubleclick.net/gampad/ads?gdfp_req=1&pvsid=1121654988385397&correlator=3092637335625663&output=ldjh&impl=fifs&eid=31064671%2C44742767%2C21065724%2C21067496&vrg=2022020301&ptt=17&gdpr_consent=CPUGaVgPUGaVgEXABAENBgCwAP_AAH_AACiQGggBIAJEQABAIAAEAIAEAAAAQBgAAEAgAAAAAAAAAAAAABAgAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAACAAAAAAAAAAAAAEAAAAAAAAAAgAAAAIAAAAAgXmAAAAkQAAEAAAAAAAQAAABAEAAAAAAAAAAAAAAAAECAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAACAA.YAAAAAAAAAA&gdpr=0&us_privacy=1YNY&sc=1&sfv=1-0-38&ecs=20220208&iu_parts=8013%2Cmercurynews.com%2Cbusiness%2CSponsorship_1%2Cinterstitial%2Ctop_leaderboard&enc_prev_ius=%2F0%2F1%2F2%2F3%2C%2F0%2F1%2F2%2F4%2C%2F0%2F1%2F2%2F5&prev_iu_szs=300x50%2C1x1%2C728x90%7C970x90%7C970x250&prev_scp=POS%3DSponsorship_1%26zeus_rendercount%3D1%26zeus_slot%3Dzeus_Sponsorship_1.init.dsk%26amznbid%3D2%26amznp%3D2%7CPOS%3Dinterstitial%26zeus_rendercount%3D1%26zeus_slot%3Dzeus_interstitial.init.dsk%26amznbid%3D2%26amznp%3D2%7CPOS%3Dtop_leaderboard%26zeus_rendercount%3D1%26zeus_slot%3Dzeus_top_leaderboard.init.dsk%26amznbid%3D1ry1i4g%26amznp%3Dc4nbwg%26zeus_triplelift%3D17%26zeus_auctionid_triplel

ift%3Db42dc764-586c-467a-a381-
62708e1b5d8c%26zeus_ix%3D23%26zeus_auctionid_ix%3D6ffd6fc5-304c-
47e8-a860-
e246341c5c46%26zeus_appnexus%3D8%26zeus_auctionid_appnexus%3D255
1394848855483249%26amzniid%3DItB7XJm5iRELGQS_LxTag0QAAAF-
2gScqwEAAA0_AVlWbK4%26amznsz%3D970x250&eri=1&cust_params=ze
us%3Dapplied%26zeus_8013%3Dwww.mercurynews.com%26kv%3Dbusine
ss%252Ccoronavirus%252Ccoronavirus-tips%252Cpm-
report%252Cqa%252Clouis-
hansen%26page%3Darticle%26content%3D%26RPN%3D134150076883%26r
url%3D%26articleid%3D7158259%26blueconic%3Dnon-
subscribers%26zeus_insights%3Dcmg%252Cios%252Cihp%252Cdpr%252Cq
8t%252Cwug%252C3bu%252Ckh5%252Cec4%252Cphj%252Caw9%252Ctbj
%252Cki0%252Cv3s%252Cuib%252Cpgg%252Cbs0&cookie=ID%3De6bf79
89231f98d6%3AT%3D1644334941%3AS%3DALNI_MZ38_wsblkBzyeqXfP
p54Zh8KqzSw&bc=31&abxe=1&dt=1644335241675&lmt=1644335241&dlt=
1644335239963&idt=1049&frm=20&biw=1075&bih=479&oid=2&adxs=915
%2C10%2C537&adys=17%2C177%2C303&adks=3262223218%2C28568375
14%2C1841053995&ucis=1%7C2%7C3&ifi=1&u_his=8&u_h=1440&u_w=2
560&u_ah=1400&u_aw=2560&u_cd=24&u_sd=1.5&u_tz=-
300&flash=0&dmc=8&url=https%3A%2F%2Fwww.mercurynews.com%2F20
20%2F05%2F24%2Fqa-mental-health-tips-for-handling-the-
pandemic%2F&vis=1&scr_x=0&scr_y=0&psz=300x50%7C1x1%7C1055x250
&msz=1x0%7C1x0%7C1x0&ga_vid=302806176.1644334646&ga_sid=16443
35242&ga_hid=1965517170&ga_fc=true&fws=0%2C0%2C0&ohw=0%2C0%
2C0&btvi=0%7C0%7C0&uach=WyJXaW5kb3dzIiwiMTAuMC4wIiwieDg2Ii
wiIiwiOTguMC40NzU4LjgyIixbXSxudWxsLG51bGwsIjY0IixbWyIgTm90IE
E7QnJhbmQiLCI5OS4wLjAuMCJdLFsiQ2hyb21pdW0iLCI5OC4wLjQ3NTg
uODIiXSxbIkdvb2dsZSBDaHJvbWUiLCI5OC4wLjQ3NTguODIiXV1d&a3p
=Eh4KDmVzcC5jcml0ZW8uY29tEgAY0P7_z-0vRQAAAAA%3D&nvt=1
HTTP/1.1
Host: securepubads.g.doubleclick.net
Connection: keep-alive
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="98", "Google
Chrome";v="98"
sec-ch-ua-mobile: ?0
User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64)
AppleWebKit/537.36 (KHTML, like Gecko) Chrome/98.0.4758.82
Safari/537.36
sec-ch-ua-platform: "Windows"
Accept: */*
Origin: https://www.mercurynews.com
X-Client-Data:
CKy1yQEIkbbJAQimtskBCMS2yQEIqZ3KAQie+csBCOeEzAEIwpfMAQ==
Sec-Fetch-Site: cross-site
Sec-Fetch-Mode: cors

```
Sec-Fetch-Dest: empty
Referer: https://www.mercurynews.com/
Accept-Encoding: gzip, deflate, br
Accept-Language: en-US,en;q=0.9
Cookie: DSID=NO_DATA; id=OPT_OUT


Source: nai-opt-out.saz
```

128.    Also, when I first arrived at the NAI Opt-out page, it incorrectly claimed that I had third-party cookies blocked as shown in the following screen shot:



Source: https://adssettings.google.com/anonymous?hl=en

129.    In order to proceed, I had to refresh the opt-out page and the third-party cookie check passed on the second try.

130.    I do not know why this third-party cookie check failed, but apparently it is a known problem given the "Try Again" link in the information block.

**D.    The IBA Opt-out Relies on Cookies and Does Not Block All Transmissions**

131.    Paragraph 21 of the Bernston Declaration offers up the IBA Opt-out add-on for Chrome which also claims to set an opt-out cookie for personalizing ads.

132.    The description of this add-on in paragraph 21 includes the following acknowledgement that the cookie-based implementation of an opt-out is flawed: "Opt out remains in effect, even after you clear your browser's cookies."

133.    However, the IBA Opt-out add-on does not block the DoubleClick IDE cookie nor the ga_vid URL parameter as shown in the following HTTP request:

<div style="border:1px solid;">

Request #482

GET
https://securepubads.g.doubleclick.net/gampad/ads?gdfp_req=1&pvsid=741215074502840&correlator=2327752398965364&output=ldjh&impl=fifs&eid=44752541%2C31060032%2C21067496&vrg=2022020301&ptt=17&gdpr_consent=CPUKSc9PUKSc9EXABBENBgCwAP_AAH_AACiQGggBIAJEQABAIAAEAIAEAAAAQBgAAEAgAAAAAAAAAAABAgAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAACAAAAAAAAAAEAAAAAAAAAAgAAAAIAAAAAgXmAAAAkQAAEAAAAAAAQAAABAEAAAAAAAAAAAAAAAAAECAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAACAA.YAAAAAAAAAAA&gdpr=0&us_privacy=1YNY&npa=1&sc=1&sfv=1-0-38&ecs=20220209&iu_parts=8013%2Cmercurynews.com%2Cbusiness%2CSponsorship_1%2Cinterstitial%2Ctop_leaderboard&enc_prev_ius=%2F0%2F1%2F2%2F3%2C%2F0%2F1%2F2%2F4%2C%2F0%2F1%2F2%2F5&prev_iu_szs=300x50%2C1x1%2C728x90%7C970x90%7C970x250&prev_scp=POS%3DSponsorship_1%26zeus_rendercount%3D1%26zeus_slot%3Dzeus_Sponsorship_1.init.dsk%26amznbid%3D2%26amznp%3D2%7CPOS%3Dinterstitial%26zeus_rendercount%3D1%26zeus_slot%3Dzeus_interstitial.init.dsk%26amznbid%3D2%26amznp%3D2%7CPOS%3Dtop_leaderboard%26zeus_rendercount%3D1%26zeus_slot%3Dzeus_top_leaderboard.init.dsk%26amznbid%3Dtjfuo0%26amznp%3D1oynv9c%26amzniid%3DIp9Btsl42QUwD7FrHzfGW7IAAAF-4BNQVgEAAA0_AaS-Ynk%26amznsz%3D728x90%26zeus_ix%3D8%26zeus_auctionid_ix%3Da4c6b743-de05-426b-948f-62c726140444%26zeus_appnexus%3D10%26zeus_auctionid_appnexus%3D6484281640145076089&eri=1&cust_params=zeus%3Dapplied%26zeus_8013%3Dwww.mercurynews.com%26kv%3Dbusiness%252Ccoronavirus%252Ccoronavirus-tips%252Cpm-report%252Cqa%252Clouis-hansen%26page%3Darticle%26content%3D%26RPN%3D308143982419%26rurl%3D%26articleid%3D7158259%26zeus_insights%3Dcmg%252Cios%252Cihp%252Cdpr%252Cq8t%252Cwug%252C3bu%252Ckh5%252Cec4%252Cphj%252Caw9%252Ctbj%252Cki0%252Cv3s%252Cuib%252Cpgg%252Cbs0&cookie_enabled=1&bc=31&abxe=1&dt=1644436870167&lmt=1644436870&dlt

</div>

=1644436866606&idt=1966&frm=20&biw=1075&bih=479&oid=2&adxs=915%2C10%2C537&adys=17%2C177%2C303&adks=3262223218%2C28568375 14%2C1841053995&ucis=1%7C2%7C3&ifi=1&u_his=5&u_h=1440&u_w=2 560&u_ah=1400&u_aw=2560&u_cd=24&u_sd=1.5&u_tz=- 300&flash=0&dmc=8&url=https%3A%2F%2Fwww.mercurynews.com%2F20 20%2F05%2F24%2Fqa-mental-health-tips-for-handling-the- pandemic%2F&vis=1&scr_x=0&scr_y=0&psz=300x50%7C1x1%7C1055x250 &msz=1x0%7C1x0%7C1x0&ga_vid=1696932872.1644436869&ga_sid=1644 436870&ga_hid=709138822&ga_fc=true&fws=0%2C0%2C0&ohw=0%2C0% 2C0&btvi=0%7C0%7C0&uach=WyJXaW5kb3dzIiwiMTAuMC4wMiwieDY2Ii wiIiwiOTguMC40NzU4LjgyIixbXSLgySBSxudWxsLG51bGwsIjY0IixbWyIgTm90IE E7QnJhbmQiLCI5OS4wLjAuMCJdLCFsiQ2hyb21pdW0iLCI5OC4wLjQ3NTg uODIiXSxbIkdvb2dsZSBDaHJvbWUiLCI5OC4wLjQ3NTguODIiXV1d&nvt= 1 HTTP/1.1

Host: securepubads.g.doubleclick.net

Connection: keep-alive

sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="98", "Google Chrome";v="98"

sec-ch-ua-mobile: ?0

User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/98.0.4758.82 Safari/537.36

sec-ch-ua-platform: "Windows"

Accept: */*

Origin: https://www.mercurynews.com

X-Client-Data: CKy1yQEIkbbJAQimtskBCMS2yQEIqZ3KAQie+csBCOeEzAEIwpfMAQ==

Sec-Fetch-Site: cross-site

Sec-Fetch-Mode: cors

Sec-Fetch-Dest: empty

Referer: https://www.mercurynews.com/

Accept-Encoding: gzip, deflate, br

Accept-Language: en-US,en;q=0.9

Cookie: IDE=AHWqTUlVYinaocDn6FH1ktDFIzpeUTDhjpkR5t1Wu0Di2Ro_- tZe8tor9dAAZeCADBU

Source: IBA-Opt-Out.saz

134.    In  addition,  in  my  testing  of  the  IBA  Opt-out  add-on  with  Chrome  version Chrome/98.0.4758.82, no "id=OPT_OUT" cookie was ever sent to Google servers.

135.    The lack of the "id=OPT_OUT" cookie with the IBA Opt-out add-on is different behavior from the NAI Opt-out and Google ad personalization page which both set a "id=OPT_OUT" cookie.

**E.      Firewalls**

136.    Paragraph 29(b) of the Bernston Declaration offers up a firewall to block traffic going to Google Ad Manager domains.

137.    The Bernston Declaration does not provide a list of these Google Ad Manager domains, so it is difficult to understand how practical such a suggestion is and if it would work in the real world.

138.    Paragraph 29(b) also goes on to make the claim that a firewall can be used to strip out X-Client-Data headers from outgoing HTTP request.

139.    However, the Bernston Declaration does not explain how this would be done in an encrypted HTTPS request which presumably a firewall would not be able to decrypt.

**F.      Standalone ad block programs**

140.    Paragraph 29(c) of the Bernston Declaration offers up the use of standalone ad blocker programs and gives as examples of AdGuard and AdLock.

141.    The Bernston Declaration provides no testing evidence that these ad blockers or any ad blockers are 100% effective for blocking all data transmissions from the Chrome browser to Google servers.

142.    The Bernston Declaration is also silent how users are supposed to deal with Web sites which block access when they detect the use of an ad blocker in the Chrome browser as described previously.

**VII.   GOOGLE TRACKS BLOCKING METHODS**

143.    The Zervas Report and Bernston Declaration are also silent on the fact that many of the blocking methods suggested in the report and the declaration are tracked by Google using a variety of methods.

144.    Footnote 20 of the Zervas Report lists the Chrome Store URL for the Google Analytics Opt-Out add-on as https://chrome.google.com/webstore/detail/google-analytics-optout/fllaojicojecljbmefodhfapmkghcbnh.

145.    The string "fllaojicojecljbmefodhfapmkghcbnh" is the app identifier for the Google Analytics Opt-Out add-on.

146.    While installing the Google Analytics Opt-Out add-on at the Chrome Store, I found extensive tracking of my activities was being done by Google Analytics.

147.    For example:

---

Request #451

GET https://ssl.google-analytics.com/__utm.gif?utmwv=5.7.2&utms=31&utmn=556628315&utmhn=chrome.google.com&utmt=event&utme=5(Model*notLoggedIn)&utmcs=UTF-8&utmsr=2560x1440&utmvp=1076x495&utmsc=24-bit&utmul=en-us&utmje=0&utmfl=-&utmdt=Google%20Analytics%20Opt-out%20Add-on%20(by%20Google)%20-%20Chrome%20Web%20Store&utmhid=2077599275&utmr=-&utmp=%2Fwebstore%2Fdetail%2Fgoogle-analytics-opt-out%2Ffllaojicojecljbmefodhfapmkghcbnh&utmht=1644238428296&utmac=UA-4436568-7&utmni=1&utmcc=__utma%3D73091649.1885378348.1644238297.1644238297.1644238297.1%3B%2B__utmz%3D73091649.1644238297.1.1.utmcsr%3Dgoogle%7Cutmccn%3D(organic)%7Cutmcmd%3Dorganic%7Cutmctr%3D(not%2520provided)%3B&utmjid=&utmu=4AAAAAAAAAAAAAAAgAAgAAE~ HTTP/1.1
Host: ssl.google-analytics.com
Connection: keep-alive
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="98", "Google Chrome";v="98"
sec-ch-ua-mobile: ?0
User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/98.0.4758.82 Safari/537.36
sec-ch-ua-platform: "Windows"
Accept: image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
Sec-Fetch-Site: cross-site
Sec-Fetch-Mode: no-cors
Sec-Fetch-Dest: image
Referer: https://chrome.google.com/
Accept-Encoding: gzip, deflate, br
Accept-Language: en-US,en;q=0.9

Source: GA-OPT-OUT-INSTALLED-AB-ENABLED.saz

---

148.    This request to Google Analytics also indicated that I was not logged in at the time of doing the installation.

149.    After installing the Google Analytics Opt-Out add-on in the Chrome browser, I found that this application identifier is sent to a Google server in an HTTP request as part of the Chrome start-up process:

Request #546

POST
https://update.googleapis.com/service/update2/json?cup2key=11:i_wQ3TlCToOKTwZ aLdqZxBzSAuLhRqpw1scIaBA4glw&cup2hreq=40f4aed5f7beee3d0c975d53b944420 1d6da678141ba1dd3dd7c1b05c0194eb5 HTTP/1.1
Host: update.googleapis.com
Connection: keep-alive
Content-Length: 3283
X-Goog-Update-AppId:
aapocclcgogkmnckokdopfmhonfmgoek,aohghmighlieiainnegkcijnfilokake,apdfllckaah abafndbhieahigkjlhalf,blpcfgokakmgnkcojhhkbfbldkacnbeo,felcaaldnbdncclmgdcncolp ebgiejap,fllaojicojecljbmefodhfapmkghcbnh,ghbmnnjooekpmoecnnnilnnbdlolhkhi,gig hmmpiobklfepjocnamgkkbiglidom,nmmhkkegccagdldgiimedpiccmgmieda,pjkljhegncp nkpknbcohdijeoejaedia
X-Goog-Update-Interactivity: bg
X-Goog-Update-Updater: chromecrx-98.0.4758.82
Content-Type: application/json
Sec-Fetch-Site: none
Sec-Fetch-Mode: no-cors
Sec-Fetch-Dest: empty
User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/98.0.4758.82 Safari/537.36
Accept-Encoding: gzip, deflate, br
Accept-Language: en-US,en;q=0.9

Source: GA-OPT-OUT-INSTALLED-AB-ENABLED.saz

150.   If JavaScript is turned off and an attempt is made to log into Gmail, a login URL contains a parameter named "nojavascript=1" which by its name, indicates that JavaScript has been disabled as shown in the following HTTP request:

---

Request #94

GET
https://accounts.google.com/ServiceLogin?continue=https%3A%2F%2Fmail.google.com%2Fmail%2F&rip=1&nojavascript=1&ifkv=AU9NCcwW1T6TmUVOqVanxswEO8Lpes5QKKR3l0SgMhwnnYbPnDPYo5ookWVyyFt2zMW-I9ZvgswvPQ&service=mail HTTP/1.1
Host: accounts.google.com
Connection: keep-alive
Upgrade-Insecure-Requests: 1
User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/98.0.4758.82 Safari/537.36
Accept:
text/html,application/xhtml+xml,application/xml;q=0.9,image/avif,image/webp,image/apng,*/*;q=0.8,application/signed-exchange;v=b3;q=0.9
X-Chrome-ID-Consistency-Request:
version=1,client_id=77185425430.apps.googleusercontent.com,device_id=f7897313-f1a1-4021-b9f7-eba59b699b34,signin_mode=all_accounts,signout_mode=show_confirmation
X-Client-Data:
CKy1yQEIkbbJAQimtskBCMS2yQEIqZ3KAQi0gcsBCOryywEInvnLAQjnhMwBCJqRzAEIgZXMAQiwlcwBCMKXzAEI4pfMAQjml8wB
Sec-Fetch-Site: same-origin
Sec-Fetch-Mode: navigate
Sec-Fetch-Dest: document
Referer:
https://accounts.google.com/ServiceLogin?continue=https%3A%2F%2Fmail.google.com%2Fmail%2F&service=mail&sacu=1&rip=1
Accept-Encoding: gzip, deflate, br
Accept-Language: en-US,en;q=0.9
Cookie: 1P_JAR=2022-02-07-12;
NID=511=O87K1fSjht0mKwxmo8WkpzxriMGrpIlP7dnTSfshPfBbngCR0ENbxkH6onFzpBNdL2fXRrU8EE6z7YTyVylUsGpwDWUlrVijjQaNwqXPlNIN0Ihe1yHwG3Pw1I_uabqHYLI58yirXhkhHGxtR04ryaciBP5H9wvFTcy6AlnxXBI;   Host-GAPS=1:NCG94WAQMxvJ_rtals9N8bkYESL4:VTxZO9wYB71xacFj

Source: NoJS.saz

---

151.   Even with JavaScript being disabled, the above HTTP request includes Google cookies and X-Client-Data header.

152.   In a similar manner, cookies being disabled during a Gmail login attempt are also reported to a Google server:

---

Request #203

GET
https://accounts.google.com/_/common/diagnostics/?diagnostics=%5B%5B%5B%22g
aia_fe_minutemaid%3Ass%22%2Cnull%2Cnull%2Cnull%2C1644237704025%5D%2
C%5B%22gaia_fe_minutemaid%3AsignInAttempt%22%2Cnull%2Cnull%2Cnull%2C
1644237704025%5D%2C%5B%22gaia_fe_minutemaid%3AidentifierPage%22%2Cn
ull%2Cnull%2Cnull%2C1644237704362%2C7418%5D%5D%5D&rt=j HTTP/1.1
Host: accounts.google.com
Connection: keep-alive
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="98", "Google Chrome";v="98"
Cache-Control: max-age=0
sec-ch-ua-mobile: ?0
User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36
(KHTML, like Gecko) Chrome/98.0.4758.82 Safari/537.36
sec-ch-ua-platform: "Windows"
Accept: */*
X-Chrome-ID-Consistency-Request:
version=1,client_id=77185425430.apps.googleusercontent.com,device_id=5ab92fc9-
3834-424f-823c-
d8d170e275ee,signin_mode=all_accounts,signout_mode=show_confirmation
X-Client-Data:
CKy1yQEIkbbJAQimtskBCMS2yQEIqZ3KAQi0gcsBCOryywEInvnLAQjnhMwBCJ
qRzAEIgZXMAQiwlcwBCMKXzAEYjp7LAQ==
Sec-Fetch-Site: same-origin
Sec-Fetch-Mode: no-cors
Sec-Fetch-Dest: empty
Referer:
https://accounts.google.com/signin/v2/deniedsigninrejected?service=mail&passive=12
09600&osid=1&continue=https%3A%2F%2Fmail.google.com%2Fmail%2Fu%2F0%
2F&followup=https%3A%2F%2Fmail.google.com%2Fmail%2Fu%2F0%2F&emr=1&
flowName=GlifWebSignIn&flowEntry=ServiceLogin
Accept-Encoding: gzip, deflate, br
Accept-Language: en-US,en;q=0.9

Source: Chrome-No-Cookies.saz

---

## VIII.   GOOGLE ENGAGES IN COOKIE-SYNCING WHICH CIRCUMVENTS BLOCKING METHODS

153.    Paragraph 39 of the Bernston Declaration states "Google does not perform any mapping of Google Analytics first-party cookie values to third-party cookies such as Biscotti".

154.    As I described in my opening report, a Google Analytics cookie value, which is stored as a first party cookie, is sent as an URL parameter in an HTTP request which also includes the value of the Biscotti cookie which is named "IDE".  That is, a third party coolie value is embedded in the HTTP request.

155.    This HTTP request was created by Google JavaScript code.

156.    This Google JavaScript code generates the HTTP request which provides the mapping of the Google Analytics cookie to the Biscotti cookie.

157.    The Zervas HAR files include similar examples of HTTP requests which map a Google Analytics cookie value to third-party IDE cookies.

158.    One such request can be found in the Zervas HAR file GOOG_ZERVAS_00000038.har with the cid URL parameter marked in blue and _gid URL parameter marked in green:

Request #317

POST
https://stats.g.doubleclick.net/j/collect?t=dc&aip=1&_r=3&v=1&_v=j96&tid=
UA-61435456-
5&cid=1781616254.1639511975&jid=182563484&gjid=2008163062&_gid=1
773996974.1639511977&_u=aChACEAiBAAAAC~&z=1463189588 http/2.0
content-length: 0
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="96", "Google
Chrome";v="96"
sec-ch-ua-mobile: ?0
user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36
(KHTML, like Gecko) Chrome/96.0.4664.93 Safari/537.36
sec-ch-ua-platform: "Windows"
content-type: text/plain
accept: */*
origin: https://www.mercurynews.com

x-client-data:
CIS2yQEIpbbJAQjEtskBCKmdygEI3tHKAQie+csBCOeEzAEItYXMAQjLic
wBCNKPzAEI1pLMARiOnssB
sec-fetch-site: cross-site
sec-fetch-mode: cors
sec-fetch-dest: empty
referer: https://www.mercurynews.com/
accept-encoding: gzip, deflate, br
accept-language: en-US,en;q=0.9
cookie: IDE=AHWqTUkKbUoi2VyU8k-3G4warCqB1lQry78H-Tu_stiQF-
0HDa5BwrBkQfOPgjzKTjo

Source: GOOG_ZERVAS_00000038.har (mercury_all.har)

159.     The same Zervas HAR file shows that the cid URL parameter is stored as the _ga

Google Analytics cookie while the _gid URL parameter is stored as the _gid Google Analytics

cookie:

Request #177

POST
https://a869.mercurynews.com/DG/DEFAULT/rest/rpc/527?referer=https%3A
%2F%2Fwww.mercurynews.com%2F2020%2F05%2F24%2Fqa-mental-
health-tips-for-handling-the-
pandemic%2F&bcsessionid=&bctempid=&overruleReferrer=&time=2021-12-
14T14%3A59%3A36-05%3A00&ts=1639511976564 http/2.0
content-length: 789
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="96", "Google
Chrome";v="96"
sec-ch-ua-mobile: ?0
user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36
(KHTML, like Gecko) Chrome/96.0.4664.93 Safari/537.36
sec-ch-ua-platform: "Windows"
content-type: text/plain
accept: */*
origin: https://www.mercurynews.com
sec-fetch-site: same-site
sec-fetch-mode: cors
sec-fetch-dest: empty
referer: https://www.mercurynews.com/
accept-encoding: gzip, deflate, br
accept-language: en-US,en;q=0.9

cookie: BCSessionID=6ef2881b-073f-4bda-94d0-c4b07dfdb683; bc_tstgrp=10; _pnvl=false;
pushly.user_puuid=yJ5mgCuP53WAhTzzb9NWBnEOCV9lRzTY; _pndnt=; _pnss=none;
_parsely_session={%22sid%22:1%2C%22surl%22:%22https://www.mercurynews.com/2020/05/24/qa-mental-health-tips-for-handling-the-pandemic/%22%2C%22sref%22:%22%22%2C%22sts%22:1639511972756%2C%22slts%22:0};
_parsely_visitor={%22id%22:%22pid=96ff1e1ab21b71f05bca66a190508e34%22%2C%22session_count%22:1%2C%22last_session_ts%22:1639511972756};
_li_dcdm_c=.mercurynews.com; _lc2_fpi=f107d3ac6b63--01fpx8eqh9exas1f2p5e5sz5w9;
RT="z=1&dm=mercurynews.com&si=c28af11d-f7b6-4def-bd20-3b17b8a04329&ss=kx6j3fow&sl=0&tt=0&bcn=%2F%2F684dd326.akstat.io%2F";
AWSALB=UIsJn7dkO53TsgO7FS2aI7ySy1qNDFQ7ltwKQj1TT3fE5HarjgA373AMPHgizEKb0wTpKo9NRIeeru95X3ryXXPiuVevcAAaherpe+jVp074mBkC3UDQrLG4M5jO;
AWSALBCORS=UIsJn7dkO53TsgO7FS2aI7ySy1qNDFQ7ltwKQj1TT3fE5HarjgA373AMPHgizEKb0wTpKo9NRIeeru95X3ryXXPiuVevcAAaherpe+jVp074mBkC3UDQrLG4M5jO; `_ga=GA1.2.1781616254.1639511975`; `_gid=GA1.2.1773996974.1639511977`

Source: GOOG_ZERVAS_00000038.har (mercury_all.har)

160.     As discussed in my opening report, the _ga and _gid are Google Analytics cookies which are set by Google JavaScript code and stored as first-party cookies of the Web site using Google Analytics.

