# JOINT DECLARATION OF JASON "JAY" BARNES, LESLEY WEAVER, AND DAVID STRAITE IN SUPPORT OF PLAINTIFFS' MOTION FOR SANCTIONS FOR DISCOVERY MISCONDUCT

## Redacted Version of Document Sought to be Sealed

**BLEICHMAR FONTI & AULD LLP**
Lesley Weaver (Cal. Bar No.191305)
Angelica M. Ornelas (Cal. Bar No. 285929)
Joshua D. Samra (Cal. Bar No. 313050)
555 12th Street, Suite 1600
Oakland, CA 994607
Tel.: (415) 445-4003
Fax: (415) 445-4020
*lweaver@bfalaw.com*
*aornelas@bfalaw.com*
*jsamra@bfalaw.com*

**SIMMONS HANLY CONROY LLC**
Jason 'Jay' Barnes (admitted *pro hac vice*)
An Truong (admitted *pro hac vice*)
Eric Johnson (admitted *pro hac vice*)
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
Fax: (212) 213-5949
*jaybarnes@simmonsfirm.com*
*atruong@simmonsfirm.com*
*ejohnson@simmonsfirm.com*

**DICELLO LEVITT GUTZLER LLC**
David A. Straite (admitted *pro hac vice*)
Corban Rhodes (admitted *pro hac vice*)
One Grand Central Place
60 East 42nd Street, Suite 2400
New York, NY 10165
Tel.: (646) 933-1000
*dstraite@dicellolevitt.com*
*crhodes@dicellolevitt.com*

Amy Keller (admitted *pro hac vice*)
Adam Prom (admitted *pro hac vice*)
Sharon Cruz (admitted *pro hac vice*)
Ten North Dearborn St., 6th Floor
Chicago, IL 60602
Tel.: (312) 214-7900
*akeller@dicellolevitt.com*
*aprom@dicellolevitt.com*
*scruz@dicellolevitt.com*

*Counsel for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| PATRICK CALHOUN, *et al*., on behalf of themselves and all others similarly situated,<br><br>　　　　　　　Plaintiffs,<br><br>　　v.<br><br>GOOGLE LLC,<br><br>　　　　　　　Defendant. | Case No. 4:20-cv-05146-YGR-SVK<br><br>**JOINT DECLARATION OF JASON "JAY" BARNES, LESLEY WEAVER, AND DAVID STRAITE IN SUPPORT OF PLAINTIFFS' MOTION FOR SANCTIONS FOR DISCOVERY MISCONDUCT**<br><br>**CIVIL L.R. 37-4(b)** |

**UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

We, Jay Barnes, Lesley E. Weaver, and David A. Straite, hereby declare under penalty of perjury:

We are co-lead counsel of record for Plaintiffs in this matter and submit this Joint Declaration in Support of Plaintiffs' Motion for Sanctions for Discovery Misconduct. We submit this declaration based on personal knowledge, and if called as witnesses, could testify competently to the facts set forth herein.

**I.    Google's Misrepresentations and Other Misconduct Regarding Not Sync Signals**

1.    On July 27, 2020, Plaintiffs filed their initial complaint, alleging claims on behalf of a putative class of "all persons residing in the United States who used Google's Chrome browser on or after July 27, 2016 without choosing to Sync with any Google Account…." Dkt. 1 at ¶ 259.

2.    The preservation and discovery of evidence sufficient to identify Chrome users who are not synced, i.e. putative class members, has been a central piece of discovery and preservation from the outset of this litigation. Throughout the course of discovery, Plaintiffs have sought evidence regarding any Google "signal," i.e. any electronic flag, code, or other indication on Google's possession that would enable Plaintiffs to identify not synced Chrome users either directly or indirectly (the "Not Synced Signal"). From the outset, it seemed logical that a signal or piece of code would need to communicate when users elected to sync, or, in the converse, not to sync. Key questions were how that command was communicated in Google's systems and whether or not such commands were retained.

3.    In January 2021, Google asked Plaintiffs for permission not to preserve data relevant to the case. Google alluded to a "Sync Traffic Log," but then claimed that this log did not contain relevant information and thus was not part of the preservation dispute. Because Google excluded sync traffic logs from its request not to preserve (and declined to provide information necessary to evaluation the claim), they were no included in the parties' discussions.

4.    During multiple meet and confers and through the exchange of various letters, including via letter on January 21, 2021, Plaintiffs specifically inquired if Google's request to stop preserving data logs included the destruction of information "reflecting synced and unsynced browser states[.]" Attached hereto as **Exhibit 2** is a true and correct copy of that January 21, 2021

letter.

5.    In response, Google claimed that there were no signals identifying sync usage, and also claimed and the Sync Traffic Log contained only traffic from synced Chrome users. Attached hereto as **Exhibit 3** is a true and correct copy of Google counsel's response letter dated January 29, 2021.

6.    Plaintiffs also specifically inquired if Google could determine a subset of the putative class by using the information in Sync Traffic Logs by (1) identifying all Google Accountholders (which it is undisputed Google could do) and then (2) eliminating from that list Google Accountholders who had enabled Sync (which Google represented was contained in the Sync Traffic Log), thereby leaving only those Google Accountholders who did not have sync enabled. Google represented that this was not possible, reiterating that (1) "Google does not have any logs showing when a user is not synced" and stated that (2) sync traffic logs only "show sync traffic Google received from users who had sync enabled."

7.    Google repeated this misrepresentation to the Court in briefing filed on March 1, 2021, stating "Chrome sync logs[] [] show sync traffic *only* for users that have sync enabled." Dkt. 120 at 4 (Google's Reply in Support of Motion for Protective Order) (emphasis added).

8.    Google made the same misrepresentations during a Court hearing on March 5, 2021. Notably, during this hearing the Court inquired about the Sync Traffic Log (which Plaintiffs had noted were conspicuously absent from Google's Motion for Protective Order). Google asserted: "The Sync Traffic logs are the logs that show data was sent to the Chrome server when a user had Sync enabled" (Mar. 5, 2021 Hrg. Tr. 11:17-20), and "[i]f a user has not enabled Sync, then the [] [] Sync Traffic logs will not show data for that user who has not enabled sync" (*Id.* at 14:15-17). In response to the Court's inquiry of whether Google is able to "identify the number of unsynced users who are using Chrome[,]" Google asserted "that is not a figure that's readily available to Google." *Id.* at 23:6-24:9. Google also falsely claimed that the Sync Traffic Logs were "not relevant[.]" *Id.* at 21:9-14.

9.    Following the March 5 hearing, the Court ordered a series of 30(b)(6) depositions related to the preservation dispute. *See, e.g.,* Dkt. 155, 192-1. During these depositions, Google's

corporate designees continued to misrepresent the existence of Not Synced Signals. For example, on April 9, 2021, Google's 30(b)(6) designee testified that Google "cannot [identify users who are not synced] because they are not synced" and "Google does not have a…Google Account ID in Chrome for users who are not signed in using Chrome sync." Transcript of Deposition of Google 30(b)(6) (David Monsees, designee) ("Monsees Depo I") at 114:7-117-8.  A true and correct copy of Monsees Depo I is attached as **Exhibit 6.**

10.    Google continued to misrepresent the existence of Not Synced Signals in written discovery responses. On August 6, 2021, Plaintiffs propounded the following interrogatories (collectively, the "Class Member Identification Interrogatories"), asking Google to:

a.    "Identify all Google Accountholders, by email, phone number, or other Google Account identifier, from whom Google received Personal Information (as alleged in the Amended Complaint) from their Chrome browser application while it was operating in an un-synced state." Interrogatory No. 13.

b.    "Identify all Google Accountholders who have never synced any device in any of their Google Accounts." Interrogatory No. 14.

c.    "Identify all Google Accountholders who have at least one device Google has associated with them that has never been synced." Interrogatory No. 15.

d.    "Identify all Google Accountholders who have clicked to unsync any of their devices or accounts." Interrogatory No. 18.

