# GOOGLE LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR AN ORDER OF SANCTIONS FOR GOOGLE'S DISCOVERY MISCONDUCT

# Redacted Version of Document Sought to be Sealed

QUINN EMANUEL URQUHART & SULLIVAN, LLP

Diane M. Doolittle (CA Bar No. 142046)
dianedoolittle@quinnemanuel.com
Sara Jenkins (CA Bar No. 230097)
sarajenkins@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

Andrew H. Schapiro (admitted *pro hac vice*)
andrewschapiro@quinnemanuel.com
Teuta Fani (admitted *pro hac vice*)
teutafani@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Telephone: (312) 705-7400
Facsimile: (312) 705-7401

Stephen A. Broome (CA Bar No. 314605)
stephenbroome@quinnemanuel.com
Viola Trebicka (CA Bar No. 269526)
violatrebicka@quinnemanuel.com
Crystal Nix-Hines (CA Bar No. 326971)
crystalnixhines@quinnemanuel.com
Alyssa G. Olson (CA Bar No. 305705)
alyolson@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Josef Ansorge (admitted *pro hac vice*)
josefansorge@quinnemanuel.com
Xi ("Tracy") Gao (CA Bar No. 326266)
tracygao@quinnemanuel.com
Carl Spilly (admitted *pro hac vice*)
carlspilly@quinnemanuel.com
1300 I Street NW, Suite 900
Washington D.C., 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100

Jomaire Crawford (admitted *pro hac vice*)
jomairecrawford@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Jonathan Tse (CA Bar No. 305468)
jonathantse@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

*Attorneys for Defendant Google LLC*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| PATRICK CALHOUN, et al., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>GOOGLE LLC,<br><br>Defendant. | Case No. 5:20-cv-05146-LHK<br><br>**GOOGLE LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR AN ORDER OF SANCTIONS FOR GOOGLE'S DISCOVERY MISCONDUCT**<br><br>Referral: The Honorable Susan van Keulen<br>Date: August 11, 2022<br>Time: 9:30 a.m.<br>Trial Date: None Set |

# TABLE OF CONTENTS

Page

I.     INTRODUCTION.................................................................................................1

II.    STATEMENT OF RELEVANT FACTS ............................................................1

       A.    Google Was Honest with the Court and Plaintiffs Regarding "Not-Synced" Signals.................................................................................................1

             1.    Google's Representations to the Court and Plaintiffs Were Accurate .........1

             2.    Plaintiffs Have Known About "Not-Synced" Signals for Over A Year ....................................................................................................4

             3.    Plaintiffs Have Not Established Any Plausible Harm .................................5

       B.    Google Complied With All Court and Special Master Orders Regarding Preservation and Production of Named Plaintiff Data ...............................................7

             1.    Google Preserved Data Associated with Named Plaintiffs' Google Accounts Pursuant to a Litigation Hold.......................................................8

             2.    Google Complied with the April 30, 2021 Production Order......................9

             3.    The Court Referred Disputes Regarding the April 30, 2021 Order to the Special Master ....................................................................................10

             4.    Google Fully Complied with the Special Master's Instructions and the Court's November 12, 2022 Order.............................................................11

             5.    Plaintiffs Identify No Prejudice or Harm...................................................13

       C.    Google Timely Disclosed ████████ and Plaintiffs Cannot Show Prejudice from the Three Purportedly Late-Produced Documents ........................13

             1.    Plaintiffs Misrepresent the Purpose and Nature of ████████ ..............14

             2.    Plaintiffs' Contention that Google Failed To Timely Disclose ████████ Existence is Flatly Incorrect............................................14

             3.    Plaintiffs' Assertions of Prejudice Are Baseless .......................................16

III.   ARGUMENT......................................................................................................18

       A.    Plaintiffs' Request to Preclude Arguments Concerning "Not-Synced" Signals Is Misguided..................................................................................................19

       B.    Plaintiffs' Requested Adverse Jury Instruction is Improper and Prejudicial ..........20

       C.    Plaintiffs' Request to Preclude Google's Consent Defense Is Improper ...............23

       D.    Plaintiffs' Other Requested Relief Is Likewise Inappropriate ...............................25

1

IV.     CONCLUSION..................................................................................................25

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

Page(s)

## Cases

*In re Akhmedova*,
2020 WL 6891828 (N.D. Cal. Nov. 24, 2020) ............................................................... 8

*Best Label Co. v. Custom Label & Decal, LLC*,
2022 WL 1525301 (N.D. Cal. May 13, 2022) ............................................................. 21

*Brown v. Google, LLC*,
No. 20-cv-3664 (N.D. Cal.) ...................................................................................... 1, 25

*United States v. Brown*,
62 F. App'x 165 (9th Cir. 2003) ................................................................................. 18

*Calvillo Manriquez v. Devos*,
411 F. Supp. 3d 535 (N.D. Cal. 2019) ........................................................................ 25

*In re Dual-Deck Video Cassette Recorder Antitrust Litig*,
10 F.3d 693 (9th Cir. 1993) ......................................................................................... 25

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) ....................................................................................... 23

*First Mercury Ins. Co. v. Great Divide Ins. Co.*,
241 F. Supp. 3d 1028 (N.D. Cal. 2017) ........................................................................ 1

*FTC v. Affordable Media, LLC*,
179 F.3d 1228 (9th Cir. 1999) ..................................................................................... 25

*Gomez v. Vernon*,
255 F.3d 1118 (9th Cir. 2001) ..................................................................................... 20

*Goodyear Tire & Rubber Co. v. Haeger*,
137 S. Ct. 1178 (2017) ................................................................................................ 25

*Hinson v. Metro. Life Ins. Co.*,
2012 WL 13054268 (N.D. Cal. Aug. 1, 2012) .............................................................. 1

*Kannan v. Apple, Inc.*,
2020 WL 9048723 (N.D. Cal. Sept. 21, 2020) ............................................................ 22

*Khan v. Rogers*,
2018 WL 4693414 (N.D. Cal. Sept. 28, 2018) .............................................................. 8

*Meta Platforms, Inc. v. BrandTotal Ltd.*,
2022 WL 1990225 (N.D. Cal. June 6, 2022) ......................................................... 21, 22

*Natural-Immunogenics Corp. v. Newport Trial Grp.*,
2016 WL 11520757 (C.D. Cal. June 16, 2016) ....................................................... 19, 23

*Network Appliance, Inc. v. Bluearc Corp.*,
2005 WL 1513099 (N.D. Cal. June 27, 2005) ......................................................... 19, 23

*Newberry v. Cty. of San Bernardino*,
750 F. App'x 534 (9th Cir. 2018) ................................................................................ 21

*Synapsis, LLC v. Evergreen Data Sys., Inc.*,
  2006 WL 2884413 (N.D. Cal. Oct. 10, 2006) ............................................................ 19

*Techsavies, LLC v. WDFA Mktg. Inc.*,
  2011 WL 723983 (N.D. Cal. Feb. 23, 2011) ............................................................ 24

*True Health Chiropractic Inc. v. McKesson Corp.*,
  2015 WL 5341592 (N.D. Cal. Sept. 12, 2015) ....................................................... 19, 23

*United States ex rel. Wiltec Guam, Inc. v. Kahaluu Const. Co.*,
  857 F.2d 600 (9th Cir. 1988) ................................................................................ 22

## Rules

Fed. R. Civ. P. 26 ........................................................................................................ 8

Fed. R. Civ. P. 30(b)(6) ....................................................... 3, 4, 5, 6, 9, 17, 18, 20

Fed. R. Civ. P. 37 ..................................................................................................... 19

Fed. R. Civ. P. 37(e) ............................................................................................21, 22

Fed. R. Civ. P. 37(b)(2)(C) ...................................................................................... 25

Fed. R. Civ. P. 37(e)(1) .......................................................................................21, 22

Fed. R. Civ. P. 37(e)(2) ............................................................................................ 21

Fed. R. Civ. P. 72(a) ................................................................................................. 23

Local Rule 7-5(b) ........................................................................................................ 1

## Additional Authorities

*https://source.chromium.org/chromium* ................................................................... 4

## I.     INTRODUCTION

Plaintiffs' sanctions motion is meritless. Their scattershot allegations regarding (1) Google's purported misrepresentations concerning "not-synced" signals, (2) its preservation and production of Named Plaintiffs' data, and (3) its production of ▉▉▉▉▉ documents, lack record support. Google has acted properly and in accordance with the orders of this Court and the Special Master at every turn. Nor do Plaintiffs have any valid justification for the sweeping sanctions they seek, which are grossly disproportionate to the conduct of which they complain. The motion should be denied.[1]

## II.    STATEMENT OF RELEVANT FACTS

### A.     Google Was Honest with the Court and Plaintiffs Regarding "Not-Synced" Signals

Plaintiffs' request that Google be sanctioned for its conduct regarding "not-synced" signals is based on three false premises: (1) Google misled the Court regarding sync traffic logs in securing the protective order, dated April 30, 2021 (the "Protective Order"); (2) Google failed to disclose such signals in discovery; and (3) Google prevented Plaintiffs from identifying their putative class of Chrome users who did not enable or disabled sync by failing to preserve certain signals.

