# EXHIBIT 1

# Redacted In Its Entirety

# EXHIBIT 2

# Redacted In Its Entirety

# EXHIBIT 3

# Redacted Version of Document Sought to be Sealed

Message

| | |
|---|---|
| **From**: | Marc Treib [treib@google.com] |
| **Sent**: | 10/16/2018 6:41:58 AM |
| **To**: | Bettina Dea [bdea@google.com] |
| **CC**: | Mikel Astiz [mastiz@google.com]; Tim Schumann [tschumann@google.com]; Nathan Parker [nparker@google.com]; Chris Pickel [sfiera@google.com] |
| **Subject**: | Re: Metrics about extensions from Sync'd data |

On Mon, Oct 15, 2018 at 8:18 PM Bettina Dea <bdea@google.com> wrote:
Also, is it ok if I set up a meeting this week to go over some more questions that I have? As I keep looking into this, more questions keep coming up (it might be because I'm not understanding the the full picture)

Sure!

On Mon, Oct 15, 2018 at 11:11 AM, Bettina Dea <bdea@google.com> wrote:

On Mon, Oct 15, 2018 at 11:09 AM, Mikel Astiz <mastiz@google.com> wrote:
On Mon, Oct 15, 2018 at 8:03 PM Bettina Dea <bdea@google.com> wrote:
Thanks!!

On Sun, Oct 14, 2018 at 11:46 PM, Marc Treib <treib@google.com> wrote:
On Fri, Oct 12, 2018 at 11:19 PM Bettina Dea <bdea@google.com> wrote:
Ah thanks so much for taking the time to answer my questions!

Some more questions:

• What does "birthday" refer to? Is this the date the storage was created?

Yup, that's pretty close! (Though I'm not sure it's an actual date, just some ID.)
It's changed when the user goes to the Sync dashboard (chrome.google.com/sync) and hits "Reset Sync".
Whenever the user signs in a new device and sync, does that mean that the birthday also changes? Does this also affect the extension creation/modification timestamp?

No, birthdays are updated rarely, when a user resets sync from the server dashboard in https://chrome.google.com/sync?hl=en-US

Ah sorry about that

• Previously Marc said " And if an extension gets repeatedly installed and uninstalled, all bets are off"
    o        Would there be multiple tombstone objects for this entity or when installed, it will revive the object? (Apologies if this might be a dumb question, I'm not familiar "tombstone objects")

Not a dumb question at all! It'll revive the existing object. There's only ever one actual object OR one tombstone per extension.

• Is it possible to ever figure out the very first time Extension Sync was enabled for a profile?

I think we can probably figure out when Sync as a whole was first enabled from the ███████ of the corresponding DeviceInfo entity. We don't have it for Extension Sync specifically AFAIK.

- How can I find out which profile a ████████ refers to?

You mean, which (Gaia) account? Profiles are a concept in Chrome, the Sync server doesn't know about them.
One of our server folks will have to comment on how to get the account :)

Do we have an idea of how many people enable auto sync in comparison to not?

Can you clarify what 'auto sync' means?
Where all the options for Sync (i.e. bookmarks, extensions) are selected. I was wondering if there's data on the percentage of people that just sync everything vs. syncing only some of the options.

On desktop, about ████ of all Chrome users have Sync enabled. Of those, the ████████ are syncing everything, but I don't have concrete numbers.

Thanks,
Mikel

On Fri, Oct 12, 2018 at 5:05 AM, Mikel Astiz <mastiz@google.com> wrote:
On Fri, Oct 12, 2018 at 1:36 PM, Marc Treib <treib@google.com> wrote:

On Fri, Oct 12, 2018 at 7:19 AM Tim Schumann <tschumann@google.com> wrote:

On Thu, Oct 11, 2018 at 10:10 PM Bettina Dea <bdea@google.com> wrote:
Hi,
I just read the documentation on how to analyze the Chrome Sync Storage Data and the flume job way seems like a viable option for us.

A few questions:

- Can we tell whether a user has had sync disabled before from the Zipit data? I see that the sync proto has a ████████████████ but it seems that this only happens when a user previously had synced on and then disabled it. The reason is because the user can download extensions prior to having sync enabled and we were thinking of just completely ignoring extensions that were installed while sync is not enabled as the ctime will not be accurate. Are there metrics how often users install extensions while sync is not on?

To my knowledge, we don't persist information about sync being disabled -- but I'll have a closer look at the server code.
We could infer this from other data sets, for example, if there are bookmarks existing with an older date.

However, as Marc pointed out, if a users temporarily stopped sync in between (possibly over multiple periods of time), our heuristics won't work and we'd get biases.

Also, multi-device users will be problematic (there might be older history from a mobile phone), as we don't distinguish the origin of elements well.

- When an extension is uninstalled, will it disappear from the ▮▮▮▮▮▮ list?

We will create a tombstone object for this entity. Marc, Mikel: Can you help me dig out how the ids of extension sync entities are computed (given an extension, can we compute it's ID?). We'll also need to double check how the timestamps of tombstones are maintained (if they exist).

The relevant code is around here [1] - we just use the extension ID as the client tag. I believe the server ID is just a hash of that.

The server ID contains some more information, but it can mostly be inferred given a client tag. I think you'd need to know the birthday too.

It should be easier to do the analysis using the client-tag-hashes, which I believe we keep for server-side tombstones too. For extensions, that'd be a certain hash of the extension ID, as Marc says.

Wrt tombstone timestamps: it'd be best to check empirically, but at least the latest architecture (USS) uses the deletion time as modification-timestamp, and the creation-time seems to be carried over from the original entity.

Cheers,
Mikel

[1]
https://cs.chromium.org/chromium/src/chrome/browser/extensions/extension_sync_data.cc?rcl=742213
0d3da18b70d4cc81951feda2ab615edef9&l=170

Cheers,

--Tim

On Thu, Oct 11, 2018 at 6:48 AM, Marc Treib <treib@google.com> wrote:
On Thu, Oct 11, 2018 at 3:35 PM Mikel Astiz <mastiz@google.com> wrote:
On Thu, Oct 11, 2018 at 3:05 PM, Marc Treib <treib@google.com> wrote:
From looking at the Sync Node Browser in ▮▮▮▮▮▮ it seems like ▮▮▮▮ might be a reasonable approximation of install time. However, when an extension is uninstalled, the sync entity is tombstoned, and I don't know how much metadata we keep around in that case. And if an extension gets repeatedly installed and uninstalled, all bets are off :)

On Thu, Oct 11, 2018 at 2:59 PM Tim Schumann <tschumann@google.com> wrote:
+Mikel Astiz, +Marc Treib to keep me honest.

thanks for reaching out Nathan.

While sync entities have a concept of creation and modification time, these are sync-specific concepts[1] -- so the creation time is about when the sync entity was created (like when sync saw the item the first time) but not when the underlying Chrome element (in your case extension) was created.

GOOG-CALH-00850595

For certain datatypes, we carry over the creation time from the original model.

I haven't myself taken a look, but IIUC treib@ suggests that's the case for extensions.

No, that's not what I was trying to say :)

More precisely: If the user is already syncing at the time of extension installation, then Sync's ▇▇▇▇ should be a pretty good approximation of extension install time.
However, for extensions that were already installed at the time Sync is turned on, the ▇▇▇ will just be the Sync-turn-on time.

Cheers,
Mikel

That said, this might be a reasonable approximation for the install-duration, in particular if you want to identify short-lived extensions.

--Tim


-------------------
[1] With possibly the exception of a few sync data types, but not extensions.

On Thu, Oct 11, 2018 at 2:31 AM Nathan Parker <nparker@google.com> wrote:
Hey Tim --

QQ: Can we get "extension install date" from ▇▇▇▇▇▇▇ data?

Background: We're looking at ways to compute a metric of how long extensions were installed (to help find Uws), and I'm wondering if we can get this from existing ▇▇▇▇▇▇ logs. We want to know, per-extension, what the distribution of ▇▇▇▇▇▇▇▇ is. Does this exist? Where would we find the schema of these data?

FYI I've included an old thread below on a similar topic where you talk about where the data is stored, so you don't have to repeat yourself. :-) FYI we didn't end up pursuing the Titanium analysis. Thanks.

-- Nathan


On Wed, May 9, 2018 at 9:57 AM Chris Pickel <sfiera@google.com> wrote:
That doc looks correct.
There's also Zipit's own docs, which are convenient in that they use Chrome Sync for many of their examples.

On Wed, May 9, 2018 at 10:46 AM Tim Schumann <tschumann@google.com> wrote:
+Chris Pickel

We have daily dumps from our data store (ZipIt) which contains all the information you need. Chris, can you help Nathan to figure out which MDB group they need to join to get access to the data?

GOOG-CALH-00850596

Also Chris, do you know if this is the best description we have for accessing the exports? (https://docs.google.com/document/d/1SM-gdbJ-prNBd6L6ENqOiZm3wUsejv4WC4p9_lKtmeA/edit#heading=h.krv2gzsw09qh) It's from 2015 and might be outdated a bit. You might be able to just get what you need from dremel directly.

Let us know if there's something we can do to help. If it's indeed just a dremel query, we might also just write that for you. I just don't know how we can identify Titanium users.

Cheers,

--Tim

On Mon, May 7, 2018 at 9:46 PM Nathan Parker <nparker@google.com> wrote:
Hi Tim --

I'd like to learn how we can do some one-off analysis with the set of extensions that Chrome-Sync users have installed. We just resolved a thread with Kay and Chelsea about the legal/privacy issues, and they agreed this is fine from those POV's.

So next step is to answer "how do we access the data," and this is where I'd like your thoughts. Kay mentioned there is no documented process for this. Should we GVC to discuss the options, or are there design docs we should start with?

The background: We're exploring building some Chrome features to be enabled when a GAIA user opts into the public Titanium program. One part is a whitelist of trusted and needed extensions. To build that we want to know what are the popular extensions for exiting Titanium users, so we'd like to join the set of (few thousand) GAIA ids with Sync data to generate a one-time aggregated report.

-- Nathan

GOOG-CALH-00850597

# EXHIBIT 4

# Unredacted Version of Document Sought to be Sealed

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION**

| | |
|---|---|
| PATRICK CALHOUN, *et al*., on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>     vs.<br><br>GOOGLE LLC,<br><br>        Defendant. | Case No. 5:20-cv-5146-LHK-SVK |

**DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS'
FIRST SET OF REQUESTS FOR ADMISSION (NOS. 1-45)**

Pursuant to Federal Rules of Civil Procedure Rule 36, Defendant Google LLC ("Google") hereby responds and objects to Plaintiffs' First Set of Requests for Admission (Nos. 1-45). These objections and responses are made solely for the purpose of and in relation to this action. In addition, the objections and responses set forth in this document are based on Google's knowledge, investigations, and analysis to date. As discovery proceeds, Google may become aware of additional facts or evidence and its analysis of the case may change. Google reserves all rights to supplement and amend its objections and responses accordingly.

**GENERAL OBJECTIONS**

The following objections apply to each and every Request for Admission ("Request") propounded by Plaintiffs and are incorporated into each of the specific objections by reference as if set forth fully therein:

1.      Google has not completed its investigation or discovery in this litigation. Google's Responses and Objections to Plaintiffs' Requests are based upon the information presently known to Google and are given without prejudice to Google's right to adduce or analyze evidence subsequent to the date of these responses. Google expressly reserves the right to revise, supplement, or otherwise amend these Responses and Objections to the extent permitted by the Federal Rules of Civil Procedure, the Local Rules of Practice and Procedure for the United States District Court for

the Northern District of California ("Civil Local Rules"), or any discovery orders governing this case.

2.    Google objects to the Requests to the extent that they seek information shielded from disclosure by the attorney-client privilege, the work-product doctrine, the settlement privilege and/or any other applicable privilege or protection from discovery.

3.    Google objects to the Requests to the extent they assume facts or legal conclusions in defining the information requested. Google hereby denies any such disputed facts or legal conclusions to the extent assumed by each request for admission. Any information provided by Google with respect to any such request is without prejudice to this objection.

4.    Google objects to Plaintiffs' definition of "Google," "Defendant," "You," and "Your" and Instruction No. 1 to the extent that they seek to require Google to respond or provide information that is not within the possession, custody, or control of Google. Google further objects to these definitions and instructions to the extent that they purport to impute knowledge of unspecified or unknown parties or persons to Google. Google further objects to these definitions as overly broad, vague, and ambiguous to the extent they purport to include entities other than Google, which is the only named defendant in the present action. Google further objects to these definitions and instruction to the extent that they include Google's attorneys and, therefore, cause requests using "Google," "Defendant," "You," and "Your" to improperly seek information protected by the attorney-client privilege, the work product doctrine, the common interest privilege, and/or any other applicable privileges or immunities.

5.    Google objects to Plaintiffs' definition of "First Run Experience" as vague and ambiguous, especially since the cited document GOOG-CALH-00044222 does not appear to reference what Plaintiffs claim it purportedly references.

6.    Google objects to Plaintiffs' definition of "Google Account Holder" as vague and ambiguous. For example, it is unclear what the term "consumer-facing service" entails since Google provides many of its services, including Gmail, YouTube, and Chrome for free, as well as what the term "application" means and what constitutes an "application." Google will interpret the term

"Google Account Holder" to mean a person who has a registered account with one of Google's services.

7.    Google objects to Plaintiffs' definition of "Google Source Code" as overly broad and unduly burdensome, as it seeks "any set of instruction" from "any of [Google's] properties or divisions" and irrelevant Google products, such as Search, Maps, Storage, Fonts, Reaptcha, the Google Custom Search Engine, or "any other Google property." Indeed, in its October 1, 2021 Order, the Court stated that "each and every transmission, whether or not authorized, neither can nor should be the subject of discovery in this case" before denying Plaintiffs' request to broaden the scope of the case from to also include www.google.com. *See* Dkt. 329. Google further objects to this definition as overly broad and unduly burdensome, as it encompasses "any set of instruction derived in whole or in part from Google or any of its properties or divisions," which encompasses source code or instructions that are not relevant to Plaintiffs' allegations in this case. Google further objects to this definition as overly broad and unduly burdensome to the extent it seeks information that exceeds the scope of Plaintiffs' allegations in this case related to Google's disclosures regarding data Google receives when users visit third-party websites that use Google services (such as Analytics or Ad Manager) while using a Chrome browser on which sync is not enabled. Google will interpret "Google Source Code" in a manner that is consistent with the relevant scope of this case to the extent it is able to.

8.    Google objects to Plaintiffs' definition of "Personal Information" which cherry-picks certain provisions in the CCPA. Plaintiffs' definition of "Personal Information" misleadingly omits the CCPA provision that makes clear that "'Personal information' does not include consumer information that is deidentified," and defines "deidentified" to mean "information that cannot reasonably identify, relate to, describe, be capable of being associated with, or be linked, directly or indirectly, to a particular consumer, provided that a business that uses deidentified information: (1) Has implemented technical safeguards that prohibit reidentification of the consumer to whom the information may pertain. (2) Has implemented business processes that specifically prohibit reidentification of the information. (3) Has implemented business processes to prevent inadvertent release of deidentified information. (4) Makes no attempt to reidentify the information." CCPA

1798.140(h). Google further objects to Plaintiffs' definition of "Personal Information" as unduly burdensome, as it would encompass all routine Internet communications including any information that is needed to establish an Internet connection, such as IP addresses. Google further objects to Plaintiffs' definition of "Personal Information" as overly broad and unduly burdensome as it encompasses a broader scope of information than what Plaintiffs specifically identified in their Complaint: "IP addresses linked to user agent," "Session and Persistent cookie identifiers," "X-client-data headers" and "Browsing history and information regarding a consumer's interaction with an Internet website". Dkt. 302-4 (SAC), ¶ 51. Google further objects to Plaintiffs' definition of "Personal Information" as overly broad and unduly burdensome because Google's relevant disclosures, including its Privacy Policy (which Plaintiffs allege is part of the contract at issue), define information as "personal information" if it personally identifies an individual user or is associated with their Google Account. Google will interpret "Personal Information" consistent with its Privacy Policy and other disclosures, which may include information that users provide to Google which personally identifies them, such as name, email address, or billing information, or other data that can be reasonably linked to such information by Google, such as information Google associates with a Google Account.

9.    Google objects to Plaintiffs' definition of "Person(s)" as overly broad and unduly burdensome in that it purports to include "a non-human entity recognized as having the rights and obligations of a human being."

10.    Google objects to Plaintiffs' definition of "Signal(s)" as overbroad and unduly burdensome, as it would include any type of information or symbol—*e.g.* "code, flag, data, number, entry, or other indicator"—that exists.

11.    Google objects to Plaintiffs' definition of "Un-Synced User" as vague and ambiguous, as it is unclear whether this term refers to a user who has never synced on any Chrome instance, never synced on a specific Chrome instance, turned sync off on that Chrome instance, or for whom sync is not functioning on that Chrome instance at that moment. Google further objects to Plaintiffs' definition of "Un-Synced User" as vague and ambiguous, as it appears to treat a user who only has sync enabled for "Settings" or "Theme" but not browsing history ("History"), the

same as a user who has sync enabled for their browsing history ("History" in Chrome)—the information at issue in this case.

12.    Google objects to Plaintiffs' definition of "Relevant Time Period" where "[d]ocuments created outside of the time period but which relate to the subject matter of this Complaint should be included when interpreting the requests set forth herein," as it essentially vitiates the purpose of having a "Relevant Time period." It is improper, unduly burdensome, and entirely disproportionate to the needs of the case for Plaintiffs to propound requests that are not time-limited.

13.    Google objects to Plaintiffs' Definitions, Instructions, and Requests to the extent they seek information and/or records that are not reasonably accessible and whose inclusion is not proportional to the needs of the case.

14.    Google objects to Plaintiffs' Definitions, Instructions, and Requests to the extent they conflict with or encompass information and/or records falling outside the scope of discovery under the Federal Rules of Civil Procedure, the Civil Local Rules, or any discovery orders governing this case.

15.    In making these objections, Google does not waive or intend to waive (a) any objections as to the competency, relevance and admissibility of any information that may be provided in response to these Requests, or the subject matter thereof; (b) any rights to object on any ground to the use of any information that may be provided in response to the Requests, or the subject matter thereof, in any subsequent proceedings, including trial of this or any other action; and (c) any rights to objection on any ground to any request for further responses to this or any discovery request.

### **OBJECTIONS AND RESPONSES TO REQUESTS FOR ADMISSION**

Subject to the foregoing objections, Google objects and responds to Plaintiffs' Requests for Admission as follows:

### **REQUEST FOR ADMISSION NO. 1:**

Admit that Chrome sent Personal Information about Plaintiffs to Google when they were using the Chrome browser and were not synced.

**RESPONSE TO REQUEST FOR ADMISSION NO. 1:**

In addition to its General Objections, Google specifically objects to this Request on the ground that it is vague, and states a general proposition with respect to a nuanced topic that turns on circumstances that are not specified in the Request. Google admits that when Plaintiffs were using the Chrome browser with or without sync enabled, but while signed into a Google website, to visit a website that uses certain Google services (such as Google Analytics and Google Ad Manager), and while Plaintiffs had selected settings in their Google Account to permit their site activity data to be stored in their Google Account, Google received information that it stored in Plaintiffs' accounts (where they were able to review it). Google treats that information as personal information in accordance with the terms of Google's Privacy Policy. Plaintiffs expressly consented to this practice. *See, e.g.*, GOOG-CALH-00592132 - GOOG-CALH-00592280. Google denies that Chrome ever sent Plaintiffs' Chrome browsing history to Google when Plaintiffs were using the Chrome browser without sync enabled. Google otherwise denies this request.

**REQUEST FOR ADMISSION NO. 2:**

Admit that when an Un-synced User visits a non-Google website that includes Google Source Code the Google Source Code instructs the Chrome browser to send Personal Information to the Google Property associated with the Google Source Code.

**RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

In addition to its General Objections, Google specifically objects to this Request on the ground that it is vague, and states a general proposition with respect to a nuanced topic that turns on circumstances that are not specified in the Request. The Request fails to specify, for example, whether the user is a Google Account holder, the browser mode and settings being used, the websites and services being used, and the specific categories of information at issue. Google therefore cannot truthfully admit or deny Request.

**REQUEST FOR ADMISSION NO. 3:**

Admit that when the Chrome browser is in its default state in an un-synced mode the Chrome browser will transmit Personal Information to Google anytime an Un-synced User visits a website on which Google Source Code appears.

1 **RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

2     Denied.

3 **REQUEST FOR ADMISSION NO. 4:**

4     Admit that when the Chrome browser is in its default state in an un-synced mode the Chrome

5 browser will transmit Personal Information to <u>Google.com</u> when an Un-synced User types into the

6 Chrome omnibar.

7 **RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

8     In addition to its General Objections, Google specifically objects to this Request on the

9 ground that it is vague, and states a general proposition with respect to a nuanced topic that turns on

10 circumstances that are not specified in the Request. Google will interpret "omnibar" to mean

11 "omnibox." Google admits that—as explained in the Chrome Privacy Notices that Plaintiffs

12 attached to their Complaint (Dkt. 2, Exs. 17-33)—if Google is the user's default search engine, then

13 the Chrome browser will transmit the characters a user types into the omnibox to Google.com. *Id.*,

14 Ex. 33 at 3 ("When you search using the omnibox or the search box on the new tab page in Chrome,

15 the characters you type (even if you haven't hit 'enter' yet) are sent to your default search engine.

16 If Google is your default search engine, predictions are based on your own search history, topics

17 related to what you're typing in the omnibox or in the search box on the new tab page, and what

18 other people are searching for. <u>Learn more</u>."). Google further admits that if a Google Account holder

19 is using Chrome with or without sync enabled, and (1) is signed into a Google website, (2) Google

20 is her default search engine, and (3) she has enabled the appropriate account settings, then searches

21 she performs using the omnibox are stored in her Google Account (where she can review them). *Id.*

22 ("If you are signed in to a Google site and Google is your default search engine, searches you

23 perform using the omnibox or the search box on the new tab page in Chrome are stored in your

24 Google Account."). Google treats such searches stored in a user's Google Account as Personal

25 Information.  Google otherwise denies this request.

26 **REQUEST FOR ADMISSION NO. 5:**

27

28

1    Admit that when the Chrome browser is in its default state in an un-synced mode the Chrome

2    browser will transmit Personal Information and the numbers, letters, and symbols that an Un-synced

3    User types into the Chrome omnibar to <u>Google.com</u>.

4    **RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

5    In addition to its General Objections, Google specifically objects to this Request on the

6    ground that it is vague, and states a general proposition with respect to a nuanced topic that turns on

7    circumstances that are not specified in the Request. Google will interpret "omnibar" to mean

8    "omnibox." Google admits that—as explained in the Chrome Privacy Notice that Plaintiffs attached

9    to their Complaint (Dkt. 2, Exs. 17-33)—if Google is the user's default search engine, then the

10   Chrome browser will transmit the numbers, letters, and symbols a user types into the omnibox to

11   Google.com. *Id.*, Ex. 33 at 3 ("When you search using the omnibox or the search box on the new

12   tab page in Chrome, the characters you type (even if you haven't hit 'enter' yet) are sent to your

13   default search engine. If Google is your default search engine, predictions are based on your own

14   search history, topics related to what you're typing in the omnibox or in the search box on the new

15   tab page, and what other people are searching for. Learn more."). Google further admits that if a

16   Google Account holder is using Chrome with or without sync enabled, and (1) is signed in to a

17   Google website, (2) Google is her default search engine, and (3) she has enabled the appropriate

18   account settings, then searches she performs using the omnibox are stored in her Google Account

19   (where she can review them). *Id.* ("If you are signed in to a Google site and Google is your default

20   search engine, searches you perform using the omnibox or the search box on the new tab page in

21   Chrome are stored in your Google Account."). Google treats such searches stored in a user's Google

22   Account as Personal Information. Google otherwise denies this request.

23   **REQUEST FOR ADMISSION NO. 6:**

24   Admit that Chrome has sent Personal Information about Chrome users to Google when users

25   are not synced since at least 2016.

26   **RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

27   In addition to its General Objections, Google specifically objects to this Request on the

28   ground that it is vague, and states a general proposition with respect to a nuanced topic that turns on

circumstances that are not specified in the Request. The Request fails to specify, for example, whether the user is a Google Account holder, the browser mode and settings being used, the websites and services being used, and the specific categories of information at issue. Google therefore cannot truthfully admit or deny this Request.

**REQUEST FOR ADMISSION NO. 7:**

Admit that Google has not suspended the practice of sending Personal Information about Chrome users to Google when users are not synced.

**RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

In addition to its General Objections, Google specifically objects to this Request on the ground that it is vague, and states a general proposition with respect to a nuanced topic that turns on circumstances that are not specified in the Request. The Request fails to specify, for example, whether the user is a Google Account holder, the browser mode and settings being used, the websites and services being used, the specific categories of information at issue, and whether the user enabled or disabled a feature that would have prevented certain categories of information from being transmitted to Google and stored in the user's account. Google therefore cannot truthfully admit or deny this Request.

**REQUEST FOR ADMISSION NO. 8:**

Admit that Google creates profiles of Chrome users from whom it has received data when they were not synced.

**RESPONSE TO REQUEST FOR ADMISSION NO. 8:**

In addition to its General Objections, Google specifically objects to this Request as vague and ambiguous as to "profiles," as Plaintiffs do not define the term and it is unclear what type of information they are referring to. For example, Plaintiffs do not specify whether they are referring to Chrome profiles (*See* GOOG-CALH-00023315, https://support.google.com/chrome/answer/2364824?hl=en&co=GENIE.Platform%3DDesktop) or Google Account profiles (*see* https://myaccount.google.com/profile). Google admits that users can provide information through either of these profile features without enabling Chrome's sync feature. Google otherwise denies this Request.

**REQUEST FOR ADMISSION NO. 9:**

Admit that when creating user profiles Google does not distinguish between data taken from users when they are synced from data taken from users when they are not synced.

**RESPONSE TO REQUEST FOR ADMISSION NO. 9:**

In addition to its General Objections, Google specifically objects to this Request as vague and ambiguous as to "profiles," as Plaintiffs do not define the term and it is unclear what type of information they are referring to. For example, Plaintiffs do not specify whether they are referring to Chrome profiles (*See* GOOG-CALH-00023315 https://support.google.com/chrome/answer/2364824?hl=en&co=GENIE.Platform%3DDesktop) or Google Account profiles (*see* https://myaccount.google.com/profile). Google admits that users can provide information through either of these profile features without enabling Chrome's sync feature. Google otherwise denies this Request.

**REQUEST FOR ADMISSION NO. 10:**

Admit that Google can identify the number of Chrome users in the United States from 2016 to present whose data was sent from Chrome to Google while not synced.

**RESPONSE TO REQUEST FOR ADMISSION NO. 10:**

Denied.

**REQUEST FOR ADMISSION NO. 11:**

Admit that Chrome sends a Signal to Google that indicates when a Chrome user is not synced.

**RESPONSE TO REQUEST FOR ADMISSION NO. 11:**

In addition to its General Objections, Google specifically objects to this Request as vague and ambiguous as to "Signal" and "indicates," as it is unclear what type of information is sufficient to be a Signal or an indication. Google admits that if a Chrome user is signed in to a Chrome browser, and signed in to a Google website, and did not have sync enabled on the Chrome browser, then Chrome may send a bit, which depending on the circumstances, may indicate to Google that sync is not enabled on that Chrome browser at that time. This bit is only sent if the user is also signed in to their Google Account at the browser level. Google otherwise denies this request.

Case No. 5:20-cv-5146-LHK-SVK

DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION (NOS. 1-45)

**REQUEST FOR ADMISSION NO. 12:**

Admit that Chrome sends a Signal to Google that indicates when a Chrome user is not signed-in and not synced.

**RESPONSE TO REQUEST FOR ADMISSION NO. 12:**

Denied.

**REQUEST FOR ADMISSION NO. 13:**

Admit that Chrome sends a Signal to Google that a Chrome user is not synced but signed-in to a Google Account.

**RESPONSE TO REQUEST FOR ADMISSION NO. 13:**

In addition to its General Objections, Google specifically objects to this Request as vague and ambiguous as to "Signal," as it is unclear what type of information is sufficient to be a Signal. Google admits that if a Chrome user is signed in to a Chrome browser, and signed in to a Google website, and did not have sync enabled on the Chrome browser, then Chrome may send a bit, which depending on the circumstances, may indicate to Google that sync is not enabled on that Chrome browser at that time. This bit is only sent if the user is also signed in to their Google Account at the browser level. Google otherwise denies this request.

**REQUEST FOR ADMISSION NO. 14:**

Admit that Chrome sends a Signal to Google that a Chrome user is not synced but signed-in to a Google Account with Personal Information that identifies the Google Account Holder.

**RESPONSE TO REQUEST FOR ADMISSION NO. 14:**

In addition to its General Objections, Google specifically objects to this Request as vague and ambiguous as to "identifies the Google Account Holder," as it is unclear to what identification Plaintiffs are referring. Google admits that if a Chrome user is signed in to a Chrome browser, and signed in to a Google website, and did not have sync enabled on the Chrome browser, then Chrome may send a bit, which depending on the circumstances, may indicate to Google that sync is not enabled on that Chrome browser at that time. Google further admits that the bit is sent with information that identifies the signed-in Google Account. Google denies that Google Account

DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION (NOS. 1-45)

1  information is sufficient in every case to identify the individual using that Google Account. Google

2  otherwise denies this request.

3  **REQUEST FOR ADMISSION NO. 15:**

4      Admit that Chrome sends a Signal to the Google sync service that a specific Chrome user is

5  not synced when the user signs-in to a Google Account but is not synced.

6  **RESPONSE TO REQUEST FOR ADMISSION NO. 15:**

7      Google admits that if a Chrome user is signed in to a Chrome browser, and signs in to a

8  Google website, and did not have sync enabled on the Chrome browser, then Chrome may send a

9  bit, which depending on the circumstances, may indicate to Google that sync is not enabled on that

10  Chrome browser at that time. Google otherwise denies this request.

11  **REQUEST FOR ADMISSION NO. 16:**

12      Admit that Chrome sends a Signal to the Google sync service that a specific Chrome user is

13  not synced when a Chrome user who has previously signed-in to a Google Account but is not synced

14  re-opens their Chrome browser after closing it without formally signing out of their Google Account.

15  **RESPONSE TO REQUEST FOR ADMISSION NO. 16:**

16      In addition to its General Objections, Google specifically objects to this Request as vague

17  and ambiguous as to "formally signing out of their Google Account," as it is unclear what the

18  distinction between formally signing out of a Google Account and signing out of a Google Account

19  is. Google admits that if a Chrome user is signed in to a Chrome browser, and signs in to a Google

20  website, and did not have sync enabled on the Chrome browser, then Chrome may send a bit, which

21  depending on the circumstances, may indicate to Google that sync is not enabled on that Chrome

22  browser at that time. Google otherwise denies this request.

23  **REQUEST FOR ADMISSION NO. 17:**

24      Admit that Chrome sends a Signal to the Google sync service when a Chrome user clicks to

25  pause sync.

26  **RESPONSE TO REQUEST FOR ADMISSION NO. 17:**

27      In addition to its General Objections, Google specifically objects to this Request as vague

28  and ambiguous as to "a Chrome user clicks to pause sync," as it is unclear what user action is being

Case No. 5:20-cv-5146-LHK-SVK

DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS
FOR ADMISSION (NOS. 1-45)

referred to. Google admits that Chrome attempts to send a request to the Google sync service when a Chrome user clicks to turn sync off on their Chrome browser. Google otherwise denies this request.

**REQUEST FOR ADMISSION NO. 18:**

Admit that Chrome sends a Signal to the Google sync service when a Chrome user clicks to turn off sync.

**RESPONSE TO REQUEST FOR ADMISSION NO. 18:**

Google admits that an instance of the Chrome browser will attempt to send a request to the Google sync service when a Chrome user clicks to turn off sync.

**REQUEST FOR ADMISSION NO. 19:**

Admit that when a user clicks to un-pause or re-start Sync, Chrome will send previously un-synced communications stored by the browser to the Chrome sync service.

**RESPONSE TO REQUEST FOR ADMISSION NO. 19:**

In addition to its General Objections, Google specifically objects to this Request on the ground that it is vague, and states a general proposition with respect to a nuanced topic that turns on circumstances that are not specified in the Request. Google further objects that the Request does not specify what Plaintiffs mean by "un-synced communications stored by the browser." Accordingly, Google cannot truthfully admit or deny this Request.

**REQUEST FOR ADMISSION NO. 20:**

Admit that Chrome sends a signal to the Google sync service when a Chrome user clicks to Sync.

**RESPONSE TO REQUEST FOR ADMISSION NO. 20:**

Google admits that an instance of the Chrome browser will attempt to send a request to the Google sync service when a Chrome user clicks to Sync.

**REQUEST FOR ADMISSION NO. 21:**

Admit that Chrome Sync logs contain data that indicates that Chrome users are not synced.

**RESPONSE TO REQUEST FOR ADMISSION NO. 21:**

Google admits that if a Chrome user is signed in to a Chrome browser, and signs in to a Google website, and did not have sync enabled on the Chrome browser, then Chrome logs may

13

1  contain a bit, that may indicate to Google that sync was not enabled for any category of sync data

2  (*i.e.* Apps, Bookmarks, Extensions, History, Settings, Theme, Reading List, Open Tabs, Passwords,

3  Addresses and more, Payment methods and addresses using Google Pay) on that Chrome browser

4  at that time. Google otherwise denies this request.

5  **REQUEST FOR ADMISSION NO. 22:**

6      Admit that Chrome sync logs contain data that indicates when Chrome users chose to sync.

7  **RESPONSE TO REQUEST FOR ADMISSION NO. 22:**

8      Google admits that Chrome sync logs contain data that indicates that Chrome users had sync

9  enabled for one or more category of sync data (*i.e.* Apps, Bookmarks, Extensions, History, Settings,

10  Theme, Reading List, Open Tabs, Passwords, Addresses and more, Payment methods and addresses

11  using Google Pay). Google otherwise denies this request.

12  **REQUEST FOR ADMISSION NO. 23:**

13      Admit that Google maintains records of when Chrome users choose to sync or un-sync.

14  **RESPONSE TO REQUEST FOR ADMISSION NO. 23:**

15      Google admits that it maintains records showing when it received data from users who had

16  sync enabled for one or more category of sync data (*i.e.* Apps, Bookmarks, Extensions, History,

17  Settings, Theme, Reading List, Open Tabs, Passwords, Addresses and more, Payment methods and

18  addresses using Google Pay). Google otherwise denies this request.

19  **REQUEST FOR ADMISSION NO. 24:**

20      Admit that Google maintains records of when Chrome users sign-in to a Google Account.

21  **RESPONSE TO REQUEST FOR ADMISSION NO. 24:**

22      Google admits that it maintains records showing when a Google Account was signed into

23  from any web browser, including Chrome.

24  **REQUEST FOR ADMISSION NO. 25:**

25      Admit that Google maintains records of when Chrome users sign-in to a Google Account

26  without also enabling sync.

27  **RESPONSE TO REQUEST FOR ADMISSION NO. 25:**

28

Google objects to this Request on the ground that it conflates different Google services and features (*e.g.*, Google Account sign, and Chrome sync), and the records relating to those services and features, which are not one and the same. Google admits that if a Chrome user is signed in to a Chrome browser, and signs in to a Google website, and had sync enabled for one or more category of sync data (*i.e.* Apps, Bookmarks, Extensions, History, Settings, Theme, Reading List, Open Tabs, Passwords, Addresses and more, Payment methods and addresses using Google Pay) on the Chrome browser, then Google's records may contain a bit, which depending on the circumstances, may indicate to Google that the Chrome user had sync enabled. Google otherwise denies this request.

**REQUEST FOR ADMISSION NO. 26:**

Admit that Google is capable of extracting and joining data and information fields from different logs or data sources to identify users who logged-in to a Google Account but did not enable sync and determine when such actions occurred.

**RESPONSE TO REQUEST FOR ADMISSION NO. 26:**

In addition to its General Objections, Google specifically objects to this Request on the ground that what Google is "capable of" is wholly irrelevant to the parties' claims and defenses, which turn on actual practices, not hypothetical "capabilities." Google further objects that the request is exceedingly vague. For example, the Request asks Google to admit that it is capable of extracting and joining unspecified "data and information fields" from unspecified "logs or data sources." Accordingly, Google cannot truthfully admit or deny this Request.

**REQUEST FOR ADMISSION NO. 27:**

Admit that Google does not distinguish between synced and un-synced Chrome traffic anywhere outside the Sync service.

**RESPONSE TO REQUEST FOR ADMISSION NO. 27:**

Denied.

**REQUEST FOR ADMISSION NO. 28:**

Admit that Google does not distinguish between synced and un-synced Chrome traffic in Display Ad logs.

**RESPONSE TO REQUEST FOR ADMISSION NO. 28:**

DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION (NOS. 1-45)

1    Google admits that Chrome's sync feature is a browser personalization feature that is not

2   designed to affect whether Google Display Ads services receive data when a Chrome browser is

3   used to visit a website that uses Google Display Ads services, and thus Display Ads logs do not

4   distinguish between (1) data from a Chrome browser on which sync was enabled for one or more

5   category of sync data (*i.e.* Apps, Bookmarks, Extensions, History, Settings, Theme, Reading List,

6   Open Tabs, Passwords, Addresses and more, Payment methods and addresses using Google Pay)

7   and (2) data from a Chrome browser on which sync was not enabled for any category of sync data.

8   **REQUEST FOR ADMISSION NO. 29:**

9    Admit that Google does not distinguish between synced and un-synced Chrome traffic in

10  Analytics logs.

11  **RESPONSE TO REQUEST FOR ADMISSION NO. 29:**

12    Google admits that Chrome's sync feature is a browser personalization feature that is

13  not  designed to affect whether Google Analytics receive data when a Chrome browser is used to

14  visit a website that uses Google Analytics, and thus Google Analytics logs do not distinguish

15  between (1) data from a Chrome browser on which sync was enabled for one or more category of

16  sync data (*i.e.* Apps, Bookmarks, Extensions, History, Settings, Theme, Reading List, Open Tabs,

17  Passwords, Addresses and more, Payment methods and addresses using Google Pay) and (2) data

18  from a Chrome browser on which sync was not enabled for any category of sync data.

19  **REQUEST FOR ADMISSION NO. 30:**

20    Admit that Google does not distinguish between synced and un-synced Chrome traffic in

21  Search logs.

22  **RESPONSE TO REQUEST FOR ADMISSION NO. 30:**

23    Google objects to this Request as seeking information that is outside the scope of the case.

24  *See* Dkt. 329.

25  **REQUEST FOR ADMISSION NO. 31:**

26    Admit that Google does not distinguish between synced and un-synced Chrome traffic in

27  Google API logs.

28  **RESPONSE TO REQUEST FOR ADMISSION NO. 31:**

Case No. 5:20-cv-5146-LHK-SVK

DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS
FOR ADMISSION (NOS. 1-45)

1       In addition to its General Objections, Google specifically objects to this Request as vague

2 and ambiguous as to "Google API logs," as it is unclear what specific logs are being referred to.

3 Google therefore cannot truthfully admit or deny this Request.

4 **REQUEST FOR ADMISSION NO. 32:**

5       Admit that Google does not distinguish between synced and un-synced Chrome traffic in

6 logs containing Chrome omnibar transmissions.

7 **RESPONSE TO REQUEST FOR ADMISSION NO. 32:**

8       Google objects to this Request as seeking information that is outside the scope of the case.

9 *See* Dkt. 329.

10 **REQUEST FOR ADMISSION NO. 33:**

11       Admit that Google does not distinguish between synced and un-synced Chrome traffic in

12 logs containing data transmitted to Google.com while a Chrome user is on a non-Google owned-

13 and-operated website.

14 **RESPONSE TO REQUEST FOR ADMISSION NO. 33:**

15       Google objects to this Request as seeking information that is outside the scope of the case.

16 *See* Dkt. 329.

17 **REQUEST FOR ADMISSION NO. 34:**

18       Admit that Google tracks the number of Chrome users who are not synced.

19 **RESPONSE TO REQUEST FOR ADMISSION NO. 34:**

20       Denied.

21 **REQUEST FOR ADMISSION NO. 35:**

22       Admit that Google seeks to convert Chrome un-synced users to Chrome synced users.

23 **RESPONSE TO REQUEST FOR ADMISSION NO. 35:**

24       In addition to its General Objections, Google specifically objects to this Request as vague

25 and ambiguous as to "seeks to convert Chrome un-synced users to Chrome synced users," as

26 Chrome sync is a browser personalization feature that Chrome users choose to enable or not enable.

27 Google admits that it informs Chrome users about the availability and function of its features,

28

1  including the Chrome sync feature in at least the Chrome settings menu, the Chrome Privacy Notice,

2  numerous Help Center articles, and the Chrome Whitepaper. Google otherwise denies the Request.

3  **REQUEST FOR ADMISSION NO. 36:**

4        Admit that Google routinely collects records of Chrome transmissions data for Chrome users

5  who are not synced.

6  **RESPONSE TO REQUEST FOR ADMISSION NO. 36:**

7        In addition to its General Objections, Google specifically objects to this Request on the

8  ground that the term "Chrome transmissions data" is unclear and undefined. Accordingly, Google

9  cannot truthfully admit or deny this Request.

10  **REQUEST FOR ADMISSION NO. 37:**

11        Admit that Google records the instances of Google Account Holders who synced during

12  their First Run Experience with a Chrome Instance.

13  **RESPONSE TO REQUEST FOR ADMISSION NO. 37:**

14        Google admits that it has records of Chrome instances on which sync was enabled during

15  the First Run Experience. Google otherwise denies the Request.

16  **REQUEST FOR ADMISSION NO. 38:**

17        Admit that Google is capable of querying, identifying, and joining data fields in logs

18  sufficient to identify Chrome users from whom it collected data when they were not synced.

19  **RESPONSE TO REQUEST FOR ADMISSION NO. 38:**

20        In addition to its General Objections, Google specifically objects to this Request on the

21  ground that what Google is "capable of" is wholly irrelevant to the parties' claims and defenses,

22  which turn on actual practices, not hypothetical "capabilities." Google further objects that the

23  request is exceedingly vague. For example, the Request asks Google to admit that it is capable of

24  extracting and joining unspecified "data fields" from unspecified "logs." Accordingly, Google

25  cannot truthfully admit or deny this Request.

26  **REQUEST FOR ADMISSION NO. 39:**

27        Admit that Google is capable of identifying Google Account Holders who synced a Chrome

28  Instance during their First Run Experience and never paused or stopped syncing.

      Case No. 5:20-cv-5146-LHK-SVK

DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS
FOR ADMISSION (NOS. 1-45)

**RESPONSE TO REQUEST FOR ADMISSION NO. 39:**

In addition to its General Objections, Google specifically objects to this Request on the ground that what Google is "capable of" is wholly irrelevant to the parties' claims and defenses, which turn on actual practices, not hypothetical "capabilities." Google admits that for some versions of Chrome it is able to identify instances of Chrome on which sync was enabled during the First Run Experience and which continue to be used with sync enabled. After conducting a reasonable inquiry, the information Google knows and can readily obtain is insufficient to enable it to admit or deny that it is capable of identifying Google Account Holders who synced a Chrome Instance during their First Run Experience and never paused or stopped syncing.

**REQUEST FOR ADMISSION NO. 40:**

Admit that Google maintains a record of all Google Account Holders who have never synced.

**RESPONSE TO REQUEST FOR ADMISSION NO. 40:**

Denied.

**REQUEST FOR ADMISSION NO. 41:**

Admit that for any single Chrome Instance, Google is capable of extracting and joining data and information fields from different logs to identify and distinguish between data sent from Chrome to Google when the Chrome Instance was synced versus when it was un-synced.

**RESPONSE TO REQUEST FOR ADMISSION NO. 41:**

In addition to its General Objections, Google specifically objects to this Request on the ground that what Google is "capable of" is irrelevant to the parties' claims and defenses, which turn on actual practices, not hypothetical "capabilities." Google further objects that the request is exceedingly vague. For example, the Request asks Google to admit that it is capable of extracting and joining unspecified "data and information fields" from unspecified "different logs." Accordingly, Google cannot truthfully admit or deny this Request.

**REQUEST FOR ADMISSION NO. 42:**

Admit that for any single Chrome Instance, Google is capable of determining whether the Chrome Instance has never been operated in an un-synced state.

1    **RESPONSE TO REQUEST FOR ADMISSION NO. 42:**

2        Denied.

3    **REQUEST FOR ADMISSION NO. 43:**

4        Admit that Google elected not to retain records of signals that a Chrome user was not synced.

5    **RESPONSE TO REQUEST FOR ADMISSION NO. 43:**

6        Google admits that it followed Magistrate Judge van Keulen's order that "Google need not

7    suspend its standard retention periods applicable to data logs that reflect event-level data of Chrome

8    users in the United States." Dkt. 174. Google otherwise denies the Request.

9    **REQUEST FOR ADMISSION NO. 44:**

10        Admit that Google elected not to retain Chrome sync logs on the advice of counsel.

11    **RESPONSE TO REQUEST FOR ADMISSION NO. 44:**

12        Google objects to this request on the ground that it asks Google to confirm or deny the

13    substance of advice from counsel, which information is privileged.

14    **REQUEST FOR ADMISSION NO. 45:**

15        Admit that Google elected not to retain records of signals that a Chrome user was not synced

16    on the advice of counsel.

17    **RESPONSE TO REQUEST FOR ADMISSION NO. 45:**

18        Google objects to this request on the ground that it asks Google to confirm or deny the

19    substance of advice from counsel, which information is privileged.

20

21    DATED:  October 12, 2021                    QUINN EMANUEL URQUHART &
22                                                 SULLIVAN, LLP

23                                        By    */s/ Andrew H. Schapiro*
                                            Andrew H. Schapiro (admitted pro hac vice)
24                                            andrewschapiro@quinnemanuel.com
                                            191 N. Wacker Drive, Suite 2700
25                                            Chicago, IL 60606
                                            Telephone: (312) 705-7400
26                                            Facsimile: (312) 705-7401

27
                                            Stephen A. Broome (CA Bar No. 314605)
28                                            sb@quinnemanuel.com

20                                    Case No. 5:20-cv-5146-LHK-SVK

Viola Trebicka (CA Bar No. 269526)
violatrebicka@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Jomaire Crawford (admitted pro hac vice)
jomairecrawford@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Josef Ansorge (admitted pro hac vice)
josefansorge@quinnemanuel.com
1300 I Street NW, Suite 900
Washington D.C., 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100

Jonathan Tse (CA Bar No. 305468)
jonathantse@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

*Attorneys for Defendant Google LLC*

Case No. 5:20-cv-5146-LHK-SVK

DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS
FOR ADMISSION (NOS. 1-45)

**PROOF OF SERVICE**

**WASHINGTON, D.C.**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in Washington, D.C. My business address is 1300 I Street, N.W., Suite 900, Washington, D.C. 20005.

On October 12, 2021, I served true copies of the following document(s) described as **DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION (NOS. 1-45)** on the interested parties in this action as follows:

**SEE ATTACHED LIST**

**BY E-MAIL OR ELECTRONIC TRANSMISSION:** I transmitted PDF format copies of the document(s) described above to the e-mail addresses on the attached Service List pursuant to the agreement between the parties to serve discovery, in lieu of other service methods, by email under Fed. R. Civ. P. 5(b)(2)(E) (*see* Joint Case Management Statement § 8.b, Docket No. 44) and on non-parties pursuant to the Court's August 12, 2021 Cross-use and Discovery Coordination Orders issued in *Brown v. Google*, Case No. 5:20-cv-03664-LHK-SVK (Dkt. 243) and *Calhoun v. Google*, Case No.: 5:20-cv-05146-LHK-SVK (Dkt. 263). The documents were transmitted by electronic transmission and such transmission was reported as complete and without error.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 12, 2021 at Washington, D.C.


*/s/ Tracy Xi Gao*
Tracy Xi Gao

DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION (NOS. 1-45)

## SERVICE LIST

*Calhoun v. Google LLC*

*Case No. 5:20-cv-05146-LHK*

**BLEICHMAR FONTI & AULD LLP**
Lesley Weaver (Cal. Bar No. 191305)
Angelica M. Ornelas (Cal. Bar No. 285929)
Joshua D. Samra (Cal. Bar No. 313050)
555 12th Street, Suite 1600
Oakland, CA 994607
Tel.: (415) 445-4003
Fax: (415) 445-4020
*lweaver@bfalaw.com*
*aornelas@bfalaw.com*
*jsamra@bfalaw.com*

**DICELLO LEVITT GUTZLER LLC**
David A. Straite (admitted *pro hac vice*)
One Grand Central Place
60 E. 42nd Street, Suite 2400
New York, NY 10165
Tel.: (646) 993-1000
*dstraite@dicellolevitt.com*

Amy E. Keller (admitted *pro hac vice*)
Ten North Dearborn Street
Sixth Floor
Chicago, IL 60602
Tel.: (312) 214-7900
*akeller@dicellolevitt.com*

**SIMMONS HANLY CONROY LLC**
Mitchell M. Breit (admitted *pro hac vice*)
Jason 'Jay' Barnes (admitted *pro hac vice*)
An Truong (admitted *pro hac vice*)
Eric Johnson (*pro hac vice* to be sought)
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
Fax: (212) 213-5949
*mbreit@simmonsfirm.com*
*jaybarnes@simmonsfirm.com*
*atruong@simmonsfirm.com*
*ejohnson@simmonsfirm.com*

*Counsel for Plaintiffs*

Case No. 5:20-cv-5146-LHK-SVK
DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS
FOR ADMISSION (NOS. 1-45)

## SERVICE LIST

*Brown v. Google LLC*
*Case No. 5:20-cv-03664-LHK*

BOIES SCHILLER FLEXNER LLP

Mark C. Mao, CA Bar No. 236165
Sean P. Rodriguez, CA Bar No. 262437
Beko Richardson, CA Bar No. 238027
Antonio Lavalle Ingram, II, CA Bar No. 300528
Alexander Justin Konik, CA Bar No. 299291
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery St., 41st Floor
San Francisco, CA 94104
Tel.: (415) 293-6800
Fax: (415) 293-6899
mmao@bsfllp.com
srodriguez@bsfllp.com
brichardson@bsfllp.com
aingram@bsfllp.com
akonik@bsfllp.com

James Lee (admitted pro hac vice)
Rossana Baeza (admitted pro hac vice)
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd St., 28th Floor
Miami, FL 33131
Tel.: (305) 539-8400
Fax: (303) 539-1307
jlee@bsfllp.com
rbaeza@bsfllp.com

Amanda K. Bonn, CA Bar No. 270891
**SUSMAN GODFREY L.L.P**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA. 90067
Tel: (310) 789-3100
Fax: (310) 789-3150
abonn@susmangodfrey.com

William S. Carmody (admitted pro hac vice)
Shawn Rabin (admitted pro hac vice)
Steven M. Shepard (admitted pro hac vice)
Alexander P. Frawley (admitted pro hac vice)
**SUSMAN GODFREY L.L.P.**
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019-6023

24

Case No. 5:20-cv-5146-LHK-SVK

Tel.: (212) 336-8330
Fax: (212) 336-8340
bcarmody@susmangodfrey.com
srabin@susmangodfrey.com
sshepard@susmangodfrey.com
afrawley@susmangodfrey.com

John A. Yanchunis (admitted pro hac vice)
Ryan J. McGee (admitted pro hac vice)
Ra Olusegun Amen (admitted pro hac vice)
Jean Sutton Martin (admitted pro hac vice)
**MORGAN & MORGAN**
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Tel.: (813) 223-5505
jyanchunis@forthepeople.com
rmcgee@forthepeople.com
ramen@forthepeople.com
jean@jsmlawoffice.com

*Attorneys for Plaintiffs Chasom Brown et al.*

Case No. 5:20-cv-5146-LHK-SVK
DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION (NOS. 1-45)

# EXHIBIT 5

# Redacted Version of Document Sought to be Sealed

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION**

PATRICK CALHOUN, *et al*., on behalf of
themselves and all others similarly situated,

      Plaintiffs,

      vs.

GOOGLE LLC,

      Defendant.

Case No. 5:20-cv-5146-LHK-SVK

**DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS'
FIFTH SET OF INTERROGATORIES (NO. 21-42)**

      Pursuant to Federal Rule of Civil Procedure 33, Defendant Google LLC ("Google") hereby provides its responses and objections to Plaintiffs' Fifth Set of Interrogatories (Nos. 21-42). These responses and objections are made solely for the purpose of and in relation to this action. In addition, the responses and objections set forth in this document are based on Google's knowledge, investigations, and analysis to date. As discovery proceeds, Google may become aware of additional facts or evidence and its analysis of the case may change. Google reserves all rights to supplement and amend its objections and responses accordingly.

**<u>GENERAL OBJECTIONS</u>**

      The following objections apply to each and every interrogatory propounded by Plaintiffs and are incorporated into each of the specific objections by reference as if set forth fully therein:

      1.      Google objects to Plaintiffs' definition of "Google," "Defendant," "You," and "Your" and Instruction No. 1 to the extent that they seek to require Google to produce or otherwise analyze any document or other information that is not within the possession, custody, or control of Google. Google further objects to this definition and instruction to the extent that they purport to impute knowledge of unspecified or unknown parties or persons to Google. Google further objects to this definition and instruction as overly broad, vague, and ambiguous to the extent they purport

Case No. 5:20-cv-5146-LHK-SVK
DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIFTH SET OF
INTERROGATORIES (NOS. 21-42)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

to include entities other than Google, which is the only named defendant in the present action. Google further objects to this definition and instruction to the extent that they include Google's attorneys and, therefore, cause interrogatories using "Google," "Defendant," "You," and "Your" to seek improperly information protected by the attorney-client privilege, the work product doctrine, the common interest privilege and/or any other applicable privileges or immunities.

2.    Google objects to Plaintiffs' definitions of "Communication," "Correspondence," "Document(s)," "Information," and "File" to the extent that they conflict with the provisions of the ESI Order pertaining to the search and production of documents. Google further objects to each interrogatory to the extent that it requires Google to search for electronically stored information in a manner that is inconsistent with the agreements reached in the parties' ESI negotiations.

3.    Google objects to Plaintiffs' definitions of "[c]oncern," "concerning," "[e]videncing," "[i]ncluding," "[r]egard," "regarding," "refer," "referring," "relate," "relating," "pertain," and "pertaining" to the extent that they propose to alter the plain meaning or scope of any specific interrogatory and to the extent that such alteration renders the interrogatory vague, ambiguous, and overbroad.

4.    Google objects to Plaintiffs' definition of "Data Transmission(s)" as overly broad and unduly burdensome, as it is not limited to computing devices or software programs relevant to this lawsuit and includes any transfer of information from a Chrome browser to "other locations," which is improperly vague.

5.    Google objects to Plaintiffs' definition of "Employee(s)" as including "any person who … purported to act on behalf of any Google entity" as overly broad, vague, and ambiguous to the extent it includes persons other than Google's employees.

6.    Google objects to Plaintiffs' definition of "Google Accountholder(s)" as vague and ambiguous to the extent it refers to an "individual who has" a Google account, as it is unclear what ownership or activity by an individual is sufficient to satisfy this definition.

7.    Google objects to Plaintiffs' definition of "Google Domain or Subdomain" as vague and ambiguous because it purports to include any domain or subdomain "associated with … Google," without providing any definition or context for that phrase.  Google also objects to

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  Plaintiffs' definition as overly broad and unduly burdensome to the extent it includes domains and

2  subdomains not at issue in this lawsuit.

3         8.     Google objects to Plaintiffs' definition of "Google Property" as overly broad and

4  unduly burdensome to the extent it includes Google products and services not at issue in this lawsuit.

5         9.     Google objects to Plaintiffs' definition of "Google Source Code" as overly broad and

6  unduly burdensome because it is not confined to Google products and services at issue in this

7  lawsuit. To the extent Plaintiffs' definition includes non-public source code, Google further objects

8  because the production of non-public, proprietary source code has already been deemed unwarranted

9  in this case. Dkt. 377 ("[T]he Court finds that the Special Master's factual conclusions regarding

10  the overbreadth of the Plaintiffs' requests for access to nonpublic source code . . . [is] well taken

11  and adopts those findings . . . Plaintiffs have not demonstrated the requisite factual basis of

12  necessity . . .").

13        10.     Google objects to Plaintiffs' definition of "Person(s)" as overly broad and unduly

14  burdensome in that it purports to include "a non-human entity recognized as having the rights and

15  obligations of a human being."

16        11.     Google objects to Plaintiffs' definition of "Policy" or "Policies" as overly broad,

17  vague, and ambiguous in that it purports to include "any rule, procedure, practice, or course of

18  conduct, whether formal or informal, written, or unwritten, recorded, or unrecorded, that was

19  recognized or followed, explicitly or implicitly."

20        12.     Google objects to Plaintiffs' definition of "Personal Information" as overly broad

21  and unduly burdensome because it extends far beyond the "personal information" referenced in

22  Plaintiffs' complaint (*see, e.g.*, Dkt. 162-3 ¶¶ 2, 4) and in Google's privacy policy, which defines

23  "personal information" as "information that you provide to us personally which personally identifies

24  you, such as your name, email address, or billing information, or other data that can be reasonably

25  linked to such information by Google, such as information we associate with your Google Account."

26        13.     Google objects to Plaintiffs' definition of "Relevant Time Period" as overly broad,

27  because it encompasses claims that may be barred by the statute of limitations. Google further

28  objects to Plaintiffs' definition of "Relevant Time Period" to the extent that it encompasses

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

information and/or records that are not reasonably accessible and whose inclusion is not proportional to the needs of the case.

14.     Google objects to Plaintiffs' definition of "Signal" as overly broad and unduly burdensome, as it would cover any type of information or symbol—e.g., "code, flag, data, number, entry, or other indicator"—that exists.

15.     Google objects to Plaintiffs' definition of "Signed-In" as "refer[ring] to signing in or logging in to a Google Account" as vague and ambiguous because it does not clarify whether the user is (1) signed into a Google Account in the Chrome browser or (2) signed into a Google Account in the content area of the browser while signed out of the Chrome browser. Google objects to Plaintiffs' definition of "Signed-In" and "Sign-In" as vague, ambiguous, and improperly circular because the definition relies on the term it seeks to define and Plaintiffs use the terms in ways that require a technical and precise meaning, but do not provide such a definition. Plaintiffs confusingly appear to use "Signed-In" as a status state for a Google User (e.g., seeking information on Users who are "not Signed-In"), but their definition in its entirety only refers to the act of "signing in or logging in to a Google Account" and not a User state. This is vague and ambiguous and does not provide the information required to answer the Interrogatories, such as whether a User who has ever logged into a Google Account is considered "Signed-in" under Plaintiffs' definition, and it says nothing of Users who may have logged into a Google Account on some devices but not on others.

16.     Google objects to Plaintiffs' definition of "Sync" as "refer[ring] to the Sync feature available on Chrome Browsers" to the extent Plaintiffs purport it adequately defines or includes alleged User states included in Plaintiffs' interrogatories, such as "Synced," "not Synced," or "un-synced," which require a technical and precise definition and are undefined in Plaintiffs' Fifth Set of Interrogatories.

17.     Google objects to Plaintiffs' Definitions, Instructions, and interrogatories to the extent they seek information and/or records that are not reasonably accessible and whose inclusion is not proportional to the needs of the case.

18.     Google objects to Plaintiffs' Definitions, Instructions, and interrogatories to the extent they conflict with or encompass information and/or records falling outside the scope of

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

discovery under the Federal Rules of Civil Procedure, the local rules of the Northern District of California, or any discovery orders governing this case.

19.    Google's responses to these interrogatories are hereby made without waiving or intending to waive, but rather, to the contrary, by preserving and intending to preserve:

    a.    All questions as to the competence, relevance, materiality, and admissibility as evidence for any purpose of the information or documents, or the subject matter thereof, in any aspect of this action or any other court action or judicial or administrative proceeding or investigation;

    b.    The right to object on any ground to the use of any such information or documents, or the subject matter thereof, in any aspect of this action or any other court action or judicial or administrative proceeding or investigation;

    c.    The right to object at any time in connection with any further response to this or any other interrogatories; and

    d.    The right at any time to supplement its responses.

20.    In offering to produce various types of documents, information, or things, Google makes no representation that any such documents, information, or things exist or are actually known (or not known) to exist.

21.    Google anticipates that future discovery, independent investigation, or analysis will supply additional facts and add meaning to known facts, as well as establish new factual conclusions and legal contentions, all of which may lead to additions to, changes in, and variations from the responses set forth herein. Google reserves the right to modify, supplement, withdraw, or otherwise alter its responses to these interrogatories in accordance with the Federal Rules of Civil Procedure, the local rules of the Northern District of California, or any discovery orders governing this case.

## SPECIFIC OBJECTIONS TO INTERROGATORIES

Subject to the foregoing objections, Google objects to Plaintiffs' interrogatories as follows:

Case No. 5:20-cv-5146-LHK-SVK

DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIFTH SET OF INTERROGATORIES (NOS. 21-42)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  **INTERROGATORY NO. 21:**

2      Identify all sources of information from which Google has sufficient data to identify Users

3  who are not Signed-In, whether such identification is possible because the data source (a) consists

4  entirely of Users who were not Signed-In; (b) includes a specific field identifying whether the User

5  was signed-in; or (c) contains Users who were Signed-In and not Signed-In, but also contains fields

6  from which Users who were potentially Signed-In can be identified and excluded.

7  **RESPONSE TO INTERROGATORY NO. 21:**

8      Google incorporates its General Objections as if set forth fully herein. Google specifically

9  objects to this Interrogatory as vague and ambiguous, as it states a general proposition with respect

10  to a nuanced topic that turns on circumstances that are not specified in the Interrogatory. For

11  example, Google objects to Plaintiffs' use of the phrase "Users who are not Signed-In" which is

12  undefined, vague and ambiguous, and requires a technical and precise definition.  Google objects to

13  Plaintiffs' use of the undefined phrase "potentially Signed-In" as vague, ambiguous, requiring a

14  technical and precise definition, and inconsistent with Plaintiffs' purported definition of "Signed-

15  In". Google further objects to this Interrogatory as overly broad and unduly burdensome, as it seeks

16  information related to "all sources of information," which is undefined, vague, ambiguous, and

17  potentially encompassing information irrelevant to this case.

18      Subject to the foregoing general and specific objections, and based on its investigation to

19  date, Google responds as follows:

20      Google is not aware of any sources of information from which Google has sufficient data to

21  establish a (i) person's full name, (ii) present or last known address, (iii) phone number, (iv) email

22  address, and the (v) present or last known place of employment, of Users who are not signed-in.

23  **INTERROGATORY NO. 22:**

24      For each such source identified in Interrogatory No. 21 above, identify the retention periods

25  and the specific data fields that can be used to isolate Users who were not Signed-In. As an example,

26  Google has maintained that Biscotti-keyed data consists primarily of data taken from Users who are

27  not Signed-In. However, Biscotti-keyed data also includes Users who were Signed-In but not

28

6

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

consented for NAC. Our understanding is that Google's systems are designed to send Signed-In traffic to Biscotti logs only when the User is non-NAC. As a result, the potential Signed-In Users can be excluded by all non-NAC data entries, leaving a remainder of Users who were all not Signed-In at the time their information was taken.

**RESPONSE TO INTERROGATORY NO. 22:**

Google incorporates its General Objections and its Specific Objections to Interrogatory No. 21 as if set forth fully herein. Additionally, Google objects to Plaintiffs' use of the undefined terms "retention periods" and "specific data fields" as vague, ambiguous, and requiring a technical and precise definition. Google also objects to Plaintiffs' use of the undefined phrase "used to isolate Users who were not Signed-In" as vague, ambiguous, and requiring a technical and precise definition, and it is unclear what "data fields" are sufficient to "isolate Users." Google objects to the Interrogatory's use of narrative to attribute views to Google without any citation to the record, such as the Interrogatory's statement that "Google has maintained that Biscotti-keyed data consists primarily of data taken from Users who are not Signed-In." Google objects and does not adopt the Interrogatory's use of other narrative to reflect "Our [*i.e.* Plaintiffs'] understanding," including the following statements:

- "Biscotti-keyed data also includes Users who were Signed-In but not consented for NAC."

- "Our understanding is that Google's systems are designed to send Signed-In traffic to Biscotti logs only when the User is non-NAC."

- "As a result, the potential Signed-In Users can be excluded by all non-NAC data entries, leaving a remainder of Users who were all not Signed-In at the time their information was taken."

Subject to the foregoing general and specific objections, and based on its investigation to date, Google incorporates by reference its response to Interrogatory No. 21.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1

**INTERROGATORY NO. 23:**

2

3   State the percentage of Google Accountholders who are "always Synced" when using the

Chrome browser. As used in this Interrogatory, "always Synced" means that the Google

4   Accountholder Synced during their First Run Experience on all Instances of Chrome browsers

5   associated with them and has not or did not ever subsequently turn Sync off for the browsers

6   associated with their respective Google Accounts.

7

**RESPONSE TO INTERROGATORY NO. 23:**

8

9   Google incorporates its General Objections as if set forth fully herein. Google specifically

10  objects to this Interrogatory as vague and ambiguous, as it states a general proposition with respect

11  to a nuanced topic that turns on circumstances that are not specified in the Interrogatory. Google

12  objects to the Interrogatory's attempt to define "always Synced" in the text of the Interrogatory, as

13  it circularly relies on the term it attempts to define, "Synced." Further, the term "Synced" is

14  undefined, vague, and ambiguous, and not logically included in Plaintiffs' definition of "Sync,"

15  which Plaintiffs generically state "refers to the Sync feature available on Chrome Browsers" and

16  does not describe an action or User state relevant to how Plaintiffs use the term "Synced" in this

17  Interrogatory. It is unclear whether "synced" in the context of this lawsuit only refers to users who

18  (i) enabled the sync function for their Chrome browsing History or (ii) also includes users who

19  enabled the sync function for their Passwords but did not enable the sync function for their Chrome

20  browsing History. Google further objects to the Interrogatory's use of the undefined phrase "Chrome

21  browsers associated" with Google Accountholders, which is vague, ambiguous, and requires a

22  technical or precise definition to alert Google of the connection Plaintiffs deem necessary for a

23  browser to be "associated" with a Google Accountholder. Google also objects to Plaintiffs'

24  definition of "Google Accountholder(s)" as vague and ambiguous and renders the Interrogatory

25  impossible to answer because Plaintiffs seek percentages related to individuals, rather than Google

26  accounts.

27  Subject to the foregoing general and specific objections, and based on its investigation to

28  date, Google responds as follows:

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1    Google does not maintain information showing the percentage of Google Accountholders

2    who are "always synced" when using the Chrome browser.  Because data showing whether a

3    Chrome browser had sync enabled during its First Run Experience ("FRE") is stored in Chrome

4    User Metrics Analysis ("UMA"), UMA data is not joined with Google Accounts, and information

5    about selections made during FRE are not included in sync traffic, a user can have sync enabled on

6    one device and not have sync enabled on a different device, a user can have sync enabled for a

7    Chrome profile on one device and not have sync enabled for a Chrome profile on the same device,

8    Google can not state the percentage of Google Accountholders who are "always synced" when using

9    the Chrome browser.

10    Subject to and without waiving the foregoing objections, Google further responds that it is

11    willing to meet and confer with Plaintiffs on the information sought through this Interrogatory.

12    **INTERROGATORY NO. 24:**

13    For each month during the class period and for each type of device and manufacturer of

14    device, state the percentage of Chrome traffic and users in the United States who were (1) synced;

15    (2) signed in but not consented for sync; (3) basic browser mode; (4) guest mode; and (5) incognito;

16    (6) WAA-off; (7) sWAA off; and (8) NAC-off.

17    **RESPONSE TO INTERROGATORY NO. 24:**

18    Google incorporates its General Objections as if set forth fully herein.  Google objects that

19    the Interrogatory is overly broad and unduly burdensome because it requests Google calculate

20    percentages for traffic and users, types of devices, and manufacturers, for eight separate categories

21    of information for every month during the years-long purported class period.  Further, Google

22    objects that, despite Plaintiffs seeking statistics related to these categories, Plaintiffs have not

23    defined any of the categories they seek information about, including "synced", "signed in but not

24    consented for sync", "basic browser mode", "guest mode", "incognito", "WAA-off", "sWAA off",

25    and "NAC-off."  Google objects that Plaintiffs' use of these categories is vague, ambiguous, and

26    each requires a technical or precise definition, particularly given Plaintiffs are seeking technical

27    "percentage[s] of Chrome traffic and users in the United States" related to each category.  Google

28

9                           Case No. 5:20-cv-5146-LHK-SVK

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

further objects to the Interrogatory's use of the term "Chrome traffic" as undefined, vague, ambiguous, and requiring a technical or precise definition because in its current form it is unclear what Chrome use constitutes "Chrome traffic."  Google objects to the Interrogatory's use of the phrase "each type of device and manufacturer of device" as undefined, vague, ambiguous, and it is unclear what the categories "type of device" or "manufacturer of device" include.

Google further objects to this interrogatory as improperly compound because it purports to seek at least eight separate categories of technical statistics that constitute at least eight discrete subparts. Google further objects to this interrogatory because, in light of Plaintiffs' Fifth Set of Interrogatories purporting to serve Plaintiffs' forty-second numbered interrogatory and Plaintiffs' inclusion of improperly compound interrogatories, such as the seventeen subparts in Interrogatory No. 30, Plaintiffs have exceeded the 53 interrogatory limit imposed by the Court. Dkt. No. 349 ("Absent a showing of good cause, each party shall be limited to 53 interrogatories. Discrete subparts shall each be counted as a separate interrogatory.").

Subject to and without waiving the foregoing objections, Google responds that it is willing to meet and confer with Plaintiffs regarding the scope and discrete subparts contained in this Interrogatory.

**INTERROGATORY NO. 25:**

For all prior versions and throughout the Class Period, identify all changes or distinctions in source code between versions of the Chrome browser, Google Display Ads, Google Ads, Google Analytics, Google reCAPTCHA, Google Maps, Google Storage, Google APIs, and any other Google source code that commands the Chrome browser to send IP address, User-Agent information, X-client data headers, cookie information, or URLs to Google servers as alleged in the First Amended Complaint and described in the Report of Richard M. Smith that Google contends would alter the result that Chrome sends such information to Google servers as alleged in the Complaint and described in the Report of Richard M. Smith.

**RESPONSE TO INTERROGATORY NO. 25**

Case No. 5:20-cv-5146-LHK-SVK

DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIFTH SET OF INTERROGATORIES (NOS. 21-42)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1    Google incorporates its General Objections as if set forth fully herein. Specifically, Google

2    objects that this Interrogatory is overly broad and unduly burdensome.  For example, it requests

3    Google identify "all changes or distinctions" in source code for "all prior versions" from the years-

4    long purported class period for eight named Google products and "any other Google source code"

5    that "commands" the Chrome browser to send particular information to Google servers. Many of

6    these products have nothing to do with Plaintiffs' allegations and request information that is

7    irrelevant and well beyond the scope of this lawsuit, such as "Google Maps," "Google

8    reCAPTCHA," "Google Storage," and "Google APIs."  Google further objects to the Interrogatory's

9    use of the undefined terms "changes" and "distinctions" relating to source code as they are vague,

10   ambiguous, and require technical and precise definition.

11   Google further objects that the Interrogatory improperly and prematurely requests

12   information that is the subject of ongoing expert discovery, including by requesting responses to

13   allegations in the report of Plaintiffs' expert witness. Under the operative scheduling order, expert

14   discovery does not conclude until June 30, 2022, and opening reports are not due until March 17,

15   2022. *See* Dkt.464; *see also* Fed. R. Civ. P. 33(a)(2) (explaining that a court may order that an

16   "interrogatory need not be answered until designated discovery is complete").  Google further

17   objects because the production of non-public, proprietary source code has already been deemed

18   unwarranted in this case.  Dkt. 377 ("[T]he Court finds that the Special Master's factual conclusions

19   regarding the overbreadth of the Plaintiffs' requests for access to nonpublic source code . . . [is] well

20   taken and adopts those findings . . . Plaintiffs have not demonstrated the requisite factual basis of

21   necessity . . .").  Google further objects that the Interrogatory improperly seeks to shift the burden

22   of proof regarding operation of the Chrome browser during the purported class period to Google

23   when the burden rests squarely with Plaintiffs. Google further objects to this Interrogatory to the

24   extent it seeks information protected from disclosure by the attorney-client privilege, the attorney

25   work product doctrine, or any other applicable privilege or protection.

26   Google further objects to this interrogatory as improperly compound because it purports to

27   seek separate and discrete sets of information regarding at least eight different Google products and

28   services.  Google further objects to this interrogatory because, in light of Plaintiffs' Fifth Set of

Case No. 5:20-cv-5146-LHK-SVK
DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIFTH SET OF
INTERROGATORIES (NOS. 21-42)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Interrogatories purporting to serve Plaintiffs' forty-second numbered Interrogatory and Plaintiffs' inclusion of improperly compound Interrogatories, such as the seventeen subparts in Interrogatory No. 30, Plaintiffs have exceeded the 53 Interrogatory limit imposed by the Court. Dkt. No. 349 ("Absent a showing of good cause, each party shall be limited to 53 interrogatories. Discrete subparts shall each be counted as a separate interrogatory."). For these reasons, Google will not provide a response to this Interrogatory.

**INTERROGATORY NO. 26:**

Identify all Google Domains and Subdomains to which Chrome sends any Personal Information about Users who are not Synced and not currently present on a Google Property, and for each Google Domain or Subdomain, identify the Google Property with which the Domain or Subdomain is associated, the specific Data or Information that Chrome sends to the Domain or Subdomain, any and all Data or Information that the Google Property associates with the Domain or Subdomain, how the Data or Information sent and the Data or Information derived from it is used and monetized by Google, where such Data or Information and associated Data or Information is stored and for how long, and where such Data or Information is further processed at Google as a result of Chrome sending it to the Domain or Subdomain in question.

**RESPONSE TO INTERROGATORY NO. 26:**

Google incorporates its General Objections as if set forth fully herein. Google objects to the phrase "Google Domains … to which Chrome sends any Personal Information about Users" as vague and ambiguous. Google objects to the Interrogatory's request for "all Google Domains and Subdomains," "any and all Data or Information that the Google Property associates with the Domain or Subdomain," "how" the data is "sent" or "derived," and "where" the data is "stored" and "processed" as overly broad, unduly burdensome, and encompassing information irrelevant to this lawsuit. Google objects to Plaintiffs' use of the phrase "Users who are not Synced," which is undefined, vague and ambiguous, and requires a technical and precise definition. For example, Plaintiffs have not explained whether they include signed-in users within their phrase "Users who are not synced," which affects the types of information sent to Google. It is also unclear whether

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1   Plaintiffs' undefined phrase includes users who are not syncing Chrome browsing History, but are

2   syncing Apps, Bookmarks, Extensions, Settings, Theme, Reading list, Open tabs, Passwords,

3   Addresses and more, or Payment methods and addresses regarding Google Pay.  It is also unclear

4   whether Plaintiffs' undefined phrase includes users who have never synced, or only users who are

5   "not synced" at a specific and unidentified time or with respect to particular devices. The term

6   "Synced," although capitalized, is undefined and not logically included in Plaintiffs' definition of

7   "Sync," which Plaintiffs generically state "refers to the Sync feature available on Chrome Browsers"

8   and does not describe an action or user state relevant to how Plaintiffs use the term "Synced" in this

9   Interrogatory.  Google further objects to Plaintiffs' use of the undefined phrase "not currently

10  present on a Google Property," which is vague, ambiguous, and requires a technical or precise

11  definition that Plaintiffs have not attempted to provide or explain.

12        Google further objects to this interrogatory because Google third-party web services that

13  receive the data at issue in this case are browser-agnostic, and unaffected by whether a Chrome user

14  has Sync enabled.[1] Accordingly, the interrogatory is based on a false premise–*i.e.*, that Chrome

15  sends information to Google web services that other browsers do not.

16        Google further objects that this interrogatory appears to be asking about every Google

17  service that receives any data, which is an improper attempt to expand the scope of the case. *See*

18  Dkt. 329 ("Simply put, each and every transmission, whether or not authorized, neither can nor

19  should be the subject of discovery in this case.").

20        Google further objects to this interrogatory as improperly compound because it purports to

21  seek separate and discrete sets of data and information regarding different Domains, Subdomains,

22  and Google Properties. Google further objects to this interrogatory because, in light of Plaintiffs'

23

24  ───────────────────

25  [1] As Google explained in its Motion for Summary Judgment, Dkt. 395 (at 4 n.8), Google's third-party web services generally receive the disputed data regardless of browser brand or whether a Chrome browser user has enabled Sync. There are a number of user-enabled features and settings in Chrome and other browsers that can block certain categories of the disputed data from being transmitted to and/or used by Google's Services (and other similar third-party web-services), such as cookie-blockers, browser plug-ins, opt-out features, and virtual private networks. Websites using Google's Services can also enable or disable settings that affect whether Google receives certain categories of data.

26

27

28

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Fifth Set of Interrogatories purporting to serve Plaintiffs' forty-second numbered Interrogatory and Plaintiffs' inclusion of improperly compound interrogatories, such as the seventeen subparts in Interrogatory No. 30, Plaintiffs have exceeded the 53 interrogatory limit imposed by the Court. Dkt. No. 349 ("Absent a showing of good cause, each party shall be limited to 53 interrogatories. Discrete subparts shall each be counted as a separate interrogatory.").

Subject to and without waiving the foregoing objections: Google is willing to meet and confer with Plaintiffs regarding the information sought in this interrogatory.

**INTERROGATORY NO. 27:**

Explain how Google uses Profile Information, including categories labeled "for Google internal use only."

**RESPONSE TO INTERROGATORY NO. 27:**

Google incorporates its General Objections as if set forth fully herein.  Specifically, Google objects that the Interrogatory is overly broad and unduly burdensome in that it requests "how Google uses Profile Information," without any purported limit to the products, services, or issues relevant to this lawsuit. Google further objects that the phrase "how Google uses Profile Information" is vague and ambiguous because, for example, it does not provide any instruction regarding the type of use Plaintiffs seek to have Google explain, and providing information on all uses would be overly broad and unduly burdensome. Google further objects to Plaintiffs' definition of "Profile Information" as vague, ambiguous, overly broad, and unduly burdensome in that it purports to include "the Data and Information that Google collects about users" without limitation.  Google further objects to Plaintiffs' quotation of the language "for Google internal use only" as a category of information included in the Interrogatory without providing citation or direction to Google regarding the source of the quoted information.  Google further objects to this Interrogatory to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or protection.

Subject to and without waiving the foregoing objections, Google directs Plaintiffs to the January 7, 2022 deposition testimony of Deepak Ravichandran in this action. Google also

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

incorporates its publicly available Help Center pages on this topic, including the page titled "About audience targeting," which can be accessed at https://support.google.com/google-ads/answer/2497941.

**INTERROGATORY NO. 28:**

Identify where Chrome sends the "bit" that "indicate[s] to Google that sync is not enabled on that Chrome browser at that time," all locations where the "bit" is stored or transmitted by Google, what other information is contained in the same storage locations associated with the "bit," including information that would identify a Google Account, and how long the "bit" is stored in each location. *See*, *e.g.* Google's Resp. to RFA No. 14.

**RESPONSE TO INTERROGATORY NO. 28:**

Google incorporates its General Objections as if set forth fully herein. Specifically, Google objects to the extent Plaintiffs mischaracterize Google's responses and objections to Plaintiffs' Request for Admission No. 14, for example by not reciting the limitation on Google's response that the "bit" referenced is sent "if a Chrome user is signed in to a Chrome browser." Google further objects that the Interrogatory's request is overly broad and unduly burdensome in that it requests "all locations" where the "bit" is sent, stored, or transmitted, "other information" contained "in the same storage locations associated with the 'bit,'" and "how long" the "'bit' is stored in each location." Google further objects that the Interrogatory is vague and ambiguous because it does not define or indicate what is sufficient to constitute "other information … associated with the 'bit,'" or the information sufficient to "identify a Google Account." Google also objects that the Interrogatory is vague and ambiguous because it does not define or indicate what is meant by information "contained in the same storage locations," which requires a precise and technical definition.

Subject to and without waiving the foregoing objections, Google responds as follows: The bit referred to in Google's response to Plaintiffs' Request for Admission No. 14 is sent to ██████ ████████████. For a list of ████ additional fields of data contained in ████████ ████████, Google refers Plaintiffs to tab 3.3.2 ██████████████████ of its November 18, 2021 spreadsheet submitted pursuant to the Special Master process. The retention period for ████

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1     ███████████████████. The bit referred to in Google's response to Plaintiffs' Request for

2     Admission No. 14 is transmitted from ████████████████ to ███████: Chrome Sync, where

3     it is stored. For a list of additional fields of data in ████████: Chrome Sync, Google refers Plaintiffs

4     to GOOG-CALH-00651647. The bit is retained in ███████ for ██████ with oldest data from

5     June 2020.

6     **INTERROGATORY NO. 29:**

7

8          Identify all persons and documents providing information in response to Plaintiffs' Requests

    for Production of Documents, Requests for Admission, and Interrogatories to Defendant.

9

10     **RESPONSE TO INTERROGATORY NO. 29:**

11          Google incorporates its General Objections as if set forth fully herein. Google specifically

12     objects to this Interrogatory as vague because Plaintiffs do not identify which of Plaintiffs' Requests

13     for Production of Documents, Requests for Admission, and Interrogatories to Defendant this

14     Interrogatory refers to. To the extent the Interrogatory refers to all Requests for Production of

15     Documents, Requests for Admission, and Interrogatories, it is overbroad, unduly burdensome, and

16     compound as Plaintiffs have propounded and Google has responded to a collective total of more

17     than 200 Requests. Google further objects to Plaintiffs' definition of "identify" as overly broad and

18     unduly burdensome, given Plaintiffs have expansively defined it as follows: "[w]hen referring to a

19     person, 'to identify' means to give, to the extent known, the (i) person's full name, (ii) present or

20     last known address, (iii) phone number, (iv) email address, and the (v) present or last known place

21     of employment." Where appropriate in its various responses, Google has cited particular documents

22     where it may have obtained information and has disclosed persons that provided information in

23     response to certain interrogatories, in the form of interrogatory verifications. For these reasons,

24     Google will not provide a response to this Interrogatory.

25     **INTERROGATORY NO. 30:**

26

27          Identify all documents supporting each of your affirmative defenses.

28     **RESPONSE TO INTERROGATORY NO. 30:**

Case No. 5:20-cv-5146-LHK-SVK

DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIFTH SET OF
INTERROGATORIES (NOS. 21-42)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1    Google incorporates its General Objections as if set forth fully herein.  Specifically, Google

2  objects to Plaintiffs' definition of "identify" as overly broad and unduly burdensome, given

3  Plaintiffs have expansively defined it as follows: "When referring to documents, 'to identify' means

4  to give, to the extent known, the (i) type of document; (ii) general subject matter; (iii) date of the

5  document creation and, if applicable, transmittal (including dates of any drafts or copies, if

6  applicable); (iv) source or location of where and how the document is stored; (v) custodian(s) of the

7  document; and (vi) the author(s), addressee(s), and recipient(s) of the document."  Google further

8  objects to this Interrogatory to the extent it seeks information protected by the attorney-client

9  privilege, the work product doctrine, or the common interest doctrine, or that is otherwise privileged

10  or protected from discovery.  *See, e.g.*, *Wahl v. Am. Sec. Ins. Co.*, 2009 WL 3463211, at *2 (N.D.

11  Cal. Oct. 23, 2009)  ("the exact documents and witnesses [defendant] intends to use for each

12  affirmative defense reveals defense counsel's mental impressions, is work product and so is

13  privileged") (quoting *Johnson v. Ocean Ships, Inc.*, 2006 WL 2166192, at *3 (W.D. Wash. July 31,

14  2006)).

15    Google further objects to this Interrogatory as improperly compound because it purports to

16  seek the factual bases for at least seventeen affirmative defenses. *See* Dkt. 195 (Google's Answer to

17  Plaintiffs' First Amended Complaint) at 42-47; *Bovarie v. Schwarzenegger*, 2011 WL 719206, at

18  *2 (S.D. Cal. Feb. 22, 2011) ("An interrogatory that seeks a response as to multiple affirmative

19  defenses is counted as a separate interrogatory for each affirmative defense.").  Google further

20  objects to this Interrogatory because, in light of Plaintiffs' Fifth Set of Interrogatories purporting to

21  serve Plaintiffs' forty-second numbered Interrogatory and Plaintiffs' inclusion of improperly

22  compound interrogatories, such as the eight subparts in Interrogatory No. 24, Plaintiffs have

23  exceeded the 53 Interrogatory limit imposed by the Court. Dkt. No. 349 ("Absent a showing of good

24  cause, each party shall be limited to 53 interrogatories. Discrete subparts shall each be counted as a

25  separate interrogatory.").  Google further objects to the Interrogatory to the extent it improperly asks

26  Google to "identify all documents supporting" each of its affirmative defenses because such request

27  is an overly broad and unduly burdensome contention Interrogatory.  *See, e.g.*, *Haggarty v. Wells*

28  *Fargo Bank*, N.A., 2012 WL 4113341, at *2 (N.D. Cal. Sept. 18, 2012) ("While contention

17

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  interrogatories are permitted, they are often overly broad and unduly burdensome when they require

2  a party to state 'every fact' or 'all facts' supporting identified allegations or defenses."); *Bovarie*,

3  2011 WL 719206, at *1 ("seeking every fact that underlies every affirmative defense is unduly

4  burdensome.").

5      Subject to and without waiving the foregoing objections, Google responds that it is willing

6  to meet and confer with Plaintiffs regarding the scope and discrete subparts contained in this

7  Interrogatory.

8  **INTERROGATORY NO. 31:**

9

10     Identify all logs and domains which contain data sufficient to identify Users who are not

   synced.

11

12  **RESPONSE TO INTERROGATORY NO. 31:**

13     Google incorporates its General Objections as if set forth fully herein.  Google specifically

14  objects to this Interrogatory as vague and ambiguous, as it states a general proposition with respect

15  to a nuanced topic that turns on circumstances that are not specified in the Interrogatory.  For

16  example, Google objects to Plaintiffs' use of the phrase "Users who are not synced," which is

17  undefined, vague and ambiguous, and requires a technical and precise definition.  Plaintiffs have

18  not explained whether they include signed-in users within their phrase "Users who are not synced,"

19  which affects the types of information sent to Google, and it is also unclear whether Plaintiffs seek

20  logs and domains with information to identity users who have never synced, or only users who are

21  "not synced" at a specific and unidentified time or with respect to particular devices. The term

22  "synced" is undefined and not logically included in Plaintiffs' definition of "Sync," which Plaintiffs

23  generically state "refers to the Sync feature available on Chrome Browsers" and does not describe

24  an action or user state relevant to how Plaintiffs use the term "synced" in this Interrogatory.  Google

25  further objects to this Interrogatory as overly broad and unduly burdensome, as it seeks information

26  related to "all logs and domains," which this Court has previously rejected and is not proportional

27  to the needs of this case.  Google further objects to this Interrogatory as overly broad and unduly

28

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  burdensome, as it is not time limited.  Google further objects that this Interrogatory improperly seeks

2  discovery that the Court has placed in the purview of the Special Master.

3       Subject to and without waiving the foregoing objections, Google responds that it is unaware

4  of any logs with data sufficient to identify Users—who are not synced—by the (i) person's full

5  name, (ii) present or last known address, (iii) phone number, (iv) email address, and the (v) present

6  or last known place of employment.

7  **INTERROGATORY NO. 32:**

8
9       Identify all efforts Google has taken to identify Users whose data was taken while they were

10  in an un-synced state.

11  **RESPONSE TO INTERROGATORY NO. 32:**

12       Google incorporates its General Objections as if set forth fully herein. Google specifically

13  objects to this Interrogatory as vague and ambiguous, as it states a general proposition with respect

14  to a nuanced topic that turns on circumstances that are not specified in the Interrogatory.  For

15  example, Google objects to Plaintiffs' use of the phrase "un-synced state" which is undefined, vague

16  and ambiguous, and requires a technical and precise definition.  Plaintiffs have not explained

17  whether they include signed-in users within their phrase "un-synced state", which affects the types

18  of information sent to Google, and it is also unclear whether Plaintiffs seek "all efforts" to identity

19  users who have never synced, or only users who are "un-synced" at a specific and unidentified time

20  or with respect to particular devices.  The term "un-synced," is undefined and not logically included

21  in Plaintiffs' definition of "Sync," which Plaintiffs generically state "refers to the Sync feature

22  available on Chrome Browsers" and does not describe an action or user state relevant to how

23  Plaintiffs use the term "un-synced" in this Interrogatory.  Google further objects to Plaintiffs' use

24  of the undefined term "data" as vague and ambiguous and an insufficient identifier of the users

25  Plaintiffs reference.  Google further objects to this Interrogatory as overly broad and unduly

26  burdensome, as it seeks irrelevant information related to third parties, such as spyware, that have no

27  relationship to Google or to any allegations in this case. Google further objects to this Interrogatory

28  as overly broad and unduly burdensome, as it seeks information related to "all efforts," which is

19

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

vague and ambiguous and not proportional to the needs of this case.  Google also objects to the Interrogatory's use of the undefined term "taken" as vague and ambiguous and disputes that any data was "taken" from users without consent. Google further objects to this Interrogatory to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or protection.

Subject to and without waiving the foregoing objections, and to the extent it understands the interrogatory, Google responds that it has not undertaken such efforts.

**INTERROGATORY NO. 33:**

Identify all Signals recorded by Google that reflect whether Users are not synced, and for each such Signal, how long it is kept, where it is stored, how it may be accesses, and how it may be joined with other data about Users in the United States in Google's custody or control.

**RESPONSE TO INTERROGATORY NO. 33:**

Google incorporates its General Objections as if set forth fully herein. Google specifically objects to this Interrogatory as vague and ambiguous, as it states a general proposition with respect to a nuanced topic that turns on circumstances that are not specified in the Interrogatory. Google further objects to this Interrogatory as vague and ambiguous as to "Signals" because it is unclear what type of information is sufficient to be a Signal, and Plaintiffs' definition includes improperly broad categories such as "number[s]," "data," "entr[ies]," and all "other indicator[s]."  Google further objects to this Interrogatory as vague and ambiguous as to "reflect whether Users are not synced," as it is unclear what type of information is sufficient to show Users are not synced.  For example, Plaintiffs have not explained whether they include signed-in users within their phrase "Users who are not synced," which affects the types of information sent to Google, and it is also unclear whether Plaintiffs seek signals with information to identity users who have never synced, or only users who are "not synced" at a specific and unidentified time or with respect to particular devices.  The term "synced," is undefined and not logically included in Plaintiffs' definition of "Sync," which Plaintiffs generically state "refers to the Sync feature available on Chrome Browsers" and does not describe an action or user state relevant to how Plaintiffs use the term "Synced" in this

DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIFTH SET OF INTERROGATORIES (NOS. 21-42)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  Interrogatory.  Google further objects to Plaintiffs' use of the undefined phrase "joined with other

2  data" as vague and ambiguous, as neither "joined" nor "data" are defined by Plaintiffs or subject to

3  a readily identifiable definition.  Google further objects to this Interrogatory as overly broad and

4  unduly burdensome, as it seeks information related to "all Signals," which encompasses irrelevant

5  information and is therefore not proportional to the needs of this case.

6       Google further objects that this Interrogatory is improperly compound, consisting of multiple

7  Interrogatories, and seeks information that is overly broad and unduly burdensome, in light of its

8  request for Google to explain "for each such Signal, how long it is kept, where it is stored, how it

9  may be accesse[d], and how it may be joined with other data about Users in the United States in

10  Google's custody or control."

11      Subject to and without waiving the foregoing objections, Google responds as follows:

12      If a Chrome user is signed in to a Chrome browser, and signed in to a Google website, and

13  did not have sync enabled on the Chrome browser, then Chrome may send a bit that is stored in the

14  ███████████████████████████████████████████ field  in  ████████████

15  ████████████  Google also incorporates its response to Interrogatory No. 28.

16  **INTERROGATORY NO. 34:**

17      Identify all Signals sent from Chrome to Google reflecting when a User is not synced.

18

19  **RESPONSE TO INTERROGATORY NO. 34:**

20      Google incorporates its General Objections as if set forth fully herein.  Google specifically

21  objects to this Interrogatory as vague and ambiguous, as it states a general proposition with respect

22  to a nuanced topic that turns on circumstances that are not specified in the Interrogatory.  Google

23  further objects to this Interrogatory as vague and ambiguous as to "reflecting when a Users is not

24  synced," as it is unclear what type of information is sufficient to show users are not synced.  For

25  example, Plaintiffs have not explained whether they include signed-in users within their phrase

26  "when a User is not synced," which affects the types of information sent to Google, and it is also

27  unclear whether Plaintiffs seek signals with information to identity users who have never synced, or

28  only users who are "not synced" at a specific and unidentified time or with respect to particular

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  devices. The term "synced," is undefined and not logically included in Plaintiffs' definition of

2  "Sync," which Plaintiffs generically state "refers to the Sync feature available on Chrome Browsers"

3  and does not describe an action or user state relevant to how Plaintiffs use the term "synced" in this

4  Interrogatory.  Google further objects to this Interrogatory as overly broad and unduly burdensome,

5  as it seeks information related to "all Signals," which encompasses irrelevant information and is

6  therefore not proportional to the needs of this case.

7        Subject to and without waiving the foregoing objections, Google responds as follows: The

8  signal sent from the Chrome client to the Chrome sync server identifying when a user is signed in

9  to a Chrome browser, and signed in to a Google website, and did not have the sync feature enabled

10  on the Chrome browser is called "is_sync_feature_enabled."

11  **INTERROGATORY NO. 35:**

12

13        State all reasons that Google promises Users that Chrome will not send Personal Information

14  to Google when Users are not synced.

15  **RESPONSE TO INTERROGATORY NO. 35:**

16        Google incorporates its General Objections as if set forth fully herein.  Google specifically

17  objects to this Interrogatory as vague and ambiguous, as it states a general proposition with respect

18  to a nuanced topic that turns on circumstances that are not specified in the Interrogatory.  Google

19  further objects to this Interrogatory as overly broad and unduly burdensome as to "Personal

20  Information" because it goes well beyond the definition of personal information in the terms of

21  Google's Privacy Policy to which Plaintiffs expressly consented (*see, e.g.*, GOOG-CALH-

22  00592132 – GOOG-CALH-00592280). Google further objects to this Interrogatory as overly broad

23  and unduly burdensome, as it seeks information related to "all reasons," which encompasses

24  irrelevant information and is therefore not proportional to the needs of this case. Google further

25  objects to this Interrogatory to the extent it seeks information protected from disclosure by the

26  attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or

27  protection. Google further objects to this Interrogatory to the extent it seeks a legal conclusion.

28

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Google further objects to the Interrogatory to the extent it improperly asks Google to "[s]tate all reasons" Google made particular disclosures prior to the close of fact and expert discovery, and to the extent that such request is an overly broad and unduly burdensome contention Interrogatory. *See, e.g.*, *Haggarty v. Wells Fargo Bank*, N.A., 2012 WL 4113341, at *2 (N.D. Cal. Sept. 18, 2012) ("While contention interrogatories are permitted, they are often overly broad and unduly burdensome when they require a party to state 'every fact' or 'all facts' supporting identified allegations or defenses."). Google further objects to this Interrogatory as vague and ambiguous as to the phrase "when Users are not synced," as it is unclear what users Plaintiffs include regarding users who are "not synced."

Subject to and without waiving the foregoing objections, Google responds as follows:

Google did not state that "Chrome will not send Personal Information [as Plaintiffs define that term] to Google when Users are not synced." Rather, the Chrome Privacy Notice upon which Plaintiffs' purport to base their claims states: "The personal information that Chrome stores won't be sent to Google unless you choose to store that data in your Google Account by turning on sync, or, in the case of passwords, payment cards, and billing information, choosing specific credentials or payment card and billing information to store in your Google Account. Learn More." Thus, this Interrogatory is based on a false premise. Further, the meaning of the sentence in the Chrome Privacy Notice, and how reasonable users would interpret it, has been the subject of extensive briefing and fact and expert depositions. Google declines to respond further.

**INTERROGATORY NO. 36:**

State all facts in support of Your contention that Plaintiffs are not harmed by the acts described in the Complaint.

**RESPONSE TO INTERROGATORY NO. 36:**

Google incorporates its General Objections as if set forth fully herein. Specifically, Google objects to this Interrogatory as overly broad and unduly burdensome as to "the acts described in the Complaint," as the Complaint included irrelevant information unrelated to the causes of action therein. Google further objects to this Interrogatory as overly broad and unduly burdensome, as it

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1   seeks information related to "all facts," which encompasses irrelevant information and is therefore

2   not proportional to the needs of this case. Google further objects to this Interrogatory to the extent

3   it seeks information protected from disclosure by the attorney-client privilege, the attorney work

4   product doctrine, or any other applicable privilege or protection. Google further objects to this

5   Interrogatory to the extent it seeks a legal conclusion and to the extent the Interrogatory seeks to

6   improperly imply the burden to prove whether Plaintiffs were harmed by the actions alleged in the

7   complaint rests with Google. Google further objects to the Interrogatory to the extent it improperly

8   asks Google to "[s]tate all facts in support" of a particular contention prior to the close of fact and

9   expert discovery, and to the extent that such request is an overly broad and unduly burdensome

10  contention Interrogatory. *See, e.g.*, *Haggarty v. Wells Fargo Bank*, N.A., 2012 WL 4113341, at *2

11  (N.D. Cal. Sept. 18, 2012) ("While contention interrogatories are permitted, they are often overly

12  broad and unduly burdensome when they require a party to state 'every fact' or 'all facts' supporting

13  identified allegations or defenses.").

14          Google further objects that the interrogatory improperly and prematurely seeks information

15  that requires expert discovery. Whether and how Plaintiffs were harmed by the acts described in

16  the complaint and the facts in support will be the subject of expert reports on both sides. *See, e.g.*,

17  *Svenson v. Google, Inc.*, 2016 WL 8943301 (N.D. Cal. 2016) (considering expert analysis to

18  determine the alleged loss of Plaintiffs' benefit of the bargain and diminution of value related to

19  Plaintiffs' personal information). Indeed, when counsel for Google asked Plaintiff Calhoun about

20  his alleged harm, such as out-of-pocket costs incurred from Google's conduct and his loss of control

21  over property with marketable value, counsel for Plaintiffs objected, in part, on the grounds that the

22  questions called for expert opinion. Calhoun, July 19, 2021 Dep. Tr. 45:5-46:22; *id*. 50:20-51:6;

23  *see also* Wilson, October 25, 2021 Dep. Tr. 180:24-181:5 (Google asking if Plaintiff Wilson's

24  "personal information [has] been used by Google in a way that harms [her]" and Plaintiffs' counsel

25  objecting that the question "[s]eeks expert testimony"); *see also* Henry, August 9, 2021 Dep. Tr.

26  114:16-23 (Google asking if Plaintiff Henry believes that, as a result of Google's alleged conduct,

27  Plaintiff Henry has "lost information that [he] once had," and Plaintiffs' counsel objecting that the

28  question "calls for expert opinion as to the specifics"). Under the operative scheduling order, expert

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

discovery does not conclude until June 30, 2022, and opening reports are not due until March 17, 2022.  *See* Dkt.464; *see also* Fed. R. Civ. P. 33(a)(2) (explaining that a court may order that an "interrogatory need not be answered until designated discovery is complete").  Further, Plaintiffs will receive the factual basis for Google's expert analysis promptly after it is served: Pursuant to the Stipulation and Order Re Expert Discovery, "the documents, data or other information relied upon" by expert witnesses must be provided within three business days of their report being served. Dkt. 307 at 4.

Subject to and without waiving the foregoing objections, and with the expectation that Google's response will be supplemented at the appropriate time by facts and documents ultimately relied upon by its experts, Google responds as follows:

Plaintiffs were not harmed including because they consented to Google's collection of the data at issue.  Further, to date, Plaintiffs' deposition testimony supports Google's contention that they were not harmed by acts described in the complaint.  For example, Plaintiff Kindler explained that she did not know any ways in which Google's conduct has affected her ability to use her personal information in any way, and that she was not aware of having lost any personal information that she once had as a result of Google's conduct.  Kindler, July 5, 2021 Dep. Tr. 64:3-13.  Other Plaintiffs testified similarly.  *See, e.g.*, Calhoun, July 19, 2021 Dep. Tr. 51:18-52:2 (explaining Plaintiff Calhoun has no recollection of ever trying to sell his browsing history, IP address, or information about his computing devices); Crespo, July 21, 2021 Dep. Tr. 138:4-15 (explaining Plaintiff Crespo has never tried and has no plans to ever sell her personal information); Wilson, October 25, 2021 Dep. Tr. 180:24-181:5 (answering "I don't know" to the following question by Google's counsel: "Dr. Wilson, so to your knowledge, has your personal information been used by Google in a way that harms you?"); Henry, August 9, 2021 Dep. Tr. 114:16-23 (answering "I'm not sure" to the question of whether Mr. Henry has "lost information that [he] once had" as a result of Google's alleged conduct).  Further, Plaintiffs have admitted that they did not pay money for the use of Chrome or Gmail.  *See, e.g.*, Plaintiffs' Aug. 2, 2021 Responses and Objections to Request For Admission Nos. 18-21.  Pursuant to Rule 33(d), Google also incorporates herein its Opposition

DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIFTH SET OF INTERROGATORIES (NOS. 21-42)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

to Plaintiffs' Motion for Class Certification and all supporting declarations, expert reports, and exhibits.

**INTERROGATORY NO. 37:**

State all facts in support of Your contention that Plaintiffs did not suffer common harm by the acts described in the Complaint.

**RESPONSE TO INTERROGATORY NO. 37:**

Google incorporates its General Objections as if set forth fully herein.  Specifically, Google objects to this Interrogatory as overly broad and unduly burdensome as to "the acts described in the Complaint," as it included irrelevant information unrelated to the causes of action in the Complaint. Google further objects to this Interrogatory as overly broad and unduly burdensome, as it seeks information related to "all facts," which encompasses irrelevant information and is therefore not proportional to the needs of this case.  Google objects to the Interrogatory's use of the term "common" as vague and ambiguous, and Plaintiffs fail to define it in their Interrogatory.  Google further objects to this Interrogatory to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or protection.  Google further objects to this Interrogatory to the extent it seeks a legal conclusion and to the extent the Interrogatory seeks to improperly imply the burden to prove whether Plaintiffs were harmed by the actions alleged in the complaint (or whether that harm was "common" among Plaintiffs) rests with Google.  Google further objects to the Interrogatory to the extent it improperly asks Google to "[s]tate all facts in support" of a particular contention prior to the close of fact and expert discovery, and to the extent that such request is an overly broad and unduly burdensome contention Interrogatory. *See, e.g.*, *Haggarty v. Wells Fargo Bank*, N.A., 2012 WL 4113341, at *2 (N.D. Cal. Sept. 18, 2012) ("While contention interrogatories are permitted, they are often overly broad and unduly burdensome when they require a party to state 'every fact' or 'all facts' supporting identified allegations or defenses.").

Google further objects that the interrogatory improperly and prematurely seeks information that requires expert discovery.  Whether and how Plaintiffs were harmed by the acts described in

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  the complaint and the facts in support will be the subject of expert reports on both sides.  *See, e.g.*,

2  *Svenson v. Google, Inc.*, 2016 WL 8943301 (N.D. Cal. 2016) (considering expert analysis to

3  determine the alleged loss of Plaintiffs' benefit of the bargain and diminution of value related to

4  Plaintiffs' personal information).  Indeed, when counsel for Google asked Plaintiff Calhoun about

5  his alleged harm, such as out-of-pocket costs incurred from Google's conduct and his loss of control

6  over property with marketable value, counsel for Plaintiffs objected, in part, on the grounds that the

7  questions called for expert opinion.  Calhoun, July 19, 2021 Dep. Tr. 45:5-46:22; *id*. 50:20-51:6;

8  *see also* Wilson, October 25, 2021 Dep. Tr. 180:24-181:5 (Google asking if Plaintiff Wilson's

9  "personal information [has] been used by Google in a way that harms [her]" and Plaintiffs' counsel

10  objecting that the question "[s]eeks expert testimony"); *see also* Henry, August 9, 2021 Dep. Tr.

11  114:16-23 (Google asking if Plaintiff Henry believes that, as a result of Google's alleged conduct,

12  Plaintiff Henry has "lost information that [he] once had," and Plaintiffs' counsel objecting that the

13  question "calls for expert opinion as to the specifics").  Under the operative scheduling order, expert

14  discovery does not conclude until June 30, 2022, and opening reports are not due until March 17,

15  2022. *See* Dkt.464; *see also* Fed. R. Civ. P. 33(a)(2) (explaining that a court may order that an

16  "interrogatory need not be answered until designated discovery is complete").  Further, Plaintiffs

17  will receive the factual basis for Google's expert analysis promptly after it is served: Pursuant to the

18  Stipulation and Order Re Expert Discovery, "the documents, data or other information relied upon"

19  by expert witnesses must be provided within three business days of their report being served. Dkt.

20  307 at 4.

21       Subject to and without waiving the foregoing objections, pursuant to Rule 33(d), Google

22  incorporates herein its Opposition to Plaintiffs' Motion for Class Certification and all supporting

23  declarations, expert reports, and exhibits.

24  **INTERROGATORY NO. 38:**

25       State all facts in support of Your contention that the Class is not ascertainable.

26

27  **RESPONSE TO INTERROGATORY NO. 38:**

28

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1    Google incorporates its General Objections as if set forth fully herein.  Google further objects

2  to this Interrogatory as overly broad and unduly burdensome, as it seeks information related to "all

3  facts," which encompasses irrelevant information and is therefore not proportional to the needs of

4  this case.  Google further objects to this Interrogatory to the extent it seeks information protected

5  from disclosure by the attorney-client privilege, the attorney work product doctrine, or any other

6  applicable privilege or protection.  Google further objects to this Interrogatory to the extent it seeks

7  expert testimony.   Google further objects to this Interrogatory to the extent it seeks a legal

8  conclusion.  Google further objects to the Interrogatory to the extent it improperly asks Google to

9  "[s]tate all facts in support" of a particular contention prior to the close of fact and expert discovery,

10  to the extent that such request is an overly broad and unduly burdensome contention Interrogatory,

11  and to the extent it seeks an improper preview of Google's opposition to class certification, which

12  is not yet due. *See, e.g.*, *Haggarty v. Wells Fargo Bank*, N.A., 2012 WL 4113341, at *2 (N.D. Cal.

13  Sept. 18, 2012) ("While contention interrogatories are permitted, they are often overly broad and

14  unduly burdensome when they require a party to state 'every fact' or 'all facts' supporting identified

15  allegations or defenses."); *See Campbell v. Facebook*, 2015 WL 3533221, at *5 (N.D. Cal. 2015)

16  (finding an interrogatory seeking "all facts that support…that this ACTION is appropriate for class

17  treatment" to be "no more than a thinly veiled attempt to sneak preview Plaintiffs' class certification

18  motion").

19    Subject to and without waiving the foregoing objections, pursuant to Rule 33(d), Google

20  incorporates herein its Opposition to Plaintiffs' Motion for Class Certification and all supporting

21  declarations, expert reports, and exhibits.

22  **INTERROGATORY NO. 39:**

23    State all facts in support of Your contention that damages are not subject to classwide proof.

24
25  **RESPONSE TO INTERROGATORY NO. 39:**

26    Google incorporates its General Objections as if set forth fully herein.  Google further objects

27  to this Interrogatory as overly broad and unduly burdensome, as it seeks information related to "all

28  facts," which encompasses irrelevant information and is therefore not proportional to the needs of

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1    this case.  Google further objects to this Interrogatory as seeking irrelevant information because it

2    is not limited to Chrome users in the United States.  Google further objects to this Interrogatory to

3    the extent it seeks information protected from disclosure by the attorney-client privilege, the

4    attorney work product doctrine, or any other applicable privilege or protection.  Google further

5    objects to this Interrogatory to the extent it seeks expert testimony.  Google further objects to this

6    Interrogatory to the extent it seeks a legal conclusion and to the extent the Interrogatory seeks to

7    improperly imply the burden to prove whether Plaintiffs were harmed by the actions alleged in the

8    complaint (or whether that harm was "common" among Plaintiffs) rests with Google.   Google

9    further objects to the Interrogatory to the extent it improperly asks Google to "[s]tate all facts in

10   support" of a particular contention prior to the close of fact and expert discovery, and to the extent

11   that such request is an overly broad and unduly burdensome contention Interrogatory.  *See, e.g.*,

12   *Haggarty v. Wells Fargo Bank*, N.A., 2012 WL 4113341, at *2 (N.D. Cal. Sept. 18, 2012) ("While

13   contention interrogatories are permitted, they are often overly broad and unduly burdensome when

14   they require a party to state 'every fact' or 'all facts' supporting identified allegations or defenses.").

15        Google further objects that the interrogatory improperly and prematurely seeks information

16   that requires expert discovery.  Whether and how Plaintiffs were harmed by the acts described in

17   the complaint and the facts in support will be the subject of expert reports on both sides.  *See, e.g.*,

18   *Svenson v. Google, Inc.*, 2016 WL 8943301 (N.D. Cal. 2016) (Considering expert analysis to

19   determine the alleged loss of Plaintiffs' benefit of the bargain and diminution of value related to

20   Plaintiffs' personal information).  Indeed, when counsel for Google asked Plaintiff Calhoun about

21   his harm, such as out-of-pocket costs incurred from Google's conduct and his alleged loss of control

22   over property with marketable value, counsel for Plaintiffs objected, in part, on the grounds that the

23   questions called for expert opinion.  Calhoun, July 19, 2021 Dep. Tr. 45:5-46:22; *id.* 50:20-51:6;

24   *see also* Wilson, October 25, 2021 Dep. Tr. 180:24-181:5 (Google asking if Plaintiff Wilson's

25   "personal information [has] been used by Google in a way that harms [her]" and Plaintiffs' counsel

26   objecting that the question "[s]eeks expert testimony"); *see also* Henry, August 9, 2021 Dep. Tr.

27   114:16-23 (Google asking if Plaintiff Henry believes that, as a result of Google's alleged conduct,

28   Plaintiff Henry has "lost information that [he] once had," and Plaintiffs' counsel objecting that the

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

question "calls for expert opinion as to the specifics"). Under the operative scheduling order, expert discovery does not conclude until June 30, 2022, and opening reports are not due until March 17, 2022. *See* Dkt.464; *see also* Fed. R. Civ. P. 33(a)(2) (explaining that a court may order that an "interrogatory need not be answered until designated discovery is complete"). Further, Plaintiffs will receive the factual basis for Google's expert analysis promptly after it is served: Pursuant to the Stipulation and Order Re Expert Discovery, "the documents, data or other information relied upon" by expert witnesses must be provided within three business days of their report being served. Dkt. 307 at 4.

Subject to and without waiving the foregoing objections, pursuant to Rule 33(d), Google incorporates herein its Opposition to Plaintiffs' Motion for Class Certification and all supporting declarations, expert reports, and exhibits.

**INTERROGATORY NO. 40:**

State all facts in support of Your contention that Google cannot identify Users in the U.S. whose Personal Information was sent by Chrome to Google when Users were not synced during the Class Period.

**RESPONSE TO INTERROGATORY NO. 40:**

Google incorporates its General Objections as if set forth fully herein. Google specifically objects to this Interrogatory as vague and ambiguous, as it states a general proposition with respect to a nuanced topic that turns on circumstances that are not specified in the Interrogatory. Google further objects to this Interrogatory as overly broad and unduly burdensome, as it seeks information related to "all facts," which encompasses irrelevant information and is therefore not proportional to the needs of this case. Google further objects to this Interrogatory to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or protection. Google further objects to this Interrogatory to the extent it seeks expert testimony or a legal conclusion. Google further objects to the Interrogatory to the extent it improperly asks Google to "[s]tate all facts in support" of a particular contention prior to the close of fact and expert discovery, and to the extent that such request is an overly broad and

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  unduly burdensome contention Interrogatory.  *See, e.g.*, *Haggarty v. Wells Fargo Bank*, N.A., 2012

2  WL 4113341, at *2 (N.D. Cal. Sept. 18, 2012) ("While contention interrogatories are permitted,

3  they are often overly broad and unduly burdensome when they require a party to state 'every fact'

4  or 'all facts' supporting identified allegations or defenses.").

5    Subject to and without waiving the foregoing objections, pursuant to Rule 33(d), Google

6  incorporates herein its Opposition to Plaintiffs' Motion for Class Certification and all supporting

7  declarations, expert reports, and exhibits.

8  **INTERROGATORY NO. 41:**

9
10  State all facts in support of Your contention that data contained in Display Logs and

11  Analytics Logs that Google did not retain in this action did not contain data that would help identify

12  Class members.

13  **RESPONSE TO INTERROGATORY NO. 41:**

14    Google incorporates its General Objections as if set forth fully herein. Google specifically

15  objects to this Interrogatory as vague and ambiguous, as it states a general proposition with respect

16  to a nuanced topic that turns on circumstances that are not specified in the Interrogatory.  Google

17  further objects to this Interrogatory as vague and ambiguous because it does not explain the data in

18  the Display Logs and Analytics Logs it refers to.  Google further objects to this Interrogatory as

19  overly broad and unduly burdensome, as it seeks information related to "all facts," which

20  encompasses irrelevant information and is therefore not proportional to the needs of this case.

21  Google further objects to this Interrogatory to the extent it seeks information protected from

22  disclosure by the attorney-client privilege, the attorney work product doctrine, or any other

23  applicable privilege or protection.  Google further objects to this Interrogatory to the extent it seeks

24  expert testimony or a legal conclusion. Google further objects to the Interrogatory to the extent it

25  improperly asks Google to "[s]tate all facts in support" of a particular contention prior to the close

26  of fact and expert discovery, and to the extent that such request is an overly broad and unduly

27  burdensome contention Interrogatory.  *See, e.g.*, *Haggarty v. Wells Fargo Bank*, N.A., 2012 WL

28  4113341, at *2 (N.D. Cal. Sept. 18, 2012) ("While contention interrogatories are permitted, they are

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1   often overly broad and unduly burdensome when they require a party to state 'every fact' or 'all

2   facts' supporting identified allegations or defenses.").

3        Subject to and without waiving the foregoing objections, Google responds that it is not aware

4   of ever contending that data contained in Display Logs and Analytics Logs that Google did not

5   retain in this action did not contain data that could help identify Class members by the (i) person's

6   full name, (ii) present or last known address, (iii) phone number, (iv) email address, and the (v)

7   present or last known place of employment (although Google has no reason to believe that such data

8   existed).  Google is willing to meet and confer with Plaintiffs on the relevance of the information

9   sought and to appropriately narrow the scope of this Interrogatory.

10  **INTERROGATORY NO. 42**

11

12       Identify, in detail, all data types and scenarios that make those data types visible to

13  consumers in My Activity and specifically state whether a consumer can view the following in My

14  Activity: (1) information Google receives when they are not signed in to a Google Account; and (2)

15  information received by Google when a Chrome user has not enabled Sync and visits a non-Google

16  website as a result of a communication that was not the result of the use clicking a link on a Google

17  owned-and-operated property or an advertisement on a non-Google owned-and-operated property.

18  **RESPONSE TO INTERROGATORY NO. 42**

19       Google incorporates its General Objections as if set forth fully herein.  Google specifically

20  objects that the Interrogatory is overly broad and unduly burdensome because it requests that Google

21  identify "all data types" in My Activity and all "scenarios" making those "data types visible" without

22  limitation to activity connected to Analytics and Ad Manager, the products at issue in this case.

23  Google further objects that Plaintiffs' use of the undefined phrase "scenarios that make those data

24  types visible to consumers in My Activity" is vague and ambiguous, and it is unclear the information

25  Plaintiffs seek to have Google "identify."  Google objects to Plaintiffs' use of the phrase "user who

26  has not enabled Sync," which is undefined, vague and ambiguous, and requires a technical and

27  precise definition.  For example, Plaintiffs have not explained whether they include signed-in users

28  within their phrase "user who has not enabled Sync," which affects the types of information sent to

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1    Google, and it is also unclear whether Plaintiffs' undefined phrase includes users who have never

2    synced, or only users who are do not have Sync "enabled" at a specific and unidentified time or with

3    respect to particular devices.  Google objects to Plaintiffs' use of the phrase "information Google

4    receives when [users] are not signed in to a Google Account," which is undefined, vague and

5    ambiguous, and requires a technical and precise definition.  Google objects to the Interrogatory as

6    vague and ambiguous because it relies on the following unclear language: "information received by

7    Google when a Chrome user has not enabled Sync and visits a non-Google website as a result of a

8    communication that was not the result of the use clicking a link on a Google owned-and-operated

9    property or an advertisement on a non-Google owned-and-operated property."

10        Subject to and without waiving the foregoing objections, Google responds that it is willing

11    to meet and confer with Plaintiffs on the information sought through this Interrogatory.

12

13    DATED:  January 31, 2022                QUINN EMANUEL URQUHART &
                                             SULLIVAN, LLP
14

15                                           By   /s/ Andrew H. Schapiro
                                                Andrew H. Schapiro (admitted pro hac vice)
16                                              andrewschapiro@quinnemanuel.com
                                                191 N. Wacker Drive, Suite 2700
17                                              Chicago, IL 60606
                                                Telephone: (312) 705-7400
18                                              Facsimile: (312) 705-7401

19
                                                Stephen A. Broome (CA Bar No. 314605)
20                                              sb@quinnemanuel.com
                                                Viola Trebicka (CA Bar No. 269526)
21                                              violatrebicka@quinnemanuel.com
                                                865 S. Figueroa Street, 10th Floor
22                                              Los Angeles, CA 90017
                                                Telephone: (213) 443-3000
23                                              Facsimile: (213) 443-3100

24
                                                Jomaire Crawford (admitted pro hac vice)
25                                              jomairecrawford@quinnemanuel.com
                                                51 Madison Avenue, 22nd Floor
26                                              New York, NY 10010
                                                Telephone: (212) 849-7000
27                                              Facsimile: (212) 849-7100

28

Case No. 5:20-cv-5146-LHK-SVK
DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIFTH SET OF
INTERROGATORIES (NOS. 21-42)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Josef Ansorge (admitted pro hac vice)
josefansorge@quinnemanuel.com
1300 I Street NW, Suite 900
Washington D.C., 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100

Jonathan Tse (CA Bar No. 305468)
jonathantse@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

*Attorneys for Defendant Google LLC*

DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIFTH SET OF
INTERROGATORIES (NOS. 21-42)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## PROOF OF SERVICE

**NEW YORK, NEW YORK**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in New York, NY. My business address is 51 Madison Avenue, 22nd Floor, New York, NY.

On January 31, 2021, I served true copies of the following document(s) described as **DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIFTH SET OF INTERROGATORIES (NOS. 21-42)** on the interested parties in this action as follows:

### SEE ATTACHED LIST

**BY E-MAIL OR ELECTRONIC TRANSMISSION:** I transmitted PDF format copies of the document(s) described above to the e-mail addresses on the attached Service List pursuant to the agreement between the parties to serve discovery, in lieu of other service methods, by email under Fed. R. Civ. P. 5(b)(2)(E) (*see* Joint Case Management Statement § 8.b, Docket No. 44) and on non-parties pursuant to the Court's August 12, 2021 Cross-use and Discovery Coordination Orders issued in *Brown v. Google*, Case No. 5:20-cv-03664-LHK-SVK (Dkt. 243) and *Calhoun v. Google*, Case No.: 5:20-cv-05146-LHK-SVK (Dkt. 263). The documents were transmitted by electronic transmission and such transmission was reported as complete and without error.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 31, 2022 at Hoboken, NJ.


*/s/ D. Seth Fortenbery*
D. Seth Fortenbery

Case No. 5:20-cv-5146-LHK-SVK
DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIFTH SET OF INTERROGATORIES (NOS. 21-42)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**SERVICE LIST**

*Calhoun v. Google LLC*

*Case No. 5:20-cv-05146-LHK*

**BLEICHMAR FONTI & AULD LLP**
Lesley Weaver (Cal. Bar No. 191305)
Angelica M. Ornelas (Cal. Bar No. 285929)
Joshua D. Samra (Cal. Bar No. 313050)
555 12th Street, Suite 1600
Oakland, CA 994607
Tel.: (415) 445-4003
Fax: (415) 445-4020
*lweaver@bfalaw.com*
*aornelas@bfalaw.com*
*jsamra@bfalaw.com*

**DICELLO LEVITT GUTZLER LLC**
David A. Straite (admitted *pro hac vice*)
One Grand Central Place
60 E. 42nd Street, Suite 2400
New York, NY 10165
Tel.: (646) 993-1000
*dstraite@dicellolevitt.com*

Amy E. Keller (admitted *pro hac vice*)
Ten North Dearborn Street
Sixth Floor
Chicago, IL 60602
Tel.: (312) 214-7900
*akeller@dicellolevitt.com*

**SIMMONS HANLY CONROY LLC**
Mitchell M. Breit (admitted *pro hac vice*)
Jason 'Jay' Barnes (admitted *pro hac vice*)
An Truong (admitted *pro hac vice*)
Eric Johnson (*pro hac vice* to be sought)
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
Fax: (212) 213-5949
*mbreit@simmonsfirm.com*
*jaybarnes@simmonsfirm.com*
*atruong@simmonsfirm.com*
*ejohnson@simmonsfirm.com*

*Counsel for Plaintiffs*

Case No. 5:20-cv-5146-LHK-SVK
DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIFTH SET OF
INTERROGATORIES (NOS. 21-42)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**SERVICE LIST**

*Brown v. Google LLC*

*Case No. 5:20-cv-03664-LHK*

BOIES SCHILLER FLEXNER LLP

Mark C. Mao, CA Bar No. 236165
Sean P. Rodriguez, CA Bar No. 262437
Beko Richardson, CA Bar No. 238027
Antonio Lavalle Ingram, II, CA Bar No. 300528
Alexander Justin Konik, CA Bar No. 299291
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery St., 41st Floor
San Francisco, CA 94104
Tel.: (415) 293-6800
Fax: (415) 293-6899
mmao@bsfllp.com
srodriguez@bsfllp.com
brichardson@bsfllp.com
aingram@bsfllp.com
akonik@bsfllp.com

James Lee (admitted pro hac vice)
Rossana Baeza (admitted pro hac vice)
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd St., 28th Floor
Miami, FL 33131
Tel.: (305) 539-8400
Fax: (303) 539-1307
jlee@bsfllp.com
rbaeza@bsfllp.com

Amanda K. Bonn, CA Bar No. 270891
**SUSMAN GODFREY L.L.P**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA. 90067
Tel: (310) 789-3100
Fax: (310) 789-3150
abonn@susmangodfrey.com

William S. Carmody (admitted pro hac vice)
Shawn Rabin (admitted pro hac vice)
Steven M. Shepard (admitted pro hac vice)
Alexander P. Frawley (admitted pro hac vice)
**SUSMAN GODFREY L.L.P.**
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019-6023

Case No. 5:20-cv-5146-LHK-SVK
DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIFTH SET OF
INTERROGATORIES (NOS. 21-42)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Tel.: (212) 336-8330
Fax: (212) 336-8340
bcarmody@susmangodfrey.com
srabin@susmangodfrey.com
sshepard@susmangodfrey.com
afrawley@susmangodfrey.com

John A. Yanchunis (admitted pro hac vice)
Ryan J. McGee (admitted pro hac vice)
Ra Olusegun Amen (admitted pro hac vice)
Jean Sutton Martin (admitted pro hac vice)
**MORGAN & MORGAN**
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Tel.: (813) 223-5505
jyanchunis@forthepeople.com
rmcgee@forthepeople.com
ramen@forthepeople.com
jean@jsmlawoffice.com

*Attorneys for Plaintiffs Chasom Brown et al.*

Case No. 5:20-cv-5146-LHK-SVK

DEFENDANT GOOGLE LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIFTH SET OF
INTERROGATORIES (NOS. 21-42)

# EXHIBIT 6

# Redacted In Its Entirety

# EXHIBIT 7

# Redacted In Its Entirety

# EXHIBIT 8

# Redacted In Its Entirety

# EXHIBIT 9

# Redacted Version of Document Sought to be Sealed

## Notes from interview with Rahul

Role & Responsibility re privacy at google?

- Aligning the company behind a long term strategy and goal around privacy
- Initially the company is very fragmented. Sundar was trying to be the tiebreaker. Sundar was struggling to get people to align. Rahuls role is to get them aligned

When you say alignment what does that mean?

- We should be super crisp about the problem we are trying to solve. When I first started talking to google leads the problem statement was described from existential crisis all the way to this is just a made up crisis ( the news industry hates us). We can't be liked by everyone. So there was no clear way to approach and solve this problem.
- Kent for example has a very risk averse and risk mitigation approach
- But Sundar says this is a moment when user expectation is changing. I want to get out ahead of that and not just react
- Google wants everything - no hard trade offs. **This isn't a free lunch. We have to make the hard decisions.**
- Antidote: Data retention - ▮▮▮▮ said we are going to lose abilities to do different things. Lorraine pushed back and said this was never your data to use to start with (mindset shift). It was a bug that you were able to do this and now we are fixing that bug.

What is your role in respect to the ▮▮▮▮▮▮ work

- I don't know - it is up to you all to figure out what you want my role to be. I do feel that we are lacking a long term privacy strategy. I would like to bring the company along on this journey as we tell the story. I am happy to make that my role.

What do you see as the main privacy challenges (consumers) face today?

- Complexity of understanding of all the data that is collected about you. It is challenging for users to understand how data is connected to create insights about user. I see this all the time with location history. It delivers good things, but then it also enables a lot of other things, and it becomes more and more complicated under the hood. There was an implicit bargain made with tech companies. But then the world got more and more complex with more devices. The original contract was a pre mobile space. And now we have not gone back to revisit that contract. Users are just living with discomfort and uneasy.
- There is a game where you have 20 dollars. You have an allocator and a receiver. If they accept they get it, if they don't they get nothing. This study show economic behavior and that people want to have a fair trade. People don't feel that way today. Today people would feel like if they were the decided they wouldn't take the deal, but since they aren't the deciders they just have to take the deal and live with it.

What do you see the main challenges are in privacy for google today?

- Privacy is such an overloaded term. I have my mental model to simplify. Ultimately our job is to become good stewards of user data (that is what privacy means). SO then what does that mean? We have a set of principles. The other part of this is that we don't know what we don't know. We can't tell what the right mental model is for users. And today we can't tell what happens to a piece of data when it comes into our systems. There are gaps, but they aren't high priority problems. But fundamentally then we don't take

seriously the responsibility of being a good steward of user data. Step 1. We are stewards. It is our responsibility to take care of it

If we are not responsible stewards, why is that a problem?

- We are collecting a ton of data. If we don't treat it with care, and users don't know what they are getting, and if you take a purely business lens to this - what does that mean for google? We are a very successful company- the risks of doing something that are not focused on being good stewards means that the benefit is nebulas but the risk is clear, so it is hard to bring people along. But we have to go back to core principles. We have to get back to basis. We have to have that moment. Our future and our differentiation is wrapped up in this and if we don't take this seriously our future is different. The struggle is that putting a price on that is very difficult.
- Example CVS decided to exit the tobacco business because of their core principles. Where they removed cigarettes they number of smokers in those areas and smokes decreased.
- Libra and FB is another good example. The fact that FB struggled with this is a clear indicator. If we don't have trust and treat data well, think about health care and alphabet - we will be limited to do things there because we lose the trust of users.

You talked about Microsofts back to basic, could you explain from your pov how it happened and what it has done?

- No specific insights, but familiar with it because of work on Chrome. When Chrome mades its moves it was surprising that Microsoft took a long time to understand and what chrome was doing to their core business. They were not nimble. When they went back to basics, they really refocused on a customer first approach. They moved away from a notion of we have products we must sell them. To we have customers, what do they need and how do we solve them.
- Google right now is in a state of FOMO. A good example is Shopping. What are we doing, we want to do something but there isn't a clear rational or plan. Chrome OS used to be like this as well. We would keep things going as a defensive mechanism as well as other things, but there was no story and so we ended up spreading ourselves very thing. What is it that we need to do - and if it means we need to give shopping or chrome etc that is okay.

Looking into the next 5 years - what are the main opportunities for google to be market leader

- We ourselves have to internalize and take seriously data stewardship. It means changing our collections and our infrastructure. In the end, users should never be surprised. They understand clearly what it means. They don't have to read the small print.
- There of course will be regulatory scrutiny and enforcement
- Our goal is to look beyond that and stay true to what users need.
- I was telling Kent that I would like the legal team to tell us longer term what the future challenges that we will face.
- I think we will exit our third party ads business and we will potentially face increasing struggles with our hardware business
- But most importantly is stewardship. If users don't opt into share data, we have to be resilient to that.

What are weakness google will have to overcome for user privacy?

- Making the necessary investment to get privacy as a foundational and long term investments. (I would describe things as incident response)
- PDPO has to step up, we have to be trusted with the other PAs.

GOOG-CABR-04833495

- Today our relationship with other PAs is a bit too tactical. We want to change this. We want them to see us as a partner in their long term success.
  - Long term Strat
  - Resourcing
  - …
- Ads will need to be changed
- Looking forward, 5 years from now, Google's business will not be what it is today. How do we map our privacy strategy to that. We need to merge our stories of privacy and what google will developing for products.
- How can privacy be an enabler for future business and product discussions

Eric talked about embracing contradictions. What are your thoughts on relationship between google account as a construct and google assistance as a construct?

- There are a couple of pieces. There is no question that Gaia is too brittle to handle the assistant. Gaia is working on this through ▇▇▇. But today we don't have the right extractions. Figuring out the household use case is an unsolved problem. Forget about assistant just think about the home generally - what is sensitive vs not, what is okay to display vs not, and how do you make choices?  Project ▇▇▇ - is a guest mode for assistant. We don't have good solutions -everything feels very ad hoc and tacked on. What does this mean in a shared experience? We don't have the right abstractions here. It shows its age when we try. It also is unclear of what the assistant is.
- Is it a product? Or is an access point to google services.  We should talk to the assistant team about how they see it. If we see it as an access point then it speaks to giving unfettered access to Google. But if it is a product then maybe it is worth solving on a series of different usage levels. There is a much deep argument past territorial space here that we haven't gotten to but need to.

Articulation and transformation - What do you think a vision needs here to be considered successful?

- The way I see it is there are many inputs into this process. 1. What we know to be true, user research. 2. Regulatory landscape - what is the future and long term future.
- You you take this and layer principles on top, what you come out with is a strategy. The conclusion inevitably follows form those sets of outputs. For example- 3P display if we look at previous approaches, there has been many conversations. But the question becomes how to we get to a place where they self decide that exiting is the right choice here, for the users, for the business, etc.

How will you personally, define success for this project?

- Clearly articulated long term vision for privacy that everyone understands
- Product strategy and also the culture and leadership shift on how this needs to change.

Personal thoughts:
We need to deliver a story that shows a future that is worth making culture shifts for, that brings us back to our roots and our original goals. We need to put users first forreal and then everything else will follow well - including regulators and gp.

GOOG-CABR-04833496

# EXHIBIT 10

# Redacted In Its Entirety

# EXHIBIT 11

# Redacted In Its Entirety

# EXHIBIT 12

# Redacted In Its Entirety

# EXHIBIT 13

# Redacted In Its Entirety

# EXHIBIT 14

# Redacted In Its Entirety

# EXHIBIT 15

# Redacted In Its Entirety

# EXHIBIT 16

# Redacted Version of Document Sought to be Sealed

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                   SAN JOSE DIVISION

4

5    PATRICK CALHOUN, ET AL., ON

6    BEHALF OF THEMSELVES AND ALL

7    OTHERS SIMILARLY SITUATED,

8          PLAINTIFFS,

9       vs.                    NO. 5:20-CV-05146-LHK-SVK

10   GOOGLE LLC,

11         DEFENDANT.

12   _____/

13

14                  *CONFIDENTIAL*

15        VIDEOTAPED DEPOSITION OF SAM HEFT-LUTHY

16         *VIA REMOTE COUNSEL VIDEOCONFERENCE*

17            MONDAY, DECEMBER 20, 2021

18                   VOLUME I

19

20

21

22   STENOGRAPHICALLY REPORTED BY:

23   MEGAN F. ALVAREZ, RPR, CSR No. 12470

24   JOB NO. 4974193

25   PAGES 1 - 331

                                      Page 1

CONFIDENTIAL

```
 1        UNITED STATES DISTRICT COURT
 2        NORTHERN DISTRICT OF CALIFORNIA
 3             SAN JOSE DIVISION
 4
 5  PATRICK CALHOUN, ET AL., ON
 6  BEHALF OF THEMSELVES AND ALL
 7  OTHERS SIMILARLY SITUATED,
 8      PLAINTIFFS,
 9  vs.         NO. 5:20-CV-05146-LHK-SVK
10  GOOGLE LLC,
11      DEFENDANT.
12  _____/
13
14
15
16      Videotaped Videoconference Deposition of
17  SAM HEFT-LUTHY, Volume I, taken on behalf of Plaintiffs,
18  VIA REMOTE COUNSEL.  Deponent testifying from
19  San Francisco, California, beginning at 9:06 a.m. and
20  ending at 6:35 p.m. on Monday, December 20, 2021, before
21  Megan F. Alvarez, RPR, Certified Shorthand Reporter
22  No. 12470.
23
24
25
                                              Page 2
```

```
 1  APPEARANCES: (ALL PARTIES APPEARING VIA VIDEOCONFERENCE)
 2
 3  FOR PLAINTIFFS:
 4      BY:  JASON "JAY" BARNES, ESQ
 5          AN V TRUONG, ESQ
 6      SIMMONS HANLY CONROY
 7      ONE COURT STREET
 8      ALTON, ILLINOIS 62002
 9      618 693 3104
10      JAYBARNES@SIMMONSFIRM COM
11  AND
12      BY:  LESLEY WEAVER, ESQ
13      BLEICHMAR FONTI & AULD LLP
14      555 12TH STREET, SUITE 1600
15      OAKLAND, CALIFORNIA 94607
16      415 445 4003
17      LWEAVER@BFALAW COM
18  AND
19      BY:  DAVID A STRAITE, ESQ
20      DICELLO LEVITT GUTZLER
21      ONE GRAND CENTRAL PLACE
22      60 EAST 42ND STREET, SUITE 2400
23      NEW YORK, NEW YORK 10165
24      646 933 1000
25      DSTRAITE@DICELLOLEVITT COM
                                              Page 3
```

```
 1  APPEARANCES:  (CONTINUED)
 2
 3  FOR DEFENDANTS:
 4      BY:  CARL SPILLY, ESQ.
 5          JOMAIRE CRAWFORD, ESQ.
 6      QUINN EMANUEL URQUHART & SULLIVAN LLP
 7      51 MADISON AVENUE, 22ND FLOOR
 8      NEW YORK, NEW YORK 10010
 9      212.849.7000
10      JOMAIRECRAWFORD@QUINNEMANUEL.COM
11      CARLSPILLY@QUINNEMANUEL.COM
12
13  ALSO PRESENT:
14      TONI BAKER, GOOGLE IN-HOUSE COUNSEL
15
16  THE VIDEO OPERATOR:
17      DAVID WEST, VERITEXT
18
19
20
21
22
23
24
25
                                              Page 4
```

```
 1            INDEX
 2  WITNESS                    EXAMINATION
 3  SAM HEFT-LUTHY
 4  VOLUME I
 5      BY MR. BARNES              21
 6
 7          --o0o--
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                              Page 5
```

1        EXHIBITS MARKED FOR IDENTIFICATION
2  No.        Description        Page
3  Exhibit 1    LinkedIn profile of Sam .............22
4        Heft-Luthy
5
6  Exhibit 2    Document entitled "Key ..............52
7        experience challenges," Bates
8        GOOG-CABR-04754160 through
9        4754167
10
11 Exhibit 3    Document entitled ██████....81
12        Perspective readout, 9/2/2000,"
13        Bates GOOG-CABR-04754257 through
14        4754291
15
16 Exhibit 4    Document entitled "All new ..........99
17        content moved over to the
18        Perspective draft," Bates
19        GOOG-CABR-04754929 through
20        4754315
21
22
23
24
25                    Page 6

1        EXHIBITS MARKED FOR IDENTIFICATION
2  No.        Description        Page
3  Exhibit 9    Document entitled "SUNDAR ..........139
4        presentation building blocks and
5        owners," Bates
6        GOOG-CABR-04015202 through
7        4015206
8
9  Exhibit 10    Document entitled "'Security .......145
10        Products,' messaging
11        opportunities," Bates
12        GOOG-CABR-04343585 through
13        4343588
14
15 Exhibit 11    Document entitled "1P ..............145
16        cross-product sharing control,"
17        Bates GOOG-CABR-04344170 through
18        4344173
19
20 Exhibit 12    Privacy controls audit, Bates ......156
21        GOOG-CABR-03682003
22
23 Exhibit 12A    Excel native file, Privacy .........159
24        controls audit, Bates
25        GOOG-CABR-03682003
                    Page 8

1        EXHIBITS MARKED FOR IDENTIFICATION
2  No.        Description        Page
3  Exhibit 5    Document entitled ██████...109
4        Perspective, Toward a
5        ██████ experience
6        strategy," Bates
7        GOOG-CABR-04754627 through
8        4754632
9
10 Exhibit 6    Document entitled "A new ...........124
11        approach to building trust, User
12        & PDPO UX, 10/13/2020," Bates
13        GOOG-CABR-03683283 through
14        3683355
15
16 Exhibit 7    Document entitled ██████...129
17        Experience Vision, Agency
18        kick-off, 1/20/21," Bates
19        GOOG-CABR-04834261 through
20        4834299
21
22 Exhibit 8    Document entitled "1P ..............134
23        cross-product sharing control,"
24        Bates GOOG-CABR-04344170 through
25        4344173
                    Page 7

1        EXHIBITS MARKED FOR IDENTIFICATION
2  No.        Description        Page
3  Exhibit 13    Document entitled "Do we have ......160
4        set of devices syncing to GAIA
5        XXX?"
6
7  Exhibit 14    E-mail dated 6/8/21 from Raquel ....163
8        Ruiz to Diogo Marques, My Linh,
9        et al., Subject: 2021-06-08,
10        Reassure xPA sync - Notes, Bates
11        GOOG-CABR-04648710 through
12        4648712
13
14 Exhibit 15    E-mail string, topmost dated .......180
15        10/15/19 from Sam Heft-Luthy to
16        pdpo-pm, Subject Fwd:
17        Aftenposten's story in
18        tomorrow's print edition, Bates
19        GOOG-CABR-03797625 through
20        3797628
21
22 Exhibit 16    Sam Heft-Luthy on Substack ........188
23
24
25
                    Page 9

3 (Pages 6 - 9)

EXHIBITS MARKED FOR IDENTIFICATION

| No. | Description | Page |
|---|---|---|
| Exhibit 17 | Article entitled "Markets, ......... | 190 |
| | Subjects, and The State," dated | |
| | 8/1/2020 by Sam Heft-Luthy | |
| | | |
| Exhibit 18 | Message string, topmost dated ...... | 192 |
| | 5/8/19 from Alexander | |
| | Schiffhauer to Dina Lamdany, | |
| | Jason Tiller, Megan Potoski, et | |
| | al., Subject APM 16, Bates | |
| | GOOG-CABR-03681851 through | |
| | 3681856 | |
| | | |
| Exhibit 19 | E-mail string, topmost dated ....... | 205 |
| | 10/22/2020 from Greg Fair to Sam | |
| | Heft-Luthy  Subject Re: Program | |
| | Review: Privacy Surfaces, Bates | |
| | GOOG-CABR-03820864 through | |
| | 3820869 | |
| | | |
| Exhibit 20 | Document entitled "User Privacy .... | 213 |
| | Moment Outline," Bates | |
| | GOOG-CABR-04343377 through | |
| | 4343390 | |

EXHIBITS MARKED FOR IDENTIFICATION

| No. | Description | Page |
|---|---|---|
| Exhibit 25 | Responses to Client Questions ...... | 230 |
| | document, Bates | |
| | GOOG-CABR-04342101 through | |
| | 4342102 | |
| | | |
| Exhibit 26 | Excel spreadsheet, Bates ........... | 236 |
| | GOOG-CALH-00061965 | |
| | | |
| Exhibit 27 | PDF printed version of Exhibit ..... | 236 |
| | 26, Excel spreadsheet, Bates | |
| | GOOG-CALH-00061965 | |
| | | |
| Exhibit 28 | ███████ Video Clip 7, Bates ........ | 247 |
| | GOOG-CALH-00045185 | |
| | | |
| Exhibit 29 | Document entitled "Team Deep ....... | 247 |
| | Dive, Q4 2020, Ads Identity & | |
| | Infrastructure," Bates | |
| | GOOG-CALH-00374314 through | |
| | 374448 | |

EXHIBITS MARKED FOR IDENTIFICATION

| No. | Description | Page |
|---|---|---|
| Exhibit 21 | Forums Overview document, Bates .... | 217 |
| | GOOG-CABR-04344029 through | |
| | 4344038 | |
| | | |
| Exhibit 22 | Message string, topmost dated ...... | 219 |
| | 1/16/2020 from Jason Liu to | |
| | Jason Tiller, Megan Potoski, | |
| | Spriha Baruah, et al., Subject | |
| | APM 16, Bates GOOG-CABR-04034636 | |
| | and 4034637 | |
| | | |
| Exhibit 23 | Document entitled "GBO Comm Doc: ... | 223 |
| | March 2021 Google privacy | |
| | Update," last updated 3/31/2021, | |
| | Bates GOOG-CABR-04755505 through | |
| | 4755542 | |
| | | |
| Exhibit 24 | Document entitled "Why ............. | 225 |
| | ███████?" Bates | |
| | GOOG-CALH-00027419 | |

EXHIBITS MARKED FOR IDENTIFICATION

| No. | Description | Page |
|---|---|---|
| Exhibit 30 | E-mail dated 9/26/18 from David .... | 251 |
| | Monsees to Reed La Botz, copying | |
| | Carmela Acevedo, Sam Heft-Luthy, | |
| | privacy advisor team, Subject: | |
| | Re: Unauth search history | |
| | questions, Bates | |
| | GOOG-CALH-00452378 through | |
| | 452380 | |
| | | |
| Exhibit 31 | Screenshot of Google "Ad ........... | 256 |
| | personalization settings" page | |
| | | |
| Exhibit 32 | Document entitled "Google Terms .... | 265 |
| | of Service, effective March 30, | |
| | 2020" | |
| | | |
| Exhibit 33 | Document entitled "Google Chrome ... | 268 |
| | Privacy Notice, Last modified: | |
| | September 23, 2021" | |
| | | |
| Exhibit 34 | Google Privacy Policy, effective ... | 273 |
| | July 1, 2021 | |

4 (Pages 10 - 13)

1 that we do fits that legal advice in -- you know, in    09:50:05
2 whatever legal regime that we're operating in.    09:50:10
3        Again, I can go into the specifics around    09:50:13
4 the way we try to improve transparency, some of the    09:50:15
5 choices that we make.  But with regards to how we    09:50:18
6 think about consent, that's, again, going to depend    09:50:21
7 a lot on the context in which we're operating here.    09:50:25
8 BY MR. BARNES:    09:50:28
9    Q.  What is your understanding of that which    09:50:29
10 is necessary to obtain consent from users in the    09:50:30
11 United States to collect their browsing history?    09:50:34
12        MR. SPILLY:  Objection.  Calls for a legal    09:50:42
13 conclusion.    09:50:43
14        THE WITNESS:  So, again, I -- in any    09:50:46
15 moment with regards to a consent that we would have    09:50:49
16 to deliver in order to collect user browsing    09:50:53
17 history, I can walk through the process of    09:50:57
18 development there.    09:50:59
19        So what would happen is if there's new    09:51:00
20 obligations changing our responsibilities, new law    09:51:02
21 that's passed, new interpretation of existing law,    09:51:06
22 we'll receive counsel from counsel and change our    09:51:10
23 products in order to -- in order to match whatever    09:51:14
24 change in legal regime we're operating in.  That    09:51:18
25 includes the United States in various ways.  I can't    09:51:22
Page 50

1 speak to the overall legal regime of the    09:51:25
2 United States in much detail, but I'll be counseled    09:51:27
3 on the specifics of that if something is relevant to    09:51:29
4 a product that we're working on.    09:51:32
5 BY MR. BARNES:    09:51:34
6    Q.  It's entirely a legal construct, not    09:51:34
7 concern about how a consumer might answer the    09:51:37
8 question, "Did I consent to that?"  Correct?    09:51:40
9        MR. SPILLY:  Objection to the form.    09:51:46
10        THE WITNESS:  As -- as I've said before,    09:51:49
11 the work that we do concretely with regards to any    09:51:51
12 legal obligation that we have is certainly not    09:51:56
13 ignorant of user understanding, user transparency,    09:52:00
14 user engagement.  I'm sure we have exhibits that we    09:52:04
15 can go through to talk about the user research that    09:52:08
16 we do.    09:52:11
17        So I wouldn't say that it's fair to    09:52:13
18 summarize the work that we do in consent as entirely    09:52:15
19 unrelated to user understanding.  Though, again, I'm    09:52:19
20 not going to be able to speculate on legal questions    09:52:23
21 of validity or -- or consent specifically as a legal    09:52:25
22 construct here.    09:52:31
23 BY MR. BARNES:    09:52:31
24    Q.  Mr. Heft-Luthy, I -- we've placed    09:52:32
25 Exhibit 2 in the share file.  Please let me know    09:52:35
Page 51

1 when that's been transmitted?    09:52:38
2        MR. BARNES:  And, Ms. Truong, if you could    09:52:40
3 do a screen share, please.    09:52:42
4        (Whereupon Exhibit 2 was marked for    09:52:44
5        identification.)    09:52:44
6 BY MR. BARNES:    09:52:51
7    Q.  While we're waiting for Ms. Crawford -- do    09:52:51
8 you not see it?  Let me ask -- I'll ask some    09:52:53
9 questions while it's getting up.    09:52:55
10        What is ▇▇▇▇▇ Mr. Heft-Luthy?    09:52:57
11        MS. CRAWFORD:  Hold on.  If we could wait,    09:53:00
12 I'm not seeing an exhibit in the exhibit folder.    09:53:02
13 And can you confirm that it's there?    09:53:07
14        Okay.  It just arrived just a second ago.    09:53:09
15 Give us all a second to get that loaded for the    09:53:12
16 witness.    09:53:15
17 BY MR. BARNES:    09:53:19
18    Q.  I'm going to ask questions that are    09:53:20
19 unrelated to the document until such time as you get    09:53:21
20 it up.    09:53:23
21        What is ▇▇▇▇▇ Mr. Heft-Luthy?    09:53:24
22        MR. SPILLY:  Objection.  Vague.    09:53:27
23        MS. CRAWFORD:  Yeah, if you can wait a    09:53:28
24 second, because you're asking --    09:53:29
25        MR. BARNES:  No, I'm not going to wait for    09:53:30
Page 52

1 you to do the technology.  It is a question that is    09:53:31
2 independent of the exhibit.    09:53:34
3 BY MR. BARNES:    09:53:34
4    Q.  What is ▇▇▇▇▇, Mr. Heft-Luthy?    09:53:35
5        MR. SPILLY:  Same objection.    09:53:39
6        THE WITNESS:  ▇▇▇▇▇ is an internal    09:53:43
7 name for a product design and strategy effort that    09:53:46
8 we engaged in through last year.    09:53:51
9 BY MR. BARNES:    09:53:55
10    Q.  Whose idea was ▇▇▇▇▇?    09:53:57
11        MR. SPILLY:  Objection.  Vague.    09:54:03
12        THE WITNESS:  Like most projects at    09:54:08
13 Google, ▇▇▇▇▇ came out of a variety of    09:54:09
14 different inputs, both work that I had been engaging    09:54:13
15 in previously as a manager of a team we call Privacy    09:54:17
16 Surfaces, which is a collection of privacy,    09:54:21
17 transparency and control surfaces, as well as    09:54:25
18 request from executive stakeholders for strategic    09:54:31
19 orientation.  And, again, like most projects, there    09:54:35
20 are a variety of different people that are coming    09:54:38
21 together to start a -- to start a project like this.    09:54:40
22 BY MR. BARNES:    09:54:43
23    Q.  Okay.  Were you the project manager for --    09:54:44
24 I'm sorry -- product.    09:54:47
25        Were you the product manager for    09:54:49
Page 53

14 (Pages 50 - 53)

| | |
|---|---|
| 1 ████████? 09:54:51 | 1 MR. SPILLY: Object to the form. 09:57:38 |
| 2 A. Yes, I was. 09:54:53 | 2 BY MR. BARNES: 09:57:39 |
| 3 Q. And what is its status today? 09:54:54 | 3 Q. Was present. Who else was present? 09:57:39 |
| 4 MR. SPILLY: Object to the form. 09:55:03 | 4 A. Cassidy Morgan from the marketing team was 09:57:40 |
| 5 THE WITNESS: ████████ is currently 09:55:04 | 5 present, if I recall correctly. Greg Fair, who was 09:57:43 |
| 6 not an active project. It was -- I can't speak to 09:55:06 | 6 my manager at the time, was also present. 09:57:47 |
| 7 exactly when it was discontinued. 09:55:11 | 7 Q. And was the idea of ████████ 09:57:52 |
| 8 BY MR. BARNES: 09:55:13 | 8 presented to outside the P- -- PO team? 09:57:54 |
| 9 Q. Okay. I mean, you can speak generally to 09:55:16 | 9 A. Not to my recollection, no. 09:58:03 |
| 10 when it was discontinued. Let's not talk about the 09:55:18 | 10 MR. SPILLY: Object -- sorry, Sam. 09:58:05 |
| 11 specific date it was discontinued. 09:55:21 | 11 Objection. Vague. 09:58:06 |
| 12 Was it discontinued in the year 2021? 09:55:23 | 12 BY MR. BARNES: 09:58:07 |
| 13 A. To my recollection, it was discontinued in 09:55:30 | 13 Q. Is -- well, I should say was Greg Fair 09:58:09 |
| 14 later 2020. But I -- I could be wrong. It could 09:55:33 | 14 your supervisor? 09:58:11 |
| 15 have overlapped with 2021 at some point. 09:55:37 | 15 A. He was, yes. 09:58:14 |
| 16 Q. Who made the decision to discontinue it? 09:55:40 | 16 Q. During the time you were the project -- I 09:58:15 |
| 17 A. We brought the project to what we felt was 09:55:49 | 17 said it again. 09:58:17 |
| 18 a reasonable outcome. We delivered a few executive 09:55:50 | 18 During the time you were the product 09:58:19 |
| 19 presentations. It was also an effort of 09:55:55 | 19 manager for ████████, was Greg Fair your 09:58:21 |
| 20 self-clarification for the team and is part of our 09:55:59 | 20 manager, your boss? 09:58:26 |
| 21 overall development process for a variety of 09:56:04 | 21 A. He was, yes. 09:58:29 |
| 22 different projects that we're engaging in. 09:56:06 | 22 Q. And who was Mr. Fair's supervisor? 09:58:30 |
| 23 So, again, like any decision to start a 09:56:09 | 23 A. I can't recall exactly. 09:58:37 |
| 24 project at Google, decision to stop a project or -- 09:56:12 | 24 Apologies on that dang lighting. Let's 09:58:46 |
| 25 or reach a conclusion is -- comes from a variety of 09:56:14 | 25 start again. 09:58:48 |
| Page 54 | Page 56 |

| | |
|---|---|
| 1 different inputs that I can -- that are part of that 09:56:17 | 1 I -- I can't recall exactly given there 09:58:49 |
| 2 process. 09:56:21 | 2 was some executive changes over the course of 2020 09:58:52 |
| 3 Q. You said "executive presentations." 09:56:22 | 3 and 2021. At certain points during ████████, 09:58:54 |
| 4 To whom were the presentations given? 09:56:24 | 4 Othar Hansson was Greg's manager. I can't speak to 09:58:59 |
| 5 A. If I recall, there was a presentation to a 09:56:32 | 5 at which points in the project he was overseeing 09:59:07 |
| 6 few design and product management directors. That 09:56:37 | 6 Greg or not, however. 09:59:09 |
| 7 was the conclusion of the project. 09:56:42 | 7 Q. Okay. What is your understanding of why 09:59:11 |
| 8 Q. Who were those design and project -- 09:56:45 | 8 Google did not go forward with the ████████ 09:59:15 |
| 9 product -- you said "PM directors." Who were the -- 09:56:50 | 9 project? 09:59:18 |
| 10 A. Yeah. 09:56:55 | 10 A. So, as I said, like any project at Google, 09:59:25 |
| 11 Q. Who were those designers and PM directors? 09:56:55 | 11 there's a variety of inputs into when projects are 09:59:28 |
| 12 MR. SPILLY: Object to the form. 09:56:59 | 12 started or stopped. 09:59:31 |
| 13 Misstates. 09:56:59 | 13 As we had had both some internal desire 09:59:37 |
| 14 THE WITNESS: So to the -- to the question 09:57:04 | 14 for self-clarification and some executive requests 09:59:38 |
| 15 of who that presentation was to, if I recall 09:57:05 | 15 for strategic position work, we incorporated both of 09:59:45 |
| 16 correctly, it included Sarah Hammond, who's a UX 09:57:08 | 16 those inputs to make the decision to stop the 09:59:48 |
| 17 director. 09:57:13 | 17 project in, I believe, late 2021. 09:59:51 |
| 18 I believe, given what -- the organization 09:57:15 | 18 Q. You mean 2020? Sorry to correct you. 09:59:56 |
| 19 at the time, it would have included Othar Hansson. 09:57:21 | 19 A. Late 2020, yes. Pardon. 09:59:58 |
| 20 But I can't recall for sure if he was physically 09:57:22 | 20 Q. Okay. Who were the executives who made 10:00:00 |
| 21 present. 09:57:28 | 21 that request? 10:00:05 |
| 22 But I -- I can recall at least Sarah 09:57:28 | 22 A. The -- which request specifically? 10:00:09 |
| 23 Hammond was present. 09:57:31 | 23 Q. You stated that "We had some executive 10:00:11 |
| 24 BY MR. BARNES: 09:57:33 | 24 requests for strategic position work." 10:00:14 |
| 25 Q. Who else? 09:57:34 | 25 Who were the executives who made requests 10:00:18 |
| Page 55 | Page 57 |

CONFIDENTIAL

1 for strategic position work?                10:00:21
2      A.   This was Rahul Roy-Chowdhury.      10:00:25
3      Q.   And where is he on the organization chart?   10:00:29
4          MR. SPILLY:  Object to form.       10:00:39
5          THE WITNESS:  At the time he was, I   10:00:43
6 believe, a vice president at Google.  And he's no   10:00:43
7 longer employed by Google.               10:00:48
8 BY MR. BARNES:                         10:00:49
9      Q.   Do you know where he is now?     10:00:50
10     A.   I do not.                      10:00:54
11     Q.   Is there a company directory where you can   10:00:55
12 look up who works where?                10:01:01
13         MR. SPILLY:  Object to the form.   10:01:03
14         THE WITNESS:  When you say "works where,"   10:01:07
15 in terms of role responsibility?  What -- what --   10:01:09
16 what do you mean by "where"?             10:01:12
17 BY MR. BARNES:                         10:01:14
18     Q.   Correct.  You just stated, role   10:01:14
19 responsibility.                        10:01:17
20     A.   There is an internal directory that Google   10:01:20
21 employees are able to use that provides, depending   10:01:24
22 on the individual employee, different levels of   10:01:28
23 information, including their responsibility, yes.   10:01:31
24     Q.   Would it include who they report to?   10:01:36
25         MR. SPILLY:  Object to the form.   10:01:41
                                          Page 58

1          THE WITNESS:  I can't speak to in all   10:01:47
2 cases given that I don't know the full    10:01:50
3 implementation, but in many cases it does provide   10:01:52
4 notice of -- of who a given person's direct manager   10:01:56
5 is, yes.                               10:02:00
6 BY MR. BARNES:                         10:02:00
7      Q.   And then vice versa, there are certainly   10:02:01
8 situations where it shows who reports to the person   10:02:04
9 in question, correct?                  10:02:09
10     A.   That's correct, yes.            10:02:14
11     Q.   Okay.  Do you have Exhibit 2,      10:02:15
12 Mr. Heft-Luthy?                        10:02:17
13     A.   Exhibit 2 is the one we're showing here,   10:02:27
14 right?                                 10:02:29
15     Q.   Right.  Correct.               10:02:29
16     A.   Yes, I have it up.             10:02:30
17     Q.   Okay.  You see in the first sentence where   10:02:32
18 it says: "This workstream aims to define an   10:02:33
19 overarching vision and strategy for PDPO to inform   10:02:37
20 the Google privacy experience"?          10:02:41
21         Why is Google coming up with an   10:02:45
22 overarching vision and strategy for this   10:02:48
23 ████████ project?                      10:02:51
24     A.   Why -- why is Google coming up with a   10:02:52
25 strategy in general or why specifically this   10:03:01
                                          Page 59

1 project?                               10:03:03
2      Q.   Let's start with in general.     10:03:04
3      A.   So as a product manager or as a company   10:03:10
4 that is building tools with regards to privacy, they   10:03:14
5 work much like any other product in that they   10:03:19
6 require a timeline of concrete design and   10:03:23
7 engineering work to meet specific business and legal   10:03:27
8 objectives.  Given that it works like any other   10:03:31
9 product work, there's a requirement for a strategic   10:03:36
10 orientation.  We have choices that we have to make   10:03:38
11 about how and when we deploy certain technologies.   10:03:42
12         Given that, there is always the desire to   10:03:47
13 develop technology in a strategic manner.  There was   10:03:51
14 a request from PDPO leadership to help, you know,   10:03:53
15 improve the strategic orientation, like there often   10:04:00
16 is for a variety of products across Google.   10:04:05
17     Q.   Okay.  You see there where it says:   10:04:08
18 "Related resources,█, definition of privacy"?   10:04:09
19         Is that a hyperlink?             10:04:12
20     A.   I can't say with certainty --    10:04:17
21         MR. SPILLY:  Objection.  Calls for   10:04:20
22 speculation.                           10:04:20
23         THE WITNESS:  Yeah, I can't say with   10:04:22
24 certainty here.                        10:04:24
25 ///
                                          Page 60

1 BY MR. BARNES:                         10:04:25
2      Q.   Mr. Heft-Luthy, are you the author -- what   10:04:25
3 is this document?  Let me ask you that.   10:04:27
4      A.   Also, just a note, I'm a Type I diabetic.   10:04:31
5 If I have to do some management, I'm not looking at   10:04:33
6 another device.                        10:04:38
7      Q.   Okay.                         10:04:39
8      A.   So let me -- let me go through just to   10:04:40
9 make sure that I am correct about which exact   10:04:41
10 document that we're referring to here.    10:04:46
11         So I -- I believe that this document would   10:05:17
12 be a -- a short strategic position paper that we   10:05:18
13 would have -- I can't recall if we would have   10:05:24
14 actually delivered this to anybody.  Certainly it   10:05:28
15 would have been circulated within the small team   10:05:31
16 working on it.                         10:05:33
17     Q.   It says "Core Team."  You're the second   10:05:34
18 member of the core team.               10:05:37
19         Do you see that on page 1?        10:05:38
20     A.   Yes.                          10:05:43
21     Q.   By "page 1," I mean CABR04754160.  Those   10:05:43
22 are called Bates numbers, and we'll refer to them as   10:05:50
23 we go on today.                        10:05:52
24         What is -- █ stands for ████████   10:05:56
25 there at the first page of this document, correct?   10:05:58
                                          Page 61

16 (Pages 58 - 61)

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | MR. SPILLY: Objection. | 10:06:07 |
| 2 | BY MR. BARNES: | 10:06:09 |
| 3 | Q. I am back on the first page. | 10:06:09 |
| 4 | A. Yeah, to -- to the best of my | 10:06:11 |
| 5 | recollection, that's correct. | 10:06:12 |
| 6 | Q. Okay. And what is the ███ definition of | 10:06:14 |
| 7 | "privacy"? | 10:06:17 |
| 8 | A. I don't recall the specific terminology | 10:06:24 |
| 9 | that we used. If we have an exhibit to review, I'm | 10:06:26 |
| 10 | happy to talk about choices that we made for that | 10:06:30 |
| 11 | definition. | 10:06:32 |
| 12 | Q. Okay. And what's the ███ research | 10:06:32 |
| 13 | synthesis? | 10:06:35 |
| 14 | MR. SPILLY: Objection. Calls for | 10:06:36 |
| 15 | speculation. | 10:06:36 |
| 16 | THE WITNESS: To the best of my | 10:06:41 |
| 17 | recollection, as part of the process for this | 10:06:41 |
| 18 | project, we asked user research -- user experience | 10:06:45 |
| 19 | researcher to collect synthesis of various research | 10:06:50 |
| 20 | that we had already conducted that would inform | 10:06:55 |
| 21 | the strategic orientation that we would have as part | 10:06:58 |
| 22 | of this program. | 10:07:02 |
| 23 | BY MR. BARNES: | 10:07:03 |
| 24 | Q. Mr. Heft-Luthy, you were the product | 10:07:04 |
| 25 | manager for ███? | 10:07:06 |

Page 62

| | | |
|---|---|---|
| 1 | A. That's correct, yes. | 10:07:08 |
| 2 | MR. BARNES: Okay. Mr. Spilly, asking | 10:07:09 |
| 3 | a -- the product manager for a product, what certain | 10:07:11 |
| 4 | terms about the product means does not call for | 10:07:15 |
| 5 | speculation. | 10:07:17 |
| 6 | Could you go -- Ms. Truong, can you turn | 10:07:18 |
| 7 | to the second page of this document? | 10:07:22 |
| 8 | BY MR. BARNES: | 10:07:23 |
| 9 | Q. Mr. Heft-Luthy, why is it difficult for | 10:07:30 |
| 10 | people to fully and meaningfully give permission to | 10:07:31 |
| 11 | Google? | 10:07:35 |
| 12 | MR. SPILLY: Objection. Vague. | 10:07:41 |
| 13 | THE WITNESS: So just to clarify, you're | 10:07:42 |
| 14 | asking me to provide context into this statement | 10:07:46 |
| 15 | from the exhibit itself? | 10:07:49 |
| 16 | BY MR. BARNES: | 10:07:51 |
| 17 | Q. And in general. | 10:07:54 |
| 18 | A. So what I -- what I can speak to is from | 10:07:59 |
| 19 | the exhibit itself. As part of the work that we | 10:08:01 |
| 20 | were doing on ███, it was our objective to | 10:08:04 |
| 21 | collect a summary of user concerns and questions | 10:08:09 |
| 22 | from across the product development process that we | 10:08:15 |
| 23 | have summarizing key challenges, both for Google | 10:08:18 |
| 24 | and, you know, specifically with regards to Google | 10:08:24 |
| 25 | technology, but also with regards to technology in | 10:08:27 |

Page 63

| | | |
|---|---|---|
| 1 | general. As, you know, one player in a broader | 10:08:31 |
| 2 | market, we're also looking at the solutions that | 10:08:35 |
| 3 | other companies are building. | 10:08:38 |
| 4 | When we ask users for their thoughts on | 10:08:41 |
| 5 | Internet technology privacy, we know that they have | 10:08:43 |
| 6 | a broad range of understanding of even what products | 10:08:46 |
| 7 | they're using at a given time with regards to am I | 10:08:50 |
| 8 | on Facebook or Instagram at given time. | 10:08:53 |
| 9 | When we talk about the input to this | 10:08:57 |
| 10 | development process, we wanted to summarize what are | 10:09:01 |
| 11 | some of the key issues that users face as they go | 10:09:03 |
| 12 | through Google and other Internet technology to try | 10:09:08 |
| 13 | to understand what we can do to improve that | 10:09:11 |
| 14 | experience across our products. | 10:09:14 |
| 15 | Q. Mr. Heft-Luthy, the very next sentence is | 10:09:16 |
| 16 | specific to Google, correct? | 10:09:19 |
| 17 | A. That is correct, yes. | 10:09:25 |
| 18 | Q. Was ███ meant to be a project | 10:09:28 |
| 19 | for Google consents or for other companies' | 10:09:33 |
| 20 | consents? | 10:09:36 |
| 21 | MR. SPILLY: Objection. Compound. | 10:09:40 |
| 22 | THE WITNESS: So the answer to your | 10:09:44 |
| 23 | question is that what we wanted to do with | 10:09:46 |
| 24 | ███ was articulate changes that Google can | 10:09:50 |
| 25 | make to its product development strategy to improve | 10:09:54 |

Page 64

| | | |
|---|---|---|
| 1 | both Google's strategic position as well as | 10:09:58 |
| 2 | achieving this through impact on a variety of | 10:10:02 |
| 3 | different touch points. | 10:10:06 |
| 4 | So that would apply to Google-specific | 10:10:07 |
| 5 | permissions which the language that you're | 10:10:11 |
| 6 | referencing is discussing. In other exhibits that | 10:10:13 |
| 7 | might be part of my custodial file, you might see | 10:10:17 |
| 8 | references to technology that would be made | 10:10:20 |
| 9 | available broadly across the Web. | 10:10:24 |
| 10 | So, to that extent, ███ was | 10:10:24 |
| 11 | intended both to discuss, you know, what can we do | 10:10:27 |
| 12 | around specific Google consent that may be offered | 10:10:30 |
| 13 | as part of our permission model but also what can we | 10:10:34 |
| 14 | do with things like private technology, consent | 10:10:38 |
| 15 | management tools, things that might improve the | 10:10:42 |
| 16 | experience, not just for users of Google but for | 10:10:44 |
| 17 | users of broader Internet technologies as well. | 10:10:47 |
| 18 | BY MR. BARNES: | 10:10:50 |
| 19 | Q. Why do people struggle to know what | 10:10:51 |
| 20 | exactly they're sharing with Google? | 10:10:54 |
| 21 | MR. SPILLY: Objection. Vague. | 10:10:59 |
| 22 | THE WITNESS: So I'm going to -- I'm going | 10:11:00 |
| 23 | to go back to the caveat that I said I'm going to | 10:11:06 |
| 24 | have to give in a lot of the answers here, which is | 10:11:10 |
| 25 | that we have a variety of different users in most | 10:11:12 |

Page 65

17 (Pages 62 - 65)

1 countries in the world that we may at certain points    10:11:17
2 have used language like "users" or "the user" as    10:11:21
3 a -- you know, as a certain rhetorical tool    10:11:26
4 internally to influence the development process.    10:11:28
5      The work that we're doing is also    10:11:33
6 incredibly informed by the fact that, you know,    10:11:34
7 there are different users with different    10:11:36
8 understandings.  So if we were to say why don't    10:11:39
9 users X, why don't users Y, there's certainly always    10:11:42
10 going to be cases where users do X or don't Y.    10:11:47
11 That's always going to be an incredibly contingent    10:11:51
12 answer.    10:11:55
13      And, again, I can speak to challenges that    10:11:55
14 we've seen, things that we try to optimize for in    10:11:57
15 our development.  Though, again, questions about    10:12:01
16 like Y does this or does not this is always going to    10:12:04
17 have a super contingent answer.    10:12:07
18 BY MR. BARNES:    10:12:10
19      Q.  Are you the author of this document,    10:12:10
20 Mr. Heft-Luthy?    10:12:12
21      A.  So I don't recall the drafting process for    10:12:25
22 this specific document.  Given that I was the    10:12:28
23 product manager for the overall process, I think it    10:12:32
24 would be fair that I heavily influenced the    10:12:36
25 direction of this document though I can't speak,    10:12:39

Page 66

1 again, to the specifics of the drafting of it or --    10:12:43
2 or specific language choices here.    10:12:45
3      MR. BARNES:  Ms. Truong, can we turn to    10:13:00
4 page 2, please?    10:13:02
5      I'm sorry.  Page 3.    10:13:12
6 BY MR. BARNES:    10:13:13
7      Q.  And this might -- this is going to be    10:13:13
8 small on the screen, but I want to ask you about    10:13:15
9 Comment 10.    10:13:19
10      Who made Comment 10?    10:13:19
11      A.  Given that it doesn't seem to indicate who    10:13:34
12 made that comment, I wouldn't be able to speculate    10:13:38
13 on that.    10:13:39
14      Q.  Was it you?    10:13:41
15      A.  As said, I -- I don't have recollection of    10:13:45
16 making or not making this specific comment, so I    10:13:48
17 wouldn't be able to speculate on who exactly drafted    10:13:51
18 it.    10:13:55
19      MR. BARNES:  Okay.  Can we go to the next    10:13:56
20 page, Ms. Truong?    10:14:00
21 BY MR. BARNES:    10:14:00
22      Q.  You see -- you see Comment 16 there,    10:14:06
23 Mr. Heft-Luthy?    10:14:07
24      A.  Yes.    10:14:10
25      Q.  Can you read that out loud?    10:14:11

Page 67

1      A.  Commented 16?    10:14:15
2      Q.  Yes.    10:14:16
3      A.  So, again, with the caveat that I don't    10:14:18
4 recall who made this comment, I'll -- I'm happy to    10:14:21
5 read it aloud.    10:14:24
6      "I'd like to see us making the point about    10:14:25
7 ads as a product.  If we can get users to think of    10:14:27
8 ads as I product, it did solve ads, but it reduces    10:14:30
9 complexity in general and gives a clearer path    10:14:34
10 forward for ads to get in line rather than being its    10:14:37
11 own special thing."    10:14:40
12      Q.  What does that mean, that phrase, "It    10:14:41
13 doesn't solve Ads," with "solve" in all caps?    10:14:42
14      MR. SPILLY:  Objection.  Foundation.    10:14:48
15 Calls for speculation.    10:14:48
16      THE WITNESS:  So, again, I can speak to    10:14:50
17 what I would feel reading this comment.    10:14:57
18      Is that what you would like me to    10:15:00
19 discuss?    10:15:01
20 BY MR. BARNES:    10:15:01
21      Q.  Right.    10:15:02
22      I want to know what the meaning of that    10:15:02
23 term "solve ads" as it related to the ██████████    10:15:04
24 project for which you were the product manager,    10:15:09
25 Mr. Heft-Luthy?    10:15:11

Page 68

1      MR. SPILLY:  Same objections.    10:15:15
2      THE WITNESS:  I'm sorry, Carl?    10:15:19
3      MR. SPILLY:  Same objections.    10:15:20
4      THE WITNESS:  So, again, with a caveat    10:15:21
5 that I don't recall the drafting process for this    10:15:23
6 specific comment, I can say, in general, we analyzed    10:15:26
7 a variety of different questions and complications    10:15:32
8 across Google.  As a product manager, your job is    10:15:36
9 often to understand, you know, opportunities for    10:15:40
10 improvement and to develop and deploy technology    10:15:44
11 that matches those opportunities.    10:15:48
12      I can speak again to stuff referenced    10:15:50
13 to -- to comments made in this document with regards    10:15:54
14 to certain user concerns that we've observed with    10:15:58
15 regards to ads.  I would hear a term "solve ads"    10:16:04
16 colloquially as referring to addressing those set of    10:16:07
17 problems.  I would perceive it as shorthand for    10:16:12
18 that, you know, broader, more -- more specific    10:16:18
19 question.    10:16:19
20      But, again, I can't speculate on the    10:16:20
21 actual drafting of the comment or how it was    10:16:23
22 received or drafted at the time because I don't    10:16:25
23 recall.    10:16:26
24 BY MR. BARNES:    10:16:27
25      Q.  What set of problems?    10:16:27

Page 69

18 (Pages 66 - 69)

1    A.  What set of problems with regards to user    10:16:36
2 advertising you're saying?                10:16:39
3    Q.  With respect to ads, what set of problems?    10:16:41
4    A.  So as we can see here in the exhibit    10:16:45
5 that's being projected right now, this document    10:16:47
6 attempts to summarize some of the key questions that    10:16:51
7 we've seen from user ads where that affects and    10:16:56
8 impacts relationships with technology and some of    10:17:00
9 the opportunities that we have to make our    10:17:03
10 relationship to the ads products that we build, you    10:17:06
11 know, always -- always more understandable for our    10:17:09
12 users.                        10:17:13
13    Q.  Does it relate to consent, Mr. Heft-Luthy?    10:17:14
14    MR. SPILLY:  Objection.  Vague.    10:17:19
15    THE WITNESS:  I would say that it's    10:17:24
16 certainly fair to say that there are consent moments    10:17:25
17 and questions at Google with Google technologies    10:17:30
18 that relate to ads.  I think it's fair to say that    10:17:33
19 both advertising and consent are related to privacy    10:17:36
20 development.                    10:17:41
21    Again, with respect to specific concrete    10:17:42
22 questions of specific concrete consent moments or    10:17:46
23 advertising questions, I can get into those as we    10:17:50
24 dive into specifics.                10:17:53
25 ///

                                    Page 70

1 BY MR. BARNES:                    10:17:54
2    Q.  What are those questions relating to    10:17:54
3 Google ads?                    10:17:56
4    MR. SPILLY:  Object to the form.    10:18:00
5    THE WITNESS:  Google provides a variety of    10:18:08
6 advertising services.  A variety of our products are    10:18:10
7 at least partially supported by advertising.  As a    10:18:14
8 result, just like any part of our products have    10:18:19
9 implications on how our products work.  It's almost    10:18:25
10 a tautology that when you add a feature to a    10:18:31
11 product, that affects how users relate to and    10:18:35
12 perceive that product.  And given that many of our    10:18:38
13 products have advertising features built in, that is    10:18:40
14 part of the overall product life cycle that we    10:18:43
15 manage when we are thinking about user advertising    10:18:46
16 questions given that, if our products offer ads, we    10:18:51
17 need to make sure that those products operate under    10:18:55
18 any privacy regime that we're building for either    10:18:58
19 legally or from a user understanding perspective.    10:19:02
20 BY MR. BARNES:                    10:19:04
21    Q.  And do you want users to have an accurate    10:19:05
22 understanding of how it works?            10:19:09
23    MR. SPILLY:  Objection.  Vague.    10:19:11
24    THE WITNESS:  Personally I can say that I    10:19:16
25 do.  It's something that I am employed by Google in    10:19:17
                                    Page 71

1 order to ensure happens.  I can say that Google    10:19:21
2 cares about user understanding both from a legal    10:19:26
3 perspective, given that in many cases in the    10:19:30
4 different regimes we operate under there are legal    10:19:34
5 requirements for transparency and notice.  Again, if    10:19:37
6 we want to get into specifics of those regimes, we    10:19:40
7 can discuss them.                10:19:43
8    Also, as this document outlines and other    10:19:44
9 work that we've done strategically will show, Google    10:19:47
10 has repeatedly taken positions that stronger user    10:19:51
11 understanding is correlated with trust with -- with    10:19:54
12 perception of Google as a -- as a useful actor in    10:20:00
13 this space and product utility.  And so it's    10:20:04
14 important to Google both from a legal and from a    10:20:07
15 product strategy perspective.            10:20:11
16 BY MR. BARNES:                    10:20:13
17    Q.  Why is trust important from a product    10:20:14
18 strategy perspective?                10:20:16
19    A.  So for a company like Google that offers a    10:20:24
20 variety of different products, our products for many    10:20:27
21 people are part of their daily lives.    10:20:31
22    If there's a -- a commonly used term    10:20:36
23 internal to Google, which is "the toothbrush test."    10:20:39
24 You want to have a product that's like a toothbrush.    10:20:42
25 People use it every day, something that's going to    10:20:46
                                    Page 72

1 be a part of your life.  Given that you're searching    10:20:47
2 for information on the Internet, watching videos on    10:20:49
3 YouTube on a regular basis, regardless of what that    10:20:54
4 is, if it's product that is something that's you    10:20:57
5 know, very useful to you, protecting your privacy,    10:20:59
6 taking issues of -- of privacy seriously is part of    10:21:02
7 that process.                    10:21:06
8    And so we recognize that trust is an    10:21:07
9 important part of user privacy -- user product    10:21:12
10 perception overall.  If a product doesn't respect    10:21:18
11 your privacy, we know that users are likely to seek    10:21:21
12 alternatives when those alternatives are available    10:21:25
13 to them.  And that's something that we recognize    10:21:28
14 as -- as an important factor in users' product    10:21:30
15 decisions.                    10:21:34
16    Q.  As trust increases, does user engagement    10:21:35
17 with Google's product increase?            10:21:39
18    MR. SPILLY:  Objection.  Vague.    10:21:44
19    THE WITNESS:  I can't speak to    10:21:45
20 individual -- again, that's going to be an    10:21:46
21 incredibly contingent question.  There's a variety    10:21:47
22 of different surfaces that we might be talking    10:21:51
23 about.  I can't speak to any specific overall --    10:21:54
24 BY MR. BARNES:                    10:21:58
25    Q.  Mr. Heft-Luthy, it would be helpful if,    10:21:58
                                    Page 73

                        19 (Pages 70 - 73)

1 instead of cabining every answer with a caveat about        10:22:00
2 what you can and can't say, if you would just answer         10:22:03
3 the question.        10:22:05
4        I'm sorry to interrupt.  But every answer,        10:22:07
5 Mr. Heft-Luthy, is -- is -- starts with a 30-second        10:22:09
6 what I can and can't say.        10:22:13
7        So I'm sorry for -- for interrupting.        10:22:18
8    A.  It's -- it's all right.  I mean -- please        10:22:24
9 go ahead.        10:22:27
10        MR. SPILLY:  Hold on.  I object to the --        10:22:27
11 I'm not sure if it's a question but to the        10:22:29
12 argumentative speech.        10:22:34
13 BY MR. BARNES:        10:22:35
14    Q.  Okay.  The question is: "As trust        10:22:36
15 increases, does user engagement increase?"        10:22:39
16 Mr. Heft-Luthy?        10:22:42
17        MR. SPILLY:  And same objections as before        10:22:45
18 to that.  Vague.        10:22:46
19        THE WITNESS:  Yeah, like I said, I'm --        10:22:47
20 I'm sorry to tell you I'm not going to be able to        10:22:50
21 speculate on that question in general.  We have        10:22:52
22 exhibits on specific product trust questions.  Like        10:22:54
23 I said, Google does a variety of research on product        10:22:59
24 trust.  If we have exhibits to review, I can -- am        10:23:02
25 more than happy to go through the research we've        10:23:04
Page 74

1 done in the space and talk aloud about specific        10:23:07
2 research that we've done.        10:23:10
3 BY MR. BARNES:        10:23:11
4    Q.  Mr. --        10:23:12
5    A.  -- trying to pose a bad question.        10:23:12
6    Q.  Mr. Heft-Luthy, why don't you just answer        10:23:13
7 the question without having to have a document put        10:23:14
8 in front of you?        10:23:16
9        Does increased trust increase user        10:23:18
10 engagement in general, Mr. Heft-Luthy?        10:23:21
11        MR. SPILLY:  Objection.  Argumentative.        10:23:24
12 And same as before, vague.        10:23:24
13        THE WITNESS:  I think it's important for        10:23:32
14 me to ensure that the answers to questions that I'm        10:23:34
15 giving are accurate and -- and specific to the way        10:23:37
16 that they're phrased and framed.  And so where I am        10:23:44
17 going to be required to offer contingency to provide        10:23:48
18 what I feel is an accurate and understandable        10:23:53
19 answer, I will do so.        10:23:56
20        Again, to that question that you asked        10:23:58
21 with regards to does user trust correlate with user        10:24:00
22 engagement, we've done research on user trust in a        10:24:06
23 variety of different surfaces and different        10:24:10
24 products.  And, again, I can't speak to that        10:24:15
25 question without going into specifics around        10:24:20
Page 75

1 specific products or specific research that we've        10:24:24
2 done.        10:24:27
3 BY MR. BARNES:        10:24:27
4    Q.  What's the answer in general,        10:24:29
5 Mr. Heft-Luthy?        10:24:30
6        MR. SPILLY:  I didn't get this question        10:24:32
7 in -- well, I can pose it to this one.  Objection.        10:24:33
8 Asked and answered at this point, I think multiple        10:24:37
9 times.        10:24:40
10 BY MR. BARNES:        10:24:41
11    Q.  Mr. Heft-Luthy, can you turn to --        10:24:49
12        MR. BARNES:  Let's go -- Ms. Truong, go to        10:24:53
13 the fourth page of the document.  It ends in 4164.        10:24:57
14 BY MR. BARNES:        10:25:01
15    Q.  You see at the top where it says "Sam's        10:25:05
16 Scratch Pad"?        10:25:06
17    A.  That's correct, I do.        10:25:09
18    Q.  Are you Sam?        10:25:09
19    A.  Given that there were no other Sams on the        10:25:15
20 ████████████  project -- again, I'm going to have to        10:25:19
21 be contingent with my answer here given that I don't        10:25:21
22 recall this specific document.  But I was not -- I        10:25:27
23 was the only Sam working the ██████████ project.        10:25:31
24 I can say that.        10:25:34
25    Q.  Is this your scratch pad, Mr. Sam --        10:25:35
Page 76

1 Mr. Heft-Luthy?        10:25:38
2    A.  As I've said, I -- I can't speak to that        10:25:39
3 question given that I don't actually recall.  I've        10:25:42
4 been asked to only provide testimony given where        10:25:45
5 it's accurate.        10:25:49
6        Again, as I've stated, I'm the only        10:25:50
7 product manager -- or I'm the only Sam that was part        10:25:53
8 of this project, to my recollection.        10:25:56
9    Q.  So you have no reason to think it's not        10:25:58
10 you, this is -- this is not Sam, as in you, your        10:26:00
11 scratch pad, correct?        10:26:04
12    A.  Again, with the caveat that I also --        10:26:07
13        MR. SPILLY:  Object -- sorry, Sam.        10:26:10
14        Object to the form.        10:26:14
15        THE WITNESS:  Again, with the caveat that        10:26:17
16 I don't specifically recall this, I think it would        10:26:18
17 be -- it would -- my -- my understanding looking at        10:26:22
18 this document would have been that I was drafting        10:26:26
19 it, yes.        10:26:29
20 BY MR. BARNES:        10:26:30
21    Q.  What do you mean by "concerns about being        10:26:36
22 profiled, surveilled" or -- "and even manipulated"?        10:26:38
23    A.  Sorry.  I'm just making sure I can review        10:26:42
24 the language.        10:26:57
25    Q.  It's the third bullet point.        10:27:04
Page 77

20 (Pages 74 - 77)

CONFIDENTIAL

| | |
|---|---|
| 1    A.  Third bullet point.              10:27:06 | 1  approach relationship with user data as a result."    10:29:49 |
| 2         Yeah.  So, to -- to this, I can say that,    10:27:08 | 2         What does that link to, do you believe?    10:29:52 |
| 3  as I mentioned, advertising products are part of    10:27:11 | 3         MR. SPILLY:  Objection.              10:29:55 |
| 4  Google's overall product offering.  They're one in    10:27:17 | 4         THE WITNESS:  Again, I --              10:29:56 |
| 5  which we see some user concern alongside questions    10:27:20 | 5         MR. SPILLY:  Speculation.              10:29:57 |
| 6  of all of our products.  It's something we can    10:27:25 | 6         THE WITNESS:  -- I don't recall.        10:29:57 |
| 7  always improve and work better.              10:27:29 | 7         MR. SPILLY:  Sam, give me a second to    10:29:58 |
| 8         As the text states here, I think it speaks    10:27:31 | 8  object.                                  10:30:00 |
| 9  for itself to a certain degree.  We know that there    10:27:35 | 9  BY MR. BARNES:                          10:30:00 |
| 10  are user concerns about this from some users, and    10:27:37 | 10    Q.  You see the third bullet point, you say    10:30:04 |
| 11  it's something with regards to user concerns about    10:27:41 | 11  there:  "By turning three controls into 300."    10:30:06 |
| 12  profiling surveillance or manipulation that we want    10:27:45 | 12         What three controls are you speaking of?    10:30:10 |
| 13  to understand and address with technology that we    10:27:49 | 13         MR. SPILLY:  Objection.  Foundation.    10:30:14 |
| 14  deploy.                                  10:27:53 | 14         THE WITNESS:  So with this language, "by    10:30:26 |
| 15         MR. BARNES:  Okay.  And, Ms. Truong, if    10:27:54 | 15  turning three controls into 300," to my          10:30:28 |
| 16  you could go to the seventh page where it says    10:27:56 | 16  recollection, this was a reference to activity    10:30:33 |
| 17  "Appendix," please.                        10:27:59 | 17  controls at Google.  At the time of drafting, that    10:30:36 |
| 18  BY MR. BARNES:                          10:28:04 | 18  would have been three controls referred to          10:30:40 |
| 19    Q.  Mr. Heft-Luthy, you see there where it    10:28:05 | 19  externally as Web and app activity, location    10:30:46 |
| 20  says:  "Google has done a lot of research"?  Is --    10:28:06 | 20  history, and YouTube history.              10:30:48 |
| 21  that appears to be a hyperlink, correct?    10:28:09 | 21  BY MR. BARNES:                          10:30:50 |
| 22         MR. SPILLY:  Objection.  Speculation.    10:28:18 | 22    Q.  What are they referred to internally as?    10:30:50 |
| 23         THE WITNESS:  Given that this is a    10:28:21 | 23    A.  They are sometimes referred to in those    10:30:56 |
| 24  reproduction of a document, and, again, a document    10:28:22 | 24  terms.  They are often also referred to with the    10:30:58 |
| 25  that I don't specifically recall drafting, I    10:28:28 | 25  abbreviations like WAA, LH, or YouTube History or    10:31:03 |
| Page 78 | Page 80 |
| 1  wouldn't be able to speculate on whether this is    10:28:30 | 1  YTH                                      10:31:08 |
| 2  simply an underlining for emphasis or a hyperlink.    10:28:33 | 2         MR BARNES:  Ms Truong, can you place P3    10:31:12 |
| 3  BY MR. BARNES:                          10:28:38 | 3  into the folder, please?                  10:31:16 |
| 4    Q.  Does Google maintain the research on this    10:28:40 | 4         (Whereupon Exhibit 3 was marked for    10:31:18 |
| 5  topic in a central location?              10:28:42 | 5    identification )                        10:31:18 |
| 6         MR. SPILLY:  Object to the form.    10:28:47 | 6         MR  SPILLY:  Could we take a break?    10:31:19 |
| 7         THE WITNESS:  On the topic of privacy and    10:28:52 | 7         MR  BARNES:  Sure  How long?          10:31:21 |
| 8  consent, you mean?                        10:28:53 | 8         MR  SPILLY:  Ten minutes  Or, actually,    10:31:24 |
| 9  BY MR. BARNES:                          10:28:55 | 9  it's up to Sam                            10:31:25 |
| 10    Q.  Of ████████ as it related to this    10:28:55 | 10         THE WITNESS:  Ten minutes sound fine    10:31:27 |
| 11  product for -- project for which you were the    10:28:57 | 11         MR  BARNES:  Let's go off the record  I'm    10:31:30 |
| 12  product manager, Mr. Heft-Luthy.          10:28:59 | 12  sorry                                    10:31:31 |
| 13    A.  So as previously stated, to my          10:29:03 | 13         THE VIDEO OPERATOR:  Off the record at    10:31:32 |
| 14  recollection, there was a request with a user    10:29:07 | 14  10:31 a m                                10:31:33 |
| 15  research -- a user experience researcher to collect    10:29:10 | 15         (Off the record at 10:31 a m  and back    10:31:34 |
| 16  a summary of privacy research that had been done    10:29:12 | 16    on the record at 10:46 a m )              10:46:21 |
| 17  both internal to Google and external that would    10:29:17 | 17         THE VIDEO OPERATOR:  Okay  We are back on    10:46:24 |
| 18  assist us with the project.  Again, that might be or    10:29:20 | 18  the record  The time is 10:46 a m  Pacific Time    10:46:24 |
| 19  might not be in my file.  I can't speak to discovery    10:29:24 | 19  BY MR  BARNES:                          10:46:27 |
| 20  process.  But there would have been at least a    10:29:28 | 20    Q   Ms Truong has shared Exhibit 3          10:46:28 |
| 21  document that was developed as part of the -- as    10:29:31 | 21         MR  BARNES:  Ms Truong, can you put that    10:46:31 |
| 22  part of the process and foundation for this project,    10:29:35 | 22  up on the screen?                        10:46:33 |
| 23  which, as I said, I -- I am under the impression    10:29:39 | 23  BY MR  BARNES:                          10:46:33 |
| 24  that the link at the top was a link to.    10:29:43 | 24    Q   And, Mr Heft-Luthy, can you let me know    10:46:33 |
| 25    Q.  Okay.  And it says:  "Foundational    10:29:46 | 25  when you have it?                        10:46:36 |
| Page 79 | Page 81 |

**Page 82**

1  A. I will.                                  10:46:38
2      MS. CRAWFORD: Not yet in the folder.    10:46:45
3  BY MR. BARNES:                              10:46:48
4  Q. While we're waiting on that,             10:46:57
5  Mr. Heft-Luthy, who is Kallebu?             10:46:58
6      MS. CRAWFORD: Wait. Sorry. Did you --   10:47:03
7  did you hear me, Jay? It's not yet in the folder.  10:47:04
8      MR. BARNES: Yes.                         10:47:08
9      MS. CRAWFORD: We don't have access to the  10:47:09
10 exhibit yet.                                 10:47:10
11     MR. BARNES: Yes, and I'm asking while we  10:47:12
12 are waiting for that to upload --            10:47:13
13     MS. TRUONG: I am, by the way.            10:47:15
14 BY MR. BARNES:                               10:47:16
15 Q. Mr. Heft-Luthy, who is Kallebu?          10:47:16
16     MR. SPILLY: Objection. Vague.           10:47:22
17     THE WITNESS: Are you referring to -- I  10:47:24
18 can't see here. Is there text that you're referring  10:47:29
19 to?                                          10:47:33
20 BY MR. BARNES:                               10:47:34
21 Q. The owner of this document is listed as a  10:47:34
22 Kallebu, K-A-L-L-E-B-U.                      10:47:36
23 A. That would be a internal user name. We   10:47:44
24 have an internal user name system. That would be  10:47:47
25 Kalle Bushman.                               10:47:50

**Page 83**

1  Q. C-A-L-L-E [sic] is -- is it Mr. or       10:47:54
2  Ms. Bushman?                                 10:47:57
3  A. It would be Mr. Bushman.                  10:47:59
4  Q. And it's just Bushman, B-U-S-H-M-A-N; is  10:48:01
5  that right?                                  10:48:04
6  A. I believe that's the correct             10:48:07
7  pronunciation.                              10:48:09
8  Q. Does Mr. Bushman report to you,          10:48:10
9  Mr. Heft-Luthy?                             10:48:12
10     Let me back up.                          10:48:15
11     At the time -- in September of 2020, did  10:48:17
12 Mr. Bushman report to you?                   10:48:19
13 A. No.                                       10:48:23
14 Q. Okay. Was he part of the PDPO team?      10:48:24
15     MR. SPILLY: Objection. Vague.           10:48:30
16     THE WITNESS: Yes.                        10:48:32
17 BY MR. BARNES:                               10:48:32
18 Q. And Mr. Heft-Luthy, who is Mimosal?      10:48:35
19     Do you see there below where it says     10:48:41
20 M-I-M-O-S-A-L? Who is that?                  10:48:42
21 A. That would be Mimosa Lynch.              10:48:53
22 Q. That's a -- that's a pretty name.        10:49:09
23     Okay. And you and Ms. Lynch were the    10:49:09
24 collaborators with Mr. Bushman on this document; is  10:49:12
25 that correct?                               10:49:14

**Page 84**

1  A. Let me review this document just to ensure  10:49:28
2  that we're referring to the right one.       10:49:31
3  Q. Sure.                                     10:49:33
4  A. Both -- both myself and Ms. Lynch        10:49:38
5  contributed to the document.                 10:49:40
6  Q. Okay. And this was a document prepared by  10:49:41
7  the PDPO team?                               10:49:43
8  A. Yes.                                      10:49:52
9  Q. What was the purpose of this document?   10:49:53
10     MR. SPILLY: Objection. Vague.           10:49:54
11     THE WITNESS: The purpose of this document  10:50:00
12 was to provide a summary of the progress that we had  10:50:02
13 made on the ███████ project up to -- up to the  10:50:07
14 point at which we delivered the presentation.  10:50:11
15     MR. BARNES: Okay. If you could go to,   10:50:14
16 Ms. Truong, 5754260.                         10:50:16
17 BY MR. BARNES:                               10:50:20
18 Q. You see where it says "Arne's words"?    10:50:26
19     Is that a "yes," Mr. Heft-Luthy? Sorry.  10:50:31
20 You have got to say "yes" or "no."           10:50:33
21 A. Wait. Sorry, that was a -- that was a    10:50:34
22 noting nod.                                  10:50:36
23     Yes, I do.                               10:50:38
24 Q. And who is Arne?                          10:50:39
25     MR. SPILLY: Sam, just a reminder that you  10:50:42

**Page 85**

1  can take the time to familiarize yourself with the  10:50:44
2  document before you speak to it.             10:50:48
3  THE WITNESS: Yep.                           10:50:51
4      MR. BARNES: Mr. Spilly --               10:50:51
5  BY MR. BARNES:                               10:50:52
6  Q. The question, Mr. Heft-Luthy, is: Who is  10:50:52
7  Arne? Who is Arne, Mr. Heft-Luthy?          10:50:57
8  A. Arne is a user experience researcher for  10:51:12
9  the Privacy and Data Protection Office.      10:51:15
10 Q. And what is Arne's full name?            10:51:17
11 A. Arne's full name is Arne de Booij.       10:51:23
12 Q. And where is he located?                 10:51:28
13 A. I don't know the answer to that question  10:51:33
14 at the time.                                 10:51:35
15     At this moment, I can't -- I can't       10:51:39
16 speculate on that.                          10:51:41
17 Q. Is he located in Mountain View           10:51:42
18 A. At no point in our collaboration was he   10:51:50
19 based in the Mountain View office.           10:51:55
20 Q. Is he in Europe?                          10:51:57
21     MR. SPILLY: Objection. Asked and        10:52:00
22 answered.                                    10:52:00
23 BY MR. BARNES:                               10:52:03
24 Q. Is he in Europe, Mr. Heft-Luthy?         10:52:07
25 A. I can't say where he is right now.       10:52:14

22 (Pages 82 - 85)

1 Through most of our collaboration, he was, yeah.    10:52:16
2   Q.  Thank you, Mr. Heft-Luthy.  These are not    10:52:20
3 difficult questions.    10:52:22
4       Where in Europe during your -- his -- your    10:52:24
5 collaboration was he?    10:52:27
6       MR. SPILLY:  Object to the form.    10:52:32
7       THE WITNESS:  Through most of our    10:52:38
8 collaboration, Arne was working out of the Munich    10:52:38
9 office.  Though through most of the ████████    10:52:46
10 project specifically, he was working from home like    10:52:50
11 many Googlers.    10:52:54
12 BY MR. BARNES:    10:52:55
13   Q.  Understand.  Understand.    10:52:56
14       Do you see below where it says:  "To    10:52:57
15 develop our perspective, we have reviewed and    10:52:59
16 analyzed more than 150 documents representing    10:53:02
17 five-plus years of trust and privacy"?    10:53:06
18       Do you see that?    10:53:12
19   A.  Yes.    10:53:12
20   Q.  Would those documents have been collected    10:53:13
21 in one place?    10:53:15
22       MR. SPILLY:  Objection.  Vague.    10:53:18
23       THE WITNESS:  I -- I can't speculate on    10:53:24
24 what specific place this would be referring to.    10:53:26
25 ///
                                                    Page 86

1 BY MR. BARNES:    10:53:29
2   Q.  Okay.  Who would know what those documents    10:53:29
3 are?    10:53:35
4   A.  With regard to who would be able to say    10:53:45
5 definitively what 150 documents we're discussing?    10:53:48
6   Q.  Correct.    10:53:51
7   A.  I don't -- I don't know of anybody that    10:53:56
8 would be able to, without reviewing previous    10:53:59
9 existing things, be able to answer that question.    10:54:03
10   Q.  If Mr. Pichai asked you to provide them,    10:54:06
11 could you do it?    10:54:11
12       "Pichai."  I'm sorry.    10:54:13
13       If Mr. Pichai asked you to provide him    10:54:14
14 with those documents, could you do so?    10:54:18
15       MR. SPILLY:  Objection.  Speculation and    10:54:25
16 form.    10:54:26
17       THE WITNESS:  I -- I wouldn't be able to    10:54:32
18 say with certainty until I would have time to do    10:54:33
19 further investigation.    10:54:36
20 BY MR. BARNES:    10:54:36
21   Q.  Has this presentation been given to    10:54:37
22 Mr. Pichai?    10:54:39
23       MR. SPILLY:  Objection.  Form.    10:54:47
24       THE WITNESS:  I have not delivered this    10:54:52
25 presentation to Mr. Pichai.    10:54:54
                                                    Page 87

1 BY MR. BARNES:    10:54:56
2   Q.  Was the concept of ████████ presented    10:54:56
3 to Mr. Pichai?    10:54:58
4       MR. SPILLY:  Objection.  Vague.    10:55:04
5       THE WITNESS:  I don't know the answer to    10:55:11
6 that question.    10:55:13
7 BY MR. BARNES:    10:55:14
8   Q.  Who would know the answer to that    10:55:14
9 question, Mr. Heft-Luthy?    10:55:16
10       MR. SPILLY:  Objection.  Calls for    10:55:20
11 speculation.    10:55:20
12       THE WITNESS:  I wouldn't be able to    10:55:27
13 speculate with certainty on that.    10:55:29
14 BY MR. BARNES:    10:55:31
15   Q.  Okay.  If we could go to page 26, which    10:55:31
16 the Bates number is -- ends in 282, please.    10:55:34
17   A.  Okay.  I have it.    10:56:10
18   Q.  Do you see it says:  "Our research    10:56:12
19 inputs"?    10:56:13
20   A.  Yes.    10:56:19
21   Q.  Why did you interview people for    10:56:19
22 ████████?    10:56:24
23       MR. SPILLY:  Objection.  Foundation.    10:56:25
24       THE WITNESS:  Can -- can you be more    10:56:33
25 specific about what aspect of why you're looking to    10:56:35
                                                    Page 88

1 get into here?    10:56:38
2 BY MR. BARNES:    10:56:39
3   Q.  Did you conduct interviews for    10:56:39
4 ████████?    10:56:42
5   A.  Yes.    10:56:48
6   Q.  Did you personally conduct those    10:56:49
7 interviews?    10:56:51
8   A.  Some of them, yes.    10:56:56
9   Q.  Who else conducted the interviews?    10:56:58
10   A.  I know that Kalle conducted at least some    10:57:07
11 of them.  I can't speculate further.    10:57:12
12   Q.  How many total were conducted?    10:57:15
13   A.  I don't recall.    10:57:21
14   Q.  Approximately how many were conducted?    10:57:24
15   A.  I wouldn't be able to speculate with a    10:57:31
16 level of certainty that I'm comfortable putting on    10:57:33
17 the record here.    10:57:35
18       I can say confidently no more than 30 were    10:57:38
19 conducted.    10:57:42
20   Q.  There are nine listed on the screen,    10:57:44
21 correct?    10:57:46
22   A.  That's correct.    10:57:50
23   Q.  So somewhere between nine and 30    10:57:51
24 interviews were conducted; is that correct?    10:57:53
25   A.  That's correct.    10:58:03
                                                    Page 89

23 (Pages 86 - 89)

**Page 90**

1  Q. How many of those do you estimate that you  10:58:04
2 conducted?                                    10:58:07
3  A. I don't recall.                           10:58:15
4  MR. SPILLY: Objection. Speculation.          10:58:16
5 BY MR. BARNES:                                10:58:16
6  Q. Were these interviews recorded?           10:58:17
7  A. I don't recall.                           10:58:22
8  Q. You were in the interview, correct?       10:58:28
9  MR. SPILLY: Objection. Foundation.           10:58:31
10  THE WITNESS: Which interview were you       10:58:36
11 referring to?                                10:58:37
12 BY MR. BARNES:                               10:58:38
13  Q. You were in some of these interviews,    10:58:38
14 correct?                                     10:58:40
15  A. Yes.                                      10:58:47
16  Q. Did you take notes on the interviews that 10:58:47
17 you conducted?                               10:58:49
18  A. I don't recall specifically who took notes 10:58:58
19 on interviews that we conducted.             10:59:01
20  Q. Were there other people in the room when 10:59:03
21 you conducted these interviews?              10:59:05
22  MR. SPILLY: Object to the form.             10:59:10
23  THE WITNESS: With the caveat that these     10:59:16
24 were all remote interviews, there were, if I recall, 10:59:18
25 people -- multiple people from our team on each of 10:59:20

**Page 91**

1 these interviews, yes.                        10:59:26
2 BY MR. BARNES:                                10:59:27
3  Q. Did someone take notes during the         10:59:27
4 interviews for your team?                     10:59:29
5  A. Yes.                                       10:59:41
6  Q. Were those notes shared amongst your team? 10:59:41
7  A. Yes.                                       10:59:45
8  Q. What was the platform you used to do the  10:59:46
9 interviews?                                   10:59:49
10  MR. SPILLY: Objection. Vague.               11:00:01
11  THE WITNESS: To -- to conduct them          11:00:02
12 specifically? What do you mean by "to do"?   11:00:03
13 BY MR. BARNES:                               11:00:05
14  Q. To conduct them.                         11:00:05
15  MR. SPILLY: Objection. Still vague.         11:00:10
16 BY MR. BARNES:                               11:00:17
17  Q. Did you use Google Meet? Mr. Heft-Luthy, 11:00:17
18 did you use Google Meet?                     11:00:19
19  A. Yes.                                      11:00:24
20  Q. Did you -- were some of the interviews   11:00:26
21 recorded?                                    11:00:29
22  A. I don't recall.                          11:00:36
23  Q. Were there transcripts of the interviews? 11:00:38
24  MR. SPILLY: Object to the form.             11:00:50
25  THE WITNESS: Do you mean in distinction     11:00:57

**Page 92**

1 from the notes of the interviews?             11:00:59
2 BY MR. BARNES:                                11:01:01
3  Q. Correct, in distinction from the notes.   11:01:01
4  A. I don't recall any transcript separate    11:01:16
5 from notes taken.                             11:01:17
6  Q. Was Mr. Pichai interviewed?               11:01:19
7  MR. SPILLY: Objection to the form.           11:01:31
8  THE WITNESS: Was Mr. Pichai interviewed      11:01:35
9 as part of this project you're asking?        11:01:38
10 BY MR. BARNES:                               11:01:40
11  Q. Correct.                                 11:01:40
12  A. Not to my recollection.                  11:01:46
13  Q. Mr. Heft-Luthy, why did it take so long to 11:01:48
14 answer that question?                        11:01:50
15  MR. SPILLY: Objection.                      11:01:53
16  THE WITNESS: I would like to make sure      11:02:00
17 that my answers to questions are accurate given that 11:02:02
18 I've been sworn in under penalty of perjury. 11:02:06
19 BY MR. BARNES:                               11:02:09
20  Q. That's fair.                             11:02:10
21  Is there -- at the -- at any point in the   11:02:11
22 project was a list compiled of everyone who was 11:02:15
23 interviewed?                                 11:02:19
24  A. Yes.                                      11:02:27
25  Q. Who has that list?                        11:02:31

**Page 93**

1  A. I can't say with certainty who would have 11:02:39
2 access to it.                                 11:02:42
3  Q. Okay. Who is -- I'm looking at the        11:02:43
4 stakeholder interview -- interviews -- Micah Laaker? 11:02:48
5 It says "Office of the CEO."                  11:02:57
6  Who is Micah Laaker?                         11:02:59
7  A. Micah Laaker is a design director. At     11:03:07
8 least he was a design director at the time of 11:03:09
9 this -- at the time of this project.          11:03:12
10  Q. Does he report to Mr. Pichai?            11:03:16
11  A. I can't speculate on that.               11:03:24
12  Q. What is Prinascrapa,                      11:03:33
13 P-R-I-N-A-S-C-R-A-P-A?                        11:03:39
14  A. I don't recall.                          11:03:39
15  Q. What's ███████?                          11:04:01
16  A. ████████████████████████               11:04:12
17 ████████████████████████████               11:04:15
18 █████.                                        11:04:17
19  Q. How many of them are there?              11:04:21
20  MR. SPILLY: Object to the form.             11:04:23
21  THE WITNESS: I wouldn't be able to          11:04:26
22 speculate on the number.                      11:04:27
23 BY MR. BARNES:                               11:04:27
24  Q. Is it more than a hundred?               11:04:28
25  A. Like I said, I can't say with certainty. 11:04:36

24 (Pages 90 - 93)

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q. How often -- what's a Brandgeist report? | 11:04:39 |
| 2 | MR. SPILLY: Object to the form. | 11:04:47 |
| 3 | THE WITNESS: What -- what information | 11:04:50 |
| 4 | about Brandgeist are you looking to get here? | 11:04:51 |
| 5 | BY MR. BARNES: | 11:04:55 |
| 6 | Q. What is it? What's a Brandgeist report? | 11:04:55 |
| 7 | A. A Brandgeist report is a marketing report | 11:05:05 |
| 8 | digging into Google's brand reputation alongside | 11:05:10 |
| 9 | competitors and with information that may vary from | 11:05:15 |
| 10 | report to report. | 11:05:20 |
| 11 | Q. How often are they conducted? | 11:05:22 |
| 12 | MR. SPILLY: Object to the form. | 11:05:28 |
| 13 | THE WITNESS: I don't know the answer to | 11:05:30 |
| 14 | that question. | 11:05:30 |
| 15 | BY MR. BARNES: | 11:05:31 |
| 16 | Q. You see below there where it says "XFN | 11:05:31 |
| 17 | POV"? | 11:05:34 |
| 18 | Does POV stand for point of view? | 11:05:36 |
| 19 | A. In common parlance at Google, POV does | 11:05:47 |
| 20 | refer to point of view. | 11:05:50 |
| 21 | Q. And what is XFN? | 11:05:51 |
| 22 | A. In common parlance at Google, XFN is used | 11:05:59 |
| 23 | to refer to cross-functional. | 11:06:02 |
| 24 | Q. So did your team look at user experience, | 11:06:08 |
| 25 | engineering, marketing, and macro trends? Explain | 11:06:13 |

Page 94

| | | |
|---|---|---|
| 1 | to me how XFN POV is a research input. | 11:06:17 |
| 2 | MR. SPILLY: Object to the form. | 11:06:24 |
| 3 | THE WITNESS: I think there were two | 11:06:28 |
| 4 | questions in there. Which would you like me to | 11:06:32 |
| 5 | answer? | 11:06:34 |
| 6 | BY MR. BARNES: | 11:06:34 |
| 7 | Q. I want to know how XFN POV is a research | 11:06:35 |
| 8 | input. | 11:06:38 |
| 9 | A. It was included in the material that the | 11:06:44 |
| 10 | team reviewed as we developed our perspective in | 11:06:46 |
| 11 | strategic outputs. | 11:06:50 |
| 12 | Q. Were there documents associated with each | 11:06:52 |
| 13 | of those XFN POV inputs? | 11:06:54 |
| 14 | MR. SPILLY: Objection. Vague. | 11:07:00 |
| 15 | THE WITNESS: As part of the XFN POV, | 11:07:09 |
| 16 | there were documents prepared, yes. | 11:07:11 |
| 17 | BY MR. BARNES: | 11:07:13 |
| 18 | Q. And how did you do the XFN POV? Did you | 11:07:14 |
| 19 | talk to people from user experience? | 11:07:16 |
| 20 | MR. SPILLY: Object to the form. | 11:07:20 |
| 21 | THE WITNESS: For the XFN POV, we had | 11:07:28 |
| 22 | different partners in those functions handle the | 11:07:32 |
| 23 | development of relevant documents. | 11:07:36 |
| 24 | BY MR. BARNES: | 11:07:37 |
| 25 | Q. Was -- is there a list of partners you | 11:07:42 |

Page 95

| | | |
|---|---|---|
| 1 | dealt with as the product manager? | 11:07:44 |
| 2 | A. I -- I don't recall for certain. | 11:07:52 |
| 3 | Q. Okay. Who made the contacts with these | 11:07:55 |
| 4 | other -- to -- to gather these other POVs? | 11:07:59 |
| 5 | MR. SPILLY: Object to the form. | 11:08:06 |
| 6 | THE WITNESS: These were handled -- as | 11:08:12 |
| 7 | part of the process of -- of running the program | 11:08:13 |
| 8 | that we handled, we identified people who would | 11:08:19 |
| 9 | handle those POVs. | 11:08:23 |
| 10 | BY MR. BARNES: | 11:08:24 |
| 11 | Q. And there was e-mail traffic, correct? | 11:08:25 |
| 12 | MR. SPILLY: Objection. Vague. | 11:08:29 |
| 13 | THE WITNESS: E-mail traffic in regards | 11:08:33 |
| 14 | to? | 11:08:35 |
| 15 | BY MR. BARNES: | 11:08:35 |
| 16 | Q. When you were making contact with each of | 11:08:35 |
| 17 | these different departments. | 11:08:37 |
| 18 | A. I don't recall the exact process by which | 11:08:47 |
| 19 | we identified contacts here. | 11:08:50 |
| 20 | MR. BARNES: Okay. Let's go to page 32, | 11:08:51 |
| 21 | Ms. Truong, please, which ends in 288. | 11:08:54 |
| 22 | BY MR. BARNES: | 11:08:58 |
| 23 | Q. In your estimation, is Arne a trustworthy | 11:09:07 |
| 24 | colleague? | 11:09:13 |
| 25 | MR. SPILLY: Objection. Form. | 11:09:19 |

Page 96

| | | |
|---|---|---|
| 1 | THE WITNESS: I'm not sure what you mean | 11:09:21 |
| 2 | by "trustworthy." | 11:09:23 |
| 3 | What specific are you asking me to trust | 11:09:24 |
| 4 | him with? | 11:09:29 |
| 5 | BY MR. BARNES: | 11:09:30 |
| 6 | Q. I'm asking that if -- when Arne | 11:09:30 |
| 7 | participated in your project, was he someone you | 11:09:32 |
| 8 | could rely upon? | 11:09:36 |
| 9 | A. Again, rely upon him to do what | 11:09:48 |
| 10 | specifically are we referring to here? | 11:09:51 |
| 11 | Q. Is Arne dishonest? | 11:09:54 |
| 12 | A. I'm -- I'm not really going to be able to | 11:09:57 |
| 13 | speculate on that question in generality. | 11:10:00 |
| 14 | Q. Okay. We're on page 32. | 11:10:03 |
| 15 | Who is Elyse? | 11:10:06 |
| 16 | A. Sorry. Could you repeat which exhibit | 11:10:16 |
| 17 | page you're on? | 11:10:21 |
| 18 | Q. Yeah. It's -- it ends in 288. I believe | 11:10:22 |
| 19 | it's page 32. It's on the screen. It's in the top | 11:10:25 |
| 20 | right corner there, E-L-Y-S-E. | 11:10:28 |
| 21 | Who is Elyse? | 11:10:34 |
| 22 | A. Elyse is a user experience designer in the | 11:10:43 |
| 23 | Privacy and Data Protection Office. | 11:10:46 |
| 24 | Q. How long has she been in PDPO? | 11:10:49 |
| 25 | A. I don't recall how long. | 11:11:00 |

Page 97

25 (Pages 94 - 97)

CONFIDENTIAL

| | |
|---|---|
| 1    Q.  Okay.  How long have you been in PDPO?        11:11:01 | 1 BY MR. BARNES:                                        11:13:57 |
| 2    A.  I switched to a role working on privacy        11:11:13 | 2    Q.  Was it primarily focused upon user            11:13:58 |
| 3 work at Google in 2017.  I can't recall how long       11:11:17 | 3 consent, Mr. Heft-Luthy?                              11:14:02 |
| 4 I've been specifically in an organizational          11:11:23 | 4       MR. SPILLY:  Objection.  Vague.                 11:14:05 |
| 5 structure referred to as the PDPO.                  11:11:25 | 5       THE WITNESS:  As previously stated, the         11:14:13 |
| 6    Q.  Has Elyse -- I'm sorry.                       11:11:29 | 6 work that my team does sometimes touches upon         11:14:14 |
| 7       What is Elyse's last name?  Did I already      11:11:31 | 7 consent as part of the landscape in which we          11:14:19 |
| 8 ask that?                                            11:11:34 | 8 operate.  It was like other work that we do also      11:14:22 |
| 9    A.  I don't believe so.                           11:11:35 | 9 addressing user concern, overall product strategy,    11:14:26 |
| 10    Q.  Okay.  What is Elyse's last name?            11:11:36 | 10 technical development, and a variety of other inputs  11:14:30 |
| 11    A.  Her last name is Bellamy.                    11:11:40 | 11 in addition to consent.                              11:14:33 |
| 12    Q.  B-E-L-L-A-M-Y?                               11:11:44 | 12 BY MR. BARNES:                                       11:14:34 |
| 13    A.  Yes.                                         11:11:47 | 13    Q.  All funneling to the idea of the consent      11:14:34 |
| 14    Q.  Is she in Mountain View?                     11:11:48 | 14 process, correct?                                    11:14:37 |
| 15    A.  I similarly don't know where she is at       11:11:58 | 15       MR. SPILLY:  Objection.  Vague.                 11:14:40 |
| 16 this time.                                          11:11:59 | 16       THE WITNESS:  I'm not sure what you mean        11:14:45 |
| 17    Q.  Generally speaking, is her office location   11:12:00 | 17 by "funneling."                                      11:14:46 |
| 18 in Northern California at Google's Mountain --      11:12:03 | 18 BY MR. BARNES:                                       11:14:47 |
| 19 associated with Google's Mountain View office,     11:12:06 | 19    Q.  Well, the consent process has a user          11:14:47 |
| 20 Mr. Heft-Luthy?                                     11:12:09 | 20 experience component to it, correct?                 11:14:50 |
| 21       MR. SPILLY:  Objection.  Asked and            11:12:10 | 21    A.  Yes.                                          11:14:56 |
| 22 answered.                                           11:12:10 | 22    Q.  And the consent process has an engineering    11:14:57 |
| 23       THE WITNESS:  The last time we had contact    11:12:18 | 23 component to it, correct?                            11:15:00 |
| 24 before she went on maternity leave, she was located 11:12:21 | 24       MR. SPILLY:  Objection.  Vague.                 11:15:06 |
| 25 in Munich.                                          11:12:25 | 25       THE WITNESS:  Insofar as anything that we       11:15:10 |
|                                              Page 98 |                                              Page 100 |
| 1 BY MR. BARNES:                                       11:12:26 | 1 do with code has an engineering component, that       11:15:12 |
| 2    Q.  Thank you.                                    11:12:26 | 2 would be correct, yes.                                11:15:16 |
| 3       MR. BARNES:  Ms. Truong, can you share         11:12:38 | 3 BY MR. BARNES:                                        11:15:17 |
| 4 Exhibit 4, please?                                   11:12:42 | 4    Q.  And the consent process has a policy           11:15:18 |
| 5       MS. TRUONG:  Just one moment.                  11:12:43 | 5 aspect to it, correct?                                11:15:20 |
| 6       (Whereupon Exhibit 4 was marked for            11:12:44 | 6       MR. SPILLY:  Objection.  Vague.                 11:15:25 |
| 7       identification.)                               11:12:44 | 7       THE WITNESS:  Again, as a product manager,      11:15:25 |
| 8 BY MR. BARNES:                                       11:12:45 | 8 my role is to manage a variety of inputs.  Some of    11:15:33 |
| 9    Q.  Mr. Heft-Luthy, was ████████ an              11:12:59 | 9 those are legal, as we've discussed.  Some of them    11:15:35 |
| 10 aspirational project?                               11:13:02 | 10 are policy, yes.                                     11:15:38 |
| 11       MR. SPILLY:  Objection.  Vague.               11:13:05 | 11 BY MR. BARNES:                                       11:15:39 |
| 12       THE WITNESS:  Can you define what you mean    11:13:08 | 12    Q.  Okay.  Can you open Exhibit 4?                11:15:40 |
| 13 by "aspirational"?                                  11:13:09 | 13       MR. BARNES:  And, Ms. Truong, can you put      11:15:41 |
| 14 BY MR. BARNES:                                      11:13:11 | 14 this on the screen?                                  11:15:42 |
| 15    Q.  Yes, I can.                                  11:13:11 | 15 BY MR. BARNES:                                       11:15:54 |
| 16       Was it a proposal to improve how Google's    11:13:12 | 16    Q.  Mr. Heft-Luthy, does ████ perspective        11:15:54 |
| 17 systems work?                                       11:13:18 | 17 draft" refer to ████████?                           11:15:59 |
| 18    A.  Yes.                                         11:13:30 | 18    A.  Yes.                                          11:16:02 |
| 19    Q.  And what was it proposing to improve?       11:13:31 | 19    Q.  First paragraph says:  "We will craft" --    11:16:07 |
| 20       MR. SPILLY:  Objection.  Vague.               11:13:33 | 20 "This document details the foundation upon which we  11:16:09 |
| 21       THE WITNESS:  Like any product strategy       11:13:40 | 21 will craft the PDF's five-year user privacy          11:16:13 |
| 22 effort at Google, it was intended to address a      11:13:43 | 22 experience vision."                                  11:16:17 |
| 23 variety of functional inputs, including underlying  11:13:47 | 23       Do you see that?                               11:16:18 |
| 24 technology, user-facing product, and marketing      11:13:54 | 24    A.  Yes.                                          11:16:25 |
| 25 material.                                           11:13:57 | 25    Q.  And then down below, do you see it says,      11:16:25 |
|                                              Page 99 |                                              Page 101 |

                                                                                      26 (Pages 98 - 101)

1 highlighted, "broad and contradictory consent"?    11:16:27
2      MR. SPILLY: Objection. Misrepresents the    11:16:37
3 document.    11:16:38
4 BY MR. BARNES:    11:16:39
5      Q. Do you see in the second paragraph where    11:16:42
6 "broad and contradictory consent" is bolded,    11:16:44
7 Mr. Heft-Luthy?    11:16:48
8      A. I see the second paragraph with the    11:16:50
9 sentence that includes that language, yes.    11:16:54
10      Q. Okay. Mr. Heft-Luthy, did the    11:16:56
11 ▆▆▆▆▆▆ project relate primarily to user    11:17:01
12 consent at Google?    11:17:06
13      MR. SPILLY: Objection. Vague.    11:17:09
14      THE WITNESS: Again, as stated, our legal    11:17:16
15 consent is a driver of some of the activity in which    11:17:19
16 we engage. The work we're doing includes consent as    11:17:25
17 well as overall user trust, general infrastructure,    11:17:29
18 the future of technology, more broadly.    11:17:33
19      So I'm not sure it would be fair to say    11:17:38
20 something in that processes is more or less primary    11:17:41
21 than others.    11:17:47
22 BY MR. BARNES:    11:17:47
23      Q. Okay. Do you recognize this document?    11:17:48
24 You want to take moment to look at it?    11:17:51
25      A. Yes, I recognize the document.    11:18:21

1      Q. And what is it?    11:18:24
2      MR. SPILLY: Object to the form.    11:18:26
3      THE WITNESS: This document is a    11:18:30
4 in-progress draft of a position paper we drafted as    11:18:33
5 part of the ▆▆▆▆▆ process.    11:18:38
6 BY MR. BARNES:    11:18:40
7      Q. You say, "We drafted."    11:18:40
8      Who is "we"?    11:18:42
9      A. "We" is the variety of stakeholders in the    11:18:43
10 project, some members of a core team, as well as    11:18:52
11 input from various partners and folks that we    11:18:55
12 invited to review.    11:19:02
13      Q. Who did you invite to review and help    11:19:04
14 draft this document?    11:19:08
15      A. I don't recall.    11:19:15
16      Q. Okay. Who has the e-mail address    11:19:16
17 ohelyse@google.com? Is that Ms. Bellamy?    11:19:18
18      A. That's correct, yes.    11:19:27
19      Q. Okay. Would you say that ▆▆▆▆▆▆    11:19:30
20 primary focus was on helping Google to get privacy    11:19:37
21 right?    11:19:41
22      MR. SPILLY: Objection. Vague.    11:19:46
23      THE WITNESS: As I said, there's a variety    11:19:52
24 of focuses for the project. Some of our focuses    11:19:53
25 could be summarized as getting privacy right.    11:19:57

1 There's also a variety of other focuses. So, again,    11:20:01
2 not sure I would be willing to say that it was    11:20:05
3 primary but a consideration among others.    11:20:07
4      MR. BARNES: Can you go to 1 -- 312,    11:20:22
5 Ms. Truong?    11:20:22
6 BY MR. BARNES:    11:20:25
7      Q. Mr. Heft-Luthy, do you see at the top    11:20:59
8 where it says "Ads as a product"?    11:21:00
9      A. Yes.    11:21:09
10      Q. And what's that first sentence say,    11:21:10
11 Mr. Heft-Luthy?    11:21:12
12      A. The segment right under it?    11:21:18
13      Q. Correct.    11:21:21
14      A. It says: "As such, ads and ads supporting    11:21:25
15 system and services (such as realtime bidding and    11:21:28
16 measurement) need to become private by default."    11:21:31
17      Q. What does "private by default" mean?    11:21:34
18      A. "Private by default" is a term used within    11:21:38
19 the PDPO, certainly within this project, to refer to    11:21:53
20 a extension of privacy-preserving technologies    11:22:00
21 further into given technological space.    11:22:03
22      Q. If you were going to explain "private by    11:22:07
23 default" to an ordinary person, what would you say    11:22:09
24 "private by default" means?    11:22:13
25      MR. SPILLY: Objection. Form.    11:22:19

1      THE WITNESS: So with regards to    11:22:21
2 technology that Google offers, I would say that    11:22:29
3 Google is building technology to make it really easy    11:22:33
4 to use Google services and understand and control    11:22:38
5 the data that's collected, including a variety of    11:22:45
6 technical means to help preserve privacy across your    11:22:49
7 experience.    11:22:54
8 BY MR. BARNES:    11:22:54
9      Q. Mr. Heft-Luthy, that's how you would    11:22:55
10 explain it to a normal person? What does "private    11:23:02
11 by default" mean, Mr. Heft-Luthy?    11:23:04
12      MR. SPILLY: Objection. Argumentative.    11:23:07
13 Asked and answered.    11:23:08
14      THE WITNESS: I believe I've already    11:23:14
15 answered that question.    11:23:15
16 BY MR. BARNES:    11:23:16
17      Q. What is the state of a product when it is    11:23:18
18 private by default?    11:23:21
19      Scratch that.    11:23:24
20      What are the attributes of a product that    11:23:25
21 are private by default?    11:23:27
22      MR. SPILLY: Objection. Vague.    11:23:31
23      THE WITNESS: With regards to specific    11:23:36
24 definitions, I don't recall if we outlined it in    11:23:38
25 specificity enough to provide a full answer to that    11:23:42

27 (Pages 102 - 105)

1 question.                              11:23:44
2 BY MR. BARNES:                          11:23:46
3     Q.  To you, Mr. Heft-Luthy, what does it mean    11:23:46
4 for a product to be private by default?       11:23:48
5         MR. SPILLY:  Objection.  Speculation --    11:23:54
6 calls for speculation and asked and answered.    11:23:55
7         THE WITNESS:  As I said, I've already    11:24:02
8 discussed the broad colloquial definition we're    11:24:04
9 operating under and wouldn't be able to speculate    11:24:09
10 further.                                11:24:11
11 BY MR. BARNES:                          11:24:11
12     Q.  You stated that "private by default"    11:24:11
13 refers to a number of technologies that Google is    11:24:14
14 developing.                             11:24:17
15         Do you recall that?              11:24:18
16     A.  That's correct.                  11:24:23
17     Q.  Is it your testimony that "private by    11:24:24
18 default" refers to those technologies that are in    11:24:26
19 the process of being developed?          11:24:29
20         MR. SPILLY:  Objection.  Misstates    11:24:34
21 witness's testimony.                     11:24:35
22         THE WITNESS:  In addition to technologies    11:24:38
23 which are already deployed that are part of Google's    11:24:41
24 development process including things like    11:24:48
25 differential privacy, it does also refer to    11:24:50

Page 106

1 technology which is in development.        11:24:53
2 BY MR. BARNES:                          11:24:54
3     Q.  Are ads and ad supporting systems private    11:24:55
4 by default at Google today?              11:25:00
5         MR. SPILLY:  Objection.  Calls for    11:25:02
6 speculation.                            11:25:03
7         THE WITNESS:  I wouldn't be able to    11:25:07
8 speculate on the answer to that question.    11:25:08
9 BY MR. BARNES:                          11:25:11
10     Q.  You -- when you were in charge of Google's    11:25:11
11 privacy policy for approximately three years; is    11:25:13
12 that correct?                           11:25:16
13     A.  Yes.                           11:25:21
14     Q.  Your testimony here today is you're unable    11:25:23
15 to state whether Google ads and ad supporting    11:25:25
16 systems are private by default today, correct?    11:25:30
17         MR. SPILLY:  Objection.  Misstates the    11:25:36
18 witness's testimony.                     11:25:39
19         THE WITNESS:  Again, I'm going to have to    11:25:43
20 provide the caveats given that I'm speaking under    11:25:44
21 oath here and I want to be precise.       11:25:48
22         With regards to this specific term of art,    11:25:51
23 "private by default" used contingently as part of a    11:25:54
24 push to increase investment in privacy preserving    11:25:01
25 technology, I can't speak to the interaction or lack    11:26:04

Page 107

1 of interaction with regards to ads overall following    11:26:08
2 or not following that term of art.       11:26:13
3 BY MR. BARNES:                          11:26:15
4     Q.  Well, the sentence says "need to become    11:26:16
5 private by default."                     11:26:18
6         Do you see that, Mr. Heft-Luthy?    11:26:19
7     A.  Yes, I see it.                   11:26:27
8     Q.  And, Mr. Heft-Luthy, you speak English,    11:26:28
9 right?                                  11:26:29
10         MR. SPILLY:  Objection.  Argumentative.    11:26:30
11 Harassing.                              11:26:31
12         THE WITNESS:  I do speak English, yes.    11:26:36
13 BY MR. BARNES:                          11:26:38
14     Q.  And if something needs to become    11:26:38
15 something, that means it's not that thing today,    11:26:41
16 correct?                                11:26:43
17         MR. SPILLY:  Objection.  Vague.    11:26:47
18         THE WITNESS:  I'm -- I'm -- I'm not sure    11:26:53
19 what you're referring to with that question    11:26:54
20 specifically.  Is this a question about ads    11:26:56
21 specifically?  What is -- what is this in reference    11:27:00
22 to?                                     11:27:01
23 BY MR. BARNES:                          11:27:02
24     Q.  This is a basic question about the meaning    11:27:02
25 of words, Mr. Heft-Luthy.                11:27:05

Page 108

1         If something needs to become something,    11:27:08
2 that refers to a process of transformation, correct?    11:27:10
3         MR. SPILLY:  Objection.  Vague.    11:27:17
4         THE WITNESS:  Again, I'm -- I'm not really    11:27:22
5 going to be able to speculate on the implications    11:27:24
6 of -- of that language in this context or in all    11:27:28
7 contexts.  I can talk specifically about    11:27:30
8 implications about certain parts of versions of use    11:27:33
9 of that language.                        11:27:37
10         MR. SPILLY:  Sorry, Sam.  I didn't get    11:27:40
11 this one in there, but also object that the document    11:27:43
12 speaks for itself.                       11:27:45
13         MR. BARNES:  Oh, thank you.  We'll accept    11:27:46
14 that objection.                         11:27:48
15         Ms. Truong, can you share Exhibit P5,    11:27:57
16 please, which will become Exhibit 5?     11:28:00
17         (Whereupon Exhibit 5 was marked for    11:28:06
18         identification.)                 11:28:06
19 BY MR. BARNES:                          11:28:12
20     Q.  Mr. Heft-Luthy, what is the EMEA 2019    11:28:12
21 deck?                                   11:28:19
22         MR. SPILLY:  Objection.  Vague.    11:28:20
23         THE WITNESS:  Is this in reference to an    11:28:22
24 exhibit?                                11:28:24
25 ///

Page 109

28 (Pages 106 - 109)

1 BY MR BARNES:                               11:28:24
2   Q   It will be                            11:28:25
3       What is EMEA at Google?               11:28:25
4   A   So EMEA is --                         11:28:35
5       THE WITNESS: I'm sorry, Carl  Go ahead    11:28:37
6       MR SPILLY: Same objection  Vague     11:28:38
7       MR BARNES: Can we go -- let's go off the   11:28:39
8 record for a moment                         11:28:40
9       MR SPILLY: If you want                11:28:42
10      THE VIDEO OPERATOR: We're off the record   11:28:45
11 at 11:28 a m                               11:28:46
12      (Off the record at 11:28 a m  and back    11:28:48
13       on the record at 11:30 a m )         11:30:13
14      THE VIDEO OPERATOR: Back on the record at   11:30:14
15 11:30                                      11:30:15
16      Go ahead                             11:30:16
17 BY MR  BARNES:                             11:30:16
18  Q   Mr Heft-Luthy, what does EMEA refer to at   11:30:17
19 Google?                                    11:30:20
20      MR  SPILLY: Same objection as before    11:30:20
21      THE WITNESS: In what context are you    11:30:24
22 referring to?  Is there part of the exhibit we can   11:30:25
23 reference?                                 11:30:28
24 BY MR  BARNES:                             11:30:28
25  Q   Do those letters together mean anything to   11:30:28

Page 110

1 you as someone who's been on the PDPO team for four   11:30:31
2 years, EMEA?                               11:30:34
3       MR SPILLY: Object to form.           11:30:38
4       THE WITNESS: Again, I -- is this in    11:30:43
5 reference to a specific document that we're going to    11:30:45
6 be referring to my recollection of?        11:30:48
7 BY MR. BARNES:                             11:30:50
8   Q.  Can you pull up Exhibit 5?           11:30:55
9   A.  Okay.                               11:30:57
10  Q.  Mr. Heft-Luthy, do you recognize this    11:31:09
11 document?                                  11:31:13
12      MR. BARNES: Ms. Truong, can you put it on    11:31:16
13 the screen, please?                        11:31:19
14      MS. TRUONG: The answer to your question    11:31:26
15 is yes.                                    11:31:27
16 BY MR. BARNES:                             11:31:27
17  Q.  What is this document?               11:31:28
18  A.  This document is another draft of a    11:31:34
19 position paper we developed as part of the    11:31:37
20  ████████████  project.                   11:31:40
21  Q.  By "we," do you mean the Google PDPO team?   11:31:41
22  A.  The same caveats of people involved that    11:31:46
23 referred to the previous exhibit that there were    11:31:50
24 attorneys involved.                        11:31:52
25  Q.  Right.                              11:31:55

Page 111

1       I mean, you were the product manager of    11:31:55
2 this team, correct?                        11:31:57
3   A.  That's correct, yes.                 11:32:01
4   Q.  Okay.  And this was a document that was    11:32:04
5 part of that project, correct?             11:32:05
6   A.  That is my recollection, yes.        11:32:12
7   Q.  Okay.  Elyse says: "Deprecated, we are    11:32:14
8 back in the actual perspective.  Thanks," with a lot    11:32:17
9 of exclamation points.                     11:32:20
10      Can you explain what that refers to?    11:32:24
11      MR. SPILLY: Objection.  Foundation.    11:32:31
12      THE WITNESS: Within Google we'll       11:32:34
13 sometimes have to manage feedback in a variety of    11:32:38
14 different documents.  I recall this being part of    11:32:40
15 that process of bringing people from one link to    11:32:44
16 another link.                              11:32:48
17 BY MR. BARNES:                             11:32:48
18  Q.  It says "deprecated," but then it      11:32:49
19 says we're -- "deprecated" and then: "We are back."   11:32:52
20      So what I'm trying to figure out here was,    11:32:56
21 was the project deprecated and then it was green --    11:32:58
22 green-lit again?                           11:33:02
23      MR. SPILLY: Object to the form.        11:33:08
24 Compound.                                  11:33:10
25      THE WITNESS: Sorry.  Could -- yeah, could    11:33:12

Page 112

1 you repeat the question here?              11:33:12
2 BY MR. BARNES:                             11:33:14
3   Q.  Was -- was the project deprecated at one    11:33:15
4 point in time and then given new life?      11:33:18
5   A.  Not to my --                        11:33:21
6       MR. SPILLY: Same objections.          11:33:25
7       THE WITNESS: Not to my recollection.    11:33:26
8 BY MR. BARNES:                             11:33:27
9   Q.  Okay.  It was deprecated once, correct?    11:33:31
10  A.  As I -- as I previously stated, upon     11:33:37
11 delivery of proposals, the project concluded, yes.    11:33:40
12  Q.  Okay.  And was not carried forward,     11:33:46
13 correct?                                   11:33:48
14  A.  That is correct, yes.                11:33:53
15  Q.  This was -- this was not a project; it was    11:33:54
16 not like Lazarus, where it died, was revived, and    11:33:57
17 then died again.                           11:34:01
18      Is that accurate to say?             11:34:02
19      MR. SPILLY: Object to the form.        11:34:06
20      THE WITNESS: I'm not familiar with the    11:34:07
21 story of Lazarus enough to speculate on whether this    11:34:09
22 is like Lazarus.  But the second part of your    11:34:12
23 statement, that is correct; it was not deprecated    11:34:15
24 and then brought back as a -- as a project.    11:34:18
25 ///

Page 113

29 (Pages 110 - 113)

CONFIDENTIAL

1 BY MR. BARNES:                           11:34:19
2    Q.  Okay.  It died once.              11:34:20
3        Okay.  Comment 1 there at the very end, it  11:34:22
4 says: "Thanks and good luck. Hope you're happy  11:34:28
5 with where this lands EOW."              11:34:30
6        Who's EOW?                        11:34:34
7    A.  EOW would be a term of art to refer to end  11:34:39
8 of week.                                 11:34:42
9    Q.  Ah-hah.  Okay.  Thank you.        11:34:44
10       MR. BARNES:  Page -- sorry.  Comment 11 on  11:34:47
11 page 3.  If we could go there, Ms. Truong.  11:34:50
12 BY MR. BARNES:                           11:34:58
13   Q.  Now you see where it says: "Absolutely;  11:34:58
14 making an effort to bolster our citations  11:35:00
15 throughout.  Just FYI, I don't have access to view  11:35:03
16 the ████ dashboard nor the EMEA 2019 deck."  11:35:08
17       Do you see that?                   11:35:13
18   A.  Let me dig in.  Which comment are you  11:35:14
19 saying this is in reference to?  Which number?  11:35:17
20   Q.  Comment 11, the second comment from the  11:35:20
21 top of the page.                         11:35:22
22   A.  Okay.  I don't recall what EMEA 2019 deck  11:35:33
23 is in reference to.                      11:35:35
24   Q.  Thank you.                         11:35:36
25       What is ████, the ████          11:35:36

                                    Page 114

1 dashboard?                               11:35:40
2       MR. SPILLY:  Objection.  Foundation.  11:35:42
3       THE WITNESS:  ████ dashboard is a  11:35:48
4 product usage overview dashboard available to  11:35:51
5 Googlers with some access restrictions associated  11:35:55
6 with it.                                 11:36:00
7 BY MR. BARNES:                           11:36:01
8    Q.  What can you see in the ████    11:36:02
9 dashboard?                               11:36:05
10       MR. SPILLY:  Object to the form.  11:36:07
11       THE WITNESS:  A variety of product and  11:36:11
12 demographic metrics relevant to Google's product  11:36:14
13 offerings.                               11:36:18
14 BY MR. BARNES:                           11:36:19
15   Q.  Do you have access to the ████   11:36:22
16 dashboard?                               11:36:24
17   A.  I don't know at this specific moment  11:36:32
18 whether I have access to ████.         11:36:34
19   Q.  Did you have it -- access to ████ at  11:36:36
20 the time you were the PD- -- the Privacy- -- I'm  11:36:40
21 sorry -- the -- the -- in charge of this project  11:36:45
22 called ████?                           11:36:50
23   A.  There are a lot of P words here.  11:36:51
24       MR. SPILLY:  Object to the form.  11:36:55
25 ///

                                    Page 115

1 BY MR. BARNES:                           11:36:55
2    Q.  Did you have -- have you had access to  11:36:55
3 ████ at some point in time?            11:36:57
4       MR. SPILLY:  Objection.  Vague as to  11:37:02
5 "████."                                 11:37:04
6       THE WITNESS:  Yeah, can you be -- so the  11:37:07
7 ████ dashboard referred to here, at various  11:37:09
8 points I have had access to as a privacy product  11:37:14
9 manager for the Privacy and Data Protection Office.  11:37:18
10 BY MR. BARNES:                           11:37:24
11   Q.  That is a lot of Ps.               11:37:24
12       Okay.  How did you use the ████   11:37:26
13 dashboard in that role with the string of Ps?  11:37:27
14       MR. SPILLY:  Objection.  Vague.    11:37:33
15       THE WITNESS:  As a product manager, I used  11:37:37
16 various dashboards in various ways to inform product  11:37:40
17 development as a product manager in the Privacy and  11:37:48
18 Data Protection Office working on privacy products.  11:37:49
19 I have used the ████ dashboard to          11:37:55
20 inform general product strategy.          11:37:57
21 BY MR. BARNES:                           11:37:59
22   Q.  Can you give me an example of how you used  11:37:59
23 the ████ dashboard to inform product strategy?  11:38:02
24   A.  So an example of ████ -- the          11:38:14
25 ████ dashboard might be to summarize the    11:38:17

                                    Page 116

1 overall mobile phone penetration in a given country.  11:38:22
2 So you might be able to use that information to say  11:38:27
3 that users in one country would be more likely to  11:38:30
4 view a given product on a mobile device versus a  11:38:35
5 desktop device, for example.             11:38:39
6    Q.  Okay.  So you log in -- is ████    11:38:41
7 something -- the ████ dashboard something you  11:38:44
8 log in to?                               11:38:46
9       MR. SPILLY:  Object to the form.  Vague.  11:38:48
10       THE WITNESS:  As previously stated, there  11:38:52
11 are access restrictions similar to other dashboards  11:38:54
12 at Google.                               11:39:00
13 BY MR. BARNES:                           11:39:00
14   Q.  Okay.  Does it have a user-facing  11:39:01
15 interface with which a person, based on their  11:39:03
16 permissions, can engage with?            11:39:06
17       MR. SPILLY:  Objection.  Vague.    11:39:10
18       THE WITNESS:  As a dashboard and, again,  11:39:16
19 caveated with users are Google employees, yes.  11:39:19
20 BY MR. BARNES:                           11:39:24
21   Q.  Okay.  And -- and can you describe what  11:39:24
22 that dashboard looks like it -- looked like when you  11:39:26
23 used the ████ dashboard?               11:39:31
24   A.  Like most dashboards, it provides a  11:39:39
25 high-level summary of pertinent information, like I  11:39:45

                                    Page 117

1 said, including demographic information for specific 11:39:48
2 countries, with the ability to drill down into 11:39:51
3 specifics depending on desired goal with using the 11:39:56
4 dashboard. 11:40:00
5 Q. Okay. So there's a high-level summary and 11:40:02
6 then there is sort of a list of different attributes 11:40:04
7 that, based on your permission level, you can drill 11:40:07
8 down into more specifics? 11:40:10
9 Is that accurate? 11:40:12
10 MR. SPILLY: Objection. Misstates the 11:40:13
11 witness's testimony. 11:40:15
12 THE WITNESS: So, as said, it provides a 11:40:16
13 high-level summary with the ability to see certain 11:40:20
14 specifics depending on current implementation of 11:40:25
15 ▮▮▮▮▮ the user's access restriction. 11:40:29
16 BY MR. BARNES: 11:40:31
17 Q. Right. 11:40:32
18 And what I mean by "drill down into the 11:40:32
19 specifics," it's not like you, as the user, have to 11:40:34
20 go to ▮▮▮▮ and know exactly what you're 11:40:37
21 searching for. I mean, in some sense you do, but 11:40:39
22 there's a list of permissions, things to which you 11:40:43
23 would have access to based on your permissions that 11:40:47
24 you could choose from; is that correct? 11:40:50
25 MR. SPILLY: Object to the form. Vague. 11:40:52

Page 118

1 THE WITNESS: So like all dashboards at 11:41:02
2 Google, there's a version available simply through 11:41:06
3 the interaction mechanism of continuing to scroll. 11:41:10
4 Beyond choosing to simply scroll, there are 11:41:12
5 abilities to either filter or change the view of 11:41:20
6 certain pieces of information that are provided. 11:41:26
7 BY MR. BARNES: 11:41:27
8 Q. How do you filter or change it in the 11:41:28
9 ▮▮▮▮ dashboard? 11:41:32
10 A. Depending on what's represented, you might 11:41:39
11 use tabs or click certain elements to change how 11:41:41
12 things are represented. 11:41:45
13 Q. Can you see all of the different things 11:41:46
14 available in ▮▮▮▮? 11:41:49
15 Could you see everything available in 11:41:54
16 ▮▮▮▮ when you -- let -- this is -- let me ask 11:41:56
17 it this way: Can you see all of the different 11:41:58
18 various categories available at ▮▮▮▮ but then 11:42:02
19 only had access to some of those categories? 11:42:06
20 MR. SPILLY: Objection. Vague and form. 11:42:09
21 THE WITNESS: So I'm -- I'm -- apologies. 11:42:13
22 I'm going to have to answer with a little bit of a 11:42:16
23 tautology here. There's a distinction between 11:42:19
24 ▮▮▮▮ as an overall product and specifically the 11:42:22
25 dashboard that we're referring to. 11:42:27

Page 119

1 Again, sorry to answer with a tautology, 11:42:31
2 but the things you can see in the ▮▮▮▮ 11:42:34
3 dashboard are the things that are available as part 11:42:36
4 of the ▮▮▮▮ dashboard. So there's a set of 11:42:38
5 fields and summaries of information that are 11:42:42
6 available through that specific access layer that 11:42:45
7 you're able to see. 11:42:48
8 BY MR. BARNES: 11:42:49
9 Q. Okay. And that -- thank you. It might 11:42:50
10 have been a tautology, but it was a helpful 11:42:53
11 tautology. 11:42:57
12 So when you go there -- let me give you an 11:42:58
13 example and you tell me if this is how it works. 11:43:00
14 Okay? 11:43:02
15 You're on the PDPO team. You only have 11:43:03
16 access to certain things in the ▮▮▮▮ dashboard. 11:43:05
17 When you went to the ▮▮▮▮ dashboard, 11:43:09
18 was the situation where they would list 50 different 11:43:11
19 things that are available in the dashboard, but you 11:43:14
20 were only able to actually access a subset of those 11:43:17
21 that relate to PDPO, or -- so that's Option 1. 11:43:22
22 Or Number 2 is, because you're in PDPO, 11:43:28
23 you have access to seven different data fields -- 11:43:31
24 I'm making up the numbers -- and you can only see 11:43:34
25 those seven different data fields? 11:43:38

Page 120

1 MR. SPILLY: Object to the form. Vague. 11:43:43
2 Calls for speculation. 11:43:47
3 THE WITNESS: Can you help clarify what 11:43:50
4 the difference between 1 and 2 is? I'm having 11:43:52
5 trouble understanding. 11:43:56
6 BY MR. BARNES: 11:43:57
7 Q. Right. 11:43:58
8 In Scenario 1, you would be able to see 11:43:58
9 all of the different fields and attributes available 11:44:01
10 even though you didn't have a permission to actually 11:44:05
11 access the data behind them. 11:44:10
12 And, then, Scenario Number 2 is you, 11:44:14
13 Sam Heft-Luthy, go to ▮▮▮▮ dashboard. You can 11:44:18
14 only see the data parameters that you can actually 11:44:22
15 access. 11:44:25
16 A. Okay. I understand your question. And 11:44:26
17 I'm -- sorry. 11:44:27
18 MR. SPILLY: I'm going to object to the 11:44:30
19 form. Vague. 11:44:31
20 You can answer. 11:44:34
21 THE WITNESS: I understand the question. 11:44:37
22 And I'm sorry to say I don't recall well enough to 11:44:39
23 be able to -- to be able to answer in detail that 11:44:43
24 question. 11:44:46
25 /// 

Page 121

31 (Pages 118 - 121)

1 BY MR. BARNES:                          11:44:46
2    Q.  Okay.  How often did you use the ▮    11:44:47
3 dashboard?                               11:44:49
4    A.  I don't think I'd be able to speculate on   11:44:56
5 that.  It would -- yeah.                 11:44:58
6    Q.  Mr. Heft-Luthy, did you use it once?   11:45:02
7    A.  I have used it more than once.    11:45:07
8    Q.  Did you use it a thousand times?  11:45:10
9    A.  I wouldn't be able to speculate on that.   11:45:16
10   Q.  Did you use it every day?         11:45:18
11       MR. SPILLY:  Objection.           11:45:25
12       You can answer.                   11:45:29
13       THE WITNESS:  There were days in which I   11:45:32
14 did not use the ▮ dashboard.            11:45:33
15 BY MR. BARNES:                          11:45:35
16   Q.  Did you use it every week?        11:45:36
17       MR. SPILLY:  Objection.  Asked and   11:45:42
18 answered now.                           11:45:42
19       MR. BARNES:  I'm sorry, Carl --   11:45:47
20 Mr. Spilly.  Show me in this record where I asked if   11:45:47
21 he used the ▮ dashboard every week.  We are   11:45:52
22 verging again into the ridiculous objections.  I am   11:45:54
23 going to ask the question again.  It has not been   11:46:00
24 asked.                                  11:46:00
25 ///
                                          Page 122

1 BY MR. BARNES:                          11:46:00
2    Q.  Mr. Heft-Luthy, when you had access to the   11:46:00
3 ▮ dashboard, did you use it at least weekly?   11:46:04
4       MR. SPILLY:  Same --              11:46:13
5       THE WITNESS:  There are weeks in which I   11:46:14
6 did not use it.                         11:46:16
7 BY MR. BARNES:                          11:46:17
8    Q.  Did you use it more weeks than not,   11:46:17
9 Mr. Heft-Luthy?                         11:46:20
10      MR. SPILLY:  Same objection.       11:46:21
11      THE WITNESS:  I don't think I'd be able to   11:46:25
12 speculate on that.                      11:46:28
13 BY MR. BARNES:                          11:46:28
14   Q.  Okay.  Mr. Heft-Luthy, this document in   11:46:29
15 the PDPO office says that a ▮ Google   11:46:30
16 will put people in a good state by default.   11:46:36
17      What is a good -- I'm sorry -- a good,   11:46:38
18 safe state by default?                  11:46:42
19      What is a good, safe state by default?   11:46:44
20      MR. SPILLY:  Objection.  Vague.    11:46:48
21      I'm sorry, Jay.  I don't know what page   11:46:51
22 you're on or where.                     11:46:53
23 BY MR. BARNES:                          11:46:58
24   Q.  Mr. Heft-Luthy, what is a good, safe state   11:47:00
25 by default as it relates to the ▮       11:47:03
                                          Page 123

1 project?                               11:47:06
2       MR. SPILLY:  Objection.  Calls for   11:47:06
3 speculation.                            11:47:06
4       THE WITNESS:  I -- I don't think I'd be   11:47:11
5 able to speculate on that question.     11:47:12
6       MR. BARNES:  Okay.  Ms. Truong, can you   11:47:14
7 put up P6?                              11:47:22
8       (Whereupon Exhibit 6 was marked for   11:47:24
9        identification.)                  11:47:24
10      MS. TRUONG:  Yes, one moment.      11:47:37
11 Document should be up as Exhibit 6.     11:48:36
12      MS. CRAWFORD:  Confirmed.          11:48:42
13 BY MR. BARNES:                          11:48:43
14   Q.  Mr. Heft-Luthy, let me know when you have   11:48:44
15 it.                                     11:48:46
16   A.  Okay.  I have it up.             11:49:18
17   Q.  Do you recognize this document,   11:49:20
18 Mr. Heft-Luthy?                         11:49:20
19   A.  No, I do not.                     11:49:27
20   Q.  You were on the PDPO team, correct?   11:49:28
21   A.  That's correct.                   11:49:32
22   Q.  How many people are on the PDPO team?   11:49:33
23   A.  I don't know the answer to that question.   11:49:40
24   Q.  Okay.  Mr. Heft-Luthy, is it approximately   11:49:42
25 a thousand, or is it approximately 50?   11:49:45
                                          Page 124

1       MR. SPILLY:  Objection.  Compound.   11:49:49
2 BY MR. BARNES:                          11:49:49
3    Q.  Or somewhere in between?         11:49:52
4       MR. SPILLY:  Object to the form.   11:49:54
5       THE WITNESS:  Like I said, I wouldn't be   11:49:55
6 able to speculate on that with any specificity.   11:49:57
7 BY MR. BARNES:                          11:50:02
8    Q.  You have no idea how many people are on   11:50:02
9 the PDPO team at Google.                11:50:04
10      Is that your testimony?            11:50:06
11      MR. SPILLY:  Objection.  Asked and   11:50:08
12 answered.                               11:50:09
13      THE WITNESS:  My testimony is that I don't   11:50:12
14 have an estimation that I feel confident testifying   11:50:15
15 under oath with.                        11:50:20
16 BY MR. BARNES:                          11:50:21
17   Q.  Okay.  So who is Shammond or S. Hammond?   11:50:22
18 Do you know who S. Hammond is on page 2 of this   11:50:26
19 document.                               11:50:29
20      Is that a "yes," Mr. Heft-Luthy?    11:50:34
21   A.  Yes.                             11:50:36
22   Q.  Who is S. Hammond?               11:50:37
23   A.  S. Hammond refers to Sarah Hammond.   11:50:42
24   Q.  Okay.  And do you work with Ms. Hammond?   11:50:46
25   A.  Yes.                             11:50:52
                                          Page 125

32 (Pages 122 - 125)

**Page 126**

1  Q  How long have you worked with Ms Hammond?    11:50:53
2  A  I don't recall with specificity    11:50:58
3  Q  Okay  Who is G Gelke?    11:51:00
4  A  G Gelke is Gretchen Gelke    11:51:11
5  Q  Okay  And do you know Gretchen Gelke?    11:51:14
6  A  Yes    11:51:19
7  Q  And do you work with Gretchen Gelke?    11:51:19
8  A  I have, yes    11:51:24
9  Q  Who is Lauren Palmer?    11:51:26
10  A  Lauren Palmer is a UX researcher    11:51:34
11  Q  Is she on the PDPO team?    11:51:37
12  A  I don't recall formal ownership in terms    11:51:45
13  of if she has responsibilities beyond PDPO  So I    11:51:50
14  can't say with specificity if she's on PDPO in that    11:51:54
15  sense    11:51:59
16  Q  Okay  Who is Tal Herman?    11:51:59
17  A  Tal Herman is a design director    11:52:06
18  Q  At PDPO?    11:52:11
19  A  That is my understanding, yes    11:52:14
20  Q  Okay  And Mr Heft-Luthy, this document    11:52:16
21  has been marked as coming from your files    11:52:19
22  Do you understand that?    11:52:23
23  MR SPILLY: Object to the form    11:52:28
24  THE WITNESS: Yes, I understand that it is    11:52:31
25  through some process associated with me    11:52:37

**Page 127**

1  BY MR. BARNES:    11:52:39
2  Q. Okay.  Do you have any reason to believe    11:52:40
3  that this is not a document that was produced by the    11:52:41
4  PDPO team?    11:52:46
5  A. I wouldn't be able to speculate on that.    11:52:50
6  Q. So if the answer is you wouldn't be able    11:52:55
7  to speculate, the answer to that question, then,    11:52:58
8  Mr. Heft-Luthy, is no.    11:53:00
9  I've asked you to identify a reason why    11:53:02
10  this would -- is not something produced by the user    11:53:05
11  in PDPO UX.    11:53:08
12  Can you identify any reason for that,    11:53:11
13  Mr. Heft-Luthy?    11:53:12
14  MR. SPILLY: Object to the form.    11:53:14
15  Argumentative.    11:53:15
16  THE WITNESS: Given that I'm not familiar    11:53:20
17  with the process by which this document was    11:53:22
18  produced, I -- I can't say with any certainty that    11:53:26
19  this was or wasn't a PDPO document given that I    11:53:31
20  don't recall it.    11:53:35
21  MR. BARNES: Okay.  Ms. Truong, can you    11:53:37
22  share Exhibit P7?    11:53:38
23  MS. TRUONG: Yes, one moment.    11:53:44
24  MR. SPILLY: You want to take a break?    11:53:45
25  MR. BARNES: No.    11:53:47

**Page 128**

1  MR. SPILLY: It's been an hour.    11:53:48
2  MR. BARNES: No.  We've got a couple more    11:53:50
3  to go and then we'll take a break.    11:53:53
4  MR. SPILLY: Sam, would you like to take a    11:53:55
5  break?    11:53:56
6  THE WITNESS: I have no objection to    11:53:57
7  continuing.  If counsel's prepared to continue, I'm    11:53:59
8  okay to continue for another 15, 20.    11:54:03
9  MR. BARNES: Mr. Spilly, you want to make    11:54:06
10  another try to ask him if he wants to take a break?    11:54:08
11  MR. SPILLY: I just need to use the    11:54:11
12  restroom.  So --    11:54:14
13  MR. BARNES: Mr. Spilly, that's all you    11:54:15
14  had to say.  Yes, we can take a break.    11:54:17
15  MR. SPILLY: Thanks.    11:54:20
16  MR. BARNES: Off the record.    11:54:20
17  THE WITNESS: I am happy to take a break.    11:54:20
18  MR. SPILLY: The first time I asked, the    11:54:22
19  answer was "no" flat, right?  I just need to go to    11:54:23
20  the bathroom.  There's nothing nefarious going on.    11:54:25
21  So, anyway, Sam, you can turn your camera    11:54:28
22  and video off.    11:54:30
23  THE VIDEO OPERATOR: Off the record,    11:54:32
24  11:54.    11:54:32
25  (Off the record at 11:54 a.m. and back    11:54:33

**Page 129**

1  on the record at 12:03 p m )    12:03:39
2  THE VIDEO OPERATOR: Okay  We are back on    12:03:46
3  the record  The time is 12:03 p m  Pacific Time    12:03:46
4  BY MR  BARNES:    12:03:49
5  Q  Mr Heft-Luthy, can you open Exhibit 7,    12:03:50
6  please?    12:03:52
7  (Whereupon Exhibit 7 was marked for    12:03:53
8  identification )    12 03:53
9  BY MR  BARNES:    12:04:11
10  Q  Let me know when you have it open, please    12:04:12
11  A  Yeah, I still don't have it yet    12:04:14
12  (Off-the-record discussion )    12:04:16
13  MR  BARNES: Ms  Truong, if you could put    12:05:01
14  it on the screen  Appreciate it    12:05:02
15  MS  TRUONG: It's there now    12:05:04
16  THE WITNESS: Again --    12:05:09
17  BY MR  BARNES:    12:05:19
18  Q  Do you have it, Mr Heft-Luthy?    12:05:20
19  A  I do, yes    12:05:21
20  Q  Do you recognize this document?    12:05:23
21  A  Yes    12:05:29
22  Q  What is this document?    12:05:30
23  A  This is a draft of a presentation    12:05:36
24  delivered to a design agency that we partnered with    12:05:40
25  as part of the ███████ project    12:05:47

33 (Pages 126 - 129)

**Page 130**

1  Q. Okay. Who was the design agency?    12:05:49
2  A. I don't recall the name of the agency.    12:05:55
3  Q. Okay. That's easy enough to find out,    12:06:01
4  though, correct?    12:06:03
5  MR. SPILLY: Objection to the form.    12:06:09
6  THE WITNESS: I can't speculate on the    12:06:10
7  process that I'd go to get the name. At some point,    12:06:11
8  I have engaged with an agency on this project.    12:06:19
9  BY MR. BARNES:    12:06:22
10  Q. Okay. As the product manager, did you    12:06:22
11  actually engage with the agency about ▮▮▮▮▮?    12:06:25
12  MR. SPILLY: Objection. Vague.    12:06:32
13  THE WITNESS: What form of engagement are    12:06:36
14  you asking about here?    12:06:39
15  BY MR. BARNES:    12:06:41
16  Q. Did you participate in the drafting of    12:06:41
17  this document in front of you today?    12:06:42
18  A. I -- looking through this document, I can't    12:06:51
19  recall if I was part of drafting this specific    12:06:53
20  document. So I -- yeah, I can't speak to my    12:06:59
21  individual role in a document like this.    12:07:05
22  Q. Okay. Is this -- there's something    12:07:09
23  referred to on page 6 of the document, which is --    12:07:10
24  ends in 66.    12:07:14
25  A. Yes.    12:07:28

**Page 131**

1  Q. Do you see where it says "This strategy    12:07:29
2  playbook"?    12:07:31
3  A. Yes.    12:07:37
4  Q. And is -- does that help refresh your    12:07:38
5  recollection? Is this the strategy playbook?    12:07:40
6  MR. SPILLY: Objection to the form.    12:07:49
7  THE WITNESS: In the process of managing a    12:07:53
8  project like this, as I talked about earlier,    12:07:56
9  there's a variety of draft versions that documents    12:08:00
10  like this will go through. It's -- it's hard for me    12:08:04
11  to speculate and say looking at this thing that I am    12:08:10
12  seeing relatively out of context what specific    12:08:15
13  document this is or isn't in reference to.    12:08:19
14  BY MR. BARNES:    12:08:21
15  Q. What is the strategy playbook?    12:08:21
16  A. The strategy playbook is a -- another    12:08:31
17  position document we produced as part of the    12:08:34
18  ▮▮▮▮▮ project.    12:08:38
19  Q. Who did you produce it for?    12:08:41
20  MR. SPILLY: Objection. Vague.    12:08:48
21  THE WITNESS: As previously mentioned,    12:08:52
22  there were a variety of executive and management    12:08:52
23  stakeholders that we presented on our progress in    12:08:58
24  and this was intended for consumption by people that    12:09:03
25  were invited to collaborate in part of the program.    12:09:08

**Page 132**

1  BY MR. BARNES:    12:09:11
2  Q. Okay. And so when you're making a    12:09:11
3  presentation to management, you are going to do your    12:09:13
4  best to make sure everything is correct; is that    12:09:16
5  right?    12:09:19
6  MR. SPILLY: Objection. Form.    12:09:23
7  THE WITNESS: When you say "correct," in    12:09:26
8  terms of like -- what are you referring to with    12:09:28
9  "correct" specifically?    12:09:31
10  BY MR. BARNES:    12:09:33
11  Q. As in that these are -- the views that you    12:09:33
12  place in this document are the views that you are    12:09:37
13  presenting to management, correct?    12:09:39
14  MR. SPILLY: Objection. Misrepresents the    12:09:44
15  document.    12:09:45
16  THE WITNESS: So, again, as I said    12:09:49
17  previously, I'm not able to speculate on this    12:09:50
18  specific document and its relationship to my    12:09:53
19  opinions. We can talk about my opinions if we want    12:09:57
20  to. I can't speak on whether this document does or    12:10:05
21  doesn't reflect them.    12:10:09
22  BY MR. BARNES:    12:10:10
23  Q. Okay. But we can agree this is a document    12:10:10
24  you recognize was produced by the PDPO team for    12:10:12
25  internal use at Google, correct?    12:10:15

**Page 133**

1  MR. SPILLY: Objection. Form.    12:10:18
2  THE WITNESS: Again, as -- as said, given    12:10:24
3  that there's a lot of different documents with    12:10:26
4  processes behind them, I can't speak to the, you    12:10:28
5  know, specific origin of these specific slides and    12:10:31
6  their content.    12:10:35
7  BY MR. BARNES:    12:10:37
8  Q. Is this a PDPO document, Mr. Heft-Luthy?    12:10:39
9  A. As said before, I'm -- I'm -- given that I    12:10:46
10  don't recognize the document, I'm not going to be    12:10:48
11  able to speculate on that, I'm sorry to say.    12:10:51
12  Q. Okay. Can we go to 277, please?    12:10:54
13  And while we're going there, let me give    12:11:02
14  you the preview because it's a simple question. It    12:11:05
15  refers to a sizzle reel.    12:11:05
16  Do you know what a sizzle reel is?    12:11:09
17  A. Yes.    12:11:12
18  Q. What's a sizzle reel?    12:11:13
19  A. The document itself discusses it. It says    12:11:23
20  it's a video to communicate the core ideas of the    12:11:25
21  ▮▮▮▮▮ experience and present the concepts.    12:11:28
22  Q. Was that created?    12:11:32
23  MR. SPILLY: Objection to the form.    12:11:37
24  THE WITNESS: To my recollection, it did    12:11:43
25  not end up being produced.    12:11:45

34 (Pages 130 - 133)

1 BY MR. BARNES:                    12:11:47
2    Q.  Okay.  Can you go to page 81, please?   12:11:51
3        What is the document g██ moments?    12:11:59
4    MR. SPILLY:  Objection.  Form.        12:12:05
5 Speculation.                        12:12:07
6    THE WITNESS:  I don't recall what -- what   12:12:13
7 that specifically refers to.            12:12:13
8 BY MR. BARNES:                     12:12:14
9    Q.  ██ refer to ████████?        12:12:15
10   A.  ██ dash something was a common phrase that   12:12:18
11 we used to refer to ████████ documents.  But as   12:12:23
12 I said, I can't speculate on ███-moments    12:12:27
13 specifically.                        12:12:31
14   Q.  Okay.                        12:12:32
15   MR. BARNES:  Ms. Truong, can you share   12:12:37
16 Exhibit P9, please?                  12:12:38
17   MS. TRUONG:  Yes, one moment.       12:12:41
18   (Whereupon Exhibit 8 was marked for    12:12:42
19   identification.)                    12:12:42
20 BY MR. BARNES:                    12:12:43
21   Q.  And while we're waiting on that,    12:12:44
22                                12:12:46
23 ████████               12:12:50
24   MR. SPILLY:  Objection.  Vague.       12:12:52
25 ████████████          12:13:00
                                 Page 134

1 ████████████          12:13:03
2 ████████████          12:13:07
3 ████████              12:13:14
4 ███.                        12:13:18
5 BY MR. BARNES:                     12:13:31
6    Q.  What is personal content?        12:13:31
7    MR. SPILLY:  Objection.  Vague.      12:13:34
8    THE WITNESS:  So like most other terms  12:13:35
9 when we're talking about privacy, there's a lot of   12:13:36
10 contingencies and caveats for how they're used   12:13:40
11 colloquially.  And when we do user-facing language   12:13:44
12 with regards to anything here, we, in -- I -- with   12:13:47
13 the context of the ████████,       12:13:53
14 there was an effort to try to develop and define   12:13:58
15 some user-facing boundaries around it.  But, again,   12:14:02
16 I can't speak in specificity with, like, a firm   12:14:05
17 definition that's going to be applicable in all   12:14:09
18 cases.                            12:14:12
19 BY MR. BARNES:                     12:14:12
20   Q.  Do you see Exhibit 8?           12:14:19
21   A.  Yes.                        12:14:41
22   Q.  Do you recognize this document?    12:14:41
23   A.  Yes.                        12:14:42
24   Q.  What is this document?          12:14:43
25   A.  This document appears to be -- again, with   12:14:52
                                 Page 135

1 the caveat that I don't know the history of some   12:14:54
2 documents prior to my editing them, this appears to   12:14:57
3 be a document produced as part of the ████1   12:15:00
4                  ████        12:15:03
5    Q.  Are you -- were you the author of -- one   12:15:05
6 of the authors of this document, Mr. Heft-Luthy?   12:15:07
7    A.  Again, with the caveat -- and I'm going to   12:15:16
8 caveat here given that I'm under oath, I can't speak   12:15:19
9 to whether every word in this is as I produced it at   12:15:21
10 the time.  I can affirm that I authored a document   12:15:27
11 with this title.                      12:15:31
12   Q.  You're listed as one of the authors,   12:15:32
13 correct?                          12:15:34
14   A.  In this document, I'm listed under   12:15:38
15 "Authors."                         12:15:40
16   Q.  You're -- so you are one of the authors of   12:15:41
17 this document, correct, Mr. Heft-Luthy?    12:15:43
18   MR. SPILLY:  Objection.  Asked and     12:15:51
19 answered.                         12:15:51
20   THE WITNESS:  As I've said with the    12:15:52
21 caveats that I've provided, I authored a document   12:15:53
22 titled "1P Cross-Product Sharing Controls."   12:15:57
23 BY MR. BARNES:                     12:16:02
24   Q.  Is a person's Web browsing history    12:16:03
25 personal content?                    12:16:05
                                 Page 136

1    MR. SPILLY:  Objection.  Vague.       12:16:08
2    THE WITNESS:  I'm not able to speculate on   12:16:12
3 that question.                       12:16:13
4 BY MR. BARNES:                     12:16:14
5    Q.  What is browsing history?         12:16:14
6    MR. SPILLY:  Same objection.  Vague.   12:16:16
7    THE WITNESS:  Similarly, any term like   12:16:20
8 that that we're going to use is going to have a   12:16:24
9 variety of definitions depending on in what context   12:16:26
10 we're using it.  Are we using it internally?    12:16:30
11 Externally?  It's hard for me to give a definition   12:16:31
12 that's going to be applicable in all contexts.   12:16:35
13 BY MR. BARNES:                     12:16:38
14   Q.  Is Google Photos different than Gmail?   12:16:38
15   MR. SPILLY:  Objection.  Vague.       12:16:42
16   THE WITNESS:  In -- in what sense are you   12:16:44
17 asking if it's different?               12:16:47
18 BY MR. BARNES:                     12:16:48
19   Q.  Are those different products?       12:16:49
20   MR. SPILLY:  Same objection.         12:16:54
21   THE WITNESS:  What -- what do you mean by   12:16:59
22 "different products" specifically?        12:17:00
23 BY MR. BARNES:                     12:17:02
24   Q.  Are Google -- is Google Photos and Gmail,   12:17:02
25 are those different products?            12:17:04
                                 Page 137

35 (Pages 134 - 137)

CONFIDENTIAL

1 you?                                                    14:51:08
2        MR. SPILLY:  Object to the form.        14:51:10
3        THE WITNESS:  As said before, it's one of  14:51:20
4 the things that I want out of my life overall.  I    14:51:22
5 think when I think about the work that I'm doing, I   14:51:24
6 need to be able to fit it into my moral framework as  14:51:26
7 a -- as a human being.  And the work that I do is no  14:51:31
8 different.                                            14:51:35
9 BY MR. BARNES:                                        14:51:35
10    Q.  And as part of that work, you want to make  14:51:35
11 things better, correct?                              14:51:38
12        MR. SPILLY:  Object to the form and vague.  14:51:48
13        THE WITNESS:  With the caveat that better   14:51:49
14 is going to rely on my own subjective understanding  14:51:51
15 of "better," yes, I would say that that is fair to   14:51:54
16 say that I want from the work that I do.              14:51:57
17 BY MR. BARNES:                                        14:52:00
18    Q.  Okay.  So, Mr. Heft-Luthy, I think there's   14:52:01
19 been -- is it your belief that you're here on behalf  14:52:02
20 of -- of Google and are testifying as Google today?  14:52:05
21        MR. SPILLY:  Objection.  Yeah, I object to  14:52:12
22 the form and vague.                                   14:52:20
23 BY MR. BARNES:                                        14:52:24
24    Q.  Is -- is that your belief, Mr. Heft-Luthy,  14:52:25
25 that you're here to testify on behalf of Google?     14:52:26
                                                      Page 210

1        MR. SPILLY:  And objection.                14:52:34
2 Argumentative.                                        14:52:34
3        I will also caution the witness that to     14:52:35
4 the extent responding to that question would require  14:52:41
5 you to reveal communications with counsel, you      14:52:45
6 should not.                                           14:52:51
7        But you can otherwise answer.               14:53:00
8        THE WITNESS:  I -- given that there's --    14:53:04
9 an answer to that question would reveal              14:53:07
10 conversations with counsel, I'm not going to be able  14:53:13
11 to answer that question.                             14:53:14
12 BY MR. BARNES:                                        14:53:15
13    Q.  Mr. Heft-Luthy, you understand you were    14:53:16
14 called here today in your individual capacity?  Do  14:53:17
15 you understand that?                                 14:53:20
16        MR. SPILLY:  Objection.  Argumentative.    14:53:21
17        THE WITNESS:  To the extent that I         14:53:31
18 previously stated, I'm currently under the           14:53:31
19 understanding that my right to privilege supersedes  14:53:33
20 the oath that I took to tell the whole truth given   14:53:36
21 that the right to privilege is still protected.      14:53:39
22        MR. BARNES:  Okay.  Ms. Truong, can you    14:53:42
23 share -- share Exhibit C6, please?                   14:53:46
24 BY MR. BARNES:                                        14:53:48
25    Q.  Does consent need to be voluntary,        14:54:00
                                                      Page 211

1 Mr. Heft-Luthy?                                       14:54:01
2        MR. SPILLY:  Objection.  Vague.  Calls for  14:54:03
3 a legal conclusion, I believe.                       14:54:05
4        THE WITNESS:  Seems like in this           14:54:16
5 question -- and just to make sure we're doing this   14:54:17
6 while we're waiting for a specific exhibit, so I'll  14:54:19
7 answer in the general.                               14:54:21
8        It seems like we're going back to the       14:54:23
9 conversation we had previously, which my answer     14:54:25
10 remains the same, which is, you know, being able to  14:54:27
11 speculate on the legal conclusion here is something  14:54:29
12 that I don't think I actually have the capacity to   14:54:32
13 do, and it's not something that I feel like I have   14:54:34
14 the ability to speculate on.                         14:54:38
15 BY MR. BARNES:                                        14:54:40
16    Q.  I'm not asking you the legal definition of  14:54:40
17 "consent."                                           14:54:43
18        I'm asking:  In common parlance, is        14:54:44
19 consent something that has to be voluntary?          14:54:48
20        MR. SPILLY:  Objection.  Asked and         14:54:53
21 answered.                                            14:54:53
22        THE WITNESS:  Once again, given the        14:55:00
23 context of consent as a legal construct, not only    14:55:02
24 would I be asked -- being asked to speculate on a   14:55:06
25 legal matter, I also would need to have more         14:55:09
                                                      Page 212

1 information about the market that we're referring    14:55:12
2 to, the context in which this question is being      14:55:14
3 asked.  It's hard for me to answer without           14:55:17
4 specifics.                                            14:55:21
5        MR. BARNES:  Okay.  C6 should be up.  Let   14:55:22
6 me know when it's number -- is it 20?                14:55:24
7        MS. TRUONG:  Yes, it should be up as        14:55:27
8 Exhibit 20.                                          14:55:29
9        (Whereupon Exhibit 20 was marked for       10:50:14
10        identification.)                            10:50:14
11 BY MR. BARNES:                                        14:55:30
12    Q.  What is this document, Mr. Heft-Luthy?      14:55:36
13    A.  To my recollection, this appears to be a   14:56:06
14 reproduction of a document which I authored that was  14:56:07
15 intended to help provide a jumping off point for a   14:56:13
16 product manager on my team who is going to develop   14:56:17
17 some work around user life cycle and being able to   14:56:21
18 have useful interventions in privacy relevant         14:56:26
19 moments for users.                                   14:56:35
20        (Reporter request for clarification.)      14:56:37
21 BY MR. BARNES:                                        14:56:37
22    Q.  If you could turn to the second -- I'm     14:56:42
23 sorry -- the third page of this document where it   14:56:43
24 says:  "Day 0:  Account Creation."                  14:56:45
25        Let me know when you're there.             14:56:47
                                                      Page 213

54 (Pages 210 - 213)

CONFIDENTIAL

1    A.  This is a page with exhibit Bates    14:56:49
2  Number 379?                              14:56:54
3    Q.  Correct.                           14:56:56
4    A.  Yes, I have it up.                  14:56:59
5    Q.  And you write:  "We know from research    14:57:00
6  that showing users such impactful settings before    14:57:01
7  they have an opportunity to use our products has a    14:57:05
8  negative impact on trust because users cannot    14:57:07
9  accurately assess risk and benefits as well because    14:57:10
10  the scope of the choices are too large for users to    14:57:14
11  effectively reason about."              14:57:17
12       Do you see that sentence?          14:57:18
13       MR. SPILLY:  Objection.  Mischaracterizes    14:57:21
14  the document.                           14:57:23
15       MR. BARNES:  Carl, what did I       14:57:26
16  mischaracterize about the document?     14:57:27
17  BY MR. BARNES:                           14:57:28
18    Q.  Do you see that sentence, Mr. Heft-Luthy?    14:57:28
19    A.  Just to confirm, you're asking me to read    14:57:32
20  the sentence starting "We know from" into the    14:57:34
21  record?                                 14:57:36
22    Q.  No, I'm not asking you to read it.  I'm    14:57:37
23  asking if you see that sentence that I read into the    14:57:39
24  record.                                 14:57:42
25    A.  I can confirm that I see that sentence    14:57:43

Page 214

1  written on this document.               14:57:45
2    Q.  Okay.  What research are you referring to    14:57:46
3  in that paragraph?                      14:57:49
4    A.  I don't recall.                     14:57:55
5    Q.  Would it be -- there's a footnote    14:57:59
6  "go/consent-uxr."                        14:58:00
7       Would that be where some of the research    14:58:04
8  would be?                               14:58:06
9       MR. SPILLY:  Objection.  Lacks foundation.    14:58:06
10       THE WITNESS:  In the common parlance of    14:58:13
11  citation as a reader, I would seek the second    14:58:16
12  footnote to find more information.  I can't speak    14:58:24
13  about the specifics of this document.    14:58:26
14  BY MR. BARNES:                           14:58:29
15    Q.  Why does showing -- this refers to "the    14:58:29
16  big three," right?  If you look up right above that,    14:58:32
17  there's three bullet points:  WAA, YouTube history,    14:58:34
18  and ad personalization.                 14:58:40
19       Do you see that?                    14:58:41
20    A.  I do.                             14:58:41
21    Q.  And those were the big -- those were the    14:58:42
22  big three you mentioned earlier, correct?    14:58:43
23       MR. SPILLY:  Objection.  Mischaracterizes    14:58:53
24  testimony.                              14:58:54
25       THE WITNESS:  No, that's not correct.    14:58:54

Page 215

1  BY MR. BARNES:                           14:58:55
2    Q.  Well, when we talked about the consent    14:58:56
3  audit, you testified when you had a sentence that    14:58:59
4  said, "We don't" -- "We're not talking about turning    14:59:01
5  three controls into 300," the three you referred to    14:59:05
6  were these three, correct?              14:59:07
7       MR. SPILLY:  Object to the form.    14:59:12
8       THE WITNESS:  No.                   14:59:12
9  BY MR. BARNES:                           14:59:12
10    Q.  Okay.  Well, at a break, we'll check the    14:59:13
11  record.                                 14:59:16
12       What were the three you referred to    14:59:16
13  previously?                             14:59:19
14    A.  To my recollection -- I don't want to    14:59:26
15  countervail the former recollection.  To my    14:59:27
16  recollection, which is why I said no originally, I    14:59:30
17  referred to the three that we were talking about    14:59:33
18  prior as Web and app activity, YouTube history, and    14:59:35
19  location history specifically.          14:59:41
20    Q.  Location history instead of ad    14:59:42
21  personalization.  Thank you.            14:59:44
22       Okay.  Ad personalization is the third one    14:59:47
23  here.                                   14:59:49
24       Why does showing Web and app activity,    14:59:54
25  YouTube history, and ad personalization have a -- an    14:59:56

Page 216

1  account creation have a negative impact on trust?    15:00:02
2       MR. SPILLY:  Object to the form.    15:00:07
3       THE WITNESS:  Given that I don't have the    15:00:19
4  research specified in front of me, it's hard for me    15:00:20
5  to speculate on that.                   15:00:21
6       MR. BARNES:  Okay.  Ms. Truong, can you    15:00:23
7  publish C7, please?                     15:00:25
8       MS. TRUONG:  That should be up as    15:00:49
9  Exhibit 21.                             15:00:49
10       (Whereupon Exhibit 21 was marked for    15:00:51
11       identification.)                   15:00:51
12  BY MR. BARNES:                           15:00:51
13    Q.  Let me know when you have it.      15:01:00
14       Can you explain what this document is,    15:01:12
15  Mr. Heft-Luthy?                          15:01:14
16       MR. SPILLY:  Objection.  Lacks foundation.    15:01:16
17       THE WITNESS:  Okay.  I have it up.  Could    15:01:41
18  you repeat the question?                15:01:42
19  BY MR. BARNES:                           15:01:43
20    Q.  Yeah.                            15:01:44
21       Could you explain what this document is,    15:01:44
22  Mr. Heft-Luthy?                          15:01:45
23       MR. SPILLY:  Same objection.        15:01:47
24       THE WITNESS:  Same caveat I'm going to    15:01:57
25  provide, which is I -- I don't recall the specific    15:01:59

Page 217

55 (Pages 214 - 217)

1 history of this document. It looks to be in a          15:02:01
2 format that is typically used for meeting notes of        15:02:05
3 particular sorts of regularly occurring meetings.         15:02:11
4 BY MR. BARNES:                          15:02:14
5    Q. Okay. So can we go to GOOG-CABR, the       15:02:15
6 one -- the page that ends in 034.              15:02:21
7       MR. BARNES: Ms. Truong, can you go ahead     15:02:23
8 and put this up on the screen?                 15:02:26
9       And there's a -- there's -- in bold it        15:02:29
10 says: "September 24/privacy checkup and the future   15:02:33
11 of proactive privacy."                      15:02:35
12       Do you recall giving a presentation on       15:02:38
13 PDPO privacy checkup on September 24?          15:02:41
14       MR. SPILLY: Objection. Vague.           15:02:56
15       THE WITNESS: It's hard for me to give       15:02:57
16 details, including whether it was on September 24th.   15:02:58
17 I can confirm having a memory and speaking at a     15:03:01
18 meeting titled "XFN UX Privacy Forum."          15:03:06
19 BY MR. BARNES:                          15:03:11
20    Q. Okay. And you see there it says: "What     15:03:12
21 does it mean for the user to be in a good privacy     15:03:14
22 state?"                              15:03:18
23       What does that mean?                  15:03:18
24       MR. SPILLY: Object to the form.           15:03:20
25       THE WITNESS: So as -- as said before,       15:03:26
                                    Page 218

1 I -- I don't recall the specific definitions of that   15:03:28
2 term and especially like articulating whether a       15:03:34
3 given user is or is not. It is a overall guideline     15:03:39
4 that we've developed within the PDPO when thinking    15:03:44
5 about approaches we have for things like regular     15:03:49
6 notice, the work that we develop with regards to the  15:03:53
7 privacy checkup to try to provide proactive advice    15:03:57
8 to our users. But it's hard for me to speculate on    15:04:01
9 a given user if a user is or is not in a good        15:04:04
10 privacy state.                          15:04:05
11       (Reporter request for clarification.)       15:04:18
12       THE WITNESS: Sorry. I do that. That's      15:04:18
13 my biggest voice coach thing.                15:04:18
14       It is hard for me to speculate at an        15:04:19
15 individual level whether a user is or is not in a     15:04:21
16 good privacy state.                       15:04:26
17       MR. BARNES: Ms. Truong, can you publish   15:04:29
18 Exhibit C9, please?                       15:04:32
19       MS. TRUONG: That should be loading now as  15:04:44
20 Exhibit 22.                            15:04:46
21       (Whereupon Exhibit 22 was marked for      15:04:46
22       identification.)                     15:04:46
23 BY MR. BARNES:                          15:04:56
24    Q. I have Exhibit 22. Do you have it,        15:04:57
25 Mr. Heft-Luthy?                         15:04:58
                                    Page 219

1       Who is -- while we're waiting, who is       15:05:03
2 Jason Liu? He's another APM16 person.           15:05:05
3       MR. SPILLY: Objection. Vague.            15:05:10
4 BY MR. BARNES:                          15:05:20
5    Q. Mr. Heft-Luthy, do you know?             15:05:26
6    A. Jason Liu is another product manager at     15:05:27
7 Google.                              15:05:30
8    Q. What's he a product manager of that you     15:05:31
9 are aware of?                          15:05:33
10    A. As previously stated, the associate        15:05:40
11 product manager program -- maybe I didn't state this  15:05:41
12 explicitly. The associate product manager program   15:05:44
13 brings together product managers working on a      15:05:48
14 variety of projects across Google. I don't actually  15:05:51
15 recall with specificity what Jason worked on or      15:05:54
16 didn't work on.                         15:05:58
17    Q. Okay. Let me know when you've got it in     15:06:00
18 front of me -- in front of you. "In front of me."     15:06:02
19 In front of you.                         15:06:04
20    A. That would be very hard for me to do. I     15:06:04
21 can let you know when I have it in front of me, and   15:06:05
22 I do.                               15:06:07
23    Q. That would actually be an objection for     15:06:08
24 speculation.                           15:06:12
25    A. Yeah, I have -- I have it. Yeah.          15:06:16
                                    Page 220

1    Q. Okay. If you could turn to the second      15:06:18
2 page here, it says -- can you read the first bullet   15:06:24
3 from you?                             15:06:30
4    A. First one on the second page you mean?     15:06:31
5    Q. Correct.                          15:06:33
6    A. It says: "Yeah on the privacy side the     15:06:34
7 hope is that Google can spin up something major and  15:06:37
8 weird in the publisher/ads ecosystem, but I'm not    15:06:40
9 sure there's" -- it looks like it's jammed with      15:06:45
10 formatting -- "there's a strong setup between Chrome  15:06:49
11 and ads to have the appetite."                15:06:53
12    Q. What do you mean you're not sure there's a  15:06:55
13 strong setup between Chrome and ads to have the     15:06:57
14 appetite to do something major on the privacy side?  15:07:00
15    A. I don't recall the conditions at the time    15:07:09
16 of drafting this message.                    15:07:11
17    Q. Okay. And then the last bullet point, can   15:07:13
18 you read that?                          15:07:15
19    A. It says -- just to confirm, we're talking    15:07:18
20 the one sent 14:10:50?                     15:07:21
21    Q. Correct.                          15:07:24
22    A. It says: "Google looks more and more      15:07:26
23 mealy-mouthed for not doing anything significant,     15:07:28
24 plus regulation is coming."                  15:07:31
25    Q. What does "mealy-mouthed" mean?          15:07:34
                                    Page 221

56 (Pages 218 - 221)

CONFIDENTIAL

1       MR. BARNES:  Thank you, Mr. Spilly.  Your       18:34:59
2  objection to keeping the deposition open is noted.       18:35:01
3       MR. SPILLY:  Thank you.              18:35:07
4       MR. BARNES:  Let's go off the record.       18:35:11
5       THE VIDEO OPERATOR:  Okay.  This will end       18:35:14
6  today's deposition of Sam Heft-Luthy.  The total       18:35:15
7  number of media units used in the deposition today       18:35:19
8  was 12 and will be retained by Veritext Legal       18:35:22
9  Solutions.  We are off the record at 6:35 p.m.       18:35:24
10  Pacific Time.  Thank you.              18:35:27
11          (TIME NOTED: 6:35 p.m.)
12              * * * * *
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                    Page 326

1
2
3
4
5
6          I, SAM HEFT-LUTHY, do hereby declare
7  under penalty of perjury that I have read the
8  foregoing transcript; that I have made any
9  corrections as appear noted, in ink, initialed by
10  me, or attached hereto; that my testimony as
11  contained herein, as corrected, is true and correct.
12      EXECUTED this _____ day of _____
13  2021, at _____, _____.
                (City)        (State)
14
15
16
17          _____
            SAM HEFT-LUTHY
18          VOLUME I
19
20
21
22
23
24
25
                                                    Page 327

CERTIFICATE OF REPORTER
1
2       I, the undersigned, a Certified Shorthand
3  Reporter of the State of California, do hereby
4  certify:
5       That the foregoing proceedings were taken
6  before me at the time and place herein set forth;
7  that any witnesses in the foregoing proceedings,
8  prior to testifying, were administered an oath; that
9  a verbatim record of the proceedings was made by me
10  using machine shorthand, which was thereafter
11  transcribed under my direction; and that the
12  foregoing is an accurate transcription thereof.
13       Further, that if the foregoing pertains to
14  the original transcript of a deposition in a federal
15  case, before completion of the proceedings, review
16  of the transcript [ ] was [X] was not requested.
17       I further certify that I am neither
18  financially interested in the action, nor a relative
19  or employee of any attorney of any party to this
20  action.
21       IN WITNESS WHEREOF, I have this date
22  subscribed my name.
23  DATED: Dec_____
24          _____
            MEGAN F. ALVAREZ
25          CSR No. 12470, RPR
                                                    Page 328

1  JASON "JAY" BARNES, ESQ.
2  jaybarnes@simmonsfirm.com
3              December 30, 2021
4  RE: CALHOUN VS. GOOGLE LLC
5  DECEMBER 20, 2021, SAM HEFT-LUTHY, JOB NO. 4974193
6  The above-referenced transcript has been
7  completed by Veritext Legal Solutions and
8  review of the transcript is being handled as follows:
9  __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext
10     to schedule a time to review the original transcript at
11     a Veritext office.
12  __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF
13     Transcript - The witness should review the transcript and
14     make any necessary corrections on the errata pages included
15     below, noting the page and line number of the corrections.
16     The witness should then sign and date the errata and penalty
17     of perjury pages and return the completed pages to all
18     appearing counsel within the period of time determined at
19     the deposition or provided by the Code of Civil Procedure.
20  __ Waiving the CA Code of Civil Procedure per Stipulation of
21     Counsel - Original transcript to be released for signature
22     as determined at the deposition.
23  __ Signature Waived – Reading & Signature was waived at the
24     time of the deposition.
25
                                                    Page 329

CONFIDENTIAL

**Deposition Errata Sheet**
**Case: Calhoun, et al. v. Google LLC**
**Deponent: Sam Heft-Luthy**
**Date of Deposition: December 20, 2021**

| Pg. and Ln. | Now Reads | Should Read | Reason |
|---|---|---|---|
| Pg: 28 Ln: 19 | a often product | a product | Transcription error |
| Pg: 30 Ln: 5 | Nina Ilyeva | Nina Ilieva | Transcription error |
| Pg: 53 Ln: 15 | as a manager of | as product manager of | Words used |
| Pg: 66 Ln: 9 | don't | do | Transcription error |
| Pg: 68 Ln: 8 | did | doesn't | Transcription error |
| Pg: 73 Ln: 4 | it's product | it's a product | Transcription error |
| Pg: 76 Ln: 6 | question | objection | Transcription error |
| Pg: 82 Ln: 25 | Bushman | Buschmann | Transcription error |
| Pg: 82 Ln: 2, 3, 4, 8, 12 | Bushman | Buschmann | Transcription error |
| Pg: 103 Ln: 3 | a | an | Transcription error |
| Pg: 104 Ln: 15 | system | systems | Transcription error |
| Pg: 104 Ln: 20 | a | an | Transcription error |
| Pg: 164 Ln: 20 | that was | that I was | Transcription error |
| Pg: 183 Ln: 4 | It's | It | Transcription error |
| Pg: 187 Ln: 16 | MR. SPILLY: | MR. BARNES: | Transcription error |
| Pg: 201 Ln: 15 | reference | referenced | Transcription error |
| Pg: 208 Ln: 17 | be a | be | Transcription error |
| Pg: 218 Ln: 17 | memory | memory of | Transcription error |

DocuSign Envelope ID: 319E70A9-90E0-421F-9201-31970956559C

CONFIDENTIAL

| Pg: 260 Ln: 5 | distinction | distinct | Transcription error |
|---|---|---|---|
| Pg: 265 Ln: 4 | are on | on | Transcription error |
| Pg: 266 Ln: 11 | graph | draft | Transcription error |
| Pg: 289 Ln: 5 | How | MR. BARNES: How | Transcription error |
| Pg: 290 Ln: 13 | allegations | obligations | Transcription error |
| Pg: 302 Ln: 21 | Sorro | Sauro | Transcription error |
| Pg: 303 Ln: 1 | Sorro | Sauro | Transcription error |
| Pg: 303 Ln: 8 | CDPR | GDPR | Transcription error |
| Pg: 309 Ln: 13 | Common parlance for Google. | In common parlance for Google, | Transcription error |
| Pg: 318 Ln: 20 | "art ownership," | art "ownership," | Transcription error |
| Pg. 319 Ln: 1-2 | "art ownership," | art "ownership," | Transcription error |

# EXHIBIT 17

# Redacted Version of Document Sought to be Sealed

BLEICHMAR FONTI & AULD LLP        DiCELLO LEVITT GUTZLER LLC        SIMMONS HANLY CONROY LLC
555 12th STREET, SUITE 1600          ONE GRAND CENTRAL PLACE          112 MADISON AVENUE, 7TH FL.
OAKLAND, CA  94607                    60 EAST 42nd STREET, SUITE 2400          NEW YORK, NY 10016
                                         NEW YORK, NY 10165

December 30, 2021

**VIA ELECTRONIC MAIL**
Jomaire Crawford, Esq.
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Email: jomairecrawford@quinnemanuel.com

> Re:    *Calhoun v. Google LLC*, No. 5:20-cv-05146-LHK-SVK (N.D. Cal.)
>        **Search Terms for ESI**

Dear Counsel:

Pursuant to the Court's order, Dkt. No. 422, Plaintiffs propose the following search terms. Should any changes be needed to conform the below to Google's preferred syntax, please include a redline showing any such changes with the hit counts due tomorrow.

1. ((revenue OR revenues OR rev OR profit OR profits) w/10 (increas* OR decreas* OR loss OR losses OR losing OR lose OR lost OR gain* OR growth OR exceed* OR impact* OR "per user" OR UID OR userid* OR identifier* OR gaia OR biscotti OR zwieback OR zwbk OR "device ID")) AND Chrome
2. Revenue w/5 (million OR millions OR billion OR billions)
3. (Chrome OR Ads OR Analytics) w/20 ((Ernst w/2 Young) OR "Ernst&Young" OR EY)
4. "███████████" or "███████████"
5. frontline AND fingerprint*
6. reCAPTCHA and security and "ads guarantee"
7. "MyActivity" AND (users OR "user visible" OR "visible to users" OR accessible)
8. "non Google account user" /20 (value OR profit OR revenue)
9. "user data value"
10. "profit per user"
11. "revenue per user"
12. Privacy w/25 (omnibar or reCAPTCHA)
13. Privacy w/25 (vertical* or profile*)
14. (Revenue or profit) w/25 depricat*
15. (Revenue or profit) w/25 chrome
16. (Revenue or profit) w/25 zwieback
17. (Revenue or profit) w/25 biscotti
18. (██████ or FTC or "federal trade commission") w/25 assess*

Counsel for Google                                        SIMMONS HANLY CONROY
December 30, 2021                                         DiCELLO LEVITT GUTZLER LLC
Page 2                                                    BLEICHMAR FONTI & AULD LLP

Regards,

Lesley E. Weaver, Esq.
BLEICHMAR FONTI & AULD LLP
Email: lweaver@bfalaw.com

Jay Barnes, Esq.
SIMMONS HANLY CONROY
Email: jaybarnes@simmonsfirm.com

David A. Straite, Esq.
DICELLO LEVITT GUTZLER LLC
Email: dstraite@dicellolevitt.com

cc (via Electronic Mail):

Additional Defendant Google's Counsel

Google Counsel (qecalhoun@quinnemanuel.com)

Plaintiffs' Counsel

Amy E. Keller, Esq. (akeller@dicellolevitt.com)
Adam Prom, Esq. (aprom@dicellolevitt.com)
Sharon Cruz, Esq. (scruz@dicellolevitt.com)
Angelica Ornelas, Esq. (aornelas@bfalaw.com)
An Truong, Esq. (atruong@simmonsfirm.com)
Eric Johnson, Esq. (ejohnson@simmonsfirm.com)

# EXHIBIT 18

# Redacted Version of
# Document Sought to be Sealed

**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7581**

WRITER'S EMAIL ADDRESS
JOMAIRECRAWFORD@QUINNEMANUEL.COM

December 31, 2021

<u>VIA E-MAIL</u>

David A. Straite
Dicello Levitt Gutzler
One Grand Central Place
60 East 42nd Street, Suite 2400
New York, New York 10165

Lesley Weaver
Bleichmar Fonti & Auld LLP
555 12th Street, Suite 1600
Oakland, CA 94607

Jay Barnes
Simmons Hanly Conroy LLC
112 Madison Ave., 7th Floor
New York, NY 10016

Re:    *Calhoun, et al. v. Google LLC* – U.S. District Court, Northern District of California, San
       Jose Division: Case No. 5:20-cv-5146-LHK-SVK

Dear Counsel,

      I write on behalf of Google LLC ("Google") in furtherance of my December 31, 2021 email
of this afternoon, and pursuant to the Court's December 22, 2021 order concerning search terms,
and specifically, the "remain[ing] 100,000 hit counts before the limits of Dkt. 349 are exhausted."
Dkt. 422.

      Google has tested (i) the 18 new terms[1] for the 41 agreed-to ESI custodians (excluding Mr.
Pichai, consistent with the Court's orders, *see* Dkt. Nos. 415, 422), and (ii) "all terms" for Mr. Liu

---

[1] The only syntax correction that Google applied was to remove the "w" from the "w/n" terms.

quinn emanuel urquhart & sullivan, llp

LOS ANGELES | NEW YORK | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE | LONDON | TOKYO | MANNHEIM | MOSCOW |
HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS

12/31/21 Ltr. from J. Crawford to D. Straite

(as requested in your December 29, 2021 email).  As we previously informed Plaintiffs, these counts exceed the 100,000 document hit cap by approximately 20,000 hits.  Dkt. 415.

Enclosed at **<u>Appendix A</u>** is a chart with the total document hit counts and unique document hit counts for the 18 new terms run across the 41 agreed-to ESI custodians and at **<u>Appendix B</u>** is a chart with the total document hit counts and unique document hit counts for "all terms" for Mr. Liu.  Enclosed at **<u>Appendix C</u>** are the 42 agreed-upon ESI custodians.

Google proposes changing the proximity limiter in Term 13 from /25 to /15 given the exorbitant volume of hits for this term.  Although the review would exceed the 100,000 cap by approximately 9,000 hits with this modification, Google is willing to accept this as a compromise, provided Plaintiffs confirm their acceptance of this proposal by **<u>2:00 p.m. PT.</u>**

We look forward to your response.


Very truly yours,

Jomaire Crawford.

Jomaire Crawford

JAC
cc:     (via email) Counsel of Record

12/31/21 Ltr. from J. Crawford to D. Straite

# Appendix A

12/31/21 Ltr. from J. Crawford to D. Straite

| # | Plaintiffs' Proposed Final Terms for 41 ESI Custodians | Doc Hit Count | Doc Hit Count (+Families) | Unique Doc Hit Count | Unique Doc Hit Count (+ Families) |
|---|---|---|---|---|---|
| 1. | ((revenue OR revenues OR rev OR profit OR profits) /10 (increas* OR decreas* OR loss OR losses OR losing OR lose OR lost OR gain* OR growth OR exceed* OR impact* OR "per user" OR UID OR userid* OR identifier* OR gaia OR biscotti OR zwieback OR zwbk OR "device ID")) AND Chrome | 14900 | 16516 | 9169 | 10141 |
| 2. | Revenue /5 (million OR millions OR billion OR billions) | 8222 | 9274 | 7358 | 8137 |
| 3. | (Chrome OR Ads OR Analytics) /20 ((Ernst w/2 Young) OR "Ernst&Young" OR EY) | 1042 | 1124 | 1003 | 1084 |
| 4. | "▮▮▮▮▮" OR "▮▮▮▮▮▮" | 2702 | 2764 | 2660 | 2720 |
| 5. | frontline AND fingerprint* | 197 | 202 | 132 | 137 |
| 6. | reCAPTCHA AND security AND "ads guarantee" | 3 | 3 | 1 | 1 |
| 7. | "MyActivity" AND (users OR "user visible" OR "visible to users" OR accessible) | 11332 | 12424 | 10926 | 12012 |
| 8. | "non Google account user" /20 (value OR profit OR revenue) | 0 | 0 | 0 | 0 |
| 9. | "user data value" | 23 | 23 | 22 | 22 |
| 10. | "profit per user" | 28 | 28 | 24 | 24 |
| 11. | "revenue per user" | 877 | 1113 | 642 | 694 |
| 12. | Privacy /25 (omnibar OR reCAPTCHA) | 329 | 355 | 308 | 332 |
| 13. | Privacy /25 (vertical* OR profile*) | 45221 | 46584 | 43931 | 45281 |
| 14. | (Revenue OR profit) /25 depricat* | 6 | 6 | 0 | 0 |
| 15. | (Revenue OR profit) /25 chrome | 10197 | 11288 | 5110 | 5618 |
| 16. | (Revenue OR profit) /25 zwieback | 219 | 219 | 145 | 145 |
| 17. | (Revenue OR profit) /25 biscotti | 1083 | 1095 | 862 | 873 |
| 18. | (▮▮▮▮ OR FTC OR "federal trade commission") /25 assess* | 1812 | 1859 | 1634 | 1679 |

4

12/31/21 Ltr. from J. Crawford to D. Straite

# Appendix B

12/31/21 Ltr. from J. Crawford to D. Straite

| # | Plaintiffs' Proposed Search Terms for Vic Liu | Doc Hit Count | Doc Hit Count (+Families) | Unique Doc Hit Count | Unique Doc Hit Count (+ Families) |
|---|---|---|---|---|---|
| 1. | OptedInToSync | 0 | 0 | 0 | 0 |
| 2. | "Opted In To Sync With Account" | 0 | 0 | 0 | 0 |
| 3. | NotOptedInToSync | 0 | 0 | 0 | 0 |
| 4. | "Not Opted In To Sync with Account" | 0 | 0 | 0 | 0 |
| 5. | "Not Opted into sync with Account" | 0 | 0 | 0 | 0 |
| 6. | (opt OR opted OR opting OR opts) AND (sync /5 account) | 81 | 172 | 2 | 2 |
| 7. | "background-sync" | 1 | 1 | 0 | 0 |
| 8. | "Sync.Posted" | 0 | 0 | 0 | 0 |
| 9. | "Sync.Startup" | 0 | 0 | 0 | 0 |
| 10. | Sync /15 startup | 13 | 23 | 2 | 2 |
| 11. | Sync /15 "start up" | 3 | 6 | 0 | 0 |
| 12. | "Sync.URL" | 0 | 0 | 0 | 0 |
| 13. | Sync /15 URL | 117 | 191 | 57 | 57 |
| 14. | "SyncEnabled" | 0 | 0 | 0 | 0 |
| 15. | "Sync.InitialState" | 0 | 0 | 0 | 0 |
| 16. | Sync /15 "initial state" | 2 | 2 | 2 | 2 |
| 17. | "Sync.Local.Enabled" | 0 | 0 | 0 | 0 |
| 18. | Sync /3 enabled | 75 | 165 | 3 | 4 |
| 19. | "Sync.ModelTypeStoreCommit" | 0 | 0 | 0 | 0 |
| 20. | "Sync.PostedClientToServer" | 0 | 0 | 0 | 0 |
| 21. | (Sync /15 client) OR (sync /15 post) OR (sync /15 server) | 1437 | 1582 | 1195 | 1243 |
| 22. | Chrome AND ((FRE OR "First Run Experience") /25 sync) | 42 | 102 | 0 | 0 |

12/31/21 Ltr. from J. Crawford to D. Straite

| | Plaintiffs' Proposed Search Terms for Vic Liu | Doc Hit Count | Doc Hit Count (+Families) | Unique Doc Hit Count | Unique Doc Hit Count (+ Families) |
|---|---|---|---|---|---|
| 23. | ((Chrome /10 (sync* OR sign-in OR unsync OR nonsync*)) /25 (percent OR percentage OR number OR proportion OR share OR shares OR thousand* OR million*)) AND (FRE OR "First Run Experience" OR histogram*) | 1 | 3 | 0 | 0 |
| 24. | Chrome AND ((never OR always OR fully OR default*) /2 sync*) | 36 | 77 | 1 | 1 |
| 25. | "chrome_uma.chrome_uma_weblog" | 30 | 30 | 28 | 28 |
| 26. | (ad OR ads OR advertisement*) /5 ((Google OR Chrome OR Android OR YouTube) /10 (secure OR security OR private OR privacy OR safe OR safety OR control OR settings OR trust OR personal OR protected OR protection OR "personal information")) | 32 | 32 | 16 | 16 |
| 27. | (NAC OR "new ads control" OR ▓▓▓▓▓) /25 (process or flow* OR UI OR UX OR "user interface" OR "user experience" OR consent* OR setting* OR opt OR opts OR opted OR opting) | 755 | 788 | 285 | 297 |
| 28. | (account /10 (create OR creates OR creation OR creating OR "set up" OR "setting up" OR registration)) AND (flow OR flows OR direct OR directs OR directed OR directing) | 1362 | 1533 | 969 | 1027 |
| 29. | "Security and Privacy Policy Creation and Maintenance Process" | 0 | 0 | 0 | 0 |
| 30. | Chrome /25 ("Privacy Advisory Council" OR "Privacy Council") | 0 | 0 | 0 | 0 |
| 31. | (("recovery email" OR "recovery phone") /25 "Google Account") /25 (use OR uses OR used OR using OR link* OR associate* OR associating OR connect* OR identifi* OR map OR maps OR mapped OR mapping OR table OR tables OR tabled OR tabling OR correlat* OR record*) | 2 | 2 | 1 | 1 |
| 32. | ("Google Analytics" /5 ("Opt-Out Browser" w/5 "Add-On")) AND ((user or users) /25 (share OR shares OR percent OR percentage OR number OR thousand* OR million* OR proportion*)) | 1 | 1 | 0 | 0 |
| 33. | ("Google Analytics" /5 ("Opt-Out Browser" /5 "Add-On")) AND (default* OR ((impact* OR gain* OR increas* OR loss* OR decreas* OR drop*) AND (rev OR revenue* OR profit* OR benefit* OR goodwill))) | 2 | 3 | 1 | 2 |

12/31/21 Ltr. from J. Crawford to D. Straite

| | Plaintiffs' Proposed Search Terms for Vic Liu | Doc Hit Count | Doc Hit Count (+Families) | Unique Doc Hit Count | Unique Doc Hit Count (+ Families) |
|---|---|---|---|---|---|
| 34. | (Privacy /25 ((user* OR UX) /5 (feedback OR survey* OR poll* OR questionnaire* OR review OR reviews OR experienc* OR research OR expectation*)) OR news OR article* OR PIR or "private information retrieval" OR UXR) AND sync* | 1840 | 2083 | 1115 | 1221 |
| 35. | (Biscotti* /15 fingerprint*) OR (("Biscotti FP" OR "biscotti_fp" OR Biscotti) /5 "native properties") | 11 | 11 | 0 | 0 |
| 36. | Gaia* /15 fingerprint* | 53 | 53 | 12 | 12 |
| 37. | ((Zwieback* OR zwbk* OR Zwiebak) /15 fingerprint*) OR (ZWBK /5 "native properties") | 8 | 8 | 0 | 0 |
| 38. | ((Gaia OR Biscotti) /5 (data OR info OR information)) AND pipeline* | 5438 | 5507 | 4740 | 4775 |
| 39. | (Gaia OR "Google Account" OR authenticated OR "personal logs" OR plogs OR "p-logs") AND (Biscotti OR unauthenticated OR "b-logs" OR "basic browser" OR DCLK or BISC) AND (conversion OR pipeline*) | 1209 | 1232 | 7 | 7 |
| 40. | (Gaia OR "Google Account" OR authenticated OR "personal logs" OR plogs OR "p-logs") AND (Zwieback OR ZWBK OR Zwiebak) AND (conversion OR pipeline*) | 9306 | 9414 | 327 | 335 |
| 41. | (Gaia OR "Google Account" OR authenticated OR "personal logs" OR plogs OR "p-logs") AND (Zwieback OR ZWBK OR Zwiebak) AND (map OR maps OR mapped OR mapping OR connect* OR associat* OR identif* OR table OR tables OR tabled OR tabling OR correlat* OR link* OR mix OR mixes OR mixed OR mixing OR use OR uses OR used OR using) | 12029 | 12184 | 2462 | 2505 |
| 42. | (Gaia OR "Google Account" OR authenticated OR "personal logs" OR plogs OR "p-logs") AND (Biscotti OR unauthenticated OR "b-logs" OR "basic browser" OR DCLK OR BISC) AND (map OR maps OR mapped OR mapping OR connect* OR associat* OR identif* OR table OR tables OR tabled OR tabling or correlat* OR link* OR mix OR mixes OR mixed OR mixing OR use OR uses OR used OR using) | 2243 | 2275 | 469 | 469 |

12/31/21 Ltr. from J. Crawford to D. Straite

| # | Plaintiffs' Proposed Search Terms for Vic Liu | Doc Hit Count | Doc Hit Count (+Families) | Unique Doc Hit Count | Unique Doc Hit Count (+ Families) |
|---|---|---|---|---|---|
| 43. | (Gaia OR "Google Account" OR authenticated OR "personal logs" OR plogs OR "p-logs") AND ▮▮▮▮ AND (map OR maps OR mapped OR mapping OR connect* OR associat* OR identif* OR table OR tables OR tabled OR tabling OR correlat* OR link* OR mix OR mixes OR mixed OR mixing OR use OR uses OR used OR using) | 328 | 331 | 57 | 59 |
| 44. | Analytics AND (("cid" OR "ga" OR "Google Analytics cookie") /10 (encrypt OR "naming convention" OR value OR values OR key OR keyed OR use OR uses OR used OR using)) | 688 | 777 | 352 | 397 |
| 45. | ▮▮▮▮▮* AND (Biscotti* OR Zwieback* OR zwbk OR Zwiebak OR device OR "id" OR identifi* OR identify*) | 357 | 359 | 237 | 239 |
| 46. | ▮▮▮▮ AND (Biscotti* OR Zwieback* OR zwbk OR Zwiebak OR device OR "id" OR identifi* OR identify*) | 89 | 105 | 21 | 35 |
| 47. | "chrome-omni" | 1 | 2 | 1 | 2 |

12/31/21 Ltr. from J. Crawford to D. Straite

# APPENDIX C

12/31/21 Ltr. from J. Crawford to D. Straite

| Google ESI Custodian List (as of December 31, 2021) | | |
|---|---|---|
| 1. Jochen Eisinger | 15. Chris Liao | 29. Michael Fink |
| 2. Alexei Svitkine | 16. Greg Fair | 30. Will Harris |
| 3. Deepti Bhatnagar | 17. Justin Schuh | 31. Robert Kaplow |
| 4. Florian Uunk | 18. David Monsees | 32. Jon Krafcik |
| 5. Helen Harris | 19. Adrienne Porter Felt | 33. Emil Ochotta |
| 6. Glenn Berntson | 20. Chetna Bindra | 34. Martin Sramek |
| 7. Hyewon Jun | 21. Michael Kleber | 35. Martin Shelton |
| 8. Keith Wright | 22. Sam Heft-Luthy | 36. Martina Laresova |
| 9. Abdelkarim Mardini | 23. Deepak Ravichandran | 37. Rory McClelland |
| 10. Sabine Borsay | 24. Sergei Vassilwitskii | 38. Linda Lu |
| 11. Alex Ainslie | 25. George Levitte | 39. Parisa Tabriz |
| 12. Tim Schumann | 26. Arne Mauser | 40. Sundar Pichai |
| 13. Dan Stone | 27. Uwe Bubeck | 41. Anil Sabharwal |
| 14. Brad Townsend | 28. Mikel Astiz | 42. Vic Liu |

# EXHIBIT 19

# Redacted In Its Entirety

# EXHIBIT 20

# Redacted Version of Document Sought to be Sealed

Message

___

| | |
|---|---|
| **From**: | Mediha Abdulhay [mediha@google.com] |
| **Sent**: | 7/28/2020 4:13:16 PM |
| **To**: | Sam Heft-Luthy [heftluthy@google.com]; Yingsi Zhang [yingsi@google.com] |
| **Subject**: | Re: ▇▇▇▇▇ project intro |

+Yingsi Zhang as well for vis

On Tue, Jul 28, 2020 at 9:10 AM Sam Heft-Luthy <heftluthy@google.com> wrote:
FYI per ping

---------- Forwarded message ---------
From: **Sam Heft-Luthy** <heftluthy@google.com>
Date: Mon, Jul 20, 2020 at 4:32 PM
Subject: ▇▇▇▇▇ project intro
To: Cassidy Morgan <cassidym@google.com>
Cc: Ilana Rosenberg <irosenberg@google.com>, Kalle Buschmann <kallebu@google.com>, Mimosa Lynch <mimosal@google.com>

Hi Cassidy,

Wanted to send a quick message to make sure you had context for a meeting that will get added to your calendar soon.

PDPO User-Facing Privacy is kicking off a project titled ▇▇▇▇▇▇ — we're still working out the exact proposed governance structure but **we'd like for you to serve in that body to provide project guidance**, hence an invite to the kickoff that we'll follow up with Ilana to set up.

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

We'll base this work on the existing narrative and principles workstreams ongoing, with a goal of building a better articulation of what we want "treating users with profound respect when it comes to controlling and understanding their data" to look and feel like.

As said, our exact governing structure is pending some more feedback from PDPO leadership later this week, but we wanted to make sure we gave context as we work to get a governing-body kickoff scheduled. We'll follow up when we have more details.

Thanks,
Sam

--

CONFIDENTIAL    GOOG-CABR-05753834

**Mediha Abdulhay**
Privacy Marketing Lead, Brand Studio
mediha@google.com
6508611660

# EXHIBIT 21

# Redacted Version of Document Sought to be Sealed

Appointment

**From:**        Google Calendar [calendar-notification@google.com]
**Sent:**        7/31/2020 2:31:48 PM
**To:**          Sam Heft-Luthy [heftluthy@google.com]

**Subject:**     Kate <> ▮▮▮▮▮ Sync
**Attachments:** invite.ics

**Start:**       7/31/2020 5:30:00 PM
**End:**         7/31/2020 6:00:00 PM
**Show Time As:** Busy

**Recurrence:**  (none)

---

**Kate Charlet has accepted this invitation.**
**Kate <> ▮▮▮▮▮ Sync**

When         Fri Jul 31, 2020 10:30am – 11am Pacific Time - Los Angeles

Joining info    Join with Google Meet
             ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

             Join by phone
             ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

             More phone numbers

Calendar     Sam Heft-Luthy

Who          • Sam Heft-Luthy - organizer
             • Kate Charlet
             • Mimosa Lynch
             • Kalle Buschmann

Some time to introduce Kalle and Mimosa and discuss next steps for Kate to provide input into ▮▮▮▮▮
workstream

---

Invitation from **Google Calendar**

You are receiving this email at the account heftluthy@google.com because you are subscribed for invitation replies on calendar Sam Heft-Luthy.

To stop receiving these emails, please log in to https://www.google.com/calendar/ and change your notification settings for this calendar.

Forwarding this invitation could allow any recipient to send a response to the organizer and be added to the guest list, or invite others regardless of their own invitation status, or to modify your RSVP. **Learn More**.

GOOG-CABR-05753851

# EXHIBIT 22

# Redacted Version
# of Document Sought
# to be Sealed

Appointment

**From:**      Google Calendar [calendar-notification@google.com]
**Sent:**      7/28/2020 8:10:19 PM
**To:**        kallebu@google.com

**Subject:**       ▮▮▮▮▮▮▮▮ Chat
**Attachments:**   invite.ics

**Start:**      8/3/2020 3:00:00 PM
**End:**        8/3/2020 3:25:00 PM
**Show Time As:** Busy

**Recurrence:**    (none)

---

Sam Heft-Luthy has accepted this invitation.

▮▮▮▮▮▮▮▮ **Chat**

When        Mon Aug 3, 2020 17:00 – 17:25 Central European Time - Berlin

Joining info   Join with Google Meet

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Join by phone

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

More phone numbers

Calendar    kallebu@google.com

Who        • kallebu@google.com - organizer
           • Breonna Rodriguez
           • Sam Heft-Luthy
           • Mimosa Lynch

Hi Breonna, as suggested by Greg we would love to take some of your time to chat about the future privacy experience vision we are working on.

---

Invitation from **Google Calendar**

You are receiving this email at the account kallebu@google.com because you are subscribed for invitation replies on calendar kallebu@google.com.

To stop receiving these emails, please log in to https://www.google.com/calendar/ and change your notification settings for this calendar.

Forwarding this invitation could allow any recipient to send a response to the organizer and be added to the guest list, or invite others regardless of their own invitation status, or to modify your RSVP. **Learn More**.

CONFIDENTIAL

GOOG-CABR-05753839

# EXHIBIT 23

# Redacted Version of Document Sought to be Sealed

Appointment

---

**From:** Google Calendar [calendar-notification@google.com]
**Sent:** 7/28/2020 2:53:03 PM
**To:** Mimosa Lynch [mimosal@google.com]

**Subject:** ▉▉▉▉▉ Stakeholder Interview
**Attachments:** edit.url; invite.ics

**Start:** 8/5/2020 5:00:00 PM
**End:** 8/5/2020 5:45:00 PM
**Show Time As:** Busy

**Recurrence:** (none)

---

Sam Heft-Luthy has accepted this invitation.

▉▉▉▉▉ **Stakeholder Interview**

| When | Wed Aug 5, 2020 7pm – 7:45pm Central European Time – Berlin |
| --- | --- |
| Joining info | Join with Google Meet |
| | ▉▉▉▉▉▉▉▉▉ |
| | Join by phone |
| | ▉▉▉▉▉▉▉▉▉▉ |
| | More phone numbers |
| Calendar | Mimosa Lynch |
| Who | • Mimosa Lynch - organizer |
| | • Micah Laaker |
| | • Sam Heft-Luthy |
| | • kallebu@google.com |
| Attachments | ▉▉▉ Charter (go/privacynative) |

Hi Micah,
Please let me know if this time doesn't work for you.

Thank you!
Mimosa

---

Invitation from **Google Calendar**

You are receiving this email at the account mimosal@google.com because you are subscribed for invitation replies on calendar Mimosa Lynch.

To stop receiving these emails, please log in to https://www.google.com/calendar/ and change your notification settings for this calendar.

Forwarding this invitation could allow any recipient to send a response to the organizer and be added to the guest list, or invite others regardless of their own invitation status, or to modify your RSVP. **Learn More**

---

# EXHIBIT 24

# Redacted Version
# of Document Sought
# to be Sealed

Appointment

| | |
|---|---|
| **From:** | Google Calendar [calendar-notification@google.com] |
| **Sent:** | 8/7/2020 8:16:17 PM |
| **To:** | kallebu@google.com; Ian Alexander [ianalexander@google.com] |

**Subject:** ███████████Interview with Ian
**Attachments:** invite.ics

**Start:** 8/12/2020 3:00:00 PM
**End:** 8/12/2020 3:30:00 PM
**Show Time As:** Tentative

**Recurrence:** (none)

---

**You have been invited to the following event.**

███████████ **Interview with Ian**

When    Wed Aug 12, 2020 17:00 – 17:30 Central European Time - Berlin

Joining info    Join with Google Meet
████████████████

Join by phone
████████████████████

More phone numbers

Calendar    kallebu@google.com

Who
- Sam Heft-Luthy - organizer
- Ian Alexander
- kallebu@google.com

**more details »**
Hey Ian,

PDPO are spinning up an effort to build a clearer articulation of Google's future privacy experience. (go█████████████ for more details)

We're in an information gathering stage and are reaching out to a few Privacy Leads to get some input for our first round. This will be a half-hour interview asking about some of the basics for how you approach your work.

Thanks!

Going (kallebu@google.com)?    **Yes** - **Maybe** - **No**    more options »

Invitation from **Google Calendar**

You are receiving this email at the account kallebu@google.com because you are subscribed for invitations on calendar kallebu@google.com.

To stop receiving these emails, please log in to https://www.google.com/calendar/ and change your notification settings for this calendar.

GOOG-CABR-05753875

Forwarding this invitation could allow any recipient to send a response to the organizer and be added to the guest list, or invite others regardless of their own invitation status, or to modify your RSVP. **Learn More**.

GOOG-CABR-05753876

# EXHIBIT 25

# Redacted Version of Document Sought to be Sealed

Appointment

**From:**      Google Calendar [calendar-notification@google.com]
**Sent:**      8/7/2020 7:37:34 PM
**To:**        Mimosa Lynch [mimosal@google.com]

**Subject:**   ▮▮▮▮▮▮▮▮▮Yooki/Kalle/Sam/Mimosa Sync
**Attachments:** invite.ics

**Start:**     8/12/2020 5:30:00 PM
**End:**       8/12/2020 6:15:00 PM
**Show Time As:** Busy

**Recurrence:**  (none)

---

Sam Heft-Luthy has accepted this invitation.

## Yooki/Kalle/Sam/Mimosa Sync

When          Wed Aug 12, 2020 6:30pm – 7:15pm Western European Time - Lisbon

Joining info  Join with Google Meet
              ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

              Join by phone
              ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

              More phone numbers

Calendar      Mimosa Lynch

Who           • Mimosa Lynch - organizer
              • Sam Heft-Luthy
              • Yooki Park
              • kallebu@google.com

Invitation from Google Calendar

You are receiving this email at the account mimosal@google.com because you are subscribed for invitation replies on calendar Mimosa Lynch.

To stop receiving these emails, please log in to https://www.google.com/calendar/ and change your notification settings for this calendar.

Forwarding this invitation could allow any recipient to send a response to the organizer and be added to the guest list, or invite others regardless of their own invitation status, or to modify your RSVP. Learn More.

CONFIDENTIAL                                                    GOOG-CABR-05753874

# EXHIBIT 26

# Redacted Version of
# Document Sought to be Sealed

Appointment

---

**From:**       Google Calendar [calendar-notification@google.com]
**Sent:**       7/30/2020 4:13:57 PM
**To:**         Sam Heft-Luthy [heftluthy@google.com]; Keith Enright [keithenright@google.com]; kallebu@google.com

**Subject:**    ███████████Keith - Stakeholder Interview
**Attachments:** invite.ics

**Start:**      8/17/2020 3:00:00 PM
**End:**        8/17/2020 3:45:00 PM
**Show Time As:** Tentative

**Recurrence:**    (none)

---

**You have been invited to the following event.**

████████████ **Keith - Stakeholder Interview**

When          Mon Aug 17, 2020 8am – 8:45am Pacific Time - Los Angeles

Joining info  Join with Google Meet
              ████████████████████

              Join by phone
              ████████████████████

              More phone numbers

Calendar      Sam Heft-Luthy

Who           • Mimosa Lynch - organizer
              • Keith Enright
              • Sam Heft-Luthy
              • kallebu@google.com

**more details »**
Going (heftluthy@google.com)?    **Yes** - **Maybe** - **No**    more options »

Invitation from Google Calendar
You are receiving this email at the account heftluthy@google.com because you are subscribed for invitations on calendar Sam Heft-Luthy.
To stop receiving these emails, please log in to https://www.google.com/calendar/ and change your notification settings for this calendar.
Forwarding this invitation could allow any recipient to send a response to the organizer and be added to the guest list, or invite others regardless of their own invitation status, or to modify your RSVP. Learn More.

# EXHIBIT 27

# Redacted Version of Document Sought to be Sealed

Appointment

---

**From**: Google Calendar [calendar-notification@google.com]
**Sent**: 8/10/2020 2:47:05 PM
**To**: Sam Heft-Luthy [heftluthy@google.com]

**Subject**: Priscila / Sam
**Attachments**: invite.ics

**Start**: 8/19/2020 7:00:00 PM
**End**: 8/19/2020 7:30:00 PM
**Show Time As**: Busy

**Recurrence**: (none)

---

Priscila Penha has accepted this invitation.
**Priscila / Sam**

| When | Wed Aug 19, 2020 12pm – 12:30pm Pacific Time - Los Angeles |
|---|---|
| Joining info | Join with Google Meet |

<span style="background:black">       </span>

Join by phone

<span style="background:black">       </span>

More phone numbers

| Calendar | Sam Heft-Luthy |
|---|---|
| Who | • Sam Heft-Luthy - organizer<br>• Priscila Penha |

Hi Priscila,

I'm a PM in PDPO on Greg Fair's team.

I'm reaching out to grab some time to discuss [REDACTED], a program to develop a 5-year vision for privacy across the company (I think Sarah reached out to flag that a calendar invite like this was coming!).

I wanted to grab some time next week to introduce myself and discuss the best way for us to make sure APaS is well represented and how we should keep in contact with you as it continues.

---

Invitation from **Google Calendar**

You are receiving this email at the account heftluthy@google.com because you are subscribed for invitation replies on calendar Sam Heft-Luthy.

To stop receiving these emails, please log in to https://www.google.com/calendar/ and change your notification settings for this calendar.

Forwarding this invitation could allow any recipient to send a response to the organizer and be added to the guest list, or invite others regardless of their own invitation status, or to modify your RSVP. **Learn More**.

---

CONFIDENTIAL

# EXHIBIT 28

# Redacted Version of Document Sought to be Sealed

Appointment

**From:**      Google Calendar [calendar-notification@google.com]
**Sent:**      8/11/2020 2:59:08 PM
**To:**        NO_TO_PROPERTY_FOUND
**CC:**        burnel@google.com

**Subject:**       ███████████ Al Verney - Stakeholder Interview
**Attachments:**  invite.ics

**Start:**          8/25/2020 2:30:00 PM
**End:**            8/25/2020 3:15:00 PM
**Show Time As:** Tentative

**Recurrence:**    (none)

---

**The following event has been created.**

██████████ **Al Verney - Stakeholder Interview**

When       Tue Aug 25, 2020 3:30pm – 4:15pm United Kingdom Time

Joining info   Join with Google Meet
            ███████████████████

            Join by phone
            ██████████████████████

            More phone numbers

Calendar    Al Verney

Who         • Sam Heft-Luthy - organizer
            • Al Verney
            • Mimosa Lynch
            • kallebu@google.com
            • burnel@google.com - optional

**more details »**
Per thread with Hannah (added to event as FYI):

As part of the kickoff for the ████████ program we would like to schedule an interview slot with you to better understand your perspective.

For background, ████████ is a program that is focused on establishing a 5 year vision for Google's future privacy experience. A key piece of this work is to understand the situation on the ground from our various partner teams in order to make sure we're developing an informed perspective. We would love to have your views and perspective on the space as we go through our first iteration of landscaping.

Prior to the interview if you could please look over the ████████ charter that would be very helpful.

---

CONFIDENTIAL

Invitation from **Google Calendar**

You are receiving this email at the account burnel@google.com because you are subscribed for new event updates on calendar Al Verney.

To stop receiving these emails, please log in to https://www.google.com/calendar/ and change your notification settings for this calendar.

Forwarding this invitation could allow any recipient to send a response to the organizer and be added to the guest list, or invite others regardless of their own invitation status, or to modify your RSVP. **Learn More**.

GOOG-CABR-05753890

# EXHIBIT 29

# Redacted Version of Document Sought to be Sealed

Appointment

**From:**      Google Calendar [calendar-notification@google.com]
**Sent:**      8/21/2020 3:28:38 PM
**To:**        David Monsees [davidmonsees@google.com]; Vlad Adzic [adzic@google.com]; Sam Heft-Luthy
               [heftluthy@google.com]; Mimosa Lynch [mimosal@google.com]; kallebu@google.com

**Subject:**   ▮▮▮▮▮▮▮▮  Stakeholder interview request
**Attachments:** invite.ics

**Start:**          8/26/2020 2:00:00 PM
**End:**            8/26/2020 2:30:00 PM
**Show Time As:** Tentative


**Recurrence:**    (none)

---

**This event has been changed.**

▮▮▮▮▮▮▮  **Stakeholder interview request**

When        Changed: Wed Aug 26, 2020 7am – 7:30am Pacific Time – Los Angeles

Joining info    Join with Google Meet
                ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮


                Join by phone
                ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮


                More phone numbers

Calendar    David Monsees

Who         • Vlad Adzic - organizer
            • hanseni@google.com - creator
            • David Monsees
            • Sam Heft-Luthy
            • Mimosa Lynch
            • kallebu@google.com

**more details »**

Going (davidmonsees@google.com)?    **Yes** - **Maybe** - **No**    more options »

---

Invitation from **Google Calendar**

You are receiving this email at the account davidmonsees@google.com because you are subscribed for updated invitations on calendar David Monsees.

To stop receiving these emails, please log in to https://www.google.com/calendar/ and change your notification settings for this calendar.

Forwarding this invitation could allow any recipient to send a response to the organizer and be added to the guest list, or invite others regardless of their own invitation status, or to modify your RSVP. **Learn More**.

CONFIDENTIAL                                                    GOOG-CABR-05747697

# EXHIBIT 30

# Redacted Version of Document Sought to be Sealed

Appointment

**From:** Google Calendar [calendar-notification@google.com]
**Sent:** 8/27/2020 2:12:19 PM
**To:** Mimosa Lynch [mimosal@google.com]

**Subject:** ██████████ David - Stakeholder Interview
**Attachments:** invite.ics

**Start:** 8/31/2020 4:00:00 PM
**End:** 8/31/2020 4:45:00 PM
**Show Time As:** Busy

**Recurrence:** (none)

David Monsees has accepted this invitation.
██████████ **David - Stakeholder Interview**

| When | Mon Aug 31, 2020 6pm – 6:45pm Central European Time - Berlin |
|---|---|
| Joining info | Join with Google Meet |
| | ████████████████████ |
| | |
| | Join by phone |
| | ████████████████████ |
| | |
| | More phone numbers |
| Calendar | Mimosa Lynch |
| Who | • Mimosa Lynch - organizer |
| | • David Monsees |
| | • Sam Heft-Luthy |
| | • kallebu@google.com |

Invitation from **Google Calendar**

You are receiving this email at the account mimosal@google.com because you are subscribed for invitation replies on calendar Mimosa Lynch.

To stop receiving these emails, please log in to https://www.google.com/calendar/ and change your notification settings for this calendar.

Forwarding this invitation could allow any recipient to send a response to the organizer and be added to the guest list, or invite others regardless of their own invitation status, or to modify your RSVP. **Learn More.**

GOOG-CABR-05747710

# EXHIBIT 31

# Redacted Version of Document Sought to be Sealed

Appointment

**From:**  Google Calendar [calendar-notification@google.com]
**Sent:**  8/24/2020 1:54:57 PM
**To:**  Giles Hogben [gilesh@google.com]; Mimosa Lynch [mimosal@google.com]; kallebu@google.com

**Subject:**  ██████████ Stakeholder Interview with Giles
**Attachments:**  invite.ics

**Start:**  9/1/2020 6:00:00 PM
**End:**  9/1/2020 6:30:00 PM
**Show Time As:** Tentative

**Recurrence:**  (none)

---

**You have been invited to the following event.**

██████████ **Stakeholder Interview with Giles**

When    Tue Sep 1, 2020 11am – 11:30am Pacific Time - Los Angeles

Joining info    Join with Google Meet
██████████████

Join by phone
████████████████

More phone numbers

Calendar    Giles Hogben

Who
- Sam Heft-Luthy - organizer
- Giles Hogben
- Mimosa Lynch
- kallebu@google.com

**more details »**
Prior to the interview we would love if Giles could read the ██████████ charter.

Going (gilesh@google.com)?    **Yes** – **Maybe** – **No**    more options »

Invitation from **Google Calendar**

You are receiving this email at the account gilesh@google.com because you are subscribed for invitations on calendar Giles Hogben.

To stop receiving these emails, please log in to https://www.google.com/calendar/ and change your notification settings for this calendar.

Forwarding this invitation could allow any recipient to send a response to the organizer and be added to the guest list, or invite others regardless of their own invitation status, or to modify your RSVP. **Learn More**

    GOOG-CABR-05753915

# EXHIBIT 32

# Redacted Version of Document Sought to be Sealed

Appointment

**From:**       Google Calendar [calendar-notification@google.com]
**Sent:**       9/15/2020 2:17:08 PM
**To:**         Jonathan McPhie [jmcphie@google.com]; Mimosa Lynch [mimosal@google.com]; Kalle Buschmann
               [kallebu@google.com]

**Subject:**    Jonathan chat re: ████████████
**Attachments:** invite.ics

**Start:**      9/16/2020 5:30:00 PM
**End:**        9/16/2020 6:00:00 PM
**Show Time As:** Tentative

**Recurrence:**   (none)

---

### You have been invited to the following event.

## Jonathan chat re: ████████████

When        Wed Sep 16, 2020 10:30am – 11am Pacific Time - Los Angeles

Joining info    Join with Google Meet
               ████████████████████

               Join by phone
               ██████████████████████

               More phone numbers

Calendar    Jonathan McPhie

Who         • Sam Heft-Luthy - organizer
            • Jonathan McPhie
            • Mimosa Lynch
            • Kalle Buschmann

### more details »
Hey Jonathan!! Welcome to the team.

I'll grab more time for a 1:1, but first wanted to grab time to discuss a program we're running to develop a privacy experience vision for the PDPO and get your thoughts

(go/████████ is the charter)

Going (jmcphie@google.com)?   **Yes** – **Maybe** – **No**    more options »

Invitation from **Google Calendar**
You are receiving this email at the account jmcphie@google.com because you are subscribed for invitations on calendar Jonathan McPhie.
To stop receiving these emails, please log in to https://www.google.com/calendar/ and change your notification settings for this calendar.
Forwarding this invitation could allow any recipient to send a response to the organizer and be added to the guest list, or invite others regardless of their own invitation status, or to modify your RSVP. **Learn More**

CONFIDENTIAL                                                     GOOG-CABR-05753967

# EXHIBIT 33

# Redacted Version of Document Sought to be Sealed

Appointment

**From:**        Google Calendar [calendar-notification@google.com]
**Sent:**        10/19/2020 9:50:32 AM
**To:**          Sam Heft-Luthy [heftluthy@google.com]; Mark Risher [risher@google.com]; Othar Hansson [othar@google.com]; Sarah Hammond [shammond@google.com]; glanza@google.com; talherman@google.com; Jan Hannemann [janhan@google.com]; Elyse Bellamy [ohelyse@google.com]; Kalle Buschmann [kallebu@google.com]; André Fialho [fialho@google.com]

**Subject:**     Privacy Narrative + ▮▮▮▮▮▮▮▮ Follow Up
**Attachments:** invite.ics

**Start:**       10/20/2020 5:00:00 PM
**End:**         10/20/2020 5:30:00 PM
**Show Time As:** Tentative

**Recurrence:**  (none)

---

**You have been invited to the following event.**

**Privacy Narrative + ▮▮▮▮▮▮▮▮ Follow Up**

When            Tue Oct 20, 2020 10am – 10:30am Pacific Time - Los Angeles

Joining info    Join with Google Meet
                ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

                Join by phone
                ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

                More phone numbers

Calendar        Sam Heft-Luthy

Who             • Mark Risher - organizer
                • devonheston@google.com - creator
                • Mimosa Lynch
                • Othar Hansson
                • Sarah Hammond
                • glanza@google.com
                • talherman@google.com
                • Sam Heft-Luthy
                • Jan Hannemann
                • Elyse Bellamy
                • Kalle Buschmann
                • André Fialho

**more details »**
Hi Mel, Alice, Devon, and Kendra!
Would it be possible to get a meeting on the calendar with Sarah, Othar, Tal, and Mark in mid October to check in on the privacy narrative and ▮▮▮▮▮▮ work.

CONFIDENTIAL

GOOG-CABR-05754210

If we could have 30 minute in an emea friendly time that would be amazing!

Thank you,
Mimosa

Going (heftluthy@google.com)?    **Yes** - **Maybe** - **No**    more options »

Invitation from **Google Calendar**

You are receiving this email at the account heftluthy@google.com because you are subscribed for invitations on calendar Sam Heft-Luthy.

To stop receiving these emails, please log in to https://www.google.com/calendar/ and change your notification settings for this calendar.

Forwarding this invitation could allow any recipient to send a response to the organizer and be added to the guest list, or invite others regardless of their own invitation status, or to modify your RSVP. **Learn More**.

# EXHIBIT 34

# Redacted Version of Document Sought to be Sealed

Appointment

**From:**     Google Calendar [calendar-notification@google.com]
**Sent:**     10/20/2020 2:49:55 PM
**To:**       Sam Heft-Luthy [heftluthy@google.com]; Mimosa Lynch [mimosal@google.com]; Mark Risher [risher@google.com]; Othar Hansson [othar@google.com]; Sarah Hammond [shammond@google.com]; glanza@google.com; talherman@google.com; Jan Hannemann [janhan@google.com]; Elyse Bellamy [ohelyse@google.com]; Kalle Buschmann [kallebu@google.com]; André Fialho [fialho@google.com]

**Subject:**     Privacy Narrative + ████████ Follow Up
**Attachments:** invite.ics

**Start:**         11/4/2020 6:00:00 PM
**End:**           11/4/2020 6:30:00 PM
**Show Time As:** Tentative

**Recurrence:**     (none)

---

**This event has been changed.**

**Changed: Privacy Narrative + ████████ Follow Up**

When          Changed: Wed Nov 4, 2020 10am – 10:30am Pacific Time - Los Angeles

Joining info   Join with Google Meet
               ████████████████████

               Join by phone
               ████████████████████

               More phone numbers

Calendar      Sam Heft-Luthy

Who           • Mark Risher - organizer
              • devonheston@google.com - creator
              • Mimosa Lynch
              • Othar Hansson
              • Sarah Hammond
              • glanza@google.com
              • talherman@google.com
              • Sam Heft-Luthy
              • Jan Hannemann
              • Elyse Bellamy
              • Kalle Buschmann
              • André Fialho

**more details »**
Hi Mel, Alice, Devon, and Kendra!
Would it be possible to get a meeting on the calendar with Sarah, Othar, Tal, and Mark in mid October to check in on the privacy narrative and ████████ work.

CONFIDENTIAL                                    GOOG-CABR-05754222

If we could have 30 minute in an emea friendly time that would be amazing!

Thank you,
Mimosa

Going (heftluthy@google.com)?    **Yes** – **Maybe** - **No**    more options »

Invitation from **Google Calendar**

You are receiving this email at the account heftluthy@google.com because you are subscribed for updated invitations on calendar Sam Heft-Luthy.

To stop receiving these emails, please log in to https://www.google.com/calendar/ and change your notification settings for this calendar.

Forwarding this invitation could allow any recipient to send a response to the organizer and be added to the guest list, or invite others regardless of their own invitation status, or to modify your RSVP. **Learn More**.

GOOG-CABR-05754223

# EXHIBIT 35

# Redacted Version of Document Sought to be Sealed

Appointment

| | |
|---|---|
| **From:** | Google Calendar [calendar-notification@google.com] |
| **Sent:** | 11/3/2020 3:49:12 PM |
| **To:** | Mark Risher [risher@google.com] |

| | |
|---|---|
| **Subject:** | Privacy Narrative + ███████ Follow Up |
| **Attachments:** | invite.ics |

| | |
|---|---|
| **Start:** | 11/4/2020 6:00:00 PM |
| **End:** | 11/4/2020 6:30:00 PM |
| **Show Time As**: | Busy |

**Recurrence**:     (none)



Sam Heft-Luthy has accepted this invitation.
**Privacy Narrative +** ███████ **Follow Up**

When        Wed Nov 4, 2020 10am – 10:30am Pacific Time - Los Angeles

Joining info    Join with Google Meet
                ████████████████████

                Join by phone
                ████████████████████

                More phone numbers

Calendar    Mark Risher

Who
- Mark Risher - organizer
- devonheston@google.com - creator
- Mimosa Lynch
- Othar Hansson
- Sarah Hammond
- glanza@google.com
- talherman@google.com
- Sam Heft-Luthy
- Jan Hannemann
- Elyse Bellamy
- Kalle Buschmann
- André Fialho

Hi Mel, Alice, Devon, and Kendra!
Would it be possible to get a meeting on the calendar with Sarah, Othar, Tal, and Mark in mid October to check in on the privacy narrative and ███████ work.

If we could have 30 minute in an emea friendly time that would be amazing!

Thank you,
Mimosa

GOOG-CABR-05754276

Invitation from **Google Calendar**

You are receiving this email at the account risher@google.com because you are subscribed for invitation replies on calendar Mark Risher.

To stop receiving these emails, please log in to https://calendar.google.com/calendar/ and change your notification settings for this calendar.

Forwarding this invitation could allow any recipient to send a response to the organizer and be added to the guest list, or invite others regardless of their own invitation status, or to modify your RSVP. **Learn More**.

CONFIDENTIAL

GOOG-CABR-05754277

# EXHIBIT 36

# Redacted Version of Document Sought to be Sealed

Appointment

**From:**  Google Calendar [calendar-notification@google.com]
**Sent:**  12/4/2020 5:05:51 PM
**To:**  Jonathan McPhie [jmcphie@google.com]; Yingsi Zhang [yingsi@google.com]; Kalle Buschmann [kallebu@google.com]

**Subject:**  ███████████  Experience Articulation
**Attachments:**  invite.ics

**Start:**  12/9/2020 4:30:00 PM
**End:**  12/9/2020 5:00:00 PM
**Show Time As:** Tentative

**Recurrence:**  (none)

---

**You have been invited to the following event.**

███████  **Experience Articulation**

When       Wed Dec 9, 2020 8:30am – 9am Pacific Time – Los Angeles

Joining info   Join with Google Meet
             ██████████████████

             Join by phone
             ████████████████████████

             More phone numbers

Calendar   Jonathan McPhie

Who        · Sam Heft-Luthy - organizer
           · Yingsi Zhang
           · Jonathan McPhie
           · Kalle Buschmann

**more details »**
Grabbing a bit of time with a motley-ish crew to talk a bit about how we can get more ambitious with our 5-year vignettes for ███████ .

Will propose a bit of pre-work via email.

Going (jmcphie@google.com)?   **Yes** – **Maybe** – **No**    more options »

Invitation from Google Calendar

You are receiving this email at the account jmcphie@google.com because you are subscribed for invitations on calendar Jonathan McPhie.

To stop receiving these emails, please log in to https://calendar.google.com/calendar/ and change your notification settings for this calendar.

Forwarding this invitation could allow any recipient to send a response to the organizer and be added to the guest list, or invite others regardless of their own invitation status, or to modify your RSVP. Learn More

GOOG-CABR-05754367

# EXHIBIT 37

# Redacted Version of Document Sought to be Sealed

**BLEICHMAR FONTI & AULD LLP**
555 12ᵗʰ STREET, SUITE 1600
OAKLAND, CA 94607

**DiCELLO LEVITT GUTZLER LLC**
ONE GRAND CENTRAL PLACE
60 EAST 42ⁿᵈ STREET, SUITE 2400
NEW YORK, NY 10165

**SIMMONS HANLY CONROY LLC**
112 MADISON AVENUE, 7ᵀᴴ FL.
NEW YORK, NY 10016

January 18, 2022

**THIS LETTER REFERENCES INFORMATION DESIGANTED CONFIDENTIAL**

**VIA ELECTRONIC MAIL**
Jonathan Tse, Esq.
Quinn Emanuel Urquhart & Sullivan, LLP
50 California Street, 22ⁿᵈ Floor
San Francisco, CA 94111
jonathantse@quinnemanuel.com

      Re:    *Calhoun v. Google LLC*, No. 5:20-cv-05146-LHK-SVK (N.D. Cal.)
           **Re: Curing Google's Deficient Production re** ███████

Dear Counsel:

      Plaintiffs request that Google cure its deficient production of ██████████ documents. Specifically, we request the following documents referenced by Mr. Sam Heft-Luthy at his December 20, 2021 deposition.

      With respect to Heft-Luthy Exhibit 3 at page GOOG-CABR04754282 (screenshot copied below), Mr. Heft-Luthy testified that he and another Google PDPO team member conducted somewhere between 9 to 30 interviews for the ██████████ project for which notes were taken and kept. *See* Heft-Luthy Dep. at 89:3-93:11. Mr. Heft-Luthy further testified to other research and "inputs" to the project. Plaintiffs request all transcripts, notes, and emails regarding interviews taken for ██████████ and all documents, research and "inputs" that pertain to ██████████.



      Mr. Heft-Luthy testified that during the course of ██████████ "[w]e delivered a few executive presentations," which included presentations to "a few design and product management

Counsel for Google                           SIMMONS HANLY CONROY
January 18, 2022                             DiCELLO LEVITT GUTZLER LLC
Page 2                                      BLEICHMAR FONTI & AULD LLP

directors." Heft Luthy Dep. at 54:18-19, 55:5-7. Plaintiffs request production of these presentations.

      Mr. Heft-Luthy testified that ██████████ "was discontinued in late 2020." Heft Luthy Dep. at 54:13-15. Plaintiffs request that Google provide documents relating to Google's decision to "discontinue" ██████████

      With respect to Heft-Luthy Exhibit 2, Plaintiffs request production of the following, which appear to be hyperlinked documents:

- ██████ definition of privacy"
- ██████ research synthesis"
- "a lot of research"

      Plaintiffs request that the information sought be produced by **January 21, 2022.** To the extent already produced, please identify the documents by bates numbers.

         Regards,

         Jay Barnes
         jaybarnes@simmonsfirm.com

         Lesley Weaver
         lweaver@bfalaw.com

         David Straite
         dstraite@dicellolevitt.com

Counsel for Google
January 18, 2022
Page 3

SIMMONS HANLY CONROY
DiCELLO LEVITT GUTZLER LLC
BLEICHMAR FONTI & AULD LLP

cc (via Electronic Mail):

Defendant Google's Counsel

Google Counsel (qecalhoun@quinnemanuel.com)


Plaintiffs' Counsel

Angelica Ornelas, Esq. (aornelas@bfalaw.com)
An Truong, Esq. (atruong@simmonsfirm.com)
Adam Prom, Esq. (aprom@dicellolevitt.com)
Sharon Cruz, Esq. (scruz@dicellolevitt.com)

# EXHIBIT 38

# Redacted Version of Document Sought to be Sealed

```
 1              IN THE UNITED STATES DISTRICT COURT
 2            FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                      SAN JOSE DIVISION
 4
 5
                                       )
 6    PATRICK CALHOUN, ET AL., ON      )
      BEHALF OF THEMSELVES AND ALL     )
 7    OTHER SIMILARLY SITUATED,        )
                                       )
 8               PLAINTIFFS,           )
                                       )
 9       VS.                           )  CASE NO.
                                       )  5:20-CV-05146-LHK-SVK
10    GOOGLE LLC,                      )
                                       )
11               DEFENDANT.            )
      _____ )
12
13
                 ** CONFIDENTIAL  - ATTORNEYS EYES ONLY **
14
15                   REMOTE PROCEEDINGS OF
16              VIDEOTAPED 30(B)(6) DEPOSITION OF
17                     MEDIHA ABDULHAY
18                  TUESDAY, APRIL 12, 2022
19
20
21
22    JOB NO. SF 5180827
23    REPORTED BY:   REAGAN EVANS, RPR, RMR, CRR, CCRR,
                     CLR, CRC, CA CSR NO. 8176
24
25
                                           Page 1
```

```
1  VIDEOTAPED 30(B)(6) DEPOSITION OF MEDIHA ABDULHAY,
2  TAKEN REMOTELY ON BEHALF OF THE PLAINTIFFS AT
3  9:03 A M , TUESDAY, APRIL 12, 2022, AT
4  SAN FRANCISCO, CALIFORNIA, BEFORE REAGAN EVANS, CA
5  CSR NO  8176, RPR, RMR, CRR, CCRR, CLR, CRC
6
7
8  APPEARANCES OF COUNSEL
9
10 FOR THE PLAINTIFFS:
11   SIMMONS HANLY CONROY
12   BY: JASON 'JAY' BARNES, ESQ
13   BY: ERIC JOHNSON, ESQ
14     (APPEARING REMOTELY)
15   112 MADISON AVENUE
16   7TH FLOOR
17   NEW YORK, NEW YORK 10016
18   (212) 784-6400
19   JAYBARNES@SIMMONSFIRM COM
20   EJOHNSON@SIMMONSFIRM COM
21
22
23
24
25
                                          Page 2
```

```
1      I N D E X
2
3  WITNESS      EXAMINATION      PAGE
4  MEDIHA ABDULHAY    BY MR. BARNES      8
5
6
7      E X H I B I T S
8
9  NO.      PAGE    DESCRIPTION
10 EXHIBIT 1    13 ███████████ PERSPECTIVE,
11      TOWARD A PRIVACY-NATIVE GOOGLE
12      EXPERIENCE, BATES STAMPED
13      GOOG-CABR-05885987 THROUGH
14      GOOG-CABR-05885991
15
16 EXHIBIT 2    26   UFP REVIEW:███████████
17      DATED MAY 17, 2021, BATES
18      STAMPED GOOG-CALH-01198496
19      THROUGH GOOG-CALH-01198511
20
21 EXHIBIT 3    29   ABDULHAY FACT SHEET, 2 PAGES
22
23
24
25
                                          Page 4
```

```
1  APPEARANCES OF COUNSEL (CONTINUED)
2  FOR THE DEFENDANT:
3   QUINN EMANUEL URQUHART & SULLIVAN, LLP
4   BY:  JOMAIRE A. CRAWFORD, ESQ.
5     (APPEARING REMOTELY)
6   51 MADISON AVENUE
7   22ND FLOOR
8   NEW YORK, NEW YORK  10010
9   (212) 849-7000
10   JOMAIRECRAWFORD@QUINNEMANUEL.COM
11   - AND -
12   BY:  CARL W. SPILLY, ESQ.
13     (APPEARING REMOTELY)
14   1300 I STREET NW
15   SUITE 900
16   WASHINGTON, D.C.  20005
17   (202) 538-8000
18   CARLSPILLY@QUINNEMANUEL.COM
19
20
21 ALSO PRESENT:
22   TONI BAKER, IN-HOUSE COUNSEL FOR GOOGLE LLC
23   CASSIA LEET, VIDEOGRAPHER
24     (APPEARING REMOTELY)
25
                                          Page 3
```

```
1      I N D E X
2      (CONTINUED)
3      E X H I B I T S
4
5  NO.      PAGE    DESCRIPTION
6  EXHIBIT 4    40 ███████████ VISION 2026,
7      DATED MAY 2021, BATES STAMPED
8      GOOG-CABR-05885992 THROUGH
9      GOOG-CABR-05886013
10
11 EXHIBIT 5    46 ███████████ CONVERSATIONS,
12      BATES STAMPED
13      GOOG-CABR-05885871 THROUGH
14      GOOG-CABR-05885942
15
16
17
18
19
20
21
22
23
24
25
                                          Page 5
```

2 (Pages 2 - 5)

| | |
|---|---|
| 1    SAN FRANCISCO, CALIFORNIA | 1    EXAMINATION |
| 2    TUESDAY, APRIL 12, 2022; 9:03 A.M. | 2 BY MR. BARNES: |
| 3 | 3    Q  Ms. Abdulhay, thank you for braving the |
| 4    THE VIDEOGRAPHER:  Good morning. | 4 traffic this morning for the deposition. |
| 5    We are going on the record at 9:03 a.m., on  09:03:01 | 5    Have you ever testified in a deposition    09:05:16 |
| 6 April 12th, 2022. | 6 before? |
| 7    Audio and video recording will continue to | 7    A  I have not. |
| 8 take place unless all parties agree to go off the | 8    Q  Okay. |
| 9 record. | 9    So a few quick basic ground rules. |
| 10    This is Media Unit 1 of the video-recorded   09:03:15 | 10    If you need to take a break, let me know,    09:05:22 |
| 11 deposition of 30(b)(6) witness Mediha Abdulhay taken | 11 but I ask that we not take a break in the middle of |
| 12 by counsel for Plaintiff in the matter of Patrick | 12 a question.  Hopefully, with just about an hour, |
| 13 Calhoun, et al., versus Google LLC, filed In the | 13 we're not going to have to take a break. |
| 14 United States District Court for the Northern | 14    Second is when you answer a question, you |
| 15 District of California, San Jose Division.  Case    09:03:35 | 15 need to answer verbally and not just with head-nods. 09:05:33 |
| 16 No. 5:20-cv-05146-LHK-SDK. | 16    Do you understand that? |
| 17    This deposition is being conducted using | 17    A  Yes. |
| 18 Veritext virtual technology.  And all participants | 18    Q  And that's so the court reporter can take |
| 19 are attending remotely. | 19 down your answer. |
| 20    My name is Cassia Leet from Veritext Legal   09:03:54 | 20    And the third thing is if you don't    09:05:42 |
| 21 Solutions, and I am the videographer. | 21 understand a question for some reason, please ask me |
| 22    The court reporter is Reagan Evans of | 22 to repeat the question, and I will do my best to do |
| 23 Veritext Legal Solutions. | 23 so. |
| 24    I am not related to any party in this | 24    Do you understand that? |
| 25 action; nor am I financially interested in the    09:04:07 | 25    A  Yes.    09:05:52 |
| Page 6 | Page 8 |

| | |
|---|---|
| 1 outcome. | 1    Q  Okay. |
| 2    Would counsel, and everyone attending | 2    Ms. Abdulhay, do you understand that you're |
| 3 remotely, please state your appearances and | 3 here today to testify on behalf of Google as Google? |
| 4 affiliations for the record. | 4    A  Yes. |
| 5    MR. BARNES:  Yes.    09:04:17 | 5    Q  And that as it relates to the topic of    09:06:04 |
| 6    Jay Barnes and Eric Johnson of Simmons | 6 ████████, your testimony will be binding on |
| 7 Hanly Conroy on behalf of Plaintiff Patrick Calhoun, | 7 Google? |
| 8 et al., and the putative class. | 8    A  Yes. |
| 9    MS. CRAWFORD:  Jomaire Crawford, and my | 9    Q  And did you prepare to testify today about |
| 10 colleague Carl Spilly, are on from Quinn Emanuel    09:04:31 | 10 the topic of ████████?    09:06:15 |
| 11 Urquhart & Sullivan on behalf of the defendant in | 11    A  Yes, I did. |
| 12 this case, Google LLC. | 12    Q  Are there any documents that you have with |
| 13    Joined with me is in-house counsel for | 13 you in the room right now? |
| 14 Google, Toni Baker. | 14    A  No, not in the room.  I do have a tab in my |
| 15    THE VIDEOGRAPHER:  Thank you.    09:04:42 | 15 browser open; however, it is a fact sheet provided    09:06:30 |
| 16    Would the court reporter please swear in | 16 to me by our counsel. |
| 17 the witness. | 17    MR. BARNES:  Ms. Crawford, I would like for |
| 18 | 18 that fact sheet to be provided to us before -- I'm |
| 19    MEDIHA ABDULHAY, | 19 going to take a break in about five minutes so that |
| 20 having been first duly sworn by the reporter,    09:05:04 | 20 you can e-mail the fact sheet to us, Ms. Crawford.   09:06:51 |
| 21    was examined and testified as follows: | 21    Understood? |
| 22 | 22    MS. CRAWFORD:  That's fine, Jay.  We'll |
| 23    THE WITNESS:  I do. | 23 take a break in five. |
| 24    THE REPORTER:  Thank you. | 24    MR. BARNES:  Okay. |
| 25 /// | 25    Q  Ms. Abdulhay, are there any other documents 09:07:00 |
| Page 7 | Page 9 |

3 (Pages 6 - 9)

1  besides the tabbed sheet that you mentioned on your
2  computer?
3      A  No.
4      Q  Okay.
5         Ms. Abdulhay, what is ███████?         09:07:12
6      A  ███████ is the internal name for a
7  project that a team within our group, called privacy
8  data protection office, PDPO, worked on between 2020
9  and 2021.
10        It was primarily a vision and strategy    09:07:36
11 project focused on the privacy user experience.
12     Q  So I asked the question what is
13 ███████.
14        You testified that it was a project in the
15 years 2020 to 2021.                            09:07:53
16        Would it be more accurate for me to have
17 asked what was ███████?
18     A  Yes, I think that's accurate.  It was a
19 work stream, the name of a work stream.
20     Q  And what was your role in ███████?  09:08:08
21     MS. CRAWFORD:  Objection.  Foundation.
22        You can answer, Ms. Abdulhay.
23     THE WITNESS:  So as I mentioned,
24 ███████ was a cross-functional project.  At
25 the time I was on Google's marketing team -- one of  09:08:28
                                                     Page 10

1  Google's marketing teams -- and I was the marketing
2  partner for the project.
3  BY MR. BARNES:
4      Q  Why did ███████ have a marketing
5  partner?                                       09:08:38
6      A  The marketing team that I worked on was
7  specifically dedicated to user trust and thinking
8  about external and internal narratives related to
9  user trust.
10        One of the goals and objectives of       09:08:52
11 ███████ was to think about ways to -- creative
12 ways to tell the narrative the team was developing.
13        And one of the approaches that we looked at
14 was potentially creating a video.  We ended up not
15 creating the video.  We stopped at a storyboard, but  09:09:17
16 marketing came in to help with that creative
17 process, as well as identified an external agency to
18 work with.
19     Q  Okay.
20     MR. BARNES:  Let's take a break, please, so  09:09:34
21 that Ms. Crawford can e-mail me the document.
22     MS. CRAWFORD:  Sure.
23        Do you imagine needing more than five
24 minutes if we get that over to you momentarily?
25     MR. BARNES:  No.  No.  I don't imagine      09:09:46
                                                     Page 11

1  needing -- let's go off the record, first.
2      THE VIDEOGRAPHER:  Going off the record.
3      The time is 9:10 a.m.
4      (Recess was taken at 9:10 a.m.
5      until 9:19 a.m.)                           09:18:56
6      THE VIDEOGRAPHER:  Back on the record.
7      The time is 9:19 a.m.
8      MR. BARNES:  Mr. Johnson, can you publish
9  what's been marked as A1, please.
10     MR. JOHNSON:  It should be up.             09:19:16
11     MR. BARNES:  Let me know when you have it,
12 Ms. Crawford.
13        And then, Ms. Abdulhay, when you eventually
14 receive it, please.
15     MS. CRAWFORD:  Okay.                       09:19:44
16        Carl can confirm when it's been published,
17 but I see it in the witness's folder here.  So I
18 think that it should be accessible.
19     THE WITNESS:  Just opened the document.
20 And if it's okay, I'll take a little bit to orient  09:20:02
21 myself.
22 BY MR. BARNES:
23     Q  Sure.
24     A  Okay.
25     Q  Okay.                                   09:20:54
                                                     Page 12

1         Ms. Abdulhay, what is the document which
2  has been marked as Exhibit 1?
3         (Whereupon Abdulhay Exhibit 1 was
4         marked for identification.)
5      THE WITNESS:  This is the ███████     09:21:03
6  Perspective.
7  BY MR. BARNES:
8      Q  And what is the -- and to be -- I want to
9  make the record that the Bates number on the first
10 page is GOOG-CABR-05885987.                    09:21:12
11        Does that track with the document you are
12 reviewing right now, Ms. Abdulhay, that says,
13 "███████ Perspective" at the top?
14     A  Yes.
15     Q  Okay.                                   09:21:28
16        And what was the purpose of the
17 ███████ Perspective?  Would you call this a
18 report?
19     A  I would not call this a report.  I would
20 call it more of a position paper.              09:21:40
21     Q  And was it a position paper -- it says at
22 the top, the "Privacy and Data Protection Office" at
23 Google.
24        Was it a position paper of the Privacy and
25 Data Protection Office at Google?              09:21:56
                                                     Page 13

4 (Pages 10 - 13)

| | |
|---|---|
| 1     MS. CRAWFORD: Objection to form. You can | 1    A  At the time when he departed an internal |

1     MS. CRAWFORD: Objection to form. You can
2 answer.
3     THE WITNESS: It's a position paper from a
4 team within that organization.
5 BY MR. BARNES:          09:22:11
6    Q  And the team, were they employees of
7 Google?
8    A  Yes.
9    Q  Who asked -- who at Google asked for the
10 position paper ▮▮▮▮▮ Perspective to be   09:22:20
11 created?
12     MS. CRAWFORD: Objection to -- as to
13 foundation and the form of the question.
14     You can answer to the extent possible.
15     THE WITNESS: There was not one specific   09:22:35
16 individual that asked for ▮▮▮▮▮. I think a
17 number of leads within PDPO decided that this would
18 be a good exercise for both self-clarification and
19 broader strategy setting.
20 BY MR. BARNES:          09:23:03
21    Q  Okay.
22     And -- sorry.
23    A  Sorry. Those leads would have been both
24 within the product and UX function.
25    Q  And who were those leads?   09:23:09

Page 14

1    A  So Rahul Roy-Chowdhury at the time was the
2 VP of product management for the PDPO.
3     And then within UX, Tal Herman and Sarah
4 Hammond were shepherding this work stream through.
5    Q  What does it mean to be the VP of product   09:23:39
6 management?
7    A  Yes.
8     So PDPO has or, you know, the organization
9 at the time PDPO, had a number of projects and
10 products within its scope.   09:24:00
11     And a VP of project management oversees the
12 strategic direction of those teams and also the --
13 ensures on execution and impact.
14    Q  Where is Mr. Roy-Chowdhury now?
15     I don't mean physically. I mean what is   09:24:17
16 his role at Google now?
17    A  He is no longer employed by Google.
18    Q  And when, to your knowledge, did he become
19 not employed by Google?
20     MS. CRAWFORD: Objection to the form.   09:24:31
21     You can answer.
22     THE WITNESS: Yes. He -- he left Google in
23 the spring of 2021.
24 BY MR. BARNES:
25    Q  And do you know where he works now?   09:24:44

Page 15

1    A  At the time when he departed an internal
2 comms was distributed indicating that he was leaving
3 to become the VP of product at a company called
4 Grammarly.
5    Q  Okay.          09:25:03
6     Do you see on the first page of the
7 ▮▮▮▮▮ Perspective document where it says
8 (as read and/or reflected:)
9       This requires an approach that
10     makes respecting user privacy the   09:25:15
11     default - or native - state of our
12     relationship with our users?
13    A  I'm sorry. For some reason, I had to
14 reauthenticate. And so I am just pulling up the
15 document again.          09:25:27
16     Can you repeat that?
17    Q  Sure.
18     Well, let me have you read it.
19     Do you see where it says "Summary," and
20 then the last sentence of that first paragraph after   09:25:37
21 the word -- after "Summary"?
22    A  Yes, the last sentence of the first
23 paragraph (as read and/or reflected:)
24       This requires an approach that
25     makes respecting user privacy the   09:25:50

Page 16

1     default - or native - state of our
2     relationship with our users.
3    Q  And by the term "▮▮▮▮▮" does
4 "native" refer to a default state?
5     MS. CRAWFORD: Objection to the form of the   09:26:06
6 question. Vague.
7     You can answer to the extent possible.
8     THE WITNESS: I think native is a broader
9 catchphrase, if you will, from our UX team's
10 perspective.          09:26:29
11     Striving to embed privacy experiences
12 across user journeys of their -- of the products
13 that they use.
14 BY MR. BARNES:
15    Q  What does Google mean by "embed privacy   09:26:41
16 experiences" within the products they use?
17    A  Yeah.
18     So, for example, we have the Google
19 account. And within the Google account, you can
20 find your key privacy and security settings and   09:26:55
21 controls.
22     And every year, over 3 billion people visit
23 the Google account to change their settings, to
24 change personal information within the Google
25 account, but we also often hear from users that they   09:27:14

Page 17

5 (Pages 14 - 17)

1 want faster, quicker, more convenient access to
2 their privacy settings, or education embedded
3 throughout their journey.
4         And so, we have teams across Google and
5 within this org, the PDPO, focused on creating     09:27:33
6 features that fulfill that broader strategy.
7         And so, for example, in 2020, you know, we
8 brought incognito mode to our apps.
9         And so with one click now, you can access
10 incognito mode from your Google account, things like  09:27:59
11 that where we think it's helpful, as we're
12 constantly striving to make our transparency and
13 control products and features more accessible and
14 easier to use.
15     Q  Can we turn to page 4 of the document,     09:28:19
16 which ends in CABR-05885990, please.
17         And do you see where it says "our path
18 forward"?
19     A  Yes.
20     Q  And the last sentence of that paragraph     09:28:38
21 says, "we" -- does that mean Google in the last
22 sentence of that paragraph?
23         MS. CRAWFORD:  Objection insofar as it asks
24 the witness to speculate.
25         You can answer to the extent possible.     09:28:47
                                                    Page 18

1         THE WITNESS:  This is a position paper that
2 was drafted as a self-clarification exercise for
3 PDPO.  So you can assume this is -- this is directly
4 speaking to the work that this team member -- these
5 team members felt PDPO should endeavor to take on.   09:29:09
6 BY MR. BARNES:
7     Q  And is PDPO part of Google?
8     A  Yes.
9     Q  And PDPO stands for Privacy and Data
10 Protection Office?                                   09:29:21
11     A  Correct.
12     Q  Is there another office within Google that
13 is -- that has charge of privacy and data protection
14 matters at Google?
15         MS. CRAWFORD:  Objection to the form of the  09:29:29
16 question.
17         You can answer.
18         THE WITNESS:  PDPO is -- was a team that
19 was created to solely focus on this, but within
20 every product area, there are designated team      09:29:46
21 members focused on trust and safety and security.
22 BY MR. BARNES:
23     Q  Is PDPO the only team at Google that is
24 solely focused on privacy and data protection?
25     A  We also have trust and safety teams outside  09:30:00
                                                    Page 19

1 of Google's PDPO as well.
2         So, no, I'm not familiar with the entire
3 landscape of our organizational structure at Google,
4 but I would say it's fair to say that there are
5 other teams dedicated to trust and safety.         09:30:20
6     Q  Is the Privacy and Data Protection Office
7 the primary team with a focus on privacy and data
8 protection?
9         MS. CRAWFORD:  Objection to the form of the
10 question.  Foundation.                             09:30:33
11         You can answer to the extent possible.
12         THE WITNESS:  Yeah.  I would say it is --
13 it is one of the primary teams, yes.
14 BY MR. BARNES:
15     Q  Okay.                                      09:30:43
16         The sentence says (as read and/or
17 reflected:)
18             We need to address the privacy
19         challenges inherent in our ads
20         business.                                 09:30:50
21         Do you see that?
22     A  I see that.
23     Q  What are the privacy challenges inherent in
24 Google's ads business?
25         MS. CRAWFORD:  Objection.  Foundation.     09:31:01
                                                    Page 20

1         You can answer, Med.
2         THE WITNESS:  So the perspective that you
3 see here was based on kind of a broad literature
4 review and research analysis that uncovered a number
5 of common misperceptions that the team identified as  09:31:23
6 being trust eroding for Google.
7         And broadly, the goal of ██████████ , of
8 course, is to identify pathways to continue to build
9 and earn trust.
10         And so one of those misperceptions -- and  09:31:49
11 I'm sure you've seen that across some of the other
12 docs -- is that some users, not all users, but there
13 are some users, and also key opinion formers, who
14 have deep misperceptions about our ads business.
15         And so I think that is what the team here   09:32:16
16 is pointing towards.
17 BY MR. BARNES:
18     Q  Does Google ads business rely on personal
19 information?
20         MS. CRAWFORD:  Objection insofar as that    09:32:29
21 question's outside the scope of the noticed topic
22 for which this.
23         THE WITNESS:  I'm sorry. --
24         MS. CRAWFORD:  Sorry about that.  Let me
25 just get the objection on the record.              09:32:41
                                                    Page 21

                                            6 (Pages 18 - 21)

1    That question seems to fall outside the
2  scope of the noticed topic for which Ms. Abdulhay
3  was designated.  So I just want to make sure the
4  record reflects that.
5    You can answer, Ms. Abdulhay, to the extent  09:32:50
6  possible.
7    THE WITNESS:  Thanks, Jomaire.
8    You know, I'm familiar.  I did a review of
9  some of the research that this team was building
10  upon for their perspective.        09:33:02
11    And I think one of the key misperceptions
12  that they are trying to tackle here is the notion
13  that -- that users see ads because Google sells
14  personal information.
15    You know, we do not sell personal      09:33:16
16  information.  We never share personal information
17  without the permission of users.
18    And so that's an example of the key
19  misperception we see in the user research, in press,
20  in headlines, that we -- we want to tackle more --   09:33:34
21  beyond the current transparency and control tools
22  that we offer today for the ads products.
23  BY MR. BARNES:
24    Q  I'm sorry, Ms. Abdulhay.  I don't believe
25  that answered my question.        09:33:49

Page 22

1    I think my question was, does Google's ads
2  business rely on personal information?
3    It was not, does Google's ads business sell
4  personal information.
5    So I want to go back to the question I     09:34:00
6  asked.  And I ask that you answer my question.
7    Does Google's ads business rely on personal
8  information?
9    MS. CRAWFORD:  First, let me just make sure
10  the record is clear, that question and the     09:34:10
11  explanatory context, Jay, is extremely
12  argumentative.
13    Setting that aside, I think I have an issue
14  with the form of the question and its use of
15  undefined terms.  It also may call for a legal     09:34:24
16  conclusion for which this witness is not being
17  offered to testify regarding.
18    But, Ms. Abdulhay, you can answer the
19  question to the extent possible.
20    MR. BARNES:  Ms. Crawford, your      09:34:38
21  objection -- your speaking objection, which became
22  coaching, was highly inappropriate.  Not
23  appreciated.  And also, a waste of time in a
24  deposition that's only supposed to be an hour.
25    Q  Ms. Abdulhay, the question is, does     09:34:51

Page 23

1  Google's ads business rely on personal information?
2    MS. CRAWFORD:  Same set of objections.
3    THE WITNESS:  You know, as we -- as you can
4  see in our ad settings tools within the Google
5  account, we provide users with the opportunity to     09:35:06
6  decide if they want to see ad personalization at
7  all.  They can turn the setting on or off.  And they
8  can also turn off WAA, web and app activity, which
9  would contribute to ad personalization.
10    You also have the option to choose if     09:35:27
11  certain interests are no longer -- if you no longer
12  want to include certain interests in your ad
13  personalization.
14    So I will say that, you know, we work hard
15  to give our users meaningful control and     09:35:46
16  transparency when it comes to ad personalization,
17  but because I am not a product manager, nor do I
18  work on the ads team, I'm not deeply familiar with
19  the data flows that undergird -- undergird our ad
20  systems.                09:36:07
21    And because I'm not sure what definition of
22  "personal information" you're using, I just would
23  not want to misspeak.
24    But I am very familiar with our
25  transparency and control tools as a product manager  09:36:18

Page 24

1  of privacy safety and security.
2  BY MR. BARNES:
3    Q  In the context of ▓▓▓▓▓, did Google
4  consider the extent to which user information was
5  sent to Google for the purposes of its ads business?  09:36:32
6    MS. CRAWFORD:  Objection to the form of the
7  question.  Vague and overbroad.
8    Ms. Abdulhay, you can answer.
9    THE WITNESS:  This -- I think it's an
10  important clarification that this work stream,     09:36:45
11  ▓▓▓▓▓, was driven primarily by our UX teams.
12  UX -- one specific UX team.
13    And the position that you see here,
14  strategy documents, storyboards with, you know, a
15  future-looking solution set, are very much divorced  09:37:03
16  from any technical realities.
17    And so if there is a reference to a data
18  flow or a data exchange, the reality is, is that the
19  individuals authoring these documents are very
20  unfamiliar with the ac -- the realities of the text  09:37:27
21  stack.
22    And so the team leaned on broad -- broad
23  understandings of user sentiments and misperceptions
24  to develop this position paper.
25    This position paper is not meant to be a     09:37:47

Page 25

7 (Pages 22 - 25)

**Page 26**

1 product roadmap or a mandate for other teams.
2     MR. BARNES: Mr. Johnson, please publish
3 Exhibit A2, which -- please publish what's been
4 marked as A2 as Exhibit 2.
5     (Whereupon Abdulhay Exhibit 2 was    09:38:10
6     marked for identification.)
7 BY MR. BARNES:
8   Q  While that's pulling up. It says, "UFP
9 Review: ███████████."
10     What does the acronym "UFP" typically stand  09:38:24
11 for?
12   A  User-facing privacy.
13   Q  Okay.
14     And who is Tal Herman?
15   A  Tal Herman is a director on the UX team.   09:38:37
16   Q  Who is Kalle Buschmann?
17   A  Kalle Buschmann is a UX researcher.
18   Q  Do you work with her?
19     MS. CRAWFORD: Sorry. I was just noting
20 that the exhibit has now been published and is   09:38:59
21 available for the witness.
22     MR. BARNES: Thank you, Ms. Crawford.
23     MS. CRAWFORD: You're welcome.
24 BY MR. BARNES:
25   Q  I will end my time-killing questions.   09:39:05

**Page 27**

1     Let me know, Ms. Abdulhay, when you have
2 the document up.
3   A  I just opened the document and I will take
4 a few moments to review it.
5   Q  Great.                09:39:20
6   A  Okay.
7     Thank you. I have reviewed it.
8   Q  Okay.
9     What is this document -- let me make the
10 record that ends in GOOG-CLAH-01198496.   09:40:50
11   A  So on the first slide you can see the name
12 of this presentation, "User-Facing Privacy Review
13 ███████████."
14     In reviewing this document, this is a
15 status update.              09:41:15
16   Q  And to whom was the status update
17 delivered?
18   A  I see the date of May 17, 2021.
19     I had actually transitioned off of the
20 marketing team by this point in time. So I am not  09:41:32
21 sure exactly who Kalle presented this deck to.
22   Q  Okay.
23     Can we -- let me back up to Exhibit 1 if we
24 could for just a second.
25     To whom was the ███████ Perspective  09:41:46

**Page 28**

1 presented?
2   A  The ███████ --
3     MS. CRAWFORD: Sorry. Let me just lodge a
4 quick objection to this question and the last
5 question, which is insofar as it calls for   09:41:56
6 speculation.
7     But you can answer the question just posed.
8     THE REPORTER: I'm sorry. At the end you
9 said you can answer the question just?
10     MS. CRAWFORD: Posed.       09:42:09
11     THE REPORTER: Thank you.
12 BY MR. BARNES:
13   Q  So let me clear it up because we had
14 colloquy. I'm not sure we're sure what the question
15 on the floor is.             09:42:19
16     I went back to Exhibit 1, which is the
17 ███████ Perspective. To whom was the
18 ███████ Perspective document marked as
19 Exhibit 1 presented?
20   A  Uh-huh.            09:42:29
21     This was shared by the PM of the project
22 Sam Heft-Luthy. He's no longer with Google.
23     It was shared with the extended project
24 team, the project leads, the consulting team, and,
25 of course, the Steering Committee.   09:42:47

**Page 29**

1   Q  Okay.
2     And who is the Steering Committee -- let
3 me -- is the Steering Committee on the exhibit --
4 yes. I see the -- I'll get to -- let's go ahead and
5 mark.                09:43:07
6     MR. BARNES: Eric, please -- Mr. Johnson,
7 please upload the Abdulhay Fact Sheet. So rather
8 than just refer to a document that's marked as an
9 exhibit, let's ...
10     (Whereupon Abdulhay Exhibit 3 was   09:43:19
11     marked for identification.)
12     MS. CRAWFORD: And when you say "marked as
13 an exhibit," you're referring to a document that has
14 not yet been published, but you're in the process of
15 marking and uploading now?   09:43:35
16     MR. BARNES: Correct. It will be marked as
17 Exhibit 3. It is the Abdulhay Fact Sheet.
18     MS. CRAWFORD: Perfect.
19     MR. BARNES: And I would like for you to
20 have the official exhibit in front of you.   09:43:45
21     I know you've got it tabbed on your
22 computer, but I would like for you to have the
23 exhibit in front of you for the question, which is
24 going to be a really simple question.
25     THE WITNESS: Yeah.       09:43:59

1 longer with Google.

2 Q  When did your leave start?

3 A  My leave started in September of 2021 and

4 concluded just recently, March 2022.

5 Q  Okay.                                09:48:30

6     If we can go to the UFP review

7 ▓▓▓▓▓▓ document.

8     If you could go to the -- it's page 4 of

9 the PDF and it ends in the number 499 and the

10 sentence (as read and/or reflected:)        09:49:00

11     Rahul our VP in 2020 had

12 paused all tactical work ...

13     What did -- what's -- what tactical work

14 was paused in 2020?

15 A  I believe this is referring to some of the  09:49:18

16 in-flight user-facing privacy projects that Rahul

17 had asked the team to come back and -- and

18 demonstrate how some of these work streams were part

19 of a broader privacy strategy for PDPO.

20 Q  What were the other user-facing privacy    09:49:48

21 projects?

22     MS. CRAWFORD:  Objection to the form of the

23 question.

24     THE WITNESS:  I was not on the product team

25 of PDPO at the time.  I'm not intimately familiar  09:50:01

Page 34

1 with the work streams that were paused.

2 BY MR. BARNES:

3 Q  Okay.

4     If we could go to the next page, of which

5 ends in -- which is GOOG Calhoun 01198500.     09:50:11

6 A  Uh-huh.

7 Q  It says (as read and/or reflected:)

8     The project was executed in

9     two phases with the second phase

10     still going on with setbacks and     09:50:26

11     changes in priorities.

12     What setbacks occurred with ▓▓▓▓▓▓

13 in the second phase?

14 A  Yes.

15     So if you recall, I had said this was a   09:50:37

16 very UX-driven project, but it was still

17 cross-functional.

18     So there are often, on cross-functional

19 working groups, disagreements between the functions

20 on the -- on whether or not the scope of the -- of  09:50:54

21 the work is appropriate, dialed into what the

22 needs -- immediate needs are, et cetera.

23     And also, sometimes disagreements on if a

24 project has reached a sufficient -- a sufficient

25 level of completion.                        09:51:12

Page 35

1     I will say that the product team had the

2 perspective that the team had reached a good

3 conclusion, a good concluding point, that they had

4 fulfilled the -- they had fulfilled the initial

5 goals and objectives of the ▓▓▓▓▓ project.   09:51:32

6     There were members of the UX team -- I

7 believe Kalle was one of them -- who felt like they

8 could take the project a bit further in terms of

9 socialization, but because -- because the work

10 sufficiently influenced OKR setting, team     09:51:51

11 resourcing, the product team didn't feel that

12 additional work needed to be done to socialize.

13 Q  Okay.

14     What do you mean by -- what does Google

15 mean by "socializing"?                       09:52:06

16 A  Yeah.

17     So, for example, potentially take the

18 storyboard on a road show to more members of PDPO or

19 more members of product teams to make sure that the

20 thesis of ▓▓▓▓▓ is well-known.               09:52:22

21     You know, in discussing the, you know, in

22 discussing this with team members at the time, I do

23 recall that the product team felt that the

24 perspective on the strategy doc and the storyboard

25 were sufficient -- had reached -- had reached the   09:52:48

Page 36

1 right individuals and had successfully influenced

2 resource allocation, as well as the fact that a

3 number of projects, you know, were sufficiently

4 addressing some of the hypotheses that are found

5 within ▓▓▓▓▓ -- not sufficiently.            09:53:09

6     That's probably not the word to right say

7 it, but were addressing these issues.

8 Q  What changes, if any, were specifically

9 made to Chrome as a result of ▓▓▓▓▓ ?

10     MS. CRAWFORD:  Objection to the           09:53:26

11 foundation -- as to foundation.

12     You can answer to the extent possible.

13     THE WITNESS:  So this was -- this is not a,

14 as I mentioned before, a product roadmap or in any

15 way, a mandate.  It specifies no product           09:53:43

16 requirements whatsoever for other teams.

17     It was a strategy and positioning paper for

18 the -- primarily the consumption of PDPO for their

19 own resource allocation and milestone setting.

20 BY MR. BARNES:                                09:54:11

21 Q  Did Google make any changes to Chrome as a

22 result of ▓▓▓▓▓ ?

23     MS. CRAWFORD:  Same objection.

24     You can answer to the extent possible.

25     THE WITNESS:  I am not aware of -- of any  09:54:22

Page 37

10 (Pages 34 - 37)

1 changes within Chrome because of ██████.
2 BY MR. BARNES:
3    Q   You testified a moment ago about
4 disagreements and you mentioned one disagreement
5 being socialization.                        09:54:38
6        Were there other disagreements?
7    MS. CRAWFORD: Objection insofar as that
8 misstates the witness's testimony. Also vague and
9 overbroad.
10       THE WITNESS: No. I -- I mean, I think all   09:54:54
11 work streams, you know, the purpose of bringing
12 together different functions is to -- is to voice
13 different opinions and perspectives. And that is
14 how work gets done often at Google.
15       So it would probably be false to say there   09:55:13
16 were no disagreements, but none that were notable or
17 significant enough that I can even recall them.
18 BY MR. BARNES:
19    Q   Okay.
20       Back to the page 5 that ends in -500. The   09:55:22
21 sentence says (as read and/or reflected:)
22       Changes in priorities.
23       What changes in priorities impacted the
24 second phase of ██████?
25    A   So I was scanning this document, and I   09:55:39

Page 38

1 think, you know, one of the key slides, you know,
2 references this, that essentially, the ██████
3 vision was successful in serving as a vehicle for
4 internal strategy setting and resource setting and
5 clarification.                        09:56:13
6 And so that is, I think, one of the
7 benefits of a project like this, is that it does
8 help teams identify, you know, what next steps they
9 potentially could take.
10      And I think that that is what this deck   09:56:29
11 reflects actually.
12 BY MR. BARNES:
13    Q   Can you identify -- you said -- I think you
14 said there was a key slide.
15      Can you identify the slide you were   09:56:39
16 referencing in your previous answer.
17    A   Yes. So, for example, 505, the privacy
18 experience vision 2026.
19      This is the conclusion of ██████, if
20 you will. It says that they are, you know, (as read   09:56:57
21 and/or reflected:)
22      Focusing on the core of the
23      new experience paradigm. They're
24      gathering feedback and refining it.
25      And then if you go further in the deck, it   09:57:10

Page 39

1 simply says that (as read and/or reflected:)
2      Our efforts are aligned with
3      the vision.
4      So, in my mind, from the product -- and
5 from the product perspective, this is ultimately how   09:57:23
6 the project concluded. And some might say
7 successfully in being able to influence the resource
8 allocation of PDPO.
9    Q   Okay.
10      MR. BARNES: Mr. Johnson, can you publish   09:57:35
11 A3, please, as Exhibit 4.
12      (Whereupon Abdulhay Exhibit 4 was
13      marked for identification.)
14 BY MR. BARNES:
15    Q   Okay.                        09:57:51
16      If you could turn -- let's stay on
17 Exhibit 2 right now, I think it is, and go to 501.
18      XFN. Do you see at the top where it says A
19 XFN project from the start?
20    A   Yes.                        09:58:06
21    Q   Does XFN just refer to cross-function?
22    A   It does.
23    Q   And X -- so X means cross; right?
24    A   It does, yes.
25    Q   Okay.                        09:58:30

Page 40

1      Can you go to 504, please. And this slide
2 says (as read and/or reflected:)
3      ... the conditions of the
4      project have changed ...
5      What conditions of the project changed?   09:58:34
6    A   So as I mentioned, I think the -- this is,
7 again, the perspective of the UX team potentially.
8 And if you see here, project conditions, it says
9 impact (as read and/or reflected:)
10      Project impact considered   09:58:54
11      sufficient by PM team.
12      I think that is the primary condition which
13 they're referring to, but I did not author this
14 slide. So I can't tell you concretely that that's
15 the only condition they're referring to.   09:59:09
16    Q   How was ██████ slowed down?
17    A   I think that's a matter of opinion, if you
18 will. And, again, there was not necessarily
19 consensus that it was slowed down, but that it -- it
20 reached a sufficient level of completion.   09:59:32
21 BY MR. BARNES:
22    Q   Can we go to 507 -- go ahead, Jomaire.
23      MS. CRAWFORD: Happy to let you continue
24 with the questions. I just wanted you to know the
25 witness does now have access to what you marked as   09:59:43

Page 41

11 (Pages 38 - 41)

1  Exhibit 4.
2      MR. BARNES:  Oh, thank you again.
3  Q  Ms. Abdulhay, can you open up what's been
4  marked as Exhibit 4.
5  A  Yes.                    09:59:59
6  Q  You testified earlier that for Exhibit 2 at
7  -505 there was this referenced Privacy Experience
8  Vision 2026.
9      Do you recall that?
10  A  Uh-huh.  Yes.              10:00:10
11  Q  And is Exhibit 4 the slide deck that
12  represents the ████████ Vision 2026?
13  A  I believe it is.  I mean, some of the
14  slides might be -- we'd have to do a close
15  comparison of the slides.          10:00:26
16  Q  Why don't you take time to review it.  And
17  I will leave the question on the table as you review
18  the document.
19  A  Okay.
20      So yes.  I've just done a quick comparison, 10:02:48
21  side-by-side comparison of the Privacy Experience
22  Vision 2026 in Exhibit ...
23  Q  4?
24  A  -- Exhibit 4 with Exhibit 2, the deck
25  reference in Exhibit.  It looks like, you know,  10:03:06

Page 42

1  know, when you are drafting a product requirement
2  doc, to then going through all of our privacy launch
3  requirements, to, of course, thinking about the user
4  experience of privacy.
5      And then as users continue to use a    10:05:01
6  product, ensuring that we are enforcing our privacy
7  commitments, we're securing that data appropriately,
8  and that we're always evolving to make sure that our
9  privacy experiences are optimized as user
10  expectations change, as our products evolve, as our  10:05:27
11  features evolve.
12      So private by design is kind of an internal
13  and external way that we reference that entire
14  end-to-end commitment to user privacy.
15  Q  If we could go to 003, please.      10:05:44
16      Let me know when you're there.
17  A  Okay.
18      Yes.
19  Q  What are the ████████ principles?
20  A  ████████ principles.  Are you     10:06:22
21  seeing that referenced on the slide somewhere?
22  Q  I am.  On 003.
23  A  Oh, 003.  I'm on the wrong slide.
24  Q  Okay.
25      Thank you.                 10:06:37

Page 44

1  the deck in Exhibit 2 was probably an earlier draft
2  or maybe a later draft.  Hard to know.
3      And this is -- Exhibit 4 is one version of
4  this presentation.
5  Q  By "this presentation," what do you mean?  10:03:22
6  A  So there is a title at the top of Exhibit 4
7  (as read and/or reflected:)
8      ████████ Vision 2026.
9      And this was one of the last -- this is the
10  last artifact, to my knowledge, of the ████████  10:03:42
11  work stream authored by our UX team member Kalle
12  Buschmann.
13  Q  Okay.
14      Can you turn to the page in the document
15  that ends in 000.  It ends in 6000.       10:03:52
16      And by "the document," I mean Exhibit 4.
17  A  Okay.
18      Okay.  Yes.
19  Q  What's it mean for a product to be private
20  by design?                    10:04:13
21  A  So, yeah.  Private by design is a term we
22  use to describe our approach to ensuring that at
23  every level of a product's development, we are
24  prioritizing user privacy.
25      So it starts at the very beginning, you    10:04:42

Page 43

1  A  Apologies.  Let me try that again.
2      003.  Okay.
3      Right.  Yes.  So at Google we have internal
4  privacy and security principles.  And they are
5  refreshed periodically as our aspirations grow,    10:07:16
6  evolve and change.
7      And in 2021, at the behest of Rahul
8  Roy-Chowdhury, the principles were actually updated.
9  And he -- the team that was working on this called
10  it the ████████.  And --         10:07:44
11  Q  Do you recall -- I'm sorry.  Go ahead.
12  A  I'm sorry.
13      MS. CRAWFORD:  You can finish.  Okay.
14      THE WITNESS:  Yeah.
15      No.  I wanted to just say it's an internal  10:07:53
16  set of principles.  And they are not a mandate.
17  They are not detailed descriptions.
18  BY MR. BARNES:
19  Q  Okay.
20      There are four listed on 003, can we agree  10:08:02
21  with that?
22  A  Yes.
23  Q  Are there any ████████ principles
24  beyond these four?
25  A  I would have to go look at the ████████  10:08:17

Page 45

12 (Pages 42 - 45)

1 principles to make sure I'm remembering them
2 correctly.
3     Q   Is there a document where the ████████
4 ██ principles are laid out for Google employees?
5     A   Yes.                          10:08:37
6         MS. CRAWFORD: Objection to the form of the
7 question. Also insofar as this is outside the scope
8 of the noticed topic.
9         But you can answer to the extent possible.
10        THE WITNESS: Yes. We do -- we do make our  10:08:48
11 internal principles available.
12 BY MR. BARNES:
13    Q   And is that easily available?
14        MS. CRAWFORD: Objection to the form of the
15 question.                           10:08:57
16        You can answer, Ms. Abdulhay.
17        THE WITNESS: Yes. They are easily
18 available.
19 BY MR. BARNES:
20    Q   Okay.                         10:09:07
21        MR. BARNES: Mr. Johnson, please mark what
22 was -- please publish what has previously marked as
23 A4, which will now become Exhibit 5.
24        (Whereupon Abdulhay Exhibit 5 was
25        marked for identification.)       10:09:26

Page 46

1 BY MR. BARNES:
2     Q   And I believe the Abdulhay Fact Sheet is
3 Exhibit 3; is that correct?
4         MS. CRAWFORD: That squares with the
5 exhibits that I'm looking at.           10:09:35
6         MR. BARNES: Okay.
7     Q   Let me know when you have Exhibit 5,
8 please, Ms. Crawford and Ms. Abdulhay.
9         MS. CRAWFORD: Okay.
10        All right. It should be accessible.    10:10:04
11 BY MR. BARNES:
12    Q   All right.
13        Ms. Abdulhay, we are coming to the end of
14 this deposition. I am not going to ask you -- I
15 will tell you in advance the question I'm going to   10:10:13
16 ask you about this lengthy document.
17        In Exhibit 3 -- on page 2 of Exhibit 3, you
18 have bullet point 2 stakeholder interviewees/sync
19 participants followed by a Bates number that is
20 GOOG-CABR-05885817.                    10:10:33
21        Do you see that on Exhibit 3?
22    A   Yes.
23        MS. CRAWFORD: I'm sorry. Can we just --
24 what page are we on, Jay?
25        MR. BARNES: We're on page 2 of Exhibit 3.  10:10:47

Page 47

1         MS. CRAWFORD: Perfect. Thank you.
2 BY MR. BARNES:
3     Q   My question is, is Exhibit 5 -- what is
4 Exhibit 5?
5         MS. CRAWFORD: And in order -- if you need  10:10:58
6 to take time in order to at least skim Exhibit 5 in
7 order to answer it, please obviously do so.
8 BY MR. BARNES:
9     Q   And then the follow-up question is that's
10 relating, I don't want Jomaire to object to         10:11:11
11 compound, but they're related questions, is
12 Exhibit 5 the document referenced in your Abdulhay
13 Fact Sheet?
14        MS. CRAWFORD: As long as the witness's
15 answer is clear and the record isn't muddled as to   10:11:31
16 the different questions you're posing, I'm fine
17 proceeding.
18        THE WITNESS: Okay.
19        I am just cross-referencing the Bates
20 number, as you call them, and what is in the fact    10:11:47
21 sheet is GOOG-CABR-05885871. That aligns with the
22 Bates number of the Exhibit 5.
23 BY MR. BARNES:
24    Q   Okay.
25    A   Which is identical.              10:12:11

Page 48

1     Q   Okay.
2         And what is Exhibit 5, generally speaking?
3 You know, you don't have to go through each page of
4 Exhibit 5.
5         Generally speaking, what is Exhibit 5?     10:12:22
6     A   Yes.
7         MS. CRAWFORD: Unless you need to in order
8 to answer the question accurately, take the time you
9 need, but if you can answer now, please do.
10        THE WITNESS: Yes.                 10:12:33
11        So I, you know, this document, I was not --
12 I was not -- did not contribute to help authoring
13 this document. My assessment in reviewing it now is
14 that it is -- it is notes from conversations.
15 BY MR. BARNES:                        10:13:02
16    Q   Taken by people relating to -- taken by
17 people relating to the ████████ project?
18        MS. CRAWFORD: Objection to form.
19        You can answer.
20        THE WITNESS: I would have to review this   10:13:15
21 entire document to give you that answer, but, for
22 example, under the first -- the first program intro
23 2020, 10-19 it says note-taker, KalleBu, that would
24 be Kalle Buschmann.
25        So that first meeting, yes, it looks like   10:13:43

Page 49

13 (Pages 46 - 49)

1 that's the core working group of ███████, but
2 we'd have to go through and see for each of these
3 who the note-takers were, who participated.
4 BY MR. BARNES:
5   Q  As part of ████████, did Kalle and   10:13:54
6 other PDPO team members interview stakeholders at
7 Google?
8   A  Yes, they did.
9   Q  Okay.
10     MR. BARNES:  Let's -- I have no further   10:14:10
11 questions at this time.
12     Let's go off the record -- well, let's go
13 off the record unless Jomaire, do you want to take a
14 break?
15     MS. CRAWFORD:  Well, let's go off the   10:14:19
16 record, and then we can hash it out.  I don't want
17 to eat up your clock.  So let's go off.
18     MR. BARNES:  Thank you.
19     THE VIDEOGRAPHER:  Going off the record.
20 The time is 10:14 a.m.                10:14:27
21     (Recess was taken at 10:14 a.m.
22     until 10:26 a.m.)
23     THE VIDEOGRAPHER:  Back on the record.  The
24 time is 10:26 a.m.
25     MS. CRAWFORD:  No questions from Google at  10:25:55

1 and signing?
2     MS. CRAWFORD:  Yes, ma'am.
3     THE REPORTER:  And I will follow suit
4 with the confidentially attorneys' eyes only on this
5 transcript.                10:27:04
6     MS. CRAWFORD:  Perfect.
7     I was just about to make sure as a
8 housekeeping matter that we marked it accordingly.
9 Thank you.
10     THE VIDEOGRAPHER:  Okay.        10:27:10
11 This concludes today's deposition of Mediha
12 Abdulhay.
13     The number of media used was one, and will
14 be retained by Veritext Legal Solutions.
15     The time is 10:27 a.m., and we're off the   10:27:25
16 record.
17     (Whereupon, at 10:27 a.m., the
18 remote deposition of MEDIHA
19 ABDULHAY was concluded.)
20         ---oOo---
21
22
23
24
25

1 this time.
2     MR. BARNES:  So I want to make a request on
3 the record that Google produce the ██████████
4 ██ principle documents.
5     And we can -- Jomaire, can -- Ms. Crawford,  10:26:08
6 you can state your piece on that and let's end for
7 the day.
8     MS. CRAWFORD:  It's not entirely sure which
9 documents you're referring to, but obviously, as you
10 know, we're outside the close of fact discovery.   10:26:19
11 And so we -- we can take this up offline, but we
12 obviously object.
13     I don't think there's been a representation
14 made by you that these haven't already been produced
15 by Google.  You should have a look at Google's   10:26:31
16 extensive document production first.  And if there's
17 anything further that you wish to request after
18 having done so, we can take that up at the
19 appropriate time, but we do object to the request,
20 but we are willing to meet and confer with you on it  10:26:45
21 pending the additional investigation I just
22 referenced.
23     MR. BARNES:  Okay.  Great.
24     That ends today.
25     THE REPORTER:  Will the witness be reading   10:26:53

1 STATE OF _____)
2 COUNTY OF _____)    ss.
3
4
5
6     I, the undersigned, hereby certify under
7 penalty of perjury under the laws of the State of
8 _____ that the foregoing testimony is true
9 and correct.
10     Executed this _____ day of _____,
11 20____, at _____, _____.
12
13
14         _____
15         MEDIHA ABDULHAY
16
17
18
19
20
21
22
23
24
25

1 STATE OF CALIFORNIA   )
2 COUNTY OF LOS ANGELES )  ss.
3
4    I, Reagan Evans, RPR, RMR, CRR, CCRR, CLR, CRC,
5 CSR No. 8176, in and for the State of California, do
6 hereby certify:
7    That prior to being examined, the witness named
8 in the foregoing deposition was by me duly sworn to
9 testify to the truth, the whole truth, and nothing
10 but the truth;
11    That said remote deposition was taken down by me
12 in shorthand at the time and place therein named and
13 thereafter reduced to typewriting under my
14 direction, and the same is a true, correct, and
15 complete transcript of said proceedings;
16    That if the foregoing pertains to the original
17 transcript of a deposition in a federal case, before
18 completion of the proceedings, review of the
19 transcript {XX} was { } was not required.
20    I further certify that I am not interested in
21 the event of the action.
    Witness my hand this 14th day of April, 2022.
22
23
24
    Reagan Evans, RPR, RMR, CRR, CCRR,
25    CLR, CRC, CSR No. 8176

                                          Page 54

---

1 _X_ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF
2    Transcript - The witness should review the transcript and
3    make any necessary corrections on the errata pages included
4    below, notating the page and line number of the corrections.
5    The witness should then sign and date the errata and penalty
6    of perjury pages and return the completed pages to all
7    appearing counsel within the period of time determined at
8    the deposition or provided by the Federal Rules.
9    __ Federal R&S Not Requested - Reading & Signature was not
10    requested before the completion of the deposition.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                                          Page 56

---

1 JOMAIRE A. CRAWFORD, ESQ.
2 JOMAIRECRAWFORD@QUINNEMANUEL.COM
3          APRIL 14, 2022
4 RE: MEDIHA ABDULHAY
5 APRIL 12, 2022, MEDIHA ABDULHAY, JOB NO. 5180827
6 The above-referenced transcript has been
7 completed by Veritext Legal Solutions and
8 review of the transcript is being handled as follows:
9 __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext
10    to schedule a time to review the original transcript at
11    a Veritext office.
12 __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF
13    Transcript - The witness should review the transcript and
14    make any necessary corrections on the errata pages included
15    below, notating the page and line number of the corrections.
16    The witness should then sign and date the errata and penalty
17    of perjury pages and return the completed pages to all
18    appearing counsel within the period of time determined at
19    the deposition or provided by the Code of Civil Procedure.
20 __ Waiving the CA Code of Civil Procedure per Stipulation of
21    Counsel - Original transcript to be released for signature
22    as determined at the deposition.
23 __ Signature Waived – Reading & Signature was waived at the
24    time of the deposition.
25

                                          Page 55

---

1 CALHOUN V. GOOGLE
2 MEDIHA ABDULHAY (#5180827)
3      E R R A T A  S H E E T
4 PAGE____ LINE____ CHANGE_____
5 _____
6 REASON_____
7 PAGE____ LINE____ CHANGE_____
8 _____
9 REASON_____
10 PAGE____ LINE____ CHANGE_____
11 _____
12 REASON_____
13 PAGE____ LINE____ CHANGE_____
14 _____
15 REASON_____
16 PAGE____ LINE____ CHANGE_____
17 _____
18 REASON_____
19 PAGE____ LINE____ CHANGE_____
20 _____
21 REASON_____
22
23 _____   _____
24 WITNESS              Date
25

                                          Page 57

---

15 (Pages 54 - 57)

**Deposition Errata**
**Case: *Calhoun, et al. v. Google LLC***
**Deponent: Mediha Abdulhay 30(b)(6)**
**Date of Deposition: April 12, 2022**

I, Mediha Abdulhay, hereby certify that I have read the transcript of my testimony taken under oath in my 30(b)(6) deposition on the 12th day of April, 2022; that the transcript is a true, complete record of my testimony and that the answers on the record as given by me are true and correct, with the following exceptions:

| Pg. and Ln. | Now reads | Should read | Reason |
|---|---|---|---|
| Pg: 11 Ln: 17 | identified | identify | Transcription Error |
| Pg: 15 Ln: 9 | time PDPO, | time, PDPO, | Punctuation |
| Pg: 24 Ln: 17 - 18 | product manager, nor do I work on the ads team, | product manager, nor do I work, on the ads team. | Punctuation |
| Pg: 25 Ln: 1 | privacy safety and security | privacy, safety, and security | Punctuation |
| Pg: 25 Ln: 11 - 12 | UX teams. UX -- one specific UX team. | UX teams – UX team – one specific UX team. | Transcription Error Punctuation |
| Pg: 25 Ln: 20 - 21 | text stack | tech stack | Transcription Error |
| Pg: 33 Ln: 17 | structure, work structure | structure – org structure | Transcription Error Punctuation |
| Pg: 36 Ln: 21 | in discussing the, you know, in | in discussing the, you know – in | Punctuation |
| Pg: 36 Ln:24 | on | and | Transcription Error |
| Pg: 37 Ln: 5 - 6 | ▮▮▮▮ -- not sufficiently. That's probably not | ▮▮▮▮ – not sufficiently, that's probably not | Punctuation |
| Pg: 41 Ln: 8 - 9 | it says impact | it says: "Impact:" | Punctuation |
| Pg: 42 Ln: 25 | reference | referenced | Transcription Error |

DocuSigned by:

*Mediha Abdulhay*

E736D79215BB4C0...

Mediha Abdulhay

5/23/2022

DATE

**CONFIDENTIAL**

# ABDULHAY FACT SHEET

**I.**  ██████████ **Team Members and Roles (GOOG-CALH-01198512, at -547)**

Core project team
- Elyse Bellamy; ohelyse@google.com (Senior Interaction Designer)
- Kalle Buschmann; kallebu@google.com (UX Design Manager - Munich)
- Mimosa Lynch; mimosal@google.com (Program Manager)
- Sam Heft-Luthy; heftluthy@google.com (Product Manager)
- Mediha Abdulhay; mediha@google.com (Product Manager)

Extended project team
- Arne De Booij; adbooij@google.com (UX Researcher)
- Carmela Acevedo; cacevedo@google.com (Software Engineer)
- D.d Zhang; shudi@google.com (Visual Designer)
- Jennifer Marlow; jamarlow@google.com (UX Researcher)
- Jess Chen; justchen@google.com (Interaction Designer)
- Johanna Woll; jwoll@google.com (UX Writer)
- Micha Segeritz; mseg@google.com (Staff Quant UX Researcher)
- Robert Brauer; robertbrauer@google.com (Senior Interaction Designer)
- Yingsi Zhang; yingsi@google.com (Product Manager)

Project leads
- Lora Felipe; felipel@google.com (Technical Program Manager)
- Greg Fair; gregfair@google.com (Product Manager)
- Gretchen Gelke; ggelke@google.com (UX Manager)
- Jessica Gan Lee; jessicagl@google.com (Senior Privacy Counsel)
- Karen Kalashian; karenkalashian@google.com (Engineering Manager)
- Tal Herman; talherman@google.com (Director of User Experience)

Consulting team
- Kate Charlet; katecharlet@google.com (Director, Data Governance)
- Micha Segeritz; mseg@google.com (Staff Quant UX Researcher)
- Troy Stram; troys@google.com (Director, Privacy Legal)
- Yooki Park; yooki@google.com (Business Operations Principal)
- Jonathan McPhie; jmcphie@google.com (Senior Product Manager)

Exec. Sponsor
- Rahul Roy-Chowdhury; rahulrc@google.com (VP, Product Management)

**CONFIDENTIAL**

Steering Committee
- Annie Klemp; annieklemp@google.com (Director, Strategy & Operations for Privacy, Safety, and Security)
- Cassidy Morgan; cassidym@google.com (VP, Brand & Reputation Marketing)
- Micah Laaker; mlaaker@google.com (Director, UX)
- Othar Hansson; othar@google.com (Principal Engineer)
- Sarah Hammond; shammond@google.com (Director, UX - Privacy, Safety & Security)
- Stephan Micklitz; micklitz@google.com (Engineering Director)

II. **Stakeholder Interviewees/Sync Participants (GOOG-CABR-05885871)**

- Emil Ochotta; emilo@google.com (Data Protection Officer)
- Breonna Danielle Rodriguez-Delgrosso; brodgz@google.com (Head of UX Design & Content: Ads Privacy)
- Shona Dutta; shonad@google.com (Visual Designer)
- JK Kearns; jkearns@google.com (Group Product Manager)
- Mark Risher; risher@google.com (Senior Director of Product Management)
- Yooki Park; yooki@google.com (Business Operations Principal)
- Jonathan McPhie; jmcphie@google.com (Senior Product Manager)
- Irene Nyavor; iwn@google.com (Program Manager)
- Giles Hogben; gilesh@google.com (Director, Privacy Engineering)
- David Monsees; davidmonsees@google.com (Product Manager)
- Cassidy Morgan; cassidym@google.com (VP, Brand & Reputation Marketing)
- Al Verney; alv@google.com (Director, Corporate Communications, EMEA)
- Kim Guemmey; guemmy@google.com (Director, Product Management)
- Priscila Penha; ppenha@google.com (Design Director)
- Stephan Micklitz; micklitz@google.com (Engineering Director)
- Bryan Horling; bhorling@google.com (Software Engineer)
- Keith Enright; keithenright@google.com (Chief Privacy Officer)
- Josh Stickler; joshst@google.com (Senior Product Manager)
- Ian Alexander; ianalexander@google.com (Product Manager)
- Othar Hansson; othar@google.com (Principal Engineer)
- Sarah Hammond; shammond@google.com (Director, UX - Privacy, Safety & Security)
- Micah Laaker; mlaaker@google.com (Director, UX)
- Rahul Roy-Chowdhury; rahulrc@google.com (VP, Product Management)
- Kate Charlet; katecharlet@google.com (Director, Data Governance)
- Troy Stram; troys@google.com (Director, Privacy Legal)

# EXHIBIT 39

# Redacted In Its Entirety

# EXHIBIT 40

# Redacted In Its Entirety

# EXHIBIT 41

# Redacted In Its Entirety

# EXHIBIT 42

# Redacted In Its Entirety

# EXHIBIT 43

# Redacted In Its Entirety