# EXHIBIT 6

```
 1                UNITED STATES DISTRICT COURT

 2          NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

 3

 4

 5    CHASOM BROWN, WILLIAM BYATT,

      JEREMY DAVIS, CHRISTOPHER

 6    CASTILLO, and MONIQUE

      TRUJILLO, individually and on

 7    behalf of all other similarly

      situated,

 8

                    Plaintiffs,

 9                                      No.

            vs.                         4:20-cv-03664-YGR-SVK

10

      GOOGLE LLC,

11

                    Defendant.

12    _____/

13

                      -- CONFIDENTIAL --

14

15        VIDEOTAPED DEPOSITION OF MICHAEL LASINSKI

16              Remote Zoom Proceedings

17                Ann Arbor, Michigan

18              Wednesday, July 20, 2022

19

20

21

22

23    REPORTED BY:

24    LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

25    Pages 1 - 225                      Job No. 5308350

                                         Page 1
```

1                    UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

3

4

5     CHASOM BROWN, WILLIAM BYATT,

      JEREMY DAVIS, CHRISTOPHER

6     CASTILLO, and MONIQUE

      TRUJILLO, individually and on

7     behalf of all other similarly

      situated,

8

                      Plaintiffs,

9                                      No.

              vs.                      4:20-cv-03664-YGR-SVK

10

      GOOGLE LLC,

11

                      Defendant.

12     _____/

13

14                    -- CONFIDENTIAL --

15          Videotaped deposition of MICHAEL LASINSKI,

16    taken on behalf of Defendant, Remote Zoom Proceedings

17    from Cambridge, Massachusetts, beginning at 10:59 a.m.

18    Eastern Daylight Time and ending at 8:28 p.m. Eastern

19    Daylight Time, on Wednesday, July 20, 2022, before

20    Leslie Rockwood Rosas, RPR, Certified Shorthand Reporter

21    No. 3462.

22

23

24

25

                                              Page  2

1    APPEARANCES:

2

3    FOR THE PLAINTIFFS:

4        BOIES SCHILLER FLEXNER LLP

5        BY: JAMES LEE, ESQ.

6        100 SE Second Street, Suite 2800

7        Miami, Florida 33131

8        (305) 539-8400

9        jlee@bsfllp.com

10

11       MORGAN & MORGAN

12       BY: JOHN A. YANCHUNIS, ESQ.

13       201 North Franklin Street, 7th Floor

14       Tampa, Florida 33602

15       (813) 223-5505

16       jyanchuis@forthepeople.com

17

18       DICELLO LEVITT GUTZLER

19       BY: SHARON CRUZ, ESQ.

20       Ten North Dearborn Street, Sixth Floor

21       Chicago, Illinois 60602

22       (312) 214-7900

23       szruz@dicellolevitt.com

24

25

                                              Page 3

```
1    APPEARANCES (Continued):

2

3    FOR THE DEFENDANT:

4        QUINN EMANUEL URQUHART & SULLIVAN, LLP

5        BY: VIOLA TREBICKA, ESQ.

6         865 South Figueroa Street, 10th Floor

7        Los Angeles, California 90017

8        (213) 443-3000

9        violatrebicka@quinnemanuel.com

10           -and-

11       BY: TEUTA FANI, ESQ.

12       191 N. Wacker Drive, Suite 2700

13       Chicago, Illinois 60606

14       (312) 705-7400

15       teutafani@quinnemanuel.com

16

17   Also Present:

18       Amna Qamer, Boies Schiller Flexner LLP, summer

19           associate

20       Angela Peterson, Quinn Emanuel Urquhart & Sullivan,

21           LLP, summer associate

22       Denisha Bacchus, Google LLC

23       Christina Bartlett, Analysis Group

24       Robert Fenton, Videographer

25
```

Veritext Legal Solutions
866 299-5127

```
 1                          I N D E X

 2

 3

 4    WEDNESDAY, JULY 20, 2022

 5

 6    WITNESS                              EXAMINATION

 7    MICHAEL LASINSKI

 8

 9        BY MS. TREBICKA                     10, 219

10        BY MR. LEE                              211

11

12    QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:

13                        (NONE)

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page 5
```

```
 1                    DEPOSITION EXHIBITS

 2                      MICHAEL LASINSKI

 3     NUMBER          DESCRIPTION                    IDENTIFIED

 4     Exhibit 1       Expert Report of Michael J.         8

 5                     Lasinski

 6     Exhibit 2       Exhibit A, Third Amended           31

 7                     Complaint

 8     Exhibit 3       GOOG-CABR-04431207 - 271           49

 9     Exhibit 4       Google Panel Terms &              116

10                     Conditions, 6.1.21

11     Exhibit 5       Google Panel Privacy Policy,      116

12                     6.1.21

13     Exhibit 6       Nielsen Printout, Computer &      130

14                     Mobile Panel

15     Exhibit 7       Nielsen Printout, Computer &      130

16                     Mobile Panel, Frequently

17                     Asked Questions

18     Exhibit 8       Nielsen Printout, U.S. Panel      131

19                     Privacy Notice Summary

20     Exhibit 9       SurveySavvy printout, How it      131

21                     Works

22     Exhibit 10      SavvyConnect printout, FAQs       131

23     Exhibit 11      SavvyConnect, Terms and           131

24                     Conditions

25     Exhibit 12      UpVoice printout, FAQs            131

                                                    Page 6
```

1    Exhibit 13      GOOG-CABR-04324934 - 44         171

2    Exhibit 14      Expert Report of Bruce A.       176

3                    Strombom

4    Exhibit 15      Screenshot, Latham & Watkins    176

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          Ann Arbor, Michigan; Wednesday, July 20, 2022

 2                      10:59 A.M.

 3

 4                      PROCEEDINGS

 5          (Exhibit 1, Expert Report of Michael J.          10:58:23

 6          Lasinski, marked for identification

 7          electronically by counsel.)

 8          THE VIDEOGRAPHER:  Good morning.  We are on the

 9   record.  The time is 10:59 a.m. Eastern Time.  Today is

10   July 20th, 2022.                                        10:58:57

11          Please note that this deposition is being

12   conducted virtually.  The quality of recording depends on

13   the quality of camera and internet connection of

14   participants.  What is seen from the witness and heard on

15   screen is what will be recorded.  Audio and video         10:59:11

16   recording will continue to take place unless all parties

17   agree to go off the record.

18          This is Media Unit 1 of the video-recorded

19   deposition of Michael Lasinski, taken by counsel for

20   Defendant, in the matter of Chasom Brown versus Google     10:59:26

21   LLC, filed in the United States District Court, Northern

22   Division of California, San Jose (sic), Case Number

23   4:20-cv-03664-YGR-SVK.

24          This deposition is being conducted remotely

25   using virtual technology.                                 10:59:53
```

Page 8

1          My name is Robert Fenton, representing Veritext

2     Legal Solutions, and I am the videographer.  The court

3     reporter is Leslie Rosas from the firm Veritext Legal

4     Solutions.  I am not related to any party in this action,

5     nor am I financially interested in the outcome.          11:00:09

6          If there are any objections to proceeding,

7     please state them at the time of your appearance.

8     Counsel and all present, including remotely, will now

9     state their appearances and affiliations for the record,

10    beginning with the noticing attorney.                    11:00:24

11         MS. TREBICKA:  Viola Trebicka, Quinn Emanuel,

12    for Google.

13         MR. LEE:  Good morning.  James Lee from Boies,

14    Schiller & Flexner for the plaintiffs, and John Yanchunis

15    from Morgan & Morgan also here for the plaintiffs.       11:00:35

16         MS. TREBICKA:  Teuta, can you also announce

17    yourself for the record?

18         MS. FANI:  Yes.  Teuta Fani with Quinn Emanuel

19    for Google, and we also have Angela Peterson also from

20    Quinn Emanuel.  She's a summer associate.  As well as    11:00:54

21    Denisha Bacchus, inhouse counsel at Google, and Christina

22    Bartlett with Analysis Group.

23         THE REPORTER:  Thank you.

24         I also see a Sharon Cruz.

25         MS. CRUZ:  Good morning.  My name is Sharon         11:01:17

Page 9

CONFIDENTIAL

```
 1    Cruz.  I am here observing on behalf of the California

 2    plaintiffs.  I'm with DiCello Levitt Gutzler.

 3              THE VIDEOGRAPHER:  Thank you.

 4              Will the court reporter please swear in the

 5    witness and then counsel may proceed.                    11:01:31

 6              THE REPORTER:  And I see Amna Qamer.

 7              MS. QAMER:  Hi.  Good morning.  I'm a summer

 8    associate with Boies Schiller, and I'll be observing

 9    today.

10              THE REPORTER:  Thank you.

11              Mr. Lasinski, if you would raise your right

12    hand, please, I'll swear you in.

13              Thank you.

14              You do solemnly state that the evidence you

15    shall give in this matter shall be the truth, the whole

16    truth and nothing but the truth, so help you God?

17              THE WITNESS:  I do.

18              THE REPORTER:  Thank you, sir.

19              You may proceed, Counsel.

20              MS. TREBICKA:  Thank you.                       11:01:59

21

22                        EXAMINATION

23    BY MS. TREBICKA:

24        Q.  Good morning, Mr. Lasinski.

25        A.  Good morning.                                     11:02:03
```

Page 10

CONFIDENTIAL

1          Q.   Good to see you here today.

2               Is anyone in the room with you today?

3          A.   No, there is not.

4          Q.   Are you at home?

5          A.   No, I'm in my office.                          11:02:15

6          Q.   Understood.

7               Mr. Lasinski, what browsers do you usually use?

8          A.   I usually use --

9               MR. LEE:  Object to the form, vague -- sorry

10     about that.                                             11:02:26

11              Objection to form, vague as to time.

12              Go ahead.

13              THE WITNESS:  I usually use Safari and Chrome.

14         Q.   BY MS. TREBICKA:  How long have you been using

15     these two browsers each?                               11:02:41

16         A.   For many years.  I'm not sure exactly how long.

17         Q.   Which one did you start using first, Safari or

18     Chrome?

19         A.   I would imagine Chrome.

20         Q.   Did you start using it before 2016?           11:03:00

21         A.   I think so.

22         Q.   But you're not certain?

23         A.   No, I would have used it before 2016.

24         Q.   What about Safari, did you use it before 2016?

25         A.   I don't know.  I don't recall if I did or did  11:03:24

                                                       Page 11

1    not.

2        Q.  Have you ever used the private browsing mode of

3    Chrome?

4        A.  Yes, I have.

5        Q.  Under what circumstances have you used the        11:03:36

6    private browsing mode of Chrome?

7            MR. LEE:  Objection to form, vague.

8            THE WITNESS:  I've used -- I have used it

9    recently to -- as part of this case, and then I've used

10   it before that as well.                                   11:04:02

11       Q.  BY MS. TREBICKA:  So setting aside your use of

12   Safari -- of the Chrome browser private browsing mode as

13   part of this case, for personal uses did you use the

14   Chrome private browsing mode, also known as Incognito, in

15   the last six months?                                      11:04:24

16       A.  Not -- no.  If I set aside this case, I have

17   not.

18       Q.  What about in the past five years?  Have you

19   used the Chrome private browsing mode in the past five

20   years for personal purposes?                              11:04:39

21       A.  I would think so, yes.

22       Q.  How many times?

23       A.  I don't know the answer to that.

24       Q.  How come?  Why don't you know?

25       A.  Because I don't --                                11:04:57

                                                       Page 12

1           MR. LEE:  Objection to form, argumentative.

2           Go ahead and answer, if you can.

3           THE WITNESS:  Because I don't keep statistics on

4     how often I go into private browsing mode.

5       Q.  BY MS. TREBICKA:  Generally speaking, in the          11:05:10

6     past five years when you've used Chrome private browsing

7     mode, what kinds of browsing have you used it for?

8           MR. LEE:  Beyond the scope of his opinions.

9           THE WITNESS:  One thing I use it for is when I'm

10    browsing for golf equipment.                                11:05:41

11      Q.  BY MS. TREBICKA:  Anything else?

12      A.  I cannot -- I mean, as I'm sitting here, I

13    cannot recall anything else.

14      Q.  Why do you use it when you browse for golf

15    equipment?                                                  11:06:00

16          MR. LEE:  Same objection.

17          THE WITNESS:  For two reasons:  One is because I

18    don't want anyone to know that I'm browsing for golf

19    equipment.  And, two, I know exactly what I'm looking

20    for, and so I don't want anything to come up that would     11:06:14

21    be different from what I'm looking for.

22      Q.  BY MS. TREBICKA:  When you say I don't want

23    anyone to know that you're browsing for golf equipment,

24    what do you mean by that?

25      A.  Well, I don't -- I want to go straight to the        11:06:41

                                                          Page 13

CONFIDENTIAL

1    websites that I want to go to.  I don't want any

2    advertisements for any different websites.  And so I -- I

3    don't want -- I -- I just want to go right where I want

4    to go.  I don't want to be bothered with anything else.

5         Q.  And in private browsing mode, is that -- on the        11:07:05

6    Chrome browser, is your expectation accomplished?

7              MR. LEE:  Calls for speculation.

8              THE WITNESS:  I don't -- I don't recall the

9    answer to that.

10        Q.  BY MS. TREBICKA:  So you don't recall whether in        11:07:20

11    private browsing mode you have been receiving

12    advertisements for golf equipment?

13             MR. LEE:  Asked and answered.

14             THE WITNESS:  I don't.

15        Q.  BY MS. TREBICKA:  You said that you don't want         11:07:31

16    anyone to know that you're browsing for golf equipment.

17    Who do you mean by "anyone"?

18        A.  I mean everyone.  I -- I don't want any person

19    and/or computer saving my -- my information.  I just want

20    to go straight to where I want to go, and I want it to be         11:07:52

21    just my own search.

22        Q.  Has your use of private browsing mode changed

23    over time?  Over the last five years, let's say.

24        A.  Well, certainly it has over the last six months

25    while I've been working on this case.                             11:08:18

                                                        Page 14

1      Q.  How has it changed over the last six months?

2      A.  I only use it for this case now.

3      Q.  Have you ever used Safari private browsing mode?

4      A.  I believe that I have, yes.

5      Q.  When have you used Safari private browsing mode?    11:08:48

6      A.  Similar to my answer for Chrome.

7      Q.  And that is -- well, let's tease that out a

8   little bit.

9          Have you used Safari private browsing mode in

10  the last six months?                                        11:09:06

11     A.  I believe that I have, yes.

12     Q.  Setting aside for purposes of this case, have

13  you used Safari private browsing mode in the last six

14  months?

15     A.  I don't recall that I have, no.                      11:09:22

16     Q.  Setting aside for purposes of this case, have

17  you used Safari in the last five years -- private

18  browsing mode in Safari?

19     A.  I believe that I have, yes.

20     Q.  How many times have you done so?                     11:09:35

21     A.  Again, I don't keep statistics, so I don't know

22  the answer to that.

23     Q.  Do you have even an approximate answer?

24     A.  I -- I would not.  No, I cannot.

25     Q.  Any answer would be pure speculation?               11:09:51

1        A.  I --

2             MR. LEE:  Outside the scope.

3             THE WITNESS:  I just haven't -- I just haven't

4    thought about it, so I just don't keep track.

5        Q.  BY MS. TREBICKA:  And what kinds of purposes do        11:10:07

6    you use the private browsing mode of Safari?

7        A.  I mean, again, I -- similar to Chrome, to browse

8    for golf equipment.

9        Q.  Anything else that you can think of that you've

10   used the private browsing mode of Safari in the last five      11:10:30

11   years?

12            MR. LEE:  Beyond the scope.

13            THE WITNESS:  I do believe that also when I've

14   been at home looking at some of my financial websites,

15   where my brokerage accounts are, I -- I look at that           11:10:52

16   through private browsing mode.

17       Q.  BY MS. TREBICKA:  Why do you use private

18   browsing mode to look at your -- at the financial

19   websites that have your brokerage accounts?

20            MR. LEE:  Same objection.                             11:11:09

21            THE WITNESS:  I mean, again, because I don't

22   want anyone knowing that I went to the website or

23   tracking any of my information or keeping any of my

24   information.

25       Q.  BY MS. TREBICKA:  Mr. Lasinski, what is your          11:11:33

                                                        Page 16

1    assignment in this case?

2        A.   My assignment in this case is to calculate the

3    damages as it relates to -- to types of harm.  One is

4    unjust enrichment, which I understand is available

5    through breach of contract and -- through disgorgement        11:12:09

6    through breach of contract.  One is actual harm through

7    restitution that's available through restitution damages.

8    One is to calculate -- a third is to calculate bases to

9    which statutory damages could be applied.  And one is --

10   and one is to determine methods of apportionment should        11:12:46

11   unjust enrichment or actual harm be awarded in this case.

12            Further, I've outlined my assignment in my

13   report.  So to the extent that I missed anything just

14   now, it would be outlined in my report.

15       Q.   You mentioned that one of your -- you mentioned        11:13:22

16   that your assignment in this case is to calculate the

17   damages as it relates to, one, unjust enrichment which

18   you understand is available through breach of contract.

19            Is your understanding that unjust enrichment is

20   available for any other claim in this case?                     11:13:52

21            MR. LEE:  Objection to form, calls for a legal

22   conclusion.

23            THE WITNESS:  It may be available through

24   other -- other areas of the case.  However, I do know

25   that it's available through breach of contract.                 11:14:45

Page 17

1     Q.  BY MS. TREBICKA:  How do you know that it's

2  available through breach of contract?

3     A.  Because I've worked on numerous breach of

4  contract cases in the past, as well as discussions with

5  counsel on this case.                              11:15:01

6     Q.  So setting aside discussions with counsel in

7  this case, is one of your opinions in this case that

8  unjust enrichment damages are available for a breach of

9  contract claim?

10    A.  I think you're asking me for a legal conclusion    11:15:18

11  there.  But my understanding from the work that I've done

12  in other cases, as well as here, that unjust enrichment

13  or disgorgement is available through breach of contract.

14    Q.  I'm only asking you for your opinion.  Is one of

15  your opinions in this case that unjust enrichment damages    11:15:37

16  are available for a breach of contract claim?

17        MR. LEE:  Asked and answered.

18        He just told you.

19        THE WITNESS:  Again, I'm not -- I'm not a

20  lawyer, so -- and I'm not trying to tie it to specific    11:15:48

21  areas of the case.  My understanding is that breach of

22  contract -- that unjust enrichment could be available

23  through breach of contract.

24        But I'm not actually offering an opinion on

25  that, I'm just offering an opinion on what the unjust    11:16:05

Page 18

1   enrichment would be if it's awarded.

2        Q.  BY MS. TREBICKA:  So you are not offering an

3   opinion that unjust enrichment is available for a breach

4   of contract claim?

5        A.  I am not offering legal opinions.  My -- my          11:16:19

6   understanding is that that would be a legal opinion.

7             What I am doing is quantifying the amount of

8   damages in this case -- that may be available in this

9   case.

10       Q.  You also mentioned actual harm.  Is your            11:16:34

11  quantification of actual harm your restitution opinion?

12  Are those one and the same?

13       A.   In this case, I have not -- yes, I've calculated

14  actual harm as restitution damages.

15       Q.  So there is no other quantification of actual        11:16:50

16  harm that you have offered or plan to offer, other than

17  your restitution opinion?

18       A.  I have not -- yes, I have not quantified any

19  other actual harm.

20       Q.  Let's turn to -- actually, let me ask you,           11:17:10

21  Mr. Lasinski, is there any paper in front of you right

22  now?

23       A.  Yes, there is.

24       Q.  And what is it?

25       A.  I have a copy of my report that I printed from       11:17:19

Page 19

CONFIDENTIAL

1    the PDF that was sent.  And then I have a copy of

2    Mr. Strombom's report that I received.

3        Q.  Are those annotated copies with your notes?

4        A.  There are no notes, no.  It's the actual just

5    straight PDF that was sent.                            11:17:40

6        Q.  Any other paper on your desk?

7        A.  Well, there is a box of tissues.  And just for

8    completeness, there is a thing of Post-it Notes.

9        Q.  Those qualify as paper, so thank you.

10       A.  I'm just trying to be complete.  So, yes, that    11:17:59

11   is paper.

12       Q.  You're being very precise.

13           Let's turn to your report, which I will mark as

14   Exhibit 1 to this deposition -- or, actually, it's been

15   premarked so I don't need to mark it.                   11:18:14

16           But it is on the Veritext Exhibit Share website.

17   Feel free to use that copy or the copy in front of you.

18       A.  I would like to just open it up on the website

19   to make sure that I have the ability to do so.

20           Okay.                                           11:19:00

21       Q.  All right.  So turn your attention to

22   paragraph 11 in your report, which is on page 4.

23           And if you could silently read along as I read

24   it into the record.

25           Paragraph 11 states:  "My assignment in this    11:19:16

                                                      Page 20

1    matter includes assessing the feasibility of identifying

2    and quantifying various measures of monetary relief tied

3    to Plaintiffs' claims, including that which I have

4    described below as Google's unjust enrichment,

5    Plaintiffs' actual damages, and statutory damages."          11:19:33

6          You say in the very first few words that your

7    assignment includes the following, what you've put in

8    your report.  Is there anything that your assignment also

9    includes that hasn't been explicitly stated in your

10   report?                                                      11:19:55

11         MR. LEE:  I'm sorry, what -- you cut out for me,

12   Viola.  What was your question?

13       Q.  BY MS. TREBICKA:  Is there anything in your

14   assignment that you've done for this case that has not

15   been explicitly stated in paragraph 11 of your report?      11:20:14

16         MR. LEE:  Objection to form, vague.

17         You know what, Viola, while Mr. Lasinski's

18   reviewing his report, I will disclose to you that he has

19   reviewed the deposition transcript of Sabine Borsay, the

20   deposition of which was taken after he had issued the        11:21:26

21   report.

22         THE WITNESS:  So just for completeness,

23   paragraph 11 is my assignment.  But I want to ensure that

24   it is not considered exclusive of my Section 10 of my

25   report, which is apportioning monetary relief to the         11:22:16

                                                        Page 21

1    class.  I also have provided an opinion on that as well.

2        Q.  BY MS. TREBICKA:  Understood.

3            And apportioning the monetary relief to the

4    class, does that include the unjust enrichment damages?

5        A.  It -- so it certainly would be one way of          11:22:44

6    allocating the unjust -- it identifies two ways of

7    allocating the unjust enrichment damages, yes.

8        Q.  What other -- as far as your apportionment

9    opinion, which you said you wanted to make sure was not

10   excluded, what damages that you quantify do you apportion   11:22:58

11   to the class?

12           When I say "what damages," I mean what types of

13   damages.

14       A.  Well, for -- for that section of the report,

15   Section 10, I am talking about either unjust enrichment    11:23:34

16   damages or restitutionary damages or actual harm.

17       Q.  If you could direct your attention to footnote 6

18   on that same page, page 4.

19       A.  Yes.

20       Q.  If you -- and if you could read silently while    11:24:02

21   I'm reading pieces of the footnote into the record.

22           You say that, "I understand from discussions

23   with Mr. Hochman that Mozilla took various steps to block

24   Google tracking beacons within the Firefox browser."

25           Do you see that?                                   11:24:23

                                                         Page 22

1      A.   Yes.

2      Q.   And the sentence preceding that, you say that,

3  "The private browsing mode offered on the Firefox browser

4  is excluded from other private browsing modes as the term

5  is used in this report."                          11:24:34

6          Do you see that?

7      A.   Yes.

8      Q.   And is your exclusion of the Firefox private

9  browsing mode a result of your conversation with

10 Mr. Hochman about Mozilla's various steps to block      11:24:44

11 tracking beacons?

12     A.   Yes, it is.

13     Q.   What did Mr. Hochman tell you about Mozilla's

14 steps to block Google's tracking beacons?

15         MR. LEE:   Objection.  The document speaks for    11:25:10

16 itself.

17         THE WITNESS:   Should I go ahead and answer that,

18 then, or --

19     Q.   BY MS. TREBICKA:   Yes.

20     A.   In performing my analysis, I was determining    11:25:48

21 which browsers, in addition to Chrome, should be

22 considered for unjust enrichment.  And I discussed that

23 with Mr. Hochman.

24         He had indicated -- he indicated that in some

25 instances, Mozilla took exactly what it says here,    11:26:26

Page 23

CONFIDENTIAL

1    various steps to block Google tracking beacons within the

2    Firefox browser.

3            If you read the next sentence that we haven't

4    read into the record, he indicated that Google may have

5    been intermittently successful in attempts to circumvent    11:26:51

6    Mozilla's efforts in this regard.  But because -- because

7    it wasn't 100 percent successful, I made the

8    determination not to include Firefox.

9        Q.  Did you make the determination to exclude any

10   other browsers from your unjust enrichment damages or      11:27:37

11   statutory damages assessment?

12           MR. LEE:  Objection.  Compound.

13           THE WITNESS:  Certainly other browsers are

14   excluded.  I've only included Safari and Edge.

15       Q.  BY MS. TREBICKA:  In your view, is the Firefox      11:28:08

16   browser a more private browser?

17       A.  I don't have a view on that.  That's outside the

18   scope of my report.

19       Q.  So the only reason that you excluded the

20   Firefox browser is because in your conversations with      11:28:22

21   Mr. Hochman, Mozilla took various steps to block Google

22   tracking beacons from the Firefox browser?

23           MR. LEE:  Objection to form, mischaracterizes

24   his prior testimony, mischaracterizes the footnote.

25           THE WITNESS:  I don't agree with that.           11:28:39

                                                    Page 24

CONFIDENTIAL

1        Q.  BY MS. TREBICKA:  What do you not agree with?

2   What part of my question do you not agree?

3        A.  In -- in coming to the conclusion of which

4   browsers to include, I had a discussion with Mr. Hochman

5   about Firefox.  Based on his representations to me, I        11:29:06

6   determined to exclude it -- determined it was appropriate

7   to exclude it.

8        Q.  Turn your attention to -- well, before we do

9   that, you're familiar with Plaintiffs' Operative

10  Complaint in this lawsuit; correct?                          11:29:35

11       A.  I have read their Complaint.

12       Q.  And it's the Third Amended Complaint, I believe,

13  the Operative Complaint?

14       A.  That is my understanding.

15       Q.  And you know that the Complaint outlines to       11:29:49

16  putative classes that it seeks to certify?

17       A.  That is my understanding.

18       Q.  Class 1 is roughly related to -- or includes

19  Incognito users; correct?

20       A.  I think that there are other restrictions or      11:30:13

21  other qualifications to the class.  But my understanding

22  is one of the qualifications is -- is to be an Incognito

23  user.

24       Q.  And class 2, one of the qualifications or

25  limitations to class 2 is that it includes users of         11:30:30

1   non-Chrome browsers in private browsing mode; correct?

2        A.   That is my understanding.

3        Q.   And you're aware that the definition of class 2

4   in the Operative Complaint is not limited to just Safari

5   and Edge users; correct?                              11:30:57

6             MR. LEE:  Objection to form.

7             THE WITNESS:  My understanding is that it

8   relates to non-Chrome browser users, not just Safari or

9   Firefox -- I'm sorry, Safari or Edge.

10       Q.   BY MS. TREBICKA:  So you are not quantifying    11:31:26

11  damages for all members of proposed class 2, in your

12  opinion; correct?

13            MR. LEE:  Objection to the extent it calls for a

14  legal conclusion.

15            THE WITNESS:  So to the extent -- I have        11:31:53

16  quantified Safari and Edge users.  I have not quantified

17  other browsers.

18       Q.   BY MS. TREBICKA:  One of the limitations or

19  requirements to belong in the class is to have used

20  private browsing mode from June 2016 to the present;     11:32:14

21  correct?

22            MR. LEE:  Which class?

23       Q.   BY MS. TREBICKA:  Both classes.

24       A.   I do believe that that is accurate.

25       Q.   And as long as a user has used private browsing  11:32:28

                                                    Page 26

1    mode once during the class period, which is June 2016 to

2    the present, that user would satisfy that requirement;

3    correct?

4        A.  I mean, I'm not making any kind of legal

5    conclusion here.  This sounds like you're asking me to          11:32:54

6    define something that's in -- in the Complaint.  I don't

7    have any dispute with that, as I sit here.

8        Q.  That's fair.

9            The better question would be:  As long as a user

10   has used private browsing mode once during the class            11:33:11

11   period, that user would satisfy that requirement, the

12   requirement of being a private browsing user, for

13   purposes of your quantification of damages?

14           MR. LEE:  Objection to form to the extent it

15   calls for a legal conclusion.                                   11:33:35

16           THE WITNESS:  I think that that -- I think that

17   that's a fair representation.

18       Q.  BY MS. TREBICKA:  Turn your attention to

19   footnote 5 now, please.

20           And about halfway through, the definition of           11:33:52

21   class 2 starts.  Well, it includes both definition of

22   class 1 and class 2.

23           So let's actually start with class 1.  On the

24   fourth line down -- and feel free to read it silently.

25   I'm not going to read it into the record.                      11:34:18

Page 27

```
1              But about the fourth line down, it states that

2      one of the requirements for belonging to the class is

3      that -- "Whose communications, including identifying

4      information and online browsing history, Google

5      nevertheless intercepted, received or collected from       11:34:35

6      June 21, 2016, through the present."

7              And I'm not representing that I'm reading the

8      whole class definition.  I'm just reading parts of what

9      I'd like to ask you a question about.

10             Do you see that?                                    11:34:52

11         A.  I see where you read.

12             MR. LEE:  And if you're going to ask about the

13     definition, I would ask Mr. Lasinski to read the whole

14     class definition before he answers questions.

15         Q.  BY MS. TREBICKA:  Do you understand what           11:35:01

16     identifying information refers to in this class

17     definition?

18             MR. LEE:  Could you repeat the question, Viola?

19         Q.  BY MS. TREBICKA:  Do you understand what

20     identifying information refers to in this class           11:35:22

21     definition?

22         A.  I think as a technical term, I don't -- I don't

23     have -- I would not have a technical definition.  I

24     don't --

25         Q.  So you have no --                                  11:36:35
```

                                                          Page 28

```
 1        A.  I don't know how to define that.

 2        Q.  You have no understanding of that term, for

 3   purposes of your opinion?

 4            MR. LEE:  Objection to form, mischaracterizes.

 5            THE WITNESS:  I do have a general understanding     11:36:52

 6   of how information is identified and transmitted through

 7   my discussions with Mr. Hochman.  However, I'm not a

 8   technical expert, so I don't -- cannot technically define

 9   this.

10        Q.  BY MS. TREBICKA:  You weren't asked to assume      11:37:18

11   what identifying information means in this case?

12        A.  In this case, I was asked to assume that there

13   are certain types of information that are identified and

14   then intercepted, received and collected.  And I've taken

15   that as an assumption in -- in making my calculations.      11:38:08

16        Q.  Okay.  It also says here, "An online browsing

17   history."

18            Do you see that?

19        A.  Yes, I do.

20        Q.  Yeah.                                               11:38:31

21            Do you understand that to be synonymous with

22   identifying information?

23        A.  My understanding is that identifying information

24   and that online browsing history is the type of

25   information that could be identified -- or would be         11:38:56
```

Page 29

1    identified.

2        Q.  So online browsing history, in your

3    understanding, is identifying information?

4        A.  No.  It's the type of -- it's the type of

5    information that is intercepted, received or collected.    11:39:21

6        Q.  So online browsing history is not necessarily

7    identifying information?

8        A.  Oh, online browsing history may be identifying

9    information.  I have not -- I'm not a technical expert,

10   so I'm not the one to determine whether or not it's      11:39:43

11   identifying information or not.

12       Q.  And in the context of your opinion, do you

13   understand that online browsing history at issue in this

14   class definition relates to the browsing history while a

15   user is in private browsing mode alone?                  11:40:02

16       A.  Yes, I do.  My calculations are very aware of

17   that.  I make a number of adjustments to ensure that that

18   is the case.

19       Q.  Earlier, just a few minutes ago, you testified

20   that you were asked to assume that there are certain      11:40:25

21   types of information that are identified and then

22   intercepted, received and collected.  Do you recall that?

23       A.  Yes.

24       Q.  Are those the types of information that are

25   outlined in the Complaint?  And let me -- why don't I     11:40:41

Page 30

1    just mark the Complaint as the next exhibit, Exhibit 2.

2          (Exhibit 2, Exhibit A, Third Amended Complaint,

3          marked for identification electronically by

4          counsel.)

5          MR. LEE:  Asked and answered.                    11:40:53

6    Q.  BY MS. TREBICKA:  So the exhibit --

7    A.  Hold on.  Nothing's coming up yet.  I guess I

8    have to do some sort of refresh?

9    Q.  Perhaps.  And the exhibit will be coming up for

10   you shortly.                                           11:41:15

11         But this is a standalone question:  Is it your

12   understanding that the types of information that are

13   outlined in the Complaint are the pieces of information

14   that you were asked to assume were identified and then

15   intercepted, received and collected?                   11:41:27

16         MR. LEE:  Wait.  Hold on.  Is this a new

17   question?  Are you withdrawing your first question?

18         MS. TREBICKA:  James, I'd actually ask that you

19   stop the speaking objections, because it's interfering

20   with the deposition which is slow as it is.            11:41:38

21         If Mr. Lasinski doesn't understand my questions,

22   he will tell me.  He's an expert witness.  He has a lot

23   of experience.  Please stop with the speaking objections.

24         MR. LEE:  Okay.  Well, for the record, I'll

25   object.  I'll just note that there are two questions    11:41:53

Page 31

1    pending and now an exhibit pending.

2            So if you're --

3            MS. TREBICKA:  That's enough.  I think that's

4    enough.

5            MR. LEE:  Excuse me.                              11:42:01

6            Mr. Lasinski, if you want to read the Complaint

7    to answer this question, go ahead.  It's marked as

8    Exhibit 2.

9        Q.  BY MS. TREBICKA:  So, Mr. Lasinski, my question

10   is:  Is it your understanding that the types of          11:42:13

11   information that you were asked to assume were identified

12   and then intercepted, received and collected, are the

13   same as those that Plaintiffs have outlined in their

14   Complaint?

15           MR. LEE:  Same objection.                         11:42:29

16           THE WITNESS:  Could you just repeat the question

17   one more time?

18       Q.  BY MS. TREBICKA:  Sure.

19           This is not -- I've marked the exhibit, the

20   Complaint.  But this is not -- I marked it for purposes   11:43:56

21   of time.  This question does not ask you to review the

22   Complaint.

23           This is -- without reviewing the Complaint right

24   now, do you have an understanding that the types of

25   information that you were asked to assume were identified 11:44:12

                                                 Page 32

```
 1    and then intercepted, received and collected, are the

 2    same as those that Plaintiffs have include in their

 3    Complaint?

 4           MR. LEE:  Calls for speculation.

 5           THE WITNESS:  I think you're asking me for a       11:44:38

 6    legal interpretation.

 7           What I did here was review the Complaint,

 8    discuss with Mr. Hochman, discuss with the attorneys the

 9    types of -- the types of information, and then determine

10    the amount, how that would impact ultimately Google's     11:45:00

11    traffic and their ability to monetize that traffic based

12    on a -- my understanding of the Complaint, my discussions

13    with Mr. Hochman, as well as counsel.

14       Q.  BY MS. TREBICKA:  Let me ask you to turn to

15    paragraph 63 in Exhibit 2, which is the Third Amended     11:45:30

16    Complaint.

17           And let me know when you're there.

18       A.  Okay.

19       Q.  It says here at line 13, "The Data Secretly

20    Collected."                                               11:45:53

21           Do you see that?

22       A.  I see where it says, "Data Secretly Collected."

23       Q.  And then paragraph 63 continues to outline

24    certain pieces of information that the message allegedly

25    intercepted from a user.  "Contains."                     11:46:06
```

Page 33

1          Do you see that?

2      A.  Yes, I do.

3      Q.  It starts with "a. The 'get request' sent from

4  the user's computer to the website."

5      A.  It does say that.  I don't know that that's a          11:46:24

6  question.  Is that a question?

7      Q.  Do you understand that this is one of the pieces

8  of information you were asked to quantify damages for,

9  the receipt of which you were asked to quantify damages

10  for?                                                          11:46:43

11          MR. LEE:  Objection to form, asked and answered.

12          Answer again, if you can.

13          THE WITNESS:  So, again, this is a technical

14  question.  To the extent that this is analyzed by

15  Mr. Hochman and counsel and this results in information      11:47:23

16  that would then be translated into unjust enrichment

17  under my calculations, yes, then this would be one of the

18  pieces of information that was quantified.

19          But the technical translation from going from a

20  'get request' to my damages analysis is just that.  It's    11:47:54

21  a combination of working with Mr. Hochman as well as

22  counsel to make sure that the footprint of what I am

23  calculating is appropriate.

24      Q.  BY MS. TREBICKA:  And moving on to the next --

25  to b on the next page, says, "The IP address of the          11:48:14

                                                          Page 34

 1    user's connection to the internet."

 2          My question is the same:  Do you understand that

 3    this is one of the pieces of information that you were

 4    asked to quantify damages for?

 5          A.  I will answer it the same way as I answered the          11:48:37

 6    last question, which is, again, to the extent that this

 7    flows into both the technical and legal components of

 8    information that was collected, and then is -- and

 9    then is used, then, by Google to generate profits, for

10    example, yes, then this would be included in my          11:49:16

11    calculation.

12          Q.  Same questions with respect to items c through

13    f, which, for the record, are information identifying the

14    browser software that the user is using, including any

15    fingerprint data as described further below, infra, at          11:49:34

16    paragraphs 100 through 105.

17          "d.  Any 'user-ID' issued by the website to the

18    user, if available (as described further below, infra, at

19    paragraph 69)."

20          "e.  Geolocation of the user, if available (as          11:49:50

21    described further below, infra, at paragraphs 105 through

22    112)."

23          And "f.  Information contained in 'Google

24    cookies,' which were saved by the user's web browser on

25    the user's device at any prior time (as described further          11:50:06

Page 35

1    below, infra, at photographs 70 through 72)."

2         My -- my question is the same, which is:  Are

3    these pieces of information there you were asked to

4    quantify damages for -- the receipt of which you were

5    asked to quantify damages for?                          11:50:27

6         MR. LEE:  Compound.

7         THE WITNESS:  I mean, again --

8         THE REPORTER:  Excuse me.  Was there an

9    objection, Mr. Lee?

10        MR. LEE:  Yeah.                                     11:50:42

11        Compound.

12        THE WITNESS:  I would have to answer this the

13   same way.  I relied on technical discussions with

14   Mr. Hochman as well as with counsel to ensure that the

15   footprint of my analysis was consistent with the       11:50:52

16   footprint of the alleged wrongful conduct here.

17        Q.  BY MS. TREBICKA:  Do you quantify damages for

18   any of these pieces of information individually?

19        MR. LEE:  Objection to form, vague.

20        THE WITNESS:  In my analysis, I calculate          11:52:37

21   damages as it relates in certain instances to overall

22   traffic in Incognito mode.  I calculate damages as it

23   relates to damages that would stem from traffic that is

24   covered by site-wide tagging or first-party cookies and

25   third-party cookies.                                    11:53:13

Page 36

```
 1              And then I also calculate damages for traffic

 2     that is only covered by third-party cookies in my

 3     analysis.  That's the analysis that I performed based on

 4     my discussions with counsel, as well as -- for unjust

 5     enrichment counsel, as well as Mr. Hochman.              11:53:30

 6              And one of the ways -- one of the damages

 7     calculations is only related to information that is

 8     collected or covered -- traffic that is covered by

 9     third-party cookies.

10       Q.  BY MS. TREBICKA:  This relates only to your         11:53:52

11     unjust enrichment opinion, though; correct?

12              MR. LEE:  Objection.  Vague as to "this."

13              THE WITNESS:  I'm sorry.  Could you repeat the

14     question?

15       Q.  BY MS. TREBICKA:  Your explanation relates only     11:54:05

16     as to the unjust enrichment opinion; correct?

17       A.  For those three types of calculations, that --

18     that is correct.

19       Q.  So with respect to your restitution opinion, do

20     you quantify damages with respect to any of these pieces  11:54:32

21     of information individually?

22       A.  If you're asking do I break them out separately,

23     I do not break them out separately.

24       Q.  Does your methodology offer any way to quantify

25     damages -- restitution damages for any of these pieces of 11:55:05
```

                                                    Page 37

1   data individually?

2       A.  I think -- I think that that would be an

3   inappropriate way to apply restitution damages.  If any

4   of this information is collected during that period of

5   time, I think that the full restitution damages, the way      11:55:46

6   I calculate it, would be applicable.

7           So I think it would be inappropriate to try to

8   do that separately.

9       Q.  And you have, in fact, not attempted to do that

10  separately?                                                   11:56:00

11      A.  I think it would be inappropriate to do so, so I

12  did not do it.

13          MR. LEE:  Hey, Viola, we've been going for a

14  little bit.  Almost an hour.  I have to use the restroom

15  real quick.  Do you mind if we break for five minutes?        11:56:14

16          MS. TREBICKA:  Sure.  We can do that.

17          MR. LEE:  Go off the record.

18          THE VIDEOGRAPHER:  Going off the record at

19  11:56 a.m.

20          (Recess.)                                             12:03:47

21          THE VIDEOGRAPHER:  We are back on the record at

22  12:04 p.m.

23      Q.  BY MS. TREBICKA:  Mr. Lasinski, before the

24  break, we were discussing pieces of information that you

25  have attempted to quantify in your damages opinion.  So       12:04:05

Page 38

1    in the same vein of questions, I have a hypothetical for

2    you.

3         Let's assume a user who is in private browsing

4    mode, let's call it Incognito, Chrome browser -- private

5    browsing mode, and not signed into her Google account,       12:04:23

6    visits Google.com and does a search.

7         Would you agree that Google receives certain

8    data from that user when she does the search?

9         A.  My --

10        MR. LEE:  Objection.                                     12:04:44

11        I'm sorry.

12        Objection.  Beyond the scope.

13        Go ahead.

14        THE WITNESS:  That's not inconsistent with my

15   understanding.                                                12:04:57

16        Q.  BY MS. TREBICKA:  And that user may also be

17   shown an ad?

18        A.  That could be possible.

19        Q.  Now, is that data that Google receives when a

20   user in this scenario does a search part of the data that    12:05:12

21   you are trying to quantify damages for?

22        A.  No.  It would not -- I would not have quantified

23   damages in that case.  At least as it pertains to my

24   unjust enrichment, it would not.

25        Q.  What about as it pertains to your restitutionary    12:05:42

Page 39

1    damages?

2         A.  It is potentially included, although it's a --

3    that seems like a very Edge case that is not -- not going

4    to be the way the vast majority of people use the

5    internet would be -- would be included.  That would just          12:06:36

6    be a very Edge case.

7         Q.  What is your basis for stating that it would be

8    an Edge case?

9         A.  My discussions with Mr. Hochman.  That's not the

10   way people search the internet, just go to Google.com do          12:06:48

11   one search and then leave and don't even click on

12   anything, just exit and leave.  As well as just personal

13   knowledge of how people search the internet.

14        Q.  So similar scenario:  A user is in private

15   browsing mode, not signed into her Google account, visits         12:07:19

16   Google.com, does a search, is displayed an ad and then

17   clicks on the ad to go to a third-party website.

18             Would the data that Google receives in that

19   scenario be included in your restitution opinion?

20        A.  So, I mean, this line of questioning is kind of          12:08:12

21   odd, because what my restitution opinion actually is is

22   calculating the number of unique monthly browser

23   instances.

24             And so you're asking, is that included?  Well,

25   potentially it could be included.  But it's -- it's --          12:08:34

Page  40

1    you know, if somebody were on the internet and they

2    browse for 7 times or 12 times or whatever, over that

3    month in Incognito --

4         I'm assuming -- I hope that we're together.  I'm

5    assuming that you meant in Incognito mode here, because I    12:08:54

6    was -- and I think that you did say that.  And so if I

7    forget that, I assume that you did mean Incognito mode.

8    Is that correct?

9         Q.  I meant private browsing mode, either Incognito,

10   Safari or Edge.                                              12:09:13

11        A.  Okay.  Okay.  Maybe -- could we just do one

12   thing, though?  I want to be -- because I didn't listen

13   for that in the question.

14        You know, if you don't mean Incognito mode or

15   private browsing mode, can you just be sure to, like,      12:09:23

16   say, "I don't mean private browsing mode"?  Because a lot

17   of times in this case I've just been thinking Incognito

18   mode -- you know, Incognito mode, but --

19        So I just want to make sure that we are on the

20   same page here.                                              12:09:38

21        Q.  That's fair.  I think what you're saying is that

22   most of our conversation will revolve around the three

23   private browsing modes for which you quantify damages,

24   Incognito, the Safari browsing mode and the -- private

25   browsing mode and the Edge private browsing mode.           12:09:54

                                                      Page 41

1          A.   Right.  I just want to make sure that I don't --

2    I could answer a question incorrectly because I could

3    assume that it's Incognito mode or private browsing mode,

4    and it's not.

5          Q.   I think you can safely -- I don't want to say        12:10:10

6    assume, because obviously you need to listen to my

7    question very carefully.  But most of our conversation

8    will involve private browsing modes.  I will make it

9    clear in my question whether it's private browsing mode

10   or regular browsing.  And I will make it extra clear if      12:10:24

11   I'm talking about all browsing, including regular

12   browsing.

13         A.   Okay.  Okay.

14         Q.   But my question was actually a specific

15   limitation in the question, where I said that this -- the    12:10:35

16   hypothetical scenario involved a private browsing mode

17   user.

18         A.   Okay.  Could you repeat the question, though,

19   because I -- I was starting to answer, and then I

20   couldn't remember if you asked that question or not -- or    12:10:51

21   made that qualifier or not.

22         Q.   That's fine.

23              So user is in private browsing mode, not signed

24   into her Google account.  During the class period does a

25   search on Google.com, is shown an ad and clicks on that      12:11:03

Page 42

CONFIDENTIAL

1    ad.

2         So my question is:  Would that activity be

3    something that you are quantifying in your restitution

4    damages opinion?

5         MR. LEE:  Incomplete hypothetical.                12:11:20

6         Go ahead and answer.

7         THE WITNESS:  Well, I mean, again, I just want

8    to make clear what I'm doing in my restitution damages.

9    And that is looking at the number of unique monthly

10   browser instances.                                     12:11:44

11        So if that results in an instance, as collected

12   by a browser -- a browser, if that results in an

13   instance, yes, that could be included -- that would be

14   included.  But all the rest of their browsing that they

15   did that month also would be included in Incognito mode.  12:12:14

16   Because I'm only -- I'm only calculating one instance per

17   month.

18        So even if there were 24 instances and even if

19   they click on 37 websites in unique browsing mode, that

20   only counts as one instance.                           12:12:37

21     Q.  BY MS. TREBICKA:  And the same hypothetical --

22   do you need me to repeat it?

23     A.  I guess so, because I thought I just answered

24   the question.

25     Q.  No, now the question is:  Would it be included   12:12:53

Page 43

1    in your unjust enrichment damages model?  But it's the

2    same hypothetical.

3            MR. LEE:  Asked and answered.

4            THE WITNESS:  So if I'm -- if I'm understanding

5    the hypothetical correctly, they go -- just so -- just to    12:13:45

6    restate it, they go to private browsing mode, they go to

7    a website, and then that website -- and then that

8    website, they're displayed an ad, and then they go to

9    another website where that ad was displayed.

10           Q.  BY MS. TREBICKA:  Correct.                      12:14:06

11           A.  I think that it could be.  But the reality is I

12   take a lot of cuts.  And so -- in my -- in my analysis.

13   So, I mean, if it's something that they click on and

14   they -- like a mobile ad, that would not be included,

15   because I've cut that out of my analysis.  Any app         12:14:44

16   traffic I've cut out of my analysis.

17           So it really would depend on how that -- how

18   that actually all transpired.

19           Q.  That's fair, Mr. Lasinski.  And we'll be talking

20   in a lot more detail about the unjust enrichment damages    12:15:00

21   model.

22           Now, what is the injury for which you're

23   quantifying damages?

24           MR. LEE:  Vague, beyond the scope.

25           THE WITNESS:  I think you're asking for a legal      12:15:27

Page 44

1    conclusion there.

2        Q.  BY MS. TREBICKA:  You don't have any other

3    answer, other than one that you believe is a legal

4    conclusion?

5        A.  I do believe that it's a legal conclusion.  So        12:15:36

6    from an injury standpoint, my understanding is that

7    Google was unjustly enriched in this case, as well as

8    the -- the private browsing users were wrongfully -- had

9    their data wrongfully taken.

10       Q.  Is one of your assumptions that every user who        12:16:08

11   falls within the class definitions was actually harmed by

12   the alleged misconduct?

13       A.  Yes, every user was harmed.

14       Q.  Now, you understand that there's some

15   variability in what users believe or are aware of about        12:16:48

16   what they let Google collect?

17           MR. LEE:  Objection.  Compound.

18           THE WITNESS:  I don't -- I don't believe that

19   anyone is fully aware of what Google collects.

20       Q.  BY MS. TREBICKA:  Do you understand that there's        12:17:10

21   at least variability in what people are aware of, as far

22   as what Google collects?

23       A.  When you're talking about the class, I don't

24   think that they -- they -- I don't think that users would

25   understand what Google collects.  I don't think class        12:17:33

Page 45

1    users would understand what they collect or -- or are

2    aware of what they collect.

3        Q.  So your opinion is that no user is aware of what

4    Google collects when a user is in private browsing mode?

5        A.  I don't think that they could be aware of what      12:17:56

6    Google collects.  I don't think Google -- I mean, I read

7    the testimony of Ms. Borsay.  She doesn't even know what

8    Google collects, and she's a key person in their private

9    browsing mode group.

10           So users -- it would -- in my opinion, would be     12:18:16

11    beyond reasonable to assume that they're aware of what

12    Google is collecting.

13        Q.  So your assumption is that every single user in

14    the class has the same level of awareness of what Google

15    collects when they are browsing in private browsing mode?   12:18:34

16           MR. LEE:  Objection.  Mischaracterizes his prior

17    testimony.

18           THE WITNESS:  I don't think I have an assumption

19    that they -- I don't have to have an assumption what

20    level of awareness they -- they have.  I just know that    12:18:48

21    they're not aware.  And they can't -- they can't be

22    aware.

23           I'm not aware of any place, or I've -- and I've

24    searched the data to see if there's anywhere that Google,

25    like, publicly states:  Here's all the information that    12:19:06

Page 46

1    we collect on you when you're in private browsing mode.

2    I'm not aware of anything like that.

3            So I've talked to Mr. Hochman.  He's not aware

4    before this case what Google collects.  And probably is

5    still not aware of everything that they collect.          12:19:31

6            Ms. Borsay isn't aware of what is collected.  So

7    I -- I don't believe that any user can be aware of what

8    Google is collecting.

9        Q.  BY MS. TREBICKA:  Do you believe that some users

10   may be aware of some of the data that Google collects but   12:19:47

11   not other pieces, while they're in private browsing mode?

12       A.  I -- maybe some -- some people might suspect

13   that there's collection, but I don't think that they

14   could be aware, because I don't think it's published

15   anywhere.  So I don't know how they could be aware of      12:20:10

16   what they collect.

17       Q.  What do you mean by "might suspect that there is

18   collection"?

19       A.  Well, people -- I mean, certainly there's press

20   from this case right now.  That's out there.  So people    12:20:26

21   know that something is going on here.  People may just be

22   paying attention to that, and so they might suspect

23   something is going on.  But they cannot be aware of what

24   is going on, in my opinion.

25       Q.  So in your opinion, would users know, for          12:21:16

Page 47

1    example, that Google knows their location when they are

2    in an Incognito mode session?

3        A.  I -- I don't have an opinion on what specific

4    users know or don't know.

5            Again, I'm not -- I haven't done a study of what    12:22:07

6    users would say that they know.  I mean, I think, again,

7    it would be hard to know something, because people aren't

8    aware of everything that Google is collecting.  They

9    can't be aware of it because it's not published.

10       Q.  Are you drawing a difference between the word    12:22:32

11   "aware" and "know"?

12       A.  I'm -- in that case, I don't think I was trying

13   to draw a difference between them.

14       Q.  So do you believe that Google -- that users are

15   aware that within an Incognito mode session, Google    12:22:55

16   learns things about the users to personalize their

17   experience when using Google products?

18           MR. LEE:  Calls for speculation, beyond the

19   scope.

20           THE WITNESS:  Could you repeat that question?    12:23:59

21       Q.  BY MS. TREBICKA:  Do you believe that Google

22   users are aware that within Incognito mode session,

23   Google is aware -- I apologize.  Let me start again.

24           Do you believe that Google users are aware that

25   within their Incognito mode session, Google knows    12:24:19

Page 48

1    their -- things about them in order to personalize their

2    experience when using Google products?

3        A.   I mean, I think if I'm understanding the

4    question correctly, you're asking me about what a user

5    would think when they go into Incognito.                    12:24:51

6            And, I mean, I'm just looking at my report, and

7    it says, "Chrome won't save the following information:

8    Your browser history, cookies and site data/information

9    entered into forums."

10           And so if you were to read -- if you were a user    12:25:06

11   and you were to read that definition, it would seem like

12   you would not be aware that they're actually using

13   information to personalize your web browsing history.

14       Q.   Okay.

15       A.   And I -- I'll also say that, you know, I read a    12:25:22

16   lot of the emails that were in this case, and it seems

17   like the Google people also understand that people don't

18   have an understanding of what is being collected.  And

19   their -- their expectations or awareness is different

20   than what Google Incognito mode actually does.              12:25:48

21           MS. TREBICKA:  Let me mark as Exhibit 3 --

22           (Exhibit 3, GOOG-CABR-04431207 - 271, marked for

23           identification electronically by counsel.)

24           MS. TREBICKA:  -- a Google document, which is

25   Tab 3 for tag purposes, with the Bates label              12:25:57

                                                        Page 49

1    GOOG-CABR-0443120.

2        Q.  Which I will represent to you is a document that

3    you cite in your report in footnote 75.

4            MR. LEE:  Give us a spell for a second, Viola.

5    It hasn't come in yet.                              12:26:27

6            THE WITNESS:  Okay.

7        Q.  BY MS. TREBICKA:  If you could turn to page 8 of

8    that document.  This is the page that I will represent to

9    you you cited in your report -- in footnote 77 -- 75 of

10   your report.                                        12:26:58

11       A.  Yes.

12       Q.  Have you seen this document before?

13       A.  I have.

14       Q.  Okay.  You recognize this document?

15       A.  I -- I do.                                  12:27:04

16       Q.  As one that you relied on?

17       A.  As one that I considered in my report, yes.

18       Q.  If you switch to -- or move to page 9, which is

19   the next page from the one that you cite in your

20   report --                                           12:27:19

21       A.  Yes.

22       Q.  -- the title says, "Chrome Incognito mode:

23   Understanding and misconceptions."

24           Do you see that?

25       A.  Yes.                                        12:27:27

Page 50

1     Q.  So if you review in the left table, it has --

2     the first column has the title "Percent Correct Answer."

3     A.  Yes.

4     Q.  Then the next column says, "Correct Answer."

5     And the following column says, "Weekly Incognito User."    12:27:51

6         Do you see that?

7     A.  You're asking me to look at this table.

8     Q.  I'm asking to situate you so that --

9     A.  Okay.

10    Q.  -- you know what we're talking about.    12:28:02

11    A.  Okay.  I'm -- I'm not -- I'm in the table but

12    I'm not sure what you're asking me yet.

13    Q.  I'm asking whether you see the -- there's two

14    tables.  Do you see that side-to-side?

15    A.  Yeah.    12:28:19

16    Q.  And I apologize.  The font is very small.

17    A.  Very small.

18    Q.  So you will have to blow it up.  And if you blow

19    it up, please focus on the left-hand table.

20    A.  Uh-huh.    12:28:31

21        Okay.

22    Q.  So the left-hand table starts with -- the very

23    first statement in the table that I'd like you to focus

24    on, says, "Within my Incognito mode session, Google

25    websites will not use what they know about me from    12:28:47

Page 51

```
 1    activities before entering Incognito mode to personalize

 2    my experience."

 3            Do you see where I am?

 4    A.  Uh-huh.

 5    Q.  "Yes"?                                      12:28:55

 6    A.  I do.

 7    Q.  And the next statement says, "Within my

 8    Incognito mode session, Google knows my location so

 9    search results in Maps, Chrome and other Google products

10    can be specific to my current location."          12:29:09

11            Do you see that?

12    A.  Yes.

13    Q.  And do you see where it says that the correct

14    answer is "true"?

15    A.  I -- I see where it says the correct answer is  12:29:19

16    "true," yes.

17    Q.  And then the next column under "Weekly Incognito

18    User," it says, ███████████

19    A.  Yes.

20    Q.  And the -- this is ███████████ of the weekly   12:29:34

21    Incognito users found the correct answer, so understood

22    that this is what Google would do within an Incognito

23    mode session; correct?

24            MR. LEE:  Objection to form, mischaracterizes

25    the document, lack of foundation.                 12:29:49
```

Page 52

```
1              THE WITNESS:  I see what you're saying.  If

2     you're asking if it does say, ███████████ it does say,

3     ██████████

4         Q.  BY MS. TREBICKA:  So the document, at least,

5     says that ██████████ of weekly Incognito users understood    12:30:20

6     that within an Incognito mode session, Google knows their

7     location; correct?

8              MR. LEE:  Could you repeat that question?

9              MS. TREBICKA:  Mr. Lee, you're aware of

10    something that's called Remote Counsel that Veritext       12:30:41

11    makes available?  And it would lower the instances of

12    interruptions if you had that open and would be able to

13    see my question.  The reporter is doing a very nice job

14    of taking it down.

15             MR. LEE:  Leslie, can you read back the         12:31:00

16    question, please?

17             (The record was read by the reporter

18             as follows:

19             "QUESTION:  So the document, at least, says that

20             ██████████ of weekly Incognito users understood

21             that within an Incognito mode session, Google

22             knows their location; correct?")

23             MR. LEE:  Objection.  Mischaracterizes the

24    document.

25             THE WITNESS:  I don't think that it says that.   12:31:29
```

                                                        Page 53

1    Q.  BY MS. TREBICKA:  What do you believe it says?

2    A.  Well, my understanding of this document is this

3    document is a survey, and people are just, by definition,

4    in my opinion, guessing at what they might or might not

5    think Google knows.                                    12:31:55

6    Q.  And what is your --

7    A.  Because --

8        MR. LEE:  Hold on.

9        Were you done, Mr. Lasinski?

10       THE WITNESS:  No, no, no.                          12:32:03

11       Because, again, like I talked before, no one

12   knows.  So this is wrong.  I mean, your question is, in

13   my opinion, is wrong in that no one knows that that's

14   actually being collected.

15       These people might have guessed that it's being   12:32:17

16   collected, but I don't think anyone knows that.

17   Q.  BY MS. TREBICKA:  And the next cell in that same

18   table, says, "Within my Incognito mode session, Google

19   learns things about me in order to personalize my

20   experience when using Google products."                12:32:37

21       The correct answer is "T," so "true."  And it

22   says here that weekly Incognito -- ██████████ of weekly

23   Incognito users found the correct answer.

24       Do you see that?

25   A.  Yes.  I have the same answer to what I just        12:32:56

Page 54

1    gave.  ▮▮▮ -- it does show that ▮▮▮▮▮▮▮ answered true.

2        Q.  Now, if it is proven that some users were aware

3    that the at issue data would be collected and still

4    proceeded to use private browsing mode, how would that

5    affect your unjust enrichment damages opinion?              12:33:21

6        A.  I don't believe that it would.  I don't believe

7    that it would.

8        Q.  And what is your basis for your answer?

9        A.  So my basis -- that basis for that answer is I

10   don't believe that they could be aware, like I said        12:33:51

11   before.  But on -- and at the same time, even if they

12   suspected, like I talked about before, this doesn't mean,

13   in my opinion, in any way that they consented to that.

14   So I don't see where I would make an adjustment to my

15   calculation.                                                12:34:24

16       Q.  Is it the same answer for your restitution

17   opinion?

18       A.  Yes, it is.

19       Q.  What about for your statutory damages opinion?

20       A.  Yes, that is the same answer.                       12:34:36

21       Q.  Now, if it is proven that some users consented

22   to the data collection, how would that affect your unjust

23   enrichment damages opinion?

24           MR. LEE:  Incomplete hypothetical.

25           THE WITNESS:  I'm not aware of anyone that did      12:35:24

                                                        Page 55

1    consent, so I -- I don't have any adjustment to it.

2         Q.  BY MS. TREBICKA:  Are you aware of users -- or

3    let me start again.

4              Are you aware of tools that users can use to opt

5    out of targeted advertisements?                        12:36:00

6              MR. LEE:  Beyond the scope, vague.

7              THE WITNESS:  I -- I have an awareness that

8    there are such tools.

9         Q.  BY MS. TREBICKA:  Have you ever used them?

10        A.  No.                                            12:36:32

11        Q.  Have you researched their -- the extent of their

12   variability?

13             MR. LEE:  Objection to form.

14        Q.  BY MS. TREBICKA:  Let me strike that.  That was

15   not a good --                                           12:36:52

16             Have you researched the various tools that exist

17   to block ads -- targeted ads?

18        A.  No, I have not.

19        Q.  And my question -- my prior question was related

20   to opting out of ads.  Similar question:  Are you aware  12:37:12

21   of user controls to block personalized ads?

22        A.  My understanding is that there are such

23   controls.

24        Q.  Have you researched them?

25        A.  I have not.                                    12:37:25

                                                         Page 56

1    Q.  What about user controls to turn off ads

2    personalization?  Are you aware that it exists?

3    A.  My understanding is that there are such tools.

4    Q.  Have you researched them for purposes of this

5    assignment?                                          12:37:40

6    A.  No.  That would not affect my calculations.

7    Q.  Let's assume that a user who is part of the

8    class browsed in a private browsing mode but was not

9    shown any Google ads.

10       Would you agree that Google was not unjustly    12:38:12

11   enriched from that class member for that particular

12   session where no ads were shown?

13   A.  No.

14   Q.  So your opinion is that Google is unjustly

15   enriched from a user in private browsing mode who was not   12:38:30

16   shown any Google ads during that session?

17   A.  Yes.

18   Q.  Can you explain?

19   A.  Sure.  So it's important for Google to know

20   information about users and whether or not they were   12:38:50

21   shown ads or not shown ads.

22       And so to the extent that information was

23   collected on that user in private -- in private browsing

24   mode and they were not shown ads, that information is

25   something that Google then is able to use in its machine   12:39:09

Page 57

1    learning algorithms.

2         Again, that's an area that I did not even

3    calculate unjust enrichment for, using data outside of

4    Incognito mode, for example, that it collects in

5    Incognito mode.                                        12:39:30

6         Also, it's able to use information and represent

7    to its advertisers, people that advertise with it, that

8    it has collected information on lots and lots of users

9    and whether or not -- and what was shown and what wasn't

10   shown to those users.                                  12:39:51

11        And it's also able to use information on -- it

12   also collects information that is useful in determining

13   conversion information as well.

14        So that data is still valuable to Google.

15        Q.  Any other basis for your opinion that Google is   12:40:10

16   unjustly enriched from a user who was not shown any

17   Google ads?

18        A.  I'm not sure.  There may be additional.  Those

19   are three reasons that I can think of, as I sit here.

20        Q.  So that class member would still be allocated    12:40:36

21   unjust enrichment damages; correct?

22        A.  I think that they should be.

23        Q.  Have you done any analysis --

24        A.  Hold on just really quickly.  And, again, we're

25   talking about a class member user who searched in        12:40:54

1    Incognito mode.

2        Q.  Correct.  I -- I used that class member as a

3    shortcut for the line of questioning that we've been

4    engaged in so that it's clear for the record and I don't

5    unnecessarily speak.                                    12:41:09

6        A.  Yeah, yeah.  I just -- again, that was a

7    little -- just being a little cautious.

8        Q.  So have you done any analysis to quantify the

9    enrichment that would accrue to Google as a result of

10   those three reasons that you outlined that Google would  12:41:33

11   still be unjustly enriched, even if it did not show an ad

12   to a putative class member?

13       A.  I -- could you restate that question?  Because

14   I'm not sure that I'm understanding it.

15       Q.  Sure.                                           12:42:19

16           I asked you whether Google would be enriched

17   from a class member who is not -- a putative class member

18   who is not shown any advertisements by Google.  And you

19   said yes.

20           And I asked you why, and you stated three bases.  12:42:34

21   And then you again confirmed that you had three bases, as

22   you were sitting here today, for why Google would still

23   be enriched from that class member.

24           Do you recall that testimony?

25       A.  Yes, I do.                                      12:42:46

                                                        Page 59

1      Q.  So my question to you is:  Have you done any

2   analysis to quantify the unjust enrichment revenue that

3   would accrue to Google as a result of -- of those three

4   bases that you outlined?

5      A.  So from a conservative perspective, I did not      12:43:10

6   calculate the value that Google gains by collecting

7   information on users that are not shown ads, as they

8   relate to using them in their machine, learning

9   algorithms as it relates to non-Incognito mode or private

10   browsing mode.  I've left that off the table.             12:44:14

11         When Google collects information and then is

12   able to communicate to its advertisers or its customers

13   about the scope -- the overall scope of its reach and/or

14   its ability to help provide -- help provide the right ads

15   so there's more likelihood of conversion, that scope --    12:44:58

16   that -- that scope of information that they have would --

17   would impact -- would impact to some extent the amount

18   of -- would impact to some extent the amount of

19   advertising and the value of that advertising.

20         So I haven't tried to isolation that in any        12:45:18

21   way.  But to some extent, it would be in my unjust

22   enrichment -- unjust enriched calculations because it

23   comes in through the amount of advertising that they're

24   able to -- or that they provide to their customers.

25      Q.  Let's assume that a user -- a putative class       12:45:50

1    member -- that's shortcut for someone in private browsing

2    mode during the relevant class period.  So let's assume

3    that a putative class member who browsed in private

4    browsing mode but Google did not collect any of the at

5    issue data for that class member.                          12:46:13

6           Do you believe that Google was unjustly enriched

7    from that class member, if Google did not collect any of

8    the at issue data?

9           MR. LEE:  Objection to the extent it calls for a

10   legal conclusion.                                          12:46:36

11          THE WITNESS:  I guess I'm just trying to imagine

12   a situation where they didn't collect any of the at issue

13   data.

14          I mean, I guess my understanding is the vast,

15   vast, vast majority of users, Google would have collected  12:47:51

16   at issue data during a private browsing mode session.  So

17   I'm not -- I don't know of a situation where they

18   wouldn't have collected that data, so --

19          MR. LEE:  Let me -- I'm sorry.

20          THE WITNESS:  So it's difficult to answer          12:48:17

21   that -- it's difficult to answer that question.

22          MR. LEE:  And I jumped in late, but let me

23   object as an incomplete hypothetical.

24      Q.  BY MS. TREBICKA:  I'm asking you to assume that

25   there are -- that there is a situation in which a class    12:48:28

                                                        Page 61

1    member who browsed in private browsing mode did not have

2    any of his or her data collected.

3            In that circumstance, in your opinion, was

4    Google unjustly enriched?

5        A.  I guess, as I sit here, I can't think about -- I    12:49:04

6    can't envision a situation where they are unjustly

7    enriched if they didn't collect any data at all.  But I

8    can't think of a situation -- a situation in which that

9    would happen.  So I'm struggling to answer the

10   hypothetical, given everything that I've answered so far    12:49:33

11   on how they can be unjustly enriched given user's data.

12       Q.  So same hypothetical.  And I'm asking you to

13   assume that there is a situation which a class member who

14   browsed in private browsing mode did not have any his or

15   her -- or her data collected.  Would that person be    12:49:52

16   entitled to restitution, in your opinion?

17       A.  Again, I can't -- I don't have a situation in

18   mind that that would happen.  I -- given everything that

19   we've just discussed, there is -- there is a possibility

20   if there is some way that you got into private browsing    12:50:45

21   mode and they didn't know you were in private browsing

22   mode and they didn't collect any information, somehow

23   they just didn't know about you as a user, maybe that

24   class member would not get restitution.

25       Q.  Same hypothetical.  Is that user entitled to    12:51:05

Page 62

1    statutory damages, in your view, if no data -- if no at

2    issue data was collected?

3        A.   I mean, I think you're asking -- again, I mean,

4    with all this, I can't think of a situation in which

5    that -- in which that happens.                           12:51:20

6            I -- there may be a possibility that they

7    wouldn't get statutory damages, but I'm not aware of a

8    situation in which that would occur.

9        Q.   Do you account for this scenario in any of your

10   damages opinions?  And by "this scenario" I mean a       12:51:40

11   putative class member whose data was not collected --

12   whose at issue data was not collected by Google.

13       A.   Yes.

14       Q.   How do you account for it in your -- we'll take

15   it one by one.                                            12:52:05

16           How do you account for it in your unjust

17   enrichment damages model?

18       A.   Well, in my unjust enrichment damages model, I

19   don't think that there is a situation where that would

20   occur.                                                    12:52:22

21           I have calculated unjust enrichment on the basis

22   of what they actually -- what they actually earned or

23   actually unjustly earned, and then I apportion that based

24   on the number of class members and unique monthly private

25   browsing instances.                                       12:52:50

                                                        Page 63

1          And so in that situation, I am not aware of any

2     type of material, number of users, who browse privately

3     that would fit what you're saying.  So I have not made

4     any kind of adjustment for that.

5          Q.  How do you account for it in your restitution          12:53:17

6     model, if at all?

7          A.  Again, in my restitution model, based on the way

8     users use private browsing mode and the information that

9     is collected and my apportionment methodology, I think

10     that the case that you're trying to outline is -- is such          12:53:50

11     an Edge case, that it would have any kind of -- it

12     wouldn't have any kind of material impact.  So I

13     haven't -- haven't made an adjustment.

14          MR. LEE:  I think now is a good time to break

15     for lunch.  It's 1 o'clock over here for the East          12:54:06

16     Coasters.

17          MS. TREBICKA:  Let me just finish this line of

18     questioning.  We have a few minutes.

19          MR. LEE:  Sure.

20          Q.  BY MS. TREBICKA:  And how do you account for it,          12:54:31

21     if at all, in your statutory damages model?  And if the

22     answer is the same, you may just say so.

23          MR. LEE:  I'll object to the extent it calls for

24     a legal conclusion.  Also, an incomplete hypothetical.

25          THE WITNESS:  So for statutory damages, one of          12:56:40

Page 64

1    the bases that I've been asked to calculate for that

2    portion of damages is the estimated number of private

3    browsing page loads.

4            And in that situation, my understanding is that

5    there are certain pages that -- certain pages that don't        12:57:22

6    have Google tracking beacons on them.

7            And given that, I have deducted those pages that

8    don't have tracking beacons on them from my calculation

9    of total page loads.

10       Q.  BY MS. TREBICKA:  That is one of your methods --        12:57:54

11            (Interruption in proceedings.)

12            THE WITNESS:  Total page -- total private

13    browsing page loads.

14            MR. LEE:  Leslie, that's L-O-A-D-S.

15       Q.  BY MS. TREBICKA:  You mentioned earlier that you        12:58:16

16    do not block personalized ads; correct?

17       A.  I do not.

18       Q.  Do you look at the personalized ads that are

19    shown to you?

20            MR. LEE:  Objection to form, beyond the scope.         12:58:31

21            THE WITNESS:  I -- you know what?  I can't even

22    recall looking at any ads.

23       Q.  BY MS. TREBICKA:  Do you ever click on them?

24            MR. LEE:  Same objection.

25            THE WITNESS:  To be honest, I can't recall the         12:58:52

                                                        Page 65

1   last time I clicked on an ad.

2          MR. LEE:  You know what?  We're going to take

3   lunch now.  This is a new line of questioning.  It's

4   actually something you started with in the morning, which

5   obviously is irrelevant, but --                          12:59:05

6          MS. TREBICKA:  It's actually not, James.  I

7   don't agree.

8          MR. LEE:  Excuse me.  Excuse me.  I'm not done.

9          So we're going to take our lunch break, as I

10  already notified you we would.  I gave you time to finish  12:59:11

11  your line of questioning.  We're going to take lunch.

12         MS. TREBICKA:  I don't agree to get off the

13  record.

14         MR. LEE:  Mr. Lasinski, do you want to take a

15  break now?                                                12:59:21

16         THE WITNESS:  Yes, I would.

17         MR. LEE:  Okay.  So are you saying you're not

18  going to go off the record, Viola, when the witness has

19  asked to take a break?  I've asked for the courtesy for a

20  lunch break.                                              12:59:30

21         We gave you a courtesy to start at 11 o'clock

22  our time, even though the witness is on the East Coast.

23  I would like the same courtesy extended that -- when we

24  pre-agreed to when lunch would be served so that my

25  witness can stay fresh and have his -- have his meal.  We  12:59:43

                                                          Page 66

 1    went through some advance work to get that coordinated,

 2    and for you to say that you refuse to go off the record

 3    and allow him to take his break at the appointed agreed

 4    time, I think is weird.

 5            MS. TREBICKA:  Mr. Lee --                          13:00:01

 6            MR. LEE:  So I'm going to direct him not to

 7    answer anymore questions until after lunch.  How about

 8    that?

 9            MS. TREBICKA:  Mr. Lee, what I'm saying is that

10    you cannot just unilaterally decide that we are taking    13:00:11

11    lunch right now.  You did not even allow me to ask you to

12    finish my line of questioning, which will only take a few

13    minutes.  So I believe that you are --

14            MR. LEE:  You certainly did.

15            MS. TREBICKA:  You are interrupting now.  Please   13:00:24

16    stop.  I believe that you are now being discourteous.

17            At any rate, as a courtesy and because this is

18    getting ridiculous, I will agree to get off the record.

19    I ask that we meet and confer privately, please.  Where

20    can I call you?                                           13:00:38

21            MR. LEE:  You don't have my cell?

22            MS. TREBICKA:  No.

23            MR. LEE:  I'll put it in the chat.  I'll put it

24    in the chat.

25            MS. TREBICKA:  Thank you.                          13:00:45

                                                        Page 67

```
 1              We can get off the record.

 2              MR. LEE:  I agree.

 3              THE VIDEOGRAPHER:  Going off the record at

 4    1:01 p.m.

 5              (Recess.)                                    13:00:51

 6              THE VIDEOGRAPHER:  We are back on the record at

 7    1:47 p.m.

 8         Q.  BY MS. TREBICKA:  Mr. Lasinski, did you have a

 9    good lunch?

10         A.  It was all right.                             13:47:07

11         Q.  All right?  Just all right?

12         A.  Just all right.

13         Q.  So --

14         A.  If you're gonna say that I'm done, then it would

15    be a great lunch.                                      13:47:19

16         Q.  In a few hours.  In a few hours.  You can have a

17    great dinner.

18              Earlier, before we broke, we were talking about

19    personalized ads.  Do you recall that conversation?

20         A.  I -- I don't really recall personalized ads.  I   13:47:33

21    recall you asking me questions about -- you asking me

22    questions about my bases in my calculations.  But I don't

23    recall personal ads, so --

24         Q.  Earlier in your testimony before lunch, you

25    testified that you do not block ads as a matter of course   13:47:57
```

Page 68

1    in your personal browsing; correct?

2        A.  I do not.

3        Q.  And you also testified that you, as a matter of

4    course, do not recall even looking at ads that are shown

5    to you; is that correct?                              13:48:13

6            MR. LEE:  Beyond the scope.

7            THE WITNESS:  I don't remember saying I don't

8    recall looking at them.  I -- I may look at them.  I

9    don't -- I though I said I don't recall clicking on them.

10       Q.  BY MS. TREBICKA:  Do you ever find personalized  13:48:30

11   ads useful, in your experience as a user?

12           MR. LEE:  Beyond the scope.

13           THE WITNESS:  I don't have an opinion on that.

14   I don't recall finding them useful.

15       Q.  BY MS. TREBICKA:  In your opinion, could some   13:48:48

16   putative class members benefit from seeing personalized

17   ads?

18           MR. LEE:  Calls for speculation.

19           Go ahead.

20           Oh, I'm sorry.  Is this in Incognito mode or not  13:49:03

21   Incognito mode?

22           MS. TREBICKA:  Putative class members in --

23   browsing in Incognito mode.

24           MR. LEE:  I'm sorry.

25           THE WITNESS:  I -- I do not see why they would  13:49:11

Page 69

1    have benefit from a personal ad in Incognito mode.  No, I

2    don't see that -- they've made the choice to browse in

3    Incognito mode, so they would not benefit.

4        Q.  BY MS. TREBICKA:  So your basis for saying that

5    they would not benefit is because they made the choice to        13:49:31

6    browse in Incognito mode?

7        A.  Correct.  They've made the choice to browse in a

8    mode that does not have personalized -- well, in my

9    understanding, would not have personalized ads.  And they

10   made that choice.                                                 13:49:47

11       Q.  So -- so in your understanding, Incognito mode

12   would not personalize ads on the basis of that Incognito

13   session?

14       A.  Well, so my understanding of personalized ads is

15   that they require third-party cookies.  And third-party         13:50:08

16   cookies come from information that is collected from

17   users during that session.

18            And so users have chosen to search in Incognito

19   mode because they want to keep their browsing private.

20   And, therefore, would not be better off -- or not benefit       13:50:34

21   from seeing personalized ads.

22       Q.  Is this the entirety of your basis for believing

23   that putative class members who browse in private

24   browsing modes would not benefit from seeing personalized

25   ads?                                                             13:50:58

Page 70

1    A.   I mean, I -- I look at it like this:  Private

2  browsing mode users have made the choice not to have

3  their private browsing information taken.  And since they

4  have made that choice, they would not benefit from

5  personalized ads.  They've made the choice to not have          13:51:34

6  their information taken.

7         My understanding is the way that you personalize

8  an ad, the way that Google personalizes ads, is based on

9  personalization.  So they would not -- their choice has

10  been taken away.  So that's not a benefit to them.            13:51:51

11    Q.   So what is your basis for your opinion that

12  users in private browsing mode have made the choice --

13  let me start over.

14         What is your basis for believing that private

15  browsing mode users would not benefit from personalized      13:52:17

16  ads?

17         MR. LEE:  Asked and answered.

18         THE WITNESS:  I guess I'm not understanding

19  your question, because I felt like I answered it with the

20  best -- with my last answer.                                  13:52:32

21    Q.   BY MS. TREBICKA:  So your basis for believing

22  that -- or for your opinion that users in private

23  browsing mode have made the choice -- let me start over.

24         So your basis for the opinion that private

25  browsing mode users would not benefit from personalized      13:52:53

Page 71

1    ads is because you believe that private browsing mode

2    users have made the choice not to have their private

3    browsing mode information collected?

4        A.  Not to have their private browsing information

5    collected and used.  And my understanding is the way that    13:53:12

6    Google serves private browsing -- I'm sorry, personalized

7    ads is through using private browsing mode information.

8            My understanding is the way that a personalized

9    ad is -- well, based on my discussion with Mr. Hochman

10   and also my review of the record, personalization occurs    13:53:34

11   through third-party cookies through which you must --

12   they must have collected and used information.

13           And, therefore, taking away a person's choice,

14   in my opinion, is just that, you've taken away that

15   person's choice.  And, therefore, they -- any speculative    13:53:58

16   benefit that they could have gotten is not -- does not

17   accrue to the user.

18       Q.  And when you say "taken away a person's choice,"

19   what do you mean by that?

20       A.  My understanding is that in private browsing    13:54:19

21   mode, users choose to have their -- users choose to have

22   their information private.  And so by collecting that

23   information and using that information, it's by

24   definition not private.  And used by Google to serve ads.

25           To some extent, this is a little bit beyond the    13:54:51

Page 72

1    point because my calculations are based on the way Google

2    determines the value of third-party cookies and the

3    revenues that they would lose if they couldn't track

4    third-party cookies.

5         And my understanding is that third-party cookies      13:55:09

6    are an input or necessary to -- for there to be a

7    personalized ad.

8         Q.  So in your opinion, is one of the reasons that

9    users privately browse so that they do not see

10   personalized ads?                                          13:55:30

11        MR. LEE:  Beyond the scope.

12        THE WITNESS:  Well, I do know from talking to

13   people -- I mean, you're asking is one of the reasons why

14   they do that.  I do know from talking to people that when

15   they do go into private browsing mode, that they don't     13:56:08

16   want to see personalized ads.

17        Certainly there are definitely people that don't

18   want to see private -- or personalized ads when they're

19   in Incognito mode.

20        Q.  BY MS. TREBICKA:  Have you done any research or    13:56:20

21   analysis to determine that people who browse in private

22   browsing mode do not want to see personalized ads?

23        MR. LEE:  Beyond the scope.

24        THE WITNESS:  What I've done -- my investigation

25   relates to whether or not they -- Google should have       13:56:54

Page 73

CONFIDENTIAL

```
1    collected that information and used that information and,

2    therefore, had the ability to serve personalized ads.

3            My understanding is when you go into private

4    browsing mode, that you -- they would not have the

5    ability -- or should not have had the ability to collect    13:57:18

6    that information.

7            And people have made that choice to go into

8    private browsing mode.  And so in that situation, taking

9    away that choice would outweigh any perceived or

10   speculative benefit of receiving a personalized ad.    13:57:36

11           MS. TREBICKA:  Move to strike as non-responsive.

12       Q.  Please listen to my question.

13           Have you done any research or analysis to

14   determine that people who browse in private browsing mode

15   do not want to see personalized ads?    13:57:53

16           MR. LEE:  Beyond the scope.

17           THE WITNESS:  So, I mean, again, with my last

18   answer, I know that people have actually gone into

19   private browsing mode and made the choice not to have

20   their information taken.    13:58:15

21           That said, I have not done a study of users in

22   the class on the topic that you asked about.

23       Q.  BY MS. TREBICKA:  What about any research or

24   analysis?  Have you undertaken any research or analysis

25   to determine that people who browse in private browsing    13:58:34
```

Page 74

1    mode do not want to see personalized advertising?

2        MR. LEE:  Asked and answered.

3        THE WITNESS:  I mean, beyond what I just said,

4    that the people have made the choice not to go -- to

5    go -- I'm sorry, to go into private browsing mode and not    13:58:49

6    have their information collected.

7        Plus, I have talked to people, and I know that

8    there are users that do not want to see personalized ads.

9    I have not done a study, if you will.

10       Q.  BY MS. TREBICKA:  I did not ask about a study,    13:59:08

11   though.  I asked about research or analysis.  So move to

12   strike, and asking it again.

13       Have you done any research or analysis to

14   determine that people who browse in private browsing mode

15   do not want to see personalized ads?    13:59:21

16       MR. LEE:  Same objection.

17       THE WITNESS:  So, again, consistent with my last

18   answer, they -- I understand that those people who have

19   gone into private browsing mode don't want their

20   information collected.    13:59:34

21       I have not done research to determine whether or

22   not users want to see -- want to see personalized ads

23   inside private browsing mode.

24       Q.  BY MS. TREBICKA:  You mentioned that you have

25   talked to people on this question of personalized ads.    13:59:48

Page 75

```
 1    How many people have you spoken to on this question?

 2         A.  Four or five.

 3         Q.  Are they putative class members?

 4         A.  Based on my understanding of the class, they

 5    potentially could be.                            14:00:21

 6         Q.  But you don't know for certain that they are?

 7         A.  No, I didn't.  I do not.

 8             MR. LEE:  Calls for a legal conclusion.

 9         Q.  BY MS. TREBICKA:  Did you ask them whether

10    they'd privately browsed?                        14:00:35

11             MR. LEE:  Beyond the scope.

12             THE WITNESS:  Yes, I did.

13         Q.  BY MS. TREBICKA:  And what was the answer for

14    each of the four or five?

15         A.  They have.                              14:00:47

16         Q.  So with respect to your restitution opinion,

17    have you -- or, actually, let me strike that.

18             Let's assume that some putative class members

19    receive some benefit from personalized ads in the private

20    browsing mode.  Do you believe that it should be offset  14:01:27

21    from your restitution damages opinion?

22             MR. LEE:  Incomplete hypothetical.

23             THE WITNESS:  No.  As I said, I can't think of a

24    reason why it would.

25         Q.  BY MS. TREBICKA:  If a Court finds that this  14:02:07
```

Page 76

1    benefit should be offset against your restitution damages

2    opinion, do you -- have you proposed any methodology for

3    doing so?

4        A.  I have not in my report, no.  I think that that

5    would be inappropriate.  I've been very conservative in          14:02:30

6    my calculation of restitution damages.  So I can't

7    imagine that any benefit would be -- would offset any --

8    in any way the conservative nature of what I did.

9        Q.  Have you attempted to quantify any such benefit

10   to putative class members from personalized ads?              14:02:45

11           MR. LEE:  Objection.  Vague.

12           THE WITNESS:  I have not.  Again, I do not

13   believe that there is a benefit.

14       Q.  BY MS. TREBICKA:  Mr. Lasinski, if you recall

15   just a few -- a minute or so ago, I asked you how many          14:03:06

16   people you've spoken with related to their view of

17   personalized ads in private browsing mode.

18           Do you remember that?

19       A.  Yes.

20       Q.  And I believe that I heard you say four or five.       14:03:23

21   Did I hear you correctly?

22       A.  Yeah.  That's an estimate, yes.

23       Q.  Understood.

24           MS. TREBICKA:  Let the record reflect that the

25   correct answer is four or five.  It was mistakenly              14:03:35

Page 77

1    transcribed as over five in the transcript.

2         MR. LEE:  We can stipulate to that.

3         Q.  BY MS. TREBICKA:  Mr. Lasinski, could we take a

4    look at your opinion -- the written opinion, your report,

5    paragraph 137?  I can help you with the page number.          14:04:04

6    This is page 60.

7         A.  Okay.

8         Q.  I would like you to -- I would like to direct

9    your attention to the second sentence in paragraph 137.

10   Well, first off, this is -- the section is "Actual          14:04:40

11   Damages"; correct?

12        A.  You're -- if I -- if I'm in the right place.  I

13   believe we're in Section 8 of my report, which is

14   entitled "Actual Damages."

15        Q.  Correct.  That's where I would like you to be.      14:04:52

16            And earlier, in the morning session, you

17   testified that your actual damages -- you have quantified

18   actual damages with your -- with a restitution

19   methodology; correct?

20        A.  Correct.                                            14:05:08

21        Q.  So paragraph 137 is that first paragraph under

22   "Actual Damages" --

23        A.  Yes.

24        Q.  -- in the "Restitution" section?

25        A.  Yes.                                                14:05:16

Page 78

1        Q.  Correct?

2        A.  Yes.

3        Q.  So I'm directing your attention to the second

4    sentence in paragraph 137 that starts with, "In my

5    opinion."                                            14:05:26

6        A.  Yep.

7        Q.  And I will read it into the record, as you can

8    read silently along.

9            "In my opinion, and as described below, such

10   actual damages can be determined as a function of the    14:05:36

11   payments necessary to incentivize an individual to

12   knowingly relinquish the choice to keep certain

13   private" -- "certain browsing private and allow an

14   organization to track all online activity."

15           Do you see that?                              14:05:55

16       A.  I do, yes.

17       Q.  I have a question with respect to the word

18   choice "as a function of."

19           So you say here, "Actual damages can be

20   determined as a function of the payments necessary."    14:06:05

21           That -- that is different from saying actual

22   damages are equal to the payments necessary to

23   incentivize an individual to knowingly relinquish,

24   et cetera; correct?

25       A.  I -- in this case, I've calculated as equal to.   14:06:33

                                                         Page 79

CONFIDENTIAL

1        Q.   Understood.

2             So even though this says as a function of, you

3    have calculated it as the actual number equal to?

4        A.   I guess I'm not understanding the difference, as

5    you're trying to have it based on your question.          14:06:53

6             I -- to make the record clear, I have not

7    calculated this section, "Actual Damages," if that's what

8    you're asking.

9        Q.   Can you say that again?  Because I didn't

10   understand.                                               14:07:19

11       A.   I think that -- I think that -- it sounded to me

12   like you were asking had I calculated damages that are

13   equal to what I calculate in actual damages that I

14   calculate in Section 8.  Or I got the impression from

15   your question, maybe wrongly, that there was a second      14:07:39

16   calculation that you were asking if I had made.  And

17   there is not.

18       Q.   That's very helpful.  Thank you.

19            I was also wondering the word choice "as a

20   function of," meaning once you understood the -- and I'm   14:07:51

21   reading from your opinion here, "The payments necessary

22   to incentivize an individual to knowingly relinquish,"

23   et cetera.  That is the actual damages that you quantify.

24   You don't do -- you don't do another step to that

25   payment -- to that amount of payment necessary to         14:08:12

1    incentivize an individual to then arrive at actual

2    damages?

3         A.  I think -- I think here we're talking about the

4    rate, if I'm understanding you correctly.  Certainly the

5    rate that I'm talking about to incentivize class members      14:08:28

6    is -- maybe we'll get to this -- $3.

7         Obviously I do do additional calculations to

8    determine the number of monthly browsing instances -- or

9    unique monthly browsing instances.  But I don't do an

10   additional calculation after I determine that the $3 is      14:08:51

11   their correct rate.

12        Q.  Okay.  Thank you.  That clarifies it.  Thank

13   you.

14        In your opinion, do you quantify the opportunity

15   cost of users in giving up privacy from Google?             14:09:06

16        MR. LEE:  Objection to form, vague.

17        THE WITNESS:  I -- I guess I have not thought

18   about it in that -- in that way.  But certainly by the --

19   by the fact that they've given up their opportunity to

20   be -- to not -- to not browse privately, this is a          14:10:04

21   payment that I think would be conservative to incentivize

22   them to actually give up that -- that right.

23        Q.  BY MS. TREBICKA:  If we could move on to the --

24   to the next paragraph.  This is where you introduce the

25   $3 per month number; is that correct?                       14:10:51

Page 81

CONFIDENTIAL

```
1         A.   I think that this is the first time that I talk

2     about the $3 per month in my report.  Wait.  No.

3     Obviously I think I talk about it in the executive

4     summary.

5         Q.   Right.                                    14:11:09

6              Just for Section 8, this is where you

7     reintroduce, perhaps, the $3 per month number.

8         A.   Okay.

9         Q.   And I'll direct your attention to the second

10    sentence.  I'll read it for the record while you read    14:11:21

11    silently along.

12             "More specifically, it is my opinion that the

13    baseline payment to Screenwise Panel participants of $3

14    per month for their use of a Screenwise browser extension

15    or a Screenwise meter app on a single device represents a    14:11:36

16    conservative indicator of the monthly payment necessary

17    for an individual to knowingly relinquish the choice to

18    keep certain browsing private and allow Google to track

19    all their online activity, regardless of browsing mode."

20             Do you see that?                           14:11:58

21        A.   Yes, I do.

22        Q.   And in your opinion, it is appropriate to

23    provide -- or restitute each class member a $3 damages

24    per month, per device, no matter how much or how little

25    they use private browsing mode during that one month;    14:12:23
```

Page 82

CONFIDENTIAL

1    correct?

2        A.  I have to modify that a little bit.  I mean,

3    they have to -- they have to use it.  There has to be a

4    private monthly browsing instance.

5            So, yes, I mean, they have to use it during that    14:12:41

6    month.  But that is correct.

7        Q.  So provided they use it in a month, it does not

8    matter how much or how little they use it to obtain the

9    $3 per month, per device, under your methodology?

10       A.  Yes, that is correct.  That's -- gets back to    14:12:58

11   what we were talking about earlier today.

12       Q.  Okay.  You also say that this value is

13   conservative.

14           Do you see that?

15       A.  Yes.    14:13:14

16       Q.  Why do you say that?  What do you mean by that?

17       A.  I say that for a number of reasons.  First,

18   there are other data points that I talk about in my

19   Section 8 here that would suggest a higher rate per

20   month.    14:14:06

21           Furthermore, for the Screenwise Panel, in that

22   case there were numerous payments made to the

23   participants in addition to the $3 per month.

24           And then, additionally, in those cases in the

25   Screenwise Panel, the users knowingly gave up their    14:14:41

Page 83

```
 1    browsing information in that case.  And in my opinion, if

 2    you are unknowingly giving it up or unwillingly giving

 3    something up, that is more valuable to you than if you

 4    knowingly give it up, and, therefore, it's conservative.

 5    Or willingly give it up, that's conservative.              14:15:36

 6            There may be other reasons why it's conservative

 7    that I've highlighted in my report, but those are three

 8    that I can think of, as I sit here.

 9       Q.  So you said that there are other data points in

10    Section 8 that would suggest a higher rate per month.      14:16:08

11    Could you tell me, in a summary fashion, what those are?

12       A.  Sure.  In a summary fashion, you know, one of

13    the things that the Screenwise survey does is it provides

14    monthly rewards of $5 for a router, $3 per device.  But

15    then it also has a $2 bonus if you connect -- or if you    14:17:04

16    use three of the four devices above.  So it provides a

17    bonus to users.

18       Q.  Are you reading from your -- or reviewing your

19    report?

20            MR. LEE:  I don't think he was done with his       14:17:23

21    answer yet, so let him finish.

22            MS. TREBICKA:  Yeah, I'm asking --

23            MR. LEE:  Hold on.  Let him finish the answer to

24    the pending question, and then you can ask a follow up.

25       Q.  BY MS. TREBICKA:  Mr. Lasinski, if you can tell     14:17:35
```

Page 84

1    me where you are so I can follow along.

2        A.  Sure.  Page 64, Figure 59.

3        Q.  Okay.

4        A.  Also, in addition, the other data points that I

5    highlight is on page 68.  Here, this indicates a $29 per          14:17:59

6    month for customers that do not opt in to an AT&T program

7    called GigaPower.

8        Q.  Uh-huh.

9        A.  And I'm just summarizing, because it's -- all

10   you asked me to do was summarize.                                 14:18:33

11       Q.  Yes, thank you.

12       A.  And then another data point is SavvyConnect,

13   which is paragraph 162, which is users can earn $5 per

14   device for up to three devices.

15       Q.  Anything else?                                            14:19:03

16       A.  Well, I mean, certainly the Nielsen computer and

17   mobile panel.  And you could end up with more dollars per

18   year there, because you could earn up to $50 a year in

19   the Nielsen -- in the Nielsen study.  Also, depending on

20   the number of devices you have, you could earn more           14:19:54

21   there.

22           Oh, I'm sorry.  I'm sorry.  Yeah, so you could

23   earn more there.  And you could earn more as a user in

24   UpVoice as well.  That's also described in my Section 8

25   as well.                                                          14:20:20

Page 85

1        Q.  Direct your attention to Figure 58 on page 63.

2        A.  Okay.

3        Q.  This is a screenshot from the Ipsos Screenwise

4   Panel, "Summary of Rewards and Payments per

5   Screenwisepanel.com"; right?                          14:20:51

6        A.  Yes.

7        Q.  And the very first square -- or rectangle, says,

8   "$20.  Earn a $20 reward if you qualify for the study."

9           Do you see that?

10       A.  Yes, I do.                                      14:21:04

11       Q.  Now, this is not applicable to the at issue data

12  which you're trying to value; correct?

13       A.  If I remember correctly -- the study correctly,

14  and I don't -- or this correctly, I believe that they're

15  asking for demographic information about the users.      14:22:04

16          I'm not sure that that demographic information

17  would be the at-issue data that we're talking about here.

18       Q.  Well, sitting here today, do you have an opinion

19  as to whether demographic information would be at issue

20  data or no?                                              14:22:28

21       A.  No.  I -- no.  What I'm saying is I don't recall

22  the complete set of information that is required that

23  goes in here -- to go in here.  It definitely requires

24  demographic information.

25          And so this is for signing up for the study and   14:22:44

                                                    Page 86

1  providing certain demographic information about the

2  panelists.

3       In my analysis, I am not attributing any of this

4  $20 towards the -- towards that information.

5    Q.  Because demographic information is not at issue        14:22:59

6  data; correct?

7       MR. LEE:  Objection to form, calls for

8  speculation, beyond the scope.

9       THE WITNESS:  The information that I remember

10  them collecting, I don't recall that as being at issue      14:23:16

11  data.

12    Q.  BY MS. TREBICKA:  The next rectangle says,

13  "$100.  Earn a $100 reward if you join and install a

14  special high-speed Wi-Fi router that we'll provide."

15       Do you see that?                                       14:23:32

16    A.  Yes, I do.

17    Q.  This is not applicable to the at issue data

18  either; correct?

19    A.  I do not know technically how the at issue data

20  gets transmitted to Google.  My understanding is that       14:24:06

21  browser data often goes through a router.  And so to the

22  extent that this -- this router is collecting that data

23  and transmitting that data, that could be applicable to

24  the at issue data.

25    Q.  In your opinion, are putative class members           14:24:43

Page 87

CONFIDENTIAL

```
 1    required to install a special high-speed Wi-Fi router?

 2         A.  No, that's not my opinion.

 3         Q.  Have you apportioned any of the $100 to -- to

 4    putative class members as part of the $3 that you

 5    apportion per month per device?                       14:25:08

 6         A.  No, I have not.  But that's obviously a benefit

 7    that those class -- I'm sorry, not class members -- that

 8    those study members study -- get.  Is it obviously $100

 9    if they install the device, plus they get a free device

10    which is high-speed.                                  14:25:28

11         Q.  And the next rectangle says, "$16."

12         Do you see that?

13         A.  Yes, I do.

14         Q.  Okay.  Do you understand how one could earn up

15    to $16 a month for each household member?              14:25:54

16         A.  Yes, I do.

17         Q.  Could you explain?

18         A.  Sure.  That's where we were on Figure 59.  A

19    router -- if you install the router and have all the

20    Wi-Fi devices connected to the Screenwise router, you   14:26:25

21    could earn up to $5 per month, so --

22         And then if you have a browser, you could earn

23    $3 per month if the browser is using the -- I'm sorry --

24    Screenwise meter browser extension.

25         The mobile phone, if you install the Screenwise     14:26:51
```

Page 88

```
1    meter app, that's $3.  And if you have a tablet and --

2    you could earn $3 for using the tablet with the

3    Screenwise meter app device.

4         If you add all of those up together, that's $16

5    per month.                                    14:27:14

6         Q.  And also the $2 bonus; correct?

7         A.  Oh, I'm sorry.  I must have skipped that piece

8    of it.  Thank you.  Yes.

9         If you -- three of the four devices above, then

10   you could earn a bonus of $2 per month.        14:27:29

11        Q.  So the $5 -- the initial bullet point, is the $5

12   for having all Wi-Fi devices connected to the Screenwise

13   meter related to the at issue data?

14        A.  Yes.

15        Q.  And how so?                            14:28:08

16        A.  Well, again, if you're -- if you're browsing

17   in -- I mean, my understanding, I am an electrical

18   engineer, and I've dealt with some of these devices

19   before.  I'm not a technical expert in this case.

20        But my understanding is that when you browse at  14:28:25

21   home, your computer connects to the internet through a

22   router, and then that router would transmit the

23   information to the users, such as Google.  That

24   information then -- you know, then Google transmits

25   information back through -- through a router.     14:28:47
```

Page 89

1          And so having a router is -- is actually

2    something that -- the data -- the data that we're talking

3    about here would go through -- in my opinion, would

4    likely go through this router.

5      Q.  Now you're adding a technical opinion to your          14:29:10

6    damages opinion in this case as to how the data would be

7    routed to Google?

8          MR. LEE:  Objection to form, mischaracterizes

9    his testimony by a lot.

10          THE WITNESS:  I'm not -- I'm not trying to do         14:29:22

11    that.  You asked:  Would this be related to the -- you

12    asked:  Would this be related to the data?

13          My understanding is that routers are one way of

14    transmitting data.  And so, yes, it -- it -- I don't know

15    of another way that one would connect to the internet if    14:29:47

16    they didn't have a device like this.

17          My understanding is if you're going to collect

18    information, you have to collect -- you have to connect

19    to the internet in some way.

20          So just from a lay person's perspective, would        14:30:01

21    this be related?  Sure.  I mean, the data has to get

22    transmitted some way.

23      Q.  BY MS. TREBICKA:  Is your opinion here today

24    that all putative class members' data is transmitted to

25    Google through a Wi-Fi router?                               14:30:18

1          A.   No, it is not.  That's not my opinion.  But my

2     understanding is that some could be.

3          Q.   Have you analyzed how many would be transmitted

4     through a Wi-Fi router versus another method?

5          A.   No, I have not.                              14:30:40

6          Q.   And you're not offering an opinion on that

7     today; correct?

8          A.   No.  I was just trying -- you -- you asked me a

9     question.  I -- I tried to answer it as best I could.

10         Q.   In your opinion, if a user -- a putative class    14:30:53

11    member user browsing in private mode has one device that

12    they use to browse -- let's call that user user A.  And

13    another user, user B, has two devices on which they

14    browse privately any given month, the first user, user A,

15    would receive $3 in restitution -- restitutionary         14:31:36

16    damages, and the second user would receive $6; correct?

17         A.   Generally, that is correct, yes.

18         Q.   And that is so even if the amount of time spent

19    privately browsing is potentially -- let's assume that

20    the amount of time spent privately browsing is the same a  14:32:02

21    given month for user A and user B; correct?

22         A.   I didn't follow that.

23         Q.   Yeah, sure.

24              MR. LEE:  Incomplete hypothetical.

25              Go ahead.                                         14:32:17

                                                  Page 91

1          Q.  BY MS. TREBICKA:  User A has one device and

2     privately browses in a give month.  Let's assume as a

3     hypothetical ten hours for that month.  User B -- user B

4     has two devices, and user B browses on -- for that same

5     month one hour on the first device and one hour on the          14:32:37

6     second device.  So user B browses for a total of two

7     hours.  Again, private browsing for that month.

8              User B would get $6 for his two hours of private

9     browsing a month, and user A would get $3 for her ten

10    hours of private browsing that month; correct?                  14:33:00

11             MR. LEE:  Incomplete hypothetical.

12             Answer if you can.

13             THE WITNESS:  Did you say -- I thought you just

14    said $10.  I don't think that that's right.  I thought it

15    was --                                                          14:33:17

16         Q.  BY MS. TREBICKA:  No.  Let me say it again in

17    more simple terms.  I did not say $10.

18             But user A, one device, ten hours a month, would

19    get --

20         A.  Oh, I'm sorry.  I'm sorry.  Ten hours is what --       14:33:27

21    I thought you said $10.  Okay.

22         Q.  Okay.  So user A, one device, ten hours a month,

23    $3 in restitutionary damages.  User B, two devices, one

24    hour each, private browsing, would get $6 for that same

25    month; correct?                                                 14:33:47

                                                                Page 92

1          A.  Yes, that's correct.

2          Q.  Now, why does -- why is that reasonable,

3     allotting more damages to a user who is, in fact,

4     browsing less?

5          A.  Well, for -- for a number of reasons.  One is we      14:34:06

6     know that that's the way the market works in this case.

7     Google is willing to pay users $3 per month, per device.

8     So it's a market -- it's a market-based method here.

9              We don't see in the -- in the table that you

10    asked me to read -- or talk about where it's $3 for a      14:34:52

11    browser only if you use it 10 hours per month or only if

12    you use it 30 hours per month.  We don't see a difference

13    in the actual -- in the actual marketplace.

14             And that's not just true in -- in this

15    particular study, but that's true in some of the other      14:35:21

16    ones that I identify as well.

17             Now, for example, like in the AT&T example, it

18    doesn't say, "I will give you $29 a month if you're a

19    heavy user and only $10 a month if you're a light user or

20    $50 a month if you're a really, really heavy user."      14:35:42

21    That's not -- that's not how this market is interacting

22    with people that are asked to be tracked.

23             The second reason is, based on my discussions

24    with Mr. Hochman -- Hochman, that it's valuable to Google

25    to know that someone was browsing ten hours a month.  And      14:36:01

                                                        Page 93

1  valuable to know that a user was browsing one hour a

2  month on one device and one hour a month on another

3  device.

4          Google isn't treating those two users

5  differently.  They're not saying to a user, "Hey, you're          14:36:20

6  a ten-hour-a-month user.  You get all these special

7  benefits or perks for different things.  And, you know,

8  one-hour-a-month-user, you only get to see -- you don't

9  get anything.  You know, you're just a small user."

10         So the way Google actually -- actually treats          14:36:45

11  the people that actually use its services, treats them

12  the same.

13      Q.  Those were the two reasons; correct?

14      A.  Those are two that I can think of as I'm sitting

15  here, yes.                                                         14:37:05

16      Q.  Okay.  Now, for the Ipsos study, it pays $3 per

17  device, but Ipsos is able to link the data across

18  devices; correct?

19      A.  That is my understanding, yes.

20      Q.  And that's what you were testifying where the          14:37:23

21  value is in -- despite the fact that it was just an hour

22  for device.  Being able to have the bird's-eye view has

23  some value; correct?

24          MR. LEE:  Objection.  Mischaracterizes.

25          THE WITNESS:  That's not what I testified to.          14:37:38

Page 94

1        Q.   BY MS. TREBICKA:  So do you believe that there

2    is no value to having the bird's-eye view of a single

3    user using two devices?

4        A.   No, I didn't say that.

5        Q.   Do you believe there is value to having that          14:37:51

6    view of a single user using two devices?

7        A.   Sure.  There -- there could be that -- there

8    would be value there.  I don't think that that value in

9    any way would outweigh from a user's perspective.

10           From a user's perspective, you taking someone's        14:38:21

11   private browsing data unwillingly, I think that that

12   still would be less valuable -- less valuable from a

13   user's perspective.

14       Q.   In -- for a putative class member who is

15   browsing in Incognito mode, so signed out of a Google        14:38:45

16   account in Incognito mode on device 1, and then that same

17   member is signed out of a Google account, so a putative

18   class member browsing in Incognito mode in device 2, is

19   it your understanding that Google links those two

20   browsing sessions and has this bird's-eye view that we've    14:39:13

21   been talking about for this putative class member?

22           MR. LEE:  Beyond the scope.

23           THE WITNESS:  That is beyond the scope of my --

24   of my opinion.  That said, I have not assumed that in my

25   calculation.                                                  14:39:33

                                                      Page 95

1          MR. LEE:  I'll also object to the extent it is

2     subject to the Court's sanction order for Google's

3     discovery misconduct.

4          Q.  BY MS. TREBICKA:  So your understand- -- you

5     have not assumed in your calculations that those two          14:39:49

6     separate browsing sessions are connected; correct?

7          MR. LEE:  Same objection.

8          THE WITNESS:  Could you -- could you repeat the

9     whole question now?  Because now I'm not sure what I'm

10    answering.                                                    14:40:02

11         Q.  BY MS. TREBICKA:  So I gave you a scenario of a

12    putative class member browsing in two devices in private

13    browsing mode.

14         And my question to you is:  In your

15    calculations, have you assumed that Google is able to         14:40:16

16    link the browsing activity on each of those devices for

17    that putative class member?

18         A.  No.  That -- that assumption is not necessary

19    for my -- I think we're only talking about restitution

20    damages now or actual harm.                                  14:40:32

21         Q.  Correct.  Restitution damages.

22         Is the answer different for unjust enrichment?

23         A.  No.  No, it's not.  I just -- you just asked me

24    a general question, and I thought -- I thought we were in

25    the middle of restitution here, and I just wanted to make    14:40:49

                                                          Page 96

 1    sure that we're -- I'm not even sure how this would apply

 2    to unjust enrichment.  I would have to think separately

 3    about that.  But I -- that's not something that I

 4    calculated in unjust enrichment.

 5        Q.  So taking you back to -- give me one second.        14:41:08

 6            Taking you back to paragraph 138, the paragraph

 7    we were discussing, which is the second paragraph in your

 8    Actual Damages section.

 9        A.  I'm sorry.  Can you just give me a second?

10        Q.  Yeah.                                               14:41:47

11        A.  Okay.

12        Q.  The last sentence -- or second-to-last line,

13    where you say -- you were talking about, "A conservative

14    indicator of the monthly payment necessary for an

15    individual to knowingly relinquish the choice to keep      14:41:58

16    certain browsing private."

17            Do you see that?

18        A.  Yes.

19        Q.  "And allow Google to track all their online

20    activity regardless of browsing mode."                     14:42:08

21            Do you see that?

22        A.  Yes.

23        Q.  Why do you say "certain browsing private" here?

24        A.  What I'm -- what I'm saying here is -- I'm being

25    consistent with the class.  So certain browsing private,   14:43:06

Page 97

1    I understand that if you browse privately in certain

2    ways, that that may not be consistent with the class.

3    Like, if you're logged in to your Google account.

4        Q.  I understand.

5        So with this certain browsing private, do you        14:43:26

6    mean to limit it to the private browsing at issue in this

7    case?

8        A.  Yes, I do.

9        Q.  And your assignment to quantify restitution --

10   class-wide restitution damages is for the at issue data    14:43:41

11   collected during private browsing at issue in this case;

12   correct?

13       MR. LEE:  Asked and answered.

14       THE WITNESS:  I -- I believe that -- I think

15   you're asking for a legal conclusion, but I believe that   14:43:58

16   that is correct.

17       Q.  BY MS. TREBICKA:  No, I asked for your

18   assignment.  What you understand your assignment to be.

19       A.  I believe that that is correct.

20       Q.  So not all of the user's online activity, rather  14:44:08

21   limited to the private browsing that is at issue in this

22   case; correct?

23       A.  Well, now I don't understand what you just said.

24       Q.  Okay.  So you -- I'll rephrase.

25       You understand your assignment in this case to        14:44:26

Page 98

1    quantify restitution for private browsing at issue in

2    this case, not for a user's -- not for a user's online

3    browsing generally, even in regular mode?

4        A.  I feel like the answer is -- that the answer to

5    that is correct.  I'm not -- because you said regular        14:44:49

6    mode, no, I'm not trying to calculate anything for

7    regular mode.

8            THE WITNESS:  I just would note that we're

9    coming up on an hour.

10           MR. LEE:  Yeah.                                       14:45:07

11           THE WITNESS:  I don't know if this is a

12   reasonable breaking time or...

13           MR. LEE:  Mr. Lasinski, we can take a break

14   whenever you want, so -- and I don't think counsel will

15   object unless you're in the middle of a question.            14:45:18

16           MS. TREBICKA:  Yeah, I mean, look, we're going

17   to be reasonable.  Obviously we're all going to be

18   reasonable.

19       Q.  If you'd like to take a break now, I'm happy to

20   take a break now.                                            14:45:30

21       A.  Okay.  Thank you.  I just have to use the

22   restroom and getting a little uncomfortable.

23           THE VIDEOGRAPHER:  Going off the record at

24   2:46 p.m.

25           (Recess.)                                            14:45:41

                                                    Page 99

CONFIDENTIAL

```
 1          THE VIDEOGRAPHER:  We are back on the record at

 2    2:55 p.m.

 3          Q.  BY MS. TREBICKA:  All right.  Mr. Lasinski,

 4    before we went on the break we were talking about

 5    paragraph 138 of your report.                        14:55:25

 6          A.  Okay.

 7          Q.  Do you recall that?

 8          A.  I do.

 9          Q.  And you testified that the restitution damages

10    that you're calculating are limited -- or should be    14:55:39

11    limited to private browsing mode; is that correct?

12          A.  Yes, it is.

13          Q.  Now, direct your attention to the last sentence

14    in paragraph 138.

15          A.  Yes.                                         14:55:56

16          Q.  Where you say -- okay.  Where you say -- and I'm

17    reading aloud, but please read silently along -- that,

18    "The $3 per month represents," picking up at line 3 -- or

19    the third line from the bottom -- "represents a

20    conservative indicator of the monthly payment necessary  14:56:12

21    for an individual to knowingly relinquish the choice to

22    keep certain browsing private and allow Google to track

23    all their online activity regardless of browsing mode."

24          Do you see that?

25          A.  Yes, I do.                                   14:56:30
```

Page 100

 1          Q.  So here you say, "And allow Google to track all

 2    of their online activity regardless of browsing mode."

 3          What does that mean?  If you're now testifying

 4    that your restitution damages calculation is limited to

 5    private browsing, why are you also stating that it allows      14:56:49

 6    Google to track -- or this $3 a month is also an attempt

 7    to restitute damages for allowing Google to track all

 8    their online activity, regardless of browsing mode?

 9          MR. LEE:  Objection.  Mischaracterizes

10    paragraph 138.                                                 14:57:11

11          THE WITNESS:  Yeah, that's not -- that's not the

12    way I read the sentence.

13          The way I read this sentence is that the

14    baseline payment of $3 per month for the use of a

15    Screenwise browser extension or a Screenwise meter app        14:57:28

16    allows Google to track all the online activity,

17    regardless of browsing mode.

18          However, it is conservative to say that that $3,

19    when someone knowingly or willingly is allowing someone

20    to track -- or, in this case Google, to track that            14:57:57

21    information, that one would apply -- and, in this case,

22    me apply, a $3 per month for certain browsing

23    information.

24          So that's the way I intended this sentence to be

25    written and what I am doing in my calculation.                14:58:18

                                                      Page 101

```
 1          Q.  BY MS. TREBICKA:  So I just want to understand.

 2    What you're saying, what you're now explaining, is

 3    that -- you're saying that the $3 a month is what Google

 4    pays users to allow Google to track all their online

 5    activity, regardless of browsing mode, and you're          14:58:45

 6    applying that $3 number to the private browsing mode, and

 7    you say that it is a conservative measure because private

 8    browsing mode is more valuable to the user because they

 9    are not knowingly relinquishing their privacy?

10          MR. LEE:  Compound.                                  14:59:12

11          THE WITNESS:  I'm sorry.  I didn't hear.

12          MR. LEE:  I just said, "Compound."  It's for the

13    record.

14          THE WITNESS:  I got it.  I understand.  Okay.

15          I think what I'm -- no, I don't think.  What I'm     14:59:25

16    saying here is that, yes, $3 per month for taking

17    someone's choice away, their private browsing choice, is

18    conservative, in this case.  And I -- and I am aware of,

19    and I understand, that Google -- well, Ipsos collects

20    more information than just the private browsing mode.      15:00:00

21          And given -- and still given that, my opinion is

22    that $3 is conservative.

23          Q.  BY MS. TREBICKA:  And I asked you earlier about

24    why you think that is conservative or what your bases are

25    for thinking that it is conservative.  And you provided    15:00:28
```

Page 102

1    me with three items.

2              One is that there's other data points that

3    suggest a higher rate.  Number two was that Screenwise

4    has numerous other payments.  And number three is that

5    it's different for a user to knowingly give up a browsing    15:00:43

6    history versus unknowingly being made to give it up.

7              Is that the -- am I correct in thinking of the

8    correct answer -- testimony that you provided in response

9    to my question of why is it conservative?

10        A.  I think -- I think you asked me to summarize --    15:01:05

11   summarize my opinions, which I did.  I think it was --

12   actually, there's probably actually more detail that I

13   gave in that answer or provided after that.

14             However -- yes, I mean, again, here, I think

15   that -- and I think it's true, that a willing buyer or a    15:01:30

16   willing seller in a case would take less -- accept less

17   than a non-willing buyer.

18             I should say not willing seller, because we're

19   talking about the class members.

20        Q.  However, in paragraph 137 in your opinion, you     15:02:11

21   say -- and this is the second sentence that we read

22   earlier.  You're talking about, "Payments necessary to

23   incentivize an individual to knowingly relinquish the

24   choice to keep certain browsing private."

25             Do you see that?                                  15:02:40

                                                    Page 103

CONFIDENTIAL

```
 1        A.  Right.

 2        Q.  So you're actually initially talking about

 3   valuing private browsing information that is knowingly

 4   relinquished.  This unknowing relinquishing is -- is new;

 5   correct?                                          15:02:59

 6        A.  No, that's not correct.

 7        Q.  So then why do you say in paragraph 137 that

 8   what you're trying to do is determine the payments

 9   necessary to incentivize an individual to knowingly

10   relinquish the choice?                            15:03:13

11        A.  Because -- because you're trying to -- you're

12   trying to incentivize a non-willing seller, somebody that

13   has decided that they're going into private browsing

14   mode, to knowingly relinquish those rights.

15            So in my opinion, that is different than     15:03:29

16   somebody who is willing to knowingly relinquish those

17   rights.  And so to the extent that I mixed up "knowingly"

18   and "willingly" earlier, that's my mistake.

19            But in this -- but in this case, I understand --

20   my assumption is that they knowingly are giving up    15:03:52

21   something that they don't -- that they have chosen not to

22   give up.

23        Q.  Okay.  Is it fair to say that you analyzed the

24   Ipsos Screenwise Panel program for purposes of your

25   opinion?                                          15:04:16
```

Page 104

```
1        A.  I did, yes.

2        Q.  What is your understanding of the purpose of the

3   Ipsos Screenwise Panel?

4            MR. LEE:  For the record, Mr. Lasinski is

5   reviewing his expert report.                              15:05:39

6            THE WITNESS:  I talk about this in Section 61 --

7   I'm sorry, page 61, paragraph 144, of my report.

8            Google has indicated that it uses the Ipsos

9   study to better understand how consumers use technology

10  and digital media.                                        15:06:17

11       Q.  BY MS. TREBICKA:  Okay.  What is your

12  understanding of what the $3 per device monthly payment

13  is meant to compensate the Screenwise participants for?

14       A.  Let me just finish my last --

15       Q.  Oh, I thought you were finished.                 15:06:40

16       A.  Yeah, no.  So that's what they -- that's what

17  they use it for.  My understanding, you know, in part of

18  it -- part of it is they want to better understand this

19  because -- and I talk about this in paragraph 151.

20  They're able to -- or they're -- they have a concern      15:07:03

21  about privacy changes leading to a reduction in

22  measurable conversions.  And so then they talk about some

23  of the benefits of performing a study like this.

24           So could you reask your next question, just so

25  I'm --                                                    15:07:21
```

Page 105

CONFIDENTIAL

```
 1          Q.  Yeah.

 2              What is your understanding of the $3 per device

 3     monthly payment -- or let me ask it again.  Sorry.

 4     Strike that.

 5              What is your understanding of what the $3 per     15:07:35

 6     device monthly payment is meant to compensate the

 7     panelists for?

 8          A.  Well, we talked about this earlier.  We talked

 9     about there is a $20 payment that's made to -- you know,

10     to get -- collect information so they can qualify for the  15:08:17

11     study.  And then there's $100 payment if you input -- if

12     you set up the router and connect to the router.

13              But then in addition to that, there's monthly

14     payments, $3 per month, to users.  And then that -- you

15     know, so that monthly payment is to incent users to       15:08:34

16     continue to participate in the study.

17          Q.  Uh-huh.

18          A.  And it's $3 per device per user.

19          Q.  Okay.  I want to put a pin in this, the

20     paragraphs that you cited.  I want to circle back to       15:09:00

21     something that you testified to just a couple minutes

22     ago, which is that -- your explanation of how private

23     browsing users are unwilling sellers of their information

24     but knowing -- but you are measuring what it will take

25     to -- for them to give up the data knowingly.             15:09:23
```

Page 106

1           And the baseline -- or the method by which you

2      get there is by looking at the willing sellers of

3      information through -- in one way, the Ipsos Screenwise

4      Panel; is that right, generally speaking?

5           A.   Generally speaking, yes.                    15:09:45

6           Q.   So I wanted to ask you about the unwilling

7      sellers and whether you have done any testing on whether

8      users would value their data less if they know of the

9      data collection.

10          MR. LEE:   Objection to form, vague.             15:10:09

11          THE WITNESS:   So -- so I'm trying to answer this

12     question, and I'm not actually sure if I -- if I agree

13     with you if I'm answering the question or if I disagree

14     with you on answering the question the way you phrased

15     it.                                                   15:10:34

16          I didn't do -- I didn't do a study, if that's

17     what you -- you're asking.  But my belief is that what

18     I'm trying to do here when I -- when I say knowingly and

19     someone that unwillingly parted with their information,

20     is --                                                 15:10:47

21          You know, some people would -- some people would

22     just not part with their private browsing information at

23     all.  I don't care if you gave them a lot of money.  You

24     know, 20 or 30 or $40 per month.  They may not do that.

25     So I'm not considering the situation where someone would  15:11:13

Page 107

CONFIDENTIAL

1    not part with their -- with their private browsing

2    information.

3         I'm trying to be fair here and say, okay,

4    what -- would somebody part with their private browsing

5    information -- knowingly part with their private browsing    15:11:29

6    information?  And I think $3 is a fair rate given what

7    we've talked about.

8         Q.  BY MS. TREBICKA:  So I want to ask the question

9    a little bit differently.

10        Have you seen any studies or testing on whether    15:11:50

11   users value their data more if they are unwilling sellers

12   of the data?

13        A.  I -- I haven't seen a study on that from a data

14   perspective.  But from an economic perspective, if you're

15   an unwilling seller versus a willing seller, you    15:12:27

16   wouldn't -- it's worth -- it's worth more to you.  So

17   your choice is worth more to you.

18        I mean, think of it this way:  I'm an unwilling

19   seller of my house.  Somebody walks up to me and says

20   they want to buy my house.  I'm, like, "Well, I'm not    15:12:49

21   moving."  You know, that's a different -- that's a

22   different set of facts than if I put my house on the

23   market and am going to sell it.

24        And from an economic perspective, a willing

25   buyer -- or, I'm sorry, a willing seller will sell for    15:13:04

Page 108

1    less than an unwilling seller.

2        Q.  Have you seen any -- or have you identified any

3    support in the literature for your answer?

4        A.  In the literature for whether or not a willing

5    buyer or a willing seller would --                    15:13:48

6        Q.  Actually, let me ask the question again.

7            Have you seen -- the question is:  Have you seen

8    any literature or studies on whether users would value

9    their data less if they know of a data collection?

10       A.  Wait, what?  I'm not -- I'm not getting it.     15:14:17

11       Q.  Okay.  So is it your view that a user would

12   value their data less if they are -- if they know of the

13   data collection?

14           MR. LEE:  Objection to form, mischaracterizes.

15           THE WITNESS:  No, I'm not.                      15:14:35

16       Q.  BY MS. TREBICKA:  Okay.  Let's keep going for

17   now.

18           We were talking about the Screenwise -- the

19   Ipsos Screenwise program.  You -- in paragraph 143 of

20   your report.                                           15:15:06

21       A.  Okay.

22       Q.  You say -- you're actually -- let me see.  In

23   the second sentence of -- of that paragraph 143, you say

24   that, "Through these studies, which are marketed as the

25   Ipsos Screenwise Panel."                               15:15:41

Page 109

CONFIDENTIAL

1        A.   Where are you at now?

2        Q.   143, second sentence.

3        A.   Okay.  I'm just -- okay.  I see it.

4        Q.   "Through these studies, which are marketed as

5   the Ipsos Screenwise Panel, members of selected US          15:15:52

6   households are paid to voluntarily link their devices,

7   operate a special router, and recruit other members of

8   the household to participate in a comprehensive online

9   data collection process."

10        Do you see that?                                       15:16:09

11        A.   Yes, I do.

12        Q.   So these are members of selected US households.

13   Have you researched Google's selection criteria for

14   Ipsos?

15        A.   No, I have not.                                   15:16:30

16        Q.   Do you know whether all putative class members

17   would have been selected to the panel had they attempted

18   to register for it?

19        A.   No, I don't know the answer to that, if they

20   would or would not have.                                    15:16:45

21        MR. LEE:  I'll also object subject to the

22   Court's sanction order.

23        Q.   BY MS. TREBICKA:  You testified that some class

24   members -- or sorry.  You testified that you don't know

25   whether some class members would have been selected or     15:16:59

Page 110

```
1    not.  Isn't that an important inquiry, for you to

2    determine whether class members would have even been able

3    to register for the Ipsos Screenwise Panel?

4         MR. LEE:  Objection subject to the Court's

5    sanction order.                                      15:17:20

6         THE WITNESS:  No, it is not.

7    Q.  BY MS. TREBICKA:  Why not?

8    A.  Because I do know that these participants

9    were -- they signed up for the study.  They knew that

10   their private -- well, all their browsing, including    15:17:33

11   their private browsing mode, to the extent that they were

12   using one of these devices or connected to the router,

13   would have been collected.  They -- so they're a

14   willing -- they're a willing seller of that information.

15        My opinion is that if you are -- if you don't      15:17:52

16   know or are not willing, that you would require more than

17   what a willing seller would sell for.

18   Q.  Okay.  So I'm just reading from your testimony.

19   You say, "My opinion is that if you are or if you don't

20   know, you are not willing, that you would require more    15:18:22

21   than a willing seller would sell for"; is that correct?

22   A.  Right.  If you're an unwilling seller, then

23   you -- then you would not.

24   Q.  And --

25   A.  You would sell for more.                         15:18:38
```

Page 111

```
 1              MR. LEE:  Hold on.  Hold on.

 2              THE WITNESS:  You would sell for more.  You

 3      would sell for more.  You would not agree to sell for

 4      less.

 5         Q.  BY MS. TREBICKA:  And your understanding of an     15:18:45

 6      unwilling seller is a seller who is unknowingly providing

 7      something; correct?

 8         A.  No.  In -- to be clear, in this case, my

 9      understanding of -- of the putative class members are

10      people that went to private browsing mode.  Even though   15:19:07

11      they had the option to go into regular browsing mode,

12      they went to private browsing mode.

13              And so that puts them in a different situation

14      than someone that's browsing in regular browsing mode.

15         Q.  So going into private browsing mode puts them in   15:19:25

16      the unwilling seller category, in your opinion?

17         A.  They are not willingly -- they are not willingly

18      transmitting -- or having their data collected, and

19      they're unknowingly having their data collected.

20         Q.  So going into private browsing mode puts them in   15:19:58

21      your unwilling seller category; correct?

22         A.  In my -- in my opinion, their choice has been

23      taken away, and so they're no longer in that -- they are

24      not in that category.

25         Q.  If a Screenwise Panelist browses in private        15:20:13
```

Page 112

CONFIDENTIAL

1    browsing mode, would you consider that person a --

2    someone who you should apportion damages to?

3             MR. LEE:  Viola, I'm assuming in your question

4    you're building in while the study is ongoing.

5             If not, I object as vague as to time frame.        15:20:43

6             MS. TREBICKA:  Okay.

7             THE WITNESS:  I guess I'm not understanding your

8    question.  If someone -- if there was a unique private

9    browsing instance, I have -- during a month, I have

10   calculated -- and I think we're just still in restitution   15:21:02

11   damages here -- I have calculated that that person should

12   be compensated.

13       Q.  BY MS. TREBICKA:  Even if that person was also

14   an Ipsos Screenwise Panel participant?

15       A.  I see -- I see what you're saying in this case.     15:21:32

16   My understanding -- my understanding -- my understanding

17   of Ipsos is if there's, like, a thousand people in that

18   study.  So there may be -- that may be a group that could

19   be selected out of whether or not there would be damages.

20       Q.  Okay.  Is your opinion that the data at issue in    15:22:10

21   this case is identical to the data that Google collects

22   through the Ipsos Screenwise Panel?

23       A.  No.

24       Q.  What is different between those two bodies of

25   data?  Actually, scratch that.  Let me ask you a slightly   15:22:28

Page 113

CONFIDENTIAL

1    different setup question.

2          Have you analyzed what the difference is between

3    the data at issue in this case and the data that's

4    collected for Ipsos?

5        A.  Yes, I have looked at the two.                    15:23:01

6        Q.  Have you compared the two?

7        A.  Yes.

8        Q.  And in your opinion, are they generally

9    comparable?

10       A.  In -- in my opinion, in the Ipsos Screenwise      15:23:23

11   study, they -- there's more data collected than would be

12   collected in private -- in private browsing mode.

13       Q.  Is the data collected qualitatively different,

14   as well as quantitatively different?

15       A.  Yes.                                               15:23:59

16       Q.  Talk to me about -- or tell me why you believe

17   that the data collected in Ipsos is qualitatively

18   different from the data at issue in this lawsuit?

19       A.  Well, I mean, I am not the technical expert, and

20   I would not be able to identify every single way in which  15:24:34

21   they're different.  But I give an example of the types of

22   data that's included in the Ipsos study.  And what I say

23   here is that placed on your mobile phone, it will record

24   everything that you see on your screen, everything that

25   you tap, everything that you type.  You know, what you     15:24:59

                                                         Page 114

CONFIDENTIAL

```
1    swipe or otherwise input.  It also includes information

2    on TV user interfaces, information from apps, as I'm sure

3    that you know, take app information out of my

4    calculations here.  It takes your name, your email

5    address, your home, your work address, telephone number.    15:25:30

6          So there's -- that's quantitatively more and

7    qualitatively more as well.

8        Q.  You're also aware that Screenwise participants

9    were subject to requirements to maintain a minimum level

10   of online activity to receive the $3 payment per month?    15:25:51

11         MR. LEE:  That is not -- that's consistent with

12   my understanding, yes.

13       Q.  BY MS. TREBICKA:  And you're also aware that

14   Screenwise participants are required to perform certain

15   activities; correct?                                       15:26:14

16       A.  I believe that that is accurate, yes.

17       Q.  And do you recall what activities they're

18   required to perform?

19       A.  I don't -- I don't recall what activities, as I

20   sit here.                                                  15:26:46

21       Q.  Okay.  Well, do you have any reason to doubt

22   that they were required to respond to notification on

23   their devices?

24       A.  I do not know.

25       Q.  Do you have any reason to doubt that they needed    15:26:57
```

Page 115

1    to check their Google profile?

2        A.  No, I do not.

3        Q.  Do you have any reason to doubt that they were

4    required to fill out surveys?

5        A.  Well, no.  I know that they were required to        15:27:20

6    fill out surveys.  We already talked about that.

7            MS. TREBICKA:  So let me just mark for the

8    record Exhibit 12, which is the Google Panel Terms &

9    Conditions.

10           I'm sorry, Tab 12 and Exhibit 4.                     15:27:33

11           (Exhibit 4, Google Panel Terms & Conditions,

12           6.1.21, marked for identification electronically

13           by counsel.)

14           MS. TREBICKA:  This is where Ms. Fani comes in

15   and rescues the day.                                         15:27:44

16           MR. LEE:  Just give us a sec for it to load.

17           MS. TREBICKA:  Okay.  It's up, I'm being told.

18           THE WITNESS:  I have it now.

19           MS. TREBICKA:  Okay.  Ms. Fani, can you, please,

20   also introduce Tab 13 -- or load it, and we'll get to it?   15:28:00

21           (Exhibit 5, Google Panel Privacy Policy, 6.1.21,

22           marked for identification electronically by

23           counsel.)

24           MS. TREBICKA:  Is it Exhibit -- we marked

25   this -- the Google Panel Terms & Conditions as Exhibit 4.   15:28:08

                                                        Page 116

CONFIDENTIAL

```
1              MR. LEE:  Is there a Bates Number on this?

2              MS. TREBICKA:  I don't believe so.

3              MR. LEE:  I'm not seeing one.  Was it produced?

4              MS. TREBICKA:  It is public, and I'm not sure if

5       we've produced it.                                   15:28:32

6              But, Ms. Fani, you can -- if there's anything

7       else to add, please unmute and tell us.

8              MS. FANI:  Yes, I can represent that this was --

9       is just a printout of a current website, the current

10      website that is -- the link of which is listed in the   15:28:51

11      bottom left-hand corner of the first page.

12             MR. LEE:  Okay.  And it wasn't produced; right?

13             MS. FANI:  I -- I have not confirmed whether or

14      not it was produced.  But it was printed from a public

15      website.                                              15:29:08

16             MR. LEE:  Okay.  Just if it was produced, please

17      let us know.

18             MS. FANI:  Okay.

19         Q.  BY MS. TREBICKA:  Mr. Lasinski, have you seen

20      this document before?                                 15:29:19

21         A.  I'm going to look at it really quickly.

22         Q.  Sure.

23         A.  I don't know if I've seen this particular

24      document.  I do believe I've seen a document similar to

25      this, if not the same as this.  Because some of the terms  15:30:45
```

Page 117

CONFIDENTIAL

```
 1    and some of the information in this document is familiar

 2    to me.

 3        Q.  Let me show you what we've marked as Exhibit 5,

 4    which is also a publicly available document, with the

 5    title "Google Panel Privacy Policy."                    15:31:08

 6           MR. LEE:  Five?

 7           MS. TREBICKA:  Correct.

 8           MR. LEE:  Okay.  This also does not have a Bates

 9    Number; correct?

10           MS. TREBICKA:  Correct.  It's a publicly        15:31:26

11    available document.

12           MR. LEE:  Okay.

13           THE WITNESS:  Okay.

14        Q.  BY MS. TREBICKA:  Have you seen this document

15    before?                                                 15:32:29

16        A.  I don't know if I've seen this particular

17    document.  I have gone to this website, and I have gone

18    to the Google Panel Privacy Policy in forming my

19    opinions.  I just don't know -- it says, "Last modified:

20    June 1, 2021."  I -- I don't recall -- I don't recall the  15:33:35

21    document that was up, if it's this exact same one.  It

22    likely is, but I'm not 100 percent sure.

23        Q.  Understood.

24           And earlier you agreed that Screenwise

25    participants are required to respond to notifications on  15:33:58
```

Page 118

1    their devices, check their Google profile, fill out

2    surveys; correct?

3        A.  My -- you asked me if I had a reason to doubt

4    that, and I do not have a reason to doubt that.

5        Q.  You don't recall that from the Google Panel        15:34:17

6    Terms & Conditions?

7        A.  I thought that -- I thought that you were asking

8    me about the question that you asked before.

9            My -- my -- that is consistent with my

10   understanding.                                              15:34:39

11       Q.  Okay.  And you agree that doing those actions

12   requires time; correct?

13       A.  If you were to do those actions, it would

14   require time.

15       Q.  And you agree that a person's time is valuable?     15:34:57

16       A.  Yes, I do.

17       Q.  And if Google expects panelists to spend time

18   doing some activities that are required by the Panel, is

19   it reasonable to expect that the panelists are being

20   compensated for that time?                                  15:35:10

21       A.  My understanding is that would be one of the

22   incentives to continue as a panel member.  So, yes, it

23   would be.

24       Q.  So part of the monetary incentives to continue

25   as a panel member are also compensating the panelists for  15:35:38

Page 119

1    his or her time; correct?

2         A.  From the panelists' perspective, yes.

3         Q.  Now, turning your attention back to the

4    Privacy -- hold on.  Let me make sure I have the right

5    one here.                                          15:36:08

6              The Google Panel Terms & Conditions.  So

7    the -- so Exhibit 4.

8         A.  Okay.

9         Q.  Okay.  And if you could turn your attention to

10   Section 11.1.                                      15:36:26

11        A.  Yes.

12        Q.  You understand that Screenwise participants

13   agree not to use "do not track" features; correct?

14        A.  Yes, I do.  That's what it says here.

15        Q.  Correct.  And they also agree not to use ad    15:37:02

16   blockers?

17        A.  Yes, that's true.

18        Q.  And they also agree not to turn off location

19   reporting services or location history services?

20        A.  They do -- they do agree to that, correct.    15:37:25

21        Q.  And putative class members are not subject to

22   such restrictions; correct?

23        A.  I do not believe that they are, that is correct.

24        Q.  Now, would you agree that there is value to

25   users in the option to turn on a "do not track" feature    15:37:43

1    or an ad blocker?

2        A.  I would agree that there is value to giving a --

3    users choice, yes.

4        Q.  And taking away that choice, as Screenwise is

5    doing for panelists, you would expect Screenwise to        15:38:09

6    compensate users accordingly; correct?

7        A.  Well, certainly this is one of the things that

8    Screenwise users are agreeing to do for the compensation

9    that they -- that they receive.

10       Q.  Other things being equal, would you agree that    15:38:45

11   data that tells you more about a particular user is more

12   valuable than data that tells you less about a particular

13   user?

14           MR. LEE:  Objection to form, vague.

15           THE WITNESS:  I would say other things being      15:39:19

16   equal, that is accurate, yes.

17       Q.  BY MS. TREBICKA:  Now, are there differences in

18   the value of different types of data?  For example, do

19   you believe that an IP address has the same value as

20   users' browsing history?                                  15:39:41

21       A.  I have not done an analysis of that, so I don't

22   know the answer to that question.

23       Q.  And all else equal, do you believe that more

24   reliable data is more valuable than less reliable data?

25           MR. LEE:  Objection to form, vague.               15:40:10

Page 121

CONFIDENTIAL

```
 1              THE WITNESS:  I mean, if you're asking me all

 2    else being equal, yes, that would be -- more reliable

 3    data would be more valuable.

 4         Q.  BY MS. TREBICKA:  And all else equal, again,

 5    more data is more valuable than less data; correct?      15:40:33

 6              MR. LEE:  Asked and answered.

 7              THE WITNESS:  I -- I believe that that is

 8    accurate, yes.

 9         Q.  BY MS. TREBICKA:  And why would you say that?

10         A.  If you're holding all else equal and you have   15:40:44

11    more information, you, by definition, have more than just

12    a subset of the information.  So it would be more

13    valuable.  Or it could -- I should say it could be more

14    valuable.  It wouldn't necessarily be more valuable, but

15    it could be more valuable.                               15:41:20

16         Q.  Now, would more data collected about a user

17    provide more information to Google about the user?

18         A.  So in my opinion, when you're talking about the

19    user and the value of the information, it's -- it's

20    valuable to know whether or not that person -- for       15:42:05

21    Google, it's valuable to know whether or not that person

22    spends time on a website or valuable to know whether or

23    not they do certain things.

24              But it's also valuable to know, and very

25    important to know, that they don't.  And so, actually,   15:42:31
```

Page 122

1    having less information is very valuable to them as well,

2    the types of people that don't spend time on websites,

3    that don't spend time on their devices and that don't

4    spend time searching stuff.  So that's also very valuable

5    to them.                                              15:42:58

6            And I'm not sure that it would be more valuable

7    one way or the other.

8        Q.  Because you haven't looked at whether one is

9    more valuable than the other; correct?  Or you haven't

10   analyzed; correct?                                    15:43:12

11       A.  That's not accurate.  I've talked to Mr. Hochman

12   about the value of data and the importance of data to

13   Google.

14           And I -- as we've -- as we've talked, here

15   I'm -- been very clear, I think, throughout my answers   15:43:31

16   that it's important to know information about users.

17   It's equally important to know if they spend less time,

18   thereby giving -- allowing Google to have less

19   information or more information.

20           So it's important for Google to know both       15:43:58

21   things.

22       Q.  And your -- your answer with respect to why

23   Google -- why it's valuable for Google to know whether a

24   user spends less time is because Google would know that a

25   particular user is not spending as much time on a        15:44:15

                                                    Page 123

```
 1    particular website; correct?

 2        A.  It gives them -- it gives them information that

 3    they're able to use in their -- in their modeling and

 4    when they're talking to their advertisers.

 5            So having information about a broad universe of     15:44:41

 6    people is very -- is important to Google.  And having

 7    information that they do or do not do certain things is

 8    important to Google.

 9        Q.  Right.

10            So we were talking about the short periods of      15:44:54

11    time spent on a website.  And your view was that that is

12    valuable to Google.  You didn't quantify how much, but it

13    is valuable to Google because it allows Google to know

14    that a particular user is spending less time on a

15    website; correct?                                          15:45:13

16        A.  So what I'm saying in there -- in this case is

17    Google wants to collect information on all users, is my

18    understanding.  They want to collect information on all

19    users.  And knowing that information about those users is

20    important to them.                                         15:45:36

21            Whether or not -- whether or not they spent a

22    certain amount of time or spend less time is important to

23    them and can be equally as important to them.

24            MR. LEE:  Viola, can we take a restroom break?

25    I didn't go last time.                                     15:45:55
```

Page 124

CONFIDENTIAL

```
 1              MS. TREBICKA:  Give me one minute.

 2              MR. LEE:  Okay.

 3              MS. TREBICKA:  Yeah, that's fine.  Let's just

 4    take a break now.

 5              MR. LEE:  Thank you.                    15:46:09

 6              THE VIDEOGRAPHER:  Going off the record at

 7    3:46 p.m.

 8              (Recess.)

 9              THE VIDEOGRAPHER:  We are back on the record at

10    3:58 p.m.                                         15:57:58

11        Q.  BY MS. TREBICKA:  Mr. Lasinski, I would like to

12    ask you about the other indicators of value that you have

13    in your report and you, in a summary fashion, identified

14    earlier as well.

15              Starting with page 68, AT&T's GigaPower campaign  15:58:21

16    and internet preferences program.

17        A.  Okay.

18        Q.  So whenever you're there -- so this is your

19    report, page 68.

20        A.  I'm there.                               15:58:42

21        Q.  Okay.  This is one of the examples of consumer

22    willingness to pay to prevent data collection or block

23    advertisements that you identified in your report;

24    correct?

25        A.  That is correct, yes.                    15:58:53
```

Page 125

CONFIDENTIAL

1      Q.  Now, have you researched what portion of AT&T's

2  customers chose to pay the extra $29 per month to opt out

3  of the internet preferences program?

4      A.  No.  That information was not available to me,

5  so I did not.                                          15:59:13

6      Q.  Did you look for it, and it was not available?

7      A.  It's not available, correct.

8      Q.  Where did you look?

9      A.  I searched on the internet and had my team

10 search.                                                15:59:31

11     Q.  Have you researched why the program was

12 discontinued?

13     A.  I do have an understanding of why it was

14 discontinued, yes.

15     Q.  Why was it discontinued?                       16:00:08

16     A.  My understanding is that AT&T was attempting to

17 simplify its offering and confirm that data collection

18 and targeted ads would be shut off as a result of the

19 change.

20     Q.  And have you researched how much AT&T charged    16:00:23

21 customers after it discontinued the program?

22     A.  No, I did not.

23     Q.  Have you researched why the program was only

24 available in three cities -- or Austin, Texas, Kansas

25 City, Missouri, and parts of Kansas?                   16:00:44

                                                   Page 126

CONFIDENTIAL

```
 1         A.  I did search for that information, but it's not

 2    available publicly.

 3         Q.  You searched online again?

 4         A.  Yes, I did.

 5         Q.  Have you researched whether AT&T used the web      16:01:20

 6    browsing information to provide TV advertisements?

 7         A.  If I remember correctly, they did, yes.

 8         Q.  What about mail-in advertisements?

 9         A.  I believe that that's also accurate.

10         Q.  Have you researched whether AT&T sold the data     16:02:04

11    that it collected through this program?

12         A.  That information is not -- I did.  That

13    information is not available publicly.

14         Q.  Turn your attention to paragraph 159, please.

15         A.  Yes.                                               16:02:34

16         Q.  And in that paragraph -- I'll read it for the

17    record, if you could read along silently.

18             "I have also identified and considered the

19    following indicators of research organizations'

20    willingness to pay users to allow for additional data      16:02:47

21    collection."

22             What does the term "additional" mean in this

23    sentence?

24             MR. LEE:  Viola, can you just tell me what

25    paragraph we're on, please?                                16:03:33
```

Page 127

1          MS. TREBICKA:  159.

2          MR. LEE:  Thanks.

3          THE WITNESS:  What I -- what I mean by

4    "additional" in this -- in this particular sentence is

5    the types of information that I'm talking about in the          16:03:56

6    paragraphs below.

7          Q.  BY MS. TREBICKA:  Additional to what?

8          A.  I don't have an additional to what.  It's --

9    it's the types of information that I'm talking about in

10   paragraphs below.                                                16:04:19

11         Q.  Just doubling back to the AT&T GigaPower

12   campaign questions, did you do any research to determine

13   whether the information that AT&T would stop collecting

14   in exchange for the $29 payment is comparable to the at

15   issue data in this case?                                         16:04:42

16         A.  Yes.  What I -- what I noted in this case is

17   that AT&T was using this information to serve

18   personalized ads tailored to your interests, including

19   search terms and web pages that you visit.

20         And so that information is comparable to the             16:06:01

21   types of information that we're talking about here.

22         I feel like somebody's talking on the -- on one

23   of the --

24         Q.  And do you know -- is that the extent of your

25   research, to determine the comparability of the two types      16:06:30

Page 128

1    of data?

2         A.  Ultimately, yes, there is not additional

3    information available.  But I was able to glean from the

4    information that was available that we're talking here

5    about personalized ads, targeted ads.                        16:06:48

6              That is based upon, for example, search terms

7    and web pages that you go to.

8         Q.  Do you know whether this information that it

9    collects and used, AT&T, could also be TV info?

10        A.  That I believe is correct.  I believe that it      16:07:48

11   could be.

12        Q.  What about mobile info?

13        A.  Do you mean information that comes from your

14   mobile device --

15        Q.  Correct.                                            16:08:35

16        A.  -- or do you mean cellular information?

17        Q.  Information that comes from your mobile device.

18        A.  I -- my understanding is that it could, because

19   we're talking about their fiber network, and if you

20   connected it to your -- to the fiber network in your        16:08:49

21   home, it could be.

22        Q.  And this information that AT&T collects and used

23   could also be anything that might happen through the

24   internet but does not involve a browser; correct?

25        A.  That is possible, yes.                             16:09:06

                                                    Page 129

1        Q.  If you could turn your attention to paragraph

2    160 on page 69.

3        A.  Yes.

4        Q.  The Nielsen Computer and Mobile Panel.

5        A.  Yes.                                      16:09:43

6        Q.  Okay.  And here you state -- I'm reading for the

7    record if you could silently follow along -- "Nielsen,

8    the world's leading provider of media and marketing

9    information, tracks and collects information related to

10   device usage to develop an understanding of consumer    16:09:58

11   behavior, including what consumers view and listen to, as

12   well as how they browse the internet."

13           Do you see that?

14       A.  Yes, I do.

15       Q.  Now, is the information that consumers listen to    16:10:12

16   at issue in this case?

17       A.  I do not believe that it is, no.

18       Q.  Let me show you exhibit -- what we've marked as

19   Exhibit 6, I believe, which is the Nielsen printout

20   related to the computer mobile panel.                    16:10:53

21           (Exhibit 6, Nielsen Printout, Computer & Mobile

22           Panel, marked for identification electronically

23           by counsel.)

24           (Exhibit 7, Nielsen Printout, Computer & Mobile

25           Panel, Frequently Asked Questions, marked for

                                                     Page 130

```
 1              identification electronically by counsel.)

 2              (Exhibit 8, Nielsen Printout, U.S. Panel Privacy

 3              Notice Summary, marked for identification

 4              electronically by counsel.)

 5              (Exhibit 9, SurveySavvy printout, How it Works,

 6              marked for identification electronically by

 7              counsel.)

 8              (Exhibit 10, SavvyConnect printout, FAQs, marked

 9              for identification electronically by counsel.)

10              (Exhibit 11, SavvyConnect, Terms and Conditions,

11              marked for identification electronically by

12              counsel.)

13              (Exhibit 12, UpVoice printout, FAQs, marked for

14              identification electronically by counsel.)

15         Q.  BY MS. TREBICKA:  Please let me know when you      16:11:04

16    have it.

17         A.  I'm here, yes.

18         Q.  Okay.  So you see this is a printout that has

19    the tagline at the top "Get rewarded for using your

20    devices"?  Have you seen this document before?             16:11:15

21         A.  Yes, I have.

22         Q.  And this is -- at the top left corner, it has

23    the Nielsen name on it; correct?

24         A.  Yes, it does.

25         Q.  And is this a computer and mobile panel page      16:11:26
```

1    explaining this program?

2         A.  It is, yes.

3         Q.  And you've seen this before?

4         A.  I have, yes.

5         Q.  And this tells you that Nielsen requires the          16:11:39

6    user to install a separate desktop application; correct?

7         A.  Yes, it does.

8         Q.  And it also tells you that Nielsen asks users to

9    complete an online user profile?

10        A.  Yes, it does.                                          16:11:55

11        Q.  Okay.  And do you know the information that goes

12   into that profile?

13        A.  Not all of it, no, I do not.

14        Q.  Nielsen also states on the first page that it

15   collects general computer and/or mobile device activity.       16:12:17

16            Do you see that?

17        A.  I don't see where you're --

18        Q.  Okay.  I don't see it either.  I think let's go

19   to the next exhibit, which should be Exhibit 7, and it's

20   a frequently asked questions document.                         16:12:44

21        A.  Yes.

22        Q.  Okay.  And if you could turn your attention on

23   that first page to "What does the Nielsen Computer &

24   Mobile App/software collect?"

25            Do you see that?                                       16:13:04

                                                          Page 132

CONFIDENTIAL

1        A.  Yes, I do.

2        Q.  Do you see that the third checkmark states:

3   "General computer and/or mobile device activity"?

4        A.  Yes, I do.  Yes.

5        Q.  Have you researched what that data is?              16:13:17

6        A.  I have not.  I could not determine that from my

7   internet searches.  That said, I will note that Nielsen

8   is asking people to willingly sign up to this, where the

9   data that we're talking about here and the users that

10  we're talking about here were not willing participants or    16:14:09

11  did not knowingly give up their data like they did here.

12       Q.  And the Nielsen panelists are required to

13  complete surveys; correct?

14       A.  I believe that that is accurate, but I don't see

15  that here.                                                    16:15:34

16       Q.  Well, let me show you exhibit -- what's been

17  marked as Exhibit 8, which is the "Nielsen U.S. Panel

18  Privacy Notice Summary," and if you could turn to page 4,

19  towards the top half of the page -- towards the bottom of

20  the top half, if that makes sense, under "demographic       16:16:08

21  data" it says, "Once your household has joined the Panel,

22  we may, from time to time, ask you to participate in

23  surveys, studies, or questionnaires and provide us with

24  additional information (mainly behavior data and

25  preference data) in order to help us better understand      16:16:24

Page 133

1   consumer behaviors and trends."

2       Do you see that?

3       A.  I do, yes.

4       Q.  So any reason to doubt that that's one of the

5   requirements to participate in the Nielsen Panel?        16:16:35

6       A.  I'm sorry.  My screen just went black.  Hold on.

7       Could you ask me that question again?

8       Q.  Do we need to get off the record?

9       A.  No.  It's back -- it's back up now.

10      Q.  Okay.  Any reason to doubt that that's one of      16:16:51

11  the requirements to participate in the Nielsen Panel?

12      A.  I mean, no.  That's not -- that is one of the

13  requirements.  I mean, if you want to have a chance to

14  win up to, you know, $500 a month, you're -- which these

15  users are given that chance to earn up to $500 a month    16:17:17

16  and $50 for participating in the Panel, they are incented

17  to do that.  I mean, as I say here, they give away

18  $10,000 of prizes every month, so you've got a chance of

19  winning $500, so you're incented to do that.

20      Q.  And where do you get the $500 per month?          16:17:46

21      A.  If you -- I'm sorry.  I had to go to Exhibit 7.

22  If you go to Exhibit 7 instead of 8, the one that we were

23  on, it talks about what happened -- what happens after I

24  sign up.

25      Q.  What page are you on?                              16:18:50

Page 134

1      A.  I'm on page -- unfortunately, it doesn't have

2   page numbers.

3      Q.  Page 2?

4      A.  Page 2.

5          It says you could win $50 a year in rewards, but      16:19:00

6   also you're eligible to win, you know, a portion of what

7   they give away each month, which is $10,000.

8      Q.  So you've talked about sweepstakes; correct?

9      A.  Yeah.  So you have -- yeah, if you're a

10  participant, you have a chance to win a portion of the      16:19:21

11  $10,000, and some people win $500.

12     Q.  Do you know how many participants there are?

13     A.  I do not know how many participants there are.

14  That information isn't publicly available.

15     Q.  Okay.  Let's move on to SavvyConnect.  That's      16:19:49

16  another one of the research organizations that you

17  included in your report; correct?

18     A.  Correct.

19     Q.  Paragraph 162.

20     A.  Paragraph 162, yes.      16:20:05

21     Q.  You're aware that SavvyConnect requires the user

22  to install a separate desktop application; right?

23     A.  Yes, I am.  Yes.

24     Q.  And you're aware that SavvyConnect requires

25  users to complete an online user profile and a portrait;      16:20:18

```
 1    correct?

 2         A.  Yes, I understand that to be the case.

 3         Q.  Do you know what goes into that profile?

 4         A.  I know in part what goes into the profile, yes.

 5         Q.  What goes in the profile?                      16:20:59

 6         A.  Well, in part, some of the information that goes

 7    into it is the user's name, their email address and basic

 8    demographic information.

 9         Q.  Okay.  And you're aware that SavvyConnect has

10    minimum activity requirements; correct?                16:21:20

11         A.  Yes, I am.

12         Q.  And that it also connects user data through

13    supplementary surveys?

14         A.  That's my understanding, yes.

15         Q.  Okay.  Let's move on to UpVoice, which is --    16:21:33

16         A.  Just to be clear, I mean, again, my

17    understanding of SavvyConnect is that you willingly enter

18    this and knowingly provide them with your information as

19    a user or a panelist.

20         Q.  And this is different from putative class       16:21:57

21    members, because in your view, they do not willingly

22    enter -- or they do not willingly give up their data or

23    knowingly give up their data; correct?

24         A.  Correct.

25         Q.  Okay.  So just to be clear, putative class      16:22:12
```

Page 136

CONFIDENTIAL

1    members do neither -- give up their data neither

2    willingly nor knowingly?

3        A.  They are not aware of -- yes, correct.  They are

4    not aware of the data that they are giving up.  That is

5    correct.                                                16:22:31

6        Q.  UpVoice.  Paragraph 163, you're aware that

7    UpVoice requires a user to install a separate desktop

8    application?

9        A.  Yes, I am.  Yes.

10       Q.  And that it has eligibility requirements for    16:22:49

11   panelists?

12       A.  Yes, that is correct.

13       Q.  And you're also aware that it requires that

14   users disable ad blockers?

15       A.  Yes, that's true.                               16:23:01

16       Q.  And that also it collects additional information

17   through supplementary surveys; correct?

18       A.  That is my understanding.

19       Q.  How did you go about identifying these companies

20   that you listed in this section of your report?         16:23:16

21       A.  Are you talking about Section 8, or are you

22   talking about just UpVoice here?

23       Q.  I'm talking about UpVoice, SavvyConnect, Nielsen

24   and the AT&T's GigaPower Campaign.

25       A.  I did research to identify these additional data 16:23:37

Veritext Legal Solutions
866 299-5127

1    points that we've just gone through.

2        Q.  Did you identify any other data points that you

3    decided not to include in your report?

4        A.  I may have, but I can't recall as I sit here.  I

5    can't recall any other data points.                    16:24:15

6        Q.  Now, moving on to allocation of the restitution

7    damages that you calculate, you propose two possible

8    methods to allocate restitution damages in paragraph 197

9    of your report; correct?

10       A.  That is correct.                                16:25:10

11       Q.  One refers to -- or one method uses the number

12   of UMPBI attributable to each class member; correct?

13       A.  Yes, it does.

14       Q.  And UMPBI stands for?

15       A.  Unique monthly private browsing instances.      16:25:26

16       Q.  And the other method is according to the number

17   of class members or putative class members now; correct?

18       A.  I know that we're switching topics, and I know

19   that this is short, but I have to quickly use the

20   restroom.  I'm sorry about this.  I just -- it can       16:25:45

21   literally be less than five minutes.

22       Q.  It's all right.

23       A.  Okay.

24           THE VIDEOGRAPHER:  Going off the record at

25   4:26 p.m.                                               16:25:56

CONFIDENTIAL

```
 1              (Recess.)

 2              THE VIDEOGRAPHER:  We are back on the record at

 3     4:30 p.m.

 4         Q.  BY MS. TREBICKA:  Okay.  Mr. Lasinski, you

 5     proposed two possible methods to allocate restitution     16:29:50

 6     damages; correct?

 7         A.  I do, yes.

 8         Q.  And we briefly touched on them before the break;

 9     correct?

10         A.  I believe that we talked about UMPBI.            16:30:01

11         Q.  The other method is according to the number of

12     class members?

13         A.  Yes, it is.

14         Q.  And is one of them preferable to the other, in

15     your opinion?                                            16:30:29

16         A.  I have not provided a preference.

17         Q.  Have you calculated the number of UMPBI deemed

18     attributable to each class member?

19         A.  You mean for the entire class have I calculated

20     the number of UMPBI of each individual class member?     16:30:56

21         Q.  Right, attributable to each class member.

22              MR. LEE:  Let me object subject to the Court's

23     sanction order for Google's discovery misconduct.

24              Are you representing that that data has been

25     produced, Counsel?                                       16:31:14
```

Page 139

CONFIDENTIAL

1          MS. TREBICKA:  I have a question for the

2    witness.  I think I need the witness to answer.

3          MR. LEE:  Okay.  So you're not going to answer

4    my question?

5          MS. TREBICKA:  We can take it up after, not on        16:31:26

6    the record.

7          MR. LEE:  All right.  Let me object based on the

8    sanction order then.

9          THE WITNESS:  So my understanding is that not --

10   that data is not available to -- for the entire class.      16:31:40

11        Q.  BY MS. TREBICKA:  Do you have an understanding

12   of how it can be --

13        A.  Can I finish or --

14        Q.  Oh, I didn't know you were not finished.  With

15   the long pauses, it's making it hard for me know to when    16:31:52

16   you're finished.

17          Go ahead.

18        A.  I appreciate that comment.  Thank you.

19          So my understanding is that data is not

20   available, and so I have not attempted to do it.            16:32:08

21        Q.  Do you know whether -- well, how do you propose

22   that it be done, given that this is one of your

23   methodologies?

24        A.  So to the extent that Google produces the data,

25   one could calculate the number of unique private browsing   16:32:49

                                                          Page 140

```
 1    instances for the class members.  Another way one could

 2    do it if that data is not available or only partially

 3    available would be through attestation.  Class members

 4    could attest what they did over the -- over the period.

 5          But to be clear, I'm not -- I'm not the            16:33:22

 6    administrator in this case.  Those are two ways that seem

 7    reasonable to me to do this calculation, but again, I'm

 8    not the administrator, so I'm not sure exactly how they

 9    would do it.

10      Q.  So how it would be done is not part of your       16:33:39

11    opinion; correct?

12          MR. LEE:  Objection to form, mischaracterizes

13    paragraph 197.

14          THE WITNESS:  I just provide two ways that it

15    could be done or a combination of those ways, but my     16:33:50

16    understanding is that at some point there will be an

17    administrator and they will determine how to -- how to do

18    this if UMPBI is selected as the correct method.

19      Q.  BY MS. TREBICKA:  And you, sitting here today,

20    do not have an opinion on how to do this if UMPBI is     16:34:16

21    selected as the correct method?

22          MR. LEE:  Objection subject to the Court's

23    sanction order for Google's discovery misconduct.

24          THE WITNESS:  I mean, again, I have to -- as I

25    sit here, I haven't -- I mean, I have ways that it could 16:34:31
```

Page 141

1    be done.  I mean, it could be done -- if Google produces

2    the information, it could be done that way.  If Google

3    doesn't produce the information or it produces only a

4    portion of the information, it could be done through

5    attestation.  Those are two ways that it could be done --    16:34:50

6        Q.  BY MS. TREBICKA:  And this is --

7        A.  -- to get this -- to get the information

8    necessary to do it this way.

9        Q.  This is your opinion, that it can be done

10   through attestation?                                        16:35:02

11       A.  That seems like a reasonable way to do it, to

12   the extent that the information isn't available from

13   Google.

14       Q.  Do either of your two methodologies propose

15   allocation of restitution damages in proportion to the    16:35:23

16   amount of at issue data that Google collected from each

17   class member?

18       A.  Yes.

19       Q.  Which one?

20       A.  So UMP- -- UMPBI would consider the amount of      16:35:56

21   information collected by Google.  It obviously --

22   obviously considers use, and so, therefore, the amount of

23   information that was collected.

24       Q.  So in your opinion, there's a direct

25   relationship between use and the amount of relationship     16:36:26

                                                       Page 142

1    -- of data that was collected?

2        A.  Yes, there is.

3        Q.  What is your opinion based on?

4        A.  My discussions with Mr. Hochman.

5        Q.  What is --                                        16:36:42

6        A.  So my -- go ahead, please.

7        Q.  No.  If you haven't finished your answer, please

8    go ahead.

9        A.  So we've talked about this earlier today.  My

10   discussions with Mr. Hochman are that when you            16:36:59

11   calculate -- when Google collects information from users

12   about their browsing history, that's valuable to Google.

13   Knowing that they're on for a long time or a short time

14   or that type of information is very valuable -- very

15   valuable to Google, and so they value that information.   16:37:33

16       And a monthly browser instance, or in this case

17   a unique monthly browser instance, is an appropriate way

18   to consider that value to Google and an appropriate way

19   to apportion it, because it considers use by the class

20   member.                                                   16:38:07

21       Q.  UMPBI does not measure use, however; correct?

22       A.  No, that's incorrect.

23       Q.  In your view, UMPBI measures use?

24       A.  It does.  I mean, you have to log on each month

25   to get a UMPBI, so if you only logged on once, you'd only  16:38:24

Page 143

CONFIDENTIAL

1    get one UMPBI.  If you logged on twice in two consecutive

2    months, you'd get two, so it's got -- it considers use.

3        Q.  But in any given month, you are provided one

4    UMPBI whether you logged on just once for five minutes or

5    every single day for the entire month; correct?            16:38:54

6        A.  Correct.

7        Q.  So in your opinion, do you believe there is a

8    direct relationship between the number of UMPBI

9    attributable to each class member and the amount of at

10   issue data Google collected from each class member?        16:39:32

11       A.  I'm not sure if there is a direct relationship

12   between UMPBI and the amount on an individual basis.

13   However, how that user is treated and -- and the

14   information that Google is able to obtain on a user,

15   whether or not they spent a long time or a short time,     16:40:16

16   which is what I think you're asking here, is important to

17   Google, and, therefore, using this measurement of use is

18   an appropriate measure for allocation.

19       We also see -- we also see this measure of

20   allocation -- you know, this measure used in the           16:40:37

21   marketplace, like what we've been talking about earlier,

22   people pay, including Google through its Ipsos study, a

23   flat monthly rate per device.

24       Q.  But you also testified earlier that Google is --

25   that in your understanding at least, Google is not able     16:41:27

Page 144

CONFIDENTIAL

1    to link to separate private browsing sessions for a

2    logged out user to each other, correct, if the user logs

3    out after every single browsing section?

4            MR. LEE:  Mischaracterizes.  Objection.

5            THE WITNESS:  I did not -- I did not testify to        16:41:52

6    that.  You asked -- I believe that you asked me a

7    question could they link that, and I said that it's not

8    necessary for my damages calculation -- for my

9    restitution calculation to assume -- to have assumed

10   that.                                                          16:42:09

11       Q.  BY MS. TREBICKA:  So for purposes of your

12   restitution calculation, you did not assume that Google

13   is able to link two separate private browsing sessions;

14   correct?

15       A.  No, that's not correct.                               16:42:31

16       Q.  What is not correct about it?

17       A.  Well, so my understanding is that they would be

18   able to link two private browsing sessions, so long as

19   they came from the client -- from the same device.

20           So I think what you were trying to get at is do      16:42:53

21   I -- have I double-counted, you know, unique monthly

22   browsing instances, and my understanding is that I have

23   not, that they can -- if there are two or three or four

24   or five browsing instances in a month, that they can say

25   that those browsing instances came from the same device.     16:43:13

                                                    Page 145

CONFIDENTIAL

```
 1    And that's my understanding of how they produced the

 2    data.

 3         Q.  Okay.  Well, you mentioned UMA data in your

 4    report; correct?

 5         A.  I do, yes.                                    16:43:39

 6         Q.  In your understanding, does every Chrome

 7    instance browsing in Incognito report UMA data?

 8         A.  If I understand your question correctly, I think

 9    that UMA data is based on sample data, and so to use UMA

10    data and to calculate the number of browsing instances,   16:44:34

11    you have to -- you have to adjust the UMA data, which I

12    did in my calculations.

13         MS. TREBICKA:  Okay.  And for the record, it's

14    U-M-A, alternatively pronounced U-M-A or UMA.

15         Q.  If a user opens Incognito mode and looks at the   16:44:59

16    new tab page, the splash screen -- the Incognito splash

17    screen, but then this -- closes the Incognito session

18    before visiting another page, does that count as the

19    UMPBI in your calculations if reported?

20         MR. LEE:  Beyond the scope.                        16:45:26

21         THE WITNESS:  I'm not aware of any data to

22    suggest that people do that, but if it came in through --

23    if it came in through the UMA data as a unique monthly

24    browsing instance, then I would have included it in my

25    analysis.                                               16:46:14
```

Page 146

1    Q.  BY MS. TREBICKA:  If a user reinstalls Chrome on

2    their device, would that reinstallation count as a single

3    UMPBI in your calculation?

4    A.  If a user reinstalls Chrome?

5    Q.  Correct.                                        16:46:43

6    A.  I don't think -- I don't think it would.

7    Q.  If a user reinstalls Chrome and then goes on to

8    do a private browsing session, would that be counted as a

9    new UMPBI in your calculation?

10   A.  I -- if I remember correctly, Mr. Strombom had   16:47:37

11   indicated that it would.  I talked to Mr. Hochman about

12   that.  My understanding is that it's not that clear.  It

13   depends on what device it's reinstalled on whether or not

14   it would actually show up as a new private browsing

15   instance or a new -- a new ID.  So I don't believe that   16:48:04

16   it would in all cases.  I believe that it could in some

17   cases.  In any event, I'm not aware of that being a

18   significant number of instances -- of private browsing

19   instances.

20   Q.  Turn your attention to paragraph 169 of your      16:48:27

21   report, and I will ask you about that first sentence in

22   your -- in that paragraph 169, which talks about "the

23   ███ factor" --

24   A.  Yes.

25   Q.  -- "indicated above to Google's prior production   16:49:00

Page 147

```
 1    of data regarding 'unique Chrome instances' in the U.S.

 2    for each month since June 2016."

 3           Do you see that?

 4       A.  I do, yes.

 5       Q.  Okay.  So this ████████ assumes that usage    16:49:11

 6    of Incognito relative to regular mode remained constant

 7    between June 2016 and June -- and 2021; correct?

 8       A.  I'm going to the schedule where that's

 9    calculated on.

10       Q.  Are you going to Schedule 18.1?              16:50:27

11       A.  Yes, I am.

12           Okay.  I'm sorry.  I'm ready for your question.

13       Q.  Okay.  So the question is:  You're assuming that

14    between June 2016 and 2021 it's a -- that the usage of

15    Incognito is constant relative to regular mode; correct?  16:51:08

16       A.  Yes, I am.

17       Q.  And did you do any research or analysis to

18    confirm whether this is a reasonable assumption?

19       A.  Yes.

20       Q.  And describe your research or analysis.       16:51:36

21       A.  Okay.  So my research is reviewing the documents

22    in the record to inform my opinion on whether or not this

23    is an appropriate assumption, and based on my research,

24    it is.

25           I was able to see in some of the documents -- I   16:52:02
```

Page 148

CONFIDENTIAL

```
 1    can't recall the specific document, but there is a

 2    document that exists in the record where there are graphs

 3    of Incognito usage, and I believe that that document goes

 4    back to 2014, and if you looked at Incognito usage, it

 5    was -- that graph showed usage in and around  ████         16:52:28

 6    ████████  .  I think it might have gone a little bit

 7    below  ███████  , but then a little bit above  ███████  ,

 8    if I'm remembering that document correctly.

 9          I also saw documents in the record that went

10    back into the 2018 time frame, if I'm remembering         16:52:55

11    correctly, that indicated that traffic was similar to

12    traffic in 2021, so while not usage, it is -- usage from

13    a browsing perspective, it does show similarity in the

14    amount of overall traffic, and that document went back to

15    2018.  I believe that there were also documents in 2019   16:53:38

16    which showed a similar level of traffic.

17          And then, you know, my understanding of

18    Incognito is that it was introduced at the same time

19    Chrome was in 2008.  I mean, we're talking about here

20    2016 to 2021, and so, you know, in -- in the world of     16:54:10

21    technology, in the world of Google, you know, an

22    eight-year technology is a relatively mature technology,

23    so that, again, would suggest to me that it's a

24    reasonable assumption to assume a consistent level of

25    traffic.  I'm sorry.  I'm sorry.  I don't mean traffic.   16:54:39
```

Page 149

1    I mean Incognito use.

2         Q.  And these documents that you are now describing,

3    are they cited in your report?

4         A.  They would be, yes.

5         Q.  Where are they cited?  Do you know off the top          16:54:53

6    of your head?  I don't -- this is not an invitation to

7    spend the remaining time looking through your report, but

8    where would they be cited, generally speaking?

9         A.  Well, generally speaking, they would be cited in

10   my docs considered.                                              16:55:14

11        Q.  Would they be cited in the footnotes of your

12   report as well?

13             MR. LEE:  Do you want him to look at the

14   footnotes, or do you want him to guess?

15             MS. TREBICKA:  No.  Again, not -- we have very          16:55:35

16   little time.  I don't know if we'll need more than the

17   seven hours.

18             MR. LEE:  That's the only reason I interrupted.

19        Q.  BY MS. TREBICKA:  I would like a -- because we

20   have not seen those documents that you are now                   16:55:44

21   describing, Mr. Lasinski, and we'd like to see them if

22   they indeed exist, so I'm asking whether you are able

23   to -- without, again, looking through the entirety of

24   your report or taking minutes to do that right now, are

25   you able to point me to a footnote or set of footnotes          16:56:04

                                                            Page 150

1    that would have these documents?

2         A.  Well, let me -- so let me just clarify two

3    things before I answer that question.

4              You, in fact, must have seen them, because they

5    are produced documents, so I can't agree that you didn't        16:56:25

6    see them or they weren't available to be seen.

7              I can take a couple minutes, depends on how many

8    you give me, and go back to the section where I talk

9    about traffic and see if I can identify them, but that

10   would depend on how much time you want me to spend on          16:56:42

11   this.

12        Q.  Which section?  Just tell me the section.  I

13   don't think I want you to spend any additional time on

14   it.  I'd just like to know the section, please.  Is it

15   the section where paragraph 169 is?                            16:56:56

16        A.  I'm not -- I'm not finding it, where they -- if

17   they -- I'm not finding where they would be footnoted.

18        Q.  Okay.  Well, we are short on time, Mr. Lasinski,

19   so I'd rather move on, but if you find them before the

20   deposition is over, please identify them for us, because      16:58:06

21   right now we just have your description of the record,

22   but not an actual citation.

23              I am planning to move on to unjust enrichment.

24   Happy to take a break, otherwise we keep going.

25   Mr. Lasinski, it's up to you.                                 16:58:25

1       A.  I'd like to take a ten-minute break.

2       Q.  Sure.

3           THE VIDEOGRAPHER:  Going off the record at

4   4:59 p.m.

5           (Recess.)                                    17:08:33

6           THE VIDEOGRAPHER:  We are back on the record at

7   5:10 p.m.

8       Q.  BY MS. TREBICKA:  All right.  Mr. Lasinski, I

9   would like to ask you about your allocation methodology

10  for unjust enrichment, which I understand is also        17:10:10

11  explained in paragraph 197 of your report that we went

12  over before the break.

13      A.  Okay.

14      Q.  Okay.

15      A.  One second.  I've just got to get back there.    17:10:22

16      Q.  Yes.  Absolutely.

17          You propose the same two methods, the UMPBI and

18  the class member method, for allocating unjust enrichment

19  damages; correct?

20      A.  Yes, I do.                                        17:10:42

21      Q.  Now, how do you propose that the unjust

22  enrichment be allocated using UMPBI?

23      A.  I guess I'm not understanding the question.

24  Could you repeat it?

25      Q.  How -- mechanically, how would you proposal       17:11:01

                                                Page 152

1    allocating unjust enrichment to individual class members

2    using UMPBI?

3            MR. LEE:  Asked and answered.

4            THE WITNESS:  Are you asking me how we would

5    calculate it, UMPBI?                                    17:11:18

6        Q.  BY MS. TREBICKA:  No.  So maybe the

7    misunderstanding is arising because when we previously

8    spoke about allocation, I was -- I understood our

9    conversation to be limited to restitutionary damages, to

10   the allocation using UMPBI over restitutionary damages.    17:11:38

11           However, if the answers with respect to unjust

12   enrichment are the same, in other words you would take

13   the top level unjust enrichment number and divide it by

14   UMPBI, then perhaps that's a way to shortcut this

15   discussion?                                              17:12:01

16       A.  When you say "top level," I mean, my

17   understanding is it would be the awarded level.  I

18   provide lots of different scenarios for unjust enrichment

19   here, so, yes, I would take the unjust enrichment and use

20   UMPBI to distribute it.                                  17:12:20

21       Q.  Okay.  How would you use UMPBI to distribute the

22   awarded unjust enrichment number?

23           MR. LEE:  Asked and answered.

24           Go ahead.

25           THE WITNESS:  I would take the award and divide    17:12:42

Page 153

CONFIDENTIAL

1    the total dollar value by the total number of UMPBI in

2    the class period, as I explain in paragraph 197.

3        Q.  BY MS. TREBICKA:  And then you would calculate

4    the UMPBI attributable to each class member?

5        A.  Yes.                                          17:13:04

6        Q.  And each UMPBI would have a certain value that

7    would be equal -- each UMPBI would have an equal value

8    per month; correct?

9        A.  Under the UMPBI scenario, correct.

10       Q.  And similarly, just a rundown of how you would    17:13:20

11   propose to allocate the unjust enrichment damages using

12   the number of class members.

13       A.  It would be a similar method.  It would -- I

14   would take the damage -- I would take the resulting

15   dollar value of the unjust enrichment and divide it by    17:13:52

16   the number of class members.

17       Q.  So each class member would take home the same

18   amount in unjust enrichment damages; correct?

19       A.  Yes, they would.

20       Q.  Now, do you think that Google earns the same     17:14:13

21   amount of revenue from each putative class member?

22       A.  I have not attempted to calculate the amount of

23   revenue that they've earned for each class member.  My

24   expectation, though, and my -- based on my discussions

25   with Mr. Hochman is that each class member and the       17:14:50

                                                     Page 154

1    information that they collect on each class member is

2    valuable.

3         We see in the marketplace where participants in

4    studies are compensated equally on a per month instance,

5    if you will, and it's as appropriate, in my opinion, to         17:15:11

6    also consider each class -- to consider each class member

7    and divide the total by each class member.

8    Q.  Why in your opinion should the allocation of

9    unjust enrichment damages not be proportional to the

10   amount of revenue that Google collected from that class         17:15:41

11   member?

12        MR. LEE:  Objection to form, mischaracterizes

13   facts.

14        THE WITNESS:  I think we need to be clear that

15   my understanding is that Google doesn't collect revenue         17:15:58

16   from class members, that they're not -- none of these

17   class members are charged for their use here, but, in

18   fact, they do collect valuable information that is put

19   into their system and used in their system.

20        And one of the value propositions that Google         17:16:22

21   has is its reach and the fact that it collects

22   information on all of the class members and can determine

23   and represent to its customers that it has such a large

24   reach and has information on all of these users, if you

25   will, or devices, if you will, is important to its         17:16:52

Page 155

CONFIDENTIAL

1    model -- to its model.

2           And so it is important that class members are --

3    in my opinion are either, A, treated equally or, B,

4    treated fairly based on the number of UMPBI or browser --

5    or private browser instances per month.                    17:17:24

6           Q.  BY MS. TREBICKA:  And what is your opinion that

7    Google's -- the value that Google receives as part of

8    the -- or from the information is in part related to or

9    based on this proposition of reach of a large number of

10   class members?                                             17:17:48

11          A.  Well, that's based on my discussions with

12   Mr. Hochman.

13          Q.  What did Mr. Hochman tell you?

14          A.  That it's important to Google's business that

15   they have a large reach, and the greater the number of    17:18:00

16   class members, the -- I'm sorry, not class members.  The

17   greater the number of users, the greater the value of --

18   the greater their value proposition is to their

19   advertisers.

20          And so he also said that in many cases it's as     17:18:17

21   important to know whether or not, for example, somebody

22   converted or didn't convert on a specific ad, so having

23   information as to the negative as well as the positive

24   can be equally important to Google, especially when

25   you're talking about, in that case, conversions.          17:18:45

                                                    Page 156

1          And so a reasonable way to apportion the unjust

2     enrichment is to consider class members on an equal basis

3     or based on use, which is what we were talking about

4     under the UMPBI method.

5          Q.  Is it based on anything other than your            17:19:08

6     discussions with Mr. Hochman?

7          A.  Well, again, I mean, another -- another --

8     another data point that we talked about earlier is we see

9     in studies when they're trying to incent, meaning Google

10    and others, trying to incent somebody to participate,       17:19:36

11    they are paid a monthly rate, and that monthly rate does

12    not change by the amount of usage for those -- for those

13    individuals.

14          Also, one thing that I think I noted earlier in

15    my testimony is that, you know, Google treats their users   17:19:59

16    similarly.  It's not like Google is saying to a user that

17    spends ten hours per month on a device, "Look, you get

18    access to special Google systems or you get access to

19    special Google treatment, but you who use it only $2 --

20    or only two hours a month, we're not going to give you --   17:20:29

21    you know, we're going to give you the low end service."

22    They just don't treat their customers that way -- or I

23    should say their users.

24          Q.  So you've just mentioned -- before the Google

25    treats their users similarly point, you mentioned that --   17:20:48

1    in the studies that they're trying to -- when they're

2    trying to incentivize, they pay a monthly rate for each

3    user; correct?

4         A.  They do, for each -- well, actually, for each

5    device.                                                17:21:06

6         Q.  For each device.

7             Now, you also admitted that certain of these

8    studies have minimum use requirements; correct?

9         A.  Yes, they do.  Sure.  Sure.

10        Q.  And there's no minimum use requirement for a    17:21:21

11   private browsing user to be part of the class; correct?

12        A.   That is my understanding, yes, that is correct.

13   But assuming that you meet that minimum use, it's not

14   like, say -- let's say the minimum use is five hours or

15   something and you go to ten hours.  It's not like        17:21:38

16   somebody who is at 20 hours then gets $7 or something

17   like that.  It just doesn't work that way.

18        Q.  Now, does the blocking of third-party cookies

19   affect Google's ability to earn revenue from the at issue

20   data?                                                   17:22:13

21             MR. LEE:  Objection to form, vague.

22             Incognito mode, Viola, or no?

23             MS. TREBICKA:  At issue data.  I believe it's

24   all private browsing.

25             MR. LEE:  Just trying to be clear.            17:22:27

                                                      Page 158

1          THE WITNESS:  So -- so yes.  If you -- if I'm

2    understanding your question correctly and you were to

3    think about my calculations, my calculations will, you

4    know, cut off, for example, in private browsing mode when

5    third-party cookies are blocked, for example, for          17:23:01

6    personalization, because my understanding is that

7    personalization is based on third-party -- is based on

8    third-party cookies, so that's how my calculations work,

9    which I think answers your question.

10        Q.  BY MS. TREBICKA:  My question was:  Does the       17:23:25

11    blocking of third-party cookies affect Google's ability

12    to earn revenue from the at issue data, and I believe the

13    answer is yes, it does; correct?

14        A.  I believe that it -- I think if I'm

15    understanding your question correctly, yes, it does, and   17:23:41

16    I have modeled that in my analysis.

17        Q.  In each one of your scenarios?

18          MR. LEE:  Again, for the record, Mr. Lasinski is

19    reviewing the expert report.

20          THE WITNESS:  So to be clear, yes, in each one       17:25:34

21    of my scenarios.  But to be -- but to be clear, at least

22    in scenario one, so the first scenario under display ads,

23    my understanding is that there are other methods by which

24    Google wrongfully collects data and is then able to get

25    to the same point as whether or not it blocked            17:26:05

Page 159

1    third-party cookies or not.

2        Q.  BY MS. TREBICKA:  Does your proposed allocation

3    method account for class members who blocked third-party

4    cookies in their browsers?

5        A.  Yes, it does.                            17:26:36

6        Q.  How so?

7        A.  So my starting calculations are actually -- my

8    calculations are actually based on how Google analyzes

9    blocking third-party cookies and the impact that it would

10   have on blocking third-party cookies, and then -- so to   17:27:02

11   the extent that -- to the extent that those unjust

12   enrichments -- those unjust enrichments would not include

13   third-party -- unjust enrichment would not include

14   third-party cookies where they were already blocked.

15       Q.  Understood as far as your unjust enrichment      17:27:41

16   calculation.

17           My question was whether the proposed allocation

18   method to individual class members takes into account the

19   class members' blocking of third-party cookies in their

20   browser?                                         17:27:55

21       A.  I do not believe that I -- no, I have not made a

22   deduction for individuals that have blocked third-party

23   cookies.

24       Q.  What about individuals who have disabled their

25   JavaScript?                                      17:28:36

1       A.  No, I have not.

2       Q.  What about for individuals who use VPNs and

3   therefore mask their IP address?

4       A.  I have not.

5       Q.  What about for individuals who disabled          17:28:55

6   personalized ads in their Google ad settings?

7       A.  No.  I have not made any adjustment for that,

8   no.

9       Q.  Your unjust enrichment methodology calculates,

10  as you were intimating, several scenarios of unjust      17:29:15

11  enrichment that a fact finder could pick from; is that

12  correct?

13      A.  That is correct, yes.

14      Q.  And the ███████████ amount in your calculation

15  represents the maximum amount of possible unjust revenue  17:29:39

16  that Google may have earned from the alleged wrongdoing;

17  correct?

18      A.  No, that is not correct.  That is the -- that is

19  the maximum amount that I have calculated of unjust

20  enrichment.  I would expect that Google earned more than  17:30:18

21  that from the data that it collected.

22      Q.  Okay.  But the ███████████ amount is your

23  highest calculation of unjust enrichment earned from the

24  alleged wrongdoing; correct?

25      A.  That is my -- that is the highest number that I    17:30:42

                                                    Page 161

1    calculated under unjust enrichment, correct.

2        Q.  And you did not deduct costs that Google may

3    have incurred to generate this revenue, potentially

4    unjustly enriched revenue; correct?

5        A.  I did not deduct costs, that is correct.  I        17:31:00

6    don't -- go ahead, please.

7        Q.  No.  Sorry, I didn't mean to --

8            MR. LEE:  If you were finished, then she should

9    go ahead.  If you were still answering, then you should

10   go ahead.  That's how this goes.                           17:31:14

11           THE WITNESS:  I don't believe that I should have

12   deducted any costs in this case.

13       Q.  BY MS. TREBICKA:  Why not?

14       A.  Well, there are a number of reasons.  One is

15   when Google performed its analysis for the ads impact --   17:31:35

16   the ads impact document that I talk about in my report,

17   and through which I model my damages under unjust

18   enrichment, they did not deduct any costs, and they're

19   talking about the impact in that case.  They're talking

20   about the impact of, in their case, Google Chrome          17:32:02

21   blocking third-party cookies by default, so that's one

22   reason.

23           The second reason is that a Google witness was

24   asked about costs as it relates to this area, and when

25   asked if they could identify -- or if she could identify   17:32:38

CONFIDENTIAL

1    any costs that would change based on calculations that

2    are similar to this, she could not identify any costs

3    that would change.

4          Third, my understanding of Google's business is

5    it's very infrastructure heavy, and based on the          17:33:01

6    infrastructure that it has in place and the amount of

7    revenue that we're talking about compared to Google's

8    global business here, we're talking about in every

9    scenario for every year below ██████████.  In some cases

10   we're talking about ████████.                              17:33:32

11         So to say that they would be able to save

12   costs -- incremental costs by such a low change in their

13   traffic seems inconsistent with what their business model

14   is.

15         And then I had a discussion with -- with          17:33:49

16   Mr. Hochman on this, and he indicated that that is his

17   understanding as well as to their business model.

18         Additionally, my understanding is that there are

19   certain types of data analysis that are done on users'

20   devices.  Actually, Mr. Hochman explained to me it's      17:34:24

21   called muling, and that that -- that those costs are

22   significant, and Google would no longer be able to save

23   those costs if it wasn't collecting this information.

24         And then finally, I mean, this is an area that

25   Mr. Strombom has looked at as well, and I find his        17:34:47

Page 163

CONFIDENTIAL

1    analysis to be completely unconvincing.  He's looked at

2    and done some sort of an analysis that looks at Google's

3    overall revenue and tries to calculate some overall cost

4    percentage, or percentages I should say, and has not

5    looked at in any way, you know, the specifics that we're          17:35:07

6    talking about here as it relates to, you know, analysis

7    of a small subset of Google's data and a relatively small

8    portion of their revenue.

9        Q.  You mentioned taking -- trying to take it from

10   the top of the narrative answer that you just provided,           17:35:41

11   you mentioned a Google witness being asked about

12   identifying costs that would change based on the

13   calculations.

14           Who is that Google witness?  Is it Katie Nguyen?

15       A.  I have to look him up.  I have it in my report.           17:36:08

16   I'll find it.

17       Q.  Okay.  Please do not look at it now.  We don't

18   have the time right now.

19           But if it is -- you represent that it is in your

20   report?                                                           17:36:24

21       A.  I do believe that it is my report, yes.

22       Q.  You also mentioned Mr. Strombom's analysis, and

23   you mentioned that it is not convincing because it -- he

24   hasn't looked in any way at the specifics of what we're

25   talking about.  What do you mean by that?                         17:36:38

1      A.  Mr. Strombom is -- if I understand his method

2    correctly, and I believe that I do, he's looked at

3    Google's overall business and overall cost structure and

4    not specifically at, you know, what would happen in a

5    situation where Google in Incognito mode collected        17:37:00

6    ultimately what is, you know, a very little bit of

7    additional information relative to Google's global

8    collection of information, and how that would impact

9    their business -- and how that would impact their

10   business, and identified specific costs that they would   17:37:30

11   have saved.

12      Q.  And when you say "identified specific costs that

13   they would have saved," what do you mean by that?

14      A.  What are the specific incremental costs that

15   would have been saved.                                     17:37:52

16      Q.  You -- hold on.  Give me a sec.

17          Okay.  You also mentioned Mr. Hochman and that

18   he explained something to you that you also used as a

19   basis for your opinion.

20          Can you tell me what Mr. Hochman told you that      17:38:21

21   supports your opinion here that costs should not be

22   removed?

23          MR. LEE:  Asked and answered.

24          THE WITNESS:  Sure.  I mean, I think I answered

25   that question.  My understanding from my discussions with  17:38:40

                                                        Page 165

1    him, when you're talking about the level of traffic that

2    we're talking about here and the amount of data that

3    we're talking about here, relative to Google's overall

4    traffic collection that it does in its normal course of

5    business, that it would be very difficult for them to cut    17:39:13

6    down their -- to cut down their infrastructure to reduce

7    their infrastructure in such a way that would provide any

8    meaningful cost savings.

9         Q.  BY MS. TREBICKA:  When a Google -- when Google

10   shows display ads to a user and receives revenue from the    17:39:39

11   advertiser, Google has to pay a revenue share to the

12   publisher; correct?

13        A.  They do in some cases, that is correct.

14        Q.  And do you believe that it's reasonable to at

15   the very least remove that share that would be paid to    17:39:59

16   the publishers?

17        A.  I mean, in this case, the advertisers -- the

18   advertisers -- as I think you know from the calculation,

19   it's not like you go from a personalized ad to no ad.

20   There still are advertisers.  My calculations indicate    17:40:38

21   that you still would be able to, under personalization,

22   show a non-personalized ad.  That's the way that Google

23   looked at it, so there would still be an advertiser that

24   you would have to share revenue with in this case.

25        Q.  Do you believe that it's reasonable to remove    17:41:07

Page 166

CONFIDENTIAL

```
 1    from your unjust enrichment calculation the share that

 2    would have to be paid to the publisher?

 3         A.  I mean, I have not seen any evidence that would

 4    indicate that it should be removed here.  I mean,

 5    Mr. Strombom had a calculation -- had the opportunity to    17:41:25

 6    calculate such a cost if that were -- if that were

 7    correctly -- correctly removed, and he did not.

 8         Q.  Let me show you Figure 24 on page 32.

 9         A.  Are you talking about my report now?

10         Q.  Yes, your report.                                  17:42:04

11         A.  Page 32, I'm sorry?

12         Q.  32, Figure 24.

13         A.  Yes.

14         Q.  This shows "U.S. Display Ads Revenues

15    Attributable to Alleged Wrongful Conduct by Liability       17:42:18

16    Scenario"; correct?

17         A.  Yes.

18         Q.  Under the "All," do you see that very first

19    column?

20         A.  Yes.                                               17:42:30

21         Q.  Yeah.  This includes unjust revenue from all US

22    display ads shown to users of private browsing mode,

23    according to your calculations; right?

24         A.  That is in part correct, yes.

25         Q.  What do you mean "in part correct"?              17:43:30
```

Page 167

```
 1        A.  Well, in this case I still have taken out

 2   revenue from AdMob.  I've taken out revenue from app

 3   traffic, but under this scenario, after -- after I make

 4   those adjustments and I make -- and I make the adjustment

 5   for Chrome traffic share -- well, Chrome share and        17:43:55

 6   Incognito share of traffic, then the remainder is

 7   considered unjust.

 8        Q.  So this would include revenue from ads shown

 9   that were not personalized using the at issue data;

10   correct?                                                  17:44:22

11        A.  No, that's not correct.

12        Q.  It would exclude revenue from ads shown that

13   were not personalized using the at issue data?

14        A.  Yeah, so my understanding of this scenario, this

15   is based on my discussion with Mr. Hochman, is there is a  17:44:44

16   scenario under which no display ads would be able to be

17   shown, given -- given the reductions that we just talked

18   about, and so those -- this is that scenario, that it

19   would -- that they -- given the issue with the data --

20   the at issue data, no display revenue -- or no display    17:45:14

21   revenue would be able to be shown or realized.

22        Q.  Are you talking about a scenario in which Google

23   simply does not receive any data from a user?

24        A.  No, I'm not.

25        Q.  What are you talking about then?                 17:45:43
```

Page 168

CONFIDENTIAL

```
1        A.  This is -- my -- this scenario is talking about

2   a situation in which Google has received information from

3   a user -- unjust information from a user, however,

4   that -- because they have received unjust information

5   from a user, they are unable to show -- unable to show    17:46:09

6   display ads.

7        Q.  And when you say this is my scenario, that's

8   talking about, as you explained, which scenario are you

9   talking about, the "All"?

10       A.  Yes.  I'm talking about Figure 25.              17:46:28

11       Q.  Figure 25.  Let me go to Figure 25.

12       A.  I thought that that's the figure that you wanted

13   me --

14       Q.  No.  I was asking you about Figure 24, but let

15   me follow you and go to Figure 25, so which -- I'm in     17:46:43

16   Figure 25.  Which one are you talking about?

17       A.  So, I mean, just to be clear, the way the math

18   works here is Figure 24, the "All" here, is made up of

19   Figure 25 and Figure 26.

20       Q.  Yes.                                            17:47:27

21       A.  Do you see that?  And then -- and then you

22   basically -- you take Figure 25 and you take Figure 26

23   and you make -- I -- I keep saying you.  I shouldn't say

24   you.  I guess I'm the one making these adjustments.

25          I make adjustments then for class definition,     17:48:03
```

Page 169

1      and then that results in Figure 27, and Figure 27 is

2      adding up Figures 25 and Figures 26 with the class

3      adjustments being made.

4          Q.  And when you say class adjustment, what do you

5      mean by that?                                          17:48:35

6          A.  Okay.  If you look at Figure 25, Figure 25 comes

7      down to a total of ███████████.  Okay.  Now, if you --

8      and then if you look at figure -- I'm sorry -- paragraph

9      71, so paragraph 71 I then multiply the █████ times --

10     for that particular calculation, because that's Chrome, I   17:49:47

11     multiply that by ██████████, and then I multiply that

12     by 95 percent to get to ████████████.

13         Q.  I understand what you are explaining.

14             Are you aware of contextual advertising?  Do you

15     know that term?                                        17:50:13

16         A.  I have heard that term before.

17         Q.  What does it mean?

18         A.  My understanding is that it's an advertisement

19     in the context -- in the context of what a user is doing.

20         Q.  Do you exclude contextual advertising from your   17:50:33

21     unjust revenue calculations?

22         A.  Are you talking about this scenario here?

23         Q.  Let's start with this scenario.

24         A.  I'm not aware that it would be -- I do not

25     believe it would be deducted here.                     17:51:23

Page 170

CONFIDENTIAL

1      Q.  Are you aware of any scenario that you calculate

2  where contextual advertising would be deducted?

3      A.  Yes.

4      Q.  Okay.

5      A.  I mean, I'm assuming that you're -- when you say      17:51:50

6  "any scenario," you mean any scenario related to my

7  unjust enrichment?

8      Q.  Correct.

9      A.  Okay.

10     Q.  Yeah, I have the answer.  Thank you.              17:51:58

11          You mentioned earlier a Google study which

12  served in part as your basis for your unjust enrichment.

13  I believe that is the ██████████ impact study; is that

14  correct?

15     A.  That is correct, yes.                             17:52:30

16     Q.  Let me mark as the next exhibit the ██████████

17  ads impact study.

18          (Exhibit 13, GOOG-CABR-04324934 - 44, marked for

19          identification electronically by counsel.)

20          THE WITNESS:  Is that Exhibit 9?                  17:52:43

21          MS. TREBICKA:  I will rely on Teuta for the

22  number, but I believe it is.  I don't know, actually.

23  I'm not sure.

24          MS. FANI:  No.  That will be Exhibit 13, which

25  I'm going to publish shortly.                            17:52:57

CONFIDENTIAL

```
 1          Q.  BY MS. TREBICKA:  Okay.

 2          A.  It's not up yet.

 3          Q.  That's okay.  My question is not with regard to

 4     the text of the ████████ study, but did you review the

 5     ████████ study for purposes of your report?          17:53:26

 6          A.  Assuming that we're talking about the same

 7     document, yes, I did.

 8          Q.  And you understand that it was conducted in

 9     2020?

10          A.  Yes.  I believe that it was, yes.            17:53:45

11          Q.  And a lot of your inputs to your unjust

12     enrichment model come from this study; correct?

13          A.  Yes, they do.

14          Q.  So, for example, turning your attention to

15     paragraph 73.                                         17:54:09

16          MR. LEE:  Are we on Exhibit 1 or 13 now?

17          MS. TREBICKA:  No, we're back on the report,

18     sorry --

19          MR. LEE:  Okay.

20          MS. TREBICKA:  -- while we're waiting for the    17:54:25

21     exhibit.

22          I'll have some questions about it, but I just

23     wanted to mark it for the record.

24          MR. LEE:  Okay.  And just FYI, 13 has been

25     loaded for me, so it's ready when you're ready.       17:54:36
```

Page 172

1        Q.  BY MS. TREBICKA:  But turning to your report,

2   paragraph 73.

3        A.  Okay.

4        Q.  You mention here the ads impact document, if you

5   look at the second full sentence on page 37 of that        17:54:50

6   paragraph -- of paragraph 73.

7        A.  I just want to draw myself into this paragraph

8   real quick.

9        Q.  Yeah.

10       A.  Okay.                                               17:55:23

11       Q.  Okay.  So you mention here the -- ███████ of

12   traffic that has third-party cookies prior to the launch

13   of ██████████.  Do you see that, that percentage?

14       A.  Yes.

15       Q.  And this percentage comes from the ██████████      17:55:38

16   study; correct?

17       A.  Correct.

18       Q.  And you used the same number for all years

19   during the class period?

20       A.  No, that's not correct.                            17:56:07

21       Q.  Let's turn to your Schedule 2.9.

22       A.  Okay.

23       Q.  Do you see --

24       A.  Oh, no, I don't.  I'm not to Schedule 2.9 yet.

25       Q.  Okay.                                              17:56:34

                                                    Page 173

1        A.  Yes, I see this.

2        Q.  Okay.  Do you see "Implied Revenue Impact from

3   Traffic With Third-Party Cookies"?

4        A.  Yes, I do.

5        Q.  And do you see the ███████ for years 2016        17:56:48

6   through 2021?

7        A.  Yes, I do.

8        Q.  Does this refresh your recollection that you do

9   use the same number for all years?

10       A.  No, it does not.  I do not use the same number   17:57:00

11  for all years.

12       Q.  Can you explain?

13       A.  Sure.

14           Maybe the best way to explain this is to look at

15  Schedules 2.4 and 2.5, starting with 2.5.              17:57:56

16       Q.  Okay.

17       A.  If you look at Schedule 2.5, you'll see in -- in

18  that year you'll see -- in 2021 you'll see a ████ there,

19  share of revenue not impacted by ███████

20  implementation.                                        17:58:25

21       Q.  ███████ not impacted?

22       A.  ███████ for 2016, 2017, 2018, 2019.  2020

23  you see the number ███████?

24       Q.  Yes.

25       A.  And then in 2021 you see the number ███████.    17:58:43

                                                    Page 174

1        Q.  Yes.

2        A.  Okay.  So then you have to take that up to

3    Schedule 2.4, and Schedule 2.4 you'll see that ███ --

4    well, I guess you don't see the ██████████ that we were

5    talking about there, but the ██████████ gets                    17:59:05

6    calculated from the ████████, right, but in 2021,

7    there's nothing -- there's nothing to multiply it by,

8    because that was impacted -- because that is impacted by

9    ██████████.

10       And in 2020, that number is -- you've got to           17:59:27

11   look at Schedule 2.5.  There's -- it's multiplied by

12   ████████, so I think it -- I think it's

13   inappropriate to say that I didn't consider that that

14   could change over time.

15       Q.  Okay.                                                  17:59:53

16       MS. TREBICKA:  I need a five-minute break so I

17   can look through my notes since we're running short on

18   time.

19       MR. LEE:  Okay.

20       (Recess.)                                                  18:00:03

21       THE VIDEOGRAPHER:  Going off the record at

22   6 o'clock p.m.

23       (Recess.)

24       THE VIDEOGRAPHER:  We are back on the record at

25   6:16 p.m.                                                       18:15:55

                                                          Page 175

1      Q.  BY MS. TREBICKA:  Mr. Lasinski, we've marked as

2    the next exhibit Bruce Strombom's rebuttal report to your

3    opening report.

4           (Exhibit 14, Expert Report of Bruce A. Strombom,

5           marked for identification electronically by

6           counsel.)

7           (Exhibit 15, Screenshot, Latham & Watkins,

8           marked for identification electronically by

9           counsel.)

10     Q.  BY MS. TREBICKA:  Let me know if you see it.  It      18:16:11

11   is Exhibit --

12          MS. TREBICKA:  Teuta?

13          MS. FANI:  It's Exhibit 14.

14          THE WITNESS:  Okay.

15     Q.  BY MS. TREBICKA:  So let me know when you have       18:16:33

16   it open.

17     A.  I do have it open.

18     Q.  Okay.  Thank you.

19          If you could direct your attention to

20   paragraph -- give me one second -- paragraphs 95 and 96.    18:16:45

21          Did you review Dr. Strombom's rebuttal report?

22     A.  I did, yes.

23     Q.  And do you recall reviewing paragraphs 95 and 96

24   in particular?

25     A.  Yes.                                                 18:17:36

                                                   Page 176

CONFIDENTIAL

```
 1        Q.  And I'll represent to you that Dr. Strombom's

 2   report at those two paragraphs provides evidence that the

 3   share of revenue driven by conversion-based auto bidding

 4   has grown over the 2016 to 2019 period.

 5        Do you have any reason to disagree with          18:17:54

 6   Dr. Strombom's evidence and conclusions?

 7        A.  I -- so I did not review his analysis to make

 8   sure that the ████████ or the ████████ year-over-year

 9   calculations were accurate, so I don't have any reason to

10   believe that he made calculations that were incorrect    18:18:59

11   from a mathematical perspective.  However, I disagree

12   with his conclusions as it -- as it relates to my

13   analysis.

14        Q.  What part of his conclusion related to

15   conversion-based auto bidding do you disagree with?      18:19:21

16        A.  So -- so in my analysis, we see that -- from the

17   ads impact document and supporting schedules that auto

18   bidding seems to have grown from ████████ -- ████████

19   to ████████, and that relates to search.

20        And the narrative around that is that that's        18:19:52

21   unprecedented growth -- unprecedented growth in auto

22   bidding.  That's about, I don't know, ████████

23   year-over-year growth, ████████████.  It's a little

24   bit more than that.

25        So if that growth from that period of time is       18:20:16
```

```
 1    unprecedented, then it would be -- these -- these

 2    calculations that he's making don't -- don't seem to --

 3    don't seem to hold water, because if a ███████ growth

 4    is unprecedented, he's making calculations for a subset

 5    of certain sales.                                        18:20:48

 6           And -- but we already know from the ads impact

 7    document or surrounding documents that a ████████

 8    growth from -- I believe it is -- I can look it up.  It's

 9    in my report, in my schedules.  From ████████ to

10    ███████ it is unprecedented.  Then these percentages    18:21:10

11    would be too high.  And I do take into account that

12    growth in auto bidding in my calculations.

13       Q.  You take into account the ██████████;

14    correct?

15       A.  I do, yes.                                        18:21:31

16       Q.  Okay.  Any other reason to disagree with

17    Dr. Strombom's opinions?

18       A.  Well, I mean, the other reason to disagree with

19    Dr. Strombom's opinion is, I mean, he's using -- he's

20    using internal -- internal documents to come up with     18:21:58

21    these growth rates that he's saying are appropriate, but

22    he could have just gotten the information from his own

23    client on what actual auto bidding -- if he thinks that

24    it was -- it's different than what I modeled, he could

25    have just gotten the information from his client.         18:22:20
```

```
1          Q.  Could you turn your attention to your report, so

2     Exhibit 1, and in particular page 12, Figure 3, the

3     "Google Incognito New Tab Page"?

4               MR. LEE:  Page 12.

5               THE WITNESS:  I'm sorry.  Okay.  I'm here.        18:23:08

6          Q.  BY MS. TREBICKA:  Figure 3?

7          A.  Yes.

8          Q.  Yes.

9               So this is the Google new tab page for

10    Incognito; correct?                                        18:23:16

11         A.  It is, correct.

12         Q.  And after ████████, the project, the bottom

13    text was added, the block third-party cookies.

14              Do you see that?

15         A.  Yes, I do.                                        18:23:32

16         Q.  And it says, "When on, sites can't use cookies

17    that track you across the web.  Features on some sites

18    may break."

19              Do you see that?

20         A.  Could you repeat -- I think you're just reading  18:23:43

21    the last line there.  I'm sorry.  Somebody honked a horn

22    outside my window.

23         Q.  No worries.  That's exactly what I read.

24         A.  Okay.

25         Q.  And you see the toggle?                           18:23:55
```

Page 179

1          A.  I do, yes.

2          Q.  And the figure in your report has turned blue,

3     which means that it's on?

4          A.  Yes, I do.

5          Q.  And do you understand that a user could turn the    18:24:04

6     toggle off, and in that case, third cookies would not be

7     blocked by default when a user is privately browsing;

8     correct?

9          A.  When it's off.  I believe that you're right when

10    it's off.                                                      18:24:32

11         Q.  Let me also show you what we've marked as

12    Exhibit 15 to your deposition.  Let me know when you're

13    in it.

14         A.  I'm in it.

15         Q.  Okay.  Do you see how this website printout,        18:24:51

16    which is of a law firm, Latham & Watkins here, but just

17    as an illustration, has a banner related to providing

18    some choices on cookies to users.  You see the first part

19    of the banner -- the banner in the color red, "The

20    cookies we use."                                              18:25:19

21             Do you see that?

22         A.  Yes, I do.

23         Q.  And "Essential cookies," do you see that --

24         A.  I do, yes.

25         Q.  -- next to it?                                       18:25:32

1          And then "Analytics cookies," do you see that?

2      A.  Yes, I do.

3      Q.  And this one in particular mentions specifically

4  Google Analytics; correct?

5      A.  Yes, it does.                                    18:25:40

6      Q.  Have you seen these types of cookie pop-ups on

7  the web as you browse?

8      A.  I have, yes.

9      Q.  And there is sometimes a toggle like you see

10  here to turn -- to either block cookies or allow cookies    18:26:13

11  as you are browsing; correct?

12      A.  That is -- that is my understanding, yes.

13      Q.  And these are equally available or shown to

14  users when users are in private browsing mode; correct?

15      A.  I haven't done a study of that.  I don't know    18:26:36

16  the answer to that.

17      Q.  Do you have any reason to doubt that these

18  are -- these also pop up when users are in private

19  browsing mode?

20      A.  No, I do not.                                    18:26:47

21          MR. LEE:  Objection.  Calls for speculation.

22  Sorry for the late objection.

23      Q.  BY MS. TREBICKA:  Now, let me now turn your

24  attention to, again, your report, page 59, Figure 56 of

25  your report, where you have an example calculation of    18:27:06

                                              Page 181

CONFIDENTIAL

```
 1    Google's unjust enrichment.

 2          Do you see that?

 3      A.  Yes, I do.

 4      Q.  So direct -- so this is sort of a visual

 5   representation of the various liability scenarios, and      18:27:28

 6   here you have teased out one liability scenario in the

 7   text underneath the table which says, "Example Unjust

 8   Enrichment Calculation," and this is the total unjust

 9   enrichment example of ████████ that we were

10   discussing earlier; correct?                                18:27:50

11      A.  Yes, it is.

12      Q.  Now, direct your attention to the first

13   banner -- let me take another step back and say this --

14   the table, separate from the example, has three

15   banners --                                                  18:28:06

16      A.  I no longer know where you are now.

17      Q.  Oh, okay.  I'm using a word "banner" in a way

18   that is --

19      A.  No.  Are you -- you're not in my report any

20   more.                                                       18:28:19

21      Q.  I am in your report.  On page -- Figure 56.

22   We're talking about your unjust enrichment calculation.

23      A.  Oh, I see.  Okay.

24      Q.  Yeah, so what I'm calling a banner is really

25   just a selection of your table.                             18:28:29
```

Page 182

CONFIDENTIAL

```
 1        A.  Okay.

 2        Q.  Okay.  So probably the wrong word, but you see

 3   how the first section of your table has "Google U.S.

 4   Display Ads Revenues Attributable to the Alleged Wrongful

 5   Conduct"?                                            18:28:40

 6        A.  Yes, I do.

 7        Q.  And then the next one has the same except for

 8   Google U.S. YouTube ads revenues?

 9        A.  Yes.

10        Q.  And the last applies to Google U.S. search ads   18:28:49

11   revenues?

12        A.  Yes.

13        Q.  And then for each you have a -- several options

14   of implicated US revenue base; correct?

15        A.  Correct.                                       18:29:03

16        Q.  Okay.  So my question to you is:  With respect

17   to that first table, or I was calling banner, the US

18   display ads revenues --

19        A.  Yes.

20        Q.  -- under the implicated US revenue base, the one   18:29:16

21   that says, "All."

22            Do you see that?

23        A.  Yes.

24        Q.  Okay.  So that's for -- in calculating that

25   unjust revenue, have you excluded or attempted to         18:29:35
```

Page 183

1    exclude, so just that one, just that piece of it, right,

2    just the one that says "All," have you attempted to

3    exclude any traffic on the basis that some users may have

4    toggled to "off" the blocking of third-party cookies in

5    the new tab page for Incognito?                    18:30:09

6         A.  No, I have not.  I -- just to be clear, in my

7    analysis, I understand that Google did not consider the

8    number of opt-ins in its ads impact document, which is I

9    think what you're talking about here, opt-in.  That data

10   was not produced, the number of opt-ins in this lawsuit,   18:30:41

11   and Mr. Strombom did not make any type of a calculation

12   or estimate of the number of opt-ins in this case.  So I

13   have not made that -- I've not made that calculation.

14        Q.  Okay.  Have you asked for that number and it was

15   not provided to you?                              18:31:07

16        MR. LEE:  Objection to form, vague.

17        THE WITNESS:  My understanding is that the

18   discovery request would -- to the extent that such

19   information was available, would have covered that

20   information.                                     18:31:32

21        Q.  BY MS. TREBICKA:  If that information were

22   available, would you attempt to exclude it from this

23   number?

24        A.  I don't know the answer to that, because I have

25   not seen that information.                        18:31:52

Page 184

CONFIDENTIAL

1      Q.   Would it depend on the actual number or

2   percentage of users who have opted in?

3          MR. LEE:  Objection based on the sanction order.

4          THE WITNESS:  I don't know that it would.  It

5   would obviously be the type of thing where I'd have to          18:32:20

6   review the information and review what's available around

7   that information to determine if or how I would use it.

8      Q.   BY MS. TREBICKA:  Well, in all fairness, if the

9   information were available, do you believe that it should

10  be at least accounted for in this number?                      18:32:35

11         MR. LEE:  Objection subject to the Court's

12  sanction order.

13         THE WITNESS:  Well, in all fairness, if it were

14  available, then I'd be able to look at it and understand

15  the data and consider whether or not it should be             18:32:49

16  accounted for, but it is something that I would consider.

17  I don't know if it should be accounted for.  It's the

18  type of thing that I would consider, though.

19     Q.   BY MS. TREBICKA:  You have not thought about

20  whether it should be accounted for or not?                    18:33:02

21         MR. LEE:  Objection to form, mischaracterizes

22  prior testimony.

23         THE WITNESS:  No.  I said I would consider -- I

24  would consider accounting for it.  It's the type of

25  information that I think I would consider accounting for,      18:33:13

Page 185

1    but I don't have that information, so I don't want to

2    speculate on what I would do with it or how I would use

3    it since I don't have it, since it was not produced, and

4    since Mr. Strombom -- and since Mr. Strombom did not make

5    any kind of accounting for it either, so I don't know          18:33:38

6    what is going to actually be produced.

7        Q.  BY MS. TREBICKA:  And my question is not whether

8    or how you would specifically use it.  My question is

9    should it be accounted for in this number according to

10   the logic of your methodology?                                 18:33:54

11       MR. LEE:  Asked and answered.  I also object

12   subject to the Court's sanction order.

13       THE WITNESS:  Again, I mean, I can't answer that

14   unless I have the information.  It's the type of

15   information that I would consider accounting for.  The         18:34:14

16   ads impact document talks about it, opt-in, but I don't

17   know what form or how it would -- how it would come in,

18   and so I don't know whether or not it should be accounted

19   for until I see the information.

20       Q.  BY MS. TREBICKA:  Do you recall that I also           18:34:36

21   showed you Exhibit 15, which was the cookie pop-up from

22   an illustrative website?  This one happened to be of

23   Latham & Watkins.

24       A.  Yes.

25       Q.  In your opinion -- or let me ask you:  Have you       18:34:51

Page 186

1    accounted for potential opt-ins through these individual

2    cookie banners on individual websites in the same

3    scenario that we were talking about, which is implicated

4    revenue US base all for US display ads revenues?

5        A.  As I -- I'm trying to think through my          18:36:03

6    calculations and determine where this would be accounted

7    for.  As I sit here, I cannot -- I believe that this also

8    would be included in the opt-in category, so I have not

9    made -- I have not made an adjustment for this.

10       Q.  Have you asked for information, or have you      18:36:36

11   looked for information related to quantifying the impact

12   that these cookie pop-ups would have on this piece or

13   scenario of your display ads revenue unjust enrichment?

14       A.  So I -- have I looked for the information, yes.

15   I've looked for the -- I looked for opt-in information.    18:37:22

16   My understanding is that opt-in information is not

17   available, based on my review of the record, my review of

18   Mr. Strombom -- or Dr. -- I guess it's Dr. Strombom --

19   Dr. Strombom's analysis, and so I'm not aware of any

20   information that is available on this point.              18:37:43

21       Q.  The same figure, Figure 56 in your report on

22   page 59 --

23           MR. LEE:  Hold on.

24       Q.  BY MS. TREBICKA:  -- the table underneath

25   "Google U.S. Display Ads Revenues," "Google U.S YouTube    18:38:10

Page 187

1    Ads Revenues Attributable to the Alleged Wrongful

2    Conduct."

3            Do you see that?

4        A.  Yes, I do.

5        Q.  So Figure 56, page 59, under "Implicated U.S    18:38:25

6    Revenue Base," the middle base, so to speak, is

7    conversion tracking from all traffic.

8            Do you see that?

9        A.  Yes, I do.

10       Q.  Okay.  And I will ask you similar questions to    18:38:41

11   the ones I asked you about the display ads revenue.  The

12   first question is:  Have you taken into account the

13   ███████████  opt-ins through the new tab page in

14   calculating this number?

15       A.  I have not accounted for that in this number.    18:39:30

16       Q.  Have you --

17       A.  Again, similar to my other answer, I did search

18   for this information.  My understanding is it's not

19   available.  It was not produced by Google and certainly

20   it wasn't something that Mr. Strombom made an adjustment    18:39:46

21   to my calculations for.

22       Q.  For the same number, have you taken into account

23   the various website cookie pop-ups opt-ins in your

24   calculations?

25       A.  So in this calculation, I am following    18:40:17

1    specifically what -- I am following what Google employees

2    did in their ads impact document.  So this is different

3    than what the Google Chrome -- I'm sorry --

4    ██████████ -- the ██████████ implementation is.  This

5    existed before Chrome -- these types of things existed        18:41:25

6    before ██████████ did, is my understanding, and so to

7    the extent that they're -- the variables that they

8    considered were consistent with these types of pop-ups,

9    then, yes, I would have considered that.

10       Q.  You separately did not consider the impact that     18:42:03

11   these various pop-ups may have in these specific

12   calculations that I'm asking you about; correct?

13       A.  I did not separately break them out of what

14   Google's calculations would have been, no.  I did not --

15   using Google's methodology, I did not separately break       18:42:29

16   them out.

17       Q.  I'm not talking about breaking them out.  I'm

18   talking about you actually taking them into account in

19   whatever calculations you did.

20          MR. LEE:  Objection to form, vague.                   18:42:48

21          THE WITNESS:  Well, again, I mean, just to be

22   clear, these types of pop-ups existed before ██████████

23   and Google was -- Google made the analysis based on its

24   implementation of ██████████.  In Google's analysis, it

25   identifies specifically opt-in as something that it did      18:43:17

Page 189

1    not consider.

2          We talked about whether or not that data was

3    available, and it is not.  However, this type of a pop-up

4    and this type of analytics was available at the time that

5    ████████    was implemented, and so they -- and they are,    18:43:37

6    in their ads impact document, considering what blocking

7    third-party cookies by default will do to their revenues.

8          And so to the extent that the variables that

9    they've calculated, and there are a number of variables

10   that go into the calculation, include that this is --      18:44:06

11   that these are possibilities, then, yes, it would be

12   included in my calculations.  I cannot identify a

13   separate area where this is calculated separately in

14   those calculations, though.

15       Q.  BY MS. TREBICKA:  Going back to the -- to         18:44:25

16   Exhibit 15, which is on your screen, if a user toggles

17   "on" the, let's say for example, analytics cookie, do you

18   have an understanding that the user is agreeing to

19   providing to that website certain of his or her

20   information?                                               18:45:00

21          MR. LEE:  In Incognito mode or non-Incognito

22   mode?

23          MS. TREBICKA:  In any mode.

24          MR. LEE:  Beyond the scope.

25          THE WITNESS:  I have not made an assumption one     18:45:26

1    way or the other about that.

2        Q.  BY MS. TREBICKA:  You were talking earlier about

3    a willing user -- or willing seller versus an unwilling

4    seller.  Do you remember that?

5        A.  Yes.                                            18:45:40

6        Q.  And also about a knowing seller versus an

7    unknowing seller.  Do you recall that?

8        A.  Yes, I do.

9        Q.  So if a user specifically toggles on the choice

10   here in this pop-up and others like it to share          18:45:54

11   information with, in this case, Google Analytics, would

12   that user be a willing seller, in your opinion?

13           MR. LEE:  In Incognito mode or non-Incognito

14   mode?

15           MS. TREBICKA:  In Incognito mode.                18:46:12

16           THE WITNESS:  I haven't analyzed that for this

17   particular situation.

18       Q.  BY MS. TREBICKA:  Would that user be a knowing

19   seller?  Have you analyzed that?

20       A.  No, I have not.  This -- this doesn't -- I don't  18:46:46

21   believe that this impacts my unjust enrichment

22   calculation in a material way.

23       Q.  And what is your opinion based on, that it

24   doesn't impact your unjust enrichment in a material way?

25       A.  Because in Google's analysis of ████████, it     18:47:12

                                                     Page 191

CONFIDENTIAL

1   chose not to model opt-ins.  Furthermore, if it were

2   material and I shared my model, you know, very clearly in

3   this report with you and with experts on the other side,

4   Strombom -- Mr. Strombom -- or Dr. Strombom has every

5   opportunity in the world to say, "This is an area where        18:47:50

6   we have information, and I can make an adjustment to

7   Mr. Lasinski's calculation," I would have considered what

8   Mr. -- or Dr. Strombom did in that situation.  He did not

9   make any kind of adjustment.

10         So they didn't model it.  He didn't make any          18:48:13

11  adjustment.  The information is not in the record.  All

12  three of those things together indicate to me that

13  it's -- I would not need to make a material adjustment to

14  my calculation.

15         Q.  And you realize that the ████████ analysis         18:48:37

16  mentioning the opt-ins is talking about the NTP page,

17  which is Figure 3 of your report; correct?

18         A.  Yes, I do.

19         Q.  Okay.  And the pop-up, an illustration of which

20  I showed you in Exhibit 15, is a separate type of opt-in      18:49:01

21  to providing information; correct?

22         A.  That is -- that is correct.

23         Q.  And the fact that Google in the ████████

24  analysis did not remove the opt-ins, could it be that

25  Google didn't consider it because it was going for an         18:49:41

1    upper bound of potential revenue lost as a result of

2    ██████████?

3        A.  Moving -- we know that they weren't going for an

4    upper bound.  There's information in the record that

5    shows that they weren't going for an upper bound.          18:49:58

6        Q.  Say that again.  Were or were not?

7        A.  We know -- we know that they were not.  There's

8    information in the record that indicates that they know

9    that there's additional areas that they could analyze,

10   and they did not.                                          18:50:16

11       Q.  So your opinion is that the ████████ analysis

12   was not going for an upper bound?

13       A.  So if you look at the ████████ analysis, one

14   of the things that they identify is that they did not

15   consider traffic from iOS, and one of the things that    18:50:36

16   they say is that it could be higher, because they didn't

17   consider such traffic from iOS -- the iOS operating

18   system in one of the documents.  So in that case, if they

19   were going for an upper bound and trying to produce

20   numbers that were an upper bound, then they would have    18:51:01

21   analyzed that.

22       Q.  Okay.  Any other reason for you believing that

23   the ████████ analysis is not going for an upper bound?

24       A.  Well, in addition to that, in addition to iOS,

25   they didn't -- they didn't -- certainly they didn't       18:51:46

```
 1    analyze private browsing modes from Safari and/or Edge if

 2    they're going for an upper bound of a calculation, but

 3    the one that I mentioned earlier is the main reason that

 4    I can think of, as I'm sitting here.

 5         Q.  Okay.  Because the ████████ analysis was with    18:52:14

 6    respect to the Chrome browser, not Safari or Edge;

 7    correct?

 8         A.  Correct.

 9         Q.  Okay.  Turning your attention back to -- well,

10    actually, on this point of upper bound, have you seen      18:52:26

11    comments in the ████████ study that state that Google

12    is using upper bounds for some metrics?

13         A.  Yes, I have.

14         Q.  And regardless, your opinion is still that

15    Google was not going for an upper bound?                   18:52:50

16         A.  Well, they would not --

17              MR. LEE:  Objection to form, mischaracterizes.

18              Go ahead.

19              THE WITNESS:  At least in the one instance that

20    I've described, that would indicate that they're not       18:53:00

21    going for an upper bound.

22         Q.  BY MS. TREBICKA:  So turning your attention back

23    to Figure 56, so we can complete the discussion of Figure

24    56, please turn your attention to the last -- to the

25    bottom table, which is -- which relates to U.S. search     18:53:16
```

Page 194

```
 1    ads revenues.

 2         A.  Yes.

 3         Q.  And here the revenue base has two options, all

 4    traffic and traffic with -- conversion tracking from all

 5    traffic or traffic with third-party cookies; correct?    18:53:32

 6         A.  Correct.

 7         Q.  Focusing your attention on conversion tracking

 8    from all traffic, which is the ██████████ number.

 9         Do you see that?

10         A.  Yes, I do.                                       18:53:43

11         Q.  So for this number, have you taken into account

12    that some users may have opted in through ██████████?

13         A.  Again, I think it's similar to my earlier

14    answers.  I do not believe that that data is available,

15    so I did not include it in my calculations.              18:54:51

16         Q.  Again, for this number, have you taken into

17    account that some users may have opted in through the

18    pop-ups similar to those -- to that depicted in

19    Exhibit 15?

20         A.  I would answer that similarly to what I answered  18:55:08

21    before, in that these pop-ups existed prior to the

22    implementation of ██████████, and Google's analysis for

23    search is only related to conversion -- conversion

24    tracking, and so to the extent that the variables that

25    they have calculated include these types of pop-ups,     18:55:43
```

Page 195

CONFIDENTIAL

```
 1    then, yes, I would have included them.

 2        Q.  But you have not separately or independently

 3    taken this into account, this -- that users may have

 4    opted in through pop-ups similar to those that are

 5    depicted in Exhibit 15?                           18:56:06

 6        A.  I have not broken that calculation out

 7    separately, if that's what you're asking.

 8        Q.  Well, not just broken out.  Again, my question

 9    is:  Have you done anything to identify and take it into

10    account, the fact that some users may have opted in     18:56:22

11    through the pop-ups similar to Exhibit 15?

12        A.  Well, look --

13            MR. LEE:  Asked and answered.

14            Go ahead.

15            THE WITNESS:  Similar to my other answers, these  18:56:35

16    were the type of pop-ups that were available or that were

17    available prior to          .  They -- they did their

18    analysis -- they did their analysis based on an

19    implementation of          .  The variables that they

20    use in their analysis, therefore, and the lost revenue   18:56:56

21    that they were looking at because of          and the

22    opt-ins is -- again, was focused on          and the

23    opt-in for          .

24            So to the extent that their variables understood

25    this, which Google understands what is going on in its   18:57:21
```

```
 1    business, yes, this would be accounted for in those

 2    calculations.

 3        Q.  BY MS. TREBICKA:  Have you analyzed or

 4    researched whether the rate at which these pop-ups

 5    existed in 2020 is the same as the rate that they existed    18:57:49

 6    in prior years or years after?

 7        A.  No, I have not.

 8        Q.  For purposes of your allocation method, do you

 9    take into account that certain users may have opted in

10    through the NTP page with ████████?                          18:58:21

11        A.  Again, that data was not -- is not available in

12    the record, so I do not -- I do not take that into

13    account.

14        Q.  For purposes of your allocation method, do you

15    take into account that certain users may have opted in      18:58:41

16    through the cookie pop-ups, an example of which is --

17    I've shown you in Exhibit 15?

18        A.  Again, that information is not available in the

19    record, so I have not made any adjustments to my

20    calculations for that.                                      18:59:02

21        MS. TREBICKA:  Let me -- why don't we take a

22    little break, because I realize we have about 47 or

23    50 minutes on the record, and I'd just like to review my

24    notes again.

25        MR. LEE:  Okay.                                         18:59:19
```

Page 197

CONFIDENTIAL

```
1           THE VIDEOGRAPHER:  Going off the record at
2     6:59 p.m.
3           (Recess.)
4           THE VIDEOGRAPHER:  We are back on the record at
5     7:12 p.m.                                        19:12:21
6       Q.  BY MS. TREBICKA:  Mr. Lasinski, you testified
7     earlier that you have read Mr. Strombom's rebuttal
8     report; correct?
9       A.  Correct.
10      Q.  Have any of your opinions changed as a result of  19:12:32
11    reading Mr. Strombom's rebuttal?
12      A.  No, they have not.
13      Q.  You have an opinion on statutory damages in this
14    case; correct?
15      A.  Correct.                                    19:12:49
16      Q.  That's Section 9 of your report, on page 78.  If
17    you could turn to that page.
18      A.  I'm there.
19      Q.  And turning your attention to paragraph 186,
20    which is on page 79, the next page.               19:13:19
21      A.  Okay.
22      Q.  You say that -- the second sentence, midway
23    through, I'm reading into the record:  "I understand from
24    Counsel could range" -- well, let me start from the top
25    so that it's clear.                              19:13:37
```

Page 198

CONFIDENTIAL

```
1              "I have not investigated or made any

2     determination regarding the relevant damages rate, which

3     I understand from Counsel could range from $100 to 10,000

4     per violation of the relevant statutes."

5              Do you see that?                          19:13:53

6         A.  Yes.

7         Q.  Do you have any opinion on what a violation is?

8              MR. LEE:  Calls for a legal conclusion.

9              THE WITNESS:  My understanding from a non-legal

10    perspective is that a violation would occur when Google   19:14:54

11    collected information or attempted to collect

12    information, but I don't have a legal definition or I'm

13    not a legal expert, but that is my understanding, is

14    violations could occur in those instances.

15        Q.  BY MS. TREBICKA:  And the reasons that I asked     19:15:21

16    about whether you have an opinion on per violation is

17    because I was wondering whether you have an opinion on

18    whether a violation is each individual piece of data

19    that's collected, that's a separate violation, or whether

20    a violation is the instance of data being transmitted to  19:15:37

21    Google?

22        A.  Could you repeat that?

23        Q.  Sure.

24             Do you have an opinion on what constitutes a

25    violation, whether it is a -- each piece of data being    19:15:52
```

Page 199

CONFIDENTIAL

1    transmitted to Google is a violation or whether it is a

2    private browsing instance that is a single violation.

3         A.  So what I've done here is calculate the number

4    of page loads where there would be information

5    transmitted to Google for my top calculation.          19:16:54

6         In the other calculations -- in the other

7    calculations, I've calculated, like I said, unique

8    monthly browsing instances, we've talked about before,

9    and the number of each member of the class.

10        Q.  You say -- in that last sentence of paragraph   19:17:33

11   186 you say, "More specifically, I understand that as it

12   relates to this matter, there are four potential bases to

13   which a statutory damages rate could be applied."

14        You've been told to assume that there are these

15   four potential bases, or alternatively, it's your opinion   19:17:58

16   that there are four potential bases?

17        MR. LEE:  Objection to form, mischaracterizes.

18        THE WITNESS:  My understanding, based on

19   discussions with counsel, is that these are the four --

20   these are four potential bases that could be applied in   19:18:27

21   this case.

22        Q.  BY MS. TREBICKA:  Okay.  Now, let's assume, just

23   for the purposes of discussion and as a hypothetical

24   illustration, that the rate per violation is $100.

25        A.  Okay.                                          19:18:49

Page 200

1      Q.  How would that be applied to the first bullet

2   point, which is, "The number of individual pageloads in

3   Incognito mode or Other Private Browsing Modes during the

4   Class Period"?

5      A.  If you're asking me to assume $100 per page        19:19:11

6   load, then you would multiply $100 per page load.

7      Q.  I'm not asking you to assume $100 per page load.

8   I'm asking you to assume $100 per violation.

9          So then the question is:  Is a violation the

10  equivalent of this -- for this bullet point the number of   19:19:34

11  individual page loads in Incognito mode, in your

12  understanding?

13     A.  My understanding is that that is one potential

14  base to which a rate could be applied.  I have not

15  assumed a rate in my calculations, so I -- yes.  That is   19:19:57

16  a base to which statutory damages could be applied.

17     Q.  Okay.  So, again, I'm supplying the rate as a

18  pure hypothetical, let's say $100 per violation.  The way

19  that you would calculate statutory damages in your model

20  is to apply the rate per violation with the number of     19:20:27

21  individual page loads in Incognito mode or other private

22  browsing modes during the class period; correct?

23     A.  Yes, if that's -- if that's the base that's

24  selected by the trier of fact, sure.  That's how you

25  would apply it.                                           19:20:49

Page 201

1    Q.  Right.  And I'll be asking you about each of the

2    bases separately, so without prejudice to what the trier

3    of fact may select.

4         How would you then allocate this number to

5    individual users?  What do you propose in your opinion?    19:21:13

6    A.  So I have not determined a methodology -- in my

7    opinion, I don't have a methodology for apportioning

8    statutory damages.  As you can see on -- in paragraph

9    197, I have determined that for unjust enrichment and

10   restitution.  As I'm sitting here, I cannot think of a    19:23:23

11   reason why it would be different for statutory damages in

12   this case, but...

13   Q.  For unjust enrichment and restitution, you did

14   not have a methodology for allocating individual page

15   loads based calculations, though; correct?    19:23:45

16   A.  That is correct.  I did not calculate that for

17   individual page loads.

18   Q.  So sitting here today, do you have a methodology

19   for allocating a statutory damages number on the basis of

20   individual page loads?    19:23:59

21   A.  No, I do not, as I'm sitting here today, based

22   on individual page loads.  Again, I'm not the

23   administrator in this case, but to the extent that

24   restitution -- I'm sorry -- statutory damages are awarded

25   based on page loads, I think that still one would be --    19:24:23

Page 202

1    it would be appropriate to use the bases that I've

2    calculated under my apportionment methodologies in

3    paragraphs 197 and Section 10 of my report.

4        Q.  So, again, assuming that the rate per violation

5    is a hypothetical $100, how would that apply to your                19:24:57

6    second potential basis, "The number of unique monthly

7    private browsing instances across the Classes during the

8    Class Period"?

9            MR. LEE:  Would you repeat that?

10       Q.  BY MS. TREBICKA:  Assuming the rate of                      19:25:24

11   violation -- per violation is a hypothetical $100, how

12   would that apply to your second potential basis, "The

13   number of unique monthly purchase -- unique private

14   browsing instances across the Classes during the Class

15   Period"?                                                            19:25:45

16           MR. LEE:  Thank you.

17           THE WITNESS:  Well, it would be -- one would

18   multiply the unique monthly private browsing instances by

19   the rate that's selected or determined.

20       Q.  BY MS. TREBICKA:  Okay.  Same question.                    19:26:15

21   Hypothetical $100 per violation.  How would that apply to

22   your third bullet, the basis that reads:  "The number of

23   unique private browsing instances across the Classes

24   during the Class Period"?

25       A.  I mean, I would apply it the same way.                     19:26:38

                                                            Page 203

CONFIDENTIAL

1          Q.  And how would you allocate this third basis to

2     individual class members?

3          A.  So, again, I think that you could allocate it

4     either way, unique monthly private browsing instances or

5     based on the number of class members.                    19:27:11

6          Q.  Well, note that the two middle bullets, one is

7     the number of unique monthly private browsing instances,

8     and the second is unique private browsing instances, not

9     monthly.

10         A.  Correct.                                         19:27:25

11         Q.  There is a difference there; correct?

12         A.  Correct.

13         Q.  And how would the allocation -- and backing up,

14    for the second bullet, the UMPBI, there is an allocation

15    that you propose for restitution and unjust enrichment on  19:27:42

16    the basis of UMPBI; correct?

17         A.  Correct.

18         Q.  For unique private browsing instances across the

19    class during the class period, there is no allocation

20    opinion for any damages expressed in your report           19:27:56

21    currently; correct?

22         A.  I don't understand the question.

23             MR. LEE:  Objection to form, mischaracterizes.

24         Q.  BY MS. TREBICKA:  Do you have --

25             MR. LEE:  Hold on.  Mischaracterizes the report.  19:28:08

Page 204

CONFIDENTIAL

1    Q.  BY MS. TREBICKA:  Do you propose an allocation

2    method on the basis of unique private browsing instances?

3    A.  No, I do not.  And just -- just to be clear,

4    though, this does say unique private browsing instances,

5    but what this really is is peak unique monthly private        19:28:45

6    browsing instances, so this is sort of a similar

7    definition to the number of class -- to the number of

8    class members or individual class members by device.

9    Q.  Okay.  So it's similar.  So this -- what is your

10   understanding of the -- of a peak unique monthly private     19:29:15

11   browsing instances?

12   A.  So what I did in this calculation is I

13   determined the peak number of unique monthly private

14   browsing instances in 2021.  That is the bases for the

15   top line in Figure 74, and then I adjusted it for the        19:29:44

16   class.  So I take the peak month data and put that into

17   the calculation.

18   Q.  And this provides you the estimated unique

19   private browsing instances for the entirety of -- well,

20   for the class period through 2021?                           19:30:20

21   A.  Well, it really -- it really is the peak.  It

22   really is the -- it's the highest number.  I'm not trying

23   to calculate this on a monthly basis.

24   Q.  Right.  So estimated unique private browsing

25   instances through 2021, this is what you are talking         19:30:44

Page 205

1    about with the third point, which is the number of unique

2    private browsing instances across the classes; right?

3        A.  Yes.  I mean, I think -- I think a better way to

4    have titled this -- because I think there's some

5    confusion here, a better way to have titled this would          19:31:04

6    have been estimated peak unique private browsing

7    instances.

8        Q.  Yeah.  And it would -- and you're referencing

9    here your Figure 74?

10       A.  Correct.                                                 19:31:21

11       Q.  Okay.  The next basis is, "The number of members

12   in each Class during the Period."

13           Do you see that?

14       A.  Yes.

15       Q.  So assuming a hypothetical rate of $100 per          19:31:29

16   violation, how would you apply that rate to this last

17   basis?

18       A.  I would multiply that rate by the estimated

19   number of class members per browser.

20       Q.  So in your opinion, the rate per violation would    19:31:51

21   be the amount that each putative class member would get?

22       A.  Correct.

23       Q.  Okay.  Now, do any of these four bases that you

24   have calculate the statutory damages in proportion to the

25   alleged harm that each class member suffered?                19:32:21

Page 206

1          A.  I guess I'm taken aback -- I'm not quite

2     understanding your question here, because at the end of

3     the day, I don't apply a rate in any of my calculations.

4          Q.  So then the answer is "no," you do not take into

5     account the alleged harm that each class member may have        19:33:29

6     suffered?  It's a flat rate?

7               MR. LEE:  Objection to form, beyond the scope.

8               THE WITNESS:  That -- I -- as I -- I've been

9     very clear in my report here.  I have not analyzed the

10    rate in any way for statutory damages.                          19:33:54

11         Q.  BY MS. TREBICKA:  Right.  So setting aside the

12    rate, you yourself, in your analysis or proposal of these

13    four bases, do not propose to calculate statutory damages

14    in proportion to the alleged harm that each class member

15    has suffered?                                                   19:34:23

16               MR. LEE:  Objection to form, beyond the scope,

17    mischaracterizes the statute in question.

18               THE WITNESS:  I mean, I have not attempted to

19    analyze it in that way, because I have not ultimately

20    determined a rate.  You're asking if it could be in            19:35:12

21    proportion to the alleged harm.  I mean, certainly I've

22    limited all of my bases to unique private browsing

23    instances or page loads or those numbers that have

24    browsed in private browsing mode, and so if one were to

25    consider those bases, that, in my opinion, would be            19:35:46

1    proportional to the alleged harm.

2        Q.  BY MS. TREBICKA:  So in your opinion,

3    calculating damages on the basis of the UMPBI would be

4    calculating damages in proportion -- for each class

5    member in proportion to the alleged harm?                    19:36:23

6            MR. LEE:  Objection to form, beyond the scope,

7    mischaracterizes the statutes.

8            THE WITNESS:  Yeah, this is beyond the scope of

9    my report.  The only thing I'm saying here is, for

10   example, if you look at my restitutionary -- my          19:36:38

11   restitution damages, I use UMPBI as one of the methods.

12           You're asking me if the -- if this could be

13   proportional.  Well, if I use UMPBI in one situation and

14   UMPBI in another situation and I know that page loads are

15   consistent among UMPBI on an average basis, that would      19:37:00

16   mean that they would be proportional, because I'm using a

17   similar base in both situations.  Something is similar in

18   both calculations.

19       Q.  BY MS. TREBICKA:  Well, do you know that page

20   loads are consistent among UMPBI?                           19:37:21

21       A.  In some cases they are, yes.

22       Q.  What is your opinion based on that in some case

23   they are?

24       A.  Based on my analysis that I did in this case.

25       Q.  And in how many cases or what proportion of       19:37:37

Page 208

```
1    cases are they consistent among UMPBI?

2         A.   I don't have that information.  I didn't do

3    it -- an analysis in that way.

4         Q.   What analysis did you do?

5              MR. LEE:  Objection.  Vague.                    19:37:56

6              THE WITNESS:  I did an analysis on page 24.3.

7         Q.  BY MS. TREBICKA:  On page?

8         A.  I'm sorry.  I'm sorry.  On Schedule 24.3.

9              And what you can see here is the -- based on the

10   information of total private browsing page loads and        19:40:01

11   UMPBI that -- over that period, it's relatively

12   consistent.

13        Q.   So what you've done here in 24.3 is divide the

14   total number of private browsing page loads by UMPBI;

15   correct?                                                    19:40:31

16        A.   Correct.

17        Q.   To arrive at an average per month; correct?

18        A.   Correct.

19        Q.   Okay.  But you do not know, on the basis of this

20   analysis, that one UMPBI has an approximate page load       19:40:43

21   that is -- or has a page load that is approximately the

22   same as another UMPBI?

23        A.   That is correct.

24        Q.   We spoke about this a little earlier, but do you

25   have a method to determine the number of UMBPIs deemed      19:41:21
```

Page 209

CONFIDENTIAL

1  attributable to each class member?

2      A.  My -- my analysis does not include calculating

3  UMPBI by class member.  I do not believe that that data

4  is available to do -- to do that kind of an analysis.

5  I'm looking at UMPBI -- my UMPBI is actually on a device    19:42:06

6  level -- effectively a device level.

7      Q.  Do you have a methodology to look at UMPBI or to

8  attribute UMPBI to a device?

9      A.  Well, a UMPBI would effectively be at a device

10 level.                                                      19:42:36

11     Q.  Okay.  I -- okay.  Do you have -- have you

12 attempted to determine how many UMPBI are attributable to

13 the named plaintiffs?

14     A.  No, I have not.

15     Q.  I have a few questions on your background.        19:43:26

16     A.  Well, let's -- we should stop for a minute here.

17 Mr. Lee seems to have --

18     Q.  Oh.

19         THE VIDEOGRAPHER:  He has dropped out just now.

20         MS. TREBICKA:  Oh, yeah.  Let's stop.             19:43:42

21         THE VIDEOGRAPHER:  Going off the record at

22 7:44 p.m.

23         (Recess.)

24         MS. TREBICKA:  If counsel is going to redirect,

25 then I will reserve the rest of my time.                   19:50:46

Page 210

```
 1          MR. LEE:  Okay.  You pass the witness?

 2          MS. TREBICKA:  If we will redirect, yes.

 3          MR. LEE:  Okay.  Why don't we take five then and

 4   let me consult with my team and see if I have a redirect.

 5   I think I have a little bit, so let's take ten, and we'll     19:50:59

 6   be back in ten.

 7          (Recess.)

 8          THE VIDEOGRAPHER:  We are back on the record at

 9   8:03 p.m.

10                                                              20:02:34

11                         EXAMINATION

12   BY MR. LEE:

13      Q.  Good evening, Mr. Lasinski.  I'm James Lee, and

14   I represent the plaintiffs this case.  Okay?

15      A.  Okay.                                                20:02:44

16      Q.  All right.  Now, Mr. Lasinski, you were asked

17   about how the Ipsos survey requires things of respondents

18   other than just allowing their data to be collected in

19   order for them to participate in that study.  Do you

20   remember questions about that?                              20:02:58

21      A.  Yes.

22      Q.  All right.  For instance, counsel for Google

23   pointed out that to participate in the Ipsos survey,

24   respondents had to fill out a survey and respond to

25   notifications, provide demographic information, all of      20:03:11
```

Page 211

CONFIDENTIAL

```
1    which requires a time investment.  Do you remember her

2    asking you questions about that?

3         A.  Yes, I do.

4         Q.  Okay.  Why don't you pull up your report at

5    Exhibit 1 and go to Figure 58.  Unfortunately, I don't      20:03:23

6    have a page number, but as soon as I get there, I'll let

7    you know.

8         A.  Yes.

9         Q.  Okay.

10        MR. LEE:  And for the record, Figure 58 is on          20:03:41

11   page 63 of the report.

12        Q.  Do you see here in Figure 58 how much a

13   respondent was paid for their time to participate in the

14   survey?

15        A.  Yes, I do.                                          20:03:54

16        Q.  And what was that amount?

17        A.  It was $20.

18        Q.  Okay.  And did you include that $20 payment in

19   your restitution calculations?

20        A.  No, I did not.                                      20:04:04

21        MS. TREBICKA:  Objection.

22        Mr. Lasinski, your counsel is now asking you

23   questions, so it's my turn to object.  If you could just

24   leave me a beat in between questions so that I don't

25   speak over you.                                              20:04:16
```

Page 212

```
1            THE WITNESS:  Okay.

2            MS. TREBICKA:  Objection.  Assumes facts and

3    document speaks for itself.

4        Q.  BY MR. LEE:  So did you hear the question, or do

5    you want me to repeat it, Mr. Lasinski?              20:04:24

6        A.  I did hear the question.

7        Q.  Okay.  I didn't hear the answer, though.

8        A.  Oh.

9        Q.  You did answer.  I just didn't hear it.

10       A.  Well, you better repeat it now, because now I'm   20:04:34

11   not quite sure what I'm answering.

12       Q.  Right.  So let me ask it again, and then wait

13   for counsel to object and then you can answer.

14       A.  I will.

15       Q.  Did you include that $20 payment anywhere in     20:04:44

16   your restitution calculation?

17           MS. TREBICKA:  Objection.  Assumes facts and

18   leading, and the document speaks for itself,

19   mischaracterizes the document.

20           THE WITNESS:  I did not include this $20, no.    20:04:55

21       Q.  BY MR. LEE:  Okay.  Let's look at Figure 59 on

22   the next page.

23           Do you see in Figure 59 that in addition to

24   paying respondents $3 for their browsing data, that

25   respondents could also be paid for other things that they  20:05:16
```

Page 213

CONFIDENTIAL

```
 1    might do as part of this survey?

 2            MS. TREBICKA:  Objection.  Vague.

 3            THE WITNESS:  Yes, I do.

 4        Q.  BY MR. LEE:  Okay.  And putting aside the $3 for

 5    the browsing data, did you include these other payments    20:05:27

 6    in any of your restitution calculations?

 7        A.  So I did not include the $3 for -- I'm sorry --

 8    the $5 for the router, nor did I include the $2 for the

 9    bonus, but from a mobile phone perspective, I could have

10    included the $3 there as well or for a tablet.            20:05:54

11        Q.  Right.  Did you ultimately end up using the $3

12    for mobile phones or tablets?

13        A.  No.  It's the same -- it's the same amount, so I

14    used the $3 for browsers.

15        Q.  Right.  Okay.  Now, is the -- is the $3 that you   20:06:08

16    applied for your restitution -- restitution calculation,

17    what is that for?

18            MS. TREBICKA:  Objection.  Calls for a

19    narrative.

20            THE WITNESS:  That is to incent a user to         20:06:26

21    knowingly give up their private browsing information.

22        Q.  BY MR. LEE:  Okay.  And do you see on Figure 59

23    under "Browser" the $3?

24        A.  Yes.

25        Q.  What's the $3 for in Figure 59 that was part of    20:06:42
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

1    the Ipsos Screenwise survey?

2        A.  The $3 is for using browsers with a Screenwise

3    meter browser extension.

4        Q.  Okay.  And why was it -- why in your opinion is

5    it appropriate to use that metric for your -- as an input        20:07:00

6    for your restitution calculation?

7        A.  Because the $3 that I'm using in restitution is

8    for people to unknowingly give up their -- or people that

9    have unknowingly given up their information, and in this

10   case, it is for people that have knowingly given up their       20:07:31

11   information through a browser.

12       Q.  Okay.  And do you believe, sitting here today,

13   that you considered all of the factors described by

14   counsel for Google, and having considered that, do you

15   find that -- your use of the $3 reasonable in this case?        20:07:54

16       A.  I still -- I still believe that my $3 is

17   conservative in this case.

18       Q.  Okay.  Now, you were asked whether you made

19   certain adjustments for things like, you know, people who

20   block third-party cookies, used a VPN, had cookie pop-up        20:08:14

21   opt-ins, new tab page opt-ins or disabled JavaScripts,

22   things like that.  Do you recall those lines of

23   questions?

24           MS. TREBICKA:  Objection.  Vague, compound.

25           THE WITNESS:  I do recall those lines of           20:08:33

Page 215

CONFIDENTIAL

1    questions.

2        Q.  BY MR. LEE:  Okay.  Are you aware of any data

3    produced by Google about the class members that would

4    tell you whether this group of people are statistically

5    significant to your calculations?                    20:08:50

6        A.  I am not aware of any such data.

7        Q.  Did Mr. Strombom identify any such data in his

8    report?

9        A.  He did not.

10       Q.  If Google were to make that information        20:09:03

11   available, would it be difficult for you to consider and,

12   if appropriate, apply any of these adjustments?

13           MS. TREBICKA:  Objection.  Leading.

14           THE WITNESS:  I do not believe that it would.

15       Q.  BY MR. LEE:  Would you be willing to consider   20:09:20

16   that information?

17       A.  I would be willing to consider it, yes.

18       Q.  Let's go to Exhibit 15.

19           Do you remember counsel for Google showing you

20   this -- I guess she called it a pop-up from the website  20:09:41

21   of Latham & Watkins LLP?

22       A.  Yes, I do.

23       Q.  And do you recall she directed your attention to

24   that pop-up that's indicated in red?

25       A.  Yes, I do.                                      20:09:59

Page 216

```
1         Q.  Okay.  Take a look at the representations made

2    in that red pop-up, and let me know if the pop-up says

3    anything about Incognito mode or any other private

4    browsing mode.

5              MS. TREBICKA:  Objection.  Leading.          20:10:10

6              THE WITNESS:  I don't see where it does --

7         Q.  BY MR. LEE:  Okay.  Let's --

8         A.  -- identify anything about private browsing

9    mode.

10        Q.  Sure.  Thank you.                            20:10:47

11             Does the pop-up say anything about Google

12   collecting data in Incognito mode or any other private

13   browsing mode?

14             MR. LEE:  Objection.  Leading.  The document

15   speaks for itself.                                    20:10:58

16             THE WITNESS:  No, it does not.

17        Q.  BY MR. LEE:  Okay.  New topic.  Do you

18   understand that Google has not provided data on class

19   members in this case other than for the named plaintiffs

20   in the case?                                          20:11:20

21             MS. TREBICKA:  Objection.  Leading.

22             THE WITNESS:  That is my understanding, yes.

23        Q.  BY MR. LEE:  Okay.  Now, if Google were to

24   provide the necessary data or class members provide

25   attestations or there's a combination of the two, would  20:11:37
```

Page 217

1    it be difficult to allocate statutory damages based on --

2    pardon me -- hold that thought.  I want to make sure I

3    get it right -- based on the number of individual page

4    loads in Incognito mode or other private browsing modes

5    during the class period?                                20:12:07

6           MS. TREBICKA:  Objection.  Compound, vague and

7    leading.

8           THE WITNESS:  I do not believe that it would.

9       Q.  BY MR. LEE:  Would it be difficult to do so in

10   the same ways I've just described, based on the number of    20:12:18

11   unique monthly private browsing instances across the

12   class during the class period?

13          MS. TREBICKA:  Objection.  Compound, vague and

14   leading.

15          THE WITNESS:  If you -- if you had that              20:12:32

16   information, it would not be difficult.

17      Q.  BY MR. LEE:  How about for unique private

18   browsing instances across the classes during the class

19   period?

20          MS. TREBICKA:  Same objections.                     20:12:45

21          THE WITNESS:  If you had that information, it

22   would not be difficult.

23      Q.  BY MR. LEE:  Okay.  And how about the number of

24   members in each class during the class period?

25          MS. TREBICKA:  Same objection.                      20:12:53

                                                    Page 218

CONFIDENTIAL

```
1              THE WITNESS:  Similarly, it would not be

2     difficult.

3              MR. LEE:  Okay.  I have no further questions for

4     now.  I pass the witness.

5              MS. TREBICKA:  All right.  I need a couple of      20:13:01

6     minutes.

7              THE VIDEOGRAPHER:  Would you like to go off the

8     record, Counsel?

9              MS. TREBICKA:  Yes.

10             MR. LEE:  Sure.                                     20:13:09

11             THE VIDEOGRAPHER:  Going off the record at

12     8:13 p.m.

13             (Recess.)

14             THE VIDEOGRAPHER:  We are back on the record at

15     8:23 p.m.                                                   20:22:46

16                      FURTHER EXAMINATION

17     BY MS. TREBICKA:

18        Q.  Mr. Lasinski, you recall in redirect your

19     counsel asked you questions about Figure 59 of your

20     report on page 64.  Could you please turn to that page?    20:22:54

21        A.  I am.

22        Q.  It says here that -- and counsel went through

23     the bullet points of how a user for Ipsos can earn

24     monthly rewards; correct?

25        A.  It does -- this does, yes.                           20:23:13
```

Page 219

CONFIDENTIAL

1        Q.   Okay.   Now, under your methodology for

2    restitution, if a user has a computer on which she has a

3    browser that she used to privately browse, you would

4    allot to that user $3 for using that browser on that

5    computer; correct?                                    20:23:37

6        A.   That is correct, yes.

7        Q.   Let's say in a given month.

8        A.   Yes.

9        Q.   Now, if that same user in that same month had a

10   mobile phone with a browser, which she also used to      20:23:50

11   privately browse, you would allot that user $3 for

12   browsing privately on that mobile phone -- an additional

13   $3, I should say; is that correct?

14       A.   That is correct, yes.

15       Q.   And if a user -- if the same user had a tablet   20:24:02

16   with a browser which she also used to browse privately in

17   that same month, you would allot her another $3 for using

18   that browser off the tablet; correct?

19       A.   Correct.

20       Q.   You recall your counsel asking you questions     20:24:19

21   about your statutory damages calculation allocation?

22       A.   I do.

23       Q.   And that is page -- Section 10 of your report,

24   and -- I'm sorry, Section 9 of your report, page 78.

25   Would you mind turning to that page?                     20:24:49

                                                    Page 220

1        A.   Page 78, you said?

2        Q.   78, yes.  Section 9, page 78 through 79.

3        A.   Okay.

4        Q.   Okay.  And your -- in your prior testimony, when

5    I was asking you questions, you talked about the ways in        20:25:04

6    which you would apply these bases to individual users and

7    also the fact that for certain of these bases you do

8    not -- you did not have an allocation opinion.  Do you

9    recall that testimony?

10           MR. LEE:  Objection to form, mischaracterizes.        20:25:25

11           THE WITNESS:  Well, I thought that I had said

12   that you could use the bases that I had calculated

13   earlier -- the apportionment methodologies that I had

14   testified to earlier.

15       Q.   BY MS. TREBICKA:  You testified, however, that        20:25:44

16   it is -- that currently you do not have a methodology to

17   apportion the UMPBI or the peak PBI to specific class

18   members; correct?

19       A.   That is correct.  My understanding, and I think

20   I said this earlier, is that that data is not available.        20:26:11

21       Q.   And counsel asked you whether -- if that -- if

22   certain data became available, whether it would be

23   difficult for you to perform that calculation.  Do you

24   recall that?

25       A.   Yes, I do.        20:26:25

1    Q.  And your answer was it is not very difficult to

2  perform that calculation.  Do you recall that?

3    A.  Yes, I do.

4    Q.  What is your answer that it is not, and I quote,

5  "very difficult to perform that calculation" based on?          20:26:40

6    A.  Well, if you had unique monthly browsing

7  instances -- private browsing instances by class member

8  and that data were -- as an example, were produced, then

9  you would know that -- I mean, you would know that

10  information with certainty, because you could determine     20:26:58

11  unique monthly private browsing instances by class

12  member.

13    Q.  So you're -- when you were answering counsel's

14  question, you were relying on a type of data which

15  identifies the private browsing instances by class          20:27:18

16  member; correct?

17    A.  I thought that that was the question.  If that

18  were available by class member, yes, then you could do

19  that calculation.

20        MS. TREBICKA:  Okay.  No further questions.          20:27:47

21        MR. LEE:  All right.  We didn't have to fight.

22        MS. TREBICKA:  Yeah, that's true.

23        THE REPORTER:  Off the record, Counsel?

24        MS. TREBICKA:  Yes.

25        THE VIDEOGRAPHER:  We are off the record at          20:27:58

                                                  Page 222

1   8:28 p.m., and this concludes today's testimony given by

2   Michael Lasinski.  The total number of media used was one

3   and will be retained by Veritext Legal Solutions.

4           (Time Noted:  8:28 p.m.)

5                       --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page  223

CONFIDENTIAL

1          I declare under the penalty of perjury under the

2    laws of the State of California that the foregoing is

3    true and correct.

4          Executed on _____, 2022, at

5    _____, _____.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page  224

CONFIDENTIAL

```
 1   STATE OF CALIFORNIA     ) ss:

 2   COUNTY OF MARIN         )

 3

 4        I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do

 5   hereby certify:

 6        That the foregoing deposition testimony was

 7   taken before me at the time and place therein set forth

 8   and at which time the witness was administered the oath;

 9        That testimony of the witness and all objections

10   made by counsel at the time of the examination were

11   recorded stenographically by me, and were thereafter

12   transcribed under my direction and supervision, and that

13   the foregoing pages contain a full, true and accurate

14   record of all proceedings and testimony to the best of my

15   skill and ability.

16        I further certify that I am neither counsel for

17   any party to said action, nor am I related to any party

18   to said action, nor am I in any way interested in the

19   outcome thereof.

20        IN WITNESS WHEREOF, I have subscribed my name

21   this 25th day of July, 2022.

22

23

24

25                  LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462
```

Page 225

```
1      JAMES LEE, ESQ.

2      jlee@bsfllp.com

3                                           July 25, 2022

4      RE: BROWN VS. GOOGLE LLC

5      JULY 20, 2022, MICHAEL LISINSKI, JOB NO. 5308350

6      The above-referenced transcript has been

7      completed by Veritext Legal Solutions and

8      review of the transcript is being handled as follows:

9      __ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

10        to schedule a time to review the original transcript at

11        a Veritext office.

12     __ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

13        Transcript - The witness should review the transcript and

14        make any necessary corrections on the errata pages included

15        below, noting the page and line number of the corrections.

16        The witness should then sign and date the errata and penalty

17        of perjury pages and return the completed pages to all

18        appearing counsel within the period of time determined at

19        the deposition or provided by the Code of Civil Procedure.

20     __ Waiving the CA Code of Civil Procedure per Stipulation of

21        Counsel - Original transcript to be released for signature

22        as determined at the deposition.

23     __ Signature Waived - Reading & Signature was waived at the

24        time of the deposition.

25
```

Page 226

1    _X_ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF

2        Transcript – The witness should review the transcript and

3        make any necessary corrections on the errata pages included

4        below, noting the page and line number of the corrections.

5        The witness should then sign and date the errata and penalty

6        of perjury pages and return the completed pages to all

7        appearing counsel within the period of time determined at

8        the deposition or provided by the Federal Rules.

9    __ Federal R&S Not Requested – Reading & Signature was not

10        requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

```
1    RE: BROWN VS. GOOGLE LLC

2    MICHAEL LISINSKI, JOB NO. 5308350

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____      _____

24   WITNESS                                  Date

25
```

Page 228

**[& - 2022]**

**&**

**&**   3:11 4:4,20
6:9,13,15 7:4
9:14,15 116:8,11
116:25 119:6
120:6 130:21,24
132:23 176:7
180:16 186:23
216:21 226:23
227:9

**0**

**0**   174:25
**03664**   1:9 2:9
8:23
**04324934**   7:1
171:18
**0443120**   50:1
**04431207**   6:8
49:22

**1**

**10,000**   134:18
135:7,11 199:3

**105**   35:16,21
**10:59**   2:17 8:2,9
**10th**   4:6
**11**   6:23 20:22,25
21:15,23 66:21
131:10
**11.1.**   120:10

**112**   35:22
**116**   6:9,11
**11:56**   38:19

**12:04**   38:22

**130**   6:13,15
**131**   6:18,20,22
6:23,25
**137**   78:5,9,21
79:4 103:20
104:7
**138**   97:6 100:5
100:14 101:10
**14**   7:2 176:4,13
**143**   109:19,23
110:2

**144**   105:7
**15**   7:4 176:7
180:12 186:21
190:16 192:20
195:19 196:5,11
197:17 216:18
**151**   105:19
**159**   127:14 128:1
**16**   88:11,15 89:4
**160**   130:2
**162**   85:13 135:19
135:20
**163**   137:6
**169**   147:20,22
151:15
**171**   7:1
**176**   7:2,4
**18.1**   148:10
**186**   198:19
200:11
**191**   4:12
**197**   138:8 141:13
152:11 154:2
202:9 203:3
**1:01**   68:4
**1:47**   68:7

**2**

**2**   6:6 25:24,25
26:3,11 27:21,22
31:1,2 32:8
33:15 84:15
89:6,10 95:18
135:3,4 157:19
214:8
**2.4**   174:15 175:3
175:3

**2.5**   174:15,17
**2.5.**   174:15
175:11

**2.9**   173:24
**2.9.**   173:21

**2008**   149:19
**201**   3:13
**2014**   149:4
**2016**   11:20,23,24
26:20 27:1 28:6
148:2,7,14
149:20 174:5,22
177:4
**2017**   174:22
**2018**   149:10,15
174:22
**2019**   149:15
174:22 177:4
**2020**   172:9
174:22 175:10
197:5
**2021**   118:20
148:7,14 149:12
149:20 174:6,18
174:25 175:6
205:14,20,25
**2022**   1:18 2:19
5:4 8:1,10 224:4
225:21 226:3,5

Page 1

**[2025.520 - 74]**

**2025.520**  226:9
  226:12
**20th**  8:10
**21**  28:6
**211**  5:10
**213**  4:8
**214-7900**  3:22
**219**  5:9
**223-5505**  3:15
**225**  1:25
**24**  43:18 167:8
  167:12 169:14
  169:18
**24.3**  209:13
**24.3.**  209:6,8
**25**  169:10,11,11
  169:15,16,19,22
  170:2,6,6 226:3
**25th**  225:21
**26**  169:19,22
  170:2
**27**  170:1,1
**2700**  4:12
**271**  6:8 49:22
**2800**  3:6
**29**  85:5 93:18
  126:2 128:14
**2:46**  99:24
**2:55**  100:2

**3**

**3**  6:8 49:21,22,25
  81:6,10,25 82:2
  82:7,13,23 83:9
  83:23 84:14
  88:4,23 89:1,2
  91:15 92:9,23
  93:7,10 94:16

100:18,18 101:6
101:14,18,22
102:3,6,16,22
105:12 106:2,5
106:14,18 108:6
115:10 179:2,6
192:17 213:24
214:4,7,10,11,14
214:15,23,25
215:2,7,15,16
220:4,11,13,17
■■■■■■■■
■■■
**30**  93:12 107:24
  227:1
**305**  3:8
**31**  6:6
**312**  3:22 4:14
**32**  167:8,11,12
**33131**  3:7
**33602**  3:14
**3462**  1:24 2:21
  225:4,25
■■■■■■■■
■■■■■■■■
■■■■
**3:46**  125:7
**3:58**  125:10

**4**

**4**  6:9 20:22
  22:18 116:10,11
  116:25 120:7
  133:18
**40**  107:24
■■■■■■■■
■■■■

■■■■■■
■■■■■■■
**44**  7:1 171:18
**443-3000**  4:8
■■■■■■■
**47**  197:22
■■■■■■■
**49**  6:8
**4:20**  1:9 2:9 8:23
**4:26**  138:25
**4:30**  139:3
**4:59**  152:4

**5**

■■■■■■■
■■■■■■■
■■■■■■■
■■■■■■■
■■■■■■
**50**  85:18 93:20
  134:16 135:5
  197:23
**500**  134:14,15,19
  134:20 135:11
**5308350**  1:25
  226:5 228:2
**539-8400**  3:8
**5411**  225:24
■■■■■■■
■■■■■■■
**58**  86:1 212:5,10
  212:12
**59**  85:2 88:18
  181:24 187:22
  188:5 213:21,23

214:22,25
219:19
**5:10**  152:7

**6**

**6**  6:13 22:17
  91:16 92:8,24
  130:19,21
  175:22
**6.1.21**  6:10,12
  116:12,21
**60**  78:6
**60602**  3:21
**60606**  4:13
**61**  105:6,7
**63**  33:15,23 86:1
  212:11
**64**  85:2 219:20
**68**  85:5 125:15
  125:19
**69**  35:19 130:2
■■■■■■■
**6:16**  175:25
**6:59**  198:2

**7**

**7**  6:15 41:2
  130:24 132:19
  134:21,22
  158:16
■■■■■■■
**705-7400**  4:14
**71**  170:9,9
■■■■■■■

**73**  172:15 173:2
  173:6
**74**  205:15 206:9

Page 2

**[75 - adjustment]**

**75**  50:3,9
**77**  50:9
**78**  198:16 220:24
221:1,2,2
**79**  198:20 221:2
▮▮▮▮▮▮
**7:12**  198:5
**7:44**  210:22
**7th**  3:13

**8**

**8**  6:4,18 50:7
78:13 80:14
82:6 83:19
84:10 85:24
131:2 133:17
134:22 137:21
▮▮▮▮▮▮
**813**  3:15
▮▮▮▮▮▮
**865**  4:6
**8:03**  211:9
**8:13**  219:12
**8:23**  219:15
**8:28**  2:18 223:1
223:4

**9**

**9**  6:20 50:18
131:5 171:20
198:16 220:24
221:2
**90017**  4:7
▮▮▮▮▮▮
**95**  170:12 176:20
176:23
**96**  176:20,23

**a**

**a.m.**  2:17 8:2,9
38:19
**aback**  207:1
**ability**  20:19
33:11 60:14
74:2,5,5 158:19
159:11 225:15
**able**  53:12 57:25
58:6,11 60:12,24
94:17,22 96:15
105:20 111:2
114:20 124:3
129:3 144:14,25
145:13,18
148:25 150:22
150:25 159:24
163:11,22
166:21 168:16
168:21 185:14
**absolutely**
152:16
**accept**  103:16
**access**  157:18,18
**accomplished**
14:6
**account**  39:5
40:15 42:24
63:9,14,16 64:5
64:20 95:16,17
98:3 160:3,18
178:11,13
188:12,22
189:18 195:11
195:17 196:3,10
197:9,13,15
207:5

**accounted**
185:10,16,17,20
186:9,18 187:1,6
188:15 197:1
**accounting**
185:24,25 186:5
186:15
**accounts**  16:15
16:19
**accrue**  59:9 60:3
72:17
**accurate**  26:24
115:16 121:16
122:8 123:11
127:9 133:14
177:9 225:13
**action**  9:4
225:17,18
**actions**  119:11
119:13
**activities**  52:1
115:15,17,19
119:18
**activity**  43:2
79:14 82:19
96:16 97:20
98:20 100:23
101:2,8,16 102:5
115:10 132:15
133:3 136:10
**actual**  17:6,11
19:10,11,14,15
19:19 20:4 21:5
22:16 78:10,14
78:17,18,22
79:10,19,21 80:3
80:7,13,23 81:1
93:13,13 96:20

97:8 151:22
178:23 185:1
**ad**  39:17 40:16
40:17 42:25
43:1 44:8,9,14
59:11 66:1 70:1
71:8 72:9 73:7
74:10 120:15
121:1 137:14
156:22 161:6
166:19,19,22
**add**  89:4 117:7
**added**  179:13
**adding**  90:5
170:2
**addition**  23:21
83:23 85:4
106:13 193:24
193:24 213:23
**additional**  58:18
81:7,10 127:20
127:22 128:4,7,8
129:2 133:24
137:16,25
151:13 165:7
193:9 220:12
**additionally**
83:24 163:18
**address**  34:25
115:5,5 121:19
136:7 161:3
**adjust**  146:11
**adjusted**  205:15
**adjustment**
55:14 56:1 64:4
64:13 161:7
168:4 170:4
187:9 188:20

[adjustment - analysis]

192:6,9,11,13
**adjustments**
30:17 168:4
169:24,25 170:3
197:19 215:19
216:12
**administered**
225:8
**administrator**
141:6,8,17
202:23
**admitted** 158:7
**admob** 168:2
**ads** 56:17,17,20
56:21 57:1,9,12
57:16,21,21,24
58:17 60:7,14
65:16,18,22
68:19,20,23,25
69:4,11,17 70:9
70:12,14,21,25
71:5,8,16 72:1,7
72:24 73:10,16
73:18,22 74:2,15
75:8,15,22,25
76:19 77:10,17
126:18 128:18
129:5,5 159:22
161:6 162:15,16
166:10 167:14
167:22 168:8,12
168:16 169:6
171:17 173:4
177:17 178:6
183:4,8,10,18
184:8 186:16
187:4,13,25
188:1,11 189:2

190:6 195:1
**advance** 67:1
**advertise** 58:7
**advertisement**
170:18
**advertisements**
14:2,12 56:5
59:18 125:23
127:6,8
**advertiser**
166:11,23
**advertisers** 58:7
60:12 124:4
156:19 166:17
166:18,20
**advertising**
60:19,19,23 75:1
170:14,20 171:2
**affect** 55:5,22
57:6 158:19
159:11
**affiliations** 9:9
**ago** 30:19 77:15
106:22
**agree** 8:17 24:25
25:1,2 39:7
57:10 66:7,12
67:18 68:2
107:12 112:3
119:11,15
120:13,15,18,20
120:24 121:2,10
151:5
**agreed** 66:24
67:3 118:24
**agreeing** 121:8
190:18

**ahead** 11:12
13:2 23:17 32:7
39:13 43:6
69:19 91:25
140:17 143:6,8
153:24 162:6,9
162:10 194:18
196:14
**algorithms** 58:1
60:9
**alleged** 36:16
45:12 161:16,24
167:15 183:4
188:1 206:25
207:5,14,21
208:1,5
**allegedly** 33:24
**allocate** 138:8
139:5 154:11
202:4 204:1,3
218:1
**allocated** 58:20
152:22
**allocating** 22:6,7
152:18 153:1
202:14,19
**allocation** 138:6
142:15 144:18
144:20 152:9
153:8,10 155:8
160:2,17 197:8
197:14 204:13
204:14,19 205:1
220:21 221:8
**allot** 220:4,11,17
**allotting** 93:3
**allow** 67:3,11
79:13 82:18

97:19 100:22
101:1 102:4
127:20 181:10
**allowing** 101:7
101:19 123:18
211:18
**allows** 101:5,16
124:13
**aloud** 100:17
**alternatively**
146:14 200:15
**amended** 6:6
25:12 31:2
33:15
**amna** 4:18 10:6
**amount** 19:7
33:10 60:17,18
60:23 80:25
91:18,20 124:22
142:16,20,22,25
144:9,12 149:14
154:18,21,22
155:10 157:12
161:14,15,19,22
163:6 166:2
206:21 212:16
214:13
**analysis** 4:23
9:22 23:20
34:20 36:15,20
37:3,3 44:12,15
44:16 58:23
59:8 60:2 73:21
74:13,24,24
75:11,13 87:3
121:21 146:25
148:17,20
159:16 162:15

**[analysis - asked]**

163:19 164:1,2,6
164:22 177:7,13
177:16 184:7
187:19 189:23
189:24 191:25
192:15,24
193:11,13,23
194:5 195:22
196:18,18,20
207:12 208:24
209:3,4,6,20
210:2,4
**analytics**  181:1,4
190:4,17 191:11
**analyze**  193:9
194:1 207:19
**analyzed**  34:14
91:3 104:23
114:2 123:10
191:16,19
193:21 197:3
207:9
**analyzes**  160:8
**angela**  4:20 9:19
**angeles**  4:7
**ann**  1:17 8:1
**annotated**  20:3
**announce**  9:16
**answer**  5:12
12:23 13:2 14:9
15:6,22,23,25
23:17 32:7
34:12 35:5
36:12 42:2,19
43:6 45:3 51:2,4
52:14,15,21
54:21,23,25 55:8
55:9,16,20 61:20

61:21 62:9
64:22 67:7
71:20 74:18
75:18 76:13
77:25 84:21,23
91:9 92:12
96:22 99:4,4
103:8,13 107:11
109:3 110:19
121:22 123:22
140:2,3 143:7
151:3 159:13
164:10 171:10
181:16 184:24
186:13 188:17
195:20 207:4
213:7,9,13 222:1
222:4
**answered**  14:13
18:17 31:5
34:11 35:5
43:23 44:3 55:1
62:10 71:17,19
75:2 98:13
122:6 153:3,23
165:23,24
186:11 195:20
196:13
**answering**  96:10
107:13,14 162:9
213:11 222:13
**answers**  28:14
123:15 153:11
159:9 195:14
196:15
**anymore**  67:7
**apologize**  48:23
51:16

**app**  44:15 82:15
89:1,3 101:15
115:3 132:24
168:2
**appearance**  9:7
**appearances**  3:1
4:1 9:9
**appearing**
226:18 227:7
**applicable**  38:6
86:11 87:17,23
**application**
132:6 135:22
137:8
**applied**  17:9
200:13,20 201:1
201:14,16
214:16
**applies**  183:10
**apply**  38:3 97:1
101:21,22
201:20,25 203:5
203:12,21,25
206:16 207:3
216:12 221:6
**applying**  102:6
**appointed**  67:3
**apportion**  22:10
63:23 88:5
113:2 143:19
157:1 221:17
**apportioned**
88:3
**apportioning**
21:25 22:3
202:7
**apportionment**
17:10 22:8 64:9

203:2 221:13
**appreciate**
140:18
**appropriate**
25:6 34:23
82:22 143:17,18
144:18 148:23
155:5 178:21
203:1 215:5
216:12
**approximate**
15:23 209:20
**approximately**
209:21
**apps**  115:2
**arbor**  1:17 8:1
**area**  58:2 162:24
163:24 190:13
192:5
**areas**  17:24
18:21 193:9
**argumentative**
13:1
**arising**  153:7
**arrive**  81:1
209:17
**aside**  12:11,16
15:12,16 18:6
207:11 214:4
**asked**  6:17 14:13
18:17 29:10,12
30:20 31:5,14
32:11,25 34:8,9
34:11 35:4 36:3
36:5 42:20 44:3
59:16,20 65:1
66:19,19 71:17
74:22 75:2,11

**[asked - aware]**

| | | | |
|---|---|---|---|
| 77:15 85:10 | **assignment** 17:1 | 127:10 128:11 | 139:21 144:9 |
| 90:11,12 91:8 | 17:2,12,16 20:25 | 128:13,17 129:9 | 154:4 167:15 |
| 93:10,22 96:23 | 21:7,8,14,23 | 129:22 | 183:4 188:1 |
| 98:13,17 102:23 | 57:5 98:9,18,18 | **at&t's** 125:15 | 210:1,12 |
| 103:10 119:3,8 | 98:25 | 126:1 137:24 | **attribute** 210:8 |
| 122:6 130:25 | **associate** 4:19,21 | **attempt** 101:6 | **attributing** 87:3 |
| 132:20 145:6,6 | 9:20 10:8 | 184:22 | **audio** 8:15 |
| 153:3,23 162:24 | **assume** 29:10,12 | **attempted** 38:9 | **austin** 126:24 |
| 162:25 164:11 | 30:20 31:14 | 38:25 77:9 | **auto** 177:3,15,17 |
| 165:23 184:14 | 32:11,25 39:3 | 110:17 140:20 | 177:21 178:12 |
| 186:11 187:10 | 41:7 42:3,6 | 154:22 183:25 | 178:23 |
| 188:11 196:13 | 46:11 57:7 | 184:2 199:11 | **available** 17:4,7 |
| 199:15 211:16 | 60:25 61:2,24 | 207:18 210:12 | 17:18,20,23,25 |
| 215:18 219:19 | 62:13 76:18 | **attempting** | 18:2,8,13,16,22 |
| 221:21 | 91:19 92:2 | 126:16 | 19:3,8 35:18,20 |
| **asking** 18:10,14 | 145:9,12 149:24 | **attempts** 24:5 | 53:11 118:4,11 |
| 27:5 33:5 37:22 | 200:14,22 201:5 | **attention** 20:21 | 126:4,6,7,24 |
| 40:24 44:25 | 201:7,8 | 22:17 25:8 | 127:2,13 129:3,4 |
| 49:4 51:7,8,12 | **assumed** 95:24 | 27:18 47:22 | 135:14 140:10 |
| 51:13 53:2 | 96:5,15 145:9 | 78:9 79:3 82:9 | 140:20 141:2,3 |
| 61:24 62:12 | 201:15 | 86:1 100:13 | 142:12 151:6 |
| 63:3 68:21,21 | **assumes** 148:5 | 120:3,9 127:14 | 181:13 184:19 |
| 73:13 75:12 | 213:2,17 | 130:1 132:22 | 184:22 185:6,9 |
| 80:8,12,16 84:22 | **assuming** 41:4,5 | 147:20 172:14 | 185:14 187:17 |
| 86:15 98:15 | 113:3 148:13 | 176:19 179:1 | 187:20 188:19 |
| 107:17 119:7 | 158:13 171:5 | 181:24 182:12 | 190:3,4 195:14 |
| 122:1 133:8 | 172:6 203:4,10 | 194:9,22,24 | 196:16,17 |
| 144:16 150:22 | 206:15 | 195:7 198:19 | 197:11,18 210:4 |
| 153:4 169:14 | **assumption** | 216:23 | 216:11 221:20 |
| 189:12 196:7 | 29:15 46:13,18 | **attest** 141:4 | 221:22 222:18 |
| 201:5,7,8 202:1 | 46:19 96:18 | **attestation** 141:3 | **average** 208:15 |
| 207:20 208:12 | 104:20 148:18 | 142:5,10 | 209:17 |
| 212:2,22 220:20 | 148:23 149:24 | **attestations** | **award** 153:25 |
| 221:5 | 190:25 | 217:25 | **awarded** 17:11 |
| **asks** 132:8 | **assumptions** | **attorney** 9:10 | 19:1 153:17,22 |
| **assessing** 21:1 | 45:10 | **attorneys** 33:8 | 202:24 |
| **assessment** | **at&t** 85:6 93:17 | **attributable** | **aware** 26:3 |
| 24:11 | 126:16,20 127:5 | 138:12 139:18 | 30:16 45:15,19 |

Veritext Legal Solutions
866 299-5127

**[aware - benefit]**

45:21 46:2,3,5
46:11,21,22,23
47:2,3,5,6,7,10
47:14,15,23 48:8
48:9,11,15,22,23
48:24 49:12
53:9 55:2,10,25
56:2,4,20 57:2
63:7 64:1
102:18 115:8,13
135:21,24 136:9
137:3,4,6,13
146:21 147:17
170:14,24 171:1
187:19 216:2,6
**awareness**  46:14
46:20 49:19
56:7

**b**

**b**  34:25 91:13,21
92:3,3,4,6,8,23
156:3 227:1
**bacchus**  4:22
9:21
**back**  38:21
53:15 68:6
83:10 89:25
97:5,6 100:1
106:20 120:3
125:9 128:11
134:9,9 139:2
149:4,10,14
151:8 152:6,15
172:17 175:24
182:13 190:15
194:9,22 198:4
211:6,8 219:14

**background**
210:15
**backing**  204:13
**banner**  180:17
180:19,19
182:13,17,24
183:17
**banners**  182:15
187:2
**bartlett**  4:23
9:22
**base**  183:14,20
187:4 188:6,6
195:3 201:14,16
201:23 208:17
**based**  25:5 33:11
37:3 63:23 64:7
71:8 72:9 73:1
76:4 80:5 93:8
93:23 129:6
140:7 143:3
146:9 148:23
154:24 156:4,9
156:11 157:3,5
159:7,7 160:8
163:1,5 164:12
168:15 177:3,15
185:3 187:17
189:23 191:23
196:18 200:18
202:15,21,25
204:5 208:22,24
209:9 218:1,3,10
222:5
**baseline**  82:13
101:14 107:1
**bases**  17:8 59:20
59:21 60:4 65:1

68:22 102:24
200:12,15,16,20
202:2 203:1
205:14 206:23
207:13,22,25
221:6,7,12
**basic**  136:7
**basically**  169:22
**basis**  40:7 55:8,9
55:9 58:15
63:21 70:4,12,22
71:11,14,21,24
144:12 157:2
165:19 171:12
184:3 202:19
203:6,12,22
204:1,16 205:2
205:23 206:11
206:17 208:3,15
209:19
**bates**  49:25
117:1 118:8
**beacons**  22:24
23:11,14 24:1,22
65:6,8
**beat**  212:24
**beginning**  2:17
9:10
**behalf**  1:7 2:7,16
10:1
**behavior**  130:11
133:24
**behaviors**  134:1
**belief**  107:17
**believe**  15:4,11
15:19 16:13
25:12 26:24
45:3,5,15,18

47:7,9 48:14,21
48:24 54:1 55:6
55:6,10 61:6
67:13,16 72:1
76:20 77:13,20
78:13 86:14
95:1,5 98:14,15
98:19 114:16
115:16 117:2,24
120:23 121:19
121:23 122:7
127:9 129:10,10
130:17,19
133:14 139:10
144:7 145:6
147:15,16 149:3
149:15 158:23
159:12,14
160:21 162:11
164:21 165:2
166:14,25
170:25 171:13
171:22 172:10
177:10 178:8
180:9 185:9
187:7 191:21
195:14 210:3
215:12,16
216:14 218:8
**believing**  70:22
71:14,21 193:22
**belong**  26:19
**belonging**  28:2
**benefit**  69:16
70:1,3,5,20,24
71:4,10,15,25
72:16 74:10
76:19 77:1,7,9

Page 7

**[benefit - browsing]**

77:13 88:6
**benefits** 94:7
  105:23
**best** 71:20 91:9
  174:14 225:14
**better** 27:9
  70:20 105:9,18
  133:25 206:3,5
  213:10
**beyond** 13:8
  16:12 39:12
  44:24 46:11
  48:18 56:6
  65:20 69:6,12
  72:25 73:11,23
  74:16 75:3
  76:11 87:8
  95:22,23 146:20
  190:24 207:7,16
  208:6,8
**bidding** 177:3,15
  177:18,22
  178:12,23
  ███████████
  ████████
**bird's** 94:22 95:2
  95:20
**bit** 15:8 38:14
  72:25 83:2
  108:9 149:6,7
  165:6 177:24
  211:5
**black** 134:6
**block** 22:23
  23:10,14 24:1,21
  56:17,21 65:16
  68:25 125:22
  179:13 181:10

215:20
**blocked** 159:5
  159:25 160:3,14
  160:22 180:7
**blocker** 121:1
**blockers** 120:16
  137:14
**blocking** 158:18
  159:11 160:9,10
  160:19 162:21
  184:4 190:6
**blow** 51:18,18
**blue** 180:2
**bodies** 113:24
**boies** 3:4 4:18
  9:13 10:8
**bonus** 84:15,17
  89:6,10 214:9
**borsay** 21:19
  46:7 47:6
**bothered** 14:4
**bottom** 100:19
  117:11 133:19
  179:12 194:25
**bound** 193:1,4,5
  193:12,19,20,23
  194:2,10,15,21
**bounds** 194:12
**box** 20:7
**breach** 17:5,6,18
  17:25 18:2,3,8
  18:13,16,21,23
  19:3
**break** 37:22,23
  38:15,24 64:14
  66:9,15,19,20
  67:3 99:13,19,20
  100:4 124:24

125:4 139:8
  151:24 152:1,12
  175:16 179:18
  189:13,15
  197:22
**breaking** 99:12
  189:17
**briefly** 139:8
**broad** 124:5
**broke** 68:18
**broken** 196:6,8
**brokerage** 16:15
  16:19
**brown** 1:5 2:5
  8:20 226:4
  228:1
**browse** 13:14
  16:7 41:2 64:2
  70:2,6,7,23 73:9
  73:21 74:14,25
  75:14 81:20
  89:20 91:12,14
  98:1 130:12
  181:7 220:3,11
  220:16
**browsed** 57:8
  61:3 62:1,14
  76:10 207:24
**browser** 12:12
  14:6 22:24 23:3
  24:2,16,16,20,22
  26:8 35:14,24
  39:4 40:22
  43:10,12,12 49:8
  82:14 87:21
  88:22,23,24
  93:11 101:15
  129:24 143:16

143:17 156:4,5
  160:20 194:6
  206:19 214:23
  215:3,11 220:3,4
  220:10,16,18
**browsers** 11:7
  11:15 23:21
  24:10,13 25:4
  26:1,17 160:4
  214:14 215:2
**browses** 92:2,4,6
  112:25
**browsing** 12:2,6
  12:12,14,19 13:4
  13:6,7,10,18,23
  14:5,11,16,22
  15:3,5,9,13,18
  16:6,10,16,18
  23:3,4,9 26:1,20
  26:25 27:10,12
  28:4 29:16,24
  30:2,6,8,13,14
  30:15 39:3,5
  40:15 41:9,15,16
  41:23,24,25,25
  42:3,8,9,10,11
  42:12,16,23
  43:14,19 44:6
  45:8 46:4,9,15
  46:15 47:1,11
  49:13 55:4 57:8
  57:15,23 60:10
  61:1,4,16 62:1
  62:14,20,21
  63:25 64:8 65:3
  65:13 69:1,23
  70:19,24 71:2,3
  71:12,15,23,25

Veritext Legal Solutions
866 299-5127

**[browsing - calling]**

72:1,3,4,6,7,20
73:15,22 74:4,8
74:14,19,25 75:5
75:14,19,23
76:20 77:17
79:13 81:8,9
82:18,19,25 83:4
84:1 89:16
91:11,19,20 92:7
92:9,10,24 93:4
93:25 94:1
95:11,15,18,20
96:6,12,13,16
97:16,20,23,25
98:5,6,11,21
99:1,3 100:11,22
100:23 101:2,5,8
101:17,22 102:5
102:6,8,17,20
103:5,24 104:3
104:13 106:23
107:22 108:1,4,5
111:10,11
112:10,11,12,14
112:14,15,20
113:1,9 114:12
121:20 127:6
138:15 140:25
143:12 145:1,3
145:13,18,22,24
145:25 146:7,10
146:24 147:8,14
147:18 149:13
158:11,24 159:4
167:22 180:7
181:11,14,19
194:1 200:2,8
201:3,22 203:7

203:14,18,23
204:4,7,8,18
205:2,4,6,11,14
205:19,24 206:2
206:6 207:22,24
209:10,14
213:24 214:5,21
217:4,8,13 218:4
218:11,18
220:12 222:6,7
222:11,15
**bruce**   7:2 176:2
176:4
**bsfllp.com**   3:9
226:2
**building**   113:4
**bullet**   89:11
201:1,10 203:22
204:14 219:23
**bullets**   204:6
**business**   156:14
163:4,8,13,17
165:3,9,10 166:5
197:1
**buy**   108:20
**buyer**   103:15,17
108:25 109:5
**byatt**   1:5 2:5

**c**

**c**   35:12
**ca**   226:9,12,20
**cabr**   6:8 7:1
49:22 50:1
171:18
**calculate**   17:2,8
17:8,16 36:20,22
37:1 38:6 58:3

60:6 65:1 80:13
80:14 99:6
138:7 140:25
143:11 146:10
153:5 154:3,22
164:3 167:6
171:1 200:3
201:19 202:16
205:23 206:24
207:13
**calculated**   19:13
63:21 79:25
80:3,7,12 97:4
113:10,11
139:17,19 148:9
161:19 162:1
175:6 190:9,13
195:25 200:7
203:2 221:12
**calculates**   161:9
**calculating**
34:23 40:22
43:16 100:10
183:24 188:14
208:3,4 210:2
**calculation**
35:11 55:15
65:8 77:6 80:16
81:10 95:25
101:4,25 141:7
145:8,9,12 147:3
147:9 160:16
161:14,23
166:18 167:1,5
170:10 181:25
182:8,22 184:11
184:13 188:25
190:10 191:22

192:7,14 194:2
196:6 200:5
205:12,17
213:16 214:16
215:6 220:21
221:23 222:2,5
222:19
**calculations**
29:15 30:16
34:17 37:7,17
57:6 60:22
68:22 73:1 81:7
96:5,15 115:4
146:12,19 159:3
159:3,8 160:7,8
163:1 164:13
166:20 167:23
170:21 177:9,10
178:2,4,12 187:6
188:21,24
189:12,14,19
190:12,14
195:15 197:2,20
200:6,7 201:15
202:15 207:3
208:18 212:19
214:6 216:5
**california**   1:2
2:2 4:7 8:22
10:1 224:2
225:1
**call**   39:4 67:20
91:12
**called**   53:10 85:7
163:21 216:20
**calling**   182:24
183:17

Page 9

[calls - ■■■■■■■■]

**calls**  14:7 17:21
26:13 27:15
33:4 48:18 61:9
64:23 69:18
76:8 87:7
181:21 199:8
214:18
**cambridge**  2:17
**camera**  8:13
**campaign**
125:15 128:12
137:24
**care**  107:23
**carefully**  42:7
**case**  8:22 12:9
12:13,16 14:25
15:2,12,16 17:1
17:2,11,16,20,24
18:5,7,7,15,21
19:8,9,13 21:14
29:11,12 30:18
39:23 40:3,6,8
41:17 45:7 47:4
47:20 48:12
49:16 64:10,11
79:25 83:22
84:1 89:19 90:6
93:6 98:7,11,22
98:25 99:2
101:20,21
102:18 103:16
104:19 112:8
113:15,21 114:3
124:16 128:15
128:16 130:16
136:2 141:6
143:16 156:25
162:12,19,20

166:17,24 168:1
180:6 184:12
191:11 193:18
198:14 200:21
202:12,23
208:22,24
211:14 215:10
215:15,17
217:19,20
**cases**  18:4,12
83:24 147:16,17
156:20 163:9
166:13 208:21
208:25 209:1
**castillo**  1:6 2:6
**category**  112:16
112:21,24 187:8
**cautious**  59:7
**ccp**  226:9,12
**cell**  54:17 67:21
**cellular**  129:16
**certain**  11:22
29:13 30:20
33:24 36:21
39:7 65:5,5 76:6
79:12,13 82:18
87:1 97:16,23,25
98:1,5 100:22
101:22 103:24
115:14 122:23
124:7,22 154:6
158:7 163:19
178:5 190:19
197:9,15 215:19
221:7,22
**certainly**  14:24
22:5 24:13
47:19 67:14

73:17 81:4,18
85:16 121:7
188:19 193:25
207:21
**certainty**  222:10
**certified**  2:20
**certify**  25:16
225:5,16
**cetera**  79:24
80:23
**chance**  134:13
134:15,18
135:10
**change**  126:19
157:12 163:1,3
163:12 164:12
175:14 228:4,7
228:10,13,16,19
**changed**  14:22
15:1 198:10
**changes**  105:21
**charged**  126:20
155:17
**chasom**  1:5 2:5
8:20
**chat**  67:23,24
**check**  116:1
119:1
**checkmark**
133:2
**chicago**  3:21
4:13
**choice**  70:2,5,7
70:10 71:2,4,5,9
71:12,23 72:2,13
72:15,18 74:7,9
74:19 75:4
79:12,18 80:19

82:17 97:15
100:21 102:17
102:17 103:24
104:10 108:17
112:22 121:3,4
191:9
**choices**  180:18
**choose**  72:21,21
**chose**  126:2
192:1
**chosen**  70:18
104:21
**christina**  4:23
9:21
**christopher**  1:5
2:5
**chrome**  11:13,18
11:19 12:3,6,12
12:14,19 13:6
14:6 15:6 16:7
23:21 26:1,8
39:4 49:7 50:22
52:9 146:6
147:1,4,7 148:1
149:19 162:20
168:5,5 170:10
189:3,5 194:6
■■■■■■■■■■
■■■■■■■■■■■
■■■■■■■■■■■
■■■■■■■■■■
■■■■■■■■■
■■■■■■■■■■■
■■■■■■■■■■■
■■■■■■■■■■

███████████ - column]

███████████
████████
**circle** 106:20
**circumstance**
  62:3
**circumstances**
  12:5
**circumvent** 24:5
**citation** 151:22
**cite** 50:3,19
**cited** 50:9
  106:20 150:3,5,8
  150:9,11
**cities** 126:24
**city** 126:25
**civil** 226:19,20
**claim** 17:20 18:9
  18:16 19:4
**claims** 21:3
**clarifies** 81:12
**clarify** 151:2
**class** 22:1,4,11
  25:18,21,24,25
  26:3,11,19,22
  27:1,10,21,22,22
  27:23 28:2,8,14
  28:16,20 30:14
  42:24 45:11,23
  45:25 46:14
  57:8,11 58:20,25
  59:2,12,17,17,23
  60:25 61:2,3,5,7
  61:25 62:13,24
  63:11,24 69:16
  69:22 70:23
  74:22 76:3,4,18
  77:10 81:5
  82:23 87:25

88:4,7,7 90:24
91:10 95:14,18
95:21 96:12,17
97:25 98:2,10
103:19 110:16
110:23,25 111:2
112:9 120:21
136:20,25
138:12,17,17
139:12,18,19,20
139:21 140:10
141:1,3 142:17
143:19 144:9,10
152:18 153:1
154:2,4,12,16,17
154:21,23,25
155:1,6,6,7,10
155:16,17,22
156:2,10,16,16
157:2 158:11
160:3,18,19
169:25 170:2,4
173:19 200:9
201:4,22 203:8
203:14,24 204:2
204:5,19,19
205:7,8,8,16,20
206:12,19,21,25
207:5,14 208:4
210:1,3 216:3
217:18,24 218:5
218:12,12,18,24
218:24 221:17
222:7,11,15,18
**classes** 25:16
26:23 203:7,14
203:23 206:2
218:18

**clear** 42:9,10
  43:8 59:4 80:6
  112:8 123:15
  136:16,25 141:5
  147:12 155:14
  158:25 159:20
  159:21 169:17
  184:6 189:22
  198:25 205:3
  207:9
**clearly** 192:2
**click** 40:11 43:19
  44:13 65:23
**clicked** 66:1
**clicking** 69:9
**clicks** 40:17
  42:25
**client** 145:19
  178:23,25
**closes** 146:17
**coast** 66:22
**coasters** 64:16
**code** 226:9,12,19
  226:20
**collect** 45:16
  46:1,2 47:1,5,16
  61:4,7,12 62:7
  62:22 74:5
  90:17,18 106:10
  124:17,18
  132:24 155:1,15
  155:18 199:11
**collected** 28:5
  29:14 30:5,22
  31:15 32:12
  33:1,20,22 35:8
  37:8 38:4 43:11
  47:6 49:18

54:14,16 55:3
57:23 58:8
61:15,18 62:2,15
63:2,11,12 64:9
70:16 72:3,5,12
74:1 75:6,20
98:11 111:13
112:18,19 114:4
114:11,12,13,17
122:16 127:11
142:16,21,23
143:1 144:10
155:10 161:21
165:5 199:11,19
211:18
**collecting** 46:12
47:8 48:8 60:6
72:22 87:10,22
128:13 163:23
217:12
**collection** 47:13
47:18 55:22
107:9 109:9,13
110:9 125:22
126:17 127:21
165:8 166:4
**collects** 45:19,22
45:25 46:4,6,8
46:15 47:4,10
58:4,12 60:11
102:19 113:21
129:9,22 130:9
132:15 137:16
143:11 155:21
159:24
**color** 180:19
**column** 51:2,4,5
52:17 167:19

**[combination - constant]**

**combination**
34:21 141:15
217:25
**come** 12:24
13:20 50:5
70:16 172:12
178:20 186:17
**comes** 60:23
116:14 129:13
129:17 170:6
173:15
**coming** 25:3
31:7,9 99:9
**comment** 140:18
**comments**
194:11
**communicate**
60:12
**communications**
28:3
**companies**
137:19
**comparability**
128:25
**comparable**
114:9 128:14,20
**compared** 114:6
163:7
**compensate**
105:13 106:6
121:6
**compensated**
113:12 119:20
155:4
**compensating**
119:25
**compensation**
121:8

**complaint** 6:7
25:10,11,12,13
25:15 26:4 27:6
30:25 31:1,2,13
32:6,14,20,22,23
33:3,7,12,16
**complete** 20:10
86:22 132:9
133:13 135:25
194:23
**completed** 226:7
226:17 227:6
**completely**
164:1
**completeness**
20:8 21:22
**completion**
227:10
**components**
35:7
**compound** 24:12
36:6,11 45:17
102:10,12
215:24 218:6,13
**comprehensive**
110:8
**computer** 6:13
6:15 14:19 34:4
85:16 89:21
130:4,20,21,24
131:25 132:15
132:23 133:3
220:2,5
**concern** 105:20
**concludes** 223:1
**conclusion** 17:22
18:10 25:3
26:14 27:5,15

45:1,4,5 61:10
64:24 76:8
98:15 177:14
199:8
**conclusions**
177:6,12
**conditions** 6:10
6:24 116:9,11,25
119:6 120:6
131:10
**conduct** 36:16
167:15 183:5
188:2
**conducted** 8:12
8:24 172:8
**confer** 67:19
**confidential** 1:13
2:14
**confirm** 126:17
148:18
**confirmed** 59:21
117:13
**confusion** 206:5
**connect** 84:15
90:15,18 106:12
**connected** 88:20
89:12 96:6
111:12 129:20
**connection** 8:13
35:1
**connects** 89:21
136:12
**consecutive**
144:1
**consent** 56:1
**consented** 55:13
55:21

**conservative**
60:5 77:5,8
81:21 82:16
83:13 84:4,5,6
97:13 100:20
101:18 102:7,18
102:22,24,25
103:9 215:17
**consider** 113:1
142:20 143:18
155:6,6 157:2
175:13 184:7
185:15,16,18,23
185:24,25
186:15 189:10
190:1 192:25
193:15,17
207:25 216:11
216:15,17
**considered**
21:24 23:22
50:17 127:18
150:10 168:7
189:8,9 192:7
215:13,14
**considering**
107:25 190:6
**considers** 142:22
143:19 144:2
**consistent** 36:15
75:17 97:25
98:2 115:11
119:9 149:24
189:8 208:15,20
209:1,12
**constant** 148:6
148:15

[constitutes - costs]

**constitutes**
199:24
**consult** 211:4
**consumer**
125:21 130:10
134:1
**consumers** 105:9
130:11,15
**contact** 226:9
**contain** 225:13
**contained** 35:23
**contains** 33:25
**context** 30:12
170:19,19
**contextual**
170:14,20 171:2
**continue** 8:16
106:16 119:22
119:24
**continued** 4:1
**continues** 33:23
**contract** 17:5,6
17:18,25 18:2,4
18:9,13,16,22,23
19:4
**controls** 56:21
56:23 57:1
**conversation**
23:9 41:22 42:7
68:19 153:9
**conversations**
24:20
**conversion**
58:13 60:15
177:3,15 188:7
195:4,7,23,23
**conversions**
105:22 156:25

**convert** 156:22
**converted**
156:22
**convincing**
164:23
**cookie** 181:6
186:21 187:2,12
188:23 190:17
197:16 215:20
**cookies** 35:24
36:24,25 37:2,9
49:8 70:15,16
72:11 73:2,4,5
158:18 159:5,8
159:11 160:1,4,9
160:10,14,19,23
162:21 173:12
174:3 179:13,16
180:6,18,20,23
181:1,10,10
184:4 190:7
195:5 215:20
**coordinated**
67:1
**copies** 20:3
**copy** 19:25 20:1
20:17,17
**corner** 117:11
131:22
**correct** 25:10,19
26:1,5,12,21
27:3 37:11,16,18
41:8 44:10 51:2
51:4 52:13,15,21
52:23 53:7,22
54:21,23 58:21
59:2 65:16 69:1
69:5 70:7 77:25

78:11,15,19,20
79:1,24 81:11,25
83:1,6,10 86:12
87:6,18 89:6
91:7,16,17,21
92:10,25 93:1
94:13,18,23 96:6
96:21 98:12,16
98:19,22 99:5
100:11 103:7,8
104:5,6 111:21
112:7,21 115:15
118:7,9,10 119:2
119:12 120:1,13
120:15,20,22,23
121:6 122:5
123:9,10 124:1
124:15 125:24
125:25 126:7
129:10,15,24
131:23 132:6
133:13 135:8,17
135:18 136:1,10
136:23,24 137:3
137:5,12,17
138:9,10,12,17
139:6,9 141:11
141:18,21
143:21 144:5,6
145:2,14,15,16
146:4 147:5
148:7,15 152:19
154:8,9,18 158:3
158:8,11,12
159:13 161:12
161:13,17,18,24
162:1,4,5 166:12
166:13 167:16

167:24,25
168:10,11 171:8
171:14,15
172:12 173:16
173:17,20
178:14 179:10
179:11 180:8
181:4,11,14
182:10 183:14
183:15 189:12
192:17,21,22
194:7,8 195:5,6
198:8,9,14,15
201:22 202:15
202:16 204:10
204:11,12,16,17
204:21 206:10
206:22 209:15
209:16,17,18,23
219:24 220:5,6
220:13,14,18,19
221:18,19
222:16 224:3
**corrections**
226:14,15 227:3
227:4
**correctly** 44:5
49:4 77:21 81:4
86:13,13,14
127:7 146:8
147:10 149:8,11
159:2,15 165:2
167:7,7
**cost** 81:15 164:3
165:3 166:8
167:6
**costs** 162:2,5,12
162:18,24 163:1

**[costs - data]**

163:2,12,12,21
163:23 164:12
165:10,12,14,21
**counsel**  8:7,19
9:8,21 10:5,19
18:5,6 31:4
33:13 34:15,22
36:14 37:4,5
49:23 53:10
99:14 116:13,23
130:23 131:1,4,7
131:9,12,14
139:25 171:19
176:6,9 198:24
199:3 200:19
210:24 211:22
212:22 213:13
215:14 216:19
219:8,19,22
220:20 221:21
222:23 225:10
225:16 226:18
226:21 227:7
**counsel's**  222:13
**count**  146:18
147:2
**counted**  145:21
147:8
**counts**  43:20
**county**  225:2
**couple**  106:21
151:7 219:5
**course**  68:25
69:4 166:4
**court**  1:1 2:1
8:21 9:2 10:4
76:25

**court's**  96:2
110:22 111:4
139:22 141:22
185:11 186:12
**courtesy**  66:19
66:21,23 67:17
**covered**  36:24
37:2,8,8 184:19
**criteria**  110:13
**cruz**  3:19 9:24
9:25 10:1
**csr**  1:24 225:4
225:25
**current**  52:10
117:9,9
**currently**  204:21
221:16
**customers**  60:12
60:24 85:6
126:2,21 155:23
157:22
**cut**  21:11 44:15
44:16 159:4
166:5,6
**cuts**  44:12
**cv**  1:9 2:9 8:23

**d**

**d**  5:1 35:17
65:14
**damage**  154:14
**damages**  17:3,7
17:9,17 18:8,15
19:8,14 21:5,5
22:4,7,10,12,13
22:16,16 24:10
24:11 26:11
27:13 34:8,9,20

35:4 36:4,5,17
36:21,22,23 37:1
37:6,20,25,25
38:3,5,25 39:21
39:23 40:1
41:23 43:4,8
44:1,20,23 55:5
55:19,23 58:21
63:1,7,10,17,18
64:21,25 65:2
76:21 77:1,6
78:11,14,17,18
78:22 79:10,19
79:22 80:7,12,13
80:23 81:2
82:23 90:6
91:16 92:23
93:3 96:20,21
97:8 98:10
100:9 101:4,7
113:2,11,19
138:7,8 139:6
142:15 145:8
152:19 153:9,10
154:11,18 155:9
162:17 198:13
199:2 200:13
201:16,19 202:8
202:11,19,24
204:20 206:24
207:10,13 208:3
208:4,11 218:1
220:21
**data**  33:19,22
35:15 38:1 39:8
39:19,20 40:18
45:9 46:24
47:10 49:8 55:3

55:22 58:3,14
61:5,8,13,16,18
62:2,7,11,15
63:1,2,11,12
83:18 84:9 85:4
85:12 86:11,17
86:20 87:6,11,17
87:19,21,22,23
87:24 89:13
90:2,2,6,12,14
90:21,24 94:17
95:11 98:10
103:2 106:25
107:8,9 108:11
108:12,13 109:9
109:9,12,13
110:9 112:18,19
113:20,21,25
114:3,3,11,13,17
114:18,22
121:11,12,18,24
121:24 122:3,5,5
122:16 123:12
123:12 125:22
126:17 127:10
127:20 128:15
129:1 133:5,9,11
133:21,24,25
136:12,22,23
137:1,4,25 138:2
138:5 139:24
140:10,19,24
141:2 142:16
143:1 144:10
146:2,3,7,9,9,10
146:11,21,23
148:1 157:8
158:20,23

Page 14

**[data - different]**

159:12,24
161:21 163:19
164:7 166:2
168:9,13,19,20
168:23 184:9
185:15 190:2
195:14 197:11
199:18,20,25
205:16 210:3
211:18 213:24
214:5 216:2,6,7
217:12,18,24
221:20,22 222:8
222:14
**date** 226:16
227:5 228:24
**davis** 1:5 2:5
**day** 116:15
144:5 207:3
225:21
**daylight** 2:18,19
**dealt** 89:18
**dearborn** 3:20
**decide** 67:10
**decided** 104:13
138:3
**declare** 224:1
**deduct** 162:2,5
162:18
**deducted** 65:7
162:12 170:25
171:2
**deduction**
160:22
**deemed** 139:17
209:25
**default** 162:21
180:7 190:7

**defendant** 1:11
2:11,16 4:3 8:20
**define** 27:6 29:1
29:8
**definitely** 73:17
86:23
**definition** 26:3
27:20,21 28:8,13
28:14,17,21,23
30:14 49:11
54:3 72:24
122:11 169:25
199:12 205:7
**definitions** 45:11
**demographic**
86:15,16,19,24
87:1,5 133:20
136:8 211:25
**denisha** 4:22
9:21
**depend** 44:17
151:10 185:1
**depending** 85:19
**depends** 8:12
147:13 151:7
**depicted** 195:18
196:5
**deposition** 1:15
2:15 6:1 8:11,19
8:24 20:14
21:19,20 31:20
151:20 180:12
225:6 226:19,22
226:24 227:8,10
**describe** 148:20
**described** 21:4
35:15,18,21,25
79:9 85:24

194:20 215:13
218:10
**describing** 150:2
150:21
**description** 6:3
151:21
**desk** 20:6
**desktop** 132:6
135:22 137:7
**despite** 94:21
**detail** 44:20
103:12
**determination**
24:8,9 199:2
**determine** 17:10
30:10 33:9
73:21 74:14,25
75:14,21 81:8,10
104:8 111:2
128:12,25 133:6
141:17 155:22
185:7 187:6
209:25 210:12
222:10
**determined** 25:6
25:6 79:10,20
202:6,9 203:19
205:13 207:20
226:18,22 227:7
**determines** 73:2
**determining**
23:20 58:12
**develop** 130:10
**device** 35:25
82:15,24 83:9
84:14 85:14
88:5,9,9 89:3
90:16 91:11

92:1,5,6,18,22
93:7 94:2,3,17
94:22 95:16,18
105:12 106:2,6
106:18 129:14
129:17 130:10
132:15 133:3
144:23 145:19
145:25 147:2,13
157:17 158:5,6
205:8 210:5,6,8
210:9
**devices** 84:16
85:14,20 88:20
89:9,12,18 91:13
92:4,23 94:18
95:3,6 96:12,16
110:6 111:12
115:23 119:1
123:3 131:20
155:25 163:20
**dicello** 3:18 10:2
**dicellolevitt.co...**
3:23
**difference** 48:10
48:13 80:4
93:12 114:2
204:11
**differences**
121:17
**different** 13:21
14:2 49:19
79:21 94:7
96:22 103:5
104:15 108:21
108:22 112:13
113:24 114:1,13
114:14,18,21

**[different - edge]**

| | | | |
|---|---|---|---|
| 121:18 136:20 153:18 178:24 189:2 202:11 | discussing 38:24 97:7 182:10 | 53:4,19,24 54:2 54:3 117:20,24 | driven 177:3 dropped 210:19 |
| **differently** 94:5 108:9 | **discussion** 25:4 72:9 153:15 163:15 168:15 194:23 200:23 | 117:24 118:1,4 118:11,14,17,21 131:20 132:20 | **e** |
| **difficult** 61:20 61:21 166:5 216:11 218:1,9 218:16,22 219:2 221:23 222:1,5 | **discussions** 18:4 18:6 22:22 29:7 33:12 36:13 37:4 40:9 93:23 143:4,10 154:24 156:11 157:6 165:25 200:19 | 149:1,2,3,8,14 162:16 172:7 173:4 177:17 178:7 184:8 186:16 189:2 190:6 213:3,18 213:19 217:14 | **e** 5:1 35:20 226:9 226:12 227:1 228:3,3,3 |
| **digital** 105:10 | | | **earlier** 30:19 65:15 68:18,24 78:16 83:11 102:23 103:22 104:18 106:8 118:24 125:14 143:9 144:21,24 157:8,14 171:11 182:10 191:2 194:3 195:13 198:7 209:24 221:13,14,20 |
| **dinner** 68:17 | | | |
| **direct** 22:17 67:6 78:8 82:9 86:1 100:13 142:24 144:8,11 176:19 182:4,12 | **disgorgement** 17:5 18:13 | **documents** 148:21,25 149:9 149:15 150:2,20 151:1,5 178:7,20 193:18 | |
| | **display** 159:22 166:10 167:14 167:22 168:16 168:20,20 169:6 183:4,18 187:4 187:13,25 188:11 | **doing** 19:7 43:8 53:13 77:3 101:25 119:11 119:18 121:5 170:19 | |
| **directed** 216:23 | | | |
| **directing** 79:3 | | | **earn** 85:13,18,20 85:23,23 86:8 87:13 88:14,21 88:22 89:2,10 134:15 158:19 159:12 219:23 |
| **direction** 225:12 | | | |
| **disable** 137:14 | | | |
| **disabled** 160:24 161:5 215:21 | **displayed** 40:16 44:8,9 | **dollar** 154:1,15 | |
| **disagree** 107:13 177:5,11,15 178:16,18 | **dispute** 27:7 | **dollars** 85:17 | **earned** 63:22,23 154:23 161:16 161:20,23 |
| | **distribute** 153:20,21 | **double** 145:21 | |
| | | **doubling** 128:11 | |
| **disclose** 21:18 | **district** 1:1,2 2:1 2:2 8:21 | **doubt** 115:21,25 116:3 119:3,4 134:4,10 181:17 | **earns** 154:20 |
| **discontinued** 126:12,14,15,21 | | | **east** 64:15 66:22 |
| **discourteous** 67:16 | **divide** 153:13,25 154:15 155:7 209:13 | **dr** 176:21 177:1 177:6 178:17,19 187:18,18,19 192:4,8 | **eastern** 2:18,18 8:9 |
| **discovery** 96:3 139:23 141:23 184:18 | **division** 1:2 2:2 8:22 | **draw** 48:13 173:7 | **economic** 108:14 108:24 |
| **discuss** 33:8,8 | **docs** 150:10 | | **edge** 24:14 26:5 26:9,16 40:3,6,8 41:10,25 64:11 194:1,6 |
| **discussed** 23:22 62:19 | **document** 23:15 49:24 50:2,8,12 50:14 52:25 | **drawing** 48:10 | |
| | | **drive** 4:12 | |

Page 16

[effectively - exhibit]

**effectively** 210:6
210:9
**efforts** 24:6
**eight** 149:22
**either** 22:15 41:9
87:18 132:18
142:14 156:3
181:10 186:5
204:4
**electrical** 89:17
**electronically**
8:7 31:3 49:23
116:12,22
130:22 131:1,4,6
131:9,11,14
171:19 176:5,8
**eligibility** 137:10
**eligible** 135:6
**email** 115:4
136:7
**emails** 49:16
**emanuel** 4:4,20
9:11,18,20
**employees** 189:1
**engaged** 59:4
**engineer** 89:18
**enriched** 45:7
57:11,15 58:16
59:11,16,23
60:22 61:6 62:4
62:7,11 162:4
**enrichment** 17:4
17:11,17,19 18:8
18:12,15,22 19:1
19:3 21:4 22:4,7
22:15 23:22
24:10 34:16
37:5,11,16 39:24

44:1,20 55:5,23
58:3,21 59:9
60:2,22 63:17,18
63:21 96:22
97:2,4 151:23
152:10,18,22
153:1,12,13,18
153:19,22
154:11,15,18
155:9 157:2
160:13,15 161:9
161:11,20,23
162:1,18 167:1
171:7,12 172:12
182:1,8,9,22
187:13 191:21
191:24 202:9,13
204:15
**enrichments**
160:12,12
**ensure** 21:23
30:17 36:14
**enter** 136:17,22
**entered** 49:9
**entering** 52:1
**entire** 139:19
140:10 144:5
**entirety** 70:22
150:23 205:19
**entitled** 62:16,25
78:14
**envision** 62:6
**equal** 79:22,25
80:3,13 121:10
121:16,23 122:2
122:4,10 154:7,7
157:2

**equally** 123:17
124:23 155:4
156:3,24 181:13
**equipment** 13:10
13:15,19,23
14:12,16 16:8
**equivalent**
201:10
**errata** 226:14,16
227:3,5
**especially**
156:24
**esq** 3:5,12,19 4:5
4:11 226:1
**essential** 180:23
**estimate** 77:22
184:12
**estimated** 65:2
205:18,24 206:6
206:18
**et** 79:24 80:23
**evening** 211:13
**event** 147:17
**evidence** 10:14
167:3 177:2,6
**exact** 118:21
**exactly** 11:16
13:19 23:25
141:8 179:23
**examination** 5:6
10:22 211:11
219:16 225:10
**example** 35:10
48:1 58:4 93:17
93:17 114:21
121:18 129:6
156:21 159:4,5
172:14 181:25

182:7,9,14
190:17 197:16
208:10 222:8
**examples** 125:21
**exchange** 128:14
**exclude** 24:9
25:6,7 168:12
170:20 184:1,3
184:22
**excluded** 22:10
23:4 24:14,19
183:25
**exclusion** 23:8
**exclusive** 21:24
**excuse** 32:5 36:8
66:8,8
**executed** 224:4
**executive** 82:3
**exhibit** 6:4,6,6,8
6:9,11,13,15,18
6:20,22,23,25
7:1,2,4 8:5
20:14,16 31:1,1
31:2,2,6,9 32:1,8
32:19 33:15
49:21,22 116:8
116:10,11,21,24
116:25 118:3
120:7 130:18,19
130:21,24 131:2
131:5,8,10,13
132:19,19
133:16,17
134:21,22
171:16,18,20,24
172:16,21 176:2
176:4,7,11,13
179:2 180:12

[exhibit - finish]

186:21 190:16
192:20 195:19
196:5,11 197:17
212:5 216:18
**exhibits** 6:1
**exist** 56:16
150:22
**existed** 189:5,5
189:22 195:21
197:5,5
**exists** 57:2 149:2
**exit** 40:12
**expect** 119:19
121:5 161:20
**expectation** 14:6
154:24
**expectations**
49:19
**expects** 119:17
**experience** 31:23
48:17 49:2 52:2
54:20 69:11
**expert** 6:4 7:2
8:5 29:8 30:9
31:22 89:19
105:5 114:19
159:19 176:4
199:13
**experts** 192:3
**explain** 57:18
88:17 154:2
174:12,14
**explained**
152:11 163:20
165:18 169:8
**explaining** 102:2
132:1 170:13

**explanation**
37:15 106:22
**explicitly** 21:9
21:15
**expressed**
204:20
**extended** 66:23
**extension** 82:14
88:24 101:15
215:3
**extent** 17:13
26:13,15 27:14
34:14 35:6
56:11 57:22
60:17,18,21 61:9
64:23 72:25
87:22 96:1
104:17 111:11
128:24 140:24
142:12 160:11
160:11 184:18
189:7 190:8
195:24 196:24
202:23
**extra** 42:10
126:2
**eye** 94:22 95:2
95:20

**f**

**f** 35:13,23
**fact** 38:9 81:19
93:3 94:21
151:4 155:18,21
161:11 192:23
196:10 201:24
202:3 221:7

**factor** 147:23
**factors** 215:13
**facts** 108:22
155:13 213:2,17
**fair** 27:8,17
41:21 44:19
104:23 108:3,6
**fairly** 156:4
**fairness** 185:8
185:13
**falls** 45:11
**familiar** 25:9
118:1
**fani** 4:11 9:18,18
116:14,19 117:6
117:8,13,18
171:24 176:13
**faqs** 6:22,25
131:8,13
**far** 22:8 45:21
62:10 160:15
**fashion** 84:11,12
125:13
**feasibility** 21:1
**feature** 120:25
**features** 120:13
179:17
**federal** 227:1,8,9
**feel** 20:17 27:24
99:4 128:22
**felt** 71:19
**fenton** 4:24 9:1
**fi** 87:14 88:1,20
89:12 90:25
91:4
**fiber** 129:19,20
**fight** 222:21

**figueroa** 4:6
**figure** 85:2 86:1
88:18 167:8,12
169:10,11,11,12
169:14,15,16,18
169:19,19,22,22
170:1,1,6,6,8
179:2,6 180:2
181:24 182:21
187:21,21 188:5
192:17 194:23
194:23 205:15
206:9 212:5,10
212:12 213:21
213:23 214:22
214:25 219:19
**figures** 170:2,2
**filed** 8:21
**fill** 116:4,6 119:1
211:24
**finally** 163:24
**financial** 16:14
16:18
**financially** 9:5
**find** 69:10
151:19 163:25
164:16 215:15
**finder** 161:11
**finding** 69:14
151:16,17
**finds** 76:25
**fine** 42:22 125:3
**fingerprint**
35:15
**finish** 64:17
66:10 67:12
84:21,23 105:14
140:13

[finished - given]

**finished** 105:15
140:14,16 143:7
162:8
**firefox** 22:24
23:3,8 24:2,8,15
24:20,22 25:5
26:9
**firm** 9:3 180:16
**first** 11:17 21:6
31:17 36:24
51:2,23 78:10,21
82:1 83:17 86:7
91:14 92:5
117:11 132:14
132:23 147:21
159:22 167:18
180:18 182:12
183:3,17 188:12
201:1
**fit** 64:3
**five** 12:18,19
13:6 14:23
15:17 16:10
38:15 76:2,14
77:20,25 78:1
118:6 138:21
144:4 145:24
158:14 175:16
211:3
**flat** 144:23 207:6
**flexner** 3:4 4:18
9:14
**floor** 3:13,20 4:6
**florida** 3:7,14
**flows** 35:7
**focus** 51:19,23
**focused** 196:22

**focusing** 195:7
**follow** 84:24
85:1 91:22
130:7 169:15
**following** 21:7
49:7 51:5
127:19 188:25
189:1
**follows** 53:18
226:8
**font** 51:16
**footnote** 22:17
22:21 24:24
27:19 50:3,9
150:25
**footnoted** 151:17
**footnotes** 150:11
150:14,25
**footprint** 34:22
36:15,16
**foregoing** 224:2
225:6,13
**forget** 41:7
**form** 11:9,11
12:7 13:1 17:21
21:16 24:23
26:6 27:14 29:4
34:11 36:19
52:24 56:13
65:20 81:16
87:7 90:8
107:10 109:14
121:14,25
141:12 155:12
158:21 184:16
185:21 186:17
189:20 194:17
200:17 204:23

207:7,16 208:6
221:10
**forming** 118:18
**forth** 225:7
**forthepeople.c...**
3:16
**forums** 49:9
**found** 52:21
54:23
**foundation**
52:25
**four** 76:2,14
77:20,25 84:16
89:9 145:23
200:12,15,16,19
200:20 206:23
207:13
**fourth** 27:24
28:1
**frame** 113:5
149:10
**franklin** 3:13
**frcp** 227:1
**free** 20:17 27:24
88:9
**frequently** 6:16
130:25 132:20
**fresh** 66:25
**front** 19:21
20:17
**full** 38:5 173:5
225:13
**fully** 45:19
**function** 79:10
79:18,20 80:2,20
**further** 17:12
35:15,18,21,25
219:3,16 222:20

225:16
**furthermore**
83:21 192:1
**fyi** 172:24

**g**

**gains** 60:6
**general** 29:5
96:24 132:15
133:3
**generally** 13:5
91:17 99:3
107:4,5 114:8
150:8,9
**generate** 35:9
162:3
**geolocation**
35:20
**getting** 67:18
99:22 109:10
**gigapower** 85:7
125:15 128:11
137:24
**give** 10:15 50:4
81:22 84:4,5
92:2 93:18 97:5
97:9 103:5,6
104:22 106:25
114:21 116:16
125:1 133:11
134:17 135:7
136:22,23 137:1
151:8 157:20,21
165:16 176:20
214:21 215:8
**given** 62:10,11
62:18 65:7
81:19 91:14,21

**[given - google's]**

102:21,21 108:6
134:15 140:22
144:3 168:17,17
168:19 215:9,10
220:7 223:1
**gives**   124:2,2
**giving**   81:15
84:2,2 104:20
121:2 123:18
137:4
**glean**   129:3
**global**   163:8
165:7
**go**   8:17 11:12
13:2,4,25 14:1,3
14:4,20,20 23:17
32:7 38:17
39:13 40:10,17
43:6 44:5,6,6,8
49:5 66:18 67:2
69:19 73:15
74:3,7 75:4,5,5
86:23 90:3,4
91:25 112:11
124:25 129:7
132:18 134:21
134:22 137:19
140:17 143:6,8
151:8 153:24
158:15 162:6,9
162:10 166:19
169:11,15
190:10 194:18
196:14 212:5
216:18 219:7
**god**   10:16
**goes**   86:23 87:21
132:11 136:3,4,5

136:6 147:7
149:3 162:10
**going**   27:25
28:12 34:19
38:13,18 40:3
47:21,23,24 66:2
66:9,11,18 67:6
68:3 90:17
99:16,17,23
104:13 108:23
109:16 112:15
112:20 117:21
125:6 138:24
140:3 148:8,10
151:24 152:3
157:20,21
171:25 175:21
186:6 190:15
192:25 193:3,5
193:12,19,23
194:2,15,21
196:25 198:1
210:21,24
219:11
**golf**   13:10,14,18
13:23 14:12,16
16:8
**gonna**   68:14
**good**   8:8 9:13,25
10:7,24,25 11:1
56:15 64:14
68:9 211:13
**goog**   6:8 7:1
49:22 50:1
171:18
**google**   1:10 2:10
4:22 6:9,11 8:20
9:12,19,21 22:24

24:1,4,21 28:4
35:9,23 39:5,7
39:19 40:15,18
42:24 45:7,16,19
45:22,25 46:4,6
46:6,8,12,14,24
47:4,8,10 48:1,8
48:14,15,17,21
48:23,24,25 49:2
49:17,20,24
51:24 52:8,9,22
53:6,21 54:5,18
54:20 57:9,10,14
57:16,19,25
58:14,15,17 59:9
59:10,16,18,22
60:3,6,11 61:4,6
61:7,15 62:4
63:12 65:6 71:8
72:6,24 73:1,25
81:15 82:18
87:20 89:23,24
90:7,25 93:7,24
94:4,10 95:15,17
95:19 96:15
97:19 98:3
100:22 101:1,6,7
101:16,20 102:3
102:4,19 105:8
113:21 116:1,8
116:11,21,25
118:5,18 119:1,5
119:17 120:6
122:17,21
123:13,18,20,23
123:23,24 124:6
124:8,12,13,13
124:17 140:24

142:1,2,13,16,21
143:11,12,15,18
144:10,14,17,22
144:24,25
145:12 149:21
154:20 155:10
155:15,20 156:7
156:24 157:9,15
157:16,18,19,24
159:24 160:8
161:6,16,20
162:2,15,20,23
163:22 164:11
164:14 165:5
166:9,9,11,22
168:22 169:2
171:11 179:3,9
181:4 183:3,8,10
184:7 187:25,25
188:19 189:1,3
189:23,23
191:11 192:23
192:25 194:11
194:15 196:25
199:10,21 200:1
200:5 211:22
215:14 216:3,10
216:19 217:11
217:18,23 226:4
228:1
**google's**   21:4
23:14 33:10
96:2 110:13
139:23 141:23
147:25 156:7,14
158:19 159:11
163:4,7 164:2,7
165:3,7 166:3

[google's - identification]

| | | | |
|---|---|---|---|
| 182:1 189:14,15 189:24 191:25 195:22 | **handled** 226:8 | **highest** 161:23 161:25 205:22 | **horn** 179:21 |
| **google.com** 39:6 40:10,16 42:25 | **happen** 62:9,18 129:23 165:4 | **highlight** 85:5 | **hour** 38:14 92:5 92:5,24 94:1,2,6 94:8,21 99:9 |
| **gotten** 72:16 178:22,25 | **happened** 134:23 186:22 | **highlighted** 84:7 | **hours** 68:16,16 92:3,7,8,10,18 92:20,22 93:11 93:12,25 150:17 157:17,20 158:14,15,16 |
| **graph** 149:5 | **happens** 63:5 134:23 | **history** 28:4 29:17,24 30:2,6 30:8,13,14 49:8 49:13 103:6 120:19 121:20 143:12 | |
| **graphs** 149:2 | **happy** 99:19 151:24 | | |
| **great** 68:15,17 | **hard** 48:7 140:15 | | **house** 108:19,20 108:22 |
| **greater** 156:15 156:17,17,18 | **harm** 17:3,6,11 19:10,11,14,16 19:19 22:16 96:20 206:25 207:5,14,21 208:1,5 | **hochman** 22:23 23:10,13,23 24:21 25:4 29:7 33:8,13 34:15,21 36:14 37:5 40:9 47:3 72:9 93:24 93:24 123:11 143:4,10 147:11 154:25 156:12 156:13 157:6 163:16,20 165:17,20 168:15 | **household** 88:15 110:8 133:21 |
| **group** 4:23 9:22 46:9 113:18 216:4 | | | **households** 110:6,12 |
| **grown** 177:4,18 | | | **huh** 51:20 52:4 85:8 106:17 |
| **growth** 177:21 177:21,23,25 178:3,8,12,21 | | | **hypothetical** 39:1 42:16 43:5 43:21 44:2,5 55:24 61:23 62:10,12,25 64:24 76:22 91:24 92:3,11 200:23 201:18 203:5,11,21 206:15 |
| **guess** 31:7 43:23 61:11,14 62:5 71:18 80:4 81:17 113:7 150:14 152:23 169:24 175:4 187:18 207:1 216:20 | **harmed** 45:11 45:13 | | |
| | **head** 150:6 | | |
| | **hear** 77:21 102:11 213:4,6,7 213:9 | | |
| | **heard** 8:14 77:20 170:16 | **hold** 31:7,16 54:8 58:24 84:23 112:1,1 120:4 134:6 165:16 178:3 187:23 204:25 218:2 | |
| | **heavy** 93:19,20 163:5 | | |
| **guessed** 54:15 | **help** 10:16 60:14 60:14 78:5 133:25 | | **i** |
| **guessing** 54:4 | | | **identical** 113:21 |
| **gutzler** 3:18 10:2 | | **holding** 122:10 | **identification** 8:6 31:3 49:23 116:12,22 130:22 131:1,3,6 131:9,11,14 171:19 176:5,8 |
| **h** | **helpful** 80:18 | **home** 11:4 16:14 89:21 115:5 129:21 154:17 | |
| **h** 228:3 | **hey** 38:13 94:5 | | |
| **half** 133:19,20 | **hi** 10:7 | **honest** 65:25 | |
| **halfway** 27:20 | **high** 87:14 88:1 88:10 178:11 | **honked** 179:21 | |
| **hand** 10:12 51:19,22 117:11 | **higher** 83:19 84:10 103:3 193:16 | **hope** 41:4 | |

Veritext Legal Solutions
866 299-5127

[identified - indicator]

**identified** 6:3
29:6,13,25 30:1
30:21 31:14
32:11,25 109:2
125:13,23
127:18 165:10
165:12
**identifies** 22:6
189:25 222:15
**identify** 93:16
114:20 137:25
138:2 151:9,20
162:25,25 163:2
190:12 193:14
196:9 216:7
217:8
**identifying** 21:1
28:3,16,20 29:11
29:22,23 30:3,7
30:8,11 35:13
137:19 164:12
**illinois** 3:21 4:13
**illustration**
180:17 192:19
200:24
**illustrative**
186:22
**imagine** 11:19
61:11 77:7
**impact** 33:10
60:17,17,18
64:12 160:9
162:15,16,19,20
165:8,9 171:13
171:17 173:4
174:2 177:17
178:6 184:8
186:16 187:11

189:2,10 190:6
191:24
**impacted** 174:19
174:21 175:8,8
**impacts** 191:21
**implementation**
174:20 189:4,24
195:22 196:19
**implemented**
190:5
**implicated**
183:14,20 187:3
188:5
**implied** 174:2
**importance**
123:12
**important** 57:19
111:1 122:25
123:16,17,20
124:6,8,20,22,23
144:16 155:25
156:2,14,21,24
**impression**
80:14
**inappropriate**
38:3,7,11 77:5
175:13
**incent** 106:15
157:9,10 214:20
**incented** 134:16
134:19
**incentives**
119:22,24
**incentivize** 79:11
79:23 80:22
81:1,5,21 103:23
104:9,12 158:2

**include** 22:4
24:8 25:4 33:2
138:3 160:12,13
168:8 190:10
195:15,25 210:2
212:18 213:15
213:20 214:5,7,8
**included** 24:14
35:10 40:2,5,19
40:24,25 43:13
43:14,15,25
44:14 114:22
135:17 146:24
187:8 190:12
196:1 214:10
226:14 227:3
**includes** 21:1,7,9
25:18,25 27:21
115:1 167:21
**including** 9:8
21:3 28:3 35:14
42:11 111:10
128:18 130:11
144:22
**incognito** 12:14
25:19,22 36:22
39:4 41:3,5,7,9
41:14,17,18,24
42:3 43:15 48:2
48:15,22,25 49:5
49:20 50:22
51:5,24 52:1,8
52:17,21,22 53:5
53:6,20,21 54:18
54:22,23 58:4,5
59:1 60:9 69:20
69:21,23 70:1,3
70:6,11,12,18

73:19 95:15,16
95:18 146:7,15
146:16,17 148:6
148:15 149:3,4
149:18 150:1
158:22 165:5
168:6 179:3,10
184:5 190:21,21
191:13,13,15
201:3,11,21
217:3,12 218:4
**incomplete** 43:5
55:24 61:23
64:24 76:22
91:24 92:11
**inconsistent**
39:14 163:13
**incorrect** 143:22
177:10
**incorrectly** 42:2
**incremental**
163:12 165:14
**incurred** 162:3
**independently**
196:2
**indicate** 166:20
167:4 192:12
194:20
**indicated** 23:24
23:24 24:4
105:8 147:11,25
149:11 163:16
216:24
**indicates** 85:5
193:8
**indicator** 82:16
97:14 100:20

Veritext Legal Solutions
866 299-5127

[indicators - intermittently]

| | | | |
|---|---|---|---|
| **indicators** | 60:11,16 62:22 | 187:10,11,14,15 | 113:9 143:16,17 |
| 125:12 127:19 | 64:8 70:16 71:3 | 187:16,20 | 146:7,24 147:15 |
| **individual** 79:11 | 71:6 72:3,4,7,12 | 188:18 190:20 | 155:4 194:19 |
| 79:23 80:22 | 72:22,23,23 74:1 | 191:11 192:6,11 | 199:20 200:2 |
| 81:1 82:17 | 74:1,6,20 75:6 | 192:21 193:4,8 | 211:22 |
| 97:15 100:21 | 75:20 84:1 | 197:18 199:11 | **instances** 23:25 |
| 103:23 104:9 | 86:15,16,19,22 | 199:12 200:4 | 36:21 40:23 |
| 139:20 144:12 | 86:24 87:1,4,5,9 | 209:2,10 211:25 | 43:10,18 53:11 |
| 153:1 160:18 | 89:23,24,25 | 214:21 215:9,11 | 63:25 81:8,9 |
| 187:1,2 199:18 | 90:18 101:21,23 | 216:10,16 | 138:15 141:1 |
| 201:2,11,21 | 102:20 104:3 | 218:16,21 | 145:22,24,25 |
| 202:5,14,17,20 | 106:10,23 107:3 | 222:10 | 146:10 147:18 |
| 202:22 204:2 | 107:19,22 108:2 | **infra** 35:15,18 | 147:19 148:1 |
| 205:8 218:3 | 108:5,6 111:14 | 35:21 36:1 | 156:5 199:14 |
| 221:6 | 115:1,2,3 118:1 | **infrastructure** | 200:8 203:7,14 |
| **individually** 1:6 | 122:11,12,17,19 | 163:5,6 166:6,7 | 203:18,23 204:4 |
| 2:6 36:18 37:21 | 123:1,16,19,19 | **inhouse** 9:21 | 204:7,8,18 205:2 |
| 38:1 | 124:2,5,7,17,18 | **initial** 89:11 | 205:4,6,11,14,19 |
| **individuals** | 124:19 126:4 | **initially** 104:2 | 205:25 206:2,7 |
| 157:13 160:22 | 127:1,6,12,13 | **injury** 44:22 | 207:23 218:11 |
| 160:24 161:2,5 | 128:5,9,13,17,20 | 45:6 | 218:18 222:7,7 |
| **info** 129:9,12 | 128:21 129:3,4,8 | **input** 73:6 | 222:11,15 |
| **inform** 148:22 | 129:13,16,17,22 | 106:11 115:1 | **instructed** 5:12 |
| **information** | 130:9,9,15 | 215:5 | **intended** 101:24 |
| 14:19 16:23,24 | 132:11 133:24 | **inputs** 172:11 | **interacting** |
| 28:4,16,20 29:6 | 135:14 136:6,8 | **inquiry** 111:1 | 93:21 |
| 29:11,13,22,23 | 136:18 137:16 | **ins** 184:8,10,12 | **intercepted** 28:5 |
| 29:25 30:3,5,7,9 | 142:2,3,4,7,12 | 187:1 188:13,23 | 29:14 30:5,22 |
| 30:11,21,24 | 142:21,23 | 192:1,16,24 | 31:15 32:12 |
| 31:12,13 32:11 | 143:11,14,15 | 196:22 215:21 | 33:1,25 |
| 32:25 33:9,24 | 144:14 155:1,18 | 215:21 | **interested** 9:5 |
| 34:8,15,18 35:3 | 155:22,24 156:8 | **inside** 75:23 | 225:18 |
| 35:8,13,23 36:3 | 156:23 163:23 | **install** 87:13 | **interests** 128:18 |
| 36:18 37:7,21 | 165:7,8 169:2,3 | 88:1,9,19,25 | **interfaces** 115:2 |
| 38:4,24 46:25 | 169:4 178:22,25 | 132:6 135:22 | **interfering** |
| 49:7,8,13 57:20 | 184:19,20,21,25 | 137:7 | 31:19 |
| 57:22,24 58:6,8 | 185:6,7,9,25 | **instance** 43:11 | **intermittently** |
| 58:11,12,13 60:7 | 186:1,14,15,19 | 43:13,16,20 83:4 | 24:5 |

Veritext Legal Solutions
866 299-5127

[internal - know]

**internal** 178:20
  178:20
**internet** 8:13
  35:1 40:5,10,13
  41:1 89:21
  90:15,19 125:16
  126:3,9 129:24
  130:12 133:7
**interpretation**
  33:6
**interrupted**
  150:18
**interrupting**
  67:15
**interruption**
  65:11
**interruptions**
  53:12
**intimating**
  161:10
**introduce** 81:24
  116:20
**introduced**
  149:18
**investigated**
  199:1
**investigation**
  73:24
**investment**
  212:1
**invitation** 150:6
**involve** 42:8
  129:24
**involved** 42:16
**ios** 193:15,17,17
  193:24
**ip** 34:25 121:19
  161:3

**ipsos** 86:3 94:16
  94:17 102:19
  104:24 105:3,8
  107:3 109:19,25
  110:5,14 111:3
  113:14,17,22
  114:4,10,17,22
  144:22 211:17
  211:23 215:1
  219:23
**irrelevant** 66:5
**isolation** 60:20
**issue** 30:13 55:3
  61:5,8,12,16
  63:2,12 86:11,17
  86:19 87:5,10,17
  87:19,24 89:13
  98:6,10,11,21
  99:1 113:20
  114:3,18 128:15
  130:16 142:16
  144:10 158:19
  158:23 159:12
  168:9,13,19,20
**issued** 21:20
  35:17
**items** 35:12
  103:1

**j**

**j** 6:4 8:5
**james** 3:5 9:13
  31:18 66:6
  211:13 226:1
**javascript**
  160:25
**javascripts**
  215:21

**jeremy** 1:5 2:5
**jlee** 3:9 226:2
**job** 1:25 53:13
  226:5 228:2
**john** 3:12 9:14
**join** 87:13
**joined** 133:21
**jose** 8:22
**july** 1:18 2:19
  5:4 8:1,10
  225:21 226:3,5
**jumped** 61:22
**june** 26:20 27:1
  28:6 118:20
  148:2,7,7,14
**jyanchuis** 3:16

**k**

**kansas** 126:24
  126:25
**katie** 164:14
**keep** 13:3 15:21
  16:4 70:19
  79:12 82:18
  97:15 100:22
  103:24 109:16
  151:24 169:23
**keeping** 16:23
**key** 46:8
**kind** 27:4 40:20
  64:4,11,12 186:5
  192:9 210:4
**kinds** 13:7 16:5
**knew** 111:9
**know** 11:25
  12:23,24 13:18
  13:19,23 14:16
  15:21 17:24

18:1 21:17
25:15 29:1
33:17 34:5 41:1
41:14,18 46:7,20
47:15,21,25 48:4
48:4,6,7,11
49:15 51:10,25
57:19 61:17
62:21,23 65:21
66:2 73:12,14
74:18 75:7 76:6
84:12 87:19
89:24 90:14
93:6,25 94:1,7,9
99:11 105:17
106:9,15 107:8
107:21,24
108:21 109:9,12
110:16,19,24
111:8,16,20
114:25 115:3,24
116:5 117:17,23
118:16,19
121:22 122:20
122:21,22,24,25
123:16,17,20,23
123:24 124:13
128:24 129:8
131:15 132:11
134:14 135:6,12
135:13 136:3,4
138:18,18
140:14,15,21
144:20 145:21
149:17,20,21
150:5,16 151:14
156:21 157:15
157:21 159:4

**[know - lee]**

164:5,6 165:4,6
166:18 170:15
171:22 176:10
176:15 177:22
178:6 180:12
181:15 182:16
184:24 185:4,17
186:5,17,18
192:2 193:3,7,7
193:8 208:14,19
209:19 212:7
215:19 217:2
222:9,9
**knowing** 16:22
106:24 124:19
143:13 191:6,18
**knowingly** 79:12
79:23 80:22
82:17 83:25
84:4 97:15
100:21 101:19
102:9 103:5,23
104:3,9,14,16,17
104:20 106:25
107:18 108:5
133:11 136:18
136:23 137:2
214:21 215:10
**knowledge** 40:13
**known** 12:14
**knows** 48:1,25
52:8 53:6,22
54:5,12,13,16

**l**

**l** 65:14
**label** 49:25

**lack** 52:25
**large** 155:23
156:9,15
**lasinski** 1:15
2:15 5:7 6:2,5
8:6,19 10:11,24
11:7 16:25
19:21 28:13
31:21 32:6,9
38:23 44:19
54:9 66:14 68:8
77:14 78:3
84:25 99:13
100:3 105:4
117:19 125:11
139:4 150:21
151:18,25 152:8
159:18 176:1
198:6 211:13,16
212:22 213:5
219:18 223:2
**lasinski's** 21:17
192:7
**late** 61:22
181:22
**latham** 7:4 176:7
180:16 186:23
216:21
**launch** 173:12
**law** 180:16
**laws** 224:2
**lawsuit** 25:10
114:18 184:10
**lawyer** 18:20
**lay** 90:20
**leading** 105:21
130:8 213:18
216:13 217:5,14

217:21 218:7,14
**learning** 58:1
60:8
**learns** 48:16
54:19
**leave** 40:11,12
212:24
**lee** 3:5 5:10 9:13
9:13 11:9 12:7
13:1,8,16 14:7
14:13 16:2,12,20
17:21 18:17
21:11,16 23:15
24:12,23 26:6,13
26:22 27:14
28:12,18 29:4
31:5,16,24 32:5
32:15 33:4
34:11 36:6,9,10
36:19 37:12
38:13,17 39:10
43:5 44:3,24
45:17 46:16
48:18 50:4
52:24 53:8,9,15
53:23 54:8
55:24 56:6,13
61:9,19,22 64:14
64:19,23 65:14
65:20,24 66:2,8
66:14,17 67:5,6
67:9,14,21,23
68:2 69:6,12,18
69:24 71:17
73:11,23 74:16
75:2,16 76:8,11
76:22 77:11
78:2 81:16

84:20,23 87:7
90:8 91:24
92:11 94:24
95:22 96:1,7
98:13 99:10,13
101:9 102:10,12
105:4 107:10
109:14 110:21
111:4 112:1
113:3 115:11
116:16 117:1,3
117:12,16 118:6
118:8,12 121:14
121:25 122:6
124:24 125:2,5
127:24 128:2
139:22 140:3,7
141:12,22 145:4
146:20 150:13
150:18 153:3,23
155:12 158:21
158:25 159:18
162:8 165:23
172:16,19,24
175:19 179:4
181:21 184:16
185:3,11,21
186:11 187:23
189:20 190:21
190:24 191:13
194:17 196:13
197:25 199:8
200:17 203:9,16
204:23,25 207:7
207:16 208:6
209:5 210:17
211:1,3,12,13
212:10 213:4,21

**[lee - maintain]**

214:4,22 216:2
216:15 217:7,14
217:17,23 218:9
218:17,23 219:3
219:10 221:10
222:21 226:1
**left** 51:1,19,22
60:10 117:11
131:22
**legal** 9:2,3 17:21
18:10 19:5,6
26:14 27:4,15
33:6 35:7 44:25
45:3,5 61:10
64:24 76:8
98:15 199:8,9,12
199:13 223:3
226:7
**leslie** 1:24 2:20
9:3 53:15 65:14
225:4,25
**level** 46:14,20
115:9 149:16,24
153:13,16,17
166:1 210:6,6,10
**levitt** 3:18 10:2
**liability** 167:15
182:5,6
**light** 93:19
**likelihood** 60:15
**limit** 98:6
**limitation** 42:15
**limitations** 25:25
26:18
**limited** 26:4
98:21 100:10,11
101:4 153:9
207:22

**line** 27:24 28:1
33:19 40:20
59:3 64:17 66:3
66:11 67:12
97:12 100:18,19
179:21 205:15
226:15 227:4
228:4,7,10,13,16
228:19
**lines** 215:22,25
**link** 94:17 96:16
110:6 117:10
145:1,7,13,18
**links** 95:19
**lisinski** 226:5
228:2
**listed** 117:10
137:20
**listen** 41:12 42:6
74:12 130:11,15
**literally** 138:21
**literature** 109:3
109:4,8
**little** 15:8 38:14
59:7,7 72:25
82:24 83:2,8
99:22 108:9
149:6,7 150:16
165:6 177:23
197:22 209:24
211:5
**llc** 1:10 2:10
4:22 8:21 226:4
228:1
**llp** 3:4 4:4,18,21
216:21
**load** 116:16,20
201:6,6,7 209:20

209:21
**loaded** 172:25
**loads** 65:3,9,13
200:4 201:11,21
202:15,17,20,22
202:25 207:23
208:14,20
209:10,14 218:4
**location** 48:1
52:8,10 53:7,22
120:18,19
**locked** 226:12
227:1
**log** 143:24
**logged** 98:3
143:25 144:1,4
145:2
**logic** 186:10
**logs** 145:2
**long** 11:14,16
26:25 27:9
140:15 143:13
144:15 145:18
**longer** 112:23
163:22 182:16
**look** 16:15,18
51:7 65:18 69:8
71:1 78:4 99:16
117:21 126:6,8
150:13 157:17
164:15,17 170:6
170:8 173:5
174:14,17
175:11,17 178:8
185:14 193:13
196:12 208:10
210:7 213:21
217:1

**looked** 114:5
123:8 149:4
163:25 164:1,5
164:24 165:2
166:23 187:11
187:14,15,15
**looking** 13:19,21
16:14 43:9 49:6
65:22 69:4,8
107:2 150:7,23
196:21 210:5
**looks** 146:15
164:2
**los** 4:7
**lose** 73:3
**lost** 193:1 196:20
**lot** 31:22 41:16
44:12,20 49:16
90:9 107:23
172:11
**lots** 58:8,8
153:18
**low** 157:21
163:12
**lower** 53:11
**lunch** 64:15 66:3
66:9,11,20,24
67:7,11 68:9,15
68:24

| m |
|---|

**m** 146:14,14
**machine** 57:25
60:8
**mail** 127:8
**main** 194:3
**maintain** 115:9

**[majority - mentioned]**

**majority** 40:4
  61:15
**making** 27:4
  29:15 140:15
  169:24 178:2,4
**maps** 52:9
**marin** 225:2
**mark** 20:13,15
  31:1 49:21
  116:7 171:16
  172:23
**marked** 8:6 31:3
  32:7,19,20 49:22
  116:12,22,24
  118:3 130:18,22
  130:25 131:3,6,8
  131:11,13
  133:17 171:18
  176:1,5,8 180:11
**market** 93:6,8,8
  93:21 108:23
**marketed**
  109:24 110:4
**marketing** 130:8
**marketplace**
  93:13 144:21
  155:3
**mask** 161:3
**massachusetts**
  2:17
**material** 64:2,12
  191:22,24 192:2
  192:13
**math** 169:17
**mathematical**
  177:11
**matter** 8:20
  10:15 21:1

**68:25 69:3**
  82:24 83:8
  200:12
**mature** 149:22
**maximum**
  161:15,19
**meal** 66:25
**mean** 13:12,24
  14:17,18 16:7,21
  22:12 27:4 36:7
  40:20 41:7,14,16
  43:7 44:13 46:6
  47:17,19 48:6
  49:3,6 54:12
  55:12 61:14
  63:3,3,10 71:1
  72:19 73:13
  74:17 75:3 83:2
  83:5,16 85:16
  89:17 90:21
  98:6 99:16
  101:3 103:14
  108:18 114:19
  122:1 127:22
  128:3 129:13,16
  134:12,13,17
  136:16 139:19
  141:24,25 142:1
  143:24 149:19
  149:25 150:1
  153:16 157:7
  162:7 163:24
  164:25 165:13
  165:24 166:17
  167:3,4,25
  169:17 170:5,17
  171:5,6 178:18
  178:19 186:13

**189:21 203:25**
  206:3 207:18,21
  208:16 222:9
**meaning** 80:20
  157:9
**meaningful**
  166:8
**means** 29:11
  180:3
**meant** 41:5,9
  105:13 106:6
**measurable**
  105:22
**measure** 102:7
  143:21 144:18
  144:19,20
**measurement**
  144:17
**measures** 21:2
  143:23
**measuring**
  106:24
**mechanically**
  152:25
**media** 8:18
  105:10 130:8
  223:2
**meet** 67:19
  158:13
**member** 57:11
  58:20,25 59:2,12
  59:17,17,23 61:1
  61:3,5,7 62:1,13
  62:24 63:11
  82:23 88:15
  91:11 95:14,17
  95:18,21 96:12
  96:17 119:22,25

**138:12 139:18**
  139:20,21
  142:17 143:20
  144:9,10 152:18
  154:4,17,21,23
  154:25 155:1,6,7
  155:11 200:9
  206:21,25 207:5
  207:14 208:5
  210:1,3 222:7,12
  222:16,18
**members** 26:11
  63:24 69:16,22
  70:23 76:3,18
  77:10 81:5
  87:25 88:4,7,8
  90:24 103:19
  110:5,7,12,16,24
  110:25 111:2
  112:9 120:21
  136:21 137:1
  138:17,17
  139:12 141:1,3
  153:1 154:12,16
  155:16,17,22
  156:2,10,16,16
  157:2 160:3,18
  160:19 204:2,5
  205:8,8 206:11
  206:19 216:3
  217:19,24
  218:24 221:18
**mention** 173:4
  173:11
**mentioned** 17:15
  17:15 19:10
  65:15 75:24
  146:3 157:24,25

**[mentioned - model]**

164:9,11,22,23
165:17 171:11
194:3
**mentioning**
192:16
**mentions**  181:3
**message**  33:24
**meter**  82:15
88:24 89:1,3,13
101:15 215:3
**method**  91:4
93:8 107:1
138:11,16
139:11 141:18
141:21 152:18
154:13 157:4
160:3,18 165:1
197:8,14 205:2
209:25
**methodologies**
140:23 142:14
203:2 221:13
**methodology**
37:24 64:9 77:2
78:19 83:9
152:9 161:9
186:10 189:15
202:6,7,14,18
210:7 220:1
221:16
**methods**  17:10
65:10 138:8
139:5 152:17
159:23 208:11
**metric**  215:5
**metrics**  194:12
**miami**  3:7

**michael**  1:15
2:15 5:7 6:2,4
8:5,19 223:2
226:5 228:2
**michigan**  1:17
8:1
**middle**  96:25
99:15 188:6
204:6
**midway**  198:22
████████████
**mind**  38:15
62:18 220:25
**minimum**  115:9
136:10 158:8,10
158:13,14
**minute**  77:15
125:1 152:1
175:16 210:16
**minutes**  30:19
38:15 64:18
67:13 106:21
138:21 144:4
150:24 151:7
197:23 219:6
**mischaracterizes**
24:23,24 29:4
46:16 52:24
53:23 90:8
94:24 101:9
109:14 141:12
145:4 155:12
185:21 194:17
200:17 204:23
204:25 207:17
208:7 213:19
221:10

**misconceptions**
50:23
**misconduct**
45:12 96:3
139:23 141:23
**missed**  17:13
**missouri**  126:25
**mistake**  104:18
**mistakenly**
77:25
**misunderstand...**
153:7
**mixed**  104:17
**mobile**  6:14,16
44:14 85:17
88:25 114:23
129:12,14,17
130:4,20,21,24
131:25 132:15
132:24 133:3
214:9,12 220:10
220:12
**mode**  12:2,6,12
12:14,19 13:4,7
14:5,11,22 15:3
15:5,9,13,18
16:6,10,16,18
23:3,9 26:1,20
27:1,10 30:15
36:22 39:4,5
40:15 41:5,7,9
41:14,15,16,18
41:18,24,25,25
42:3,3,9,16,23
43:15,19 44:6
46:4,9,15 47:1
47:11 48:2,15,22
48:25 49:20

50:22 51:24
52:1,8,23 53:6
53:21 54:18
55:4 57:8,15,24
58:4,5 59:1 60:9
60:10 61:2,4,16
62:1,14,21,22
64:8 69:20,21,23
70:1,3,6,8,11,19
71:2,12,15,23,25
72:1,3,7,21
73:15,19,22 74:4
74:8,14,19 75:1
75:5,14,19,23
76:20 77:17
82:19,25 91:11
95:15,16,18
96:13 97:20
99:3,6,7 100:11
100:23 101:2,8
101:17 102:5,6,8
102:20 104:14
111:11 112:10
112:11,12,14,15
112:20 113:1
114:12 146:15
148:6,15 158:22
159:4 165:5
167:22 181:14
181:19 190:21
190:22,23
191:13,14,15
201:3,11,21
207:24 217:3,4,9
217:12,13 218:4
**model**  44:1,21
63:17,18 64:6,7
64:21 156:1,1

[model - note]

162:17 163:13
163:17 172:12
192:1,2,10
201:19
**modeled** 159:16
178:24
**modeling** 124:3
**modes** 23:4
41:23 42:8
70:24 194:1
201:3,22 218:4
**modified** 118:19
**modify** 83:2
**monetary** 21:2
21:25 22:3
119:24
**monetize** 33:11
**money** 107:23
**monique** 1:6 2:6
**month** 41:3
43:15,17 81:25
82:2,7,14,24,25
83:6,7,9,20,23
84:10 85:6 88:5
88:15,21,23 89:5
89:10 91:14,21
92:2,3,5,7,9,10
92:18,22,25 93:7
93:11,12,18,19
93:20,25 94:2,2
94:6,8 100:18
101:6,14,22
102:3,16 106:14
107:24 113:9
115:10 126:2
134:14,15,18,20
135:7 143:24
144:3,5 145:24

148:2 154:8
155:4 156:5
157:17,20
205:16 209:17
220:7,9,17
**monthly** 40:22
43:9 63:24 81:8
81:9 82:16 83:4
84:14 97:14
100:20 105:12
106:3,6,13,15
138:15 143:16
143:17 144:23
145:21 146:23
157:11,11 158:2
200:8 203:6,13
203:18 204:4,7,9
205:5,10,13,23
218:11 219:24
222:6,11
**months** 12:15
14:24 15:1,10,14
144:2
**morgan** 3:11,11
9:15,15
**morning** 8:8
9:13,25 10:7,24
10:25 66:4
78:16
**move** 50:18
74:11 75:11
81:23 135:15
136:15 151:19
151:23
**moving** 34:24
108:21 138:6
193:3

**mozilla** 22:23
23:25 24:21
**mozilla's** 23:10
23:13 24:6
**muling** 163:21
**multiplied**
175:11
**multiply** 170:9
170:11,11 175:7
201:6 203:18
206:18

**n**

**n** 4:12 5:1
**name** 9:1,25
115:4 131:23
136:7 225:20
**named** 210:13
217:19
**narrative** 164:10
177:20 214:19
**nature** 77:8
**necessarily** 30:6
122:14
**necessary** 73:6
79:11,20,22
80:21,25 82:16
96:18 97:14
100:20 103:22
104:9 142:8
145:8 217:24
226:14 227:3
**need** 20:15 42:6
43:22 134:8
140:2 150:16
155:14 175:16
192:13 219:5

**needed** 115:25
**negative** 156:23
**neither** 137:1,1
225:16
**network** 129:19
129:20
**nevertheless**
28:5
**new** 31:16 66:3
104:4 146:16
147:9,14,15,15
179:3,9 184:5
188:13 215:21
217:17
**nguyen** 164:14
**nice** 53:13
**nielsen** 6:13,15
6:18 85:16,19,19
130:4,7,19,21,24
131:2,23 132:5,8
132:14,23 133:7
133:12,17 134:5
134:11 137:23
**non** 26:1,8 60:9
74:11 103:17
104:12 166:22
190:21 191:13
199:9
**normal** 166:4
**north** 3:13,20
**northern** 1:2 2:2
8:21
**notating** 226:15
227:4
**note** 8:11 31:25
99:8 133:7
204:6

**[noted - okay]**

**noted**  128:16
157:14 223:4
**notes**  20:3,4,8
175:17 197:24
**nothing's**  31:7
**notice**  6:19
131:3 133:18
**noticing**  9:10
**notification**
115:22
**notifications**
118:25 211:25
**notified**  66:10
**ntp**  192:16
197:10
**number**  6:3 8:22
30:17 40:22
43:9 63:24 64:2
65:2 78:5 80:3
81:8,25 82:7
83:17 85:20
93:5 102:6
103:3,4 115:5
117:1 118:9
138:11,16
139:11,17,20
140:25 144:8
146:10 147:18
153:13,22 154:1
154:12,16 156:4
156:9,15,17
161:25 162:14
171:22 173:18
174:9,10,23,25
175:10 184:8,10
184:12,14,23
185:1,10 186:9
188:14,15,22

190:9 195:8,11
195:16 200:3,9
201:2,10,20
202:4,19 203:6
203:13,22 204:5
204:7 205:7,7,13
205:22 206:1,11
206:19 209:14
209:25 212:6
218:3,10,23
223:2 226:15
227:4
**numbers**  135:2
193:20 207:23
**numerous**  18:3
83:22 103:4

**o**

**o**  65:14
**o'clock**  64:15
66:21 175:22
**oakland**  1:2 2:2
**oath**  225:8
**object**  11:9
31:25 61:23
64:23 96:1
99:15 110:21
113:5 139:22
140:7 186:11
212:23 213:13
**objection**  11:11
12:7 13:1,16
16:20 17:21
21:16 23:15
24:12,23 26:6,13
27:14 29:4
32:15 34:11
36:9,19 37:12

39:10,12 45:17
46:16 52:24
53:23 56:13
61:9 65:20,24
75:16 77:11
81:16 87:7 90:8
94:24 96:7
101:9 107:10
109:14 111:4
121:14,25
141:12,22 145:4
155:12 158:21
181:21,22
184:16 185:3,11
185:21 189:20
194:17 200:17
204:23 207:7,16
208:6 209:5
212:21 213:2,17
214:2,18 215:24
216:13 217:5,14
217:21 218:6,13
218:25 221:10
**objections**  9:6
31:19,23 218:20
225:9
**observing**  10:1,8
**obtain**  83:8
144:14
**obviously**  42:6
66:5 81:7 82:3
88:6,8 99:17
142:21,22 185:5
**occur**  63:8,20
199:10,14
**occurs**  72:10
**odd**  40:21

**offer**  19:16
37:24
**offered**  19:16
23:3
**offering**  18:24
18:25 19:2,5
91:6 126:17
**office**  11:5
226:11
**offset**  76:20 77:1
77:7
**oh**  30:8 69:20
85:22 89:7
92:20 105:15
140:14 173:24
182:17,23
210:18,20 213:8
**okay**  20:20
29:16 31:24
33:18 41:11,11
42:13,13,18
49:14 50:6,14
51:9,11,21 66:17
78:7 81:12 82:8
83:12 85:3 86:2
88:14 92:21,22
94:16 97:11
98:24 99:21
100:6,16 102:14
104:23 105:11
106:19 108:3
109:11,16,21
110:3,3 111:18
113:6,20 115:21
116:17,19
117:12,16,18
118:8,12,13
119:11 120:8,9

**[okay - outlined]**

| | | | |
|---|---|---|---|
| 125:2,17,21 | 220:1 221:3,4 | 57:14 58:15 | 192:5 |
| 130:6 131:18 | 222:20 | 62:3,16 69:13,15 | **opt** 56:4 85:6 |
| 132:11,18,22 | **once** 27:1,10 | 71:11,22,24 | 126:2 184:8,9,10 |
| 134:10 135:15 | 80:20 133:21 | 72:14 73:8 | 184:12 186:16 |
| 136:9,15,25 | 143:25 144:4 | 76:16,21 77:2 | 187:1,8,15,16 |
| 138:23 139:4 | **ones** 93:16 | 78:4,4 79:5,9 | 188:13,23 |
| 140:3 146:3,13 | 188:11 | 80:21 81:14 | 189:25 192:1,16 |
| 148:5,12,13,21 | **ongoing** 113:4 | 82:12,22 84:1 | 192:20,24 |
| 151:18 152:13 | **online** 28:4 | 86:18 87:25 | 196:22,23 |
| 152:14 153:21 | 29:16,24 30:2,6 | 88:2 90:3,5,6,23 | 215:21,21 |
| 161:22 164:17 | 30:8,13 79:14 | 91:1,6,10 95:24 | **opted** 185:2 |
| 165:17 170:6,7 | 82:19 97:19 | 102:21 103:20 | 195:12,17 196:4 |
| 171:4,9 172:1,3 | 98:20 99:2 | 104:15,25 | 196:10 197:9,15 |
| 172:19,24 173:3 | 100:23 101:2,8 | 111:15,19 | **opting** 56:20 |
| 173:10,11,22,25 | 101:16 102:4 | 112:16,22 | **option** 112:11 |
| 174:2,16 175:2 | 110:8 115:10 | 113:20 114:8,10 | 120:25 |
| 175:15,19 | 127:3 132:9 | 122:18 139:15 | **options** 183:13 |
| 176:14,18 | 135:25 | 141:11,20 142:9 | 195:3 |
| 178:16 179:5,24 | **ooo** 223:5 | 142:24 143:3 | **order** 49:1 54:19 |
| 180:15 182:17 | **open** 20:18 | 144:7 148:22 | 96:2 110:22 |
| 182:23 183:1,2 | 53:12 176:16,17 | 155:5,8 156:3,6 | 111:5 133:25 |
| 183:16,24 | **opening** 176:3 | 165:19,21 | 139:23 140:8 |
| 184:14 188:10 | **opens** 146:15 | 178:19 186:25 | 141:23 185:3,12 |
| 192:19 193:22 | **operate** 110:7 | 191:12,23 | 186:12 211:19 |
| 194:5,9 197:25 | **operating** | 193:11 194:14 | **organization** |
| 198:21 200:22 | 193:17 | 198:13 199:7,16 | 79:14 |
| 200:25 201:17 | **operative** 25:9 | 199:17,24 | **organizations** |
| 203:20 205:9 | 25:13 26:4 | 200:15 202:5,7 | 127:19 135:16 |
| 206:11,23 | **opinion** 18:14,24 | 204:20 206:20 | **original** 226:10 |
| 209:19 210:11 | 18:25 19:3,6,11 | 207:25 208:2,22 | 226:21 |
| 210:11 211:1,3 | 19:17 22:1,9 | 215:4 221:8 | **outcome** 9:5 |
| 211:14,15 212:4 | 26:12 29:3 | **opinions** 13:8 | 225:19 |
| 212:9,18 213:1,7 | 30:12 37:11,16 | 18:7,15 19:5 | **outline** 33:23 |
| 213:21 214:4,15 | 37:19 38:25 | 63:10 103:11 | 64:10 |
| 214:22 215:4,12 | 40:19,21 43:4 | 118:19 178:17 | **outlined** 17:12 |
| 215:18 216:2 | 46:3,10 47:24,25 | 198:10 | 17:14 30:25 |
| 217:1,7,17,23 | 48:3 54:4,13 | **opportunity** | 31:13 32:13 |
| 218:23 219:3 | 55:5,13,17,19,23 | 81:14,19 167:5 | 59:10 60:4 |

Page 31

[outlines - particular]

**outlines**  25:15
**outside**  16:2
 24:17 58:3
 179:22
**outweigh**  74:9
 95:9
**overall**  36:21
 60:13 149:14
 164:3,3 165:3,3
 166:3

**p**

**p.m.**  2:18 38:22
 68:4,7 99:24
 100:2 125:7,10
 138:25 139:3
 152:4,7 175:22
 175:25 198:2,5
 210:22 211:9
 219:12,15 223:1
 223:4
**page**  20:22 22:18
 22:18 34:25
 41:20 50:7,8,18
 50:19 65:3,9,12
 65:13 78:5,6
 85:2,5 86:1
 105:7 117:11
 125:15,19 130:2
 131:25 132:14
 132:23 133:18
 133:19 134:25
 135:1,2,3,4
 146:16,18 167:8
 167:11 173:5
 179:2,3,4,9
 181:24 182:21
 184:5 187:22

 188:5,13 192:16
 197:10 198:16
 198:17,20,20
 200:4 201:5,6,7
 201:11,21
 202:14,17,20,22
 202:25 207:23
 208:14,19 209:6
 209:7,10,14,20
 209:21 212:6,11
 213:22 215:21
 218:3 219:20,20
 220:23,24,25
 221:1,2 226:15
 227:4 228:4,7,10
 228:13,16,19
**pageloads**  201:2
**pages**  1:25 65:5
 65:5,7 128:19
 129:7 225:13
 226:14,17,17
 227:3,6,6
**paid**  110:6
 157:11 166:15
 167:2 212:13
 213:25
**panel**  6:9,11,14
 6:16,18 82:13
 83:21,25 85:17
 86:4 104:24
 105:3 107:4
 109:25 110:5,17
 111:3 113:14,22
 116:8,11,21,25
 118:5,18 119:5
 119:18,22,25
 120:6 130:4,20
 130:22,25 131:2

 131:25 133:17
 133:21 134:5,11
 134:16
**panelist**  112:25
 136:19
**panelists**  87:2
 106:7 119:17,19
 119:25 120:2
 121:5 133:12
 137:11
**paper**  19:21 20:6
 20:9,11
**paragraph**  20:22
 20:25 21:15,23
 33:15,23 35:19
 78:5,9,21,21
 79:4 81:24
 85:13 97:6,6,7
 100:5,14 101:10
 103:20 104:7
 105:7,19 109:19
 109:23 127:14
 127:16,25 130:1
 135:19,20 137:6
 138:8 141:13
 147:20,22
 151:15 152:11
 154:2 170:8,9
 172:15 173:2,6,6
 173:7 176:20
 198:19 200:10
 202:8
**paragraphs**
 35:16,21 106:20
 128:6,10 176:20
 176:23 177:2
 203:3

**pardon**  218:2
**part**  12:9,13
 25:2 39:20 57:7
 88:4 105:17,18
 107:22 108:1,4,5
 119:24 136:4,6
 141:10 156:7,8
 158:11 167:24
 167:25 171:12
 177:14 180:18
 214:1,25
**parted**  107:19
**partially**  141:2
**participant**
 113:14 135:10
**participants**
 8:14 82:13
 83:23 105:13
 111:8 115:8,14
 118:25 120:12
 133:10 135:12
 135:13 155:3
**participate**
 106:16 110:8
 133:22 134:5,11
 157:10 211:19
 211:23 212:13
**participating**
 134:16
**particular**  57:11
 93:15 117:23
 118:16 121:11
 121:12 123:25
 124:1,14 128:4
 170:10 176:24
 179:2 181:3
 191:17

[parties - phone]

**parties** 8:16
**parts** 28:8
  126:25
**party** 9:4 36:24
  36:25 37:2,9
  40:17 70:15,15
  72:11 73:2,4,5
  158:18 159:5,7,8
  159:11 160:1,3,9
  160:10,13,14,19
  160:22 162:21
  173:12 174:3
  179:13 184:4
  190:7 195:5
  215:20 225:17
  225:17
**pass** 211:1 219:4
**pauses** 140:15
**pay** 93:7 125:22
  126:2 127:20
  144:22 158:2
  166:11
**paying** 47:22
  213:24
**payment** 80:25
  80:25 81:21
  82:13,16 97:14
  100:20 101:14
  105:12 106:3,6,9
  106:11,15
  115:10 128:14
  212:18 213:15
**payments** 79:11
  79:20,22 80:21
  83:22 86:4
  103:4,22 104:8
  106:14 214:5

**pays** 94:16 102:4
**pbi** 221:17
**pdf** 20:1,5
  226:12 227:1
**peak** 205:5,10,13
  205:16,21 206:6
  221:17
**penalty** 224:1
  226:16 227:5
**pending** 32:1,1
  84:24
**people** 40:4,10
  40:13 45:21
  47:12,19,20,21
  48:7 49:17,17
  54:3,15 58:7
  73:13,14,17,21
  74:7,14,18,25
  75:4,7,14,18,25
  76:1 77:16
  93:22 94:11
  107:21,21
  112:10 113:17
  123:2 124:6
  133:8 135:11
  144:22 146:22
  215:8,8,10,19
  216:4
**perceived** 74:9
**percent** 24:7
  51:2 52:18,20
  53:2,3,5,20
  54:22 55:1
  118:22 148:5
  149:6,7,7 163:9
  163:10 170:11
  170:12 173:11
  174:5,21,22,25

  175:4,5,6,12
  177:8,8,18,18,19
  177:22,23 178:3
  178:7,9,10,13
**percentage**
  164:4 173:13,15
  185:2
**percentages**
  164:4 178:10
**perform** 115:14
  115:18 221:23
  222:2,5
**performed** 37:3
  162:15
**performing**
  23:20 105:23
**period** 27:1,11
  38:4 42:24 61:2
  141:4 154:2
  173:19 177:4,25
  201:4,22 203:8
  203:15,24
  204:19 205:20
  206:12 209:11
  218:5,12,19,24
  226:18 227:7
**periods** 124:10
**perjury** 224:1
  226:17 227:6
**perks** 94:7
**person** 14:18
  46:8 62:15
  113:1,11,13
  122:20,21
**person's** 72:13
  72:15,18 90:20
  119:15

**personal** 12:13
  12:20 40:12
  68:23 69:1 70:1
**personalization**
  57:2 71:9 72:10
  159:6,7 166:21
**personalize**
  48:16 49:1,13
  52:1 54:19
  70:12 71:7
**personalized**
  56:21 65:16,18
  68:19,20 69:10
  69:16 70:8,9,14
  70:21,24 71:5,15
  71:25 72:6,8
  73:7,10,16,18,22
  74:2,10,15 75:1
  75:8,15,22,25
  76:19 77:10,17
  128:18 129:5
  161:6 166:19,22
  168:9,13
**personalizes**
  71:8
**perspective** 60:5
  90:20 95:9,10,13
  108:14,14,24
  120:2 149:13
  177:11 199:10
  214:9
**pertains** 39:23
  39:25
**peterson** 4:20
  9:19
**phone** 88:25
  114:23 214:9
  220:10,12

**[phones - private]**

**phones** 214:12
**photographs**
36:1
**phrased** 107:14
**pick** 161:11
**picking** 100:18
**piece** 89:7 184:1
187:12 199:18
199:25
**pieces** 22:21
31:13 33:24
34:7,18 35:3
36:3,18 37:20,25
38:24 47:11
**pin** 106:19
**place** 8:16 46:23
78:12 163:6
225:7
**placed** 114:23
**plaintiffs** 1:8 2:8
3:3 9:14,15 10:2
21:3,5 25:9
32:13 33:2
210:13 211:14
217:19
**plan** 19:16
**planning** 151:23
**please** 8:11 9:7
10:4,12 27:19
31:23 51:19
53:16 67:15,19
74:12 100:17
116:19 117:7,16
127:14,25
131:15 143:6,7
151:14,20 162:6
164:17 194:24
219:20

**plus** 75:7 88:9
**point** 73:1 85:12
89:11 141:16
150:25 157:8,25
159:25 187:20
194:10 201:2,10
206:1
**pointed** 211:23
**points** 83:18
84:9 85:4 103:2
138:1,2,5 219:23
**policy** 6:11
116:21 118:5,18
**pop** 181:6,18
186:21 187:12
188:23 189:8,11
189:22 190:3
191:10 192:19
195:18,21,25
196:4,11,16
197:4,16 215:20
216:20,24 217:2
217:2,11
**portion** 65:2
126:1 135:6,10
142:4 164:8
**portrait** 135:25
**positive** 156:23
**possibilities**
190:11
**possibility** 62:19
63:6
**possible** 39:18
129:25 138:7
139:5 161:15
**post** 20:8
**potential** 187:1
193:1 200:12,15

200:16,20
201:13 203:6,12
**potentially** 40:2
40:25 76:5
91:19 162:3
**pre** 66:24
**preceding** 23:2
**precise** 20:12
**preferable**
139:14
**preference**
133:25 139:16
**preferences**
125:16 126:3
**prejudice** 202:2
**premarked**
20:15
**present** 4:17 9:8
26:20 27:2 28:6
**press** 47:19
**prevent** 125:22
**previously** 153:7
**printed** 19:25
117:14
**printout** 6:13,15
6:18,20,22,25
117:9 130:19,21
130:24 131:2,5,8
131:13,18
180:15
**prior** 24:24
35:25 46:16
56:19 147:25
173:12 185:22
195:21 196:17
197:6 221:4
**privacy** 6:11,19
81:15 102:9

105:21 116:21
118:5,18 120:4
131:2 133:18
**private** 12:2,6,12
12:14,19 13:4,6
14:5,11,22 15:3
15:5,9,13,17
16:6,10,16,17
23:3,4,8 24:16
26:1,20,25 27:10
27:12 30:15
39:3,4 40:14
41:9,15,16,23,24
41:25 42:3,8,9
42:16,23 44:6
45:8 46:4,8,15
47:1,11 55:4
57:8,15,23,23
60:9 61:1,3,16
62:1,14,20,21
63:24 64:8 65:2
65:12 70:19,23
71:1,3,12,14,22
71:24 72:1,2,4,6
72:7,20,22,24
73:15,18,21 74:3
74:8,14,19,25
75:5,14,19,23
76:19 77:17
79:13,13 82:18
82:25 83:4
91:11 92:7,8,10
92:24 95:11
96:12 97:16,23
97:25 98:5,6,11
98:21 99:1
100:11,22 101:5
102:6,7,17,20

**[private - putative]**

103:24 104:3,13
106:22 107:22
108:1,4,5 111:10
111:11 112:10
112:12,15,20,25
113:8 114:12,12
138:15 140:25
145:1,13,18
147:8,14,18
156:5 158:11,24
159:4 167:22
181:14,18 194:1
200:2 201:3,21
203:7,13,18,23
204:4,7,8,18
205:2,4,5,10,13
205:19,24 206:2
206:6 207:22,24
209:10,14
214:21 217:3,8
217:12 218:4,11
218:17 222:7,11
222:15
**privately** 64:2
67:19 73:9
76:10 81:20
91:14,19,20 92:2
98:1 180:7
220:3,11,12,16
**prizes** 134:18
**probably** 47:4
103:12 183:2
**procedure**
226:19,20
**proceed** 10:5,19
**proceeded** 55:4
**proceeding** 9:6

**proceedings**
1:16 2:16 8:4
65:11 225:14
**process** 110:9
**produce** 142:3
193:19
**produced** 117:3
117:5,12,14,16
139:25 146:1
151:5 184:10
186:3,6 188:19
216:3 222:8
**produces** 140:24
142:1,3
**production**
147:25
**products** 48:17
49:2 52:9 54:20
**profile** 116:1
119:1 132:9,12
135:25 136:3,4,5
**profits** 35:9
**program** 85:6
104:24 109:19
125:16 126:3,11
126:21,23
127:11 132:1
**project** 179:12
**pronounced**
146:14
**proportion**
142:15 206:24
207:14,21 208:4
208:5,25
**proportional**
155:9 208:1,13
208:16

**proposal** 152:25
207:12
**propose** 138:7
140:21 142:14
152:17,21
154:11 202:5
204:15 205:1
207:13
**proposed** 26:11
77:2 139:5
160:2,17
**proposition**
156:9,18
**propositions**
155:20
**proven** 55:2,21
**provide** 60:14,14
60:24 82:23
87:14 122:17
127:6 133:23
136:18 141:14
153:18 166:7
211:25 217:24
217:24
**provided** 22:1
83:7 102:25
103:8,13 139:16
144:3 164:10
184:15 217:18
226:19 227:8
**provider** 130:8
**provides** 84:13
84:16 177:2
205:18
**providing** 87:1
112:6 180:17
190:19 192:21

**public** 117:4,14
**publicly** 46:25
118:4,10 127:2
127:13 135:14
**publish** 171:25
**published** 47:14
48:9
**publisher** 166:12
167:2
**publishers**
166:16
**pull** 212:4
**purchase** 203:13
**pure** 15:25
201:18
**purpose** 105:2
**purposes** 12:20
15:12,16 16:5
27:13 29:3
32:20 49:25
57:4 104:24
145:11 172:5
197:8,14 200:23
**put** 21:7 67:23
67:23 106:19
108:22 155:18
205:16
**putative** 25:16
59:12,17 60:25
61:3 63:11
69:16,22 70:23
76:3,18 77:10
87:25 88:4
90:24 91:10
95:14,17,21
96:12,17 110:16
112:9 120:21
136:20,25

Page 35

**[putative - really]**

138:17 154:21
206:21
**puts**  112:13,15
112:20
**putting**  214:4

**q**

**qamer**  4:18 10:6
10:7
**qualifications**
25:21,22,24
**qualifier**  42:21
**qualify**  20:9 86:8
106:10
**qualitatively**
114:13,17 115:7
**quality**  8:12,13
**quantification**
19:11,15 27:13
**quantified**  19:18
26:16,16 34:18
39:22 78:17
**quantify**  22:10
34:8,9 35:4 36:4
36:5,17 37:20,24
38:25 39:21
41:23 59:8 60:2
77:9 80:23
81:14 98:9 99:1
124:12
**quantifying**  19:7
21:2 26:10 43:3
44:23 187:11
**quantitatively**
114:14 115:6
**question**  21:12
25:2 27:9 28:9
28:18 31:11,17

31:17 32:7,9,16
32:21 34:6,6,14
35:2,6 36:2
37:14 41:13
42:2,7,9,14,15
42:18,20 43:2,24
43:25 48:20
49:4 53:8,13,16
53:19 54:12
56:19,19,20
59:13 60:1
61:21 71:19
74:12 75:25
76:1 79:17 80:5
80:15 84:24
91:9 96:9,14,24
99:15 103:9
105:24 107:12
107:13,14 108:8
109:6,7 113:3,8
114:1 119:8
121:22 134:7
140:1,4 145:7
146:8 148:12,13
151:3 152:23
159:2,9,10,15
160:17 165:25
172:3 183:16
186:7,8 188:12
196:8 201:9
203:20 204:22
207:2,17 213:4,6
222:14,17
**questioning**
40:20 59:3
64:18 66:3,11
67:12

**questionnaires**
133:23
**questions**  5:12
6:17 28:14
31:21,25 35:12
39:1 67:7 68:21
68:22 128:12
130:25 132:20
172:22 188:10
210:15 211:20
212:2,23,24
215:23 216:1
219:3,19 220:20
221:5 222:20
**quick**  38:15
173:8
**quickly**  58:24
117:21 138:19
**quinn**  4:4,20
9:11,18,20
**quinnemanuel....**
4:9,15
**quite**  207:1
213:11
**quote**  222:4

**r**

**r**  228:3,3
**r&s**  227:1,9
**raise**  10:11
**range**  198:24
199:3
**rate**  67:17 81:4,5
81:11 83:19
84:10 103:3
108:6 144:23
157:11,11 158:2
197:4,5 199:2

200:13,24
201:14,15,17,20
203:4,10,19
206:15,16,18,20
207:3,6,10,12,20
**rates**  178:21
**reach**  60:13
155:21,24 156:9
156:15
**read**  20:23,23
22:20 24:3,4
25:11 27:24,25
28:11,13 32:6
46:6 49:10,11,15
53:15,17 79:7,8
82:10,10 93:10
100:17 101:12
101:13 103:21
127:16,17
179:23 198:7
**reading**  22:21
28:7,8 80:21
84:18 100:17
111:18 130:6
179:20 198:11
198:23 226:23
227:9
**reads**  203:22
**ready**  148:12
172:25,25
**real**  38:15 173:8
**reality**  44:11
**realize**  192:15
197:22
**realized**  168:21
**really**  44:17
58:24 68:20
93:20,20 117:21

**[really - related]**

182:24 205:5,21
205:21,22
**reask**  105:24
**reason**  24:19
76:24 93:23
115:21,25 116:3
119:3,4 134:4,10
150:18 162:22
162:23 177:5,9
178:16,18
181:17 193:22
194:3 202:11
228:6,9,12,15,18
228:21
**reasonable**
46:11 93:2
99:12,17,18
119:19 141:7
142:11 148:18
149:24 157:1
166:14,25
215:15
**reasons**  13:17
58:19 59:10
73:8,13 83:17
84:6 93:5 94:13
162:14 199:15
**rebuttal**  176:2
176:21 198:7,11
**recall**  11:25
13:13 14:8,10
15:15 30:22
59:24 65:22,25
68:19,20,21,23
69:4,8,9,14
77:14 86:21
87:10 100:7
115:17,19

118:20,20 119:5
138:4,5 149:1
176:23 186:20
191:7 215:22,25
216:23 219:18
220:20 221:9,24
222:2
**receipt**  34:9 36:4
**receive**  76:19
91:15,16 115:10
121:9 168:23
**received**  20:2
28:5 29:14 30:5
30:22 31:15
32:12 33:1
169:2,4
**receives**  39:7,19
40:18 156:7
166:10
**receiving**  14:11
74:10
**recess**  38:20
68:5 99:25
125:8 139:1
152:5 175:20,23
198:3 210:23
211:7 219:13
**recognize**  50:14
**recollection**
174:8
**record**  8:9,17
9:9,17 20:24
22:21 24:4
27:25 31:24
35:13 38:17,18
38:21 53:17
59:4 66:13,18
67:2,18 68:1,3,6

72:10 77:24
79:7 80:6 82:10
99:23 100:1
102:13 105:4
114:23 116:8
125:6,9 127:17
130:7 134:8
138:24 139:2
140:6 146:13
148:22 149:2,9
151:21 152:3,6
159:18 172:23
175:21,24
187:17 192:11
193:4,8 197:12
197:19,23 198:1
198:4,23 210:21
211:8 212:10
219:8,11,14
222:23,25
225:14
**recorded**  8:15
8:18 225:11
**recording**  8:12
8:16
**recruit**  110:7
**rectangle**  86:7
87:12 88:11
**red**  180:19
216:24 217:2
**redirect**  210:24
211:2,4 219:18
**reduce**  166:6
**reduction**
105:21
**reductions**
168:17

**referenced**  226:6
**referencing**
206:8
**refers**  28:16,20
138:11
**reflect**  77:24
**refresh**  31:8
174:8
**refuse**  67:2
**regard**  24:6
172:3
**regarding**  148:1
199:2
**regardless**  82:19
97:20 100:23
101:2,8,17 102:5
194:14
**register**  110:18
111:3
**regular**  42:10,11
99:3,5,7 112:11
112:14 148:6,15
**reinstallation**
147:2
**reinstalled**
147:13
**reinstalls**  147:1
147:4,7
**reintroduce**  82:7
**relate**  60:8
**related**  9:4 25:18
37:7 56:19
77:16 89:13
90:11,12,21
130:9,20 156:8
171:6 177:14
180:17 187:11
195:23 225:17

**[relates - researched]**

**relates** 17:3,17
26:8 30:14
36:21,23 37:10
37:15 60:9
73:25 162:24
164:6 177:12,19
194:25 200:12
**relationship**
142:25,25 144:8
144:11
**relative** 148:6,15
165:7 166:3
**relatively** 149:22
164:7 209:11
**released** 226:21
**relevant** 61:2
199:2,4
**reliable** 121:24
121:24 122:2
**relied** 36:13
50:16
**relief** 21:2,25
22:3
**relinquish** 79:12
79:23 80:22
82:17 97:15
100:21 103:23
104:10,14,16
**relinquished**
104:4
**relinquishing**
102:9 104:4
**rely** 171:21
**relying** 222:14
**remainder** 168:6
**remained** 148:6
**remaining** 150:7

**remember** 42:20
69:7 77:18
86:13 87:9
127:7 147:10
191:4 211:20
212:1 216:19
**remembering**
149:8,10
**remote** 1:16 2:16
53:10
**remotely** 8:24
9:8
**remove** 166:15
166:25 192:24
**removed** 165:22
167:4,7
**repeat** 28:18
32:16 37:13
42:18 43:22
48:20 53:8 96:8
152:24 179:20
199:22 203:9
213:5,10
**rephrase** 98:24
**report** 6:4 7:2
8:5 17:13,14
19:25 20:2,13,22
21:8,10,15,18,21
21:25 22:14
23:5 24:18 49:6
50:3,9,10,17,20
77:4 78:4,13
82:2 84:7,19
100:5 105:5,7
109:20 125:13
125:19,23
135:17 137:20
138:3,9 146:4,7

147:21 150:3,7
150:12,24
152:11 159:19
162:16 164:15
164:20,21 167:9
167:10 172:5,17
173:1 176:2,3,4
176:21 177:2
178:9 179:1
180:2 181:24,25
182:19,21
187:21 192:3,17
198:8,16 203:3
204:20,25 207:9
208:9 212:4,11
216:8 219:20
220:23,24
**reported** 1:23
146:19
**reporter** 2:20
9:3,23 10:4,6,10
10:18 36:8
53:13,17 222:23
**reporting** 120:19
**represent** 50:2,8
58:6 117:8
155:23 164:19
177:1 211:14
**representation**
27:17 182:5
**representations**
25:5 217:1
**representing** 9:1
28:7 139:24
**represents** 82:15
100:18,19
161:15

**request** 34:3,20
184:18
**requested** 227:1
227:9,10
**require** 70:15
111:16,20
119:14
**required** 86:22
88:1 115:14,18
115:22 116:4,5
118:25 119:18
133:12
**requirement**
27:2,11,12
158:10
**requirements**
26:19 28:2
115:9 134:5,11
134:13 136:10
137:10 158:8
**requires** 86:23
119:12 132:5
135:21,24 137:7
137:13 211:17
212:1
**rescues** 116:15
**research** 73:20
74:13,23,24
75:11,13,21
127:19 128:12
128:25 135:16
137:25 148:17
148:20,21,23
**researched**
56:11,16,24 57:4
110:13 126:1,11
126:20,23 127:5
127:10 133:5

Page 38

**[researched - safari]**

197:4
**reserve** 210:25
**respect** 35:12
37:19,20 76:16
79:17 123:22
153:11 183:16
194:6
**respond** 115:22
118:25 211:24
**respondent**
212:13
**respondents**
211:17,24
213:24,25
**response** 103:8
**responsive** 74:11
**rest** 43:14
210:25
**restate** 44:6
59:13
**restitute** 82:23
101:7
**restitution** 17:7
17:7 19:11,14,17
37:19,25 38:3,5
40:19,21 43:3,8
55:16 62:16,24
64:5,7 76:16,21
77:1,6 78:18,24
91:15 96:19,21
96:25 98:9,10
99:1 100:9
101:4 113:10
138:6,8 139:5
142:15 145:9,12
202:10,13,24
204:15 208:11
212:19 213:16

214:6,16,16
215:6,7 220:2
**restitutionary**
22:16 39:25
91:15 92:23
153:9,10 208:10
**restrictions**
25:20 120:22
**restroom** 38:14
99:22 124:24
138:20
**result** 23:9 59:9
60:3 126:18
193:1 198:10
**resulting** 154:14
**results** 34:15
43:11,12 52:9
170:1
**retained** 223:3
**return** 226:17
227:6
**revenue** 60:2
154:21,23
155:10,15
158:19 159:12
161:15 162:3,4
163:7 164:3,8
166:10,11,24
167:21 168:2,2,8
168:12,20,21
170:21 174:2,19
177:3 183:14,20
183:25 187:4,13
188:6,11 193:1
195:3 196:20
**revenues** 73:3
167:14 183:4,8
183:11,18 187:4

187:25 188:1
190:7 195:1
**review** 32:21
33:7 51:1 72:10
172:4 176:21
177:7 185:6,6
187:17,17
197:23 226:8,10
226:13 227:2
**reviewed** 21:19
**reviewing** 21:18
32:23 84:18
105:5 148:21
159:19 176:23
**revolve** 41:22
**reward** 86:8
87:13
**rewarded**
131:19
**rewards** 84:14
86:4 135:5
219:24
**ridiculous** 67:18
**right** 10:11 14:3
19:21 20:21
32:23 42:1
47:20 60:14
67:11 68:10,11
68:11,12 78:12
81:22 82:5 86:5
92:14 100:3
104:1 107:4
111:22 117:12
120:4 124:9
135:22 138:22
139:21 140:7
150:24 151:21
152:8 164:18

167:23 175:6
180:9 184:1
202:1 205:24
206:2 207:11
211:16,22
213:12 214:11
214:15 218:3
219:5 222:21
**rights** 104:14,17
**robert** 4:24 9:1
**rockwood** 1:24
2:20 225:4,25
**room** 11:2
**rosas** 1:24 2:20
9:3 225:4,25
**roughly** 25:18
**routed** 90:7
**router** 84:14
87:14,21,22 88:1
88:19,19,20
89:22,22,25 90:1
90:4,25 91:4
106:12,12 110:7
111:12 214:8
**routers** 90:13
**rpr** 1:24 2:20
225:4,25
**rules** 227:8
**rundown** 154:10
**running** 175:17

| s |
|---|

**s** 65:14 228:3
**sabine** 21:19
**safari** 11:13,17
11:24 12:12
15:3,5,9,13,17
15:18 16:6,10

Veritext Legal Solutions
866 299-5127

**[safari - see]**

24:14 26:4,8,9
26:16 41:10,24
194:1,6
**safely** 42:5
**sales** 178:5
**sample** 146:9
**san** 8:22
**sanction** 96:2
110:22 111:5
139:23 140:8
141:23 185:3,12
186:12
**satisfy** 27:2,11
**save** 49:7 163:11
163:22
**saved** 35:24
165:11,13,15
**saving** 14:19
**savings** 166:8
**savvyconnect**
6:22,23 85:12
131:8,10 135:15
135:21,24 136:9
136:17 137:23
**saw** 149:9
**saying** 41:21
53:1 64:3 66:17
67:9 69:7 70:4
79:21 86:21
94:5 97:24
102:2,3,16
113:15 124:16
157:16 169:23
178:21 208:9
**says** 23:25 29:16
33:19,22 34:25
49:7 50:22 51:4
51:5,24 52:7,13

52:15,18 53:5,19
53:25 54:1,18,22
80:2 86:7 87:12
88:11 108:19
118:19 120:14
133:21 135:5
179:16 182:7
183:21 184:2
217:2 219:22
**scenario** 39:20
40:14,19 42:16
63:9,10 96:11
154:9 159:22,22
163:9 167:16
168:3,14,16,18
168:22 169:1,7,8
170:22,23 171:1
171:6,6 182:6
187:3,13
**scenarios** 153:18
159:17,21
161:10 182:5
**schedule** 148:8
148:10 173:21
173:24 174:17
175:3,3,11 209:8
226:10
**schedules** 174:15
177:17 178:9
**schiller** 3:4 4:18
9:14 10:8
**scope** 13:8 16:2
16:12 24:18
39:12 44:24
48:19 56:6
60:13,13,15,16
65:20 69:6,12
73:11,23 74:16

76:11 87:8
95:22,23 146:20
190:24 207:7,16
208:6,8
**scratch** 113:25
**screen** 8:15
114:24 134:6
146:16,17
190:16
**screenshot** 7:4
86:3 176:7
**screenwise**
82:13,14,15
83:21,25 84:13
86:3 88:20,24,25
89:3,12 101:15
101:15 103:3
104:24 105:3,13
107:3 109:18,19
109:25 110:5
111:3 112:25
113:14,22
114:10 115:8,14
118:24 120:12
121:4,5,8 215:1
215:2
**screenwisepan...**
86:5
**se** 3:6
**search** 14:21
39:6,8,20 40:10
40:11,13,16
42:25 52:9
70:18 126:10
127:1 128:19
129:6 177:19
183:10 188:17
194:25 195:23

**searched** 46:24
58:25 126:9
127:3
**searches** 133:7
**searching** 123:4
**sec** 116:16
165:16
**second** 3:6 50:4
78:9 79:3 80:15
82:9 91:16 92:6
93:23 97:5,7,9
97:12 103:21
109:23 110:2
152:15 162:23
173:5 176:20
198:22 203:6,12
204:8,14
**secretly** 33:19,22
**section** 21:24
22:14,15 78:10
78:13,24 80:7,14
82:6 83:19
84:10 85:24
97:8 105:6
120:10 137:20
137:21 145:3
151:8,12,12,14
151:15 183:3
198:16 203:3
220:23,24 221:2
**see** 9:24 10:6
11:1 22:25 23:6
28:10,11 29:18
33:21,22 34:1
46:24 50:24
51:6,13,14 52:3
52:11,13,15 53:1
53:13 54:24

**[see - shown]**

| | | | |
|---|---|---|---|
| 55:14 69:25 | **seen** 8:14 50:12 | 110:2 127:23 | **settings** 161:6 |
| 70:2 73:9,16,18 | 108:10,13 109:2 | 128:4 147:21 | **setup** 114:1 |
| 73:22 74:15 | 109:7,7 117:19 | 173:5 198:22 | **seven** 150:17 |
| 75:1,8,15,22,22 | 117:23,24 | 200:10 | **share** 20:16 |
| 79:15 82:20 | 118:14,16 | **separate** 96:6 | 166:11,15,24 |
| 83:14 86:9 | 131:20 132:3 | 132:6 135:22 | 167:1 168:5,5,6 |
| 87:15 88:12 | 150:20 151:4,6 | 137:7 145:1,13 | 174:19 177:3 |
| 93:9,12 94:8 | 167:3 181:6 | 182:14 190:13 | 191:10 |
| 97:17,21 100:24 | 184:25 194:10 | 192:20 199:19 | **shared** 192:2 |
| 103:25 109:22 | **select** 202:3 | **separately** 37:22 | **sharon** 3:19 9:24 |
| 110:3,10 113:15 | **selected** 110:5 | 37:23 38:8,10 | 9:25 |
| 113:15 114:24 | 110:12,17,25 | 97:2 189:10,13 | **short** 124:10 |
| 130:13 131:18 | 113:19 141:18 | 189:15 190:13 | 138:19 143:13 |
| 132:16,17,18,25 | 141:21 201:24 | 196:2,7 202:2 | 144:15 151:18 |
| 133:2,14 134:2 | 203:19 | **serve** 72:24 74:2 | 175:17 |
| 144:19,19 148:3 | **selection** 110:13 | 128:17 | **shortcut** 59:3 |
| 148:25 150:21 | 182:25 | **served** 66:24 | 61:1 153:14 |
| 151:6,9 155:3 | **sell** 108:23,25 | 171:12 | **shorthand** 2:20 |
| 157:8 167:18 | 111:17,21,25 | **serves** 72:6 | **shortly** 31:10 |
| 169:21 173:13 | 112:2,3,3 | **service** 157:21 | 171:25 |
| 173:23 174:1,2,5 | **seller** 103:16,18 | **services** 94:11 | **show** 55:1 59:11 |
| 174:17,18,18,23 | 104:12 108:15 | 120:19,19 | 118:3 130:18 |
| 174:25 175:3,4 | 108:15,19,25 | **session** 48:2,15 | 133:16 147:14 |
| 176:10 177:16 | 109:1,5 111:14 | 48:22,25 51:24 | 149:13 166:22 |
| 179:14,19,25 | 111:17,21,22 | 52:8,23 53:6,21 | 167:8 169:5,5 |
| 180:15,18,21,23 | 112:6,6,16,21 | 54:18 57:12,16 | 180:11 |
| 181:1,9 182:2,23 | 191:3,4,6,7,12 | 61:16 70:13,17 | **showed** 149:5,16 |
| 183:2,22 186:19 | 191:19 | 78:16 146:17 | 186:21 192:20 |
| 188:3,8 195:9 | **sellers** 106:23 | 147:8 | **showing** 216:19 |
| 199:5 202:8 | 107:2,7 108:11 | **sessions** 95:20 | **shown** 39:17 |
| 206:13 209:9 | **sense** 133:20 | 96:6 145:1,13,18 | 42:25 57:9,12,16 |
| 211:4 212:12 | **sent** 20:1,5 34:3 | **set** 12:16 86:22 | 57:21,21,24 58:9 |
| 213:23 214:22 | **sentence** 23:2 | 106:12 108:22 | 58:10,16 59:18 |
| 217:6 | 24:3 78:9 79:4 | 150:25 225:7 | 60:7 65:19 69:4 |
| **seeing** 69:16 | 82:10 97:12 | **setting** 12:11 | 167:22 168:8,12 |
| 70:21,24 117:3 | 100:13 101:12 | 15:12,16 18:6 | 168:17,21 |
| **seeks** 25:16 | 101:13,24 | 207:11 | 181:13 197:17 |
| | 103:21 109:23 | | |

[shows - speculative]

shows  166:10
  167:14 193:5
shut  126:18
sic  8:22
side  51:14,14
  192:3
sign  133:8
  134:24 226:16
  227:5
signature  225:24
  226:21,23,23
  227:9
signed  39:5
  40:15 42:23
  95:15,17 111:9
significant
  147:18 163:22
  216:5
signing  86:25
silently  20:23
  22:20 27:24
  79:8 82:11
  100:17 127:17
  130:7
similar  15:6 16:7
  40:14 56:20
  117:24 149:11
  149:16 154:13
  163:2 188:10,17
  195:13,18 196:4
  196:11,15 205:6
  205:9 208:17,17
similarity
  149:13
similarly  1:7 2:7
  154:10 157:16
  157:25 195:20
  219:1

simple  92:17
simplify  126:17
simply  168:23
single  46:13
  82:15 95:2,6
  114:20 144:5
  145:3 147:2
  200:2
sir  10:18
sit  27:7 58:19
  62:5 84:8
  115:20 138:4
  141:25 187:7
site  36:24 49:8
sites  179:16,17
sitting  13:12
  59:22 86:18
  94:14 141:19
  194:4 202:10,18
  202:21 215:12
situate  51:8
situated  1:7 2:7
situation  61:12
  61:17,25 62:6,8
  62:8,13,17 63:4
  63:8,19 64:1
  65:4 74:8
  107:25 112:13
  165:5 169:2
  191:17 192:8
  208:13,14
situations
  208:17
six  12:15 14:24
  15:1,10,13
sixth  3:20
skill  225:15

skipped  89:7
slightly  113:25
slow  31:20
small  51:16,17
  94:9 164:7,7
software  35:14
  132:24
sold  127:10
solemnly  10:14
solutions  9:2,4
  223:3 226:7
somebody  41:1
  104:12,16 108:4
  108:19 156:21
  157:10 158:16
  179:21
somebody's
  128:22
someone's  95:10
  102:17
soon  212:6
sorry  11:9 21:11
  26:9 37:13
  39:11 61:19
  69:20,24 72:6
  75:5 85:22,22
  88:7,23 89:7
  92:20,20 97:9
  102:11 105:7
  106:3 108:25
  110:24 116:10
  134:6,21 138:20
  148:12 149:25
  149:25 156:16
  162:7 167:11
  170:8 172:18
  179:5,21 181:22
  189:3 202:24

209:8,8 214:7
  220:24
sort  31:8 164:2
  182:4 205:6
sounded  80:11
sounds  27:5
south  4:6
speak  59:5 188:6
  212:25
speaking  13:5
  31:19,23 107:4,5
  150:8,9
speaks  23:15
  213:3,18 217:15
special  87:14
  88:1 94:6 110:7
  157:18,19
specific  18:20
  42:14 48:3
  52:10 149:1
  156:22 165:10
  165:12,14
  189:11 221:17
specifically
  82:12 165:4
  181:3 186:8
  189:1,25 191:9
  200:11
specifics  164:5
  164:24
speculate  186:2
speculation  14:7
  15:25 33:4
  48:18 69:18
  87:8 181:21
speculative
  72:15 74:10

Veritext Legal Solutions
866 299-5127

**[speed - supervision]**

**speed** 87:14 88:1 88:10

**spell** 50:4

**spend** 119:17 123:2,3,4,17 124:22 150:7 151:10,13

**spending** 123:25 124:14

**spends** 122:22 123:24 157:17

**spent** 91:18,20 124:11,21 144:15

**splash** 146:16,16

**spoke** 153:8 209:24

**spoken** 76:1 77:16

**square** 86:7

**ss** 225:1

**standalone** 31:11

**standpoint** 45:6

**stands** 138:14

**start** 11:17,20 27:23 48:23 56:3 66:21 71:13,23 170:23 198:24

**started** 66:4

**starting** 42:19 125:15 160:7 174:15

**starts** 27:21 34:3 51:22 79:4

**state** 9:7,9 10:14 130:6 194:11

224:2 225:1 226:9,12

**stated** 21:9,15 59:20

**statement** 51:23 52:7

**states** 1:1 2:1 8:21 20:25 28:1 46:25 132:14 133:2

**stating** 40:7 101:5

**statistically** 216:4

**statistics** 13:3 15:21

**statute** 207:17

**statutes** 199:4 208:7

**statutory** 17:9 21:5 24:11 55:19 63:1,7 64:21,25 198:13 200:13 201:16 201:19 202:8,11 202:19,24 206:24 207:10 207:13 218:1 220:21

**stay** 66:25

**stem** 36:23

**stenographically** 225:11

**step** 80:24 182:13

**steps** 22:23 23:10,14 24:1,21

**stipulate** 78:2

**stipulation** 226:20

**stop** 31:19,23 67:16 128:13 210:16,20

**straight** 13:25 14:20 20:5

**street** 3:6,13,20 4:6

**strike** 56:14 74:11 75:12 76:17 106:4

**strombom** 7:3 147:10 163:25 165:1 167:5 176:4 184:11 186:4,4 187:18 187:18 188:20 192:4,4,4,8 216:7

**strombom's** 20:2 164:22 176:2,21 177:1,6 178:17 178:19 187:19 198:7,11

**structure** 165:3

**struggling** 62:9

**studies** 108:10 109:8,24 110:4 133:23 155:4 157:9 158:1,8

**study** 48:5 74:21 75:9,10 85:19 86:8,13,25 88:8 88:8 93:15 94:16 105:9,23 106:11,16

107:16 108:13 111:9 113:4,18 114:11,22 144:22 171:11 171:13,17 172:4 172:5,12 173:16 181:15 194:11 211:19

**stuff** 123:4

**subject** 96:2 110:21 111:4 115:9 120:21 139:22 141:22 185:11 186:12

**subscribed** 225:20

**subset** 122:12 164:7 178:4

**successful** 24:5,7

**suffered** 206:25 207:6,15

**suggest** 83:19 84:10 103:3 146:22 149:23

**suite** 3:6 4:12

**sullivan** 4:4,20

**summarize** 85:10 103:10,11

**summarizing** 85:9

**summary** 6:19 82:4 84:11,12 86:4 125:13 131:3 133:18

**summer** 4:18,21 9:20 10:7

**supervision** 225:12

Veritext Legal Solutions
866 299-5127

**[supplementary - targeted]**

supplementary
  136:13 137:17
supplying
  201:17
support  109:3
supporting
  177:17
supports  165:21
sure  11:16 20:19
  22:9 32:18
  34:22 38:16
  41:15,19 42:1
  51:12 57:19
  58:18 59:14,15
  64:19 84:12
  85:2 86:16
  88:18 90:21
  91:23 95:7 96:9
  97:1,1 107:12
  115:2 117:4,22
  118:22 120:4
  123:6 141:8
  144:11 152:2
  158:9,9 165:24
  171:23 174:13
  177:8 199:23
  201:24 213:11
  217:10 218:2
  219:10
surrounding
  178:7
survey  54:3
  84:13 211:17,23
  211:24 212:14
  214:1 215:1
surveys  116:4,6
  119:2 133:13,23
  136:13 137:17

surveysavvy
  6:20 131:5
suspect  47:12,17
  47:22
suspected  55:12
svk  1:9 2:9 8:23
swear  10:4,12
sweepstakes
  135:8
swipe  115:1
switch  50:18
switching
  138:18
synonymous
  29:21
system  155:19
  155:19 193:18
systems  157:18
szruz  3:23

**t**

t  54:21 228:3,3
tab  49:25 116:10
  116:20 146:16
  179:3,9 184:5
  188:13 215:21
table  51:1,7,11
  51:19,22,23
  54:18 60:10
  93:9 182:7,14,25
  183:3,17 187:24
  194:25
tables  51:14
tablet  89:1,2
  214:10 220:15
  220:18
tablets  214:12

tag  49:25
tagging  36:24
tagline  131:19
tailored  128:18
take  8:16 44:12
  63:14 66:2,9,11
  66:14,19 67:3,12
  78:3 99:13,19,20
  103:16 106:24
  115:3 124:24
  125:4 140:5
  151:7,24 152:1
  153:12,19,25
  154:14,14,17
  164:9 169:22,22
  175:2 178:11,13
  182:13 196:9
  197:9,12,15,21
  205:16 207:4
  211:3,5 217:1
taken  2:16 8:19
  21:20 29:14
  45:9 71:3,6,10
  72:14,18 74:20
  112:23 168:1,2
  188:12,22
  195:11,16 196:3
  207:1 225:7
takes  115:4
  160:18
talk  82:1,3 83:18
  93:10 105:6,19
  105:22 114:16
  151:8 162:16
talked  47:3
  54:11 55:12
  75:7,25 106:8,8
  108:7 116:6

  123:11,14 135:8
  139:10 143:9
  147:11 157:8
  168:17 190:2
  200:8 221:5
talking  22:15
  42:11 44:19
  45:23 51:10
  58:25 68:18
  73:12,14 81:3,5
  83:11 86:17
  90:2 95:21
  96:19 97:13
  100:4 103:19,22
  104:2 109:18
  122:18 124:4,10
  128:5,9,21,22
  129:4,19 133:9
  133:10 137:21
  137:22,23
  144:21 149:19
  156:25 157:3
  162:19,19 163:7
  163:8,10 164:6
  164:25 166:1,2,3
  167:9 168:22,25
  169:1,8,9,10,16
  170:22 172:6
  175:5 182:22
  184:9 187:3
  189:17,18 191:2
  192:16 205:25
talks  134:23
  147:22 186:16
tampa  3:14
tap  114:25
targeted  56:5,17
  126:18 129:5

[team - thought]

| | | | |
|---|---|---|---|
| **team** 126:9 | 78:17 94:25 | **things** 48:16 | 146:8 147:6,6 |
| 211:4 | 100:9 106:21 | 49:1 54:19 | 149:6 151:13 |
| **tease** 15:7 | 110:23,24 | 84:13 94:7 | 154:20 155:14 |
| **teased** 182:6 | 144:24 198:6 | 121:7,10,15 | 157:14 159:3,9 |
| **technical** 28:22 | 221:14,15 | 122:23 123:21 | 159:14 165:24 |
| 28:23 29:8 30:9 | **testify** 145:5 | 124:7 151:3 | 166:18 175:12 |
| 34:13,19 35:7 | **testifying** 94:20 | 189:5 192:12 | 175:12 179:20 |
| 36:13 89:19 | 101:3 | 193:14,15 | 184:9 185:25 |
| 90:5 114:19 | **testimony** 24:24 | 211:17 213:25 | 187:5 194:4 |
| **technically** 29:8 | 46:7,17 59:24 | 215:19,22 | 195:13 202:10 |
| 87:19 | 68:24 90:9 | **think** 11:21 | 202:25 204:3 |
| **technology** 8:25 | 103:8 111:18 | 12:21 16:9 | 206:3,3,4 211:5 |
| 105:9 149:21,22 | 157:15 185:22 | 18:10 25:20 | 221:19 |
| 149:22 | 221:4,9 223:1 | 27:16,16 28:22 | **thinking** 41:17 |
| **telephone** 115:5 | 225:6,9,14 | 32:3 33:5 38:2,2 | 102:25 103:7 |
| **tell** 23:13 31:22 | **testing** 107:7 | 38:5,7,11 41:6 | **thinks** 178:23 |
| 84:11,25 114:16 | 108:10 | 41:21 42:5 | **third** 6:6 17:8 |
| 117:7 127:24 | **teuta** 4:11 9:16 | 44:11,25 45:24 | 25:12 31:2 |
| 151:12 156:13 | 9:18 171:21 | 45:24,25 46:5,6 | 33:15 36:25 |
| 165:20 216:4 | 176:12 | 46:18 47:13,14 | 37:2,9 40:17 |
| **tells** 121:11,12 | **teutafani** 4:15 | 48:6,12 49:3,5 | 70:15,15 72:11 |
| 132:5,8 | **texas** 126:24 | 53:25 54:5,16 | 73:2,4,5 100:19 |
| **ten** 3:20 92:3,9 | **text** 172:4 | 58:19,22 62:5,8 | 133:2 158:18 |
| 92:18,20,22 | 179:13 182:7 | 63:3,4,19 64:9 | 159:5,7,8,11 |
| 93:25 94:6 | **thank** 9:23 10:3 | 64:14 67:4 | 160:1,3,9,10,13 |
| 152:1 157:17 | 10:10,13,18,20 | 76:23 77:4 | 160:14,19,22 |
| 158:15 211:5,6 | 20:9 67:25 | 80:11,11 81:3,3 | 162:21 163:4 |
| **term** 23:4 28:22 | 80:18 81:12,12 | 81:21 82:1,3 | 173:12 174:3 |
| 29:2 127:22 | 85:11 89:8 | 84:8,20 92:14 | 179:13 180:6 |
| 170:15,16 | 99:21 125:5 | 94:14 95:8,11 | 184:4 190:7 |
| **terms** 6:9,23 | 140:18 171:10 | 96:19 97:2 | 195:5 203:22 |
| 92:17 116:8,11 | 176:18 203:16 | 98:14 99:14 | 204:1 206:1 |
| 116:25 117:25 | 217:10 | 102:15,15,24 | 215:20 |
| 119:6 120:6 | **thanks** 128:2 | 103:10,10,11,14 | **thought** 16:4 |
| 128:19 129:6 | **thereof** 225:19 | 103:15 108:6,18 | 43:23 81:17 |
| 131:10 | **thing** 13:9 20:8 | 113:10 123:15 | 92:13,14,21 |
| **testified** 30:19 | 41:12 157:14 | 132:18 140:2 | 96:24,24 105:15 |
| 68:25 69:3 | 185:5,18 208:9 | 144:16 145:20 | 119:7,7 169:12 |

Veritext Legal Solutions
866 299-5127

[thought - trebicka]

| | | | |
|---|---|---|---|
| 185:19 218:2 | **times** 12:22 | **touched** 139:8 | 200:1,5 |
| 221:11 222:17 | 15:20 41:2,2,17 | **track** 16:4 73:3 | **transmitting** |
| **thousand** 113:17 | 170:9 | 79:14 82:18 | 87:23 90:14 |
| **three** 37:17 | **tissues** 20:7 | 97:19 100:22 | 112:18 |
| 41:22 58:19 | **title** 50:22 51:2 | 101:1,6,7,16,20 | **transpired** 44:18 |
| 59:10,20,21 60:3 | 118:5 | 101:20 102:4 | **treat** 157:22 |
| 84:7,16 85:14 | **titled** 206:4,5 | 120:13,25 | **treated** 144:13 |
| 89:9 103:1,4 | **today** 8:9 10:9 | 179:17 | 156:3,4 |
| 126:24 145:23 | 11:1,2 59:22 | **tracked** 93:22 | **treating** 94:4 |
| 182:14 192:12 | 83:11 86:18 | **tracking** 16:23 | **treatment** |
| **tie** 18:20 | 90:23 91:7 | 22:24 23:11,14 | 157:19 |
| **tied** 21:2 | 141:19 143:9 | 24:1,22 65:6,8 | **treats** 94:10,11 |
| **time** 2:18,19 8:9 | 202:18,21 | 188:7 195:4,7,24 | 157:15,25 |
| 8:9 9:7 11:11 | 215:12 | **tracks** 130:9 | **trebicka** 4:5 5:9 |
| 14:23 32:17,21 | **today's** 223:1 | **traffic** 33:11,11 | 9:11,11,16 10:20 |
| 35:25 38:5 | **toggle** 179:25 | 36:22,23 37:1,8 | 10:23 11:14 |
| 55:11 64:14 | 180:6 181:9 | 44:16 149:11,12 | 12:11 13:5,11,22 |
| 66:1,10,22 67:4 | **toggled** 184:4 | 149:14,16,25,25 | 14:10,15 16:5,17 |
| 82:1 91:18,20 | **toggles** 190:16 | 151:9 163:13 | 16:25 18:1 19:2 |
| 99:12 113:5 | 191:9 | 166:1,4 168:3,5 | 21:13 22:2 |
| 119:12,14,15,17 | **told** 18:18 | 168:6 173:12 | 23:19 24:15 |
| 119:20 120:1 | 116:17 165:20 | 174:3 184:3 | 25:1 26:10,18,23 |
| 122:22 123:2,3,4 | 200:14 | 188:7 193:15,17 | 27:18 28:15,19 |
| 123:17,24,25 | **tools** 56:4,8,16 | 195:4,4,5,5,8 | 29:10 31:6,18 |
| 124:11,14,22,22 | 57:3 | **transcribed** 78:1 | 32:3,9,18 33:14 |
| 124:25 133:22 | **top** 131:19,22 | 225:12 | 34:24 36:17 |
| 133:22 143:13 | 133:19,20 150:5 | **transcript** 21:19 | 37:10,15 38:16 |
| 143:13 144:15 | 153:13,16 | 78:1 226:6,8,10 | 38:23 39:16 |
| 144:15 149:10 | 164:10 198:24 | 226:13,13,21 | 43:21 44:10 |
| 149:18 150:7,16 | 200:5 205:15 | 227:2,2 | 45:2,20 47:9 |
| 151:10,13,18 | **topic** 74:22 | **translated** 34:16 | 48:21 49:21,24 |
| 164:18 175:14 | 217:17 | **translation** | 50:7 53:4,9 54:1 |
| 175:18 177:25 | **topics** 138:18 | 34:19 | 54:17 56:2,9,14 |
| 190:4 210:25 | **total** 65:9,12,12 | **transmit** 89:22 | 61:24 64:17,20 |
| 212:1,13 223:4 | 92:6 154:1,1 | **transmits** 89:24 | 65:10,15,23 66:6 |
| 225:7,8,10 | 155:7 170:7 | **transmitted** 29:6 | 66:12 67:5,9,15 |
| 226:10,18,24 | 182:8 209:10,14 | 87:20 90:22,24 | 67:22,25 68:8 |
| 227:7 | 223:2 | 91:3 199:20 | 69:10,15,22 70:4 |

Veritext Legal Solutions
866 299-5127

**[trebicka - umpbi]**

71:21 73:20
74:11,23 75:10
75:24 76:9,13,25
77:14,24 78:3
81:23 84:22,25
87:12 90:23
92:1,16 95:1
96:4,11 98:17
99:16 100:3
102:1,23 105:11
108:8 109:16
110:23 111:7
112:5 113:6,13
115:13 116:7,14
116:17,19,24
117:2,4,19 118:7
118:10,14
121:17 122:4,9
125:1,3,11 128:1
128:7 131:15
139:4 140:1,5,11
141:19 142:6
145:11 146:13
147:1 150:15,19
152:8 153:6
154:3 156:6
158:23 159:10
160:2 162:13
166:9 171:21
172:1,17,20
173:1 175:16
176:1,10,12,15
179:6 181:23
184:21 185:8,19
186:7,20 187:24
190:15,23 191:2
191:15,18
194:22 197:3,21

198:6 199:15
200:22 203:10
203:20 204:24
205:1 207:11
208:2,19 209:7
210:20,24 211:2
212:21 213:2,17
214:2,18 215:24
216:13 217:5,21
218:6,13,20,25
219:5,9,17
221:15 222:20
222:22,24
**trends** 134:1
**tried** 60:20 91:9
**trier** 201:24
202:2
**tries** 164:3
**true** 52:14,16
54:21 55:1
93:14,15 103:15
120:17 137:15
222:22 224:3
225:13
**trujillo** 1:6 2:6
**truth** 10:15,16
10:16
**try** 38:7
**trying** 18:20
20:10 39:21
48:12 61:11
64:10 80:5
86:12 90:10
91:8 99:6 104:8
104:11,12
107:11,18 108:3
145:20 157:9,10
158:1,2,25 164:9

187:5 193:19
205:22
**turn** 19:20 20:13
20:21 25:8
27:18 33:14
50:7 57:1 120:9
120:18,25
127:14 130:1
132:22 133:18
147:20 173:21
179:1 180:5
181:10,23
194:24 198:17
212:23 219:20
**turned** 180:2
**turning** 120:3
172:14 173:1
194:9,22 198:19
220:25
**tv** 115:2 127:6
129:9
**twice** 144:1
**two** 11:15 13:17
13:19 22:6
31:25 51:13
91:13 92:4,6,8
92:23 94:4,13,14
95:3,6,19 96:5
96:12 103:3
113:24 114:5,6
128:25 138:7
139:5 141:6,14
142:5,14 144:1,2
145:13,18,23
151:2 152:17
157:20 177:2
195:3 204:6
217:25

**type** 29:24 30:4
30:4 64:2
114:25 143:14
184:11 185:5,18
185:24 186:14
190:3,4 192:20
196:16 222:14
**types** 17:3 22:12
29:13 30:21,24
31:12 32:10,24
33:9,9 37:17
114:21 121:18
123:2 128:5,9,21
128:25 163:19
181:6 189:5,8,22
195:25

| u |
| --- |

**u** 146:14,14
**u.s** 187:25 188:5
**u.s.** 6:18 131:2
133:17 148:1
167:14 183:3,8
183:10 187:25
194:25
**uh** 51:20 52:4
85:8 106:17
**ultimately** 33:10
129:2 165:6
207:19 214:11
**uma** 146:3,7,9,9
146:11,14,23
**umbpis** 209:25
**ump** 142:20
**umpbi** 138:12,14
139:10,17,20
141:18,20
142:20 143:21

Page 47

**[umpbi - unknowingly]**

143:23,25 144:1
144:4,8,12
146:19 147:3,9
152:17,22 153:2
153:5,10,14,20
153:21 154:1,4,6
154:7,9 156:4
157:4 204:14,16
208:3,11,13,14
208:15,20 209:1
209:11,14,20,22
210:3,5,5,7,8,9
210:12 221:17
**unable** 169:5,5
**uncomfortable**
99:22
**unconvincing**
164:1
**underneath**
182:7 187:24
**understand** 17:4
17:18 22:22
28:15,19 29:21
30:13 31:21
34:7 35:2 45:14
45:20,25 46:1
49:17 75:18
80:10 88:14
96:4 98:1,4,18
98:23,25 102:1
102:14,19
104:19 105:9,18
120:12 133:25
136:2 146:8
152:10 165:1
170:13 172:8
180:5 184:7
185:14 198:23

199:3 200:11
204:22 217:18
**understanding**
17:19 18:11,21
19:6 25:14,17,21
26:2,7 29:2,5,23
30:3 31:12
32:10,24 33:12
39:15 44:4 45:6
49:3,18 50:23
54:2 56:22 57:3
59:14 61:14
65:4 70:9,11,14
71:7,18 72:5,8
72:20 73:5 74:3
76:4 80:4 81:4
87:20 89:17,20
90:13,17 91:2
94:19 95:19
105:2,12,17
106:2,5 112:5,9
113:7,16,16,16
115:12 119:10
119:21 124:18
126:13,16
129:18 130:10
136:14,17
137:18 140:9,11
140:19 141:16
144:25 145:17
145:22 146:1,6
147:12 149:17
152:23 153:17
155:15 158:12
159:2,6,15,23
163:4,17,18
165:25 168:14
170:18 181:12

184:17 187:16
188:18 189:6
190:18 199:9,13
200:18 201:12
201:13 205:10
207:2 217:22
221:19
**understands**
196:25
**understood** 11:6
22:2 52:21 53:5
53:20 77:23
80:1,20 118:23
153:8 160:15
196:24
**undertaken**
74:24
**unfortunately**
135:1 212:5
**unilaterally**
67:10
**unique** 40:22
43:9,19 63:24
81:9 113:8
138:15 140:25
143:17 145:21
146:23 148:1
200:7 203:6,13
203:13,18,23
204:4,7,8,18
205:2,4,5,10,13
205:18,24 206:1
206:6 207:22
218:11,17 222:6
222:11
**unit** 8:18
**united** 1:1 2:1
8:21

**universe** 124:5
**unjust** 17:4,11
17:17,19 18:8,12
18:15,22,25 19:3
21:4 22:4,6,7,15
23:22 24:10
34:16 37:4,11,16
39:24 44:1,20
55:5,22 58:3,21
60:2,21,22 63:16
63:18,21 96:22
97:2,4 151:23
152:10,18,21
153:1,11,13,18
153:19,22
154:11,15,18
155:9 157:1
160:11,12,13,15
161:9,10,15,19
161:23 162:1,17
167:1,21 168:7
169:3,4 170:21
171:7,12 172:11
182:1,7,8,22
183:25 187:13
191:21,24 202:9
202:13 204:15
**unjustly** 45:7
57:10,14 58:16
59:11 61:6 62:4
62:6,11 63:23
162:4
**unknowing**
104:4 191:7
**unknowingly**
84:2 103:6
112:6,19 215:8,9

Veritext Legal Solutions
866 299-5127

**[unmute - vague]**

**unmute** 117:7
**unnecessarily**
59:5
**unprecedented**
177:21,21 178:1
178:4,10
**unwilling** 106:23
107:6 108:11,15
108:18 109:1
111:22 112:6,16
112:21 191:3
**unwillingly** 84:2
95:11 107:19
**upper** 193:1,4,5
193:12,19,20,23
194:2,10,12,15
194:21
**ups** 181:6 187:12
188:23 189:8,11
189:22 195:18
195:21,25 196:4
196:11,16 197:4
197:16
**upvoice** 6:25
85:24 131:13
136:15 137:6,7
137:22,23
**urquhart** 4:4,20
**usage** 130:10
148:5,14 149:3,4
149:5,12,12
157:12
**use** 11:7,8,13,24
12:11,13 13:9,14
14:22 15:2 16:6
16:17 20:17
38:14 40:4
51:25 55:4 56:4

57:25 58:6,11
64:8 82:14,25
83:3,5,7,8 84:16
91:12 93:11,12
94:11 99:21
101:14 105:9,17
120:13,15 124:3
138:19 142:22
142:25 143:19
143:21,23 144:2
144:17 146:9
150:1 153:19,21
155:17 157:3,19
158:8,10,13,14
161:2 174:9,10
179:16 180:20
185:7 186:2,8
196:20 203:1
208:11,13 215:5
215:15 221:12
**useful** 58:12
69:11,14
**user** 25:23 26:25
27:2,9,11,12
30:15 33:25
35:14,17,18,20
39:3,8,16,20
40:14 42:17,23
45:10,13 46:3,4
46:13 47:7 49:4
49:10 51:5
52:18 56:21
57:1,7,15,23
58:16,25 60:25
62:23,25 69:11
72:17 85:23
91:10,11,12,12
91:13,13,14,14

91:16,21,21 92:1
92:3,3,4,6,8,9,18
92:22,23 93:3,19
93:19,20 94:1,5
94:6,8,9 95:3,6
102:8 103:5
106:18 109:11
115:2 121:11,13
122:16,17,19
123:24,25
124:14 132:6,9
135:21,25
136:12,19 137:7
144:13,14 145:2
145:2 146:15
147:1,4,7 157:16
158:3,11 166:10
168:23 169:3,3,5
170:19 180:5,7
190:16,18 191:3
191:9,12,18
214:20 219:23
220:2,4,9,11,15
220:15
**user's** 34:4 35:1
35:24,25 62:11
95:9,10,13 98:20
99:2,2 136:7
**users** 25:19,25
26:5,8,16 45:8
45:15,24 46:1,10
47:9,25 48:4,6
48:14,16,22,24
52:21 53:5,20
54:23 55:2,21
56:2,4 57:20
58:8,10 60:7
61:15 64:2,8

70:17,18 71:2,12
71:15,22,25 72:2
72:21,21 73:9
74:21 75:8,22
81:15 83:25
84:17 85:13
86:15 89:23
93:7 94:4 102:4
106:14,15,23
107:8 108:11
109:8 120:25
121:3,6,8,20
123:16 124:17
124:19,19
127:20 132:8
133:9 134:15
135:25 137:14
143:11 155:24
156:17 157:15
157:23,25
163:19 167:22
180:18 181:14
181:14,18 184:3
185:2 195:12,17
196:3,10 197:9
197:15 202:5
221:6
**uses** 12:13 105:8
138:11
**usually** 11:7,8
11:13

**v**

**vague** 11:9,11
12:7 21:16
36:19 37:12
44:24 56:6
77:11 81:16

Veritext Legal Solutions
866 299-5127

**[vague - way]**

107:10 113:5
121:14,25
158:21 184:16
189:20 209:5
214:2 215:24
218:6,13
**valuable**  58:14
84:3 93:24 94:1
95:12,12 102:8
119:15 121:12
121:24 122:3,5
122:13,14,14,15
122:20,21,22,24
123:1,4,6,9,23
124:12,13
143:12,14,15
155:2,18
**value**  60:6,19
73:2 83:12
86:12 94:21,23
95:2,5,8,8 107:8
108:11 109:8,12
120:24 121:2,18
121:19 122:19
123:12 125:12
143:15,18 154:1
154:6,7,15
155:20 156:7,17
156:18
**valuing**  104:3
**variability**  45:15
45:21 56:12
**variables**  189:7
190:8,9 195:24
196:19,24
**various**  21:2
22:23 23:10
24:1,21 56:16

182:5 188:23
189:11
**vast**  40:4 61:14
61:15,15
**vein**  39:1
**veritext**  9:1,3
20:16 53:10
223:3 226:7,9,11
**versus**  8:20 91:4
103:6 108:15
191:3,6
**video**  8:15,18
**videographer**
4:24 8:8 9:2
10:3 38:18,21
68:3,6 99:23
100:1 125:6,9
138:24 139:2
152:3,6 175:21
175:24 198:1,4
210:19,21 211:8
219:7,11,14
222:25
**videotaped**  1:15
2:15
**view**  24:15,17
63:1 77:16
94:22 95:2,6,20
109:11 124:11
130:11 136:21
143:23
**viola**  4:5 9:11
21:12,17 28:18
38:13 50:4
66:18 113:3
124:24 127:24
158:22

**violation**  199:4,7
199:10,16,18,19
199:20,25 200:1
200:2,24 201:8,9
201:18,20 203:4
203:11,11,21
206:16,20
**violations**
199:14
**violatrebicka**
4:9
**virtual**  8:25
**virtually**  8:12
**visit**  128:19
**visiting**  146:18
**visits**  39:6 40:15
**visual**  182:4
**voluntarily**
110:6
**vpn**  215:20
**vpns**  161:2
**vs**  1:9 2:9 226:4
228:1

---
**w**
---

**wacker**  4:12
**wait**  31:16 82:2
109:10 213:12
**waiting**  172:20
**waived**  226:23
226:23
**waiving**  226:20
**walks**  108:19
**want**  13:18,20
13:22,25 14:1,1
14:3,3,3,4,15,18
14:19,20,20
16:22 21:23

32:6 41:12,19
42:1,5 43:7
66:14 70:19
73:16,18,22
74:15 75:1,8,15
75:19,22,22
99:14 102:1
105:18 106:19
106:20 108:8,20
124:18 134:13
150:13,14
151:10,13 173:7
186:1 213:5
218:2
**wanted**  22:9
96:25 107:6
169:12 172:23
**wants**  124:17
**water**  178:3
**watkins**  7:4
176:7 180:16
186:23 216:21
**way**  22:5 35:5
36:13 37:24
38:3,5 40:4,10
55:13 60:21
62:20 64:7 71:7
71:8 72:5,8 73:1
77:8 81:18
90:13,15,19,22
93:6 94:10 95:9
101:12,13,24
107:3,14 108:18
114:20 123:7
141:1 142:2,8,11
143:17,18
153:14 157:1,22
158:17 164:5,24

**[way - works]**

| | | | |
|---|---|---|---|
| 166:7,22 169:17 | **wednesday** 1:18 | **witness** 5:6,12 | 155:14 159:1,20 |
| 174:14 182:17 | 2:19 5:4 8:1 | 8:14 10:5,17 | 162:11,23 |
| 191:1,22,24 | **weekly** 51:5 | 11:13 12:8 13:3 | 164:11,14 |
| 201:18 203:25 | 52:17,20 53:5,20 | 13:9,17 14:8,14 | 165:24 171:20 |
| 204:4 206:3,5 | 54:22,22 | 16:3,13,21 17:23 | 176:14 179:5 |
| 207:10,19 209:3 | **weird** 67:4 | 18:19 21:22 | 184:17 185:4,13 |
| 225:18 | **went** 16:22 67:1 | 23:17 24:13,25 | 185:23 186:13 |
| **ways** 22:6 37:6 | 100:4 112:10,12 | 26:7,15 27:16 | 189:21 190:25 |
| 98:2 141:6,14,15 | 134:6 149:9,14 | 29:5 31:22 | 191:16 194:19 |
| 141:25 142:5 | 152:11 219:22 | 32:16 33:5 | 196:15 199:9 |
| 218:10 221:5 | **whereof** 225:20 | 34:13 36:7,12,20 | 200:18 203:17 |
| **we've** 38:13 59:3 | **wi** 87:14 88:1,20 | 37:13 39:14 | 207:8,18 208:8 |
| 62:19 95:20 | 89:12 90:25 | 43:7 44:4,25 | 209:6 211:1 |
| 108:7 117:5 | 91:4 | 45:18 46:18 | 213:1,20 214:3 |
| 118:3 123:14,14 | **wide** 36:24 98:10 | 48:20 50:6 53:1 | 214:20 215:25 |
| 130:18 138:1 | **william** 1:5 2:5 | 53:25 54:10 | 216:14 217:6,16 |
| 143:9 144:21 | **willing** 93:7 | 55:25 56:7 | 217:22 218:8,15 |
| 176:1 180:11 | 103:15,16,17,18 | 61:11,20 64:25 | 218:21 219:1,4 |
| 200:8 | 104:12,16 107:2 | 65:12,21,25 | 221:11 225:8,9 |
| **web** 35:24 49:13 | 108:15,24,25 | 66:16,18,22,25 | 225:20 226:13 |
| 127:5 128:19 | 109:4,5 111:14 | 69:7,13,25 71:18 | 226:16 227:2,5 |
| 129:7 179:17 | 111:14,16,17,20 | 73:12,24 74:17 | 228:24 |
| 181:7 | 111:21 133:10 | 75:3,17 76:12,23 | **wondering** |
| **website** 16:22 | 191:3,3,12 | 77:12 81:17 | 80:19 199:17 |
| 20:16,18 34:4 | 216:15,17 | 87:9 90:10 | **word** 48:10 |
| 35:17 40:17 | **willingly** 84:5 | 92:13 94:25 | 79:17 80:19 |
| 44:7,7,8,9 117:9 | 101:19 104:18 | 95:23 96:8 | 182:17 183:2 |
| 117:10,15 | 112:17,17 133:8 | 98:14 99:8,11 | **words** 21:6 |
| 118:17 122:22 | 136:17,21,22 | 101:11 102:11 | 153:12 |
| 124:1,11,15 | 137:2 | 102:14 105:6 | **work** 18:11 67:1 |
| 180:15 186:22 | **willingness** | 107:11 109:15 | 115:5 158:17 |
| 188:23 190:19 | 125:22 127:20 | 111:6 112:2 | 159:8 |
| 216:20 | **win** 134:14 | 113:7 116:18 | **worked** 18:3 |
| **websites** 14:1,2 | 135:5,6,10,11 | 118:13 121:15 | **working** 14:25 |
| 16:14,19 43:19 | **window** 179:22 | 122:1,7 128:3 | 34:21 |
| 51:25 123:2 | **winning** 134:19 | 140:2,2,9 141:14 | **works** 6:21 93:6 |
| 187:2 | **withdrawing** | 141:24 145:5 | 131:5 169:18 |
| | 31:17 | 146:21 153:4,25 | |

Veritext Legal Solutions
866 299-5127

**[world - zoom]**

| | |
|---|---|
| **world**  149:20,21 | 163:9 174:18 |
| 192:5 | 177:8,8,23,23 |
| **world's**  130:8 | **years**  11:16 |
| **worries**  179:23 | 12:18,20 13:6 |
| **worth**  108:16,16 | 14:23 15:17 |
| 108:17 | 16:11 173:18 |
| **written**  78:4 | 174:5,9,11 197:6 |
| 101:25 | 197:6 |
| **wrong**  54:12,13 | **yep**  79:6 |
| 183:2 | **ygr**  1:9 2:9 8:23 |
| **wrongdoing** | **youtube**  183:8 |
| 161:16,24 | 187:25 |
| **wrongful**  36:16 | **z** |
| 167:15 183:4 | ████████ |
| 188:1 | **zoom**  1:16 2:16 |
| **wrongfully**  45:8 | |
| 45:9 159:24 | |
| **wrongly**  80:15 | |
| **x** | |
| **x**  5:1 227:1 | |
| **y** | |
| **yanchunis**  3:12 | |
| 9:14 | |
| **yeah**  29:20 36:10 | |
| 51:15 59:6,6 | |
| 77:22 84:22 | |
| 85:22 91:23 | |
| 97:10 99:10,16 | |
| 101:11 105:16 | |
| 106:1 125:3 | |
| 135:9,9 167:21 | |
| 168:14 171:10 | |
| 173:9 182:24 | |
| 206:8 208:8 | |
| 210:20 222:22 | |
| **year**  85:18,18 | |
| 135:5 149:22 | |

Page 52

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.