2022 WL 3018061
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

Ursula FREITAS, Plaintiff,
v.
CRICKET WIRELESS, LLC, Defendant.

No. C 19-07270 WHA
|
Signed July 29, 2022

**Attorneys and Law Firms**

Daniel Timothy LeBel, Consumer Law Practice of Daniel T. LeBel, San Francisco, CA, Jennifer Dale Bennett, Neil Kumar Sawhney, Gupta Wessler PLLC, San Francisco, CA, Andrew R. Taylor, Pro Hac Vice, Bryce B. Bell, Pro Hac Vice, Mark W. Schmitz, Pro Hac Vice, Bell Law, LLC, Kansas City, MO, Ashley Scott Waddell, Pro Hac Vice, Waddell Law Firm LLC, Kansas City, MO, Eric Barton, Pro Hac Vice, Melody Renee Dickson, Pro Hac Vice, Tyler William Hudson, Pro Hac Vice, Austin P. Brane, Wagstaff & Cartmell LLP, Kansas City, MO, Jonathan Ellis Taylor, Matthew W. H. Wessler, Gupta Wessler PLLC, Washington, DC, for Plaintiff.

Archis Ashok Parasharami, Daniel Edward Jones, Pro Hac Vice, Kevin S. Ranlett, Pro Hac Vice, Mayer Brown LLP, Washington, DC, Christopher A. Cole, Pro Hac Vice, Crowell Moring LLP, Washington, DC, David Lloyd Anderson, Jennifer H. Lee, Matthew Patrick Henry, Nicole Marie Ryan, Sheila Anil Gogate Armbrust, Sidley Austin LLP, San Francisco, CA, Kristin J. Madigan, Crowell & Moring LLP, San Francisco, CA, David Ryan Carpenter, Sidley Austin LLP, Los Angeles, CA, John Nadolenco, Mayer Brown LLP, Los Angeles, CA, Jarman Douglas Russell, Pro Hac Vice, Jason Kirschner, Pro Hac Vice, Matthew David Ingber, Pro Hac Vice, Richard Allen Spehr, Pro Hac Vice, Mayer Brown LLP, New York, NY, for Defendant.

### ORDER RE DEFENDANT'S MOTION TO DECERTIFY AND PLAINTIFF'S MOTION TO AMEND CLASS DEFINITION

WILLIAM ALSUP, United States District Judge

### INTRODUCTION

**\*1** In this RICO class action, defendant moves to decertify the class. Plaintiff moves to amend the class definition. For the reasons that follow, defendant's motion is **GRANTED**. Plaintiff's motion is **DENIED AS MOOT**.

### STATEMENT

Plaintiff Ursula Freitas claims that defendant, Cricket Wireless, LLC, advertised 4G wireless service and sold 4G-capable phones in markets where defendant did not actually provide 4G coverage. Thus, plaintiff alleges harm on behalf of a class of similarly situated Cricket customers who paid for 4G phones and coverage but received only 3G coverage, which was slower and cheaper than 4G coverage.

A previous order in this action certified the following FRCP 23(b)(3) class:

> All persons in the United States with a customer address in a geographic market with no Cricket 4G/LTE network coverage who between November 1, 2012, and September 30, 2014, purchased from Cricket a 4G/LTE monthly plan for service on LegacyCricket's network, or later activated a 4G/LTE plan with the device for service on LegacyCricket's network.

(Dkt. No. 298 at 19). Thereafter, defendant filed a motion to compel arbitration, arguing certain class members were subject to arbitration due to contracts included inside defendant's phone boxes. Among other reasons, defendant argued certain class members were subject to arbitration because:

- until May 18, 2014, defendant placed a "Quick Start Guide" inside phone boxes, which included an arbitration provision.

Because the parties had yet to disseminate class notice, an order on the motion to compel arbitration merely excluded certain class members from the class definition rather than order them to arbitrate. That order excluded only the following persons:

> - all class members who made a purchase prior to May 18, 2014, and who, at the time of purchase, resided in Delaware, Florida, Illinois, Indiana, Louisiana, Maine, Maryland, New York, Rhode Island, South Dakota, Tennessee, Washington, West Virginia, and Wisconsin, except for those who opted out of arbitration.

