**Pages 1 - 75**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

```
PATRICK CALHOUN, ET AL.,        )
                                )
          Plaintiffs,           )
                                )
  VS.                           )      NO. CV 20-05146-YGR
                                )
GOOGLE LLC,                     )
                                )
          Defendant.            )
_____ )
```

Oakland, California
Friday, August 26, 2022

**<u>TRANSCRIPT OF PROCEEDINGS</u>**

**<u>APPEARANCES</u>**:

For Plaintiffs:

    BLEICHMAR FONTI & AULD LLP
    555 12th Street, Suite 1600
    Oakland, CA 94607
    **BY: LESLEY WEAVER, ESQUIRE
    ANGELICA MARIA ORNELAS, ESQUIRE**

    DICELLO LEVITT GUTZLER LLC
    One Grand Central Place
    60 East 42nd St., Suite 2400
    New York, NY 10165
    **BY: DAVID A. STRAITE, ESQUIRE
    CORBAN S. RHODES, ESQUIRE**

    DICELLO LEVITT GUTZLER
    Ten North Dearborn Street
    Chicago, IL 60602
    **BY: ADAM PROM, ESQUIRE**

Reported By:    Pamela Batalo-Hebel, CSR No. 3593, RMR, FCRR
                Official Reporter

**APPEARANCES CONTINUED:**

                SIMMONS HANLY CONROY
                231 S. Bemiston Avenue, Suite 525
                St. Louis, MO 63105
      BY:  **JAY BARNES, ESQUIRE**

                SIMMONS HANLY CONROY
                112 Madison Avenue, 7th Floor
                New York, NY 10016
      BY:  **AN V. TRUONG, ESQUIRE**

                SIMMONS HANLY CONROY
                One Court Street
                Alton, IL 62002
      BY:  **JENNIFER M. PAULSON, ESQUIRE**

For Defendant:

                QUINN EMANUEL URQUHART SULLIVAN LLP
                191 N. Upper Wacker Drive, Suite 2700
                Chicago, IL 60606
      BY:  **ANDREW H. SCHAPIRO, ESQUIRE**
           **JOSEPH H. MARGOLIES, ESQUIRE**

                QUINN EMANUEL URQUHART SULLIVAN, LLP
                865 South Figueroa Street, 10th Floor
                Los Angeles, CA 90017
      BY:  **VIOLA TREBICKA, ESQUIRE**
           **STEPHEN BROOME, ESQUIRE**
           **ALYSSA G. OLSON, ESQUIRE**

                QUINN EMANUEL URQUHART SULLIVAN, LLP
                1300 I Street NW, Suite 900
                Washington, DC 20005
      BY:  **XI GAO, ESQUIRE**

**Friday - August 26, 2022**                                    **8:30 a.m.**

**P R O C E E D I N G S**

**---oOo---**

            **THE CLERK:**  Now calling CV 20-5146, Calhoun, et al.

vs. Google LLC.

        Counsel, please approach the podiums, starting with the

plaintiff, state your appearance for the record.

            **MS. WEAVER:**  Good morning, Your Honor.  Lesley

Weaver of Bleichmar Fonti & Auld on behalf of the plaintiffs.

            **MR. STRAITE:**  Good morning, Your Honor.  David Straite

with DiCello Levitt, also for plaintiffs.

            **MR. BARNES:**  Good morning, Your Honor.  Jay Barnes on

behalf of the Calhoun plaintiffs from Simmons Hanly Conroy.

            **MS. TRUONG:**  Good morning, Your Honor.  An Truong,

Simmons Hanly Conroy, on behalf of plaintiffs.

            **MR. RHODES:**  Good morning, Your Honor.  Corban Rhodes,

DiCello Levitt, also for plaintiff.

            **MS. ORNELAS:**  Good morning, Your Honor.  Angelica

Ornelas from Bleichmar Fonti & Auld, also for plaintiffs.

            **MR. PROM:**  Good morning, Your Honor.  Adam Prom,

DiCello Levitt, also on behalf of plaintiffs.

            **MS. PAULSON:**  Good morning, Your Honor.  Jenny Paulson

from Simmons Hanly Conroy, also on behalf of plaintiffs.

            **THE COURT:**  Good morning everyone.

        In Alameda County, it is no longer required that you wear

1    a mask.  You're welcome to.  My perspective is that whatever

2    makes people most comfortable you should use, but in this

3    courtroom, especially if you're speaking, you don't need to

4    have a mask, in my perspective.

5        All right.  On the defense side.

6            **MR. SCHAPIRO:**  Good morning, Your Honor.  Andrew

7    Schapiro from Quinn Emanuel for Google.

8            **THE COURT:**  Good morning.

9            **MS. OLSON:**  Good morning, Your Honor.  Aly Olson from

10   Quinn Emanuel on behalf of Google.

11           **THE COURT:**  Good morning.

12           **MS. TREBICKA:**  Good morning, Your Honor.  Viola

13   Trebicka, Quinn Emanuel, also on behalf of Google.

14           **THE COURT:**  Good morning.

15           **MR. BROOME:**  Good morning, Your Honor.  Stephan Broome

16   from Quinn Emanuel, also for Google.

17           **THE COURT:**  Good morning.

18           **MS. GAO:**  Good morning, Your Honor.  Tracy Gao from

19   Quinn Emanuel, also for Google.

20           **THE COURT:**  Good morning.

21           **MR. MARGOLIES:**  Good morning, Your Honor.  Joseph

22   Margolies, Quinn Emanuel, also for Google.

23           **THE COURT:**  Good morning to everyone.

24       We have a number of motions on calendar today.  We will

25   start with the motion for summary judgment, but what I'd like

1  to know is if the arguments are being divided and who is making

2  the various arguments.

3      We will start with the plaintiffs.

4          **MS. WEAVER:**  Good morning, Your Honor.  Lesley Weaver.

5      I will be arguing class certification.  Mr. Barnes will be

6  arguing summary judgment or, rather, our opposition to it.  And

7  Mr. Straite will be arguing *Daubert* motions and with a

8  carve-out for a couple of the causes of action should they

9  arise on class cert.

10          **THE COURT:**  Okay.  Thank you.

11          **MR. SCHAPIRO:**  Good morning, Your Honor.

12      We've divided it somewhat differently.  I'm going to be

13  handling the consent issues on both summary judgment and class

14  certification.  My colleague, Ms. Trebicka, is going to be

15  arguing the failure of the plaintiffs to present a damages

16  model for class certification and the *Daubert* regarding

17  Mr. Mangum.  My colleague, Mr. Broome, will be handling any

18  questions about the individual causes of action or most of the

19  causes of action for class certification purposes.  And our

20  star team of associates here have some discrete sub-issues,

21  should they come up, with regard to experts and some of the

22  evidence.

23          **THE COURT:**  All right.  Well, Mr. Schapiro, let me

24  know what those are.  If we have time, I will try to make sure

25  to get to them so that they have an opportunity to argue.

1         **MR. SCHAPIRO:**  That would be great.

2      Ms. Olson is -- will be handling -- I'm forgetting --

3         **THE COURT:**  We can't hear you.

4         **MR. SCHAPIRO:**  Yes.  I was just checking to make sure

5    I had the experts right.

6      If there are questions about our expert, Professor Erdem,

7    or if there is any dispute which will not be about the

8    declaration of Greg Fair, Ms. Olson will be handling those.

9      Ms. Gao is here only in case there are some questions that

10   come up with the logs which there have been fights about, as

11   you probably know, Your Honor.

12        **THE COURT:**  Okay.

13        **MR. SCHAPIRO:**  Mr. Margolies is going to be handling

14   the motion to supplement the record that we have.  We've filed

15   a motion to supplement the record with material from the Brown

16   case.

17        **THE COURT:**  Okay.  Yes.  I'm not sure I will get to

18   those, but we will see.

19        **MR. SCHAPIRO:**  I have one matter that I think is

20   accurately characterized as housekeeping, Your Honor.  As we

21   notified the Court when you asked about the audio feed, we do

22   not intend to make use or refer in any specific way to any

23   sealed documents.  We haven't heard -- we didn't hear anything

24   back from the plaintiffs, but our hope is that the same way we

25   have managed to do it in front of Judge van Keulen, references

1    can be made in a general way if there is some need to point to

2    a document that has been sealed.

3        **THE COURT:**  The parties are ordered to do that, to not

4    reveal any information that is sealed.  This is being broadcast

5    over the AT&T line.

6        **MR. SCHAPIRO:**  Thank you, Judge.

7        **MS. WEAVER:**  Understood, Your Honor.

8        **THE COURT:**  Let's start with the motion for summary

9    judgment on consent.  So I think that is Barnes and Schapiro,

10   if you will both go to the mics.  Rarely, if ever, do I just

11   let you stand there and talk.

12        I think some of the issues with respect to the motion for

13   summary judgment and in particular on consent are relatively

14   undisputed; right?  We are talking about the individual

15   plaintiffs here.  Whether or not they understood what they were

16   doing is potentially up for debate, but there really is no

17   dispute that they clicked that button for the Consent Bump

18   Agreement; correct?

19        **MR. BARNES:**  Well, Google's records stated that they

20   clicked --

21        **THE COURT:**  You haven't disputed that.  Do you?

22        **MR. BARNES:**  They have no memory of having clicked

23   that button.  It's an ephemeral button.  They have no memory of

24   clicking it.

25        **THE COURT:**  And you haven't -- that's why I said there

1   is really no dispute.  You haven't identified any nefarious

2   reason on behalf of Google that would suggest that their

3   documents -- their business records aren't accurate.

4           **MR. BARNES:**  Well, Your Honor, based on the -- the

5   motion pending before Judge van Keulen with respect to the

6   clicking of that button, correct, we do not have evidence of

7   doctoring records.

8           **THE COURT:**  Okay.  We have a lot to do today so I

9   would like to focus on what I want to focus on.

10          **MR. BARNES:**  I understand.

11          **THE COURT:**  And as I always tell young lawyers,

12  concede when you need to concede.  If there is something else

13  out there down the line, that's fine, but in front of me,

14  there's nothing; correct?

15          **MR. BARNES:**  Correct.

16          **THE COURT:**  Okay.  So then it seems to me the question

17  with respect to consent is we have all of these different

18  agreements, and my question for Google is if the policy with

19  respect to using Chrome, which explicitly says that unless you

20  sync, information isn't being transmitted -- explain to me how

21  it is that consumers, and these consumers in particular, are

22  supposed to know that this other agreement supersedes and/or

23  cancels out that agreement.  And I say "agreement" loosely

24  because these are policies.  We'll get to the policy issue

25  later.

1      Go ahead.  Mr. Schapiro.

2            **MR. SCHAPIRO:**  Sure.

3      So, Your Honor, there -- as you have yourself written,

4 when analyzing a contract, the Court must analyze the contract

5 as a whole, and as you've pointed out right now --

6            **THE COURT:**  Well, right, and this is an adhesion

7 document.  This isn't something that a consumer has an ability

8 to change.

9            **MR. SCHAPIRO:**  That's correct, Your Honor.  And so the

10 Chrome Privacy Notice on which the plaintiffs base their case,

11 the document that the plaintiffs didn't read, says in -- right

12 in the beginning that this document gives information about

13 features that are specific to Chrome, and I think it's

14 important right at the outset here to distinguish between the

15 two different data flows that are at issue here.

16            **THE COURT:**  Well, where do you explain those data

17 flows to the consumer?  Remember, you do have to read it as a

18 whole, but it's construed against Google because you're in

19 total control.

