# August 11, 2022 TRANSCRIPT OF SEALED PROCEEDINGS

# Redacted Version of Document Sought to be Sealed

Pages 1 - 201

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Susan van Keulen, Magistrate Judge

PATRICK CALHOUN, ELAINE CRESPO,       )
CLAUDIA KINDLER, DR. CORINICE         )
WILSON, DR. RODNEY JOHNSON,           )
MICHAEL HENRY, ZACHARY GREEN,         )
and JASON STONE, on behalf of         )
themselves and all others             )
similarly situated,                   )
                                      )
          Plaintiffs,                 )
                                      )
  VS.                                 )   NO. C 20-05146 YGR (SVK)
                                      )
GOOGLE LLC,                           )   SEALED BY ORDER OF THE COURT
                                      )
          Defendant.                  )
_____)

**TRANSCRIPT SEALED BY ORDER OF THE COURT**

**CERTIFIED COPY**

San Jose, California
Thursday, August 11, 2022

TRANSCRIPT OF SEALED PROCEEDINGS

APPEARANCES:

For Plaintiffs:

          BLEICHMAR, FONTI & AULD LLP
          555 - 12th Street, Suite 1600
          Oakland, California 94607
     BY:  LESLEY E. WEAVER, ATTORNEY AT LAW
          ANGELICA M. ORNELAS, ATTORNEY AT LAW

     (APPEARANCES CONTINUED ON FOLLOWING PAGE)

REPORTED BY: Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
             CSR No. 7445, Official U.S. Reporter

1   <u>**APPEARANCES**</u>:   (CONTINUED)

2   For Plaintiffs:

3                       DiCELLO LEVITT GUTZLER LLC
                        One Grand Central Place
                        60 East 42nd Street, Suite 2400
4                       New York, New York 10165
                  BY:  **DAVID A. STRAITE, ATTORNEY AT LAW**
5                       **CORBAN S. RHODES, ATTORNEY AT LAW**

6                       DiCELLO LEVITT GUTZLER LLC
                        10 North Dearborn Street, Sixth Floor
7                       Chicago, Illinois 60601
                  BY:  **SHARON D. CRUZ, ATTORNEY AT LAW**

8

9                       SIMMONS HANLY CONROY LLC
                        112 Madison Avenue, Seventh Floor
10                      New York, New York 10016
                  BY:  **JASON "JAY" BARNES, ATTORNEY AT LAW**
11                      **AN TRUONG, ATTORNEY AT LAW**

12                      SIMMONS HANLY CONROY LLC
                        One Court Street
13                      Alton, Illinois 62002
                  BY:  **JENNIFER M. PAULSON, ATTORNEY AT LAW**

14

15  For the Brown Plaintiffs:
                        BOIES SCHILLER FLEXNER LLP
16                      44 Montgomery Street, 41st Floor
                        San Francisco, California 94104
17                BY:  **MARK C. MAO, ATTORNEY AT LAW**

18  For Defendant:
                        QUINN, EMANUEL,URQUHART & SULLIVAN LLP
19                      191 North Wacker Drive, Suite 2700
                        Chicago, Illinois 60606
20                BY:  **ANDREW H. SCHAPIRO, ATTORNEY AT LAW**
                        **JOSEPH H. MARGOLIES, ATTORNEY AT LAW**
21
                        QUINN, EMANUEL,URQUHART & SULLIVAN LLP
22                      51 Madison Avenue, 22nd Floor
                        New York, New York 10010
23                BY:  **JOSEF TEBOHO ANSORGE, ATTORNEY AT LAW**

24             **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

25

```
1   APPEARANCES:   (CONTINUED)

2   For Defendant:
                            QUINN, EMANUEL, URQUHART & SULLIVAN LLP
3                           865 South Figueroa Street, Tenth Floor
                            Los Angeles, California 90017
4                     BY:   STEPHEN A. BROOME, ATTORNEY AT LAW
                            VIOLA TREBICKA, ATTORNEY AT LAW
5                           ALYSSA "ALY" G. OLSON, ATTORNEY AT LAW

6

7   Also Present:          Antoinette "Toni" E. Baker
                           Matt Boles
8                          Zubair Shafiq, Ph.D.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNDER SEAL BY ORDER OF THE COURT

| | |
|---|---|
| 1 | <u>**Thursday - August 11, 2022**</u>         <u>**9:32 a.m.**</u> |
| 2 | P R O C E E D I N G S |
| 3 | ---o0o--- |
| 4 | (The following proceedings were placed under seal by Order |
| 5 | of the Court:) |
| 6 | **THE COURT:** All right. We have a full calendar today, so |
| 7 | Ms. Fanthorpe, if you'll call the matter, we'll get underway. |
| 8 | **THE CLERK:** Calling Case 20-cv-5146, Calhoun, et al. vs. |
| 9 | Google LLC. This is a sealed hearing. |
| 10 | Counsel, could you please identify yourselves for the |
| 11 | record, beginning with plaintiff. |
| 12 | **MS. WEAVER:** Good morning, Your Honor. Lesley Weaver of |
| 13 | Bleichmar Fonti & Auld on behalf of the plaintiffs. |
| 14 | With me today from my firm is Angelica Ornelas. And my |
| 15 | co-counsel want to introduce themselves. |
| 16 | **THE COURT:** Thank you, Ms. Weaver. |
| 17 | **MR. STRAITE:** Good morning, Your Honor. David Straite |
| 18 | from DiCello Levitt in New York on behalf of the Calhoun |
| 19 | plaintiffs. Also joining me from DiCello Levitt we have Sharon |
| 20 | Cruz and we have Corban Rhodes. |
| 21 | **THE COURT:** Excellent. Good morning. |
| 22 | **MR. BARNES:** Good morning, Your Honor. Jay Barnes from |
| 23 | Simmons Hanly & Conroy. Also with me today is An Truong and |
| 24 | Jenny Paulson. |
| 25 | **THE COURT:** Good morning. |

UNDER SEAL BY ORDER OF THE COURT

1     **MR. BARNES:**  Thank you.

2     **THE COURT:**  Excellent.  Thank you.

3     **MS. WEAVER:**  And I should add, we have our expert

4  Professor Zubair Shafiq here today.

5     **THE COURT:**  Mr. Shafiq.

6     **MS. WEAVER:**  And also, Matt Boles will be helping us

7  present.

8     **THE COURT:**  Excellent.  Excellent.

9     Good morning, everyone.  Thank you for being here.

10    And for the defendant today?

11    **MR. SCHAPIRO:**  Good morning, Your Honor.  Andrew Schapiro

12 for Google.  And I will invite my colleagues to introduce

13 themselves.

14    **THE COURT:**  Thank you.

15    Good morning, Your Honor.  Viola Trebicka for Google from

16 Quinn Emanuel.

17    And, Your Honor, just a brief explanation.  In the

18 excitement to come over to court today, I forgot my jacket.  I

19 lost it this morning.  So I apologize.  It's no disrespect.

20 It's just my forgetfulness.

21                         (Laughter.)

22    **THE COURT:**  Well, I'm thrilled that you are excited to be

23 here, Ms. Trebicka.  And no problem.

24    **MS. OLSON:**  Good morning, Your Honor.  Aly Olson from

25 Quinn Emanuel, also for Google.

UNDER SEAL BY ORDER OF THE COURT

1     **MS. FANI:**  Good morning, Your Honor.  Teuta Fani, also

2  from Quinn Emanuel, and also for Google.

3     **THE COURT:**  Thank you.

4     **MR. MARGOLIES:**  Good morning, Your Honor.  Joseph

5  Margolies, also from Quinn Emanuel, also for Google.

6     **THE COURT:**  Good morning.

7     **MR. ANSORGE:**  Good morning, Your Honor.  Josef Ansorge of

8  Quinn Emanuel, also for Google.

9     **THE COURT:**  Good morning.

10     **MR. BROOME:**  Good morning, Your Honor.  Stephen Broome

11  from Quinn Emanuel for Google.

12     **THE COURT:**  Good morning.

13     **MR. SCHAPIRO:**  And, Your Honor, in the courtroom, we have

14  an attorney from Google here, who I think you've seen before,

15  Ms. Toni Baker.

16     **THE COURT:**  Good morning.  Thank you for being here.

17     All right.  We also have Mr. Mao.

18     **MR. MAO:**  Yes, Your Honor.  This is by stipulation of the

19  parties.

20     **THE COURT:**  All right.  And who are you representing here

21  today, Mr. Mao?

22     **MR. MAO:**  The Brown plaintiffs.

23     **THE COURT:**  All right.  Thank you.

24     And we have, I'll note for the record, our Special Masters

25  here today at the request of the Court, Mr. Douglas Brush and

UNDER SEAL BY ORDER OF THE COURT

1    Mr. Timothy Schmidt.

2         Thank you both for being here.

3         All right.  A couple of things.  I will note for the

4    record, again, that this hearing is sealed.  I did seal it at

5    the direction of the Court, not because it addresses discovery

6    misconduct, per se, but because the subject matter is very

7    technical and much of the paperwork in support of this motion

8    has been filed under seal.  So we will proceed under seal, and

9    then, as usual, we will review the transcript and indicate

10   which portions need, if any, to remain sealed.

11        All right.  What we're going to do today is address the

12   plaintiffs' motion for sanctions on discovery misconduct.  As I

13   told counsel in a pre-hearing conference call, I've allotted

14   sufficient time, more than enough time for this proceeding

15   today.  I have allowed four hours.  I do expect that we will be

16   able to move through this more quickly than that.

17        The parties indicated early on that they do not -- will

18   not be calling witnesses, which will help that process.

19        Also, I have been through the filings.  I've been through

20   all of the briefing and all of the materials cited in those

21   briefs in support and opposition of this proceeding.  So I am

22   very familiar with the arguments and the evidence on both

23   sides.  I want to hear from both sides.  I have, obviously,

24   some questions.  I'm sure you have some additional points to

25   make.  But we will keep this -- keep it moving.

UNDER SEAL BY ORDER OF THE COURT

1   So with that in mind, as you are aware, when we had a

2   similar proceeding in the *Brown* matter where we did have live

3   witnesses, I ran that as a hybrid argument and evidentiary

4   hearing, and we did have some exhibits come into evidence.

5   Here, I had indicated to the parties, if it's cited in the

6   papers or referred to specifically in your presentations here

7   today, then that is the material I will designate as the record

8   and, obviously, consider in my opinion.  I don't think we need

9   to, and I don't think the proceeding calls for moving documents

10  into evidence separately.  If the parties have a different

11  view, you can certainly address that.  But I think that

12  accepting it as part of the record, as I have indicated, will,

13  again, help us to move through this in a streamlined fashion.

14  All right?

15  So with that, let me share with you a little bit on

16  vocabulary from the Court's perspective, and then we'll move

17  into the presentations of counsel.

18  I also want to remind counsel, before I do that, we were

19  very fortunate today to have an in-person court reporter.  And

20  as we all know, speaking with masks can make that a little bit

21  more complicated.  When you come to the podium to address

22  the Court, you may remove your mask if you are comfortable

23  doing so; but whether you do or do not, please speak slowly and

24  clearly, and I will try to remind you, so that the court

25  reporter is able to get a clean record.

UNDER SEAL BY ORDER OF THE COURT

1   And, Ms. Dub, do not be shy about interrupting the parties

2   or asking them to slow down as needed.

3   Also, keep in mind, when you come to an acronym, to

4   identify that in the first instance, again, for our record.

5   Okay.  Vocabulary.  I just want to be sure that the

6   parties understand from the Court's perspective how I am using

7   these terms, and they are the following.

8   Synced.  Synced, s-y-n-c-e-d.  To me, I am using that term

9   when a party or user is synced by any mechanism.  That is,

10  either through some default mechanism or through choice, you

11  are either synced or the alternative state is you are not

12  synced, a user is not synced.  And, again, I use that term

13  broadly by any mechanism, by default, by operation of program,

14  or could be a party's election.

15  Being not synced has a subcategory of stop sync or

16  unsynced, which I'm not sure is actually a term of art, but I

17  have seen those used somewhat interchangeably in the papers.  I

18  take unsynced or stop sync as a change in a state.  A party was

19  synced, and then either something happened or they did

20  something and they are no longer synced.

21  So broadly, we have "synced" and "not synced"; and you can

22  be not synced perhaps by having stopped sync.  Okay?

23  All right, then.  Let's turn to the issues that plaintiffs

24  have brought before the Court today.

25  In their papers, plaintiffs identify four categories of

UNDER SEAL BY ORDER OF THE COURT

 1   misconduct:  the sync or not sync signal issue; the

 2   production of plaintiffs' data; preservation of plaintiffs'

 3   data; and the ████████████ issue.

 4        For each section, as you address it -- and, again, as we

 5   talked about in our pre-call, we'll take each of those

 6   distinctly.  And maybe 2 and 3 go together, but I leave that to

 7   plaintiffs.  But however you address it, then we will -- we

 8   will hear what plaintiffs have to say, and then I want to hear

 9   from Google.

10        At the end of the proceedings, we can -- if we have used

11   our time efficiently, we can go back for a wrap-up.

12        But there are -- for plaintiffs, I want you to keep in

13   mind the following, really, three questions as we move through

14   each of these categories.  And I want to be sure, as you are

15   closing out a category, that you have given me answers to these

16   three questions, which are:

17        What are the plaintiffs going to trial without?  As a

18   result of the alleged misconduct, what is it that's missing?

19   And I say "going to trial."  Maybe it is going to class cert or

20   maybe it is opposing summary judgment.  But what is it that is

21   missing as a result of the alleged misconduct?

22        At what juncture in the litigation do plaintiffs contend

23   that whatever this missing piece is should have been disclosed

24   or produced?  What is the -- what's the point of -- the failure

25   point, from the construction industry?

UNDER SEAL BY ORDER OF THE COURT

1    And then the third question is:  All right.  Then what is

2    the remedy to address that wrong?  What is the tailored remedy

3    that addresses that problem that you've identified?  Okay?

4        And as I say, I've been through the papers.  I certainly

5    have seen and understand the arguments.  But I want to be sure

6    that it is clear as to the plaintiffs' view on each of those.

7        And obviously, for Google, it's slightly the inverse; but

8    either what has been produced or disclosed or was not required

9    to be produced or disclosed, depending on the argument?  And if

10   there's something missing, why is that not -- why is there no

11   prejudice?  How is there no prejudice?

12       The first argument to the plaintiffs is essentially really

13   the prejudice argument.

14       Okay.  With that structure in mind, from the plaintiffs.

15       **MS. WEAVER:**  Good morning, Your Honor.  Lesley Weaver on

16   behalf of the plaintiffs from Bleichmar Fonti.

17       We're appearing today upon the plaintiffs' motion for

18   sanctions against Google, Docket Number 669-1.

19       Briefly, Your Honor, in response to your inquiry about

20   structure, what we had planned in response to the last pretrial

21   conference is that we'll have a brief introduction here.

22       We've divided the categories exactly as the Court

23   suggested, into three buckets.  I'll ask for an opening of

24   roughly 15 minutes on not sync signals.  We will have an

25   opening from Mr. Straite on ███████████ for about 12 minutes,

UNDER SEAL BY ORDER OF THE COURT

```
 1   10 minutes, I think.  We're revising downward.  And then

 2   Mr. Barnes will speak for about 25 to 30 minutes on named

 3   plaintiffs' data, which is arguably more complicated.

 4       But we had hoped to reserve for rebuttal so that I could

 5   have 10 minutes in rebuttal, Mr. Straite could have 10 minutes

 6   in rebuttal, and then 10 minutes for Mr. Barnes.

 7       THE COURT:  Okay.

 8       MS. WEAVER:  And then the concluding remarks, Mr. Straite

 9   was going to talk about remedies for all three across the board

10   and try to do a summation of that style, if that's agreeable.

11       THE COURT:  Okay.  As long as, again, the remedies are

12   specific so I'm getting those answers to those questions.

13       And, Ms. Weaver, in the format, when you referred to

14   "opening," then I would hear from Google?  Is that --

15       MS. WEAVER:  Yeah.

16       THE COURT:  Okay.

17       MS. WEAVER:  I think we would do opening, and then Google

18   could have an opportunity, and then we'd like a chance for

19   rebuttal.

20       THE COURT:  All right.  Mind your time.

21       MS. WEAVER:  We will.  And this all -- I'm not very good

22   at math, but it all was less than two hours when we did it.

