UNITED STATES DISTRICT COURT   *ORIGINAL*

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

| | | |
|---|---|---|
| PATRICK CALHOUN, et al., on behalf of themselves and all others similarly situated, | ) ) ) ) | **Evidentiary Hearing** |
| | ) | Pages 1 - 271 and |
| | ) | 272 - 330 |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | NO. C 20-05146 YGR |
| | ) | |
| GOOGLE LLC, | ) | |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Monday, October 24, 2022 |

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:             Simmons Hanly Conroy LLC
                            112 Madison Avenue, Seventh Floor
                            New York, New York  10016
                    BY:  JAY BARNES,
                         JENNIFER M. PAULSON,
                         AN V. TRUONG, ATTORNEYS AT LAW

                            Bleichmar Fonti & Auld LLP
                            555 12th Street, Suite 1600
                            Oakland, California  94607
                    BY:  ANGELICA M. ORNELAS,
                         LESLEY E. WEAVER, ATTORNEYS AT LAW

Reported By:      Raynee H. Mercado, CSR No. 8258

    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

```
 1                  A P P E A R A N C E S (CONT'D.)

 2

 3    For Plaintiffs:        DiCello Levitt LLC
                             60 East 42nd Street, Suite 2400
 4                           New York, New York  10165
                        BY:  DAVID A. STRAITE, ATTORNEY AT LAW
 5
                             DiCello Levitt (IL)
 6                           DiCello Levitt LLC
                             Ten N. Dearborn Street, 6th Floor
 7                           Chicago, Illinois  60601
                        BY:  SHARON D. CRUZ, ATTORNEY AT LAW
 8

 9    For Defendant:         Quinn Emanuel Urquhart & Sullivan LLP
                             191 North Wacker Drive, Suite 2700
10                           Chicago, Illinois 60606
                        BY:  ANDREW H. SCHAPIRO,
11                           JOSEPH H. MARGOLIES, ATTORNEYS AT LAW

12                           Quinn Emanuel Urquhart & Sullivan LLP
                             865 S. Figueroa Street, Floor 10
13                           Los Angeles, California  90017
                        BY:  STEPHEN A. BROOME,
14                           ALYSSA G. OLSON,
                             VIOLA TREBICKA, ATTORNEYS AT LAW
15
                             Quinn Emanuel Urquhart & Sullivan LLP
16                           1300 I Street N.W
                             Washington, D.C.  20005
17                      BY:  JOSEF T. ANSORGE, ATTORNEY AT LAW

18                           Quinn Emanuel Urquhart & Sullivan LLP
                             711 Louisiana Streeet, Suite 500
19                           Houston, Texas  77002
                        BY:  BRETT N. WATKINS, ATTORNEY AT LAW
20
                             Quinn Emanuel Urquhart & Sullivan LLP
21                           51 Madison Avenue, 22nd Floor
                             New York, New York  10010
22                      BY:  JOMAIRE A. CRAWFORD, ATTORNEY AT LAW

23

24                           --o0o--

25
```

1                        **I N D E X**

2

3
                                                    **PAGE**      **VOL.**
4

5       OPENING STATEMENT BY MR. SCHAPIRO          14          1

6       OPENING STATEMENT BY MR.  BARNES           22          1

7       CLOSING ARGUMENT BY MR. SHAPIRO            321         1

8       CLOSING ARGUMENT BY MR. BARNES             325         1

9

10      **DEFENDANT'S WITNESSES**                  **PAGE**      **VOL.**

11      ZERVAS, GEORGIOS

12      DIRECT EXAMINATION BY MS. TREBICKA         27          1

13      VOIR DIRE EXAMINATION BY MR. BARNES        33          1

14      DIRECT EXAMINATION (RESUMED) BY MS. TREBICKA  35       1

15      CROSS-EXAMINATION BY MR. BARNES            87          1

16      REDIRECT EXAMINATION BY MS. TREBICKA       132         1

17

18      SHAFIQ, ZUBAIR

19      EXAMINATION BY THE COURT                   80          1

20

21      BERNTSON, GLENN

22      DIRECT EXAMINATION BY MR. BROOME           135         1

23      CROSS-EXAMINATION BY MR. BARNES            149         1

24

25

| **DEFENDANT'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| GANEM, STEVEN | | |
| DIRECT EXAMINATION BY MR. WATKINS | 155 | 1 |
| CROSS-EXAMINATION BY MS. TRUONG | 163 | 1 |
| REDIRECT EXAMINATION BY MR. WATKINS | 169 | 1 |
| | | |
| PORTER FELT, ADRIENNE | | |
| DIRECT EXAMINATION BY MS. CRAWFORD | 170 | 1 |
| CROSS-EXAMINATION BY MS. ORNELAS | 187 | 1 |
| | | |
| FAIR, GREGORY | | |
| DIRECT EXAMINATION BY MR. BROOME | 192 | 1 |
| CROSS-EXAMINATION BY MR. STRAITE | 197 | 1 |
| REDIRECT EXAMINATION BY MR. BROOME | 212 | 1 |
| | | |
| KLEBER, MICHAEL | | |
| DIRECT EXAMINATION BY MS. TREBICKA | 214 | 1 |
| CROSS-EXAMINATION BY MR. BARNES | 228 | 1 |
| REDIRECT EXAMINATION BY MS. TREBICKA | 240 | 1 |
| CROSS-EXAMINATION BY MR. BARNES | 243 | 1 |

| PLAINTIFFS' WITNESSES | PAGE | VOL. |
|---|---|---|
| SMITH, RICHARD | | |
| DIRECT EXAMINATION BY MS. TRUONG | 246 | 1 |
| CROSS-EXAMINATION BY MR. SMITH | 263 | 1 |
| | | |
| SHAFIQ, ZUBAIR (UNDER SEAL) | | |
| DIRECT EXAMINATION BY MR. BARNES | 272 | 1 |
| DIRECT EXAM (RESUMED) BY MR. BARNES | 297 | 1 |
| CROSS-EXAMINATION BY MR. SCHAPIRO | 305 | 1 |
| REDIRECT EXAMINATION BY MR. BARNES | 319 | 1 |

# E X H I B I T S

| PLAINTIFFS' EXHIBITS | W/DRAWN | IDEN | EVID | VOL. |
|---|---|---|---|---|
| B149 | | | 248 | 1 |
| B153 | | | 97 | 1 |
| 154 | | | 111 | 1 |

--o0o--

```
 1   Monday, October 24, 2022                        8:35 A.M.
 2                         P R O C E E D I N G S
 3                              --o0o--
 4        THE CLERK:  Now calling civil case 20-5146-YGR,
 5   Calhoun, et al. versus Google, LLC.
 6      Counsel, starting with the plaintiffs, please state your
 7   appearance for the record.
 8                   (Off-the-record discussion.)
 9        THE COURT:  At the mics.  Always at the mics.  That's
10   why we're now in person again, so you remember.
11        MR. BARNES:  I apologize, Your Honor.  Jay Barnes,
12   Simmons Hanly Conroy, on behalf of the plaintiffs.
13        MS. WEAVER:  Good morning, Your Honor.  Lesley
14   Weaver, Bleichmar Fonti, on behalf of the plaintiffs.
15        THE COURT:  Good morning.
16        MR. STRAITE:  Good morning, Your Honor.  David
17   Straite, Dicello Levitt, also for plaintiffs.
18        THE COURT:  Okay.  Good morning.
19        MS. ORNELAS:  Good morning, Your Honor.  Angelica
20   Ornelas from Bleichmar Fonti & Auld, also for the plaintiffs.
21        THE COURT:  Okay.  I don't have -- oh, O-R-N-E-L-A-S?
22        MS. ORNELAS:  Yes, Your Honor.
23        THE COURT:  Okay.  Good morning.
24        MS. TRUONG:  Good morning, Your Honor.  An Truong,
25   Simmons Hanley Conroy, on behalf of plaintiffs.
```

```
 1              THE COURT:  Good morning.

 2              MS. PAULSON:  Good morning, Your Honor.  Jenny

 3   Paulson from Simmons Hanley Conroy on behalf of the plaintiffs

 4   as well.

 5              THE COURT:  Good morning.

 6       And you must be Ms. Cruz?

 7              MS. CRUZ:  I am, Your Honor.  Ms. Sharon Cruz from

 8   Dicello Levitt on behalf of the plaintiffs.

 9              THE COURT:  All right.  Good morning.

10       Okay.  For the defendants.

11       Defendants, Mr. Schapiro, good morning.

12              MR. SCHAPIRO:  Good morning, Your Honor.  Andrew

13   Schapiro from Quinn Emanuel for defendant.

14              MR. BROOME:  Good morning, Your Honor.  Stephen

15   Broome from Quinn Emanuel for the defendant.

16              THE COURT:  Okay.

17              MS. TREBICKA:  Your Honor.  Good morning.  Viola

18   Trebicka, Quinn Emanuel, for defendants.

19              THE COURT:  Good morning.

20              MS. CRAWFORD:  Good morning, Your Honor.  Jomaire

21   Crawford from Quinn Emanuel on behalf of the defendant, Google

22   LLC.

23              THE COURT:  Good morning.

24              MR. WATKINS:  Good morning, Your Honor.  Brett

25   Watkins from Quinn Emanuel on behalf of the defendant.
```

1        **THE COURT:**  Okay.  Good morning.

2        **MR. ANSORGE:**  Good morning, Your Honor.  Josef

3    Ansorge with Quinn Emanuel on behalf of defendant as well.

4        **THE COURT:**  Okay.  Good morning.

5        **MS. OLSON:**  Good morning, Your Honor.  Alyssa Olson,

6    Quinn Emanuel, on behalf of defendant.

7        **THE COURT:**  Okay.

8        **MR. MARGULIES:**  Good morning, your Honor.  Joseph

9    Margolies, Quinn Emanuel, also for defendant.

10       **THE COURT:**  Great.  Okay.  Good morning.

11    Okay.  So let's get started.  I'm assuming I'm hearing

12    first from defendants, Mr. Schapiro or is it Mr. Broome?

13       **MR. SCHAPIRO:**  Good morning, your Honor.

14    I think there are a number of housekeeping items that both

15    sides wanted to address before we get started.

16       **THE COURT:**  Okay.

17       **MR. SCHAPIRO:**  If that's all right.

18       **THE COURT:**  All right.  Who do I have from the

19    plaintiff?  So I've got Broome from the defense and Straite?

20       **MR. BROOME:**  So the first issue, Your Honor, is

21    sequestering witnesses.

22       **THE COURT:**  So I don't plan on sequestering experts

23    because I may call experts up here and have them both at the

24    podium at the exact same time.

25       **MR. BROOME:**  Understood.  And the issue, Your Honor,

1    is:  Are Google's engineers who are talking about the

2    technology experts?  And the --

3           **THE COURT:**  Not for purposes of this hearing.

4           **MR. BROOME:**  Okay.

5      The next issue, Your Honor, was I think the -- both sides

6    wanted to do an approximately five-minute opening at the

7    beginning if Your Honor would indulge us.

8           **THE COURT:**  Okay.

9           **MR. STRAITE:**  Also closing.

10           **MR. BROOME:**  Oh, okay.  And a closing, an

11    approximately five-minute closing if that's all right.

12           **THE COURT:**  All right.

13           **MR. BROOME:**  There is a dispute over Google's witness

14    Michael Kleber.  He was identified by plaintiffs on a number

15    of topics.  We've prepared him.  He's flown out here today.

16    We intend to put him on as rebuttal to some of plaintiffs'

17    points as well.  And the plaintiffs have withdrawn him from

18    their list.  We would still like to have some time to put him

19    on today given that he's out here and prepared to testify.

20           **THE COURT:**  Okay.  Well, we'll see where we are at

21    the end of the day.

22           **MR. BROOME:**  Okay.  And then I think the final

23    dispute is with respect to Mr. Eisenger who is testifying

24    remotely from Google's offices in New York.  The plaintiffs

25    have asked for a monitor, somebody from their firm, to be in

1    Google's offices with him.  We don't think that's necessary.

2    You can ask him, he'll be alone in the room without counsel.

3    So we don't think --

4         **THE COURT:**  So you just make sure, and I will --

5    look, I've run trials by Zoom.  I have no reason to think that

6    anybody's doing anything unethical.  I want him in a room that

7    has nothing in it.

8         **MR. BROOME:**  Exactly.

9         **THE COURT:**  I will ask him to verify for me by moving

10   his camera around and showing me the room to verify that

11   there's nothing in it.  That's how I deal with it.

12        **MR. BROOME:**  That works for us.  Thank you, Your

13   Honor.

14        **THE COURT:**  Okay.

15        **MR. BROOME:**  And unless Mr. Straite tells me

16   otherwise, I think that's it.

17        **MR. STRAITE:**  Thank you.  I have a couple other

18   things, Your Honor, for some opening housekeeping.

19      Regarding Mr. Kleber, we -- plaintiffs did call him as a

20   witness, but then we agreed with Google we would designate his

21   30(b)(6) transcript in lieu of testimony.  So we were

22   surprised to see that he was now being called by Google.

23      So when it comes to his portion, we can address that, but

24   we don't intend to ask him questions beyond the designation.

25        **THE COURT:**  Okay.  Well, I haven't read anything so

1    we'll see.

2         **MR. STRAITE:**  Thank you, Your Honor.

3    We also met and conferred with Google regarding the

4    sealing issue.  We have an agreement, just so you're aware of

5    it, before we put any demonstrative or any other document on

6    the computer screens, we'll first show it to counsel to see if

7    they have any objection.  If they do, then we can turn off the

8    screens that face the courtroom and only have the screens

9    internally facing.

10         **THE COURT:**  And then let me get a couple of the

11    plaintiffs' lawyers to move that flat screen.  It should be

12    faced towards the audience so people can see it.

13    Okay.  Go ahead.

14         **MR. BROOME:**  I'm sorry.  We do have --

15         **THE COURT:**  Mr. Straite, are you done?

16         **MR. STRAITE:**  Done with sealing.

17    I believe Mr. Broome is going to talk about --

18         **MR. BROOME:**  Yes, I --

19              (Simultaneous colloquy.)

20         **THE COURT:**  So this isn't a conversation.

21         **MR. BROOME:**  Understood.

22         **THE COURT:**  It's a court proceeding.  And because it

23    is a court proceeding, only one person can talk at a time.

24         **MR. STRAITE:**  Thank you, Your Honor.  I would defer

25    to Mr. Broome because I believe he's about to raise the same

1    issue.

2         **MR. BROOME:**  I left out the big ticket item, Your

3    Honor.

4         We have an objection to Dr. Shafiq's expert report that

5    was submitted on October 12th, and I believe the plaintiffs

6    have some objections to some of what our expert, Dr. Zervas,

7    will testify.

8         Our objection to Dr. Shafiq's rebuttal report is solely to

9    the extent they seek to admit that report into evidence to the

10   extent it is not testified to today.

11        And Your Honor will recall that when we were before you

12   last on September 20th, we had asked for expert reports in

13   advance of this hearing.  And Mr. Straite said we can do

14   outlines of what the witnesses will testify to at the hearing.

15        And so that's what we had agreed to.  And our

16   understanding was that the witnesses will put in outlines.

17   None of those outlines were signed or sworn under oath.

18   They're just outlines.  They're not evidence in and of

19   themselves.

20        On October 5th when we put in the opening reports -- or

21   the opening outlines -- excuse me -- plaintiffs put in an

22   outline from Dr. Shafiq making several points.

23        On October 12th when the date for putting in responsive

24   outlines, plaintiffs put in a 30-page -- 38-page expert report

25   with 600 pages of exhibits.  And they -- we met and conferred

```
1    with them and they're now taking the position that regardless
2    of whether all of that -- all of the points in his expert
3    report are covered today at the hearing, the report and the
4    exhibits are all evidence in the record.
5        We object to that.  We don't think that's fair.  We're not
6    going to have time to cross-examine him on everything that we
7    think is wrong in that report.  So we'd ask that it be
8    excluded to the extent it's not covered today and not subject
9    to cross-examination, or alternatively the opportunity to
10   submit a response.
11           THE COURT:  All right.  We'll deal with it later.  I
12   haven't read it.  So you don't have anything to worry about
13   until I decide whether or not I want to read it.
14           MR. STRAITE:  Thank you, Your Honor.
15       Mr. Barnes also may want to speak on that point.
16           THE COURT:  I don't want to hear it.  I'm --
17               (Simultaneous colloquy.)
18           MR. BARNES:  Not on Dr. Shafiq, on Dr. Zervas.
19   There's two issues regarding experts.  That was for
20   Dr. Shafiq.  And we also have an issue regarding Dr. Zervas.
21           THE COURT:  All right.
22           MR. BARNES:  So regarding Dr. Zervas, plaintiffs
23   object to -- that he's not qualified to render these opinions
24   and that his methods are unreliable.
25           THE COURT:  Okay.  We'll get to that on
```

1    cross-examination.

2         **MR. BARNES:**  That --

3         **THE COURT:**  Not --

4         **MR. BARNES:**  Excuse me.  I'm sorry, Your Honor.

5         **THE COURT:**  Folks, we need to get going.  You want

6    seven or eight hours, I understand?  That means we need to

7    move.

8        You have an objection on qualifications.  Okay.  So what's

9    next?

10        **MR. BARNES:**  I wanted to make sure we had the

11   opportunity to cross-examine him --

12        **THE COURT:**  Okay.

13        **MR. BARNES:**  -- before the Court accepted him as an

14   expert witness.

15        **THE COURT:**  We can do that.  All right.

16        **MR. BARNES:**  Thank you, Your Honor.

17        **THE COURT:**  Sit down.  Let's go.

18       Mr. Broome, who's first?

19        **MR. BROOME:**  Mr. Schapiro will do the opening.  Thank

20   you.

21        **THE COURT:**  Mr. Schapiro, you may proceed.

22       My clock reads 8:44.  You have five minutes.

23                          **OPENING STATEMENT**

24        **MR. SCHAPIRO:**  Your Honor, we're here today to answer

25   a narrow factual question that Your Honor posed in docket

1    entry 858.  And that question was:  Does Google receive the

2    same categories of the at-issue data through browsers other

3    than Chrome?

4         The answer, with the exception of the X-Client Data

5    Header, is yes, Google receives the same categories of the

6    at-issue data from browsers other than Chrome.  Google

7    receives first IP addresses linked to user agents through

8    browsers other than Chrome.  Google receives cookie

9    identifiers including the client ID through browsers other

10   than Chrome.  Google receives individual URL's through

11   browsers other than Chrome.  And some of those URL's are

12   correlated on Google's servers into what plaintiffs call

13   browsing history.  And finally, Your Honor, Google receives

14   the users' POST communications through browsers other than

15   Chrome.

16        Just as Google.com and Gmail.com can be accessed from all

17   major browsers, the web services at issue in this case, Your

18   Honor, Google Analytics and Google Ad Manager, function

19   regardless of the browser used to visit a website running

20   those Google services.

21        And that's because Google's web services are designed and

22   implemented and maintained to function on all major web

23   browsers.  Website administrators, you will hear, expect

24   Google Analytics, Google Ad Manager, and Google's other web

25   services to function regardless of the browser their website

1    visitors are using.

2        And website administrators, you will hear, would not use

3    Google web services if they would only work for visitors using

4    a Chrome browser.

5        Now, because Google receives the same categories of

6    at-issue data through browsers other than Chrome, it would

7    make no sense for Google to disclose the data collection in

8    the Chrome privacy notice as opposed to the Google privacy

9    policy which does disclose this data flow.

10       In fact, it would likely cause a misimpression that the

11   data collection takes place only from Chrome browsers when it

12   does not.  And users could falsely believe that Google does

13   not receive any of the at-issue data when they're on a browser

14   other than Chrome such as Safari or Firefox.

15       So for this reason, Google discloses the data collection

16   at issue in the privacy policy which applies to Google

17   products and services across the board and not just the Chrome

18   browser.

19       I think you will note in this hearing or you will see that

20   the plaintiffs want the hearing to be about everything but the

21   issue the Court has asked the parties to address.

22       Plaintiffs are going to seek to narrow the types of

23   at-issue data.  For example, the second data category the

24   Court asked about are unique persistent cookie identifiers

25   including the client ID

1    Plaintiffs seek to limit that category to third-party

2  cookies.  But the client ID is not stored in a third-party

3  cookie.  It is a first-party cookie that Google receives

4  through Chrome and non-Chrome browsers.  I think based on what

5  we have received, the plaintiffs will also spend a lot of time

6  today making arguments about something called link decoration.

7  But link decoration is not a category of data the Court asked

8  about.  Link decoration is also never mentioned in the

9  plaintiffs' complaint.  What link decoration is and how it

10  functions is not relevant to today's evidentiary hearing.

11    I anticipate you will also hear from plaintiffs' expert

12  Dr. Shafiq that there's a greater volume of transmissions of

13  the at-issue data from Chrome than from other browsers.  But

14  that, too, has nothing to do with the question the Court

15  posed.  The Court's order asked whether the same categories of

16  data are collected and not whether any bit of data is sent

17  more frequently.

18    And, Your Honor, there's a reason why frequency does not

19  matter.  This entire issue flows out of questions about

20  Google's disclosures.  Whether the data flow should be

21  disclosed in the crime -- Chrome privacy notice does not turn

22  on the volume of transmissions.

23    I also anticipate that plaintiffs' expert Dr. Shafiq is

24  going to talk a lot about the X-Client Data Header and how

25  combinations of data that include the X-Client Data Header are

1    sent only in Chrome.

2        Your Honor, of course that's true.  Dr. Shafiq's tests

3    confirm that it is only sent in Chrome.  The X-Client Data

4    Header is sent only in Chrome.

5        So today, Your Honor, you're going to hear live testimony

6    from six Google employees:  Three engineering directors,

7    Dr. Adrians Porter-Felt, Dr. Glenn Berntson, and Dr. Jochen

8    Eisenger.  Between the three of them, they supervise more than

9    400 software engineers and they have more than 30 years of

10   experience at Google.

11       You'll hear from a principal software engineer, Michael

12   Kleber, who has expertise in both digital advertising and the

13   Chrome browser.  And you'll hear from two product managers,

14   Steve Ganem and former Googler, Greg Fair, who is currently

15   the digital identity chief and acting chief product officer

16   for the State of California Department of Technology.

17       And, Your Honor, you will hear from our expert,

18   Dr. Georgios Zervas, who will testify that Google's receipt of

19   the four categories of at-issue data Your Honor asked about is

20   not contingent on the browser.

21       Your Honor, at the end of the day, you will have heard a

22   lot of testimony but nothing to refute the simple fact that

23   the services at issue in this case are browser-agnostic, and

24   that is why Google discloses the data collection in

25   browser-agnostic terms.

 1          **THE COURT:**  Can you remind me what paragraph of the

 2     complaint these five categories of data come from.

 3          **MR. SCHAPIRO:**  I think it's 43 or --

 4          **UNIDENTIFIED SPEAKER:**  160.  Oh.  141.

 5          **THE COURT:**  141.  Thank you.

 6          **MR. SCHAPIRO:**  And I think that's cited in Your

 7     Honor's order setting this hearing.  Correct?

 8        Do we have that up on the screen?

 9        Oh, we're trying to put that up.

10          **THE COURT:**  That's fine.  Let me hear -- thank you.

11        And so --

12          **MR. BARNES:**  Your Honor, may I answer the question

13     you just asked as well?  Because there's a dispute over what

14     the at-issue data is.  There's a list of POST communications.

15     There's a lot of talk about GET communications and URLs as

16     well, which are part of browsing history information.

17          **THE COURT:**  Those five categories, am I wrong that

18     they came from paragraph 141 of your complaint?

19          **MR. BARNES:**  There are additional -- no, you are not.

20     There are additional paragraphs of our complaint that talk

21     about other at-issue data.

22          **THE COURT:**  What paragraphs?

23          **MR. BARNES:**  Your Honor, I will get you -- can I get

24     you a specific --

25          **THE COURT:**  I want a list.

```
 1            MR. BARNES:  Okay.  I will get you a list.  I do not

 2    have it with me at this specific moment, Your Honor.

 3            THE COURT:  That's odd.  That's what the entire

 4    hearing is about.

 5            MR. SCHAPIRO:  And for what it's worth, Your Honor,

 6    we pulled this simply from Your Honor's order.

 7            THE COURT:  Because that's where I saw it defined.

 8            MR. BARNES:  Okay.  For example, paragraph 140 --

 9            THE COURT:  I don't want examples.

10            MR. BARNES:  It's paragraph 141, Your Honor.  It says

11    the user's browsing history in the form of the contents of the

12    user's GET request and information relating to the substance

13    purport or meaning of the website's portion of the

14    communication with the user.  That's from the paragraph --

15            MR. SCHAPIRO:  We don't --

16                    (Simultaneous colloquy.)

17            THE COURT:  Do not talk.

18            MS. WEAVER:  We object to the demonstrative as being

19    incomplete --

20            THE COURT:  You know what, Ms. Weaver, you sit down.

21    One at a time.

22            MS. WEAVER:  Fair enough.

23            THE COURT:  You do not get to tag team.  So everybody

24    has forgotten how courtrooms work.  This is going to be a

25    stark reminder if you don't dig into your memory blocks to
```

1   figure out how to remind yourself how to do it.

2          Give me the list because I got that from your complaint.

3          **MR. BARNES:**   Paragraph 141 says Chrome sends the

4   personal information to Google when a user exchanges

5   communications with any website that includes Google

6   surveillance source code.   Again, regardless of whether a user

7   is logged into Google Sync or not.

8          The list is the user's persistent cookie identifiers, the

9   user's browsing history in the form of the contents of the

10  user's GET request and information relating to the substance

11  purport or meaning of the website's portion of the

12  communication with the user, in many cases the contents of the

13  user's POST communications, the user's IP and user address,

14  the user agent information about their device, and the user's

15  X-Client Data Header information.

16         In addition to that, I am moving through the documents

17  now.   Google -- at issue is whether Google forms profiles from

18  Chrome sending this information to Google and whether those

19  profiles can even be created from non-Chrome data.

20         There are -- there are paragraphs in here about cradle to

21  grave dossiers being created as a result of the transmissions

22  of this data and consumer profiles that Google has been aware

23  has been at issue in this case since the beginning.

24         Regarding link decoration, it is referred to in our

25  complaint as cookie syncing whereby there are certain cookie

1  values that are transmitted through GET and POST request

2  headers in a way to evade any effort by a consumer to block

3  tracking by a company like Google.

4      And so, Your Honor -- Your Honor, may I explain something

5  on their slide?

6          **THE COURT:**  Time's ticking.

7      **MR. BARNES:**  Oh, I didn't know this was my opening,

8  Your Honor.  Okay.

9              (Simultaneous colloquy.)

10              **OPENING STATEMENT**

11     **MR. BARNES:**  The client ID is the link decoration.

12  The client ID listed in subparagraph 2 is the link decoration.

13     So, Your Honor, there are two questions today.  The first

14  is whether it is a necessary function of how the Internet

15  works for browsers to send this information to Google, and

16  whether the browser used makes a difference in terms of what

17  information is sent.

18     The answer to both of these questions is no.  Mr. Richard

19  Smith will testify it is not necessary for any browser

20  function, for Chrome or any other browser, to send this

21  combination of browsing history information and identifiers

22  back to the browser manufacturer on nonmanufacturer websites

23  or to Google on non-Google websites.  We believe that Google's

24  witnesses will agree.

25          **THE COURT:**  So hold on.  Whether or not it's

1    necessary isn't the question.  The question is whether all the

2    browsers do it.

3         **MR. BARNES:**  Correct.  I'm reading from document 858

4    that says Google's position is that such collection is a

5    necessary function of how the Internet works.

6         And so we're going to put on testimony that the

7    transmission of this data, particularly this collection of

8    data, is not a necessary function of how the Internet works as

9    it relates to transmissions to Google on non-Google websites

10   and transmissions back to the browser manufacturer.

11        As it relates to this -- if Your Honor wants to ask --

12        **THE COURT:**  No, that wasn't the question I was

13   asking.

14        **MR. BARNES:**  Okay.  As to the second question,

15   whether the browsers work the same, the testimony you're going

16   to hear today is no.

17        The evidence from both plaintiffs' and Google's witnesses

18   will show that Chrome does not work the same as other

19   browsers.  There are at least three different ways there are

20   true -- this is true.

21        First, Chrome sends more personal information back to the

22   manufacturer and Google than any other browser.  The evidence

23   will show that all other browsers have some sync

24   functionality.

25        For example, if you sync in Safari, it will send your

1    browsing history information and identifiers back to Apple,

2    the browser manufacturer.  But testing from Dr. Shafiq and

3    Google's experts will show that Chrome is the only browser

4    that sends browsing history information and these identifiers

5    back to the manufacturer on websites not controlled or owned

6    by Google.

7        Second, testing from Dr. Shafiq and Google's experts will

8    confirm that Chrome is the only browser that sends browsing

9    history information and identifiers in normal operations to

10   Google on non-Google websites.

11       On this topic, the Court will receive 30(b)(6) testimony

12   from Google witnesses that state, and I quote, every major

13   browser handles cookies differently.  Second quote:  No two

14   browsers have the same behavior at the same moment.  Third

15   quote:  Chrome is the last significant browser on the market

16   that supports third-party cookies.

17       Testing, testimony, and internal Google documents will

18   further show that there is no way to make Chrome as

19   privacy-protective as other browsers.  Even if a user

20   manipulates the setting to block third-party cookies in

21   Chrome, which is a tiny minority of users, there are at least

22   nine different ways that Safari and Firefox and Brave are more

23   privacy-protective than Chrome with respect to the data at

24   issue in this case.

25       Next, we have heard talk about browser-agnostic.  Our

1    expert will tell you that that is not a term used amongst

2    experts who study Internet transmissions via browser.  The

3    evidence will show that these browser differences result in

4    Google's back-end ad systems acting very differently.

5        Professor Shafiq will explain that Google's ad systems

6    respond differently depending on whether a person is using

7    Chrome versus Safari versus Firefox, Edge, or Brave.  In the

8    non-Chrome browsers, Google's ad systems lose access to the

9    identifiers that Google uses to create detailed user profiles

10   and dossiers that it then uses to serve highly targeted

11   advertising based on tracking users across multiple websites

12   and across multiple devices.

13       On this topic, the Court will receive 30(b)(6) testimony

14   that when Safari implemented something called Intelligent

15   Tracking Prevention, it meant that, quote, any system that's

16   relying on cookies, which would be Google's systems, that can

17   be accessed across domains, that you have a stable user

18   identifier across different sites, those systems don't work

19   anymore.  These cookies are basically broken.  That's Google's

20   30(b)(6) witnesses.

21           **THE COURT:**  Okay.  Can you -- we need to finish up.

22   Your five minutes are over.

23           **MR. BARNES:**  Yes, Your Honor.

24       Now, finally, Mr. Schapiro noted that the reason it's not

25   in the Chrome privacy notice is because it's in the general

1    policy.

2        What I would like to point --

3            THE COURT:  So I am not here to hear argument over

4    policy definitions.  I'm here to understand the technology.

5    That's the only reason we are here.

6            MR. BARNES:  Thank you, Your Honor.  I agree.

7        I was responding to him.  If you don't want to hear it, I

8    understand.  I wanted to respond to what Mr. Schapiro said.

9    If you don't want to hear it, that is -- that is just fine.

10            THE COURT:  All right.  First witness.

11            MS. TREBICKA:  Your Honor, Google would like to call

12    Dr. Georgios Zervas.

13            THE COURT:  Okay.  Go up to the witness stand.

14            MS. TREBICKA:  Yes, Dr. Zervas to the witness

15    stand and --

16            THE COURT:  And you should --

17            MS. TREBICKA:  -- Your Honor, I'm instructed to go to

18    the other lectern?

19                    (Simultaneous colloquy.)

20            THE CLERK:  Please raise your right hand.

21                    **GEORGIOS ZERVAS**,

22    called as a witness by the defendant, having been duly sworn,

23    testified as follows:

24            THE CLERK:  Thank you.  You may sit down.  Please

25    speak into the microphone.  State your full name and spell

```
 1    your last name.

 2             THE WITNESS:  Good morning.  My name is Georgios

 3    Zervas.  It is spelled, my first name, G-E-O-R-G-I-O-S.  Last

 4    name Zervas, Z-E-R-V-A-S.

 5             THE COURT:  All right.  Given the objection, let's go

 6    ahead and start with qualifications, at which point -- who is

 7    cross-examining Mr. -- or Professor Zervas?

 8             MR. BARNES:  I am, Your Honor.

 9             THE COURT:  All right.

10        After we get through the qualifications and the nature of

11    the basis for the opinions, that is, why is he qualified to

12    opine on whatever it is he thinks he's going to opine on, I'll

13    give you an opportunity to voir dire him.

14        Proceed.

15             MS. TREBICKA:  Do we have the demonstrative up for

16    the -- for Her Honor?

17             THE COURT:  Mr. Garcia, I think they're asking for

18    the computer.

19             THE CLERK:  I'm turning it on right now.

20             MS. TREBICKA:  Thank you.

21                  (Demonstrative published.)

22                    DIRECT EXAMINATION

23    BY MS. TREBICKA:

24    Q.  Dr. Zervas --

25             THE COURT:  That monitor should be working as well.
```

1          Mr. Garcia, I don't know why that monitor is turned

2     differently.

3               THE CLERK:  Oh, they turned it because they were

4     messing around with it.

5               MR. SCHAPIRO:  Mr. Garcia, which way should I turn

6     it?

7               THE CLERK:  Basically towards the --

8               THE COURT:  Well, it's so that you can see it.

9     BY MS. TREBICKA:

10    Q.  Dr. Zervas, good morning.

11    A.  Good morning.

12    Q.  Would you please tell the Court -- we have a slide on your

13    qualifications.  Would you please walk through some of your

14    qualifications -- or actually let me do it this way.

15         Would you please tell the Court what your current position

16    is?

17    A.  Of course.  I'm an associate professor of marketing at the

18    Questrom School of Business -- you can see the title on the

19    slide -- School of Business at Boston University.

20         Well, I'm also a founding member of the faculty of

21    computing and data sciences and affiliated faculty of the

22    computer science department.

23    Q.  What does it mean to be an affiliated faculty of the

24    department of computer science?

25    A.  For instance, it gives you the opportunity to attend

ZERVAS - DIRECT / TREBICKA

1    seminars and supervise Ph.D. students.

2    Q.  And what -- as far as the faculty of computing and data

3    science, what is the subject matter of that faculty?

4    A.  It's -- this is an ongoing process.  It relates to data

5    science and potentially how many other disciplines relate to

6    data science.  So it brings together scientists from computer

7    science, statistics, economics, marketing, social sciences,

8    and it's a novel enterprise at the U and I'm helping build it.

9    Q.  How many founding members are there?

10   A.  I forget the exact number, but maybe in the order of

11   like 10 or 20, something like that, I would say.

12   Q.  Understood.

13       And what about your educational qualifications?  Do you

14   have a bachelor's degree?

15   A.  I do.  I have a bachelor's in computer science from

16   Imperial College London.

17   Q.  Do you have any other advanced degrees?

18   A.  I hold two more advanced degrees.  A master of arts in

19   interactive media from the London College of Communication and

20   a Ph.D. in computer science from Boston University.

21   Q.  The interactive media master of arts, what kind of study

22   did that involve?

23   A.  A lot of it actually related to the web, understanding how

24   it works and web development.

25   Q.  Did it relate to browsing on the web in any way?

1   **A.**   We definitely had to build websites.  So yes.

2   **Q.**   And what about your computer science Ph.D., what was --

3   what did that involve, that study?

4   **A.**   A lot of my work, and that's how I find myself in the

5   marketing department, involved the study of online platforms.

6   So I analyze data from online platforms to arrive at

7   conclusions that might be relevant for technology, marketing,

8   and economics.

9   **Q.**   When you say data from online platforms, what do you mean?

10  **A.**   I can give you an example.  So for instance, in my work, I

11  have analyzed data from Yelp, for instance, Yelp reviews.  I

12  have analyzed data from Airbnb.  So that would be demand and

13  pricing data.  I have analyzed data from Groupon, if you

14  remember that, which was an online coupon site where you could

15  buy coupons, to understand the implications of these platforms

16  on consumer and firm behavior which are topics that marketing

17  cares about.

18  **Q.**   What other roles or positions do you hold that are

19  relevant to the questions that we're discussing here today?

20  **A.**   I have listed a couple for you.  But at the high level, I

21  sit either on program committees or editorial boards for

22  leading computer science and marketing conferences and

23  journals.  So I have experience reading others' work,

24  critiquing it, providing constructive feedback, and

25  shepherding that work to publication.

1    **MS. TREBICKA:**  Okay.  Next, Your Honor, I'd like to

2    ask some questions about what Dr. Zervas did to arrive at his

3    conclusions, but I'm going to skip over the assignment

4    unless -- to make it more efficient.  Or --

5    I'm looking at Your Honor.  How about I go through what we

6    have here and to give Your Honor the full view.

7    **THE COURT:**  Well, I need to know what the nature of

8    the opinions are that he wants to propose because there's an

9    objection that he isn't qualified to do so.

10   **MS. TREBICKA:**  Understood, Your Honor.  Let me -- let

11   me do this.

12   **Q.**  Dr. Zervas, you had an assignment for today, correct?

13   **A.**  I did.

14   **Q.**  And that assignment, in fact, had a few parts?

15   **A.**  Yes, and I can go through them if you wish.

16   **Q.**  Please do for Her Honor.

17   **A.**  Your Honor, I was -- I worked on three things.

18   First, I want to provide a brief overview tutorial, if you

19   will, of how third-party web services work.  Second, I

20   evaluated the question posed by the Court which is whether the

21   collection of the at-issue data is browser-agnostic.  And

22   finally, offer responses to certain opinions offered by

23   plaintiffs' experts.

24   **Q.**  And as to the first assignment, providing an overview of

25   how third-party services work, what part of your education and

 1    experience makes you qualified to provide Her Honor that

 2    tutorial?

 3    **A.**   I -- obviously I have a Ph.D. in computer science so I

 4    know how these technologies works.  I have undergraduate

 5    degree in computer science.  These are pretty -- Your Honor,

 6    these are pretty fundamental and easy topics.  This is -- I

 7    hate to say that, but this is nothing super complicated.  And

 8    I could show you in one minute how to do the same data

 9    collection I did.

10        I'm sorry to say that.

11            **THE COURT:**  You shouldn't say that to people who --

12    who hire you.

13                          (Laughter.)

14            **THE WITNESS:**  I provide extra value on top of that.

15            **THE COURT:**  All right.

16        Let me hear -- is it Mr. Broome?  Or no, Mr. Straite?

17        **MR. BARNES:**  Mr. Barnes.

18            **THE COURT:**  Mr. Barnes, do you want to voir dire him?

19        **MR. BARNES:**  Yes, I do, Your Honor.

20        **MS. TREBICKA:**  Your Honor, would you like me to move

21    to the next lectern or sit down?

22            **THE COURT:**  Doesn't matter, I don't care.  Either

23    one.

24

25

1
<u>**VOIR DIRE EXAMINATION**</u>

2
**BY MR. BARNES:**

3
**Q.**  Good morning, Dr. Zervas.  Good to see you again.

4
Dr. Zervas, Google hired you to analyze how different browsers

5
work; is that correct?

6
**A.**  No.  My assignment was more specific.

7
Mr. Barnes, good to see you as well.  Good morning.

8
My assignment was to evaluate the question at hand whether

9
the transmissions of at-issue data happen for different

10
browsers under different configurations.

11
**Q.**  And did that involve comparing different browsers?

12
**A.**  Certainly but only with regard to the question at hand.

13
**Q.**  And did it involve analysis of network data transmissions

14
from the various browsers to Google and other entities?

15
**A.**  Of course, yes.

16
**Q.**  Google's Gregory Fair declaration cited in Docket 858 says

17
that --

18
**THE COURT:**  Mr. Barnes, I'm only concerned about his

19
qualifications.

20
**MR. BARNES:**  Yes.  Google's services are

21
browser-agnostic.  Did you have any insight into Google's

22
back-end services and how they operate after data is sent from

23
a browser to Google?

24
**THE COURT:**  That's not an issue for voir dire.  The

25
question is his qualifications.  What is it about his Ph.D.

1    and master's that are insufficient for these basic questions?

2          MR. BARNES:  Your Honor, Mr. Zervas is going to

3    testify that Google's back-end servers are browser-agnostic.

4    And in order to do so, our expert says you have to be able to

5    see what happens on the back end, and he has not seen what

6    happens.

7          THE COURT:  Okay.  That's not -- that's a separate --

8    a separate objection.

9          MR. BARNES:  Okay.

10   Q.  Dr. Zervas, you just testified about analyzing data that

11   you had received from certain web sites as part of your work,

12   correct?

13         THE COURT:  You know what, enough.  Sit down.

14      The objection -- you can cross-examine him on these

15   things.  These all go to weight.  I haven't heard a question

16   out of you that somehow his computer science background won't

17   allow him to give me a quick tutorial on these topics.

18         MR. BARNES:  Your Honor, we're objecting to his

19   testing because he is not qualified for his testing.

20   Q.  Have you ever published an article on Internet data

21   transmissions that you recorded and published that went

22   through a peer review process?

23   A.  We discussed one such paper in my deposition, Mr. Barnes.

24   You questioned me about it as I recall it --

25         THE COURT:  You need to sit closer to the mic.

 1        **THE WITNESS:**  My apologies, Your Honor.

 2        Mr. Barnes, the way I understand your question, one paper

 3    is the one that we discussed in my deposition where I analyzed

 4    transmissions by the Edge browser, in this particular says --

 5    in this particular paper to understand how consumers discover

 6    products and services on the web through ads or organic

 7    navigation.  So I did.

 8    **BY MR. BARNES:**

 9    **Q.**  And that paper was done after the data had been collected

10    by Microsoft, provided in a database, and given to you,

11    correct?

12        **THE COURT:**  Okay.  You will get to ask these

13    questions when you cross-examine him.

14        **MR. BARNES:**  Thank you, Your Honor.

15        **THE COURT:**  Proceed.

16        **MS. TREBICKA:**  Thank you, Your Honor.

17              **DIRECT EXAMINATION (Resumed)**

18        **MS. TREBICKA:**  Next, Dr. Zervas has prepared a short

19    tutorial for Your Honor.  And we would like to have Dr. Zervas

20    present it without attorney direction if that is all right.  I

21    will have a few questions after the tutorial.

22        **THE COURT:**  That's fine.

23        **MS. TREBICKA:**  Okay.  Dr. Zervas --

24        Do we have the clicker for Dr. Zervas?

25        **THE WITNESS:**  I do.  I'm holding it.

 1              **MS. TREBICKA:**  Thank you.

 2              **THE COURT:**  Go ahead.

 3              **THE WITNESS:**  Would you like me to stay here, Your

 4      Honor?

 5              **THE COURT:**  Yes.

 6              **THE WITNESS:**  Thank you.

 7          So, Your Honor, I would like to give you a brief technical

 8      overview of how browsers and websites work, focusing in

 9      particular on third-party services.

10          First of all, what is a browser?  Probably you know the

11      answer.  It's a piece of software that all of us use to

12      navigate the web.  There are many different browser

13      manufacturers, but one thing that they have in common is that

14      all these browsers adhere to common Internet standards that

15      organizations like the dub dub dub consortium developed.

16                          (Demonstrative published.)

17              **THE WITNESS:**  To request a website -- and again I'm

18      sure you know that you can either search for it, or if you

19      know the name of website, you can type it directly in the

20      location bar of your browser.  In this particular case, I have

21      typed the domain name georgetown.edu.

22                          (Demonstrative published.)

23              **THE WITNESS:**  Now before your browser can communicate

24      with the web server or the website georgetown.edu, it needs to

25      know its network location.  So it uses something called the

1    domain name system, which is a bit like a phone book that will

2    map this easy-to-remember name, georgetown.edu, to what we

3    call an IP address.

4        An IP address is a sequence of numbers, and it gives you

5    the network location of a device so you can communicate with

6    that.  And then it can communicate back with you.

7                    (Demonstrative published.)

8            THE WITNESS:  One important thing to know is that IP

9    addresses can be shared among multiple devices.  So for

10   instance, I connected to the Wi-Fi that the court provides and

11   some colleagues of mine did as well.  It's very likely that we

12   shared the same IP address.  Or with, you know, household

13   members behind the same -- or sitting at Starbucks.  So this

14   is something common.

15       IP addresses might change over time for the same device.

16   That makes them dynamic.  Or they might -- for longer periods

17   of time.  That makes them static.

18                    (Demonstrative published.)

19           THE WITNESS:  Now once you know the IP address of the

20   website, your browser will dispatch a so-called HTTP request.

21   And again this is part of the standards that browsers use to

22   communicate with web servers.  There is nothing in those

23   standards, if you read the documents that are developed, that

24   says that Chrome should communicate with websites one way,

25   Firefox the other.  So in that sense, those standards are, if

1    you will, browser-agnostic.

2            **MR. BARNES:**  Your Honor, I'm going to object to

3    relevance as to how browsers interact with a first-party

4    website.

5            **THE COURT:**  Overruled.  That's not a legal objection.

6    If you have a legal objection, give me the number.

7            **MR. BARNES:**  Objection, relevance.

8            **THE COURT:**  Overruled.

9            **THE WITNESS:**  May I continue, Your Honor?

10            **THE COURT:**  You may.

11                    (Demonstrative published.)

12            **THE WITNESS:**  So what is HTTP?  It's a standard set

13    of rules that Internet-connected devices use to communicate on

14    the web.  I don't want to bore you with all the details, but I

15    want to call your attention to two methods that have come

16    across in this case, GET and POST, and tell you a bit more

17    about these specific types of HTTP requests.

18            **THE COURT:**  I'm going to interrupt you just for a

19    moment.

20        Mr. Barnes, I take what both sides say with a grain of

21    salt.  So understand that I understand that.  So you can make

22    your objection, but I'm just trying to get through today.

23            **MR. BARNES:**  I understand, Your Honor.  Point taken.

24            **THE COURT:**  Go ahead.

25            **THE WITNESS:**  Thank you, Your Honor.

1          (Demonstrative published.)

2          **THE WITNESS:**  A GET request is conventionally used to

3    retrieve specific information from a web server, for instance

4    a web page.  And it looks a bit like these five lines that I

5    have at the bottom of my slide.  You will see the GET method.

6    You will see that I'm requesting home dot HTML which is a

7    specific page.

8          And importantly requests also carry convention -- by

9    convention a standard set of headers.  I will call your

10   attention to two headers.  User agent.  This simply tells the

11   device that you're connected to what sort of device you're

12   using.  A desktop browser, a mobile browser, what brand, what

13   version, and so on.

14         Headers can also add cookies.  And I will tell you a bit

15   more about cookies in a moment.  But remember that they're

16   carried in headers.

17         (Demonstrative published.)

18         **THE WITNESS:**  POST requests are very similar.  The

19   only difference is that conventionally they're used to either

20   create or obtain records on the server.  This is just fancy

21   words for saying that when you fill out a form on the web,

22   most likely this happens using a POST request.  And POST

23   requests also carry those headers conventionally.

24         (Demonstrative published.)

25         **THE WITNESS:**  Once the web server receives your HTTP

ZERVAS - DIRECT / TREBICKA

 1    request, it's going to respond with an HTTP response.

 2                    (Demonstrative published.)

 3         **THE WITNESS:**  It looks a bit like a request.  It says

 4    the web server says 200 okay.  This is computer lingo for

 5    saying it understood the request and it can respond to that

 6    and provide you information.  The data responded how long the

 7    content is.  And importantly the web server can also set a

 8    cookie.

 9       To what I have before, this is -- this works -- it doesn't

10    say anything about first party or third party.  This is your

11    browser interacting with another web server on the web.

12                    (Demonstrative published.)

13         **THE WITNESS:**  Now what is a website?  To us, when

14    we're using our browsers, it appears that as this nice unified

15    consistent picture.  But to put this picture together, there

16    are many puzzle pieces.  So I think a more apt analogy for a

17    website is something that has different pieces of the puzzle,

18    and for the picture to be complete, all the pieces of the

19    puzzle need to be there.

20       Some types of pieces that you can encounter are HTML

21    documents, style sheets that make the page beautiful.

22                    (Off-the-record discussion.)

23         **THE WITNESS:**  Images, videos, and also importantly,

24    JavaScript.  JavaScript is a programming language that's the

25    lingo of -- frankly [sic] of the web.

```
 1                        (Demonstrative published.)

 2            THE WITNESS:  And it is used quite frequently to

 3     develop third-party services, used by websites.

 4            MR. BARNES:  Your Honor, objection, relevance.

 5     Rule 401.

 6            THE COURT:  Overruled.

 7                        (Demonstrative published.)

 8            THE COURT:  Go ahead.

 9            THE WITNESS:  Thank you.

10        Most websites include a variety of third-party services.

11     And often these services are provided by different vendors.

12     For instance, you might go to Zappos to buy a new pair of

13     shoes and you might use PayPal to check out.  In this

14     particular instance, Zappos, the first-party website, is using

15     a third-party payment processing solution to allow its

16     customers to pay via PayPal.

17        Zappos can also use Microsoft Bing.

18            MR. BARNES:  Objection, relevance to Microsoft Bing.

19            THE COURT:  So you know what, overruled.

20        How much -- how much time are you all asking for?  How

21     much time?

22            MR. BARNES:  Forty-five minutes for Mr. Zervas.

23            THE COURT:  No, total.  How much are you asking for

24     total?

25            MR. BARNES:  Today?
```

 1          **THE COURT:**  Yes.

 2          **MR. BARNES:**  Two and a half hours -- I think it's

 3     about three each side.

 4          **THE COURT:**  Okay.  That's all you get.  Three each

 5     side.  And so --

 6          **MR. BARNES:**  Understood, Your Honor.

 7          **THE COURT:**  -- if they spend their time on totally

 8     irrelevant information, that's on them.

 9          **MR. BARNES:**  Understood, Your Honor.

10          **THE WITNESS:**  May I continue?

11          **THE COURT:**  Go ahead.

12          **THE WITNESS:**  Thank you.

13        And to give you a final example, Zappos might also use yet

14     another party -- yet another third-party service, Google

15     Analytics, to understand how users interact with those sites.

16        The important thing to know is that in this particular

17     case, it is Zappos and its web developers that decided to use

18     those services and incorporate them into the code of the

19     website.

20                    (Demonstrative published.)

21          **THE WITNESS:**  The way this works is by incorporating

22     into HTML documents something called a script or a tag, but

23     really you can just think of it as a reference to a JavaScript

24     file that will execute in your browser.

25                    (Demonstrative published.)

1    **THE WITNESS:**  So a browser makes a request to

2    first-party service, *New York Times*.  The *New York Times*

3    responds with all these puzzle pieces.

4               (Demonstrative published.)

5         **THE WITNESS:**  Within the HTML document, we might see

6    a tag for a third-party service.  The browser will execute

7    that tag as intended by the developer of the website.  And

8    that is what may often trigger a third-party HTTP request.  So

9    the blue boxes are servers that do not belong to the *New York*

10   *Times* here.

11              (Demonstrative published.)

12        **THE WITNESS:**  They could be, for example, the

13   third-party advertising service that returns relevant ads that

14   are shown by the *New York Times* to whoever is visiting that

15   website.

16              (Demonstrative published.)

17        **THE WITNESS:**  Beyond their choice to incorporate

18   different types of third-party services, website owners can

19   configure them as they deem appropriate.

20      For instance, the *New York Times* can choose the size and

21   location of ads.  And if it's using analytics, it can choose

22   what metrics to track to understand patterns of behavior.

23              (Demonstrative published.)

24        **THE WITNESS:**  Why do websites rely on third-party

25   services?

 1        If advertising third-party services did not exist, the

 2    other solution would be for every website publisher to try to

 3    create individual relationships with every potential

 4    advertiser.

 5        And as you can imagine, Your Honor, this becomes --

 6            THE COURT:  So I don't actually care about this part.

 7            THE WITNESS:  No problem.  I can -- I can skip it.

 8                 (Demonstrative published.)

 9            THE WITNESS:  Would you like me to skip the

10    third-party services' web analytics as well, Your Honor?

11        I can start, and please instruct me to move forward if

12    it's not of relevance, Your Honor.

13        Analytic services are also used for consumers and

14    advertisers.  And publishers -- publishers understand how the

15    websites work, and they make improvements which benefit their

16    users.

17        One thing that actually I want to call to your attention

18    is that some of these services happen to be manufactured or

19    provided by companies that also make browsers.  For instance,

20    Google Analytics and Chrome, as an example --

21            THE COURT:  Okay.  I don't know how that's relevant

22    to what I'm looking for.

23            THE WITNESS:  I'm sorry, Your Honor.  Maybe it

24    foreshadows what I really want to talk about later and maybe

25    it will become clearer later, but I understand the confusion.

1    But I just wanted to call your attention that sometimes

2    third-party services are -- happen to be manufactured by

3    companies that make browsers.  And you will see, I hope -- I

4    promise that I will make an effort to show you the relevance

5    of that fact in a moment.

6         THE COURT:  Okay.

7              (Demonstrative published.)

8         THE WITNESS:  Again, it's the choice of websites to

9    incorporate those tags.  You know, many people do that,

10   including counsel for plaintiffs.

11             (Demonstrative published.)

12        THE WITNESS:  And, you know what, let me skip that

13   slide because it -- it's not adding much.

14             (Demonstrative published.)

15        THE WITNESS:  So one thing that I did when I started

16   examining the question that the Court posed is to look at the

17   so-called source code, the lines of code that are included in

18   the Google Tag Manager script.  This is the script or tag that

19   web masters incorporate in their code to provide services like

20   analytics.

21       And I looked at this tag across five different browsers to

22   see if there are any differences in the source code.  So I

23   read the code and I analyzed it, and I could only see trivial

24   differences that, at least in my professional opinion, do not

25   affect their functionality.

 1    So next let's talk a bit about cookies.

 2                   (Demonstrative published.)

 3        **THE WITNESS:**  Cookies are small files that are stored

 4    on your browser, and they have the ability to recall small

 5    pieces of information across different visits to the same site

 6    but enable functionalities that improve user experience.

 7        Importantly, users, through settings in their browsers,

 8    can restrict cookies.  And also users in all browsers that I

 9    know can delete existing cookies on their browsers.

10        Cookies can be session or persistent.  Very simply,

11    session cookies, when you quit your browser they get deleted.

12    Persistent cookies stay there.

13        First-party cookies are set by the website you're

14    visiting, for instance, the *New York Times*.  Third-party

15    cookies are set by third-party services that the website might

16    be using.

17                   (Demonstrative published.)

18        **THE WITNESS:**  How do cookies work?  I hinted at that,

19    through HTTP headers.  So you make a request to first-party

20    site.  It responds back with its puzzle pieces.  One extra

21    piece might be in this case the first-party cookie.

22        This is going to be stored in the browser's so-called

23    cookie jar.

24                   (Demonstrative published.)

25        **THE COURT:**  Is that what they really call it?

```
 1          THE WITNESS:  It's true, that's what they call it,

 2    Your Honor.

 3          THE COURT:  Okay.

 4          THE WITNESS:  It's a term of art, I guess.

 5       So if there is a cookie in your cookie jar, and you visit

 6    the New York Times again, it's going to be carried back with

 7    an HTTP request via header, assuming that settings in your

 8    browser allow that.

 9                    (Demonstrative published.)

10          THE WITNESS:  As I hinted, these cookies can be used

11    to remember your --

12                    (Off-the-record discussion.)

13          THE COURT:  Your log-in status.

14          THE WITNESS:  Your log-in status so you don't have to

15    log in again if you visit the New York Times.

16                    (Demonstrative published.)

17          THE WITNESS:  Cookies can also facilitate the

18    provision of analytic services.  So here I'm showing you an

19    example of a first-party cookie transmitted -- whose value is

20    transmitted to an analytic server.

21       And cookies can also be third party.  So if I communicate

22    with a third-party ad server, it might return a third-party

23    cookie.  But I have made it look like a chocolate chip cookie

24    here.  And it goes into your cookie jar.

25                    (Demonstrative published.)
```

1         **THE WITNESS:**  Advertising cookies are usually used

2    for personalization, which means to show you relevant ads and

3    frequency capping which means to not show you too many ads so

4    you become annoyed with them and you start ignoring them.

5                   (Demonstrative published.)

6         **THE WITNESS:**  I mentioned that you can delete

7    cookies.  This is how you do it in Chrome.  Other browsers

8    have similar interfaces.

9                   (Demonstrative published.)

10        **THE WITNESS:**  And let me skip a few slides, Your

11   Honor, and get to the interesting part.

12                  (Demonstrative published.)

13        **THE WITNESS:**  All browsers have settings.  And a

14   common type of setting is whether cookies are enabled.  If

15   you, in your browser, disable cookies, despite the attempt of

16   a web server for the cookies to be set, those cookies will not

17   be set and they will not be sent back to the server in

18   subsequent requests.

19      The same thing holds for JavaScript.

20                  (Demonstrative published.)

21        **THE WITNESS:**  You, as the user, can enable or disable

22   JavaScript.  This is important because as I mentioned, Your

23   Honor, many third-party services use JavaScript to run.  So if

24   JavaScript is disabled, this code will not run and it will not

25   trigger third-party transmissions that rely on JavaScript.

1          (Demonstrative published.)

2          **THE WITNESS:**  There are also content blocking

3     extensions.  What are extensions?  Think of them as small apps

4     or pieces of software that you can add to your browser that

5     enhance its functionality.

6          So if you want to block transmissions to Google Ad Manager

7     and Google Analytics, you can use something called uBlock

8     Origin.  And these things are --

9          **THE COURT:**  uBlock Origin?

10         **THE WITNESS:**  uBlock Origin.

11         **THE COURT:**  Go ahead.

12         **THE WITNESS:**  I don't know, Your Honor, if it's

13    called NuBlock or uBlock.  I'm always confused about that.

14    But I call it uBlock.  Some people call it NuBlock.  Probably

15    it's the same thing.

16          (Demonstrative published.)

17         **THE WITNESS:**  Google also provides an extension

18    called the Google Analytics Opt-out, which as you guess, it's

19    meant to stop transmissions to Google Analytics.

20         And I want to call your attention here, it says available

21    from different browsers, not just Chrome.

22         And with that, I would like to conclude, Your Honor.

23    Thank you for listening.

24         **MS. TREBICKA:**  Your Honor, this was the tutorial

25    part.  I have a few questions for Dr. Zervas.

1    **Q.**   In particular, Dr. Zervas, you testified at the beginning

2    that you've also reviewed and have attempted to answer the

3    Court's question as to the browser-agnostic nature of the

4    collection of the at-issue data.

5        How did you go about reviewing and analyzing the Court's

6    question?

7    **A.**   I did a couple of things.  First I analyzed the named

8    plaintiffs' data.

9                    (Demonstrative published.)

10           **THE WITNESS:**  And second, I conducted some original

11   testing of my own in different browser configurations.

12   **BY MS. TREBICKA:**

13   **Q.**   So in terms of analyzing the names -- the named

14   plaintiffs' data, could you please tell the Court what you

15   did, what you looked at, and how you reviewed it?

16                    (Demonstrative published.)

17           **THE WITNESS:**  Of course.

18       So Google produced approximately 80 gigabytes of log

19   files.  So log files, think of them, Your Honor, just like an

20   Excel file with rows that describe different events, and

21   columns that have different data types, that are keyed to

22   plaintiffs' Google accounts.

23       So my understanding is that the named plaintiffs were

24   logged in when they were using -- for the purpose of that

25   data.

1        Plaintiffs used different browsers to interact with Google

2    third-party services, including Chrome, Safari, Edge, Firefox.

3    And when they visited sites other than Google properties,

4    these log files contained the data that Google received from

5    these interactions with third-party services.

6    **BY MS. TREBICKA:**

7    **Q.**  When you analyzed this data, what did you find?

8                    (Demonstrative published.)

9            **THE WITNESS:**  I will give you a high-level overview.

10       And we examine -- I examined this question from different

11   vantage points, but essentially the at-issue data, the

12   categories of which I describe here, is transmitted to

13   Google -- to Google services and is found in these logs

14   regardless of the browser that the named plaintiffs are using.

15       Here I have an example specifically for Dr. Wilson.

16   **BY MS. TREBICKA:**

17   **Q.**  It shows that there is no Firefox data.  Do you see that?

18   **A.**  I do see that.

19   **Q.**  And how is that?  Why is that?

20   **A.**  It -- it's slightly subtle.  It says there is no Firefox

21   data corresponding to visits on non-Google sites.  So I

22   remember, for instance, Dr. Wilson visited YouTube, but that's

23   a Google property so I noted for the purposes of my analysis.

24   **Q.**  So in other words, it simply means that there was no

25   Firefox data available for you to review?

1    **A.**   In that particular log file, no, there wasn't.

2    **Q.**   How did you go about putting this summary slide together?

3    **A.**   It's best illustrated through an example, if I may.  So I

4    will move to the next slide.

5                    (Demonstrative published.)

6         **THE WITNESS:**  So this is a visit that Dr. Wilson did

7    using the Safari browser to the website that I present here on

8    the slide.  That's on the left.  And then as a consequence of

9    that visit, Dr. Wilson interacted with Google third-party

10   services.

11       And then when I look at the log files, I noticed that the

12   following items were logged for Dr. Wil -- for that specific

13   interaction:  The IP address, the user agent, the cookie

14   identifier, and the URL of the site that Dr. Wilson was

15   visiting.

16   **BY MS. TREBICKA:**

17   **Q.**   Here you had three pieces of the data, Dr. Zervas.  Why is

18   it that the POST content is missing, POST communication,

19   rather?

20   **A.**   There was nothing in his log file that could tell me

21   whether something was a GET or a POST.  So it did not allow me

22   this granularity for my analysis.

23   **Q.**   And the X-Client Data Header is missing as well.  How do

24   you explain that?

25   **A.**   I have a very easy explanation.  Dr. Wilson was using

ZERVAS - DIRECT / TREBICKA

1   Safari in that particular case.

2   Q.  And why does that explain the missing X-Client Data

3   Header?

4   A.  Because only Chrome uses the X-Client Data Header.

5   Q.  Dr. Zervas, what conclusion do you draw as a result of

6   this analysis that you've performed?

7   A.  Well, I think this analysis informs the question of

8   whether data collection is browser-agnostic.  Because when I

9   look at this example, or a similar example with Edge, or yet

10   another example with Edge for a different named plaintiff,

11   these categories of at-issue data were indeed collected by

12   Google third-party services.

13   Q.  You testified that you -- and --

14          THE COURT:  Is the term "user agent" a technical

15   term?

16          THE WITNESS:  Yes, Your Honor.  It simply means what

17   sort of program or software you're using to interact with a

18   website.  And it's a technical term.

19          THE COURT:  Go ahead.

20          MS. TREBICKA:  May I continue?

21   Q.  Dr. Zervas, you testified that in addition to analyzing

22   the named plaintiffs' data, you also conducted some browsing

23   testing, browser testing; is that right?

24              (Demonstrative published.)

25          THE WITNESS:  This is right.  I did some testing of

1    my own.  And I recorded HTTP transmissions from the browser to

2    Google servers under two different segments.

3        And let me slow down here.  So, first, I configured other

4    browsers to behave a bit more similar to Chrome with respect

5    to tracking.  And in a separate test, I configured Chrome to

6    behave a bit more similar to other browsers, again with

7    respect to tracking.

8    **BY MS. TREBICKA:**

9    **Q.**  Let's move to the next slide, and perhaps you can explain

10   to the Court what -- the next slide.

11                   (Demonstrative published.)

12          **THE WITNESS:**  My apologies.

13   **BY MS. TREBICKA:**

14   **Q.**  One more -- yes, let's rest here.

15       Perhaps you could explain to the Court what this

16   slide shows.

17   **A.**  I would be happy to.

18       So, Your Honor, the rows in this table are different

19   categories of at-issue data.

20       The columns in the table represent different browsers and

21   their respective configurations.

22       For instance, column 1 is Chrome in its -- is Chrome in

23   its default setting.  And column 2 is Safari with intelligent

24   tracking protection [sic] disabled.

25       Wherever I show a checkmark, it means that I observed the

1   transmission of this category of at-issue data to a Google

2   third-party service.

3   **Q.**   Let's move to -- not the next slide, the one after that.

4   What is it that you tested here?

5   **A.**   So this refers to my second test where I configured Chrome

6   to be a bit more similar to other browsers.

7        If you remember, Your Honor, I mentioned this extension

8   uBlock Origin.  So this is what I used to block communications

9   with DoubleClick and Google Analytics in this particular case.

10        In this example, I did not observe the at-issue data, the

11   categories of at-issue data being transmitted when I was using

12   Chrome.  I did observe these transmissions when I was using

13   the other browsers.

14   **Q.**   In your testing of the browser transmissions, did you also

15   have occasion to compare Chrome in its default mode versus the

16   other browsers in their default mode?

17   **A.**   Yes, and I regret not putting them in the same slide.

18        But, Your Honor, I will animate for you.

19        So if you look at this slide at the last three columns,

20   they show you whether the transmission of at-issue data

21   happened for Safari, Firefox, and mention their default

22   settings.  And if I scroll two slides back, and you focus on

23   the first column, it includes data, it includes the analysis

24   for Chrome in its default setting.  And I arrive at the same

25   conclusion.

ZERVAS - DIRECT / TREBICKA

1    **Q.**  And what is that conclusion, Dr. Zervas?

2    **A.**  My apologies.  The conclusion is that -- to answer your

3    question, when you look at browsers in their default settings,

4    these categories of at-issue data are transmitted to Google

5    third-party services.

6    **Q.**  Let us focus on Slide 67.  That's fine, wherever we are,

7    67 is good.

8                        (Demonstrative published.)

9    **BY MS. TREBICKA:**

10   **Q.**  And I'd like to draw your attention to the very last row,

11   cookie valleys.  Do you see that?

12   **A.**  I do see that.

13   **Q.**  What kind -- does this contain both first-party and

14   third-party cookies?

15   **A.**  It's even more specific than that.  A cookie might be

16   first party or third party, but it's still a cookie.  And also

17   cookies can be transmitted via cookie header.  Or occasionally

18   they can be appended, added if you will, at the end of a URL

19   as a so-called URL parameter.

20   **Q.**  And why did you look at this category as cookie values

21   instead of separating it out as first-party cookies or

22   third-party cookies?

23   **A.**  This was my best understanding of the at-issue data and

24   what I read in the court order.  So that's what it says.

25   **Q.**  Are you aware of any browser in its default mode blocking

1    first-party cookies being transmitted?

2    **A.**   Without any changes, not that I know of.

3    **Q.**   And you have tested this, correct?

4    **A.**   It's such common knowledge that I have not done a specific

5    test to that.  But I have never seen first-party cookies being

6    blocked in a default setting.

7    **Q.**   But in your testing, have you observed first-party cookies

8    being passed even in a browser's default mode?

9    **A.**   I have.

10   **Q.**   So on the basis of these tests that you've conducted, how

11   would you respond to the Court's question about whether the

12   at-issue data collection is browser-agnostic?

13                    (Demonstrative published.)

14             **THE WITNESS:**  I would respond affirmatively, meaning

15   that the question is whether the collection -- data collection

16   by Google third-party services is browser-agnostic, which I

17   understand to mean does it depend on what browser you're

18   using.  And when I use different browsers, I saw the same

19   transmissions.  So to me, this is browser-agnostic.

20   **BY MS. TREBICKA:**

21   **Q.**   Dr. Zervas, your last assignment, your third assignment,

22   was to review Dr. Shafiq's analysis and opine on it, you

23   testified earlier, right?

24   **A.**   Yes, I had occasion to do that.

25   **Q.**   Yeah.  And what are -- what are your response -- or

1    opinions on Dr. Shafiq's testing?

2    **A.**   I have a number of opinions.   Some of them are slightly

3    more technical so I will try to present them clearly and

4    slowly but --

5                    (Demonstrative published.)

6         **THE WITNESS:**  -- at a high level, one difficulty that

7    I had with Dr. Shafiq's analysis is that there is no disclosed

8    methodology.

9       And this, Your Honor, for instance, in scientific papers

10   is very common to know how data is collected.

11        **THE COURT:**  Slow down.

12        **THE WITNESS:**  I'm so sorry.

13        **THE COURT:**  Go ahead.

14        **THE WITNESS:**  For instance, there was no

15   documentation, there were no videos or code outlining the data

16   collection.

17      And why is that important, Your Honor?  It is important

18   because sometimes we want to reintroduce each other's work and

19   be sure that we don't have any mistakes.  We all make

20   mistakes.

21      In addition, it's not specified what the state of the

22   browsers was during testing.  It's unclear, and I will get

23   into that in a bit more detail, where the page is fully

24   loaded.

25      You remember, Your Honor, how I said it's like a puzzle?

1   It's not clear in some tests whether all the pieces of the

2   puzzle were received.  And that's important because some

3   pieces of this puzzle, they can trigger transmissions to

4   third-party services that we would not observe if the page is

5   not fully loaded.

6   **BY MS. TREBICKA:**

7   **Q.**  Did you have any other opinions on Dr. Shafiq's testing or

8   methodology?

9   **A.**  I did.  This is not -- to the best of my ability to

10  understand Dr. Shafiq's report, this is not disclosed in the

11  report but this disclosed in Dr. Shafiq's production.  Some

12  tests were conducted a couple of weeks apart.  And given that

13  we're visiting new sites, Your Honor, these sites may change

14  daily or hourly.  And that can affect how many transmissions

15  happen from one day to the next.

16  **Q.**  And moving on from Dr. Shafiq's data collection

17  methodology, have you formed an opinion on Dr. Shafiq's

18  analysis methodology, what he -- how he analyzes the data

19  collected?

20  **A.**  I did.  Let me tell you first how Dr. Shafiq does things

21  and how I do things.

22                    (Demonstrative published.)

23          **THE WITNESS:**  So Dr. Shafiq counts.  So if a user

24  agent string is sent with third-party service, Dr. Shafiq

25  counts one.  If it's sent again, he counts two.  If it's the

1    same user agent string in exactly the same interaction,

2    Dr. Shafiq still counts two.

3        So, Your Honor, if I tell you my name five times today,

4    that counts as five.  But you have learned my name the first

5    time I told you my name.

6        I tried to check for existence is the at-issue data

7    transmitted to Google third-party services or not, which is

8    how I understood also the question where -- we have gathered

9    to discuss here today.

10   **BY MS. TREBICKA:**

11   **Q.**  And as far as the volume of transmissions, did you have

12   occasion to also review the volume of transmissions that

13   Dr. Shafiq arrives at and whether it comports with your

14   analysis and testing?

15   **A.**  As I was reading Dr. Shafiq's report, certain numbers

16   didn't coincide with priors that I have about how browser and

17   the Internet works.  So I started digging a bit deeper, much

18   like what I do when I notice something strange when I'm

19   reviewing a paper.

20       So for instance, Dr. Shafiq, Your Honor, these -- these

21   are numbers that I have copied-pasted from Dr. Shafiq's report

22   without changing them, apart from correcting them because

23   Dr. Shafiq provided errata so that these are the correct

24   numbers that Dr. Shafiq provided.

25       Column 2 of my table --

1              (Demonstrative published.)

2          **THE WITNESS:**    -- presents a column from Table 4, as

3     I recall it, from Dr. Shafiq's report.  And this shows the

4     number of transmissions for different categories of at-issue

5     data that do not match my definition.  I want to point that

6     out.

7        When Dr. Shafiq was testing Chrome with third-party

8     cookies -- well, actually he records certain counts.  That

9     test was done on 9/9.

10       Next, I'm showing you a column from Table 2 in

11    Dr. Shafiq's data.  So as you're reading the report, it might

12    be something -- a comparison that one naturally -- so I've put

13    them side by side.  This shows Safari, the prior date, 9/8, in

14    its default configuration.  And I'm just comparing the counts.

15       And what I see, Your Honor, is that with the exception of

16    the X-Client Data Header, these are broadly similar.  I do not

17    see any substantial differences here.

18          **MS. TREBICKA:**  And if we can move on to the next

19    slide.

20              (Demonstrative published.)

21    **BY MS. TREBICKA:**

22    **Q.**  You have highlighted here certain data numbers from

23    Mr. Shafiq's report.  Could you please explain to the Court

24    what this means?

25    **A.**  Yes, I can tell you how -- why I have highlighted them,

ZERVAS - DIRECT / TREBICKA

1    Your Honor.

2        So this -- it's -- it's kind of counterintuitive.  It's

3    what made me look deeper.

4        So at a high level, Your Honor, column 3, Safari in its

5    default setting, more tracking protection.  Column 4, Safari

6    with tracking protection disabled, less tracking protection.

7        So naturally even a non-expert might expect more

8    transmissions to Google third-party services.  And what you

9    see here is a vastly reduced number of transmissions when

10   tracking protection is disabled.

11       So I started asking myself why is that.

12   **Q.**  And what did you find?

13   **A.**  I don't want to bore you with technical details, but in

14   the data that Dr. Shafiq produced, it's a standard format that

15   I can understand as well.  There is a specific field that

16   records how long it takes for a web page to load.  For

17   instance, ten seconds.

18       And as you can imagine, Your Honor, this might be useful

19   for web developers, right?  They want to make their websites

20   fast.

21       For the data corresponding to the test in the fourth

22   column, this field is missing.

23       Now there isn't much documentation to say why this is

24   missing.  But one plausible reason for this omission is that

25   the page not fully load.  And that coincides with the fact

1    that it's a secure transmission.

2    **Q.**  Let's move to the next slide.

3              (Demonstrative published.)

4         **THE WITNESS:**  So I know I have made many comparisons,

5    and I promise this is my last one.

6         But the comparison that happens directly in Dr. Shafiq's

7    report is column 1 versus column 4, both appearing in Table 3,

8    I believe, if my memory serves me right.

9         So what are we comparing here and what are we drawing

10   conclusions about browser-agnostics from?  Chrome in its

11   default setting, on the 8th of September versus Safari two

12   weeks later doing an incomplete page load.

13        So it's not whether the conclusions are right or wrong.

14   It's more that I would not use this data to support any

15   conclusion, Your Honor, because the data is broken.

16   **BY MS. TREBICKA:**

17   **Q.**  Dr. Zervas, you have tested the browsers with different

18   settings changed, right?  You testified to that.

19   **A.**  I have.

20   **Q.**  And are those user settings that the user can manipulate

21   or different types of settings?

22   **A.**  These are, yes, users control their browsers.  They can

23   enable or disable cookies.  They can install extensions and so

24   on and so forth.

25   **Q.**  And have you also had occasion to review and understand

1    better the types of user settings that various browsers have

2    offered over the years?

3    **A.**    I have a slide for that.

4    **Q.**    Sixty-four.

5    **A.**    Sixty-four.  I'm so sorry.  I skipped over it.

6                       (Demonstrative published.)

7           **THE WITNESS:**  This, Your Honor, is a timeline of the

8    implementation of different tracking protection initiatives

9    that browsers have taken over the years.  It's not complete,

10   but it gives you sort of the big picture.

11        And there are two things that at least I take away from

12   the slide.  First of all, prior to the end of 2017, browsers

13   behaved more similarly with respect to tracking protection.

14        Then Apple, around the end of 2017, invented intelligent

15   tracking protection.  And then other browsers started making

16   changes to implement tracking protection features.

17        But when we talk about tracking protection, we have to

18   take the context of when.  Because this is -- this is -- this

19   is very novel technology, Your Honor.  This is something that

20   is happening right now.  And even something like the ITP, it

21   has many versions, for instance.  There isn't one version of

22   ITP.  Apple keeps updating that.

23           **THE COURT:**  And just so the court reporter knows,

24   you're saying ITP?

25           **THE WITNESS:**  I'm so sorry.  ITP, Intelligent

1    Tracking Protection.

2    **BY MS. TREBICKA:**

3    **Q.**   Is the Intelligent Tracking Protection that Apple

4    instituted in 2017 the same as the protection Apple offers in

5    its Safari browser today?

6    **A.**   As I hinted, because the service has evolved and there are

7    different versions, I don't recall the exact timeline.  And I

8    have not highlight that here, but there are differences for

9    sure.

10   **Q.**   And is any one browser that you're aware of and have

11   looked at offering the exact same protections in its default

12   settings today?

13   **A.**   No.  These tracking protection services are quite nuanced,

14   and, you know, they vary a lot from browser to browser.

15   **Q.**   Okay.  Let's move forward to Slide 80.

16   **A.**   Of course.  Oops.  What happened here?

17                    (Demonstrative published.)

18        **THE WITNESS:**  I'm so sorry.

19   **BY MS. TREBICKA:**

20   **Q.**   Let me ask you, have you had occasion to correct for any

21   of the flaws in Professor Shafiq's testing in your analysis?

22   **A.**   Yes.  And I want to be -- I don't want to be broad and

23   mischaracterizing the fault.  The specific fault is the

24   omissions in the data collection.  That's the one thing I

25   tried to correct.

 1        Excuse me.  You said Slide 84?

 2   **Q.**  Eighty.

 3        **MR. SCHAPIRO:**  Our technical operator can take over

 4   if you want to --

 5        **THE WITNESS:**  I'm good, thank you.  Just click the

 6   home button.

 7                  (Simultaneous colloquy.)

 8        **THE WITNESS:**  So I recollected, so just to give you

 9   some context, Dr. Shafiq did a test where he visited a page on

10   the *LA Times*.  I visited that same news article.  I recorded

11   videos of my testing.  I waited for the pages to fully load.

12   I did my testing twice on two separate days.  I don't make

13   comparisons across days, but I did the same test twice to see

14   that I get the same result within two days.  And I recorded a

15   similar flow of the categories of at-issue data that we were

16   discussing across these browsers.

17   **BY MS. TREBICKA:**

18   **Q.**  Why did you conduct the test twice?

19   **A.**  I conducted the test twice for robustness, if you will,

20   because as I mentioned, new sites, they change from day to

21   day.  One day you go, you see a video ad.  The other day you

22   go, you see a picture ad.  That might trigger different

23   numbers of transmissions to third-party services.

24   **Q.**  And what did you observe when you conducted this test?

25                  (Demonstrative published.)

 1              **THE WITNESS:**  So I want to walk you through, and I

 2      know it's a complex analysis, but let me just quickly set the

 3      stage.

 4          So what we have here, we have Dr. Shafiq's data which I

 5      have reason to believe is incomplete.  And then we have the

 6      data that I collected, what I took care to allow pages to

 7      fully load.

 8          In this particular test, first I'm looking at Dr. Shafiq's

 9      data, Your Honor, with whatever omissions it might -- it might

10      have.  And when I look at the categories of at-issue data, as

11      I understand them, four browsers in their default settings,

12      all of the transmissions happen.

13      **BY MS. TREBICKA:**

14      **Q.**  So let me stop here and ask you, given that you've

15      reviewed Dr. Shafiq's data and you've also collected your own

16      data and drawn analysis and conclusions from it, what are your

17      disagreements with Dr. Shafiq?

18      **A.**  Frankly, you know, it's quite simple.  We both recorded

19      communications from websites to third-party Google services.

20      And we both observed that communications of at-issue data

21      happen.

22          We present our analysis in a different way.  Our

23      methodology is different, Your Honor, if you will.  But I

24      believe my methodology here answers the question at hand,

25      whether these transmissions happen across browsers, which I

1    think speaks to the question of whether it's browser-agnostic.

2    **Q.**  So focusing on Slide 81, could you explain what it shows

3    and what the conclusion is -- or what data you analyzed and

4    what the conclusion is.

5    **A.**  I analyzed Dr. Shafiq's data from his visit to the *LA*

6    *Times* for browsers in their default settings.  I looked for

7    transmissions of at-issue data as I defined them in my work.

8    And in all cases, those transmissions happened as indicated by

9    the checkmarks that you see on the slides.

10   **Q.**  And if we move to the next slide, Slide 82 --

11                    (Demonstrative published.)

12   **BY MS. TREBICKA:**

13   **Q.**  -- could you explain what data is analyzed and what the

14   conclusion is?

15   **A.**  Yes.  This is not a methodology that I endorse.  But I was

16   curious to see -- you know, I -- you cannot say someone makes

17   a mistake without checking your own work.

18       So when I collected my own data, I wanted to see the

19   volume of transmissions for categories of at-issue data as

20   Dr. Shafiq defines them are more similar than I -- what I had

21   seen in Dr. Shafiq's collection.  And indeed these numbers are

22   broadly similar with a couple of exceptions.

23   **Q.**  And I noticed that first-party cookies does not appear in

24   any of the rows in the first column.  Why is that?

25   **A.**  The simple answer is because this is the matter of view

1   that Dr. Shafiq takes in his report.  He analyzes specifically

2   third-party cookies but not cookie values as they appear in --

3   in the list of at-issue data.

4   **Q.**  And if we were to include a row here that allows for

5   first-party cookies, what would that row show?

6   **A.**  It would show non-zeros for all browsers.

7   **Q.**  What in your estimation or opinion has caused the numbers,

8   the volumes, the numbers of transmissions in Dr. Shafiq's data

9   to be disparate when you compare Chrome to other browsers

10   versus what it shows here which is that the numbers are

11   comparable?

12                   (Demonstrative published.)

13        **THE WITNESS:**  I think it goes back to two things that

14   we discussed.  One I suspect is the testing being done two

15   weeks apart in certain cases.  And the other one is incomplete

16   recording of certain data sets, not waiting for pages to load.

17   **BY MS. TREBICKA:**

18   **Q.**  Understood.  And that goes back to the puzzle piece, just

19   so that I have it in my mind?

20   **A.**  That's one way to think about it.  Certain pieces of

21   puzzle were missing and the picture was not completely --

22   **Q.**  Let's next move to the next slide, 83.  Could you tell the

23   Court what you have analyzed, what data set and what it shows?

24                   (Demonstrative published.)

25        **THE WITNESS:**  So again, Your Honor, now I'm looking

1    at Dr. Shafiq's data and I'm applying my methodology.  And I

2    compare Chrome to other browsers configured to behave a bit

3    more like Chrome.  And in all instances, I observed the

4    transmissions of at-issue data to Google third-party services.

5    **BY MS. TREBICKA:**

6    **Q.**  And if we move on to the next slide, 84, what have you --

7    what have you analyzed and what does it show?

8                    (Demonstrative published.)

9            **THE WITNESS:**  Now, Your Honor, I'm going back to my

10   data set.  And I'm not doing that to confuse anyone.  I'm

11   doing it because the counts in Dr. Shafiq's data I think are

12   incorrect.

13       So when I look at counts, as Dr. Shafiq prefers, and I

14   look at the categories of at-issue data as he defines them,

15   broadly the picture is the same except, of course, for

16   X-Client Data which is not transmitted by other browsers.

17   **BY MS. TREBICKA:**

18   **Q.**  And moving on to the next slide, 85, same exercise.  Will

19   you please tell us which data set you've analyzed and what the

20   conclusions are?

21                   (Demonstrative published.)

22           **THE WITNESS:**  So again I'm looking at Dr. Shafiq's

23   data.  And in this particular case, I'm comparing Chrome with

24   third-party cookie enabled, so third-party cookies are blocked

25   to other browsers in their default configurations.

1    And you know, by now this is a familiar picture.  You can

2    see that the categories of at-issue data are transmitted for

3    all browsers in their respective configurations to Google

4    third-party services.

5    **BY MS. TREBICKA:**

6    **Q.**  And the next slide, could you please explain to us what

7    data set and what conclusion.

8                    (Demonstrative published.)

9        **THE WITNESS:**  I promise I think that's the last one I

10    have on that analysis.  So here I have used the corrected

11    counts that I collected, my own data set, Your Honor.

12    And again, the takeaway from all these numbers is that

13    when you fix the data collection and you make this comparison,

14    the numbers appear far more similar than what might have been

15    indicated in the report that I read.

16    **BY MS. TREBICKA:**

17    **Q.**  So now we've looked at three different comparisons.  All

18    browsers in default mode.  Chrome in default with other

19    browsers' protections removed or disabled.  And thirdly,

20    Chrome with third-party cookie blocking on and the browser's

21    in default mode.

22    What do these three comparisons tell you?

23                    (Demonstrative published.)

24        **THE WITNESS:**  I would add one more comparison, that

25    we have looked at both with data I collected and data

1   Dr. Shafiq collected.  And when you look at those data sets,

2   you arrive at the conclusion that the transmissions of these

3   categories of at-issue data happen regardless of what browser

4   you might be using.

5       And it goes back to your point about what is my

6   fundamental disagreement with Dr. Shafiq.  In a sense things

7   of commonality, we observe those same transmissions, but our

8   data collection methodology are different.

9   **BY MS. TREBICKA:**

10  **Q.**  Now what would happen if a browser, in its default mode,

11  blocked all transmissions to any Google domain?

12      We can look at Slide 89 perhaps.

13                  (Demonstrative published.)

14          **THE WITNESS:**  Of course.

15      Well, obviously those transmissions would not happen, but

16  the material consequence that a user using a website that

17  utilizes Google services would be that these Google services

18  would not appear on the page.  They would not work.

19      An example is I told you that I started consumer reviews.

20  I've used Yelp a lot.  So here I'm showing you Yelp.  It shows

21  you restaurant reviews for both the restaurants and a map of

22  Boston so you can find those restaurants.  That's on the left.

23      If I block transmissions to Google, the map will not

24  render and you will not be able to see those -- the location

25  of those restaurants, which is what Yelp intended you to see.

 1   BY MS. TREBICKA:

 2   Q.  Are you aware of any browser that in its default mode

 3   blocks all transmissions to all Google domains?

 4   A.  No.  No.  Unless you're sitting behind a firewall that

 5   blocks transmissions to Google.  But the browser wouldn't do

 6   that, no.

 7   Q.  Let's move to the next slide.

 8       Obviously we know Chrome is manufactured by Google.  Are

 9   there any reasons that a Chrome browser will send

10   transmissions back to the manufacturer for reasons other

11   than -- or are there any -- are there reasons other than

12   communicating with Google for third-party services

13   transmissions that a browser may want to communicate with its

14   manufacturer?

15   A.  Of course.  A common reason is to receive security

16   updates, patches, upgrades to functionality.  So all browsers

17   and many pieces of software do that.

18                   (Demonstrative published.)

19   BY MS. TREBICKA:

20   Q.  And are you aware of other browsers, in their -- if you

21   use them not synced, sending transmissions back to their

22   manufacturer even when they are not visiting websites of that

23   manufacturer?

24   A.  Yes.

25       Your Honor, remember when you asked me why I'm telling you

1    that Microsoft makes Bing analytics and Google makes Google

2    Analytics and they also make browsers?  Now we have gotten to

3    the point where this is useful information.

4        So here in this example, I'm using on the top the Safari

5    browser manufactured by Apple to visit a site called Street

6    Food Maps that shows the location of food trucks.

7        As it happens, and this is a pure coincidence, this site

8    uses Apple Maps, not Google Maps.  And in this particular

9    case, one could say that Safari is sending data to Apple.

10       But, Your Honor, this is what we call -- in a lot of the

11   research that I do in economics and marketing, we care about

12   causation, not correlation.  We do not make policy

13   prescriptions or prescriptions for new drugs based on

14   correlations.  That would lead us astray.

15       This is a happenstance.  It happens to be that the

16   consumer is using Safari, and it happens to be that the site

17   chose to -- chose to use Google maps.  And then we count that

18   as a transmission of, you know, Safari sending data to Apple.

19   **Q.**  Did you conduct this test yourself, Dr. Zervas?

20   **A.**  Yes, if you can call it a test.  I went to the site, yes,

21   and I saw what transmissions happened.

22   **Q.**  Were you synced on the Safari server -- browser when you

23   did that?

24   **A.**  No, I was not.

25   **Q.**  And what is this next example?

1      (Demonstrative published.)

2          THE WITNESS:  It's the same story.  I don't want to

3   bore you with the details, but I'm using Edge to visit a site,

4   Subaru.  And as I recall it, they're using analytics provided

5   by Microsoft.  And again this is a coincidence, a

6   happenstance, a correlation.  In that case, Edge sends data to

7   Microsoft.

8   BY MS. TREBICKA:

9   Q.  And, Dr. Zervas, you may not have been in the courtroom,

10  but in the opening statements, plaintiffs' counsel referred to

11  link decoration.  Do you know what link decoration is?

12  A.  I have a definition I can offer.

13  Q.  Okay.  What is link decoration?

14  A.  So a link, first of all, is a URL that has a specific

15  structure that might appear on a page and you can click on

16  that.

17      Sometimes, this original link --

18          (Demonstrative published.)

19          THE WITNESS:  -- is modified --

20      And actually it's good that I moved the slide or someone

21  moved the slide.

22      It's modified to append something to the original URL.

23      So for instance, Your Honor, this memo equals long

24  gibberish, that is an instance of link decoration.

25          THE COURT:  Where?

 1            **THE WITNESS:**  It must be line 1, 2, 3, 4, 5, 6 where

 2    it says URL.

 3            **THE COURT:**  Yeah.  You can --

 4            **THE WITNESS:**  And can you see "memo" after the

 5    question mark, Your Honor?

 6            **THE COURT:**  You can circle it for me.

 7            **THE WITNESS:**  Oh, I can.  Let's see.

 8                    (Witness complying.)

 9            **THE COURT:**  Okay.  Great.

10            **THE WITNESS:**  So link decorations refers to the

11    practice of taking a link that has a specific structure, in

12    this particular case without all this memo stuff, and then

13    post-hoc adding that.

14    **BY MS. TREBICKA:**

15    **Q.**  Is Google the only entity that engages in link decoration?

16    **A.**  Here I'm showing you an example of link decoration from a

17    non-Google domain.  And just based on my professional

18    knowledge, this is fairly common practice for many services.

19    **Q.**  And is it a link decoration, is that a concept that's used

20    by websites, browsers, or third-party services?

21    **A.**  It's -- it's a term of art.  I'm not --

22    **Q.**  Let me re --

23    **A.**  Yes.

24    **Q.**  Let me make a better question.  That was not a good

25    question.

1        Who decides whether there will be link decoration or not?

2    Is it the browser, the website, or the --

3    **A.**  I understand your question.  Thank you for clarifying.

4        No.  That would be the third-party services or first-party

5    services, but not the browser in any instance.

6    **Q.**  Okay.  Let's move to the next slide.

7                    (Demonstrative published.)

8    **BY MS. TREBICKA:**

9    **Q.**  How common in the industry is link decoration?

10               **THE COURT:**  Mr. Garcia, will you clean the screen,

11   please.

12               **THE WITNESS:**  It's not something that I have measured

13   over time, but certainly it's something that I have

14   encountered more and more frequently.  It seems to be

15   prevalent.

16       And in fact, if you look at Apple's Intelligent Tracking

17   Protection guidelines, it recommends link decoration as a

18   method to do three [sic] important things for the web:

19   Analytics, which means understanding who comes to your site;

20   and ad retribution, which means when you click on an ad, Your

21   Honor, and then you buy something, was it the ad that caused

22   that?  That's very important for advertisers to know.

23       And this is what we use link decoration for in the case of

24   ad retribution.

25

1   BY MS. TREBICKA:

2   Q.   And why would Apple recommend link decoration when it

3   describes its Intelligent Tracking Prevention?

4        THE COURT:   I don't think he's qualified to tell me

5   about Apple's motive.

6        MS. TREBICKA:   May I ask a different question, Your

7   Honor?

8        THE COURT:   You may.

9   BY MS. TREBICKA:

10  Q.   Why would it become necessary to use link decoration in

11  the face of ITP?

12  A.   Because other -- there are many ways to achieve the same

13  goal frequently on the web.  And maybe ITP is not compatible

14  with other methods, but it is compatible with link decoration.

15  That's my guess, yes.

16       MS. TREBICKA:   And, Your Honor, I'm being told -- I

17  had missed this, but I'm being told that Dr. Zervas mistakenly

18  said Google Maps in reference to the slide 91.

19       THE COURT:   Yeah, I picked that up.

20       THE WITNESS:   Oh.  I'm so sorry.

21       MS. TREBICKA:   Thank you.  And let's correct it.

22  It's supposed to say Apple Maps.

23       THE COURT:   I -- that's what I understood.

24       MR. SCHAPIRO:   Thank you.

25       MS. TREBICKA:   Thank you, Your Honor.

1    **Q.**  So, Dr. Zervas, in conclusion, what do your tests and

2    analysis, how would you answer the Court's question?

3            **THE COURT:**  I have that as well.

4            **MS. TREBICKA:**  Okay.  Thank you, Your Honor.

5            **THE COURT:**  Can I ask -- thank you.

6        Is Professor Shafiq in the courtroom?

7            **MR. BARNES:**  Yes, Your Honor.

8            **THE COURT:**  Could you come up here, sir, please, for

9    a moment.

10       And I understand I'm going to hear from you later.

11       Mr. Garcia, will you put him under oath, please.

12           **THE CLERK:**  Just approach that microphone right

13   there.

14           **THE COURT:**  Raise your right hand.

15           **THE CLERK:**  Please raise your right hand.

16                        **ZUBAIR SHAFIQ**,

17   called as a witness by the plaintiffs, having been duly sworn,

18   testified as follows:

19           **THE CLERK:**  Thank you.  You may put your hand down.

20       Please state your full name into the mic and spell your

21   last name.

22           **WITNESS SHAFIQ:**  My full name is Zubair Shafiq.  The

23   last name is Shafiq, S-H-A-F-I-Q.

24

25

1
**EXAMINATION**

2          **THE COURT:**  Okay.  Professor, where are you a

3   professor?

4          **WITNESS SHAFIQ:**  I'm associate professor of computer

5   science at University of California Davis.

6          **THE COURT:**  Okay.  So I understand I will hear from

7   you and I understand you probably don't agree with everything

8   that the professor said here this morning, but I don't have

9   time to waste.

10      And so I do want to make sure that I understand or at

11  least confirm -- I received this morning, and you watched him,

12  what I would call was the 101, you know, explanation of how

13  the Internet works, right?

14      Would you agree with that?

15          **WITNESS SHAFIQ:**  The tutorial that Dr. Zervas gave --

16          **THE COURT:**  Yes.

17          **WITNESS SHAFIQ:**  -- was broadly correct.

18          **THE COURT:**  Okay.  So that tutorial, is there

19  anything about that tutorial portion that you would disagree

20  with?

21          **WITNESS SHAFIQ:**  The portions in the tutorial where

22  he was trying to assert like who decides to put source code

23  and how the browser chooses to execute that source code, I do

24  not agree with that.

25      So, for example, he mentioned that if a site uses Google

 1    Analytics, Google Analytics source code is served on the site.

 2    So the source code that is served on that site can be

 3    different based on the browser that the user uses, and

 4    Dr. Zervas tried to minimize that by saying those were trivial

 5    differences.  They were not.

 6         **THE COURT:**  Okay.  So let me back up.  His

 7    explanation of how a browser worked and how it requested

 8    websites, any objection to that portion of the tutorial?

 9         **WITNESS SHAFIQ:**  No.  That --

10         **THE COURT:**  Okay.  So that -- so we're not going to

11    argue about that, right?

12         **WITNESS SHAFIQ:**  Yeah.

13         **THE COURT:**  And his explanation about what domain

14    names are and IP addresses, none of that you disagree with,

15    right?

16         **WITNESS SHAFIQ:**  I do disagree with his -- some of

17    the comments he has made about cookies.  He has tried to lump

18    together first-party and third-party cookies, and I will

19    extensively talk about those differences.

20         **THE COURT:**  Okay.  In terms of the -- the

21    standardized set of rules, any objection to his statements

22    with respect to that?

23         **WITNESS SHAFIQ:**  So which standardized set of rules?

24         **THE COURT:**  HTTP, that it's a standardized set of

25    rules.

1    **WITNESS SHAFIQ:**  Yes, it is a standardized protocol.

2    **THE COURT:**  So we don't have to get into any of that,

3    right?

4    And do you agree or disagree that websites include a

5    variety of third-party services?

6    **WITNESS SHAFIQ:**  I agree.

7    **THE COURT:**  Okay.  So we don't have to --

8    **WITNESS SHAFIQ:**  Yeah, but there is a great

9    disagreement about the transmission of data due to the

10   inclusion of those third-party services across different

11   browsers.

12   **THE COURT:**  Okay.  Do you recall the slide that you

13   objected to?

14   **WITNESS SHAFIQ:**  I don't know the number of but one

15   of the slides he showed Google Analytics.  I don't know if

16   someone has -- Google counsel knows which slide.

17   **THE COURT:**  What was the point?  What was the point

18   he made --

19   **WITNESS SHAFIQ:**  He was showing that Google Analytics

20   source code that is downloaded on different browsers is nearly

21   identical.  It is not identical.  It is different.  And then

22   when --

23   **THE COURT:**  Do you know which slide he's talking

24   about?

25   **MR. BARNES:**  Yes.  He's --

```
 1              THE COURT:  Can you pull it up?

 2          WITNESS ZERVAS:  My screen is off, Your Honor.

 3              (Comments not heard by the reporter.)

 4              THE COURT:  Could you give him access back to his

 5    slide deck.

 6          My slides are not numbered so --

 7              MS. TREBICKA:  They should be numbered in the bottom.

 8          WITNESS ZERVAS:  Your Honor, it's here.  We have it

 9    on the screen.

10                      (Demonstrative published.)

11              THE COURT:  Okay.  Thirty-four.

12          WITNESS SHAFIQ:  And there was, I believe, a slide

13    right before this where he was showing Google Analytics.

14    Yeah, this and --

15          MR. BARNES:  Thirty-four.

16          WITNESS SHAFIQ:  There was a slide where it also said

17    Google Analytics specifically.

18                      (Pause in the proceedings.)

19              THE COURT:  Do you know which one?

20          WITNESS ZERVAS:  I know this one, I understand what

21    Dr. Shafiq is saying.  I'm not quite sure I understand the

22    other slide that he is referring to.

23              THE COURT:  All right.  Hold on.  He's looking.

24          WITNESS SHAFIQ:  Yeah, so this slide 21.

25              THE COURT:  Twenty-one and -- okay.
```

1              (Demonstrative published.)

2          **WITNESS SHAFIQ:**  This is the slide that was showing

3    that on Zappos there is a third-party service included Google

4    Analytics.

5          **THE COURT:**  Okay.  So this -- this -- this says that

6    most websites include a variety of third-party services.

7    Right?

8          **WITNESS SHAFIQ:**  Yes.

9          **THE COURT:**  Okay.  And I thought you said you agree

10   with that proposition.

11         **WITNESS SHAFIQ:**  Yeah, but what source code is

12   downloaded as a result of inclusion of that service and what

13   is the understanding of the transmission of data to, in this

14   case, Google's servers as a result of execution of that URL

15   that is mentioned, that explanation was incorrect.

16         **THE COURT:**  Okay.

17         **WITNESS SHAFIQ:**  In my opinion.

18         **THE COURT:**  What's your explanation?

19         **WITNESS ZERVAS:**  I don't think I mentioned any --

20         **THE COURT:**  Okay.  Then stop.

21      What do you think he -- so what is your -- what is your

22   understanding?

23         **WITNESS SHAFIQ:**  It is my understanding that when

24   users use different browsers to visit a site, let's say

25   zappos.com, which happens to include source code from Google

1    Analytics, the source code that is downloaded in the browser

2    is distinct.  The execution of that source code in different

3    browsers is different.  Different browsers execute that

4    different source code differently such that the transmissions

5    of user identifiers and browsing history information are

6    different across different browsers.

7            **THE COURT:**  And do you disagree with that?

8            **WITNESS ZERVAS:**  I -- I disagree with that, Your

9    Honor, because I -- I examined these transmissions, both using

10   my own data and Dr. Shafiq's data.

11           **THE COURT:**  Okay.  So what -- where do you -- what is

12   the basis of your opinion?  What -- what analysis have you

13   done to formulate that opinion?

14           **WITNESS SHAFIQ:**  In my report, there are extensive

15   tests that I have shown that these transmissions are

16   different.  For example, I don't know if Dr. Zervas had one of

17   the tables from my report that will be discussed later on

18   where I show that when Google Analytics -- when Google's

19   source code is executed on non-Google websites, there are no

20   transmission of cookie information to Google.  There are no

21   transmissions of IP address, user agent, and X-Client Data

22   Header from that browse -- from non-Chrome browsers to Google.

23           **THE COURT:**  Well, we know about the X-Client Data,

24   I'm sure we'll get -- somebody is going to explain it to me

25   later.  Everybody agrees that that's unique.  So -- right?

1    **WITNESS SHAFIQ:**  But I believe there are some

2    differences in opinions about why it is transmitted and

3    whether or not it is used by Google in its ad systems.

4         **THE COURT:**  On page -- somebody move it to 34.

5              (Demonstrative published.)

6         **THE COURT:**  Okay.  So what is the problem with this

7    slide from your perspective?

8         **WITNESS SHAFIQ:**  So in this slide when Dr. Zervas was

9    explaining this, he was -- he basically is not showing you the

10   full source code.  He said that there are, quote, unquote,

11   minor differences, I believe that's what he said.  And that is

12   incorrect.  He is trying to give the impression that the

13   source code is -- well, he says like nearly identical.  So I

14   think I disagree with his representation about the identical

15   nature of this.

16       And then the transmissions that result as -- as a result

17   of execution of this code in different browsers that are shown

18   in this slide, I also disagree with that.  I believe those are

19   incorrect.

20        **THE COURT:**  Okay.

21       All right.  Thank you, sir.

22        **WITNESS SHAFIQ:**  Yeah.

23        **THE COURT:**  All right.  Cross?

24        **MR. BARNES:**  Thank you, Your Honor.

25

<u>CROSS-EXAMINATION</u>

**BY MR. BARNES:**

**Q.**  Good morning again, Dr. Zervas.

     Can we put -- can we do tab B41 and place that on the

screen in a way that does not show -- Exhibit -- it's marked

Exhibit B41 in your tabs, Your Honor.  Google has stipulated

to its admissibility.  And if we could share a copy with

Google, we'll share a copy with Your Honor.

     And, Mr. Clerk, can you make sure at this point in time

that the -- those screens are not shown?

          **THE COURT:**  Not public.

          **THE CLERK:**  Yeah.

          **THE COURT:**  So --

          **THE CLERK:**  It's off.

          **THE COURT:**  Mr. Garcia, this is yours.  I have mine.

Thank you.

          **MR. BARNES:**  Your Honor, do you have the exhibit?

          **THE COURT:**  I do.  The operational plan?

          **MR. BARNES:**  Yes.  It says "Buyside 2020 Operational

Plan" at the top.

          **THE COURT:**  So you can, Mr. Garcia, it's fine for the

parties and if one of the -- if the law clerks, if you can

move those screens inward, then we can have --

     No, the jury screens.  If you can move them inward so that

they're not facing the public, then Mr. Garcia, you -- can you

1   put it on the jury screens or not?

2           **MR. BARNES:**  And, Your Honor --

3           **THE COURT:**  No?

4               (Court and Clerk confer off the record.)

5           **THE COURT:**  Okay.

6           **MR. BARNES:**  Just so you know, for Dr. Zervas I have

7   a couple, and that's it.  The rest will be exhibits that can

8   be public.

9           **THE COURT:**  Okay.  Go ahead.

10          **MR. BARNES:**  And can you place B41 on the screen now,

11  please?

12          **THE COURT:**  On the nonpublic screens.

13          **MR. BARNES:**  On the nonpublic screens.

14      Which, Mr. Clerk, it should show up on this screen; is

15  that correct?

16      Here we go.

17               (Demonstrative published.)

18  **BY MR. BARNES:**

19  **Q.**  Okay.  Dr. Zervas, in performing your testing, was your

20  goal to represent to the Court house browsers work in the real

21  world?

22  **A.**  My goal was to answer the Court's question which is

23  whether the collection of at-issue data is browser-agnostic.

24  **Q.**  And in terms of doing that report, were you trying to

25  answer that question for consumers who use browsers in the

 1   real world, real world consumers?

 2   **A.**   Real world consumers use Chrome, Firefox, Safari, and

 3   Edge.

 4   **Q.**   If you could turn to the second page.

 5        I'm sorry.

 6   **A.**   I do not see anything here, I'm afraid.

 7   **Q.**   I apologize.  We can hand you a copy of the exhibit.

 8            **THE COURT:**  You should be able to --

 9            **THE WITNESS:**  All right.  I can see it now.

10            **MR. BARNES:**  If you can go to page 2, Mr. Strong.

11        I'm sorry, Mr. Strong, it's page 3.  I have a double-sided

12   copy.

13   **Q.**   I'm going to circle (indicating) -- I'm going to circle

14   something here, Mr. Zervas.

15        (Exhibit published to witness, counsel, and the Court.)

16   **BY MR. BARNES:**

17   **Q.**   In reaching your conclusion that the browsers send the

18   same data to Google, did you consider the fact that Safari

19   accounts for, and because this is sealed, that number of

20   queries with the number shown there lacking cookies?

21   **A.**   What is the document, Mr. Barnes?  What are queries?  What

22   is the fraction?  What is the -- I -- can you give me some

23   context about those numbers?

24   **Q.**   Do you not understand what a query is on Google's -- in

25   Google's back-end systems?

ZERVAS - CROSS / BARNES

1    **A.**  It could be many things.  So for instance, when I visit

2    Google and I conduct a search, that's called a query.

3    **Q.**  Okay.  Let's go to the paragraph above.

4           **MR. BARNES:**  Your Honor, I don't know that the

5    paragraph above is the type of paragraph that should be sealed

6    from the public.  I'd like Mr. Zervas to read that paragraph

7    out loud.

8           **THE WITNESS:**  Mr. Barnes, to be clear, you're

9    referring to browser changes?

10   **BY MR. BARNES:**

11   **Q.**  Correct.

12   **A.**  Oh, thank you.

13        And --

14           **THE COURT:**  Go ahead.

15           **MR. BARNES:**  Any objection from Google?

16           **MR. SCHAPIRO:**  Sorry.  Where are we?

17           **THE COURT:**  It's the paragraph under the header of

18   Browser Changes.

19           **MR. BROOME:**  Oh.

20   **BY MR. BARNES:**

21   **Q.**  Can you read the paragraph, Dr. Zervas?

22   **A.**  Yes.

23        Reacting to end-user concerns, browsers have become more

24   restrictive with user data.  Starting with Apple's intelligent

25   tracking protection and now extending to Firefox's enhanced

1    tracking protection, usage of third-party cookies is becoming

2    increasingly challenging.

3              MR. BARNES:   Okay.  And in the next sentence, Your

4    Honor, may he read that sentence, or does Google object to the

5    next sentence being public?

6              MR. BROOME:   Without the numbers.

7              MR. BARNES:   Without the numbers, and we'll make a

8    record what the numbers are is Google's objection, Your Honor,

9    unless you want to overrule the objection to that.

10             THE COURT:   I don't.

11        What's the question?  I can read.

12             MR. BARNES:   I want to know if he considered whether

13   Safari is that percentage cookieless when it sends data to

14   Google.

15             THE WITNESS:   That was not relevant to the question

16   that we were asked to answer, Mr. Barnes, to the best of my

17   understanding.  And what I see here in fact coincides with

18   that timeline I presented earlier which shows that, yes, Apple

19   did intelligent tracking protection, later on Firefox, and

20   this is an ongoing landscape of ever-changing tracking

21   protections implemented across browsers.

22   BY MR. BARNES:

23   Q.  It's your testimony here today that it's not relevant to

24   whether the browsers are the same if the overwhelming majority

25   of Safari users do not have cookies transmitted to Google?

1    **A.**   Let's take this number, 96 percent lacking cookies.  First

2    of all, this is not a hundred percent.  So this shows that

3    Safari indeed sends cookies.

4         Second, here you're not really -- I'm lacking a bit of

5    context.  What cookies are we talking about?  You have

6    mentioned third-party cookies in your report, but we have also

7    examined cookie values.  So I hesitate to reach these broad

8    conclusions based on one sentence on deep technical topics

9    without -- I cannot reach that conclusion based on that,

10   Mr. Barnes.

11   **Q.**   And, Dr. Zervas, you didn't have any access to Google's

12   internal ad systems, did you?

13   **A.**   I did not, Mr. Barnes.

14   **Q.**   Dr. Zervas, you cannot tell the Court whether cookieless

15   traffic is treated differently by Google's ad systems, can

16   you?

17   **A.**   That -- I cannot tell the Court, but the Court, my

18   understanding is, did not ask that question.

19   **Q.**   And you cannot tell the Court whether cookieless traffic

20   from Safari leads to a situation where Google is not able to

21   build detailed user profiles over time and across different

22   websites, can you?

23   **A.**   Again, that was not my understanding of the question.  But

24   I also do not quite understand what you mean by detailed

25   users' profiles over time and what these things are.

1    **Q.**  And that's because you've not had any access to Google's

2    internal ad serving system and how those ad serving systems

3    are impacted by the data sent by different browsers, correct?

4            **MS. TREBICKA:**  Objection, Your Honor, asked and

5    answered.

6            **THE WITNESS:**  I did not collect --

7            **THE COURT:**  The clock is ticking.

8        Overruled.

9        You all are -- you're going to all run out of time.  I

10   guarantee you.

11           **MR. BARNES:**  Thank you, Your Honor.

12   **Q.**  What is enhanced tracking protection in Firefox?

13   **A.**  It's tracking protection.  So it blocks communications to

14   certain known trackers.

15   **Q.**  And ETP is the default in Firefox, correct?

16   **A.**  As far as I recall it, yes.

17   **Q.**  What percentage of Firefox users turn off ETP?

18   **A.**  I have not measured that, Dr. Barnes [sic].

19   **Q.**  Have you asked Google what percentage of Firefox users

20   turn off ETP?

21   **A.**  I did not, Mr. Barnes, because again it was not important

22   for me to know this figure in order to answer the question at

23   hand.  I had the basis and the support for my analysis in my

24   report and the data I produced to you.

25   **Q.**  On October 12th, you provided -- well, counsel provided

1    plaintiffs with screenshots of the Firefox settings you tested

2    in the first round of your testing, correct?

3    **A.**  I do not recall the date, but I take your word for it,

4    Mr. Barnes.

5         **MR. BARNES:**  Can we show the Firefox screenshot?

6    Your Honor, this is a rebuttal exhibit.  It was not

7    exchanged until October 12th by Google.

8    -- could provide Google with a copy.

9                   (Demonstrative published.)

10   **BY MR. BARNES:**

11   **Q.**  Dr. Zervas, is this a fair and accurate representation of

12   the screenshot that you provided to plaintiffs showing how you

13   changed the Firefox settings in order to manipulate the

14   browsers to make them work similarly?

15   **A.**  You're referring to all the testing we conducted today,

16   right?

17   **Q.**  Well, you didn't conduct it today.  It was what --

18   **A.**  Sorry, the test -- my apologies.  The testing we're

19   discussing today.

20   **Q.**  Correct.

21   **A.**  Thank you.

22        For specific tests, that was the configuration.  But it --

23   to be clear, that's not the only configuration of Firefox that

24   I tested.

25             **MR. BARNES:**  Okay.  Can we go to the second page.

1          (Demonstrative published.)

2    BY MR. BARNES:

3    Q.  In order -- Dr. Zervas, you would agree that in order to

4    get to that custom setting, you'd have to first move the

5    browser off the standard setting, correct?

6    A.  That's correct.

7    Q.  Is this page 2 of this exhibit a fair and accurate

8    representation of the standard setting in Firefox?

9    A.  To the best of my recollection and at least in recent

10   versions, yes, it is.

11   Q.  And so in order to do your testing to normalize the

12   browsers by manipulating the settings, you would have -- you

13   had to turn off the setting that says it is our most powerful

14   privacy feature ever, to move to a less protective setting,

15   correct?

16   A.  Mr. Barnes, to change settings, I had to change them, yes,

17   I changed that setting.

18   Q.  And in order to get the results that you presented to the

19   Court, you had to change the settings of the Firefox browser,

20   didn't you?

21   A.  That's not accurate, Mr. Barnes.  I did not have to do

22   that.  I did that to provide a thorough analysis.  And I also

23   provide tests where I do not change the settings.  What --

24       May I continue, Your Honor?

25          MR. BARNES:  I --

1          **THE WITNESS:**  Or not?

2          **THE COURT:**  No.  Do we have hard copies of that?

3          **MR. BARNES:**  I believe that it was -- was it handed

4     up?  I apologize, Your Honor.  And --

5          **THE COURT:**  Okay.  Could you hand it to my law clerk,

6     please.

7          **MR. BARNES:**  And while that is being handed up, I'd

8     like to move that tab B41 be admitted as Exhibit 1.

9          **THE COURT:**  No.  B41 --

10         **MR. BARNES:**  That was the previous witness.

11         **THE COURT:**  B41 is admitted as B41.

12         **MR. BARNES:**  Oh, okay.  Then we'll admit it as B41.

13         **THE COURT:**  No.  I'll admit it.

14         **MR. BARNES:**  You'll admit it as B41.  Thank you, Your

15    Honor.

16         How would you like me to number this screenshot as an

17    exhibit?

18         **THE COURT:**  It will be next in order, whichever --

19    and I was looking at your -- I don't know what your A, B's and

20    C's, D's, E's stand for.  So we'll just be -- we'll call it

21    B153.

22         **MR. BARNES:**  B153.  I move that Exhibit B153 be

23    admitted into evidence, your Honor.

24         **THE COURT:**  Admitted.

25

1          (Plaintiffs' Exhibit B153 received in evidence.)

2              **MR. BARNES:**  Thank you.

3      We can turn the public screens back on.

4      Mr. Strong, can we go to Slide 69 of our -- sorry -- 59 of

5  the Zervas report?

6              **THE COURT:**  I don't know what that is.

7              **MR. BARNES:**  It's the Zervas slides that Google just

8  used.

9                  (Demonstrative published.)

10  **BY MR. BARNES:**

11  **Q.**  Dr. Zervas, you testified earlier that Dr. Wilson, one of

12  the named plaintiffs in this action, that you saw evidence

13  that she was using Firefox on YouTube which is a Google-owned

14  and operating -- operated site, correct?

15  **A.**  That's correct.

16  **Q.**  And yet when you tested -- when you examined the named

17  plaintiff data produced by Google, there was no Firefox data

18  at all corresponding with Dr. Wilson from non-Google websites,

19  correct?

20  **A.**  I examined the GAIA key data, and I could not see any GAIA

21  key data corresponding to Firefox and visiting non-Google

22  properties.

23  **Q.**  And for Dr. Wilson, in fact, there was no Firefox data at

24  all that you could identify, correct?

25  **A.**  I think we mentioned that I saw a visit to YouTube.

1    **Q.**  Correct, on non-Google websites.  Thank you, Dr. Zervas,

2    you're correct.  On non-Google websites, though, there was no

3    Firefox data at all, correct?

4    **A.**  Not that I could see.

5    **Q.**  Okay.  Did you count the number of entries of named

6    plaintiff data that Google produced?

7    **A.**  It was 80 gigabytes.

8    **Q.**  Did you review the Shafiq rebuttal report?

9    **A.**  Of course.

10   **Q.**  And did you review paragraph 71A of the Shafiq rebuttal

11   report?

12          **MR. BARNES:**  If we could put the Shafiq rebuttal

13   report on the screen, please, paragraph 71A which is at

14   page 31.

15          **THE COURT:**  I don't know what exhibit that is.

16          **MR. BARNES:**  That is exhibit --

17          **THE COURT:**  I tell you what we're going to -- we've

18   been on the record two hours.  So we're going to go ahead and

19   take a break because my court reporter needs a break.

20       We'll stand in recess for 15 minutes.

21       (Recess taken at 10:34 A.M.; proceedings resumed at

22   10:46 A.M.)

23          **THE COURT:**  Okay.  Let's go back on the record.

24       Mr. Barnes, you can proceed.

25          **MR. BARNES:**  Thank you, Your Honor.

1          I've -- we have Exhibit C4 is on the screen.

2          Does Your Honor have a copy of C4?

3               **THE COURT:**  I do.

4               **MR. BARNES:**  Okay.  If we could go to paragraph 71

5     which is on page 31, Mr. Strong.

6                    (Demonstrative published.)

7     **BY MR. BARNES:**

8     **Q.**  Dr. Zervas, you testified just before the break that you

9     did review the Shafiq rebuttal report.

10    **A.**  Yes, I did.

11    **Q.**  And you understand that in the Shafiq rebuttal report,

12    Dr. Shafiq also analyzed the named plaintiff data which Google

13    produced in this action pursuant to the plaintiffs' request

14    that Google produce all data in its possession relating to the

15    named plaintiffs, correct?

16    **A.**  Yes.  And I remember those numbers here that you're

17    showing me, the 192,000 for instance.

18    **Q.**  Do you have any reason to dispute the numbers that

19    Dr. Shafiq put in his report about the analysis of named

20    plaintiff data?

21    **A.**  I did not count that number myself.  I found some

22    discrepancies in other numbers, but let's say this number is

23    correct.

24    **Q.**  Okay.

25               **MR. BARNES:**  Can we show Exhibit B62, please.

```
1                        (Exhibit published.)

2                     (Pause in the proceedings.)

3    BY MR. BARNES:

4    Q.   What is DoubleClick.net?

5    A.   A domain name.

6    Q.   And is the domain controlled by Google?

7    A.   It's owned by Google.

8    Q.   Okay.

9            MR. BARNES:   Can you go down where it says, "Risks,"

10   and the second bullet point, if we could blow that second

11   bullet point up, please.

12                       (Exhibit published.)

13   BY MR. BARNES:

14   Q.   Can you describe for the Court what GKS web traffic is?

15   A.   (Reviewing document.)

16       I forget what the acronym GKS stands for.

17   Q.   In determining whether Google services were

18   browser-agnostic, then, you had no consideration of the

19   percentage of GKS web traffic that DoubleClick, which is

20   Google's ads division, receives from Chrome?

21   A.   You can remind me, if you want, what the acronym stands

22   for so I can give you more informed answer.  But frankly, I

23   don't think the answer matters because it doesn't affect my

24   testing.  In all cases, I observed transmissions of the

25   categories of at-issue data to Google.  This is a percentage
```

1    as I understand it.

2    Q.  It's not relevant that the overwhelming majority of web

3    traffic that Google is able to associate with a Google user's

4    account identifier comes from Chrome rather than any other

5    browser?

6            MS. TREBICKA:  Objection, assumes facts.

7                (Clarification by the Court Reporter.)

8            THE COURT:  Overruled.

9        Mr. Garcia, if you could turn my mic on.

10           THE CLERK:  There you go.

11           THE COURT:  Thank you.

12           THE WITNESS:  I'm sorry.  Can you repeat the

13   question, Mr. Barnes.

14   BY MR. BARNES:

15   Q.  Sure.  Your testimony is it's not relevant to your opinion

16   that the overwhelming majority of web traffic that Google

17   receives and associates directly with users' Google accounts

18   comes from Chrome rather than other browsers?

19   A.  So that number that you highlighted does not affect the

20   conclusions that I reached through my independent testing.

21       Moreover, from what I understand you're telling me, and

22   I'm lacking broader context here, I think, you're saying that

23   a lot of Chrome traffic is associated with the Google account

24   which to me is not very surprising because Chrome users are

25   likely to have Google accounts.  Is that what you're saying?

ZERVAS - CROSS / BARNES

1    I'm --

2    **Q.**  And --

3    **A.**  -- confused.

4    **Q.**  And non-Chrome traffic is not associated by Google with

5    Google accounts, correct?

6    **A.**  It can be if you have a Google account.  But if you're a

7    Microsoft Edge user, you usually have a -- what is it called,

8    a Windows account.

9    **Q.**  Dr. Zervas, do you agree that Chrome does not block

10   third-party cookies in its normal operations?

11   **A.**  In the versions of Chrome that I tested in default

12   settings, third-party cookies are not blocked, Mr. Barnes.

13   **Q.**  And what percentage of Chrome users change their

14   third-party cookie settings?

15   **A.**  I do not know the answer to that question, Mr. Barnes.

16   **Q.**  Do you remember submitting a report on class certification

17   in this case?

18   **A.**  Are you referring to my rebuttal to Dr. Shafiq?

19   **Q.**  Well, let me ask this.  Did you review reports submitted

20   by Mr. Richard Smith in this case relating to class

21   certification?

22   **A.**  I did review reports by, yes, both Dr. Smith and

23   Dr. Shafiq.

24   **Q.**  Do you recall that Dr. -- that Mr. Smith identified that a

25   tiny percentage of Chrome users block third-party cookies?

1    **A.**  How was that measurement done, Mr. Barnes, by Mr. Smith?

2    I don't -- I don't recall that exact fact.  It seems like

3    something very difficult to measure for someone like me.

4    **Q.**  Because you don't have access to Google's internal

5    systems, correct?

6    **A.**  Potentially, yes.  I don't know what I would find in

7    Google's internal systems that may or may not answer that

8    question.  But through the testing that I did, it doesn't

9    speak to the question that you're asking me to answer.

10            **MR. BARNES:**  Your Honor, to avoid the sealing issue,

11    the section of the report to which I refer, it's at

12    docket 482-13, paragraph 13, citing a Google document with the

13    Bates number CABR04263403 that identifies that only a

14    de minimis number of Chrome users change the default settings.

15            **MS. TREBICKA:**  Your Honor, we'd like to see the

16    document.  We don't have that.

17            **THE COURT:**  So --

18            **MR. BARNES:**  It's --

19            **THE COURT:**  I don't under -- I don't know what the

20    point of it was.  But keep moving.

21            **MR. BARNES:**  Yes, Your Honor.

22    **Q.**  Who is Raymond Hill?

23    **A.**  Sitting here right now, I don't recall that name.

24    **Q.**  Do you know a Raymond Gorhill?

25    **A.**  Same answer.

ZERVAS - CROSS / BARNES

1    **Q.**   Okay.

2        How do you enable Intelligent Tracking Prevention in

3    Chrome?

4    **A.**   You mean in Safari?

5    **Q.**   No.  I mean in Chrome.  How can a user make Chrome work

6    like Safari by enabling Intelligent Tracking Prevention in

7    Chrome?

8    **A.**   This would be impossible because Chrome doesn't have

9    something called Intelligent Tracking Protection.  But I think

10   what you're asking is how you can make it behave more similar

11   to something like intelligent tracking protection.  And I

12   showed you on example on my slides that would be uBlock

13   Origin, for instance.

14   **Q.**   Okay.  Can we go to Slide 69?

15                    (Demonstrative published.)

16   **BY MR. BARNES:**

17   **Q.**   I think you testified earlier you weren't sure, some

18   people call it uBlock, some people call it Show Block.

19   **A.**   No.  Nu.  Nu as in the Greek letter.  NuBlock.

20   **Q.**   NuBlock.  Okay.

21        What is uBlock Origin?

22   **A.**   It's an extension.

23        An extension, Your Honor, is just -- I think I said that

24   an app or a small piece of software that you can install on

25   your browser to extend its functionality.

1    **Q.**   It's not owned by Google, correct?

2    **A.**   As far as I know, no.  But, yes.

3    **Q.**   And uBlock Origin is not a Chrome setting, correct?

4    **A.**   It provides settings within the Chrome browser.  So uBlock

5    Origin has settings.  You open Chrome, you open uBlock Origin,

6    and you can configure it to alter features.  If you want to

7    make it look like ITP, you can click buttons and change it to

8    make it look like ITP.

9    **Q.**   Dr. Zervas, there is no way for a Chrome user, through the

10   Chrome settings, to get to uBlock Origin, correct?

11   **A.**   That's not how you get to any extension, Mr. Barnes.

12   **Q.**   Right.  Because it's not part of the settings of the

13   Chrome browser.  uBlock Origin is a separate thing from the

14   Chrome browser, correct?

15   **A.**   That's why it's called an extension.

16   **Q.**   Okay.  And in order to get Chrome to operate similarly to

17   Safari, Firefox, and Edge, you had to go outside of the Chrome

18   browser and install an extension that is not owned or operated

19   by Google, correct?

20   **A.**   No.  Mr. Barnes, you're making broader statement than I am

21   comfortable with.  Because what you're saying is you want to

22   make Chrome behave like ITP in Safari.  Not other browsers.

23   In general, browsers are different.  ITP has changed.

24   Different users use different settings.

25        So if you want to tell me a specific set of behaviors that

1    you want me to accomplish through Chrome, I can try to do

2    that.

3        But a broad assertion of making something, you know, the

4    same do ITP, I'm not -- I'm not sure what this --

5                    (Simultaneous colloquy.)

6    **BY MR. BARNES:**

7    **Q.**  And so in order to reach the conclusions you reached, you

8    have to manipulate what's going on in the browsers, correct?

9    **A.**  No, that's not correct.  In order to perform my tests,

10   some tests rely on changing settings.  For these tests to be

11   accurate, the settings have to be changed.

12       My conclusions rely on all of my tests that I performed.

13   And some tests use default settings.

14       In fact, when we did that animation, Your Honor, where I

15   went back and forth to compare default settings across

16   browsers, that comparison also exists in my slides.

17       So my conclusions do not rely on manipulating a setting.

18   My conclusions rely on the measurements I performed.

19   **Q.**  If we were measuring emissions from an automobile, do you

20   think it would be okay to change the settings in the car away

21   from its normal operations to compare it to other cars?

22   **A.**  Can you repeat that, Mr. Barnes?  I'm --

23                    (Simultaneous colloquy.)

24   **BY MR. BARNES:**

25   **Q.**  If we were comparing emissions from an automobile, would

1    it be acceptable to say, "Oh, these cars are the same because

2    in this car, you can -- you can manipulate how the car works.

3    And if you manipulate how the car works in its normal -- away

4    from its normal operation, it will work like this other car"?

5    **A.**   I'm -- okay, let's take a step back.  The only analogy I

6    can see between cars and browsers is that both of them can

7    have third-party parts, you know, Pirelli tires on a BMW car.

8    And also they can have extensions.  I'm not a fan of cars.  I

9    drive a very old car.  But I know people who tweak their cars.

10   And that can increase miles per gallons.  It can change

11   emissions.

12       So if two cars have the same emissions, they have the same

13   emissions.  That's how I can answer your question.

14   **Q.**   And in order for you to get these cars to have the same

15   emissions, you had to go outside of the car manufacturer and

16   install something on the browser that's not even a Chrome or a

17   Google product, correct?

18   **A.**   We now -- I'm -- I'm struggling a bit because now we

19   mentioned both cars and browsers in the same question.  Can

20   you please repeat that?

21   **Q.**   Let's move on.

22          **MR. BARNES:**   If we could go to Slide 52, please.

23                 (Demonstrative published.)

24   **BY MR. BARNES:**

25   **Q.**   Your Slide 52 shows the page you used to upload uBlock

1    Origin, correct?

2    **A.**   Not to upload.  It's an illustration, it's a graphic.

3    **Q.**   Understand.  To install uBlock Origin?

4    **A.**   To install uBlock Origin, you would click that "add to

5    Chrome" button, if that's --

6    **Q.**   Great.

7            **MR. BARNES:**  Can you distribute uBlock 1, please?

8                    (Pause in the proceedings.)

9            **MR. BARNES:**  And can we show uBlock 1 on the screen,

10   please?

11                   (Demonstrative published.)

12           **MR. BARNES:**  Your Honor, do you have a paper copy of

13   it?

14           **THE COURT:**  I do not.

15           **MR. BARNES:**  Okay.  If we could -- Mr. Strong, if you

16   could blow up the bottom right corner of the screen.

17                   (Exhibit published.)

18   **BY MR. BARNES:**

19   **Q.**   I'll ask you again, Dr. Zervas, who is Raymond Hill?

20   **A.**   Ah.  Based on what you -- can you please go back.

21       Ah, it says offered by.  So I think it was on the bottom

22   right, presumably the person who coded uBlock Origin.

23   **Q.**   Why should a Chrome user, in order to make Chrome operate

24   similarly to Safari, have to trust some person named Raymond

25   Hill and his browser extension?

ZERVAS - CROSS / BARNES

1    **A.**   For the same reason, Mr. Barnes, that we trust people like

2    Lin Torvalds who wrote Linux to run mission critical systems

3    like real time systems that we, you know, our lives depend on

4    because probably he's a very good programmer that people

5    trust.

6        Moreover, I have a lot of expertise in reputation systems.

7    So it's true, there can be quality uncertainty.  This is a

8    fundamental thing in economics.  How do we resolve quality

9    uncertainty in those instances?  One way is by reading reviews

10   for these extensions and ratings.  And people, for reporting

11   abuse, as the button shows.  And it seems to me that this is a

12   respectable extension.

13   **Q.**   So in order to make the Chrome browser work like the other

14   browsers, a user has to install this extension, do a

15   research -- do some research on this Raymond Hill guy, and

16   determine whether they can trust Raymond Hill, and then make

17   the decision to do so?

18   **A.**   Frankly, I don't think any user of uBlock Origin has done

19   any research on Raymond Hill.  As I mentioned, people would go

20   and read reviews of that extension from other consumers

21   because, Mr. Barnes, when I go to a restaurant, I don't ask

22   the chef if the food is good.  I go to Yelp to read reviews.

23   **Q.**   Where in the Chrome privacy notice does it say in order to

24   make Chrome act as privacy protective as Safari or Firefox,

25   you need to install a browser extension from a guy named

1    Raymond Hill?

2    **A.**   I have not noticed those words in any privacy policy.

3    But, again, I think we need to be slightly more -- I would

4    prefer for my own comfort to be a bit more precise,

5    Mr. Barnes.

6         You're saying to make Chrome be like Safari, and this is

7    sort of a broad statement.  There are different configurations

8    of Chrome, different configurations of Safari, different

9    versions.

10         So, for instance, you have presented -- I'm sorry, not

11    you.  Dr. Shafiq presents in his tables are all about

12    third-party cookies.  That seems to me that somehow it's an

13    important category for this case, right?

14         For third-party cookies, you don't need an extension.  You

15    go to the settings, you check a box, and you can enable or

16    disable them.  So it depends on what the goal, the specific

17    goal you want to accomplish is, Mr. Barnes.

18    **Q.**   Dr. -- Dr. Zervas, you agree that blocking third-party

19    cookies in Chrome does not get anywhere near to the privacy

20    protections offered by Intelligent Tracking Prevention,

21    correct?

22    **A.**   This is -- it would be misleading for me to either agree

23    or disagree with the statement.

24         Let me give you an example.  To the best of my

25    understanding, for instance, ITP, Your Honor, and that's

1    something that many people do not know, it allows some

2    third-party cookies.  So when I block third-party cookies

3    completely in Chrome, the behavior is perhaps more restrictive

4    with respect to third-party cookies.

5    **Q.**  But there are other -- there are at least nine other

6    functions in ITP that offer privacy protections that blocking

7    third-party cookies in Chrome won't offer, correct?

8    **A.**  I haven't counted them, Mr. Barnes.

9            **MR. BARNES:**  Ms. Paulson, can you distribute

10   uBlock 2, please.

11       And can we put uBlock 2 on the screen?

12       Let me back up.

13   **Q.**  Is uBlock 1 a fair and accurate representation of what the

14   install screen looks like for the uBlock Origin extension?

15   **A.**  The previous one where you say "ad," not this additional

16   information thing.

17   **Q.**  The one that's not blown up.  Okay.  Thank you.

18           **MR. BARNES:**  I'd offer uBlock 1 into evidence as

19   B140 --

20           **THE COURT:**  154.

21           **MR. BARNES:**  154.  Thank you, Your Honor.

22           **THE COURT:**  154 is admitted.

23       (Plaintiffs' Exhibit 154 received in evidence)

24           **MR. BARNES:**  Can we put uBlock 2 on the screen,

25   please.

1                  (Exhibit published.)

2    BY MR. BARNES:

3    Q.   Dr. Zervas, when you click to install the uBlock Origin

4    browser to Chrome to make it work more like Safari and

5    Firefox, was there a pop-up that showed up on your screen?

6    A.   Yes.  As I recall it, yes.

7    Q.   Is this a fair and accurate representation of the pop-up

8    that showed up on your screen?

9    A.   To the best of my recollection, but I have provided videos

10   of my tests.

11   Q.   And so in the process of installing this extension not

12   owned by Google, controlled by some guy named Raymond Hill,

13   Chrome encourages users to turn on sync.

14   A.   I struggle with the phrasing "controlled by Raymond Hill"

15   because let me explain a bit how these extensions work.

16        So these extensions, they're meant to block certain

17   transmissions to known trackers.  And usually it's not some

18   guy name of Raymond Hill who decides what these trackers are.

19   The most important aspects of these extensions, and I have

20   studied another one deeply in my research, Adblock Plus, they

21   have this so-called white list and black list that are things

22   that should be allowed communication to or stop communication

23   to.

24        And a lot of these lists -- and I think it's important to

25   know that they're crowd sourced.  There are many people on the

1    web who can contribute to those lists.

2        So when you say "controlled by Raymond Hill," I think

3    that's not entirely accurate.  There are many pieces that come

4    together for this extension to work.  And a lot of these

5    pieces are provided by the public.  So I think it's important

6    to acknowledge that.

7        And I think in the paper that you asked me about that we

8    discussed in my deposition or something, I have studied those

9    extensions, Mr. -- Mr. Barnes.

10   **Q.**  So, Dr. Zervas, who does control uBlock Origin then?

11   **A.**  I think I answered that question, Mr. Barnes, so what's

12   his name --

13                    (Simultaneous colloquy.)

14   **BY MR. BARNES:**

15   **Q.**  Can you name any specific -- you said you weren't sure it

16   was really Raymond Hill.  Can you name any other specific

17   entity that controls uBlock Origin?

18   **A.**  I believe the public, like you and I can go and make

19   suggestions and contributions to amend the white lists or

20   things that are permitted, or black lists which are things

21   that would be blocked.  I'm not sure if they're called that

22   but, yeah.

23   **Q.**  Okay.  Let me get back to my original question.  When you

24   installed the uBlock Origin, you agree that the Chrome browser

25   puts a pop-up up that encourages you to turn on sync, correct?

1    **A.**    Whether it encourages you or not is, you know, a question

2    I think for my colleagues who study psychology, there is a

3    button.

4    **Q.**    Okay.  Are you aware that Chrome recently announced

5    changes to extensions in something called Manifest V3?

6    **A.**    Not right now, I'm not.  This doesn't ring a bell right

7    now.

8    **Q.**    Are you aware that Manifest V3 would disable uBlock

9    Origin?

10    **A.**    What do you mean by disable, Dr. -- Mr. Barnes?

11    **Q.**    Are you aware that there are reports that Manifest V3 from

12    Chrome will make it so that uBlock Origin does not work

13    anymore?

14    **A.**    Can it be made to work?  Or is that like -- because

15    sometimes I upgrade my computer, an old version of a program

16    that I have, doesn't work, and then I get a new version.  Is

17    that the situation we're describing?  Or is that just --

18    **Q.**    Is it safe to say you're not aware of any such reports?

19    **A.**    That -- that would be safe to say.  I have not seen

20    anything that says uBlock Origin is disappearing from Chrome.

21    **Q.**    Okay.

22        **MR. BARNES:**    Can we go to Slide 7 of the Google

23    Zervas results?

24    Your Honor, Google provided a second round of testing

25    results from Dr. Zervas on Thursday, the 20th.  We analyzed

1    that.  We created slides for it.  We provided those yesterday

2    to Google.

3    **Q.**  Dr. -- Dr. Zervas, have you had the opportunity to see

4    those slides?

5    **A.**  Briefly, Mr. Barnes.

6    **Q.**  And, Dr. Zervas, we were working as fast as we could.  We

7    got the -- we got the information at the end --

8    **A.**  I'm not talking -- I didn't mean for this to sound as a

9    complaint.  I appreciate that you provided them in advance.

10   **Q.**  Okay.  And did you review Professor Shafiq's rebuttal

11   report regarding transmissions back to their respective

12   manufacturer-owned domains?

13   **A.**  Yeah.  If there is a specific paragraph you want to point

14   me to.

15   **Q.**  Paragraphs 2A and 3A of the report.

16        **MR. BARNES:**  And that's Attachment C -- that's C4,

17   Your Honor, paragraphs 2A.

18        2A says he tested whether Chrome operates the same as

19   other browsers with respect to the sync function.

20        3A is his finding that Chrome does not work the same as

21   other browsers with respect to the sync function.

22        Can we put Slide 7 up?

23        Okay.  Why don't you hand out the --

24        **THE COURT:**  So we need three copies.  One for me, one

25   for my clerk, one for the court, that is, the court file.

1              (Exhibit published.)

2         THE COURT:  Okay.  But do you have a copy.

3         THE CLERK:  I do not have a copy.

4         THE COURT:  Okay.  So anything you want admitted, we

5    need two copies on this side.

6    BY MR. BARNES:

7    Q.  After seeing the slides we submitted to Google yesterday,

8    did you have an opportunity to review the accuracy of Slide 7?

9    A.  All of the slides.  And I found a number of mistakes, I'm

10   afraid.

11   Q.  Okay.  For Slide 7, did you find any transmissions from

12   Safari back to Apple on non-Apple websites in the testing that

13   you submitted on Thursday?

14   A.  So just to set the context, this is a slide you created

15   and you provided.  In other slides on that deck, there were

16   certain figures that seemed implausible to me.  So I went back

17   to my own data and checked, and the numbers are wrong.  I did

18   not have time to check every single number you gave me.  So

19   it's hard for me to take these numbers at heart.

20        But this is not the core of the question.  If we go back

21   to the slide that I presented to Her Honor, it's entirely

22   coincidental.  If you use Safari and you go to a site that is

23   incorporated Apple Maps, you call that a transmission from the

24   browser to the manufacturer.  This is not what we call a

25   causal effect in my discipline, Mr. Barnes.  This is a

 1    correlation.  It's completely coincidental.

 2        As to the numbers, I hesitate to offer an opinion, and I

 3    can help you if you want to fix some mistakes but --

 4                    (Simultaneous colloquy.)

 5           THE WITNESS:  -- cannot take the numbers literally.

 6    BY MR. BARNES:

 7    Q.  Dr. Zervas, you agree that on the -- on the Safari

 8    browser, Safari as a general rule does not transmit browsing

 9    history information plus third-party cookies back to Apple on

10    non-Apple websites when a user is not synced, correct?

11    A.  I -- I think I showed you an example where this happens in

12    my slides.

13    Q.  You showed an example to Maps.  Did that have third-party

14    cookies attached to it?

15    A.  It had the URL as the repair [sic].

16    Q.  Did it have third-party cookies attached to it?

17    A.  We can go and check.  I do not recall right now.  It's

18    plausible that it could have had them.

19    Q.  Have you done any testing as to the prevalence of Apple's

20    presence on non-Apple websites that would cause the

21    transmission of any data from Safari back to the Apple

22    browsers on those non-Apple websites?

23    A.  Did I count how many websites that don't belong to Apple

24    use Apple services?  I did not do that, Mr. Barnes.

25    Q.  Do you disagree that Apple's presence on non-Apple

 1    websites is a tiny sliver of Google's presence on non-Google

 2    websites?

 3    **A.**   As I mentioned, I did not count.  And I think you didn't

 4    mean non-Google websites, you meant non-Apple websites.

 5    **Q.**   Yes.  Apple and non-Apple websites.  Thank you.

 6         What about Firefox and Mozilla?  I saw you did not have

 7    any example of the Firefox browser sending cookies or browsing

 8    history information back to Mozilla on non-Mozilla websites

 9    when a user is not synced.

10    **A.**   May I give you one now?  So all it takes to understand the

11    coincident -- coincidental nature of those things, imagine

12    that I'm a fan of Firefox.  I used to be actually.  I used to

13    use Firefox a lot.  And let's say I create a website where I

14    link to the Firefox logo.  That would count as a third-party

15    transmission because it's hosted by Mozilla.  It would carry a

16    referring URL and it would be a transmission, not something

17    the term I would use, but to manufacture on domains.

18    **Q.**   Dr. Zervas, it would not -- it would not contain

19    third-party cookies, would it?

20    **A.**   That example that I gave you, it would not contain

21    third-party cookies --

22                        (Simultaneous colloquy.)

23              **THE WITNESS:**  I'm sorry.  Go ahead.

24              **MS. TREBICKA:**  May I ask that the witness be allowed

25    to finish the question -- the answer.

1       **MR. BARNES:**  Sorry.  I thought he was --

2   **Q.**  Go ahead, Dr. Zervas.

3       **MS. TREBICKA:**  Thank you.

4       **THE WITNESS:**  It's fine.

5   **BY MR. BARNES:**

6   **Q.**  And you cannot identify any example for the Court of

7   Firefox transmitting browsing history information plus

8   third-party cookies back to Mozilla, which is the

9   manufacturer, on a non-Mozilla website when a user is not

10  synced.

11  **A.**  I don't have one handy for you now, but I don't preclude

12  the existence of such a thing.

13  **Q.**  And that's because Mozilla is not in the ad tech business

14  like Google is, correct?

15  **A.**  I agree with that.  As far as I know, Mozilla doesn't have

16  an advertising platform.

17  **Q.**  Mozilla operates a browser that is geared to protect

18  consumers of that browser, correct?

19  **A.**  What do you mean "protect," Mr. Barnes?  All browsers try

20  to protect their users from, you know, attacks and leaking

21  data and fishing and scams.

22  **Q.**  Mozilla doesn't create profile information about -- about

23  Firefox users from their activity on non-Mozilla websites when

24  they are not synced, correct?

25      **MS. TREBICKA:**  Objection, Your Honor, outside of the

1    scope.  Calls for speculation.  There's absolutely no

2    foundation.

3              **THE COURT:**  Sustained.  You can set some foundation

4    if you wish.

5    **BY MR. BARNES:**

6    **Q.**  Dr. Zervas, Chrome is the only browser that's -- do you

7    agree that Chrome is the only significant browser on the

8    market that sends browsing history information plus

9    third-party cookies plus the combination of IP address, user

10   agent, and X-Client Data Header back to its manufacturer --

11             **THE COURT:**  Could you, in your hypothetical, take out

12   the X-Client Data Header?  Because we know that.  I'd like the

13   answer to that question without that component.

14             **MR. BARNES:**  Thank you, Your Honor.

15   **Q.**  Dr. Zervas, you agree that Chrome is the only significant

16   browser on the market today that sends browsing history

17   information and third-party cookies back to the browser

18   manufacturer on websites that are not owned by the

19   manufacturer when the user is not synced?

20   **A.**  I would like to go back to my example of --

21             **THE COURT:**  No.  Could you just answer that question

22   yes or no or you don't know.  Could you give me a straight

23   answer?

24             **THE WITNESS:**  I understand.

25        I would not agree exactly as stated.  And --

1          THE COURT:  What would you change?

2          THE WITNESS:  I have presented counter examples to

3     what Mr. Barnes is asserting.

4          THE COURT:  So the question was whether it was a -- a

5     significant browser, right, so we're talking about the handful

6     perhaps that you analyzed.  Is there any other browser that

7     sends browsing history information on websites that are not

8     owned by the manufacturer and third-party cookies when someone

9     is not synced?  If so, which browser?

10         THE WITNESS:  Thank you, Your Honor.

11       My Safari example that I showed in my slides transmits the

12    entire URL which contains the URL of the page that the user is

13    visiting to Apple Maps.  So that's a counter example to what

14    Mr. Barnes is saying.

15         THE COURT:  Is that the only example you have?

16         THE WITNESS:  I had another example for Edge on the

17    same slide where Edge makes a similar communication to

18    Microsoft.  And even -- if you recall, Your Honor, perhaps

19    more easily, when we looked at Zappos, it uses Microsoft Bing

20    for search.  If I had used Edge to visit Zappos, that would

21    count as a communication to the browser's manufacturer per --

22    per Mr. Barnes' question.

23    BY MR. BARNES:

24    Q.  Dr. Zervas, you would agree your Apple example does not

25    include the transmission of third-party cookies.

1    **A.**  I -- sitting here right now, the honest answer is I do not

2    recall, Mr. Barnes, so I don't want to say one way or the

3    other.

4    **Q.**  And you don't have an example of Firefox at all, do you?

5    **A.**  An example, no, apart from the one that I stated, the

6    hypothetical example that I stated.

7    **Q.**  Does Mozilla even track users on non-Firefox -- on

8    non-Mozilla websites with third-party cookies anywhere?

9    **A.**  I'm sorry.  I -- what do you mean by track?

10   **Q.**  Does Mozilla have third-party cookies through which it

11   tracks Firefox users not synced browsing history on

12   non-Mozilla websites?

13           **MS. TREBICKA:**  Objection, Your Honor, calls for

14   speculation.

15           **THE COURT:**  Overruled.

16           **THE WITNESS:**  I did not test that, Mr. Barnes.  It

17   was not important for me to understand the answer to this

18   question in order to determine whether -- going back to the

19   Court's question, whether these categories of at-issue data

20   are -- here is why I hesitated a bit.  I am confused.  I

21   thought we're talking about transmissions to Google.  And

22   that's what I analyzed, Mr. Barnes.

23   **BY MR. BARNES:**

24   **Q.**  Dr. Zervas --

25   **A.**  All browsers that I -- I will stop.  I'm sorry.

1    **Q.**  Dr. Zervas, you understand this case is about sync

2    functionality?

3    **A.**  I understand this case -- one element of this case to be

4    about sync functionality.

5    **Q.**  And Chrome is the only browser that sends vast quantities

6    of browsing history information and third-party cookies back

7    to the browser manufacturer on websites that are not owned or

8    operated by the browser manufacturer, correct?

9    **A.**  All browsers that I tested send the categories of at-issue

10   data back to Google third-party services.  That I can say with

11   confidence.  And that's the basis for my opinion that the

12   collection of at-issue data by Google third-party services,

13   which I understand is the question today, is browser-agnostic.

14   **Q.**  There --

15   **A.**  What if I -- I'm sorry.

16   **Q.**  Dr. Zervas, you agree that the Chrome privacy notice is

17   the only browser privacy notice that promises not to send

18   information to Google, correct?

19          **THE COURT:**  All right.  There's no point in getting

20   into legal arguments.  I don't need him for that.

21          **MR. BARNES:**  Understand, Your Honor.

22      Let's go to Slide 60, please.  I'm sorry.  Slide 60 of the

23   Google presentation.

24                  (Demonstrative published.)

25

1    **BY MR. BARNES:**

2    **Q.**  Dr. Zervas, what is the client ID listed in the middle of

3    the page here?

4    **A.**  I think, Mr. Barnes, it refers to "cid," client ID, which

5    is typically the analytics cookie.

6    **Q.**  Is it called a "cid" data parameter?

7    **A.**  Maybe.  I do not know.

8    **Q.**  Are you holding yourself out today to be an expert in link

9    decoration?

10   **A.**  I know a few things about link decoration.  And I'm happy

11   to answer certain questions.  And if I don't know other

12   things, I'm happy to tell you I do not know.

13   **Q.**  Are you holding yourself out today to be an expert on link

14   decoration or not, Dr. Zervas?

15   **A.**  Your Honor, is "expert" a legal term here?  I'm confused.

16   I have expertise that can speak to link decoration.

17   **Q.**  Do you recall testifying in a deposition in this case,

18   Dr. Zervas?

19   **A.**  Yes, to you, Mr. Barnes.

20   **Q.**  Do you recall when I asked you about the "cid" data

21   parameter?

22   **A.**  I recall a discussion about "cid."  The words "data

23   parameter," I'll take your word they were used.  I don't

24   remember that.

25   **Q.**  Today you're saying you know what that "cid" data

1    parameter is, correct?

2    **A.**   I said that I think it refers to the analytics cookie.

3    **Q.**   What do you mean you think?  Are you telling the Court

4    that you know what it is, or you're merely speculating about

5    what it is?

6    **A.**   I'm telling the Court that now that I recall our

7    discussion a bit better, I think there are at least a couple

8    of different cookies with different functionalities.  I forget

9    what the other ones that are called "cid."  And here, "cid"

10   stated in the definition, this is not language I wrote.  It's

11   stated in the list of at-issue data.

12                    (Simultaneous colloquy.)

13   **BY MR. BARNES:**

14   **Q.**   Right, but it's in Slide 60 that you testified about,

15   isn't it, Dr. Zervas?

16   **A.**   Yes, sir.

17   **Q.**   Okay.  And do you understand there's another cookie value

18   called "gid" that is sometimes sent by Google in URLs?

19   **A.**   To the best of my recollection -- do you mean "gaid"

20   maybe?

21   **Q.**   I mean "gid."

22   **A.**   "gid," okay.  I -- I -- sitting here right now, I don't

23   remember the name of every cookie, but it sounds very

24   plausible that there's something called "gid."

25   **Q.**   Do you recall when I asked you why is the "underscore gid"

 1   value as in an HTTP query parameters when you block

 2   third-party cookies in Chrome?

 3   **A.**   Oh, yes, I remember that discussion, Mr. Barnes.

 4   **Q.**   And what was your answer?

 5   **A.**   I don't recall my answer, but can you -- do you have

 6   something to show me?

 7                    (Simultaneous colloquy.)

 8               **MR. BARNES:**  Sure.

 9        Your Honor, may I approach and provide --

10               **THE WITNESS:**  Thank you, Mr. Barnes.

11               **MS. TREBICKA:**  Your Honor, may we know what page?

12               **THE COURT:**  Absolutely.

13   **BY MR. BARNES:**

14   **Q.**   If you look at the bottom of page 228, Dr. Zervas.

15   **A.**   (Reviewing document.)

16        Yes, Mr. Barnes.

17   **Q.**   And when I asked about cookie values being sent in HTTP

18   query parameters in January, what was your answer?

19   **A.**   I said the answer is that blocking third-party cookies

20   blocks cookies and we have not discussed cookies so far.

21   **Q.**   Okay.

22   **A.**   I should have said blocks third-party cookies.

23   **Q.**   And can we move on to page 231, and when I asked you why

24   is the "underscore gid" value being transmitted to Google

25   Analytics when third parties -- when you have blocked

1    third-party cookies in Chrome?

2        Can you tell the Court what your answer was in January?

3    **A.**   Yes.  I said the answer is, Mr. Barnes, because this is

4    not a cookie transmission.

5    **Q.**   And yet you've told the Court today in paragraph 60 -- or

6    in Slide 60 that it is a cookie transmission.

7    **A.**   I see what you're getting at.  So, Mr. Barnes, as I

8    indicated in my slides, cookie values, which I understand are

9    the transmissions that we care about, can be sent to Google

10   third-party services as third-party -- so as third-party

11   cookies or as -- or by appending them to URLs.  And this is

12   the -- the latter case.

13   **Q.**   Do you recall when I asked you about the "cid" value that

14   you identify here, Dr. Zervas?

15   **A.**   I would care to refresh my memory.  I remember vaguely.

16   **Q.**   Can we go to page 242?

17   **A.**   Yes.

18   **Q.**   And on line 11, you asked me, "You're referring to the

19   'cid' value, Mr. Barnes?"

20       And I said, "Correct."

21       Do you see that?

22   **A.**   (Reviewing document.)

23       There is an exhibit mentioned in the question.  So, yes,

24   I -- I'm lacking a bit of context, but, yes, I see what you're

25   saying.

1    Q.  And on line 21 in answer to a question about the "cid"

2    data parameter, you said, "I'm going to speculate."  Correct?

3    A.  Correct.

4    Q.  And then on the next page, on line -- on page 243, line 2,

5    you said, "That would be my guess to your question."

6    A.  (Reviewing document.)

7        Yes, it's there in the transcript.  I said those words.

8    Q.  And today you're representing that you know all about the

9    "cid" data parameter, correct?

10        MS. TREBICKA:  Objection, Your Honor.  Misstates the

11   witness's testimony.

12        THE WITNESS:  I never said that I know everything

13   there is to know about --

14        THE COURT:  The objection is overruled, but it's -- I

15   don't have the full context so we'll see.

16        THE WITNESS:  I -- I don't believe I said those

17   words, Mr. Barnes, that I know everything there is to know

18   about the "cid" parameter.

19   BY MR. BARNES:

20   Q.  Dr. Zervas, you did two rounds of testing in this matter?

21   A.  You mean my prior report and the report I provided more

22   recently?

23   Q.  Correct.

24   A.  Sure.

25   Q.  Dr. Zervas, the paper you identified earlier where you

1    analyzed data, that data had already been collected and

2    provided to you, correct?

3    **A.**   Yes.  But trust me, it was a lot of work to parse and

4    extract the data.  Without specific expertise into how

5    Microsoft collects the data, it would be very difficult to do

6    this work.  It took us about, I think, more than a year.

7    **Q.**   Right, but in the testing you're doing in this case, you

8    are testing the network transmissions, recording them, and

9    then making conclusions based on the testing and conclusions

10   you did, right?

11   **A.**   Yes.  There was a different question I was asking in that

12   research paper and a different question that I'm answering

13   here today --

14   **Q.**   Okay.

15   **A.**   -- that necessitate different methodologies.

16   **Q.**   You've never published a paper in a peer-reviewed journal,

17   have you, that involved your collection and recording of

18   Internet browser transmissions, correct?

19            **THE COURT:**  Okay.  Everyone's used about an hour.

20   Just to let you know, a third of your time has passed.

21            **MR. BARNES:**  I'm going to take three more minutes,

22   Your Honor.

23            **THE COURT:**  Just letting you know.  Go ahead.

24            **THE WITNESS:**  That's not how I would present --

25   represent my work, Mr. Barnes, because that paper contains

1    transmissions from, as I recall it, the Edge browser to

2    Microsoft.  So --

3    **BY MR. BARNES:**

4    **Q.**  But you didn't record those, correct?

5    **A.**  No.  Microsoft systems recording them -- are recording

6    them.  It's not a person that is recording them, Mr. Barnes.

7    It's a system that records them.  And then you need an expert

8    like me to extract them and analyze them.

9    **Q.**  Dr. Zervas, you did your first-round test with a program

10   called Selenium?

11   **A.**  I did some tests with Selenium, that's correct.

12   **Q.**  You understand that Selenium would never survive a

13   peer-review process, Dr. Zervas?

14   **A.**  Has it been through peer review?

15   **Q.**  I'm asking if you understand whether Selenium would ever

16   survive a peer-review process?

17   **A.**  Nobody would submit Selenium to a peer-review journal.

18   **Q.**  But that's what you used for this testing, correct?

19   **A.**  But this is like saying I'm going to submit like this

20   clicker to a journal.  It doesn't make sense to submit a piece

21   of software to a journal for peer review.

22   **Q.**  The results of Selenium testing, Dr. Zervas, the results

23   of Selenium testing would never survive peer review in a

24   journal publication, correct?

25   **A.**  No, that's not correct.  This is not how science works.

 1    **Q.**  Okay.

 2    **A.**  For the question at hand, I --

 3        Your Honor, may I continue?  Or should --

 4                    (Simultaneous colloquy.)

 5    **BY MR. BARNES:**

 6    **Q.**  The answer is no.

 7            **MR. BARNES:**  Dr. Shafiq will testify in a moment,

 8    Your Honor.

 9            **THE WITNESS:**  But I disagree with that, and I would

10    like to state my answer.

11            **THE COURT:**  You'll get a chance.

12            **THE WITNESS:**  Okay.

13    **BY MR. BARNES:**

14    **Q.**  And second-round test results, were they done -- were they

15    a stateful crawl or a stateless crawl?

16    **A.**  It was -- I don't know what definition you're using for

17    stateless and stateful, but I cleared cookies between tests.

18    **Q.**  You don't know the difference between the terms "stateful

19    crawl" versus "stateless crawl"?

20            **THE COURT:**  He said he didn't understand what you

21    were saying or what you were --

22                    (Simultaneous colloquy.)

23            **MR. BARNES:**  Thank you, Your Honor.  No further

24    questions for this witness.

25            **THE COURT:**  Okay.

```
 1              MS. TREBICKA:  Your Honor, may I have 30 seconds to

 2      confer.

 3              THE COURT:  You may.  Your clock's running.

 4                   (Pause in the proceedings.)

 5              MS. TREBICKA:  Thank you, Your Honor.

 6                      REDIRECT EXAMINATION

 7      BY MS. TREBICKA:

 8      Q.  Dr. Zervas, you recall certain questions that Mr. Barnes

 9      asked you about how you analyzed and were able to compare the

10      various transmissions between browsers in their various

11      states; do you recall that?

12      A.  Yes, multiple questions, I think, to that effect.

13      Q.  And there were some questions about uBlock Origin,

14      correct?

15      A.  Correct.

16      Q.  And there were also some questions about blocking

17      third-party cookies on Chrome with the user settings, correct?

18      A.  Yes, we discussed that.

19      Q.  And in your testing, did you also have an occasion to

20      compare the browsers in their default state without any

21      extensions and without any changed user settings?

22      A.  I did.  And the moniker I would like to use for here

23      onward is when we flick back between two slides to compare

24      browsers in their default states.

25      Q.  And why did you choose to compare these browsers'
```

1    transmissions in these three different configurations?

2    **A.**   Together, they paint a complete picture that says that

3    regardless of certain settings, for instance, in default,

4    transmission of these categories of at-issue data happen and

5    they go to Google third-party services.

6    **Q.**   And to answer the question of whether these pieces of data

7    are transmitted to Google when a user is browsing on a

8    non-Google website in the various browsers, do you need to

9    change the configurations or do you -- or -- or implement or

10   download any extensions?

11   **A.**   Let's see if I understand your question correctly.  For

12   some tests, I had to install extensions and some tests I had

13   to change settings.

14   **Q.**   But you were also able to answer the Court's question by

15   using the default configuration of each browser, correct?

16   **A.**   Correct, based on the comparison we discussed in your

17   prior question.

18   **Q.**   And what did you find when you used the browser in their

19   default settings, the four browsers you tested?

20   **A.**   Regarding the four categories of at-issue data that I

21   display in my presentation, I found that for all four browsers

22   in their default settings, the transmission of at-issue data

23   occurs.

24            **MS. TREBICKA:**  No further questions, Your Honor.

25            **THE COURT:**  Okay.  I take it -- we didn't reference

1  at all the -- the sync designation.  I take it that nothing is

2  different.  What you testified to, it's all the same whether

3  it's sync or not, correct?

4          **THE WITNESS:**  I would --

5          **THE COURT:**  With respect to your opinion in terms of

6  the collection of data, it's all the same whether it's synced

7  or no.

8          **THE WITNESS:**  No, Your Honor.  I did not test in the

9  sync state.  So I hesitate is to reach conclusions --

10          **THE COURT:**  All right.

11          **THE WITNESS:**  -- for something I did not test.

12          **THE COURT:**  You didn't test that.

13          **THE WITNESS:**  It's a different feature.  I did not

14  test that.  That's why I want to be clear for you.

15          **THE COURT:**  Okay.  Thank you.

16      Next witness.

17      You may step down.  Thank you.

18          **THE WITNESS:**  Oh, thank you.

19          **MR. BROOME:**  Your Honor, we'll call Dr. Glenn

20  Berntson.

21          **UNIDENTIFIED SPEAKER:**  Your Honor, may I approach?  I

22  think we left the clicker on the stand.

23          **THE COURT:**  You may.

24          **THE CLERK:**  To the witness stand.

25      Will you please raise your right hand.

1                          **GLENN BERNTSON**,

2      called as a witness by the defendant, having been duly sworn,

3      testified as follows:

4                **THE CLERK:**  Thank you.  You may be seated.

5           Please speak into the mic.  State your full name and spell

6      your last name.

7                **THE WITNESS:**  My full name is Glenn Merlin Berntson.

8      My last name is spelled B- as in boy, E-R-N-T-S-O-N.

9                **THE COURT:**  Good afternoon -- or good morning.

10          You may proceed.

11                       **DIRECT EXAMINATION**

12     BY MR. BROOME:

13     **Q.**  Good morning, Dr. Berntson.

14          How long have you been at Google?

15     **A.**  Just over ten and a half years.

16     **Q.**  And what is your title?

17     **A.**  I'm an engineering director.

18     **Q.**  And do you lead any teams at Google?

19     **A.**  I lead a few teams.  I lead the ad manager serving team.

20     I lead the -- RTB teams which includes authorized buyers in

21     open bidding.  And I lead our web SDK teams which supports

22     both Ad Manager and AdSense.

23     **Q.**  And how large is the team that you manage?

24     **A.**  It's about 115 people.

25     **Q.**  And are those people engineers or non-engineers or a

BERNTSON - DIRECT / BROOME

1    combination?

2    **A.**  They're all engineers.

3    **Q.**  Okay.

4         And you mentioned Ad Manager and AdSense.  Those are

5    Google ads products, I presume?

6    **A.**  That is correct.

7    **Q.**  And can you explain to the Court what those products are,

8    what they do?

9    **A.**  Sure.

10         AdSense and Ad Manager are products that Google provides

11    to publishers like CNN or the *New York Times* or even Disney,

12    so that they can take their content display ads with their

13    content and thereby earn money for the content that they make

14    available on the Internet.

15    **Q.**  And if a website publisher wants to use these services,

16    how would they go about doing that?

17    **A.**  Well, first thing that they do is just set up an account

18    with AdSense or Ad Manager, which includes setting out various

19    properties like this is my website, et cetera.  They download

20    the SDK that we provided based on which product that they were

21    using and integrate that into their website.

22    **Q.**  Okay.  You mentioned -- did you mention an SDK?  Can you

23    explain what an SDK is?

24    **A.**  Sure.  An SDK on the web is a piece of JavaScript code

25    that a publisher would interact with on their site to set up

BERNTSON - DIRECT / BROOME

1    how ads show up on their site.

2    **Q.**   Okay.  And now, when a user visits a website that's

3    using -- that has installed the Ad Manager or AdSense SDK,

4    what -- what happens?  What does the browser do when it

5    encounters that SDK?

6    **A.**   Well, going --

7         **THE COURT:**  It's a developer's kit, right?

8         **THE WITNESS:**  It's a developer's kit.

9         **THE COURT:**  The first word is standard, or what is --

10        **THE WITNESS:**  Software.

11        **THE COURT:**  Software developer kit.

12        **THE WITNESS:**  Yeah.

13        **THE COURT:**  Thank you.

14        **THE WITNESS:**  Stepping back a little bit, the flow in

15    the web is a user would click on a link, and that link would

16    have an address to the site that they want to download, or

17    they type a URL into the browser.  And the first thing the

18    browser does is it goes get -- goes and gets all the content

19    from the publisher's site and it starts rendering that

20    content.

21        As that content renders, the publisher is actually

22    controlling what is happening as that content is rendering,

23    including calling the SDK and saying, hey, I'd like to show an

24    ad in this slot on the page and I'd like it to correspond to

25    this particular campaign.

1      So there's a bunch of interaction that the publisher has

2  directly with the SDK.  And the publisher says now, SDK, go

3  get me some ads.

4      What's happening is as the publisher content is then

5  rendering on the page, the SDK, with the publisher

6  instructions, makes a call to, say, a Google ad server to say

7  get me an ad.

8      We take all the information on that ad request, get the

9  right ad for the publisher, return it back to the page, and

10  then the SDK renders that ad into the publisher's page.

11  **BY MR. BROOME:**

12  **Q.**  When the SDK makes a call to Google's servers, what form

13  is that call made in?

14  **A.**  You mean, the protocol?  It's all HTTP.

15  **Q.**  Okay.  And do the -- so the call is made in the form of an

16  HTTP request to Google servers?

17  **A.**  That is correct.

18  **Q.**  Okay.  And do the HTTP requests get routed to specific

19  servers that support the product or service that's being

20  requested?

21  **A.**  Yeah.  Each -- you know, for the AdSense SDK and the Ad

22  Manager SDK, they make calls to specific endpoints, addresses,

23  if you will, in the Internet.  So they end up at a Google

24  front end that then routes it internally to our serving

25  system.

BERNTSON - DIRECT / BROOME

1   Q.   What information is usually contained in the HTTP requests

2   that get sent to Ad Manager and AdSense?

3   A.   Best way of thinking about it is the requests consist of

4   sort of two parts, a head and a body.  And the head is

5   standard information that's included in all HTTP requests that

6   include things like the IP address, the refer URL, the user

7   agent, and, if they're present, third-party cookies.

8       The body contains the specific information that, say, a

9   publisher instructed the SDK that I want an ad -- I want an ad

10  to come into this slot, et cetera.  So the specifics of the

11  request to get the ad end up in the body of the request.

12  Q.   Do Ad Manager and AdSense receive the standard information

13  contained in the HTTP request, the information that you just

14  described, regardless of the browser being used?

15  A.   Yes.

16  Q.   Did Google design the HTTP protocol?

17  A.   No.

18  Q.   Does Google control what information is contained in the

19  HTTP protocol?

20  A.   No.

21  Q.   So when Ad Manager and AdSense receive an HTTP request

22  from a browser visiting a page using those services, will that

23  request include IP address, user agent, URLs, and cookies

24  regardless of the browser used?

25  A.   So long as the third-party cookies are enabled on that

BERNTSON - DIRECT / BROOME

1    browser, yes.  All the other fields are always present.

2    Q.  And what about first-party cookies?

3    A.  Yeah.  We -- we set first-party cookies in browsers and

4    send those as well.

5    Q.  Do Google Ad Manager and AdSense only work if the browser

6    is browsing -- if the user is browsing in Chrome?

7    A.  Not at all.

8    Q.  Do these services work on all browsers?

9    A.  Yes, they work on all browsers.

10   Q.  Is the technological process employed by Ad Manager and

11   AdSense different across the different browsers?

12   A.  No.  Our SDKs are built to support industry standards that

13   all browsers support.

14   Q.  Okay.  And why is that?  Why -- why not design services

15   that are tailored to specific browsers?

16   A.  That would be wasteful from an engineering perspective.

17   Because there are standards and because browsers support

18   standards in terms of how content is rendered, how the HTTP

19   protocol works, it's far, far easier to build a single SDK

20   that works across all browsers.

21       There's another really important reason, which is

22   publishers are in the same position.  They build their pages

23   to render across all browsers.  And it would be a significant

24   additional burden the publishers would have to take on if they

25   also had to manage different versions of SDKs on different

1    browsers.

2              THE COURT:  Well, they do on phones.  So are you sure

3    that they don't -- I mean if you've got an Android versus an

4    Apple, they have to -- you know, if you're a game developer or

5    someone else, you have to do it on -- on the different --

6              THE WITNESS:  Yeah, but those are apps as opposed to

7    websites.

8              THE COURT:  Okay.  So you -- so that's not a

9    distinction.  Everybody -- in fact it can be designed in a way

10   that is browser-agnostic.

11             THE WITNESS:  Absolutely.

12             THE COURT:  All right.

13        Go ahead.

14   BY MR. BROOME:

15   Q.  What about the terms of the data that Google Ad Manager

16   and AdSense collect and use in order to serve ads, are these

17   services designed to collect different categories of data

18   depending on which browser the user is in?

19   A.  No.

20        I'd like to add to that.  When we talk about, say, what's

21   in the head of an HTTP request, this is standard information

22   that's included on every HTTP request regardless of which

23   browser you're talking about.  And so we use what information

24   is available that then comes to our servers.

25        We have not designed our SDKs and the information that is

1    then sent to our servers to serve an ad that's different by

2    different browser type.  It differs by what capabilities a

3    browser has but not to browser type.

4    **Q.**  Okay.  What if certain categories of data, for example,

5    cookies, are not available because they're blocked, then --

6    then what happens?

7    **A.**  Well, then we don't have access to that information.  We

8    can still serve an ad.

9    **Q.**  And you understand that some browsers block third-party

10   cookies by default?

11   **A.**  That is correct.

12   **Q.**  And does Chrome block third-party cookies by default?

13   **A.**  Most -- by default no.  If you go into Incognito mode, by

14   default third-party cookies are blocked by Chrome.

15   **Q.**  Are you aware that plaintiffs' expert, Dr. Shafiq, has

16   opined that because third-party cookies are blocked by default

17   in some browsers but not in Chrome, this means that Google

18   services like Ad Manager and AdSense are not in fact

19   browser-agnostic?

20   **A.**  I am aware of that allegation.

21   **Q.**  And what do you make of that allegation?

22   **A.**  That allegation is not true.

23   **Q.**  And why is that?

24   **A.**  Because we don't change how we serve an ad based off of

25   whether it's Chrome or Safari.  The behavior of ad serving

BERNTSON - DIRECT / BROOME

1    changes based off of what data is available.  And if

2    third-party cookies are not available, we'll fall back to some

3    other piece of information.  But we would have that same

4    fallback behavior regardless of what browser it was.

5    Q.  If a Chrome user enabled third-party cookie blocking and

6    therefore no third-party cookies were present on Chrome, would

7    Ad Manager and AdSense be able to collect third-party cookies

8    from that Chrome user?

9    A.  No.

10   Q.  And if a Firefox user disabled third-party cookie blocking

11   and therefore third-party cookies were not present, would

12   Ad Manager and AdSense receive third-party cookies?

13   A.  Yes.

14   Q.  I'm sorry.  If -- okay.  And why is that?

15   A.  Third party --

16   Q.  Let me ask a better question.  Sorry.

17       Where would that information be contained?

18   A.  Well, third-party cookies was an industry standard.  Five

19   years ago, every browser supported it.  And what's happened is

20   some browsers have enabled blocking third-party cookies by

21   default.  Different browsers have different approaches for how

22   they're applying that.

23       But fundamentally, different browsers now have different

24   sets of capabilities than what they had five years ago.

25       Our SDKs were designed to support all the functionality.

BERNTSON - DIRECT / BROOME

 1   And so what's changed was some browsers blocking third-party

 2   cookies by default is now there's some information that is not

 3   available on some ad requests on some browsers.

 4   **Q.**  Does blocking third-party cookies impact whether

 5   Ad Manager and AdSense receive the other categories of data

 6   that are at issue -- issue here?  For example, IP address,

 7   user agent, the URL of the page the user is visiting?

 8   **A.**  No.

 9   **Q.**  Does blocking third-party cookies affect whether Google

10   Ad Manager or AdSense receive first-party cookies?

11   **A.**  No.

12   **Q.**  Do Ad Manager and AdSense receive and use first-party

13   cookies?

14   **A.**  Yes.

15   **Q.**  For what purposes?

16   **A.**  Largely the same sets of use cases that third-party

17   cookies support, including things like frequency capping.  If

18   an advertiser doesn't want one person to see the same ad over

19   and over again, we can use a cookie that contains an

20   identifier for that user to basically say, oh, they've seen

21   that ad already so I'm not going to show it to them again.

22   **Q.**  All right.  Are you aware that of any browser that blocks

23   first-party cookies by default?

24   **A.**  I am not.

25         **MR. BROOME:**  Okay.  I'd like to pull up plaintiffs'

 1    Demonstrative Set 1, Slide 6, if we could.

 2                    (Demonstrative published.)

 3    **BY MR. BROOME:**

 4    **Q.**  Do you have the demonstrative in front of you?

 5    **A.**  Yes, I do now.

 6    **Q.**  Okay.  Do you see that it shows that if a Chrome user

 7    visits a Mayo Clinic web page using Google Ad services, Chrome

 8    will send certain categories of information to DoubleClick

 9    servers in order to serve the ad.  You see that?

10    **A.**  Yes.

11    **Q.**  That is categories 1 through 5?

12    **A.**  Um-hmm.

13    **Q.**  Now if we could go to the next slide, Slide 7.

14                    (Demonstrative published.)

15    **BY MR. BROOME:**

16    **Q.**  Now, in Slide 7, the user is visiting the same web page in

17    Safari.  Do you see that?

18    **A.**  Yes.

19    **Q.**  Okay.  And the -- the slide suggests that the only part of

20    the HTTP request that is sent to the DoubleClick server is IP

21    address and user agent.  Do you see that?

22    **A.**  Yes, I do.

23    **Q.**  And is that accurate, Dr. Berntson?

24    **A.**  It is not.

25    **Q.**  Well, what about the X-Client Data Header?  Plaintiffs

BERNTSON - DIRECT / BROOME

1    have drawn a thick red line through the X-Client Data Header

2    saying it's not sent in Safari.  Is that true?

3    **A.**  That is true.

4    **Q.**  Okay.  And why is that?

5    **A.**  Because it's a Chrome-only header field.

6    **Q.**  All right.  What about category 5, the URL of the web page

7    that the user is visiting, do Google Ad Manager and AdSense

8    receive that information from Safari and other browsers?

9    **A.**  Yes.

10   **Q.**  Does Safari block the URL as this slide suggests?

11   **A.**  No.

12   **Q.**  Does any browser outright block the URL information from

13   going to Google domains?

14   **A.**  No.

15   **Q.**  What about cookies, do Google Ad Manager and AdSense

16   receive cookies from Safari?

17   **A.**  By default, third-party cookies are mostly disabled on

18   Safari.  So we don't really receive third-party cookies.  But

19   we continue to receive first-party cookies.

20   **Q.**  Just a few more questions, Dr. Berntson.

21       Are you familiar with Chrome's sync feature?

22   **A.**  I am.

23   **Q.**  Do Google Ad Manager or Google AdSense receive any Chrome

24   sync data?

25   **A.**  No.  We -- we don't receive any of that data.  We don't

BERNTSON - DIRECT / BROOME

1    use any of that data.

2    Q.   What about the Chrome browsing history that a user can

3    sync to their Google account, do Ad Manager or AdSense receive

4    any of that data?

5    A.   No.

6    Q.   Dr. Berntson, are you familiar with -- you're familiar

7    with Chrome's X-Client Data Header?

8    A.   I am.

9    Q.   And you've read Dr. Shafiq's October 12th report?

10   A.   I have.

11   Q.   Did you read his opinion that the X-Client Data Header is

12   used by Google ads and Google display ads for advertising

13   purposes?

14   A.   I did see that.

15   Q.   And do Google Ad Manager or AdSense use the X-Client Data

16   Header for ad serving?

17   A.   No.

18   Q.   Well, does Dr. Shafiq cite any evidence that supports his

19   opinion that Google uses the X-Client Data Header for ad

20   serving?

21   A.   I didn't see any such evidence.

22   Q.   Well, he says the X-Client Data Header shows up in some

23   DoubleClick logs.  Isn't that evidence?

24   A.   No.

25   Q.   And why is that?

1    **A.**  Because the information is included in -- as a header that

2    comes in on the ad request and then is logged by our front-end

3    system.  It doesn't mean we actually use the data.  It's

4    logged, but it is not actually used.

5    **Q.**  So Google has not used the X-Client Data Header for any ad

6    serving purposes?

7    **A.**  That is correct.

8    **Q.**  Does Google use the X-Client Data Header for any -- to

9    track users across sites?

10    **A.**  Not as part of the ad serving, no.

11            **THE COURT:**  Then what's the point?  Why log it?

12            **THE WITNESS:**  I'm not a Chrome expert.  But my

13    understanding is one of the teams that was exploring replacing

14    the TCIP protocol with a Google internal standard said, oh, I

15    want to run some experiments where I change sort of our

16    internal networking protocols at Google, and I want to use

17    Chrome to run those experiments.

18        So they enabled the X-Client Data Header on the requests

19    that came into ads.  And then the internal networking team was

20    exploring different networking protocols using the X-Client

21    Data Header as information for managing the experiment.

22            **THE COURT:**  Keep going.

23            **MR. BROOME:**  Thank you, Dr. Berntson.  No further

24    questions at this time.

25            **THE COURT:**  Cross.

1          **MR. BARNES:**  Your Honor, I hate to do this, but the

2     exhibits I'm going to use, all of them have internal code

3     words that is really going to present a problem for taking his

4     examination if we don't close just this portion of the

5     hearing.

6          **THE COURT:**  Well, let's get your first question so I

7     can see what you're talking about.

8                        **CROSS-EXAMINATION**

9     BY MR. BARNES:

10    **Q.**  Okay.  Well, the first one, I'll do the first ones to get

11    those out of the way that aren't -- that aren't in the way.

12         Dr. Berntson, you agree Google does not combine IP address

13    and user information to identify or track users, correct?

14    **A.**  For the purposes of advertising.

15    **Q.**  Okay.  So when we talk about other browsers may send IP

16    address and user agent information to Google, Google is not

17    using that information for advertising, tracking, for any

18    purpose, correct?

19    **A.**  For the purposes of tracking users for advertising,

20    correct.

21    **Q.**  Correct.  And it's your -- Google's position is that it

22    does not fingerprint for advertising purposes, correct?

23    **A.**  Google does not use fingerprinting for tracking users for

24    advertising purposes.

25    **Q.**  And there may be other companies that do, but Google does

 1    not, correct?

 2    **A.**   Correct.

 3          **MR. BARNES:**  Okay.  I'd like to distribute B58.  And,

 4    Your Honor, what B58 is, is it contains a slide that has a

 5    depiction of Google's back-end serving systems.

 6       May I show it to Google counsel, the slide I'm talking

 7    about?

 8          **THE COURT:**  You may.

 9              (Pause in the proceedings.)

10          **MR. BARNES:**  I don't want to speak for Google counsel

11    except Mr. Broome just said that that needs to be sealed.

12    And, Your Honor, I don't know how to ask the questions in a

13    way that --

14          **THE COURT:**  All right.  So all right.  You're not

15    excused.  Step down.

16       Next witness.

17       We'll do it anything that has to be sealed, end of the

18    day.

19       So how much time do you want to reserve for your cross?

20          **MR. BARNES:**  Can I -- seeing that, is there --

21    there's another slide I don't think needs to be sealed that I

22    think I can use, and then I will reserve 15 -- 12 minutes for

23    him at the end of the day.

24          **THE COURT:**  Okay.

25          **MR. BARNES:**  And may I check with Google counsel

```
 1    about this slide?

 2            THE COURT:  Yes.

 3                    (Pause in the proceedings.)

 4            MR. BARNES:  Okay.  Please distribute B54.

 5       And I want to keep it on the slide -- the slide where it

 6    says the web as it stands today so that we -- because there

 7    may be other things in the document that are sealed and I

 8    don't want those.

 9            THE COURT:  All right.  What's the number again?

10            MR. BARNES:  It is B54.  The Bates number is

11    CABR-00641149.

12            THE COURT:  Okay.  I don't know what you're

13    distributing.  I have B54.  Are you distributing something

14    else?

15            MR. BARNES:  We are distributing the specific pages

16    that we're going to focus on in B54.

17            THE COURT:  Okay.  Just hold -- those are for you,

18    Mr. Garcia.

19       Go ahead.

20            MR. BARNES:  Okay.  And can we pull B54 up on the

21    screen, the page that says "The web as it stands today."

22                    (Exhibit published.)

23    BY MR. BARNES:

24    Q.  Doctor, do you have a copy, Dr. Berntson?

25    A.  I do not.
```

1          MR. BARNES:  B54.

2     BY MR. BARNES:

3     Q.  Dr. Berntson, we can agree that when Google makes sales

4     pitches to large advertisers, that it attempts to be accurate

5     in the assertions that it makes to those advertisers?

6          THE COURT:  What is this document?

7          MR. BARNES:  Are you asking me, Your Honor?

8          THE COURT:  I --

9          MR. BARNES:  This is a document that is a sales pitch

10    that Google made to McDonald's explaining Google's advertising

11    services.  And one of the slides has an overview of, quote,

12    the web as it stands today.

13         THE COURT:  All right.  Okay.  And this is in his --

14    in his department?

15    BY MR. BARNES:

16    Q.  Display ads is in your department, correct, Dr. Berntson?

17    A.  My team is part of display ads.  This seems to be covering

18    a part of display ads that I'm not an expert on.

19    Q.  You're not an expert on the web as it -- if you look at

20    the screen now where it says "The web as it stands today" and

21    there is a little icon of Firefox, a little Safari icon, and a

22    Chrome icon?

23         MR. BROOME:  Object.

24         THE WITNESS:  I'm referring specifically to this

25    document which came from a sell side -- sorry -- a buy side

1    measurement team that I have no direct interactions with.

2    **BY MR. BARNES:**

3    **Q.** Okay. I want to ask you about the slide and "The web as

4    it stands today."

5        **MR. BROOME:** Objection, Your Honor. Lack of

6    foundation. There's a list of people who seem to be involved

7    in this --

8        **THE COURT:** Overruled.

9        **MR. BROOME:** -- presentation.

10       **THE COURT:** If he doesn't know anything, he doesn't

11   know anything.

12   **BY MR. BARNES:**

13   **Q.** Are you unable to testify about the web as it stands today

14   as shown in the slide on the screen, Dr. Berntson?

15   **A.** I'm happy to read the content here and then respond if I'm

16   aware of sort of the content of this, but I will need one

17   minute to review the content.

18       **MR. BARNES:** Your Honor, I'm sorry. If -- I want to

19   move on because we've got limited time.

20       I'd like to put -- Google has stipulated to the

21   admissibility of B54. So I'd like to move for its

22   introduction into evidence.

23       **THE COURT:** B54 is admitted.

24       (Plaintiffs' Exhibit B54 received in evidence.)

25       **MR. BARNES:** And I will withhold my time for later

1    for the sealed documents.

2           THE COURT:  Okay.  Reserving 12.

3       You can step down, but you're not excused.

4       Next witness.

5           MR. SCHAPIRO:  Your Honor, may I just ask one

6    question?  We may need to speak with Mr. Berntson just about

7    some logistical issues.

8           THE COURT:  That's fine.  You may not speak with him,

9    you are ordered not to speak with him about this exhibit until

10   after these proceedings are closed.

11          MR. SCHAPIRO:  I just wanted to raise it in case

12   anyone saw us speaking with him, it's because his plans for

13   today have just been changed.

14          THE COURT:  Understand.

15      Next witness.

16          MR. WATKINS:  Your Honor, Google calls Mr. Steve

17   Ganem.

18          THE COURT:  You need to identify yourself, sir.

19          MR. WATKINS:  Oh, sorry.  Brett Watkins from Quinn

20   Emanuel for Google.

21          THE CLERK:  Would you please raise your right hand.

22                      STEVEN GANEM,

23   called as a witness by the defendant, having been duly sworn,

24   testified as follows:

25          THE CLERK:  Thank you.  You may put your hand down

1    and be seated.

2        Please state your full name and spell your last name.

3            **THE WITNESS:**  My name is Steven Ganem, spelled G-A-N-

4    as in Nancy, E-M as in Mary.

5            **THE COURT:**  Good afternoon.

6        You may proceed.

7                    <u>**DIRECT EXAMINATION**</u>

8    **BY MR. WATKINS:**

9    **Q.**  Mr. Ganem, are you currently employed by Google?

10   **A.**  Yes.

11   **Q.**  And what is your job at Google?

12   **A.**  I'm a group product manager.

13   **Q.**  And are you a group product manager for any specific

14   product?

15   **A.**  Yes, group product manager for Google Analytics.

16   **Q.**  And briefly, what does your role entail?

17   **A.**  I manage a team of product managers that basically decide

18   on how our product works.  And I also look after our business.

19   **Q.**  Do you work with engineers as part of your job?

20   **A.**  I do.

21   **Q.**  And do you interact with customers as part of your job?

22   **A.**  I do.

23   **Q.**  At a high level, what is Google Analytics?

24   **A.**  Google Analytics is a product that helps businesses better

25   understand how users are engaging with their website or their

GANEM – DIRECT / WATKINS

1  app.

2  Q.  And how would one of those businesses start using Google

3  Analytics?

4  A.  A prospective Google Analytics customer might first visit

5  the marketing website, learn about the product, and at some

6  point decide to create an account.

7     When they create an account, they sign our terms of

8  service.  And at some point, they're given instructions

9  that -- on how to integrate Google Analytics on their website

10  or app.

11  Q.  And how would they go about doing that integration on

12  their website or app?

13  A.  On the web, for example, they're given a block of

14  JavaScript code that they copy and paste onto their web pages,

15  and that's really all it takes to get started.

16  Q.  And once that block of JavaScript code is installed on

17  their web page, what happens when a visitor goes to their web

18  page?

19  A.  When a user visits their website, and assuming that the

20  user has not blocked Google Analytics using one of our add-ons

21  for browsers, then the JavaScript code is activated, it

22  downloads the code for Google Analytics, and it executes.

23  Q.  And what happens when that code executes?

24  A.  Typically at that point, assuming analytics was not

25  blocked, it will start transmitting the events that correspond

GANEM – DIRECT / WATKINS

1    to the user's behavior on the website.  So, for example, as a

2    user visits different pages on the website that are tagged

3    with Google Analytics, it will send page view events to Google

4    Analytics which are used to generate reports for the customer.

5    **Q.**  And does Google Analytics' collection of data differ based

6    on the browser that the user is using to visit the website?

7    **A.**  No, it doesn't.

8    **Q.**  Why is that?

9    **A.**  It's important for our customers to understand how users

10   are engaging with their website or products or services across

11   all browsers.  And end users use a variety of different

12   browsers.

13   **Q.**  And what would happen if Google Analytics didn't measure

14   things the same across different browsers?

15   **A.**  If things were measured differently on different browsers,

16   there would be a bias in the data.  So a business trying to

17   understand, for example, what products and services or content

18   are popular with their customers, they would always have to

19   account for this bias, and they really couldn't read it

20   simply.

21   **Q.**  I'd like to ask about some specific types of data.  Does

22   the data that Google Analytics may receive when a user visits

23   a website owned by a Google Analytics customer, could it

24   include IP address?

25   **A.**  Yes.  IP address is transmitted with any information going

1    across the Internet.

2    **Q.** Would that be true for different browsers, Chrome and

3    Safari, Firefox and Edge, for example?

4    **A.** Yes.

5    **Q.** And does the data that Google Analytics may receive

6    include user agent?

7    **A.** Yes, it does.

8    **Q.** Would that be true for the same browsers?

9    **A.** Yes, it would, but the values would be different because

10   user agent indicates what browser is being used.

11   **Q.** Does the data that Google Analytics may receive include

12   URL information?

13   **A.** Yes, it does.

14   **Q.** And is that also true for each of the browsers, Chrome,

15   Firefox, Safari, and Edge?

16   **A.** Yes.  This indicates what page the user visited.

17   **Q.** Does the data that Google Analytics may receive include

18   first-party cookies?

19   **A.** It does.

20   **Q.** What are first-party cookies?

21   **A.** First-party cookies are cookies stored in the domain of

22   the website that have information related to the user visiting

23   the website.

24   **Q.** Can you give an example of a first-party cookie that's

25   used by Google Analytics?

1    **A.**  Google Analytics stores the client ID in the first-party

2    cookie on the website.  And the client ID is a randomly

3    generated number that's associated with the visitor to the

4    website.

5    **Q.**  Why does Google Analytics use first-party cookies?

6    **A.**  That's the appropriate thing to do to use since this is a

7    visitor on the customer's own website.  It's their first-party

8    data.

9    **Q.**  Are the first-party cookies that are used by Google

10   Analytics, are they identifiable with a specific person?

11   **A.**  They're not.  These are pseudonymous, not at all derived

12   from or associated with identity of the user.

13   **Q.**  If a user visited a different website owned by a different

14   Google Analytics customer, would they have the same client ID

15   or would it be different based on the different website?

16   **A.**  It would be different, randomly generated number for each

17   site that they visit.

18   **Q.**  Are the first-party cookies that are used by Google

19   Analytics, are they used for cross-site tracking?

20   **A.**  No, they're not.

21   **Q.**  And does Google Analytics' receipt of first-party cookies,

22   including the client ID, does that differ based on what web

23   browser the user is using?

24   **A.**  No, it doesn't.

25   **Q.**  So the Google Analytics would receive the client ID from,

1    for example, Safari?

2    **A.**   Yes, it would.

3    **Q.**   And Edge?

4    **A.**   Yes.

5    **Q.**   And also Firefox?

6    **A.**   Yes.

7    **Q.**   Does the data that Google Analytics may receive, would it

8    also include third-party cookies?

9    **A.**   Potentially.  The -- Google Analytics customers can enable

10   a feature called Google Signals in Google Analytics to

11   instruct our JavaScript code to collect third-party cookies

12   when available for certain advertising-related services.

13   **Q.**   What type of customer would do that?

14   **A.**   Typically an advertiser who is also using Google

15   Analytics.

16   **Q.**   And do customers who use those advertising-related

17   features, do they have the tell the visitors to their websites

18   that they're collecting that type of information?

19   **A.**   All Google Analytics customers, including these, have a

20   requirement to disclose their use of Google Analytics, what

21   it's collecting and how it's being used.

22       And additionally, where they have legal obligations to

23   acquire consent, for example in California for CCPA, they --

24   Google Analytics customer is required to obtain that consent.

25   **Q.**   How would they do that?

GANEM - DIRECT / WATKINS

1    **A.**   Typically you'll see pop-ups when you visit websites

2    asking for permissions.

3    **Q.**   And does Google Analytics' collection of third-party

4    cookies, does that differ based on browser if that feature is

5    enabled?

6    **A.**   No, it doesn't.  It -- if the third party cookie is

7    available regardless of the browser, and this feature is

8    enabled in Google Analytics, then the JavaScript code will

9    collect it.

10   **Q.**   And what if the third-party cookies happen to be blocked

11   in a browser?

12   **A.**   If third-party cookies are blocked in a browser, for

13   example, if on Chrome you're in an Incognito session and it's

14   not there, then the cookie won't be written and therefore when

15   the JavaScript code executes, it won't find a cookie and

16   therefore it can't collect one.

17   **Q.**   And is that true for all different browsers?

18   **A.**   Yes.

19   **Q.**   You mentioned JavaScript.  Does the JavaScript code that

20   is delivered by Google Analytics to the user's browser, does

21   that differ based on the browser?

22   **A.**   No.  The JavaScript code itself is -- is identical.

23   **Q.**   And does that mean that the code will work in exactly the

24   same way on different browsers?

25   **A.**   No, not quite.

GANEM - DIRECT / WATKINS

1   Q.   Can you give an example of a way it might differ?

2   A.   Yes.  For example, recently there were updates made to the

3   Safari browser so that when you opened it, it shows your most

4   recent sites that you visited and it gives you a preview of

5   those.  And that was implemented by Apple in such a way that

6   it would trigger the Google Analytics code to believe that a

7   visitor -- a visit was happening to those websites when in

8   fact it was just a preview.

9       So our engineers, in order to try to account for what

10  otherwise would be bias in the data, had to make changes to

11  the JavaScript code such that if this preview mode was

12  happening, these visits would be discounted.

13  Q.   Is it the case that where there are differences like that,

14  the goal is to operate slightly differently to collect the

15  same type of measurement data between different browsers?

16  A.   Definitely.  The goal so is to homogenize the data as much

17  as possible that our customers don't have to think too hard

18  about the reports that they're viewing and how they might be

19  different on different browsers.

20  Q.   And so, for example, if a different browser like Firefox

21  were to implement like that thumbnail feature that you were

22  referring to for Safari, would the JavaScript -- the Google

23  Analytics JavaScript code react to that and proceed in the

24  same way to account for that feature?

25  A.   Yes, it would.

1    **Q.**  And last question.  If the Chrome browser were set to

2    block all transmissions to Google by default, including Google

3    Analytics, how would that impact Google Analytics and its

4    customers?

5    **A.**  This would severely impact businesses' ability to

6    understand what customers are doing on their website since

7    many users use Chrome and the data wouldn't be available.

8         **MR. WATKINS:**  Thank you, Mr. Ganem.

9      No further questions, Your Honor.

10        **THE COURT:**  Cross?  And make sure to identify

11   yourself, please.

12        **MS. TRUONG:**  An Truong for plaintiffs, Your Honor.

13        **THE COURT:**  You may proceed.

14                    **CROSS-EXAMINATION**

15   BY MS. TRUONG:

16   **Q.**  Good afternoon, Mr. Ganem.

17   **A.**  Good afternoon.

18   **Q.**  You just testified that you are a product manager at

19   Google; is that correct?

20   **A.**  Yes.

21   **Q.**  And you oversee the product Google Analytics; is that

22   correct?

23   **A.**  I'm one of the group product managers on Google Analytics.

24   **Q.**  Okay.  You are not currently employed as an engineer at

25   Google; is that correct?

1    **A.**   That's correct.

2    **Q.**   Okay.  And you testified with respect to a Google

3    Analytics customer.  Who is the Google Analytics customer?

4    **A.**   A business.

5    **Q.**   And you stated that the Google Analytics customer, when

6    they want to employ that product, they sign a Google Analytics

7    terms of service; is that correct?

8    **A.**   Yes.

9    **Q.**   And, again, you're talking about a business that would

10   sign that term of service, correct?

11   **A.**   Yes.

12   **Q.**   Individual users do not sign terms of service for Google

13   Analytics, correct?

14   **A.**   It typically -- these are businesses using it.  It may be

15   that they're hobbyists, but by and large they're large and

16   small businesses of all sizes using the product.

17   **Q.**   Okay.  So with respect to a Chrome user, an individual

18   user on the end -- the other end of that browser, they're not

19   planning on signing on for Google Analytics terms of service;

20   is that correct?

21   **A.**   That is correct.

22   **Q.**   A Chrome user is signing on for the Chrome product,

23   correct?

24   **A.**   Yes.

25   **Q.**   And you stated that the Google Analytics operates with a

GANEM - CROSS / TRUONG

1  JavaScript source code; is that correct?

2  **A.**  For websites, yes.

3  **Q.**  For websites.  And a website puts that source code on

4  their web page, correct?

5  **A.**  Yes.

6  **Q.**  What executes the source code?

7  **A.**  The -- when the HTML is downloaded, the browser executes

8  the HTML including JavaScript code that's contained within it.

9  **Q.**  And your testimony is that the JavaScript source code is

10  the same for any browser on the market, correct?

11  **A.**  Yes.  The payload that's delivered to the user's browser

12  is the same irrespective of the browser.

13  **Q.**  And the design of Google Analytics source code is to

14  transmit information back to Google Analytics, correct?

15  **A.**  Yes, to provide that service for customers.

16  **Q.**  But the outcome of what information is transmitted back to

17  Google Analytics will depend on the browser that a user is

18  using, correct?

19  **A.**  In effect perhaps.  But the -- there are many different

20  ways to get browsers of different types into that state.

21  **Q.**  But let's take, for example, Safari.  You're familiar with

22  Safari, correct?

23  **A.**  Yes.

24  **Q.**  You're familiar that Safari in default mode has what is

25  called the ITP feature, correct?

1    **A.**   Yes.

2    **Q.**   The ITP feature of blocked third-party cookies, correct?

3    **A.**   Yes.

4             **THE COURT:**  You need to slow down.

5             **MS. TRUONG:**  I will, Your Honor.  Thank you.

6    **Q.**   So in that example, if a user is browsing on Safari in

7    default mode, Google Analytics would not transmit third-party

8    cookies, correct?

9    **A.**   Yes.

10   **Q.**   Are you familiar with the Brave browser?

11   **A.**   Somewhat.

12   **Q.**   Are you familiar with the feature Brave Shields in the

13   Brave browser?

14   **A.**   I'm not.

15   **Q.**   Okay.

16       If Brave Shields were to, by default, block Google

17   Analytics source code, then that source code would not

18   execute, correct?

19   **A.**   I'm not familiar enough with the Brave Shield feature.

20   **Q.**   I am just speaking hypothetically if there's a browser out

21   there that is designed by default to block Google Analytics

22   source code, then that source code will not execute for that

23   particular user, correct?

24   **A.**   Again, I'd have to guess, but if the Google Analytics

25   source code doesn't execute, then Google Analytics won't

1    collect data in general.  That's similar to the add-ons that

2    are available for Chrome and Safari.  If those are installed,

3    they also block the execution of Google Analytics source code.

4    **Q.**  Thank you.

5       So the output of information that's being transmitted by a

6    particular -- withdrawn.

7       The output of information that will go to Google Analytics

8    depends on a particular browser that's being used, correct?

9    **A.**  It depends on which features are enabled and what data is

10   available.

11   **Q.**  Okay.  Looking at browsers, though, in their default mode,

12   browsers in their default mode, let's take for example,

13   Safari, Chrome, Edge, Brave, those all operate differently in

14   their default mode, correct?

15   **A.**  Again, I don't know too much about Brave.  But, yes,

16   Safari, Firefox, they operate differently.

17   **Q.**  Okay.  So let's stick with those two.

18      Again in that example then, the information being

19   transmitted by Chrome, Safari, and Firefox would be different,

20   correct?

21   **A.**  If the -- in their default modes, Safari and Firefox don't

22   drop third-party cookies.  So no third-party cookies would be

23   collected in their default modes.

24      On Chrome, depending on whether third-party cookies are

25   enabled by the user, then cookies would only be collected when

1    available.

2    Q.    And that's because all browsers are different, correct?

3    A.    That's -- they're very much the same, but they may have

4    some different settings.

5    Q.    Browsers, in their default mode, differ in the available

6    transmission of data, correct?

7    A.    Browsers in their default mode have different default

8    settings, among them third-party cookie enablement.

9    Q.    Okay.  And depending on those default settings, the Google

10    Analytics source code will operate differently, correct?

11    A.    The source code operates the same which is it looks for

12    third-party cookies, and if one is available, irrespective of

13    browser, it collects it.

14    Q.    Okay.  But the execution of that source code will differ

15    depending on the web browser, correct?

16    A.    Not depending on the web browser, but depending on the

17    availability of the cookie.

18    Q.    Okay.  And the availability of the cookie depends on the

19    default -- default modes of the web browser, correct?

20    A.    The availability of the cookie depends on whether

21    third-party cookies are enabled at that point.

22          MS. TRUONG:    Okay.  May I just have a few moments to

23    confer, Your Honor?

24       No further questions for this witness.

25          MR. WATKINS:    Wait, wait.  Just very briefly, Your

GANEM – REDIRECT / WATKINS

1    Honor.

2                    **REDIRECT EXAMINATION**

3    **BY MR. WATKINS:**

4    **Q.**  Mr. Ganem, you were asked about third-party cookies.

5    **A.**  Yes.

6    **Q.**  And I believe based on prior answers that those are used

7    for instances where the Analytics customer has enabled some

8    advertising features?

9    **A.**  Yes.

10   **Q.**  So for advertising features to be enabled, does the

11   Analytics customer have to actively change something from like

12   the sort of baseline Analytics functionality?

13   **A.**  Yes.  By default, Google Analytics is not configured to

14   collect third-party cookies.  Google Analytics customers which

15   wish to collect third-party cookies have to enable the Google

16   signal setting, which again is off by default.

17          **MR. WATKINS:**  Thank you, Mr. Ganem.  No further

18   questions.

19          **THE COURT:**  Okay.  You may step down.  And you're

20   excused.

21       Next witness.

22          **MS. CRAWFORD:**  Jomaire Crawford for Google.

23          **THE COURT:**  And who are you calling?

24          **MS. CRAWFORD:**  Dr. Felt to the stand, please?

25          **THE COURT:**  Doctor...?

```
 1            MS. CRAWFORD:  Adrienne Porter Felt.

 2            THE CLERK:  If you'd please raise your right hand.

 3                     ADRIENNE PORTER FELT,

 4    called as a witness by the Defendant, having been duly sworn,

 5    testified as follows:

 6            THE CLERK:  Thank you.  You can put your hand down

 7    and be seated.

 8        Please state your full name and spell your last name.

 9            THE WITNESS:  Adrienne Porter Felt.  My last name is

10    spelled F- as in frank, E-L-T.

11            THE COURT:  Good afternoon.

12        You may proceed.

13                     DIRECT EXAMINATION

14    BY MS. CRAWFORD:

15    Q.  Good afternoon.

16        Do you go by any other name, Adriana?

17    A.  Yes.  I prefer my first name to be said Adriana.

18    Q.  And would it be fine if I addressed you as "Dr. Felt" for

19    purposes of my examination today?

20    A.  Yes.  I prefer that in this context.

21    Q.  Dr. Felt, where do you work?

22    A.  At Google.

23    Q.  What title do you currently hold?

24    A.  I'm a director of engineering on the Chrome team.

25    Q.  How long have you held this position?
```

1    **A.**   About two years.

2    **Q.**   How long have you worked on the Chrome browser?

3    **A.**   For about ten years.

4    **Q.**   Did you always hold the title that you currently have?

5    **A.**   No.  I started at Google actually after my Ph.D. as a

6    research scientist.  I then worked as a software engineer for

7    a time, getting promoted to senior staff software engineer.

8    And from there I joined management and I became a director of

9    engineering.

10   **Q.**   So let's focus on your current role in management.

11        What do you do as a Chrome engineering director?

12   **A.**   I manage a team of about a hundred people that encompasses

13   three main areas.  The first is Chrome on iOS.  The second is

14   the Chrome content team.  And the third is Chrome's data

15   science and engineering team.

16        So data science and engineering covers the data

17   scientists, product analysts, and software engineers who work

18   on our telemetry platform, on our AB testing infrastructure,

19   and on our launch rollout infrastructure.

20   **Q.**   And about how many Google employees report to you across

21   the three teams that you manage, Dr. Felt?

22   **A.**   About a hundred.

23   **Q.**   Are these all or mostly engineers?

24   **A.**   Most engineers.  It also includes data scientists and

25   product analysts.

FELT - DIRECT / CRAWFORD

1   **Q.**  All right.  Dr. Felt, are you aware of the types of data

2   that browsers transmit in the context of loading and rendering

3   websites?

4   **A.**  Yes.  So when a browser goes to load a website on behalf

5   of user, it will contact the server.  In that transmission, it

6   will give the server the IP address where the information

7   should be returned to.  So that's sort of like the return

8   address on some mail you might send.

9       The URL, that tells the server which piece of information

10  the server should be returning.  The user agent string which

11  tells the server about the type of device which lets it --

12  which lets the server know what version of the content should

13  be returned so that it can be compatible with the device.

14      Cookies might be included in the request depending on a

15  number of things such as user settings.  And there also might

16  be a number of headers.  The headers might include things like

17  if there's a form, it might include some of the parameters for

18  the form, or specifically in the case of Chrome, the X-Client

19  Data Header.

20  **Q.**  And are those five types of data sent as part of the

21  standard HTTP request?

22  **A.**  Yes, all except the X-Client Data Header.

23  **Q.**  And do all major browsers send HTTP requests to retrieve

24  content features on websites?

25  **A.**  Yes.  And this -- this process of communicating between

1  clients and servers is standardized, different parts of it in

2  the ITF and the W3C.

3  **Q.**  And what is W3C?

4  **A.**  The W3C is the standards body.  In general, you know,

5  browsers want to interoperate with websites so that you can go

6  load the same website in Chrome, you can load it in Safari,

7  you can load it in Edge.  And so even though, you know, we all

8  are trying to innovate, in the end in general, the features

9  that we add get standardized through a group where different

10  browser vendors come and talk to each other and agree on how

11  something should work.

12  **Q.**  Now let's talk through the first three of the five data

13  types that you just identified:  IP address, URL, and user

14  agent string.

15      Are these three types of data only sent in Chrome?

16  **A.**  No.  They're sent by all browsers.

17  **Q.**  What would happen if Chrome did not transmit an IP

18  address?

19  **A.**  If -- if Chrome didn't transmit an IP address, the server

20  wouldn't know who to send the information back to.

21  **Q.**  What would happen if a browser didn't transmit the user

22  agent string?

23  **A.**  The server wouldn't know what version content to return to

24  the -- to the browser.

25  **Q.**  And why is that important?

FELT - DIRECT / CRAWFORD

1    **A.**   So there are -- in general, the user agent string lets the

2    server know what type of functionality is there and, for

3    example, what the size might be.

4        So on a mobile phone, you're going to expect a smaller

5    version of the page than on desktop were you likely have a

6    larger screen.  For example, low power devices might get a

7    less resource-consumptive version of the websites.

8        And also, you know, if you've got some Internet -- old

9    Internet Explorer instance running on a library computer, when

10   it talks to the server, the server wants to return a version

11   that's not going to have the modern features that you might

12   expect in a modern Chrome or modern Safari so that they can --

13   that old computer in the library is still going to be able to

14   load the content.

15   **Q.**   And what would happen if a browser didn't transmit URL

16   information?

17   **A.**   So there are two parts of URL.  For example, in

18   wikipedia.org/dogs, the first part is what website should be

19   returned.  Some servers host content from multiple websites.

20       The second part is the specific piece of information,

21   right?  In this case, you want to read about dogs.  You don't

22   want to go to the Wikipedia home page.  So if the URL wasn't

23   present, the server wouldn't know specifically what piece of

24   information to return.

25   **Q.**   And what about cookies?  Are cookies only sent in Chrome?

FELT - DIRECT / CRAWFORD

1    **A.**    No.    Cookies are sent in other browsers as well.

2    **Q.**    Are you aware of user settings that may impact whether

3    Chrome sends cookies when a user visits a specific website?

4    **A.**    Yes.    So users can go into settings and change when they

5    want cookies to be sent.    They can clear cookies.    They can

6    set a policy that, for example, clears cookies every time you

7    shut down the browser.    And you can also get a different

8    cookie policy based on whether you're using Incognito mode or

9    main browser mode.

10    **Q.**    And are these settings available to users of the Chrome

11    browser?

12    **A.**    Yes.

13    **Q.**    Does Chrome ever circumvent or modify these settings once

14    they've been set by a user, to your knowledge?

15    **A.**    No.    And if that happened, I would consider it a bug.

16    **Q.**    Now what would happen if a browser didn't transmit

17    cookies, whether by default or otherwise?

18    **A.**    Cookies are used for things like implementing

19    authentication or a shopping cart.    So, for example, if I'm on

20    one version of my bank website and then I open another window,

21    another tab to my banking website, I expect to still be logged

22    in.    That functionality is like using cookies.

23        Similarly shopping carts.    If, you know, maybe I've got

24    five different Amazon windows open.    I expect that my shopping

25    cart will be available in each of them.

FELT - DIRECT / CRAWFORD

1   **Q.**   Does Chrome currently block third-party cookies by

2   default?

3   **A.**   Not by default in the main browsing mode.   Although by

4   default, Incognito browsing does not include third-party

5   cookies.

6   **Q.**   Why doesn't Chrome block third-party cookies in default

7   across all modes even though it does Incognito?

8   **A.**   You know, it's -- it's something that the Chrome team has

9   put a lot of thought into.   There was -- there's been a

10   general discussion with the public, with web developers, with

11   advertising companies to think about how the web could

12   transition away from relying on third-party cookies for

13   advertising.

14       The reason why it's so important today is because most

15   Internet content is free to me as a viewer because they're

16   supported by advertisements.   The fact that these

17   advertisements are there, that I see them, that I click on

18   them allows that content to be produced without a cost to me

19   specifically.

20       Now, that technology today in most companies depends on

21   the fact that browsers are transmitting third-party cookies.

22       If Chrome were to overnight stop extending third-party

23   cookies to any -- in any context, it would really devastate

24   the revenue model underlying this industry.

25       Now, we've been looking at how to move off of that.   And

1    there is a publicly available timeline outlining new API's

2    that Chrome is trying to lease so that we can eventually stop

3    transmitting third-party cookies.  And this has been done with

4    a lot of input from developers as well as regulators.

5    **Q.**  You previously explained that websites execute HTTP

6    requests.  Are those requests used to return both first- and

7    third-party web content?

8    **A.**  Yes.

9    **Q.**  Is there anything unusual about this, Dr. Felt?

10   **A.**  No.  That's in general how the Internet works.  If I'm

11   building a website for myself, I'm not going to want to

12   reimplement everything.

13       You know, imagine that I own a restaurant company and I

14   wanted to let people know how to find my restaurant.  I'm not

15   going to go out and build a mapping service.  However, I might

16   want to embed Bing Maps so that people can see in iframe where

17   my business is.

18       And in that context, you know, the browser would -- you

19   know, the URL the user types in would be for my web -- for my

20   restaurant company, but then in an iframe there would be

21   content coming from Bing Maps.

22   **Q.**  And is Bing Maps an example of a third-party web service?

23   **A.**  Yes.

24   **Q.**  Does Chrome support third-party web services in the

25   context of loading and rendering websites?

1   **A.**   Yes.

2   **Q.**   And do all other major browsers also support third-party

3   services in this context?

4   **A.**   Yes.

5   **Q.**   Does Google offer third-party web services to your

6   knowledge?

7   **A.**   Yes.

8   **Q.**   Does Chrome transmit the same information to Google's web

9   services as it does to other third-party services?

10  **A.**   Yes.  The only exception would be the X-Client Data Header

11  which is only included to a subset of Google-owned domains.

12  **Q.**   And what would happen, Dr. Felt, if Google's web services

13  didn't receive IP address, user agent string, and URL?

14  **A.**   Well, as I mentioned earlier, they might not work.  They

15  certainly wouldn't work if they didn't have an IP address

16  because they wouldn't know where to return the information to.

17         User agent string, we run into compatibility problems.

18         And for the URL, we wouldn't know, you know, what exact

19  information to return.

20         Now in some cases like, for example, returning a font from

21  Google fonts, you know, this might change the look of the page

22  but not outright break it.  But if you want to embed a YouTube

23  video on your page and we're not telling YouTube what video to

24  display, then it's not going to work and the meaning of the

25  page might be completely altered.

FELT - DIRECT / CRAWFORD

1  **Q.**  Is Google the only browser manufacturer to offer a web

2  browser and third-party web services?

3  **A.**  No.  Apple and Microsoft both do as well.

4  **Q.**  Can you repeat that answer, please?

5  **A.**  No.  Microsoft and Apple both do as well.

6  **Q.**  Now, would you expect those two companies to send data

7  back to their respective browser manufacturers when a user

8  visits a website utilizing the manufacturer's web services?

9  **A.**  Yes.  For example, Apple has a podcast player where you

10  can load Apple podcasts.

11      In Safari, when Safari is loading a web page that has an

12  iframe that has the Apple podcast player in it, I would

13  suspect IP address to be transmitted, user agent string to be

14  transmitted, and the URL to be transmitted.

15  **Q.**  I want to come back -- oh, let me ask one more question on

16  the topic.

17      What happens for browsers that don't offer third-party web

18  services?  Are you aware of any such browsers?

19  **A.**  I don't think that either Firefox or Brave offer web

20  services.

21  **Q.**  So would you expect Firefox or Brave to get the at-issue

22  data through the third-party context if they don't offer

23  third-party web services?

24  **A.**  Well, no, I wouldn't expect that they would run into this

25  because they're not offering those services.

1    **Q.** Now, you mentioned the X-Client Data Header a few times,

2    and I just want to briefly revisit that.

3        What is the function of the X-Client Data Header,

4    Dr. Felt?

5    **A.** The X-Client Data Header is part of how we do AV trials

6    before we roll out features. So, for example, let's say we

7    are testing something that's meant to improve latency, meaning

8    how fast the page loads.

9        If we rolled it out to a hundred percent and then it turns

10   out it doesn't work or it has bugs, well, we're a pretty big

11   browser so that would have a pretty big negative impact.

12       So instead we might do a 5 percent trial where 5 percent

13   would be in group A with the new thing, 5 percent would be in

14   B with the current behavior, and the -- the rest would not be

15   involved in the experiment.

16       And the X-Client Data Header would allow us to sort of

17   mark the requests going to Google servers as being either in

18   group A or in group B. And that way we could measure in

19   aggregate to connections from group A generally load faster

20   than connections from group B.

21   **Q.** Now, you mentioned that if 5 percent was in group A and

22   5 percent was in group B, there is a remaining percentage of

23   browser instances that would not have -- be associated with an

24   experiment.

25       Does that mean that there are instances where an X-Client

1    Data Header value is not attributed to a specific browser

2    instance?

3    **A.**   So there are times when a client might not transmit an

4    X-Client Data Header.  Various reasons.  An enterprise policy

5    might prevent it from being set.  A firewall might prevent it

6    from being set.  Or for whatever reason the client hasn't been

7    assigned into any experiment groups.

8    **Q.**   Is the X-Client Data Header value that you just mentioned

9    unique to any individual Chrome user?

10   **A.**   No.  It's designed not to be unique.  Again we're looking

11   at behaviors in aggregate.  We're not looking at individual

12   clients.

13   **Q.**   Is the X-Client Data Header used to track users of the

14   Chrome browser?

15   **A.**   No.

16   **Q.**   Is the X-Client Data Header used to serve personalized ads

17   through the Chrome browser?

18   **A.**   No.

19   **Q.**   But isn't the X-Client Data Header sent to

20   DoubleClick.net?

21   **A.**   Yes, it is.  And that was for an experiment for a protocol

22   called QUIC.  QUIC is an alternative to TCP.  And like I was

23   saying earlier, this actually was -- was intended to speed up

24   latency, particularly in cases of multiplex connections.

25        And when my colleagues were working on this, they wanted

1    to know is this going to make ad requests faster or slower.

2    We didn't just look at ads.  We looked at other types of

3    requests.  But we're talking specifically about DoubleClick

4    here.

5         So the question was, you know, would people go in the TCP

6    group or they would go in the QUIC group.  And actually I

7    think they maybe had two or three different groups relating to

8    QUIC at the time that they were testing against each other.

9         And then they looked in aggregate to see what the latency

10   was, meaning the load time for connections using these

11   different versions.

12   **Q.**  Now in the course of that experiment or otherwise, has the

13   X-Client Data Header been used in selecting or returning ads

14   to users?

15   **A.**  No.

16   **Q.**  Does Google combine the X-Client Data Header with other

17   types of data like the IP address or the user agent string to

18   track users?

19   **A.**  No.

20   **Q.**  And is Chrome the only browser to routinely send data back

21   to its manufacturer?

22   **A.**  Other browsers also have telemetry platforms.  For

23   example, Firefox has a telemetry platform.  You can view some

24   of their aggregate statistics publicly on the web that result

25   from the platform.

1    I also believe that Edge has their own telemetry platform

2    that's fairly similar --

3              (Court reporter clarification.)

4         **THE WITNESS:**  I also believe Edge has their own

5    telemetry platform based on UMA.  UMA is U-M-A.  Because they

6    are a fork of Chrome -- Chromium.

7    **BY MS. CRAWFORD:**

8    **Q.**  Now, Dr. Felt, I'd like to ask you about browser

9    functionality and whether or not browsers serve other

10   functions than rendering and loading websites which is

11   something that you spent a few moments of your time today

12   testifying about.

13        Are there other features that browsers offer?

14   **A.**  Yes.  Browsers try to make it generally easier to access

15   the Internet.  So for example, the translate feature, if I

16   load a page that's in a language I don't speak, the

17   translation feature can translate it to English or Spanish for

18   me.

19        Auto fill, password management, other features like that.

20   We also have a feature called sync that makes it easy for you

21   to get access to pages you've recently visited across multiple

22   devices that are all signed in and syncing.

23   **Q.**  Let's focus on the last item that you just mentioned in

24   that list which was the sync feature.  How does that feature

25   work in Chrome specifically?

FELT - DIRECT / CRAWFORD

1    **A.**    Let's say I have Chrome on my desktop and also Chrome on

2    my phone.    If I'm enabled for sync on both, I may be doing

3    some task in the elevator, on the train on my phone.    And then

4    I want to finish it on my desktop when I get -- get back to my

5    house or office.

6        If I turn sync on and enable browsing history as one of

7    the types of data to be synced, then the list of URLs that I'm

8    visiting over time, specifically kind of the ones you'd see at

9    the top of a -- of the top, the top of the window will be

10   synced to Google server.

11       And then at the end of the day, I get off the train.    I

12   get home.    I log on on my desktop.    I'm able to see the tabs

13   that are open on my other device.    I can just click on them

14   and then continue my task there on the other device.

15   **Q.**    Now, can a user choose what information to sync across

16   their devices?

17   **A.**    Yes.    So you can have sync not turned on at all.    Some

18   people use the browser that way.    Or you can enable sync and

19   within that you can choose.    By default all types are enabled

20   once you've turned on sync.    But you can choose.    You can sync

21   extensions and not browsing history.    Or you can -- you know,

22   I think there's maybe ten different types of data set you can

23   choose from.

24   **Q.**    So just to be clear, Chrome browsing history is an example

25   of information that a user can choose to sync with their

FELT - DIRECT / CRAWFORD

1    Google account; is that right?

2    **A.**   Yes.

3    **Q.**   Is Chrome browsing history automatically sent to Google

4    when a user enables sync?

5    **A.**   You have to enable the feature first.  And once it's

6    enabled, then data would be sent to Google servers.

7    **Q.**   Otherwise would Chrome browsing history be sent to sync

8    when a user is not syncing?

9    **A.**   No.

10   **Q.**   If a user visits a non-Google website with Google web

11   services, does enabling or disabling sync impact whether

12   Chrome sends Google's web services the at-issue data?

13   **A.**   No.  The features are totally not related.  You know,

14   there's the core browser functionality of loading websites

15   which includes loading subresource context, third-party

16   context.  And then there's also this sync feature which is

17   something built in addition to the core browsing functionality

18   to make it easier to use the browser across devices.

19   **Q.**   Do browsers other than Chrome offer a sync feature?

20   **A.**   Yes.

21   **Q.**   Can you give a few instances of browsers to offer the

22   feature?

23   **A.**   I know that Safari and Edge both offer their own sync

24   features.

25   **Q.**   And do the Chrome features in those browsers work roughly

1    similarly to how you described it working in Chrome in terms

2    of the ability to sync information across devices?

3    **A.**   Yes.  The core value proposition of sync on these multiple

4    different browser types is that you can access your browsing

5    history across multiple devices or, for example, when you go

6    from an old iPhone to a new iPhone.

7    **Q.**   In Safari, Edge, and Firefox, which are browsers that have

8    sync features, are IP address, user agent, URL information

9    sent to third-party web services when the user does not sync?

10   **A.**   Yes.  Because that core browser functionality of loading

11   websites isn't related to their sync features.

12   **Q.**   Now, what if the third-party web service is owned and

13   operated by the same company that manufacturers the browser,

14   is that same information sent regardless of whether the user

15   is synced?

16   **A.**   Yes.  I wouldn't expect any difference.  If I'm using Edge

17   and, you know, I go to that restaurant web page that has a

18   Bing map embedded in it, I would expect that even if sync is

19   off when you're using Edge, Edge is still going to load the --

20   the Microsoft's Bing map.  And in order to do that, they'll

21   have to send IP address, it will send the URL, it will send

22   the user agent string.  That's all.

23   **Q.**   So for those two companies, does the sync feature control

24   whether each browser sends their respective third-party web

25   services the at-issue data?

1    **A.**    No.  It does not control that.

2    **Q.**    And is the same true for the Chrome browser?

3    **A.**    The same is true for the Chrome browser, yes.

4         **MS. CRAWFORD:**  Thank you.  No further questions.

5         **THE COURT:**  All right.  Let's go ahead and we'll

6    stand in recess until 1:30.  I would ask that everybody leave

7    the courtroom so that my staff gets a break.

8         Thank you.

9         (Recess taken at 12:44 P.M.; proceedings resumed at

10    1:30 P.M.)

11         **THE COURT:**  Let's go back on the record.

12         We're back on the record.  The record will reflect that

13    the witness is on the stand.

14         Counsel, cross-examination, and please identify yourself.

15         **MS. ORNELAS:**  Good afternoon, Your Honor.  Angelica

16    Ornelas.

17         **THE COURT:**  You may proceed.

18                        **CROSS-EXAMINATION**

19    BY MS. ORNELAS:

20    **Q.**  Good afternoon, Dr. Felt.  Welcome back.  I hope you had a

21    nice lunch.

22    **A.**  Thank you.

23    **Q.**  Chrome does not block third-party cookies by default,

24    right?

25    **A.**  In normal browsing mode, correct.

FELT - CROSS / ORNELAS

1    **Q.**  Safari does block third-party cookies by default, right?

2    **A.**  Some cookies, yes.

3           **THE COURT:**  You need to speak up.  I can't hear you.

4           **THE WITNESS:**  Some cookies, yes.

5    BY MS. ORNELAS:

6    **Q.**  Firefox blocks third-party cookies by default, right?

7    **A.**  Some cookies, yes.

8    **Q.**  Does Firefox block third-party cookies sent by

9    DoubleClick?

10   **A.**  I don't know.  I'm sorry.

11   **Q.**  Do you agree that defaults matter for end user of a

12   browser?

13          **MS. CRAWFORD:**  Objection.

14          **THE COURT:**  I don't understand that question.  And I

15   don't know why her opinion on that matters.

16          **MS. ORNELAS:**  Understood, Your Honor.  I'll move on.

17   **Q.**  Dr. Felt, do you understand that the data issue in this

18   case includes third-party cookie transmissions to Google?

19   **A.**  Yes.

20   **Q.**  And is it correct that Chrome sends third-party cookies

21   and browsing history information to Google on non-Google

22   websites even when a user is not synced?

23   **A.**  I'm sorry.  Can you repeat that --

24   **Q.**  Sure.  I'll --

25   **A.**  -- at the end.

FELT - CROSS / ORNELAS

1    **Q.**    -- try and make it better.

2         Do you agree that Chrome sends third-party cookies and

3    browsing history information to Google DoubleClick on

4    non-Google websites even when a user is not synced?

5    **A.**    No.  Google does not send browsing history to DoubleClick.

6    **Q.**    Safari does not send third-party cookies and browsing

7    history information to Google on non-Google websites, correct?

8    **A.**    Safari will send first-party cookies to Google.

9    **Q.**    Understood.  My question was a little bit different.

10   Safari does not send third-party cookies and browsing history

11   information to Google on non-Google websites, right?

12   **A.**    It might.  It would depend on the user settings.

13   **Q.**    Firefox does not send third-party cookies and browsing

14   history information to Google on non-Google websites, correct?

15   **A.**    It would depend on the user settings.

16   **Q.**    And if we're talking default settings?

17   **A.**    By default, I think that -- so Firefox has a list of which

18   sites can and cannot receive third-party cookies by default.

19   I don't think that cookies are attached to most Google domains

20   when they're in third-party context in Firefox by default.

21   **Q.**    Thank you, Dr. Felt.

22        You testified earlier that the X-Client Data Header is not

23   used to deliver ads, correct?

24   **A.**    Yes.

25   **Q.**    Is it correct that Google uses the X-Client Data Header to

1    conduct A/B testing for Google advertising products?

2    **A.**    It's used broadly for A/B testing for Chrome changes.

3    **Q.**    And not for Google advertising products.

4    **A.**    Not for Google advertising products.

5    **Q.**    So, for example, the -- would the X-Client Data Header be

6    used to measure whether or not ads load faster?

7    **A.**    Yes, it might be used for that.

8    **Q.**    Thank you.

9         The X-Client Data Header appears in personal display ads,

10    queries logs, correct?

11    **A.**    I can't -- I'm not sure.  I can't speak to exactly which

12    logs it's recorded in.

13         There are multiple logs versus my understanding is that

14    the X-Client Data Header would be received and used for

15    wherever they're doing the aggregate analysis of the results

16    of the A/B tests but would not move further downstream in logs

17    that are used for advertising purposes.

18    **Q.**    So would it surprise you to learn that X-Client Data

19    Header appears in a personal display ads queries log?

20    **A.**    I'm not sure.  I would need to learn more about the log

21    source and what it was used for.

22    **Q.**    Thank you, Dr. Felt.

23         You testified earlier that if Chrome started blocking

24    third-party cookies by default, it would devastate the ads

25    revenue model; is that right?

FAIR - DIRECT / BROOME

1    **A.**  Yes.

2    **Q.**  And that would include Google's ad revenue model, correct?

3    **A.**  Yes.

4    **Q.**  Thank you, Dr. Felt.  I don't have anything further.

5            **THE COURT:**  Any other questions?

6        If not, next witness.

7            **MS. CRAWFORD:**  Nothing further, Your Honor.

8            **THE COURT:**  All right.  You're excused.  Thank you.

9        Next witness.

10           **MR. BROOME:**  Your Honor, we'll call Mr. Greg Fair.

11                     (Pause in the proceedings.)

12           **THE CLERK:**  Will you please approach the witness

13   stand.

14       Raise your right hand.

15                          **GREGORY FAIR**,

16   called as a witness by the defendant, having been duly sworn,

17   testified as follows:

18           **THE CLERK:**  Thank you.  You may put your hand down,

19   be seated.  State your full name, spell your last name.

20           **THE WITNESS:**  Full name is Gregory Lon Fair, last

21   name spelled F- as in frank, A-I-R.

22           **THE COURT:**  Good afternoon.

23       You may proceed.

24

25

FAIR - DIRECT / BROOME

## DIRECT EXAMINATION

**BY MR. BROOME:**

**Q.**  Mr. Fair, good afternoon.

**A.**  Good afternoon.

**Q.**  Where do you currently work?

**A.**  I work at the California Department of Technology.

**Q.**  And what is your position at the California Department of Technology?

**A.**  I'm the Digital Identity Chief and Acting Chief Product Officer for the State of California Department of Technology.

**Q.**  And what are your -- what are your responsibilities in that role?

**A.**  I run a product team focusing on digital identity and some of the underlying technology platforms that the State uses for things like its California.gov websites.

**Q.**  What's digital identity?

**A.**  Digital identity is the way you sign in to things when you're online.  And in California right now, there's a whole bunch of different digital identities like you might have at the DMV or you might have at the Parks and Rec service.  And so I oversee all of those and how they might fit together.

**Q.**  How long have you held that position, Mr. Fair?

**A.**  About a year, since December of last year.

**Q.**  And where did you work before December of last year?

**A.**  I was at Google.

FAIR - DIRECT / BROOME

1    **Q.**  And can you explain your role and -- title and role at

2    Google?

3    **A.**  Sure.  For a -- the most recent chunk of time I was at

4    Google, I was the senior product manager in the privacy and

5    data protection office at Google where I oversaw a team of

6    product managers that worked specifically on Google's

7    user-facing privacy products and privacy technologies.

8         **THE COURT:**  Okay.  Why would you leave Google to go

9    work for the State?

10        **THE WITNESS:**  I had been at a startup before that.

11   But a long time ago, I was a teacher.  And I think it was

12   about time.  I was kind of ready to get back on the --

13   lifelong Californian.  It just seemed like the right thing to

14   do at the right moment in time.

15        **THE COURT:**  So were you not in California when you

16   were working for Google?

17        **THE WITNESS:**  I was.

18        **THE COURT:**  Okay.  All right.  Go ahead.

19   **BY MR. BROOME:**

20   **Q.**  What's the privacy and data protection office at Google?

21   **A.**  It is a department within Google that was focused on

22   privacy and privacy products.  So thinking about privacy

23   across all of Google's services and products.

24   **Q.**  Are you being paid by Google for your time spent preparing

25   and attending the hearing today?

FAIR - DIRECT / BROOME

1   **A.**   No, I'm not.

2   **Q.**   And so what are you doing here?

3   **A.**   I -- in my time at Google, I was there for almost ten

4   years, a really big significant portion of the time I spent

5   there was working on privacy-related issues and trying to make

6   sure that we were doing the best we could.  I led a team that

7   was focused on that.

8       And my understanding of the case was that some of that

9   work was being represented in a way that did not seem like an

10  interpretation that was accurate, and I wanted to be able to

11  help explain things wherever possible.

12  **Q.**   Are you familiar with the data collection that's at issue

13  in this case, Mr. Fair?

14  **A.**   Yes, I am.

15  **Q.**   And can you describe it at a high level?

16  **A.**   At a high level, my understanding is it relates to the

17  data that is collected on websites that are non-Google

18  websites that included Google third-party services.

19  **Q.**   And is that data collection by Google unique to Chrome

20  users?

21  **A.**   No, it's not.  It's browser-agnostic.

22  **Q.**   Mr. Fair, are you familiar with a feature available to

23  Google account holders called "My Activity"?

24  **A.**   I'm very familiar with it, yes.

25  **Q.**   And when you say very familiar, why is that?

FAIR - DIRECT / BROOME

1    **A.**  I was the lead product manager on that when it first

2    launched.

3    **Q.**  Okay.  And can you explain what My Activity is?

4    **A.**  Sure.  My Activity is a place where Google account holders

5    can go to see the information associated with their account.

6    They can -- it's a transparency tool in that way.  You can

7    actually see it in -- in detail.  You can also take action on

8    it.  So it's also a control tool.  You can edit individual

9    items or delete individual items, delete the entire set of

10   items.  You can also get more information about individual

11   item.  And you can also change the settings that correspond to

12   that data.

13   **Q.**  And how does it fit into the data collection that's at

14   issue in this case?

15   **A.**  It -- it's -- this is the place where Google's account --

16   the Chrome sync data is -- is stored.  It's when it's tied to

17   a Google account.  So this is Google account data.

18   **Q.**  Okay.  You said Chrome sync data.  But do you understand

19   that the -- the data at issue in this case is the data that --

20   I think you said before is the data that Google receives

21   through third-party web services?

22   **A.**  Yes --

23   **Q.**  Correct?

24   **A.**  -- I understand that.

25   **Q.**  Okay.  And is -- is that the same as Chrome sync data?

1    **A.**  No, it's not.  So it's specific to the account type data.

2    And there may be some overlap in some cases, but that's the

3    whole point, that this is actually an account tool related to

4    account data.

5    **Q.**  So does the -- does the at-issue for Google account

6    holders browsing in Chrome, does the at-issue data show up in

7    their My Activity?

8    **A.**  The only way that it would show up in there is if they had

9    a number of settings on and certain services had it enabled.

10   **Q.**  Okay.

11   **A.**  So related specifically to the Google data control

12   settings.

13   **Q.**  All right.  And if -- if the Chrome user is signed into

14   their account, for example, and browsing, browsing while

15   signed into their account and had executed the appropriate

16   consents, would that -- the at-issue data show up in their

17   accounts?

18   **A.**  That's exactly when it would show up in the accounts, and

19   it would be displayed in the My Activity tool.

20           **MR. BROOME:**  No further questions.  Thank you.

21           **THE COURT:**  All right.  Any cross?

22       And don't forget to identify yourself.

23           **MR. STRAITE:**  Good afternoon, Your Honor.  And good

24   afternoon, Mr. Fair.  David Straite for the plaintiffs.

25

FAIR - CROSS / STRAITE

<u>CROSS-EXAMINATION</u>

**BY MR. STRAITE:**

**Q.**  Mr. Fair, do you recall last year you were deposed in this case?

**A.**  I do remember.

**Q.**  Did you recall it was me --

                    (Simultaneous colloquy.)

          **THE COURT:**  One at a time.

          **THE WITNESS:**  I'm sorry.

          **THE COURT:**  Well, you don't know.  He knows.

     Go ahead.

          **MR. STRAITE:**  Ms. Paulson, could we have the declaration, please.  Sorry.

                    (Pause in the proceedings.)

**BY MR. STRAITE:**

**Q.**  Mr. Fair, do you remember executing a declaration in support of summary judgment in this case?

**A.**  I do.

          **MR. STRAITE:**  Your Honor, we're handing -- circulating what is styled as Declaration of Greg Fair in Support of Google's Motion for Summary Judgment.

     This appears on the docket at 393-4.

     And plaintiffs understand this is the declaration that Your Honor referred to in the order setting this hearing.

**Q.**  Mr. Fair, do you have this document in front of you?

1    **A.**    I do.

2    **Q.**    Please take a moment to look at it.  Does this document

3    look familiar?

4    **A.**    I haven't been through the whole thing, but it certainly

5    looks familiar based on the first couple of pages.

6    **Q.**    And on the last page, do you see it says executed on this

7    29th day of November 2021 in Los Altos, California.  Do you

8    see that?

9    **A.**    I do.

10    **Q.**    Is that your signature?

11    **A.**    It is.

12    **Q.**    Did you write this document?

13    **A.**    I approved all the language in it and worked with a number

14    of folks to -- to get it written in the way that was

15    appropriate for this particular forum.

16    **Q.**    Okay.  And could you please turn to page 2 and in

17    particular paragraph 5.

18         Could you please read paragraph 5 aloud?

19    **A.**    Five.  When a user visits a website choosing to use

20    certain Google services such as Google's advertising or

21    analytic services (the Google services), Google may receive

22    certain categories of data to provide to Google services.

23    Google's receipt of such data is not contingent on whether the

24    user is browsing in Chrome as opposed to another --

25                        (Off-the-record discussion.)

 1          **THE WITNESS:**  -- as opposed to another browser

 2    because the Google services are, quote, browser-agnostic, end

 3    quote, i.e., all other things being equal, Google services

 4    receive the same categories of data (with the exception of the

 5    X-Client Data Header) regardless of the browser.

 6    **BY MR. STRAITE:**

 7    **Q.**  Did you write that paragraph, Mr. Fair?

 8    **A.**  As I mentioned, I did approve the language and -- and

 9    reviewed it.  I didn't author every word verbatim.

10    **Q.**  What did you mean by the word "categories" in that

11    paragraph?

12    **A.**  Let me see where that is.

13          So in the third line, it looks like line either 20 or 21,

14    when we talk about the types of categories of data, there are

15    certain types of data that just travel when rendering web

16    pages.  And some of those are passed along to Google when

17    providing certain Google services.  So that might be something

18    like an IP address or a user agent.

19    **Q.**  Okay.  Are third-party cookies a separate category?

20    **A.**  Are third-party cookies a separate category of data from

21    what?

22    **Q.**  As you're using the word "categories" here, are

23    third-party cookies a category of data as you were using the

24    word "categories" here?

25    **A.**  (Reviewing document.)

1    I don't know that I would have characterized it as that

2    type of data.  Cookies are a very specific technology like a

3    web technology rather than a type of data, if you know what I

4    mean.  Like because the cookie itself actually carries data on

5    it.  Does that make sense?

6        So I think that in general I'm talking about categories of

7    data, I genuinely mean categories of data.

8    Q.  Okay.  So hypothetically if a Chrome user surfing the web

9    visits the mayoclinic.org and third-party cookies are then

10   caused to be sent to Google from the Chrome browser, is that a

11   category of data that you're referring to in this paragraph,

12   or is that not a category of data that you're referring to in

13   this paragraph?

14   A.  I think that the cookie itself is a technology.  And the

15   data on the cookie associated with it would be the data.

16   That's what I'm trying to differentiate.

17       Does that make sense?

18   Q.  No.

19   A.  All right.  So one is the vehicle by which information is

20   transferred.  The other one is the actual data itself.

21   Q.  I'm trying to figure out what you meant by

22   browser-agnostic, and you make reference to categories of

23   data.

24   A.  Uh-huh.

25   Q.  So if Chrome browser sends a third-party cookie to Google,

FAIR - CROSS / STRAITE

1    but the same visit to the same website, the Mayo Clinic

2    website, is done via Safari, and Safari does not send a

3    third-party cookie to Google, are those the same categories of

4    data being sent to Google or are they different?

5    **A.**   The data associated with the cookies would fit in the same

6    kind of categories you're talking about.  The difference there

7    is that it relates to the types of settings that might be

8    enabled by the user or by the browser.

9    **Q.**   Okay.

10   **A.**   So I think the answer is yes on the data, but no

11   specifically related to the cookie because the cookie is a

12   technology.

13   **Q.**   So if the Chrome browser sends a third-party cookie to

14   Google upon visiting Mayo Clinic, and if the Safari browser

15   does not send any third-party cookies to Google for that same

16   visit to Mayo Clinic, are the browsers -- is that data

17   delivery browser-agnostic?

18   **A.**   Absolutely.

19   **Q.**   So even though one browser is sending third-party cookies

20   and another is not, your testimony is these browsers are

21   working the same?

22   **A.**   They work exactly the same because they respect the

23   browser settings related to third-party cookies.  Every

24   browser, at least every major browser that I'm aware of, has

25   the ability to deliver cookies, first-party or third-party

1    cookies.  There are settings associated with them.  There are

2    even additional settings that allow an individual user to set

3    specific websites they might or might not want to -- to

4    permission.

5    **Q.**  And same hypothetical.  A user is visiting the Mayo Clinic

6    website, first using Chrome, second using Safari.  Suppose

7    Chrome sends a URL of that visit to Google and Safari sends a

8    shorter URL associated with that visit.  Is that the same

9    category of information or is that different?

10   **A.**  The URL itself would probably fit in the same category of

11   information.  There are any number of reasons why there might

12   be minor differences between the way the technology is passed.

13       Although I wouldn't frame it as again the browser sending

14   it.  This is a matter of the -- the request to render the web

15   page, information gets passed to the rendering service.  In

16   this case it would be Chrome or Safari as you were talking

17   about.

18       So it's -- it's not exactly how you're framing it, but

19   that's roughly accurate.

20                    (Off-the-record discussion.)

21           **MR. STRAITE:**  Ms. Cruz is going to circulate another

22   document.  These are excerpts from a 30(b)(6) deposition of a

23   Google employee named Michael Kleber.  These excerpts, Your

24   Honor, were exchanged between counsel, and we stipulated that

25   these can be admitted.

 1                THE COURT:  Does it have a number?

 2                THE CLERK:  Is this the number on here, A2?

 3                MR. STRAITE:  Yes.

 4                THE COURT:  What is the number?

 5                MR. STRAITE:  I think it's A2.

 6                THE WITNESS:  Yes, Your Honor.

 7                THE COURT:  If I have a number, I have it.

 8                MR. STRAITE:  May I see it?

 9     Q.  Mr. Fair, do you know the name Michael Kleber?

10     A.  I am familiar with it through the deposition.

11     Q.  Have you ever met Mr. Kleber?

12     A.  I don't remember meeting Mr.  --

13     Q.  Have you ever spoken with him?

14     A.  I do not remember having spoken with him.

15     Q.  Is he an engineer?

16     A.  I can't remember.

17     Q.  Are you an engineer?

18     A.  I am not an engineer.

19     Q.  Are you familiar with the concept of a 30(b)(6)

20     deposition?

21     A.  I am not.

22     Q.  Okay.

23         Could you please open this exhibit?  We're going to use

24     the numbered pages from the excerpts.  We'll start with

25     page 11.

```
 1    A.   (Reviewing document.)

 2    Q.   Do you have page 11 in front of you?

 3    A.   I do.

 4    Q.   Do you see line 10 has the Q and then it says the word

 5    "and."  Do you see that line?

 6    A.   Yes.

 7    Q.   So the question at this deposition is:

 8         "And what is the difference between Chrome and Apple

 9    Safari as it relates to third-party cookies?"

10         There's then an objection.

11         And then starting on line 14, the witness, this is

12    Mr. Kleber speaking on behalf of Google, says:

13         "Things are in the middle of changing in the world of

14    browsers.  So at the moment, I would say every major browser

15    handles cookies differently.  They were used" -- sorry --

16    "There used to be consistency across browsers.  And right now,

17    there are many browsers, each experimenting with different

18    ways of changing the web to make it more private, especially

19    in the context of cookies.

20         "So no two browsers have the same behavior at the moment."

21         Then flip to the next page, please, page 12.  We'll start

22    with line 4.  Mr. Barnes then asked Mr. Kleber:

23         "And now, you just testified that all browsers, if I could

24    go down further, no two browsers have the same behavior at the

25    moment.  Can you explain that?"
```

1          And then there's an objection.

2          And then the witness, Mr. Kleber, continues on line 9:

3          "Yeah, that is absolutely the unfortunate situation that

4    we're in right now.  All browsers would prefer to get to an

5    end state in which everybody agreed on how the web should

6    work.  Generally, you can't do that all at once.  Browsers are

7    trying out different possibilities for what that more private

8    and sustainable end state ought to be.  And probably the

9    ultimate destination will be some combination of the different

10   approaches that the different major browsers are in the middle

11   of working through and talking about and collaborating on

12   right now."

13         Were you aware that Mr. Kleber testified on behalf of

14   Google that the browsers are, quote, different?

15   **A.**  I didn't see where he specifically said that the browsers

16   are different, but I did see he was addressing some of the

17   ways that browser technologies are approaching privacy.

18   Sorry, I didn't see that exact quote.

19   **Q.**  Do you see he uses the word "differently" on line 17 of

20   page 11?

21   **A.**  Differently, yes.

22   **Q.**  Specifically with respect to third-party cookies?

23   **A.**  Which line was that?

24   **Q.**  What?

25   **A.**  Which line was that?  I'm sorry.

FAIR - CROSS / STRAITE

1    **Q.**   That's lines 16 and 17 of page 11.

2    **A.**   Yes.  So --

3    **Q.**   Did you --

4    **A.**   -- where he's saying that each major browser handles

5    cookies differently, yes, I saw that.

6    **Q.**   Do you have any reason to believe that Mr. Kleber is

7    wrong?

8    **A.**   I do not.

9    **Q.**   Mr. Fair, what is ITP as used by Apple?

10   **A.**   They're -- in the Apple space, it's a -- it's a targeting

11   setting effectively that provides an anonymous identifier in

12   order for ad targeting on the iOS platform.

13   **Q.**   Okay.  Let's delve into what ITP is specifically and how

14   it handles transmissions to Google differently from Chrome.

15        So first of all, if ITP in its default state on Safari is

16   used, will it block third-party cookies automatically?

17   **A.**   I am not familiar with the current default settings for

18   how they're -- how Apple is setting ITP on Safari.

19   **Q.**   Were you familiar with ITP on November 29th when you

20   signed your declaration?

21   **A.**   Yes.

22   **Q.**   And on November 29th of last year, did ITP, in its default

23   state on Safari, block third-party cookies?

24   **A.**   I believe that it did.

25   **Q.**   Okay.  And what else does ITP do to -- when it's

1  deciding -- executing code on how to transmit data to Google,

2  what else does ITP do?

3  **A.**  I'm not sure how to process that question.  I'm sorry.

4  **Q.**  Okay.  Does ITP block known trackers?

5  **A.**  I don't know that I would characterize -- and this is

6  maybe a better question for the Apple team and how they're

7  building that browser, the way they're treating that

8  particular setting and additional -- the additional things

9  they are putting on top of it.

10      I think that it sounds like what you're asking is that in

11  the settings default state on or off, how does it work.  And I

12  think that in general when these settings are on, they allow

13  for web technologies to work as web data is transferred.  And

14  in general when they are off, they limit that targeting.

15  **Q.**  My question is whether Safari's ITP will block known

16  trackers?

17  **A.**  I believe that Safari has its own specific list of known

18  trackers that it tries to block.  And I understand that other

19  companies keep different lists.

20  **Q.**  Do you know whether Google is on the list of known

21  trackers blocked by ITP?

22  **A.**  I do not know that.

23  **Q.**  Did you know it at the time you signed your declaration

24  saying that data at issue in this case is browser-agnostic?

25  **A.**  At the time of this declaration, I can't remember

1    specifically if I had a list of all the different known

2    trackers that iOS or that Apple was using in terms of its

3    blocking.

4    **Q.**  Does Apple Safari, using ITP in its default configuration,

5    have fingerprinting protection?

6    **A.**  I -- I'm not sure.

7    **Q.**  Were you sure at the time when you signed this

8    declaration?

9    **A.**  I could have looked into it and verified that, but I can't

10   remember.

11   **Q.**  Okay.  Does ITP have machine learning?

12   **A.**  To my understanding there might be some in there, yes,

13   that's what I remember about some of the browser technologies

14   that Apple was using at the time.

15   **Q.**  Would the machine learning in ITP change the way personal

16   information is sent to Google?

17   **A.**  I don't think in a way that you're characterizing that it

18   would make sense.  There are certain transfer of data via the

19   web that is simply the way the web works, and it's not being

20   transformed by the -- by artificial intelligence the way

21   you're describing it.

22   **Q.**  Does ITP in any way restrict the use of first-party

23   cookies?

24   **A.**  I am not an expert on ITP.  So diving into all the detail

25   of how Apple's products work probably would not be something I

FAIR - CROSS / STRAITE

1    would speak to in great detail.

2    **Q.**  Were you an expert on November 29th of last year when you

3    signed your declaration?

4    **A.**  Yes, I was an expert on web technologies through Google,

5    and I have a very good general understanding of the way these

6    browsers work.

7    **Q.**  And on --

8    **A.**  I was not an Apple employee at the time, sorry.

9    **Q.**  Apologize.

10    On the 29th of November when you signed your declaration,

11    what was your understanding of how ITP blocked or didn't block

12    first-party cookies that might go to Google?

13    **A.**  The main category of -- not category, wrong word.  The

14    main type of data that we're talking about relating to ITP

15    would be related to the blocking or not blocking of

16    third-party cookies and when that default was set.

17    **Q.**  Isn't it true that ITP will purge first-party cookies

18    after one day?

19    **A.**  I do not know.

20    **Q.**  Did you know on the 29th of November when you signed your

21    declaration?

22    **A.**  I do not remember.

23    **Q.**  And Firefox, are you familiar with the Firefox browser?

24    **A.**  I am similarly roughly familiar with the Firefox browser,

25    yes.

FAIR - CROSS / STRAITE

1    **Q.**  What is ETP?

2    **A.**  Each browser has kind of an equivalent version of a

3    setting that they're using.  I'm less familiar with ETP than I

4    was with ITP because it wasn't on our -- kind of on the list

5    of browsers that are used most.  It was one I was a little

6    less focused on.

7    **Q.**  Were you familiar with ETP on November 29th when you

8    signed your declaration saying that data flow is

9    browser-agnostic?

10   **A.**  I was familiar that these settings existed.  I was

11   familiar with their -- that they controlled third-party

12   cookies, and that was the main piece of information that was

13   relevant to how the web traffic was passed.

14   **Q.**  What else does ETP do in Firefox other than block

15   third-party cookies?

16   **A.**  I'm not familiar with every detail of how ETP in Firefox

17   works.

18   **Q.**  Are you -- would it surprise you to learn that Firefox

19   employs disconnect.me block lists?

20   **A.**  That wouldn't.  That's a company that I would expect them

21   to partner with.

22   **Q.**  And how does that impact the data flow at issue in this

23   case?

24   **A.**  It doesn't substantively affect it because if the setting

25   is on, third-party cookies are enabled.  If the setting is --

```
 1   excuse me -- are not passed -- let me switch that.  If the

 2   setting is enabled, then the third-party cookies don't get

 3   passed.  And if it's not enabled, then third-party cookies do

 4   get passed.

 5   Q.  And we've already established that.

 6   A.  Yes.

 7   Q.  But I'm talking beyond the third-party cookie blocker.

 8   I'm talking about the disconnect.me block list.  How is that

 9   different from third-party cookie blocking in Firefox?

10   A.  I'm not sure what you mean.  I'm sorry.

11   Q.  Disconnect.me block lists, you testified you believe are

12   used by Firefox?

13   A.  I think I testified that it did not surprise me that they

14   had used it.

15   Q.  Did you study whether disconnect.me block lists used on

16   Firefox would change the way data is sent from the Firefox

17   browser to Google?

18   A.  The primary detail related to my statement --

19   Q.  It's a yes-or-no question.

20   A.  Can you repeat the question then?

21   Q.  Did you study the extent to the which disconnect.me block

22   lists on Firefox changed the way the data issue in this case

23   is transmitted to Google?

24   A.  The specifics around disconnect.me --

25                      (Simultaneous colloquy.)
```

FAIR - REDIRECT / BROOME

```
 1    BY MR. STRAITE:

 2    Q.  It's a yes-or-no question.

 3    A.  I was trying to answer.  I'm sorry.

 4        The specifics around disconnect.me's behavior isn't

 5    something that I explicitly studied.

 6    Q.  Thank you.

 7        Is there a way in Chrome to turn on ITP the way it's used

 8    on Safari?

 9    A.  ITP is not a Chrome setting so that obviously would not

10    exist --

11    Q.  Okay.  Thank you.

12    A.  -- in Chrome.

13            MR. STRAITE:  No further questions.

14            MR. BROOME:  Just a few more.

15                    REDIRECT EXAMINATION

16    BY MR. BROOME:

17    Q.  Mr. Fair, Mr. Straite asked you a number of questions

18    about default browser settings.

19        Does your declaration that you submitted in support of

20    summary judgment in this case go into an analysis about the

21    different default browser settings?

22    A.  It does not.

23    Q.  Does your declaration address Safari ITP?

24    A.  It does not.

25    Q.  Does your declaration focus at all or analyze how Chrome
```

1    default privacy settings are different than Safari's default

2    privacy settings?

3    **A.**   It does not.

4    **Q.**   Did you -- did your declaration instead address whether

5    Google's services are designed to collect the same data from

6    all browsers regardless of which default or user-enabled

7    settings are being used?

8    **A.**   Yes.  I think that was the primary thrust exactly.

9    **Q.**   Mr. Fair, why don't Google's disclosures for the data

10   collection at issue here distinguish between browsers and

11   highlight all of the different browser settings, default or

12   otherwise, that may affect what data Google receives?

13          **MR. STRAITE:**  Objection, Your Honor.  I thought we

14   already had a ruling about not talking about the disclosures

15   in legal argument.

16          **THE COURT:**  I think that that's appropriate.

17   Sustained.

18          **MR. BROOME:**  Withdrawn.

19      No further questions.  Thank you, Mr. Fair.

20          **THE COURT:**  All right, sir.  You may step down.

21   Thank you.  You're excused.

22      Next witness.

23          **MS. TREBICKA:**  Your Honor, Google would like to call

24   Michael Kleber.

25          **MR. BARNES:**  Your Honor, this is the -- what we

1    previewed early where we have an objection to Mr. Kleber's

2    testimony.  We call him in lieu -- we wanted 30(b)(6)

3    testimony from Google.  Google agreed to that.  That's all we

4    wanted him for.

5        Google did not submit an affirmative outline for

6    Mr. Kleber as required by the Court's order, and we object to

7    his testimony.

8            **MS. TREBICKA:**  And, Your Honor --

9            **THE COURT:**  Noted.

10       Next witness.

11           **MS. TREBICKA:**  Michael Kleber.

12           **THE CLERK:**  Mr. Kleber, please raise your right hand.

13                       **MICHAEL KLEBER**,

14   called as a witness by the defendant, having been duly sworn,

15   testified as follows:

16           **THE CLERK:**  Thank you.  You may put your hand down,

17   be seated, and state your full name and spell your last name.

18           **THE WITNESS:**  Michael Kleber, K-L-E-B-E-R.

19           **THE COURT:**  All right.  Good afternoon.

20       You may proceed.

21           **THE WITNESS:**  Thank you.

22                   **DIRECT EXAMINATION**

23   BY MS. TREBICKA:

24   **Q.**  Thank you, Mr. Kleber.  And I'll just give you a caution.

25   We've had a problem with witnesses going a little fast.  So

1  we're going to take it slow.  It's later in the day.  We want

2  to give the court reporter an easier time taking down

3  everything that's written.

4  A.  Absolutely.

5  Q.  Mr. Kleber, what is your -- where are you employed?

6  A.  At Google.

7  Q.  What is your position at Google?

8  A.  I am a principal software engineer working on the Privacy

9  Sandbox.

10  Q.  And are you with a particular product within Google?

11  A.  With the Chrome web browser.

12  Q.  Understood.

13      You mentioned the Privacy Sandbox.  What is the Privacy

14  Sandbox?

15  A.  It's an effort started by Google a few years ago to change

16  the way the web works to make it much more private than it has

17  been in the past, without breaking things that are important

18  about the web.

19  Q.  What do you mean without breaking things that are

20  important about the web?

21  A.  Anytime you want to change the web, you need to do so

22  carefully and thoughtfully because there are lots of websites

23  that depend on the way the web works.  The efforts to make the

24  web more private include things like removal of third-party

25  cookies which are used by many different parts of the web.  So

KLEBER - DIRECT / TREBICKA

1  just removing them risks breaking a lot of things.

2  Q.  And you mentioned that the Privacy Sandbox is an

3  initiative started by Google.  It -- has it remained within

4  Google?

5  A.  The Privacy Sandbox was started by Google initially.  But

6  it's an effort to change the entire web.  And like all efforts

7  to change the way the web works, it involves collaboration

8  among many different parties.

9      So a lot of the pieces of the Privacy Sandbox now include

10  ideas that came from a number of other parties, including

11  other web browsers and including other affected companies.

12  Q.  What do you mean when you say other affected companies?

13  Who are the other stakeholders who provide input to the

14  Privacy Sandbox?

15  A.  So certainly the input process is open to anyone who wants

16  to participate.  It generally takes place in a public forum.

17  Most notable among these forums is the W3C, or the Worldwide

18  Web Consortium.

19      Aside from browsers, other parties who are interested

20  include many folks who provide the technology that makes the

21  web work, and notably among those for the Privacy Sandbox

22  includes ad tech companies.

23  Q.  And as part of your role with the Privacy Sandbox, do you

24  have any familiarity with how other browsers may experiment to

25  increase user privacy without breaking the web in your -- in

KLEBER - DIRECT / TREBICKA

1    your words?

2    **A.**   Yes, absolutely.   The reason that we all get together in

3    the W3C is to provide a venue where all the different browser

4    vendors can talk to one another about the ideas that we are

5    proposing or experimenting with or developing, with the goal

6    of us all coming to eventually a common understanding of what

7    the good ideas are for the way the web should change.

8    **Q.**   Has any one browser found a complete solution to the

9    third-party cookies that doesn't interfere with functionality?

10   **A.**   No, certainly not.

11   **Q.**   Does Chrome block third-party cookies?

12   **A.**   Currently in Chrome, third-party cookies are blocked in

13   Incognito, or the Chrome's private browsing mode, but are not

14   blocked in regular mode.

15   **Q.**   Are there any settings in Chrome that would allow users to

16   block third-party cookies?

17   **A.**   Yes.   Chrome, like other browsers, has a large range of

18   settings, including one that allows all cookies no matter

19   what, one that breaks all cookies no matter what, even

20   first-party cookies.   The web doesn't work very well if you

21   use that setting.   One that turns off third-party cookies in

22   general, yes.

23   **Q.**   And all those settings are native to Chrome; is that --

24   **A.**   That's right.

25   **Q.**   -- right?

KLEBER - DIRECT / TREBICKA

1   **A.**   Those are all settings that are built into Chrome.

2   **Q.**   Does Safari block by default all third-party cookies?

3   **A.**   No, it does not.

4   **Q.**   Will you explain how -- will you explain your answer?

5                **THE COURT:**  Can I ask first, though?

6                **MS. TREBICKA:**  Yes.

7                **THE COURT:**  Incognito in private browsing mode,

8   that's only if you're -- if you have a Chrome account and

9   you're logged in?

10                **THE WITNESS:**  No.  Actually Incognito mode is a way

11   that you can open up a new tab inside of the Chrome web

12   browser, completely irrespective of whether you're logged in

13   or whether you have a Google account.  It's a way of signaling

14   to the browser that you intend to do some browsing that you

15   hope to be more private than the standard.

16                **THE COURT:**  Okay.

17                **THE WITNESS:**  And so the browser does things like

18   erase all of the data about what happened in Incognito mode

19   when you're done with that.

20                **THE COURT:**  Okay.  And then what about private

21   browsing modes, do you have to be logged in for that one?

22                **THE WITNESS:**  Sorry.  Private browsing mode is not a

23   specific -- it's more of a general term that is used to

24   describe something like this across different browsers.  So

25   there is a private browsing mode kind of thing in Firefox and

1    in Edge as well, for example.  But in the case of Chrome,

2    Incognito mode is what I'm referring to.

3              THE COURT:  Oh, I see.  So that's just a generic.

4              THE WITNESS:  That's how I was using it.  Sorry if

5    there was confusion.

6              MS. TREBICKA:  So --

7              THE COURT:  Okay.  Go ahead.

8    BY MS. TREBICKA:

9    Q.  Mr. Kleber, when an user opens up an Incognito window, is

10   the user automatically signed out if they're signed in to a

11   Google account?

12             MR. BARNES:  Objection, Your Honor.  Incognito is

13   expressly carved out of our class.  I understand if we want to

14   have some limited --

15             THE COURT:  So I am asking the question.  And

16   generally, if the Judge is asking a question, you shouldn't

17   object.

18             MR. BARNES:  Understand, Your Honor.

19             THE COURT:  I'm trying to understand.  I have three

20   of these cases.  I've got him on the stand.

21             MR. BARNES:  Understand totally.  Thank you, Your

22   Honor.

23             THE COURT:  So can you answer the question?

24             THE WITNESS:  When you open an Incognito mode tab in

25   Chrome, it does not carry over any of the information stored

1    in the rest of your Chrome browser.  We try to make it as much

2    as possible as if you had just installed a brand-new browser

3    and were starting browsing for the first time.

4        So in particular, if you're logged in to the browser and

5    then you open an Incognito mode tab, you would not be logged

6    in in that Incognito mode tab.

7            **MS. TREBICKA:**  Does that answer Your Honor's

8    question?

9            **THE COURT:**  One other question.

10       Regardless of any of these settings, if they're either

11   first-party cookies or third-party cookies being sent, if you

12   are logged in versus not logged in, the nature of who you are

13   is different given -- so that is, if you're not logged in to

14   begin with, then how do they -- they don't have any

15   information other than your address, that is, your -- your

16   computer address.

17           **THE WITNESS:**  Right.  Being logged in, I would say,

18   is sort of a euphemism for remembering a certain kind of

19   information about you which is probably remembered in a cookie

20   or something like a cookie.

21       If there's no cookies at all involved and nothing that is

22   being saved, then, yeah, it -- it's hard for me to understand

23   how you would be logged in.

24           **THE COURT:**  Okay.  Go ahead.

25

1    BY MS. TREBICKA:

2    Q.   And when an Incognito tab is closed, what happens to the

3    cookies that may have been stored in that Incognito tab cookie

4    jar?

5    A.   They would be erased, deleted.

6    Q.   And they would be deleted in a way that if you open

7    another tab in the same browser, they would not be

8    repopulated; is that right?

9    A.   To be as precise as possible, you might have multiple

10   Incognito mode tabs open at the same time, and the special

11   behavior of Incognito mode kicks in when you close all of

12   them.  But if you close all of the Incognito mode tabs inside

13   the Chrome browser, then any state gets erased.  Like cookies

14   for example, the browser forgets it all.  And if you open a

15   new Incognito mode tab afterwards, that would not be restored,

16   it's just gone.

17   Q.   And if you open a new Incognito mode, the cookie jar would

18   be entirely empty; is that right?

19   A.   That's correct.

20   Q.   And if you -- when you close that Incognito tab, that

21   cookie jar would be deleted?

22   A.   Correct.

23   Q.   And as we learned earlier, "cookie jar" is a term of art

24   here?

25   A.   It is, yes.  We like our metaphors.

KLEBER - DIRECT / TREBICKA

1   **Q.**  We were talking a little bit about the Safari browser.  So

2   the Safari browser does not block all third-party cookies; is

3   that right?  That's what you -- that was your testimony?

4   **A.**  That's my understanding.

5   **Q.**  And does Safari browser block first-party cookies?

6   **A.**  So it depends -- the answer to this question depends on

7   exactly when you're asking it because over the course of the

8   last five years, Safari has had, I think, four or maybe five

9   different ways of handling cookies.

10      The most up-to-date information that I have is Safari will

11  usually block third-party cookies but has some exceptions to

12  try to prevent things from breaking on the web.

13      It will usually -- it reserves the right to play around

14  with first-party cookies.  If they're set in one way from a

15  server, then they just are set as normal.  If they're set in a

16  different way through JavaScript, then Safari will limit the

17  lifetime of those cookies so they don't last for more than a

18  week, but they're not blocked outright.

19  **Q.**  Does Firefox, by default, block all third-party cookies?

20  **A.**  No.  Firefox has another different behavior, generally

21  referred to as partitioning cookies.  It means that a

22  particular third party can still set cookies and retrieve

23  those cookies later.

24      But if you're visiting one website and the parties sets a

25  third-party cookie, then when you visit a different top-level

1    website, that first third-party cookie would not be available

2    and it would see a different cookie jar, as it were.

3    **Q.**  Does Firefox block all first-party cookies?

4    **A.**  No.

5    **Q.**  Now, if a browser blocks third-party cookies by default,

6    does it interfere with more than just ad serving?

7    **A.**  Yes, certainly.

8    **Q.**  And how is that?

9    **A.**  Third-party cookies are a multiuse piece of technology

10   that has been around for as long as the web has been around,

11   and so it has grown to be used for a wide range of things.

12       An act as simple as logging into a website that we were

13   discussing before might very well use third-party cookies as

14   part of the way it's implemented.

15   **Q.**  But, Mr. Kleber, in 2020 Google announced a timeline to

16   deprecate third-party cookies on Chrome, right?  And was that

17   part of the Privacy Sandbox project?

18   **A.**  Yes, that's exactly right.  In 2019, we announced the

19   beginning of the Privacy Sandbox effort.  And in 2020, we

20   announced our intention to go through with this Privacy

21   Sandbox project, which included adding a lot of new

22   capabilities to browsers to address some of the things that

23   would break if third-party cookies were removed.  And then

24   once we had done that, to deprecate and remove third-party

25   cookies from Chrome.

KLEBER - DIRECT / TREBICKA

1    **Q.**  And what was the timeline that was announced in 2020?

2    **A.**  We said that we expected we would complete this within two

3    years.

4    **Q.**  Has that timeline been achieved?

5    **A.**  No, it has not.

6    **Q.**  Would you explain why it has not been achieved?

7    **A.**  Absolutely.

8        Modifying the web is not an activity that Google

9    undertakes all by itself.  As I said before, changes to the

10   web is a large-scale collaborative process with many people

11   participating in the discussions of how to do it.  Really like

12   any web standardization effort.  That's why we have web

13   standards.

14       Over the course of our discussions of the parts of the

15   Privacy Sandbox that we felt we needed to implement to keep

16   the web healthy and working, we received a lot of feedback

17   from many parties, certainly including ad tech companies, but

18   also from other parties like, for example, government

19   regulators who were also hearing the opinions of other ad tech

20   companies.

21       And all these parties together convinced us that we needed

22   to make some changes and also needed to add more time to our

23   expected third-party cookie removal timeline in order to allow

24   for more time for integration and for testing and for analysis

25   of the impact.

1    **Q.** What kind of regulators expressed an interest in Google's

2    Privacy Sandbox timeline?

3    **A.** The two primary regulators that conversations have been

4    with have been privacy regulators around the world, of course,

5    and also competition regulators.  In this case, notably

6    including the United Kingdom's Competition and Markets

7    Authority, or CMA.

8    **Q.** And what was the feedback that was received, to the extent

9    you can share, from these competition regulators, specifically

10   on the timeline of the deprecation of third-party cookies?

11   **A.** The primary feedback was that the timeline was too fast.

12   It made unreasonable expectations of how long it would take

13   for other parties to switch over to using third-party cookies,

14   and that without sufficient time for the advertising ecosystem

15   to run tests and give feedback to regulators about the impact

16   of removing third-party cookies, the Privacy Sandbox project

17   ran the risk of favoring Google over some of Google's

18   competitors in the advertising space.

19   **Q.** If Google were to deprecate third-party cookies tomorrow

20   on Chrome, who would suffer more, non-Google websites -- from

21   a revenue standpoint, non-Google websites or Google websites?

22           **MR. BARNES:** Objection, calls for speculation.

23           **THE COURT:** Sustained.

24           **MS. TREBICKA:** Your Honor, may I form the foundation?

25           **THE COURT:** You can try.

 1   BY MS. TREBICKA:

 2   **Q.**  Mr. Kleber, are issues surrounding the effect of

 3   deprecating third-party cookies some of the issues that you

 4   have had a chance to review, think about, and analyze as part

 5   of the Privacy Sandbox initiative?

 6   **A.**  Yes.

 7   **Q.**  And has that been with respect to effects on Google as

 8   well as others in the ad tech industry?

 9   **A.**  The information that I have immediately top of mind for me

10   is focused on our public discussions of the Privacy Sandbox.

11   And that has focused primarily on the impact of removing

12   third-party cookies on other websites.

13       I don't have information immediately available to share

14   about the impact on Google specifically.  And actually doing a

15   good job of coming up with that information is a very hard

16   task.

17   **Q.**  So then let me ask --

18           **THE COURT:**  Not particularly relevant anyway to what

19   we're doing.  So I'd move on.

20           **MS. TREBICKA:**  Okay.

21   **Q.**  Mr. Kleber, could you take a look at the five items of

22   data that are in the demonstrative on the -- on your left.

23       Do you see -- could you see it from here?  Are you able to

24   see it?

25   **A.**  Yes.

1    **Q.**  So removing here or non -- sort of taking away from the

2    equation the X-Client Data Header, which is point 3, are these

3    items of categories, so user's IP addresses linked to user

4    agents, cookie identifiers including the client ID, so

5    first-party and third-party cookies, URLs -- it says here

6    browsing history, but the -- the point of that is plaintiffs

7    refer to it as browsing history, it's the URLs that are

8    passed, and the content of the user's POST communications.

9        Are you aware of any browser that blocks all of those four

10   items by default in regular communications on the Internet?

11   **A.**  No.

12            **MS. TREBICKA:**  No further questions, Your Honor.

13            **THE COURT:**  Okay.  Do you want to cross-examine him?

14            **MR. BARNES:**  Yes, Your Honor.

15            **THE COURT:**  Okay.

16    And I will note that I did look at the excerpt that you

17   designated for him, and it was the one piece that you reviewed

18   in the -- with the other witness.

19            **MR. BARNES:**  Okay.

20            **THE COURT:**  There's nothing more than that.

21            **MR. BARNES:**  I --

22            **THE COURT:**  I didn't see anything more than that.

23            **MR. BARNES:**  It's not in the -- yeah, in the excerpt,

24   that's all that there was.  I'm not going to go back to that

25   excerpt, Your Honor.

```
 1              THE COURT:  Okay.  Go ahead.

 2                      CROSS-EXAMINATION

 3   BY MR. BARNES:

 4   Q.  Good afternoon, Mr. Kleber.

 5        Are all cookies created equal?

 6   A.  I'm not sure what you mean by that.

 7   Q.  So you testified that Safari sometimes sends certain

 8   cookies, first-party cookie values, to Google domains,

 9   correct?

10   A.  I don't think I said anything about that at all.

11   Q.  Does Safari not send first-party cookie values to Google

12   domains?

13   A.  It very much depends on what the circumstances are.  I'm

14   sorry, I'm really not sure what situation you're referring to.

15   Q.  Okay.  You talked about Safari capping the lifetime of

16   certain first-party cookies, correct?

17   A.  Yes.

18   Q.  And they capped the lifetime at 24 hours; is that correct?

19   A.  Safari has a bunch of complex logic which sometimes caps

20   first-party cookie lifetimes at 24 hours and sometimes at

21   seven days, I believe.

22   Q.  Is --

23   A.  Although they might have made some change to that.

24   Q.  Okay.  And is link decoration a technique that is an

25   attempt to track people in a world without third-party
```

1    cookies, Mr. Kleber?

2    **A.**   Link decoration is a tricky phrase.  It's used by a lot of

3    different people to mean a lot of different things.  But

4    certainly some people use it to refer to something that could

5    be used as a tracking technique.

6    **Q.**   Okay.  Mr. Kleber, I will tell you you are awfully

7    consistent in your testimony because earlier you did say link

8    decoration does mean different things to different people.

9    But one of the things it means is a way to send cookie values

10    through URL data parameters to track people on a world without

11    third-party cookies, correct?

12    **A.**   Actually I can't think of a use of link decoration that

13    fits that description offhand.  Can you --

14    **Q.**   Okay.  So link decoration, in your opinion, does not allow

15    a company such as Google to track a user across different

16    websites and across different devices?

17    **A.**   One possible thing that you could do with link decoration

18    that a -- that a third party could try to do with link

19    decoration could involve trying to track a user as they

20    navigate from one website to another website.

21    **Q.**   To the -- to the extent that Safari sends first-party

22    cookie identifiers to Google through URL data parameters, does

23    Google use that information to form user profiles about those

24    Safari users?

25    **A.**   I -- sorry, I'm trying to understand the situation you're

1   talking about.  Is this a discussion of Google Analytics that

2   we're having?

3   **Q.**  If -- if Safari -- does Safari -- in your opinion, does

4   Safari sometimes send cookie identifiers to Google through URL

5   data parameters?

6   **A.**  The -- the way you're describing that doesn't really make

7   sense to me.

8          **THE COURT:**  Okay.  Could we back up a minute?

9   Because the word -- the term "link decorations" isn't a term

10  used in the complaint at all.

11         **MR. BARNES:**  It -- that term is not used.  At the

12  time we filed the complaint, we did not understand that that's

13  how Google says the term.

14         **THE COURT:**  So it's not used in the complaint, and I

15  want to make sure I understand it.

16         **MR. BARNES:**  Correct.

17         **THE COURT:**  All right.  So could you define what it

18  is?

19         **THE WITNESS:**  Sure.  As I said, I can give you what I

20  think my definition of link decoration would be.  But I have

21  to caution that other people might use it to mean different

22  things.  It's kind of a slippery term.

23         **THE COURT:**  So how do you define it?

24         **THE WITNESS:**  I would say a link is like a URL.  You

25  click on a link on one page and end up landing on another page

1   as a result.  That's the standard behavior of web browsing.

2       Link decoration, as I would define it, is somebody coming

3   along and modifying the link that you're clicking on so that

4   it conveys or carries with it additional new information, not

5   just the page you're navigating to, but also some extra

6   information that this party had on the site you're coming from

7   and that they might want to convey across this boundary to the

8   site you're navigating to.

9           THE COURT:  Okay.  I get it now.  Hence decoration of

10  the link.

11          THE WITNESS:  Exactly.

12          MR. BARNES:  And, Your Honor, I did find it.  It's

13  paragraphs 74 and 75 of our complaint.  We describe Chrome

14  sharing the client ID value with Google regardless of user

15  sync status including when third-party cookies are blocked

16  which we allege is a deceptive privacy practice already

17  successfully challenged by the FTC when Google attempted it in

18  2011.

19          THE COURT:  You know, in 74 and 75, you do not use

20  that phrase specifically.

21          MR. BARNES:  Correct.  Because we did not know that's

22  how Google used the term when we filed the complaint because

23  we didn't have any discovery.

24          THE COURT:  Okay.  That's fine.  I was still

25  accurate.  I can do search find and --

KLEBER - CROSS / BARNES

```
 1                   (Simultaneous colloquy.)

 2          MR. BARNES:  Okay, 74, 75, and Ms. Weaver told me 155

 3    and 165 as well.

 4    Q.  On Safari, if a first-party cookie, because of

 5    partitioning, Google cannot use any cookie values sent through

 6    link decoration to track those users across different

 7    websites, correct?

 8    A.  No, I don't think that's correct.

 9    Q.  Does Google track Safari users via link decoration across

10    different websites?

11    A.  Sorry.  Your -- your description of link decoration and

12    first-party cookies really has me confused.  I don't

13    understand the behavior that you're talking about.

14    Q.  In the absence of third-party cookies, does Google track

15    users on Safari across different websites?

16          THE COURT:  Could I ask this question first?  So I

17    make sure I understand.

18      From -- Mr. Barnes, are you saying that Google creates

19    link decorations?

20          MR. BARNES:  Yes.

21          THE COURT:  Okay.  So --

22          MR. BARNES:  In Chrome.

23          THE COURT:  Does Google create link decorations?

24          THE WITNESS:  I --

25          THE COURT:  All right.  Well, you're hesitating.
```

1      Where do you get the information that Google creates link

2   decorations?

3         **MR. BARNES:**  Dr. Shafiq can testify to the fact that

4   Google Ads uses link decoration, particularly in Chrome where

5   it is far more effective than it is in Safari.

6         **THE COURT:**  Okay.  All right.  Go ahead and ask your

7   new question.

8         **MR. BARNES:**  Okay.

9   **Q.**  Do Google's ad systems connect signed-in Chrome data to

10  signed-out Chrome identifiers?

11  **A.**  I don't believe so.

12  **Q.**  Okay.  Do Google's ad systems connect signed-in Chrome

13  identifiers to signed-out Chrome identifiers?

14  **A.**  I don't believe so.  Are you talking about -- what do you

15  mean by signed-out identifiers?

16  **Q.**  A cookie that -- a value, an identifier associated with a

17  user's browser when they are signed out.  Does Google connect

18  those identifiers to users' Google account identifiers?

19  **A.**  I -- I'm afraid you need to be more specific for --

20                (Simultaneous colloquy.)

21  BY MR. BARNES:

22  **Q.**  Does Google create a map of Biscotti identifiers to count

23  identifiers?

24  **A.**  Not that I know of.

25  **Q.**  The Zwieback identifier, does Google create a map of

```
 1    Zwieback identifiers to GAIA identifiers?

 2               THE COURT:  How do you spell that?

 3               MR. BARNES:  Z-W-I-E-B-A-C-K.

 4               MS. TREBICKA:  Your Honor, we're going into sealed

 5    territory at this point.

 6               MR. BARNES:  Those terms are not sealed, Your Honor.

 7               THE COURT:  Okay.  Answer that one question.

 8               THE WITNESS:  Again, not that I know of.  But let me

 9    be clear that my job is to work on the Chrome browser, and the

10    questions you're asking are not about the Chrome browser.

11    You're asking questions about -- something about what happens

12    in Google's internal systems after it receives information

13    from the outside world, and that's not information that a

14    browser manufacturer generally knows or has access to about

15    Google or any other website.

16    BY MR. BARNES:

17    Q.  The Chrome section of Google doesn't know what the ad

18    section of Google is doing, Mr. Kleber?  Is that your

19    testimony?

20    A.  The details like you're asking, yeah, that's right.

21    That's not information that I immediately know the answer to.

22    Q.  Do you have any knowledge about whether Google Ads'

23    ability to map Biscotti identifiers to GAIA identifiers exists

24    in Chrome to an extent that it does not exist in Safari?

25               THE COURT:  Do you have information on that topic,
```

KLEBER - CROSS / BARNES

1    yes or no?

2              **THE WITNESS:**  Sorry, that was -- that was GAIA and --

3    **BY MR. BARNES:**

4    **Q.**  Biscotti.

5    **A.**  Biscotti you're asking about?  Biscotti, in my

6    understanding of the term, is a third-party cookie.  So

7    third-party cookies are something that exist if third-party

8    cookies are turned on.  They are not available at all if

9    third-party cookies are turned off.

10   **Q.**  So, Mr. Kleber, my question was whether Google's ad system

11   has a greater ability to tie and map Biscotti identifiers to

12   Google account identifiers for Chrome users versus users of

13   the Safari, Firefox, and every other browser?

14   **A.**  No, I don't believe so.

15   **Q.**  Do you have -- but you have no access to Google's ad

16   systems, correct?

17   **A.**  Right.  I work on the browser.  I don't work on Google ad

18   systems.

19   **Q.**  You're in charge of Google's privacy system and you've not

20   been given access to how Google's ad system works, correct?

21   **A.**  No, I am certainly not in charge of Google's privacy

22   system.  That's definitely not my role.

23   **Q.**  That is fair.  You're in charge of the Chrome moving

24   towards a more private web, correct?

25   **A.**  I'm an engineer working on that project, yes.

1   **Q.**   Mr. Kleber, you'd agree there's a problem with browsers

2   today.   And I'm sure you know what it is.   It's privacy.

3   **A.**   I'm sorry.   Is that a question?

4   **Q.**   Yeah.   Do you agree with that statement that there's a

5   problem with the web today and that it is privacy?

6   **A.**   I think there are a lot of things about the web that we

7   people who work on browsers want to change to make better.

8   And right now privacy is certainly one of them.   That's why my

9   effort exists.

10  **Q.**   You believe it's unreasonable to expect the consumer to

11  know the third party is tracking them, correct?

12  **A.**   I'm sorry.   Could you ask that again?

13  **Q.**   It's not reasonable to expect a consumer to know the third

14  party's tracking them, correct?

15  **A.**   From the point of view of the browser, we shouldn't expect

16  the consumer to be in charge of keeping track of anything

17  about the details of how browsers work.   That's the job of

18  people like me who work on web browsers, not the job of people

19  who use them.

20  **Q.**   And, Mr. Kleber, people should be -- you agree people

21  should be able to browse the web without worrying that someone

22  is collecting a dossier on them for what they're doing?

23          **MS. TREBICKA:**   Objection, Your Honor.   If Mr. Barnes

24  would like to show the witness a document, then --

25          **THE COURT:**   That's not a legal objection.   Overruled.

1    This is cross.

2                  **THE WITNESS:**  Yes.  I think that that is exactly the

3    sort of change that we want to make to the web.  Quite right.

4    **BY MR. BARNES:**

5    **Q.**  In fact, that's what you said on behalf of Google at a

6    Google developer conference, correct?

7    **A.**  I don't have a transcript of previous talks that I've

8    given, but I'm willing to believe you.

9    **Q.**  Mr. Kleber, do you agree that Google creates dossiers

10   about consumers who use Chrome?

11   **A.**  Certainly not.

12                  **MR. BARNES:**  Can you distribute what's been marked as

13   B17.

14   **Q.**  While that is happening, Mr. Kleber, do you know that

15   there is a database where Google stores user profile

16   information?

17   **A.**  I have no doubt that there is.

18   **Q.**  Do you know what the name of it is?

19   **A.**  A database of user profile information?  That's --

20   **Q.**  If you --

21   **A.**  -- not a clear enough description --

22   **Q.**  Okay.

23   **A.**  -- for me to be sure.

24   **Q.**  Is that database with user profile information available

25   to Google ads when a user is using the Safari browser?

```
1    A.  I'm sorry.  Again, I'm not sure what database you're

2    referring to.

3    Q.  Okay.

4         MR. BARNES:  Can we put B17 on the screen in a way

5    that is not on the public screen, please.

6         THE COURT:  Give him a copy of the document, please.

7         MR. BARNES:  Ms. Paulson.

8         THE COURT:  Give him a copy of the document.

9         THE WITNESS:  Thank you.

10         MS. TREBICKA:  Your Honor, I would like to object to

11    foundation.  There is a list of --

12         THE COURT:  Okay.  The objection is -- lay a

13    foundation before asking questions.

14         MR. BARNES:  Your Honor, Google stipulated to the

15    admissibility of the document.

16         THE COURT:  It could have been, but that doesn't mean

17    that this witness can talk about it.

18         MR. BARNES:  Understand, Your Honor.

19         THE COURT:  Lay a foundation.

20         MR. BARNES:  Okay.

21      Let's pull it up on the screen?

22         THE COURT:  No.  Don't pull it up on the screen.  I

23    thought you said that --

24         MR. BARNES:  Right.  I understand, Your Honor.

25    Q.  Mr. Kleber, have you worked on projects relating to how
```

1    Google creates detailed user profiles that they store in a

2    database?

3    **A.**    No, that's not my part of Google.

4    **Q.**    Okay.

5        **MR. BARNES:**  I will ask no further questions of this

6    witness.  But, Your Honor, I would like B17 to be admitted

7    into evidence.  Google stipulated to its admissibility.  It's

8    the name of a project.

9        **THE COURT:**  So, you know what, we'll talk about that

10   later.  My inclination is to say no because I don't have

11   anybody to testify about it.  And so -- I can take judicial

12   notice of the title of it.

13       **MR. BARNES:**  And the description.

14       **THE COURT:**  But I'm reading it -- well, I don't know

15   what the description is.  Lawyers don't seem to understand

16   that just because there's a document and just because there's

17   a stipulation, that it means something if you don't have a

18   witness to talk about it.

19       **MR. BARNES:**  We will call Dr. Berntson, Your Honor.

20   I understand the Court's schedule.  And we were -- I have no

21   further questions for Mr. Kleber.

22       **THE COURT:**  All right.  Any redirect?

23       **MS. TREBICKA:**  Thank you, Your Honor.  I'll keep it

24   brief.

25

KLEBER - REDIRECT / TREBICKA

 1                    <u>REDIRECT EXAMINATION</u>

 2   BY MS. TREBICKA:

 3   Q.  Mr. Kleber, Mr. Barnes asked you a few questions relating

 4   to linking Biscotti identifiers to GAIA identifiers that was

 5   more feasible or more pervasive when it came to information of

 6   Chrome users versus other types of browsers, users of those

 7   browsers.

 8       Do you have any reason to believe that the profiles or the

 9   information collected from Chrome users and maps from Biscotti

10   to GAIA would be in any way different from -- or more than the

11   information for users of other browsers?

12   A.  Not that I know of.

13   Q.  And do you have any reason to believe that there is indeed

14   such a mapping of Biscotti identifiers to GAIA identifiers?

15   A.  No.

16   Q.  Do you have any reason to believe that there's a mapping

17   of Zwieback identifiers to GAIA identifiers?

18   A.  I'm afraid I'm really not sure.  I'm not the right person

19   to ask about that.

20   Q.  Understood.  Understood.

21       There was testimony related to reduce -- to link

22   decoration, correct?

23   A.  Yes.

24   Q.  Is link decoration something that is done by the website

25   on which a user is?

 1          **THE COURT:**  There's no foundation for him to answer

 2     that question.  He couldn't answer me.

 3          **MS. TREBICKA:**  Your Honor, I believe that there is

 4     foundation, and I'm happy to lay it.  I think that --

 5          **THE COURT:**  As long as you're not coaching him, that

 6     would be fine.

 7          **MS. TREBICKA:**  Absolutely.

 8          **THE COURT:**  So, but he couldn't answer that question

 9     when I asked him.  So I don't know why he could answer it for

10     you but not for me.

11          **MS. TREBICKA:**  I believe that he did not understand

12     the question, Your Honor.  So I would like to help.  That's my

13     only intention.

14          **THE COURT:**  As long as you're not trying to testify.

15          **MS. TREBICKA:**  Absolutely.

16     **Q.**  So, Mr. Kleber --

17          **MS. TREBICKA:**  I will start from the beginning, Your

18     Honor, just so that the record is clear.

19     **Q.**  What is link decoration in your understanding?

20          **THE COURT:**  He already answered that question.

21     What's the next one?

22     **BY MS. TREBICKA:**

23     **Q.**  The next one is who does the link decoration?  Which

24     entity?

25     **A.**  Again, it can be used in different ways.  I would usually

KLEBER - REDIRECT / TREBICKA

1    use the phrase link decoration to refer to a link on a

2    particular web page that is modified by a third party in order

3    to convey information at the time of navigation.

4    **Q.**   And what is the third party that you're referring to?

5    **A.**   It certainly could be an ad tech.

6    **Q.**   Anything else that you can think of?

7    **A.**   Those are the ones that I generally think about in the

8    context of link decoration.

9    **Q.**   Are there any -- are you aware of efforts to reduce link

10   decoration by browsers generally?

11   **A.**   Yes.

12   **Q.**   Are you aware of efforts by the Chrome browser to reduce

13   link decoration?

14   **A.**   Yes.

15   **Q.**   Can you testify to those?

16   **A.**   Sure.

17       Link decoration can be used to try to propagate some

18   notion of who a user is from one website to another.

19       It's very hard to prevent this from happening in general

20   because link decoration really is just part of the use of URLs

21   as you navigate around the web.

22       There are a few particularly well-known URL parameters,

23   that is, particular ways that additional information gets

24   added to links that convey something about a user's identity

25   from one website to another.

1          And I think that all browsers that I know of are in the

2     middle of a sort of collective conversation about what we can

3     do to change navigation on the web or storage of information

4     on the web to keep link decoration of that sort from being

5     useful as a tracking technique.

6     Q.   Is Chrome part of those conversations with other browsers?

7     A.   Yes.  Absolutely.  In Chrome right now, we do some amount

8     of removing particular URL parameters that we think are

9     associated with tracking.  For example, when you move into an

10    Incognito window.  If you're doing regular browsing and then

11    want to open a link in an Incognito tab, that's a sign that

12    the user wants to disassociate that from the rest of their web

13    activity.

14         So we have an experiment going right now involving

15    removing certain URL parameters in that case to try to

16    mitigate the ability to track.

17              MS. TREBICKA:  No further questions, Your Honor.

18              MR. BARNES:  Very brief -- very briefly, Your Honor.

19                        CROSS-EXAMINATION

20    BY MR. BARNES:

21    Q.   You're trying to mitigate the ability of third parties to

22    track people by appending data in the URL, correct?

23    A.   Right.

24    Q.   Can't Google Ads just stop doing it today?

25    A.   So Chrome is a web browser that is used by everybody.  And

1    the job of us people who work on Chrome is to change the way

2    the web works so that certain things involving tracking are no

3    longer possible.  That's my job.

4        You're absolutely right that any individual party on the

5    web might choose not to use the capabilities that are possible

6    today.  But as a browser vendor, we don't want to count on

7    people of their own initiative not tracking.  We want to

8    change the web so that nobody can do this kind of tracking.

9    **Q.**  Right, but Google controls ads and if Google controls

10   Chrome and Chrome wants to stop link decoration, couldn't just

11   Google lead by example and Google Ads stop link decoration for

12   itself?

13   **A.**  I think that in a competitive marketplace where there's a

14   lot of different companies who are trying to show ads, having

15   one ad tech company choose not to use some of the tools that

16   are available to it might be justifiable in some cases, but I

17   certainly can't expect that Google or any other particular ad

18   tech company would just completely stop doing something like

19   tracking that it turns out ends up making websites a lot more

20   money.

21       It just doesn't seem reasonable to ask any ad tech company

22   to voluntarily dramatically decrease the amount of money that

23   they make for their customers.

24   **Q.**  But Chrome says link decoration needs to be limited,

25   right?

```
 1            THE COURT:  Okay.  I get the point.
 2            MR. BARNES:  Thank you, Judge.
 3            THE COURT:  All right.  Sir, you're excused.  Thank
 4     you.
 5            THE WITNESS:  Thank you.
 6            THE COURT:  Next witness.
 7            MR. BROOME:  There was -- well, I think we're done
 8     putting on our case, Your Honor.  Thank you.
 9            THE COURT:  All right.  Anything from the plaintiffs'
10     side?
11            MR. BARNES:  Yes.  Yes, Your Honor.
12            MS. TRUONG:  Your Honor, plaintiffs call Mr. Richard
13     Smith to the stand, please.
14            THE COURT:  Okay.
15            THE CLERK:  Into the box, Mr. Smith.
16            THE WITNESS:  Okay.
17            THE CLERK:  Would you please raise your right hand.
18                          RICHARD SMITH,
19     called as a witness by the plaintiffs, having been duly sworn,
20     testified as follows:
21            THE CLERK:  Thank you.  You may put your hand down
22     and be seated.  Please state your full name and spell your
23     last name.
24            THE WITNESS:  My name is Richard M. Smith.  The last
25     name is S-M-I-T-H.
```

 1          **THE COURT:**  Good afternoon, sir.

 2          **THE WITNESS:**  Good afternoon, Your Honor.

 3          **THE COURT:**  You may proceed.

 4          **MS. TRUONG:**  Thank you, Your Honor.

 5                          **DIRECT EXAMINATION**

 6          **MS. TRUONG:**  I'd like to start by marking a document

 7   as Plaintiffs' B156 for identification, please.

 8          **THE COURT:**  Isn't it already marked?

 9          **MS. TRUONG:**  This is, Your Honor, Attachment A to

10   what is I believe marked as B149.  It's Mr. Smith's curriculum

11   vitae.  We just excerpted it for ease of reference for

12   everyone.

13          **THE COURT:**  Okay.  I don't want more documents.  In

14   fact, I'm going to return most of this stuff to all of you.

15   What's the document number again?

16          **MS. TRUONG:**  It's B149, Your Honor, Attachment A is

17   Mr. Smith's CV.

18          **THE COURT:**  All right.  Go ahead.

19          **MS. TRUONG:**  If we can show the document to the

20   witness, please.

21   **BY MS. TRUONG:**

22   **Q.**  Mr. Smith, we're showing you what's been marked for

23   identification --

24          **MS. TREBICKA:**  Actually, Your Honor, just for

25   clarification, I believe the Court wants to keep the same

```
 1    exhibit number as B149; is that right?
 2              THE COURT:  So if it's not -- I understood you to say
 3    it's 149, and it's an attachment.
 4              MS. TRUONG:  That's correct, attachment A.
 5              THE COURT:  So that's what it is.
 6              MS. TRUONG:  Thank you.
 7    Q.  Mr. Smith, do you recognize this document?
 8    A.  Yes, I do.
 9    Q.  Okay.  What is it?
10    A.  It's my CV.
11    Q.  Okay.  And is this an accurate reflection of your
12    employment and educational history?
13    A.  Yes, it is.
14              MS. TRUONG:  Your Honor, I'd ask that this document
15    be admitted into evidence as Plaintiffs' B149.
16              THE COURT:  Well, I'm still looking for it in 149.
17        I don't see that it's -- I see it now.  All right.
18        Okay.  I mean I'll admit it.  As long as you understand it
19    would never get admitted in a trial.  It's hearsay.
20        Go ahead.
21        It's hearsay.  Do you understand that?
22              MS. TRUONG:  I can go through it, Your Honor.
23              THE COURT:  I'm going to admit it.  I just want you
24    to understand that it's hearsay, that if we were in a trial,
25    if I had a jury, it would never get admitted.
```

SMITH - DIRECT / TRUONG

```
1        Do you understand?
2            MS. TRUONG:  I'm sorry, Your Honor, I don't.  It's
3    Mr. Smith's curriculum vitae.
4            THE COURT:  You know what, can somebody on the
5    plaintiffs' side explain that to her at some point?
6                    (Simultaneous colloquy.)
7            THE COURT:  It's okay.  This is a teaching moment.
8            MS. TRUONG:  Thank you.
9            THE COURT:  I'm going to admit it because I'm a judge
10   and I know what hearsay is.  You have to figure out why I'm
11   not going to admit it later if we were in a jury trial.  Okay?
12           MS. TRUONG:  I will do that, Your Honor.
13           THE COURT:  All right.  Go ahead.
14       (Plaintiffs' Exhibit B149 received in evidence)
15   BY MS. TRUONG:
16   Q.  Mr. Smith, what is your educational background?
17   A.  I have a degree in computer science from North Carolina
18   State University, and I was in the class of 1974.
19   Q.  Okay.  And where are you currently employed?
20   A.  I have a company, a consulting company called Boston
21   Software Forensics, and I work there as a consultant.
22   Q.  How long have you had that company?
23   A.  Since approximately 2005.
24   Q.  Okay.  And what does that company do?
25   A.  I do primarily legal consulting in litigation involving
```

SMITH - DIRECT / TRUONG

1    computer software.  A lot of my cases are involved around

2    patent litigation and other types of IP litigation, as well as

3    privacy cases like this one.

4    Q.  Okay.  And when you say "software," does that include

5    browsers?

6    A.  Yes, it does.

7    Q.  Just to clarify, web browsers, correct?

8    A.  Yes, web browsers.

9    Q.  And as part of your employment with Boston Software

10   Forensics, have you had occasion to analyze how web browsers

11   work?

12   A.  Yes, I have.  It's pretty common in the cases that I work

13   in.  I've worked in many different patent cases and a fair

14   number of them involved web browsers and their communications

15   with back-end servers.

16   Q.  Okay.  And can you expand more on how you would

17   investigate the functionality of a web browser?

18   A.  Well, typically for the communication side of things, I'd

19   use a tool called Fiddler which allows me to observe the

20   communications between commands that a browser -- requests

21   that a browser sends to a server and the responses that come

22   back from servers.

23       There are similar built-in tools in web browsers today in

24   the developer tool section that allow the captures of network

25   transmissions also.  And so I use those some -- sometimes

SMITH - DIRECT / TRUONG

1    also.

2    **Q.** Okay. And that's something you do as a regular part of

3    your work with Boston Software Forensics; is that right?

4    **A.** Yes, that's correct.

5    **Q.** Okay. And prior to Boston Software Forensics, where were

6    you employed?

7    **A.** For about five years -- well, before Boston Software

8    Forensics, I worked for a nonprofit organization called The

9    Privacy Foundation.

10   **Q.** And what did you do with The Privacy Foundation?

11   **A.** I had a title of chief technology officer. And at The

12   Privacy Foundation, we looked a lot at the tracking that goes

13   on in consumer products, and some of those products would be

14   browsers.

15   **Q.** Okay. And before Privacy Foundation, where were you

16   employed?

17   **A.** I had a software company that I cofounded in 1986 called

18   Phar Lap Software. And we did development tools that other

19   software companies would use to create software.

20   **Q.** Okay. And have you done any testifying work, Mr. Smith?

21   **A.** Yes, I've done some. One of the -- one of the -- two of

22   the cases I worked on were actually antitrust lawsuits, but

23   they involved -- both cases involved the Internet Explorer

24   browser.

25   **Q.** Okay. And when you say involved the Internet Explorer,

1   what did your work consist of in those cases?

2   **A.**   My job on that case was, along with one other person, was

3   to analyze the security problems of the Internet Explorer

4   browser and compare them to other browsers.

5   **Q.**   And when you say security problems, what do you mean?

6   **A.**   Well, software can have bugs in them.  And a certain type

7   of bug presents a security issue.  Say somebody could run

8   malicious code on your browser.  That would be a kind of

9   worst-case situation.

10  **Q.**   And -- I'm sorry.  Go ahead.

11  **A.**   So security -- security falls -- a particular type of bug,

12  but it's -- it causes the -- bad people can do bad things to

13  your browser.

14  **Q.**   Okay.  And when you're investigating these security bugs,

15  what are you doing?

16  **A.**   In this -- in that particular lawsuit, it was mostly

17  investigating security flaws that other people found.

18  **Q.**   Okay.

19  **A.**   And rating -- rating the problems and the issues with

20  them.

21  **Q.**   Okay.  And Mr. Smith, do you have any experience

22  testifying before -- before U.S. Congress?

23  **A.**   Yes, I have.

24  **Q.**   Okay.

25  **A.**   I've testified in a couple -- couple times, about 20 years

1    ago.  And one of the -- one of the committees that I

2    testified, it was actually on similar issues that we're

3    talking about here today which is online profiling.

4    **Q.**  Okay.  And have you worked with any federal agencies as

5    part of your work?

6    **A.**  Yes.  I've also participated in a variety of committees at

7    the F -- Federal Trade Commission.  And these -- these

8    committees or workshops were involved in some of the same

9    issues that we're talking about here today.

10   **Q.**  And when you say same issues, what are you referring to?

11   **A.**  The -- how online tracking happens and the creation of

12   profiles.

13   **Q.**  Okay.

14          **MS. TRUONG:**  Your Honor, I would ask that Mr. Smith

15   be qualified as an expert in software analysis, browser

16   functionality, and Internet transmissions.

17          **THE COURT:**  Any objection?

18          **MR. SCHAPIRO:**  No objection.

19          **MR. BROOME:**  No objection.

20          **THE COURT:**  All right.  Admitted.

21   BY MS. TRUONG:

22   **Q.**  Mr. Smith, you've been sitting here today listening to the

23   testimony; is that correct?

24   **A.**  That's correct, yes.

25   **Q.**  Okay.  You've heard a number of people testify with

SMITH - DIRECT / TRUONG

1    respect to various types of information that's transmitted on

2    the Internet, correct?

3    **A.**  That's correct.

4    **Q.**  Okay.  Did you hear the testimony about cookies?

5    **A.**  Yes.  Well, cookies were throughout today, the discussion

6    of the cookies, first party versus third parties so...

7    **Q.**  Okay.  And can you explain that distinction, first-party

8    versus third-party cookies?

9    **A.**  Yes.  A first-party cookie is a cookie that's set and

10    returned back to the website that you're on.  So if we look in

11    the browser window in the simplest way, the website that's

12    identified in the -- in the web address window on your browser

13    will get back a first-party cookie.

14        A third-party cookie is going to be set and sent back to

15    other companies that are providing content also in that -- the

16    web page that you're viewing.  So a third-party cookie is an

17    identifier or can be an identifier that's going back to these

18    third-party companies.

19    **Q.**  Okay.  And then is there any other distinction between

20    first-party or third-party cookies?

21    **A.**  Well, the -- I think the most important distinction really

22    is in the case of a -- a first-party cookie would only go back

23    to the web -- you know, the web page or the website that

24    you're on.  There's some more complicated rules there.  But

25    back to -- technically back to domain that you're at.  So if

SMITH - DIRECT / TRUONG

1    you're at the *New York Times*, they're going to get their

2    cookies, but they're not going to get the *Washington Post*

3    cookies.

4         With third-part cookies, though, what really distinguishes

5    them from first-party cookies is that they allow tracking

6    across websites.  And I don't think that's been emphasized

7    enough today in some of the discussions here.

8         The point of using a third-party cookie is that it allows

9    the third party to gather information about as a person goes

10   across the web and surfs the web.

11   **Q.**   Okay.  And with respect to web browsers, in their default

12   mode do web browsers operate the same with respect to the

13   transmission of third-party cookies?

14   **A.**   They do -- absolutely do not.

15   **Q.**   Okay.  Can you describe that, please?

16   **A.**   Yes.  The -- we've talked about a number of different web

17   browsers today here.  And, you know, obviously Chrome is the

18   subject of the -- most of the conversation.

19        So by default, the Chrome browser today sends out

20   third-party cookies.  There are settings, you can turn it off,

21   but by default in what's been called the main browser mode as

22   opposed to Incognito mode, it sends out third-party cookies by

23   default.

24        Other popular browsers, you know, particularly like Safari

25   and Firefox and Edge, in many cases block most third-party

SMITH - DIRECT / TRUONG

1    cookies.  Or they put them, in the case of Firefox, put them

2    in a partition which limits their ability to cross -- do

3    tracking across websites.

4    **Q.**  So is it correct to say, Mr. Smith, that web browsers

5    dictate whether and to what extent third-party cookies are

6    transmitted back to certain third parties?

7    **A.**  Yeah.  The default settings dictate it, I would say.  And

8    the user has some ability to go in and change, you know, the

9    defaults.  But the design decisions of the browser determine

10   this, yes.

11          **THE COURT:**  So as I understand the debate, not making

12   any comments on who's right, who's wrong, just as I understand

13   the debate, it's not that there is a nonexistence.  It's just

14   that these other three browsers who you identified, the

15   argument is that they do significantly less.

16          **THE WITNESS:**  Well, they -- they do signif -- they --

17   by not sending third-party cookies -- and a third-party

18   cookie --

19          **THE COURT:**  I'm asking a simpler question.

20          **THE WITNESS:**  Okay.

21          **THE COURT:**  My question, I just want confirmation.

22   It's not that you're saying it is zero, it is just

23   significantly less.

24          **THE WITNESS:**  Significantly less, yes.

25          **THE COURT:**  So they do send some, just significantly

SMITH - DIRECT / TRUONG

1   less.

2          **THE WITNESS:**  In some circumstances, they can.  I'm

3   not -- there's three different other browsers here.  I think

4   in the case of Safari, I'm not aware of when it would send

5   third-party cookies.  So it's -- but it's significantly less.

6          **THE COURT:**  Okay.  Go ahead.

7   **BY MS. TRUONG:**

8   **Q.**  And, Mr. Smith, have you heard the phrase "browsing

9   history information" being discussed today?

10  **A.**  Yes, I have.

11  **Q.**  And in your opinion, what does browsing history

12  information mean in terms of an Internet transmission?

13  **A.**  So browsing history information would be the -- the

14  primary thing would be the URL of the web page that viewing on

15  the screen in the web browser.

16      And so browsing history would be a collection of browsing

17  history information, if you will.  It would be the different

18  web pages as -- that you visit over time.

19      And so browsing history information would include the URL

20  that I mentioned, an IP address of where you access the web

21  page, the time you access -- the date and time when you access

22  the web page, possibly information about the browser such as

23  user agent, things like that.

24      And the key issue here, as I see it, is that the

25  third-party cookie value, which is an ID number that

1    identifies a user's browser, allows the stringing together of

2    all those different transmissions to create the browsing

3    history over time.

4    **Q.**  I'm sorry, you said the stringing together of all --

5    **A.**  Yeah.

6    **Q.**  Can you explain that a little more, please?

7    **A.**  Yeah.  So each web page would be like the -- that one

8    visits would be an entry like in the browsing history.  So I

9    would put the browsing history information as like kind of one

10   entry in a much longer list of web pages that you visit.

11   **Q.**  Okay.

12   **A.**  But the key thing is that the third-party cookie is needed

13   in order to create that list.  Otherwise when a -- when a

14   browser history information arrives, you don't know what slot

15   to put it in.

16   **Q.**  Okay.

17       In Chrome, when a user is browsing the Internet in default

18   mode, does Chrome send browsing history information along with

19   third-party cookies to Google when a user is on a

20   non-Google-owned-and-operated website?

21   **A.**  Yes, they would, uh-huh.

22   **Q.**  And how does that occur?

23   **A.**  Well, in the -- we've talked a little bit about this

24   today.  But the web page would have a JavaScript tag -- or

25   it's been called tag or JavaScript code -- that would be

1    inserted by the website developer on the web page.

2        That tag would fetch information -- a JavaScript program

3    from a Google server which gets downloaded into the web

4    browser, executed by the web browser, and it creates a

5    transmission then, i.e., an HTTP request back to a Google

6    server.

7        The type of transmission I think that's most interesting

8    here is a tracking pixel.  And it's not a term I've actually

9    heard here today.  But it's really no different than any other

10   HTTP GET request other than the fact that its purpose in life

11   is to simply send tracking information off to -- to a third

12   party, in this case Google.  But it's no -- it's just an HTTP

13   request.

14   **Q.**  And in terms of the trans --

15            **THE COURT:**  I didn't hear you.  It's just a what?

16            **THE WITNESS:**  It's an HTTP request -- sorry -- that

17   we've already talked a lot about today.

18   **BY MS. TRUONG:**

19   **Q.**  And in terms of that transmission of the tracking pixel,

20   does that tracking pixel get transmitted at the same way when

21   a user is using Chrome versus Safari in its default mode?

22   **A.**  Okay.  A tracking pixel in Safari can be sent up in the

23   same way to a Google server with one major difference, and

24   that is the third-party cookie.  If -- if the Google server is

25   using third-party cookies, that third-party cookie will be

SMITH - DIRECT / TRUONG

1    blocked by Safari and will not be sent up.  And therefore you

2    get this information that's kind of just floating out there

3    that can't be really tied to a particular person.

4    **Q.**  And if I understood your testimony from earlier, that

5    third-party cookie is what enabled that third party to be able

6    to track that user across various websites; is that correct?

7    **A.**  That's correct, yes.  Uh-huh.

8    **Q.**  And, Mr. Smith, did you hear the testimony today with

9    respect to IP address, X-Client Data Header, and the user

10   agent?

11   **A.**  Yes.  I've heard various discussions of -- of those, you

12   know, those terms, yes, uh-huh.

13   **Q.**  And in your experience with respect to the Chrome browser

14   in default mode, does the Chrome browser send the combination

15   of all three of those data points to Google when a user is on

16   a non-Google-owned-and-operated website?

17   **A.**  It can.  It doesn't always send the X-Client Data to every

18   Google server.  There's a list inside the Chrome browser which

19   ones to send it to.  DoubleClick.net is one example of a

20   domain where the X-Client Data would go to where I believe

21   Google Analytics is not.

22   **Q.**  Okay.  But in say, for example, Safari, if a user is in

23   Safari in default mode and browsing the Internet, would that

24   combination of information, IP address, user agent, and

25   X-Client Data Header, be sent back to Apple, the browser

SMITH - DIRECT / TRUONG

1    manufacturer, if the user is not on --

2              **THE COURT:**  Well, that's -- look, that question

3    doesn't help me because you include the X-Client Data Header,

4    which everybody knows, so I don't know why we'd go through

5    this again, that it's -- that it's Chrome-specific.  So you

6    need to ask your hypothetical without that in there.

7              **MS. TRUONG:**  Your Honor --

8    **Q.**  Does -- do other browsers send the IP address and user

9    agent in the same manner that the Chrome browser does?

10   **A.**  Yes.  If we were just talking about those two items, it

11   would be the same in all browsers.

12   **Q.**  But with respect to Chrome, what is the significance of

13   the combination of IP address plus user agent plus X-Client

14   Data Header?

15   **A.**  The X-Client Data Header just provides another data point,

16   if you will, that can uniquely identify a user.

17   **Q.**  And can you explain that a little more?  Another data

18   point to uniquely identify a user?

19   **A.**  Yeah, this was touched on today, earlier today.  But an IP

20   address can be -- can identify typically a household.  So if

21   I'm surfing the web from my home, the IP address that the

22   outside -- the Internet sees is the IP address of my router.

23        But I'm not the only person at my home that's surfing the

24   web.  My wife might be on her iPhone, somebody else might be

25   on an iPad, and something like that.

SMITH - DIRECT / TRUONG

1    So the idea is that the user agent in combination with the

2    IP address is more specific to a device within the home.  And

3    then the X-Client Data actually adds another data point and

4    makes something even more unique.

5        You might have two people in that home both running the

6    Chrome browser on Windows with the same version, but they have

7    different X-Client Data Header settings.

8            **THE COURT:**  What is the X-Client Data Header data

9    then?

10           **THE WITNESS:**  Pardon?

11           **THE COURT:**  What is it then?

12           **THE WITNESS:**  It's a number -- it's a number, a very

13   long string of numbers and letters that's sent out -- my

14   understanding, and we had some testimony of it today, to -- to

15   allow Chrome developers to do experiments.

16           **THE COURT:**  I understand that, but how is it created

17   in the first instance to -- you've made a conclusion about

18   what it means.  And so I'm asking you what it is in order to

19   reach the conclusion of what it means in combination with the

20   other two.

21           **THE WITNESS:**  Yeah.  It's -- it's just -- it

22   potentially uniquely identifies the browser in combination

23   with the other things.  Because it's another number that could

24   be -- be combined with the IP address, the user agent, and

25   then the client data -- client data itself.  All those things

SMITH - DIRECT / TRUONG

1    are -- you know, it would be like --

2         THE COURT:  But it constantly changes then?  So if

3    I -- if I'm upstairs and using my computer, that might have

4    one X-Client Data Header.  And then I go downstairs and use a

5    different device, that might have a different one.

6         THE WITNESS:  That's correct.  If the -- if both

7    devices have -- have different -- both running the Chrome

8    browser, yeah, they could very easily have different X-Client

9    Data.  So you could distinguish devices within a home even

10   though they share the same IP address.

11        THE COURT:  And the next day it wouldn't have the

12   same header?  Or would they -- each of the devices have the

13   same header?

14        THE WITNESS:  I don't know.  That would be a question

15   for Google.  I don't know how often X-Client Data gets changed

16   and under what circumstances.

17        THE COURT:  Do you know whether it changes at all?

18        THE WITNESS:  I have some indications it might

19   change, but I don't -- I don't know the details.

20        THE COURT:  Okay.

21     Go ahead.

22        MS. TRUONG:  I have no further questions for this

23   witness, Your Honor.

24        THE COURT:  All right.  Any cross?  And you are down

25   to very few minutes.

```
 1          Twenty minutes left for the defense.
 2               MR. BROOME:  I'm sorry.  I missed that, Your Honor.
 3     Did you say 32 minutes?
 4               THE COURT:  Twenty, that's all you have left.
 5               MR. BROOME:  Including for this witness and
 6     Mr. Shafiq?
 7               THE COURT:  Twenty minutes.
 8               MR. BROOME:  Can we have a moment to confer?
 9                    (Pause in the proceedings.)
10                       CROSS-EXAMINATION
11     BY MR. BROOME:
12     Q.  Mr. Smith, you testified that you have a degree in
13     computer science, correct?
14     A.  That's correct.
15     Q.  And is that a -- what level of degree is that?
16     A.  It's a bachelor's degree.
17     Q.  And you currently work at Boston Software Forensics?
18     A.  That's correct.
19     Q.  And how many employees in that company?
20     A.  Just myself.  One.
21     Q.  And is that a company primarily geared towards doing
22     analysis for litigation?
23     A.  Yes, uh-huh.
24     Q.  And have you worked with plaintiffs' counsel before?
25     A.  Yes, I have.
```

SMITH - CROSS / BROOME

1    **Q.**  You mentioned the Fiddler tool that was a way that you

2    were able to analyze the transmissions from Chrome and other

3    browsers to various third-party domains, correct?

4    **A.**  Yes.

5    **Q.**  And then you also mentioned that browsers have built-in

6    tools, right?

7    **A.**  That's correct, yes.

8    **Q.**  And they're actually quite simple to use, aren't they?

9    You can right click, click "inspect," and that will bring up

10   the -- all the sources on the page, correct?

11   **A.**  I wouldn't say they're simple to use, but they're --

12   they're pretty easy to bring up.  But you have to be able to

13   understand what you're looking at.

14   **Q.**  Well, do you disagree with the way I characterize how you

15   would access developer tools?

16   **A.**  I -- there's a few more steps in there, I believe, but,

17   you know, not too many more.

18   **Q.**  Okay.  And if you click on the sources, it will actually

19   say what the sources are on the -- on the page including by

20   listing the actual domains.  You don't need to interpret code.

21   It will actually say, for example, Google Analytics.  Correct?

22   **A.**  Okay, well, that's a different -- that's a different panel

23   in the developer tool sources.  Yes, that's a tool for doing

24   that, yes, uh-huh.

25   **Q.**  And that -- you get to that the same way.  You right

SMITH - CROSS / BROOME

```
 1    click, click "inspect," the page, and then --
 2    A.   I hit "Shift Control I" to get -- bring it up --
 3    Q.   There are multiple different ways --
 4                  (Simultaneous colloquy.)
 5          THE WITNESS:  Correct.
 6          THE COURT:  One at a time.  Go ahead.
 7    BY MR. BROOME:
 8    Q.   Mr. Smith, have you -- during the course of your
 9    engagement for this matter, did you gain access to Google's
10    back-end systems?
11    A.   I did not.
12    Q.   Should all -- should all browsers block third-party
13    cookies by default?
14    A.   I think that would be a good idea.
15    Q.   Should all browsers obscure IP addresses?
16    A.   I think that's a difficult thing to do.
17    Q.   Okay.  Do all browsers obscure IP addresses?
18    A.   It depends on kind of what you mean by "all browsers."
19    You typically block IP addresses in a browser by using
20    something -- software called a VPN.  And, you know, that
21    sometimes can come as a browser extension.  It's not
22    necessarily part of the browser.
23    Q.   Okay.  Do all browsers have built-in VPN's?
24    A.   I believe Safari has the ability to -- to mask IP
25    addresses for trackers.
```

1    Q.  And that's not universally deployed across Safari, is it?

2    A.  I don't know all the -- I don't know all the different

3    versions and over time and when it -- when it's done.  No, I

4    haven't investigated that.

5    Q.  Okay.  And do any other browsers have a feature that

6    allows you to mask IP address?

7    A.  Well, they always have -- they have the ability to use an

8    HTTP proxy or a VPN, to configure that, but they -- that

9    capability is not part of the browser.  It's something the

10   browser can -- can use.

11   Q.  Understood.

12   A.  The distinction.

13   Q.  You were asked whether Chrome sends browsing history

14   information to Google when a user -- a Chrome user visits

15   websites that use Google third-party services.

16       Do you remember that?

17           MS. TRUONG:  Objection.  Mischaracterizes the

18   testimony.

19           THE COURT:  Overruled.  He can clarify.

20           THE WITNESS:  I -- I didn't really remember saying

21   Google services in there, but I said Google servers I believe

22   is what I was talking about.

23   BY MR. BROOME:

24   Q.  That's fine.  So is it your opinion that Chrome sends

25   browsing history to Google servers when a Chrome user visits a

1   website that is using Google services, a non-Google website

2   that's using Google services.

3   **A.**  Yeah, with -- yes, in those tracking pixels I talked about

4   browsing history information go off, say, to Google and Google

5   Analytics to DoubleClick.  And also Google Ads.  Yes, I've

6   seen that.

7   **Q.**  Okay.  And in the HTT -- or when you say browsing history,

8   are you referring to the fact that the URL is contained in the

9   HTTP request?

10  **A.**  Let me clarify that because the HTTP request is going to a

11  Google server.  So there's a URL for the Google server, and

12  embedded in that URL can be the URL of the web page that

13  you're visiting.

14  **Q.**  Is a single URL embedded in an HTTP request browsing

15  history, in your opinion?

16  **A.**  Not if -- that's all you ever go to on the web, I guess it

17  would be.  But that would not be a reasonable thing.

18      I think that, you know, browsing history information seems

19  to be like one page, and then browser history would be --

20  oops -- would be the list of -- a list of web pages you

21  visited.

22  **Q.**  Do any browsers other than Chrome block the URL in --

23  contained in the HTTP protocol -- excuse me -- in the HTTP

24  request from being sent to Google servers?

25          **MS. TRUONG:**  Objection.  Assumes facts not in

SMITH - CROSS / BROOME

```
 1    evidence.

 2              THE COURT:  Overruled.

 3              THE WITNESS:  I don't know all -- I'm not sure.  I do

 4    know the browsers nowadays block full URLs and referrers, but

 5    that's not what we're talking about here.  URLs that are

 6    embedded in the main URL.

 7    BY MR. BROOME:

 8    Q.  And browsers nowadays, you said browsers nowadays block

 9    the full URL in the refer?

10    A.  Right.  Which has not been talked about today.

11    Q.  And that includes Chrome, right?  Chrome is one of the

12    browsers that blocks --

13    A.  Uh-huh.

14    Q.  Okay.  You said that IP plus user agent plus X-Client Data

15    Header provides another data point to identify a user.  Is

16    that your testimony?

17    A.  Yes.  Uh-huh.  It's to distinguish a user, I would --

18    Q.  Okay.  And you've reviewed the record in this case.

19    Correct?

20              MS. TRUONG:  Objection, form.

21              THE COURT:  Overruled.

22              THE WITNESS:  Sorry.  I'm not sure what you mean

23    by --

24    BY MR. BROOME:

25    Q.  Well, fair -- fair -- fair question.
```

1    You've reviewed a lot of the deposition testimony and a

2    lot of the documents that Google has produced in this case,

3    correct?

4    **A.**  I have reviewed some deposition testimony, some

5    declarations, and some Google documents, yes, I have.

6    **Q.**  Have you seen any evidence that Google does in fact use

7    the X-Client Data Header alone or in combination with any

8    other data to identify users or devices?

9    **A.**  I have not.  But I did see one document with a Google

10   engineer basically expressing concerns like I have expressed

11   here.

12   **Q.**  Right.  Expressing concerns and saying that Google should

13   not do that, correct?

14   **A.**  It's been a while since I've seen the document.  I can't

15   quote exactly.

16   **Q.**  All right.  And one final question.  You said that the

17   X-Client Data Header could be used to distinguish between

18   devices within a home.

19   **A.**  Yes.

20   **Q.**  Yeah.

21   **A.**  Potentially.

22   **Q.**  Have you seen any evidence that Google uses the X-Client

23   Data Header in that way?

24   **A.**  I have not.

25        **MR. BROOME:**  No further questions.  Thank you.

SMITH - CROSS / BROOME

 1            **THE COURT:**  All right.  Plaintiffs only have

 2    28 minutes left.  Are you done with this witness?

 3            **MS. TRUONG:**  Yes.  No further questions, Your Honor.

 4            **THE COURT:**  All right.  Sir, you're excused.  Thank

 5    you.  Okay.

 6            **MR. BARNES:**  Your Honor, we're going to call

 7    Dr. Shafiq.  He's going to have things that are sealed.  I

 8    think we ought to seal the courtroom.  I'm a hundred percent

 9    confident Google is going to say that there are documents he's

10    going to testify to that should be sealed.

11            **THE COURT:**  Okay.

12            **MR. BARNES:**  So I don't know.  I just want to give

13    you that notice.  And I don't know how you want to deal with

14    it.

15            **THE COURT:**  I'm not ready for you.

16         Sir, I'm not ready for you.

17            **THE WITNESS:**  Oh, sorry.

18            **THE COURT:**  And he's already been sworn in.

19         Okay.  So I've got 28 minutes left on plaintiffs' clock

20    and 12 minutes left on the defense clock.  We're going to go

21    ahead and take a short break so that we don't have to be

22    interrupted.  My court reporter needs her break.  So we're

23    going to stand in recess until 3:30.

24         I will seal the courtroom then for this portion.

25         At 4:10, no later than 4:15, I'll reopen the courtroom.

```
 1   If anybody is here who's not going to be in the courtroom

 2   wants to come back, they can.  Each side will be given five

 3   minutes to close.  That will be the schedule for the

 4   afternoon.

 5           MR. SCHAPIRO:  Can I make one request, Your Honor?

 6   That before the closing, just so we can aggregate and be

 7   efficient, that we have a five-minute break to boil down our

 8   thoughts to a five-minute closing based on what we hear?

 9           THE COURT:  Maybe.

10           MR. SCHAPIRO:  Thank you, Your Honor.

11           THE COURT:  All right.  We'll stand in recess till

12   3:30.  At that point, the courtroom will be closed -- or

13   sealed.

14           MR. SCHAPIRO:  And, Your Honor, we have -- oops.

15     We have a couple of witnesses who are in-house Google

16   attorneys who've been privy to the -- these are Google

17   documents.  They can stay.

18           THE COURT:  I don't care.

19           MR. SCHAPIRO:  Cool.

20               (Recess taken at 3:22 P.M.)

21

22           *       *       *       *       *

23           (The transcript of proceedings at pages 272 through

24   320 are under seal and bound separately.)

25
```

```
 1                        *    *    *    *    *
 2              (The transcript of the proceedings at pages 272
 3    through 320 were held under seal and are bound separately.)
 4         (The proceedings in open court continue as follows:)
 5                  (Proceedings resumed at 4:31 P.M.)
 6              THE COURT:  All right.  Mr. Schapiro.
 7              MR. SCHAPIRO:  Are we back?
 8              THE COURT:  So fast when you're having fun, right?
 9              MR. SCHAPIRO:  I think Mr. Barnes is still out.  I
10    think.  I think their whole team is still out.
11         Do you want me to go in the hallway and try to get them?
12              THE COURT:  Someone from the plaintiffs' side better
13    get your colleagues.  Otherwise they're going to miss
14    Mr. Schapiro's close.
15                      (Off-the-record discussion.)
16              THE COURT:  I looked at the clock.  When I say "four
17    minutes," I mean four minutes.
18         All right.  Be seated.
19         That's why juries like to be here because we are on time,
20    always on time.
21         Mr. Schapiro, you may proceed.
22                         CLOSING ARGUMENT
23              MR. SCHAPIRO:  Your Honor, during my opening
24    statement, I said that you were going to hear a lot of
25    testimony about a lot of things but that very little of it
```

CLOSING ARGUMENT \ SHAPIRO

1   from the plaintiffs' side was going to go to the core issue.

2   And I think today's hearing has borne that out.

3       You would think, if you were just a stranger to this

4   hearing, that the question the Court had asked is whether

5   Chrome is the most privacy-protective browser on the market.

6   But that's not the question that we're here to answer and

7   that's not the question that is posed in our motion for

8   summary judgment based on express consent.  It's conflating

9   questions.

10      The reason we are here is to determine whether these

11  categories of data are received by Google regardless of what

12  type of browser is visiting a web page that uses Google

13  services.

14      Now one thing that was very clear today is that browser

15  settings are changing and evolving.  And so what Google does

16  is describe the landscape of data that it may receive

17  regardless of what browser you're in and what settings you

18  enable.  It would make little sense to do anything different.

19      Indeed by the plaintiffs' logic, Google could say to a

20  Firefox user, "Oh" -- could suggest to a Firefox user, "No, we

21  only receive this information when you're in Chrome," when

22  that's entirely untrue.

23      Depending on the Firefox user's settings, that user may

24  also be conveying data to Chrome.  That is why it is disclosed

25  in a browser-agnostic disclosure in our privacy policy.

CLOSING ARGUMENT \ SHAPIRO

1       Now, Your Honor, the defendants spent -- excuse me -- the

2   plaintiffs spent 15 minutes of questions on Mr. Hill and

3   uBlock Origin, many questions on RTB bidding, which is a

4   totally different case before you about auctions.  All of

5   those are about either two things.  One, how different

6   browsers work, not how the services work when encountering

7   different browsers, or two, what happens on Google's back end.

8       They're getting it backwards talking about how browsers

9   differ rather than how the services interact with different

10  browsers.

11      You asked a question to Mr. Smith, the plaintiffs' expert

12  who testified after lunch.  And you said -- it was -- it was,

13  I think, in the -- the most perceptive question that anyone

14  asked.  I wish we had asked it.  And that was:  Well, are you

15  saying they send some of these third-party cookies but just

16  less?

17      And Mr. Smith said:  Yeah, that's what I'm saying.  Some

18  of these other browsers, they send the same categories of the

19  at-issue data, but they might send less.

20      And, Your Honor, that is why we design and disclose our

21  services regardless of browser type.

22      Mr. Zervas -- excuse me -- Dr. Zervas made a few points

23  that were never answered by Mr. Shafiq.  And so I think when

24  you go back, if you look at the tables that Dr. Shafiq

25  included in his report that purport to show that there's in

1    some instances a greater frequency of transmission of data to

2    Google, why that's a red herring.

3        For instance, you might see 95 transmissions of user

4    agent.  But it's the same user agent, Your Honor.  So if it's

5    95 transmissions when he's using Chrome and 80-something on

6    Safari or Firefox, it is still just the same data being

7    passed.  I believe Mr. Zervas gave an example of that.  If I

8    say my name is Andy Schapiro to you once or I say it twice,

9    I'm giving you the same information.

10       Mr. Zervas -- excuse me -- Dr. Zervas showed substantial

11   flaws in the testing that Dr. Shafiq did.  Those are available

12   in the PowerPoint that we presented to you.

13       But at the end of the day, it doesn't really matter.  It

14   doesn't really matter because subject to whatever fighting

15   Dr. Shafiq wanted to do with me, and you saw it, and whatever

16   asterisk there might be on here, the dispute between the two

17   experts was actually relatively minor.

18       Both of them agree that when you look at the data, all of

19   these categories of information are passed when a user, in any

20   type of browser, visits a website that is using a -- excuse

21   me -- a non-Google website that is using Google services.

22       So whatever the plaintiffs may have wanted to turn this

23   into a hearing about Supermixer or RTB auctions or whether

24   there's something significant about the fact that Google,

25   which is present on the web as an advertiser or a provider of

1    maps or analytics, whether there's something significant about

2    the fact that people in Chrome often encounter Google services

3    and maybe less frequently people in Safari encounter Apple

4    services, is neither here nor there.

5        The fundamental question has been answered, has been

6    answered in the affirmative, that the web services are, for

7    the relevant purposes here, browser-agnostic.  That is why

8    they're disclosed in a browser-agnostic privacy policy.  And

9    that is why our motion for summary judgment on express consent

10   should be granted.

11           **THE COURT:**  All right.

12       Mr. Barnes.

13                       **CLOSING ARGUMENT**

14           **MR. BARNES:**  Thank you, Your Honor.

15       The services that Google keeps talking about are not

16   consumer services.  They are not the subject of any contracts

17   between consumers and Google.  Mr. Schapiro referenced the

18   privacy policy four times in his closing statement.

19       Here's what the terms say, Your Honor.  And I -- part of

20   this may be my fault flubbing a question at the last hearing.

21   The specific does not govern the general.  What the contract

22   says is that service-specific additional terms govern the use

23   of that service.

24       And the Google terms of use includes a link to a list of

25   services that it is referring to as service-specific

1    additional services.

2        Google ads is not on that list.  Google display ads is not

3    on that list.  Google -- Google Analytics is not on that list.

4    The Google privacy policy is not on that list.

5        Chrome and the Chrome privacy notice are on that list.

6    And the first sentence of the Chrome privacy notice says:

7    This is the document where Chrome users learn how to control

8    the information that's collected, stored, and shared when you

9    use the Google Chrome browser.

10       We had this hearing today to demonstrate that not only is

11   Google the only browser -- we submitted privacy policies from

12   the other browsers so you could compare.  Not only is Chrome

13   the only browser that sends this quantitatively and

14   qualitatively different information to Google when users are

15   not synced.  It is the only browser that makes users promises

16   specific to privacy from Chrome.

17       The Chrome privacy notice by the Google terms of service

18   is the only document that governs when it comes to learning

19   how to control the information that's collected, stored, and

20   shared when you use the Google Chrome browser.  That's the

21   first sentence of the Chrome privacy notice.

22       And the privacy policy that Mr. Schapiro references, at

23   the bottom of it, it has a hyperlink that says:  Learn more

24   about privacy practices in other Google products.  And the

25   first link is, is to the Chrome privacy notice.

1       And what the evidence -- we -- there's always an irony

2   here.  The Chrome people, we submitted the deposition

3   testimony of Sabine Borsay from Chrome.  She denies that

4   Chrome sends browsing history information to Google when users

5   are not synced.  Our experts testified to the opposite.

6       Regarding X-Client Data Header and its nature, that is a

7   dispute of material fact -- a genuine dispute of material fact

8   sufficient to deny summary judgment on its own.

9       And when you look at the specific promises in that notice,

10  Google violates them.  And, Your Honor, one of them is this.

11  Because Google today kept downplaying the amount of personal

12  information.  The Chrome privacy notice expressly says, in

13  general, the fact that you use Chrome to access Google

14  services such as Gmail does not cause Google to receive any

15  additional personally identifying information about you.

16      Chrome is the only browser to make that promise.  Chrome

17  is the only browser to break that promise.

18      The testimony you heard today showed that the data that

19  Chrome sends to Google is both quantitatively and

20  qualitatively different.  And there was only one person today

21  who you heard from who has analyzed both the front end of the

22  system, which is how the browsers work, and the back of the

23  system, which is how Google's services to developers and

24  advertisers react differently to different browsers.

25      Every browser acts differently.  Google's own 30(b)(6)

1    deponents testified to that.  And those differences make a

2    profound difference in what it means for privacy for Chrome

3    users versus other users.  Chrome is the only browser from

4    which Google is able to create detailed user profiles and

5    dossiers across different devices that link signed-out

6    activity to signed-in activity across devices.  No other

7    browser is like that.

8         Mr. Schapiro also mentioned:  Well, you don't know what

9    percentage of what browsing they did in the other browsers.

10        We asked Google to produce all the information it had.

11   Google didn't produce anything from Firefox.  Google didn't

12   produce -- Google barely produced anything from Safari.  And

13   the reason is that those browsers work differently in a way

14   that means they don't send information that Google collects to

15   collect the profile information to create the dossiers that

16   are at the heart of this case.

17        And for that reason, we hope and believe that you should

18   deny the motion for summary judgment, Your Honor.

19        **THE COURT:**  Okay.  Thank you very much.  I'll take it

20   under submission.  It's been a long day.  Appreciate it.

21              (Off-the-record discussion.)

22        **THE COURT:**  Okay.  To alleviate motion practice, the

23   Court hereby orders that the parties themselves can receive a

24   copy of the sealed portion of the transcript.

25        All right.  Thank you.

```
 1                MR. BROOME:  Thank you, Your Honor.

 2                MR. STRAITE:  Your Honor, I appreciate the

 3      indulgence.

 4           During the hearing, both sides made reference to

 5      Dr. Shafiq's rebuttal report.  This has been provided to the

 6      Court at tab C4 of your binder.  We move formally for its

 7      admission into evidence, given the fact that both sides made

 8      reference to it.

 9                MR. BROOME:  Your Honor, we have no problem having it

10      admitted to the extent it was discussed today.  But our

11      objection is that he put in this big expert report which

12      wasn't contemplated.  And so to the extent there are parts of

13      that report that he was not cross-examined on or did not come

14      up in his direct --

15                THE COURT:  Yeah, I'm not -- look.  I'm not

16      inclined -- literally, I'm going to -- you're going to send --

17      you are going to send someone to come back and get these

18      binders.

19                MR. STRAITE:  Yes, ma'am.

20                THE COURT:  I've been out of town, and I was told

21      that we had eight boxes of documents, which I was very

22      surprised about.

23           So I am not looking at anything that wasn't discussed.

24      I'm happy to look at the -- to look at the report to the

25      extent it was discussed.  And so you're ordered to meet and
```

```
 1   confer and send me a -- a edited version.  You can just black
 2   out -- just those portions that were referred to today so that
 3   I have that as backup.
 4       But I'm not going to sit and read stuff that we didn't
 5   talk about.
 6       We already have a pretty big record in this case.  My
 7   primary goal in today's hearing was to understand more
 8   technically what each side was thinking, and I think I have
 9   that.
10       It could be that those reports are needed if this case
11   goes on.  Be used in the future.  But for my purposes, I think
12   I have what I need.  I don't know that I need it.  But to the
13   extent I've got it with me, I'm only going to look at the
14   portion that we talked about.  I'm not -- I'm not going to
15   make assumptions about anything that's been submitted that we
16   did not discuss.
17       Okay?
18            MR. BROOME:  Thank you, Your Honor.
19            THE WITNESS:  All right.  Thank you.  Safe travels.
20           (Proceedings were concluded at 4:47 P.M.)
21                         --o0o--
22
23
24
25
```

1

2                    **CERTIFICATE OF REPORTER**

3

4            I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6    I further certify that I am neither counsel for, related to,

7    nor employed by any of the parties to the action in which this

8    hearing was taken, and further that I am not financially nor

9    otherwise interested in the outcome of the action.

10

11    _____

12        Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

13                  Friday, October 28, 2022

14

15

16

17

18

19

20

21

22

23

24

25