**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

PATRICK CALHOUN, ET AL.

Plaintiffs,

v.

GOOGLE, LLC,

Defendant.

CASE NO.  20-cv-5146-YGR
**ORDER GRANTING GOOGLE'S MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AS MOOT; AND ORDER RE PENDING ADMINISTRATIVE MOTIONS**
Re: Dkt. Nos. 340, 395, 425, 427, 488, 855, 909

Plaintiffs Patrick Calhoun, Elaine Crespo, Michael Henry, Cornice Wilson, Rodney Johnson, and Claudia Kindler bring this suit against defendant Google, LLC based on Google's alleged data collection practices and use of data from "users who chose not to 'Sync' their Google accounts with Chrome while browsing the web." (Dkt. 162-3, First Amended Complaint, "FAC", ¶ 1.)[1] Six alleged claims remain: (1) violation of the California Invasion of Privacy Act (Count Five); (2) intrusion upon seclusion (Count Seven); (3) breach of contract (Count Eight); (4) breach of the implied covenant of good faith and fair dealing (Count Nine); (5) statutory larceny (Count Thirteen); and (6) violation of California's Unfair Competition Law (Count Fourteen).

Pending before the Court is Google's Motion for Summary Judgment on Consent (Dkt. No. 395, "Mot.") and plaintiffs' Motion for Class Certification (Dkt. 340, "Class Cert. Mot."). Having carefully considered the parties' briefing, the admissible evidence, the record in this case, and upon further consideration after oral argument which occurred on August 26, 2022, and the evidentiary hearing which occurred on October 24, 2022, Google's Motion for Summary Judgment is hereby **GRANTED** and plaintiffs' Motion for Class Certification is **DENIED AS MOOT**.[2]

---

[1] There are also two related actions pending in front of this Court: *Brown et al. v. Google LLC*, 20-3664, which deals with Google's alleged surreptitious interception and collection of personal and sensitive user data while users are in "private browsing mode," and *In re Google RTB Consumer Privacy Litigation*, 21-2155, which focuses not on collection but on Google's alleged sharing and selling of consumers' personal information through its Real-Time Bidding ("RTB") system.

[2] Also pending before the Court is plaintiffs' Motion for Leave to Supplement the Briefing

United States District Court
Northern District of California

United States District Court
Northern District of California

# I.  BACKGROUND

## A.  Alleged Data Collection and Use

Plaintiffs' FAC alleges as follows:

Plaintiffs are users of Google's Chrome browser who allege that they "chose not to 'Sync' their [Chrome] browsers with their Google accounts while browsing the web from July 27, 2016 to the present." (FAC ¶ 1.)  Chrome's Sync feature allows users to store their personal information by logging into Chrome with their Google account.  (*Id.* ¶ 45.)  Google promises users that they need not provide any personal information to use Chrome and that any information that Chrome stores will not be sent to Google unless one syncs their account. (*Id.* ¶ 3.)  However, Google "intentionally and unlawfully causes Chrome to record and send users' personal information to Google regardless of whether a user elects to Sync or even has a Google account." (*Id.*)

The personal information collected and sent to Google includes: (i) "unique, persistent cookie identifiers"; (ii) "the user's browsing history in the form of the contents of the users' GET requests and information relating to the substance, purport, or meaning of the website's portion of the communication with the user"; (iii) "the contents of the users' POST communications"; (iv) "the user IP address and User-Agent information about their device"; and (v) "the user's x-client-data identifier", (collectively, "at-issue" data).  (*Id.* ¶ 141.)

Plaintiffs also allege that Google improperly uses the at-issue data. According to plaintiffs, Google engages in "cookie-syncing" whereby "first-party cookies are set by websites with which users are directly interacting, but then those first-party websites also pass that cookie value [] along to Google Analytics, where Google takes the personal information it has about the user's

---

Regarding Remedies, Dkt. No. 855, plaintiffs' Administrative Motion for Leave to Supplement the Record as to Google's Motion for Summary Judgment and to File a Sur-Reply, Dkt. No. 909, and several administrative motions to seal. Having denied plaintiffs' Motion for Class Certification as moot, the Motion to Supplement the Briefing Regarding Remedies is also **DENIED AS MOOT**. Plaintiffs' Motion for Leave to Supplement the Record and File a Sur-Reply as to Summary Judgment is also **DENIED**. The evidence plaintiffs seek to proffer is similar to evidence that already exists in this case. Therefore, the Court finds supplementation of the record or additional briefing unnecessary.

As to the administrative motions to seal, these motions are **DENIED** to the extent the information is referenced and included in this Order. The specific motions will be addressed by separate court order.

particular browser and links the Google Analytics first-party cookie information to Google's own third-party cookies and the user's browsing." (*Id.* ¶ 69.)  Google also allegedly "combine[s] . . . personal information that it obtained when [users are] not logged-in to Google sync with other data it has about [users]" "to create detailed dossiers about individual's personal information" for targeted advertising. (*Id.* ¶¶ 174, 180, 186, 258.)

The FAC defines a proposed class as all persons residing in the United States whose personal information was collected by Google when they used Google's Chrome browser and chose not to Sync their browser with any Google account, with a class period of July 27, 2016 to the present. (*Id.* ¶ 262.)

**B.      Google's Representations and Disclosures**

Relevant for this motion, the parties represent that the following different policies govern the conduct alleged herein: (1) Google's General Terms of Use ("General ToS") and Google's related Privacy Policy ("General Privacy Policy"); (2) Chrome Privacy Notice; (3) Consent Bump Agreement; and (4) New Account Creation Agreement. These agreements contain several representations and disclosures. Relevant portions are discussed herein.

**1.      *General ToS and General Privacy Policy***

Google's General ToS provides that it describes "what [one] can expect from [Google] as [they] use Google services . . . ." and "helps define Google's relationship with [users]."  (Dkt. No. 462, Barnes Declaration "Barnes Decl.," Ex. 32 at 1.)  Further, "understanding these terms is important because, by using our services, you're agreeing to these terms." *Id.*  Plaintiffs also invoke Google's specific terms and policies for specific Google services. (*Id.* at 2.) Relevant here, a hyperlink is included to a list of services and their additional service-specific terms, including the Chrome Privacy Notice. (*Id.*)  The General ToS states that where "these terms conflict with the service-specific additional terms, the additional terms will govern for that service." (*Id.* at 14.)

Prior to March 31, 2020, Google's General ToS incorporated Google's General Privacy Policy. (*See e.g.,* Dkt. No. 2, Exhibits of Original Complaint, "Compl. Exs.," at Exs. 2-5.)

Google's General Privacy Policy states, "as you use our services, we want you to be clear how we're using information and the ways in which you can protect your privacy." (*Id.* at Ex. 7.)

