**BLEICHMAR FONTI & AULD LLP**
Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Joshua D. Samra (SBN 313050)
1330 Broadway, Suite 630
Oakland, CA 94612
Tel.: (415) 445-4003
Fax: (415) 445-4020
*lweaver@bfalaw.com*

**SIMMONS HANLY CONROY LLP**
Jason 'Jay' Barnes (admitted *pro hac vice*)
Jayne Conroy (admitted *pro hac vice*)
An Truong (admitted *pro hac vice*)
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
Fax: (212) 213-5949
*jaybarnes@simmonsfirm.com*

**DiCELLO LEVITT LLP**
David A. Straite (admitted *pro hac vice*)
Julia Veeser (admitted *pro hac vice*)
Adam Prom (admitted *pro hac vice*)
485 Lexington Avenue, Suite 1001
New York, NY 10017
Tel.: (646) 933-1000
*dstraite@dicellolevitt.com*

*Counsel for Plaintiffs*
*[Additional counsel on signature page]*

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA – OAKLAND DIVISION

PATRICK CALHOUN, et al., *on behalf of themselves and all others similarly situated,*

                Plaintiffs,

v.

GOOGLE LLC,

                Defendant.

Case No. 4:20-cv-05146-YGR-SVK

**PLAINTIFFS' NOTICE OF RENEWED MOTION AND RENEWED MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL; MEMORANDUM OF LAW IN SUPPORT THEREOF**

Judge:     Hon. Yvonne Gonzalez Rogers
Date:      February 4, 2025
Time:      2:00 pm
Courtroom: 1, 4th Floor

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

## **TABLE OF CONTENTS**

PAGE

NOTICE OF MOTION AND MOTION ........................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................... 2

I.      INTRODUCTION AND SUMMARY OF ARGUMENT ...................................... 2

II.     STATEMENT OF FACTS .................................................................................... 4

    A.      The Chrome Contract ............................................................................... 4

    B.      Chrome Sends Account Holders' PI to Google's Servers ........................ 5

    C.      Google Analyzes, Monetizes and Uses Class Member PI ........................ 7

    D.      Class Members and Their Communications are Ascertainable ................ 7

III.    LEGAL STANDARD ........................................................................................... 8

IV.     ARGUMENT ........................................................................................................ 8

    A.      The Prerequisites of Rule 23(a) Are Met ................................................. 8

        1.      There Are Millions of Class Members .......................................... 8

        2.      Google's Standardized Contracts and Uniform Conduct Create Common Questions Across the Board. ........................................... 8

        3.      Plaintiffs' Claims Are Typical of Those of the Class. .................. 9

        4.      Named Plaintiffs and Their Counsel Meet the Adequacy Requirement ...... 10

    B.      Common Issues Predominate the Contract, UCL, CIPA, and Intrusion Claims ..... 11

        1.      Common Issues Predominate for the Breach of Contract Claim ............... 11

        2.      Common Issues Predominate the UCL Claim ............................ 13

        3.      Common Issues Predominate the CIPA Claim ........................... 15

        4.      Common Issues Predominate the Intrusion Claim ..................... 17

        5.      Damages Can Be Determined on a Class-Wide Basis ............... 19

    C.      Class Treatment Is Superior to Other Forms of Adjudication. ............... 22

    D.      Alternatively, the Court Should Certify a Rule 23(c)(4) Class for Common Issues ..... 22

    E.      Class Certification Is Appropriate Under Rule 23(b)(2) ........................ 24

V.      CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

PAGE(S)

**CASES**

*Ades v. Omni Hotels Mgmt. Corp.*,
   2014 WL 4627271 (C.D. Cal. Sept. 8, 2014) ............................................................ 20

*AIU Ins. Co. v. Sup. Ct.*,
   51 Cal.3d 807 (1990) ................................................................................................ 11

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
   568 U.S. 455 (2013) .................................................................................................... 8

*Avilez v. Pinkerton Gov't Servs., Inc.*,
   596 F.App'x. 579 (9th Cir. 2015) ........................................................................ 22, 23

*Bateman v. Am. Multi-Cinema, Inc.*,
   623 F.3d 708 (9th Cir. 2010) .................................................................................... 20

*Berryman v. Merit Prop. Mgmt., Inc.*,
   152 Cal. App. 4th 1544 (2007) ................................................................................. 14

*Bradach v. Pharmavite, LLC*,
   735 F.App'x 251 (9th Cir. 2018) .............................................................................. 14

*Briseno v. ConAgra Foods, Inc.*,
   844 F.3d 1121 (9th Cir. 2017) .................................................................................. 22

*Brodsky v. Apple, Inc.*,
   445 F.Supp.3d 110 (N.D. Cal. 2020) ........................................................................ 17

*Brown v. Google, LLC*,
   2022 WL 17961497 (N.D. Cal. Dec. 12, 2022) ........................................................ 21

*Brown v. Google, LLC*,
   685 F.Supp.3d 909 (N.D. Cal. 2023) ........................................................................ 17

*Calhoun v. Google*,
   113 F.4th 1141 (9th Cir. 2024) ................................................................... 11, 18, 23

*Cappello v. Walmart, Inc.*,
   394 F.Supp.3d 1015 (N.D. Cal. 2019) ...................................................................... 14

*Casa Herrera, Inc. v. Beydoun*,
   32 Cal.4th 336 (2004) ............................................................................................... 12

*Congdon v. Uber Techs., Inc.*,
   291 F.Supp.3d 1012 (N.D. Cal. 2018) ...................................................................... 12

*D'Angelo v. Penny OpCo, LLC*,
   2023 WL 7006793 (S.D. Cal. Oct. 24, 2023) ........................................................... 20

*Desnick v. Am. Broad. Cos., Inc.*,
   44 F.3d 1345 (7th Cir. 1995) .................................................................................... 19

*Diaz v. Albertson's LLC*,
   2016 WL 8904415 (C.D. Cal. Dec. 20, 2016) .......................................................... 23

*Doe v. Chao*,
  540 U.S. 614 (2004) .................................................................................................. 20

*Doe v. Mindgeek USA, Inc.*,
  702 F.Supp.3d 937 (C.D. Cal. 2023) ......................................................................... 20

*Elation Sys., Inc. v. Fenn Bridge LLC*,
  71 Cal. App. 5th 958 (2021) ...................................................................................... 20

*Ellis v. Costco*,
  285 F.R.D. 492 (N.D. Cal. 2012) ............................................................................... 20

*Ellsworth v. U.S. Bank, N.A.*,
  2014 WL 2734953 (N.D. Cal. June 13, 2014) ............................................................. 9

*Epic Games v. Apple, Inc.*,
  559 F.Supp.3d 898 (N.D. Cal. 2021),
  *partially rev'd on other grounds*, 67 F.4th 946 (9th Cir. 2023) .................................. 15

*Esparza v. Sand & Sea, Inc.*,
  2 Cal.App.5th 781 (2016) ........................................................................................... 12

*Fed. Trade Comm'n v. Neovi, Inc.*,
  604 F.3d 1150 (9th Cir. 2010) .............................................................................. 14, 15

*Feller v. Transamerica Life Ins. Co.*,
  2017 WL 6496803 (C.D. Cal. Dec. 11, 2017) .............................................................. 9

*Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*,
  326 F.R.D. 592 (N.D. Cal. 2018) ................................................................................. 8

*Harris v. comScore, Inc.*,
  292 F.R.D. 579 (N.D. Ill. 2013) ................................................................................. 13

*Hervey v. Mercury Cas. Co.*,
  185 Cal. App. 4th 954 (2010) ..................................................................................... 12

*In re Activision Sec. Litig.*,
  621 F.Supp.415 (N.D. Cal. 1985) ............................................................................... 23

*In re Anthem, Inc. Data Breach Litig.*,
  162 F.Supp.3d 953 (N.D. Cal. 2016) .......................................................................... 14

*In re Anthem, Inc. Data Breach Litig.*,
  2016 WL 3029783 (N.D. Cal. May 27, 2016) ............................................................. 14

*In re Conseco Life Ins. Co. Life Trend Ins. Marketing & Sales Practice Litigation*,
  920 F.Supp.2d 1050 (N.D. Cal. 2013), *vacated by judgment approving settlement*,
  2013 WL 10349975 (N.D. Cal. Nov. 8, 2013) ........................................................... 13

*In re Facebook Biometric Info. Priv. Litig.*,
  326 F.R.D. 535 (N.D. Cal. 2018) ................................................................................. 8

*In re Google Assistant Privacy Litig.*,
  457 F.Supp.3d 797 (N.D. Cal. 2020) ..................................................................... 20, 21

*In re Google RTB Consumer Priv. Litig.*,
  2024 WL 2242690 (N.D. Cal. Apr. 4, 2024) ............................................................... 12

*In re Google RTB Consumer Privacy Litig.*,
  606 F.Supp.3d 935 (N.D. Cal. 2022)................................................................17

*In re Google RTB*,
  2024 WL 2242690 (N.D. Cal. Apr. 4, 2024).....................................................17

*In re Lieberman*,
  245 F.3d 1090 (9th Cir. 2001)..........................................................................16

*In re Pharmatrak, Inc.*,
  329 F.3d 9 (1st Cir. 2003)................................................................................18

*Javier v. Assurance IQ, LLC*,
  2022 WL 1744107 (9th Cir. May 31, 2022)......................................................16

*Kamakahi v. Am. Soc'y for Reprod. Med.*,
  305 F.R.D. 164 (N.D. Cal. 2015)......................................................................23

*Kearney v. Solomon Smith Barney Inc.*,
  39 Cal.4th 95 (2006).........................................................................................16

*Leyva v. Medline Ind., Inc.*,
  716 F.3d 510 (9th Cir. 2013)............................................................................20

*LSIMC, LLC v. Am. Gen. Life Ins. Co.*,
  2022 WL 4596597 (C.D. Cal. Aug. 4, 2022)....................................................23

