# EXHIBIT E1
## to Joint Attorney Declaration ISO Plaintiffs' Renewed Motion for Class Certification [Redacted]

# Expert Report of
# Russell W. Mangum, Ph.D., dated Oct. 13, 2021

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

PATRICK CALHOUN, et al.,
*Plaintiffs*,

v.

GOOGLE LLC,
*Defendant*.

C.A. No. 20-CV-05146-LHK

## EXPERT REPORT OF RUSSELL W. MANGUM III, PH.D. IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## October 13, 2021

## UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Patrick Calhoun, et al. v. Google LLC

# Table of Contents

I.   EXECUTIVE SUMMARY ...........................................................................................1

   I.A. Assignment ..................................................................................................1

   I.B. Qualifications ...............................................................................................2

   I.C. Documents Reviewed ...................................................................................3

   I.D. Summary of Conclusions .............................................................................4

II.  BACKGROUND ......................................................................................................4

   II.A. Summary of Allegations ..............................................................................4

   II.B. Plaintiffs and Class Members .....................................................................5

   II.C. Defendant ....................................................................................................6

   II.D. Overview of Google's Advertising Services ................................................8

   II.E. Advertisement Optimization .....................................................................11

   II.F. Consumer Personal Information Data as a Source of Value .......................13

III. ANALYSIS FRAMEWORK ...................................................................................14

IV.  DEFENDANT'S UNJUST ENRICHMENT .............................................................14

   IV.A. Personal Information of Browser Users Provides Significant Value to Advertisers and Google ..........................................................................15

     IV.A.1. Google's Internal Research Demonstrates the Value of Behavioral Advertising ..................................................................15

     IV.A.2. Peer-Reviewed Public Research Further Establishes the Value of Behavioral Advertising .........................................................17

   IV.B. Google's Unjust Enrichment Can be Calculated Using Methods Common to the Class ..................................................................................................20

V.   RESTITUTION OF VALUE OF PERSONAL INFORMATION ...............................23

   V.A. The Economic Value of Privacy ................................................................24

     V.A.1. Peer-Reviewed Research on the Value of Data Privacy .................26

     V.A.2. Consumer Payments to Protect Personal Information ...................30

   V.B. The Economic Value of Personal Information ............................................33

   V.C. Damages Can be Calculated using Methods Common to the Class ............35

VI.  CONCLUSION ......................................................................................................36

   

Patrick Calhoun, et al. v. Google LLC

# I.   EXECUTIVE SUMMARY

## I.A. Assignment

1.   I have been engaged by Simmons Hanly Conroy, Dicello Levitt Gutzler, and Bleichmar Fonti & Auld LLP, counsel for the putative class, to provide expert analysis, and, if necessary, expert testimony in the above listed matter pending in the United States District Court for the Northern District of California, San Jose Division, under Case No. 20-CV-05146-LHK. I understand Plaintiffs have accused Google LLC ("Google" or "Defendant") of wrongly collecting personal data from users of Google's web browser Chrome while they were not synced.[1] I have been asked to undertake the following tasks relating to an assessment of the economic impact to Plaintiffs resulting from Plaintiffs' allegations against Defendant:

- Determine the feasibility of ascertaining and calculating class-wide damages in this action attributable to Defendant's alleged misconduct;

- Similarly, determine the feasibility of ascertaining and computing Defendant's unjust profits attributable to Defendant's alleged misconduct; and

- Evaluate appropriate methodologies by which the magnitude of class-wide impact can be determined.

2.   I understand that at this stage of the legal proceedings, Plaintiffs are filing a motion for class certification. I have been requested to file this expert report to address, from an economics perspective, certain issues that may be pertinent to the class certification analysis. I understand the inquiry into the merits of the case will occur at some later date, at which time, I may be called upon to offer further analysis or testimony. At the same time, though they need not be resolved with finality at this stage of the case, merits issues or questions that play a role in my analysis of class certification issues have been addressed and analyzed.

3.   My analysis is conducted through an evaluation of evidence relevant to the facts of the case available at the time of submitting this report. Given the ongoing nature of the case and the

---

[1]   Class Action Complaint, July 27, 2020, ¶¶ 1–4.

Patrick Calhoun, et al. v. Google LLC

open status of discovery, if additional information becomes available, I may update my analysis appropriately.

4.      I understand this case has been brought against Google on behalf of Chrome users within the US who did not enable sync or disabled sync on the Chrome browser while browsing the internet over the relevant time period ("Class Members"), excluding browsing in Incognito mode. As discussed more fully below, the allegations I have been asked to address relate to Google failing to fulfill the terms of the Chrome contract agreements with said users.

5.      I understand the alleged damages class period to be July 27, 2016, through present ("Class Period").[2]

6.      For the purposes of my analyses, I assume that Defendant is liable. I have prepared this report given this primary operating assumption.

## I.B. Qualifications

7.      I am a Professor at Concordia University Irvine, School of Business and Economics. I am also the Executive Vice President of Cirque Analytics, an economics consulting firm established in 2021 with offices in Irvine, California, Los Angeles, California, Jackson Hole, Wyoming, and Washington DC. Cirque Analytics provides economic, financial, and statistical research and analysis to private and public sector clients in the United States and abroad.

8.      I hold a PhD and a MA in economics from the University of Southern California, and a BA in economics, with honors, from California State University, Fullerton. I have been actively employed in the area of economic analysis for over 25 years. After completing my graduate education, I served as an economist with the US Federal Trade Commission, Bureau of Economics, from July 1995 through August 1998. After leaving the Commission, I held positions as an economist and expert for Nathan Associates, PricewaterhouseCoopers, and Analysis Group. In 2021, I joined Cirque Analytics. I began teaching at Concordia University Irvine in 2013. Prior to that, I taught courses at Johns Hopkins University, The

---

[2]     Class Action Complaint, July 27, 2020, ¶ 1.

Patrick Calhoun, et al. v. Google LLC

University of Southern California, and Pepperdine University. During the Spring 2021 academic semester, I was a Visiting Researcher at the University of Winchester, School of Business, Law and Technology.

9.     I am or have been a member of several professional associations, including the American Economic Association, the Orange County Intellectual Property Law Association, the Los Angeles Intellectual Property Law Association, the American Bar Association, and the Licensing Executives Society, for which I previously served as the Chair of the Orange County Chapter. I have written articles and given presentations on various aspects of economic damages.

10.     I have often analyzed issues related to various economic matters, including economic impact and commercial damages. I have analyzed such claims and damages in many different industries, such as electronics, software, semiconductors, telecommunications, oil refining, agriculture, medical instruments, music and entertainment, apparel, and various consumer goods. I have been qualified as an expert in both state and federal courts and have analyzed and provided opinions regarding economic impacts in many cases, for both plaintiffs and defendants.

11.     Cirque Analytics charges $675 per hour for my work in this matter. Professional staff members employed by Cirque Analytics also assist me. Neither my compensation nor Cirque Analytics' is contingent upon the outcome of this case.

12.     My curriculum vitae is attached to this declaration as **Appendix 1**. Also included in **Appendix 1** is a list of the matters in which I have testified at deposition or trial in the past four years, along with a list of my publications for at least the past ten years.

## I.C. Documents Reviewed

13.     In conducting my analysis, I, or supporting staff at my direction, have reviewed various documents and materials provided to me in this case. Those documents include, but are not limited to, documents produced by Google, legal materials filed as part of this action, deposition testimony, publicly available materials, as well as academic and legal research.

---

The set of documents, materials, and information I considered are listed in this report, **Exhibits**, or in the attached **Appendix 2**. My analysis and conclusions are based on the information available to me. If additional relevant information becomes available, I will update my analysis appropriately.

### I.D. Summary of Conclusions

14.    Based on my analysis and review of the evidence and the facts of the case available to-date, I have determined the following:

- Assessment of economic damages attributed to Google's alleged wrongdoing is feasible based on the available evidence and data.

- The data and methodology relevant to the assessment and computation of the economic impact is common to the class.

- As a result of the alleged wrongdoing, Google obtained Class Members' valuable data and personal information. Given the data collection, Google earned additional profits, and thereby was unjustly enriched.

## II.     BACKGROUND

### II.A. Summary of Allegations

15.    Plaintiffs allege the putative Class Members' relationship with Google is governed by various contractual agreements, such as the Google General Terms of Service, the Chrome Terms of Service, and the Chrome Privacy Notice (collectively the "Chrome Agreements").[3] Pursuant to these agreements, Google was to provide Chrome users with use of the browser without Chrome sending, or Google collecting, any of their personal information data unless a user enabled the sync function.[4] According to Plaintiffs, Google promises that "[y]ou don't need to provide any personal information to use Chrome…" that "[t]he personal information that Chrome stores won't be sent to Google unless you choose to store that data in your Google Account by turning on sync," and that unless you are synced and have chosen to

---

3    Class Action Complaint, July 27, 2020, ¶¶ 26–28 and 351. *See, e.g.,* Google, "Google Chrome Privacy Notice," Sept. 23, 2021, https://www.google.com/chrome/privacy/ (hereinafter "Google Chrome Privacy Notice 2021"); Google, "Google Terms of Service," Mar. 31, 2020, https://policies.google.com/terms; Google, "Google Chrome and Chrome OS Additional Terms of Service," Jan. 1, 2021, https://www.google.com/chrome/terms/.

4    Class Action Complaint, July 27, 2020, ¶¶ 2, 6, and 36.

Patrick Calhoun, et al. v. Google LLC

"personalize your Google experience outside of Chrome, Google will only use your Chrome data after it's anonymized and aggregated with data from other users."[5] However, Chrome allegedly breaches its Chrome Agreements by sending Class Members' personal information data to Google regardless of whether a user is synced.[6] Similarly, Google allegedly collects Chrome users' personal information even if the user does not have a Google account and uses that information to create profiles of users.[7]

16.    According to Plaintiffs, the personal information collected by Google from Class Members includes, but is not necessarily limited to, information on IP addresses, unique cookie identifiers, browser identifiers, and other internet browsing history data.[8] I understand the data Google collected from Class Members did not differ from the data it collected from synced users, except in that Class Members did not consent to Google's access.[9] I explain in more detail below how Google was able to use the personal information of Class Members and synced users alike for targeted advertising thereby increasing Google's ad revenues and profits.

### II.B. Plaintiffs and Class Members[10]

17.    Each of the named plaintiffs is an adult residing in the US and has used the Chrome browser without enabling the sync feature or has disabled sync on one or more occasions. None of the plaintiffs has consented to Google obtaining his/her personal information from Chrome in general. However, Google received Plaintiffs' personal information from Chrome, including the content of communications.

---

[5]    Google Chrome Privacy Notice 2021; Class Action Complaint, July 27, 2020, ¶ 2 and Exhibit 33 (Chrome Privacy Notice at 5). These quotes appear in several other versions of Google Chrome's privacy notice. *See, e.g.,* Google, "Google Chrome Privacy Notice," Jan. 15, 2021, https://www.google.com/chrome/privacy/archive/20210115/; Google, "Google Chrome Privacy Notice," Sept. 24, 2018, https://www.google.com/chrome/privacy/archive/20180924/.

[6]    Class Action Complaint, July 27, 2020, ¶ 3.

[7]    Class Action Complaint, July 27, 2020, ¶ 3.

[8]    Class Action Complaint, July 27, 2020, ¶ 4.

[9]    Class Action Complaint, July 27, 2020, ¶¶145–152.

[10]    Class Action Complaint, July 27, 2020, ¶¶ 20–23.

     I understand there is a motion before the court for the withdrawal and addition of certain named plaintiffs. Plaintiffs' Reply Memorandum in Support of Motion to Substitute Plaintiffs, Oct. 1, 2021.

---

Patrick Calhoun, et al. v. Google LLC

18.   I understand that all persons in the US similarly situated to Plaintiffs, who used Chrome and
      did not enable the sync feature or who disabled it during the Class Period, are potential Class
      Members (excluding browsing while in Incognito mode). During the Class Period, Class
      Members used the Google Chrome browser governed by the Chrome Agreements, but
      Chrome did not disclose that Class Members' personal information would be sent to Google.

## II.C. Defendant

19.   Google is comprised of two segments: Google Services and Google Cloud.[11, 12] Google
      Cloud includes enterprise cloud services, namely the Google Cloud Platform for
      applications development, and Google Workspace collaboration tools.[13] The cloud division's
      revenue is primarily generated from fees earned from the cloud platform and collaboration
      tools.[14] Google Services is consumer focused with products including Android, Chrome,
      Gmail, Google Drive, Google Maps, Google Photos, Google Play, Google Search, and
      YouTube.[15] The Google Services group revenue includes advertising revenue as well as non-
      advertising revenue earned through app purchases, devices sales, YouTube subscriptions,
      and other products and services.[16]

20.   Google's revenue is largely generated through advertising, which, as shown in Table 1
      below, accounts for over 80 percent of total revenue.

---

[11]   Alphabet Inc., Form 10-K, FYE 2020, p. 6.

[12]   Alphabet Inc., a holding company, is a collection of businesses and is the parent company of Google, its largest
       business. Alphabet Inc., Form 10-K, FYE 2020, p. 5.

[13]   Alphabet Inc., Form 10-K, FYE 2020, p. 7.

[14]   Alphabet Inc., Form 10-K, FYE 2020, p. 7.

[15]   Alphabet Inc., Form 10-K, FYE 2020, p. 6.

[16]   Alphabet Inc., Form 10-K, FYE 2020, pp. 33–35.

---

Confidential — Attorneys' Eyes Only

Patrick Calhoun, et al. v. Google LLC

**Table 1. Annual Google Revenue Breakdown, 2016–2020**

|  | 2016 | | 2017 | | 2018 | | 2019 | | 2020 | |
|---|---|---|---|---|---|---|---|---|---|---|
|  | $MM | % | $MM | % | $MM | % | $MM | % | $MM | % |
| Google Advertising | $79,383 | 88% | $95,577 | 86% | $116,461 | 85% | $134,811 | 84% | $146,924 | 81% |
| Google Other | $10,601 | 12% | $10,914 | 10% | $14,063 | 10% | $17,014 | 11% | $21,711 | 12% |
| Google Cloud | N/A | N/A | $4,056 | 4% | $5,838 | 4% | $8,918 | 6% | $13,059 | 7% |
| Total Google Revenue | $89,984 | | $110,547 | | $136,362 | | $160,743 | | $181,694 | |

Sources: Alphabet's 2016–2020 10-K's.

Additional financial details for Google and Alphabet are provided in Appendix 3.

21.    At the heart of this case is Google's Chrome browser. The product is a web browser that works across platforms, such as Android, Windows, and iOS. Since its release in 2008, Chrome's usage has grown considerably and it now captures the majority of the US browser market.[17, 18] Over the Class Period, Chrome consistently accounted for nearly half of the US browser usage market. Figure 1 below shows the growth of Chrome's browser market share in the US since 2009.[19]

---

[17]    Google, "A fresh take on the browser," Google official blog, Sept. 1, 2008, https://googleblog.blogspot.com/2008/09/fresh-take-on-browser.html.

[18]    StatCounter, "Browser Market Share United States of America," *available at* https://gs.statcounter.com/browser-market-share/all/united-states-of-america/#monthly-200901-202108.

[19]    Based on total webpage visits.

Confidential — Attorneys' Eyes Only                                                                                    7

Patrick Calhoun, et al. v. Google LLC



**Figure 1. Chrome US Browser Market Share, 2009–2021**

Source: https://gs.statcounter.com/browser-market-share/all/united-states-of-america/#monthly-200901-202108

## II.D. Overview of Google's Advertising Services

22.     As explained above, Google sells various products and services to consumers and businesses, but ultimately earns most of its revenue through advertising services. The advertising revenues are generated through different channels, including Google Search and other Google properties (e.g., Google Play, Gmail, and Google Maps), YouTube, and third-party webpages (which constitute Google Network Member's properties).[20] Said differently, Google earns revenue through customers' placement of advertisements on both Google webpages and third-party webpages that make ad space available through the Google network. For example, advertisers bid for advertisement placement and then pay Google when a user clicks on that ad. In the case of third-party webpages, Google shares a percentage of the revenue with that website's creator ("publisher").

---

[20]   Alphabet Inc., Form 10-K, FYE 2020, pp. 33 and 59.

Patrick Calhoun, et al. v. Google LLC

23.    There are different types of ads depending on the location and targeting approach, namely Search ads and Display ads.[21] Search ads are shown to users after searching for a company or product, for example, on Google Search or Google Maps. Display ads are those shown when a user visits any site within Google's network of over 2 million websites, videos and apps.[22] As discussed more fully below, Google's platform and network enables advertisers to target their Display Ads to various consumer groups based on attributes, such as age, gender, parental status, and interests.[23]

24.    Google earns advertising revenue from its own webpages by selling advertisement placements on Google Search results pages, within users' Gmail accounts, in the Google Play marketplace, and on Google Maps search pages. Similarly, Google earns revenue through placements of advertisements on YouTube search results pages as well as from the video advertisements users view prior to viewing a selected YouTube video.

25.    Separate from advertisements on Google pages, advertisers may opt to place ads on third-party webpages that comprise Google Network Member properties.[24] These third-party network members use the Google network and platform to display relevant ads on their properties (i.e., webpages).[25] This way, advertisers are able to utilize the Google network to obtain maximum exposure for their ads to the most relevant audience. The third-party publishers then, receive compensation based on a fixed percentage of the advertisement fees charged by Google.[26]

26.    Google's advertising customers purchase ad space through various means within the Google technology portfolio, such as Google Ads, Ad Manager, AdMob, AdSense, and YouTube

---

[21]   Google, "Google Ads: How Google Ads works," accessed Oct. 8, 2021, https://ads.google.com/intl/en_id/home/resources/reach-larger-new-audiences/.

[22]   Google, "Google Ads: How Google Ads works," accessed Oct. 8, 2021, https://ads.google.com/intl/en_id/home/resources/reach-larger-new-audiences/.

[23]   Google, "Google Ads: How Google Ads works," accessed Oct. 8, 2021, https://ads.google.com/intl/en_id/home/resources/reach-larger-new-audiences/.

[24]   Google, "Google AdSense," accessed Oct. 4, 2021, https://www.google.com/adsense/start/.

[25]   Alphabet Inc., Form 10-K, FYE 2020, p. 6.

[26]   Google, "Google AdSense Help: AdSense revenue share," accessed Oct. 4, 2021, https://support.google.com/adsense/answer/180195?hl=en&ref_topic=1319755.

---

Patrick Calhoun, et al. v. Google LLC

Advertising.[27] Google Ads and YouTube Advertising are ad placement purchasing tools for advertisers,[28] whereas AdSense, AdMob, and Ad Manager are resources for website and application publishers. Each tool is tailored to a different form of advertising through Google. For example, AdSense acts as an ad network and is best for publishers of third-party pages, enabling the monetization of one's website.[29] Similarly, AdMob is a resource for publishers, but is an advertising network and platform tool focused on mobile device advertising.[30] Ad Manager serves as a platform geared towards large publishers with significant direct sales.[31] Google Ads, on the other hand, is a tool for advertisers to purchase ad placements on Google properties, such as Google Search and Google Maps pages, as well as third-party network websites and applications.[32] YouTube Advertising is, as it sounds, the mechanism for advertisers to purchase ad space on YouTube.[33]

27. Table 2 below summarizes Google's advertising revenue by advertisement channel. As shown in Table 2, the largest channel is Google properties (e.g., Google Search (google.com), Gmail, Google Maps), followed by ads from third-party network pages, and then YouTube ads.

---

[27] Alphabet Inc., Form 10-K, FYE 2020, pp. 34 and 59.

[28] In 2018, Google AdWords became Google Ads which represents the full range of advertising types through Google. Google, "Google Ads Help: Google AdWords is now Google Ads," accessed Oct. 4, 2021, https://support.google.com/google-ads/answer/9028765?hl=en.

[29] Google, "Compare Ad Manager, AdSense, and AdMob," accessed Oct. 4, 2021, https://support.google.com/admanager/answer/9234653.

[30] Google, "Compare Ad Manager, AdSense, and AdMob," accessed Oct. 4, 2021, https://support.google.com/admanager/answer/9234653.

[31] Google, "Compare Ad Manager, AdSense, and AdMob," accessed Oct. 4, 2021, https://support.google.com/admanager/answer/9234653.

[32] Google, "Google Ads," accessed Oct. 4, 2021, https://ads.google.com/home/.

[33] YouTube, "YouTube Advertising," accessed Oct. 4, 2021, https://www.youtube.com/ads/.

---

Confidential — Attorneys' Eyes Only

**Table 2. Google Advertising Revenue by Segment, 2017–2020 ($MM)**

| Year | Google Search and Other | YouTube ads | Third-party Network pages | Advertising Revenue |
|---|---|---|---|---|
| 2017 | $69,811 | $8,150 | $17,616 | $95,577 |
| 2018 | $85,296 | $11,155 | $20,010 | $116,461 |
| 2019 | $98,115 | $15,149 | $21,547 | $134,811 |
| 2020 | $104,062 | $19,772 | $23,090 | $146,924 |
| | $357,284 | $54,226 | $82,263 | $493,773 |

Sources: Alphabet 2019 10-K; Alphabet 2020 10-K.

Additional financial details for Google and Alphabet are provided in Appendix 3.

## II.E. Advertisement Optimization

28.   As Google explains, it makes money because its advertising tools "deliver relevant ads at just the right time."[34] Google describes a benefit of its ad products and services as the ability to target ads based on various criteria, including those specific to customers, such as location, age, and language.[35] Google further explains that as part of its advertising audience targeting, it categorizes consumers based on interest (e.g., sports, travel, car shopping, or visitors to company's website), intents, and demographics.[36] In fact, as Google markets to advertisers, its platform audience segment targeting enables advertisers to "reach people based on who they are, their interests and habits, what they're actively researching, or how they've interacted with your business."[37] Google clarifies that it identifies audience segments using data on user website pages history and past search history.[38, 39]

29.   There are three general categories of approaches to targeting advertisement placements. The first category is first-party and contextual information, which involves placing ads based on

---

[34]   Alphabet Inc., Form 10-K, FYE 2020, p. 6.

[35]   Google, "Google Ads Help: Benefits of online advertising and Google Ads," accessed Oct. 4, 2021, https://support.google.com/google-ads/answer/6123875?hl=en.

[36]   Google, "Google Ads Help: About audience targeting," accessed Oct. 4, 2021, https://support.google.com/google-ads/answer/2497941?hl=en.

[37]   Google, "Google Ads Help: About audience targeting," accessed Oct. 4, 2021, https://support.google.com/google-ads/answer/2497941?hl=en.

[38]   Google, "Google Ads Help: About audience targeting," accessed Oct. 4, 2021, https://support.google.com/google-ads/answer/2497941?hl=en.

[39]   I understand Google Ads also has a feature where advertisers may refine an ad campaign to users that have previously visited their website, referred to as "remarketing lists for search ads" or "RLSA." RLSA features may lead to increased ad prices and revenue. I further understand that at this point certain RLSA information has not been produced.

---

the content of the website itself; for example, putting an ad for strollers on a website for baby names. The second category is the use of general information about the interests of the user (e.g., "show this ad to Classical Music Lovers"), which are "typically inferred based on observing what sites or pages they visit," using tracking techniques like third-party cookies or device fingerprinting.[40] The third approach is based on specific previous browsing history or online activity of the user (e.g., "offer a discount on some shows that you left in the shopping cart").[41] Contextual advertising, which aligns the content of ads with the content of the website itself, is used by Google to target ads by using keyword analysis and other factors to determine what the webpage is about before placing ads based on the content.[42] The second and third categories are considered behavioral advertising, and rely on personal information from browser users, such as the data collected from Class Members by Google without consent.

30.   Online behavioral advertising refers to "any process used whereby data are collected across multiple web domains owned or operated by different entities to categorize likely consumer interest segments for use in advertising online."[43] Google uses personalized advertising since it determines users' interest based on previous activity.[44] Behavioral advertising allows advertisers to better align ad campaigns to the users' observed preferences, thereby increasing the effectiveness of the advertisement. A 2010 study by Howard Beales found that the price advertisers paid for behaviorally targeted ads was 2.68 times more than standard network advertising and that the behaviorally targeted advertisements were more

---

[40]   GitHub, "Federated Learning of Cohorts (FLoC)," n.d. (GOOG-CALH-00030186–188). A cookie is a small file that is sent to a user's computer when the user visits a website and therefore allows the website to recognize the user's browser in subsequent visits. A third-party cookie is created by a site other than the webpage you are visiting that owns some of the content, like ads, on the webpage. *See* Google Chrome Privacy Notice 2021; Google Chrome Help, "Clear, enable, and manage cookies in Chrome," accessed Oct. 4, 2021, https://support.google.com/chrome/answer/95647.

[41]   GitHub, "Federated Learning of Cohorts (FLoC)," n.d. (GOOG-CALH-00030186–188).

[42]   Google, "Ways in which ads are targeted to your website," n.d. (GOOG-CALH-00014555).

[43]   Network Advertising Initiative, "2008 NAI Principles: The Network Advertising Initiative's Self-Regulatory Code of Conduct," accessed Oct. 4, 2021, https://www.networkadvertising.org/principles.pdf.

[44]   Google, "Ways in which ads are targeted to your website," n.d. (GOOG-CALH-00014555).

