**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

Stephen A. Broome (CA Bar No. 314605)
stephenbroome@quinnemanuel.com
Viola Trebicka (CA Bar No. 269526)
violatrebicka@quinnemanuel.com
Crystal Nix-Hines (CA Bar No. 326971)
crystalnixhines@quinnemanuel.com
Alyssa G. Olson (CA Bar No. 305705)
alyolson@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Xi ("Tracy") Gao (CA Bar No. 326266)
tracygao@quinnemanuel.com
Carl Spilly (admitted *pro hac vice*)
carlspilly@quinnemanuel.com
1300 I Street NW, Suite 900
Washington D.C., 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100

Andrew H. Schapiro (admitted *pro hac vice*)
andrewschapiro@quinnemanuel.com
Teuta Fani (admitted *pro hac vice*)
teutafani@quinnemanuel.com
Joseph H. Margolies (admitted *pro hac vice*)
josephmargolies@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Telephone: (312) 705-7400
Facsimile: (312) 705-7401

*Counsel for Defendant Google LLC*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| PATRICK CALHOUN, *et al.*, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GOOGLE LLC,<br><br>Defendant. | Case No. 4:20-cv-05146-YGR-SVK<br><br>**GOOGLE LLC'S OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION**<br><br>The Honorable Yvonne Gonzalez Rogers<br>Courtroom: 1 – 4th Floor<br>Date: February 4, 2025<br>Time: 2:00 p.m.<br>Amended Complaint Filed: April 16, 2021<br><br>Trial Date: None Set |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.  PRELIMINARY STATEMENT .................................................................................1

II.  RELEVANT FACTUAL BACKGROUND ...............................................................3

    A.  Many Variables Affect Whether Google's Services Receive and Use the Data .................................................................................................................3

    B.  Google's Account Holder Agreements, Privacy Policy, and Many Other Disclosures Explain Google Receives the Data .........................................4

    C.  Google Encouraged Account Holders to Review and Manage the Data on Their MyActivity Pages—and Millions of Them Did ...............................6

    D.  Plaintiffs Admit That They and Many Class Members Never Even Saw the CPN, Let Alone Adopted Their Alleged Interpretation of It ....................7

    E.  The Data Is Not Uniformly Associated with Class Members .....................8

III.  ARGUMENT ...........................................................................................................9

    A.  Implied Consent Implicates Myriad Individual Issues that Defeat Typicality and Predominance ........................................................................................9

        1.  Numerous Sources Put Many Users on Notice of the Data Collection........10

        2.  Implied Consent Is a Defense to All Four Claims......................................13

    B.  Express Consent Cannot Be Resolved with Classwide Evidence—Defeating Typicality and Predominance....................................................................15

    C.  Plaintiffs' Four Causes of Action Require Individualized Inquiries Beyond Implied Consent That Defeat Typicality and Predominance .....................16

        1.  Contract: Plaintiffs Fail to Show Common Evidence of Breach ................16

        2.  UCL: Plaintiffs Fail to Show Their Actual Reliance or Entitlement to a Presumption of Classwide Reliance ......................................................17

        3.  CIPA § 631: Plaintiffs Fail to Show Common Evidence of Interception of "Contents" While "in Transit … Within This State"..........19

        4.  Privacy: Plaintiffs Fail to Show Uniform Expectation of Privacy or Highly Offensive Conduct ......................................................................20

    D.  Plaintiffs Fail to Show that a Rule 23(c)(4) Issues Class Should Be Certified........23

    E.  Plaintiffs Fail to Show That a Rule 23(b)(2) Class Should be Certified.................24

IV.  CONCLUSION .......................................................................................................25

1

## **TABLE OF AUTHORITIES**

2

**Page**

3

**Cases**

4

*Algarin v. Maybelline, LLC,*
  300 F.R.D. 444 (S.D. Cal. 2014)..................................................................................... 25

5

6

*Am. Optometric Soc'y, Inc. v. Am. Bd. of Optometry, Inc.,*
  2011 WL 13129754 (C.D. Cal. May 27, 2011)................................................................ 24

7

*Avilez v. Pinkerton Gov't Servs., Inc.,*
  596 F. App'x 579 (9th Cir. 2015).................................................................................... 23

8

9

*Backhaut v. Apple Inc.,*
  2015 WL 4776427 (N.D. Cal. Aug. 13, 2015).................................................... 10, 13, 17, 23

10

11

*Bennett v. N. Am. Bancard, LLC,*
  2022 WL 1667045 (S.D. Cal. May 25, 2022)................................................................... 17

12

*Berger v. Home Depot USA, Inc.,*
  741 F.3d 1061 (9th Cir. 2014)......................................................................................... 18

13

14

*Brown v. Google, LLC,*
  2022 WL 17961497 (N.D. Cal. Dec. 12, 2022) ...........................................................*passim*

15

*Brown v. Google LLC,*
  525 F. Supp. 3d 1049 (N.D. Cal. 2021) ........................................................................... 11

16

17

*Brown v. Google LLC,*
  685 F. Supp. 3d 909 (N.D. Cal. 2023) ............................................................................ 20

18

19

*Calhoun v. Google, LLC,*
  113 F.4th 1141 (9th Cir. 2024).............................................................................. 9, 15, 25

20

*Campbell v. Facebook Inc.,*
  315 F.R.D. 250 (N.D. Cal. 2016) .................................................................................... 10

21

22

*In re Conseco Life Ins. Co. Life Trend Ins. Mktg. & Sales Prac. Litig.,*
  920 F. Supp. 2d 1050 (N.D. Cal. 2013) ........................................................................... 13

23

24

*Desnick v. Am. Broad. Companies, Inc.,*
  44 F.3d 1345 (7th Cir. 1995)........................................................................................... 15

25

*Dimas v. JPMorgan Chase Bank, N.A.,*
  2018 WL 809508 (N.D. Cal. Feb. 9, 2018)....................................................................... 17

26

27

*dotStrategy, Co. v. Facebook, Inc.,*
  2021 WL 2550391 (N.D. Cal. June 22, 2021) ................................................................... 18

28

*Durell v. Sharp Healthcare*,
    183 Cal. App. 4th 1350 (2010) ............................................................. 17

*In re Facebook, Inc. Internet Tracking Litig.*,
    956 F.3d 589 (9th Cir. 2020) ................................................... 19, 21, 22

*In re Google Assistant Priv. Litig.*,
    457 F. Supp. 3d 797 (N.D. Cal. 2020) ............................................ 22, 23

*In re Google Inc. Gmail Litig.*,
    2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) ........................................ 11

*In re Google Inc. Gmail Litig.*,
    2014 WL 1102660 (N.D. Cal. Mar. 18, 2014) ................................ 10, 11, 13

*In re: Google RTB Consumer Priv. Litig.*,
    2024 WL 2242690 (N.D. Cal. Apr. 4, 2024) ............................ 10, 11, 12, 14

*In re Google RTB Consumer Priv. Litig.*,
    606 F. Supp. 3d 935 (N.D. Cal. 2022) .................................................. 11

*Griffith v. TikTok, Inc.*,
    2024 WL 4308813 (C.D. Cal. Sept. 9, 2024) ....................................*passim*

*Griffith v. TikTok, Inc.*,
    2024 WL 4874556 (C.D. Cal. Oct. 22, 2024) ....................................... 9, 20

*Gulec v. Boeing Co.*,
    698 F. App'x 372 (9th Cir. 2017) ......................................................... 15

*Hammerling v. Google, LLC*,
    2024 WL 937247 (9th Cir. Mar. 5, 2024) ............................................. 24

*Hammerling v. Google LLC*,
    615 F. Supp. 3d 1069 (N.D. Cal. 2022) ................................................ 19

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992) ............................................................... 16

*Harris v. comScore, Inc.*,
    259 F.R.D. 579 (N.D. Ill. 2013) .......................................................... 13

*Hart v. TWC Prod. & Tech. LLC*,
    2023 WL 3568078 (N.D. Cal. Mar. 30, 2023) ......................... 10, 11, 15, 20

*Hart v. TWC Prod. & Tech. LLC*,
    526 F. Supp. 3d 592 (N.D. Cal. 2021) .................................................. 11

*Hill v. Nat'l Collegiate Athletic Ass'n*,
    7 Cal. 4th 1 (Cal. 1994) ...................................................................... 15

1

2

*Hubbard v. Google*,
   2024 WL 3302066 (N.D. Cal. July 1, 2024) ........................................................................ 13

3

*Kearney v. Salomon Smith Barney, Inc.*,
   39 Cal. 4th 95 (2006) ........................................................................................................... 20

4

5

*Lewis v. YouTube, LLC*,
   244 Cal. App. 4th 118 (2015) .............................................................................................. 25

6

7

*Mazza v. Am. Honda Motor Co., Inc.*,
   666 F.3d 581 (9th Cir. 2012) ............................................................................................... 18

8

*McCoy v. Alphabet, Inc.*,
   2021 WL 405816 (N.D. Cal. Feb. 2, 2021) .......................................................................... 19

9

10

*Moreno v. San Francisco Bay Area Rapid Transit Dist.*,
   2017 WL 6387764 (N.D. Cal. Dec. 14, 2017) ...................................................................... 22

11

12

*Pfizer Inc. v. Superior Ct.*,
   182 Cal. App. 4th 622 (2010) .............................................................................................. 18

13

*In re Pharmatrak, Inc.*,
   329 F.3d 9 (1st Cir. 2003) ................................................................................................... 15

14

15

*Pollack v. Foto Fantasy, Inc.*,
   2010 WL 11595486 (C.D. Cal. July 15, 2010) .................................................................... 22

16

17

*Pulaski & Middleman, LLC v. Google, Inc.*,
   802 F.3d 979 (9th Cir. 2015) ............................................................................................... 18

