UNITED STATES DISTRICT COURT    *ORIGINAL*

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

| | |
|---|---|
| PATRICK CALHOUN, et al., on ) behalf of themselves and all) others similarly situated,  ) )          Plaintiffs,     ) )  vs.                ) ) GOOGLE LLC,            ) )         Defendant.   ) _____) | **Motions Hearing** NO. C 20-05146 YGR Pages 1 - 99 Oakland, California Friday, March 28, 2025 |

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:          Simmons Hanly Conroy LLC
                         112 Madison Avenue, Seventh Floor
                         New York, New York  10016
                    BY:  JAY BARNES,
                         AN V. TRUONG, ATTORNEYS AT LAW

                         Simmons Hanly Conroy
                         One Court Street
                         Alton, Illinois  62002
                    BY:  ERIC S. JOHNSON, ATTORNEY AT LAW


Reported By:          Raynee H. Mercado, CSR No. 8258


    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

## A P P E A R A N C E S (CONT'D.)


For Plaintiffs:        Bleichmar Fonti & Auld LLP
                       555 12th Street, Suite 1600
                       Oakland, California  94607
                  BY:  ANNE K. DAVIS,
                       LESLEY E. WEAVER, ATTORNEYS AT LAW


                       DiCello Levitt LLC
                       485 Lexington Avenue, Suite 1001
                       New York, New York  10017
                  BY:  DAVID A. STRAITE, ATTORNEY AT LAW


                       DiCello Levitt LLC
                       Ten N. Dearborn Street, 6th Floor
                       Chicago, Illinois  60602
                  BY:  JULIA VEESER, ATTORNEY AT LAW



For Defendant:         Quinn Emanuel Urquhart & Sullivan LLP
                       191 North Wacker Drive, Suite 2700
                       Chicago, Illinois 60606
                  BY:  ANDREW H. SCHAPIRO, ATTORNEY AT LAW


                       Quinn Emanuel Urquhart & Sullivan LLP
                       865 S. Figueroa Street, Floor 10
                       Los Angeles, California  90017
                  BY:  STEPHEN A. BROOME,
                       CRYSTAL NIX-HINES,
                       ALYSSA G. OLSON,
                       VIOLA TREBICKA, ATTORNEYS AT LAW



                           --o0o--

```
 1    Friday, March 28, 2025                    9:00 a.m.
 2                    P R O C E E D I N G S
 3                         --o0o--
 4
 5         THE CLERK:  Calling the civil matter 20-CV-5146-YGR,
 6    Calhoun, et al. versus Google, LLC.
 7       Parties, please step forward to the lecterns, state your
 8    appearances for the record starting with the plaintiffs.
 9         MR. BARNES:  Good morning, Your Honor.  Jay Barnes on
10    behalf of the plaintiffs.  And for efficiency, we also have
11    with me my colleagues, Anne Davis, Leslie Weaver --
12         THE COURT:  Hold on.
13         MR. BARNES:  I'm sorry.
14         THE COURT:  I don't know everybody.  So, Ms. Davis,
15    you're the first here?
16         MS. DAVIS:  I am.
17         MR. BARNES:  Correct.
18         THE COURT:  Ms. Weaver I know.
19         MR. BARNES:  Ms. Weaver.
20      Ms. An Truong.
21         THE COURT:  Okay.
22         MS. TRUONG:  Good morning, Your Honor.
23         THE COURT:  Good morning.
24         MR. BARNES:  Eric Johnson.
25         MR. JOHNSON:  Good morning.
```

1    **THE COURT:**  Okay.

2    **MR. BARNES:**  David Straite, Your Honor.

3    **THE COURT:**  Okay.

4    **MR. BARNES:**  And Julia Veeser.

5    That's all for the plaintiffs, Your Honor.

6    **THE COURT:**  Well, there's one other person there.

7    **MR. BARNES:**  That is Julia Law.  She is the best

8    legal assistant in the United States.

9    **THE COURT:**  Okay.

10    (Off-the-record discussion.)

11    (Simultaneous colloquy.)

12    **UNIDENTIFIED SPEAKER:**  Julia Law of Bleichmar Fonti,

13    Your Honor.

14    **THE COURT:**  Okay.

15    **MR. BARNES:**  That's all for us.

16    **THE COURT:**  All right.

17    **MR. BROOME:**  Good morning, Your Honor.  Stephen

18    Broome from Quinn Emanuel for Google.

19    **THE COURT:**  Mr. Broome, good morning.  Mr. Schapiro.

20    **MR. SCHAPIRO:**  Good morning.  Andy Schapiro.

21    **THE COURT:**  Good morning.

22    Ms. Nix-Hines, good morning.

23    **MS. NIX-HINES:**  Good morning, Your Honor.  Crystal

24    Nix-Hines for Google.  It's nice to see you again.

25    **THE COURT:**  You, too.

```
 1            Ms. Trebicka.
 2            MS. TREBICKA:  Good morning, Your Honor.  Viola
 3    Trebicka for Google.
 4            THE COURT:  And that means you must be Ms. Olson.
 5            MS. OLSON:  Aly Olson for Google.
 6            THE COURT:  All right.
 7       All right.  Well, you're back again, as they say.
 8       So are there -- have you divided up the arguments?  I'd
 9    like to know.  From the plaintiff side, we'll start with you.
10            MR. BARNES:  Thank you, Your Honor.  Jay Barnes.
11       I will be arguing the class certification motion.
12       Anne Davis will be arguing the Daubert motion with respect
13    to Erdem.
14       David Straite will be arguing the Daubert motion with
15    respect to Schwartz.
16            THE COURT:  Okay.
17       Mr. Shapiro?
18            MR. SCHAPIRO:  Your Honor, I will be arguing class
19    certification.
20       Mr. Broome will be arguing the Daubert with regard to
21    Ms. Erdem.
22       And Ms. Nix-Hines will be arguing the Schwartz Daubert.
23            THE COURT:  All right.  Let's start with class cert,
24    then.  If the two of you will come to the mic.  You should
25    know by now it's rarely -- well, maybe you don't know,
```

```
 1    Mr. Barnes.  Rarely, if ever, do I let you have the mic

 2    without interruption.  Okay.

 3        Going to start with heart of the motion.  I'm in trial so

 4    this is my day off from trial, so we'll see how much energy I

 5    have to listen to what you all have to say beyond your papers.

 6        So we'll start with what's most important.  And that's

 7    implied consent.

 8        You may begin.

 9        Well, let me just say, I think implied consent is a

10    problem for defendants.  I don't know how you get past

11    predominance with implied consent as a potential and major

12    issue in this case.

13        I've already written on it so you know that.  I'm not

14    exactly sure why I would do anything different than I have

15    before.

16        Proceed.

17        MR. BARNES:  I understand.  Thank you, Your Honor.

18        With respect to the implied consent, as you know, on a

19    motion for class certification, we think it's important to

20    take it affirmative defense claim by claim.

21        And with respect to each different claim, we would suggest

22    that the Court should follow the following analytical

23    approach:  First, what are the consent rules for this claim.

24        Second, what is the specific challenged conduct for this

25    claim.
```

1        Third, what evidence did Google actually present about

2   that challenge conduct.

3        4th, is Google's evidence common.

4        And fifth, how does that purported evidence apply to the

5   challenged conduct?

6        Is it essentially what the Ninth Circuit already rejected

7   in *Calhoun*; that is, does it talk about Google's collection of

8   information versus Chrome sending personal information to

9   Google?

10       Does it address the challenged conduct at all, which is

11  from Judge Breyer's decision in *Torres* where he said that is a

12  threshold class-wide question.

13       And then, finally, is it enough for Google to prevail as a

14  matter of law?  And we think *Tyson's Foods* from the

15  Supreme Court instructs that in order to deny certification on

16  that basis, it must be such that no one could agree with the

17  plaintiffs.

18       And with that rubric, I think the place to start --

19            **THE COURT:**  Did you say Breyer or Beeler?

20            **MR. BARNES:**  Judge Breyer was the *Torres* opinion from

21  November of 2024.  It was a CIPA case.  He analyzed the

22  *Calhoun* decision in this case, held that it applied to express

23  and implied consent, and said that where the defendant has

24  attempted to introduce extra-contractual documents, there is a

25  threshold common question of whether those documents address

1   the challenged conduct.

2       With respect to -- so we think it's important to go claim

3   by claim.

4       The first claim, Your Honor -- and we outline this in your

5   slides at Slide 6.  We outline the challenged conduct for each

6   claim and then the evidence that Google purports to present --

7           **THE COURT:**  Well, hold on.

8           **MR. BARNES:**  Okay.

9           **THE COURT:**  You've given me multiple slides, so which

10  am I supposed to be looking at?

11          **MR. BARNES:**  I think Slide 6.

12          **THE COURT:**  I have three sets of slides --

13          **MR. BARNES:**  I'm sorry.

14          **THE COURT:**  -- all different.

15      Which am I supposed to be reviewing?

16          **MR. BARNES:**  It is the "Hearing on Plaintiff's

17  Renewed Motion for Class Certification" that has

18  confidentiality designation at the bottom (indicating).

19          **THE COURT:**  Okay.  So breach of contract.

20          **MR. BARNES:**  Correct.

21      So I -- just for the Court's guidance, Slide 6 has the

22  overview of the challenged conduct for each and how the

23  consent rules apply in each claim.

24      For breach of contract, the specific information relating

25  to implied consent is on Slide 15.  And what I would start

1    with is Your Honor's statement describing the *Gmail* litigation

2    case, which Google relies on heavily, stating that for --

3              **THE COURT:**  Hold on.  Hold on.

4         You say in your breach of contract bullet that it's --

5    that implied consent is not a defense?

6              **MR. BARNES:**  Correct.

7              **THE COURT:**  Response.

8              **MR. SCHAPIRO:**  Implied consent is a valid defense for

9    contract claims, Your Honor.  The Ninth Circuit itself in this

10   very case, in *Calhoun* -- this is at 113 F.4th at 1147, said

11   and I quote, "general principles of contract law include

12   express or implied consent."

13        In fact, that is on the plaintiff's own Slide number 3 in

14   their Erdem *Daubert* slide presentation.  They quote that, and

15   it's -- shouldn't be surprising because Your Honor applied

16   implied consent to reject class certification in the *Brown*

17   case with which we're all familiar.

18        Your Honor did the same thing in the *RTB* case where Your

19   Honor said "consent may be a defense to an action for breach

20   of contract when, for example, the defendant can show that the

21   plaintiff previously accepted and consented to the performance

22   now asserted as a breach."

23              **THE COURT:**  Yeah, I'm --

24        All right.  A response.

25        It -- it's -- do you have a case that supports this notion

1  that implied consent does not -- is not a defense in a

2  contract case?

3          **MR. BARNES:**  Yes.  The --

4          **THE COURT:**  Which one?

5          **MR. BARNES:**  The *Gmail* case.

6          **THE COURT:**  All right.  What else?

7          **MR. BARNES:**  The parole evidence rule, the rules of

8  contract interpretation, and the Restatement (Second) -- and

9  the rules we've set out on Slide 15.  The restatement of the

10  contracts, which California follows, says that standardized

11  agreements are deemed integrated for the terms included in the

12  writing and interpret --

13          **THE COURT:**  Hold on.

14          **MR. BARNES:**  -- wherever reasonable --

15          **THE COURT:**  I said hold on.

16          **MR. BARNES:**  Okay.

17                  (Pause in the proceedings.)

18          **THE COURT:**  Okay.  That's interesting pivot.

19          **MR. BARNES:**  Your Honor, I would -- I would note that

20  Your Honor's pretrial instructions require the parties to cite

21  to California or federal analog for a jury instruction.

22      There is no jury instruction for implied consent in

23  California on breach of contract.  There are implied

24  consent-like affirmative defenses to breach of contract in

25  California.  They are waiver and innovation, but Google didn't

1    raise those defenses, but it can't meet the elements of any of

2    those defenses.

3        Now, putting that to the side, this Court doesn't need to

4    decide the question of whether implied consent as a general

5    principle is available as a defense to contract.

6        **THE COURT:**  -- absolutely do.  I absolutely have to

7    decide this.  One, because I've decided it in the past in very

8    similar cases.  And so you're asking me to do something that

9    is different.

10        Two, when I think about class certification motions, I

11    think about what I'm saying I can try.  And that's fundamental

12    to my decisions on class certification.  Can I try this case

13    as a class action -- and I have tried several -- or can I not?

14        So I disagree with that assessment.  If you can't convince

15    me, then you lose on that issue.

16        **MR. BARNES:**  I understand, Your Honor.  And here's --

17    may I explain what I mean by that?

18        **THE COURT:**  All right.

19        **MR. BARNES:**  If you go to Slide number 9, there is no

20    dispute in this case that there are three documents that

21    consist of the Chrome contract.  There is the Google Terms of

22    Service.  There is the Chrome Privacy Notice, and there is the

23    Google Privacy Policy.

24        Slide 9 has excerpts of the Google Terms of Service.  What

25    the Google Terms of Service says is it incorporates what

1    Google refers to as "service-specific additional terms" and

2    says that if these terms conflict with service-specific

3    additional terms, the additional terms govern for that

4    service.

5        There is a hyperlinked page that's on the right side of

6    Slide 9.  It lists the services that use Google's terms and --

7    of service and their service-specific additional terms and

8    policies.

9        And for Chrome, it lists the Google Chrome Privacy Notice.

10   The Google general privacy policy is not a service-specific

11   additional term.  The Google ads doesn't have a

12   service-specific additional terms.  Neither does display ads,

13   neither does analytics, or any of the other services Google

14   raises.

15       If you go to the next slide, Your Honor, on the left side

16   of the page is an excerpt from the Google Privacy Policy.

17   Just like the terms of use, the Google Privacy Policy tells

18   users for related privacy practices about Chrome, there's a

19   hyperlink.  It's the first hyperlink that sends users to the

20   Chrome Privacy Notice.

21       And on the right-hand side of the page, we have the first

22   sentences of the Chrome Privacy Notice that tells users the

23   Chrome Privacy Notice is what governs what is collected,

24   stored, and shared when you use the Google Chrome browser.  So

25   when Your Honor talks about how to try this case, what I would

1    submit to you is that for every single piece of evidence

2    Google attempts to put up, what we will put in front of the

3    jury are these three documents that say the Chrome Privacy

4    Notice is the document that matters.

5        And that is what Judge Breyer was talking about with a

6    threshold question whether any of the other --

7            **THE COURT:**  *Torres* only had one source of

8    information.

9            **MR. BARNES:**  I believe that *Torres* had privacy

10   policies and a news article as well.

11       This -- the next question, Your Honor, is going towards,

12   is, does any of Google's purported evidence address the

13   conduct or negate these promises.  And we don't think that

14   they do.

