**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **PATRICK CALHOUN, ET AL.,**<br><br>     Plaintiffs,<br><br>  v.<br><br>**GOOGLE LLC**,<br><br>     Defendant. | Case No.: 4:20-CV-05146-YGR<br><br>**ORDER DENYING MOTION FOR CLASS CERTIFICATION**<br><br>Re: Dkt. Nos. 1058, 1060, 1077, & 1081. |

In this action, plaintiffs are users of defendant Google LLC's ("Google's") Chrome web browser who allege that their privacy rights were violated when Google appropriated personally identifiable information it had contractually promised to leave untouched. This is one of three actions over which the Court is presiding regarding this genre of allegations. The specific claims at issue here differ significantly from the other two.

Having carefully considered the papers submitted and the pleadings in this action, and for the reasons set forth below, the Court hereby **DENIES** the motion for class certification **WITHOUT LEAVE TO AMEND**.[1]

**I.    BACKGROUND**

**A.    Factual Background**

This case arises from a set of promises Google made to users of its web browser Chrome. More specifically, Google promised it would not collect the personal information ("PI") of any Chrome user who chose not to "sync" their Chrome browser with their Google account. (Dkt. No. 162-3, First Amended Complaint "FAC", ¶ 1.) In particular, Google's Chrome Privacy Notice

---

[1] Plaintiffs seek leave to file additional documents in support of their motion for class certification in order that the Court may take judicial notice of them. (Dkt. No. 1058.) Because the Court finds the motion appropriate for resolution without consideration of the additional documents, the request is **DENIED**. Additionally, plaintiffs move to strike the expert reports of two defense experts. (Dkt. Nos. 1077, 1081.) As stated on the record at argument, the Court views these requests as attempts to circumvent the *Daubert* process. There are no valid grounds to exclude these experts, and plaintiffs' objections to their reports go to weight, not admissibility. Motions to strike under such circumstances tax judicial resources. The motions are **DENIED.**

("CPN") promised Chrome users they need not "provide any personal information to use Chrome" and that "the personal information that Chrome stores won't be sent to Google unless [users] choose to store that data in [their] Google Account by turning on sync." (*Id.* ¶¶ 44-45 (quoting CPN).)

Multiple governing documents are relevant to the instant motion and plaintiffs categorize them thusly:

> The Chrome Contract consists of four primary documents: from September 2018 to March 2020, it consisted of (1) the Chrome Terms of Service; (2) the Chrome Privacy Notice; and (3) the Google Privacy Policy. From March 2020 to present, the Chrome Contract consisted of (1) the Google Terms of Service; (2) the Chrome Privacy Notice; and (3) the Google Privacy Policy. For both periods, the Chrome Contract included express integration clauses.

(Dkt. No. 1061-1, Motion for Class Certification ("Mtn.") at 4.) Though different documents comprised the sum total of the contract between Google and plaintiffs, plaintiffs attest that "[t]hroughout the Class Period, the Chrome Contract promised that Chrome would not send personal information to Google unless a person chose to sync their Chrome data with their Google Account." (*Id.* at 5.)

While the CPN contained the promises referenced above, Google disclosed information about data collection in other documents. The Court previously made three relevant findings: One, Google's "General Privacy Policy discloses that Google collects the at-issue data when users visit websites that use Google services . . . [and] also discloses how Google uses the at-issue data." Two, the "Consent Bump Agreement . . . disclosed that users generate data when they use Google's services [and] that Google will use this information to make ads across the web more relevant." Three, the New Account Agreement "disclosed the type of data that is collected when one uses a Google service" along with how it is used. (Dkt. No. 935, Order Granting Google's Motion for Summary Judgment ("MSJ Order") at 17-20 (internal cites omitted).)

Notwithstanding these other disclosures, plaintiffs allege that Google's data collection practices violated its agreement with Chrome users throughout the class period. Thus: "Using Google source code, Chrome is designed to—and does—send class members' PI to Google,

whether a Chrome user has enabled Chrome's Sync feature." (Mtn. at 5 (internal cites omitted).) The FAC identifies the relevant transmitted PI for Chrome users as unique, persistent cookie identifiers; browsing history in the form of the contents of the users' GET requests and POST communications; IP addresses; User-Agent information about users' devices; and x-client-data identifiers. (FAC ¶ 141.) Plaintiffs allege Chrome users' PI is valuable to Google, who uses it "to create detailed dossiers about [an] individual's personal information" for targeted advertising. (*Id.* ¶ 258.) For purposes of this motion only, the Court accepts as true that Google collects the data identified above when Chrome users are not synced. *See Calhoun v. Google, LLC*, 113 F.4th 1141, 1144 (9th Cir. 2024) ("At the motion to dismiss stage, Google did not deny collecting Plaintiffs' data while using Chrome in an unsynced mode.").

