# In the United States Court of Appeals for the Ninth Circuit

Patrick Calhoun, Elaine Crespo, Michael Henry, Corinice Wilson, Rodney Johnson, and Claudia Kindler

*Plaintiffs-Petitioners*,

v.

Google, LLC,

*Defendant-Respondent.*

On Petition for Permission to Appeal from the United States District Court for the Northern District of California Case No. 4:20-cv-05146 (The Hon. Yvonne Gonzalez Rogers)

## PETITION FOR PERMISSION TO APPEAL UNDER FEDERAL RULE OF CIVIL PROCEDURE 23(f)(REDACTED)

Lesley E. Weaver
Bleichmar Fonti & Auld, LLP
1330 Broadway, Suite 630
Oakland, CA 94612
(415) 797-2617

David A. Straite
Corban S. Rhodes
DiCello Levitt LLP
485 Lexington Avenue, 10th Floor
New York, NY 10017
(646) 933-1000

*(Counsel continued on inside cover)*

Matthew W.H. Wessler
Gregory A. Beck
Gupta Wessler LLP
2001 K Street NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
matt@guptawessler.com

Jason O. Barnes
Thien An Vinh Truong
Simmons Hanly Conroy, LLP
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6276

June 23, 2025

ADAM J. LEVITT
AMY E. KELLER
ADAM PROM
DiCELLO LEVITT LLP
10 North Dearborn Street, 6th Floor
Chicago, IL 60602
(312) 214-7900

ERIC S. JOHNSON
JENNIFER M. PAULSON
SIMMONS HANLY CONROY, LLC
One Court Street
Alton, IL 62002
(618) 259-6231

# TABLE OF CONTENTS

Introduction ........................................................................................... 1

Background ............................................................................................ 5

    I.    Factual history ....................................................................... 5

    II.   Procedural history .............................................................. 6

Reasons for granting the petition ................................................... 10

    I.    The district court's predominance holding is manifestly erroneous because it conflicts with this Court's mandate and with California's black-letter law ....................................... 11

          A.    The district court's order blatantly disregards this Court's mandate. ........................................... 11

          B.    Under controlling California law, the plaintiffs' breach-of-contract claim involves no individualized issues of consent. ................................................. 17

    II.   District courts in the Ninth Circuit are divided over the important question of when disclosures can defeat class certification. ........................................................................ 21

Conclusion ............................................................................................ 24

# TABLE OF AUTHORITIES

## Cases

*Alaska Department of Fish & Game v. Federal Subsistence Board,*
    --- F.4th ---, 2025 WL 1551415 (9th Cir. 2025) ..................................................... 16

*Bolin v. Sears Roebuck,*
    231 F.3d 970 (5th Cir. 2000)...........................................................................18, 21

*Brown v. Google,*
    2022 WL 17961497 (N.D. Cal. 2022) ............................................................18, 23

*Calhoun v. Google, LLC,*
    113 F.4th 1141 (9th Cir. 2024)......................................1, 2, 7, 8, 9, 10, 12, 13, 14, 15, 20

*Chamberlan v. Ford Motor Co.,*
    402 F.3d 952 (9th Cir. 2005)....................................................2, 3, 10, 16, 21, 22, 23

*Creech v. Tewalt,*
    84 F.4th 777 (9th Cir. 2023) ............................................................................... 11

*DeLeon v. Verizon Wireless, LLC,*
    143 Cal. Rptr. 3d 810 (Cal. Ct. App. 2012)......................................................... 19

*Frasco v. Flo Health, Inc.,*
    --- F.R.D. ---, 2025 WL 1433825 (N.D. Cal. 2025) ........................ 4, 12, 15, 20, 23

*FTC v. Figgie International, Inc.,*
    994 F.2d 595 (9th Cir. 1993)............................................................................... 13

*Gene & Gene, LLC v. BioPay, LLC,*
    624 F.3d 698 (5th Cir. 2010) ..............................................................................17

*Griffith v. TikTok, Inc.,*
    2024 WL 5279224 (C.D. Cal. 2024)....................................................................23

*Harris v. comScore, Inc.,*
    292 F.R.D. 579 (N.D. Ill. 2013) ....................................................................19, 20

*In re Facebook, Inc. Internet Tracking Litigation,*
    956 F.3d 589 (9th Cir. 2020).........................................................................13, 14

*In re Facebook, Inc., Consumer Privacy User Profile Litigation,*
   402 F. Supp. 3d 767 (N.D. Cal. 2019) ..............................................................9, 15

*In re Google Inc. Gmail Litigation,*
   2014 WL 1102660 (N.D. Cal. 2014) ...................................................................23

*In re Google RTB Consumer Privacy Litigation,*
   2024 WL 2242690 (N.D. Cal. 2024) .............................................................18, 23

*In re Monumental Life Insurance Co.,*
   365 F.3d 408 (5th Cir. 2004) ...............................................................................21

*Lakes v. Ubisoft, Inc.,*
   --- F. Supp. 3d ---, 2025 WL 1036639 (N.D. Cal. 2025).....................................23

*Leyva v. Medline Industries Inc.,*
   716 F.3d 510 (9th Cir. 2013) ........................................................................... 4, 22

*Libman v. Apple, Inc.,*
   2024 WL 4314791 (N.D. Cal. 2024) ...................................................................23

*Long v. Provide Commerce, Inc.,*
   200 Cal. Rptr. 3d 117 (Cal. Ct. App. 2016)........................................................12

*Moldex-Metric, Inc. v. McKeon Products, Inc.,*
   891 F.3d 878 (9th Cir. 2018) ...............................................................................17

*Montana v. Talen Montana, LLC,*
   130 F.4th 675 (9th Cir. 2025)............................................................................... 11

*Pinnacle Museum Tower Association v. Pinnacle Market Development (US), LLC,*
   145 Cal. Rptr. 3d 514 (Cal Ct. App. 2012) .........................................................20

*Rodman v. Safeway,*
   2014 WL 988992 (N.D. Cal. 2014)................................................................19, 20

*Rodriguez v. Google LLC,*
   --- F. Supp. 3d ---, 2025 WL 50425 (N.D. Cal. 2025)................................... 13, 23

*Simpson v. Dart,*
   23 F.4th 706 (7th Cir. 2022) ...............................................................................17

*Smith v. Facebook, Inc.*,
    745 F. App'x 8 (9th Cir. 2018) ........................................................... 9, 12

*St. Aubin v. Carbon Health Technologies, Inc.*,
    2024 WL 4369675 (N.D. Cal. 2024) ...................................................... 23

*Torres v. Prudential Financial, Inc.*,
    2024 WL 4894289 (N.D. Cal. 2024)............................. 4, 12, 15, 16, 20, 23

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016)................................................................................ 16

*United States v. Thrasher*,
    483 F.3d 977 (9th Cir. 2007) ....................................................... 2, 11, 16

*United Steel, Paper & Forestry, Rubber, Manufacturing, Energy, Allied Industrial &*
    *Service Workers International Union, AFL-CIO, CLC v. ConocoPhillips Co.*,
    593 F.3d 802 (9th Cir. 2010) ................................................................. 21

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011).............................................................................. 17

*Williams v. Martorello*,
    59 F.4th 68 (4th Cir. 2023) .................................................................. 17

*Zarif v. Hwareh.com, Inc.*,
    2025 WL 486317 (S.D. Cal. 2025)......................................................... 23

**Statutes**

California Civil Code § 1638-39 .................................................................. 3

**Other Authorities**

Restatement (Second) of Contracts § 211(2) ............................................. 19

## INTRODUCTION

The plaintiffs in this case, users of Google's popular Chrome web browser, claim that the company designed the browser to surreptitiously transmit their personal information to Google—despite Chrome's contractual promise that "personal information … won't be sent to Google." 3-ER-358. The district court denied class certification on the ground that individualized determinations would be necessary to decide whether each Chrome user impliedly consented to this practice notwithstanding this promise. That decision flouts the mandate of this Court, which held in a prior published opinion that Google could *not* meet its burden to show consent in this case. *Calhoun v. Google, LLC*, 113 F.4th 1141 (9th Cir. 2024).

