# EXHIBIT D2
**to Joint Attorney Declaration ISO Plaintiffs' Renewed Motion for Class Certification [Filed Under Seal]**

**Expert Rebuttal Report of Prof. Joseph Turow, dated Feb. 15, 2022**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

PATRICK CALHOUN, et al., *on behalf of themselves and all others similarly situated*,

                Plaintiffs,

*v.*

GOOGLE LLC,

                Defendant.

Case No. 4:20-cv-05146-YGR-SVK

**EXPERT REBUTTAL REPORT OF JOSEPH TUROW, Ph.D.**

# TABLE OF CONTENTS

I.   EXECUTIVE SUMMARY ................................................................................................ 3

II.  FOUNDATION FOR MY OPINIONS .......................................................................... 9

    A.   I Formed My Opinions Using Methodologies Accepted in My Field. ......................... 11

        1.   Rebuttal Opinion #1: Professor Erdem's argument that my report is not guided by specialist knowledge or scientific method is simply wrong. ..................................... 11

        2.   Rebuttal Opinion #2: Professor Erdem's critique that I do not define personal information is misplaced. ........................................................................................... 14

        3.   Rebuttal Opinion #3:  I stand by my decision that a survey is unnecessary to understand the misleading presentation Google makes to reasonable people about its use of people's Chrome data if they decide not to sync. ..................................... 17

III. PROFESSOR ERDEM'S SURVEYS ARE DEFICIENT ........................................... 20

    A.   Overview of Basic Methodologies Required to Conduct Adequate Surveys ............... 20

        1.   The survey should be nationally representative. ..................................................... 20

        2.   The sample should be chosen to be neutral regarding the topic studied. .................. 21

        3.   The survey should not contain statements that leads respondents toward answers. . 22

        4.   The surveys should present choices appropriate to the questions. ........................... 22

    B.   The Many Drawbacks of the Erdem Surveys ............................................................. 23

        1.   Professor Erdem's surveys are inadequate for the purposes she claims. ................. 23

        2.   There is no record of the actual instrument Professor Erdem used. ......................... 25

        3.   The survey instruments Professor Erdem created did not speak to major issues of this case. .............................................................................................................. 27

        4.   Professor Erdem's survey notices, questions and interpretations are flawed. ........... 38

IV. CONCLUSION ............................................................................................................. 39

## I.     EXECUTIVE SUMMARY

**1.**     I submitted an opening report in this case on October 13, 2021 expressing the following opinions, based upon decades of experience reviewing privacy policies and applying that to the specific questions in this case:

> a.     ~~Opinion #1: A reasonable person reading the Chrome Sync Setup Windows would understand that Google will only personalize its services if sync is enabled.~~
>
> ~~b.~~     ~~Opinion #2: A reasonable person who reads the Chrome Privacy Notice from would understand that Chrome does not send personal information to Google unless a person enables sync.~~
>
> ~~c.~~     ~~Opinion #3: A reasonable person who reads the Google's General Privacy Policy would understand that Google receives personal information from Chrome only if sync is enabled.~~
>
> d.     Opinion #4: Reasonable consumers wrongly believe that the label "privacy policy" means their privacy is protected and are unable to comprehend the legalese in privacy policies.

**2.**     In part two of this report, I respond to Prof. Erdem's criticisms of these opinions, particularly focused on the concept that in order to express such opinions, I must have conducted a survey. Sometimes surveys, if well focused, properly conducted and not biased, can provide additional data to consider when analyzing an issue. That is not required on this motion. My opinions are grounded in evidence in this case and upon years of research and study, including my work leading the longest stretch of surveys of American consumer attitudes related to Internet privacy. Specifically:

Expert Rebuttal Report of Joseph Turow, Ph.D.
Case No. 4:20-cv-05146-YGR-SVK

a.    <u>Rebuttal opinion #1</u>:  Prof. Erdem's argument that my report is not guided by specialist knowledge or scientific method is simply wrong. My specialized knowledge is based on a deep understanding of the history and nature of privacy policies in the context of how firms craft the policies and work to confuse typical members of the public. My expertise allows me to apply discourse analysis—a method well-established in my field—in order to present an understanding of how companies craft certain plain meanings and embed them in the texts of otherwise impenetrable privacy policies in order to encourage regular people to draw meanings that are not accurate.

b.    <u>Rebuttal opinion #2</u>:  Prof. Erdem's critique that I do not define personal information is misplaced. As Google and companies writing privacy policies know, personal information is any information that can be reasonably linked to a person, as now defined by the landmark California privacy law. But by hiding descriptions of what companies are taking behind jargon or technical terms, the policies obscure what people understand. In making these statements, I am not expressing an opinion about the legal definition. I am considering whether a reasonable person could understand what Chrome sends to Google about them and how Google links it to other information it has about them, and the devices they are using. My opinion is that a reasonable person would not. In my deposition I explained that I used "personal information" in my report because Google uses that term. Turow Dep. Tr. 120:10-14.

    c.    <u>Rebuttal opinion #3</u>: The criticism that I needed to conduct a survey to reach my opinions is wrong. I stand by my opinion that a survey is unnecessary in this case to identify the misleading presentations Chrome makes to reasonable people about its use of their Chrome data if they do not enable sync, or if they disable it. A survey may be useful when the plain meaning of the situation or text to a reasonable person is in doubt. This is simply not the case here, as my review of the existing research on this topic, analysis of the policies themselves, and evidence in this case has demonstrated.

3.    In part three of this report, I address the three surveys conducted by Prof. Erdem, using a market research company called Dynata, with a respondent panel recruited under its "E-Rewards" name rather than an established survey research company. Because I have conducted many nationwide surveys in the past, carried out by highly reputable firms such as SSRS, Roper, and Princeton Research, I have a deep understanding of survey research. Since 1999 I have conducted over nine gold standard nationally representative surveys regarding privacy related topics and users' understanding of Internet data practices. I conclude that Prof. Erdem's surveys for Google did not employ commonly accepted survey principles that meet that standard. Because of inherent flaws in the respondent pool, questions she poses as related to the questions at issue, and how she analyzes data, her conclusions would not survive peer review. I find her surveys flawed on multiple levels, including:

    a.    Prof. Erdem's survey is not reliable because her techniques for recruiting respondents via Dynata/e-rewards are biased and are not acceptable survey-participant selection methodologies. Rather than a random sample of

potential class members, Dynata/e-rewards recruited an unrepresentative sample (adults interested in technology); excluded respondents who say they do not understand the questions posed; excluded everyone under eighteen; and excluded people who failed to reveal personal information about themselves, such as age or gender. These are not appropriate screening questions in this context because I understand the class includes younger persons and people who care about privacy—and the survey sample excludes them. Moreover, by expressly inviting people interested in technology to take her surveys, Prof. Erdem, through Dynata, may be bringing into the sample people who sync with Chrome in real life and excluding the large percentages of the population who do not—thereby making the survey findings invalid. Prof. Erdem in her deposition seemed to know little about how the survey was administered, and she was unable even to say how people were paid, although she was sure they received financial compensation.

