# GOOGLE LLC'S OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION

# Broome Decl. Ex. 2
# Expert Report of Tulin Erdem, PhD

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

PATRICK CALHOUN, *et al.*, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

GOOGLE LLC,

Defendant.

Case No. 5:20-cv-05146-LHK-SVK

# EXPERT REPORT OF TÜLIN ERDEM, PH.D.

## December 22, 2021

**Table of Contents**

I.  QUALIFICATIONS ....................................................................................1

II. ALLEGATIONS AND ASSIGNMENT..................................................2

    A.  Allegations ........................................................................................2

    B.  Assignment .......................................................................................4

III. SUMMARY OF OPINIONS ......................................................................7

IV. BACKGROUND ........................................................................................10

    A.  Google's Chrome browser ...............................................................10

    B.  At-Issue Data ...................................................................................11

    C.  Relevant policies and disclosures ...................................................13

V.  FRAMEWORK AND EMPIRICAL APPROACH .................................14

VI. CHROME USERS UNDERSTAND THAT GOOGLE RECEIVES THEIR AT-ISSUE DATA INCLUDING IP ADDRESS, REFERRER URL, AND COOKIES......15

    A.  My Consumer Expectations Survey demonstrates that Chrome users believe and understand that Google receives their IP address, referrer URL, and cookies ........................................................16

    B.  Chrome users engage with Chrome and Google features in a manner consistent with an expectation that information from browsing activities is shared with Google ...........................22

    C.  Academic literature is consistent with the consumer expectations expressed in my Consumer Expectations Survey ...............................23

VII. USERS VALUE CHROME AND WOULD CONTINUE TO USE IT EVEN IF CERTAIN DISCLOSURES WERE CHANGED TO ADDRESS PLAINTIFFS' ALLEGED CONCERNS ...........................................24

    A.  My Materiality Survey demonstrates users would continue to use Chrome despite changes to the disclosures................................25

    B.  Public data show how users continue to choose Chrome despite Plaintiffs' alleged privacy concerns ..............................................28

    C.  Studies demonstrate that users' preferences for privacy are context-specific ............29

VIII. REACTIONS TO THE ACCOUNT HOLDER AGREEMENTS DEMONSTRATE THAT CHROME USERS UNDERSTAND THAT THEIR DATA ARE SHARED ...34

    A.  Overview of the Scenario Application Survey ...........................35

    B.  Results of the Scenario Application Survey ...............................37

IX. PLAINTIFFS' EXPERTS PRESENT COMMON CONCEPTUAL FLAWS IN THEIR OPINIONS REGARDING CONSUMER EXPECTATIONS AND BEHAVIOR.............................................................38

i

**X.     PROF. TUROW'S OPINIONS ARE BASED ON AN UNSUPPORTED INTERPRETATION OF THE RELEVANT POLICIES AND DISCLOSURES, AND THEY LACK SUPPORT FROM EMPIRICAL ANALYSIS OR SCIENTIFIC METHOD** ........................................................................**39**

**XI.    SURVEY RESULTS, GOOGLE DOCUMENTS, AND PEER-REVIEWED STUDIES CONTRADICT PROF. JOHN'S OPINIONS** ..................................**41**

    A.   Prof. John does not define the personal information she opines on and her opinions lack support ...............................................42

    B.   My survey results, Google documents, and peer-reviewed studies contradict Prof. John's opinions that consumers believe that using Chrome in its default state (Basic Mode) will prevent Google services from receiving the At-Issue Data ...............................................................................43

    C.   My survey results, Google documents, and peer-reviewed studies contradict Prof. John's implication that internet privacy is the most important thing that consumers care about ...............................................44

**XII.   CONTRARY TO DR. MANGUM'S CLAIM, CONJOINT ANALYSIS IS ILL-EQUIPPED TO ACCURATELY MEASURE THE VALUE OF PRIVACY IN THIS MATTER** ...............................................................................................**45**

    A.   Dr. Mangum fails to identify the product itself, as well as its attributes and levels, a fundamental step of any conjoint analysis ....................46

    B.   Dr. Mangum fails to explain how he plans to design a conjoint analysis that represents respondents' real-world experience .............................48

    C.   Dr. Mangum fails to explain how he plans to address the difference between stated preference and the revealed preference for privacy............................49

    D.   The two studies cited by Dr. Mangum are not applicable to the facts of this matter .................................................................................51

## I.    QUALIFICATIONS

1.    I am the Leonard N. Stern Professor of Business Administration and Professor of Marketing at the Stern School of Business, New York University (NYU). I previously served as the Co-Director of the Center for Digital Economy Research and the Director of NYU's Stern Center for Measurable Marketing. I am currently serving as the Chair of the Stern Marketing Department.

2.    Before joining the Stern School of Business in 2006, I was the E.T. Grether Professor of Business Administration and Marketing at the Haas School of Business, University of California at Berkeley. I joined the Haas School of Business in 1993 where I served as the Associate Dean for Academic Affairs, the Marketing Group Chair, and the PhD Director. I was also the Chair of the campus-wide Committee on Research (COR) and the University of California, Berkeley representative of the University of California system-wide COR.

3.    I hold a BA from Boğaziçi University in Turkey and an MA in Economics and a PhD in Business Administration from the University of Alberta in Canada, with a major in marketing and minors in economics and statistics. My research interests include consumer behavior and choice, consumer decision-making under uncertainty, advertising, brand management and equity, econometric modeling, empirical modeling and quantitative analysis, marketing mix effectiveness, marketing research and pricing. I have published several papers in top journals in my field and have received "best paper" awards, as well as major research grants, including two major National Science Foundation (NSF) grants. I have also been named an ISMS (INFORMS Society for Marketing Science) Fellow for my life-time contributions to the marketing field and ISMS.

4.    I served as the Editor-in-Chief of the *Journal of Marketing Research*, the preeminent academic journal of the American Marketing Association, which publishes work on topics including consumer behavior, marketing science models, marketing strategy and marketing research methodologies. I also served as an Area Editor at a top-tier journal called *Marketing Science* and as Associate Editor for Quantitative Marketing and Economics at the *Journal of Consumer Research.* I also served as a Senior Editor at *International Journal of Research in Marketing.* Currently, I am on the advisory council for both *Marketing Science* and the *Journal of Marketing Research*. I am also serving as an Area Editor of the

*Journal of Market Behavior*. I serve as an editorial board member of many scholarly journals, including the *Journal of the Academy of Marketing Science* and *Marketing Letters*.

5.    I have more than 25 years of teaching experience, during which I have taught empirical market research, branding, brand and product management, marketing management and international marketing in undergraduate, MBA and executive education programs. I have also taught doctoral seminars on consumer choice and various aspects of marketing modeling.

6.    In addition to my academic appointments and research, from 2008 to 2012 I was an Academic Partner at Prophet, a branding and marketing consultancy firm. In this role, I helped Prophet to run several marketing research and consumer decision-making studies for Prophet's clients.

7.    I have served as an expert witness in several cases, on matters relating to marketing, consumer behavior, brand positioning, and brand equity. I have conducted, analyzed, and evaluated consumer surveys in these roles. My testimony has never been excluded from litigation due to any issue involving my qualifications or expertise.

8.    A complete list of my publications, honors, awards, and professional activities is provided in my CV, attached in **Appendix A**. The list of cases where I submitted my testimony is available in **Appendix B**.

## II.    ALLEGATIONS AND ASSIGNMENT

### A.    ALLEGATIONS

9.    I understand that Plaintiffs Patrick Calhoun, Elaine Crespo, Michael Henry, Dr. Rodney Johnson, Dr. Claudia Kindler, and Dr. Corinice Wilson (collectively "Plaintiffs") allege in their First Amended Complaint that, among other things, Google, LLC ("Google") "intentionally and unlawfully causes Chrome to record and send users' personal information to Google regardless of whether a user elects to Sync or even has a Google account." They further state that Chrome performs this function despite Google "expressly promis[ing] Chrome users that they 'don't need to provide any personal information to use

Chrome' and that '[t]he personal information that Chrome stores won't be sent to Google unless you choose to store that data in your Google Account by turning on sync.'"[1]

10. Plaintiffs assert that "Plaintiffs and other Un-Synced Chrome Users have suffered privacy harm and economic harm as a result of Google's wrongful acts."[2]

11. Plaintiffs assert that

Chrome sends the following personal information to Google when a user exchanges communications with any website that includes Google surveillance source code […] ***regardless of whether a user is logged-in to Google Sync or not*** [emphasis in original]:
   a. The user's unique, persistent cookie identifiers;
   b. The user's browsing history in the form of the contents of the users' GET requests and information relating to the substance, purport, or meaning of the website's portion of the communication with the user;
   c. In many cases, the contents of the users' POST communications;
   d. The user's IP address and User-Agent information about their device; and
   e. The user's x-client-data identifier.[3]

12. Plaintiffs assert that "[t]he contract governing the relationship between Google and Chrome with respect to Chrome on the date of the first complaint consisted of three documents:"

   a. Google general Terms of Service dated March 31, 2020;

   b. Google Chrome and Chrome OS Additional Terms of Service dated March 31, 2020; and

   c. Chrome Privacy Notice dated May 20, 2020.[4]

---

[1] First Amended Class Action Complaint, *Patrick Calhoun et. al. v. Google LLC*, Case No. 5:20-cv-05146-LHK-SVK, United States District Court for the Northern District of California - San Jose Division, April 16, 2021 ("FAC"), ¶¶ 2-3; Plaintiffs' Notice of Motion and Motion for Class Certification and Appointment of Class Representatives and Class Counsel; Memorandum of Law in Support thereof, *Patrick Calhoun. et. al. v. Google LLC*, Case No. 5:20-cv-05146-LHK-SVK, United States District Court for the Northern District of California - San Jose Division, October 14, 2021 ("Motion for Class Certification"), Memorandum of Points and Authorities, at p.1.

[2] FAC, ¶ 13.

[3] FAC, ¶ 141.

[4] FAC, ¶ 33.

13. Plaintiffs also allege that prior to March 31, 2020, the Google Privacy Policy is also included in the contract.[5]

14. I understand that the Google Privacy Policy ("PP") as of July 1, 2020 and the Google Chrome Privacy Notice ("CPN") as of May 20, 2020 were the "operative Google documents relating to the Chrome browser" at the time the Complaint was filed. I also understand that the PP, the CPN, and the Web & App Activity ("WAA") Help Page are relevant to consumers' expectations related to their web browsing information.[6]

15. I understand that Plaintiffs allege certain language in the Chrome Privacy Notice ("CPN") and Google Privacy Policy ("PP") is misleading.[7] I also understand from counsel that Plaintiffs imply that certain language in the CPN should be clarified.[8,9]

16. Plaintiffs make these allegations on behalf of a class ("Proposed Class") defined as:

> All Google Chrome users in the United States who did not enable "Sync" while browsing the web using Chrome ("Not Synced Chrome Users") or who disabled "Sync" while browsing using Chrome ("Unsynced Users"), at any time between July 27, 2016 to the present (the "Class Period"). Browsing using the Chrome browser in Incognito mode is excluded from the Class.[10]

## B. ASSIGNMENT

17. Counsel for Google has asked me to analyze the understanding, perception, and expectations of Chrome users related to certain claims put forth by Plaintiffs. Specifically, I was asked to analyze the following:

---

5    FAC, at FN 2.

6    Plaintiffs' Second Amended Responses and Objections to Defendant's Amended Interrogatory No. 7, *Patrick Calhoun et. al. v. Google LLC*, Case No. 5:20-cv-05146-LHK-SVK, United States District Court for the Northern District of California - San Jose Division, Dec. 6, 2021 ("Second Amended Responses"). See **Appendix D** for the PP that has been effective as of July 1, 2020. See **Appendix E** for the CPN effective as of May 20, 2020. See **Appendix F** for the WAA Help Page.

7    See for example, FAC, ¶¶ 43-47. See also, Second Amended Responses, at pp. 7-13.

8    "Instead of ceasing collection or clarifying disclosures, Google argues that its multiple privacy policies, which vaguely disclose data collection, override its specific contractual promises to the contrary." Motion for Class Certification, Memorandum of Points and Authorities, at p. 1.

9    See **Section VII** and **Appendix E** for details of the clarifying modification.

10    Motion for Class Certification, Notice of Motion and Motion, at p. 1.

a.  The extent to which Chrome users expect Google to receive information such as IP address, referrer URL, and cookies while using Chrome to browse the internet;[11] and whether their expectations are affected by using Sync Browsing Mode or not, while being presented with the CPN, PP, and WAA Help Page or not. See **Section VI**.

b.  The extent to which Chrome users are likely to continue using Chrome, depending on what is described in the CPN and PP presented to them. See **Section VII**.

c.  The extent to which Chrome users understand that Google receives Google Account holders' activity from sites and apps that partner with Google following the presentation of disclosures describing features of Google Accounts.[12] See **Section VIII**.

18.  I have also been asked to review and evaluate certain opinions relating to my expertise and assignment offered by Plaintiffs' experts Prof. Joseph Turow,[13] Prof. Leslie John,[14] and Dr. Russell Mangum (collectively, "Plaintiffs' Experts").[15] I discuss the specific opinions

---

[11]  I understand from FAC that Plaintiffs' allegation regarding user's browsing history relates only to "user's browsing history in the form of the contents of the users' GET requests and information related to the substance, purport, or meaning of the website's portion of the communication with the user." See FAC, ¶ 141. Instead of the technical terms used by the Plaintiffs (*i.e.*, GET request, POST communication), I test consumer understanding, perception, and expectations related to referrer URL. This is because I understand that referrer URL is defined in the PP and is an easier-to-understand concept. See **FN 30** for the definition of referrer URL. Similarly, cookies and IP address broadly cover At-Issue Data related to cookies and IP address, are defined in the PP, and are easier to understand than terms used by Plaintiffs.

[12]  These disclosures were sent to existing Google Account holders and new Google Account creators ("Account Holder Agreements") starting in June 2016. See Declaration of Gregory Fair Regarding Google's Disclosures in Support of Google's Opposition to Plaintiffs' Motion for Class Certification, *Patrick Calhoun et. al. v. Google LLC*, Case No. 5:20-cv-05146-LHK-SVK, United States District Court for the Northern District of California - San Jose Division, December 17, 2021 ("Fair Declaration"), at p. 2. See **Section IV.C** for additional discussion of the Account Holder Agreements. See **Section VIII** for the discussion of key questions asked in my Scenario Application Survey.

[13]  Expert Report of Professor Joseph Turow, *Patrick Calhoun et. al. v. Google LLC*, Case No. 5:20-cv-05146-LHK-SVK, United States District Court for the Northern District of California - San Jose Division, October 13, 2021 ("Turow Report").

[14]  Declaration of Leslie K. John, *Patrick Calhoun et. al. v. Google LLC*, Case No. 5:20-cv-05146-LHK-SVK, United States District Court for the Northern District of California - San Jose Division, October 13, 2021 ("John Report").

[15]  Expert Report of Russell W. Mangum III, Ph.D. in Support of Plaintiffs' Motion for Class Certification, *Patrick Calhoun et. al. v. Google LLC*, Case No. 5:20-cv-05146-LHK-SVK, United States District Court for the Northern District of California - San Jose Division, October 13, 2021 ("Mangum Report").

of each expert that I address below. See **Section IX**, **Section X**, **Section XI**, and **Section XII**.

    a.    I evaluate Prof. Turow's opinion that "[a] 'reasonable person' would interpret Google's disclosures to mean that Chrome does not take personal information unless the user elects to 'sync' the browser with a Google Account."[16]

    b.    I evaluate Prof. John's opinions that:

        i.    "A common methodology can be applied to answering questions about consumer expectations and actions and would not require individual questioning of all consumers."[17]

        ii.    "Consumers care about their privacy on the internet."[18]

        iii.    "It is reasonable for a consumer to use Chrome in the not-synced state and believe that Chrome will not send their personal information to Google. This is true for consumers who read Google's privacy policies and for consumers who do not."[19]

        iv.    "The Plaintiffs' experiences mentioned in their depositions are typical of reasonable consumers."[20]

    c.    Finally, I evaluate Dr. Mangum's opinion that "conjoint analysis can be used to estimate the reduction in market value, if any, due to Chrome violating its Chrome Agreements and sharing with Google the personal information of Chrome users that did not enable sync."[21]

19.    In preparing this report, I have relied upon my educational background and professional experience, surveys I designed specifically in connection with my assignment and the facts of this matter, data and documents produced in this matter, reports submitted by Plaintiffs'

---

[16]   Turow Report, at p. 4.

[17]   John Report, at p. 2.

[18]   John Report, at p. 3.

[19]   John Report, at p. 3.

[20]   John Report, at p. 7.

[21]   Mangum Report, ¶ 77.

Experts (including accompanying backup materials), deposition testimony, and publicly available information. **Appendix C** shows the list of materials I relied upon while forming the opinions in this report.

20.    I am being compensated at my standard rate of $1,100 per hour, plus expenses, for my work in this case. In addition, I receive compensation based on the professional fees of Analysis Group, Inc., which has provided research support under my direction and supervision. My compensation is neither contingent on my findings nor on the outcome of this case and the opinions I express are in no way contingent on the compensation I receive. I reserve the right to supplement the opinions expressed in this report, if asked to do so, in response to any new information provided by the parties after the date of my signature below.

## III.  SUMMARY OF OPINIONS

21.    Based on (1) my expertise in marketing, consumer behavior, and decision-making; and marketing research; (2) materials I have reviewed in conjunction with this matter; and (3) the results I obtained through the three studies I designed, conducted, and analyzed; I reach the following opinions:

    a.    The results of my **Consumer Expectations Survey** demonstrate that the average respondent believes and understands that Google receives their IP address, referrer URL, and cookies while browsing the internet in both Sync On and Sync Off settings. The findings from my survey are consistent with existing data highlighting the ways in which Chrome users engage with features related to the management of these settings, and they are consistent with the results from academic literature. See **Section VI**.

    b.    The results of my **Materiality Survey** show that the average respondent is extremely likely to continue using Chrome after being presented with the CPN and PP. Modifications to the CPN to state that Google receives the At-Issue Data through its web-services installed on third-party websites whether or not Sync is enabled do not have a statistically significant impact on respondents' likelihood of continuing to use Chrome. The findings of my survey are consistent with publicly available usage data, which show that consumers continue to choose Chrome

7

despite the privacy concerns alleged by Plaintiffs and Plaintiffs' Experts. These results are further confirmed by peer-reviewed studies finding that consumers are willing to disclose their personal data when faced with deciding between more privacy or changes in quality, even though the same consumers claim that privacy is important to them. Additionally, peer-reviewed studies also find that consumer preferences, decisions, and what they consider as personal information are context-specific. See **Section VII**.

c.     The results of my **Scenario Application Survey** show that, after being presented with Account Holder Agreements included in Google's terms for Account holders, the average respondent strongly believes that Google receives activity from sites and apps that partner with Google. See **Section VIII**.

d.     There are conceptual issues common to the opinions offered by Plaintiffs' Experts Prof. Turow, Prof. John, and Dr. Mangum. Specifically, Plaintiffs' Experts offer opinions on key concepts, such as personal information, without clearly defining them. Plaintiffs' Experts fail to provide evidence tailored to the relevant online context and specific to the facts of this matter. Additionally, Plaintiffs' Experts fail to articulate or implement scientific methods to support their opinions. See **Section IX**.

e.     Prof. Turow's opinions amount to conjecture, with no case-specific basis or supporting analysis. Among other things, Prof. Turow's opinions are based on his own unsupported interpretation of the relevant policies and disclosures. He did not conduct any survey-based analysis or any other form of consumer research tailored to the matters at issue in this case. As a telling illustration of the non-specific ways in which he provides his opinions, he fails to define what he means by the broad term "personal information" or otherwise distinguish between the categories of information Plaintiffs highlight, versus any other category potentially considered personal information that are not at issue. As a result, his opinion that "a 'reasonable person' would interpret Google's disclosures to mean that Chrome does not take personal information unless the user elects to 'sync' the browser with a Google Account" is overly vague, uninformative, and contradicted as it would relate to At-

8

Issue Data by results from my Consumer Expectation Survey, and it is not consistent with empirical data or peer-reviewed studies. See **Section X**.

f.  Prof. John's opinions are also based on an unsupported interpretation of the relevant policies and disclosures that lacks connection to the Chrome user environment and experience. Prof. John does not define the "personal information" upon which she opines. The opinions further lack support from context-specific empirical analysis or appropriate scientific methods. She has not conducted any survey or consumer research specific to this case. My survey results, Google documents, and peer-reviewed studies contradict Prof. John's opinions that consumers believe that using Chrome in its default state (Basic Mode) will prevent Google services from receiving the At-Issue Data. They also contradict Prof. John's implication that internet privacy is the most important thing that consumers care about. See **Section XI**.

g.  Contrary to Dr. Mangum's claim, conjoint analysis is ill-equipped to accurately measure the value of privacy in this matter. While conjoint analyses can be useful in certain contexts, it also has well-known limitations that make it inappropriate to assess the value of privacy as asserted by Dr. Mangum. Among other things, in this case, the well-known "privacy paradox" makes clear that stated preferences (preferences that are obtained through methods such as conjoint) and revealed preferences (preferences revealed in the marketplace by actual consumer behavior and actions) can diverge. In contexts where stated preferences are likely to differ from revealed preferences, conjoint analysis is not an appropriate method. Additionally, conjoint analyses are often used when introducing new products, when the price of the product or service is compared against other products to assess price sensitivity or willingness to pay for certain features, which is a setting that is different from free products such as Chrome (and most other browsers). It is telling that he did not conduct such an analysis, or outline with any specificity how he or anyone else might even conduct such an analysis. Finally, the two studies cited by Dr. Mangum as support for his assertions are not applicable to the facts of this mater. See **Section XII**.

## IV.  BACKGROUND

22.   In this section I provide an overview of the Chrome browser, what I describe as "At-Issue Data," and policies and disclosures relevant to this case. The purpose of this section is not to provide a comprehensive or technical review of these areas, but rather to provide general background related to my analyses and opinions in the sections below.[22]

### A.   GOOGLE'S CHROME BROWSER

23.   Chrome is free software for browsing the internet, published by Google.[23] Sync is an optional Chrome feature that users may choose to enable. Sync transmits certain information that Chrome stores locally by default – such as the user's browsing history, bookmarks and passwords — to their Google Account so that they may access it when they sign in and sync on other computers and devices.[24] Chrome currently offers five browsing modes for users to choose from:[25]

   a.   *Basic browser mode*: In this mode, information (*e.g.*, Chrome browsing history, personal information and passwords, permissions granted to websites, cookies, data saved by add-ons including browser extensions, records of downloads from websites) is saved locally on users' systems.

   b.   *Sign in without Sync enabled*: In this mode, users who are signed into a Google service are signed into the Chrome browser (unless the user disables this feature in settings). Users may be offered to save certain information (*e.g.*, passwords, payment methods and related information) to their Google Account, but it is not saved by default.

   c.   *Sign in with Sync enabled*: In this mode, information stored locally on the browser by default is stored in users' Google Accounts on Google's servers. As a result, users may access saved information (*e.g.*, browsing history, bookmarks, tabs,

---

[22]   For technical discussion of these concepts, see Expert Report of Yiling Chen, Ph.D., December 22, 2021 ("Chen Report") and Expert Report of Georgios Zervas, Ph.D., December 22, 2021 ("Zervas Report").

[23]   "Google Chrome - Home," *Google*, available at: https://www.google.com/chrome/, accessed on December 14, 2021.

[24]   **Appendix E.1**.

[25]   **Appendix E.1**.

passwords and autofill information, and other browser settings) when signed in and synced to Chrome on other devices such as computers in other locations, tablets, or mobile devices.[26]

d. *Incognito mode*: In this mode, Chrome will not save information such as browsing history, cookies and site data, information entered in forms, snapshots of visited pages, or records of downloads locally on the user's browser after the user closes the Incognito session. In addition, in Incognito mode, Chrome will not share existing cookies stored on the browser with the sites the user visits in Incognito mode. Sites may deposit new cookies on the user's browser, but they are only stored and transmitted until the user closes the last Incognito window. However, users still have access to information from their existing profile, such as suggestions based on their browsing history and saved passwords while they are browsing in Incognito mode.

e. *Guest mode*: Guest mode is identical to Incognito mode except that, in Incognito mode, the user still has access to their existing browser profile; in Guest mode, the user can browse without seeing information from existing profiles.

### B. AT-ISSUE DATA

24. Plaintiffs assert (see **Section II.A**) the relevant "personal information" in this matter includes the following, which is described in greater technical detail in the Chen Report and Zervas Report, which I collectively refer to as "At-Issue Data":

a. ***The user's unique, persistent cookie identifiers***: Cookies are text files with small pieces of data that are used to identify a specific browser instance and to improve web browsing experience. Data stored in a cookie is created by the website upon the connection and is labeled with an ID unique to the device visiting the website.[27]

---

[26] **Appendix E.1**.

[27] "What are Cookies?," *Kaspersky*, available at: https://www.kaspersky.com/resource-center/definitions/cookies, accessed on December 21, 2021. The PP defines cookie as "a small file containing a string of characters that is sent to your computer when you visit a website. When you visit the site again, the cookie allows that site to recognize your browser. Cookies may store user preferences and other information. You can configure your browser to refuse all cookies or to indicate when a cookie is being sent. However, some website features or services may not function properly without cookies."

b. ***The user's browsing history in the form of the contents of the users' GET requests and information relating to the substance, purport, or meaning of the website's portion of the communication with the user***: A GET request is an instruction for the website's server to display content in the user's browser. It includes certain information from the user's browser about the context of the request, including referrer URL.[28]

c. ***The contents of the users' POST communications***: If a user filled out a form on a website to request information, the web browser makes connection with the website by sending a POST communication.[29]

d. ***The user's IP addresses and User-Agent information about their device***:

    i. An IP address is a unique address, comprised of a string of numbers separated by periods, that identifies a device on the internet or a local network. Like their real-world analogs, IP addresses allow information to be sent between devices on a network.[30]

    ii. User-agent information is typically part of a GET request, which provides information about properties of the requesting user's web-connected system (*e.g.*, application, mobile vs. desktop, browser, operating system).

e. ***The user's x-client-data identifier***: X-client-data header contains information describing the active variations of Chrome — that are used for testing new features in Chrome.[31]

---

[28] The PP defines referrer URL (Uniform Resource Locator) as "information transmitted to a destination webpage by a web browser, typically when you click a link to that page. The Referrer URL contains the URL of the last webpage the browser visited."

[29] FAC, ¶ 123.

[30] "What is an IP Address - Definition and Explanation," *Kaspersky*, available at: https://www.kaspersky.com /resource-center/definitions/what-is-an-ip-address, accessed on December 21, 2021. The PP states, "[e]very device connected to the Internet is assigned a number known as an Internet protocol (IP) address. These numbers are usually assigned in geographic blocks. An IP address can often be used to identify the location from which a device is connecting to the Internet."

[31] "Google Chrome Privacy Whitepaper," *Google*, February 4, 2021, available at: https://www.google.com/chrome /privacy/whitepaper.html, accessed on December 21, 2021.

### C.    RELEVANT POLICIES AND DISCLOSURES

25.    I understand from counsel that Google discloses its collection of the At-Issue Data in the following documents:[32]

    a.    ***Google Privacy Policy ("PP")***: The PP is "meant to help you understand what information we collect, why we collect it, and how you can update, manage, export and delete your information."[33]

    b.    ***Chrome Privacy Notice ("CPN")***: The CPN describes features that are specific to Chrome and distinguishes the different browsing modes. The CPN provides that, "any personal information that is provided to Google or stored in your Google Account will be used and protected in accordance with the Google Privacy Policy, as changed from time to time."[34]

    c.    ***Web & App Activity ("WAA") Help Page***: The WAA Help Page explains that "[i]f Web & App Activity is turned on, your searches and activity from other Google services are saved in your Google Account, so you may get more personalized experiences, like faster searches and more helpful app and content recommendations. You can turn Web & App Activity off or delete past activity at any time."[35]

    d.    ***Account Holder Agreements***: I understand that starting in June 2016, Google pushed a set of terms describing new features of Google Accounts to existing Google Account holders and new Google Account creators ("Account Holder Agreements"). These features allow Google Account holders to view and control some of their account activities (*e.g.*, activity on sites and apps that use Google services, video watch history for YouTube, search history for Google Maps, history for Google.com, and browsing history on Chrome if users chose additional settings) under the Web & App Activity setting. The Account Holder Agreements explain

---

[32]    Although CPN does not address the collection of the at-issue data, I included it as part of the relevant policies and disclosures because Plaintiffs' claims are based on the CPN. Second Amended Responses, at pp. 7-10.

[33]    **Appendix D.1**.

[34]    **Appendix E.1**.

[35]    **Appendix F**.

that Google stores and processes users' data when using Google services. Depending on the users' account settings, some of this data may be associated with the users' Google Accounts. The Account Holder Agreements also explain that Google uses users' data to deliver personalized ads and improve the user experience.[36] See **Appendix G** and **Appendix H** for the Account Holder Agreements for new Google Account holders ("New Account Creation Agreement") and for existing Google Account holders as of June 2016 ("Consent Bump Agreement").[37]

## V.    FRAMEWORK AND EMPIRICAL APPROACH

26.    I have reviewed Google documents produced in this case, publicly available data and reports, as well as existing scientific research. Because consumer expectations of privacy and consumer interpretations of privacy policies are context specific, I conducted a series of surveys specific to the facts of this matter to address multiple questions that cannot be answered by existing data and literature.[38] Surveys are commonly used in numerous settings, including in academia and legal disputes, to address a wide range of issues and questions.[39] My research approach follows professional standards and best practices for

---

[36]    GOOG-CABR-04067825-7867.

[37]    During the sign-up process, Google Account creators are shown a page titled "Privacy and Terms" that they must agree to in order to create an account. The page describes much of the same information as the push notification shown to the existing Google Account holders. The Consent Bump Agreement explained that there were "[s]ome new features for your Google Account." At the bottom of the page, users could Agree to turn on the new features or select More Options to customize settings. Note that Chrome Sync information was only shown to users who previously synced their Chrome history and was not shown otherwise. See **Appendix G** and **Appendix H**.

[38]    "Words, though, rarely have singular meaning. No matter how carefully drafted, the reasonable understanding of a word or phrase often depends on the circumstances in which it was used when the contract was made. . . . A survey would ask a pool of respondents, who resemble the contracting parties, what meaning they assign to the language. If the respondents are about evenly split, the term should be regarded as ambiguous. But if one meaning garners noticeably greater support among the survey respondents, it presumptively ought to prevail." Ben-Shahar, O. and Strahilevitz, L. J., "Interpreting Contracts via Surveys and Experiments," *New York University Law Review*, Vol. 92, December 2017, pp. 1753-1827 ("Ben-Shahar and Strahilevitz (2017)"), at pp. 1761 and 1766.

[39]    Ben-Shahar and Strahilevitz (2017), at pp. 1769-1771; Lavrakas, P. J., *Encyclopedia of Survey Research Methods*, SAGE Publications, Inc., 2008, at p. 33.

survey-based research, both generally as well as specifically for surveys conducted for the purpose of litigation.[40]

27.    In **Section VI** to **Section VIII**, I provide further details on how I addressed each component of my assignment, including a complete description of the survey research I conducted (*e.g.*, survey design, stimuli, and key questions), the results I obtained from the survey research, and where appropriate, a review of Google's materials and relevant scientific research to contextualize my findings. In **Section IX** to **Section XII**, I discuss the relevant opinions of Plaintiffs' Experts.


## VI.    CHROME USERS UNDERSTAND THAT GOOGLE RECEIVES THEIR AT-ISSUE DATA INCLUDING IP ADDRESS, REFERRER URL, AND COOKIES

28.    Plaintiffs assert that "Google . . . misrepresented its privacy practices,"[41] and that "[t]he information that Google misrepresented and concealed would be, and is, material to reasonable consumers, namely, that rather than not sharing the information at issue as represented, in fact that information was shared with Google."[42] In other words, Plaintiffs imply that a "reasonable" consumer would not expect the At-Issue Data to be shared with Google.[43] That assertion is refuted by my Chrome-specific research, the documents produced in this matter, and peer-reviewed studies about user expectations of privacy on the internet.

29.    In accordance with my assignment, I designed my Consumer Expectations Survey to determine how Chrome users expect information to be handled while using Chrome, to what extent their expectations would be dependent on whether Sync mode is enabled, and to what extent the impact of Sync mode is dependent on whether respondents were shown

---

[40]    I describe how my surveys follow best practices in **Appendix I**. I designed my surveys in accordance with the standards set forth by the Federal Judicial Center in the "Reference Guide on Survey Research" and in the "Manual for Complex Litigation." Both sources are cornerstone references for survey design in litigation. See Diamond, S. S., "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*, Third Edition, National Academies Press, 2011, pp. 359-423 ("Diamond (2011)"). See also, *Manual for Complex Litigation*, Fourth Edition, Federal Judicial Center, 2004.

[41]    FAC, ¶ 415.

[42]    FAC, ¶ 415.

[43]    As discussed in **Section X** and **Section XI**, Plaintiffs' experts Prof. Turow and Prof. John opine that consumers do not expect their personal information be shared with Google.

and asked to review the CPN, PP, and WAA Help Page. Many Chrome users do not necessarily understand the mechanics of how Chrome obtains data and information, nor do they necessarily understand the definition of At-Issue Data. Therefore, in my Consumer Expectations Survey, I specifically test Chrome user understanding, perception, and expectations related to IP address, referrer URL, and cookies.

30.    In addition to my survey, I reviewed data produced in this matter to evaluate how Google Account holders engage with Chrome and Google features, and whether they intend to share their At-Issue Data with Google. I also reviewed relevant peer-reviewed studies about consumers' expectations about privacy while using the internet.

## A.    MY CONSUMER EXPECTATIONS SURVEY DEMONSTRATES THAT CHROME USERS BELIEVE AND UNDERSTAND THAT GOOGLE RECEIVES THEIR IP ADDRESS, REFERRER URL, AND COOKIES

### 1.    Overview of the Consumer Expectations Survey

31.    **Target Population.** Consistent with the Proposed Class, the target population consists of adult Chrome users residing in the US.[44] For each experimental group, the number of targeted respondents is 250.

32.    **Survey Design.** Respondents were randomly assigned to one of four experimental groups (see **Exhibit 1** below). Respondents in Group A and C were in the Sync Off condition (*i.e.*, seeing an image of Chrome with the Sync Button off), while respondents in Groups B and D were in the Sync On condition (*i.e.*, seeing an image of Chrome with the Sync Button on). Respondents in Groups A and B were presented with two images showing browser settings (*i.e.*, an image of Chrome with the Sync Button on or off, and an image of a bookmarks setting as a distractor). Respondents in Groups C and D were presented with the same two images showing browser settings, as well as three additional images showing

---

[44]    "The target population consists of all elements (i.e., individuals, or other units) whose characteristics or perceptions the survey is intended to represent." Diamond (2011), at p. 376. I required the screener to be applied to a sample representative of the general population in the US (i.e., matched to the Census on age, gender, and region) so that the final sample is representative of the target population. See **Appendix I** for detailed discussion of sample selection. See also, **Appendix L.1**.

the CPN, PP, and WAA Help Page. The images were presented in a randomized order across respondents.

33.    Plaintiffs' Experts assert that most consumers do not actually review privacy policies.[45] Thus, for respondents in Groups C and D, after they were presented with CPN or PP, they were presented with a highlighted version of the same disclosure to draw attention to certain language that Google or Plaintiffs or both consider relevant to the At-Issue Data.[46,47] I understand that the highlighted language in the CPN includes the statements that the Plaintiffs allege is misleading.[48]

**Exhibit 1. Consumer Expectations Survey Experimental Groups**

|  | Sync Off | Sync On |
|---|---|---|
| **No Policies** | *Group A*<br>• Image of Sync Button Off<br>• Image of Bookmarks Setting | *Group B*<br>• Image of Sync Button On<br>• Image of Bookmarks Setting |
| **All Policies** | *Group C*<br>• Image of Sync Button Off<br>• Image of Bookmarks Setting<br>• CPN (w/ and w/o highlights)<br>• PP (w/ and w/o highlights)<br>• WAA Help Page | *Group D*<br>• Image of Sync Button On<br>• Image of Bookmarks Setting<br>• CPN (w/ and w/o highlights)<br>• PP (w/ and w/o highlights)<br>• WAA Help Page |

34.    **Key questions.** Respondents in all four groups were asked to express the degree to which they agree or disagree (on a scale of 1 ["Strongly disagree"] to 5 ["Strongly agree"]) with statements based on the images they just viewed. Specifically, respondents were asked a series of questions regarding different data types: "[b]ased on the sync settings [and documents] you just viewed, how strongly do you agree or disagree that Google receives

---

[45]    See for example, John Report, at p. 6.

[46]    "As contract formalists would like it, respondents could be shown only the disputed text; or, as the realists advocate, they could be exposed to additional facts surrounding the case. Practically, however, the survey method—by typically relying on respondents with limited attention and sophistication—restricts the quantum of such background facts." Ben-Shahar and Strahilevitz (2017), at p. 1778.

[47]    See **Appendix D** and **Appendix E** for highlighted versions of the CPN and PP.

[48]    Second Amended Response, at pp. 7-11.

your [data type] while browsing the internet?" "Data type" may refer to IP addresses,[49] referrer URLs,[50] cookies,[51] name,[52] passwords and login information for websites,[53] or payment information.[54, 55]

35. The average Chrome user expectation of Google receiving information can be calculated from the numerical values corresponding to the individual response options (1 = "Strongly disagree," 2 = "Disagree," 3 = "Neither agree nor disagree," 4 = "Agree," 5 = "Strongly agree"). Given this scale, the interpretation of the resulting average is such that any value greater than the midpoint (3) would mean that the respondents/Chrome user believes that the information is received by Google; a value close to 5 would mean that respondents/Chrome users nearly universally believe that their information is received by Google. A value close to 1 would indicate that respondents/Chrome users nearly universally do not think Google receive their information.

### 2.  Results from the Consumer Expectations Survey

36. Based on the results from this survey, it is clear that the average respondent believes and understands that Google receives their IP addresses, referrer URLs, and cookies while browsing the internet in both Sync On and Sync Off conditions. **Exhibit 2** presents results from the Consumer Expectations Survey, showing the average Chrome user expectation of

---

[49]  Respondents were presented with the definition: "IP Address - Every device connected to the Internet is assigned a number known as an Internet protocol (IP) address. An IP address can often be used to identify the location from which a device is connecting to the Internet." See **Appendix L.1**.

[50]  Respondents were presented with the definition: "Referrer URL - A referrer URL contains the URL (web address) of the last webpage the browser visited." See **Appendix L.1**.

[51]  Respondents were presented with the definition: "Cookie – A small file containing a string of characters that is sent to your computer when you visit a website. When you visit the site again, the cookie allows that site to recognize your browser. Cookies may store user preferences and other information." See **Appendix L.1**.

[52]  Respondents were presented with the definition: "Name - A word or set of words by which a person is referred to. This could be used when signing-in to accounts, filling out forms, or communicating with individuals or organizations while browsing the internet." See **Appendix L.1**.

[53]  Respondents were presented with the definition: "Passwords and login information - Account names and associated passwords required to login to individual accounts online." See **Appendix L.1**.

[54]  Respondents were presented with the definition: "Payment information - Any data that enables a person to access a customer's account, such as a debit card, credit card, or bank account info." See **Appendix L.1**.

[55]  See **FN 13** for the reason to study IP address, referrer URL, and cookies. Additionally, name, payment information, and passwords and login information relate to personal information as defined in the PP as well as information that can be stored in a user's Google Account as specified in the CPN.

information Google would receive (*i.e.*, the level of agreement or disagreement that Google receives users' IP addresses, referrer URLs, cookies, names, passwords and login information for websites, or payment information) while browsing the internet, across each of the four categories of respondents (Groups A-D).[56] **Exhibit 2** shows that for respondents in Group A (*i.e.*, respondents that were presented with an image of the Sync Button off and no CPN, PP, or WAA Help Page), the average expectation is 4.04 for IP addresses (between "agree" and "strongly agree"), 3.86 for referrer URLs (between "neither agree nor disagree" and "agree"), and 3.97 for cookies (between "neither agree nor disagree" and "agree"). The percentage of respondents in Group A that strongly agree or agree that Google receives their data (*i.e.*, chose answer option 4 or 5) is 76 percent for IP addresses, 69 percent for referrer URLs, and 75 percent for cookies.[57] The average respondent also agrees that Google receives their name, passwords and login information for websites, or payment information. For respondents in Group A, the average expectation is 3.97 for name (between "neither agree nor disagree" and "agree"), 3.67 for passwords and login information for websites (between "neither agree nor disagree" and "agree"), and 3.48 for payment information (between "neither agree nor disagree" and "agree").

---

[56]  See **Appendix O.1** for average, standard deviation, and statistical tests.

[57]  See **Appendix O.1**.

**Exhibit 2. Chrome Users' Average Expectation of Google Receiving
At-Issue and Other Data While Browsing the Internet**

"Based on the sync settings [and documents] you just viewed, how strongly do you agree or disagree that Google
receives your [data type] while browsing the internet?" (1 = "Strongly disagree" 5 = "Strongly agree")

|  | Group A Sync Off No Policies (n = 250) | Group B Sync On No Policies (n = 250) | Group C Sync Off All Policies (n = 252) | Group D Sync On All Policies (n = 252) |
|---|---|---|---|---|
| **IP Address** | 4.04 | 3.99 | 4.00 | 4.02 |
| **Referrer URLs** | 3.86 | 3.95 | 3.89 | 3.89 |
| **Cookies** | 3.97 | 4.03 | 4.08 | 4.00 |
| **Name** | 3.97 | 3.94 | 3.90 | 3.67 |
| **Passwords and Login Information for Websites** | 3.67 | 3.85 | 3.76 | 3.64 |
| **Payment Information** | 3.48 | 3.49 | 3.46 | 3.40 |

Source: **Appendix O.1**.

37.    **Exhibit 3** shows an assessment of whether the differences in Chrome user expectation
between the Sync Off condition and Sync On condition are statistically significant. It shows
that respondents' expectations that Google receives their information while using Chrome
is not affected by the Sync status being on or off. Comparing the average expectation
between respondents in the Sync Off condition (Group A and C) and those in the Sync On
condition (Group B and D), there is no statistically significant difference between these
two groups regarding their expectation for IP addresses, referrer URLs, and cookies (see
**Exhibit 3** and **Appendix O.1**). In other words, the average/typical respondent in Sync Off
condition believes and understands that Google receives their IP addresses, referrer URLs,
cookies, and payment information while browsing the internet using Chrome to a similar
extent as the average/typical respondent in Sync On condition.[58]

---

[58]    Although there are statistically significant differences for name and for passwords and log in information for
websites (see **Appendix O.1**), such results may occur by chance. This is because as the number of tests increases,
the probability of observing at least one significant result due to chance would increase. For example, as in this
analysis alone, six hypotheses are tested simultaneously. At significance level of 5 percent, the probability of
observing at least one significant result is $1-(1-0.05)^6=0.265$. In other words, with six tests being considered at
the same time, there is a 26.5 percent chance of observing at least one significant result purely by chance. A

38.     **Exhibit 3** also shows the lack of statistically significant difference between Sync Off condition and Sync On condition holds true regardless of whether respondents were presented with the relevant policies and disclosures. For example, for IP address, the difference between Sync Off condition and Sync On condition is -0.06 for respondents not presented with relevant policies and disclosures and is 0.02 for respondents presented with relevant policies and disclosures. Neither of the differences is statistically significant.

### Exhibit 3. Difference in Chrome Users' Average Expectation of Google Receiving Their Data While Browsing the Internet

"Based on the sync settings [and documents] you just viewed, how strongly do you agree or disagree that Google receives your [data type] while browsing the internet?" (1 = "Strongly disagree" 5 = "Strongly agree")

|  | Sync On vs Sync Off (Group A + C vs Group B + D | Sync On vs Sync Off, No Policies (Group A vs Group B) | Sync On vs Sync Off, All Policies (Group C vs Group D) |
|---|---|---|---|
| **IP Address** | -0.02 | -0.06 | 0.02 |
| **Referrer URLs** | 0.04 | 0.09 | -0.01 |
| **Cookies** | -0.01 | 0.06 | -0.08 |
| **Name** | -0.13** | -0.03 | -0.22** |
| **Passwords and Login Information for Websites** | 0.03 | 0.18* | -0.12 |
| **Payment Information** | -0.02 | 0.01 | -0.06 |

Note: Symbols ***, **, and * represent statistical significance at the 1%, 5%, and 10% levels respectively. Significance level is based on two-tailed Student's t-test.

Source: **Appendix O.1**.

commonly used method of adjusting for multiple tests is Bonferroni correction, which sets the significance level at $\alpha/n$. For six tests with 5 percent significance level, the adjusted significance level would be 0.05/6. When applying Bonferroni correction, none of the differences shown in Exhibit 3 between Sync On condition and Sync Off condition would be statistically significant. Further, incorporating this adjustment into the analyses presented later would not change the results and or the conclusions drawn from them.

.

**B.    CHROME USERS ENGAGE WITH CHROME AND GOOGLE FEATURES IN A MANNER CONSISTENT WITH AN EXPECTATION THAT INFORMATION FROM BROWSING ACTIVITIES IS SHARED WITH GOOGLE**

39.    Data demonstrate that many Google Account holders intend to share their browsing activities with Google. For example, Google Account holders control whether to save their searches and activity from Google services to their Google Account by turning on or off WAA.[59] By turning on WAA, Google Account holders choose to allow Google to receive information from their browsing and search activities in exchange for more personalized experiences, like faster searches and more helpful app and content recommendations.[60] Data show that 88.3 percent of active US Google Accounts *ever* had WAA turned on between July 27, 2016 and July 27, 2020, and 69.2 percent of active Accounts *always* had WAA turned on between July 27, 2016 and July 27, 2020.[61]

40.    As another example, by choosing to turn the Ads Personalization on or off, Google Account holders decide whether or not to allow Google to show them personalized ads based on their personal information in their Google Accounts, data from advertisers that partner with Google, and/or Google's estimation of their interests.[62] Data show that between July 27, 2016 and July 27, 2020, 97.6 percent of active US Google Accounts had Google Ads Personalization on the entire time, while holders of only 2.4 percent of active Accounts had Google Ads Personalization turned off at any time.[63]

---

[59]    **Appendix F**.

[60]    Google Account holders can control the collection of activity from third party sites that use Google services by toggling the checkbox next to the "[i]nclude Chrome history and activity from sites, apps, and devices that use Google services" sub-setting.

[61]    Similarly, holders of 80.5 percent of active Accounts ever had sWAA ON (include Chrome history and activity from sites, apps, and devices…) during the Class Period; 57.5 percent of active Accounts had sWAA always ON during the Class Period. The number of Google Accounts includes enterprise accounts. See Fair Declaration, ¶ 81 and Exhibit 88 (GOOG-CABR-05424604).

[62]    "Ad Personalization," *Google*, available at: https://adssettings.google.com/authenticated, accessed on December 14, 2021 (requires account login).

[63]    Fair Declaration, ¶ 79 and Exhibit 88 (GOOG-CABR-05424604).

### C.  ACADEMIC LITERATURE IS CONSISTENT WITH THE CONSUMER EXPECTATIONS EXPRESSED IN MY CONSUMER EXPECTATIONS SURVEY

41.     Consistent with my survey results, scientific studies, some of which were conducted by Plaintiffs' Experts, have found that consumers understand that their personal information is being collected while browsing the internet.[64] For example, a survey conducted by Prof. Turow and co-authors in 2005 found that "[m]ost internet-using US adults are aware that companies can follow their behavior online. Fully 80% know marketers 'have the ability' to track them across the web, and 62% know that a company 'can tell' if they have opened its email without getting their response."[65]

42.     Further, in his expert report, Prof. Turow cited a Google document that presents focus group discussions regarding privacy and ad personalization.[66] The document shows that Chrome users understand that marketers are collecting and using their data. For example, one person stated "[w]e have to come to terms with the fact that companies are going to have profiles of us. If they can use that to our advantage in some way, so be it."[67] Another person stated "[p]eople acknowledge that the collection of data, and the use of ads, are a fact of life."[68] Another person stated "[t]he attitude is essentially, '[t]hey're going to collect my data anyway. I might as well get something out of it.'"[69]

43.     These discussions are consistent with numerous scientific articles demonstrating that a large portion of consumers also understand that they can take action to manage the extent of their data being collected online. For example, a 2017 survey asked respondents about the measures they took with regard to online privacy.[70] A majority of respondents stated

---

[64]  Note that the definition of personal information is context specific and varies across studies. See **Section VII.C** and **Section IX** for additional discussion.

[65]  Turow, J., Feldman, L., and Meltzer, K., "Open to Exploitation: American Shoppers Online and Offline," *Annenberg Public Policy Center of the University of Pennsylvania*, 2005, at p. 17.

[66]  Turow Report, GOOG-CABR-00422093-2182.

[67]  GOOG-CABR-00422093-2182 at 2098.

[68]  GOOG-CABR-00422093-2182 at 2099.

[69]  GOOG-CABR-00422093-2182 at 2102.

[70]  Kunst, A., "Leading U.S. Online User Privacy Measures 2017," *Statista*, December 20, 2019, available at: https://www.statista.com/statistics/714130/us-online-usage-privacy-measures-usage/, accessed on December 14, 2021.

that they deleted cookies (67 percent), deleted their browser history (71 percent), or deleted cached information (61 percent). As early as 2004, survey evidence showed that over half of respondents cleared their cookies at some point in 2004 and about 39 percent of them deleted cookies at least on a monthly basis, and the cookie deletion rate could be as high as 58 percent of users if anti-spyware software, which also erases many cookies, is included in the estimate.[71] These actions indicate that (i) a significant portion of consumers are aware that their data is being collected as they browse the internet, and (ii) many consumers take steps to prevent certain types of data collection.

## VII. USERS VALUE CHROME AND WOULD CONTINUE TO USE IT EVEN IF CERTAIN DISCLOSURES WERE CHANGED TO ADDRESS PLAINTIFFS' ALLEGED CONCERNS

44.    Plaintiffs allege that "[h]ad Google been transparent about its level of surveillance, user engagement—a key metric for Google's sales—would have decreased,"[72] and that "[w]arning users would have chilled Chrome engagement as well as discourage potential new users from joining."[73] Though much of the language in the CPN and PP describes the data collected by Google when using Google's features and services, I understand from counsel that Plaintiffs allege that the relevant policies and disclosures do not "accurately or adequately provide[d] Chrome users with information about how Chrome shares information with Google."[74]

45.    In accordance with my assignment, I designed my Materiality Survey to measure whether and to what extent Chrome users would continue using Chrome after being specifically presented with the CPN and PP, and to study whether the users' willingness to use Chrome

---

[71]    Morrissey, B., "Users Often Delete Web-Tracking Cookies," *Adweek*, March 14, 2005, available at: https://www.adweek.com/brand-marketing/users-often-delete-web-tracking-cookies-78340/, accessed on December 16, 2021; "Accurate Web Site Visitor Measurement Crippled by Cookie Blocking and Deletion," *Jupitermedia*, March 14, 2005, available at: http://web.archive.org/web/20051028235851/http://www.jupitermedia.com/corporate/releases/05.03.14-newjupresearch.html, accessed on December 14, 2021; Sipior, J. C., Ward, B. T., and Mendoza, R. A., "Online Privacy Concerns Associated with Cookies, Flash Cookies, and Web Beacons," *Journal of Internet Commerce*, Vol. 10, 2011, at p. 3.

[72]    FAC, ¶ 11.

[73]    FAC, ¶ 238.

[74]    Second Amended Responses, at p. 7.

would change with increased clarification of certain language in the CPN specifically addressing Plaintiffs' allegations as to how class members would interpret the CPN.

46.    In addition to my survey, I reviewed publicly available data of Chrome usage trends despite the privacy concerns alleged by Plaintiffs and Plaintiffs' Experts. I also reviewed academic research about people's willingness to disclose their personal information in the context of added user benefits such as better services.

## A.    MY MATERIALITY SURVEY DEMONSTRATES USERS WOULD CONTINUE TO USE CHROME DESPITE CHANGES TO THE DISCLOSURES

### 1.    Overview of the Materiality Survey

47.    **Target Population.** As in my Consumer Expectations Survey, the target population for this survey consists of adult Chrome users residing in the US.[75] For each experimental group, the number of targeted respondents is 250.

48.    **Survey Design.** I understand that Plaintiffs allege that the CPN is misleading because "in combination with other descriptions in the Chrome Privacy Notice, it gives Chrome users the impression that their browsing history is only saved in Google's servers relating to a person's Google Account if they have chosen to Sync their Chrome data."[76] To study the impact of clarifying language in CPN, respondents in my Materiality Survey were randomly assigned to one of the two experimental groups (see **Exhibit 4** below).

**Exhibit 4. Materiality Survey Experimental Groups**

| Group A | • Unmodified CPN (w/ and w/o highlights) <br> • PP (w/ and w/o highlights) |
|---------|---------------------------------------------------------------------------|
| Group B | • Modified CPN (w/ and w/o highlights) <br> • PP (w/ and w/o highlights) |

---

[75]    **Appendices I and L.2**.

[76]    Second Amended Responses, at p. 9.

49.    Respondents in Group A were presented with the CPN and PP "as is," without modification. Respondents in Group B were presented with the same information, except that certain language in the CPN was modified. Specifically, certain edits were made to the description regarding that not enabling Sync while using Chrome in Basic mode does not affect whether Google receives the At-Issue Data through its web-services installed on third-party websites. **Exhibit 5** below shows the excerpts of the current, unmodified CPN and the modified CPN, where the text in the red box was added for clarification.[77]

**Exhibit 5. Excerpts of Unmodified CPN and Modified CPN**

50.    Similar to my Consumer Expectations Survey, the order of presenting the CPN and PP were randomized across respondents. For all respondents, after they were presented with the CPN or PP, they were presented with highlighted versions of the same CPN or PP to draw attention to certain language that Google and/or Plaintiffs consider as relevant to the data collection at issue and/or misleading.

51.    **Key questions.** After being presented with the policies, respondents in both groups were asked to express how likely or unlikely they were to continue using Chrome. Specifically, respondents were asked to select a value from a scale of 1 ("Extremely unlikely") to 5 ("Extremely likely").

52.    The average likelihood can be calculated using the numerical values corresponding to response options (1 = "Extremely unlikely," 2 = "Unlikely," 3 = "Neither likely nor unlikely," 4 = "Likely," 5 = "Extremely likely"). An average value greater than 3 means that respondents/Chrome users on average are likely to continue using Chrome after viewing the CPN and PP; an average value close to 5 means that respondents/Chrome users nearly universally are extremely likely to continue using Chrome; whereas the average value close to 1 means that respondents/Chrome users are unlikely to continue using Chrome.

### 2.    *Results of the Materiality Survey*

53.    The results of my survey show that the average respondent is likely to continue using Chrome after being presented with the CPN and PP. The modified language in CPN does not have a statistically significant impact on respondents' likelihood to continue using Chrome. **Exhibit 6** presents results from the Materiality Survey, showing the average likelihood of the respondents to continue using Chrome after viewing the CPN and PP. Specifically, for respondents in Group A, after being presented with the unmodified CPN and PP, the average likelihood to continue using Chrome is 4.19 (between "likely" and "extremely likely"). Similarly, for respondents in Group B, after being presented with the CPN with certain language modified, and after being presented with the PP, the average likelihood to continue using Chrome is 4.17 (between "likely" and "extremely likely"). The differences across groups are not statistically significant according to multiple methods to assess significance. The results show that respondents in both groups were between

27

likely and extremely likely to continue using Chrome, and modified language to the CPN had no impact on respondents' willingness to use Chrome.

### Exhibit 6. Average Likelihood to Continue Using Chrome

"How likely or unlikely are you to continue using Google Chrome?"
(1 = "Extremely unlikely" 5 = "Extremely likely")

| | Group A Unmodified CPN (n = 254) | Group B Modified CPN ( n= 255) |
|---|---|---|
| **Average Likelihood** | 4.19 | 4.17 |
| **p-value Mean t-test** | 0.86 | |
| **p-value Chi-square Distribution** | 0.71 | |

Source: **Appendix O.2**.

## B.  PUBLIC DATA SHOW HOW USERS CONTINUE TO CHOOSE CHROME DESPITE PLAINTIFFS' ALLEGED PRIVACY CONCERNS

54.  Publicly available data show that consumers continue to choose Chrome over other browser options even as concerns over internet privacy have increased in the past decade.[78] Chrome has gained market share since its launch and continues to be the top browser choice over other options such as Apple Safari, Microsoft Edge, Mozilla Firefox for US

---

[78]  A large majority of US consumers believe control over access to private online information is very/extremely important. See GOOG-CABR-05156497-6555, at 6503. Further, the level of concern for privacy has increased significantly over the last decade. See Muhammad, Z. "Global Privacy Concerns in 2020 and the Impact of the Coronavirus," *Digital Information World*, July 7, 2020, available at: https://www.digitalinformationworld .com/2020/07/privacy-concerns-are-high html, accessed on December 14, 2021. For example, using Google's trends feature, the volume of searches related to "data privacy" tripled from 2010 to 2020, while as a comparison, the volume of searches for "internet browser" declined during the same period by approximately 75 percent. See "Google Trends - Search Term 'data privacy,'" *Google Trends*, available at: https://trends.google. com/trends/explore?date=2010-01-01%202020-01-01&geo=US&q=data%20privacy, accessed on December 16, 2021; "Google Trends - Search Terms 'internet browser," *Google Trends*, available at: https://trends. google.com/trends/explore?date=2010-01-01%202020-01-01&geo=US&q=internet%20browser, accessed on December 14, 2021. As another example, the markets for cyber security and privacy features such as VPNs (a Virtual Private Network gives users more online privacy and anonymity while connected to the internet) have also grown substantially over the past decade. See "Cyber Security Market Current and Future Investment Opportunities in World By 2025," *ABNewsWire*, April 24, 2020, available at: https://www. abnewswire.com/pressreleases/cyber-security-market-current-and-future-investment-opportunities-in-world-by-2025-grand-view-research-inc_481170.html., accessed on December 14, 2021. See also, Marvin, R., "The VPN Market Will Reach \$36 Billion By 2020," *PCMag*, December 10, 2018, available at: https://www. pcmag.com/news/the-vpn-market-will-reach-36-billion-by-2022, accessed on December 14, 2021.

consumers.[79] US Consumers clearly continue to choose Chrome over other browsers, irrespective of greater public discussion over privacy. Continued use indicates a preference for Chrome's privacy features, a tradeoff for other features that users consider more important, or a combination of these reasons. These data are consistent with the results of my Materiality Survey that consumers choose Chrome after being presented with clear explanations regarding the impact of enabling or not enabling Sync.

### C.    STUDIES DEMONSTRATE THAT USERS' PREFERENCES FOR PRIVACY ARE CONTEXT-SPECIFIC

55.    Numerous peer-reviewed studies find that consumers are willing to disclose their personal data when faced with the tradeoffs between more privacy and other things such as convenience, personalization, additional service, or changes in quality of their experience, even though the same consumers claim that privacy is important to them. Consumers' revealed preferences (*i.e.*, their choices in the marketplace) suggest that the costs associated with careful consideration of details of privacy outweigh the benefits of privacy to them. For instance, in an online survey of 119 participants, almost 90 percent of respondents reported that they were moderately or very concerned about privacy.[80] However, nearly 30 percent of those same participants admitted to behaviors such as disclosing their phone numbers for discounts or better services, and approximately 22 percent did so with their social security number.[81] Another study focused on establishing a cryptocurrency community found that when "privacy requires additional effort or comes at the cost of a less smooth user experience, consumers are quick to abandon technology that would offer them greater protection."[82] A recent poll of 1,000 consumers found that despite not feeling comfortable with sharing their personal data, "nearly half (44%) of consumers say they'd

---

[79]    "Browser Market Share Worldwide," *StatCounter*, available at: https://gs.statcounter.com/browser-market-share#yearly-2009-2020, accessed on December 16, 2021.

[80]    Acquisti, A. and Grossklags, J., "Privacy and Rationality in Individual Decision Making," *Security & Privacy, IEEE*, Vol. 3, No. 1, January 2005, at pp. 27-28.

[81]    Acquisti, A. and Grossklags, J., "Privacy and Rationality in Individual Decision Making," *Security & Privacy, IEEE*, Vol. 3, No. 1, January 2005, at p. 29.

[82]    Athey, S., Catalini, C., and Tucker, C., "The Digital Privacy Paradox: Small Money, Small Costs, Small Talk," *NBER Working Paper Series*, June 2017, at pp. 1,18.

be somewhat or very comfortable sharing their personal information in exchange for a discount or special offering from a brand they liked."[83]

56.  The same tradeoff is evidenced in this case. Plaintiffs themselves testified that they kept using Chrome despite the availability of other browsers and despite their awareness that their data was being shared with Google. For example, Plaintiff Crespo testified that, despite understanding that the ads were targeted or tailored for her based on other web browsing that she had done, she kept using Chrome after the lawsuit was filed.[84] Plaintiffs Johnson and Henry also testified that they continued to use Chrome after the lawsuit was filed despite the availability of other browsers.[85]

57.  Researchers have also found that consumer preferences and privacy-related decisions depend on the context of the tradeoff they are making. For example, one study shows that privacy preferences can be affected by the specific circumstances such as timing and the placement of the privacy indicator presented to consumers.[86] Therefore, the evaluation of personal data concerns and behaviors requires "extreme context-dependency," and "case-by-case arrangements are needed."[87] "Indeed, an entire strand of literature . . . argues that privacy valuations are extremely sensitive to contextual effects."[88]

---

[83]  Hein, K., "Half of US Consumers Accept All Cookies Despite Concerns about How Their Data Is Shared," *The Drum*, November 17, 2021, available at: https://www.thedrum.com/news/2021/11/17/half-us-consumers-accept-all-cookies-despite-concerns-about-how-their-data-shared, accessed on December 21, 2021.

[84]  "Q. You mentioned earlier in the deposition that you had sometimes seen targeted ads when you used Chrome. Do you recall that? A. Yes. Q. And that you thought it was creepy but you did keep using Chrome after that, correct? A. Yes. Q. And you understood that the ads were targeted or tailored for you based on other web browsing that you had done, correct? . . . THE WITNESS: That's how it appears, yes." See Remote Video Deposition of Elaine Crespo, July 22, 2021 ("Crespo Deposition"), at 126:7-19. See also, Crespo Deposition, at 49:13-23 and 51:21-23.

[85]  Remote Videotaped Oral Deposition of Dr. Rodney Johnson, October 23, 2021, 44:11-45:19 and 131:20-134:13. Videotaped Videoconference Deposition via Zoom of Michael Henry, August 9, 2021, at 22:7-17.

[86]  Egelman, S., Tsai, J., Cranor, L. F., and Acquisti, A., "Timing is Everything? The Effects of Timing and Placement of Online Privacy Indicators," *Proceedings of the SIGCHI Conference on Human Factors in Computing Systems*, April 2009, at pp. 319-328.

[87]  Morando, F., Iemma, R., and Raiteri, E., "Privacy Evaluation: What Empirical Research on Users' Valuation of Personal Data Tells Us," *Internet Policy Review*, Vol. 3, No. 2, May 2014 ("Morando et al. (2014)"), at p. 8.

[88]  Morando et al. (2014), at p. 3.

58.    To illustrate the sensitivity of privacy valuation, consider a series of studies from 1990 to 2003 on privacy segmentation.[89] The series of studies divide the respondents into three categories with varying levels of concern for privacy: High concern, Medium concern, and Low concern. Because these studies used varying privacy topics, results varied across the years and by data type. For example, one study in this series asked respondents about their concern over personal medical information; 48 percent of respondents were categorized as High concern. Another study in this series asked respondents about the use of computers to store medical information; 22 percent of people were categorized as High concern. A study conducted in 2010 similarly measured levels of privacy concern but asked questions related to the context of free, ad-based, online services. In this study, only one percent of users, termed the "privacy concerned," placed a "high value on a strict adherence to privacy."[90]

59.    The importance of context in consumer behavior and decision-making, including when dealing with privacy concerns, is highlighted by Prof. John's own research. For example, in her 2018 paper, Prof. John noted that it is "widely accepted that choices are susceptible to contextual influences."[91] Additionally, in a 2011 publication related to privacy, Prof. John noted that "[b]eyond the idea that privacy concern is subject to preference uncertainty, we further posit that people are likely to seek to resolve such uncertainty by relying on contextual cues."[92] Another article authored by Prof. John further highlighted this point by noting that "people are more comfortable with third-party data sharing, a practice they ordinarily deem invasive, when they have a sense of control — even if what they seem to control has nothing to do with ads they see or the data shared."[93]

---

[89]    Kumaraguru, P., Cranor, L. F., "Privacy Indexes: A Survey of Westin's Studies," *Carnegie Mellon University, School of Computer Science, Institute for Software Research International*, December 2005, at pp. 17-19.

[90]    "Consumers Driving the Digital Uptake - The Economic Value of Online Advertising-based Services for Consumers," *IAB Europe*, September 2010, available at: https://www.youronlinechoices.com/white_paper_consumers_driving_the_digital_uptake.pdf, at p. 6.

[91]    Thomadsen, R., Rooderkerk, R.P., Amir, O., Arora, N., Bollinger, B., Hansen, K., John, L., Liu, W., Sela, A., Singh, V., and Sudhir, K., "How Context Affects Choice," *Customer Needs and Solutions*, November 2017, at p. 2.

[92]    John, L. K., Acquisti, A., and Loewenstein, G., "Strangers on a Plane: Context-dependent Willingness to Divulge Sensitive Information," *Journal of Consumer Research*, Vol. 37, No. 5, February 2011, at pp. 859.

[93]    John, L. K., "Uninformed Consent," *Harvard Business Review*, September 2018, at p. 6.

60.     The variation in the common understanding of personal information is also apparent in how various websites define personal information. **Exhibit 7** and **Appendix P** compares the privacy policies of a selection of entities, specifically focusing on whether IP address, cookies, referrer URL, and browsing history are considered personal information. The selection of entities includes universities and law firms relevant to this case, publishers of other popular web browsers, and a selection of the most visited websites in the US. As shown in **Exhibit 7**, the type of At-Issue Data that are described as personal information varies across entities. For example, IP address is described as personal information by Wikipedia and eBay but is *not* described as personal information by University of Pennsylvania, New York University, or Apple.

**Exhibit 7. Description of IP Address, Cookies, and Referrer URL as Personal Information in Privacy Policies of Selected Websites[94]**

| Source | IP Address | Cookies | Referrer URL | Browsing History |
|---|---|---|---|---|
| **Universities** | | | | |
| Harvard Business School | Yes | Yes | Yes | Yes |
| University of Pennsylvania | No | No | No | No |
| New York University | No | No | No | No |
| **Law Firms** | | | | |
| Bleichmar Fonti & Auld | No | No | No | No |
| Simmons Hanly Conroy | No | No | No | No |
| Kaplan Fox | No | No | No | No |
| Dicello Levitt Gutzler | No | No | No | No |
| **Browser Publishers** | | | | |
| Safari (Apple) | No | No | No | Yes |
| Firefox (Mozilla) | Yes | No | No | No |
| Microsoft Edge (Microsoft) | Yes | No | No | Yes |
| Opera | No | No | No | No |
| **Other Websites** | | | | |
| Pew Research Center | No | No | No | No |
| FTC | No | No | No | No |
| Amazon | Yes | Yes | Yes | Yes |
| Facebook | No | No | No | No |
| Yahoo | No | No | No | No |
| Wikipedia | Yes | No | No | No |
| Reddit | No | No | No | No |
| eBay | Yes | Yes | Yes | Yes |
| Walmart | Yes | Yes | Yes | No |
| Twitter | Yes | Yes | No | No |
| Instagram | No | No | No | No |
| ESPN (The Walt Disney Company) | No | No | No | No |
| Fandom | Yes | Yes | Yes | Yes |
| CNN (Warner Media) | No | No | No | No |
| Fox News | No | No | No | No |
| Twitch | Yes | Yes | Yes | No |
| Craigslist | No | No | No | No |
| Netflix | No | No | No | No |
| The Weather Company | No | No | No | No |
| Accuweather | No | No | No | No |
| Zillow | No | No | No | No |
| IMDB | Yes | Yes | Yes | No |
| USPS | No | No | No | No |
| Pinterest | No | No | No | No |
| Target | No | No | No | No |
| LinkedIn | No | No | No | No |
| NY Times | Yes | Yes | No | Yes |

Source: Appendix P.

61.    In addition, certain documents that I reviewed in this case show that what consumers consider as personal information varies and that consumers are more sensitive to some type

of information than others. For example, a focus group discussion that Google conducted with regard to privacy and ad personalization notes that Chrome users generally delineate between different types of data and that they are more sensitive towards some types of data than others. "Users . . . perceive the data used for ads as more general." They consider their own data as their Social Security number, financial information, and where they were born, *i.e.*, information that allows "somebody [to] take hold of your life and do something negative." One Chrome user states "I don't care [if] they're just finding out what I'm interested in."[95]

## VIII.   REACTIONS TO THE ACCOUNT HOLDER AGREEMENTS DEMONSTRATE THAT CHROME USERS UNDERSTAND THAT THEIR DATA ARE SHARED

62.    Plaintiffs allege that "Google does not obtain consent from Un-Synced Chrome Users to intercept these communications."[96] As discussed in **Section IV.C**, I understand that starting in June 2016, Google pushed the Consent Bump Agreement to existing Google Account holders and new Google Account creators were shown the New Account Creation Agreement. These Account Holder Agreements stated that Google stores and processes users' data when they interact with websites using Google services, and that depending on the account settings, some of this data may be associated with users' Google Accounts. It also explained that Google Account holders could view and control the information stored in their Accounts under the Web & App Activity setting.

63.    In accordance with my assignment, I designed my Scenario Application Survey to assess whether and to what extent Chrome users understand that Google receives data reflecting their activity on sites and apps that partner with Google after seeing Google's Account Holder Agreements (either the disclosure for existing Google Account holders, or for new Google Account creators).

---

[95]    See GOOG-CABR-00422093-2182 at 2129.

[96]    FAC, ¶ 8.

## A.  OVERVIEW OF THE SCENARIO APPLICATION SURVEY

64.    **Target Population.** As in my Consumer Expectations Survey and my Materiality Survey, the target population for this survey consists of adult Chrome users residing in the US.[97] For each experimental group, the number of targeted respondents is 250.

65.    **Survey Design.** Respondents in my Scenario Application Survey were randomly assigned to one of the two groups: New Account Creation Agreement group, and Consent Bump Agreement group (see **Exhibit 8** below). All respondents were presented with a scenario describing how a hypothetical user may be presented with the Account Holder Agreements and interact with the Chrome browser.[98] After reviewing the description of the web browsing scenario, respondents in Group A were shown the New Account Creation Agreement, and respondents in Group B were shown the Consent Bump Agreement.[99, 100] I understand that as of July 30, 2021, out of all the US-based account holders that received the Consent Bump Agreement (or the "completers"), approximately 82.5 percent opted in.[101] Thus, to better mimic real life user experience (*i.e.*, not shown additional policies unless relevant links are clicked), respondents in my Scenario Application survey were not presented with the CPN, PP, or WAA Help Page.

---

[97]    **Appendices I and L.3**.

[98]    The web browsing scenario was described as "Sofia / Victor has been using Chrome to browse the internet on her / his personal laptop. Sofia / Victor recently agreed to terms of service related to saving her / his web and app activity. Sofia / Victor uses Chrome for a variety of browsing activities. For example, she / he routinely uses the Chrome browser to log-in to her / his social media accounts to share and discuss topics about news, politics, and more. She / he also relies on Chrome to frequently access Gmail. To do so, Sofia / Victor signs-in to a Google/Gmail Account when using Chrome. Sofia / Victor does not use Incognito mode or change other browser settings." The name of the subject (and corresponding pronouns) was randomly assigned. See **Appendix L.3** for the survey script.

[99]    See **Section IV.C** for discussion on Account Holder Agreements for new Google Account creators and for existing Google Account holders.

[100]    Note that in the Consent Bump Agreement, there is a paragraph about Chrome Sync: "You have Chrome browsing history stored in your Google Account. Learn more about how turning on this setting affects how this data is used for personalization." See **Appendix H**. This paragraph about Chrome Sync was only shown to users who previously synced their Chrome history (not shown otherwise). The stimuli used for my Scenario Application Survey is based on the version of the Account Holder Agreement without the Chrome Sync paragraph. This approach tests consumer expectation in the Sync Off condition.

[101]    Fair Declaration, ¶ 34.

**Exhibit 8. Scenario Application Survey Experimental Groups**

| Group A | • New Account Creation Agreement |
|---------|----------------------------------|
| Group B | • Consent Bump Agreement |

66. **Key questions.** Based on their understanding of the policy they just read, respondents in both groups were asked to express their expectation on whether Google receives information about activity from sites and apps that partner with Google. Specifically, they were asked two questions.

    a.    "Based on your understanding of the policies you just read, please select one of the following regarding information about Sofia's / Victor's <u>activity from sites and apps that partner with Google</u>."

    b.    "Based on your understanding of the policies you just read, which of the following options would <u>you expect most survey respondents</u> to select regarding information about Sofia's / Victor's <u>activity from sites and apps that partner with Google</u>."[102]

67. Respondents were asked to select from a scale of 1 ("Google definitely does not receive this information") to 5 ("Google definitely receives this information").

68. The average understanding can be calculated using the numerical values corresponding to response options (1 = "Google definitely does not receive this information," 2 = "Google probably does not receive this information," 3 = "It is uncertain whether Google receives this information or not," 4 = "Google probably receives this information," 5 = "Google definitely receives this information"). A value greater than 3 means that the respondents/Chrome users on average understand that Google receives activity from sites and apps that partner with Google; a value close to 5 means that respondents/Chrome users nearly universally believe that Google definitely receives activity from sites and apps that

---

[102] Asking respondents to predict the other survey respondents' interpretation is consistent with the approach proposed in the academic literature. "We did that to see whether respondents as a group were good at predicting how the majority of people would respond. If people can predict accurately how most of their peer would resolve a case involving contractual ambiguity, it strengthens the case for making survey evidence of this kind legally dispositive." See Ben-Shahar and Strahilevitz (2017), at pp. 1783-1784.

partner with Google; whereas a value close to 1 means that respondents/Chrome users do not think Google would receive that information.

### B.   RESULTS OF THE SCENARIO APPLICATION SURVEY

69.   Results of my Scenario Application Survey shows that an average respondent strongly believe that Google definitely receives activity from sites and apps that partner with Google. **Exhibit 9** presents results from the Scenario Application Survey, showing Chrome users' average understanding of whether Google receives activity from sites and apps that partner with Google. The average value for Group A is 4.48 (between "Google probably receives this information" and "Google definitely receives this information"), and the average value for Group B is 4.44 (again between "Google probably receives this information" and "Google definitely receives this information").

#### Exhibit 9. Chrome Users' Average Expectation of Google Receiving Information about Activity from Sites and Apps that Partner with Google

(1 = "Google definitely does not receive this information") to 5 = "Google definitely receives this information")

| | | **Group A**<br>New Account<br>Creation<br>Agreement | **Group B**<br>Consent Bump<br>Agreement |
|---|---|---|---|
| "Based on your understanding of the policies you just read, please select one of the following regarding information about Sofia's / Victor's <u>activity from sites and apps that partner with Google</u>." | Average Expectation | 4.48 | 4.44 |
| | Percentage of Responses ≥4 | 88% | 86% |
| "Based on your understanding of the policies you just read, which of the following options would <u>you expect most survey respondents</u> to select regarding information about Sofia's / Victor's <u>activity from sites and apps that partner with Google</u>." | Average Expectation | 4.38 | 4.32 |
| | Percentage of Responses ≥4 | 87% | 85% |

Source: **Appendix O.3**.

70.   Not only are the average values close to 5, but an overwhelming percentage of respondents understand that Google receives activity from sites and apps that partner with Google. Close to 90 percent of respondents answered with a value of 4 or 5.

71.   Results are similar regardless of whether respondents were asked about their own understanding (*i.e.*, answer to question Q2), or their expectation of other survey

respondents' understanding (*i.e.*, answer to question Q3). This suggests that respondents "can predict accurately how most of their peers would resolve a case involving contractual ambiguity."[103]

## IX. PLAINTIFFS' EXPERTS PRESENT COMMON CONCEPTUAL FLAWS IN THEIR OPINIONS REGARDING CONSUMER EXPECTATIONS AND BEHAVIOR

72.   There are several fundamental issues common to each of Plaintiffs' Experts — Prof. Leslie John, Prof. Joseph Turow, and Dr. Russell Mangum — when opining on consumer expectations and behavior, such that, in my opinion, none of their opinions are based on valid research meeting professional standards applicable to the context of this case.

73.   First, Plaintiffs' Experts offer opinions on broad, ambiguous terms, such as "personal information," without defining them. Neither Prof. Turow nor Prof. John defined what personal information they are opining on (**Section X** and **Section XI**). As illustrated above, consumer preferences, decisions, and what users consider as personal information are context specific.[104] Without properly defining personal information, Plaintiffs' Experts' opinions are not tethered to the facts of this matter.

74.   Second, Plaintiffs' Experts fail to provide evidence specific to the facts presented. For example, Prof. Turow relies on his own unsupported interpretation of Chrome's disclosures and terms of service (**Section X**). In addition, Prof. John and Dr. Mangum rely on studies that are not directly applicable to this matter (**Section XI** and **Section XII**). Specifically, the personal information in those studies (*e.g.*, gender, relationship status, past purchase history, credit card information, medical history, etc.) differs from the At-Issue Data and as such are uninformative.

75.   Third, Plaintiffs' Experts fail to articulate or implement a scientific method (*e.g.*, survey, empirical analysis) supporting their opinions. Despite stating "[c]onsumer behavior can be observed in a variety of ways, a common one being surveys," Prof. John does not conduct

---

[103]   Ben-Shahar and Strahilevitz (2017), at p. 1784.

[104]   See **Section VII.C**.

any survey to support her opinions.[105] Similarly, despite stating "conjoint analysis can be used to estimate the reduction in market value, if any, due to Chrome violating its Chrome Agreements and sharing with Google the personal information of Chrome users that did not enable sync," Dr. Mangum does not describe or propose a conjoint analysis, nor does he conduct one.

76.     These common issues render Plaintiffs' Experts' opinions unreliable. I discuss detailed critiques of their opinions in **Section X** to **Section XII** below.

## X.     PROF. TUROW'S OPINIONS ARE BASED ON AN UNSUPPORTED INTERPRETATION OF THE RELEVANT POLICIES AND DISCLOSURES, AND THEY LACK SUPPORT FROM EMPIRICAL ANALYSIS OR SCIENTIFIC METHOD

77.     Prof. Turow opines that "a 'reasonable person' would interpret Google's disclosures to mean that Chrome does not take personal information unless the user elects to 'sync' the browser with a Google Account."[106] However, Prof. Turow did not define what "personal information" he is opining on. In fact, none of the studies cited by Prof. Turow in his reports, or relevant studies authored by Prof. Turow that I reviewed, study At-Issue Data, or mentioned At-Issue Data as personal information. When asked in his deposition, Prof. Turow agreed that a reasonable person reading the relevant policies would understand that "personal information and passwords to help fill out forms or sign in to the sites you visit is a separate category of information that Chrome stores locally on a user's browser, separate from the browsing history information."[107]

78.     In addition, some Plaintiffs have admitted that they do not understand the term "personal information" to encompass all the At-Issue Data. For example, in her deposition, Plaintiff Kindler noted that she is "fine with Google having [her] IP address," and she did not consider "[t]he question that I...typed in the search bar" and her IP address as "personal

---

[105]  John Report, at p. 2.

[106]  Turow Report, at p. 4.

[107]  Videotaped Zoom Deposition of Joseph Turow, Ph.D., November 8, 2021 ("Turow Deposition"), at 150:15-24 and 166:4-12.

information."[108] Plaintiff Johnson testified, "PI [personal information] associated with [your] Google Account" means name, "e-mail addresses, tax information, EIN numbers."[109] Plaintiff Crespo testified "[p]ersonal information to me is anything that identifies, you know, like preferences or personal habits or sensitive information. … So anything that could be traced back to me I consider personal information."[110] Plaintiff Henry testified that personal information is "[l]ike addresses, browser history, and those types of things."[111] Prof. Turow also acknowledged that unless a person knows about IP addresses, or unless a privacy policy specifically includes the term, "a reasonable person" would not assume that personal information includes IP address.[112]

79.    Moreover, Prof. Turow did not offer any empirical analysis to support his opinion. Rather, the evidence he cites in his report and discussed in his deposition overgeneralizes and fails to take into account the online Chrome context relevant to the decision-making of the members in the Proposed Class. Prof. Turow's opinion appears to be based on his personal interpretation of Chrome's disclosures and terms of service. In his deposition testimony, when asked the methodology he applied in order to arrive at his opinion, Prof. Turow answered, "I was an English major. I have a sensitivity to language. I read the materials very closely, and tried to understand the plain language, the plain meaning of the language, as they are stated across the privacy notices and the policies that I read."[113] He stated that "virtually everybody reading this document would come to [the same conclusion as him] because of the way the words are crafted."[114] Prof. Turow does not provide any scientific

---

[108]    Videotaped Zoom Deposition of Dr. Claudia Kindler, July 5, 2021 ("Kindler Deposition"), at 311:15-312:7 and 313:5-7.

[109]    Johnson Deposition, at 226:6-8 and 227:1-16.

[110]    Crespo Deposition, at 29:18-30:3.

[111]    Henry Deposition, at 23:1-6.

[112]    Turow Deposition, at 131:1-2, 173:17-174:11 and 186:13-17.

[113]    Turow Deposition, at 15:6-15.

[114]    Turow Deposition, at 100:1-3. In his deposition, Prof. Turow also states that "I think if the judge read everything that I read, she would come, or he, to the same conclusion." Turow Deposition, at 115:3-5. He testifies that the expertise he's offering is a person who reads the plain language in the documents. "Q. Is that the expertise you're offering, a person who reads the plain language in the documents? . . . THE WITNESS: Within the context of my knowledge of the — of the area. Yes." See Turow Deposition, at 117:11-15.

reasoning, nor does he conduct any surveys or empirical studies to support his claim that his personal characterization is representative of the Proposed Class.[115]

80. Prof. Turow's unsupported claim that everybody reading the disclosures would come to the same conclusion is even contradicted by Plaintiffs' other expert, Prof. John. In her report, Prof. John acknowledges variation in understanding among individuals, and opines that "if consumers did read the relevant privacy disclosures [*i.e.*, the PP and the CPN], they would not come to one singular interpretation of what these notices mean."[116]

81. Further, Prof. Turow's opinion is contradicted by results from my Consumer Expectations Survey. As discussed in **Section VII.A**, the average respondent believes and understands that Google receives their IP addresses, referrer URLs, and cookies while browsing the internet using Chrome. Moreover, the average respondent in Sync Off condition *believes* that Google receives their IP addresses, referrer URLs, cookies while browsing the internet in Chrome to a similar extent as the average respondent in Sync On condition.

## XI. SURVEY RESULTS, GOOGLE DOCUMENTS, AND PEER-REVIEWED STUDIES CONTRADICT PROF. JOHN'S OPINIONS

82. Prof. John offers four opinions: (1) "A common methodology can be applied to answering questions about consumer expectations and actions and would not require individual questioning of all consumers."[117] (2) "Consumers care about their privacy on the internet."[118] (3) "It is reasonable for a consumer to use Chrome in the not-synced state and believe that Chrome will not send their personal information to Google. This is true for consumers who read Google's privacy policies and for consumers who do not."[119] (4) "The Plaintiffs' experiences mentioned in their depositions are typical of reasonable consumers."[120]

---

[115]   In his deposition, Prof. Turow states that by "virtually everyone," he means people over the age of 18, not on drugs, and having a decent vocabulary. See Turow Deposition, at 100:9-17.

[116]   John Report, at p. 5.

[117]   John Report, at p. 2

[118]   John Report, at p. 3.

[119]   John Report, at p. 3.

[120]   John Report, at p. 7.

83.    However, as discussed in **Section XI.A** below, like Prof. Turow, Prof. John does not define the personal information she is opining on. She does not conduct any surveys or research, nor does she provide other support, specific to the facts of this matter, making all of her opinions unreliable. As discussed in **Section XI.B** below, her third opinion regarding a reasonable consumer's expectation in the not-synced state is contradicted by results from my Consumer Expectations Survey, Google documents, and peer-reviewed studies. Also, as discussed in **Section XI.C** below, results from my Materiality Survey, public data, and peer-reviewed studies show that despite the fact that consumers care about their privacy (Prof. John's second opinion), consumers continued to use Chrome when browsing the internet.

### A.    PROF. JOHN DOES NOT DEFINE THE PERSONAL INFORMATION SHE OPINES ON AND HER OPINIONS LACK SUPPORT

84.    Like Prof. Turow, Prof. John does not define what "personal information" she is opining on. None of the studies cited by Prof. John, or relevant studies authored by Prof. John that I reviewed, studies At-Issue Data such as IP address, cookies, referrer URL in the context of Chrome or other browsers nor do they study browsing history.

85.    Also, like Prof. Turow, Prof. John does not conduct any surveys or empirical studies specific to the facts of this case to support her opinions. She admits that consumers' expectations on invasion of privacy is "context-dependent."[121] Yet, she provides a generalized opinion based on other research (much of it dated) that is not germane to the context here.

86.    Prof. John relies on her "years of research and knowledge of this field in general" in reaching her opinions.[122] However, the studies on which she bases her opinions are not directly related to the facts and allegations of this matter. For example, in her report, Prof. John notes that one of her studies "assessed what users deem reasonable — versus unreasonable — use of their personal data in the context of online behavioral

---

[121]    John Report, at p. 3.

[122]    John Report, at p. 2.

advertising."[123] This study is related to consumer preferences over specific data being used for personalized advertisements. It does not assess Chrome users' expectations of privacy regarding the At-Issue Data. Specifically, respondents in the study were "told that 'Facebook generates personalized advertisements for their users using various methods' and were presented with the 30 ad practices in random order. For each item, participants rated the extent to which they agreed with the statement: 'Facebook should show me advertisements based on [practice].'"[124] The 30 ad practices tested included information such as gender, sexual orientation, relationship status, past purchase history on another company's website, etc. This study also acknowledges the importance of context when it comes to consumer behavior. For example, the results of this study show that consumer preferences with respect to data being used for personalized advertisements varied by the amount of trust they placed in the platform. The paper notes that "users who trust Facebook were more likely to engage with an ad that revealed acceptable information flows than those who distrust Facebook."[125]

### B. MY SURVEY RESULTS, GOOGLE DOCUMENTS, AND PEER-REVIEWED STUDIES CONTRADICT PROF. JOHN'S OPINIONS THAT CONSUMERS BELIEVE THAT USING CHROME IN ITS DEFAULT STATE (BASIC MODE) WILL PREVENT GOOGLE SERVICES FROM RECEIVING THE AT-ISSUE DATA

87.    Prof. John opines that "[i]t is reasonable for a consumer to use Chrome in the not-synced state and believe that Chrome will not send their personal information to Google. This is true for consumers who read Google's privacy policies and for consumers who do not."[126] Prof. John opines that "if consumers did read the relevant privacy disclosures . . . a common — and perhaps even the most common — understanding would be to conclude that not syncing means that Google would not collect their personal information."[127] Again,

---

123    John Report, at p. 3.

124    Kim, T., Barasz, K., and John., L. K., "Why Am I Seeing This Ad? The Effect of Ad Transparency on Ad Effectiveness," *Journal of Consumer Research*, Vol. 45, No. 5, February 2019, pp. 906-932, at p. 911.

125    Kim, T., Barasz, K., and John., L. K., "Why Am I Seeing This Ad? The Effect of Ad Transparency on Ad Effectiveness," *Journal of Consumer Research*, Vol. 45, No. 5, February 2019, pp. 906-932, at p. 915.

126    John Report, at p. 3.

127    John Report, at p. 5.

Prof. John provides no survey or context-specific research to support this opinion. However, as discussed in **Section VI**, my survey results show that the average respondent believes and understands that Google receives their IP addresses, referrer URLs, and cookies while browsing the internet. My survey results also show that the average respondent in Sync Off condition believes that Google receives their IP addresses, referrer URLs, cookies, and payment information while browsing the internet to a similar extent as the average respondent in Sync On condition. Also, as discussed in **Section VI**, documents from Google and evidence from peer-reviewed studies corroborate with my survey results, and they contradict Prof. John's opinions.

### C. MY SURVEY RESULTS, GOOGLE DOCUMENTS, AND PEER-REVIEWED STUDIES CONTRADICT PROF. JOHN'S IMPLICATION THAT INTERNET PRIVACY IS THE MOST IMPORTANT THING THAT CONSUMERS CARE ABOUT

88.    Prof. John opines that "[c]onsumers care about their privacy on the internet."[128] This is a vague statement, particularly given Prof. John's admission that "privacy [is an] abstract ethereal concept," and that privacy is "kind of like love. Like how do you define love?"[129] By making this assertion, Prof. John implies that privacy is a profound, metaphysical attribute similar to love, or that the value of privacy is high. However, Prof. John fails to acknowledge that consumers also value services provided by internet companies including Google. As discussed in **Section VII.C**, academic studies have found that while people think privacy is important, they disclose their personal information easily, and this so-called "privacy paradox" is recognized in Prof. John's own research. In a 2015 article, Prof. John notes "[i]n polls and surveys, consumers indicate profound and increasing concern for their privacy. Yet from the posting of suggestive photographs on social networking sites to the impulsive broadcasting of illicit activities on Twitter, consumers' behavior often suggests a remarkable lack of discretion. This 'privacy paradox' has also

---

[128]   John Report, at p. 3.

[129]   John Deposition, at 163:3-24.

been documented empirically — in various lab settings, people who indicate serious privacy concern nevertheless reveal intimate details of their lives for trivial rewards."[130]

89.  Prof. John explains that people's attitudes about privacy do not align with their behavior because a lack of awareness of the erosion in privacy.[131] However, as the results of my Materiality Survey show, the average respondent is extremely likely to continue using Chrome after being presented with the CPN and PP. In addition, being presented with a CPN with additional clarifying language to specifically address Plaintiffs' alleged interpretation of that document does not impact the likelihood of continuing to use Chrome for an average respondent.

## XII. CONTRARY TO DR. MANGUM'S CLAIM, CONJOINT ANALYSIS IS ILL-EQUIPPED TO ACCURATELY MEASURE THE VALUE OF PRIVACY IN THIS MATTER

90.  Conjoint analysis is typically used to study consumer preferences for alternative products or services with varying features, and is often used when introducing new products to the marketplace.[132] When the price of the product or service is compared against consumer preferences of other product features, results from the conjoint analysis can be used to assess consumer price sensitivity and willingness to pay for specific product features.[133] Dr. Mangum opines that "conjoint analysis can be used to estimate the reduction in market value, if any, due to Chrome violating its Chrome Agreements and sharing with Google the personal information of Chrome users that did not enable sync."[134]

91.  However, other than specifying that in this matter, "the feature is the personal information protection, and the product is Chrome's browsing services," Dr. Mangum fails to describe how he plans to design such a conjoint analysis, whether such a conjoint analysis would be

---

[130]  John, L., "We Say We Want Privacy Online, But Our Actions Say Otherwise," *Harvard Business Review*, October 2015.

[131]  John Report, at p. 3.

[132]  Orme, B, K., *Getting Started with Conjoint Analysis*, Third Edition, Research Publishers LLC, 2014 ("Orme (2014)"), at pp. 1-4.

[133]  Orme (2014), at p. 88.

[134]  Mangum Report, ¶ 77.

feasible, let alone conducts one.[135] It is my opinion that such a methodology is ill-equipped to accurately measure the value of privacy in this matter, explained below.

## A. DR. MANGUM FAILS TO IDENTIFY THE PRODUCT ITSELF, AS WELL AS ITS ATTRIBUTES AND LEVELS, A FUNDAMENTAL STEP OF ANY CONJOINT ANALYSIS

92.    Implicitly, marketplace predictions that rely on conjoint analysis assume that consumers view products as a combination of different product attributes and levels and they make tradeoffs amongst these product attributes and levels when selecting a product that best fits their needs.[136] In designing a conjoint analysis, the researcher sets forth their view of the marketplace and competing products, by defining products, attributes, and levels.[137] A product, such as a watch, may be composed of certain attributes like brand, shape of the face, digital v. analog, material used in the watch band, price, and color. Each attribute, such as color, may in turn consist of multiple levels, such as blue, red, or yellow. Despite acknowledging that "[a] basic objective of a conjoint analysis is to allocate the value or utility of a product/service into the values attributable to individual features and attributes,"[138] Dr. Mangum does not explain which product(s), attributes, or levels he plans to include in his hypothetical conjoint analysis.

93.    First, Dr. Mangum fails to identify which product(s) he plans to look at. He simply states that "the product is Chrome's browsing services."[139] However, as explained in **Section IV.A**, Chrome offers five browsing modes including Basic browsing mode, Sign In without Sync enabled, Sign In with Sync enabled, Incognito mode, and Guest mode. Chrome also offers different versions for desktop, mobile device, enterprises, and

---

[135]  Mangum Report, ¶ 73.

[136]  Orme (2014), at p. 53.

[137]  Orme (2014), at p. 53.

[138]  Mangum Report, ¶ 74.

[139]  Mangum Report, ¶ 73.

developers.[140] Dr. Mangum fails to sufficiently define which product(s) to include in his hypothetical conjoint analysis.

94.    Second, he fails to explain how he plans to include the "particular feature of a product" — "the personal information protection" — for which the hypothetical conjoint analysis would provide "a quantitative assessment of consumers' value."[141] As discussed in **Section VII.C** and by Plaintiffs' expert Prof. John, what consumers consider to be personal information as well as their preferences and decisions regarding personal information are context specific. Further, a study conducted by Prof. John finds that "[i]ndividuals assigned markedly different values to the privacy of their data depending on (1) whether they were asked to consider how much money they would accept to disclose otherwise private information or how much they would pay to protect otherwise public information and (2) the order in which they considered different offers for their data."[142] Prof. John and coauthors state that "[t]he results highlight the sensitivity of privacy valuation to contextual, nonnormative factors."[143] Therefore, defining personal information and introducing personal information in the conjoint analysis in different ways could have a major impact on consumer preference, choice, responses to the study, and ultimately the estimated value "Chrome users place on the privacy protection of Chrome not sharing their personal information with Google."[144] Dr. Mangum fails to address these important issues.

95.    Further, properly specifying product attributes and levels requires careful evaluation of the alternatives. Specific to this matter, it is important to evaluate the existing alternatives to the Chrome browser, specifically those alternatives that have no appreciable differences with respect to At-Issue Data, versus other products such as the Brave browser or Duck Duck Go search engine that attempt to distinguish themselves as providing additional

---

[140] "The Browser Built By Google," *Google*, available at: https://www.google.com/chrome/, accessed on December 14, 2021; "Download & install Google Chrome," *Google Chrome,* available at: https://support.google.com/chrome/answer/95346?hl=en&co=GENIE.Platform%3DAndroid&oco=0, accessed on December 19, 2021.

[141] Mangum Report, ¶ 73.

[142] Acquisti, A., John, L.K., and Loewenstein, G., "What is Privacy Worth?," *The Journal of Legal Studies*, Vol. 42, No. 2, June 2013, pp. 249-274, at p. 249.

[143] Acquisti, A., John, L.K., and Loewenstein, G., "What is Privacy Worth?," *The Journal of Legal Studies*, Vol. 42, No. 2, June 2013, pp. 249-274, at p. 249.

[144] Mangum Report, ¶ 81.

privacy protections.[145] Dr. Mangum fails to discuss the existence of these alternative browsers or search products, which are free, and would certainly have implications for any estimation of "value" associated with additional, yet-to-be specified privacy protection features.

## B. DR. MANGUM FAILS TO EXPLAIN HOW HE PLANS TO DESIGN A CONJOINT ANALYSIS THAT REPRESENTS RESPONDENTS' REAL-WORLD EXPERIENCE

96.     Even if Dr. Mangum had properly specified the product(s), attributes, and levels, he fails to explain how he plans to design a conjoint analysis that represents real-world consumer experience of browsing the internet, including use of maps, videos, and other online services. Academic literature on conjoint analysis emphasizes the importance for the product features and levels of each feature in a conjoint survey design to be as realistic as possible,[146] emphasizing that "choice tasks should be designed to be realistic and natural, approximating as closely as possible the actual choice context; and the choices offered should be credible" and that unrealistic features can "have an adverse effect on . . . any resulting predictions."[147] A study found that using text-based descriptions that accompany rough images, rather than realistic images, can have a large impact on the estimation using conjoint analysis.[148] Dr. Mangum fails to explain how he plans to describe the at-issue product — Chrome's browsing services — to survey respondents so that the choice tasks presented to survey respondents replicate the browsing experience as close to real-world as possible. Dr. Mangum also has not explained how he plans to introduce the at-issue

---

[145]  "Brave is one of the safest browsers on the market today. It blocks privacy-invasive ads & trackers. It blocks third-party data storage and IP address collection. It protects from browser fingerprinting. It upgrades every webpage possible to secure https connections. And it does all this by default." "The Best Privacy Online," *Brave*, available at: https://brave.com/, accessed on December 17, 2021; "Our Privacy Policy is Simple: We Don't Collect or Share Any of Your Personal Information." "Tired of Being Tracked Online? We can help," *DuckDuckGo,* available at: https://duckduckgo.com/, accessed on December 14, 2021.

[146]  Orme (2014), at pp. 19-22.

[147]  Carson, R. T., Louviere, J. J., Anderson, D. A., Arabie, P., Bunch, D. S., Hensher, D. A., Johnson, R. M., Kuhfeld, W. F., Steinberg, D., Swait, J., Timmermans, H., and Wiley, J. B., "Experimental Analysis of Choice," *Marketing Letters,* Vol. 5, No. 4, 1994, pp. 351-368, at p. 355; Steckel, J. H., DeSarbo, W. S. and Mahajan, V., "On the Creation of Acceptable Conjoint Analysis Experimental Designs," *Decision Sciences*, Vol. 22, No. 2, 1991, pp. 435-442, at p. 435.

[148]  Hauser, J. R., Eggers, F., and Selove, M., "The Strategic Implications of Scale in Choice-Based Conjoint Analysis," *Marketing Science*, Vol. 38, No. 6, 2019, pp. 1059-1081.

product features in the conjoint analysis. Specifically, Dr. Mangum has not explained how "personal information protection" of Chrome users who did not enable Sync could be included in the conjoint survey in a succinct, accurate, and realistic manner.

97.    Moreover, Dr. Mangum has not explained how he plans to introduce price in the conjoint analysis. As discussed in **Section IV.A**, Chrome is free, which is different from the typical products that conjoint analysis typically evaluates (*e.g.*, consumer packaged goods, consumer electronics products, automobiles). The price for Chrome being zero adds to the complication of estimating of consumers' price sensitivity and willingness to pay using conjoint analysis.

## C.    DR. MANGUM FAILS TO EXPLAIN HOW HE PLANS TO ADDRESS THE DIFFERENCE BETWEEN STATED PREFERENCE AND THE REVEALED PREFERENCE FOR PRIVACY

98.    Even if Dr. Mangum was able to design a proper conjoint analysis, he still fails to address the difference between stated presence and the revealed preference for privacy. Conjoint analysis would measure survey respondents' stated preference for privacy, which as academic research has shown, is greatly different from their revealed preferences. In context where stated preferences are likely to differ from revealed preferences, conjoint analysis is not an appropriate method.

99.    In fact, this inconsistency between stated preference and revealed preference for privacy, or the "privacy paradox," is recognized by Plaintiffs' expert Prof. John. One of Prof. John's studies finds that people are willing to accept very small rewards such as a baked cookie in exchange for disclosing personal and sensitive information, even though they may indicate that privacy is important.[149] Prof. John explains, "[t]his isn't all that unusual, [w]e agree to similar contracts all the time. In the abstract we say we care about privacy and I believe us, but when push comes to shove we do something very different."[150]

---

[149]    Manthorpe, R., "Ever Suffered from Selfie Regret? Why Some People Share When They Shouldn't," *Wired*, April 11, 2016, available at: https://www.wired.co.uk/article/leslie-john-harvard-irrational-decision-making, accessed on December 14, 2021.

[150]    Manthorpe, R. "Ever Suffered from Selfie Regret? Why Some People Share When They Shouldn't," *Wired*, April 11, 2016, available at: https://www.wired.co.uk/article/leslie-john-harvard-irrational-decision-making, accessed on December 14, 2021.

100.   A 2007 academic article documents two separate studies where participants were first asked their willingness to disclose specific pieces of information and then several weeks later were asked to actually provide the same information to a market researcher.[151] In both studies, the authors find that "individuals provide significantly greater amounts of personal information than they say they will."[152] Similarly, another study finds that, when choosing between two nearly identical DVD stores that differed in the amount of personal information they required, subjects were willing to provide significantly more sensitive information for a savings of only 1 Euro, despite 75 percent of subjects stating in a post experiment survey that they had very strong interest in data protection and 95 percent stating that they were interested in protection of their personal information.[153]

101.   The gap between what people say and what they do when it comes to their privacy complicates an estimate of consumers' price sensitivity and willingness to pay using conjoint analysis. Although conjoint analysis relies on a choice context, the results still can bear no relationship to consumers' revealed preferences in the actual marketplace, where few consumers choose browsers with additional privacy protection features despite the fact that those browsers are available at no cost as well. In fact, compared to other products such as the Brave browser with additional privacy protections, consumers clearly prefer Chrome in the real marketplace. The global desktop browser market share of Chrome in 2021 is 77.03 percent, whereas the market share of the Brave browser is only 0.05

---

[151]   Norberg, P. A., Horne, D. R., and Horne, D. A., "The Privacy Paradox: Personal Information Disclosure Intentions versus Behaviors," *Journal of Consumer Affairs,* Vol. 41, No. 1, 2007, pp. 100-126 ("Norberg et al. (2007)"), at p. 109.   In the first study, participants were asked whether they would disclose seventeen pieces of personal information in exchange for a $20 incentive.   The average participant stated they would be willing to disclose 8.70 items.  Then, twelve weeks later, the same participants were asked to provide the same seventeen pieces of personal information to a representative visiting their campus under the guise of carrying out research for a pilot program for a bank (with no monetary incentive).   The average participant provided 14.75 items. See Norberg et al. (2007), at pp. 111-113. In the second study, which had a similar design with sixteen requested personal items, the authors found that the average participant stated they were willing to provide 10.49 items but actually provided 15.16 items. See Norberg et al., at p. 116.

[152]   Norberg et al. (2007), at p. 113 and 115-116.

[153]   Beresford, A., R., Kubler, D., and Preibusch, S., "Unwillingness to Pay for Privacy: A Field Experiment." *Economic Letters*, Vol. 117, No. 1, 2012, pp. 25-27.

percent.[154] Dr. Mangum fails to offer any explanation as to how his proposed conjoint analysis would be able to address these important issues.

### D. THE TWO STUDIES CITED BY DR. MANGUM ARE NOT APPLICABLE TO THE FACTS OF THIS MATTER

102. Dr. Mangum cites to two studies — Hann et al. (2007) and Krasnova et al. (2009) — as the bases for his opinion that conjoint analysis can be used to estimate the value of personal information.[155] However, as discussed in **Section VII.C**, people's expectation, preference, and decisions regarding sharing personal information are context-specific. Neither of the two studies are designed for the facts of this matter, and the tradeoffs the respondents faced in the two studies differ from those faced by the members in the Proposed Class. As a result, findings from these studies cannot be directly used to measure the value, if any, of privacy in this matter.

103. Specifically, Hann et al. (2007) studies respondents' willingness to register with a website while facing tradeoffs between certain benefits (monetary reward and visit frequency/time saving) and incomplete privacy protection (against unauthorized secondary use, improper access, and error).[156] Respondents were asked to rank websites that followed 18 combinations of these benefits and privacy protections based on their preference. These rankings were used to quantify the value of privacy protections. Hann et al. (2007) differs from the matter at issue in several ways. First, the type of information tested in the study is different from the At-Issue Data. The personal information studied includes name, home address, phone number, e-mail address, credit card information, occupation, medical history, and stock portfolio.[157] At-Issue Data such as IP address, cookie identifiers, and

---

[154] "Global Desktop Browser Market Share for 2021," *Kinsta*, available at: https://kinsta.com/browser-market-share/, accessed on December 14, 2021.

[155] Mangum Report, ¶¶ 79-82.

[156] Hann, I., Hui, K., Lee, S. T., and Png, I. P. L., "Overcoming Online Information Privacy Concerns: An Information-Processing Theory Approach," *Journal of Management Information Systems,* Vol. 24, No. 2, 2007, pp. 13-42 ("Hann et al. (2007)"), at p. 22.

[157] "The personal information consisted of name, home address, phone number, e-mail address, credit card information, and some industry-specific information. In particular, travel Web sites requested the person's occupation, travel purpose, destination, and frequency of travel, as well as frequent flyer numbers; health- care Web sites asked for medical history, drug allergies, and prescription record; and financial Web sites asked for household income, stock portfolio, and previous stock trading experience." Hann et al. (2007), at p. 23.

referrer URLs are not part of the study. Further, the sample of this study are university students, 84 of which are from the US, and the rest of which are from Singapore.[158] This is different from the population of the Proposed Class, which is comprised of users from various age groups and educational background.

104.   Krasnova et al. (2009) "attempt[s] to assess the value of privacy in monetary terms" through a conjoint analysis, in which respondents make choices among various attributes of online social networks.[159] The attributes of online social networks related to privacy included (i) the customizability of friend groups that could access one's profile and (ii) whether the OSN provider would use no information, demographic information (age, gender, city, academic major), or demographic information and personal information (work, hobbies, personal interests, religion, political orientation, groups, relationship status, sexual orientation, photos, videos) to personalize advertisements.[160] That study differs from this matter in many ways. First, the context of online social networks in 2009 (when they were still in relative infancy) differs greatly from the context of Chrome during the Class Period. Second, the attributes in this study do not apply to the At-Issue Data in this case. Third, the sample of this study comprised of 168 European participants, who are not representative of the Proposed Class.[161]

105.   Dr. Mangum does not provide any explanation as to how the value of privacy estimated in these two studies can be applied to this matter given the highly context-specific nature of preference and choices related to personal information.

_____

Tülin Erdem

---

[158]   Hann et al. (2007), at Table 1.

[159]   Krasnova, H., Hildebrand, T., and Guenther, O., "Investigating the Value of Privacy in Online Social Networks: Conjoint Analysis," *ICIS 2009 Proceedings*, Paper 173, 2009, pp. 1-18 ("Krasnova et al. (2009)"), at pp. 1, 7.

[160]   Krasnova et al. (2009), at p. 5.

[161]   Krasnova et al. (2009), at p. 7.

**APPENDIX A**

**CURRICULUM VITAE**

# CURRICULUM VITAE

## Tülin Erdem

Leonard N. Stern Professor of Business and Professor of Marketing

Leonard N. Stern School of Business
New York University
806 Tisch Hall, 40 West Fourth Street
New York, New York 10012-1126
Tel: 212 998 0404, E-mail: terdem@stern.nyu.edu

## EDUCATION

| | |
|---|---|
| 1993 | Ph.D. Business Administration (major: Marketing), University of Alberta |
| 1989 | ABD Economics, University of Alberta |
| 1987 | M.A. Economics, University of Alberta |
| 1986 | B.A. Economics (Honors), Boğaziçi University |

## ACADEMIC POSITIONS

| | |
|---|---|
| 2006-present | Leonard N. Stern Professor of Business and Professor of Marketing |
| | Stern School of Business, New York University |
| Spring 2013 | Visiting Professor, Columbia Business School, Columbia University |
| 2003-2006 | E.T. Grether Professor of Business Administration and Marketing |
| | Haas School of Business, University of California at Berkeley |
| 1998-2003 | Associate Professor (with tenure) |
| | Haas School of Business, University of California at Berkeley |
| 1993-1998 | Assistant Professor |
| | Haas School of Business, University of California at Berkeley |
| 1989-1993 | Graduate Assistant |
| | Faculty of Business, University of Alberta |
| 1986-1989 | Research/ Teaching Assistant |
| | Department of Economics, University of Alberta |

## AWARDS, HONORS, GRANTS

| | |
|---|---|
| 2020 | Named MSI (Marketing Science Institute) Inaugural Academic Fellow |
| 2020 | AMA Sheth Doctoral Consortium Faculty Fellow (also in 1998, 2000, from 2007-2014 and 2017-2019) |
| 2019 | ISMS Doctoral Consortium Fellow (also from 2007 through 2018) |
| 2018 | Named ISMS (INFORMS Marketing Society) Fellow |
| 2018 | Finalist, ISMS Long-Term Impact Paper Award |
| 2018 | Outstanding Achievement Award given by The Society of Foreign Consuls in NY |
| 2018 | TENT Foundation Grant ($40,000) |
| 2008 | Finalist, John D.C. Little Best Paper Award |
| 2007-8 | Outstanding Reviewer Award, Journal of Marketing |
| 2003 | Finalist, William O'Dell Best Paper Award |

| 1998-2002 | National Science Foundation (NSF) grant, SBR-9812067, $ 178,000.00 |
| 1998 | Finalist, Paul Green Best Paper Award |
| 1996 | Winner of John D.C. Little Best Paper Award |
| 1996 | Winner of Frank M. Bass Best Dissertation Paper Award |
| 1995-7 | National Science Foundation (NSF) grant SBR-9511280, $ 100,000.00 |
| 1994-5 | Junior Faculty Research Grant, University of California, Berkeley |
| 1994 | Regents' Junior Faculty Fellowship, University of California, Berkeley |
| 1993 | Co-winner of the AMA John A. Howard Doctoral Dissertation Award |
| 1993 | Recipient of the Gold Medal of the Governor General of Canada, awarded for academic excellence at the graduate level at Canadian Universities |
| 1992 | AMA Doctoral Consortium Fellow |
| 1990-2 | Domtar Ph.D. Fellowship, Faculty of Business, University of Alberta |

## PROFESSIONAL ACTIVITIES

Affiliations:  American Marketing Association, European Marketing Association Institute for Operations Research and the Management Sciences,

Advisory Board: Journal of Marketing Research (2012-present)
Marketing Science (2015-present)

Editor-in-Chief: Journal of Marketing Research (2009-2012)

Area Editor:  Journal of Marketing Behavior (2015-2019)
International Journal of Research in Marketing (2016-present)
Marketing Science (2002-2009)

Associate Editor: Journal of Consumer Research (2005-2009)
Quantitative Marketing and Economics (2003-2009)

Editorial Board Member: Academy of Marketing Science (2006-present), International Journal of Research in Marketing (1996-2015), Journal of Consumer Research (2011-2014), Journal of Marketing (2003-2009), Journal of Marketing Research (1998-2009), Marketing Letters (1996-present), Marketing Science (1997-2009, 2014-2015)

Ad-hoc Reviewer: ACR, AMA John A. Howard Doctoral Dissertation, American Economic Review, Association for Consumer Research, California Management Review, Economterica, International Economic Review, Journal of Applied Econometrics, Journal of Business and Economic Statistics, Journal of Econometrics, Journal of Agricultural and Resource Economics, Journal of Economic Psychology,  Journal of Retailing and Consumer Services, OMEGA, Management Science, Marketing Science Institute, NSF, Psychometrica, Review of Economics and Statistics

Reviewer: National Science Foundation (NSF), Israel Science Foundation (ISF)

A-2

President-Elect, President, Past President: ISMS, INFORMS Society of Marketing Science (2004-2009)

Member of Board of Trustees: TENT Partnership for Refugees (2020-present)

Member of Sheth Foundation Board (2020-present)

Member of AMA (American Marketing Association) Publications Committee (2018-prsent)

Member of Board of Trustees: Sabancı University, Istanbul, Turkey (2014-2017)

Member, Business Studies Panel of the Research Grants Council of Hong Kong (2014)

Conference Organizations:

Co-Chair, 2019 ISMS Marketing Science Conference
Co-Chair, 2019 AMA Sheth Doctoral Consortium
Co-Track Chair, 2015: JAMS International Conference
Co-Chair, 2013 ISMS Marketing Science Conference
Co-Chair, 2010 Marketing Dynamics Conference
Co-Chair of Program Committee, Cheung Kong GSB Marketing Research Forum, Beijing China, June 2009
Co-Chair, 2003 and 2008 QME (Quantitative Marketing and Economics) Conference
Chair, Marketing Track, 2003 INFORMS International Meetings
Co-Chair, 2001 Tri-Annual Invitational Choice Symposium
Co-Chair, 1997 ISMS Marketing Science Conference

Member of the Steering Committee, 2004, 2007, 2010, 2013, 2016, 2019 Tri-Annual Invitational Choice Symposium
Member of Advisory Committee, 2011, 2015 Marketing Dynamics Conference
Member of Program Committee, 2006, Marketing Dynamics Conference
Member of Program Committee, 2004, 2005, 2009, 2016 QME (Quantitative Marketing and Economics) Conference
Member of Program Committee, 2005 ACR (Association for Consumer Research) Conference

Workshop Co-Chair, Tri-Annual Invitational Choice Symposium, 1998, 2004, 2013 and 2016

A-3

**RESEARCH**

Interests

Advertising and Pricing, Brand Equity, Branding, Brand Management and Strategy, Econometric Modeling, Individual Decision-Making and Choice, Marketing Science Models of Consumer Behavior and Marketing Mix Strategy, Marketing & Society, Social Marketing.

Refereed Publications

Ching, Andrew, Tülin Erdem and Michael Keane (2020), "How Much Do Consumers Know About the Quality of Products? Evidence from the Diaper Market," *Japanese Economic Review*. The Japanese Economic Review, 71(4), 541-569

Erdem, Tülin and Joffre Swait (2016), "The Information-Economics Perspective on Brand Equity", Foundations and Trends® in Marketing: Vol. 10: No. 1, pp 1-59. http://dx.doi.org/10.1561/1700000041

Ching, Andrew, Tülin Erdem and Michael Keane (2016), "Models for Marketing Dynamics and Learning: A Survey of Recent Developments." Handbook of Marketing Decision Models. Eds.: Berend Wierenga and Ralf van der Lans. New York: Springer.

Che, Hai, Tülin Erdem and T. Sabri Öncü (2015), "Consumer Learning and Evolution of Consumer Brand Preferences." *Quantitative Marketing and Economic*, Volume 13, Issue 3, 173-202. (Lead Article.)

Cutright, Keisha, Tülin Erdem, Gavan Fitzsimmons and Ron Shachar (2014), "Finding Brands and Losing your Religion?" *Journal of Experimental Psychology*, Vol 143 (6, December), 2209-2222.

Ching, Andrew T., Tülin Erdem and Michael P. Keane (2014), "A Simple Method to Estimate the Roles of Learning, Inventories and Category Consideration in Consumer Choice", *Journal of Choice Modeling*, vol.13, 60-72.

Swait, Joffre, Tülin Erdem and Tom Peters (2014), "Shocks to Brand Equity: An Information Economics Perspective on the US Auto Industry 2006-2010." *Customer Needs and Solutions*, 1 (3), 317-332.

Erdem, Tülin and Joffre Swait (2014), "Branding and Brand Equity Models," in *The History of Marketing Science,* eds. Scott Neslin and Russell Winer. Now Publishers Series in Business, Volume 3, 237-261.

Ching, Andrew, Tülin Erdem and Michael Keane (2013), "Learning Models: An Assessment of Progress, Challenges and New Developments," *Marketing Science* (32), 6, 913-938.

Erdem, Tülin and Sue Ryung Chang (2012), "A Cross-Category and Cross-Country Analysis of Umbrella Branding for National and Store Brands," Special 40th Anniversary issue of *Journal of the Academy of Marketing Science* 40 (1), 86-101.

Shachar, Ron, Tülin Erdem, Gavan Fitzsimons, Keisha Wells (2011), "Brands: The Opiate of the Non-Religious Masses?" *Marketing Science* 30, 92-110.

Erdem, Tülin, Michael Katz and Baohong Sun (2010) "A Simple Test for Distinguishing between Internal Reference Price Theories," *Quantitative Marketing and Economics* 8, 303-332.

Yang, Sha, Yi Zhao, Tülin Erdem, Ying Zhao (2010), "Modeling the Intra-Household Behavioral Interaction," *Journal of Marketing Research,* 47 (3), 470-484.

Erdem, Tülin and Joffre Swait (2010), "Utility-Based Models of Brand Equity," in *Brands and Brand Management: Contemporary Research*, 207-229, eds. Rohini Ahluwalia, Mike Houston and Barbara Loken.  Routledge, New York.

Ching, Andrew, Tülin Erdem and Michael Keane (2009), "The Price Consideration Model of Brand Choice," *Journal of Applied Econometrics* 24, 3 (March-April), 393-420.

Erdem, Tülin, Michael Keane and Baohong Sun (2008), "A Dynamic Model of Brand Choice When Price and Advertising Signal Product Quality," *Marketing Science*, 27 (6), 1111-1125. (2008 Finalist for the Little Best Paper Award and 2018 Finalist for ISMS Long-Term Impact Award).

Erdem, Tülin, Michael Keane and Baohong Sun (2008), "Advertising and Consumer Price Sensitivity in Experience Goods Markets," *Quantitative Marketing and Economics*, 6 (2), 139-176.

Bronnenberg, **Bart**, Jean Pierre Dubé, Carl Mela, Paulo Albuquerque, Tülin Erdem, Brett Gordon, Dominique Hanssens, Guenter Hitsch, Han Hong, Baohong Sun (2008), "Measuring Long Run Marketing Effects and their Implications for Long Run Marketing Decisions," *Marketing Letters, 19*(3), 367-82.

Swait, Joffre and Tülin Erdem (2007) "Characterizing Brand Effects on Choice Set Formation and Preference Discrimination under Uncertainty," *Marketing Science* 26 (5), 679-697.

Chintagunta, Pradeep, Tülin Erdem, Peter Rossi and Michel Wedel (2006), "Structural Modeling In Marketing: Review and Assessment," *Marketing Science*, 25 (6) 604-616.

Erdem, Tülin, Joffre Swait and Ana Valenzuela (2006), "Brands as Signals: A Cross-Country Validation Study," *Journal of Marketing*, 70 (1), 34-49.

Erdem, Tülin, Kannan Srinivasan, Wilfred Amaldoss, Patrick Bajari, Hai Che, Teck Ho, Wes Hutchinson, Michael Katz, Michael Keane, Bob Meyer and Peter Reiss (2005), "Theory Driven Choice Models," *Marketing Letters*, 16 (3), 225-237.

Erdem, Tülin, Michael P. Keane, T. Sabri Öncü and Judi Strebel (2005), "Learning About Computers: An Analysis of Information Search and Technology Choice," *Quantitative Marketing and Economics* 3 (3), 207-246.

Strebel, Judi, Tülin Erdem and Joffre Swait (2004), "Consumer Search in High Technology Markets: Exploring the Use of Traditional Information Channels," *Journal of Consumer Psychology* 14, 96-103.

Erdem, Tülin and Joffre Swait (2004), "Brand Credibility and its Role in Brand Choice and Consideration," *Journal of Consumer Research* 31 (1), 191-199.

Erdem, Tülin, Ying Zhao and Ana Valenzuela (2004), "Performance of Store Brands: A Cross-Country Analysis of Consumer Store Brand Preferences, Perceptions and Risk," *Journal of Marketing Research*, 41 (1), 86-100.

Erdem, Tülin, Susumu Imai and Michael Keane (2003), "A Model of Consumer Brand and Quantity Choice Dynamics under Price Uncertainty," *Quantitative Marketing and Economics*, 1 (1), 5-64. (Lead article.)

Erdem, Tülin and Baohong Sun (2002), "An Empirical Investigation of Spillover Effects of Marketing Mix Strategy in Umbrella Branding," *Journal of Marketing Research,* 39 (4), 408-420.

Swait, Joffre and Tülin Erdem (2002), "The Effects of Temporal Consistency of Sales Promotions and Availability on Consumer Choice Behavior," *Journal of Marketing Research,* 34 (3), 304-320.

Erdem, Tülin, Joffre Swait and Jordan Louviere (2002), "The Impact of Brand Credibility on Consumer Price Sensitivities across Multiple Product Categories," *International Journal of Research in Marketing*, 19 (1), 1-19 (lead article).

Erdem, Tülin, Glenn Mayhew and Baohong Sun (2001), "Understanding the Reference Price Sensitive Shopper: A Within and Cross-Category Analysis," *Journal of Marketing Research*, 38 (4), 445-457.

Erdem, Tülin and Baohong Sun (2001), "Testing for Choice Dynamics in Panel Data," *Journal of Business and Economic Statistics*, 19 (2), 142-152.

Erdem, Tülin, Joffre Swait, Susan Broniarczyk, Dipankar Chakravarti, Jean-Noel Kapferer, Michael Keane, John Roberts, Jan-Benedict Steenkamp and Florian Zettelmeyer (1999), "Brand Equity, Consumer Learning and Choice," *Marketing Letters,* 10 (3) 301-318.

Erdem, Tülin and Russell Winer (1999), "Econometric Modeling of Competition: A Multi-Category Choice-Based Mapping Approach," *Journal of Econometrics*, 89, 159-175.

Erdem, Tülin, Michael P. Keane and Baohong Sun (1999), "Missing Price and Coupon Availability Data in Scanner Panels: Correcting for the Self-Selection Bias in the Choice Model Parameters," *Journal of Econometrics,* 89, 177-196.

Erdem, Tülin (1998), "An Empirical Analysis of Umbrella Branding," *Journal of Marketing Research*, 35 (3), 339-351 (finalist for Paul Green best paper award).

Erdem, Tülin and Joffre Swait (1998), "Brand Equity as a Signaling Phenomenon," *Journal of Consumer Psychology,* 7 (2), 131-157.

Meyer, Bob, Tülin Erdem, Fred Feinberg, Itzhak Gilboa, Wes Hutchinson, Aradhna Krishna, Steve Lippman, Carl Mela, Amit Pazgal, Drazen Prelec and Joel Steckel (1997), "Dynamic Influences on Individual Choice Behavior," *Marketing Letters,* 8 (3), 349-360.

Erdem, Tülin (1996), "A Dynamic Analysis of Market Structure based on Panel Data," *Marketing Science,* 15 (4), 359-378.

Erdem, Tülin and Michael P. Keane (1996), "Decision-Making under Uncertainty: Capturing Dynamic Choice Processes in Turbulent Consumer Goods Markets," *Marketing Science,* 15 (1), 1-20 (lead article).

Finn, Adam and Tülin Erdem (1995), "Economic Impact of Tourists Visiting a Mega-Multi Mall," *Tourism Management*, 16 (5), 367-373.

Winer, Russell, Randolph E. Bucklin, John Deighton, Tülin Erdem, Peter Fader, J. Jeffrey Inman, Hotaka Katahira, Katherine N. Lemon and Andrew Mitchell (1994), "When Worlds Collide: The Implications of Panel Data-based Choice Models for Consumer Behavior," *Marketing Letters*, 5 (4), 383-394.

Swait, Joffre, Tülin Erdem, Jordan J. Louviere and Chris Dubelaar (1993), "The Equalization Price: A Measure of Consumer-perceived Brand Equity," *International Journal of Research in Marketing,* 10 (special issue on Brand Equity), 23-45.

A-7

Other Publications

Erdem, Tülin, Kevin L. Keller, Dmitri Kuksov and Rik Pieters (2016), "Understanding Branding in a Digitally Empowered World," *International Journal of Research in Marketing,* Special Issue *Marketing* on *Branding in a Digitally Empowered World*, 33 (1), 3‒10.

Huber, Joel and Tülin Erdem, (2014), "JMR in Transition: Reflections on the 2006-2012 Period," 50th Anniversary Special Issue of *Journal of Marketing Research*, 51, February, 133-35.

Erdem, Tülin (2010), "State of the Journal", *Editorial* in *Journal of Marketing Research,* 47 (6), 997.

Erdem, Tülin (2010), "Spanning the Boundaries", *Editorial* in *Journal of Marketing Research,* 47 (1), 1-2.

Rangaswamy, Arvind, James J. Cochran, Tülin Erdem, John R. Hauser, Robert J. Meyer (2008) "Editor-in-Chief Search Committee Report: The Digital Future is Now," *Marketing Science*, Editorial, 27,1, 1-3.

Erdem, Tülin and Russell Winer (2002), "A Brief History of Choice Modeling in Marketing," *Marketing Letters*, 13 (3), 157-162 (special issue based on the 5th Invitational Choice Symposium, guest editors T. Erdem and R. Winer).

Papers under Review & Working Papers

Ana Martinovici, Pieters, Rik, Tülin Erdem, (2021),"Attention and Utility Accumulation: An Eye-Movement Analysis of Brand Choice." Under 2nd review at *Journal of Marketing Research.*

Raluca Ursu. Zhang, Qianyun Poppy and Tülin Erdem (2021), "Prior Information and Search Costs: Evidence from Eye-Tracking." Under review at *Management Science.*

Kwon, Minjung, Tülin Erdem and Masakazu Ishihara (2020), "Counter-Cyclical Price Promotion: Capturing Seasonal Category Expansion under Endogenous Consumption." Under review at *Quantitative Marketing and Economics.*

Erdem, Tülin, Cagdas Sirin, and Poppy Zhang (2019), "Social Responsibility and Brand Equity in the Era of Brands with a Social Purpose: Does Helping Refugees Help Brand?"

Siham, El Kihal, Tülin Erdem and Christian Schulze (2019), "Is it How

A-8

You Start How You Finish? Customer Return Rate Evolution in Online Retailing?"

White Papers

Erdem, Tülin, Cagdas Sirin, Vishal Singh and Qianyun Poppy Zhang (2019), "How Helping Refugees Helps Brands: An Analysis of French, German, and Italian Consumer Perceptions How Helping Refugees Helps Brands." NYU-Stern and TENT White Paper.

Erdem, Tülin, Cagdas Sirin, Vishal Singh and Qianyun Poppy Zhang (2018), "How Helping Refugees Helps Brands." NYU-Stern and TENT White Paper.

Selected Work in Progress

"Consideration Set Formation: An Eye-Tracking Analysis," with Bart Bronnenberg and Rik Pieters.

"Purpose-Driven Branding," with Cagdas Sirin, Poppy Zhang and Vishal Singh.

"Framing the Immigration Discourse," with Selcuk Sirin.

"Product Relaunch and Brand Repositioning," with Sue Chang.

Invited (Research) Keynote Talks

Keynote Speaker, *European Marketing Association Conference* (*EMAC*), Glasgow, Scotland, May 2018.

Keynote Speaker, *Marketing Dynamics Conference,* hosted by Stanford University, Las Vegas, Nevada, August 2014.

Invited Research Presentations

*Research Seminar,* Bilkent University, January 2020.
*Research Seminar,* UNC Chapel Hill, October 2019
*ISMS Doctoral Consortium,* University of Roma Tre*,* June 2019.
*AMA Sheth Doctoral Consortium,* NYU-Stern, June 2019.
*Research Seminar,* HBS, Inaugural Marketing Research Camp, May 2019
*Research Seminar,* Stanford University, May 2019
*Research Seminar,* IDC Herzliya, Israel, January 2019.
*Research Camp,* ESADE, Barcelona, Spain, July 2018.
*AMA Sheth Doctoral Consortium,* University of Leeds, June 2018.
*ISMS Doctoral Consortium,* Temple University*,* June 2018.

A-9

*AMA Sheth Doctoral Consortium,* University of Iowa, June 2017.
*ISMS Doctoral Consortium,* University of Southern California, June 2017.
*Research Seminar*, Northwestern University, February 2017.
*Invitational Choice Symposium,* hosted by University of Alberta, May 2016.
*Research Seminar,* Temple University, April 2016.
*Research Seminar,* Koç University, March 2016.
*Research Seminar,* University of Delaware, February 2016.
*ISMS Doctoral Consortium,* John Hopkins University, June 2015.
*Economics Seminar Series,* Rice University, Department of Economics, April 2015.
*Research Seminar,* University of Toronto, April 2015.
*Marketing Workshop,* Queen's University, April 2015.
*IO & Marketing Joint Seminar Series,* University of Zurich, March 2015.
*AMA Sheth Doctoral Consortium,* Northwestern University, June 2014.
*EMAC Conference,* Valencia, Spain, June 2014.
*Research Seminar,* Goethe University, June 2014
*ISMS Doctoral Consortium, Özyeğin University,* Istanbul, Turkey, July 2013.
*Measuring & Managing Brands in a Digital World,* NYU Stern Center for Measurable Marketing, May 2013.
*Marketing Research Camp,* Jones School of Management, Rice University, May 2013.
*Marketing Workshop,* Columbia Business School, Columbia University, April 2013.
*Research Seminar,* CUNY Graduate Center, April 2013.
*Marketing Workshop,* The Wharton School, University of Pennsylvania, April 2013.
*Research Seminar,* Graduate School of Management, UC Davis, March 2013
*Research Seminar,* City College of New York, March 2013.
*Research Seminar,* Oxford University, Saïd School of Business, Oxford, February 2013.
*Özyeğin University Public Lecture Series*, July 2012.
*ISMS Doctoral Consortium and Marketing Science Conference*, Boston, MA, June 2012.
*Research Seminar,* School of Business, Rutgers, Newark, April 2012.
*Distinguished Speaker Series,* Isenberg School of Management, UMASS, Amherst, March 2012.
*Distinguished Speaker Series,* School of Business, George Washington University, March 2012.
*Marketing Workshop,* Foster School of Business, University of Washington, November 2011.
*Marketing Seminar Series,* Marshall School of Business, USC, August 2011.
*Keynote Speaker, Marketing Dynamics Conference,* Jaipur, India, July 2011.
*ISMS Doctoral Consortium and Marketing Science Conference,* Houston, TX, June 2011.
*AMA Sheth Doctoral Consortium,* Oklahoma State University, June 2011.
*Research Seminar,* Department of Economics, McGill University, May, 2011.
*Research Seminar,* Koç University, Istanbul, Turkey, March 2011.
*Speaker Series,* Carey School of Business, John Hopkins University, January 2011.
*Marketing Workshop,* School of Business, University of Alberta, November 2010.

A-10

*Research Seminar,* School of Management, Yale University, November 2010.
*Marketing Speaker Series,* Georgia Institute of Technology, October 2010.
*London Business School Marketing Research Camp,* London, England, July 2010.
*ISMS Doctoral Consortium and Marketing Science Conference,* Cologne, Germany, June 2010.
*AMA Sheth Doctoral Consortium,* Texas Christian University, June 2010
*Invitational Choice Symposium*, hosted by University of Miami and University of Technology Sydney, May 2010.
*Marketing Workshop,* Fordham University, May 2010.
*Marketing Seminar Series*
HBS, March 2010.
*Marketing Workshop,* Baruch College, December 2009.
Keynote Speaker*, Marketing Dynamics Conference*, NY, NY, August 2009.
*AMA Summer Educators' Conference,* Chicago, IL, August 2009.
*Research Seminar,* Universidad Autónoma de Madrid, Madrid, Spain, July 2009.
*Cheung Kong GSB Marketing Research Forum,* Beijing, China, June 2009.
*Marketing Science Conference,* University of Michigan, June 2009.
*AMA Sheth Doctoral Consortium,* Georgia State University, June 2009.
*ISMS Doctoral Consortium and Marketing Science Conference,* University of Michigan, June 2009.
*Research Seminar,* University of Rochester, April 2009.
*Marketing Research Camp*, Pennsylvania State University, April 2009.
Advertising Research Foundation, Marketing Modelers' Seminar Series, NY, NY, March 2009.
*AMA Winter Educators Conference,* Tampa, Florida, February 2009.
*Özyeğin University Public Lecture Series,* Istanbul, Turkey, December 2008.
*Bilkent Research Camp,* Bilkent University, Ankara, Turkey, June 2008.
*ISMS Doctoral Consortium,* University British Columbia, June 2008.
*AMA Sheth Doctoral Consortium,* University of Missouri, June 2008.
*Marketing Research Camp,* Texas A&M University, April 2008.
*Marketing Seminar Series,* Duke University, December 2007.
*Marketing Seminar Series,* Columbia University, November 2007.
*5th QME Conference,* discussant, Chicago, IL, October 2007.
*ISMS Doctoral Consortium*, Singapore Management University, Singapore, June 2007.
*Invitational Choice Symposium*, hosted by Wharton School, May 2007.
*AMA Sheth Doctoral Consortium*, Arizona State University, May 2007.
Advertising Research Foundation, Marketing Modelers' Seminar Series, NY, NY, May 2007.
*4-School Colloquium,* Columbia, NYU, Wharton, Yale hosted by Wharton, April 2007.
*Marketing Research Camp,* University of Pittsburgh, February 2007.
*Marketing Science Doctoral Consortium,* University of Pittsburgh, June 2006.
*Marketing Workshop,* University of California, Riverside, June 2006.
*Research Seminar,* Yale University, December 2005.
*Distinguished Lectureship Series,* University of Michigan, October 2005.
*Marketing Workshop,* New York University, September 2005.
*Graduate School of Management Seminar,* Sabancı University, Istanbul, Turkey, July

2005.

*Faculty of Business Administration Seminar*, Bilkent University, Ankara, Turkey, July 2005.

*Marketing Science Doctoral Consortium,* Emory University, June 2005.

*Hightower Distinguished Lectureship Series,* Emory University, December 2004.

*IO Workshop*, Duke University, October 2004.

*ACR Doctoral Consortium*, Portland, Oregon, October 2004.

*Marketing Science Doctoral Consortium,* Erasmus University, Netherlands, June 2004.

*Invitational Choice Symposium*, hosted by University of Colorado, June 2004.

*Marketing Seminar Series,* Stanford University, February 2004.

*Business School Seminar Series*, San Francisco State University, October 2003.

*Marketing Science Doctoral Consortium,* University of Maryland, June 2003.

*Marketing Seminar Series,* Northwestern University, April 2003.

*Marketing Research Camp,* Washington University, March 2003.

*Cowles Conference on Estimation of Dynamic Demand Models*, Economics Department, Yale University, November 2002.

*ACR Doctoral Consortium*, Atlanta, Georgia, October 2002.

*Research Seminar,* Yale University, May 2002.

*Marketing Seminar Series*, University of Colorado, April 2002.

*Marketing Seminar Series,* Washington University, St. Louis, May 2001.

*Marketing Seminar Series*, MIT, April 2001.

*Marketing Seminar Series,* Harvard Business School, April 2001.

*Marketing Seminar Series,* University of Houston, March 2001.

*AMA Summer Educators Conference Special Session on Brand Equity honoring David Aaker*, Chicago, August 2000.

*AMA Sheth Doctoral Consortium,* University of Western Ontario, August 2000.

*Research Seminar,* University of Toronto, March 2000.

*Marketing Workshop,* University of California, Davis, December 1999.

*Econometrics in Tel Aviv,* Dept. of Economics, Tel Aviv University, Israel, June 1999.

*Marketing Seminar Series,* UC Irvine, March 1999.

*Marketing Seminar Series*, Cornell University, February 1999.

*Marketing Research Camp,* UCLA, January 1999.

*Marketing Seminar Series,* University of Pennsylvania, December 1998.

*Marketing Seminar Series,* New York University, December 1998.

*AMA Doctoral Consortium,* University of Georgia, August 1998.

*Marketing Seminar Series,* GSIA, Carnegie Mellon University, May 1998.

*CEDA (Committee on Economic Development of Australia) Conference* on Building Brands in the Knowledge Economy, Sydney and Melbourne, Australia, September 1998.

*Invitational Symposium on Choice Modeling and Behavior*, hosted by HEC, Jouy- en-Josas, France, July 1998.

*Research Seminar,* Koç University, Istanbul, Turkey, June 1998.

*Applied Econometrics and Quantitative Methods Summer Workshop*, Koc University, Istanbul, Turkey, August 1997.

*Marketing Seminar Series*, University of Texas at Dallas, May 1997.

A-12

*Marketing Workshop*, MIT, April 1997.
*5th Annual Winter Research Retreat*, University of Florida, March 1997.
Invitational Symposium on Choice Modeling and Behavior, hosted by Columbia University, June 1996.
*Marketing Seminar Series*, MIT, November 1995.
*Marketing Seminar Series*, Ohio State University, May 1995.
*AMA Advanced Research Techniques Forum*, Beaver Creek, Colorado, June 1994.
*Marketing Seminar Series*, Stanford University, November 1993.
*Invitational Symposium on Choice Modeling and Behavior*, hosted by Duke University, July 1993.

Conference Presentations

   *ISMS Marketing Science Conference,* University of Roma Tre*, June 2019.
*EIRASS Conference,* Edinburgh, Scotland, July 2016.
*Academy of Marketing Science, World Congress,* Bari, Italy. July 2015.
*Marketing Science Conference,* Marketing Science Conference, Özyeğin University, Istanbul, Turkey, July 2013.
*EIRASS Conference,* Zagreb, Croatia, July 2008.
*Marketing Science Conference,* UBC, Vancouver, Canada, June 2008.
*Marketing Science Conference*, SMU, Singapore, June 2007.
*EIRASS Conference,* Budapest, Hungry, July 2006.
*Marketing Science Conference,* Pittsburgh, PA, June 2006.
*Marketing Dynamics Conference,* Sacramento, CA, September 2005
*Marketing Science Conference*, Atlanta, GA, June 2005.
*EIRASS Conference,* Prague, Czech Republic, July 2004.
*Marketing Science Conference,* Rotterdam, Netherlands, June 2004.
*Quantitative Marketing and Economics Conference,* Chicago, IL, October 2003.
*EURO/INFORMS Joint International Meeting,* Istanbul, Turkey, July 2003.
*Marketing Science Conference,* Washington D.C., June 2003.
*AMA Advanced Research Techniques (ART) Forum,* Monterey, CA, June 2003.
*Bayes Conference,* Columbus, Ohio, November 2002.
*Marketing Science Conference,* Edmonton, AB, Canada, June 2002.
*Marketing Science Conference*, Wiesbaden, Germany, July 2001.
*EIRASS Conference,* Sintra, Portugal, July 2000.
*Marketing Science Conference*, LA, CA, June 2000.
*Marketing Science Conference,* Syracuse, NY, May 1999.
*Marketing Science Conference,* Fontainebleau, France, July 1998.
*INFORMS Fall Meetings*, Dallas, Texas, October 1997.
*Association for Consumer Research Conference*, Denver, CO, October 1997.
*Marketing Science Conference,* Berkeley, CA, March 1997.
*Marketing Science Conference*, Gainesville, FL, March 1996.
*INFORMS Spring Meetings*, Los Angeles, CA, April 1995.
*Marketing Science Conference*, Tucson, AZ, March 1994.

*Marketing Science Conference*, St. Louis, MI, March 1993.
*Marketing Science Conference*, London, England, July 1992.
*Marketing Science Conference*, Delaware, March 1991.
*MSI Conference on Managing Brand Equity*, Austin, TX, November 1990.
*Marketing Science Conference*, Urbana, IL, March 1990.


Selected Other Presentations

"Destination and Place Branding," Kafkasya University, Kars, Istanbul, January 2019.
"Branding for Start-Ups II," HUG ((Hamdi Ulukuaya Girsimi), Erzincan, Turkey, January 2019
"Social Marketing and the Era of Brands with a Purpose," Turkish Women's International Network, Istanbul, Turkey, December 2018.
"How Helping Refugees may help your Brand," TENT Foundation Annual Meeting, New York City, May 2018.
HUG (Hamdi Ulukuaya Girsimi), Branding Panel, Istanbul, January 2018.
HUG (Hamdi Ulukuaya Girsimi), Entrepreneurship Panel, NYU-Stern, November 2017.
"Brands in Motion," BBI (BAU Branding Innovation) Launch Conference, Istanbul, Turkey, January 2016.
"Power of Images in Branding," Summer International University, Aladdin Project by Unesco/Erasmus+, Bahcesehir University, Cappadocia, Turkey, July 2015.


**TEACHING**

Interests

Brand Management and Strategy, Marketing Management, Marketing Planning, Marketing Strategy, Marketing Models

Experience

*Teaching:*
  *Undergraduate*:
    *Stern*: Brand Strategy and Planning
    *Haas*: Marketing (Core)
  *MBA*:
    *Stern*: (Core) Marketing, Advanced Product  Planning
    *Haas*: Branding, Brand Management
  *Ph.D.*:
    *Stern*: Quantitative Applications in Marketing
    *Haas*: Empirical Modeling, Marketing Models, Choice Models, Individual Topics in Marketing
  *Executive Education*:
    *Stern*: Brand Strategy and Planning

*Graduate and Post-Graduate Mentorship*:
   *Post-Doctoral Mentorship:*
      Baohong Sun (1995-1997). Carnegie Mellon University.

   *Chair & Co-Chair of Ph.D. thesis committee:*

      Qianyun Poppy Zhang (2018-present).
      Minjung Kwon (2018). Co-winner of 2017 ISMS Doctoral Proposal Competition.
      Sue Chang (2012).
      Rachel Shacham (2011).
      Johanna Sussman Ilfeld (2004).
      Judi Strebel (1997).

   *Member of Ph.D. thesis committee:*
      <u>Marketing</u>
      Eunkyung An (2020-present)
      Yuzhou Liu (2015)
      Tingting Fan (2014)
      Wenbo Wang (2012).
      Mantian Hu (2012).
      Sherif Naser (2008).
      Yeşim Orhun (2006).
      Liang Guo (2003).
      Ying Zhao (2001).
      Mark Stiving (1996).

      <u>Other</u>
      Mürüvvet Çelikbas (2002, Industrial Eng. and OR)
      Timothy Beatty (2001, Agricultural Economics)
      Craig Mohn (1999, Agricultural Economics)
      Panupol Lerssrisuriya (1998, Industrial Eng. and OR)
      Alan Cooke (1997, Psychology)

   *External Examiner (Dissertation Defense)*

      Avery Haviv (2014, University of Toronto)

   *Member of several Oral Examination Committees*


<u>Effectiveness</u>

   At Haas: member of Club 6.0 (median 6.0 and above on a 7-point scale in regard to teaching effectiveness) in the majority of the courses taught during 1993-2006.

At Stern: a mean of 6.0 and above on a 7-point scale in regard to teaching effectiveness in several courses (2006-2018); a mean of 4.0 and above (2018-present) in the majority of courses.

## ADMINISTRATIVE SERVICE

Stern School of Business

| | |
|---|---|
| 2017-present | Chair, Marketing Department |
| 2015-2017 | Member of Advisory Council to the Department Chair |
| 2014-2017 | Member of NYU Faculty Advisory Committee on Academic Priorities |
| 2012-2017 | Member of Promotion and Tenure Committee |
| 2008-2009 | Director, Stern Center for Measurable Marketing |
| 2007-2008 | Co-Director, Center for Digital Economy Research (CeDER) |
| 2007-2009 | Member of MBA Core Curriculum Committee |
| 2007-2009 | Member of Senior Faculty Review Committee |
| 2007-2008 | Member of *Ad Hoc* Search Committee in Environmental Studies |
| 2006-2007 | Research Director, Center for Digital Economy Research (CeDER) |
| 2006-2007 | Member of Global Task Force |

Haas School of Business

| | |
|---|---|
| 2005-2006 | Ph.D. Program Director, Haas School of Business |
| 2005-2006 | Chair, Committee on Research (Academic Senate Committee) |
| 2005-2006 | Member of DIVCO (UC Berkeley Divisional Council) |
| 2004-2005 | Member of UCORP (University Committee on Research Policy). UC system-wide committee, UC Berkeley Representative |
| 2004-2005 | Vice-Chair, Committee on Research (Academic Senate Committee) |
| 2004-2005 | Chair, Policy and Planning ($P^2$) Committee |
| 2003-2004 | Member of Policy and Planning ($P^2$) Committee |
| 2003-2004 | Member of Academic Affairs Advisory Council |
| 2003-2004 | Chair, Marketing Group |
| 2002-2003 | Associate Dean for Academic Affairs and Faculty Chair |
| 2001-2004 | Member of Haas School Hiring Committee |
| 2001-2004 | Member of Committee on Research (Academic Senate Committee) |
| 2001-2002 | Co-Associate Dean for Academic Affairs and Chair of Haas School Hiring Committee |
| 2001-2002 | Acting Chair, Marketing Group |
| 1999-2001 | Member of Policy and Planning ($P^2$) Committee |
| 1999-2000 | Member of Faculty and Ph.D. Computer Committee (FPCC) |
| 1999-2000 | Member of Space Allocation Committee |
| 1996 | Member of *ad hoc* Marketing Ph.D. Program Evaluation Committee |

**SELECTED INDUSTRY EXPERIENCE**

- Founding Advisory Board Chair, BBI (BAU Branding Innovation), 2016, BBI is a Global Think-and-Do Tank about Branding based in Istanbul, Turkey.
- Academic Partner of Prophet (2008-2012). Prophet is a Strategic Brand and Marketing Consultancy.

**SELECTED LITIGATION EXPERIENCE INVOLVING EXPERT TESTIMONY**

- *Consumer Financial Protection Bureau v. Navient Corporation, et al.,* Case No. 3:17-CV-00101-RDM (2020) Retained by CFPB.  Testified by deposition on consumer choice and comprehension of communications in relation to student loan repayment plans.

- *TS Media, Inc., Tavis Smiley Presents, Inc., and The Smiley Group, Inc. v. Public Broadcasting Service.* Case No. 2018 CA 001247 B (2020). Retained by PBS. Testified in court on employee misconduct in relation to organizations' brand equity and credibility.

- *Hitachi Maxell, Ltd. v. Huawei Device USA, Inc. and Huawei Device Co., Ltd. Hitachi Maxell, Ltd. v. ZTE Corp. and ZTE USA Inc.* (2018). Retained by Hitachi Maxell, Ltd. Testified by deposition and in court on consumer awareness and perceived importance of smartphone/tablet features.

- *Federal Trade Commission v. DirecTV Corporation and DirecTV, LLC.* Case No: 3:15cv-01129 (2016-2017). Retained by FTC. Testified twice by deposition and in court on consumer comprehension of marketing and advertising materials.

- *Church and Dwight Co., Inc. v. SPD Swiss Precision Diagnostics, GMBH*, Civil Action No.: 1:14 CV 585 (AJN) (2015, 2017). Retained by Proskauer Rose LLP. Testified twice by deposition and in court on consumer demand, decision-making & behavior and competitive strategy in home pregnancy test kits markets; misleading and deceptive advertising and harm.

- *Apple Inc. vs. Samsung Electronics Co, Ltd: Samsung Electronics America; Samsung Telecommunications America, LLC.* Case No: 12-cv-00630-LHK (2013-2014). Retained by Samsung. Testified by deposition and in court on consumer demand in smartphone and tablet markets.

**APPENDIX B**

**PRIOR TESTIMONY IN PAST FOUR YEARS**

**Expert Testimony in Past Four Years**

- *BBK Tobacco & Foods, LLP v. Central Coast Agriculture, Inc.* Case No.: 2:19-cv-05216-MTL (2021). Retained by Central Coast Agriculture. Testified by deposition on likelihood of consumer confusion.

- *Minor, et al. v. Baker Mills, Inc. and Kodiak Cakes, LLC.* Case No.: 20-cv-02901-RS. Retained by Kodiak. Testified by deposition on opinions regarding Plaintiffs' Expert's proposed conjoint analysis.

- *Kiva Health Brands, LLC v. Kiva Brands, Inc.* Case No. 3:19-cv-03459-CRB (2021). Retained by Kiva Brands, Inc. Testified by deposition on likelihood of consumer confusion and the methods to measure the value of a brand.

- *Jeffrey Koenig v. Vizio, Inc.* Case No. BC702266 (2021). Retained by Vizio, Inc. Testified by deposition on consumer comprehension of modifiers in marketing materials.

- *Pearlstein, et al. v. BlackBerry Limited, et al.* Case No. 1:13-cv-7060-CM (2020). Retained by Kahn Swick & Foti, LLC. Testified by deposition on aspects of strategic marketing pertaining to certain BlackBerry products.

- *Maxell, Ltd., v. Apple, Inc.* Case No. 5:19-cv-00036 (2020) Retained by Maxell. Testified by deposition on consumer awareness and perceived importance of smartphone/tablet features.

- *Match Group, LLC v. Bumble Trading Inc., et al.* Case No. 6:18-cv-00080-ADA (2020) Retained by Bumble. Testified by deposition on likelihood of consumer confusion and materiality of at-issue trade dress.

- *Consumer Financial Protection Bureau v. Navient Corporation, et al.* Case No. 3:17-CV-00101-RDM (2020) Retained by CFPB. Testified by deposition on consumer choice and comprehension of communications in relation to student loan repayment plans.

- *TS Media, Inc., Tavis Smiley Presents, Inc., and The Smiley Group, Inc. v. Public Broadcasting Service.* Case No. 2018 CA 001247 B (2020). Retained by PBS. Testified in court on employee misconduct in relation to organizations' brand equity and credibility.

- *Absorption vs. Reckitt Benckiser Group PLC.* Civil Action No. 2:17-cv-12872 (2019). Retained by Sheppard Mullin LLC (2019). Testified by deposition on marketing strategy, product introductions, brand extensions, channel design and channel power.

- *Grasshopper House, LLC v. Clean & Sober Media LLC, Cliffside Malibu and Richard L. Taite.* Civil Action No. 2:18-cv-00923-SVW-RAO (2019). Retained by Clean & Sober Media. Testified by deposition on brand harm and role of online reviews in consumer decision-making.

- *Hitachi Maxell, Ltd. v. Huawei Device USA, Inc. and Huawei Device Co., Ltd. Hitachi Maxell, Ltd. v. ZTE Corp. and ZTE USA Inc*. (2018). Retained by Hitachi Maxell, Ltd. Testified by deposition and in court on consumer awareness and perceived importance of smartphone/tablet features.

- *Federal Trade Commission v. DirecTV Corporation and DirecTV, LLC*. Case No: 3:15cv-01129 (2016-2017). Retained by FTC. Testified twice by deposition and in court on consumer comprehension of marketing and advertising materials.

- *Church and Dwight Co., Inc. v. SPD Swiss Precision Diagnostics, GMBH*, Civil Action No.: 1:14 CV 585 (AJN) (2015, 2017). Retained by Proskauer Rose LLP. Testified twice by deposition and in court on consumer demand, decision-making & behavior and competitive strategy in home pregnancy test kits markets; misleading and deceptive advertising and harm.

**APPENDIX C**

**MATERIALS RELIED UPON**

## Materials Relied Upon

### Court and Legal Documents

- Declaration of Gregory Fair Regarding Google's Disclosures in Support of Google's Opposition to Plaintiffs' Motion for Class Certification, *Patrick Calhoun et. al. v. Google LLC*, Case No. 5:20-cv-05146-LHK-SVK, United States District Court for the Northern District of California - San Jose Division, December 17, 2021.
- Declaration of Leslie K. John, *Patrick Calhoun et. al. v. Google LLC*, Case No. 5:20-cv-05146-LHK-SVK, United States District Court for the Northern District of California - San Jose Division, October 13, 2021.
- Expert Report of Georgios Zervas Ph.D., *Patrick Calhoun et. al. v. Google LLC*, Case No. 5:20-cv-05146-LHK-SVK, United States District Court for the Northern District of California - San Jose Division, December 22, 2021.
- Expert Report of Professor Joseph Turow, *Patrick Calhoun et. al. v. Google LLC*, Case No. 5:20-cv-05146-LHK-SVK, United States District Court for the Northern District of California - San Jose Division, October 13, 2021.
- Expert Report of Russell W. Mangum III, Ph.D. in Support of Plaintiffs' Motion for Class Certification, *Patrick Calhoun et. al. v. Google LLC*, Case No. 5:20-cv-05146-LHK-SVK, United States District Court for the Northern District of California - San Jose Division, October 13, 2021.
- Expert Report of Yiling Chen, Ph.D., *Patrick Calhoun et. al. v. Google LLC*, Case No. 5:20-cv-05146-LHK-SVK, United States District Court for the Northern District of California - San Jose Division, December 22, 2021.
- First Amended Class Action Complaint, *Patrick Calhoun et. al. v. Google LLC*, Case No. 5:20-cv-05146-LHK-SVK, United States District Court for the Northern District of California - San Jose Division, April 16, 2021.
- Plaintiffs' Notice of Motion and Motion for Class Certification and Appointment of Class Representatives and Class Counsel; Memorandum of Law in Support thereof, *Patrick Calhoun et. al. v. Google LLC*, Case No. 5:20-cv-05146-LHK-SVK, United States District Court for the Northern District of California - San Jose Division, October 14, 2021.
- Plaintiffs' Second Amended Responses and Objections to Defendant's Amended Interrogatory No. 7, *Patrick Calhoun et. al. v. Google LLC*, Case No. 5:20-cv-05146-LHK-SVK, United States District Court for the Northern District of California - San Jose Division, Aug. 26, 2021.
- Remote Video Deposition of Elaine Crespo, July 22, 2021.
- Remote Videotaped Oral Deposition of Dr. Rodney Johnson, October 23, 2021.
- Videotaped Videoconference Deposition via Zoom of Michael Henry, August 9, 2021.
- Videotaped Zoom Deposition of Dr. Claudia Kindler, July 5, 2021.
- Videotaped Zoom Deposition of Joseph Turow, Ph.D., November 8, 2021.

### Bates-Stamped Documents

- GOOG-CABR-00422093-2182.
- GOOG-CABR-04067825-7867.
- GOOG-CABR-05424604.
- GOOG-CABR-05156497-6555.

### Academic Articles and Books

- Acquisti, A. and Grossklags, J., "Privacy and Rationality in Individual Decision Making," *Security & Privacy, IEEE*, Vol. 3, No. 1, January 2005.
- Acquisti, A., John, L.K., and Loewenstein, G., "What is Privacy Worth?," *The Journal of Legal Studies*, Vol. 42, No. 2, June 2013, pp. 249-274.
- Athey, S., Catalini, C., and Tucker, C., "The Digital Privacy Paradox: Small Money, Small Costs, Small Talk," *NBER Working Paper Series*, June 2017.
- Ben-Shahar, O. and Strahilevitz, L.J., "Interpreting Contracts via Surveys and Experiments," *New York University Law Review*, Vol. 92, December 2017, pp. 1753-1827.
- Beresford, A., R., Kubler, D., and Preibusch, S., "Unwillingness to Pay for Privacy: A Field Experiment." *Economic Letters*, Vol. 117, No. 1, 2012, pp. 25-27.
- Carson, R. T., Louviere, J. J., Anderson, D. A., Arabie, P., Bunch, D. S., Hensher, D. A., Johnson, R. M., Kuhfeld, W. F., Steinberg, D., Swait, J., Timmermans, H., and Wiley, J. B., "Experimental Analysis of Choice," *Marketing Letters*, Vol. 5, No. 4, 1994, pp. 351-368.
- Diamond, S. S., "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*, Third Edition, National Academies Press, 2011, pp. 359-423.

- Egelman, S., Tsai, J., Cranor, L. F., and Acquisti, A., "Timing is Everything? The Effects of Timing and Placement of Online Privacy Indicators," *Proceedings of the SIGCHI Conference on Human Factors in Computing Systems*, April 2009.
- Hann, I., Hui, K., Lee, S. T., and Png, I. P. L., "Overcoming Online Information Privacy Concerns: An Information-Processing Theory Approach," *Journal of Management Information Systems*, Vol. 24, No. 2, 2007, pp. 13-42.
- Hauser, J. R., Eggers, F., and Selove, M., "The Strategic Implications of Scale in Choice-Based Conjoint Analysis," *Marketing Science*, Vol. 38, No. 6, 2019, pp. 1059-1081.
- John, L. K., "Uninformed Consent," *Harvard Business Review*, September 2018.
- John, L., "We Say We Want Privacy Online, But Our Actions Say Otherwise," Harvard Business Review, October 2015.
- John, L. K., Acquisti, A., and Loewenstein, G., "Strangers on a Plane: Context-dependent Willingness to Divulge Sensitive Information," *Journal of Consumer Research*, Vol. 37, No. 5, February 2011.
- Kim, T., Barasz, K., and John., L. K., "Why Am I Seeing This Ad? The Effect of Ad Transparency on Ad Effectiveness," *Journal of Consumer Research*, Vol. 45, No. 5, February 2019, pp. 906-932.
- Krasnova, H., Hildebrand, T., and Guenther, O., "Investigating the Value of Privacy in Online Social Networks: Conjoint Analysis," *ICIS 2009 Proceedings*, Paper 173, 2009, pp. 1-18.
- Kumaraguru, P., Cranor, L. F., "Privacy Indexes: A Survey of Westin's Studies," *Carnegie Mellon University, School of Computer Science, Institute for Software Research International*, December 2005.
- Lavrakas, P. J., *Encyclopedia of Survey Research Methods*, SAGE Publications, Inc., 2008.
- Lin, C, A., "Online-Service Adoption Likelihood," *Journal of Advertising Research*, Vol. 39, No. 2, 1999, pp. 79-89.
- Malhotra, Naresh K., "Questionnaire Design and Scale Development," in *The Handbook of Marketing Research*, eds. Grover, R. and Vriens, V., Sage Publications, 2006.
- *Manual for Complex Litigation*, Fourth Edition, Federal Judicial Center, 2004.
- Morando, F., Iemma, R., and Raiteri, E., "Privacy Evaluation: What Empirical Research on Users' Valuation of Personal Data Tells Us," *Internet Policy Review*, Vol. 3, No. 2, May 2014.
- Norberg, P. A., Horne, D. R., and Horne, D. A., "The Privacy Paradox: Personal Information Disclosure Intentions versus Behaviors," *Journal of Consumer Affairs*, Vol. 41, No. 1, 2007, pp. 100-126.
- Orme, B, K., *Getting Started with Conjoint Analysis*, Third Edition, Research Publishers LLC, 2014.
- Sipior, J. C., Ward, B. T., and Mendoza, R. A., "Online Privacy Concerns Associated with Cookies, Flash Cookies, and Web Beacons," *Journal of Internet Commerce*, Vol. 10, 2011.
- Steckel, J. H., DeSarbo, W. S. and Mahajan, V., "On the Creation of Acceptable Conjoint Analysis Experimental Designs," *Decision Sciences*, Vol. 22, No. 2, 1991, pp. 435-442.
- Thomadsen, R., Rooderkerk, R.P., Amir, O., Arora, N., Bollinger, B., Hansen, K., John, L., Liu, W., Sela, A., Singh, V., and Sudhir, K., "How Context Affects Choice," *Customer Needs and Solutions*, November 2017.
- Turow, J., Feldman, L., and Meltzer, K., "Open to Exploitation: American Shoppers Online and Offline," *Annenberg Public Policy Center of the University of Pennsylvania*, 2005.

**Other**

- Data from Consumer Expectations Survey, fielded from November 17 to November 30, 2021 ("21101590.xlsx").
- Data from Materiality Survey, fielded from November 17 to November 30, 2021 ("2108882.xlsx").
- Data from Scenario Application Survey, fielded from November 17 to November 30, 2021 ("21081070.xlsx").

**Other Public Documents**

- "About Dynata," *Dynata*, available at: https://www.dynata.com/company/about-us/, accessed on October 29, 2021.
- "Accurate Web Site Visitor Measurement Crippled by Cookie Blocking and Deletion," *Jupitermedia*, March 14, 2005, available at: http://web.archive.org/web/20051028235851/http://www.jupitermedia.com/corporate/releases/05.03.14-newjupresearch html, accessed on December 14, 2021.
- "Ad Personalization," *Google*, available at: https://adssettings.google.com/authenticated, accessed on December 14, 2021.
- "Browser Market Share Worldwide," *StatCounter*, available at https://gs.statcounter.com/browser-market-share#yearly-2009-2020, accessed on December 14, 2021.
- "Browser Market Share Worldwide," *StatCounter*, available at: https://gs.statcounter.com/browser-market-share#yearly-2009-2020, accessed on December 14, 2021.
- "Consumers Driving the Digital Uptake - The Economic Value of Online Advertising-based Services for Consumers," *IAB Europe*, September 2010, available at: https://www.youronlinechoices.com/white_paper_consumers_driving_the_digital_uptake.pdf.

- "Cyber Security Market Current and Future Investment Opportunities in World By 2025," *ABNewsWire*, April 24, 2020, available at: https://www.abnewswire.com/pressreleases/cyber-security-market-current-and-future-investment-opportunities-in-world-by-2025-grand-view-research-inc_481170.html., accessed on December 14, 2021.
- "DIY Market Research & Insights," *Dynata*, available at: https://www.dynata.com/research-insights, accessed on October 29, 2021.
- "Download & install Google Chrome," *Google Chrome*, available at: https://support.google.com/chrome/answer/95346?hl=en&co=GENIE.Platform%3DAndroid&oco=0, accessed on December 19, 2021.
- "Global Desktop Browser Market Share for 2021," *Kinsta*, available at: https://kinsta.com/browser-market-share/, accessed on December 14, 2021.
- "Google Chrome - Home," Google, available at: https://www.google.com/chrome/, accessed on December 14, 2021.
- "Google Chrome Privacy Whitepaper," *Google*, February 4, 2021, available at: https://www.google.com/chrome/privacy/whitepaper html, accessed on December 14, 2021.
- "Google Trends - Search Term 'data privacy,'" *Google Trends*, available at: https://trends.google.com/trends/explore?date=2010-01-01%202020-01-01&geo=US&q=data%20privacy, accessed on December 16, 2021.
- "Google Trends - Search Terms 'internet browser," *Google Trends*, available at: https://trends.google.com/trends/explore?date=2010-01-01%202020-01-01&geo=US&q=internet%20browser, accessed on December 16, 2021.
- "The Best Privacy Online," *Brave*, available at: https://brave.com/, accessed on December 17, 2021.
- "The Browser Built By Google," *Google*, available at: https://www.google.com/chrome/, accessed on December 14, 2021.
- "Tired of Being Tracked Online? We can help," *DuckDuckGo*, available at: https://duckduckgo.com/, accessed on December 14, 2021.
- "What are Cookies?," *Kaspersky*, available at: https://www kaspersky.com/resource-center/definitions/cookies, accessed on December 14, 2021.
- "What Is An IP Address - Definition and Explanation," *Kaspersky*, available at: https://www kaspersky.com /resource-center/definitions/what-is-an-ip-address, accessed on December 14, 2021.
- Hein, K., "Half of US Consumers Accept All Cookies Despite Concerns about How Their Data Is Shared," *The Drum*, November 17, 2021, available at: https://www.thedrum.com/news/2021/11/17/half-us-consumers-accept-all-cookies-despite-concerns-about-how-their-data-shared, accessed on December 14, 2021.
- Kunst, A. "Leading U.S. Online User Privacy Measures 2017," *Statista*, December 20, 2019, available at: https://www.statista.com/statistics/714130/us-online-usage-privacy-measures-usage/, accessed on December 14, 2021.
- Manthorpe, R., "Ever Suffered from Selfie Regret? Why Some People Share When They Shouldn't," *Wired*, April 11, 2016, available at: https://www.wired.co.uk/article/leslie-john-harvard-irrational-decision-making, accessed on December 14, 2021.
- Marvin, R., "The VPN Market Will Reach $36 Billion By 2020," *PCMag*, December 10, 2018, available at: https://www.pcmag.com/news/the-vpn-market-will-reach-36-billion-by-2022, accessed on December 14, 2021.
- Morrissey, B., "Users Often Delete Web-Tracking Cookies," *Adweek*, March 14, 2005, available at: https://www.adweek.com/brand-marketing/users-often-delete-web-tracking-cookies-78340/, accessed on December 14, 2021.
- Muhammad, Z. "Global Privacy Concerns in 2020 and the Impact of the Coronavirus," *Digital Information World*, July 7, 2020, available at: https://www.digitalinformationworld.com/2020/07/privacy-concerns-are-high.html, accessed on December 14, 2021.
- Reimann, C., "Conducting an Online Survey? How to Make Sure You Don't Get Bad Data," *KS&R*, 2020, available at: http://www ksrinc.com/thought-leadership/pdf/KSR_Online_Data_Integrity.pdf.
- Sawyer, A. G., "Demand Artifacts in Laboratory Experiments in Consumer Research," *Journal of Consumer Research*, Vol. 1, No. 4, March 1975, pp. 20-30.

**APPENDIX D.1**

**PRIVACY POLICY** – **JULY 1, 2020**



## When you use our services, you're trusting us with your information. We understand this is a big responsibility and work hard to protect your information and put you in control.

This Privacy Policy is meant to help you understand what information we collect, why we collect it, and how you can update, manage, export, and delete your information.

---

We build a range of services that help millions of people daily to explore and interact with the world in new ways. Our services include:

- Google apps, sites, and devices, like Search, YouTube, and Google Home

- Platforms like the Chrome browser and Android operating system

- Products that are integrated into third-party apps and sites, like ads and embedded Google Maps

You can use our services in a variety of ways to manage your privacy. For example, you can sign up for a Google Account if you want to create and manage content like emails and photos, or see more relevant search results. And you can use many Google services when you're signed out or without creating an account at all, like searching on Google or watching YouTube videos. You can also choose to browse the web privately using Chrome in Incognito mode. And across our services, you can adjust your privacy settings to control what we collect and how your information is used.

To help explain things as clearly as possible, we've added examples, explanatory videos, and definitions for key terms. And if you have any questions about this Privacy Policy, you can contact us.

---

INFORMATION GOOGLE COLLECTS

## We want you to understand the types of information we collect as you use our services

We collect information to provide better services to all our users — from figuring out basic stuff like which language you speak, to more complex things like which ads you'll find most useful, the people who matter most to you online, or which YouTube videos you might like. The information Google collects, and how that information is used, depends on how you use our services and how you manage your privacy controls.

When you're not signed in to a Google Account, we store the information we collect with unique identifiers tied to the browser, application, or device you're using. This helps us do things like maintain your language preferences across browsing sessions.

When you're signed in, we also collect information that we store with your Google Account, which we treat as personal information.

## Things you create or provide to us



When you create a Google Account, you provide us with personal information that includes your name and a password. You can also choose to add a phone number or payment information to your account. Even if you aren't signed in to a Google Account, you might choose to provide us with information — like an email address to receive updates about our services.

We also collect the content you create, upload, or receive from others when using our services. This includes things like email you write and receive, photos and videos you save, docs and spreadsheets you create, and comments you make on YouTube videos.

## Information we collect as you use our services

### Your apps, browsers & devices



We collect information about the apps, browsers, and devices you use to access Google services, which helps us provide features like automatic product updates and dimming your screen if your battery runs low.

The information we collect includes unique identifiers, browser type and settings, device type and settings, operating system, mobile network information including carrier name and phone number, and application version number. We also collect information about the interaction of your apps, browsers, and devices with our services, including IP address, crash reports, system activity, and the date, time, and referrer URL of your request.

We collect this information when a Google service on your device contacts our servers — for example, when you install an app from the Play Store or when a service checks for automatic updates. If you're using an Android device with Google apps, your device periodically contacts Google servers to provide information about your device and connection to our services. This information includes things like your device type, carrier name, crash reports, and which apps you've installed.

### Your activity





We collect information about your activity in our services, which we use to do things like recommend a YouTube video you might like. The activity information we collect may include:

- Terms you search for

- Videos you watch

- Views and interactions with content and ads

- Voice and audio information when you use audio features

- Purchase activity

- People with whom you communicate or share content

- Activity on third-party sites and apps that use our services

- Chrome browsing history you've synced with your Google Account

If you use our services to make and receive calls or send and receive messages, we may collect telephony log information like your phone number, calling-party number, receiving-party number, forwarding numbers, time and date of calls and messages, duration of calls, routing information, and types of calls.

You can visit your Google Account to find and manage activity information that's saved in your account.

 **Go to Google Account**

## Your location information

We collect information about your location when you use our services, which helps us offer features like driving directions for your weekend getaway or showtimes for movies playing near you.

Your location can be determined with varying degrees of accuracy by:

- GPS

- IP address

- Sensor data from your device

- Information about things near your device, such as Wi-Fi access points, cell towers, and Bluetooth-enabled devices

The types of location data we collect depend in part on your device and account settings. For example, you can turn your Android device's location on or off using the device's settings app. You can also turn on Location History if you want to create a private map of where you go with your signed-in devices.

In some circumstances, Google also collects information about you from publicly accessible sources. For example, if your name appears in your local newspaper, Google's Search engine may index that article and display it to other people if they search for your name. We may also collect information about you from trusted partners, including marketing partners who provide us with information about potential customers of our business services, and security partners who provide us with information to protect against abuse. We also receive information from advertisers to provide advertising and research services on their behalf.

We use various technologies to collect and store information, including cookies, pixel tags, local storage, such as browser web storage or application data caches, databases, and server logs.

WHY GOOGLE COLLECTS DATA

## We use data to build better services

We use the information we collect from all our services for the following purposes:

### Provide our services



We use your information to deliver our services, like processing the terms you search for in order to return results or helping you share content by suggesting recipients from your contacts.

### Maintain & improve our services



We also use your information to ensure our services are working as intended, such as tracking outages or troubleshooting issues that you report to us. And we use your information to make improvements to our services — for example, understanding which search terms are most frequently misspelled helps us improve spell-check features used across our services.

## Develop new services



We use the information we collect in existing services to help us develop new ones. For example, understanding how people organized their photos in Picasa, Google's first photos app, helped us design and launch Google Photos.

## Provide personalized services, including content and ads



We use the information we collect to customize our services for you, including providing recommendations, personalized content, and customized search results. For example, Security Checkup provides security tips adapted to how you use Google products. And Google Play uses information like apps you've already installed and videos you've watched on YouTube to suggest new apps you might like.

Depending on your settings, we may also show you personalized ads based on your interests. For example, if you search for "mountain bikes," you may see an ad for sports equipment when you're browsing a site that shows ads served by Google. You can control what information we use to show you ads by visiting your ad settings.

- We don't show you personalized ads based on sensitive categories, such as race, religion, sexual orientation, or health.

- We don't share information that personally identifies you with advertisers, such as your name or email, unless you ask us to. For example, if you see an ad for a nearby flower shop and select the "tap to call" button, we'll connect your call and may share your phone number with the flower shop.

 Go to Ad Settings



We use data for analytics and measurement to understand how our services are used. For example, we analyze data about your visits to our sites to do things like optimize product design. And we also use data about the ads you interact with to help advertisers understand the performance of their ad campaigns. We use a variety of tools to do this, including Google Analytics. When you visit sites that use Google Analytics, Google and a Google Analytics customer may link information about your activity from that site with activity from other sites that use our ad services.

## Communicate with you



We use information we collect, like your email address, to interact with you directly. For example, we may send you a notification if we detect suspicious activity, like an attempt to sign in to your Google Account from an unusual location. Or we may let you know about upcoming changes or improvements to our services. And if you contact Google, we'll keep a record of your request in order to help solve any issues you might be facing.

## Protect Google, our users, and the public



We use information to help improve the safety and reliability of our services. This includes detecting, preventing, and responding to fraud, abuse, security risks, and technical issues that could harm Google, our users, or the public.

We use different technologies to process your information for these purposes. We use automated systems that analyze your content to provide you with things like customized search results, personalized ads, or other features tailored to how you use our services. And we analyze your content to help us detect abuse such as spam, malware, and illegal content. We also use algorithms to recognize patterns in data. For example, Google Translate helps people communicate across languages by detecting common language patterns in phrases you ask it to translate.

We may combine the information we collect among our services and across your devices for the purposes described above. For example, if you watch videos of guitar players on YouTube, you might see an ad for guitar lessons on a site that uses our ad products. Depending on your account settings, your activity on other sites and apps may be associated with your personal information in order to improve Google's services and the ads delivered by Google.

If other users already have your email address or other information that identifies you, we may show them your publicly visible Google Account information, such as your name and photo. This helps people identify an email coming from you, for example.

We'll ask for your consent before using your information for a purpose that isn't covered in this Privacy Policy.

---

YOUR PRIVACY CONTROLS

# You have choices regarding the information we collect and how it's used

This section describes key controls for managing your privacy across our services. You can also visit the Privacy Checkup, which provides an opportunity to review and adjust important privacy settings. In addition to these tools, we also offer specific privacy settings in our products — you can learn more in our Product Privacy Guide.

 Go to Privacy Checkup

## Managing, reviewing, and updating your information

When you're signed in, you can always review and update information by visiting the services you use. For example, Photos and Drive are both designed to help you manage specific types of content you've saved with Google.

We also built a place for you to review and control information saved in your Google Account. Your Google Account includes:

### Privacy controls

 Activity Controls

Decide what types of activity you'd like saved in your account. For example, you can turn on Location History if you want traffic predictions for your daily commute, or you can save your YouTube Watch History to get better video suggestions.

Go to Activity Controls

 Ad settings

Manage your preferences about the ads shown to you on Google and on sites and apps that partner with Google to show ads. You can modify your interests, choose whether your personal information is used to make ads more relevant to you, and turn on or off certain advertising services.

Go to Ad Settings

 About you

Control what others see about you across Google services.

**Go to About You**

---

 Shared endorsements

Choose whether your name and photo appear next to your activity, like reviews and recommendations, that appear in ads.

**Go to Shared Endorsements**

---

 Information you share

If you're a G Suite user, control whom you share information with through your account on Google+.

**Go to Information You Share**

---

## Ways to review & update your information

 My Activity

My Activity allows you to review and control data that's created when you use Google services, like searches you've done or your visits to Google Play. You can browse by date and by topic, and delete part or all of your activity.

**Go to My Activity**

---

 Google Dashboard

Google Dashboard allows you to manage information associated with specific products.

**Go to Dashboard**

---

 Your personal information

Manage your contact information, such as your name, email, and phone number.

**Go to Personal Info**

---

When you're signed out, you can manage information associated with your browser or device, including:

- Signed-out search personalization: Choose whether your search activity is used to offer you more relevant results and recommendations.

- YouTube settings: Pause and delete your YouTube Search History and your YouTube Watch History.

- Ad Settings: Manage your preferences about the ads shown to you on Google and on sites and apps that partner with

## Exporting, removing & deleting your information

You can export a copy of content in your Google Account if you want to back it up or use it with a service outside of Google.

 **Export your data**

You can also request to remove content from specific Google services based on applicable law.

To delete your information, you can:

- Delete your content from specific Google services

- Search for and then delete specific items from your account using My Activity

- Delete specific Google products, including your information associated with those products

- Delete your entire Google Account

 **Delete your information**

And finally, Inactive Account Manager allows you to give someone else access to parts of your Google Account in case you're unexpectedly unable to use your account.

There are other ways to control the information Google collects whether or not you're signed in to a Google Account, including:

- Browser settings: For example, you can configure your browser to indicate when Google has set a cookie in your browser. You can also configure your browser to block all cookies from a specific domain or all domains. But remember that our services rely on cookies to function properly, for things like remembering your language preferences.

- Device-level settings: Your device may have controls that determine what information we collect. For example, you can modify location settings on your Android device.



SHARING YOUR INFORMATION

## When you share your information

Many of our services let you share information with other people, and you have control over how you share. For example, you can share videos on YouTube publicly or you can decide to keep your videos private. Remember, when you share information publicly, your content may become accessible through search engines, including Google Search.

When you're signed in and interact with some Google services, like leaving comments on a YouTube video or reviewing an app in Play, your name and photo appear next to your activity. We may also display this information in ads depending on your Shared endorsements setting.

## When Google shares your information

We do not share your personal information with companies, organizations, or individuals outside of Google except in the following cases:

### With your consent

We'll share personal information outside of Google when we have your consent. For example, if you use Google Home to make a reservation through a booking service, we'll get your permission before sharing your name or phone number with the restaurant. We'll ask for your explicit consent to share any sensitive personal information.

### With domain administrators

If you're a student or work for an organization that uses Google services (like G Suite), your domain administrator and resellers who manage your account will have access to your Google Account. They may be able to:

- Access and retain information stored in your account, like your email

- View statistics regarding your account, like how many apps you install

- Change your account password

- Suspend or terminate your account access

- Receive your account information in order to satisfy applicable law, regulation, legal process, or enforceable governmental request

- Restrict your ability to delete or edit your information or your privacy settings

### For external processing

We provide personal information to our affiliates and other trusted businesses or persons to process it for us, based on our instructions and in compliance with our Privacy Policy and any other appropriate confidentiality and security measures. For example, we use service providers to help us with customer support.

### For legal reasons

We will share personal information outside of Google if we have a good-faith belief that access, use, preservation, or disclosure of the information is reasonably necessary to:

meet any applicable law, regulation, legal process, or enforceable governmental request, we share information about the number and type of requests we receive from governments in our Transparency Report.

- Enforce applicable Terms of Service, including investigation of potential violations.

- Detect, prevent, or otherwise address fraud, security, or technical issues.

- Protect against harm to the rights, property or safety of Google, our users, or the public as required or permitted by law.

We may share non-personally identifiable information publicly and with our partners — like publishers, advertisers, developers, or rights holders. For example, we share information publicly to show trends about the general use of our services. We also allow specific partners to collect information from your browser or device for advertising and measurement purposes using their own cookies or similar technologies.

If Google is involved in a merger, acquisition, or sale of assets, we'll continue to ensure the confidentiality of your personal information and give affected users notice before personal information is transferred or becomes subject to a different privacy policy.



KEEPING YOUR INFORMATION SECURE

## We build security into our services to protect your information

All Google products are built with strong security features that continuously protect your information. The insights we gain from maintaining our services help us detect and automatically block security threats from ever reaching you. And if we do detect something risky that we think you should know about, we'll notify you and help guide you through steps to stay better protected.

We work hard to protect you and Google from unauthorized access, alteration, disclosure, or destruction of information we hold, including:

- We use encryption to keep your data private while in transit

- We offer a range of security features, like Safe Browsing, Security Checkup, and 2 Step Verification to help you protect your account

- We review our information collection, storage, and processing practices, including physical security measures, to prevent unauthorized access to our systems

- We restrict access to personal information to Google employees, contractors, and agents who need that information in order to process it. Anyone with this access is subject to strict contractual confidentiality obligations and may be disciplined or terminated if they fail to meet these obligations.



EXPORTING & DELETING YOUR INFORMATION

## You can export a copy of your information or delete it from your Google Account at any time

You can export a copy of content in your Google Account if you want to back it up or use it with a service outside of Google.

 **Export your data**

To delete your information, you can:

- Delete your content from specific Google services

- Search for and then delete specific items from your account using My Activity

- Delete specific Google products, including your information associated with those products

- Delete your entire Google Account

 **Delete your information**

RETAINING YOUR INFORMATION

We retain the data we collect for different periods of time depending on what it is, how we use it, and how you configure your settings:

- Some data you can delete whenever you like, such as the content you create or upload. You can also delete activity information saved in your account, or choose to have it deleted automatically after a set period of time.

- Other data is deleted or anonymized automatically after a set period of time, such as advertising data in server logs.

- We keep some data until you delete your Google Account, such as information about how often you use our services.

- And some data we retain for longer periods of time when necessary for legitimate business or legal purposes, such as security, fraud and abuse prevention, or financial record-keeping.

When you delete data, we follow a deletion process to make sure that your data is safely and completely removed from our

When you delete your data, we follow a deletion process to make sure that your data is safely and completely removed from our servers or retained only in anonymized form. We try to ensure that our services protect information from accidental or malicious deletion. Because of this, there may be delays between when you delete something and when copies are deleted from our active and backup systems.

You can read more about Google's data retention periods, including how long it takes us to delete your information.



COMPLIANCE & COOPERATION WITH REGULATORS

We regularly review this Privacy Policy and make sure that we process your information in ways that comply with it.

## Data transfers

We maintain servers around the world and your information may be processed on servers located outside of the country where you live. Data protection laws vary among countries, with some providing more protection than others. Regardless of where your information is processed, we apply the same protections described in this policy. We also comply with certain legal frameworks relating to the transfer of data, such as the EU-U.S. and Swiss-U.S. Privacy Shield Frameworks.

When we receive formal written complaints, we respond by contacting the person who made the complaint. We work with the appropriate regulatory authorities, including local data protection authorities, to resolve any complaints regarding the transfer of your data that we cannot resolve with you directly.

## California requirements

The California Consumer Privacy Act (CCPA) requires specific disclosures for California residents.

This Privacy Policy is designed to help you understand how Google handles your information:

- We explain the categories of information Google collects and the sources of that information in Information Google collects.

- We explain how Google uses information in Why Google collects data.

- We explain when Google may share information in Sharing your information. Google does not sell your personal information.

The CCPA also provides the right to request information about how Google collects, uses, and discloses your personal information. And it gives you the right to access your information and request that Google delete that information. Finally, the CCPA provides the right to not be discriminated against for exercising your privacy rights.

We describe the choices you have to manage your privacy and data across Google's services in Your privacy controls. You can exercise your rights by using these controls, which allow you to access, review, update and delete your information, as

well as expert and individual copy of your document as we will validate your request by verifying that you're signed in to your Google Account. If you have questions or requests related to your rights under the CCPA, you (or your authorized agent) can also contact Google.

The CCPA requires a description of data practices using specific categories. This table uses these categories to organize the information in this Privacy Policy.

| Categories of personal information we collect | Business purposes for which information may be used or disclosed | Parties with whom information may be shared |
|---|---|---|
| **Identifiers** such as your name, phone number, and address, as well as unique identifiers tied to the browser, application, or device you're using.<br><br>**Demographic information**, such as your age, gender and language.<br><br>**Commercial information** such as your payment information and a history of purchases you make on Google's services.<br><br>**Biometric information** if you choose to provide it, such as fingerprints in Google's product development studies.<br><br>**Internet, network, and other activity information** such as your search terms; views and interactions with content and ads; Chrome browsing history you've synced with your Google Account; information about the interaction of your apps, browsers, and devices with our services (like IP address, crash reports, and system activity); and activity on third-party sites and apps that use our services. You can review and control activity data stored in your Google Account in My Activity.<br><br>**Geolocation data**, such as may be determined by GPS, IP address, and other data from sensors on or around your device, depending in part on your device and account settings. Learn more about Google's use of location information.<br><br>**Audio, electronic, visual and similar information**, such as voice and audio information when you use audio features.<br><br>**Professional, employment, and education information**, such as information you provide or that is maintained through a G Suite account by an organization at which you study or work | **Protecting against security threats, abuse, and illegal activity:** Google uses and may disclose information to detect, prevent and respond to security incidents, and for protecting against other malicious, deceptive, fraudulent, or illegal activity. For example, to protect our services, Google may receive or disclose information about IP addresses that malicious actors have compromised.<br><br>**Auditing and measurement:** Google uses information for analytics and measurement to understand how our services are used, as well as to fulfill obligations to our partners like publishers, advertisers, developers, or rights holders. We may disclose non-personally identifiable information publicly and with these partners, including for auditing purposes.<br><br>**Maintaining our services:** Google uses information to ensure our services are working as intended, such as tracking outages or troubleshooting bugs and other issues that you report to us.<br><br>**Research and development:** Google uses information to improve our services and to develop new products, features and technologies that benefit our users and the public. For example, we use publicly available information to help train Google's language models and build features like Google Translate.<br><br>**Use of service providers:** Google shares information with service providers to perform services on our behalf, in compliance with our Privacy Policy and other appropriate confidentiality and security measures. For example, we may rely on service providers to help provide customer support.<br><br>**Advertising:** Google processes | **Other people with whom you choose to share your information**, like docs or photos, and videos or comments on YouTube.<br><br>**Third parties to whom you consent to sharing your information**, such as services that integrate with Google's services. You can review and manage third party apps and sites with access to data in your Google Account.<br><br>**Service providers**, trusted businesses or persons that process information on Google's behalf, based on our instructions and in compliance with our Privacy Policy and any other appropriate confidentiality and security measures.<br><br>**Domain administrators**, if you work or study at an organization that uses Google services like G Suite.<br><br>**Law enforcement or other third parties**, for the legal reasons described in Sharing your information. |

**Other information you create or provide**, such as the content you create, upload, or receive (like photos and videos or emails, docs and spreadsheets). Google Dashboard allows you to manage information associated with specific products.

**Inferences** drawn from the above, like your ads interest categories.

**Advertising.** Google processes information, including online identifiers and information about your interactions with advertisements, to provide advertising. This keeps Google's services and many of the websites and services you use free of charge. You can control what information we use to show you ads by visiting your ad settings.

**Legal reasons:** Google also uses information to satisfy applicable laws or regulations, and discloses information in response to legal process or enforceable government requests, including to law enforcement. We provide information about the number and type of requests we receive from governments in our Transparency Report.

ABOUT THIS POLICY

## When this policy applies

This Privacy Policy applies to all of the services offered by Google LLC and its affiliates, including YouTube, Android, and services offered on third-party sites, such as advertising services. This Privacy Policy doesn't apply to services that have separate privacy policies that do not incorporate this Privacy Policy.

This Privacy Policy doesn't apply to:

- The information practices of other companies and organizations that advertise our services

- Services offered by other companies or individuals, including products or sites that may include Google services, be displayed to you in search results, or be linked from our services

## Changes to this policy

We change this Privacy Policy from time to time. We will not reduce your rights under this Privacy Policy without your explicit consent. We always indicate the date the last changes were published and we offer access to archived versions for your review. If changes are significant, we'll provide a more prominent notice (including, for certain services, email notification of Privacy Policy changes).

RELATED PRIVACY PRACTICES

## Specific Google services

The following privacy notices provide additional information about some Google services:

- Chrome & the Chrome Operating System

- Play Books

- Payments

- Fiber

- Google Fi

- G Suite for Education

- YouTube Kids

- Google Accounts Managed with Family Link, for Children under 13 (or applicable age in your country)

- Voice and Audio Collection from Children's Features on the Google Assistant

## Other useful resources

The following links highlight useful resources for you to learn more about our practices and privacy settings.

- Your Google Account is home to many of the settings you can use to manage your account

- Privacy Checkup guides you through key privacy settings for your Google Account

- Google's safety center helps you learn more about our built-in security, privacy controls, and tools to help set digital ground rules for your family online

- Privacy & Terms provides more context regarding this Privacy Policy and our Terms of Service

- Technologies includes more information about:

  - How Google uses cookies

  - Technologies used for Advertising

  - How Google uses pattern recognition to recognize things like faces in photos

  - How Google uses information from sites or apps that use our services

## Key terms

### Affiliates

An affiliate is an entity that belongs to the Google group of companies, including the following companies that provide consumer services in the EU: Google Ireland Limited, Google Commerce Ltd, Google Payment Corp, and Google Dialer Inc. Learn more about the companies providing business services in the EU.

### Algorithm

A process or set of rules followed by a computer in performing problem-solving operations.

### Application data cache

An application data cache is a data repository on a device. It can, for example, enable a web application to run without an internet connection and improve the performance of the application by enabling faster loading of content.

## Browser web storage

Browser web storage enables websites to store data in a browser on a device. When used in "local storage" mode, it enables data to be stored across sessions. This makes data retrievable even after a browser has been closed and reopened. One technology that facilitates web storage is HTML 5.

## Cookies

A cookie is a small file containing a string of characters that is sent to your computer when you visit a website. When you visit the site again, the cookie allows that site to recognize your browser. Cookies may store user preferences and other information. You can configure your browser to refuse all cookies or to indicate when a cookie is being sent. However, some website features or services may not function properly without cookies. Learn more about how Google uses cookies and how Google uses data, including cookies, when you use our partners' sites or apps.

## Device

A device is a computer that can be used to access Google services. For example, desktop computers, tablets, smart speakers, and smartphones are all considered devices.

## Google Account

You may access some of our services by signing up for a Google Account and providing us with some personal information (typically your name, email address, and a password). This account information is used to authenticate you when you access Google services and protect your account from unauthorized access by others. You can edit or delete your account at any time through your Google Account settings.

## IP address

Every device connected to the Internet is assigned a number known as an Internet protocol (IP) address. These numbers are usually assigned in geographic blocks. An IP address can often be used to identify the location from which a device is connecting to the Internet.

## Non-personally identifiable information

This is information that is recorded about users so that it no longer reflects or references an individually-identifiable user.

## Personal information

This is information that you provide to us which personally identifies you, such as your name, email address, or billing information, or other data that can be reasonably linked to such information by Google, such as information we associate with your Google Account.

## Pixel tag

A pixel tag is a type of technology placed on a website or within the body of an email for the purpose of tracking certain activity, such as views of a website or when an email is opened. Pixel tags are often used in combination with cookies.

## Referrer URL

A Referrer URL (Uniform Resource Locator) is information transmitted to a destination webpage by a web browser, typically when you click a link to that page. The Referrer URL contains the URL of the last webpage the browser visited.

## Sensitive personal information

This is a particular category of personal information relating to topics such as confidential medical facts, racial or ethnic origins, political or religious beliefs, or sexuality.

## Server logs

Like most websites, our servers automatically record the page requests made when you visit our sites. These "server logs" typically include your web request, Internet Protocol address, browser type, browser language, the date and time of your request, and one or more cookies that may uniquely identify your browser.

A typical log entry for a search for "cars" looks like this:

```
123.45.67.89 - 25/Mar/2003 10:15:32 -
http://www.google.com/search?q=cars -
Firefox 1.0.7; Windows NT 5.1 -
740674ce2123e969
```

- `123.45.67.89` is the Internet Protocol address assigned to the user by the user's ISP. Depending on the user's service, a different address may be assigned to the user by their service provider each time they connect to the Internet.

- `25/Mar/2003 10:15:32` is the date and time of the query.

- `http://www.google.com/search?q=cars` is the requested URL, including the search query.

- `Firefox 1.0.7; Windows NT 5.1` is the browser and operating system being used.

- `740674ce2123e969` is the unique cookie ID assigned to this particular computer the first time it visited Google. (Cookies can be deleted by users. If the user has deleted the cookie from the computer since the last time they've visited Google, then it will be the unique cookie ID assigned to their device the next time they visit Google from that particular device).

## Unique identifiers

A unique identifier is a string of characters that can be used to uniquely identify a browser, app, or device. Different identifiers vary in how permanent they are, whether they can be reset by users, and how they can be accessed.

Unique identifiers can be used for various purposes, including security and fraud detection, syncing services such as your email inbox, remembering your preferences, and providing personalized advertising. For example, unique identifiers stored in cookies help sites display content in your browser in your preferred language. You can configure your browser to refuse all cookies or to indicate when a cookie is being sent. Learn more about how Google uses cookies.

On other platforms besides browsers, unique identifiers are used to recognize a specific device or app on that device. For example, a unique identifier such as the Advertising ID is used to provide relevant advertising on Android devices, and can be managed in your device's settings. Unique identifiers may also be incorporated into a device by its manufacturer (sometimes called a universally unique ID or UUID), such as the IMEI-number of a mobile phone. For example, a device's unique identifier can be used to customize our service to your device or analyze device issues related to our services.

## Additional Context

### ads you'll find most useful

For example, if you watch videos about baking on YouTube, you may see more ads that relate to baking as you browse the web. We also may use your IP address to determine your approximate location, so that we can serve you ads for a nearby pizza delivery service if you search for "pizza." Learn more about Google ads and why you may see particular ads.

### advertising and research services on their behalf

For example, advertisers may upload data from their loyalty-card programs so that they can better understand the performance of their ad campaigns. We only provide aggregated reports to advertisers that don't reveal information about individual people.

### Android device with Google apps

Android devices with Google apps include devices sold by Google or one of our partners and include phones, cameras, vehicles, wearables, and televisions. These devices use Google Play Services and other pre-installed apps that include services like Gmail, Maps, your phone's camera and phone dialer, text-to-speech conversion, keyboard input, and security features.

### combine the information we collect

Some examples of how we combine the information we collect include:

- When you're signed in to your Google Account and search on Google, you can see search results from the public web, along with relevant information from the content you have in other Google products, like Gmail or Google Calendar. This can include things like the status of your upcoming flights, restaurant, and hotel reservations, or your photos. Learn more

- If you have communicated with someone via Gmail and want to add them to a Google Doc or an event in Google Calendar, Google makes it easy to do so by autocompleting their email address when you start to type in their name. This feature makes it easier to share things with people you know. Learn more

- The Google app can use data that you have stored in other Google products to show you personalized content, depending on your settings. For example, if you have searches stored in your Web & App Activity, the Google app can show you news articles and other information about your interests, like sports scores, based your activity. Learn more

- If you link your Google Account to your Google Home, you can manage your information and get things done through the Google Assistant. For example, you can add events to your Google Calendar or get your schedule for the day, ask for status updates on your upcoming flight, or send information like driving directions to your phone. Learn more

### customized search results

For example, when you're signed in to your Google Account and have the Web & App Activity control enabled, you can get more relevant search results that are based on your previous searches and activity from other Google services. You can learn more here. You may also get customized search results even when you're signed out. If you don't want this level of search customization, you can search and browse privately or turn off signed-out search personalization.

Examples of how we use your information to deliver our services include:

- We use the IP address assigned to your device to send you the data you requested, such as loading a YouTube video

- We use unique identifiers stored in cookies on your device to help us authenticate you as the person who should have access to your Google Account

- Photos and videos you upload to Google Photos are used to help you create albums, animations, and other creations that you can share. Learn more

- A flight confirmation email you receive may be used to create a "check-in" button that appears in your Gmail

- When you purchase services or physical goods from us, you may provide us information like your shipping address or delivery instructions. We use this information for things like processing, fulfilling, and delivering your order, and to provide support in connection with the product or service you purchase.

### detect abuse

When we detect spam, malware, illegal content, and other forms of abuse on our systems in violation of our policies, we may disable your account or take other appropriate action. In certain circumstances, we may also report the violation to appropriate authorities.

### devices

For example, we can use information from your devices to help you decide which device you'd like to use to install an app or view a movie you buy from Google Play. We also use this information to help protect your account.

### ensure and improve

For example, we analyze how people interact with advertising to improve the performance of our ads.

### ensure our services are working as intended

For example, we continuously monitor our systems to look for problems. And if we find something wrong with a specific feature, reviewing activity information collected before the problem started allows us to fix things more quickly.

### Information about things near your device

If you use Google's Location services on Android, we can improve the performance of apps that rely on your location, like Google Maps. If you use Google's Location services, your device sends information to Google about its location, sensors (like accelerometer), and nearby cell towers and Wi-Fi access points (like MAC address and signal strength). All these things help to determine your location. You can use your device settings to enable Google Location services. Learn more

### legal process, or enforceable governmental request

Like other technology and communications companies, Google regularly receives requests from governments and courts around the world to disclose user data. Respect for the privacy and security of data you store with Google underpins our approach to complying with these legal requests. Our legal team reviews each and every request, regardless of type, and we frequently push back when a request appears to be overly broad or doesn't follow the correct process. Learn more in our Transparency Report.

### make improvements

For example, we use cookies to analyze how people interact with our services. And that analysis can help us build better products. For example, it may help us discover that it's taking people too long to complete a certain task or that they have trouble finishing steps at all. We can then redesign that feature and improve the product for everyone.

### may link information

Google Analytics relies on first-party cookies, which means the cookies are set by the Google Analytics customer. Using our systems, data generated through Google Analytics can be linked by the Google Analytics customer and by Google to third-party cookies that are related to visits to other websites. For example, an advertiser may want to use its Google Analytics data to create more relevant ads, or to further analyze its traffic. Learn more

### partner with Google

There are over 2 million non-Google websites and apps that partner with Google to show ads. Learn more

### payment information

For example, if you add a credit card or other payment method to your Google Account, you can use it to buy things across our services, like apps in the Play Store. We may also ask for other information, like a business tax ID, to help process your payment. In some cases, we may also need to verify your identity and may ask you for information to do this.

We may also use payment information to verify that you meet age requirements, if, for example, you enter an incorrect birthday indicating you're not old enough to have a Google Account. Learn more

### personalized ads

You may also see personalized ads based on information from the advertiser. If you shopped on an advertiser's website, for example, they can use that visit information to show you ads. Learn more

### phone number

If you add your phone number to your account, it can be used for different purposes across Google services, depending on your settings. For example, your phone number can be used to help you access your account if you forget your password, help people find and connect with you, and make the ads you see more relevant to you. Learn more

### protect against abuse

For example, information about security threats can help us notify you if we think your account has been compromised (at which point we can help you take steps to protect your account).

### publicly accessible sources

For example, we may collect information that's publicly available online or from other public sources to help train Google's language models and build features like Google Translate.

**rely on cookies to function properly**

For example, we use a cookie called 'lbcs' that makes it possible for you to open many Google Docs in one browser. Blocking this cookie would prevent Google Docs from working as expected. Learn more

**safety and reliability**

Some examples of how we use your information to help keep our services safe and reliable include:

- Collecting and analyzing IP addresses and cookie data to protect against automated abuse. This abuse takes many forms, such as sending spam to Gmail users, stealing money from advertisers by fraudulently clicking on ads, or censoring content by launching a Distributed Denial of Service (DDoS) attack.

- The "last account activity" feature in Gmail can help you find out if and when someone accessed your email without your knowledge. This feature shows you information about recent activity in Gmail, such as the IP addresses that accessed your mail, the associated location, and the date and time of access. Learn more

**sensitive categories**

When showing you personalized ads, we use topics that we think might be of interest to you based on your activity. For example, you may see ads for things like "Cooking and Recipes" or "Air Travel." We don't use topics or show personalized ads based on sensitive categories like race, religion, sexual orientation, or health. And we require the same from advertisers that use our services.

**Sensor data from your device**

Your device may have sensors that can be used to better understand your location and movement. For example, an accelerometer can be used to determine your speed and a gyroscope to figure out your direction of travel.

**servers around the world**

For example, we operate data centers located around the world to help keep our products continuously available for users.

**services to make and receive calls or send and receive messages**

Examples of these services include:

- Google Hangouts, for making domestic and international calls

- Google Voice, for making calls, sending text messages, and managing voicemail

- Google Fi, for a phone plan

**show trends**

When lots of people start searching for something, it can provide useful information about particular trends at that time. Google Trends samples Google web searches to estimate the popularity of searches over a certain period of time and shares those results publicly in aggregated terms. Learn more

specific Google services

For example, you can delete your blog from Blogger or a Google Site you own from Google Sites. You can also delete reviews you've left on apps, games, and other content in the Play Store.

## specific partners

For example, we allow YouTube creators and advertisers to work with measurement companies to learn about the audience of their YouTube videos or ads, using cookies or similar technologies. Another example is merchants on our shopping pages, who use cookies to understand how many different people see their product listings. Learn more about these partners and how they use your information.

## synced with your Google Account

Your Chrome browsing history is only saved to your account if you've enabled Chrome synchronization with your Google Account. Learn more

## the people who matter most to you online

For example, when you type an address in the To, Cc, or Bcc field of an email you're composing, Gmail will suggest addresses based on the people you contact most frequently.

## third parties

For example, we process your information to report use statistics to rights holders about how their content was used in our services. We may also process your information if people search for your name and we display search results for sites containing publicly available information about you.

## Views and interactions with content and ads

For example, we collect information about views and interactions with ads so we can provide aggregated reports to advertisers, like telling them whether we served their ad on a page and whether the ad was likely seen by a viewer. We may also measure other interactions, such as how you move your mouse over an ad or if you interact with the page on which the ad appears.

## your activity on other sites and apps

This activity might come from your use of Google services, like from syncing your account with Chrome or your visits to sites and apps that partner with Google. Many websites and apps partner with Google to improve their content and services. For example, a website might use our advertising services (like AdSense) or analytics tools (like Google Analytics), or it might embed other content (such as videos from YouTube). These services may share information about your activity with Google and, depending on your account settings and the products in use (for instance, when a partner uses Google Analytics in conjunction with our advertising services), this data may be associated with your personal information.

Learn more about how Google uses data when you use our partners' sites or apps.

**APPENDIX D.2**

**PRIVACY POLICY – JULY 1, 2020 (WITH HIGHLIGHTS)**



When you use our services, you're trusting us with your information. We understand this is a big responsibility and work hard to protect your information and put you in control.

This Privacy Policy is meant to help you understand what information we collect, why we collect it, and how you can update, manage, export, and delete your information.

We build a range of services that help millions of people daily to explore and interact with the world in new ways. Our services include:

- Google apps, sites, and devices, like Search, YouTube, and Google Home

- Platforms like the Chrome browser and Android operating system

- Products that are integrated into third-party apps and sites, like ads and embedded Google Maps

You can use our services in a variety of ways to manage your privacy. For example, you can sign up for a Google Account if you want to create and manage content like emails and photos, or see more relevant search results. And you can use many Google services when you're signed out or without creating an account at all, like searching on Google or watching YouTube videos. You can also choose to browse the web privately using Chrome in Incognito mode. And across our services, you can adjust your privacy settings to control what we collect and how your information is used.

To help explain things as clearly as possible, we've added examples, explanatory videos, and definitions for key terms. And if you have any questions about this Privacy Policy, you can contact us.

---

INFORMATION GOOGLE COLLECTS

## We want you to understand the types of information we collect as you use our services

We collect information to provide better services to all our users — from figuring out basic stuff like which language you speak, to more complex things like which ads you'll find most useful, the people who matter most to you online, or which YouTube videos you might like. The information Google collects, and how that information is used, depends on how you use our services and how you manage your privacy controls.

When you're not signed in to a Google Account, we store the information we collect with unique identifiers tied to the browser, application, or device you're using. This helps us do things like maintain your language preferences across browsing sessions.

When you're signed in, we also collect information that we store with your Google Account, which we treat as personal information.

## Things you create or provide to us



When you create a Google Account, you provide us with personal information that includes your name and a password. You can also choose to add a phone number or payment information to your account. Even if you aren't signed in to a Google Account, you might choose to provide us with information — like an email address to receive updates about our services.

We also collect the content you create, upload, or receive from others when using our services. This includes things like email you write and receive, photos and videos you save, docs and spreadsheets you create, and comments you make on YouTube videos.

## Information we collect as you use our services

### Your apps, browsers & devices



We collect information about the apps, browsers, and devices you use to access Google services, which helps us provide features like automatic product updates and dimming your screen if your battery runs low.

The information we collect includes unique identifiers, browser type and settings, device type and settings, operating system, mobile network information including carrier name and phone number, and application version number. We also collect information about the interaction of your apps, browsers, and devices with our services, including IP address, crash reports, system activity, and the date, time, and referrer URL of your request.

We collect this information when a Google service on your device contacts our servers — for example, when you install an app from the Play Store or when a service checks for automatic updates. If you're using an Android device with Google apps, your device periodically contacts Google servers to provide information about your device and connection to our services. This information includes things like your device type, carrier name, crash reports, and which apps you've installed.

### Your activity





We collect information about your activity in our services, which we use to do things like recommend a YouTube video you might like. The activity information we collect may include:

- Terms you search for

- Videos you watch

- Views and interactions with content and ads

- Voice and audio information when you use audio features

- Purchase activity

- People with whom you communicate or share content

- Activity on third-party sites and apps that use our services

- Chrome browsing history you've synced with your Google Account

If you use our services to make and receive calls or send and receive messages, we may collect telephony log information like your phone number, calling-party number, receiving-party number, forwarding numbers, time and date of calls and messages, duration of calls, routing information, and types of calls.

You can visit your Google Account to find and manage activity information that's saved in your account.

 Go to Google Account

## Your location information



We collect information about your location when you use our services, which helps us offer features like driving directions for your weekend getaway or showtimes for movies playing near you.

Your location can be determined with varying degrees of accuracy by:

- GPS

- IP address

- Sensor data from your device

- Information about things near your device, such as Wi-Fi access points, cell towers, and Bluetooth-enabled devices

The types of location data we collect depend in part on your device and account settings. For example, you can turn your Android device's location on or off using the device's settings app. You can also turn on Location History if you want to create a private map of where you go with your signed-in devices.

In some circumstances, Google also collects information about you from publicly accessible sources. For example, if your name appears in your local newspaper, Google's Search engine may index that article and display it to other people if they search for your name. We may also collect information about you from trusted partners, including marketing partners who provide us with information about potential customers of our business services, and security partners who provide us with information to protect against abuse. We also receive information from advertisers to provide advertising and research services on their behalf.

We use various technologies to collect and store information, including cookies, pixel tags, local storage, such as browser web storage or application data caches, databases, and server logs.

WHY GOOGLE COLLECTS DATA

## We use data to build better services

We use the information we collect from all our services for the following purposes:

### Provide our services



We use your information to deliver our services, like processing the terms you search for in order to return results or helping you share content by suggesting recipients from your contacts.

### Maintain & improve our services



We also use your information to ensure our services are working as intended, such as tracking outages or troubleshooting issues that you report to us. And we use your information to make improvements to our services — for example, understanding which search terms are most frequently misspelled helps us improve spell-check features used across our services.

## Develop new services



We use the information we collect in existing services to help us develop new ones. For example, understanding how people organized their photos in Picasa, Google's first photos app, helped us design and launch Google Photos.

## Provide personalized services, including content and ads



We use the information we collect to customize our services for you, including providing recommendations, personalized content, and customized search results. For example, Security Checkup provides security tips adapted to how you use Google products. And Google Play uses information like apps you've already installed and videos you've watched on YouTube to suggest new apps you might like.

Depending on your settings, we may also show you personalized ads based on your interests. For example, if you search for "mountain bikes," you may see an ad for sports equipment when you're browsing a site that shows ads served by Google. You can control what information we use to show you ads by visiting your ad settings.

- We don't show you personalized ads based on sensitive categories, such as race, religion, sexual orientation, or health.

- We don't share information that personally identifies you with advertisers, such as your name or email, unless you ask us to. For example, if you see an ad for a nearby flower shop and select the "tap to call" button, we'll connect your call and may share your phone number with the flower shop.

 **Go to Ad Settings**

## Measure performance



We use data for analytics and measurement to understand how our services are used. For example, we analyze data about your visits to our sites to do things like optimize product design. And we also use data about the ads you interact with to help advertisers understand the performance of their ad campaigns. We use a variety of tools to do this, including Google Analytics. When you visit sites that use Google Analytics, Google and a Google Analytics customer may link information about your activity from that site with activity from other sites that use our ad services.

## Communicate with you



We use information we collect, like your email address, to interact with you directly. For example, we may send you a notification if we detect suspicious activity, like an attempt to sign in to your Google Account from an unusual location. Or we may let you know about upcoming changes or improvements to our services. And if you contact Google, we'll keep a record of your request in order to help solve any issues you might be facing.

## Protect Google, our users, and the public



We use information to help improve the safety and reliability of our services. This includes detecting, preventing, and responding to fraud, abuse, security risks, and technical issues that could harm Google, our users, or the public.

We use different technologies to process your information for these purposes. We use automated systems that analyze your content to provide you with things like customized search results, personalized ads, or other features tailored to how you use our services. And we analyze your content to help us detect abuse such as spam, malware, and illegal content. We also use algorithms to recognize patterns in data. For example, Google Translate helps people communicate across languages by detecting common language patterns in phrases you ask it to translate.

We may combine the information we collect among our services and across your devices for the purposes described

We may combine the information we collect among our services and across your devices for the purposes described above. For example, if you watch videos of guitar players on YouTube, you might see an ad for guitar lessons on a site that uses our ad products. Depending on your account settings, your activity on other sites and apps may be associated with your personal information in order to improve Google's services and the ads delivered by Google.

If other users already have your email address or other information that identifies you, we may show them your publicly visible Google Account information, such as your name and photo. This helps people identify an email coming from you, for example.

We'll ask for your consent before using your information for a purpose that isn't covered in this Privacy Policy.

YOUR PRIVACY CONTROLS

## You have choices regarding the information we collect and how it's used

This section describes key controls for managing your privacy across our services. You can also visit the Privacy Checkup, which provides an opportunity to review and adjust important privacy settings. In addition to these tools, we also offer specific privacy settings in our products — you can learn more in our Product Privacy Guide.

 Go to Privacy Checkup

## Managing, reviewing, and updating your information

When you're signed in, you can always review and update information by visiting the services you use. For example, Photos and Drive are both designed to help you manage specific types of content you've saved with Google.

We also built a place for you to review and control information saved in your Google Account. Your Google Account includes:

### Privacy controls

 **Activity Controls**

Decide what types of activity you'd like saved in your account. For example, you can turn on Location History if you want traffic predictions for your daily commute, or you can save your YouTube Watch History to get better video suggestions.

**Go to Activity Controls**

 **Ad settings**

Manage your preferences about the ads shown to you on Google and on sites and apps that partner with Google to show ads. You can modify your interests, choose whether your personal information is used to make ads more relevant to you, and turn on or off certain advertising services.

**Go to Ad Settings**



About you

Control what others see about you across Google services.

Go to About You

Shared endorsements

Choose whether your name and photo appear next to your activity, like reviews and recommendations, that appear in ads.

Go to Shared Endorsements

Information you share

If you're a G Suite user, control whom you share information with through your account on Google+.

Go to Information You Share

Ways to review & update your information

My Activity

My Activity allows you to review and control data that's created when you use Google services, like searches you've done or your visits to Google Play. You can browse by date and by topic, and delete part or all of your activity.

Go to My Activity

Google Dashboard

Google Dashboard allows you to manage information associated with specific products.

Go to Dashboard

Your personal information

Manage your contact information, such as your name, email, and phone number.

Go to Personal Info

When you're signed out, you can manage information associated with your browser or device, including:

- Signed-out search personalization: Choose whether your search activity is used to offer you more relevant results and recommendations.

- YouTube settings: Pause and delete your YouTube Search History and your YouTube Watch History.

- Ad Settings: Manage your preferences about the ads shown to you on Google and on sites and apps that partner with Google to show ads.

## Exporting, removing & deleting your information

You can export a copy of content in your Google Account if you want to back it up or use it with a service outside of Google.

 **Export your data**

You can also request to remove content from specific Google services based on applicable law.

To delete your information, you can:

- Delete your content from specific Google services

- Search for and then delete specific items from your account using My Activity

- Delete specific Google products, including your information associated with those products

- Delete your entire Google Account

 **Delete your information**

And finally, Inactive Account Manager allows you to give someone else access to parts of your Google Account in case you're unexpectedly unable to use your account.

There are other ways to control the information Google collects whether or not you're signed in to a Google Account, including:

- Browser settings: For example, you can configure your browser to indicate when Google has set a cookie in your browser. You can also configure your browser to block all cookies from a specific domain or all domains. But remember that our services rely on cookies to function properly, for things like remembering your language preferences.

- Device-level settings: Your device may have controls that determine what information we collect. For example, you can modify location settings on your Android device.



SHARING YOUR INFORMATION

## When you share your information

Many of our services let you share information with other people, and you have control over how you share. For example, you can share videos on YouTube publicly or you can decide to keep your videos private. Remember, when you share information publicly, your content may become accessible through search engines, including Google Search.

When you're signed in and interact with some Google services, like leaving comments on a YouTube video or reviewing an app in Play, your name and photo appear next to your activity. We may also display this information in ads depending on your Shared endorsements setting.

## When Google shares your information

We do not share your personal information with companies, organizations, or individuals outside of Google except in the following cases:

### With your consent

We'll share personal information outside of Google when we have your consent. For example, if you use Google Home to make a reservation through a booking service, we'll get your permission before sharing your name or phone number with the restaurant. We'll ask for your explicit consent to share any sensitive personal information.

### With domain administrators

If you're a student or work for an organization that uses Google services (like G Suite), your domain administrator and resellers who manage your account will have access to your Google Account. They may be able to:

- Access and retain information stored in your account, like your email

- View statistics regarding your account, like how many apps you install

- Change your account password

- Suspend or terminate your account access

- Receive your account information in order to satisfy applicable law, regulation, legal process, or enforceable governmental request

- Restrict your ability to delete or edit your information or your privacy settings

### For external processing

We provide personal information to our affiliates and other trusted businesses or persons to process it for us, based on our instructions and in compliance with our Privacy Policy and any other appropriate confidentiality and security measures. For example, we use service providers to help us with customer support.

### For legal reasons

We will share personal information outside of Google if we have a good-faith belief that access, use, preservation, or disclosure of the information is reasonably necessary to:

- Meet any applicable law, regulation, legal process, or enforceable governmental request. We share information about the number and type of requests we receive from governments in our Transparency Report.

- Enforce applicable Terms of Service, including investigation of potential violations.

- Detect, prevent, or otherwise address fraud, security, or technical issues.

- Protect against harm to the rights, property or safety of Google, our users, or the public as required or permitted by law.

We may share non-personally identifiable information publicly and with our partners — like publishers, advertisers, developers, or rights holders. For example, we share information publicly to show trends about the general use of our services. We also allow specific partners to collect information from your browser or device for advertising and measurement purposes using their own cookies or similar technologies.

If Google is involved in a merger, acquisition, or sale of assets, we'll continue to ensure the confidentiality of your personal information and give affected users notice before personal information is transferred or becomes subject to a different privacy policy.



KEEPING YOUR INFORMATION SECURE

## We build security into our services to protect your information

All Google products are built with strong security features that continuously protect your information. The insights we gain from maintaining our services help us detect and automatically block security threats from ever reaching you. And if we do detect something risky that we think you should know about, we'll notify you and help guide you through steps to stay better protected.

We work hard to protect you and Google from unauthorized access, alteration, disclosure, or destruction of information we hold, including:

- We use encryption to keep your data private while in transit

- We offer a range of security features, like Safe Browsing, Security Checkup, and 2 Step Verification to help you protect your account

- We review our information collection, storage, and processing practices, including physical security measures, to prevent unauthorized access to our systems

- We restrict access to personal information to Google employees, contractors, and agents who need that information in order to process it. Anyone with this access is subject to strict contractual confidentiality obligations and may be disciplined or terminated if they fail to meet these obligations.



EXPORTING & DELETING YOUR INFORMATION

## You can export a copy of your information or delete it from your Google Account at any time

You can export a copy of content in your Google Account if you want to back it up or use it with a service outside of Google.

    **Export your data**

To delete your information, you can:

- Delete your content from specific Google services

- Search for and then delete specific items from your account using My Activity

- Delete specific Google products, including your information associated with those products

- Delete your entire Google Account

    **Delete your information**

RETAINING YOUR INFORMATION

We retain the data we collect for different periods of time depending on what it is, how we use it, and how you configure your settings:

- Some data you can delete whenever you like, such as the content you create or upload. You can also delete activity information saved in your account, or choose to have it deleted automatically after a set period of time.

- Other data is deleted or anonymized automatically after a set period of time, such as advertising data in server logs.

- We keep some data until you delete your Google Account, such as information about how often you use our services.

- And some data we retain for longer periods of time when necessary for legitimate business or legal purposes, such as security, fraud and abuse prevention, or financial record-keeping.

When you delete data, we follow a deletion process to make sure that your data is safely and completely removed from our servers or retained only in anonymized form. We try to ensure that our services protect information from accidental or malicious deletion. Because of this, there may be delays between when you delete something and when copies are deleted

malicious deletion. Because of this, there may be delays between when you delete something and when copies are deleted from our active and backup systems.

You can read more about Google's data retention periods, including how long it takes us to delete your information.



COMPLIANCE & COOPERATION WITH REGULATORS

We regularly review this Privacy Policy and make sure that we process your information in ways that comply with it

## Data transfers

We maintain servers around the world and your information may be processed on servers located outside of the country where you live. Data protection laws vary among countries, with some providing more protection than others. Regardless of where your information is processed, we apply the same protections described in this policy. We also comply with certain legal frameworks relating to the transfer of data, such as the EU-U.S. and Swiss-U.S. Privacy Shield Frameworks.

When we receive formal written complaints, we respond by contacting the person who made the complaint. We work with the appropriate regulatory authorities, including local data protection authorities, to resolve any complaints regarding the transfer of your data that we cannot resolve with you directly.

## California requirements

The California Consumer Privacy Act (CCPA) requires specific disclosures for California residents.

This Privacy Policy is designed to help you understand how Google handles your information:

- We explain the categories of information Google collects and the sources of that information in Information Google collects.

- We explain how Google uses information in Why Google collects data.

- We explain when Google may share information in Sharing your information. Google does not sell your personal information.

The CCPA also provides the right to request information about how Google collects, uses, and discloses your personal information. And it gives you the right to access your information and request that Google delete that information. Finally, the CCPA provides the right to not be discriminated against for exercising your privacy rights.

We describe the choices you have to manage your privacy and data across Google's services in Your privacy controls. You can exercise your rights by using these controls, which allow you to access, review, update and delete your information, as well as export and download a copy of it. When you use them, we'll validate your request by verifying that you're signed in to your Google Account. If you have questions or requests related to your rights under the CCPA, you (or your authorized

agent) can also contact Google.

The CCPA requires a description of data practices using specific categories. This table uses these categories to organize the information in this Privacy Policy.

| Categories of personal information we collect | Business purposes for which information may be used or disclosed | Parties with whom information may be shared |
|---|---|---|
| **Identifiers** such as your name, phone number, and address, as well as unique identifiers tied to the browser, application, or device you're using.<br><br>**Demographic information**, such as your age, gender and language.<br><br>**Commercial information** such as your payment information and a history of purchases you make on Google's services.<br><br>**Biometric information** if you choose to provide it, such as fingerprints in Google's product development studies.<br><br>**Internet, network, and other activity information** such as your search terms; views and interactions with content and ads; Chrome browsing history you've synced with your Google Account; information about the interaction of your apps, browsers, and devices with our services (like IP address, crash reports, and system activity); and activity on third-party sites and apps that use our services. You can review and control activity data stored in your Google Account in My Activity.<br><br>**Geolocation data**, such as may be determined by GPS, IP address, and other data from sensors on or around your device, depending in part on your device and account settings. Learn more about Google's use of location information.<br><br>**Audio, electronic, visual and similar information**, such as voice and audio information when you use audio features.<br><br>**Professional, employment, and education information**, such as information you provide or that is maintained through a G Suite account by an organization at which you study or work.<br><br>**Other information you create or** | **Protecting against security threats, abuse, and illegal activity:** Google uses and may disclose information to detect, prevent and respond to security incidents, and for protecting against other malicious, deceptive, fraudulent, or illegal activity. For example, to protect our services, Google may receive or disclose information about IP addresses that malicious actors have compromised.<br><br>**Auditing and measurement:** Google uses information for analytics and measurement to understand how our services are used, as well as to fulfill obligations to our partners like publishers, advertisers, developers, or rights holders. We may disclose non-personally identifiable information publicly and with these partners, including for auditing purposes.<br><br>**Maintaining our services:** Google uses information to ensure our services are working as intended, such as tracking outages or troubleshooting bugs and other issues that you report to us.<br><br>**Research and development:** Google uses information to improve our services and to develop new products, features and technologies that benefit our users and the public. For example, we use publicly available information to help train Google's language models and build features like Google Translate.<br><br>**Use of service providers:** Google shares information with service providers to perform services on our behalf, in compliance with our Privacy Policy and other appropriate confidentiality and security measures. For example, we may rely on service providers to help provide customer support.<br><br>**Advertising:** Google processes information, including online identifiers and information about | **Other people with whom you choose to share your information**, like docs or photos, and videos or comments on YouTube.<br><br>**Third parties to whom you consent to sharing your information**, such as services that integrate with Google's services. You can review and manage third party apps and sites with access to data in your Google Account.<br><br>**Service providers**, trusted businesses or persons that process information on Google's behalf, based on our instructions and in compliance with our Privacy Policy and any other appropriate confidentiality and security measures.<br><br>**Domain administrators**, if you work or study at an organization that uses Google services like G Suite.<br><br>**Law enforcement or other third parties**, for the legal reasons described in Sharing your information. |

provide, such as the content you create, upload, or receive (like photos and videos or emails, docs and spreadsheets). Google Dashboard allows you to manage information associated with specific products.

Inferences drawn from the above, like your ads interest categories.

your interactions with advertisements, to provide advertising. This keeps Google's services and many of the websites and services you use free of charge. You can control what information we use to show you ads by visiting your ad settings.

**Legal reasons:** Google also uses information to satisfy applicable laws or regulations, and discloses information in response to legal process or enforceable government requests, including to law enforcement. We provide information about the number and type of requests we receive from governments in our Transparency Report.

ABOUT THIS POLICY

## When this policy applies

This Privacy Policy applies to all of the services offered by Google LLC and its affiliates, including YouTube, Android, and services offered on third-party sites, such as advertising services. This Privacy Policy doesn't apply to services that have separate privacy policies that do not incorporate this Privacy Policy.

This Privacy Policy doesn't apply to:

- The information practices of other companies and organizations that advertise our services

- Services offered by other companies or individuals, including products or sites that may include Google services, be displayed to you in search results, or be linked from our services

## Changes to this policy

We change this Privacy Policy from time to time. We will not reduce your rights under this Privacy Policy without your explicit consent. We always indicate the date the last changes were published and we offer access to archived versions for your review. If changes are significant, we'll provide a more prominent notice (including, for certain services, email notification of Privacy Policy changes).

RELATED PRIVACY PRACTICES

## Specific Google services

The following privacy notices provide additional information about some Google services:

- Chrome & the Chrome Operating System

- Play Books

- Payments

- Fiber

- Google Fi

- G Suite for Education

- YouTube Kids

- Google Accounts Managed with Family Link, for Children under 13 (or applicable age in your country)

- Voice and Audio Collection from Children's Features on the Google Assistant

## Other useful resources

The following links highlight useful resources for you to learn more about our practices and privacy settings.

- Your Google Account is home to many of the settings you can use to manage your account

- Privacy Checkup guides you through key privacy settings for your Google Account

- Google's safety center helps you learn more about our built-in security, privacy controls, and tools to help set digital ground rules for your family online

- Privacy & Terms provides more context regarding this Privacy Policy and our Terms of Service

- Technologies includes more information about:

  - How Google uses cookies

  - Technologies used for Advertising

  - How Google uses pattern recognition to recognize things like faces in photos

  - How Google uses information from sites or apps that use our services

## Key terms

### Affiliates

An affiliate is an entity that belongs to the Google group of companies, including the following companies that provide consumer services in the EU: Google Ireland Limited, Google Commerce Ltd, Google Payment Corp, and Google Dialer Inc. Learn more about the companies providing business services in the EU.

### Algorithm

A process or set of rules followed by a computer in performing problem-solving operations.

### Application data cache

An application data cache is a data repository on a device. It can, for example, enable a web application to run without an internet connection and improve the performance of the application by enabling faster loading of content.

## Browser web storage

Browser web storage enables websites to store data in a browser on a device. When used in "local storage" mode, it enables data to be stored across sessions. This makes data retrievable even after a browser has been closed and reopened. One technology that facilitates web storage is HTML 5.

## Cookies

A cookie is a small file containing a string of characters that is sent to your computer when you visit a website. When you visit the site again, the cookie allows that site to recognize your browser. Cookies may store user preferences and other information. You can configure your browser to refuse all cookies or to indicate when a cookie is being sent. However, some website features or services may not function properly without cookies. Learn more about how Google uses cookies and how Google uses data, including cookies, when you use our partners' sites or apps.

## Device

A device is a computer that can be used to access Google services. For example, desktop computers, tablets, smart speakers, and smartphones are all considered devices.

## Google Account

You may access some of our services by signing up for a Google Account and providing us with some personal information (typically your name, email address, and a password). This account information is used to authenticate you when you access Google services and protect your account from unauthorized access by others. You can edit or delete your account at any time through your Google Account settings.

## IP address

Every device connected to the Internet is assigned a number known as an Internet protocol (IP) address. These numbers are usually assigned in geographic blocks. An IP address can often be used to identify the location from which a device is connecting to the Internet.

## Non-personally identifiable information

This is information that is recorded about users so that it no longer reflects or references an individually-identifiable user.

## Personal information

This is information that you provide to us which personally identifies you, such as your name, email address, or billing information, or other data that can be reasonably linked to such information by Google, such as information we associate with your Google Account.

## Pixel tag

A pixel tag is a type of technology placed on a website or within the body of an email for the purpose of tracking certain activity, such as views of a website or when an email is opened. Pixel tags are often used in combination with cookies.

## Referrer URL

A Referrer URL (Uniform Resource Locator) is information transmitted to a destination webpage by a web browser, typically when you click a link to that page. The Referrer URL contains the URL of the last webpage the browser visited.

## Sensitive personal information

This is a particular category of personal information relating to topics such as confidential medical facts, racial or ethnic origins, political or religious beliefs, or sexuality.

## Server logs

Like most websites, our servers automatically record the page requests made when you visit our sites. These "server logs" typically include your web request, Internet Protocol address, browser type, browser language, the date and time of your request, and one or more cookies that may uniquely identify your browser.

A typical log entry for a search for "cars" looks like this:

```
123.45.67.89 - 25/Mar/2003 10:15:32 -
http://www.google.com/search?q=cars -
Firefox 1.0.7; Windows NT 5.1 -
740674ce2123e969
```

- `123.45.67.89` is the Internet Protocol address assigned to the user by the user's ISP. Depending on the user's service, a different address may be assigned to the user by their service provider each time they connect to the Internet.

- `25/Mar/2003 10:15:32` is the date and time of the query.

- `http://www.google.com/search?q=cars` is the requested URL, including the search query.

- `Firefox 1.0.7; Windows NT 5.1` is the browser and operating system being used.

- `740674ce2123e969` is the unique cookie ID assigned to this particular computer the first time it visited Google. (Cookies can be deleted by users. If the user has deleted the cookie from the computer since the last time they've visited Google, then it will be the unique cookie ID assigned to their device the next time they visit Google from that particular device).

## Unique identifiers

A unique identifier is a string of characters that can be used to uniquely identify a browser, app, or device. Different identifiers vary in how permanent they are, whether they can be reset by users, and how they can be accessed.

Unique identifiers can be used for various purposes, including security and fraud detection, syncing services such as your email inbox, remembering your preferences, and providing personalized advertising. For example, unique identifiers stored in cookies help sites display content in your browser in your preferred language. You can configure your browser to refuse all cookies or to indicate when a cookie is being sent. Learn more about how Google uses cookies.

On other platforms besides browsers, unique identifiers are used to recognize a specific device or app on that device. For example, a unique identifier such as the Advertising ID is used to provide relevant advertising on Android devices, and can be managed in your device's settings. Unique identifiers may also be incorporated into a device by its manufacturer (sometimes called a universally unique ID or UUID), such as the IMEI-number of a mobile phone. For example, a device's unique identifier can be used to customize our service to your device or analyze device issues related to our services.

## Additional Context

### ads you'll find most useful

For example, if you watch videos about baking on YouTube, you may see more ads that relate to baking as you browse the web. We also may use your IP address to determine your approximate location, so that we can serve you ads for a nearby pizza delivery service if you search for "pizza." Learn more about Google ads and why you may see particular ads.

### advertising and research services on their behalf

For example, advertisers may upload data from their loyalty-card programs so that they can better understand the performance of their ad campaigns. We only provide aggregated reports to advertisers that don't reveal information about individual people.

### Android device with Google apps

Android devices with Google apps include devices sold by Google or one of our partners and include phones, cameras, vehicles, wearables, and televisions. These devices use Google Play Services and other pre-installed apps that include services like Gmail, Maps, your phone's camera and phone dialer, text-to-speech conversion, keyboard input, and security features.

### combine the information we collect

Some examples of how we combine the information we collect include:

- When you're signed in to your Google Account and search on Google, you can see search results from the public web, along with relevant information from the content you have in other Google products, like Gmail or Google Calendar. This can include things like the status of your upcoming flights, restaurant, and hotel reservations, or your photos. Learn more

- If you have communicated with someone via Gmail and want to add them to a Google Doc or an event in Google Calendar, Google makes it easy to do so by autocompleting their email address when you start to type in their name. This feature makes it easier to share things with people you know. Learn more

- The Google app can use data that you have stored in other Google products to show you personalized content, depending on your settings. For example, if you have searches stored in your Web & App Activity, the Google app can show you news articles and other information about your interests, like sports scores, based your activity. Learn more

- If you link your Google Account to your Google Home, you can manage your information and get things done through the Google Assistant. For example, you can add events to your Google Calendar or get your schedule for the day, ask for status updates on your upcoming flight, or send information like driving directions to your phone. Learn more

### customized search results

For example, when you're signed in to your Google Account and have the Web & App Activity control enabled, you can get more relevant search results that are based on your previous searches and activity from other Google services. You can learn more here. You may also get customized search results even when you're signed out. If you don't want this level of search customization, you can search and browse privately or turn off signed-out search personalization.

### deliver our services

Examples of how we use your information to deliver our services include:

- We use the IP address assigned to your device to send you the data you requested, such as loading a YouTube video

- We use unique identifiers stored in cookies on your device to help us authenticate you as the person who should have access to your Google Account

- Photos and videos you upload to Google Photos are used to help you create albums, animations, and other creations that you can share. Learn more

- A flight confirmation email you receive may be used to create a "check-in" button that appears in your Gmail

- When you purchase services or physical goods from us, you may provide us information like your shipping address or delivery instructions. We use this information for things like processing, fulfilling, and delivering your order, and to provide support in connection with the product or service you purchase.

## detect abuse

When we detect spam, malware, illegal content, and other forms of abuse on our systems in violation of our policies, we may disable your account or take other appropriate action. In certain circumstances, we may also report the violation to appropriate authorities.

## devices

For example, we can use information from your devices to help you decide which device you'd like to use to install an app or view a movie you buy from Google Play. We also use this information to help protect your account.

## ensure and improve

For example, we analyze how people interact with advertising to improve the performance of our ads.

## ensure our services are working as intended

For example, we continuously monitor our systems to look for problems. And if we find something wrong with a specific feature, reviewing activity information collected before the problem started allows us to fix things more quickly.

## Information about things near your device

If you use Google's Location services on Android, we can improve the performance of apps that rely on your location, like Google Maps. If you use Google's Location services, your device sends information to Google about its location, sensors (like accelerometer), and nearby cell towers and Wi-Fi access points (like MAC address and signal strength). All these things help to determine your location. You can use your device settings to enable Google Location services. Learn more

## legal process, or enforceable governmental request

Like other technology and communications companies, Google regularly receives requests from governments and courts around the world to disclose user data. Respect for the privacy and security of data you store with Google underpins our approach to complying with these legal requests. Our legal team reviews each and every request, regardless of type, and we frequently push back when a request appears to be overly broad or doesn't follow the correct process. Learn more in our Transparency Report.

### make improvements

For example, we use cookies to analyze how people interact with our services. And that analysis can help us build better products. For example, it may help us discover that it's taking people too long to complete a certain task or that they have trouble finishing steps at all. We can then redesign that feature and improve the product for everyone.

### may link information

Google Analytics relies on first-party cookies, which means the cookies are set by the Google Analytics customer. Using our systems, data generated through Google Analytics can be linked by the Google Analytics customer and by Google to third-party cookies that are related to visits to other websites. For example, an advertiser may want to use its Google Analytics data to create more relevant ads, or to further analyze its traffic. Learn more

### partner with Google

There are over 2 million non-Google websites and apps that partner with Google to show ads. Learn more

### payment information

For example, if you add a credit card or other payment method to your Google Account, you can use it to buy things across our services, like apps in the Play Store. We may also ask for other information, like a business tax ID, to help process your payment. In some cases, we may also need to verify your identity and may ask you for information to do this.

We may also use payment information to verify that you meet age requirements, if, for example, you enter an incorrect birthday indicating you're not old enough to have a Google Account. Learn more

### personalized ads

You may also see personalized ads based on information from the advertiser. If you shopped on an advertiser's website, for example, they can use that visit information to show you ads. Learn more

### phone number

If you add your phone number to your account, it can be used for different purposes across Google services, depending on your settings. For example, your phone number can be used to help you access your account if you forget your password, help people find and connect with you, and make the ads you see more relevant to you. Learn more

### protect against abuse

For example, information about security threats can help us notify you if we think your account has been compromised (at which point we can help you take steps to protect your account).

### publicly accessible sources

For example, we may collect information that's publicly available online or from other public sources to help train Google's language models and build features like Google Translate.

### rely on cookies to function properly

For example, we use a cookie called 'lbcs' that makes it possible for you to open many Google Docs in one browser. Blocking this cookie would prevent Google Docs from working as expected. Learn more

### safety and reliability

Some examples of how we use your information to help keep our services safe and reliable include:

- Collecting and analyzing IP addresses and cookie data to protect against automated abuse. This abuse takes many forms, such as sending spam to Gmail users, stealing money from advertisers by fraudulently clicking on ads, or censoring content by launching a Distributed Denial of Service (DDoS) attack.

- The "last account activity" feature in Gmail can help you find out if and when someone accessed your email without your knowledge. This feature shows you information about recent activity in Gmail, such as the IP addresses that accessed your mail, the associated location, and the date and time of access. Learn more

### sensitive categories

When showing you personalized ads, we use topics that we think might be of interest to you based on your activity. For example, you may see ads for things like "Cooking and Recipes" or "Air Travel." We don't use topics or show personalized ads based on sensitive categories like race, religion, sexual orientation, or health. And we require the same from advertisers that use our services.

### Sensor data from your device

Your device may have sensors that can be used to better understand your location and movement. For example, an accelerometer can be used to determine your speed and a gyroscope to figure out your direction of travel.

### servers around the world

For example, we operate data centers located around the world to help keep our products continuously available for users.

### services to make and receive calls or send and receive messages

Examples of these services include:

- Google Hangouts, for making domestic and international calls.

- Google Voice, for making calls, sending text messages, and managing voicemail.

- Google Fi, for a phone plan.

### show trends

When lots of people start searching for something, it can provide useful information about particular trends at that time. Google Trends samples Google web searches to estimate the popularity of searches over a certain period of time and shares those results publicly in aggregated terms. Learn more

### specific Google services

For example, you can delete your blog from Blogger or a Google Site you own from Google Sites. You can also delete reviews you've left on apps, games, and other content in the Play Store.

## specific partners

For example, we allow YouTube creators and advertisers to work with measurement companies to learn about the audience of their YouTube videos or ads, using cookies or similar technologies. Another example is merchants on our shopping pages, who use cookies to understand how many different people see their product listings. Learn more about these partners and how they use your information.

## synced with your Google Account

Your Chrome browsing history is only saved to your account if you've enabled Chrome synchronization with your Google Account. Learn more

## the people who matter most to you online

For example, when you type an address in the To, Cc, or Bcc field of an email you're composing, Gmail will suggest addresses based on the people you contact most frequently.

## third parties

For example, we process your information to report use statistics to rights holders about how their content was used in our services. We may also process your information if people search for your name and we display search results for sites containing publicly available information about you.

## Views and interactions with content and ads

For example, we collect information about views and interactions with ads so we can provide aggregated reports to advertisers, like telling them whether we served their ad on a page and whether the ad was likely seen by a viewer. We may also measure other interactions, such as how you move your mouse over an ad or if you interact with the page on which the ad appears.

## your activity on other sites and apps

This activity might come from your use of Google services, like from syncing your account with Chrome or your visits to sites and apps that partner with Google. Many websites and apps partner with Google to improve their content and services. For example, a website might use our advertising services (like AdSense) or analytics tools (like Google Analytics), or it might embed other content (such as videos from YouTube). These services may share information about your activity with Google and, depending on your account settings and the products in use (for instance, when a partner uses Google Analytics in conjunction with our advertising services), this data may be associated with your personal information.

Learn more about how Google uses data when you use our partners' sites or apps.

**APPENDIX E.1**

**CHROME PRIVACY NOTICE – MAY 20, 2020 (UNMODIFIED)**

Google Chrome

# Google Chrome Privacy Notice

Learn how to control the information that's collected, stored, and shared when you use the Google Chrome browser on your computer or mobile device, Chrome OS, and when you enable Safe Browsing in Chrome. Although this policy describes features that are specific to Chrome, any personal information that is provided to Google or stored in your Google Account will be used and protected in accordance with the Google Privacy Policy, as changed from time to time. Google's retention policy describes how and why Google retains data.

If Google Play apps have been enabled on your Chromebook, the use and protection of information collected by Google Play or the Android operating system is governed by the Google Play Terms of Service and Google Privacy Policy. Details specific to Chrome are provided in this Notice where relevant.

### Details about the Privacy Notice

In this Privacy Notice, we use the term "Chrome" to refer to all the products in the Chrome family listed above. If there are differences in our policy between products, we'll point them out. We change this Privacy Notice from time to time.

"Beta," "Dev," or "Canary" versions of Chrome let you test new features still being created in Chrome. This Privacy Notice applies to all versions of Chrome, but might not be up-to-date for features still under development.

For step-by-step guides to managing your privacy preferences, read this overview of Chrome's privacy controls.

## Table of contents:

- Browser modes
- Managing users in Chrome
- Safe Browsing practices
- Privacy practices of using apps, extensions, themes, services, and other add-ons
- More information

# Browser modes

You don't need to provide any personal information to use Chrome, but Chrome has different modes that you can use to change or improve your browsing experience. Privacy practices are different depending on the mode that you're using.

## Basic browser mode

The basic browser mode stores information locally on your system. This information might include:

- Browsing history information. For example, Chrome stores the URLs of pages that you visit, a cache of text, images and other resources from those pages, and, if the network actions prediction feature is turned on, a list of some of the IP addresses linked from those pages.

- Personal information and passwords, to help you fill out forms or sign in to sites you visit.

- A list of permissions that you have granted to websites.

- Cookies or data from websites that you visit.

- Data saved by add-ons.

- A record of what you downloaded from websites.

You can manage this information in several ways:

- You can delete your browsing history information

- You can manage or delete stored browsing data from the Cookies and Site Data dialog

- You can stop Chrome from accepting cookies. Learn more

- You can review stored passwords in Chrome settings. Learn more

- You can view and manage your stored Autofill information. Learn more

The personal information that Chrome stores won't be sent to Google unless you choose to store that data in your Google Account by turning on sync, or, in the case of payment cards and billing information, choosing specific payment card and billing information to store in your Google Payments account. Learn More

## How Chrome handles your information

**Information for website operators.** Sites that you visit using Chrome will automatically receive standard log information, including your system's IP address and data from cookies. In general, the fact that you use Chrome to access Google services, such as Gmail, does not cause Google to receive any additional personally identifying information about you. On Google websites and other websites that opt in, if Chrome detects signs that you are being actively attacked by someone on the network (a "man in the middle attack"), Chrome may send information about that connection to Google or the website you visited to help determine the extent of the attack and how the attack functions. Google provides participating website owners with reports about attacks occurring on their sites.

**Prerendering.** To load web pages faster, Chrome has a setting that can look up the IP addresses of links on a web page and open network connections. Sites and Android apps can also ask the browser to preload the pages you might visit next. Preloading requests from Android apps are controlled by the same setting as Chrome-initiated predictions. But preloading instructions from sites are always performed, regardless of whether Chrome's network prediction feature is enabled. If prerendering is requested, whether by Chrome or by a site or app, the preloaded site is allowed to set and read its own cookies just as if you had visited it, even if you don't end up visiting the prerendered page. Learn more.

**Location.** To get more geographically relevant information, Chrome gives you the option to share your location with a site. Chrome won't allow a site to access your location without your permission; however, on mobile devices, Chrome automatically shares your location with your default search engine if the Chrome app has permission to access your location and you haven't blocked geolocation for the associated web site. Chrome uses Google Location Services to estimate your location. The information that Chrome sends to Google Location Services may include:

- The Wi-Fi routers closest to you
- Cell IDs of the cell towers closest to you
- The strength of your Wi-Fi or cell signal
- The IP address that is currently assigned to your device

Google doesn't have control over third-party websites or their privacy practices, so be cautious when sharing your location with a website.

**Updates.** Chrome periodically sends information to Google to check for updates, get connectivity status, validate the current time, and estimate the number of active users.

**Search features.** If you are signed in to a Google site and Google is your default search engine, searches you perform using the omnibox or the search box on the new tab page in Chrome are stored in your Google Account.

**Search prediction service.** To help you find information faster, Chrome uses the prediction service provided by your default search engine to offer likely completions to the text you are typing. When you search using the omnibox or the search box on the new tab page in Chrome, the characters you type (even if you haven't hit "enter" yet) are sent to your default search engine. If Google is your default search engine, predictions are based on your own search history, topics related to what you're typing in the omnibox or in the search box on the new tab page, and what other people are searching for. Learn more. Predictions can also be based on your browsing history. Learn more

**Navigation assistance.** When you can't connect to a web page, you can get suggestions for alternative pages similar to the one you're trying to reach. In order to offer you suggestions, Chrome sends Google the URL of the page you're trying to reach.

**Autofill and password management.** In order to improve Chrome's Autofill and password management services, Chrome sends Google limited, anonymous information about the web forms that you encounter or submit while Autofill or password management is enabled, including a hashed URL of the web page and details of the form's structure. Learn more.

**Payments.** When you are signed into Chrome with your Google account, Chrome may offer to save payment cards and related billing information to your Google Payments account. Chrome may also offer you the option of filling payment cards from your Google Payments account into web forms. If you have cards saved locally in Chrome, Chrome may prompt you to save them to your Google Payments account. If you use a payment card from your Google Payments account or choose to save your payment card in your Google Payments account for future use, Chrome will collect information about your computer and share it with Google Pay to protect you from fraud and provide the service. If supported by the merchant, Chrome will also allow you to pay using Google Pay.

**Language.** In order to customize your browsing experience based on the languages that you prefer to read, Chrome will keep a count of the most popular languages of the sites you visit. This language preference will be sent to Google to customize your experience in Chrome. If you have turned on Chrome sync, this language profile will be associated with your Google Account and, if you include Chrome history in your Google Web & App Activity, it may be used to personalize your experience in other Google products. View Activity Controls.

**Web Apps on Android.** On Android devices, if you select "add to homescreen" for a website that has been optimized for fast, reliable performance on mobile devices, then Chrome will use a Google server to create a native Android package for that website on your device. The Android package allows you to interact with the web app as you would with an Android app. For example, the web app will appear in your list of installed apps. Learn more.

**Usage statistics and crash reports.** By default, usage statistics and crash reports are sent to Google to help us improve our products. Usage statistics contain information such as preferences, button clicks, performance statistics, and memory usage. In general, usage statistics do not include web page URLs or personal information, but, if you have turned on "Make searches and browsing better / Sends URLs of pages you visit to Google", then Chrome usage statistics include information about the web pages you visit and your usage of them. If you have enabled Chrome sync, Chrome may combine any declared age and gender information from your Google account with our statistics to help us build products better suited for all demographics. For example, we may collect statistics to identify web pages that load slowly. We use this information to improve our products and services, and to give web developers insight into improving their pages. Crash reports contain system information at the time of the crash, and may contain web page URLs or personal information, depending on what was happening at the time the crash report was triggered. We may share aggregated, non-personally identifiable information publicly and with partners — like publishers, advertisers or web developers. You can change whether usage statistics and crash reports are sent to Google at any time. Learn more. If Google Play apps are enabled on your Chromebook and Chrome usage statistics are enabled, then Android diagnostic and usage data is also sent to Google.

**Media licenses.** Some websites encrypt media to protect against unauthorized access and copying. For HTML5 sites, this key exchange is done using the Encrypted Media Extensions API. In the process of allowing access to this media, session identifiers and licenses may be stored locally. These identifiers can be cleared by the user in Chrome using Clear Browsing Data with "Cookies and other site data" selected. For sites that use Adobe Flash Access, Chrome will provide a unique identifier to content partners and websites. The identifier is stored on your system. You can deny this access in the settings under Content Settings, Protected content, and reset the ID using Clear Browsing Data with "Cookies and other site data" selected. If you access protected content in Chrome on Android, or access higher quality or offline content on Chrome OS, a content provider may ask Chrome for a certificate to verify the eligibility of the device. Your device will share a site specific identifier with the website to certify that its cryptographic keys are protected by Chrome hardware. Learn more.

**Other Google services.** This notice describes the Google services that are enabled by default in Chrome. In addition, Chrome may offer other Google web services. For example, if you encounter a page in a different language, Chrome will offer to send the text to Google for translation. You will be notified of your options for controlling these services when you first use them. You can find more information in the Chrome Privacy Whitepaper.

## Identifiers in Chrome

Chrome includes a number of unique and non-unique identifiers necessary to power features and functional services. For example, if you use push messaging, an identifier is created in order to deliver notices to you. Where possible, we use non-unique identifiers and remove identifiers when they are no longer needed. Additionally, the following identifiers help us develop, distribute, and promote Chrome, but are not directly related to a Chrome feature:

- **Installation tracking.** Each copy of the Windows desktop version of the Chrome browser includes a temporary randomly generated installation number that is sent to Google when you install and first use Chrome. This temporary identifier helps us estimate the number of installed browsers, and will be deleted the first time Chrome updates. The mobile version of Chrome uses a variant of the device identifier on an ongoing basis to track the number of installations of Chrome.

installations of Chrome.

- **Promotion tracking.** In order to help us track the success of promotional campaigns, Chrome generates a unique token that is sent to Google when you first run and use the browser. In addition, if you received or reactivated your copy of the desktop version of the Chrome browser as part of a promotional campaign and Google is your default search engine, then searches from the omnibox will include a non-unique promotional tag. All mobile versions of the Chrome browser also include a non-unique promotional tag with searches from the omnibox. Chrome OS may also send a non-unique promotional tag to Google periodically (including during initial setup) and when performing searches with Google. Learn more

- **Field trials.** We sometimes conduct limited tests of new features. Chrome includes a seed number that is randomly selected on first run to assign browsers to experiment groups. Experiments may also be limited by country (determined by your IP address), operating system, Chrome version, and other parameters. A list of field trials that are currently active on your installation of Chrome is included in all requests sent to Google. Learn more

## Sign-in and Sync Chrome modes

You also have the option to use the Chrome browser while signed in to your Google Account, with or without sync enabled.

**Sign in on Desktop.** On desktop versions of Chrome, signing into or out of any Google web service, like google.com, signs you into or out of Chrome. You can turn this off in settings. Learn more. If you are signed in to your Google Account on desktop, Chrome may offer to save your payment cards and related billing information to your Google Payments account. This personal information will be used and protected in accordance with the Google Privacy Policy.

**Sync.** When you sign in to the Chrome browser or a Chromebook and enable sync with your Google Account, your personal information is saved in your Google Account on Google's servers so you may access it when you sign in and sync to Chrome on other computers and devices. This personal information will be used and protected in accordance with the Google Privacy Policy. This type of information can include:

- Browsing history
- Bookmarks
- Tabs
- Passwords and Autofill information
- Other browser settings, like installed extensions

Sync is only enabled if you choose. Learn more. To customize the specific information that you have enabled to sync, use the "Settings" menu. Learn more. You can see the amount of Chrome data stored for your Google Account and manage it on the Data from Chrome sync Dashboard. On the Dashboard, except for Google Accounts created through Family Link, you can also disable sync and delete all the associated data from Google's servers. Learn more. For Google Accounts created in Family Link, sign-in is required and sync cannot be disabled because it provides parent management features, such as website restrictions. However, children with Family Link accounts can still delete their data and disable synchronization of most data types. Learn More. The Privacy Notice for Google Accounts created in Family Link applies to Chrome sync data stored in those accounts.

### How Chrome handles your synced information

When you enable sync with your Google Account, we use your browsing data to improve and personalize your experience within Chrome. You can also personalize your experience on other Google products, by allowing your Chrome history to be included in your Google Web & App Activity. Learn more

You can change this setting on your Account History page or manage your private data whenever you like. If you don't use your Chrome data to personalize your Google experience outside of Chrome, Google will only use your Chrome data after it's anonymized and aggregated with data from other users. Google uses this data to develop new features, products, and services, and to improve the overall quality of existing products and services. If you would like to use Google's cloud to store and sync your Chrome data but you don't want Google to access the data, you can encrypt your synced Chrome data with your own sync passphrase. Learn more

## Incognito mode and guest mode

You can limit the information Chrome stores on your system by using incognito mode or guest mode. In these modes, Chrome won't store certain information, such as:

- Basic browsing history information like URLs, cached page text, or IP addresses of pages linked from the websites you visit
- Snapshots of pages that you visit
- Records of your downloads, although the files you download will still be stored elsewhere on your computer or device

### How Chrome handles your incognito or guest information

**Cookies.** Chrome won't share existing cookies with sites you visit in incognito or guest mode. Sites may deposit new cookies on your system while you are in these modes, but they'll only be stored and transmitted until you close the last incognito or guest window.

**Browser configuration changes.** When you make changes to your browser configuration, like bookmarking a web page or changing your settings, this information is saved. These changes are not affected by incognito or guest mode.

**Permissions.** Permissions you grant in incognito mode are not saved to your existing profile.

**Profile information.** In incognito mode, you will still have access to information from your existing profile, such as suggestions based on your browsing history and saved passwords, while you are browsing. In guest mode, you can browse without seeing information from any existing profiles.

# Managing Users in Chrome

## Managing users for personal Chrome use

You can set up personalized versions of Chrome for users sharing one device or computer. Note that anyone with access to your device can view all the information in all profiles. To truly protect your data from being seen by others, use the built-in user accounts in your operating system. Learn more.

## Managing users on Chrome for Enterprise

Some Chrome browsers or Chromebooks are managed by a school or company. In that case, the administrator has the ability to apply policies to the browser or Chromebook. Chrome contacts Google to check for these policies when a user first starts browsing (except in guest mode). Chrome checks periodically for updates to policies.

An administrator can set up a policy for status and activity reporting for Chrome, including location information for Chrome OS devices. Your administrators may also have the ability to access, monitor, use or disclose data accessed from your managed device.

# Safe Browsing practices

Google Chrome and certain third-party browsers, like some versions of Mozilla Firefox and Apple's Safari, include Google's Safe Browsing feature. With Safe Browsing, information about suspicious websites is sent and received between the browser you are using and Google's servers.

## How Safe Browsing works

Your browser contacts Google's servers periodically to download the most recent "Safe Browsing" list, which contains known phishing and malware sites. The most recent copy of the list is stored locally on your system. Google doesn't collect any account information or other personally identifying information as part of this contact. However, it does receive standard log information, including an IP address and cookies.

Each site you visit is checked against the Safe Browsing list on your system. If there's a match, your browser sends Google a hashed, partial copy of the site's URL so that Google can send more information to your browser. Google cannot determine the real URL from this information. Learn more.

The following Safe Browsing features are specific to Chrome:

- If you have turned on Safe Browsing's Enhanced Protection mode, Chrome provides additional protections, and sends Google additional data, as described in Chrome settings. Learn more. Some of these protections may also be available as standalone features, subject to separate controls, where Standard Protection is enabled.

- If you have turned on "Make searches and browsing better / Sends URLs of pages you visit to Google" and Safe Browsing is enabled, Chrome sends

- If you have turned on "Make searches and browsing better / Sends URLs of pages you visit to Google" while Safe Browsing is enabled, Chrome sends Google the full URL of each site you visit to determine whether that site is safe. If you also sync your browsing history without a sync passphrase, these URLs will be temporarily associated with your Google account to provide more personalized protection. This feature is disabled in incognito and guest modes.

- Some versions of Chrome feature Safe Browsing technology that can identify potentially harmful sites and potentially dangerous file types not already known by Google. The full URL of the site or potentially dangerous file might also be sent to Google to help determine whether the site or file is harmful.

- Chrome uses Safe Browsing technology to scan your computer periodically, in order to detect unwanted software that prevents you from changing your settings or otherwise interferes with the security and stability of your browser. Learn more. If this kind of software is detected, Chrome might offer you the option to download the Chrome Cleanup Tool to remove it.

- You can choose to send additional data to help improve Safe Browsing when you access a site that appears to contain malware or when Chrome detects unwanted software on your computer. Learn more.

- If you use Chrome's password manager, Safe Browsing checks with Google when you enter any saved password on an uncommon page to protect you from phishing attacks. Chrome does not send your passwords to Google as part of this protection. In addition, Safe Browsing protects your Google Account password. If you enter it on a likely phishing site, Chrome will prompt you to change your Google Account password. If you sync your browsing history, or if you are signed in to your Google Account and choose to notify Google, Chrome will also flag your Google Account as likely phished.

- If you are signed in to your Google Account, Chrome will also warn you when you use a username and password that may have been exposed in a data breach. To check, when you sign in to a site, Chrome sends Google a partial hash of your username and other encrypted information about your password, and Google returns a list of possible matches from known breaches. Chrome uses this list to determine whether your username and password were exposed. Google does not learn your username or password, or whether they were exposed, as part of this process. This feature can be disabled in Chrome settings. Learn more.

- On desktop and Android versions of Chrome, you can always choose to disable the Safe Browsing feature within Chrome settings. On iOS versions of Chrome, Apple controls the Safe Browsing technology used by your device and may send data to Safe Browsing providers other than Google.

# Privacy practices of apps, extensions, themes, services, and other add-ons

You can use apps, extensions, themes, services and other add-ons with Chrome, including some that may be preinstalled or integrated with Chrome. Add-ons developed and provided by Google may communicate with Google servers and are subject to the Google Privacy Policy unless otherwise indicated. Add-ons developed and provided by others are the responsibility of the add-on creators and may have different privacy policies.

## Managing add-ons

Before installing an add-on, you should review the requested permissions. Add-ons can have permission to do various things, like:

- Store, access, and share data stored locally or in your Google Drive account
- View and access content on websites you visit
- Use notifications that are sent through Google servers

Chrome can interact with add-ons in a few different ways:

- Checking for updates
- Downloading and installing updates
- Sending usage indicators to Google about the add-ons

Some add-ons might require access to a unique identifier for digital rights management or for delivery of push messaging. You can disable the use of identifiers by removing the add-on from Chrome.

From time to time, Google might discover an add-on that poses a security threat, violates the developer terms for Chrome Web Store, or violates other legal agreements, laws, regulations, or policies. Chrome periodically downloads a list of these dangerous add-ons, in order to remotely disable or remove them from

## Server Log Privacy Information

Like most websites, our servers automatically record the page requests made when you visit our sites. These "server logs" typically include your web request, Internet Protocol address, browser type, browser language, the date and time of your request and one or more cookies that may uniquely identify your browser.

Here is an example of a typical log entry for where the search is for "cars" looks like this, followed by a breakdown of its parts:

```
123.45.67.89 - 25/Mar/2003 10:15:32 - https://www.google.com/search?q=cars - Firefox 1.0.7; Windows NT 5.1 -
740674ce2123e969
```

- `123.45.67.89` is the Internet Protocol address assigned to the user by the user's ISP. D; depending on the user's service, a different address may be assigned to the user by their service provider each time they connect to the Internet.;
- `25/Mar/2003 10:15:32` is the date and time of the query.;
- `https://www.google.com/search?q=cars` is the requested URL, including the search query.;
- `Firefox 1.0.7; Windows NT 5.1` is the browser and operating system being used.;
- `740674ce2123a969` is the unique cookie ID that was assigned to this particular computer the first time it visited a Google site. (Cookies can be deleted by users. If the user has deleted the cookie from the computer since the last time they've/s/he visited Google, then it will be the unique cookie ID assigned to their device the user the next time theys/he visits Google from that particular computer).

# More information

Information that Google receives when you use Chrome is used and protected under the Google Privacy Policy. Information that other website operators and add-on developers receive, including cookies, is subject to the privacy policies of those websites.

Google complies with certain legal frameworks relating to the transfer of data, such as the EU-US and Swiss-US Privacy Shield Framework. Learn more.

# Key Terms

## Cookies

A cookie is a small file containing a string of characters that is sent to your computer when you visit a website. When you visit the site again, the cookie allows that site to recognize your browser. Cookies may store user preferences and other information. You can configure your browser to refuse all cookies or to indicate when a cookie is being sent. However, some website features or services may not function properly without cookies. Learn more about how Google uses cookies and how Google uses data, including cookies, when you use our partners' sites or apps.

## Google Account

You may access some of our services by signing up for a Google Account and providing us with some personal information (typically your name, email address and a password). This account information is used to authenticate you when you access Google services and protect your account from unauthorized access by others. You can edit or delete your account at any time through your Google Account settings.

**APPENDIX E.2**

**CHROME PRIVACY NOTICE – MAY 20, 2020 (UNMODIFIED WITH HIGHLIGHTS)**

Google Chrome

# Google Chrome Privacy Notice

Learn how to control the information that's collected, stored, and shared when you use the Google Chrome browser on your computer or mobile device, Chrome OS, and when you enable Safe Browsing in Chrome. Although this policy describes features that are specific to Chrome, any personal information that is provided to Google or stored in your Google Account will be used and protected in accordance with the Google Privacy Policy, as changed from time to time. Google's retention policy describes how and why Google retains data.

If Google Play apps have been enabled on your Chromebook, the use and protection of information collected by Google Play or the Android operating system is governed by the Google Play Terms of Service and Google Privacy Policy. Details specific to Chrome are provided in this Notice where relevant.

### Details about the Privacy Notice

In this Privacy Notice, we use the term "Chrome" to refer to all the products in the Chrome family listed above. If there are differences in our policy between products, we'll point them out. We change this Privacy Notice from time to time.

"Beta," "Dev," or "Canary" versions of Chrome let you test new features still being created in Chrome. This Privacy Notice applies to all versions of Chrome, but might not be up-to-date for features still under development.

For step-by-step guides to managing your privacy preferences, read this overview of Chrome's privacy controls.

## Table of contents:

- Browser modes
- Managing users in Chrome
- Safe Browsing practices
- Privacy practices of using apps, extensions, themes, services, and other add-ons
- More information

# Browser modes

You don't need to provide any personal information to use Chrome, but Chrome has different modes that you can use to change or improve your browsing experience. Privacy practices are different depending on the mode that you're using.

## Basic browser mode

The basic browser mode stores information locally on your system. This information might include:

- Browsing history information. For example, Chrome stores the URLs of pages that you visit, a cache of text, images and other resources from those pages, and, if the network actions prediction feature is turned on, a list of some of the IP addresses linked from those pages.

- Personal information and passwords, to help you fill out forms or sign in to sites you visit.

- A list of permissions that you have granted to websites.

- Cookies or data from websites that you visit.

- Data saved by add-ons.

- A record of what you downloaded from websites.

You can manage this information in several ways:

- You can delete your browsing history information.

- You can manage or delete stored browsing data from the Cookies and Site Data dialog.

- You can stop Chrome from accepting cookies. Learn more.

- You can review stored passwords in Chrome settings. Learn more.

- You can view and manage your stored Autofill information. Learn more.

The personal information that Chrome stores won't be sent to Google unless you choose to store that data in your Google Account by turning on sync, or, in the case of payment cards and billing information, choosing specific payment card and billing information to store in your Google Payments account. Learn More.

## How Chrome handles your information

**Information for website operators.** Sites that you visit using Chrome will automatically receive standard log information, including your system's IP address and data from cookies. In general, the fact that you use Chrome to access Google services, such as Gmail, does not cause Google to receive any additional personally identifying information about you. On Google websites and other websites that opt in, if Chrome detects signs that you are being actively attacked by someone on the network (a "man in the middle attack"), Chrome may send information about that connection to Google or the website you visited to help determine the extent of the attack and how the attack functions. Google provides participating website owners with reports about attacks occurring on their sites.

**Prerendering.** To load web pages faster, Chrome has a setting that can look up the IP addresses of links on a web page and open network connections. Sites and Android apps can also ask the browser to preload the pages you might visit next. Preloading requests from Android apps are controlled by the same setting as Chrome-initiated predictions. But preloading instructions from sites are always performed, regardless of whether Chrome's network prediction feature is enabled. If prerendering is requested, whether by Chrome or by a site or app, the preloaded site is allowed to set and read its own cookies just as if you had visited it, even if you don't end up visiting the prerendered page. Learn more.

**Location.** To get more geographically relevant information, Chrome gives you the option to share your location with a site. Chrome won't allow a site to access your location without your permission; however, on mobile devices, Chrome automatically shares your location with your default search engine if the Chrome app has permission to access your location and you haven't blocked geolocation for the associated web site. Chrome uses Google Location Services to estimate your location. The information that Chrome sends to Google Location Services may include:

- The Wi-Fi routers closest to you
- Cell IDs of the cell towers closest to you
- The strength of your Wi-Fi or cell signal
- The IP address that is currently assigned to your device

Google doesn't have control over third-party websites or their privacy practices, so be cautious when sharing your location with a website.

**Updates.** Chrome periodically sends information to Google to check for updates, get connectivity status, validate the current time, and estimate the number of active users.

**Search features.** If you are signed in to a Google site and Google is your default search engine, searches you perform using the omnibox or the search box on the new tab page in Chrome are stored in your Google Account.

**Search prediction service.** To help you find information faster, Chrome uses the prediction service provided by your default search engine to offer likely completions to the text you are typing. When you search using the omnibox or the search box on the new tab page in Chrome, the characters you type (even if you haven't hit "enter" yet) are sent to your default search engine. If Google is your default search engine, predictions are based on your own search history, topics related to what you're typing in the omnibox or in the search box on the new tab page, and what other people are searching for. Learn more. Predictions can also be based on your browsing history. Learn more.

**Navigation assistance.** When you can't connect to a web page, you can get suggestions for alternative pages similar to the one you're trying to reach. In order to offer you suggestions, Chrome sends Google the URL of the page you're trying to reach.

**Autofill and password management.** In order to improve Chrome's Autofill and password management services, Chrome sends Google limited, anonymous information about the web forms that you encounter or submit while Autofill or password management is enabled, including a hashed URL of the web page and details of the form's structure. Learn more.

**Payments.** When you are signed into Chrome with your Google account, Chrome may offer to save payment cards and related billing information to your Google Payments account. Chrome may also offer you the option of filling payment cards from your Google Payments account into web forms. If you have cards saved locally in Chrome, Chrome may prompt you to save them to your Google Payments account. If you use a payment card from your Google Payments account or choose to save your payment card in your Google Payments account for future use, Chrome will collect information about your computer and share it with Google Pay to protect you from fraud and provide the service. If supported by the merchant, Chrome will also allow you to pay using Google Pay.

**Language.** In order to customize your browsing experience based on the languages that you prefer to read, Chrome will keep a count of the most popular languages of the sites you visit. This language preference will be sent to Google to customize your experience in Chrome. If you have turned on Chrome sync, this language profile will be associated with your Google Account and, if you include Chrome history in your Google Web & App Activity, it may be used to personalize your experience in other Google products. View Activity Controls.

**Web Apps on Android.** On Android devices, if you select "add to homescreen" for a website that has been optimized for fast, reliable performance on mobile devices, then Chrome will use a Google server to create a native Android package for that website on your device. The Android package allows you to interact with the web app as you would with an Android app. For example, the web app will appear in your list of installed apps. Learn more.

**Usage statistics and crash reports.** By default, usage statistics and crash reports are sent to Google to help us improve our products. Usage statistics contain information such as preferences, button clicks, performance statistics, and memory usage. In general, usage statistics do not include web page URLs or personal information, but, if you have turned on "Make searches and browsing better / Sends URLs of pages you visit to Google", then Chrome usage statistics include information about the web pages you visit and your usage of them. If you have enabled Chrome sync, Chrome may combine any declared age and gender information from your Google account with our statistics to help us build products better suited for all demographics. For example, we may collect statistics to identify web pages that load slowly. We use this information to improve our products and services, and to give web developers insight into improving their pages. Crash reports contain system information at the time of the crash, and may contain web page URLs or personal information, depending on what was happening at the time the crash report was triggered. We may share aggregated, non-personally identifiable information publicly and with partners – like publishers, advertisers or web developers. You can change whether usage statistics and crash reports are sent to Google at any time. Learn more. If Google Play apps are enabled on your Chromebook and Chrome usage statistics are enabled, then Android diagnostic and usage data is also sent to Google.

**Media licenses.** Some websites encrypt media to protect against unauthorized access and copying. For HTML5 sites, this key exchange is done using the Encrypted Media Extensions API. In the process of allowing access to this media, session identifiers and licenses may be stored locally. These identifiers can be cleared by the user in Chrome using Clear Browsing Data with "Cookies and other site data" selected. For sites that use Adobe Flash Access, Chrome will provide a unique identifier to content partners and websites. The identifier is stored on your system. You can deny this access in the settings under Content Settings, Protected content, and reset the ID using Clear Browsing Data with "Cookies and other site data" selected. If you access protected content in Chrome on Android, or access higher quality or offline content on Chrome OS, a content provider may ask Chrome for a certificate to verify the eligibility of the device. Your device will share a site specific identifier with the website to certify that its cryptographic keys are protected by Chrome hardware. Learn more.

**Other Google services.** This notice describes the Google services that are enabled by default in Chrome. In addition, Chrome may offer other Google web services. For example, if you encounter a page in a different language, Chrome will offer to send the text to Google for translation. You will be notified of your options for controlling these services when you first use them. You can find more information in the Chrome Privacy Whitepaper.

## Identifiers in Chrome

Chrome includes a number of unique and non-unique identifiers necessary to power features and functional services. For example, if you use push messaging, an identifier is created in order to deliver notices to you. Where possible, we use non-unique identifiers and remove identifiers when they are no longer needed. Additionally, the following identifiers help us develop, distribute, and promote Chrome, but are not directly related to a Chrome feature.

- **Installation tracking.** Each copy of the Windows desktop version of the Chrome browser includes a temporary randomly generated installation number that is sent to Google when you install and first use Chrome. This temporary identifier helps us estimate the number of installed browsers, and will be deleted the first time Chrome updates. The mobile version of Chrome uses a variant of the device identifier on an ongoing basis to track the number of installations of Chrome.

installations of Chrome.

- **Promotion tracking.** In order to help you track the success of promotional campaigns, Chrome generates a unique token that is sent to Google when you first run and use the browser. In addition, if you received or reactivated your copy of the desktop version of the Chrome browser as part of a promotional campaign and Google is your default search engine, then searches from the omnibox will include a non-unique promotional tag. All mobile versions of the Chrome browser also include a non-unique promotional tag with searches from the omnibox. Chrome OS may also send a non-unique promotional tag to Google periodically (including during initial setup) and when performing searches with Google. Learn more.

- **Field trials.** We sometimes conduct limited tests of new features. Chrome includes a seed number that is randomly selected on first run to assign browsers to experiment groups. Experiments may also be limited by country (determined by your IP address), operating system, Chrome version, and other parameters. A list of field trials that are currently active on your installation of Chrome is included in all requests sent to Google. Learn more.

## Sign-in and Sync Chrome modes

You also have the option to use the Chrome browser while signed in to your Google Account, with or without sync enabled.

**Sign in on Desktop.** On desktop versions of Chrome, signing into or out of any Google web service, like google.com, signs you into or out of Chrome. You can turn this off in settings. Learn more. If you are signed in to your Google Account on desktop, Chrome may offer to save your payment cards and related billing information to your Google Payments account. This personal information will be used and protected in accordance with the Google Privacy Policy.

**Sync.** When you sign in to the Chrome browser or a Chromebook and enable sync with your Google Account, your personal information is saved in your Google Account on Google's servers so you may access it when you sign in and sync to Chrome on other computers and devices. This personal information will be used and protected in accordance with the Google Privacy Policy. This type of information can include:

- Browsing history
- Bookmarks
- Tabs
- Passwords and Autofill information
- Other browser settings, like installed extensions

Sync is only enabled if you choose. Learn More. To customize the specific information that you have enabled to sync, use the "Settings" menu. Learn more. You can see the amount of Chrome data stored for your Google Account and manage it on the Data from Chrome sync Dashboard. On the Dashboard, except for Google Accounts created through Family Link, you can also disable sync and delete all the associated data from Google's servers. Learn more. For Google Accounts created in Family Link, sign-in is required and sync cannot be disabled because it provides parent management features, such as website restrictions. However, children with Family Link accounts can still delete their data and disable synchronization of most data types. Learn More. The Privacy Notice for Google Accounts created in Family Link applies to Chrome sync data stored in those accounts.

### How Chrome handles your synced information

When you enable sync with your Google Account, we use your browsing data to improve and personalize your experience within Chrome. You can also personalize your experience on other Google products, by allowing your Chrome history to be included in your Google Web & App Activity. Learn more.

You can change this setting on your Account History page or manage your private data whenever you like. If you don't use your Chrome data to personalize your Google experience outside of Chrome, Google will only use your Chrome data after it's anonymized and aggregated with data from other users. Google uses this data to develop new features, products, and services, and to improve the overall quality of existing products and services. If you would like to use Google's cloud to store and sync your Chrome data but you don't want Google to access the data, you can encrypt your synced Chrome data with your own sync passphrase. Learn more.

## Incognito mode and guest mode

You can limit the information Chrome stores on your system by using incognito mode or guest mode. In these modes, Chrome won't store certain information, such as:

- Basic browsing history information like URLs, cached page text, or IP addresses of pages linked from the websites you visit
- Snapshots of pages that you visit
- Records of your downloads, although the files you download will still be stored elsewhere on your computer or device

### How Chrome handles your incognito or guest information

**Cookies.** Chrome won't share existing cookies with sites you visit in incognito or guest mode. Sites may deposit new cookies on your system while you are in these modes, but they'll only be stored and transmitted until you close the last incognito or guest window.

**Browser configuration changes.** When you make changes to your browser configuration, like bookmarking a web page or changing your settings, this information is saved. These changes are not affected by incognito or guest mode.

**Permissions.** Permissions you grant in incognito mode are not saved to your existing profile.

**Profile information.** In incognito mode, you will still have access to information from your existing profile, such as suggestions based on your browsing history and saved passwords, while you are browsing. In guest mode, you can browse without seeing information from any existing profiles.

# Managing Users in Chrome

## Managing users for personal Chrome use

You can set up personalized versions of Chrome for users sharing one device or computer. Note that anyone with access to your device can view all the information in all profiles. To truly protect your data from being seen by others, use the built-in user accounts in your operating system. Learn more.

## Managing users on Chrome for Enterprise

Some Chrome browsers or Chromebooks are managed by a school or company. In that case, the administrator has the ability to apply policies to the browser or Chromebook. Chrome contacts Google to check for these policies when a user first starts browsing (except in guest mode). Chrome checks periodically for updates to policies.

An administrator can set up a policy for status and activity reporting for Chrome, including location information for Chrome OS devices. Your administrators may also have the ability to access, monitor, use or disclose data accessed from your managed device.

# Safe Browsing practices

Google Chrome and certain third-party browsers, like some versions of Mozilla Firefox and Apple's Safari, include Google's Safe Browsing feature. With Safe Browsing, information about suspicious websites is sent and received between the browser you are using and Google's servers.

## How Safe Browsing works

Your browser contacts Google's servers periodically to download the most recent "Safe Browsing" list, which contains known phishing and malware sites. The most recent copy of the list is stored locally on your system. Google doesn't collect any account information or other personally identifying information as part of this contact. However, it does receive standard log information, including an IP address and cookies.

Each site you visit is checked against the Safe Browsing list on your system. If there's a match, your browser sends Google a hashed, partial copy of the site's URL so that Google can send more information to your browser. Google cannot determine the real URL from this information. Learn more.

The following Safe Browsing features are specific to Chrome:

- If you have turned on Safe Browsing's Enhanced Protection mode, Chrome provides additional protections, and sends Google additional data, as described in Chrome settings. Learn more. Some of these protections may also be available as standalone features, subject to separate controls, where Standard Protection is enabled.

- If you have turned on "Make searches and browsing better / Sends URLs of pages you visit to Google" and Safe Browsing is enabled, Chrome sends

- If you have turned on "Make searches and browsing better / Sends URLs of pages you visit to Google" and Safe Browsing is enabled, Chrome sends Google the full URL of each site you visit to determine whether that site is safe. If you also sync your browsing history without a sync passphrase, these URLs will be temporarily associated with your Google account to provide more personalized protection. This feature is disabled in incognito and guest modes.

- Some versions of Chrome feature Safe Browsing technology that can identify potentially harmful sites and potentially dangerous file types not already known by Google. The full URL of the site or potentially dangerous file might also be sent to Google to help determine whether the site or file is harmful.

- Chrome uses Safe Browsing technology to scan your computer periodically, in order to detect unwanted software that prevents you from changing your settings or otherwise interferes with the security and stability of your browser. Learn more. If this kind of software is detected, Chrome might offer you the option to download the Chrome Cleanup Tool to remove it.

- You can choose to send additional data to help improve Safe Browsing when you access a site that appears to contain malware or when Chrome detects unwanted software on your computer. Learn more.

- If you use Chrome's password manager, Safe Browsing checks with Google when you enter any saved password on an uncommon page to protect you from phishing attacks. Chrome does not send your passwords to Google as part of this protection. In addition, Safe Browsing protects your Google Account password. If you enter it on a likely phishing site, Chrome will prompt you to change your Google Account password. If you sync your browsing history, or if you are signed in to your Google Account and choose to notify Google, Chrome will also flag your Google Account as likely phished.

- If you are signed in to your Google Account, Chrome will also warn you when you use a username and password that may have been exposed in a data breach. To check, when you sign in to a site, Chrome sends Google a partial hash of your username and other encrypted information about your password, and Google returns a list of possible matches from known breaches. Chrome uses this list to determine whether your username and password were exposed. Google does not learn your username or password, or whether they were exposed, as part of this process. This feature can be disabled in Chrome settings. Learn more.

- On desktop and Android versions of Chrome, you can always choose to disable the Safe Browsing feature within Chrome settings. On iOS versions of Chrome, Apple controls the Safe Browsing technology used by your device and may send data to Safe Browsing providers other than Google.

# Privacy practices of apps, extensions, themes, services, and other add-ons

You can use apps, extensions, themes, services and other add-ons with Chrome, including some that may be preinstalled or integrated with Chrome. Add-ons developed and provided by Google may communicate with Google servers and are subject to the Google Privacy Policy unless otherwise indicated. Add-ons developed and provided by others are the responsibility of the add-on creators and may have different privacy policies.

## Managing add-ons

Before installing an add-on, you should review the requested permissions. Add-ons can have permission to do various things, like:

- Store, access, and share data stored locally or in your Google Drive account
- View and access content on websites you visit
- Use notifications that are sent through Google servers

Chrome can interact with add-ons in a few different ways:

- Checking for updates
- Downloading and installing updates
- Sending usage indicators to Google about the add-ons

Some add-ons might require access to a unique identifier for digital rights management or for delivery of push messaging. You can disable the use of identifiers by removing the add-on from Chrome.

From time to time, Google might discover an add-on that poses a security threat, violates the developer terms for Chrome Web Store, or violates other legal agreements, laws, regulations, or policies. Chrome periodically downloads a list of these dangerous add-ons, in order to remotely disable or remove them from

## Server Log Privacy Information

Like most websites, our servers automatically record the page requests made when you visit our sites. These "server logs" typically include your web request, Internet Protocol address, browser type, browser language, the date and time of your request and one or more cookies that may uniquely identify your browser.

Here is an example of a typical log entry for where the search is for "cars" looks like this, followed by a breakdown of its parts:

```
123.45.67.89 - 25/Mar/2003 10:15:32 - https://www.google.com/search?q=cars - Firefox 1.0.7; Windows NT 5.1 -
740674ce2123e969
```

- `123.45.67.89` is the Internet Protocol address assigned to the user by the user's ISP. D; depending on the user's service, a different address may be assigned to the user by their service provider each time they connect to the Internet.;
- `25/Mar/2003 10:15:32` is the date and time of the query.;
- `https://www.google.com/search?q=cars` is the requested URL, including the search query.;
- `Firefox 1.0.7; Windows NT 5.1` is the browser and operating system being used.;
- `740674ce2123a969` is the unique cookie ID that was assigned to this particular computer the first time it visited a Google site. (Cookies can be deleted by users. If the user has deleted the cookie from the computer since the last time they've/s/he visited Google, then it will be the unique cookie ID assigned to their device the user the next time theys/he visits Google from that particular computer).

# More information

Information that Google receives when you use Chrome is used and protected under the Google Privacy Policy. Information that other website operators and add-on developers receive, including cookies, is subject to the privacy policies of those websites.

Google complies with certain legal frameworks relating to the transfer of data, such as the EU-US and Swiss-US Privacy Shield Framework. Learn more.

# Key Terms

## Cookies

A cookie is a small file containing a string of characters that is sent to your computer when you visit a website. When you visit the site again, the cookie allows that site to recognize your browser. Cookies may store user preferences and other information. You can configure your browser to refuse all cookies or to indicate when a cookie is being sent. However, some website features or services may not function properly without cookies. Learn more about how Google uses cookies and how Google uses data, including cookies, when you use our partners' sites or apps.

## Google Account

You may access some of our services by signing up for a Google Account and providing us with some personal information (typically your name, email address and a password). This account information is used to authenticate you when you access Google services and protect your account from unauthorized access by others. You can edit or delete your account at any time through your Google Account settings.

**APPENDIX E.3**

**CHROME PRIVACY NOTICE – MAY 20, 2020 (MODIFIED)**

Google Chrome

# Google Chrome Privacy Notice

Learn how to control the information that's collected, stored, and shared when you use the Google Chrome browser on your computer or mobile device, Chrome OS, and when you enable Safe Browsing in Chrome. Although this policy describes features that are specific to Chrome, any personal information that is provided to Google or stored in your Google Account will be used and protected in accordance with the Google Privacy Policy, as changed from time to time. Google's retention policy describes how and why Google retains data.

If Google Play apps have been enabled on your Chromebook, the use and protection of information collected by Google Play or the Android operating system is governed by the Google Play Terms of Service and Google Privacy Policy. Details specific to Chrome are provided in this Notice where relevant.

### Details about the Privacy Notice

In this Privacy Notice, we use the term "Chrome" to refer to all the products in the Chrome family listed above. If there are differences in our policy between products, we'll point them out. We change this Privacy Notice from time to time.

"Beta," "Dev," or "Canary" versions of Chrome let you test new features still being created in Chrome. This Privacy Notice applies to all versions of Chrome, but might not be up-to-date for features still under development.

For step-by-step guides to managing your privacy preferences, read this overview of Chrome's privacy controls.

## Table of contents:

- Browser modes
- Managing users in Chrome
- Safe Browsing practices
- Privacy practices of using apps, extensions, themes, services, and other add-ons
- More information

# Browser modes

You don't need to provide any personal information to use Chrome, but Chrome has different modes that you can use to change or improve your browsing experience. Privacy practices are different depending on the mode that you're using.

## Basic browser mode

The basic browser mode stores information locally on your system. This information might include:

- Browsing history information. For example, Chrome stores the URLs of pages that you visit, a cache of text, images and other resources from those pages, and, if the network actions prediction feature is turned on, a list of some of the IP addresses linked from those pages.

- Personal information and passwords, to help you fill out forms or sign in to sites you visit.

- A list of permissions that you have granted to websites.

- Cookies or data from websites that you visit.

- Data saved by add-ons.

- A record of what you downloaded from websites.

You can manage this information in several ways:

- You can delete your browsing history information.

- You can manage or delete stored browsing data from the Cookies and Site Data dialog.

- You can stop Chrome from accepting cookies. Learn more.

- You can review stored passwords in Chrome settings. Learn more.

- You can view and manage your stored Autofill information. Learn more.

The personal information that Chrome stores won't be sent to Google unless you choose to store that data in your Google Account by turning on sync, or, in the case of payment cards and billing information, choosing specific payment card and billing information to store in your Google Payments account. Learn More.

Enabling sync affects only whether the personal information stored locally on your Chrome browser, such as your bookmarks, passwords, and autofill information, is stored in your Google Account so that you may access it when you use Chrome on other computers and devices. If you choose not to enable sync, that will not prevent Google from receiving information about your activity on sites and apps that use our services. As described in our Privacy Policy, when you use Chrome or another browser to visit third-party sites and apps that use our services, such as our Google Analytics and advertising services, Google receives information about your activity such as unique identifiers, browser type and settings, device type and settings, IP address, cookies, and the referrer URL of the page(s) you visited. You can choose whether to store activity from sites and apps that partner with Google in your Google Account by visiting My Activity. To learn about how to manage your privacy when you browse the web, read our Privacy Policy.

## How Chrome handles your information

**Information for website operators.** Sites that you visit using Chrome will automatically receive standard log information, including your system's IP address and data from cookies. In general, the fact that you use Chrome to access Google services, such as Gmail, does not cause Google to receive any additional personally identifying information about you. On Google websites and other websites that opt in, if Chrome detects signs that you are being actively attacked by someone on the network (a "man in the middle attack"), Chrome may send information about that connection to Google or the website you visited to help determine the extent of the attack and how the attack functions. Google provides participating website owners with reports about attacks occurring on their sites.

**Prerendering.** To load web pages faster, Chrome has a setting that can look up the IP addresses of links on a web page and open network connections. Sites and Android apps can also ask the browser to preload the pages you might visit next. Preloading requests from Android apps are controlled by the same setting as Chrome-initiated predictions. But preloading instructions from sites are always performed, regardless of whether Chrome's network prediction feature is enabled. If prerendering is requested, whether by Chrome or by a site or app, the preloaded site is allowed to set and read its own cookies just as if you had visited it, even if you don't end up visiting the prerendered page. Learn more.

**Location.** To get more geographically relevant information, Chrome gives you the option to share your location with a site. Chrome won't allow a site to access your location without your permission; however, on mobile devices, Chrome automatically shares your location with your default search engine if the Chrome app has permission to access your location and you haven't blocked geolocation for the associated web site. Chrome uses Google Location Services to estimate your location. The information that Chrome sends to Google Location Services may include:

- The Wi-Fi routers closest to you
- Cell IDs of the cell towers closest to you
- The strength of your Wi-Fi or cell signal
- The IP address that is currently assigned to your device

Google doesn't have control over third-party websites or their privacy practices, so be cautious when sharing your location with a website.

**Updates.** Chrome periodically sends information to Google to check for updates, get connectivity status, validate the current time, and estimate the number of active users.

**Search features.** If you are signed in to a Google site and Google is your default search engine, searches you perform using the omnibox or the search box on the new tab page in Chrome are stored in your Google Account.

**Search prediction service.** To help you find information faster, Chrome uses the prediction service provided by your default search engine to offer likely completions to the text you are typing. When you search using the omnibox or the search box on the new tab page in Chrome, the characters you type (even if you haven't hit "enter" yet) are sent to your default search engine. If Google is your default search engine, predictions are based on your own search history, topics related to what you're typing in the omnibox or in the search box on the new tab page, and what other people are searching for. Learn more. Predictions can also be based on your browsing history. Learn more.

**Navigation assistance.** When you can't connect to a web page, you can get suggestions for alternative pages similar to the one you're trying to reach. In order to offer you suggestions, Chrome sends Google the URL of the page you're trying to reach.

**Autofill and password management.** In order to improve Chrome's Autofill and password management services, Chrome sends Google limited, anonymous information about the web forms that you encounter or submit while Autofill or password management is enabled, including a hashed URL of the web page and details of the form's structure. Learn more.

**Payments.** When you are signed into Chrome with your Google account, Chrome may offer to save payment cards and related billing information to your Google Payments account. Chrome may also offer you the option of filling payment cards from your Google Payments account into web forms. If you have cards saved locally in Chrome, Chrome may prompt you to save them to your Google Payments account. If you use a payment card from your Google Payments account or choose to save your payment card in your Google Payments account for future use, Chrome will collect information about your computer and share it with Google Pay to protect you from fraud and provide the service. If supported by the merchant, Chrome will also allow you to pay using Google Pay.

**Language.** In order to customize your browsing experience based on the languages that you prefer to read, Chrome will keep a count of the most popular languages of the sites you visit. This language preference will be sent to Google to customize your experience in Chrome. If you have turned on Chrome sync, this language profile will be associated with your Google Account and, if you include Chrome history in your Google Web & App Activity, it may be used to personalize your experience in other Google products. View Activity Controls.

**Web Apps on Android.** On Android devices, if you select "add to homescreen" for a website that has been optimized for fast, reliable performance on mobile devices, then Chrome will use a Google server to create a native Android package for that website on your device. The Android package allows you to interact with the web app as you would with an Android app. For example, the web app will appear in your list of installed apps. Learn more.

**Usage statistics and crash reports.** By default, usage statistics and crash reports are sent to Google to help us improve our products. Usage statistics contain information such as preferences, button clicks, performance statistics, and memory usage. In general, usage statistics do not include web page URLs or personal information, but, if you have turned on "Make searches and browsing better / Sends URLs of pages you visit to Google", then Chrome usage statistics include information about the web pages you visit and your usage of them. If you have enabled Chrome sync, Chrome may combine any declared age and gender information from your Google account with our statistics to help us build products better suited for all demographics. For example, we may collect statistics to identify web pages that load slowly. We use this information to improve our products and services, and to give web developers insight into improving their pages. Crash reports contain system information at the time of the crash, and may contain web page URLs or personal information, depending on what was happening at the time the crash report was triggered. We may share aggregated, non-personally identifiable information publicly and with partners — like publishers, advertisers or web developers. You can change whether usage statistics and crash reports are sent to Google at any time. Learn more. If Google Play apps are enabled on your Chromebook and Chrome usage statistics are enabled, then Android diagnostic and usage data is also sent to Google.

**Media licenses.** Some websites encrypt media to protect against unauthorized access and copying. For HTML5 sites, this key exchange is done using the Encrypted Media Extensions API. In the process of allowing access to this media, session identifiers and licenses may be stored locally. These identifiers can be cleared by the user in Chrome using Clear Browsing Data with "Cookies and other site data" selected. For sites that use Adobe Flash Access, Chrome will provide a unique identifier to content partners and websites. The identifier is stored on your system. You can deny this access in the settings under Content Settings, Protected content, and reset the ID using Clear Browsing Data with "Cookies and other site data" selected. If you access protected content in Chrome on Android, or access higher quality or offline content on Chrome OS, a content provider may ask Chrome for a certificate to verify the eligibility of the device. Your device will share a site specific identifier with the website to certify that its cryptographic keys are protected by Chrome hardware. Learn more.

**Other Google services.** This notice describes the Google services that are enabled by default in Chrome. In addition, Chrome may offer other Google web services. For example, if you encounter a page in a different language, Chrome will offer to send the text to Google for translation. You will be notified of your options for controlling these services when you first use them. You can find more information in the Chrome Privacy Whitepaper.

## Identifiers in Chrome

Chrome includes a number of unique and non-unique identifiers necessary to power features and functional services. For example, if you use push

messaging, or delete these accounts, or accounts may become active again if previously deactivated, and remind customers when they are no longer needed. Additionally, the following identifiers help us develop, distribute, and promote Chrome, but are not directly related to a Chrome feature.

- **Installation tracking.** Each copy of the Windows desktop version of the Chrome browser includes a temporary randomly generated installation number that is sent to Google when you install and first use Chrome. This temporary identifier helps us estimate the number of installed browsers, and will be deleted the first time Chrome updates. The mobile version of Chrome uses a variant of the device identifier on an ongoing basis to track the number of installations of Chrome.

- **Promotion tracking.** In order to help us track the success of promotional campaigns, Chrome generates a unique token that is sent to Google when you first run and use the browser. In addition, if you received or reactivated your copy of the desktop version of the Chrome browser as part of a promotional campaign and Google is your default search engine, then searches from the omnibox will include a non-unique promotional tag. All mobile versions of the Chrome browser also include a non-unique promotional tag with searches from the omnibox. Chrome OS may also send a non-unique promotional tag to Google periodically (including during initial setup) and when performing searches with Google. Learn more.

- **Field trials.** We sometimes conduct limited tests of new features. Chrome includes a seed number that is randomly selected on first run to assign browsers to experiment groups. Experiments may also be limited by country (determined by your IP address), operating system, Chrome version, and other parameters. A list of field trials that are currently active on your installation of Chrome is included in all requests sent to Google. Learn more.

## Sign-in and Sync Chrome modes

You also have the option to use the Chrome browser while signed in to your Google Account, with or without sync enabled.

**Sign in on Desktop.** On desktop versions of Chrome, signing into or out of any Google web service, like google.com, signs you into or out of Chrome. You can turn this off in settings. Learn more. If you are signed in to your Google Account on desktop, Chrome may offer to save your payment cards and related billing information to your Google Payments account. This personal information will be used and protected in accordance with the Google Privacy Policy.

**Sync.** When you sign in to the Chrome browser or a Chromebook and enable sync with your Google Account, your personal information is saved in your Google Account on Google's servers so you may access it when you sign in and sync to Chrome on other computers and devices. This personal information will be used and protected in accordance with the Google Privacy Policy. This type of information can include:

- Browsing history
- Bookmarks
- Tabs
- Passwords and Autofill information
- Other browser settings, like installed extensions

Sync is only enabled if you choose. Learn More. To customize the specific information that you have enabled to sync, use the "Settings" menu. Learn more. You can see the amount of Chrome data stored for your Google Account and manage it on the Data from Chrome sync Dashboard. On the Dashboard, except for Google Accounts created through Family Link, you can also disable sync and delete all the associated data from Google's servers. Learn more. For Google Accounts created in Family Link, sign-in is required and sync cannot be disabled because it provides parent management features, such as website restrictions. However, children with Family Link accounts can still delete their data and disable synchronization of most data types. Learn More. The Privacy Notice for Google Accounts created in Family Link applies to Chrome sync data stored in those accounts.

### How Chrome handles your synced information

When you enable sync with your Google Account, we use your browsing data to improve and personalize your experience within Chrome. You can also personalize your experience on other Google products, by allowing your Chrome history to be included in your Google Web & App Activity. Learn more.

You can change this setting on your Account History page or manage your private data whenever you like. If you don't use your Chrome data to personalize your Google experience outside of Chrome, Google will only use your Chrome data after it's anonymized and aggregated with data from other users. Google uses this data to develop new features, products, and services, and to improve the overall quality of existing products and services. If you would like to use Google's cloud to store and sync your Chrome data but you don't want Google to access the data, you can encrypt your synced Chrome data with your own sync passphrase. Learn more.

## Incognito mode and guest mode

You can limit the information Chrome stores on your system by using incognito mode or guest mode. In these modes, Chrome won't store certain information, such as:

- Basic browsing history information like URLs, cached page text, or IP addresses of pages linked from the websites you visit
- Snapshots of pages that you visit
- Records of your downloads, although the files you download will still be stored elsewhere on your computer or device

### How Chrome handles your incognito or guest information

**Cookies.** Chrome won't share existing cookies with sites you visit in incognito or guest mode. Sites may deposit new cookies on your system while you are in these modes, but they'll only be stored and transmitted until you close the last incognito or guest window.

**Browser configuration changes.** When you make changes to your browser configuration, like bookmarking a web page or changing your settings, this information is saved. These changes are not affected by incognito or guest mode.

**Permissions.** Permissions you grant in incognito mode are not saved to your existing profile.

**Profile information.** In incognito mode, you will still have access to information from your existing profile, such as suggestions based on your browsing history and saved passwords, while you are browsing. In guest mode, you can browse without seeing information from any existing profiles.

# Managing Users in Chrome

## Managing users for personal Chrome use

You can set up personalized versions of Chrome for users sharing one device or computer. Note that anyone with access to your device can view all the information in all profiles. To truly protect your data from being seen by others, use the built-in user accounts in your operating system. Learn more.

## Managing users on Chrome for Enterprise

Some Chrome browsers or Chromebooks are managed by a school or company. In that case, the administrator has the ability to apply policies to the browser or Chromebook. Chrome contacts Google to check for these policies when a user first starts browsing (except in guest mode). Chrome checks periodically for updates to policies.

An administrator can set up a policy for status and activity reporting for Chrome, including location information for Chrome OS devices. Your administrators may also have the ability to access, monitor, use or disclose data accessed from your managed device.

# Safe Browsing practices

Google Chrome and certain third-party browsers, like some versions of Mozilla Firefox and Apple's Safari, include Google's Safe Browsing feature. With Safe Browsing, information about suspicious websites is sent and received between the browser you are using and Google's servers.

## How Safe Browsing works

Your browser contacts Google's servers periodically to download the most recent "Safe Browsing" list, which contains known phishing and malware sites. The most recent copy of the list is stored locally on your system. Google doesn't collect any account information or other personally identifying information as part of this contact. However, it does receive standard log information, including an IP address and cookies.

Each site you visit is checked against the Safe Browsing list on your system. If there's a match, your browser sends Google a hashed, partial copy of the site's URL so that Google can send more information to your browser. Google cannot determine the real URL from this information. Learn more.

The following Safe Browsing features are specific to Chrome:

- If you have turned on Safe Browsing's Enhanced Protection mode, Chrome provides additional protections, and sends Google additional data, as described in Chrome settings. Learn more. Some of these protections may also be available as standalone features, subject to separate controls, where Standard Protection is enabled.

- If you have turned on "Make searches and browsing better / Sends URLs of pages you visit to Google" and Safe Browsing is enabled, Chrome sends Google the full URL of each site you visit to determine whether that site is safe. If you also sync your browsing history without a sync passphrase, these URLs will be temporarily associated with your Google account to provide more personalized protection. This feature is disabled in incognito and guest modes.

- Some versions of Chrome feature Safe Browsing technology that can identify potentially harmful sites and potentially dangerous file types not already known by Google. The full URL of the site or potentially dangerous file might also be sent to Google to help determine whether the site or file is harmful.

- Chrome uses Safe Browsing technology to scan your computer periodically, in order to detect unwanted software that prevents you from changing your settings or otherwise interferes with the security and stability of your browser. Learn more. If this kind of software is detected, Chrome might offer you the option to download the Chrome Cleanup Tool to remove it.

- You can choose to send additional data to help improve Safe Browsing when you access a site that appears to contain malware or when Chrome detects unwanted software on your computer. Learn more.

- If you use Chrome's password manager, Safe Browsing checks with Google when you enter any saved password on an uncommon page to protect you from phishing attacks. Chrome does not send your passwords to Google as part of this protection. In addition, Safe Browsing protects your Google Account password. If you enter it on a likely phishing site, Chrome will prompt you to change your Google Account password. If you sync your browsing history, or if you are signed in to your Google Account and choose to notify Google, Chrome will also flag your Google Account as likely phished.

- If you are signed in to your Google Account, Chrome will also warn you when you use a username and password that may have been exposed in a data breach. To check, when you sign in to a site, Chrome sends Google a partial hash of your username and other encrypted information about your password, and Google returns a list of possible matches from known breaches. Chrome uses this list to determine whether your username and password were exposed. Google does not learn your username or password, or whether they were exposed, as part of this process. This feature can be disabled in Chrome settings. Learn more.

- On desktop and Android versions of Chrome, you can always choose to disable the Safe Browsing feature within Chrome settings. On iOS versions of Chrome, Apple controls the Safe Browsing technology used by your device and may send data to Safe Browsing providers other than Google.

# Privacy practices of apps, extensions, themes, services, and other add-ons

You can use apps, extensions, themes, services and other add-ons with Chrome, including some that may be preinstalled or integrated with Chrome. Add-ons developed and provided by Google may communicate with Google servers and are subject to the Google Privacy Policy unless otherwise indicated. Add-ons developed and provided by others are the responsibility of the add-on creators and may have different privacy policies.

## Managing add-ons

Before installing an add-on, you should review the requested permissions. Add-ons can have permission to do various things, like:

- Store, access, and share data stored locally or in your Google Drive account
- View and access content on websites you visit
- Use notifications that are sent through Google servers

Chrome can interact with add-ons in a few different ways:

- Checking for updates
- Downloading and installing updates
- Sending usage indicators to Google about the add-ons

Some add-ons might restore account or authentication number (or digital rights management) or for privacy or token messaging. You can disable these token identifiers by removing the add-on from Chrome.

From time to time, Google might discover an add-on that poses a security threat, violates the developer terms for Chrome Web Store, or violates other legal agreements, laws, regulations, or policies. Chrome periodically downloads a list of these dangerous add-ons, in order to remotely disable or remove them from your system.

## Server Log Privacy Information

Like most websites, our servers automatically record the page requests made when you visit our sites. These "server logs" typically include your web request, Internet Protocol address, browser type, browser language, the date and time of your request and one or more cookies that may uniquely identify your browser.

Here is an example of a typical log entry for where the search is for "cars" looks like this, followed by a breakdown of its parts:

```
123.45.67.89 - 25/Mar/2003 10:15:32 - https://www.google.com/search?q=cars - Firefox 1.0.7; Windows NT 5.1 -
740674ce2123e969
```

- `123.45.67.89` is the Internet Protocol address assigned to the user by the user's ISP. D; depending on the user's service, a different address may be assigned to the user by their service provider each time they connect to the Internet.;
- `25/Mar/2003 10:15:32` is the date and time of the query.;
- `https://www.google.com/search?q=cars` is the requested URL, including the search query.;
- `Firefox 1.0.7; Windows NT 5.1` is the browser and operating system being used.;
- `740674ce2123a969` is the unique cookie ID that was assigned to this particular computer the first time it visited a Google site. (Cookies can be deleted by users. If the user has deleted the cookie from the computer since the last time they've/s/he visited Google, then it will be the unique cookie ID assigned to their device the user the next time theys/he visits Google from that particular computer).

## More information

Information that Google receives when you use Chrome is used and protected under the Google Privacy Policy. Information that other website operators and add-on developers receive, including cookies, is subject to the privacy policies of those websites.

Google complies with certain legal frameworks relating to the transfer of data, such as the EU-US and Swiss-US Privacy Shield Framework. Learn more.

## Key Terms

### Cookies

A cookie is a small file containing a string of characters that is sent to your computer when you visit a website. When you visit the site again, the cookie allows that site to recognize your browser. Cookies may store user preferences and other information. You can configure your browser to refuse all cookies or to indicate when a cookie is being sent. However, some website features or services may not function properly without cookies. Learn more about how Google uses cookies and how Google uses data, including cookies, when you use our partners' sites or apps.

### Google Account

You may access some of our services by signing up for a Google Account and providing us with some personal information (typically your name, email address and a password). This account information is used to authenticate you when you access Google services and protect your account from unauthorized access by others. You can edit or delete your account at any time through your Google Account settings.

**APPENDIX E.4**

**CHROME PRIVACY NOTICE – MAY 20, 2020 (MODIFIED WITH HIGHLIGHTS)**

# Google Chrome Privacy Notice

Learn how to control the information that's collected, stored, and shared when you use the Google Chrome browser on your computer or mobile device, Chrome OS, and when you enable Safe Browsing in Chrome. Although this policy describes features that are specific to Chrome, any personal information that is provided to Google or stored in your Google Account will be used and protected in accordance with the Google Privacy Policy, as changed from time to time. Google's retention policy describes how and why Google retains data.

If Google Play apps have been enabled on your Chromebook, the use and protection of information collected by Google Play or the Android operating system is governed by the Google Play Terms of Service and Google Privacy Policy. Details specific to Chrome are provided in this Notice where relevant.

### Details about the Privacy Notice

In this Privacy Notice, we use the term "Chrome" to refer to all the products in the Chrome family listed above. If there are differences in our policy between products, we'll point them out. We change this Privacy Notice from time to time.

"Beta," "Dev," or "Canary" versions of Chrome let you test new features still being created in Chrome. This Privacy Notice applies to all versions of Chrome, but might not be up-to-date for features still under development.

For step-by-step guides to managing your privacy preferences, read this overview of Chrome's privacy controls.

## Table of contents:

- Browser modes
- Managing users in Chrome
- Safe Browsing practices
- Privacy practices of using apps, extensions, themes, services, and other add-ons
- More information

# Browser modes

You don't need to provide any personal information to use Chrome, but Chrome has different modes that you can use to change or improve your browsing experience. Privacy practices are different depending on the mode that you're using.

# Basic browser mode

The basic browser mode stores information locally on your system. This information might include:

- Browsing history information. For example, Chrome stores the URLs of pages that you visit, a cache of text, images and other resources from those pages, and, if the network actions prediction feature is turned on, a list of some of the IP addresses linked from those pages.

- Personal information and passwords, to help you fill out forms or sign in to sites you visit.

- A list of permissions that you have granted to websites.

- Cookies or data from websites that you visit.

- Data saved by add-ons.

- A record of what you downloaded from websites.

You can manage this information in several ways:

- You can delete your browsing history information.

- You can manage or delete stored browsing data from the Cookies and Site Data dialog.

- You can stop Chrome from accepting cookies. Learn more.

- You can review stored passwords in Chrome settings. Learn more.

- You can view and manage your stored Autofill information. Learn more.

The personal information that Chrome stores won't be sent to Google unless you choose to store that data in your Google Account by turning on sync, or, in the case of payment cards and billing information, choosing specific payment card and billing information to store in your Google Payments account. Learn More.

Enabling sync affects only whether the personal information stored locally on your Chrome browser, such as your bookmarks, passwords, and autofill information, is stored in your Google Account so that you may access it when you use Chrome on other computers and devices.  If you choose not to enable sync, that will not prevent Google from receiving information about your activity on sites and apps that use our services.  As described in our Privacy Policy, when you use Chrome or another browser to visit third-party sites and apps that use our services, such as our Google Analytics and advertising services, Google receives information about your activity such as unique identifiers, browser type and settings, device type and settings, IP address, cookies, and the referrer URL of the page(s) you visited.  You can choose whether to store activity from sites and apps that partner with Google in your Google Account by visiting My Activity.  To learn about how to manage your privacy when you browse the web, read our Privacy Policy.

## How Chrome handles your information

**Information for website operators.** Sites that you visit using Chrome will automatically receive standard log information, including your system's IP address and data from cookies. In general, the fact that you use Chrome to access Google services, such as Gmail, does not cause Google to receive any additional personally identifying information about you. On Google websites and other websites that opt in, if Chrome detects signs that you are being actively attacked by someone on the network (a "man in the middle attack"), Chrome may send information about that connection to Google or the website you visited to help determine the extent of the attack and how the attack functions. Google provides participating website owners with reports about attacks occurring on their sites.

**Prerendering.** To load web pages faster, Chrome has a setting that can look up the IP addresses of links on a web page and open network connections. Sites and Android apps can also ask the browser to preload the pages you might visit next. Preloading requests from Android apps are controlled by the same setting as Chrome-initiated predictions. But preloading instructions from sites are always performed, regardless of whether Chrome's network prediction feature is enabled. If prerendering is requested, whether by Chrome or by a site or app, the preloaded site is allowed to set and read its own cookies just as if you had visited it, even if you don't end up visiting the prerendered page. Learn more.

**Location.** To get more geographically relevant information, Chrome gives you the option to share your location with a site. Chrome won't allow a site to access your location without your permission; however, on mobile devices, Chrome automatically shares your location with your default search engine if the Chrome app has permission to access your location and you haven't blocked geolocation for the associated web site. Chrome uses Google Location Services to estimate your location. The information that Chrome sends to Google Location Services may include:

- The Wi-Fi routers closest to you
- Cell IDs of the cell towers closest to you
- The strength of your Wi-Fi or cell signal
- The IP address that is currently assigned to your device

Google doesn't have control over third-party websites or their privacy practices, so be cautious when sharing your location with a website.

**Updates.** Chrome periodically sends information to Google to check for updates, get connectivity status, validate the current time, and estimate the number of active users.

**Search features.** If you are signed in to a Google site and Google is your default search engine, searches you perform using the omnibox or the search box on the new tab page in Chrome are stored in your Google Account.

**Search prediction service.** To help you find information faster, Chrome uses the prediction service provided by your default search engine to offer you completions to the text you are typing. When you search using the omnibox or the search box on the new tab page in Chrome, the characters you type (even if you haven't hit "enter" yet) are sent to your default search engine. If Google is your default search engine, predictions are based on your own search history, topics related to what you're typing in the omnibox or in the search box on the new tab page, and what other people are searching for. Learn more. Predictions can also be based on your browsing history. Learn more.

**Navigation assistance.** When you can't connect to a web page, you can get suggestions for alternative pages similar to the one you're trying to reach. In order to offer you suggestions, Chrome sends Google the URL of the page you're trying to reach.

**Autofill and password management.** In order to improve Chrome's Autofill and password management services, Chrome sends Google limited, anonymous information about the web forms that you encounter or submit while Autofill or password management is enabled, including a hashed URL of the web page and details of the form's structure. Learn more.

**Payments.** When you are signed into Chrome with your Google account, Chrome may offer to save payment cards and related billing information to your Google Payments account. Chrome may also offer you the option of filling payment cards from your Google Payments account into web forms. If you have cards saved locally in Chrome, Chrome may prompt you to save them to your Google Payments account. If you use a payment card from your Google Payments account or choose to save your payment card in your Google Payments account for future use, Chrome will collect information about your computer and share it with Google Pay to protect you from fraud and provide the service. If supported by the merchant, Chrome will also allow you to pay using Google Pay.

**Language.** In order to customize your browsing experience based on the languages that you prefer to read, Chrome will keep a count of the most popular languages of the sites you visit. This language preference will be sent to Google to customize your experience in Chrome. If you have turned on Chrome sync, this language profile will be associated with your Google Account and, if you include Chrome history in your Google Web & App Activity, it may be used to personalize your experience in other Google products. View Activity Controls.

**Web Apps on Android.** On Android devices, if you select "add to homescreen" for a website that has been optimized for fast, reliable performance on mobile devices, then Chrome will use a Google server to create a native Android package for that website on your device. The Android package allows you to interact with the web app as you would with an Android app. For example, the web app will appear in your list of installed apps. Learn more.

**Usage statistics and crash reports.** By default, usage statistics and crash reports are sent to Google to help us improve our products. Usage statistics contain information such as preferences, button clicks, performance statistics, and memory usage. In general, usage statistics do not include web page URLs or personal information, but, if you have turned on "Make searches and browsing better / Sends URLs of pages you visit to Google", then Chrome usage statistics include information about the web pages you visit and your usage of them. If you have enabled Chrome sync, Chrome may combine any declared age and gender information from your Google account with our statistics to help us build products better suited for all demographics. For example, we may collect statistics to identify web pages that load slowly. We use this information to improve our products and services, and to give web developers insight into improving their pages. Crash reports contain system information at the time of the crash, and may contain web page URLs or personal information, depending on what was happening at the time the crash report was triggered. We may share aggregated, non-personally identifiable information publicly and with partners — like publishers, advertisers or web developers. You can change whether usage statistics and crash reports are sent to Google at any time. Learn more. If Google Play apps are enabled on your Chromebook and Chrome usage statistics are enabled, then Android diagnostic and usage data is also sent to Google.

**Media licenses.** Some websites encrypt media to protect against unauthorized access and copying. For HTML5 sites, this key exchange is done using the Encrypted Media Extensions API. In the process of allowing access to this media, session identifiers and licenses may be stored locally. These identifiers can be cleared by the user in Chrome using Clear Browsing Data with "Cookies and other site data" selected. For sites that use Adobe Flash Access, Chrome will provide a unique identifier to content partners and websites. The identifier is stored on your system. You can deny this access in the settings under Content Settings, Protected content, and reset the ID using Clear Browsing Data with "Cookies and other site data" selected. If you access protected content in Chrome on Android, or access higher quality or offline content on Chrome OS, a content provider may ask Chrome for a certificate to verify the eligibility of the device. Your device will share a site specific identifier with the website to certify that its cryptographic keys are protected by Chrome hardware. Learn more.

**Other Google services.** This notice describes the Google services that are enabled by default in Chrome. In addition, Chrome may offer other Google web services. For example, if you encounter a page in a different language, Chrome will offer to send the text to Google for translation. You will be notified of your options for controlling these services when you first use them. You can find more information in the Chrome Privacy Whitepaper.

## Identifiers in Chrome

Chrome includes a number of unique and non-unique identifiers necessary to power features and functional services. For example, if you use push

messaging to identify updates to Chrome and privacy notices, to ensure newly added features, and remove features when they are no longer needed. Additionally, the following identifiers help us develop, distribute, and promote Chrome, but are not directly related to a Chrome feature.

- **Installation tracking.** Each copy of the Windows desktop version of the Chrome browser includes a temporary randomly generated installation number that is sent to Google when you install and first use Chrome. This temporary identifier helps us estimate the number of installed browsers, and will be deleted the first time Chrome updates. The mobile version of Chrome uses a variant of the device identifier on an ongoing basis to track the number of installations of Chrome.

- **Promotion tracking.** In order to help us track the success of promotional campaigns, Chrome generates a unique token that is sent to Google when you first run and use the browser. In addition, if you received or reactivated your copy of the desktop version of the Chrome browser as part of a promotional campaign and Google is your default search engine, then searches from the omnibox will include a non-unique promotional tag. All mobile versions of the Chrome browser also include a non-unique promotional tag with searches from the omnibox. Chrome OS may also send a non-unique promotional tag to Google periodically (including during initial setup) and when performing searches with Google. Learn more.

- **Field trials.** We sometimes conduct limited tests of new features. Chrome includes a seed number that is randomly selected on first run to assign browsers to experiment groups. Experiments may also be limited by country (determined by your IP address), operating system, Chrome version, and other parameters. A list of field trials that are currently active on your installation of Chrome is included in all requests sent to Google. Learn more.

## Sign-in and Sync Chrome modes

You also have the option to use the Chrome browser while signed in to your Google Account, with or without sync enabled.

**Sign in on Desktop.** On desktop versions of Chrome, signing into or out of any Google web service, like google.com, signs you into or out of Chrome. You can turn this off in settings. Learn more. If you are signed in to your Google Account on desktop, Chrome may offer to save your payment cards and related billing information to your Google Payments account. This personal information will be used and protected in accordance with the Google Privacy Policy.

**Sync.** When you sign in to the Chrome browser or a Chromebook and enable sync with your Google Account, your personal information is saved in your Google Account on Google's servers so you may access it when you sign in and sync to Chrome on other computers and devices. This personal information will be used and protected in accordance with the Google Privacy Policy. This type of information can include:

- Browsing history
- Bookmarks
- Tabs
- Passwords and Autofill information
- Other browser settings, like installed extensions

Sync is only enabled if you choose. Learn More. To customize the specific information that you have enabled to sync, use the "Settings" menu. Learn more. You can see the amount of Chrome data stored for your Google Account and manage it on the Data from Chrome sync Dashboard. On the Dashboard, except for Google Accounts created through Family Link, you can also disable sync and delete all the associated data from Google's servers. Learn more. For Google Accounts created in Family Link, sign-in is required and sync cannot be disabled because it provides parent management features, such as website restrictions. However, children with Family Link accounts can still delete their data and disable synchronization of most data types. Learn More. The Privacy Notice for Google Accounts created in Family Link applies to Chrome sync data stored in those accounts.

### How Chrome handles your synced information

When you enable sync with your Google Account, we use your browsing data to improve and personalize your experience within Chrome. You can also personalize your experience on other Google products, by allowing your Chrome history to be included in your Google Web & App Activity. Learn more.

You can change this setting on your Account History page or manage your private data whenever you like. If you don't use your Chrome data to personalize your Google experience outside of Chrome, Google will only use your Chrome data after it's anonymized and aggregated with data from other users. Google uses this data to develop new features, products, and services, and to improve the overall quality of existing products and services. If you would like to use Google's cloud to store and sync your Chrome data but you don't want Google to access the data, you can encrypt your synced Chrome data with your own sync passphrase. Learn more.

## Incognito mode and guest mode

You can limit the information Chrome stores on your system by using incognito mode or guest mode. In these modes, Chrome won't store certain information, such as:

- Basic browsing history information like URLs, cached page text, or IP addresses of pages linked from the websites you visit
- Snapshots of pages that you visit
- Records of your downloads, although the files you download will still be stored elsewhere on your computer or device

## How Chrome handles your incognito or guest information

**Cookies.** Chrome won't share existing cookies with sites you visit in incognito or guest mode. Sites may deposit new cookies on your system while you are in these modes, but they'll only be stored and transmitted until you close the last incognito or guest window.

**Browser configuration changes.** When you make changes to your browser configuration, like bookmarking a web page or changing your settings, this information is saved. These changes are not affected by incognito or guest mode.

**Permissions.** Permissions you grant in incognito mode are not saved to your existing profile.

**Profile information.** In incognito mode, you will still have access to information from your existing profile, such as suggestions based on your browsing history and saved passwords, while you are browsing. In guest mode, you can browse without seeing information from any existing profiles.

# Managing Users in Chrome

## Managing users for personal Chrome use

You can set up personalized versions of Chrome for users sharing one device or computer. Note that anyone with access to your device can view all the information in all profiles. To truly protect your data from being seen by others, use the built-in user accounts in your operating system. Learn more.

## Managing users on Chrome for Enterprise

Some Chrome browsers or Chromebooks are managed by a school or company. In that case, the administrator has the ability to apply policies to the browser or Chromebook. Chrome contacts Google to check for these policies when a user first starts browsing (except in guest mode). Chrome checks periodically for updates to policies.

An administrator can set up a policy for status and activity reporting for Chrome, including location information for Chrome OS devices. Your administrators may also have the ability to access, monitor, use or disclose data accessed from your managed device.

# Safe Browsing practices

Google Chrome and certain third-party browsers, like some versions of Mozilla Firefox and Apple's Safari, include Google's Safe Browsing feature. With Safe Browsing, information about suspicious websites is sent and received between the browser you are using and Google's servers.

## How Safe Browsing works

Your browser contacts Google's servers periodically to download the most recent "Safe Browsing" list, which contains known phishing and malware sites. The most recent copy of the list is stored locally on your system. Google doesn't collect any account information or other personally identifying information as part of this contact. However, it does receive standard log information, including an IP address and cookies.

Each site you visit is checked against the Safe Browsing list on your system. If there's a match, your browser sends Google a hashed, partial copy of the site's URL so that Google can send more information to your browser. Google cannot determine the real URL from this information. Learn more.

The following Safe Browsing features are specific to Chrome:

- If you have turned on Safe Browsing's Enhanced Protection mode, Chrome provides additional protections, and sends Google additional data, as described in Chrome settings. Learn more. Some of these protections may also be available as standalone features, subject to separate controls, where Standard Protection is enabled.

- If you have turned on "Make searches and browsing better / Sends URLs of pages you visit to Google" and Safe Browsing is enabled, Chrome sends Google the full URL of each site you visit to determine whether that site is safe. If you also sync your browsing history without a sync passphrase, these URLs will be temporarily associated with your Google account to provide more personalized protection. This feature is disabled in incognito and guest modes.

- Some versions of Chrome feature Safe Browsing technology that can identify potentially harmful sites and potentially dangerous file types not already known by Google. The full URL of the site or potentially dangerous file might also be sent to Google to help determine whether the site or file is harmful.

- Chrome uses Safe Browsing technology to scan your computer periodically, in order to detect unwanted software that prevents you from changing your settings or otherwise interferes with the security and stability of your browser. Learn more. If this kind of software is detected, Chrome might offer you the option to download the Chrome Cleanup Tool to remove it.

- You can choose to send additional data to help improve Safe Browsing when you access a site that appears to contain malware or when Chrome detects unwanted software on your computer. Learn more.

- If you use Chrome's password manager, Safe Browsing checks with Google when you enter any saved password on an uncommon page to protect you from phishing attacks. Chrome does not send your passwords to Google as part of this protection. In addition, Safe Browsing protects your Google Account password. If you enter it on a likely phishing site, Chrome will prompt you to change your Google Account password. If you sync your browsing history, or if you are signed in to your Google Account and choose to notify Google, Chrome will also flag your Google Account as likely phished.

- If you are signed in to your Google Account, Chrome will also warn you when you use a username and password that may have been exposed in a data breach. To check, when you sign in to a site, Chrome sends Google a partial hash of your username and other encrypted information about your password, and Google returns a list of possible matches from known breaches. Chrome uses this list to determine whether your username and password were exposed. Google does not learn your username or password, or whether they were exposed, as part of this process. This feature can be disabled in Chrome settings. Learn more.

- On desktop and Android versions of Chrome, you can always choose to disable the Safe Browsing feature within Chrome settings. On iOS versions of Chrome, Apple controls the Safe Browsing technology used by your device and may send data to Safe Browsing providers other than Google.

# Privacy practices of apps, extensions, themes, services, and other add-ons

You can use apps, extensions, themes, services and other add-ons with Chrome, including some that may be preinstalled or integrated with Chrome. Add-ons developed and provided by Google may communicate with Google servers and are subject to the Google Privacy Policy unless otherwise indicated. Add-ons developed and provided by others are the responsibility of the add-on creators and may have different privacy policies.

## Managing add-ons

Before installing an add-on, you should review the requested permissions. Add-ons can have permission to do various things, like:

- Store, access, and share data stored locally or in your Google Drive account
- View and access content on websites you visit
- Use notifications that are sent through Google servers

Chrome can interact with add-ons in a few different ways:

- Checking for updates
- Downloading and installing updates
- Sending usage indicators to Google about the add-ons

Some add-ons might require access to a unique number for digital rights management or for delivery of push messaging. You can disable these such identifiers by removing the add-on from Chrome.

From time to time, Google might discover an add-on that poses a security threat, violates the developer terms for Chrome Web Store, or violates other legal agreements, laws, regulations, or policies. Chrome periodically downloads a list of these dangerous add-ons, in order to remotely disable or remove them from your system.

## Server Log Privacy Information

Like most websites, our servers automatically record the page requests made when you visit our sites. These "server logs" typically include your web request, Internet Protocol address, browser type, browser language, the date and time of your request and one or more cookies that may uniquely identify your browser.

Here is an example of a typical log entry for where the search is for "cars" looks like this, followed by a breakdown of its parts:

```
123.45.67.89 - 25/Mar/2003 10:15:32 - https://www.google.com/search?q=cars - Firefox 1.0.7; Windows NT 5.1 -
740674ce2123e969
```

- `123.45.67.89` is the Internet Protocol address assigned to the user by the user's ISP. D; depending on the user's service, a different address may be assigned to the user by their service provider each time they connect to the Internet.;
- `25/Mar/2003 10:15:32` is the date and time of the query.;
- `https://www.google.com/search?q=cars` is the requested URL, including the search query.;
- `Firefox 1.0.7; Windows NT 5.1` is the browser and operating system being used.;
- `740674ce2123a969` is the unique cookie ID that was assigned to this particular computer the first time it visited a Google site. (Cookies can be deleted by users. If the user has deleted the cookie from the computer since the last time they've/s/he visited Google, then it will be the unique cookie ID assigned to their device the user the next time theys/he visits Google from that particular computer).

# More information

Information that Google receives when you use Chrome is used and protected under the Google Privacy Policy. Information that other website operators and add-on developers receive, including cookies, is subject to the privacy policies of those websites.

Google complies with certain legal frameworks relating to the transfer of data, such as the EU-US and Swiss-US Privacy Shield Framework. Learn more.

# Key Terms

## Cookies

A cookie is a small file containing a string of characters that is sent to your computer when you visit a website. When you visit the site again, the cookie allows that site to recognize your browser. Cookies may store user preferences and other information. You can configure your browser to refuse all cookies or to indicate when a cookie is being sent. However, some website features or services may not function properly without cookies. Learn more about how Google uses cookies and how Google uses data, including cookies, when you use our partners' sites or apps.

## Google Account

You may access some of our services by signing up for a Google Account and providing us with some personal information (typically your name, email address and a password). This account information is used to authenticate you when you access Google services and protect your account from unauthorized access by others. You can edit or delete your account at any time through your Google Account settings.

**APPENDIX F**

**WEB & APP ACTIVITY (WAA) HELP PAGE**

# Find & control your Web & App Activity

If Web & App Activity is turned on, your searches and activity from other Google services are saved in your Google Account, so you may get more personalized experiences, like faster searches and more helpful app and content recommendations.

You can turn Web & App Activity off or delete past activity at any time.

**Note**: If you got your Google Account through work or school, you might need to contact your administrator to turn on the Web & App Activity additional service for your organization.

Android    **Computer**    iPhone & iPad

## Turn Web & App Activity on or off

1. On your computer, visit the Activity controls ☒ page. You may be asked to sign in to your Google Account.
2. Turn **Web & App Activity** on or off.
3. When **Web & App Activity** is on:
   - You can check the box next to "Include Chrome history and activity from websites and apps that use Google services."
   - You can check the box next to "Include audio recordings."

**Note**: Some browsers and devices may have more settings that affect how this activity is saved.

## Find or delete your activity

You can find and delete your Web & App Activity by visiting My Activity ☒ . Learn more about how to delete activity manually or set up automatic deletion.

**Tip**: To add more security, you can require an extra verification step to view your full history on My Activity ☒  .

## What's saved as Web & App Activity

Info about your searches and other activity on Google sites, apps, and services    ⌃

When Web & App Activity is on, Google saves information like:

- Searches and other things you do on Google products and services, like Maps and Play
- Your location, language, IP address, referrer, and whether you use a browser or an app
- Ads you click, or things you buy on an advertiser's site
- Information on your device like recent apps or contact names you searched for

**Note**: Activity could be saved even when you're offline.

## Info about your browsing and other activity on sites, apps, and devices that use Google services ⌃

When Web & App Activity is on, you can include additional activity like:

- Sites and apps that partner with Google to show ads
- Sites and apps that use Google services, including data that apps share with Google
- Your Chrome browsing history
- Android usage & diagnostics, like battery level and system errors

To let Google save this information:

- Web & App Activity must be on.
- The box next to "Include Chrome history and activity from sites, apps, and devices that use Google services" must be checked.

Your Chrome history is saved only if you're signed in to your Google Account and have Chrome Sync turned on. Learn about Chrome Sync.

**Note:** If you use a shared device or sign in with more than one account, activity might be saved to the default account on the browser or device you use.

---

## Audio recordings ⌃

When Web & App Activity is on, you can include audio recordings from your interactions with Google Search, Assistant, and Maps as part of your activity. Learn about audio recordings.

To let Google save this information:

- Web & App Activity must be on.
- The box next to "Include audio recordings" must be checked.

# How your saved activity is used

Learn more about how Google uses your saved activity ☒ and helps keep it private.

For more information about how Google treats search queries generally, review the Privacy Policy FAQ ☒ .

# How Web & App Activity works when you're signed out

Your search and ad results may be customized using search-related activity even if you're signed out. To turn off this kind of search customization, you can search and browse privately. Learn how.

# Browser history

In the Activity controls ☑ page, you can also check the box to "Include Chrome history and activity from sites, apps, and devices that use Google services." When this box is checked, you can control whether activity from your device is saved.

Your searches and the sites you visit may also be stored in your browser or the Google Toolbar. Learn how to delete your history on Chrome, Toolbar, Safari ☑ , Internet Explorer ☑ , or Firefox ☑ .

☐ Give feedback about this article

**APPENDIX G**

**NEW ACCOUNT CREATION AGREEMENT**



# Privacy and Terms

To create a Google Account, you'll need to agree to the **Terms of Service** below.

In addition, when you create an account, we process your information as described in our **Privacy Policy**, including these key points:



## Data we process when you use Google

- When you set up a Google Account, we store information you give us like your name, email address, and telephone number.
- When you use Google services to do things like write a message in Gmail or comment on a YouTube video, we store the information you create.
- When you search for a restaurant on Google Maps or watch a video on YouTube, for example, we process information about that activity – including information like the video you watched, device IDs, IP addresses, cookie data, and location.
- We also process the kinds of information described above when you use apps or sites that use Google services like ads, Analytics, and the YouTube video player.

You're in control of the data we collect & how it's used

## Why we process it

We process this data for the purposes described in **our policy**, including to:

- Help our services deliver more useful, customized content such as more relevant search results;
- Improve the quality of our services and develop new ones;
- Deliver personalized ads, depending on your account settings, both on Google services and on sites and apps that partner with Google;
- Improve security by protecting against fraud and abuse; and
- Conduct analytics and measurement to understand how our services are used. We also have partners that measure how our services are

used. Learn more about these specific advertising and measurement partners.

## Combining data

We also combine this data among our services and across your devices for these purposes. For example, depending on your account settings, we show you ads based on information about your interests, which we can derive from your use of Search and YouTube, and we use data from trillions of search queries to build spell-correction models that we use across all of our services.

## You're in control

Depending on your account settings, some of this data may be associated with your Google Account and we treat this data as personal information. You can control how we collect and use this data now by clicking "More Options" below. You can always adjust your controls later or withdraw your consent for the future by visiting My Account (myaccount.google.com).

**More options** ⌃

Customize your Google experience by confirming your personalization settings and the data stored with your account.

You can always learn more about these options, adjust them, and review your activity in your Google Account (account.google.com).

### ⟲  Web & App Activity

Saves your activity on Google sites and apps, including searches and associated info like location. Also saves activity from sites, apps, and devices that use Google services, including Chrome history. This helps Google provide better search results, suggestions, and personalization across Google services. Activity older than 18 months will be automatically deleted. You can change your auto-delete option, stop saving activity, or delete it manually at account.google.com.

  Save my Web & App Activity in my Google Account

I don't save my Web & App Activity in my Google Account

Learn more about Web & App Activity

## Ad personalization

Google can show you ads based on your activity on Google services (such as Search or YouTube), and on websites and apps that partner with Google.

⦿ Show me personalized ads

◯ Show me ads that aren't personalized

Learn more about Ad personalization

## ▶ YouTube History

Saves the YouTube videos you watch and the things you search for on YouTube. This helps Google give you better recommendations, remember where you left off, and more. Activity older than 36 months will be automatically deleted. You can change your auto-delete option, stop saving activity, or delete it manually at account.google.com.

⦿ Save my YouTube History in my Google Account

◯ Don't save my YouTube History in my Google Account

These settings apply wherever you are signed in to your new Google Account.

☐ Send me occasional reminders about these settings

Cancel                    I agree

**APPENDIX H**

**CONSENT BUMP AGREEMENT**



### Some new features for your Google Account

We've introduced some optional features for your account, giving you more control over the data Google collects and how it's used, while allowing Google to show you more relevant ads.

## What changes if you turn on these new features?

1. More information will be available in your *Google Account*, making it easier for you to review and control



When you use Google services like Search and YouTube, you generate data — things like what you've searched for and videos you've watched. You can find and control that data in *My Account* under the **Web & App Activity** setting.

With this change, this setting may also include browsing data from Chrome and activity from sites and apps that partner with Google, including those that show ads from Google.

2. Google will use this information to make ads across the web more relevant for you



In *My Account*, the **Ads Personalization** setting currently lets Google use data in your account to tailor ads that appear in Google products.

With this change, this setting will also let Google use data in your account to improve the relevance of ads on websites and apps that partner with Google.

These settings apply across all of your signed-in devices and across all Google services. You can change them any time in *My Account*. Learn more about these features, including how they affect shared devices.

## What's still the same?

- Google does not sell your personal information to anyone

- You control the types of information we collect and use at *My Account* (myaccount.google.com)

**Choose I AGREE to turn these features on or MORE OPTIONS for more choices.**

MORE OPTIONS          I AGREE

### More about these new features

We think these new features will make your Google experience better and we hope this page will help you decide what's right for you. Read on for more about the change and how it affects the data Google collects, your privacy settings, and the ads you see.

### Why does Google collect data and where does it come from?

Data helps us make our services faster, smarter, and more useful for you. For example, when you allow Google Maps to know your location, it can show you the quickest way home.

Some of the data that Google collects comes from our own products and some of it comes from your visits to sites and apps that partner with Google. These new features allow you to make more of this information visible in your *Google Account*, so your info is easier to review and control. The new features also expand our ability to make Google services better, including making the ads you see in Google products and across the web more relevant to you.

### How does Google give you control over your information?

We created *My Account* (myaccount.google.com) to give you one central place where you can quickly access and manage your information. You also have easy-to-use settings there that allow you to decide how you want our services to work for you.

These new features introduce updates to two key privacy settings in your account:

- Your **Web & App Activity** setting lets you see and control data you generate when using Google services, like things you search for and search results you select. Google uses this data to improve your experience, including giving you better search results. If you turn on these new features, your *Web & App Activity* may also include browsing data from Chrome and activity from sites and apps that partner with Google, including those that show ads from Google.

- Your **Ads Personalization** setting lets Google use data from your account, such as the searches you've done and your location, to make the ads we show you more relevant and useful. If you turn on these new features, Google can use that same data to improve the relevance of ads on sites and apps that partner with Google and across your signed-in devices.

If you decide not to turn on these new features, your settings and Google experience will stay the same.

### What if you use more than one *Google Account* at the same time?

You can control your settings separately for each of your accounts. But if you use more than one account at the same time, Google applies the settings from your default account.

On the web, your default account is the first account you use each time you sign in to a new browser. On mobile devices, the default account depends on your operating system and the apps you use.

For example, if you sign in on the web with two different Google accounts, Google will use *Web & App Activity* and *Ads Personalization* settings from the account you signed in to first, both to save data and to personalize your experience.

### Why do ads matter and how does Google decide what ads to show?

Ads allow Google to offer Gmail, YouTube, Search, Maps, and many other services for free. When you use those services, our goal is to make the ads there as relevant for you as possible. The information in your *Google Account* helps us do that.

Ads also allow other sites and apps to offer their content for free. More than 2 million of them, likely many that you use, rely on Google to provide the ads they show. This change now makes it possible for us to use the same information in your *Google Account* to improve the ads we show you while you're signed in and visiting those sites and apps.

In more technical terms, instead of personalizing ads using a cookie ID for each of your devices, as we do today, this change makes it possible to use a single identifier associated with your account that gets used in Google products and across the web.

While we try to show you the best ads possible, we know we don't always get it right, and that's why you have ways to control the ads you see. For example, *Mute This Ad* lets you remove ads you don't find relevant. And with this change, your ads preferences work whenever you're signed in — across all Google products and on all your signed-in devices.

### What do we mean by "websites and apps that partner with Google"?

Many websites and apps use Google technologies to improve their content and services. For example, a website might use our advertising services (like AdSense) or analytics tools (like partners who use Google Analytics to improve the ads they show).

As you use these sites, your web browser may send certain information to Google that may include the web address of the page that you're visiting, your IP address, or cookies previously set by the site or Google. In the case of mobile apps, this could also include the name of the app and an identifier that helps us to determine which ads we've served to other apps on your device.

The features described today don't change the types of data collected from these websites and apps — they simply change how that data is stored and used.

See the Google Privacy Policy for more information about what data we collect, why we collect it, and what we do with it.

BACK

**APPENDIX I**

**SURVEY IMPLEMENTATION, DESIGN, AND ADMINISTRATION**

## Survey Implementation, Design, and Administration

## I.    INTRODUCTION

1.    I conducted three surveys to address multiple questions specific to the facts of this matter.

   a.    My Consumer Expectations Survey uses an experimental design to determine how Chrome users would expect information to be handled while using Chrome and to what extent their expectations would be dependent on whether Sync mode is enabled, while being presented with the CPN, PP, and WAA Help Page or not.

   b.    My Materiality Survey uses an experimental design to measure whether and to what extent users would continue using the Chrome browser after being presented with the CPN and PP, and to study whether Chrome users' intent to use Chrome would change with increased clarification of certain language in the CPN addressing Plaintiffs' allegations as to how class members would likely interpret the CPN.

   c.    My Scenario Application Survey uses an experimental design to measure whether and to what extent Chrome users understand that Google receives data reflecting their activity on sites and apps that partner with Google after seeing Google's Account Holder Agreements (either the disclosure for existing Google Account holders, or for new Google Account creators).

2.    The design and implementation of my surveys follow professional standards and best practices for survey-based research, both generally as well as specifically for surveys conducted for the purpose of litigation. Specifically, I designed and implemented my surveys according to the guidelines set forth in the *Manual for Complex Litigation* and Shari Diamond's *Reference Guide on Survey Research* ("Diamond (2011)"), including identifying and sampling from the appropriate target population, utilizing an experimental design with multiple groups (also known as conditions) to isolate an effect, designing the questions in a way that minimizes the potential for bias, pretesting the survey, and administering the

survey.[1] In this appendix, I discuss each of these aspects of my survey design and implementation in turn.

## II.    SURVEY QUESTIONNAIRE DESIGN

3.    To implement the Consumer Expectations Survey, the Materiality Survey, and the Scenario Application Survey, I applied survey question design principles that minimize demand artifacts. I identified the relevant population for the research objective and constructed the stimuli. Respondents in all three surveys were presented with stimuli before they answered the main survey questions. The stimuli followed an experimental design and varied across multiple conditions. Of note, I designed my three surveys to have the same target population and used identical screener questions to construct my sample.

### A.    Identifying and Sampling from the Relevant Population

4.    According to Diamond (2011), defining the proper target population is one of the first steps in designing a survey.[2] "The target population consists of all elements (*i.e.*, individuals or other units) whose characteristics or perceptions the survey is intended to represent."[3] A carefully executed survey includes screening questions ("screener") that determine a potential respondent's eligibility to participate in the survey.[4] These screeners help to "terminate" any respondents who do not match the description of the target population, ensuring that a relevant group of consumers answers the survey questions. Consistent with the Proposed Class, the target population of my surveys consists of adult Chrome users residing in the US. To achieve this target population, I first required the panel provider to institute survey start quotas based on the 2018 estimates from the US Census Bureau for age, gender, and geography. I then required the screener to be applied to the representative sample of the general population in the US so that the final sample is representative of the target population.

---

[1]    *Manual for Complex Litigation*, Fourth Edition, Federal Judicial Center, 2004, at pp. 102-104; Diamond, S. S., "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*, Third Edition, National Academies Press, 2011, pp. 359-423 ("Diamond (2011)").

[2]    Diamond (2011), at p. 376.

[3]    Diamond (2011), at p. 376.

[4]    Diamond (2011), at pp. 386-387.

5.    The screening section consisted of the following questions:[5]

    a.    **Introduction (QS1):** I began the survey with introductory text that contained instructions for respondents. I instructed respondents not to guess because guessing can distort results, as I discuss in **Section II.B**. I also informed respondents to wear glasses or corrective lenses if respondents wear them while using a desktop computer, laptop computer, or tablet to ensure that respondents could see the stimuli clearly. I told respondents to not use the "Back" button of their browser while taking the survey, and I also instructed the survey vendor to disable the "Back" button and not show a "Back" button within the survey. By not allowing respondents to go back to previous questions in the survey, respondents cannot revise responses to questions they have already answered based on information they see later in the survey.

    b.    **Captcha (QS2):** I included a Captcha at the beginning of the survey where respondents needed to input a unique verification code. This verification ensures that the survey was taken by a real respondent and not a bot.

    c.    **Relevant Population (QS3-QS5 and QS7):** As the Proposed Class consists of Chrome users, I screened for my target population, which was defined as adult Chrome users residing in the US.

    I asked respondents to provide their age, gender, and state of residence in QS3, QS4, and QS5 respectively. In the age question (QS3), respondents who answered that they were under the age of 18 or "Prefer not to answer" were terminated. In the gender question (QS4), respondents who answered "Prefer not to answer" were terminated. In the state of residence question (QS5), respondents who answered "Prefer not to answer" or "Don't know / Unsure" were terminated. It is standard practice to terminate respondents who do not provide definitive responses for the age, gender, and state of residence questions as these responses do not provide sufficient information for me to verify if these respondents contribute to a balanced and representative sample. Additionally, I ensured that respondents' reported age

---

[5]    The full screener (and survey) instrument is included in **Appendices L.1, L.2, and L.3**.

and gender matched the records on file at the panel company.[6] This helps ensure quality as respondents who may not be answering truthfully or are rushing through the survey would be terminated.

In QS7, I screened for respondents who use Google Chrome as an internet browser across the internet-connected device(s) they own. To minimize bias, I asked respondents to select from a list of options rather than to answer "yes" or "no" to whether they use "Google Chrome." I constructed this list of options based on the most popular browsers on the market, as well as the Brave browser which attempts to distinguish itself as providing additional privacy protections.[7] Among the answer options, I included a "red herring," a fictitious internet browser called "Blue Steel," which I used as a quality check for respondents' answers.[8] Respondents were terminated if they selected the red herring. Respondents were allowed to continue with the survey if they selected "Google Chrome" as one of their responses and did not select "Blue Steel." Additionally, respondents were terminated if they selected "Don't know / Unsure" as this response does not provide sufficient information for me to verify if they are a Chrome user.

d. **Employment (QS6):** The screener also included a question that excluded any respondents who reported being employed by or having a family member employed by a law firm, legal services organization, or court. Questions such as these are used to identify and exclude respondents who are likely to have prior opinions or

---

[6]   In QS4, respondents were terminated only if they answered "Male" or "Female" and their response did not align with the information on file with the panel provider. If respondents answered "Other" or "Prefer not to answer," they were not terminated if their response did not align with the record on the panel.

[7]   I did not include mobile-specific browsers (Android, UC Browser, Samsung Internet, and Nokia). "Browser Market Share Worldwide," *StatCounter*, available at: https://gs.statcounter.com/browser-market-share#yearly-2009-2020, accessed on December 14, 2021; "Brave is one of the safest browsers on the market today. It blocks privacy-invasive ads & trackers. It blocks third-party data storage and IP address collection. It protects from browser fingerprinting. It upgrades every webpage possible to secure https connections. And it does all this by default." "The Best Privacy Online," *Brave*, available at: https://brave.com/, accessed on December 17, 2021.

[8]   "Red herrings" are answer options "that are not legitimate" (e.g., a fake brand name or service) and including them can be "very effective in identifying 'bad' survey takers." Reimann, C., "Conducting an Online Survey? How to Make Sure You Don't Get Bad Data," *KS&R*, 2020, available at: http://www.ksrinc.com/thought-leadership/pdf/KSR_Online_Data_Integrity.pdf.

specialized knowledge on the topic of interest. Exclusion of such respondents is common practice in survey research for litigation purposes.

### B.    Minimizing Demand Artifacts through Appropriate Survey Design

6.    The design of the survey questionnaires involved constructing appropriate questions to minimize demand artifacts. Demand artifacts "include all aspects of the experiment which can cause the subject to perceive, interpret, and act upon what he believes is expected or desired of him by the experimenter."[9] According to Diamond (2011), "the wording of a question, open-ended or closed-ended, can be leading or non-leading and the degree of suggestiveness of each question must be considered in evaluating the objectivity of a survey."[10] The questions and answer options included in my questionnaire have been formulated to avoid confusing respondents, to avoid steering respondents to a particular answer, and to keep them from guessing. By minimizing guessing, avoiding leading questions and order effects, and ensuring participant objectivity, I minimized demand artifacts.

7.    **Avoiding Guessing:** If respondents make guesses when answering questions, the survey results may be distorted. Diamond (2011) explains that the use of quasi- and full-filter questions reduces guessing. Quasi-filter questions offer a "no response" option, such as "Don't know / Unsure / No opinion." Full-filter questions precede a substantive question and ask the respondent whether or not they are aware of or have an opinion on the substantive question, filtering out those that are not aware or have no opinion. Both quasi- and full-filter questions avoid demand artifacts and are important elements of careful survey design. "By signaling to the respondent that it is appropriate not to have an opinion, the question reduces the demand for an answer and, as a result, the inclination to hazard a guess just to comply."[11] In my surveys, I instructed respondents at the beginning and before the start of the main questionnaire, "If you don't know an answer to a question or if you don't have an opinion, please don't guess. Simply indicate this in your response by selecting the "Don't know /

---

9     Sawyer, A. G., "Demand Artifacts in Laboratory Experiments in Consumer Research," *Journal of Consumer Research*, Vol. 1, No. 4, March 1975, pp. 20-30, at p. 20.

10    Diamond (2011), at p. 393.

11    Diamond (2011), at p. 390.

Unsure" option. There are no right or wrong answers."[12] I then utilized both quasi-filters and full-filter questions where appropriate. In particular, all closed-ended questions in the main survey included a "Don't know / Unsure" answer option. All surveys included an open-ended (free-response) follow-up question related to awareness of ongoing litigation that was preceded by a full-filter closed-ended question, ensuring that the respondent was not asked about their opinion when she or he had none. These follow-up questions also included a "Don't know / Unsure" quasi-filter answer option.

8. **Avoiding Order Effects:** Diamond (2011) also warns that, "[t]he order in which questions are asked on a survey and the order in which response alternatives are provided in a closed-ended question can influence the answers."[13] For example, when response options are shown visually, respondents are more likely to choose the first option in the list due to primacy effects.[14] Careful ordering of the questions and randomization of the order of answer options help to control for these order effects.[15] In my surveys, I took several steps to do so. I ordered questions from general to more specific, randomized the order in which certain stimuli and questions were shown, and randomized the order of certain answer options.

9. **Avoiding Unbalanced, Leading Questions:** Similarly, in order to reduce demand artifacts, survey questions should use balanced language. The surveys that I conducted in this matter used double-sided questions, placing equal emphasis on positive and negative positions. For example, rather than asking "How *likely* are you to continue using Google Chrome?" the first question of my Materiality Survey questionnaire (after the stimuli) asked "How *likely or unlikely* are you to continue using Google Chrome?" This approach avoids leading questions that are weighted in a particular direction and may elicit a particular response.

10. **Double-Blind Approach:** Finally, Diamond (2011) explains that "[t]o ensure objectivity in the administration of the survey, it is standard interview practice in surveys conducted for litigation to do double-blind research whenever possible: both the interviewer and the

---

12    See **Appendices L.1, L.2, and L.3**, Questions QS1 and Q0.

13    Diamond (2011), at p. 395.

14    Diamond (2011), at p. 396.

15    Diamond (2011), at pp. 395-396.

respondent are blind to the sponsor of the survey and its purpose."[16] I avoided interviewer bias by administering my surveys through Dynata, a survey provider with a reputable online panel.[17] Specifically, I worked with Dynata for the programming and hosting of the survey instruments. Dynata also recruited respondents through its online panel via an email invitation.[18] Dynata ensured that respondents who took one of my three surveys could not take the other two. I also avoided clues as to the purpose or sponsor of the studies. Note that survey stimuli and questions were not masked from the brand names of Google or Chrome. This is because, as described in my report, my assignment to test consumer expectations and understanding of Google and Chrome is highly context dependent and should not be divorced from the brand names. Google and Chrome's unique position in the marketplace as the dominating technology further demands contextual treatment of stimuli and survey questions. To mask the purpose and sponsor of the studies, I added language such as "This survey is about internet browsers. You have been selected to answer questions about <u>Chrome</u>, which is a browser from a company named <u>Google</u> [emphasis in original]" to create the perception that the brand had been selected at random from the list of browsers respondents previously selected, and that the purpose is more generally related to internet browsers rather than privacy. Similarly, I include distractor questions where appropriate. For example, my Consumer Expectation Survey includes stimuli and questions about bookmarks to dilute the notion that the survey's purpose is primarily focused on privacy.

### C.    Stimuli

11.    The stimuli images reflect what respondents would experience when encountering or reviewing privacy disclosures related to Chrome usage in real life. To ensure that the stimuli would be representative of each respondent's experience, the desktop version of the stimuli was presented to respondents who took the survey on a desktop or laptop computer and the

---

[16]    Diamond (2011), at pp. 410-411.

[17]    Dynata is a survey provider with a reputable consumer online panel comprised of more than 62 million consumers worldwide. See "DIY Market Research & Insights," *Dynata*, available at: https://www.dynata.com/research-insights, accessed on October 29, 2021; "About Dynata," *Dynata*, available at: https://www.dynata.com/company/about-us/, accessed on October 29, 2021.

[18]    See **Appendix M** for a standard Dynata survey invitation.

mobile version of the stimuli was presented to respondents who took the survey on a smartphone, tablet, or other mobile device.

12. I provided thumbnails of the stimuli images that respondent viewed when they answered the main survey questions.[19] It is a typical practice to make the stimuli available for respondents when they are answering questions as the survey is not intended to be a memory test. In the real world, users can revisit and review policies if they wish. In the surveys, I reminded respondents when I first presented the policies that they could be consulted again if so desired, and then I reminded respondent the thumbnails were of images they already viewed.

13. I understand that Plaintiffs' experts claim that most consumers do not actually review privacy policies.[20] To encourage respondents to read the policies, I instructed the survey programmer to set a minimum viewing time of 15 or 30 seconds per image.[21] I selected this amount of time as it encourages respondents to spend some time viewing the images, while avoiding a minimum viewing time that is too long, which would create respondent fatigue.[22] Respondents were shown a countdown button with the number of seconds remaining before they could move to the next screen of the survey. As I describe later in this section, after respondents were presented with certain policies, they were presented with highlighted versions of the same policy to draw attention to certain language that Google or Plaintiffs or

---

[19] In my Consumer Expectations Survey, the sync settings and bookmarks settings stimuli were not available as thumbnails for all the key survey questions, but only for the relevant groups of questions. The sync stimulus was available as a thumbnail in Q1, and the bookmarks stimulus was available as a thumbnail in Q2. **Appendix L.1**.

[20] See for example, Declaration of Leslie K. John, *Patrick Calhoun et. al. v. Google LLC*, Case No. 5:20-cv-05146-LHK-SVK, United States District Court for the Northern District of California - San Jose Division, October 13, 2021, at p. 6.

[21] In my Consumer Expectations Survey, the sync settings and bookmark settings images needed to be viewed for a minimum of 15 seconds each, the unhighlighted PP and CPN needed to be viewed for a minimum of 30 seconds each, the highlighted PP and CPN needed to be viewed for a minimum of 15 seconds each, and the WAA needed to be viewed for a minimum of 30 seconds. **Appendix L.1**; In my Materiality Survey, the unhighlighted PP and CPN needed to be viewed for a minimum of 30 seconds each, and the highlighted PP and CPN needed to be viewed for a minimum of 15 seconds each. **Appendix L.2**; In my Scenario Application Survey, the version of the policy shown to the respondent (New Account Creation Agreement and Consent Bump Agreement) needed to be viewed for a minimum of 30 seconds. **Appendix L.3**.

[22] My survey asks respondents to view the privacy policies for longer than users would in real life, encouraging respondents to pay attention to the privacy policies. For example, according to Google documents, the median time that users spend on certain consent screens is 5-10 seconds. See for example, GOOG-CABR-05156497-6555 at 05156521.

both consider relevant to the At-Issue Data.[23, 24] I understand from counsel that the highlighted language in the CPN and PP includes the statements that the Plaintiffs allege are misleading.[25]

14.   My stimuli featured the following documents that contain Google's disclosures of its collection of the At-Issue Data.[26] The full-sized versions of the policies are presented in **Appendices D to H**.[27] Key differences in the stimuli between experimental groups are presented in **Appendices K.1, K.2, and K.3**.[28]

### 1.    Google Privacy Policy

15.   The Google Privacy Policy ("PP") is "meant to help you understand what information we collect, why we collect it, and how you can update, manage, export and delete your information."[29] I asked the panel provider to program the stimuli images with the header and table of contents along with a scrolling feature to mimic the real-world user experience. For the PP, I directed respondents in the survey text to click on the headings under the Table of Contents to help them navigate to specific sections of the policy. Hyperlinks and buttons within the stimuli images were disabled so that respondents would not be able to view any images that were not relevant to the survey.

---

[23]   "As contract formalists would like it, respondents could be shown only the disputed text; or, as the realists advocate, they could be exposed to additional facts surrounding the case. Practically, however, the survey method—by typically relying on respondents with limited attention and sophistication—restricts the quantum of such background facts." Ben-Shahar, O. and Strahilevitz, L.J., "Interpreting Contracts via Surveys and Experiments," *New York University Law Review*, December 2017, Vol. 92:1753 ("Ben-Shahar and Strahilevitz (2017)"), at p. 1778.

[24]   See **Appendices D.2, E.2, and E.4** for highlighted versions of the PP and CPN.

[25]   Plaintiffs' Second Amended Responses and Objections to Defendant's Amended Interrogatory No. 7, *Patrick Calhoun et. al. v. Google LLC*, Case No. 5:20-cv-05146-LHK-SVK, United States District Court for the Northern District of California - San Jose Division, Dec. 6, 2021 ("Second Amended Responses"), at pp. 7-11.

[26]   Although CPN does not address the collection of the at-issue data, I included it as part of the relevant policies and disclosures because Plaintiffs' claims are based on the CPN. Second Amended Responses, at pp. 7-13.

[27]   To ensure that the images are scaled to a sufficient size, the header and table of contents are not presented in the full-sized PP in **Appendices D.1 and D.2**.

[28]   To show how the stimuli images appeared in the actual survey, the header and table of contents are presented in the PP images in **Appendices K.1 and K.2**.

[29]   **Appendix D.1**, at p. 1.

16.    After I presented an unhighlighted version of the PP in the survey, I presented a highlighted version of the same disclosure to draw attention to certain language that Google or Plaintiffs or both consider relevant to the At-Issue Data.[30] For example, I understand that Plaintiffs allege that the following text is "false and misleading in that Google collects Chrome browsing history even when a user has not chosen to Sync:" "We collect information about your activity in our services. … The activity information we collect may include: … Chrome browsing history you've synced with your Google Account."[31] These texts are highlighted to draw attention to this allegedly misleading statement.[32]

### 2.    Chrome Privacy Notice

17.    The Chrome Privacy Notice ("CPN") describes features that are specific to Chrome and distinguishes the different browsing modes. The CPN provides that, "any personal information that is provided to Google or stored in your Google Account will be used and protected in accordance with the Google Privacy Policy, as changed from time to time."[33]

18.    As with the PP, after I presented an unhighlighted version of the CPN in the survey, I presented a highlighted version of the same CPN to draw attention to certain language that Google or Plaintiffs or both consider relevant to the At-Issue Data.[34] For example, I understand that Plaintiffs allege that the following text is "false and misleading in that the Google Chrome Privacy Notice does not accurately or adequately provide Chrome users with information about how Chrome shares information with Google:" "Learn how to control the information that's collected, stored, and shared when you use the Google Chrome browser on your computer or mobile device, Chrome OS, and when you enable Safe Browsing in

---

[30]    Second Amended Responses, at pp. 10-11.

[31]    Second Amended Responses, at p. 10.

[32]    **Appendix D.2**.

[33]    **Appendix E.1**, at p. 1.

[34]    First Amended Class Action Complaint, *Patrick Calhoun et. al. v. Google LLC*, Case No. 5:20-cv-05146-LHK-SVK, United States District Court for the Northern District of California - San Jose Division, April 16, 2021, ¶¶ 43-45; Second Amended Responses, at pp. 7-10.

Chrome."[35] These texts are highlighted to draw attention to this allegedly misleading statement.[36]

### 3.  Web & App Activity Help Page

19.  The Web & App Activity ("WAA") Help Page explains that "[i]f Web & App Activity is turned on, your searches and activity from other Google services are saved in your Google Account, so you may get more personalized experiences, like faster searches and more helpful app and content recommendations. You can turn Web & App Activity off or delete past activity at any time."[37]

### 4.  Account Holder Agreements

20.  I understand that starting in June 2016, Google pushed a set of terms describing new features of Google Accounts to existing Google Account holders and new Google Account creators ("Account Holder Agreements"). These features allow Google Account holders to view and control some of their account activities (*e.g.*, activity on sites and apps that use Google services, video watch history for YouTube, search history for Google Maps, history for Google.com, and browsing history on Chrome if users chose additional settings) under the Web & App Activity setting. The Account Holder Agreements explain that Google stores and processes users' data when using Google services. Depending on the users' account settings, some of this data may be associated with the users' Google Account. The set of Account Holder Agreements also explain that Google uses users' data to deliver personalized ads and improve the user experience.[38]

---

[35]  Second Amended Responses, at p. 7.

[36]  **Appendices E.2 and E.4**.

[37]  **Appendix F**.

[38]  See **Appendix G and Appendix H** for the Account Holder Agreements for new Google Account holders ("New Account Creation Agreement") and for existing Google Account holders ("Consent Bump Agreement").

### D.    Main and Follow-Up Question Design

21. All three of my surveys use five-point scale questions for the main question(s) of the survey.[39] Respondents were asked to select a point on the scale or select a separate "Don't Know / Unsure" option. I instructed the survey programmer to not include a starting point on the scale to avoid biasing the respondent to select a certain point on the scale. I also instructed the survey programmer to randomize between presenting the scale item options as 1-2-3-4-5 or 5-4-3-2-1 to mitigate the impact of any order effects. If there was more than one scale question in a survey, the same respondent would see the same order of scale item options across all scale questions. For example, if a respondent was presented with scale items in the order of 5-4-3-2-1 in the first question of the survey, any subsequent questions would also be in the order of 5-4-3-2-1.

22. All three of my surveys contained the same follow-up questions on litigation awareness. Respondents were first asked whether they were or were not aware of any lawsuits related to internet usage and/or browsing (QF1). Then, respondents who selected "Yes" to QF1 were asked to describe the lawsuit (QF2). It is standard practice to include litigation awareness questions to assess whether respondents may have prior knowledge of the allegations tested in the survey.

### E.    Best Practices in Experimental Design

23. I used a test / control experimental design in the Consumer Expectations Survey and the Materiality Survey. Diamond (2011) explains that "[s]urveys that merely record consumer impressions have a limited ability to answer questions about the origins of those impressions;"[40] however, "[b]y adding one or more appropriate control groups, the survey expert can test directly the influence of the stimulus."[41]

---

[39]  Five-point scales have been recommended in survey literature and have been used in past survey research. See Malhotra, Naresh K., "Questionnaire Design and Scale Development," in *The Handbook of Marketing Research*, eds. Grover, R. and Vriens, V., Sage Publications, 2006 ("Malhotra (2006)"), at pp. 87-88; Lin, C, A., "Online-Service Adoption Likelihood," *Journal of Advertising Research*, Vol. 39, No. 2, 1999 ("Lin (1999)"), pp. 79-89, at p. 82; Ben-Shahar and Strahilevitz (2017).

[40]  Diamond (2011), at p. 397.

[41]  Diamond (2011), at p. 398.

24.  In a survey with a commonly used test / control experimental design, respondents answer the same questions about the stimuli they viewed; the questions asked do not vary across groups. Therefore, the use of control groups can correct for "preexisting beliefs or other background noise," because such unwanted influences would exist in similar proportions in both the test and control groups.[42] In other words, any effects caused by background noise would occur equally in both groups and thus be netted out when comparing the responses between the groups. Hence, measuring the differences in responses between groups isolates the effect of the hypothesized causal variable on the respondents' perceptions.

## F.  Design of My Three Surveys

25.  In the subsections below, I outline the experimental groups and stimuli presented in each survey.

### 1.  Consumer Expectations Survey

26.  Respondents were randomly assigned into one of four experimental groups. Respondents in Group A and C were in the Sync Off condition (*i.e.*, seeing an image of Chrome with the Sync Button off), while respondents in Group B and D were in the Sync On condition (*i.e.*, seeing an image of Chrome with the Sync Button on). Respondents in Groups A and B were presented with two images showing browser settings (*i.e.*, an image of Chrome with the Sync Button on or off, and an image of the Chrome bookmarks setting as a distractor). Respondents in Groups C and D were presented with the same two images showing browser settings, as well as three additional images showing the CPN, PP, and WAA Help Page. The differences among the groups are summarized in the following table:

---

[42]  Diamond (2011), at pp. 398-399.

**Table I.1.A**
**Consumer Expectations Survey Experimental Groups**

| | Sync Off | Sync On |
|---|---|---|
| **No Policies** | *Group A* <br>• Image of Sync Button Off <br>• Image of Bookmarks Setting | *Group B* <br>• Image of Sync Button On <br>• Image of Bookmarks Setting |
| **All Policies** | *Group C* <br>• Image of Sync Button Off <br>• Image of Bookmarks Setting <br>• CPN (w/ and w/o highlights) <br>• PP (w/ and w/o highlights) <br>• WAA Help Page | *Group D* <br>• Image of Sync Button On <br>• Image of Bookmarks Setting <br>• CPN (w/ and w/o highlights) <br>• PP (w/ and w/o highlights) <br>• WAA Help Page |

27.    This set up allowed me to isolate to what extent Chrome users' expectation of information to be handled while using Chrome is dependent on whether Sync mode is enabled, and to what extent the impact of Sync mode is consistent, regardless of whether respondents were shown and asked to review the CPN, PP, and WAA Help Page or not, by comparing Groups A and C (Sync Off) to Groups B and D (Sync On). Respondents across all groups answered the same set of questions. By varying the Sync Button image, it allowed me to isolate consumers' expectation of privacy attributable to the Sync Button, for respondents that did not view the policies as well as those that did view the policies. Respondents in Groups A and B both saw two images showing browser settings. Groups A and C served as the control group as the Sync Button was turned off in the image that varied while Groups B and D served as the test group as the Sync Button was turned on in the image that varied. I created experimental conditions for No Policies and All Policies to demonstrate whether the effect of the Sync Button is consistent when respondents see or do not see the privacy policies. Respondents in Groups C and D both saw two images showing browser settings plus three additional images showing privacy policies. The results broken down by No Policies and All policies are available in **Appendix O**.

28.    The order of the stimuli and main questions in my Consumer Expectations Survey was randomized to minimize the impact of any order effects. Within each group of stimuli images, the order of the images was randomized. First, the order of sync button settings and bookmarks settings images was randomized (Q0C). Then, the order of the PP (Q0D), CPN

(Q0E), and WAA Help Page (Q0F) images was randomized.[43] Additionally, the order of the question groups was randomized. Therefore, respondents either saw the group of key survey questions (Q1) or the group of distractor questions (Q2) first. Then, within the respective groups of key survey questions and distractor questions, the order of the questions was randomized.

29. After viewing the images, respondents in all four groups were asked a series of questions regarding different data types: "Based on the sync settings [and documents] you just viewed, how strongly do you agree or disagree that Google receives your [data type] while browsing the internet?" "Data type" refers to IP addresses,[44] referrer URLs,[45] cookies,[46] name,[47] passwords and login information for websites,[48] or payment information.[49, 50] Specifically, respondents were asked to select a point among the following five-point scale: "Strongly disagree," "Disagree," "Neither agree nor disagree," "Agree," and "Strongly agree"[51] or select a separate "Don't Know / Unsure" option.

---

[43]  The unhighlighted and highlighted versions of the same policy were always shown consecutively (e.g., the unhighlighted version of the CPN would always be followed by the highlighted version of the CPN).

[44]  Respondents were presented with the definition: "IP Address - Every device connected to the Internet is assigned a number known as an Internet protocol (IP) address. An IP address can often be used to identify the location from which a device is connecting to the Internet." See **Appendix L.1**.

[45]  Respondents were presented with the definition: "Referrer URL - A referrer URL contains the URL (web address) of the last webpage the browser visited." See **Appendix L.1**.

[46]  Respondents were presented with the definition: "Cookie - A small file containing a string of characters that is sent to your computer when you visit a website. When you visit the site again, the cookie allows that site to recognize your browser. Cookies may store user preferences and other information." See **Appendix L.1**.

[47]  Respondents were presented with the definition: "Name - A word or set of words by which a person is referred to. This could be used when signing-in to accounts, filling out forms, or communicating with individuals or organizations while browsing the internet." See **Appendix L.1**.

[48]  Respondents were presented with the definition: "Passwords and login information - Account names and associated passwords required to login to individual accounts online." See **Appendix L.1**.

[49]  Respondents were presented with the definition: "Payment information - Any data that enables a person to access a customer's account, such as a debit card, credit card, or bank account info." See **Appendix L.1**.

[50]  See Expert Report of Tülin Erdem, Ph.D., *Patrick Calhoun et. al. v. Google LLC*, Case No. 5:20-cv-05146-LHK-SVK, United States District Court for the Northern District of California - San Jose Division, December 22, 2021, **FN 11** for the reason to study IP address, referrer URL, and cookies. Additionally, name, payment information, and passwords and login information relate to personal information as defined in the PP. Additionally, CPN specifies that this information can be stored in a user's Google Account.

[51]  See Malhotra (2006), at pp. 87-88; Lin (1999), at p. 82.

30.   The average Chrome user expectation of Google receiving information can be calculated from the numerical values corresponding to the individual response options (1 = "Strongly disagree," 2 = "Disagree," 3 = "Neither agree nor disagree," 4 = "Agree," 5 = "Strongly agree"). Given this scale, the interpretation of the resulting average is such that any value greater than the midpoint (3) means that the average Chrome user believes that the information is received by Google; a value close to 5 means that Chrome users nearly universally believe that their information is received by Google. A value close to 1 would indicate that Chrome users nearly universally do not think Google would receive that information.

### 2.    Materiality Survey

31.   Respondents were randomly assigned into one of two experimental groups. Respondents in Group A were presented with the unmodified CPN and PP. Respondents in Group B were presented with the same information, except that certain language in the CPN was modified, specifically addressing Plaintiffs' allegations as to how class members would interpret the CPN. The differences between the groups are summarized in the following table:

**Table I.1.B**
**Materiality Survey Experimental Groups**

| Group A | • Unmodified CPN (w/ and w/o highlights)<br>• PP (w/ and w/o highlights) |
|---------|--------------------------------------------------------------------------|
| Group B | • Modified CPN (w/ and w/o highlights)<br>• PP (w/ and w/o highlights) |

32.   This set up allowed me to isolate the effect of the increased clarification of certain language. Respondents in the two groups saw the same images, except for the additional language in the CPN in Group B. Respondents in both groups answered the same set of questions. By only varying the presence of the increased clarification of certain language, it allowed me to isolate whether the users' willingness to use Chrome would change with this increased clarification of the language. Group A served as the control group as the CPN was unmodified while Group B served as the test group as the CPN contained the additional language.

33. The order of the stimuli in my Materiality Survey was randomized to minimize the impact of any order effects. Respondents either saw the PP (Q0B) or the CPN (Q0C) first.[52]

34. After being presented with the policies, respondents in both groups were asked, "How likely or unlikely are you to continue using Google Chrome?"[53] Specifically, respondents were asked to select a point among the following five-point scale: "Extremely unlikely," "Unlikely," "Neither likely nor unlikely," "Likely," and "Extremely likely"[54] or select a separate "Don't Know / Unsure" option.

35. The average likelihood can be calculated using the numerical values corresponding to response options (1 = "Extremely unlikely," 2 = "Unlikely," 3 = "Neither likely nor unlikely," 4 = "Likely," 5 = "Extremely likely"). An average value greater than 3 means that respondents on average are likely to continue using Chrome after viewing the CPN and PP; an average value close to 5 means that respondents nearly universally are extremely likely to continue using Chrome; whereas the average value close to 1 means that respondents are unlikely to continue using Chrome.

### 3. Scenario Application Survey

36. Respondents were randomly assigned into one of two groups. All respondents were first presented with a scenario describing how a hypothetical user may be presented with one of the Account Holder Agreements and interact with the Chrome browser.[55] The scenario provides context for respondents to interpret the policies.[56] The web browsing scenario was described as

> Sofia / Victor has been using Chrome to browse the internet on her / his personal laptop. Sofia / Victor recently agreed to terms of service related to saving her / his web and app activity. Sofia / Victor uses Chrome for a variety of browsing activities. For example, she / he routinely uses the Chrome browser to log-in to her / his social media accounts to share and discuss topics about news, politics, and more. She / he also relies

---

[52]   As in my Consumer Expectations Survey, the unhighlighted and highlighted versions of the same policy were always shown consecutively (e.g., the unhighlighted version of the CPN would always be followed by the highlighted version of the CPN).

[53]   **Appendix L.2**.

[54]   See Malhotra (2006), at pp. 87-88; Lin (1999), at p. 82.

[55]   **Appendix L.3**.

[56]   See Ben-Shahar and Strahilevitz (2017), at p. 1783.

on Chrome to frequently access Gmail. To do so, Sofia / Victor signs-in to a Google/Gmail Account when using Chrome. Sofia / Victor does not use Incognito mode or change other browser settings.

The name of the subject (and corresponding pronouns) was randomly assigned.

37.    After the scenario was presented, respondents in Group A were shown the New Account Creation Agreement, and respondents in Group B were shown the Consent Bump Agreement. The differences between the groups are summarized in the following table:

**Table I.1.C**
**Scenario Application Survey Experimental Groups**

| Group A | • New Account Creation Agreement |
|---------|----------------------------------|
| Group B | • Consent Bump Agreement |

38.    This set up allowed me to observe whether and to what extent users who saw the New Account Creation Agreement and users who saw the Consent Bump Agreement had a similar understanding that Google receives data reflecting their activity on sites and apps that partner with Google. Respondents in the two groups were presented with the same scenario and respondents in both groups answered the same set of questions.

39.    Based on their understanding of the policy they just read, respondents in both groups were asked to express their expectation on whether Google receives information about activity from sites and apps that partner with Google. Specifically, they were asked two questions.[57]

    a.    "Based on your understanding of the policy you just read, please select one of the following regarding information about Sofia's / Victor's <u>activity from sites and apps that partner with Google</u>."

    b.    "Based on your understanding of the policy you just read, which of the following options would <u>you expect most survey respondents</u> to select regarding information about Sofia's / Victor's <u>activity from sites and apps that partner with Google</u>."[58]

---

[57]    **Appendix L.3**.

[58]    Asking respondents to predict the other survey respondents' interpretation is consistent with the approach proposed in the academic literature. "We did that to see whether respondents as a group were good at predicting

40.  Respondents were asked to select a point among the following five-point scale: "Google definitely does not receive this information," "Google probably does not receive this information," "It is uncertain whether Google receives this information or not," "Google probably receives this information," and "Google definitely receives this information," or select a separate "Don't Know / Unsure" option. These answer options are based on the literature on designing surveys to assess contract interpretation.[59]

41.  The average understanding can be calculated using the numerical values corresponding to response options (1 = "Google definitely does not receive this information," 2 = "Google probably does not receive this information," 3 = "It is uncertain whether Google receives this information or not," 4 = "Google probably receives this information," 5 = "Google definitely receives this information"). A value greater than 3 means that the respondents on average understand that Google receives activity from sites and apps that partner with Google; a value close to 5 means that respondents nearly universally believe that Google definitely receives activity from sites and apps that partner with Google; whereas a value close to 1 means that respondents do not think Google would receive that information.

## III.  PRETESTING

42.  According to Diamond (2011), "[t]exts on survey research generally recommend pretests as a way to increase the likelihood that questions are clear and unambiguous."[60] Pretests are valuable in identifying areas of difficulty or confusion that should be adjusted or clarified before administering the final survey. During the pretest phase, my three surveys were administered to a small sample of the target population who were asked to complete the survey while "thinking out loud" and answer follow-up questions about their experience. Under my direction, Dynata conducted pretests from November 9th to November 12th, 2021. Over the course of the four days, interviewers called and interviewed a total of 30

---

how the majority of people would respond. If people can predict accurately how most of their peer would resolve a case involving contractual ambiguity, it strengthens the case for making survey evidence of this kind legally dispositive." Ben-Shahar and Strahilevitz (2017), at pp. 1783-1784.

[59]  See Ben-Shahar and Strahilevitz (2017), at p. 1783.

[60]  Diamond (2011), at p. 388.

respondents.[61] Specifically, a trained interviewer asked each respondent, who were "blind" to the purpose and sponsor of the study, whether or not he or she had any problems or difficulty while taking the survey, and whether or not any of the questions, answer options, or text guiding the respondent was unclear.[62] In addition, the pretest interview asked respondents to state their perceptions of the purpose of conducting the survey. Based on the answers to this question I was able to assess the potential presence of demand artifacts.

**Table I.2**
**Summary of Pretests**

| Follow-up Question | No problems | Some problems | Total |
|---|---|---|---|
| Q1. Did you have any problems while taking the survey? [1] | 28 | 2 | 30 |
| Q2. Did you think any questions were unclear? If so, which ones and why? [2] [3] | 26 | 4 | 30 |
| Q3. Did you think any answer options were unclear? If so, which ones and why? [4] | 29 | 1 | 30 |
| Q4. Did you or did you not have any difficulty viewing the survey or images in the survey? [5] | 29 | 1 | 30 |
| Q5. Did you think that the text guiding you through the survey was clear? [6] | 27 | 3 | 30 |

Notes:
[1] One respondent said that the survey contained a lot of information. Another respondent mentioned that the print was small in the survey links.
[2] One respondent indicated general confusion by the questions. One respondent mentioned that they were confused by the questions about hyperlinks, while another respondent mentioned that they were confused by the thumbnails. One respondent also mentioned that they had questions about cookies.
[3] One respondent indicated that they did not know what the survey was talking about in a voiceover while taking the survey. Since this comment was not in response to Q2, this respondent was not counted here.
[4] One respondent indicated general confusion by the answer options.
[5] One respondent mentioned that the images were a little light.
[6] One respondent said that the text was too technical, while another respondent mentioned that the text could get quite cumbersome. One respondent also said that while the text was unclear to them due to their lack of familiarity with internet terminology.

Source: Pretest notes.

43.     Based on the results of pretesting the three surveys summarized in **Table I.2**, respondents did not face any problems and generally thought the survey was clear, as reflected in the

---

[61]    These 30 respondents were split among experimental groups across the three surveys.

[62]    **Appendix J**.

table above. Additionally, while going through the survey, respondents were able to voice over their thoughts. In the survey question regarding viewing the policy webpages and accessing information, three out of 30 pretest respondents voiced over that they found the mention of hyperlinks confusing in the question because they did not click on any hyperlinks. I added "hyperlinks indicated by blue underlined text" to this question to remind respondents how some of the hyperlinks looked like in the stimuli images.[63] Furthermore, 12 out of 30 pretest respondents indicated that the privacy policies were long or contained a lot of information to read. To help respondents feel less overwhelmed, I added the following text to accompany the images to remind respondents that they will be able to access the policies later when answering the questions: "You will be able to view [these pages / these images / this policy / this help page / this scenario / these terms of service] again as you answer any questions."[64] Later, when the thumbnails were presented, I added the following text to remind respondents that the thumbnails contained images they have reviewed before and do not contain any new material: "These are thumbnails of the stimuli that you have seen so far."

## IV.    SURVEY ADMINISTRATION

44.    Diamond (2011) explains that "[t]o ensure objectivity in the administration of the survey, it is standard interview practice in surveys conducted for litigation to do double-blind research whenever possible: Both the interviewer and the respondent are blind to the sponsor of the survey and its purpose."[65] I avoided interviewer bias by administering all three surveys through an online panel.

---

[63]   "Throughout this survey, you viewed policy webpages where some hyperlinks functioned, and some hyperlinks indicated by blue underlined text did not. Were you or were you not able to view the policy webpages and access the information you needed to answer the questions asked in this survey?" **Appendix L.1**, Question Q3 and **Appendix L.2**, Question Q2; "Throughout this survey, you viewed a policy webpage where hyperlinks indicated by blue text did not function. Were you or were you not able to view the policy webpage and access the information you needed to answer the questions asked in this survey?" **Appendix L.3**, Question Q3.

[64]   **Appendix L.1**, Questions Q0C, Q0D2, Q0E2, and Q0F; **Appendix L.2**, Question Q0B2 and Q0C2; **Appendix L.3**, Question Q0C.

[65]   Diamond (2011), at pp. 410-411.

### A.    Consumer Expectations Survey Administration

45.    I fielded my Consumer Expectations Survey from November 17th to November 30th, 2021.[66] A total of 1,004 respondents qualified for and completed the survey and made up my main analytical sample. See **Table I.3.A** (Consumer Expectations Survey Response Statistics).

---

[66]    Respondents qualified for and completed the survey from November 17th through November 29th. Respondents who were fielded the survey on November 30th consisted of those who exceeded the quota, were terminated, or dropped out.

**Table I.3.A**
**Consumer Expectations Survey Response Statistics**

| Status | N | % |
|---|---|---|
| *Total Clicks* [1] | 2,840 | 100% |
| *Completed Survey* | 1,153 | 41% |
|     Excluded by Survey Vendor [2] | 149 | 5% |
|     Final Analytical Sample | 1,004 | 35% |
| *Screened Out of Survey* | 1,224 | 43% |
|     Overquota [3] | 111 | 4% |
|     RVID Dupes [4] | 0 | 0% |
|     At QS2 (Captcha) | 27 | 1% |
|     At QS3 (Age) / QS4 (Gender) [5] | 368 | 13% |
|     At QS5 (State) [6] | 52 | 2% |
|     At QS6 (Employment) [7] | 97 | 3% |
|     At QS7 (Browser) [8] | 561 | 20% |
|     At QS8 (Primary Browser) [9] | 8 | 0% |
| *Dropped Out of Survey* | 463 | 16% |
|     During Screener | 232 | 8% |
|     After Screener | 231 | 8% |

**Notes:**

[1] The total number of people who clicked on the survey link is the sum of "Completed Survey," "Screened Out of Survey," and "Dropped Out of Survey."

[2] Respondents were excluded from the final analytical sample by the survey vendor if they failed a quality check conducted by the survey vendor.

[3] Respondents were screened out of the survey if they exceeded the survey quotas.

[4] Duplicate responses were removed.

[5] Respondents were screened out at QS3 if they were under 18 years old, preferred not to answer, or if the age they indicated did not match the age on file with Dynata. Respondents were screened out at QS4 if they preferred not to answer or if they indicated "Male" or "Female" and their response did not match the gender on file with Dynata.

[6] Respondents were screened out at QS5 if they indicated "Prefer not to answer" or "Don't know /

[7] Respondents were screened out at QS6 if they or anyone else in their household had ever been employed by a law firm, legal services organization, or court.

[8] Respondents were screened out at QS7 if they indicated that they used the "Blue Steel" browser, did not use "Google Chrome" as a browser, or if they selected "Don't know / Unsure."

[9] Respondents were screened out at QS8 if they indicated that they used the "Blue Steel" browser as their primary browser.

**Source:** 21101590.xlsx.

46.   Respondent demographics for the main analytical sample are presented in **Table I.4.A** (Consumer Expectations Survey Respondent Demographics).

**Table I.4.A**
**Consumer Expectations Survey Respondent Demographics**

| Demographic | Starts[1] | | At QS7[2] | | Completes[3] | |
|---|---|---|---|---|---|---|
| | N | % | N | % | N | % |
| *Age* | | | | | | |
| 18-29 | 644 | 24% | 365 | 19% | 191 | 19% |
| 30-39 | 509 | 19% | 335 | 17% | 206 | 21% |
| 40-49 | 475 | 17% | 356 | 18% | 200 | 20% |
| 50-59 | 434 | 16% | 339 | 17% | 216 | 22% |
| 60+ | 667 | 24% | 563 | 29% | 191 | 19% |
| **Total** | 2729 | 100% | 1958 | 100% | 1004 | 100% |
| *Gender* | | | | | | |
| Female | 1307 | 49% | 1011 | 52% | 572 | 57% |
| Male | 1365 | 51% | 939 | 48% | 428 | 43% |
| Other | - | - | 8 | 0% | 4 | 0% |
| **Total** | 2672 | 100% | 1958 | 100% | 1004 | 100% |
| *U.S. Region* | | | | | | |
| Midwest | 642 | 24% | 475 | 24% | 270 | 27% |
| Northeast | 507 | 19% | 366 | 19% | 182 | 18% |
| South | 979 | 36% | 676 | 35% | 339 | 34% |
| West | 601 | 22% | 441 | 23% | 213 | 21% |
| **Total** | 2729 | 100% | 1958 | 100% | 1004 | 100% |

Notes:
[1] Age, gender, and U.S. region distributions are calculated using the "NexusAge," "NexusGender," and "NexusRegion" variables, respectively.
[2] Age, gender, and U.S. region distributions are calculated using the "QS3," "QS4," and "Region_US" variables, respectively, for all respondents who provided a response to "QS7. Thinking about the internet-connected device(s) you use at home and at work, which internet browser(s) do you currently use?"
[3] Age, gender, and U.S. region distributions are calculated using the "QS3," "QS4," and "Region_US" variables, respectively, for all respondents who completed the survey and are in the final analytical sample. See Table I.3.A.
[4] All response options that do not result in termination from the survey are shown.

**Source:** 21101590.xlsx.

### B.    Materiality Survey Administration

47.  I fielded my Materiality Survey from November 17th to November 30th, 2021. A total of 509 respondents qualified for and completed the survey and made up my main analytical sample. See **Table I.3.B** (Materiality Survey Response Statistics).

**Table I.3.B**
**Materiality Survey Response Statistics**

| Status | N | % |
|---|---|---|
| *Total Clicks* [1] | *1,775* | *100%* |
| *Completed Survey* | *574* | *32%* |
| Excluded by Survey Vendor [2] | *65* | *4%* |
| Final Analytical Sample | *509* | *29%* |
| *Screened Out of Survey* | *968* | *55%* |
| Overquota [3] | *389* | *22%* |
| RVID Dupes [4] | *0* | *0%* |
| At QS2 (Captcha) | *11* | *1%* |
| At QS3 (Age) / QS4 (Gender) [5] | *214* | *12%* |
| At QS5 (State) [6] | *22* | *1%* |
| At QS6 (Employment) [7] | *40* | *2%* |
| At QS7 (Browser) [8] | *284* | *16%* |
| At QS8 (Primary Browser) [9] | *8* | *0%* |
| *Dropped Out of Survey* | *233* | *13%* |
| During Screener | *115* | *6%* |
| After Screener | *118* | *7%* |

**Notes:**

[1] The total number of people who clicked on the survey link is the sum of "Completed Survey," "Screened Out of Survey," and "Dropped Out of Survey."

[2] Respondents were excluded from the final analytical sample by the survey vendor if they failed a quality check conducted by the survey vendor.

[3] Respondents were screened out of the survey if they exceeded the survey quotas.

[4] Duplicate responses were removed.

[5] Respondents were screened out at QS3 if they were under 18 years old, preferred not to answer, or if the age they indicated did not match the age on file with Dynata. Respondents were screened out at QS4 if they preferred not to answer or if they indicated "Male" or "Female" and their response did not match the gender on file with Dynata.

[6] Respondents were screened out at QS5 if they indicated "Prefer not to answer" or "Don't know /

[7] Respondents were screened out at QS6 if they or anyone else in their household had ever been employed by a law firm, legal services organization, or court.

[8] Respondents were screened out at QS7 if they indicated that they used the "Blue Steel" browser, did not use "Google Chrome" as a browser, or if they selected "Don't know / Unsure."

[9] Respondents were screened out at QS8 if they indicated that they used the "Blue Steel" browser as their primary browser.

**Source:** 2108882.xlsx.

48.  Respondent demographics for the main analytical sample are presented in **Table I.4.B** (Materiality Survey Respondent Demographics).

**Table I.4.B**
**Materiality Survey Respondent Demographics**

| Demographic | Starts[1] | | At QS7[2] | | Completes[3] | |
|---|---|---|---|---|---|---|
| | N | % | N | % | N | % |
| *Age* | | | | | | |
| 18-29 | 340 | 25% | 190 | 19% | 96 | 19% |
| 30-39 | 268 | 19% | 172 | 17% | 109 | 21% |
| 40-49 | 219 | 16% | 163 | 16% | 100 | 20% |
| 50-59 | 181 | 13% | 144 | 15% | 95 | 19% |
| 60+ | 379 | 27% | 321 | 32% | 109 | 21% |
| **Total** | 1387 | 100% | 990 | 100% | 509 | 100% |
| *Gender* | | | | | | |
| Female | 669 | 49% | 521 | 53% | 307 | 60% |
| Male | 690 | 51% | 467 | 47% | 200 | 39% |
| Other | - | - | 2 | 0% | 2 | 0% |
| **Total** | 1359 | 100% | 990 | 100% | 509 | 100% |
| *U.S. Region* | | | | | | |
| Midwest | 275 | 20% | 201 | 20% | 127 | 25% |
| Northeast | 250 | 18% | 183 | 18% | 85 | 17% |
| South | 557 | 40% | 393 | 40% | 194 | 38% |
| West | 305 | 22% | 213 | 22% | 103 | 20% |
| **Total** | 1387 | 100% | 990 | 100% | 509 | 100% |

**Notes:**

[1] Age, gender, and U.S. region distributions are calculated using the "NexusAge," "NexusGender," and "NexusRegion" variables, respectively.

[2] Age, gender, and U.S. region distributions are calculated using the "QS3," "QS4," and "Region_US" variables, respectively, for all respondents who provided a response to "QS7. Thinking about the internet-connected device(s) you use at home and at work, which internet browser(s) do you currently use?"

[3] Age, gender, and U.S. region distributions are calculated using the "QS3," "QS4," and "Region_US" variables, respectively, for all respondents who completed the survey and are in the final analytical sample. See Table I.3.B.

[4] All response options that do not result in termination from the survey are shown.

**Source:** 2108882.xlsx.

### C.     Scenario Application Survey Administration

49.  I fielded my Scenario Application Survey from November 17th to November 30th, 2021. A total of 507 respondents qualified for and completed the survey and made up my main analytical sample. See **Table I.3.C** (Scenario Application Survey Response Statistics).

**Table I.3.C**
**Scenario Application Survey Response Statistics**

| Status | N | % |
|---|---|---|
| *Total Clicks* [1] | 1,479 | 100% |
| *Completed Survey* | 593 | 40% |
| Excluded by Survey Vendor [2] | 86 | 6% |
| Final Analytical Sample | 507 | 34% |
| *Screened Out of Survey* | 694 | 47% |
| Overquota [3] | 176 | 12% |
| RVID Dupes [4] | 0 | 0% |
| At QS2 (Captcha) | 10 | 1% |
| At QS3 (Age) / QS4 (Gender) [5] | 184 | 12% |
| At QS5 (State) [6] | 19 | 1% |
| At QS6 (Employment) [7] | 40 | 3% |
| At QS7 (Browser) [8] | 260 | 18% |
| At QS8 (Primary Browser) [9] | 5 | 0% |
| *Dropped Out of Survey* | 192 | 13% |
| During Screener | 120 | 8% |
| After Screener | 72 | 5% |

**Notes:**

[1] The total number of people who clicked on the survey link is the sum of "Completed Survey," "Screened Out of Survey," and "Dropped Out of Survey."

[2] Respondents were excluded from the final analytical sample by the survey vendor if they failed a quality check conducted by the survey vendor.

[3] Respondents were screened out of the survey if they exceeded the survey quotas.

[4] Duplicate responses were removed.

[5] Respondents were screened out at QS3 if they were under 18 years old, preferred not to answer, or if the age they indicated did not match the age on file with Dynata. Respondents were screened out at QS4 if they preferred not to answer or if they indicated "Male" or "Female" and their response did not match the gender on file with Dynata.

[6] Respondents were screened out at QS5 if they indicated "Prefer not to answer" or "Don't know /

[7] Respondents were screened out at QS6 if they or anyone else in their household had ever been employed by a law firm, legal services organization, or court.

[8] Respondents were screened out at QS7 if they indicated that they used the "Blue Steel" browser, did not use "Google Chrome" as a browser, or if they selected "Don't know / Unsure."

[9] Respondents were screened out at QS8 if they indicated that they used the "Blue Steel" browser as their primary browser.

**Source:** 21081070.xlsx.

50.  Respondent demographics for the main analytical sample are presented in **Table I.4.C** (Scenario Application Survey Respondent Demographics).

**Table I.4.C**
**Scenario Application Survey Respondent Demographics**

| Demographic | Starts[1] N | Starts[1] % | At QS7[2] N | At QS7[2] % | Completes[3] N | Completes[3] % |
|---|---|---|---|---|---|---|
| *Age* | | | | | | |
| 18-29 | 314 | 24% | 181 | 19% | 99 | 20% |
| 30-39 | 276 | 21% | 161 | 17% | 93 | 18% |
| 40-49 | 212 | 16% | 161 | 17% | 102 | 20% |
| 50-59 | 192 | 15% | 160 | 17% | 106 | 21% |
| 60+ | 311 | 24% | 269 | 29% | 107 | 21% |
| **Total** | 1305 | 100% | 932 | 100% | 507 | 100% |
| *Gender* | | | | | | |
| Female | 629 | 49% | 507 | 54% | 299 | 59% |
| Male | 643 | 51% | 423 | 45% | 206 | 41% |
| Other | - | - | 2 | 0% | 2 | 0% |
| **Total** | 1272 | 100% | 932 | 100% | 507 | 100% |
| *U.S. Region* | | | | | | |
| Midwest | 262 | 20% | 195 | 21% | 117 | 23% |
| Northeast | 245 | 19% | 166 | 18% | 96 | 19% |
| South | 536 | 41% | 373 | 40% | 188 | 37% |
| West | 262 | 20% | 198 | 21% | 106 | 21% |
| **Total** | 1305 | 100% | 932 | 100% | 507 | 100% |

**Notes:**
[1] Age, gender, and U.S. region distributions are calculated using the "NexusAge," "NexusGender," and "NexusRegion" variables, respectively.
[2] Age, gender, and U.S. region distributions are calculated using the "QS3," "QS4," and "Region_US" variables, respectively, for all respondents who provided a response to "QS7. Thinking about the internet-connected device(s) you use at home and at work, which internet browser(s) do you currently use?"
[3] Age, gender, and U.S. region distributions are calculated using the "QS3," "QS4," and "Region_US" variables, respectively, for all respondents who completed the survey and are in the final analytical sample. See Table I.3.C.
[4] All response options that do not result in termination from the survey are shown.

**Source:** 21081070.xlsx.

**APPENDIX J**

**PRETEST MODERATOR INSTRUMENT**

**Pretest Moderator Instrument**

[Interviews are conducted over the phone by blind-to-the-purpose interviewers at survey vendor while respondent completes the survey online.]

Q-INTRO. Could I speak with **[INSERT NAME]**?

**[IF NEEDED]** We are calling him/her for a phone interview that he/she scheduled with **[INSERT PANEL]**. He/she agreed to help us by giving his/her opinions.

- ❏ Yes
- ❏ No **[SCHEDULE CALLBACK]**

This call may be monitored for quality assurance purposes. [Do not wait for an answer, continue with the survey unless the respondent says otherwise.]

Q-INTRO2. Thanks for taking the time to do this survey with us, **[INSERT NAME]**. First off, do you have access to a computer or a mobile device right now?

- ❏ Yes
- ❏ No **[WAIT UNTIL THEY ARE AT A COMPUTER/MOBILE DEVICE]**

Q-INTRO3. Thank you! The link to the website you need to go to was provided in the email you received from us, please follow that link. **[IF NECESSARY REMIND WHO THE SENDER OF THE EMAIL WAS, OR RESEND LINK]**. I will be on the phone the entire time you are taking the survey, so feel free to "think out loud" or bring up anything you would like while you are taking the survey. Please be thorough in your response and take as much time as you need. Please note that there is no correct or incorrect way to take this survey, we would like you to approach this exercise as realistically as possible. Please also note that the first several questions are identical to the survey you took to qualify for this interview.

When you are ready, please begin taking the survey.

**[ALLOW THE RESPONDENT TO TAKE THE SURVEY AND FINISH.]**

**[QUESTIONS TO ASK AFTER THE RESPONDENT FINISHED RESPONDING TO ALL SURVEY QUESTIONS.]**

Q1. Did you have any problems while taking the survey?

Q2. Did you think any questions were unclear? If so, which ones and why?

Q3. Did you think any answer options were unclear? If so, which ones and why?

Q4. Did you or did you not have any difficulty viewing the survey or images in the survey?

Q5. Did you think that the text guiding you through the survey was clear?

Q6. What do you think might be the purpose for conducting this survey?

Q7. What makes you think so?

Q8. Is there anything else you would like to say about the survey?

Thank you so much for your time.  Your participation is appreciated and we will make sure you get credit for completing this survey.

**APPENDIX K.1**

**CONSUMER EXPECTATIONS SURVEY STIMULI**

**Consumer Expectations Survey Experimental Groups**

|  | Sync Off | Sync On |
|---|---|---|
| **No Policies** | ***Group A***<br>• Image of Sync Button Off<br>• Image of Bookmarks Setting | ***Group B***<br>• Image of Sync Button On<br>• Image of Bookmarks Setting |
| **All Policies** | ***Group C***<br>• Image of Sync Button Off<br>• Image of Bookmarks Setting<br>• CPN (w/ and w/o highlights)<br>• PP (w/ and w/o highlights)<br>• WAA Help Page | ***Group D***<br>• Image of Sync Button On<br>• Image of Bookmarks Setting<br>• CPN (w/ and w/o highlights)<br>• PP (w/ and w/o highlights)<br>• WAA Help Page |

**Image of Sync Button On / Off**

**Test Groups A / C (Sync Off)**



**Test Groups B / D (Sync On)**



K.1-1

**Image of Sync Button On / Off**
**(Same across all test groups)**

**Test Groups A / B / C / D**



**Chrome Privacy Notice**
**(Partial Image – See Appendix E.1 for Full Text)**

**Test Groups C / D**

Google Chrome

# Google Chrome Privacy Notice

Learn how to control the information that's collected, stored, and shared when you use the Google Chrome browser on your computer or mobile device, Chrome OS, and when you enable Safe Browsing in Chrome. Although this policy describes features that are specific to Chrome, any personal information that is provided to Google or stored in your Google Account will be used and protected in accordance with the Google Privacy Policy, as changed from time to time. Google's retention policy describes how and why Google retains data.

If Google Play apps have been enabled on your Chromebook, the use and protection of information collected by Google Play or the Android operating system is governed by the Google Play Terms of Service and Google Privacy Policy. Details specific to Chrome are provided in this Notice where relevant.

### Details about the Privacy Notice

In this Privacy Notice, we use the term "Chrome" to refer to all the products in the Chrome family listed above. If there are differences in our policy between products, we'll point them out. We change this Privacy Notice from time to time.

"Beta," "Dev," or "Canary" versions of Chrome let you test new features still being created in Chrome. This Privacy Notice applies to all versions of Chrome, but might not be up-to-date for features still under development.

For step-by-step guides to managing your privacy preferences, read this overview of Chrome's privacy controls.

## Table of contents:

- Browser modes
- Managing users in Chrome
- Safe Browsing practices
- Privacy practices of using apps, extensions, themes, services, and other add-ons
- More information

**Chrome Privacy Notice with Highlights**
**(Partial Image – See Appendix E.2 for Full Text)**

**Test Groups C / D**

Google Chrome

# Google Chrome Privacy Notice

Learn how to control the information that's collected, stored, and shared when you use the Google Chrome browser on your computer or mobile device, Chrome OS, and when you enable Safe Browsing in Chrome. Although this policy describes features that are specific to Chrome, any personal information that is provided to Google or stored in your Google Account will be used and protected in accordance with the Google Privacy Policy, as changed from time to time. Google's retention policy describes how and why Google retains data.

If Google Play apps have been enabled on your Chromebook, the use and protection of information collected by Google Play or the Android operating system is governed by the Google Play Terms of Service and Google Privacy Policy. Details specific to Chrome are provided in this Notice where relevant.

### Details about the Privacy Notice

In this Privacy Notice, we use the term "Chrome" to refer to all the products in the Chrome family listed above. If there are differences in our policy between products, we'll point them out. We change this Privacy Notice from time to time.

"Beta," "Dev," or "Canary" versions of Chrome let you test new features still being created in Chrome. This Privacy Notice applies to all versions of Chrome, but might not be up-to-date for features still under development.

For step-by-step guides to managing your privacy preferences, read this overview of Chrome's privacy controls.

## Table of contents:

- Browser modes
- Managing users in Chrome
- Safe Browsing practices
- Privacy practices of using apps, extensions, themes, services, and other add-ons
- More information

**Google Privacy Policy**
**(Partial Image – See Appendix D.1 for Full Text)**

**Test Groups C / D**



**Google Privacy Policy with Highlights**
**(Partial Image– See Appendix D.2 for Full Text)**

**Test Groups C / D**



**Web & App Activity Help Page**
**(Partial Image – See Appendix F for Full Text)**

**Test Groups C / D**

# Find & control your Web & App Activity

If Web & App Activity is turned on, your searches and activity from other Google services are saved in your Google Account, so you may get more personalized experiences, like faster searches and more helpful app and content recommendations.

You can turn Web & App Activity off or delete past activity at any time.

**Note:** If you got your Google Account through work or school, you might need to contact your administrator to turn on the Web & App Activity additional service for your organization.

Android    Computer    iPhone & iPad

## Turn Web & App Activity on or off

1. On your computer, visit the Activity controls ☑ page. You may be asked to sign in to your Google Account.
2. Turn **Web & App Activity** on or off.

**APPENDIX K.2**

**MATERIALITY SURVEY STIMULI**

**Materiality Survey Experimental Groups**

| | |
|---|---|
| ***Group A*** | • Unmodified CPN (w/ and w/o highlights)<br>• PP (w/ and w/o highlights) |
| ***Group B*** | • Modified CPN (w/ and w/o highlights)<br>• PP (w/ and w/o highlights) |

**Chrome Privacy Notice**
**(Partial Image – See Appendices E.1 and E.3 for Full Text)**

**Test Group A (Unmodified)**

- You can view and manage your stored Autofill information. Learn more.

The personal information that Chrome stores won't be sent to Google unless you choose to store that data in your Google Account by turning on sync, or, in the case of payment cards and billing information, choosing specific payment card and billing information to store in your Google Payments account. Learn More.

How Chrome handles your information

**Information for website operators.** Sites that you visit using Chrome will automatically receive standard log information, including your system's IP address and data from cookies. In general, the fact that you use Chrome to access Google services, such as Gmail, does not cause Google to receive any additional personally identifying information about you. On Google websites and other websites that opt in, if Chrome detects signs that you are being actively attacked

**Test Group B (Modified)**

- You can view and manage your stored Autofill information. Learn more.

The personal information that Chrome stores won't be sent to Google unless you choose to store that data in your Google Account by turning on sync, or, in the case of payment cards and billing information, choosing specific payment card and billing information to store in your Google Payments account. Learn More.

Enabling sync affects only whether the personal information stored locally on your Chrome browser, such as your bookmarks, passwords, and autofill information, is stored in your Google Account so that you may access it when you use Chrome on other computers and devices. If you choose not to enable sync, that will not prevent Google from receiving information about your activity on sites and apps that use our services. As described in our Privacy Policy, when you use Chrome or another browser to visit third-party sites and apps that use our services, such as our Google Analytics and advertising services, Google receives information about your activity such as unique identifiers, browser type and settings, device type and settings, IP address, cookies, and the referrer URL of the page(s) you visited. You can choose whether to store activity from sites and apps that partner with Google in your Google Account by visiting My Activity. To learn about how to manage your privacy when you browse the web, read our Privacy Policy.

How Chrome handles your information

**Information for website operators.** Sites that you visit using Chrome will automatically receive standard log information, including your system's IP address and data from cookies. In general, the fact that you use Chrome to access Google services, such as Gmail, does not cause Google to receive any additional personally identifying information about you. On Google websites and other websites that opt in, if Chrome detects signs that you are being actively attacked

**Chrome Privacy Notice with Highlights**
**(Partial Image – See Appendix E.2 and E.4 for Full Text)**

### Test Group A (Unmodified)

- You can view and manage your stored Autofill information. Learn more.

The personal information that Chrome stores won't be sent to Google unless you choose to store that data in your Google Account by turning on sync, or, in the case of payment cards and billing information, choosing specific payment card and billing information to store in your Google Payments account. Learn More.

How Chrome handles your information

**Information for website operators.** Sites that you visit using Chrome will automatically receive standard log information, including your system's IP address and data from cookies. In general, the fact that you use Chrome to access Google services, such as Gmail, does not cause Google to receive any additional personally identifying information about you. On Google websites and other websites that opt in, if Chrome detects signs that you are being actively attacked by someone on the network (a "man in the middle attack"), Chrome may send information about that connection to Google or the website you visited to help determine the extent of the attack and how the attack functions. Google provides participating website owners with reports about attacks occurring on their sites.

### Test Group B (Modified)

- You can view and manage your stored Autofill information. Learn more.

The personal information that Chrome stores won't be sent to Google unless you choose to store that data in your Google Account by turning on sync, or, in the case of payment cards and billing information, choosing specific payment card and billing information to store in your Google Payments account. Learn More.

Enabling sync affects only whether the personal information stored locally on your Chrome browser, such as your bookmarks, passwords, and autofill information, is stored in your Google Account so that you may access it when you use Chrome on other computers and devices. If you choose not to enable sync, that will not prevent Google from receiving information about your activity on sites and apps that use our services. As described in our Privacy Policy, when you use Chrome or another browser to visit third-party sites and apps that use our services, such as our Google Analytics and advertising services, Google receives information about your activity such as unique identifiers, browser type and settings, device type and settings, IP address, cookies, and the referrer URL of the page(s) you visited. You can choose whether to store activity from sites and apps that partner with Google in your Google Account by visiting My Activity. To learn about how to manage your privacy when you browse the web, read our Privacy Policy.

How Chrome handles your information

**Information for website operators.** Sites that you visit using Chrome will automatically receive standard log information, including your system's IP address and data from cookies. In general, the fact that you use Chrome to access Google services, such as Gmail, does not cause Google to receive any additional personally identifying information about you. On Google websites and other websites that opt in, if Chrome detects signs that you are being actively attacked by someone on the network (a "man in the middle attack"), Chrome may send information about that connection to Google or the website you visited to help determine the extent of the attack and how the attack functions. Google provides participating website owners with reports about attacks occurring on their sites.

**Google Privacy Policy**
**(Partial Image – See Appendix D.1 for Full Text)**

**Test Groups A / B**



**Google Privacy Policy with Highlights**
**(Partial Image – See Appendix D.2 for Full Text)**

**Test Groups A / B**



**APPENDIX K.3**

**SCENARIO APPLICATION SURVEY STIMULI**

**Scenario Application Survey Experimental Groups**

| | |
|---|---|
| ***Group A*** | • New Account Narnia 2.0 Consent Disclosure |
| ***Group B*** | • Existing Account Narnia 2.0 Consent Disclosure |

**New Account Narnia 2.0 Consent Disclosure**
**(Partial Image – See Appendix G for Full Text)**

**Test Group A**



## Privacy and Terms

To create a Google Account, you'll need to agree to the
Terms of Service below.

In addition, when you create an account, we process your
information as described in our Privacy Policy, including
these key points:

### Data we process when you use Google

- When you set up a Google Account, we store
  information you give us like your name, email
  address, and telephone number.
- When you use Google services to do things like
  write a message in Gmail or comment on a
  YouTube video, we store the information you
  create.
- When you search for a restaurant on Google Maps
  or watch a video on YouTube, for example, we
  process information about that activity – including
  information like the video you watched, device IDs,
  IP addresses, cookie data, and location.
- We also process the kinds of information
  described above when you use apps or sites that
  use Google services like ads, Analytics, and the
  YouTube video player.



You're in control of the data we
collect & how it's used

K.3-1

**Existing Account Narnia 2.0 Consent Disclosure**
**(Partial Image – See Appendix H for Full Text)**

**Test Group B**





## Some new features for your Google Account

We've introduced some optional features for your account, giving you
more control over the data Google collects and how it's used, while
allowing Google to show you more relevant ads.

What changes if you turn on these new features?

1.  More information will be available in your *Google Account*, making it easier for
    you to review and control



When you use Google services like Search and YouTube, you generate data — things like
what you've searched for and videos you've watched. You can find and control that data in
*My Account* under the **Web & App Activity** setting.

K.3-2

**APPENDIX L.1**

**CONSUMER EXPECTATIONS SURVEY INSTRUMENT**

Consumer Expectations Survey Instrument
Survey Programmer Instructions

[NATIONAL 18+ SAMPLE; INBOUND SAMPLE MATCHED ON AGE/GENDER/REGION TO CENSUS]

[TARGET 1000 COMPLETES]

[PROGRAMMER NOTES IN BOLD CAPS AND BRACKETS]

[DISABLE THE BROWSER'S "BACK" BUTTON AND DO NOT SHOW A "BACK" BUTTON WITHIN THE SURVEY]

[FORCE RESPONSES TO ALL QUESTIONS]

*Notes to respondent in italics*

### Introduction and Screening

[NO SURVEY TITLE AND NO QUESTION NUMBER TO BE DISPLAYED TO RESPONDENTS.]

[DIGITAL FINGERPRINTING SHOULD BE USED TO AVOID REPEAT PARTICIPATION. DO NOT INVITE RESPONDENTS WHO WERE INVITED TO TAKE THE OTHER SURVEYS.]

[PANEL MEMBERS SHOULD BE MATCHED TO THE CENSUS ON AGE, GENDER, AND REGION. THAT IS, THE SCREENER SHOULD BE APPLIED TO A SAMPLE REPRESENTATIVE OF THE GENERAL POPULATION IN THE UNITED STATES SO THAT THE FINAL SAMPLE IS REPRESENTATIVE OF THE TARGET POPULATION FOR THE SURVEY (BASED ON ACTUAL QUALIFICATION).]

QS1.   Thank you for your willingness to participate in our study. Your opinions are very important to us. If you don't know an answer to a question or if you don't have an opinion, please don't guess. Simply indicate this in your response by selecting the "Don't know / Unsure" option. There are no right or wrong answers.

Your answers will be kept in strict confidence and the results of this study will not be used to try to sell you anything. If you wear glasses or corrective lenses when using a desktop computer, laptop computer, or tablet, please wear them throughout the survey.

Please do not use the "Back" button of your browser while taking the survey. This survey will take less than 15 minutes of your time. When you are ready to get started, please select the "Continue" button.

["CONTINUE" BUTTON TAKES RESPONDENT TO QUESTION S2]

[TEXT FOR TERMINATES: "Thank you for your interest in our study. We are no longer looking for people who match your characteristics. We appreciate your time."]

[NEXT PAGE]

QS2.  Captcha

**[INSERT CAPTCHA]**


**[NEXT PAGE]**


QS3.  Into which of the following categories does your age fall? (*Select one only*)

**[RANDOMIZE ORDER, AS IS AND REVERSE; KEEP "PREFER NOT TO ANSWER" LAST]**
- ⊙ Under 18 **[TERMINATE]**
- ⊙ 18 - 29
- ⊙ 30 - 39
- ⊙ 40 - 49
- ⊙ 50 - 59
- ⊙ 60 or older
- ⊙ Prefer not to answer **[ANCHOR LAST; TERMINATE]**


**[TERMINATE IF AGE DOES NOT MATCH THE CATEGORY PASSED BY PANEL PROVIDER]**


**[NEXT PAGE]**


QS4.  Are you…? (*Select one only*)

**[RANDOMIZE ORDER, AS IS AND REVERSE; KEEP "OTHER" AND "PREFER NOT TO ANSWER" LAST]**
- ⊙ Male
- ⊙ Female
- ⊙ Other **[ANCHOR SECOND TO LAST]**
- ⊙ Prefer not to answer **[ANCHOR LAST; TERMINATE]**


**[TERMINATE IF GENDER DOES NOT MATCH THE VALUES PASSED BY PANEL PROVIDER ONLY IF "MALE" OR "FEMALE" IS SELECTED]**


**[NEXT PAGE]**


QS5.  In which state do you live? (*Select one only*)

**[DROP DOWN MENU OF 50 STATES + DISTRICT OF COLUMBIA; HIDDEN VARIABLE FOR REGION; DETERMINE US CENSUS REGION BASED ON STATE SELECTED. ADD "PREFER NOT TO ANSWER" AND "DON'T KNOW/UNSURE" OPTIONS BELOW DROP DOWN MENU]**
- ⊙ Prefer not to answer **[ANCHOR SECOND TO LAST; TERMINATE]**
- ⊙ Don't know / Unsure **[ANCHOR LAST; TERMINATE]**

**[NEXT PAGE]**

QS6.  Have you or any member of your household ever worked for any of the following types of companies? (*Select all that apply*)

**[RANDOMIZE LIST; KEEP "NONE OF THE ABOVE" LAST]**

- ☐ A technology company or technology consultancy
- ☐ A law firm, legal services organization, or court **[TERMINATE]**
- ☐ A real estate agency
- ☐ A retail store
- ☐ A grocery store
- ☐ A fitness center
- ☐ An academic institution
- ☐ A healthcare provider or medical office
- ☐ A construction company
- ☐ A marketing, market research, or advertising agency
- ⊙ None of the above **[ANCHOR LAST; EXCLUSIVE]**

**[NEXT PAGE]**

QS7.  Thinking about the internet-connected device(s) you use at home and at work, which internet browser(s), if any, do you currently use? (*Select all that apply*)

**[RANDOMIZE LIST; KEEP "OTHER" AND "DON'T KNOW / UNSURE" LAST]**

- ☐ Internet Explorer
- ☐ Microsoft Edge
- ☐ Safari
- ☐ Brave
- ☐ Google Chrome **[TERMINATE IF NOT SELECTED]**
- ☐ Mozilla Firefox
- ☐ Opera
- ☐ Blue Steel **[TERMINATE]**
- ☐ Other (Please specify) **[ANCHOR SECOND TO LAST]**
- ⊙ Don't know / Unsure **[TERMINATE; ANCHOR LAST; EXCLUSIVE]**

**[NEXT PAGE]**

QS8.  Which internet browser(s) is/are set as the default browser on your device(s) at home and at work? (*Select all that apply*)

**[USE SAME ORDER AS QS7]**

- ☐ Internet Explorer
- ☐ Microsoft Edge
- ☐ Safari
- ☐ Brave
- ☐ Google Chrome
- ☐ Mozilla Firefox
- ☐ Opera
- ☐ Blue Steel **[TERMINATE]**
- ☐ **[IF 'OTHER' SELECTED IN QS7, POPULATE WITH INDIVIDUAL RESPONSE FROM QS7; ANCHOR THIRD TO LAST]**
- ☐ Other (Please specify) **[ANCHOR SECOND TO LAST]**
- ⊙ Don't know / Unsure **[ANCHOR LAST; EXCLUSIVE]**

**[S8FLAG: INCREMENT TO YES IF QS8 ITEM SELECTED IS NOT SELECTED IN QS7]**

**[NEXT PAGE]**

**Main Questionnaire**

**[USE LEAST FILL TO ASSIGN RESPONDENTS TO 1 OF 4 GROUPS]**

| | NUMBER OF COMPLETES | STIMULI DESCRIPTION |
|---|---|---|
| GROUP A<br><br>(No policies, Sync Off) | 250 | • Image of Sync Button Off<br>• Image of Bookmarks Setting |
| GROUP B<br><br>(No policies, Sync On) | 250 | • Image of Sync Button On<br>• Image of Bookmarks Setting |
| GROUP C<br><br>(All policies, Sync Off) | 250 | • Image of Sync Button Off<br>• Image of Bookmarks Setting<br>• CPN (w/ and w/o highlights)<br>• PP (w/ and w/o highlights)<br>• WAA Help Page |
| GROUP D<br><br>(All policies, Sync On) | 250 | • Image of Sync Button On<br>• Image of Bookmarks Setting<br>• CPN (w/ and w/o highlights)<br>• PP (w/ and w/o highlights)<br>• WAA Help Page |

**[SHOW Q0A TO GROUPS A AND B ONLY]**

Q0A. Based on your answers to the previous questions, you have qualified for this survey.

This survey is about internet browsers. You have been selected to answer questions about <u>Chrome</u>, which is a browser from a company named <u>Google</u>.

Next, you will see two Chrome browser pages that correspond with various user settings. After, you will be asked to answer a few questions. You will be able to view these pages again as you answer the questions.

Please do not use your browser's "Back" button.

If you don't know an answer to a question or if you don't have an opinion, please don't guess. Simply indicate this in your response by selecting the "Don't know / Unsure" option. There are no right or wrong answers.

**[NEXT PAGE]**

**[SHOW Q0B TO GROUPS C AND D ONLY]**

Q0B. Based on your answers to the previous questions, you have qualified for this survey.

This survey is about internet browsers. You have been selected to answer questions about <u>Chrome</u>, which is a browser from a company named <u>Google</u>.

Next, you will see several images. Two of the images display Chrome browser settings, three display policy webpages. After, you will be asked to answer a few questions. You will be able to view these images again as you answer the questions.

Please do not use your browser's "Back" button.

If you don't know an answer to a question or if you don't have an opinion, please don't guess. Simply indicate this in your response by selecting the "Don't know / Unsure" option. There are no right or wrong answers.

**[NEXT PAGE]**

Q0C. You will now see two pages related to Chrome browser settings that may be turned off or on. Please pay attention to the areas indicated by the red arrows. You will be able to view these images again as you answer any questions.



Sync Off Setting                                    Sync On Setting

Bookmarks Setting



**[RANDOMIZE ORDER OF THE TWO CHROME SETTINGS IMAGES]**

**[SHOW CHROME SYNC IMAGE CORRESPONDING WITH THE RESPONDENT'S GROUP; E.G. THE PAGE WITH 'SYNC-OFF' IS SHOWN TO GROUP A AND C]**

**[AFTER THE PAGE IS BROUGHT UP ON THE SCREEN, THERE SHOULD BE A 15-SECOND DELAY BEFORE THE "Continue" BUTTON APPEARS. A COUNT-DOWN SHOULD BE PRESENTED ABOVE THE IMAGE WITH THE FOLLOWING TEXT: "The "Continue" button will appear in X seconds" (THIS TEXT SHOULD BE REMOVED WHEN X=0)]**

**[NEXT PAGE]**

**[SHOW THE CHROME BOOKMARKS SETTING PAGE TO ALL GROUPS]**

**[AFTER THE PAGE IS BROUGHT UP ON THE SCREEN, THERE SHOULD BE A 15-SECOND DELAY BEFORE THE "Continue" BUTTON APPEARS. A COUNT-DOWN SHOULD BE PRESENTED ABOVE THE IMAGE WITH THE FOLLOWING TEXT: "The "Continue" button will appear in X seconds" (THIS TEXT SHOULD BE REMOVED WHEN X=0)]**

**[NEXT PAGE]**

**[RANDOMIZE ORDER OF Q0D THROUGH Q0F; SHOW TO GROUPS C AND D ONLY]**

Q0D. You will now see the <u>Google Privacy Policy</u>. Please read the privacy policy carefully. Hyperlinks within the policy have been disabled, however clicking on the headings under the Table of Contents [on the left-hand side / near the top of the page] will help you navigate to specific sections of the policy. **Please scroll through the window below to see the whole image. The continue button can be found at the bottom of the page.**

**[SHOW THE GOOGLE PRIVACY POLICY]**



**[USE 'on the left-hand side' FOR DESKTOP VERSIONS AND 'near the top of the page' FOR MOBILE VERSIONS]**

**[AFTER THE POLICY IS BROUGHT UP ON THE SCREEN, THERE SHOULD BE A 30-SECOND DELAY BEFORE THE "Continue" BUTTON APPEARS.
A COUNT-DOWN SHOULD BE PRESENTED ABOVE THE IMAGE WITH THE FOLLOWING TEXT: "The "Continue" button will appear in X seconds" (THIS TEXT SHOULD BE REMOVED WHEN X=0)]**

[NEXT PAGE]

Q0D2. Thank you for reviewing the policy. Please take another look at the sections highlighted below before continuing. You will be able to view this policy again as you answer any questions. **Please scroll through the window below to see the whole image. The continue button can be found at the bottom of the page.**

[DISPLAY THE HIGHLIGHTED VERSION OF THE POLICY]

**[AFTER THE POLICY IS BROUGHT UP ON THE SCREEN, THERE SHOULD BE A 15-SECOND DELAY BEFORE THE "Continue" BUTTON APPEARS.**
**A COUNT-DOWN SHOULD BE PRESENTED UNDER THE IMAGE WITH THE FOLLOWING TEXT: "The "Continue" button will appear in X seconds" (THIS TEXT SHOULD BE REMOVED WHEN X=0)]**

[NEXT PAGE]

Q0E. You will now see the <u>Google Chrome Privacy Notice</u>. Please read the privacy notice carefully. Hyperlinks within the policy have been disabled, however clicking on the headings under the Table of Contents near the top of the page will help you navigate to specific sections of the policy. **Please scroll through the window below to see the whole image. The continue button can be found at the bottom of the page.**

**[DISPLAY THE CHROME PRIVACY NOTICE]**



**[AFTER THE NOTICE IS BROUGHT UP ON THE SCREEN, THERE SHOULD BE A 30-SECOND DELAY BEFORE THE "Continue" BUTTON APPEARS.**
**A COUNT-DOWN SHOULD BE PRESENTED ABOVE THE IMAGE WITH THE FOLLOWING TEXT: "The "Continue" button will appear in X seconds" (THIS TEXT SHOULD BE REMOVED WHEN X=0)]**

[NEXT PAGE]

Q0E2. Thank you for reviewing the policy. Please take another look at the sections highlighted below before continuing. You will be able to view this policy again as you answer any questions. **Please scroll through the window below to see the whole image. The continue button can be found at the bottom of the page.**

**[DISPLAY THE HIGHLIGHTED VERSION OF THE POLICY]**

**[AFTER THE POLICY IS BROUGHT UP ON THE SCREEN, THERE SHOULD BE A 15-SECOND DELAY BEFORE THE "Continue" BUTTON APPEARS.**
**A COUNT-DOWN SHOULD BE PRESENTED ABOVE THE IMAGE WITH THE FOLLOWING TEXT: "**The "Continue" button will appear in X seconds**" (THIS TEXT SHOULD BE REMOVED WHEN X=0)]**

**[NEXT PAGE]**

Q0F. You will now see Google's <u>Find & control your Web & App Activity – Help Page</u>. Please read the help page carefully. Hyperlinks within the page have been disabled. You will be able to view this help page again as you answer any questions. **Please scroll through the window below to see the whole image. The continue button can be found at the bottom of the page.**

**[SHOW THE WAA HELP PAGE IMAGE]**



**[AFTER THE IMAGE IS BROUGHT UP ON THE SCREEN, THERE SHOULD BE A 30-SECOND DELAY BEFORE THE "Continue" BUTTON APPEARS.**
**A COUNT-DOWN SHOULD BE PRESENTED ABOVE THE IMAGE WITH THE FOLLOWING TEXT: "**The "Continue" button will appear in X seconds**" (THIS TEXT SHOULD BE REMOVED WHEN X=0)]**

**[NEXT PAGE]**

**[THUMBNAILS OF ALL THE STIMULI THAT ARE SHOWN TO EACH INDIVIDUAL GROUP SHOULD BE AVAILABLE FOR THE REMAINDER OF THE MAIN QUESTIONNAIRE (Q1-Q3); HOWEVER FOR THE SYNC/BOOKMARK SETTING IMAGES, SHOW THE SYNC STIMULUS FOR Q1s (Q1.A-Q1.G) AND THE BOOKMARKS STIMULUS FOR QUESTIONS Q2s (Q2.A-Q2.F); PRESENT THE HIGHLIGHTED VERSION OF THE IMAGE IN THUMBNAILS IF THE IMAGE HAS BOTH UNHIGHLIGHTED AND HIGHLIGHTED VERSIONS; ADD TITLES TO EACH THUMBNAIL (USE THE FOLLOWING:** <u>Sync Setting</u>**,** <u>Bookmarks Setting</u>**,** <u>Find & control your Web & App Activity – Help Page</u>**,** <u>Chrome Privacy Notice</u>**,** <u>Google Privacy Policy</u>**); AT THE TOP OF THE PAGE DISPLAY THE**

**FOLLOWING TEXT: "(You can click on the thumbnails to see the enlarged versions. These are thumbnails of the images that you have seen so far.)"** ]

**[RANDOMIZE ORDER OF QUESTION GROUPS Q1 AND Q2; WITHIN EACH GROUP OF QUESTIONS, RANDOMIZE ORDER OF INDIVIDUAL QUESTIONS; KEEP Q1.A ANCHORED FIRST WITHIN THE Q1 GROUP AND Q2.A ANCHORED FIRST WITHIN THE Q2 GROUP]**

Q1A. In the following six (6) questions, we will ask you to express how much you agree or disagree with a particular statement based on the sync settings you just viewed.

**[NEXT PAGE]**

Q1B. <u>Based on the sync settings [and documents] you just viewed</u>, how strongly do you agree or disagree that Google receives your <u>IP address</u> while browsing the internet? *(IP Address - Every device connected to the Internet is assigned a number known as an Internet protocol (IP) address. An IP address can often be used to identify the location from which a device is connecting to the Internet)*

**[USE 'and documents' FOR GROUPS C AND D]**

**[RANDOMIZE ORDER OF FIRST 5 OPTIONS BETWEEN 1-2-3-4-5 OR 5-4-3-2-1, NO STARTING POINT]**



| 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|
| Strongly disagree | Disagree | Neither agree nor disagree | Agree | Strongly agree |

⊙ Don't know / Unsure **[EXCLUSIVE]**

**[NEXT PAGE]**

Q1C. <u>Based on the sync settings [and documents] you just viewed</u>, how strongly do you agree or disagree that Google receives <u>referrer URLs</u> while browsing the internet? *(Referrer URL – A referrer URL contains the URL (web address) of the last webpage the browser visited.)*

**[USE 'and documents' FOR GROUPS C AND D]**

**[KEEP SCALE ORDER THE SAME AS THE FIRST SCALE]**



| 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|
| Strongly disagree | Disagree | Neither agree nor disagree | Agree | Strongly agree |

⊙ Don't know / Unsure **[EXCLUSIVE]**

**[NEXT PAGE]**

Q1D. <u>Based on the sync settings [and documents] you just viewed</u>, how strongly do you agree or disagree that Google receives your <u>cookies</u> while browsing the internet? *(Cookie – A small file containing a string of characters that is sent to your computer when you visit a website. When you visit the site again, the cookie allows that site to recognize your browser. Cookies may store user preferences and other information)*

**[USE** 'and documents' **FOR GROUPS C AND D]**

**[KEEP SCALE ORDER THE SAME AS THE FIRST SCALE]**



| 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|
| Strongly disagree | Disagree | Neither agree nor disagree | Agree | Strongly agree |

⊙ Don't know / Unsure **[EXCLUSIVE]**

**[NEXT PAGE]**

Q1E. <u>Based on the sync settings [and documents] you just viewed</u>, how strongly do you agree or disagree that Google receives your <u>name</u> while browsing the internet? *(Name - A word or set of words by which a person is referred to. This could be used when signing-in to accounts, filling out forms, or communicating with individuals or organizations while browsing the internet.)*

**[USE** 'and documents' **FOR GROUPS C AND D]**

**[KEEP SCALE ORDER THE SAME AS THE FIRST SCALE]**



| 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|
| Strongly disagree | Disagree | Neither agree nor disagree | Agree | Strongly agree |

⊙ Don't know / Unsure **[EXCLUSIVE]**

**[NEXT PAGE]**

Q1F. <u>Based on the sync settings [and documents] you just viewed</u>, how strongly do you agree or disagree that Google receives your <u>passwords and login information for websites</u> while browsing the internet? *(Passwords and login information - Account names and associated passwords required to login to individual accounts online.)*

**[USE** 'and documents' **FOR GROUPS C AND D]**

**[KEEP SCALE ORDER THE SAME AS THE FIRST SCALE]**



1 — Strongly disagree
2 — Disagree
3 — Neither agree nor disagree
4 — Agree
5 — Strongly agree

⊙ Don't know / Unsure **[EXCLUSIVE]**

**[NEXT PAGE]**

Q1G. <u>Based on the sync settings [and documents] you just viewed</u>, how strongly do you agree or disagree that Google receives your <u>payment information</u> while browsing the internet? *(Payment information - Any data that enables a person to access a customer's account, such as a debit card, credit card, or bank account info.)*

**[USE 'and documents' FOR GROUPS C AND D]**

**[KEEP SCALE ORDER THE SAME AS THE FIRST SCALE]**



1 — Strongly disagree
2 — Disagree
3 — Neither agree nor disagree
4 — Agree
5 — Strongly agree

⊙ Don't know / Unsure **[EXCLUSIVE]**

**[NEXT PAGE]**

Q2A. Over the following <u>five (5)</u> questions, we will ask you to express how much you agree or disagree with a particular statement based on the <u>bookmark settings</u> you just viewed.

**[NEXT PAGE]**

Q2B. <u>Based on the bookmark settings you just viewed</u>, how strongly do you agree or disagree that the bookmarks bar <u>allows users to access frequently visited websites</u>?

**[KEEP SCALE ORDER THE SAME AS THE FIRST SCALE]**



1 — Strongly disagree
2 — Disagree
3 — Neither agree nor disagree
4 — Agree
5 — Strongly agree

⊙ Don't know / Unsure **[EXCLUSIVE]**

**[NEXT PAGE]**

Q2C. <u>Based on the bookmark settings you just viewed</u>, how strongly do you agree or disagree that users can <u>pick which websites are displayed</u> in the bookmarks bar?

**[KEEP SCALE ORDER THE SAME AS THE FIRST SCALE]**



| 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|
| Strongly disagree | Disagree | Neither agree nor disagree | Agree | Strongly agree |

⊙  Don't know / Unsure **[EXCLUSIVE]**

**[NEXT PAGE]**

Q2D. <u>Based on the bookmark settings you just viewed</u>, how strongly do you agree or disagree that the 'Show bookmarks bar' toggle is <u>ON by default</u>?

**[KEEP SCALE ORDER THE SAME AS THE FIRST SCALE]**



| 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|
| Strongly disagree | Disagree | Neither agree nor disagree | Agree | Strongly agree |

⊙  Don't know / Unsure **[EXCLUSIVE]**

**[NEXT PAGE]**

Q2E. <u>Based on the bookmark settings you just viewed</u>, how strongly do you agree or disagree that the bookmarks in your bookmarks bar <u>will be saved and appear the next time you open Chrome</u>?

**[KEEP SCALE ORDER THE SAME AS THE FIRST SCALE]**



| 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|
| Strongly disagree | Disagree | Neither agree nor disagree | Agree | Strongly agree |

⊙  Don't know / Unsure **[EXCLUSIVE]**

**[NEXT PAGE]**

Q2F. <u>Based on the bookmark settings you just viewed</u>, how strongly do you agree or disagree that the bookmarks in your bookmarks bar are <u>easy to edit</u> on the Chrome internet browser?

**[KEEP SCALE ORDER THE SAME AS THE FIRST SCALE]**



| 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|
| Strongly disagree | Disagree | Neither agree nor disagree | Agree | Strongly agree |

⊙  Don't know / Unsure **[EXCLUSIVE]**

**[NEXT PAGE]**

**[SHOW Q3 TO GROUPS C AND D ONLY]**

Q3. Throughout this survey, you viewed policy webpages where some hyperlinks functioned, and some hyperlinks indicated by blue underlined text did not. Were you or were you not able to view the policy webpages and access the information you needed to answer the questions asked in this survey? *(Select only one option.)*

**[RANDOMIZE ORDER]**
  ⊙  I was able to view the policy webpages and access the information I needed to answer the questions asked in this survey.
  ⊙  I was not able to view the policy webpages and/or access the information I needed to answer the questions asked in this survey.
  ⊙  Don't know / Unsure **[ANCHOR LAST]**

**[NEXT PAGE]**

**Follow Up Questions**

QF1.  Prior to this survey, were you or were you not aware of any lawsuits related to internet usage and/or browsing? (*Please select one only*) **[RANDOMIZE ORDER]**

- ⊙ Yes, I was aware of at least one lawsuit
- ⊙ No, I was not aware of any lawsuit **[SKIP TO THANK YOU PAGE]**
- ⊙ Don't know / Unsure **[SKIP TO THANK YOU PAGE]**

**[NEXT PAGE]**

QF2.  You indicated that you were aware of at least one lawsuit regarding internet usage and/or browsing. Please describe the lawsuit(s) you were aware of: (*Please type in your response. If you do not know the answer or are unsure, please select "Don't know / Unsure"*)

```
┌─────────────────────────────────────────────────────────┐
│                                                         │
│                                                         │
│                                                         │
└─────────────────────────────────────────────────────────┘
```

**[OPEN-ENDED TEXT BOX, LIMITING TO 1000 CHARACTERS]**
**[REQUIRE AT LEAST 4 CHARACTERS; SHOW ERROR "Please be thorough in your response." IF ENTRY IS LESS THAN 4 CHARACTERS]**

- ⊙ Don't know / Unsure **[EXCLUSIVE]**

**[GO TO THANK YOU PAGE]**

**APPENDIX L.2**

**MATERIALITY SURVEY INSTRUMENT**

**Materiality Survey Instrument**
**Survey Programmer Instructions**

[NATIONAL 18+ SAMPLE; INBOUND SAMPLE MATCHED ON AGE/GENDER/REGION TO CENSUS]

[TARGET 500 COMPLETES]

[PROGRAMMER NOTES IN BOLD CAPS AND BRACKETS]

[DISABLE THE BROWSER'S "BACK" BUTTON AND DO NOT SHOW A "BACK" BUTTON WITHIN THE SURVEY]

[FORCE RESPONSES TO ALL QUESTIONS]

*Notes to respondent in italics*

### Introduction and Screening

[NO SURVEY TITLE AND NO QUESTION NUMBER TO BE DISPLAYED TO RESPONDENTS.]

[DIGITAL FINGERPRINTING SHOULD BE USED TO AVOID REPEAT PARTICIPATION. DO NOT INVITE RESPONDENTS WHO WERE INVITED TO TAKE THE OTHER SURVEYS.]

[PANEL MEMBERS SHOULD BE MATCHED TO THE CENSUS ON AGE, GENDER, AND REGION. THAT IS, THE SCREENER SHOULD BE APPLIED TO A SAMPLE REPRESENTATIVE OF THE GENERAL POPULATION IN THE UNITED STATES SO THAT THE FINAL SAMPLE IS REPRESENTATIVE OF THE TARGET POPULATION FOR THE SURVEY (BASED ON ACTUAL QUALIFICATION).]

QS1.   Thank you for your willingness to participate in our study. Your opinions are very important to us. If you don't know an answer to a question or if you don't have an opinion, please don't guess. Simply indicate this in your response by selecting the "Don't know / Unsure" option. There are no right or wrong answers.

Your answers will be kept in strict confidence and the results of this study will not be used to try to sell you anything. If you wear glasses or corrective lenses when using a desktop computer, laptop computer, or tablet, please wear them throughout the survey.

Please do not use the "Back" button of your browser while taking the survey. This survey will take less than 15 minutes of your time. When you are ready to get started, please select the "Continue" button.

["CONTINUE" BUTTON TAKES RESPONDENT TO QUESTION S2]

[TEXT FOR TERMINATES: "Thank you for your interest in our study. We are no longer looking for people who match your characteristics. We appreciate your time."]

[NEXT PAGE]

QS2.  Captcha

**[INSERT CAPTCHA]**


**[NEXT PAGE]**


QS3.  Into which of the following categories does your age fall? (*Select one only*)

**[RANDOMIZE ORDER, AS IS AND REVERSE; KEEP "PREFER NOT TO ANSWER" LAST]**

- ⊙ Under 18 **[TERMINATE]**
- ⊙ 18 - 29
- ⊙ 30 - 39
- ⊙ 40 - 49
- ⊙ 50 - 59
- ⊙ 60 or older
- ⊙ Prefer not to answer **[ANCHOR LAST; TERMINATE]**


**[TERMINATE IF AGE DOES NOT MATCH THE CATEGORY PASSED BY PANEL PROVIDER]**


**[NEXT PAGE]**


QS4.  Are you…? (*Select one only*)

**[RANDOMIZE ORDER, AS IS AND REVERSE; KEEP "OTHER" AND "PREFER NOT TO ANSWER" LAST]**

- ⊙ Male
- ⊙ Female
- ⊙ Other **[ANCHOR SECOND TO LAST]**
- ⊙ Prefer not to answer **[ANCHOR LAST; TERMINATE]**


**[TERMINATE IF GENDER DOES NOT MATCH THE VALUES PASSED BY PANEL PROVIDER ONLY IF "MALE" OR "FEMALE" IS SELECTED]**


**[NEXT PAGE]**


QS5.  In which state do you live? (*Select one only*)

**[DROP DOWN MENU OF 50 STATES + DISTRICT OF COLUMBIA; HIDDEN VARIABLE FOR REGION; DETERMINE US CENSUS REGION BASED ON STATE SELECTED. ADD "PREFER NOT TO ANSWER" AND "DON'T KNOW/UNSURE" OPTIONS BELOW DROP DOWN MENU]**

- ⊙ Prefer not to answer **[ANCHOR SECOND TO LAST; TERMINATE]**
- ⊙ Don't know / Unsure **[ANCHOR LAST; TERMINATE]**

**[NEXT PAGE]**

QS6.  Have you or any member of your household ever worked for any of the following types of companies? (*Select all that apply*)

**[RANDOMIZE LIST; KEEP "NONE OF THE ABOVE" LAST]**

- ☐ A technology company or technology consultancy
- ☐ A law firm, legal services organization, or court **[TERMINATE]**
- ☐ A real estate agency
- ☐ A retail store
- ☐ A grocery store
- ☐ A fitness center
- ☐ An academic institution
- ☐ A healthcare provider or medical office
- ☐ A construction company
- ☐ A marketing, market research, or advertising agency
- ⊙ None of the above **[ANCHOR LAST; EXCLUSIVE]**

**[NEXT PAGE]**

QS7.  Thinking about the internet-connected device(s) you use at home and at work, which internet browser(s) do you currently use? (*Select all that apply*)

**[RANDOMIZE LIST; KEEP "OTHER" AND "DON'T KNOW / UNSURE" LAST]**

- ☐ Internet Explorer
- ☐ Microsoft Edge
- ☐ Brave
- ☐ Safari
- ☐ Google Chrome **[TERMINATE IF NOT SELECTED]**
- ☐ Mozilla Firefox
- ☐ Opera
- ☐ Blue Steel **[TERMINATE]**
- ☐ Other (Please specify) **[ANCHOR SECOND TO LAST]**
- ⊙ Don't know / Unsure **[TERMINATE; ANCHOR LAST; EXCLUSIVE]**

**[NEXT PAGE]**

QS8.  Which internet browser(s) is/are set as the default browser on your device(s) at home and at work? (*Select all that apply*)

**[USE SAME ORDER AS QS7]**

- ☐ Internet Explorer
- ☐ Microsoft Edge
- ☐ Safari
- ☐ Brave
- ☐ Google Chrome
- ☐ Mozilla Firefox
- ☐ Opera
- ☐ Blue Steel **[TERMINATE]**
- ☐ **[IF 'OTHER' SELECTED IN QS7, POPULATE WITH INDIVIDUAL RESPONSE FROM QS7; ANCHOR THIRD TO LAST]**
- ☐ Other (Please specify) **[ANCHOR SECOND TO LAST]**
- ⊙ Don't know / Unsure **[ANCHOR LAST; EXCLUSIVE]**

**[S8FLAG: INCREMENT TO YES IF QS8 ITEM SELECTED IS NOT SELECTED IN QS7]**

**[NEXT PAGE]**

**Main Questionnaire**

**[USE LEAST FILL TO ASSIGN RESPONDENTS TO 1 OF 2 GROUPS]**

| CONDITION | NUMBER OF COMPLETES | STIMULI DESCRIPTION |
|---|---|---|
| GROUP A (Unmodified CPN) | 250 | • Unmodified CPN (w/ and w/o highlights)<br>• PP (w/ and w/o highlights) |
| GROUP B (Modified CPN) | 250 | • Modified CPN (w/ and w/o highlights)<br>• PP (w/ and w/o highlights) |

Q0A. Based on your answers to the previous questions, you have qualified for this survey.

This survey is about internet browsers. You have been selected to answer questions about <u>Chrome</u>, which is an internet browser from a company named <u>Google</u>. Next, you will see two policy webpages. After, you will be asked to answer a few questions. You will be able to view these pages again as you answer the questions.

Please do not use your browser's "Back" button.

If you don't know an answer to a question or if you don't have an opinion, please don't guess. Simply indicate this in your response by selecting the "Don't know / Unsure" option. There are no right or wrong answers.

**[NEXT PAGE]**

**[RANDOMIZE THE ORDER OF Q0B AND Q0C]**

Q0B. You will now see the <u>Google Privacy Policy</u>. Please read the privacy policy carefully. Hyperlinks within the policy have been disabled, however clicking on the headings under the Table of Contents [on the left-hand side / near the top of the page] will help you navigate to specific sections of the policy. **Please scroll through the window below to see the whole image. The continue button can be found at the bottom of the page.**

**[USE 'on the left-hand side' FOR DESKTOP VERSIONS AND 'near the top of the page' FOR MOBILE VERSIONS]**

**[SHOW THE GOOGLE PRIVACY POLICY]**



**[AFTER THE POLICY IS BROUGHT UP ON THE SCREEN, THERE SHOULD BE A 30-SECOND DELAY BEFORE THE "Continue" BUTTON APPEARS.
A COUNT-DOWN SHOULD BE PRESENTED ABOVE THE IMAGE WITH THE FOLLOWING TEXT: "The "Continue" button will appear in X seconds" (THIS TEXT SHOULD BE REMOVED WHEN X=0)]**

**[NEXT PAGE]**

Q0B2. Thank you for reviewing the policy. Please take another look at the sections highlighted below before continuing. You will be able to view this policy again as you answer any questions. **Please scroll through the window below to see the whole image. The continue button can be found at the bottom of the page.**

**[DISPLAY THE HIGHLIGHTED VERSION OF THE POLICY]**

**[AFTER THE POLICY IS BROUGHT UP ON THE SCREEN, THERE SHOULD BE A 15-SECOND DELAY BEFORE THE "Continue" BUTTON APPEARS.
A COUNT-DOWN SHOULD BE PRESENTED ABOVE THE IMAGE WITH THE FOLLOWING TEXT: "The "Continue" button will appear in X seconds" (THIS TEXT SHOULD BE REMOVED WHEN X=0)]**

**[NEXT PAGE]**

Q0C. You will now see the <u>Google Chrome Privacy Notice</u>. Please read the privacy notice carefully. Hyperlinks within the policy have been disabled, however clicking on the headings under the Table of Contents near the top of the page will help you navigate to specific sections of the policy. **Please scroll through the window below to see the whole image. The continue button can be found at the bottom of the page.**

**[SHOW THE VERSION OF THE CHROME PRIVACY NOTICE CORRESPONDING WITH THE RESPONDENT'S GROUP]**



**[AFTER THE NOTICE IS BROUGHT UP ON THE SCREEN, THERE SHOULD BE A 30-SECOND DELAY BEFORE THE "Continue" BUTTON APPEARS.**
**A COUNT-DOWN SHOULD BE PRESENTED ABOVE THE IMAGE WITH THE FOLLOWING TEXT: "The "Continue" button will appear in X seconds" (THIS TEXT SHOULD BE REMOVED WHEN X=0)]**

**[NEXT PAGE]**

Q0C2. Thank you for reviewing the policy. Please take another look at the sections highlighted below before continuing. You will be able to view this policy again as you answer any questions. **Please scroll through the window below to see the whole image. The continue button can be found at the bottom of the page.**

**[DISPLAY THE HIGHLIGHTED VERSION OF THE POLICY]**

**[AFTER THE POLICY IS BROUGHT UP ON THE SCREEN, THERE SHOULD BE A 15-SECOND DELAY BEFORE THE "Continue" BUTTON APPEARS.**
**A COUNT-DOWN SHOULD BE PRESENTED ABOVE THE IMAGE WITH THE FOLLOWING TEXT: "The "Continue" button will appear in X seconds" (THIS TEXT SHOULD BE REMOVED WHEN X=0)]**

**[NEXT PAGE]**

**[PROVIDE THUMBNAILS OF POLICIES VIEWED BY EACH RESPONDENT FOR Q1-Q2; ADD TITLES TO EACH THUMBNAIL (USE THE FOLLOWING: <u>Chrome Privacy Notice</u>, <u>Google Privacy Policy</u>); PRESENT THE HIGHLIGHTED VERSION OF THE IMAGE IN THUMBNAILS IF THE IMAGE HAS BOTH UNHIGHLIGHTED AND HIGHLIGHTED VERSIONS; AT THE TOP OF THE PAGE DISPLAY THE FOLLOWING TEXT: "(You can click on the thumbnails to see the enlarged versions. These are thumbnails of the images that you have seen so far.)"]**

Q1. How likely or unlikely are you to continue using Google Chrome?

**[RANDOMIZE ORDER OF FIRST 5 OPTIONS BETWEEN 1-2-3-4-5 OR 5-4-3-2-1, NO STARTING POINT]**



| 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|
| Extremely unlikely | Unlikely | Neither likely nor unlikely | Likely | Extremely likely |

◉ Don't know / Unsure **[EXCLUSIVE]**

**[NEXT PAGE]**

Q2. Throughout this survey, you viewed policy webpages where some hyperlinks functioned, and some hyperlinks indicated by blue underlined text did not. Were you or were you not able to view the policy webpages and access the information you needed to answer the questions asked in this survey? *(Select only one option.)*

**[RANDOMIZE ORDER]**

      ◉ I was able to view the policy webpages and access the information I needed to answer the questions asked in this survey.

      ◉ I was not able to view the policy webpages and/or access the information I needed to answer the questions asked in this survey.

      ◉ Don't know / Unsure **[ANCHOR LAST]**

**[NEXT PAGE]**

**Follow Up Questions**

QF1.  Prior to this survey, were you or were you not aware of any lawsuits related to internet usage and/or browsing? (*Please select one only*) **[RANDOMIZE ORDER]**

⊙    Yes, I was aware of at least one lawsuit
⊙    No, I was not aware of any lawsuit **[SKIP TO THANK YOU PAGE]**
⊙    Don't know / Unsure **[SKIP TO THANK YOU PAGE]**

**[NEXT PAGE]**

QF2.  You indicated that you were aware of at least one lawsuit regarding internet usage and/or browsing. Please describe the lawsuit(s) you were aware of: (*Please type in your response. If you do not know the answer or are unsure, please select "Don't know / Unsure"*)

```

```

**[OPEN-ENDED TEXT BOX, LIMITING TO 1000 CHARACTERS]**
**[REQUIRE AT LEAST 4 CHARACTERS; SHOW ERROR "Please be thorough in your response." IF ENTRY IS LESS THAN 4 CHARACTERS]**

⊙ Don't know / Unsure **[EXCLUSIVE]**

**[GO TO THANK YOU PAGE]**

**APPENDIX L.3**

**SCENARIO APPLICATION SURVEY INSTRUMENT**

**Scenario Application Survey Instrument**
**Survey Programmer Instructions**

**[NATIONAL 18+ SAMPLE; INBOUND SAMPLE MATCHED ON AGE/GENDER/REGION TO CENSUS]**

**[TARGET 500 COMPLETES]**

**[PROGRAMMER NOTES IN BOLD CAPS AND BRACKETS]**

**[DISABLE THE BROWSER'S "BACK" BUTTON AND DO NOT SHOW A "BACK" BUTTON WITHIN THE SURVEY]**

**[FORCE RESPONSES TO ALL QUESTIONS]**

*Notes to respondent in italics*

**Introduction and Screening**

**[NO SURVEY TITLE AND NO QUESTION NUMBER TO BE DISPLAYED TO RESPONDENTS.]**

**[DIGITAL FINGERPRINTING SHOULD BE USED TO AVOID REPEAT PARTICIPATION. DO NOT INVITE RESPONDENTS WHO WERE INVITED TO TAKE THE OTHER SURVEYS.]**

**[PANEL MEMBERS SHOULD BE MATCHED TO THE CENSUS ON AGE, GENDER, AND REGION. THAT IS, THE SCREENER SHOULD BE APPLIED TO A SAMPLE REPRESENTATIVE OF THE GENERAL POPULATION IN THE UNITED STATES SO THAT THE FINAL SAMPLE IS REPRESENTATIVE OF THE TARGET POPULATION FOR THE SURVEY (BASED ON ACTUAL QUALIFICATION).]**

QS1.   Thank you for your willingness to participate in our study. Your opinions are very important to us. If you don't know an answer to a question or if you don't have an opinion, please don't guess. Simply indicate this in your response by selecting the "Don't know / Unsure" option. There are no right or wrong answers.

Your answers will be kept in strict confidence and the results of this study will not be used to try to sell you anything. If you wear glasses or corrective lenses when using a desktop computer, laptop computer, or tablet, please wear them throughout the survey.

Please do not use the "Back" button of your browser while taking the survey. This survey will take less than 15 minutes of your time. When you are ready to get started, please select the "Continue" button.

**["CONTINUE" BUTTON TAKES RESPONDENT TO QUESTION S2]**

**[TEXT FOR TERMINATES: "Thank you for your interest in our study. We are no longer looking for people who match your characteristics. We appreciate your time."]**

**[NEXT PAGE]**

QS2.  Captcha

**[INSERT CAPTCHA]**

**[NEXT PAGE]**

QS3.  Into which of the following categories does your age fall? (*Select one only*)

**[RANDOMIZE ORDER, AS IS AND REVERSE; KEEP "PREFER NOT TO ANSWER" LAST]**

- ⊙ Under 18 **[TERMINATE]**
- ⊙ 18 - 29
- ⊙ 30 - 39
- ⊙ 40 - 49
- ⊙ 50 - 59
- ⊙ 60 or older
- ⊙ Prefer not to answer **[ANCHOR LAST; TERMINATE]**

**[TERMINATE IF AGE DOES NOT MATCH THE CATEGORY PASSED BY PANEL PROVIDER]**

**[NEXT PAGE]**

QS4.  Are you…? (*Select one only*)

**[RANDOMIZE ORDER, AS IS AND REVERSE; KEEP "OTHER" AND "PREFER NOT TO ANSWER" LAST]**

- ⊙ Male
- ⊙ Female
- ⊙ Other **[ANCHOR SECOND TO LAST]**
- ⊙ Prefer not to answer **[ANCHOR LAST; TERMINATE]**

**[TERMINATE IF GENDER DOES NOT MATCH THE VALUES PASSED BY PANEL PROVIDER ONLY IF "MALE" OR "FEMALE" IS SELECTED]**

**[NEXT PAGE]**

QS5.  In which state do you live? (*Select one only*)

**[DROP DOWN MENU OF 50 STATES + DISTRICT OF COLUMBIA; HIDDEN VARIABLE FOR REGION; DETERMINE US CENSUS REGION BASED ON STATE SELECTED. ADD "PREFER NOT TO ANSWER" AND "DON'T KNOW/UNSURE" OPTIONS BELOW DROP DOWN MENU]**

- ⊙ Prefer not to answer **[ANCHOR SECOND TO LAST; TERMINATE]**
- ⊙ Don't know / Unsure **[ANCHOR LAST; TERMINATE]**

**[NEXT PAGE]**

QS6.  Have you or any member of your household ever worked for any of the following types of companies? (*Select all that apply*)

**[RANDOMIZE LIST; KEEP "NONE OF THE ABOVE" LAST]**

- ☐ A technology company or technology consultancy
- ☐ A law firm, legal services organization, or court **[TERMINATE]**
- ☐ A real estate agency
- ☐ A retail store
- ☐ A grocery store
- ☐ A fitness center
- ☐ An academic institution
- ☐ A healthcare provider or medical office
- ☐ A construction company
- ☐ A marketing, market research, or advertising agency
- ◉ None of the above **[ANCHOR LAST; EXCLUSIVE]**

**[NEXT PAGE]**

QS7.  Thinking about the internet-connected device(s) you use at home and at work, which internet browser(s) do you currently use? (*Select all that apply*)

**[RANDOMIZE LIST; KEEP "OTHER" AND "DON'T KNOW / UNSURE" LAST]**

- ☐ Internet Explorer
- ☐ Microsoft Edge
- ☐ Safari
- ☐ Brave
- ☐ Google Chrome **[TERMINATE IF NOT SELECTED]**
- ☐ Mozilla Firefox
- ☐ Opera
- ☐ Blue Steel **[TERMINATE]**
- ☐ Other (Please specify) **[ANCHOR SECOND TO LAST]**
- ◉ Don't know / Unsure **[TERMINATE; ANCHOR LAST; EXCLUSIVE]**

**[NEXT PAGE]**

QS8.  Which internet browser(s) is/are set as the default browser on your device(s) at home and at work? (*Select all that apply*)

**[USE SAME ORDER AS QS7]**

- ☐ Internet Explorer
- ☐ Microsoft Edge
- ☐ Safari
- ☐ Brave
- ☐ Google Chrome
- ☐ Mozilla Firefox
- ☐ Opera
- ☐ Blue Steel **[TERMINATE]**
- ☐ **[IF 'OTHER' SELECTED IN QS7, POPULATE WITH INDIVIDUAL RESPONSE FROM QS7; ANCHOR THIRD TO LAST]**
- ☐ Other (Please specify) **[ANCHOR SECOND TO LAST]**
- ⊙ Don't know / Unsure **[ANCHOR LAST; EXCLUSIVE]**

**[S8FLAG: INCREMENT TO YES IF QS8 ITEM SELECTED IS NOT SELECTED IN QS7]**

**[NEXT PAGE]**

**Main Questionnaire**

**[USE LEAST FILL TO ASSIGN RESPONDENTS TO 1 OF 2 GROUPS]**

| CONDITION | NUMBER OF COMPLETES | STIMULI |
|---|---|---|
| GROUP A (New Account Creation Agreement) | 250 | • New Account Creation Agreement |
| GROUP B (Consent Bump Agreement) | 250 | • Consent Bump Agreement |

**[ADDITIONALLY, USE LEAST FILL FOR THE USE OF SOFIA / VICTOR (AND CORRESPONDING PRONOUNS) WITHIN THE FOLLOWING SCENARIOS]**

| SUBGROUP | NAME OF SUBJECT | PRONOUN |
|---|---|---|
| A.S, B.S | Sofia | her/she |
| A.V, B.V | Victor | his/him/he |

Q0A. Based on your answers to the previous questions, you have qualified for this survey.

This survey is about internet browsers. You have been selected to answer questions about <u>Chrome</u>, which is a browser from a company named <u>Google</u>.

If you don't know an answer to a question or if you don't have an opinion, please don't guess. Simply indicate this in your response by selecting the "Don't know / Unsure" option. There are no right or wrong answers.

**[NEXT PAGE]**

Q0B. Now, imagine the following scenario:

Please read the scenario description carefully. You will be able to view this scenario again as you answer any questions.

L.3-5

---

SCENARIO FOR ALL GROUPS

Sofia / Victor has been using Chrome to browse the internet on her / his personal laptop. Sofia / Victor recently agreed to terms of service related to saving her / his web and app activity. Sofia / Victor uses Chrome for a variety of browsing activities. For example, she / he routinely uses the Chrome browser to log-in to her / his social media accounts to share and discuss topics about news, politics, and more. She / he also relies on Chrome to frequently access Gmail. To do so, Sofia / Victor signs-in to a Google/Gmail Account when using Chrome. Sofia / Victor does not use Incognito mode or change other browser settings.

---

**[DISPLAY THE SCENARIO DESCRIPTION CORRESPONDING WITH THE RESPONDENT'S SUBJECT GENDER.]**

**[THE "Continue" BUTTON SHOULD BE AVAILABLE AFTER A 15-SECOND COUNTDOWN. A COUNT-DOWN SHOULD BE PRESENTED UNDER THE DESCRIPTION WITH THE FOLLOWING TEXT: "The "Continue" button will appear in X seconds" (THIS TEXT SHOULD BE REMOVED WHEN X=0)]**

**[NEXT PAGE]**

Q0C. You will now see the terms of service viewed by Sophia / Victor. Please read carefully. Hyperlinks and buttons within the policy have been disabled. You will be able to view these terms of service again as you answer any questions. **Please scroll through the window below to see the whole image. The continue button can be found at the bottom of the page.**

**[USE 'SOFIA' OR 'VICTOR' ACCORDING TO WHICHEVER NAME IS GIVEN TO THE RESPONDENT]**

**[SHOW THE VERSION OF THE NARNIA DISCLOSURE CORRESPONDING WITH THE RESPONDENT'S GROUP]**

Consent Bump Agreement                    New Account Creation Agreement



**[AFTER THE NOTICE IS BROUGHT UP ON THE SCREEN, THERE SHOULD BE A 30-SECOND DELAY BEFORE THE "Continue" BUTTON APPEARS.**
**A COUNT-DOWN SHOULD BE PRESENTED ABOVE THE IMAGE WITH THE FOLLOWING TEXT: "The "Continue" button will appear in X seconds" (THIS TEXT SHOULD BE REMOVED WHEN X=0)]**

**[NEXT PAGE]**

**[DISPLAY THE SCENARIO ABOVE Q1 AND Q2]**

**[A THUMBNAIL OF THE POLICY SHOWN TO EACH GROUP SHOULD BE AVAILABLE FOR Q1-Q3; ADD A TITLE TO THE THUMBNAIL (USE THE FOLLOWING: Terms of Service); AT THE TOP OF THE PAGE DISPLAY THE FOLLOWING TEXT: "(You can click on the thumbnail to see the enlarged version. This is a thumbnail of the image that you previously saw.)"]**

Q1.  Based on your understanding of the policy you just read, please select one of the following regarding information about Sofia's / Victor's <u>activity from sites and apps that partner with Google</u>:

**[USE 'SOFIA' OR 'VICTOR' ACCORDING TO WHICHEVER NAME IS GIVEN TO THE RESPONDENT]**

**[RANDOMIZE ORDER OF FIRST 5 OPTIONS BETWEEN 1-2-3-4-5 OR 5-4-3-2-1, NO STARTING POINT]**



|  |  |  |  |  |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 |
| Google <u>definitely does not</u> receive this information | Google <u>probably does not</u> receive this information | It is <u>uncertain</u> whether Google receives this information or not | Google <u>probably</u> receives this information | Google <u>definitely</u> receives this information |

⊙  Don't know / Unsure **[EXCLUSIVE]**

**[DISPLAY Q2 UNDER Q1 ON THE SAME PAGE]**

Q2.  Based on your understanding of the policy you just read, which of the following options would <u>you expect most survey respondents</u> to select regarding information about Sofia's / Victor's <u>activity from sites and apps that partner with Google</u>:

**[USE 'SOFIA' OR 'VICTOR' ACCORDING TO WHICHEVER NAME IS GIVEN TO THE RESPONDENT]**

**[USE SAME ORDER OF SCALE AS ABOVE, NO STARTING POINT]**



|  |  |  |  |  |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 |
| Google <u>definitely does not</u> receive this information | Google <u>probably does not</u> receive this information | It is <u>uncertain</u> whether Google receives this information or not | Google <u>probably</u> receives this information | Google <u>definitely</u> receives this information |

⊙  Don't know / Unsure **[EXCLUSIVE]**

**[NEXT PAGE]**

Q3. Throughout this survey, you viewed a policy webpage where hyperlinks indicated by blue text did not function. Were you or were you not able to view the policy webpage and access the information you needed to answer the questions asked in this survey? *(Select only one option.)*

**[RANDOMIZE ORDER]**

⊙  I was able to view the policy webpage and access the information I needed to answer the questions asked in this survey.

⊙  I was not able to view the policy webpage and/or access the information I needed to answer the questions asked in this survey.

⊙  Don't know / Unsure **[ANCHOR LAST]**

**[NEXT PAGE]**

**Follow Up Questions**

QF1. Prior to this survey, were you or were you not aware of any lawsuits related to internet usage and/or browsing? (*Please select one only*) **[RANDOMIZE ORDER]**

⊙ Yes, I was aware of at least one lawsuit
⊙ No, I was not aware of any lawsuit **[SKIP TO THANK YOU PAGE]**
⊙ Don't know / Unsure **[SKIP TO THANK YOU PAGE]**

**[NEXT PAGE]**

QF2. You indicated that you were aware of at least one lawsuit regarding internet usage and/or browsing. Please describe the lawsuit(s) you were aware of: (*Please type in your response. If you do not know the answer or are unsure, please select "Don't know / Unsure"*)

```
[                                                                    ]
[                                                                    ]
[                                                                    ]
```

**[OPEN-ENDED TEXT BOX, LIMITING TO 1000 CHARACTERS]**
**[REQUIRE AT LEAST 4 CHARACTERS; SHOW ERROR "Please be thorough in your response." IF ENTRY IS LESS THAN 4 CHARACTERS]**

⊙ Don't know / Unsure **[EXCLUSIVE]**

**[GO TO THANK YOU PAGE]**

L.3-10

**APPENDIX M**

**SURVEY INVITATION**

**Example Survey Invitation[1]**



---

[1]  This screenshot is an example taken from previous surveys that has been edited to reflect information that was presented to survey respondents in this case. Due to system limitations at the survey provider, an example of a real survey invitation for this project is unavailable.

**APPENDIX N.1**

**CONSUMER EXPECTATIONS SURVEY SCREENSHOTS
(CONDITION GROUP D)**

0%

Thank you for your willingness to participate in our study. Your opinions are very important to us. If you don't know an answer to a question or if you don't have an opinion, please don't guess. Simply indicate this in your response by selecting the "Don't know / Unsure" option. There are no right or wrong answers.

Your answers will be kept in strict confidence and the results of this study will not be used to try to sell you anything. If you wear glasses or corrective lenses when using a desktop computer, laptop computer, or tablet, please wear them throughout the survey.

Please do not use the "Back" button of your browser while taking the survey. This survey will take less than 15 minutes of your time. When you are ready to get started, please select the "Continue" button.

Continue



Please enter the code exactly as it appears in the box below, and then click "Continue" to continue.

TOE2DY

Continue



Into which of the following categories does your age fall?
*(Select one only)*

- Under 18
- 18 – 29
- 30 – 39
- 40 – 49
- 50 – 59
- 60 or older
- Prefer not to answer

Continue





12%

Have you or any member of your household ever worked for any of the following types of companies?
*(Select all that apply)*

- [ ] A fitness center
- [ ] A construction company
- [ ] A grocery store
- [ ] A real estate agency
- [ ] A healthcare provider or medical office
- [ ] A technology company or technology consultancy
- [ ] A retail store
- [ ] A law firm, legal services organization, or court
- [ ] An academic institution
- [ ] A marketing, market research, or advertising agency
- [ ] None of the above

Continue

15%

Thinking about the internet-connected device(s) you use at home and at work, which internet browser(s), if any, do you currently use?

*(Select all that apply)*

☐ Microsoft Edge

☐ Google Chrome

☐ Safari

☐ Opera

☐ Blue Steel

☐ Mozilla Firefox

☐ Brave

☐ Internet Explorer

☐ Other (Please specify) [                    ]

☐ Don't know / Unsure

Continue

18%

Which internet browser(s) is/are set as the default browser on your device(s) at home and at work?
*(Select all that apply)*

☐ Microsoft Edge

☐ Google Chrome

☐ Safari

☐ Opera

☐ Blue Steel

☐ Mozilla Firefox

☐ Brave

☐ Internet Explorer

☐ Other (Please specify) [                    ]

☐ Don't know / Unsure

Continue



26%

Based on your answers to the previous questions, you have qualified for this survey.

This survey is about internet browsers. You have been selected to answer questions about Chrome, which is a browser from a company named Google.

Next, you will see several images. Two of the images display Chrome browser settings, three display policy webpages. After, you will be asked to answer a few questions. You will be able to view these images again as you answer the questions.

Please do not use your browser's "Back" button.

If you don't know an answer to a question or if you don't have an opinion, please don't guess. Simply indicate this in your response by selecting the "Don't know / Unsure" option. There are no right or wrong answers.

Continue

You will now see two pages related to Chrome browser settings that may be turned off or on. Please pay attention to the areas indicated by the red arrows. You will be able to view these images again as you answer any questions.

(The "Continue" button will appear in 12 seconds.)





39%

You will now see the Google Chrome Privacy Notice. Please read the privacy notice carefully. Hyperlinks within the policy have been disabled, however clicking on the headings under the Table of Contents near the top of the page will help you navigate to specific sections of the policy. **Please scroll through the window below to see the whole image. The continue button can be found at the bottom of the page.**

*(The "Continue" button will appear in 11 seconds.)*

**Google** Chrome

# Google Chrome Privacy Notice

Learn how to control the information that's collected, stored, and shared when you use the Google Chrome browser on your computer or mobile device, Chrome OS, and when you enable Safe Browsing in Chrome. Although this policy describes features that are specific to Chrome, any personal information that is provided to Google or stored in your Google Account will be used and protected in accordance with the Google Privacy Policy, as changed from time to time. Google's retention policy describes how and why Google retains data.

If Google Play apps have been enabled on your Chromebook, the use and protection of information collected by Google Play or the Android operating system is governed by the Google Play Terms of Service and Google Privacy Policy. Details specific to Chrome are provided in this Notice where relevant.

### Details about the Privacy Notice

In this Privacy Notice, we use the term "Chrome" to refer to all the products in the Chrome family listed above. If there are differences in our policy between products, we'll point them out. We change this Privacy Notice from time to time.

"Beta," "Dev," or "Canary" versions of Chrome let you test new features still being created in Chrome. This Privacy Notice applies to all versions of Chrome, but might not be up-to-date for features still under development.

Thank you for reviewing the policy. Please take another look at the sections highlighted below before continuing. You will be able to view this policy again as you answer any questions. **Please scroll through the window below to see the whole image. The continue button can be found at the bottom of the page.**

*(The "Continue" button will appear in 5 seconds.)*

---

Google Chrome

# Google Chrome Privacy Notice

Learn how to control the information that's collected, stored, and shared when you use the Google Chrome browser on your computer or mobile device, Chrome OS, and when you enable Safe Browsing in Chrome. Although this policy describes features that are specific to Chrome, any personal information that is provided to Google or stored in your Google Account will be used and protected in accordance with the Google Privacy Policy, as changed from time to time. Google's retention policy describes how and why Google retains data.

If Google Play apps have been enabled on your Chromebook, the use and protection of information collected by Google Play or the Android operating system is governed by the Google Play Terms of Service and Google Privacy Policy. Details specific to Chrome are provided in this Notice where relevant.

### Details about the Privacy Notice

In this Privacy Notice, we use the term "Chrome" to refer to all the products in the Chrome family listed above. If there are differences in our policy between products, we'll point them out. We change this Privacy Notice from time to time.

"Beta," "Dev," or "Canary" versions of Chrome let you test new features still being created in Chrome. This Privacy Notice applies to all versions of Chrome, but might not be up-to-date for features still under development.

41%

You will now see Google's <u>Find & control your Web & App Activity – Help Page</u>. Please read the help page carefully. Hyperlinks within the page have been disabled. You will be able to view this help page again as you answer any questions. **Please scroll through the window below to see the whole image. The continue button can be found at the bottom of the page.**

*(The "Continue" button will appear in 26 seconds.)*

# Find & control your Web & App Activity

If Web & App Activity is turned on, your searches and activity from other Google services are saved in your Google Account, so you may get more personalized experiences, like faster searches and more helpful app and content recommendations.

You can turn Web & App Activity off or delete past activity at any time.

**Note:** If you got your Google Account through work or school, you might need to contact your administrator to turn on the Web & App Activity additional service for your organization.

Android        Computer        iPhone & iPad

# Turn Web & App Activity on or off

1. On your computer, visit the Activity controls ☒ page. You may be asked to sign in to your Google Account.
2. Turn **Web & App Activity** on or off.

44%

You will now see the Google Privacy Policy. Please read the privacy policy carefully. Hyperlinks within the policy have been disabled, however clicking on the headings under the Table of Contents on the left-hand side will help you navigate to specific sections of the policy. **Please scroll through the window below to see the whole image. The continue button can be found at the bottom of the page.**

*(The "Continue" button will appear in 22 seconds.)*



Thank you for reviewing the policy. Please take another look at the sections highlighted below before continuing. You will be able to view this policy again as you answer any questions. **Please scroll through the window below to see the whole image. The continue button can be found at the bottom of the page.**

*(The "Continue" button will appear in 4 seconds.)*



50%

*(You can click on the thumbnails to see the enlarged versions. These are thumbnails of the images that you have seen so far.)*



| Sync Setting | Google Privacy Policy | Chrome Privacy Notice | Find & control your Web & App Activity – Help Page |

In the following six (6) questions, we will ask you to express how much you agree or disagree with a particular statement based on the sync settings you just viewed.

Continue

51%



*(You can click on the thumbnails to see the enlarged versions. These are thumbnails of the images that you have seen so far.)*

Based on the sync settings and documents you just viewed, how strongly do you agree or disagree that Google receives your IP address while browsing the internet? *(IP Address - Every device connected to the Internet is assigned a number known as an Internet protocol (IP) address. An IP address can often be used to identify the location from which a device is connecting to the Internet)*

Strongly disagree — Disagree — Neither agree nor disagree — Agree — Strongly agree

☐ *Don't know / Unsure*

Continue



*(You can click on the thumbnails to see the enlarged versions. These are thumbnails of the images that you have seen so far.)*

**Sync Setting**   **Google Privacy Policy**   **Chrome Privacy Notice**   **Find & control your Web & App Activity – Help Page**

<u>Based on the sync settings and documents you just viewed</u>, how strongly do you agree or disagree that Google receives your <u>name</u> while browsing the internet? *(Name - A word or set of words by which a person is referred to. This could be used when signing-in to accounts, filling out forms, or communicating with individuals or organizations while browsing the internet.)*

Strongly disagree — Disagree — Neither agree nor disagree — Agree — Strongly agree

☐ *Don't know / Unsure*

Continue

57%

*(You can click on the thumbnails to see the enlarged versions. These are thumbnails of the images that you have seen so far.)*



**Sync Setting**   **Google Privacy Policy**   **Chrome Privacy Notice**   **Find & control your Web & App Activity – Help Page**

<u>Based on the sync settings and documents you just viewed</u>, how strongiy do you agree or disagree that Google receives <u>referrer URLs</u> while browsing the internet? *(Referrer URL – A referrer URL contains the URL (web address) of the last webpage the browser visited.)*

Strongly disagree — Disagree — Neither agree nor disagree — Agree — Strongly agree

☐ *Don't know / Unsure*

Continue



Based on the sync settings and documents you just viewed, how strongly do you agree or disagree that Google receives your cookies while browsing the internet? *(Cookie – A small file containing a string of characters that is sent to your computer when you visit a website. When you visit the site again, the cookie allows that site to recognize your browser. Cookies may store user preferences and other information)*

Strongly disagree — Disagree — Neither agree nor disagree — Agree — Strongly agree

☐ *Don't know / Unsure*

Continue

63%



*(You can click on the thumbnails to see the enlarged versions. These are thumbnails of the images that you have seen so far.)*

**Sync Setting**  **Google Privacy Policy**  **Chrome Privacy Notice**  **Find & control your Web & App Activity – Help Page**

<u>Based on the sync settings and documents you just viewed</u>, how strongly do you agree or disagree that Google receives your <u>passwords and login information for websites</u> while browsing the internet? *(Passwords and login information - Account names and associated passwords required to login to individual accounts online.)*

Strongly disagree — Disagree — Neither agree nor disagree — Agree — Strongly agree

☐ *Don't know / Unsure*

Continue



*(You can click on the thumbnails to see the enlarged versions. These are thumbnails of the images that you have seen so far.)*

Based on the sync settings and documents you just viewed, how strongly do you agree or disagree that Google receives your payment information while browsing the internet? *(Payment information - Any data that enables a person to access a customer's account, such as a debit card, credit card, or bank account info.)*

Strongly disagree — Disagree — Neither agree nor disagree — Agree — Strongly agree

☐ *Don't know / Unsure*

Continue

69%

*(You can click on the thumbnails to see the enlarged versions. These are thumbnails of the images that you have seen so far.)*



| Bookmarks Setting | Google Privacy Policy | Chrome Privacy Notice | Find & control your Web & App Activity – Help Page |

Over the following <u>five (5)</u> questions, we will ask you to express how much you agree or disagree with a particular statement based on the <u>bookmark settings</u> you just viewed.

Continue

72%

*(You can click on the thumbnails to see the enlarged versions. These are thumbnails of the images that you have seen so far.)*



**Bookmarks Setting**   **Google Privacy Policy**   **Chrome Privacy Notice**   **Find & control your Web & App Activity – Help Page**

Based on the bookmark settings you just viewed, how strongly do you agree or disagree that the bookmarks in your bookmarks bar will be saved and appear the next time you open Chrome?

→   Strongly disagree — Disagree — Neither agree nor disagree — Agree — Strongly agree

☐ *Don't know / Unsure*

Continue



Based on the bookmark settings you just viewed, how strongly do you agree or disagree that the 'Show bookmarks bar' toggle is ON by default?

Strongly disagree · Disagree · Neither agree nor disagree · Agree · Strongly agree

☐ Don't know / Unsure

Continue



*(You can click on the thumbnails to see the enlarged versions. These are thumbnails of the images that you have seen so far.)*

**Bookmarks Setting**  **Google Privacy Policy**  **Chrome Privacy Notice**  **Find & control your Web & App Activity – Help Page**

Based on the bookmark settings you just viewed, how strongly do you agree or disagree that the bookmarks bar allows users to access frequently visited websites?

Strongly disagree — Disagree — Neither agree nor disagree — Agree — Strongly agree

☐ *Don't know / Unsure*

Continue

81%



*(You can click on the thumbnails to see the enlarged versions. These are thumbnails of the images that you have seen so far.)*

Based on the bookmark settings you just viewed, how strongly do you agree or disagree that the bookmarks in your bookmarks bar are easy to edit on the Chrome internet browser?

Strongly disagree — Disagree — Neither agree nor disagree — Agree — Strongly agree

☐ *Don't know / Unsure*

Continue

84%



*(You can click on the thumbnails to see the enlarged versions. These are thumbnails of the images that you have seen so far.)*

**Bookmarks Setting**   **Google Privacy Policy**   **Chrome Privacy Notice**   **Find & control your Web & App Activity – Help Page**

Based on the bookmark settings you just viewed, how strongly do you agree or disagree that users can pick which websites are displayed in the bookmarks bar?

Strongly disagree          Disagree          Neither agree nor disagree          Agree          Strongly agree

☐ *Don't know / Unsure*

Continue

87%

*(You can click on the thumbnails to see the enlarged versions. These are thumbnails of the images that you have seen so far.)*

| Sync Setting | Bookmarks Setting | Google Privacy Policy | Chrome Privacy Notice | Find & control your Web & App Activity – Help Page |
|---|---|---|---|---|



Throughout this survey, you viewed policy webpages where some hyperlinks functioned, and some hyperlinks indicated by blue underlined text did not. Were you or were you not able to view the policy webpages and access the information you needed to answer the questions asked in this survey?

*(Select only one option.)*

○ I was able to view the policy webpages and access the information I needed to answer the questions asked in this survey.

○ I was not able to view the policy webpages and/or access the information I needed to answer the questions asked in this survey.

○ Don't know / Unsure

Continue



Prior to this survey, were you or were you not aware of any lawsuits related to internet usage and/or browsing?
*(Please select one only)*

- Yes, I was aware of at least one lawsuit
- No, I was not aware of any lawsuit
- Don't know / Unsure

Continue

92%

You indicated that you were aware of at least one lawsuit regarding internet usage and/or browsing. Please describe the lawsuit(s) you were aware of:

*(Please type in your response. If you do not know the answer or are unsure, please select "Don't know / Unsure")*

☐ Don't know / Unsure

Continue

Thank you for taking our survey. Your efforts are greatly appreciated!

**APPENDIX N.2**

**MATERIALITY SURVEY SCREENSHOTS
(CONDITION GROUP B)**

0%

Thank you for your willingness to participate in our study. Your opinions are very important to us. If you don't know an answer to a question or if you don't have an opinion, please don't guess. Simply indicate this in your response by selecting the "Don't know / Unsure" option. There are no right or wrong answers.

Your answers will be kept in strict confidence and the results of this study will not be used to try to sell you anything. If you wear glasses or corrective lenses when using a desktop computer, laptop computer, or tablet, please wear them throughout the survey.

Please do not use the "Back" button of your browser while taking the survey. This survey will take less than 15 minutes of your time. When you are ready to get started, please select the "Continue" button.

Continue

0%

Please enter the code exactly as it appears in the box below, and then click "Continue" to continue.

LNUSBI

Continue

5%

## Into which of the following categories does your age fall?
*(Select one only)*

○ Under 18
○ 18 – 29
○ 30 – 39
○ 40 – 49
○ 50 – 59
○ 60 or older
○ Prefer not to answer

Continue

10%

Are you...?
*(Select one only)*

○ Male

○ Female

○ Other

○ Prefer not to answer

Continue



21%

Have you or any member of your household ever worked for any of the following types of companies?
*(Select all that apply)*

☐ A fitness center

☐ An academic institution

☐ A marketing, market research, or advertising agency

☐ A healthcare provider or medical office

☐ A grocery store

☐ A technology company or technology consultancy

☐ A retail store

☐ A law firm, legal services organization, or court

☐ A construction company

☐ A real estate agency

☐ None of the above

Continue

26%

Thinking about the internet-connected device(s) you use at home and at work, which internet browser(s) do you currently use?

*(Select all that apply)*

- Brave
- Mozilla Firefox
- Google Chrome
- Blue Steel
- Microsoft Edge
- Opera
- Safari
- Internet Explorer
- Other (Please specify) [_____]
- Don't know / Unsure

Continue



Which internet browser(s) is/are set as the default browser on your device(s) at home and at work?
*(Select all that apply)*

- Brave
- Mozilla Firefox
- Google Chrome
- Blue Steel
- Microsoft Edge
- Opera
- Safari
- Internet Explorer
- Other (Please specify) [_____]
- Don't know / Unsure

Continue

45%

Based on your answers to the previous questions, you have qualified for this survey.

This survey is about internet browsers. You have been selected to answer questions about Chrome, which is an internet browser from a company named Google. Next, you will see two policy webpages. After, you will be asked to answer a few questions. You will be able to view these pages again as you answer the questions.

Please do not use your browser's "Back" button.

If you don't know an answer to a question or if you don't have an opinion, please don't guess. Simply indicate this in your response by selecting the "Don't know / Unsure" option. There are no right or wrong answers.

Continue

51%

You will now see the Google Chrome Privacy Notice. Please read the privacy notice carefully. Hyperlinks within the policy have been disabled, however clicking on the headings under the Table of Contents near the top of the page will help you navigate to specific sections of the policy. **Please scroll through the window below to see the whole image. The continue button can be found at the bottom of the page.**

*(The "Continue" button will appear in 28 seconds.)*

Google Chrome

# Google Chrome Privacy Notice

Learn how to control the information that's collected, stored, and shared when you use the Google Chrome browser on your computer or mobile device, Chrome OS, and when you enable Safe Browsing in Chrome. Although this policy describes features that are specific to Chrome, any personal information that is provided to Google or stored in your Google Account will be used and protected in accordance with the Google Privacy Policy, as changed from time to time. Google's retention policy describes how and why Google retains data.

If Google Play apps have been enabled on your Chromebook, the use and protection of information collected by Google Play or the Android operating system is governed by the Google Play Terms of Service and Google Privacy Policy. Details specific to Chrome are provided in this Notice where relevant.

## Details about the Privacy Notice

In this Privacy Notice, we use the term "Chrome" to refer to all the products in the Chrome family listed above. If there are differences in our policy between products, we'll point them out. We change this Privacy Notice from time to time.

"Beta," "Dev," or "Canary" versions of Chrome let you test new features still being created in Chrome. This Privacy Notice applies to all versions of Chrome, but might not be up-to-date for features still under development.

56%

Thank you for reviewing the policy. Please take another look at the sections highlighted below before continuing. You will be able to view this policy again as you answer any questions. **Please scroll through the window below to see the whole image. The continue button can be found at the bottom of the page.**

*(The "Continue" button will appear in 14 seconds.)*

Google Chrome

# Google Chrome Privacy Notice

Learn how to control the information that's collected, stored, and shared when you use the Google Chrome browser on your computer or mobile device, Chrome OS, and when you enable Safe Browsing in Chrome. Although this policy describes features that are specific to Chrome, any personal information that is provided to Google or stored in your Google Account will be used and protected in accordance with the Google Privacy Policy, as changed from time to time. Google's retention policy describes how and why Google retains data.

If Google Play apps have been enabled on your Chromebook, the use and protection of information collected by Google Play or the Android operating system is governed by the Google Play Terms of Service and Google Privacy Policy. Details specific to Chrome are provided in this Notice where relevant.

### Details about the Privacy Notice

In this Privacy Notice, we use the term "Chrome" to refer to all the products in the Chrome family listed above. If there are differences in our policy between products, we'll point them out. We change this Privacy Notice from time to time.

"Beta," "Dev," or "Canary" versions of Chrome let you test new features still being created in Chrome. This Privacy Notice applies to all versions of Chrome, but might not be up-to-date for features still under development.

You will now see the Google Privacy Policy. Please read the privacy policy carefully. Hyperlinks within the policy have been disabled, however clicking on the headings under the Table of Contents on the left-hand side will help you navigate to specific sections of the policy. **Please scroll through the window below to see the whole image. The continue button can be found at the bottom of the page.**

*(The "Continue" button will appear in 29 seconds.)*



Thank you for reviewing the policy. Please take another look at the sections highlighted below before continuing. You will be able to view this policy again as you answer any questions. **Please scroll through the window below to see the whole image. The continue button can be found at the bottom of the page.**

*(The "Continue" button will appear in 14 seconds.)*



68%



*(You can click on the thumbnails to see the enlarged versions. These are thumbnails of the images that you have seen so far.)*

How likely or unlikely are you to continue using Google Chrome?
*(Click below to move the slider)*

Extremely unlikely    Unlikely    Neither likely nor unlikely    Likely    Extremely likely

☐ *Don't Know / Unsure*

Continue



*(You can click on the thumbnails to see the enlarged versions. These are thumbnails of the images that you have seen so far.)*

Throughout this survey, you viewed policy webpages where some hyperlinks functioned, and some hyperlinks indicated by blue underlined text did not. Were you or were you not able to view the policy webpages and access the information you needed to answer the questions asked in this survey?

*(Select only one option.)*

○ I was not able to view the policy webpages and/or access the information I needed to answer the questions asked in this survey.

○ I was able to view the policy webpages and access the information I needed to answer the questions asked in this survey.

○ Don't know / Unsure

Continue

82%

Prior to this survey, were you or were you not aware of any lawsuits related to internet usage and/or browsing?
*(Please select one only)*

○ Yes, I was aware of at least one lawsuit

○ No, I was not aware of any lawsuit

○ Don't know / Unsure

Continue

87%

You indicated that you were aware of at least one lawsuit regarding internet usage and/or browsing. Please describe the lawsuit(s) you were aware of:

*(Please type in your response. If you do not know the answer or are unsure, please select "Don't know / Unsure")*

☐ Don't know / Unsure

Continue

Thank you for taking our survey. Your efforts are greatly appreciated!

**APPENDIX N.3**

**SCENARIO APPLICATION SURVEY SCREENSHOTS
(CONDITION GROUP B.S)**

0%

Thank you for your willingness to participate in our study. Your opinions are very important to us. If you don't know an answer to a question or if you don't have an opinion, please don't guess. Simply indicate this in your response by selecting the "Don't know / Unsure" option. There are no right or wrong answers.

Your answers will be kept in strict confidence and the results of this study will not be used to try to sell you anything. If you wear glasses or corrective lenses when using a desktop computer, laptop computer, or tablet, please wear them throughout the survey.

Please do not use the "Back" button of your browser while taking the survey. This survey will take less than 15 minutes of your time. When you are ready to get started, please select the "Continue" button.

Continue









21%

Have you or any member of your household ever worked for any of the following types of companies?
*(Select all that apply)*

- [ ] A technology company or technology consultancy
- [ ] A grocery store
- [ ] A retail store
- [ ] A real estate agency
- [ ] An academic institution
- [ ] A law firm, legal services organization, or court
- [ ] A construction company
- [ ] A marketing, market research, or advertising agency
- [ ] A healthcare provider or medical office
- [ ] A fitness center
- [ ] None of the above

Continue

26%

Thinking about the internet-connected device(s) you use at home and at work, which internet browser(s) do you currently use?
*(Select all that apply)*

☐ Internet Explorer

☐ Mozilla Firefox

☐ Blue Steel

☐ Opera

☐ Brave

☐ Safari

☐ Microsoft Edge

☐ Google Chrome

☐ Other (Please specify) [_____]

☐ Don't know / Unsure

Continue

31%

Which internet browser(s) is/are set as the default browser on your device(s) at home and at work?
*(Select all that apply)*

- [ ] Internet Explorer
- [ ] Mozilla Firefox
- [ ] Blue Steel
- [ ] Opera
- [ ] Brave
- [ ] Safari
- [ ] Microsoft Edge
- [ ] Google Chrome
- [ ] Other (Please specify) [_____]
- [ ] Don't know / Unsure

Continue



45%

Based on your answers to the previous questions, you have qualified for this survey.

This survey is about internet browsers. You have been selected to answer questions about Chrome, which is a browser from a company named Google.

If you don't know an answer to a question or if you don't have an opinion, please don't guess. Simply indicate this in your response by selecting the "Don't know / Unsure" option. There are no right or wrong answers.

Continue

51%

Now, imagine the following scenario:

Please read the scenario description carefully. You will be able to view this scenario again as you answer any questions.

**Sofia has been using Chrome to browse the internet on her personal laptop. Sofia recently agreed to terms of service related to saving her web and app activity. Sofia uses Chrome for a variety of browsing activities. For example, she routinely uses the Chrome browser to log-in to her social media accounts to share and discuss topics about news, politics, and more. She also relies on Chrome to frequently access Gmail. To do so, Sofia signs-in to a Google/Gmail Account when using Chrome. Sofia does not use Incognito mode or change other browser settings.**

*(The "Continue" button will appear in 11 seconds.)*

56%

You will now see the terms of service viewed by Sofia. Please read carefully. Hyperlinks and buttons within the policy have been disabled. You will be able to view these terms of service again as you answer any questions. **Please scroll through the window below to see the whole image. The continue button can be found at the bottom of the page.**

*(The "Continue" button will appear in 19 seconds.)*





## Some new features for your Google Account

We've introduced some optional features for your account, giving you more control over the data Google collects and how it's used, while allowing Google to show you more relevant ads.

What changes if you turn on these new features?



*(You can click on the thumbnail to see the enlarged version. This is a thumbnail of the image that you previously saw.)*

Terms of Service

Sofia has been using Chrome to browse the internet on her personal laptop. Sofia recently agreed to terms of service related to saving her web and app activity. Sofia uses Chrome for a variety of browsing activities. For example, she routinely uses the Chrome browser to log-in to her social media accounts to share and discuss topics about news, politics, and more. She also relies on Chrome to frequently access Gmail. To do so, Sofia signs-in to a Google/Gmail Account when using Chrome. Sofia does not use Incognito mode or change other browser settings.

Based on your understanding of the policy you just read, please select one of the following regarding information about Sofia's activity from sites and apps that partner with Google:
*(Click below to move the slider)*

Google definitely does **not** receive this information | Google probably does **not** receive this information | It is uncertain whether Google receives this information or not | Google probably receives this information | Google definitely receives this information

☐ *Don't Know / Unsure*

Based on your understanding of the policy you just read, which of the following options would you expect most survey respondents to select regarding information about Sofia's activity from sites and apps that partner with Google:
*(Click below to move the slider)*

Google definitely does **not** receive this information | Google probably does **not** receive this information | It is uncertain whether Google receives this information or not | Google probably receives this information | Google definitely receives this information

☐ *Don't Know / Unsure*

Continue

N.3-12

77%

*(You can click on the thumbnail to see the enlarged version. This is a thumbnail of the image that you previously saw.)*



Throughout this survey, you viewed a policy webpage where hyperlinks indicated by blue text did not function. Were you or were you not able to view the policy webpage and access the information you needed to answer the questions asked in this survey?

*(Select only one option.)*

○ I was able to view the policy webpage and access the information I needed to answer the questions asked in this survey.

○ I was not able to view the policy webpage and/or access the information I needed to answer the questions asked in this survey.

○ Don't know / Unsure

Continue

82%

Prior to this survey, were you or were you not aware of any lawsuits related to internet usage and/or browsing?
*(Please select one only)*

○ Yes, I was aware of at least one lawsuit

○ No, I was not aware of any lawsuit

○ Don't know / Unsure

Continue

87%

You indicated that you were aware of at least one lawsuit regarding internet usage and/or browsing. Please describe the lawsuit(s) you were aware of:

*(Please type in your response. If you do not know the answer or are unsure, please select "Don't know / Unsure")*

☐ Don't know / Unsure

Continue

Thank you for taking our survey. Your efforts are greatly appreciated!

**APPENDIX O.1**

**FULL CONSUMER EXPECTATIONS SURVEY RESULTS**

**Appendix O.1-1**
**Consumer Expectations Survey**
**Mean Likelihood of Google Receiving Information**
**"Q1B–Q1G. Based on the sync settings [and documents] you just viewed, how strongly do you agree or disagree that Google receives your [data type] while browsing the internet?"**

|  | Group A Sync Off No Policies n = 250 | Group B Sync On No Policies n = 250 | Group C Sync Off All Policies n = 252 | Group D Sync On All Policies n = 252 |
|---|---|---|---|---|
| IP Address[1] | 4.04 | 3.99 | 4.00 | 4.02 |
| (SD) | 0.92 | 0.89 | 0.98 | 0.96 |
| Percent of responses of 4 or 5 | 76% | 75% | 77% | 76% |
| Referrer URLs[1][2] | 3.86 | 3.95 | 3.89 | 3.89 |
| (SD) | 0.92 | 0.91 | 0.90 | 0.92 |
| Percent of responses of 4 or 5 | 69% | 77% | 72% | 71% |
| Cookies[1] | 3.97 | 4.03 | 4.08 | 4.00 |
| (SD) | 0.99 | 0.90 | 0.91 | 0.94 |
| Percent of responses of 4 or 5 | 75% | 80% | 81% | 76% |
| Name[1] | 3.97 | 3.94 | 3.90 | 3.67 |
| (SD) | 1.01 | 0.87 | 0.99 | 1.06 |
| Percent of responses of 4 or 5 | 75% | 73% | 72% | 63% |
| Passwords and Login Information[1] | 3.67 | 3.85 | 3.76 | 3.64 |
| (SD) | 1.10 | 1.02 | 1.17 | 1.06 |
| Percent of responses of 4 or 5 | 63% | 74% | 67% | 62% |
| Payment Information[1] | 3.48 | 3.49 | 3.46 | 3.40 |
| (SD) | 1.11 | 1.07 | 1.14 | 1.15 |
| Percent of responses of 4 or 5 | 55% | 56% | 56% | 55% |

**Notes:**
[1] The mean likelihood of Google receiving information is calculated using the numerical values corresponding to response options (1-5). Values correspond to response options as follows: 1 = "Strongly disagree", 2 = "Disagree", 3 = "Neither agree nor disagree", 4 = "Agree", 5 = "Strongly agree."
[2] Q1C asks "Based on the sync settings you just viewed, how strongly do you agree or disagree that Google receives referrer URLs while browsing the internet?"
[3] Responses of "Don't know / Unsure" are excluded from all calculations.

**Source:** Consumer Expectations Survey.

**Appendix O.1-2**
**Consumer Expectations Survey**
**Mean Likelihood of Google Receiving Information (Sync On vs Sync Off)**
**"Q1B–Q1G. Based on the sync settings [and documents] you just viewed, how strongly do you agree or disagree that Google receives your [data type] while browsing the internet?"**

| | Sync On | Sync Off | Sync On-Off Mean Difference | Sync On vs Sync Off $p$-value[1] | |
| --- | --- | --- | --- | --- | --- |
| | n = 502 | n = 502 | | Mean t-test[2] | Chi-Square Distribution |
| IP Address[3] | 4.00 | 4.02 | -0.02 | 0.748 | 0.907 |
| (SD) | 0.92 | 0.95 | | | |
| Referrer URLs[3][4] | 3.91 | 3.88 | 0.04 | 0.558 | 0.855 |
| (SD) | 0.92 | 0.91 | | | |
| Cookies[3] | 4.01 | 4.03 | -0.01 | 0.855 | 0.778 |
| (SD) | 0.92 | 0.95 | | | |
| Name[3] | 3.80 | 3.93 | -0.13 | 0.050** | 0.067* |
| (SD) | 0.98 | 1.00 | | | |
| Passwords and Login Information[3] | 3.75 | 3.72 | 0.03 | 0.718 | 0.404 |
| (SD) | 1.04 | 1.14 | | | |
| Payment Information[3] | 3.45 | 3.47 | -0.02 | 0.772 | 0.909 |
| (SD) | 1.11 | 1.13 | | | |

**Notes:**
[1] Symbols ***, **, and * represent statistical significance at the 1%, 5%, and 10% levels respectively.
[2] Two-tailed Student's t-test.
[3] The mean likelihood of Google receiving information is calculated using the numerical values corresponding to response options (1-5). Values correspond to response options as follows: 1 = "Strongly disagree", 2 = "Disagree", 3 = "Neither agree nor disagree", 4 = "Agree", 5 = "Strongly agree."
[4] Q1C asks "Based on the sync settings you just viewed, how strongly do you agree or disagree that Google receives referrer URLs while browsing the internet?"
[5] Responses of "Don't know / Unsure" are excluded from all calculations except for Chi-square distribution tests.

**Source:** Consumer Expectations Survey.

**Appendix O.1-3**
**Consumer Expectations Survey**
**Mean Likelihood of Google Receiving Information (Sync On vs Sync Off, No Policies)**
**"Q1B–Q1G. Based on the sync settings you just viewed, how strongly do you agree or disagree that Google receives your [data type] while browsing the internet?"**

| | Group B Sync On No Policies | Group A Sync Off No Policies | Sync On-Off Mean Difference | Sync On vs Sync Off p-value[1] | |
| | | | | Mean t-test[2] | Chi-Square Distribution |
| | n = 250 | n = 250 | | | |
|---|---|---|---|---|---|
| IP Address[3] | 3.99 | 4.04 | -0.06 | 0.498 | 0.726 |
| (SD) | 0.89 | 0.92 | | | |
| Referrer URLs[3] [4] | 3.95 | 3.86 | 0.09 | 0.338 | 0.236 |
| (SD) | 0.91 | 0.92 | | | |
| Cookies[3] | 4.03 | 3.97 | 0.06 | 0.515 | 0.356 |
| (SD) | 0.90 | 0.99 | | | |
| Name[3] | 3.94 | 3.97 | -0.03 | 0.761 | 0.120 |
| (SD) | 0.87 | 1.01 | | | |
| Passwords and Login Information[3] | 3.85 | 3.67 | 0.18 | 0.081* | 0.316 |
| (SD) | 1.02 | 1.10 | | | |
| Payment Information[3] | 3.49 | 3.48 | 0.01 | 0.890 | 0.968 |
| (SD) | 1.07 | 1.11 | | | |

**Notes:**

[1] Symbols ***, **, and * represent statistical significance at the 1%, 5%, and 10% levels respectively.

[2] Two-tailed Student's t-test.

[3] The mean likelihood of Google receiving information is calculated using the numerical values corresponding to response options (1-5). Values correspond to response options as follows: 1 = "Strongly disagree", 2 = "Disagree", 3 = "Neither agree nor disagree", 4 = "Agree", 5 = "Strongly agree."

[4] Q1C asks "Based on the sync settings you just viewed, how strongly do you agree or disagree that Google receives referrer URLs while browsing the internet?"

[5] Responses of "Don't know / Unsure" are excluded from all calculations except for Chi-square distribution tests.

**Source:** Consumer Expectations Survey.

**Appendix O.1-4**
**Consumer Expectations Survey**
**Mean Likelihood of Google Receiving Information (Sync On vs Sync Off, All Policies)**
**"Q1B–Q1G. Based on the sync settings and documents you just viewed, how strongly do you agree or disagree that Google receives your [data type] while browsing the internet?"**

| | Group D Sync On All Policies | Group C Sync Off All Policies | Sync On-Off Mean Difference | Sync On vs Sync Off $p$-value[1] | |
|---|---|---|---|---|---|
| | n = 252 | n = 252 | | Mean t-test[2] | Chi-Square Distribution |
| IP Address[3] | 4.02 | 4.00 | 0.02 | 0.851 | 0.822 |
| (SD) | 0.96 | 0.98 | | | |
| Referrer URLs[3][4] | 3.89 | 3.89 | -0.01 | 0.918 | 0.960 |
| (SD) | 0.92 | 0.90 | | | |
| Cookies[3] | 4.00 | 4.08 | -0.08 | 0.372 | 0.448 |
| (SD) | 0.94 | 0.91 | | | |
| Name[3] | 3.67 | 3.90 | -0.22 | 0.019** | 0.258 |
| (SD) | 1.06 | 0.99 | | | |
| Passwords and Login Information[3] | 3.64 | 3.76 | -0.12 | 0.259 | 0.152 |
| (SD) | 1.06 | 1.17 | | | |
| Payment Information[3] | 3.40 | 3.46 | -0.06 | 0.602 | 0.948 |
| (SD) | 1.15 | 1.14 | | | |

**Notes:**
[1] Symbols ***, **, and * represent statistical significance at the 1%, 5%, and 10% levels respectively.
[2] Two-tailed Student's t-test.
[3] The mean likelihood of Google receiving information is calculated using the numerical values corresponding to response options (1-5). Values correspond to response options as follows: 1 = "Strongly disagree", 2 = "Disagree", 3 = "Neither agree nor disagree", 4 = "Agree", 5 = "Strongly agree."
[4] Q1C asks "Based on the sync settings you just viewed, how strongly do you agree or disagree that Google receives referrer URLs while browsing the internet?"
[5] Responses of "Don't know / Unsure" are excluded from all calculations except for Chi-square distribution tests.

**Source:** Consumer Expectations Survey.

**APPENDIX O.2**

**FULL MATERIALITY SURVEY RESULTS**

**Appendix O.2**
**Materiality Survey**
**Mean Likelihood to Continue using Google Chrome (Unmodified CPN vs Modified CPN)**
**"Q1. How likely or unlikely are you to continue using Google Chrome?"**

| | Group A Unmodified CPN | Group B Modified CPN | Unmodified CPN-Modified CPN Mean Difference | Unmodified CPN vs Modified CPN p-value[1] | |
| --- | --- | --- | --- | --- | --- |
| | n = 254 | n = 255 | | Mean t-test[2] | Chi-Square Distribution |
| Mean[3] | 4.19 | 4.17 | 0.02 | 0.856 | 0.711 |
| (SD) | 1.08 | 1.09 | | | |
| n[4] | 241 | 237 | | | |

**Notes:**
[1] Symbols ***, **, and * represent statistical significance at the 1%, 5%, and 10% levels respectively.
[2] Two-tailed Student's t-test.
[3] The mean likelihood of continuing to use Chrome is calculated using the numerical values corresponding to response options (1-5). Values correspond to response options as follows: 1 = "Extremely unlikely", 2 = "Unlikely", 3 = "Neither likely nor unlikely", 4 = "Likely", 5 = "Extremely likely."
[4] Shows number of responses after removing responses of "Don't know / Unsure".
[5] Responses of "Don't know / Unsure" are excluded from all calculations except for Chi-square distribution tests.

**Source:** Materiality Survey.

**APPENDIX O.3**

**FULL SCENARIO APPLICATION SURVEY RESULTS**

**Appendix O.3-1**
**Scenario Application Survey**
**Mean Likelihood of Google Receiving Information (New Account Creation Agreement vs Consent Bump Agreement)**
**"Q1. Based on your understanding of the policy you just read, please select one of the following regarding information about Sofia / Victor's activity from sites and apps that partner with Google:"**

**"Q2. Based on your understanding of the policy you just read, which of the following options would you expect most survey respondents to select regarding Sofia / Victor's activity from sites and apps that partner with Google:"**

| | Group A New Account Creation Agreement n = 253 | Group B Consent Bump Agreement n = 254 | New Account- Consent Bump Mean Difference | New Account vs Consent Bump $p$-value[1] | |
| --- | --- | --- | --- | --- | --- |
| | | | | Mean t-test p-value[2] | Chi-Square Distribution |
| Mean of Q1 and Q2[3] [4] | 4.42 | 4.38 | 0.04 | 0.624 | 0.879 |
| (SD) | 0.79 | 0.80 | | | |
| (n)[5] | 231 | 237 | | | |
| Mean of Q1[3] | 4.48 | 4.44 | 0.04 | 0.618 | 0.490 |
| (SD) | 0.88 | 0.86 | | | |
| (n)[5] | 225 | 232 | | | |
| Mean of Q2[3] | 4.38 | 4.32 | 0.06 | 0.467 | 0.936 |
| (SD) | 0.87 | 0.89 | | | |
| (n)[5] | 228 | 227 | | | |

**Notes:**
[1] Symbols ***, **, and * represent statistical significance at the 1%, 5%, and 10% levels respectively.
[2] Two-tailed Student's t-test.
[3] The mean likelihood of Google receiving information is calculated using the numerical values corresponding to response options (1-5). Values correspond to response options as follows: 1 = "Google definitely does not receive this information", 2 = "Google probably does not receive this information", 3 = "It is uncertain whether Google receives this information or not", 4 = "Google probably receives this information", 5 = "Google definitely receives this information."
[4] For respondents who selected "Don't know / Unsure" for one of Q1 and Q2, the mean value is the value of the response for the other of the two questions.
[5] Shows number of responses after removing responses of "Don't know / Unsure".
[6] Responses of "Don't know / Unsure" are excluded from all calculations except for Chi-square distribution tests.
[7] Respondents were shown a hypothetical scenrio involving a fictional person (either Victor or Sophia) and asked to evaluate the likelihood that Google received specific types of information.

**Source:** Scenario Application Survey.

**Appendix O.3-2**
**Scenario Application Survey**

**Mean Likelihood of Google Receiving Information (New Account Creation Agreement vs Consent Bump Agreement)**

**"Q1. Based on your understanding of the policy you just read, please select one of the following regarding information about Sofia / Victor's activity from sites and apps that partner with Google:"**

**"Q2. Based on your understanding of the policy you just read, which of the following options would you expect most survey respondents to select regarding Sofia / Victor's activity from sites and apps that partner with Google:"**

| | Group A New Account Creation Agreement n = 253 | Group B Consent Bump Agreement n = 254 | Q1 and Q2 Cronbach's alpha |
|---|---|---|---|
| Mean of Q1 and Q2[1] [2] | 4.42 | 4.38 | |
| Q1: Percent of responses of 4 or 5 | 88% | 86% | |
| Q2: Percent of responses of 4 or 5 | 87% | 85% | |
| (n)[3] | 231 | 237 | |
| Cronbach's Alpha | | | 0.78 |

**Notes:**
[1] The mean likelihood of Google receiving information is calculated using the numerical values corresponding to response options (1-5). Values correspond to response options as follows: 1 = "Google definitely does not receive this information", 2 = "Google probably does not receive this information", 3 = "It is uncertain whether Google receives this information or not", 4 = "Google probably receives this information", 5 = "Google definitely receives this information."
[2] For respondents who selected "Don't know / Unsure" for one of Q1 and Q2, the mean value is the value of the response for the other of the two questions.
[3] Shows number of responses after removing responses of "Don't know / Unsure".
[4] Responses of "Don't know / Unsure" are excluded from all calculations.
[5] Respondents were shown a hypothetical scenrio involving a fictional person (either Victor or Sophia) and asked to evaluate the likelihood that Google received specific types of information.

**Source:** Scenario Application Survey.

**APPENDIX P**

**PRIVACY POLICIES OF WEBSITES TABLE**

**Appendix P**
**Description of IP Address, Cookies, and Referrer URL as Personal Information ("PI") in Privacy Policies of Selected Websites**

| | Source | IP Address Mentioned | PI | Cookies Mentioned | PI | Referrer URL Mentioned | PI | Browsing History Mentioned | PI | Provisions for Specific Jurisdictions | Relevant quotes from the policy |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **Selected Universities** | | | | | |
| 1 | Harvard Business School [https://www.hbs.edu/about/campus-and-culture/policies/Pages/privacy.aspx] | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Personal information is information related to an identified or identifiable natural person. *The policy does not describe IP address, cookies, referrer URL, or browsing history as either personal information or non-personal information.* |
| 2 | University of Pennsylvania [https://www.upenn.edu/about/privacy-policy] | Yes | No | Yes | No | No | No | Yes | No | Yes | "Personal Information" is information that identifies you as an individual or relates to an identifiable individual including, but not limited to: - Name - Postal address (including billing and shipping addresses) - Telephone number - Email address - Credit and debit card number - Profile picture - Social media account ID - PennKeys or other Penn-issued system credentials - Other information that you voluntarily provide through your use of the Services, and may include sensitive information, such as health, financial, or racial and ethnic origin information. ... **"Other Information"** is any information that does not reveal your specific identity or does not directly relate to an identifiable individual: - **Browser and device information** - App usage data - **Information collected through cookies, pixel tags and other technologies** - Demographic information and other information provided by you that does not reveal your specific identity - Information that has been aggregated in a manner such that it no longer reveals your specific identity Using cookies Cookies allow us to collect information such as browser type, time spent on the Services, **pages visited**, language preferences, and other traffic data. |

**Appendix P**
**Description of IP Address, Cookies, and Referrer URL as Personal Information ("PI") in Privacy Policies of Selected Websites**

| | Source | IP Address Mentioned | PI | Cookies Mentioned | PI | Referrer URL Mentioned | PI | Browsing History Mentioned | PI | Provisions for Specific Jurisdictions | Relevant quotes from the policy |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3 | New York University [https://www.nytimes.com/privacy/privacy-policy] | Yes | No | Yes | No | No | No | Yes | No | No | **Non-Personally Identifiable Information:** When you visit NYU websites and other NYU digital properties, we may automatically collect and store information sent by your web browser, such as **IP addresses** (i.e., the Internet address of your computer) in server logs. We also collect standard information about your computer (such as your web browser and operating system) and about your usage of our websites and digital properties **(such as pages visited, length of visit, and search queries). This information, which does not identify your** (*sic*) **personally**, is aggregated and used to help diagnose problems and suggest points for improving parts of our website and digital properties. **Our use of cookies does not involve the collection of personally identifiable information.** |

**Appendix P**
**Description of IP Address, Cookies, and Referrer URL as Personal Information ("PI") in Privacy Policies of Selected Websites**

| | Source | IP Address Mentioned | PI | Cookies Mentioned | PI | Referrer URL Mentioned | PI | Browsing History Mentioned | PI | Provisions for Specific Jurisdictions | Relevant quotes from the policy |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **Selected Law Firms** | | | | | |
| 4 | Bleichmar Fonti & Auld [https://www.bfalaw.com/privacy] | Yes | No | Yes | No | Yes | No | Yes | No | Yes | The personal information we collect<br>We may collect personal information from you in the course of our business. ... Generally, the information we collect includes your:<br>- Basic identifying information, such as your name, your preferred form of address, the company you work for, and your job title or position<br>- Contact information, such as your postal and email addresses, and phone and fax number(s)<br>- Financial information, such as bank account information needed to process payments<br>- Technical information, such as information from your visits to our website or in relation to electronic communications we send to you<br>- Information you provide to us in connection with meetings and events we organize, including access and dietary requirements<br>- Identification and background information, we collect as part of our client acceptance procedures (which may be provided by third parties)<br>- Personal information provided to us by or on behalf of our clients or generated by us in the course or providing legal services to them.<br>The personal information we collect may include special categories of data.<br><br>**How we collect information**<br>Automatically-collected information<br>**We use cookies,** log files, pixel tags, local storage objects and other tracking technologies **to automatically collect information** when users access or use the services or visit our Site, **such as an IP address**, general location information, domain name, page views, a date/time stamp, browser type, device type, device ID, Internet service provider ("ISP"), **referring/exit URLs**, operating system, language, clickstream data, and other information about the links clicked, features used, size of files uploaded, streamed or deleted, and similar device and usage information. |

**Appendix P**
**Description of IP Address, Cookies, and Referrer URL as Personal Information ("PI") in Privacy Policies of Selected Websites**

| | Source | IP Address Mentioned | PI | Cookies Mentioned | PI | Referrer URL Mentioned | PI | Browsing History Mentioned | PI | Provisions for Specific Jurisdictions | Relevant quotes from the policy |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 5 | Simmons Hanly Conroy [https://www.simmonsfirm.com/privacy-policy/] | Yes | No | Yes | No | No | No | Yes | No | No | Information We Collect<br><br>The Simmons Firm collects information about you when you interact with our Sites and Services. When you use our Sites and Services, we collect information about the devices you use such as a computer, mobile phone, or tablet. We may collect, store, and use information you provide to us when you use our Sites and Services, including when you, complete a web form, communicate with our live chat agents, or otherwise correspond with us regarding the Sites and Services. The information we collect may include, but is not limited to, your name, phone number, email address, and your reason for communicating with us.<br><br>**In addition, we may automatically collect information about the devices you use** to interact with our Sites and Services. The information we automatically collect may include your device identifier, device information, web browser, and **browsing information collected through Cookies and Other Technologies, such as your IP address** and location.  We may also automatically collect information about how you use the Sites and Services, such as what you have searched for and viewed on the Sites and Services.<br><br>Our Sites and Services do not collect personal information about your online activities over time and across third party websites or online services.  Therefore, "do not track" signals transmitted from web browsers do not apply to our Sites and Services, and we do not alter any of our data collection and use practices upon receipt of such a signal. |
| 6 | Kaplan Fox [https://www.kaplanfox.com/privacypolicies.html] | No | No | No | No | No | No | No | No | No | Kaplan Fox asks for personal data such as your name or address when you request information through our Web site.<br><br>*No references to IP address, cookies, or referrer URL are found in the policy.* |

**Appendix P**
**Description of IP Address, Cookies, and Referrer URL as Personal Information ("PI") in Privacy Policies of Selected Websites**

| | Source | IP Address | | Cookies | | Referrer URL | | Browsing History | | Provisions for Specific | Relevant quotes from the policy |
| | | Mentioned | PI | Mentioned | PI | Mentioned | PI | Mentioned | PI | Jurisdictions | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 7 | Dicello Levitt Gutzler [https://dicellolevitt.com/privacy-policy/] | Yes | No | Yes | No | Yes | No | Yes | No | Yes | **Information We Collect** **We collect non-public personal information about you from the following sources:** **Information we receive from you on applications or other forms (such as your name, address, address, email address, and phone number).** Cookies Please do not submit any confidential, proprietary or sensitive personally identifiable information (e.g. Social Security Number; driver's license number; or credit card, bank account or other financial information). If you do you do so at your own risk and we will not be liable to you or responsible for consequences of your submission. Use of Web Server Logs and Cookies When you visit our website, we may track information about your visit and store that information in web server logs, which are records of the activities on our sites. The servers automatically capture and save the information electronically. Examples of the information we may collect include: your unique **Internet protocol address**; the name of your unique Internet service provider; the town/city, county/state and country from which you access our website; the kind of browser or computer you use; the number of links you click within the site; the date and time of your visit; **the web page from which you arrived to our site**; **the pages you viewed on the site**; and certain searches/queries that you conducted via our website(s). |

**Appendix P**
**Description of IP Address, Cookies, and Referrer URL as Personal Information ("PI") in Privacy Policies of Selected Websites**

| Source | IP Address Mentioned | PI | Cookies Mentioned | PI | Referrer URL Mentioned | PI | Browsing History Mentioned | PI | Provisions for Specific Jurisdictions | Relevant quotes from the policy |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | **Selected Browser Publishers** | | | | | |
| 8  Safari (Apple) [https://www.apple.com/ legal/privacy/en-ww/] | Yes | No | Yes | No | No | No | Yes | Yes | Yes | we treat any data that relates to an identified or identifiable individual or that is linked or linkable to them by Apple as "personal data," no matter where the individual lives.<br><br>Personal Data Apple Collects from You<br>... we may collect a variety of information, including:<br>- Account Information. Your Apple ID and related account details, including email address, devices registered, account status, and age<br>- Device Information. Data from which your device could be identified, such as device serial number, or about your device, such as browser type<br>...<br>- Usage Data. Data about your activity on and use of our offerings, such as app launches within our services, including **browsing history**; search history; product interaction; crash data, performance and other diagnostic data; and other usage data<br>...<br>Cookies and Other Technologies<br>Apple's websites, online services, interactive applications, and advertisements may use "cookies" and other technologies such as web beacons.<br><br>**Apple generally treats data we collect using these cookies and similar technologies as nonpersonal data.** However, to the extent that Internet Protocol (IP) addresses or similar identifiers are considered personal data by local law, we also treat these identifiers as personal data in those regions. In addition, Apple sometimes combines nonpersonal data collected from these technologies with other personal data Apple holds. When we combine data in this way, we treat the combined data as personal data for purposes of this Privacy Policy. |
| 9  Firefox (Mozilla) [https://www.mozilla.or g/en-US/privacy/] | Yes | Yes | Yes | No | Yes | No | Yes | No | No | For us, "personal information" means information which either directly identifies you (like your name, email address, or billing information) or can be reasonably linked or combined to identify you (like an account identification number or **IP address**). |

**Appendix P**
**Description of IP Address, Cookies, and Referrer URL as Personal Information ("PI") in Privacy Policies of Selected Websites**

| | Source | IP Address Mentioned | PI | Cookies Mentioned | PI | Referrer URL Mentioned | PI | Browsing History Mentioned | PI | Provisions for Specific Jurisdictions | Relevant quotes from the policy |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10 | Microsoft Edge (Microsoft)<br><br>[https://privacy.microsoft.com/en-us/privacystatement?PrintView=true; https://support.microsoft.com/en-us/windows/microsoft-edge-browsing-data-and-privacy-bb8174ba-9d73-dcf2-9b4a-c582b4e640dd] | Yes | Yes | Yes | No | No | No | Yes | Yes | Yes | **Personal data we collect**<br><br>The data we collect can include the following:<br>...<br>Interactions<br>Other examples of interactions data include:<br>- Device and usage data. Data about your device and the product and features you use, including information about your hardware and software, how our products perform, as well as your settings. For example:<br>...<br>**Browse history.** Data about the webpages you visit.<br>Device, connectivity, and configuration data. Data about your device, your device configuration, and nearby networks. For example, data about the operating systems and other software installed on your device, including product keys. In addition, **IP address**, device identifiers (such as the IMEI number for phones), regional and language settings, and information about WLAN access points near your device.<br><br>**Cookies** are small text files placed on your device to store data that can be recalled by a web server in the domain that placed the cookie. This data often consists of a string of numbers and letters that uniquely identifies your computer, but it can contain other information as well.<br><br>**Personal data associated with your Microsoft account includes credentials, name and contact data, payment data, device and usage data, your contacts, information about your activities, and your interests and favorites.** |
| 11 | Opera<br><br>[https://www.opera.com/privacy] | Yes | No | Yes | No | No | No | No | No | Yes | As a general rule, users of our software applications and services are anonymous to us, and we have no feasible ways to identify you. However certain categories of data may be collected while using our applications and services, and some of this information may be considered "personal data" by the law. |

**Appendix P**
**Description of IP Address, Cookies, and Referrer URL as Personal Information ("PI") in Privacy Policies of Selected Websites**

| Source | IP Address Mentioned | PI | Cookies Mentioned | PI | Referrer URL Mentioned | PI | Browsing History Mentioned | PI | Provisions for Specific Jurisdictions | Relevant quotes from the policy |
|---|---|---|---|---|---|---|---|---|---|---|
| **Selected Websites** | | | | | | | | | | |
| 12  Pew Research Center<br><br>[https://www.pewresearch.org/about/privacy-policy/] | Yes | No | Yes | No | Yes | No | Yes | No | Yes | <u>Information we collect automatically</u>. We may collect certain information automatically when you use our Sites, such as your **Internet protocol (IP) address**, device and advertising identifiers, browser type, operating system, Internet service provider, **pages that you visit before and after using the Sites**, the date and time of your visit, information about the links you click, **the pages you view**, the general manner in which you navigate the Sites, and other standard server log information.<br><br>*The policy does not explicitly describe IP address, cookies, referrer URL, or browsing history as either personal information or non-personal information.* |
| 13  FTC<br><br>[https://www.ftc.gov/site-information/privacy-policy] | No | No | No | No | No | No | No | No | No | In most instances, we collect minimal personal information, such as name, address, telephone number, or email address. In limited cases, depending on the nature of your request or of our law enforcement investigations, we also may collect other personal information such as Social Security numbers, account numbers, or mortgage or health information. We also may collect information about your visit to our websites for security and internal operations purposes. |

**Appendix P**
**Description of IP Address, Cookies, and Referrer URL as Personal Information ("PI") in Privacy Policies of Selected Websites**

| | Source | IP Address | | Cookies | | Referrer URL | | Browsing History | | Provisions for Specific Jurisdictions | Relevant quotes from the policy |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Mentioned | PI | Mentioned | PI | Mentioned | PI | Mentioned | PI | | |
| 14 | Amazon<br><br>[https://www.amazon.com/gp/help/customer/display.html?nodeId=468496&ref_=footer_privacy] | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | **What Personal Information About Customers Does Amazon Collect?**<br>We collect your personal information in order to provide and continually improve our products and services.<br>Here are the types of personal information we collect:<br>...<br><br>- Automatic Information: We automatically collect and store certain types of information about your use of Amazon Services, including information about your interaction with content and services available through Amazon Services. Like many websites, **we use "cookies" and other unique identifiers**, and we obtain certain types of information when your web browser or device accesses Amazon Services and other content served by or on behalf of Amazon on other websites. Click here to see examples of what we collect.<br><br>Examples of Information Collected<br>Automatic Information<br>Examples of the information we collect and analyze include:<br>- the **internet protocol (IP) address** used to connect your computer to the internet;<br>- the full **Uniform Resource Locator (URL) clickstream to**, through, and from our websites, including date and time; **products and content you viewed or searched for**; page response times, download errors, length of visits to certain pages, and page interaction information (such as scrolling, clicks, and mouse-overs);<br><br>We may also use device identifiers, cookies, and other technologies on devices, applications, and our web pages to collect **browsing, usage, or other technical information.** |

**Appendix P**
**Description of IP Address, Cookies, and Referrer URL as Personal Information ("PI") in Privacy Policies of Selected Websites**

| | Source | IP Address Mentioned | PI | Cookies Mentioned | PI | Referrer URL Mentioned | PI | Browsing History Mentioned | PI | Provisions for Specific Jurisdictions | Relevant quotes from the policy |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 15 | Facebook [https://www.facebook.com/privacy/explanation] | Yes | No | Yes | No | No | No | Yes | No | Yes | As described below, we collect information from and about the computers, phones, connected TVs and other web-connected devices you use that integrate with our Products, and we combine this information across different devices you use. |
| | | | | | | | | | | | Network and connections: information such as the name of your mobile operator or ISP, language, time zone, mobile phone number, **IP address**, connection speed and, in some cases, information about other devices that are nearby or on your network .... |
| | | | | | | | | | | | Cookie data: data from cookies stored on your device, including cookie IDs and settings. |
| | | | | | | | | | | | Information from partners. These partners provide information about **your activities off Facebook**— including information about your device, websites you visit, purchases you make, the ads you see, and how you use their services.... |
| | | | | | | | | | | | *The policy does not explicitly describe IP address, cookies, referrer URL, or browsing history as either personal information or non-personal information.* |
| 16 | Yahoo [https://legal.yahoo.com/us/en/yahoo/privacy/index.html] | Yes | No | Yes | No | Yes | No | Yes | No | Yes | *The policy does not explicitly describe IP address, cookies, referrer URL, or browsing history as either personal information or non-personal information.* |

**Appendix P**
**Description of IP Address, Cookies, and Referrer URL as Personal Information ("PI") in Privacy Policies of Selected Websites**

| | Source | IP Address Mentioned | PI | Cookies Mentioned | PI | Referrer URL Mentioned | PI | Browsing History Mentioned | PI | Provisions for Specific Jurisdictions | Relevant quotes from the policy |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 17 | Wikipedia [https://foundation.wiki media.org/wiki/Privacy_ policy] | Yes | Yes | Yes | No | Yes | No | Yes | No | Yes | Information you provide us or information we collect that could be used to personally identify you. To be clear, while we do not necessarily collect all of the following types of information, we consider at least the following to be "personal information" if it is otherwise nonpublic and can be used to identify you: (a) your real name, address, phone number, email address, password, identification number on government-issued ID, **IP address**, user-agent information, payment account number; (b) when associated with one of the items in subsection (a), any sensitive data such as date of birth, gender, sexual orientation, racial or ethnic origins, marital or familial status, medical conditions or disabilities, political affiliation, and religion. <br><br> <u>Information We Receive Automatically</u> <br>...This information includes the type of device you are using (possibly including unique device identification numbers, for some beta versions of our mobile applications), the type and version of your browser, your browser's language preference, the type and version of your device's operating system, in some cases the name of your internet service provider or mobile carrier, **the website that referred you to the Wikimedia Sites**, **which pages you request and visit**, and the date and time of each request you make to the Wikimedia Sites. |
| 18 | Reddit [https://www.redditinc.c om/policies/privacy-policy] | Yes | No | Yes | No | Yes | No | Yes | No | Yes | <u>Information We Collect Automatically</u> <br>... <br><u>Log and usage data</u>: We may log information when you access and use the Services. This may include your **IP address**, user-agent string, browser type, operating system, **referral URLs**, device information (e.g., device IDs), device settings, mobile carrier name, **pages visited**, links clicked, the requested URL, and search terms. <br><br>*The policy does not explicitly describe IP address, cookies, referrer URL, or browsing history as either personal information or non-personal information.* |

**Appendix P**
**Description of IP Address, Cookies, and Referrer URL as Personal Information ("PI") in Privacy Policies of Selected Websites**

| | Source | IP Address Mentioned | PI | Cookies Mentioned | PI | Referrer URL Mentioned | PI | Browsing History Mentioned | PI | Provisions for Specific Jurisdictions | Relevant quotes from the policy |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 19 | eBay [https://www.ebay.com/ help/policies/member-behaviour-policies/user-privacy-notice-privacy-policy] | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | 4.2 Personal data we collect automatically when you use our Services or create an eBay account<br><br>...<br>- Location data, including your general location data (**e.g., IP address**) and the precise location data of your mobile device. Please note that for most mobile devices, you can manage or disable the use of location services for all applications in the settings menu of your mobile device.<br>- Computer and connection information, such as statistics regarding your use of our Services, information on data traffic to and from websites, **referral URL**, information on advertisements, your **IP address**, your access times including **accessed pages within our Services**, your language settings and your weblog information.<br><br>4.3 Personal data we collect in connection with the **use of cookies** and similar technologies<br>We use cookies, web beacons and similar technologies to collect data while you use our Services. We collect this data from the devices (including mobile devices) that you use our Services with. |

**Appendix P**
**Description of IP Address, Cookies, and Referrer URL as Personal Information ("PI") in Privacy Policies of Selected Websites**

| | Source | IP Address Mentioned | PI | Cookies Mentioned | PI | Referrer URL Mentioned | PI | Browsing History Mentioned | PI | Provisions for Specific Jurisdictions | Relevant quotes from the policy |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 20 | Walmart [https://corporate.walmart.com/privacy-security/walmart-privacy-policy] | Yes | Yes | Yes | Yes | Yes | Yes | Yes | No | Yes | Personal information is information that identifies you or reasonably can be linked to information that identifies you. For example, when you place an item on layaway or place an order online, to fulfill your order we collect personal information, such as name, address, phone number, and credit or debit card information.<br><br>What Information Do We Collect?<br>**We may collect the following categories of personal information.** Not all categories may be collected about every individual:<br>- Personal identifiers, such as name and address<br>- Device and online identifiers and related information, such as telephone number and email address<br>- Internet, application, and network activity, such as **cookie IDs** and browser visits<br><br>Information Collected From a Device Associated With You or Your Household<br><br>Here are some examples:<br>- Device Information: We collect technical information when you visit our websites or use our mobile applications or services. This may include information such as **Internet Protocol (IP) address**, the type of mobile device you use, your device operating system and browser type, a unique device identifier, **the address of referring websites**, the path you take through our websites, and other information about your session on our websites.<br><br>We belong to ad networks that may use your **browsing history** across participating websites and mobile services to show you interest-based advertisements. |

**Appendix P**
**Description of IP Address, Cookies, and Referrer URL as Personal Information ("PI") in Privacy Policies of Selected Websites**

| | Source | IP Address Mentioned | PI | Cookies Mentioned | PI | Referrer URL Mentioned | PI | Browsing History Mentioned | PI | Provisions for Specific Jurisdictions | Relevant quotes from the policy |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 21 | Twitter [https://twitter.com/en/privacy] | Yes | Yes | Yes | Yes | Yes | No | Yes | No | Yes | When you use Twitter, even if you're just looking at Tweets, **we receive some personal information** from you like the type of device you're using and your **IP address**.<br><br>If you click on an external link or an ad on our services, that advertiser or website operator might figure out that you came from Twitter or Periscope, along with other information associated with the ad you clicked such as characteristics of the audience it was intended to reach. **They may also collect other personal data from you, such as cookie identifiers or your IP address.**<br><br>When you view our content on third-party websites that integrate Twitter content such as embedded timelines or Tweet buttons, **we may receive Log Data that includes the web page you visited**. We use this information to better understand the use of our services, to protect the safety and integrity of our platform, and to show more relevant content, including ads. **We do not associate this web browsing history with your name, email address, phone number, or username, and we delete, obfuscate, or aggregate it after no longer than 30 days.** |
| 22 | Instagram [https://help.instagram.com/519522125107875] | Yes | No | Yes | No | No | No | Yes | No | Yes | I. What kinds of information do we collect?<br>...<br>Network and connections: information such as the name of your mobile operator or ISP, language, time zone, mobile phone number, **IP address**, connection speed and, in some cases, information about other devices that are nearby or on your network ....<br>Cookie data: **data from cookies stored on your device**, including cookie IDs and settings.<br>...<br>Information from partners.<br>...<br>These partners provide information about your activities off Facebook—including information about your device, **websites you visit**, purchases you make, the ads you see, and how you use their services....<br><br>*The policy does not explicitly describe IP address, cookies, referrer URL, or browsing history as either personal information or non-personal information.* |

**Appendix P**
**Description of IP Address, Cookies, and Referrer URL as Personal Information ("PI") in Privacy Policies of Selected Websites**

| | Source | IP Address | | Cookies | | Referrer URL | | Browsing History | | Provisions for Specific Jurisdictions | Relevant quotes from the policy |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Mentioned | PI | Mentioned | PI | Mentioned | PI | Mentioned | PI | | |
| 23 | ESPN (The Walt Disney Company)<br><br>[https://privacy.thewaltdisneycompany.com/en/current-privacy-policy/<br><br>https://privacy.thewaltdisneycompany.com/en/definitions/] | Yes | No | Yes | No | No | No | Yes | No | Yes | Personal information means information that identifies (whether directly or indirectly) a particular individual, such as the individual's name, postal address, email address, and telephone number. When anonymous information is directly or indirectly associated with personal information, the resulting information also is treated as personal information.<br><br>We collect **two basic types of information – personal information (as defined in this policy) and anonymous information (as defined in this policy)** – and we may use personal and anonymous information to create a third type of information, aggregate information (also defined in this policy).   In particular, we collect:<br><br>- **Activity information about your use**, and the use by any person(s) you authorize through your account, of our sites and applications, such as the content you view or post, how often you use our services, and your preferences;<br>- **Usage, viewing, technical, and device data** when you visit our sites, use our applications on third-party sites or platforms, or open emails we send, or connect with our wireless Internet access services and other similar technologies, including your browser or device type, unique device identifier, and **IP address** ...<br><u>ANONYMOUS INFORMATION</u><br>Anonymous information means information that does not directly or indirectly identify, and cannot reasonably be used to identify, an individual guest. |

**Appendix P**
**Description of IP Address, Cookies, and Referrer URL as Personal Information ("PI") in Privacy Policies of Selected Websites**

| | Source | IP Address Mentioned | PI | Cookies Mentioned | PI | Referrer URL Mentioned | PI | Browsing History Mentioned | PI | Provisions for Specific Jurisdictions | Relevant quotes from the policy |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 24 | Fandom [https://www.fandom.com/privacy-policy] | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | PERSONAL INFORMATION WE COLLECT ... <br> <u>Information Collected Automatically</u> <br> <u>Automatic Data Collection.</u> We may collect certain information automatically when you use the Services. This information may include your **Internet protocol (IP) address**, user settings, MAC address, **cookie identifiers**, mobile carrier, mobile advertising and other unique identifiers, details about your browser, operating system or device, location information (including inferred location based off of your IP address), Internet service provider, **pages that you visit before, during, and after using the Services**, information about the links you click, information about how you interact with the Services, including the frequency and duration of your activities, the search requests you submit on the Services, and other information about how you use the Services. We may attempt to infer other information about you based on this information, or associate it with your accounts on other devices. <br><br> <u>Cookies, Pixel Tags/Web Beacons, and Analytics Information.</u> We, as well as third parties that provide content, advertising, or other functionality on the Services, may use cookies, pixel tags, local storage, and other technologies ("Technologies") to automatically collect information through the Services. Technologies are essentially small data files placed on your devices that allow us and our partners to record certain pieces of information whenever you visit or interact with our Services. |
| 25 | CNN (Warner Media) [https://www.warnermediaprivacy.com/policycenter/b2c/WMNS/en-us/] | Yes | No | Yes | No | Yes | No | Yes | No | Yes | We may collect different types of information during your interactions with our Sites and through our advertising and media across the Internet and mobile apps. This information may include **personal information (e.g., name, phone number, postal address, email address, and certain payment information), technical information (e.g., device identifier, IP address, browser type, operating system) and usage information (e.g., how you use and navigate to and from our Sites, and information about content or advertisements you have been shown or have clicked on).** |

**Appendix P**
**Description of IP Address, Cookies, and Referrer URL as Personal Information ("PI") in Privacy Policies of Selected Websites**

| Source | IP Address Mentioned | PI | Cookies Mentioned | PI | Referrer URL Mentioned | PI | Browsing History Mentioned | PI | Provisions for Specific Jurisdictions | Relevant quotes from the policy |
|---|---|---|---|---|---|---|---|---|---|---|
| 26 Fox News [https://www.foxnews.com/privacy-policy] | Yes | No | Yes | No | No | No | Yes | No | Yes | This Privacy Policy applies to our collection and use of your **personal information (i.e., information that identifies a specific person, such as full name or email personal address)**. It also describes generally our practices for handling non-personal information (for example, interests, demographics and services usage). <br><br> Activity Information. When you access and interact with the Fox News Services, Fox News and its service providers may collect certain information about those visits. For example, in order to permit your connection to the Fox News Services, our servers receive and record information about your computer, device, and browser, including potentially your **IP address**, browser type, and other software or hardware information. <br><br> **Cookies** and other tracking technologies. These technologies may also be used to collect and store information about your usage of the Fox News Services, such as **pages you have visited, search history, and the video and other content you have viewed.** <br><br> *The policy does not explicitly describe IP address, cookies, referrer URL, or browsing history as either personal information or non-personal information.* |
| 27 Twitch [https://www.twitch.tv/p/en/legal/privacy-notice/] | Yes | Yes | Yes | Yes | Yes | Yes | No | No | Yes | Personal Information Twitch Collects About You <br>… <br>Automatically Collected Information: When you access the Twitch Services or open one of our emails, we automatically record and store certain information about your system by using cookies and other types of technologies. ... **Examples of such information we automatically collect include Internet Protocol address ("IP Address")**, a unique user ID, device and browser types and identifiers, **referring and exit page addresses**, software and system type, and information about your usage of Twitch Services. |
| 28 Craigslist [https://www.craigslist.org/about/privacy.policy] | Yes | No | Yes | No | No | No | Yes | No | Yes | *The policy does not use terms such as "personal information".* |

**Appendix P**
**Description of IP Address, Cookies, and Referrer URL as Personal Information ("PI") in Privacy Policies of Selected Websites**

| | Source | IP Address Mentioned | PI | Cookies Mentioned | PI | Referrer URL Mentioned | PI | Browsing History Mentioned | PI | Provisions for Specific Jurisdictions | Relevant quotes from the policy |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 29 | Netflix [https://help.netflix.com/ legal/privacy] | Yes | No | Yes | No | Yes | No | Yes | No | Yes | Information we collect automatically: ... - your activity on the Netflix service, such as title selections, **shows you have watched, search queries, and activity in Netflix games**; ... - device and software characteristics (such as type and configuration), connection information including type (wifi, cellular), statistics on page views, referring source (for example, **referral URLs**), **IP address** (which may tell us your general location), browser and standard web server log information; - **information collected via the use of cookies**, web beacons and other technologies, including ad data (such as information on the availability and delivery of ads, the site URL, as well as the date and time). (See our "Cookies and Internet Advertising" section for more details.) *The policy does not explicitly describe IP address, cookies, referrer URL, or browsing history as either personal information or non-personal information.* |

**Appendix P**
**Description of IP Address, Cookies, and Referrer URL as Personal Information ("PI") in Privacy Policies of Selected Websites**

| | Source | IP Address Mentioned | PI | Cookies Mentioned | PI | Referrer URL Mentioned | PI | Browsing History Mentioned | PI | Provisions for Specific Jurisdictions | Relevant quotes from the policy |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 30 | The Weather Channel [https://weather.com/en-US/twc/privacy-policy] | Yes | No | Yes | No | Yes | No | Yes | No | Yes | **How and Why We Collect and Use Personal Data and Other Information** In order to operate the Services and to maximize your experience, **we may collect and use information, some of which may be considered personal data.** ... **Some of the information we collect through automated means may, whether alone or combined with other data, be personal data.** For example, we automatically collect: - Information about your device and device capabilities - Information about your device operating system - Information about your browser - Information about how you use and interact with the Services - Your activities on the Services - **IP address** - Advertising identifiers - Mobile or Internet Carrier - Browser type - Browser identifier - **Referring URL** We work with a variety of advertising services that use various technologies to collect data about your use of the Services (**such as content viewed** or ads clicked on) on our behalf or on behalf of advertisers (Advertising Vendors) inorder to serve relevant ads. Advertising Vendors use various technologies on the Services to (among other purposes): track how the Services are used, **what pages or content users interact with**, and what sites or mobile applications users interact with after they leave the Services.... |

**Appendix P**
**Description of IP Address, Cookies, and Referrer URL as Personal Information ("PI") in Privacy Policies of Selected Websites**

| | Source | IP Address Mentioned | PI | Cookies Mentioned | PI | Referrer URL Mentioned | PI | Browsing History Mentioned | PI | Provisions for Specific Jurisdictions | Relevant quotes from the policy |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 31 | Accuweather [https://www.accuweather.com/en/privacy] | Yes | No | Yes | No | No | No | Yes | No | Yes | "Personally Identifiable Information" or "PII" means information by Personal which a natural person can be specifically identified. This information includes things such name, address and email address. Your username and a password You supply are examples of PII. **Information about a device or the location of a device may be PII, but only if We also have other information that, when combined with information about that device, might lead to identification of You or another natural person.** ... We may collect Your PII or device information, including Your device's location, when You use the AccuWeather Sites. <u>Information Your device provides passively about the device, the network it is on and the device's location. ...</u> These may be used to allow AccuWeather and its Providers and others who assist AccuWeather in the support of AccuWeather Sites to know Your device's location, **web browsing movements** or information about the environment near the device. |
| 32 | Zillow [https://www.zillowgroup.com/zg-privacy-policy/] | Yes | No | Yes | No | Yes | No | Yes | No | Yes | When you use our services, we collect a variety of information from and about you and your devices. Some of this information identifies you directly (like an email address) while some of it is associated with you through your account, profile, or device (like the homes you choose to save or your location data). The kind of data we collect about you depends on how you use Zillow. If you only use our services to browse for homes, we'll have less information about you than if we help you sell your home, get a mortgage, sign your lease, or if you use any of our other transaction services. **Even if you don't have an account with us, we may still collect some data about you,** like your email address and phone number if you choose to contact a real estate agent through our platform, **or your IP address and other device information when you browse our sites or use our apps.** ... We collect information about how you use Zillow. This includes things like your **home search history, homes you view, purchase activity**, what you've clicked on and other uses of our features, and the amount of time you spend looking at different parts of our websites. *The policy does not explicitly describe IP address, cookies, referrer URL, or browsing history as either personal information or non-personal information.* |

**Appendix P**
**Description of IP Address, Cookies, and Referrer URL as Personal Information ("PI") in Privacy Policies of Selected Websites**

| | Source | IP Address Mentioned | PI | Cookies Mentioned | PI | Referrer URL Mentioned | PI | Browsing History Mentioned | PI | Provisions for Specific Jurisdictions | Relevant quotes from the policy |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 33 | IMDB [https://www.imdb.com/ privacy?ref_=ft_pvc] | Yes | Yes | Yes | Yes | Yes | Yes | Yes | No | Yes | **What Personal Information About Users Does IMDb Collect?** We collect your personal information in order to provide and continually improve our services and your experience at IMDb. Here are the types of personal information we collect: <br><br>Automatic Information: We automatically collect and store certain types of information about your use of IMDb Services, including information about your interaction with content and services available through IMDb Services. Like many websites, **we use "cookies"** and other unique identifiers, and we obtain certain types of information when your web browser or device accesses IMDb Services and other content served by or on behalf of IMDb on other websites. <br><br>Examples of the information we collect and analyze include: <br>- the **internet protocol (IP) address** used to connect your computer to the internet; <br>... <br>- purchase and **content use history**; <br>- **the full Uniform Resource Locator (URL) clickstream to, through, and from our websites**, including date and time; **content you viewed or searched for**; and <br><br>**We may also use device identifiers, cookies**, and other technologies on devices, applications, and our web pages to collect browsing, usage, or other technical information. |
| 34 | USPS [https://about.usps.com/ who/legal/privacy-policy/full-privacy-policy.htm] | Yes | No | Yes | No | Yes | No | No | No | No | Personal information may include your name, email, mailing and/or business address, phone numbers, or other information that identifies you personally. <br><br>*The policy does not explicitly describe IP address, cookies, referrer URL, or browsing history as either personal information or non-personal information.* |

**Appendix P**
**Description of IP Address, Cookies, and Referrer URL as Personal Information ("PI") in Privacy Policies of Selected Websites**

| | Source | IP Address Mentioned | PI | Cookies Mentioned | PI | Referrer URL Mentioned | PI | Browsing History Mentioned | PI | Provisions for Specific Jurisdictions | Relevant quotes from the policy |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 35 | Pinterest [https://policy.pinterest.com/en/privacy-policy] | Yes | No | Yes | No | No | No | Yes | No | Yes | 2. We also get technical information when you use Pinterest<br><br>Log data. When you use Pinterest, our servers record information ("log data"), including information that your browser automatically sends whenever you visit a website, or that your mobile app automatically sends when you're using it. This log data includes your **Internet Protocol address** (which we use to infer your approximate location), **the address of and activity on websites you visit that incorporate Pinterest features** (like the "Save" button—more details below), searches, browser type and settings, the date and time of your request, how you used Pinterest, **cookie data** and device data. |
| 36 | Target [https://www.target.com/c/target-privacy-policy/-/N-4sr7p?Nao=0#AccessingPersonalInformation] | Yes | No | Yes | No | No | No | Yes | No | Yes | Types of information Collected:<br>...<br>**- IP Address**<br><br>We and our service providers use anonymous identifiers such as **cookies** and other technologies to collect and store certain types of information (e.g., **click stream information**, browser type, time and date, subject of advertisements clicked or scrolled over, hardware/software information, cookie and session ID) whenever you interact with us or third-parties that use our services.<br><br>We merge data collected from our own websites and mobile application(s). Examples of the data collected include: cookie IDs, device Advertising IDs, transaction and **browsing history**.<br><br>*Personal information is discussed explicitly in the California section and not elsewhere except for a brief statement that says personal information will be shared when it pertains to purchases and will be shared with the selling businesses.* |

**Appendix P**
**Description of IP Address, Cookies, and Referrer URL as Personal Information ("PI") in Privacy Policies of Selected Websites**

| | Source | IP Address Mentioned | PI | Cookies Mentioned | PI | Referrer URL Mentioned | PI | Browsing History Mentioned | PI | Provisions for Specific Jurisdictions | Relevant quotes from the policy |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 37 | LinkedIn [https://www.linkedin.com/legal/privacy-policy] | Yes | No | Yes | No | Yes | No | Yes | No | Yes | We collect **personal data** from you when you provide, post or upload it to our Services, such as when you fill out a form, (e.g., with demographic data or salary), respond to a survey, or submit a resume or fill out a job application on our Services.<br><br>We use log-ins, **cookies**, device information and **internet protocol ("IP") addresses** to identify you and log your use.<br><br>we receive the **URL of both the site you came from and the one you go to** and the time of your visit.<br>...<br>We target (and measure the performance of) ads to Members, Visitors and others both on and off our Services directly or through a variety of partners, using the following data, whether separately or combined:<br>...<br>Data from your use of our Services (e.g., **search history, feed, content you read,** who you follow or is following you, connections, groups participation, **page visits, videos you watch,** clicking on an ad, etc.), including as described in Section 1.3;<br><br>*The policy does not explicitly describe IP address, cookies, referrer URL, or browsing history as either personal information or non-personal information.* |
| 38 | NY Times [https://www.nytimes.com/privacy/privacy-policy] | Yes | Yes | Yes | Yes | No | No | Yes | Yes | Yes | The information we gather about you depends on the context. By and large, it's information about you that can personally identify you — either on its own or when combined with other information.<br><br>*The NYT privacy policy page says that most of the information they collect is personal information, but does not define personal information nor does it categorize the examples of collected information into personal information and non-personal information.* |

**Notes:**

[1] If a source explicitly mentions IP address, cookies, referrer URL, or browsing history as personal information, the corresponding entry in the table is marked as "Yes." If a source does not explicitly mention IP address, cookies, referrer URL, or browsing history as personal information, or if the source explicitly classifies them as non-personal information, the corresponding entry in the table is marked as "No."

[2] Some privacy policies have separate provisions for certain jurisdictions including for California residents under the California Privacy Protection Act (CPPA). In such cases, classification of information under the general privacy policy, under sections not describing these provisions are considered for the purpose of populating this table.

[3] *Italicized* text corresponds to notes from me. Rest of the text is direct quotes from the privacy policies. Emphasis has been added to quotes to highlight the most relevant text.