161.     These same two Google Analytics cookie values are also sent as URL parameters to a Google Analytics server as shown by the same Zervas HAR file:

Request #285

POST https://www.google-analytics.com/j/collect?v=1&_v=j96&a=1773302523&t=pageview&_s=1&dl=https%3A%2F%2Fwww.mercurynews.com%2F2020%2F05%2F24%2Fqa-mental-health-tips-for-handling-the-pandemic%2F&dr=&dp=%2F2020%2F05%2F24%2Fqa-mental-health-tips-for-handling-the-pandemic%2F&ul=en-us&de=UTF-8&dt=Mental%20health%20tips%20for%20handling%20the%20pandemic&sd=24-

bit&sr=1536x864&vp=887x754&je=0&_u=aChACEAjBAAAAC~&jid=1825
63484&gjid=2008163062&cid=1781616254.1639511975&tid=UA-61435456-
5&_gid=1773996974.1639511977&_r=1&gtm=2wgc10TLFP4R&cd2=mercur
ynews.com&cd3=mercurynews.com&cd4=&cd5=2020-05-
24T07%3A00%3A20-07%3A00&cd6=2020-05-24T07%3A00%3A20-
07%3A00&cd7=2020-05-27T04%3A27%3A51-
07%3A00&cd8=unknown&cd9=no&cd10=Business&cd11=5.8.2&cd12=&cd1
3=WP&cd14=Business&cd15=Business&cd16=&cd17=&cd18=&cd19=&cd2
0=&cd21=https%3A%2F%2Fwww.mercurynews.com%2F2020%2F05%2F24
%2Fqa-mental-health-tips-for-handling-the-pandemic&cd22=qa-mental-health-
tips-for-handling-the-
pandemic&cd23=7158259&cd24=article&cd25=BANG&cd26=Louis%20Hans
en&cd27=Q%26amp%3BA%3A%20Mental%20health%20tips%20for%20han
dling%20the%20pandemic&cd28=https%3A%2F%2Fwww.mercurynews.com
%2F2020%2F05%2F24%2Fqa-mental-health-tips-for-handling-the-
pandemic%2F&cd29=Q%26amp%3BA%3A%20Mental%20health%20tips%2
0for%20handling%20the%20pandemic&cd30=&cd32=p-
4ctCQwtnNBNs2&cd33=BayAreaNewsGroup&cd34=true&cd35=coronavirus
%2C%20mental%20health%2C%20tips%2C%20surviving%2C%20exercise%
2C%20Santa%20Clara%20University%2C%20psychology%2C%20health%2C
%20COVID-
19%2C%20Silicon%20Valley%2C%20stress%2C&cd36=5242&cd37=840&cd
38=Louis%20Hansen&cd49=true&cd50=Mozilla%2F5.0%20(Windows%20N
T%2010.0%3B%20Win64%3B%20x64)%20AppleWebKit%2F537.36%20(K
HTML%2C%20like%20Gecko)%20Chrome%2F96.0.4664.93%20Safari%2F5
37.36&cd51=&cd54=lhansen%40bayareanewsgroup.com&cd55=Bay%20Area
%20News%20Group&cd62=metered&cd53=1781616254.1639511975&z=143
7690465 h3
content-length: 0
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="96", "Google
Chrome";v="96"
sec-ch-ua-mobile: ?0
user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36
(KHTML, like Gecko) Chrome/96.0.4664.93 Safari/537.36
sec-ch-ua-platform: "Windows"
content-type: text/plain
accept: */*
origin: https://www.mercurynews.com
sec-fetch-site: cross-site
sec-fetch-mode: cors
sec-fetch-dest: empty
referer: https://www.mercurynews.com/
accept-encoding: gzip, deflate, br
accept-language: en-US,en;q=0.9

Source: GOOG_ZERVAS_00000038.har (mercury_all.har)

162. The Google Analytics _ga cookie value is also sent as the cid URL parameters to a www.google.com server along with a google.com cookie as shown in the same Zervas HAR file:

Request #338

GET https://www.google.com/ads/ga-audiences?t=sr&aip=1&_r=4&slf_rd=1&v=1&_v=j96&tid=UA-61435456-5&cid=1781616254.1639511975&jid=182563484&_u=aChACEAiBAAAAC~&z=666972174 h3
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="96", "Google Chrome";v="96"
sec-ch-ua-mobile: ?0
user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/96.0.4664.93 Safari/537.36
sec-ch-ua-platform: "Windows"
accept: image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
x-client-data: CIS2yQEIpbbJAQjEtskBCKmdygEI3tHKAQie+csBCOeEzAEItYXMAQjLicwBCNKPzAEI1pLMARiOnssB
sec-fetch-site: cross-site
sec-fetch-mode: no-cors
sec-fetch-dest: image
referer: https://www.mercurynews.com/
accept-encoding: gzip, deflate, br
accept-language: en-US,en;q=0.9
cookie: __Secure-3PSID=EwhnaQ--zxbpNKP10c9By0veBfhz0rhMnKTWHs_JZW3lViLw_cBnqZknNVFn9JkGutt_4g.; __Secure-3PAPISID=QrfbJNKyxVBDfABw/AjbwHagbvHbcYEmWp; NID=511=uZNOidO3IYn_v4TDcx5cuITU7EGHzqsXLzVemxezMPrknpaO9Vd1P3SAfzjFqfDPWsrEta-CKuqkzrogurPKkrDNcSz9SrLVPJpsaKL_YGcY8MdaAWDqpCsmT-LtPecom-eacj51asbet-GJqBY5iltvscKgDTVxjqNPNT0rVjsqsE8FO4Je3pxMceA; __Secure-3PSIDCC=AJi4QfGB9zsKVgDSr_B8oV5keVBWSyuw9VY0jUspnCoCdRXgo6oN_LBBq81C0kQ6Lo5yBslzvg

Source: GOOG_ZERVAS_00000038.har (mercury_all.har)

163. The Google presentation entitled ████████████████████████ ██████ (GOOG-CABR-05404845) describes how the Google Analytics cookie value is

████████████████████████████████████████

███████████:



Source: GOOG-CABR-05404845, at -855.

164.    The HTTP requests described in paragraphs 78-82 of my opening report and from the Zervas Report above appear to be described in the slide ███████████████████

165.    ████████████████████████████████████████

████████████████████████████████████████:



Source: GOOG-CABR-05404845, at -860.

166.    Other Google documents explain similar functions. A document titled ███████

███████████████████" explains that Google designed a system to ███████████

███████████████████████████████████" for the purpose of

being ████████████████████████████████████████

███████████████████████████." GOOG-CABR-04678050.  As

background, the Google document explains that █████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████."

GOOG-CABR-04678050.

167.    These internal Google documents explain what I described in my initial report.

<p align="center">***</p>

Executed this 15th day of February 2022 at Boston, Massachusetts.

By: _____
Richard M. Smith

# EXHIBIT A
## to the Expert Rebuttal Report of R. Smith

**Richard M. Smith**
**Rebuttal Report Feb. 15, 2021**
*Calhoun, et al. v. Google LLC*

In preparing my expert report, I reviewed and relied on the following materials:

The following expert reports and declarations:

- My expert report of October 14, 2021 including all materials I reviewed and relied on for the expert report.
- Declaration of Glenn Berntson Regarding Google Ad Manager In Opposition to Plaintiffs' Motion for Class Certification, December 21, 2021.
- Expert Report of Georgios Zervas, Ph.D., December 22, 2021 including all exhibits, appendices, and produced HAR and spreadsheet files (GOOG_ZERVAS_00000001 – GOOG_ZERVAS_00000103)
- Expert Report of Yiling Chen, Ph.D., December 22, 2021 including all exhibits, appendices, and produced HAR and spreadsheet files (GOOG_CHEN_00000001 - GOOG_CHEN_000000192)
- Errata Sheet for the Expert Report of Yiling Chen, Ph.D, dated Feb. 1, 2022

Deposition testimony taken in the matter of *Calhoun v Google, LLC*:

- Georgios Zervas on Jan. 26, 2022, including all exhibits
- Yiling Chen on Feb. 2, 2022, including all exhibits

Documents produced by Google (by starting Bates number):

- GOOG-CABR-04263403
- GOOG-CABR-05404845
- GOOG-CABR-04678050
- GOOG-CABR-04408167
- GOOG-CABR-05303296

The following Fiddler and Developer Tools capture files created in 2022:

- AdBlock.saz
- AdBlock-Config.saz
- AdBlock-install.saz
- AdBlock-Wells-Fargo-Login.saz
- Chrome-No-Cookies.saz
- Chrome-Sync-On-and-Off.saz
- Chrome-Sync-On-and-Off.har
- Clear-Cookies-on-Exit.saz
- Edge-With-Default-Settings.saz
- Firefox-With-Default-Settings.saz

- GA-OPT-OUT-INSTALLED-AB-ENABLED.saz
- google-ad-settings.saz
- HULU-DP-VPN.saz
- IBA-Opt-Out.saz
- IBA-Opt-Out-2.saz
- IBA-Opt-Out-Remove.saz
- IBA-Opt-Out-Remove-2.saz
- nai-opt-out.saz
- NoJS.saz

The following screen movie video files created in 2022:

- AdBlock.wmv
- AdBlock-Config.wmv
- AdBlock-Install.wmv
- adguard-adlock.wmv
- Chrome-No-Cookies.wmv
- Cookies-Back-On.wmv
- Chrome-Sync-On-and-Off.wmv
- Clear-Cookies-on-Exit.wmv
- Edge-With-Default-Settings.wmv
- Firefox-With-Default-Settings.wmv
- GA-OPT-OUT-INSTALLED-AB-ENABLED.wmv
- google-ad-settings.wmv
- HULU-DP-VPN.wmv
- IBA-Opt-Out.wmv
- IBA-Opt-Out-2.wmv
- IBA-opt-out-at-Chrome-Store.wmv
- IBA-Opt-Out-Remove.wmv
- IBA-Opt-Out-Remove-2.wmv
- nai-opt-out.wmv
- NoJS.wmv

Information available via the following Web pages:

- https://chrome.google.com/webstore/detail/google-analytics-opt-out/fllaojicojecljbmefodhfapmkghcbnh
- https://chrome.google.com/webstore/detail/iba-opt-out-by-google/gbiekjoijknlhijdjbaadobpkdhmoebb
- https://chrome.google.com/webstore/detail/adblock-%E2%80%94-best-ad-blocker/gighmmpiobklfepjocnamgkkbiglidom
- https://help.getadblock.com/support/solutions/articles/6000055743-how-to-disable-adblock-on-specific-sites
- https://www.apple.com/safari/docs/Safari_White_Paper_Nov_2019.pdf

- https://adssettings.google.com/anonymous?hl=en
- https://adguard.com/en/adguard-windows/overview.html
- https://adlock.com/adlock-for-windows
- https://adlock.com
- https://code.google.com/archive/p/google-opt-out-plugin/

# EXHIBIT FFF
## Redacted Version of Document Sought to be Sealed

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

|  |  |
|---|---|
| PATRICK CALHOUN, et al., *on behalf of themselves and all others similarly situated*,<br><br>          Plaintiffs,<br>     v.<br><br>GOOGLE LLC,<br><br>          Defendant. | Case No. 4:20-cv-05146-YGR-SVK |

# EXPERT REBUTTAL REPORT OF RICHARD M. SMITH IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# February 15, 2022

## TABLE OF CONTENTS

I.     EXECUTIVE SUMMARY OF OPINIONS PROFFERED ................................................2

II.    QUALIFICATIONS AND BACKGROUND ................................................................4

III.   BLOCKING METHODS PROPOSED IN THE ZERVAS REPORT WILL NOT
STOP ALL DATA TRANSMISSIONS TO GOOGLE AND WILL CAUSED WEB
SITES TO FAIL.................................................................................................................5

      A.    Cookie Blocking .................................................................................................6

      B.    Disabling JavaScript .......................................................................................12

      C.    The Google Analytics Opt-out........................................................................16

      D.    The AdBlock Add-on Extension.......................................................................22

      E.    The Use of a VPN Does Not Prevent Data Transmissions to Google .................29

IV.   THE CHEN REPORT'S CONCLUSIONS ABOUT TRANSMISSIONS FROM
CHROME TO GOOGLE, AS COMPARED TO OTHER BROWSERS, IS
INCORRECT AND BASED ON A FLAWED METHODOLOGY................................31

V.    CHROME DEVELOPMENT TOOLS ARE NOT A RELIABLE METHOD OF
CAPTURING NETWORK TRAFFIC FROM THE CHROME BROWSER..................36

VI.   BLOCKING METHODS PROPOSED IN THE BERSTON DECLARATION WILL
NOT STOP ALL DATA TRANSMISSIONS TO GOOGLE AND WILL CAUSE WEB
SITES TO FAIL..............................................................................................................41

      A.    The "Clear Cookies and Site Data" Option Does Not Stop Transmissions...........42

      B.    "Opting Out of Personalized Ads" Relies on Cookies and Does Not Stop All
Transmissions .................................................................................................43

      C.    The NAI Opt-Out Relies on Cookies and Does Not Stop All Transmissions .......50

      D.    The IBA Opt-out Relies on Cookies and Does Not Block All Transmissions ......52

      E.    Firewalls..........................................................................................................55

      F.    Standalone ad block programs ..........................................................................55

VII.  GOOGLE TRACKS BLOCKING METHODS .........................................................55

VIII. GOOGLE ENGAGES IN COOKIE-SYNCING WHICH CIRCUMVENTS
BLOCKING METHODS.................................................................................................60

## EXPERT REBUTTAL REPORT OF RICHARD M. SMITH

### I.      EXECUTIVE SUMMARY OF OPINIONS PROFFERED

1.      As I will explain in the remainder of this report, I believe the Zervas Report, the Chen Report, and the Bernston Declaration all provide incorrect and misleading information about: the operation of the Chrome browser and its transmission of personal information to Google servers; methods which claim to block the transmission of personal information to Google servers; the mapping of data between Google servers; and, the operation of the Chrome browser compared to other browsers such as Firefox and Edge.

2.      As used in this report, "personal information" includes IP addresses, User-Agent information, browsing history information, the Chrome X-client data header, cookie identifiers, device identifiers, and the content of communications the users exchange on non-Google websites. I also understand Google uses the personal information that Chrome sends to it for purposes of creating consumer profiles, that is sometimes referred to as derived data. Neither my initial nor this rebuttal report covers derived data or its use.

3.      Rebuttal Opinion No. 1: Based on my experience in the field, it is my opinion that both the Zervas and Chen Report used flawed methods to test transmissions that Chrome sends from user's computing devices to Google's servers. Because of these flaws, neither Report reaches an accurate conclusion regarding the transmission of flowing at start up from Chrome to Google. My report identifies multiple additional transmissions that the Zervas and Chen Reports omit.

   a.   Both reports used the Chrome Developer tools (created by Google) rather than Fiddler. Unlike Fiddler, the Chrome Developer tools do not capture all data transmissions that are sent to Google.

   b.   Both reports do not turn the Chrome Developer tools recording systems on until after the Chrome browser had been opened and communications had started. This excludes certain transmissions that Chrome sends to Google immediately upon start-up.

c. The Zervas Report criticizes the fact that I only tested six websites. However, Dr. Zervas ignores that he himself has had a peer-reviewed paper published that extrapolates the results of testing a single website to a broader industry. More importantly, the reason the transmissions occur is the combination of how the Chrome browser is designed and how Google's source code operates. The tests I performed is less about specific websites than it is about the operation of Google's source code relating to the various properties to which it causes Chrome to send transmissions. The results for Google Analytics, Google Ads (google.com), Google DoubleClick, and Google APIs source code would be the same across millions of different websites. I chose six as exemplars rather than burden the Court with a report that ran thousands of pages long to report the same things over and over again.

d. The Zervas Report also criticizes that I did not test prior versions of the Chrome browser. Although prior versions are available for his own testing, Dr. Zervas did not perform any such tests. The reason is that the Chrome browser has not substantially changed in the functions I described in my opening report. Regardless of the version of Chrome, it was designed to follow the instructions of Google source code that command the Chrome browser to transmit the data at issue from the user's personal computing devices to Google's servers even when they were not present at a Google website.

e. Finally, the Chen Report tested Chrome in its default settings but manually changed the settings in the other browsers tested to make them less privacy protective and hence, more like Chrome. Based on my experience, this is not a valid way to test comparative products because the Chen Report changed features of the other browsers.

4. **Rebuttal Opinion No. 2**: The Zervas Report claims that "Chrome does not function the same way for all users" and lists a series of alleged steps a user could take to stop Chrome from

sending their personal information to Google. However, my testing shows that none of the purported blocking methods offered in the Zervas report stop all data transmissions of personal information from a user's Chrome browser to Google servers. Most of the blocking solutions offered negatively impact the operation of the Chrome browser and some cause many Web sites to fail and are expressly "not recommended" by Google (such as blocking JavaScript or all cookies).

5.      <u>Rebuttal Opinion No. 3</u>: The Zervas Report incorrectly claims that mappings of data received from Chrome browsers is expressly prohibited by Google's internal policies. However, the underlying data associated with the Zervas Report (called HAR files) show that the Chrome browser sent information to Google servers which is mapped by cookie values. Further, an internal Google Analytics presentation describes the mapping as involving the mapping of such information that I described in my opening report and which was confirmed in the Zervas HAR files. Moreover, Google's public Web sites describe the integration of Google offerings such as Google Analytics.

6.      <u>Rebuttal Opinion No. 4</u>: The Chen Report claims that Chrome sends no more personal information to Google's servers than any other web browser.  This is not true. My testing and Google documents show that the X-Client-Data header is unique to Chrome and Chrome transmits more third-party cookies to Google in its default settings than Firefox, Edge, and Safari.

## II.      QUALIFICATIONS AND BACKGROUND

7.      I am the owner of Boston Software Forensics LLC of Boston, Massachusetts. For approximately the last 15 years, I have been providing consulting services to the legal industry, primarily involving the analysis of software systems to understand how they operate.

8.      I have been retained by counsel for Plaintiffs as an expert in this matter. I previously submitted a report in support of Plaintiffs' Motion for Class Certification, dated October 14, 2021, which sets my expert qualifications.[1]

---

[1] *Calhoun, et al. v. Google, LLC*, Smith Report, dated October 14, 2021. at ¶¶ 1-2, Exs. A and B.

9. On December 22, 2021, Google submitted a response to Plaintiffs' Motion for Class Certification, which included declarations and documents which addressed issues raised in my report.

10. I submit this rebuttal report to address issues raised in Google's response; the reports of Prof. Georgios Zervas ("Zervas Report") and Prof. Yiling Chen ("Chen Report"); and the declaration of the Google employee Glenn Bernston ("Bernston Declaration").

11. I reserve the right to supplement and amend this rebuttal report based on additional materials and information made available to me.

12. In addition to the items identified in Exhibit C of my October 14, 2021 report, a list of materials received, reviewed and relied upon for this rebuttal report is set forth in attached **Exhibit A.[2]**

## III. BLOCKING METHODS PROPOSED IN THE ZERVAS REPORT WILL NOT STOP ALL DATA TRANSMISSIONS TO GOOGLE AND WILL CAUSED WEB SITES TO FAIL

13. The Zervas Report claims there are a variety of methods which purport to block data transmissions from the Chrome browser to Google servers. These "solutions" are:

    a.  Cookie blocking

    b.  Disabling JavaScript

    c.  The Google Analytics Chrome opt-out extension

    d.  The AdBlock Chrome extension

    e.  Guest and Incognito modes

    f.  Use of a Virtual Private Network or "VPN."

14. As described below, none of these offered-up blocking methods work completely to block all data transmissions of personal information from the Chrome browser (located on user's devices) to Google servers.

---

[2] It is my understanding that counsel for Google has been provided access to all my underlying testing and reliance documents. To the extent the Court seeks review of any cited documents or testing in this report, I will coordinate with counsel to ensure that they are produced.

15.     As described below, most of the blocking methods can cause Web sites to fail or block access.

16.     In many cases, Web sites do not tell a user the source of the failure caused by a blocking method and how to correct a problem.

17.     As described below, Google recommends users to not turn off JavaScript or block all cookies because Web sites will become unusable.

**A.      Cookie Blocking**

18.     Paragraphs 31-34 of the Zervas Report describe cookie settings of the Chrome browser and some limited testing that was done with these settings.

19.     Paragraph 32 of the Zervas Report states that the following Cookie settings were tested:

      a.   Allow all cookies

      b.   Block third-party cookies

      c.   Block all cookies

20.     The Chrome browser also has a 4th setting "Block third-party cookies in Incognito" which in my testing allows all cookies when not in Incognito or Guest mode.  This option appears now to be the default cookie option in Chrome.

21.     The Chrome browser presents these 4 cookies options as following in Settings:



Source: Chrome browser settings

22.     The Zervas Report offers no opinion on how many users change the default cookie setting in Chrome to another setting. However, Google's own analysis concluded that ███████ of users block third party cookies. GOOG-CABR-04263403.

23.     Paragraph 32 of the Zervas Report, states that the "IDE cookie was not sent to domains associated with Google" when third-party cookies were being blocked in Chrome because IDE is a third-party cookie.

24.     However, paragraph 32 is both incorrect and misleading about Chrome's ability to block *all* third-party cookies.

25.     As I stated in my original report, Google Analytics cookies such as the _ga and _gid cookies can be created and stored by JavaScript as first-party cookie and then sent to third-party servers as URL parameters.

26.     Both the Chen and Zervas Reports define these JavaScript cookies created by third-party JavaScript code as third-party cookies, stating "third-party cookies are created by entities other than the website is visiting".

27.     Indeed, the underlying data for the Zervas Report shows the _ga and _gid cookie values being sent as URL parameters to Google servers *when Chrome has been configured to block third-party cookies*:

---

Request #135

POST
https://a869.mercurynews.com/DG/DEFAULT/rest/rpc/651?referer=https%3A%2F%2Fwww.mercurynews.com%2F2020%2F05%2F24%2Fqa-mental-health-tips-for-handling-the-pandemic%2F&bcsessionid=&bctempid=&overruleReferrer=&time=2021-12-14T15%3A28%3A14-05%3A00&ts=1639513694975 http/2.0
content-length: 112
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="96", "Google Chrome";v="96"
sec-ch-ua-mobile: ?0
user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/96.0.4664.93 Safari/537.36
sec-ch-ua-platform: "Windows"
content-type: text/plain
accept: */*
origin: https://www.mercurynews.com
sec-fetch-site: same-site
sec-fetch-mode: cors
sec-fetch-dest: empty
referer: https://www.mercurynews.com/
accept-encoding: gzip, deflate, br

---

accept-language: en-US,en;q=0.9
cookie: BCSessionID=4fff4624-e5f1-4180-843c-ffacf4cd01fa; bc_tstgrp=10;
_pnvl=false; pushly.user_puuid=U4UEosv6QJAcG8F9xxQotXcXuvWstbPH;
_pndnt=; _pnss=none;
_parsely_session={%22sid%22:1%2C%22surl%22:%22https://www.mercurynews.co
m/2020/05/24/qa-mental-health-tips-for-handling-the-
pandemic/%22%2C%22sref%22:%22%22%2C%22sts%22:1639513692574%2C%22s
lts%22:0};
_parsely_visitor={%22id%22:%22pid=b23d76467464bf11fe976f3ec8aad1f3%22%2C
%22session_count%22:1%2C%22last_session_ts%22:1639513692574};
_li_dcdm_c=.mercurynews.com; _lc2_fpi=f107d3ac6b63--
01fpxa36t1vj444namv5hntkx0; RT="z=1&dm=mercurynews.com&si=31feaed6-ff3c-
4de4-b90a-
f8d0bf962a9e&ss=kx6k4as3&sl=0&tt=0&bcn=%2F%2F17de4c0f.akstat.io%2F";
AWSALB=YFV51xaETmhDKPb7BwT+Nj3qItV33asKlXjb13gKvwJ6mR8pzp+gWG
Tjk/3kHz8tcZ5AUwBAYu1VE0kH1wYqSD72+NUmjbRoSrKYhbIo7ygEHyBR5s6J
TmD4R+kV;
AWSALBCORS=YFV51xaETmhDKPb7BwT+Nj3qItV33asKlXjb13gKvwJ6mR8pzp
+gWGTjk/3kHz8tcZ5AUwBAYu1VE0kH1wYqSD72+NUmjbRoSrKYhbIo7ygEHyB
R5s6JTmD4R+kV; <mark>ga=GA1.2.1549923150.1639513695;</mark>
<mark>_gid=GA1.2.536743444.1639513695</mark>

Request #214

POST https://www.google-
analytics.com/j/collect?v=1&_v=j96&a=1638395647&t=pageview&_s=1&dl=https%3
A%2F%2Fwww.mercurynews.com%2F2020%2F05%2F24%2Fqa-mental-health-tips-
for-handling-the-pandemic%2F&dr=&dp=%2F2020%2F05%2F24%2Fqa-mental-
health-tips-for-handling-the-pandemic%2F&ul=en-us&de=UTF-
8&dt=Mental%20health%20tips%20for%20handling%20the%20pandemic&sd=24-
bit&sr=1536x864&vp=887x754&je=0&_u=aChACEAjBAAAAC~&jid=2143195337
&gjid=4052239959&<mark>cid=1549923150.1639513695</mark>&tid=UA-61435456-
5&<mark>_gid=536743444.1639513695</mark>&_r=1&gtm=2wgc10TLFP4R&cd2=mercurynews.co
m&cd3=mercurynews.com&cd4=&cd5=2020-05-24T07%3A00%3A20-
07%3A00&cd6=2020-05-24T07%3A00%3A20-07%3A00&cd7=2020-05-
27T04%3A27%3A51-
07%3A00&cd8=unknown&cd9=no&cd10=Business&cd11=5.8.2&cd12=&cd13=WP
&cd14=Business&cd15=Business&cd16=&cd17=&cd18=&cd19=&cd20=&cd21=http
s%3A%2F%2Fwww.mercurynews.com%2F2020%2F05%2F24%2Fqa-mental-health-
tips-for-handling-the-pandemic&cd22=qa-mental-health-tips-for-handling-the-
pandemic&cd23=7158259&cd24=article&cd25=BANG&cd26=Louis%20Hansen&cd
27=Q%26amp%3BA%3A%20Mental%20health%20tips%20for%20handling%20the%
20pandemic&cd28=https%3A%2F%2Fwww.mercurynews.com%2F2020%2F05%2F2
4%2Fqa-mental-health-tips-for-handling-the-
pandemic%2F&cd29=Q%26amp%3BA%3A%20Mental%20health%20tips%20for%2
0handling%20the%20pandemic&cd30=&cd32=p-

4ctCQwtnNBNs2&cd33=BayAreaNewsGroup&cd34=true&cd35=coronavirus%2C%2 0mental%20health%2C%20tips%2C%20surviving%2C%20exercise%2C%20Santa%2 0Clara%20University%2C%20psychology%2C%20health%2C%20COVID-19%2C%20Silicon%20Valley%2C%20stress%2C&cd36=5242&cd37=840&cd38=Lo uis%20Hansen&cd49=true&cd50=Mozilla%2F5.0%20(Windows%20NT%2010.0%3 B%20Win64%3B%20x64)%20AppleWebKit%2F537.36%20(KHTML%2C%20like% 20Gecko)%20Chrome%2F96.0.4664.93%20Safari%2F537.36&cd51=&cd54=lhansen %40bayareanewsgroup.com&cd55=Bay%20Area%20News%20Group&cd62=metered &cd53=1549923150.1639513695&z=416929332

Request #220

POST
https://stats.g.doubleclick.net/j/collect?t=dc&aip=1&_r=3&v=1&_v=j96&tid=UA-61435456-5&cid=1549923150.1639513695&jid=2143195337&gjid=405223959&_gid=5367434 44.1639513695&_u=aChACEAiBAAAAC~&z=1153635142 http/2.0
content-length: 0
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="96", "Google Chrome";v="96"
sec-ch-ua-mobile: ?0
user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/96.0.4664.93 Safari/537.36
sec-ch-ua-platform: "Windows"
content-type: text/plain
accept: */*
origin: https://www.mercurynews.com
x-client-data:
CIS2yQEIpbbJAQjEtskBCKmdygEI3tHKAQie+csBCOeEzAEItYXMAQjLicwBCN KPzAEI1pLMARiOnssB
sec-fetch-site: cross-site
sec-fetch-mode: cors
sec-fetch-dest: empty
referer: https://www.mercurynews.com/
accept-encoding: gzip, deflate, br
accept-language: en-US,en;q=0.9

Source: GOOG_ZERVAS_00000042.har (mercury_TPcookies.har)

28.    I discuss data transmissions involving _ga, _gid cookies and the cid and _gid URL parameters in further detail below.