11.    On September 7, 2021, Google served its Responses and Objections to the Class Member Identification Interrogatories. Rather than correct the record and acknowledge the existence of Not Synced Signals, Google objected that the interrogatories sought "information that exceeds the scope of Google's preservation obligations established by the Court in this action."[1]

12.    On September 10, 2021, Plaintiffs noted the deficiency in Google's interrogatory responses and wrote to Google counsel requesting that "Google identify, in writing, for each

---

[1] As discussed in the next section, Google's objection, which was predicated on the Court's order related to Google's Motion for Protective Order, are baseless, as Google had expressly limited its Motion for Protective Order to only ▮▮▮ specific logs, none of which implicate the preservation of the Not Sync Signals at issue here.

interrogatory …. [w]hether Google maintained records of sync, unsync, not synced, or any other signals indicating a Chrome user's browser-state sufficient to identify absent class members for the entire class period." Google refused to provide a substantive answer to this request.

13.     On December 6, 2021, Plaintiffs moved to compel Google's answers to the Class Member Identification Interrogatories. *See* Dkt. 397 at 2-3. At no point during this briefing, or the lead up to it, did Google correct the misrepresentations it had made to the Court regarding Not Synced Signals.  Instead, Google asked that the Court refer the issue back to Special Master Brush for a "determination concerning the dataflows that affect class member identification." *Id*. at 3.

14.     Google also misrepresented the record regarding the Not Synced Signals in its responses and objections to Plaintiffs' Requests for Admission.

   a. Plaintiffs' original RFA requested that Google admit that is could identify users who were not synced.

   b. Google specifically denied that "Chrome sends a Signal to Google that indicates when a Chrome user is not signed-in and not synced." *See* RFA 12.

15.     In February 2021, Plaintiffs requested that Google produce relevant data dictionaries and database architecture documentation in order to craft a reasonable preservation proposal. *See* Dkt. 118-5. Google responded that it would do so (*see* Mar. 5. Hrg. Tr. 42:16-46:7), and the Court directed that the information be produced (*Id.* at 48:13-53:20).

16.     On September 23, 2021, Plaintiffs requested Google identify the data sources where signals for exist. Indeed, Plaintiffs were specific in their request:

> "Plaintiffs specifically request Google identify where ███████████ transmitted from Chrome to Google when a Chrome user signs-in to any Google service without enabling Sync or opens the Chrome browser while still in a SignedIn state is sent and stored, for how long it is stored, and whether Google has been preserving such information. By making this specific request, Plaintiffs do not intend to limit Google's responsibility to inform Plaintiffs of where Sync or Unsync signals are stored."

17.     Google responded via letter to the Special Master on September 27, 2021, stating that it was "searching through data sources for these fields, but can already confirm that the fields and descriptions disclosed … do not contain these signals."

18.     At this same time, the Parties were submitted log preservation proposals to the Court. *See* Dkt. 293 (filed September 27, 2021).

a.    <u>Plaintiffs' Proposal</u>: Because Google continued to refuse to provide an accounting of where Not Synced Signals were stored, Plaintiffs proposed that Google identify log parameters, including not synced signals, so they could craft an appropriate preservation plan. *See* Dkt. 293-4. Plaintiffs stated that they were "concerned … that Google [wa]s deliberately shielding from discovery information that will provide a roadmap for identifying the class. This includes identifying unsynced users[.]" Dkt. 293-4 at 5. Plaintiffs specifically proposed that the Court order Google to identify, by September 3, 2021, "a list of fields in each relevant log … specifically includ[ing] all fields from sync and/or sync traffic logs, as well as identification of fields and logs that capture data flowing through ███████████ [the Sync server] and ████████████." Dkt. 293-4 at 6.

b.    <u>Google's Proposal</u>: Google proposed a random daily sampling of ████ log events per day that "would also include a lookup of information in sync traffic logs." Dkt. 293-4 at 2. Google's preservation proposal did not identify relevant field information. Google refused to identify relevant fields to Plaintiffs and maintained that there was no such thing as a not synced or unsynced signal.

19.    On November 12, 2021, the Court ordered Google to provide schema, fields, and field descriptions, this time specifying that the information must be provided for sources with Sync signals. *See* Nov. 12, 2021 Order on Special Master Report & Recommendations. Google failed to comply.

20.    On November 18, 2021, Google produced fields and brief descriptions for the ChromeSync server log called ████████████. Row ████ of this log identified a field named "sync_feature_enabled." Google's description of this field stated that it showed "whether the client has full sync (or, Sync the feature) enabled or transport-only (aka ████). Logged only when the value is present in the request." By asserting that a value is "Logged only when the value is present in the request," Google misrepresented that it only logged the value when sync feature

was enabled.

A.     **Google Leveraged Its Misrepresentations to Oppose Class Certification**

21.     On October 14, 2021, Plaintiffs filed their Motion for Class Certification (Dkt. 339), including the expert reports of Richard M. Smith (Dkt. 339-16) (the "Smith Report") and Zubair Shafiq (Dkt. 339-22) (the "Shafiq Report").

22.     The Smith Report opined that "a specific signal that Chrome sends to the Google Sync Service to indicate to Google that the user is not Synced and which is accompanied by the specific Google account to which the user has signed-in – for example, an email address." Dkt. 339-22 at 36, ¶ 113. It further stated that, "it would be straightforward for Google to keep a record of these incoming signals attached to specific account holders if Google has not done so already." *Id*. ¶ 114. The Smith Report specifically identified six circumstances in which a not synced signal is sent to Google. *Id*. ¶ 116.

23.     The Smith Report further explained that one of the signals is named "is_sync_feature_enabled" and that it indicates "[w]hether the client has full sync (or, sync the feature) enabled or not." *Id*. ¶¶ 139-40. It then states that the "is_sync_feature_enabled" signal "is set to zero" when a user is "signed in with sync off." *Id*. ¶ 144. The Smith Report then states that "[a]fter sync has been turned on," the "is_sync_feature_enabled" value "is now 1 which appears to indicate that Sync has been enabled." *Id*. ¶ 149.

24.     Because Smith (and Plaintiffs) do not have their own access to Google's backend storage systems, it was impossible for Plaintiffs to submit evidence of how such a signal was received and saved by Google.

25.     The reason the Smith Report stated that "it would be straightforward" for Google to preserve the not synced signals rather than identifying precisely where they were stored is that Google continued to deny even the existence of any such signals until October 12, 2021 and even then did not correct the record to identify the precise signals and when and how they are sent, received, and stored – and for how long.

26.     The Shafiq Report identified "several accurate methods … using Google's own systems and databases that already exist" through which "Google can identify Chrome users who did not enabled sync or who disabled sync." Dkt. 339-22 at 11, ¶ 61. The Shafiq Report states that,

"[i]f Google has and had saved [the Signed In But Not Consented for Sync signal], all-signed in but not consented for sync Chrome users could be easily identified for whatever time frame Google decided to retain the data." *Id*. ¶ 62. The Shafiq Report further explains that "Google could just as easily have designed Chrome to send a separate signal indicating that a user was signed-out and not synced." *Id*. ¶ 63.

27.     In opposing class certification, Google offered the Declaration of Tim Schumann. Dkt. 430-16. Schumann's declaration attempted to rebut the Shafiq Report regarding not synced signals and claimed that "Dr. Shafiq's proposed approaches will fail to identify Chrome users who did not enable sync or who disabled sync." *Id*. ¶ 2. Schumann stated that Shafiq's approach would fail because it "assumes that ████████ [in the ████████ database] will only be present … if the user has enabled Sync" and "[t]hat is a flawed assumption [because] the ████████ value … will also be present for a user who signed into the Chrome browser on their desktop and signed into a Google site (like Gmail) but did not have sync enabled." *Id*. ¶ 5. Schumann makes the same statement for Google's Takeout product. *Id*. ¶ 6. Schumann further explains that "the 'Chrome Sync' record can exist for a user" who is signed in "but never enabled sync" but that "the 'access log activity' records are only retained for less than ████." *Id*. ¶ 6. The Schumann Declaration omits the existence of signals that exist when a user clicks to turn off sync – and thus be transitioned to a basic browser or signed out mode.