### 1.     Google's Representations to the Court and Plaintiffs Were Accurate

Plaintiffs seek sanctions based on alleged misrepresentations Google's counsel purportedly made over 16 months ago at the March 5, 2021 hearing on Google's motion for a protective order (the "March 5 Hearing"). Mot. 6–7. But the March 5 Hearing had nothing to do with "not-synced" signals; its purpose was to assess Google's burden of preserving ▉▉▉▉▉▉▉ in the disputed logs. *See* Dkt. 125. That context is critical. Plaintiffs' interpretations of Google's comments at the March 5 Hearing are grossly inaccurate.

---

[1]   Paragraphs 2–14, 19–20, 25, 28–31, 34-35, 37–43, 45, 49–52, 54–55, 61–64, 67, 70, 74–76, 78–81, 83, 85, 89, 91, 95–96, 98, 100, 103–104, 106–109, 111, 113, 119–121, 124 of the Joint Declaration (Dkt. 669-3) should also be stricken since they contain conclusions and argument in violation of Local Rule 7-5(b). *See Hinson v. Metro. Life Ins. Co.*, 2012 WL 13054268, at *1 (N.D. Cal. Aug. 1, 2012) (striking "in substantial part" an attorney declaration containing "improper argument in violation of Civ. L.R. 7-5(b)"); *First Mercury Ins. Co. v. Great Divide Ins. Co.*, 241 F. Supp. 3d 1028, 1045 (N.D. Cal. 2017) (sustaining objection to argumentative paragraphs in declaration); *see also Brown v. Google, LLC*, No. 20-cv-3664, Dkt. 588 at 2–4.

*First,* Plaintiffs falsely claim the Court asked about "whether Google maintained not synced signals." Mot. 7. The Court never asked such a question. Google made no representations regarding "not-synced" signals. And the Court and Google's counsel never even mentioned "signals." Instead, Plaintiffs quote from Google counsel's introductory statement about the general data types in various logs, including a statement that "the sync traffic logs will not show data for that user who has not enabled sync." *Id.* (quoting Mar. 5, 2021 Hr'g Tr. 14:13–20). With regard to the data alleged to be improperly collected in this case, which was the focus of counsel's description, this statement is entirely accurate. The sync data at issue (*e.g.*, Chrome browsing history) is not sent to Google for users who have not enabled sync; therefore, the Chrome logs do not record it. Schumann Decl. ¶ 9. This statement was not meant to address the nuance that sync traffic logs record a signal that *may* indicate when a user is signed-in but not consented to sync.

*Second*, Plaintiffs mistakenly claim Google falsely responded to the following question from the Court: "is Google able to identify the number of unsynced users who are using Chrome . . . like the Plaintiffs allege they were?" Dkt. 137 ("Mar. 5, 2021 Hr'g Tr.") 23:6–11. Google's counsel responded, "that is not a figure that's readily available to Google." *Id.* 23:22–23. This statement is accurate: Plaintiffs' purported class of Chrome users who did not enable (or disabled) sync captures a broad swath of users: (1) Google Account holders who are signed in but not synced; (2) Google Account holders who are signed out of their Google Accounts (and therefore not synced); (3) non-Google Account holders who are unable to sync a device to a Google Account (because they do not have one); and (4) users browsing while in Guest Mode (but excluding Incognito Mode). Google cannot readily identify the number of all such users. Schumann Decl. ¶ 20. Plaintiffs rely on a single document, Mot. 7 (citing Jt. Decl. ¶ 31, Ex. 4), in which an engineer stated that Google's ability to determine "all accounts that ever enabled sync" is limited because Google cannot distinguish between "sync or just a sign-in event." But that document, highlighting the difficulty of identifying a portion of class members, only confirms that Google cannot identify all Chrome users browsing without syncing. Schumann Decl. ¶ 22.

*Third,* Plaintiffs claim that Google incorrectly told the Court that it "'do[es] not record identifiers for logged out users.'" Mot. 1 (citing Mar. 5, 2021 Hr'g Tr. 12:2–10). But Google actually

said, correctly, that the "sync traffic logs do not include any of the identifiers, the cookies, that Google uses for advertising when users are logged out of their Google account, or any of the identifiers that Google Analytics uses, such as Client I.D.'s" and so the "sync traffic logs do not have any of these identifiers in them. They do not record identifiers for logged out users." Mar. 5, 2021 Hr'g Tr. 12:2–15; *see also* Schumann Decl. ¶ 21; Pls.' Ex. 6 (Apr. 9, 2021 Rule 30(b)(6) Tr.) 117:2–8. Plaintiffs do not dispute, nor could they, that the sync traffic logs do not contain advertising cookies for users browsing while signed out of their Google accounts.

Similarly, Plaintiffs lack factual support for each of the purportedly "false" statements they allege Google made to conceal the existence of "not-synced" signals. Mot. 8. *First,* consistent with Google's representation at the March 5 Hearing, Google corporate witness David Monsees accurately responded "my understanding is that we cannot" to the question of whether Google could "identify today all users who are not synced [sic]." *Compare* Pls.' Ex. 6 (Apr. 9, 2021 Rule 30(b)(6) Tr.) 116:16–20, 117:2–8, *with* Mar. 5, 2021 Hr'g Tr. 23:22–23.[2] *Second*, Plaintiffs cite nothing in support of their claim that Google denied the existence of a "not-synced" signal at an October 5, 2021 Special Master Conference. Nor could they—Google never made such a statement. Ansorge Decl. ¶ 86. *Third,* Google accurately denied that "Chrome sends a Signal to Google that indicates when a Chrome user is not signed-in and not synced," Mot. 8 (citing Google's Responses and Objections to Pls.' RFA No. 12), because Google does not receive a signal showing when a user is browsing Chrome while not signed into his or her Google account. *See* Schumann Decl. ¶ 11. *Fourth*, Google could not have "failed to inform the Court that it had made false statements of fact in its earlier submissions," Mot. 8, because, as demonstrated above, it made no false statements.[3] *Fifth*, contrary to Plaintiffs' assertion, none of Google's class certification arguments turns on the absence of any sync or "not-synced" signals. *See infra* Section III.A.

---

[2]   Moreover, Plaintiffs do not fairly characterize Mr. Monsees's Rule 30(b)(6) testimony, which makes clear that he did not prepare to respond to out-of-scope questions about logs indicating "not synced" browser states. Jt. Decl. Ex. 6 (April 9, 2021 Monsees Tr.) at 114:18–15. For that reason, Google's counsel objected to each of the questions related to traffic logs and sync signals. *Id.*

[3]   Plaintiffs do not identify what "earlier submissions" they mean. If they are referring to Google's representations at the March 5 Hearing, the assertion has no merit for the reasons explained above.

## 2.    Plaintiffs Have Known About "Not-Synced" Signals for Over A Year

Despite 16 months of extensive discovery on "not-synced" signals, Plaintiffs allege Google concealed the existence of such signals, including the ███████████ and the ████ signals, for the "entire discovery period." Mot. 8. That assertion is demonstrably wrong.

- These signals are publicly disclosed in chrome://sync-internals/, publicly available source code at https://source.chromium.org/chromium, and can be observed through inspecting network traffic with chrome://net-export/.

- Google produced ████ of documents about these signals beginning in April 2021. Olson Decl. ¶¶ 2–3.

- Google confirmed the existence of these signals on October 12, 2021 in response to Plaintiffs' requests for admission, Olson Decl. Ex. 4 (Responses & Objections to First Set of RFAs) at Nos. 13, 18.[4]

- In compliance with the Court's November 12, 2021 Order (Dkt. 377), Google produced a list of the data sources containing ████ signals on November 23, 2021. Ansorge Decl. Ex. 34. Weeks later, Plaintiffs served an interrogatory about "not-synced" signals, and on January 31, 2022 Google again confirmed the existence of the "is_sync_feature_enabled" in the Chrome sync traffic logs.[5] Olson Decl. Ex. 5 (Responses & Objections to Fifth Set of Interrogatories) at No. 34.

- Realizing it had inadvertently left out the ███████████ signal—which Plaintiffs had long known about from Google's written discovery and Mr. Schumann's deposition— Google served a supplemental response before the discovery cut-off, a day after Mr. Schumann realized the inadvertent exclusion. Schumann Decl. ¶ 15.

Repeatedly, Plaintiffs have demonstrated they were aware of the "not-synced" signals prior to "the last day of fact discovery." Mot. 9. On June 11, 2021, Plaintiffs questioned Google's corporate designee about "not-synced" signals. *See* Ansorge Decl. Ex. 4 (June 11, 2021 Rule 30(b)(6) Tr.) 402:18–403:6. In September 2021, Plaintiffs requested a Rule 30(b)(6) deposition on "not-synced" signals, specifically referencing the ████ and stop sync signals (and then,

---

[4]    Specifically, Google admitted that (1) when a user is signed in to a Google account and the Chrome browser, Chrome may send a signal that "may indicate to Google that sync is not enabled on that Chrome browser at that time," (*i.e.*, ████) and that (2) the "Chrome browser will attempt to send a request to the Google sync service when a Chrome user clicks to turn off sync," (*i.e.*, ██████████).