(Dkt. No. 370 at 15). Both parties have appealed that order. Briefing on appeal will be complete by October 21, 2022.[1]

[1] Defendant later filed another motion to compel arbitration. An order on that motion excluded more persons from the class. This order does not address the exclusions provided in that prior order because those exclusions do not affect plaintiff (Dkt. No. 417 at 17).

The class definition is currently as follows:

> All persons in the United States with a customer address in a geographic market with no Cricket 4G/LTE network coverage who purchased from Cricket a 4G/LTE monthly plan for service on LegacyCricket's network, or later activated a 4G/LTE plan with the device for service on LegacyCricket's network: (1) between November 1, 2012, and May 17, 2014, having a customer address in the state of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Georgia, Hawaii, Idaho, Iowa, Kansas, Kentucky, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Texas, Utah, Vermont, Virginia, or Wyoming; or (2) between May 18, 2014, and September 30, 2014; excluding the 15,529 persons within either of groups (1) and (2) above who, during or after May 2017, accepted the Terms and Conditions via electronic signature at one of defendant's stores; and excluding the 438 persons within either of groups (1) and (2) above who accepted the Terms and Conditions on defendant's website.

**\*2** (Dkt. No. 417 at 17).

As a result, the sole plaintiff and class representative, Ursula Freitas, now falls outside the class definition. Specifically, plaintiff had a customer address in Washington and made a purchase on October 22, 2013.

Defendant moves to decertify on two grounds: (1) plaintiff's damages model does not comport with either of her two theories of class-wide liability; and (2) plaintiff is inadequate to represent the class because she falls outside the class definition. Plaintiff moves to amend the class definition. This order follows full briefing and oral argument.

## ANALYSIS

### 1. DEFENDANT WAIVED ANY RIGHT TO ARBITRATE AGAINST PLAINTIFF.

In the briefing on plaintiff's motion to amend, plaintiff contends defendant waived the right to arbitrate against her. For the sake of efficient administration of this action, this order addresses that issue here.

"Waiver ... 'is the intentional relinquishment or abandonment of a known right.' To decide whether a waiver has occurred, the court focuses on the actions of the person who held the right ...." The Supreme Court recently held "prejudice is not a condition of finding that a party waived its right to ... compel arbitration under the [Federal Arbitration Act]." So the test

for waiver now has only two elements. Thus, "a party waives its contractual right to arbitration if it [1] knew of the right; [and] [2] 'acted inconsistently with that right.' " *Morgan v. Sundance, Inc.*, No. 21-328, 596 U.S. ––––, 142 S.Ct. 1708, 212 L.Ed.2d 753 (2022) (citations omitted).

Here, defendant waived the right to arbitrate against plaintiff. *First*, even before plaintiff was added to this lawsuit, defendant knew of the right to arbitrate. Defendant, however, chose not to compel arbitration under the contract applicable to plaintiff (Dkt. No. 50 at 2). *Second*, after plaintiff was added to this lawsuit, defendant filed two motions to dismiss against plaintiff on key merits issues (Dkt. Nos. 165, 213). Those acts were inconsistent with the right to arbitrate. *See Newirth by & through Newirth v. Aegis Senior Communities, LLC*, 931 F.3d 935, 940 (9th Cir. 2019). Only afterward did defendant move to compel arbitration under the contract applicable to plaintiff — at which point it also moved for summary judgment on the merits. Both elements of waiver are met.

### 2. THE CALIFORNIA CLAIM IS DISMISSED.

Because plaintiff is not a California resident, the claim under California Civil Code Section 1750 must be **DISMISSED**, leaving only the RICO claim. However, the class will be decertified as per the next section.

### 3. PLAINTIFF'S DAMAGES MODEL FAILS *COMCAST*.

"Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation. For such an order, particularly during the period before any notice is sent to members of the class, 'is inherently tentative.' " *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (citation omitted). The plaintiff bears the burden of showing the requirements of FRCP 23 are met when a defendant moves to decertify. *Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 947 (9th Cir. 2011).

 *3 "[A]t the class-certification stage ... any model supporting a 'plaintiff's damages case must be consistent with its liability case.' " "[A] model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory [of liability]." "[C]ourts must conduct a 'rigorous analysis' to determine whether that is so." "If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of [FRCP] 23(b)(3)." Yet "[c]alculations need not be exact." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013) (citations omitted).