20            **MR. SCHAPIRO:**  So, Your Honor, the one document that

21 we know these plaintiffs, as to whom we're moving for summary

22 judgment, clicked "I agree" is the --

23            **THE COURT:**  Let's start with Chrome, because that's --

24 that is their best case, and you have to show me how it is as a

25 matter of law -- as a matter of law -- that they somehow

1  void -- whatever they believe was in that policy as a

2  controlling document, how that gets voided out by some other

3  policy.

4          **MR. SCHAPIRO:**  Sure.  Our position, I think, takes it

5  from the other direction, however, Your Honor --

6          **THE COURT:**  I --

7          **MR. SCHAPIRO:**  -- which is that we --

8          **THE COURT:**  So do you want to engage with me or not?

9  I understand you would prefer not to -- you would prefer for me

10  not to look at it that way.

11          **MR. SCHAPIRO:**  I only want to engage with you,

12  Your Honor.

13      So the Chrome Privacy Notice --

14          **THE COURT:**  Right.

15          **MR. SCHAPIRO:**  -- states that the document that is --

16  that Chrome stores is the promise -- supposed promise that the

17  plaintiffs are relying on, that the --

18          **THE COURT:**  Can we look at the language.  462-34, page

19  3 of 13.

20      "The personal information that Chrome stores won't be sent

21  to Google unless you choose to store that data in your Google

22  account by turning on Sync," and then it goes on.

23          **MR. SCHAPIRO:**  Correct.

24          **THE COURT:**  That's where I start.

25          **MR. SCHAPIRO:**  Correct.

1        **THE COURT:**  So now that we're starting there, right,

2   I'm a Google customer, I'm using Chrome because Google has told

3   me that Chrome -- the personal information that Chrome stores

4   won't be sent to Google unless you choose to store that data in

5   your Google account by turning on Sync.  Where do you tell me

6   that that representation is different explicitly?

7        **MR. SCHAPIRO:**  Your Honor, in the Chrome Privacy

8   Notice, the Chrome Privacy Notice refers to information that is

9   stored on your system.  The data over which the plaintiffs are

10   suing is not the data that Chrome stores on your system.  It is

11   data --

12        **THE COURT:**  So where do you say that?

13        **MR. SCHAPIRO:**  Well, the opening portion of the

14   statement says these are -- this describes features that are

15   unique to Chrome.

16        **THE COURT:**  You have to focus on language,

17   Mr. Schapiro.  Point me to the language that you're focused on.

18        **MR. SCHAPIRO:**  I think it is -- the second sentence of

19   the Privacy Notice says this describes features that are

20   specific to Chrome, but I think there is no dispute in this

21   case that the data collection that the plaintiffs are

22   complaining of is not specific to Chrome.  It happens if you

23   are in Safari and you visit a site that has an ad run by

24   Google, it happens if you are in Microsoft Edge.  So this is

25   talking about something --

1          **THE COURT:**  Where does it say that in this policy?

2     What is specific to Chrome in this policy?

3          **MR. SCHAPIRO:**  All of this policy is specific to

4     Chrome.

5          **THE COURT:**  Explain to me where you explain to the

6     user how it is -- because, look, this is a pretty -- that

7     sentence that I read is -- seems to be simple English for a

8     reasonable consumer.  Personal information that Chrome stores

9     isn't going to be sent to Google.  Okay.  That seems pretty

10    straightforward.

11         **MR. SCHAPIRO:**  Right.  So maybe the way to -- to

12    answer your question as directly as I can, Your Honor, is that

13    we do not dispute that the personal information that Chrome

14    stores, when you sync, is sent to Google.  So I think the fight

15    is about whether that is this data.

16         **THE COURT:**  It's about how you are communicating --

17    it's not just the data.  It's how you've communicated that to

18    consumers.

19         **MR. SCHAPIRO:**  Yes.  And this is where I think the

20    only thing I can do is to point you to the agreements in which

21    we say the -- the Accountholder Agreements in the Privacy

22    Policy that say when you are surfing the web --

23         **THE COURT:**  Okay.

24         **MR. SCHAPIRO:**  -- all of this data comes to us --

25         **THE COURT:**  So let's go to that.  So where do you want

1    me to look?

2         MR. SCHAPIRO:  Your Honor, we could start with

3    either -- we could start with the Consent Bump Agreement, which

4    we know every one of these plaintiffs read and clicked.  Well,

5    we know they clicked "agreed" to it so we have to engage in the

6    fiction that they read it.  And the Consent Bump Agreement

7    says --

8         THE COURT:  And I want you to refer to specific

9    documents, ECF numbers, so I can follow you.  It looks like the

10   Fair declaration probably shows it the cleanest.

11        MR. SCHAPIRO:  Yes.  So I'm on page 20 now of the Fair

12   declaration.  I do not have the ECF number handy, although I

13   can get it.

14        THE COURT:  So page 20 --

15        MR. SCHAPIRO:  Paragraph 23 is where I would begin.

16        THE COURT:  Okay.  So then that's not page 20 of his

17   declaration.  I'm looking at -- page 20 has paragraph 34.

18   Paragraph 20 is on page 10 of his declaration, Docket 393-4.

19        MR. SCHAPIRO:  So for whatever reason, I'm looking at

20   paragraph 23 on page 20 of -- of my document, but I assume the

21   paragraphs are the same, so if I can use the paragraph number,

22   Your Honor --

23        THE COURT:  Okay.

24        MR. SCHAPIRO:  Does paragraph 23 in the version you

25   are looking at begin, "The Consent Bump Agreement explained"?

1          **THE COURT:**  That's not what I'm looking at.  So I'm

2     looking at a document entitled "Declaration of Gregory Fair in

3     Support of Google's Motion for Summary Judgment."

4          **MR. SCHAPIRO:**  I am, too.  I guess apparently I have

5     the -- a version that was submitted with class cert as opposed

6     to a version that was submitted with summary judgment.

7          Okay.  So paragraph 19 of the summary judgment submission.

8          **THE COURT:**  Okay.

9          **MR. SCHAPIRO:**  I apologize for that, Your Honor.

10         So does that paragraph 19 begin "The Consent Bump

11    Agreement explained"?

12         **THE COURT:**  Yes.

13         **MR. SCHAPIRO:**  So the Consent Bump Agreement states,

14    after the numeral 2, "Google will use this information to make

15    ads across the web more relevant for you.  When you use Google

16    Services like Search and YouTube, you generate data, things

17    like what you've searched for and videos you've watched.  You

18    can find and control that data in My Account under the Web and

19    Activity Setting.  And with this change, this setting may also

20    include browsing data from Chrome and" -- and the "and" word is

21    important here because it's separate -- "activity from sites

22    and apps that partner with Google, including those that show

23    ads from Google."

24         **THE COURT:**  This doesn't say that -- you know, we're

25    lawyers, and so for us the word "and" has legal significance.

1   What this doesn't say is that it's somehow separate and apart

2   from Chrome.  I mean, a reasonable person could read that as

3   being including as opposed to separate and apart.

4          **MR. SCHAPIRO:**  Well, I don't think if we -- if we send

5   the readers to -- as we do here, we invite them to look at the

6   My Activity page, which we made visible, I don't see how a

7   reasonable person could have thought that just using Chrome out

8   of the box, which is what this is, just Chrome in its regular

9   basic mode, would mean that the ordinary things that happen

10  when you're on the Internet, like your IP address being shared

11  with the resource that is actually creating and populating on

12  the web page somehow wouldn't work in Google's own browser.

13      I mean, there is a struggle here, of course, Your Honor,

14  with trying to find the right balance in disclosures and trying

15  to find a disclosure that is short and concise enough that

16  people will read it, and one of these plaintiffs -- actually a

17  couple of them - but Ms. Kindler said she wants the disclosures

18  to be shorter and having it long enough and detailed enough so

19  that it describes every possibility.  We believe that we've

20  done both here.  We've provided people with a short, concise

21  disclosure in the Accountholder Agreements that is less than

22  two pages but that also sends them to other resources if they

23  want to learn more about it and, in particular, My Activity

24  where they can see in realtime and where these plaintiffs saw

25  in realtime -- at least one of them who visited My Activity --

1    saw the data that was being collected, and after seeing that

2    data that's being collected, to believe that somehow the --

3    this general collection of data, which is described in the

4    Accountholder Agreements and in the Privacy Policy, is negated

5    by a totally separate feature, Sync, which is made to

6    synchronize your bookmarks, your passwords, your autofill

7    across your devices -- it's apples and oranges.  And if we were

8    to try to describe in this policy every circumstance in

9    which -- that is covered here, we would surely leave something

10   out and get sued in that way.

11       So of course it works in basic browsing mode and it works

12   in Safari and it works in Edge, but we can't specify all of

13   those and have a workable disclosure.

14           **THE COURT:**  All right.  Response.

15           **MR. BARNES:**  Your Honor, first, there is a disputed

16   statement of fact that Mr. Schapiro just made.  I actually

17   think it's not disputed.  Mr. Schapiro made a misstatement of

18   fact.  He stated that the information stored by Chrome is not

19   sent to Google unless you Sync.  That is false.

20       The browsing history information at issue in this case is

21   stored on the Chrome browser and it is transmitted to Google

22   regardless of whether you Sync.  The cookies at issue in this

23   case are transmitted by Chrome to Google, regardless of whether

24   a user enables Sync.  There is something called an "Ex-Client

25   Data Header" which is unique.  It's an identifier unique to the

1    Chrome browser that is transmitted from Chrome to Google

2    regardless of if a user Syncs.

3         And there is something that Google, I think, completely

4    misses here, and that is -- two things, really.  If you look at

5    our chart and our response -- on pages 3 and 4 of our response,

6    it's not -- the promise you read, Your Honor, is -- of course I

7    think that's the fundamental promise, but that promise is

8    essentially repeated in -- we have nine different places where

9    it is repeated in some form or fashion.  And Google does not

10   engage with any of these other express, clearly stated promises

11   that are in the Chrome Privacy Notice.

12        The other thing that is completely missing from Google's

13   motion and that is consent -- there is two parts to consent,

14   right?  The first part is what was disclosed.  The second part

15   is what did the defendant actually do.  And there is nothing in

16   Google's motion about what Google actually did.

17        And the great irony is that Google claims that our

18   plaintiffs consented to this and the whole world consents to

19   this, but if you look at that chart on the right side, how

20   Google Systems actually operate, what they actually do is all

21   redacted from public view, and I'm not allowed to tell -- I'm

22   not allowed to say those things out loud.  If Google had

23   obtained -- in order to obtain consent, Google has to disclose

24   the specific practices.  These things are not trade secrets.

25   They are just descriptions of how Google's Systems work with

1    respect to the Chrome browser.

2         Mr. Schapiro -- Google also stated that Chrome works just

3    like any other browser.  The evidence demonstrates that that's

4    not true.  The Ex-Client Data header is unique to Chrome.  The

5    expert reports demonstrate that Chrome transmits more personal

6    information to Google than any other browser.

7         Finally, Google stated they -- they have made a big deal

8    about clicking the "I agree" button, and Google correctly

9    stated that the law says that we are to presume that the users

10   read the agreements.  Well, the evidence in this case is also

11   that the plaintiffs agreed to the Google Terms of Service, and

12   in order to use Chrome, you have to agree to the Chrome Terms

13   of Service and Chrome Privacy Notice.  So even though our

14   plaintiffs do not recall clicking on the "law consent" button,

15   they did in Google's records -- Google has records of our

16   plaintiffs' agreement to the Chrome Terms of Service -- or to

17   the Google Terms of Service, which expressly say if there is

18   any conflict with any other document, the Chrome Privacy Notice

19   is what governs the use of Chrome.