23   So...

24       THE COURT:  Very well.

25       MS. WEAVER:  Great.  So, good morning.
```

UNDER SEAL BY ORDER OF THE COURT

1    There are three basic rules that govern the conduct of

2  discovery under the Federal Rules of Civil Procedure and the

3  local rules of this Court that are the backbone of our motion.

4  First, obey and comply with court orders; second, do not make

5  misrepresentations to the Court and, if you do, correct any

6  misinformation provided to the Court as soon as possible; and,

7  three, do not destroy evidence relevant to claims or defenses

8  without prior relief.  There is no self-help provided on either

9  of these three issues.

10    Plaintiffs have identified these three areas of material

11  discovery in this case where Google has violated one or more of

12  these basic precepts, and often it is all three.

13    First, with regard to not sync data, Google misrepresented

14  to the Court and the plaintiffs, from the very outset of this

15  litigation, whether or not a signal was maintained by Google on

16  its servers that identify when a server is not in a not sync

17  state.  Google compounded those misrepresentations by issuing

18  false and misleading interrogatory responses, RFA responses,

19  and refusing to provide answers to written discovery on the

20  topics or to meet and confer to clarify contradictions in their

21  responses.

22    Google never corrected certain sworn written responses to

23  interrogatories and correct statements that misled the

24  plaintiffs and the Court.

25    Google also directly violated this Court's November 12th

UNDER SEAL BY ORDER OF THE COURT

1   order, which required Google expressly to identify sync state

2   signals, which included signals that allow an inference of a

3   not sync state.  The Court could easily find these actions were

4   not in good faith.

5        Were plaintiffs harmed?  Yes, in three ways.

6        One, late production of this evidence after the close of

7   discovery prevented plaintiffs from developing a full factual

8   record relating to them.  Two, Google sought to capitalize on

9   those misrepresentations by moving for a protective order which

10  it obtained based on misstatements.  And, three, Google sought

11  to gain litigation advantage by opposing class certification,

12  specifically arguing that plaintiffs cannot exclude uninjured

13  class members from their proposed class definition.  That's not

14  synced.

15       Second, ████████████ documents.  Google refused to

16  produce critical documents, the interview notes, while knowing

17  they were directly relevant to Google's main defense in its

18  motion for summary judgment.  Those documents relate to

19  Google's own internal admissions by senior executives that

20  Google is not providing meaningful disclosures to users about

21  whether or not their information is being collected or sent

22  from Chrome to Google when they are not synced.  Google ignored

23  eight requests from the plaintiffs seeking production of those

24  documents and only produced them in April, after the close of

25  discovery.

UNDER SEAL BY ORDER OF THE COURT

1       Were plaintiffs harmed?  Yes.  Again, they were precluded

2   from developing a full factual record.

3       And Google sought to gain litigation advantage by moving

4   for summary judgment on the issue of consent long before the

5   summary judgment deadline and before producing those key

6   documents.

7       Third, named plaintiffs' data.  Google refused to comply

8   with orders of this Court requiring Google to produce named

9   plaintiff data it had collected.

10      **THE COURT:**  Slow down just a little bit.

11      **MS. WEAVER:**  Sure.

12      And in failing even to identify, let alone produce, the

13  core set of data Google had already created a pipeline to

14  collect and preserve, and denying, after the fact, that Google

15  was even capable of doing it at the same time they were

16  secretly doing it, Google abused the Special Master process and

17  violated multiple court orders.

18      Those tactics forced the Court, the Special Master, and

19  plaintiffs to engage in days, weeks, and months of negotiations

20  over procedures and productions designed by Google to fail.

21  They failed because Google delayed implementing searches so

22  that data expired and null sets were returned, and that's

23  further spoliated evidence.

24      In combination with failing to preserve certain categories

25  of named plaintiff data at the outset and then designing search

UNDER SEAL BY ORDER OF THE COURT

1   procedures that yielded null sets, Google has spoliated

2   evidence and prevented the plaintiffs from showing to the jury

3   the full set of data collected from Chrome and sent to Google.

4        To this day, Google refuses to produce a complete set of

5   all of the data it has preserved.  And for some categories of

6   data, Google did not even commence preservation until seven

7   months after the filing of the complaint.

8        Were plaintiffs harmed?  Yes.

9        Now, Google advances two arguments to explain its

10  misconduct, and neither has merit.

11       First, Google claims it gave notice to plaintiffs.  It

12  says because it told plaintiffs it wasn't producing all

13  responsive evidence, Google could withhold critical evidence.

14  Google then says it's plaintiffs fault.  But the record is

15  clear that plaintiffs were persistent, even dogged in pursuing

16  the discovery; and the idea that notice absolves Google from

17  producing responsive materials is unsupported by the law,

18  especially given the asymmetry of information here.  Google

19  bore the burden of transparency and disclosure and, ultimately,

20  compliance with its discovery obligations.  It has veered far

21  from that course.

22       Second, Google claims that partial productions are enough.

23  Producing some relevant material, Google says, absolves a party

24  from completing its discovery obligations.  But Google doesn't

25  get to pick and choose which of the many responsive materials

UNDER SEAL BY ORDER OF THE COURT

1   it wants to produce and withhold the rest.  And although Google

2   claims its partial productions cure those violations,

3   preventing plaintiffs from conducting discovery, the Court

4   should find otherwise.

5       The reason is that the critical discovery that we're

6   talking about here is material, especially in the case of the

7   ████████████ documents, especially thwarting plaintiffs'

8   ability to describe the full set of data to the jury that

9   Chrome sent to Google.

10      Finally, we'll address remedies.  And Mr. Straite will

11  cover those more specifically.

12      So with Your Honor's permission, we'll move into the not

13  synced section.

14      MR. SCHAPIRO:  Your Honor, we didn't have an opening

15  statement prepared, but I'll give a five-minute one, if I may.

16      THE COURT:  Why don't you just reserve.  Let's do sync,

17  and you may then address it -- use your time as -- you can do

18  it if you want, or you can --

19      MR. SCHAPIRO:  That's fine, Your Honor.  It's just we have

20  a sync section, a ████████████ section, a Numbers 2 and 3

21  section.

22      THE COURT:  I understand.

23      MR. SCHAPIRO:  We haven't had the opportunity to present

24  this overview or to respond to the overview.  I guess if

25  Your Honor understands that we take issue with pretty much

UNDER SEAL BY ORDER OF THE COURT

1    everything Ms. Weaver said --

2         **THE COURT:**  I absolutely understand that.

3         **MR. SCHAPIRO:**  -- I'll stipulate to that.

4         **THE COURT:**  I understand that, Mr. Schapiro.

5         **MR. SCHAPIRO:**  Okay.  Thank you, Judge.  I think after you

6    hear our presentations, you will understand the overview as

7    well.

8         **THE COURT:**  I believe so.  And you may respond in -- you

9    can start your response to sync with an overview, if you like.

10   I'll certainly allow time for that.

11        **MR. SCHAPIRO:**  Thank you.

12        **MS. WEAVER:**  Thank you, Your Honor.

13        So synced/not synced category.  Google falsely maintained

14   a narrative for more than two years that it could not identify

15   the not synced class.  And, Your Honor, it began on August 30th

16   of 2020.

17        Plaintiffs propounded their first set of interrogatories

18   that specifically sought the total number of Chrome users who

19   never sync, sometimes sync, and always sync.  That was our

20   Interrogatory Number 3.  And on September 30th, Google

21   responded.  And critically, this is what Google said (as read):

22             "Google does not maintain information showing

23        the number of Chrome users in the United States who

24        did not sync their Chrome browser with a Google

25        account."

UNDER SEAL BY ORDER OF THE COURT

1        That's critical because in this response, they didn't say

2    "signal," and they didn't narrow it.  They said they do not

3    maintain information, and that is categorically false.

4        **THE COURT:**  And where is that interrogatory response?

5        **MS. WEAVER:**  That is referenced in Docket Number 77-3,

6    Your Honor.

7        And Google has never corrected this false statement.  But

8    interestingly, it was verified by Tim Schumann, who you're

9    going to hear about today, on March 24th, 2021.

10       **THE COURT:**  And what's the interrogatory number?

11       **MS. WEAVER:**  Number 3.

12       Google has never corrected that false statement.

13       On January 29th, in meet and confers -- following meet and

14   confers between plaintiffs and Google, Google responded to

15   follow-up correspondence and wrote (as read):

16           "In your letter, you also asked about logs

17       reflecting synced and unsynced browser states."

18       Google wrote (as read):

19           "Disabling sync is a client-side action that is

20       not visible server-side; i.e., to Google."

21       That is paragraph 15 of plaintiffs' Findings of Fact

22   Number 18.

23       They also said in the same letter (as read):

24           "You asked about logs reflecting synced and

25       unsynced browser states."

UNDER SEAL BY ORDER OF THE COURT

1 And, again, confirmed that it was not visible server-side.

2 February 5th and 17th, Google moved for a protective

3 order, the Court is well aware, seeking court permission not to

4 preserve relevant data.  That's Dockets 102 around 109.

5 And in the course of the hearing on that motion on

6 March 25th, 2021, Google told this Court expressly, on at least

7 five different statements, that sync traffic logs, quote, will

8 not show data for a user who has not enabled sync.

9 That's the hearing transcript at 12 -- page 12, lines 2 to

10 10; page 14, lines 13 to 17.

11 That statement also said if a user has not enabled sync,

12 then the sync traffic logs will not show data for that user.

13 That was false.

14 There are a number of claims.  Those are in the record,

15 Your Honor, repeatedly, in our findings of fact.

16 April 9th, 2021, this Court allowed a 30(b)(6) deposition.

17 It was the first one in the case.  And David Monsees,

18 testifying on behalf of Google, said that Google cannot

19 identify users who are not synced because they are not synced.

20 And he said that they do not have a user ID or a GAIA or Google

21 ID in chromo for users who are not signed in.  That is false.

22 That's the motion at page 6 and Plaintiffs' Exhibit -- or the

23 joint declaration at Exhibit 6.

24 On August 6th, 2021, we served our third set of

25 interrogatories, seeking class member identification and

UNDER SEAL BY ORDER OF THE COURT

1   identifying not sync signals that had been observed by

2   plaintiffs' expert but never disclosed by Google.  Google did

3   not provide substantive responses except to, again, deny.

4   That's the findings of fact, paragraph 25.

5        THE COURT:  Isn't there -- wasn't there, after the hearing

6   and my April order, wasn't there a 30(b)(6) deposition --

7        MS. WEAVER:  Yes.

8        THE COURT:  -- in June?

9        MS. WEAVER:  That is what I just referred to.

10       THE COURT:  I thought there was one in the June time

11  frame.  Am I --

12       MS. WEAVER:  There's another one, and I'm about -- yeah.

13  There were three 30(b)(6) depositions, Your Honor, where

14  Mr. Monsees testified.  And in none of them did he identify a

15  not sync signal.

16       THE COURT:  Wasn't there discussion of stop sync in the

17  June --

18       MS. WEAVER:  There was.  And that's very interesting.

19  There was a Chromium document that was identified in that

20  deposition.  And it's funny, because Mr. Schapiro at the time

21  objected, saying this was a public document, not produced in

22  this case.  And, in fact, in Google's own slides, Your Honor --

23  I believe it's --

24       THE COURT:  I'm sure we'll get to that.

25       MS. WEAVER:  Yeah, we'll get to that.  I was saving it for

UNDER SEAL BY ORDER OF THE COURT

1   rebuttal, frankly.

2       But in their own slides, one of their defenses is that we

3   should have found this in public documents.  But when we tried

4   to take the testimony about the public documents, Mr. Monsees

5   explained to us that that wasn't operative and that there

6   wasn't a not sync signal.

7       And we can continue to give examples of the conflicting

8   information that Google provided.

9       Also, I should correct the record.  For those

10  interrogatories, it's Docket 677-3, not 77-3.

11      **THE COURT:**  Yeah.  I thought that --

12      **MS. WEAVER:**  I apologize.

13      **THE COURT:**  -- that number sounded just a bit low.

14      **MS. WEAVER:**  Okay.  So back to August 6.  We sent our

15  third set of interrogatories.  And as they were conferring over

16  the preservation order, on August 26th plaintiffs received this

17  e-mail from Google.  This is important because Google claims

18  here that this was a revelation of a not sync signal; but, in

19  fact, in this e-mail you can see that Google, again, called

20  this a sync signal, not a -- because it says here in the red

21  "information showing the user had sync enabled."

22      Again, there was this consistent narrative that we don't

23  have a not sync signal.

24      On October --

25      **THE COURT:**  What is the --

UNDER SEAL BY ORDER OF THE COURT

1      **MS. WEAVER:**  Yes?

2      **THE COURT:**  -- exhibit number for the e-mail?

3      **MS. WEAVER:**  That's Docket 777, dash -- actually, I need

4  to look here -- 1 -- Exhibit 19, I believe.  It's a little

5  obscured here on my PowerPoint.  I apologize.

6      Yes, Exhibit 19.

7      So, again, Your Honor, on October 5th and 12th, in a

8  Special Master hearing for which we do not have a transcript,

9  on the 5th and then on the 12th, Google again denied the

10  existence of not sync signals.  That is Docket Number 670 at

11  page 8 on our joint declaration for the October 5th hearing.

12      On September 2nd, the plaintiffs propounded a first set of

13  RFAs; and those RFAs, among other things, said (as read):

14          "Admit that Chrome sends a sync signal to Google

15      when a Chrome user clicks to turn off sync."

16      On October 12th, Google said -- Google's response was

17  confusing.  It said, "It may send a bit."  It didn't say

18  "a signal," and it said "it may."  And because this was

19  inconsistent with all of the evidence that we had taken, we

20  immediately asked to meet and confer with Google to get some

21  clarity.

22      **THE COURT:**  Inconsistent how?

23      **MS. WEAVER:**  Well, they had said there was no sync signal,

24  and all of a sudden they said, "It may send a bit."

25      **THE COURT:**  You mean they had said there was no not sync

UNDER SEAL BY ORDER OF THE COURT

1  signal?

2  **MS. WEAVER:**  They said, "It may send a bit."

3  I don't know what that means.  That's exactly their

4  language.

5  **THE COURT:**  I'm asking, why is this answer inconsistent

6  with the information that you believe you had?

7  **MS. WEAVER:**  Because prior to this, they had unequivocally

8  said there is no signal at all.  And it's --

9  **THE COURT:**  For?

10  **MS. WEAVER:**  Not sync.

11  **THE COURT:**  Okay.  But then you asked the question --

12  **MS. WEAVER:**  Right.

13  **THE COURT:**  -- appropriately.

14  **MS. WEAVER:**  (As read):

15      "Admit that Chrome sends a sync signal to Google

16      when a Chrome user clicks off sync."

17  And they say it may send a bit when it syncs.

18  But to your point, Your Honor, we have always been trying

19  to find discovery of any signals so that we can infer the --

20  infer that without that signal, somebody is not synced or,

21  obviously, if there is a not sync signal, yeah.

22  And so here, they weren't saying there is a not sync

23  signal.  They were, again, just saying there may be a sync

24  signal, for the first time.

25  And for this, we were trying to figure out how to piece

**UNDER SEAL BY ORDER OF THE COURT**

1   together the relevant --

2       **THE COURT:**  But up unto -- through this time, through the

3   early work that plaintiffs had done -- and I know plaintiffs

4   raised a not sync or a sync stop or stop sync signal with

5   the Court at the hearing in March, because you said your work

6   had indicated that that existed, and you wanted me to then

7   use -- you were arguing, therefore, I should preserve the event

8   logs.

9       **MS. WEAVER:**  Right.

10      **THE COURT:**  I remember that.

11      **MS. WEAVER:**  Right.

12      **THE COURT:**  And we have this other -- we have the

13  follow-on 30(b)(6).  There's the letters that you point to.

14      So it appears to me that both sides are aware there are

15  sync signals.  And there's some sort of stop sync signal.

16  Plaintiffs' preliminary work has certainly shown that.  You

17  haven't been given a name.  It hasn't been identified.  But

18  you're aware of the signals.

19      And appropriately, you ask the RFA; and Google says -- I

20  understand you take issue with the clarity of the response, but

21  they don't say there's none; they say it may send -- a bit may

22  send in this circumstance.

23      **MS. WEAVER:**  They say there's a sync signal.

24      **THE COURT:**  Mm-hmm.

25      **MS. WEAVER:**  That's consistent.

UNDER SEAL BY ORDER OF THE COURT

1     THE COURT:  Right.

2     MS. WEAVER:  So there were two things to clarify,

3  Your Honor.

4     First, in March of 2021, Google told you that the

5  Chrome sync traffic logs were not relevant.  They told you it

6  was only sync signals.

7     So we knew there was a sync -- that they were --

8     THE COURT:  They said it was only sync traffic.

9     MS. WEAVER:  Right.

10    THE COURT:  Someone had to be synced for their traffic to

11  be logged.

12    MS. WEAVER:  Exactly.

13    And, in fact, we now know that the Chrome sync traffic

14  logs do reflect whether or not there's not sync.  There are two

15  signals in the Chrome sync traffic logs -- and I'll just jump

16  ahead here, Your Honor -- the ███████ signal, which is signed in

17  but not consented for sync; and then only in a live

18  demonstration in front of the Special Master --

19    THE COURT:  I know the story of disabled sync.

20    MS. WEAVER:  Okay.  So now Google admits that those two

21  signals, which reflect some version of not sync state, is in

22  the Chrome traffic logs.

23    And one of the very interesting things that happened in

24  Google's PowerPoint slides, Your Honor, is that they assert for

25  the first time that the Chrome sync traffic logs were part of

1  your protective order.  But they had argued to you the exact

2  opposite.  They told you on March 5th that the Chrome sync

3  traffic logs were not relevant and that is why they weren't

4  preserved.

5      And so the spoliation that occurred because of that,

6  because they did not preserve the Chrome sync traffic logs,

7  means that for the named plaintiffs, we don't have those not

8  synced signals.

9      And then when we tried to -- well, we'll get to in

10 a minute on the named plaintiffs' data.

11     So the reason I'm -- the one thing I'm telling Your Honor

12 is that the March 5th, 2021, hearing, all of the messaging was:

13 There's a sync signal.  Sync signals are not relevant to who is

14 not synced.

15     And so they tell us again in this interrogatory response

16 they may send a bit.  And for us, the question is:  Is that bit

17 binary?  If it's on -- if it's not on, can we infer not synced?

18 And when we try to meet and confer, we don't get very far.

19     So on November 12th, Your Honor orders Google specifically

20 to provide this:  Quote, any potentially relevant data sources

21 where information about sync state signals are stored,

22 including where sync state is expressly stated or can be

23 inferred.

24     So Your Honor was telling Google to give us and identify

25 those potentially relevant data sources, and Google has still

UNDER SEAL BY ORDER OF THE COURT

1   not done it.

2        There's a very interesting thing that happens here,

3   Your Honor.  On November 23rd, Google provided a response to

4   the plaintiffs.  This is in Tab 13 in our new exhibits.  And

5   it's a little complicated, Your Honor, because there's some

6   Excel spreadsheets.

7        But Tab 3.3.2 is an Excel spreadsheet of a log.  That log

8   is labeled "███████████████████."  And the reason that this

9   is so important is that on November 23rd, 2021, in response to

10  the Court's November 12th order, Google identified ███ fields

11  from that log, and they were only sync signals, but the

12  SyncDisabled field was not identified.  And the SyncDisabled

13  field is in that log, because we received the log later through

14  the Special Master process.  And that Tab 13 at 3.3.2 was

15  identified two hours before the close of discovery on March 4th

16  by Google as having the SyncDisabled log.  Why was that field

17  missing in the November 23rd, '21, disclosure?

18       On December 6th, plaintiffs move to compel because we did

19  not receive information about sync state signals that were

20  expressly or could be inferred.  Google did not respond and

21  then demanded that the matter be referred to the

22  Special Master, which is what occurred.  And then, as I just

23  said, two hours before the close of discovery, the

24  SyncDisabled signal.

25       On July 1st, Google identified -- admits in opposition to

UNDER SEAL BY ORDER OF THE COURT

1    this sanctions motion that Google account holders who are

2    signed out are not synced.  That's significant because that's

3    another example of a sync state that, until July 1st, 2022,

4    Google did not admit could be used to infer and identify not

5    synced users.

6        We are still awaiting compliance.  We have identified in

7    correspondence at least six more express or inferred not sync

8    signals in addition to ███████ and SyncDisabled.  They're listed

9    here on Slide 11.  And I'm behind.

10       (As read):

11                  "

12

13                                                        "

14       Those are in our Findings of Fact, paragraphs 74 to 90,

15   and paragraph 91, specifically.

16       And what is the harm?  So, briefly --

17       THE COURT:  Well, hang on.

18       MS. WEAVER:  Yeah.  Go ahead.

19       THE COURT:  So is it plaintiffs' position that these are

20   not sync signals that Google should have identified?  And when

21   should they have identified them?

22       MS. WEAVER:  They should have identified them, frankly, at

23   the outset of the litigation --

24       THE COURT:  Well --

25       MS. WEAVER:  -- in the ESI meet and confer.

**UNDER SEAL BY ORDER OF THE COURT**

1    They should have identified them in the March 5th hearing

2   when they were seeking protective orders so that the Court

3   could know where those signals lived, in what logs, before

4   the Court issued a protective order saying they didn't have to

5   preserve certain logs.

6        They should have identified them --

7        **THE COURT:**  Are these signals in the sync log?

8        **MS. WEAVER:**  I think some of them are.  And I'll defer to

9   Mr. Barnes.

10       Other than the two, ▇▇▇▇ and SyncDisabled, which were in

11  the not sync logs -- I'm looking at this slide here.

12       Do you want to address that, Jay?

13       **MR. BARNES:**  Your Honor, I think some are derived from

14  sync logs; in other words, there may be a pipeline from sync

15  logs.

16       For example, the second one, "▇▇▇▇▇▇▇▇ from

17  ▇▇▇▇▇▇▇▇▇▇" in GAIA ▇▇▇▇, we believe we have not

18  had enough discovery to determine whether that column is

19  populated through a pipeline from the sync log.

20       The SyncDisabled is the same deal.

21       And the ▇▇▇▇▇▇, ▇▇▇▇▇▇▇▇, and

22  ▇▇▇▇▇▇▇ are in other logs that identify when a user is

23  signed out.

24       And Google's opposition admitted that "signed out" means

25  you are not synced without any exceptions.

UNDER SEAL BY ORDER OF THE COURT

1   **THE COURT:**  So these are signals, from plaintiffs'

2  position, from which a not synced status can be inferred; is

3  that fair?

4   **MS. WEAVER:**  That's correct, Your Honor.

5   And, you know, one of Google's defenses is that none of

6  these signals, Google says, is a, quote/unquote, universal

7  signal.  But, of course, that's not the standard.

8   And what we've been trying to do is to determine through

9  discovery of any of these signals which were identified, many

10 of them, in Mr. Richard Smith, our expert's expert report in

11 connection with moving for class certification.  We have not

12 been able to conduct or receive any discovery relating to them.

13  And I'll note, Your Honor, just -- I actually wouldn't

14 mind just collapsing, because you're cutting to the heart of

15 these.  I'll collapse the rebuttal into our closing argument.

16  If I could put up Google slides, Matt.

17  The misstatements continue, even on this briefing.

18  **THE COURT:**  Well, why don't you wait.

19  **MS. WEAVER:**  Yes.

20  **THE COURT:**  And let me hear from Google.

21  **MS. WEAVER:**  Okay.  Fine.  I will wait.

22  **THE COURT:**  I think that would be appropriate.

23  **MS. WEAVER:**  Great.

24  As to the harm, obviously, Google, in our view, obtained a

25 protective order based on misrepresentations to the Court; and

UNDER SEAL BY ORDER OF THE COURT

1   that means that sync signals, at least ▇▇▇▇ and SyncDisabled,

2   and sync traffic logs were not preserved.

3        These other signals relating to sync state, we've never

4   received discovery on; and we don't -- we're not sure

5   necessarily what logs they're in other than what Mr. Barnes

6   told you.

7        We can also confer with our experts here on a break and

8   get back to you with any further information on that.

9        THE COURT:  But the preservation issue, obviously, it took

10  us a long time to get to preservation --

11       MS. WEAVER:  Right.

12       THE COURT:  -- in this case.

13       It's very complicated --

14       MS. WEAVER:  Right.

15       THE COURT:  -- by the technology and by positioning on

16  both sides, as I've said in various orders and on the record.

17       So now we have preservation.  And it reaches back but it's

18  going forward.  And obviously, you can't preserve what isn't

19  there.  But wasn't there a process to get to preservation?  And

20  eventually, we got there.

21       We were never going to be able to have full preservation

22  of sync logs.  I mean, that just -- given the volume of data,

23  the tens of millions or hundreds of millions of Chrome users

24  and event-level data, we were never going to be able to flip

25  that switch and have that preserved.

UNDER SEAL BY ORDER OF THE COURT

1      **MS. WEAVER:**  I understand that, Your Honor.  What we've

2  learned -- there are actually two, kind of, preservation

3  issues.  There's the bigger preservation issue that we've now

4  been talking about on a class-wide basis, et cetera.

5      We started out -- and we'll get to named plaintiffs' data.

6  There should have been no burden in preserving not sync signals

7  for our original eight plaintiffs.  And because Google didn't

8  identify the fields transparently and say, "This field is in

9  this log and it can be extracted" -- like, you can extract

10  these fields and create its own little log to preserve.  And,

11  in fact, Google did that with regard to some of the named

12  plaintiff data.

13      So there was always a misrepresentation happening from

14  Google, saying we were demanding that everything be preserved.

15  That was never the case.  I have a small firm.  I didn't want

16  everything.  I wanted them to tell us what are the fields for

17  your named plaintiffs, extract it, search for it, and preserve

18  it.  And there were roadblocks thrown up left and right.  And

19  Mr. Barnes will get to this, about how difficult it was.

20      But in the end, when the Special Master ordered them to do

21  it, some of these searches took five days.  And if they had

22  identified the not synced signals in March or after

23  November 12th, we could have identified and preserved evidence

24  then.  That data is gone.

25      There now is an ongoing preservation.  But they didn't

UNDER SEAL BY ORDER OF THE COURT

1    identify at the time, transparently, those not sync signals.

2    And there could have been a myriad of solutions.  And because

3    we don't have even discovery about these other states, it's --

4    you know, the burden -- it's an impossible burden on the

5    plaintiffs to say:  Oh, well, we know that this could have been

6    extracted or joined.

7         But that lack of disclosure, which is what the Northern

8    District ESI checklist is all about, did not happen when it

9    should have.

10        THE COURT:  All right.

11        MS. WEAVER:  Okay.  We obviously, then, didn't get to

12   conduct discovery to figure out a plan.

13        And then Google opposed class certification based on these

14   omissions, expressly saying that our definitions include

15   uninjured class members.  And that is also just false on the

16   merits, Your Honor, because these sync signals, even █████ and

17   SyncDisabled, don't have false positives.  That's in the record

18   in Mr. Shafiq's declaration.  So any class definition we

19   proposed is underinclusive, not overinclusive.

20        And, again, if we had had other ways to cross-check with

21   other cross sync signals, we could prove that a multitude of

22   different ways.  We think we've done it.  But that discovery

23   was denied us.

24        THE COURT:  So, Ms. Weaver, I can't help -- in tackling

25   this motion, I can't stay away from the class cert papers.  So

UNDER SEAL BY ORDER OF THE COURT

1   I looked at those.  I see the Shafiq declaration saying:  Well,

2   here's how we can identify class.  And there's a list, a

3   process.

4        But what is the plaintiffs' intention?  In two weeks, or

5   whatever it is, you'll be before Judge Gonzalez Rogers.  How

6   are you going to identify the class?  What are the plaintiffs

7   going to do?  Are you going to do it by self-authentication?

8        **MS. WEAVER:**  No.  We think that using these signals, we

9   can identify who is not synced.  But there's a missing piece,

10  and harm that's also associated with, for example, revenue

11  numbers.

12       **THE COURT:**  Okay.  But before we get to that --

13       **MS. WEAVER:**  Okay.

14       **THE COURT:**  -- in terms of identifying class members, so

15  you have data from which you will identify class members?

16       **MS. WEAVER:**  And Google will argue that we can't.  Google

17  has argued --

18       **THE COURT:**  I understand --

19       **MS. WEAVER:**  Yeah.  Got it.

20       **THE COURT:**  -- there's an opposition --

21       **MS. WEAVER:**  Yes.

22       **THE COURT:**  -- to be sure.

23       **MS. WEAVER:**  Yes.

24       **THE COURT:**  But you have a collection of data that's been

25  produced through all of our hard work --

UNDER SEAL BY ORDER OF THE COURT

1      **MS. WEAVER:**  Right.

2      **THE COURT:**  -- over the last 15 months, and you'll run

3  your process, as you've explained it to Judge Gonzalez Rogers,

4  and say -- ultimately say:  This is our -- certify:  This is

5  our class.

6      **MS. WEAVER:**  Yes.  We have identified -- using these

7  people, this is how we can identify the class.

8      Now, of course, ascertainability --

9      **THE COURT:**  A different issue.

10     **MS. WEAVER:**  Yeah.

11     **THE COURT:**  I'm purposely --

12     **MS. WEAVER:**  Great.

13     **THE COURT:**  -- not going there.

14     **MS. WEAVER:**  Good.

15     **THE COURT:**  And I'm also not going to decide the validity

16 of the approach --

17     **MS. WEAVER:**  Right.

18     **THE COURT:**  -- because, of course, Google will oppose it.

19     But, okay.  So you have data to do that?

20     **MS. WEAVER:**  Yes, we do have data to do that.  The

21 question is whether -- you know, Google's going to challenge

22 whether it's robust enough.  But we think we can do that.

23     **THE COURT:**  Okay.  And then you wanted to shift.

24     Okay.  So that's class cert.  Who's in the class?  And

25 how, if at all, do the issues here today impact -- the sync

UNDER SEAL BY ORDER OF THE COURT

1  issues impact other aspects of your case --

2      MS. WEAVER:  Right.

3      THE COURT:  -- like revenue?

4      MS. WEAVER:  So --

5      THE COURT:  In other words, my first question:  What's

6  missing at trial?

7      MS. WEAVER:  Right.  Excellent question.

8      So you identify never syncers and full-time syncers and,

9  we asked in that very first Interrogatory Number 3, sometimes

10  syncers.

11      Our language has evolved.  Frankly, we used unsynced as

12  not synced in the beginning.  So we learned about it.

13      But the general concept is knowing if somebody did not

14  sync at a certain time and is a field that you can isolate in

15  logs.

16      If there were a signal, we could have isolated -- oh, for

17  example, there were temp logs that associate revenue numbers

18  with individual users; or there is an argument that Mr. Barnes

19  will engage in on whether you can associate Biscotti IDs --

20  signed-out IDs sufficient to identify people and then attach

21  that to other elements of our proof of claim, including were

22  they put in verticals.

23      THE COURT:  Are your expert reports with regards to -- on

24  damages, are those done?

25      MS. WEAVER:  Yes.

UNDER SEAL BY ORDER OF THE COURT

1    **THE COURT:**  Okay.

2    **MS. WEAVER:**  Those are submitted.

3        Mr. Mangum is our expert.  He submitted a couple of

4    theories of liability.  One key one is, just look at how Google

5    pays users.  But there are other elements, which is, there are

6    these fields in revenue logs that we now see tied to individual

7    identifiers, whether signed in or signed out.

8        And if we could have said these people are not synced and

9    then here are their revenue numbers over time and correlate

10   that, that would have been one way to be very, very specific.

11       We still think we can get to where people are -- we still

12   think that we can get to where people -- were they damaged.

13   And, again, apportionment is something that we can deal with

14   with experts as well.

15       But obviously, it would have been much more efficient,

16   simpler, perhaps accurate, if we had had those original logs

17   preserved or even for the eight named plaintiffs, who are now

18   six, just to say these are exemplars.  That was always our

19   hope.

20   **THE COURT:**  Understood.

21   **MS. WEAVER:**  Yeah.

22   **THE COURT:**  Okay.  So you have an approach to class

23   identification.  You have an approach to assessment of damages.

24   **MS. WEAVER:**  Yes.

25   **THE COURT:**  Okay.

UNDER SEAL BY ORDER OF THE COURT

1      **MS. WEAVER:**  And Google wants to challenge both, saying

2   that they aren't robust enough.

3      **THE COURT:**  Of course.  I understand.

4      **MS. WEAVER:**  Right.  And we've been denied the discovery

5   to respond fully to the robust arguments because we were not

6   given the evidence.

7      So that's the jist of it, Your Honor.

8      **THE COURT:**  Okay.

9      **MS. WEAVER:**  Okay?

10     **THE COURT:**  All right.

11     **MS. WEAVER:**  Thank you.  And now we'll have Mr...

12     **THE COURT:**  Why don't I hear from Google at this point.

13     **MS. WEAVER:**  Oh, on the not synced?  That's fine.  Great.

14     **THE COURT:**  All right.

15     **MS. WEAVER:**  And then we'll do the rebuttal on this topic

16   and then move on?  Is that what Your Honor is thinking?

17     **THE COURT:**  We'll have a brief, or you can save it all

18   till the end.

19     **MS. WEAVER:**  Okay.  Great.  Thank you.

20     **THE COURT:**  I want to keep us moving.  Almost 45 minutes

21   on the substance.

22     Give me just a second, Ms. Trebicka.

23     All right.  Please.

24     **MS. TREBICKA:**  Thank you, Your Honor.

25     I'd like to make sure that we can also see the slides.

UNDER SEAL BY ORDER OF THE COURT

1    And I think Ms. Fani is helping with that.  If we can give it

2    just a few seconds.

3        THE COURT:  Sure.

4        MS. TREBICKA:  I can start us off.

5        These are heavy accusations.

6        THE COURT:  Are the slides also in the binder?  Or...

7        MS. TREBICKA:  They are in the binder, Your Honor.  So if

8    you have that, I think we can wait to catch -- we can start and

9    then --

10       MR. SCHAPIRO:  Ms. Fanthorpe, is there any switch we need

11   to --

12       MS. TREBICKA:  Ah, a switch from plaintiffs to defendants

13   maybe?

14       THE CLERK:  No.  I have it on defendants now.

15       There was a computer screen showing.

16       MS. TREBICKA:  I'll wait, Your Honor, just so that it's

17   not --

18       THE COURT:  That's fine.

19       MS. TREBICKA:  -- awkward, and then everybody can follow

20   along.

21       THE CLERK:  There's a desktop on.  Is that --

22       THE COURT:  Do you have a screensaver on?

23       MS. FANI:  No, that's not mine.

24       MS. TREBICKA:  We conquer technology.

25       MS. FANI:  We just had it working.  Apologies, Your Honor.

UNDER SEAL BY ORDER OF THE COURT

1       **THE COURT:**  Not a problem.  Not a problem.

2       **MS. TREBICKA:**  I think we just figured it out, Your Honor.

3       **THE COURT:**  Okay.  Everybody but me has --

4       **MS. TREBICKA:**  That will not do.

5       **THE COURT:**  Well, that's all right.  Okay.  I see it on --

6       **THE CLERK:**  Did your screen go off?

7       **THE COURT:**  It was trying to get the signal, but it didn't

8  come through.  But I can --

9       **MS. TREBICKA:**  Is it still off, Your Honor, your screen?