United States District Court
Northern District of California

The General Privacy Policy in effect at the beginning of the class period made the following disclosures regarding Google's collection of data from users:

> Information we get from your use of our services. We **collect information about the services that you use and how you use them, like when you . . . visit a website that uses our advertising services, or view and interact with our ads and content**. This information includes:
>
> - Device information . . . such as your hardware model, operating system version, **unique device identifiers**, and mobile network information . . . **Google may associate your device identifiers . . . with your Google Account**.
>
> - Log information. . . [w]hen you use our services or view content provided by Google, we automatically collect and store certain information in server logs. This includes:
>
>    - **details of how you used our service, such as your search queries . . .**
>    - **Internet protocol address.**
>    - **device event information such as . . . the date and time of your request and referral URL.**
>    - **Cookies that may uniquely identify your browser or your Google Account.**
>
> Cookies and similar technologies.
>
> **We and our partners use various technologies to collect and store information when you visit a Google service, and this may include using cookies or similar technologies to identify your browser or device. We also use these technologies to collect and store information when you interact with services we offer to our partners, such as advertising services or Google features that may appear on other sites.** When used in conjunction with our advertising services, such as those using the DoubleClick cookie, Google Analytics **information is linked**, by the Google Analytics customer or by Google, using Google technology, **with information about visits to multiple sites**.
>
> **Information we collect** when you are signed in to Google, in addition to information we obtain about you from partners, **may be associated with your Google Account**. When information is associated with your Google Account, we treat it as personal information.

United States District Court
Northern District of California

How we use information we collect.

**We use the information we collect from all of our services . . . to offer you tailored content –like giving you more relevant search results and ads.**

We use information collected from cookies and other technologies, like pixel tags, to improve your user experience and the overall quality of our services. One of the products we use to do this on our own services is Google Analytics. For example, by saving your language preferences, we'll be able to have our services appear in the language you prefer. When showing you tailored ads, we will not associate an identifier from cookies or similar technologies with sensitive categories, such as those based on race, religion, sexual orientation or health.

**We may combine personal information from one service with information, including personal information, from other Google services** – for example to make it easier to share things with people you know. **Depending on your account settings, your activity on other sites and apps may be associated with your personal information in order to improve Google's services and the ads delivered by Google.**

**"linked with information about visits to multiple sites"**

**Google Analytics is based on first-party cookies. Data generated through Google Analytics can be linked, by the Google Analytics customer or by Google, using Google technology, to third-party cookies, related to visits to other websites, for instance when an advertiser wants to use its Google Analytics data to create more relevant ads, or to further analyze its traffic.**

Learn more.

**"your activity on other sites and apps"**

This activity might come from your use of Google products like Chrome Sync or from your visits to sites and apps that partner with Google. Many websites and apps partner with Google to improve their content and services. For example, a website might use our advertising services (like AdSense) or analytics tools (like Google Analytics). **These products share information about your activity with Google and, depending on your account settings and the products in use (for instance, when a partner uses Google Analytics in conjunction with our advertising services), this data may be associated with your personal information.**

Learn more.

(*Id.*) (Emphasis supplied.) Subsequent versions of Google's General Privacy Policy made similar disclosures. (*Id.* at Exs. 8-16; Dkt. No. 393-3, Fair Declaration, "Fair Decl.," at ¶¶ 56-58.)  In addition to explaining that Google collects "activity on third-party sites and apps that use our services," Google also disclosed in subsequent policies that one's "Chrome browsing history you've synced with your Google Account" is also collected. (Compl. Exs., at Ex. 16.) The General Privacy Policy "applies to all of the services offered by Google Inc. and its affiliates" and services offered on other sites (such as Google's advertising services) but excludes those services that have a separate privacy policy that does not incorporate the General Privacy Policy. (*Id.* at Ex. 7 at 5.)

### 2.    *Chrome Privacy Notice*

The Chrome Privacy Notice, which is incorporated into both the General ToS and the General Privacy Policy, invites users to "learn how to control the information that's collected, stored, and shared when you use the Google Chrome browser." (Barnes Decl., Ex. 33 at 1.) The policy states that it "describes features that are specific to Chrome" and that "any personal information that is provided to Google or stored in your Google Account will be used and protected in accordance with the Google Privacy Policy." (*Id.*) Relevant here, the Chrome Privacy Notice contains the following disclosures:

> **You don't need to provide any personal information to use Chrome**, but Chrome has different modes you can use to change or improve your browsing experience. Privacy practices are different depending on the mode you're using.
>
> The basic browser mode stores information locally on your system. This information might include: . . . browsing history information. For example, Chrome stores the URLs of pages that you visit, a cache of texts, images and other resources from those pages . . . cookies or data from websites you visit . . . [and] a record of what you downloaded from websites.
>
> **The personal information that Chrome stores won't be sent to Google unless you choose to store that data in your Google Account by turning on sync . . .**
>
> **Information for website operators.** Sites that you visit using Chrome will automatically receive standard log information, including your system's IP address and data from cookies. In general, the fact that you use Chrome to access Google

services, such as Gmail, does not cause Google to receive any additional personally identifying information about you.

**Identifiers in Chrome.** Chrome includes a number of unique and non-unique identifiers necessary to power features and functional services. For example, if you use push messaging, an identifier is created in order to deliver notices to you. Where possible, we use non-unique identifiers and remove identifiers when they are no longer needed. Additionally, the following identifiers help us develop, distribute, and promote Chrome, but are not directly related to a Chrome feature.

- ○ [. . .]
- ○ [. . .]
- ○ **Field trials. We sometimes conduct limited tests of new features. Chrome includes a seed number that is randomly selected on first run to assign browsers to experiment groups. Experiments may also be limited by country (determined by your IP address), operating system, Chrome version, and other parameters. A list of field trials that are currently active on your installation of Chrome is included in all requests sent to Google. Learn more.**

When you sign in to the Chrome browser or a Chromebook and enable sync with your Google Account, your personal information is saved in your Google Account on Google's servers so you may access it when you sign in and sync to Chrome on other computers and devices. This personal information will be used and protected in accordance with the Google Privacy Policy. This type of information can include:

- Browsing history,
- Bookmarks,
- Tabs,
- Password and autofill information,
- Other browser settings, like installed extensions

Sync is only enabled if you choose.

**Server Log Privacy Information.**
Like most websites, our servers automatically record the page requests made when you visit our sites. These "server logs" typically include your **web request, Internet Protocol address**, browser type, browser language, the date and time of your request and **one or more cookies that may uniquely identify your browser**.

More information

Information that Google receives when you use Chrome is used and protected under the Google Privacy Policy. Information that other website operators and add-

7

on developers receive, including cookies, is subject to the privacy policies of those
websites.

Key terms

A cookie is a small file containing a string of characters that is sent to your
computer when you visit a website. When you visit the site again, the cookie allows
that site to recognize your browser. Cookies may store user preferences and other
information. You can configure your browser to refuse all cookies or to indicate
when a cookie is being sent. However, some website features or services may not
function properly without cookies. Learn more about how Google uses cookies and
how Google uses data, including cookies, when you use our partners' sites or apps.

(*Id.*) (Emphasis supplied.)  As indicated above, the Chrome Privacy Notice includes a link to the

General Privacy Policy.

### 3.    *Consent Bump Agreement*

The Consent Bump Agreement is a push down banner that Google showed to account

holders either when they visited a "Google owned-and-operated property" while signed into their

account or when users signed into their account for the first time after June 2016. (Dkt. No. 393-4,

Gregory Fair Decl., ¶¶ 16-19.)  Google launched the Consent Bump Agreement in June 2016.

(*Id.*)  A depiction when it was first launched is included as Appendix A. The Consent Bump

Agreement explained that Google had introduced "some new features for your Google Account"

and that:

when you used Google services like Search and YouTube, you generate data—
things like what you've searched for and videos you've watched. You can find and
control that data in My Account under the Web & App Activity setting. With this
change, this setting may also include **browsing data from Chrome and activity
from sites and apps that partner with Google, including those that show ads
from Google**.