*Lytle v. Nutramax Labs., Inc.*,
  114 F.4th 1011 (9th Cir. 2024).........................................................................19

*Masterson v. Sine*,
  68 Cal.2d 222 (1968).........................................................................................12

*Mullins v. Premier Nutrition Corp.*,
  2016 WL 1535057 (N.D. Cal. Apr. 15, 2016)...................................................22

*Oasis W. Realty, LLC v. Goldman*,
  51 Cal. 4th 811 (2011)......................................................................................11

*Opperman v. Path, Inc.*,
  2016 WL 3844326 (N.D. Cal. July 15, 2016)...................................................20

*Parsons v. Ryan*,
  754 F.3d 657 (9th Cir. 2014)............................................................................25

*Patel v. Facebook*,
  932 F.3d 1264 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 937 (2020) ...............20

*Pulaski & Middleman, LLC v. Google, Inc.*,
  802 F.3d 979 (9th Cir. 2015)............................................................................14

*Raffin v. Medicredit, Inc.*,
  2017 WL 131745 (C.D. Cal. Jan. 3, 2017)........................................................25

*Ribas v. Clark*,
  38 Cal.3d 355 (1985).........................................................................................16

*Rodriguez v. Google*,
  2024 WL 38302 (N.D. Cal. Jan. 3, 2024)...................................................17, 21

*Rodriguez v. Hayes*,
591 F.3d 1105, 1124 (9th Cir. 2010),
*abrogated on other grounds by*
*Rodriguez Diaz v. Garland*, 53 F.4th 1189 (9th Cir. 2022) ................................................................ 9

*Silver v. Stripe*,
2021 WL 3191752 (N.D. Cal. July 28, 2021) .......................................................................... 12, 18

*Slivinsky v. Watkins-Johnson Co.*,
221 Cal. App. 3d 799 (1990) .......................................................................................................... 12

*Staton v. Boeing Co.*,
327 F.3d 938 (9th Cir. 2003) .......................................................................................................... 10

*Svenson v. Google Inc.*,
2016 WL 8943301 (N.D. Cal. Dec. 21, 2016) ................................................................................ 21

*Tait v. BSH Home Appliances Corp.*,
289 F.R.D. 466 (C.D. Cal. 2012) .................................................................................................... 14

*Torres v. Mercer Canyons Inc.*,
835 F.3d 1125 (9th Cir. 2016) .......................................................................................................... 8

*TRW, Inc. v. Andrews*,
534 U.S. 19 (2001) .......................................................................................................................... 16

*Tyson Foods, Inc. v. Bouaphakeo*,
577 US 442 (2016) .......................................................................................................................... 11

*U.S. ex rel. Terry v. Wasatch Advantage Grp., LLC*,
327 F.R.D. 395 (E.D. Cal. 2018) ...................................................................................................... 9

*U.S. v. Nishiie*,
996 F.3d 1013 (9th Cir. 2021) .......................................................................................................... 16

*Valentino v. Carter-Wallace, Inc.*,
97 F.3d 1227 (9th Cir. 1996) .......................................................................................................... 22

*Wagner v. Glendale Adventist Med. Ctr.*,
216 Cal. App. 3d 1379 (1989) ........................................................................................................ 12

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ..................................................................................................................... 9, 24

*Ward v. United Airlines, Inc.*,
2021 WL 534364 (N.D. Cal. Feb. 12, 2021) .................................................................................. 24

*Williams v. Apple, Inc.*,
2021 WL 2186223 (N.D. Cal. May 28, 2021) ................................................................................ 22

*Williams v. Apple, Inc.*,
338 F.R.D. 629, 638 (N.D. Cal. 2021) .................................................................................. 9, 11, 13

*Williams v. Gerber Products Co.*,
552 F.3d 934 (9th Cir. 2008) .......................................................................................................... 14

*Wortman v. Air New Zealand*,
326 F.R.D. 549 (N.D. Cal. 2018) ...................................................................................................... 8

*WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*,
  655 F.3d 1039 (9th Cir. 2011) .......................................................................... 12

**STATUTES**

Cal. Civ. Code § 1636 .......................................................................................... 11

Cal. Civ. Code § 1638 .......................................................................................... 12

Cal. Civ. Code § 1639 .......................................................................................... 12

Cal. Pen. Code § 630 ............................................................................................ 16

Cal. Pen. Code § 631(a) ....................................................................................... 15

Cal. Pen. Code § 632.7 ......................................................................................... 20

**RULES**

Fed. R. Civ. P. 23(b)(2) ................................................................................ *passim*

Fed. R. Civ. P. 23(b)(3) ................................................................................ *passim*

Fed. R. Civ. P. 23(c)(4) ......................................................................... 1, 22, 23

**OTHER AUTHORITIES**

7AA Wright & Miller, *Fed. Prac. & Proc. Civ.* § 1790 (3d ed) ....................... 23

*Newberg & Rubenstein on Class Actions* § 4:92 (6th ed. 2022) ...................... 22

Reinstatement (Second) of Torts § 867) .............................................................. 20

Restatement (Second) of Contracts § 211(2) cmt. e ........................................... 11

PLAINTIFFS' NOTICE OF MOTION AND RENEWED MOTION FOR CLASS CERTIFICATION
CASE NO. 4:20-CV-05146-YGR-SVK

1

**TABLE OF EXHIBITS**

2

This Motion is based upon this Notice of Motion and Motion, the incorporated Memorandum

3

of Law, and the exhibits attached to the Joint Declaration of counsel for Plaintiffs, Jason 'Jay' Barnes,

4

David A. Straite, and Lesley E. Weaver (the "Joint Decl."). For ease of reference, the exhibits have

5

been sub-categorized as follows:

6

- Exhibits A1-A43: Documents that comprise the "Chrome Contract" and other documents
relevant thereto.

7

8

- Exhibits B1-B7: Expert Report and Rebuttal Report of Richard M. Smith relating to
whether Chrome is designed to, and commonly does, transmit the at-issue data to
Google's servers when a class member is not synced, and other documents relevant
thereto.

9

10

- Exhibits C1-C48: Expert Report, Rebuttal Report, and Declarations of Prof. Zubair
Shafiq relating to whether common evidence exists regarding whether the at-issue data is
"personal information;" identification of class members and at-issue communications;
how Chrome operates when compared to the operations of competing browsers; and other
documents relevant thereto.

11

12

13

- Exhibits D1-D24: Expert Report and Rebuttal Report of Prof. Joseph Turow relating to
whether common evidence exists regarding privacy and consent, and other documents
relevant thereto.

14

15

- Exhibits E1-19: Expert Report and Rebuttal Report of Dr. Russell Mangum relating to
whether common evidence exists to calculate damages through a common methodology,
and other documents relevant thereto.

16

17

- Exhibits F1-F2: Expert Report and Rebuttal Report of Prof. Leslie John relating to
whether common evidence exists regarding consumer expectations of privacy, consent,
and typicality.

18

19

- Exhibits G1-G24: Named Plaintiff documents in support of Class Certification, including
deposition testimony from Proposed Class Representatives, exemplars of Named Plaintiff
data, and written discovery responses.

20

21

- Exhibits H1-H3: Updated Firm Resumes.

22

Per the Court's instructions at the September 30, 2024 Case Management Conference, the

23

expert reports identified above are the same reports submitted in support of Plaintiffs' original

24

motion, with portions stricken as appropriate. *See* 9/30/24 CMC Tr. at 6:2-5. In addition, some of the

25

documents identified above are documents which Plaintiffs' experts would have considered and used

26

to support supplemental expert reports, had they been permitted to do so. Consistent with the Court's

27

instructions, these documents are included as exhibits, but no new supplemental reports are included.

28

Contemporaneously with this Renewed Motion, Plaintiffs also filed a Motion for Leave to file a Request for Judicial Notice of a narrow set of disclosures and documents taken from Google's website, updated Plaintiff declarations, and counsel resumes.

This Motion may also be supported by rebuttal evidence submitted on reply, and any further argument presented to the Court.

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE THAT on February 4, 2025 at 2:00 p.m., before the Honorable Yvonne Gonzalez Rogers of the United States District Court for the Northern District of California, Plaintiffs will and do hereby move the Court, pursuant to Fed. R. Civ. P. 23(b)(2) and 23(b)(3), to issue an order certifying a class consisting of:

> All Google Accountholders who accepted Google's U.S. Terms of Service prior to October 4, 2023 and who used the Chrome Browser in the (1) Basic Browser and/or (2) Signed In, But Not Consented for Sync modes from September 23, 2018 to the present.

In the alternative, Plaintiffs seek certification pursuant to Fed. R. Civ. P. 23(c)(4) as to any claim for which the Court determines one or more issues are not appropriate for (b)(3) certification.

Excluded from the proposed Class is Defendant Google LLC, its parent Alphabet, Inc. and any intermediate parents, subsidiaries, affiliates, officers, and directors; any entity in which Google has a controlling interest; and all judicial officers assigned to hear any aspect of this litigation, as well as their staff and immediate family members.

Plaintiffs further move for their appointment as class representatives and to appoint Lesley E. Weaver of Bleichmar Fonti & Auld LLP, David A. Straite of DiCello Levitt LLP, and Jason 'Jay' Barnes of Simmons Hanly Conroy LLP as class counsel.

## STATEMENT OF ISSUES PRESENTED

1. Whether the Court should certify contract, UCL, CIPA, and intrusion upon seclusion claims under Fed. R. Civ. P. 23(b)(3)?

2. In the alternative, whether the Court should certify Plaintiffs' contract, UCL, CIPA and intrusion upon seclusion claims under Fed. R. Civ. P. 23(c)(4), if the Court declines certification under Fed. R. Civ. P. 23(b)(3)?

3. Whether the Court should certify the same claims under Fed. R. Civ. P. 23(b)(2)?

4. Whether the Court should appoint the Plaintiffs as class representatives and appoint class counsel under Fed. R. Civ. P. 23(c)(1)(B) and 23(g)?

### MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

At its core, this case is simple. Beginning September 24, 2018, the Chrome browser promised it would not send users' "personal information" to Google unless users chose to sync their Chrome data with their Google Account. That was false. Chrome sends the same "personal information" (IP addresses, User-Agent, X-client data headers, cookies, and browsing history information) (hereafter referred to as "PI") to Google whether a user "syncs" or not. Google then analyzes and monetizes that PI for its own purposes, building detailed user dossiers by connecting the PI with Google's vast stores of other information. That is, even for users who do not choose to sync, their PI is sent to Google, matched with other Google data and used to target them for Google's gain.

Like other cases based on uniform consumer contracts, this case is readily certifiable. But this is not an ordinary contract case. Google dominates the internet. Through Google's advertising products and arrangements with non-Google websites, such as Ads, Display Ads, and Analytics, Google reaches into nearly every aspect of consumers' online activity. For many people, the Chrome browser is their gateway to the internet. But using Chrome does not mean that users want Chrome to send their PI to Google so it can be consolidated and used to profile them. And Google knows this. That's why it promised users that Chrome in its default mode would not send their PI to Google. In doing so, Google created the false impression that it gave people a choice between accepting Google's internet surveillance—by turning on sync—or rejecting it.

Google's conduct was duplicitous. Google made this singular promise in the face of competitive threats to reassure users that Chrome would respect their privacy. For example, in June 2018, Safari—Chrome's biggest competitor—announced major changes to its browser designed to protect users from being tracked across the internet. Google immediately estimated that, as a result of Safari's changes, billions of Google's advertising dollars were at risk. In-house strategy documents refer to an "arms race," through which Chrome's competitors would "challenge Chrome's market share by distinguishing themselves through the privacy protecting features of those browsers." Google feared that "Chrome will find itself inevitably falling behind the other browsers … because it may not want to hurt Google's own cross-site ad tech products." Company insiders

worried that competitors' privacy moves could "create an existential risk for Google."

The proposed Class Period begins just three months after Safari implemented its new privacy protections. Chrome could have matched them, but Google chose not to. Instead, in September 2018, Google made Chrome *less* private while falsely promising users *more* privacy. Prior to September 24, 2018, Chrome promised users that their PI would "not be sent to Google unless you…*sign in* to Chrome." On September 24, 2018, Chrome changed its disclosures to promise that PI would not be sent to Google "unless you choose to … *turn[] on Chrome sync*." This promise purported to give users control. But it was just an illusion. As Plaintiffs have established, Chrome sends the same core set of PI to Google using Google code regardless of sync status.

Common questions predominate the issues in this narrowed motion for class certification. *First*, Google's communications to class members throughout the Class Period are uniform. *Second*, express consent is governed by an objective, reasonable person standard. *Third*, implied consent is also governed by a reasonable person standard, and is not a defense to the written integrated contract governed by the four corners of the agreement here. Nor is implied consent a defense to UCL or CIPA claims here. No precedent holds that implied consent is a defense to the UCL claims in this case. Similarly, consent is not a complete defense to a CIPA claim, which prohibits interceptions that occur in "any unauthorized manner" *or* without the prior consent of "all parties to the communication." *Fourth*, intrusion upon seclusion relies on objective standards. *Finally*, damages are common or can be calculated by relying on Google's own measure of fair market value via Google ▉▉▉▉▉, which courts have recognized as a class-wide damages methodology.

Plaintiffs also seek certification under Rule 23(b)(2), for injunctive relief on their contract, CIPA, UCL and intrusion upon seclusion claims. The proposed injunctive relief flows naturally from Plaintiffs' claims, by requiring Google to change the default regime from one where Chrome sends the data with vague disclosures to one where Google must clearly explain what it is doing and get express consent from users. This would afford users transparency, notice, and choice.

Accordingly, Plaintiffs move under Fed. R. Civ. P. 23(b)(2) and 23(b)(3) to certify a damages and injunctive relief class based upon their contract, UCL, CIPA, and intrusion upon seclusion claims for all Google Accountholders who accepted Google's U.S. Terms of Service prior to October 4,

2024 and who used the Chrome Browser in the (1) Basic Browser and/or (2) Signed In, But Not Consented for Sync modes from September 23, 2018 to the present.[1]

## II.    STATEMENT OF FACTS

### A.    The Chrome Contract

The Chrome Contract consists of four primary documents: from September 2018 to March 2020, it consisted of (1) the Chrome Terms of Service; (2) the Chrome Privacy Notice; and (3) the Google Privacy Policy. From March 2020 to present, the Chrome Contract consisted of (1) the Google Terms of Service; (2) the Chrome Privacy Notice; and (3) the Google Privacy Policy. For both periods, the Chrome Contract included express integration clauses.

The proposed Class Period begins on September 23, 2018, when Chrome made the express promise not to send users' PI to Google if users did not enable sync. From that time until March 2020, the Chrome Terms of Service expressly incorporated the Google Privacy Policy ("GPP") and Chrome Privacy Notice ("CPN") and stated that those documents "constitute[d] the whole legal agreement between you and Google." Ex. A6. For class members, from March 2020 to October 2023, the Google Terms of Service ("GTOS") expressly incorporated the CPN as a "service-specific additional term" that "would govern for that service" in the event of a conflict with other terms. The GTOS also stated that the CPN, as a service-specific additional term, "define[s] our relationship and mutual expectation as you use these services." Exs. A21, 22.[2] The CPN, in turn, expressly stated that it was where users would "learn how to control the information that's collected, stored, and shared when you use the Google Chrome browser." Exs. A7-A19. The GPP was expressly incorporated into the Chrome Privacy Notice, but only with respect to "personal information that is provided to Google or stored in your Google Account" and only to the extent that it does not conflict with the Chrome Privacy Notice. *See* Exs. A7-A19, A20-A22. And, until October 4, 2023, the Google Privacy Policy expressly incorporated and directed Google Accountholders to the Chrome Privacy Notice (by

---

[1] Plaintiffs do not move for certification of the Implied Covenant or larceny claims. Six additional claims are "de-prioritized" until after trial pursuant to Court order (Dkts. 51 & 54) (Counts 1, 6, 10, 12, 14, and 16), and are not the subject of this motion.

[2] Google Ads, Display Ads, and Analytics (the "services" for which Google claims to have garnered consent) do not have "service-specific additional terms."

hyperlinked reference) for questions related to privacy practices. *See* Exs. A24-A38.

Throughout the Class Period, the Chrome Contract promised that Chrome would not send personal information to Google unless a person chose to sync their Chrome data with their Google Account. Chrome stated this promise many ways:

1. "You don't need to provide any personal information to use Chrome;"
2. "The fact that you use Chrome … will not cause Google to receive any additional personally identifying information about you;"
3. "[W]hen you sign in to the Chrome browser … *and enable sync* … your personal information is saved in your Google Account on Google's servers;"
4. Unless you "enable sync" and turn on "Google Web & App Activity," "Google will only use your Chrome data after its anonymized and aggregated with data from other users."

Exs. A7-A19 (CPN); A20-A22 (GTOS, stating "service-specific additional terms" govern); A24-A37 (GPP referring back to CPN); G24 (Plaintiffs' Resp. to ROG 7, re misleading statements).

This express promise was reinforced by what users saw when they first signed up for Chrome. Throughout the Class Period, ████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████ Ex. C2; Dkt. 430-3, Fair Decl., Exs. 3-14. Further, when not synced, the browser uniformly presents the option to "Turn on Sync." *See, e.g.*, Ex. G13, Calhoun Dep., 21:1-4 ("It says 'sync' really big right in the corner, I assumed and understand that to mean that my information would not be sent to anyone unless I pressed that button."); *see also* Exs. G14, Crespo Dep., 119:7-8; 142:5-9 (same); G15, Henry Dep., 24:11-19 (same). The parties agree that as part of the ███ and Google Account creation process, class members accepted the core contract terms, binding the class and Google alike to those terms.

## B. Chrome Sends Account Holders' PI to Google's Servers

Using Google source code, Chrome is designed to—and does—send class members' PI to Google, "whether a Chrome user has enabled Chrome's Sync feature." Ex. B2 ¶¶ 12, 100-109 ("Chrome sends … Chrome user information in the same manner for every use because the source code used in Chrome is the same across all Chrome browsers."); Dkt. 430-3, Fair Decl. ¶ 6 ("Google receipt of the disputed data … is not affected by … Chrome's Sync feature."). Google's expert testified that "regardless of certain settings, transmission of these categories of at-issue data happen

and they go to Google third-party servers." Exs. B5, MSJ Hearing Tr., at 133 (testimony of Prof. Zervas); B3 (data flow); B4 (graphic from Prof. Zervas depicting "Browsing history" and "cookies and other site data" are stored locally); *see also* Ex. B6, Berntson Dep., 141:20-24; 139:4-7 (testifying that at-issue data, *e.g.*, IP address, referrer URLs, user-agent, and, when present, third-party cookies, is "standard information that's included in all HTTP requests"). And Google confirms that individual user controls, like cookie blocking, do not prevent Chrome from sending the rest of the PI to Google. *See, e.g.*, *id.* at 144:4-21 (Dr. Berntson testifying that "blocking third party cookies" does "not impact" whether Google "receive[s] the other categories of at-issue data"); Exs. B2, Smith Reb., ¶¶ 12, 48-109 (blocking third-party cookies does not prevent transmission of other data, and refuting efficacy of other purported "controls"); C1, Shafiq Rpt., ¶¶ 14, 20 (Chrome "unifiedly designed to and, in fact, does send [PI] to Google even without Sync;" including URLs, IP address, User-Agent, X-client, and cookies.); C48, Svitkine Dep., at 247:7-260:1 (██████████ ████████████████████████████████████████████████). As explained by Plaintiffs' expert Richard Smith, user controls do raise individualized issues because "none of the purported blocking methods offered in the Zervas report stop all data transmissions of personal information from a user's Chrome browser to Google servers." B2, Smith Reb., ¶ 4; *see also id.* at ¶¶ 13-75, 104-142.