Patrick Calhoun, et al. v. Google LLC

successful.[45] Similarly, another empirical study in 2009 found the clickthrough rate ("CTR")[46] increased by as much as 670% with behavioral targeting.[47]

## II.F. Consumer Personal Information Data as a Source of Value

31.   It is well understood that as a matter of economics, information has value. Information on markets, products, competitors, and/or customers enable companies to make more effective business and profit maximizing decisions.[48] Value associated with information, particularly consumer information, is more than just a theoretical concept. According to the annual PwC survey of CEOs, data on customer and client preferences was rated as the most critical category of data.[49]

32.   As mentioned above, and discussed more fully below, information on customers is a material contributor to the success of Google's advertisement business. Part of Google's advertising strategy is to use behavioral targeting, which is reliant on personal information, to refine the user audience.[50] Google is thereby able to assist advertisers in promoting ads to the appropriate audience, increasing the likelihood of revenue generation and therefore the value to Google's advertiser customers.[51]

33.   The following sections will address how Google has benefited from the use of customer information and from the personal information of Class Members specifically. I also discuss

---

[45]   Howard Beales, "The Value of Behavioral Targeting," *Network Advertising Initiative,* Mar. 2010.

[46]   Clickthrough rate, a metric to assess the effectiveness of online advertisements, refers to number of clicks for an ad compared to the number of times the ad is shown. Google, "Google Ads Help: Clickthrough rate (CTR): Definition," *available at* https://support.google.com/google-ads/answer/2615875?hl=en.

[47]   *See* Jun Yan, Gang Wang, En Zhang, Yun Jiang, and Zheng Chen, "How Much Can Behavioral Targeting Help Online Advertising?" *WWW 2009 MADRID!*, 2009, http://www2009.eprints.org. The article states:

>   Through studying ads CTR before and after user segmentation for ads delivery, we observe that ads CTR can be improved by as much as 670% over all the ads we collected. The t-test results, which are very close to zero, confirm the statistical significance of CTR improvements. In addition, we notice that if we can further design more advanced BT strategies, such as novel user representation approaches and novel user segmentation algorithms, ads CTR can be further improved beyond 1,000%.

[48]   *See e.g.*, Robert S. Pindyck and Daniel Rubinfeld, *Microeconomics* (Upper Saddle River: Pearson Education, Inc., 2013), 174–175.

[49]   PwC, "22nd Annual Global CEO Survey," 2019, *available at* https://www.pwc.com/gx/en/ceo-survey/2019/report/pwc-22nd-annual-global-ceo-survey.pdf.

[50]   Google, "Behavioral targeting," accessed Oct. 4, 2021, https://support.google.com/displayvideo/answer/2879688?hl=en.

[51]   Alphabet Inc., Form 10-K, FYE 2020, p. 6.

---

the economic value of this personal information, and of the protection that consumers seek for this data.

## III.   ANALYSIS FRAMEWORK

34.   The economic analysis framework is centered on the claim that Google wrongly collected personal data from Class Members, financially gained from use of the data, and failed to provide Class Members with a browser product that adhered to the privacy policies as agreed to in the Chrome Agreements.

35.   As discussed above, the data Google collected includes information on IP addresses, unique cookies and other browser and device identifiers, and other internet browsing history data. These data constitute a consumer's online profile or identity. The personal information data that Google improperly collected has economic value to the user, to Google, and in the marketplace generally. Thus, the economic impact assessment consists of analysis of defendant's profits, as well as analysis of the value of the user data and user data protection.

36.   First, given the claim that Google was unjustly enriched, Google's excess profits due to the alleged conduct are assessed. This disgorgement of defendant's profit analysis includes identification of excess profit, as well as a proposed profit allocation method.

37.   Second, I analyze the value of the data collected inappropriately by Google as indicated by direct and indirect evidence, such as various market measures and evidence on consumer preferences. These measures include studies on consumer's value of data privacy, market datapoints reflecting third-parties' willingness to pay for online consumer data, and consumers' payments to reduce or block access to consumer profile or identity data.

## IV.   DEFENDANT'S UNJUST ENRICHMENT

38.   As described in the prior section, Plaintiffs have claimed that Google was unjustly enriched as a result of the alleged misconduct. This requires a disgorgement of the profits that Google derived from Chrome due to the personal information it improperly collected from Class Members and would not have otherwise received had Google not violated the Chrome

Patrick Calhoun, et al. v. Google LLC

Agreements. In this section I discuss some of the evidence available that can be used to reliably identify the portion of Google's profits attributable to the alleged misconduct.

## IV.A. Personal Information of Browser Users Provides Significant Value to Advertisers and Google

39.    As explained above, having access to a user's personal information allows for more targeted advertising, such as behavioral advertising, that is more effective and more valuable to the advertiser and therefore to Google. The impact of behavioral advertising on website revenue is demonstrated through public research as well as through Google's own internal studies. The personal information that Google received from Class Members in breach of the Chrome Agreements translates to additional profits that Google would not have received absent the alleged misconduct.

### IV.A.1. Google's Internal Research Demonstrates the Value of Behavioral Advertising

40.    The first piece of economic evidence is from Google itself. Google performed an experiment on the effect of disabling third-party cookies on publisher (i.e., website) revenue. The goal of the experiment was to "empirically quantify the effect that disabling access to third-party cookies would have on the programmatic ad revenue of web publishers."[52] Google's randomized controlled experiment focused on the top 500 global publishers. To perform the experiment, Google disabled access to cookies for a small fraction of randomly selected users. The primary finding was that average revenue for publishers decreased by 52 percent and median revenue decreased 64 percent. ███████████████████████████████ ███████████████████████████████.[53]

41.    ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████[54] For instance, in a product update post, Google noted publicly that "Recent studies have

---

[52]  Deepak Ravichandran and Nitish Korula, "Effect of disabling third-party cookies on publisher revenue," Aug. 27, 2019 (GOOG-CALH-00040905–907).

[53]  ████████████████████████████████ (GOOG-CALH-00070750–754 at 752).

[54]  See, e.g., Deepak Ravichandran and Nitish Korula, "Effect of disabling third-party cookies on publisher revenue," Aug. 27, 2019 (GOOG-CALH-00040905–907).

---

shown that when advertising is made less relevant by removing cookies, funding for publishers falls by 52% on average."[55]



42.

43.

44.

---

[55] Justin Schuh, "Building a more private web," Google, Aug. 22, 2019 (GOOG-CALH-00030128–129).

[56] Hjun, mohitb, and gberntson, "High-Level Design: PPID for Programmatic," Jan. 27, 2020 (GOOG-CALH-00030556–563).

[57] Email from Allie Bodack, Google, to ads_breaking, "AdExchanger + Digiday: Publisher/Personalized Ads Analysis," Sept. 3, 2019 (GOOG-CALH-00491018–1021).

[58] (GOOG-CALH-00070142–145).

[59] (GOOG-CABR-00137199–233 at 220).

[60] (GOOG-CABR-00134120–126).

[61] (GOOG-CALH-00046046–6060 at 6050 and 6053).

[62] (GOOG-CALH-00046046–6060 at 6048).

[63] GOOG-CABR-00112576.xlsx.

[64] GOOG-CABR-00112576.xlsx.

---



45. This consistent reiteration of Google's own research findings makes clear that Google was well informed about the value behavioral advertising provided to publishers, and by extension, to Google's advertising business.

### IV.A.2. Peer-Reviewed Public Research Further Establishes the Value of Behavioral Advertising

46. Google's 52 percent finding exactly mirrored the findings of a study conducted by Professor Garrett Johnson (and others) from Boston University using a different method and data.[66] I discuss his academic research and findings, along with other public research findings that address the impact of cookies and other user tracking mechanisms on publisher revenues.

47. Similar to Google's study, this study found a 52 percent reduction in revenue associated with considerations of consumer privacy. The team was able to utilize transaction data from an ad exchange and exploiting consumers who opt-out of personalized ads through AdChoices. The study exploits the finding that 0.23 percent of users have opted out of personalized ads by making proactive selections through AdChoices. Their finding of a 52 percent reduction in revenue is found to be equivalent to a loss of $8.58 in ad spending per American opt-out consumer. This paper also finds that opt-out users tend to be more technologically sophisticated and that opt-out rates tend to be higher in older and wealthier American cities.[67]

48. As background, the AdChoices program grew out of a 2009 FTC report on online behavioral advertising.[68] Industry participants formed the DAA consortium with the goal of setting self-

---

65  GOOG-CABR-00112576.xlsx.

66  Garrett A. Johnson, Scott K. Shriver, and Shaoyin Du, "Consumer privacy choice in online advertising: Who opts out and at what cost to industry?" *Marketing Science* 39, no. 1 (Jan.–Feb. 2020): 33–51 (hereinafter "Johnson 2019").

67  Johnson 2019, p. 4.

68  Johnson 2019, pp. 7–10; FTC, "Self-Regulatory Principles For Online Behavioral Advertising," Feb. 2009.

regulatory principles to coincide with the findings from the 2009 FTC report.[69] AdChoices launched in October 2010. The basics of the AdChoices program are that internet users are able to opt-out of personalized advertisements through a cookie. The user clicks on an icon and the user is then directed to a website with the option of opting out of personalized advertisements. Within two years, the AdChoices program extended to about 90 percent of websites in the online behavioral advertising market. The opt out mechanism provided by AdChoices is not considered particularly strong as an internet user can erase their opt-out choice by simply clearing the cookies on their browser (something I understand that users who do not want personalized ads may regularly do). As such, Johnson 2019 finds that only 0.23 percent of US users within the data collected have opted out of personalized ads.[70]

49.  As additional background, online display ads are sold through two channels: guaranteed contracts and real-time auctions. Real-time auctions in 2015 accounted for 31 percent of US online display ad spending and behavioral advertising is concentrated on the real-time auction channel.[71] The data for the analysis consist of "online display ad transactions processed over one week in June 2015" obtained from an ad exchange, "which is a clearinghouse for real-time auctions."[72] An ad exchange has the benefit of observing all sides of the transaction, including the supply of impressions and prices. Certain users are automatically excluded from the analysis: ad-blocking users because their browser extensions prevent the ad request from being sent to the ad exchange.[73]

50.  Prices are observed in the data in terms of the price paid per thousand impressions (CPM). A second-price auction system is utilized (the winning bidder pays the amount bid by the second highest-bidder).[74] And the distribution of prices have a very long right-hand tail (some impressions have very high prices relative to the mean and median prices). The authors find that 67.4 percent of impressions are sold on the exchange, indicating that many

---

69  Johnson 2019, pp. 7–10; Digital Advertising Alliance, "About the Digital Advertising Alliance," DAA, accessed on Oct. 5, 2020, https://digitaladvertisingalliance.org/about.

70  Johnson 2019, pp. 16.

71  Johnson 2019, p. 10.

72  Johnson 2019, pp. 10–11.

73  Johnson 2019, pp. 10–13.

74  Note, I understand that Google transitioned to a first-price auction system starting in 2019. *See, e.g.,* Google, "2019 Google Ad Manager releases archive," Q4 2019 (GOOG-CABR-00034698–709 at 698).

impressions are not sold given prices bid were below the reserve price. US users are found to account for 50.6 percent of the impressions sampled by the authors.[75]

51.    The authors for the Johnson 2019 analysis perform a variety of regression specifications and obtain a number of marginal effects of the opt-out effect on advertising spending. The five values presented range from a reduction in price of 37.45 percent to 52.04 percent (focusing on US).[76] Using a difference-in-differences estimator, the authors find similar results.[77]

52.    The authors note that the estimates provided in their paper "can estimate industry willingness to pay," but that they "are unable to compute consumer's valuation for privacy."[78] The authors find that the people who choose to opt out have a greater valuation of privacy.[79] The finding then of a 52 percent reduction in revenue presents a reasonable metric for the outside valuation of a consumers' privacy information.

53.    Professor Johnson continued to back up the findings of his team (along with Google's that were reported at a similar time) through articles and his presence on Twitter. For instance, one author noted that "cookies increase ad prices by a factor of two to three" and that "without behavioral targeting, prices fell by half."[80] Professor Johnson also publicly announced his research findings through Twitter and then continued the discussion by citing Google's findings when they came out.[81]

54.    Two additional studies support the findings from Johnson's team and Google. Goldfarb and Tucker studied 9,596 ad campaigns and obtained an estimate of 65 percent for the value of

---

[75]  Johnson 2019, pp. 13–14.

[76]  Johnson 2019, Table 3.

[77]  Johnson 2019, Table 4.

[78]  Johnson 2019, p. 28.

[79]  Johnson 2019, p. 28. *See also* Alessandro Acquisti, Leslie K. John, and George Loewenstein, "What is Privacy Worth?" *The Journal of Legal Studies* 42, no. 2 (June 2013): 249–274; Aleecia M. McDonald and Lorrie Faith Cranor, "Americans' Attitudes About Internet Behavioral Advertising Practices," *Proceedings of the 9th annual ACM workshop on Privacy in the electronic society,* WPES 2010: 63–72.

[80]  Sarah Sluis, "Marketing Professor Garrett Johnson Wants You To Know That Cookies Increase Ad Revenue," *Ad Exchanger,* Sept. 3, 2019.

[81]  *See, e.g.,* Garrett Johnson, @garjoh_canuck, Twitter, Apr. 15, 2019, https://twitter.com/garjoh_canuck/status/1117874397191163904; Garrett Johnson, @garjoh_canuck, Twitter, Aug. 22, 2019, https://twitter.com/garjoh_canuck/status/1164566217602031621?s=20.

Patrick Calhoun, et al. v. Google LLC

cookies after a cookie-restriction policy was established in Europe.[82] And Beales and Eisenach studied two ad exchanges and a large, multi-site publisher and found a reduction of more than 66 percent for cookieless impressions fetching lower prices than new cookied impressions.[83]

55.    These studies demonstrate how much publishers value behavioral advertising and the personal information on which it relies. Since the value and effectiveness of ads directly contribute to Google's ad revenue and profits, Google therefore places significant economic value on personal information and behavioral advertising as well.

## IV.B. Google's Unjust Enrichment Can be Calculated Using Methods Common to the Class

56.    Identifying Google's profit premium due to the collection of the consumer identity data from Class Members vis-à-vis Chrome is a multistep process. First, Google's revenue associated with Chrome is identified. Next, the increase in Chrome-related revenue attributable to the personal information gained from Class Members is computed to isolate the revenue premium. Lastly, costs are accounted for to determine the profit on the revenue premium. The calculation outlined below is based on available evidence, including internal Google documents, as well as publicly available information.

57.    

[82]    Avi Goldfarb and Catherine Tucker, "Privacy Regulation and Online Advertising," *Management Science* 51, no. 1 (2011): 57–71.

[83]    J. Howard Beales and Jeffrey A. Eisenach, "An Empirical Analysis of the Value of Information Sharing in the Market for Online Content," Navigant Economics, Jan. 2014, pp. 1–15.

[84]    ████████████████████████████████████████████████████████████████

[85]    Alphabet Inc., Form 10-K, FYE 2020, p. 36; Alphabet Inc., Form 10-K, FYE 2018, p. 30.

Patrick Calhoun, et al. v. Google LLC

58.     While not all advertising utilizes on personal information (since Google engages in some
        degree of contextual advertising).[86] In the ordinary course of business, Google has expressly
        stated



59.     To estimate the portion of revenue relevant to the Class, the percentage needs to account for
        users who are not synced.



60.     As detailed above, ▮▮▮▮▮▮▮▮▮▮▮▮ independent third-party research
        show that removing access to consumer identity information reduces advertising revenue by
        52 percent. If Google had not received the personal information from Class Members, then
        this portion of revenue that can be attributed to the information improperly collected from
        Class Members, would be reduced by 52 percent. The resulting calculation of ▮▮▮▮▮ of
        Display Ad revenue represents the revenue premium that Google received as a result of the



Patrick Calhoun, et al. v. Google LLC

alleged misconduct. ███████████████████████████
███████████████████████████████

**Table 3. Google's Revenue Premium Calculation**

| Description | Input or Calculation | Percentage Estimate |
|---|---|---|



61. ████████████████████████████████
████████████████████████████████
████████████████████████████

62. ██████████████████████████████████
██████████████████████████████████
████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
███████

---

90  *See* Exhibit 3.
91  *See, e.g.,* Alphabet 2018 10-K, pp. 35 and 56; Alphabet 2020 10-K, pp. 55 and 66.

63.   Following the analysis outlined above, Google's unjust enrichment may be computed based on the following formula:

Google Profit Premium = Revenue Premium %[92] × Display Ads Revenue[93] × Profit %[94]

64.   I understand that Google has provided monthly data on the US Google accounts that had sync enabled.[95] It is reasonable to expect Google to be able to provide monthly data on the total number of Google accounts and therefore the number of non-synced Google accounts on a monthly basis can then be estimated. The profit premium computed above may then be allocated based on the number of Google account months.[96]

## V.   RESTITUTION OF VALUE OF PERSONAL INFORMATION

65.   I discuss above Google's unjust enrichment in terms of additional revenue and profit generated as a result of its misconduct. However, this does not address the harm incurred by Class Members due to Chrome's violation of the privacy terms in the Chrome Agreements. In this section, I discuss the reduction in value of browsing services received by Chrome users as well as the value of the personal information improperly obtained by Google.

66.   The economic value of the Class Members' personal information collected by Google can be analyzed from two angles: 1) estimating the value Class Members place on privacy protections; and 2) assessing the value of Class Members' personal information itself. I discuss approaches to estimating consumer value of personal information and privacy protection, including direct and indirect evidence, as found in peer-reviewed studies and as

---

92   See Table 3.
93   See Table 2.
94   See Exhibit 3.
95   Defendant's Responses and Objections to Plaintiffs' First Set of Interrogatories (Nos. 1–7), Response to Interrogatory No. 3, Sept. 30, 2020. Google can use User Metrics Analysis to determine the count of unique users which had Chrome Sync enabled. *See* Deposition of David Monsees, Apr. 9, 2021 (volume 1), pp. 211–212 and Exhibit 11. *See also* [REDACTED] GOOG-CALH-00029294–296 at 295).
96   Google tracks and segments browser profiles by account. *See, e.g.,* Deposition of David Monsees, June 11, 2021 (volume 2), pp. 452 and 456–457. [REDACTED] (GOOG-CABR-00355077–5082 at 5078).

evidenced in actual marketplace transactions. The market measures corroborate and support the notion that consumer data is valuable.

## V.A. The Economic Value of Privacy

67.  Class Members entered into an exchange with Google expecting to receive browsing services, pursuant to the Chrome Agreements, in which their personal information would be stored by Chrome but not sent to Google unless the Chrome user turned on sync.[97] However, the service that Class Members did receive was one in which Chrome shared personal information with Google, breaching this privacy policy and violating Class Members' privacy their knowledge or consent.

68.  The difference in economic value between the services agreed upon and those received constitutes damages since Class Members did not receive the full benefit of the bargain that both parties agreed to. The difference between the services agreed to and those received is the value of Chrome not sharing personal information with Google. A Chrome user that did not sync, agreed to store his/her information locally on Chrome on their own computing device, but did not consent to that information being shared more broadly to Google and used for other purposes.[98] Google's violation of the Chrome Agreements in using the non-synced user's personal information outside of the parameters that were agreed upon has an economic value to Google based on data that is also valuable to the Class Member.

69.  Assessing this reduction in economic value received by consumers relates to demand for selected features of Chrome as well as for the browsing service overall. Conceptual shifts in consumer demand can result from a change in one or multiple determinants of demand. The determinants of demand may include factors such as income, prices of related goods, and/or consumer tastes.[99] Had Chrome represented to its users at the time of agreement to terms of service that user's data would be automatically sent to Google (instead of explicitly stating that the personal information Chrome stores *won't* be sent to Google), users may not have

---

[97]  Class Action Complaint, July 27, 2020, ¶ 2.

[98]  Class Action Complaint, July 27, 2020, ¶ 2; Plaintiff's Responses and Objections to Defendant's Second Set of Interrogatories (Nos. 6–9), Response to Interrogatory No. 6, Mar. 12, 2021.

[99]  Robert S. Pindyck and Daniel Rubinfeld, *Microeconomics* (Upper Saddle River: Pearson Education, Inc., 2013), Ch. 2.

Patrick Calhoun, et al. v. Google LLC

been willing to enter into the agreement that they did in the real world. In other words, how the Class Member's data is utilized contributes to the value the user places on Chrome's browsing service, and when that threshold of privacy that was agreed upon and expected is not met, the Class Member is harmed by the economic value of that difference in service.

70.   Determining the economic value of that difference in service as a result of Chrome's breach in contract comes down to assessing the value that browser users place on their privacy and control of their own personal information. This damage impact and corresponding reduction in economic value received by Class Members can be estimated using survey data.

71.   Use of survey data is a recognized approach for economic impact assessments, including analyzing the demand for a particular feature of a product/service. For example, according to the *Reference Manual on Scientific Evidence*, "a survey could evaluate the desirability of a new feature for a product and the premium that consumers will pay for it."[100] The *Reference Manual* further notes "[a]nother situation arises when the data can only be obtained by interviewing individuals. This often arises because damages hinge on consumer preference."[101] Use of survey data is consistent with, and further supported by, Google's own use of surveys in the ordinary course of business. Evidence in this case reveals that Google commissions and considers surveys when assessing the performance, pricing, and decisions relating to its products.[102] I discuss below a specific approach, called conjoint analysis, that utilizes surveys to apportion values for individual component characteristics from the overall value of a product or service. Conjoint analysis is an analysis methodology accepted and used for market research in commercial practice, public policy, and academic environments and has also, at times, been utilized by Google in its own research.[103, 104]

---

[100] *Reference Manual on Scientific Evidence,* Third Edition, Federal Judicial Center: Committee on Science, Technology, and Law Policy and Global Affairs, p. 470.

[101] *Reference Manual on Scientific Evidence,* Third Edition, Federal Judicial Center: Committee on Science, Technology, and Law Policy and Global Affairs, p. 483.

[102] See, for example, ███████████████████████████████████████████████████████████████ (GOOG-CALH-00079151–202 at 162–185).

[103] Paul Green and V. Srinivasan, "Conjoint Analysis in Consumer Research: Issues and Outlook," *The Journal of Consumer Research* 5, no. 2 (Sept. 1978): pp. 103 and 116–117; Anders Gustafsson, Andreas Herrmann, and Frank Huber, *Conjoint Measurement: Methods and Applications* (Springer, 2003), pp. 5–8.

Patrick Calhoun, et al. v. Google LLC

72.    This section addresses the value of personal information privacy as estimated by 1) peer-reviewed conjoint analyses evaluating various privacy concerns; and 2) established market measures of users' payments for privacy measures (such as products designed to preserve user data and prevent any unauthorized data access or sharing).

### V.A.1. Peer-Reviewed Research on the Value of Data Privacy

73.    Conjoint analysis is a quantitative assessment of consumers' value associated with a particular feature of a product while controlling for other exogenous features and market factors.[105] Here, the feature is the personal information protection, and the product is Chrome's browsing services.

74.    A basic objective of a conjoint analysis is to allocate the value or utility of a product/service into the values attributable to individual features and attributes (the "part-worth"). Such analysis may be useful for market research, such as pricing and feature additions/updates decision inquiries.

75.    Conjoint analysis includes surveying consumers or potential consumers on product selections among various versions of the product/service at issue. For example, respondents are presented with numerous product options with alternative sets of features and product prices. Respondents are instructed to select the preferred choice or rank the choices given the presented product alternative and price combination options. Through numerous iterations of this process, data is collected from which datasets may be created to document consumer choices when faced with various product options.

76.    Given the consumer choice dataset, statistical analysis, such as regression analysis, is then applied to isolate the value associated with individual product features or attributes. Importantly, proper statistical analysis of the consumer choice data enables the estimation of

---

[104]  Chris Chapman, Kate Krontiris, John S. Webb, *Profile CBC: Using Conjoint Analysis for Consumer Profiles*, Proceedings of the 18th Sawtooth Software Conference, Mar. 2015, pp. 185–196, *available at* https://sawtoothsoftware.com/resources/technical-papers.

[105]  Paul Green and V. Srinivasan, "Conjoint Analysis in Consumer Research: Issues and Outlook," *The Journal of Consumer Research* 5, no. 2 (Sept. 1978): p. 103; Anders Gustafsson, Andreas Herrmann, and Frank Huber, *Conjoint Measurement: Methods and Applications* (Springer, 2003), pp. 7–8.

Patrick Calhoun, et al. v. Google LLC

the economic value of a particular feature and its contribution to the overall economic value of a product while controlling for the value and contribution of other features. Ultimately, the conjoint analysis separates the economic value of the feature at-issue from other value contributing factors.

77.   Accordingly, conjoint analysis can be used to estimate the reduction in market value, if any, due to Chrome violating its Chrome Agreements and sharing with Google the personal information of Chrome users that did not enable sync.

78.   There are sufficient survey and conjoint studies in this industry such that the value of personal information protection can be estimated. Dr. Il-Horn Hann, Dr. Kai-Lung Hui, Dr. Sang-Yong Tom Lee and Dr. Ivan P. L. Png conducted a survey and conjoint analysis addressing this issue which was published in the *Journal of Management Information Systems*.[106]

79.   Hann et al. conducted a study to assess the value online consumers place on privacy concerns and potential benefits of sharing personal information with a website. Specifically, Hann et al. analyzed three privacy concerns: 1) deliberate or accidental errors in the user's personal data; 2) improper access to personal information, where a user's personal information is not restricted to authorized personnel; and 3) secondary use of personal data, where the personal information provided may be used for purposes other than the primary or stated purpose. Hann et al. also looked at two potential benefits of sharing personal information with websites: 1) monetary rewards or promotions that websites may offer, such as discounts, free shipping or products, or simple cash incentives, in exchange for personal information; and 2) the convenience / time savings that a user receives when providing personal information to a website that the consumer accesses with some level of frequency. The 268 survey respondents from the US and Singapore were asked to rank, from "most preferred" to "least preferred," 18 hypothetical website portals with differing characteristics according to the five dimensions (error review, improper access, unauthorized secondary use, monetary reward,

---

[106]   Il-Horn Hann, Kai-Lung Hui, Sang-Yong Tom Lee and Ivan P. L. Png, "Overcoming Online Information Privacy Concerns: An Information-Processing Theory Approach," *Journal of Management Information Systems* 24, no. 2, pp. 13–42 (hereinafter "Hann et al., 2007").