18

*Reitman v. Champion Petfoods USA, Inc.*,
   830 F. App'x 880 (9th Cir. 2020) ........................................................................................ 23

19

20

*Ribas v. Clark*,
   38 Cal. 3d 355 (1985) .......................................................................................................... 14

21

22

*Rodriguez v. Google LLC*,
   2024 WL 38302 (N.D. Cal. Jan. 3, 2024) ..................................................................... 15, 21

23

*RSI Corp. v. Int'l Bus. Machines Corp.*,
   2012 WL 3277136 (N.D. Cal. Aug. 9, 2012) ....................................................................... 25

24

25

*Schellenbach v. GoDaddy.com, LLC*,
   321 F.R.D. 613 (D. Ariz. 2017) ........................................................................................... 24

26

*Silver v. Stripe Inc.*,
   2021 WL 3191752 (N.D. Cal. July 28, 2021) ...................................................................... 15

27

28

*Singh v. Google LLC*,
   2022 WL 94985 (N.D. Cal. Jan. 10, 2022) .......................................................................... 18

*Smith v. Facebook, Inc.*,
   745 F. App'x 8 (9th Cir. 2018) .................................................................................... 25

*True Health Chiro., Inc. v. McKesson Corp.*,
   896 F.3d 923 (9th Cir. 2018) ...................................................................................... 10

*TRW, Inc. v. F.T.C.*,
   647 F.2d 942 (9th Cir. 1981) ...................................................................................... 24

*U.S. v. W. T. Grant Co.*,
   345 U.S. 629 (1953) .................................................................................................... 24

*Walker v. Life Ins. Co. of the Southwest*,
   953 F.3d 624 (9th Cir. 2020) ................................................................................ 17, 18

*Williams v. Apple, Inc.*,
   338 F.R.D. 629 (N.D. Cal. 2021) ................................................................................ 13

*In re Zynga Privacy Litig.*,
   750 F.3d 1098 (9th Cir. 2014) .................................................................................... 19

## **Rules/Statutes**

F.R.C.P. 23(a) ..................................................................................................... 2, 19, 24

F.R.C.P. 23(b)(2) .......................................................................................................... 24

F.R.C.P. 23(c)(4) ...................................................................................................... 2, 23

GOOGLE'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1    **I.    PRELIMINARY STATEMENT**

2    Plaintiffs seek to recover billions in purportedly "unjust profits" on behalf of all Chrome

3    users from whom Google received data when they browsed the internet without "Sync" enabled.

4    But nothing unjust or untoward occurred here. The record confirms that millions of Chrome users

5    understand the routine data collection and the fact that it has nothing to do with Sync.

6    The data collection is no secret: Google discloses it in many ways—including in its Privacy

7    Policy and Account Holder Agreements that Plaintiffs and millions of class members reviewed. The

8    collection is also disclosed by websites using Google's services, and is a frequent topic of public

9    discourse. Beyond these disclosures, Google promotes its "MyActivity" feature—available at

10   http://myactivity.google.com—that allows users to review, search, and delete the data associated

11   with their Accounts, and Google reminds users to review MyActivity on a regular basis. Millions of

12   Chrome users do so every week. Google even includes a transparency tool in Chrome that allows

13   users to see the data collection in real time. Indeed, there are so many sources informing users of

14   the routine data collection that the plaintiffs in the related *Brown* case (who are also class members

15   here) observe it is "common knowledge."

16   Notwithstanding these disclosures, Plaintiffs insist that the Chrome Privacy Notice ("CPN")

17   misled class members into believing that simply using Chrome without Sync would block the data

18   collection. But *Plaintiffs* certainly were not misled by the CPN—they admit they never read it. Their

19   experts concede that many class members would not have read it either, and, even if they had, would

20   "not come to one singular interpretation." These are critical concessions that defeat both typicality

21   and predominance through Google's implied consent defense, which this Court repeatedly has held

22   turns on a user's "individual, and subjective understanding" of the particular disclosures to which

23   she was exposed. Class members who used Chrome without Sync while aware of the data collection,

24   and who never read the CPN, impliedly consented. But determining which class members read the

25   CPN and which did not is not possible in a class proceeding. For this reason and those that follow,

26   class certification should be denied.

27   *First*, implied consent defeats typicality and predominance. Plaintiffs' admission that they

28   never read the CPN means their claims are not typical of those class members who did and who

GOOGLE'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

might more credibly pursue Plaintiffs' core theory. And Plaintiffs do not even attempt to show that Google's implied consent defense is subject to common proof. Nor could they: the record confirms there are numerous sources alerting Chrome users to the data collection, and that individualized questions regarding what information "certain class members knew, read, saw, or encountered" abound, defeating predominance. *See Brown v. Google, LLC*, 2022 WL 17961497, at *19 (N.D. Cal. Dec. 12, 2022) (Gonzalez Rogers, J.). Instead, Plaintiffs assert that the four claims they seek to certify are somehow immune to an implied consent defense. Their argument has been rejected by this Court and others in decisions finding implied consent defeated predominance for similar claims, notwithstanding the existence of a form contract.

*Second*, Google's express consent defense similarly renders Plaintiffs' claims atypical and defeats predominance. The Ninth Circuit held that express consent turns on disputed issues of material fact, but those issues are not common across the Plaintiffs, let alone the class.

*Third*, Plaintiffs' four causes of action each involve elements and additional defenses beyond consent for which Plaintiffs fail to demonstrate typicality and predominance.

*Fourth*, issue certification pursuant to Rule 23(c)(4) is inappropriate because it would not materially advance the litigation. Implied consent and numerous claim-specific individualized questions make it impossible to resolve liability classwide. And attempting to make a "prima facie" case for liability that Google must rebut in individual suits would unfairly prejudice Google.

*Finally*, an injunctive relief class should be denied for numerous reasons, including because Plaintiffs fail to satisfy Rule 23(a)'s typicality requirement. In addition, no forward-looking relief is necessary because Google has already removed the CPN pursuant to the *Brown* settlement. The Court correctly found that Google's remaining disclosures adequately explain the data collection, and the Ninth Circuit did not disturb that finding—indeed, multiple Ninth Circuit decisions support it. Simply put, with the CPN gone, there is no basis for anyone to believe that using Chrome without Sync prevents the data collection. And class members who want to review and delete the data associated with their Accounts can already do so on their MyActivity pages.

## II.    RELEVANT FACTUAL BACKGROUND[1]

### A.    Many Variables Affect Whether Google's Services Receive and Use the Data

Google is a trusted provider of popular web services like Analytics, Ads, Maps and Fonts (the "Services"). The Services allow websites to better understand their customers, serve ads, provide navigational services, or provide other features. To function, these Services rely on routine HTTP requests that generally contain certain basic data elements unless blocked by the user or website. Plaintiffs challenge the Services' receipt of five data categories.[2]

It is undisputed that third-party websites that use Google scripts to enable the Services intend to send the Data to Google when a user in any browser or browser mode visits their website. Ex. 1 ("Chen Rep.") § V;[3] Fair Decl. ¶ 5; Dkt. 935 (MSJ Order) at 14-16 (acknowledging both parties' experts agreed "how browsers work and how they request websites" and that "the at-issue data is collected and transmitted to Google by all the major browsers"). The process at issue—directing HTTP resource requests to third-party web-service providers—has been ubiquitous on the internet for well over a decade. Chen Report § IV. And most popular websites use multiple third-party web services that employ the same process. *Id.* ¶ 50.

However, whether a Google Service receives a given Data category depends on many factors and varies across websites and class members. Ex. 5 ("Zervas Rep.") ¶ 13, § III.A.1. For example, Analytics and Ad Manager each offer features that websites can enable to prevent Google from collecting or using certain Data categories. Berntson Decl. § B.1; Ganem Decl. § B.1. In addition, Chrome users can enable settings and tools that prevent Google from receiving certain Data categories. Ganem Decl. §§ B.2-3; Berntson Decl. § B.2; Zervas Rep. § III.A.1. These include

---

[1]    Plaintiffs attach more than twenty documents and deposition excerpts that were not previously filed on the docket, some of which post-date the prior class certification briefing, and many of which are not addressed in their motion. *See, e.g.*, Pls.' Exs. C18, C23-C27, C30-C34, C38-C41, E12-16, E19. If, as they have done before, Plaintiffs "misquote and cherry-pick," Dkt. 935 at 26, these documents in Reply, Google respectfully reserves its right to object.

[2]    They are (1) "cookie identifiers"; (2) "GET requests"; (3) "POST communications"; (4) "IP address and User-Agent information"; and (5) "x-client-data identifier[s]" (the "Data"). Dkt. 163 ("FAC") ¶ 141.

[3]    All citations to "Ex." refer to the Exhibits attached to the Declaration of Stephen A. Broome.

cookie blockers, VPNs, ad blockers, disabling Ads Personalization, and the Analytics Opt-Out extension. *Id.* Plaintiffs' expert admits that "31% of internet users" use VPNs, and "popular ad blockers provide the same services: hiding the user's IP address." Pls.' Ex. E1 (Mangum Rep.) ¶¶ 84-88. In addition, some Services do not collect certain Data categories (*e.g.*, cookies, X-Client-Data headers). Crossland Decl. ¶ 10; Ganem Decl. ¶ 9.

Google's use of the Data also varies by Service. Some Services (like Fonts and Maps) do not (i) associate the Data with a user's Account or identity, (ii) share the Data with other Services, or (iii) use the Data for advertising. Crossland Decl. ¶¶ 11, 13; Cassidy Decl. ¶¶ 6, 8. They use the Data only to provide the (free) Service. *Id.* Thus, whether Google collected the Data from a class member or used it for profit—the predicates for liability and damages—depends on which Services the user interacted with, and the tools and features enabled by the user and the websites.