15           **THE COURT:**  They have evidence of a survey regarding

16   what consumers think they are doing.  I mean, the problem I've

17   always had with this case is it's too generic.  It's -- you

18   know, it's using -- it's using Chrome.  It's using the

19   internet, so to speak.  That's -- that's the problem I've had

20   with this case.  It's not *RTB*.  It is not *Brown*.  It's a

21   generic case.  So how people think about using searches in

22   browsers is very different than clicking on a button and

23   saying you're going Incognito.

24       So the sources of information about which the average

25   consumer has regarding searches on the Internet is quite

1    different than the other cases.

2         **MR. BARNES:**  So I want to be clear, Your Honor.

3    We're not talking in this case about searches on google.com.

4    We are talking about the same types of communications --

5         **THE COURT:**  No, you're talking about searches on

6    Chrome.

7         **MR. BARNES:**  We're not talking about searches.  We're

8    talking about web browsing communications that are the same

9    communications -- the same type of communications that were at

10   issue in *RTB* and browned -- and *Brown*.  They are URL --

11        **THE COURT:**  Certainly is not *Brown*.

12        **MR. BARNES:**  They are full-string URL inquiries.

13        **THE COURT:**  It is not *Brown*.

14        **MR. BARNES:**  So, Your Honor, what I would point you

15   to is Slide 11.  Slide 11 has a set of specific promises that

16   are made in the Chrome Privacy Notice to consumers.  Google

17   made these promises in a binding contract that applies to all

18   users.

19       I understand that Google wants to run away from its

20   contract promises, but this is a promise.

21       With respect to the specific sources of information, Your

22   Honor -- so let me -- I -- I'd like to talk briefly about the

23   other three claims in the challenged conduct because what

24   we're talking about --

25        **THE COURT:**  I don't want to go there yet.

 1            **MR. BARNES:**  Okay.

 2            **THE COURT:**  Section 211, a response on that.  If this

 3    is a form adhesion contract, and this -- this approach hasn't,

 4    I don't think, been really litigated, it may be cause for a

 5    change.

 6        But if it -- this is a -- an adhesion contract which no

 7    one -- no consumer -- and that's always the problems we have

 8    with these things -- can change, can't call up Google and say,

 9    "Hey, change your Terms of Service."

10        Does Section 211 of the restatement say in this context

11    where Google has all the control implied consent is not a

12    defense or anything to that effect?

13            **MR. SCHAPIRO:**  No, Your Honor.  And there's --

14    there's no case that says that.  I think maybe what's --

15    what's happening here is that the plaintiffs are confusing two

16    different inquiries.

17        It's absolutely true that a contract of adhesion -- if

18    you're trying to decide whether the contract is binding or

19    what it means, in that case, there's, you know, one objective

20    view of, you know, what does it say.  And it's true; that's

21    interpreted in some -- that's something that can be

22    interpreted uniformly.

23        Implied consent, as Your Honor has indicated in your other

24    cases, is a completely different inquiry.  The question there

25    is a review of the surrounding circumstances to indicate what

1    did this person know.  And that's why *Brown*, *RTB*, *Gmail*,

2    *Backhaut vs. Apple*, *Campbell v. Facebook*, *Hart*, all came out

3    the way that they did.  There's a consistent line of precedent

4    in this district holding in the Internet context that

5    individualized issues regarding consent are likely to

6    overwhelmingly predominant over common issues where there is,

7    to quote Judge Koh in *Gmail*, a panoply of sources from which

8    users could have learned of Google's data collection.

9        And there's of course also this maxim of California law

10    that says he who consents to an act is not harmed by it.

11    That's been quoted in some of the cases.

12        I -- seems to hear Mr. Barnes suggesting that there's not

13    an adequate panoply of sources here.  And I just don't see how

14    that can be sustained, you know, as we've indicated in our

15    briefs and in our -- our slides here.

16        They're the Google disclosures, the privacy policy, the

17    account holder agreements, the Google help pages, the

18    MyActivity page, the Chrome developer tools, the third-party

19    privacy policies, the third-party news articles, and, as Your

20    Honor noted, a survey is showing tremendous variation in

21    awareness and expectation.

22        **THE COURT:**  Why shouldn't Google, though, being all

23    powerful and in control of this situation, not be held to only

24    what they disclose?  That is, why should Google benefit from

25    this generic concept of implied consent when everything is

1   under their control and Google itself could have made it clear

2   what it was they were doing, if the jury finds that it was

3   doing anything -- that -- again, I'm not -- I'm not commenting

4   on whether or not it was doing anything wrong.

5       But to the extent it was doing anything, right, why

6   shouldn't it be held and limited to disclosing that what it

7   does falls within the confines of the express statements?

8           MR. SCHAPIRO:   Sure.  Well, as an initial matter --

9   and Your Honor won't be surprised to hear that we believe

10  Google has absolutely done that and I think Your Honor's

11  summary judgment ruling, the part that I believe was not in

12  any way touched by the Ninth Circuit, which indicated that the

13  privacy policy and account holder agreements adequately

14  reveal -- people know this.

15      The *Brown* plaintiffs in their own complaint say it's

16  common knowledge that when you use the Internet in a Basic

17  mode, not -- not with privacy -- not with Incognito on, of

18  course, Google is going to receive data such as this.

19      The question in this case -- and we haven't heard of a

20  single individual who actually -- and actual real-life human

21  being who believed this -- because their plaintiff did not

22  even read the Chrome Privacy Notice, but okay, the question

23  is, well, if you combine the Chrome Privacy Notice with that

24  adequate privacy policy, does that change it somehow?

25      But that's all the more reason why we have the right to

 1    inquire of individual plaintiffs, what did you know before you

 2    went on the Internet and used Chrome?  If this were an

 3    individual case, obviously, as the -- as the Court knows,

 4    we -- we can't be forced to -- to surrender defenses that we

 5    would have in an individual case.  And if this were an

 6    individual case, the primary discussion would be about implied

 7    consent.

 8        Did you read the privacy policy?  Did you understand it?

 9    Were you exposed to -- did you click on the MyActivity page,

10    which one of these very plaintiffs did.  One of these

11    plaintiffs visited the MyActivity page.  Were you aware of

12    these news articles, so we can't be stripped of the ability to

13    make those arguments whether it's a -- a class action or an

14    individual case.

15            THE COURT:  All right.  A response to that.

16            MR. BARNES:  Your Honor, I think what my friend from

17    Google is saying is contrary to black letter contract law and

18    would destroy consumer contract law in this country.

19        It is --

20            THE COURT:  So are you saying that if they went to

21    trial, they could not inquire on those topics of an individual

22    plaintiff?

23            MR. BARNES:  With -- with respect to the contract

24    claim, subjective intent and subjective understanding --

25            THE COURT:  I'm just asking --

```
 1                    (Simultaneous colloquy.)

 2          THE COURT:  -- yes or no.

 3      Are you saying that they could not inquire --

 4          MR. BARNES:  I believe --

 5          THE COURT:  -- on -- Let me finish.

 6      To -- that they could not inquire to an individual

 7   plaintiff about their knowledge and potential implied consent?

 8          MR. BARNES:  With respect to the contract claim, it

 9   is not relevant.  Individual understanding of a --

10          THE COURT:  So the answer to my question is "you're

11   correct, they cannot."

12          MR. BARNES:  It's -- subjective understanding is not

13   relevant to contract interpretation, correct.  That is an open

14   question with respect to other documents.  However, it is

15   an -- implied consent is an objective inquiry from a

16   reasonable person standard --

17          THE COURT:  Where did you have law on that?

18                    (Simultaneous colloquy.)

19          MR. BARNES:  From the --

20          THE COURT:  That is absolutely not the case.  It's

21   subjective with respect to implied consent.  It is objective

22   with respect to express consent.

23          MR. BARNES:  So the -- we believe that the Ninth

24   Circuit held otherwise.

25          THE COURT:  Where?
```

```
 1            MR. BARNES:  Judge Breyer --

 2            THE COURT:  Let's look at -- I don't care what Judge

 3   Breyer's doing when I've got a Ninth Circuit opinion.

 4            MR. BARNES:  Judge Breyer interpreted Calhoun in this

 5   case and --

 6                      (Simultaneous colloquy.)

 7            THE COURT:  Let's look at Calhoun.  Calhoun says --

 8            MR. BARNES:  Consent may be express or implied, but

 9   it must be actual.

10            THE COURT:  Right.  There's a -- right.

11            MR. BARNES:  And --

12            THE COURT:  There's nothing -- there's nothing

13   remarkable about that basic proposition.

14            MR. BARNES:  And the next sentence is "and to be

15   actual, the disclosures in question must explicitly notify the

16   users of the conduct in question."

17            THE COURT:  Well, that's not what it says.

18            MR. BARNES:  I am quoting -- I am not looking

19   directly.  It says -- the language is "explicitly notify."  I

20   believe that's -- I can pull it -- the --

21            THE COURT:  No, I got that.

22            MR. BARNES:  -- Your Honor, but I am confident that

23   the explicit notification is there.

24         And so the question, even if implied consent is a defense,

25   for consent to be actual, the disclosures must explicitly
```

 1   notify users of the conduct at issue.  That's the direct quote

 2   from the Ninth Circuit.

 3       So the threshold question that Judge Breyer interpreting

 4   *Calhoun* in the *Torres* case said is do any of the additional

 5   documents talk about the conduct at issue, and are they enough

 6   for Google to prevail -- Breyer didn't say this.  *Tyson's*

 7   *Foods* says this.

 8       Are they enough for Google to prevail as a matter of

 9   summary judgment?  And I think to do so, Your Honor, we need

10   to talk about those different categories of documents because

11   I think if Your Honor looks at them closely, they will fall

12   apart.  Google's defense is a house of cards.

13       Google's --

14           **THE COURT:**  So -- so your analogies are maybe

15   interesting for press that's listening, not interesting for

16   me.

17           **MR. BARNES:**  I understand.  So --

18           **THE COURT:**  Well, if you understand, don't do it.

19       Let's just focus on the facts and --

20           **MR. BARNES:**  So -- may I address MyActivity?

21       Let me -- let me back up, Your Honor, because we started

22   with, is implied consent a defense to breach of contract.  Our

23   position is no.  Prior to *Brown* and *RTB*, there is no

24   California state law case saying that it is a defense.  It's

25   not in CACI.

```
 1          Our second defense is even if it is a defense, it is not
 2     available as a defense in this case to defeat class
 3     certification.
 4          THE COURT:  So the Ninth Circuit does say, for
 5     consent to be actual, the disclosures must explicitly notify
 6     users of the conduct at issue.
 7          So how would all sorts of other sources explicitly notify
 8     the users of the conduct at issue, back to my point regarding
 9     Google's control of its -- of its notification.
10          So where is the -- why would I ever get into -- to
11     plaintiff's point, why would I ever get into anything else
12     that they may have known if the Ninth Circuit says for consent
13     to be actual, the disclosures have to explicitly notify?
14          MR. SCHAPIRO:  All right.  So two answers.  First --
15          THE COURT:  And by the way, the other thing, I have
16     looked for CACI instruction on implicit consent or implied
17     consent in a contract case, and I can't find it.  It's not
18     there.
19          MR. SCHAPIRO:  So -- so two answers.  First, there's
20     something else in the Calhoun decision that bears note, and
21     this is the citation that I -- the quote that I read a moment
22     ago.  You -- Your Honor's asking us, is there -- is there any
23     Ninth Circuit law that says implied consent applies in
24     contract law.
25          In this very case, quote, general principles of contract
```

1    law include express or implied consent.  So I think that

2    threshold issue should be considered decided.  There's no

3    reason for you to -- to change your -- the approach you took

4    in -- in *RTB* or *Brown*.

5        So then the question, is okay, is the disclose --

6            THE COURT:  So we can all agree that the Ninth

7    Circuit said consent can be express or implied.  There are two

8    kinds of consent.

9            MR. SCHAPIRO:  Yes, and it said specifically in

10   contract law.

11       And so then the question is, does the -- does the -- the

12   assertion that the plaintiffs are making here that says, well,

13   the -- the disclosures have to be very, you know, sufficiently

14   specific.

15           THE COURT:  Well, the Ninth Circuit says it has to

16   explicitly notify.

17           MR. SCHAPIRO:  Has to explicitly notify.  The -- the

18   Ninth Circuit in this case -- the *Calhoun* decision is

19   consistent with Your Honor's summary judgment ruling; that is,

20   that the privacy policy, the only reason that the Ninth

21   Circuit did not follow -- the way that the Ninth Circuit

22   distinguished the *Smith* and *Hammerling* cases which were the

23   two Ninth Circuit cases that had looked at this very privacy

24   policy and said, "yes, it informs people of this specific

25   collection that is being complained of here."

1           The only reason was that the Ninth Circuit said, "well,

2    there is this other document that you had," the Chrome Privacy

3    Notice, and that may have -- that may have led people to reach

4    a different conclusion.

5           So the disclosures here, the privacy policy, the account

6    holder agreements, I don't think there can be any dispute,

7    adequately disclose the complaint -- the issues that are

8    complained of.  And that's consistent with the other cases, so

9    I think in -- in their briefing -- and this might be what

10   Mr. Barnes is also adverting to, well, disclosures might not

11   specifically talk about sync, which I'll submit, Your Honor,

12   is because, as Your Honor was -- was getting at earlier, this

13   case is at such a level of generality, of course, it's not

14   going to say, Google -- there aren't going to be stories

15   saying Google collects all of this material even when you're

16   not in sync because nobody actually thinks that.

17          So it's the same way it wouldn't say Google actually

18   collects this material even if it's a Tuesday and not just a

19   Wednesday.

20          But in -- in other cases, so in -- in the *Gmail* case, this

21   same lack of specificity argument was made, and it was

22   rejected.  The third-party sources out in the -- in the *Gmail*

23   case, the plaintiffs in that case, said, oh, well, it doesn't

24   specifically say -- with enough specificity what is done here.

25          The Court said, well, that's okay.  I'm entitled and, in

1   fact, obligated to look at all the surrounding circumstances

2   to see what someone knew.

3       In fact *RTB* case, Your Honor rejected a very similar

4   argument.  The -- the plaintiffs in that case said, "well,

5   it's not sufficiently specific, the disclosure."  And Your

6   Honor correctly, we would submit, said, "well, I'm entitled

7   and a jury would be entitled to look at the surrounding

8   circumstances."

9       And here, again, the *Brown* plaintiffs say it's common

10  knowledge.  The plaintiffs have not put forth any contrary

11  evidence that anyone other than they and their experts believe

12  that all of this data collection occurs only if you enable

13  sync.  Maybe that's why their survey experts didn't actually

14  conduct a survey, and the articles and disclosures

15  specifically represent Google and Chrome.

16      That's more than sufficient.  And it's in line with the

17  seven cases I think that we -- we list in our first or second

18  slide from this district applying the implied consent defense

19  to --

20              **THE COURT:**  All right.