### B. Procedural Background

The Court granted Google's summary judgment motion on consent grounds, finding that "the documents plaintiffs cite[d], viewed individually and holistically, [were] insufficient to establish a genuine material dispute as to whether plaintiffs consented to Google's conduct." (MSJ Order at 27.) This Court's decision rested on a finding that Google collected the at-issue data regardless of which browser was in use, and therefore its collection and use was governed by the "browser-agnostic" general privacy policies, not the Chrome-specific CPN. (*See id.* at 16 ("Because the Court finds that the at-issue data collected is not specific to Chrome but browser agnostic, the Court also finds that Google's general policies apply.").

On appeal, the Ninth Circuit reversed. The Court of Appeals held this Court "should have reviewed the terms of the various disclosures and decided whether a reasonable user reading them would think that he or she was consenting to the data collection." *Calhoun*, 113 F.4th at 1148. "Because applying the correct standard reveals disputes of material fact regarding whether 'reasonable' users of Google's product consented to Google's data collection practices," the Ninth Circuit remanded the consent issue for trial "assuming a plaintiff class is certified." *Id.* at 1151.

Following the remand order, plaintiffs now move to certify a class of
> All Google Accountholders who accepted Google's U.S. Terms of Service prior to October 4, 2023 and who used the Chrome Browser in the (1) Basic Browser and/or (2) Signed In, But Not Consented for Sync modes from September 23, 2018 to the present.

3

(Mtn. at 1.) Plaintiffs move for certification under Rule 23(b)(3) and 23(b)(2) or, alternatively, an issue class under Rule 23(c)(4) "as to any claim for which the Court determines one or more issues are not appropriate for (b)(3) certification." (*Id.*)

## II. LEGAL FRAMEWORK

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki,* 442 U.S. 682, 700-01 (1979)). Because of this, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.* at 348-49 (quoting *East Tex. Motor Freight Syst., Inc. v. Rodriguez,* 431 U.S. 395, 403 (1977)).

"Before certifying a class, the trial court must conduct a rigorous analysis to determine whether the party seeking certification has met the prerequisites of Rule 23." *Mazza v. Am. Honda Motor Co., Inc.,* 666 F.3d 581, 588 (9th Cir. 2012) (internal quotation marks omitted). The rigorous analysis that a court must conduct requires "judging the persuasiveness of the evidence presented" for and against certification and "resolv[ing] any factual disputes necessary to determine whether" the requirements of Rule 23 have been satisfied. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982–83 (9th Cir. 2011). A "district court must consider the merits if they overlap with the Rule 23(a) requirements." *Id.* at 981. Importantly, "Rule 23 does not set forth a mere pleading standard." *Dukes,* 564 U.S. at 350. "A party seeking class certification must affirmatively demonstrate his compliance with the rule" and "be prepared to prove" as much. *Id.*

Rule 23 is satisfied when a party demonstrates meeting all four prerequisites of Rule 23(a) plus one of three factors in Rule 23(b). Specifically, Rule 23(a) requires a showing that: (1) the class is so numerous that joinder of all members is impracticable; (2) common questions of law or fact as to the class exist; (3) the claims or defenses of the representative parties are typical of those of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). Relevant here, certification under Rule 23(b)(3) is appropriate only if "the questions of law or fact common to class members predominate over any questions affecting only individual members" and "a class action is superior to other available methods for fairly and

1  efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(2) permits
2  certification of a class when "the party opposing the class has acted or refused to act on grounds
3  that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is
4  appropriate respecting the class as a whole."