In reversing the district court's grant of summary judgment to Google on its consent defense, this Court held that the standard for consent is an objective one: whether "a *reasonable person*" viewing the company's disclosures would understand that they were consenting to the practice at issue. *Id.* at 1146 (emphasis added). If a reasonable Chrome user "could have plausibly understood [Google's] disclosures as *not* disclosing" the company's conduct, "then the disclosures are insufficient to establish consent." *Id.* at 1147. And in applying that test, the Court resolved the question against Google: "[W]hen the disclosures are read together and in the light most favorable to [the plaintiffs], a reasonable user would not necessarily understand

1

that they were consenting"—especially considering Google's express assurances that Chrome would not send personal information to Google. *Id.* at 1150.

But in denying class certification on remand, the district court nevertheless held that Google could still prevail on its consent defense as to individual class members. In direct conflict with this Court's opinion, the district court asserted that "[i]mplied consent asks about a user's *subjective* understanding of the terms of the relevant agreement." Order at 8 n.3 (Dkt. 1105) (emphasis added). Positing that different "reasonable user[s] would not necessarily understand" Google's disclosures the same way, the court concluded that applying the defense would require "individualized inquiries as to each user's subjective understanding of its data collection practices." *Id.* at 8-9. Based solely on that holding, the court held that the plaintiffs had failed to establish predominance under Rule 23(b)(3).

For two reasons, the district court's denial of class certification is so "obviously wrong" that it demands this Court's immediate review under Rule 23(f). *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 958 (9th Cir. 2005). *First*, the district court's order violates the mandate rule. On remand from this Court, the district court was "bound by the decree as the law of the case." *United States v. Thrasher*, 483 F.3d 977, 981 (9th Cir. 2007). But while this Court mandated a "reasonable person" test, the district court looked instead to "each class member's subjective understanding." Order at 13. And while this Court, after reviewing Google's disclosures, held that the company

could not prevail under the proper objective test, the district court looked to the same evidence to conclude that the answer would vary among class members. *See id.* at 8. That plain violation of this Court's mandate is a "manifest error" that alone justifies granting the petition. *Chamberlan*, 402 F.3d at 958. There is no sense in allowing the district court and the parties to litigate the case to judgment under a legal rule that this Court has already rejected in this very case.

*Second*, the district court based its predominance determination on a mistaken and unwise legal conclusion: That the same implied-consent defense that it applied to the plaintiffs' privacy torts also applies to their claim for breach of contract, thus again requiring the court to inquire into each "user's subjective understanding of the terms of the relevant agreement." Order at 8 n.3. But in California, the law of contracts is clear: It is *objective* intent, as evidenced by the words of the contract, that controls interpretation—not the subjective understanding of the parties. *See* Cal. Civ. Code § 1638-39.

The district court's contrary rule, if widely adopted, would effectively foreclose the class-action device in cases involving standardized contracts. In almost any case, a defendant could argue that different users might have different subjective understandings of its contractual obligations. To adopt such a rule would thus "sound the death-knell" not only of this class action, but "of the class action device" itself in breach-of-contract cases. *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir.

2013). It would also make it impossible for defendants to secure Rule 12 dismissal in such cases, given that plaintiffs could always claim an understanding of the contract that differs from its express terms. Indeed, there would be little point in using standardized form contracts at all if, as the district court concluded, their meaning changed depending on users' "varying understandings" of Google's commitments. Order at 8 n.3.

The decision below deepens a growing divide among federal courts in the Ninth Circuit. In the past half-year or so, district judges in California have reached polar opposite conclusions on whether the defense of implied consent is a "bar to predominance" (and thus class actions) in cases involving form contracts. *See, e.g.*, *Frasco v. Flo Health, Inc.*, --- F.R.D. ---, 2025 WL 1433825, at *14 (N.D. Cal. 2025) (Donato, J.); *see also, e.g.*, *Torres v. Prudential Fin., Inc.*, 2024 WL 4894289, at *7 (N.D. Cal. 2024)(Breyer, J.) ("[T]he issue of how a reasonable user would understand Prudential's privacy policies is a common one that can be resolved with class-wide proof."). Only this Court can rectify this intolerable state of affairs and provide the needed guidance to district courts and parties. The Court should grant the petition.

# BACKGROUND

## I.   Factual history

Chrome is the most widely used browser in the world. 8-ER-1581. In the United States, about half of all internet users rely on Chrome to browse the web on their computers, tablets, and smartphones. *Id.*[1]

Google's Terms of Service direct Chrome users to a policy called the "Chrome Privacy Notice," which makes a clear promise to Chrome users: "[y]ou don't need to provide any personal information to use Chrome." 3-ER-357. Although Chrome stores user information "locally on [the user's] system"—including "[p]ersonal information," "browsing history information," and "cookies" or other data from third-party websites—the privacy notice explains that this information "won't be sent to Google unless you choose to store [it] in your Google Account by turning on sync." 3-ER-357-58. Google also assures users that "[s]ync is only enabled if you choose." 3-ER-363. "If you don't use your Chrome data to personalize your Google experience outside of Chrome," Google promises that it "will only use your Chrome data after it's anonymized and aggregated with data from other users." *Id.*

These promises, however, are false. Contrary to the Chrome Privacy Notice's express terms, Chrome sends detailed, personal information about *every* user to Google, regardless of whether they enabled sync. Google then uses this information

---

[1] All internal citations, quotation marks, and alterations are omitted unless otherwise indicated.

to compile detailed profiles on users encompassing thousands of data points, including sensitive and personal information related to race, gender, religion, nationality, sexual orientation, health, political beliefs, and sexual interests. 5-ER-796-869. For example, the Chrome-based personal information that Google produced for just the six named plaintiffs—all of whom did not choose to sync when using Chrome—consisted of more than 11,000 files exceeding 46 gigabytes. 7-ER-1234.

The purpose of these user profiles—and all of Google's other tracking and data-collection efforts—is to further the company's primary source of revenue: advertising. In 2016, for example, nearly 90 percent of Google's revenue came from its targeted-advertising programs. 8-ER-1589. Google's comprehensive user profiles can track users across devices and allow the company to dynamically target individuals with highly personalized ads. This personal data has real market value; a 2015 article estimated that the commercial value of a single internet user's data varied from about $15 to more than $40. 8-ER-1583. And Google itself has internally estimated that it would lose at least ███████ in advertising revenue if it lost access to personal information in Chrome. *See* 5-ER-660-64.

## II.   Procedural history

The plaintiffs are Chrome users who chose not to sync their browsers with their Google accounts. Nevertheless, Chrome sent their personal information to

Google, including sensitive browsing history information. 8-ER-1567-80. The plaintiffs asserted claims for breach of contract, as well as common law and statutory privacy claims.

**_Motion to dismiss._** Google moved to dismiss. Dkt. 57. In doing so, the company "did not deny collecting [the plaintiffs'] data while using Chrome in an unsynced mode." *Calhoun*, 113 F.4th at 1144. Instead, it contended that, despite the Chrome Privacy Notice's assurances, the plaintiffs had "consented" to these secret data transmissions. *Id.* In support, Google asserted that its "general" (as opposed to Chrome-specific) privacy policy—which vaguely states that Google may "collect information about your activity … on third-party sites"—adequately disclosed its data-*collection* practices to users. Dkt. 57 at 13.

The district court (Judge Koh) disagreed. To meet its burden on the affirmative defense of consent, the court explained, Google would need to show both that its "disclosures [] explicitly notif[ied] users of the practice at issue," and that they "have only one plausible interpretation." 3-ER-407-08. Google fell far short of making those showings. "[N]either Google's Privacy Policy nor any other disclosure," the court observed, "states that Google engages in the alleged data collection while users are using Chrome without sync." 3-ER-413. "To the contrary, Google's disclosures state that the data will *not* be sent to Google" in those circumstances. *Id.* (emphasis added). Because "Google's representations might have

led a reasonable user to believe that Google did not collect his or her personal information when the user was not synced," the court concluded, "Google cannot show that Plaintiffs expressly consented." 3-ER-412. The court thus denied the motion to dismiss.

***Summary judgment.*** While discovery was ongoing, Google moved for summary judgment solely on consent, arguing again that the company's general privacy policy sufficiently disclosed its data-collection practices to users. Dkt. 395 at 3-6. In addition, Google tried to bolster its consent defense with two pop-up notices that briefly appeared on users' screens beginning in 2016: a "Consent Bump Agreement" and a "New Account Creation Agreement." *Calhoun*, 113 F.4th at 1145. The contrary promises in the Chrome Privacy Notice didn't matter, the company asserted, because there was no evidence the plaintiffs had read and understood those promises. *Id.* at 1145-46, 1150-51.