b.    Prof. Erdem's surveys are not reliable for the questions relevant to this case because she showed respondents the wrong documents to answer the major questions in this case. If the Chrome contract with consumers is governed by the Chrome Privacy Notice, which the Google Terms of Service specifically says governs use of the Chrome browser —above any other general statements made by Google, then one would expect a survey to focus on that. My opinion is that Google's secret backend systems of what

it does with the data that Chrome sends are so complex that it is impossible to structure an efficient survey at all.

c.   Prof. Erdem's surveys are not reliable for the questions relevant to this case because the questions she asked in the surveys are not relevant to this case. As I understand from the complaint, the relevant promises are contained in the Google general Terms of Service dated March 31, 2020 ("General TOS"); the Google Chrome and Chrome OS Additional Terms of Service dated March 31, 2020 ("Chrome TOS"); and the Chrome Privacy Notice dated May 20, 2020  ("Chrome Privacy Notice"), which state: (1) "you don't need to provide any personal information to use Chrome;" (2) "the personal information that Chrome stores won't be sent to Google unless you choose to store that data in your Google Account by turning on sync" where the list of applicable information include "browsing history information" and "cookies or data from websites that you visit"; (3) "in general, the fact that you use Chrome to access Google services … does not cause Google to receive any additional personally identifying information about you," (4) "sync is only enabled if you choose"; (5) if the user does not sync and chooses to enable something called Web & App Activity, "Google will only use your Chrome data after it's anonymized and aggregated with data from other users"; (6) sync is how users can determine if "Google may use your history to personalize Search and other Google services," and the general implied promise that if a user does not sync, Chrome won't send their personal information to Google. Prof. Erdem does not ask any questions

Expert Rebuttal Report of Joseph Turow, Ph.D.
Case No. 4:20-cv-05146-YGR-SVK

specific to Chrome or about Chrome sending browsing history information to Google when users are not on a Google website and have not enabled sync. Good surveys contain questions that speak directly to the issues the researchers are exploring. The critical fact pattern of the case is therefore excluded from the surveys, rendering it impossible to draw the conclusions that she asserts based on her data.

d.    Prof. Erdem's surveys are not reliable because the instruments she used were not neutral. Rather, they were biased toward results Google would want. For example, by associating Chrome with what she called "brand Google" throughout the survey Prof. Erdem "primed" users for responses that agreed Chrome shares data with Google. In addition, Prof. Erdem highlighted how she wanted respondents to answer by literally underlining what she believed were the key words in the question, words that she took directly out of a document that she had just shown the users. Oddly, that document was not the Chrome Privacy Notice or the Google terms of service that govern the contract between Chrome and its users. (Prof. Erdem had mislabeled the document in question as the "terms of service.") Incorrect attribution included, the entire survey was designed in ways that seem aimed to bake into it what Prof. Erdem hopes to find. The obvious biases invalidate her conclusions.

e.    Finally, the way Prof. Erdem presented the materials relating to her survey was extremely difficult to understand. There is no one coherent document that presents what was shown to respondents in what order. Some slides

appear to be missing or are not the original slides. For some reason, Prof. Erdem and the company that administered them did not record the actual flow of her online surveys, although she herself viewed the survey online. If I were able to view the actual survey as it was administered, I might be able to offer more observations. Instead, I am astonished that Prof. Erdem has not complied with a key rule of reputable survey creators: being able to present to evaluators the entire survey as the respondents saw it.

f.    The irredeemable flaws in Prof. Erdem's surveys make it impossible to draw the conclusions that she asserts based on her data, let alone the strong ones she puts at the outset of her report. Those paragraphs mis-describe her survey results, both as to the questions actually asked and the actual results. For example, her results did not fall predominantly in the "strongly agree" category (category 5), but she reports that they did in her summary. One has to review her results in one of the many appendices at the back to see the error. I address this and other issues below.

## II.    FOUNDATION FOR MY OPINIONS

4.    I am the Robert Lewis Shayon Professor of Communication at the Annenberg School for Communication at the University of Pennsylvania. My research focuses on digital cultural industries, especially at the intersection of the internet, marketing, and society. My work focuses on issues of media surveillance and privacy, particularly as that relates to marketers.

5.    I am an elected Fellow of the International Communication Association and was presented with a Distinguished Scholar Award by the National Communication Association. A 2005 New York Times Magazine article referred to me as "probably the reigning academic expert

on media fragmentation." In 2010, the New York Times called me "the ranking wise man on some thorny new-media and marketing topics." In 2012, the TRUSTe internet privacy-management organization designated me a "privacy pioneer" for my research and writing on marketing and digital-privacy.

6.      I have authored eleven books, edited five, and written more than 160 articles on mass media industries. More than 100 of these are peer-reviewed with field accepted methods. My most recent books are The Voice Catchers: How Marketers Listen In To Exploit Your Feelings, Your Privacy, and Your Wallet (Yale University Press, 2021), The Aisles Have Eyes: How Retailers Track Your Shopping, Strip Your Privacy, and Define Your Power (Yale, 2017) and Media Today: Mass Communication in a Converging World (Routledge, Fall 2016; Serbian edition in two volumes, 2015). Yale University Press has licensed The Voice Catchers for translation into Spanish, Chinese, and Korean. In 2011 Yale University Press published my book The Daily You: How the New Advertising Industry is Defining Your Identity and Your World (Yale, 2011; Turkish edition, 2015). In 2010 the University of Michigan Press published Playing Doctor: Television, Storytelling, and Medical Power, a history of prime time TV and the sociopolitics of medicine, and in 2013 it won the McGovern Health Communication Award from the University Of Texas College of Communication. Other books reflecting current interests are Niche Envy: Marketing Discrimination in the Digital Age (MIT Press, 2006), Breaking Up America: Advertisers and the New Media World (University of Chicago Press, 1997; paperback, 1999; Chinese edition 2004); and The Hyperlinked Society: Questioning Connections in the Digital Age (edited with Lokman Tsui, University of Michigan Press, 2008).

7.      I teach graduate and undergraduate courses on data collection, privacy policies, media industries and society, and advertising and society.

Expert Rebuttal Report of Joseph Turow, Ph.D.
Case No. 4:20-cv-05146-YGR-SVK

8.     Since 1999 I have conducted national surveys of the American public on issues relating to marketing, new media, privacy and society, which have received a great deal of attention in The New York Times and other popular press outlets, as well as in the research community. I have been interviewed widely about my research, including by NPR's Fresh Air with Terry Gross (twice), the Atlantic, the BBC, CBS News, and elsewhere. I have also written about media and advertising for the popular press, including The New York Times, The Atlantic, The Washington Post, The Boston Globe, and The Los Angeles Times. My op-ed essay about Americans' misunderstanding of privacy policies and its implications for social policy appeared in an August 20, 2018 New York Times issue of the print paper and online. My research has received financial support from the Digital Trust Foundation, the John D. and Catherine T. MacArthur Foundation, the Kaiser Family Foundation, the Robert Wood Johnson Foundation, the Federal Communications Commission, and the National Endowment for the Humanities, among others.[1]

### A.     I Formed My Opinions Using Methodologies Accepted in My Field.

#### 1.     Rebuttal Opinion #1: Professor Erdem's argument that my report is not guided by specialist knowledge or scientific method is simply wrong.