29.     Paragraph 31 of the Zervas Report also offers up the option of blocking all cookies to prevent transmissions to Google but concedes that cookie blocking "may interfere with the functionality of certain website features".

30.     The Zervas Report offers no explanation of what this "interference" includes or the types of website features that might not function.

31.     The Zervas Report also fails to provide any statistics on how common these failures would be and whether a user is notified of the problem.

32.     Blocking all cookies is not a realistic option because it will interfere with most Web site login functionality—even on Google owned and operated web properties.

33.     The following screen shot shows Google's Gmail service failing when a user attempts to log into Gmail with all cookies blocked:



Source: https://accounts.google.com

34.     Google informs a user they must turn on cookies to use the Gmail service.

35.    Likewise, Wells Fargo's Website requires users to enable cookies in order to log into their online bank account:



Source: https://connect.secure.wellafargo.com

36.    I do not have any internal documents or knowledge of how many users block all cookies. However, because blocking all cookies harms the functionality of the browser and is expressly "not recommended" by Google in Chrome settings, the percentage of users who do so is likely very small.

### B.    Disabling JavaScript

37.    Paragraphs 35-40 of the Zervas Report offers up disabling JavaScript in the Chrome browser as another method to prevent data transmissions from the Chrome browser to the Google servers.

38.    Google's own analysis indicates that, as of 2018, only 0.1% of users were disabling JavaScript. Zervas Ex. 5 at 2 ("Chances are, JavaScript is already enabled in your browser; it helps power lots of the websites people use every day. But, because it may save bandwidth or help pages load more quickly, a tiny minority of our users (0.1%) choose to keep it off.")

39.    While paragraph 38 of the Zervas Reports admits that "many web pages do use certain JavaScript-dependent features," it offers no evidence regarding how common it is for Web pages to require JavaScript to be enabled in Chrome in order to function properly.

40.    Nor does the Zervas Reports offer any opinion about how users would be informed that JavaScript must be enabled in order to use a Web site.

41.    Dr. Zervas admitted during his deposition that he did not test the usability of Gmail with JavaScript disabled, Zervas Tr. at 139:19-25. However, Google's own Gmail service is one such Web site which requires JavaScript to be enabled in Chrome.

42.    If a user attempts to login into Gmail with JavaScript disabled, Google displays the following error message recommending the user "signing in on a browser that has JavaScript turned on":



Source: https://accounts.google.com

43.    Google Maps also provides an error message informing a Chrome user that they must turn on JavaScript in order to use the Web site:



Source: https://google.com/maps

44.     However, not all Web sites explicitly inform users the page failed because JavaScript is disabled. The Wells Fargo online banking login simply shows a blank page without informing a user that they must turn on JavaScript:



Source: https://connect.secure.wellsfargo.com

45.    In addition, the underlying data for the Zervas Report shows that not all data transmissions from the Chrome browser to Google servers are stopped by disabling JavaScript. For example, the following HTTP GET requests from the Zervas data shows such transmission still occur:

---

Request #8
GET https://www.googletagmanager.com/ns.html?id=GTM-TLFP4R http/2.0
upgrade-insecure-requests: 1
user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36
(KHTML, like Gecko) Chrome/96.0.4664.110 Safari/537.36
accept:
text/html,application/xhtml+xml,application/xml;q=0.9,image/avif,image/webp,image/
apng,*/*;q=0.8,application/signed-exchange;v=b3;q=0.9
sec-fetch-site: cross-site
sec-fetch-mode: navigate
sec-fetch-dest: iframe
referer: https://www.mercurynews.com/
accept-encoding: gzip, deflate, br
accept-language: en-US,en;q=0.9


Request #13

GET https://fonts.googleapis.com/css?family=Open+Sans:400,600,700&display=swap
http/2.0
user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36
(KHTML, like Gecko) Chrome/96.0.4664.110 Safari/537.36
accept: text/css,*/*;q=0.1
x-client-data:
CIS2yQEIpbbJAQjEtskBCKmdygEI3tHKAQie+csBCOeEzAEItYXMAQjLicwBCN
KPzAEI1pLMARiOnssB
sec-fetch-site: cross-site
sec-fetch-mode: no-cors
sec-fetch-dest: style
referer: https://www.mercurynews.com/
accept-encoding: gzip, deflate, br
accept-language: en-US,en;q=0.9

Source: GOOG_ZERVAS_00000041.har (mercury_JS.har)

---

46.     In     fact,     Request     #8     from     above     is     only     transmitted     to     the www.googletagmanager.com server when scripting has been **_disabled_** as the following HTML code from the Mercury News home page shows:

```
<!-- Google Tag Manager (noscript) -->
<noscript><iframe src='https://www.googletagmanager.com/ns.html?id=GTM-
TLFP4R' height='0' width='0'
style='display:none;visibility:hidden'></iframe></noscript>
<!-- End Google Tag Manager (noscript) -->

Source: GOOG_ZERVAS_00000041.har (mercury_JS.har)
```

47.     Request #13 above also shows that turning off JavaScript does not block the transmission of the User-Agent or the X-Client-data header to the Google server fonts.googleapis.com. In addition to these, the user's IP address would be sent from Chrome to Google.

48.     In addition, Dr. Zervas admitted that blocking JavaScript would not prevent transmissions to Google, agreeing that, " █████████████████████████████████ █████████████████████████████████████████████████████████ and explaining (1) " ███████████████████████████████████████████████ " or " █████████████████████." Zervas Tr. at 126:14-21; 128:2-3; *see also Id.* at 136:10-12 (" █ █████████████████████████████████████████████████████████████ ████████████████████ ")

### C.     The Google Analytics Opt-out

49.     Paragraphs 41-44 of the Zervas Report offer up another blocking method, the Google Analytics Opt-out Add-on extension, to stop transmissions between the Chrome browser and Google servers.

50.     According to the description of the Google Analytics Opt-Out extension in the Chrome Web Store, enabling the add-on affects Google Analytics-related data transmissions:



Source: https://chrome.google.com/webstore/detail/google-analytics-opt-out/fllaojicojecljbmefodhfapmkghcbnh.

51.     However, based on my review of the GOOG_ZERVAS_00000039.har data file, I found that Google Analytics Opt-out Add-on does not stop all data transmissions related to Google Analytics from being made by the Chrome browser.

52.     Even with this Google Analytics Opt-out Add-on installed, a Chrome browser will still contact a Google server to fetch a Google Analytics JavaScript file as shown in the following HTTP GET request from the GOOG_ZERVAS_00000039.har file:

| |
|---|
| Request #129 |
| |
| GET https://www.google-analytics.com/analytics.js h3 |
| sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="96", "Google Chrome";v="96" |
| sec-ch-ua-mobile: ?0 |
| user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/96.0.4664.110 Safari/537.36 |

sec-ch-ua-platform: "Windows"
accept: */*
sec-fetch-site: cross-site
sec-fetch-mode: no-cors
sec-fetch-dest: script
referer: https://www.mercurynews.com/
accept-encoding: gzip, deflate, br
accept-language: en-US,en;q=0.9

Source: GOOG_ZERVAS_00000039.har (mercury_analytics.har)

53.     The Google Analytics JavaScript file still executes in the Chrome browser with the Google Analytics Opt-out add-on installed.

54.     The Google Analytics JavaScript file also continues to create the **ga** and **gid** cookie values with the add-on installed as shown in the following HTTP GET request from the same GOOG_ZERVAS_00000039.har file:

Request #459

GET https://www.mercurynews.com/wp-content/uploads/2021/07/SJM-L-DTSJ-x-12.jpg?w=1024&h=732 http/2.0
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="96", "Google Chrome";v="96"
sec-ch-ua-mobile: ?0
user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/96.0.4664.110 Safari/537.36
sec-ch-ua-platform: "Windows"
accept: image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
sec-fetch-site: same-origin
sec-fetch-mode: no-cors
sec-fetch-dest: image
referer: https://www.mercurynews.com/2020/05/24/qa-mental-health-tips-for-handling-the-pandemic/
accept-encoding: gzip, deflate, br
accept-language: en-US,en;q=0.9
cookie: bc_tstgrp=5; _pnvl=false;
pushly.user_puuid=td5n0fG9eVfRcwkjf1LqQeAxKy07wRvq; _pndnt=; _pnss=none;
ai_user=1g9x3|2021-12-16T20:07:13.123Z;
_parsely_session={%22sid%22:1%2C%22surl%22:%22https://www.mercurynews.co
m/2020/05/24/qa-mental-health-tips-for-handling-the-
pandemic/%22%2C%22sref%22:%22%22%2C%22sts%22:1639685234190%2C%22s
lts%22:0};
  _parsely_visitor={%22id%22:%22pid=771ae75da6c85428248e9122cf43d954%22%2

C%22session_count%22:1%2C%22last_session_ts%22:1639685234190};
_li_dcdm_c=.mercurynews.com; _lc2_fpi=f107d3ac6b63--
01fq2dp7yp557eycwnxgh2zkyj; RT="z=1&dm=mercurynews.com&si=79a04ca2-
328c-4ce9-bf54-
5c7df3d56b30&ss=kx9e91an&sl=0&tt=0&bcn=%2F%2F68794907.akstat.io%2F";
_lr_geo_location=US; __qca=P0-1037288684-1639685236540; _pnlspid=10402;
anonDeviceId=1adbcdc629755962b25b94a3c4c38168;
_vfz=www%2Emercurynews%2Ecom.00000000-0000-4000-8000-
c86bf0725f23.1639685240.1.medium=direct|source=|sharer_uuid=|terms=;
_vfa=www%2Emercurynews%2Ecom.00000000-0000-4000-8000-
c86bf0725f23.7ebdba1f-e07d-4088-9441-
a2b75c820588.1639685240.1639685240.1639685240.1;
osano_consentmanager_uuid=84dec289-c823-40d5-8b27-1c3d2da92dcb;
osano_consentmanager=hz-
cYsCKKENBUKREbUcq6vPe3wGy5xdRFy9J2XWXTdeywKbvkCyIc7Tf9uZuyH50
ECRvA7PNbOWv0VIquDhAjPm0JKpRWu7YKoBB2NNoyeXLLrcaRztHEJfZU9kB
MWsm8H5Dz8AZM7GO2HeYPnEdJNh40ucchPMupdaCIT399_weXgRB6aCtKhJF
Mw2s0bAK4FRl2YCNlT7G9scMQo8XJ1WEucETb2smdhjbnjNwtG4ibpsTiCdjjD1k
NlKfqjvDGaNWUMr8FnQ_IpJs9x2w3nNlze7g7ewG2xJf3qKn70QRpT_RWamNFaN
RKs4uWoAAUjKaOa38rNbpbY6CYLKer69VCapE5krOQRQvN4C4YKh7GpYxFhE
T-
aqGXlWt6RZnYmNsFjTAwaX8UpSqEsc6BxQtLV6vNfuzKbWw9osAk8jqtb_SWAn
u1gS2t_gdRCITPtC3DihFMoypHdpiiKFp1W-
l81G59qDzL9usyxT_7fI7yw3D50JL3hzK5x2BoeHSnhqIsK8-
ZP5vzwypWgI3tn7MzlBbOvwjuRT6DlVElScDV9s7Ru1HO5a_fFvEuSJDaKQSlFako
rq4SFapJ-SF-
n3mEBhZfrEXVtEwdHIklGwJRWr0PuOywvhK0DjjGXD9p28VKlf_iqoOJybunPcM
MyYOuoq--_x9OU2VhwpYSdW3v35qKrP7q1j_6StugPBv-
2qZICNsaKuOzARC9Q5P4MX8Fw9aa_VlzR9hd4QkDngNu83JcqlAuQpBxnTU-
JchL_iHb5yA_0M=; BCTempID=e5dce137-5828-4f12-ae51-e8634347214f;
BCSessionID=e5dce137-5828-4f12-ae51-e8634347214f;
_vfb=www%2Emercurynews%2Ecom.00000000-0000-4000-8000-
c86bf0725f23.1.10.1639685240....; ABTestCookie=A;
ai_session=PRpcil|1639685240689.7|1639685240689.7; ntv_as_us_privacy=1YNY;
_ga=GA1.2.1094589372.1639685242; _gid=GA1.2.1561224651.1639685242;
_fbp=fb.1.1639685242192.566748168; _ntv_uid=86d8338a-5cdb-406b-8cf6-
2d54a526770a; OB-USER-TOKEN=ed60826f-4abd-45d0-8fb0-8b6c48e1b74c;
sub_nxt_upd_ac_DFM_BANGWPPRODWAB_PROD=1;
__idcontext=eyJjb29raWVJRCI6Ilo3R0FPS1FQSUdCRkE0RTNaM05ORFgyTFRKR
klFVUlLNlQ1SVE3U1o2QVFBPT09PSIsImRldmljZUlEIjoiWjdHQU9LUVBJQ0xS
V1NORTNMRk1MNlJWN0UzS0E0QUU3SE0yVzdETVpJV1E9PT09PSIsInYiOjF9;
WENKNFIyV0U1UVBUQzZHSjY1WlhlUQ1lRUT09PT09PSIsInYiOjF9;
sub_nxt_DFM_BANGWPPRODWAB_PROD={%222%22:{%22104000%22:{%22ac
%22:1%2C%22ac_d%22:1%2C%22s%22:%222021-12-
16T20:07:24.130Z%22}%2C%22_ac_d%22:1%2C%22_ac%22:1%2C%22_acnv%22:
104000}};

bounceClientVisit3993v=N4IgNgDiBcIBYBcEQM4FIDMBBNAmAYnvgO6kB0Atg
KYBOAxgK40CeAdlcSmXQPYVG4ADEKKCArAIAsRAI4BDALTVWCOWAVwq
ahHAUIAlqgUAzHjQ1zWAEzD7WAcz2aFES1aoV9dIiAA0IGhgQPxAUKnsYAG0
AXQBfIA

Source: GOOG_ZERVAS_00000039.har (mercury_analytics.har)

55.    The _ga cookie value also continues to be sent from the Chrome browser on the user's device to a Google DoubleClick ad server as a <mark>ga_cid</mark> URL parameter with the Google Analytics Opt-out add-on installed and enabled.

Request #1114

GET
https://securepubads.g.doubleclick.net/gampad/ads?gdfp_req=1&pvsid=338687732813
4305&correlator=1641590950113027&output=ldjh&impl=fifs&eid=31060978%2C31
061029%2C21067496%2C31062930&vrg=2021120601&ptt=17&gdpr_consent=CPR
VB3FPRVB3FEXABAENBgCwAP_AAH_AACiQGggBIAJEQABAIAAEAIAEAA
AAQBgAAEAgAAAAAAAAAAAABAgAAAAAAAAAAAAAAAAAAAAAAA
AAAAAAAAAAAAAAAAAAAAAAAAAAAACAAAAAAAAAAAAEAAAA
AAAAAAAAgAAAAIAAAAAgXmAAAAkQAAEAAAAAAAQAAABAEA
AAAAAAAAAAAAAAAECAAAAAAAAAAAAAAAAAAAAAAAAAAAAA
AAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAA
AAAACAA.YAAAAAAAAAA&gdpr=0&us_privacy=1YNY&sc=1&sfv=1-0-
38&ecs=20211216&iu_parts=8013%2Cmercurynews.com%2Cbusiness%2CSponsors
hip_1&enc_prev_ius=%2F0%2F1%2F2%2F3&prev_iu_szs=300x50&ris=31&rcs=1&
prev_scp=POS%3DSponsorship_1%26zeus_rendercount%3D2%26zeus_slot%3Dzeus
_Sponsorship_1.ref.dsk%26amznbid%3D2%26amznp%3D2&eri=1&cust_params=zeu
s%3Dapplied%26zeus_8013%3Dwww.mercurynews.com%26kv%3Dbusiness%252Cc
oronavirus%252Ccoronavirus-tips%252Cpm-report%252Cqa%252Clouis-
hansen%26page%3Darticle%26content%3D%26RPN%3D258499450601%26rurl%3D
%26articleid%3D7158259%26zeus_insights%3Dcmg%252Cios%252Cihp%252Cdpr
%252Cq8t%252Cwug%252C3bu%252Ckh5%252Cec4%252Cphj%252Caw9%252Ct
bj%252Cki0%252Cv3s%252Cuib%252Cpgg%252Cbs0&bc=31&abxe=1&lmt=16396
85267&dt=1639685267797&dlt=1639685230866&idt=3208&frm=20&biw=1271&bi
h=952&oid=2&adxs=1111&adys=17&adks=3262223218&ucis=1&ifi=5&u_his=6&u
_h=1080&u_w=1920&u_ah=1040&u_aw=1920&u_cd=24&u_sd=1&u_tz=-
300&flash=0&url=https%3A%2F%2Fwww.mercurynews.com%2F2020%2F05%2F24
%2Fqa-mental-health-tips-for-handling-the-
pandemic%2F&vis=1&dmc=8&scr_x=0&scr_y=0&psz=300x50&msz=1x0&psts=AG
kb-H8pgFk5N6XOcVypXLZo5AXp5hLk5Cs3i_RQ0Ri8-
RUUuUCieJtzkHXheeUFEYZz4e7uGuIlDRKyPcMh_JnQcWjEcA%2CAGkb-
H8uQqLLMXEQ95L0Jta8V3gA7SnTTqtFLvqV4cgwtQrEUXuGsORQxRWdEVu_v2
mfWMvweB8jXox10zc%2CAGkb-H_XqMQMCpYHJkh7skJuXlimd-

DkT69bhfqe6k80h25sXTg-o67AFTVJAsjKiJUjcv8-
iLW8JPaIoXUdC3qJNg&ga_vid=549979856.1639685236&ga_sid=1639685236&ga_
hid=2056970610&ga_fc=true&ga_cid=1094589372.1639685242&fws=128&ohw=0&
btvi=0&uach=WyJXaW5kb3dzIiwiMTAuMC4wIiwieDg2IiwiIiwiOTYuMC40NjY0L
jExMCIsW10sbnVsbCxudWxsLCI2NCJd&nvt=1 h3
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="96", "Google Chrome";v="96"
sec-ch-ua-mobile: ?0
user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36
(KHTML, like Gecko) Chrome/96.0.4664.110 Safari/537.36
sec-ch-ua-platform: "Windows"
accept: */*
origin: https://www.mercurynews.com
x-client-data:
CIS2yQEIpbbJAQjEtskBCKmdygEI3tHKAQie+csBCOeEzAEItYXMAQjLicwBCN
KPzAEI1pLMARiOnssB
sec-fetch-site: cross-site
sec-fetch-mode: cors
sec-fetch-dest: empty
referer: https://www.mercurynews.com/
accept-encoding: gzip, deflate, br
accept-language: en-US,en;q=0.9
cookie:
IDE=AHWqTUnMV1rZtJqLDZsx6queuHD6WU7OKh2F3AiFx1J5y6GgyQQynZjNy
yEgDVlVDJE

Source: GOOG_ZERVAS_00000039.har (mercury_analytics.har)

56.    Dr. Zervas confirmed my finding in his deposition. Zervas Tr. at ("█████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████. But I can tell you that the g -- the

underscore ga cookie here is being sent to Mercury News. It would be what we call a first-party

cookie. So this is a transmission of the cookie from the Chrome browser to the party that sent it,

which is Mercury News in this case. This is what's happening."); *see also Id.* at 168:17-169:1

("████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████

████.")

57.     Both the Zervas Report and the description of the Google Analytics Opt-out add-on extension are silent about the continued use of Google Analytics JavaScript code and cookies when the Google Analytics Opt-out add-on extension is installed and enabled in Chrome.

### D.     The AdBlock Add-on Extension

58.     Paragraphs 45-48 of the Zervas Report offer up another blocking method, the AdBlock Add-on extension, to stop transmissions from the Chrome browser on user's computing devices to Google servers.

59.     Without explaining for what purpose, the Zervas Report states that he tested the AdBlock Add-on extension using a *manual configuration* rather than the default configuration. *See also* Zervas Tr. at 185:23-25.

60.     The Zervas Report did not provide any testing results from running the AdBlock Add-on extension in its default configuration. In his deposition, Dr. Zervas explained that "██

████████████████████████████████████████████

████████████████████████████████████." Zervas Tr. 186:-7. He then explained that "████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████." Zervas Tr. 187:17-188:3. Zervas testified that he did not know if Google as one of those

61.     The Zervas Report also does not provide any statistics about the usage of the AdBlock Add-on extension among users in various configurations, including those used in the report. Zervas Tr. at 186:18-21.

62.     It is not intuitive to users how to change the settings of the AdBlock Add-on extension. For example, there is no easy button to click in order to access the settings and the

settings are not shown during the initial setup process. In addition, in the process of installing the AdBlock browser extension, Chrome tells users that "It can: Read and change all your data on all websites." Zervas Ex. 10:



Source: Zervas Ex. 10

63.     Regardless, the underlying Zervas testing data shows that not all data transmissions from the Chrome browser to Google servers are blocked by the AdBlock Add-on extension – even with the changed configurations that Zervas made to the extension:

Request #4

GET
https://fonts.googleapis.com/css?family=Droid+Sans%3A400%2C700%7CDroid+Seri
f%3A400%2C400i%2C700%2C700i%7CArvo%3A400%2C400i%2C700%2C700i&v
er=5.8.2 http/2.0
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="96", "Google Chrome";v="96"
origin: https://www.mercurynews.com
sec-ch-ua-mobile: ?0
user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36
(KHTML, like Gecko) Chrome/96.0.4664.110 Safari/537.36
sec-ch-ua-platform: "Windows"
accept: text/css,*/*;q=0.1

x-client-data:
CIS2yQEIpbbJAQjEtskBCKmdygEI3tHKAQie+csBCOeEzAEItYXMAQjLicwBCN
KPzAEI1pLMARiOnssB
sec-fetch-site: cross-site
sec-fetch-mode: cors
sec-fetch-dest: style
referer: https://www.mercurynews.com/
accept-encoding: gzip, deflate, br
accept-language: en-US,en;q=0.9

Source: GOOG_ZERVAS_00000037.har (mercury_adblock.har)

---

Request #13

GET
https://maps.googleapis.com/maps/api/js?key=AIzaSyB0TOv46pgshuLhvImI1q7cJnS
bYu3yHNU&ver=5.8.2 http/2.0
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="96", "Google Chrome";v="96"
sec-ch-ua-mobile: ?0
user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36
(KHTML, like Gecko) Chrome/96.0.4664.110 Safari/537.36
sec-ch-ua-platform: "Windows"
accept: */*
x-client-data:
CIS2yQEIpbbJAQjEtskBCKmdygEI3tHKAQie+csBCOeEzAEItYXMAQjLicwBCN
KPzAEI1pLMARiOnssB
sec-fetch-site: cross-site
sec-fetch-mode: no-cors
sec-fetch-dest: script
referer: https://www.mercurynews.com/
accept-encoding: gzip, deflate, br
accept-language: en-US,en;q=0.9

Source: GOOG_ZERVAS_00000037.har (mercury_adblock.har)

---

Request #13

GET https://www.google.com/coop/cse/brand?form=cse-search-box&lang=en h3
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="96", "Google Chrome";v="96"
sec-ch-ua-mobile: ?0
user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36
(KHTML, like Gecko) Chrome/96.0.4664.110 Safari/537.36

```
sec-ch-ua-platform: "Windows"
accept: */*
x-client-data:
CIS2yQEIpbbJAQjEtskBCKmdygEI3tHKAQie+csBCOeEzAEItYXMAQjLicwBCN
KPzAEI1pLMARiOnssB
sec-fetch-site: cross-site
sec-fetch-mode: no-cors
sec-fetch-dest: script
referer: https://www.myflorida.com/
accept-encoding: gzip, deflate, br
accept-language: en-US,en;q=0.9
cookie:    Secure-3PSID=FAhnaS5iwTHPfE  ojpiJ4K-Y-
tOaGoo89ZmrnzXgN0pUfHdyG5rpmVYpi-eGeR2lgk7MnQ.;  __Secure-
3PAPISID=EMqnQ2B5TlqT3SeG/A3N2yldnUMrp3  28Z;
NID=511=HbqdAunsnk2FToR1EPfeCyc1sq-KO861SVNOaS7cLtkCbmb-
ZGV8znEGrG-iXszj3VsdGMzpNfDyJ0-
JCFGpexJyJIMX9ytXgOi5OmN7kUPQ9V1o3ZN1XU3fJOAcdNYqKj11StvBlW3RL
-qHUkRqHQ  Joi49Y9xZc5hvzclquIIO3bjfe1mmxbpiBd8;    Secure-
3PSIDCC=AJi4QfH4AHhBHe0EUWPhvr62l99w6KR9FW9BEi_cJ8XiHIVvdw5IPpb
luoQ4QrhdapxnUFSh
```