**B.     Plaintiffs Begin to Learn the Truth Regarding Not Synced Signals**

**1.     The ████ Signal, also known as the "Signed In But Not Consented for Sync"**

28.     On January 13, 2022, Plaintiffs took the deposition of Google employee Tim Schumann in Switzerland. During his deposition, Mr. Schumann made various admissions regarding the existence of Not Synced Signals.  He testified that Chrome regularly sends a signal to the Sync Traffic Logs (also known as Sync Servers or gwslogs) for users who are "Signed In But Not Consented for Sync." Schumann Dep. 38:7-25, 58:1-8; 125:10-16. Internally, Google referred to this signal as ████ *Id.* A true and correct copy of excerpts of the deposition of Tim Schumann is attached hereto as **Exhibit 5.**

29.     According to Mr. Schumann, the ████ signal is tied to individual Google

Accounts and stored for approximately 30 days in Sync Traffic Logs before they are "destroyed." *Id*. at 131:18-132:9. In addition, Mr. Schumann disclosed that the ██████ signal could be used to identify Not Synced Chrome users, contradicting almost a year of statements to the contrary in this litigation.

30.    In addition, Mr. Schumann disclosed that Google created two pipelines to send this signal to other Google Account-keyed services, i.e. creating the ability to link them to individual Google accounts. The first pipeline goes to a storage system called ██████ where the signal is stored for ████ before they are "auto deleted." *Id*. at 189:6-10, Schuman Dep. Exs. 10-15. The second pipeline is called the ████████████, which sends the signal to a database that stores aggregate information. But before the data is aggregated, it is sent to an "intermediate table" called ████████████ that stores the signal alongside Google Account and device identifiers ████████████. *Id*. at 129:18-130:20; Schumann Dep. Ex. 7. Thus, the ████ signal could be used to identify Not Synced Chrome users, but only for a limited amount of time. Mr. Schumann testified that compiling a list of not synced users via the ████ signal would "be quick" and involve "[m]aybe a day or two of work" related to the approval process to compile such a list. *Id*. at 94:25-97:14; Schumann Dep. Ex. 4.

31.    Documents produced by Google show that Mr. Schumann was engaged in discussions with other Google employees regarding how Google could identify class members as early as January 2021, the same time that Google began its campaign for a protective order. This conversation was produced in discovery at GOOG-CALH-00854375, a true and correct copy of which is attached hereto as **Exhibit 4**.

    **2.    The ████████████ Signal**

32.    On March 4, 2022 (the last day of fact discovery), the Special Master arranged a live demonstration of Google's internal logs, via video conference, that included Google engineers, counsel for all parties (including counsel for Plaintiffs in Brown v. Google), and Plaintiffs' experts.

33.    Plaintiffs' expert Prof. Zubair Shafiq and counsel observed a Google employee conduct a live search that revealed an additional Not Synced Signal – the ████████████ Signal – pass from Chrome to Google. As explained by Prof. Shafiq in his supplemental brief in support of Plaintiffs' Objections to the April 4, 2022 Special Master Report and Recommendation, this

signal identifies class members who chose to "Turn Off" Sync, an action that would then be capable

of identifying them as a user in "Basic" or "Signed Out browsing mode.

34.    Later that same day, at 11:52 P.M. Pacific, with *eight minutes* left to the end of fact

discovery, Google finally amended its discovery answers to acknowledge the existence of the

███████████ Signal. In its supplemental response to Interrogatory No. 34, Google stated:

> When a Chrome user stops sync, the Chrome client sends a ██████████
> signal to the Chrome Sync server. … The signal is recorded in Chrome Sync's
> ████████ data store, ████████████ where the record is retained until the
> user clears the sync data associated with that Google Account or deletes the Google
> Account. The signal is also recorded in the ████████████.

A true and correct copy of Google's amended responses to ROG No. 34 is attached hereto as

**Exhibit 8**.

35.    While Google asserts that the ████████████ Signal is recorded in the ███

████████████, based on Plaintiffs' review, Google failed to identify this signal as a field

in that log when it submitted field names and schemas to the Special Master back in November 28,

2021.

36.    The discovery cut-off in this action was March 4, 2022.

37.    On March 12, 2022, the Parties submitted competing proposals for identification of

class members, wherein Google proposed to "preserve (a) ████████ signal … and (b)

████████████ signal" going forward. Dkt. 560.

38.    At the March 17, 2022 hearing, Google also stated that it was "offering to preserve

[Not Synced] values through the ████████ bit that [it] had discussed in the second and third

preservation proposals." *Id.* at 47:9-11. However, Google's offer failed to inform the Court that this

offer was contingent on Plaintiffs acquiescing to Google's demand that Plaintiffs not request

preservation of Sync Traffic Logs (which include the ████████████ signal). In other words,

after Mr. Schumann outed Google's falsehoods regarding Not Sync Signals (i.e. confirming the

████████ signal), Google would agree to preserve the ████████ signal *only if* Plaintiffs would agree

to the destruction of the ████████████ Signal.

39.    On March 18, 2022, the Court rejected Google's proposal and ordered Google to

preserve ████████ *and* ████████████ signals. *See* Dkt. 579.

**3.** ███████████████ **Signal**

40.     Also on March 18, 2022, Google produced two documents indicating additional storage of sync consent signals that had not previously been disclosed to Plaintiffs, the Special Master, or the Court. In GOOG-CABR-05882544, Google employees discuss a signal for ███████████████ associated with a system called "the Audit Recording Infrastructure (ARI) to create durable audit records for the user consents" in various Google products, including Chrome. *See also* GOOG-CABR-05882537 (also produced Mar. 18, 2022).

**4.     Zwieback** ██████ **Field Names**

41.     On February 25, 2022, with only 2 weeks to go before the end of fact discovery, Google produced field names for Zwieback ██████. Among the Zwieback fields included several not previously revealed that record sync status: (1) ███████████████; (2) ███████████████; and (3) ███████████████. *See* GOOG-CALH-01170421, a true and correct copy of which is attached hereto as **<u>Exhibit 7</u>**. By this production, Plaintiffs learned for the first time that Zwieback ██████ columns include (1) addresses, (2) phone numbers, and (3) several columns where Gaia and Zwieback identifiers are co-mingled, disposing of the myth that Zwieback logs are "anonymous."

**5.     The Sync_Feature_Enabled Signal, with Sub-Designations of "True" and "False"**

42.     On April 23, 2022, Google finally produced Sync Traffic Logs and Gaia ██████ data associated with certain Plaintiffs and test accounts created by Dr. Zubair Shafiq.

43.     The April 23, 2022 Sync Traffic Log production confirmed that the logs store Not Synced Signals in a way that directly identifies a specific user that is not consented for sync. For example, the produced information pinpointed the time of the entry, the individual email address nedstark904@gmail.com, the UserID of 936530432958, the UserAgent associated with the entry, the "Birthday" associated with the account, and that "sync_feature_enabled" equals "false." The production further showed that the nedstark904@gmail.com account had sync_featured_enabled equals false eight times in approximately one hour; and that a separate synced test account created by Dr. Shafiq (Brain Stark) had "sync_feature_enabled: true" appear 105 times over roughly the same time period. The time stamps correspond to when Prof. Shafiq disabled sync in his test

accounts.

44.    The same production also shows the precise time that a user first enabled sync and the last time they disabled sync. The screenshot below shows a creation timestamp of ████████████, which converts to April 28, 2021 at 4:11:57.821 p.m. GMT; and the last modified timestamp, which converts to Sept. 22, 2021 at 1:11:52.393 p.m. GMT:



45.    As a result of Google's failure to timely identify and preserve Not Synced Signals, Plaintiffs have been denied discovery relating to them and have been foreclosed from referring to them in briefing class certification or summary judgment. Plaintiffs now know that the Not Synced Signals Google concealed can be used to identify class members, and down to the specific dates on which Chrome sent their personal information to Google without authorization.