[5]    Plaintiffs misleadingly claim that Google "ignored" the Special Master's January 5, 2022 Order to provide all field names and descriptions of ZWBK ████. Mot. 9. Google does not maintain a list of field names or descriptions for ZWBK ████, *see* Dkt. 694-4 at 4, but Google did provide the column names and annotations for the more than ████ ZWBK ████ columns. Dkt. 713–4 at 7.

1   inexplicably, failed to take the deposition). Ansorge Decl. Ex. 37 at 3. Plaintiffs' experts discussed

2   "not-synced" signals nine months ago in reports supporting Plaintiffs' class certification motion.

3   *See* Dkt. 339-14 (Sealed Smith Report) ¶¶ 110–158 (referencing "is_sync_feature_enabled"); Dkt.

4   339-20 (Sealed Shafiq Report) ¶ 64 ("[I]f a Chrome user is signed in to a Chrome browser, and signs

5   in to a Google website, and did not have sync enabled on the Chrome browser, then Chrome may

6   send a bit, which depending on the circumstances, may indicate to Google that sync is not enabled

7   on that Chrome browser at that time.").

8      Google even offered additional discovery on these signals that Plaintiffs failed to accept.

9   First, on August 27, 2021, at Plaintiffs' request, Google offered preservation of "[i]nformation

10   showing whether [a] user had sync enabled at the time of the log entry." Dkt. 293-4 at 2. Plaintiffs

11   refused to accept Google's offer. Dkt. 294. Second, Google made Tim Schumann available to testify

12   in his individual capacity and as Google's corporate witness on "not-synced" signals on October 8

13   and 11, 2021, prior to Plaintiffs' class certification filing deadline. Yet, Plaintiffs decided not to take

14   a Rule 30(b)(6) deposition of Mr. Schumann, and delayed his individual deposition until January

15   13, 2022. Ansorge Decl. ¶ 96.

16      At the deposition, Plaintiffs spent more than 282 transcript pages on "not-synced" signals,

17   and Mr. Schumann testified at length about ▆▆▆▆ and stop sync signals (which include

18   ▆▆▆▆▆▆▆).[6] *See, e.g.*, Ansorge Decl. Ex. 39 (Schumann Tr.) 38:7–25; 214:4–217:25;

19   Schumann Decl. ¶ 12.

### 3.   Plaintiffs Have Not Established Any Plausible Harm

21      Plaintiffs' contention that Google committed discovery misconduct because it "destroyed

22   relevant not synced signals" from logs, Mot. 19, is foreclosed by this Court's April 30, 2021

23   Protective Order.[7] That Order, which resulted from extensive briefing and oral argument and issued

---

[6]   Plaintiffs knew that Google receives signals in certain instances when a user stops sync, which
would include the ▆▆▆▆▆ signal. Plaintiffs even referred to "stop sync signals" during
Mr. Schumann's deposition. Ansorge Decl. Ex. 39 at 214:4. They cannot now claim they only
learned about such signals on the last day of discovery.

[7]   Plaintiffs cannot reasonably assert that the Protective Order does not extend to the sync traffic
logs, Mot. 19, when they expressly asked that these logs be preserved, Dkt. 117-4, and the Court

1     *after* Plaintiffs took a Court-authorized seven-hour Rule 30(b)(6) deposition on the issue of

2     preservation, Dkt. 129, authorized Google to retain its standard retention periods for Chrome users'

3     event-level data—including the signals in dispute. The Court reached that decision aware that the

4     logs may contain relevant data, including data that could potentially be used to identify class

5     members. Mar. 5, 2021 Hr'g Tr. 37–38. Much of discovery has since been focused on what data can

6     reasonably and proportionally be preserved and produced. And under the Special Master's Modified

7     Preservation Plan, Google will preserve the ███ and ███████ signals. Dkt. 713-4.

8       Even crediting Plaintiffs' serial mischaracterization of the record, the motion fails to

9     establish any plausible harm. *First,* Plaintiffs erroneously claim earlier preservation of "not-synced"

10    signals would have provided "a ready-made database of information to identify class members."

11    Mot. 19. "Not-synced" signals cannot identify the class because they are not related to a user's

12    visiting a non-Google website that has installed Google services, which is central to Plaintiffs'

13    allegations. *See, e.g.*, Dkt. 162-3 at ¶ 276; Schumann Decl. ¶ 21. Moreover, Plaintiffs have

14    previously acknowledged that Google has no logs showing every instance in which a Chrome user

15    browses without sync enabled: on March 3, 2021, Plaintiffs demanded that Google build and

16    preserve a *new* "Do Not Sync (DNS or X-Not-Synced) signal that Google can store in its existing

17    logs," Ansorge Decl. Ex. 35 at 2. Many instances in which a Chrome user browses without sync

18    enabled are not identified in the logs at all. Schumann Decl. ¶¶ 19–20. The client-side sync feature

19    does not rely on Google's server's knowing details about users' browsing state. *Id.* ¶ 11. Thus,

20    Plaintiffs incorrectly characterize Google's statement in a letter that "[d]isabling sync is a client-

21    side [device side] action that is not visible server-side (i.e., to Google). Therefore, Google does not

22    have any logs showing when a user is not synced." Mot. 7 (partially quoting Jan. 29, 2021 letter

23    from Google). The letter truthfully conveyed that Google does not necessarily know when a client

24    has disabled sync. Schumann Decl. ¶¶ 11, 20.

25       *Second*, Plaintiffs falsely characterize the ███ signal as identifying all users who are

26    signed in to their Google account but have not consented to sync. Mot. 9. In fact, that signal has

28    confirmed their inclusion in the Order, Dkt. 127; *see also* Mar. 5, 2021 Hr'g Tr. 11–14, 21, 24, 34–36.

1   been recorded only since April 2018 and only when very specific conditions are satisfied.[8] The

2   signal does not identify all users who are signed-in but not synced. Schumann Decl. ¶¶ 18, 19.

3       *Third*, Plaintiffs incorrectly assert that the ████████████ signal "easily identifies

4   signed out and not synced users," thereby capturing "the portion of the class that is not captured by

5   the ████ [signal]." Mot. 9. The ████████████ signal is not recorded in a variety of instances

6   in which sync is disabled, including when a user signs out of his or her Google account (disabling

7   sync by default), enters a "sync paused state" because their authentication cookie expires, or, instead

8   of opting to "turn off sync," disables sync by deselecting the checkbox for all or any portion of data

9   for which a user can enable sync. Schumann Decl. ¶¶ 14, 19. This signal thus does not even identify

10  all users who were once synced and turned off sync, much less all signed-out users who browsed

11  without enabled sync, as Plaintiffs claim. *See* Schumann Decl. ¶¶ 14, 19; Pls.' Ex. 8 (Google's

12  Amended Response to Pls.' Rog No. 34). Nor would ████████████ identify non-Google

13  Account holders (who by definition are not signed in and not synced) browsing on Chrome.

14  Schumann Decl. ¶ 19. In other words, even if Google had preserved "not-synced" signals from the

15  inception of this case, Plaintiffs could not rely on them to identify their class, and thus cannot

16  demonstrate prejudice pertaining to "not-synced" signals.

**B.   Google Complied With All Court and Special Master Orders Regarding Preservation and Production of Named Plaintiff Data**

17
18      Plaintiffs' unsubstantiated claims that Google's efforts to preserve and produce Named

19  Plaintiffs' data violated the April 30, 2021 and November 12, 2021 Orders, Mot. 10–14, are

20  inconsistent with the record, as detailed below. These claims are also an untimely and improper

21  attempt to relitigate matters the Court and Special Master already resolved.

22      *First*, Plaintiffs claim that Google's preservation obligations extended beyond the Named

23  Plaintiffs' authenticated data to data associated with pseudonymous unauthenticated identifiers. *See*

24  Mot. 14–15. That is incorrect because these unauthenticated identifiers may relate to users other

25  than Named Plaintiffs. Although Google had no obligation to preserve this data from the start of the

26
27
28  ────────────────
    [8]   The ████ signal is sent only when users (1) are signed into their Google Account, (2) signed into the Chrome browser, and do not turn sync on. Schumann Decl. ¶ 11.

case, out of an abundance of caution, Google *did* preserve data associated with unauthenticated identifiers extracted from Plaintiffs' devices.

*Second*, Plaintiffs' claim that Google was obligated to produce everything it preserved, *see* Mot. 10–12, incorrectly equates preservation with production obligations. *See, e.g.*, *In re Akhmedova*, 2020 WL 6891828, at *1 (N.D. Cal. Nov. 24, 2020) (obligations to preserve materials are distinct from production of documents responsive to a subpoena); *Khan v. Rogers*, 2018 WL 4693414, at *2 (N.D. Cal. Sept. 28, 2018) (same); Ansorge Decl. Ex. 14 at 93:9–13. The Court only recently ordered production of Named Plaintiff litigation hold data, and Google promptly complied. Ansorge Decl. ¶¶ 84–85.

### 1. Google Preserved Data Associated with Named Plaintiffs' Google Accounts Pursuant to a Litigation Hold

Google preserved data related to the Google Accounts ("GAIA") purportedly belonging to the Named Plaintiffs and identified in the Complaint soon after Plaintiffs filed this lawsuit. Ansorge Decl. ¶ 3. Unsatisfied with this reasonable and proportional approach, Plaintiffs demanded that Google preserve ▮▮▮▮▮▮ of event-level data from all potentially relevant data sources until Plaintiffs decided what they needed. *See* Dkt. 109 at 1. When Google objected on the basis of burden, Plaintiffs accused Google of spoliation. Dkt. 109-4 ¶ 7.