Restitution is one form of damages. It is "a remedy whose purpose is 'to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest.' " "Restitution is ... determined by taking the difference between the market price actually paid by consumers and the true market price that reflects the impact of the unlawful, unfair, or fraudulent business practices." *Brazil v. Dole Packaged Foods, LLC*, No. 12-CV-01831-LHK, 2014 WL 5794873, at *5 (N.D. Cal. Nov. 6, 2014) (Judge Lucy Koh) (citation omitted).

Here, plaintiff's damages model estimates restitution. Specifically, plaintiff attempts to calculate the "price premium" attributable to: (1) defendant's alleged practice of selling 4G-capable *phones* in markets where defendant provided only 3G coverage; and (2) defendant's alleged practice of selling 4G *service plans* in markets where defendant provided only 3G coverage. Accordingly, for each theory of liability, plaintiff's model must isolate the price premium attributable only to overcharges due to misrepresentations about 4G coverage. *See Comcast*, 569 U.S. at 35, 133 S.Ct. 1426; *Brazil*, 2014 WL 5794873, at *5.

At class certification, plaintiff stated "[its] expert [could] use econometric tools to isolate the value of 4G/LTE" (Dkt. No. 225 at 8). Relying on plaintiff's assurances, a prior order granting class certification found that "a feasible class-wide method of damages calculation exists in our case" (Dkt. No. 298 at 15). Thereafter, plaintiff provided a damages model to defendant. Defendant then moved to exclude the damages model under FRE 702. This district court has not yet ruled on that motion because, due to the ongoing appeal, a stay is in place on all matters except those addressed herein (*see* Dkt. No. 436). This order considers the sufficiency of plaintiff's damages model for each theory of liability in turn. [2]

---

[2]  Prior to class certification, plaintiff provided two preliminary expert reports. Those reports made only general reference to potential methods of calculation. Thereafter, plaintiff provided two final expert reports, which comprise the complete damages model to which this order refers.

### A. PRICE PREMIUM FOR 4G-CAPABLE PHONES.

To calculate the price premium for 4G-capable phones, plaintiff's expert Mallinson compared the prices of 4G-capable phones (that defendant sold) to those of similar 3G-capable phones (that defendant and other carriers sold). Defendant provided plaintiff with a maximum and a minimum price for each 4G-capable phone for each month during the class period. Defendant also provided plaintiff with price data for the 3G-capable phones, which reflected phone prices for both defendant and its competitors for each month during the class period.[3]

[3] Defendant did not have data on the actual purchase prices of its 4G-capable phones. So it provided plaintiff with a range of prices for each phone.

For each pair of similar 4G and 3G-capable phones, plaintiff's expert Browne calculated the difference between the average price of the phones for each month during the class period. He converted those price differences to percentages and took the average for each pair of phones over the entire class period. Thereafter, based on the number of sales of each type of 4G-capable phone during the class period, he calculated a weighted average percentage for the price difference across all phone pairs: 36 percent.

 *4  Finally, for each 4G-capable phone, plaintiff's expert Browne multiplied (1) that weighted average percentage by (2) the number of sales of the phone during the class period by (3) the average price of the phone over the class period. Summing the products for all the 4G-capable phones provided damages of approximately $65.6 million. Performing the same multiplication and summation using the maximum price for each 4G-capable phone provided a maximum damages figure of $82.9 million (*see* Dkt. No. 311-2).

Defendant argues, with respect to its 4G-capable phones, that that model does not isolate those damages attributable only to overcharges due to misrepresentations about 4G coverage. This order agrees. Although plaintiff's expert Mallinson selected 3G-capable phones "most closely comparable" to the 4G-capable phones "in terms of brand value and technical specifications," there were significant differences between the phones that were left unaccounted for (Dkt. No. 311-2 at 166).

Of the four pairs of 4G-capable phones plaintiff's experts used for the damages calculations: each had a faster processor and a larger battery than its counterpart 3G-capable phone; three had double the amount of memory as their counterparts; three had double the storage capacity as their counterparts; three had larger displays than their counterparts; and two had front-facing cameras while their counterparts did not (Dkt. No. 311-2 at 90–92).