20        That, Your Honor --

21        **THE COURT:**  It doesn't say that.  It says that the

22   more specific controls the general.

23        **MR. BARNES:**  Correct.  It says "service specific

24   additional terms," and if you click that link, it includes --

25   the Chrome Privacy Notice is within that -- is within the

1    services on that link.  That's in -- that's Docket 462-33.

2        And then the Google Privacy Policy that Google mentions

3    has a statement -- that's Docket 462-35 at 18 -- that says for

4    specific Google Services, it points users to -- it has a

5    hyperlink to Chrome and the Chrome Operating System which sends

6    users to the same Chrome Privacy Notice that Google is -- has

7    completely ignored in its motion for summary judgment.

8        **THE COURT:**  So is the data the same or not?

9        A response, Mr. Schapiro.

10       **MR. SCHAPIRO:**  The data is -- is not identical,

11   Your Honor.

12       So I want to just correct one --

13       **THE COURT:**  Let me ask this question.

14       Is there then a material dispute of fact, because

15   plaintiffs say that it's different from what you claim it is

16   and that there are documents showing that.

17       **MR. SCHAPIRO:**  Oh, I'm sorry.  I misunderstood your

18   question, Your Honor.  I thought you meant the data that is

19   provided when people visit Google Services and the data that

20   Chrome stores.

21       I don't think that on this motion it matters, that there

22   might be a dispute about what Google does with the data after

23   it is received, which is what I understood Mr. Barnes to be

24   saying.

25       The causes of action here focus on the collection of the

1    data.  They have another case, the RTB case, where part of what

2    they're talking about is how the data is used here, but in

3    their Complaint, they're complaining that the data is

4    intercepted or collected against their will.  And that just

5    cannot be jibed with the fact that all of these accountholders

6    expressly agreed, using a disclosure that is similar to the one

7    that the Ninth Circuit found sufficient in the Smith case --

8    expressly agreed that Google could receive this data when they

9    visit sites or use apps that use Google Services.

10        The fact that an unrelated data flow about Sync, when

11   you're making sure that your passwords on your phone are

12   similar to the passwords on your computer, has nothing to do

13   with the consent that these plaintiffs gave and the language in

14   the Chrome Privacy Notice, which is a notice, is not sufficient

15   to vitiate that clear consent that was given.

16        It would really be impossible for companies to function if

17   they couldn't have a notice like the Accountholder Agreements

18   here and rely on that agreement, especially when we are

19   reminding and even pleading with plaintiffs to visit the My

20   Activity page.

21        I took the deposition of one of the named plaintiffs here,

22   and I showed him the emails that had been sent to him over and

23   over by Google and said, "Well, these are saying do a privacy

24   checkup.  Go to the My Activity page.  You can see here what

25   information Google is receiving about you," and he said, "Well,

1    I don't have time to read emails," and I said, "What disclosure

2    do you think would have been sufficient," and he says, "Well,

3    they should have advertised on television, and that would have

4    alerted me."

5         It's not a standard that's workable.

6         **THE COURT:**  The question is do you win as a matter of

7    law or does a jury decide what is reasonable?

8         **MR. SCHAPIRO:**  We win --

9         **THE COURT:**  So just because you want to win as a

10   matter of law doesn't necessarily mean that you are entitled to

11   win as a matter of law.  Perhaps a jury as opposed to a single

12   judge or perhaps a panel of three judges would be better -- a

13   better vehicle for deciding what's reasonable.

14        **MR. SCHAPIRO:**  We don't believe that with the legal

15   backdrop that currently exists as described in cases like *Smith*

16   *vs. Facebook* and some of the other ones that we've cited in

17   our -- in our submissions to Your Honor, that any reasonable

18   jury could, consistent with the law, find that the agreement

19   and consent that was provided by these five plaintiffs is

20   somehow inadequate.  That is a question that can be determined

21   from these basic undisputed facts which is Google does receive

22   the data that is described in the Accountholder Agreements.

23   Every plaintiff clicked "I agree."  There is a Chrome Privacy

24   Notice that talks about Chrome and Sync, which does not negate

25   that consent.

1          **THE COURT:**  Then what good is Chrome if it's no

2     different than any other browser?

3          **MR. SCHAPIRO:**  Well, Chrome in some ways is, the

4     company I'm sure would point out, in some ways faster.  In some

5     ways --

6          **THE COURT:**  Where does it say that?  Point me to the

7     disclosure that says use Chrome because it's faster not because

8     it gives you more privacy.

9          **MR. SCHAPIRO:**  Oh, I'm sorry.  I thought you were just

10    asking me what features Chrome has that people may like.

11        If you're asking again about the disclosure --

12         **THE COURT:**  I think the point is, is that people use

13    Chrome because it's supposed to provide more privacy.

14         **MR. SCHAPIRO:**  I don't think that's accurate or

15    supported by the record, Your Honor, but even if it were, the

16    features that -- excuse me -- the data collection that the

17    plaintiffs are complaining about in this case is not anything

18    that is unique to Chrome.  That data collection -- of course,

19    "collection" might even be the wrong word -- the receipt of

20    that data is a function of how the Internet works.  The IP

21    address can't -- you can't use the web without -- unless you're

22    using a VPN -- without providing an IP address so that the, you

23    know, servers with which you are communicating know where to

24    send the information.

25         So whatever features there might be about Chrome do not

speak to the question here which is was this receipt of data

disclosed by Google and agreed to by these plaintiffs, and the

answer to both of those questions are "yes."

**THE COURT:**  All right.  A response.

**MR. BARNES:**  Well, it sounds like Google just raised a

material issue of fact.  He said you can't -- the Internet

won't work without disclosing the IP address of a Chrome user.

That's a disputed issue of fact because an IP address can be

masked.  I believe it's masked in some other browsers.

There is also a disputed issue of fact here where they say

oh, this is -- just works like others browsers.  I think our

experts show that it does not work like other browsers, and I

think Your Honor was exactly right.  If you look at the Chrome

Privacy Notice, that Privacy Notice is designed to give

ordinary consumers the assurances that Google has their back

and that Chrome will protect their privacy from top to bottom.

The first sentence is that "This is" -- "Learn how to control

the information that's collected, stored, and shared when you

use the Google Chrome browser."

You go down, it says, "Well, you don't need to provide any

personal information to use Chrome."  That's not true.  Google

automatically creates personal information in the Chrome

browser and sends it to itself for purposes of advertising

without telling users.

The next -- and the -- on our list is what you highlighted

1    correctly, I think -- is the core promise, but there are so

2    many in this contract that are broken by Google.  "Chrome" --

3    here is another one.  "Chrome does not cause Google to receive

4    any additional personally identifiable information about you."

5    That is not true.  And apparently it's a disputed issue of fact

6    by Google.  And we have testimony from Google employees that we

7    cite in the record here that that sentence in the Chrome

8    Privacy Notice is not true.

9        The next one on our chart is "Sync is only enabled if you

10   choose."  If you look at the right hand of the column there,

11   Your Honor, I can't even tell you in open court the truth about

12   Google's Systems.

13       The next sentence is that if you do not enable Sync and

14   Wah, quote, Google will only use your Chrome data after it's

15   anonymized and aggregated with data from other services."

16   Again, if you go to --

17       **THE COURT:**  So let's -- looking at this chart that

18   begins on page 9 to page 10, the sealed Docket 461-4,

19   Mr. Schapiro, any specific -- any comments that you want to

20   make in open court with respect to that chart?

21       **MR. SCHAPIRO:**  Yes, Your Honor.

22       So the first is that, as I said a moment ago, the use of

23   the data is not at issue.  It's not put at issue by this

24   Complaint.  So much of what is listed here has to do with

25   supposed use of data.

1    But the idiosyncratic statements by isolated Google

2    employees who are trying to assess the -- the strength of their

3    disclosures do not override what is public-facing here.  There

4    will always be robust internal conversations.  Most of the

5    items cited by -- the conversations cited by the plaintiffs

6    don't even have to do with Chrome or Sync, but those that do

7    are the types of conversations that go on within a company

8    trying to assess how best to -- to improve its product.

9    **THE COURT:**  Well, I see -- I see eight blocks which

10   don't have to do with Chrome.  Oh, nine blocks.  Sorry.  Just

11   tell me the numbers.  Block 1 starts on page 9.

12   **MR. SCHAPIRO:**  So my page 9 -- we're having a page

13   issue in here.  I just want to make sure I'm looking at the

14   same chart.  This chart?

15   **MR. BARNES:**  I think so.

16   **THE COURT:**  I'm looking at the chart that's in the

17   opposition with -- it's a two-column chart.  It says what

18   Google says publicly --

19   **MR. SCHAPIRO:**  Yes.

20   **THE COURT:**  -- and what Google does internally.  You

21   said that these don't even deal with Chrome.  There are nine

22   rows.  Which rows do not deal with Chrome?

23   **MR. SCHAPIRO:**  Number 7 does not, the specific

24   statement pointed out here.

25   I apologize, Your Honor.  I was thinking about a different

1   chart which was referring to internal Google conversations, so

2   the point on this is the point that I made initially, which is

3   that what is done internally with data, some of which might be

4   a material dispute of fact, is not relevant to these causes of

5   action that the plaintiffs have raised.

6        And I think I should point out when Your Honor was asking

7   how is it that people can know about the collection of this

8   data, that in the related Brown case, the plaintiffs have

9   alleged that it is common knowledge -- the Brown plaintiffs

10  have said it's common knowledge that when you are in the basic

11  ordinary mode, this data is collected, but only when it's in

12  Incognito -- that's their theory, the Incognito case -- is it

13  not collected.

14        **MR. BARNES:**  Your Honor, I move to strike the comment

15  about the Brown case.  It's not --

16        **THE COURT:**  Are you a lawyer in that case?

17        **MR. BARNES:**  No, I'm not, Your Honor.

18        **THE COURT:**  But Ms. Weaver is; right?

19        **MR. BARNES:**  No.  Ms. Weaver is not in Brown.  We are

20  also in the RTB case.

21        Brown is the case -- Mr. Mao is here from the Brown case.

22  We are not a lawyer in the Brown case.  I am moving to strike

23  it from the record in this case.

24        **THE COURT:**  Denied.

25        **MS. WEAVER:**  We were not present in those

1    depositions and had no --

2                **THE COURT:**  That's fine.  I'm still denying it.

3            **MR. BARNES:**  Thank you, Your Honor.

4            **MR. SCHAPIRO:**  It's in the Complaint, not just in

5    depositions in Brown, Your Honor.

6        So the scope agreement is really -- it's a red herring

7    here, this argument that oh, well Google does or may -- there

8    is a dispute about whether Google does certain things

9    internally.  The question instead is, was there something that

10   violated the agreement -- that vitiated the agreement that we

11   had from the plaintiffs when they clicked those very clear

12   documents, and the answer is that there is not.

13       You had also asked, although I don't know if it's worth

14   coming back to, where the Chrome Privacy Notice states that --

15   sorry -- where Chrome is described as potentially faster,

16   loading pages faster.  I'm told it's page 3 of the notice.  But

17   our position is that that's not material.  The question really

18   is just this Privacy Notice, which says these are features

19   specific to Chrome, really provides any basis to vitiate the

20   consent that was admittedly given by these named plaintiffs.

21               **THE COURT:**  Okay.  I understand the arguments.

22       Any final comments on this motion, which is really all

23   about consent?

24           **MR. SCHAPIRO:**  Nothing here.

25           **MR. BARNES:**  Two from the plaintiffs, Your Honor.