10      **THE COURT:**  Yeah.

11      **MS. TREBICKA:**  That troubles me, because we may be moving

12  around slides.  I mean, our slide deck was big.

13      **THE COURT:**  Let me turn it off and back on.

14      **MS. TREBICKA:**  Okay.  Thank you.

15      **THE CLERK:**  It just went off for all of us.

16      **MS. WEAVER:**  Your Honor, we may have a hard copy.

17      If you wanted to use that, Viola.  I don't know.

18      **MS. TREBICKA:**  Your Honor has the hard -- Her Honor has

19  the hard copy.

20      **MS. WEAVER:**  So, I mean, as long as --

21      **MS. TREBICKA:**  The issue is the --

22      **MS. WEAVER:**  We have an electronic version of your slide

23  show here.

24      **MS. TREBICKA:**  Oh, wait.  It just came on.  Is that you

25  guys or is that us?

UNDER SEAL BY ORDER OF THE COURT

1        MS. FANI:  That's us.

2        MS. TREBICKA:  Okay.  We got it.  But, Your Honor, can you

3   see?

4        THE COURT:  Well, I can see these screens.  And if I have

5   that and hard copy -- I, frankly, look more at the hard copy

6   anyway.  And I know you may have moved around.  That's fine.

7        MS. TREBICKA:  Your Honor, we were overinclusive because

8   we didn't know what exactly we'd need to respond to.

9        (Discussion off the record between the Courtroom Deputy

10   and the Court.)

11        THE COURT:  Let's keep going.

12        MS. TREBICKA:  I'll keep going, and I'll make sure that

13   Your Honor is on the page that I'm talking about.

14        But as I started off, Your Honor --

15        MS. WEAVER:  If I may.

16        MS. TREBICKA:  Yes.

17        MS. WEAVER:  There is one correction to a question that

18   you asked that my team has given me.  And to give them an

19   opportunity to respond, if I could just make a quick

20   clarification on the record.

21        THE COURT:  Yes.

22        MS. WEAVER:  Would that be --

23        MS. TREBICKA:  That'd be fine.

24        MS. WEAVER:  Sorry about that.

25        MS. TREBICKA:  No.  It's fine.

UNDER SEAL BY ORDER OF THE COURT

1        **MS. WEAVER:**  You asked if in the March 5th hearing we --

2    you asked about the chronology and whether we knew by March 5th

3    that there was a not sync signal.

4        This is the chronology.  We'd observed a signal coming

5    from something called Clients4.google.com.

6        **THE COURT:**  Right.

7        **MS. WEAVER:**  We asked about it.  And then in the hearing,

8    it was denied.  So that's -- in the hearing, we were hearing

9    there was -- the March 5th hearing, there is no not sync

10   signal, and that was what was maintained until we learned about

11   ███████ later.

12       **THE COURT:**  I understand.  Okay.  Great.

13       **MS. TREBICKA:**  Your Honor, thank you for the opportunity.

14       Heavy accusations, both today and in the papers.  They are

15   as troubling as they are unsupported, and particularly

16   troubling as an officer of the court who takes her obligations

17   seriously and has sought to learn, understand, and digest very

18   difficult technology and formulate factual responses that are

19   informative as well as truthful for Your Honor.

20       There is no basis for any sanctions on this record, let

21   alone the types of sanctions that plaintiffs seek, preclusion

22   sanctions that are, as courts have held, the most severe and

23   that need -- that needs to show -- plaintiffs, to get them,

24   need to show certain requirements; and those requirements are

25   bad faith or violation of a court order and, in both instances,

UNDER SEAL BY ORDER OF THE COURT

1   prejudice.

2       And I thought Your Honor's questions at the beginning were

3   very insightful because they went to precisely those three

4   issues.  So that's what I'd like to focus my presentation on

5   today.

6       THE COURT:  Okay.  Let me just -- thank you, Ms. Trebicka.

7       MS. TREBICKA:  Absolutely.

8       THE COURT:  I'm with you.

9       My monitor is really trying hard to turn on, and it keeps,

10  like -- I get it for --

11      MS. TREBICKA:  Flickering?

12      THE COURT:  Let me just --

13      THE CLERK:  Jackson is on his way up here.

14      THE COURT:  Oh, I was just going to fiddle with the

15  connection for a second.  Let me just do that.

16      MS. TREBICKA:  Your Honor, would you prefer to take a

17  short break?

18      THE COURT:  No.  No.  I would like us to keep going

19  because we have a lot to cover.

20      MS. TREBICKA:  Yes.

21      THE COURT:  And I really can see Ms. Fanthorpe's screen

22  quite clearly, and I do have the hard copies, which is what I

23  mostly use anyway.

24      MS. TREBICKA:  Okay.  That's fine, Your Honor.

25      THE COURT:  Thank you, though.  Okay.

UNDER SEAL BY ORDER OF THE COURT

1    **MS. TREBICKA:** So the presentation --

2    **THE COURT:** Yes.

3    **MS. TREBICKA:** -- as a mental map for Your Honor, three

4    big issues:  no bad faith, no violation of a court order, and

5    certainly no prejudice.

6        And I will cover each, and I will clearly signal post for

7    Your Honor what we're covering.

8        I want to cover no bad faith first.  The fulcrum of the

9    bad faith argument is the March 5 hearing, the statements that

10   counsel made at the March 5 hearings -- at the March 5 hearing.

11   And the fulcrum is that counsel misrepresented the truth about

12   not sync signals.

13       That is absolutely incorrect.  What they say on their

14   Slide 4 -- Your Honor has both hard copies?

15   **THE COURT:** Mm-hmm.

16   **MS. TREBICKA:** -- is (as read):

17       "March 5 Hearing:  The Court asks Google

18       directly whether Google maintained 'Not-Synced'

19       Signals."

20   **THE COURT:** Mm-hmm.

21   **MS. TREBICKA:** There is no transcript cite, and that is

22   nowhere in the transcript.  That question was never asked.  And

23   it makes sense because the hearing was not about not synced

24   signals.  The hearing was about Google's request that it be

25   permitted to preserve its event-level logs in the regular

UNDER SEAL BY ORDER OF THE COURT

1   course of business.

2        And Your Honor asked specific questions when faced with

3   Google's request, and Your Honor's -- the issue that Your Honor

4   was trying to solve was one of proportionality, knowing that

5   there was potentially relevant data in these event-level logs.

6   Was the burden that Google had to undertake to preserve

7   everything, to put a stop to the retention periods as they

8   existed, did that overwhelm the potentially relevant

9   information?  And Your Honor found, yes, it did.

10       Now, Your Honor, if we can go to -- actually, before we

11  move on to the next slide, I'd like to -- for Your Honor's

12  notes, page 38 of the transcript, lines 1 and 15 -- 1 through

13  15, is where that is very clearly understood and articulated by

14  Your Honor, the fact that potentially relevant information, of

15  course, is at issue; the question is one of proportionality.

16       And if we can move to our Slide 7, Ms. Fani.

17       Your Honor, Google's Slide 7.  Before the hearing,

18  the Court asked very specific questions of the parties to focus

19  on, and Google in particular, and the questions revolved around

20  the data allegedly collected according to the complaint.

21       Let's move to the next page, Your Honor, Slide 8.  It

22  shows -- it's a screenshot from the complaint.  It shows the

23  data allegedly improperly collected.

24       And here's the use scenario for this data.  This is what

25  the data that they claim is improperly collected is all about.

UNDER SEAL BY ORDER OF THE COURT

 1    It's a user who goes to a third-party website that has Google

 2    Ad Manager or Google Analytics as a service on the third-party

 3    website; and Google, as a result of that visit, obtains this

 4    information, plaintiffs allege, even though the user is on a

 5    third-party website.

 6        So that is the mind-set with which, of course, the March

 7    hearing was conducted.

 8        Now, let's move to the next slide, Your Honor, Slide 9.

 9    Very different from sync data.  That's the basic disconnect in

10    the complaint.  The data that's allegedly collected is of a

11    different nature from what is trying to be superimposed with

12    the disclosures, the sync disclosures.

13        Sync data use scenario:  User has a Chrome browser on her

14    mobile, enables sync.  That data, such as apps, bookmarks,

15    history, settings, et cetera, is saved in her Google account so

16    that it is available for the user to use on a different device.

17    That's the sync data flow.

18        Not sync?  It means not that.

19        So if Your Honor could flip to page 8 -- or, sorry --

20    page 10, the next one.  Again, there can be no dispute that the

21    March 5 hearing focused on the data as alleged in the

22    complaint.

23        If Your Honor could move to page 12.  There can also be no

24    dispute that the parties were at the inception of log

25    discovery, what we've now come to understand as log discovery.

UNDER SEAL BY ORDER OF THE COURT

1    In fact, the dispute at that hearing was:  Should these logs be

2    preserved at all?

3        Now that looks like a very quaint dispute, now that we're

4    knee deep in logs and I can tell you the difference between a

5    log and a data source, which I didn't even know there was a

6    difference 20 months ago.

7        But that's where we were at that time, and discovery is

8    where we were headed towards.  And Your Honor, after that

9    hearing, allowed plaintiffs discovery with a deposition.

10       Your Honor asked:  Why not written discovery?

11       And plaintiffs said:  Well, you know, we're going to get

12   responses.  They're going to be very technical.  We'd rather

13   have a conversation with a live person.

14       Your Honor granted that.  And that is the first Monsees

15   deposition that plaintiffs' counsel was referring to.

16       A word on that deposition.  That deposition --

17       **THE COURT:**  Excuse me just one moment --

18       **MS. TREBICKA:**  Yes.

19       **THE COURT:**  -- Ms. Trebicka.

20       **MS. TREBICKA:**  Of course.

21       **THE COURT:**  Ms. Weaver, the tapping, if you can do it --

22       **MS. WEAVER:**  Oh, I'm so sorry.

23       **THE COURT:**  -- without making any noise.

24       That's all right.  Thank you.

25       Go ahead.

UNDER SEAL BY ORDER OF THE COURT

1    **MS. TREBICKA:**  Thank you, Your Honor.

2    The Monsees deposition, yes, questions about not sync were

3    asked.  Mr. Schapiro defended it.  And they were outside of the

4    scope.  The witness -- because Mr. Monsees -- Google is very

5    silo'd.  You've probably learned that by now as well.

6    Mr. Monsees does not know about sync traffic logs.

7    Mr. Schapiro objected as out of scope but still allowed

8    the witness to answer for completeness of record.  Your Honor

9    had asked us to allow the witness to answer, even if the

10   question was out of scope.  And that is the joint declaration,

11   Exhibit 6, Your Honor, the bottom of page 114.

12   Now, on sync specifically, we, of course, offered

13   Mr. Tim Schumann as a 30(b)(6) deponent.  And I'll get to that.

14   But that was not taken.  That deposition, even though we

15   offered it, was never taken.  That would have been the proper

16   deposition to take on not sync signals.

17   **THE COURT:**  Did Mr. Monsees -- is this the cite I'm

18   remembering where he says on the record "That's not my area,"

19   but then he proceeds to answer --

20   **MS. TREBICKA:**  Yes.

21   **THE COURT:**  -- or am I remembering a different --

22   **MS. TREBICKA:**  No.  Yes, Your Honor.  And I don't know if

23   that's all on page 114.  It is all on page 114.

24   Let's move to page 16, Your Honor, because that's one of

25   the statements -- what we've heard today was a little vague,

UNDER SEAL BY ORDER OF THE COURT

1  but I'd like to really go back to the record and understand

2  what it is that we were talking about at that hearing, and

3  that's the second statement that Ms. Weaver alluded to.

4       The core data at issue, the data that we were focused on

5  at this hearing is the URLs of the websites that users visit.

6  Now, after 18 months of discovery, there's still no indication

7  or evidence that URLs of websites that users who are not synced

8  visit are in those sync traffic logs that I was talking about

9  here.

10      Now, plaintiffs claim that this statement was inaccurate

11  because of something that's known as the ███████ signal.  The

12  ███████ signal may be recorded in the sync traffic logs for

13  certain unsynced users.  And, Your Honor, again, as a mental

14  map, for that to happen, that unsynced user needs to be, of

15  course, browsing on Chrome and needs to be logged into the

16  browser, as well as logged into a content area, such as Gmail.

17  That is an exception to the general rule that sync traffic logs

18  are for synced users.  That was introduced in 2019.  At the

19  time of the hearing, I was not aware of it.

20      Since the hearing, there has been abundant discovery on

21  the ███████ signal.  There has been depositions on it.  There

22  has been document discovery.  There have been written document

23  discovery, thousands of pages of Special Master discovery on

24  that precise signal, that exception to the general rule that I

25  articulated.

UNDER SEAL BY ORDER OF THE COURT

1    Your Honor, if you have any more questions -- I mean,

2  obviously, that is something that is extremely important to me;

3  so if you have any questions on that particular point, I would

4  be very happy to field them.

5    **THE COURT:**  No.  I understand the argument, Ms. Trebicka,

6  and I hear the discussion around context and where certainly

7  the Court was and, of course, plaintiffs very early in the

8  process.

9    And what I will continue to consider is:  But what did

10  Google know?  And I appreciate -- I'm not talking about

11  counsel.  I'm talking about -- I mean, obviously, you are the

12  voice of Google before the Court.

13    And whether or not someone is unsynced is obviously an

14  issue in the case from the earliest days because that's a

15  critical component of the class definition.  So how is that

16  determined?  Where are those indicators, whether they are

17  binary sync signals or an actual not synced signal?

18    So I'm just -- Google knows.  I mean, Google knows what

19  signals it has and what logs it has, Google writ large,

20  notwithstanding its silo'd organization.  But I also appreciate

21  that our discussions in March were very much on log

22  preservation and proportionality.  So that's --

23    **MS. TREBICKA:**  Yeah.  If I may just add to that,

24  Your Honor.

25    Not only logs and proportionality, but also remember the

UNDER SEAL BY ORDER OF THE COURT

1  two different data flows at issue.  So reading the complaint,

2  your mind-set is user visiting third-party website.  It's a

3  completely different data flow from the sync data flow that at

4  that point had not been one of the things that we had focused

5  on.  Again, this was early in log discovery.

6      And, Your Honor, the other point I'd like you to remember

7  is that -- I'll go through this one by one -- is that it was

8  abundantly made clear as soon as that type of discovery started

9  in earnest.  And that's what I will move to right now.

10      **THE COURT:**  Okay.  Let's do that.

11      **MS. TREBICKA:**  Because I think plaintiffs also attempt to

12  show bad faith, unsuccessfully, in the very process of

13  discovery.

14      I'd like to point to the interrogatories that were early

15  on, in September, Interrogatory Number 3, Your Honor.  That is

16  Docket 267, I believe.  I'm sorry.  467.  I may be butchering

17  that.  I will find a cite, Your Honor.

18      But on page 7, Google states that (as read):

19          "Google does not maintain the number of Chrome

20          users in the United States who did not sync their

21          Chrome browser with a Google account."

22      Again, the simple example of why that is unequivocally

23  true is a user without a Google account, a user who uses

24  Chrome in basic browser mode, does not have a Google account,

25  there is no readily available number for -- that will encompass

UNDER SEAL BY ORDER OF THE COURT

1   that user.

2       Your Honor, you also --

3       **THE COURT:**  What's the date of that interrogatory

4   response, Ms. Trebicka?

5       **MS. TREBICKA:**  Interrogatory Response Number 3.

6       **THE COURT:**  What's the date?

7       **MS. TREBICKA:**  Oh, the date?  It's September.

8   September 30th, Your Honor, 2020.

9       **THE COURT:**  2020?  2020?

10      **MS. TREBICKA:**  2020, correct.

11      And, Your Honor, you also asked the question or are

12  considering the question:  Well, what did Google know about

13  sync traffic logs?

14      And that is the perfect question for a 30(b)(6) on that

15  issue, on the sync traffic logs issue.  The notice was

16  propounded.  We prepared Mr. Schumann on it.  We offered him in

17  October of 2021.  The deposition was not taken.

18      **THE COURT:**  Okay.

19      **MS. TREBICKA:**  Moving on, Your Honor, to the rest of the

20  discovery process, the extensive and transparent discovery

21  process into a number of signals, including the two not sync

22  signals that plaintiffs are focused on today, which is the

23  Is Sync Feature Enabled, otherwise known as ████████, and

24  SyncDisabledEvent.

25      **THE COURT:**  So before we go to those signals --

UNDER SEAL BY ORDER OF THE COURT

1      **MS. TREBICKA:**  Yes.

2      **THE COURT:**  -- I just want to go back to your point about

3   Interrogatory Number 3.

4      And I'm not quite sure -- we were talking about -- we had

5   the hearing discussion and the follow-on Monsees in context,

6   and I get that; I get the arguments there.

7      **MS. TREBICKA:**  Yes.

8      **THE COURT:**  And then your point on the response to

9   Interrogatory 3?

10     **MS. TREBICKA:**  Your Honor, it was out of order.  You

11  noticed.  I apologize.  It was something that we had not

12  focused on in our presentation because it was not an important

13  part of the papers; but since it was mentioned today, I wanted

14  to point out to Your Honor that it was absolutely correct; that

15  the interrogatory is still correct.

16     Counsel stood up today and said that it was a

17  misstatement.  It is not.

18     **THE COURT:**  Okay.

19     **MS. TREBICKA:**  There's nothing to correct.

20     **THE COURT:**  All right.  Okay.

21     **MS. TREBICKA:**  Your Honor --

22     **THE COURT:**  It was out of order.

23     **MS. TREBICKA:**  Yes, out of order.  I apologize.  I love

24  chronologies, but this one came to me out of order.

25     **THE COURT:**  Okay.  So, ████████.

UNDER SEAL BY ORDER OF THE COURT

1     **MS. TREBICKA:**  So, yes, Your Honor.  Those are the two

2  signals at issue today.

3     I want to take it chronologically.  Would Your Honor

4  please move to Slide 27.

5     **THE COURT:**  Okay.

6     **MS. TREBICKA:**  These signals, many of them are public

7  knowledge.  Your Honor even noted that at the March 5 hearing.

8  Plaintiffs had been running tests.

9     There is -- the sort of architecture that I'd like

10  Your Honor to keep in mind is that the browser emits signals

11  for a certain issue, the Chrome browser; and then that

12  signal -- or is supposed to emit.  May or may not be emitted,

13  depending -- it depends on certain browser-specific or

14  device-specific issues.  For example, enterprise devices and

15  browser, I'm told, are of a different nature.  And then the

16  browser may or may not be received server-side by Google.

17     And that's what we mean when we say that enabling or

18  disabling sync is a device -- is a client-specific action.

19  "Client" means browser in this instance.

20     But those types of -- the signals are publicly disclosed,

21  and that is Slide 27; that's the next slide, Slide 28; and the

22  next one, Slide 29.  Chromium is an open source code.  It's

23  available for everyone to see.

24     **THE COURT:**  So why aren't those signals in the list of

25  signals that are shared in November of 2021 following my order?

UNDER SEAL BY ORDER OF THE COURT

1    And I know I'm taking you out of your chronology.

2    **MS. TREBICKA:**  That's okay, Your Honor.

3    **THE COURT:**  But why aren't they on that list?

4    **MS. TREBICKA:**  They are.

5    **THE COURT:**  They're in that spreadsheet?

6    **MS. TREBICKA:**  They are in that spreadsheet.

7    **THE COURT:**  Okay.

8    **MS. TREBICKA:**  May I explain that, or would you like me to

9    keep going in chronological order?

10   **THE COURT:**  Let's go there.

11   **MS. TREBICKA:**  Let's go there?  Okay.  So that is the --

12   let's go there.  That is Slide 38, Your Honor.

13   Actually, yes, let's -- Ms. Fani, can we please use the

14   plaintiff slide which has the order language.  And remind me

15   what that slide is.

16   Your Honor, since you're going there, I'd like to make it

17   very clear, absolutely clear what I'm talking about.

18   **THE COURT:**  Mm-hmm.  I think it is --

19   **MS. TREBICKA:**  Let me find it, Your Honor, what it is in

20   plaintiffs --

21   **THE COURT:**  It's Slide 8, I think.  8 and 9?

22   **MS. TREBICKA:**  Yes, Your Honor, Slide 8.

23   So this is the order.  The order says -- I'm reading from

24   3, from Point 3.

25   Well, actually, let's -- so let's go to the first Point 3,

UNDER SEAL BY ORDER OF THE COURT

1   which orders (as read):

2           ". . . Google," the highlighted, "is to provide

3       to the Special Master full schemas, a list of ALL

4       fields with their descriptions, a list of tools,"

5       et cetera, et cetera.

6       And then going to the next 3, which is highlighted (as

7   read):

8           "Any potentially relevant data source (from the

9       list provided by Google on September 17 . . .

10      named" -- it has a specific name -- ") where

11      information about sync-state signals are stored,

12      where sync-state is expressly stated or can be

13      inferred or from which signals include . . . ." and

14      then there's specific signals.

15      Your Honor, we did, from those data sources.

16      And now if you could go to our slide, Slide 38.

17      This is what we provided.  This is the data sources that

18  store the ███████ signal.  This is what we included in these

19  slides.  And they're highlighted here.  Well, not highlighted,

20  but the red rectangle, Your Honor.

21      And then the question is, what about -- counsel stated:

22  What about the SyncDisabledEvent?

23      The SyncDisabledEvent --

24      **THE COURT:**  Let me -- just before we leave ███████, it's

25  Google's position that -- or Google's response that on this

UNDER SEAL BY ORDER OF THE COURT

1    spreadsheet, it does identify the ███████ signal in response to

2    my November order?

3        **MS. TREBICKA:**  Correct, Your Honor.

4        **THE COURT:**  Okay.  Okay.

5        **MS. TREBICKA:**  So the ███████ signal is found in these two

6    sources that were included in the spreadsheet identified in the

7    order.

8        Now, counsel made the comment that it's -- that the

9    SyncDisabledEvent signal does not appear.

10       Now, the SyncDisabledEvent does appear.  It's not with

11   that name.  Your Honor may have -- one thing that you may have

12   already devined by yourself is that these signals have

13   different names.  It's a field; it's a signal.  You know, it

14   has a variety of different names.

15       I direct Your Honor's attention to Ansorge declaration,

16   Exhibit 32 at page --

17       **MR. SCHAPIRO:**  34.

18       **MS. TREBICKA:**  32.

19       **MR. SCHAPIRO:**  Okay.

20       **MS. TREBICKA:**  Your Honor, put a pin on that.

21   I'm pretty sure it's 32.

22   At 47, Your Honor.

23       **THE COURT:**  Okay.  So --

24       **MS. TREBICKA:**  Your Honor, it's 34.  I apologize.

25       **THE COURT:**  So Exhibit 34 to the Ansorge declaration?

1       MS. TREBICKA:  Yes.

2       THE COURT:  Oh, yeah, yeah, yeah.

3       MS. TREBICKA:  Okay?  At page 47.

4       THE COURT:  Okay.  Oh, yeah.  Mm-hmm.

5       MS. TREBICKA:  Okay.  It should say " ███████

6    ██████████████████████. "

7       THE COURT:  Mm-hmm.

8       MS. TREBICKA:  Row 8, Your Honor, it says "Request."

9    When the request field is formatted as ████████ ████ ████

10   ████████ ██████ █████ █████████ ██████, " that indicates the

11   SyncDisabledEvent signal.  It doesn't indicate it in those --

12   in that specific signal term, the SyncDisabledEvent.  This is

13   how it is recorded or explained or -- "recorded," I think, is

14   the best term -- in this log.

15      THE COURT:  At line 8?

16      MS. TREBICKA:  Correct.

17      THE COURT:  Where it just says --

18      MS. TREBICKA:  The one that says "Request."

19      THE COURT:  It just says "Request."

20      MS. TREBICKA:  The way that we followed Your Honor's order

21   was we went to the log that was identified, the data source; we

22   pulled all populated fields in a reasonable sample, wanted to

23   be broad; and we produced those in what you see here today,

24   Your Honor.

25      THE COURT:  Okay.  So Google's response to the argument by

UNDER SEAL BY ORDER OF THE COURT

1   plaintiffs that ████ and SyncDisabled are in the sync logs

2   and should have been identified early in the process is that

3   they were identified pursuant to the November order?

4        **MS. TREBICKA:** Not quite, Your Honor.

5        **THE COURT:** Okay.

6        **MS. TREBICKA:** If I may start with my chronology --

7        **THE COURT:** Turn to the chronology.

8        **MS. TREBICKA:** -- you will see that this was the

9   culmination and certainly not the beginning.

10       May I proceed, Your Honor?

11       **THE COURT:** Of course.

12       **MS. TREBICKA:** Okay.  Slide 27.  Or, I'm sorry.  Slide 30.

13       We went through Slide 27 through 29.  That was the public

14   disclosure of these signals.

15       **THE COURT:** Mm-hmm.

16       **MS. TREBICKA:** Slide 30, we have a summary exhibit that

17   identified the documents produced that mentioned ████ just

18   until May 2021, and there was approximately 100 just until

19   May 2021.  It's now in the thousands, of course.

20       **THE COURT:** But this doesn't tie it to a sync log.  It

21   identifies the signal?

22       **MS. TREBICKA:** The fact that there is a signal.

23       What we can do, Your Honor, is identify the documents that

24   actually tie it to a sync log.  We haven't done that for today.

25   We're happy to do that and respond.

UNDER SEAL BY ORDER OF THE COURT

1    **THE COURT:**  Is it Google's position, or can you answer

2    this question, as to whether any of Google's production in this

3    time frame, since we're on the chronology, ties either signal

4    to a sync log?

5    **MS. TREBICKA:**  I would have to confirm, Your Honor.  I

6    don't want to misstate something.  But I will confirm and

7    respond.

8    **THE COURT:**  I just want to know if you can do it here

9    today.  I understand that it's Google's position it is tied --

10   or these two signals are reflected as part of sync logs when we

11   get to November.  I'm just trying to figure out if it happened

12   sooner.  Understood.

13   Okay.  Let's go on.

14   **MS. TREBICKA:**  Okay.  So, Your Honor, if we move to

15   Slide 32, the proof that these signals were known and discussed

16   extensively between the parties, in the Special Master

17   proceeding and otherwise, is in the pudding.  These were even

18   discussed with the Special Master.  This is a letter from

19   September referencing the Is_Sync_Feature_Enabled field.

20   There were discussions about these fields, of course,

21   throughout the discovery period.

22   **THE COURT:**  Okay.  And the October RFA response, obviously

23   plaintiffs take issue with that as hiding the ball --

24   **MS. TREBICKA:**  Yes.

25   **THE COURT:**  -- or muddying the issue, not clarifying.

UNDER SEAL BY ORDER OF THE COURT

1      Explain.

2      **MS. TREBICKA:**  Yes, Your Honor.  And that is the very next

3  slide.

4      **THE COURT:**  Yes, it is.

5      **MS. TREBICKA:**  Instead of putting representations of what

6  we said, Your Honor, I'd like us to look at what we said.

7      **THE COURT:**  Mm-hmm.

8      **MS. TREBICKA:**  And what we said is that we admitted that

9  this signal may be emitted in certain circumstances.

10     And, of course, as you can imagine, the technology is

11 complicated.  Had we said something more categorical than that

12 we would have probably been wrong.  What we said is more

13 explanation so that plaintiffs can understand and have a

14 written verified response as to what had been already discussed

15 at length in prior proceedings and discovery.

16     **THE COURT:**  Mm-hmm.

17     **MS. TREBICKA:**  There is no misstatement there, Your Honor,

18 or muddying the water.

19     And, Your Honor, the fact that these are clear and that

20 they are admissions is also demonstrated by plaintiffs' own

21 expert reports which rely on this very admission and this very

22 wording to make their point.

23     The expert reports I'm referring to are the ones submitted

24 in support of the class certification motion.

25     **THE COURT:**  Mm-hmm.

UNDER SEAL BY ORDER OF THE COURT

1      **MS. TREBICKA:**  And perhaps we can go there.  That's

2  Slide 37, Your Honor.

3      Dr. Shafiq certainly did not think the water was muddy.

4      **THE COURT:**  Mm-hmm.  Okay.

5      **MS. TREBICKA:**  By October 2021, when the Shafiq

6  declaration, the Smith declaration, and plaintiffs' class

7  certification briefing was filed, there had been extensive

8  discovery.

9      And since we took Dr. Shafiq's declaration out of order,

10  if you go one slide back, Your Honor, to page 37, here is

11  plaintiffs' expert's references to the not sync signals.

12      Plaintiffs will claim these public documents were a

13  haystack -- or a needle in the haystack.  They were not,

14  especially considering the rest of the discovery surrounding

15  it.  They were even referenced in Mr. Smith's October 2021

16  report.

17      **THE COURT:**  Okay.

18      **MS. TREBICKA:**  Your Honor, I mentioned Mr. Schumann

19  before, and the reason I mentioned him is because he is the

20  person most knowledgeable on sync-state signals and --

21      **THE COURT:**  No.  I got --

22      **MS. TREBICKA:**  Yes.

23      **THE COURT:**  I understood, and the parties had clearly laid

24  out their positions.

25      I did look at the 30(b)(6) notice and the efforts to get

1   Mr. Schumann into a jurisdiction where he could be deposed, and

2   that was November, and then that comes off.

3       I understand the plaintiffs' position is they needed a

4   production, and I understand Google's position is he was

5   available, and then he was taken as an individual in January.

6       MS. TREBICKA:  Yeah.  Your Honor, just to correct one

7   small thing.  It was October that he was made available, not

8   November.

9       THE COURT:  Correct.

10      MS. TREBICKA:  So it was October, before the class

11  certification briefing was filed.

12      THE COURT:  Mm-hmm.  Okay.

13      MS. TREBICKA:  In December 2021, more written discovery

14  was served.  Again, this is almost a full year after the

15  January discussions.  And Google responded to this discovery;

16  served to confirm what plaintiffs had already known and Google

17  had already disclosed through the Special Master process.

18      And, Your Honor, I'd like to pause here.  This is

19  Slide 40, Your Honor, if you're following my --

20      THE COURT:  So that's a January 2022 response?

21      MS. TREBICKA:  Correct, Your Honor.

22      THE COURT:  I wanted to make sure of that.  Okay.

23      MS. TREBICKA:  Yes.

24      I'd like to pause on the Special Master proceedings

25  because, as Your Honor may be aware, they were extensive.  They

UNDER SEAL BY ORDER OF THE COURT

1     were long.  We met on the weekends.

2          Thank you for your dedication.  And, of course, thank you

3     to the team for its dedication.

4          They did not start to get transcribed until a certain

5     point.  There was a lot of information that was conveyed, that

6     was exchanged without a transcript.  There was a lot,

7     Your Honor.  And if we are not -- if I'm not able here today to

8     point to something that was said in a Special Master transcript

9     it was because it wasn't recorded before.

10         But the Special Master process was exactly what was needed

11    and Your Honor had the foresight to push the parties into to

12    discover these extremely complicated -- this extremely

13    complicated infrastructure.

14         I was not the attorney taking the lead on the

15    Special Master proceeding.  It was Mr. Ansorge, right there,

16    because he understands these issues a lot more.  So my limited

17    knowledge should not mean that that's the limited knowledge

18    that was conveyed at the time.

19         **THE COURT:**  I understand.  And I think that both parties

20    are aware, from our many proceedings and discussions with the

21    Special Master, that the Special Master kept the Court very

22    well informed of the parallel proceedings that were going on in

23    front of that team, and I'm well aware of the depth and

24    complexity of the process.

25         **MS. TREBICKA:**  Okay.  Your Honor, I'd like to point out

UNDER SEAL BY ORDER OF THE COURT

1    one more thing.

2        Plaintiffs again stated that they first discovered the

3    SyncDisabledEvent signal in a live demo on March 4th.   That is

4    demonstrably untrue.

5        I also take issue with their Slide 10, where it states (as

6    read):

7            "[On] March 4, 2022:   Two hours before the close

8        of discovery Google serves supplemental response,"

9        et cetera.

10    And then says (as read):

11            "This occurred only after Plaintiffs observed a

12        SyncDisabled signal in a meeting with Google

13        engineers running real time searches overseen by the

14        Special Master.   Schumann verifies this."

15    Schumann did not verify that the SyncDisabledEvent was

16    noted for the first time in the March 4th hearing because that

17    is demonstrably untrue because not only had there been

18    discovery before that, but their own expert, Mr. Smith,

19    included the SyncDisabledEvent in his rebuttal report.

20        And I'll point Your Honor to plaintiffs' joint declaration

21    Exhibit 13 at paragraph 14.

22        THE COURT:   Hang on.   Hang on.

23        MS. TREBICKA:   Yeah.

24        THE COURT:   Plaintiff joint dec what?

25        MS. TREBICKA:   Exhibit 13, Your Honor, paragraph 14.

UNDER SEAL BY ORDER OF THE COURT

1       **THE COURT:**  Is that the Smith rebuttal report?

2       **MS. TREBICKA:**  Yes, Your Honor.

3       **THE COURT:**  Okay.

4       **MS. TREBICKA:**  Paragraph 14, it says (as read):

5               "The SyncDisabledEvent field appears in 2012

6       copyrighted source code that I've referenced in my

7       opening report."

8       **THE COURT:**  And what's the date of the report, that --

9       **MS. TREBICKA:**  October 2021, Your Honor.

10      Your Honor, just to clarify, you asked what was the date

11  of the opening report or the rebuttal report?

12      **THE COURT:**  The report you were quoting from.

13      **MS. TREBICKA:**  Say that again, Your Honor.

14      **THE COURT:**  The report you were quoting from, which I

15  understood to be the rebuttal.

16      **MS. TREBICKA:**  Right.  That is not -- okay.  That is not

17  October 2021, Your Honor.  Let me find it because I don't have

18  it.  But the rebuttal report references the opening report.

19      **THE COURT:**  I understand.

20      **MS. TREBICKA:**  Right.  Let me find it, Your Honor.

21      I don't know the date of the rebuttal report.

22      **THE COURT:**  Okay.  And the opening report date is?

23      **MS. TREBICKA:**  October 2021.

24      **THE COURT:**  Okay.

25      **MS. TREBICKA:**  The rebuttal report date is January 2022.

UNDER SEAL BY ORDER OF THE COURT

1       **THE COURT:**  I can also look it up.

2       Okay.

3       **MS. TREBICKA:**  So, Your Honor, because the record may have

4   gotten a little cloudy at this point, I'd like to confirm that

5   the SyncDisabledEvent was referenced in the opening report in

6   October 2021 and then again in the rebuttal report in

7   January 2022.

8       **THE COURT:**  Okay.

9       **MS. TREBICKA:**  Okay.  Thank you, Your Honor.

10      I promised Your Honor sign posts.  We're talking about bad

11  faith/no bad faith in discovery.

12      Next, court order violation.  That's the other thing that

13  plaintiffs would need to prove, plus prejudice, in order to get

14  the sanctions that they seek.

15      There has been no order violation.  Your Honor jumped

16  ahead to the November 12th order a little bit.

17      **THE COURT:**  I think we covered that.

18      **MS. TREBICKA:**  So I think we covered that.

19      One thing I would like to note, however, is that Mr. --

20  that the Special Master team confirmed on December 21 of 2021

21  that the -- that Google had complied with the November 12th

22  order.

23      And I realize it's not in what we have cited so far.  I

24  have copies here for Your Honor and for opposing counsel, if I

25  may approach, or do it at the end.

UNDER SEAL BY ORDER OF THE COURT

1   THE COURT:  That's fine.  It's not in the large binder --

2   MS. TREBICKA:  Stack.

3   THE COURT:  -- of new exhibits?  It's another new exhibit?

4   MS. TREBICKA:  I'm afraid it's not, Your Honor.

5   THE COURT:  All right.  Hand it up.

6           (Document handed up to the Court.)

7   MS. WEAVER:  Your Honor, we'd like a moment to look, and

8   reserve our rights with regard to this document.

9   THE COURT:  Yes, of course.

10  MS. TREBICKA:  May I hand it to Her Honor while --

11  THE COURT:  Yes.

12  MS. TREBICKA:  -- you reserve your rights?

13  THE COURT:  Yes.  We will hand it up.  All rights

14  reserved.

15  Do you have another copy, Ms. Trebicka, for --

16  MS. TREBICKA:  Yes, Your Honor.

17  THE COURT:  -- for my clerk?

18  MS. TREBICKA:  Yes, of course.  Your Honor, I apologize.

19  That's why I had it in my hand.

20  THE COURT:  Thank you.

21  Just for the record, in argument, Ms. Trebicka has handed

22  up what appears to be an e-mail dated December 21, 2021, from

23  Mr. Schmidt of the Special Master team to the parties.

24  MS. TREBICKA:  Thank you, Your Honor.

25  THE COURT:  At some point, you can be heard, Ms. Weaver.

UNDER SEAL BY ORDER OF THE COURT