(*Id.*) (Emphasis supplied.)  Further, it explained that "Google will use this information to make ads

across the web more relevant for you." (*Id.*)

The Consent Bump Agreement included a link to a Frequently Asked Questions ("FAQs")

page through the "Learn More" link. (Fair Decl., at ¶ 23.) The FAQ page stated in relevant part:

Many websites and apps use Google technologies to improve their
content and services. For example, a website might use our
advertising services (like Adsense) or analytics tools (like partners
who use **Google Analytics to improve the ads they show**).

United States District Court
Northern District of California

8

> As you use these sites, **your web browser may send certain information to Google that may include the web address of the page that you're visiting, your IP address, or cookies previously set by the site or Google**.

(*Id*. at Ex. 3 at GOOG-CABR-04067841) (Emphasis supplied.)

Customers were then provided choices.  The options allowed a user to: "Choose I AGREE to turn these features on or MORE OPTIONS for more choices."  (*See id.* at Ex. 3, at GOOG-CABR-04067836.)  If the user selected "I AGREE," the new settings were turned on. (Fair Decl., ¶ 24.)  Alternatively, if the user selected "MORE OPTIONS," the user was taken to a screen that offered several options, including "No changes- continue on your way"; "No changes -review key privacy settings more fully"; or "Yes, I'm in- turn on these new features." (*Id.*)

### 4.    *New Account Creation Agreement*

Finally, beginning around June 2016, Google also updated its New Account Creation Agreement, which required users creating new accounts to agree to certain disclosures. (*Id.* at ¶ 32.)  A depiction of this agreement when it was first launched is included as Appendix B.

The New Account Creation Agreement incorporates Google's General Terms of Service and General Privacy Policy and states, "[b]y choosing 'I agree' below you agree to Google's Terms of Service. You also agree to our Privacy Policy, which describes how we process your information . . . ." (*Id.*).

The New Account Creation Agreement discloses the "data we process when you use Google." Specifically, the agreement explained:

- When you use Google services to do things like write a message in Gmail or comment on a YouTube video, we store the information you create.

- When you search for a restaurant on Google Maps or watch a video on YouTube, for example, **we process information about that activity—including information like the video you watched, device IDs, IP addresses, cookie data, and location.**

- **We also process the kinds of information described above when you use apps or sties that use Google services like ads, Analytics,** and the YouTube video player.

- Depending on your account settings, some of this data may be associated with your Google Account and we treat this data as personal Information. You can control how we collect and use this data at My Account (myaccount.google.com).

Additionally, it explains why the collected information is processed, including to:

- Help our services deliver more useful, customized content such as more relevant search results;

- Improve the quality of our services and develop new ones;

- **Deliver personalized ads, both on Google services and on sites and apps that partner with Google**;

- Improve security by protecting against fraud and abuse; and

- **Conduct analytics and measurement to understand how our services are used.**

The New Account Agreement also explains that data is combined across services:

> **We also combine data among our services and across your devices for these purposes.** For example, we show you ads based on information from your use of Search and Gmail, and we use data from trillions of search inquires to build spell-correction models that we use across all of our services.

(*Id.*) (Emphasis supplied.) The New Account Agreement requires users to either click "I Agree or Cancel." (*Id.*)

In May 2018, Google modified the New Account Creation Agreement to include more disclosures about how information is combined. (*See id.* ¶ 37.) The modified New Account Agreement explains that "[Google] show[s] you ads based on information about your interests, which we can derive from your use of Search and YouTube." (*Id.* at Ex. 22.)  The modifications also include the addition of a paragraph titled "You're in Control" and a "MORE OPTIONS" link to make it easier for users to adjust their settings. (*Id.* at Exs. 22-23.)  The "You're in Control" language states:

> Depending on your account settings, some of this data may be associated with your Google Account and we treat this data as personal information. You can control how we collect and use this data now by clicking "More Options" below. You can always adjust your controls later or withdraw your consent for the future by visiting My Account (myaccount.google.com).

(*Id.* at Ex. 22.)

United States District Court
Northern District of California

## II.   LEGAL STANDARD

A party may move for summary judgment on a "claim or defense." Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As a general matter, where the party moving for summary judgment would bear the burden of proof at trial, that moving party bears the initial burden of proof at summary judgment as to each material fact to be established in the complaint and must show that no reasonable jury could find other than for the moving party. *See S. California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) *(citing* William W Schwarzer, et al., CALIFORNIA PRACTICE GUIDE: FEDERAL CIVIL PROCEDURE BEFORE TRIAL (Rutter Group) § 14:124–127 (2001)).

 If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish the existence of material disputes of fact that may affect the outcome of the case under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). Indeed, it is not the duty of the district court "to scour the record in search of a genuine issue of triable fact." *Id.* "A mere scintilla of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some significant probative evidence tending to support the complaint." *Summers v. Teichert & Son, Inc.*,127 F.3d 1150, 1152 (9th Cir.1997) (citation and internal quotation marks omitted). If the non-moving party fails to make this showing, the moving party is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When deciding a summary judgment motion, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255.

///

///

///

11

1    III.    **GOOGLE'S MOTION FOR SUMMARY JUDGMENT ON CONSENT**

2        A.    **"Consent" Framework**

3        Google contends that plaintiffs' remaining claims are barred because plaintiffs consented

4    to Google's receipt and use of the at-issue data. More specifically, consent is a defense to:

5        (1) violation of the California Invasion of Privacy Act ("CIPA") (Count Five) by the plain

6    terms of the statute, Cal. Pen. Code §§ 631(a), 632(a) (prohibiting wiretapping and eavesdropping

7    "without the consent of all parties to the communication");

8        (2) intrusion upon seclusion (Count Seven), *see Smith v. Facebook, Inc*., 262 F. Supp. 3d

9    943, 955–56 (N.D. Cal. 2017), *aff'd*, 745 F. App'x 8 (9th Cir. 2018) ("Plaintiffs' consent . . . bars

10   their common-law tort claims [for intrusion upon seclusion]");

11       (3) breach of contract (Count Eight); and (4) breach of the implied covenant of good faith

12   and fair dealing (Count Nine); *see In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F.

13   Supp. 3d 767, 792, 801–803 (N.D. Cal. 2019) (dismissing plaintiffs' breach of contract claim and

14   parallel breach of the implied covenant of good faith and fair dealing claims, explaining that

15   plaintiffs consented to the conduct of "allowing standard app developers to obtain user

16   information through users' friends" when they created their Facebook accounts);

17       (5) statutory larceny (Count Thirteen) by the plain terms of the statute, *see People v. Brock*,

18   143 Cal. App. 4th 1266, 1274 (2006) ("Theft by larceny . . . is not committed when the property is

19   taken with the owner's consent."); and

20       (6) violation of California's Unfair Competition Law ("UCL") (Count Fourteen), which is

21   predicated on Google's representations and plaintiffs' other claims.