Google describes the PI transmitted by Chrome as the "at issue data," but this Court has found that it is personal information. *See* Dkt. 142, Order on Mot. to Dismiss, at 15-16 ("As Google's counsel conceded at the hearing … the data at issue in the instant case falls within the[] broad definitions of personal information."). Consistent with the Court's ruling, Google expressly includes "███████████████████████████████████████████████████████████████████ ████████████." Ex. C45 at -508. Plaintiffs' expert Dr. Shafiq explains that the data Chrome sends to Google is always "personal information." That's because it is (1) above the universally accepted scientific measure of identifiability ("entropy"), such that people can be identified by it; and (2) associated by Google with each class member's Google Account.[3] Further, after fact discovery-

---

[3] *See* Exs. C1 ¶¶ 18-30 (entropy), 71, 96-99 (██████████████████); C2 ¶¶ 1, 3, 5-9, 17-24, 37-46, 63-70, 121-132; 141-155; C9 ¶¶ 3-8; C10 ¶¶ 14-35; C11 ¶¶ 6-32 ("Google commingles signed-in and signed-out information" and other at-issue data next to precise geo-location, street addresses,

closed and a Court-ordered preservation plan, Google produced documents and employee affidavits consistent with Dr. Shafiq's opinions explaining how Google ties the PI together through joinability keys, mapping/linking tables, and other means. *See* Exs. C3 (███████████████████); C4-C11 (███████████████████).

## C.    Google Analyzes, Monetizes and Uses Class Member PI

Google analyzes, monetizes, and uses Plaintiffs' PI using the same systems for all class members. Dr. Shafiq described this process on October 24. *See* Ex. C20 at 284:7-289:20; *see also* Exs. C11-C13; C15-C18; C21; C23-C29; C35-C40. Specifically, while Chrome is sending the PI to Google (and the communication is ongoing), Google (1) identifies the user with the "██████████ ████," (2) centralizes the data (*see* Ex. C11 ¶¶ 6, 18-26); (3) analyzes its content, which includes sorting Plaintiffs' PI into detailed "█████████"(*see* Ex. C28, ████████████████████ ████████); (4) sends its analysis to Google's database to enrich the profiles Google builds about account holders (*see* Exs. C23-C29, "███████████"); (5) extracts existing profile information to target users; and (6) runs a "████████████" to do so. For illustrations (*see* Exs. C13, C35-C38). Remarkably, this all happens in the middle of the communication and while the page is still rendering to the user. Ex. C1 ¶¶ 32-35. Google also keeps receipts from the ███████████ reflecting the data compiled and used. *See* Ex. C11 (████████████████████████████ ████████████████████████████████████████ ████████████).[4] The same process is used for all Class members in the Class Period.

## D.    Class Members and Their Communications are Ascertainable

The proposed class is comprised of Google Accountholders, who Google can identify. In fact,

___

credit card info, other IDs, age, gender, race, ethnicity, income, children, education, and millions of other "fields"); C12 ¶¶ 47-56; C13 (Demonstratives); C20 at 280:25-283:18; 287:13-288:17; 296:21-298:18; 303:2-23; C18 (█████████████████████████████); C15-16 ("█████████████████████████████████████."); C3 █████████████████████████████████████████████; C4 (Order based on Google evidence "mapping CID/UID to Biscotti ID."); C5 (Google describing signed-out "linkages" derived from "signed-in browsing activities"); C7 (same); C38, at -823 (███████████████████████████████████████████████████████████); C18 (████████████████).

[4] ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ —

Google was ordered to preserve the class-wide data that can identify the Class. *See* Dkt. 766. Thus, while ascertainability is not an element for class certification in this Circuit, class members and their communications are readily ascertainable for all times that Google preserved the data.[5]

## III.    LEGAL STANDARD

"[T]he ultimate goal of Rule 23 is to determine whether efficiency and justice are best served by plaintiffs pursuing their claims on behalf of a class…." *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 607 (N.D. Cal. 2018). "The proposed class action must satisfy all four requirements of Rule 23(a), and at least one of the sub-sections of Rule 23(b)." *In re Facebook Biometric Info. Priv. Litig.*, 326 F.R.D. 535, 541 (N.D. Cal. 2018); *see also Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013) (merits questions should only be considered to the extent relevant to determine whether Rule 23 prerequisites are satisfied).

## IV.    ARGUMENT

Pursuant to Rules 23(b)(2) and (b)(3), Plaintiffs seek certification of claims for breach of contract, the UCL, CIPA, and intrusion upon seclusion. The Proposed Class is defined as:

> All Google Accountholders who accepted Google's U.S. Terms of Service on or prior to October 4, 2023 and who used the Chrome Browser in the (1) Basic Browser and/or (2) Signed In, But Not Consented for Sync modes from September 23, 2018 to the present (the "Class Period").

This proposed class is certifiable because membership "can be established by means of objective, verifiable criteria," *Wortman v. Air New Zealand*, 326 F.R.D. 549, 555 (N.D. Cal. 2018), and the "definition is reasonably co-extensive with Plaintiffs' chosen theory of liability." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1136-37 (9th Cir. 2016).

### A.    The Prerequisites of Rule 23(a) Are Met

#### 1.    There Are Millions of Class Members.

Numerosity is met here. *See* Ex. E11, Google's Resp. to ROG No. 1, Appendix A.

#### 2.    Google's Standardized Contracts and Uniform Conduct Create

---

[5] *See* Exs. C1 ¶¶ 78-113; C2 ¶¶ 2, 6, 8, 23-24, 47-62, 120, 136, 157-175, 191-194; C3 (███████ ██); C5 ("[D]ata … stor[ed] in the *Calhoun* case is all keyed by an identifier that is stored together with the data. So if we get a [signed-out identifier] or if we get a [Google Account ID], we can search the data that is associated with [those IDs]."); C6 (███████ ██████████); C7 (Signed-out linkages … derived from ID mappings/linkages that [include] signed-in data."); C8 (███); C9 ¶¶ 12-16 (███████████████); C10 ¶¶ 7-12 (similar).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Common Questions Across the Board.**

An issue is common if it is of "such a nature that it is capable of class wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "Even a single common question will do." *Id.* at 359. Here, Google's standardized contracts and uniform conduct present common questions suitable for certification. *See, e.g.*, *Ellsworth v. U.S. Bank, N.A.*, 2014 WL 2734953, at *20 (N.D. Cal. June 13, 2014) ("[C]ourts routinely certify class actions regarding breaches of form contracts.").[6] Standardized contracts are interpreted "without regard to [each class member's] knowledge or understanding of the standard terms of the writing." *Williams*, 338 F.R.D. at 638. Thus, Google's form contracts present common questions.

Breach is likewise a common question. *See Transamerica*, 2017 WL 6496803, at *6. Chrome sends the at-issue data to Google regardless of Sync status (Ex. B7) and whether such information qualifies as "personal information" is also common. *See* n.3 *supra*. Additional common questions include application of a reasonable person standard to questions of consent on the contract, UCL, CIPA, and intrusion claims. Similarly, the question of whether Google's conduct would be "highly offensive to a reasonable person" is also a common question. *Opperman v. Path, Inc.*, 205 F.Supp.3d 1064, 1072 (N.D. Cal. 2016) (describing elements of intrusion upon seclusion claim).

### 3. Plaintiffs' Claims Are Typical of Those of the Class.

Typicality is met where "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (internal quotations omitted), *abrogated on other grounds by Rodriguez Diaz v. Garland*, 53 F.4th 1189 (9th Cir. 2022). The class representatives are typical because their experiences are "reasonably co-extensive with those of absent class members; they need not be substantially identical." *Id*. Each Class Representative is or was a Google

---

[6] *See, e.g.*, *Williams v. Apple, Inc.*, 338 F.R.D. 629, 638 (N.D. Cal. 2021) (holding that, a "key common issue predominates here: all class members 'signed a standard form contract' with the same challenged language"); *U.S. ex rel. Terry v. Wasatch Advantage Grp., LLC*, 327 F.R.D. 395, 416 (E.D. Cal. 2018) (collecting cases) ("California district courts commonly certify classes for breach of contract claims" involving form contracts.); *Feller v. Transamerica Life Ins. Co.*, 2017 WL 6496803, at *11, 13 (C.D. Cal. Dec. 11, 2017) (claims premised on "uniform policy language and uniform conduct" "present the classic case for treatment as a class action") (quotations omitted).

Accountholder and Chrome user who (1) agreed to the Chrome Contract; (2) used Chrome while not synced; and (3) had their personal information sent from Chrome to Google's servers.[7] Plaintiffs' expectations and actions are consistent with how an objectively reasonable person behaves. *See* Exs. F1 at pp. 3-8); D1 ¶¶ 13-30. They were each harmed when Chrome sent their PI to Google without consent. *See* Exs. G1 (Calhoun Decl. ¶ 7 ("It's tantamount to stalking.")); G2 (Crespo Decl. ¶ 5 ("[V]ery annoying and creepy.")); G3 (Henry Decl. ¶ 5 ("[I]t's crazy that [Google] [] know[s] everything…without me knowing")); G4 (Johnson Decl. ¶¶ 3, 5 ("communications are reflections of who I am" and "I never consented to Chrome sharing my personal information… with Google)); G5 (Kindler Decl. ¶ 7 ("I believe that what Google is doing … is wrong.")); G6 (Wilson Decl. ¶ 5 ("I believe my online activities should be private unless I give permission and it should not be used by Google to create a file about me and my online activity")). Named Plaintiffs' expectations are also consistent with Google's internal documents showing consumer privacy expectations. *See* Exs. D3 (████████████████████); D4 (████████████████████), and other docs.