Patrick Calhoun, et al. v. Google LLC

and time savings) above. Hann et al. then analyzed the trade-offs between the various privacy and benefit outcomes to determine the marginal utility (or "part-worth") of each dimension as measured by the rank (or "motivational score") assigned to the websites by the respondent.[107]

80.   Hann et al. confirm that users are willing to give up some of their privacy for economic incentives and they estimate the value that online consumers place on the different dimensions of privacy. The survey respondents in the US revealed that a dollar of monetary reward increased the motivational score of a website by a range of 0.181 to 0.265 per dollar of monetary reward.[108] This range of marginal utility per dollar reward provides a dollar measure that can then be used to convert the part-worth values of the different privacy protections to dollar values. For example, Hann et al. find that when a web site has a privacy policy that restricts against improper access of personal information, survey respondents rank that website higher, increasing the motivational score by 3.007 (out of 18).[109] Since, for US respondents, the marginal utility per dollar of monetary reward is 0.181–0.265, then the range in value that respondents placed on restriction against improper access of personal information is $11.34–$16.61.[110] Hann et al. provides this breakdown for the three privacy dimensions, recreated below:

---

[107]   See Hann et al., 2007, pp. 22–23. The authors explain their conjoint analysis methodology:

> The basic estimation procedure underlying the conjoint analysis is a main effects analysis of variance (ANOVA), which computes utilities such that the rank ordering of the sums of each alternative's set of part-worths is the same as the actual rank ordering of the alternatives. The basic building block of our conjoint analysis is built on the following model:

$$Ranking = \alpha + \sum_{j \in \{\$10, \$20\}} Outcome_{\text{Fin. Rew.}, j} * PW_{\text{Fin. Rew.}, j}$$
$$+ \sum_{k \in \{dly, wkly\}} Outcome_{\text{Freq.}, k} * PW_{\text{Freq.}, k} + Outcome_{\text{Error}} * PW_{\text{Error}}$$
$$+ Outcome_{\text{Sec. Use}} * PW_{\text{Sec. Use}} + Outcome_{\text{Unauth. Access}} * PW_{\text{Unauth. Access}} + \varepsilon.$$

[108]   An increase from $5 to $10 of monetary reward increased the motivational score by 1.327. 1.327 ÷ ($10 − $5) = 0.265 increase in motivational score per dollar of reward. An increase from $10 to $20 of monetary reward increased the motivational score by 1.814. 1.814 ÷ ($20 − $10) = 0.181 increase in motivational score per dollar of reward. See Hann et al., 2007, Table 2, p. 29.

[109]   Hann et al., 2007, Table 2, p. 27.

[110]   (3.007 marginal utility) ÷ (0.181 marginal utility per dollar) = $16.61. (3.007 marginal utility) ÷ (0.265 marginal utility per dollar) = $11.34. I understand the figures in the text differ slightly from those presented in Table 4 due to rounding. The calculations in the text are for purposes of illustration – the figures presented in Table 4 and in Hann et al., 2007, Table 3 are used for the calculation of damages.

---

Patrick Calhoun, et al. v. Google LLC

**Table 4. Value of Privacy**

| Web site privacy policy | Value (USD) | | |
|---|---|---|---|
| | United States | | Singapore |
| Review for error | $11.18 | - $16.36 | $10.45 |
| Restriction against improper access | $11.33 | - $16.58 | $19.73 |
| Secondary use not allowed | $7.98 | - $11.68 | $26.93 |

*Source:* Hann et al., 2007, Table 3.

81.    The value Chrome users place on the privacy protection of Chrome not sharing their personal information with Google can be estimated using two of the three privacy dimensions that Hann et al. studied: 1) restriction against improper access and 2) secondary use not allowed.[111] The claims at issue relate to data stored by Chrome that is sent to Google, as opposed to error in the storage of data at Chrome. Totaling these values we can conclude that, among US subjects, protection against improper access and secondary use of personal information is worth between $19.31 and $28.26.[112] Adjusting from 2007 dollars to 2016 dollars yields $22.48–$32.90.[113]

---

[111] To measure the value of restriction against improper access Hann et al. assigned the different web portals that the survey respondents were asked to rank, one of the two following characteristics: either the portal stated that 1) it had no policy on access to personal information or that 2) only authorized personnel from within the company, who have been trained in privacy issues, would be able to access to the personal information.

Hann et al. assigned each web portal one of two characteristics relating to the secondary use to ascertain the value users placed on that restriction. The portal stated either states that 1) the personal information will not be used for any purpose other than it's intended use (for facilitating stock quotations or transactions in the financial portal example) or that 2) the personal information may be analyzed for other purposes, such as revealing the user's Web usage preferences.

[112] Since the values are calculated for each component based on that component's individual marginal utility, the dollar values can simply be added together. As a lower bound: $11.33 + $7.98= $19.31; and as an upper bound: $16.58 + $11.68 = $28.26.

[113] Using the Consumer Price Index for All Urban Consumers (CPI-U) US city average series for all items (not seasonally adjusted) to convert April 2007 dollars to July 2016 (240.628 ÷ 206.686) = 1.642. BLS, "CPI Inflation Calculator," *available at* https://www.bls.gov/data/inflation_calculator.htm; BLS, "Databases, Tables & Calculators by Subject," *available at* https://data.bls.gov/timeseries/CUUR0000SA0.

This calculation adjusts for inflation from 2007, but the 2016 dollars are still conservative since they do not account for any increase in the value that consumers place on their personal information protection since 2007. Concern over privacy and personal data use has only increased over time. See Swish Goswami, "The Rising Concern Around Consumer Data And Privacy," *Forbes*, Dec. 14, 2020. See also a 2018 SAS survey of over 500 US consumers, in which "Almost three-fourths (73 percent) of survey participants said they are more concerned about their data privacy now than they were a few years ago." SAS, "Data Privacy: Are You Concerned," *available at* https://www.sas.com/en/whitepapers/data-privacy-110027.html. In 2021 KPMG conducted a similar survey of 2,000 adults in the US and found that the vast majority of respondents "say that data privacy is a growing concern." Orson Lucas, "Corporate data responsibility," KPMG, Aug. 2021, *available at* https://advisory.kpmg.us/content/dam/advisory/en/pdfs/2021/corporate-data-responsibility-bridging-the-consumer-trust-gap.pdf.

It is clear that Google recognized this growing privacy concern. ██████████████████████████████████████

---

Confidential — Attorneys' Eyes Only

Patrick Calhoun, et al. v. Google LLC

82.     Further support of the value that individuals place on the protection and restriction of their personal information is found in another conjoint study conducted by Hanna Krasnova, Thomas Hildebrand and Oliver Guenther.[114] Krasnova et al. looked at online social networks (OSNs) to assess the value that participants place on five different OSN attributes, including the use of personal information by the OSN provider. Krasnova et al. found that an average user would be willing to spend between €14.14 and €17.24 ($18.75 and $22.84) *per year* if the OSN provider refrained from using the demographic information provided for personalized advertising.[115]

83.     Consumers placing value on data privacy, particularly as it relates to not sharing data with others, ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ██████████

### V.A.2. Consumer Payments to Protect Personal Information

84.     The analysis I detail above provides insight into the value that consumers place on privacy protections concerning their personal information. This economic value is also demonstrated

The growing concern over how companies collect and use data has led to new laws in the United States and abroad. In 2016, the European Union passed the General Data Protection Regulation and two years later, California signed into law the California Consumer Privacy Act.

[114] Hanna Krasnova, Thomas Hildebrand, and Oliver Guenther, "Investigating the Value of Privacy in Online Social Networks: Conjoint Analysis," *ICIS 2009 Proceedings,* paper 173, 2009 (hereinafter "Krasnova et al, 2009").

[115] Krasnova et al., 2009, p. 15. Euros were converted to USD using January 2009 exchange rate of 1.324 USD to Euro. See Federal Reserve, "Foreign Exchange Rates," Oct. 4, 2021, *available at* https://www.federalreserve.gov/releases/h10/hist/dat00_eu.htm.

Using the (CPI-U) to convert January 2009 dollars to July 2016, this comes to $21.37 to 26.03 per year. (240.628 ÷ 211.143) = 1.140. See BLS, "CPI Inflation Calculator," *available at* https://www.bls.gov/data/inflation_calculator.htm; BLS, "Databases, Tables & Calculators by Subject," *available at* https://data.bls.gov/timeseries/CUUR0000SA0.

[116] ████████████████████████████████ (GOOG-CABR-04229398–446 at 403).

through consumer behavior in the purchasing of privacy services. VPNs (Virtual Private Networks) provide a real market example of internet users' willingness to pay for online privacy. VPNs are a software that allows the user to browse the internet "via secure, encrypted tunnels," keeping their online activity anonymous and private.[117] The costs of popular VPNs serve as benchmarks for the prices that individuals are willing to pay for their online security and protection of personal data.[118]

85.   ExpressVPN, one of the highest rated VPNs,[119] encrypts its user's online activity to protect the user's personal information, such as the IP address and device location, from "websites, apps and services that want to track you" as well from possible security breaches.[120] ExpressVPN also comes with specific apps for all devices and browsers, such as a chrome extension, and costs $12.95 a month for up to five devices.[121]

86.   Many popular ad blockers provide the same services: hiding the user's IP address and giving the ability to obscure or change the virtual location, as well as protect online activity to prevent "your browsing data from being stored, collected and sold by third parties."[122] NordVPN charges $11.95 a month for up to six devices, while CyberGhost costs $12.99 a month for up to seven devices, and Private Internet Access is $9.95 a month for up to 10 devices.[123] In addition to preventing tracking while browsing the internet, Surfshark VPN also blocks ads at a cost of $12.95 a month.[124] All of these VPNs offer extremely discounted

---

[117]  Techradar, "The best VPN service 2021," accessed Oct. 4, 2021, https://www.techradar.com/vpn/best-vpn.

[118]  For example, Named Plaintiff Patrick Calhoun spent $55 for the first year on NordVPN. Deposition of Patrick Calhoun, July 19, 2021, 46:16–47:8.

[119]  Techradar, "The best VPN service 2021," accessed Oct. 4, 2021, https://www.techradar.com/vpn/best-vpn. *See also* Reviews.org, "10 Best VPN Services 2021," Sept. 1, 2021, https://www.reviews.org/vpn/best-vpn-services/; CNET, "Best VPN service of 2021," Oct. 2, 2021, https://www.cnet.com/tech/services-and-software/best-vpn.

[120]  ExpressVPN "What is a VPN?" accessed Oct. 4, 2021, https://www.expressvpn.com/what-is-vpn.

[121]  ExpressVPN "Download a VPN app and protect any device," accessed Oct. 4, 2021, https://www.expressvpn.com/vpn-software; ExpressVPN, "Order," accessed Oct. 4, 2021, https://www.expressvpn.com/order.

[122]  Private Internet Access, "Private Internet Access: VPN Features," accessed Oct. 4, 2021, https://www.privateinternetaccess.com/vpn-features.

[123]  NordVPN, "Home Page," accessed Oct. 4, 2021, https://nordvpn.com/; CyberGhost, "Home Page," accessed Oct. 4, 2021, https://www.cyberghostvpn.com/en_US; Private Internet Access, "Special 3-Year Plan," accessed Oct. 4, 2021, https://www.privateinternetaccess.com/buy-vpn-online.

[124]  Surfshark, "Pricing," accessed Oct. 4, 2021, https://surfshark.com/pricing.

---

Patrick Calhoun, et al. v. Google LLC

monthly rates for longer subscriptions; 6 month subscriptions range around $6–$10 per month[125] and 2 year plans ranging around $2-$4 per month.[126]

87.   VPNs with longer plans can be purchased on an annual basis. ExpressVPN offers an annual rate of $99.95 and NordVPN as of the date of this report costs $59.00 annually.[127] Other VPNs offer even more competitive rates with TunnelBear VPN costing $59.88 annually for up to 5 devices,[128] IPVanish costing $77.99 annually for unlimited devices,[129] and Fastest VPN offering a three-year subscription for $39.95 triennially for up to ten different devices.[130]

88.   VPNs are increasingly common, and with 31% of internet users worldwide having used a VPN, the VPN industry is expected to reach $31.1 billion in 2021.[131] According to Security.org, 40% of VPN users use their VPN for general privacy reasons, "like securing their personal data," demonstrating that a significant portion of internet users value and are willing to pay for software to protect their privacy and personal information.[132, 133]

---

[125]   ExpressVPN, "Choose your ExpressVPN plan," accessed Oct. 4, 2021, https://www.expressvpn.com/order; CyberGhost, "Home Page," accessed Oct. 4, 2021, https://www.cyberghostvpn.com/en_US/; Surfshark, "Pricing," accessed Oct. 4, 2021, https://surfshark.com/pricing.

[126]   Surfshark, "Pricing," accessed Oct. 4, 2021, https://surfshark.com/pricing; NordVPN, "Home Page," accessed Oct. 4, 2021, https://nordvpn.com/.

[127]   ExpressVPN, "Order," accessed Oct. 4, 2021, https://www.expressvpn.com/order; NordVPN, "Home page," accessed Oct. 4, 2021, https://nordvpn.com/.

[128]   Forbes, "Best VPN Services," Jul 11, 2019, https://www.forbes.com/sites/tjmccue/2019/07/11/best-vpn-services/?sh=c6ce5c729e8e. See also TunnelBear, "Get an unlimited TunnelBear Plan," accessed Oct. 4, 2021, https://www.tunnelbear.com/account/checkout.

[129]   Forbes, "Best VPN Services," Jul 11, 2019, https://www.forbes.com/sites/tjmccue/2019/07/11/best-vpn-services/?sh=c6ce5c729e8e. See also IP Vanish, "Pricing," accessed Oct. 4, 2021, https://www.ipvanish.com/pricing/?cjevent=1450509d264811ec803300410a1c0e0d&CID=5370367&cjdata=MXxOfD B8WXww.

[130]   Fastest VPN, "Features," accessed Oct. 4. 2021, https://fastestvpn.com/features; Fastest VPN, "Buy VPN and Get Private Cloud Storage for Free," accessed Oct. 4, 2021, https://fastestvpn.com/buy-vpn.

[131]   DataProt, "VPN Statistics for 2021-Keeping Your Browsing Habits Private," Mar 21, 2021, https://dataprot.net/statistics/vpn-statistics/.

[132]   Aliza Vigderman and Gabe Turner, "2021 VPN Usage Statistics," Security.org, Sept. 9, 2021, https://www.security.org/vpn/statistics/#why.

[133]   This is further supported by research conducted by Janice Y. Tsai et al which analyzed the value online consumers place on the privacy policies and the display thereof when purchasing from websites. Tsai et al found that "consumers tend to purchase from online retailers who better protect their privacy…. [and] that when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites." Janice Y. Tsai, Serge Egelman, Lorrie Cranor, Alessandro Acquisti "The Effect of Online Privacy Information on Purchasing Behavior: An Experimental Study," *Information Systems Research* Vol. 22, no. 2, June 2011, pp. 254-268.

---

## V.B. The Economic Value of Personal Information

89.   I discuss above the value that Google and Google's advertiser customers place on access to personal information. These data are also valued widely for advertising, marketing, and research across any number of industries. In this section, I discuss the economic value of personal information as depicted by actual marketplace examples.

90.   The value of personal information and online behavior is apparent in the way that research companies pay users for the collection of their online data. The willingness of these companies to provide direct payment to users demonstrates the monetary value companies place on online behavior and personal data. There are many examples of research companies that pay users to download software that collects data on the users ongoing online activity.

91.   One such example is SavvyConnect, a desktop application launched in 2009 by SurveySavvy, an online survey platform, to conduct behavioral market research while users browse the internet.[134] SavvyConnect pays $5 per device per month to install and activate the software on a computer, phone, or tablet to collect data from users' devices.[135]

92.   Google launched a similar study of online behavior. Ipsos, a large global market research company,[136] conducted a consumer research study for Google.[137] The Ipsos Screenwise Panel provides users rewards in exchange for collecting information on how they use the internet. Participants can earn $20 for participating in the study, an additional $100 value if they join and install a special WiFi router, and up to $16 per month for each household member (aged 13 or older) who joins with their device.[138]

93.   Personal information and online behavior and preferences are especially helpful for marketing research and advertising. For example, BrandTotal is a market research firm willing to pay users to collect their data to benefit advertising research and targeting. BrandTotal created a panel UpVoice to provide insights to brands "on their advertising

---

[134]   SurveySavvy, "How it Works," accessed Oct. 4, 2021, https://www.surveysavvy.com/how_it_works.

[135]   SurveySavvy, "What is SavvyConnect?" accessed Oct. 4, 2021, https://www.surveysavvy.com/savvyconnect.

[136]   Ipsos, "Key figures," accessed Oct. 4, 2021, https://www.ipsos.com/en/key-figures.

[137]   Ipsos, "Ipsos Screenwise Panel," accessed Oct. 4, 2021, https://screenwisepanel.com/.

[138]   Ipsos, "Ipsos Screenwise Panel," accessed Oct. 4, 2021, https://screenwisepanel.com/.

Patrick Calhoun, et al. v. Google LLC

activities and the ad campaigns of their competitors."[139] In exchange for installing the
software, the user is rewarded with a $5 signing bonus and the ability to earn at least $75 in
the first year (if active social users) for visiting Facebook, Twitter, YouTube, LinkedIn, and
Amazon. The software anonymously collects data about the ads displayed on these sights in
exchange for daily points that can be redeemed. In addition to the collecting information on
the ads the user is exposed to, the software also collects personal information such as name,
email and demographic information.[140]

94.     Another example is Nielsen, a professional research company and "the world's leading
        provider of media and marketing information" that funds a panel for computer and mobile
        data.[141] The panel offers up to $50 a year for installing their app on a mobile device and
        enters you into a $10,000 monthly sweepstakes for installing the software on your
        computer.[142] Registering for the panel may involve providing "personal identifying
        information," including name, address, email and other personal, demographic information
        and unique identifiers as well as behavior or preference data. The software collects data on
        website activity, online services, device information including IP address, location
        information, and files received, uploaded, or downloaded.[143]

95.     Nielsen and other research companies are willing to pay users to access the types of data
        collected by Google through Chrome including name, email address, browsing history, and
        other PI associated with the user.[144] A single user, in exchange for allowing the passive

---

[139]  UpVoice, "How can we help you," accessed Oct. 4, 2021, https://www.joinupvoice.com/faq.

[140]  UpVoice, "How can we help you," accessed Oct. 4, 2021, https://www.joinupvoice.com/faq.

[141]  Neilsen, "About Us," accessed Oct. 4, 2021,
       https://computermobilepanel.nielsen.com/ui/US/en/sdp/landing?SourceId=195&PID=15877&PID2=1023b2824bbb106a
       8ae24c4b8a4fbc.

[142]  Neilsen, "Neilsen Computer & Mobile Panel," accessed Oct. 4, 2021,
       https://computermobilepanel.nielsen.com/ui/US/en/sdp/landing?SourceId=195&PID=15877&PID2=1023b2824bbb
       106a8ae24c4b8a4fbc.

[143]  Neilsen, "Privacy & Cookie Notice," Jan. 2020, *available at*
       https://computermobilepanel.nielsen.com/ui/US/en/privacypolicyen.html

[144]  Plaintiff's Responses and Objects to Defendant's Second Set of Interrogatories (Nos. 6–9), Response to Interrogatory
       No. 8, Mar. 12, 2021.

---

Patrick Calhoun, et al. v. Google LLC

collection of their browsing history and online activity, can earn anywhere from $50–$192 annually.[145]

## V.C. Damages Can be Calculated using Methods Common to the Class

96.    The value Chrome users place on the protection of their personal information is indicative of the amount by which each Class Member was damaged due to the breach in the Chrome Agreements. Similarly, the payments and offers made and accepted for access to user online personal information provide further support for the value of user personal information. I describe above methods and market measures that can be used to reliably estimate this value, which can then be multiplied by the number of Class Member accounts to calculate the total damages for the class. ███████████████████████████████████ ████████████████████████████ To the extent that Class Members have multiple Google accounts at issue, the calculation can factor in multiple sets of consumer data by way of multiple accounts.[147]

97.    As discussed above, I understand that Google has provided monthly data on the sync-traffic from Google accounts that had sync accounts enabled.[148] It is reasonable to expect Google to be able to provide monthly data on the total number of Google accounts and therefore the number of non-synced Google accounts on a monthly basis can then be estimated using these two data sources.

---

[145] Nielson pays users up to $50 annually (not including monthly sweepstakes), while SavvyConnect pays users $5 per month, totaling $60 annually. Ipsos pays a single user $16 per month, totaling $192 annually (not including the $20 participation payment, or the $100 incentive for WiFi router installation. *See* Neilsen, "Neilsen Computer & Mobile Panel," accessed Oct. 4, 2021, https://computermobilepanel.nielsen.com/ui/US/en/sdp/landing?SourceId=195&PID=15877&PID2=1023b2824bbb106a8ae24c4b8a4fbc; SurveySavvy, "What is SavvyConnect?" accessed Oct. 4, 2021, https://www.surveysavvy.com/savvyconnect; Ipsos, "Ipsos Screenwise Panel," accessed Oct. 4, 2021, https://screenwisepanel.com/.

[146] ██████████████████████████████████████████████████████████████████ See Heinz Tschabitscher, "How Many People Use Email Worldwide," Lifewire, May 31, 2021, *available at* https://www.lifewire.com/how-many-email-users-are-there-1171213.

[147] For example, a Class Member may have two Google accounts, one for family and health related items, and one for leisure shopping. Each account may have its own set of consumer identification data.

[148] Defendant's Responses and Objections to Plaintiffs' First Set of Interrogatories (Nos. 1–7), Response to Interrogatory No. 3, Sept. 30, 2020.

Patrick Calhoun, et al. v. Google LLC

## VI.    CONCLUSION

98.    A browser user's personal information has economic value as demonstrated by Google's
ability to generate revenue and profit, by a user's willingness to pay for services restricting
access to personal information, and by the value other companies place on access to such
data. By collecting the personal information of users that did not enable the sync feature,
Google generated revenue that it would not have been able to generate absent the alleged
misconduct, and consumers were harmed based on not receiving the value of services that
Chrome agreed to. Privacy protection and personal information have real economic value,
which can be reliably estimated using methods common to the class.

Russell W. Mangum III

October 13, 2021

---



APPENDIX 1

# RUSSELL W. MANGUM III



4 Park Plaza                    T (949) 594-1601
Suite 1930                      mangum@cirqueanalytics.com
Irvine, CA 92614

## CURRENT POSITIONS

Executive Vice President, Cirque Analytics, LLC; 2021- present
Professor, Concordia Univ Irvine, Sch of Business and Economics; 2013 - present

## EDUCATION

Ph.D., economics, University of Southern California, 1995
M.A., economics, University of Southern California, 1992
B.A., economics (hons), Calif. State University, Fullerton, 1988

## SPECIALIZED EXPERIENCE, RESEARCH, OR INTEREST

Antitrust; Commercial Disputes; Intellectual Property; Statistics and Econometrics, Valuation

## PAST POSITIONS

| 2021 | Visiting Researcher, Univ of Winchester, Sch of Bus, Law, and Tech | Winchester, UK |
| 2007-2021 | Sr. Vice President, Nathan Associates, Inc. | Irvine, CA |
| 2002–2012 | Associate Adjunct Professor, USC, Dept. of Economics | Los Angeles, CA |
| 2001–2007 | Vice President, Analysis Group, Inc. | Los Angeles, CA |
| 2001 | Manager, PricewaterhouseCoopers, Financial Advisory Svcs. | Los Angeles, CA |
| 1998–2001 | Managing Associate, Nathan Associates Inc. | Arlington, VA |
| 1998–2000 | Adjunct Professor, John Hopkins University, Krieger School | Washington, DC |
| 1995–1998 | Economist, U.S. Federal Trade Commission | Washington, DC |

## COURSES TAUGHT

- Principles of Micro/Macroeconomics, Interm. Micro/Macroeconomics, Managerial Economics, Statistics and Econometrics, Finance, Money and Financial Markets, Economics of Sin, Environmental Economics, Business Information Technology, Advanced Topics in Economics

## EXPERIENCE SUMMARY

Dr. Mangum has over 25 years of experience in economic analysis, research, and teaching. His consulting practice centers on economic analysis and damages quantification in matters related to intellectual property and technology, antitrust, class certification, statistical analysis, and complex commercial disputes. Dr. Mangum's experience as an economic expert is extensive, with testimony in over 100 matters before local, state, and federal courts. Dr. Mangum has taught graduate and undergraduate courses in economics, statistics, finance, and econometrics. He is currently an Associate Professor of Economics in the School of Business and Economics at Concordia University Irvine, and has previously taught at Johns Hopkins University, The University of Southern California, and Pepperdine University. Dr. Mangum previously worked at Nathan Associates, Inc., PricewaterhouseCoopers, and The United States Federal Trade Commission, Bureau of Economics.