Chrome's Sync feature, by contrast, is unrelated to—and has no impact on—the Data at issue in this case. Sync is not a privacy tool. The CPN explains that enabling Sync allows users to store certain categories of information *not* at issue here—*e.g.*, passwords/logins, payment cards, bookmarks, tabs, Chrome history, auto-fill information—in their Google Accounts so that they "may access it when [they] sign in and sync to Chrome on other computers and devices." Pls.' Exs. A7-A19; Mardini Decl. ¶ 17; Fair Decl § A. This data differs in nature, purpose, and process from the Data at issue. Fair Decl. § A; Mardini Decl. § D; Chen Rep. ¶¶ 58-59.

## B. Google's Account Holder Agreements, Privacy Policy, and Many Other Disclosures Explain Google Receives the Data

Google and third-party disclosures separately notified class members that Google receives the Data. Fair Decl. §§ C-F; Exs. 44-72. As the Court previously found, Google's "Privacy Policy discloses that Google collects the at-issue data when users visit websites that use Google services" and "also discloses how Google uses the at-issue data." Dkt. 935 at 17-18. The Privacy Policy has been viewed hundreds of millions of times. Fair Decl. ¶ 75.

The Privacy Policy disclosed that Google receives the precise categories of Data at issue through "[p]roducts that are integrated into third-party apps and sites, like ads and embedded Google Maps." Fair Decl. ¶ 70. It also explained that Google collects information about users' "[a]ctivity

on third-party sites and apps that use our services," and distinguished such Data from "Chrome browsing history you've synced with your Google Account." *Id.* ¶¶ 70-71, 73.

Each Plaintiff, and millions of class members, also reviewed and agreed to one or more Account Holder Agreements that disclosed the Data collection and that did not suggest that using Chrome without Sync would block it. For example, eligible existing Account holders as of June 2016—including Plaintiffs Crespo, Henry, Wilson, and Johnson—were shown the Consent Bump Agreement. Fair Decl. § B.1. The Consent Bump Agreement explains:

> When you use Google services like Search and YouTube, you generate data — things like what you've searched for and videos you've watched. You can find and control that data in My Account under the Web & App Activity setting.
>
> With this change, this setting may also include browsing data from Chrome ***and activity from sites and apps that partner with Google, including those that show ads from Google***.

*Id.* ¶ 23 (emphasis added). The Consent Bump Agreement also linked to a FAQ page that states:

> Many websites and apps use Google technologies to improve their content and services. For example, a website might use our advertising services (like AdSense) or analytics tools (like partners who use Google Analytics to improve the ads they show).
>
> ***As you use these sites, your web browser may send certain information to Google that may include the web address of the page that you're visiting, your IP address, or cookies previously set by the site or Google....***

*Id.* ¶ 30 (emphasis added). The Consent Bump Agreement further discloses that "Google will use this information to make ads across the web more relevant to you." *Id.* ¶ 23. Several plaintiffs, and millions of Google Account holders, reviewed this agreement and selected "**I AGREE**." *Id.* ¶¶ 32-34, 39-43. However, millions of other Google Account holders did not see the Consent Bump Agreement because they were not eligible, and millions more did not consent. *Id.* ¶¶ 32-38. Plaintiffs' class definition sweeps in all these differently situated users.

Users creating new accounts after June 2016—including Plaintiffs Calhoun, Kindler, Johnson, and Wilson—were shown a New Account Creation Agreement that disclosed the Data collection in similar but different terms. *Id.* § B.2. The agreement explains that Google processes information about users' activity, "including information like the video you watched, device IDs, IP

address, cookie data, and location[,] … when you use apps or sites that use Google services like ads, Analytics, and the YouTube video player." *Id.* ¶ 48. The agreement also specifies that Google may use this information to "[d]eliver personalized ads … both on Google services and on sites and apps that partner with Google." *Id.* ¶ 49. Several plaintiffs, and millions of Google Account holders, reviewed this agreement and selected "**I AGREE**." *Id.* ¶¶ 56-62.

Google also provides an online Help Center containing articles that (1) explain Google receives the Data when users (in any browser) visit websites that use the Services, and (2) distinguish that Data collection from the information Google receives when a Chrome user enables Sync. *Id.* ¶¶ 93-101. Indeed, the CPN itself linked to one such article that received millions of views. *Id.* ¶ 98. In addition, Google requires websites using its Services to provide a privacy policy that discloses their use of the Services. *Id.* § E. Many websites comply by linking to a page titled "HOW GOOGLE USES INFORMATION FROM SITES OR APPS THAT USE OUR SERVICES." *Id.* ¶¶ 68, 114, 117. That page, too, discloses the Data collection:

> [W]hen you visit a website that uses advertising services like AdSense, including analytics tools like Google Analytics, or embeds video content from YouTube, your web browser automatically sends certain information to Google. This includes the URL of the page you're visiting and your IP address. We may also set cookies on your browser or read cookies that are already there.

*Id.* ¶ 68. This page has also been viewed millions of times. *Id.* ¶ 75.

These are among the most prominent disclosures, but there are others. Chrome even includes a tool that allows users to view the third-party domains—including Google domains—receiving Data from the websites they visit. *Id.* § F; Chen Rep. § VI. And myriad news articles and third-party privacy policies discuss Google's data collection practices. Exs. 49-72.

Simply stated, that Google receives the Data is no secret. And none of these disclosures or articles in any way suggests that using Chrome without Sync prevents the Data collection.

### C.    Google Encouraged Account Holders to Review and Manage the Data on Their MyActivity Pages—and Millions of Them Did

The Account Holder Agreements (and other Google disclosures, including the CPN) directed Google Account holders to their MyActivity pages to review and manage the Data associated with their Accounts. Fair Decl. § D. Google also routinely advises Account holders by email to review

their MyActivity pages and conduct a "Privacy Checkup" that explains the information associated with their Accounts. *Id.* ¶¶ 103-12. Plaintiffs each received these reminders. Exs. 28-43.

On MyActivity, Account holders who enabled a feature that stores "Web & App Activity" in their Google Accounts and agreed to include "activity from sites, apps, and devices that use Google services"—as Plaintiffs did—can review and delete information associated with their Accounts. Fair Decl. ¶¶ 40-43, 58-61, § D. That information includes Data Google received when Account holders visited websites using the Services, regardless of whether Sync was enabled. *See* Fair Decl. Exs. 89-99 (Plaintiffs' Web & App Activity excerpts). MyActivity is a prominent tool that dispels any misconception that using Chrome without Sync prevents Google from receiving the Data. Google Account holders visit MyActivity millions of times every week. *Id.* ¶ 85.

### D. Plaintiffs Admit That They and Many Class Members Never Even Saw the CPN, Let Alone Adopted Their Alleged Interpretation of It

In contrast to the Account Holder Agreements, the CPN upon which Plaintiffs rely is not required reading for class members—they would have needed to seek it out.[4] Plaintiffs admit *they* never reviewed it,[5] and their experts admit that most Chrome users would not have either.[6] Even for those class members who did review the CPN, Plaintiffs have provided no common proof they interpreted the CPN uniformly. Rather, Plaintiffs' expert Prof. John admitted that "if consumers did read the [CPN], they would not come to one singular interpretation." Pls.' Ex. F1 (John Rep.) at 5.[7]

---

[4] Plaintiffs' modified class period begins September 23, 2018, the date Google modified the CPN to reflect that signed-in mode and Sync mode had been separated. Plaintiffs' assertion that the change "made Chrome less private" (Mot. 2-3) is false; the change *enhanced* privacy because it required an additional step—beyond signing in to Chrome—to enable Sync. *See* Fair Decl. ¶¶ 4, 8-9 & nn.1, 5.

[5] *See* Ex. 6, at Response to Interrogatory 1; Ex. 8, at Response to Interrogatory 6; Ex. 10 at Responses to Interrogatories 1 and 6; Ex. 17 (Kindler Tr.) at 26:16-17, 31:14-32:4, 37:25-38:5, 48:24-49:16, 99:23-100:1, 226:23-227:5-9, 314:20-315:17; Ex. 18 (Crespo Tr.) at 31:12-25, 33:12-34:23, 84:24-86:24; Ex. 19 (Calhoun Tr.) at 20:14-21:4, 22:11-26:16, 65:22-66:24, 75:5-6; Ex. 20 (Henry Tr.) at 25:13-27:18, 32:19-33:5, 93:9-22, 119:20-121:22; Ex. 21 (Wilson Tr.) at 156:11-16, 206:2-8, 210:6-11, 281:10-282:13; Ex. 22 (Johnson Tr.) at 63:8-64:10, 67:1-16, 73:6-19.

[6] Turow Rep. ¶ 28; John Rep. at 6-7; Ex. 24 (John Tr.) at 120:19-121:12, 122:3-6, 125:11-19, 126:13-17, 250:7-9, 258:13-15, 278:24-279:3; Ex. 23 (Turow Tr.) at 305:4-11, 305:25-306:6.

[7] Although the Court authorized Plaintiffs to strike portions of expert reports that are no longer relevant to their narrower proposed class, Plaintiffs struck admissions (such as this one) they now wish their expert did not make. Google should be entitled to rely on such admissions, particularly

Tellingly, Plaintiffs' experts conducted no surveys of Chrome users' interpretations of the CPN or other relevant disclosures. Ex. 23 ("Turow Tr.") at 35:7-12; Ex. 24 ("John Tr.") at 84:17-18. But Google's expert did. Prof. Tulin Erdem surveyed **actual Chrome users** and confirmed that:

- Many Chrome users **believe** Google receives their IP addresses, referrer URLs, and cookies while browsing the Internet and this expectation is not affected by Sync being on or off, or whether users viewed relevant privacy policies (Ex. 2 ("Erdem Rep.") § VI);

- There is **no material impact** on Chrome users' likelihood of using Chrome after they are presented with modified versions of the CPN and Privacy Policy to further clarify that Google's receipt of the Data occurs whether or not Sync is enabled (*id.* § VII); and

- Many Chrome users **strongly believe** that Google **definitely** receives the Data from websites that partner with Google after reviewing the Account Holder Agreements (*id.* § VIII).