21              **MR. SCHAPIRO:**  -- find no predominance.

22              **THE COURT:**  I'll go ahead and -- and go through each

23  of these claims with you or allow you to -- to do that.

24      Even though, again, the Ninth Circuit says that the

25  defense applies in terms of consent to each of these claims.

1          **MR. SCHAPIRO:**  Your Honor, can I just also address

2    the *Torres* case, which Mr. Barnes has brought up a couple of

3    times because --

4          **THE COURT:**  Okay.

5          **MR. SCHAPIRO:**  -- that case is completely consistent

6    with what we're arguing here.

7       In the *Torres* case, that's the -- we cite two *Torres* cases

8    in our brief.  This is the --

9          **THE COURT:**  The Breyer case.

10         **MR. SCHAPIRO:**  The Breyer one.  All that happened

11   there was that the -- the judge looked and said, "this privacy

12   policy didn't provide any notice."  Well, it's the opposite

13   here.  Your Honor and we would submit the Ninth Circuit said

14   okay.  The privacy policy does provide notice here.

15      Secondly, the news articles in that case, the Court said

16   actually show that people didn't expect the collection going

17   on.  So -- so the defendant just hadn't made an adequate

18   submission.

19      And then Judge Breyer said, "Okay.  Well, essentially,

20   there's just not enough here.  But the implied consent inquiry

21   is the right inquiry.  It's just I'm just not seeing anything

22   here."

23      What we have in our case is the -- you know, the panoply

24   of sources that -- the line of cases defeating class

25   certification because of implied consent, a panoply of sources

1    say, I don't think *Torres* is inconsistent in any way.  It's

2    perfectly fine to say -- if you come in and say that I have

3    one obscure privacy policy that doesn't say anything about

4    this, that's not enough for me to say that individual defenses

5    will predominate.

6        **THE COURT:**  Okay.  The --

7        **MR. BARNES:**  Your Honor, I just want to make sure

8    there's somewhat equal time here.

9        Mr. Shapiro said some things about the Ninth Circuit's

10   opinion that are not true.  Mr. Shapiro said that the Ninth

11   Circuit said the Google Privacy Policy was sufficient.  That's

12   not true.  The Google Privacy Policy also has a promise that

13   says, "your Chrome browsing history is only saved to your

14   account if you've enabled Chrome synchronization to your

15   Google account."

16       That's on page 1148 of the Ninth Circuit's opinion that

17   went into its analysis, so what Mr. Shapiro says about the

18   privacy policy being sufficient and with respect to the Ninth

19   Circuit is just flat wrong.

20       Now, if I could turn to Your Honor's questions claim by

21   claim, which is assuming implied consent applies --

22       **THE COURT:**  It's not my question.  It's your request.

23   Let's be clear.

24       **MR. BARNES:**  Okay.  My request.

25       The -- on the contract claim, even if it is a defense, it

1    is important to remember, Your Honor, that we are talking

2    about Chrome, which is an independent product from Google, as

3    Google has acknowledged in the *Brown* case.

4        And I quote, "Google and Chrome are not synonymous.

5    Chrome, a downloadable web browser, is just one of Google's

6    many different offerings."  And the Chrome Privacy Notice,

7    uses the terms differently.  We cited that in our Erdem reply.

8    And here's why it's important with respect to Chrome.

9        There are five different modes in Chrome.  There's the

10   Incognito mode.  There's the Guest mode.  We do not have

11   claims on behalf of them because we think that the personal

12   information issue for those two types of modes are more

13   difficult than they are for the two modes that we have at

14   issue in this case.

15       There is the Synced mode, and there is the Basic Browser

16   mode, and there is the Signed in, but Not Consented for Sync

17   mode.  That last one I did not make that term up.  That is

18   Google's term for the mode.

19       Our case is about Basic Browser mode and Signed In, but

20   Not Consented for Sync.  It is not about just general web

21   browsing.  It is about web browsing on Chrome that has a

22   privacy promise that is binding on all class members in its

23   contract that expressly says Chrome will not send personal

24   information to Google unless you sync.

25       Google told people in its contract that they had a choice,

1    but they never actually had a choice.

2        There's also the fact that Mr. Shapiro keeps talking about

3    general articles about collection and, of course, people knew

4    that.

5        That's not true with respect to Chrome and how Chrome

6    works.

7        And I think it's important for Your Honor to look at the

8    intrusion to our opening brief where we talked about the time

9    line of when this case begins.

10        Our class period begins on September 24th, 2018.  It does

11    so because --

12            THE COURT:  Twenty-third?

13            MR. BARNES:  Twenty-third?  Okay.  September 23rd,

14    2018.

15        It does so because on that date, Google changed the Chrome

16    Privacy Notice to promise more privacy.  That date and time

17    line was not an accident.  Just a few months before, Chrome's

18    primary competitor Apple Safari had announced that it was

19    going to stop sending this type of information to companies

20    like Google.

21        And -- and the runup in the previous six or seven months,

22    there had been all kinds of press attention about the scope of

23    Google's collection generally.  Google provided in their

24    slides, a *Wall Street Journal* article about concerns about

25    Google's collection of information.  That article is from

1    April of 2018, before our class period begins.

2        The theory of this case to be presented to a jury is to

3    that Google's collection was coming under increasing scrutiny

4    and Google realized that if people understood that the Chrome

5    browser automatically sends personal information Google's

6    servers, they would stop using Chrome, which is -- would be a

7    disaster for Google as a business overall.

8        And so what they did instead of matching Apple's privacy

9    promises and how the browser works, they made Chrome less

10   private, and they promised more privacy.  That is the essence

11   of the big picture of this case.

12       On the contract claim, it is about the product.  It's not

13   about any one specific communication.  So if Google points to

14   one website's privacy policy that in theory, could have

15   informed some users, that website privacy policy doesn't tell

16   that user that Chrome is designed by default to send personal

17   information on just -- to Google on just about every website

18   on the Internet.

19       That's the contract claim, Your Honor.  And Google --

20   Google has not addressed or identified any document anywhere

21   in its evidence that identifies that Chrome sends personal

22   information by default to Google.

23       None of these documents say that.  Even the Erdem survey

24   doesn't go there, and --

25            THE COURT:  You said in your statement that they made

1    it less private.  Are you arguing that they actually changed

2    the nature in which it operated?  Or are you just saying, it

3    effectively was less private because they promised more

4    privacy?

5          **MR. BARNES:**  They added a --

6          **THE COURT:**  Did they change the manner in which it

7    operated?  Yes or no?  I'm trying to understand.

8          **MR. BARNES:**  They added a sync feature.  Prior to

9    that, if you -- it was if you signed in, some personal

10   information would be sent.

11      After that, it was if you sign in and sync, your personal

12   information will be sent to Google.

13         **THE COURT:**  So they didn't change it.  They just

14   added a separated option?  They didn't change the basic

15   product.

16         **MR. BARNES:**  Oh, I understand what you mean now.  The

17   Signed In -- Signed In mode would have continued to send

18   personal information to Google, but the promise changed so

19   that it's -- no longer said that.

20         **THE COURT:**  So do you not understand what I'm asking,

21   Mr. Barnes?

22      The signed-in function remained the same.  They just

23   classified -- they created a different classification for

24   syncing.

25         **MR. BARNES:**  Except -- yes and --

1      **THE COURT:**  And they changed the disclosures.

2      **MR. BARNES:**  And they said, "unless you sync,

3  personal information won't be sent to Google."

4      **THE COURT:**  They changed the disclosures.  They

5  didn't change -- they didn't go in and recode what was going

6  on.  Right?

7      You don't have any evidence of that.

8      **MR. BARNES:**  I -- I think -- let me -- let me go

9  to -- let me --

10      **THE COURT:**  It's really a question.  Don't you know

11  whether or not you have evidence of a physical --

12      **MR. BARNES:**  They added another function, Your Honor,

13  and they promised that the old function did not send personal

14  information to Google.

15      **THE COURT:**  Okay.  That's -- then the answer to my

16  question is "yes."  I don't understand --

17      **MR. BARNES:**  Okay.

18      **THE COURT:**  -- why you're -- it's not a trick

19  question, Mr. Barnes.

20      **MR. BARNES:**  I understand, Your Honor.

21      **THE COURT:**  I'm trying understand.

22      They didn't change how it operated except that they added

23  it -- another option and they added a disclosure.

24      **MR. BARNES:**  I would say -- yes, the disclosure --

25  the disclosure was not true, though.  The disclosure that they

1    added was not true.

2            **THE COURT:**  That's your argument.  I understand

3    that's your argument.

4            **MR. BARNES:**  I -- I --

5            **THE COURT:**  All right.  Go ahead.

6        So we still haven't gotten to the second claim.  What else

7    do you want to say?

8            **MR. BARNES:**  Let's -- so the UCL claim --

9            **THE COURT:**  We'll run out of the time if you don't

10   move on.

11           **MR. BARNES:**  The UCL claim, Your Honor, the conduct

12   is about the Chrome browser as a whole being designed by

13   default to send personal information to Google regardless of

14   whether a user chooses to sync.

15       And then at the back end, Google forms dossiers from the

16   information and uses that.  We have not seen -- Google has not

17   provided any evidence from any source disclosing that

18   activity.

19       And I'd like to go through their purported categories of

20   defenses with respect to the UCL claim.  And we'll have

21   some -- some overlap to other claims, but I think it's

22   important for Your Honor to analyze the actual evidence that

23   Google has put forth.

24       The first evidence that they suggest is the statements in

25   the Google Privacy Policy.  Our response to that, Your Honor,

1   is that the Ninth Circuit already rejected that argument.  And

2   it would -- it would be inconsistent with the Ninth Circuit's

3   order to say that the privacy policy statements could undo --

4   or sufficient to prevail and deny class certification here.

5       The second category they cite are what they call the

6   Google -- "other agreements," which are I think the consent

7   bump and NAC.  The first thing is that these do not address

8   the challenged conduct, except they point back to the Chrome

9   Privacy Notice and the same promise.

10      The -- the Ninth Circuit considered them and rejected

11  them, and they are common because Google submitted a

12  declaration from Greg Fair saying that they are similar and

13  they were provided to all Google account holders -- holders

14  during the periods of time that they existed.

15          **THE COURT:**  Can you remind me, which prong are you

16  proceeding on?

17          **MR. BARNES:**  We are proceeding under an unlawful

18  prong that goes with the CIPA claim, and it will rise or fall

19  with the CIPA claim.

20          **THE COURT:**  What --

21          **MR. BARNES:**  We're also proceeding under an unfair

22  prong that obviously will not rise or fall with the CIPA claim

23  but is a separate -- a separate claim.

24      If you look at the Fair declaration, Your Honor, he goes

25  through these -- this Narnia -- this -- consent bump and NAC

1    and what he says is -- he provides a screenshot that appears

2    in those processes.  And what the screenshot says in the Fair

3    declaration, which is at Docket 1074, is that when this option

4    is on, data saved in your Google account may include, and the

5    second bullet point is "your Chrome history if Chrome sync is

6    turned on."  It's the same promise.

7        The third bullet point has information about activity from

8    sites absent devices that use Google services.  But that's the

9    same sort of thing that Google raised in the Ninth Circuit

10   with respect to the privacy policy that the Ninth Circuit

11   rejected.

12       So that's -- that's their -- why their defenses will fail

13   on a class-wide basis for the consent bump and NAC.

14       The second category they have is "other websites."

15       I think it's important for Your Honor to understand the

16   distinction between this case and *Gmail*.  In *Gmail*, Google

17   submitted 2,006 news articles and 13 million web pages that

18   disclose the conduct at issue.

19       What we have here are 31 documents total.  Five privacy

20   policies.  Those privacy policies share two characteristics.

21   Number one, none of them say anything about Chrome sending

22   personal information to Google regardless of sync.

23       None of them say "Our privacy policy overcomes what Google

24   told you about the chrome privacy browser."

25       The next thing is -- and this is pointed out by Greg Fair.

 1    And we cite this in the opposition.  Google requires websites

 2    using its services to provide a privacy policy, and they

 3    provide common language for those websites to use.

 4         That common language points users back to the Google

 5    Privacy Policy, which contains the promise about Chrome sync,

 6    about browsing history not being saved to your account unless

 7    you enable Chrome sync, and which points users to the Chrome

 8    Privacy Notice.  All roads lead back to the Chrome Privacy

 9    Notice.

10         The next bullet point they have, Your Honor, are news

11    articles.  And I would add, Your Honor, there is no evidence

12    that anyone saw any of these privacy policies.  They criticize

13    our plaintiffs for not reading privacy policies and they

14    acknowledge no one reads these privacy policies, which are on

15    every website on the Internet.

16         The next item they have are news articles, and I think

17    this is -- this is really interesting Your Honor.  If you'll

18    go to their slides, their Slide number 10 has what I would

19    guess are their -- what they think are their three best news

20    articles.

21         Let me know when you're there, Your Honor.

22         The one at the top has a snippet from CNN Business.  I

23    think it's very important to Your Honor to read the entire

24    article because a little down -- a little ways down -- first

25    of all, it's not -- this is before the class period.

1    But a little ways down, here is -- Google is quoted in

2    that article.  And here's what Google says in that article:

3    "This report is commissioned by a professional DC lobbyist

4    group and written by a witness for Oracle in their ongoing

5    copyright litigation, so," comma, "it's no surprise that it

6    contains wildly misleading information."

7        **THE COURT:**  All right.

8        **MR. BARNES:**  This is an exhibit we will want to

9    submit to the jury.

10        **THE COURT:**  A response?

11    And --

12        **MR. SCHAPIRO:**  Yeah, I'll -- I'll keep it brief.

13        **THE COURT:**  By the way, Mr. Shapiro --

14        **MR. SCHAPIRO:**  Yes.

15        **THE COURT:**  -- you folks should know the case number

16    in this case does not start with a 5.  That's San Jose.  It's

17    starts with a 4 --

18        **MR. SCHAPIRO:**  I apologize.

19        **THE COURT:**  -- which is Oakland.

20        **MR. SCHAPIRO:**  Sorry, Your Honor.

21    I will try briefly to respond to everything that

22    Mr. Barnes has -- has just said.  And I'll try and keep it

23    brief.

24    He started with what I would describe as an opening

25    statement, telling a story about how Google decided it needed

1   to change its disclosures and at a certain time because of

2   some articles.  That will be disputed, Your Honor.

3       The Ninth Circuit, Your Honor, can read the *Calhoun*

4   decision.  It rejected none of the principles that Mr. Barnes

5   said were rejected.  To the contrary, the Ninth Circuit said,

6   well, some of these things are jury issues.  That's why it

7   came back.  And that's why we have the right, we believe, to

8   try this case but to try these cases with our defenses to

9   juries.

10       I mean, the very last page of --

11           **THE COURT:**  It's up to UCL's, not a jury claim.