5  Finally, "[w]hen appropriate, an action may be brought or maintained as a class action with
6  respect to particular issues." Fed. R. Civ. P. 23(c)(4). Certification of an issue class is "appropriate"
7  only if it "materially advances the disposition of the litigation as a whole." *Rahman v. Mott's LLP*,
8  693 F. App'x 578, 579 (9th Cir. 2017) (cleaned up). Each proposed Rule 23(c)(4) issue class "must
9  still meet the requirements of Rule 23(a) and (b) (except for the predominance requirement of Rule
10 23(b)(3))." *Tasion Commc'ns., Inc. v. Ubiquiti Networks, Inc.*, 308 F.R.D. 630, 633 (N.D. Cal.
11 2016) (citing *Avilez v. Pinkerton Gov't. Servs.*, 596 Fed. App'x 579, 579 (9th Cir. 2015)); *see also*
12 *Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 6 F.3d 177, 189 (4th Cir. 1993) (holding that each
13 subclass on each issue must independently meet all the Rule 23(a) requirements and fall in at least
14 one of the Rule 23(b) categories).

15 **III.  ANALYSIS**
16     **A.  Rule 23(b)(3)**
17 Rule 23(b)(3) requires the Court to determine whether "questions of law or fact common to
18 class members predominate over any questions affecting only individual members." Fed. R. Civ. P.
19 23(b)(3). "An individual question is one where 'members of a proposed class will need to present
20 evidence that varies from member to member,' while a common question is one where 'the same
21 evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to
22 generalized, class-wide proof.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)
23 (citation omitted). The "predominance inquiry asks whether the common, aggregation-enabling,
24 issues in the case are more prevalent or important than the non-common, aggregation-defeating,
25 individual issues." *Id.* (quoting 2 W. Rubenstein, 2 Newberg on Class Actions § 4:50 (5th ed.)).
26 "When 'one or more of the central issues in the action are common to the class and can be said to
27 predominate, the action may be considered proper under Rule 23(b)(3) even though other important
28 matters will have to be tried separately, such as damages or some affirmative defenses peculiar to

5

some individual class members.'" *Id.* (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778 (3d ed.)). "Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011) (citation omitted).

Google challenges the damages class certification under 23(a)'s typicality prong and 23(b)'s predominance prong. Here, the Court finds the latter dispositive as to all four causes of action.

According to Google, the affirmative defense of implied consent defeats predominance in this matter. In *Brown v. Google LLC*, this Court noted that the Ninth Circuit "instructs that a defendant must present non-speculative evidence that an affirmative defense would require individualized inquiries to defeat the predominance inquiry." 2022 WL 17961497, at *18 (N.D. Cal. 2022) (relying on *True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 931-32 (9th Cir. 2018)). Because case law is clear that implied consent is a defense to each cause of action at issue in this matter, the Court must "analyze[] Google's proffered evidence in light of its burden to show consumers consented to, or had adequate notice of, the data collected, stored, and disclosed." *Id*.

Google provides five sources of information from which a Chrome user could have understood which data it collected.

First, Google points to its privacy policy. As this Court previously found, "Google's 'Privacy Policy discloses that Google collects the at-issue data when users visit websites that use Google services' and 'also discloses how Google uses the at-issue data.'" (MSJ Order at 17-18). That privacy policy contained several disclosures, such as informing readers:

> We collect information about your activity in our services, which we use to do things like recommend a YouTube video you might like. The activity information we collect may include . . . Terms you search for[,] . . . Activity on third-party sites and apps that use our service[, and] Chrome browsing history you've synced with your Google Account.

(Dkt. No. 1074, Declaration of Gregory Fair In Support of Google's Opposition to Plaintiffs' Renewed Motion for Class Certification ("Fair Decl.") ¶ 70.) Google notes it "keeps statistics on how many times its Privacy Policy and other disclosure pages are viewed and how much time users

spent on the page" and states the policy "was viewed more than 225 million times" between March 2018 and July 2020. (*Id*. ¶ 75.)

Second, anyone with a Google account may have signed one or more "Account Holder Agreements" which disclosed its data collection practices. (*Id*. ¶ 17.) By way of example, Google points to its "Consent Bump Agreement" which stated, for example:

> When you use Google services like Search and YouTube, you generate data — things like what you've searched for and videos you've watched. You can find and control that data in My Account under the Web & App Activity setting. With this change, this setting may also include browsing data from Chrome and activity from sites and apps that partner with Google, including those that show ads from Google.

(Dkt. No. 1074-19; Fair Decl., Ex. 18 at 13.) This particular agreement allowed readers to click through to a FAQ page further disclosing the collection of certain data. "As of October 31, 2016, holders of tens of millions of U.S. Accounts had seen the Consent Bump Agreement," and "[a]pproximately 89% of those Accounts consented" to it." (Fair Decl. ¶ 33.)