During summary-judgment briefing, Judge Koh was elevated to this Court, and the case was reassigned to Judge Gonzalez Rogers. The new judge then granted summary judgment in favor of Google, holding that the company had met its burden to show that it adequately disclosed its conduct. The court concluded that "a reasonable person viewing those disclosures"—the general Privacy Policy, the New Account Creation Agreement, and the "Consent Bump"—"would understand that

8

Google … collect[s] its users' data" and "that Google combines and links this information across sites and services for targeted advertising purposes." 1-ER-25.

**First appeal.** On appeal, this Court reversed. The Court began by clarifying the standard for consent. The proper question, this Court held, is "whether the circumstances, considered as a whole, demonstrate that a reasonable person understood that an action would be carried out so that their acquiescence demonstrates knowing authorization." *Calhoun*, 113 F.4th at 1147 (quoting *Smith v. Facebook, Inc.*, 745 F. App'x 8, 8 (9th Cir. 2018)). "If that user could have plausibly understood the disclosures 'as *not* disclosing that [Google] would engage in particular conduct,' then the disclosures are insufficient to establish consent." *Id.* (quoting *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 789 (N.D. Cal. 2019)).

Applying that objective standard, the Court held that Google failed to meet its burden on its consent defense. The Chrome Privacy Notice, it observed, is more specific to the privacy of Chrome users than the general disclosures, "includes more detail on the distinctions between Chrome browsing modes," and makes an "affirmative statement" promising not to engage in the challenged conduct "unless [users] choose to turn on sync." *Calhoun*, 113 F.4th at 1150. Thus, when the disclosures "are read together and in the light most favorable to Plaintiffs, a reasonable user would not necessarily understand that they were consenting to the data collection at issue." *Id.*

***Class certification.*** Rather than applying the "reasonable user" standard mandated by this Court to the plaintiffs' class-certification motion, the district court on remand held that the defense of consent "asks about a user's *subjective understanding of the terms of the relevant agreement.*" Order at 8 n.3 (emphasis added). The court declined to read this Court's holding "broadly" to mandate an objective standard. *Id.* In its view, all this Court held was that "a reasonable user would not *necessarily* understand that they were consenting." *Id.* at 9 (quoting *Calhoun*, 113 F.4th at 1150). But "[i]t does not automatically follow," the court reasoned, "that *no* reasonable user would so understand." *Id.* Based solely on that holding, the court concluded that "Google has met its burden of presenting concrete evidence sufficient to show individualized inquiries as to each user's subjective understanding," *id.* at 8—a result irreconcilable with the one reached by this Court.

## REASONS FOR GRANTING THE PETITION

This case checks all the boxes for immediate review. Under this Court's test, review under Rule 23(f) is "most appropriate" when a class-certification ruling meets one or more of three criteria: either it (1) is "manifestly erroneous," (2) raises "unsettled and fundamental issue[s] of law," or (3) is likely dispositive of the litigation—the "death-knell situation" for the plaintiff. *Chamberlan*, 402 F.3d at 959. These three categories are "merely guidelines," not "a rigid test," and this Court has

"broad discretion" to permit a "worthy" appeal even if "a petition does not fit" any of the above situations. *Id.* at 960.

This is the unusual case in which *all three* factors are satisfied: the decision contravenes this Court's clear mandate in a previous appeal and California's black-letter contract law; it implicates a clear split among the district courts on an important issue that requires resolution by this Court; and it will indisputably signal the death knell of the litigation if an appeal is not permitted.

## I.    The district court's predominance holding is manifestly erroneous because it conflicts with this Court's mandate and with California's black-letter law.

### A.    The district court's order blatantly disregards this Court's mandate.

"The mandate rule states that when a higher court decides an issue and remands the case, that issue is finally settled." *Montana v. Talen Mont., LLC*, 130 F.4th 675, 691 (9th Cir. 2025). The district court is then "bound by the decree as the law of the case, and must carry it into execution according to the mandate." *Thrasher*, 483 F.3d at 981. "In determining which matters fall within the compass of a mandate, district courts must implement both the letter and the spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces." *Creech v. Tewalt*, 84 F.4th 777, 787 (9th Cir. 2023). Here, the district court's class-certification order flies in the face of this Court's mandate, both in reasoning and result.

**1.** In the first appeal, this Court held that "the district court failed to apply the correct standard" to Google's consent defense. *Calhoun*, 113 F.4th at 1149. The proper question, the Court held, is "whether the circumstances, considered as a whole, demonstrate that a *reasonable person* understood that an action would be carried out so that their acquiescence demonstrates knowing authorization." *Id.* at 1147 (quoting *Smith*, 745 F. App'x at 8 (emphasis added); *see, e.g., Long v. Provide Com., Inc.*, 200 Cal. Rptr. 3d 117, 125 (Cal. Ct. App. 2016) (disagreeing that a "hyperlink was sufficiently conspicuous to put a reasonable user on notice"). As other courts have understood, the Court thus established an objective test that "does not turn on individual class members' subjective understandings of privacy disclosures" and "is not a bar to predominance." *Frasco*, 2025 WL 1433825, at *14 (citing *Calhoun*, 113 F.4th at 1147); *see also Torres*, 2024 WL 4894289, at *7 ("[T]he issue of how a reasonable user would understand [] privacy policies is a common one that can be resolved with class-wide proof." (citing *Calhoun*, 113 F.4th at 1148)).

Based on this Court's clear holding, the district court on remand "should have reviewed the terms of the various disclosures and decided whether a *reasonable user* reading them would think that he or she was consenting to the data collection." *Calhoun*, 113 F.4th at 1148 (emphasis added). But the district court declined to read this Court's decision so "broadly." Order at 9. Instead, it held that the implied-consent defense "asks about a user's *subjective understanding* of the terms of the relevant

agreement"—an issue that it thought would vary among different "reasonable user[s]" in the class. Order at 8 n.3, 9 (emphasis added).

That decision honors neither the letter nor the spirit of this Court's mandate. As this Court explained, "the governing standard" on the consent defense "is what a 'reasonable user' of a service would understand they were consenting to"—a standard that turns on the "level of sophistication attributable to the *general public*," not individual users. *Calhoun*, 113 F.4th at 1149, 1151 (emphasis added). Under a "reasonable person" test like this one, the "standard is *objective*, not subjective." *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 603 (9th Cir. 1993) (emphasis added); *see, e.g.*, *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 602 (9th Cir. 2020) (holding that "the relevant question" is "whether a user would reasonably expect that Facebook would have access to the user's individual data"); *Rodriguez v. Google LLC*, --- F. Supp. 3d ---, 2025 WL 50425, at *5 (N.D. Cal. 2025) (holding that the test is "whether a reasonable user reading [the disclosures] would think that he or she was consenting to the data collection"). This Court's reliance on that standard thus "unambiguously referred the district court to the state of mind of a *hypothetical* reasonable person," not to the "actual knowledge" of multiple real-world class members. *Figgie Int'l*, 994 F.2d at 603 (emphasis added).

**2.** Because the district court applied a different standard from this Court, it is not surprising that it also reached a different result. In applying the "reasonable

person" test, this Court held that when Google's Chrome Privacy Notice, its general privacy policy, and the pop-up notices on which it relied below "are read together and in the light most favorable to" the plaintiffs, "a reasonable user would not necessarily understand that they were consenting to the data collection at issue." *Calhoun*, 113 F.4th at 1150; *see also Internet Tracking Litig.*, 956 F.3d at 603. But the district court, relying on the same three documents, held the opposite: that "Google has met its burden of presenting concrete evidence sufficient to show individualized inquiries as to each user's subjective understanding of its data collection practices." Order at 8.

In addition to Google's general privacy policy and the two-pop up notices, all of which this Court considered in the first appeal, the district court cited just two sources from which it said class members could have learned about Google's practices: Google's "help center" web pages and its "agreements with websites that use its services." Order at 7-8. But neither Google nor the district court identified any language from these sources addressing the specific conduct at issue: whether Chrome sends personal information to Google even when a person chooses not to sync.