9.     I draw on my specialized knowledge and scientific method from four areas: the analysis of media industries and organizations; the conduct of large-scale population surveys of the U.S. populations; teaching classes and hearing feedback from people over decades about what they pay attention to (or not); and the systematic analysis of industry discourse, with a particular focus on Internet privacy policies and notices.

---

[1] A fuller list of my qualifications, my compensation for my work in this case, and my prior expert work are set forth in my October 13, 2021 report. A list of the materials I have reviewed since completing my October 13, 2021 report is attached hereto as **Exhibit A**. It is my understanding that Google has been provided access to the materials identified in Exhibit A. Upon the Court's request, I will provide any materials cited in this report.

10.      For three decades, my primary area of study has been the digital marketing system, how it works, and its implications for media and the larger society. Since 1996 I have written five books, noted above, on the industrial dynamics of digital marketing and their implications for society, particularly when it comes to privacy.

11.      I have also conducted representative national surveys to learn what Americans know and understand about the changing marketing world and what they think about issues related to marketing surveillance and privacy. The nine surveys I have conducted since 1999 were carried out by well-known survey companies using widely accepted survey methodologies such as state of the art sampling methods, contacting people by both wireline and cellular phone, and employing best practices for instrument design. I have analyzed my findings with the help of professional statisticians, and articles based on my survey work have been accepted by peer-reviewed journals. The *New York Times* has vetted and covered all but one of my surveys with individual articles about them. (The Associated Press got an "exclusive" to write about the one we didn't submit to the *Times*.) I have also presented my perspectives about the policy implications of my research, and my opinions about privacy policies to Congressional Committees, marketing-industry groups, and through essays in the popular media, including three guest essays in *The New York Times*. I have also used the survey data for articles in major refereed journals.

12.      In addition to the expertise I bring from my survey work, I have brought all my other qualitative expertise to bear on this assignment. That includes speaking about digital-privacy issues with people from all walks of life over the decades—including many hundreds of students in classrooms and many dozens of everyday people in public-library and community-center talks. These opportunities have provided me with feedback about what people pay attention to or not when they approach issues of privacy on websites and apps. The experiences have allowed me to

consider the social context with sensitivity after I have carried out my systematic textual discourse analysis.

13.    I have long experience interpreting and opining on privacy policies for reports, peer-reviewed journal articles, and government meetings. I use systematic discourse analysis in the long tradition of academic privacy experts whose work is published in major refereed journals. The purpose of my work here—what I was asked to do—was to read the various privacy policies and terms-and-conditions carefully and analyze them to extrapolate what a reasonable person would get from it.  In doing that, I drew on my decades-long history of interrogating texts as an English major and (during my doctoral studies) Folklore student, and industry communications, including privacy policies, as a Communication professor and teacher for nearly three decades. Contrary to Prof. Erdem's understanding of what I said in my deposition, my opinions are not "based on [my] personal interpretation of Chrome's disclosures and terms of service." This approach—discourse analysis[2]—is used in today's world to interrogate all sorts of public documents and industry communications, including privacy policies.[3] My combined knowledge of industry dynamics, digital-marketing technologies, and privacy policies allows me an interpretive expertise that is rare among academics. In my many years of performing academic research on countless privacy policies, I have found that companies employ common techniques

---

[2] See, for example, Marianne Jorgensen and Louise Phillips, Discourse Analysis as Theory and Method (London: SAGE Publications, 2002).

[3] See, for example, Pollach, I. "What's wrong with privacy policies?" Communications of the ACM, 50:9 (September 2007), 102-108; Antón, A.I., Earp, J.B., He, Q., Stufflebeam, W., Bolchini, D., and Jensen, C. "The lack of clarity in financial privacy policies and the need for standardization." *IEEE Security and Privacy 2*, 2 (Mar. 2004), 36–45; Reidenberg, JR, et al, "Ambiguity in Privacy Policies and the Impact of Regulation," Legal Studies 45:52 ( U of Chicago Law School), June 2016,  S163-S190; and Draper, N and Turow, J, "The Corporate Cultivation of Digital Resignation," *New Media and Society*, March 2019, 1824-1839.

to obfuscate important information while leading people astray with plain language that people can misinterpret. For example, many privacy policies begin with sentences that assure people the companies "care about their privacy." Successive paragraphs which are much harder to read, however, reveal that the firms take an astounding amount of data from people without informing them when they do that. The informed critical analysis I conduct of privacy policies fits with a rhetorical tradition in communication research rhetoric that looks systematically at language and tries to understand the meaning that communicators (for example, Google).

14.      Although my surveys indicate that different percentages of American society hold different levels of knowledge and different opinions, my industry research together with my teaching and wide-ranging discussions with people from all walks of life have resulted in my identification of key "through lines" about "reasonable people" when it comes to the relationship between Americans and the digital-media-and-marketing system. We live in an era where reasonable people know little, and are confused, about the data-extraction regimes that surround them, at least partly because the companies they deal with go out of their way to make it difficult to understand their data-extraction activities so that people won't be concerned. The elements of this case provide a good example of this obfuscation, and a good place apply my multifaceted expertise.

### 2.   Rebuttal Opinion #2: Professor Erdem's critique that I do not define personal information is misplaced.

12.      For the purpose of my report, my definition is what I understand to be the Court's definition in its ruling on the motion to dismiss, interpreting California law and Google's contracts, Google's internal definition, and Plaintiffs' definition in the First Amended Complaint. That is, "personal information" is information that is reasonably capable of being linked to a person or that person's communications devices – which I understand to include a person's IP address, User-

Agent information, browsing history information, cookie and other device identifiers, and the detailed profile information that Google derives from the information Chrome sends to Google.

13.     Documents I have reviewed since my report confirm my opinion. For example, in a document called "Google Factbase: Ads Data Policies and Statements" from July 2020, Google internally explains:

> It's important to understand the difference between PII data (personally identifiable information) and personal information or personal data. … Personal information or personal data, on the other hand, is a broader term [than PII]. It includes PII but also includes information that reasonably can be linked to a specific person (e.g. IP addresses, cookies, AdID, or IDFA). E.g., GOOG-CABR-04604487, at -507.

This document says that "PII is information that personally identifies an individual and any other data that can be reasonably linked to such information by Google. The following basic guidelines apply to classifying data as PII: …PII includes any information that is combined with PII or can be linked to PII with a reasonable level of confidence based on information available to Google[;] [i]f there is any doubt about whether the information is PII, Googlers should treat the data as PII until the data is reclassified[;] … [s]olely for the purposes of classifying data internally at Google, the following types of data are classified as PII by default until reclassified: IP addresses, unique cookie or device ID and unique account identifiers (such as account or customer ID, GAIA ID, project ID or screen name;" and "[d]ata categorized as PII under these Guidelines may differ from data defined as 'personal information,' 'personal data,' or 'personally identifiable information' in Google's external statements or applicable laws." *Id.* at -508. This definition is consistent with my use of the term in my report.