Source: GOOG_ZERVAS_00000043.har (myfl_adblock.har)

64.     In these HTTP requests, Google Cookies are marked in blue and X-Client-Data headers are marked in green.

65.     When the default configuration of the AdBlock Add-on extension is used, additional data transmissions are made from the Chrome browser to Google servers as shown in the following HTTP requests:

```
Request #233

GET https://www.google-analytics.com/analytics.js HTTP/1.1
Host: www.google-analytics.com
Connection: keep-alive
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="98", "Google Chrome";v="98"
sec-ch-ua-mobile: ?0
User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36
(KHTML, like Gecko) Chrome/98.0.4758.82 Safari/537.36
sec-ch-ua-platform: "Windows"
Accept: */*
Sec-Fetch-Site: cross-site
Sec-Fetch-Mode: no-cors
```

Sec-Fetch-Dest: script
Referer: https://www.mercurynews.com/
Accept-Encoding: gzip, deflate, br
Accept-Language: en-US,en;q=0.9

Source: AdBlock.saz

---

Request #255

POST https://www.google-analytics.com/j/collect?v=1&_v=j96&a=1665037967&t=pageview&_s=1&dl=https%3A%2F%2Fwww.mercurynews.com%2F&dr=&dp=%2F&ul=en-us&de=UTF-8&dt=The%20Mercury%20News%20-%20Bay%20Area%20news%2C%20sports%2C%20business%2C%20entertainment%2C%20lifestyle%20and%20commentary&sd=24-bit&sr=2560x1440&vp=1075x479&je=0&_u=aGBACEAjBAAAAC~&jid=1236348908&gjid=2078037628&cid=2019070894.1644240378&tid=UA-61435456-5&_gid=1554273546.1644240378&_r=1&gtm=2wg220TLFP4R&cd2=mercurynews.com&cd3=mercurynews.com&cd8=unknown&cd9=no&cd10=home&cd11=5.9&cd12=&cd13=WP&cd14=Home&cd15=&cd16=&cd17=&cd18=&cd19=&cd21=https%3A%2F%2Fwww.mercurynews.com%2F&cd24=home&cd25=BANG&cd27=Home&cd28=https%3A%2F%2Fwww.mercurynews.com%2F&cd29=Home&cd30=&cd32=p-4ctCQwtnNBNs2&cd33=BayAreaNewsGroup&cd34=true&cd35=&cd50=Mozilla%2F5.0%20(Windows%20NT%2010.0%3B%20Win64%3B%20x64)%20AppleWebKit%2F537.36%20(KHTML%2C%20like%20Gecko)%20Chrome%2F98.0.4758.82%20Safari%2F537.36&cd51=&cd61=Not%20Set&cd53=2019070894.1644240378&z=263010949 HTTP/1.1
Host: www.google-analytics.com
Connection: keep-alive
Content-Length: 0
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="98", "Google Chrome";v="98"
sec-ch-ua-mobile: ?0
User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/98.0.4758.82 Safari/537.36
sec-ch-ua-platform: "Windows"
Content-Type: text/plain
Accept: */*
Origin: https://www.mercurynews.com
Sec-Fetch-Site: cross-site
Sec-Fetch-Mode: cors
Sec-Fetch-Dest: empty
Referer: https://www.mercurynews.com/
Accept-Encoding: gzip, deflate, br
Accept-Language: en-US,en;q=0.9

Source: AdBlock.saz

Request #281

POST
https://stats.g.doubleclick.net/j/collect?t=dc&aip=1&_r=3&v=1&_v=j96&tid=UA-61435456-5&cid=2019070894.1644240378&jid=1236348908&gjid=2078037628&_gid=1554273546.1644240378&_u=aGBACEAiBAAAAC~&z=752759869 HTTP/1.1
Host: stats.g.doubleclick.net
Connection: keep-alive
Content-Length: 0
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="98", "Google Chrome";v="98"
sec-ch-ua-mobile: ?0
User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/98.0.4758.82 Safari/537.36
sec-ch-ua-platform: "Windows"
Content-Type: text/plain
Accept: */*
Origin: https://www.mercurynews.com
X-Client-Data: CKy1yQEIkbbJAQimtskBCMS2yQEIqZ3KAQie+csBCOeEzAEIwpfMAQ==
Sec-Fetch-Site: cross-site
Sec-Fetch-Mode: cors
Sec-Fetch-Dest: empty
Referer: https://www.mercurynews.com/
Accept-Encoding: gzip, deflate, br
Accept-Language: en-US,en;q=0.9

Source: AdBlock.saz

---

Request #283

GET https://www.google.com/ads/ga-audiences?t=sr&aip=1&_r=4&slf_rd=1&v=1&_v=j96&tid=UA-61435456-5&cid=2019070894.1644240378&jid=1236348908&_u=aGBACEAiBAAAAC~&z=1229534268 HTTP/1.1
Host: www.google.com
Connection: keep-alive
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="98", "Google Chrome";v="98"
sec-ch-ua-mobile: ?0
User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/98.0.4758.82 Safari/537.36
sec-ch-ua-platform: "Windows"
Accept: image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8

<div style="border:1px solid black;">

==X-Client-Data:==
==CKy1yQEIkbbJAQimtskBCMS2yQEIqZ3KAQie+csBCOeEzAEIwpfMAQ==
Sec-Fetch-Site: cross-site
Sec-Fetch-Mode: no-cors
Sec-Fetch-Dest: image
Referer: https://www.mercurynews.com/
Accept-Encoding: gzip, deflate, br
Accept-Language: en-US,en;q=0.9

Source: AdBlock.saz

</div>

66.     In these HTTP requests, Google Analytics cookie values sent as URL parameters are marked in ==blue== and X-Client-Data headers are marked in ==green==.

67.     The Zervas Report is also silent on the fact that users are prohibited from accessing certain Web sites if they are using an ad blocker such as AdBlock.

68.     In such cases, a Web site may require a user to turn off an ad blocker, provide an exception for the Web site to the ad blocker, or pay a subscription fee in order to access the Web site.

69.     One such Web site is the Mercury News Web site as shown in the following screen shot:



Source: https://mercurynews.com

70.     The AdBlock Web site provides instructions on how to temporarily or permanently disable AdBlock on specific Web sites:

## How to disable AdBlock on specific sites

**AdBlock Support**
Modified on: Sat, Jul 24, 2021 at 3:47 PM

Are you trying to watch a video or read an article on a site that doesn't allow ad blockers? Do you want to support a site you love by allowing it to show you ads? Use the steps below to pause AdBlock temporarily or add a site to your allowlist to see ads every time you visit.

**Note:** The methods described below work in desktop browsers on Chrome, Firefox and Edge. There are similar steps for the Mac app. You can also pause AdBlock on your mobile device or add websites to your allowlist on your iPhone or iPad.

### ^ Allow Ads On a Domain (Website)

To allow ads to show on the site you're currently visiting, click the AdBlock toolbar icon to open the AdBlock menu. Under **Pause on this site**, select **Once** to temporarily pause AdBlock on that site or **Always** to add the site to your allowlist.

When paused once, AdBlock will automatically start blocking ads again when you leave the site. If paused always, the site will be added to your allowlist ensuring that ads will continue to show every time you visit the site.

To start blocking ads on a site again, click the AdBlock toolbar icon and select **Unpause AdBlock**. You can also manually remove the site from your allowlist:

1. Click the AdBlock toolbar icon and select the **gear symbol**.
2. On the Customize tab next to "Manually edit your filters," click **Edit**.
3. Delete any line containing the name of the website.
4. Click **Save**.
5. Go back to the page you were viewing and reload it.

Source:       https://help.getadblock.com/support/solutions/articles/6000055743-how-to-disable-adblock-on-specific-sites

**E.      The Use of a VPN Does Not Prevent Data Transmissions to Google**

71.     Paragraphs 52-54 of the Zervas Report offer the use of a VPN as a method of masking an IP address used by the Chrome browser when communicating with a Google server.

72.     The Zervas Report provides no statistics on how common the use of VPNs is among Chrome users.

73.     Even when a user is using a VPN, the Chrome browser will send User-Agent headers, cookie values, URL parameters, X-Client-Data headers, browsing history information, and the content of user communications on non-Google websites to Google. However, the Zervas Report is silent on this.

74.     The Zervas Report is also silent on the fact that some Web sites, for security reasons, block access if they determine a user is using a VPN.

75.     One such Web site is Hulu which rejects login attempts from a Chrome browser using a VPN as shown in the following screen shot:



Source: https://hulu.com/welcome

76.     Other Web sites, such as Disney Plus, silently fail when the Chrome browser is used with a VPN as the following screen shot shows with a blank login page at Disney Plus:



Source: https://disneyplus.com/en-gb/login

## IV.   THE CHEN REPORT'S CONCLUSIONS ABOUT TRANSMISSIONS FROM CHROME TO GOOGLE, AS COMPARED TO OTHER BROWSERS, IS INCORRECT AND BASED ON A FLAWED METHODOLOGY

77.     The Chen Report states the following opinion in Paragraph 10a:

"The way that Chrome operates is typical of other browsers with respect to the issues relevant to this case. Chrome responds to third-party scripts in the same way that other popular browsers do. Thus, there is nothing unique about how Google designed Chrome that affects the data collection and processes at issue here."

78.     This conclusion is misleading and incorrect.

79.     According to Paragraph 63 of the Chen Report, browser settings were "adjusted" to "allow all cookies" before testing was done with the Firefox and Edge browsers.

80.     These "adjustments" made for purposes of the Chen Report are what caused the Firefox and Edge browsers to send third-party cookies in a manner similar to Chrome. *See e.g.* Chen Tr. at 147:9-13 (**Q.** Okay. And why did you turn enhanced tracking protection on Firefox

off? **A.** Because I want my experiments to compare what data was transmitted when nothing was blocked, all third-party cookies can possibly be passed."); *Id.* at 147:22-25 (regarding Edge).

81.    Had the Chen Report not made "adjustments" to the Firefox and Edge browser settings, the Firefox and Edge browsers would not have responded to the Google-supplied scripts in the same manner as the Chrome browser.

82.    Therefore, the Chrome browser, in it is default configuration, makes transmissions to Google servers that would not occur with Firefox and Edge in their respective default configurations.

83.    Unlike the Chrome browser, the Firefox and Edge browsers also do not send the X-Client-Data header in HTTP requests to specific Google servers.

84.    The Firefox browser offers a feature called Enhanced Tracking Protection which "blocks many of these trackers" as shown in the following screen shot from Firefox settings:



Source: Firefox browser settings

85.     In the latest version of Firefox, "Standard" blocking is ***turned on by default*** with Enhanced Tracking Protection.

86.      However, Exhibit 1 to the Chen Report makes clear that the "adjustments" to Firefox go beyond just turning on all cookies, but also ***turning off all tracking protections*** including making sure "enhanced tracking protection" is turned "'Off' for each website".

87.      The Chen Report also ignores that the Chrome browser does not have an equivalent feature to Firefox's enhanced tracking protection.

88.      It is my opinion that the "adjustments" to the Firefox browser settings makes the Chen Firefox tests flawed and any conclusions or opinions drawn from them are equally flawed and unreliable.

89.      The Edge browser also contains a Tracking prevention feature which is described in Edge settings as follows:



Source: Edge browser settings

90.      As shown above, "Balanced" is the default setting.

91.      The Chen Report does not state whether she "adjusted" the Edge Tracking prevention settings for the Edge tests but Exhibit 1 indicates she "Toggle[d] "Block third-party cookies" off".

92.     The Chen Report did not test Apple's Safari browser, but it also has a tracking protection feature called "Intelligent Tracking Prevention" (ITP).

93.     The Safari ITP feature is described in a Nov. 2019 Apple White Paper as follows:

## Protection from cross-site tracking

In the years since the web was created, technology has been developed to track user behavior across websites for advertising purposes. Users experience this tracking in action when they look at a product online and then ads for that product seem to follow them around the web. Tracking is pervasive; some websites include 100 or more trackers from different companies on a single page.

Because tracking uses web technology that also provides features required for the proper operation of websites, simply blocking all of the functionality used for tracking can cause issues, including not being able to save sign-in information or remember items in a shopping cart.

In iOS 11 and macOS High Sierra, Safari added a feature called Intelligent Tracking Prevention to address this problem. The goal of ITP is to limit tracking while still enabling websites to function normally. ITP works by learning which domains are used to track a user and then immediately isolating and purging the tracking data that they attempt to store on the user's device. The process of learning about domains uses machine learning and happens on device, so it doesn't share the user's browsing history information with Apple. This on-device approach applies the same high standard to every website that is visited. And because ITP is turned on by default, there is no need to change anything in Settings or Safari preferences to receive tracking protection.

Source: https://www.apple.com/safari/docs/Safari_White_Paper_Nov_2019.pdf

94.     The browser comparison methodology used for the Chen Report is also fundamentally flawed for three additional reasons.

  a.  The Chen Report used the Chrome Developer tools (created by Google) for her report rather than Fiddler. Unlike Fiddler, the Chrome Developer tools do not capture all data transmissions that are sent to Google.

  b.  The Chen Report did not gather data until well after the Chrome browser had been opened and communications had started.

c.  The Chen Report cleared all data from the browser before each test, rendering the process not a valid test of real-world conditions, which both Dr. Chen and Dr. Zervas acknowledged based on the fact that neither of them typically clear their information before using a browser.

## V.   CHROME DEVELOPMENT TOOLS ARE NOT A RELIABLE METHOD OF CAPTURING NETWORK TRAFFIC FROM THE CHROME BROWSER

95.     Both the Zervas Report and Chen Report state that the Chrome Developer Tools were used to capture network traffic to and from the Chrome Browser and Web servers including Google servers.  See paragraph 29 of the Zervas Report and paragraph 65 of the Chen Report. This is an issue because both reports reflect many fewer transmissions to Google sites.

My analysis has revealed that the Chrome Developer Tools do not capture all transmissions.  Thus the conclusions of both reports on this point are incorrect.

96.     In my testing of the Chrome Developer Tools, I found that Chrome Developer Tools do not include all HTTP requests and responses made by the Chrome browser.

97.     In particular, the Chrome Browser does not put the following kinds of HTTP requests and responses in a HAR file:

a.  HTTP requests and responses related to Chrome Sync

b.  HTTP requests and responses for the Chrome Omnibox

c.  A percentage of HTTP requests and responses for unknown reasons

98.     In addition, I found no method of using the Chrome Developer Tools to record the start-up process of the Chrome browser which makes HTTP requests to Google servers.

99.     In addition, I found that the HAR files include entries for cached files which do not result in actual network requests.

100.    The Fiddler debugging tool has none of these same limitations as the Chrome Developer Tools.  The Fiddler tool begins recording transmissions immediately upon start up.

101.    To illustrate the limitations of the Chrome Developer Tools, I recorded a Chrome session with both the Chrome Developer Tools (in Chrome-Sync-On-and-Off.har) and Fiddler (in Chrome-Sync-On-and-Off.saz) at the same time.

102.    The following are examples of HTTP requests from the Chrome browser to Google servers which Fiddler was able to capture, but the Chrome Developer Tools were not:

Request #1720

GET https://ade.googlesyndication.com/ddm/activity/dc_oe=ChMI6MGlhNv69QIV UKafCh0Slgm_EAAYACClILNKQhMI3Oiog9v69QIVDwpoCB2nhQER;met =1;&timestamp=1644687712058;eid1=2;ecn1=0;etm1=13; HTTP/1.1
Host: ade.googlesyndication.com
Connection: keep-alive
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="98", "Google Chrome";v="98"
Cache-Control: max-age=0
sec-ch-ua-mobile: ?0
User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/98.0.4758.82 Safari/537.36
sec-ch-ua-platform: "Windows"
Accept: */*
X-Client-Data: CKy1yQEIkbbJAQimtskBCMS2yQEIqZ3KAQie+csBCOeEzAEI04/MAQjCl8 wB
Sec-Fetch-Site: same-site
Sec-Fetch-Mode: no-cors
Sec-Fetch-Dest: empty
Referer: https://74ea71965d02ba4f930f5dcccff2f917.safeframe.googlesyndication.com/
Accept-Encoding: gzip, deflate, br
Accept-Language: en-US,en;q=0.9

Request #158

POST https://clients4.google.com/chrome-sync/command/?client=Google+Chrome&client_id=p9zUlOK5fvuwDZEIHFn 5dA%3D%3D HTTP/1.1
Host: clients4.google.com
Connection: keep-alive
Content-Length: 742
Pragma: no-cache
Cache-Control: no-cache

Authorization: Bearer
ya29.A0ARrdaM_3IusLSHv1pRgEPYhu4ZCGDdjhb82EpkMDK3YvvNCDn4
nnXuwHPPruIMDaQhhYIAssl7lk3OzrlHQYM5gwXgjhGgiJFQyvuDjjmV1Cs
f_UsxcMSFf3OcX1fWJrBPOYYOeFqVu_5o6fpgJnj-CMuQZapTzbGPs-
KTjTlMLqezA5Dex_Pq0sKfqmpqafsjr57LQ1Kx7pkq-
m0jDwQ7jQgUygodmpvU1ahjaDAYL3JxSp7mIEluGR0mvExTg3F8m5jiw
User-Agent: Chrome WIN 98.0.4758.82
(7f0488e8ba0d8e019187c6325a16c29d9b7f4989-refs/branch-
heads/4758@{#972}) channel(stable)
Content-Type: application/octet-stream
X-Client-Data:
CKy1yQEIkbbJAQimtskBCMS2yQEIqZ3KAQi0gcsBCOryywEInvnLAQjnh
MwBCNOPzAEImpHMAQjCl8wBCOKXzAEI5pfMAQ==
Sec-Fetch-Site: none
Sec-Fetch-Mode: no-cors
Sec-Fetch-Dest: empty
Accept-Encoding: gzip, deflate, br
Accept-Language: en-US,en;q=0.9


Request #4272


GET https://accounts.google.com/Logout HTTP/1.1
Host: accounts.google.com
Connection: keep-alive
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="98", "Google
Chrome";v="98"
sec-ch-ua-mobile: ?0
sec-ch-ua-platform: "Windows"
Upgrade-Insecure-Requests: 1
User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64)
AppleWebKit/537.36 (KHTML, like Gecko) Chrome/98.0.4758.82
Safari/537.36
Accept:
text/html,application/xhtml+xml,application/xml;q=0.9,image/avif,image/webp
,image/apng,*/*;q=0.8,application/signed-exchange;v=b3;q=0.9
X-Chrome-ID-Consistency-Request:
version=1,client_id=77185425430.apps.googleusercontent.com,device_id=b0e
8eb3a-3302-4885-a048-
44a10add4811,sync_account_id=106136058950774396990,signin_mode=all_a
ccounts,signout_mode=show_confirmation
X-Client-Data:
CKy1yQEIkbbJAQimtskBCMS2yQEIqZ3KAQi0gcsBCOryywEInvnLAQjnh
MwBCNOPzAEImpHMAQjCl8wBCOKXzAEI5pfMAQ==
Sec-Fetch-Site: none
Sec-Fetch-Mode: navigate
Sec-Fetch-User: ?1

Sec-Fetch-Dest: document
Accept-Encoding: gzip, deflate, br
Accept-Language: en-US,en;q=0.9
Cookie:
ACCOUNT_CHOOSER=AFx_qI6J2fb6jS2i_EjwzVt0wCPQ0ZE81AV2rVuT
2BjSj9xIKuB0Ec0TKgTVN-
HqesT570l4RqciAHrQRJU6_P7WD8O1jcEJKhAbv7iCNVIJdZkhySxunQbpfi
BjC64MGgnfW-NT4LzQGFlHxUeA7pG3UVeomNIrtw;
SEARCH_SAMESITE=CgQI2JQB; SID=HAiwiKOOOZO2j6qy-P4-
2KfYGpZvuRdM_ZNnBVp3R5Rm_tabsQd6c-jHiI7ctYF5gWizmA.;
__Secure-1PSID=HAiwiKOOOZO2j6qy-P4-
2KfYGpZvuRdM_ZNnBVp3R5Rm_tabUUThzmTaGy8zr_wqez-JiQ.;
__Secure-3PSID=HAiwiKOOOZO2j6qy-P4-
2KfYGpZvuRdM_ZNnBVp3R5Rm_tabdICuGnVw2MzvRqZGU6hznQ.;
HSID=ABPDcJt-op2e4FiA8; SSID=AAisyX-XogFJIS3hj;
APISID=KBYyyBq9cy0ruVwQ/A-4m4vj3lWaUhpPce;
SAPISID=fWpqo4BI_taqDUB4/A9hRVD5f3dw3i-c24; __Secure-
1PAPISID=fWpqo4BI_taqDUB4/A9hRVD5f3dw3i-c24; __Secure-
3PAPISID=fWpqo4BI_taqDUB4/A9hRVD5f3dw3i-c24;
NID=511=t4uL_6csGN9lRnucckHNQupPTik_uXqGt_tkikVX1xhtIk1CShNsG
wZqfSD4m6FhoFhYYIfFbNDowLIDcLpyVhTJpW9gk-
_XyRcNAuGHidUcFR9hSQK9GNK2r7VxZJoswtl7CYr7Aji_VXocN_zvjIogJ
rwsEckq7xsWtnFqwS0lRQSyjW5vo4XFbNM0Gn0v615ff1OhhZHmq6ke29C
wU5yPchCo2-YlJvtLmIxSr0kkrs55uao; 1P_JAR=2022-02-12-17;
LSID=o.chat.google.com|o.mail.google.com|s.youtube:HAiwiHIRXxOqTlDHs
E_y_rnh1Bu1RVMPhNnzNUT1Y5cHaSiO003n__TxzSkMDh7uaw90Bw.;
__Host-
1PLSID=o.chat.google.com|o.mail.google.com|s.youtube:HAiwiHIRXxOqTlD
HsE_y_rnh1Bu1RVMPhNnzNUT1Y5cHaSiOhByro7_MZRlupnVlwr7bCw.;
__Host-
3PLSID=o.chat.google.com|o.mail.google.com|s.youtube:HAiwiHIRXxOqTlD
HsE_y_rnh1Bu1RVMPhNnzNUT1Y5cHaSiOVOUUDfu80hpEwWzet8L2vQ.;
__Host-GAPS=1:T37I49ZdKm-M-
A3AcutGdGPVfuyCGakt4wQ_TSp2AvQDiMYyQsQ2r5870LZH3V83k_OIC
S6XUiTIoFnSDjLNg42Zd7O3qQ:HxoJSGxAlZFnuFu-;
SIDCC=AJi4QfFGHO2Z3Me4jqJbuW_hXV71rR00rSpJOjeM76naM8zo7iDx
9wtiD03Fx85gJzgCVGSJ; __Secure-3PSIDCC=AJi4QfG-
zw79gT7ZnNaYZuSjyYrVYt8jdmiw-
J_T3dWAJTD0vRE4kJf28q0ggMa2gwnXpUs2LQ

Request #4303

GET
https://googleads.g.doubleclick.net/pagead/drt/so?r=4353139998551929972
HTTP/1.1
Host: googleads.g.doubleclick.net

Connection: keep-alive
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="98", "Google
Chrome";v="98"
sec-ch-ua-mobile: ?0
User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64)
AppleWebKit/537.36 (KHTML, like Gecko) Chrome/98.0.4758.82
Safari/537.36
sec-ch-ua-platform: "Windows"
Accept: image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
X-Client-Data:
CKy1yQEIkbbJAQimtskBCMS2yQEIqZ3KAQi0gcsBCOryywEInvnLAQjnh
MwBCNOPzAEImpHMAQjCl8wBCOKXzAEI5pfMAQ==
Sec-Fetch-Site: cross-site
Sec-Fetch-Mode: no-cors
Sec-Fetch-Dest: image
Referer: https://accounts.google.com/
Accept-Encoding: gzip, deflate, br
Accept-Language: en-US,en;q=0.9
Cookie: IDE=AHWqTUnT2-
sOK5C6nz7QgrUWT4Iq1vsdTBM4j4PiKp9j7fEzSMUu-b3un5reuVfpqqo


Request #22

POST
https://update.googleapis.com/service/update2/json?cup2key=11:Dajro3s7Q2aP
jg9FSef_q30jmczpFda-
rXmqC4Atxeg&cup2hreq=9705ae1d1d391e4d90ea1f32dc8560a1d90f58c021ff
cb208443e69000765a98 HTTP/1.1
Host: update.googleapis.com
Connection: keep-alive
Content-Length: 2768
X-Goog-Update-AppId:
aapocclcgogkmnckokdopfmhonfmgoek,aohghmighlieiainnegkcijnfilokake,apdf
llckaahabafndbhieahigkjlhalf,blpcfgokakmgnkcojhhkbfbldkacnbeo,felcaaldnbd
ncclmgdcncolpebgiejap,ghbmnnjooekpmoecnnnilnnbdlolhkhi,nmmhkkegccagd
ldgiimedpiccmgmieda,pjkljhegncpnkpknbcohdijeoejaedia
X-Goog-Update-Interactivity: bg
X-Goog-Update-Updater: chromecrx-98.0.4758.82
Content-Type: application/json
Sec-Fetch-Site: none
Sec-Fetch-Mode: no-cors
Sec-Fetch-Dest: empty
User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64)
AppleWebKit/537.36 (KHTML, like Gecko) Chrome/98.0.4758.82
Safari/537.36
Accept-Encoding: gzip, deflate, br

```
Accept-Language: en-US,en;q=0.9

Request #78

GET https://www.google.com/complete/search?client=chrome-
omni&gs_ri=chrome-ext-
ansg&xssi=t&q=dev+tools&oit=4&cp=9&pgcl=7&gs_rn=42&psi=1LDQzL6a
b3abVVSB&sugkey=AIzaSyBOti4mM-6x9WDnZIjIeyEU21OpBXqWBgw
HTTP/1.1
Host: www.google.com
Connection: keep-alive
X-Client-Data:
CKy1yQEIkbbJAQimtskBCMS2yQEIqZ3KAQi0gcsBCOryywEInvnLAQjnh
MwBCNOPzAEImpHMAQjCl8wBCOKXzAEI5pfMAQ==
Sec-Fetch-Site: none
Sec-Fetch-Mode: no-cors
Sec-Fetch-Dest: empty
User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64)
AppleWebKit/537.36 (KHTML, like Gecko) Chrome/98.0.4758.82
Safari/537.36
Accept-Encoding: gzip, deflate, br
Accept-Language: en-US,en;q=0.9
Cookie: __Secure-3PSID=HAiwiKOOOZO2j6qy-P4-
2KfYGpZvuRdM_ZNnBVp3R5Rm_tabdICuGnVw2MzvRqZGU6hznQ.;
__Secure-3PAPISID=fWpqo4BI_taqDUB4/A9hRVD5f3dw3i-c24;
NID=511=t4uL_6csGN9lRnucckHNQupPTik_uXqGt_tkikVX1xhtIk1CShNsG
wZqfSD4m6FhoFhYYIfFbNDowLIDcLpyVhTJpW9gk-
_XyRcNAuGHidUcFR9hSQK9GNK2r7VxZJoswtl7CYr7Aji_VXocN_zvjIogJ
rwsEckq7xsWtnFqwS0lRQSyjW5vo4XFbNM0Gn0v615ff1OhhZHmq6ke29C
wU5yPchCo2-YlJvtLmIxSr0kkrs55uao; 1P_JAR=2022-02-12-17; __Secure-
3PSIDCC=AJi4QfGwdgz_AsABIHyjl2Wqach8105XtG4IiwbFl_JZr2fKuB05
mOIU5O5RabxSetzi_Uw2Fw

Source: Chrome-Sync-On-and-Off.saz
```

103.    It is not possible to say after the fact with any certainty what all of the HTTP requests were not recorded in the Zervas and Chen HAR files by the Chrome Developer Tools.