## II.    Google's Failure to Timely Produce Key Consent Documents

46.    Plaintiffs served multiple Requests for Production of Documents ("RFP") related to studies, evaluations, documentation and analysis of user expectations of privacy and understanding of user consent interfaces. This includes the RFPs set forth below:

a.    "Studies or evaluations of privacy expectations of Chrome users, whether authored by You or by third parties" (RFP No. 12);

b.    "Documents related to Chrome and data privacy" (RFP No. 13);

c.    "All documents relating to any process through which Google claims to have obtained express or implied consent from Users to send personal information to Google (including cookies, X-client data headers, IP addresses, User-

Agent information, and other identifiers) associated with Chrome browsing history" (RFP No. 50);

d.   "All Documents relating to the process, user interfaces or flow through which Google claims to obtain user consent for Web & App Activity ("WAA"), supplemental Web & App Activity ("sWAA"), "NAC," … or any other program or process through which Google claimed it has obtained User consent to collect User Information on non-Google properties" (RFP No. 51);

e.   "All Documents relating to NAC … or ███ consent flow" (RFP No. 53);

f.   "All Documents relating to 'account creation flow' from 2012 to present, … including studies … or other mentions of consumer sentiment surrounding the process or considered alternatives" (RFP No. 55); and,

g.   "All studies, surveys, focus groups, and reports, research, commissions projects, task forces, tasks assignments or discussion relating to Users' perception of Google's privacy policies and practices, including whether or not Google respects Users' privacy" (RFP No. 76).

47.   On November 30, 2021, Google filed a Motion for Summary Judgment on its First Affirmative Defense of Consent. *See* Dkt. 395. In doing so, Google represented to the Court that there was no dispute of material fact that would preclude a finding that Plaintiffs had consented to Google's conduct at issue. Dkt. 395 at 2. Google's consent argument was predominantly based on a Google Account Holder Agreement with Google and agreement to the Google Privacy Policy. *Id.*

48.   On December 20, 2021, Plaintiffs took the deposition of a Google employee named Sam Heft-Luthy, a member of Google's Privacy and Data Protection Office (PDPO). Plaintiffs understand that Mr. Heft-Luthy was also considered the "owner" of the Google Privacy Policy for much of the class period. A true and correct copy of excerpts of the deposition of Sam Heft-Luthy is attached hereto as **Exhibit 10.**

49.   During this deposition, Mr. Heft-Luthy identified a Google project called ███ ███ which was an internal Google project related to "privacy, transparency and control surfaces, as well as request from executive stakeholders for strategic orientation." Heft-Luthy Dep.

Tr. 53:12-21. As part of this project, Mr. Heft-Luthy participated in interviews with dozens of Google stakeholders to determine their beliefs about Google's purported consent process.

50.     At the time of Mr. Heft-Luthy's deposition, Google had not produced all responsive documents related to this project. Critically, Google had omitted from production the interview notes with the Google stakeholders.

51.     Following Mr. Heft-Luthy's deposition, Plaintiffs requested that Google produce all documents associated with ██████████, including transcripts or other notes from interviews of key Google stakeholders associated with the project.

52.     On January 10, 2022, Plaintiffs filed their Opposition to Google's Motion for Summary Judgment on Consent. Dkt. 462, but without the benefit of the requested ████████ documents, which Google had refused to produce.

53.     On January 18, 2022, Plaintiffs contacted Google again, and renewed their request for ██████████ documents, including interviews.

54.     On January 28, 2022, Google filed its Reply in Support of Its Motion for Summary Judgment on Consent. Dkt. 475. In its Reply, Google argued that Plaintiffs were "misquoting and misconstruing internal Google emails and draft documents" and that "[i]nternal discussions by a handful of more than 150,000 people employed by Google" cannot defeat Google's consent argument. Dkt. 475 at 1-2, 12. Google further argued that one of the documents in question merely "reflected the author's scratchpad' notes" and have nothing to do with Google's consent argument. Dkt. 475 at 14, n. 20.

55.     On February 4, 2022, during a meet and confer, Google finally said that it would produce responsive documents to Plaintiffs' ████████ request. But Google did not.

56.     On March 21, 2022, Plaintiffs renewed their request again.

57.     On March 23, 2022, Plaintiffs renewed their request again.

58.     On March 25, 2022, Plaintiffs renewed their request again.

59.     On March 31, 2022, Plaintiffs renewed their request again.

60.     On April 4, 2022, Plaintiffs renewed their request again.

61.     On April 6, 2022, Google produced 24 additional documents relating to ████

JOINT DECLARATION ISO OF MOTION FOR SANCTIONS FOR DISCOVERY MISCONDUCT

1    ███████. Far from being internal discussions from random Google employees, ████████████ is

2    described in these documents as a █████████████████████████████████████

3    ████████████████████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████████████████

6    █████████████████████

7         62.    The "final" paper from the PDPO (Google's primary office for user privacy

8    experience issues), was titled ████████████ Perspective: Toward a ███████████ Google

9    experience." It included the following admissions:

10           a.    ██████████ would "require[] an approach that makes **respecting user privacy**

11               **the default** – or native – state of our relationship with users."

12           b.    "In this new privacy-native approach, **Google will ask for personal data only**

13               **for specific, limited purposes that provide clear benefits to users**."

14           c.    "At Google, we believe privacy is a universal right[.]"

15           d.    "Our research analysis and stakeholder interviews have shown that Google's

16               **consent approach**, enabling the broad collection and use of personal data, is a

17               root cause for our systemic privacy challenges."

18           e.    "Our approach [to consent] has become out-of-step with user expectations and

19               regulations. It makes it difficult for people to understand how we use their data

20               in all circumstances, to make the right choices for them, and for us to take clear

21               positions and distinguish ourselves among competitors."

22           f.    "People often face significantly complex consents when they are creating a

23               Google Account, or trying to accomplish a particular task, and don't have the

24               time or capacity to absorb all the details, let alone understand the precise impact

25               their choices might have on the particular services they use."

26        63.    Google also produced an associated document that was a summary of research

27   analysis, bearing bates number GOOG-CABR-05885181, a true and correct copy of which is

28   attached hereto as **Exhibit 12.** Among other things, this summary concluded:

a. "Google's few consent moments alone, very early in the relationship are not enough to help users form accurate expectations about risks involved and benefits gained when engaging in a data-sharing relationship with Google." -183

b. ███████████████████████████████████████████████████ -198. "Both in live experiments, log data and in scaled qual, ██████████████████ to take a decision on a consent. I don't know about you but I can't even get past the first sentence in that time." (Direct quote from document author)

c. "Engagement is low because consent is not a users' primary goal and they perceive consent as overwhelming." -199

d. "When people do engage with consent, we see that many don't understand the effect of their choice on risk and benefits," include WAA controls. -200.

e. "[I]t is clear that even when reviewing the text [of WAA], most people will not figure out the exact outcome of their consent choice on data collection and usage." -263

f. "Among other things, consent needs to be freely given, specific, and informed. This primary means that a person knows: data – what data will be collected; purpose – what it will be used for" and "that they can: decline, not say yes to use a service; change: that consent can always be revoked/changed" and that "for the above, the choice & control need to be specific." -290

g. "Consent" is "a very bad place for people to form accurate expectations about how their data will be used. … To many participants, it is not clear what the effect of their consent choice is on things like: data collected, purpose of the data collection including its value, amount of ads they will see." -301.