In response, Google built engineering pipelines to preserve event-level data associated with the Named Plaintiffs' GAIA IDs in late February 2021 (the "Litigation Hold Data"). Ansorge Decl. ¶ 6. Plaintiffs now claim they "did not learn" about the Litigation Hold Data "until the last week of fact discovery," Mot. 21, but Google disclosed the Litigation Hold Data in February 2021, *see* Dkt. 101-4 at 3. Google also promptly sought relief by filing an emergency motion for a Protective Order on February 17, 2021. Dkt. 108-4.

At the March 5 Hearing, the Court acknowledged that "just because the data exists doesn't mean it's necessarily subject to discovery under Rule 26," Mar. 5, 2021 Hr'g Tr. 50:22–23, and later ordered a deposition focused on Google's logs and a production of "a sample from each of the four categories of logs discussed at the hearing for each named plaintiff," Dkt. 155 at 1. Google complied, producing sample data on April 6, 2021 and a witness on April 9, 2021. Ansorge Decl. ¶¶ 9–10. On

April 30, 2021, the Court ruled that "Google need not suspend its standard retention periods applicable to data logs that reflect event-level data of Chrome users in the United States." Dkt. 174 ("Protective Order").

### 2.      Google Complied with the April 30, 2021 Production Order

After obtaining Plaintiffs' consent, Google agreed to produce relevant, non-duplicative Named Plaintiff data associated with their GAIAs. Google objected, however, to the extent Plaintiffs' request also sought unauthenticated user data—*i.e.* pseudonymous data that does not identify *a particular user*. Dkt. 164 at 3 (Dispute No. 1.3); Dkt. 166 at 3 (Dispute No. 1.3). Google's objection was based on privacy concerns—without certainty about the user associated with the unauthenticated data, Google could not obtain the necessary consent. Dkt. 151-4 at 7. As the Court knows, Google "fully segregates authenticated from unauthenticated data[.]" Dkt. 206 at 4.[9] This segregation is key to Google's efforts to protect users' privacy.[10] Ansorge Decl. Ex. 1 (Apr. 9, 2021 Rule 30(b)(6) Tr.) 313:8-313:12 ("[W]e have policies and systems to prevent" anonymous or pseudonymous cookie IDs from being "correlate[d] . . . with a user identity, like a gaia ID."). Unless a user signs in, Google will not know which of the potentially many users of a device is browsing the internet. Even Plaintiffs acknowledged the problem but nevertheless insisted that the data must be produced. *Id.* Ex. 2 (Apr. 29, 2021 Hr'g Tr.) 44:24–45:6 (Plaintiffs' counsel recognizing that "a device that's linked to a named Plaintiff . . . may also be [associated with activity by] your spouse if there's two people sharing the same device").

---

[9]    Plaintiffs claim, without support, that Google actually links authenticated and unauthenticated information. Mot. 14. This is categorically wrong. Google documents and testimony demonstrate that this linking does not occur. *See, e.g.*, Dkt. 428-22 ¶¶ 8–10. Although Plaintiffs assert "Google produced data for one of Plaintiffs' test accounts by conducting a search for a biscotti-identifier in a Gaia-keyed log," Mot. 14–15 (citing Jt. Decl. ¶ 103), their only support is an argumentative chart (improperly included in an attorney declaration, *see supra* n.1) with no substantiation. Plaintiffs are also wrong that GAIA and Zwieback identifiers are co-mingled in ██████. Mot. 15 (citing Jt. Decl. ¶¶ 42-43); Dkt. 713-4 at 6–7.

[10]    The separation of authenticated and unauthenticated data is also enshrined in the consent framework developed at the start of the class period in 2016, which is based on the "key principle" that Google will not use "data collected while signed in to target ads when the user is signed out, or vice versa." Dkt. 225-9 (Tr. of GOOG-CALH-00045185) 17:22–25.

On April 30, 2021, the Court ordered Google to produce data associated with Named Plaintiffs, including, "device data associated with any Plaintiff" and "recogniz[ed] that additional disputes regarding the available data may arise." Dkt. 173-1 at 1–2 (Disputes Nos. 1.3, 2.2). Google immediately complied, searching both the authenticated **and** unauthenticated identifiers the Named Plaintiffs provided, and producing the associated data. Ansorge Decl. ¶ 16. Moreover, while the Court did not require Google to preserve data associated with the Named Plaintiffs' unauthenticated identifiers, Google engineers developed pipelines in ███████ to preserve data associated with Biscotti IDs extracted from the cookie values Plaintiffs provided (adding to the Litigation Hold Data). *Id.* ¶ 32.[11]

### 3. The Court Referred Disputes Regarding the April 30, 2021 Order to the Special Master

Dissatisfied, Plaintiffs requested that Google infer a second order of unauthenticated identifiers, even further removed from Plaintiffs, that could have come from any device Plaintiffs ever used to log into their Google Accounts, including devices not belonging to Plaintiffs. Dkt. 206 at 4 ("Google represents that it will produce plaintiff profiles, web browsing history and other information associated with their Google accounts and associated with the small universe of other identifiers that Plaintiffs happened to discover during the investigation of claims in this case. But Google refuses to disclose the other identifiers (likely the vast majority of Plaintiffs' identifiers) and produce plaintiff information associated with those as well.").

Reverse-engineering second-level unauthenticated identifiers—as Plaintiffs urged—would present a substantial privacy risk. Such identifiers could be associated with **any** device Plaintiffs ever used to log into their Google Accounts—even a public computer in a library. The identifier would thereby capture browsing activity of a large number of *other* users, including non-members of the putative class. In short, Google could "disclose" the secondary unauthenticated identifiers to Plaintiffs only by undermining the robust privacy-preserving policies and system designs Google

---

[11]   At the time, Google did not preserve Zwieback-keyed data because Zwieback ID is not used to key the data at issue: data generated when users visit a third-party website that uses Google Analytics or Ad Manager. Rather, Zwieback ID is set in cookies by google.com domains, like Search. Ansorge Decl. ¶ 32. On October 1, 2021, the Court denied Plaintiffs' request for discovery into transmissions to Google.com. Dkt. 329 at 2; *see also* Dkt. 579-4 at 1 (Denying discovery into "Search logs.").

maintains to segregate these two types of data.[12]

Because this is a complex technical issue with significant privacy implications, the Court referred this dispute to the Special Master on July 13, 2021. Dkts. 246–247; Ansorge Decl. ¶ 30. Recognizing the burden and privacy implications of Plaintiffs' request, the Special Master did not order Google to reverse-engineer identifiers, and instead ordered Plaintiffs to provide additional device identifiers for Google to search. Ansorge Decl. ¶¶ 55, 80.

### 4.   Google Fully Complied with the Special Master's Instructions and the Court's November 12, 2022 Order

Since July 2021, at the Court's direction, the Special Master has carefully overseen the complex process of producing Named Plaintiff and potential class member data. On September 16, 2021, the Court set forth a funneled three-step process "to address issues of production of documents regarding Plaintiffs and potential class members": (1) identify potentially relevant sources and their retention periods, (2) provide additional information for a subset of sources identified in the first step, and (3) search a subset of the sources in the second step. Dkt. 309. Pursuant to this process, Google identified ▉ potentially relevant sources of ESI and their retention periods, and specifically disclosed that Litigation Hold Data was preserved from ▉ of these data sources. Ansorge Decl. ¶¶ 43, 45 & Ex. 11.

In its Order of November 12, 2021 ("November 12 Order"), the Court adopted the Special Master's October 20, 2021 Report & Recommendation ("October 20 R&R"), and directed Google to provide "a full list of all data sources which have been searched during the overall discovery process, . . . includ[ing] . . . a list of all bates ranges in the production(s) associated with each searched data source identified specifically by data source" and a declaration that "[a]ll responsive data related to the Named Plaintiffs have been produced from all searched data sources in the respective prior searches." Dkt. 377 at 10.

---

[12]  Plaintiffs claim that Google's quick production of "device-keyed information" proves Google's assertions of the burden associated with having to reverse-engineer identifiers "categorically false." Mot. 14. That is wrong. Google quickly produced information associated with Plaintiff-provided unauthenticated identifiers. Ansorge Decl. ¶ 57, 81–82. It would be substantially more time consuming and burdensome to fulfill Plaintiffs' separate request to reverse-engineer unauthenticated identifiers beyond those Plaintiffs provided. See Dkt. 232-4 (Sealed MTC Opp.) at 1, 6–9.