Plaintiff's experts did not control for any of those features. Plaintiff's damages model assumes that none of those features contributed to the price difference between the 4G and 3G-capable phones. "Rather than answer the critical question why that price difference existed, or to what extent it was a result of [defendant]'s actions, [plaintiff] instead assumed that 100 percent of that price difference was attributable to [defendant]'s alleged misrepresentations" about 4G coverage. *In re POM Wonderful LLC*, No. ML 10-02199 DDP RZX, 2014 WL 1225184, at *5 (C.D. Cal. Mar. 25, 2014) (Judge Dean D. Pregerson).

The expert who selected the comparable 3G-capable phones suggests that controlling for the enhanced features of the 4G-capable phones was unnecessary. He claims those features did not contribute to the price differences: "with class members' inability to connect to 4G/LTE networks, those capabilities were severely diminished." To corroborate this claim, he quotes a single web article:

> If you live in an area that doesn't have 4G coverage, there's no advantage to a 4G phone. In fact, you'll have serious battery life problems if you buy an LTE phone and don't disable 4G LTE, as the radio's search for a non-existent signal will drain your battery quickly.

(Dkt. No. 311-2 at 164). This is insufficient. As an initial matter, the quotation addresses only battery life. It does not address any other phone capabilities that the lack of 4G coverage could affect. Moreover, even if defendant's 4G-capable phones were used solely in 3G areas, their longer battery lives would be useful.[4]

[4] Defendant's expert also cited the web article — but not for its instructive value. He cited it as an example of consumer confusion regarding 4G technology (Dkt. No. 311-3 at 142 n. 77).

"In the end, it is not enough for [plaintiff] to just say that the [model] controls for other factors; [plaintiff] must show

the [district court] that the model can. [Plaintiff] has not done so." *Brazil*, 2014 WL 5794873, at \*13. "The price premium model's inability to account for any differences between the [4G-capable] products and [the] chosen comparable [3G-capable] products ... renders the price premium model insufficient under *Comcast*." *Brazil v. Dole Packaged Foods, LLC*, No. 12-CV-01831-LHK, 2014 WL 2466559, at \*16 (N.D. Cal. May 30, 2014) (Judge Lucy H. Koh); *see Werdebaugh v. Blue Diamond Growers*, No. 12-CV-02724-LHK, 2014 WL 7148923, at \*12 (N.D. Cal. Dec. 15, 2014) (Judge Lucy H. Koh); *In re POM*, 2014 WL 1225184, at \*5; *Hilsley v. Ocean Spray Cranberries, Inc.*, No. 17-CV-2335-GPC (MDD), 2018 WL 6300479, at \*17 (S.D. Cal. Nov. 29, 2018) (Judge Gonzalo P. Curiel).

**\*5** In addition, plaintiff's experts did not account for the potential impact of defendant's brand on the price premium. Brand value may have contributed to customers' willingness to pay more for defendant's 4G-capable phones than for competitors' comparable 3G-capable phones. In fact, one of plaintiff's experts conceded that defendant is "clearly a brand, and there is some brand value in that" (Mallinson Dep. 152). Other decisions have found that the failure to control for brand value casts doubt over price premium calculations. *Brazil*, 2014 WL 2466559, at \*16; *Werdebaugh*, 2014 WL 7148923, at \*11.

It is true that a prior order "decline[d] to consider challenges to plaintiffs' experts because their [preliminary] reports [were] not needed to decide the class certification issue." That statement, however, referred only to the *admissibility* of the preliminary expert reports (Dkt. No. 298 at 18). Now, however, defendant challenges the *sufficiency* of the final expert reports to satisfy *Comcast*. Although those issues entail consideration of overlapping facts, they are ultimately separate issues. This order may consider the *Comcast* issue irrespective of the admissibility issue. *See Comcast*, 569 U.S. at 32 n. 4, 133 S.Ct. 1426.

There are several methods of damages analysis that one can employ to control for confounding variables. *See Hilsley*, 2018 WL 6300479, at \*14; *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1103, 1111 (N.D. Cal. 2018) (Judge Lucy H. Koh). Plaintiff has not employed any of them. Because plaintiff's damages model does not even attempt to control for confounding variables, it fails *Comcast* with respect to the price premium for 4G-capable phones. *See Comcast*, 569 U.S. at 35, 133 S.Ct. 1426.