1        Google just said scope really is not at issue.  That is an

2    incorrect statement of law.  Consent is not an all-or-nothing

3    proposition.  I think that statement is inconsistent with

4    Your Honor's ruling in the *Silver vs. Stripe* case which is 2021

5    Westlaw 3191752 that we cite in the papers.

6        It is also inconsistent with *Theofel vs. Farey-Jones*,

7    which is a Ninth Circuit case on point which says the Ninth

8    Circuit grants no refuge to a defendant who would have internal

9    comments like Google has about its broken consent process in

10    this case.

11        And finally there is a case from the First Circuit called

12    *In Re Pharmatrak* that points out the hypothetical situation

13    where a company has a software product where it makes a

14    contractual promise not to disclose personal information to its

15    own servers, and the defendant in that case argued it had

16    gained consent because people just know, basically, was the

17    argument.  And the First Circuit in very -- very prescient

18    language explained that when you make a contractual promise

19    that is clear, as Your Honor has said these promises are

20    clear --

21            **THE COURT:**  Don't put words in my mouth.

22        **MR. BARNES:**  I apologize, Your Honor.

23        We believe these promises are clear.  That you can't back

24    away from it by some general inclination that people consent

25    without a specific undoing of that promise.

1       **THE COURT:** Okay.

2       **MR. SCHAPIRO:** Your Honor, can I just respond briefly

3   to that because the -- the argument about scope is the same

4   argument that was made to -- to Judge Davilla and to the Ninth

5   Circuit --

6       **THE COURT:** Davila.

7       **MR. SCHAPIRO:** Davila. I apologize. I'm from

8   Chicago, Your Honor.

9       -- Judge Davila and to the Ninth Circuit, I believe even

10  by Mr. Barnes in the *Smith vs. Facebook* case, and it was

11  rejected.

12      The language that Google used here in the Accountholder

13  Agreements and the Privacy Policy exceeds the level of

14  specificity that was held accurate there in that case and I

15  believe -- I don't want to -- you're way more familiar than I

16  am with the *Smith vs. Silver* case, but in the *Smith vs.*

17  *Facebook* case, the disclosure said we use this to target ads,

18  and in the *Smith vs.* -- excuse me -- in the *Silver vs. Stripe*

19  case, the disclosure said we obtain identifiers, demographic

20  information, commercial information, Internet activity.  In

21  both of those cases, that was ruled sufficient to describe the

22  use.  And to try and go further -- again, we dispute that there

23  is any evidence that Google went beyond the scope of consent,

24  but to require a description of everything that a company might

25  do with data is not legally required and would be an

1    impractical standard.

2            **THE COURT:**  Okay.  Let's move on.  I've got a really

3    very full calendar today.

4        So on the motion for class cert.  And obviously this is

5    done in the context of having a pending motion for summary

6    judgment.  If I grant the motion for summary judgment, then you

7    have no class plaintiffs, so that would be denied; right?

8        In terms of class cert, there are lots of different

9    issues.  Defendants don't really argue that numerosity does not

10    matter; right?  To the extent there is anything, this is "we've

11    got numerosity."

12            **MR. SCHAPIRO:**  That's correct, Your Honor.

13            **THE COURT:**  I do have a question, though, about how we

14    are identifying -- it's the same question that I've had in

15    Apple cases.  Discovery indicates that there are more than

16    418 million versions of the Chrome browser in use as of

17    September 2020.  Of those, 60 percent desktop users, 43 percent

18    Android users don't sync their accounts.

19        Do we have people, accounts, or just open browsers?  What

20    is it that we actually have?  Because I need people.

21            **MS. WEAVER:**  Understood, Your Honor.

22        We like those people.  They're our clients.  And we can

23    identify them in Google's records.

24        I have your Apple decision here in front of me, and you

25    did say there Apple's records cannot isolate the class members.

1    We have that ability here in spades.  The Shafiq report --

2            **THE COURT:**  Okay.

3            **MS. WEAVER:**  The Shafiq report --

4            **THE COURT:**  I'm just asking the question.

5            **MR. SCHAPIRO:**  And we dispute that, Your Honor, at

6    least in part.

7        This proposed class includes, among others, people who

8    aren't even Google accountholders, so if someone doesn't have a

9    Google account, there is no way to associate a human with that

10   instance of Chrome's.

11           **THE COURT:**  And let's talk about that as well.  Every

12   plaintiff clicked the Consent Bump Agreement and/or has an

13   account, so that's at issue.

14       For those who did not -- and let me just make sure that I

15   understand the facts because clearly you all live these cases

16   and I don't.

17       Can you use Chrome and not be an accountholder?

18           **MR. SCHAPIRO:**  Yes.  And, in fact, Your Honor --

19           **THE COURT:**  That's all I need.  Hold on, Mr. Schapiro.

20       So the answer to the question is "yes."  So there is a

21   group of people out there, right, who can use Chrome and not be

22   accountholders.

23           **MR. SCHAPIRO:**  And if I could just say -- I'm getting

24   excited about this, Your Honor, but that is what that statement

25   in the Chrome Privacy Notice is telling people.  You don't have

```
 1   to provide personal information to use Chrome, meaning you
 2   don't have to sign up for an account.
 3           THE COURT:  Okay.  Hold on.
 4       This issue of whether or not the Consent Bump Agreement
 5   somehow overrides the Chrome policy, none of the current
 6   representatives can -- are similarly situated to a
 7   non-accountholder who doesn't have that problem.
 8           MS. WEAVER:  That's not true, Your Honor.
 9           THE COURT:  Who?
10           MS. WEAVER:  So non-Google accountholders are, for
11   example, part of the preservation order so they can click on
12   the Consent Bump but not have a Google account, yes.
13           THE COURT:  Which plaintiff is not an accountholder
14   and has -- for which the Consent Bump Agreement arguments do
15   not apply?
16           MS. WEAVER:  That is a good question.  Okay.
17           THE COURT:  I looked through this, and I think the
18   answer is there's none.
19           MR. BARNES:  All of our plaintiffs are accountholders.
20           THE COURT:  Exactly.
21           MS. WEAVER:  Yes.  That's true.
22           THE COURT:  So there are no plaintiffs who don't have
23   the ability to argue that whole issue that Google is concerned
24   about with Consent Bump Agreement -- there are no plaintiffs
25   who can say, Well, that doesn't apply to me, and, in fact, it
```

1    doesn't apply to all those millions of users who don't have an

2    account with Google.

3        MS. WEAVER:  That is true.  And if Your Honor finds

4    that dispositive, in fact, the preservation order that was

5    entered by Judge van Keulen identifies non-Google

6    accountholders whose data was taken while they were not synced,

7    and we would seek leave to substitute someone in as a class

8    representative on their behalf.

9        THE COURT:  All right.  So I wanted to make sure I

10   understood that specific issue.

11       MS. WEAVER:  And I might submit, Your Honor, that for

12   purposes of this case, there is no conflict between Google

13   accountholders and non-Google accountholders whose data was

14   taken while not synced because the representations are uniform

15   across both sets of plaintiffs, meaning the at-issue statements

16   apply to --

17       THE COURT:  Where do I find that the Consent Bump

18   Agreement -- that the plaintiffs in fact consented to what

19   the -- to what Google says?  You want me to throw the whole

20   case out?  Is that what you are saying?

21       MS. WEAVER:  Yes.  I'm saying they are similarly

22   situated.  I think that Google accountholders are adequate reps

23   for non-Google accountholders and the inverse because the

24   statements don't turn on whether or not they're Google

25   accountholders.

1          **THE COURT:**  Ms. Weaver --

2          **MS. WEAVER:**  Yes.

3          **THE COURT:**  -- I want to be very clear on this.  If I

4     find for Google on the motion for summary judgment, you are

5     explicitly saying that you want to take this to the Ninth

6     Circuit, that you are not asking me for any leave to have a

7     different plaintiff who can represent non-accountholders; is

8     that correct?

9          **MS. WEAVER:**  I would ask you for leave if you found

10    that to be dispositive, yes.

11         **MR. SCHAPIRO:**  And if I may, Your Honor, I think that

12    that shines a light on one of the problems here, because either

13    these plaintiffs are appropriately situated to represent the

14    entire class or they're not.  We would argue that there truly

15    is no way to identify non-Google accountholders, but that's

16    really just the tip of the iceberg.

17         **THE COURT:**  It's one of many issues.

18         **MR. SCHAPIRO:**  The proposed class includes people who

19    expressly consented to the data through these agreements and

20    people who didn't; people who read the Chrome Privacy Notice on

21    which most of these claims are based, those who didn't; people

22    who are aware of the data collection because they reviewed My

23    Activities -- Your Honor, tens of millions of people, including

24    one of the named plaintiffs, do that every week -- and people

25    who didn't; people for whom their data was associated with a

1    Google account and for whom it was not.  I could go on.

2        But a group trial could never provide due process or

3    fairness to Google or even to absent class members in

4    circumstances such as this.

5            **MS. WEAVER:**  If I may respond, Your Honor?

6            **THE COURT:**  You may.

7            **MS. WEAVER:**  Google's entire motion for summary

8    judgment was brought on a class-wide basis --

9            **THE COURT:**  No --

10           **MS. WEAVER:**  They didn't distinguish --

11           **MR. SCHAPIRO:**  Huh-uh.

12           **THE COURT:**  It is not.  The class isn't certified.

13           **MS. WEAVER:**  Fair enough.  Well, that is a true point.

14   But what I mean is the representations are uniform.  And these

15   are -- and what Your Honor, I believe, was --

16           **THE COURT:**  So as I understand it, Google has taken a

17   very strategic approach to their motion.  They get one.  I told

18   them not to bring it.  They brought it anyway.  But I've not

19   certified a class, and so any ruling with respect to their

20   motion for summary judgment is specific to the named

21   plaintiffs.

22       Frequently defendants do not bring motions for summary

23   judgment until after a class is certified because then the

24   ruling applies to the whole class.  Defense lawyers are

25   sophisticated.  They know what they're doing.  And any ruling

1    would not apply to a class that's not been certified.

2            MS. WEAVER:  Understood, Your Honor.  And I agree.

3            MR. SCHAPIRO:  And, Your Honor, in our view, of

4    course, the -- certainly agreeing with everything you've just

5    said, of course.  The motion for summary judgment and the class

6    certification motion go -- or our opposition here go hand in

7    hand.  So, you know, we've moved for summary judgment because

8    these named plaintiffs gave express consent --

9            THE COURT:  I understand.  But assuming that I denied

10   your motion, I still have a pending class cert motion.

11        And I hear your arguments with respect to the various

12   differences between how people engage with Chrome and searching

13   on Google, but I would expect that you would make the same

14   arguments as you have with respect to the -- that group in any

15   event; right?

16           MR. SCHAPIRO:  Yes.  I think -- I think that's

17   correct.

18           THE COURT:  Okay.

19        I think that really just highlights what the issues are

20   for the class cert motion.

21        We need to talk about damages, and I'll let you talk some

22   about the *Dauberts* which impact that motion.

23           MR. SCHAPIRO:  All right.  Then I will step aside.

24        I just want to say two things in closing, Your Honor, if I

25   may.

1      **THE COURT:**  You may.

2      **MR. SCHAPIRO:**  One is the thing I overlooked but

3  wanted to remind the Court because we mentioned it in our

4  papers, that the plaintiffs in their responses to us have

5  admitted that they are legally deemed to have agreed to the

6  Privacy Policy as well so not just the Accountholder

7  Agreements.

8      And, secondly, just that no one who reviewed the My

9  Activity page could possibly think that using Chrome in its

10  basic default state somehow keeps the data from being received

11  by Google.