```
 1        MS. WEAVER:  Okay.

 2        THE COURT:  Thank you.

 3        Go ahead.

 4        MS. TREBICKA:  Your Honor, we covered no court order

 5   violation.  I will move on to no prejudice.

 6        THE COURT:  Okay.  What does this go to?

 7        MS. TREBICKA:  No court order violation.

 8        THE COURT:  That's what I thought.

 9        MS. TREBICKA:  Confirmed by the Special Master.  That's

10   why I wanted to hand it up now, Your Honor.

11        THE COURT:  All right.  Point me specifically.

12        MS. TREBICKA:  Yes, Your Honor.  Mr. Schmidt --

13        THE COURT:  Okay.

14        MS. TREBICKA:  -- states --

15        THE COURT:  All right.

16        MS. TREBICKA:  -- (as read):

17            "Google has" --

18        Mr. Schmidt e-mailed to Mr. Straite (as read):

19            "Google has provided the field information for

20        the remaining potentially relevant data sources

21        requested.  You will find this information on the

22        share file in a folder named 2021-12-21.  Please

23        provide your selection of data sources from which you

24        would like Google to perform searches on as well as

25        those search terms and criteria by COBEST
```

UNDER SEAL BY ORDER OF THE COURT

1       December 23rd, 2021."

2       **THE COURT:**  Going to the next step in --

3       **MS. TREBICKA:**  Yes, Your Honor.

4       **THE COURT:**  Understood.

5       **MS. TREBICKA:**  Instead of my using my big slides, I'd like

6   Your Honor's attention on plaintiff slide to go through the

7   harm.

8       **THE COURT:**  Just a moment.  I'm looking for my --

9       **MS. TREBICKA:**  Yes, Your Honor.

10      **THE COURT:**  -- for my notes.

11      Correct.  All right.  Go ahead, Ms. Trebicka.

12      **MS. TREBICKA:**  Your Honor, page 12, Slide 12 of

13  plaintiffs, the question is:  What is the harm?  That's the

14  question Your Honor opened with as well.

15      There is no harm.  Let's go one by one.

16      (As read):

17          "Number 1.  Google secured a protective order

18      based on false statements to the Court . . . ."

19      Period.  I'm inserting a period.

20      That is not correct.  That is absolutely not correct.  As

21  I explained at the start, counsel faithfully adhered to the

22  duty of candor to the Court.  And in any event, the protective

23  order was not on the basis of what relevant information may or

24  may not have been.

25      Second phrase of Number 1 (as read):

UNDER SEAL BY ORDER OF THE COURT

1          ". . . and did not preserve not sync signals."

2      That is actually not correct either because as we have

3 explained to plaintiffs and, I believe, to Your Honor,

4 certainly to the Special Master, the ▮▮▮▮ signal -- the two

5 signals at issue -- the ▮▮▮▮ signal is preserved in ▮▮▮▮

6 from the inception.  The ▮▮▮▮ signal is not very old.  It's

7 since 2019.  It's preserved.

8      And it's one of the sources that, if you'll recall,

9 Your Honor, was identified in Slide 38.

10      **THE COURT:**  Okay.

11      **MS. TREBICKA:**  The SyncDisabledEvent is preserved in

12 ▮▮▮▮ since the user's account creation, and we have disclosed

13 that fact in response to Plaintiffs' Interrogatory 34, served

14 on January 31, 2022.  There is no loss of data.

15      **THE COURT:**  It's preserved where?  In the ▮▮▮▮ --

16      **MS. TREBICKA:**  ▮▮▮▮.  Your Honor may recall ▮▮▮▮

17 discussions.

18      **THE COURT:**  Is this ▮▮▮▮ writ large?

19      **MS. TREBICKA:**  Your Honor, I don't have a more precise

20 indication, but perhaps my colleagues will help me if you'd

21 like the record to be complete.

22      **THE COURT:**  No.  That's all right.  Go ahead.

23      **MS. TREBICKA:**  And, of course, as Your Honor also remarked

24 in the beginning, we have the preservation plan, which will

25 preserve much more than just these two signals.

UNDER SEAL BY ORDER OF THE COURT

```
1        Moving on to plaintiffs' next claimed harm (as read):

2            "Plaintiffs did not have the opportunity to

3        conduct discovery about the undisclosed not signals."

4        That is also wrong, Your Honor.  And as a summary of the

5   information disclosed in discovery that I went through today,

6   I'd like to point Your Honor to our Slide 26, again, a summary

7   slide of the various discovery responses on these signals and

8   other discovery provided on these signals.

9        (As read):

10           "Number 3:  Google opposed class certification

11       based on omissions and false representations."

12       That is wrong as well.  Your Honor has read our opposition

13  to their class certification motion.  The argument with respect

14  to class member non-identifiability is a very simple one.

15  There's no way to identify non-Google account holders.

16       And with respect to uninjured class members, which

17  plaintiffs also specifically mentioned, as Your Honor knows, it

18  has nothing to do with sync signals.  It has to do with the

19  fact that, in our view, personal information is not always

20  passed for those -- for all putative class members and certain

21  other uninjured class member arguments that are more economic

22  in nature.