22   Consent may be an element of a claim but it is also "an affirmative defense for which defendant

23   bears the burden of proof." *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1044 (9th

24   Cir. 2017).

25       Consent "can be [express] or implied, but any consent must be actual." *In re Google, Inc.*,

26   2013 WL 5423918, at *12 (N.D. Cal Sept. 26, 2013). Consent is only effective if the person

27   alleging harm consented "to the particular conduct, or to substantially the same conduct" and if the

28   alleged tortfeasor did not exceed the scope of that consent.  Restatement (Second) of Torts § 892A

1   (1979) §§ 2(b), 4 ("no one suffers a legal wrong as the result of an act to which . . . he freely

2   consents").  For consent to be actual, the disclosures must "explicitly notify" users of the conduct

3   at issue.  *In re Google, Inc.* at *13; *see also Campbell v. Facebook, Inc.*, 77 F. Supp. 3d 836, 847–

4   48 (N.D. Cal. 2014) (explaining that, for a finding of consent, the disclosures must have given

5   users notice of the "specific practice" at issue).

6          **B.     Undisputed Facts Regarding Types of Data Collected**

7          The parties do not dispute that plaintiffs agreed to the agreements discussed above when

8   plaintiffs either created new Google accounts or when they signed into their existing accounts after

9   June 2016.  (*See* Fair Decl., ¶¶ 18-55; *id.* at Ex. 3 at 6.)[3] The core issues are: which agreement

10  controls the at-issue data collection, and to the extent consent exists, whether it is effective.

11  Plaintiffs contend that the Chrome Privacy Notice applies because they are Chrome users using

12  the Chrome browser.  Google disagrees.  It argues that because the data collection at issue (except

13  for the X-client-data header) is "browser-agnostic," Google's general policies apply. The Chrome

14  Privacy Notice only applies to "features specific to Chrome" and the features at issue are not

15  specific to Chrome.

16         To better understand the parties' positions, and to have a more fulsome record on the

17  _____

18         [3]  While plaintiffs argue that the Fair Declaration is facially inadmissible because it is not
    based on personal knowledge, they do not mount an actual attack on the substance of the
19  declaration, nor do they dispute that they agreed to the various agreements discussed in the
    declaration.

20         In any event, plaintiffs' motion to strike the Fair Declaration does not persuade.  Gregory
    Fair explains in his declaration that he worked as a Product Manager with Google's Privacy and
21  Data Protection Office and that the regular course of his duties included "manag[ing] . . . Google's
    framework for obtaining user consent . . . review[ing] and approv[ing] related disclosures,
22  including disclosure to users about Google's data collection practices." (Fair Decl., ¶ 1.) Mr. Fair
    also explains that he is "familiar with the consent process that Google launched in or around June
23  2016 to obtain the consent of Google Account holders, like plaintiffs, to store the data at issue in
    their Google Accounts and use it to personalize ads." (*Id.*)  Thus, Mr. Fair has demonstrated that
24  he has personal knowledge and can testify about the information contained in his declaration.

25         Plaintiffs' objection that Mr. Fair was merely "informed" about certain issues does not
    warrant striking the declaration. (*See* Fair Decl., ¶¶ 2, 3, 28-31, 46-49, 71.)  Plaintiffs do not
26  dispute this information, so the fact that Mr. Fair was informed of it does not render his
    declaration inadmissible. Plaintiffs remaining arguments about the inadmissibility also do not
27  persuade. Much of those arguments elevate form over substance. Accordingly, plaintiffs' request
    to strike the Fair Declaration is **DENIED**.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1  fundamental issue of whether the data collection at-issue is specific to Chrome or browser-

2  agnostic, the Court held an evidentiary hearing. The hearing lasted approximately 7.5 hours and

3  included live testimony from eight witnesses.

4         For the reasons set forth below, the Court finds no dispute exists that the collection of the

5  at-issue data, except for the X-client-data identifier, is browser-agnostic. The evidence shows that

6  plaintiffs now complain not about the type or nature of the data but the quantity and its use.

7         Google's expert, Dr. Georgios Zervas, an associate professor of marketing at Boston

8  University's Questrom School of Business, testified that all categories of the at-issue data are

9  collected irrespective of the browser one uses.[4] (Dkt. No. 911, Evidentiary Hearing Transcript-

10  Part 1, "Evidentiary Tr. Part One", at 51:9-14.)  To support his opinion, Dr. Zervas started with a

11  tutorial on how the Internet works.

12         In the tutorial, Dr. Zervas explained how browsers work and how they request websites.

13  (Evidentiary Tr. Part One, at 36:7-49:23.)  Plaintiffs' expert, Dr. Zubair Shafiq, Associate

14  Professor of Computer Science at University of California, Davis, did not dispute these basic

15  concepts. (*Id.* at 81:6-82:6.) When a user types a website URL into an address bar, the browser

16  sends a "HTTP Request"[5] to the website server in order to retrieve information. (*Id.* at 37:19-

17  40:1.) Precisely because of this standardization, different browsers can communicate with

18  websites in the same way to load the same webpages. (*Id.* at 37:19-38:1.)

19         Next, Dr. Zervas testified that he analyzed named-plaintiffs' data which consisted of

20  approximately 80GB of server log files. (*Id.* at 50:10-51:5.) The server logs contained record data

21  about plaintiffs' visits to websites using Google's third party services. (*Id.*) He conducted testing

22  on that data which confirmed that the at-issue data is transmitted to Google regardless of the

23  browser used. (*Id.* at 51:9-14.) Because plaintiffs used different browsers, Dr. Zervas was able to

24

25        [4] In this order, where the Court refers to the "at-issue data being browser-agnostic" that

26  includes all of the data *except* for the X-client-data identifier (also referred to as the X-client-data header). The parties agree that the X-client-data identifier is specific to Chrome.

27        [5] HTTP is short for Hypertext Transfer Protocol. *See* https://www.techopedia.com/definition/2336/hypertext-transfer-protocol-http (last visited December 9, 2022).

28

United States District Court
Northern District of California

1   compare the transmission from Chrome browsers and non-Chrome browsers (Safari, Edge, and

2   Firefox). (*Id.* at 51:1-5.) In comparing the transmissions, he testified that one's user-agent, URL,

3   IP address, and cookie identifiers were all sent to Google when users visited sites that used

4   Google's services irrespective of the browser being used. (*Id.* at 51:9-15.)

5       Next, Dr. Zervas conducted another type of testing where he adjusted settings in different

6   browsers to make them more like Chrome and also adjusted the settings in Chrome to have

7   Chrome perform more like other browsers. (*Id.* at 55:5-56:7.) In doing so, he reached the same

8   conclusion. The at-issue data transmissions are the same irrespective of the browser. (*Id.* at 57:10-

9   19.)

10      Similarly, plaintiffs' expert, Dr. Shafiq, ultimately testified that, with the exception of the

11  X-client-data header, the at-issue data is collected and transmitted to Google by all the major

12  browsers. (Dkt. No. 912, Evidentiary Hearing Transcript- Part 2, "Evidentiary Tr. Part Two", at

13  308:14-318:15.) Dr. Shafiq does not dispute that the at-issue data is collected irrespective of the

14  browser used.