### 4. Named Plaintiffs and Their Counsel Meet the Adequacy Requirement.

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class," as determined by whether Plaintiffs and their counsel have any conflicts of interest with other Class members and will vigorously prosecute the action. *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003). There are no conflicts. The Named Plaintiffs have already proven their adequacy by investing hours in this case, responding to extensive discovery, permitting forensic imaging of their personal devices, collecting documents, and testifying in depositions. They will continue to safeguard the interests of class members as the case proceeds. *See* Exs. G1 (Calhoun Decl. ¶¶ 9-12); G2 (Crespo Decl. ¶¶ 7-10); G3 (Henry Decl. ¶¶ 6-9); G4 (Johnson Decl. ¶¶ 6-11); G5 (Kindler Decl. ¶¶ 10-13); G6 (Wilson Decl. ¶¶ 7-11). Proposed Class Counsel have extensive experience litigating internet privacy cases, and have and will continue to vigorously prosecute this

---

[7] *See* Dkt. 430-3, Fair Decl. §§ B.1, B.2 regarding contract agreements; Exs. G17 (GOOG-CALH-00027547) (IP address for Claudia Kindler); G18 (GOOG-CALH-00651647) (User-Agent and Device data associated with Plaintiffs); G19 (GOOG-CALH-00061948) (inferred interests file for Elaine Crespo); G20 (GOOG-CALH-00492852) (X-client data header info for Michael Henry); G21 (GOOG-CALH-00039102) (first-party cookie data associated with Claudia Kindler); G22 (GOOG-CALH-00039120) (Signed-out activity associated with Patrick Calhoun); G23 (GOOG-CALH-00027803) (Signed-in activity associated with Patrick Calhoun going back to Nov. 15, 2012).

1    case. *See* Joint Decl. at ¶¶ 26-31, Exs. H1-H3. There are no conflicts that would impede counsel's

2    ability to litigate this action to a successful outcome. *See* Joint Decl. ¶¶ 27-31.

3        **B.    Common Issues Predominate the Contract, UCL, CIPA, and Intrusion Claims**

4        Class certification under Rule 23(b)(3) is appropriate when common "questions of law or fact

5    . . . predominate over any question affecting only individual members." Fed. R. Civ. P. 23(b)(3).

6    Class certification under Rule 23(b)(3) is appropriate when common "questions of [law or fact] . . .

7    predominate over any question affecting only individual members." Fed. R. Civ. P. 23(b)(3). Thus,

8    when "one or more of the central issues in the action are common to the class and can be said to

9    predominate, the action may be considered proper for under Rule 23(b)(3) even though other

10    important matters will have to be tried separately, such as damages or some affirmative defenses

11    peculiar to some individual class members." *Tyson Foods, Inc. v. Bouaphakeo*, 577 US 442, 453

12    (2016) (citation omitted). A single predominant issue may enough. *See id.*

13        **1.    Common Issues Predominate for the Breach of Contract Claim**

14        For the breach of contract claim, Plaintiffs must establish "(1) the existence of the contract,

15    (2) the plaintiff's performance or excuse for nonperformance, (3) the defendant's breach, and (4) the

16    resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011).

17    "[T]he mutual intention of the parties at the time the contract is formed governs interpretation" *AIU*

18    *Ins. Co. v. Sup. Ct.*, 51 Cal.3d 807, 821 (1990) (citing Cal. Civ. Code § 1636); "[I]n construing and

19    applying a standardized contract," courts "seek to effectuate the reasonable expectations of the

20    average member of the public who accepts it." *Williams*, 338 F.R.D. at 638 (quoting Restatement

21    (Second) of Contracts § 211(2) cmt. e). In so doing, the Court is not to "attribut[e] . . . the skill of an

22    experienced business lawyer or someone who is able to easily ferret through a labyrinth of legal

23    jargon to understand what he or she is consenting to." *Calhoun v. Google*, 113 F.4th 1141, 1151 (9th

24    Cir. 2024). Instead, "the governing standard is what a 'reasonable user' of a service would understand

25    they were consenting to, not what a technical expert would." *Id*. at 1149 ("reasonable user" equated

26    with "the general public.").

27        In this case, the existence of a contract, and scope of consent, should be determined by

28    reference to the Chrome Contract. *See*, *e.g.*, *Silver v. Stripe*, 2021 WL 3191752, at *3 (N.D. Cal. July

28, 2021) (looking to website's form privacy policy to determine existence of contract and scope of consent). Thus, "[e]xtrinsic evidence is generally not admissible to contradict or supplement the terms of a fully integrated contract." *Congdon v. Uber Techs., Inc.*, 291 F.Supp.3d 1012, 1021 (N.D. Cal. 2018). While extrinsic evidence "may be used to 'explain or interpret ambiguous contract language,' . . . [i]n the case of "ambiguous terms within a form contract, such terms would be construed against the drafter." *Id.* at 1022. Instead, mutual assent "must be communicated by each party to the other" and "determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts," not "unexpressed intentions or understandings." *Esparza v. Sand & Sea, Inc*., 2 Cal.App.5th 781, 788 (2016). Further, "[w]hen a contract is reduced to writing, the intent[] of the parties is to be ascertained from the writing alone, if possible," and "[e]xtrinsic evidence" cannot "contradict unambiguous express contractual terms." *WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1051 (9th Cir. 2011) (citing Cal. Civ. Code § 1639); *see also* Cal. Civ. Code § 1638 ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."); *Hervey v. Mercury Cas. Co*., 185 Cal. App. 4th 954, 961 (2010) ("[I]ntent is to be inferred, if possible, solely from the written provisions of the contract.").

For "integrated" contracts, extrinsic evidence is not admissible because "as a matter of law the agreement is the writing itself," and all else is "legally irrelevant." *Casa Herrera, Inc. v. Beydoun*, 32 Cal.4th 336, 344 (2004). This parol evidence rule applies any time that "the parties intended their writing to serve as the exclusive embodiment of their agreement," *Wagner v. Glendale Adventist Med. Ctr.*, 216 Cal. App. 3d 1379, 1385-86 (1989). "When only part of the agreement is integrated, the [parol evidence] rule applies to that part." *Slivinsky v. Watkins-Johnson Co.*, 221 Cal. App. 3d 799, 805 (1990) (quoting *Masterson v. Sine*, 68 Cal.2d 222, 225 (1968)). Whether the Chrome Contract is integrated is a common question that will be determined by reference to the contract alone. As this Court held in *In re Google RTB Consumer Priv. Litig.*, any "express consent" will "be resolved on the basis of Google's standardized disclosures . . . alone." 2024 WL 2242690, at *15 (N.D. Cal. Apr. 4, 2024).

Implied consent is not a defense on the facts here—where the claim alleges the breach of

express promises in a form contract. In *Williams*, the Court explained that a form contract must be "interpreted wherever reasonable as treating alike all those similarly situated, without regard to their knowledge or understanding of the standard terms of the writing." 338 F.R.D. at 638. As *Williams* points out, "many courts have rejected the argument [Google] makes here." *Id.* (collecting cases); *see also In re Conseco Life Ins. Co. Life Trend Ins. Marketing & Sales Practice Litigation*, 920 F.Supp.2d 1050, 1065 (N.D. Cal. 2013) (noting that form contracts are drafted "precisely in order to avoid the problem Conseco now invites—that thousands of policyholders have thousands of different understandings of a standard form"), *vacated by judgment approving settlement*, 2013 WL 10349975 (N.D. Cal. Nov. 8, 2013). In *Harris v. comScore, Inc*., the Court rejected a surveillance software company's similar claim that implied consent could be garnered outside the form contract, explaining that the rule that consent "can also be implied from the surrounding circumstances…has no place where a party manifested consent through the adoption of a form contract." 292 F.R.D. 579, 585 (N.D. Ill. 2013).

Google has argued that third-party disclosures beyond the four corners of the contract bear on consent. This, Google claims, means that an individualized inquiry is required through analysis of whether each class member read the terms of service of *other* websites to determine whether Chrome was in fact sending their PI to Google when users were not synced. The argument fails for many reasons, but three are plain: (1) there is no basis to argue that third parties can amend the Chrome contract; (2) even if there were any basis for such amendment, no third-party website says expressly that Chrome does send users' PI to Google when they elect not to sync (Google cannot point to a single one that does); and (3) no objectively reasonable person would think that they have to read the terms of service of every third-party website to understand how Chrome functions.

All other questions are indisputably common. Agreement to terms will be proven through records of Account Holder consent (Dkt. 430-3, Fair Decl., ¶¶ 39-43); and Plaintiffs' performance is shown by continued use of their Google Account and Chrome. *See* Exs. G1-G6. Google's breach will turn on common evidence that Chrome uniformly sends PI to Google regardless of sync status.

       **2.**    <u>**Common Issues Predominate the UCL Claim**</u>

1    The UCL prohibits "any unlawful, unfair, or fraudulent business act or practice." *Cappello*

2    *v. Walmart, Inc.*, 394 F.Supp.3d 1015, 1018 (N.D. Cal. 2019). UCL claims are "ideal for class

3    certification because they will not require the court to investigate class members' individual

4    interaction with the product." *Bradach v. Pharmavite, LLC*, 735 F.App'x 251, 254-255 (9th Cir.

5    2018). "For this reason, district courts in California routinely certify consumer class actions arising

6    from alleged violation of the … UCL." *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 480

7    (C.D. Cal. 2012) (collecting cases). "[I]ndividualized proof of deception, reliance, and injury" is not

8    required. *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 985-86 (9th Cir. 2015). UCL

9    claims are "governed by the 'reasonable consumer' test" and, in claims about a product, "reasonable

10    consumers should [not] be expected to look beyond misleading representations on the front of the

11    box to discovery the truth from the ingredient list in small print on the side of the box." *Williams v.*

12    *Gerber Products Co.*, 552 F.3d 934, 938-39 (9th Cir. 2008).

13    The "unfair" prong is satisfied where a defendant's conduct either "offends an established

14    public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially

15    injurious to consumers." *In re Anthem, Inc. Data Breach Litig.*, 162 F.Supp.3d 953, 990 (N.D. Cal.