## PROFESSIONAL EXPERIENCE

### *Intellectual Property*

Dr. Mangum has substantial experience in the area of intellectual property damages, including claims related to infringement of patents; FRAND licensing commitments; patent pools; copyrights; and trademarks; as well as theft of trade secrets; false designation of origin; and false advertising. The case contexts in which Dr. Mangum has performed these analyses include:

- Patent infringement related to:
  - Computer, electronics, and telecommunication industry:
    - Cellular communication network technology;
    - Modem communication devices;
    - Wireless communication network devices (routers, cards, including under FRAND licensing committments);
    - Handheld device navigation applications;
    - NIC hardware and chipsets;
    - Semiconductors;
    - Webswitching and IP router network hardware;
    - Wired and wireless portable electronic temperature sensor devices;
    - Electronic eReader devices;
    - Digital TV Tuners under FRAND licensing commitments;
    - Automated lipsinc animation used in video games;
    - Data encryption devices.
    - VoIP network telephony services.
  - Medical devices:
    - Artificial vertebral disc implants;
    - Trocar seals for laparoscopic surgery;
    - Spinal fusion implants;
    - Breast biopsy devices;
    - Remote medical information monitoring technology.
  - Energy
    - Specialized valves used in oil refining;
    - Electric utility management systems;
    - Wide-area real time phasor measurement and monitoring.
  - Food and agriculture:
    - Additive-infused candy;
    - Nutritional supplements;
    - New variety of late ripening white grapes;

- Structures and methods utilized in the growing of grapes and raisins.
- Business software
  - eProcurement;
  - Business intelligence;
  - Design and simulation;
  - Call routing software;
  - Computer tracking;
  - Program and application management;
- Clothing and clothing design
  - Padded athletic shirits/pants; shoes; headwear; accessories;
- Miscellaneous
  - Electronic nicotine delivery systems (NDS)
  - Personal watercraft devices and accessories
  - Consumer advertising design via use of digital media
  - Automated stapling machines used in bed manufacturing
  - Specialized hardware and control systems used in high-rise elevators
  - Electronic exchange systems for trading of commodities futures contracts
  - Electronic data management system used in public transportation projects
  - Document and print inspection systems
- <u>Trademark, trade dress, or copyright infringement related to:</u>
  - Sponsorship with motorsports, automotive repair tools and devices, beverages and snacks, and apparel;
  - Real estate property aquizition services;
  - Online dining reservation and payment services;
  - Internet search engine terms related to retail sales of food and arranged food products;
  - Enterprise Resource Plannning (ERP) software;
  - Veterinary Teleradiology (online/internet) Services;
  - Devices and software for online mobile device data extraction and IT network devices;
  - Clothing, shoes, and jewelry;
  - Advertising and marketing through wireless mobile communications;
  - Motion picture trademarks in the manufacture of clothing;
  - Furniture products (mechanized and non-mechanized);
  - Portable combustion engines;
  - Infant care products;
  - Homeopathic products;

- Postal measuring products;

- Scented candle products;

- Children's toys and art;

- Design plans for a theme amusement park.

- <u>Theft of trade secrets related to:</u>

  - Cold extraction coffee processes

  - Electronic mechanisms for payment processing;

  - Techical documents, Product features, customer data, and marketing methods/models related to Systems for General Floor Hospital Monitiring of patient vital statistics;

  - Training methods, pricing models, and customer status databases related to Enterprise Resourve Plannning (ERP) software;

  - Customer data and information, and pricing models related to employee pension and benefits insurance brokerage services;

  - Government contracted research into laser vibrometry;

  - Devices and software for mobile device data extraction;

  - IT system design and implementation for the US defense industry;

  - Electronic engineering and CAD packages used in US naval warcraft architecture;

  - Methods for mathematical simulations for the pricing of mortgage backed securities;

  - Soy coffee alternative products;

  - Design, development, marketing, and manufacturing of toys;

  - Computer game accessories.

- <u>False advertising, false designation of orgin, or unauthorized use of likeness related to:</u>

  - Chemical dependence treatment services;

  - Real estate property aquizition services;

  - Security monitoring systems and services;

  - Consumer appliances;

  - High Availability Disaster Recovery (HA/DR) business software;

  - Medical data printer systems;

  - Furniture products;

  - Composed music and lyrics used in television commercials;

  - Restaurant meals and shopping services;

  - Internet advertising services via advertorial placement on publishers' websites;

  - Nutritional supplements and beverages.

- <u>Inventorship disputes related to:</u>

  - Cold extraction coffee processes

  - Spinal fusion implant systems;

- Interarterial guidewire and embolic filter devices.

## *Competition/Antitrust*

Dr. Mangum has substantial experience in the area of competition and antitrust, including analyses of relevant product and geographic markets, market power, monopolization, and likelihood of monopolization from impending events. These analyses usually include statistical and econometric analysis of market data to identify the extent of competition, and the magnitude of competition. The case contexts in which Dr. Mangum has performed these analyses include:

- Evaluated common impact and estimated damages, for direct and indirect purchasers, from price fixing and other conspiracies in the markets for commercial tissue paper, bulk vitamins, high-end automobiles, ready mix concrete, consumer apparel, Korean noodles, packaged seafood, meat products, interior molded doors, airline travel, and pharmaceuticals.

- Evaluation of alleged competitive forclosure in the market for sleep apnea products, including relevant markets, market power, and lost profits damages.

- Evaluation of alleged price discrimination across dealers of hardscape building materials.

- Evaluation of antitrust claims and affirmative defenses of patent misuse related to required terms in patent license programs for flash memory semiconductors and systems.

- Evaluation of market segments, market channels, and cost pass-through in the market for DRAM-containing products and NFL brand apparel.

- Estimation of damages related to:
  - A conspiracy to boycott developments in DRAM packaging;
  - Foreclosure of competition in market for footware insoles and inserts.

- Evaluation of competitive effects of exclusive dealing clause in a franchise agreement.

- Evaluated the competitive effects of exclusive dealing policies regarding:
  - Acute care hospital and physician services;
  - Customer purchase data exchange related to direct mail advertising and sales;
  - Free standing insert advertising (coupon) services;
  - Replacement parts for 3-piece body welder systems;
  - Interconnect agreements between internet backbone communication services;
  - Supply of biological inputs used in creating generic biologic therapeutic treatments;
  - Professional sports branded athletic apparel;
  - Durable medical equipment;
  - Pharmaceuticals.

- Analyzed the competitive effects from wrongful patent application and issuance (fraud on the patent office) related to processes and mechanisms for food preparation and processing.

- Analyzed the likely competitive effects of proposed mergers in various industries, including hospital services, physician services, pharmaceuticals, medical insurance, construction aggregates, supermarkets, auto parts, cable systems and programming, industrial refractories, and computer game software.

## *Commercial Disputes*

- Evaluated claims of damages related to attempted sale of cold extraction coffee company and the discover of patents allegedly based on confidential information.

- Evaluated claims of damages related to failure to close a sale for multiple solar energy production peoperties/companies.

- Estimated damages in the form of lost profits from breach of contract in a services joint venture involving use of indexes and associated data for creation and analysis of international financial securitied and derivatives.

- Estimated damages in the form of disgorgement and lost company value related to brokerage services involving employee pension and benefit programs.

- Evaluated claims of replacement cost and lost profits damages related to alleged interference in the market for femtocell wireless communication products.

- Evaluated claims of damages in the form of lost profits and disgorgement of compensation and benefit from alleged unauthorized use of confidential materials in the market for government contracts for research into laser vibrometry.

- Estimated damages from employee theft of HDD computer memory products from s research/testing facility. Calculated value based on historical in-channel market price and on historical costs of manufacturing and sales.

- Evaluated claims of lost profits damages arising from alleged professional malpractice related to commercial development and land use.

- Provided statistical and data analysis of invoices for disaster recovery and construction services. Estimated lost profits related to alleged fraud, breach of contract, and tortious interference.

- Estimated damages related to alleged breaches of contract, including:

  - Contract involving the development and sale of solar power generation projects;

  - Contract involving the supply of active incredients in nutriceuticals;

  - Non-solicitation agreement between government defense contracting companies;

  - Contract for concession services at amusement parks;

  - Contract for creation and promotion of credit reporting services;

  - Contract for supply of MLB jerseys used in creation of sports memorabilia;

  - Contract for blending and supply contracts for specialized non-dairy beverages;

  - Non-compete clauses (restaurant lease, franchising, structural steel fabrication);

  - Contract for earning and redeeming of frequent flyer miles;

  - Contract for purchase of television airtime on a local over-the-air station;

  - Contract for representation and sale of television programming;

  - Royalty contract regarding design and functionality elements use in toys;

  - Contract for technology and support from software conference bridge systems;

  - Contract for conference calling services and long distance calls connection services.

- Estimated damages from defamation related to the launch of a clinic for medical disorders.

Jackson Hole, WY          Irvine, CA          Los Angeles, CA          Washington, DC

- Evaluated claims by the CA Coastal Commission related to lost recreational value from proposed coastal bluff seawall construction.

- Evaluated concepts and methods for calculating proceeds from from a Qi Tam suit related to improper medical lab billing practices.

- Estimated damages related to Quantum Meruit claims involving use of software to manage viewing and storage of electronic medical images.

## *Employment and Labor*

- Estimated damages related to lost profits; lost company value, employee training and hiring expense, and/or disgorgement of defendant's profits in multiple cases related to the alleged breach of non-solicitation agreements and unauthorized use of confidential information by departing employees the insurance and MLM health and wellness industries.

- Estimated lost profits damages and/or disgorgement of defendant's profits in multiple cases related to the alleged breach of non-solicitation agreements and unauthorized use of confidential information involving government defense contracting companies.

- Estimated plaintiff's lost profits and disgorgement of defendant's profits related to the theft of trade secrets by departing employees in the automated emergency/disaster response industry.

- Estimated disgorgement of defendant's profits related to the theft of trade secrets by departing employees in the naval engineering industry.

- Provided statistical analysis of employee time card and pay data to estimate instances of underpayment or missed breaks.

- Estimated lost earnings and compensation damages related to an alleged wrongful termination of an employee; evaluated lost wages/earnings, lost retirement benefits, and lost compensation through stock options.

- Estimated damages to an employee/inventor related to exclusion as an inventor from PCT applications following termination from a start-up medical devices company; evaluated the plaintiff's claims of lost share of proceeds from technology share.

## *Statistical and Econometric Analysis*

- Performed regression analysis to evaluate class-wide damages related to class certification in the context of alleged conspiracy on the prices of interior molded doors.

- Performed regression analysis to evaluate class-wide damages related to class certification in the context of alleged conspiracy on the prices of packaged seafood.

- Performed regression analysis to evaluate class-wide damages related to class certification in the context of alleged conspiracy on the prices of transatlantic air travel.

- Performed regression analysis to evaluate class-wide damages related to class certification in the context of alleged conspiracy on the prices of Korean noodle products.

- Evaluated regression and statistical analysis offered in support of damages related to an alleged breach of non-solicitation agreements and unauthorized use of confidential information by departing employees the insurance and MLM health and wellness industries.

- Evaluated regression and statistical analysis offered in support of damages and common impact in an indirect purchaser class action related to alleged false advertising for nutritional supplement beverages.

- Performed regression analysis to evaluate class-wide damages related to class certification in the context of alleged conspiracy and exclusive agreement between professional sports teams and an apparel manufacture.

- Performed regression analysis to estimate class-wide damages related to class certification in the context of alleged price fixing in markets for ready mix concrete.

- Performed regression analysis to estimate pass-through of anticompetitive price increases in the manufacturing and sale of DRAM and DRAM containing devices.

- Provided statistical analysis of employee time card and pay data to estimate instances of underpayment or missed breaks.

- Provided sampling techniques and statistical analysis of customer service database to estimate the extent of use of an allegedly infringing feature in a commercial router.

- Evaluated sampling techniques and extrapolation estimates related to allegedly improper medical billing practices and in the context of damages related to construction defects.

- Provided statistical and econometric analysis of survivorship related to consumer membership attrition in credit reporting programs.

- Provided statistical and econometric analysis of the correlation between purchase of infringing products and consequential purchase of related services.

- Provided statiscal analysis and estimate of medical product sales in the absence of data from third party sales force.

- Provided statiscal and econometric analysis of conference calling minutes related to alleged intentional interference and unfair competition.

- Conducted statistical analysis of incremental costs in support of lost profits calculations.

## EXPERT WITNESS EXPERIENCE (SINCE 2016)

- *CPI Security Systems Inc. v. Vivint Smart Home Inc. et al.,* United States District Court, Western District of North Carolina, Charlotte Division (2021). Provided deposition testimony on behalf of plaintiff involving unjust enrichment and royalty damages related to alleged false advertising and unfair competition related to security monitoring systems and services.

- *Martifer-Silverado Fund I, LLC and Silverado Power LLC v. Talesun Solar USA, Ltd.,* Superior Court of California, San Francisco County (2021). Provided trial and depsition testimony on behalf of Defendant, related to alleged breach of contract involving solar energy projects.

- *Javo Beverage Co., Inc., v. Stephen Corey,* American Arbitration Association (2021). Provided trial (arbitration) and deposition testimony on behalf of respondent related to breach of contract and misappropriation of confidential information and technology in the market for coffee extracts.

- *Andrea Wlliams and James Stewart (class reps) v. Apple Inc.,* United States District Court, Northern District of California (2021). Submitted an expert report on behalf of plaintiffs related to damages involving alleged breach of contract regarding provision of electronic file storage.

- *In Re Broiler Chicken Antitrust Litigation,* United States District Court, Northern District of Illinois (2021). Provided deposition testimony on behalf of plaintiffs related to the economic effects of an alleged conspiracy to constrain capacity in the broiler chicken industry.

- *QC Manufacturing, Inc., v. Solatube International, Inc. and Brighter Concepts, Inc. dba Solatube Home Daylight,* JAMS Arbitration, Los Angeles, CA (2020). Provided trial (arbitration) testimony on behalf of complainant related to a breach of contract (litigation settlement agreement) involving whole house fans.

- *Sprint Communications Company LP v. Cequel Communications, LLC, et al.,* United States District Court, District of Delaware (2020). Provided deposition testimony on behalf of plaintiff related to lost profits and royalty damages from alleged patent infringement involving VoIP telephony network services.

- *In Re Domestic Airline Travel Antitrust Litigation,* United States District Court, District of Columbia (2020). Provided deposition testimony on behalf of plaintiff class related to the economic effects of an alleged conspiracy to constrain capacity in the domestic airline travel industry.

- *RV Skincare Brands LLC v. Digby investments Ltd.., Quickbox LLC, et al.,* United States District Court, Southern District of New York (2020). Submitted an expert report on behalf of certain defendant related to damages from alleged counterfeit sales and trademark infringement involving fulfillment of skincare product commerce.

- *Cisco Systems Inc. et al. v. Zahid Hassan Sheikh et al.,* United States District Court, Northern District of California (2020). Provided deposition testimony on behalf of certain defendants related to damages from alleged counterfeit sales and trademark infringement involving transceiver and switching IT network equipment.

- *San Diego Country Credit Union v. Citizens Equity First Credit Union,* United States District Court, Southern District of California (2020). Provided deposition testimony on behalf of plaintiff related to damages flowing from fraudulent declaration in the registration of a trademark involving credit unions.

- *Sprint Communications Company LP v. Atlantic Broadband Finance LLC, et al.,* United States District Court, District of Delaware (2020). Provided deposition testimony on behalf of plaintiff related to lost profits royalty damages from alleged patent infringement involving VoIP telephony network services.

- *Sprint Communications Company LP v. Charter Communications Inc. et al.,* United States District Court, District of Delaware (2020). Provided deposition testimony on behalf of plaintiff related to lost profits and royalty damages from alleged patent infringement involving VoIP telephony network services.

- *Sprint Communications Company LP v. Mediacom Communications Corp.,* United States District Court, District of Delaware (2020). Provided deposition testimony on behalf of plaintiff related to lost profits and royalty damages from alleged patent infringement involving VoIP telephony network services.

- *Sprint Communications Company LP v. TPC Global LLC et al.,* United States District Court, District of Delaware (2020). Provided deposition testimony on behalf of plaintiff related to lost profits and royalty damages from alleged patent infringement involving VoIP telephony network services.

- *Sprint Communications Company LP v. Wideopenwest Inc. et al.,* United States District Court, District of Delaware (2020). Provided deposition testimony on behalf of plaintiff related to lost profits and royalty damages from alleged patent infringement involving VoIP telephony network services.

- *S&P Dow Jones Indices LLC and SPDJ Singapore Pte Ltd. v. BSE Ltd.,* United States District Court, Northern District of California (2020). Provided trial (tribunal) testimony on behalf of claimants and counterrespondants for an arbitration concerning damages from breach of contract in a service joint venture related to the use of indexes and associated data for creation and analysis of international financial securitied and derivatives.

- *In Re: Molded Doors Indirect Purchaser Antitrust Litigation*, United States District Court, Eastern District of Virginia, Richmond Division (2020). Provided deposition testimony related to class certification and the merits phase of an antitrust case on behalf of an indirect purchaser plaintiff class related to the evaluation of common impact, pass-through, and class wide damages involving alleged collusion on the prices for interior molded doors.

- *Citcon USA LLC v. Riverpay Inc. et al.,* United States District Court, Northern District of California (2019). Provided trial and deposition testifimony on behalf of defendant/counterplaintiff concerning damages from alleged tortious intereference and breach of contract involving electronic payment processing network services.

- *3G Licensing, et al., v. Lenovo Group Ltd., et al.,* United States District Court, District of Delaware (2019). Submitted an expert report on behalf of defendants Lenovo and Motorola Mobility related to reasonable royalty damages for patent infringement involving cellular phone network technologies.

- *Inteliquent, Inc. v. Free Conferencing Corporation, et al.,* United States District Court, Northern District of Illinois, Eastern Division (2019). Provided deposition testimony on behalf of Counterclaim Plaintiffs, related to alleged breach of contract, intentional interference, and unfair competition involving conference calling services and long-distance calls connection network services.

- *In Re: Packaged Seafood Products Litigation*, United States District Court, Southern District of California (2019). Provided deposition testimony related to the merits phase of the case and also testfied at a bench trial (evidentiary hearing) on behalf of direct purchaser plaintiff class related to class certification and estimation of class wide damages in an antitrust case involving alleged collusion on the prices for packaged seafood. Also issued initial and reply reports regarding class certification and initial and reply reports related to antitrust effects and damages.

- *T.R.P. Company, Inc., v. Similasan AG and Similasan Corporation,* United States District Court, District of Nevada (2019). Provided deposition testimony on behalf of plaintiff/counter-defendant involving unjust enrichment and lost profits related to trademark infringement of certain homeopathic products.

- *Advanced Digital Solutions International, Inc., v. Rahi Systems, Inc., et al.,* Superior Court for the State of California, County of Alameda (2019). Provided deposition testimony on behalf of plaintiff concerning disgorgement damages related to trade secret misappropriation involving the theft of customer lists.

- *ADT LLC and ADT US Holdings v. Alder Holdings LLC, et al.,* United States District Court, Southern District of Florida, Palm Beach Division (2019). Provided trial and deposition testimony on behalf of plaintiff involving unjust enrichment and royalty damages related to alleged false advertising and unfair competition, and contempt of injunction related to security monitoring systems and services.

- *ADT LLC v. Security Networks LLC et al.,* United States District Court, Southern District of Florida, Palm Beach Division (2019). Submitted an expert report on behalf of plaintiff involving unjust enrichment and royalty damages related to alleged false advertising and unfair competition, and contempt of injunction related to security monitoring systems and services.

- *ADT LLC & ADT US Holdings, Inc. v. Northstart Alarm Services LLC et al.,* United States District Court, Southern District of Florida (2019). Submitted an expert report on behalf of plaintiff involving unjust enrichment and royaty damages related to alleged false advertising and unfair competition, and contempt of injunction related to security monitoring systems and services.

- *Grasshopper House LLC. V. Clean & Sober Medua LLC., et al.*, and *Cliffside Malibu, et al. v. Grasshopper House LLC, et al.* United States District Court, Central District of California, Western Division (2019). Provided trial and deposition testimony on behalf of counterclaim plaintiffs involving damages from alledged false advertising related to treatment services for chemical dependence.

- *In Re Korean Ramen Antitrust Litigation,* United States District Court, Northern District of California, San Francisco Division (2018). Provided trial and deposition testimony on behalf of a class of purchasers of Korean Noodles related to damages from an alledged antitrust price fixing conspiracy.

- *Monster Energy Company v. Integradted Supply Network LLC*, United States District Court, Central District of California (2018). Provided trial testimony on behalf of plaintiff related to damages from alleged trademark and trade dress infringement involving beverages and snacks, tools, and clothing, motorsports and sponsorship and promotion.

- *Soteria Encryption LLC v. Apricorn Inc., et al.,* United States District Court, Central District of California, Western Division (2018). Submitted an expert report on behalf of defendants Apricorn and Lenovo related to reasonable royalty damages for patent infringement involving data encryption network devices.

- *McRO Inc. v. Bandai Nameco Games America Inc., et al.*, United States District Court, Central District of California, Western Division (2018). Provided deposition testimony on behalf of certain defendants related to damages from alleged patent infringement involving automated lipsinc animation used in video games.

- *In Re: Transpacific Passenger Air Transportation Antitrust Litigation*, United States District Court, Northern District of California San Francisco Division (2018). Provided deposition testimony on behalf of direct purchaser plaintiff class related to class certification and estimation of class wide damages in an antitrust case involving alleged collusion on the prices for transatlantic air travel.

- *Express Homebuyers USA, LLC, v. WBH Marketing Inc.*, United States District Court, Eastern District of Virgina, Alexandria Division (2018). Provided deposition testimony on behalf of defendant/counterplaintiff related to damages from alleged trademark infringement and trade libel involving real estate propery acquisition services.

- *Schneider* et *al. v. Chipotle Mexican Grill, Inc.*, United States District Court, Northern District of California, San Francisco Division (2017). Provided deposition testimony on behalf of defendant related to class certification and price premium damages involving alleged false statements about food product ingredients.

- *Microsoft Corporation v. A&S Electronic Inc.* United States District Court, Northern District of California (2017). Submitted an expert report on behalf of defendant related to damages from alleged trademark and copyright infringement involving business productivity software packages.

- *Personal Watercraft Product SAS v. Flydive, Inc., et al.,* United States District Court, Central District of California, Southern Division (2017). Submitted an expert declaration on behalf of plaintiff related to irreparable harm from alleged patent infringement in the personal watercraft industry.

- *ADT LLC and ADT US Holdings v. Vivint Inc.,* United States District Court, Southern District of Florida, Palm Beach Division (2017). Provided deposition testimony on behalf of plaintiff involving unjust enrichment and royalty damages related to alleged false advertising and unfair competition related to security monitoring systems and services.

- *Profoot Inc. v. Bayer Healthcare LLC,* United States District Court, Easterm District of New Jersey (2017). Provided deposition testimony on behalf of plaintiff Profoot, involving lost profits damages related to alleged anticompetitive actions in the market for footware insoles and inserts.

- *In re: Sotera Wireless, Inc., Debtor,* United States Bankruptcy Court, Southern District of California (2017). Provide trial and deposition testimony on behalf of creditor Masimo Corporation, involving lost profits, unjust enrichment, and royalty damages related to alleged theft of trade secrets in the market for systems used in general floor hospital patent monitoring.

- *Globeride Inc., v. Pure Fishing, Inc.,* United States District Court, Central District of California (2017). Provided deposition testimony on behalf of plaintiff concerning reasonable royalty damages related to alleged patent infringement involving fishing reels.

## RESEARCH PAPERS AND PUBLICATIONS

- "FRAND Commitments and Royalties for Standard Essential Patents", with S. Bosworth and E. Matolo, in Complications and Quandaries in the ICT Sector, Bharadwaj, Gupta, and Devaiah eds., Ch. 2, Springer Open, ISBN 978-981-10-449570, 2018.

- "Corrective Advertising in Lanham Act Damages: The Use and Misuse of Past Advertising Expenditures" with S. Bosworth and E. Matolo, *The Trademark Reporter*, May-June Volume, 2017.

- "The Case for Admitting Settlement License Agreements in a Reasonable Royalty Analysis," with S. Conroy and R. Knudsen, 2011, *Les Nouvelles,* Volume XLVI No. 4, 2012.

- "Cost Analysis," with J. Kinrich and A. Meister, in Intellectual Property Damages, Guidelines and Analysis, 2004 supplement, M. Glick, L. Reymann, and R. Hoffman, eds., Chapter 14a, Wiley: New York.

- "Analysis and Measurement of Damages in Patent Infringement Actions," with J. Kinrich, 2003, proceedings of Practicing Law Institute.