These surveys are among the best evidence that many class members already understand that Google receives the Data (regardless of Sync mode), are fine with it, and would not change their use of Chrome. In rebuttal, Plaintiffs offer only attorney argument and their experts' *ipse dixit*.

### E.    The Data Is Not Uniformly Associated with Class Members

Millions of class members use Chrome in its default mode ("Basic") and browse the internet while signed out of their Google Accounts. For these millions of users, Google does not link the Data to their Accounts or information that "personally identifies" a user.[8] Monsees Decl. §§ A-B. Rather, the Data is associated at most with a cookie that is not associated with the user's Account.[9] *Id.* Google implements protocols and processes to ensure such users are **not** identified and that the Data **cannot** be "reasonably linked" to information that "personally identifies" a user. *Id.* Practically speaking, this means these users cannot be identified to confirm class membership. *Id.*; Zervas Rep. §§ III.A.4, III.B.2; Berntson Decl. ¶¶ 27-32. It also means the Data is not uniformly "personal information." *See* Ex. 3 ("Schwartz Rep.") § V.B.[10]

---

where Google has not had the opportunity to depose Plaintiffs' experts on their removal.

[8] Google's Privacy Policy defines "Personal Information" as "information that you provide to us which personally identifies you, such as your name, email address, or billing information, or other data that can be reasonably linked to such information by Google, such as information we associate with your Google Account." Monsees Decl. ¶ 5.

[9] Some services do not even associate the Data with cookies. *See, e.g.*, Crossland Decl. ¶ 10.

[10] Plaintiffs falsely assert that "Google expressly includes 'IP addresses, unique cookie or device

1    Plaintiffs' claim that the Data is always "associated by Google with each class member's

2    Google Account" (Mot. 6) is false and relies on flawed analysis that willfully disregards how

3    Google's systems work. The analysis was conducted by Dr. Shafiq—a go-to expert for privacy

4    plaintiffs whose opinions courts have criticized as "misleading," "require[ing] scrutiny," and

5    "rel[ying] on several assumptions that Plaintiffs have not shown to be true." *Griffith v. TikTok, Inc.*,

6    2024 WL 4308813, at *3, *8 (C.D. Cal. Sept. 9, 2024); *see also Griffith v. TikTok, Inc.*, 2024 WL

7    4874556, at *2 (C.D. Cal. Oct. 22, 2024) (describing the "deeply flawed analysis by Dr. Shafiq" and

8    "numerous ways Dr. Shafiq erred"). For example, the ███████████ that Dr. Shafiq falsely

9    describes (Mot. 7) as a mechanism for linking signed-in and signed-out data is specifically designed

10   to **prevent** the mapping of signed-in and signed-out identifiers. Berntson Decl. ¶¶ 31-35. It simply

11   extracts and then partitions identifiers. *Id.* It does not "identif[y] the user." Mot. 7. Dr. Shafiq

12   concedes that his methodology for identifying class members is speculative and depends on

13   "gather[ing] more knowledge." Ex. 26 ("Shafiq Tr.") at 218:6-11. Even Dr. Shafiq's latest opinion,

14   *see, e.g.*, Pls. Ex. C11, shows only that data from different users (signed-in and signed-out) might

15   be reflected in the same log, not that the same user's signed-in and signed-out data is joined (it is

16   not).[11] Given Google's substantial efforts to prevent such joining, it is unsurprising that Plaintiffs

17   have not identified *any* reliable method to identify signed-out Chrome users. *See, e.g.*, Ex. 25

18   ("Smith Tr.") at 116:16-118:20; Schumann Decl. ¶¶ 2-8; Zervas Rep. § III.B.2.a.

19   **III.    ARGUMENT**

20       **A.    Implied Consent Implicates Myriad Individual Issues that Defeat Typicality
             and Predominance**

21

22       "The parties do not dispute that consent is a valid defense to [Plaintiffs'] claims." *Calhoun*

23   *v. Google, LLC*, 113 F.4th 1141, 1147 (9th Cir. 2024); *Brown*, 2022 WL 17961497, at *19 (consent

24   ———————————

25   ID[s], and unique account [IDs] as 'personally identifiable information.'" Mot. 6 (citing Ex. C45).
     The cited document says this classification is "[s]olely for the purpose of classifying data internally
     at Google" and only "until reclassified." Ex. C45 at -508. The same document also says "Google

26   interprets PII to exclude, for example: pseudonymous cookie IDs" and "IP addresses." *Id.* at -507.

27   [11] Google has not had the opportunity to respond to, or depose, Plaintiffs' experts on any rebuttal or
     supplemental reports (*e.g.*, Pls.' Exs. B2, C2, C11, D2, E2, F2), including one which was submitted

28   just weeks before the case was dismissed in December 2022.

1    is a defense to contract, CIPA, UCL, and invasion of privacy claims). "In privacy litigation, consent

2    can be 'express,' but it can also be 'implied in fact based on whether the surrounding circumstances

3    demonstrate' that the party whose personal information was collected knew it." *In re: Google RTB*

4    *Consumer Priv. Litig.*, 2024 WL 2242690, at *12 (N.D. Cal. Apr. 4, 2024) (Gonzalez Rogers, J.).

5    "Implied consent … is an intensely factual question that requires consideration of the circumstances

6    surrounding the alleged privacy violation," and thus "a broad set of materials are relevant to

7    determining whether [] consent should be implied," including Google's disclosures, third-party

8    disclosures and articles, and surveys.[12] *Id.* Implied consent requires "a factfinder [] to assess each

9    account holder's individual, and subjective understanding" of the information they viewed about

10   the challenged data collection. *Id.* at *14; *see also Brown*, 2022 WL 17961497, at *19 (same); *In re*

11   *Google Inc. Gmail Litig.*, 2014 WL 1102660, at *21 (N.D. Cal. Mar. 18, 2014) (same).[13] Consent

12   defenses that must be litigated on an individual basis preclude class certification. *True Health*

13   *Chiro., Inc. v. McKesson Corp.*, 896 F.3d 923, 931 (9th Cir. 2018).

14              **1.    Numerous Sources Put Many Users on Notice of the Data Collection**

15            **Google Disclosures.** The Court has already found that the Account Holder Agreements and

16   Privacy Policy disclose the challenged Data collection. Dkt. 935 at 17-20, 22; *see also* Fair. Decl.

17   §§ B-C.[14] Many Google Help pages do too. *See* Fair Decl. ¶¶ 68-69, 75, 93-101, 113-118; Pls. Ex.

---

18

19   [12] *See also Hart v. TWC Prod. & Tech. LLC*, 2023 WL 3568078, at *11 (N.D. Cal. Mar. 30, 2023)
     (implied consent defeated predominance where surveys, the privacy policy, news articles and others

20   sources indicated that "users could have learned that TWC used their location data for advertising
     purposes"); *Brown*, 2022 WL 17961497, at *17-18 (implied consent defeated predominance where

21   surveys, media and academic reports, developer tools, and Google disclosures indicated many users
     were on notice of the data collection); *Campbell v. Facebook Inc.*, 315 F.R.D. 250, 266 (N.D. Cal.

22   2016) ("individual issues of implied consent do predominate … due to the media reports on the
     practice" because "[e]ven if Facebook hid its practice, as long as users heard about it from

23   somewhere and continued to use the relevant features, that can be enough to establish implied
     consent."); *Backhaut v. Apple Inc.*, 2015 WL 4776427, at *14 (N.D. Cal. Aug. 13, 2015) (similar).

24

25   [13] Plaintiffs incorrectly assert (Mot. 1, 11, 18) that the Ninth Circuit held that implied consent is
     "governed by a reasonable user standard." Implied consent was not at issue in Google's summary

26   judgment motion or Plaintiffs' appeal, and thus the Ninth Circuit did not address it. However, even
     if an objective, reasonable user standard applied, individualized questions would still predominate

27   because the Court would have to consider what a reasonable user would understand from the
     particular sources of information to which each individual class member was exposed.

28   [14] Plaintiffs implicitly acknowledge this by limiting their class to Chrome users who signed up for

C22 at -375-78. Even if inadequate to establish express consent as a matter of law, at a minimum these disclosures placed many class members **on notice** of the Data collection, which is sufficient for implied consent. Indeed, in *Gmail*, *Brown*, and *RTB*, the courts found Google's disclosures insufficient to establish express consent as a matter of law, but nevertheless held they supported an implied consent defense by placing at least some users on notice of the challenged data collection.[15]

The CPN cannot remedy the predominance problem created by implied consent. Plaintiffs admit they never read it; their experts opined that many Chrome users would not have either, and that, even if they did, they would not interpret it in the same way.[16] Class members who reviewed the Privacy Policy, Account Holder Agreements, or Google Help Pages, but (like Plaintiffs) did not review the CPN, would have understood Google collects the Data and would have no basis for believing that using Chrome without Sync would block it. And even for those class members who did review the CPN, assessing implied consent requires individualized inquiry to determine how they interpreted it in light of the totality of disclosures they reviewed. Plaintiffs' failure to review the CPN also defeats typicality because Google's implied consent defense is stronger as to Plaintiffs compared to class members who did review the CPN.

**MyActivity and Chrome Tools.** Google Account Holders who agreed to the Data being associated with their Accounts (like Plaintiffs) can view a list of any websites from which Google received Data through its Services on their My Activity pages. MyActivity includes activity when they were not synced and plainly illustrates that using Chrome without Sync does not prevent the

---

Google Accounts prior to the CPN being taken down.