12           **MR. SCHAPIRO:**  That's true, Your Honor.  The very

13   last page of the *Calhoun* decision, the Court endorses what

14   Your Honor did in *Brown*.  It essentially says, well, in

15   *Brown* -- *Brown* was the better sequence by which to analyze the

16   issue here.

17       And -- and, you know, I'm happy to address each of the

18   individual claims, but I don't think you're going to reach

19   them if, as we hope, you believe that implied consent, which

20   is a defense as -- as plaintiffs' own brief in the Ninth

21   Circuit said are defense to all claims.

22       Implied consent is -- is dispositive here.  So, first,

23   Mr. Barnes was talking about some of the news articles.  We've

24   submitted the Broome declaration, which has a whole series of

25   news articles.  We, of course, invite the Court to read them

 1    and to -- to compare them to articles that were used in other

 2    cases.

 3        Exhibit 51, Exhibit 53, Exhibit 54, Exhibit 57, all of the

 4    50s in the -- in the Broome declaration.

 5        But we don't even need to go that far because

 6    Mr. *Brown*'s -- excuse me -- Mr. Barnes is incorrect when he

 7    says that there's no evidence in the record that individual

 8    putative class members were exposed to the disclosures that

 9    we're citing.

10        Docket 1074, Your Honor, is the Fair declaration.  And in

11    the Fair declaration at paragraph 33, Mr. Fair states that as

12    of October 2016, 10s -- holders of tens of the millions of

13    U.S. accounts had seen the consent bump agreement.

14        Paragraph 34, as of July 30th, 2021, hundreds of millions

15    of U.S.-based accounts were shown the consent bump agreement.

16    And that includes plaintiffs Crespo, Henry, Wilson, and

17    Johnson.

18        Paragraph 62, hundreds of millions of U.S.-based accounts

19    were created after users selected "I agree to the new

20    account" -- "new account creation agreement including *Calhoun*.

21    Kindler, Johnson, and Wilson.

22        The privacy policy, this is paragraph 75 of the Fair

23    declaration, was viewed -- I think the -- the number is

24    sealed, but it is in the nine figures.  It is hundreds of

25    millions of times between March 2018 and July 2020.

1   On average, this is also from that declaration, users

2   spent 2 minutes and 25 seconds on the privacy policy page.

3   Paragraph 84, Plaintiff Johnson visited the activity

4   controls page in March -- on March 10th of 2019.  More broadly

5   on average, from July 20th to 2020 -- this is paragraph 85 --

6   to September 13th, 2021, U.S. Google account holders visited

7   their MyActivity pages more than 170 million times every week.

8   I could go on.  But there -- the -- the Fair declaration

9   belies Mr. Barnes' suggestion that, oh, notify users -- we

10  wouldn't be able to -- to find class members who had been

11  exposed to these sources.

12  The -- on the -- intrusia [phonetic] -- the UCL claim, I

13  mean, we make our points in our briefs, but this is a

14  misrepresentation case.  Reliance is required because the

15  claims are based on --

16  **THE COURT:**  -- reliance -- both Judge Seeborg and

17  Freeman rejected that approach that you're spousing, right.

18  **MR. SCHAPIRO:**  In a misrepresentation case?

19  Your Honor, I don't think so.  And I think that's why the

20  plaintiffs are -- are trying to say, well, it's not a pure

21  misrepresentation case.  But if one looks at the complaint --

22  **THE COURT:**  Well, they're -- they're arguing that

23  both -- that I should rely -- or that I should be persuaded by

24  what Seeborg and Freeman did in *Capello* and *Svenson* and not

25  require reliance.

1            **MR. SCHAPIRO:**  Yes, and -- and in those cases, if

2     I -- if I remember correctly, the defendants -- excuse me --

3     the plaintiffs had essentially disavowed misrepresentation

4     claims.  That's -- perhaps they would want to do that here,

5     but in this case, the complaint -- it's -- we would submit

6     it's impossible to read the complaint in this case and not

7     interpret it as a misrepresentation case.

8          Now, obviously, of course, implied consent also defeats

9     predominance in the UCL claims here.

10         With regard to the -- I can't recall if Mr. Barnes

11    addressed the intrusion or the CIPA cases --

12            **THE COURT:**  Not yet.

13            **MR. BARNES:**  Not yet.

14            **MR. SCHAPIRO:**  All right.

15         I want to respond to everything he said, but there's --

16    there's also one overarching point that I want to make about

17    the -- about the slides here, which is I think one could get

18    the impression from reading the plaintiff's reply brief or --

19    or their slides that we have a super-complicated question here

20    which requires untangling every aspect of on which date did

21    Google change this or that, and -- and, Your Honor, the --

22    that might makes sense because they're fighting an uphill

23    battle because there's really just a very simple question

24    here, which why I think our slide presentation is 13 slides

25    and not 40 or whatever it is.

1        This case follows *Brown*.  It follows *RTB*.  It follows

2    *Hart*.  It follows the other implied consent cases.

3        If there's anything I haven't responded to, I will, but

4    we'd be happy to rest on our briefs on these individual

5    claims.

6              **THE COURT:**  All right.  Let's move to CIPA.

7              **MR. BARNES:**  So, Your Honor, Mr. Shapiro kind of

8    proved my point with respect to the consent bump and agreement

9    and NAC being common.

10       Google knows who these people are.  Under *True Health*,

11   that's a -- that's a subclassable [phonetic] issue.  They also

12   don't address the conduct at issue, and the Ninth Circuit

13   considered them and reject- -- said that's not enough for

14   Google to prevail as a matter of law.

15       On CIPA, the -- the consent rules are determined by the

16   language of the statute.  And the statute says that "Google

17   must have either consent of all parties to the communication

18   or it's -- it's" -- "without the consent of all parties to the

19   communication," comma, "or in any unauthorized manner."

20       So the first issue is, does Chrome -- is Chrome sending

21   personal information to Google?  Is that manner of sending it

22   authorized?  That is what the language in the statute says.

23       Google does not address it.  It says that that's just

24   semantics.  Your Honor, semantics are how statutes are

25   interpreted.  There's a comma.  There's an "or," and there's

1    two different clauses.  And the reason for that is CIPA is

2    designed to have maximum privacy for personal liberties in the

3    State of California.  That's what the legislative history

4    says.  That's what the California Supreme Court has said.

5    That's what the Ninth Circuit has said in interpreting the

6    statute.

7        Google has not presented any evidence of any document

8    saying that Chrome sends personal information to Google.  All

9    they want to talk about are collection documents.  That's the

10   same thing that the Ninth Circuit said is not enough to

11   prevail on a motion for summary judgment.

12       We believe this case is simple, Your Honor.  The promise

13   is Chrome will not send personal information to Google.

14   Google can submit a billion documents about Google's general

15   collection of information.  None of them refute the Chrome

16   Privacy Notice in the contract that says Chrome will not send

17   personal information to Google.

18       We are going to be a one-track record.  That is what the

19   case is about.  And until they can identify documents that

20   address that, they lose.

21       The next one is without the consent of all the parties,

22   and the Ninth Circuit has explained that CIPA requires prior

23   consent.  So in order for Google to prevail on this, they have

24   to show prior consent to each and every interception.  There

25   is no way they can possibly do that.

1    No one reads every website, even -- accepting their

2    privacy policy argument the best you can, no one reads every

3    website privacy policy.

4        In their opposition, they have a -- a response to this

5    that includes no citation to any evidence in the record.  They

6    have no evidence about prior -- prior consent.  There are --

7        **THE COURT:**  So why wouldn't you bring a motion for

8    summary judgment?

9        **MR. BARNES:**  On prior consent?

10       **THE COURT:**  If it is so -- if it is so clear and

11   undisputed, why wouldn't you do that?

12       **MR. BARNES:**  If you certify a class, maybe we will.

13   And we'll do it on a class-wide basis.

14       There are -- there are four additional terms -- Your

15   Honor --

16       **THE COURT:**  And, again -- The issue of consent is

17   right back in front of us.

18       And that consent can -- again, per the Ninth Circuit be

19   express or implied.

20       **MR. BARNES:**  That's correct.  But to be implied, it

21   still must be actual, and the disclosure must explicitly

22   notify about the conduct.

23       And Google has the burden --

24       **THE COURT:**  How is that --

25       Well, all right.  Go ahead.

1        **MR. BARNES:**  Google has the burden of presenting that

2   evidence.  That's the rule from the Ninth Circuit.  Judge

3   Breyer in *Torres* interpreting it -- in implied consent and

4   *Calhoun* said that's exactly how it applies.  We think Judge

5   Breyer got it right, that it is an objective standard, and

6   that they have to present evidence.

7        There are four additional categories that they cite.  The

8   fourth one is MyActivity.  We actually think, Your Honor,

9   MyActivity is -- demonstrates that we should win as a matter

10  of law on the Basic Browser mode.

11       There are two modes at issue in this case, Your Honor,

12  Basic Browser mode and Signed In, But Not Consented for Sync.

13       Google has told this Court that MyActivity -- you can see

14  what's going on here by going to MyActivity.  That is not

15  true.

16       MyActivity does not show any information from Basic

17  Browser mode.  Google admits that.  That's Monsees declaration

18  at page 6.  It's Exhibit C2, paragraphs 30 to 36 of our

19  report.

20       **THE COURT:**  All right.  And can you give me the case

21  cite, someone from your table, as to where Judge Breyer in his

22  case in *Torres* uses the word "objective"?

23       **MR. BARNES:**  Yes, Your Honor.  I believe it's in one

24  of our slides.

25       The -- so it does not show Basic browser mode at all.

1    And, in fact, Your Honor, Google denies that it connects Basic

2    Browser information to Google accounts.  We have common

3    evidence that we will submit to the contrary.

4        And so I ask Your Honor -- effectively, Google's defense

5    seems to be we don't do it, but we did, you consented to it

6    anyway.  And it strikes me as odd that they're denying the

7    conduct at issue in the case and saying that users consented

8    to it.

9        Basic Browser mode sends personal information to Google

10    that is not shown in MyActivity.  It is hidden from users.

11        **THE COURT:**  A response.

12        **MR. SCHAPIRO:**  A CIPA claim has two basic elements.

13    So there's the consent -- well, there's the consent defense,

14    there's content, and there's in -- in transit.  And these

15    elements are not suitable in this case for class treatment on

16    consent.

17        The class, the current class, is Google account holders.

18    So class members necessarily had to see the privacy policy,

19    account holder agreements, prior to any activity that falls

20    within the class definition.  And figuring out when they

21    impliedly consented and if it occurred prior to browsing or

22    prior to the start of the class period would be an

23    individualized issue.

24        Second, the plaintiffs can't show that Google intercepted

25    content uniformly.  Your Honor, is very familiar with the

1    *Zynga* case from the Ninth Circuit.  IP addresses and refer

2    headers are not content.

3        In the *Griffith vs. TikTok* case, which I think was Judge

4    Tigar, which we cite in our briefs, their own expert -- the

5    plaintiff's own expert, Dr. Shafiq said that only 4 percent of

6    URLs have search terms embedded in them such that -- now this

7    is me speaking, not Dr. Shafiq -- such that they would be

8    content.  That's 2024 Westlaw 4874556 at star 2.

9        As the Court said in Griffith and as Your Honor knows, it

10   is the contents of the URLs, not the mere fact that URLs were

11   sent that matters.  And that cannot be -- it cannot be

12   demonstrated in this case in any uniform way that URLs that

13   were sent -- all or even mainly can be categorized as content.

14       Then there's the question of in transit in California.

15   And I know that Your Honor in the *RTB* case rejected a -- a --

16   an "in transit" argument because there was no evidence in the

17   record.  I think you had said that the -- that Google

18   should -- should have produced evidence if it had it that it

19   processed *RTB* bids from other locations.

20       Here, we have a verified interrogatory.  This is

21   Docket 1073-21.  It's Exhibit 15 to the Broome declaration.

22   We have a verified interrogatory that, quote, there are no

23   Google data centers in California used to provide ads and

24   analytic services.

25       Now, Dr. Shafiq then put in some claims about servers --

 1    and I don't want to take us down a rabbit hole, Your Honor,

 2    but these are some of the reports that plaintiff submitted

 3    after the -- because of the timing of the schedule to which we

 4    had no opportunity to respond.  And we challenged them earlier

 5    as -- as improper rebuttal.

 6        But the bottom line is we would need to assess for each

 7    transmit something actually was transmitted through

 8    California.  So I think that addresses why the CIPA claim is

 9    not suitable for a class treatment beyond just the broad

10    implied consent.

11            MR. BARNES:  Your Honor, I have the *Torres* quote.

12            THE COURT:  I'm not looking for a quote.  I'm looking

13    for a page number where the word "objective" appears.

14            MR. BARNES:  It is Page 4 to -- "must demonstrate

15    that a reasonable person would have understood that the

16    actions would have been carried out."

17            THE COURT:  All right.  So that's -- it's not -- the

18    word "objective" isn't there.  It's the standard that you're

19    referencing.

20            MR. BARNES:  Yeah.  Correct.  It's the reasonable

21    person standard, which is an objective standard.

22        Your Honor, may I address the contents issue and the

23    geolocation issue?  And I'd like to do them in reverse.

24        Mr. Shapiro referenced Exhibit 15, and what Google

25    submitted to the Court in Exhibit 15 was just the

```
 1        interrogatory answer.  That interrogatory answer incorporated

 2        by reference certain documents that Google produced.

 3           We went back before the hearing and looked at those

 4        documents.  I'd like the Court to have the entire answer to

 5        the interrogatory in the record because it conflicts, I think,

 6        with the representations made that Google made in its

 7        opposition.

 8           May I hand it forward?

 9               THE COURT:  Did you give it to the other side

10        already?

11               MR. BARNES:  We did not, Your Honor.  This is a --

12        this is evidence that they submitted.  They submitted

13        Exhibit 15, and they did not include the documents that they

14        incorporated by reference.

15               THE COURT:  Do you have a second one?

16               MR. BARNES:  I do.

17                   (Pause in the proceedings.)

18               MR. BARNES:  So with regards to geolocation, there's

19        a -- a layered approach here.  I want to first talk about

20        Exhibit 15 and what the attached documents show, that what I

21        pinpointed there, we highlighted that all of these servers --

22        the servers involved in all of the items that are at issue in

23        this case or most of them are centrally managed out of Google

24        headquarters in Mountain View, California.  That's a

25        class-wide question.
```

1        If that's enough of a California nexus to prevail, then we

2    prevail either for everyone or it's not enough for everyone.

3    So that's question number one.  You don't have to decide that

4    on this the merits today, but it's just a class-wide question.

5        The second issue with respect to that -- and this is in

6    Slide 24 -- is that even if there are distinctions amongst

7    class members, those distinctions can be easily resolved to

8    create a subclass from the preservation -- preserved data in

9    this case.