Third, any user creating a Google account after June 2016 signed a New Account Creation Agreement. (*Id*. ¶ 44.) This agreement disclosed the collection and subsequent use of certain user data, "including information like the video you watched, device IDs, IP address, cookie data, and location[,] … when [account holders] use apps or sites that use Google services like ads, Analytics, and the YouTube video player." (Dkt. No. 1074-19; Fair Decl., Ex. 18 at 6.) At least four named plaintiffs, and users representing hundreds of millions of U.S. accounts, consented to this agreement. (Fair Decl. ¶¶ 57, 62.)

Fourth, Google's help center contains several articles "direct[ing] users to their My Activity pages." (*Id*. ¶ 93.) These articles allow users to view what sorts of data Google collects and offers instructions on how to delete much of it. (*See id*. ¶¶ 93-110.)[2]

---

[2] Google provides copies of these articles, titled: "How Google helps you manage data with My Activity," "Delete Your Activity," "View & control activity in your account," "Find, control & delete the info in your Google Account," "Control what activity gets saved to your account," "Find & control your Web & App Activity," "Clear browsing data," and "Delete your Chrome browsing history." (*See id*., Exs. 17, 102-06, 108-09; Dkt. Nos. 1074-18, 1074-107 – 1074-111, 1074-113-1074-114.)

Fifth, and finally, "Google's agreements with websites that use its services require those websites to make certain disclosures" about data collection practices. (*Id.* ¶ 113.) For example, websites using Google Analytics must

> post a Privacy Policy and that Privacy Policy must provide notice of [the third-party websites'] use of cookies, identifiers for mobile devices (e.g., Android Advertising Identifier or Advertising Identifier for iOS) or similar technology used to collect data. [The websites] must disclose the use of Google Analytics, and how it collects and processes data.

(Fair Decl., Ex. 115; Dkt. No. 1074-122 at 5.) So, too, with websites using Google Ad Manager, which requires "a privacy policy that clearly discloses any data collection, sharing and usage that takes place on any site, app, email publication or other property as a consequence of [the] use of Google products," and "must disclose to users that third parties may be placing and reading cookies on [their] browsers, or using web beacons to collect information as a result of ad serving." (Fair Decl., Ex. 117; Dkt. No. 1074-124 at 7.)

Google has met its burden of presenting concrete evidence sufficient to show individualized inquiries as to each user's subjective understanding of its data collection practices. The proposed class contains millions of Chrome users, each of whom was exposed to, and may have explicitly or implicitly consented to, varying disclosures potentially providing notice that their use of Chrome meant their data would be collected. In this regard, this case is identical to this Court's previous adjudication in *Brown v. Google.* 2022 WL 17961497, at *19 (Google provided "evidence that its consent defense would be based on individual, and subjective, interactions of what certain class members knew, read, saw, or encountered" and the "[e]vidence shows variation between what users knew or did not know.").[3]

---

[3] Plaintiffs take issue with Google's focus on "data collection," arguing that this mis-frames the real inquiry, which asks whether the personal information of Chrome users was sent to Google in both synced and un-synced modes. (Dkt. No. 1080, Plaintiffs' Reply In Support of Renewed Motion for Class Certification ("Reply") at 3.) To the extent the argument is intended to negate the Court's consideration of the panoply of sources of information Google provides, the Court disagrees. Implied consent asks about a user's subjective understanding of the terms of the relevant agreement; it is "an intensely factual question that requires consideration of the circumstances surrounding the alleged privacy violation" that takes into account "a broad set of materials." *In re Google RTB Consumer Priv. Litig.*, 2024 WL 2242690, at *12 (internal cites omitted). Google has

Plaintiffs offer several arguments to defeat Google's implied consent argument. None persuades.

First, plaintiffs urge that implied consent is not a defense to the four causes of action. The Court disagrees. *See Brown*, 2022 WL 17961497, at *19; *RTB*, 2024 WL 2242690, at *14; *see also* Dkt. No. 142, Order Granting in Part and Denying in Part Motion to Dismiss at 12 & n.3 (J. Koh, stating that "[c]onsent is a defense to Plaintiffs' claims" and listing cases). As a corollary, plaintiffs argue the Court may not consider extrinsic evidence in the specific context of the breach of contract and UCL claims, since those relate to an integrated contract. The argument may be true when applied to the interpretation of a specific contractual term, but the implied consent inquiry permits a court to consider extrinsic evidence to the extent necessary to determine a party's subjective understanding of the terms to which they consented.[4]