To support a finding of consent, a disclosure must "explicitly notify users of the conduct at issue" in a way that has only one plausible interpretation. *Calhoun*, 113 F.4th at 1147. If a "user could have plausibly understood the disclosures 'as *not*

disclosing that [Google] would engage in particular conduct,' then the disclosures are insufficient to establish consent." *Id.* (quoting *In re Facebook*, 402 F. Supp. 3d at 789). The district court's vague reference to unspecified help pages and agreements is far "too general" to suggest that Google gave "explicit notice to the particular conduct at issue here." *Torres*, 2024 WL 4894289, at *8; *see also Frasco*, 2025 WL 1433825, at *14.

In any event, as this Court observed, anything that could be gleaned from other sources must be read in light of the Chrome Privacy Notice's express promise that Chrome would not send personal information to Google absent a user's voluntary decision to sync. *See Calhoun*, 113 F.4th at 1149. Google's terms of service specify that, if any of its general contract "terms conflict with the service-specific additional terms," including the Chrome Privacy Notice, "the additional terms will govern for that service." 3-ER-383. Even if other sources could be read to disclose Google's practices, its Chrome-specific policy could still "reasonably be read to say the opposite." *Calhoun*, 113 F.4th at 1149. Reliance on those sources to show consent would ignore "the critical fact" in this case: that Google "represented to the plaintiffs that their information would not be collected, but then proceeded to collect it anyway." *Id.* at 1150.

**3.** The district court thought that it wasn't bound by this Court's mandate because the first appeal was about summary judgment, not class certification. Order

at 9 n.5. It is true that a district court on remand "may consider and decide any matters left open by the mandate of this court," including the question of class certification. *Thrasher*, 483 F.3d at 981. But although this Court's mandate did not bar the district court from either granting or denying certification, it *did* bar the court from doing so for reasons that conflict with "[a]ny issue conclusively decided or decided by necessary implication in the first appeal." *Alaska Dep't of Fish & Game v. Fed. Subsistence Bd.*, --- F.4th ---, 2025 WL 1551415, at *10 (9th Cir. 2025). This Court's mandate thus left the district court free to "evaluate whether the effort required to ascertain which class members read the privacy policies would defeat predominance." *Torres*, 2024 WL 4894289, at *7. But it could do so only *after* "a factfinder determines that a reasonable user would understand [Google's] privacy policies in such a way that … confer[s] consent." *Id.* And where "[r]easonable minds may differ" on a core question of fact, "[r]esolving that question … is the near-exclusive province of the jury." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 459 (2016).

The district court's flouting of this Court's straightforward holding to reach an incompatible result was "manifest error" that warrants this Court's immediate review "even absent a showing of another factor." *Chamberlan*, 402 F.3d at 959. The error is "significant" both to this litigation and to class actions in general, "easily ascertainable from the petition itself," and turns on a question of law subject to this Court's de novo review. *Id.*; *see Moldex-Metric, Inc. v. McKeon Prods., Inc.*, 891 F.3d 878,

887 (9th Cir. 2018) (de novo review applies to whether a district court complied with the mandate). It is thus an ideal candidate for interlocutory review. *See, e.g.*, *Williams v. Martorello*, 59 F.4th 68, 77 (4th Cir. 2023) (granting 23(f) petition to determine whether a "post-mandate decision of the district court violated the mandate rule"); *Gene & Gene, LLC v. BioPay, LLC*, 624 F.3d 698, 702 (5th Cir. 2010) (granting petition on whether the "mandate rule foreclose[d] the district court's actions on remand").

**B.    Under controlling California law, the plaintiffs' breach-of-contract claim involves no individualized issues of consent.**

Under Rule 23, "class certification is not an all-or-nothing proposition." *Simpson v. Dart*, 23 F.4th 706, 713 (7th Cir. 2022). "This observation flows from the text of Rule 23 itself: an order certifying a class 'must define the class *and the class claims, issues, or defenses.*'" *Id.* (emphasis added). To comply with that requirement, "[w]hen conducting class certification analyses, district courts should assess" Rule 23's requirements "as to each of the putative class claims*." Id.* The alternative—a "one size (or one claim) approach"—would be "at odds with the 'rigorous analysis' required." *Id.* (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)).

Rather than conducting the claim-focused analysis that Rule 23 requires, the district court generally found "that implied consent is a defense to each cause of action at issue." Order at 6. And rather than analyzing the elements of consent as applied to those claims, the court summarily found the defense "dispositive as to *all four*" of the plaintiffs' claims. *Id.* (emphasis added). For that sole reason, the court

denied class certification under Rule 23(b)(3) on every claim—including the claim for breach of contract. *Id.*

The district court's indiscriminate denial of class certification is another manifest error that cries out for review. Rule 23 requires courts to analyze certification "on a claim-by-claim, rather than holistic basis." *Bolin v. Sears Roebuck*, 231 F.3d 970, 976 (5th Cir. 2000). If the district court had conducted that required inquiry, it would have had no choice but to conclude that class members' subjective understanding of Google's practices has no bearing on the plaintiffs' breach-of-contract claims.

**1.** Despite its assertion that the "case law is clear," the district court cited no authority supporting its conclusion that the issue of consent creates individualized issues on the contract claim. Resolution of that issue, the court held, turns on "individualized inquiries as to each user's subjective understanding of [Google's] data collection practices." Order at 8. But the only contract cases the court cited in support were the court's own decisions in *Brown v. Google*, 2022 WL 17961497, at *19 (N.D. Cal. 2022), and *In re Google RTB Consumer Priv. Litig.*, 2024 WL 2242690, at *1 (N.D. Cal. 2024). Like the class-certification decision here, those decisions simply applied the concept of consent indiscriminately to contract claims, without authority holding the defense applicable in that context.

California, however, "recognizes the objective theory of contracts, under which it is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation." *Rodman v. Safeway*, 2014 WL 988992, at *7 (N.D. Cal. 2014). The "[m]utual consent necessary to the formation of a contract is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words." *DeLeon v. Verizon Wireless, LLC*, 143 Cal. Rptr. 3d 810, 820 (Cal. Ct. App. 2012). Thus, in almost every contract case, "the meaning of the contract will be determined by the objective meaning" of the contract's terms. *Rodman*, 2014 WL 988992, at *8.

That is especially true "in a standardized contract" like Google's, where terms are "interpreted wherever reasonable as treating alike all those similarly situated, without regard to their knowledge or understanding." *Id.* (quoting Restatement (Second) of Contracts § 211(2)). In *Harris v. comScore, Inc.*, for example, the court had little difficulty rejecting a defendant's argument "that the scope of consent will vary for each plaintiff depending on his subjective understanding of the agreement and the surrounding circumstances." 292 F.R.D. 579, 585 (N.D. Ill. 2013). "[T]hat rule,"

the court held, "has no place where a party manifested consent through the adoption of a form contract." *Id.*[2]

It is for this reason that, "when viewed in light of Rule 23, claims arising from interpretations of a form contract appear to present the classic case for treatment as a class action, and breach of contract cases are routinely certified as such." *Rodman*, 2014 WL 988992, at *7. The district court's contrary conclusion—that the contract claim here would turn "on each class member's subjective understanding of [Google's] promises," Order at 13—is therefore wrong as a matter of black-letter law.

**2.** Even if the district court's reading of the contract's language were plausible, it would not undermine predominance. Whether or not the district court's interpretation is the right one, the question whether Google's disclosures put users on notice is an objective one "that can be resolved with class-wide proof." *Torres*, 2024 WL 4894289, at *7; *Frasco*, 2025 WL 1433825, at *14 (holding that implied consent is not a "bar to predominance" for this reason). If the answer to that question is "no," the consent defense won't affect the class going forward and can't defeat predominance. And if the answer is "yes" (i.e., in Google's favor), "the district court can revisit its certification decision at that time." *United Steel, Paper & Forestry, Rubber,*

---

[2] It is true that "implied consent" may be relevant for questions of contract formation. *See Calhoun*, 113 F.3d at 1147 (citing *Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US), LLC*, 145 Cal. Rptr. 3d 514 (Cal Ct. App. 2012)). But there is no dispute over that issue here.

*Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. ConocoPhillips Co.*, 593 F.3d 802, 810 (9th Cir. 2010). "What a district court may not do is to … decline to certify the class on the basis of a mere potentiality that may or may not be realized." *Id.*

## II.   District courts in the Ninth Circuit are divided over the important question of when disclosures can defeat class certification.

**A.** The district court's denial of certification under Rule 23(b)(3) also warrants review because it raises "unsettled and fundamental issue[s] of law" important to class actions. *Chamberlan*, 402 F.3d at 959. By looking to each class member's subjective understanding, the district court adopted a rule that would "foreclose use of the class action device" in the very privacy cases in which it is most needed—those involving form contracts to which millions of users have agreed. That is "a result inconsistent with the efficiency aims of rule 23." *In re Monumental Life Ins. Co.*, 365 F.3d 408, 421 (5th Cir. 2004). And the court further undermined the purposes of Rule 23 by extending its decision "holistically" to all the plaintiffs' claims. *Bolin*, 231 F.3d at 976. "Certification on a claim-by-claim … basis is necessary to preserve the efficiencies of the class action device." *Id.*

If this Court does not step in, the district court's order will effectively terminate this litigation. The absent class members' individual claims are too modest to be litigated independently, without the cost-sharing benefits of aggregate litigation. *See Chamberlan*, 402 F.3d at 957. Even if some of the plaintiffs have the potential to litigate

their claims in federal court, many others do not—particularly in light of the risk that losing could result in assessment of costs that could outstrip their potential recovery.

The district court's holding that the existence of disclosures destroys Rule 23(b)(3)'s predominance requirement, if widely adopted, would "sound the death-knell" not only of this class action but "of the class action device" itself in any case involving standardized contracts. *Leyva*, 716 F.3d at 514. Under the district court's rule, a company could easily defeat certification (and effectively evade liability) for acts violating its contract terms. All it has to do is identify at least one internet source that a class member could, in theory, interpret as contradicting its express contractual promises—thus creating individualized questions of consent unsuitable for class review. That rule would encourage internet companies like Google to run roughshod over their users' privacy rights, secure in the knowledge that they will face at most a few individual, low-value claims.

For these reasons, the decision presents a "fundamental issue of law relating to class actions, important both to the specific litigation and generally," that justifies immediate review under Rule 23(f). *Chamberlan*, 402 F.3d at 959. A quick resolution of these "important, unsettled legal questions" is needed for both "the orderly progress of [this] complex litigation" and for "the orderly development of law." *Id.* at 958.

**B.** The decision below also implicates a significant intra-circuit split on an issue that in recent years has plagued district courts in the Ninth Circuit. In the

absence of this Court's guidance, courts have come down all over the map on the circumstances in which a consent to disclosures can defeat certification.[3] In direct conflict with the decision here, courts in some cases have found that consent is an objective standard presenting a common question "that can be resolved with class-wide proof." *Torres*, 2024 WL 4894289, at *7; *see also, e.g.*, *Frasco*, 2024 WL 4280933, at *2. Some have applied the consent defense to breach-of-contract claims, *see Brown*, 2022 WL 17961497, at *19; *Google RTB*, 2024 WL 2242690, at *1, while others have limited it to the privacy context, *see In re Google Inc. Gmail Litigation*, 2014 WL 1102660, at *14 (N.D. Cal. 2014).

This division among the district courts can only be fixed by this Court. *See Chamberlan*, 402 F.3d at 960. Until it is, otherwise identically situated class actions (even those involving the same standardized contract) will meet diametrically opposite outcomes, undermining predictability for corporations and consumers alike. That alone justifies granting the petition. *Id.*

---

[3] *See, e.g.*, *Frasco*, 2025 WL 1433825, at *6-8 (N.D. Cal. 2025) (Donato, J.); *Lakes v. Ubisoft, Inc.*, --- F. Supp. 3d ---, 2025 WL 1036639, at *5-6 (N.D. Cal. 2025) (Thompson, J.); *Zarif v. Hwareh.com, Inc.*, 2025 WL 486317, at *6 (S.D. Cal. 2025) (Bashant, J.); *Rodriguez*, 2025 WL 50425, at *5 (N.D. Cal. 2025) (Seeborg, J.); *Griffith v. TikTok, Inc.*, 2024 WL 5279224, at *5 (C.D. Cal. 2024) (Blumenfeld, J.); *Torres*, 2024 WL 4894289, at *4-5 (Breyer, J.); *St. Aubin v. Carbon Health Techs., Inc.*, 2024 WL 4369675, at *8 (N.D. Cal. 2024) (Tigar, J.); *Libman v. Apple, Inc.*, 2024 WL 4314791, at *6 (N.D. Cal. 2024) (Davila, J.).

## CONCLUSION

This Court should grant the petition for permission to appeal.

Respectfully submitted,

*/s/Matthew W.H. Wessler*
MATTHEW W.H. WESSLER
GREGORY A. BECK
GUPTA WESSLER LLP
2001 K Street NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*

LESLEY E. WEAVER
BLEICHMAR FONTI & AULD, LLP
1330 Broadway, Suite 630
Oakland, CA 94612
(415) 797-2617

DAVID A. STRAITE
CORBAN S. RHODES
DICELLO LEVITT LLP
485 Lexington Avenue, 10th Floor
New York, NY 10017
(646) 933-1000

JASON O. BARNES
THIEN AN VINH TRUONG
SIMMONS HANLY CONROY, LLP
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6276

ADAM J. LEVITT
AMY E. KELLER
ADAM PROM
DICELLO LEVITT LLP
10 North Dearborn Street, 6th Floor
Chicago, IL 60602
(312) 214-7900

ERIC S. JOHNSON
JENNIFER M. PAULSON
SIMMONS HANLY CONROY, LLP
One Court Street
Alton, IL 62002
(618) 259-6231

June 23, 2025                          *Counsel for Plaintiffs-Petitioners*

# CERTIFICATE OF COMPLIANCE

This petition complies with the page-volume limitations set out in Ninth Circuit Rule 5-2(b) and 32-3 because it is 5,597 words. This petition complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

_/s/Matthew W.H. Wessler_
MATTHEW W.H. WESSLER

## CERTIFICATE OF SERVICE

I hereby certify that on June 23, 2025, I electronically filed the foregoing petition with the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit by using the ACMS system. All counsel consented in writing to electronic service via email. I emailed the petition to the following people:

Stephen A. Broome
stephenbroome@quinnemanuel.com

Alyssa G. Olson
alyolson@quinnemanuel.com

Andrew H. Schapiro
andrewschapiro@quinnemanuel.com

Viola Trebicka
violatrebicka@quinnemanuel.com

*/s/Matthew W.H. Wessler*
MATTHEW W.H. WESSLER

**Exhibit A**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| **PATRICK CALHOUN, ET AL.,** | **Case No.: 4:20-CV-05146-YGR** |
| Plaintiffs, | **ORDER DENYING MOTION FOR CLASS CERTIFICATION** |
| v. | Re: Dkt. Nos. 1058, 1060, 1077, & 1081. |
| **GOOGLE LLC,** | |
| Defendant. | |

In this action, plaintiffs are users of defendant Google LLC's ("Google's") Chrome web browser who allege that their privacy rights were violated when Google appropriated personally identifiable information it had contractually promised to leave untouched. This is one of three actions over which the Court is presiding regarding this genre of allegations. The specific claims at issue here differ significantly from the other two.

Having carefully considered the papers submitted and the pleadings in this action, and for the reasons set forth below, the Court hereby **DENIES** the motion for class certification **WITHOUT LEAVE TO AMEND**.[1]

I. **BACKGROUND**

    A. **Factual Background**

This case arises from a set of promises Google made to users of its web browser Chrome. More specifically, Google promised it would not collect the personal information ("PI") of any Chrome user who chose not to "sync" their Chrome browser with their Google account. (Dkt. No. 162-3, First Amended Complaint "FAC", ¶ 1.) In particular, Google's Chrome Privacy Notice

---

[1] Plaintiffs seek leave to file additional documents in support of their motion for class certification in order that the Court may take judicial notice of them. (Dkt. No. 1058.) Because the Court finds the motion appropriate for resolution without consideration of the additional documents, the request is **DENIED**. Additionally, plaintiffs move to strike the expert reports of two defense experts. (Dkt. Nos. 1077, 1081.) As stated on the record at argument, the Court views these requests as attempts to circumvent the *Daubert* process. There are no valid grounds to exclude these experts, and plaintiffs' objections to their reports go to weight, not admissibility. Motions to strike under such circumstances tax judicial resources. The motions are **DENIED**.