Expert Rebuttal Report of Joseph Turow, Ph.D.
Case No. 4:20-cv-05146-YGR-SVK

14.    It might be noted here that Prof. Erdem argues that "numerous peer-reviewed studies find that consumers are willing to disclose their personal data when faced with the trade-off between more privacy and other things such as convenience, personalization, additional service, or changes in quality of their experience" (Erdem Report, pg. 29).  This is an incomplete recitation of the facts. Research I conducted with a nationally representative population, carried out by major survey company employing industry-standard survey methods, shows that Americans actually do not like trade-offs. What appears to be trade-offs is actually a sense of resignation.[4] Several other studies also find that, rather than seeing the world through trade-offs, Americans see themselves caught in situations that lead to resignation, privacy fatigue,[5] apathy,[6] privacy cynicism,[7] or similar emotions about their relations with companies that take their data. Internal Google documents show that Google understands this too. As part of a proposal from the Google privacy team called Privacy Native, a Google privacy employee stated that people viewed Google as "a black []hole suc[k]ing in data" that was so big that "people feel they can't do anything to avoid it." GOOG-CABR-00803929 at -4016.

15.    Prof. Erdem emphasizes the importance of context dependence when it comes to meaning and seems to argue that this context dependence undermines my opinion that reasonable

---

[4] Joseph Turow, Michael Hennessy, and Nora Draper, *The Tradeoff Fallacy*, Annenberg School for Communication, July 2015, https://www.asc.upenn.edu/sites/default/files/TradeoffFallacy_1.pdf.

[5] Hanbyul Choi, Jonghwa Park, and Yoonhyuk Chun, "The Role Of Privacy Fatigue In Online Privacy Behavior," *Computers In Human Behavior*, 81 (April 2018), 42-51.

[6] Eszter Hargittai and Alice Marwick, "'what Can I Really Do?' Explaining The Privacy Paradox With Online Apathy," *International Journal of communication*, 10 (2016), https://ijoc.org/index.php/ijoc/article/view/4655 .

[7] Christoph Lutz, Christian Hoffman, and Giulia Ranzini, "Data Capitalism In The User: An Exploration Of Privacy Cynicism In Germany," *New Media And Society*, 22:7 (2020), 1168 – 1187.

Expert Rebuttal Report of Joseph Turow, Ph.D.
Case No. 4:20-cv-05146-YGR-SVK

Americans would be confused by Google's language around sync and un-sync (Erdem Report, pg. 30 among others). But the context in this situation is quite clear to me based on my industry, survey, and textual research: Google is using people's personal data for marketing purposes and its language plainly suggests people who use Chrome can prevent Google's use of their data while they are browsing on Chrome based on the promise that Chrome will not send their personal information Google unless they choose to enable sync. This is a particular context, not many contexts. So it's hard to understand how the idea of context dependence comes into play.

16.    Prof. Erdem similarly presents research from Carnegie Mellon University about Alan Westin's research (Erdem Report, pg. 31, para. 58) regarding Westin's identification of greater and lesser privacy-concerned groups. His work in this area has no direct connection to the issues here, and Prof. Erdem makes no convincing links. Rather, and in general, the Erdem report and the study it describes seem aimed at muddying the issues. This report underscores why a close analysis of the Chrome Privacy Notice and Google's other privacy-policy rhetoric by someone, such as I, who understands the history of such obfuscation, is useful and informative. The approach allows the analyst to push away irrelevant arguments and point to ways privacy policies embed plain language that reasonable people can understand amid the turgid but possibly accurate material, relying on the plain language that will lead the reader in the wrong directions.

### 3.  Rebuttal Opinion #3:  I stand by my decision that a survey is unnecessary to understand the misleading presentation Google makes to reasonable people about its use of people's Chrome data if they decide not to sync.

17.    I stand by my opinion that a survey is unnecessary to understand the misleading presentations Chrome makes to reasonable people about its use of their Chrome data if they decide not to sync. A survey may be useful when the plain meaning of the situation or text to a reasonable person is in doubt. This is simply not the case here. When confronted with the elements of this

case, I realized that they were very amenable to the method of systematic textual analysis. The evidence clearly shows that Chrome used phrases with seemingly clear meaning to lead readers to believe activities that were simply not true. I felt quite comfortable analyzing Google's materials in the context of my 30 years of work in the areas of digital technologies, advertising, and society along with reviewing hundreds of privacy policies and learning how reasonable people understand them, as well as my review of the evidence in this case. Google's CEO, Sundar Pichai, seems to agree with my overall finding.  In a confidential Google document uncovered in this case, a Google employee recalls that "Sundar's stated is [sic] that if you don't want to share your data with Google, Chrome might not be the right browser for you."[8] Not surprisingly, Chrome does not present this notice when introducing its privacy policy or sync setting. In addition, knowing the complexities of the personal information that Chrome sends to Google and the complexities of how Google uses that information on the backend, I am doubtful that any survey could be designed that accurately and efficiently apprises respondents of all of the pertinent facts needed to set the context for questions related to this case.

18.    My analysis of documents produced by Google in this case, none of which were considered by Prof. Erdem, show why Prof. Erdem's purported results are not reliable to answer the questions posed in this case. For example, even employees at Google internally admit that its privacy policies and internal systems are incomprehensible. In one document, a Google employee joked that "apart from" another Google employee named David Monsees "nobody can answer" the question of what "data is being collected (or not)." GOOG-CABR-04509888.

19.    In one document, the "owner" of the Google Privacy Policy concedes that "it's difficult for people to fully / meaningfully give permission [because] much of the language

---

[8] GOOG-CALH-00044423.

intended to be comprehensive feels vague and hard-to-parse for non-engineers / lawyers." GOOG-CABR-04754160 at -161. Because of this, it is a "struggle [for users] to grasp … the value their collected data enables, how their data will be used … the service implications of denying Google access to their data, [and] what will happen with data after it's collected." *Id.* People like the Plaintiffs in this case "feel unequipped to make informed decisions, or even question whether they have a genuine choice if they want to enjoy Google services." *Id.* People just "don't have the time or capacity to absorb all the information we're putting in front of them, let alone understand the precise impact their choices might have on the services they use." GOOG-CABR-04754627 at -629; *see also* GOOG-CABR-0475257 at -270 ("Because People DON'T understand the ecosystem and instead think of Google as the products they personally use, the value we do promise is abstract and often doesn't actually manifest within their experience. This calls our integrity/intentions into question[,] [w]hich reinforces confusion/suspicion about creepy ads/tracking….").