## VI.   BLOCKING METHODS PROPOSED IN THE BERSTON DECLARATION WILL NOT STOP ALL DATA TRANSMISSIONS TO GOOGLE AND WILL CAUSE WEB SITES TO FAIL

104.    Glenn Berntson, the Engineering Director and a Lead of the Google Ad Manager team at Google, provided a declaration in this case which I was asked to review.

105.    The Berntson Declaration offers up many of the same blocking methods as the Zervas Report which he claims will block data transmissions from the Chrome browser to Google servers.

106.    These same claimed blocking methods are:

    a.  Cookie blocking

    b.  Disabling JavaScript

    c.  Google Analytics Chrome opt-out extension

    d.  AdBlock Chrome extension

    e.  Guest and Incognito modes

    f.  VPN

107.    I have covered these claimed blocking methods above in my analysis of the Zervas Report and that analysis applies also to the Bernston Declaration.  That is, the Berntson Declaration is in error to the extent it makes these assertions.

108.    The Bernston Declaration also offers the following additional blocking methods:

    a.  Enabling "clear cookies and site data when you close all windows" in Chrome settings

    b.  Opting Out of Personalized Ads (for users not signed into a Google Account)

    c.  Interest-Based Ads (IBA) Opt-out Add-on

    d.  The Network Advertising Initiative's ("NAI's") Opt-Out page

    e.  Turning off Ad Personalization

    f.  Using a firewall

    g.  Using a standalone ad blocker program

### A.    The "Clear Cookies and Site Data" Option Does Not Stop Transmissions

109.    Paragraph 19(c) of the Bernston Declaration suggests that, if a user enables the "clear cookies and site data when you close all windows" option of the Chrome browser, then enabled "Google Ad Manager will not receive any cookies set in a prior session".

110.   This description of the "clear cookies and site data when you close all windows" option is incomplete and misleading.

111.   The option does not affect the transmission of a new cookie values, IP address, and X-Client-Data headers in a new Chrome session.

112.   The Bernston Declaration is also silent about what happens with the restoration and/or correlation of Google cookies when a user logs into their Google account in both a prior session and a new session in the Chrome browser

**B.   "Opting Out of Personalized Ads" Relies on Cookies and Does Not Stop All Transmissions**

113.   Paragraph 19(f) of the Bernston Declaration offers up the option of Opting out of Personalized Ads in the Chrome browser.  A user does this opting-out on the Web page at the URL https://adssettings.google.com/whythisad as shown in paragraph 19(f).

114.   The Web page allows users to opt out both of Google search ads and Web ads by selecting the appropriate tab.

115.   The Web page also has a tab for YouTube, but the tab has no opt-out option.

116.   The following screen shots show the three tabs in their default state:





Source: https://adssettings.google.com/anonymous?hl=en

117. The following screen shot shows ad personalization being turned off:



Source: https://adssettings.google.com/anonymous?hl=en&tb=web

118.     However, with ad personalization turned off, data transmissions with unique cookie values continue to be sent from the Chrome browser to Google servers.

119.     For example, with ad personalization turned off, the value of the Google Analytic _ga cookie is sent to a doubeclick.net server as the URL parameter ga_vid is shown below in the following HTTP GET request:

Request #3891

GET
https://securepubads.g.doubleclick.net/gampad/ads?gdfp_req=1&pvsid=4099953460911827&correlator=3262105034908821&output=ldjh&impl=fifs&adsid=ChAIgMaIkAYQnZOH2K2Vx4NfEhoAlsWo0250-IIabSVjtw4cSraVsaT4PH7RNQ&jar=2022-02-08-16&eid=31064681&vrg=2022020301&ptt=17&gdpr_consent=CPZqbKwPZqbKwEXABAENBgCwAP_AAH_AACiQGggBIAJEQABAIAAEAIAEAAAAQBgAAEAgAAAAAAAAAAABAgAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAACAAAAAAAAAAAAEAAAAAAAAAAgAAAAIAAAAAgXmAAAAkQAAEAAAAAAAAQAAABAEAAAAAAAAAAAAAAAAECAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAACAA.YAAAAAAAAAA&gdpr=0&us_privacy=1YNY&sc=1&sfv=1-0-

38&ecs=20220527&iu_parts=8013%2Cmercurynews.com%2Cbusiness%2COutstream_Video&enc_prev_ius=%2F0%2F1%2F2%2F3&prev_iu_szs=480x360&prev_scp=POS%3DOutstream_Video%26zeus_rendercount%3D1%26zeus_slot%3Dzeus_Outstream_Video.init.dsk&eri=1&cust_params=zeus%3Dapplied%26zeus_8013%3Dwww.mercurynews.com%26kv%3Dbusiness%252Ccoronavirus%252Ccoronavirus-tips%252Cpm-report%252Cqa%252Clouis-hansen%26page%3Darticle%26content%3D%26RPN%3D333703734067%26rurl%3D%26articleid%3D7158259%26blueconic%3Dnon-subscribers%26zeus_insights%3Dcmg%252Cios%252Cihp%252Cdpr%252Cq8t%252Cwug%252C3bu%252Ckh5%252Cec4%252Cphj%252Caw9%252Ctbj%252Cki0%252Cv3s%252Cuib%252Cpgg%252Cbs0%26title%3DMental-health-tips-for-handlin%26full_title%3DMental-health-tips-for-handling-the-pandemic&cookie_enabled=1&bc=31&abxe=1&dt=1653667908843&lmt=1653667908&dlt=1653667853786&idt=3695&frm=20&biw=1075&bih=495&oid=2&adxs=371&adys=1732&adks=1286466235&ucis=4&ifi=5&u_his=7&u_h=1440&u_w=2560&u_ah=1400&u_aw=2560&u_cd=24&u_sd=1.5&u_tz=-240&flash=0&dmc=8&url=https%3A%2F%2Fwww.mercurynews.com%2F2020%2F05%2F24%2Fqa-mental-health-tips-for-handling-the-pandemic%2F&vis=1&scr_x=0&scr_y=1061&psz=609x0&msz=1x0&psts=AGkb-H814S525aAu3potkuMCyb8sYizBsMsBz5lCNKNNBeNZwuU0pgRwrODoXBNLvYatYUmjuvX1btcs8PY0pEcYCZIemw%2CAGkb-H9Vcdgbs4cJUR_V0wNoMVBpxKrMgBOsEa7X7yQErIM-3VjEhK7YqIlog5aviSKPjnvjFXoRiWrXtZd78Vvu39eXGw%2CAGkb-H-MUIiGw6N6Ayd2Pt1hNalxQLe440j9YLW76izy6isCQodVZz7zMsUxRfzZvZInjJtNfdy6I9vPlZhVP2fLNMNQIg&ga_vid=504353525.1653667771&ga_sid=1653667861&ga_hid=214099166&ga_fc=true&fws=0&ohw=0&btvi=1&uach=WyJXaW5kb3dzIiwiMTAuMC4wIiwieDg2IiwiIiwiOTguMC40NzU4LjgyIixbXSxudWxsLG51bGwsIjY0IixbWyIgTm90IEE7QnJhbmQiLCI5OS4wLjAuMCJdLFsiQ2hyb21pdW0iLCI5OC4wLjQ3NTguODIiXSxbIkdvb2dsZSBDaHJvbWUiLCI5OC4wLjQ3NTguODIiXV1d&a3p=Eh4KDmVzzC5jcml0ZW8uY29t9tEgAY0KCkspAwRQAAAAA%3D&nvt=3 HTTP/1.1
Host: securepubads.g.doubleclick.net
Connection: keep-alive
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="98", "Google Chrome";v="98"
sec-ch-ua-mobile: ?0
User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/98.0.4758.82 Safari/537.36
sec-ch-ua-platform: "Windows"
Accept: */*
Origin: https://www.mercurynews.com
X-Client-Data: CKy1yQEIkbbJAQimtskBCMS2yQEIqZ3KAQie+csBCOeEzAEIwpfMAQ==
Sec-Fetch-Site: cross-site

```
Sec-Fetch-Mode: cors
Sec-Fetch-Dest: empty
Referer: https://www.mercurynews.com/
Accept-Encoding: gzip, deflate, br
Accept-Language: en-US,en;q=0.9
Cookie: id=OPT_OUT


Source: google-ad-settings.saz
```

120.     This same _ga cookie value was previously sent to the same doubleclick.net server

before opting-out of Google ad personalization as shown in the following HTTP GET request:

Request #379

GET
https://securepubads.g.doubleclick.net/gampad/ads?gdfp_req=1&pvsid=365900
5191221823&correlator=2749793251569343&output=ldjh&impl=fifs&vrg=20
22020301&ptt=17&gdpr_consent=CPZqa1lPZqa1lEXABAENBgCwAAFAA
H_AACiQGggBIAJEQABAIAAEAIAEAAAAQBAAAEAgAAAAAAAAAA
AABAgAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAA
AAAAAAAAAAAAAACAAAAAAAAAAAAAAAAAAAAAAAAAgA
AAAIAAAAAgXmAAAAkQAAEAAAAAAAQAAABAEAAAAAAA
AAAAAAAAAAECAAAAAAAAAAAAAAAAAAAAAAAAAAAAAA
AAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAA
AAAAAACAA.YAAAAAAAAAAA&gdpr=0&us_privacy=1Y-
Y&npa=1&sc=1&sfv=1-0-
38&ecs=20220527&iu_parts=8013%2Cmercurynews.com%2Cbusiness%2CC
ube1_RRail_ATF&enc_prev_ius=%2F0%2F1%2F2%2F3&prev_iu_szs=300x2
50%7C300x600%7C300x1050%7C160x600&prev_scp=POS%3DCube1_RRai
l_ATF%26zeus_rendercount%3D1%26zeus_slot%3Dzeus_Cube1_RRail_ATF
.init.dsk%26amznbid%3Dxz9csg%26amznp%3D1oynv9c%26amzniid%3DIuE
Yw-hFZcy8Yfb4m2bEGxEAAAF-
2hVARQEAAA0_ARuPb80%26amznsz%3D300x250%26crt_pb%3D0.31%26
crt_bidid%3Dmnimkd%26zeus_appnexus%3D12%26zeus_auctionid_appnexus
%3D8275784190156156546&eri=1&cust_params=zeus%3Dapplied%26zeus_
8013%3Dwww.mercurynews.com%26kv%3Dbusiness%252Ccoronavirus%25
2Ccoronavirus-tips%252Cpm-report%252Cqa%252Clouis-
hansen%26page%3Darticle%26content%3D%26RPN%3D333703734067%26r
url%3D%26articleid%3D7158259%26zeus_insights%3Dcmg%252Cios%252C
ihp%252Cdpr%252Cq8t%252Cwug%252C3bu%252Ckh5%252Cec4%252Cph
j%252Caw9%252Ctbj%252Cki0%252Cv3s%252Cuib%252Cpgg%252Cbs0&
bc=31&abxe=1&dt=1653667773396&lmt=1653667773&dlt=1653667763916
&idt=4243&frm=20&biw=1075&bih=495&oid=2&adxs=909&adys=746&adk
s=3094759181&ucis=4&ifi=4&u_his=2&u_h=1440&u_w=2560&u_ah=1400
```

```
&u_aw=2560&u_cd=24&u_sd=1.5&u_tz=-
240&flash=0&dmc=8&url=https%3A%2F%2Fwww.mercurynews.com%2F20
20%2F05%2F24%2Fqa-mental-health-tips-for-handling-the-
pandemic%2F&vis=1&scr_x=0&scr_y=100&psz=310x600&msz=1x0&psts=A
Gkb-H9awlplzm3R5rYar7qljqzk%2CAGkb-H-
L8kvTgXxqjkPz1ppxHq3VQiEf08As6EuvB8ZhmZLLnOESIEVRoAkY5Et4U
R2CFV0f4z8vCvCebXsy6jn-0oJlUQ%2CAGkb-
H_nA29_9odEWIXLLupGl3OOKoxrMw6Nto7oQTKh5kQ88NRl1em-
6lf5Hb63YfSN9q30k31TxZr2CUCLCA&ga_vid=504353525.1653667771&ga
_sid=1653667771&ga_hid=279644202&ga_fc=true&fws=0&ohw=0&btvi=1&
uach=WyJXaW5kb3dzIiwiMTAuMC4wIiwieDg2IiwiIiwiOTguMC40NzU4Lj
gyIixbXSxudWxsLG51bGwsIjY0IixbWyJGTm90IEE7QnJhbmQiLCI5OS4wLj
AuMCJdLFsiQ2hyb21pdW0iLCI5OC4wLjQ3NTguODIiXSxbIkdvb2dsZSBD
aHJvbWUiLCI5OC4wLjQ3NTguODIiXV1d&nvt=1 HTTP/1.1
Host: securepubads.g.doubleclick.net
Connection: keep-alive
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="98", "Google
Chrome";v="98"
sec-ch-ua-mobile: ?0
User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64)
AppleWebKit/537.36 (KHTML, like Gecko) Chrome/98.0.4758.82
Safari/537.36
sec-ch-ua-platform: "Windows"
Accept: */*
Origin: https://www.mercurynews.com
X-Client-Data:
CKy1yQEIkbbJAQimtskBCMS2yQEIqZ3KAQie+csBCOeEzAEIwpfMAQ==
Sec-Fetch-Site: cross-site
Sec-Fetch-Mode: cors
Sec-Fetch-Dest: empty
Referer: https://www.mercurynews.com/
Accept-Encoding: gzip, deflate, br
Accept-Language: en-US,en;q=0.9
Cookie:
IDE=AHWqTUnT3KnMsSyTpTsSuB8vmm1XUwwNud1XhhY41WzH_sT7T
WHaRUPt473y4_H4p44

Source: google-ad-settings.saz
```

121.   The opting-out process did delete the DoubleClick IDE cookie and replace it with

a "id=OPT_OUT" cookie, but the opting-out process had no effect on the _ga cookie value being

transmitted to Google's DoubleClick server.

122.     I also found that clearing cookies in the Chrome browser removed the search and Web ad personalization opt-outs as shown in the following screen shots:



Source: https://adssettings.google.com/anonymous?hl=en

123.     This problem with the Google ad personalization opt-outs being quietly cancelled when clearing cookies is due to a flawed implementation of the opt-outs relying on cookies.

### C.     The NAI Opt-Out Relies on Cookies and Does Not Stop All Transmissions

124.    Paragraph 22 of the Bernston Declaration offers up the Network Advertising Initiative's (NAI) Opt-Out as another option for opt-outing out of personalized advertising by Google.

125.    Paragraph 22 goes on to say that the NAI Opt-out page works in a similar manner to the Google's Ad personalization settings page.

126.    Indeed, the NAI Opt-out page suffers from the same problems as Google's Ad personalization settings page: it does not block _ga cookie values being sent to Google DoubleClick servers and an NAI opt-out is silently cancelled when cookies are cleared in the Chrome browser.

127.    The following HTTP Request from the Chrome browser shows the _ga cookie still being sent to a Google DoubleClick server as a ga_vid URL parameter after opting out at the NAI opt-out page:

<div style="border:1px solid">

Request #2662

GET
https://securepubads.g.doubleclick.net/gampad/ads?gdfp_req=1&pvsid=1121654988385397&correlator=3092637335625663&output=ldjh&impl=fifs&eid=31064671%2C44742767%2C21065724%2C21067496&vrg=2022020301&ptt=17&gdpr_consent=CPUGaVgPUGaVgEXABAENBgCwAP_AAH_AACiQGggBIAJEQABAIAAEAIAEAAAAQBgAAEAgAAAAAAAAAAAABAgAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAACAAAAAAAAAAAAEAAAAAAAAAAgAAAAIAAAAAgXmAAAAkQAAEAAAAAAAQAAABAEAAAAAAAAAAAAAAAAECAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAACAA.YAAAAAAAAAA&gdpr=0&us_privacy=1YNY&sc=1&sfv=1-0-38&ecs=20220208&iu_parts=8013%2Cmercurynews.com%2Cbusiness%2CSponsorship_1%2Cinterstitial%2Ctop_leaderboard&enc_prev_ius=%2F0%2F1%2F2%2F3%2C%2F0%2F1%2F2%2F4%2C%2F0%2F1%2F2%2F5&prev_iu_szs=300x50%2C1x1%2C728x90%7C970x90%7C970x250&prev_scp=POS%3DSponsorship_1%26zeus_rendercount%3D1%26zeus_slot%3Dzeus_Sponsorship_1.init.dsk%26amznbid%3D2%26amznp%3D2%7CPOS%3Dinterstitial%26zeus_rendercount%3D1%26zeus_slot%3Dzeus_interstitial.init.dsk%26amznbid%3D2%26amznp%3D2%7CPOS%3Dtop_leaderboard%26zeus_rendercount%3D1%26zeus_slot%3Dzeus_top_leaderboard.init.dsk%26amznbid%3D1ry1i4g%26amznp%3Dc4nbwg%26zeus_triplelift%3D17%26zeus_auctionid_triplel

</div>

ift%3Db42dc764-586c-467a-a381-62708e1b5d8c%26zeus_ix%3D23%26zeus_auctionid_ix%3D6ffd6fc5-304c-47e8-a860-e246341c5c46%26zeus_appnexus%3D8%26zeus_auctionid_appnexus%3D2551394848855483249%26amzniid%3DItB7XJm5iRELGQS_LxTag0QAAAF-2gScqwEAAA0_AVlWbK4%26amznsz%3D970x250&eri=1&cust_params=zeus%3Dapplied%26zeus_8013%3Dwww.mercurynews.com%26kv%3Dbusiness%252Ccoronavirus%252Ccoronavirus-tips%252Cpm-report%252Cqa%252Clouis-hansen%26page%3Darticle%26content%3D%26RPN%3D134150076883%26rurl%3D%26articleid%3D7158259%26blueconic%3Dnon-subscribers%26zeus_insights%3Dcmg%252Cios%252Cihp%252Cdpr%252Cq8t%252Cwug%252C3bu%252Ckh5%252Cec4%252Cphj%252Caw9%252Ctbj%252Cki0%252Cv3s%252Cuib%252Cpgg%252Cbs0&cookie=ID%3De6bf7989231f98d6%3AT%3D1644334941%3AS%3DALNI_MZ38_wsblkBzyeqXfPp54Zh8KqzSw&bc=31&abxe=1&dt=1644335241675&lmt=1644335241&dlt=1644335239963&idt=1049&frm=20&biw=1075&bih=479&oid=2&adxs=915%2C10%2C537&adys=17%2C177%2C303&adks=3262223218%2C2856837514%2C1841053995&ucis=1%7C2%7C3&ifi=1&u_his=8&u_h=1440&u_w=2560&u_ah=1400&u_aw=2560&u_cd=24&u_sd=1.5&u_tz=-300&flash=0&dmc=8&url=https%3A%2F%2Fwww.mercurynews.com%2F2020%2F05%2F24%2Fqa-mental-health-tips-for-handling-the-pandemic%2F&vis=1&scr_x=0&scr_y=0&psz=300x50%7C1x1%7C1055x250&msz=1x0%7C1x0%7C1x0&ga_vid=302806176.1644334646&ga_sid=1644335242&ga_hid=1965517170&ga_fc=true&fws=0%2C0%2C0&ohw=0%2C0%2C0&btvi=0%7C0%7C0&uach=WyJJXaW5kb3dzIiwiMTAuMC4wIiwieDg2IiwiIiwiOTguMC40NzU4LjgyIixbXSxudWxsLG51bGwsIjY0IixbWyIgTm90IEE7QnJhbmQiLCI5OSwLjAuMCJdLFsiQ2hyb21pdW0iLCI5OC4wLjQ3NTguuODIiXSxbIkdvb2dsZSBDaHJvbWUiLCI5OC4wLjQ3NTguuODIiXV1d&a3p=Eh4KDmVzcC5jcml0ZW8uY29tENDg4uY29tEgAY0P7_z-0vRQAAAAA%3D&nvt=1
HTTP/1.1
Host: securepubads.g.doubleclick.net
Connection: keep-alive
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="98", "Google Chrome";v="98"
sec-ch-ua-mobile: ?0
User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/98.0.4758.82 Safari/537.36
sec-ch-ua-platform: "Windows"
Accept: */*
Origin: https://www.mercurynews.com
X-Client-Data: CKy1yQEIkbbJAQimtskBCMS2yQEIqZ3KAQie+csBCOeEzAEIwpfMAQ==
Sec-Fetch-Site: cross-site
Sec-Fetch-Mode: cors

```
Sec-Fetch-Dest: empty
Referer: https://www.mercurynews.com/
Accept-Encoding: gzip, deflate, br
Accept-Language: en-US,en;q=0.9
Cookie: DSID=NO_DATA; id=OPT_OUT