64.    Google also produced a document summarizing interviews with key Google stakeholders, in a document bearing bates number GOOG-CABR-05885871, a true and correct copy of which is attached hereto as **Exhibit 11.** Contrary to Google's assertion on its motion for summary judgment, these were not unimportant random Googlers but instead high-ranking executives with

authority to bind Google. Moreover, not a single one of the Google executives interviewed agreed with Google's argument on its motion for summary judgment. Among other things, key Googlers (including executives) admitted:

a. "If people were the deciders, they wouldn't take the deal, but they are not the deciders."

b. "Our ads system as design[ed] doesn't really give the user choice."

c. "Sundar proudly likes 2 AC [account consent] settings. Users don't."

d. "We have gaps in how our system works and what we promise to people."

e. "At Google, we still seem to believe in that fantasy that users agreed to this."

f. "Consent is no longer consent if you think of ads as a product."

g. "One example are all th[e] controls that we have that have horrible names that don't mean anything to anyone, not even within the company."

h. ""Most of the systems we built up in an assumption that people don't want to tell us things."

i. "There is no coherent strategy" on "privacy at Google."

j. "Our data infrastructure is not designed for privacy."

k. "[T]he fact that we can't explain what we have on you to users is probably our biggest challenge" on privacy. "I don't have the faintest idea what Google has on me. My Activity is a couple XML logs. If I do Takeout that's a bunch of JSON files."

l. "Google is too big."

m. "Even with the sum of many controls you don't always end up with what you expect. There is device vs. browser vs. the app vs. the account level controls. Many controls doing many things across many different surfaces. Does it do what it supposed to do, do users understand it? If that is the key part of our strategy, then I don't think it is working."

n. "When I look at UDC, what is sWAA v. WAA vs. YT? They don't make sense because of the naming and there are hidden functions that people don't know.

JOINT DECLARATION ISO OF MOTION FOR SANCTIONS FOR DISCOVERY MISCONDUCT

Like Chrome sync and others that I don't even understand and can't describe."

o. "We need to decouple ads and privacy."

p. "Everyone is concerned about their data being collected. They don't know about it and they don't know how to control it. Big companies are collecting all these things. I don't know about it, I can't do anything about it. They are doing it for their own benefit or it is a concern because it could be leaked and I can't control it. The challenge we face is how do we exist in this world where everyone is concerned and get to the point where we can function well without irrep[arable] harm to our brand and the company."

q. "I don't like the idea of Google having data about users that they can't say no to."

r. The "complexity of the technology … is beyond the grasp of nearly everyone … We are transferring the onus of all that complexity from companies to users. We are asking users to navigate it. We have ideas how we can make UI and interfaces better. This makes things less transparent and is in conflict with our business model, our ads model, and our economic motives are unclear. There is no clear solution to this."

s. "User have a right to know … [but] the reasons we provide are so high level and abstract that they don't make sense to people."

t. "We should find ways to do measurement in a way that we don't need consent I don't think people will consent to measurement because they feel that they are giving something up without anything in return. The value they are getting is so intellectually distant that it is really hard for them to understand. A lot of the value is for the advertiser not for the user."

u. "Privacy is not the priority for most people in ads."

v. "There are core stakeholders at the company who think that [privacy] is impossible or too hard to do and therefore not worth it."

w. "We know privacy is a core user need."

JOINT DECLARATION ISO OF MOTION FOR SANCTIONS FOR DISCOVERY MISCONDUCT

x. "Users don't know what is happening under the hood."

y. "We need to decouple ads and privacy."

z. "Won't it creep people out to know how much we are paying attention."

aa. "Signup flows are not a good moment to explain or present these kinds of things [purported consents] to users."

bb. For Privacy Native to succeed, "it needs to confront the s[acred] cow."

cc. "PDPO is someone you want to hide things from because if they know they will make things worse."

dd. "Someone named Ben Smith tried to do something like this, the TLDR was that 'teams thought it made sense but then once they were told they had to stop doing stuff, they balked and the thing kinda fell apart. At a high level, teams thought it m[ade] sense for us to point in that direction! …. But they hit some walls …. [and] framed it largely around an all-or-nothing approach …. so that led to a bunch of high-stakes and somewhat defense conversations about 'direct user benefit' because, for example, 'stop collecting data for ads measurement' means basically no more ads measurement at all. So the conversation was 'Measurement delivers $XX billion in revenue??? And nothing is gonna win against $XXB :)" -881.

ee. "Do you think it is possible for users to reckon with and make a choice about data collection for the aggregate? No, because we don't frame consent that way." -886.

ff. "I see a lot of evidence of us doing what Larry and Sergey wanted us to do which is pushing the boundaries and then dealing with the consequence. I don't know if you can change the company because this is the dynamic."

gg. "A serious signal we could send to the market would be to cut off the limb. The struggle there could be the impact. You could argue that this is a good thing for society, because many of the things that use the services are not positive. In many places we are seen as the people that undermine democracy."

hh. "We need to get to a degree of simplicity and honest[y] with the public and our users."

ii. "It is sad that PDPO is seen as an impediment rather than a warmly embraced partner to Google's ethos. If we don't do this and get it right, then we are going to be run over. People are doing short-term thinking and not long-term fixes."

jj. "We don't understand our users. Every time we run these studies, we learn that users don't get us and we don't know what to do."

kk. "Privacy needs massive investment. It requires us to re-engineer … complete products for the sake of privacy not anything else."

ll. "There are few presidents at Google, which is a sign that we want people to be autonomous. But in privacy it is kind of hard to let people do what they want to do. The harm is that people think they can do whatever they want, but this doesn't work well for a regulated problem, it works well for product development. We are pretty grumpy about it and in denial about it (regulation). If you want to work in a bank, you have to get a license to work in a bank, and if you screw up, you lose your license. But we really resist the idea that anyone can tell us what to do."

mm.  "Usres don't understand what is going on, and nobody is talking to them about it. They are being talked at. How do you trust someone who talks at you but don't show you what is in their heart? They need to be equal stakeholders. They don't understand what it is going on."

nn. "Not being able to have agency over what you do with my data" is a big challenge.

oo. "We are not taking our responsibility as a steward of user data seriously."

pp. "I am not able to have agency over what you do with my data."

qq. There is "[n]o coherent and simple access to privacy controls across all apps, in Chrome and Android."

65.    On April 12, 2022, Plaintiffs took a 30(b)(6) deposition relating to ███████.

During the deposition, Google testified that the final version of the ███████ white paper was "a position paper" of PDPO, a team that "was created to solely focus on" privacy and data protection matters at Google, and which is "the primary team with a focus on privacy and data protection at Google." Deposition of Google, Ms. Abdulhay, designee, Tr. at 19:1-21; 20:6-13.

66.    Google admitted that it did not make "any changes within Chrome because of ████████." *Id.* 37:21—38:1.

67.    Google's further admitted that there was a disconnect between those in charge of user privacy disclosures, and those in charge with the actual data flows. Ms. Abdulhay further testified that she was "not deeply familiar with the data flows that undergird our ads system" and "the reality is that" PDPO members "are very unfamiliar with … the realities of the tech stack." *Id.* 25:13-24.

68.    Google confirmed that GOOG-CABR-05885871 contains "notes from conversations" that were "taken by people relating to the ████████ project" and the process where "PDPO team members interview[ed] stakeholders at Google." *Id.* 48:9-50:9.

**III.    Google's Failure to Preserve Plaintiff Device-Keyed (i.e, Biscotti and Zwieback-keyed) Information**

69.    On September 1, 2020, Plaintiffs served RFP No. 5, which called for Google to provide all "data and information related to or associated with the Plaintiffs," their identifiers, "and all data collected from their Chrome browsers of any kind," including but not limited to browsing history information and cookies (hereinafter "Plaintiff Information"). *See* Dkt. 166 at 3.

70.    Google objected to production of Plaintiff Information as it related to device-keyed information, eventually introducing Plaintiffs to the concept of the Zwieback and Biscotti identifiers.  Plaintiffs understand as follows:

a.    <u>Zwieback</u>: The Zwieback identifier (related to the cookie referred to as "NID") is an identifier that Chrome sends to Google via Google.com when Chrome users are on non-Google websites or types anything into the Chrome omnibar.[2] It is the most common example of an identifier provided in

---

[2] The omnibar is the navigation bar in the Chrome browser, which is linked to Google search.

1    Plaintiffs' original complaint. *See, e.g.* Dkt. 1, ¶¶ 158, 161, 170, 183, 188,

2    190

3    b.    <u>Biscotti</u>: The Biscotti identifier (related to the cookie referred to as "IDE") is

4    an identifier that Chrome sends to Google via Doubleclick.net when Chrome

5    users communicate with a non-Google website that contains DoubleClick

6    source code. It is also referenced in Plaintiffs' original complaint.