1   Google fully complied with the November 12 Order, as the Special Master subsequently
2   confirmed. Ansorge Decl. Ex. 9 (November 22, 2021 email). Plaintiffs now claim that Google
3   violated this Order because it did not also produce the Litigation Hold Data. But, by the time of the
4   Court's Order, the Special Master had consistently denied Plaintiffs' requests for Named Plaintiff
5   data Google "has preserved but not yet produced." *Id.* ¶¶ 46–47. Therefore, both Google and the
6   Special Master understood the relevant provisions of the October 20 R&R and November 12 Order
7   to refer to the data Google searched for purposes of production, ***not*** the Litigation Hold Data. *Id.*
8   Ex. 12 (confirming that "Special Master Brush has determined that [Plaintiffs' request for
9   'Production of Data Google Has Preserved But Not Produced' is] outside the scope of Exhibit 1,
10  Section 4 [of the November 12, 2021 Order.]").

11  Both the Special Master and the Court have consistently drawn a distinction between the full
12  universe of preserved data and the data that should be produced in discovery.
13  Mar. 5, 2021 Hr'g Tr. 50:22–23 ("Just because the data exists doesn't mean it's necessarily subject
14  to discovery under Rule 26."); Ansorge Decl. Ex. 25 (Mar. 15, 2022 SM Hr'g Tr.) 30:23–24 ("Just
15  because they're preserved doesn't mean they get produced."). And there was good reason not to
16  order the production: because the broad set of Litigation Hold data was for preservation, not
17  production, it was stored in a non-optimized raw format to ensure prompt preservation. Ansorge
18  Decl. ¶ 6. When finally ordered to be produced, it took days of work by a Google engineer to
19  reconstitute it into a production-ready format. Dkt. 704-4 at 2.

20  Plaintiffs now also claim Google withheld the Litigation Hold Data "so that Google could
21  justify turning over null sets," Mot. 13, but that could not be further from the truth. Precisely to
22  resolve this issue of getting only null sets of data in return, Google agreed to run searches on
23  identifiers provided by Plaintiffs' expert, Dr. Shafiq, and produced all responsive data. Ansorge
24  Decl. ¶ 57. In the months that followed, Google produced ███████ of additional data across ██████
25  of data sources related to identifiers provided by Plaintiffs and Dr. Shafiq. *Id.*

26  After Plaintiffs continued to push for discovery beyond what the Special Master deemed
27  relevant and proportionate, the Special Master finally acquiesced and ordered production of
28  Litigation Hold Data that did not contain information confidential to third-party publishers, which

Google produced on March 9 and 10, 2022. *Id.* ¶ 71. Plaintiffs delayed the rest of Google's production by failing to follow the Special Master's instructions to provide searches for the rest of the data that contains confidential publisher information. *Id.* ¶ 83. Google produced all Litigation Hold Data on June 30, 2022. *Id.* ¶ 85.

### 5.   Plaintiffs Identify No Prejudice or Harm

The extensive chronology of this dispute shows that Google consistently preserved and produced Named Plaintiff data pursuant to its obligations, Court orders, and specific Special Master guidance. Contrary to their eleventh-hour prejudice claim, Mot. 3, Plaintiffs cannot establish any hardship from not having the Litigation Hold Data earlier. Plaintiffs' initial selection of data sources in December 2021 was hardly made "at random," Mot. 13, but rather guided by Plaintiffs' eight experts with the full benefit of: (i) all potentially relevant data sources and identification of which ones were part of the Litigation Hold Data; (ii) descriptions of each source's purpose and function and their retention status, relevant field names and descriptions; (iii) documents to aid searching and working with the requested sources; and (iv) thousands of pages of Plaintiff data, as well as a list of corresponding bates numbers, dates on which the searches were carried out, full scripts and identifiers used for the searches, and names of the tools used for the searches. Ansorge Decl. ¶¶ 43, 45 & Ex. 34; Dkt. 383-2. Accordingly, Plaintiffs' prejudice claims ring hollow. Most tellingly, Plaintiffs fail to offer any explanation of how the additional data that Google is alleged to have improperly withheld would have been ***useful***, despite having had since March 2022, before filing their Motion, around 80 percent of the Litigation Hold Data. *See id.* ¶ 78 & Ex. 28.

### C.   Google Timely Disclosed ▮▮▮▮▮▮▮ and Plaintiffs Cannot Show Prejudice from the Three Purportedly Late-Produced Documents

Plaintiffs claim that Google's consent defense—and its dispositive motion[13]—should be stricken because Google purportedly withheld important discovery about a "secret" ▮▮▮▮▮

---

[13]   On November 30, 2021, Google filed a motion for summary judgment seeking a ruling that Plaintiffs consented to Google's receipt of the at-issue data as a matter of law because each named Plaintiff affirmatively selected "I Agree" to one or both of the Account Holder Agreements and the Google Privacy Policy, which explicitly disclosed the data collection at issue. Dkt. 429. Google's motion is therefore not based on "default account settings," as Plaintiffs' claim. Mot. 3.

"study" or "survey." Notice at iii;[14] Mot. 3, 15, 21, 22. By contrast, the record establishes that (1) ████████ is not a "study" of the at-issue disclosures; (2) Google long ago disclosed ████████ and Plaintiffs had ample opportunity to explore it in discovery; and (3) Plaintiffs can point to no prejudice from the three late-produced documents.

### 1. Plaintiffs Misrepresent the Purpose and Nature of ████████

Plaintiffs fundamentally misrepresent the nature of ████████. ████████ was in no way a targeted "study" of the "very disclosures at issue in the motion for summary judgment." Mot. 15. Rather, it was a five-year, forward-looking Google project aimed at shoring up and expanding upon Google's position as a leader in privacy and safety. Olson Decl. Exs. 19–20. ████████ was a cross-product effort to "define an overarching vision and strategy . . . to inform the Google privacy experience across products and services." *Id*. Ex. 15.[15]

### 2. Plaintiffs' Contention that Google Failed To Timely Disclose ████████ Existence is Flatly Incorrect

Google produced over ██ documents explicitly referencing ████████ ***before it filed its MSJ***, Olson Decl. ¶ 16, and an additional ██ documents referencing ████████ ***before Plaintiffs filed their Opposition to Google's MSJ***, *id*. ¶ 23. Allegations of sandbagging cannot be credited when Plaintiffs' own MSJ Opposition includes (i) an entire page explicitly discussing ████████ (ii) citation to multiple ████████ documents from Google's productions, and (iii) five pages discussing numerous other documents in a section titled "Google Internally Admits Its 'Consent' Process Is Broken."[16] Dkt. 462 (Sealed MSJ Opp.) at 12–17; Dkt. 462-1 (Barnes Decl.) Exs. 24, 47–50, 62, 69.

---

[14]   Plaintiffs' Notice of Motion improperly contains argument beyond the 25-page limit set by the local rules and should be stricken. Civ. L.R. 7-2.

[15]   *See also* Olson Decl. Ex. 10 at -258 (████████ objective was to "[d]evelop a privacy experience vision aimed at a five-year time horizon"); *id*. Ex. 16 (Heft-Luthy Tr.) 53:6–8 (████████ was "a product design and strategy effort"); *id*. Ex. 38 (Abdulhay Tr.) 10:5–11 (████████ was "a vision and strategy project focused on the privacy user experience.").

[16]   The sanctions motion recycles the argument from the MSJ Opposition that internal Google documents show Google's consent process or consent flow is "broken," Notice at iii; Mot. 3, even though ***none*** of the at-issue documents here uses that term. Thus, not only have Plaintiffs already made this argument in the opposition for which they are claiming prejudice, but none of the at-issue documents provides any further support for that argument.

1    Equally baseless is Plaintiffs' contention that they did not learn of the █████████

2    "stakeholder interviews" or "survey" until Google witness Sam Heft-Luthy "inadvertently" and

3    "unwittingly" acknowledged them at his December 20, 2021 deposition. Mot. 3–4, 15, 21. Well

4    before Plaintiffs deposed Mr. Heft-Luthy, Google had produced ██████ of documents specifically

5    referencing the fact of the interviews, Olson Decl. ¶ 16; *see also id.* ¶¶ 7–14, including detailed

6    notes from one of the interviews, *id.* Ex. 9, summaries of the first nine interviews, *id.* Ex. 8, and a

7    list of 19 of the 25 interviewees whose interviews were documented in Plaintiffs' Exhibit 11, *id.* Ex.

8    14. Indeed, Plaintiffs' counsel came to Mr. Heft-Luthy's deposition armed with over half a dozen

9    Google-produced documents discussing ██████████, and asked detailed questions about the

10   ██████████ project. *Id.* Ex. 16 (Heft-Luthy Tr.) 6:6–7:20; 10:22–25; 52:10–134:13; 213:12–

11   217:5. Plaintiffs' counsel specifically raised the ██████████ stakeholder interviews referenced in

12   an exhibit. *Id.* 88:21–93:11; *see also* Olson Decl. ¶ 10. Plaintiffs did not request the interview notes

13   at that time. Olson Decl. ¶ 18. Following Mr. Heft-Luthy's deposition (and still a few days before

14   Plaintiffs filed their Opposition), Plaintiffs deposed Greg Fair, who served as Google's declarant

15   concerning the factual bases of Google's MSJ, and was the custodian for nearly a quarter of the

16   already produced ██████████ documents. *Id.* ¶¶ 22, 24. Plaintiffs found the time to ask him about

17   the UN Declaration of Human Rights, but chose to ask ***zero*** questions about ██████████ or the

18   related interviews. *Id.* Four weeks after Mr. Heft-Luthy's deposition and a week after Plaintiffs filed

19   their MSJ Opposition, Plaintiffs finally asked Google to produce "all transcripts, notes, and emails

20   regarding interviews taken for ██████████ and all documents, research and 'inputs' that pertain

21   to ██████████." *Id.* Ex. 37.