## B. PRICE PREMIUM FOR 4G SERVICE PLANS.

Now, this order turns to whether plaintiff's damages model satisfies *Comcast* with respect to her second theory of liability: defendant's sale of 4G service plans (as opposed to phones) in areas without 4G coverage.

To calculate the price premium for 4G service plans, plaintiff's expert Mallinson first chose a benchmark for the value of defendant's 4G service plans in areas where defendant did not provide 4G coverage. That chosen benchmark was based on competitors' 4G service plans that had low amounts of 4G data allowance (between 250 MB to 1000 MB per month). [5] He found that competitors' service plans and defendant's internal emails show $40 per month is a reasonable benchmark value. He then compared the prices of defendant's 4G service plans during the class period to the benchmark. Defendant sold 4G service plans at $50, $60, and $70 per month for 2500 MB, 5000 MB, and 10000 MB of data allowance per month, respectively. Thus, he estimated that defendant overcharged class members $10, $20, or $30 per month depending on the rate plan that class members chose. Plaintiff's expert Browne then summed the overcharges for all class members over all applicable months, providing damages of $59.8 million (*see* Dkt. No. 311-2). [6]

[5] Data allowance represents a maximum amount of internet consumption over a given time.

[6] Defendant charged the same price for its 3G and 4G service plans until September 15, 2013. Thereafter, defendant began offering only 4G service plans. Thus, the calculations run from September 15, 2013, to the end of the class period.

Defendant argues, with respect to its 4G service plans, that that model does not isolate those damages attributable only to overcharges due to misrepresentations about 4G coverage. Again, this order agrees. Plaintiff's damages model does not control for numerous potential differences between defendant's plans and benchmark plans. For example, all of defendant's plans included unlimited access to a certain music service, which competitors' plans lacked. Former plaintiff Jermaine Thomas stated the music service was what had "sold" him on his 4G service plan, suggesting the music service added value to the plan (Thomas Dep. 83). In addition, defendant's two most expensive plans included international text and media messaging, mobile hotspot capability, visual

voicemail, credits for 411 directory service, and data backup, which may have contributed to those plans' value over and above that of the least expensive plan (Dkt. No. 311-3 at 69). Plaintiff's damages model does not account for those variables. And, again, it does not account for brand value.

**\*6** Plaintiff's expert Mallinson purports to have accounted for the music service's value. He asserts that defendant had stopped marketing the music service after September 15, 2013. But defendant has provided a declaration and exhibits rebutting that assertion (Towster Decl. ¶ 5, Exhs. A, B). He makes a conclusory statement that the availability of a separate music service rendered defendant's music service valueless. He also asserts that, whereas defendant's customers allegedly had no 4G data allowance, the small 4G data allowance in the benchmark service plan compensates for any added value from the music service. The damages model does not prove up either of those assertions.

Again, plaintiff "assumed that 100 percent of [the] price difference was attributable to [defendant]'s alleged misrepresentations" about 4G coverage. *In re POM Wonderful LLC*, 2014 WL 1225184, at \*5. Because plaintiff's damages model does not even attempt to control for confounding variables, it fails *Comcast* with respect to the price premium for 4G service plans. *See Comcast*, 569 U.S. at 35, 133 S.Ct. 1426.

\* \* \*

Time and time again, plaintiff's counsel have made missteps, and we have found ways to excuse them. Of significance are the *fifteen* potential class representatives who have been dismissed throughout this action. But, at long last, plaintiff's counsel have overreached too far and made too critical a mistake. There will be no second try, for to allow retries on such fundamentals would encourage overreaching. Counsel and their experts should have been reasonable from the start and lived up to the promises made at class certification. The class is hereby **DECERTIFIED**. Within two weeks, counsel must advise as to what notice needs to be given to the class regarding the decertification.

## CONCLUSION

For the foregoing reasons, defendant's motion to decertify the class is **GRANTED**. Plaintiff's motion to amend the class definition is **DENIED AS MOOT**.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 3018061

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.