12      **THE COURT:**  Okay.  And remind me quickly, so I have

13  it, which of the plaintiffs did that?

14      **MR. SCHAPIRO:**  It was Johnson -- Johnson is the one

15  who we know, Rodney Johnson, who reviewed his My Activity page

16  in 2019.

17      We also know that tens of millions of consumers review

18  that every -- page -- their pages every week, and we've

19  provided examples in our submissions of what one would see when

20  one goes there.

21      I'll leave it at that.

22      **THE COURT:**  Okay.

23      **MS. WEAVER:**  If I may respond on that point,

24  Your Honor?

25      **THE COURT:**  You may.

1          **MS. WEAVER:**   The My Activity page is a woefully

2     inadequate disclosure of what Google is actually doing.   And as

3     Mr. Barnes said, you can't have consent without full

4     disclosure.

5          At Docket 340-8, Exhibit G, the same plaintiff said, "My

6     searches and communications are reflections of who I am, and I

7     never consented to Chrome sharing my personal information with

8     Google."

9          I think it is a question for the jury.   Dr. Corinice

10    Wilson, who is the executive director of Tulsa Community

11    College and one of our plaintiffs, said in her deposition, "Why

12    would I have to take steps to protect data that should not have

13    been stored?   If I do not sync, that information's not

14    collected on the server and is not disseminated, it's not

15    taken.   That is the promise that Google makes."

16         So she said, "Again, using my example of AT&T, when I

17    place a call, I'm not expecting someone to listen and then go

18    say, 'This is what Dr. Wilson is thinking and feeling' and

19    having a personalized experience and then disseminating that

20    information."

21         You know, I think the Court would be correct to find that

22    in the absence of an express negation, "Okay, we told you that

23    if you don't sync, Chrome's not sending data, personal

24    information to Google," and in fact we have proven in the

25    Complaint in paragraphs -- we have examples from the outset of

1    this litigation that that is exactly what Google is doing.

2        And what you heard Mr. Schapiro say is, "Oh, we do receive

3    the data.  We're just using it for a different purpose."  So

4    there is no denial that they promised not to do something, and

5    it's undisputed that they're doing it for everyone:  Google

6    accountholders, non-Google accountholders.  Anyone who

7    downloads Chrome, their personal information is sent from

8    Chrome to Google.

9        And we want to show the jury it in realtime, like in our

10   paragraph -- in our Complaint, we have paragraphs that are just

11   snapshots, but when our named plaintiffs saw the data flowing

12   from their -- and it happens in milliseconds, in the blink of

13   an eye to Google.

14       And then the second piece, which we have not gotten to, is

15   for breach of good faith and unfair dealing.  Obviously the

16   contractual claims can be certified.  Breach of good faith and

17   unfair dealing, there are multiple practices not disclosed in

18   the Complaint.  And, in fact, Google initially, in the related

19   case, denied they created profiles.  Well, they do.  It's in

20   our opening motion.  And the plaintiffs are not comfortable

21   with it.  It's in the record.

22       Dr. Wilson also testified at Docket 340-10, Exhibit 1, "I

23   believe my online activity should be private, and it should not

24   be used by Google to create a file about me and my online

25   activity."

1      And in terms of frustrating the purpose of the contract,

2  Your Honor, they haven't stopped.  They've had these records

3  and these Fiddler files in their position since we filed this

4  Complaint, and for two years, Google could have done two

5  things.  They could have had Chrome stop sending personal

6  information to Google or they could have told people the truth.

7      Why not change the disclosure?  Why not just give the

8  express negation?  "You know what, if you don't sync, we're

9  still sending your personal information to Google."  That is

10  what's offensive on a class-wide basis.

11          **THE COURT:**  It's strategic, and you know that as well.

12  They change it, and then you use it against them.

13          **MR. SCHAPIRO:**  Your Honor, two sentences in response.

14          **THE COURT:**  That's one.

15          **MR. SCHAPIRO:**  I do not believe -- Your Honor, I do

16  not believe that that's responsive to the point I made.

17      The point I made was that no one could look at the My

18  Activity page and believe that using Sync in its basic default

19  mode was somehow a privacy tool that doesn't share any

20  information.

21      Secondly, the Fiddler information is visible through

22  Chrome.  You can just open it up, and so that's the point.

23          **THE COURT:**  I understand your perspectives.

24          **MR. SCHAPIRO:**  Thank you.

25          **THE COURT:**  Okay.  On *Dauberts*, who do I have for the

1    *Daubert*?  I have Mr. Straite.

2              **MS. WEAVER:**  Depending on the *Daubert*.  For Mangum,

3    it's Mr. Barnes, and for the others, it's Mr. Straite.

4              **THE COURT:**  Mr. Straite.

5         On the defense, the *Dauberts*?

6              **MR. BROOME:**  Thank you, Your Honor.

7              **THE COURT REPORTER:**  Your name, please.

8              **MR.BROOME:**  Stephen Broome.

9              **THE COURT:**  Would you repeat your names.

10             **MS. WEAVER:**  David Straite for the plaintiffs.

11             **MR. BROOME:**  Could I just clarify, Your Honor, are we

12   talking about the motion to strike Professors Turow and John?

13             **THE COURT:**  We can start there.

14             **MR. BROOME:**  Okay.

15             **THE COURT:**  I didn't hear your name.

16             **MR. BROOME:**  Stephen Broome, Your Honor, from Quinn

17   Emanuel.

18        Your Honor, both Professors John and Turow purport to

19   opine on how reasonable people would interpret certain of

20   Google's disclosures, and they offer opinions about consumer

21   expectations relating to online privacy.  They both

22   acknowledged in their reports that the scientific method that

23   they and others in their field typically apply is to conduct a

24   consumer survey, but neither of them did that here.  And, in

25   fact, in depositions, both experts rejected the idea of doing a

1    survey in this case.  They opt instead to just read Google's

2    disclosures themselves --

3         **THE COURT:**  So, look, this is what I'm going to do.

4    To the extent that I try this case -- and I've tried class

5    actions -- experts cannot -- and some of them here try to --

6    opine on the ultimate issue of fact.  Some of these experts

7    say, "A reasonable person would find X."  That is not

8    acceptable.  The "reasonable person" by definition is the jury.

9    What the jury decides is what a reasonable person finds.

10        What an expert can say -- and that's why I'm not prepared

11   to strike the experts in their entirety -- is that, "Look,

12   Ladies and Gentlemen of the Jury, I've done all of these

13   surveys.  For the last 20 years, I have been working on these

14   topics, marketing, digital media, and what I can -- I can tell

15   you what I've found.  I have found X, Y, Z."  And the jury can

16   take that information and decide what is reasonable.

17        I do not let experts take the next step, which is to say,

18   "I'm telling you, Ladies and Gentlemen, this is reasonable."

19   If they want to do that, they have to qualify to sit on the

20   jury, and of course they won't.

21        So what I end up having to do is figure out -- because

22   these -- all of these individuals have qualifications.  That

23   would be a typical *Daubert*, that they don't have

24   qualifications, but all these experts do.  The question is have

25   they gone too far.  Sometimes they have and sometimes they have

1    not.

2        Is there any opinion in particular that you're concerned

3    about with respect to -- that you'd like to discuss with

4    respect to Turow or John?

5        **MR. BROOME:**  Well, for both experts, Your Honor, I

6    think in light of your comments, any opinion that goes to what

7    reasonable people would think we say is -- goes too far, and I

8    think that is the gist of all of their opinions.

9        Some of the opinions in Ms.-- sorry -- excuse me -- in

10   Professor John's report I think are just too vague to even

11   assist the trier of fact like one of the opinions is that

12   people care about privacy.  Privacy is important.

13       **THE COURT:**  I don't agree with that.  I mean -- and,

14   frankly, you know, it's something that you can cross-examine

15   on.  I don't know that 20-year-olds think privacy is important

16   at all.

17       **MR. BROOME:**  I would agree.

18       **THE COURT:**  Now, a federal judge, yeah, I would say we

19   think privacy is very of important.

20       **MR. BROOME:**  Understood, Your Honor.

21       The other defect I would like to highlight with respect to

22   Professors John and Turow is that they do not define key terms

23   in their reports in order to render their opinions.

24       **THE COURT:**  That's what deposition is for.  If you

25   didn't ask them what they meant, that's on you.

1      **MR. BROOME:**  We did ask them what they meant, and they

2  were unable to define it, and that is the reason we're raising

3  it.  Obviously one of the key issues in the case is how

4  somebody would interpret the term "personal information," and

5  neither of the -- of these experts, these consumer

6  expectations experts --

7      **THE COURT:**  That's not the basis for a *Daubert* motion,

8  is it?  How does that fall within the context of a *Daubert*?

9      **MR. BROOME:**  I think it's ultimately going to wind up

10  confusing the jury.

11      **THE COURT:**  How is that within the framework, the

12  legal framework of what a *Daubert* is?

13      **MR. BROOME:**  It's unreliable testimony, Your Honor.

14  They haven't gone deep enough in analyzing the actual phrases

15  at issue in the case.

16      **THE COURT:**  I'm not persuaded on that particular

17  point.

18      **MR. BROOME:**  Understood, Your Honor.

19      **THE COURT:**  Any comments?

20      **MR. STRAITE:**  No, Your Honor.  We stand on the papers,

21  and we hear you regarding the limitation of what they can and

22  cannot testify with respect to ultimate questions.  We hear

23  you.

24      **THE COURT:**  And you understand that they have, in

25  fact, tried to do that, and those things will be stricken.

1          **MR. STRAITE:**  Understood, Your Honor.

2          **THE COURT:**  Okay.  Let's move to damages.

3          **MR. BROOME:**  Your Honor, if I could make one

4    additional point with respect to, frankly, all of the experts.

5    We have the objection to the reply evidence.  We negotiated a

6    schedule with the plaintiffs for class certification.

7    Judge Koh ordered that class certification expert discovery

8    occur before class certification briefing, and with plaintiffs'

9    reply brief, we got five additional expert reports, most of

10   them two, three, four, five times longer than the original

11   reports.  That was after we had deposed all of these experts.

12        And obviously we've had no opportunity to challenge these

13   opinions.  And there is serious prejudice to Google here,

14   Your Honor, because some of these opinions, especially the

15   technical ones, are based on tests that -- of complicated

16   technological systems that the plaintiffs' experts ran after we

17   deposed them, and we've got hundred-page reports that --

18          **THE COURT:**  Don't worry.  If we go to trial on this

19   case, you will have plenty of opportunity to make sure that the

20   discovery you need has been taken.

21          **MR. BROOME:**  Understood, Your Honor.  We just -- we

22   would ask that they not be considered with respect to the class

23   certification motion.

24          **THE COURT:**  I'll think about it.  Okay.

25          **MR. BROOME:**  Thank you, Your Honor.

1          **THE COURT:**  Damages.

2      State your appearances for the record, please.

3          **MR. BARNES:**  Jay Barnes again on behalf of the

4  plaintiffs, Your Honor.

5          **MS. TREBICKA:**  Viola Trebicka with Quinn Emanuel on

6  behalf of Google.

7          **THE COURT:**  Good morning.

8      I want to start with this notion of unjust enrichment and

9  restitution and the legal basis upon which that is a proper

10  remedy.

11      Mr. Barnes.

12          **MR. BARNES:**  Thank you, Your Honor.

13      In a situation where there is a contract that includes

14  affirmative statements and a contracting party's promise not to

15  use something, unjust enrichment -- restitution is available as

16  a contract remedy.