23       Lastly, Your Honor, Number 4 (as read):

24           "Google violated this Court's April 30,

25       2021 . . . order."
```

UNDER SEAL BY ORDER OF THE COURT

1     We did not hear much about that today.  It's wrong.  That

2   dealt with preservation of data.  Had not -- did not address

3   not sync signals.

4     We'll talk more about preservation of data.  So I'll

5   reserve that argument for later.

6     The November 12th order, we spoke about the November 12th

7   order.

8     I'd like to address one more slide in their presentation,

9   Your Honor, and that is Slide 11.  So having finished the harm

10  and rebutted the harm that plaintiffs claim, if you move to

11  Slide 11, this is additional argument that there are certain

12  signals out there that plaintiffs haven't been able to explore

13  in discovery.

14      **THE COURT:**  Plaintiffs say we found at least --

15      **MS. TREBICKA:**  At least --

16      **THE COURT:**  We have found more not synced signals.

17      **MS. TREBICKA:**  Your Honor, with all due respect, let's

18  look at them one by one.

19      The first three are none other than ███████ and

20  SyncDisabled.  Is_Sync_Feature_Enabled, that's ███████.

21      The second, ████████████ from ███████████████████

22  column in GAIA ███████ -- now, I'm omitting the dashes -- is a

23  sync enabled event as it appears in GAIA ███████.

24      The third one, SyncDisabled, is a SyncDisabledEvent.

25      **THE COURT:**  I'm sorry.  I'm sorry, Ms. Trebicka.  The

UNDER SEAL BY ORDER OF THE COURT

```
1    first is ████.  Is that what you're saying?
2        MS. TREBICKA:  Correct.
3        THE COURT:  Okay.  The second is?
4        MS. TREBICKA:  SyncDisabledEvent as it appears in GAIA
5    ████.
6        THE COURT:  Okay.
7        MS. TREBICKA:  The third is SyncDisabledEvent.
8        The last three, Your Honor, are not sync signals, not
9    express sync signals.
10       The Court first ruled on July 15th, the modified
11   preservation plan, that's Docket 766, that these identity
12   signals are not express sync signals.
13       The plaintiffs sought reconsideration.  We discussed it
14   last week.  And on Friday, the Court affirmed its ruling they
15   are not express sync-state signals.  That's Docket 815.
16       THE COURT:  But my order in November was express or
17   inferred.
18       MS. TREBICKA:  Correct, Your Honor.  But now we're talking
19   about what these are.
20       THE COURT:  I see.  Okay.
21       MS. TREBICKA:  And there is no indication that we haven't
22   provided information of these.  In fact, they're not found in
23   sync traffic logs.  These are identity signals, Your Honor.
24       We go back to thematically or just, again, as a roadmap --
25   I keep using that word but -- to this idea that there's a
```

UNDER SEAL BY ORDER OF THE COURT

1   disconnect between the data that they allege was improperly

2   collected and sync flow, sync/unsync flow.  It's entirely

3   disconnected.  These identity signals are not in sync traffic

4   logs, and Mr. Barnes confirmed.

5        And, Your Honor, the same logic applies.  These are not

6   express state -- signals for express sync states.

7        THE COURT:  I understand the argument.

8        MS. TREBICKA:  Okay.

9        THE COURT:  Okay.  I want to wrap up and finish, please.

10       MS. TREBICKA:  Your Honor --

11       THE COURT:  I want to hear --

12       MS. TREBICKA:  Yes.

13       THE COURT:  -- briefly --

14       MS. TREBICKA:  With that, they have failed to show any

15   sanctions are warranted, Your Honor.

16       THE COURT:  Okay.

17       MS. TREBICKA:  And I reserve, if there is a minute or two,

18   in rebuttal.

19       THE COURT:  I think we can probably wait for an overall

20   closing.  Thank you.

21       MS. TREBICKA:  Thank you, Your Honor.

22       THE COURT:  All right.  Ms. Weaver, if you'd like five

23   minutes to address the sync issue, you may do so.

24       MS. WEAVER:  Thank you, Your Honor.  It will be brief.

25   Some of this we're doing on the fly.

UNDER SEAL BY ORDER OF THE COURT

1    Mr. Boles, could you pull up that log?

2    Ms. Trebicka just said that in this Table 3.3.2, that in

3  line 8 it reveals the SyncDisabled or ████████.  It does neither.

4  We'll just show you the visual right here.

5    If you look at line 8, it says --

6    **THE COURT:**  I pulled it from --

7    **MS. WEAVER:**  Yeah.

8    **THE COURT:**  -- the declaration.

9    **MS. WEAVER:**  Okay.  So from our perspective and looking at

10 all of these discovery responses, which were not amended,

11 Google did not come back and say, "This is a

12 SyncDisabled signal."  Even the responses they point out to you

13 saying it's a bit, it didn't say "████████."  It didn't say,

14 "This is SyncDisabled."

15    We just heard new information in this hearing,

16 representations that weren't in the papers about what those six

17 sync signals identified by Dr. Shafiq are.  We've never said

18 this.

19    I think Your Honor pointed out that those -- some of those

20 signals would allow inferences.  We've not had discovery on

21 them.

22    Mr. Smith's report was relying on public information.  And

23 significantly, at the time he was asking about that, Google was

24 still telling us they don't maintain the signals server-side.

25 So his whole report was saying, "I see it here saved locally.

UNDER SEAL BY ORDER OF THE COURT

1    Does Google have it on the server-side?"  And at that point in

2    time, they were still saying that it simply wasn't true.

3         I also want to just point out that Ms. Trebicka opened,

4    and they've doubled down in this hearing, by saying you didn't

5    ask in the March 5th hearing about not sync signals.  But you

6    did.  You specifically said -- and it's on page 23.

7         Give me just a moment here.  Sorry.

8         **THE COURT:**  And my monitor talks to your system, but not

9    to the plaintiffs.

10        **MS. WEAVER:**  Yeah.  So even in their Findings of Fact in

11   paragraph 45, they say that you did not ask in the hearing

12   about the not sync signal.

13        **THE COURT:**  I know the argument.

14        **MS. WEAVER:**  The March 5th.

15        You actually did, and I'm trying to find the actual quote.

16        At 23, line 6, you said (as read):

17             "Let me ask you this question" -- and there's

18        some ellipses -- "which is for a given period of

19        time, and let's say September of 2020 . . . is Google

20        able to identify the number of unsynced users who are

21        using Chrome . . . ?"

22        And Ms. Trebicka said (as read):

23             "My understanding, Your Honor, is that that is

24        not a figure that's readily available to Google."

25        And Mr. Schumann then later in his deposition, which we

UNDER SEAL BY ORDER OF THE COURT

1   did take -- we never declined to take it -- then said that,

2   actually, they could do it in a matter of days.  And that's

3   also in the record.

4       I think the -- we obviously object to this new submission

5   exhibit.  I think what this e-mail was reflecting was that some

6   information had been provided by Google, not that they had

7   complied with their discovery obligations.

8       I think writ large, the question here is whether this was

9   a game of hide the ball, and we think it is.

10      You know, in the -- I will also say there are a couple

11  other just flat misstatements.  Paragraph 40 of Google's

12  finding of fact says they never misrepresented whether or not

13  there are not sync signals, and then it relies on Mr. Ansorge's

14  dec at paragraph 86.  He's referring to Special Master

15  hearings.

16      There was clearly a misrepresentation made to the Court.

17  And nobody said anything today about attempts to correct or

18  amend any written discovery response except for the one on 34.

19      And I apologize.  I think Ms. Trebicka is correct that my

20  slide was misleading.  Mr. Schumann verified the interrogatory.

21      THE COURT:  I'm aware.

22      MS. WEAVER:  Yeah.  But he was the one who verified the

23  original interrogatory saying the opposite.  And so for us,

24  it's been a game of whipsaw.  We still don't have it all

25  figured out.

UNDER SEAL BY ORDER OF THE COURT

1        With regard to the prejudice on the retention of the logs,

2   the question is:  When did Google start retaining?  Because it

3   didn't happen when the complaint was filed.  And those

4   identifiers were in there.

5        Thank you, Your Honor.

6        **THE COURT:**  All right.  Thank you.  Thank you, Ms. Weaver.

7        Okay.  This is the argument where I spent certainly the

8   most of my time because I think it is -- it's close, but

9   I think it is the more complex -- the most complex of the

10  issues presented.  The plaintiffs' data issue is probably a

11  close second.

12       So what we're going to do now is we will take a break till

13  12:45 -- or, excuse me -- 11:45.  11:45.  A 15-minute break.

14  15-plus.

15       And then when we resume, I would like to turn to the

16  plaintiffs' data issue.  I know the plaintiffs had intended for

17  us to move to the ▮▮▮▮▮▮▮▮ issue, but I'd like to get to

18  plaintiffs' data because there's some overlap, at least in the

19  discussion points or in the vocabulary, with the topic that we

20  just covered.  Okay?

21       So that's where we will go.

22       And, Ms. Fanthorpe, if you'll check with Jackson to see --

23       **THE CLERK:**  He's on his way up.

24       **THE COURT:**  -- if he can tweak my monitor.

25       It only doesn't like to talk on this side, and it talks on

UNDER SEAL BY ORDER OF THE COURT

1    the other.

2       So, thank you very much.

3       **THE CLERK:**  Of course.

4       **THE COURT:**  All right.  We are in recess for 15 minutes.

5                (Recess taken at 11:27 a.m.)

6            (Proceedings resumed at 11:46 a.m.)

7       **THE COURT:**  All right.  Let's turn to the plaintiffs' data

8    issue, and I will -- or the named plaintiffs' data issue, and I

9    will hear from plaintiffs.

10       **MR. BARNES:**  May I approach, Your Honor?

11       **THE COURT:**  Please.

12       **MR. BARNES:**  Okay.  Thank you, Your Honor.  Thank you for

13    your patience.  As Your Honor knows, sometimes I get excited

14    and start talking fast.  So I'm going to do my best not to do

15    that.  The court reporter and I --

16       **THE COURT:**  I will correct you when you go too fast.

17       **MR. BARNES:**  All right.  So Your Honor asked three

18    questions you said you were interested in.  I want to start

19    with those three questions.

20       The first one you asked, according to my notes, is:  What

21    are the plaintiffs going to trial without?

22       And it's a little bit different for each of the three

23    categories:  GAIA, Zwieback, and Biscotti.

24       For GAIA-keyed data, we are missing the most important

25    GAIA-keyed data.  That is information in the back-end logs that

UNDER SEAL BY ORDER OF THE COURT

1   contain historical detailed profile information, whether

2   communications intercepted from Chrome were sensitive, and

3   plaintiff-specific revenue information.

4        For Zwieback-keyed data, we are going to the jury with no

5   named plaintiff data, to our knowledge.  We are also going to

6   the jury with no ability -- well, I should say limited ability

7   to establish the connections that Google makes between

8   Zwieback- and GAIA-keyed data, as well as other personal

9   information.

10       The late disclosures in this case state on their face that

11  GAIA IDs are contained in Zwieback ██████ and that Zwieback IDs

12  are contained in GAIA ███████

13       Google admitted on June 15 that Zwieback ██████ contains

14  phone numbers, street addresses, and precise geo-location.

15       **THE COURT:**  And, I'm sorry.  Did you say you have -- oh,

16  go ahead.  I'm sorry.  You said there's no data, no Zwieback

17  data for the named plaintiffs.

18       **MR. BARNES:**  Correct.  No meaningful Zwieback-keyed data

19  for the named plaintiffs of which we are aware.  And as I go

20  into the presentation, I'll talk more about that.

21       **THE COURT:**  Okay.  And let's go back to the GAIA data.

22  You said you're missing revenue information.  That was preceded

23  by?

24       **MR. BARNES:**  The detailed historical profile information

25  that exists in the logs, for which there was never a full

UNDER SEAL BY ORDER OF THE COURT

1  search.   There was only a partial search based on dates where

2  we were forced to guess.

3       **THE COURT:**  Just tell me what's missing.  Don't tell me

4  why it's missing.

5       **MR. BARNES:**  Okay.

6       **THE COURT:**  Tell me what's missing.

7       **MR. BARNES:**  Fair enough.

8       I think that's in my slides.

9       **THE COURT:**  Okay.

10       **MR. BARNES:**  It's detailed profile information.  It's

11  whether the intercepted communications were sensitive or not.

12  It is -- we have a great slide for you, Your Honor, where I

13  can -- rather than try to memorize it off the top of my head,

14  there's a lot of different information in these logs that were

15  not produced and have never been fully searched.

16       For Biscotti-keyed data, for three named plaintiffs, to

17  the best of our searching through the logs, we have five pages

18  of -- five PDF pages of data.

19       For the others, through our best searching of the logs, we

20  have no pre-complaint data.  And we'll talk about that in a

21  minute.

22       **THE COURT:**  And, I'm sorry.  What's the -- are we down to

23  six named plaintiffs?

24       **MR. BARNES:**  We have six, yes.

25       **THE COURT:**  So three, you've got something, not --

UNDER SEAL BY ORDER OF THE COURT

1    **MR. BARNES:**  Well, we don't have historical information at

2    issue in the complaint, and we have -- what we do have is not

3    the type of information -- it's not the full search of

4    information.  It's not the type of information --

5        **THE COURT:**  I thought you were making a distinction, that

6    three, you had something and three, you had --

7        **MR. BARNES:**  Three, we have something, because I don't

8    want to make a misrepresentation to the Court.

9        **THE COURT:**  I understand.

10       **MR. BARNES:**  We don't have gigabytes.  We have less than

11   gigabytes for those three.  But I don't want Your Honor to -- I

12   don't want to make a misrepresentation to the Court.  Right?

13   We do have some for three.  We can talk about what we have.

14       **THE COURT:**  And for the other three?

15       **MR. BARNES:**  For the other three, we have -- we believe we

16   have five pages --

17       **THE COURT:**  Okay.

18       **MR. BARNES:**  -- of PDF.

19       So the second question you asked is:  At what juncture

20   should they have been disclosed or produced?

21       So we think the preservation date attached the day Google

22   was served with the complaint.  We included -- our case is a

23   little bit differently situated.  We included Google account

24   information in our complaint that Google used to preserve basic

25   Google account information.

UNDER SEAL BY ORDER OF THE COURT

1    Our complaint also included Biscotti cookie IDs, and it

2  also included Zwieback cookie IDs.  In fact, it included more

3  Zwieback-related transmissions than any other type of

4  transmission in the complaint.  And we alleged unauthorized

5  transmissions from Chrome to Google.com on non-Google websites

6  than all other unauthorized transmissions combined.  That's the

7  Zwieback data for which we have nothing.

8    Now, what Google may come up here and tell you is:  Well,

9  we did some Zwieback productions late.

10    Here's what we have.  We have some Shafiq data that is

11  encoded.  They only did a search for, as best we can tell,

12  ██ ████████ of Zwieback ██████.  We asked for them to be decoded

13  so that they would be understandable to human beings.  We had a

14  funny colloquy at a recent conference with Your Honor.

15    And what they did to decode it was they only produced

16  approximately ██ ████████ of the data that was decoded, and we

17  have no idea what happened to the other -- what's the other

18  ██ ████████ of Zwieback ██████.

19    You asked -- so, sorry.  I'm jumping around.  You asked:

20  At what juncture should they have been disclosed or produced?

21    So the first thing is, the preservation obligation

22  attached the moment Google was served with the complaint.

23    When should they have been produced?  We --

24    THE COURT:  Let me just -- as far as attaching at the time

25  of service of the complaint, you made the point that the

UNDER SEAL BY ORDER OF THE COURT

1  complaint has a lot of references to Zwieback data.  Okay?

2  What about the other two?

3       MR. BARNES:  It also has Biscotti identifiers and,

4  I believe -- I was less focused on this Your Honor.  I believe

5  it also has our plaintiffs' Google account, their e-mail

6  addresses, from which Google can get their -- the number string

7  that is attached which is called the GAIA ID, that is attached

8  to their e-mail account.

9       THE COURT:  Okay.

10      MR. BARNES:  So then the question is:  When should it have

11  been produced?

12      Well, we served RFP 5 on August 30th, 2021.  And the

13  Special Master process demonstrated that it is easy for Google

14  to search and produce data from the data source known as

15  ███.  And we think that a full search of ███, which was

16  eventually ordered but I don't think really carried out at any

17  point in time, should have been done and that data produced on

18  September 30, 2021.  That's GAIA ███, ███ ███, and

19  Zwieback ███.

20      In addition to that, there are ███ ███ logs that,

21  as Your Honor knows, they're GAIA keyed.  And primarily, the

22  logs that they have disclosed are Display Ads logs.  And I'll

23  talk about why that's not sufficient in a moment.  Those are

24  Biscotti keyed.

25      Google created some pipelines in February.

UNDER SEAL BY ORDER OF THE COURT

1    **THE COURT:**  Well, we were at -- you just referenced an RFP

2    that you served in August of '21.

3    **MR. BARNES:**  Correct.  RFP 5 was served on August 30th.

4    **THE COURT:**  All right.  So you have a September -- you

5    said 30th?

6    **MR. BARNES:**  September 30th, correct.

7    **THE COURT:**  Of 2021.

8    **MR. BARNES:**  And just to be clear, because there's some

9    language in Google's opposition, in their slides about having a

10   protective order that they didn't have to preserve data.

11   We didn't hear any arguments in the motion for protective

12   order that Google had permission to not preserve named

13   plaintiff data.  We're talking -- we're down to six.  We had

14   eight total.  We're talking about eight total people in the

15   entire world, Your Honor.  That's not something to delete.

16   And, I'm sorry.  My counsel just told me it was

17   September 30th of 2020.

18   **THE COURT:**  That's why I asked.

19   **MR. BARNES:**  We have been in this case for a while,

20   Your Honor.

21   **THE COURT:**  I think that's what your papers say.

22   **MR. BARNES:**  Right.  And so what's the tailored remedy?

23   That's in paragraph 354 of the complaint.  It is a jury

24   instruction, Your Honor, to inform the jury of Google's conduct

25   specifically as it relates to --

UNDER SEAL BY ORDER OF THE COURT

1   **THE COURT:**  Is that in the proposed -- or you said in the
2   complaint?

3   **MR. BARNES:**  I'm sorry.  It's in the proposed order.
4   Paragraph 354 of the proposed order.

5       In the last discussion, you noted that preservation -- the
6   preservation issue got to be very complicated.

7       If Your Honor would recall, at the start of the process
8   for RFP Number 5, the plaintiffs made clear to Your Honor we
9   thought plaintiff data could be a roadmap for all of discovery.

10      And if you will recall -- and I believe this is in the
11  March 5th hearing -- we asked Google to identify the fields in
12  the relevant logs.  In that hearing, Google said of course it
13  would do so.  We didn't get fields until December, and even
14  then, it was limited to the top 100.

15      Now, in the preservation process, Google is telling
16  the Court that it needs to first extract some data in order to
17  tell what fields are in the logs.  We think just producing the
18  proto would be easier; but fine, that's Google's claim for now.

19      Google had created pipelines in February of 2021 for
20  58 GAIA-keyed logs.  If it had simply produced the data from
21  those logs, we would have had the field names in February of
22  2021 and the preservation nightmare that we feel like we were
23  forced to go through would have not lasted nearly as long,
24  because it wasn't until we got those fields that we were able
25  to identify that which we wanted preserved on a class-wide

UNDER SEAL BY ORDER OF THE COURT

1   basis, because it was never our position that we wanted

2   everything preserved, Your Honor.  We only wanted what was

3   necessary to preserve to identify class members and their

4   damages.

5        In fact, if you can look at the August 2021 preservation

6   proposal, we didn't have a proposal for Your Honor.  All we

7   said was, in order to make a proposal, Google has to tell us

8   the fields.

9        So I want to -- let's talk about named plaintiff data.  If

10  we could go to Slide Number 1.  And I want to take just a quick

11  ride in a time machine.

12       THE COURT:  Hang on.

13       THE CLERK:  Can I just make sure?  Is the TV on?

14  Okay.  Thank you.

15       THE COURT:  I'm sorry.  Your slide number what?

16       MR. BARNES:  It is Slide -- I'm sorry.  It's Slide 20 for

17  plaintiffs.  It's Slide 1 of my presentation.  So...

18       THE COURT:  The only number I care about --

19       MR. BARNES:  I know.  I know.  Is Slide 20.

20       THE COURT:  So let me just -- you just stepped aside and

21  wanted to talk -- and talked about the fields issue.  Where

22  does that fit --

23       MR. BARNES:  Here's where it fits.

24       THE COURT:  Excuse me.

25       -- in my three questions?

UNDER SEAL BY ORDER OF THE COURT

1      **MR. BARNES:**  In your three questions.

2          At this point in time, for those ▮ logs, we have a decent

3   idea, obviously, of what the fields are in those logs.

4          For Zwieback-keyed data, we believe, based on deposition

5   testimony, that Google has never disclosed the back-end

6   Zwieback logs that this Court required Google to identify in

7   its November -- in paragraph 4 of its November 12th, 2021,

8   order.  So for the back-end Zwieback logs, we don't have -- we

9   don't have any fields.

10         There are some logs that have Zwieback and Biscotti.

11     **THE COURT:**  I understand.  But what are we talking about?

12     **MR. BARNES:**  I wanted -- Your Honor mentioned in the first

13  and talked about the relationship between the not sync signals

14  and -- sorry -- plaintiff data and the preservation issue.

15     **THE COURT:**  Okay.

16     **MR. BARNES:**  And this goes to the issue of how Google's

17  conduct has stymied our ability to get the discovery we need in

18  different areas such that the plaintiff data, the failure to

19  timely produce it completely changed the nature of our

20  discovery plan.

21     **THE COURT:**  Okay.

22     **MR. BARNES:**  If we had got the plaintiff data early --

23  there are fields in the plaintiff data that we didn't get until

24  it was too late.  We were done with written discovery.

25         But we'll get to them in just a minute, and I will

UNDER SEAL BY ORDER OF THE COURT

1    identify specific fields for which we would have promulgated

2    RFPs that we never had the opportunity to do so.

3         THE COURT:  Okay.

4         MR. BARNES:  So July 27th, 2020, is when we filed our

5    complaint.  I just want to give Your Honor one example.

6         Matt, can you pull up Docket 1, please.

7         What's on your screen is a screenshot of paragraph 158 of

8    the complaint, something that has the plaintiffs' personal

9    identifiers in it.

10        What you see as labeled "NID" on your screen is a Zwieback

11   cookie.  There are more allegations of unauthorized

12   transmissions involving Zwieback cookies in our original

13   complaint and our first amended complaint than any other data

14   transmission.

15        THE COURT:  What was that paragraph number?

16        MR. BARNES:  This is paragraph 158.

17        And I will note, Your Honor, I picked this paragraph

18   because we asked Mr. Monsees about paragraph 158 in the first

19   30(b)(6) deposition.  Mr. Monsees said, to know where this is

20   stored at Google, you would have to look at all of the logs

21   keyed off of Google.com.  This is from our complaint.

22   Ms. Weaver's questioning was cut off by Google counsel.

23        Now, the reason I want to tell Your Honor, when you see

24   the complaint, there was an error in the complaint.  It

25   identifies it as Google Analytics, but you can see from the

UNDER SEAL BY ORDER OF THE COURT

1    screenshot it's www.google.com.  At the bottom left where it

2    says "Host," that shows that this transmission was made from

3    the Chrome browser to Google.com.

4        And then you can see other examples in our complaint which

5    are 158, 161, 170, 172, 177, 183, 188, and 190.  And I raise

6    this at the start of the plaintiff data discussion today

7    because Ms. Trebicka got up and said that this case is about

8    Google Ad Manager and Google Analytics.  Your Honor has

9    overruled their objection in this form, and the Special Master,

10   at least six times.  They are excluding Google Ads, which is

11   the most alleged transmission.

12       And Google, Your Honor, we would note, did not object to

13   Zwieback until September of 2021.  Over a year into the case

14   before they objected.

15       Let's go to the April 29th hearing, if we could.

16       So we served the RFP.  We have this back-and-forth.

17   Google teaches us about GAIA -- the existence of GAIA,

18   Biscotti, and Zwieback.  Google eventually objects to producing

19   what it calls unauthenticated identifiers.  That's Zwieback and

20   Biscotti.  As we learned, we don't think they're

21   unauthenticated at all because Google ties them to GAIA IDs

22   through the mapping tables.

23       So we have a hearing on April 29th.  Your Honor asks the

24   plaintiffs specifically:  What are you seeking?  Mr. Straite

25   says:  We're seeking GAIA; we're seeking Zwieback; we're

UNDER SEAL BY ORDER OF THE COURT

 1   seeking Biscotti.

 2       In response, Google admits that Zwieback and Biscotti are,

 3   quote, tied to the device.  We can think of them as almost like

 4   it's a license plate.  Did not object to Zwieback.

 5       What happens?  The Court, in that very hearing, makes an

 6   oral ruling from the bench that says it's appropriate for

 7   Google to turn over the information it has on the named

 8   plaintiffs, including profile data, device data, whether or not

 9   it can authenticate that it is only used by the plaintiff.

10       On April 30th, the Court follows with a written order

11   referencing back to the discussion at the hearing.  Now, at

12   this point, that's where the conduct for each of the

13   identifiers diverges a little bit.  So for GAIA-keyed data,

14   Google produced basic Google account information.  They also

15   produced ████ ███████ logs.  They identified ██ other logs

16   that contained GAIA-keyed data.

17       And we said:  What about these?

18       And Google said:  We're not giving you those.  We've

19   complied.

20       So we filed another motion to compel.  And in June of

21   2021, this is what Google told the Court.  First, it told

22   the Court that to produce anything more than the ███

23   ████████ logs would be unduly burdensome because it would

24   require all of these engineering resources, time, and support.

25       Here's what we learned.  Google engineered pipelines to

UNDER SEAL BY ORDER OF THE COURT

1  preserve event-level data associated with the named plaintiffs'

2  GAIA IDs in February 2021 which was completed in March 2021.

3  So at the time Google was telling the Court that it would be so

4  impossible to do this, it had already completed creation of a

5  pipeline to extract the data.

6      Next, Your Honor, Google said that the withheld plaintiff

7  information is equally available to the plaintiffs.

8      Your Honor, that's not true.  GAIA ████████ and GAIA ███████

9  are not available to plaintiffs.  We are here in a closed

10  hearing because we're not even allowed to say those words in

11  public.

12      The third thing they claimed is that the withheld

13  information would just contain duplicative and cumulative

14  information.

15      That, too, is false.  And we're going to show you -- we're

16  going to give you two examples.  The first is

17  ████████████████████; the second is GAIA ████████.

18      And GAIA ██████ is just based on the column names that

19  they gave us and the very brief descriptions of them.

20      For ██████████████████, it's one of the ██.  If

21  Your Honor had two weeks, I could explain to you all of the

22  missing data in the other ██.

23      THE COURT:  Don't you dare.

24                    (Laughter.)

25      MR. BARNES:  So let's go to the next slide for this one,

UNDER SEAL BY ORDER OF THE COURT

1    ████████████████████████

2         These are the six general areas that are not captured by

3    the logs Google produced in June of 2021.

4         The first is revenue information.  That ██████████████ --

5         **THE COURT:**  I'm sorry.  What --

6         **MR. BARNES:**  I'm on Slide 27.

7         **THE COURT:**  No, I understand.  But you're saying that GAIA

8    ████████ is not duplicative or cumulative because this is data

9    in the GAIA ████████ log?

10        **MR. BARNES:**  This is data in the ██████████████████████

11   log that is not present in the ████████ data that was

12   produced to us.

13        So this first one, ████████████████████████ this is

14   ████ ██████████████ ██ ██ ████ █ █ ██ ██ █ ██ █ ████████

15   ████ ██ ██ ████████ ██████ ████████ ███ ██ ████.

16        This is particularly important because Google had not

17   produced the ██████████████████ log at the time of our

18   class certification briefing; and Google opposed class

19   certification by saying it did not apportion profits per user,

20   which is an interesting way of avoiding saying whether it had

21   logs that captured revenue per user.  We discovered this

22   ██████████████████ log does have revenue per user.

23        The second general category is profile information.  So

24   there's User-Profile-Lists, User-Profile-Segments,

25   Targeting-Criteria, User-List-IDs, which is -- our

1   understanding is kind of like a record, a coded record of

2   websites and actions that users have taken on non-Google

3   websites.

4        The next one is ██████████████████.  And that has

5   a true or false value.

6        Targeting-Verticals is, as I think the name suggests -- a

7   vertical, Your Honor, is a taxonomic --

8        THE COURT:  I get it.  I think we can --

9        MR. BARNES:  Okay.

10       THE COURT:  -- move through these in a --

11       MR. BARNES:  Great.

12       THE COURT:  -- summary fashion.

13       MR. BARNES:  Next one is content.  Porn percent,

14   content-URLs.  A ████████ █ ███████ ████████ ████████

15   ██ ███████ ████ █ ███████████ ██ █████.

16       Geo-location, if you'll recall, early in the motions,

17   Google said it couldn't figure out who's in the U.S. and who's

18   not.  Well, they've got latitude and longitude here.

19       Identifiers.  This log has GAIA and Biscotti in the same

20   log.

21       The next one is user-state signals.  These are user-state

22   signals that can be identified -- used to infer sync state.

23   Google said -- in its opposition to this motion, they admitted

24   that when you're signed out, that is not synced.  There are no

25   exceptions to that rule.  That means any signal or combination

1  of signals that identify a person is signed out is an inferred

2  sync state.

3      If we had had these logs earlier, we would have had a much

4  better idea of how to preserve and how to show this to a jury.

5      Next is GAIA ███████.  You've seen a lot of argument on

6  GAIA ███████ and Zwieback ███████, Your Honor.  So ██ columns

7  with Zwieback in them; ██ with sync state; ██ with IP address;

8  ██ columns with geo-location.

9      Now, what the Special Master process demonstrated is that

10 Google had the data; it just failed to produce it.  But not

11 only did they fail to produce it; they never actually searched

12 for it.  Because we understood the Special Master process was

13 set up -- the searches were set up as a test so that we could

14 get a limited, but robust, set of plaintiff data for the

15 historical period, the vast historical period.

16     After the second-round searches on May 17th, 2022, the

17 Special Master issued an order by e-mail.  The Special Master

18 told Google to search for Zwieback, Biscotti, IP user agent,

19 and GAIA for length of retention or beginning of class period

20 in the first amended complaint, whichever is more recent.

21     Google's response was to tell the Special Master they had

22 already done this.  Google never did this.

23     And here's why it's important now.  We don't have the full

24 set of information, even from that very narrowed set of logs we

25 identified as being the most relevant.

UNDER SEAL BY ORDER OF THE COURT

1      If you go to the next slide, Dr. Shafiq explained that the

2  Special Master's judgment was sound.  Google is able to search

3  and extract the full period of the logs.  To our knowledge,

4  there is no evidence to the contrary anywhere in the record.

5      And by this point in the process, we had narrowed it down

6  significantly, as Your Honor is well aware.  We went through a

7  winnowing process.  That winnowing process would have been a

8  lot quicker if we had got the plaintiff data earlier.  But we

9  went through the winnowing process; and after we went through

10  the winnowing process, Google still didn't search and produce

11  it.

12      So why it matters for GAIA-keyed data?  The law of this

13  case is that we adequately allege -- and I think we win as a

14  matter of law -- reasonable expectation of privacy.  But in

15  addition to that, we need to show highly offensive to a jury.

16  The volume and scope of the conduct is relevant -- and the

17  sensitivity is relevant to this determination.  We don't have

18  the plaintiff data, the full set of plaintiff data to show the

19  jury the volume and scope of the data.

20      Next, let's talk briefly about the Special Master process

21  in this February data.  Your Honor appointed the Special Master

22  to help with technical issues.

23      On November 12th, Your Honor ordered Google to -- now,

24  this is the wrong -- I apologize.  My slide has the wrong

25  paragraph of the order.  That's my mistake.

UNDER SEAL BY ORDER OF THE COURT

1    Paragraph 1 says (as read):

2        "Google must provide a full list of all data

3    sources which have been searched through the process,

4    the dates on which it was searched."

5    On December 29th, 2021 --

6    THE COURT:  What's the right -- did you say it's

7    paragraph 1?

8    MR. BARNES:  It's paragraph 1 of the Calhoun portion of

9    that order.

10    On December 29th of 2021, we proposed our ▉ data sources.

11    As the Special Master will tell you, that was with much teeth

12    gnashing on our part --

13    THE COURT:  I know.

14    MR. BARNES:  -- complaining that we were guessing.

15    The highlighted logs are logs that we later learned Google

16    already possessed our named plaintiffs' data.  So unbeknownst

17    to us, Google limited the time frame of their search; and as a

18    result, in January we got null set productions.

19    What I mean by a "null set production" is --

20    THE COURT:  Wait.  Let's go back to the highlighted logs

21    on --

22    MR. BARNES:  Yes.

23    THE COURT:  -- Slide 40, please.

24    And your point was, Mr. Barnes?

25    MR. BARNES:  All of these logs --

UNDER SEAL BY ORDER OF THE COURT

1    **THE COURT:**  Oh, were already preserved.

2    **MR. BARNES:**  -- Google had already searched them.

3    They already possessed the named plaintiff data.  It was

4    only our named plaintiffs' data.

5    We did searches in the first round, and we got null set

6    results.  And by a "null set result," what I mean is we got an

7    Excel spreadsheet back that had one row, three pieces of data.

8    The first piece of data was the identifier they searched for;

9    the second piece of data was the log; and the third piece of

10   data was the time period they searched for.  I may have those

11   in the wrong order they appear in the line, but that's all we

12   got.  We literally got no actual data back other than they had

13   done this search and it produced nothing as a result.

14   So then we go through a second round of search proposals.

15   And at this point in time, I think the Special Master was

16   getting tired of me, in particular, and he had a great idea.

17   His great idea was that we're going to do a live demonstration

18   with Google engineers, with plaintiffs' experts, and with all

19   counsel in both cases.  So that's what we did.

20   If we could go to the next slide.

21   Just to give you the timeline again here, on April 30th,

22   Your Honor ordered the production of all named plaintiff data.

23   On December 21st, we did the first-round search request.

24   In January, we got null set results.

25   On March 1st, we have this conference where a Google

UNDER SEAL BY ORDER OF THE COURT

1    engineer, identified to us as Sasha, states that Google had

2    already searched, segregated, and preserved data from ▆

3    GAIA-keyed ▆▆▆ logs, including ▆ that resulted in the

4    null set data productions.

5        So you might imagine, Your Honor, we were very interested

6    in that.  We asked follow-up questions about what it would take

7    to produce that data.

8        Sasha testified that there would need to be some

9    processing, but it could be done relatively quickly.

10       On March 1st, that same day, the Special Master orally

11   orders immediate production.

12       On March 3rd, he follows up with a written order.

13       On, I believe, March 8th, Google produces non-publisher

14   data from this data that had already been searched.  It took

15   five days.  To the extent they didn't produce it on

16   September 30th, 2020, they should have produced it on

17   May 4th or May 5th, 2021.

18       Now, what Google is going to tell you is:  Well, not all

19   of that information was available on April 30th.  Sure, that

20   may be true.  But there was plaintiff data in those -- that was

21   extracted via searches from those pipelines available in April,

22   and Google could have identified that fact to us.  Instead,

23   what did we learn?  Google had been sitting on this data since

24   February of 2021.

25       Now, after they produced the non-publisher data, there was

UNDER SEAL BY ORDER OF THE COURT

 1   a new hurdle erected for us to figure out.  And that new hurdle

 2   was an assertion that Google would have to notify these

 3   publishers and that would just be too burdensome.

 4        After two and a half months of going back and forth, on

 5   May 25th Google admitted the burden associated with

 6   communicating with all these separate publish- -- the burden is

 7   associated with communicating with all these separate

 8   publishers.  There was never a technical burden with the

 9   production of this information.  They never raised the "Hey, we

10   have to send an e-mail to all of these different publishers and

11   that would be burdensome for us" as an objection to this Court.

12        Your Honor, Google's technical arguments, I think, really

13   didn't give the Court or the plaintiffs much of a choice but to

14   ask for a Special Master, because at the time those arguments

15   were made, we didn't know that; you didn't know that.  And

16   based on those false and misleading claims about technical

17   burden, the Court appointed a Special Master.

18        He was incredibly patient with us.

19        **THE COURT:**  Well, but, Mr. Barnes, is it your -- this

20   is -- I saw this argument in the papers.  But are you

21   suggesting that -- okay.  By March of 2021, according to the

22   plaintiffs, Google has preserved named plaintiffs' GAIA data,

23   some set of GAIA data --

24        **MR. BARNES:**  Correct.

25        **THE COURT:**  -- from certain logs and that that should have

1  been turned over at that time.

2      I mean, it should have been preserved from the time the

3  complaint was filed.  It was the complaint, et cetera -- I

4  mean, the pipeline, et cetera, is developed; it's in place.

5  The data is preserved by the 31st -- or, excuse me -- by March

6  of 2021.  And certainly, at that point it should have been

7  turned over.

8      **MR. BARNES:**  Yes.  And it most certainly should have been

9  turned over in response to the Court's order, order from the

10 bench on April 29th and then written follow-up on April 30th.

11     **THE COURT:**  Okay.  And it's plaintiffs' position that if

12 only that had been turned over, we wouldn't have needed any of

13 the Special Master; that that data, if it had been turned over,

14 would have given you enough information about fields, as to the

15 six or eight named plaintiffs, that that would have been

16 enough?

17     **MR. BARNES:**  In conjunction with a couple other things, if

18 I may explain.

19     So "yes" on the ████████ ████████ logs.  Google would have

20 also needed to disclose GAIA ██████.  It would have also needed

21 to disclose what I said earlier, remember the production from

22 ████████ and the fields in the sync server logs, the

23 identification of the sync-state signals, which I understand

24 Ms. Trebicka might not have known when she said those things.

25 But to Your Honor's point, Google knew.  Google was well aware

UNDER SEAL BY ORDER OF THE COURT

1   of sync-state signals; right?

2       **THE COURT:**  But, again, to get to that -- I mean, that was

3   a process.  We had to figure out logs and data and where data

4   is.

5       So I get that the plaintiffs' argument is:  Well, there

6   was at least a subset of information, there was a package of

7   information that related to the named plaintiffs that may have

8   then enabled us to -- give us guidance as to how to proceed

9   with discovery from there on.

10      **MR. BARNES:**  Right.  Discovery is supposed to be

11  self-executing.  And so when we asked for named plaintiff data

12  and ████████ is easy to search, they should have produced ████████.

13  When Your Honor ordered it, they should have produced ████████.

14      They set up these pipelines for ████████ logs that they

15  had.  All of them were GAIA-keyed ████████ logs.  Okay?  We'll

16  grant that.  But the deal with GAIA- versus Biscotti-keyed

17  ████████ logs is the Biscotti-keyed logs basically contain all

18  of the same information.  So we were -- production -- we think

19  they do.  If Google tells us different, that's a new fact for

20  us.

21      But if you produce the GAIA-keyed logs, our experts would

22  be able to extrapolate everything that was in the

23  Biscotti-keyed logs so that we would be able to say:  Okay, you

24  don't have to produce; you don't have to do searches of all of

25  it.  These are the -- this is the narrowing that we're going to

UNDER SEAL BY ORDER OF THE COURT

1    do.

2         And we could have come back to Your Honor on the

3    preservation proposal, just like we did eventually when we got

4    the fields, and said:  We want the identifiers; we want

5    sync-state signals; we want content.

6         **THE COURT:**  Right.  We still would have had to have done

7    the work that had to be done on what's to be -- on identifying

8    and figuring out the parameters of what is going to be

9    preserved.  I get it would have given you some guidance.

10        **MR. BARNES:**  Perhaps.

11        **THE COURT:**  But there was other stuff.

12        **MR. BARNES:**  There was other stuff.

13        So, Your Honor, we're not saying you were wrong to appoint

14   a Special Master.

15        **THE COURT:**  No, no, no.

16        **MR. BARNES:**  We absolutely needed a Special Master.

17        **THE COURT:**  No.  I'm just trying to figure out what's

18   the -- again, this is your argument.

19        **MR. BARNES:**  Right.

20        **THE COURT:**  And it's in the papers.

21        **MR. BARNES:**  Right.

22        **THE COURT:**  "Oh.  But for getting this preserved data..."

23        And I'm trying to really figure out --

24        **MR. BARNES:**  If we had received this preserved data, we

25   had received ██████, the ██████ information, and we had

UNDER SEAL BY ORDER OF THE COURT

1    received the fields that Google told Your Honor it was not

2    going to -- I think the quote from the March 5th hearing is

3    "We're not hiding them in any way."

4        If those three things would have been produced, I really

5    don't think we would have needed a Special Master.  Our experts

6    would have been able to ferret it out.

7        Now, in all fairness, I think we probably would have had

8    other discovery disputes.  I'm not saying it would have been

9    some paradise.

10   **THE COURT:**  No.  I understand.

11   **MR. BARNES:**  Right?  But I think we would have had

12   sufficient data that we may not have ever needed a Special

13   Master.

14       Your Honor was right to appoint one because of the

15   technical arguments that Google made.  But if Google had simply

16   produced that for which there was no technical burden for

17   producing, no -- I should say no undue technical burden for

18   producing, we would be in a much, much different position in

19   this case.

20       And to the point about discovery, Your Honor, we didn't

21   get to ask discovery questions about the

22   ██████████████████████████.  Right?  Or much of those other

23   ones.

24       Okay.  So Biscotti and Zwieback are going to be much

25   faster, I promise.

UNDER SEAL BY ORDER OF THE COURT

1      Biscotti-keyed data, Google's defense is that they did

2   produce Biscotti-keyed data.  And in paragraph 16 of the

3   declaration attached, they reference GOOG-00039102 to 39130.

4   We have an example for Your Honor of that.  We have a hard

5   copy, if I can hand this up.

6                 (Document handed up to the Court.)

7      **MR. BARNES:**  Thank you.

8      So, Your Honor, this is the -- if I counted the pages

9   right -- three, four -- yeah.  This is the five pages.  Now,

10  maybe Google will tell us we're wrong here today; but to the

11  best of our ability to figure out, this is what they were

12  referencing as Biscotti-keyed data, and this is what we have

13  for Kindler, Crespo, and Calhoun.

14     Next, Your Honor, Google -- on August 4th, we took a

15  30(b)(6) deposition.

16     **THE COURT:**  Okay.  I'm sorry.  I'm still trying to -- I

17  understand you say this is what you got.

18     **MR. BARNES:**  Right.  This is --

19     What's the exhibit number?

20     This is Exhibit 32.  So my point is, when Google says,

21  "Hey, we produced this" --

22     **THE COURT:**  To what?

23     **MR. BARNES:**  It is Plaintiffs' Additional Exhibit 32.

24     My point is, when Google -- sorry, Your Honor.

25     **THE COURT:**  Go ahead.

**UNDER SEAL BY ORDER OF THE COURT**

1    **MR. BARNES:**  My point is when Google says, "Hey, we
2    produced the Biscotti-keyed data in response to the Court's
3    order," this is the best we can figure out what they're talking
4    about.

5        And Your Honor can review it for yourself and figure out
6    if it has value to show to a jury for the highly offensive
7    element.

8        **THE COURT:**  Okay.

9        **MR. BARNES:**  Next, on August 4th, Harding testified that
10   Google was only now looking into Biscotti identifiers.

11       It seems like his testimony was a little bit off because
12   Google later -- this is in Ansorge Declaration, Exhibit 11,
13   identified that it searched for DBL logs on June 24th, 2021,
14   and September 30th, 2021.  And as you can see, there was
15   nothing found.  That's, we believe, because the data had
16   already expired.

17       So the prejudice to plaintiffs for Biscotti-keyed data is
18   much the same as GAIA, Your Honor.  We don't have the picture
19   to present to the jury of the full scope of Google's conduct.

20       The next, Your Honor, is Zwieback-keyed data.

21       **THE COURT:**  Let me just stop you there.

22       **MR. BARNES:**  Okay.

23       **THE COURT:**  Make sure I understand.

24       Okay.  Go ahead.

25       **MR. BARNES:**  The next is Zwieback-keyed data.  And I'll

UNDER SEAL BY ORDER OF THE COURT

1  take you back to the April 29th hearing.  We literally spelled
2  it out, and the Court ordered the production of Zwieback-keyed
3  data.
4      So what's Google say in opposition to sanctions?  They
5  admit at the time Google did not preserve Zwieback-keyed data.
6      **THE COURT:**  Mm-hmm.
7      **MR. BARNES:**  Then on November 12th -- this is paragraph 4
8  of the November 12th order -- you ordered Google to identify
9  any back-end logs where at least three data parameters are
10 found, including Zwieback, and then five other -- five other
11 parameters that, obviously, those are in the order because we
12 explained to Your Honor that the data we have, Google hadn't
13 disclosed where the --
14     **THE COURT:**  I remember.
15     **MR. BARNES:**  Okay.  If you will recall, Google had
16 provided Display Ad logs.  Mr. Vic Lou told us -- first,
17 Mr. Monsees testified April 9th, 2021, that paragraph 158 would
18 be keyed off of Google.com.  That's not a Display Ads log.
19     And then Vic Lou, who's in charge of Google's A1 Team,
20 testified in March of 2022 that his team creates user profiles
21 for Google.com based on activity that is sent from users'
22 browsers to Google.com on non-Google websites and that it is
23 totally distinct from the Display Ads data that Google spent
24 from September of 2022 -- or, sorry -- September of 2021 to
25 even today attempting to limit this case to, inappropriately.

UNDER SEAL BY ORDER OF THE COURT

1        On June 30th, in response to Your Honor's order that

2    Google produce the data it had already searched, Google

3    produced an ad queries log.  It's a search log, Your Honor; and

4    it showed evidence of Google using activity it had captured

5    from non- -- from users' browsers, which would include Chrome

6    and would include not synced users, on non-Google websites.

7        After November, the Special Master ordered Zwieback --

8    said Zwieback ███████ is in the case.  In January, Your Honor

9    ordered full Zwieback ███████ production.  I think in February

10   again.  And we had this -- a lot of discussions about

11   preservation of Zwieback ███████.  It is in the case.  It has

12   been from the moment we filed our complaint.  Google knew it

13   was in our case from the moment we filed the complaint.

14       So why does it matter even more for Zwieback than

15   Biscotti?  Because Zwieback and Biscotti are not the same

16   thing.  Zwieback data, we believe, although we've had only

17   limited discovery, is far more robust than Biscotti-keyed data.

18   There are far more Zwieback ███████ columns than there are ███

19   ███████ columns.  ███ ███████ is Biscotti.

20       So when Google finally produced the Zwieback ███████

21   columns on February 22nd, we were surprised to see ██ columns

22   where GAIA IDs are listed in what they produced to us, ███████

23   with telephone information.

24       Google admitted initially -- again, I keep going back to

25   this.  They admitted that telephone information is in there,

UNDER SEAL BY ORDER OF THE COURT

1   and then their lawyers retracted it 15 days later.

2       We don't have any way to test the retraction.  There's at

3   least ▇ column with street addresses, which they have

4   admitted.  There are at least ▇ columns with precise

5   geo-location.  That's personally identifiable.  At least ▇

6   columns with IP addresses.  At least ▇ columns with sync

7   status.

8       Then we got GAIA ▇ on -- we didn't get it till

9   May 9th.  I understand Google -- there was a little snafu, but

10  we didn't get it till May 9th.  ▇ columns were Zwieback IDs on

11  the face of the document.

12      So Google's argument that they're making to the Court now,

13  that they've made to the Court on the preservation order, is an

14  illustration of the prejudice of its conduct with regards to

15  Zwieback because Google is now saying that what these documents

16  say on their face are not true.  But Google had all the

17  opportunity in the world to allow us to engage in discovery on

18  this and refused to do so.  They maintained an objection that

19  was not based in any fact.  It was contrary to what we clearly

20  alleged in the complaint.

21      Now, finally, Your Honor, I think Google is going to get

22  up here and make a big argument about reverse engineering

23  Identifiers Number 1 and Number 2, that they don't link device

24  IDs with GAIA IDs.  This is not true.  It's a false statement.

25  And I would point you to Plaintiffs' Tab 23.  We provided

UNDER SEAL BY ORDER OF THE COURT

1    Your Honor with --

2         THE COURT:  Plaintiffs' Tab 23?

3         MR. BARNES:  I'm sorry.

4         THE COURT:  Which tab is that?

5         MR. BARNES:  Plaintiffs' Additional Exhibits Tab 23.

6         We provided a native file of a video clip that was

7    introduced as Exhibit 45 in the second Monsees deposition.

8         Google cites the same video to argue that it does not mix

9    authenticated and what it calls unauthenticated identifiers.

10   But if you go on in the video -- I'm just going to pull two

11   quotes rather than play the video for you.

12        He says but, with regards to Google's claim -- I'm quoting

13   directly from my notes from this morning.

14        (As read):

15             "■ ■■■ ■■■■■■ ■■ ■■■■ ■■■■■■■■."

16        Then he goes on (as read):

17             ■■ ■■■ ■ ■ ■■ ■■■■■ ■■ ■■ ■

18   ■■■■■ ■■■ ■■ ■■■ ■■■■ ■■■."

19        Then he goes on (as read):

20             "■■■ ■■ ■■■ ■■■ ■■ ■■■ ■■■■■

21   ■■■■■ ■■ ■ ■■■■ ■■■."

22        Give you a preview of my rebuttal, Your Honor.  If Google

23   gets up here and argues that they don't connect Biscotti to

24   GAIA or Zwieback to GAIA, we're going to use the exhibits that

25   Google provided to the Court to demonstrate that that is false.

UNDER SEAL BY ORDER OF THE COURT

1   **THE COURT:**  Okay.  Let's just go back.  I still have an

2   outstanding question on the GAIA-keyed data.

3   **MR. BARNES:**  Yes.

4   **THE COURT:**  In response to my question to you, which is,

5   okay, if they have produced it -- let's set aside the idealized

6   argument of everything would have been fine and we wouldn't

7   have needed the Special Master process.

8       You said:  Well, if we had the GAIA-keyed data that had

9   been preserved as to the named plaintiffs, if we had the ▇▇▇▇

10  data, and if we had the fields -- right?  Okay.  So we've had a

11  lot of discussions about the fields and production of the

12  fields.

13      Let's go back to the ▇▇▇▇ data, because I'm still not

14  sure what is it that you're saying is this third piece that, if

15  you'd had it, with the GAIA preserved piece and the fields that

16  we got to later.

17  **MR. BARNES:**  Okay.  Well, Your Honor is aware because

18  we've had this dispute on preservation, we still don't know

19  what the fields even are in GAIA, Zwieback, or Biscotti ▇▇▇▇.

20      If you'll allow me 15 seconds to --

21  **THE COURT:**  15.

22  **MR. BARNES:**  If Google would simply produce the protos

23  that they are reviewing in those things --

24  **THE COURT:**  And they are past that.

25  **MR. BARNES:**  -- we'd have the answer.

1       Okay.  Thank you for letting me have my 15 seconds.

2       **THE COURT:**  We talked about fields in ███████.

3       **MR. BARNES:**  Right.

4       **THE COURT:**  We've narrowed that -- in the preservation

5  discussions --

6       **MR. BARNES:**  Right.

7       **THE COURT:**  -- we have narrowed that down to the columns

8  from which we are extracting or preserving data.

9       **MR. BARNES:**  That would have provided for a natural

10  winnowing process that we would not -- as what happened at the

11  end.  After we figured out the fields and we had the

12  second-round test result data, in March we were able to say:

13  Okay, these are the logs for which we want the full searches

14  done.

15       Our experts happened to think it would not be overly

16  burdensome to search all of the logs and produce the data.  I

17  understand Google will dispute that.  I'm not trying to go

18  there.  But at the very least, with this information, we could

19  have had an informed discussion about preservation, about

20  production of full sets of named plaintiff data.

21       **THE COURT:**  And so when you referred to "and the ███████

22  information" --

23       **MR. BARNES:**  Right.

24       **THE COURT:**  -- you're saying "If we had had identification

25  of all the fields in the ███████ data source"?

UNDER SEAL BY ORDER OF THE COURT