15      This is confirmed by Dr. Shafiq's own analysis. By comparing the same kinds of data

16  across browsers one necessarily concedes that the data is in fact collected. Thus, the Court finds

17  plaintiffs' focus has shifted.  Dr. Shafiq agreed that Google receives IP addresses, URLs, and user

18  agents *irrespective of the browser* but now emphasizes that the data is "qualitatively" and

19  "quantitatively" different.  (*Id.*)  For instance, Dr. Shafiq testified that the amount of information

20  contained in these sources as sent from Chrome is greater than the amount of information sent in

21  other browsers. (*Id.*) Next, he admitted that all browsers send first party cookies. (*Id.* at 310:12-

22  311:10.) The new focus is that Chrome's first party cookies tend to last longer than other

23  browsers' cookies. (*Id.* at 311:11-13.)[6] Dr. Shafiq also testified that all browsers send GET and

24  POST communications but that the information in other browsers are not as detailed and specific

25

26      [6] He also testified that some browsers like Firefox and Edge block third party cookies in
    their default settings and Chrome does not. That said, plaintiffs' expert, Richard Smith, owner of

27  Boston Software Forensics LLC, testified that while Safari, Edge, and Firefox block third party
    cookies in many cases, there are still instances where these browsers send them to Google. (*Id.* at

28  255:11-256:5.)  Google's expert, Michael Kleber, principal software engineer for Chrome, also
    testified to the same. (*Id.* at 222:1-223:2.)

1    as the information in the Chrome browser because other browsers do not send the full URLs. (*Id.*

2    at 317:4-7.)

3          To reinforce the proposition that the same kind of data is collected by all browsers, Glenn

4    Bernston, Engineering Director and Lead of the Google Ad Manager team, testified that Google

5    designs its javascript and software developer kits to comport with industry standards, such as

6    HTTP, so that publishers can build their webpages to work the same regardless of the browser one

7    uses.  (Evidentiary Tr. Part One, at 139:1-141:1.)  Thus, Google also has to design and implement

8    its web services to function the same irrespective of the browser one uses. (*Id.*)

9          Similarly, Steven Ganem, Group Product Manager for Google Analytics, testified that

10   Google Analytics' collection of one's data does not differ based on the browser one uses because

11   the whole purpose of data analytics is to measure the use of one's product and such measurement

12   must be collected and measured the same across different browsers so that the information is not

13   biased. (*Id.* at 157:5-158:19.)  Thus, Google's javascript code needs to be identical for every

14   browser. (*Id.*) Dr. Adriene Felt, Director of Engineering for the Chrome Data Science &

15   Engineering team at Google, concurred. (*Id.* at 173:12-177:21.) Dr. Felt also explained that the

16   only data that is specific to Chrome is the X-client-header, which Google uses to conduct trial

17   periods on select browsers before rolling out certain features to all browsers. (*Id.* at 178:8-11,

18   180:1-20.)

19         Thus, the Court finds the undisputed evidence shows that the at-issue collection is

20   browser-agnostic, with the exception of the X-client-data header.

21         **C.     Analysis of Relevant Policy Agreements**

22         Because the Court finds that the at-issue data collected is not specific to Chrome but

23   browser agnostic, the Court also finds that Google's general policies apply. More specifically, the

24   General Privacy Policy, New Account Creation Agreement, and Consent Bump Agreement

25   governs the collection of those categories of information identified by plaintiffs, namely "unique,

26   persistent cookie identifiers"; "users' browsing history in the form of the users' GET requests and

27   information relating to the substance, purport, or meaning of the website's portion of the

28   communication with the user"; "the contents of the users' POST communications"; and the "user

United States District Court
Northern District of California

16

IP address and User-Agent information about their device."

However, with respect to the X-client-data header, that data is specific to Chrome, and accordingly, the Chrome Privacy Notice governs the collection of that piece of data.[7]

### D.    Plaintiff-Specific Consent

Having identified the controlling agreement for each category of data collected, the Court analyzes (1) whether each named plaintiff consented to the at-issue conduct and (2) the extent to which the consents were effective and legally sufficient. This includes consenting to (a) the General Privacy Policy, (b) the Consent Bump Agreement, (c) the New Account Agreement, and (d) the Chrome Privacy Notice.

#### 1.    Evidence of Each Plaintiff's Consent

##### a.    *General Privacy Policy (All Plaintiffs)*

The undisputed evidence demonstrates that all plaintiffs are Google account holders and thereby agreed to Google's General Privacy Policy when they created their Google accounts. (Fair Decl., ¶¶ 34-35; *see also* Dkt. No. 395-4, Stephen Broome Decl., Ex. 5, at Response 1B.) It is also undisputed that the material terms of the General Privacy Policy, at least until March 31, 2020, were the same throughout the class period. (FAC ¶ 34; Compl. Exs., at Exs. 7-16.)

The General Privacy Policy discloses that Google collects the at-issue data when users visit websites that use Google services.  (Compl. Exs., at Ex. 7.)  The policy states that Google collects "information about the services that you use and how you use them, like when you . . . visit a website that uses our advertising services, or view and interact with our ads and content." (*Id.*) The

---

[7] This makes sense given that browser settings are ever-changing and default settings have evolved over time. Some browsers may send more information to Google, and some send less, the amount varies depending on various settings. That is why it is important to describe the collection in browser agnostic terms like Google does in its general policies because, as shown at the evidentiary hearing, the settings and changes across browsers evolve over time, and at different times.

So, having Google's disclosure of the at-issue data in browser-agnostic terms, rather than by specific-browser, enables Google users, irrespective of the browser used, to know how it is that Google collects and utilizes one's data. Having this collection disclosed in Chrome's Privacy Notice, as plaintiffs suggest, could create the impression that this collection only occurs on Chrome and not on other browsers.

United States District Court
Northern District of California

1   policy explains that such information includes "search queries"; "Internet protocol address";

2   "cookies"; and "referrer URL". (*Id.*)

3          The General Privacy Policy also discloses how Google uses the at-issue data. (*Id.*)  For

4   instance, Google discloses that the information collected "from all of [Google's] services [is used]

5   to offer you tailored content—like giving you more relevant search results and ads." (*Id.*)

6   Plaintiffs allege that Google combines users' personal information with other data for purposes of

7   targeted advertising. (*Id.*)  However, the privacy policy discloses that Google "may combine

8   personal information from one service with information, including personal information, from

9   other Google services" and that one's "activity on other sites and apps may be associated with

10  your personal information in order to improve Google's services and the ads delivered by

11  Google." (*Id.*)

12         Plaintiffs also allege that Google engages in what plaintiff calls "cookie-syncing," whereby

13  Google takes information from first party cookies and links it with Google's own third party

14  cookies.  (*Id.*) The General Privacy Policy also discloses this conduct under a paragraph titled

15  "linked with information about visits to multiple sites." (*Id.*) The paragraph explains how "Google

16  Analytics is based on first-party cookies" and that data generated through Google Analytics "can

17  be linked, by the Google Analytics customer or by Google," "to third party cookies." (*Id.*) The

18  paragraph also explains that this information is used for targeted advertising. (*Id.*)

19         Thus, in agreeing to Google's General Privacy Policy, the Court finds plaintiffs agreed to

20  the alleged data-collection (except for X-Client-data header) and the alleged use of the data.

21              b.    <u>Consent Bump Agreement (Plaintiffs Crespo, Henry, Wilson, and
                      Johnson)</u>

22         The undisputed evidence demonstrates that plaintiffs Crespo, Henry, Wilson, and Johnson

23  consented to Google's Consent Bump Agreement.  Thus:

24         Crespo viewed the Consent Bump Agreement and selected the "I AGREE" button on

25  August 26, 2016. (Fair Decl., at Ex. 5.)  Plaintiff Henry viewed the Consent Bump Agreement and

26  selected "I AGREE" on October 28, 2016. (*Id.* at Ex. 9.)  Plaintiff Wilson viewed the Consent

27  Bump Agreement and selected "I AGREE" on December 13, 2018. (*Id.* at Ex. 12.) Plaintiff

28  Johnson viewed the Consent Bump Agreement on July 13, 2016, August 30, 2016, and October 9,

United States District Court
Northern District of California

2017, respectively, and selected "I AGREE" each time. (*Id.* at Exs. 19-21.)