16    2016).[8] Alternatively, under a "balancing test," (1) "the consumer injury is substantial;" (2) "not

17    outweighed by any countervailing benefits to consumers or to competition;" and (3) "is not an injury

18    the consumers themselves could reasonably have avoided." *Berryman v. Merit Prop. Mgmt., Inc.*,

19    152 Cal. App. 4th 1544, 1555, 1556 & n.2 (2007). "Substantial injury" includes "a small harm to a

20    large number of people," and "courts look to whether the consumers had a free and informed choice"

21    to determine if the harm was "reasonably avoidable." *Fed. Trade Comm'n v. Neovi, Inc.*, 604 F.3d

22    1150, 1157-58 (9th Cir. 2010).

23    Both "unfairness" tests will be resolved by common evidence. Determining whether

24    Google's conduct "offends an established public policy" turns on Google's conduct alone. Among

25    the conduct challenged here is whether it was unfair for Google to promise that Chrome would not

26    send users PI to Google—even though it was designed to do so by default, thereby preventing

---

[8] For "unlawful" prong of the UCL "borrows violations of other laws and makes them "independently actionable" under the UCL. *In re Anthem, Inc. Data Breach Litig.*, 2016 WL 3029783, at *32 (N.D. Cal. May 27, 2016). Thus, the unlawful UCL claims mirror the CIPA claim.

browser users from exercising informed choices about the data price charged to use Chrome versus other browsers. In *Epic Games v. Apple, Inc.*, this Court held that Apple's actions to "prevent[] informed choice among users" of Internet software was "unfair" as a matter of law. 559 F.Supp.3d 898, 1055 (N.D. Cal. 2021), *partially rev'd on other grounds*, 67 F.4th 946 (9th Cir. 2023), This is consistent with "unfair" claims under the FTC Act, where "courts look to whether the consumers had a free and informed choice." *Neovi, Inc.*, 604 F.3d at 1158. Likewise, whether Google's conduct—in advertising that the price of Chrome did not involve sending of personal information to Google even though it did—was "immoral, unethical, oppressive, unscrupulous, or substantially injurious" will be determined by Google's conduct alone. For example, ███████████████████████

███████████████████████████████████████████████████████

███████████████████████████████. *See* Ex. C22. Thus, the surreptitious nature of Google's actions and lack of transparency factor into the fairness analysis. The quantity and quality of the information Chrome sends to Google, reach of Google's worldwide ad tracking system, will also inform a factfinder's analysis of the unfair prong. These are common questions.

### 3.   Common Issues Predominate the CIPA Claim

To prove a claim under the California Invasion of Privacy Act, a plaintiff must show that the defendant (1) "willfully" and (2) "without the consent of all parties to the communication, or in any unauthorized manner;" (3) "reads, or attempts to read, or to learn the contents or meaning of any message, report or communication;" (4) "while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state." Cal. Pen. Code § 631(a).

All elements turn on common proof. To start, the uniformity of Google's conduct, through its systems and disclosures, is common. Next, whether Google acted in "any unauthorized manner" *or* "without the consent of all parties" is also common. As with all statutory claims, the words in the statute govern. Here, CIPA prohibits interceptions without "consent of all the parties *or* in any unauthorized manner." Three cardinal rules of statutory interpretation apply: (1) start with "the language of the statute and give[] effect to its plain meaning;" (2) "construe" that statute, upon the whole, such that, "if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant;" and (3) "terms connected by a disjunctive" should "ordinarily" "be given separate

meanings." *In re Lieberman*, 245 F.3d 1090, 1092 (9th Cir. 2001); *TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001); *U.S. v. Nishiie*, 996 F.3d 1013, 1023 (9th Cir. 2021) (reflecting the three rules).

The question here is whether "in any unauthorized manner" has a different meaning than "without the consent of all parties to the communication" when separated by "or." Under the cardinal rules, different phrases divided by a disjunctive mean different things. The first clause here relates to "consent of all parties," while the second relates to the "manner" of the conduct. This interpretation is consistent with the codified legislative history (*see* Cal. Pen. Code § 630) and precedent from the California Supreme Court, which has explained that, for CIPA, there is "a substantial distinction…between the secondhand repetition of the contents of a conversation" versus "its simultaneous dissemination to an unannounced second auditor." *Ribas v. Clark*, 38 Cal.3d 355, 360-61 (1985). Here, whether Chrome was "authorized" to send at-issue data to Google is a common question determined entirely by the Chrome Contract. By promising Plaintiffs control but designing Chrome's code to prevent it, Google commonly violated Plaintiffs' choices.

In addition, "implied consent" is not an available defense because, under CIPA, any consent must be "prior consent of all parties to a communication." *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *2 (9th Cir. May 31, 2022) (noting the California Supreme Court's statement that under CIPA, a recorder must "first inform[] all parties to the conversation" that it is being recorded (quoting *Kearney v. Solomon Smith Barney Inc.*, 39 Cal.4th 95, 118 (2006))); *Ribas*, 38 Cal.3d at 361 (CIPA requires "assent of all parties to a communication before another may listen"). The consent question turns on Google's express disclosures because the PI flows from Chrome to Google before the page is fully finished loading on the class member's screen. *See* Exs. C2 ¶¶ 31-35; B1 ¶¶ 23-24. Thus, Google's position that each class member must have read and understood all non-Google website's privacy statements before that statement rendered on their screen to consent to Chrome sending the PI to Google, before the privacy statement itself would be rendered on the screen, is a far cry from prior express consent, implausible and unsupported by any evidence, which is Google's burden.

Google's actions to read or attempt to read or learn "the contents or meaning" of the at-issue communications will also rise or fall with common evidence of how Google's systems work. Specifically, content includes "content categories;" URLs; "details about the content within the site;"

and "keywords about the site." *In re Google RTB Consumer Privacy Litig.*, 606 F.Supp.3d 935, 949 (N.D. Cal. 2022); *see also Brown v. Google, LLC*, 685 F.Supp.3d 909, 935-36 (N.D. Cal. 2023) (applying the same reasoning to reject Google's argument that the intercepted data is not "contents" of a communication under both the ECPA and CIPA claims) (citing *Brodsky v. Apple, Inc.*, 445 F.Supp.3d 110, 127 (N.D. Cal. 2020)). Google keeps receipts of this communications content, and the evidence shows these categories are maintained for each Named Plaintiff. *See* Ex. C12, ¶¶ 27-30, Ex. D, lines 30, 304-321, 507-516, 711-725. The question of timing is common. *See* Exs. C1 ¶¶ 31-35; B1 ¶¶ 23-24. And the question of nexus to California was (1) decided as a matter of the contract, which adopts California law; (2) Google's presence and relevant decision-making in California; and (3) Google's discovery conduct, in which it waived the defense by asserting that location of its servers was not relevant to any claim. *See* Ex. E11, Google's Resp. to ROG No. 5; *In re Google RTB*, 2024 WL 2242690, at *10 (N.D. Cal. Apr. 4, 2024) (rejecting attempt to raise a CIPA location defense after Google failed to produce any evidence to support that defense during discovery). Further, California nexus can be proved with Google's receipts identifying the location of the class member, non-Google website, and Google servers involved in each at-issue communication. *See* Ex. C12, lines 15, 533, 934, 1694, 2223.

### 4.    <u>Common Issues Predominate the Intrusion Claim</u>

Intrusion upon seclusion has two elements, each of which are subject to common proof: "whether (1) there exists a reasonable expectation of privacy, and (2) the intrusion was highly offensive." *Rodriguez v. Google*, 2024 WL 38302, at *4 (N.D. Cal. Jan. 3, 2024). The "reasonable expectation of privacy" test "is an objective one" that "does not require Plaintiffs to prove subjective expectation" but instead is "founded on broadly based and widely accepted community norms." *Id*. Similarly, the "highly offensive" element is determined under an objective "reasonable person" standard. *Id*. In *Rodriguez*, the Court certified an intrusion class based on "Google's uniform disclosures and users' uniform conduct." *Id*. at *6. It also found that any "individual representations by [third parties] do not outweigh Google's common representation[s]." *Id*. at *5. The same reasoning holds true here. Like *Rodriguez*, Google's disclosures, class member privacy choices (*i.e.*, to use Chrome in Basic or Signed In But Not Consented for Sync modes), and the at-issue conduct

1   are all uniform. If anything, this case is even better suited for class certification because Chrome's

2   promise that not syncing prevented PI from flowing to Google was false, for every Class member.

3   Whether the false promise is highly offensive to a reasonable user is a common question.

4       Google will argue that the Ninth Circuit ruling was limited to "express consent," but there is

5   no limitation in the ruling itself. To the contrary, the Ninth Circuit's analysis begins with, "First,

6   consent can be [express] or implied, but any consent must be actual" and "to be actual, the disclosures

7   must explicitly notify users of the conduct at issue." *Calhoun*, 113 F.4th at 1147 (quotations omitted).

8   Here, Google wrote the source code that commands Chrome to send the PI to Google—and the (false)

9   promise that it would not do so. Similarly, Google may again argue, as referenced above, that third

10  party contracts bear on Plaintiffs' contract claims. But per the Chrome Contract, as a "service-

11  specific additional term," the CPN is the document that governs the agreement. *Id.* at 1145. In *Silver*

12  *v. Stripe*, this Court correctly explained that "privacy is not an 'all-or-nothing' proposition." 2021

13  WL 3191752, at *6. Rather, the Court must look to the specifics of the alleged consent and consider

14  "the nature and volume" of the relevant information. *Id*. In *Stripe*, the Court held that plaintiffs had

15  a viable claim where the defendant did not disclose that it was compiling web-browsing histories,

16  financial information, and device information into consumer reports it shared. *Id*. Likewise, here,

17  Plaintiffs have a viable claim where Google promised that the Chrome browser would not send PI to

18  Google's servers. Similarly, in *In re Pharmatrak, Inc.*, the First Circuit explained that a court must

19  look to "the *dimensions of the consent* and then ascertain whether the interception exceeded those

20  boundaries." 329 F.3d 9, 19-20 (1st Cir. 2003). *Pharmatrak* also explained that, where a party

21  "received assurances from" the defendant that its "service did not and could not collect personally

22  identifiable information," there can be no implied consent because a contrary interpretation would

23  "undercut efforts by one party to a contract to require that [] privacy interests…be protected by the

24  other party to the contract" and "lead to irrational results." *Id*. at 20. *Pharmatrak* proposed a scenario

25  directly applicable to this case, where a defendant "intentionally designed its software, contrary to

26  its representations and its clients' expectations, to redirect all possible personal information to [the

27  defendant's] servers, which collected and mined the data." *Id*. Allowing vague statements outside

28  the four corners of a written agreement to enable contractual breach would completely upend the

principles of contract formation and reliance. Put simply, the express promise cannot be defeated by implied consent. *See Desnick v. Am. Broad. Cos., Inc.*, 44 F.3d 1345, 1351 (7th Cir. 1995) ("[T]here can be no implied consent in any nonfictitious sense of the term when express consent is procured by a misrepresentation or a misleading omission").