## PAST OR PRESENT AWARDS, PROFESSIONAL MEMBERSHIPS

Outstanding Antitrust Litigation Achievement in Economics, American Antitrust Institute, 2019

American Antitrust Institute, advisory board member

American Bar Association, member

American Economic Association, member

Licensing Executives Society, member, chapter chair

Los Angeles County Bar Association, member

Los Angeles Intellectual Property Law Association, member

Orange County Bar Association, member

Orange County Patent Law Association, member

# Appendix 2
# Materials Received

## Legal documents

- Complaint, July 27, 2020
- First Amended Complaint, Apr. 16, 2021
- Google's Responses and Objections to Plaintiffs' First Set of Interrogatories (Nos. 1–7), Sept. 30, 2020
- Google's Responses and Objections to Plaintiffs' Third Notice of Rule 30(b)(6) Deposition, July 29, 2021
- Letter from Aly Olson, Quinn Emanuel, to Beko Reblitz-Richardson, Boies Schiller Flexner, and David Straite, DiCello Levitt Guzler, "Re: Chasom Brown et. al. v. Google LLC – U.S. District Court, Northern District of California, San Jose Division: Case No. 5:20-cv-03664-LHK; and Calhoun, et al. v. Google LLC – U.S. District Court, Northern District of California, San Jose Division: Case No. 5:20-cv-5146-LHK-SVK," Oct. 6, 2021
- Order Regarding Motion to Dismiss, Mar. 17, 2021
- Plaintiffs' Responses and Objections to Defendant's Second Set of Interrogatories (Nos. 6–9), Mar. 12, 2021
- Plaintiffs' Reply Memorandum in Support of Motion to Substitute Plaintiffs, Oct. 1, 2021

## Depositions

- Deposition of Curt Harting, Aug. 4, 2021
- Deposition of David Monsees, Apr. 9, 2021 (volume 1)
- Deposition of David Monsees, June 11, 2021 (volume 2)
- Deposition of Dr. Claudia Kindler, July 5, 2021
- Deposition of Elaine Crespo, July 22, 2021
- Deposition of Michael Henry, Aug. 9, 2021
- Deposition of Patrick Calhoun, July 19, 2021

## Publicly available materials

- Aleecia M. McDonald and Lorrie Faith Cranor, "Americans' Attitudes About Internet Behavioral Advertising Practices," Proceedings of the 9th annual ACM workshop on Privacy in the electronic society, WPES 2010: 63–72
- Alessandro Acquisti, Leslie K. John, and George Loewenstein, "What is Privacy Worth?" *The Journal of Legal Studies* 42, no. 2 (June 2013): 249–274
- Aliza Vigderman and Gabe Turner, "2021 VPN Usage Statistics," Security.org, Sept. 9, 2021, https://www.security.org/vpn/statistics/#why
- Alphabet Inc., Form 10-K, FYE 2015
- Alphabet Inc., Form 10-K, FYE 2016
- Alphabet Inc., Form 10-K, FYE 2017
- Alphabet Inc., Form 10-K, FYE 2018
- Alphabet Inc., Form 10-K, FYE 2019
- Alphabet Inc., Form 10-K, FYE 2020
- Anders Gustafsson, Andreas Herrmann, and Frank Huber, *Conjoint Measurement: Methods and Applications* (Springer, 2003), pp. 7–8
- Avi Goldfarb and Catherine Tucker, "Privacy Regulation and Online Advertising," *Management Science* 51, no. 1 (2011): 57–71
- BLS, "CPI Inflation Calculator," *available at* https://www.bls.gov/data/inflation_calculator.htm
- BLS, "Databases, Tables & Calculators by Subject," *available at* https://data.bls.gov/timeseries/CUUR0000SA0

Confidential – Attorneys' Eyes Only

# Appendix 2
# Materials Received

- Chris Chapman, Kate Krontiris, John S. Webb, Profile CBC: Using Conjoint Analysis for Consumer Profiles, Proceedings of the Sawtooth Software Conference, Mar. 2015, *available at* https://sawtoothsoftware.com/resources/technical-papers.
- CNET, "Best VPN service of 2021," Oct. 2, 2021, https://www.cnet.com/tech/services-and-software/best-vpn
- CyberGhost, "Home Page," accessed Oct. 4, 2021, https://www.cyberghostvpn.com/en_US
- DataProt, "VPN Statistics for 2021-Keeping Your Browsing Habits Private," Mar 21, 2021, https://dataprot.net/statistics/vpn-statistics/
- Digital Advertising Alliance, "About the Digital Advertising Alliance," DAA, accessed Oct. 5, 2020, https://digitaladvertisingalliance.org/about
- ExpressVPN "Download a VPN app and protect any device," accessed Oct. 4, 2021, https://www.expressvpn.com/vpn-software
- ExpressVPN "What is a VPN?" accessed Oct. 4, 2021, https://www.expressvpn.com/what-is-vpn.
- ExpressVPN, "Order," accessed Oct. 4, 2021, https://www.expressvpn.com/order
- Fastest VPN, "Buy VPN and Get Private Cloud Storage for Free," accessed Oct. 4, 2021, https://fastestvpn.com/buy-vpn
- Fastest VPN, "Features," accessed Oct. 4. 2021, https://fastestvpn.com/features
- Federal Reserve, "Foreign Exchange Rates," Oct. 4, 2021, *available at* https://www.federalreserve.gov/releases/h10/hist/dat00_eu.htm
- Forbes, "Best VPN Services," Jul 11, 2019, https://www.forbes.com/sites/tjmccue/2019/07/11/best-vpn-services/?sh=c6ce5c729e8e
- FTC, "Self-Regulatory Principles For Online Behavioral Advertising," Feb. 2009
- Garrett A. Johnson, Scott K. Shriver, and Shaoyin Du, "Consumer privacy choice in online advertising: Who opts out and at what cost to industry?" *Marketing Science* 39, no. 1 (Jan.–Feb. 2020): 33–51
- Garrett Johnson, @garjoh_canuck, Twitter, Apr. 15, 2019, https://twitter.com/garjoh_canuck/status/1117874397191163904
- Garrett Johnson, @garjoh_canuck, Twitter, Aug. 22, 2019, https://twitter.com/garjoh_canuck/status/1164566217602031621?s=20
- Google, "A fresh take on the browser," Google official blog, Sept. 1, 2008, https://googleblog.blogspot.com/2008/09/fresh-take-on-browser.html
- Google, "Behavioral targeting," accessed Oct. 4, 2021, https://support.google.com/displayvideo/answer/2879688?hl=en
- Google, "Compare Ad Manager, AdSense, and AdMob," accessed Oct. 4, 2021, https://support.google.com/admanager/answer/9234653
- Google, "Google Ads Help: About audience targeting," accessed Oct. 4, 2021, https://support.google.com/google-ads/answer/2497941?hl=en
- Google, "Google Ads Help: Benefits of online advertising and Google Ads," accessed Oct. 4, 2021, https://support.google.com/google-ads/answer/6123875?hl=en
- Google, "Google Ads Help: Clickthrough rate (CTR): Definition," *available at* https://support.google.com/google-ads/answer/2615875?hl=en
- Google, "Google Ads Help: Google AdWords is now Google Ads," accessed Oct. 4, 2021, https://support.google.com/google-ads/answer/9028765?hl=en
- Google, "Google Ads," accessed Oct. 4, 2021, https://ads.google.com/home/

Confidential – Attorneys' Eyes Only

# Appendix 2
# Materials Received

- Google, "Google AdSense Help: AdSense revenue share," accessed Oct. 4, 2021, https://support.google.com/adsense/answer/180195?hl=en&ref_topic=1319755
- Google, "Google AdSense," accessed Oct. 4, 2021, https://www.google.com/adsense/start/
- Google, "Google Chrome Privacy Notice," Jan. 15, 2021, https://www.google.com/chrome/privacy/archive/20210115/
- Google, "Google Chrome Privacy Notice," Sept. 23, 2021, https://www.google.com/chrome/privacy/
- Google, "Google Chrome Privacy Notice," Sept. 24, 2018, https://www.google.com/chrome/privacy/archive/20180924/
- Google Chrome Help, "Clear, enable, and manage cookies in Chrome," accessed Oct. 4, 2021, https://support.google.com/chrome/answer/95647
- Hanna Krasnova, Thomas Hildebrand, and Oliver Guenther, "Investigating the Value of Privacy in Online Social Networks: Conjoint Analysis," *ICIS 2009 Proceedings,* paper 173, 2009
- Heinz Tschabitscher, "How Many People Use Email Worldwide," Lifewire, May 31, 2021, *available at* https://www.lifewire.com/how-many-email-users-are-there-1171213
- Howard Beales, "The Value of Behavioral Targeting," Network Advertising Initiative, Mar. 2010
- Il-Horn Hann, Kai-Lung Hui, Sang-Yong Tom Lee and Ivan P. L. Png, "Overcoming Online Information Privacy Concerns: An Information-Processing Theory Approach," *Journal of Management Information Systems* 24, no. 2, pp. 13–42
- IP Vanish, "Pricing," accessed Oct. 4, 2021, https://www.ipvanish.com/pricing/?cjevent=1450509d264811ec803300410a1c0e0d&CID=5370367&cjdata=MXxOfDB8WXww
- Ipsos, "Ipsos Screenwise Panel," accessed Oct. 4, 2021, https://screenwisepanel.com/.
- Ipsos, "Key figures," accessed Oct. 4, 2021, https://www.ipsos.com/en/key-figures.
- J. Howard Beales and Jeffrey A. Eisenach, "An Empirical Analysis of the Value of Information Sharing in the Market for Online Content," Navigant Economics, Jan. 2014, pp. 1–15
- Jun Yan, Gang Wang, En Zhang, Yun Jiang, and Zheng Chen, "How Much Can Behavioral Targeting Help Online Advertising?" *WWW 2009 MADRID!,* 2009, http://www2009.eprints.org
- Neilsen, "Neilsen Computer & Mobile Panel," accessed Oct. 4, 2021, https://computermobilepanel.nielsen.com/ui/US/en/sdp/landing?SourceId=195&PID=15877&PID2=1023b2824bbb106a8ae24c4b8a4fbc
- Neilsen, "Privacy & Cookie Notice," Jan. 2020, *available at* https://computermobilepanel.nielsen.com/ui/US/en/privacypolicyen.html
- Network Advertising Initiative, "2008 NAI Principles: The Network Advertising Initiative's Self-Regulatory Code of Conduct," accessed Oct. 4, 2021, https://www.networkadvertising.org/principles.pdf
- NordVPN, "Home Page," accessed Oct. 4, 2021, https://nordvpn.com/
- Orson Lucas, "Corporate data responsibility," KPMG, Aug. 2021, *available at* https://advisory.kpmg.us/content/dam/advisory/en/pdfs/2021/corporate-data-responsibility-bridging-the-consumer-trust-gap.pdf
- Paul Green and V. Srinivasan, "Conjoint Analysis in Consumer Research: Issues and Outlook," *The Journal of Consumer Research* 5, no. 2 (Sept. 1978): pp. 103 and 116–117
- PC Mag, "The Best VPN Services for 2021," Sept. 27, 2021, https://www.pcmag.com/picks/the-best-vpn-services

Confidential – Attorneys' Eyes Only

# Appendix 2
# Materials Received

- Private Internet Access, "Special 3-Year Plan," accessed Oct. 4, 2021, https://www.privateinternetaccess.com/buy-vpn-online
- Private Internet Access, "Private Internet Access: VPN Features," accessed Oct. 4, 2021, https://www.privateinternetaccess.com/vpn-features
- PwC, "22nd Annual Global CEO Survey," 2019, *available at* https://www.pwc.com/gx/en/ceo-survey/2019/report/pwc-22nd-annual-global-ceo-survey.pdf
- *Reference Manual on Scientific Evidence,* Third Edition, Federal Judicial Center: Committee on Science, Technology, and Law Policy and Global Affairs
- Reviews.org, "10 Best VPN Services 2021," Sept. 1, 2021, https://www.reviews.org/vpn/best-vpn-services/
- Robert S. Pindyck and Daniel Rubinfeld, *Microeconomics* (Upper Saddle River: Pearson Education, Inc., 2009)
- Sarah Sluis, "Marketing Professor Garrett Johnson Wants You To Know That Cookies Increase Ad Revenue," Ad Exchanger, Sept. 3, 2019
- SAS, "Data Privacy: Are You Concerned," *available at* https://www.sas.com/en/whitepapers/data-privacy-110027.html
- StatCounter, "Browser Market Share United States of America," *available at* https://gs.statcounter.com/browser-market-share/all/united-states-of-america/#monthly-200901-202108
- Surfshark, "Pricing," accessed Oct. 4, 2021, https://surfshark.com/pricing
- SurveySavvy, "How it Works," accessed Oct. 4, 2021, https://www.surveysavvy.com/how_it_works.
- SurveySavvy, "What is SavvyConnect?" accessed Oct. 4, 2021, https://www.surveysavvy.com/savvyconnect.
- Swish Goswami, "The Rising Concern Around Consumer Data And Privacy," *Forbes,* Dec. 14, 2020
- Techradar, "The best VPN service 2021," accessed Oct. 4, 2021, https://www.techradar.com/vpn/best-vpn
- TunnelBear, "Get an unlimited TunnelBear Plan," accessed Oct. 4, 2021, https://www.tunnelbear.com/account/checkout
- UpVoice, "How can we help you," accessed Oct. 4, 2021, https://www.joinupvoice.com/faq
- YouTube, "YouTube Advertising," accessed Oct. 4, 2021, https://www.youtube.com/ads/

### Other case materials

- Transcript of a Google presentation, June 23, 2021 (Exhibit E)

### Bates documents on following pages

Confidential – Attorneys' Eyes Only

Patrick Calhoun, et al. v. Google LLC

# Appendix 2
# Materials Received

| | | | |
|---|---|---|---|
| GOOG-CABR-00034585 | GOOG-CABR-00101824 | GOOG-CABR-00112576 | GOOG-CABR-00124571 |
| GOOG-CABR-00034698 | GOOG-CABR-00102089 | GOOG-CABR-00113473 | GOOG-CABR-00124804 |
| GOOG-CABR-00038162 | GOOG-CABR-00102205 | GOOG-CABR-00113476 | GOOG-CABR-00125243 |
| GOOG-CABR-00038175 | GOOG-CABR-00102573 | GOOG-CABR-00113493 | GOOG-CABR-00125543 |
| GOOG-CABR-00051817 | GOOG-CABR-00103249 | GOOG-CABR-00113845 | GOOG-CABR-00126373 |
| GOOG-CABR-00053831 | GOOG-CABR-00103278 | GOOG-CABR-00114661 | GOOG-CABR-00128202 |
| GOOG-CABR-00056947 | GOOG-CABR-00103598 | GOOG-CABR-00114741 | GOOG-CABR-00128540 |
| GOOG-CABR-00057706 | GOOG-CABR-00103636 | GOOG-CABR-00115012 | GOOG-CABR-00130197 |
| GOOG-CABR-00085945 | GOOG-CABR-00103836 | GOOG-CABR-00115076 | GOOG-CABR-00132160 |
| GOOG-CABR-00087102 | GOOG-CABR-00106204 | GOOG-CABR-00115316 | GOOG-CABR-00132780 |
| GOOG-CABR-00087149 | GOOG-CABR-00106441 | GOOG-CABR-00115748 | GOOG-CABR-00133210 |
| GOOG-CABR-00088952 | GOOG-CABR-00106574 | GOOG-CABR-00116509 | GOOG-CABR-00134004 |
| GOOG-CABR-00089033 | GOOG-CABR-00106626 | GOOG-CABR-00116712 | GOOG-CABR-00134052 |
| GOOG-CABR-00089357 | GOOG-CABR-00106951 | GOOG-CABR-00116720 | GOOG-CABR-00134120 |
| GOOG-CABR-00089452 | GOOG-CABR-00107656 | GOOG-CABR-00116817 | GOOG-CABR-00135463 |
| GOOG-CABR-00090778 | GOOG-CABR-00107792 | GOOG-CABR-00116903 | GOOG-CABR-00135991 |
| GOOG-CABR-00094034 | GOOG-CABR-00107826 | GOOG-CABR-00116916 | GOOG-CABR-00136112 |
| GOOG-CABR-00094463 | GOOG-CABR-00108242 | GOOG-CABR-00116986 | GOOG-CABR-00136305 |
| GOOG-CABR-00094788 | GOOG-CABR-00108919 | GOOG-CABR-00117008 | GOOG-CABR-00136347 |
| GOOG-CABR-00094941 | GOOG-CABR-00108982 | GOOG-CABR-00117120 | GOOG-CABR-00136987 |
| GOOG-CABR-00095330 | GOOG-CABR-00109171 | GOOG-CABR-00117728 | GOOG-CABR-00136991 |
| GOOG-CABR-00095356 | GOOG-CABR-00109372 | GOOG-CABR-00118274 | GOOG-CABR-00137013 |
| GOOG-CABR-00095970 | GOOG-CABR-00109888 | GOOG-CABR-00118392 | GOOG-CABR-00137173 |
| GOOG-CABR-00098374 | GOOG-CABR-00109891 | GOOG-CABR-00118484 | GOOG-CABR-00137192 |
| GOOG-CABR-00099479 | GOOG-CABR-00109894 | GOOG-CABR-00118492 | GOOG-CABR-00137199 |
| GOOG-CABR-00099540 | GOOG-CABR-00110022 | GOOG-CABR-00121175 | GOOG-CABR-00137234 |
| GOOG-CABR-00099935 | GOOG-CABR-00110264 | GOOG-CABR-00121444 | GOOG-CABR-00137309 |
| GOOG-CABR-00100404 | GOOG-CABR-00110568 | GOOG-CABR-00121571 | GOOG-CABR-00137518 |
| GOOG-CABR-00100610 | GOOG-CABR-00110824 | GOOG-CABR-00122519 | GOOG-CABR-00137630 |
| GOOG-CABR-00101632 | GOOG-CABR-00111931 | GOOG-CABR-00122754 | GOOG-CABR-00138266 |

Confidential – Attorneys' Eyes Only

Patrick Calhoun, et al. v. Google LLC

# Appendix 2
## Materials Received

| | | | |
|---|---|---|---|
| GOOG-CABR-00139853 | GOOG-CABR-00160096 | GOOG-CABR-00163415 | GOOG-CABR-00173446 |
| GOOG-CABR-00140255 | GOOG-CABR-00160106 | GOOG-CABR-00163423 | GOOG-CABR-00173503 |
| GOOG-CABR-00140464 | GOOG-CABR-00160116 | GOOG-CABR-00163432 | GOOG-CABR-00173728 |
| GOOG-CABR-00140786 | GOOG-CABR-00160127 | GOOG-CABR-00163441 | GOOG-CABR-00173748 |
| GOOG-CABR-00141416 | GOOG-CABR-00160138 | GOOG-CABR-00163452 | GOOG-CABR-00173765 |
| GOOG-CABR-00141569 | GOOG-CABR-00160149 | GOOG-CABR-00163462 | GOOG-CABR-00173772 |
| GOOG-CABR-00141714 | GOOG-CABR-00160162 | GOOG-CABR-00163472 | GOOG-CABR-00173779 |
| GOOG-CABR-00141724 | GOOG-CABR-00160175 | GOOG-CABR-00163483 | GOOG-CABR-00173786 |
| GOOG-CABR-00141734 | GOOG-CABR-00160188 | GOOG-CABR-00163494 | GOOG-CABR-00173794 |
| GOOG-CABR-00141751 | GOOG-CABR-00160202 | GOOG-CABR-00163505 | GOOG-CABR-00174560 |
| GOOG-CABR-00142075 | GOOG-CABR-00160216 | GOOG-CABR-00163518 | GOOG-CABR-00174561 |
| GOOG-CABR-00142194 | GOOG-CABR-00160230 | GOOG-CABR-00163531 | GOOG-CABR-00174562 |
| GOOG-CABR-00142678 | GOOG-CABR-00160245 | GOOG-CABR-00163544 | GOOG-CABR-00174569 |
| GOOG-CABR-00142693 | GOOG-CABR-00160246 | GOOG-CABR-00163558 | GOOG-CABR-00174570 |
| GOOG-CABR-00143022 | GOOG-CABR-00160261 | GOOG-CABR-00163581 | GOOG-CABR-00174572 |
| GOOG-CABR-00143193 | GOOG-CABR-00160262 | GOOG-CABR-00163603 | GOOG-CABR-00176344 |
| GOOG-CABR-00143914 | GOOG-CABR-00160277 | GOOG-CABR-00163618 | GOOG-CABR-00176346 |
| GOOG-CABR-00144583 | GOOG-CABR-00160278 | GOOG-CABR-00163619 | GOOG-CABR-00176399 |
| GOOG-CABR-00144847 | GOOG-CABR-00160318 | GOOG-CABR-00163634 | GOOG-CABR-00176402 |
| GOOG-CABR-00147385 | GOOG-CABR-00160319 | GOOG-CABR-00163635 | GOOG-CABR-00176623 |
| GOOG-CABR-00153882 | GOOG-CABR-00160360 | GOOG-CABR-00163650 | GOOG-CABR-00176627 |
| GOOG-CABR-00160020 | GOOG-CABR-00160361 | GOOG-CABR-00165766 | GOOG-CABR-00177016 |
| GOOG-CABR-00160028 | GOOG-CABR-00160403 | GOOG-CABR-00165767 | GOOG-CABR-00177027 |
| GOOG-CABR-00160036 | GOOG-CABR-00160404 | GOOG-CABR-00166923 | GOOG-CABR-00177032 |
| GOOG-CABR-00160044 | GOOG-CABR-00160446 | GOOG-CABR-00166924 | GOOG-CABR-00177037 |
| GOOG-CABR-00160053 | GOOG-CABR-00163374 | GOOG-CABR-00172242 | GOOG-CABR-00177042 |
| GOOG-CABR-00160061 | GOOG-CABR-00163382 | GOOG-CABR-00172514 | GOOG-CABR-00177050 |
| GOOG-CABR-00160069 | GOOG-CABR-00163390 | GOOG-CABR-00172784 | GOOG-CABR-00177218 |
| GOOG-CABR-00160078 | GOOG-CABR-00163398 | GOOG-CABR-00173409 | GOOG-CABR-00177226 |
| GOOG-CABR-00160087 | GOOG-CABR-00163407 | GOOG-CABR-00173421 | GOOG-CABR-00177400 |

Confidential – Attorneys' Eyes Only

Patrick Calhoun, et al. v. Google LLC

# Appendix 2
## Materials Received

| | | | |
|---|---|---|---|
| GOOG-CABR-00177414 | GOOG-CABR-00178636 | GOOG-CABR-00220829 | GOOG-CABR-00225825 |
| GOOG-CABR-00177422 | GOOG-CABR-00178677 | GOOG-CABR-00224709 | GOOG-CABR-00225907 |
| GOOG-CABR-00177852 | GOOG-CABR-00178687 | GOOG-CABR-00224713 | GOOG-CABR-00225918 |
| GOOG-CABR-00177865 | GOOG-CABR-00178728 | GOOG-CABR-00224714 | GOOG-CABR-00225952 |
| GOOG-CABR-00177877 | GOOG-CABR-00178745 | GOOG-CABR-00224715 | GOOG-CABR-00226006 |
| GOOG-CABR-00177887 | GOOG-CABR-00178787 | GOOG-CABR-00225067 | GOOG-CABR-00226259 |
| GOOG-CABR-00177896 | GOOG-CABR-00178788 | GOOG-CABR-00225071 | GOOG-CABR-00226264 |
| GOOG-CABR-00177904 | GOOG-CABR-00178830 | GOOG-CABR-00225080 | GOOG-CABR-00226292 |
| GOOG-CABR-00177952 | GOOG-CABR-00182109 | GOOG-CABR-00225085 | GOOG-CABR-00226301 |
| GOOG-CABR-00177971 | GOOG-CABR-00182154 | GOOG-CABR-00225195 | GOOG-CABR-00226490 |
| GOOG-CABR-00177983 | GOOG-CABR-00182158 | GOOG-CABR-00225198 | GOOG-CABR-00226491 |
| GOOG-CABR-00178023 | GOOG-CABR-00182202 | GOOG-CABR-00225202 | GOOG-CABR-00226813 |
| GOOG-CABR-00178032 | GOOG-CABR-00182337 | GOOG-CABR-00225211 | GOOG-CABR-00226851 |
| GOOG-CABR-00178044 | GOOG-CABR-00183079 | GOOG-CABR-00225217 | GOOG-CABR-00226978 |
| GOOG-CABR-00178057 | GOOG-CABR-00188028 | GOOG-CABR-00225220 | GOOG-CABR-00227659 |
| GOOG-CABR-00178071 | GOOG-CABR-00188029 | GOOG-CABR-00225223 | GOOG-CABR-00227660 |
| GOOG-CABR-00178082 | GOOG-CABR-00189199 | GOOG-CABR-00225226 | GOOG-CABR-00228641 |
| GOOG-CABR-00178093 | GOOG-CABR-00190698 | GOOG-CABR-00225238 | GOOG-CABR-00228644 |
| GOOG-CABR-00178104 | GOOG-CABR-00192113 | GOOG-CABR-00225246 | GOOG-CABR-00228656 |
| GOOG-CABR-00178117 | GOOG-CABR-00192118 | GOOG-CABR-00225249 | GOOG-CABR-00228883 |
| GOOG-CABR-00178130 | GOOG-CABR-00192123 | GOOG-CABR-00225366 | GOOG-CABR-00228887 |
| GOOG-CABR-00178147 | GOOG-CABR-00192128 | GOOG-CABR-00225370 | GOOG-CABR-00228889 |
| GOOG-CABR-00178161 | GOOG-CABR-00192133 | GOOG-CABR-00225375 | GOOG-CABR-00228891 |
| GOOG-CABR-00178210 | GOOG-CABR-00192138 | GOOG-CABR-00225379 | GOOG-CABR-00229139 |
| GOOG-CABR-00178242 | GOOG-CABR-00192150 | GOOG-CABR-00225384 | GOOG-CABR-00229163 |
| GOOG-CABR-00178257 | GOOG-CABR-00192239 | GOOG-CABR-00225389 | GOOG-CABR-00229437 |
| GOOG-CABR-00178279 | GOOG-CABR-00192246 | GOOG-CABR-00225395 | GOOG-CABR-00229440 |
| GOOG-CABR-00178294 | GOOG-CABR-00192254 | GOOG-CABR-00225804 | GOOG-CABR-00229441 |
| GOOG-CABR-00178295 | GOOG-CABR-00192316 | GOOG-CABR-00225814 | GOOG-CABR-00229443 |
| GOOG-CABR-00178310 | GOOG-CABR-00192325 | GOOG-CABR-00225816 | GOOG-CABR-00229449 |