[15] *Compare In re Google Inc. Gmail Litig.*, 2013 WL 5423918, at *15 (N.D. Cal. Sept. 26, 2013) (denying motion to dismiss based on express consent), *with Gmail*, 2014 WL 1102660, at *21 (denying (b)(3) class based on implied consent); *compare Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1063 (N.D. Cal. 2021) (rejecting express consent defense at motion to dismiss stage), *with Brown*, 2022 WL 17961497, at *19 (denying (b)(3) class based on implied consent); *compare In re Google RTB Consumer Priv. Litig.*, 606 F. Supp. 3d 935, 949 (N.D. Cal. 2022) (denying motion to dismiss based on express consent), *with RTB*, 2024 WL 2242690, at *14 (denying (b)(3) class based on implied consent); *compare Hart v. TWC Prod. & Tech. LLC*, 526 F. Supp. 3d 592, 601 (N.D. Cal. 2021) (rejecting express consent defense at motion to dismiss stage), *with Hart*, 2023 WL 3568078, at *11 (denying (b)(3) class based on implied consent).

[16] *See supra* nn.5&6.

Data collection. Fair Decl. § D. Google routinely reminded Account Holders to review their MyActivity pages, and millions of them, including one Plaintiff, did so. Exs. 28-43; Fair Decl. ¶ 84. Even more, Chrome provided a simple tool allowing any interested user to see the Data transmissions to Google in real time. Fair Decl. § F; *see also* Exs. 47-48; *Brown*, 2022 WL 17961497, at *18 (noting the same "developer tool that users can use to see, in real time, what data is being collected when users are browsing…" and that one plaintiff had used the tool).

**Third-party Disclosures**. Websites using Google Services generally have their own privacy policies disclosing Google's receipt of the Data. Fair Decl. § E; Exs. 44-46, 59-70, 73-77. For example, websites that Plaintiffs visited explicitly disclosed that they used Google Analytics to track and report website traffic, and Google Ads to serve ads based on past website visits. *See, e.g.*, Exs. 6, 10, 75-77; *see also RTB*, 2024 WL 2242690, at *13 (noting that publishers "themselves have privacy policies that disclose they may share information with Google for advertisements"). Plaintiffs admit these disclosures put users on notice of the Data collection. Ex. 18 (Crespo Tr.) at 169:24-170:6; Ex. 19 (Calhoun Tr.) at 82:8-16, 85:3-14; Ex. 22 (Johnson Tr.) at 165:22-166:5.

**News Articles.** Google's receipt of the Data is also regularly reported in prominent news articles. *See, e.g.*, Exs. 49-58, 71-72; *see also RTB*, 2024 WL 2242690, at *13 (noting Google's argument that "its account holders could learn about its [] data collection from third-party materials like news articles and nonprofit reports"); *Brown*, 2022 WL 17961497, at *18 ("several media and academic reports []publicly disclosed the alleged conduct").

**User Surveys and "Common Knowledge."** Prof. Erdem conducted three surveys that confirm many Chrome users understand both that Google receives the Data and that its collection is not affected by Sync. Erdem Rep. §§ VI, VIII; *see also RTB*, 2024 WL 2242690, a *14 (considering consumer surveys in support of implied consent defense); *Brown*, 2022 17961497, at *18 (same). Indeed, even the *Brown* plaintiffs (also class members here) note the Data collection is "common knowledge." Case No. 4:20-cv-03664-YGR-SVK, Dkt. 886 ¶ 163 ("It is common knowledge that Google collects information about the web-browsing activity of users who are <u>not</u> in 'private

browsing mode.'");[17] *see also Hubbard v. Google*, 2024 WL 3302066, at *7 (N.D. Cal. July 1, 2024) ("Contemporary internet browsing involves the collection of users' data, including by tracking users across the internet, <u>and a reasonable user should expect as much</u>." (emphasis in original)).

In sum, there are numerous and disparate sources putting class members on notice of the Data collection. "A factfinder, in determining whether class members impliedly consented to the alleged conduct would have to determine the sources of information to which each class member was exposed" which "would require individualized assessment into class members' experience." *Brown*, 2022 WL 17961497, at *19.

### 2.    <u>Implied Consent Is a Defense to All Four Claims</u>

This Court and others have repeatedly held that implied consent applies to the four claims Plaintiffs seek to certify. *See supra* at 10 & n.12 (citing cases). Plaintiffs' attempt to sidestep that authority is meritless.

<u>**Breach of Contract**</u>. Plaintiffs contend that implied consent cannot defeat their contract claim because (1) the alleged contract must be interpreted under the reasonable-user standard, not based on users' subjective interpretations; and (2) the contract is integrated and cannot be amended based on "third party disclosures beyond the four corners of the contract."[18] Mot. 11-13. Both arguments miss the mark. Even accepting Plaintiffs' interpretation of the contract, implied consent "may [] be a defense to an action for breach of contract when, for example, the defendant can show that the plaintiff previously accepted and consented to the performance now asserted as a breach."

---

[17] *Brown* and *Calhoun* challenge the same data collection. *Compare Brown* FAC ¶¶ 63-83, *with* FAC ¶¶ 113-142. But the *Calhoun* theory—that using Chrome in ***any*** mode other than Sync mode (even Chrome's default "Basic" mode) would prevent the challenged data collection—is contradicted by the *Brown* theory that only Incognito mode prevents the same data collection.

[18] Neither *Williams v. Apple, Inc.*, 338 F.R.D. 629 (N.D. Cal. 2021), nor *In re Conseco Life Ins. Co. Life Trend Ins. Mktg. & Sales Prac. Litig.*, 920 F. Supp. 2d 1050, 1052 (N.D. Cal. 2013) (cited at Mot. 13), involved implied consent. And Plaintiffs' reliance (Mot. 13) on *Harris v. comScore, Inc.*, 259 F.R.D. 579 (N.D. Ill. 2013), for the proposition that implied consent is not a defense where there is a form contract is wrong. Judge Koh found *Harris*'s reasoning "unpersuasive" because "express and implied consent are analytically distinct" and "a finder of fact [is] allowed to consider a broader set of materials in answering the factual question whether users impliedly consented." *Gmail*, 2014 WL 1102660, at *19. Indeed, in *Gmail*, *Brown*, *RTB*, *Campbell*, and *Backhaut*, the courts found implied consent defeated predominance notwithstanding defendants' form contracts.

*RTB*, 2024 WL 2242690, at *12 (citing 2 Cal. Affirmative Def. 32:1 (2d ed.)); *Brown*, 2022 WL 17961497, at *19 (finding implied consent defeated predominance for contract claim). That is exactly what Google is entitled to show at trial—*i.e.*, regardless of how the contract is interpreted, many class members were aware of and consented to the Data collection. Indeed, because the Plaintiffs indisputably viewed one or more of the Account Holder Agreements, and admit they never saw the CPN, Google has a compelling argument that *they* impliedly consented.

**UCL.** Plaintiffs contend that "UCL claims are governed by the 'reasonable consumer' test and "reasonable consumers should [not] be expected to look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print on the side of the box." Mot. 14. This case presents the opposite situation: millions of class members (Plaintiffs included) were presented with Account Holder Agreements, a Privacy Policy, and other sources that disclosed the data collection; while far fewer class members (not even Plaintiffs) bothered to read "the side of the box" (the CPN) where the allegedly misleading statements existed. In any event, Plaintiffs fundamental premise is flawed. Applying the "reasonable consumer" test does not mean Google is limited to the contract documents. If class members were aware of the Data collection and consented to it, that is a defense Google is entitled to present at trial. The Court reached the same conclusion in *Brown* and *RTB* and Plaintiffs cite no contrary authority.

**CIPA.** Plaintiffs argue that implied consent is not a defense to CIPA "because the [Data] flows from Chrome to Google before the page is fully finished loading on the class member's screen," and thus class members could not have received notice until after Google already received Data from Chrome. Mot. 16. Plaintiffs ignore the circumstances of users who: (1) first used Chrome to visit Google.com, where the disclosures are presented and Google is a party to the communication; (2) used another browser to review Google's disclosures and/or third party disclosures or sources before using Chrome; and (3) received notice from non-Internet sources.

Nor is there merit to Plaintiffs' semantic argument that users might have "consented" to the data collection but not "authorized" it. The only case Plaintiffs cite to support this point, *Ribas v. Clark*, 38 Cal. 3d 355 (1985), uses the phrases "without…consent" and "unauthorized" interchangeably and makes no distinction between express and implied consent. *Id.* at 359–61.

1    **Intrusion Upon Seclusion**. "The plaintiff in an invasion of privacy case … must not have

2    manifested by his or her conduct a voluntary consent." *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal.

3    4th 1, 26 (Cal. 1994). Plaintiffs nevertheless argue that implied consent is not a defense to their

4    privacy claim because the "reasonable expectation of privacy" element is an "objective one." Mot.

5    17. But class members must have "an *actual* expectation of privacy" before it can be reasonable.

6    *See id.* at 26 (emphasis added); *see also Hart*, 2023 WL 3568078, at *9 (denying certification where

7    "resolution of Plaintiffs' claim … turns on individualized factual questions of whether each user

8    *actually maintained* their reasonable expectation of privacy" despite numerous sources placing users

9    on notice of the data practices) (emphasis added); *Gulec v. Boeing Co.*, 698 F. App'x 372, 373 (9th

10   Cir. 2017) (affirming dismissal of invasion of privacy claim where plaintiff failed to show that "*he

11   had* a reasonable expectation of privacy *in light of his consent*" (emphasis added)). Class members

12   who were aware of the Data collection but never read the CPN would not have had the expectation

13   that Plaintiffs claim. Rather, by using Chrome without Sync while aware of the Data collection, they

14   "manifested by [their] conduct a voluntary consent."[19] *Hill*, 7 Cal. 4th at 26; *Hart*, 2023 WL

15   3568078, at *10 (users "implied consent through their conduct when they continued to use the

16   applications despite exposure to materials that disclosed the challenged practices").