10        If you look at Slide 24, the right-hand side of the page,

11    Google maintains receipts of the at issue communications that

12    show where the user is, where the website is, and where

13    Google's server is.  So to the extent there's a geolocation

14    problem, all you do is write a computer query to identify all

15    of the communications that occurred.  One of these three

16    things in California, and that's a California communication.

17    It's pretty easy.

18        With respect to contents, staying on the same slide,

19    Mr. Shapiro talked about *Griffith* and certain inquiries

20    this -- that's a merit question.  If you look at Slide 23,

21    this is what I call a receipt of the intercepted data, just

22    one example.  And it has identifiers that are connected to

23    each other.  In the third row down, it has the full-string

24    URL.  It has document -- it has verticals where it looks at

25    the URL and says what it's about.

 1          And then if you go down to the bottom, it has other

 2     clear -- things that are clear content.

 3          We gave one example.  Every entry in these tables has

 4     these fields.  It is a class-wide question.

 5          Even to the extent Your Honor might later agree that it

 6     has to be a search query, just like with the California issue,

 7     that, too, can be resolved by a computer query into the

 8     preserved database because there's a way to identify search

 9     queries in the database.  You look for entries that have "Q

10     equals" anything.

11          **THE COURT:**  And your expert says this where?

12          **MR. BARNES:**  The -- this is in Exhibit C12.  Talks

13     about -- this was a response to the motion for summary

14     judgment.

15          I believe it's also in C1 where he talks -- but C1 was

16     submitted before Google produced the preserved data.

17          Your Honor --

18          **THE COURT:**  So I'm asking where the evidence is in

19     this motion for what you just argued.

20          **MR. BARNES:**  I believe it's Exhibit C12.  And I think

21     Your Honor needs to understand the time line of evidence --

22     this type of evidence in this case.

23          When we initially moved for class certification, Google

24     had not produced any data from these databases.  They produced

25     some before our reply.  And then four months after the close

 1    of fact discovery, they produced a whole bunch more.

 2        And nine months after the close of the fact discovery,

 3    they disclosed what we had been seeking since the first motion

 4    to compel that we filed in the case relating to RFP number 5.

 5    And that was its back-end data architecture showing how the

 6    content of communications in various identifiers was attached

 7    to each other.

 8        We asked to update our expert reports so that we can agree

 9    that late-received information in the context of this motion.

10    Google objected.  We were not given permission to file expert

11    reports to address that late-filed information.

12        So to the extent that there is a lack of an expert report

13    on this type of item, well, we didn't have the opportunity to

14    submit it, Your Honor.

15            THE COURT:  That's because Judge -- the Magistrate

16    Judge denied your request?

17            MR. BARNES:  Well, two reasons, when the case got

18    back from the Ninth Circuit, we asked Google -- because we

19    read her prior order as requiring class-wide production.

20    Google disagreed.  We briefed it.  Google said, we don't need

21    class-wide production for anything.

22            THE COURT:  Wait.

23            MR. BARNES:  And Judge van Keulen denied our motion.

24            THE COURT:  Right, because she disagreed with your

25    articulation of what the history was.

1        **MR. BARNES:**  I don't know that -- she disagreed with

2   our interpretation that when it got back, Google would have to

3   produce the class-wide data, and Google had argued we didn't

4   need it for class certification.

5        **THE COURT:**  My memory is that there was a big dispute

6   and you believed that you had made a request for class-wide

7   production.  And the record as she reviewed indicated that you

8   actually had not, that it was your error, and that's why the

9   request was denied.

10        **MR. BARNES:**  I think that's incorrect.  I think the

11   dispute --

12        **THE COURT:**  All right.

13        **MR. BARNES:**  -- dispute was that we read -- we had

14   requested it.  We read her order as having required production

15   when the case got back from the Ninth Circuit.

16        **THE COURT:**  I've so many of these data cases, I'd

17   have to go back and check to the extent that it's relevant.

18        **MR. BARNES:**  And --

19        **THE COURT:**  I know at least with one set of

20   plaintiffs there was a big dispute, and it was the plaintiffs'

21   error in their own production requests.

22        **MR. BARNES:**  Your Honor, we spent a million dollars

23   on a special master to get this information.  We tried for two

24   years to get it.  We thought we had an order compelling its

25   production and Google said we didn't need it.  And Judge

1    van Keulen said, you don't have to produce it -- that Google

2    does not have to produce it before class cert.

3         And let me -- correct.  We alone didn't spend over a

4    million dollars.  The plaintiffs did.

5              **THE COURT:**  Okay.

6              **MR. BARNES:**  If -- if Your Honor has no further

7    questions on the -- CIPA claim, I think that leaves intrusion?

8         For intrusion, all elements are common.  We think that the

9    case to rely upon that is directly on point is *Rodriguez vs.*

10   *Google*.  And in *Rodriguez*, there were thousands upon thousands

11   of apps with privacy disclosures, just like there would be

12   thousands of websites.  And Judge Seeborg said that though --

13   anything that those apps said does not overcome the --

14   Google's common representation to class members for purposes

15   of finding predominance.

16        We think *Rodriguez* is directly on point with this case.

17   It relates to the control.  Then the other case is the

18   *Opperman vs. Path* case.

19        And I'd like to address, Your Honor, the *TWC* case that

20   Google cites because the *TWC* case is completely inapposite.

21   In The Weather Channel, the plaintiffs granted express consent

22   to the conduct at issue.  They defined their -- the conduct at

23   issue was collection of geolocation information.

24        And they find their class as users who, quote, granted The

25   Weather Channel access to the users' geolocation.  The Court

1    found in that case that, quote, that it is undisputed that the

2    Weather Channel's privacy policy explicitly disclosed the

3    practice at issue.

4        That's the only case they rely for intrusion, and the

5    facts don't fit here, 'cause there's clearly -- there's

6    clearly a dispute.

7        And I don't have anything else on the intrusion claim,

8    Your Honor.  I would just point the Court -- Court -- I'm

9    sorry -- point Your Honor to the *Rodriguez* decision.

10        **THE COURT:**  All right.

11        Any response?

12        **MR. SCHAPIRO:**  Briefly, Your Honor.  Reasonable

13    expectation can't be determined class wide.  There's an

14    objective standard, but it must be actual and based on a

15    representation, so that's the *Hill vs.* --

16        **THE COURT:**  But it's an objective standard.

17        **MR. SCHAPIRO:**  Yes, but --

18        **THE COURT:**  And Google is doing things in one

19    particular way.  And the question is whether that particular

20    way is offensive.

21        **MR. SCHAPIRO:**  But here, the supposed

22    representation -- 'cause there has to be an actual belief

23    expectation based on a specific representation -- it's based

24    on the CPN, the Chrome Privacy Notice, which many, probably

25    most according to the plaintiff's own experts, of people did

1  not read.  Their experts said that the failure to read the

2  CPN, the thing on which this supposed expectation was based --

3       **THE COURT:**  Okay.

4       **MR. SCHAPIRO:**  -- is typical.

5       **THE COURT:**  So the elements are, one, whether there

6  was a reasonable expectation of privacy with respect to how --

7  as I understood it, with respect to how the data is getting

8  distributed.

9     Is that right or wrong?

10      **MR. BARNES:**  Correct.

11      **THE COURT:**  Okay.  So it has nothing to do with -- I

12  don't see where there are individual issues on the

13  distribution of the data.

14      **MR. SCHAPIRO:**  It's about the expectation about the

15  distribution of the data --

16      **THE COURT:**  Yeah, and --

17      **MR. SCHAPIRO:**  -- because how do --

18      **THE COURT:**  But it's a reasonable person standard, so

19  the jury can decide whether the general public would

20  reasonably believe that there was a -- that there was a

21  privacy interest in how the data -- all data was getting

22  distributed, period.

23      **MR. SCHAPIRO:**  I been before Your Honor enough to

24  know I shouldn't fight too much, but I want to take one more

25  try on this.

```
 1          So the Facebook tracking case, for example, is one
 2    where --
 3              THE COURT:  Yeah, hold on.
 4              MR. SCHAPIRO:  -- the expectation --
 5              THE COURT:  Hold on.
 6              MR. SCHAPIRO:  Sure.
 7              THE COURT:  Hold on, Mr. Shapiro, because I want to
 8    make sure I understand the facts and the theory as it is --
 9    it's not how you want to litigate the case.
10              MR. SCHAPIRO:  Yes.
11              THE COURT:  You can litigate it however you want.
12          The question is how they want to litigate it.  And what
13    they want to tell the jury is that Google is taking every --
14    everybody who goes -- let's just do the Basic browsing mode of
15    Chrome.  Anybody who goes into Chrome, Basic browsing mode,
16    haven't done anything else, whatever it is they're doing,
17    certain data is being sent to Google.  Whatever it is.
18          And the question is should people in general have a
19    reasonable expectation of privacy.  Yes or no?  If the answer
20    is no, which the jury very well could find because of all the
21    reasons that you're going to explain to them, that that --
22    that that argument is somewhat ludicrous because everybody
23    knows -- that's what you're going to say -- everybody knows
24    that certain amounts of data are going to get distributed.
25          Like, the answer to that question is no, but it's still
```

 1   common and there's still common evidence about a general

 2   practice applied to the general population.  That's their

 3   argument.  I don't understand -- now, you may have a different

 4   approach, but that's their argument.

 5          MR. SCHAPIRO:  That is their argument except for one

 6   thing, that this is the case about sync.  Right?  In

 7   shorthand --

 8          THE COURT:  No, there's -- they've asked for class

 9   certification with Basic.

10          MR. SCHAPIRO:  Yes.  So what I'm saying, there's the

11   case about sync -- this case from the beginning has been --

12   the plaintiffs themselves say, "I thought that Google wasn't

13   getting my data, and the reason I thought that is because I

14   thought the word 'sync' or 'sync as described in the CPN'

15   meant that only when I synced would Google get my information.

16   I understood that Google might get my information, but I

17   thought that would only happen when I sync and so you tricked

18   us with whatever it was you were doing about sync."

19      That's why I'm referring to the Facebook tracking case.

20   That's a case where there was a general privacy policy, but

21   there was also allegedly a contrary promise such that someone

22   who was aware of that contrary promise objectively,

23   reasonably, could have had an expectation that his or her data

24   wasn't being shared with Facebook.

25      So the reason that this can't be determined class wide is

1    that the expectation on which they rely in their complaint and

2    have relied throughout this case has to do with the sync

3    question, which --

4            **THE COURT:**  It's --

5            **MR. SCHAPIRO:**  -- most -- most people will not be

6    aware of, but some will.

7            **THE COURT:**  That's an argument --

8            **MR. SCHAPIRO:**  And --

9            **THE COURT:**  -- about -- it's an argument about a

10   common issue.

11           **MR. SCHAPIRO:**  It's an argument about an

12   individualized defense in our view.

13           **THE COURT:**  I -- it can't be because it's a -- it's

14   an objective standard on --

15           **MR. SCHAPIRO:**  So --

16           **THE COURT:**  -- that issue.

17           **MR. SCHAPIRO:**  I'm forgetting the case, Your Honor.

18   Maybe one of my colleagues can give it to me.

19      But there's a case from this district in which of your

20   colleagues I think very concisely says "objectivity does not

21   equate to uniformity."  "Objectivity does not equate to

22   uniformity."

23      So that is -- the question is, if -- do I have a

24   reasonable expectation of privacy if I think I can walk down

25   the street --

```
 1                      (Simultaneous colloquy.)
 2            THE COURT:  Does any person.  That's the whole point
 3      of the objective inquiry.
 4            MR. SCHAPIRO:  Yes.
 5            THE COURT:  Does any person.
 6         Now, you may not as an individual have had it, right,
 7      'cause obviously a plaintiff is going to get on a stand and
 8      say, "I -- I had a expectation of privacy."  And the evidence
 9      is going to show all of what happened and all of how these
10      things work, and the jury -- the jury's determination is what
11      is the reasonable person standard.
12         So the jury could say, collectively, we've heard
13      everything, and you know what?  Objectively speaking, there is
14      no expectation of privacy.  So your subjective belief is
15      wrong.
16            MR. SCHAPIRO:  A hundred --
17            THE COURT:  That's -- that's a failure of proof.
18            MR. SCHAPIRO:  A hundred percent.  And yet, it's not
19      uniform.  And here's why, Your Honor.
20         And -- and -- the question is, would a person -- would it
21      be objectively reasonable for someone who was exposed to
22      whatever I was exposed to to have had this belief.
23         So you could say it's not objectively reasonable for you
24      having walked into the courtroom and seen cameras all around
25      to think that no one would see a picture of you.  You may
```

1   think that's subjectively reasonable, but it's not.

2       But someone who walks into, you know, a basement in the

3   building and doesn't see cameras all over the place, might

4   say -- or to the bathroom --

5           **THE COURT:**  But it's --

6           **MR. SCHAPIRO:**  -- say it's objectively reasonable for

7   me not to expect a camera in the bathroom.

8           **THE COURT:**  Yeah, but it's -- but it's the same

9   evidence.

10          **MR. SCHAPIRO:**  But the people walked into different

11  places.  That is, some people were in the place with the

12  cameras.  That is they had been exposed to this promise --

13  supposed promise and knew all about it -- strike "promise" --

14  rather, this disclosure.

15          **THE COURT:**  You're not treating consumers

16  differently.  Google is not treating them differently.

17  They're not telling them which room to go into.  Google is

18  acting uniformly.  And it is whatever it is doing in that

19  uniform approach, is what -- is what will be evaluated.

20          **MR. SCHAPIRO:**  Google is uniformly presenting a

21  variety of opportunities for people to learn what it is doing.

22          **THE COURT:**  Right.

23          **MR. SCHAPIRO:**  Some of them --

24          **THE COURT:**  And so -- and so Google is uniformly --

25  will explain -- Google will come in here and explain uniformly

1     what we do when someone's in the Basic Browser mode.  And

2     Google will uniformly explain what they do when someone has

3     signed in but not consented to the modes.  That's what Google

4     will explain.

5         And the jury will decide objectively whether if someone is

6     in one of those modes, there's a reasonable expectation of

7     privacy.

8         Then the second question they'd have to define or decide

9     is, is that highly offensive.

10             **MR. SCHAPIRO:**  So let me address "highly offensive,"

11    Your Honor, which we will contend can't be decided class wide.

12    As Your Honor knows, the degree and setting of the

13    intrusion --

14             **THE COURT:**  Is objective.

15             **MR. SCHAPIRO:**  Is objective.

16             **THE COURT:**  Is objective.

17             **MR. SCHAPIRO:**  But, Your Honor, millions of class

18    members were aware of the data collection from the

19    disclosures.  Millions reviewed the MyActivity page.  Millions

20    turned ad personalization off.  Millions used cookie blockers.