Second, plaintiffs assert that the Ninth Circuit foreclosed the issue. The Court does not read the Court of Appeals' decision so broadly. The Ninth Circuit found that "when the disclosures are read together and in the light most favorable to Plaintiffs, a reasonable user would not *necessarily* understand that they were consenting to the data collection at issue." *Calhoun*, 113 F.4th at 1150 (emphasis supplied). It does not automatically follow, however, that *no* reasonable user would so understand. It's hard to envision how this issue could be tried globally. With such a wide variation in sources of information to which millions of class members were exposed, the notion that plaintiffs' single approach predominates lacks credibility.[5]

---

provided evidence that demonstrates different users may have had varying understandings of Google's data collection practices and the commitments required by Google under the CPN. For the implied consent analysis, this is sufficient.

[4] For this reason, plaintiffs' citation to a quote from *RTB* stating that extrinsic evidence is irrelevant is misplaced. (*See* Reply at 6.) In context, that quote spoke about the injunctive relief inquiry under Rule 23(b)(2), and specifically contrasted that inquiry from the implied consent analysis, where extrinsic evidence was deemed relevant. *See RTB*, 2024 WL 2242690, at *15 ("Though the Court agrees with Google that individualized inquiries will be required for implied consent, [the injunctive relief] question will be resolved on the basis of Google's standardized disclosures . . . alone.").

[5] That material disputes of fact are questions for the jury is not the issue. (*See* Reply at 1.) To satisfy Rule 23, a plaintiff must still show predominance. The Ninth Circuit recognized the

9

Third, plaintiffs raise certain arguments going to the reasonableness of any putative class member's understanding that Google collected their PI.[6] These arguments require interpretation of the various sources of information proffered by Google, the precise sort of inquiry that is likely to overwhelm questions common to the class.

\*\*\*

For the reasons enumerated above, the Court finds as it did in both *Brown* and *RTB*, namely inquiries relating to Google's implied consent defense will overwhelm the damages claims for all causes of action. The motion to certify a Rule 23(b)(3) damages class is **DENIED WITH PREJUDICE.**

B.  **Rule 23(b)(2)**

Unlike a damages class, a Rule 23(b)(2) class does not require predominance or superiority.

> Rule 23(b)(2) allows class treatment when the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. . . . the focus is not on the claims of the individual class members, but rather whether [defendant] has engaged in a common policy.

*Des Roches v. Cal. Physicians' Serv.,* 320 F.R.D. 486, 507 (N.D. Cal. 2017) (cleaned up).

Plaintiffs present several requests for injunctive relief: requiring Chrome or Google to: (i) "provide accurate and clear statements" about its data collection practices, (ii) permit Chrome users to affirmatively opt in to data collection, (iii) allow Chrome users the opportunity to view and delete the data Google collects from them, and (iv) provide e-mail and in-product notice of any future changes to the Chrome contract. (*See* Mtn. at 24.)

---

distinction. *Calhoun*, 113 F.4th at 1151 (remanding the issue for trial "assuming a plaintiff class is certified.").

[6] For example, plaintiffs posit that here, the CPN made Chrome-specific promises and stated that document controlled over others, and thus it would be unreasonable for a user to impliedly consent based on other documents. (*See* Reply at 6-7.) Even if a reasonable proposition, the Court cannot make that finding as a matter of law, and eliminate the evidence of all the other documents to the issue at hand.

As a threshold matter, defendant asserts named plaintiffs are atypical and therefore cannot satisfy Rule 23(a) because they did not actually read the CPN. Typicality is a "permissive" standard and requires the claims of named class members be "reasonably co-extensive with those of absent class members." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (abrogated on other grounds by *Rodriguez Diaz v. Garland*, 53 F.4th 1189 (9th Cir. 2022)) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)). Under this flexible standard, the Court understands that all class members were in the same contractual relationship with Google, received the same set of promises, and had the same types of PI sent to Google. This weighs in favor of typicality. However, the evidence regarding the various exposures class members had to disclosures, including whether they read the CPN, weighs against typicality. Ultimately, the Court need not decide.