("CPN") promised Chrome users they need not "provide any personal information to use Chrome" and that "the personal information that Chrome stores won't be sent to Google unless [users] choose to store that data in [their] Google Account by turning on sync." (*Id*. ¶¶ 44-45 (quoting CPN).)

Multiple governing documents are relevant to the instant motion and plaintiffs categorize them thusly:

> The Chrome Contract consists of four primary documents: from September 2018 to March 2020, it consisted of (1) the Chrome Terms of Service; (2) the Chrome Privacy Notice; and (3) the Google Privacy Policy. From March 2020 to present, the Chrome Contract consisted of (1) the Google Terms of Service; (2) the Chrome Privacy Notice; and (3) the Google Privacy Policy. For both periods, the Chrome Contract included express integration clauses.

(Dkt. No. 1061-1, Motion for Class Certification ("Mtn.") at 4.) Though different documents comprised the sum total of the contract between Google and plaintiffs, plaintiffs attest that "[t]hroughout the Class Period, the Chrome Contract promised that Chrome would not send personal information to Google unless a person chose to sync their Chrome data with their Google Account." (*Id*. at 5.)

While the CPN contained the promises referenced above, Google disclosed information about data collection in other documents. The Court previously made three relevant findings: One, Google's "General Privacy Policy discloses that Google collects the at-issue data when users visit websites that use Google services . . . [and] also discloses how Google uses the at-issue data." Two, the "Consent Bump Agreement . . . disclosed that users generate data when they use Google's services [and] that Google will use this information to make ads across the web more relevant." Three, the New Account Agreement "disclosed the type of data that is collected when one uses a Google service" along with how it is used. (Dkt. No. 935, Order Granting Google's Motion for Summary Judgment ("MSJ Order") at 17-20 (internal cites omitted).)

Notwithstanding these other disclosures, plaintiffs allege that Google's data collection practices violated its agreement with Chrome users throughout the class period. Thus: "Using Google source code, Chrome is designed to—and does—send class members' PI to Google,

whether a Chrome user has enabled Chrome's Sync feature." (Mtn. at 5 (internal cites omitted).)
The FAC identifies the relevant transmitted PI for Chrome users as unique, persistent cookie
identifiers; browsing history in the form of the contents of the users' GET requests and POST
communications; IP addresses; User-Agent information about users' devices; and x-client-data
identifiers. (FAC ¶ 141.) Plaintiffs allege Chrome users' PI is valuable to Google, who uses it "to
create detailed dossiers about [an] individual's personal information" for targeted advertising. (*Id*. ¶
258.) For purposes of this motion only, the Court accepts as true that Google collects the data
identified above when Chrome users are not synced. *See Calhoun v. Google, LLC*, 113 F.4th 1141,
1144 (9th Cir. 2024) ("At the motion to dismiss stage, Google did not deny collecting Plaintiffs'
data while using Chrome in an unsynced mode.").

**B. Procedural Background**

The Court granted Google's summary judgment motion on consent grounds, finding that
"the documents plaintiffs cite[d], viewed individually and holistically, [were] insufficient to
establish a genuine material dispute as to whether plaintiffs consented to Google's conduct." (MSJ
Order at 27.) This Court's decision rested on a finding that Google collected the at-issue data
regardless of which browser was in use, and therefore its collection and use was governed by the
"browser-agnostic" general privacy policies, not the Chrome-specific CPN. (*See id*. at 16 ("Because
the Court finds that the at-issue data collected is not specific to Chrome but browser agnostic, the
Court also finds that Google's general policies apply.").

On appeal, the Ninth Circuit reversed. The Court of Appeals held this Court "should have
reviewed the terms of the various disclosures and decided whether a reasonable user reading them
would think that he or she was consenting to the data collection." *Calhoun*, 113 F.4th at 1148.
"Because applying the correct standard reveals disputes of material fact regarding whether
'reasonable' users of Google's product consented to Google's data collection practices," the Ninth
Circuit remanded the consent issue for trial "assuming a plaintiff class is certified." *Id*. at 1151.

Following the remand order, plaintiffs now move to certify a class of
> All Google Accountholders who accepted Google's U.S. Terms of
> Service prior to October 4, 2023 and who used the Chrome Browser in
> the (1) Basic Browser and/or (2) Signed In, But Not Consented for
> Sync modes from September 23, 2018 to the present.

(Mtn. at 1.) Plaintiffs move for certification under Rule 23(b)(3) and 23(b)(2) or, alternatively, an issue class under Rule 23(c)(4) "as to any claim for which the Court determines one or more issues are not appropriate for (b)(3) certification." (*Id.*)

## II.   LEGAL FRAMEWORK

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki,* 442 U.S. 682, 700-01 (1979)). Because of this, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.* at 348-49 (quoting *East Tex. Motor Freight Syst., Inc. v. Rodriguez,* 431 U.S. 395, 403 (1977)).

"Before certifying a class, the trial court must conduct a rigorous analysis to determine whether the party seeking certification has met the prerequisites of Rule 23." *Mazza v. Am. Honda Motor Co., Inc.,* 666 F.3d 581, 588 (9th Cir. 2012) (internal quotation marks omitted). The rigorous analysis that a court must conduct requires "judging the persuasiveness of the evidence presented" for and against certification and "resolv[ing] any factual disputes necessary to determine whether" the requirements of Rule 23 have been satisfied. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982–83 (9th Cir. 2011). A "district court must consider the merits if they overlap with the Rule 23(a) requirements." *Id.* at 981. Importantly, "Rule 23 does not set forth a mere pleading standard." *Dukes,* 564 U.S. at 350. "A party seeking class certification must affirmatively demonstrate his compliance with the rule" and "be prepared to prove" as much. *Id.*

Rule 23 is satisfied when a party demonstrates meeting all four prerequisites of Rule 23(a) plus one of three factors in Rule 23(b). Specifically, Rule 23(a) requires a showing that: (1) the class is so numerous that joinder of all members is impracticable; (2) common questions of law or fact as to the class exist; (3) the claims or defenses of the representative parties are typical of those of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). Relevant here, certification under Rule 23(b)(3) is appropriate only if "the questions of law or fact common to class members predominate over any questions affecting only individual members" and "a class action is superior to other available methods for fairly and

1  efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(2) permits

2  certification of a class when "the party opposing the class has acted or refused to act on grounds

3  that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is

4  appropriate respecting the class as a whole."

5        Finally, "[w]hen appropriate, an action may be brought or maintained as a class action with

6  respect to particular issues." Fed. R. Civ. P. 23(c)(4). Certification of an issue class is "appropriate"

7  only if it "materially advances the disposition of the litigation as a whole." *Rahman v. Mott's LLP*,

8  693 F. App'x 578, 579 (9th Cir. 2017) (cleaned up). Each proposed Rule 23(c)(4) issue class "must

9  still meet the requirements of Rule 23(a) and (b) (except for the predominance requirement of Rule

10  23(b)(3))." *Tasion Commc'ns., Inc. v. Ubiquiti Networks, Inc.*, 308 F.R.D. 630, 633 (N.D. Cal.

11  2016) (citing *Avilez v. Pinkerton Gov't. Servs.*, 596 Fed. App'x 579, 579 (9th Cir. 2015)); *see also*

12  *Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 6 F.3d 177, 189 (4th Cir. 1993) (holding that each

13  subclass on each issue must independently meet all the Rule 23(a) requirements and fall in at least

14  one of the Rule 23(b) categories).

15  **III.**   **ANALYSIS**

16      **A.**     **Rule 23(b)(3)**

17        Rule 23(b)(3) requires the Court to determine whether "questions of law or fact common to

18  class members predominate over any questions affecting only individual members." Fed. R. Civ. P.

19  23(b)(3). "An individual question is one where 'members of a proposed class will need to present

20  evidence that varies from member to member,' while a common question is one where 'the same

21  evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to

22  generalized, class-wide proof.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)

23  (citation omitted). The "predominance inquiry asks whether the common, aggregation-enabling,

24  issues in the case are more prevalent or important than the non-common, aggregation-defeating,

25  individual issues." *Id.* (quoting 2 W. Rubenstein, 2 Newberg on Class Actions § 4:50 (5th ed.)).