20.    Another Google research document states that "showing users such impactful settings before they have an opportunity to use our products has a negative impact on trust because users can't accurately access risks and benefits, as well as because the scope of the choices are too large for users to effectively reason about." GOOG-CABR-0434337 at -379. The process is so bad that Google employees have internally admitted that "users have no stake in that relationship, and as such being asked to consent to something that doesn't benefit them simply doesn't make sense." GOOG-CABR-04754160 at -165. Another Google privacy employee said that Google's approach to consent and privacy is "out-of-step with user expectations and regulations … mak[ing] it more difficult for people to understand how we use their data in all circumstances [and] to make the right choices for them[.]" GOOG-CABR-05244535 at -76. Yet more documents reveal an email conversation where Google employees admit users would "be shocked to learn that we're still

Expert Rebuttal Report of Joseph Turow, Ph.D.
Case No. 4:20-cv-05146-YGR-SVK

gathering info about them" (GOOG-CABR-03681262 at -266) when they are signed-out and another where top Chrome employees say "there's no real difference" for synced and not synced "for users who'd prefer not to store their data with Google." GOOG-CALH-00460046. Google even admits that the sync function "doesn't communicate the big-picture well to users" because "browsing history [is] collected in the account when Sync [is] off." GOOG-CALH-00042297 at -335. Still another says that "the current set of consents about how Chrome history may be used do not provide any clear view of how users' data may be used, and … needs a significant amount of improvement to achieve real transparency," however, "at the same time, we are also advised not to modify the string [of words in the notification] to avoid bringing more attention." GOOG-CABR-00111801 at -807.

## III.  PROFESSOR ERDEM'S SURVEYS ARE DEFICIENT

21.    Turning now to Prof. Erdem's report: It is opinion under cover of deficient empirical research.  The surveys Prof. Erdem conducted are highly flawed, as are her interpretations. The firm conducting the surveys used biased techniques for recruiting respondents, the survey instruments Prof. Erdem created did not speak to major issues of this case, the instruments were biased toward results Google would want, and Prof. Erdem's interpretation of the findings were similarly biased in Google's direction. Most problematic, however, is the impossibility of actually seeing how the company administered the survey because Prof. Erdem did not record the actual flow of her online surveys.

### A.    Overview of Basic Methodologies Required to Conduct Adequate Surveys

#### 1.    The survey should be nationally representative.

22.    While I do not dispute that experiments and panels can provide relevant information, Prof. Erdem's surveys are far from the gold standard.

23.    In recent years, survey researchers have developed accepted online as well as offline ways of carrying out gold standard national surveys.  To date, my national surveys have followed the most traditionally accepted procedure—phone (wireline and cell phone) interviews with US adults using random digit dial samples conducted by a major survey research firm.  Here is the way we described the approach in out 2015 report, "The Tradeoff Fallacy":

> The survey was conducted from February 23 to March 15, 2015 by Princeton Survey Research Associates International. PSRAI conducted telephone interviews with a nationally representative, English or Spanish speaking sample of 1,506 adult internet users living in the continental United States. A combination of landline (n=750) and wireless (n=756, including 412 without a landline phone) random digit dial (RDD) samples was used to represent all adults in the continental United States who have access to either a landline or cellular telephone. The interviews averaged 20 minutes. Based on a 7-callback procedure and using the American Association of Public Opinion research (AAPOR) RR3 method, a standard for this type of survey, the overall response rates were a rather typical 10 percent for the landline sample and 10 percent for the cellular sample. Statistical results are weighted to correct known demographic discrepancies.[1]
>
> The margin of sampling error for the complete set of weighted data is ±2.9 percent at the 95% confidence level. The margin of error is higher for smaller subgroups within the sample. Table 1 provides an introductory snapshot of the population we interviewed. As Table 1 indicates, women slightly outnumber men; 76% designate themselves as White, 11% identify themselves as Blacks or African American, Asians or Pacific Islanders comprise 4%, Native Americans comprise about 1%, and "mixed race" makes up 3%.  Hispanics (White and Black) comprise about 11% of the sample.  About 54% are under age 45.  Most have at least some higher education, and 30% report over $75,000 household income while 25% list it as below $30,000; 14% refused to reveal their household income.

---

[1] A two-stage procedure was used to weight this dual-frame sample. The first stage of weighting corrected for different probabilities of selection associated with the number of adults in each household and each respondent's telephone usage patterns. This weighting also adjusts for the overlapping landline and cell sample frames and the relative sizes of each frame and each sample.

The second stage of weighting balanced total sample demographics to population parameters. The total sample was balanced to match national population parameters for sex, age, education, race, Hispanic origin, region (U.S. Census definitions), population density, and telephone usage. The basic weighting parameters came from the U.S. Census Bureau's 2013 American Community Survey data. The population density parameter was derived from Census 2010 data. The telephone usage parameter came from the analysis of the NHIS data (Blumberg SJ, Luke JV. Wireless substitution: Early release of estimates from the National Health Interview Survey, January-June, 2014. National Center for Health Statistics. Dec 2014).

24.    As we will see, Professor Erdem's research fails when it comes to these procedures, which are generally applicable irrespective of the survey medium.

### 2.    The sample should be chosen to be neutral regarding the topic studied.

25.    The accepted sampling method noted above ensures that the researcher has not

skewed the respondent population to be either for or against the topics of study. The aim is to construct a sample that will parallel the larger population in the percentages that know certain kinds of information, hold certain attitudes, or support or don't support the research hypotheses. Moreover, when a researcher introduces the survey topic to a potential respondent, the standard method is to carefully avoid describing the specific issue (for example, opinions about privacy technologies) so that the respondents will not be "primed" or predisposed to answer in one way or another. For example, in a 2019 national survey I led, which was conducted by SSRS, we told the respondent, "We are conducting an important national survey about some interesting topics. This is not a sales call."

### 3. The survey should not contain statements that leads respondents toward answers.

26.    My co-researchers and I work hard to make sure that none of our questions suggests what answers we want or expect, in order to ensure the questions elicit unbiased responses. We also are careful to give respondents choices that match the questions we are asking. This is the widely accepted and methodologically sound approach to survey research in my field. Leading respondents to particular answers, and confusing the issue by giving them incorrect choices, destroys the aim of the survey—to find out what people really know or believe. Prof. Erdem does the opposite in important contexts.

### 4. The surveys should present choices appropriate to the questions.

27.    The methodologically sound approach to survey research is to ask fact questions in terms of true and false, and don't know. Researchers should reserve agree/disagree type responses to opinion questions. They should allow for agree strongly, agree, disagree, disagree strongly, and also a volunteered not sure or no opinion. Prof. Erdem gave the "agree/disagree" choices to respondents for fact questions, with serious implications for understanding. Because of this,

respondents are actually providing an opinion rather than demonstrating knowledge or understanding. And yet when Prof. Erdem states her conclusions at the beginning of her report, she says that respondents "understand."

### B.    The Many Drawbacks of the Erdem Surveys

#### 1.    Professor Erdem's surveys are inadequate for the purposes she claims.

28.    Two major difficulties are the survey firm and the population surveyed. It is presented as if the population she surveyed is nationally representative of the demographic of the class, but Prof. Erdem does not provide support for that. Prof. Erdem discusses neither of these sufficiently in the main report or in the Appendix I ("Survey Implementation, Design, and Administration.")  Of particular note, only found in an Appendix N screen shot, is that the survey provider (Dynata) recruits respondents under the label e-Rewards.  A web article about e-Rewards described it as "a free online survey taking software that eventually offers rewards in the form of various gift cards."[9]  That same article noted numerous comments online discouraging people from participating in e-Rewards surveys because of the paltry payback.  Such comments might discourage certain kinds of people from being part of the survey firm's samples.