Source: nai-opt-out.saz
```

128.   Also, when I first arrived at the NAI Opt-out page, it incorrectly claimed that I had third-party cookies blocked as shown in the following screen shot:



Source: https://adssettings.google.com/anonymous?hl=en

129.   In order to proceed, I had to refresh the opt-out page and the third-party cookie check passed on the second try.

130.   I do not know why this third-party cookie check failed, but apparently it is a known problem given the "Try Again" link in the information block.

**D.   The IBA Opt-out Relies on Cookies and Does Not Block All Transmissions**

131.   Paragraph 21 of the Bernston Declaration offers up the IBA Opt-out add-on for Chrome which also claims to set an opt-out cookie for personalizing ads.

132.    The description of this add-on in paragraph 21 includes the following acknowledgement that the cookie-based implementation of an opt-out is flawed: "Opt out remains in effect, even after you clear your browser's cookies."

133.    However, the IBA Opt-out add-on does not block the DoubleClick IDE cookie nor the ga_vid URL parameter as shown in the following HTTP request:

Request #482

GET
https://securepubads.g.doubleclick.net/gampad/ads?gdfp_req=1&pvsid=741215074502840&correlator=2327752398965364&output=ldjh&impl=fifs&eid=44752541%2C31060032%2C21067496&vrg=2022020301&ptt=17&gdpr_consent=CPUKSc9PUKSc9EXABBENBgCwAP_AAH_AACiQGggBIAJEQABAIA AEAIAEAAAAQBgAAEAgAAAAAAAAAAAABAgAAAAAAAAAAAAAA AAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAACAAA AAAAAAAAAEAAAAAAAAAAAAAgAAAAAIAAAAAgXmAAAAk QAAEAAAAAAAQAAABAEAAAAAAAAAAAAAAAAAECAAAAAA AAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAA AAAAAAAAAAAAAAAAAAAAAAAAAAAAAAACAA.YAAAAAAAAA AA&gdpr=0&us_privacy=1YNY&npa=1&sc=1&sfv=1-0-38&ecs=20220209&iu_parts=8013%2Cmercurynews.com%2Cbusiness%2CSponsorship_1%2Cinterstitial%2Ctop_leaderboard&enc_prev_ius=%2F0%2F1%2F2%2F3%2C%2F0%2F1%2F2%2F4%2C%2F0%2F1%2F2%2F5&prev_iu_szs=300x50%2C1x1%2C728x90%7C970x90%7C970x250&prev_scp=POS%3DSponsorship_1%26zeus_rendercount%3D1%26zeus_slot%3Dzeus_Sponsorship_1.init.dsk%26amznbid%3D2%26amznp%3D2%7CPOS%3Dinterstitial%26zeus_rendercount%3D1%26zeus_slot%3Dzeus_interstitial.init.dsk%26amznbid%3D2%26amznp%3D2%7CPOS%3Dtop_leaderboard%26zeus_rendercount%3D1%26zeus_slot%3Dzeus_top_leaderboard.init.dsk%26amznbid%3Dtjfuo0%26amznp%3D1oynv9c%26amzniid%3DIp9Btsl42QUwD7FrHzfGW7IAAAF-4BNQVgEAAA0_AaS-Ynk%26amznsz%3D728x90%26zeus_ix%3D8%26zeus_auctionid_ix%3Da4c6b743-de05-426b-948f-62c726140444%26zeus_appnexus%3D10%26zeus_auctionid_appnexus%3D6484281640145076089&eri=1&cust_params=zeus%3Dapplied%26zeus_8013%3Dwww.mercurynews.com%26kv%3Dbusiness%252Ccoronavirus%252Ccoronavirus-tips%252Cpm-report%252Cqa%252Clouis-hansen%26page%3Darticle%26content%3D%26RPN%3D308143982419%26rurl%3D&articleid%3D7158259%26zeus_insights%3Dcmg%252Cios%252Cihp%252Cdpr%252Cq8t%252Cwug%252C3bu%252Ckh5%252Cec4%252Cphj%252Caw9%252Ctbj%252Cki0%252Cv3s%252Cuib%252Cpgg%252Cbs0&cookie_enabled=1&bc=31&abxe=1&dt=1644436870167&lmt=1644436870&dlt

=1644436866606&idt=1966&frm=20&biw=1075&bih=479&oid=2&adxs=915
%2C10%2C537&adys=17%2C177%2C303&adks=3262223218%2C28568375
14%2C1841053995&ucis=1%7C2%7C3&ifi=1&u_his=5&u_h=1440&u_w=2
560&u_ah=1400&u_aw=2560&u_cd=24&u_sd=1.5&u_tz=-
300&flash=0&dmc=8&url=https%3A%2F%2Fwww.mercurynews.com%2F20
20%2F05%2F24%2Fqa-mental-health-tips-for-handling-the-
pandemic%2F&vis=1&scr_x=0&scr_y=0&psz=300x50%7C1x1%7C1055x250
&msz=1x0%7C1x0%7C1x0&ga_vid=1696932872.1644436869&ga_sid=1644
436870&ga_hid=709138822&ga_fc=true&fws=0%2C0%2C0&ohw=0%2C0%
2C0&btvi=0%7C0%7C0&uach=WyJXaW5kb3dzIiwiMTAuMC4wIiwieDg2Ii
wiIiwiOTguMC40NzU4LjgyIixbXSSxudWxsLG51bGwsIjY0IixbWyIgTm90IE
E7QnJhbmQiLCI5OS4wLjAuMCJdLFsiQ2hyb21pdW0iLCI5OC4wLjQ3NTg
uODIiXSxbIkdvb2dsZSBDaHJvbWUiLCI5OC4wLjQ3NTguODIiXV1d&nvt=
1 HTTP/1.1
Host: securepubads.g.doubleclick.net
Connection: keep-alive
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="98", "Google
Chrome";v="98"
sec-ch-ua-mobile: ?0
User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64)
AppleWebKit/537.36 (KHTML, like Gecko) Chrome/98.0.4758.82
Safari/537.36
sec-ch-ua-platform: "Windows"
Accept: */*
Origin: https://www.mercurynews.com
X-Client-Data:
CKy1yQEIkbbJAQimtskBCMS2yQEIqZ3KAQie+csBCOeEzAEIwpfMAQ==
Sec-Fetch-Site: cross-site
Sec-Fetch-Mode: cors
Sec-Fetch-Dest: empty
Referer: https://www.mercurynews.com/
Accept-Encoding: gzip, deflate, br
Accept-Language: en-US,en;q=0.9
Cookie:
IDE=AHWqTUlVYinaocDn6FH1ktDFIzpeUTDhjpkR5t1Wu0Di2Ro_-
tZe8tor9dAAZeCADBU

Source: IBA-Opt-Out.saz

134.   In addition, in my testing of the IBA Opt-out add-on with Chrome version

Chrome/98.0.4758.82, no "id=OPT_OUT" cookie was ever sent to Google servers.

135.    The lack of the "id=OPT_OUT" cookie with the IBA Opt-out add-on is different behavior from the NAI Opt-out and Google ad personalization page which both set a "id=OPT_OUT" cookie.

**E.    Firewalls**

136.    Paragraph 29(b) of the Bernston Declaration offers up a firewall to block traffic going to Google Ad Manager domains.

137.    The Bernston Declaration does not provide a list of these Google Ad Manager domains, so it is difficult to understand how practical such a suggestion is and if it would work in the real world.

138.    Paragraph 29(b) also goes on to make the claim that a firewall can be used to strip out X-Client-Data headers from outgoing HTTP request.

139.    However, the Bernston Declaration does not explain how this would be done in an encrypted HTTPS request which presumably a firewall would not be able to decrypt.

**F.    Standalone ad block programs**

140.    Paragraph 29(c) of the Bernston Declaration offers up the use of standalone ad blocker programs and gives as examples of AdGuard and AdLock.

141.    The Bernston Declaration provides no testing evidence that these ad blockers or any ad blockers are 100% effective for blocking all data transmissions from the Chrome browser to Google servers.

142.    The Bernston Declaration is also silent how users are supposed to deal with Web sites which block access when they detect the use of an ad blocker in the Chrome browser as described previously.

**VII.    GOOGLE TRACKS BLOCKING METHODS**

143.    The Zervas Report and Bernston Declaration are also silent on the fact that many of the blocking methods suggested in the report and the declaration are tracked by Google using a variety of methods.

144.     Footnote 20 of the Zervas Report lists the Chrome Store URL for the Google Analytics Opt-Out add-on as   https://chrome.google.com/webstore/detail/google-analytics-optout/fllaojicojecljbmefodhfapmkghcbnh.

145.     The string "fllaojicojecljbmefodhfapmkghcbnh" is the app identifier for the Google Analytics Opt-Out add-on.

146.     While installing the Google Analytics Opt-Out add-on at the Chrome Store, I found extensive tracking of my activities was being done by Google Analytics.

147.     For example:

Request #451

GET https://ssl.google-analytics.com/__utm.gif?utmwv=5.7.2&utms=31&utmn=556628315&utmhn=chrome.google.com&utmt=event&utme=5(Model*notLoggedIn)&utmcs=UTF-8&utmsr=2560x1440&utmvp=1076x495&utmsc=24-bit&utmul=en-us&utmje=0&utmfl=-&utmdt=Google%20Analytics%20Opt-out%20Add-on%20(by%20Google)%20-%20Chrome%20Web%20Store&utmhid=2077599275&utmr=-&utmp=%2Fwebstore%2Fdetail%2Fgoogle-analytics-opt-out%2Ffllaojicojecljbmefodhfapmkghcbnh&utmht=1644238428296&utmac=UA-4436568-7&utmni=1&utmcc=__utma%3D73091649.1885378348.1644238297.1644238297.1644238297.1%3B%2B__utmz%3D73091649.1644238297.1.1.utmcsr%3Dgoogle%7Cutmccn%3D(organic)%7Cutmcmd%3Dorganic%7Cutmctr%3D(not%2520provided)%3B&utmjid=&utmu=4AAAAAAAAAAAAAAAgAAgAAE~ HTTP/1.1
Host: ssl.google-analytics.com
Connection: keep-alive
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="98", "Google Chrome";v="98"
sec-ch-ua-mobile: ?0
User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/98.0.4758.82 Safari/537.36
sec-ch-ua-platform: "Windows"
Accept: image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
Sec-Fetch-Site: cross-site
Sec-Fetch-Mode: no-cors
Sec-Fetch-Dest: image
Referer: https://chrome.google.com/
Accept-Encoding: gzip, deflate, br
Accept-Language: en-US,en;q=0.9

Source: GA-OPT-OUT-INSTALLED-AB-ENABLED.saz

148.   This request to Google Analytics also indicated that I was not logged in at the time of doing the installation.

149.   After installing the Google Analytics Opt-Out add-on in the Chrome browser, I found that this application identifier is sent to a Google server in an HTTP request as part of the Chrome start-up process:

Request #546

POST
https://update.googleapis.com/service/update2/json?cup2key=11:i_wQ3TlCToOKTwZ
aLdqZxBzSAuLhRqpw1scIaBA4glw&cup2hreq=40f4aed5f7beee3d0c975d53b944420
1d6da678141ba1dd3dd7c1b05c0194eb5 HTTP/1.1
Host: update.googleapis.com
Connection: keep-alive
Content-Length: 3283
X-Goog-Update-AppId:
aapocclcgogkmnckokdopfmhonfmgoek,aohghmighlieiainnegkcijnfilokake,apdfllckaah
abafndbhieahigkjlhalf,blpcfgokakmgnkcojhhkbfbldkacnbeo,felcaaldnbdncclmgdcncolp
ebgiejap,<mark>fllaojicojecljbmefodhfapmkghcbnh</mark>,ghbmnnjooekpmoecnnnilnnbdlolhkhi,gig
hmmpiobklfepjocnamgkkbiglidom,nmmhkkegccagdldgiimedpiccmgmieda,pjkljhegncp
nkpknbcohdijeoejaedia
X-Goog-Update-Interactivity: bg
X-Goog-Update-Updater: chromecrx-98.0.4758.82
Content-Type: application/json
Sec-Fetch-Site: none
Sec-Fetch-Mode: no-cors
Sec-Fetch-Dest: empty
User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36
(KHTML, like Gecko) Chrome/98.0.4758.82 Safari/537.36
Accept-Encoding: gzip, deflate, br
Accept-Language: en-US,en;q=0.9

Source: GA-OPT-OUT-INSTALLED-AB-ENABLED.saz

150.    If JavaScript is turned off and an attempt is made to log into Gmail, a login URL contains a parameter named "nojavascript=1" which by its name, indicates that JavaScript has been disabled as shown in the following HTTP request:

---

Request #94

GET
https://accounts.google.com/ServiceLogin?continue=https%3A%2F%2Fmail.google.com%2Fmail%2F&rip=1&nojavascript=1&ifkv=AU9NCcwW1T6TmUVOqVanxswEO8Lpes5QKKR3l0SgMhwnnYbPnDPYo5ookWVyyFt2zMW-I9ZvgswvPQ&service=mail HTTP/1.1
Host: accounts.google.com
Connection: keep-alive
Upgrade-Insecure-Requests: 1
User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/98.0.4758.82 Safari/537.36
Accept:
text/html,application/xhtml+xml,application/xml;q=0.9,image/avif,image/webp,image/apng,*/*;q=0.8,application/signed-exchange;v=b3;q=0.9
X-Chrome-ID-Consistency-Request:
version=1,client_id=77185425430.apps.googleusercontent.com,device_id=f7897313-f1a1-4021-b9f7-eba59b699b34,signin_mode=all_accounts,signout_mode=show_confirmation
X-Client-Data:
CKy1yQEIkbbJAQimtskBCMS2yQEIqZ3KAQi0gcsBCOryywEInvnLAQjnhMwBCJqRzAEIgZXMAQiwlcwBCMKXzAEI4pfMAQjml8wB
Sec-Fetch-Site: same-origin
Sec-Fetch-Mode: navigate
Sec-Fetch-Dest: document
Referer:
https://accounts.google.com/ServiceLogin?continue=https%3A%2F%2Fmail.google.com%2Fmail%2F&service=mail&sacu=1&rip=1
Accept-Encoding: gzip, deflate, br
Accept-Language: en-US,en;q=0.9
Cookie: 1P_JAR=2022-02-07-12;
NID=511=O87K1fSjht0mKwxmo8WkpzxriMGrpIlP7dnTSfshPfBbngCR0ENbxkH6onFzpBNdL2fXRrU8EE6z7YTyVylUsGpwDWUlrVijjQaNwqXPlNIN0Ihe1yHwG3Pw1I uabqHYLI58yirXhkhHGxtR04ryaciBP5H9wvFTcy6AlnxXBI;    Host-GAPS=1:NCG94WAQMxvJ_rtals9N8bkYESL4:VTxZO9wYB71xacFj

Source: NoJS.saz

---

151.    Even with JavaScript being disabled, the above HTTP request includes Google cookies and X-Client-Data header.

152.    In a similar manner, cookies being disabled during a Gmail login attempt are also reported to a Google server:

---

Request #203

GET
https://accounts.google.com/_/common/diagnostics/?diagnostics=%5B%5B%5B%22g aia_fe_minutemaid%3Ass%22%2Cnull%2Cnull%2Cnull%2C1644237704025%5D%2 C%5B%22gaia_fe_minutemaid%3AsignInAttempt%22%2Cnull%2Cnull%2Cnull%2C 1644237704025%5D%2C%5B%22gaia_fe_minutemaid%3AidentifierPage%22%2Cn ull%2Cnull%2Cnull%2C1644237704362%2C7418%5D%5D%5D&rt=j HTTP/1.1
Host: accounts.google.com
Connection: keep-alive
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="98", "Google Chrome";v="98"
Cache-Control: max-age=0
sec-ch-ua-mobile: ?0
User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36
(KHTML, like Gecko) Chrome/98.0.4758.82 Safari/537.36
sec-ch-ua-platform: "Windows"
Accept: */*
X-Chrome-ID-Consistency-Request:
version=1,client_id=77185425430.apps.googleusercontent.com,device_id=5ab92fc9-3834-424f-823c-
d8d170e275ee,signin_mode=all_accounts,signout_mode=show_confirmation
X-Client-Data:
CKy1yQEIkbbJAQimtskBCMS2yQEIqZ3KAQi0gcsBCOryywEInvnLAQjnhMwBCJ qRzAEIgZXMAQiwlcwBCMKXzAEYjp7LAQ==
Sec-Fetch-Site: same-origin
Sec-Fetch-Mode: no-cors
Sec-Fetch-Dest: empty
Referer:
https://accounts.google.com/signin/v2/deniedsigninrejected?service=mail&passive=12 09600&osid=1&continue=https%3A%2F%2Fmail.google.com%2Fmail%2Fu%2F0% 2F&followup=https%3A%2F%2Fmail.google.com%2Fmail%2Fu%2F0%2F&emr=1& flowName=GlifWebSignIn&flowEntry=ServiceLogin
Accept-Encoding: gzip, deflate, br
Accept-Language: en-US,en;q=0.9

Source: Chrome-No-Cookies.saz

---

## VIII.   GOOGLE ENGAGES IN COOKIE-SYNCING WHICH CIRCUMVENTS BLOCKING METHODS

153.    Paragraph 39 of the Bernston Declaration states "Google does not perform any mapping of Google Analytics first-party cookie values to third-party cookies such as Biscotti".

154.    As I described in my opening report, a Google Analytics cookie value, which is stored as a first party cookie, is sent as an URL parameter in an HTTP request which also includes the value of the Biscotti cookie which is named "IDE".   That is, a third party coolie value is embedded in the HTTP request.

155.    This HTTP request was created by Google JavaScript code.

156.    This Google JavaScript code generates the HTTP request which provides the mapping of the Google Analytics cookie to the Biscotti cookie.

157.    The Zervas HAR files include similar examples of HTTP requests which map a Google Analytics cookie value to third-party IDE cookies.

158.    One such request can be found in the Zervas HAR file GOOG_ZERVAS_00000038.har with the cid URL parameter marked in blue and _gid URL parameter marked in green:

| |
|---|
| Request #317 |
| POST https://stats.g.doubleclick.net/j/collect?t=dc&aip=1&_r=3&v=1&_v=j96&tid=UA-61435456-5&cid=1781616254.1639511975&jid=182563484&gjid=2008163062&_gid=1773996974.1639511977&_u=aChACEAiBAAAAC~&z=1463189588 http/2.0 |
| content-length: 0 |
| sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="99", "Google Chrome";v="96" |
| sec-ch-ua-mobile: ?0 |
| user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/96.0.4664.93 Safari/537.36 |
| sec-ch-ua-platform: "Windows" |
| content-type: text/plain |
| accept: */* |
| origin: https://www.mercurynews.com |

x-client-data:
CIS2yQEIpbbJAQjEtskBCKmdygEI3tHKAQie+csBCOeEzAEItYXMAQjLic
wBCNKPzAEI1pLMARiOnssB
sec-fetch-site: cross-site
sec-fetch-mode: cors
sec-fetch-dest: empty
referer: https://www.mercurynews.com/
accept-encoding: gzip, deflate, br
accept-language: en-US,en;q=0.9
cookie: IDE=AHWqTUkKbUoi2VyU8k-3G4warCqB1lQry78H-Tu_stiQF-
0HDa5BwrBkQfOPgjzKTjo

Source: GOOG_ZERVAS_00000038.har (mercury_all.har)

159.     The same Zervas HAR file shows that the cid URL parameter is stored as the _ga

Google Analytics cookie while the _gid URL parameter is stored as the _gid Google Analytics

cookie:

Request #177

POST
https://a869.mercurynews.com/DG/DEFAULT/rest/rpc/527?referer=https%3A
%2F%2Fwww.mercurynews.com%2F2020%2F05%2F24%2Fqa-mental-
health-tips-for-handling-the-
pandemic%2F&bcsessionid=&bctempid=&overruleReferrer=&time=2021-12-
14T14%3A59%3A36-05%3A00&ts=1639511976564 http/2.0
content-length: 789
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="96", "Google
Chrome";v="96"
sec-ch-ua-mobile: ?0
user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36
(KHTML, like Gecko) Chrome/96.0.4664.93 Safari/537.36
sec-ch-ua-platform: "Windows"
content-type: text/plain
accept: */*
origin: https://www.mercurynews.com
sec-fetch-site: same-site
sec-fetch-mode: cors
sec-fetch-dest: empty
referer: https://www.mercurynews.com/
accept-encoding: gzip, deflate, br
accept-language: en-US,en;q=0.9

cookie: BCSessionID=6ef2881b-073f-4bda-94d0-c4b07dfdb683; bc_tstgrp=10; _pnvl=false;
pushly.user_puuid=yJ5mgCuP53WAhTzzb9NWBnEOCV9lRzTY; _pndnt=; _pnss=none;
_parsely_session={%22sid%22:1%2C%22surl%22:%22https://www.mercurynews.com/2020/05/24/qa-mental-health-tips-for-handling-the-pandemic/%22%2C%22sref%22:%22%22%2C%22sts%22:1639511972756%2C%22slts%22:0};
_parsely_visitor={%22id%22:%22pid=96ff1e1ab21b71f05bca66a190508e34%22%2C%22session_count%22:1%2C%22last_session_ts%22:1639511972756};
_li_dcdm_c=.mercurynews.com; _lc2_fpi=f107d3ac6b63--01fpx8eqh9exas1f2p5e5sz5w9;
RT="z=1&dm=mercurynews.com&si=c28af11d-f7b6-4def-bd20-3b17b8a04329&ss=kx6j3fow&sl=0&tt=0&bcn=%2F%2F684dd326.akstat.io%2F";
AWSALB=UIsJn7dkO53TsgO7FS2aI7ySy1qNDFQ7ltwKQj1TT3fE5HarjgA373AMPHgizEKb0wTpKo9NRIeeru95X3ryXXPiuVevcAAaherpe+jVp074mBkC3UDQrLG4M5jO;
AWSALBCORS=UIsJn7dkO53TsgO7FS2aI7ySy1qNDFQ7ltwKQj1TT3fE5HarjgA373AMPHgizEKb0wTpKo9NRIeeru95X3ryXXPiuVevcAAaherpe+jVp074mBkC3UDQrLG4M5jO; <mark>ga=GA1.2.1781616254.1639511975;</mark>
<mark>_gid=GA1.2.1773996974.1639511977</mark>

Source: GOOG_ZERVAS_00000038.har (mercury_all.har)

160.    As discussed in my opening report, the _ga and _gid are Google Analytics cookies which are set by Google JavaScript code and stored as first-party cookies of the Web site using Google Analytics.

161.    These same two Google Analytics cookie values are also sent as URL parameters to a Google Analytics server as shown by the same Zervas HAR file:

Request #285

POST https://www.google-analytics.com/j/collect?v=1&_v=j96&a=1773302523&t=pageview&_s=1&dl=https%3A%2F%2Fwww.mercurynews.com%2F2020%2F05%2F24%2Fqa-mental-health-tips-for-handling-the-pandemic%2F&dr=&dp=%2F2020%2F05%2F24%2Fqa-mental-health-tips-for-handling-the-pandemic%2F&ul=en-us&de=UTF-8&dt=Mental%20health%20tips%20for%20handling%20the%20pandemic&sd=24-

bit&sr=1536x864&vp=887x754&je=0&_u=aChACEAjBAAAAC~&jid=1825
63484&gjid=2008163062&cid=1781616254.1639511975&tid=UA-61435456-
5&_gid=1773996974.1639511977&_r=1&gtm=2wgc10TLFP4R&cd2=mercur
ynews.com&cd3=mercurynews.com&cd4=&cd5=2020-05-
24T07%3A00%3A20-07%3A00&cd6=2020-05-24T07%3A00%3A20-
07%3A00&cd7=2020-05-27T04%3A27%3A51-
07%3A00&cd8=unknown&cd9=no&cd10=Business&cd11=5.8.2&cd12=&cd1
3=WP&cd14=Business&cd15=Business&cd16=&cd17=&cd18=&cd19=&cd2
0=&cd21=https%3A%2F%2Fwww.mercurynews.com%2F2020%2F05%2F24
%2Fqa-mental-health-tips-for-handling-the-pandemic&cd22=qa-mental-health-
tips-for-handling-the-
pandemic&cd23=7158259&cd24=article&cd25=BANG&cd26=Louis%20Hans
en&cd27=Q%26amp%3BA%3A%20Mental%20health%20tips%20for%20han
dling%20the%20pandemic&cd28=https%3A%2F%2Fwww.mercurynews.com
%2F2020%2F05%2F24%2Fqa-mental-health-tips-for-handling-the-
pandemic%2F&cd29=Q%26amp%3BA%3A%20Mental%20health%20tips%2
0for%20handling%20the%20pandemic&cd30=&cd32=p-
4ctCQwtnNBNs2&cd33=BayAreaNewsGroup&cd34=true&cd35=coronavirus
%2C%20mental%20health%2C%20tips%2C%20surviving%2C%20exercise%
2C%20Santa%20Clara%20University%2C%20psychology%2C%20health%2C
%20COVID-
19%2C%20Silicon%20Valley%2C%20stress%2C&cd36=5242&cd37=840&cd
38=Louis%20Hansen&cd49=true&cd50=Mozilla%2F5.0%20(Windows%20N
T%2010.0%3B%20Win64%3B%20x64)%20AppleWebKit%2F537.36%20(K
HTML%2C%20like%20Gecko)%20Chrome%2F96.0.4664.93%20Safari%2F5
37.36&cd51=&cd54=lhansen%40bayareanewsgroup.com&cd55=Bay%20Area
%20News%20Group&cd62=metered&cd53=1781616254.1639511975&z=143
7690465 h3
content-length: 0
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="96", "Google
Chrome";v="96"
sec-ch-ua-mobile: ?0
user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36
(KHTML, like Gecko) Chrome/96.0.4664.93 Safari/537.36
sec-ch-ua-platform: "Windows"
content-type: text/plain
accept: */*
origin: https://www.mercurynews.com
sec-fetch-site: cross-site
sec-fetch-mode: cors
sec-fetch-dest: empty
referer: https://www.mercurynews.com/
accept-encoding: gzip, deflate, br
accept-language: en-US,en;q=0.9

Source: GOOG_ZERVAS_00000038.har (mercury_all.har)

162.   The Google Analytics _ga cookie value is also sent as the cid URL parameters to a www.google.com server along with a google.com cookie as shown in the same Zervas HAR file:

---

Request #338

GET https://www.google.com/ads/ga-audiences?t=sr&aip=1&_r=4&slf_rd=1&v=1&_v=j96&tid=UA-61435456-5&cid=1781616254.1639511975&jid=182563484&_u=aChACEAiBAAAAC~&z=666972174 h3
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="96", "Google Chrome";v="96"
sec-ch-ua-mobile: ?0
user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/96.0.4664.93 Safari/537.36
sec-ch-ua-platform: "Windows"
accept: image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
x-client-data: CIS2yQEIpbbJAQjEtskBCKmdygEI3tHKAQie+csBCOeEzAEItYXMAQjLicwBCNKPzAEI1pLMARiOnssB
sec-fetch-site: cross-site
sec-fetch-mode: no-cors
sec-fetch-dest: image
referer: https://www.mercurynews.com/
accept-encoding: gzip, deflate, br
accept-language: en-US,en;q=0.9
cookie: __Secure-3PSID=EwhnaQ--zxbpNKP10c9By0veBfhz0rhMnKTWHs_JZW3lViLw_cBnqZknNVFn9JkGutt_4g.; __Secure-3PAPISID=QrfbJNKyxVBDfABw/AjbwHagbvHbcYEmWp; NID=511=uZNOidO3IYn_v4TDcx5cuITU7EGHzqsXLzVemxezMPrknpaO9Vd1P3SAfzjFqfDPWsrEta-CKuqkzrogurPKkrDNcSz9SrLVPJpsaKL_YGcY8MdaAWDqpCsmT-LtPecom-eacj51asbet-GJqBY5iltvscKgDTVxjqNPNT0rVjsqsE8FO4Je3pxMceA; __Secure-3PSIDCC=AJi4QfGB9zsKVgDSr_B8oV5keVBWSyuw9VY0jUspnCoCdRXgo6oN_LBBq81C0kQ6Lo5yBslzvg

Source: GOOG_ZERVAS_00000038.har (mercury_all.har)

---

163.   The Google presentation entitled ██████████████████████████████ ████████ (GOOG-CABR-05404845) describes how the Google Analytics cookie value is

██████████████████████████████████████████████████████

████████████████ :



Source: GOOG-CABR-05404845, at -855.

164.    The HTTP requests described in paragraphs 78-82 of my opening report and from the Zervas Report above appear to be described in the slide ████████████████████████

165.    █████████████████████████████████████████████████████

███████████████████████████████████████████████ :



Source: GOOG-CABR-05404845, at -860.

166.     Other Google documents explain similar functions. A document titled ████████

████████████████████" explains that Google designed a system to ████████████

████████████████████████████" for the purpose of

being ████████████████████████████████████

████████████████████████." GOOG-CABR-04678050.  As

background, the Google document explains that ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████."

GOOG-CABR-04678050.

167.     These internal Google documents explain what I described in my initial report.

<div align="center">***</div>

Executed this 15th day of February 2022 at Boston, Massachusetts.

By: _____

Richard M. Smith

# EXHIBIT A
## to the Expert Rebuttal Report of R. Smith

**Richard M. Smith**
**Rebuttal Report Feb. 15, 2021**
*Calhoun, et al. v. Google LLC*

In preparing my expert report, I reviewed and relied on the following materials:

The following expert reports and declarations:

- My expert report of October 14, 2021 including all materials I reviewed and relied on for the expert report.
- Declaration of Glenn Berntson Regarding Google Ad Manager In Opposition to Plaintiffs' Motion for Class Certification, December 21, 2021.
- Expert Report of Georgios Zervas, Ph.D., December 22, 2021 including all exhibits, appendices, and produced HAR and spreadsheet files (GOOG_ZERVAS_00000001 – GOOG_ZERVAS_00000103)
- Expert Report of Yiling Chen, Ph.D., December 22, 2021 including all exhibits, appendices, and produced HAR and spreadsheet files (GOOG_CHEN_00000001 - GOOG_CHEN_000000192)
- Errata Sheet for the Expert Report of Yiling Chen, Ph.D, dated Feb. 1, 2022

Deposition testimony taken in the matter of *Calhoun v Google, LLC*:

- Georgios Zervas on Jan. 26, 2022, including all exhibits
- Yiling Chen on Feb. 2, 2022, including all exhibits

Documents produced by Google (by starting Bates number):

- GOOG-CABR-04263403
- GOOG-CABR-05404845
- GOOG-CABR-04678050
- GOOG-CABR-04408167
- GOOG-CABR-05303296

The following Fiddler and Developer Tools capture files created in 2022:

- AdBlock.saz
- AdBlock-Config.saz
- AdBlock-install.saz
- AdBlock-Wells-Fargo-Login.saz
- Chrome-No-Cookies.saz
- Chrome-Sync-On-and-Off.saz
- Chrome-Sync-On-and-Off.har
- Clear-Cookies-on-Exit.saz
- Edge-With-Default-Settings.saz
- Firefox-With-Default-Settings.saz

- GA-OPT-OUT-INSTALLED-AB-ENABLED.saz
- google-ad-settings.saz
- HULU-DP-VPN.saz
- IBA-Opt-Out.saz
- IBA-Opt-Out-2.saz
- IBA-Opt-Out-Remove.saz
- IBA-Opt-Out-Remove-2.saz
- nai-opt-out.saz
- NoJS.saz

The following screen movie video files created in 2022:

- AdBlock.wmv
- AdBlock-Config.wmv
- AdBlock-Install.wmv
- adguard-adlock.wmv
- Chrome-No-Cookies.wmv
- Cookies-Back-On.wmv
- Chrome-Sync-On-and-Off.wmv
- Clear-Cookies-on-Exit.wmv
- Edge-With-Default-Settings.wmv
- Firefox-With-Default-Settings.wmv
- GA-OPT-OUT-INSTALLED-AB-ENABLED.wmv
- google-ad-settings.wmv
- HULU-DP-VPN.wmv
- IBA-Opt-Out.wmv
- IBA-Opt-Out-2.wmv
- IBA-opt-out-at-Chrome-Store.wmv
- IBA-Opt-Out-Remove.wmv
- IBA-Opt-Out-Remove-2.wmv
- nai-opt-out.wmv
- NoJS.wmv

Information available via the following Web pages:

- https://chrome.google.com/webstore/detail/google-analytics-opt-out/fllaojicojecljbmefodhfapmkghcbnh
- https://chrome.google.com/webstore/detail/iba-opt-out-by-google/gbiekjoijknlhijdjbaadobpkdhmoebb
- https://chrome.google.com/webstore/detail/adblock-%E2%80%94-best-ad-blocker/gighmmpiobklfepjocnamgkkbiglidom
- https://help.getadblock.com/support/solutions/articles/6000055743-how-to-disable-adblock-on-specific-sites
- https://www.apple.com/safari/docs/Safari_White_Paper_Nov_2019.pdf

- https://adssettings.google.com/anonymous?hl=en
- https://adguard.com/en/adguard-windows/overview.html
- https://adlock.com/adlock-for-windows
- https://adlock.com
- https://code.google.com/archive/p/google-opt-out-plugin/

# EXHIBIT JJJ
# Redacted Version of Document Sought to be Sealed

# EXHIBIT KKK
# Redacted Version of Document Sought to be Sealed

# EXHIBIT LLL
## Redacted Version of
## Document Sought to be Sealed

CONFIDENTIAL