7    71.    On December 31, 2020, at Google's request, Plaintiffs supplemented RFP No. 5 to

8    provide Google with identifiers for the named Plaintiffs, including the Zwieback and Biscotti

9    identifiers.[3]

10   72.    On April 20, 2021, Plaintiffs sought to compel production of "all data Google

11   possess about the [] Named Plaintiffs[.]" In response, Google claimed that it objected only "to the

12   extent [Plaintiffs] seek[] unauthenticated user data and may capture information related to users

13   other than Plaintiffs." Dkt. 164.

14   73.    At a discovery hearing on April 29, 2021, Plaintiffs specifically requested that the

15   Court compel Google to produce **all** data and documents related to the Named Plaintiffs that can be

16   found through "a search of databases with [identifiers that track users when they are signed out]the

17   Zwieback, Biscotti, and Gaia identifiers" (Apr. 29, 2021 Hrg. Tr. at 39:4-41:10), i.e. device-keyed

18   (Zwieback and Biscotti) and account-keyed (Gaia) data related to Named Plaintiffs. In response,

19   Google reiterated its "unauthenticated user" objection, arguing that "Zwieback and Biscotti — those

20   identifiers are . . . tied to a device." *Id.* at 43:1-4.

21   74.    The Court rejected Google's argument. On April 30, 2021, the Court ordered that

22   "Google must produce the information it has associated with the named Plaintiffs, including as

23   detailed at the hearing, profile data, data from non-synced sources, and *any device data associated*

24   *with any Plaintiff.*" Dkt. 173-1 at 1 (emphasis added).

25   75.    Google refused to comply with this order, and on June 23, 2021, Plaintiffs filed a

26   formal Motion to Compel Production of Plaintiff Information. Dkt. 226.

27   _____

[3] On April 16, 2021, Plaintiffs filed their Amended Class Action Complaint, identifying new
28   Plaintiffs.  Plaintiffs provided identifiers for the newly-added Plaintiffs, including Biscotti and
Zwieback identifiers to Google on May 3, 2021.

76.     On July 1, 2021, Google responded by arguing that Plaintiffs' request for device-keyed data argued that if Google complied, it would be violating Google's own internal policies about connecting signed out users' identifiers to their Google accounts, and refused to produce the data on that basis. Dkt. 231 at 1:14-16. As discussed below, this statement to the Court was not true.

77.     On July 13, 2021, the Court referred the dispute to the Special Master. *See* Dkt. 247.

**A.    Google's Failure to Preserve Biscotti-Keyed Data**

78.     Plaintiffs took a Rule 30(b)(6) deposition of Google (Dr. Curtis Harting, designee) on the topic of data logs.  During that deposition, Dr. Harting confirmed that Google did not start to search for Plaintiffs' Biscotti-keyed data until "Spring" of 2021: approximately nine months after the Plaintiffs filed their complaint, and stopped using Chrome.

79.     Internal documents produced by Google have revealed that the Biscotti identifier present in Biscotti logs is hashed after ███████ but the other underlying data is not. As a result, when Plaintiffs filed their original complaint, every day that elapsed before Google preserved the Biscotti-keyed data resulted in another day of each Plaintiffs' Biscotti-keyed data being made such that it was no longer available for preservation or production. As a result, all pre-Complaint Biscotti-keyed data relating to the named Plaintiffs (and for which Plaintiffs provided specific identifiers with the original Complaint and again at Google's request on December 31, 2020) would have been rendered unavailable by Google's systems on or about April 27, 2021. Thus, if Google did not attempt to preserve before that date – all of Plaintiffs' Biscotti-keyed data would have effectively been destroyed.

80.     To Plaintiffs' knowledge, with only one exception, Google made no effort to preserve Biscotti-keyed data prior to its deletion. The only exception known to Plaintiffs is that Google searched, extracted, and preserved a single Biscotti-keyed communication sent from Plaintiff Calhoun – one that was included as an example in the original complaint.

81.     Based on the timeline of producing ███████ data in March 2022 and the fact that Google did search for, extract, and preserve a not synced communication for Plaintiff Calhoun, it would have been easy for Google to search, extract, and preserve pre-Complaint Biscotti-keyed data for all Plaintiffs. Google simply chose not to do so.

82.     On January 14, 2022, Google produced GOOG-CABR-05741806, titled "IBA

1  ▆▆▆ Developer Guide," which contains a three-step process to "retrieve data associated with
2  your cookie":

**Retrieve data associated with your cookie**

1. Retrieve your cookie ID by following the instructions in How to retrieve your DoubleClick cookie ID. Your cookie ID is an alphanumeric string that resembles the following: ▆▆▆

2. Paste your cookie into the User ID field in the ▆▆▆ home screen. Click the Search button.

3. ▆▆▆ returns the information about the cookie stored in ▆▆▆ userlist membership (a.k.a. boom lists), user profiles associated with the cookie, and so on.

10  83.     Plaintiffs requested that Google search Biscotti-keyed logs by combinations of other
11  data elements that might not have been destroyed by Google's systems. Those efforts failed. Google
12  produced null sets for the vast majority of Plaintiffs' requests that attempted to remedy its failure to
13  preserve.

14  **B.     Google's Failure to Preserve Zwieback-Keyed Information**

15  84.     As set forth above, Plaintiffs' allegations include specific reference to Zwieback
16  identifiers, and Plaintiffs have requested the production of Zwieback-keyed Plaintiff Information
17  since at least April 2021.

18  85.     Not only is production of Zwieback information relevant to key allegations in this
19  case, but Plaintiffs understand that Zwieback-keyed information accounts for a large portion of
20  Google's Chrome revenue. Google's production demonstrates that Google stands to lose a
21  substantial percentage of revenue from Chrome if Chrome could no longer transmit Zwieback (and
22  other) cookies to Google.com when Chrome users not Synced.

23  86.     On April 30, 2021, the Court ordered Google to produce – without limitation – all
24  information Google "has associated with the named Plaintiffs, including, as detailed at the hearing,
25  profile data, data from non-synced sources, and any device data associated with any Plaintiff." Dkt.
26  173.

27  87.     On October 14, 2021, Plaintiffs filed their Motion for Class Certification. Dkt. 340.
28  Consistent with their First Amended Complaint, Plaintiffs submitted evidence that Chrome is
uniformly designed to send Not Synced users' personal information to Google, without limitation

as to the specific Google property to which Chrome sends such personal information. For example, Plaintiffs submitted the Expert Report of Richard Smith in Support of Class Certification which detailed transmissions that personal information that Chrome sends to Google Ads for Not Synced Chrome users. Dkt. 340-16, Smith Rpt. ¶¶ 80, 94-96, 100-09.

88.    On October 14, 2021, Plaintiffs also submitted the Report of Dr. Zubair Shafiq in Support of Class Certification. Dr. Shafiq concluded that "Zwieback-keyed data will be the most efficient and thorough method to identify Chrome users who were not signed-in and thus not syned[.]" Dkt. 340-19, Shafiq Rpt. ¶¶ 108-112.

89.    On November 12, 2021, after extensive briefing and an in-person hearing, the Court ruled that Zwieback is a relevant identifier in this case. *See* Dkt. 378, Order at 11. The Court also directed Google to produce Zwieback-keyed data.

90.    On November 27, 2021, (seven weeks after substantial completion and six weeks after Plaintiffs' Motion for Class Certification), Google produced GOOG-CABR-05292934, an email indicating that "loss of Zwieback [i.e. signed-out Google Ads] in 3P would amount to ████" in annual revenue while "loss of Gaia would easily exceed ████ at the very least[.]"

91.    On December 22, 2021, Google filed its Opposition to Plaintiffs' Motion for Class Certification. Dkt. 429. The first sentence of Google's fact section described the case as Plaintiffs' Original and First Amended Complaints alleged, that it involved "data that Google receives when users visit third-party websites that use Google's web-services (e.g. Analytics, Ads, embedded Maps, Fonts) (the 'Services')." Google's Opposition then proceeds with purported evidence and arguments relating to the very topics on which Google has refused to provide Plaintiffs with discovery.

92.     On January 5, 2022, the Special Master ordered that Google add Zwieback ▌▌

and Zwieback ▌ data sources to the potentially relevant set of data sources for the *Calhoun* matter.