22   Plaintiffs also falsely declare they had to file their opposition "without the benefit of the

23   requested ██████████ documents" because "Google had refused to produce" them. Jt. Decl. ¶ 52.

24   Plaintiffs waited months after being aware of it to request ██████████-specific search terms, and

25   Google agreed the very next day. Olson Decl. ¶¶ 19–20. Plaintiffs did not request an extension to

26   file their Opposition (due January 10, 2022) to review and incorporate documents that might be

27   produced as a result of the newly added terms. *Id.* ¶ 21. Nor did they seek to supplement their

28   briefing with any of the more than 500 additional responsive documents Google produced before

the fact discovery cut-off. Olson Decl. ¶¶ 25, 46; *but see* Dkt. 494 (filing surrebuttal to address new legal authority).

### 3.   Plaintiffs' Assertions of Prejudice Are Baseless

Despite sweeping claims of prejudice, Plaintiffs' motion references just ***three*** of the two-dozen documents produced in early April 2022: (i) GOOG-CABR-05885987 (Jt. Decl. ¶ 62); (ii) GOOG-CABR-05885871 (Jt. Decl. Ex. 11); and (iii) GOOG-CABR-05885181 (Jt. Decl. Ex. 12). The information Plaintiffs claim is relevant in each was actually produced earlier:

**GOOG-CABR-05885987.** This document is a ███████ position paper compiled to assist Google's Privacy & Data Protection Office ("PDPO") with "resource allocation and milestone setting." *Id.* Ex. 38 (Abdulhay Tr.) 37:17–19. Plaintiffs' MSJ Opposition cites a prior version, ***identical in virtually all material respects***—including each of the six excerpts Plaintiffs identified in this Motion. Olson Decl. ¶ 55 (chart showing overwhelming similarities). In fact, one of the quotations Plaintiffs trumpet was featured verbatim in the MSJ Opposition brief. *Compare* Jt. Decl. ¶ 62.e., *with* MSJ Opp. at 16.

**GOOG-CABR-05885871**. This document contains notes from interviews of 25 privacy "stakeholders" within Google, conducted by members of the ███████ project team. None of Plaintiffs' claims related to this document stands up to scrutiny.

*First*, Plaintiffs contend that the April 2022 production of this document "foreclosed the opportunity to cross-examine witnesses – Google 'stakeholders' . . . that undermine Google's consent defense." Mot. 21. But earlier-produced documents identified nearly all of the same interviewed "stakeholders" and their roles at Google. In early October 2021, when Plaintiffs had selected only two out of 20 fact witnesses to be deposed, Olson Decl. ¶ 61, Google produced a summary of "information from ███████ interviewees through July in our first round" (approximately one-third of the total interviews conducted), *id.* Ex 8 at -734. The summary noted that "more conversations are informing future work." *Id.* It explicitly listed the names of the Google employees who had been interviewed in the "first round," *id*, and included quotations from the very interviews Plaintiffs now claim were "secret," *id.* at -736. In late October 2021, Google also produced the entire interview notes with Rahul Roy-Chowdhury, which contain the same quotations

1    Plaintiffs now cite in their brief. *Compare id.* Ex. 9 at -494, *with* Mot. 3, 16, 22. And on November

2    16, 2021, Google produced a spreadsheet identifying 19 of the 25 interviewees whose interviews

3    were documented in Plaintiffs' Exhibit 11. Olson Decl. Ex. 14.

4            Throughout discovery, Google produced additional documents referencing the interviews

5    and identifying the interviewees. *See, e.g.*, Olson Decl. Exs. 21–36. By November 16, 2021,

6    Plaintiffs had the names of 21 of the 25 of the interviewees, yet Plaintiffs did not elect to depose

7    any listed interviewees even though they did not select their final three fact witness depositions until

8    February 24, 2022. *Id.* ¶¶ 62–63. Further, Plaintiffs had the opportunity to depose Google's Rule

9    30(b)(6) witness, Mediha Abdulhay, on ███████████, including the stakeholder interview notes

10   and three other ██████████ documents produced in April 2022. *Id.* Ex. 38 (Abdulhay Tr.) 4:10–

11   5:14; 13:1–14; 27:9–15; 42:11–43:12; 46:1–50:8.

12           *Second*, Plaintiffs incorrectly suggest that ██████████████ was a survey conducted to "record"

13   the views of Google "stakeholders" regarding "Google's consumer disclosures – including the very

14   disclosures at issue in the motion for summary judgment." Mot. 15. Not one of the wide range of

15   general privacy topics covered was aimed at measuring the adequacy of Google's disclosures or

16   user consent. This did not stop Plaintiffs from claiming the interview notes show "how widely

17   Google senior management understood that consent was illusory," Mot. 3,[17] or express

18   "disagree[ment] with the notion…that users 'consented' to Google's collection of their personal

19   information," Mot. 21–22, when no such statements exist. Or claiming that the notes include

20   "overwhelming consensus that Google's disclosures were confusing" or that they "failed to

21   adequately advise users of the full nature and scope of Google's collection practices," Mot. 16, when

22   the only reference to consumers' being "confused" was not about Google's disclosures, but about

23   the difference between "no tracking" and "no ads." Pls.' Ex. 11 at -935. Plaintiffs' other

24   misrepresentations are too numerous to include here. *See* Olson Decl. ¶ 64.

25           **GOOG-CABR-05885181**. This document is a compilation of consent-related user

26   experience research that was prepared as a reference point for a variety of internal Google projects.

27   _____

28   [17]  Very few of the interviewees would qualify as an executive, much less a "high level executive"
     or "senior management." Olson Decl. Ex. 10 at -282; *id.* Ex. 38 (Abdulhay Tr.) Ex. 3.

Pls.' Ex. 12 at -182. Plaintiffs now claim Google committed "an extraordinary act of bad faith" by withholding this document. Mot. 16. Nonsense. Google produced *four* nearly identical versions of Exhibit 12 on September 24, 2021 and November 16, 2021. Olson Decl. ¶ 72 (chart showing identical language from Joint Declaration ¶ 63 and Exhibit 12 in the Consent UXR Presentation Google produced in September 2021) & Exs. 40–43. Although Plaintiffs possessed these documents, they chose not to ask either Mr. Heft-Luthy or Mr. Fair about them, nor did they include them among the 74 MSJ Opposition exhibits filed months later.

In sum, while two of the documents Plaintiffs cite were inadvertently withheld as privileged, and the third was inadvertently marked not responsive, *id.* ¶¶ 52, 58-59, 66–67,[18] two were identical or substantively identical to earlier-produced documents and the third was explicitly referenced in earlier-produced documents, as described above. And the hundreds of ███████ documents Google produced, including before Plaintiffs filed their MSJ Opposition, confirm Google's good faith and the lack of prejudice to Plaintiffs.

## III.   **ARGUMENT**

The facts above demonstrate there is no basis for sanctions, let alone the extreme relief Plaintiffs seek in their Proposed Order (mentioned nowhere in their brief). These evidentiary sanctions require a showing of bad faith, prejudice, or both.[19] As shown below, the Motion should be denied because it does not come close to meeting this stringent burden.

---

[18] GOOG-CABR-05885987 and GOOG-CABR-05885871 were initially withheld as privileged and included on Google's privilege log. Olson Decl. ¶ 52 (Entry 533 from Calhoun Priv Log 001); *id.* ¶ 58 (CABR 6303 from 11/16/2021 Priv log). After Plaintiffs requested additional ███████ documents on January 18, 2022, and in preparation for Google's Rule 30(b)(6) deposition on ███████, Google re-reviewed these documents and produced them. *Id.* ¶¶ 52, 59. GOOG-CABR-05885181 was inadvertently tagged not-responsive, although duplicates had already been produced in September and November 2021. *Id.* ¶ 66. Google nevertheless produced it after re-review. *Id.* ¶ 6.

[19] As Plaintiffs acknowledge, any sanction imposed under the Court's inherent authority must be preceded by an express finding of bad faith. Mot. 5; *see also United States v. Brown*, 62 F. App'x 165, 166 (9th Cir. 2003) ("[The Ninth Circuit] ha[s] consistently held that bad faith is required whenever courts invoke inherent powers to sanction, regardless of the form of the sanction . . . .").

**A.      Plaintiffs' Request to Preclude Arguments Concerning "Not-Synced" Signals Is Misguided**

Plaintiffs ask the Court to prevent Google from relying on the "absence of signals from which browser state can be determined" to argue that (1) the proposed Class cannot be ascertained; (2) damages cannot be apportioned on a classwide basis, and (3) the proposed Class definition—defined to include only users who are not synced—contains any "uninjured" class members. Proposed Order ¶ 3. "[O]n the menu of sanctions that a court may select from in applying Rule 37, preclusion of evidence is among the most severe." *True Health Chiropractic Inc. v. McKesson Corp.*, 2015 WL 5341592, at *6 (N.D. Cal. Sept. 12, 2015) (quoting *Network Appliance, Inc. v. Bluearc Corp.*, 2005 WL 1513099, at *3 (N.D. Cal. June 27, 2005)). Issue preclusion sanctions are likewise reserved for discovery abuse "so extreme and prejudicial that no lesser remedy will cure the harm." *Synapsis, LLC v. Evergreen Data Sys., Inc.*, 2006 WL 2884413, at *1 (N.D. Cal. Oct. 10, 2006). For this reason, such sanctions are "rarely impose[d]." *Natural-Immunogenics Corp. v. Newport Trial Grp.*, 2016 WL 11520757, at *6 (C.D. Cal. June 16, 2016).