17      I took your question from the contract claim first.

18  Perhaps you meant it from the other --

19          **THE COURT:**  So this is not -- right?  This is not a

20  contract that's -- where, you know, I hire one person to do

21  something else.  We sign a contract.  We know what kind of --

22  you know, pay you $50,000 to fix my bathroom or something, to

23  renovate.

24      We have policies here.  One of the first questions I had

25  is where is the consideration.  If you have a breach -- if you

1    have a contract claim, you have to have consideration.  What is

2    the consideration?  Back to Law School 101.

3         MR. BARNES:  Great question, Your Honor.  Two things.

4    Use of the browser itself is consideration because it

5    gives Google the opportunity, when a user does certain things,

6    to take advantage of that.  There is -- there is also a mutual

7    exchange of promises, which is consideration in and of itself,

8    and it gives Google the opportunity to get in the door with a

9    product that would permit the plaintiff perhaps to use Sync so

10   that Google could use said information.

11   So there is your consideration.  It's a mutual exchange of

12   promises.  It is the use of the product because Google wants

13   people to use its product, which also includes the opportunity

14   for Google, if the plaintiff then chooses, to take advantage of

15   the use of that product if the plaintiff so chooses.

16        MS. TREBICKA:  May I respond, Your Honor?

17        THE COURT:  Yes.

18        MS. TREBICKA:  Consideration doesn't have to be more

19   than a peppercorn, but it has to be a peppercorn that goes from

20   one party to the other to be consideration.

21        THE COURT:  Is there a contract or not?

22        MS. TREBICKA:  We do not dispute that -- that's not

23   something that we are disputing for purposes of damages.

24        THE COURT:  So simple answer is yes?  There is a

25   contract?

1          **MS. TREBICKA:**  Your Honor, yes, there is a contract.

2          **THE COURT:**  Okay.  Just say "yes."  I've got a lot of

3     things to do today.  So if I ask you a simple question, give me

4     a simple answer.

5          **MS. TREBICKA:**  Your Honor, yes.

6       I do take issue, though, with the consideration that

7     plaintiffs' counsel identified.

8          **THE COURT:**  That's fine.  That's not ultimately the

9     driving issue.

10      All right.  So everybody agrees there's a contract.  In

11    terms of the law of restitution or the law of unjust

12    enrichment, what is your best case that those are legal

13    remedies available for an express breach of contract claim?

14         **MR. BARNES:**  It is *Landsberg vs. Scrabble Crossword*

15    *Game Players* which is 802 F.2d 1193.  That's a Ninth Circuit

16    case from 1986.  That is -- I found that case.  I figured

17    Your Honor might ask that after reading Google's reply.

18      That's a case where the promise at issue was two things.

19    One, that the defendant could use and pay for the manuscript

20    that the plaintiff had created and also that the defendant

21    would not use or copy the manuscript without his consent and

22    without payment to him of an acceptable sum.

23      And what the Ninth Circuit held in this case was that the

24    plaintiff was able to recover not just the first promise which

25    was that, Hey, we'll pay you for the manuscript, but also the

1   amount of unjust enrichment received as a result of breaching

2   the promise not to use the information without his permission

3   and consent, which we think fits a lot -- along the lines of

4   this case perfectly because this contract includes multiple

5   express promises about not using -- first of all, not even

6   sending, but then second of all, not using personal information

7   without authorization.

8       And the Ninth Circuit held in that case that the best

9   measure of the plaintiff's losses due to the breach consistent

10  with Cal Civil Code 3358 would be both the defendant's

11  unjust -- would include the unjust enrichment and, quote, to

12  read the contract as requiring anything less than both

13  compensation and permission would be to sanction a forced

14  exchange.

15      And that essentially is what's going --

16          **THE COURT:**  When did you find that case?

17      **MR. BARNES:**  Last night, Your Honor, preparing for --

18  looking at Google's reply and thinking that Your Honor might

19  ask this specific question about a better case than what we

20  had.

21          **THE COURT:**  Did you let the defense know?

22      **MR. BARNES:**  No, Your Honor.  It was late last night.

23          **THE COURT:**  Okay.  In the future -- we've got a lot of

24  lawyers here -- you let the other side know.  I've said this

25  many times.  How is she supposed to respond?  You could have

1    sent her -- I sat on a Ninth Circuit panel, had a judge send

2    me -- we were exchanging notes about what case, you know, might

3    force a decision one way versus the other.

4        They have emails.

5            MR. BARNES:  I understand, Your Honor.

6        We also cite cases in our briefs that we think stand for

7    that proposition, but the -- we thought it was a Ninth Circuit

8    case that is the best case for this proposition.  And --

9            THE COURT:  On the contrary, what is your best case

10   that it's not, or do you agree that those are available --

11           MS. TREBICKA:  We do not.  For breach of contract, we

12   do not, Your Honor.  They are not available.

13       The best case for restitution is *Parino vs. Bidrack, Inc.*

14   It is cited in our papers.  838 F.Supp.2d 900.

15       And further, for unjust enrichment, California Civil Code

16   3358 and authorities that rely on it, which are also cited in

17   our motion, that limit expressly contract damages to an amount

18   no greater than the plaintiff could have gained by the full

19   performance of the contract on both sides.

20       Here, of course, plaintiffs paid nothing to use Chrome,

21   and therefore that amount is zero.

22       That applies equally to the good faith and fair dealing,

23   Your Honor, and that is established in the case law, *Johnson*

24   *vs. Napa Valley Wine Train*, N.D. Cal February 9th, 2016.

25           THE COURT:  You agree under California law that unjust

enrichment is, in fact, a remedy?

**MS. TREBICKA:**  It is a remedy, Your Honor.  It is not a remedy for breach of contract.

**THE COURT:**  What is it a remedy for?

**MS. TREBICKA:**  It could be a remedy for a tort, for example, but not for contract.  It could also be a remedy -- Your Honor, may I -- it could be a remedy for quasi-contract.

**THE COURT:**  Right.  So why is that claim not here?

**MR. BARNES:**  At the beginning of this case, we were asked to prioritize claims.  I think we may have an unjust enrichment claim or a quasi-contract claim, and it didn't make the prioritized list.

I apologize, Your Honor.  I don't have the list of the other claims that have sort of been pushed behind.

**THE COURT:**  It didn't.  So my question is -- and I looked at it.  You chose strategically to bring an express breach of contract claim when I'm struggling to see what express damages or what kinds of damages can be available.

Unjust enrichment is, in fact, a remedy under California law, but it is brought in a quasi-contract basis, and yet you left that claim -- you decided not to proceed on that claim.

**MR. BARNES:**  I think that we were forced to make choices and that did not -- we were forced to have basically a draft with the defendant about what claims would go forward and be prioritized.  It is Count 10 --

1          **THE COURT:** I know what it is.

2          **MR. BARNES:** Okay.

3      And, yes, it did not make the draft. So I believe that we

4  had -- how many choices did we have? There were ten total made

5  and then we had five, they had five. And we wanted to make

6  sure to hit --

7          **THE COURT:** What do you mean they had five and you had

8  five?

9          **MR. BARNES:** When Judge Koh ordered us to prioritize

10 claims, the defendants got to pick five and the plaintiffs were

11 told to pick five.

12         **THE COURT:** The defendants were able to pick your

13 claims?

14         **MR. BARNES:** Yes.

15         **THE COURT:** Well, that's interesting.

16         **MR. BARNES:** And I apologize for not sending the

17 *Landsberg vs. Scrabble* case to counsel. It's a last-minute

18 find.

19         **THE COURT:** Every time it happens, I just make the

20 point again.

21         **MR. BARNES:** Okay.

22         **MS. TREBICKA:** Your Honor, may I respond?

23         **THE COURT:** No.

24     All right. In terms of -- and the reason I'm not is

25 because I'm still struggling with whether or not you can

1    actually -- it's not as if the -- it's not an appropriate

2    remedy.  It just has to be an appropriate remedy for the

3    pending claim.  And it's not clear to me that the remedy that

4    you seek is available under the claims that you have.  That's

5    what I'm struggling with.

6        And I understand that you still have that claim there.

7    It's never been dismissed.  But it's not -- as you all know, I

8    inherited this case, and it's not how I would have dealt with

9    it in the first instance.

10       All right.  What else do you all want to say about

11   damages?

12           MS. TREBICKA:  Who starts, Your Honor?  Mr. Barnes and

13   I are looking at each other.  Who would you like to start?

14           THE COURT:  You can.

15           MS. TREBICKA:  Thank you, Your Honor.

16       Allocation, Your Honor, is going to be a big issue --

17           THE COURT:  I wouldn't spend a lot time on that.  We

18   have many issues to get to before allocation.

19           MS. TREBICKA:  I understand, Your Honor.

20       Uninjured class members for damages as well.

21       Well, actually let me take a step back and say the issue

22   that Your Honor identified where there is a claim but there is

23   no remedy that plaintiffs have identified is not limited to

24   breach of contract.  It is also the case for some of their

25   other claims, and if Your Honor has an interest in me going

1    through those, I'd be happy to do that.

2              **THE COURT:**  Well, I've read your brief.

3              **MS. TREBICKA:**  Okay.

4              **THE COURT:**  I don't agree with everything that you

5    argue, but -- for instance, nominal damages I think are

6    appropriate.  I don't agree with you there.  Statutory damages

7    under CIPA I think are appropriate.

8         I don't know what the plaintiffs mean by general damages.

9    It has no meaning to me in the context of this case.

10             **MS. TREBICKA:**  Your Honor, with respect to nominal

11   damages, there is a recent case out of the Northern District of

12   California that I have brought copies of.

13             **THE COURT:**  You did the same thing?  You had this and

14   didn't tell the other side?

15             **MS. TREBICKA:**  We did find it last night as well, but

16   I have copies, and I'm happy to share.

17             **THE COURT:**  Did you send him an email?

18             **MS. TREBICKA:**  I did not.

19             **THE COURT:**  Okay.  So same to you.

20             **MS. TREBICKA:**  Understood, Your Honor.

21             **THE COURT:**  Both sides are doing the same thing.  It

22   would be better if you had exchanged that information.

23        Give me a cite.  I don't need a copy.

24             **MR. BARNES:**  May we have a copy?

25             **MS. TREBICKA:**  I will give you a copy.

```
1              MR. BARNES:  Thank you.
2              MS. TREBICKA:  Your Honor, the cite is Siino vs.
3    Foresters Life Insurance and Annuity, 340 F.R.D. 157.
4              THE COURT:  All right.  You have extra copies?
5              MS. TREBICKA:  I do, Your Honor.
6              THE COURT:  Just hand it to my law clerk.  Okay.  And
7    the --
8              MS. TREBICKA:  And, Your Honor --
9              THE COURT:  The short point of the case?
10             MS. TREBICKA:  The short point is that nominal -- a
11   class may not be certified based on nominal damages alone.
12             THE COURT:  Okay.
13             MS. TREBICKA:  And we agree with that, Your Honor.
14   And it's an established precedent also in the Brazil vs. Dole
15   case by Judge Koh.  And I can -- I have that cite.  That is
16   cited in our brief, but I can --
17             THE COURT:  I have it.
18             MS. TREBICKA:  Okay.
19             THE COURT:  Okay.
20             MS. TREBICKA:  Your Honor, I'd like to talk about
21   uninjured class members as well.
22             THE COURT:  All right.
23             MS. TREBICKA:  And the Supreme Court there in
24   TransUnion has affirmed that an unharmed class member may not
25   be awarded damages.
```

1    The Ninth Circuit in *Olean* recently confirmed that the

2    district court must determine that the common question

3    predominates over any individual questions at the class

4    certification stage, including individualized questions about

5    injury, and we have details --

6        **THE COURT:**  I'm very familiar with *TransUnion* and

7    *Olean*.  What else?