```
 1        MR. BARNES:  And here's --

 2        THE COURT:  Wait.  Right?

 3        MR. BARNES:  Correct.

 4        THE COURT:  Okay.  That's what I wanted to know.

 5        MR. BARNES:  Right.  And here's why we think that's

 6   doable.

 7        THE COURT:  Oh, okay.  I know.  I know.  I saw --

 8        MR. BARNES:  There's never been any real -- I don't think

 9   there's a serious argument that --

10        THE COURT:  I understand.

11        MR. BARNES:  -- GAIA ███████ is difficult to search.

12        THE COURT:  We have had these arguments.

13        MR. BARNES:  All right.  GAIA is easy.

14        THE COURT:  Well, that's what --

15        MR. BARNES:  And then we want to know -- okay.  That was

16   maybe going a little too far, Your Honor.

17        We would want to know about other sync signals, of course,

18   as well, and not sync signals.

19        THE COURT:  I understand three things.  You've got three

20   things.

21        Okay.  Let me hear from Google about preservation,

22   production of the named plaintiffs.

23        MR. BARNES:  Thank you, Your Honor.  Thank you for your

24   patience.

25        THE COURT:  Thank you.
```

UNDER SEAL BY ORDER OF THE COURT

1    **MR. BARNES:**  It is a long topic.

2    **MS. TREBICKA:**  Is it working for Your Honor?

3    **THE COURT:**  It is.  I understand it's a hardware -- your

4    hardware -- my hardware doesn't like your hardware.  Don't take

5    it personally.

6        Mr. Schapiro?

7    **MR. SCHAPIRO:**  Your Honor, there's a lot there to respond

8    to, and I think I can do it in a fairly condensed way.

9        But I think right towards the end, there was a remark from

10   the Court that I think is key to the presentation that I'm

11   going to make here.  And that is, you said to Mr. Barnes, "We

12   have had these arguments."  And that is entirely true.

13       And I think one thing that was really missing from

14   Mr. Barnes' presentation and from the plaintiffs' submissions

15   here is the extent to which all of these issues have been the

16   subject of live disputes, many of which were ultimately decided

17   in our favor.

18       There are a lot of topics that are on the table here.

19   But, actually, the real question before the Court is:  Did we

20   violate either of these orders, the April order or the November

21   order?  Did we violate an obligation to preserve under Rule 26,

22   more broadly?  And the answer is that we did not.

23       Each time that the plaintiffs have said in this case that

24   there was something we refused to produce, in every single

25   instance, what was actually going on there was that there was a

UNDER SEAL BY ORDER OF THE COURT

1   live dispute.  There was an objection or we raised questions or

2   sought reconsideration.  Fortunately, you were there and the

3   Special Master was there and are able to, I hope and trust,

4   remember that.

5       But the other thing that the plaintiffs have to show, in

6   addition to showing that we actually violated an order, was

7   that there was some bad faith here or some intention to, to use

8   Ms. Weaver's phrase, hide the ball.  And there's absolutely no

9   basis for such a finding here.  There was no intent to deprive;

10  therefore, no sanctions would be appropriate.

11      And I want to walk through a little bit of what happened

12  here because it is enlightening not only in terms of how we got

13  here, but also of Google's state of mind, which is one of the

14  key questions here.

15      We did what we were told, even when it changed, and we

16  took affirmative steps to go beyond that.  And fortunately,

17  under our system, if a Special Master tells you to do something

18  and you do it, you don't get sanctioned.  And if a court says

19  you don't need to do something and you don't do it, you don't

20  get sanctioned.

21      There are narrow, specific claims here.  So here's what I

22  want to speak about.

23      Actually, before I do that, let me just -- because they

24  don't necessarily fit crisply into the presentation I have.  I

25  was trying to keep track of some of the things that Mr. Barnes

UNDER SEAL BY ORDER OF THE COURT

1    stated that, unfortunately, just are not accurate.

2        He stated that no Zwieback data was produced for named

3    plaintiffs.  That's incorrect.  Data was produced for named

4    plaintiffs on March 31st, 2022.

5        He said that Google did not object to Zwieback being in

6    the case until September of 2021.  That's not accurate.  We

7    objected immediately in response to the RFPs.

8        He cites to Your Honor's November 12th order regarding the

9    identification of back-end logs with three of six categories,

10   including Zwieback.  We identified ■ back-end logs in

11   response, as I believe the Court and the Special Master may

12   attest.

13       All right.  Quick roadmap of what I'm going to talk about

14   here, just as I previewed a moment ago.  Number one, we

15   fulfilled our preservation obligations; number two, we complied

16   with all court orders; number three, we didn't spoliate any

17   data; and, number four, the plaintiffs' sanctions request is

18   entirely improper.

19       So, first, we fulfilled out preservation obligations.

20   Your Honor may recall, at the beginning of this case, Google

21   preserved a tremendous amount of the plaintiffs' data.  It

22   included Google account subscriber information and,

23   importantly, the My Activity data for websites with Google

24   Analytics and Ad Manager, which everyone at this point viewed

25   as the crux of the case.

UNDER SEAL BY ORDER OF THE COURT

1    So while that was going on, the plaintiffs sent a letter
2  to Google in January of last year requesting wholesale
3  preservation of billions of gigabytes of data, and we objected
4  on burden grounds.  They accused us of spoliation.  So they
5  wanted us to preserve far beyond what we were already
6  preserving.  We objected, and we came to the Court.  We didn't
7  want to take a chance on this.

8    We had a hearing in front of Your Honor.  And given the
9  immense burden of what the plaintiffs wanted here and the
10 accusation of sanctions, which obviously we have to take
11 seriously, we did two things:  Number one, we moved for the
12 protective order; and, Number two, we began preserving what we
13 call here "the litigation hold data" as a precaution.

14    **THE COURT:**  Is that the pipeline?

15    **MR. SCHAPIRO:**  Yes.  So I'll tell you what the litigation
16 hold data is.  That's actually in my next slide.  It was
17 event-level data from ▇▇▇▇ and ▇▇▇▇▇ logs that were
18 associated with the plaintiffs' GAIA IDs.  So we began creating
19 that preservation pipeline in February of last year.  We
20 completed it in March of last year.

21    But this is a critical point here.  Putting something on
22 hold is not the same thing as searching it.  And the vast bulk
23 of the arguments that you've heard today and in the plaintiffs'
24 papers seem to suggest that putting something on hold or
25 preserving it is the same thing as searching it.

UNDER SEAL BY ORDER OF THE COURT

1    I think a simple analogy is to an e-mail box hold,

2  you know, something we're more used to in everyday litigation.

3  You might put a custodian's e-mails on hold.  That doesn't mean

4  that you have searched them, by any means.

5    And the process here, just like when you put an e-mail box

6  on hold, consisted of preserving data with specific GAIA IDs in

7  specific log sources.  Okay?  And those logs sources contained

8  Google data, publisher data, data for products not at all at

9  issue in this case.

10    And as the Special Master knows, querying historic logs

11  sources that are not indexed for searching is a very complex

12  and burdensome process.  It's not like just querying a

13  database.  And this is preserved in a form it's written to

14  every day or over a certain period.  It's not preserved in a

15  form that is optimized for searching.

16    And the Special Master did -- the Special Master ordered

17  that we preserve the litigation hold data that did not require

18  publisher notice eventually to be produced so that it would

19  inform the plaintiffs' searches in the Special Master process.

20    THE COURT:  So there's one of the plaintiffs' complaints,

21  obviously, key complaints -- right? -- is:  Well, this had been

22  preserved back in February, March of 2021 and it doesn't get

23  produced till spring of 2022, first the Special Master order

24  and then my follow-on order.

25    MR. SCHAPIRO:  Yes.  All of this, Your Honor -- and this

UNDER SEAL BY ORDER OF THE COURT

1    is critical -- took place out in the open.  We've always been

2    transparent about the data.

3        And I think I have some citations coming up here later on

4    in the slide presentation which the Special Master -- I can't

5    recall -- perhaps the Court said too "Preservation does not

6    mean production."  But the other point here is, preservation

7    also doesn't mean that something was searched.

8        So all of this took place, as I said, in front of the

9    Special Master, in front of Your Honor.  We offered to preserve

10   the litigation hold data in February 2021.  We announced that

11   we were preserving it on March 5th, 2021.

12       And the plaintiffs knew all of this.  All of this.  How do

13   we know that they knew about it?  Because on September 27th,

14   2021, we provided plaintiffs with a detailed list of the

15   specific sources that were being preserved, and the plaintiffs

16   right away asked the Special Master to produce all that data.

17   It was denied.  It was denied.

18       On this slide, then, is an excerpt from a list that the

19   plaintiffs -- this is my Slide 57 -- list that the plaintiffs

20   sent on December 29th of 2021 to request litigation hold data;

21   and it's built on a spreadsheet that we sent to them to

22   disclose the specific litigation hold data sources that were

23   being preserved.  What you see here is that they are entirely

24   aware that this data was being preserved.

25       So just to sum up the issue, the point on this

**UNDER SEAL BY ORDER OF THE COURT**

1    preservation, in February 2021, as I said, we offered to

2    preserve the litigation hold data.

3         March 2021, we informed the plaintiffs and the Court --

4    and the Court -- that we were preserving the data.

5         September 27th -- that's the slide you just saw -- we gave

6    the plaintiffs detailed information on exactly what data

7    sources were being preserved.

8         In response, they asked for production of the data.  It

9    was denied.

10        On December 29th, 2021, they again asked for production of

11   all the preserved data, using our list of data sources.  Again,

12   the Special Master, properly in our view, denied that request.

13        **THE COURT:**  And what's Google's objection to production

14   before the Special Master in this time frame?

15        **MR. SCHAPIRO:**  Yes.  Our objection at the time was the

16   massive amount of data that is preserved (a) included large

17   amounts of data that are not relevant, that (a) may not even

18   belong to the plaintiffs because it's overinclusive; that

19   (b) includes products -- you know, Google shopping or

20   something -- where people are signed in that's not relevant;

21   that (b) there is a burden involved, including the publisher

22   notification burden which later became an issue.

23        And I have seen in -- oh, sorry.

24        Okay.  Including the notification of publishers' data.

25        Let me clarify something.  Mr. Barnes suggested that the

UNDER SEAL BY ORDER OF THE COURT

1  only objection we had to preservation or production of data was

2  regarding the publisher notification.  That's absolutely not

3  the case.

4      We had the same impression you did, Your Honor, from the

5  plaintiffs' papers, that they were saying the Special Master

6  process was all for naught, and that certainly was not our

7  experience in this instance.

8      But the publisher notification is a big project because

9  what it means is you have all of these -- let's say it's

10  *The New York Times*.  *New York Times* has a contractual agreement

11  with Google that, before we produce any of their information,

12  we have to give them reasonable notice.

13      **THE COURT:**  You briefed the issue before me.

14      **MR. SCHAPIRO:**  Yes.

15      I can attest, we had contract lawyers who were taking the

16  phone calls of all of these publishers, saying, "Sorry.  What

17  is this that you're turning over?  Why?  Where?  What are you

18  turning over?"  Et cetera.  So there was some burden and, we

19  thought, not much upside.

20      But the point here is that it was argued.  This is how

21  litigation works.  We said we shouldn't have to; they said you

22  should.  Two or three times they were denied; and then,

23  eventually -- maybe persistence prevails -- the Special Master,

24  for the first time, ordered production of the litigation hold

25  data in March of 2022 and we promptly complied.

UNDER SEAL BY ORDER OF THE COURT

1        Now, it was clear from the beginning that not all of the

2   litigation hold data would be produced immediately because we

3   had the issue about the publisher notification, which was some

4   ██ ████████ of it.  But there's no -- the point here is, there's

5   no violation of any court order or direction from the Special

6   Master, and there's nobody hiding the ball, by any means.

7        So now that we've discussed the preservation that we

8   undertook, that we did undertake, I want to address some of the

9   preservation that we did not initially undertake, and that's

10  data related to unauthenticated identifiers.

11       And, Your Honor, Google had very good reason to be

12  hesitant about preserving this -- preserving -- or treating

13  this as data associated with the named plaintiffs.  As I think

14  most of us are familiar now, unauthenticated data --

15  identifiers are pseudonymous.  We don't know who is generating

16  the data, and it's not limited to individual users.  It could

17  be someone's spouse.  It could be someone in the same public

18  library who's sitting down at that computer.

19       So those are some of the reasons why Google was hesitant

20  to preserve that data.  But we were always up-front with the

21  Special Master and the Court that we were not preserving or we

22  did not believe we should have to preserve that data.  We did,

23  however, preserve data that we could verify belonged to these

24  plaintiffs.

25       And maybe this is familiar already to the Court.  I'm on

1    Slide 59.  But so, just so we're all singing from the same

2    hymnal here, Your Honor, GAIA identifier is authenticated.

3    It's associated with a particular user, typically someone who's

4    logged in.  Unauthenticated data is not associated with a

5    particular identified user.

6         Zwieback is contained in cookies that are on

7    Google-owned pages.

8         Biscotti is contained in cookies from Google Ads.

9         MR. BROOME:  Google Ad Manager.

10        MR. SCHAPIRO:  Ad Manager.  I thought that slide was

11   wrong.  That's why I turned around.  That slide should say --

12        THE COURT:  I have my own cheat sheet here.

13        MR. SCHAPIRO:  Yeah.  It should say "Ad Manager" on 59.

14   That was why I paused and turned around.

15        Now, as I said a moment ago, we informed the Court of

16   this.

17        And this is, I think, our theme and why Your Honor should,

18   without too much hesitation, rule for us on this entire piece

19   on this.  Everything that was happening was just a fight in

20   court where we're winning battles and losing battles in front

21   of Your Honor and in front of the Special Master.

22        Was anyone in the dark about the fact that we were not

23   preserving unauthenticated data?  Absolutely not.  In March of

24   2021, at the same time we explained what we were preserving, we

25   indicated what we were not preserving as well.  And as I said,

UNDER SEAL BY ORDER OF THE COURT

1    we objected to searching -- next, to Slide 61 -- objected to

2    searching for and producing the unauthenticated identifiers.

3        **THE COURT:**  I'm sorry.  Mr. Schapiro, I just want to be

4    sure.  When you say you told the Court there'd be no

5    preservation, you're referring to the March hearing with the

6    "It's not readily available" quote?  Is that it?

7        **MR. SCHAPIRO:**  I know that was one instance.

8        **THE COURT:**  Mm-hmm.

9        **MR. SCHAPIRO:**  I think there was -- the fact that there

10   were always fights about whether we should preserve the

11   unauthenticated data I think could have left no one with any

12   question about the fact that we were not preserving the

13   unauthenticated data.

14       **THE COURT:**  And I order it following the March hearing --

15   or April.

16       **MR. SCHAPIRO:**  Yes.  So I'm going to get to in a moment --

17       **THE COURT:**  Okay.

18       **MR. SCHAPIRO:**  -- the April 30th order.

19       **THE COURT:**  Yes, March and April.

20       **MR. SCHAPIRO:**  Yes, the April 30th order and why there was

21   no violation of that order.  I'm just proceeding now.  I'm at

22   April 20th; so I'm pretty close here.

23       So this is the RFP Number 5 that Your Honor heard about a

24   couple of times from Mr. Barnes.  This is a dispute chart that

25   was submitted.  This is Docket 164.  It's just an example.

UNDER SEAL BY ORDER OF THE COURT

1    **THE COURT:**  I know it well, yes.

2    **MR. SCHAPIRO:**  So Google objected.

3        Now, with that background and the chronology covered,

4    let's turn to the allegations, beginning with this argument

5    that we violated the April 30th and November 12th orders.

6        So the April 30th order directed Google to produce the

7    information it has associated with the named plaintiffs,

8    including profile data, data from non-synced sources, and

9    device -- any device data associated with any plaintiff.  And

10   this was the start of some of the dispute and request for

11   clarification that culminated in the appointment of the Special

12   Master, because our position was:  Well, wait a minute.  What

13   does this sweep?

14       We produced voluminous GAIA-keyed data that's associated

15   with the named plaintiffs.  We produced Google Analytics and

16   Ad Manager data associated with unauthenticated identifiers

17   that the plaintiffs provided to Google, which is important here

18   because, again, in an effort not to sweep in people who are not

19   the plaintiffs and in interpreting Your Honor's direction that

20   we produce information associated with the named plaintiffs, we

21   said to the plaintiffs, as occurred in the *Brown* case too,

22   I believe:  Fine.  Let's generate identifiers, pseudonymous

23   identifiers, and then we can use those to search.

24       We were only able to determine that the unauthenticated

25   data that we produced was associated with the named plaintiffs

UNDER SEAL BY ORDER OF THE COURT

1    because they sent us the relevant identifiers.

2         And as I said a moment ago, at this time, major -- and

3    beyond, there were major questions that remained about the

4    scope of this order, which is what culminated in the

5    appointment of the Special Master.

6         And Your Honor may recall, there was a subsequent order

7    from Your Honor -- I can't recall if it was the November 12th

8    order or another one in the fall -- in which Your Honor

9    specifically said:  To the extent that I've issued orders on

10   this topic prior to the appointment of the Special Master, the

11   Special Master is empowered to narrow or modify that, taking

12   into account burden and proportionality.  Because, reasonably

13   enough, you didn't want to hear us all fighting it out in front

14   of Your Honor.

15        Obviously, some things were not encompassed in this order:

16   all of plaintiffs' Gmail messages or their YouTube history.

17   But there were questions about what was relevant and what was

18   proportional to produce.

19        Let's skip over 64 and go to 65.

20        So now, Mr. Barnes says he's going to show us a video.  I

21   can't remember if it was relating to this or something else.

22   He said he thought we're going to argue that -- about reverse

23   engineering.  And he's prescient, because what underlies the

24   plaintiffs' argument that we should have known from the

25   beginning that we should -- that we could somehow preserve

 1   unauthenticated data that they believe would be related to

 2   these plaintiffs is related to this.

 3        They allege we violated this order in two ways; right?

 4   The first they say is that we didn't produce all of the

 5   unauthenticated identifiers associated with the plaintiffs.

 6   But what they really mean is that we did not reverse engineer

 7   their unauthenticated identifiers from their GAIA IDs; that we

 8   didn't attempt to link their GAIA IDs to the unauthenticated

 9   identifiers that might have been associated with the same

10   device or, in some cases, app or browser as those GAIA IDs.

11        And we cannot do this for an important reason, and we said

12   this throughout.  It's not a secret or any unilateral decision.

13        THE COURT:  Let me -- Mr. Schapiro, on Docket -- on

14   Slide 65, you refer to Docket 226.

15        MR. SCHAPIRO:  Slide 65?

16        THE COURT:  64.  On Slide --

17        MR. SCHAPIRO:  Yeah, I think we must have switched our

18   numbering here.  I'm sorry about that.

19        THE COURT:  All right.

20        MR. SCHAPIRO:  I have this as 65.

21        The slide that should be up now that I'm talking about

22   says "Google Was Not Required to Reverse-Engineer Pseudonymous

23   Identifiers"?

24        THE COURT:  Correct.

25        MR. SCHAPIRO:  Okay.

UNDER SEAL BY ORDER OF THE COURT

1   **THE COURT:**  And on the screen, it's labeled as Slide 64.

2   In my notebook, it's Slide 65.

3   **MR. SCHAPIRO:**  I think we may have pulled out and moved to

4   a different place Number 64.  That might be our --

5   **THE COURT:**  That's fine.  The slides match.

6   **MR. SCHAPIRO:**  The slides match, and they match what I

7   intend to be saying.  And if it turns out that the number's

8   been thrown off as we go on, I'll fix it.

9   **THE COURT:**  Okay.  So my question is:  On the slide that

10  is titled "Google Was Not Required to Reverse-Engineer

11  Pseudonymous Identifiers," there's a reference there that

12  Google argues plaintiffs are moving to compel reverse

13  engineering, and you cite to Docket 226.

14  And what is Docket 226?

15  **MR. SCHAPIRO:**  What is Docket 226?

16  **THE COURT:**  I don't have that.

17  **MR. BROOME:**  The motion to compel.

18  **MR. SCHAPIRO:**  It's the motion to compel that was filed

19  around this time.

20  **THE COURT:**  Okay.  Before me?

21  **MR. SCHAPIRO:**  Yes.  Yes, Your Honor, it was before you,

22  not the Special Master.

23  Now, Google's policies -- a key component of Google's

24  internal policies and data infrastructure -- and we've said

25  this throughout the case -- is that we do not join

UNDER SEAL BY ORDER OF THE COURT

1   authenticated and unauthenticated information.  Our policies

2   prohibit it.  The data is processed and stored in a way that

3   prevents it.  Our employees know and follow these policies.  It

4   does not happen.

5       And this point is supported in detail -- and we can kind

6   of go down this rabbit hole, but the slides that we submitted

7   in our appendix, we had them prepared because we thought in

8   case this becomes the main focus of the hearing -- and we're

9   happy to answer additional questions about that -- but we have

10  attached slides that we were holding in reserve.  And I think

11  it's probably in my best interest to continue, but those slides

12  address that and we're happy to address that further.

13      **THE COURT:**  I understand Google's argument against reverse

14  engineering.  What's not clear to me is that that's what

15  plaintiffs were asking for.  But I may have overlooked that,

16  and I'll obviously let plaintiffs respond to that.

17      **MR. SCHAPIRO:**  Understood.  And I think we've laid it out

18  in our papers, but the short version is, they said:  Well, you

19  have our GAIA IDs and so you should be able to take that and

20  infer unauthenticated identifiers from those.  Or they would

21  say that they're no longer unauthenticated.

22      And we say:  Well, that requires mixing things that are,

23  by policy and by infrastructure, not to be mixed.

24      **THE COURT:**  Okay.

25      **MR. SCHAPIRO:**  And, I mean, it goes to this next point on

UNDER SEAL BY ORDER OF THE COURT

1    Slide Number -- what I hope will be Slide Number 66, this idea

2    that isolating unauthenticated identifiers -- unauthenticated

3    data, rather, is easy.  That's something that's argued in their

4    briefing.  We cite it here.

5        And one of the main things that the plaintiffs rely on

6    there is that we have said we could quickly produce

7    Biscotti-keyed identifiers data.  But that can only be done --

8    and the Special Master knows this well because he oversaw this

9    process -- if the plaintiffs provide IDs to us directly.  When

10   they do that, yes, we can identify data quickly.

11       So they made this argument to the Special Master.  We've

12   had this dispute before.  The Court, recognizing that it was

13   technical in nature, this is one that the Court referred to the

14   Special Master.

15       The Special Master did not order Google to violate its

16   policies and reverse engineer what plaintiffs' unauthenticated

17   identifiers might have been.  He ordered us, instead -- excuse

18   me.  He ordered the plaintiffs to provide unauthenticated

19   cookie values for Google to search.  So there was a period

20   where that was what was being done.

21       And just to remind the Court of why we're here and why

22   this matters, because the plaintiffs are saying, "Well, wait

23   a minute.  At that point, you should have already been doing

24   this.  You should have been wholesale."

25       But we're in the middle of a discussion with the Special

UNDER SEAL BY ORDER OF THE COURT

1    Master who says, "No.  Do it this way."

2         And we did it that way.

3         We also did around that time add Biscotti-keyed data to

4    the litigation hold data.  So I think this will be now 67 in

5    the rearranged version of the slides.

6         So after the April 30th order, the Court knew that we were

7    not preserving all data.  The April 30th order didn't order us

8    to change our preservation policies, but we began developing

9    pipelines to preserve Biscotti-keyed data keyed to the IDs that

10   the plaintiffs provided, which is not something for which we

11   should be punished or sanctioned but, rather, is laudable and

12   rational of saying:  Well, let's go above and beyond here.

13   What should we preserve?

14        Again, in litigation, you preserve things or put people on

15   a litigation hold as insurance.  Who knows whether down the

16   road this is going to be something about which there's a fight?

17   Let's put it on hold.

18        **THE COURT:**  All right.  So just so defendants are aware, I

19   don't have this -- what you have as Slide 67.

20        **MR. SCHAPIRO:**  Oh, okay.  So this would be your Slide 64.

21        And I think and hope that after --

22        **THE COURT:**  Ah, so you just moved it.  After this, it

23   should be okay.

24        **MR. SCHAPIRO:**  I think and hope that after this, our order

25   is correct.

UNDER SEAL BY ORDER OF THE COURT

1    **THE COURT:**  Got it.

2    **MR. SCHAPIRO:**  The sequence of one side was changed.

3    **THE COURT:**  Okay.  Okay.

4    **MR. SCHAPIRO:**  All right.  Now, a second order that

5    plaintiffs allege Google violated was the November 12th order.

6    And this should be Slide 68.  Does your Slide 68 match?

7    **THE COURT:**  Yep.

8    **MR. SCHAPIRO:**  Okay.  Good.

9    **THE COURT:**  We're back on track.

10    **MR. SCHAPIRO:**  So the text here -- so this order ordered

11    Google to provide a full list of data sources which have been

12    searched during the overall discovery process.

13    And then, again, as you'll see down highlighted in red (as

14    read):

15    ". . . from all searched data sources in the

16    respective prior searches."

17    And whether it's a willful misreading or we are ships

18    passing in the night, the plaintiffs' position here is:  Well,

19    the stuff you had preserved is searched.

20    It's not.  And any analogy to normal litigation holds

21    should make that clear.

22    Google was required to provide this declaration to the

23    best of its knowledge, and Google complied.  And one way that

24    we know that Google was in compliance and also, critically,

25    Your Honor, one way to assess Google's state of mind at this

1    time, which is a key element of any sanctions inquiry, is that

2    the Special Master evaluated our responsive submissions and

3    determined that they complied.

4        You see (as read):

5            "The Special Master finds that the document

6        provided . . . satisfies the Order's requirements."

7            "The Special Master finds that the documents

8        found within the file . . . satisfy the Order's

9        requirements."

10       So we were not required to produce all of this data that

11   was preserved but not produced, this litigation hold data, in

12   2021.  And the plaintiffs -- and all of these discussions, as I

13   said, happened out in the open.  I think this largely repeats

14   what we've said.

15       Now, the November 12th order itself, in particular, did

16   not concern the litigation hold data.  The plaintiffs argue

17   that the way we violated the November 12th order is -- strike

18   it.  Their argument here is particularly implausible because

19   the Special Master expressly determined that this data

20   preserved, but not produced, is out of scope.  Right?

21       The plaintiffs asked the Special Master to order

22   production of all of this.  And we have his order up here on

23   the screen.  It says (as read):

24           "Special Master Brush has determined that

25       Sections F, G, H, and I are outside the scope of

UNDER SEAL BY ORDER OF THE COURT

1    Exhibit 1, Section 4, at this time.  Therefore, the

2    tasks requested in these sections are not required to

3    be performed by Google at this time."

4    **THE COURT:**  Mm-hmm.

5    **MR. SCHAPIRO:**  So, again, no bad faith, no intent to do

6    anything other than engage in a robust and sometimes contested

7    or adversarial discovery process.

8        Now, when the Special Master eventually did determine that

9    Google should produce the litigation hold data -- and now I'm

10   on Slide 71 -- after having previously rejected that request a

11   number of times, Google produced that data immediately.

12   ██ ████████ ██ ████████ of that data required publisher

13   notice, and the Special Master did not order wholesale

14   production of that data.

15       **THE COURT:**  I'm aware of how we get to that production.

16       **MR. SCHAPIRO:**  You were there.  You lived it.

17       And so what actually happened was the Special Master

18   directed that the remaining -- this is Slide 72 -- litigation

19   hold data should be searched prior to production pursuant to

20   the search process that had been going on for all of these

21   months -- again, evidence that it was not something that anyone

22   could rationally label data that had already been searched in

23   the discovery process in this case.

24       So here, we have multiple statements from the

25   Special Master.  This is from the time in which we were

UNDER SEAL BY ORDER OF THE COURT

1    recording and creating transcripts.  But my memory is that --

2    and I want to be careful here because I'm in court.  To the

3    best of my recollection, this was not the first time we had

4    heard this.

5        But here you see the Special Master saying (as read):

6            "Just because they're preserved doesn't mean

7        they get produced."

8            "The judge and I have already

9        conferred . . . we're not going to take this data at

10       wholesale exception."

11       And then plaintiffs themselves saying -- I think this was

12   Mr. Straite.  I could be wrong -- down towards the bottom here

13   (as read):

14           "We, as Plaintiffs, thought it was smarter to

15       get all of the historically preserved Plaintiffs'

16       data to inform further [sic] searches.  We understand

17       that's been rejected."

18       That was in April of this year.  Again, a typical

19   discovery dispute in a case; not something that merits any type

20   of sanction at all.

21       Go to the next slide.

22       Plaintiffs brought the matter before this Court, and then

23   the Court did order Google to produce the remainder of the

24   litigation hold data.

25       We were disappointed that we lost that, but we did.  We

UNDER SEAL BY ORDER OF THE COURT

 1   complied.  That happens in discovery.  You win some; you lose

 2   some.  We even produced additional litigation hold data through

 3   the date of the production order to give the order its broadest

 4   interpretation.

 5        This is Slide 73.

 6        And subsequently, the Court considered the issue closed.

 7   So you can look at the very bottom part here.  Look after

 8   the -- so the part that's highlighted here says (as read):

 9             ". . . provided Google complied with its

10        representations to the Court . . . ." .

11        I want to be clear.  Those representations were about the

12   date on which we were providing.  You may remember we were

13   saying we will get it done, I think it was, by the next day, or

14   that we'd gotten it done the prior day.

15        (As read):

16             ". . . the issue of the balance of the

17        production of the data that had been collected is now

18        closed."

19        All right.  So just to some extent to sum up here, Google

20   has complied with all court orders here.  And the allegation

21   that somehow we violated the April 30th order or the

22   November 12th order, these allegations are, to some extent,

23   based on two misconceptions.

24        The first is that we had some obligation to produce all of

25   this data that was on hold before -- on a date before it was

**UNDER SEAL BY ORDER OF THE COURT**

1    ordered by the Special Master or by Your Honor, despite the

2    fact that those requests had been denied in the past.

3        And the second, which goes only to the April 30th order,

4    that we could join this authenticated/unauthenticated data and

5    then should have done that spontaneously and produced all of

6    that.

7        So a few words about the spoliation claim here.  I think

8    I've only got six or seven more slides.

9        **THE COURT:**  I think you can do it in fewer than that.

10       **MR. SCHAPIRO:**  I'll do it in fewer than that.

11       Biscotti-keyed data.  There was no spoliation of Biscotti

12   data.  And the plaintiffs -- excuse me.  We were up-front with

13   the Court that we did not originally -- initially preserve

14   unauthenticated identifiers.  Since that time, however, we've

15   produced gigabytes of Biscotti-keyed data, and we continue to

16   preserve Biscotti-keyed data pursuant to the preservation plan.

17       Next, the Zwieback data.  This one is important and worth

18   pausing on for a moment, because we heard a whole bunch about

19   Zwieback data from opposing counsel.

20       You know, the plaintiffs in their brief actually cite to

21   Your Honor's October 1st, 2021, order without actually engaging

22   with what it says.

23       I was struck by the fact that Mr. Barnes, when he stood

24   up, kept referring back to the complaint, saying:  Well, this

25   should have been obvious to anyone about Zwieback because

UNDER SEAL BY ORDER OF THE COURT

```
 1   Zwieback was in our complaint.
 2        Well, this is a dispute that has been around for a while.
 3   And in Your Honor's October 1st, 2021, order, you specifically
 4   said (as read):
 5             "At issue is the identification and production of
 6   data reflecting allegedly unauthorized transmittals of
 7   personal data to Google.com (or Google Search or Google
 8   Ads)."
 9        That's Zwieback.
10        And you said -- and this is right above the second
11   highlighting (as read):
12             "Although there are allegations of transmittals
13        of personal information to Google.com, nearly all
14        such allegations also include substantial allegations
15        of transmittals to Google Display . . . or Google
16        Analytics."
17        I'm sorry.  Just below the first highlighting as well,
18   Your Honor said (as read):
19             "Plaintiffs point to the first amended complaint
20        detailing such transmittals."
21        So this was had out in front of you in October.  They
22   said:  But it's in the complaint, Your Honor.  We should get
23   it.
24        And then Your Honor very sensibly said (as read):
25             "Simply put, each and every transmission,
```

UNDER SEAL BY ORDER OF THE COURT

1          whether or not authorized, neither can nor should be

2          the subject of discovery in this

3          case . . . Plaintiffs' request . . . is DENIED."

4          Ultimately, Google and the plaintiffs negotiated a

5     preservation protocol that includes Zwieback-keyed data which

6     Google is now preserving, not necessarily because we agree that

7     it's relevant, but because that's what you try to do in a case.

8     Let's work out some compromise.

9          And there's certainly been no prejudice because the

10    Special Master permitted searches based on Zwieback IDs from

11    Dr. Shafiq's browsing tests.

12         You heard a moment ago that Zwieback data contains

13    personally identified information.  We addressed these points

14    in detail -- I'm moving ahead -- in Docket Number 713-4.

15    Zwieback data does not contain GAIA IDs and vice versa.  The

16    two are not associated.

17         The plaintiffs rely on Dr. Shafiq's expertise simply to

18    read the names of some column headings.  But as we have

19    explained to them and explained over and over again and lay out

20    in Docket 713, the fact that there's a docket heading there

21    does not mean there is any data actually written to that

22    source, to that log.  And if there were, you would have seen in

23    Dr. Shafiq's declaration some analysis of the actual Zwieback

24    data that Google produced to the plaintiffs, which, in fact,

25    contains no authenticated information at all.

UNDER SEAL BY ORDER OF THE COURT

1    Let's talk about the requested remedy here, which is

2    almost a nuclear one.  Plaintiffs are requesting -- based on

3    what were run-of-the-mill discovery disputes, many of which

4    they lost so there's no misconduct here, but certainly no bad

5    intent or bad faith, they're requesting an adverse jury

6    instruction that we spoliated data and that the data we did not

7    preserve would have proven a significant piece of their own

8    case.

9    That would be highly prejudicial to Google and requires a

10   showing that the plaintiffs have not come close to making.

11   They have to show that something should have been preserved

12   under Rule 37(e).  This is our Slide 80, but Your Honor

13   probably knows this.  They haven't made that showing.

14   They have to show that the requested remedy is no greater

15   than necessary to cure the prejudice.  They haven't shown any

16   prejudice, let alone prejudice that would support something

17   like this.  And for this instruction, they have to show that we

18   acted with intent to deprive another party of information's use

19   in the litigation.

20   There is no basis on this record or what Your Honor has

21   seen with your own eyes to conclude that Google intended to

22   deprive the other side of anything.

23   So you've seen the legal standard here.  The standard is

24   not met.  The rule isn't even triggered.  We met our

25   obligations to preserve ESI.

**UNDER SEAL BY ORDER OF THE COURT**

1   We can jump through Slides 81, 82, because I saw
2   Your Honor looking at the clock.

3       But no measures are necessary to cure any prejudice
4   because there has been none.  We have produced the exact same
5   type of data that plaintiffs allege that we failed to preserve.

6       And plaintiffs have provided -- I think Mr. Barnes at the
7   end had no good answer, to my ears, when Your Honor asked him
8   repeatedly:  Well, what would you have done with this?  What
9   would you have done with this?

10      They have this type of data already.  And whatever
11  arguments they want to make about whether it's offensive that
12  Google does X, Y, or Z, they can make.

13      And the case law bears this out.  There's a very recent
14  case by Chief Magistrate Judge Spero called the *Meta Platforms*
15  case which we think is instructive in this regard.

16      So to close, Google has never intended to deprive
17  plaintiffs of this data.  We've gone to great efforts to
18  preserve above and beyond our obligations.  And whenever we
19  have resisted or questioned preservation or production it has
20  been due to either an argument about lack of relevance or
21  burden or a violation of our internal privacy policies.

22      Your Honor, ordering sanctions on this record is not only
23  inappropriate, but it would send exactly the wrong message.  It
24  would send the message that if you're fighting out discovery
25  battles and you lose or late in the case you say, "You know

UNDER SEAL BY ORDER OF THE COURT

1  what?  It would have been nice to have something else," you can

2  try to knock out the other side's case by seeking some type of

3  adverse jury instruction.  That's not how litigation is

4  supposed to work.

5      **THE COURT:**  Thank you, Mr. Schapiro.

6      All right.  Mr. Barnes, you can address it in a closing.

7  Okay?  I got it.  I got it.

8      So let's figure out how we manage the remainder of the

9  time.  It is 1:15.

10     We still have ███████████.  I think that should take

11 substantially less time, not because it's not important to the

12 plaintiffs, but it's, I think, a more clear subject on both

13 sides.  And then I will give both sides an opportunity for a

14 closing statement.  Brief.  We've been through a lot of

15 material.

16     But I do think it would be good to take a short break, and

17 that will give you all time to collect, edit your thoughts and

18 comments on ███████████ and to prepare your summary closing

19 responses.

20     So I'm happy to hear from all sides, but if we take 20

21 minutes -- and I will ask Madam Court Reporter as well -- but

22 if we take 20 and then come back, can we do ███████████ 10

23 minutes each side and then go to summary?

24     Mr. Straite?

25     **MR. STRAITE:**  Yes, Your Honor, plaintiffs can do it in 10.

UNDER SEAL BY ORDER OF THE COURT

```
 1        THE COURT:  Okay.  And?
 2        MS. OLSON:  That's fine, Your Honor.
 3        MR. SCHAPIRO:  We might need 12.
 4        THE COURT:  Okay.  So we'll do 20 minutes on
 5   ████████████.  And I do not need 20 minutes from each side in
 6   summary, but I'll allow it, but we don't need it.  Okay.  How
 7   about that?
 8        So let's do that.  We will break now for 20 minutes and
 9   then resume and finish in that hour.  Okay?  All right.
10   Thank you.
11        We are adjourned.  No, we're not adjourned.  We're in
12   recess.  Don't go away.
13                    (Recess taken at 1:17 p.m.)
14                  (Proceedings resumed at 1:42 p.m.)
15        THE COURT:  All right.  Please be seated.
16        All right.  We are back on the record and underway for
17   our, hopefully, final session.
18        Mr. Straite?
19        MR. STRAITE:  Permission to approach?
20        THE COURT:  Of course.
21        MR. STRAITE:  Not the bench.  The podium.  Thank you.
22        THE COURT:  Podium.  There you go.
23        MR. STRAITE:  The podium.
24        The best part of speaking at the podium is I get to take
25   the mask off for 10 minutes.
```

UNDER SEAL BY ORDER OF THE COURT

1        THE CLERK:  Exactly.

2        MR. STRAITE:  Thank you, Your Honor.  David Straite for

3   the Calhoun plaintiffs.

4        I'll be handling the ███████████ arguments.  We're

5   committed to doing this in 10 minutes or less.

6        ███████████ was a project at Google.  We now know that

7   it was and is secret.  It was never implemented.  Management

8   rejected it.  It was a project ██ ████ ███████ ████

9   ████████████████ ██ █ ████████ ██████.

10       A part of the process for the ███████████ project, the

11  team got high-level authorization to interview key executives

12  and engineers about a number of issues, including the consent

13  flow that is at issue in the summary judgment motion that

14  Google filed here.  Consent has been Google's number one

15  defense from the beginning of this case.

16       The ███████████ program contains two key documents that

17  were withheld during the entirety of fact discovery.  One is a

18  compilation of interview notes from 24 key executives and

19  engineers; and the other is the related white paper with the

20  summation and recommendations that we now know was rejected.

21       Those interview notes were never produced.  The end of

22  fact discovery, of course, was in March, but there was an

23  earlier deadline in October for substantial completion.

24       What did some of the engineers and executives say during

25  these interviews -- thank you -- during the ███████████

UNDER SEAL BY ORDER OF THE COURT