The Consent Bump Agreement, which did not materially change throughout the relevant class period, disclosed that users generate data when they use Google's services, including "browsing data from Chrome and activity from sites and apps that partner with Google, including those that show ads from Google"; that "Google will use this information to make ads across the web more relevant"; "with this change, this setting will also let Google use data in your account to improve the relevance of ads that appear in Google products"; and that the settings "apply across all of your signed in devices and across all Google services." (*Id.* at Ex. 6.) The Bump Agreement's Learn More page also disclosed that other applications and services use Google technologies such as Adsense or Google Analytics and that as users use sites that use Google's services, "your web browser may send certain information to Google that may include the web address of the page you're visiting, your IP address, or cookies previously set by the site or Google. (*Id.* at Ex. 3 at GOOG-CABR-04067841.) The language right before the "I AGREE" button stated: "Choose I AGREE to turn these features on or MORE OPTIONS for more choices." (*Id.* at GOOG-CABR-04067836.)  Plaintiffs Crespo, Henry, Wilson, and Johnson all clicked "I AGREE" and thus consented to the collection of their browsing history, cookie identifiers, and IP address when they agreed to the Consent Bump Agreement.

        c.    <u>New Account Creation Agreement (Plaintiffs Calhoun, Wilson, Johnson, and Kindler)</u>

The undisputed evidence demonstrates that plaintiffs Calhoun, Wilson, Johnson, and Kindler agreed to Google's New Account Creation Agreement when they created new Google accounts after June 2016.  Thus:

Plaintiff Calhoun viewed and agreed to the New Account Creation Agreement on January 12, 2017 and June 24, 2017. (Fair Decl., Exs. 27-28.)  Similarly, plaintiffs Wilson and Johnson also viewed and agreed to Google's New Account Creation Agreement when they created new Google accounts on September 25, 2018 and September 9, 2019, respectively. (*Id.* at Exs. 38, 35.) Plaintiff Kindler viewed and agreed to Google's New Account Creation Agreement on May 5, 2020 when she created a Google account on that date. (*Id.* at Ex. 32.)

During the class period, the New Account Agreement disclosed the type of data that is

collected when one uses a Google service, including "device IDs, IP addresses, cookie data, and

location"; that such information is collected and used when one uses "apps or sites that use Google

services like ads and Analytics"; that this is used to "deliver personalized ads, both on Google

services and on sites and apps that partner with Google"; that it is also used to "conduct analytics

and measurements"; and that Google "combine[s] data among our services and across your

devices" for targeted advertising.  (*Id.* at Ex. 3, at GOOG-CABR-04067829-30.) Thus, when

plaintiffs clicked the "I AGREE" button they consented to the alleged data collection and conduct.

### d. *Chrome Privacy Notice (All Plaintiffs)*

Similarly, it is undisputed that all plaintiffs agreed to the Chrome Privacy Notice. (Stephen

Broome Decl., Ex. 5, at Response 1B.) The Chrome Privacy Notice, which applies to "features

specific to Chrome," discloses Google's use and of the X-Client-data header. (Compl. Exs at Ex.

33.)

> The Chrome Privacy Notice discloses just that:
>
> **Identifiers in Chrome**
> Chrome includes a number of unique and non-unique identifiers
> necessary to power features and functional services. . . . Where
> possible, we use non-unique identifiers and remove identifiers when
> they are no longer needed. Additionally, the following identifiers
> help us develop, distribute, and promote Chrome, but are not
> directly related to a Chrome feature.
>
> - [. . .]
> - [. . .]
> - **Field trials.** We sometimes conduct limited tests of new
>   features. Chrome includes a seed number that is randomly
>   selected on first run to assign browsers to experiment groups.
>   Experiments may also be limited by country (determined by
>   your IP address), operating system, Chrome version, and
>   other parameters. A list of field trials that are currently active
>   on your installation of Chrome is included in all requests
>   sent to Google. Learn More.

(*Id*.) Clicking "Learn More" takes users to the Chrome Privacy Whitepaper which also describes

the X-Client-data header. Accordingly, plaintiffs agreed to Google's use of the X-Client-header

data when they agreed to the Chrome Privacy Notice.

///

United States District Court
Northern District of California

## 2.   Whether the Consent is Legally Sufficient[8]

### a.   *Analysis*

Having determined that all plaintiffs have consented at least once, and for plaintiffs Wilson and Johnson twice, to the collection of the at-issue data, plaintiffs make the alternative argument that the consent was not effective or legally sufficient.  For the reasons set forth below, the Court disagrees.

The Ninth Circuit's unpublished decision *Smith v. Facebook, Inc.*, 745 F. App'x 8-9 (9th Cir. 2018) (affirming dismissal) is instructive. There the district court reviewed Facebook's Terms and Policies, which stated that Facebook "collect[s] information when you visit or use third party websites and apps that use our Services" and that "we use all of the information we have about you to show you relevant ads" and found that agreeing to such disclosures was "[k]nowing authorization."  The court found that plaintiffs had consented to the alleged conduct and found that "a reasonable person viewing those disclosures would understand that Facebook maintains the practices of (a) collecting its users' data from third-party sites and (b) later using the data for advertising purposes." *Smith v. Facebook*, 745 F. App'x at 8-9.

---

[8]   Preliminarily, the parties dispute whether the Court may consider Google's express consent argument in light of Judge Koh's prior ruling at the motion to dismiss stage. Plaintiffs urge that Judge Koh's prior ruling on Google's motion to dismiss precludes the Court from determining whether plaintiffs consented to the alleged conduct at summary judgment based on the law of the case doctrine. Plaintiffs do not persuade. A ruling by a court for purposes of a motion to dismiss does not bind the court on a subsequent motion for summary judgment as the standards are entirely different: one considers plausibility, the other, the actual factual record. *See e.g., Braden Partners, LP v. Twin City Fire Ins. Company*, No. 14-cv-1689- JST, 2017 WL 63019, at * 6 (N.D. Cal Jan. 5, 2017) ("Given the different standards for motions to dismiss and motions for summary judgment, courts may (and routinely do) reconsider the same legal arguments at the summary judgement stage) (citations omitted); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014), *cert denied*, 135 S. Ct. 946 (2015) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.") Motions to dismiss are bound by the pleadings. Judge Koh's ruling did not consider all the disclosures that Google proffers on summary judgment. Further, part of Judge Koh's ruling was based on the proposition that the General Privacy Policy was excluded from Google's Terms of Service as of March 31, 2020. However, the undisputed evidence demonstrates that all plaintiffs agreed to Google's General Privacy Policy prior to March 31, 2020. Accordingly, the Court finds that it may therefore consider Google's express consent argument on summary judgment.

United States District Court
Northern District of California

1   As applied here, the General Privacy Policy, Consent Bump Agreement, and New Account

2   Agreement all have language that presents a similar level of specificity as Facebook's disclosure.

3   The General Privacy Policy discloses that Google collects "information about the services that you

4   use and how you use them" as well as information when a user "visits a website that uses

5   [Google's] advertising services, or [when you] view and interact with our ads and content."