Plaintiffs will also submit evidence that Google itself employed common standards to assess its own consent process. Company insiders acknowledge that users want privacy but do not understand Google's processes. Ex. C42, at -428 ("███████████████████████████████████ ███████████████████████████████████████████████████████████████████ ██████████████"). Internally, Google acknowledges that its "███████████████████ █████████████████████" Interview notes with key Google executives include comments that match the experience of the Named Plaintiffs. Ex. D3 (reflecting comments from Google executives, █████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████ ███████████████████████████████████████).

And common evidence will show that Google's actions were duplicitous. Google designed Chrome to automatically send highly detailed PI to Google so that Google can build user profiles. Chrome stands alone in that practice. No other browser manufacturer builds user profiles in this manner or sends to itself highly detailed PI without express consent. Ex. C12 ¶¶ 3-40, 64 (██ █████████████████████████████████████████████████████████████████████ ███████████████████████████████████████). That is, at trial, the evidence will show that Google internally relies on common understandings of user preference (which it then disregards). The same reasonable person common understanding methodology applies to the legal analysis of whether those actions are unfair or highly offensive.

## 5.   Damages Can Be Determined on a Class-Wide Basis

Plaintiffs' proposed damages calculations flow from the common harms Google inflicted on class members. *See Lytle v. Nutramax Labs., Inc.*, 114 F.4th 1011, 1027 (9th Cir. 2024) (confirming plaintiff must only show that damages "stemmed from the defendant's actions that created the legal

liability," not that the damages are the same for everyone (quoting *Leyva v. Medline Ind., Inc.*, 716 F.3d 510, 513-14 (9th Cir. 2013))). Six categories of damages apply, all of which are uniform. Four damage metrics do not require expert analysis: statutory, nominal, general and punitive. Statutory damages are available under CIPA as a matter of law and are identical for all violations. *See* Cal. Pen. Code § 632.7; *D'Angelo v. Penny OpCo, LLC*, 2023 WL 7006793, at *4 (S.D. Cal. Oct. 24, 2023). These penalties are common, identical, and certifiable; and large aggregate damages will not defeat certification where there is no cap on total statutory damages. *See Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 721-23 (9th Cir. 2010) (holding potentially enormous statutory damages "is not an appropriate reason to deny class certification"); *Patel v. Facebook*, 932 F.3d 1264, 1276–77 (9th Cir. 2019) (holding same for Illinois BIPA), *cert. denied*, 140 S. Ct. 937 (2020); *Ades v. Omni Hotels Mgmt. Corp.*, 2014 WL 4627271, at *13-14 (C.D. Cal. Sept. 8, 2014) (applying *Bateman* to CIPA, declining to consider high damages as a factor against class certification).

Nominal damages are uniform and available for breach of contract and privacy claims. *Elation Sys., Inc. v. Fenn Bridge LLC*, 71 Cal. App. 5th 958, 965-66 (2021) ("A plaintiff is entitled to recover nominal damages for the breach of a contract, despite inability to show" actual damages). General damages are also uniform and available for the contract and privacy claims. *See In re Google Assistant Privacy Litig.*, 457 F.Supp.3d 797, 834 (N.D. Cal. 2020) (contract claims); *see also Doe v. Chao*, 540 U.S. 614, 621 (2004) ("Traditionally, the common law has provided such victims with a claim for 'general' damages, which for privacy and defamation torts are presumed damages: a monetary award calculated without reference to specific harm." (citing Reinstatement (Second) of Torts § 867)). Punitive damages are available on the privacy claim and are certifiable under Rule 23(b)(3). *See, e.g.*, *Ellis v. Costco*, 285 F.R.D. 492, 542-44 (N.D. Cal. 2012) (granting (b)(3) certification on punitive damages claims ); *Opperman v. Path, Inc.*, 2016 WL 3844326, at *16-17 (N.D. Cal. July 15, 2016) (holding that "the availability of punitive damages is amenable to classwide resolution"); *Doe v. Mindgeek USA, Inc.*, 702 F.Supp.3d 937, 951 (C.D. Cal. 2023) ("The availability of punitive damages here 'hinges…on the defendant's conduct toward the class as a whole.'" (quoting *Opperman*, 2016 WL 3844326, at *16)).

Finally, benefit-of-the-bargain damages flow from Plaintiffs' contract and UCL claims, and unjust enrichment flows from contract. *Svenson v. Google Inc.*, 2016 WL 8943301, at *11 (N.D. Cal. Dec. 21, 2016) ("Lost benefit of the bargain is a viable theory of injury for breach of contract and unfair competition."); *In re Google Assistant*, 546 F.Supp.3d at 967 ("[A] defendant's unjust enrichment can satisfy the 'damages' element of a breach of contract claim"). Plaintiffs offer simple methodologies for measuring each. *First*, using evidence produced after briefing closed on summary judgment and class certification, Plaintiffs can measure the amount of additional profits Google obtained from class members' PI. *See* Exs. E1, Mangum Rpt., ¶¶ 38-64; E2, Mangum Reb., ¶¶ 11-16, 26-29, 38-62. Using Google's internal revenue documents, Plaintiffs propose a methodology to (1) calculate Google's revenue premium from the availability of PI from Chrome; (2) isolate the U.S. portion; (3) apply the portion not synced users; (4) remove Incognito browser mode portion; and (5) apply computed profit margins. Plaintiffs' model is corroborated by late-produced 30(b)(6) testimony and documents showing that Google engaged in similar analyses. Joint Decl. ¶ 22; Ex. E12 (Liu Tr., referring to ███████████████████████████████████████████████ ████████████████████████████████████████████████████████). Thus Google's own tests and similar methodologies are reasonable bases to calculate class-wide damage for Google's unjustly earned profits.

*Second*, through its ███████████████████████████████████████████ █████████████████████████████████████. Joint Decl. ¶ 23; Ex. E15. ████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████. *See Brown v. Google, LLC*, 2022 WL 17961497, at *3-5 (N.D. Cal. Dec. 12, 2022) (██████████ admissible as restitution value for browsing data); *see also Rodriguez v. Google*, 2024 WL 38302, at *11-13 (same, class-wide damages). That's correct because ████████████████ measure reflects what Google was willing to pay for users' PI, and what individuals were willing to accept. In other words, ██████████████████ indicates the value of the data Google inappropriately obtained from Class Members, factoring in the price for individuals' willingness to forgo certain

1    privacy regarding the at-issue data. Therefore, this second methodology also is a reasonable, and

2    common, input to calculate actual or general damages category applicable to the intrusion upon

3    seclusion claim. These methodologies are straightforward and turn on common elements.[9]

4    **C.    Class Treatment Is Superior to Other Forms of Adjudication.**

5    Rule 23(b)(3) requires a finding that "a class action is superior to other available methods for

6    fairly and efficiently adjudicating the controversy." Cases "'where litigation costs dwarf potential

7    recovery' are paradigmatic examples of those well-suited for classwide prosecution." *Mullins v.*

8    *Premier Nutrition Corp.*, 2016 WL 1535057, at *8 (N.D. Cal. Apr. 15, 2016)). Here, there is no

9    dispute that the litigation costs are high for claims that are modest on a per-class-member basis.

10    Google also previously argued that a class action was not superior here because the scope of

11    the class was not ascertainable. As a legal matter, Plaintiffs need not "demonstrate that there is an

12    administratively feasible to determine who is in the class." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d

13    1121, 1124-25 (9th Cir. 2017); *see also Williams v. Apple, Inc.*, 2021 WL 2186223, at *12 (N.D.

14    Cal. May 28, 2021) (applying *Briseno* to reject ascertainability as a class certification requirement).

15    However, the class here is perfectly ascertainable for all times periods where Google preserved the

16    data. *See* Dkt. 766, Preservation Order. Class treatment is manageable and well suited here.

17    **D.    Alternatively, the Court Should Certify a Rule 23(c)(4) Class for Common Issues**

18    Rule 23(c)(4) provides that, "[w]hen appropriate, an action may be brought or maintained as

19    a class action with respect to particular issues." Plaintiffs need not show predominance on all issues

20    to certify an issues class. *Newberg & Rubenstein on Class Actions* § 4:92 (6th ed. 2022); *see Avilez*

21    *v. Pinkerton Gov't Servs., Inc.*, 596 F.App'x. 579, 579-80 (9th Cir. 2015) ("We need not decide

22    whether these subclasses, as modified, would satisfy the predominance requirement of Rule 23(b)(3).