Confidential – Attorneys' Eyes Only

Patrick Calhoun, et al. v. Google LLC

# Appendix 2
# Materials Received

| | | | |
|---|---|---|---|
| GOOG-CABR-00229458 | GOOG-CABR-00229620 | GOOG-CABR-00355077 | GOOG-CABR-00829524 |
| GOOG-CABR-00229463 | GOOG-CABR-00229624 | GOOG-CABR-00357228 | GOOG-CABR-00829529 |
| GOOG-CABR-00229468 | GOOG-CABR-00229628 | GOOG-CABR-00357233 | GOOG-CABR-00829534 |
| GOOG-CABR-00229475 | GOOG-CABR-00229633 | GOOG-CABR-00357239 | GOOG-CABR-00829544 |
| GOOG-CABR-00229480 | GOOG-CABR-00229644 | GOOG-CABR-00357244 | GOOG-CABR-00829549 |
| GOOG-CABR-00229485 | GOOG-CABR-00229652 | GOOG-CABR-00357904 | GOOG-CABR-00829553 |
| GOOG-CABR-00229490 | GOOG-CABR-00229657 | GOOG-CABR-00359701 | GOOG-CABR-00829557 |
| GOOG-CABR-00229504 | GOOG-CABR-00229662 | GOOG-CABR-00359824 | GOOG-CABR-00829561 |
| GOOG-CABR-00229523 | GOOG-CABR-00229667 | GOOG-CABR-00361614 | GOOG-CABR-00829565 |
| GOOG-CABR-00229525 | GOOG-CABR-00229672 | GOOG-CABR-00374780 | GOOG-CABR-00829577 |
| GOOG-CABR-00229530 | GOOG-CABR-00229706 | GOOG-CABR-00376894 | GOOG-CABR-00829578 |
| GOOG-CABR-00229535 | GOOG-CABR-00229711 | GOOG-CABR-00484512 | GOOG-CABR-00829579 |
| GOOG-CABR-00229543 | GOOG-CABR-00229774 | GOOG-CABR-00491838 | GOOG-CABR-00829600 |
| GOOG-CABR-00229551 | GOOG-CABR-00229792 | GOOG-CABR-00547607 | GOOG-CABR-00829665 |
| GOOG-CABR-00229557 | GOOG-CABR-00229799 | GOOG-CABR-00706690 | GOOG-CABR-00829668 |
| GOOG-CABR-00229558 | GOOG-CABR-00229809 | GOOG-CABR-00707099 | GOOG-CABR-00831122 |
| GOOG-CABR-00229562 | GOOG-CABR-00229816 | GOOG-CABR-00708108 | GOOG-CABR-00831132 |
| GOOG-CABR-00229570 | GOOG-CABR-00229824 | GOOG-CABR-00710486 | GOOG-CABR-00831133 |
| GOOG-CABR-00229571 | GOOG-CABR-00229831 | GOOG-CABR-00710749 | GOOG-CABR-00831134 |
| GOOG-CABR-00229574 | GOOG-CABR-00229839 | GOOG-CABR-00710860 | GOOG-CABR-00831135 |
| GOOG-CABR-00229576 | GOOG-CABR-00229847 | GOOG-CABR-00710972 | GOOG-CABR-00831145 |
| GOOG-CABR-00229578 | GOOG-CABR-00229894 | GOOG-CABR-00710989 | GOOG-CABR-00831146 |
| GOOG-CABR-00229580 | GOOG-CABR-00230108 | GOOG-CABR-00711216 | GOOG-CABR-00831147 |
| GOOG-CABR-00229583 | GOOG-CABR-00230109 | GOOG-CABR-00772135 | GOOG-CABR-00831148 |
| GOOG-CABR-00229587 | GOOG-CABR-00348938 | GOOG-CABR-00773212 | GOOG-CABR-00831149 |
| GOOG-CABR-00229590 | GOOG-CABR-00349425 | GOOG-CABR-00773232 | GOOG-CABR-00831150 |
| GOOG-CABR-00229604 | GOOG-CABR-00349433 | GOOG-CABR-00777237 | GOOG-CABR-00877178 |
| GOOG-CABR-00229608 | GOOG-CABR-00349519 | GOOG-CABR-00783475 | GOOG-CABR-00877183 |
| GOOG-CABR-00229612 | GOOG-CABR-00349574 | GOOG-CABR-00797331 | GOOG-CABR-00877193 |
| GOOG-CABR-00229616 | GOOG-CABR-00353886 | GOOG-CABR-00805429 | GOOG-CABR-00877289 |

Confidential – Attorneys' Eyes Only

Patrick Calhoun, et al. v. Google LLC

# Appendix 2
# Materials Received

| | | | |
|---|---|---|---|
| GOOG-CABR-00877294 | GOOG-CABR-03609936 | GOOG-CABR-03612135 | GOOG-CABR-03633782 |
| GOOG-CABR-00877299 | GOOG-CABR-03609969 | GOOG-CABR-03612482 | GOOG-CABR-03635047 |
| GOOG-CABR-00877310 | GOOG-CABR-03609973 | GOOG-CABR-03612539 | GOOG-CABR-03635294 |
| GOOG-CABR-00877314 | GOOG-CABR-03609977 | GOOG-CABR-03612824 | GOOG-CABR-03635405 |
| GOOG-CABR-00877317 | GOOG-CABR-03610145 | GOOG-CABR-03613350 | GOOG-CABR-03636634 |
| GOOG-CABR-00877322 | GOOG-CABR-03610156 | GOOG-CABR-03618685 | GOOG-CABR-03639045 |
| GOOG-CABR-00877326 | GOOG-CABR-03610161 | GOOG-CABR-03618869 | GOOG-CABR-03639099 |
| GOOG-CABR-00892075 | GOOG-CABR-03610172 | GOOG-CABR-03618937 | GOOG-CABR-03642114 |
| GOOG-CABR-00892800 | GOOG-CABR-03610178 | GOOG-CABR-03619392 | GOOG-CABR-03642116 |
| GOOG-CABR-00892992 | GOOG-CABR-03610184 | GOOG-CABR-03621251 | GOOG-CABR-03642126 |
| GOOG-CABR-00893146 | GOOG-CABR-03610190 | GOOG-CABR-03622706 | GOOG-CABR-03642138 |
| GOOG-CABR-00893164 | GOOG-CABR-03610196 | GOOG-CABR-03623263 | GOOG-CABR-03644863 |
| GOOG-CABR-00893529 | GOOG-CABR-03610387 | GOOG-CABR-03624336 | GOOG-CABR-03644998 |
| GOOG-CABR-00893656 | GOOG-CABR-03610883 | GOOG-CABR-03624468 | GOOG-CABR-03645183 |
| GOOG-CABR-00893739 | GOOG-CABR-03611050 | GOOG-CABR-03624546 | GOOG-CABR-03647356 |
| GOOG-CABR-00894131 | GOOG-CABR-03611093 | GOOG-CABR-03624683 | GOOG-CABR-03652531 |
| GOOG-CABR-00905553 | GOOG-CABR-03611191 | GOOG-CABR-03624965 | GOOG-CABR-03652816 |
| GOOG-CABR-00916995 | GOOG-CABR-03611262 | GOOG-CABR-03624966 | GOOG-CABR-03652901 |
| GOOG-CABR-03606044 | GOOG-CABR-03611264 | GOOG-CABR-03625627 | GOOG-CABR-03653236 |
| GOOG-CABR-03607555 | GOOG-CABR-03611266 | GOOG-CABR-03625645 | GOOG-CABR-03653263 |
| GOOG-CABR-03609407 | GOOG-CABR-03611268 | GOOG-CABR-03625656 | GOOG-CABR-03653379 |
| GOOG-CABR-03609778 | GOOG-CABR-03611271 | GOOG-CABR-03626144 | GOOG-CABR-03655253 |
| GOOG-CABR-03609783 | GOOG-CABR-03611274 | GOOG-CABR-03627469 | GOOG-CABR-03655443 |
| GOOG-CABR-03609789 | GOOG-CABR-03611378 | GOOG-CABR-03628374 | GOOG-CABR-03655515 |
| GOOG-CABR-03609795 | GOOG-CABR-03611380 | GOOG-CABR-03629931 | GOOG-CABR-03656870 |
| GOOG-CABR-03609801 | GOOG-CABR-03611417 | GOOG-CABR-03630071 | GOOG-CABR-03656880 |
| GOOG-CABR-03609807 | GOOG-CABR-03611619 | GOOG-CABR-03630076 | GOOG-CABR-03657086 |
| GOOG-CABR-03609814 | GOOG-CABR-03611693 | GOOG-CABR-03630218 | GOOG-CABR-03657160 |
| GOOG-CABR-03609925 | GOOG-CABR-03611826 | GOOG-CABR-03631336 | GOOG-CABR-03657218 |
| GOOG-CABR-03609931 | GOOG-CABR-03611958 | GOOG-CABR-03631912 | GOOG-CABR-03657364 |

Confidential – Attorneys' Eyes Only

Patrick Calhoun, et al. v. Google LLC

# Appendix 2
## Materials Received

| | | | |
|---|---|---|---|
| GOOG-CABR-03658499 | GOOG-CABR-03666957 | GOOG-CABR-03668908 | GOOG-CABR-03682184 |
| GOOG-CABR-03660302 | GOOG-CABR-03667008 | GOOG-CABR-03669058 | GOOG-CABR-03682624 |
| GOOG-CABR-03661289 | GOOG-CABR-03667012 | GOOG-CABR-03669109 | GOOG-CABR-03683546 |
| GOOG-CABR-03662314 | GOOG-CABR-03667059 | GOOG-CABR-03669465 | GOOG-CABR-03683871 |
| GOOG-CABR-03662353 | GOOG-CABR-03667102 | GOOG-CABR-03669485 | GOOG-CABR-03683875 |
| GOOG-CABR-03662355 | GOOG-CABR-03667145 | GOOG-CABR-03669516 | GOOG-CABR-03684167 |
| GOOG-CABR-03662357 | GOOG-CABR-03667167 | GOOG-CABR-03669553 | GOOG-CABR-03701856 |
| GOOG-CABR-03662359 | GOOG-CABR-03667213 | GOOG-CABR-03670152 | GOOG-CABR-03701912 |
| GOOG-CABR-03662361 | GOOG-CABR-03667215 | GOOG-CABR-03671494 | GOOG-CABR-03707760 |
| GOOG-CABR-03662363 | GOOG-CABR-03667277 | GOOG-CABR-03672068 | GOOG-CABR-03711380 |
| GOOG-CABR-03662365 | GOOG-CABR-03667362 | GOOG-CABR-03672810 | GOOG-CABR-03713119 |
| GOOG-CABR-03662601 | GOOG-CABR-03667366 | GOOG-CABR-03672811 | GOOG-CABR-03713956 |
| GOOG-CABR-03662975 | GOOG-CABR-03667390 | GOOG-CABR-03672812 | GOOG-CABR-03717130 |
| GOOG-CABR-03662990 | GOOG-CABR-03667401 | GOOG-CABR-03672814 | GOOG-CABR-03717489 |
| GOOG-CABR-03663032 | GOOG-CABR-03667434 | GOOG-CABR-03672823 | GOOG-CABR-03717912 |
| GOOG-CABR-03663152 | GOOG-CABR-03667474 | GOOG-CABR-03672830 | GOOG-CABR-03718169 |
| GOOG-CABR-03663566 | GOOG-CABR-03667532 | GOOG-CABR-03672907 | GOOG-CABR-03718204 |
| GOOG-CABR-03663606 | GOOG-CABR-03667863 | GOOG-CABR-03674280 | GOOG-CABR-03720591 |
| GOOG-CABR-03663687 | GOOG-CABR-03667922 | GOOG-CABR-03676183 | GOOG-CABR-03728231 |
| GOOG-CABR-03663855 | GOOG-CABR-03667926 | GOOG-CABR-03676936 | GOOG-CABR-03730752 |
| GOOG-CABR-03663918 | GOOG-CABR-03668013 | GOOG-CABR-03676944 | GOOG-CABR-03731006 |
| GOOG-CABR-03664108 | GOOG-CABR-03668260 | GOOG-CABR-03676952 | GOOG-CABR-03731319 |
| GOOG-CABR-03664122 | GOOG-CABR-03668263 | GOOG-CABR-03677269 | GOOG-CABR-03731361 |
| GOOG-CABR-03664350 | GOOG-CABR-03668266 | GOOG-CABR-03678005 | GOOG-CABR-03731987 |
| GOOG-CABR-03666002 | GOOG-CABR-03668269 | GOOG-CABR-03679561 | GOOG-CABR-03732123 |
| GOOG-CABR-03666125 | GOOG-CABR-03668272 | GOOG-CABR-03679913 | GOOG-CABR-03732752 |
| GOOG-CABR-03666266 | GOOG-CABR-03668275 | GOOG-CABR-03680867 | GOOG-CABR-03732796 |
| GOOG-CABR-03666502 | GOOG-CABR-03668395 | GOOG-CABR-03681746 | GOOG-CABR-03732852 |
| GOOG-CABR-03666604 | GOOG-CABR-03668648 | GOOG-CABR-03682004 | GOOG-CABR-03733169 |
| GOOG-CABR-03666881 | GOOG-CABR-03668684 | GOOG-CABR-03682015 | GOOG-CABR-03733590 |

Confidential – Attorneys' Eyes Only

Patrick Calhoun, et al. v. Google LLC

# Appendix 2
# Materials Received

| | | | |
|---|---|---|---|
| GOOG-CABR-03733599 | GOOG-CABR-03745434 | GOOG-CABR-03806171 | GOOG-CABR-03822476 |
| GOOG-CABR-03733621 | GOOG-CABR-03751585 | GOOG-CABR-03809311 | GOOG-CABR-03822983 |
| GOOG-CABR-03734136 | GOOG-CABR-03753240 | GOOG-CABR-03809408 | GOOG-CABR-03823611 |
| GOOG-CABR-03734137 | GOOG-CABR-03753832 | GOOG-CABR-03811784 | GOOG-CABR-03823643 |
| GOOG-CABR-03734143 | GOOG-CABR-03755473 | GOOG-CABR-03811798 | GOOG-CABR-03823697 |
| GOOG-CABR-03735161 | GOOG-CABR-03756369 | GOOG-CABR-03811879 | GOOG-CABR-03824415 |
| GOOG-CABR-03735374 | GOOG-CABR-03756373 | GOOG-CABR-03811948 | GOOG-CABR-03824525 |
| GOOG-CABR-03735704 | GOOG-CABR-03759850 | GOOG-CABR-03812080 | GOOG-CABR-03824630 |
| GOOG-CABR-03736233 | GOOG-CABR-03759853 | GOOG-CABR-03812119 | GOOG-CABR-03824988 |
| GOOG-CABR-03736538 | GOOG-CABR-03759877 | GOOG-CABR-03813517 | GOOG-CABR-03825000 |
| GOOG-CABR-03736684 | GOOG-CABR-03766920 | GOOG-CABR-03818566 | GOOG-CABR-03825480 |
| GOOG-CABR-03739225 | GOOG-CABR-03768904 | GOOG-CABR-03819301 | GOOG-CABR-03825483 |
| GOOG-CABR-03739282 | GOOG-CABR-03793232 | GOOG-CABR-03819450 | GOOG-CABR-03825484 |
| GOOG-CABR-03740018 | GOOG-CABR-03793291 | GOOG-CABR-03819464 | GOOG-CABR-03825499 |
| GOOG-CABR-03740051 | GOOG-CABR-03793860 | GOOG-CABR-03819578 | GOOG-CABR-03825503 |
| GOOG-CABR-03740085 | GOOG-CABR-03793886 | GOOG-CABR-03820757 | GOOG-CABR-03825504 |
| GOOG-CABR-03740088 | GOOG-CABR-03793927 | GOOG-CABR-03821105 | GOOG-CABR-03829529 |
| GOOG-CABR-03740329 | GOOG-CABR-03793932 | GOOG-CABR-03821121 | GOOG-CABR-03829773 |
| GOOG-CABR-03740496 | GOOG-CABR-03794543 | GOOG-CABR-03821123 | GOOG-CABR-03836302 |
| GOOG-CABR-03740753 | GOOG-CABR-03803310 | GOOG-CABR-03821139 | GOOG-CABR-03836486 |
| GOOG-CABR-03740945 | GOOG-CABR-03803316 | GOOG-CABR-03821140 | GOOG-CABR-03840500 |
| GOOG-CABR-03741026 | GOOG-CABR-03803320 | GOOG-CABR-03821141 | GOOG-CABR-03841074 |
| GOOG-CABR-03741029 | GOOG-CABR-03803598 | GOOG-CABR-03821142 | GOOG-CABR-03841130 |
| GOOG-CABR-03741619 | GOOG-CABR-03803946 | GOOG-CABR-03821143 | GOOG-CABR-03841399 |
| GOOG-CABR-03741891 | GOOG-CABR-03804414 | GOOG-CABR-03821144 | GOOG-CABR-03841402 |
| GOOG-CABR-03742140 | GOOG-CABR-03804729 | GOOG-CABR-03821148 | GOOG-CABR-03841514 |
| GOOG-CABR-03743113 | GOOG-CABR-03804734 | GOOG-CABR-03821504 | GOOG-CABR-03841688 |
| GOOG-CABR-03743978 | GOOG-CABR-03805309 | GOOG-CABR-03822325 | GOOG-CABR-03841719 |
| GOOG-CABR-03744621 | GOOG-CABR-03806074 | GOOG-CABR-03822459 | GOOG-CABR-03841837 |
| GOOG-CABR-03745195 | GOOG-CABR-03806075 | GOOG-CABR-03822460 | GOOG-CABR-03841860 |

Confidential – Attorneys' Eyes Only

Patrick Calhoun, et al. v. Google LLC

# Appendix 2
# Materials Received

| | | | |
|---|---|---|---|
| GOOG-CABR-03841892 | GOOG-CABR-03920806 | GOOG-CABR-03960827 | GOOG-CABR-03981044 |
| GOOG-CABR-03842730 | GOOG-CABR-03921696 | GOOG-CABR-03960921 | GOOG-CABR-03981045 |
| GOOG-CABR-03842821 | GOOG-CABR-03923566 | GOOG-CABR-03962234 | GOOG-CABR-03981050 |
| GOOG-CABR-03844143 | GOOG-CABR-03923570 | GOOG-CABR-03962238 | GOOG-CABR-03981093 |
| GOOG-CABR-03844150 | GOOG-CABR-03923575 | GOOG-CABR-03962627 | GOOG-CABR-03982214 |
| GOOG-CABR-03844251 | GOOG-CABR-03923862 | GOOG-CABR-03962630 | GOOG-CABR-03982826 |
| GOOG-CABR-03844587 | GOOG-CABR-03925971 | GOOG-CABR-03962636 | GOOG-CABR-03982893 |
| GOOG-CABR-03844589 | GOOG-CABR-03953859 | GOOG-CABR-03962643 | GOOG-CABR-03983310 |
| GOOG-CABR-03844600 | GOOG-CABR-03955968 | GOOG-CABR-03962645 | GOOG-CABR-03983413 |
| GOOG-CABR-03844836 | GOOG-CABR-03956382 | GOOG-CABR-03962647 | GOOG-CABR-03984402 |
| GOOG-CABR-03845167 | GOOG-CABR-03957893 | GOOG-CABR-03962649 | GOOG-CABR-03984448 |
| GOOG-CABR-03845233 | GOOG-CABR-03958602 | GOOG-CABR-03962651 | GOOG-CABR-03984534 |
| GOOG-CABR-03845251 | GOOG-CABR-03958723 | GOOG-CABR-03962679 | GOOG-CABR-03984819 |
| GOOG-CABR-03846279 | GOOG-CABR-03958732 | GOOG-CABR-03962751 | GOOG-CABR-03985788 |
| GOOG-CABR-03846316 | GOOG-CABR-03958914 | GOOG-CABR-03962764 | GOOG-CABR-03986198 |
| GOOG-CABR-03846321 | GOOG-CABR-03958919 | GOOG-CABR-03962832 | GOOG-CABR-03986202 |
| GOOG-CABR-03846323 | GOOG-CABR-03959079 | GOOG-CABR-03962846 | GOOG-CABR-03986769 |
| GOOG-CABR-03846371 | GOOG-CABR-03959081 | GOOG-CABR-03962848 | GOOG-CABR-03987025 |
| GOOG-CABR-03848670 | GOOG-CABR-03959102 | GOOG-CABR-03962872 | GOOG-CABR-03987100 |
| GOOG-CABR-03848672 | GOOG-CABR-03959104 | GOOG-CABR-03963592 | GOOG-CABR-03987422 |
| GOOG-CABR-03848674 | GOOG-CABR-03959360 | GOOG-CABR-03964148 | GOOG-CABR-03987555 |
| GOOG-CABR-03848676 | GOOG-CABR-03959506 | GOOG-CABR-03964151 | GOOG-CABR-03987605 |
| GOOG-CABR-03848678 | GOOG-CABR-03959512 | GOOG-CABR-03964371 | GOOG-CABR-03987661 |
| GOOG-CABR-03848680 | GOOG-CABR-03959513 | GOOG-CABR-03964452 | GOOG-CABR-03987813 |
| GOOG-CABR-03848952 | GOOG-CABR-03959516 | GOOG-CABR-03964847 | GOOG-CABR-03987878 |
| GOOG-CABR-03848960 | GOOG-CABR-03959518 | GOOG-CABR-03965065 | GOOG-CABR-03988074 |
| GOOG-CABR-03849212 | GOOG-CABR-03960144 | GOOG-CABR-03969437 | GOOG-CABR-03988215 |
| GOOG-CABR-03907597 | GOOG-CABR-03960815 | GOOG-CABR-03975127 | GOOG-CABR-03989420 |
| GOOG-CABR-03910665 | GOOG-CABR-03960818 | GOOG-CABR-03977191 | GOOG-CABR-03993030 |
| GOOG-CABR-03911012 | GOOG-CABR-03960821 | GOOG-CABR-03978368 | GOOG-CABR-03994168 |

Confidential – Attorneys' Eyes Only

Patrick Calhoun, et al. v. Google LLC

# Appendix 2
# Materials Received

| | | | |
|---|---|---|---|
| GOOG-CABR-03994284 | GOOG-CABR-04016063 | GOOG-CABR-04065073 | GOOG-CALH-00002062 |
| GOOG-CABR-03999689 | GOOG-CABR-04016105 | GOOG-CABR-04065075 | GOOG-CALH-00002082 |
| GOOG-CABR-04003555 | GOOG-CABR-04016313 | GOOG-CABR-04065076 | GOOG-CALH-00002101 |
| GOOG-CABR-04004286 | GOOG-CABR-04016396 | GOOG-CABR-04229398 | GOOG-CALH-00002131 |
| GOOG-CABR-04004454 | GOOG-CABR-04016398 | GOOG-CABR-04304939 | GOOG-CALH-00002138 |
| GOOG-CABR-04004680 | GOOG-CABR-04016426 | GOOG-CABR-04613034 | GOOG-CALH-00002146 |
| GOOG-CABR-04004889 | GOOG-CABR-04016439 | GOOG-CABR-04623906 | GOOG-CALH-00002347 |
| GOOG-CABR-04007784 | GOOG-CABR-04016452 | GOOG-CALH_00027787 | GOOG-CALH-00002690 |
| GOOG-CABR-04008395 | GOOG-CABR-04016513 | GOOG-CALH-00000022 | GOOG-CALH-00002963 |
| GOOG-CABR-04008731 | GOOG-CABR-04016516 | GOOG-CALH-00000050 | GOOG-CALH-00002967 |
| GOOG-CABR-04008815 | GOOG-CABR-04016583 | GOOG-CALH-00000078 | GOOG-CALH-00002973 |
| GOOG-CABR-04009518 | GOOG-CABR-04016617 | GOOG-CALH-00000106 | GOOG-CALH-00002982 |
| GOOG-CABR-04009691 | GOOG-CABR-04020243 | GOOG-CALH-00000134 | GOOG-CALH-00002990 |
| GOOG-CABR-04009731 | GOOG-CABR-04028068 | GOOG-CALH-00000162 | GOOG-CALH-00002998 |
| GOOG-CABR-04009904 | GOOG-CABR-04028073 | GOOG-CALH-00000190 | GOOG-CALH-00003105 |
| GOOG-CABR-04010127 | GOOG-CABR-04029733 | GOOG-CALH-00000218 | GOOG-CALH-00003107 |
| GOOG-CABR-04010128 | GOOG-CABR-04030119 | GOOG-CALH-00000246 | GOOG-CALH-00003112 |
| GOOG-CABR-04010177 | GOOG-CABR-04032907 | GOOG-CALH-00000274 | GOOG-CALH-00003117 |
| GOOG-CABR-04010373 | GOOG-CABR-04033047 | GOOG-CALH-00000302 | GOOG-CALH-00003119 |
| GOOG-CABR-04010466 | GOOG-CABR-04033073 | GOOG-CALH-00000330 | GOOG-CALH-00003126 |
| GOOG-CABR-04010950 | GOOG-CABR-04033371 | GOOG-CALH-00000358 | GOOG-CALH-00003129 |
| GOOG-CABR-04011109 | GOOG-CABR-04033386 | GOOG-CALH-00000386 | GOOG-CALH-00003131 |
| GOOG-CABR-04012084 | GOOG-CABR-04033440 | GOOG-CALH-00000411 | GOOG-CALH-00003141 |
| GOOG-CABR-04012667 | GOOG-CABR-04033712 | GOOG-CALH-00000436 | GOOG-CALH-00003143 |
| GOOG-CABR-04012780 | GOOG-CABR-04033839 | GOOG-CALH-00000461 | GOOG-CALH-00003146 |
| GOOG-CABR-04012814 | GOOG-CABR-04033892 | GOOG-CALH-00000487 | GOOG-CALH-00003156 |
| GOOG-CABR-04013029 | GOOG-CABR-04033903 | GOOG-CALH-00000513 | GOOG-CALH-00003159 |
| GOOG-CABR-04013129 | GOOG-CABR-04033925 | GOOG-CALH-00000539 | GOOG-CALH-00003174 |
| GOOG-CABR-04014588 | GOOG-CABR-04033926 | GOOG-CALH-00000565 | GOOG-CALH-00003246 |
| GOOG-CABR-04016055 | GOOG-CABR-04034011 | GOOG-CALH-00000591 | GOOG-CALH-00003252 |