17   **B.    Express Consent Cannot Be Resolved with Classwide Evidence—Defeating
         Typicality and Predominance**

18

19       The Ninth Circuit held that Google's express consent defense turns on disputed issues of

20   material fact. *Calhoun*, 113 F.4th at 1151. But those disputed issues are not common across the

21   class. For example, millions of class members—including Plaintiffs—expressly agreed to one or

22   more Account Holder Agreements that Google will argue authorized the Data collection. But

23   ―――――――――――――

24   [19] Plaintiffs' cases do not support a contrary conclusion. *See Rodriguez v. Google LLC*, 2024 WL
     38302, *4 (N.D. Cal. Jan. 3, 2024) (acknowledging that even under objective standards, courts may

25   "examin[e]… 'the surrounding circumstances' to ascertain whether a person had a reasonable
     expectation of privacy"); *In re Pharmatrak, Inc.*, 329 F.3d 9, 20 (1st Cir. 2003) (mere use of a

26   product, without any disclosures that the defendant received the data, was inadequate to find implied
     consent); *Silver v. Stripe Inc.*, 2021 WL 3191752, *4, *6 (N.D. Cal. July 28, 2021) (did not address

27   implied consent); *Desnick v. Am. Broad. Companies, Inc.*, 44 F.3d 1345, 1351-56 (7th Cir. 1995)
     (affirmed the dismissal of privacy and wiretapping claims even where consent would not have been

28   given if full facts were known).

millions of other class members did not, including the millions of class members who were never shown the Consent Bump Agreement and the millions of class members who were shown it but did not consent. *See* Fair Decl. ¶¶ 34-38. Similarly, millions of class members did not see the New Account Creation Agreement because they were already Account holders when it launched. Plaintiffs are thus atypical because they are subject to "unique defenses which threaten to become the focus of the litigation," rendering "class certification [] inappropriate." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). And because class members are differently situated with respect to the Account Holder Agreements they viewed and consented to (or declined to consent to), express consent also defeats predominance.[20]

### C.   Plaintiffs' Four Causes of Action Require Individualized Inquiries Beyond Implied Consent That Defeat Typicality and Predominance

#### 1.   <u>Contract: Plaintiffs Fail to Show Common Evidence of Breach</u>

Plaintiffs' contract claim cannot be certified because they fail to show that the breach element can be resolved uniformly. They state without citation that "Google's breach will turn on common evidence that Chrome uniformly sends PI to Google regardless of sync status." Mot. 13. That is incorrect. Many variables affect whether Google receives Data, and, if so, which Data it receives, including which website the user visits, whether the user is signed-in to their Google Account, which Service(s) the website is using (if any), and the user's settings. *See supra* § II.A.; Zervas Rep. § III.A.1; Bernston Decl. § B; Ganem Decl. § B & ¶ 9; Crossland Decl. ¶ 10. Indeed, the evidence Plaintiffs cite to show uniformity in the Data "sent from Chrome to Google," Mot. 10 n.7 (citing Pls.' Exs. G17-G23), shows the opposite—*i.e.*, substantial variation in Data Google received.

Nor have Plaintiffs shown that common evidence can answer whether the Data Google receives is "personal information." Plaintiffs' expert Dr. Shafiq admitted this. *See, e.g.*, Shafiq Tr. at 149:9-150:17 (IP address is not PII if multiple users share the same IP address or IP address is for an internet cafe); *id.* at 161:14-162:4 (whether cookie is PII depends on whether cookie value

---

[20] Despite claiming there is one standard form contract, Plaintiffs elsewhere concede that "the Chrome Contract" is different depending on the time period. Mot. 4

changes and "whether Google servers maintain a mapping of the changed cookie"); *see also* Zervas Rep. § III.B.3. As explained in Section II.E., when a Chrome user is not signed-in to a Google Account, the Data is not linked with information that identifies the user. Monsees Decl. §§ A-B. And some Services—*e.g.*, Fonts—do not even associate the Data with cookies at all. Crossland Decl. ¶ 10. Therefore, the Data is not uniformly "personal information," Schwartz Rep. § V.B, and Google's receipt of it does not necessarily breach the contract even on Plaintiffs' theory. Individualized issues thus pervade the breach of contract claim. *Cf. Griffith*, 2024 WL 4308813, at *4 (certification denied because "the viability of Plaintiffs' claims depends on the nature of the information sent to Defendants [which] …. varies widely by website and by class member").

### 2.    UCL: Plaintiffs Fail to Show Their Actual Reliance or Entitlement to a Presumption of Classwide Reliance

Plaintiffs' UCL claim cannot be certified for two additional reasons. *First*, to certify a UCL claim, Plaintiffs must prove *they* actually relied on the alleged misrepresentations. *See Walker v. Life Ins. Co. of the Southwest*, 953 F.3d 624, 630 (9th Cir. 2020) ("The California Supreme Court has interpreted [the UCL] to mean that named plaintiffs … ***must show proof of 'actual reliance' at the certification stage***." (emphasis added)). Proof of reliance is required "under all three prongs of the UCL where [as here] such claims are premised on misrepresentations."[21] *Backhaut*, 74 F. Supp. 3d at 1047-48; *Bennett v. N. Am. Bancard, LLC*, 2022 WL 1667045, at *12 (S.D. Cal. May 25, 2022) ("courts require a showing of reliance from named plaintiffs asserting UCL claims based on alleged misrepresentations irrespective of which of the UCL's prongs the claims are brought under").[22] Plaintiffs' admission that they did not review the CPN (*supra* n.5) forecloses their ability

---

[21] Plaintiffs' UCL "unlawful" and "unfair" prong claims are based on the CPN's alleged misrepresentations. *See, e.g.*, Mot. 2 (CPN "created the false impression"); Mot. 14 (describing issue under unfair prong as "whether it was unfair for Google to promise that Chrome would not send users PI to Google"); FAC ¶¶ 414-15 (alleging, in support of "unfair" prong, that "Google and Chrome promised Plaintiffs not to send their PI to Google even when Plaintiffs were Un-Synced" and that "Google [] ***misrepresented*** its privacy practices" (emphasis added)).

[22] *See also Dimas v. JPMorgan Chase Bank, N.A.*, 2018 WL 809508, at *9 (N.D. Cal. Feb. 9, 2018) ("this Court has consistently required allegations of actual reliance…for claims under all three prongs of the UCL where such claims are premised on misrepresentations"); *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1355 (2010) ("to have standing to bring a claim under the 'unlawful' prong of the UCL, in which the predicate unlawful conduct is based on

to satisfy the typicality and predominance requirements for their UCL claim.

*Second*, although a presumption of deception, reliance, and injury may arise under the UCL for *absent* class members in certain circumstances, the Ninth Circuit has repeatedly held that no such presumption applies where, as here, it is undisputed that "many class members were never exposed to the allegedly misleading statements."[23] *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 595-96 (9th Cir. 2012); *Walker*, 953 F.3d at 631 ("To establish a reliance presumption [for a UCL claim], the operative question [is] whether the defendant so pervasively disseminated material misrepresentations that all plaintiffs must have been exposed to them."); *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1069-70 (9th Cir. 2014) (affirming denial of certification of UCL claim where the plaintiff "has not alleged that each individual was exposed to the same misrepresentations and deceptions").[24] Rather, in cases like this, "[t]he relevant class must be defined in such a way as to include only members who were exposed to [the representation] that is alleged to be materially misleading"—*i.e.*, the CPN. Plaintiffs have not defined—and cannot define—the class in the required manner. Indeed, were they to do so, they themselves would be excluded from the class—

---

misrepresentations,...actual reliance is an element of the claim").

[23] This case is unlike *Brown* where the plaintiffs relied on a screen that popped up each time users enabled Incognito mode. Here, only users who went looking for the CPN would see it. Nor can Plaintiffs show uniform exposure by pointing to the "First Run Experience" screens and the "Turn on Sync" button. Mot. 5. The First Run Experience is shown only to the first person to open the Chrome browser on a given device, and a user who chooses not to sign in to Chrome with their Google Account would not see the statements about Chrome Sync. Mardini Decl. § E; Fair Decl. § A. As Plaintiffs' acknowledge (Mot. 5), the statement that "Google may use your history to personalize Search and other Google services" only appears if the user enables Sync—which Plaintiffs assert they did not do. Further, those screens neither contain misrepresentations nor suggest that ***not*** enabling Sync prevents the Data collection. Mardini Decl. § E; Fair Decl. § A.

[24] *See also Pfizer Inc. v. Superior Ct.*, 182 Cal. App. 4th 622, 632 (2010) (finding UCL class overbroad where it included members who were not exposed to the alleged misrepresentations and therefore "could not possibly have lost money or property as a result of the unfair competition"); *Singh v. Google LLC*, 2022 WL 94985, at *12 (N.D. Cal. Jan. 10, 2022) (denying certification of UCL claim where the allegedly misleading statements were "buried on two pages on Google's website, neither of which need to be viewed"); *dotStrategy, Co. v. Facebook, Inc.*, 2021 WL 2550391, at *8 (N.D. Cal. June 22, 2021) (similar). Even *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979 (9th Cir. 2015), cited by Plaintiffs, acknowledges that "predominance may not exist in a UCL case in which different members of the class were 'exposed to quite disparate information....'" *Id.* at 986 & n.7.

further underscoring their inability to satisfy Rule 23(a)'s typicality requirement.