21    Millions used VPNs.

22             **THE COURT:**  But Mr. --

23             **MR. SCHAPIRO:**  -- that the expectation of privacy in

24    pseudonymous data, which some of these people have and some

25    didn't, is lower than data associated with an individual's

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

```
 1        identity, so with --

 2                THE COURT:  This is such a classic common question.

 3        We as a society decide in trials whether something constitutes

 4        offensiveness to such a high degree as to intrude on -- on

 5        privacy.  How else do we get there?  How else does the -- do

 6        the people of the United States tell corporations what they

 7        believe to be highly offensive or not?  How else do we do

 8        that?

 9                MR. SCHAPIRO:  The question will be, as it would be

10        in an individual case -- is, what was the thing that was done

11        to you and is that objectively highly offensive.

12                THE COURT:  Right.  And it is the --

13                MR. SCHAPIRO:  Thing that was --

14                THE COURT:  -- objectively highly offensive part that

15        makes it common.

16                MR. SCHAPIRO:  But the thing that was done to you,

17        plaintiff, will be -- virtually everyone will be different

18        because of what they knew, what they accepted --

19                THE COURT:  -- doesn't treat them differently.

20                MR. SCHAPIRO:  If someone has cookie blockers on, how

21        can that person recover for the fact that some other people in

22        the class had data that Google received?  Objectively can it

23        be highly offensive for someone who had a cookie blocker on

24        and understood what that was.

25            Anyway, I hear Your Honor.  This is our position.  We've
```

 1    laid it out in our briefs.  I respectfully think we're

 2    correct, but I hear what you're saying.

 3                    (Pause in the proceedings.)

 4            THE COURT:  So respond to that.

 5        If I read everything and I made an informed choice and I

 6    knew what was going on and there are people -- millions of

 7    people who read nothing, who didn't know what was going on,

 8    who relied on documents or didn't rely on documents, all of

 9    those different vantage points, how is that not

10    individualized?

11            MR. BARNES:  Well, let's start with the default rule.

12    It's Google's burden on the implied consent issue.

13        There are two cases not cited in this section but cited

14    elsewhere in the briefs.  *In re Pharmatrak* is one of them.

15    And then there's a -- a case *Harris vs. comScore*.

16        *In re Pharmatrak* was a case where the defendant

17    essentially argued, hey, you go on the Internet, you know

18    everything is fair game.  And the First Circuit back in 2003

19    in that case said, "no, that's not the case."  Even -- consent

20    to use of a service is not consent to anything goes.  And they

21    described a hypothetical situation where a software --

22            THE COURT:  Well, in that case, didn't the -- wasn't

23    it that the pharma company's part of the issue was that they

24    didn't -- the plaintiffs there didn't even allege, right, that

25    the personal information was being collected?

 1          **MR. BARNES:**  I think they did allege it was being

 2    collected.  What the defendant said is that the pharmaceutical

 3    companies consented by signing up for the service.  And what

 4    the First Circuit said is, no, there were contractual

 5    protections that said this wouldn't happen with the software

 6    service, and so you can't use that to get around it.

 7          **THE COURT:**  Well, what if -- can I get clarity?

 8       My notes say that the companies -- that the -- that the

 9    plaintiffs did not allege that.

10          **MR. BARNES:**  Did not allege -- they alleged --

11          **THE COURT:**  -- that the pharmaceuticals knew that the

12    PI was being collected.

13          **MR. BARNES:**  That's right.  They've sued a different

14    entity.  They sued a third-party service provider, not the

15    pharmaceutical companies that hosted the web pages.  That is

16    correct.

17          **THE COURT:**  So content -- consent could not --

18          **MR. BARNES:**  The Ninth Circuit --

19                    (Simultaneous colloquy.)

20          **MR. BARNES:**  The Ninth Circuit said that the

21    pharmaceutical companies did not consent to this conduct, in

22    part because there were contract protections that said it

23    would not be sent.  And to hold otherwise would turn contract

24    law upside-down and make it so that people couldn't be

25    protected by their contract rights.  So that's -- that's the

1    first.

2        The second is it is Google's burden to show where there

3    is -- this is disclosed anywhere.  I think the question is

4    we're talking about Chrome as a whole.  And we're talking

5    about a very specific promise --

6            **THE COURT:**  Well, not --

7        **MR. BARNES:**  -- specific to Chrome.

8            **THE COURT:**  No.  You're not talking about Chrome as a

9    whole.

10           **MR. BARNES:**  Right.

11           **THE COURT:**  You're talking about Chrome in two of

12   five modes.

13       **MR. BARNES:**  You're correct.  We are talking about

14   Chrome in Basic mode and signed in for [sic] -- consented for

15   sync.  And we talking about the totality of what happens in

16   those two modes.

17       Mr. Shapiro talked --

18           **THE COURT:**  Is the evidence different between --

19   would the evidence be different in each of the five modes?

20       **MR. BARNES:**  Incognito and Guest mode are definitely

21   different.  Sync mode is -- I can explain the differences in

22   these -- in the top three modes.

23       Can I -- I'd like to put Incognito and Guest mode just to

24   the side.

25       In sync mode, the URL goes and your Google account goes to

1  Google.  And it is stored in a way that you can see your sync

2  data on Google's servers.  Okay?

3      In Basic Browser mode, the URL is sent to Google,

4  identifiers are sent to Google.  Those identifiers are

5  connected to Google accounts on the back end of Google's

6  system and they are personal information as a matter of law.

7  And then in the "Signed In, But Not Consented for Sync"

8  mode --

9          **THE COURT:**  And they're collected on the back end?

10         **MR. BARNES:**  They are collected -- the Chrome sends

11 it.  We explain the two modes, Your Honor, in Slide 4.  And if

12 you -- we explain how you sign in -- how you get in each mode.

13 And then we explain the personal information that Chrome

14 sends.

15     There are seven different categories in "Signed In, But

16 Not Consented for Sync" that are sent directly from Chrome to

17 Google servers.  There are six in the Basic Browser mode, but

18 the nature of what this information is and how Google connects

19 it makes it connected to a Google account.  And that is --

20     I'll let Your Honor catch up to the slide.

21              (Pause in the proceedings.)

22         **MR. BARNES:**  So if you look at the first --

23         **THE COURT:**  Well, you don't have this for all -- all

24 five modes.  You only have it for the two.

25         **MR. BARNES:**  That's correct.  'Cause Incognito and

```
 1    Guest mode are not relevant to this case.  And the -- we don't

 2    have it for the sync mode, but the sync mode would have the

 3    Google I.D. and the -- the URL.

 4         THE COURT:  So what about Google account holders who

 5    knew how all -- who knew how Incognito worked?

 6         MR. BARNES:  What do you mean by that?

 7      The Incognito promise is that Chrome will not collect

 8    certain information.  Not these types of things.

 9         Incognito, also has -- because it has a general promise in

10    the private -- in the contract that personal information won't

11    be sent to Google outside -- absent of sync, then Incognito

12    mode would be included in that.

13         But the Incognito promise in this case, as Google pointed

14    out in the Brown case, is that Chrome browser wouldn't get the

15    information.  Nothing about Google.  That was their whole

16    defense in Brown on the motion for summary judgment, Your

17    Honor.  Maybe not their whole defense, but it was a key focus

18    of their defense.  And that's the distinction between Basic

19    and Incognito is --

20         THE COURT:  My question is slightly differently.

21         MR. BARNES:  Okay.

22         THE COURT:  It's been my experience that younger

23    people are much more tech savvy than all of those in -- all

24    the people in this courtroom except for maybe one or two who

25    are much older.  We didn't grow up with the Internet.  We all
```

 1   became lawyers at -- well, I remember being a young lawyer

 2   when the firm was talking about this thing that was out there

 3   that was all new.

 4          **MR. SCHAPIRO:**  We Shepardized with books.

 5          **THE COURT:**  I had to explain to the law clerks what

 6   "Shepardize" means.  They didn't understand that we used to

 7   use books.

 8       All right.  So my point is, is that there's hugely vastly

 9   different perspectives about how all of these modes work.  And

10   so the reason that I asked, would the evidence be different

11   with respect to all these modes, is because a jury of retired

12   individuals who were 70 might be very different and come to a

13   very different answer than a jury who is entirely comprised of

14   20-year-olds because their views about what these things mean,

15   are different.

16       Their views about what might be offensive might be

17   different.  The evidence with respect to each of these things

18   and each of the promises or not promises is different.

19       One's lens is informed by one's engagement with all of

20   these various modes.  So, you know, talking out loud here,

21   right?  How do I try this case when the lens looking at the

22   problem are millions of people -- are millions of lenses?

23   Millions of lenses.

24       I could see the path with Incognito because that seemed to

25   me to be really different.  When someone says, "I'm clicking

 1    on the little guy with the -- with the hat and the -- and the

 2    mask 'cause I don't want anybody to know what I'm doing," and

 3    there was a -- a pop-up that said, "Oh, by the way, we still

 4    are sending stuff to three entities" -- I think it was

 5    three -- but they didn't disclose that they were sending it to

 6    themselves, that to me was different than just Basic.

 7            MR. BARNES:  So let me -- let me address how I think

 8    we'd present this claim to a jury.  And that is the reasonable

 9    expectation of privacy can be derived, first of all, because

10    the -- the default rule is privacy.  A company like Google has

11    to get consent to this conduct before it engages in it.

12        The second thing we would say is there is a contract that

13    applies to everyone where Google made this statement.  Google

14    promised that Chrome would not send personal information to

15    Google unless you chose to sync.

16        It did not keep that promise.  In fact, Chrome was

17    designed to send personal information to Google by default in

18    the Basic mode and in the Signed in, but Not Consented for

19    Sync mode.

20        The way we're going to argue it to a jury, Your Honor, is

21    to say that Chrome is effectively surveillance software even

22    though Google told people the opposite and never just came out

23    and said, "Hey, you know what?  We used Chrome to surveil

24    basically everything you do on the Internet."

25        The highly offensive nature of it does not revolve around

1   any specific communication that was intercepted.  It revolves

2   around Google sold a product, a software product, that is

3   effectively a surveil- -- is effectively surveillance software

4   without telling anybody it was surveillance software for

5   Google and, in fact, promising the exact opposite.

6       That's what we will argue as highly offensive.  And, Your

7   Honor, I think you put it well earlier.  The American jury

8   system is the way to do this.  Maybe you get a jury of retired

9   people, maybe we got a jury of young people, but the American

10  jury system is supposed to be a cross-section of -- of

11  American society and the jury decides as the representatives

12  of society that come in and make this highly offensive

13  determination.

14      But the evidence I just outlined is going to be the same

15  for every single class member.

16          **THE COURT:**  Well, that throws out your CIPA claim,

17  then, doesn't it?  Because that's specific communications.

18          **MR. BARNES:**  It does not --

19          **THE COURT:**  I mean, you can't -- you can't have it

20  both ways.

21          **MR. BARNES:**  Well --

22          **THE COURT:**  It's either generic or it's not.

23          **MR. BARNES:**  Claim-by-claim analysis is a -- we could

24  argue to the jury that it's highly offensive because of the

25  whole of it.

1    And on the CIPA claim, what we need is it -- the CIPA

2    claim doesn't -- it doesn't rely upon whether the contents

3    were sensitive or not.  Any contents are good enough.  So the

4    argument that it's got to be about health care or financial

5    information just isn't an element of a CIPA claim.

6    If you call your -- if you go to a dog grooming website,

7    that's content on the content issue.  So I think there -- it

8    doesn't throw it out because they're different questions for

9    each claim.

10        **THE COURT:**  You know -- I -- has anyone ever

11   authorized a CIPA claim?  The California Penal Code

12   Section 631(a) was not really made for this purpose.  And

13   you -- the plaintiffs' bar keeps throwing it in, and I don't

14   understand why, because that's not the purpose of that

15   statute, to manage the entirety of the Internet.

16        **MR. BARNES:**  Judge Breyer just certified one in

17   *Torres*.  I think that the purpose of the act when it was

18   passed --

19        **THE COURT:**  When was it passed?

20        **MR. BARNES:**  1960 -- 1968.

21        **THE COURT:**  So 30 years before the Internet.

22        **MR. BARNES:**  And -- correct.  And California case

23   law, including after Congress passed the Electronic

24   Communications Privacy Act, kept up and said it -- it is

25   modernized with modern times because if you look at the --

 1          THE COURT:  Has the California Supreme Court weighed

 2     in on this?

 3          MR. BARNES:  Yes, it has.  It has -- it has issued

 4     rulings that CIPA is updated with statutes -- or with

 5     technology, and it has relied upon the introductory statements

 6     to CIPA, which I think are in Section 630?

 7        And I think *Ribas vs. Clark* has a good explanation of it.

 8          THE COURT:  Well, that talks about listening.

 9          MR. BARNES:  It does.  And I think that was a case

10     that connected it to -- there's a California Supreme Court

11     case that I -- doesn't come -- the name doesn't come to mind

12     where the question was, does it apply to cell phone

13     transmissions, I think, where they said even though it didn't

14     specifically say that, yes, we're going to -- CIPA, because of

15     its broad intent, is intended to apply to that.

16                    (Off-the-record discussion.)

17          MR. BARNES:  Your Honor, there are two issues I do

18     want to make sure I'm able to raise before the end, 'cause

19     we've gone through the claims.

20          MR. SCHAPIRO:  I have some responses I'd like to make

21     to that, though, Your Honor.

22          THE COURT:  Go ahead.

23          MR. SCHAPIRO:  Your Honor, I want to come back

24     briefly to the point that I was -- you know, about which you

25     and I had our colloquy earlier about whether the reasonable

1    expectation of privacy is something that can be determined

2    class wide.

3        And Mr. Barnes said we rely only on the *Hart vs. TCW* case.

4    We don't, but I want to redo the principle from that as well.

5    The *Griffith vs. TikTok* case, which is a recent case from this

6    district is an intrusion case.  And the Court says -- that's

7    the one in which the Court said objectivity does not dictate

8    uniformity across the class.  And the Court says, it's appears

9    self-evident --

10            **THE COURT:**  Who was that -- who wrote that?

11            **MR. SCHAPIRO:**  This was Blumenfeld -- or sorry.

12    Central District of California.  Blumenfeld, Central District

13    of California.  Sorry.  Recent case, *Griffith vs. TikTok* --

14            **THE COURT:**  Magistrate Judge?

15            **MR. SCHAPIRO:**  I do not know, Your Honor.  No, it

16    says "United States District Judge, Stanley Blumenfeld, Jr."

17    I'm from Chicago, Your Honor, but --

18            **THE COURT:**  All right.  Go ahead.

19            **MR. SCHAPIRO:**  In this case, the Court says -- so

20    this was about certain pixel -- alleged pixel tracking that

21    TikTok was doing when -- when people visited websites.

22        And the Court says, "for example, it is not clear that a

23    person visiting the Build-a-Bear website has the same

24    expectation of privacy or is likely to disclose equally

25    sensitive information as a visitor to the website or Rite-Aid

1    Pharmacy."

2        The Court says, "Here, class members did not encounter" --

3    excuse me.  "Class members visited hundreds of thousands of

4    different websites with varying disclosures about data

5    collection.  They did not all take the same steps to safeguard

6    their privacy."