Under Rule 23(b)(2), plaintiffs must show "concrete and particularized legal harm . . . coupled with a sufficient likelihood that [they] will again be wronged in a similar way." *Backhaut v. Apple Inc.*, 2015 WL 4776427, at *8 (N.D. Cal. 2015) (internal citation omitted). The future injury may be neither "conjectural" nor "hypothetical;" rather, there must be a "real and immediate threat of repeated injury." *Id*. (internal citations omitted). Here, plaintiffs cannot do so. First, with respect to their claims sounding in contract, plaintiffs conceded that the current promises with regard to Chrome's data collection exist in non-contractual documents. (*See* Hearing Tr. at 86:22-24 ("Google replaced [the CPN] with what's called 'privacy in Chrome' documents, which are not contractual anymore.").) Thus, there are no contractual promises to be enforced.

Second, as to the non-contractual claims, plaintiffs argue their injuries are ongoing because (i) Google continues to take PI without consent and (ii) the new disclosures are unintelligible. The evidentiary record compels a different conclusion. Plaintiffs' case rests on a theory of liability grounded in the synced/not-synced distinction found in the CPN. Because the CPN no longer exists, however, the alleged harm from lack of disclosure about this distinction cannot flow from the surviving documents. (*Cf*, MSJ Order at 17 (finding that the Google Privacy Policy adequately "discloses that Google collects the at-issue data when users visit websites that use Google services."); *see also Calhoun*, 113 F.4th at 1150 (Ninth Circuit finding that only the CPN–but not the other relevant documents–"mentions the sync/non-sync distinction.").)

To counter the claim that Google has completely removed the offending promises, plaintiffs' counsel pointed at argument to Google's current privacy policy which states: "Your Chrome browsing history is only saved to your account if you've enabled Chrome sync with your account." (Hearing Tr. at 86:9-10.) In declaration, though, a product manager with Google's Privacy and Data Protection Office ("PDPO") stated that the Chrome browsing history by itself is distinct from the data at issue here.

> Chrome browsing history, and the data that Google receives through the Google Services (i.e., the data at issue here), are different. Chrome browsing history does not include the disputed data—cookie identifiers; GET or POST requests; IP address and user-agent information; or X-Client-Data Headers. . . . Chrome browsing history consists of a list of all the webpages (URLs) visited within the last 90 days (unless the user has deleted her history within that window) and the time when they were visited. This includes visits to websites that do not use Google Services. Google does not receive Chrome browsing history from Chrome users who have not enabled Sync.

(Fair Decl. ¶ 12.) From the evidentiary record before the Court, therefore, plaintiffs have failed to identify any surviving promise in Google's various disclosures that evidence an ongoing promise to avoid collecting data that Google does, in fact, surreptitiously collect. As a result, injunctive relief is not warranted.

Plaintiffs' motion to certify an injunctive class under Rule 23(b)(2) is **DENIED**.

### C.     Rule 23(c)(4)

Plaintiffs' final request is for certification of an issue class under Rule 23(c)(4). Predominance is not strictly a requirement in order to certify a Rule 23(c)(4) issue class, but a district court is within its discretion to refuse to certify one where "numerous individualized issues affect[] determinations of liability [and therefore] make Rule 23(c)(4) certification inefficient." *Reitman v. Champion Petfoods USA, Inc.*, 830 F. App'x. 880, 882 (9th Cir. 2020). "Rule 23(c)(4) enables a district court to certify an issue class [w]hen appropriate, but a court does not abuse its discretion when it declines to do so because certifying a class does not materially advance[ ] the disposition of the litigation as a whole." *Id.* (internal cites omitted).

Plaintiffs argue that an issue class would materially advance the litigation from an efficiency perspective because a *prima facie* case for liability can be established through classwide proof. As other courts have found, issue class certification is ineffective in efficiently driving the litigation where individualized issues impact the underlying liability determination. *See, e.g.*, *Reitman*, 830 Fed. App'x. at 882; *Backhaut*, 2015 WL 4776427, at *3 n.3.

Though implied consent is an affirmative defense, it still means liability in this case ultimately turns on each class member's subjective understanding of defendant's promises.

The motion to certify an issue class under Rule 23(c)(4) is **DENIED.**

## IV. CONCLUSION

For the reasons stated above, plaintiffs' motion for class certification is **DENIED WITH PREJUDICE**. Within twenty-one (21) days of the issuance of this Order, parties shall meet and confer and submit a joint scheduling proposal for the remainder of this action. The parties' pending motions to seal will be addressed by separate court order.

This terminates Dkt. Nos. 1058, 1060, 1077, & 1081.

**IT IS SO ORDERED**.

Date: June 9, 2025

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**