26  "When 'one or more of the central issues in the action are common to the class and can be said to

27  predominate, the action may be considered proper under Rule 23(b)(3) even though other important

28  matters will have to be tried separately, such as damages or some affirmative defenses peculiar to

1  some individual class members.'" *Id.* (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal

2  Practice and Procedure § 1778 (3d ed.)). "Considering whether 'questions of law or fact common to

3  class members predominate' begins, of course, with the elements of the underlying cause of

4  action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011) (citation omitted).

5       Google challenges the damages class certification under 23(a)'s typicality prong and 23(b)'s

6  predominance prong. Here, the Court finds the latter dispositive as to all four causes of action.

7       According to Google, the affirmative defense of implied consent defeats predominance in

8  this matter. In *Brown v. Google LLC*, this Court noted that the Ninth Circuit "instructs that a

9  defendant must present non-speculative evidence that an affirmative defense would require

10 individualized inquiries to defeat the predominance inquiry." 2022 WL 17961497, at *18 (N.D.

11 Cal. 2022) (relying on *True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 931-32

12 (9th Cir. 2018)). Because case law is clear that implied consent is a defense to each cause of action

13 at issue in this matter, the Court must "analyze[] Google's proffered evidence in light of its burden

14 to show consumers consented to, or had adequate notice of, the data collected, stored, and

15 disclosed." *Id*.

16      Google provides five sources of information from which a Chrome user could have

17 understood which data it collected.

18      First, Google points to its privacy policy. As this Court previously found, "Google's

19 'Privacy Policy discloses that Google collects the at-issue data when users visit websites that use

20 Google services' and 'also discloses how Google uses the at-issue data.'" (MSJ Order at 17-18).

21 That privacy policy contained several disclosures, such as informing readers:

22             We collect information about your activity in our services, which we
              use to do things like recommend a YouTube video you might like. The
23            activity information we collect may include . . . Terms you search for[,]
              . . . Activity on third-party sites and apps that use our service[, and]
24            Chrome browsing history you've synced with your Google Account.

25 (Dkt. No. 1074, Declaration of Gregory Fair In Support of Google's Opposition to Plaintiffs'

26 Renewed Motion for Class Certification ("Fair Decl.") ¶ 70.) Google notes it "keeps statistics on

27 how many times its Privacy Policy and other disclosure pages are viewed and how much time users

28

spent on the page" and states the policy "was viewed more than 225 million times" between March 2018 and July 2020. (*Id*. ¶ 75.)

Second, anyone with a Google account may have signed one or more "Account Holder Agreements" which disclosed its data collection practices. (*Id*. ¶ 17.) By way of example, Google points to its "Consent Bump Agreement" which stated, for example:

> When you use Google services like Search and YouTube, you generate data — things like what you've searched for and videos you've watched. You can find and control that data in My Account under the Web & App Activity setting. With this change, this setting may also include browsing data from Chrome and activity from sites and apps that partner with Google, including those that show ads from Google.

(Dkt. No. 1074-19; Fair Decl., Ex. 18 at 13.) This particular agreement allowed readers to click through to a FAQ page further disclosing the collection of certain data. "As of October 31, 2016, holders of tens of millions of U.S. Accounts had seen the Consent Bump Agreement," and "[a]pproximately 89% of those Accounts consented" to it. (Fair Decl. ¶ 33.)

Third, any user creating a Google account after June 2016 signed a New Account Creation Agreement. (*Id*. ¶ 44.) This agreement disclosed the collection and subsequent use of certain user data, "including information like the video you watched, device IDs, IP address, cookie data, and location[,] … when [account holders] use apps or sites that use Google services like ads, Analytics, and the YouTube video player." (Dkt. No. 1074-19; Fair Decl., Ex. 18 at 6.) At least four named plaintiffs, and users representing hundreds of millions of U.S. accounts, consented to this agreement. (Fair Decl. ¶¶ 57, 62.)

Fourth, Google's help center contains several articles "direct[ing] users to their My Activity pages." (*Id*. ¶ 93.) These articles allow users to view what sorts of data Google collects and offers instructions on how to delete much of it. (*See id*. ¶¶ 93-110.)[2]

---

[2] Google provides copies of these articles, titled: "How Google helps you manage data with My Activity," "Delete Your Activity," "View & control activity in your account," "Find, control & delete the info in your Google Account," "Control what activity gets saved to your account," "Find & control your Web & App Activity," "Clear browsing data," and "Delete your Chrome browsing history." (*See id*., Exs. 17, 102-06, 108-09; Dkt. Nos. 1074-18, 1074-107 – 1074-111, 1074-113-1074-114.)

Fifth, and finally, "Google's agreements with websites that use its services require those websites to make certain disclosures" about data collection practices. (*Id.* ¶ 113.) For example, websites using Google Analytics must

> post a Privacy Policy and that Privacy Policy must provide notice of [the third-party websites'] use of cookies, identifiers for mobile devices (e.g., Android Advertising Identifier or Advertising Identifier for iOS) or similar technology used to collect data. [The websites] must disclose the use of Google Analytics, and how it collects and processes data.

(Fair Decl., Ex. 115; Dkt. No. 1074-122 at 5.) So, too, with websites using Google Ad Manager, which requires "a privacy policy that clearly discloses any data collection, sharing and usage that takes place on any site, app, email publication or other property as a consequence of [the] use of Google products," and "must disclose to users that third parties may be placing and reading cookies on [their] browsers, or using web beacons to collect information as a result of ad serving." (Fair Decl., Ex. 117; Dkt. No. 1074-124 at 7.)

Google has met its burden of presenting concrete evidence sufficient to show individualized inquiries as to each user's subjective understanding of its data collection practices. The proposed class contains millions of Chrome users, each of whom was exposed to, and may have explicitly or implicitly consented to, varying disclosures potentially providing notice that their use of Chrome meant their data would be collected. In this regard, this case is identical to this Court's previous adjudication in *Brown v. Google.* 2022 WL 17961497, at *19 (Google provided "evidence that its consent defense would be based on individual, and subjective, interactions of what certain class members knew, read, saw, or encountered" and the "[e]vidence shows variation between what users knew or did not know.").[3]

_____

[3] Plaintiffs take issue with Google's focus on "data collection," arguing that this mis-frames the real inquiry, which asks whether the personal information of Chrome users was sent to Google in both synced and un-synced modes. (Dkt. No. 1080, Plaintiffs' Reply In Support of Renewed Motion for Class Certification ("Reply") at 3.) To the extent the argument is intended to negate the Court's consideration of the panoply of sources of information Google provides, the Court disagrees. Implied consent asks about a user's subjective understanding of the terms of the relevant agreement; it is "an intensely factual question that requires consideration of the circumstances surrounding the alleged privacy violation" that takes into account "a broad set of materials." *In re Google RTB Consumer Priv. Litig.*, 2024 WL 2242690, at *12 (internal cites omitted). Google has

Plaintiffs offer several arguments to defeat Google's implied consent argument. None persuades.

First, plaintiffs urge that implied consent is not a defense to the four causes of action. The Court disagrees. *See Brown*, 2022 WL 17961497, at *19; *RTB*, 2024 WL 2242690, at *14; *see also* Dkt. No. 142, Order Granting in Part and Denying in Part Motion to Dismiss at 12 & n.3 (J. Koh, stating that "[c]onsent is a defense to Plaintiffs' claims" and listing cases). As a corollary, plaintiffs argue the Court may not consider extrinsic evidence in the specific context of the breach of contract and UCL claims, since those relate to an integrated contract. The argument may be true when applied to the interpretation of a specific contractual term, but the implied consent inquiry permits a court to consider extrinsic evidence to the extent necessary to determine a party's subjective understanding of the terms to which they consented.[4]

Second, plaintiffs assert that the Ninth Circuit foreclosed the issue. The Court does not read the Court of Appeals' decision so broadly. The Ninth Circuit found that "when the disclosures are read together and in the light most favorable to Plaintiffs, a reasonable user would not *necessarily* understand that they were consenting to the data collection at issue." *Calhoun*, 113 F.4th at 1150 (emphasis supplied). It does not automatically follow, however, that *no* reasonable user would so understand. It's hard to envision how this issue could be tried globally. With such a wide variation in sources of information to which millions of class members were exposed, the notion that plaintiffs' single approach predominates lacks credibility.[5]

---

provided evidence that demonstrates different users may have had varying understandings of Google's data collection practices and the commitments required by Google under the CPN. For the implied consent analysis, this is sufficient.