29.    A hint of the narrowness of the survey sample is in the "example survey invitation" that Prof. Erdem presents in Appendix M; see below.  (She says it is a reconstruction of what E-rewards presents to potential survey takers because she was not able to reproduce the real thing; she doesn't state the reason.). As seen in the screen shot below, the invitation explicitly says that the survey topic is "Technology." That might encourage certain members of e-Rewards' survey population to answer the questions and others to stay away. Thus, the survey results may reflect

---

[9] Jeremy Gill, "Five Reasons To Avoid E-Rewards Surveys," Turbo Future, January 14, 2021, https://turbofuture.com/internet/e-rewards-survey-review, accessed January 4, 2022.

the conclusions of a non-representative sample more likely to believe that Google in general collects all of their data simply because of Google's dominant presence (known especially well to technology aficionados), not because Chrome is sending data to Google in a not synced state when a person is not on a Google website (which the survey did not ask).

Example Survey Invitation:



30.    Even more significantly, the screening questions did not ask if users had ever synced Google accounts.  Thus, the surveys are not testing for users' "first run experience" with syncing.

31.    In addition to the biased sample due to the invitation's label, the sample is biased due to screening questions.  The survey firm blocked people who preferred not to answer regarding their age, gender, or state of residence. Prof. Erdem stated in her deposition that the survey firm blocked these individuals from participating because Dynata could not verify the identity of the individuals. In her report, Prof. Erdem states that it is "standard practice to terminate respondents

who do not provide sufficient information for me to verify if these respondents contribute to a balanced and representative sample" (Erdem Report, Appendix I-3). This is simply not the case. In my long experience with several major national research firms, unless demographic questions are crucial to the topic of the study, they are asked at the end. Statistical weighting may be used after the fact to account for imbalances in the representativeness of the sample. Apart from not comporting with survey norms, not allowing people who didn't want to give data on age, gender or state of residence may well have excluded people who are particularly concerned with privacy issues. That further biased the sample. It is ironic that a survey purportedly designed to gather a representative sample of people's beliefs about Internet privacy and their personal information would exclude all people who refused to hand over their personal information.

**2.    There is no record of the actual instrument Professor Erdem used.**

32.    This survey was conducted online, and Prof. Erdem states that "the stimuli images reflect what respondents would experience when encountering or reviewing privacy disclosures related to Chrome usage in real life. To ensure that the stimuli would be representative of each respondent's experience, the desktop version of the stimuli was presented to respondents who took the survey on a desktop or laptop computer and the mobile version of the stimuli was presented to respondents who took the survey on a smartphone, tablet, or other mobile device" (Erdem Report, Appendix I-7 - I-8, para. 11). The problem with this statement is that we have no record of what actually happened.  All we have are screenshots, and even those are in at least some cases "recreated."  Dr. Erdem's report suggests the screenshots provided are not identical to those presented to respondents.  For example, Prof Erdem states, "This screenshot is an example taken from previous surveys that has been edited to reflect information that was presented to survey respondents in this case. Due to system limitations at the survey provider, an example of a real

survey invitation for this project is unavailable" (Erdem Report, Appendix M-1, fn. 1). In her deposition, Prof. Erdem acknowledged she took the survey herself but didn't record it. Erdem Dep. Tr. 37:12-22. The reason the lack of a recording of the exact flow of the survey is important is that the presentation of words and how they appear have significant influence on readers. That is in fact my field of study. For example, rather than showing respondents what Chrome users in real settings actually see when they decide to sync or not sync, Prof. Erdem explained that she showed a setting button, which appears after a user has already selected to sync or not sync. This sort of questioning procedure casts doubts on the generalizability of the surveys to the case at hand. To add to the sloppiness of the research, some critical screenshots – including the one purporting to reflect whether a user is synced or not – are hardly legible (Erdem Report, Appendix N.1-10 - N.1-11). It seems as if Prof. Erdem didn't care or want to share key elements of her work.

33.    The dynamic manipulation that Prof. Erdem describes but we can never see seems to have biased the results by at a critical point being so different from the real way people who see privacy policies peer at them. As Prof. Erdem herself notes, "My survey asks respondents to view the privacy policies for longer than users would in real life, encouraging respondents to pay attention to the privacy policies. For example, according to Google documents, the median time that users spend on certain consent screens is 5-10 seconds" (Erdem Report, Appendix I-8, fn. 22). Prof. Erdem says she required that the privacy policy stay on the screen for 15 seconds for privacy policies with highlighted sentences and 30 seconds for privacy policies with unhighlighted selected sentences is simply not anything someone would find in real life. But even the document she cites from an internal Google analysis says that people stay on those pages 5-10 seconds if they review them at all. Erdem Dep. Tr. 106:5-11, Ex. 52. It is possible, even probable, that this sort of manipulation of the material that ignored real world conditions led the respondents to answer

questions about the case in ways they otherwise would not.  And Prof. Erdem herself decided what to highlight without an accurate understanding of what information Chrome is sending to Google. Erdem Dep. Tr. 76:17-78:5.

**3.    The survey instruments Professor Erdem created did not speak to major issues of this case.**

34.    *The consumer expectation survey* focuses on the wrong data at an indefinite time and place and backwards data flow.

35.    Specifically, the consumer expectation survey asks respondents "based on the sync settings [and documents] you just viewed, how strongly do you agree or disagree that Google receives your [data type] while browsing the internet?" The "data types" are IP addresses, referrer URLs, cookies, name, password and login information for websites, or payment information.

36.    The first reason the consumer expectations survey is unreliable is that the screenshots of the sync settings primed the users to answer the question the way Prof. Erdem wants because Prof. Erdem makes Google.com the background of the screenshot.

//

//

//

Expert Rebuttal Report of Joseph Turow, Ph.D.
Case No. 4:20-cv-05146-YGR-SVK

37.     Given this screenshot, it is not surprising that respondents answered how Prof. Erdem wished. In fact, the only surprise is that 100 percent of respondents did not agree with the question.



38.     Given the ubiquity of Google's services, the bigger surprise is that not all respondents agreed with Prof. Erdem as she wished.

39.     The second reason the consumer expectations survey is unreliable is that Prof. Erdem shows respondents the wrong documents. Prof. Erdem describes that she showed users (in random order) the Chrome Privacy Notice, the Google Privacy Policy, and a WAA Help Page. There are many problems with this approach.



40.     I understand that the Google general Terms of Service also governs the relationship between Chrome and its users. However, Prof. Erdem does not show respondents the Google Terms of Service or apprise them of its statement that the Chrome Privacy Notice governs Chrome above all other documents and statements made by Google.

//

//

41.    Also, I understand the WAA page shown to consumers is not regularly shown to Chrome users.   And, I understand that even Google does not claim that the WAA Help page that Prof. Erdem shows respondents is part of its contract with consumers.  The WAA page shown by Prof. Erdem is misleading because when a user actually goes through the WAA process, they are exposed to this pop-up screen:

**Web & App Activity**

When this option is on, data saved in your Google Account may include:

- Your searches and things you do on other Google services, including your location and other associated data
- Your Chrome history (if Chrome Sync is turned on)
- Your activity from sites, apps, and devices that use Google services

Got it

Source: Greg Fair Decl. ¶ 54.