```
1            IN THE UNITED STATES DISTRICT COURT
2          FOR THE NORTHERN DISTRICT OF CALIFORNIA
3                   SAN JOSE DIVISION
4    _____
     PATRICK CALHOUN, et al.,      )
5    on behalf of themselves and   )
     all others similarly          )
6    situated,                     )
                                   )
7            Plaintiffs,           )
                                   )Case No.: 5:20-cv-5146-LHK-SVK
8    vs.                           )
                                   )
9    GOOGLE LLC,                   )
                                   )
10           Defendant.           )
     _____)
11
12               *** CONFIDENTIAL ***
13
14
15      VIDEOTAPED REMOTE DEPOSITION OF STEVE GANEM
16      Deponent testifying from Huntington Beach,
17                   California
18            Friday, February 11, 2022
19                   Volume I
20
21
22   Stenographically Reported By:
     Melissa M. Villagran, RPR
23   CSR No. 12543
24   Job No. 5081594
25   PAGES 1 - 123
```

CONFIDENTIAL

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                    SAN JOSE DIVISION

 4    _____

      PATRICK CALHOUN, et al.,      )

 5    on behalf of themselves and   )

      all others similarly          )

 6    situated,                     )

                                    )

 7            Plaintiffs,           )

                                    )Case No.: 5:20-cv-5146-LHK-SVK

 8    vs.                           )

                                    )

 9    GOOGLE LLC,                   )

                                    )

10            Defendant.            )

      _____)

11

12                *** CONFIDENTIAL ***

13

14         Videotaped remote deposition of STEVE GANEM,

15    Volume I, taken on behalf of Plaintiffs with all

16    participants appearing remotely via videoconference

17    and the Deponent testifying from Huntington Beach,

18    California, beginning at 7:54 a.m. and ending at

19    11:20 a.m. on Friday, February 11, 2022, before

20    Melissa M. Villagran, RPR, Certified Shorthand

21    Reporter No. 12543.

22

23

24

25
```

Veritext Legal Solutions
866 299-5127

```
 1    APPEARANCES:

 2    ALL ATTENDEES APPEARING REMOTELY

 3

 4    For Plaintiffs:

 5         BLEICHMAR FONTI & AULD LLP

 6         BY:  LESLEY WEAVER

 7              JOSHUA SAMRA

 8         Attorneys at Law

 9         555 12th Street, Suite 1600

10         Oakland, California 946907

11         415.445.4003

12         Lweaver@bfalaw.com

13         Jsamra@bfalaw.com

14

15         - and -

16

17         SIMMONS HANLY CONROY

18         BY:  JASON "JAY" BARNES

19         Attorney at Law

20         112 Madison Avenue, Seventh Floor

21         New York, New York 10016

22         618.693.3104

23         jaybarnes@simmonsfirm.com

24

25
```

Page 3

CONFIDENTIAL

```
 1    APPEARANCES (continued):

 2

 3    For Plaintiffs:

 4          DICELLO LEVITT GUTZLER

 5          BY:  DAVID A. STRAITE

 6          Attorney at Law

 7          One Grand Central Place

 8          New York, New York 10165

 9          646.933.1000

10          dstraite@dicellolevitt.com

11

12    For Defendants and the Deponent:

13          QUINN EMANUEL URQUHART & SULLI8VAN LLP

14          BY:  VIOLA TREBICKA

15          Attorney at Law

16          865 South Figueroa Street, Tenth Floor

17          Los Angeles, California 90017

18          213.443.3000

19          violatrebicka@quinnemanuel.com

20

21

22

23

24

25

                                            Page  4
```

CONFIDENTIAL

```
 1    APPEARANCES (continued):

 2

 3    For Defendants and the Deponent:

 4         QUINN EMANUEL URQUHART & SULLI8VAN LLP

 5         BY:  BRETT WATKINS

 6         Attorney at Law

 7         Pennzoil Place

 8         711 Louisiana Street, Suite 500

 9         Houston, Texas  77002

10         713-221-7030

11         brettwatkins@quinnemanuel.com

12

13    Also Present:

14         Matthew Gubiotti, Google

15         Amir Steinhart, Google

16

17    Videographer:

18         Cassia Leet

19

20

21

22

23

24

25
```

Page 5

```
 1    BY MR. BARNES:

 2        Q   Okay.

 3            It says in the first bullet point (as read):

 4            ████████████████████████

              ████████████████                        10:28:28

 6            Do you see that?

 7        A   Yes.

 8        Q   Can you explain the difference there.

 9        A   ████████████████████████████████

      ██████████████████████████████            ████████

      ██████████████████████████████████

      ████████████████████████████████████

      ███████████

14        Q   Is the big -- is the large discrepancy

15    between those two in this slide deck the result of    10:29:06

16    ████████████████  being just rolled out around the

17    time that you put this presentation together?

18            MS. TREBICKA:   Objection; calls for

19    speculation.

20            THE DEPONENT:   This is just a statement of    10:29:22

21    the facts at the time.

22    BY MR. BARNES:

23        Q   Okay.

24            How did you calculate the ████████████ annual

25    run rate in this slide?                               10:29:40
```

Page 95

```
 1        A   I believe this was derived from the dashboard

 2    and -- that one of the engineers, and the exact

 3    nature and details of that query of the script that

 4    generated those numbers I don't know.

 5        Q   Who was the engineer who built it?          10:30:17

 6        A   I don't know.

 7        Q   What is the dashboard that the engineer

 8    built?

 9        A   It's a -- it's a dashboard to measure the

10    ███████████████████████████████████████     ███████████

11    ████████████ .

12        Q   Does the dashboard still exist?

13            MS. TREBICKA:  Objection; lacks foundation.

14            THE DEPONENT:  I believe so.

15    BY MR. BARNES:                                       10:31:07

16        Q   Do you check the dashboard occasionally?

17        A   Sporadically.

18        Q   What is the dashboard named?

19        A   I don't recall off the top of my head.

20        Q   How do you get to it?                        10:31:34

21        A   Typically through a bookmark.

22        Q   Is the bookmark on your computer you're using

23    now?

24        A   Perhaps.  I think so.

25        Q   Can you look and tell me what the name of the  10:31:54
```

Page 96

CONFIDENTIAL

1

2

3

4

5

6

7

8          I, STEVE GANEM, do hereby declare under

9     penalty of perjury that I have read the foregoing

10    transcript; that I have made any corrections as

11    appear noted, in ink, initialed by me, or attached

12    hereto; that my testimony as contained herein, as

13    corrected, is true and correct.

14          EXECUTED this _____ day of _____,

15    _____, at _____, _____.

                  (City)                  (State)

16

17

18

19

20                  _____

                  STEVE GANEM

21                  VOLUME I

22

23

24

25

                                    Page 122

CONFIDENTIAL

1          I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, Registered

3    Professional Reporter, Certified Live Note Reporter,

4    do hereby certify:

5          That the foregoing proceedings were taken

6    before me at the time and place herein set forth;

7    that any witnesses in the foregoing proceedings,

8    prior to testifying, were duly sworn; that a record

9    of the proceedings was made by me using machine

10   shorthand which was thereafter transcribed under my

11   direction; that the foregoing transcript is a true

12   record of the testimony given.

13         Further, that if the foregoing pertains to

14   the original transcript of a deposition in a Federal

15   Case, before completion of the proceedings, review

16   of the transcript [  ] was [  ] was not requested.

17         I further certify I am neither financially

18   interested in the action nor a relative or employee

19   of any attorney or party to this action.

20         IN WITNESS WHEREOF, I have this date

21   subscribed my name.

22   Dated: February 11, 2022

23

24                    _____

                      MELISSA M. VILLAGRAN

25                    CSR No. 12543 RPR

                                        Page 123

1    VIOLA TREBICKA, ESq.

2    violatrebicka@quinnemanuel.com

3                                          February 11, 2022

4    RE: PATRICK CALHOUN   vs.  GOOGLE LLC

5    February 11, 2022-STEVE GANEM-5081594

6    The above-referenced transcript has been

7    completed by Veritext Legal Solutions and

8    review of the transcript is being handled as follows:

9    __ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

10      to schedule a time to review the original transcript at

11      a Veritext office.

12   __ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

13      Transcript - The witness should review the transcript and

14      make any necessary corrections on the errata pages included

15      below, notating the page and line number of the corrections.

16      The witness should then sign and date the errata and penalty

17      of perjury pages and return the completed pages to all

18      appearing counsel within the period of time determined at

19      the deposition or provided by the Code of Civil Procedure.

20   __ Waiving the CA Code of Civil Procedure per Stipulation of

21      Counsel - Original transcript to be released for signature

22      as determined at the deposition.

23   __ Signature Waived - Reading & Signature was waived at the

24      time of the deposition.

25

                                              Page 124

CONFIDENTIAL

1    _X_ Federal R&S Requested (FRCP 30(e)(1)(B)) - Locked .PDF

2        Transcript - The witness should review the transcript and

3        make any necessary corrections on the errata pages included

4        below, noting the page and line number of the corrections.

5        The witness should then sign and date the errata and penalty

6        of perjury pages and return the completed pages to all

7        appearing counsel within the period of time determined at

8        the deposition or provided by the Federal Rules.

9    __ Federal R&S Not Requested - Reading & Signature was not

10       requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 125

```
1    PATRICK CALHOUN   vs.   GOOGLE LLC

2    STEVE GANEM-5081594

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   WITNESS                            Date

25
```

Page 126

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# EXHIBIT MMM
## Redacted Version of Document Sought to be Sealed

CONFIDENTIAL

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                    SAN JOSE DIVISION

 4     _____

       PATRICK CALHOUN, et al.,      )

 5     on behalf of themselves and   )

       all others similarly          )

 6     situated,                     )

                                     )

 7            Plaintiffs,            )

                                     )Case No.: 5:20-cv-5146-LHK-SVK

 8     vs.                           )

                                     )

 9     GOOGLE LLC,                   )

                                     )

10            Defendant.             )

       _____)

11

12                  *** CONFIDENTIAL ***

13

14        VIDEOTAPED REMOTE DEPOSITION OF DEEPAK RAVICHANDRAN

15        Deponent testifying from Mountain View, California

16                  Friday, January 7, 2022

17                        Volume I

18

19

20

21

22     Stenographically Reported By:

       Melissa M. Villagran, RPR

23     CSR No. 12543

24     Job No. 4992196

25     PAGES 1 - 320
```

CONFIDENTIAL

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                      SAN JOSE DIVISION

 4     _____

       PATRICK CALHOUN, et al.,      )

 5     on behalf of themselves and   )

       all others similarly          )

 6     situated,                     )

                                     )

 7              Plaintiffs,          )

                                     )Case No.: 5:20-cv-5146-LHK-SVK

 8     vs.                           )

                                     )

 9     GOOGLE LLC,                   )

                                     )

10              Defendant.           )

       _____)

11

12                   *** CONFIDENTIAL ***

13

14        Videotaped remote deposition of DEEPAK

15     RAVICHANDRAN, Volume I, taken on behalf of Plaintiff

16     with all participants appearing remotely via

17     videoconference and the Deponent testifying from

18     Mountain View, California, beginning at 9:28 a.m. and

19     ending at 6:10 p.m. on Friday, January 7, 2022, before

20     Melissa M. Villagran, RPR, Certified Shorthand Reporter

21     No. 12543.  6:10 p.m.

22

23

24

25
```

Page 2

```
 1    APPEARANCES:

 2    ALL ATTENDEES APPEARING REMOTELY

 3

 4    For Plaintiffs:

 5         BLEICHMAR FONTI & AULD LLP

 6         BY:  LESLEY WEAVER

 7              ANJELICA ORNELAS

 8         Attorneys at Law

 9         555 12th Street, Suite 1600

10         Oakland, California  946907

11         415.445.4003

12         Lweaver@bfalaw.com

13         Aornelas@bfalaw.com

14

15         - and -

16

17         SIMMONS HANLY CONROY

18         BY:  JASON "JAY" BARNES

19         Attorney at Law

20         112 Madison Avenue, Seventh Floor

21         New York, New York  10016

22         618.693.3104

23         jaybarnes@simmonsfirm.com

24

25
```

Page  3

```
 1    APPEARANCES (continued):

 2

 3    For the Brown plaintiffs:

 4         MORGAN & MORGAN

 5         BY:  RYAN MCGEE

 6         Attorney at Law

 7         201 North Franklin Street, Suite 700

 8         Tampa, Florida  33602

 9         813.223.0931

10         rmcgee@forthepeople.com

11

12    For Defendants and THE DEPONENT:

13         QUINN EMANUEL URQUHART & SULLI8VAN LLP

14         BY:  BRETT WATKINS

15         Attorney at Law

16         Pennzoil Place

17         711 Louisiana Street, Suite 500

18         Houston, Texas  77002

19         713-221-7030

20         brettwatkins@quinnemanuel.com

21

22

23

24

25

                                        Page  4
```

1          In a large -- in many other cases, there is

2     no notice when you first access a publisher page.

3     However, in many -- in almost all cases you have

4     a -- the ad has a button that is a -- that is

5     usually a link called Ad Choices or some variation          10:09:01

6     of it.  If you click on it there is a -- there are

7     some instructions that say that your information is

8     collected by cookies by using third-party

9     systems -- third-party cookies.

10          And this system is available to all users and        10:09:20

11     they are -- and the description and usage are all

12     published on externally-facing websites for an

13     average user.

14     Q    When did that practice of in certain cases in

15     California that there would be a notice, when did          10:09:50

16     that -- when was that first implemented?

17     A    To the best of my recollection,

18     somewhere -- sometime in 20- -- early 2020.

19     Q    Thank you.

20          And -- okay.  So going back to Exhibit 1, do         10:10:07

21     you see there's the sentence following says (as

22     read):

23     ████████████████████████████

   ██  ████████████████████████████."

25     A    Yes, I do see.                                        10:10:21



1       Q   Do you see that sentence?

2           Okay.

3       A   Sorry.

4       Q   We can pick it up a little.  I was trying to

5   get us to the pattern of looking at documents          10:10:33

6   together.

7           What did you mean when you wrote "███████

8   ██████████████████████████████"?

9       A   ████████████████████████████████

10  ██████████████████████████████████████████  ██████████

11  ████████████████████████████████████████

12  ███████████████████████████████

13  █████████████████████████████████████████

14  ████████████████████████████████████

15  ██████████████████████████████████████████  ██████████

16  █████████████████████████████

17      █████████████████████████████████████

18  ███████████████████████████████████

19  ███████████████████████████████████

20  ██████████████████████████████████████████  ██████████

21  ███  █████████████████████████████████████

22  ███  █████

23      ████████████  ████████████████████

24      █████████████████████████████████████

25  ██████████████████████████████████          10:12:05

Page 40

CONFIDENTIAL



1

14

25              Again, this is a motivating example, but          10:13:40

Page 41

CONFIDENTIAL

1    that's what it means.

2         So ███████████████████████████

     ███████████████████████████.

4    Q    Thank you.

5         I'd like to unpack that a teeny bit if I        10:13:53

6    could with some definitions for the record.

7         What is a double-click cookie?

8    A    So the double-click cookie is mentioned in

9    this document throughout the -- in multiple places

10   in the document.                                     10:14:13

11        Double-click cookie is Google's third-party

12   cookie.  It's called internally double-click cookie

13   at Google and also externally it's called

14   double-click cookie.

15   Q    What is a cookie?                                10:14:26

16   A    A cookie is a piece of identifier that is

17   dropped by a browser that can uniquely identify the

18   browser under a set of conditions.

19   Q    And how are the conditions set?

20   A    So usually the -- the source that drops the     10:14:45

21   cookie is the only source that can read the cookie.

22        So if for example, Facebook drops a cookie

23   while a user is accessing Facebook, only Facebook

24   will have access to that cookie.  Snapchat perhaps

25   cannot read that cookie.                             10:15:21

                                                    Page 42



1          Looking where it says background on the first

2     page, do you see the first sentence that says (as

3     read):

4

11:18:50

11     Do you see that?

12     A    Yes, I see that.

13     Q    What does ▮ refer to?

14          MR. WATKINS:  Objection; foundation.

15          THE DEPONENT: ▮.              11:18:59

16     BY MS. WEAVER:

17     Q    And ▮ what does that refer to?

18          MR. WATKINS:  Same objection.

19          THE DEPONENT: ▮

11:19:16

21     BY MS. WEAVER:

22     Q    Okay.

23

11:19:25

Page 80

1      A    Yes, I'm aware of that.

2      Q    And what was it?

3      A    ████████████████████████████

██    ██████████████████████████████

██    ███████████████   █████████████      █████████

██    █████████████████████████

7      Q    And was it --

8      A    This --

9      Q    I'm so sorry.

10     A    This practice is very similar to how most of      11:20:04

11   ad tech industry works.

12     Q    Okay.

13          Was Google's project here called Rubicon?

14     A    Rubicon is not a Google's project.   Rubicon

15   at that time was a separate entity running one of      11:20:21

16   these non Google SSPs.

17     Q    Understood.

18          So -- and there's a sentence here that says

19   (as read):

20          "There are current efforts to      11:20:35

21          establish data co-op agreements with

22          third-party exchanges."

23          Do you see that?

24     A    I see that.

25     Q    And is that consistent with your      11:20:41

Page 81

```
 1    BY MS. WEAVER:

 2        Q    Okay.  Yes.

 3             And then turning to the next page, it ends in

 4    5377, it reads there (as read):
```



```
12             Do you see that?

13        A    Can you tell me -- I'm --

14        Q    I'm sorry.  Yes, the first sentence at the

15    top of the page.                                    11:32:01

16        A    Give me a minute to read it.

17        Q    Yes.

18        A    That is correct.

19        Q    And do you see there's a comment there (as

20    read):                                              11:32:16

21
```

```
                                                    11:32:29
```

```
                                             Page 89
```

1          Do you see that comment?

2     A   Yes, I do see that.

3     Q   I have the same question:  ████████████████

      ████████████  are we talking about here?

5          MR. WATKINS:  Objection; vague.                    11:32:44

6          THE DEPONENT:  So in this context I'm not

7     sure what this question means, but generally

8     speaking, ████████████, as I mentioned before, that

9     could be ████████████  And then use the -- then

10    use the (indecipherable) ████████████████████  ████████

      ████████████████████████████████

      ████████████████e.

13         So these are various -- like, and then we

14    could derive ████████████████.  ████████████████

      ████████████████      ████████

      ████████████████████████.

17    BY MS. WEAVER:

18    Q   Okay.

19         And turning to the next page that ends in

20    5378.  You see a spreadsheet there, correct?        11:33:34

21    A   Yes, I do see a big table.

22    Q   And the table says name -- at the top:  ██████

      ████████████████████████

24         Do you see that?

25    A   Yes, I see that.                                  11:33:50

                                                      Page 90

CONFIDENTIAL

1      Q   So there's one entry that says, ███████████

       ███████████████████████████"

3          Do you see that?

4      A   Can you tell me which number --

5      Q   It's four down, I think.                    11:34:03

6      A   Yes, I see that.

7      Q   So what is -- what ██████ is that?

8          MR. WATKINS:  Objection; vague.

9          THE DEPONENT:  ███████████████████████

       ████████████████████████████████████    ███████████

       ████████████████████████  █████████████████████████

       ████████████

13     BY MS. WEAVER:

14     Q   Okay.

15     A   Many of them -- sorry.                       11:34:28

16         And many of them could be derived or other

17     sources here.

18     Q   Okay.  And you say "many of them."

19         For example, ████████████████████████████

                                                        11:34:38

       ██████████████████████

21         What is that?

22     A   Can you tell me what number is that?

23     Q   It's the one right above it.

24     A   Oh.

25         Yes, I see that.                             11:34:49

                                                        Page 91



1        That one is we have a ███████████████

██████████    ████████████████████████████

█████████████████████████   ████

██████████████████████████████████

█████████████████████████████████    ███████

████████████████████████████████

████████████████████████████████

█████████████████████

             ████████████████████████████

         ████████████████                    11:35:36

11       Q    And when you say and derived ██████████

██████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████    ████████

█████████████████████████████████

         ████████████████████

18            Is that a fair description?

19            MR. WATKINS:  Objection; vague.

20            THE DEPONENT:  So yes, your intuition is    11:36:03

21   correct there.

22        ████████████████████████████████

████████████████████████████████

████████████████████████████████

         ██████████████████████████            11:36:24

                                       Page 92

CONFIDENTIAL

```
 1      ████████

 2      BY MS. WEAVER:

 3          Q    Okay.

 4               Then the next -- well, let's go second from

 5      the top.  It says (as read):                        11:36:33

 6                    ████████████████████████

 █              ████████████████████

 8               Do you see that?

 9          A    I see that.

10          Q    What is ████████████████████?              11:36:43

11               MR. WATKINS:  Objection to the form.

12               THE DEPONENT:  ████████████████

 █      ██████████████████████████████████████████████

 █      ████████████   ████████████████████████

 █      ██████████████████████████████████████   ███████

 █      ████████████████████████████████████████

 █      ████████████████████████████

 █      ██████████████████████████   And a brand --

19      Coca Cola is a brand.  If somebody sees a Coca Cola

20      brand, it does not mean they are going to buy Coke   11:37:34

21      right away, but that's the idea.

22      BY MS. WEAVER:

23          Q    ████████████████████████████████████

 █      ████████████████████████████████████

 █      ████████████████████████████████████             11:37:47
```

                                                       Page 93

CONFIDENTIAL

1  ███████████████████████████████████████

   █  ██████████████████████████

3          MR. WATKINS:  Objection; form.

4          THE DEPONENT:  The users -- this

5  system -- I'm not talking about this specific        11:38:07

6  column, but generally speaking, ████████████████████

   █  █████████████████████████████████████

   █  █████████████████████████████████

9          For example, if you have a teenager who has a

10 Ferrari poster in their bedroom, it doesn't mean      11:38:30

11 that this teenager is going to go buy a Ferrari, but

12 this teenager may be interested in the Ferrari

13 brand.  That's the definition.  It's more subtle.

14             ████████████████████████████████████████

   █                                                    11:38:51

16 BY MS. WEAVER:

17     Q    Okay.

18          And then now one, two, three, four, five down

19 it says "████████████████████████████

20          Do you see that?                             11:39:04

21     A    Sorry.  I went away from my monitor.  Sorry.

22          Yes, I see that.

23     Q    What does that refer to?

24     A    At this point I don't recollect what ██████

25 refers to.                                            11:39:28

                                              Page 94

```
 1      A   Yes.

 2      Q   Is there a similar analogy for realtime

 3  profiles and long-term profiles in display ads?

 4          MR. WATKINS:  Objection; calls for

 5  speculation.                                       12:33:17

 6          THE DEPONENT:  In display ads the terminology

 7  as to the best of my knowledge is short-term

 8  profiles and long-term profiles.

 9  BY MS. WEAVER:

10      Q   And what is a ████████████████      ████████

    ██   ████

12      A   █████████████████████████████████

██  █████████████████████████████████████

██  ███████████████   Yeah.

15      Q   And what is a ██████████████           12:33:51

16      A   A██████████████████████████████

██  ██████████████████████  to the best of

18  my knowledge.

19      Q   So here do you see for realtime profiles it

20  says SLO of ████████████,  ████████████████   ████████

██  ████████████████████████.

22          Do you see that?

23          MR. WATKINS:  Objection; mischaracterizes the

24  document.

25  BY MS. WEAVER:                                     12:34:29
```

                                                    Page 133

CONFIDENTIAL

1    Q    Do you have an understanding as to what that

2    means?

3    A    I can -- I can tell you what SLO at ███

     ████████████████████.

5    Q    What does that mean?                    12:34:38

6    A    So SLO is a standard term that's used in many

7    of -- many of these ad tech companies.  It stands

8    for service level something.

9         It basically means that that is a best effort

10   to make sure █████████████████████████   █████████

     ██████████████████████████████████.

12   Q    And how was that accomplished in the industry

13   in your understanding?

14        MR. WATKINS:  Objection; vague.

15        THE DEPONENT:  SLO and SLAs are a generic    12:35:25

16   industry term, and the way it's accomplished is you

17   benchmark your system.

18        You implement a system.  Then you benchmark

19   it and -- and try to come up with scenarios on which

20   this benchmark can be broken and then apply          12:35:50

21   mitigations, and you keep on building it over time

22   and then you reach a state where let's say in the

23   past 30 or 60 days you hardly had any issue.  At

24   that point you would say that this system is SLA or

25   SLO, whatever is the metric here.                    12:36:06

DocuSign Envelope ID: 1FF26C35-2A97-4B27-A3A6-618EAFDB5DB2

CONFIDENTIAL

```
 1

 2

 3

 4

 5

 6

 7

 8            I, DEEPAK RAVICHANDRAN, do hereby declare

 9     under penalty of perjury that I have read the

10     foregoing transcript; that I have made any

11     corrections as appear noted, in ink, initialed by

12     me, or attached hereto; that my testimony as

13     contained herein, as corrected, is true and correct.

14            EXECUTED this _____ day of _____,
                              9                      Feb
15     _____, at _____, _____.
        2022        Mountain View           CA
                    (City)                    (State)

16

17

18

19

20            _____

              DEEPAK RAVICHANDRAN

21            VOLUME I

22

23

24

25

                                          Page 316
```

1          I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, Registered

3     Professional Reporter, Certified Live Note Reporter,

4     do hereby certify:

5          That the foregoing proceedings were taken

6     before me at the time and place herein set forth;

7     that any witnesses in the foregoing proceedings,

8     prior to testifying, were duly sworn; that a record

9     of the proceedings was made by me using machine

10    shorthand which was thereafter transcribed under my

11    direction; that the foregoing transcript is a true

12    record of the testimony given.

13         Further, that if the foregoing pertains to

14    the original transcript of a deposition in a Federal

15    Case, before completion of the proceedings, review

16    of the transcript [  ] was [ X ] was not requested.

17         I further certify I am neither financially

18    interested in the action nor a relative or employee

19    of any attorney or party to this action.

20         IN WITNESS WHEREOF, I have this date

21    subscribed my name.