*See* January 5, 2022 Email Correspondence, Subject: *Plaintiffs Request for Zwieback* ▌▌ *and*

*Zwieback* ▌ *Fields and Schema*.



93.     Google did not produce the data as ordered.

94.     To Plaintiffs' knowledge, Google made no effort to preserve the Named Plaintiffs'

Zwieback data beyond what is preserved in the ordinary course.

95.     At this point, it is too late to recover. Internal Google documentation specifies that

Zwieback-keyed data is deleted after ▌▌ of inactivity. *See* GOOG-CABR-04796222. "If the

user doesn't visit a Google property for ▌▌ (where it would have been refreshed and life-

extended), the cookie expires from the browser's cookie jar and is no longer returned. For the same

reason, if the metadata stored for that UID in ▌▌ indicates ▌▌ of inactivity, a tombstone

record is written against the UID triggering a deletion of associated data, and the ▌▌ process

> If the user doesn't visit a Google property for ▌▌ (where it would have been
> refreshed and life-extended), the cookie expires from the browser's cookie jar and is no
> longer returned. For the same reason, if the metadata stored for that UID in ▌▌
> indicates ▌▌ of inactivity, a tombstone record is written against the UID triggering
> a deletion of associated data, and the ▌▌ process removes data stored against
> that UID.

removes data stored against that UID." *Id.* at -223, reproduced here:

96.     Through the Special Master process, Plaintiffs requested production of Zwieback-keyed information for each Plaintiff. On March 10, 2022, Google produced ZWBK ███ data for one Plaintiff that consisted entirely of a Zwieback tombstone:

As importantly, ████████ is a timestamp equal to April, 30, 2021, meaning, Google let this Plaintiff's data expire on April 30, 2021.

97.     On the same date, Google produced ZWBK ████ data associated with test accounts created by Dr. Shafiq. This Shafiq test account production showed:

    a.  Data associated with Recaptcha visits on non-Google websites ████

    b.  zwieback-state information that identified the account as being signed-out, which also, by definition, identifies the user as being not synced;

    c.  ████ events that Google's documentation show are tracked with precise geo-location;

98.     Google's belated production of Zwieback-keyed information associated with Dr. Shafiq's test accounts demonstrates conclusively that Google tracks not-synced Chrome usage as alleged in the complaint but Google failed to preserve relevant Zwieback-keyed data for the Named Plaintiffs.

## IV.     Google's Misrepresentations Regarding its Compliance with the Court's Order to Produce Plaintiff Account-Keyed Information

99.     On April 30, 2021, the Court ordered Google to Plaintiff Information. Dkt. 173.

100.    On May 3, 2021, Google informed Plaintiffs that it would not comply with the Court's April 30, 2021 Order. Instead, Google stated it would produce only a *subset* of account-keyed data, from sources of Google's choosing, without input from Plaintiffs and without transparency as to the data contained within data sources it was not producing.

101.    On June 2, 2022, Google represented to the Court that it had complied with the order

and "produced what we were supposed to produce, or well, what we believe we were supposed to produce in terms of the data associated with the plaintiffs." Jun. 2, 2021 Hrg. Tr. 48:16-18.

102.    On June 23, 2021, Plaintiffs filed a Motion to Compel Production of Plaintiff Information, alerting the Court that Google had "only produce[d] a subset of Google Account-keyed data – of its choosing" in response to the Court's order, and omitted entirely device-keyed information. Dkt. 226 at 5.

103.    On July 1, 2021, Google filed its opposition to Plaintiffs' motion. Dkt. 232. Regarding production of "Google Account-keyed data," Google made the following false assertions:

| Google's Statement | The Truth |
| --- | --- |
| Plaintiffs' request for "all" Google Account-keyed information "would sweep into discovery data received from Google products and services that have nothing to do with use of a Chrome browser to visit websites running Ad Manager or Analytics." | Google's claim that the case was limited to "Ad Manager" and "Analytics" was knowingly false. Plaintiffs original and First Amended Complaint alleged more unauthorized Chrome transmissions to Google.com when not synced Chrome users were not on a Google website than any other transmissions. Late produced discovery revealed that the revenues Google derives from these transmissions constitutes the bulk of unjust enrichment in the case and that logs associated with those transmissions contain Not Synced signals. |
| "[M]uch (if not all) of this information is already available to Plaintiffs through the Google Takeout tool." Dkt. 232-4 at 3:10-13. Google further explained that it had produced (1) My Activity chrome browsing data for Ads and Analytics; and (2) subscriber settings" and that "[t]hese are *the* GAIA_keyed information related to the browser communications at issue here, namely communications on the Chrome browser without sync enabled while browsing third-party websites that embed Google services like Google Ad Manager and Google Analytics[.]" *Id.* at 3-4. Emphasis added. | Google's factual statement that "My Activity" and "subscriber settings" data "are the Gaia-keyed information related to the browsing communications here" was knowingly false. There are scores of other relevant Gaia-keyed data logs that contain information not present or available to Plaintiffs in My Activity or subscriber settings. |
| "[E]ven if the information sought by Plaintiffs were relevant, Google should not be compelled to identify and produce it because this information is equally available to Plaintiffs. … Plaintiffs—like all Google account holders—can use Google's publicly-available 'Takeout-tool' to export their Google Account-keyed information for ▇ categories of information tied to different Google products and services[.]" Id. | Google's factual statement that data in additional logs "is equally available to Plaintiffs" was knowingly false. Logs that Google had not produced at the time (or disclosed the data contained in them) contain highly relevant information that was not "equally available to Plaintiffs." This unavailable information includes (1) synced versus not synced status; (2) user profile |

| | |
|---|---|
| at 7. "Anything more," Google argued, "would be unduly burdensome for Google." *Id.* | information; (3) additional identifiers, such as Biscotti-identifiers that are present in GAIA-keyed logs in contravention of Google's public privacy promises; (4) specific geo-location information; (5) browser fingerprint information; (6) revenue information tied to specific users; (7) various purported user "consents" or privacy controls that can also be used to distinguish synced versus not synced traffic; and even (8) specific ads shown to specific users at specific times. |
| "Plaintiffs incorrectly claim that Google is withholding relevant GAIA-keyed information because it produced to Plaintiffs a spreadsheet identifying ▇ data logs, but only searched and produced data related to ▇ of those logs. (Mot. at 6). However, only ▇ of the ▇ logs are keyed to a Google Account ("GAK"); the rest are keyed to a pseudonymous non-Google Account identifier ("NGAK"). See Plaintiffs' ex. B (GOOG-CALH-00027455). Google produced information from the eight specified logs because information is propagated from the identified Google Account-keyed logs to the ▇ logs that Google searched; the rest of the logs would contain duplicative and cumulative information, production of which the Federal Rules were designed to prohibit." *Id.* at 5-6 | Google's factual statement that the ▇ logs keyed to a Google Account "would contain duplicative and cumulative information" was knowingly false for the same reasons that the data in the additional logs "is equally available to Plaintiffs" was knowingly false. The Gaia-keyed data produced by Google to that point in the case lacked the additional information set forth above that is present in the Gaia-keyed logs Google refused to produce. <br><br> Further, Google gave the Court the false impression that it had not searched the other log. Specifically, Google's statement that it "produced information from … the ▇ logs that Google searched; the rest of the logs would contain duplicative and cumulative information" gives the Court the impression that Google had not already searched any logs other than the ▇ it had already produced. However, as Plaintiffs would not discover until the last week of fact discovery, this claim was false. Google began searching, segregating, and preserving Plaintiff data from the "other" Gaia-keyed logs before it filed its opposition to Plaintiffs' motion to compel. |

104.    Moreover, Google did not inform the Court that it had already searched, segregated and preserved Gaia-keyed information, and that there was no technical burden to its production. Rather, Google intentionally withheld this information in order to encourage a discovery process that was inefficient and ineffective.