**Google has acted in good faith.** Google undertook its preservation efforts—including its decision not to suspend standard retention periods for Chrome users' event-level data—transparently and in full compliance with the Court's Protective Order. *See supra* Section II.A. Google accurately represented to the Court and the parties the very real limitations of the sync traffic logs, including that they do not record data for all users who are not synced and cannot identify the total number of users who have not enabled or disabled sync. Since the March 5, 2021 Hearing, Google consistently provided discovery regarding "not-synced" signals, disclosing such signals in its production and written responses well before Plaintiffs filed their motion for class certification. Contrary to what Plaintiffs claim, Google's class certification opposition does not rely on the "absence" of sync signals for any arguments, *see generally* Dkt. 429; *see also* Dkt. 427 at 14–16.[20]

---

[20]   Google opposed class certification based on Plaintiffs' failure to propose a class wide damages methodology that accounted for uninjured class members, including (1) users who consented to collection of data; (2) users who value personalized advertising more than their data; (3) users whose personal information was not received by Google, and (4) users who could have enabled a multitude of different options and settings to limit the amount and type of data Google received. Dkt. 429 at 20–23. None of these could be identified and excluded using "not-synced" signals.

1  Because Google has acted in good faith, preclusion sanctions are not available under the Court's

2  inherent authority. *Gomez v. Vernon*, 255 F.3d 1118, 1134 (9th Cir. 2001).

3       ***Plaintiffs have suffered no prejudice.*** Plaintiffs' assertion that Google had within its

4  possession, but failed to preserve, the data necessary to generate a list of putative class members,

5  Mot. 19, is baseless. *See supra* Sections II.A.1 & 3. Among other challenges, users without a Google

6  Account are not "readily identifiable" by any means (for reasons unrelated to "not-synced" signals),

7  and the signals at issue have no way to determine whether users visited non-Google websites that

8  use Google services (a requirement to be in the class). *Id*. Plaintiffs' further assertion that this

9  information would "quantify actual unjust enrichment damages on a per user basis," Mot. 19, is

10  wrong because such damages would depend on a multitude of individual factors that cannot be

11  determined by "not-synced" signals, including whether the class member was harmed in the first

12  place and the settings or options they may have enabled to mitigate such alleged harm. *See* Dkt. 427

13  at 14–16; Dkt. 426-10 at 22–34.

14       Moreover, Google has transparently provided ample discovery on both signals Plaintiffs

15  claim are important (█████████████ and █████). The Special Master is finalizing a preservation

16  plan as a culmination of Google's efforts, and Google has already agreed to preserve these signals.

17  Any alleged delay in preservation is Plaintiffs' own doing by, for example, rejecting Google's

18  August 27, 2021 preservation proposal, waiting until January 2022 to depose Mr. Schumann, and,

19  after noticing a Rule 30(b)(6) deposition on signals, deciding not to take it. *See supra* Section II.A.2.

20  Google's good faith and lack of prejudice to Plaintiffs preclude sanctions.

21       **B.     Plaintiffs' Requested Adverse Jury Instruction is Improper and Prejudicial**

22       Based on their claim that Google insufficiently preserved and produced data associated with

23  the Named Plaintiffs, Plaintiffs request a jury instruction that Google destroyed evidence "favorable

24  to Plaintiffs," and that the non-preserved evidence would have shown (1) "that Chrome was in fact

25  unlawfully disclosing personal information of Named Plaintiffs and Class Members to Google" and

26  (2) "that the nature and volume of information being unlawfully disclosed was objectively

27  unreasonable and highly offensive." Proposed Order ¶ 4. Since there has been neither spoliation nor

28

prejudice, no adverse instruction is warranted, much less one this inflammatory and prejudicial.[21]

Where one party alleges that another has spoliated electronically stored information, sanctions are available exclusively pursuant to Rule 37(e). *Newberry v. Cty. of San Bernardino*, 750 F. App'x 534, 537 (9th Cir. 2018); *Best Label Co. v. Custom Label & Decal, LLC*, 2022 WL 1525301, at *2 n.1 (N.D. Cal. May 13, 2022). Under Rule 37(e), "[i]f a court finds that the loss of [electronically stored] information has prejudiced the moving party, it may order 'measures no greater than necessary to cure the prejudice.'" *Best Label*, 2022 WL 1525301, at *2 (quoting Fed. R. Civ. P. 37(e)(1)). These measures may include an adverse jury instruction *only* if the court further finds that the nonmoving party "acted with the intent to deprive another party of the information's use in the litigation." *Id.* (citing Fed. R. Civ. P. 37(e)(2)). "[E]ven gross negligence . . . in failing to retain relevant evidence is not sufficient to support an adverse inference under Rule 37(e)(2)." *Meta Platforms, Inc. v. BrandTotal Ltd.*, 2022 WL 1990225, at *6 (N.D. Cal. June 6, 2022) (denying adverse instruction where "it is possible that BrandTotal intentionally failed to preserve [user data] logs," and its conduct gave "at least some support to that theory," but "Meta has not shown that to be the most likely explanation for the ongoing automatic deletion of those logs"). No instruction is warranted.

**Google preserved and produced Plaintiffs' data in good faith.** Google had no "intent to deprive" Plaintiffs of discoverable information. *Meta Platforms*, 2022 WL 1990225, at *6 (denying adverse instructions under Rule 37(e) where requisite intent is absent). To the contrary, Google's efforts to preserve class member data complied with the Court's determination that "Google need not suspend its standard retention periods" for event-level Chrome user data. *See supra* Section II.B.1. At the start of the case, Google also preserved the Named Plaintiffs' authenticated data; it later preserved relevant unauthenticated data associated with Plaintiffs' devices. *See supra* Section

---

[21]   Plaintiffs' requested instruction that non-preserved evidence would have established that Google's data collection is "highly offensive" is unfounded. At least four of the Named Plaintiffs admitted they continue to use Chrome despite full awareness of Google's data collection. Dkt. 429 at 17 & n.22. And Plaintiffs' counsels' own websites use Google services that share visitor data with Google. *Id.* at 5. For these and other reasons, Plaintiffs' claim that Google's conduct is "highly offensive" is simply not credible.

1    II.B.2. As the detailed chronology above reveals, Google's productions carefully followed the

2    directives of the Court and Special Master. *See supra* Section II.B. Plaintiffs can point to nothing to

3    rebut that inevitable conclusion.

4           **Plaintiffs have suffered no prejudice.** An adverse instruction is further unwarranted because

5    Rule 37(e) authorizes only "measures no greater than necessary to cure the prejudice," and there has

6    been no prejudice here. *First*, Google has produced ███████ of the ***exact same type*** of Biscotti-

7    and Zwieback-keyed data that Plaintiffs allege Google spoliated. *See supra* Section II.B.4. Plaintiffs

8    claim the non-preserved data could have been relevant to their invasion of privacy and intrusion-

9    upon-seclusion claims because it bears on the "nature and volume" of data Google collected, Mot.

10   20–21, but they offer no reason that the voluminous Biscotti- and Zwieback-keyed data Google

11   produced would not serve the same purpose. *See Kannan v. Apple, Inc.*, 2020 WL 9048723, at *8

12   (N.D. Cal. Sept. 21, 2020) (prejudice from incomplete discovery is "limited" where movant had

13   "access to other sources of information about" the same topic). And since Plaintiffs have identified

14   no evidence in the produced data to support their requested instruction, they are not entitled to a

15   declaration from the Court that the (materially same) non-preserved data would have proven their

16   case. *See, e.g.*, *Meta Platforms*, 2022 WL 1990225, at *7 (denying adverse inference instructions

17   where moving party "identifie[d] no evidence besides the absence of the [allegedly spoliated data]

18   to support th[e] allegations").

19          *Second*, as explained in Section II.B.4, Google has produced all of the Litigation Hold Data.

20   That Plaintiffs did not receive this data earlier cannot itself be sanctionable prejudice because

21   (i) Plaintiffs already had access to the same kind of data that did not require publisher notice, (ii)

22   Plaintiffs' experts will have months to examine the recently-produced data before merits reports are

23   due on September 8, 2022, Dkt. 725 at 1, and (iii) Google withheld data requiring publisher notice

24   with the Special Master's express authorization. *See supra* Section II.B.4; *see also United States ex*

25   *rel. Wiltec Guam, Inc. v. Kahaluu Const. Co.*, 857 F.2d 600, 604 (9th Cir. 1988) (delayed production

26   "did not prejudice the outcome of [the] action" even if it "caused serious inconvenience"). Plaintiffs

27   were not hampered in "engag[ing] in follow-up discovery." Mot. 20.