8        **MS. TREBICKA:**  Your Honor, Dr. Mangum and, as a

9    result, plaintiffs do not have a methodology that is common to

10   the class to identify and exclude unharmed class members.  Just

11   as an example, Dr. Mangum's methodology fails to account for

12   users who are not entitled to restitution because the benefit

13   that they obtained in the form of personalized content, which

14   is well supported in the record, nullifies any harm that they

15   may have incurred.  It's sort of a dial.  It may -- it both

16   works towards variability, therefore necessitating

17   individualized inquiries into the harm and the amount of

18   restitution that is due, but it also works if it's -- if the

19   benefit is high enough, it also works to nullify any

20   restitution and therefore any harm to the -- to the putative

21   class member.

22       Here Chrome is a free product, and some plaintiffs have

23   testified that they do not have any out-of-pocket costs and

24   others have claimed that they have paid some minimal amounts,

25   but that just adds to the individualized inquiry here.  The

1    determination of harm will necessarily be individualized.

2         **THE COURT:**  Well, it's interesting you use the word

3    "free."  I think economists say that there is no such thing as

4    free; right?  And Google certainly makes a lot of money.

5    But -- interesting.

6         All right.  Any comment?

7         **MR. BARNES:**  Yes, Your Honor.

8         There are no uninjured class members.  We deal with this

9    in the response to the *Daubert* motion on Mangum.  Google's

10   experts, they -- they raised five issues on how the

11   transmissions of personal information might be blocked.  Our

12   experts refute that.  And in addition to that, their experts

13   admitted in many cases in their depositions that the methods

14   they said would lead to a class member being uninjured do not

15   work the way they had said in their initial report.

16        In addition to that, there's a Google employee who

17   testified.  Again, it's cited in our opp to the Mangum papers,

18   explaining the technical background of the uninjured class

19   members.

20        In addition to that, there is a way to do so.  We have a

21   simple theory of liability and a simple damages model that

22   matches it.  The theory of liability is that Chrome promised

23   not to send personal information to Google.  Google took it and

24   profited from it.

25        The damages models are -- on the economic side are

twofold.  One is for the restitution, and that asks the question what is the fair market value of the personal information that is sent from Chrome to Google without authorization.  For that, we use Google's own assessment of what the fair market value of this is.

Google has a program.  It's called Screenwise.  It is a publicly-known program where they pay users a per device per month amount based solely on collecting browsing history associated with the identifiers connected in this account. It's a separate amount for the browser and the browsing history.  And they pay the same amount to participants in that program, regardless of whether they receive one transmission or a million transmissions from that participant in the program, demonstrating that Google itself has put a fair -- placed a fair market value on this information.

The second method is the unjust enrichment return of the undue revenue and profits Google derived from this.  And, again, Dr. Mangum is not proposing some complicated econometric analysis.  This is math, and the formula he uses is essentially the same formula Google used internally to figure out the amount of revenue it would lose if it lost access to identifiers in Chrome.  So that's the -- that's how you calculate the broad.

With respect to the uninjured class members, Dr. Shafiq identifies a way that Google Systems can be used to identify

1   very specific communications that were taken while a user was

2   not synced.  We have an order from Judge van Keulen that Google

3   was preserving data sufficient to do that, and potentially of

4   all defendants that could be before you, this defendant more

5   than any other is capable of slicing and dicing the information

6   in this way because that's what they do every single day with

7   their ad system.

8             THE COURT:  Okay.  Any final comments?

9             MS. TREBICKA:  May I respond, Your Honor, to

10   Mr. Barnes --

11             THE COURT:  Yes.

12             MS. TREBICKA:  Yes.  Thank you.

13        So Screenwise, it is not comparable in the related case,

14   Brown case.

15             THE COURT:  Well --

16             MS. TREBICKA:  The damages expert also looked at the

17   very same program and testified it is qualitatively and

18   quantitatively --

19             THE COURT:  We can't talk about that; right?  I mean,

20   I overruled the objection in the first instance, but they

21   weren't at the depositions, so I think you need to move on.

22             MS. TREBICKA:  Understood.  They were at the

23   depositions.

24             THE COURT:  Oh, I thought Ms. Weaver said they

25   weren't.

1          **MR. BARNES:**  We were not allowed to ask any questions.

2     We were only allowed to be there as an observer, and it's not

3     our expert to defend.

4          **THE COURT:**  Let's keep going.

5          **MS. TREBICKA:**  Yes, Your Honor.

6          And it is not a fair market value of the data, the

7     Screenwise panel.  That's not the purpose of it.  The purpose

8     of it is to get a -- to gain a birdseye view of what a user

9     does, and therefore the payment that goes to the user is not

10    for the amount of data or how often the data is collected;

11    it's, rather, about understanding what a user does.  It's

12    apples and oranges with what we're trying to do here, which is

13    value the data.  It is not comparable.

14         Your Honor, the Shafiq rebuttal of course we haven't had a

15    chance to rebut, Dr. Shafiq's now methods, to show that the

16    unjust enrichment or any other compensation can be given to

17    users, but if you review that report, it's stringing together a

18    bunch of code names for projects.  It's not a methodology that

19    will allow Your Honor to actually identify damages.

20         And I'd like to point Your Honor's attention to the recent

21    *Bowerman* case in the Ninth Circuit where the district court

22    certified a class, held an eight-day trial on that class.  Only

23    after expenditure of these massive judicial resources did the

24    Ninth Circuit de-certify the class because it held that

25    determination of damages was far messier than promised by

1   plaintiff's counsel and excessively difficult.

2           **THE COURT:**  Which case was this?

3           **MS. TREBICKA:**  *Bowerman*, Your Honor.  Let me get the

4   cite for you.

5           **THE COURT:**  Is it in your brief?  Is it in your brief?

6           **MS. TREBICKA:**  It is a supplemental authority,

7   Your Honor, that we submitted because it was issued after our

8   briefing went in.

9           **THE COURT:**  That's fine.

10          **MS. TREBICKA:**  Do you want the cite?

11          **THE COURT:**  No.  As long as it's in the record, I'm

12  good.

13          **MS. TREBICKA:**  It is in the record.

14          **THE COURT:**  Okay.

15          **MS. TREBICKA:**  Yep.

16          **THE COURT:**  What I'm going to do at this point is I've

17  got a case behind yours.  I do want to hear from -- I just want

18  to hear what the issue is from the three junior lawyers so they

19  can come to the mic.

20          **MS. TREBICKA:**  Thank you, Your Honor.

21          **MR. BARNES:**  Your Honor, I'm not certain who is going

22  to cover what so I'm going to stay up until they say what it

23  is, and then we'll ...

24          **THE COURT:**  Go ahead.  Make your appearance.  Tell me

25  what your issues is.

1          **MS. OLSON:**  Good morning, Your Honor.  Aly Olson from

2     Quinn Emanuel.

3          My issues were not really affirmative so I don't really

4     need to raise them unless Your Honor has questions about them,

5     but I was prepared to discuss whether there was critiques about

6     Professor Erdem's expert report who is our survey expert and

7     Greg Fair's fact declaration, which we submitted in support of

8     both motions.

9          **THE COURT:**  Any question on those topics or comments?

10          **MR. BARNES:**  No.  I mean, look, in general we think

11     the Erdem report is not reliable.  We didn't bring a *Daubert*

12     motion, so it's really not teed up today.  And we stand on our

13     briefing with regard to Mr. Fair and the unreliability of his

14     declaration as well.

15          And I have nothing to add beyond the papers.

16          **THE COURT:**  All right.  And in just a minute or so,

17     tell me why you think it is reliable, or you can respond to

18     them.

19          **MS. OLSON:**  Sure.

20          So Mr. Fair testified and put in his declaration that he

21     was one of the creators of the consent process that we rely

22     upon in our motion for summary judgment and in opposition to

23     class certification.  And he -- he created this system and

24     helped -- and while he had people help him pull some of the

25     documents, he spoke with those people, reviewed the documents,

1  and many of the documents are public disclosures which he is

2  just kind of explaining and walking through, and the ones that

3  aren't, he has personal knowledge of and has lots of experience

4  with, which he testified about at his deposition and put in his

5  declaration.

6        **THE COURT:**  Mr. Fair seems to have a substantial

7  amount of personal knowledge.

8        **MR. STRAITE:**  He does, Your Honor, with respect to the

9  images of what is produced.  Mr. Fair was leaving the company.

10  He did not actually pull the records of which plaintiff clicked

11  which buttons.  He had someone else do that, and that person in

12  turn pushed the project off to another unnamed engineer.

13      We have no personal knowledge in the declaration that the

14  documents are what they say they are.  He took someone's else

15  word, and that person in turn took some else's word that these

16  plaintiffs were actually the plaintiffs who clicked on these

17  buttons during the Consent Bump.  It's not personal knowledge,

18  and they admitted that.

19        **THE COURT:**  Response.

20        **MS. OLSON:**  What is not in the declaration is just the

21  name of the person who pulled that, but Mr. Fair still reviewed

22  the records before putting in the declaration what he put in

23  the declaration.  He still verified them after the fact.  He

24  just didn't give plaintiffs the name.

25        **THE COURT:**  I understand.

1      Okay.  Next.

2          **MS. GAO:**  Thank you, Your Honor.  My name is Tracy

3    Gao.  I'm actually only here regarding any questions regarding

4    Special Master discovery or Google's data logging system, any

5    questions regarding that comes up, so --

6          **THE COURT:**  No one has raised it.  Is there an issue

7    that I need to hear about on that topic?

8          **MR. BARNES:**  Not today, Your Honor.

9          **THE COURT:**  Okay.  At the mic always.

10    Thank you.

11          **MS. GAO:**  Thank you, Your Honor.

12          **THE COURT:**  And last?

13          **MR. MARGOLIES:**  Your Honor, Joseph Margolies from

14    Quinn Emanuel.  I appreciate the opportunity to appear.

15      I was prepared to discuss anything about our motion for

16    leave to supplement the record.  It sounds like Your Honor has

17    already considered and dealt with that here, but if you have

18    any additional questions, I am happy to answer them.

19          **THE COURT:**  Any issue with that?

20          **MR. STRAITE:**  Thank you, Your Honor.  David Straite

21    for plaintiffs.

22      Obviously we filed our opposition.  The documents that

23    Google wants to put into this case were -- is evidence from

24    another case, related case, Brown.  It is plaintiff depositions

25    that we were not allowed to ask questions of, an expert we were

1   not allowed to ask questions of and weren't a part of, and more

2   importantly, after the motion was filed to supplement the

3   record with that extra evidence, Google is now moving to strike

4   some of that same evidence as unreliable in Brown.  So it's a

5   bit of an ironic twist.

6        We leave it to the Court's discretion.  We don't think it

7   helps the merits anyway so it's a minor issue, but it is

8   technically improper, in our view.

9        **THE COURT:**  Okay.  So how is that fair?

10       **MR. MARGOLIES:**  Well, Your Honor, we believe you are

11  entitled to consider that information when you are being asked

12  in two different cases to certify classes that are potentially

13  conflicting, and we believe that the information is important

14  because plaintiffs have essentially alleged that people would

15  uniformly believe reasonably that the contract means one thing

16  whereas we have evidence from members of the same class --

17       **THE COURT:**  If you were going to use the evidence in

18  this case, why didn't you afford them the opportunity to ask

19  questions at the deposition?