```
 1   process?
 2        One engineer -- sorry.  One executive said (as read):
 3             "When I look at UDC, what is sWAA versus WAA
 4        versus YT?"
 5        sWAA is s-W-A-A, versus WAA, W-A-A.  Y-T is YouTube.
 6        This sWAA and WAA, these acronyms, these are part of the
 7   consent flow when Chrome users sign up for an account or when
 8   they download Chrome.  These are the controls that Google cites
 9   to in its motion for summary judgment.
10        What does this executive say?
11        (As read):
12             "They don't make sense because of the naming and
13        there are hidden functions that people don't know.
14        Like Chrome sync and others that I don't even
15        understand and can't describe."
16        That is remarkable.  A senior Google engineer admits:  I
17   can't understand the consent flow and can't describe it.
18        THE COURT:  Do you know what slide that is?  I know I've
19   seen it.
20        MR. STRAITE:  Slide 15.  I apologize, Your Honor.
21        THE COURT:  Slide?
22        MR. STRAITE:  Plaintiffs' Slide 15.
23        THE COURT:  Oh, oh, oh.  Got it.  Going backward in time.
24        No, that's not right.
25        How about if I get in your book of slides?  That might
```

UNDER SEAL BY ORDER OF THE COURT

1    help.

2         **MR. STRAITE:**  We'll be going back to the other book.

3         **THE COURT:**  All right.  Now I'm back on board.

4         **MR. STRAITE:**  So at the bottom of Slide 15, plaintiffs'

5    Slide 15 --

6         **THE COURT:**  Right.  So --

7         **MR. STRAITE:**  -- you see some of the quotes.

8         **THE COURT:**  -- a question I had -- and I know I kept you

9    limited on time but -- and you just made reference to this.

10        Is that language in the consent that's at issue in this

11   case, the consent --

12        **MR. STRAITE:**  The sWAA and the WAA?

13        **THE COURT:**  Mm-hmm.

14        **MR. STRAITE:**  Yes.  That's Supplemental Web and App

15   Activity, and WAA stands for Web and App Activity.  Yes, at

16   issue in the summary judgment motion for sure.

17        Another example.  And there are dozens of quotes, but

18   here's another one.  An executive says (as read):

19             "I don't like the idea of Google having data

20        about users that they can't say no to."

21        Another executive says (as read):

22             "Users don't understand what is going on, and

23        nobody is talking to them about it."

24        These interview notes, which were produced in April, we

25   provided to the Court.  Not only did we cite it in the

UNDER SEAL BY ORDER OF THE COURT

1   Findings -- plaintiffs' proposed Findings of Fact at

2   paragraphs 280 and 284, but they're also produced as Exhibit 11

3   to plaintiff's joint declaration in support of sanctions.

4   That's at Docket Number 670-12.

5        Next slide, please.

6        So let's just go undisputed facts.  We'll go really

7   quickly through these.  There's a bit of an animation.  If you

8   don't have the animation, it will still work with the printout,

9   Your Honor.

10        So, first substantial completion deadline was October 6.

11        Then the end of November, right after Thanksgiving, Google

12   moved for summary judgment on its affirmative defense of

13   consent.  It always has been the number one affirmative

14   defense.  Not only did Google use this as the basis, the sole

15   basis for the summary judgment motion.  It is literally called

16   "Affirmative Defense Number 1" in their answer to

17   the complaint.

18        THE COURT:  Mr. Straite, I'm just going to have you slow

19   down a little bit.  I know I created the time pressure and that

20   makes everybody talk fast, and that was not my intention.  So

21   take a breath.

22        MR. STRAITE:  Absolutely, Your Honor.

23        The next critical date, on December 20th, 2021, Mr. Barnes

24   took the deposition of Google executive Sam Heft-Luthy,

25   intimately involved in the ▮▮▮▮▮▮▮▮▮ project.  Several

UNDER SEAL BY ORDER OF THE COURT

1   hundred ████████ documents had been produced in advance of

2   this.  We knew about ████████.  We didn't quite understand

3   it.  So Mr. Barnes asked about it.

4        In addition to talking about it, Mr. Heft-Luthy said, "Oh,

5   and I interviewed several executives and engineers."

6        "Are there notes from these?"

7        "Yes, there are."

8        "Where are those notes?"

9        "Oh, I compiled them into a single document."

10       During the break, Mr. Barnes asked for a copy of those

11   interview notes.  They were not provided.

12       Next, it is undisputed after the holidays plaintiffs

13   followed up on January 18th, 2020 [sic], in a letter request to

14   Google saying:  We asked for those interview notes.  They've

15   not been produced.  Please produce.

16       Next, on February 4th, we renewed our request again.

17   Again, we got silence from Google.  There was no objection.

18   There were no questions.  There was silence.

19       Next, on March 21st, 2022, again plaintiffs renew the

20   request.  We got silence.

21       Next, March 23rd, two days later, again, where are these

22   interview notes?

23       Next March 25th, where are these notes?

24       Finally, Google says on March 31st:  Okay.  We're looking

25   into it.  We'll get them to you.

UNDER SEAL BY ORDER OF THE COURT

1       Then on March 4th, plaintiffs' final renewed request.  We

2  threatened to move to compel, and Google produced them, and

3  they're explosive.  And most of the interview notes were never

4  produced in any form anywhere else in litigation.

5       In parallel to this, what's going on that's not on this

6  timeline?  In parallel, Google moves for summary judgment.

7       We respond.  We said:  Huh, we're seeing some e-mails.  We

8  even saw one of the 24 interview notes had been referenced or

9  reproduced elsewhere.  We see other people talking in e-mail

10  chatter, saying:  Hey, there's a lot of discomfort at Google

11  that the consent flow is broken, that people aren't consenting.

12       But you told the Court to rule, as a matter of law, that

13  these plaintiffs had consented.

14      **THE COURT:**  Yeah.  So what's missing?  I mean, you've

15  gotten the documents.

16      **MR. STRAITE:**  Correct.

17      **THE COURT:**  You didn't come to me to ask for a deposition

18  after the cutoff or anything, but you got them.  So what's

19  missing?

20      **MR. STRAITE:**  So as Your Honor knows, we did have the

21  opportunity at the end of 2021 to suggest new deponents and new

22  ESI custodians.  Those deadlines had passed before we got the

23  notes.  We did not have an opportunity to read them.  They were

24  explosive.  We did not have an opportunity to say to

25  Your Honor:  We would like to have more ESI custodians and get

UNDER SEAL BY ORDER OF THE COURT

1   more documents.  We didn't have the opportunity to depose them.

2      There were two witnesses in the list of 24 that we had

3   deposed in the past but didn't have the benefit of these notes.

4      We have no idea how deep the conversations go with these

5   non-ESI custodians, these people we didn't depose or, even with

6   the people we did depose, how much were Google executives

7   talking about the issue of consent.

8      We're confident that our reply in opposition to the

9   summary judgment is sufficient to beat it, but it would be

10   important for the fact finder, the jury needs to know how much

11   discomfort there is at Google regarding the consent flow.  The

12   consent is not really happening.

13      **THE COURT:**  But don't you have that story from the

14   documents that you have in hand?

15      **MR. STRAITE:**  No, Your Honor.  All we have are interview

16   notes, a single document.  We also have the white paper that

17   gives recommendations.

18      **THE COURT:**  But you have other documents, ███████ -- or

19   do you?  I mean, it's a question.  I haven't seen them.

20      Do you have other ██████████ documents upon which you

21   can base a story to the jury -- not a -- base your theme to the

22   jury that Google was -- inside of Google, they were very

23   uncomfortable with the consent flow?

24      **MR. STRAITE:**  Yes, we could and did tell that story with

25   what we had, draft documents and e-mails, in opposition to

1  summary judgment.  This additional document, the interview

2  notes, strengthen, support, and confirm that story.

3      THE COURT:  Okay.

4      MR. STRAITE:  But --

5      THE COURT:  And in this time frame -- and I don't know the

6  answer to this, which is why I'm asking the question.

7      In the spring of 2022, as we're dealing with discovery

8  issues and you're getting me discovery charts, I don't recall

9  seeing this issue about there's these interview notes that

10  we've asked for five, six, seven times and they haven't been

11  produced.

12      MR. STRAITE:  Right.  We threatened to move to compel, and

13  then they produced them.  So we did not have to bring it to

14  Your Honor because they did actually produce them.

15      THE COURT:  Okay.  But they produced them in April.  Okay.

16      MR. STRAITE:  Yes.  Exactly, Your Honor.

17      THE COURT:  All right.

18      MR. STRAITE:  So we don't have the benefit -- we never got

19  to propound additional interrogatories.  We never got to see

20  the documents from any of these executives except for a few.

21      These interview notes are important, the single most

22  important consent document.  Yes, Google produced other

23  ▬▬▬▬▬▬ documents, but ▬▬▬▬▬▬▬ goes beyond simply

24  the views that executives have regarding the consent flow at

25  Google.  There's nowhere else in these documents, with a couple

UNDER SEAL BY ORDER OF THE COURT

 1   of exceptions -- for example, there's one employee named

 2   Mr. Roy-Chowdhury, C-h-a -- o-w-d-h-u-r-y; and his interview

 3   notes were produced in another document, in an earlier draft.

 4   Two other employees as well, we knew they had been interviewed,

 5   and the identity of 21 of the 24 executives were revealed in

 6   other documents.

 7        We had no idea what the interviews were about, what they

 8   said.  And we were never told, until a month after fact

 9   discovery, that the actual content of the interviews had been

10   preserved and collected in a single document.

11        So although there were several hundred ▮▮▮▮▮▮▮▮▮▮

12   documents produced, none of them had this compilation of

13   interview notes, not a single one, other than with respect to

14   Mr. Roy -- and that's one last name -- R-o-y, dash, Chowdhury.

15        THE COURT:  Okay.  And this may be addressed in the remedy

16   discussion, but what does Google want?  What's the remedy that

17   fits this late production of documents?

18        MR. STRAITE:  So plaintiffs want -- first of all, this is

19   a violation of a court order.  Your Honor set March 4th, by

20   court order, as the deadline for final completion, end of fact

21   discovery, and that was violated.

22        And I would disagree with my colleague, Mr. Schapiro, who

23   says that we need to show bad faith.  Actually, a violation of

24   a court order is sanctionable even without bad faith.

25        What is the prejudice here?  It is enormous.  There are so

UNDER SEAL BY ORDER OF THE COURT

1  many documents we didn't get.  We did not construct ESI search

2  terms, nor did we add these employees for ESI custodians.

3      So the remedy we're seeking is to be able to show these

4  interview notes to the jury.  And Google does not have the

5  right, then, to explain them away with discovery that we were

6  denied access to.

7      THE COURT:  Okay.

8      MR. STRAITE:  Thank you.

9      THE COURT:  I got it.  Thank you, Mr. Straite.

10     All right.  Go ahead.

11     MS. OLSON:  Good afternoon, Your Honor.

12     THE COURT:  Ms. Fani, is this right?

13     MS. OLSON:  This is Ms. Olson.

14     THE COURT:  Ms. Olson.  Thank you.

15     MS. OLSON:  Aly Olson.

16     THE COURT:  Got it.

17     MS. OLSON:  Thank you.

18     Google produced nearly a thousand documents about

19     ██████████ throughout the fact discovery period starting

20  from April 2021.

21     Sorry.  I guess we're still pulling up the slides.

22     THE CLERK:  My apologies.

23     THE COURT:  I have your slides here too.

24     MS. OLSON:  But I'll start on Slide 89, if you want to

25  turn to it while we're pulling it up.

UNDER SEAL BY ORDER OF THE COURT

1     **THE CLERK:**  There it is.

2     **THE COURT:**  All right.  I've got it in front of me.

3     **MS. OLSON:**  Okay.  Great.

4     Contrary to what plaintiffs told Your Honor seven times in

5     their motions, and repeated again today, ▮▮▮▮▮▮▮▮ was not

6     a secret.

7     At Mr. Heft-Luthy's deposition in December 2021,

8     plaintiffs came prepared to ask him about ▮▮▮▮▮▮▮▮.  They

9     brought more than half a dozen documents to the deposition, and

10    they were the first to raise ▮▮▮▮▮▮▮ at that deposition.

11    Contrary to what plaintiffs told Your Honor in what is

12    actually four times, which I missed cites to motion at 15 and

13    21, ▮▮▮▮▮▮▮ did not come to light because of an

14    inadvertent or unwitting disclosure at Mr. Heft-Luthy's

15    deposition.

16    In opposition to plaintiffs' -- in plaintiffs' opposition

17    to Google's motion for summary judgment, plaintiffs cited again

18    about half a dozen documents referencing ▮▮▮▮▮▮ and

19    spent about a page discussing ▮▮▮▮▮▮ in their

20    opposition.

21    Contrary to what plaintiffs told Your Honor, plaintiffs

22    did not have to file their opposition without the benefit of

23    these documents.

24    These facts explain why plaintiffs backed away from these

25    claims in their reply, and now they're focused on,

UNDER SEAL BY ORDER OF THE COURT

1    essentially -- well, it was two -- it was three and then it was

2    two and now it's kind of one document, which is Plaintiffs'

3    Exhibit 11, the interview notes.

4        They can't show bad faith on this record, nor can they

5    show prejudice, given that the information contained in those

6    two documents was also in earlier-produced documents.

7        And I just want to point out that today is actually the

8    first time that plaintiffs have acknowledged that they have

9    interview notes from Mr. Roy-Chowdhury and they have

10   interview -- they have quotes from the interview notes of other

11   executives that were produced in October 2021.

12       Okay.  Let's go to Slide 88.

13       If you look here at the green boxes at the top, you'll see

14   that there's nearly a thousand documents about ▇▇▇▇▇▇▇

15   produced throughout the fact discovery period.

16       And I think it's just worth noting that ▇▇▇▇▇▇▇ was

17   a short-lived project that got underway in the second half of

18   2020, just as discovery was beginning in this case, and it

19   ended in early 2021.  And I think Mr. Straite said that the

20   program was rejected, but I think, as it was explained by

21   Mr. Heft-Luthy and again at the ▇▇▇▇▇▇▇ 30(b)(6)

22   deposition which occurred in April after these documents were

23   produced, the project was -- was completed.  It was a -- it was

24   a project where they prepared a final report, and that was the

25   end of the project.  It wasn't a proposal that was rejected.

UNDER SEAL BY ORDER OF THE COURT

1    So focusing now on the 265 documents that reference

2    ████████████ that were produced before Google even filed its

3    motion for summary judgment, those included summaries of,

4    I think, the first seven interviews; notes from one of the

5    interviews that plaintiffs cite in their motion; and it

6    included dozens of documents referencing the notes.

7        **THE COURT:**  So let me just fast-forward --

8        **MS. OLSON:**  Yeah.

9        **THE COURT:**  -- Ms. Olson, to the January of 2022 time

10   frame --

11       **MS. OLSON:**  Okay.

12       **THE COURT:**  -- where, according to plaintiffs' timeline,

13   that's where they start asking for the documents following,

14   must be, Mr. Heft-Luthy's deposition.

15       **MS. OLSON:**  Yeah.

16       **THE COURT:**  And it takes -- the documents don't get turned

17   over until April.

18       So what takes so long?

19       **MS. OLSON:**  Yeah.  So they asked for those two documents,

20   and they had been -- those -- I guess they really asked for the

21   interview notes and other documents related to ████████████

22   that -- if there were other documents that Google hadn't

23   produced yet.

24       And so Google investigated and found that the documents

25   they were asking about had been previously initially marked as

UNDER SEAL BY ORDER OF THE COURT

```
1   "Privileged" and they were on the privilege log.  Those
2   documents and many of the others that they were asking about
3   were long presentations that involved counsel on their face,
4   and so they had to be re-reviewed for privilege, along with --
5   which is consistent with a lot of other re-review of privilege
6   that has been going on at this time.
7       I think another thing to note is during this time from
8   when they first requested the notes in January 2022, there
9   was -- you know, there was a lot going on in this case.  There
10  was depositions.  There was hearings.  And I think this task
11  got a little bit pushed down kind of the endless priority list
12  of plaintiffs' requests.
13      And I just wanted to make a note about Mr. Straite's
14  timeline.  I think he said February 4th they asked again and
15  heard nothing.  I think February 4th there was actually a meet
16  and confer where we told plaintiffs we were working on finding
17  these documents and we were going to produce them.  And then we
18  didn't hear from them again until the end of March, potentially
19  because it also was lower on their endless list of priorities.
20  And when they brought it up again in March, we produced it --
21  we produced the documents a week or two after they first
22  started -- they brought it up again.
23      THE COURT:  Okay.  And then who was produced for the
24  30(b)(6) --              30(b)(6) deposition?
25      MS. OLSON:  Her name is Ahmed Abdullah.
```

UNDER SEAL BY ORDER OF THE COURT

1       THE COURT:  Mm-hmm.

2       MS. OLSON:  And at that -- and they -- and plaintiffs

3   reserved about an hour for that deposition or they took an hour

4   for that deposition out of their 30(b)(6) time.  They asked her

5   about both of the two documents at issue, although the

6   interview notes, pretty much all they did was authenticate

7   them.

8       And so given now their claims of how key these documents

9   are and how important they are, you know, they only

10  authenticated the interview notes with their -- with Google's

11  30(b)(6) witness on ███████████.

12      THE COURT:  Okay.  And is there any dispute over

13  authentication?  I assume not, since Google produced them.  But

14  they used the deposition to authenticate them.  So -- and

15  Google doesn't dispute that, does it?

16      MS. OLSON:  No, Google doesn't dispute that the interview

17  notes are authentic.

18      THE COURT:  Are what they appear to be?

19      MS. OLSON:  Correct.

20      THE COURT:  Okay.  All right.  I took you off your

21  comment.

22      MS. OLSON:  No.  It's okay.  Let's skip ahead, I think,

23  to -- let's go to Slide 101.

24      THE COURT:  I like that a lot.

25                          (Laughter.)

UNDER SEAL BY ORDER OF THE COURT

1      **THE COURT:**  Excellent.

2      **MS. OLSON:**  Plaintiffs' motion quoted from three

3  interviewees:  Rahul Roy-Chowdhury, Othar Hansson, and

4  Emil Ochotta.  Plaintiffs didn't really acknowledge until just

5  five minutes ago that they had the interview notes for

6  Mr. Roy-Chowdhury since October 2021.  They had quotes from the

7  interview of Mr. Hansson, again, in October 2021.

8      And even on their Slide 15, they've now picked out three

9  different quotes from three different interviews.  But if you

10  go to the next slide, you can see that, again, one of the

11  quotes that they picked was from Brianna Rodriguez which was in

12  a document that they had in October -- on October 5th, 2021,

13  when Google produced it.

14      And, again, if we now turn to Slide 105, I hope -- yeah --

15  again, so these are the interview notes that Google had

16  produced October 26, 2021, with Mr. Roy-Chowdhury which had the

17  exact quotes that they are citing to in their motion and that I

18  will note were inconspicuous- -- or were conspicuously removed

19  from their reply after Google pointed out that plaintiffs had

20  this document since October.

21      Okay.  Let's -- next, 107.

22      Plaintiffs concede that they had the identities of most of

23  the interviewees but claim they're, nevertheless, prejudiced

24  because they didn't have the notes themselves.

25      Next slide.

UNDER SEAL BY ORDER OF THE COURT

1    But they had interview notes for some of these people.

2    They had the full interview notes from Mr. Roy-Chowdhury's

3    interview since October 2021, and they had quotes from the

4    interviews of six other people, including two of the people

5    they've now highlighted in their briefing and today.

6    They didn't seek to depose those people.  They didn't seek

7    to -- they didn't seek to search their documents.  And as

8    Your Honor pointed out, they didn't come to you and ask to

9    depose these people after the documents were produced.  And

10   plaintiffs have not even today identified anyone specifically

11   that they would have deposed if they had these notes earlier.

12   **THE COURT:**  All right.  Give me your final comments,

13   Ms. Olson.

14   **MS. OLSON:**  Okay.  Then I think my final comment, I will

15   go to answer your question -- answer your question at the

16   beginning, was:  What is the remedy for this specific problem?

17   And the remedy Mr. Straite described is actually not the

18   remedy they ask for in their motion or in their Findings of

19   Fact.

20   So let's go to Slide 122.

21   They're asking for an order striking Google's affirmative

22   defense of consent and precluding Google from arguing it

23   obtained consent going forward.

24   This is a sanction to strike an entire affirmative defense

25   which does require good faith, not just a violation of an

UNDER SEAL BY ORDER OF THE COURT

1    order --

2         **THE COURT:**  Bad faith.

3         **MS. OLSON:**  Sorry.  Bad faith.  Of course, yeah.

4         It requires bad faith, not just violation of a court

5    order, which cannot be shown on this record.

6         And even if only prejudice were needed to be shown, it

7    cannot be shown based on the fact of the previously produced

8    documents, including what they used with Mr. Heft-Luthy, what

9    they cited in opposition to their motion for summary judgment,

10   and the fact they were able to ask Google's 30(b)(6) witness

11   about these documents.

12        And I'll just add one more thing.

13        If we go to Slide 120.

14        Plaintiffs are asking the Court in the proposed Findings

15   of Fact to make conclusions that go to the merits of Google's

16   motion for summary judgment which, as you noted earlier, would

17   be heard in front of Judge Gonzalez Rogers in about two weeks.

18        And if you go to 116.

19        Plaintiffs were able to spend almost five pages addressing

20   this exact issue in their opposition and cited seven

21        ▮▮▮▮▮▮▮▮▮▮ documents and a dozen others that they claim

22   undermine Google's consent defense.  They made that argument,

23   and Judge Gonzalez Rogers will decide it.

24        We, in our opposition -- or in our reply, made clear we

25   don't think that internal documents of what people at Google

UNDER SEAL BY ORDER OF THE COURT

1  think are relevant to the question before the Court, which is

2  whether the disclosures that plaintiffs consented to are

3  legally sufficient to notify them of the data collection at

4  issue and whether -- no matter who said it, whether it's in a

5  final or a draft document, that's not dispositive of that legal

6  question.

7          **THE COURT:**  Understood.

8          **MS. OLSON:**  Thank you, Your Honor.

9          **THE COURT:**  Thank you, Ms. Olson.  Appreciate it.

10  All right.  Very helpful.

11         Thank you, Mr. Straite.

12         Thank you, Ms. Olson.

13         Okay.  Let's turn to closing summaries and remedies.  And

14  I'm mindful that plaintiffs had said they want to address

15  remedies, really, in closing.  So I want to be sure you do

16  that.  I want to be sure my question is answered:  What are the

17  tailored remedies for these categories of misconduct that the

18  plaintiffs allege?  And if there's any other open points that

19  you wanted to make or emphasize in reply to Google's arguments,

20  you can do so.

21         So if you need a few extra minutes there, I understand.  I

22  know I sort of doubled you up.  And I don't want you talking at

23  lightning speed, but let's try to get this done.

24         **MR. BARNES:**  Thank you, Your Honor.

25         Mr. Straite and I are going to split this up.  I'm going

UNDER SEAL BY ORDER OF THE COURT

1    to do a closing and a little bit of rebuttal relating to the

2    plaintiff data.

3          THE COURT:  Okay.

4          MR. BARNES:  And I'm going to be efficient, but not too

5    quickly speaking.

6          So the first point, Your Honor, is -- I think you will

7    like this news.  It's an issue that's not in dispute.  Reverse

8    engineering is not an issue on this motion.  We think the

9    evidence is that Google can do it, but we've not brought this

10   issue on this motion.

11         On that point, Mr. Schapiro stated in his argument that

12   when they do that -- by "that," I believe he meant produce the

13   identifiers at issue associated with devices, like Biscotti and

14   Zwieback IDs -- we, meaning Google, can identify that data

15   quickly.  These are just my notes as I scribbled them down as

16   he was talking.

17         Well, Your Honor, in this case, we actually did that.  The

18   identifiers were in the complaint.

19         And then on December 31st, 2020, at Google's request, we

20   provided the identifiers to Google in a letter.

21         And then on May 4th, 2021, before the appointment of a

22   Special Master, it's on the screen, the letter from

23   December 31st.  Those are the identifiers, six months before

24   the Special Master was appointed.

25         And what we heard in Google's presentation was an

UNDER SEAL BY ORDER OF THE COURT

1   admission.  While they say they immediately preserved data,

2   they didn't do anything until February of 2021.  That's seven

3   months after the filing of the complaint, seven months after

4   they had the plaintiffs' identifiers that they admitted to

5   today.  They can quickly produce data once they have those

6   identifiers.

7        THE COURT:  Okay.  So, I'm sorry, Mr. Barnes.

8        MR. BARNES:  Yes.

9        THE COURT:  So what identifiers are you referring to?

10  What specifically are you saying?

11       MR. BARNES:  So in the complaint, we had Zwieback IDs; we

12  had Biscotti IDs; and we had GAIA IDs.  On December 31st, when

13  we sent this letter that's on the screen right now --

14       THE COURT:  December 31st of 2021?

15       MR. BARNES:  2020.

16       THE COURT:  2020.  Okay.

17       MR. BARNES:  December 31st of 2020, six months before the

18  Special Master was appointed.

19       The complaint had these identifiers 11 months before the

20  Special Master was appointed.

21       THE COURT:  Generally.  But the letter specifically

22  identifies them?

23       MR. BARNES:  No.  The complaint has the identifiers in

24  them.  You can check the complaint.  It has the IDs.

25       THE COURT:  Okay.

UNDER SEAL BY ORDER OF THE COURT

1    MR. BARNES:  And then -- and to the extent Google is

2  making an argument it needed the IDs, the proper thing for it

3  to have done was to say: Hey, you better provide us these IDs

4  as quickly as you can because this data will age out if you

5  don't.

6    THE COURT:  So your point is the identifiers were provided

7  so data could have been preserved.

8    MR. BARNES:  It could have been --

9    THE COURT:  Unauthenticated data could have been

10  preserved.

11    MR. BARNES:  Correct.  Exactly.  And Google waited seven

12  months.  That didn't just result in the timing out of the

13  device data.  It also resulted in timing out of GAIA-keyed

14  data.  Our calculation is ▮ ▮▮▮▮▮ of the GAIA-keyed data

15  would be timed out by the seven-month period.

16    We also figured out plaintiffs did not receive

17  pre-complaint activity, and they changed their behavior after

18  the filing of the complaint.  Now, because we did these time

19  slices, we do have some narrow bands of time slices from before

20  the complaint, but we don't have the entirety.  And we think

21  the Special Master process demonstrated Google could have done

22  that at any point in time.

23    Third point, Mr. Schapiro repeatedly said preserved data

24  does not always have to be produced.  Of course that is true.

25  There's a big exception, though, Your Honor, and that's when a

UNDER SEAL BY ORDER OF THE COURT

1    court orders it to be produced.  And on April 30th, 2021,

2    Your Honor, ordered Google to produce the GAIA-keyed

3    information they had associated with our plaintiffs.

4        So the other thing Mr. Schapiro said is that Google had

5    made these arguments about publisher notice to the

6    Special Master early in the Special Master process.  You're

7    going to talk to Mr. Brush.  We do not believe that to be true.

8    Google entirely refused to discuss the preserved data.  They

9    represented that it had not been searched.  And so to this

10   point, I want to --

11       Can we pull up Google Slide 72, please?

12       And this -- I'm sorry.  This goes to the good faith/bad

13   faith issue, Your Honor.  This very slide demonstrates what

14   we're talking about, about Google misleading -- the misleading

15   claims that Google made about this data.

16       Special Master Brush, on the top left corner, on

17   March 15th, 2022, says (as read):

18           "It doesn't mean they're searched," referring to

19       these logs.  "Just because they're preserved doesn't

20       mean they get produced."

21       True.  So that interim step, they have to be searched and

22   responsive.  As it turns out, all of the data was responsive.

23   Now, how do we know they were searched?

24       Can we go to Google Slide 56?

25       This middle quote describes how they were searched.

UNDER SEAL BY ORDER OF THE COURT

1        (As read):

2

3

4

5

6

7

8        That is how -- that is a description of how searches of

9   databases work.  You create a script with certain things you

10  want to pull out of the database; you pull that data out; and

11  that's your search result.

12       And Google was sitting on those search results for over a

13  year and, when ordered to produce it, took them five days.

14  That's for the non- -- I'm sorry.  That's for the non-publisher

15  data, took five days.  Then we know the publisher data required

16  the notice to the publishers.

17       If we could go back to Slide 72.

18       It's also a misrepresentation of the nature of what we

19  were asking the Special Master.  On the bottom right corner,

20  Mr. Straite says (as read):

21            "We, as Plaintiffs, thought it . . . smarter to

22       get all of the historically preserved Plaintiffs'

23       data" -- and then this part is not highlighted --

24       "all of the . . . data to inform future searches."

25       That goes to the exact point I was making earlier,

UNDER SEAL BY ORDER OF THE COURT

1    Your Honor, that if Google had simply produced this named

2    plaintiff data when ordered to do so, it would have informed --

3    it would have given us an informed basis in the preservation

4    proposal and how to do this in an efficient way that would not

5    have required a Special Master.

6        Mr. Schapiro told you -- suggested we had made some

7    argument that the Special Master process was not beneficial or

8    not necessary.  We are not making that argument at all.  We

9    would --

10       THE COURT:  I know that.

11       MR. BARNES:  Okay.  We would not be here today but for the

12   Special Master's patience and Your Honor's patience.

13       The fourth issue I have is Zwieback.  I want to clear up

14   the record a little bit.  It's great that Dr. Shafiq is here.

15       We have Zwieback data for one named plaintiff.  Her name

16   is Elaine Crespo.  We have ■ kilobytes of data, which I've

17   been told is about ■ PDF pages.  We only have, for Dr. Shafiq,

18   ■ ■ ■ columns, I believe, of Zwieback-keyed data, even

19   though it was ordered a full production.  One of those columns

20   is GAIA user info.

21       And as we told Your Honor earlier, through this data

22   process, Google, on almost every situation, decrypted the

23   data -- decrypted much of the data before they gave it to us

24   with one exception.  When they gave us Zwieback ■■■■ data,

25   all of the sudden it was encrypted in a way we could not read.

UNDER SEAL BY ORDER OF THE COURT

1   When we asked for it to be decrypted, translated so it can be

2   understood by a human or a member of a jury, half of the data

3   disappeared on March 30th in the re-production.  Don't know

4   what happened to it, but the data is dramatically smaller.  And

5   that is in the Shafiq -- I believe it's in the Shafiq rebuttal

6   declaration.

7        Mr. Schapiro also said that they objected early to

8   Zwieback.  I'd like to put up on the board -- I think Google

9   introduced their responses to R&Os, our early R&Os, and this is

10   Joint Rebuttal Exhibit 21.

11        Is that correct?  If we can put that on the screen.

12        This is not the plaintiff data section, Your Honor.  But

13   if you look at Google's response to Request Number 6 that's on

14   the screen, Google says it's going to produce data relating to

15   Chrome sync, Chrome Metrics, Google Analytics, Google Ad

16   Manager, and Google Ads.

17        Google Ads is Zwieback.  Google did not object to

18   Google Ads at the beginning of this case, nor did they object

19   in January of 2021 -- or, I'm sorry -- December 31st of 2020

20   when we sent them Zwieback IDs, nor did they object in January,

21   nor did they object at the first Monsees deposition when we

22   were asking questions straight from the complaint.

23        The first we heard of Google's position, first we

24   understood Google's position was on June 22nd, 2021, when they

25   told us with respect to the third 30(b)(6) deposition -- let me

UNDER SEAL BY ORDER OF THE COURT

1   back up a step.

2       Let's show Monsees Deposition Exhibit 2, fact sheet, which

3   is joint rebuttal declaration 25.  This was a fact sheet

4   prepared by Google counsel for Google's 30(b)(6) deponent.

5   Here's what they did.

6       If we could blow it up.

7       That NID cookie that they gave him a fact sheet to tell us

8   about, that's the Zwieback cookie.  No objection that Zwieback

9   is out of scope to the case.

10      The next thing that happened is July 22nd, 2021, Google

11  served the responses and objections to our third 30(b)(6) --

12      **THE COURT:**  I get it.  I got the parade.  And if you want

13  to give me a cite to slides, but I'd really like to hear about

14  the remedies.

15      **MR. BARNES:**  Okay.  One more thing about this, Your Honor.

16      We sent four follow-up letters requesting Google's

17  position.  We did not hear back from them until they -- until

18  we had to file our motion.

19      Finally, one more point, and then I will get to the

20  remedy, I promise, on my rebuttal.  Google threw in an appendix

21  that is a surrebuttal.  The fact is Google links device IDs to

22  GAIA IDs, and I want to just talk really briefly about --

23      **THE COURT:**  I understand that dispute.  I got it.  I have

24  been through it, and I see what both sides say about it.

25      **MR. BARNES:**  What I want to make certain, Your Honor, is

UNDER SEAL BY ORDER OF THE COURT

1  that there is not a wayward paragraph in a Findings of Fact

2  relating to whether these two things are tied together from

3  Google or not because we think we have irrefutable evidence

4  that they do.

5      THE COURT:  I understand.

6      MR. BARNES:  Thank you.

7      Okay.  Now, on to remedy.  Thank you, Your Honor, for your

8  patience.

9      Relates to remedy, Mr. Schapiro ended his presentation

10 with saying:  What would plaintiffs have done with the data?

11 This goes to why the remedy is necessary.

12     THE COURT:  Okay.  So are we talking about plaintiffs'

13 data?

14     MR. BARNES:  We are talking about plaintiffs' data.

15     THE COURT:  Okay.

16     MR. BARNES:  Here's what we would have done.  We would

17 have brought in the full scope of Chrome's unauthorized

18 transmissions to Google when the user was not synced.  We would

19 have shown all of that tracking to the jury.

20     There is no person in the world who has any idea that

21 Google is engaging in this conduct.  Google's own

22 ███████████   their own people say they don't.

23     And the scope of the data collected is highly relevant to

24 whether Google's conduct is highly offensive.  It's also highly

25 relevant to consent.

1    So instead of being able to come to the jury and say,

2  "These are six ordinary people who used Chrome in a not sync

3  state.  This is the promise Google made.  This is what they

4  actually did, what Google actually did.  Weigh the two of them

5  together," we don't have the data for the jury to make that

6  assessment, that full assessment, because they prevented us

7  from getting it.

8    Now, we have other information; right?  We have other

9  information we can present to a jury.  But Google prevented us

10  from showing the jury the most relevant, the most direct

11  evidence of how it violated our clients' rights, and that is

12  the harm.

13    So what's the remedy?  The remedy is in --

14    **THE COURT:**  Let me be sure I understand.  What would you

15  be showing?

16    **MR. BARNES:**  What would we be showing?

17    **THE COURT:**  The history of everything that was transmitted

18  for these seven --

19    **MR. BARNES:**  We would be showing the jury, because the

20  scope is relevant, all of the data that Chrome unlawfully

21  transmitted to Google while the users were not synced.  And we

22  believe that the jury would be shocked at the full amount of

23  data and that we would get, based on that, the jury finding

24  that it would be highly offensive.

25    And in addition to that, we would get the historical

1   verticals that they put people into, the profile information,

2   the porn scores, every medical communication they sent that

3   Google intercepted, everything about education, everything

4   about familial relationship problems that they sent, that

5   Google does for hundreds of millions of Americans without ever

6   telling them.

7        And the way to present that to a jury is with the named

8   plaintiff data, to explain, because they're just like everyone

9   else.  But Google prevented us from doing that because they let

10  that data expire.

11       For Zwieback, we have the additional -- additional problem

12  of -- so for Biscotti, we got these ████████████████████████

13  logs that clearly show the connection.  For Zwieback, all we

14  have is what it says on the face of the document; right?

15       So what's the remedy?  The remedy is the jury instruction

16  that we've proposed in the proposed order, which is that Google

17  destroyed relevant evidence when it had an obligation to

18  preserve it and that that evidence would be favorable to the

19  plaintiffs.

20       On the point of whether we have to show the relevance of

21  data that Google -- that the defendant destroyed or did not

22  produce, we don't.  There's a Ninth Circuit case directly on

23  point called *Leon vs. IDX Systems*, which is 464 F.3d 951

24  Ninth Circuit 2006.  It says (as read):

25            ". . . because 'the relevance of the destroyed

UNDER SEAL BY ORDER OF THE COURT

1          documents cannot be clearly ascertained [as

2          it] . . . no longer exist,' a party 'can hardly

3          assert any presumption of irrelevance . . . .'"

4          Thank you for your patience, Your Honor.  If Your Honor

5    has any further questions, I'd be happy to answer them, but

6    I think you probably don't for me.

7          THE COURT:  I think I've got it, Mr. Barnes.  Thank you.

8          MR. BARNES:  Thank you.

9          MR. STRAITE:  So good morning, Your Honor, or should I say

10   good afternoon.  Yes.

11         THE COURT:  Good afternoon.

12         MR. STRAITE:  David Straite for the Calhoun plaintiffs

13   with a quick summation.

14         And I cannot go through all the remedies that we sought in

15   the plaintiffs' proposed Conclusions of Law.  There are

16   many pages.  We're out of time.  We stand by all of them.

17         We discussed earlier a couple of things I'd like to

18   highlight, remedies that we'd like to discuss in a little more

19   detail based on the conversation today.

20         Today we have emphasized three rules:  Obey court orders;

21   don't make false statements to the Court and proactively

22   correct any statement that you later learn had been false; and

23   don't destroy evidence without prior relief from the Court; in

24   other words, no self-help.

25         The evidence presented today conclusively establishes that

1    Google violated all three rules.   Sanctions are warranted.

2        First, the not sync signals.  You heard Ms. Weaver

3    methodically lay out the timeline of Google's unequivocal and

4    repeated false claims that Google does not know whether Chrome

5    users are unsynced and Google's false claims that there are no

6    express not sync signals.

7        Google even obtained a protective order that Google then

8    improperly used to justify destroying critical sync traffic

9    logs after falsely telling the Court that these logs only

10   relate to synced users.

11       In January of this year, Google's own witness, Tim

12   Schumann, finally admitted the opposite with respect to the

13   ███████ signal, the signed-in-but-not-consented-for-sync signal.

14   It exists and is stored in these very traffic logs.

15       Then on March 4th, the last day of fact discovery, Google

16   admitted to plaintiffs that there is a second express signal,

17   but Google never corrected the earlier false statements made a

18   year ago to this Court. We don't know if any others exist.

19       Second, for the ██████████████ project, you heard me walk

20   through the timeline of uncontested facts regarding Google's

21   withholding of two critical consent documents between

22   October 2021 and April 2022, documents that record candid

23   admissions of 24 senior executives and engineers, admitting

24   that Google's consent flow is hopelessly broken.  In parallel,

25   however, Google filed a summary judgment motion asking

UNDER SEAL BY ORDER OF THE COURT

 1 | this Court to rule as a matter of law the exact opposite.

 2 | Third, you heard Mr. Barnes detail Google's remarkable

 3 | efforts to avoid preserving and producing the named plaintiff

 4 | data in violation of repeated court orders. Vast quantities of

 5 | named plaintiff data are now no longer recoverable, and Google

 6 | is still inexplicably refusing to preserve certain

 7 | Zwieback-keyed data. These facts are uncontroverted.

 8 | Google's defenses rest on claims of inadvertence, or "You

 9 | were on notice," or "No harm, no foul," or "You got something

10 | similar."

11 | For the not sync signals, Google says the original hearing

12 | on its motion for a protective order only related to the

13 | identifiers at issue in the complaint. But, of course, the

14 | complaint, Docket Number 1, paragraph Number 1, makes clear

15 | that the case is brought on behalf of unsynced or not synced

16 | users. And, in any event, the Court expressly asked Google

17 | about the synced traffic logs. Google falsely represented what

18 | was in them.

19 | Google also claims these two signals were inadvertently

20 | not disclosed. But last September Google was ordered to

21 | produce a list of fields in the sync traffic logs and Google

22 | produced a spreadsheet of ███ field names except one, the one

23 | that actually is named SyncDisabled. Did the Excel spreadsheet

24 | just drop it? We don't know.

25 | When Google amended its rog responses on the very last day

UNDER SEAL BY ORDER OF THE COURT

1    of fact discovery to admit to the SyncDisabled signal, did

2    Google just happen to discover that oversight on that day, or

3    was it because earlier that week the Special Master lead a live

4    demo of the Google data logs and plaintiffs' sharp-eyed expert

5    happened to see the SyncDisabled signal?

6        For the two critical ████████████ documents, Google

7    claims that the interview notes and the related white paper

8    were inadvertently withheld as privileged.  But Mr. Barnes

9    asked for these very documents by name on December 20th at a

10   break at the deposition after Mr. Heft-Luthy revealed their

11   existence.  Did Google inadvertently fail to respond to

12   Mr. Barnes' request?

13       Plaintiffs then followed up in writing in January, and

14   Google reacted with silence.  Was that also inadvertent?

15       And Google's silence to the follow-up request in February,

16   repeated in March, were those also inadvertent?

17       When Google, in parallel, moved for a summary judgment,

18   asking the Court to rule the exact opposite, was that also

19   inadvertent?

20       And for the failure to produce the named plaintiff data,

21   almost a year ago the Court ordered that a Google employee --

22   not counsel -- verify under oath that the data had been

23   produced no later than November 18th, 2021.  That employee,

24   Andre Golueke, refused to comply.  Instead, carefully crafted

25   his declaration to say the data had been produced or was in

UNDER SEAL BY ORDER OF THE COURT

1   process.  The data should have been produced following the

2   April 30th order and certainly should have been produced by

3   November 18th, 2021.  That declaration has never been updated.

4        Was Google's decision to withhold the named plaintiff data

5   for another six months, was it inadvertent?  Was it because of

6   a good faith dispute?  Did Google resort to self-help?  Did the

7   Special Master overrule this Court's order, repeated orders to

8   produce that data?

9        The evidence also conclusively establishes prejudice to

10   the plaintiffs.  Google obtained a court order that Google used

11   to justify spoliating sync traffic logs.  Google also

12   obstructed discovery into these logs until after the

13   depositions had concluded.

14        Google withheld the two most important consent documents

15   while simultaneously making a play to dismiss the case on a

16   theory of consent, past the end of fact discovery, when it was

17   too late to depose the interviewed executives or ask that their

18   documents be searched.

19        Google also spoliated named plaintiff data, and what it

20   did produce, it produced at the end of the Special Master

21   process rather than at the beginning, as this Court ordered,

22   wasting enormous resources.

23        Plaintiffs, therefore, have asked for three types of

24   remedies.  These are outlined in our proposed order and, more

25   importantly, in plaintiffs' proposed Findings of Fact and

UNDER SEAL BY ORDER OF THE COURT

1    Conclusions of Law.  They start at paragraph 299 of the

2    proposed Conclusions of Law.  That's on page 65.  They go on

3    for many pages.  They're detailed and supported by appropriate

4    case law and summation of the evidence.  We do not have enough

5    time, nor would you want me, to read through all of these.

6        **THE COURT:**  I have been through them.  Thank you.

7        **MR. STRAITE:**  We still ask for all of the remedies that

8    are in these paragraphs.

9        Earlier, during the end of the ████████████ section, you

10   also asked me:  What remedies are you seeking?

11       I added an additional suggestion regarding how

12   inappropriate it would be for Google to introduce new evidence

13   that we hadn't had a chance to vet in opposition to the summary

14   judgment or to the issue of consent in the Findings of Fact and

15   Conclusions of Law.

16       We also asked for an order striking the first affirmative

17   defense of consent, given the delay in producing these

18   documents and the inability to take discovery.  That still

19   stands.  But I added that in as a clarification as an option

20   for the Court if it wanted a less drastic remedy.

21       We also asked for several jury instructions, not only for

22   the Rule 16 violations, but also Rule 37 violations.

23       Just to clarify, for the not synced state dispute, we are

24   also -- I think it's in there.  Just to make sure we're clear,

25   we are asking for a jury instruction on the named plaintiffs'

UNDER SEAL BY ORDER OF THE COURT