6   (Compl. Exs., at Ex. 7.) The Consent Bump Agreement disclosed that clicking "I AGREE" meant

7   agreeing to allow Google to collect "activity from sites and apps that partner with Google,

8   including those that show ads from Google." (Fair Decl., at Ex. 3, at GOOG-CABR-04067836.)

9   Similarly, the New Account Agreement also discloses that Google processes the at-issue data

10  "when you use apps or sites that use Google's services like ads, Analytics, and the YouTube video

11  player" in part to "[d]eliver personalized ads . . . both on Google services and on sites and apps

12  that partner with Google." (*Id.* at Ex. 3, at GOOG-CABR-04067829-30.)

13  As in *Smith*, the Court finds that a reasonable person viewing those disclosures would

14  understand that Google maintains the practices of (a) collecting its users' data when users use

15  Google services or third party sites that use Google's services and (b) that Google uses the data for

16  advertising purposes.  The Court also finds that a reasonable user reviewing these same

17  disclosures would understand that Google combines and links this information across sites and

18  services for targeted advertising purposes.  Likewise, in reviewing Google's General Privacy

19  Policy, a reasonable user would understand that Google engages in "cookie-syncing."

20  b.   *Plaintiffs' Additional Arguments*

21  Plaintiffs proffer a set of six arguments in attempt to create a factual dispute as to whether

22  plaintiffs consented to the alleged conduct. The Court addresses each.  In general, the arguments

23  repeat the notion that the disclosures were not specific enough and also posit that any consent is

24  negated by the Chrome Privacy Notice and internal Google documents.  None of these arguments

25  persuade.

26  First, with respect to the assertion that the General Privacy Policy, Consent Bump

27  Agreement, and New Account Agreement do not disclose the conduct at issue, nor the express

28  promises at issue, plaintiffs fail to persuade for the reasons set forth above. (*See supra* sections

1    III.D.1-2a.) Rather than address the express language in these policies, plaintiffs largely ignore the

2    text and cherry pick language to try and manufacture a factual dispute. Such attempt fails.

3            Second, plaintiffs argue that any consent under the Consent Bump Agreement is

4    ineffective because the agreement does not give users the option to say "No."  The Court

5    disagrees. The Consent Bump Agreement gives users two options:  to either click "I AGREE" or

6    "More Options".  (Fair Decl., ¶¶ 19, 24.) Users who clicked on the "More Options" were taken to

7    a screen that allowed them to select either: "No changes – continue on your way"; "No changes –

8    review key privacy settings more fully"; or "yes, I'm in – turn on these features." (*Id.* at ¶ 24.)

9    Thus, users had the option to decline the additional features.[9]

10           Third, plaintiffs also contend that the Consent Bump Agreement does not state that it

11   overrides express promises made to Chrome users. Thus, according to plaintiffs, a user reading the

12   Consent Bump Agreement may think that it does not apply to Chrome users. However, plaintiffs

13   ignore the express language indicating that the settings, if turned on, "apply across all of your

14   signed-in devices and across all Google services." (*Id.* at ¶ 19.)

15           Fourth, plaintiffs aver that "the extent and scope of Google's actual collection and use

16   grossly exceed the scope of conduct disclosed." (Dkt. No. 461-4, Opposition to Motion for

17   Summary Judgment, ("Opp.") at 2.) Importantly, this conduct is not alleged in, nor forms the basis

18   of, plaintiffs' operative complaint[10] which only alleges that Google allegedly engages in "cookie-

19

20

21           [9] Oddly, plaintiffs also submit that the Consent Bump Agreement "did not even garner

22   consent for non-Chrome users . . . ." (Opp. at 8). This argument is irrelevant because plaintiffs
     seek to represent a class of Chrome users, not non-Chrome users.

23           [10]  For instance, plaintiffs argue that Google's conduct exceeds its disclosures because

24   Chrome sends more personal information to Google than other browsers, Google utilizes internal
     systems to sync and link data across services and sites, Google does not anonymize not-synced

25   data, and that Google sells users' personal information. (Opp. at 10-12.) However, none of this
     conduct is alleged to in the FAC. Rather, the FAC only focuses on Google's receipt of the at-issue

26   data, Google's alleged creation of users' profiles, and the conduct that plaintiffs call cookie-
     syncing or cookie decorator. (FAC ¶¶ 69, 141, 174, 180, 186, 258.) Thus, the Court does not

27   address these new theories at summary judgment. *See Ray v. State Farm Mut. Auto. Ins. Co.*, 2021
     WL 4902357, at *1 (9th Cir. Oct. 21, 2021) (explaining that "it was improper for the [plaintiffs] to

28   advance these new theories for the first time in its opposition to summary judgment.")

United States District Court
Northern District of California

syncing"[11] and the practice of combining users' information to create profiles for targeted advertising.[12] Each is disclosed. A material dispute of fact on this topic does not exist.

Fifth, plaintiffs claim that any consent is negated by their acceptance of the Chrome Privacy Notice. Plaintiffs argue that a reasonable user reading the Chrome Privacy Notice would think that Google blocks all collection of the at-issue data when one uses the Chrome browser. Specifically, plaintiffs focus on the statements that one "do[esn't] need to provide any personal information to use Chrome" and that "the personal information that Chrome stores won't be sent to Google unless you choose to store that data in your Google Account by turning on sync."

To make this argument plaintiffs completely ignore critical text and read others out of context. Importantly, the Chrome Privacy Notice explicitly indicates that it only "describes features that are specific to Chrome." The notice then explains that certain information is automatically collected when people visit Google sites while using Chrome. The information includes "web request, Internet Protocol address, browser type, browser language, the date and time of your request and one or more cookies that may uniquely identify your browser." The notice also discloses that Chrome collects the requested URL, including the search query. Right under this disclosure is a "More Information" section that states that "information that Google receives when you used Chrome is used and protected under the Google Privacy Policy." The Privacy Policy is hyperlinked in this text. Much of this information constitutes the at-issue data in this case. The Chrome Privacy Notice explains that personal information is not required to use

[11]  Plaintiffs describe "cookie-syncing" as the process whereby first-party cookies pass on information that is gathered from its website to Google Analytics and Google then takes that information and links it to Google's own third party cookies. (FAC ¶ 69.)  In this regard, the General Privacy Policy discloses this conduct under a paragraph titled "linked with information about visits to multiple sites." The paragraph explains how "Google Analytics is based on first-party cookies" and that data generated through Google Analytics "can be linked, by the Google Analytics customer or by Google," "to third party cookies." The General Privacy Policy also discloses that this information is used for targeted advertising.

[12]  Similarly, Google discloses that it may combine users' personal information across Google services and that one's activity on other sites may be associated with other personal information in Google's possession for targeted advertising. Plaintiffs' arguments that Google did not disclose the amount of data, or the technological way in which the data is collected, does not persuade. Google discloses that it collects the at-issue data, that the data may be combined and linked with other data from different sources, and that the combined data may be used for targeted advertising.

Chrome, but when one uses Chrome and provides personal information, that information is collected in accordance with Google's General Privacy Policy.