23    On remand, the district court shall certify" a (c)(4) class "on the issue whether there exists a prima

24    facie case for liability."). The Ninth Circuit broadly interprets Rule 23(c)(4). *See Valentino v. Carter-*

25    *Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) ("Even if the common questions do not

26    _____

27    [9] Plaintiffs rely, in part, here and elsewhere, on discovery produced after the close of briefing on
class certification and summary judgment. The Court's statements at the September 30, 2024 CMC

28    hearing prohibited supplemental expert reports. Plaintiffs would have submitted such supplemental
reports had they been permitted. Joint Decl. ¶¶ 5-8, 13, 22-23.

predominate . . . so that class certification of the entire action is warranted, Rule 23 authorizes [district courts] in appropriate cases to isolate the common issues under Rule 23(c)(4)(A) and proceed with class treatment of these particular issues.").[10] Accordingly, issue certification is appropriate if it "materially advance[s]" the litigation. *E.g.*, *LSIMC, LLC v. Am. Gen. Life Ins. Co.*, 2022 WL 4596597, at *12 (C.D. Cal. Aug. 4, 2022); *Diaz v. Albertson's LLC*, 2016 WL 8904415, at *6 (C.D. Cal. Dec. 20, 2016). Indeed, courts may grant Rule 23(c)(4) certification "even if only one common issue can be identified as appropriate for class treatment." 7AA Wright & Miller, *Fed. Prac. & Proc. Civ.* § 1790 (3d ed); *see also In re Activision Sec. Litig.*, 621 F.Supp.415, 438 (N.D. Cal. 1985) (finding "it both appropriate and desirable to certify a defendant class . . . to litigate the single issue under § 12(2) of material misrepresentations and omissions").

As argued above, all issues in this case can and should be resolved through common evidence at trial. However, even if the Court disagrees about implied consent (or any other issue), it would be appropriate to certify all other issues. Per *Avilez*, an issues class is appropriate where a prima facie case for liability can be established with common evidence, and there is no dispute that, to the extent it is available to a defendant, "consent is an affirmative defense for which defendant bears the burden of proof." *Calhoun*, 113 F.4th at 1147; *see Avilez*, 596 Fed. App'x at 579-80. To the extent the Court finds implied consent to be individualized, then the facts are similar to *Avilez*, where the Ninth Circuit ruled that the District Court abused its discretion to certify a class that "include[d] employees who signed class action waiver," but ordered the District Court to certify a class under Rule 23(c)(4) on "whether there exists a prima facie case for liability" and, if so, to then "proceed to entertain [the defendant's] affirmative defenses." *Avilez*, 596 F.App'x. at 579-80.

By certifying common claims capable of being tried with common evidence (as detailed in the accompanying Trial Plan), instead of piecemeal litigation and evaluating the *same evidence* thousands of times, this Court will preserve judicial economy and advance the resolution of this litigation. *See Kamakahi v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164, 176 (N.D. Cal. 2015)

---

[10] So do other Circuits. *See, e.g.*, *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 227 (2d Cir. 2006) (holding a (c)(4) liability class may be certified whether or not the claim as a whole satisfies predominance); *Gunnells v. Healthplan Servs.*, 348 F.3d 417, 439-45 (4th Cir. 2003) (extended analysis of Rule 23(c)(4)); *Martin v. Behr Dayton Thermal Prods.*, 896 F.3d 405, 411-13 (6th Cir. 2018) (adopting "the broad approach" to Rule 23(c)(4)).

1   (courts entertaining an issues class should consider "whether the adjudication of the certified issues

2   would significantly advance the resolution of the underlying case, thereby achieving judicial

3   economy and efficiency. This approach would be far superior to *Brown*, where the more than 100,000

4   individual claims flooded California courts and this Court before being remanded. It would be far

5   more efficient that all issues that can be tried through common evidence be tried in the class setting,

6   rather than presenting the same liability evidence thousands of times.

7       **E.    Class Certification Is Appropriate Under Rule 23(b)(2)**

8       An injunctive or declaratory relief class is appropriate where defendant acted or refused to

9   act on grounds that apply generally to the class, so that final injunctive relief is appropriate respecting

10  the class as a whole. *See* Fed. R. Civ. P. 23(b)(2). The "key to the (b)(2) class is 'the indivisible

11  nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it

12  can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-*

13  *Mart Stores v. Dukes*, 564 U.S. at 360. The rule "does not require [courts] to examine the viability

14  or bases of class members' claims for declaratory and injunctive relief, but only to look at whether

15  class members seek uniform relief from a practice applicable to all of them." *Ward v. United Airlines,*

16  *Inc.*, 2021 WL 534364, at *7 (N.D. Cal. Feb. 12, 2021).

17      Here, the injunctive relief Plaintiffs seek is built on transparency, choice, and notice for all

18  class members. *First*, Chrome should provide accurate and clear statements about when and what PI

19  it sends to Google and how that PI is combined with other data and used by Google. *Second*, Chrome

20  should be ordered to provide a mechanism for users to opt in, only after clear disclosures. That is,

21  the default will not allow Chrome to send PI to Google. *Third*, class members should be given the

22  means to request and view Google's dossiers on them, including how Google mapped/linked their

23  signed-out identifiers and activity to their Google Accounts. *Fourth*, class members should be able

24  to request deletion of those profiles and data. *Fifth*, Google should be ordered to provide express in-

25  product and email notice of changes to the Chrome Contract, as it promised, before they take effect.

26  Such relief would apply equally to "each member of the class."[11] Finally, Google's attempted

27  _____

28  [11] Plaintiffs do not suggest that Google cannot amend the contract. The contract gives Google the

1  "deprecation" of its past false promises in the CPN does not mean that Chrome users who became

2  Google Account Holders after October 4, 2023 may not have a contract claim for damages. All class

3  members who were account holders before then face ongoing harm, because Google's conduct—

4  taking PI without consent—has not changed. That is, class members who used Chrome subject to the

5  CPN are still harmed. And Plaintiffs, who have testified that they are forced to use Chrome, cannot

6  evade the harm. *See* Exs. G1 (Calhoun Decl. ¶ 8); G2 (Crespo Decl. ¶ 5); G4 (Johnson Decl. ¶ 11);

7  G5 (Kindler Decl. ¶ 8); G6 (Wilson Decl. ¶ 6). Equally important, the disclosures replacing the CPN

8  are even more convoluted, confusing—essentially written in hieroglyphics.[12] Google's continued

9  refusal to disclose that Chrome sends personal information to Google by default, after promising

10  users who signed up before October 4, 2023, that it would not do so, continues to breach the contract,

11  violate the UCL and CIPA, and intrude upon class members' reasonable expectations of privacy.

12  The requested relief can and will halt Google's uniform unlawful practices, making (b)(2)

13  certification appropriate. *See, e.g.*, *Parsons v. Ryan*, 754 F.3d 657, 688 (9th Cir. 2014) ("requirements

14  are unquestionably satisfied when" class members "seek uniform…relief from policies or practices"

15  that apply to the whole class); *Raffin v. Medicredit, Inc.*, 2017 WL 131745, at *9-10 (C.D. Cal. Jan.

16  3, 2017) (requirements met where disputed policy applies to the entire class).

17  **V.    CONCLUSION**

18      For the reasons stated above, Plaintiffs respectfully request that the Court grant their Motion

19  for Class Certification, appoint class representatives, and appoint class counsel.

21  Dated: October 30, 2024                    Respectfully submitted,

22  **BLEICHMAR FONTI & AULD LLP**            **SIMMONS HANLY CONROY LLP**

23  By:    */s/ Lesley E. Weaver*              By:    */s/ Jay Barnes*
24  Lesley E. Weaver (SBN 191305)            Jason 'Jay' Barnes (admitted *pro hac vice*)
    Anne K. Davis (SBN 267909)               Jayne Conroy (admitted *pro hac vice*)

25  ___
    express right to do so, including "material" changes and to "reduce" consumer rights. But Google
26  promised that it would only do so after providing "reasonable advance notice" and obtaining "explicit
    consent." The appropriate mechanisms for doing so will likely be the subject of merits briefing.

27  [12] On the merits, Plaintiffs' expert Joseph Turow will opine that the "Privacy in Chrome" statements
28  that Google claims to have "replaced" the promises in the CPN may be even worse because they are
    a classic "rabbit hole" disclosure that is unintelligible to a normal person.

Joshua D. Samra (SBN 313050)
1330 Broadway, Suite 630
Oakland, CA 94612
Tel.: (415) 445-4003
Fax: (415) 445-4020
*lweaver@bfalaw.com*
*adavis@bfalaw.com*
*jsamra@bfalaw.com*

An Truong (admitted *pro hac vice*)
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
Fax: (212) 213-5949
*jaybarnes@simmonsfirm.com*
*jconroy@simmonsfirm.com*
*atruong@simmonsfirm.com*

Gregory S. Mullens (admitted *pro hac vice*)
75 Virginia Road, 2nd Floor
White Plains, New York 10603
Tel.: (415) 445-4006
*gmullens@bfalaw.com*

Eric Johnson (admitted *pro hac vice*)
Jennifer 'Jenny' Paulson (admitted *pro hac vice*)
One Court Street
Alton, IL 62002
Tel.: 618-693-3104
*ejohnson@simmonsfirm.com*
*jpaulson@simmonsfirm.com*

**DiCELLO LEVITT LLP**

By:    */s/ David A. Straite*
David A. Straite (admitted *pro hac vice*)
Corban Rhodes (admitted *pro hac vice*)
485 Lexington Avenue, Suite 1001
New York, NY 10017
Tel.: (646) 933-1000
*dstraite@dicellolevitt.com*
*crhodes@dicellolevitt.com*

Amy E. Keller (admitted *pro hac vice*)
Adam Prom (admitted *pro hac vice*)
Julia Veeser (admitted *pro hac vice*)
Ten North Dearborn St., Sixth Floor
Chicago, IL 60602
Tel.: (312) 214-7900
*akeller@dicellolevitt.com*
*aprom@dicellolevitt.com*
*jveeser@dicellolevitt.com*

*Counsel for Plaintiffs and the Proposed Class*

1

## ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)

2

I, Lesley E. Weaver, attest that concurrence in the filing of this document has been obtained

3

from the other signatories. I declare under penalty of perjury that the foregoing is true and correct.

4

Executed this 30th day of October, 2024, at Oakland, California.

5

6

*/s/ Lesley E. Weaver*
Lesley E. Weaver

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28