Confidential – Attorneys' Eyes Only

Patrick Calhoun, et al. v. Google LLC

# Appendix 2
# Materials Received

| | | | |
|---|---|---|---|
| GOOG-CALH-00003263 | GOOG-CALH-00005257 | GOOG-CALH-00005941 | GOOG-CALH-00006759 |
| GOOG-CALH-00003276 | GOOG-CALH-00005260 | GOOG-CALH-00005949 | GOOG-CALH-00006946 |
| GOOG-CALH-00003435 | GOOG-CALH-00005264 | GOOG-CALH-00005955 | GOOG-CALH-00006957 |
| GOOG-CALH-00003447 | GOOG-CALH-00005268 | GOOG-CALH-00005961 | GOOG-CALH-00007129 |
| GOOG-CALH-00003458 | GOOG-CALH-00005275 | GOOG-CALH-00005967 | GOOG-CALH-00007139 |
| GOOG-CALH-00003468 | GOOG-CALH-00005279 | GOOG-CALH-00005973 | GOOG-CALH-00007156 |
| GOOG-CALH-00003478 | GOOG-CALH-00005286 | GOOG-CALH-00006029 | GOOG-CALH-00007199 |
| GOOG-CALH-00003526 | GOOG-CALH-00005319 | GOOG-CALH-00006069 | GOOG-CALH-00007211 |
| GOOG-CALH-00003539 | GOOG-CALH-00005330 | GOOG-CALH-00006079 | GOOG-CALH-00007224 |
| GOOG-CALH-00003550 | GOOG-CALH-00005335 | GOOG-CALH-00006088 | GOOG-CALH-00007227 |
| GOOG-CALH-00003559 | GOOG-CALH-00005343 | GOOG-CALH-00006098 | GOOG-CALH-00007233 |
| GOOG-CALH-00003568 | GOOG-CALH-00005351 | GOOG-CALH-00006108 | GOOG-CALH-00007247 |
| GOOG-CALH-00004233 | GOOG-CALH-00005426 | GOOG-CALH-00006118 | GOOG-CALH-00007250 |
| GOOG-CALH-00004246 | GOOG-CALH-00005433 | GOOG-CALH-00006131 | GOOG-CALH-00007259 |
| GOOG-CALH-00004255 | GOOG-CALH-00005603 | GOOG-CALH-00006140 | GOOG-CALH-00007348 |
| GOOG-CALH-00004271 | GOOG-CALH-00005835 | GOOG-CALH-00006145 | GOOG-CALH-00007418 |
| GOOG-CALH-00004621 | GOOG-CALH-00005844 | GOOG-CALH-00006148 | GOOG-CALH-00007428 |
| GOOG-CALH-00004631 | GOOG-CALH-00005850 | GOOG-CALH-00006159 | GOOG-CALH-00007433 |
| GOOG-CALH-00004978 | GOOG-CALH-00005853 | GOOG-CALH-00006164 | GOOG-CALH-00007441 |
| GOOG-CALH-00004987 | GOOG-CALH-00005859 | GOOG-CALH-00006171 | GOOG-CALH-00007448 |
| GOOG-CALH-00004995 | GOOG-CALH-00005862 | GOOG-CALH-00006178 | GOOG-CALH-00007455 |
| GOOG-CALH-00005001 | GOOG-CALH-00005869 | GOOG-CALH-00006183 | GOOG-CALH-00007736 |
| GOOG-CALH-00005009 | GOOG-CALH-00005872 | GOOG-CALH-00006187 | GOOG-CALH-00007746 |
| GOOG-CALH-00005224 | GOOG-CALH-00005879 | GOOG-CALH-00006197 | GOOG-CALH-00007754 |
| GOOG-CALH-00005230 | GOOG-CALH-00005885 | GOOG-CALH-00006204 | GOOG-CALH-00007763 |
| GOOG-CALH-00005237 | GOOG-CALH-00005899 | GOOG-CALH-00006687 | GOOG-CALH-00007767 |
| GOOG-CALH-00005242 | GOOG-CALH-00005912 | GOOG-CALH-00006698 | GOOG-CALH-00007814 |
| GOOG-CALH-00005246 | GOOG-CALH-00005920 | GOOG-CALH-00006710 | GOOG-CALH-00007821 |
| GOOG-CALH-00005249 | GOOG-CALH-00005928 | GOOG-CALH-00006721 | GOOG-CALH-00007828 |
| GOOG-CALH-00005253 | GOOG-CALH-00005934 | GOOG-CALH-00006732 | GOOG-CALH-00007836 |

Confidential – Attorneys' Eyes Only

Patrick Calhoun, et al. v. Google LLC

# Appendix 2
# Materials Received

| | | | |
|---|---|---|---|
| GOOG-CALH-00007844 | GOOG-CALH-00009631 | GOOG-CALH-00010094 | GOOG-CALH-00011890 |
| GOOG-CALH-00008752 | GOOG-CALH-00009638 | GOOG-CALH-00010095 | GOOG-CALH-00011892 |
| GOOG-CALH-00008763 | GOOG-CALH-00009669 | GOOG-CALH-00010102 | GOOG-CALH-00011895 |
| GOOG-CALH-00008798 | GOOG-CALH-00009705 | GOOG-CALH-00010103 | GOOG-CALH-00011899 |
| GOOG-CALH-00008803 | GOOG-CALH-00009709 | GOOG-CALH-00010104 | GOOG-CALH-00011906 |
| GOOG-CALH-00008804 | GOOG-CALH-00009714 | GOOG-CALH-00010110 | GOOG-CALH-00011999 |
| GOOG-CALH-00008811 | GOOG-CALH-00009723 | GOOG-CALH-00010111 | GOOG-CALH-00012255 |
| GOOG-CALH-00008860 | GOOG-CALH-00009726 | GOOG-CALH-00010122 | GOOG-CALH-00012264 |
| GOOG-CALH-00009018 | GOOG-CALH-00009732 | GOOG-CALH-00010123 | GOOG-CALH-00012277 |
| GOOG-CALH-00009046 | GOOG-CALH-00009741 | GOOG-CALH-00010133 | GOOG-CALH-00012287 |
| GOOG-CALH-00009069 | GOOG-CALH-00009808 | GOOG-CALH-00010144 | GOOG-CALH-00014555 |
| GOOG-CALH-00009071 | GOOG-CALH-00009815 | GOOG-CALH-00010158 | GOOG-CALH-00015949 |
| GOOG-CALH-00009080 | GOOG-CALH-00009822 | GOOG-CALH-00010168 | GOOG-CALH-00017076 |
| GOOG-CALH-00009082 | GOOG-CALH-00009829 | GOOG-CALH-00010177 | GOOG-CALH-00017164 |
| GOOG-CALH-00009091 | GOOG-CALH-00009833 | GOOG-CALH-00010187 | GOOG-CALH-00017203 |
| GOOG-CALH-00009093 | GOOG-CALH-00009836 | GOOG-CALH-00010201 | GOOG-CALH-00017215 |
| GOOG-CALH-00009104 | GOOG-CALH-00009909 | GOOG-CALH-00010209 | GOOG-CALH-00017228 |
| GOOG-CALH-00009117 | GOOG-CALH-00009920 | GOOG-CALH-00010217 | GOOG-CALH-00017243 |
| GOOG-CALH-00009130 | GOOG-CALH-00009924 | GOOG-CALH-00010222 | GOOG-CALH-00017256 |
| GOOG-CALH-00009145 | GOOG-CALH-00009930 | GOOG-CALH-00010225 | GOOG-CALH-00017267 |
| GOOG-CALH-00009158 | GOOG-CALH-00009934 | GOOG-CALH-00010233 | GOOG-CALH-00017294 |
| GOOG-CALH-00009185 | GOOG-CALH-00009940 | GOOG-CALH-00010236 | GOOG-CALH-00017356 |
| GOOG-CALH-00009211 | GOOG-CALH-00009944 | GOOG-CALH-00010241 | GOOG-CALH-00018373 |
| GOOG-CALH-00009294 | GOOG-CALH-00009949 | GOOG-CALH-00010249 | GOOG-CALH-00018383 |
| GOOG-CALH-00009303 | GOOG-CALH-00009954 | GOOG-CALH-00010257 | GOOG-CALH-00018394 |
| GOOG-CALH-00009312 | GOOG-CALH-00009962 | GOOG-CALH-00010267 | GOOG-CALH-00018405 |
| GOOG-CALH-00009415 | GOOG-CALH-00009999 | GOOG-CALH-00010276 | GOOG-CALH-00018415 |
| GOOG-CALH-00009423 | GOOG-CALH-00010031 | GOOG-CALH-00011022 | GOOG-CALH-00018580 |
| GOOG-CALH-00009427 | GOOG-CALH-00010050 | GOOG-CALH-00011071 | GOOG-CALH-00018591 |
| GOOG-CALH-00009625 | GOOG-CALH-00010089 | GOOG-CALH-00011762 | GOOG-CALH-00018603 |

Confidential – Attorneys' Eyes Only

Patrick Calhoun, et al. v. Google LLC

# Appendix 2
# Materials Received

| | | | |
|---|---|---|---|
| GOOG-CALH-00018614 | GOOG-CALH-00027297 | GOOG-CALH-00031854 | GOOG-CALH-00038577 |
| GOOG-CALH-00019155 | GOOG-CALH-00027409 | GOOG-CALH-00031962 | GOOG-CALH-00040770 |
| GOOG-CALH-00019164 | GOOG-CALH-00027413 | GOOG-CALH-00032023 | GOOG-CALH-00040778 |
| GOOG-CALH-00019174 | GOOG-CALH-00027451 | GOOG-CALH-00032142 | GOOG-CALH-00040786 |
| GOOG-CALH-00019184 | GOOG-CALH-00027477 | GOOG-CALH-00032157 | GOOG-CALH-00040794 |
| GOOG-CALH-00019194 | GOOG-CALH-00027536 | GOOG-CALH-00032221 | GOOG-CALH-00040802 |
| GOOG-CALH-00019203 | GOOG-CALH-00027762 | GOOG-CALH-00032516 | GOOG-CALH-00040810 |
| GOOG-CALH-00019213 | GOOG-CALH-00027774 | GOOG-CALH-00032582 | GOOG-CALH-00040818 |
| GOOG-CALH-00019220 | GOOG-CALH-00028701 | GOOG-CALH-00033277 | GOOG-CALH-00040826 |
| GOOG-CALH-00019225 | GOOG-CALH-00029143 | GOOG-CALH-00033694 | GOOG-CALH-00040834 |
| GOOG-CALH-00019317 | GOOG-CALH-00029294 | GOOG-CALH-00033864 | GOOG-CALH-00040842 |
| GOOG-CALH-00019328 | GOOG-CALH-00029410 | GOOG-CALH-00034602 | GOOG-CALH-00040850 |
| GOOG-CALH-00019340 | GOOG-CALH-00029450 | GOOG-CALH-00034696 | GOOG-CALH-00040858 |
| GOOG-CALH-00019355 | GOOG-CALH-00029541 | GOOG-CALH-00034703 | GOOG-CALH-00040866 |
| GOOG-CALH-00019370 | GOOG-CALH-00029592 | GOOG-CALH-00034802 | GOOG-CALH-00040905 |
| GOOG-CALH-00019378 | GOOG-CALH-00029689 | GOOG-CALH-00034805 | GOOG-CALH-00040928 |
| GOOG-CALH-00019388 | GOOG-CALH-00029823 | GOOG-CALH-00034998 | GOOG-CALH-00041325 |
| GOOG-CALH-00019406 | GOOG-CALH-00029838 | GOOG-CALH-00034999 | GOOG-CALH-00041809 |
| GOOG-CALH-00019421 | GOOG-CALH-00030001 | GOOG-CALH-00035009 | GOOG-CALH-00041842 |
| GOOG-CALH-00019552 | GOOG-CALH-00030088 | GOOG-CALH-00035084 | GOOG-CALH-00042020 |
| GOOG-CALH-00019576 | GOOG-CALH-00030104 | GOOG-CALH-00035182 | GOOG-CALH-00042071 |
| GOOG-CALH-00025952 | GOOG-CALH-00030109 | GOOG-CALH-00035342 | GOOG-CALH-00042192 |
| GOOG-CALH-00025954 | GOOG-CALH-00030128 | GOOG-CALH-00035378 | GOOG-CALH-00042342 |
| GOOG-CALH-00025956 | GOOG-CALH-00030134 | GOOG-CALH-00035752 | GOOG-CALH-00042343 |
| GOOG-CALH-00025958 | GOOG-CALH-00030186 | GOOG-CALH-00035797 | GOOG-CALH-00042656 |
| GOOG-CALH-00027152 | GOOG-CALH-00030534 | GOOG-CALH-00035898 | GOOG-CALH-00043221 |
| GOOG-CALH-00027154 | GOOG-CALH-00030556 | GOOG-CALH-00036661 | GOOG-CALH-00043330 |
| GOOG-CALH-00027162 | GOOG-CALH-00030591 | GOOG-CALH-00037113 | GOOG-CALH-00045186 |
| GOOG-CALH-00027278 | GOOG-CALH-00030603 | GOOG-CALH-00037701 | GOOG-CALH-00045718 |
| GOOG-CALH-00027290 | GOOG-CALH-00031806 | GOOG-CALH-00038022 | GOOG-CALH-00045948 |

Confidential – Attorneys' Eyes Only

Patrick Calhoun, et al. v. Google LLC

# Appendix 2
## Materials Received

| | | | |
|---|---|---|---|
| GOOG-CALH-00046046 | GOOG-CALH-00046218 | GOOG-CALH-00046566 | GOOG-CALH-00046959 |
| GOOG-CALH-00046061 | GOOG-CALH-00046219 | GOOG-CALH-00046567 | GOOG-CALH-00046972 |
| GOOG-CALH-00046062 | GOOG-CALH-00046236 | GOOG-CALH-00046571 | GOOG-CALH-00046973 |
| GOOG-CALH-00046063 | GOOG-CALH-00046237 | GOOG-CALH-00046585 | GOOG-CALH-00046974 |
| GOOG-CALH-00046078 | GOOG-CALH-00046238 | GOOG-CALH-00046586 | GOOG-CALH-00047029 |
| GOOG-CALH-00046079 | GOOG-CALH-00046255 | GOOG-CALH-00046587 | GOOG-CALH-00047033 |
| GOOG-CALH-00046080 | GOOG-CALH-00046256 | GOOG-CALH-00046601 | GOOG-CALH-00047039 |
| GOOG-CALH-00046095 | GOOG-CALH-00046257 | GOOG-CALH-00046602 | GOOG-CALH-00047045 |
| GOOG-CALH-00046096 | GOOG-CALH-00046274 | GOOG-CALH-00046603 | GOOG-CALH-00047051 |
| GOOG-CALH-00046097 | GOOG-CALH-00046288 | GOOG-CALH-00046617 | GOOG-CALH-00047165 |
| GOOG-CALH-00046101 | GOOG-CALH-00046314 | GOOG-CALH-00046618 | GOOG-CALH-00047179 |
| GOOG-CALH-00046105 | GOOG-CALH-00046337 | GOOG-CALH-00046619 | GOOG-CALH-00047180 |
| GOOG-CALH-00046109 | GOOG-CALH-00046391 | GOOG-CALH-00046634 | GOOG-CALH-00047181 |
| GOOG-CALH-00046113 | GOOG-CALH-00046431 | GOOG-CALH-00046635 | GOOG-CALH-00047182 |
| GOOG-CALH-00046118 | GOOG-CALH-00046437 | GOOG-CALH-00046636 | GOOG-CALH-00047352 |
| GOOG-CALH-00046123 | GOOG-CALH-00046449 | GOOG-CALH-00046651 | GOOG-CALH-00047365 |
| GOOG-CALH-00046128 | GOOG-CALH-00046481 | GOOG-CALH-00046652 | GOOG-CALH-00047371 |
| GOOG-CALH-00046134 | GOOG-CALH-00046493 | GOOG-CALH-00046653 | GOOG-CALH-00047385 |
| GOOG-CALH-00046140 | GOOG-CALH-00046494 | GOOG-CALH-00046668 | GOOG-CALH-00047386 |
| GOOG-CALH-00046146 | GOOG-CALH-00046507 | GOOG-CALH-00046675 | GOOG-CALH-00047401 |
| GOOG-CALH-00046152 | GOOG-CALH-00046508 | GOOG-CALH-00046695 | GOOG-CALH-00047402 |
| GOOG-CALH-00046158 | GOOG-CALH-00046509 | GOOG-CALH-00046720 | GOOG-CALH-00047403 |
| GOOG-CALH-00046164 | GOOG-CALH-00046510 | GOOG-CALH-00046915 | GOOG-CALH-00047417 |
| GOOG-CALH-00046180 | GOOG-CALH-00046523 | GOOG-CALH-00046927 | GOOG-CALH-00047418 |
| GOOG-CALH-00046181 | GOOG-CALH-00046524 | GOOG-CALH-00046928 | GOOG-CALH-00047433 |
| GOOG-CALH-00046182 | GOOG-CALH-00046537 | GOOG-CALH-00046929 | GOOG-CALH-00047434 |
| GOOG-CALH-00046198 | GOOG-CALH-00046538 | GOOG-CALH-00046942 | GOOG-CALH-00047449 |
| GOOG-CALH-00046199 | GOOG-CALH-00046551 | GOOG-CALH-00046943 | GOOG-CALH-00047450 |
| GOOG-CALH-00046200 | GOOG-CALH-00046552 | GOOG-CALH-00046944 | GOOG-CALH-00047451 |
| GOOG-CALH-00046217 | GOOG-CALH-00046553 | GOOG-CALH-00046958 | GOOG-CALH-00047466 |

Confidential – Attorneys' Eyes Only

Patrick Calhoun, et al. v. Google LLC

# Appendix 2
# Materials Received

| | | | |
|---|---|---|---|
| GOOG-CALH-00047467 | GOOG-CALH-00068060 | GOOG-CALH-00071437 | GOOG-CALH-00079113 |
| GOOG-CALH-00047501 | GOOG-CALH-00068652 | GOOG-CALH-00071591 | GOOG-CALH-00079151 |
| GOOG-CALH-00047517 | GOOG-CALH-00068688 | GOOG-CALH-00071592 | GOOG-CALH-00079239 |
| GOOG-CALH-00047518 | GOOG-CALH-00068689 | GOOG-CALH-00071593 | GOOG-CALH-00079310 |
| GOOG-CALH-00047519 | GOOG-CALH-00068694 | GOOG-CALH-00071716 | GOOG-CALH-00079473 |
| GOOG-CALH-00047535 | GOOG-CALH-00068733 | GOOG-CALH-00071754 | GOOG-CALH-00080180 |
| GOOG-CALH-00047536 | GOOG-CALH-00068814 | GOOG-CALH-00072235 | GOOG-CALH-00081013 |
| GOOG-CALH-00047537 | GOOG-CALH-00068895 | GOOG-CALH-00072581 | GOOG-CALH-00081361 |
| GOOG-CALH-00047554 | GOOG-CALH-00068919 | GOOG-CALH-00072643 | GOOG-CALH-00081743 |
| GOOG-CALH-00047555 | GOOG-CALH-00069032 | GOOG-CALH-00073039 | GOOG-CALH-00081748 |
| GOOG-CALH-00047556 | GOOG-CALH-00069683 | GOOG-CALH-00073526 | GOOG-CALH-00081809 |
| GOOG-CALH-00047573 | GOOG-CALH-00069689 | GOOG-CALH-00073540 | GOOG-CALH-00082151 |
| GOOG-CALH-00047574 | GOOG-CALH-00070010 | GOOG-CALH-00073547 | GOOG-CALH-00082273 |
| GOOG-CALH-00047575 | GOOG-CALH-00070114 | GOOG-CALH-00073766 | GOOG-CALH-00082358 |
| GOOG-CALH-00047592 | GOOG-CALH-00070123 | GOOG-CALH-00073864 | GOOG-CALH-00082375 |
| GOOG-CALH-00047593 | GOOG-CALH-00070142 | GOOG-CALH-00074113 | GOOG-CALH-00082378 |
| GOOG-CALH-00047594 | GOOG-CALH-00070146 | GOOG-CALH-00074583 | GOOG-CALH-00082443 |
| GOOG-CALH-00047611 | GOOG-CALH-00070149 | GOOG-CALH-00076426 | GOOG-CALH-00084071 |
| GOOG-CALH-00047612 | GOOG-CALH-00070226 | GOOG-CALH-00077055 | GOOG-CALH-00084078 |
| GOOG-CALH-00047936 | GOOG-CALH-00070538 | GOOG-CALH-00077081 | GOOG-CALH-00084876 |
| GOOG-CALH-00052909 | GOOG-CALH-00070731 | GOOG-CALH-00077222 | GOOG-CALH-00084999 |
| GOOG-CALH-00052958 | GOOG-CALH-00070750 | GOOG-CALH-00077340 | GOOG-CALH-00085019 |
| GOOG-CALH-00053097 | GOOG-CALH-00070776 | GOOG-CALH-00077368 | GOOG-CALH-00085425 |
| GOOG-CALH-00053428 | GOOG-CALH-00070800 | GOOG-CALH-00077489 | GOOG-CALH-00086021 |
| GOOG-CALH-00054448 | GOOG-CALH-00070878 | GOOG-CALH-00077520 | GOOG-CALH-00086057 |
| GOOG-CALH-00059297 | GOOG-CALH-00070996 | GOOG-CALH-00077529 | GOOG-CALH-00087369 |
| GOOG-CALH-00059438 | GOOG-CALH-00071006 | GOOG-CALH-00077634 | GOOG-CALH-00087372 |
| GOOG-CALH-00061965 | GOOG-CALH-00071027 | GOOG-CALH-00077780 | GOOG-CALH-00087441 |
| GOOG-CALH-00064022 | GOOG-CALH-00071037 | GOOG-CALH-00078279 | GOOG-CALH-00087673 |
| GOOG-CALH-00068050 | GOOG-CALH-00071051 | GOOG-CALH-00079088 | GOOG-CALH-00087689 |

Confidential – Attorneys' Eyes Only

Patrick Calhoun, et al. v. Google LLC

# Appendix 2
# Materials Received

| | | | |
|---|---|---|---|
| GOOG-CALH-00093015 | GOOG-CALH-00123780 | GOOG-CALH-00157063 | GOOG-CALH-00164488 |
| GOOG-CALH-00097350 | GOOG-CALH-00124703 | GOOG-CALH-00157669 | GOOG-CALH-00165315 |
| GOOG-CALH-00099080 | GOOG-CALH-00126643 | GOOG-CALH-00157961 | GOOG-CALH-00165380 |
| GOOG-CALH-00099083 | GOOG-CALH-00126656 | GOOG-CALH-00158509 | GOOG-CALH-00165871 |
| GOOG-CALH-00099087 | GOOG-CALH-00126667 | GOOG-CALH-00158895 | GOOG-CALH-00167497 |
| GOOG-CALH-00100926 | GOOG-CALH-00126728 | GOOG-CALH-00159989 | GOOG-CALH-00167675 |
| GOOG-CALH-00101593 | GOOG-CALH-00126742 | GOOG-CALH-00160031 | GOOG-CALH-00168077 |
| GOOG-CALH-00105741 | GOOG-CALH-00126759 | GOOG-CALH-00160034 | GOOG-CALH-00171230 |
| GOOG-CALH-00106769 | GOOG-CALH-00126800 | GOOG-CALH-00160076 | GOOG-CALH-00171243 |
| GOOG-CALH-00113255 | GOOG-CALH-00126822 | GOOG-CALH-00160119 | GOOG-CALH-00171256 |
| GOOG-CALH-00113275 | GOOG-CALH-00126852 | GOOG-CALH-00160127 | GOOG-CALH-00171269 |
| GOOG-CALH-00113340 | GOOG-CALH-00127960 | GOOG-CALH-00160141 | GOOG-CALH-00171282 |
| GOOG-CALH-00113945 | GOOG-CALH-00129726 | GOOG-CALH-00160201 | GOOG-CALH-00172089 |
| GOOG-CALH-00114301 | GOOG-CALH-00130564 | GOOG-CALH-00160204 | GOOG-CALH-00172129 |
| GOOG-CALH-00114627 | GOOG-CALH-00130566 | GOOG-CALH-00160209 | GOOG-CALH-00172222 |
| GOOG-CALH-00114632 | GOOG-CALH-00130568 | GOOG-CALH-00160536 | GOOG-CALH-00172234 |
| GOOG-CALH-00114638 | GOOG-CALH-00133258 | GOOG-CALH-00160656 | GOOG-CALH-00172245 |
| GOOG-CALH-00114644 | GOOG-CALH-00133398 | GOOG-CALH-00160825 | GOOG-CALH-00172256 |
| GOOG-CALH-00114650 | GOOG-CALH-00134537 | GOOG-CALH-00160866 | GOOG-CALH-00172263 |
| GOOG-CALH-00114657 | GOOG-CALH-00134544 | GOOG-CALH-00161211 | GOOG-CALH-00172271 |
| GOOG-CALH-00114668 | GOOG-CALH-00134687 | GOOG-CALH-00161251 | GOOG-CALH-00172279 |
| GOOG-CALH-00114676 | GOOG-CALH-00136717 | GOOG-CALH-00161372 | GOOG-CALH-00172358 |
| GOOG-CALH-00114684 | GOOG-CALH-00137755 | GOOG-CALH-00161444 | GOOG-CALH-00172368 |
| GOOG-CALH-00114692 | GOOG-CALH-00138379 | GOOG-CALH-00163156 | GOOG-CALH-00172378 |
| GOOG-CALH-00114700 | GOOG-CALH-00150842 | GOOG-CALH-00164080 | GOOG-CALH-00172389 |
| GOOG-CALH-00114708 | GOOG-CALH-00150846 | GOOG-CALH-00164156 | GOOG-CALH-00172400 |
| GOOG-CALH-00114795 | GOOG-CALH-00150851 | GOOG-CALH-00164270 | GOOG-CALH-00172411 |
| GOOG-CALH-00114890 | GOOG-CALH-00154758 | GOOG-CALH-00164437 | GOOG-CALH-00172422 |
| GOOG-CALH-00115304 | GOOG-CALH-00154764 | GOOG-CALH-00164439 | GOOG-CALH-00172434 |
| GOOG-CALH-00122648 | GOOG-CALH-00154975 | GOOG-CALH-00164441 | GOOG-CALH-00172446 |