### 3.    CIPA § 631: Plaintiffs Fail to Show Common Evidence of Interception of "Contents" While "in Transit … Within This State"

Plaintiffs' CIPA claim raises additional individualized inquiries. *First*, Plaintiffs fail to show Google intercepted the "contents" of communications classwide. CIPA § 631. Plaintiffs allege Google intercepted GET requests containing referrer headers, IP addresses, cookies, and user-agent. FAC ¶¶ 141.[25] The Ninth Circuit has held that IP addresses and "referer header information … [that] included the user's Facebook ID and the address of the webpage from which the user's HTTP [] request was sent … does not meet the definition of 'contents' because these pieces of information are not the 'substance, purport or meaning' of a communication."[26] *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1102, 1107 (9th Cir. 2014); *see also Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1093 (N.D. Cal. 2022) ("URLs are record information [for purposes of CIPA] when they only reveal a general webpage address and basic identification information"; they are contents only "when they reproduce a person's personal search engine queries"); *McCoy v. Alphabet, Inc.*, 2021 WL 405816, at \*14 (N.D. Cal. Feb. 2, 2021); *Griffith*, 2024 WL 4308813, at \*7.

Even if *some* of the at-issue data is content, Plaintiffs still do not identify any class-wide evidence that content is shared with Google uniformly across billions of website visits by millions of putative class members. In *Brown*, the Court denied summary judgment after holding that the plaintiffs had provided one example of Google receiving "the type of search queries the Ninth

---

[25] Although Plaintiffs also allege that, "in many cases," Google intercepted "the contents of users' POST communications" FAC ¶ 141(c)—which might include search terms or messages—Plaintiffs cannot show Google received such information classwide. Whether Google received POST requests containing "content" requires individualized inquiries into whether: (1) the user visited a website that uses a Service that collects POST requests; (2) the user made a POST request (which is not automatic); and (3) the particular POST request contains "content." *See* Zervas Rep. § IV.

[26] In analyzing the intrusion claim in *In re Facebook, Inc. Internet Tracking Litigation*, the Ninth Circuit distinguished the URLs at issue in *Zynga*—and here—"which revealed only that a Facebook user had clicked on a link to a gaming website" from the information at issue there which "could emanate ***from search terms inputted*** into a third-party search engine." 956 F.3d 589, 605 (9th Cir. 2020) (emphasis added). Such search term inquiries are not at issue, and would not apply classwide. Moreover, if the search engine used was Google, it would be a party to the communication, defeating the claim.

Circuit thought could be content." *Brown v. Google LLC*, 685 F. Supp. 3d 909, 936 (N.D. Cal. 2023). But Plaintiffs identify no evidence that Google received such data from every class member.[27] Whether a particular website visit resulted in Google's receipt of such information is an individualized issue that predominates the CIPA claim. Indeed, the evidence Plaintiffs cite as showing Google collected "contents" from the Named Plaintiffs (Mot. 17 (citing Pls.' Ex. C12 at Ex. D) shows nothing of the kind, further defeating typicality and predominance.

*Second*, Plaintiffs fail to identify classwide evidence that the alleged interceptions occurred while the communications were "in transit ... within this state." CIPA § 631. None of the Google servers that receive the Data at issue are in California. *See* Ex. 15.[28] Whether the interception occurred "within this state" would require individualized inquiries, such as, at a minimum, whether the user was in California at the time of the alleged communication.

### 4. Privacy: Plaintiffs Fail to Show Uniform Expectation of Privacy or Highly Offensive Conduct

Plaintiffs' privacy claim "ask[s] whether: (1) there exists a reasonable expectation of privacy, and (2) the intrusion was highly offensive." Dkt. 142, at 26.

**Reasonable Expectation of Privacy.** "California law … contemplates that certain factors personal to an individual may affect whether that individual maintained a reasonable expectation of privacy" and courts have therefore "found individualized issues to overwhelm common issues at class certification for such claims." *Hart*, 2023 WL 3568078, at *9; *Griffith*, 2024 WL 4308813, at *5 (declining to certify privacy claim because "objectivity does not dictate uniformity across the class"). Plaintiffs' conclusory assertion that over a hundred million Chrome users would have the

---

[27] For example, in *Griffith*, Dr. Shafiq "concluded that approximately 4 percent of URLs contained search terms." 2024 WL 4874556, at *2. Dr. Shafiq has not even conducted a similar analysis here, let alone provided evidence that Chrome always sends Google data that constitutes "contents" under CIPA.

[28] Plaintiffs omit Google's amended response to their Interrogatory No. 5 which explains that "[t]here are currently no Google data centers in California used to provide Ads and Analytics Services." Ex. 15. Plaintiffs' assertion that CIPA's "within this state" element can be satisfied by a California choice of law clause for purposes of contract interpretation has no basis in law. *See Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95, 119 (2006) (CIPA applies to "conversation[s] of a California resident who is within California").

same expectation of privacy across all of their internet browsing (including to Google websites) when Sync is not enabled is facially implausible.

Plaintiffs argue that class members had a uniformly reasonable expectation of privacy based on "Chrome's promise that not syncing prevented PI from flowing to Google." Mot. 18. At a minimum, class members would have to *be aware of* that alleged promise for it to give rise to an expectation of privacy. It is undisputed that Plaintiffs and many class members never saw it. And Prof. Erdem's surveys demonstrate the alleged expectation is not universal. Erdem Rep. § VI.

This case contrasts starkly with *Rodriguez*—on which Plaintiffs rely (Mot. 17)—where the class was limited to users who the plaintiffs alleged had an expectation of privacy based on their "decisions *affirmatively* to switch off the WAA and sWAA buttons" that allegedly should have prevented the data collection. 2024 WL 38302, at *5 (emphasis added). Indeed, in *Rodriguez* the court acknowledged that "analysis of surrounding circumstances may sometimes be necessary to determine whether a user *maintained* their reasonable expectation of privacy. *Id.* at *6 (emphasis in original). There, "that question [was] eclipsed by the undisputed fact that all class members switched off their sWAA settings." *Id.* Here, by contrast, there is no similar class-wide evidence.

**Highly Offensive.** Plaintiffs conclusorily assert that "[w]hether the false promise is highly offensive to a reasonable user is a common question." Mot. 18. But the Ninth Circuit has held that the element "requires a holistic consideration of factors such as the likelihood of serious harm to the victim [and] the degree and setting of the intrusion." *Facebook Tracking*, 956 F.3d at 606. These factors cannot be assessed *en masse* for a diverse class that includes:

- millions of class members who were aware of the data collection in light of the disclosures and tools described above and in the Fair Declaration;
- millions of Google Account holders who saw in their My Activity pages that Google records the Data ***notwithstanding*** the fact that they have not enabled Sync;
- millions of Chrome users who, according to the *Brown* Plaintiffs, allegedly believed it was necessary to use Incognito mode to prevent the exact same Data collection process;
- millions of Chrome users who use Chrome to visit websites owned and operated by Google (*e.g.*, Gmail, google.com, YouTube, Google Maps);
- millions of Google Account holders who turned Ads Personalization off, such that Google did not use the Data for advertising purposes;
- millions of Chrome users who enable Chrome's cookie blockers that prevent cross-site

tracking;

- millions of Chrome users who use VPNs or other privacy tools that prevent their full IP addresses and similar information from being sent to Google (and other service providers);[29] and

- millions of Chrome users who used Basic mode such that the Data Google received was associated at most with a cookie (if cookies were not blocked) and not their identities.[30]

Thus, "the existence of reasonable expectations of privacy and the requisite offensiveness will depend on the nature of the information collected from each class member." *Griffith*, 2024 WL 4308813, at *6, *9 ("classifying the information with these high-level categories [IP address, user agent, cookies, URL, etc.], without more" was inadequate because "privacy concerns are not identical across all websites" and "people have different expectations of privacy"); *see also Pollack v. Foto Fantasy, Inc.*, 2010 WL 11595486, at *4 (C.D. Cal. July 15, 2010) (certification denied where the "highly offensive" element would require the Court "to ascertain each customer's actual activities and behavior…, evaluate the personal or intimate nature of this behavior, and consider each customer's individual expectation of privacy").

Moreover, Plaintiffs Crespo, Henry, Johnson, and Wilson admit they continue to use Chrome—and not just for work—fully aware of the Data collection.[31] Having knowingly and voluntarily subjected themselves to the Data collection, they cannot credibly contend it is "highly offensive," further undermining typicality and predominance.

---

[29] Plaintiffs argue (Mot. 6) that there is no single user control that would "stop all data transmissions" at issue, and therefore the use of such tools does not raise individualized issues. But that is untrue. If a signed-out user has blocked cookies and used a VPN to visit the New York Times website, for example, the only data Google receives associated with the user's device might be user agent (*e.g.*, Chrome version 132 on a MacBook Pro). Many users would not find Google's receipt of such data even slightly offensive, let alone highly offensive.

[30] *See Facebook Tracking*, 956 F.3d at 603 ("Plaintiffs allege Facebook obtained a comprehensive browsing history *of an individual*.") (emphasis added); *In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 831 (N.D. Cal. 2020) ("relevant factors [in assessing offensiveness of the privacy intrusion] include . . . the degree to which the recordings are anonymized"); *Moreno v. San Francisco Bay Area Rapid Transit Dist.*, 2017 WL 6387764, at *8 (N.D. Cal. Dec. 14, 2017) (sharing plaintiffs' "anonymous client id … and location" is not "highly offensive").

[31] *See, e.g.*, Ex. 18 (Crespo Tr.) at 49:13-16, 51:21-23; Ex. 20 (Henry Tr.) at 22:7-17; Ex. 21 (Wilson Tr.) at 56:18-21; Ex. 22 (Johnson Tr.) at 44:11-45:10, 131:20-134:13.