7        So the Court says that "It appears that the existence of

8    reasonable expectations of privacy and the requisite

9    offensiveness will depend on the nature of information

10    collected from each class member."

11        And similarly, in the *Hart* case, the *Hart vs. Weather*

12    *Channel* case, the Court said, that -- and I think this should

13    be unobjectionable -- that the -- "in an intrusion case, the

14    plaintiff must have conducted himself or herself in a manner

15    consistent with an actual expectation of privacy."

16        "The plaintiff must have conducted himself or herself in a

17    manner consistent --"

18            **THE COURT:**  Is that based on California law?

19        **MR. SCHAPIRO:**  It is.  It's -- yes.  It is.

20        "He or she must not have manifested by his or her conduct

21    a voluntary consent to the invasive actions of defendant."

22        "He or she must not have manifested by his or her conduct

23    a voluntary consent to the invasive actions of the defendant."

24            **THE COURT:**  Okay.

25        **MR. SCHAPIRO:**  The plaintiffs in their briefing claim

```
1   that -- that their position is supported by a different case
2   called Opperman.  But Opperman itself says -- this is a
3   quote -- "Plaintiffs must conduct themselves in a manner
4   consistent with an actual expectation of privacy."  And then
5   cites a California case, Shulman vs. Group W Productions,
6   which noted that the plaintiff must have an objectively
7   reasonable expectation of seclusion or solitude in the place,
8   conversation, or data source.  Although the expectation of --
9   excuse me.  Although the expectation must be objectively
10  reasonable -- and -- and by the way, what I'm reading now, I'm
11  not sure if this is a paraphrase from my notes or the -- or
12  the case, so I'm --
13          THE COURT:  It --
14          MR. SCHAPIRO:  "The plaintiff must still hold that
15  expectation" so we in individual cases would be able to say,
16  "you did not" -- "here's an objectively reasonable expectation
17  perhaps, but you didn't hold it" so --
18          THE COURT:  Let me ask this question, the -- I
19  thought I saw somewhere that Google has data that shows who
20  actually clicked on the privacy notice.
21          MR. SCHAPIRO:  No, we don't.
22          MR. BARNES:  Yes, Your Honor.  Google can track that.
23  It's on Google's websites.  Google can track all of that
24  information.
25          MR. SCHAPIRO:  No, we can't.  And I would defer to
```

```
 1    any colleagues --

 2            THE COURT:  So let's assume for purposes of argument

 3    that it can.  What if the class was limited to only those who

 4    clicked on the privacy notice and in that context, wouldn't

 5    Google be -- or shouldn't Google be bound by the objective

 6    disclosures in the notice?

 7            MR. SCHAPIRO:  At the threshold, that would mean

 8    these named plaintiffs are out and have no standing because --

 9            THE COURT:  Okay.

10            MR. SCHAPIRO:  -- they said they didn't.

11            THE COURT:  So -- but I'm just -- I'm thinking --

12    Okay.  That could be.

13    So -- but just hypothetically, teasing through these

14    issues, if -- if what the plaintiffs are saying is that you

15    should be bound by that, and there is, in fact, evidence of

16    who was -- who at least accessed that document, all of this

17    then, implied consent -- it may be a defense, but they

18    still -- the plaintiffs in that context would still have the

19    ability to say, okay.  That may be true.  You can do -- you

20    know, you can present evidence, but our perspective is that

21    they clicked on that notice; they are entitled to have the

22    disclosures be consistent with that notice.  And if you

23    can't -- if you failed to comply with that notice, then you

24    should be liable.

25            MR. SCHAPIRO:  I don't think that -- well, putting
```

 1    aside the fact that one cannot determine -- that's not

 2    workable.  And if we have to provide additional data on that,

 3    we can.

 4        But putting that aside, if the question were just is

 5    somebody bound -- so I think we're -- you know, there are two

 6    questions here.  Is the contract binding?  And it is.  The

 7    contract is binding.

 8        The second question is, did the person, based on all of

 9    the circumstances through his or her conduct, consent to

10    whatever it is they're complaining of now by continuing to use

11    the service?  That is a separate question, and it wouldn't be

12    obviated --

13            THE COURT:  Except that --

14            MR. SCHAPIRO:  -- by that approach.

15            THE COURT:  Except that because you have five

16    different modes, if there is a notice where you make a promise

17    that if you're in this particular mode, it is not by

18    definition the other modes.  And you were using a Basic mode

19    surreptitiously to get the same information that the other

20    modes where you told people you were not collecting things,

21    right -- it's like, okay -- and the reason I thought about

22    this was when you said, you know, if -- if you go to a dog pet

23    site, you might not care.  If you to go to Rite-Aid, you

24    might.

25        Well, if you know that you've got these modes and Google's

 1    telling me if you're in one of these various modes, this is

 2    what we do.  But if you're in a different one, then we're not

 3    doing -- we're not collecting.

 4        So when I go to Rite-Aid, I choose to go Incognito because

 5    you've told me you're not collecting it in Basic.  But then

 6    you do, in fact, collect it in Basic, shouldn't you be held to

 7    what you've disclosed?

 8        Or for those people -- and it may be more, but at least --

 9    at least for those people who we know have accessed it,

10    shouldn't you be bound by what you said regardless of anything

11    implied?

12            MR. SCHAPIRO:  Your Honor, even -- even the Ninth

13    Circuit didn't say that.  The Ninth Circuit looked at --

14            THE COURT:  The Ninth Circuit didn't say a lot of

15    things, and it threw it back to me.

16            MR. SCHAPIRO:  Fair.

17        But I would submit that if that were the case, the Ninth

18    Circuit would have said, well, okay, there's -- there's no

19    express consent here.  There's no consent here.  As opposed to

20    saying "Well, it depends because how people --"

21            THE COURT:  They're not going to -- the Ninth Circuit

22    is not going to engage in hypotheticals when the factual

23    record -- they were opining on a very specific issue.

24            MR. SCHAPIRO:  So if I understand your question

25    correctly, you're referring to the Chrome Privacy Notice,

1     right, in which you say that there was a -- that people may

2     have read the Chrome Privacy Notice and --

3          **THE COURT:**  Or whatever the specific notices are that

4     the -- that the plaintiffs are relying on.  I note that one

5     because it looms large in this case.

6          **MR. SCHAPIRO:**  Right.

7        I think we're back where we started because the vast

8     majority of people, including all of these plaintiffs, never

9     saw the Chrome Privacy Notice, but some people did.

10          **THE COURT:**  Well, that's --

11          **MR. SCHAPIRO:**  Some people read the privacy policy;

12    some people didn't.

13          **THE COURT:**  There has to be a way to make sure that

14    your client is being held responsible for their conduct.

15          **MR. SCHAPIRO:**  So on that, Your Honor, I want to say,

16    we hear you loud and clear with that.  We strongly believe, of

17    course, that there -- there is no misconduct here.

18        The injustice here is really just that Google has -- has

19    had to face this particular suit which is a tremendously

20    generic suit about, you know, we would -- we would

21    respectfully say nothing.

22        There are lots of suits out there, and Google is being

23    sued a lot, and Your Honor knows that.  And it's not lost on

24    the company.  And -- and I wouldn't deny for a minute -- I'm

25    actually a believer in the way that the legal system

1   incentivizes companies to be careful about what they're doing

2   'cause they don't want to be sued.

3       That does not mean that this suit, which I would

4   respectively [sic] say borders on frivolous -- that's just my

5   personal opinion.

6           **THE COURT:**  Well, you didn't convince the Ninth

7   Circuit, Mr. Shapiro.

8           **MR. SCHAPIRO:**  Well, the Ninth Circuit said that a

9   jury could look at the -- yeah, you're right.  But this is my

10  belief, that a jury could look at the Chrome Privacy Notice

11  and -- and could look at the Chrome Privacy Notice in

12  combination with the rest of the -- of the contract and maybe

13  not know about the -- the general collection that is disclosed

14  elsewhere.

15      But to the extent that the Court is concerned about a need

16  to -- to incentivize companies properly, this company's

17  properly incentivized, and that -- and that doesn't in our

18  view change the fact that this case is firmly in line with the

19  seven or eight cases that we've discussed earlier, some of

20  which involve Google, some of which didn't, in which complied

21  consent has been found again and again to make class treatment

22  unsuitable.

23          **MR. BARNES:**  Your Honor, may I briefly respond?

24          **THE COURT:**  You may.

25          **MR. BARNES:**  Mr. Shapiro said the contract is

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    binding.  The contract is binding.  Yes, it is.  And now

2    they're saying "except when it's not."  The contract is

3    binding.  The contract rights apply to --

4         **THE COURT:**  Do you know how many cases I try where I

5    have contracts and the parties come in and say, "Yes, but we

6    all acted outside the terms of the contract?"

7         Do you know how many cases get filed in federal court and

8    state court?  Thousands of cases.  Thousands of cases.

9         **MR. BARNES:**  I tried contract cases, Your Honor.

10         **THE COURT:**  Yeah, so have I.  That's my point.

11    Right?

12         There -- it's -- yes, he says that.  But there -- there

13    are other issues.  I've had enough on this.

14         We've now gone two hours.  I actually -- I know you all

15    have prepped to argue the motions to exclude or strike, but I

16    can tell you that I'm not really particularly interested in

17    argument.  I don't think they're good motions.  All these

18    issues go to weight, not admissibility.

19         I don't think there's an ethical issue that has been

20    raised.  And it is -- it is motions like this which is the

21    reason why I cap *Daubert* motions and motions to strike to

22    three, because people don't like the result of what the

23    experts are saying and so they bring motions under the guise

24    of something else.

25         It happens in all of these big cases.  And it's the reason

1    why we as district judges are stopping it.  We're putting a

2    cap, so you got your three.  But I'll give you five minutes on

3    each side if you want to argue it.  But I've got your papers.

4    And I don't think that they're good motions.

5        Not that I'm being transparent with my feelings.

6                        (Laughter.)

7        **MR. BARNES:**  I -- I think we're good, Your Honor.

8        The two things I did want to mention on the main brief

9    that on (b)(2), Google makes a merits argument.  We will

10    vigorously dispute those merits about post-appeal conduct.

11    And we didn't have the ability to present evidence of it.

12        The promises didn't go away.  They still exist.  And I can

13    explain -- there are -- the privacy policy promise about the

14    Chrome -- your Chrome browsing history is only saved to your

15    account if you've --

16        (Interruption by the Certified Stenographic Court Reporter

17    to request clarification of the record.)

18        **THE COURT:**  Why don't we take -- we're going to take

19    a five-minute break so that my court reporter doesn't have to

20    type for five minutes.

21        Stand in recess for five minutes.

22        (Recess taken at 10:59 A.M.; proceedings resumed at 11:03

23    A.M.)

24        **THE COURT:**  Let's open back up.

25                    (Pause in the proceedings.)

1          **THE COURT:**  Okay.  Edwin, are we ready or not?

2          **MR. BARNES:**  Plaintiffs are ready, Your Honor.

3          **THE CLERK:**  Yes, Your Honor.

4          **THE COURT:**  Yes?

5          **THE CLERK:**  Ready, Your Honor.

6          **THE COURT:**  Okay.  We're back on the record.

7      I did want to talk about one other issue and that is

8  whether the claim for injunctive relief is mooted.

9          There has been, as I understand it, changes coming out of

10  other litigation, but the plaintiffs in page 33 of 36 in

11  Docket 1061-1 -- that's the sealed version -- identify six

12  different requests for injunctive relief.

13          So I'd like to go through this to understand whether or

14  not there's anything left to be done, given that I thought

15  defense, right, is arguing that injunctive relief is mooted?

16          **MR. SCHAPIRO:**  Yes, Your Honor.

17          **THE COURT:**  So the first thing they say is, "first,

18  Chrome should provide accurate and clear statements about when

19  and what personal information it sends to Google and how that

20  personal information is combined with other data when used by

21  Google."

22          Is there anything done with respect to that request?

23          **MR. SCHAPIRO:**  Yes, Your Honor.  So the Chrome

24  Privacy Notice has been completely deprecated.

25          **THE COURT:**  Has been completely...?

1    **MR. SCHAPIRO:**  Sorry.  The Chrome Privacy Notice is

2    deprecated.  It longer exists or appears.  And so the --

3    sorry.

4        I'm flipping -- which slide was it with that list of six?

5        **THE COURT:**  I just took it -- I didn't --

6        **MR. BARNES:**  It's Slide 31.

7        **MR. SCHAPIRO:**  Thirty-one.

8        All right.  So the privacy policy -- again, which is the

9    only reason that the Ninth Circuit -- excuse me -- was the

10   Chrome Privacy Notice, which is why the Ninth Circuit said

11   this case was not like *Smith* and *Hammerling*, cases in which

12   the -- the claims were thrown out, was because the Chrome

13   Privacy Notice, according to the Ninth Circuit -- I think this

14   is also what Your Honor's position had been -- could be

15   misleading.

16       Well, that has now been deprecated.  There is no more

17   Chrome Privacy Notice.  There's the privacy policy, which I

18   think Your Honor and the Ninth Circuit at least implicitly

19   have agreed is the baseline that explains Google collects all

20   this data.

21       This whole case has been -- I understand why the

22   plaintiffs might want to try to change it now, but from its

23   inception, this case has been about the supposed promise in

24   the Chrome Privacy Notice that supposedly says that if you

25   don't have sync enabled, your data won't be collected.  So --

1          **THE COURT:** So if the Chrome Privacy Notice doesn't

2     exist, how can this request -- why isn't this request for

3     relief mooted?

4          **MR. BARNES:** Because the promises still exist.

5       The first promise is in the Google Privacy Policy.

6          **THE COURT:** Okay. It --

7          **MR. BARNES:** That still exists. The second thing --

8     I can cite it if you want me to, Your Honor.

9       It says, "Your Chrome browsing history is only saved to

10    your account if you've enabled Chrome sync with your account."

11    That --

12         **THE COURT:** Okay. So -- hold on.

13      So -- so what you're asking for is that Chrome change

14    its -- not change the privacy notice but that it change

15    something else.

16         **MR. BARNES:** No, Your Honor. I want to explain why

17    this has not been done, why part one has not been done. And

18    the first part of that -- there are multiple parts to this.

19      The first part is that the promise is still being made and

20    that that's the -- that's the first part where it's made. The

21    second place where it is made is Google did not just deprecate

22    the Chrome Privacy Notice. Google replaced it with what's

23    called "privacy in Chrome" documents, which are not

24    contractual anymore.

25      Ironically, while arguing that they have mooted the

1   dispute, they have objected to the Court taking no- --

2   judicial notice of the replacement of the Chrome Privacy

3   Notice.  Those are in Exhibits D8 to D19.  There is a

4   motion -- request for judicial notice for those that Google

5   has objected to.