[4] For this reason, plaintiffs' citation to a quote from *RTB* stating that extrinsic evidence is irrelevant is misplaced. (*See* Reply at 6.) In context, that quote spoke about the injunctive relief inquiry under Rule 23(b)(2), and specifically contrasted that inquiry from the implied consent analysis, where extrinsic evidence was deemed relevant. *See RTB*, 2024 WL 2242690, at *15 ("Though the Court agrees with Google that individualized inquiries will be required for implied consent, [the injunctive relief] question will be resolved on the basis of Google's standardized disclosures . . . alone.").

[5] That material disputes of fact are questions for the jury is not the issue. (*See* Reply at 1.) To satisfy Rule 23, a plaintiff must still show predominance. The Ninth Circuit recognized the

Third, plaintiffs raise certain arguments going to the reasonableness of any putative class member's understanding that Google collected their PI.[6] These arguments require interpretation of the various sources of information proffered by Google, the precise sort of inquiry that is likely to overwhelm questions common to the class.

\*\*\*

For the reasons enumerated above, the Court finds as it did in both *Brown* and *RTB*, namely inquiries relating to Google's implied consent defense will overwhelm the damages claims for all causes of action. The motion to certify a Rule 23(b)(3) damages class is **DENIED WITH PREJUDICE.**

## B.   **Rule 23(b)(2)**

Unlike a damages class, a Rule 23(b)(2) class does not require predominance or superiority.

> Rule 23(b)(2) allows class treatment when the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. . . . the focus is not on the claims of the individual class members, but rather whether [defendant] has engaged in a common policy.

*Des Roches v. Cal. Physicians' Serv.,* 320 F.R.D. 486, 507 (N.D. Cal. 2017) (cleaned up).

Plaintiffs present several requests for injunctive relief: requiring Chrome or Google to: (i) "provide accurate and clear statements" about its data collection practices, (ii) permit Chrome users to affirmatively opt in to data collection, (iii) allow Chrome users the opportunity to view and delete the data Google collects from them, and (iv) provide e-mail and in-product notice of any future changes to the Chrome contract. (*See* Mtn. at 24.)

---

distinction. *Calhoun*, 113 F.4th at 1151 (remanding the issue for trial "assuming a plaintiff class is certified.").

[6] For example, plaintiffs posit that here, the CPN made Chrome-specific promises and stated that document controlled over others, and thus it would be unreasonable for a user to impliedly consent based on other documents. (*See* Reply at 6-7.) Even if a reasonable proposition, the Court cannot make that finding as a matter of law, and eliminate the evidence of all the other documents to the issue at hand.

As a threshold matter, defendant asserts named plaintiffs are atypical and therefore cannot satisfy Rule 23(a) because they did not actually read the CPN. Typicality is a "permissive" standard and requires the claims of named class members be "reasonably co-extensive with those of absent class members." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (abrogated on other grounds by *Rodriguez Diaz v. Garland*, 53 F.4th 1189 (9th Cir. 2022)) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)). Under this flexible standard, the Court understands that all class members were in the same contractual relationship with Google, received the same set of promises, and had the same types of PI sent to Google. This weighs in favor of typicality. However, the evidence regarding the various exposures class members had to disclosures, including whether they read the CPN, weighs against typicality. Ultimately, the Court need not decide.

Under Rule 23(b)(2), plaintiffs must show "concrete and particularized legal harm . . . coupled with a sufficient likelihood that [they] will again be wronged in a similar way." *Backhaut v. Apple Inc.*, 2015 WL 4776427, at *8 (N.D. Cal. 2015) (internal citation omitted). The future injury may be neither "conjectural" nor "hypothetical;" rather, there must be a "real and immediate threat of repeated injury." *Id.* (internal citations omitted). Here, plaintiffs cannot do so. First, with respect to their claims sounding in contract, plaintiffs conceded that the current promises with regard to Chrome's data collection exist in non-contractual documents. (*See* Hearing Tr. at 86:22-24 ("Google replaced [the CPN] with what's called 'privacy in Chrome' documents, which are not contractual anymore.").) Thus, there are no contractual promises to be enforced.

Second, as to the non-contractual claims, plaintiffs argue their injuries are ongoing because (i) Google continues to take PI without consent and (ii) the new disclosures are unintelligible. The evidentiary record compels a different conclusion. Plaintiffs' case rests on a theory of liability grounded in the synced/not-synced distinction found in the CPN. Because the CPN no longer exists, however, the alleged harm from lack of disclosure about this distinction cannot flow from the surviving documents. (*Cf*, MSJ Order at 17 (finding that the Google Privacy Policy adequately "discloses that Google collects the at-issue data when users visit websites that use Google services."); *see also Calhoun*, 113 F.4th at 1150 (Ninth Circuit finding that only the CPN–but not the other relevant documents–"mentions the sync/non-sync distinction.").)

To counter the claim that Google has completely removed the offending promises, plaintiffs' counsel pointed at argument to Google's current privacy policy which states: "Your Chrome browsing history is only saved to your account if you've enabled Chrome sync with your account." (Hearing Tr. at 86:9-10.) In declaration, though, a product manager with Google's Privacy and Data Protection Office ("PDPO") stated that the Chrome browsing history by itself is distinct from the data at issue here.

> Chrome browsing history, and the data that Google receives through the Google Services (i.e., the data at issue here), are different. Chrome browsing history does not include the disputed data—cookie identifiers; GET or POST requests; IP address and user-agent information; or X-Client-Data Headers. . . . Chrome browsing history consists of a list of all the webpages (URLs) visited within the last 90 days (unless the user has deleted her history within that window) and the time when they were visited. This includes visits to websites that do not use Google Services. Google does not receive Chrome browsing history from Chrome users who have not enabled Sync.

(Fair Decl. ¶ 12.) From the evidentiary record before the Court, therefore, plaintiffs have failed to identify any surviving promise in Google's various disclosures that evidence an ongoing promise to avoid collecting data that Google does, in fact, surreptitiously collect. As a result, injunctive relief is not warranted.

Plaintiffs' motion to certify an injunctive class under Rule 23(b)(2) is **DENIED**.

## C.     Rule 23(c)(4)

Plaintiffs' final request is for certification of an issue class under Rule 23(c)(4). Predominance is not strictly a requirement in order to certify a Rule 23(c)(4) issue class, but a district court is within its discretion to refuse to certify one where "numerous individualized issues affect[] determinations of liability [and therefore] make Rule 23(c)(4) certification inefficient." *Reitman v. Champion Petfoods USA, Inc.*, 830 F. App'x. 880, 882 (9th Cir. 2020). "Rule 23(c)(4) enables a district court to certify an issue class [w]hen appropriate, but a court does not abuse its discretion when it declines to do so because certifying a class does not materially advance[ ] the disposition of the litigation as a whole." *Id.* (internal cites omitted).

Plaintiffs argue that an issue class would materially advance the litigation from an efficiency perspective because a *prima facie* case for liability can be established through classwide proof. As other courts have found, issue class certification is ineffective in efficiently driving the litigation where individualized issues impact the underlying liability determination. *See, e.g.*, *Reitman*, 830 Fed. App'x. at 882; *Backhaut*, 2015 WL 4776427, at *3 n.3.

Though implied consent is an affirmative defense, it still means liability in this case ultimately turns on each class member's subjective understanding of defendant's promises.

The motion to certify an issue class under Rule 23(c)(4) is **DENIED.**

## IV. CONCLUSION

For the reasons stated above, plaintiffs' motion for class certification is **DENIED WITH PREJUDICE**. Within twenty-one (21) days of the issuance of this Order, parties shall meet and confer and submit a joint scheduling proposal for the remainder of this action. The parties' pending motions to seal will be addressed by separate court order.

This terminates Dkt. Nos. 1058, 1060, 1077, & 1081.

**IT IS SO ORDERED**.

Date: June 9, 2025

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

13