42.    The middle bullet point clearly states that WAA only saves "Your Chrome history (if Chrome Sync is turned on)." If Prof. Erdem wished for her study to reflect conclusions that could be attributed to the class, she should have included the disclosures users would be more likely to be exposed to.

43.    The third reason the consumer expectations survey is unreliable is that Prof. Erdem asked the wrong questions – in three different ways.

44.    First, Prof. Erdem phrased questions in ways that are not part of the Chrome contract with its users. The survey asks if "*Google receives*" certain data "while browsing the internet?" But that is not the language used by the Chrome Privacy Notice, which expressly

promises, "The personal information that Chrome stores [including "browsing history information" and "cookies or data from websites that you visit") *won't be sent* to Google unless you choose to store that data in your Google Account by turning on sync[.]" By asking questions about data flows using the language of the Google Privacy Policy, Prof. Erdem is moving her survey respondents away from the Chrome Privacy Notice, where they would see that plainly understood statement that supports the plaintiffs' case.

45.    Second, Prof. Erdem does not specify the locations where such data flow is an issue in the case. Rather than specifically ask about when a person is using Chrome while not synced and not on a Google website, Prof. Erdem generically asks whether Google receives certain data while "while browsing the internet." This is not a question in this case. As I understand it, Plaintiffs have not complained about certain information going to Google when they are at Google.com or YouTube.com or Gmail.com—only when they are using Chrome. Prof. Erdem's failure to specify the issue at the case renders this survey invalid.

46.    Third, Prof. Erdem asks about the data types that are not at issue in this complaint. Of those chosen by Prof, Erdem, only IP address is at issue in this case. Prof. Erdem does not ask about User-Agent, X-client data headers, or browsing history. Nor does she ask generically about "personal information," which is the precise phrase deployed in the Chrome Privacy Notice.

47.    Prof. Erdem's choice of "referrer URLs" is yet another of biased phrasing. Prof. Erdem testified that she thought "browsing history" was a loaded term disputed by the parties, so she substituted "referrer URLs" as a stand-in for that phrase. Erdem Dep. Tr. 189:3-25. But "referral URLs" is not the same thing as "browsing history." Moreover, "browsing history" is a phrase that consumers are *more* likely to understand. A review of Plaintiffs' First Amended Complaint shows they referenced "browsing history" or "web-browsing history" 22 separate times

– and only one of those references mentions GET requests. Plaintiffs' FAC expressly defines "browsing history" as "a record of a communication or communications that a user exchanges on the Internet and includes both the content of the communication or communications and data associated with it, such as the time of the communication or communications." FAC ¶ 94. I understand that one of Google's purported browser technology experts gave a similar definition at his deposition, answering that "web-browsing history" is "a sequence of visits to websites." Zervas Dep. Tr. 25:3-10. Further, although "browsing history" is the term used in Plaintiffs' First Amended Complaint and "browsing history information" is the term used in the Chrome Privacy Notice (i.e. the most important document), the term "referral URL" does not appear anywhere in the Chrome Privacy Notice or Plaintiffs' First Amended Complaint.

48.    Curiously, that odd technical term *referrer URL* that Prof. Erdem chose for her survey respondents does appear in the Google Privacy Policy where Google says it "collects information about the *interaction* of your … browsers and devices *with our services*, including IP address …. and the date, time and referrer URL of your request."  Emphasis added. As explained above, a reasonable user would likely assume that *interaction with our services* means a user actively interacting with Google.com, Gmail.com, YouTube.com, or any one of dozens of other Google services to consumers. Until January 5, 2022, the term "services" was defined in Google's terms of service with consumers like the Plaintiffs in this case to include "Google apps and sites (like Search and Maps); platforms (like Google Play); integrated services (like Maps embedded in other companies' apps or sites); [and] "devices and other goods (like Google Home)." That Prof. Erdem chose a term *referrer URL* that is only present in the Google Privacy Policy exposes the bias of the surveys. The aim here, as elsewhere in the surveys, might have been to confuse both Chrome sync and non-sync respondents into believing they were being asked about Chrome

sending information to Google-owned sites, and only appear as if they were answering the questions regarding Chrome sending information to Google regarding sites Google doesn't own.

49.    Prof. Erdem also made the mistake of supplying her own definitions for certain terms. Specifically, Prof. Erdem's definition of the term "cookies" is disqualifying by itself. Prof. Erdem defined "cookies" as "a small file containing a string of characters that is sent to your computer when you visit a website. When you visit the site again, the cookie allows *that site* to recognize your browser. Cookies may store user preferences and other information." Prof. Erdem Report, Appendix I-15, fn. 46 (emphasis added). This, however, is the definition of a first-party cookie. For example, this definition applies to cookies that Google sets and read when a user is directly present and interacting with Google.com, Gmail.com, or YouTube.com. It does not include the third-party cookies and cookie syncing transmissions to avoid cookie blockers alleged by Plaintiffs that are at issue in this case. By defining cookies with a first-party meaning, Prof. Erdem if presenting her respondents with a benign understanding of a technology that plaintiffs understand as highly problematic.

50.    Prof. Erdem testified that she took this definition of "cookie" from https://www.kaspersky.com/resource-center/definitions/cookies. The very page from which Prof. Erdem took her definition explains the difference that "Third-party cookies are more troubling" and "are generated by websites that are different from the web pages users are currently surfing[.] … Third-party cookies let advertisers or analytics companies track an individual's browsing history across the web on any sites that contain their ads." (Tis definition is incomplete as it relates to this case because, I am informed, Chrome sends cookies and other personal information to Google for communications on non-Google websites where there are no advertisements.) Prof. Erdem's misleading definition of cookies is compounded by the screenshot showing Google.com,

the use of the term "referrer URLs" instead of "browsing history" or "browsing history information," the failure to limit the question to non-Google websites, and the reversal of the data flow.

51.    Prof. Erdem's questions about name, password and login information, and payment information are not relevant to this case. However, the results of those questions illustrate the invalidity of her survey method. In addition to "browsing history information" and "cookies," the Chrome Privacy Notice expressly promises that "The personal information that Chrome stores won't be sent to Google unless you choose to store that data in your Google Account by turning on sync." Those data types include "passwords, to help you fill out forms or sign in to sites you visit" and "in the case of passwords, payment cards, and billing information, choosing specific credentials or payment card and billing information to store in your Google Account." Regardless of this specific promise, more users answered that they agreed that Google received such information when a user was not synced than answered that they disagreed. Further, the difference between the agreement rate for these items was much lower than one would expect given Prof. Erdem's underlying assertion and assumption – that users understand what Chrome is sending based on the documents at issue. Based on the Chrome Privacy Notice, Groups A and C (in paragraph 36 of Prof. Erdem's report) should have universally answered that "passwords and login information," "name," and "payment information" would not be received by Google when a person was not synced. Instead, more of those respondents said such information would be sent to Google than not. The only logical explanation of that is that respondents either did not read the Chrome Privacy Notice or were confused based on Prof. Erdem's biased question.