22

23    Dated: January 10, 202

24

MELISSA M. VILLAGRAN

25                        CSR No. 12543 RPR

Page 317

**Deposition Errata**
**Case: *Calhoun, et al. v. Google LLC***
**Deponent: Deepak Ravichandran**
**Date of Deposition: January 7, 2022**

| Pg. and Ln. | Now reads | Should read | Reason |
|---|---|---|---|
| 13:4 | New Castle | Newcastle | Transcription Error |
| 14:12 | haven't been | haven't | Extra Word |
| 15:6 | APIs. That | APIs that | Punctuation |
| 15:22 | Michael Cleber | Michael Kleber | Misspelling |
| 16:1 | Brad Lassie | Brad Lassey | Misspelling |
| 16:9 | Phillip Lee | Philip Lee | Misspelling |
| 16:13 | Kaus Tobaken (phonetic). | Kaustubha Govind | Misspelling |
| 17:17 | Aleen Asiree Amini (phonetic) | Ali Nasiri Amini | Misspelling |
| 18:22 | Venay Goyal | Vinay Goel | Misspelling |
| 21:13 | FLoC API | FLoC | Extra Word |
| 36:13 | pre structure | tree structure | Transcription Error |
| 36:14 | group | group of | Extra Word |
| 37:6 | this | these | Transcription Error |
| 39:1 | In a large | By and large | Transcription Error |
| 79:22 | Yeton Bai | Yijian Bai | Misspelling |
| 85:13 | 2.2 | 2.0 | Transcription Error |
| 85:16 | [sic] | DELETE | Extra Word |
| 86:10 | double-click | the double-click | Missing Article |
| 90:10 | (indecipherable) | raw | Transcription Error |
| 99:4 | George Levitt | George Levitte | Misspelling |
| 99:5 | Levitt | Levitte | Misspelling |
| 108:13 | Alex | AdX | Misspelling |
| 188:23 | Nefar Truong Pakob | Lisa Trongprakob | Misspelling |
| 221:1 | Sitti Chaij | Sittichai Jiampojamarn | Misspelling |
| 227:3 | decide | decided | Transcription Error |
| 232:7 | Cal | global | Transcription Error |
| 239:2 | Ben Gabrit | Ben Galbraith | Misspelling |
| 250:11 | vacuum | a vacuum | Missing Article |
| 287:3 | Weishi | Wei Shi | Misspelling |

2/9/2022

Signature                          Date

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# EXHIBIT NNN
## Redacted Version of Document Sought to be Sealed

Message

| From: | Arne de Booij [adebooij@google.com] |
|---|---|
| Sent: | 2/12/2019 4:12:14 PM |
| To: | Chetna Bindra [cbindra@google.com]; Robert Brauer [robertbrauer@google.com]; Greg Fair [gregfair@google.com] |
| CC: | Tara Rush [lusted@google.com]; Alex Nicolaou [anicolao@google.com]; Savanna Valdes [svaldes@google.com] |
| Subject: | Re: consent |

+Robert Brauer UXD for Consent work
+Greg Fair PM for Consent work

Hi Alex,

thanks for the call today, as promised, some follow up info

Results of transcreation effort

Alternative approaches around consent (connect with robertbrauer@ for more info)
go/deferred-setup
http://go/earplug

Engagement with reminder emails
+Greg Fair do you know if we have any stats on engagement with the PPR emails?

thanks
Arne

On Tue, Feb 12, 2019 at 3:56 PM Arne de Booij <adebooij@google.com> wrote:
  sorry, meant to share this deck instead go/t.n██████-notices


  On Tue, Feb 12, 2019 at 3:47 PM Arne de Booij <adebooij@google.com> wrote:
  Alex and I have interacted/emailed a bit a few months ago and I believe I had pointed you at the ████
  research (go/████████ and e.g. go/10thingsconsent) as well as the CB██ research. (see pasted thread below)

  To your points below, yes, that will happen and besides crafting a ████████████████████████████
  ████████████████████████████████████████████████████████████████
  ████████████████████████████

  ████████████████████████████████████████████████████████████
  ████████████████████████

  Alex said:

  The core issue is that the subset of consent research I have read convinced me that ████████████████
  ████████████████s:

  (1)████████████████████████████████████████████████; and

(2) ███████████████████████████████████████████████
███████████████

███████████████████████████████████████████████████████
███████████████████████████████████████████████

---------- Forwarded message ---------
From: **Robert Brauer** <robertbrauer@google.com>
Date: Wed, Nov 28, 2018 at 1:35 PM
Subject: Re: Consent & Users' understanding of it
To: Manya Sleeper <manya@google.com>
Cc: Arne de Booij <adebooij@google.com>, <anicolao@google.com>, Savanna Valdes <svaldes@google.com>


Hey Alex, Thanks for reaching out.
As you can tell from the comments below.. ███████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████ How can we help you with that on
██████████████

On Wed, Nov 28, 2018 at 5:18 AM Manya Sleeper <manya@google.com> wrote:


On Tue, Nov 27, 2018 at 9:17 AM Arne de Booij <adebooij@google.com> wrote:
I would say that is fairly accurate. again, levels of comprehension depend on user engagement and type of consent but in ███████████████████████████████████████████████.

+1 to everything Arne said


I don't think we need to do more research on ██████████████ but we are definitely doing more research to see how we can ██████████████ - next week we're in Paris studying two aspects of consent in go/██████████ go/██████████ has results from a lot of other studies in the consent space ██████████
██████████:)

Again, +1 to what Arne said.

More broadly - external research has also shown that privacy (and security) tend to be a secondary task during most everyday activities - i.e., folks are focused on getting something done and not privacy (because of both focus and practical reasons - i.e., engaging with all privacy content that comes up throughout the day is would often take up more time than is realistic).

*However* this has a strong caveat - in contextually specific moments, privacy can move to the forefront (e.g., if the user is doing something privacy sensitive, if they notice a privacy sensitive trigger, if they are particularly concerned about something they notice during a setup flow, etc.). In these situations, they may take privacy-related actions (such as reading consents more carefully...or other behaviors).

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████



Let me know if any of those areas see, useful, and I can try to pull some more specific (mostly external) references.

-Manya

As for details of consent research for ▮▮▮▮▮-▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

thanks
Arne

On Tue, Nov 27, 2018 at 6:05 PM Alex Nicolaou <anicolao@google.com> wrote:

y'. Does that seem like an accurate thing to say? Or if we aren't sure, is there research we can do to get more sure about it? I'd love to look through the details of ▮▮▮▮ consent research for example if it gets at some of these questions in detail.

alex

On Tue, Nov 27, 2018 at 11:59 AM Arne de Booij <adebooij@google.com> wrote:
Hi Alex,

Hope this helps

thanks
Arne

GOOG-CABR-00186136

On Tue, Feb 12, 2019 at 2:31 PM Chetna Bindra <cbindra@google.com> wrote:
 Let's plan for that. Let me put it on. Purpose is sharing and discussing the consent research. Is that ok?

 On Tue, Feb 12, 2019, 7:52 AM Arne de Booij <adebooij@google.com wrote:
  10AM NYC?  that is 16:00 my time- that works for me

  Just to set my expectations, what's the goal & agenda of this meeting? I've seen some emails fly around
  while I was out but haven't seen a clear set of questions or topics

  thanks!
  arne


 On Tue, Feb 12, 2019 at 1:30 PM Chetna Bindra <cbindra@google.com> wrote:
  Arne, Savanna - does that work? (Realize it might be too early in MTV).

  On Tue, Feb 12, 2019, 7:26 AM Tara Rush <lusted@google.com wrote:
   Alex has a meeting at 11am that I can't move, but he's ok before (10-11) or after (11:30-2).

   Thanks,
   Tara

  On Mon, Feb 11, 2019 at 11:33 PM Chetna Bindra <cbindra@google.com> wrote:
   Can we get time tomorrow?

   On Fri, Feb 8, 2019, 7:36 PM Savanna Valdes <svaldes@google.com wrote:
    I peeked at the event and it looks like Arne is OOO on Monday - we may need to push to Tuesday if
    that's the case.

   On Fri, Feb 8, 2019 at 3:51 PM Chetna Bindra <cbindra@google.com> wrote:
    added. thanks I will attend the second half hour

    On Fri, Feb 8, 2019 at 4:29 PM Savanna Valdes <svaldes@google.com> wrote:
     Arne de Booij (adebooij@) is the lead UXR

    On Fri, Feb 8, 2019 at 1:22 PM Chetna Bindra <cbindra@google.com> wrote:
     savanna - who else from UXR?

     On Fri, Feb 8, 2019 at 4:21 PM Tara Rush <lusted@google.com> wrote:
      Great ! 8am is ok for Alex then. I'll move his conflicts, so will add a room in WAT once I do that.

      Thanks!
      Tara

     On Fri, Feb 8, 2019 at 4:17 PM Savanna Valdes <svaldes@google.com> wrote:
      Yep, 8am is ok for me. Thanks for checking!

      On Fri, Feb 8, 2019 at 1:15 PM Chetna Bindra <cbindra@google.com> wrote:
       Yes, I can make that work. Depends on savanna. Once we agree on a time, please lmk
       and I will set up the meeting

       On Fri, Feb 8, 2019 at 4:14 PM Tara Rush <lusted@google.com> wrote:

CONFIDENTIAL

Hi!

Can 8am PT work on Monday? I can't do anything until  11am if 8am PT can't work.

Please let me know.

Thanks
Tara

> On Fri, Feb 8, 2019 at 11:21 AM Tara Rush <lusted@google.com> wrote:
> Hi!
>
> In taking a quick look on Monday - I can't see a time that works for everyone. Alex has some important meetings that I unfortunately can't get him out of, and it looks as though Savanna has a bit of a busy day as well. Is it possible to push this to Tuesday or Wednesday?
>
> Thanks
> Tara
>
> On Fri, 8 Feb 2019 at 14:16, Chetna Bindra <cbindra@google.com> wrote:
> Savanna,
> Thank you for the offer. Extremely happy to see Alex become more familiar with the consent research. Lets plan for a small meeting with you and a couple of the PDPO researchers  you mentioned and Alex and myself
>
> Tara,
> Can we try and get some time on Monday with Alex for an hour?
>
> Thanks,
> Chetna
>
>
> --
> Chetna Bindra  |  Ads Regulations. User Trust and Privacy  |  Google New York

--
**Savanna Valdes**
User Experience Researcher
svaldes@google.com
650-203-7187

CONFIDENTIAL

--

Chetna Bindra  |  Ads Regulations. User Trust and Privacy |  Google New York

--

Chetna Bindra  |  Ads Regulations. User Trust and Privacy |  Google New York

--
**Savanna Valdes**
User Experience Researcher
svaldes@google.com
650-203-7187

--

Chetna Bindra  |  Ads Regulations. User Trust and Privacy |  Google New York

GOOG-CABR-00186139

--
**Savanna Valdes**
User Experience Researcher
svaldes@google.com
650-203-7187

--

Chetna Bindra | Ads Regulations. User Trust and Privacy | Google New York

--
**Savanna Valdes**
User Experience Researcher
svaldes@google.com
650-203-7187

--

**Arne de Booij**
UX Researcher

GOOG-CABR-00186140

adebooij@google.com

Google Germany GmbH
Erika-Mann-Straße 33
80636 München

--

**Arne de Booij**
UX Researcher
adebooij@google.com

Google Germany GmbH
Erika-Mann-Straße 33
80636 München

--

**Arne de Booij**
UX Researcher
adebooij@google.com

Google Germany GmbH
Erika-Mann-Straße 33
80636 München

--

**Arne de Booij**
UX Researcher
adebooij@google.com

Google Germany GmbH
Erika-Mann-Straße 33
80636 München

GOOG-CABR-00186142

DocID :                     GOOG-CABR-00186134

BegDoc :                    GOOG-CABR-00186134

EndDoc :                    GOOG-CABR-00186142

DocID_BEGATT :

DocID_ENDATT :

Parent_Attachment :

Folder Name :               CROSS-PROD002

Custodian :                 Greg Fair

CONFIDENTIALITY :           Confidential

OWNER :                     adebooij

Author :

From :                      arne de booij
                            <adebooij@google.com>

Recipients :                robert brauer
                            <robertbrauer@google.com>;
                            chetna bindra
                            <cbindra@google.com>;greg fair <gregfair@goog

CC :                        savanna valdes
                            <svaldes@google.com>;tara rush
                            <lusted@google.com>;alex nicolaou
                            <anicolao@google.com>

BCC :

Title :                     Re: consent

MasterDate :

Sent Date :

Creation Date :

Date Created :

Last Modified Date :

Application Name :

Page Count :                9

Location :

File Name :

Due to size limitations, not all document information was included on this page.

# EXHIBIT OOO
# Redacted Version of Document Sought to be Sealed

# EXHIBIT PPP
## Redacted Version of
## Document Sought to be Sealed

Message

| | |
|---|---|
| **From:** | Karen Saville [karensaville@google.com] |
| **Sent:** | 4/26/2018 3:09:39 PM |
| **To:** | Martin Lukasiewycz [martinluka@google.com] |
| **CC:** | Branimir Dolički [branimir@google.com]; David Monsees [davidmonsees@google.com]; Rajni Posner [rajnip@google.com]; Greg Fair [gregfair@google.com]; Arne de Booij [adebooij@google.com]; Jens Mueller [muellerj@google.com] |
| **Subject:** | Re: Replacing 'Activity' with 'History' |

We did not make this change UDC GDPR updates.

I will likely be incorporating it into the next version of UDC and updating internal UXW style guides to reflect "history" as best practice, unless anyone here objects.

Thanks,
Karen

On Thu, Apr 26, 2018 at 7:52 AM Martin Lukasiewycz <martinluka@google.com> wrote:
Hi Branimir,
As I currently do not see this change in go/udc-uxw-master, I would assume that this change is not happening.

Best,
Martin

On Thu, Apr 26, 2018 at 5:12 PM, Branimir Dolicki <branimir@google.com> wrote:
Thanks Martin,

When exactly is "activity" going to be replaced with "history" in UDC?

Thanks!

-- B

On Thu, Apr 26, 2018 at 4:06 PM Martin Lukasiewycz <martinluka@google.com> wrote:
Hi Branimir,
Following up a little bit delayed on this topic: In go/udc-uxw-master you can have a look at proposed changes. At the current state, its still ... Activity instead of ... History.

# Redacted - Privilege

Best,
Martin

On Tue, Apr 10, 2018 at 6:17 PM, Branimir Dolicki <branimir@google.com> wrote:
On Tue, Apr 10, 2018 at 7:12 AM David Monsees <davidmonsees@google.com> wrote:
Before GDPR. Most of those strings were "finalized" weeks ago but small edits keep coming in.

+Martin Lukasiewycz +Jens Mueller

CONFIDENTIAL

We need to make this change for ▮▮▮▮ as well. It's a bit unfortunate that we just finished LQA and legal reviews. How do we do this in go/▮▮▮-uxw in an orderly fashion?

Greetings,

-- Branimir

On Mon, Apr 9, 2018, 9:57 PM Rajni Posner <rajnip@google.com> wrote:
Really helpful to see where you are landing on the UI language & definitely ties to the related "personalization" & "data" terminology discussion in flight.

When will this UDC language be updated?

On Mon, Apr 9, 2018 at 8:43 PM, David Monsees <davidmonsees@google.com> wrote:
Sorry for never following up on this!

In the updated UDC language, we're just focusing everything on "data" and not changing any of the setting names. Granted, we know that terms like "web & app activity" mean zero to a user, but at least we've improved the descriptions.

FYI that all the proposed language for UDC settings and the setting UI are in Column E of go/udc-uxw-master.

On Mon, Mar 12, 2018 at 2:42 PM Rajni Posner <rajnip@google.com> wrote:
Dave -

Yes, thanks for re-raising.

Few questions to help determine next steps / get a decision:
- Would we change name of Activity Controls to History Controls or just the descriptive copy?
- What is the proposed new name fo WAA?
- Can you share a few examples of proposed language & how it would read?
- Have you received approval on this reco from Eric & Mark already to make this change?

This does not feel like a Lorraine-level decision is needed here.  Instead, we could push for a decision via Tamar and her leads - which includes Marketing (Cassidy) and Product (Eric & Mark).   There is a meeting this Thursday, and we could get on the agenda, if you are able to join David to speak to it directly from a Product POV and I could join from a PMM POV.

Rajni

On Mon, Mar 12, 2018 at 8:43 AM, David Monsees <davidmonsees@google.com> wrote:
Hi Rajni,

GOOG-CABR-04994798

TL;DR, what is process for approving the term "history" to describe UDC? If this needs a Loraine review, what's the right format for that?

After years of saying/writing the word "activity", my brain has become totally comfortable with that term; however, we still believe it confuses users. The clearer/simple our terminology, the less likely users will misassume what data is saved ("activity must mean fitness data") and how that data is used ("this all sounds like it's for ads"). I want to remove any terminology shackles and use the terms that make the most sense for users.

We also don't seem to be that invested in the term "activity" -- 'Activity Controls' and WAA/VAA are the only uses of the term in a sea of "history" settings (Chrome History, YouTube History, Location History, Assistant History, etc.). Assistant History is a great example of one of the most external/branded projects at Google deciding to use the clear/generic term -- the Assistant gets the spotlight, not the information that comes from it or is consumed by it.

I know we've talked about this before, but now UXW/UXR could use a decision.

Dave

--
**Google Inc., product mgmt.**
mail: davidmonsees@google.com
chat: davidmonsees@google.com @ Google Hangouts
visit: 1600 Amphitheater Parkway, Mountain View, CA 94043
talk: **443.610.4008** @ mobile or **650.479.4008** @ office

--
Rajni Posner Brand Strategist, User Trust Marketing **Google Brand Studio**

--
**Google Inc., product mgmt.**
mail: davidmonsees@google.com
chat: davidmonsees@google.com @ Google Hangouts
visit: 1600 Amphitheater Parkway, Mountain View, CA 94043
talk: 443.610.4008 @ mobile or 650.479.4008 @ office

--
Rajni Posner Brand Strategist, User Trust Marketing **Google Brand Studio**

CONFIDENTIAL

# EXHIBIT QQQ
# Redacted Version of Document Sought to be Sealed

# EXHIBIT RRR
## Redacted Version of
## Document Sought to be Sealed

Message

**From**: Chris Liao [chrisliao@google.com]
**Sent**: 7/17/2019 6:57:23 PM
**To**: Robert Banz [banz@google.com]
**CC**: Vic Liu [vicliu@google.com]; Joshua Knox [joshuak@google.com]
**Subject**: Re: Estimated revenue impact if Zwieback SameSite mitigations don't land?

Understood - thanks!

On Wed, Jul 17, 2019 at 11:55 AM Robert Banz <banz@google.com> wrote:

> We're unfrozen for the aspects that involve moving forward on our SameSite work; of course that could change once we're found wanting once we submit our "reliability self assessment."
>
> It's very good to have a number to attach to our efforts when making risk/reward decisions.
>
> On Wed, Jul 17, 2019 at 8:52 PM Chris Liao <chrisliao@google.com> wrote:
>> With +Vic Liu's help (thanks Vic), I've added some numbers to the agenda for tomorrow. Basically, ██████
>> ██████████████████████████████████ ).
>>
>> On Wed, Jul 17, 2019 at 9:49 AM Chris Liao <chrisliao@google.com> wrote:
>>> Thanks Robert - reading your last email (the FYI), it isn't entirely clear to me if Zwieback ████████
>>> ██████████████████████ going into production?
>>>
>>> In terms of revenue impact to ████████████████████████████████
>>> ███████████████████████ Let me circle
>>> back when I can get a rough number from Vic (unless Goody comes back with the estimate earlier); I'd
>>> expect it to be in ████████████████
>>>
>>> Chris
>>>
>>> On Wed, Jul 17, 2019 at 12:32 AM Robert Banz <banz@google.com> wrote:
>>>> FYI:
>>>>
>>>> Following the lead of ████████ after this clarification from GPI's SRE leadership on ████████
>>>> ██████████████████████ . We have high confidence that our existing test and release
>>>> procedures ██████████████████ when considering the types of changes we are currently
>>>> making.
>>>>
>>>> We will follow up on the Reliability Reset action items and file bugs categorizing improvements
>>>> that can be made to our service, that we will prioritize over the next few weeks and quarters.
>>>>
>>>> We may put on hold some changes from going into production (such as ████████████████
>>>> ███████████████████████ ) until RR AIs are
>>>> addressed that would ██████████████████████████
>>>>
>>>> Specifically:

GOOG-CABR-05292934

* The current Zwieback ███████████████████████████████ and then production beginning today.
* ███████████████████████████ will be unfrozen.
* Global "████████████████████████████████████████; any pushes will be done manually with consideration for deltas that they include.


On Thu, Jul 11, 2019 at 12:13 PM Robert Banz <banz@google.com> wrote:

Basically, if we're to take the message from the Reliability Reset meeting I've just sat in at face value, if we're in scope for it, we're basically in a production freeze with the exception of making changes that would get our service to play within the rules spelled out by go/reliability-rules. Since, for example, ████ ██████████████████████████████ -- I really don't know how long it would take us to deal with that.

Since we're in Core Systems (and not TI), I'm still waiting for clear communication from our leadership as to what our response is -- but we'll consider us in a prod freeze until otherwise instructed.

The reason I'm asking what our ████████████████████████████████████████ ████████████-whatever that's needed to keep the ball rolling forward... Only if necessary, of course :)

-rob

On Wed, Jul 10, 2019 at 6:29 PM Joshua Knox <joshuak@google.com> wrote:


On Wed, Jul 10, 2019 at 12:21 AM Robert Banz <banz@google.com> wrote:

Hey Chris & Josh,

By now you've probably learned of the "████████████████

I hadn't, appreciate you flagging.

and I've been told by Leadership[tm] that Zwieback is most certainly considered in scope.

Speaking **hypothetically**, if we were to have to pivot to work on our service architecture to address satisfying the dictates in go/reliability-rules (specifically those regarding any global state / control plane / rollout issues), it would put our work on the ████████ ██████████████.

Could you elaborate ████████████████? ████████████████████████████ ██████████████████?

What are your current estimates of revenue impact if Zwieback ████████████████████?

I don't know if we have such a number, so we may need to chase Goody and team. Do you know of any such analysis, Chris?

It would be useful to have a {nice, big round} number to use when communicating this upward.

Thanks!

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

--
Chris Liao
chrisliao@google.com


--
Chris Liao
chrisliao@google.com


--
Chris Liao
chrisliao@google.com

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# EXHIBIT SSS
# Redacted Version of Document Sought to be Sealed

# EXHIBIT TTT
## Redacted Version of Document Sought to be Sealed

Message
_____

**From:**      Rory McClelland [rorymcclelland@google.com]
**Sent:**      7/9/2019 6:31:23 AM
**To:**        Mardini [mardini@google.com]; Florian Uunk [feuunk@google.com]
**CC:**        Parisa Tabriz [parisa@google.com]; Alex Ainslie [ainslie@google.com]; Alex Nicolaou [anicolao@google.com]; Anil
               Sabharwal [anilsa@google.com]; Ben Galbraith [bgalbs@google.com]; Ben Goodger [beng@google.com]; Brad
               Lassey [lassey@google.com]; Darin Fisher [darin@google.com]; Ivy Choi [ivyc@google.com]; Jack Chen
               [jlchen@google.com]; Jochen Eisinger [eisinger@google.com]; Margret Schmidt [margrets@google.com]; Michael
               Kleber [kleber@google.com]; Mike West [mkwst@google.com]; Rick Byers [rbyers@google.com]; Shimi Rahim
               [srahim@google.com]; Vivek Sekhar [vsekhar@google.com]
**Subject:**   Re: Update on Sundar ███████ review

+Florian Uunk


On Tue, 26 Mar 2019 at 16:53, Mardini <mardini@google.com> wrote:
 + Shimi

 On Mon 25 Mar 2019 at 12:28, Parisa Tabriz <parisa@google.com> wrote:
  +Alex Ainslie

  On Fri, Mar 22, 2019 at 8:40 AM Jack Chen <jlchen@google.com> wrote:

# Redacted - Privilege

  **Jack**



  **From:** Parisa Tabriz <parisa@google.com>
  **Sent:** Friday, March 22, 2019 11:00 AM
  **To:** Michael Kleber <kleber@google.com>
  **Cc:** Jochen Eisinger <eisinger@google.com>; Brad Lassey <lassey@google.com>; Mike West <mkwst@google.com>;
  AbdelKarim Mardini <mardini@google.com>; Alex Nicolaou <anicolao@google.com>; Anil Sabharwal
  <anilsa@google.com>; Ben Galbraith <bgalbs@google.com>; Ben Goodger <beng@google.com>; Darin Fisher
  <darin@google.com>; Ivy Choi <ivyc@google.com>; Jack Chen <jlchen@google.com>; Margret Schmidt
  <margrets@google.com>; Rick Byers <rbyers@google.com>; Rory McClelland <rorymcclelland@google.com>; Vivek
  Sekhar <vsekhar@google.com>
  **Subject:** Re: Update on Sundar ███████ review


  Thanks for the notes Ben, and thanks for driving this presentation for Chrome.


  On Fri, Mar 22, 2019 at 7:07 AM Michael Kleber <kleber@google.com> wrote:
   +Brad Lassey

GOOG-CABR-04675770

On Fri, Mar 22, 2019 at 3:43 AM Jochen Eisinger <eisinger@google.com> wrote:
+AbdelKarim Mardini

On Fri, Mar 22, 2019 at 6:12 AM Mike West <mkwst@google.com> wrote:
+Jochen, Rory

On Fri 22. Mar 2019 at 05:58, Alex Nicolaou <anicolao@google.com> wrote:
[+kleber, rbyers, mkwst]

On Thu, Mar 21, 2019 at 4:29 PM Ben Galbraith <bgalbs@google.com> wrote:
Hi gang,

Good meeting w/ Sundar today. Quick takeaways, more formal debrief to follow in an already-scheduled meeting:

- Overall, Sundar showed a great deal of savviness about the nuance of the space, and was very appreciative of our efforts. He acknowledged that our position is a hard one, and shared his desire for us to get out in public with our own narrative ASAP.

- He agreed that we should be investing in the ████████████████████████████████████
████████████████████████

- He liked the elements of the plan we presented:
a. ████████████████████████████
b. ██████████████████████████████████████
c. ████████████████████████████████████████
d. ████████████████████████████████████ "████████████"; Sundar was particularly excited about this and felt it could be a very powerful component of the narrative

- There was some discussion about whether we should block 3P cookies because it was becoming a de facto expectation of a modern browser. Sundar led the discussion on the topic, and ultimately trusted us to game it out properly, but encouraged us to not underestimate how much the specific mechanism of 3P cookies had become part of the public narrative and to look for ways to defuse that concern, balancing simplicity and nuance appropriately.

Look forward to going into deeper detail when we meet.

GOOG-CABR-04675771

On a personal note, today marked an important milestone in 8+ months of intense work from so many people across Chrome and Ads. *Thank you* to everyone on this thread, and please convey that to so many on your teams who have helped.

This is obviously just one more step in a long journey. There are lots of details to flesh out on all of these tracks.

To the Browser leads and teams, thank you for being flexible as the scope of this update expanded to represent some of your ideas and plans, and I look forward to working closely w/ you as you develop them further.

Best...

Ben

--
-mike

--
Forewarned is worth an octopus in the bush.

--

CONFIDENTIAL

GOOG-CABR-04675772