105.    On September 16, 2021, the Court ordered Google to "identify to the Special Master and Plaintiffs all databases and data logs (collectively, 'data sources') that may contain *responsive* information." Dkt. 273 at 1 (emphasis added). For each responsive source, Google was to "provide at a minimum: (1) the name of the database or log;[and] (2) a description of the data source's purpose and function." Dkt. 273 at 2. Further, "[f]or each selected data source, Google will provide,

at a minimum: (1) the data schema; (2) definitions and descriptions of each field; (3) tools which Google employees ("Googlers") use to search each data source; and (4) instruction sets and manuals for all tools identified." Dkt. 273.

106.    Google did not comply with this order. Google did not identify "all databases and data logs … that may contain responsive information." Nor did it reveal that it had already searched and segregated Plaintiff data from dozens of relevant logs for which it had not yet produced information.

107.    Instead, on September 27, 2021, Google identified to the Special Master dozens of logs for which it had "preserved" but not "produced" Plaintiff data. Google provided no explanation for what it meant by "preserved" – such as whether a search had been done and what information was preserved – nor did Google present any burden to producing this preserved information.

108.    On October 6, 2021, Plaintiffs requested that Google comply with the Court's order, including that Google "provide Plaintiffs with a list of all logs and other sources for which Google has searched for data about Plaintiffs are devices associated with the Plaintiffs." Google refused.

109.    On October 13, 2021, Plaintiffs requested production of the information that Google had stated it had already "preserved," or that Google provide details as to any alleged burdens of production. Google refused.

110.    On November 12, 2021, the Court ordered Google "to provide the Special Master a full list of *all data sources which have been searched* during the overall discovery process." Dkt. 377 (emphasis added). Google was ordered to provide "the name of the data source" and "the date[s] on which the searches to date were carried out." *Id.* The Court further ordered that "Google shall provide a declaration, under penalty of perjury from Google, not counsel, that (1) to the best of its knowledge, Google has provided a complete list of data sources that contain information relevant to Plaintiffs' claims; and (2) all *responsive* data related to the Named Plaintiffs have been produced from all searched data sources in the respective prior searches." *Id.* (emphasis added).

111.    Google did not comply with this order: Google did not identify the data it had already searched, segregated, and preserved; Google falsely certified that provided a list of relevant data sources; and Google still has not produced the responsive data from prior searches.

112.    On four separate occasions (December 1, 14, 23, and 29, 2021), Plaintiffs repeated their request that Google produce the information it had labeled as "preserved" but not "produced," or provide details as to any burdens on production. Google refused or ignored each request.

113.    Instead of simply producing such data, which Plaintiffs would later learn Google had already been searched, segregated, and preserved, Google forced Plaintiffs, the Special Master, and the Court to engage in a convoluted and opaque discovery process: Google withheld full disclosure of all relevant logs, fields and descriptions, while insisting that (1) Plaintiffs must blindly select from whatever logs Google had deigned to disclose, then (2) construct search queries based on a subset of fields and descriptions that Google provided, which were incomplete and misleading from the outset, so that (3) Google would conduct *new searches* into some of the same logs that Google *had already preserved Plaintiff Information*.

114.    On January 19, 2022, on a call with the Special Master, Plaintiffs requested that Google provide more information about the preserved plaintiff data. Google refused and further refused to confirm whether it was raising a burdens argument as to production of the preserved data.

115.    On January 25, 2022, Google gave the same response in writing, formally refusing to respond on substance and claiming that Plaintiffs' request for more information "contradicts" the Special Master process. A true and correct copy of the letter is attached hereto as **Exhibit 9**.

116.    From January 25 to February 25, 2022, Plaintiffs renewed their request that Google provide more information about the "preserved" data on every call with Google and the Special Master. Google refused to provide any additional information each time.

117.    On February 25, 2022, with permission and as directed by the Special Master, Plaintiffs raised this dispute (Issue 1.3) before the Court. *See* Dkt. 510.

118.    On February 27, 2022, Plaintiffs renewed their request that Google "produce the historical plaintiff-related data already gathered and preserved (but not produced) in advance of the expert meetings" that the Special Master scheduled for the week of March 1-5, 2022. Google refused.

119.    On March 1, 2022, the Special Master, counsel, Plaintiffs' experts, and Google employees convened for live demonstrations of Google's systems. On that video call, Plaintiffs

learned, for the first time from a Google employee, that the "preserved data" had already been searched and segregated. At the end of the conference, the Special Master ordered Google to produce all Plaintiff information it had previously searched and had in its possession.

120.    Google did not comply with the Special Master's order.

121.    On March 8, 2022, Google asked the Special Master to be excused from the production of data it was ordered to produce on April 30, 2021. Google raised a new obstacle to production: the previously searched data included what Google claimed to be "publisher information," that, by contract, required Google to provide notice of its disclosures to affected publishers. Google argued that the process of providing notice to publishers would extend Plaintiff data production process too long. In response, the Special Master ordered Google to produce all previously searched data that did not contain alleged "publisher information" and did not make a decision whether Google must produce the "publisher data."

122.    On March 9, 2022, five days after fact discovery concluded and almost a year after being ordered to do so, Google produced "the preserved [plaintiff] data from logs that do not contain" what Google claimed to be "publisher information." But Google continued to refuse to produce Plaintiff data that Google contended required publisher notice.

123.    After March 9, 2022, Plaintiffs learned, for the first time, that there are approximately ▆ publishers from which Google claims it must provide notice before turning over Plaintiffs' own data to Plaintiffs' pursuant to a court order. Plaintiffs also learned that the notice process consists of merely a form letter or email sent from Google to the publisher – and that the publisher does not have any right or ability to prevent Google from producing the information. Plaintiffs requested that Google produce an exemplar of the form letter or email for review. Google refused.

124.    Plaintiffs understand that there is no technical impediment to production of the data with "publisher information." Nor is there any argument from Google that the data is not relevant. Instead, Google's refusal is based entirely on the inconvenience to counsel of providing mere notice to a large number of publishers.

125.    On May 14, 2022, the Special Master sent an email to the parties saying, "it has come

JOINT DECLARATION ISO OF MOTION FOR SANCTIONS FOR DISCOVERY MISCONDUCT

to my attention that Google is currently withholding the production of search results for data sets containing third-party publisher confidential data requiring third-party notification. It has been my understanding that the notification process had begun some time ago and should have been completed and productions made.  I now also understand that Google unilaterally decided to make third-party notifications in the Calhoun matter, combined with those made in the Brown matter. This is unacceptable." He also said, "[s]hould the aforementioned productions not be made by May 20, 2022, sanctions will be imposed in the amount of $5,000 per calendar day for every day past May 20, 2022, until Google has provided to Plaintiffs, in full, the production of the results of all completed searches requiring third-party publisher notification." A true and correct copy of the Special Master's email order is attached hereto as **Exhibit 1.**

126.    On May 20, 2022, the deadline to produce the publisher notice data, Google only produced a subset of the "publisher notice" data – only the data gathered as the result of newly conducted searched; but as confirmed in an email to the Special Master just today, May 24, 2022, Google takes the position that data gathered in *prior* searches – data related to the Named Plaintiffs that has twice been ordered to be produced – need never be produced because of ambiguity in the Special Master's email order of May 14, 2022.

127.    The Special Master has been paid $897,011 in fees as of May 24, 2022. The *Calhoun* Plaintiffs have paid $224,253, for which they seek payment from Google.

We declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 24th day of May 2022, at Jefferson City, Missouri.

**SIMMONS HANLY CONROY LLC**

*/s/ Jay Barnes*
Jason "Jay" Barnes

Executed this 24th day of May 2022, at Oakland, California

**BLEICHMAR FONTI & AULD LLP**

*/s/ Lesley Weaver*
Lesley Weaver

Executed this 24th day of May 2022, at Marbletown, New York.

**DICELLO LEVITT & GUTZLER LLC**

*/s/ David A. Straite*
David Straite

## **ATTESTATION**

I, David A. Straite, am the ECF User whose identification and password are being used to file this document pursuant to Civil L.R. 5-1(h)(3). I attest under penalty of perjury that the signatories above have concurred in the filing of this document.

*/s/ David A. Straite*