28

1    *Third*, even if Plaintiffs had been prejudiced by lack of access to non-preserved data, their

2    requested instruction is clearly "greater than necessary to cure" it. Fed. R. Civ. P. 37(e)(1).

3    Determining whether a defendant's conduct is "highly offensive" requires "a holistic consideration

4    of factors such as the likelihood of serious harm to the victim, the degree and setting of the intrusion,

5    the intruder's motives and objectives, and whether countervailing interests or social norms render

6    the intrusion inoffensive." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 606 (9th Cir.

7    2020). This analysis encompasses far more than just what data Google collects, and therefore

8    Plaintiffs' (incorrect) claim that Google spoliated that data does not justify removing the ***entirety*** of

9    the offensiveness inquiry from the jury.[22]

10       **C.    Plaintiffs' Request to Preclude Google's Consent Defense Is Improper**

11       Plaintiffs ask the Court to strike Google's affirmative defense of consent based on ***three***

12   documents Google produced after Plaintiffs filed their MSJ Opposition. As noted above, preclusive

13   sanctions are available only for "discovery abuse that is so extreme and prejudicial that no lesser

14   remedy will cure the harm." *Natural-Immunogenics Corp.*, 2016 WL 11520757, at *6; *True Health*

15   *Chiropractic*, 2015 WL 5341592, at *6–7 (denying sanctions for "delay[ing] the production of

16   discoverable information" because "Plaintiffs have not sufficiently explained how this delay

17   affected their ability to obtain additional discovery or make arguments in its motions"); *Nuance*

18   *Comms.*, 2012 WL 5904709, at *3 (rejecting preclusion sanctions when further discovery could

19   have cured the alleged prejudice from an "untimely production" and "permitted the Court and a jury

20   to resolve [the claims at issue] on the merits"). Where, as here, a discovery sanction would dismiss

21   a claim or defense, "mere negligent conduct is insufficient to impose the severe penalty of

22   exclusionary sanctions, and a showing of bad faith is required."[23] *Network Appliance, Inc.*, 2005

23   WL 1513099, at *3. Plaintiffs have shown neither bad faith nor prejudice.

24

---

25   [22]   As Google noted in its class certification opposition, putative class members are differently
     situated for purposes of the "highly offensive" element, not only because Google collected different

26   data from different users, but because millions of users were aware of—and apparently indifferent
     to—the data Google collected related to their browsing activity. *See* Dkt. 429 at 16–17.

27   [23]   Plaintiffs acknowledge that to the extent this Court determines that preclusion of Google's
     affirmative defense is appropriate—and it is not—it must "confine [its] order to 'a

28   recommendation.'" Mot. 5 (quoting Fed. R. Civ. P. 72(a)).

1        ***Google provided substantial discovery on*** ▮▮▮▮▮▮▮▮ ***Months Before it Filed The MSJ.***

2    The hundreds of ▮▮▮▮▮▮ documents Google produced during fact discovery include the

3    precise information Plaintiffs claim was crucial to their opposition to Google's MSJ. *See supra*

4    Section II.C.3. Plaintiffs do not (and cannot) identify a single material fact they did not know before

5    opposing summary judgment, or a single step Google took to "conceal" those facts. Indeed,

6    Plaintiffs' complaint can be boiled down to the delayed production of ***one*** document containing

7    notes from internal interviews that Google inadvertently withheld entirely as privileged (and

8    included on its privilege log) rather than producing it in redacted form. Contrary to Plaintiffs' claims

9    that "Google hoped to get a quick ruling on summary judgment before ever having to reveal the

10   truth," Mot. 3, Google's productions between October 5, 2021 and November 16, 2021 gave

11   Plaintiffs notice of these interviews—including detailed notes from one interview, interview

12   summaries of others, and the identities of 21 of the 25 interviewees—before Google even filed the

13   MSJ. Olson Decl. ¶¶ 7–14, 16, 62. Had Plaintiffs believed those productions were insufficient, "the

14   appropriate relief for this misconduct was not to ask for issue preclusion sanctions, but to seek a

15   discovery extension" or a motion to compel. *Nuance Comms.*, 2012 WL 5904709, at *3; *Techsavies,*

16   *LLC v. WDFA Mktg. Inc.*, 2011 WL 723983, at *3 (N.D. Cal. Feb. 23, 2011) ("Discovery disputes

17   should be resolved soon after the problem appears, rather than by exclusionary and sanctions

18   motions filed after discovery has terminated.").

19       ***Plaintiffs were not prejudiced by delayed production of three documents.*** Plaintiffs'

20   contention that the three documents at issue "undermine [Google's] motion for summary judgment,"

21   Mot. 15, is wrong. ▮▮▮▮▮▮▮▮ is not a study about the adequacy or meaning of the disclosures at

22   issue in this case. *See supra* II.C.1. Plaintiffs clearly understood this, or they would not have delayed

23   pursuing additional discovery on ▮▮▮▮▮▮ until after filing their MSJ Opposition. *See supra*

24   Section II.C.2. And contrary to their claim that they were "preclud[ed] from taking depositions,"

25   Mot. 4, Plaintiffs had every opportunity—yet declined—to depose any of the ▮▮▮▮▮▮

26   interviewees identified in documents produced between October 2021 and January 2022. *Id.* That

27   Plaintiffs failed to pursue this issue before seeking sanctions reveals that "its claim of prejudice is

28   exaggerated" and the motion should be denied. *See Nuance Comms.*, 2012 WL 5904709, at *3.

### D.      Plaintiffs' Other Requested Relief Is Likewise Inappropriate

*Plaintiffs' request that the Court find Google "in civil contempt for abuse of the discovery process,"* Dkt. 669-2 (Sealed Proposed Order) ¶ 2—a remedy mentioned nowhere in their brief—is unsupported and must be denied. It is "well settled" that a party may be found in civil contempt only if (i) the moving party provides "clear and convincing evidence" that the non-moving party "violated a specific and definite order of the court," *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1239 (9th Cir. 1999), (ii) the alleged violation does not "appear[] to be based on a good faith and reasonable interpretation of the [court's order]," and (iii) there has been no "substantial compliance," *In re Dual-Deck Video Cassette Recorder Antitrust Litig*, 10 F.3d 693, 695 (9th Cir. 1993) (internal quotation marks omitted); *see also Calvillo Manriquez v. Devos*, 411 F. Supp. 3d 535, 539 (N.D. Cal. 2019) (contempt inappropriate even "where there are a few minor violations despite the fact that 'every reasonable effort has been made to comply.'"). As demonstrated above, none of these elements is satisfied. Generalized allegations about "abuse of the discovery process" are not a basis for contempt, and, in any case, no such abuse has occurred.

*Plaintiffs' requests for monetary sanctions* fail for the same reasons as their other requests. Even if some monetary sanction were warranted (it is not), it would be limited to reimbursement for the reasonable expenses incurred in preparing the Motion. *See, e.g.*, *Brown v. Google LLC*, Dkt. 593-3 (Redacted Order) at Ex. A, Conclusions of Law ("*Brown* Order") ¶¶ 47–52 (granting only those fees "incurred by Plaintiffs in filing the Sanctions Motion" and rejecting request for Special Master fees). Plaintiffs' request for all fees and costs incurred in opposing Google's motion for summary judgment, Proposed Order ¶ 5, is likewise invalid. Even if the three documents at issue had been produced earlier, Plaintiffs cannot reasonably contend that Google never would have filed the motion, or that Plaintiffs would not have opposed it. *See, e.g.*, Fed. R. Civ. P. 37(b)(2)(C) (limiting sanctions to expenses "caused by the failure"); *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1184 (2017) (applying same rule to inherent-authority sanctions).

### IV.      **CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiffs' request for sanctions.

1    DATED: July 1, 2022

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

QUINN EMANUEL URQUHART & SULLIVAN,
LLP


By    _/s/ Andrew H. Schapiro_
         Andrew H. Schapiro

Andrew H. Schapiro (admitted *pro hac vice*)
andrewschapiro@quinnemanuel.com
Teuta Fani (admitted *pro hac vice*)
teutafani@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Telephone: (312) 705-7400
Facsimile: (312) 705-7401

Diane M. Doolittle (CA Bar No. 142046)
dianedoolittle@quinnemanuel.com
Sara Jenkins (CA Bar No. 230097)
sarajenkins@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

Stephen A. Broome (CA Bar No. 314605)
stephenbroome@quinnemanuel.com
Viola Trebicka (CA Bar No. 269526)
violatrebicka@quinnemanuel.com
Crystal Nix-Hines (Bar No. 326971)
crystalnixhines@quinnemanuel.com
Alyssa G. Olson (CA Bar No. 305705)
alyolson@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Jomaire A. Crawford (admitted *pro hac vice*)
jomairecrawford@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Josef Ansorge (admitted *pro hac vice*)
josefansorge@quinnemanuel.com
Xi ("Tracy") Gao (CA Bar No. 326266)
tracygao@quinnemanuel.com
Carl Spilly (admitted *pro hac vice*)
carlspilly@quinnemanuel.com
1300 I Street NW, Suite 900
Washington D.C., 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100

Jonathan Tse (CA Bar No. 305468)
jonathantse@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

*Attorneys for Defendant Google LLC*