20       **MR. MARGOLIES:**  Well, your Honor, at the time that the

21  depositions were held, the order that those depositions would

22  be part of the record in this case had not yet come about.

23  That order came down in March.  Those were not part of the

24  record in this case yet.

25       **THE COURT:**  Did you provide the opportunity for them

1    to go and depose the people whose information you want to use

2    in this case?

3         MR. MARGOLIES:  They have not had that opportunity nor

4    do I believe --

5         THE COURT:  Offered the opportunity?

6         MR. MARGOLIES:  I don't believe we have, Your Honor.

7         THE COURT:  Okay.

8         MR. MARGOLIES:  I don't believe there are witnesses to

9    offer, is my point.

10        THE COURT:  Interesting.  All right.

11    Do you want to say something?  There is a partner who

12    jumped up, I think.

13        MR. BROOME:  I think he handled it well, Your Honor.

14        THE COURT:  Good enough.

15    I will say on the record, I think Quinn, at least in my

16    experience, always does a really good job of trying to give

17    some little argument to their junior lawyers, and I have always

18    tried to provide them with the opportunity to come to the mic.

19    I think it is a -- it is a practice that maybe other law firms

20    should consider doing because it's tough to get up to the mic.

21    I keep saying I'm not scary, but people don't believe me, so...

22        MR. MARGOLIES:  Thank you, Your Honor.  I do

23    appreciate it.

24        MS. WEAVER:  Your Honor, may I ask leave to just -- to

25    respond to the case that counsel identified just a moment ago

1    on the damages issue, because I think there are a couple points

2    that might be helpful.

3            **THE COURT:**  Is it not in the briefing?

4            **MS. WEAVER:**  It's not in the briefing because we

5    didn't have the case, and there are two quick points that I

6    think I would like to make.

7            **THE COURT:**  Okay.

8            **MS. WEAVER:**  One is that -- this is the *Siino vs.*

9    *Foresters Life*, and Ms. Trebicka managed to just hand it to me.

10            The first thing is that this case on its face notes that

11    under UCL restitution, claims that we have brought here, claims

12    that do not require reliance because when we filed the Second

13    Amended, there was no misreps, we get restitution, and this

14    case says, "The return of the excess of what the plaintiff gave

15    the defendant over the value of what the plaintiff received."

16            **THE COURT:**  Yeah.  I don't have an issue with the law

17    that says that you're entitled to restitutionary damages under

18    the UCL.

19            **MS. WEAVER:**  Right.

20            **THE COURT:**  But your claim -- you have other claims.

21            **MS. WEAVER:**  True.

22            And the second point, Your Honor, is on the breach of

23    contract section in the same case.  In fact, it appears -- and

24    this is a cursory look -- that what happened there was it was

25    involving an insurance claim, and they were looking to the

1    internal records of the insurers there, and it refers

2    specifically to opt-out values.  And what we would suggest

3    here -- so in the breach of contract section, it is saying the

4    original underlying court upheld use of reserve values to value

5    the policies at issue, and while it didn't necessarily agree

6    with the calculation, we would argue that there is a

7    methodology using opt-out values like Google's Screenwise in

8    this case to put some dollar value greater than zero.

9            **THE COURT:**  Okay.

10           **MS. WEAVER:**  Thank you.

11           **THE COURT:**  Okay.

12           **MS. TREBICKA:**  Your Honor, I've since --

13           **THE COURT:**  So never talk until you get to the mic

14    because my court reporter is a superhero but not always can she

15    hear you when you're --

16           **MS. TREBICKA:**  I apologize, Your Honor.  I wanted to

17    be respectful, but here I am, and I have had now a chance to

18    review the case that plaintiffs cited today that they did not

19    send us last night, so -- and it -- it does -- the contract

20    claim for which they claim there is unjust enrichment, it does

21    not turn upon the existence of a protectable property interest

22    but upon the implied promise to pay the reasonable value of the

23    material disclosed.

24       There is no such implied promise to pay here, Your Honor.

25    So it is inapposite.

1    **THE COURT:**  Okay.  Quick response.

2    **MR. BARNES:**  I think Your Honor needs to review the

3    case -- I think it's directly on point -- *Landsberg vs.*

4    *Scrabble*.  Counsel -- there is some other --

5    **THE COURT:**  That's fine.

6    **MR. BARNES:**  Okay.

7    **THE COURT:**  All right.  Thank you.

8    **MR. BARNES:**  Your Honor, may I make one other quick

9    point just because you said you were confused about our general

10   damages claim?  Just one sentence.

11       And general versus nominal.  Nominal is available for an

12   invasion of any right.  With respect to privacy damages, the

13   Supreme Court -- we site *Chou vs. Chow* -- has said that the

14   general damages are an amount awarded without regard to

15   pecuniary harm.  It's based on how highly offensive it is.

16       And the reason we make the distinction between nominal and

17   general in the privacy area is I believe that the general --

18   nominal means a dollar or ten.  I think the general can be

19   more.  That's all.

20   **THE COURT:**  So "nominal" typically means no more than

21   one dollar.  No more than one dollar is easy to apply across

22   millions of users.

23       How offensive something is to someone, I don't know how

24   you would ever be able to prove that on a class-wide basis when

25   you have users whose view and -- of privacy differs.

1       **MR. BARNES:**  And the answer to that, I think, is in

2  *Opperman vs. Path* which we cited in our briefs which is a case

3  from Judge Tigar who talked about the elements for invasion of

4  privacy and intrusion upon seclusion.  It does not depend on

5  the individual views of the plaintiffs, but instead it is --

6  whether something is highly offensive is taken from the view of

7  a reasonable person, and there's some very -- there's very good

8  language from Judge Tigar explaining -- and it was -- it was

9  handed up to me.

10       **THE COURT:**  That's okay.  We are beyond the time I was

11  going to spend.

12       **MR. BARNES:**  I think *Opperman vs. Path* speaks to your

13  question directly, Your Honor.

14       **THE COURT:**  And you want to respond?

15       **MS. TREBICKA:**  Yes, Your Honor.

16    General damages, not supported, not with reference to a

17  particular or specific claim.  No means to calculate the

18  damages on a class-wide basis.

19       **THE COURT:**  Did you address in your briefing *Opperman*?

20       **MS. TREBICKA:**  Not that particular issue that

21  plaintiffs have just raised now.

22       **THE COURT:**  Okay.

23       **MS. TREBICKA:**  But I'd like an opportunity to respond,

24  if possible.

25       **THE COURT:**  No.  I will -- if -- look, I'm going to go

1    back.  I'm going to consider everything again based upon your

2    arguments.  If I want briefing or if I want additional

3    argument, I promise you I will let you know.  Okay.

4        Yes?

5            MR. BROOME:  Your Honor, may I respond to the *Opperman*

6    point that Mr. Barnes raised?

7            THE COURT:  No.

8        Okay.  Is there anything else -- the motions are deemed

9    submitted.

10        Is there anything else that I need to talk to you all

11    about while you're here?

12            MR. SCHAPIRO:  Your Honor, we were wondering -- I

13    don't know if Your Honor knows yet -- whether you anticipate

14    that the arguments on the class certification motions in Brown

15    are going to stay on the schedule for September 20th because it

16    affects a few other things we're doing.  We're assuming it is,

17    and we are going full speed ahead.

18            THE COURT:  Well, I've got three trials in September.

19    Do you want to push it over?

20            MR. SCHAPIRO:  Yeah.  I think we would be perfectly

21    content with that, Your Honor.

22            THE COURT:  Isn't this -- okay.

23            MR. BARNES:  We can't speak on behalf of Brown.

24    Mr. Mao is here from Brown.

25            THE COURT:  All right.  Mr. Mao, come on up.

1          **MR.MAO:**  Sorry, Your Honor.

2          **THE COURT:**  No apologies.

3          **MR. MAO:**  This is Mark Mao, Boies Schiller Flexner,

4    for the Brown plaintiffs in a separate case.

5          I know, Your Honor, that there was no mention that they

6    were going to be trying to seek a continuance today.  In fact,

7    we actually have a stipulation in principle with the other side

8    saying that they would not be seeking such a continuance.  We

9    have emails on that, Your Honor.

10          **THE COURT:**  Well, this is really a question about me,

11    not about you.

12          **MR. MAO:**  I appreciate that, Your Honor.

13          **MR. BROOME:**  I think really it is a question for you,

14    Your Honor.  And Mr. Mao is correct.  We had asked for an

15    extension on another *Daubert* motion that they had filed which

16    is noticed for the 27th.  We would assume it would make sense

17    to hear that together, but we did agree that we would not seek

18    a continuance.

19          **THE COURT:**  Okay.  I always -- I always put things on

20    the same date, just because it makes no judicial sense to have

21    cases where -- I mean, if I'm going to work on one case, I'm

22    going to work on all the motions relative to that case.

23          So are you currently scheduled for argument on both the

24    20th and 27th?

25          **MR. BROOME:**  That is correct.

1          **MR. MAO:**  That is because we didn't think that the

2    *Daubert* and motions to strike were necessary to decide --

3          **THE COURT:**  It doesn't matter.  Did you not hear what

4    I just said?  When I look at a case, I look at everything

5    relative to that case.  That's efficient.  Okay.  And I have

6    three trials before then.

7        So everything is getting moved to the 27th, and whether it

8    stays on the 27th, it depends.  I don't know.  I'm not there

9    yet.

10          **MR. BROOME:**  Understood.

11          **MR. SCHAPIRO:**  Your Honor, with apologies, the 27th, I

12    believe, is the second day of Rosh HaShanah which my family

13    observes, so I wouldn't be able to travel or work on that day.

14    Others can handle it, I'm sure, but just flagging that -- any

15    day one or two after or before, but -- I'm sorry to bother

16    Your Honor with that.

17          **THE COURT:**  I'm pulling up my calendar.  When is Rosh

18    HaShanah?

19          **MR. SCHAPIRO:**  The 26th and 27th are the two days on

20    which one is not supposed to work.

21          **THE COURT:**  I can put you on for October 4th.  Any

22    conflicts?

23          **MR. MAO:**  I would have to grab my calendar,

24    Your Honor.  Sorry.

25          **THE COURT:**  You all go -- go and meet and confer and

```
 1   make sure that that works.

 2            MR. BROOME:  I actually do have a conflict.

 3            THE COURT:  Go and meet and confer and tell me what

 4   works.

 5            MR. BROOME:  Okay.  And tell you what works.

 6   Understood.

 7            THE COURT:  Well, after you said you have a conflict,

 8   figure it out.  I'm not apparently going to decide it right

 9   now, but I do put everything on the same day.

10            MR. MAO:  If I may ask, which may help this, are you

11   only willing to -- are you only able to do that on Fridays

12   because these are all Fridays.

13            THE COURT:  No.  Those are Tuesdays.  My standard law

14   and motion calendar is Tuesday.  The reason you're here on a

15   Friday is because I inherited this case.  It's been on my

16   backlog, and I had to specially set it to get it in.  Typically

17   I don't do this on Fridays.

18            MR. MAO:  Okay.

19            THE COURT:  We will find a day.  Don't worry.  But it

20   will all be together.  It will not be separate.

21            MR. BROOME:  Thank you, Your Honor.

22            THE COURT:  Anything else?  No?  All right.  Then

23   everybody stay safe.

24            MR. BROOME:  Nothing from us.

25            THE COURT:  We'll stand in recess.
```

1          (Proceedings adjourned at 10:17 a.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                        <u>CERTIFICATE OF REPORTER</u>

4            I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Monday, August 29, 2022

8

9    *Pamela Batalo Hebel*

10   _____
     Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
11   U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25