```
1   data to include their not sync status.  There is no evidence,

2   because Google let it expire, of when these plaintiffs were in

3   the unsynced state prior to the filing of the complaint.  It

4   would be unfair for us not to have a jury instruction that says

5   that these plaintiffs were presumed to be in the unsynced state

6   prior to the filing of the complaint.  Google destroyed

7   evidence that could confirm that.  They shouldn't benefit at

8   trial from the absence of that evidence.

9        Otherwise, we stand by all of the remedies that we seek

10  starting on paragraph 299 of the Conclusions of Law.

11       Finally, Your Honor, for the reimbursement of attorneys'

12  fees and Special Master fees that are requested here,

13  plaintiffs respectfully request that the order allow plaintiffs

14  to submit the application within a fixed amount of time after

15  the order.  We recommend 30 days, but we're open to whatever

16  the Court feels is best.

17       For the application on attorneys' fees specifically,

18  plaintiffs request that the time detail would be submitted to

19  the Court in camera and only the summaries would then be filed

20  on the docket.

21       Your Honor, plaintiffs are well aware of the resources and

22  the time that the Court has devoted to this matter for the past

23  two years.  I know my colleagues at the defense table also

24  agree on this point.  We appreciate it, and we say thank you.

25       THE COURT:  Thank you, Mr. Straite.
```

UNDER SEAL BY ORDER OF THE COURT

1    Google?

2         MR. SCHAPIRO:  We two are going to divide our closing

3    remarks.  So I think Ms. Trebicka will go first.

4         MS. TREBICKA:  I am happy to go first.

5         MR. BARNES:  Your Honor, I just want to make sure the

6    record is clear regarding the pre-complaint sync status of our

7    plaintiffs.

8         One of our plaintiffs synced one device pre-complaint.

9    There is some evidence of that.  We asked Google to search sync

10   traffic logs.  There was no evidence of any other plaintiff

11   ever syncing, ever syncing.  So we have evidence that no

12   plaintiff other than Elaine Crespo ever synced a device by the

13   absence of sync data.

14        Thank you.

15        THE COURT:  Ms. Trebicka?

16        MS. TREBICKA:  Okay.  Your Honor, that is a substantive

17   point about what the evidence in the record is and is not that

18   I'm not going to address right now.

19        But what I would like to address is a few points

20   specifically on the sync issue.  The first one, Your Honor, is

21   that plaintiffs are asking you to make inference upon inference

22   related to counsel's and Google's state of mind on these

23   issues.  And much of the building blocks that they're using to

24   arrive at the ultimate conclusion of bad faith or intent to

25   deprive are deficient.  Cites are missing from the proposed

UNDER SEAL BY ORDER OF THE COURT

1   Order of Fact that plaintiffs have provided to you, and that is
2   because, I believe we have shown, a lot of them do not hold up
3   to scrutiny.

4       Your Honor, on the point of prejudice, on the point of
5   harm, which Your Honor is asking us to address, I would like to
6   reiterate that there is no gap in preservation when it comes to
7   these two sync signals.  The ███████ signal is preserved in
8   ███████ since its inception, and that is something that we've
9   stated again and again.  Plaintiffs are aware.  It is not new
10  information.

11      Second, the SyncDisabledEvent signal is also stored in
12  ███████ since the user's account creation.  And we have
13  disclosed that in response to written interrogatories.  It's
14  something that is already out there in the record.  And that is
15  an omission that I find pretty critical, this understanding
16  that there is really no prejudice that we're talking about.

17      **THE COURT:**  So we're talking about in terms of class
18  identification, not named plaintiffs?  We're talking about --
19  you're talking about the sync signals and that signals that
20  indicate someone is not synced, two of them that are in the
21  sync logs, you're talking about their duration of preservation.

22      **MS. TREBICKA:**  Correct, Your Honor.  And since the named
23  plaintiffs are in the class, their sync signals are being
24  preserved as we speak as well.  Well, the not sync signals;
25  right?  The ones that I'm talking about here.

UNDER SEAL BY ORDER OF THE COURT

1    Your Honor asked about -- plaintiffs now are saying that

2    they've identified at least six more not sync signals in

3    addition to ████ and SyncDisabled.  We showed that the first

4    three are really just the sync signals -- not sync signals we

5    have been discussing, and the rest are not express sync

6    signals.  They are not found in the traffic logs, Your Honor,

7    in the sync traffic logs that is, again, the central dispute

8    about the March 5 hearing.

9    Your Honor, we heard that as far as the Zwieback-related

10   data or associated data for named plaintiffs, the harm would be

11   great in that it's purportedly not preserved, et cetera,

12   because it wouldn't be able to be shown to the jury.

13   I might remind Your Honor and plaintiffs that just last

14   week we had an extensive preservation-related hearing about

15   Zwieback data that would be retained en masse, petabytes of

16   Zwieback-associated data.  And that is precise- -- some of it

17   is samples.  Some of it is wholesale.  We had that discussion.

18   I'm not going to repeat it.

19   The harm concerning any data that may have been lost

20   because of the very good reasons and arguments that were

21   discussed today is minimal, at best, given precisely this

22   preservation plan that exists.  If a class is certified, then

23   that preservation data is there and there will be presumably

24   another conversation about what of it must be produced.

25   And finally, Your Honor, I actually have a clarification,

UNDER SEAL BY ORDER OF THE COURT

1 and then I will yield the floor to Mr. Schapiro.

2      We talked about the Smith rebuttal declaration.  That's

3 the Joint Exhibit 13, the Plaintiffs' Joint Exhibit 13.  I

4 mistakenly said that it was the January '22 rebuttal

5 declaration.  It's actually the July 21, 2022, rebuttal

6 declaration in support of plaintiffs' sanctions motion.

7      **THE COURT:**  So your cite to the Smith rebuttal report --

8 give me that again.

9      **MS. TREBICKA:**  Yes.  Plaintiffs' joint declaration

10 Exhibit 13, so that is a July 2022 declaration that confirms

11 that in October of 2021 Mr. Smith said the SyncDisabledEvent

12 appears in public source code.

13      **THE COURT:**  Got it.  Thank you, Ms. Trebicka.

14      **MS. TREBICKA:**  Thank you, Your Honor.

15      **MR. SCHAPIRO:**  Your Honor, we have provided to the Court

16 extensive proposed Findings of Fact and Conclusions of Law.

17 And I would respectfully request that the Court begin and, I

18 hope, end with those, because they are, to some extent, a

19 surrebuttal.

20      There was a lot that was in the reply brief in this case

21 that we didn't have a chance to answer.  And I do not believe

22 that any fair-minded person can read the account, which is

23 replete with citations, can read the account that is set forth

24 in those proposed Findings of Fact and Conclusions of Law and

25 reach any other conclusion -- any conclusion other than that

UNDER SEAL BY ORDER OF THE COURT

1   Google acted here at all times in compliance with its discovery

2   obligations and that ordering any type of sanctions would be

3   erroneous and inappropriate.

4        Mr. Straite, when he stood up at the beginning, said that

5   there are three principles he wanted to bear in mind.  He said

6   obey court orders, don't make false statements, don't destroy

7   evidence.

8        As I hope we have persuaded Your Honor here today -- and

9   you can flip through our slides as well -- there has been no

10  showing by the plaintiffs here that Google failed to obey any

11  court order.  There has been no showing that Google made any

12  false statement to the Court.  There's been no showing that

13  Google destroyed evidence other than evidence that timed out

14  because of the -- because no one had ordered it yet to be

15  preserved and there was no obligation under Rule 26 to

16  preserve.

17       I want to answer a couple of somewhat scattershot points

18  that were made because I think, you know, going second, that's

19  something that might make the most sense for me --

20       THE COURT:  Okay.  Before --

21       MR. SCHAPIRO:  -- rather than waving the flag.

22       THE COURT:  -- you launch down that path, just staying on

23  your last point --

24       MR. SCHAPIRO:  Yes.

25       THE COURT:  -- about obligations to preserve under

UNDER SEAL BY ORDER OF THE COURT

```
 1   Rule 26.
 2       MR. SCHAPIRO:  Yes.
 3       THE COURT:  When the complaint is filed and there are
 4   eight named plaintiffs, doesn't Google have an obligation at
 5   that time to -- does Google have an obligation at that time to
 6   preserve their data as it's reflected as to what's going on in
 7   the complaint?
 8       MR. SCHAPIRO:  No, I don't believe so.
 9       So we asked for data so that we could find these people by
10   any Google accounts.  But I believe what counsel was referring
11   to a moment ago was, there are these screenshots in the
12   complaint that show what they call Fiddler data and it shows
13   data going back and forth.
14       And their suggestion is that we should have looked at that
15   and said:  Oh, well, let's go -- there's this stuff in this
16   complaint.  Let's go take these unauthenticated identifiers and
17   run them against X, Y, or, Z.
18       There's no obligation to parse the complaint in that way.
19   And we objected from the beginning.  There was ample
20   opportunity for the plaintiffs, if they thought we should have
21   done that, to have raised it early on.
22       But beyond that, there's nothing they would have gained
23   out of that.  They have, as Ms. Trebicka just pointed out,
24   ample opportunity to show that -- the argument in this case,
25   Your Honor, is going to be:  Oh, what signals does Google
```

UNDER SEAL BY ORDER OF THE COURT

1  receive?  What do you think about that?  What do people

2  understand about sync?

3      The plaintiffs are well situated to make all of those

4  arguments, and without -- given that the plaintiffs here at

5  times have, I would say, implicitly -- and sometimes veering

6  into explicitly -- questioned our motivations, including,

7  I think, making, you know, suggestions that counsel is hiding

8  the ball or something, I think it is worth noting that at every

9  turn, whatever happens to be missing at the time of a

10  conference is the most important thing in the entire case.

11      ███████████ illustrates that quite well.

12      THE COURT:  Well, let's just stay for a moment on

13  Mr. Barnes' point about, okay, complaint's filed; you have

14  named plaintiffs; what should have been preserved?  What should

15  Google have made sure did not get subject to its automatic

16  deletion, to the point of because the volume of what was

17  transmitted is something's that they will want to and are

18  entitled to argue to the jury?

19      MR. SCHAPIRO:  So the plaintiffs have -- so, first of all,

20  at the beginning, it seemed, I think to all of us, I think even

21  to the Court, that what was at issue here was authenticated

22  information, authenticated data.  We took into account the

23  evolution of the case and added certain Biscotti-keyed data.

24      Google account data was preserved in September, right off

25  the bat.  The plaintiffs want to muddy the waters by saying we

UNDER SEAL BY ORDER OF THE COURT

1    also had to preserve Zwieback, ignoring that the Court had

2    ordered, you know -- as late as October 1st, 2021, the Court

3    agreed with us, saying that Zwieback was not -- even though it

4    was mentioned in the complaint, Your Honor said that we didn't

5    have to preserve it.  So that fight was had.  We won that

6    fight.

7         So surely, if Your Honor reached that conclusion in

8    October, there was nothing wrong with us reaching that

9    conclusion when we received the complaint.

10        It would set an unsustainable bar for a company to say,

11   when it receives a 150-page -- paragraph -- again, it was a

12   long complaint -- that it needs to sit down and say:

13   All right, on our own, let's figure out what argument someone

14   might make that a judge might initially agree with us on, that

15   down the road some months later might get revised.

16        THE COURT:  Well, the argument is that the complaint

17   identifies these transmissions and talks about Zwieback

18   identifiers and GAIA identifiers.

19        And as I understand the argument -- and it's been a -- I

20   didn't look at the complaint today.  I have, obviously, from

21   time to time.  The argument is that then Google was on notice

22   to preserve that data as to the named plaintiffs.

23        MR. SCHAPIRO:  I can only repeat what I said, which

24   I believe answers that, Your Honor, which is that -- maybe I

25   can do more because I'm getting a Post-it.

UNDER SEAL BY ORDER OF THE COURT

1    Someone else who understands what is on this Post-it is

2    going to -- I have a generic answer, but if someone wants to

3    answer specifically --

4        **THE COURT:**  Give me your answer, Mr. Schapiro.  I know how

5    hard it is to be handed notes during oral argument --

6        **MR. SCHAPIRO:**  Yeah, yeah.  So --

7        **THE COURT:**  -- and translate those.

8        **MS. TREBICKA:**  Your Honor, again, I will give you an

9    answer because it is a question that we're asking ourselves

10   too, you know.  And the response is, Your Honor, at that time,

11   remember, this is unauthenticated data.  We see it in a

12   complaint.  We do not know that it is plaintiffs' data.

13       Google, on the other hand, separate from litigation, has

14   lots of policies against just taking data that is

15   unauthenticated from its logs and preserving it because there

16   are these policies in place that say, you know, this is very

17   sensitive, important data.  You take it when you have consent

18   of the person to take it and preserve it that way.

19       If you recall, Your Honor, we had a long conversation

20   about what type of consent plaintiffs needed to give Google so

21   that we can preserve that data.  Right?

22       **THE COURT:**  So that would go to the Zwieback data; right?

23   Allegedly.

24       **MS. TREBICKA:**  Correct, Your Honor.

25       **THE COURT:**  I mean, so --

**UNDER SEAL BY ORDER OF THE COURT**

1        MR. SCHAPIRO:  And Biscotti.

2        MS. TREBICKA:  And Biscotti too, not just Zwieback.

3        THE COURT:  I understand.

4        And if I am understanding Mr. Barnes' argument, but

5    there's also the GAIA identifiers, which is --

6        MS. TREBICKA:  Correct.

7        MR. SCHAPIRO:  That was all preserved.

8        MS. TREBICKA:  We preserved the GAIA identifier-related

9    data --

10        THE COURT:  Starting?

11        MS. TREBICKA:  -- in September of 2020, when the complaint

12    was filed.

13        We were given e-mail addresses, and that is how --

14        MR. SCHAPIRO:  And consent, which we needed.

15        MS. TREBICKA:  Well, no.  Initial- -- two different steps.

16    Right?

17        We preserved that.  And then we produced it to them with

18    consent.  Right?

19        THE COURT:  Understood.

20        MR. SCHAPIRO:  Can I just pull back the camera, as someone

21    who was present at the creation and now has to worry about,

22    wow, what might someone think I should have been doing when the

23    next complaint gets filed?

24        When we received this compliant, here's what we saw.  We

25    saw these people are saying:  Wow, when I'm not synced -- which

UNDER SEAL BY ORDER OF THE COURT

1   means basically I'm just using Chrome out of the box the way

2   any normal person might use Chrome who chooses not to enable

3   sync -- I was amazed to find out that if I go to a site that

4   runs Google Ads, something gets sent to Google.

5       And our view was:  Well, that should essentially be not

6   controversial.  Of course when you visit a site that runs

7   Google Ads, something gets sent to Google.

8       So they have these Fiddler experiments.  And our view at

9   the time, not having hashed out all these things with the

10  plaintiffs, was:  Well, that's fine, but that's not going to

11  the nub of the case.  We are not going to dispute that that

12  happens.  Of course that happens.  The question is:  Why would

13  you believe anything else?

14      And so the idea that having seen that and seen these

15  Fiddler experiments, which, to a lawyer reading the complaint,

16  looked like they were trying to show something saying, "Isn't

17  this amazing these signals get sent?"  We're thinking, yeah,

18  there's not going to be any dispute that those signals get

19  sent; that we should have jumped ahead and said, "Well, but

20  maybe down the road the plaintiffs are going to say that we

21  needed specific -- to take these specific identifiers."

22      And we had certain arguments we could raise about them.

23  Until they come to us and say:  These are the arguments that we

24  want to make and these are the discovery requests we are

25  propounding, at which point we get into the process here in

UNDER SEAL BY ORDER OF THE COURT

1    this Court, is asking far too much and is not fair to say that

2    we spontaneously should reach that conclusion.

3         **THE COURT:**  I understand the argument.

4         **MR. SCHAPIRO:**  Thank you.

5         The Special Master search process, by the way, I think,

6    you know, to conduct searches of complex data structures -- and

7    the Special Master understands this -- it was necessary to

8    query for specific IDs and specific data sources for specific

9    time periods.

10        And this was recognized in the November 12th order.  We

11   followed the Special Master instructions.  I'm back on the obey

12   court orders; don't make false --

13        **THE COURT:**  Got it.

14        **MR. SCHAPIRO:**  -- statements.

15        Zwieback makes an appearance later in the case, and even

16   then, before that, there was a dispute.  It was clear that we

17   certainly thought it was not in the case.  It came up.  We won,

18   and it wasn't in the scope of the case.  And then we lost.

19        If this is the standard, then I think no defendant will

20   ever be free from risk of sanctions.

21        There's one thing I need to correct that I think

22   Ms. Trebicka said incorrectly a moment ago, just so we clean up

23   the record.  The ▌▌▌▌ and SyncDisabled signals are not

24   preserved in Chrome logs, but in ▌▌▌▌ in ▌▌▌.

25        Is that correct?

UNDER SEAL BY ORDER OF THE COURT

1    THE COURT:  I though ███████ is in ██████████.

2    MS. TREBICKA:  The ██████ signal is preserved in ████████.

3    THE COURT:  Right.

4    MS. TREBICKA:  And SyncDisabled is preserved in ██████.

5    MR. SCHAPIRO:  So I think Ms. Trebicka might have

6    misspoken.  And I had just written a note because I wanted to

7    make sure that no one --

8    THE COURT:  That's what my notes reflect, what we just

9    said.

10   MR. SCHAPIRO:  Oh, okay.

11   THE COURT:  I think it was --

12   MR. SCHAPIRO:  Okay.  Great.

13   Your Honor, reminding all -- coming back to the specific

14   violations of court orders that are at issue here that have

15   been brought before the Court, I want to just remind the Court

16   that the April 30th order was raised, I would say, I provide

17   without exaggeration, probably in every other hearing we had

18   before the Special Master.  Pretty much every other hearing the

19   plaintiffs said:  Well, this is a violation of the April 30th

20   order.

21   So the notion that now, after having hashed all of that

22   out, we should be somehow found liable for having violated the

23   April 30th order does not hold water.

24   And I was starting to say a moment ago that, without

25   necessarily impugning motives, there's -- we've seen this

UNDER SEAL BY ORDER OF THE COURT

1   phenomenon, which is that anything that the plaintiffs get

2   either late or say should have been preserved becomes the most

3   important thing in the case.  And just saying it doesn't make

4   it true.

5       Your Honor, I think ██████████ really illustrated that.

6   There was -- we're down now to one document, maybe two

7   documents that they didn't receive, and they are now explosive

8   and the most important documents in the case; whereas as you

9   saw, they spent five pages in their summary judgment papers

10  citing to ████████ documents and interviews.

11      Let me just see if there are any other things I need to

12  cover here to make sure there's no confusion.

13      We have produced all the litigation hold data.  They have

14  all of that data.

15      The November 12th order asked us to identify sources with

16  sync signals.  We did that.

17      In their written discovery requests, plaintiff asked where

18  specifically the ██████ signal is stored.  We answered that.

19      Plaintiffs asked Google to make Schumann available for

20  their -- prior to their class cert motion.  We did make him

21  available.

22      Plaintiffs asked us about sync signals in our RFAs.  We

23  offered a qualified -- appropriately qualified admission, as

24  under the federal rules.  We did that.

25      So the suggestion here that there was a violation of a

UNDER SEAL BY ORDER OF THE COURT

```
 1   court order, that there was any destruction of evidence, and
 2   whatever Mr. Straite's third point was -- yes -- false
 3   statement to the Court, does not match the actual record in
 4   this case.
 5        Now I'm going to close by reminding the Court something
 6   that Ms. Weaver said in her very first remarks here.  She said
 7   the important things in litigation like this are transparency
 8   and disclosure, transparency and disclosures.
 9        And I think if the Court applies those two tests to the
10   issues before Your Honor, it should be clear that this motion
11   has to be denied, because even if, as Your Honor was asking me
12   a few moments ago, one might second guess and say should Google
13   have made a different decision after the complaint was filed,
14   there's been transparency and disclosure from the very
15   beginning about what we're doing and not doing, and the parties
16   have had a chance to hash it out.
17        So I'll end where I began, which is I would respectfully
18   refer the Court to our Findings of Fact and Conclusions of Law,
19   our proposed Findings of Fact and Conclusions of Law, which
20   I think are the roadmap to resolving this dispute properly and
21   in accordance with the law.
22        THE COURT:  Thank you, Mr. Schapiro.
23        Final, final comment.
24        MS. WEAVER:  Thank you very much.  I'll be very brief.
25        So we filed the complaint on July 17th, 2020.  We issued
```

UNDER SEAL BY ORDER OF THE COURT

1   RFP 5 on August 30, 2020.  We immediately asked to meet and

2   confer.  We asked to follow the ESI guidelines for the Northern

3   District.  Tell us what you're preserving.

4        Google knows what SCI consent forms are.  They did not

5   mention at that time.  The paragraphs that are associated with

6   the named plaintiffs have the Zwieback identifiers.  Nobody

7   said anything about that.

8        And to ask -- to act as though in October '21, a year

9   later, when the Court issued one order on Zwieback affirming

10  their decision not to preserve made the prior fall, is the

11  perfect example of self-help.  And there was no transparency

12  there.  And we were repeatedly asking to discuss it.  That's

13  what happened with the preservation order.  That's the first

14  and main point.

15       Teeny evidentiary objections.  We move to strike

16  Ms. Trebicka's arguments in this hearing about what those

17  SyncDisabled signals are or are not.  That is argument.  It

18  hasn't been briefed.  We have in the record what our experts

19  think they are.  But to hear for the first time on August 11th

20  that Google thinks these are the same signals that they

21  disclosed is news to us.  We don't think it's appropriately

22  before the Court.  We also don't think it's true.

23       With regard to the Smith declaration, Google continues to

24  overlook that what he was saying is that he had observed, doing

25  independent tests, that there was a SyncDisabled signal

UNDER SEAL BY ORDER OF THE COURT

1    appearing on local servers, and he raised it in the face of

2    Google's continuing representations that they did not maintain

3    a signal on their own servers.

4        And, again, they never went back and clarified their

5    answers.  Their interrogatory responses didn't say, except for

6    one on March 4th:  Here's the ███████ signal.  Here's the

7    SyncDisabled signal.  And they never said -- and still

8    haven't -- that they would look to investigate the other

9    signals that our experts have identified.

10       Finally, here today we were baffled by this argument that

11   Google made in their slides that somehow the sync traffic logs

12   were covered by the previous preservation order.  I think

13   they've withdrawn it today because they didn't raise it.  But

14   obviously, it was not.

15       And this argument that some of these sync signals are

16   preserved in ██████████ or elsewhere, we're surprised by this

17   again today.  Why haven't they produced that for all of the

18   named plaintiffs?

19       Thank you, Your Honor.

20       MR. SCHAPIRO:  One sentence, Your Honor, or a sentence

21   fragment.

22       THE COURT:  Okay.

23       MR. SCHAPIRO:  No bad faith.  No intent.

24       THE COURT:  Okay.  All right.  We're only one hour over my

25   estimate; so we exceeded my estimate by 25 percent, if I'm

UNDER SEAL BY ORDER OF THE COURT

1    doing my math right, but that's pretty good for us in this

2    case.

3          So I want to thank everyone for your preparation.  As

4    always, I want to take this opportunity to, again, highlight

5    the very hard work of the Special Master and Mr. Schmidt who

6    have tirelessly addressed these issues, many of these issues,

7    and I believe to both sides' benefit in this litigation and

8    certainly to the benefit of the Court.

9          So I appreciate, again, the parties' preparation for

10   today, and I will take the motion under submission.  I will

11   give it careful consideration.

12         In an ideal world, you would have an order from me before

13   your arguments before Judge Gonzalez Rogers on August 26th, but

14   I cannot promise that that would happen.  I would like it to

15   happen, but there's a lot here, and there's a lot of good

16   material that was of assistance to the Court from both sides

17   today.  So I want to be sure I give this due consideration.

18         At this point, I don't anticipate that I want or need

19   either additional briefing or updated proposed findings; but

20   I'm going to, again, give that some careful consideration and,

21   if I do, I will let you know.  I am mindful of other deadlines,

22   other impending deadlines, and I will keep that in mind if I

23   ask for that additional information.  All right?

24         So thank you all again very much.  I appreciate it.  And

25   I think those are all my Post-it notes for closing comments.

UNDER SEAL BY ORDER OF THE COURT

1     And we are adjourned.  Thank you.

2             (Proceedings adjourned at 3:02 p.m.)

3                     ---o0o---

4

5             <u>CERTIFICATE OF REPORTER</u>

6        I certify that the foregoing is a correct transcript

7   from the record of proceedings in the above-entitled matter.

8

9   DATE:  Tuesday, August 16, 2022

10

11

12   _____

13   Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
               Official United States Reporter

14

15

16

17

18

19

20

21

22

23

24

25