Further, plaintiffs contend that a dispute regarding consent also exists because the Chrome Privacy Notice provides that "the personal information that Chrome stores won't be sent to Google unless you choose to store that data in your Google Account by turning on sync." According to plaintiffs, Google breaches this promise by receiving Chrome users' data.  Again, plaintiffs ignore that the Notice also explains that Chrome "stores information locally on your system" when using the basic browser mode. The information might include: "browsing history information" such as "the URLs of pages that you visit, a cache of text, images, and other resources from those pages" and in some instances "a list of some of the IP addresses linked from those pages."  However, plaintiffs have not established that the at-issue data collection is information that Chrome stores. Rather, the at-issue data here is data that Google receives when users visit websites that utilize Google services while using Chrome. Thus, Google's promise not to store information does not establish a triable issue of fact.

Thus, the statements in the Chrome Privacy Notice cannot be read in a vacuum or cherry-picked. Nor can express language be ignored.  As explained above, the at-issue data is not specific to Chrome, nor is the alleged misuse of such information. (*See supra* section III.B.)  Consent is not negated. Plaintiffs' interpretation is belied by the express language of the Chrome Privacy Notice. Accordingly, plaintiffs' argument that the Chrome Privacy Notice negates any alleged consent also fails.

Finally, plaintiffs submit that any supposed consent is negated because documents suggest Google admits that its consent model is broken and does not live up to the express promises. Here, plaintiffs identify various internal documents by Google employees that comment on Google's practices.  The documents fail to establish a triable issue of fact as to whether plaintiffs consented to the at-issue conduct at least three reasons.

One: many of the documents are general in nature and do not address the specific disclosures and/or at-issue data. (Barnes Decl., Exs. 24, 47, 61) (untitled and undated draft documents explaining Google's plans and vision for future disclosures and commenting on the

state of Google's current consent flow)[13]; *see also id*. at Ex. 59 (document answering the question "What is Google's perspective on the use of encrypted PII (i.e. email) for user tracking generally?"); *id*. at Ex. 60-428 (plaintiffs refer to subsection titled "Apple/ Firefox changes [3P Cookies Removed] Don't Change the User Experience").

Two: plaintiffs misquote and cherry-pick. For instance, plaintiffs cite Exhibit 53 for the proposition that "[f]or signed-in users, Googlers internally admit 'there's no real difference' between Sync and Signed in But Not Consent for Sync 'for users who'd prefer not to store their data with Google.'" However, the context of the email is relevant. The sender of the email explained that they are left wondering whether "there [is] really a need for Sync in the longer term" because "[b]oth Sign-in and Sync are tied to one's Google account, so there's no real difference there for users who'd prefer not to store data with Google." Similarly, plaintiffs cite Exhibit 52 for the proposition that Google admits that users would be shocked to learn that we're still gathering info about them[.]" However, plaintiffs omit both the beginning and the end of the sentence which indicate that the comment was based on the speaker's suspicion ("I suspect") and the speaker's acknowledgement that they could be mistaken ("but perhaps I'm wrong"); *see also id.* at Ex. 51 (plaintiffs proffer as stating that "apart from David [Monsees], nobody can answer" the question of what "data is being collected (or not) [.]" Plaintiffs omit the response email which followed stating, "I don't think we expect people to know what data exactly is being collected but I hope people can understand that we are still collecting data within in app if they say 'no' to the cross-product consent [] and that we are also collecting data in all other apps"); *id.* at Ex. 15 ("Well, we know from research . . . that users generally have no idea what they're agreeing to *because of this automatic scroll-n-click behaviors*" not "we know from research . . . that users generally have no idea what they're agreeing to") (emphasis supplied).

Three: Plaintiffs mischaracterize key deposition testimony. For instance, plaintiffs claim Abdelkarim Mardini's, Google's Head of Chrome Trust & Safety, "admitted last month under

---

[13] Plaintiffs rely on many draft documents that are either undated, untitled, or do not have an author/drafter listed and thus, cannot, without more, be attributed to Google as admissions. Even viewing the documents in favor of plaintiffs, they fail to establish a genuine material factual dispute for the reasons identified herein.

oath that he was not even aware Chrome sent PI when not synced." (*Id.* at Ex. 1 at 47:22-53:4; 54:2-8).  Plaintiffs' summary is inaccurate. Rather, Mr. Mardini testified that when visiting a non-Google site using a Chrome browser, the X-client-data header could potentially be sent back to Google if the header is available on that browser.  Plaintiffs allege that the X-client-data header is personal information, thus plaintiffs' representation that Mr. Mardini did not know that Chrome sent personal information when not synced is not true.  Moreover, he does not mention one's sync status.

In light of the foregoing, the documents plaintiffs cite, viewed individually and holistically, are insufficient to establish a genuine material dispute as to whether plaintiffs consented to Google's conduct.

Following limited remand from the Ninth Circuit, the Court clarifies that this Order applies to all claims asserted in plaintiffs' First Amended Complaint, including the six "Dormant Claims." Counts 1 (the federal Wiretap Act), 2 (Invasion of Privacy), 10 (Unjust Enrichment), and 12 (the California Computer Data Access and Fraud Act) are dismissed, following plaintiffs' stipulation. Counts 15 (punitive damages) and 16 (declaratory judgment) are terminated because plaintiffs may not recover punitive damages or obtain injunctive relief in the absence of any other live cause of action.

***

Thus, based on the record, the Court concludes, as a matter of law that Google adequately disclosed, and plaintiffs consented to, the collection of the at-issue data. Accordingly, Google's motion for summary judgment based on consent is hereby **GRANTED**.

## IV.   CONCLUSION

For the foregoing reasons, the Court hereby **GRANT** Google's Motion for Summary Judgment. The Court **DENIES** plaintiffs' Motion for Class Certification and plaintiffs' Motion for Leave to Supplement the Briefing Regarding Remedies **AS MOOT**. The Court **DENIES** plaintiffs' Motion for Leave to Supplement the Record as to Google's Motion for Summary Judgment and to File a Sur-Reply. The parties' pending motions to seal will be addressed by separate court order.

This Order terminates Docket Numbers 340, 395, 425, 427, 488, 855, and 909.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IT IS SO ORDERED.**

Dated:  May 16, 2023

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

Appendix A

United States District Court
Northern District of California

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



25 | (Fair Decl., at Ex. 3, at GOOG-CABR-04067836.)

26
27
28

United States District Court
Northern District of California

Appendix B

## Privacy and Terms

By choosing "I agree" below you agree to Google's Terms of Service.

You also agree to our Privacy Policy, which describes how we process your information, including these key points:

### Data we process when you use Google

- When you use Google services to do things like write a message in Gmail or comment on a YouTube video, we store the information you create.
- When you search for a restaurant on Google Maps or watch a video on YouTube, for example, we process information about that activity – including information like the video you watched, device IDs, IP addresses, cookie data, and location.
- We also process the kinds of information described above when you use apps or sites that use Google services like ads, Analytics, and the YouTube video player.

Depending on your account settings, some of this data may be associated with your Google Account and we treat this data as personal information. You can control how we collect and use this data at My Account (myaccount.google.com).

### Why we process it

We process this data for the purposes described in our policy, including to:

- Help our services deliver more useful, customized content such as more relevant search results;
- Improve the quality of our services and develop new ones;
- Deliver personalized ads, both on Google services and on sites and apps that partner with Google;
- Improve security by protecting against fraud and abuse; and
- Conduct analytics and measurement to understand how our services are used.

### Combining data

We also combine data among our services and across your devices for these purposes. For example, we show you ads based on information from your use of Search and Gmail, and we use data from trillions of search queries to build spell-correction models that we use across all of our services.

CANCEL     I AGREE

(*Id.* at GOOG-CABR-04067829-30.)

30