Confidential – Attorneys' Eyes Only

Patrick Calhoun, et al. v. Google LLC

# Appendix 2
## Materials Received

| | | | |
|---|---|---|---|
| GOOG-CALH-00172458 | GOOG-CALH-00300487 | GOOG-CALH-00335179 | GOOG-CALH-00355503 |
| GOOG-CALH-00172470 | GOOG-CALH-00300526 | GOOG-CALH-00335191 | GOOG-CALH-00355521 |
| GOOG-CALH-00172483 | GOOG-CALH-00300612 | GOOG-CALH-00351252 | GOOG-CALH-00355532 |
| GOOG-CALH-00172496 | GOOG-CALH-00300631 | GOOG-CALH-00352366 | GOOG-CALH-00355533 |
| GOOG-CALH-00172509 | GOOG-CALH-00300714 | GOOG-CALH-00352373 | GOOG-CALH-00355534 |
| GOOG-CALH-00172522 | GOOG-CALH-00300774 | GOOG-CALH-00352376 | GOOG-CALH-00355544 |
| GOOG-CALH-00172535 | GOOG-CALH-00301035 | GOOG-CALH-00355392 | GOOG-CALH-00355545 |
| GOOG-CALH-00172548 | GOOG-CALH-00301359 | GOOG-CALH-00355399 | GOOG-CALH-00355549 |
| GOOG-CALH-00172905 | GOOG-CALH-00301985 | GOOG-CALH-00355400 | GOOG-CALH-00355560 |
| GOOG-CALH-00173022 | GOOG-CALH-00303399 | GOOG-CALH-00355401 | GOOG-CALH-00355561 |
| GOOG-CALH-00189561 | GOOG-CALH-00303689 | GOOG-CALH-00355409 | GOOG-CALH-00355572 |
| GOOG-CALH-00190533 | GOOG-CALH-00305127 | GOOG-CALH-00355410 | GOOG-CALH-00355575 |
| GOOG-CALH-00285898 | GOOG-CALH-00334087 | GOOG-CALH-00355418 | GOOG-CALH-00355586 |
| GOOG-CALH-00285907 | GOOG-CALH-00334923 | GOOG-CALH-00355419 | GOOG-CALH-00355587 |
| GOOG-CALH-00286823 | GOOG-CALH-00334933 | GOOG-CALH-00355420 | GOOG-CALH-00355588 |
| GOOG-CALH-00289224 | GOOG-CALH-00334937 | GOOG-CALH-00355428 | GOOG-CALH-00355599 |
| GOOG-CALH-00289674 | GOOG-CALH-00334948 | GOOG-CALH-00355429 | GOOG-CALH-00355600 |
| GOOG-CALH-00290609 | GOOG-CALH-00334952 | GOOG-CALH-00355437 | GOOG-CALH-00355612 |
| GOOG-CALH-00290690 | GOOG-CALH-00334963 | GOOG-CALH-00355438 | GOOG-CALH-00355621 |
| GOOG-CALH-00290826 | GOOG-CALH-00335117 | GOOG-CALH-00355447 | GOOG-CALH-00355633 |
| GOOG-CALH-00292922 | GOOG-CALH-00335128 | GOOG-CALH-00355450 | GOOG-CALH-00355634 |
| GOOG-CALH-00296316 | GOOG-CALH-00335129 | GOOG-CALH-00355459 | GOOG-CALH-00355635 |
| GOOG-CALH-00296855 | GOOG-CALH-00335140 | GOOG-CALH-00355460 | GOOG-CALH-00355647 |
| GOOG-CALH-00296957 | GOOG-CALH-00335141 | GOOG-CALH-00355469 | GOOG-CALH-00355648 |
| GOOG-CALH-00297349 | GOOG-CALH-00335152 | GOOG-CALH-00355470 | GOOG-CALH-00355660 |
| GOOG-CALH-00297388 | GOOG-CALH-00335153 | GOOG-CALH-00355480 | GOOG-CALH-00355667 |
| GOOG-CALH-00297844 | GOOG-CALH-00335154 | GOOG-CALH-00355481 | GOOG-CALH-00355679 |
| GOOG-CALH-00299141 | GOOG-CALH-00335165 | GOOG-CALH-00355482 | GOOG-CALH-00355690 |
| GOOG-CALH-00300402 | GOOG-CALH-00335166 | GOOG-CALH-00355492 | GOOG-CALH-00355702 |
| GOOG-CALH-00300451 | GOOG-CALH-00335178 | GOOG-CALH-00355493 | GOOG-CALH-00355703 |

Confidential – Attorneys' Eyes Only

Patrick Calhoun, et al. v. Google LLC

# Appendix 2
# Materials Received

| | | | |
|---|---|---|---|
| GOOG-CALH-00355740 | GOOG-CALH-00356778 | GOOG-CALH-00375311 | GOOG-CALH-00375567 |
| GOOG-CALH-00355753 | GOOG-CALH-00356781 | GOOG-CALH-00375312 | GOOG-CALH-00375666 |
| GOOG-CALH-00355754 | GOOG-CALH-00356796 | GOOG-CALH-00375329 | GOOG-CALH-00375679 |
| GOOG-CALH-00355755 | GOOG-CALH-00356797 | GOOG-CALH-00375334 | GOOG-CALH-00375680 |
| GOOG-CALH-00355768 | GOOG-CALH-00356812 | GOOG-CALH-00375340 | GOOG-CALH-00375694 |
| GOOG-CALH-00355769 | GOOG-CALH-00356815 | GOOG-CALH-00375380 | GOOG-CALH-00375695 |
| GOOG-CALH-00355785 | GOOG-CALH-00356831 | GOOG-CALH-00375387 | GOOG-CALH-00375696 |
| GOOG-CALH-00355796 | GOOG-CALH-00356836 | GOOG-CALH-00375388 | GOOG-CALH-00375711 |
| GOOG-CALH-00355797 | GOOG-CALH-00356852 | GOOG-CALH-00375396 | GOOG-CALH-00375712 |
| GOOG-CALH-00355798 | GOOG-CALH-00356853 | GOOG-CALH-00375397 | GOOG-CALH-00375727 |
| GOOG-CALH-00355809 | GOOG-CALH-00356869 | GOOG-CALH-00375398 | GOOG-CALH-00375728 |
| GOOG-CALH-00355810 | GOOG-CALH-00356870 | GOOG-CALH-00375406 | GOOG-CALH-00375787 |
| GOOG-CALH-00355821 | GOOG-CALH-00356887 | GOOG-CALH-00375407 | GOOG-CALH-00375834 |
| GOOG-CALH-00355822 | GOOG-CALH-00356888 | GOOG-CALH-00375415 | GOOG-CALH-00375851 |
| GOOG-CALH-00355833 | GOOG-CALH-00356905 | GOOG-CALH-00375416 | GOOG-CALH-00376308 |
| GOOG-CALH-00355845 | GOOG-CALH-00357018 | GOOG-CALH-00375417 | GOOG-CALH-00376318 |
| GOOG-CALH-00355846 | GOOG-CALH-00357033 | GOOG-CALH-00375427 | GOOG-CALH-00376319 |
| GOOG-CALH-00355858 | GOOG-CALH-00357034 | GOOG-CALH-00375430 | GOOG-CALH-00376457 |
| GOOG-CALH-00355859 | GOOG-CALH-00357173 | GOOG-CALH-00375440 | GOOG-CALH-00376462 |
| GOOG-CALH-00356639 | GOOG-CALH-00357190 | GOOG-CALH-00375441 | GOOG-CALH-00376467 |
| GOOG-CALH-00356652 | GOOG-CALH-00357191 | GOOG-CALH-00375448 | GOOG-CALH-00376472 |
| GOOG-CALH-00356653 | GOOG-CALH-00357208 | GOOG-CALH-00375459 | GOOG-CALH-00378063 |
| GOOG-CALH-00356666 | GOOG-CALH-00357209 | GOOG-CALH-00375464 | GOOG-CALH-00379385 |
| GOOG-CALH-00356669 | GOOG-CALH-00357226 | GOOG-CALH-00375476 | GOOG-CALH-00385899 |
| GOOG-CALH-00356682 | GOOG-CALH-00373883 | GOOG-CALH-00375477 | GOOG-CALH-00387063 |
| GOOG-CALH-00356705 | GOOG-CALH-00373997 | GOOG-CALH-00375489 | GOOG-CALH-00387117 |
| GOOG-CALH-00356719 | GOOG-CALH-00374152 | GOOG-CALH-00375490 | GOOG-CALH-00387128 |
| GOOG-CALH-00356721 | GOOG-CALH-00374633 | GOOG-CALH-00375511 | GOOG-CALH-00387129 |
| GOOG-CALH-00356735 | GOOG-CALH-00374659 | GOOG-CALH-00375523 | GOOG-CALH-00387140 |
| GOOG-CALH-00356764 | GOOG-CALH-00374825 | GOOG-CALH-00375554 | GOOG-CALH-00387141 |

Confidential – Attorneys' Eyes Only

Patrick Calhoun, et al. v. Google LLC

# Appendix 2
# Materials Received

| | | | |
|---|---|---|---|
| GOOG-CALH-00387152 | GOOG-CALH-00414221 | GOOG-CALH-00414987 | GOOG-CALH-00429754 |
| GOOG-CALH-00391163 | GOOG-CALH-00414233 | GOOG-CALH-00415004 | GOOG-CALH-00429758 |
| GOOG-CALH-00391334 | GOOG-CALH-00414234 | GOOG-CALH-00415005 | GOOG-CALH-00429762 |
| GOOG-CALH-00391356 | GOOG-CALH-00414246 | GOOG-CALH-00415022 | GOOG-CALH-00429766 |
| GOOG-CALH-00391365 | GOOG-CALH-00414247 | GOOG-CALH-00420890 | GOOG-CALH-00429770 |
| GOOG-CALH-00391366 | GOOG-CALH-00414259 | GOOG-CALH-00420901 | GOOG-CALH-00429775 |
| GOOG-CALH-00391376 | GOOG-CALH-00414410 | GOOG-CALH-00420902 | GOOG-CALH-00429780 |
| GOOG-CALH-00391387 | GOOG-CALH-00414423 | GOOG-CALH-00420915 | GOOG-CALH-00429786 |
| GOOG-CALH-00391388 | GOOG-CALH-00414441 | GOOG-CALH-00420916 | GOOG-CALH-00429793 |
| GOOG-CALH-00391399 | GOOG-CALH-00414455 | GOOG-CALH-00422011 | GOOG-CALH-00429800 |
| GOOG-CALH-00391400 | GOOG-CALH-00414464 | GOOG-CALH-00422945 | GOOG-CALH-00429807 |
| GOOG-CALH-00391907 | GOOG-CALH-00414478 | GOOG-CALH-00422979 | GOOG-CALH-00429814 |
| GOOG-CALH-00405869 | GOOG-CALH-00414484 | GOOG-CALH-00422980 | GOOG-CALH-00429821 |
| GOOG-CALH-00405875 | GOOG-CALH-00414498 | GOOG-CALH-00423178 | GOOG-CALH-00429970 |
| GOOG-CALH-00413898 | GOOG-CALH-00414499 | GOOG-CALH-00423331 | GOOG-CALH-00431210 |
| GOOG-CALH-00413909 | GOOG-CALH-00414513 | GOOG-CALH-00423437 | GOOG-CALH-00431423 |
| GOOG-CALH-00413914 | GOOG-CALH-00414514 | GOOG-CALH-00424212 | GOOG-CALH-00431866 |
| GOOG-CALH-00413925 | GOOG-CALH-00414529 | GOOG-CALH-00427081 | GOOG-CALH-00434002 |
| GOOG-CALH-00413927 | GOOG-CALH-00414530 | GOOG-CALH-00427125 | GOOG-CALH-00434634 |
| GOOG-CALH-00413938 | GOOG-CALH-00414545 | GOOG-CALH-00427292 | GOOG-CALH-00434670 |
| GOOG-CALH-00414047 | GOOG-CALH-00414547 | GOOG-CALH-00427350 | GOOG-CALH-00435877 |
| GOOG-CALH-00414060 | GOOG-CALH-00414563 | GOOG-CALH-00427444 | GOOG-CALH-00435960 |
| GOOG-CALH-00414125 | GOOG-CALH-00414566 | GOOG-CALH-00428483 | GOOG-CALH-00436014 |
| GOOG-CALH-00414138 | GOOG-CALH-00414582 | GOOG-CALH-00428587 | GOOG-CALH-00436333 |
| GOOG-CALH-00414139 | GOOG-CALH-00414585 | GOOG-CALH-00428766 | GOOG-CALH-00436513 |
| GOOG-CALH-00414152 | GOOG-CALH-00414601 | GOOG-CALH-00429099 | GOOG-CALH-00436683 |
| GOOG-CALH-00414197 | GOOG-CALH-00414606 | GOOG-CALH-00429740 | GOOG-CALH-00436921 |
| GOOG-CALH-00414208 | GOOG-CALH-00414623 | GOOG-CALH-00429743 | GOOG-CALH-00436951 |
| GOOG-CALH-00414209 | GOOG-CALH-00414628 | GOOG-CALH-00429746 | GOOG-CALH-00437416 |
| GOOG-CALH-00414220 | GOOG-CALH-00414645 | GOOG-CALH-00429750 | GOOG-CALH-00437520 |

Confidential – Attorneys' Eyes Only

Patrick Calhoun, et al. v. Google LLC

# Appendix 2
# Materials Received

| | | | |
|---|---|---|---|
| GOOG-CALH-00437861 | GOOG-CALH-00463278 | GOOG-CALH-00477992 | GOOG-CALH-00491232 |
| GOOG-CALH-00438884 | GOOG-CALH-00465829 | GOOG-CALH-00478014 | GOOG-CALH-00491237 |
| GOOG-CALH-00439459 | GOOG-CALH-00470091 | GOOG-CALH-00478525 | GOOG-CALH-00491245 |
| GOOG-CALH-00439629 | GOOG-CALH-00470094 | GOOG-CALH-00478640 | GOOG-CALH-00491252 |
| GOOG-CALH-00439689 | GOOG-CALH-00471790 | GOOG-CALH-00479040 | GOOG-CALH-00491259 |
| GOOG-CALH-00440532 | GOOG-CALH-00472119 | GOOG-CALH-00479775 | GOOG-CALH-00491277 |
| GOOG-CALH-00443621 | GOOG-CALH-00472121 | GOOG-CALH-00480027 | GOOG-CALH-00491279 |
| GOOG-CALH-00451103 | GOOG-CALH-00472300 | GOOG-CALH-00480060 | GOOG-CALH-00491323 |
| GOOG-CALH-00451107 | GOOG-CALH-00472365 | GOOG-CALH-00480075 | GOOG-CALH-00491325 |
| GOOG-CALH-00451112 | GOOG-CALH-00472682 | GOOG-CALH-00480127 | GOOG-CALH-00491386 |
| GOOG-CALH-00452014 | GOOG-CALH-00472841 | GOOG-CALH-00480191 | GOOG-CALH-00491569 |
| GOOG-CALH-00452027 | GOOG-CALH-00473426 | GOOG-CALH-00490538 | GOOG-CALH-00491620 |
| GOOG-CALH-00452028 | GOOG-CALH-00473663 | GOOG-CALH-00490729 | GOOG-CALH-00491722 |
| GOOG-CALH-00452029 | GOOG-CALH-00473693 | GOOG-CALH-00490791 | GOOG-CALH-00491787 |
| GOOG-CALH-00452079 | GOOG-CALH-00473743 | GOOG-CALH-00490839 | GOOG-CALH-00491789 |
| GOOG-CALH-00452084 | GOOG-CALH-00473831 | GOOG-CALH-00490997 | GOOG-CALH-00491819 |
| GOOG-CALH-00452687 | GOOG-CALH-00473921 | GOOG-CALH-00491000 | GOOG-CALH-00491822 |
| GOOG-CALH-00452698 | GOOG-CALH-00474162 | GOOG-CALH-00491003 | GOOG-CALH-00491868 |
| GOOG-CALH-00452699 | GOOG-CALH-00474167 | GOOG-CALH-00491006 | GOOG-CALH-00491885 |
| GOOG-CALH-00452700 | GOOG-CALH-00474254 | GOOG-CALH-00491009 | GOOG-CALH-00491907 |
| GOOG-CALH-00452734 | GOOG-CALH-00475326 | GOOG-CALH-00491012 | GOOG-CALH-00491911 |
| GOOG-CALH-00452736 | GOOG-CALH-00475856 | GOOG-CALH-00491015 | GOOG-CALH-00491915 |
| GOOG-CALH-00452785 | GOOG-CALH-00476507 | GOOG-CALH-00491018 | GOOG-CALH-00491920 |
| GOOG-CALH-00461475 | GOOG-CALH-00476678 | GOOG-CALH-00491090 | GOOG-CALH-00491925 |
| GOOG-CALH-00462174 | GOOG-CALH-00476928 | GOOG-CALH-00491093 | GOOG-CALH-00491930 |
| GOOG-CALH-00462408 | GOOG-CALH-00477217 | GOOG-CALH-00491202 | GOOG-CALH-00492127 |
| GOOG-CALH-00462741 | GOOG-CALH-00477454 | GOOG-CALH-00491206 | GOOG-CALH-00492257 |
| GOOG-CALH-00462890 | GOOG-CALH-00477514 | GOOG-CALH-00491211 | GOOG-CALH-00544715 |
| GOOG-CALH-00462898 | GOOG-CALH-00477891 | GOOG-CALH-00491216 | GOOG-CALH-00544952 |
| GOOG-CALH-00462944 | GOOG-CALH-00477903 | GOOG-CALH-00491227 | GOOG-CALH-00547585 |

Confidential – Attorneys' Eyes Only

Patrick Calhoun, et al. v. Google LLC

# Appendix 2
# Materials Received

GOOG-CALH-00553243

GOOG-CALH-00558572

GOOG-CALH-00561786

GOOG-CALH-00566937

GOOG-CALH-00570110

GOOG-CALH-00570563

GOOG-CALH-00572323

GOOG-CALH-00573210

GOOG-CALH-00573842

GOOG-CALH-00574233

GOOG-CALH-00576041

GOOG-CALH-00576152

GOOG-CALH-00576699

GOOG-CALH-00577214

GOOG-CALH-00577289

GOOG-CALH-00577558

GOOG-CALH-00577709

GOOG-CALH-00577836

GOOG-CALH-00578336

GOOG-CALH-00578338

GOOG-CALH-00578343

GOOG-CALH-00578530

PLAINTIFFS00027745

PLAINTIFFS00034560

PLAINTIFFS00034563

Confidential – Attorneys' Eyes Only

Patrick Calhoun, et al. v. Google LLC

# Appendix 3

Confidential – Attorneys' Eyes Only

Patrick Calhoun, et al. v. Google LLC

**Exhibit 1**
**Annual Alphabet Revenue Breakdown, 2016–2020**

| | | 2016 | | 2017 | | 2018 | | 2019 | | 2020 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | $MM | % | $MM | % | $MM | % | $MM | % | $MM | % |
| Google Advertising | [1] | $79,383 | 87.4% | $95,577 | 86.2% | $116,461 | 85.1% | $134,811 | 83.3% | $146,924 | 80.5% |
| Google Properties | [2] | $63,785 | | $77,961 | | $96,451 | | $113,264 | | $123,834 | |
| Google Search and Other | [3] | | | $69,811 | | $85,296 | | $98,115 | | $104,062 | |
| YouTube ads | [4] | | | $8,150 | | $11,155 | | $15,149 | | $19,772 | |
| Google Network Members' properties | [5] | $15,598 | | $17,616 | | $20,010 | | $21,547 | | $23,090 | |
| Google Other | [6] | $10,601 | 11.7% | $10,914 | 9.8% | $14,063 | 10.3% | $17,014 | 10.5% | $21,711 | 11.9% |
| Google Cloud | [7] | N/A | N/A | $4,056 | 3.7% | $5,838 | 4.3% | $8,918 | 5.5% | $13,059 | 7.2% |
| Other Bets | [8] | $288 | 0.3% | $477 | 0.4% | $595 | 0.4% | $659 | 0.4% | $657 | 0.4% |
| Hedging gains (losses) | [9] | $539 | 0.6% | ($169) | -0.2% | ($138) | -0.2% | $455 | 0.3% | $176 | 0.1% |
| Total Alphabet Revenue | [10] | $90,811 | | $110,855 | | $136,819 | | $161,857 | | $182,527 | |

**Notes & Sources:**

[1] = [2] + [5].

[2] = [3] + [4].

[3] Google Search & other consists of revenues generated on Google search properties (including revenues from traffic generated by search distribution partners who use Google.com as their default search in browsers, toolbars, etc.) and other Google owned and operated properties like Gmail, Google Maps, and Google Play. Alphabet 2019 10-K, p. 30.

[4] YouTube ads consists of revenues generated primarily on YouTube properties. Alphabet 2019 10-K, p. 30.

[5] Google Network Members' properties consist of revenues generated primarily on Google Network Members' properties participating in AdMob, AdSense, and Google Ad Manager. Alphabet 2019 10-K, p. 30.

[6] Google Other consists of Google Play, hardware (including Google Nest home products, Pixelbooks, Pixel phones and other devices), and YouTube non-advertising (including YouTube Premium and YouTube TV subscriptions and other services; and other products and services). Alphabet 2020 10-K, p. 35

[9] Google's hedging program includes cash flow hedges, fair value hedges, net investment hedges, and an assortment of other derivatives. Alphabet 2018 10-K, p. 62.

[10] = [1] + [6] + [7] + [8] + [9].

Alphabet 2018 10-K, p. 56; Alphabet 2019 10-K, p. 29; Alphabet 2020 10-K, p. 66.

Confidential – Attorneys' Eyes Only

Patrick Calhoun, et al. v. Google LLC

**Exhibit 2**
**Google Advertising Revenue by Business Segment, 2017–2020 ($MM)**

| Year | Google Search and Other [1] | YouTube ads [2] | Third-party Network pages [3] | Total Advertising Revenue [4] |
|---|---|---|---|---|
| 2017 [5] | $69,811 | $8,150 | $17,616 | $95,577 |
| 2018 [5] | $85,296 | $11,155 | $20,010 | $116,461 |
| 2019 [6] | $98,115 | $15,149 | $21,547 | $134,811 |
| 2020 [6] | $104,062 | $19,772 | $23,090 | $146,924 |

**Notes & Sources:**

[1] Google Search & other consists of revenues generated on Google search properties (including revenues from traffic generated by search distribution partners who use Google.com as their default search in browsers, toolbars, etc.) and other Google owned and operated properties like Gmail, Google Maps, and Google Play.

[2] YouTube ads consists of revenues generated primarily on YouTube properties.

[3] Google Network Members' properties consist of revenues generated primarily on Google Network Members' properties participating in AdMob, AdSense, and Google Ad Manager.

[4] = [1] + [2] + [3].

[5] Alphabet 2019 10-K, p. 30.

[6] Alphabet 2020 10-K, p. 33.

Confidential – Attorneys' Eyes Only

Patrick Calhoun, et al. v. Google LLC

**Exhibit 3**
**Google Profit Margin, 2016–2020 ($MM)**

|  |  | 2016 | 2017 | 2018 | 2019 | 2020 | Total |
|---|---|---|---|---|---|---|---|
| Google Revenue | [1] | $89,984 | $110,378 | $136,224 | $160,743 | $181,694 | $679,023 |
|  |  |  |  |  |  |  |  |
| Costs and Operating Expenses |  |  |  |  |  |  |  |
| Costs | [2] | $35,138 | $45,583 | $59,549 | $71,896 | $84,732 | $296,898 |
| Research and Development | [3] | $13,948 | $16,625 | $21,419 | $26,018 | $27,573 | $105,583 |
| Sales and Marketing | [4] | $10,485 | $12,893 | $16,333 | $18,464 | $17,946 | $76,121 |
| General and Administrative | [5] | $6,985 | $6,872 | $8,126 | $9,551 | $11,052 | $42,586 |
|  |  |  |  |  |  |  |  |
| Income from operations | [6] | $23,428 | $28,405 | $30,797 | $34,814 | $40,391 | $157,835 |
|  |  |  |  |  |  |  |  |
| Gross Profit Margin | [7] | 61% | 59% | 56% | 55% | 53% | 56% |
| Net Profit Margin | [8] | 26% | 26% | 23% | 22% | 22% | 23% |

**Notes & Sources:**
[1] Alphabet 2018 10-K, p. 27; Alphabet 2020 10-K, p. 33.
[2] Alphabet 2018 10-K, p. 32; Alphabet 2020 10-K, p. 38.
[3] Alphabet 2018 10-K, p. 33; Alphabet 2020 10-K, p. 39.
[4] Alphabet 2018 10-K, p. 34; Alphabet 2020 10-K, p. 39.
[5] Alphabet 2018 10-K, p. 34; Alphabet 2020 10-K, p. 39.
[6] = [1] − [2] − [3] − [4] − [5].
[7] Total Gross Profit Margin is calculated using direct costs only. [7] = ([1] − [2]) ÷ [1].
[8] Total Net Profit Margin is calculated using all costs and operating expenses. [8] = [6] ÷ [1].

Confidential – Attorneys' Eyes Only