1    **D.    Plaintiffs Fail to Show that a Rule 23(c)(4) Issues Class Should Be Certified**

2    Rule 23(C)(4) issue certification is inappropriate because "numerous individualized issues

3    affecting determinations of liability make [such] certification inefficient." *Reitman v. Champion*

4    *Petfoods USA, Inc.*, 830 F. App'x 880, 882 (9th Cir. 2020). Contrary to Plaintiffs' assertion, a *prima*

5    *facie* case for liability *cannot* be established with common evidence given that: (1) implied consent

6    requires an individualized analysis of what each class member "knew, read, saw, or encountered"

7    before any liability can be established, *Brown*, 2022 WL 17961497, at *19, and (2) liability for each

8    cause of action turns on additional individualized issues, *see supra* § III.C.[32] That distinguishes this

9    case from Plaintiffs' core authority in which liability could be proven with common evidence and

10   the only individualized question was whether each class member had signed a class-action waiver.

11   *Avilez v. Pinkerton Gov't Servs., Inc.*, 596 F. App'x 579, 579–80 (9th Cir. 2015).

12   Plaintiffs are simply wrong that individualized consent issues can be segregated from the

13   rest of the liability inquiry because consent is an affirmative defense. Mot. 23. As an initial matter,

14   for the CIPA claims, Plaintiffs have the burden to prove *lack of consent*, which cannot be done

15   classwide. *Google Assistant*, 457 F. Supp. 3d at 828 ("the plaintiff bringing a CIPA claim has the

16   burden to prove that the defendant lacked consent"). Further, purporting to find Google "prima

17   facie" liable to the whole class (when consent actually *precludes* liability as to tens of millions of

18   users) would unfairly prejudice Google in subsequent individual proceedings—where class

19   members who consented to the conduct they challenge would benefit from an instruction that

20   Google has otherwise already been found liable. And despite what Plaintiffs argue, there would be

21   no efficiency gains in exchange for that prejudice. Many core facts of the case (*e.g.*, the Data Google

22   collects and how it is used, and how Google discloses that collection and use) are undisputed, and

23   would not require burdensome presentation of evidence "thousands of times" in individual actions.

24   *Contra* Mot. 24. The reason there were "more than 100,000 individual claims" in *Brown*, *see id.*, is

25

26   ───────────────

27   [32] *See Backhaut*, 2015 WL 4776427, at *3 n.3 (denying Rule 23(c)(4) certification because "each
     claim will ultimately require an individualized determination of whether or not a proposed class
28   member or the sender impliedly consented to any interception," such that it is "unclear what utility
     . . . a liability-only class would have").

1   not that no issues class was certified, but rather that—like here—liability turned on individualized

2   issues. This is not "an appropriate case in which [the Court should] exercise its discretion to

3   adjudicate those issues classwide." *Griffith*, 2024 WL 4308813 at *12.

4           **E.**        **Plaintiffs Fail to Show That a Rule 23(b)(2) Class Should be Certified**

5           Certification of a Rule 23(b)(2) injunctive relief class is not appropriate for several reasons.

6   *First*, certification of an injunctive relief class requires Plaintiffs to satisfy Rule 23(a)'s typicality

7   requirement, which they fail to do. *See supra* §§ III.A-C. No further analysis is required.[33]

8           *Second*, an injunctive class is inappropriate here because there is no longer any potential

9   basis for the alleged confusion or risk of future harm. Google removed the CPN as part of the *Brown*

10   settlement. By limiting their class to only those users who signed up for Google Accounts before

11   Google removed the CPN, Mot. 1, 4-5, Plaintiffs tacitly acknowledge there is no longer any basis

12   for believing that using Chrome without Sync will block the Data collection. "The purpose of an

13   injunction is to prevent future violations." *U.S. v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953).

14   Plaintiffs bear the burden to show injunctive relief is necessary to prevent "some cognizable danger

15   of recurrent violation." *TRW, Inc. v. F.T.C.*, 647 F.2d 942, 954 (9th Cir. 1981). That a defendant

16   removed allegedly misleading statements is "one of the factors to be considered in determining the

17   appropriateness of granting an injunction against the now-discontinued acts." *Am. Optometric Soc'y,*

18   *Inc. v. Am. Bd. of Optometry, Inc.*, 2011 WL 13129754, at *3 (C.D. Cal. May 27, 2011); *see also*

19   *Schellenbach v. GoDaddy.com, LLC*, 321 F.R.D. 613, 630 (D. Ariz. 2017) (denying Rule 23(b)(2)

20   class where defendant modified disclosures to describe at-issue behavior).

21           Even more, this Court and the Ninth Circuit have already found the remaining disclosures—

22   the Account Holder Agreements and the Privacy Policy—disclose the at-issue data collection. Dkt.

23   935 at 17-20, 22; *see also Hammerling v. Google, LLC*, 2024 WL 937247, at *2 (9th Cir. Mar. 5,

---

[33] For example, a jury could conclude Plaintiffs' claims fail due to their selection of "I AGREE" on one or more of the Account Holder Agreements, or because they did not read the CPN on which their claims are based, while many absent class members are not subject to those same vulnerabilities—*e.g.*, Chrome users who were not shown the Account Holder Agreements (or did not consent to them), or who *did* review the CPN. In addition, the UCL claim requires exposure to and reliance on the CPN, and the privacy claim requires a reasonable expectation of privacy based on reviewing the CPN. While some class members might satisfy these elements, Plaintiffs cannot.

1    2024) (Google's Privacy Policy "expressly contemplates" Google "collecting [users'] activity data"

2    from third-party sites and apps); *Smith v. Facebook, Inc.*, 745 F. App'x 8 (9th Cir. 2018) (similar).

3    The Ninth Circuit did not hold otherwise on appeal in this case; on the contrary, it held only that

4    "when the disclosures are read *together* [*i.e.*, with the CPN] and in the light most favorable to

5    Plaintiffs, a reasonable user would not necessarily understand that they were consenting to the data

6    collection at issue." *Calhoun*, 113 F.4th at 1150. That decision rested on (and distinguished

7    *Hammerling* and *Smith* on the basis of) statements in the CPN, which no longer exists. *See Algarin*

8    *v. Maybelline*, LLC, 300 F.R.D. 444, 458 (S.D. Cal. 2014) ("These consumers will not benefit from

9    the injunctive relief as they cannot demonstrate a probability of future injury; if they know the 'truth'

10   they cannot be further deceived"). Moreover, class members who want to view and delete the data

11   associated with their Accounts can do so in their MyActivity portal. Fair Decl. § D. Further

12   transparency by way of Court-ordered injunction is not needed.[34]

13        Nor is any other injunctive relief necessary or appropriate here. Plaintiffs have not even

14   attempted to demonstrate that every class member would benefit from—or would even want—

15   extreme relief like "not allow[ing] Chrome to send [Data] to Google" *by default.* Mot. 24. Most

16   class members likely would not, since preventing these routine transmissions would prevent users

17   from accessing (1) Google sites and (2) the useful Google services that websites' publishers intend

18   to display (*e.g.*, maps, videos, fonts, or ads). That absurd outcome would harm users and the internet

19   ecosystem with no tangible privacy benefits.

20   **IV.    CONCLUSION**

21        Class certification should be denied.

22

23

24

---

25   [34] Further, Plaintiffs cannot seek to certify an injunctive relief class based on a contract claim
     because injunctive relief is "explicitly unavailable in contract actions." *RSI Corp. v. Int'l Bus.*
26   *Machines Corp.*, 2012 WL 3277136, at *7 (N.D. Cal. Aug. 9, 2012); Cal. Civ. Code § 3423 ("An
     injunction may not be granted . . . [t]o prevent the breach of a contract the performance of which
27   would not be specifically enforced . . . ."). Plaintiffs do not seek specific performance, *see* FAC §
     VIII (Prayer for Relief), nor could they, given that would require a showing of inadequacy of legal
28   remedy. *Lewis v. YouTube, LLC*, 244 Cal. App. 4th 118, 126 (2015).

1    DATED: December 4, 2024          QUINN EMANUEL URQUHART &
2                                     SULLIVAN, LLP

3
                                      By _____ /s/ Andrew H. Schapiro _____
4                                        Andrew H. Schapiro (admitted *pro hac vice*)
                                         andrewschapiro@quinnemanuel.com
5                                        Teuta Fani (admitted *pro hac vice*)
                                         teutafani@quinnemanuel.com
6                                        Joseph H. Margolies (admitted *pro hac vice*)
                                         josephmargolies@quinnemanuel.com
7                                        191 N. Wacker Drive, Suite 2700
8                                        Chicago, IL 60606
                                         Telephone: (312) 705-7400
9                                        Facsimile: (312) 705-7401

10                                       Stephen A. Broome (CA Bar No. 314605)
11                                       stephenbroome@quinnemanuel.com
                                         Viola Trebicka (CA Bar No. 269526)
12                                       violatrebicka@quinnemanuel.com
                                         Crystal Nix-Hines (CA Bar No. 326971)
13                                       crystalnixhines@quinnemanuel.com
                                         Alyssa G. Olson (CA Bar No. 305705)
14                                       alyolson@quinnemanuel.com
                                         865 S. Figueroa Street, 10th Floor
15                                       Los Angeles, CA 90017
                                         Telephone: (213) 443-3000
16                                       Facsimile: (213) 443-3100
17
18                                       Xi ("Tracy") Gao (CA Bar No. 326266)
                                         tracygao@quinnemanuel.com
19                                       Carl Spilly (admitted *pro hac vice*)
                                         carlspilly@quinnemanuel.com
20                                       1300 I Street NW, Suite 900
21                                       Washington D.C., 20005
                                         Telephone: (202) 538-8000
22                                       Facsimile: (202) 538-8100

23                                       *Attorneys for Defendant Google LLC*

24
25
26
27
28