6        Those documents contain statements, while not identical to

7   what Google had in the Chrome Privacy Notice, that make the

8   same types of assertions.

9        In our opening brief, we pointed out that if we had been

10  permitted to do so, we would have filed an expert report from

11  Joe Turrow, who would have classified this as a classic rabbit

12  hole disclosure that is unintelligible to a reasonable person.

13           **THE COURT:**  All right.

14       Second, you argue that Chrome should be ordered to provide

15  a mechanism for users to opt out or to opt in only after clear

16  disclosures; that is, that the default will not allow Chrome

17  to send personal information to Google.

18       How is that mooted?

19           **MR. BARNES:**  Sorry.

20           **THE COURT:**  I'm not asking you.

21           **MR. BARNES:**  Sorry.

22           **MR. SCHAPIRO:**  Your Honor, it's not -- that one is

23  one that is not mooted.  It is just one that even if we were

24  on a straight (b)(2) arguing for -- we would say can't be a

25  basis for a (b)(2).  That would essentially mean the Internet

 1    wouldn't work for most people by default because you have to

 2    get requests and post requests in Basic mode.

 3         So what they're saying is you need to change your system

 4    so that it works some way that we would like and that a lot of

 5    people wouldn't want, but we have the right to order Google to

 6    change the way it not just disclose and explain what it does

 7    but change the way the product works, which is, in fact, the

 8    way that it would essentially break the Internet.  But that

 9    doesn't really matter.

10         Our position is that they don't -- they should not be

11    entitled to a (b)(2) here to require Google to change the way

12    the product works beyond the disclosures.  And they -- they

13    bear the burden, right?  This is from the -- Judge Koh's

14    decision in *Backhaut -- Backhaut vs. Apple --*

15              **THE COURT:**  I understand the argument.

16              **MR. SCHAPIRO:**  -- showing the likelihood of future

17    injury, not just a risk.  Likelihood, not just a risk.

18              **MR. BARNES:**  Your Honor, may I respond?

19              **THE COURT:**  No.

20         Number 3, class members should be given the means to

21    request and view Google's dossiers on them including how

22    Google mapped, linked their signed-out identifiers and

23    activity to their Google accounts.

24         How is that mooted?

25              **MR. SCHAPIRO:**  The class is now Google account

1    holders only, correct?

2            **THE COURT:**  Yes.

3            **MR. SCHAPIRO:**  So Google account holders -- Google

4    account holders already have the ability to review and delete

5    the data tied to their Google account.  That's in MyActivity.

6            **THE COURT:**  Okay.  So why isn't that enough?

7            **MR. BARNES:**  Because that's not true.  They do not

8    have the ability to delete Basic Browsing mode activity, and

9    they do not have the ability to delete the additional types of

10   information that are included in Exhibit C12, which are the

11   backend receipts.

12           **THE COURT:**  All right.

13       Four, that -- which -- so that's essentially another

14   version of three.

15           **MR. BARNES:**  Well, it's the -- three is you can view

16   them.  Four is you can delete them.  The C12 -- well, we have

17   an Exhibit C12 on -- I forget the slide -- you can't view that

18   if you're a class member.

19           **THE COURT:**  Is that right?

20           **MR. BARNES:**  C4 is you can't delete it.  Mr. Shapiro

21   talks about deletion.  You also can't delete Basic Browser

22   mode.  You also can't delete that stuff in those Basic backend

23   logs.

24           **THE COURT:**  Can you delete what's in C12?

25           **MR. SCHAPIRO:**  I do not have C12 on my fingers.  I

1    can tell you or one of my colleagues can tell you what you can

2    delete, which is essentially in our view, the data collection

3    that the plaintiffs complain of in this case, which is you've

4    gathered results showing what websites I have visited and my

5    activity on the web.  You can delete that in MyActivity.

6        I invite Your Honor to or your clerks to go back and take

7    a look if you are Google account holders.  I'm not sure

8    exactly what they mean by "dossiers" or "backend receipts."  I

9    apologize.

10        **MR. BARNES:**  Your Honor, as we said previously, the

11    Basic Browser information, browsing --

12        **MR. SCHAPIRO:**  Oh.

13        **MR. BARNES:**  The browsing history information in

14    Basic Browsing mode is not even exposed to users in

15    MyActivity.  And Google's own witnesses acknowledge that.

16    It's the Monsees declaration.  I believe it's paragraph 7,

17    although I'm saying this from memory without notes in front of

18    me.

19        **MR. SCHAPIRO:**  Your Honor, I want to make sure I get

20    the record right so can I ask Mr. Broome, who can explain it

21    better than I can, to address this?

22        **MR. BROOME:**  Yes.  Thank you, Your Honor.  Stephen

23    Broome.

24        Mr. Barnes is correct that through MyActivity, you cannot

25    delete Basic Browsing data because that data is not associated

1    with your Google account identity, so that is anonymous data.

2        However, in the *Brown* settlement, part of the settlement

3    was that we were going to delete -- delete the data that came

4    out of the special -- special master discovery process.  And

5    those processes were coordinated and Basic Browsing data is

6    also being deleted because the deletions in the *Brown* case are

7    not limited to Incognito browsing because, as I think we've

8    explained to you before, Google doesn't know if you're an

9    Incognito or Basic because there are no cookies identifying

10   that.

11       So in the *Brown* settlement, all of this data -- I can't

12   remember what the exact time period is, but all this data

13   was -- was deleted.  All the historical data was deleted

14   whether you were Basic, Incognito, or not.

15       If you're a Google account holder, as the class is limited

16   to, and you're browsing while you're signed in, then, you

17   know, under the CCPA, we have to provide a mechanism for users

18   to delete data that's associated with them.  And so that's

19   how -- part of how Google complies with the CCPA, is that they

20   make this portal available so you can see all the data that --

21   and all the different websites that Google has learned that

22   you've visited.  And you can delete them individually or you

23   can delete them all at once.

24       And there's a lot of functionality within MyActivity that,

25   again, you can just go on it and -- and look for yourself.

1   But we've presented a fair amount of evidence on it.

2        THE COURT:  So are you saying that the *Brown*

3   settlement resolved three and four?

4        MR. BROOME:  I believe the *Brown* settlement in

5   combination with MyActivity would resolve three and four.

6        MR. BARNES:  Your Honor, this is the first time we've

7   heard of any of this.  None of this evidence is in the record.

8        THE COURT:  I -- I -- okay.  That's fine.

9        MR. BARNES:  And -- and in addition to that --

10       THE COURT:  You're asking me for -- for specific

11   relief.  They're arguing it's moot.  I'm asking follow-up

12   questions.  And -- and I can get a record later.  I want to

13   understand what --

14       MR. BARNES:  I understand.

15       THE COURT:  -- what's going on.

16   So you have my attention today.  You won't have it next

17   week.

18       MR. BARNES:  I -- may I respond to the things that

19   Mr. Broome just said?

20       THE COURT:  Yes.

21       MR. BARNES:  We vigorously dispute the assertion that

22   Google cannot tell the difference between a Google account

23   holder in Basic Browser mode versus the other modes.

24   There -- if you look at Slide 30, it is -- I believe it's

25   Exhibit C3, as part of the preservation order in this case,

1    Bryant Chan, an engineering director at Google, submitted a

2    sworn declaration that -- that they have a way to tie the two

3    together for Google account holders.  And there are fields in

4    the databases that Google preserved that have the answer to

5    this question.

6         And I am -- I am a little bit shocked to have heard that

7    from Google counsel here today with no evidence in the record

8    of it because we think the evidence in the record directly

9    contradicts it.

10              THE COURT:  All right.  A response.

11              MR. SCHAPIRO:  We've -- deletions in connection with

12   the *Brown* settlement answer and respond to numbers three and

13   four.  We don't --

14              THE COURT:  A response to -- to your -- to Mr. Chan's

15   declaration.

16              MR. SCHAPIRO:  So this is Slide --

17              THE COURT:  Thirty.

18              MR. SCHAPIRO:  Thirty.

19        The slide on manageability, so Google has encryption keys

20   which pseudonymize -- oh, I'm sorry.  There's something -- I'm

21   told there's some things under seal.

22        Do you want to address this, by the way?  You know this

23   issue.

24              MR. BARNES:  Your Honor, while they're --

25              THE COURT:  No.  I can't listen to both of you.

1         **MR. BARNES:**  Understand.

2         **MR. SCHAPIRO:**  Yeah, hop up.

3    Again, I want to make sure the record is right and I --

4    because you're asking what Google is currently doing and so

5    I'm going --

6         **THE COURT:**  Ms. Trebicka.

7         **MS. TREBICKA:**  Yes, Your Honor.

8    So the Bryant Chan declaration actually supports what we

9    have been saying here, which is Google has policies,

10    procedures, and technical impediments to linking the

11    unauthenticated data to a GAIA ID.  That's what the Chan

12    declaration says.

13    Now, what plaintiffs are saying is that, well, the Chan

14    declaration also talks about an encryption key which applies

15    to the unauthenticated data.  This encryption key actually

16    guaranties that the unauthenticated data, when collected at

17    the same time as authenticated data, cannot be read at the

18    same time and, therefore, cannot be linked to the

19    authenticated data.

20    So the Chan declaration and everything in the record,

21    frankly, confirms that the unauthenticated data is kept

22    separately from and not linked to the authenticated data.

23         **THE COURT:**  All right.

24    Plaintiffs should just make note about what they believe

25    they are or are not doing.  It's not going to ultimately

 1  impact the decision on this motion.

 2          **MR. BARNES:**  Okay.  I understand.

 3      It's -- it's not moot.  We dispute what they are saying.

 4  That is a -- absolutely a merits question, Your Honor.

 5      I can go into the weeds on it, but we absolutely dispute

 6  it.  There is evidence in the record on this motion.  I am

 7  frantically searching for -- through -- where we cited it.

 8  But there's -- in addition to the Chan declaration --

 9                  (Simultaneous colloquy.)

10          **MR. BARNES:**  And, frankly, Your Honor, it goes to

11  implied consent because they are denying core conduct.  How

12  can they say anyone consented to conduct they are denying in

13  front of you?

14      Anyway, we'll move on to the next mootness issue.

15          **THE COURT:**  Okay.  I don't actually even understand

16  what you're asking for in five.

17          **MR. BARNES:**  So under number five, Your Honor,

18  Slide 32 has the provisions.  The privacy policy promises,

19  quote, we will not reduce your rights under the privacy policy

20  without your explicit consent.  If changes are significant,

21  we'll provide a more prominent notice including, for certain

22  services, email notification of privacy policy changes.  There

23  is no dispute that the deprecation of the Chrome Privacy

24  Notice and any purported changes to promises that Google made

25  were never provided to class members and Google never had

 1    explicit consent to change those.

 2        They made a change to the privacy policy.  They made a

 3    change to the Chrome Privacy Notice.  They have a contract

 4    promise that says they can't do that without express consent

 5    so we want them to honor their contract.

 6        That's the first.

 7            THE COURT:  Well, hold on.

 8        A response.

 9            MR. SCHAPIRO:  Yeah, I was puzzled when I read this

10    one when we got the slides the other day.

11        As far as I can tell, what the plaintiffs are asking for

12    is they want us to un-deprecate the CPN, email everyone saying

13    we're going to deprecate it, and then re-deprecate it.

14            THE COURT:  Was it not -- was that not done as part

15    of the *Brown* settlement, so --

16            MR. SCHAPIRO:  Different notices were provided --

17    the -- in -- in the *Brown* settlement.

18            THE COURT:  Lawyers in the *Brown* case know that you

19    were doing this?  Was this part of the *Brown* settlement?

20            MS. TREBICKA:  Yes.

21            MR. SCHAPIRO:  Yes.

22            THE COURT:  So you want me to find that there's a --

23    some violation because the lawyers in *Brown* --

24            MR. BARNES:  No.

25            THE COURT:  -- worked with Google to get rid of the

1    notice?

2            **MR. BARNES:**  No, Your Honor.

3      They are saying they changed the privacy promises that

4    apply to our case, not *Brown*.  And in doing so, they did not

5    provide notice or get express consent to change their conduct

6    for our class members, even though --

7            **THE COURT:**  You have no class.  You don't have a

8    class.

9            **MR. BARNES:**  Understand, Your Honor.

10           **THE COURT:**  That -- and there is a class represented

11    by counsel who have negotiated something.  And just because

12    you came in after the fact, you're --

13           **MR. BARNES:**  Your Honor, there are two different

14    cases.

15           **THE COURT:**  I understand --

16                  (Simultaneous colloquy.)

17           **THE COURT:**  -- two different cases.

18      Do you know how many times I get cases that overlap with

19    other cases?  I get them all the time.

20      And sometimes one case resolves issues that someone else

21    would like to litigate.  That's why I'm asking these

22    questions.

23           **MR. BARNES:**  There was no notice to class members in

24    *Brown*.

25           **THE COURT:**  There is -- if -- and apparently --

1              **MR. BARNES:**  As it required for the contract for the

2     putative class that we represent.

3              **THE COURT:**  You don't represent a class in *Brown*.

4              **MR. BARNES:**  I said -- I said the putative class that

5     we represent in this case.  They are saying in this case --

6              **THE COURT:**  You don't have a class.

7              **MR. BARNES:**  That's why I said "the putative class,"

8     Your Honor.

9              **THE COURT:**  Right.  They don't have to give you a

10    notice if lawyers who represent many of your people who you're

11    trying to represent --

12             **MR. SCHAPIRO:**  Yes.

13             **THE COURT:**  -- on behalf of that class have agreed to

14    changes.

15             **MR. BARNES:**  Those changes are not related to -- they

16    are -- Google is still making the promises, Your Honor.

17        The promises still exist in the privacy policy.  They

18    still exist in the privacy in Chrome documents.  Deleting a

19    document and moving the promises elsewhere does not solve the

20    problem.  It just moves them to a different location.

21        And their contract promised that in order to reduce

22    rights, which would include these rights, they have to provide

23    this type of notice.  That's in the contract, your Honor.

24             **THE COURT:**  Okay.

25        I'll take it under submission.  Thank you.

1        **MR. SCHAPIRO:**  Thank you, Your Honor.

2        **MR. BARNES:**  Thank you, Your Honor.

3        (Proceedings were concluded at 11:24 A.M.)

4                        --o0o--

5

6

7                 **CERTIFICATE OF REPORTER**

8

9        I certify that the foregoing is a correct transcript

10   from the record of proceedings in the above-entitled matter.

11   I further certify that I am neither counsel for, related to,

12   nor employed by any of the parties to the action in which this

13   hearing was taken, and further that I am not financially nor

14   otherwise interested in the outcome of the action.

15

16   _____

17        Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

18             Saturday, March 29, 2025

19

20

21

22

23

24

25