52.    It is also remarkable that the differences in answers between the sync off and sync on groups is minimal across all data types. Prof. Erdem says this "shows that respondents'

expectations that Google receives their information while using Chrome is not affected by the Sync status being on or off." To the contrary, this actually suggests that Prof. Erdem's questions were biased and the respondents did not read the documents placed in front of them. There was nothing in Prof. Erdem's design to ensure that respondents actually took the time necessary to read and understand any of the documents. To the contrary, Prof. Erdem encouraged users not to read the documents in full by placing a timer countdown on the screen for 15 or 30 seconds informing the respondent that, as soon as they waited out the timer, they would be able to move on to the next page and more quickly collect the payment associated with taking the survey. This is a stark contrast to what Google understands happens in real life, as confirmed by the documents she relies on. That document shows users spend 5-10 seconds on just the new account creation screen.

53.    The evidence also shows that to actually comprehend the meaning of the terms, people need significantly more time – on the order of 100 times – to comprehend and answer questions about them that test knowledge.  On December 20, 2021, Plaintiffs' counsel took the deposition of Sam Heft-Luthy, a Google employee who I understand was the "owner" of the Google Privacy Policy for much of the class period. In that deposition I understand from counsel that he took more than 17 minutes to review the policy before agreeing to answer questions about it.

//

//

54.     Plaintiffs' counsel pointed out in Prof. Erdem's deposition that the key Privacy Policy promise that "Your Chrome browsing history is only saved to your account if you've enabled Chrome synchronization with your Google Account" appears via a hyperlink pop-up in the Privacy Policy as it is actually displayed to users.



55.     But in Prof. Erdem's rendering of the policy, this promise is relegated to the 23rd and last page of the document – a page that Mr. Heft-Luthy had not reached after 17 minutes of reviewing the same document. It seems clear that Prof. Erdem didn't want her survey respondents to reach that page.

56.     Mr. Heft-Luthy's testimony on the meaning of "consent," in general, and as it relates to Google, is also instructive in considering the inadequacies of Prof. Erdem's survey and her attacks upon me. Mr. Heft-Luthy first testified that "consent" was "a legal construct that we operate within at Google" and that Google has "different obligations for transparency and user choice with regards to data processing [that] may be different from place to place." Heft-Luthy Dep. Tr. 32:4-13. When asked "what the word 'consent' means" outside of a legal context, Heft-Luthy answered that he was "not going to be able to speculate on the specific context of 'consent' in a broad sense." *Id*. at 34:24-35:6. When asked if "real consent" was possible "without an understandable and clear explanation of what someone is consenting to," Mr. Heft-Luthy refused

Expert Rebuttal Report of Joseph Turow, Ph.D.
Case No. 4:20-cv-05146-YGR-SVK

to answer on the grounds that he thought it was a legal question and "a very broad term with a variety of implications" that he was not "comfortable speculating on in broad terms." *Id*. at 37:25-39:14. When asked if he could garner consent through a foreign language that the other person did not understand, Mr. Heft-Luthy could not answer. *Id*. at 39:20-41:3. Nor could he answer whether consent was "valid where the party giving the consent does not understand what they're consenting to." *Id*. at 42:7-25. When asked if he would "agreed that forced consent is not consent," Mr. Heft-Luthy was unable to answer. *Id*. at 44:8-19. Nor could he answer if consent was valid "where there is no choice but to say yes." Heft-Luthy Dep. Tr. 44:21-45:25.

57.    *The materiality survey* shows respondents the Google privacy policy and the Chrome privacy notice, with no sync button or even a reference to the possibility of not syncing.  Accepted survey research adheres to the principle of presenting material to be tested in the way respondents would see it in the real world. Prof. Erdem's surveys are not designed accordingly.

58.    The survey instrument also encouraged confusion regarding the major issues of the case by placing people (seemingly) randomly into sync and not-sync conditions without defining what sync means—a key term for this case—even though she did define other terms such as IP address and cookie. We consequently don't know if the respondents had any idea of the meaning of their assignments and what, if anything, they should read about them in the privacy policies. Possibly even more problematic, Prof. Erdem did not ask the respondents what Chrome syn state they use in their everyday lives.  Especially in view of the sample bias likely caused by the "technology" heading on the survey invitation, it is possible may of the respondents placed in the non-sync survey bucket are syncing in real life.  Their survey answers—and the lack of significant differences in answers between the sync and non-sync conditions—may well relate to the "non-

Expert Rebuttal Report of Joseph Turow, Ph.D.
Case No. 4:20-cv-05146-YGR-SVK

sync" respondents drawing on their sync expectations in real life.

59.     *The scenario application* survey is unreliable because it also inappropriately primes the answers that Prof. Erdem seeks, shows respondents the wrong documents, and mislabels those documents. For example, it labels WAA and NAC documents as the "terms of service" – even though they are not the actual "terms of service."

### 4.    Professor Erdem's survey notices, questions and interpretations are flawed.

60.     Right from the start, Prof. Erdem's survey told her respondents that Google owns Chrome. More than once, the survey noted the browser as Google Chrome. The survey did not describe Internet Explorer or Safari by its owner. Repeating this relationship might push respondents in both the sync and unsync conditions into discerning that the "correct" survey answers are those that link Google to taking data from its owned entity. Put differently, the survey prodded respondents toward answers the survey creator wanted.

61.     Another flawed approach to questions that may well have tilted answers in the direction the creators wanted relates to the "likelihood of Google receiving information" across different conditions (*see* Erdem Report, Appendix O.1-1 – 1-4). This is a factual issue (Google is likely or not likely, or not sure). But Prof. Erdem gave choices typically reserved for opinion questions in surveys: agree strongly, agree, neither agree nor disagree, disagree, disagree strongly. In answering a factually verifiable question such as this with agree-disagree choices, it seems clear that "agree strongly" and "disagree strongly" indicates being sure of the answer, while the others indicate degrees of uncertainty.  Because Prof. Erdem doesn't give us the percentages of the sample that answered each choice (she combines agree and strongly agree, and doesn't note the percentages of the others), we have no way of knowing how many people ticked off "disagree strongly" (the clearly incorrect answer) or somewhat disagree. But the fact that the average

answers are at 4.0 and less than 4.0 betrays a level of doubt about the answer among the respondents that Prof. Erdem does not consider. She concludes that "the average/typical respondent in Sync Off condition believes and understands that Google receives their IP addresses, referrer URLs, cookies, and payment information while browsing the internet using Chrome to a similar extent as the average/typical respondent in Sync On condition" (Erdem Report, pg. 20, para. 37). But the correctness of this conclusion is not at all clear. A better way to understand these findings is that some percentages—possibly high percentages—of the sample in both conditions have doubts about what answer to give.

62.     The lack of clarity regarding these data parallels the lack of clarity and problems inherent in these surveys, from the way they were fielded to the bias in selecting the sample to their lack of availability in their original form to questions and statements that pushed people toward answers. The findings simply do not speak validly to the issues of this class complaint.

## IV.    CONCLUSION

My initial opinions are based on the methodologies and techniques routinely applied in my field of study. It is Prof. Erdem's work that would not withstand scrutiny under the commonly accepted principles that must be followed to have a valid survey that is generalizable to the issues at hand.

***

Dated: February 15, 2022

_____
Joseph Turow, Ph.D.