# GOOGLE LLC'S OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION

# Broome Decl. Ex. 23
# Excerpts from the November 8, 2021 deposition of Joseph Turrow

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                      SAN JOSE DIVISION

                          ---o0o---

 4   PATRICK CALHOUN, et al.,        )

 5   on behalf of themselves and     )

 6   all others similarly            )

 7   situated,                       )

 8            Plaintiffs,            )

 9   vs.                             )Case No.

10   GOOGLE LLC,                     )5:20-cv-5146-LHK-SVK

11            Defendant.             )

12   _____)

13

14                      CONFIDENTIAL

15

16           Videotaped Zoom Deposition of

17                JOSEPH TUROW, Ph.D.

18             Monday, November 8, 2021

19

20

21

22

23   Katy E. Schmidt

24   RPR, RMR, CRR, CSR 13096

25   Veritext Job No.: 4880489
```

Page 1

CONFIDENTIAL

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE NORTHERN DISTRICT OF CALIFORNIA

3    SAN JOSE DIVISION

---o0o---

4  PATRICK CALHOUN, et al.,    )

5  on behalf of themselves and  )

6  all others similarly      )

7  situated,            )

8      Plaintiffs,      )

9  vs.            )Case No.

10  GOOGLE LLC,        )5:20-cv-5146-LHK-SVK

11      Defendant.    )

12  _____)

13    BE IT REMEMBERED that, pursuant to Notice, and

14  on Monday, the 8th day of November, 2021, commencing at

15  the hour of 7:11 a.m., thereof, in Philadelphia,

16  Pennsylvania, before me, KATY E. SCHMIDT, a Certified

17  Shorthand Reporter in and for the County of Yolo, State

18  of California, there virtually personally appeared

19

20    JOSEPH TUROW, Ph.D.

21  called as a witness herein, who, being by me first duly

22  sworn, was thereupon examined and interrogated as

23  hereinafter set forth.

24

25

Page 2

---

1 APPEARANCES:

2 For The Plaintiffs:

3    (Appeared via Zoom)

4    BLEICHMAR FONTI & AULD LLP

     BY: LESLEY WEAVER, Esq.

5    555 12th Street, Suite 1600

     Oakland, California 994607

6    415.445.4003

     lweaver@bfalaw.com

7

     DICELLO LEVITT GUTZLER

8    BY: DAVID, STRAITE, Esq. (pro hac vice)

     BY: SHARON CRUZ, Esq.

9    One Grand Central Place

     60 East 42nd Street, Suite 2400

10   New York, New York 10165

     646.933.1000

11   dstraite@dicellolevitt.com

12   SIMMONS HANLY CONROY

     BY: JASON "JAY" BARNES, Esq.

13   One Court Street

     Alton, Illinois 62002

14   618.693.3104

     jaybarnes@simmonsfirm.com

15

16 For The Defendants:

     (Appeared via Zoom)

17   Quinn Emanuel Urquhart & Sullivan LLP

18   BY: STEPHEN BROOME, Esq.

     BY: ALY OLSON, Esq.

19   865 S Figueroa Street, 10th Floor

20   Los Angeles, California 90017

21   stephenbroome@quinnemanuel.com

22

23 Also present:

24   David West, videographer

25   Laura O'Laughlin, expert

Page 3

---

1      INDEX OF EXAMINATION

2      ---o0o---

3                  Page

4  Examination by Mr. Broome        07

5  Examination by Mr. Straite        352

6  Examination by Mr. Broome        358

7      ---o0o---

8

9    QUESTIONS INSTRUCTED NOT TO ANSWER

10

11    Page    Line

12

13    (NOTHING  OFFERED.)

14      ---o0o---

15

16

17

18

19

20

21

22

23

24

25

Page 4

---

1      INDEX OF EXHIBITS

2      ---o0o---

3  Number                  Page

4  Exhibit 1    Consent Bump 2.0 for Narnia    45

5    2.0: LAUNCHED UX

6  Exhibit 2    Expert Report of Professor    102

7  Joseph Turow

8  Exhibit 3    Penn Privacy Policy        126

9  Exhibit 4    Google Chrome Privacy Notice  145

10 Exhibit 5    Document Find & Control your  249

11 Web & App Activity

12 Exhibit 6    Google Privacy Policy        272

13 Exhibit 7    Document titled Exhibit B    298

14 Exhibit 8    Document from Electronic    348

15 Frontier Foundation

16

17

18

19

20

21

22

23

24

25

Page 5

2 (Pages 2 - 5)

Veritext Legal Solutions
866 299-5127

1          PHILADELPHIA, PENNSYLVANIA
2          MONDAY, NOVEMBER 8, 2021; 7:11 A.M.
3                    ---o0o---
4          THE VIDEOGRAPHER:  Okay.  Good morning.  We    07:11
5 are on the record.  The time is 10:11 a.m. and that is    07:11
6 Eastern time.  The date today is November 8th, 2021.    07:11
7          Please note the microphones are sensitive and    07:12
8 may pick up whispering and private conversations.    07:12
9          Audio and video recording will continue to    07:12
10 take place unless all parties agree to go off the    07:12
11 record.    07:12
12          This is Media Unit 1 of the video-recorded    07:12
13 deposition of Professor Joseph Turow, taken by counsel    07:12
14 for defendant in the matter of Patrick Calhoun, et al.    07:12
15 versus Google LLC, filed in the United States District    07:12
16 Court for the Northern District of California, San Jose    07:12
17 division.  The case number is 5 colon 20cv5146-LHK-SVK.    07:12
18          The deposition is being conducted using remote    07:12
19 counsel technology.    07:12
20          My name is David West.  I am the videographer.    07:12
21 The court reporter is Kathryn Schmidt.  We represent    07:12
22 Veritext Legal Solutions.    07:12
23          I am not related to any party in this action,    07:12
24 nor am I financially interested in the outcome.    07:12
25          Counsel will now state their appearances and    07:13

Page 6

1 affiliations for the record.  If there are any    07:13
2 objections to proceeding, please state them at the time    07:13
3 of your appearance, beginning with the noticing    07:13
4 attorney.    07:13
5          MR. BROOME:  Good morning.  Stephen Broome    07:13
6 from Quinn Emanuel representing Google, and I'm joined    07:13
7 by my colleague, Aly Olson.    07:13
8          MR. STRAITE:  Okay.  And for plaintiffs this    07:13
9 is David Straite with the firm Dicello Levitt Gutzler    07:13
10 in New York.    07:13
11          Joining me is my colleague Sharon Cruz, also    07:13
12 from Dicello Levitt Gutzler from Chicago.    07:13
13          THE VIDEOGRAPHER:  Okay.  With that, the    07:13
14 court reporter may now swear the witness in and we will    07:13
15 continue.    07:13
16                    ---o0o---    07:13
17          JOSEPH TUROW,    07:13
18 called as a witness by the Defendants, who, being first    07:13
19 duly sworn to tell the truth, the whole truth and    07:13
20 nothing but the truth, was examined and testified as    07:13
21 follows:    07:13
22          EXAMINATION BY MR. BROOME    07:13
23 BY MR. BROOME:    07:14
24    Q.  Good morning, Professor Turow.    07:14
25    A.  Good morning.    07:14

Page 7

1    Q.  And how would you describe your primary field    07:14
2 of research, broadly speaking.    07:14
3    A.  Broadly speaking, I study media industries,    07:14
4 with a particular focus on the intersection between    07:14
5 digital media advertising and society.    07:14
6    Q.  You have conducted a number of consumer    07:14
7 surveys in your career; correct?    07:14
8    A.  I wouldn't call them consumer surveys.  They    07:14
9 are surveys of the U.S. population.    07:14
10    Q.  Okay.  Would you describe any of them as    07:14
11 consumer surveys?    07:14
12    A.  No.  To me a consumer survey is a survey done    07:14
13 by a company for consumer purposes, meaning advertising    07:14
14 purposes.    07:14
15          My purposes are sociological.  I try to find    07:14
16 out what people know, what people think, what some of    07:14
17 the social implications of that are.    07:15
18          And I also study the industries around them.    07:15
19    Q.  Okay.  How many surveys have you conducted in    07:15
20 your career?    07:15
21    A.  I think eight.  I've helped some other places    07:15
22 like pew do parts of surveys.  I believe there are    07:15
23 eight.  I started in 1999, which was our first survey.    07:15
24 The last one that I'd done is a couple of years ago.  So    07:15
25 I think about eight.    07:15

Page 8

1          MR. STRAITE:  And, Steve, this is David.  I    07:15
2 apologize for interrupting.  I noticed as we were    07:15
3 entering our appearances there is one name I don't    07:15
4 recognize.  On the Zoom it's important to know who that    07:15
5 person is.    07:15
6          MR. BROOME:  Sure.  Who is the -- what's the    07:15
7 name?    07:15
8          MR. STRAITE:  Looks like it's Ms. Laughlin --    07:15
9 O'Laughlin?    07:15
10          MR. BROOME:  Oh, that's -- yes.  It's    07:15
11 Laura O'Laughlin from -- one of our consulting experts    07:15
12 at Analysis Group.    07:15
13          MR. STRAITE:  Okay.  Was it -- I apologize if    07:15
14 I missed the e-mail.    07:16
15          Did you ask whether one of your consultants    07:16
16 could attend today's deposition?    07:16
17          MR. BROOME:  I'm not sure.  Do you have an    07:16
18 objection to it?    07:16
19          MR. STRAITE:  I don't know.  It's hard to say.    07:16
20 I don't know who this consultant is.    07:16
21          MR. BROOME:  Sure.  She's a consultant for    07:16
22 Google in this case.    07:16
23          MR. STRAITE:  Okay.  Is she an expert of    07:16
24 yours, a testifying expert?    07:16
25          MR. BROOME:  She's a consulting expert.    07:16

Page 9

3 (Pages 6 - 9)

CONFIDENTIAL

Page 10

```
1        MR. STRAITE:  Consulting expert.  Okay.      07:16
2        Well, I think what we'll do, we'll continue   07:16
3   the questions for now, and at the break I'll consult  07:16
4   with co-counsel.                                  07:16
5        MR. BROOME:  Okay.  Do you want to take a    07:16
6   break now or are you good to proceed?             07:16
7        MR. STRAITE:  No.  I'm good for now.         07:16
8        MR. BROOME:  Okay.                           07:16
9   BY MR. BROOME:                                    07:16
10  Q.  All right.  Professor Turow, you said you've  07:16
11  conducted eight surveys in your career?           07:16
12  A.  I believe, yeah.                              07:16
13  Q.  Yep?                                          07:16
14  A.  I believe there are eight.                    07:16
15  Q.  Okay.  And were you involved in designing     07:16
16  those surveys?                                     07:16
17  A.  Yes.  In fact, most of them were -- all of    07:16
18  them were primarily designed by me.               07:16
19  Q.  Okay.  And would you consider yourself to be  07:16
20  an expert in designing surveys?                   07:16
21  A.  That's hard to say.  I've done them.  I don't 07:17
22  know that anybody has called me an expert.  I like to  07:17
23  believe that they're done well.                   07:17
24       MR. STRAITE:  Objection.  Vague as to the   07:17
25  previous question.                                07:17
```

Page 11

```
1   BY MR. BROOME:                                    07:17
2   Q.  And generally speaking, why did you consult  07:17
3   those surveys?                                     07:17
4        MR. STRAITE:  Objection.  Vague.            07:17
5        THE WITNESS:  Should I answer?              07:17
6        MR. STRAITE:  Yes.  I'm sorry.              07:17
7   Professor Turow, when I lodge an objection, you do need  07:17
8   to answer the question, unless I instruct you otherwise.  07:17
9        But I do need to get the objection for the  07:17
10  record, even if it's a question you can answer.    07:17
11       THE WITNESS:  It's a really interesting story.  07:17
12       Back in 1999, the Annenberg Public Policy   07:17
13  Center was starting up, and the dean of the school, who  07:17
14  was also the head of the Public Policy Center,    07:17
15  Kathleen Jamieson, came to me and she said, "We want to  07:17
16  have a technology and society area of the Public Policy  07:18
17  Center.  Would you be interested in leading that?"  07:18
18       And I said I would, after thinking about it.  07:18
19       And the internet was fairly new as a         07:18
20  commercial entity at the time, and one of the issues  07:18
21  that came up was what do parents and children think  07:18
22  about the internet and giving up data on the internet?  07:18
23       So that was our first survey, and it sort of  07:18
24  took a life of its own.  And since then, every few years  07:18
25  I've done surveys, either with the support of the  07:18
```

Page 12

```
1   Annenberg Public Policy Center, the Annenberg School,  07:18
2   Foundation, that kind of thing.                   07:18
3   BY MR. BROOME:                                    07:18
4   Q.  Okay.  And have most of your -- most of all of  07:18
5   your surveys been focused on internet users?      07:18
6        I would say --                               07:18
7        MR. STRAITE:  Objection as to form.         07:18
8        THE WITNESS:  I would say yes.              07:18
9   BY MR. BROOME:                                    07:18
10  Q.  Okay.  And have most or all of your surveys  07:18
11  been focused on sort of expectations for understandings  07:18
12  of what's happening online by internet users?     07:19
13       MR. STRAITE:  Objection.  Vague.  Objection as  07:19
14  to form.                                           07:19
15       THE WITNESS:  Some of them have focused on  07:19
16  expectations.  I don't know what you exactly mean by  07:19
17  expectations.                                      07:19
18       We often ask questions about attitudes.  We  07:19
19  ask questions about understanding.  We ask questions  07:19
20  about knowledge, which may be the same thing.  And --  07:19
21  yeah.                                              07:19
22  BY MR. BROOME:                                    07:19
23  Q.  Yeah.  Okay?                                  07:19
24  A.  Scenarios sometimes to tease out people's    07:19
25  understanding.                                     07:19
```

Page 13

```
1   Q.  Good.                                         07:19
2        And what is the purpose of conducting a     07:19
3   survey?                                            07:19
4        MR. STRAITE:  Objection.  Vague.  Objection as  07:19
5   to form.                                           07:19
6        THE WITNESS:  Our purpose is to understand  07:19
7   what Americans think and know about this world of  07:19
8   the internet that it's surrounding.               07:19
9   BY MR. BROOME:                                    07:19
10  Q.  And what is the benefit of conducting a survey  07:19
11  as opposed to some other form of research?        07:19
12       MR. STRAITE:  Objection.  Relevance.        07:19
13  Objection.  Vague.  Objection as to form.         07:20
14       THE WITNESS:  A survey is one way of        07:20
15  understanding the world.  It's not the only way of  07:20
16  understanding the world.  I'm quite aware of that.  It  07:20
17  is one way to encourage a social conversation about  07:20
18  important happenings in society.                   07:20
19  BY MR. BROOME:                                    07:20
20  Q.  Okay.  When you're trying to determine       07:20
21  internet users' knowledge about a particular topic, what  07:20
22  is the benefit of a survey as opposed to some other form  07:20
23  of research?                                       07:20
24       MR. STRAITE:  Objection.  Vague.  Objection as  07:20
25  to form.  Objection.  Relevance.                  07:20
```

4 (Pages 10 - 13)

1    THE WITNESS: We are often interested in how    07:20
2  much people know about particular aspects of the    07:20
3  intersection of marketing and media, marketing policy,    07:20
4  what companies do and don't do with their data.    07:20
5    That's one way to try to understand what    07:20
6  people -- what -- how the world is working with    07:20
7  Americans.    07:21
8  BY MR. BROOME:
9    Q.  And what are the other ways that you can use    07:21
10  to get at that same answer?    07:21
11    A.  What do you mean?  Could you rephrase what the    07:21
12  question is?    07:21
13    MR. STRAITE: Let me get my objection in.    07:21
14  Objection.  Vague.  Objection.  Relevance.    07:21
15  Objection as to form.    07:21
16  BY MR. BROOME:    07:21
17    Q.  Yeah.  You said surveys are one way that we    07:21
18  can research, you know, internet users' understanding of    07:21
19  what's happening online.    07:21
20    What are the other ways?    07:21
21    A.  Well, I wouldn't -- I think that is a -- a    07:21
22  way of doing it.    07:21
23    I've also done studies of how the industries    07:21
24  operate.    07:21
25    And in the case before us, I've been asked to    07:21

Page 14

1  look at the language of terms and conditions of privacy    07:21
2  policies to try to understand what a kind of reasonable    07:21
3  person would take out of those materials with respect to    07:21
4  Chrome syncing, un-syncing.    07:22
5    Q.  Uh-huh.  Okay.    07:22
6    And what methodology did you apply in order to    07:22
7  arrive at your opinions in this case?    07:22
8    A.  Well, I approached it in a variety of ways.    07:22
9    I have a strong background in understanding    07:22
10  the nature of the -- material nature of the technology.    07:22
11  I was an English major.  I have a sensitivity to    07:22
12  language.  I read the materials very closely, and tried    07:22
13  to understand the plain language, the plain meaning of    07:22
14  the language, as they are stated across the privacy    07:22
15  notices and the policies that I read.    07:22
16    It also turns out that I read -- that I came    07:22
17  across -- and we can talk about this -- a comment by --    07:22
18  or a writing in an article by Bennett Cyphers, who's a    07:22
19  chief technologist for the Electronic Frontier    07:22
20  Foundation, who essentially corroborated my    07:22
21  interpretation in an article of his, almost exactly.    07:23
22    So it isn't just my interpretation.  It's the    07:23
23  corroboration of my interpretation in the wild, as it    07:23
24  were.    07:23
25    Q.  Your understanding of Mr. Cyphers' article is    07:23

Page 15

1  that it corroborates your opinions almost exactly?    07:23
2    Is that what I understood you to say?    07:23
3    A.  Mm-hm.  Yes.    07:23
4    Q.  And have you spoken to Mr. Cyphers about his    07:23
5  article?    07:23
6    A.  Not -- no, not about the article.  I had    07:23
7  communication by e-mail with him several weeks before on    07:23
8  a totally different context having to do with an opinion    07:23
9  piece I was thinking of writing, which never went    07:23
10  anywhere.    07:23
11    The way I got to his article was I teach a    07:24
12  class called advertising and society.  And we were going    07:24
13  to -- I was going to talk in one of the classes about    07:24
14  the deprecation of the third-party cookie and FLoC.    07:24
15  I had assigned some things for them to read, but I was    07:24
16  also reading materials separately and came across this    07:24
17  particular article.  And as I was reading it, I said,    07:24
18  "Hey, this has something to do with what I'm doing    07:24
19  research for regarding the case in front of us."    07:24
20    Q.  Okay.  So I want to go back to the question I    07:24
21  asked you before.  And we will come back to Mr. Cyphers'    07:24
22  article later in the deposition.    07:24
23    Okay.  I asked you what methodology did you    07:24
24  apply in order to arrive at your opinion in this case?    07:24
25  And you listed off several I guess elements of your    07:24

Page 16

1  approach.    07:24
2    A.  Yes.    07:24
3    Q.  You said "I approached it in a variety of    07:24
4  ways."    07:24
5    One, you said you have a strong background in    07:25
6  understanding the nature -- the nature of -- I'm not    07:25
7  sure what that says.  But let me withdraw that.    07:25
8    I think you said that you were an English    07:25
9  major?    07:25
10    A.  I was, yes.    07:25
11    Q.  You have a sensitivity to language?    07:25
12    A.  Mm-hm.    07:25
13    Q.  And you read the materials very closely.    07:25
14    Is there anything else that you'd like to    07:25
15  identify -- and sorry -- and the Cyphers article.    07:25
16    Is there anything else beyond that you would    07:25
17  identify as part of the methodology that you applied in    07:25
18  reaching your opinions in this case?    07:25
19    A.  I would say those are the dominant ones, yes.    07:25
20    Q.  Okay.  And are those -- is the average    07:25
21  American an English major?    07:25
22    A.  I wouldn't used the word average American.    07:25
23    MR. STRAITE: Let me get my objections in.    07:25
24  Objection.  Relevance.    07:25
25  ///

Page 17

5 (Pages 14 - 17)

1 BY MR. BROOME:                    07:26
2    Q.  You wouldn't use the words average American.  07:26
3       Okay.  What words would you use?          07:26
4    A.  We're talking about a reasonable person here.  07:26
5 Average American is a statistical position or a    07:26
6 nonsensical one.                    07:26
7       But we're talking here about a reasonable  07:26
8 person reading plain language and its meaning.    07:26
9    Q.  Okay.  You would agree that most people are  07:26
10 not English majors; fair?              07:26
11   A.  I would agree.                  07:26
12      MR. STRAITE:  Objection.  Calls for      07:26
13 speculation.                      07:26
14 BY MR. BROOME:                    07:26
15   Q.  And would you agree that most people do not  07:26
16 read privacy policies very closely?          07:26
17      MR. STRAITE:  Objection.  Relevance.      07:26
18 Objection.  Vague.                  07:26
19      THE WITNESS:  It's -- it is true that privacy  07:26
20 policies are opaque.  I would argue that they are  07:26
21 written as if they were purposefully opaque.    07:26
22      But the position here is not that people are  07:26
23 reading privacy policies.  The position here is that  07:26
24 whether or not they read the privacy policy, they would  07:26
25 come to the same conclusion.              07:27

*Page 18*

1 BY MR. BROOME:                    07:27
2    Q.  Okay.                      07:27
3    A.  Language that Google has set forth with the  07:27
4 words "sync" and "un-sync," the way in which Google    07:27
5 presents the entry to using Chrome when you sign up, you  07:27
6 don't have to read the privacy policy to make -- draw  07:27
7 the conclusion that there is a fundamental difference  07:27
8 between what Google does with syncing and un-syncing    07:27
9 when it comes to people's information.        07:27
10   Q.  Is the methodology that you applied in      07:27
11 rendering your opinions in this case one that is    07:27
12 accepted in your field of research?          07:27
13      MR. STRAITE:  Objection.  Vague.        07:27
14      THE WITNESS:  I don't even know what that    07:27
15 means, to be honest.  Because this -- the -- what I was  07:27
16 asked to do here is to be an expert witness, bringing my  07:27
17 knowledge and my interpretive ability to the situation.  07:27
18 This is not something I do as an everyday part of my    07:27
19 work.  It is something that I can bring to the table as  07:27
20 an expert in the area.                07:28
21 BY MR. BROOME:                    07:28
22   Q.  Have you ever been asked to render an opinion  07:28
23 on what reasonable people think about any particular  07:28
24 topic?                        07:28
25   A.  Let me think.                  07:28

*Page 19*

1    I was involved in a case with Vizio where I    07:28
2 was asked to be an expert witness and part of that    07:28
3 involved reading Vizio's policies and trying to get the  07:28
4 plain meaning of the policies.  So I would say yes.    07:28
5    Q.  Okay.  And did you publish a report in that  07:28
6 case?                        07:28
7    A.  I believe there's a report.  I don't know if  07:28
8 it got published.                  07:28
9    Q.  Well, I mean, did you --            07:28
10   A.  It was part of the case.            07:28
11   Q.  -- send in a report that was filed in the    07:28
12 case?                        07:28
13   A.  Yes, I did.                    07:28
14   Q.  Okay.  And aside from that -- aside from the  07:29
15 Vizio case, can you think of any other examples of where  07:29
16 you've been -- rendered an opinion on what reasonable  07:29
17 people think?                    07:29
18   A.  No.                      07:29
19   Q.  And in the Vizio case, were you asked to opine  07:29
20 on what reasonable people think?          07:29
21   A.  I believe that was the remit.  I'm not -- I    07:29
22 don't remember the exact words, but essentially that's  07:29
23 what I did.                      07:29
24   Q.  Did you describe the methodology that you used  07:29
25 to render your opinions in this case as one that is    07:29

*Page 20*

1 accepted in your field of research as reliable?    07:29
2      MR. STRAITE:  Objection.  Vague.  Objection.  07:29
3 Relevance.                      07:29
4      THE WITNESS:  I would say that there's a    07:29
5 tradition within communication search of rhetoric where  07:29
6 people look at the language and try to understand the  07:29
7 meaning that communicators provide in their language.  07:29
8 So I do think that there is a tradition within the    07:30
9 field, yes.                      07:30
10 BY MR. BROOME:                    07:30
11   Q.  Okay.  What do you mean by "a tradition"?    07:30
12   A.  Rhetoricians look at language and they look at  07:30
13 other things but language -- aside from language.  But  07:30
14 rhetoricians look at language and they try to unpack the  07:30
15 meaning of language.  That's what people do.  And it is  07:30
16 a strong tradition going all the way back to Socrates in  07:30
17 the field.                      07:30
18   Q.  Are you a rhetorician?            07:30
19   A.  I have some background in rhetoric.  That's    07:30
20 why I brought up my being an English major.  There are  07:30
21 elements of being an English major that relates to    07:30
22 rhetoric, yes.                    07:30
23   Q.  Okay.  And those are undergraduate courses;    07:30
24 correct?                      07:30
25   A.  I was a graduate student as well.  I got a    07:30

*Page 21*

1 Ph.D. But my undergraduate tradition -- my      07:30
2 undergraduate major was in English.      07:30
3          I took American studies classes which also      07:30
4 relate to textual analysis when I was a graduate      07:31
5 student, yes.      07:31
6    Q.  Okay.  Which classes did you take when -- I'm      07:31
7 sorry.  Let me back up.      07:31
8          When you say you were a graduate student, are      07:31
9 you referring to when you were doing your Master's or      07:31
10 your Ph.D.?      07:31
11    A.  They came together.  But Ph.D.      07:31
12    Q.  Okay.  And you took classes on -- say that      07:31
13 again.  Which classes did you --      07:31
14    A.  I took classes in American studies, for      07:31
15 example, where I looked at -- I remember this.  The      07:31
16 paper was about the ways in which Saturday Evening Post      07:31
17 short stories depicted the roles of men in women in 1905      07:31
18 compared to 1955.  And it involved a textual analysis of      07:31
19 the -- of magazine short stories across decades, across      07:31
20 those two decades.      07:31
21          I did an analysis for on a folklore class      07:31
22 on -- this was in graduate school, looking at -- in      07:32
23 fact, the entire class was about how to analyze      07:32
24 folktales textually, and what we can infer through      07:32
25 looking at the language in folktales.      07:32

Page 22

1    Q.  Okay.  Is it your opinion that you can      07:32
2 reliably determine internet users' expectations on a      07:32
3 particular -- with respect to a particular topic without      07:32
4 surveying them about that topic?      07:32
5    A.  Well --      07:32
6          MR. STRAITE:  Objection -- let me get      07:32
7 objections in.      07:32
8          THE WITNESS:  Yeah.      07:32
9          MR. STRAITE:  Objection.  Relevance.      07:32
10 Objection.  Misstates his report.      07:32
11          THE WITNESS:  Yeah.  I'm not talking about      07:32
12 expectations here, sir.  I'm talking about the plain      07:32
13 language of the policies that you people have put out in      07:32
14 front of individuals.  It has nothing to do with      07:32
15 expectation.      07:32
16 BY MR. BROOME:      07:32
17    Q.  Interpretations?      07:32
18    A.  Well, it's interpretations.  That's very      07:32
19 different from expectations.      07:32
20    Q.  Understood.  Okay.      07:32
21          Let me ask the question again then with that      07:33
22 clarification.      07:33
23          Can you reliably determine how reasonable      07:33
24 people would interpret a particular disclosure without      07:33
25 surveying them about how they interpret that disclosure?      07:33

Page 23

1    A.  In the case that we're talking about, the      07:33
2 answer has to be yes.  It is so straightforward.  And      07:33
3 there are no -- a survey on this type of thing would      07:33
4 involve trying to understand contradictions, trying to      07:33
5 understand tensions.      07:33
6          The way in which Google documents here are      07:33
7 presented are so straightforward that it would be very      07:33
8 difficult not to make the -- to draw the meanings that      07:33
9 I propose in my report.      07:33
10    Q.  Is it so straightforward that you wouldn't      07:33
11 even really need an expert opinion to opine on what      07:33
12 reasonable people think?      07:33
13    A.  Well, I was asked to do this, and I've done it      07:33
14 to the best of my ability.  And I think that -- I think      07:33
15 that anybody who approached this material would -- in a      07:34
16 neutral way would come to the same conclusions that I      07:34
17 have.  I honestly genuinely believe that.      07:34
18    Q.  Okay.  So is it so straightforward that you      07:34
19 don't need an expert opinion to opine on what reasonable      07:34
20 people think what about Google?      07:34
21          MR. STRAITE:  Asked and answered.  And I think      07:34
22 verbatim you just asked him.      07:34
23          THE WITNESS:  That's not my -- I didn't make      07:34
24 the decision to hire me.      07:34
25 ///

Page 24

1 BY MR. BROOME:      07:34
2    Q.  No.  I'm asking your opinion.      07:34
3    A.  I can't make that opinion.  I really -- my      07:34
4 sense is that I was hired because I could opine on      07:34
5 something where I have a background and have the      07:34
6 facility to draw a conclusion.      07:34
7          If it were complex, I would say so.  Maybe the      07:34
8 issue was to see whether someone with my ability would      07:34
9 find complexities that were untapped by the people who      07:35
10 were asking me to do work.      07:35
11          But it is quite straightforward, remarkably      07:35
12 straightforward.      07:35
13    Q.  Okay.  Do you believe that when researching      07:35
14 internet users' interpretations or expectations, that      07:35
15 context is important?      07:35
16          MR. STRAITE:  Objection.  Relevance.      07:35
17 Objection.  Vague.      07:35
18          THE WITNESS:  I'm sorry that you keep putting      07:35
19 expectations and interpretations together because      07:35
20 they're fundamentally different.      07:35
21 BY MR. BROOME:      07:35
22    Q.  Okay.  So let me break it down.      07:35
23          Do you believe that you could -- do you      07:35
24 believe that when researching consumer interpretations,      07:35
25 context is important?      07:35

Page 25

7 (Pages 22 - 25)

CONFIDENTIAL

| | |
|---|---|
| 1 And let me give you an example. 07:35 | 1 I'm not looking at the people themselves. 07:37 |
| 2 A. Mm-hm. 07:35 | 2 There's a big difference. 07:37 |
| 3 Q. If a survey of Apple users indicated that they 07:35 | 3 The way you're asking the question, it's -- 07:37 |
| 4 generally did not understand Apple's privacy policy, 07:35 | 4 makes it -- implies that I'm looking at the people. 07:37 |
| 5 that does not necessarily mean that Amazon users would 07:36 | 5 I'm looking at the language that a reasonable 07:37 |
| 6 not understand Amazon's privacy policy; correct? 07:36 | 6 person would get a meaning from. That's a very 07:37 |
| 7 MR. STRAITE: Objection as to form. 07:36 | 7 different story. 07:37 |
| 8 Objection. Relevance. 07:36 | 8 MR. BROOME: Understood. 07:38 |
| 9 THE WITNESS: The way you put it, yes, it's 07:36 | 9 BY MR. BROOME: 07:38 |
| 10 correct. The logic of it, yeah. 07:36 | 10 Q. I'm actually asking about your -- let's put 07:38 |
| 11 BY MR. BROOME: 07:36 | 11 this sort of in the framework of your use of surveys 07:38 |
| 12 Q. Right. Okay. 07:36 | 12 previously; right? You conducted -- 07:38 |
| 13 The policies could be completely different; 07:36 | 13 A. Yeah. But that's not what I'm here for. I 07:38 |
| 14 correct? 07:36 | 14 mean, I could talk about my surveys, but that's not what 07:38 |
| 15 MR. STRAITE: Same objections. 07:36 | 15 my remit was, sir. I mean -- 07:38 |
| 16 THE WITNESS: Yes. 07:36 | 16 Q. Understood. 07:38 |
| 17 BY MR. BROOME: 07:36 | 17 A. -- my theories have nothing to do with what I 07:38 |
| 18 Q. All right. And they could be describing 07:36 | 18 wrote here. 07:38 |
| 19 different technologies; correct? 07:36 | 19 Q. We all agree about that. I agree. 07:38 |
| 20 MR. STRAITE: Same objections. 07:36 | 20 But -- and I agree, at least insofar as you 07:38 |
| 21 THE WITNESS: Yeah. Given your hypothetical, 07:36 | 21 didn't conduct any surveys here. But I think that's 07:38 |
| 22 yes. 07:36 | 22 kind of what I'm trying to get at. And I want to -- 07:38 |
| 23 BY MR. BROOME: 07:36 | 23 MR. STRAITE: Are you testifying or are you 07:38 |
| 24 Q. And they could be describing things in 07:36 | 24 asking a question here? 07:38 |
| 25 different ways, one more user friendly than the other; 07:36 | 25 BY MR. BROOME: |
| Page 26 | Page 28 |

| | |
|---|---|
| 1 correct? 07:36 | 1 Q. I want to ask you some questions -- 07:38 |
| 2 MR. STRAITE: Objection. Same objection. 07:36 | 2 A. Yeah. 07:38 |
| 3 Also objection as to incomplete hypothetical. | 3 Q. -- about your process and other context. 07:38 |
| 4 THE WITNESS: They could. I mean, we could 07:36 | 4 A. Sure. 07:38 |
| 5 get into a whole discussion of the rhetoric of user 07:36 | 5 Q. Okay. Would you agree that -- the fact that 07:38 |
| 6 friendly, but we won't do that now. 07:36 | 6 reasonable people might be confused about one paragraph 07:38 |
| 7 BY MR. BROOME: 07:36 | 7 of a privacy policy does not mean that they would be 07:38 |
| 8 Q. Maybe we will later. 07:36 | 8 confused about the next paragraph of the same policy? 07:38 |
| 9 A. Yes. 07:36 | 9 MR. STRAITE: Objection. Incomplete 07:39 |
| 10 Q. Okay. And it's also important when 07:36 | 10 hypothetical. Objection. Relevance. 07:39 |
| 11 researching internet users' interpretations, the 07:36 | 11 THE WITNESS: I think that it depends on the 07:39 |
| 12 particular provision at issue is also important; 07:37 | 12 paragraphs. Depends on how they were juxtaposed. I 07:39 |
| 13 correct? 07:37 | 13 would argue that confusion in one paragraph or explicit 07:39 |
| 14 A. Say that again, please. 07:37 | 14 understanding in one paragraph could relate to the next 07:39 |
| 15 Q. Yeah. That was not a very good question. 07:37 | 15 paragraph. 07:39 |
| 16 When you're researching internet users' 07:37 | 16 So, for example, if one makes a statement 07:39 |
| 17 interpretations of a privacy policy, for example, the 07:37 | 17 about syncing and un-syncing in one paragraph, and then 07:39 |
| 18 particular provision at issue is important; correct? 07:37 | 18 makes another statement about syncing and un-syncing in 07:39 |
| 19 MR. STRAITE: Objection. Vague. Objection 07:37 | 19 another paragraph, the context can be important. You 07:39 |
| 20 relevance. 07:37 | 20 know, the two can come together, yes. 07:39 |
| 21 THE WITNESS: I think you're phrasing the 07:37 | 21 BY MR. BROOME: 07:39 |
| 22 question incorrectly given my remit. 07:37 | 22 Q. Thank you. 07:39 |
| 23 I -- my remit was to look at the language of 07:37 | 23 And would you agree that reasonable people 07:39 |
| 24 the privacy policies and the terms and conditions, and 07:37 | 24 might interpret a privacy policy differently, depending 07:39 |
| 25 to say what a reasonable person would get out of it. 07:37 | 25 on whether they had been exposed to a different document 07:39 |
| Page 27 | Page 29 |

8 (Pages 26 - 29)

1 before reading the privacy policy?          07:39
2    A.  No.  I --                             07:39
3       MR. STRAITE:  Objection.  Relevance.   07:39
4 Objection.  Incomplete hypothetical.  Objection --  07:39
5       THE WITNESS:  No.  I don't think -- I think  07:39
6 that --                                      07:39
7       THE COURT REPORTER:  Excuse me.  I'm sorry.  I  07:39
8 need you to pause, please, Professor Turow.  I apologize  07:39
9 for interrupting but I -- there was overlap so I didn't  07:39
10 get everything.                             07:39
11      MR. STRAITE:  I just remind Professor Turow  07:39
12 that it's better to wait for me to get my objections on  07:40
13 than to answer the question.  You still do need to  07:40
14 answer.                                     07:40
15      THE WITNESS:  I apologize.             07:40
16      So, Mr. Broome, could you rephrase it?  07:40
17      MR. BROOME:  Yep.                      07:40
18 BY MR. BROOME:
19   Q.  Interpret users -- well, let me strike that.  07:40
20      Reasonable people might interpret a privacy  07:40
21 policy differently depending on whether they have  07:40
22 previously read a related document that explains certain  07:40
23 of the information in the privacy policy.   07:40
24      MR. STRAITE:  Same objections as before.  07:40
25 Incomplete hypothetical.  Objection as to relevance.  07:40

Page 30

1 Objection.  Vague.                          07:40
2       THE WITNESS:  Yeah.  I have a hard time  07:40
3 making -- drawing a conclusion about that because so  07:40
4 much of it would depend on what it is that people are  07:40
5 reading.                                    07:41
6       The -- in terms of what I have written, it's  07:41
7 quite clear that all the documents converge to tell  07:41
8 people that syncing is fundamentally different in terms  07:41
9 of personal information given out from un-syncing.  07:41
10      If we're talking about that, I have no problem  07:41
11 making the statement that the documents work together  07:41
12 to -- if a person were to read them, all of them, work  07:41
13 together to assure an individual that if you do not sync  07:41
14 your information, it will not be stored and used by  07:41
15 Google.                                     07:41
16 BY MR. BROOME:
17   Q.  Well, are you certain that you have all the  07:41
18 documents that relate to that topic?        07:41
19      MR. STRAITE:  Objection.  Vague.  Objection.  07:41
20 Argumentative.                              07:41
21      MR. BROOME:  Let me ask it slightly     07:41
22 differently actually.  Hold on.  Sorry.  I'll withdraw  07:41
23 that question.                              07:41
24      THE WITNESS:  Okay.                     07:41
25 ///

Page 31

1 BY MR. BROOME:                              07:41
2    Q.  When you refer to the documents here as being  07:41
3 so unequivocally clear, which documents are you  07:42
4 referring to?                               07:42
5    A.  The sign-in document when one signs in for the  07:42
6 first time to Chrome, and the uses and permissions,  07:42
7 terms and conditions document, and the privacy notice  07:42
8 by Chrome and the privacy policy by Google.  07:42
9       Particularly the last two on the sign-in are  07:42
10 the most relevant.                          07:42
11   Q.  Okay.  And do you know whether the sign-in is  07:42
12 shown to all people who use Chrome?          07:42
13      MR. STRAITE:  Objection.  Calls for       07:42
14 speculation.                                07:42
15      THE WITNESS:  I don't know for a fact.  But I  07:42
16 myself went through the process of reinstalling Chrome  07:42
17 and found what I saw that is very much what I was told  07:42
18 is there, yes.                              07:43
19 BY MR. BROOME:                              07:43
20   Q.  Okay.  But you're not certain whether all  07:43
21 people who -- all Chrome users actually go through that  07:43
22 sign-in process?                            07:43
23      MR. STRAITE:  Same objection.  Asked and  07:43
24 answered.                                   07:43
25      THE WITNESS:  I would assume that in order to  07:43

Page 32

1 get onto Chrome, you would have to sign in.  07:43
2 BY MR. BROOME:                              07:43
3    Q.  Okay.  Have you done any research into whether  07:43
4 that is true or is it just merely an assumption?  07:43
5    A.  No.  It's -- I have not personally done any  07:43
6 research.                                   07:43
7    Q.  Okay.  Would you agree that Google is a very  07:43
8 well-known company among internet users in the  07:43
9 United States?                              07:43
10      MR. STRAITE:  Objection.  Relevance.  07:43
11 Objection.  Vague.                          07:43
12      THE WITNESS:  Certainly well known, yes.  07:43
13 BY MR. BROOME:                              07:43
14   Q.  Okay.  And would you agree that internet  07:43
15 users' expectations as to whether Google is receiving  07:43
16 data when users browse online might be different than  07:43
17 their expectations as to whether some lesser-known  07:43
18 company is receiving data when users browse online?  07:43
19      MR. STRAITE:  Objection.  Vague.  Objection.  07:44
20 Relevance.                                  07:44
21      THE WITNESS:  I'm not sure why that would  07:44
22 relate to what I was supposed to study here.  07:44
23      In other words, I'm -- again, we're talking  07:44
24 about what the documents tell people.  But if you were  07:44
25 asking me to opine, I would say that people would have  07:44

Page 33

9 (Pages 30 - 33)

| Page 34 | Page 36 |
|---|---|

**Page 34**

1 certain expectations of Google, but the documents speak 07:44
2 for themselves. They -- and the sign-in speaks for 07:44
3 itself. And the distinctions speak for themselves. And 07:44
4 I think people would -- would read the distinctions and 07:44
5 believe it because Google said so. 07:44
6 BY MR. BROOME:
7 Q. Okay. I understand that you want to focus 07:44
8 this on specific documents but I'm allowed to ask 07:44
9 questions more broadly. So -- 07:44
10 A. Okay. 07:44
11 Q. -- I think I sort of got part of an answer to 07:44
12 my question, but let me just ask it again. 07:44
13 Would you agree that internet users' 07:45
14 expectations as to whether Google is receiving data 07:45
15 when they browse online might be different than their 07:45
16 expectations as to whether some lesser-known company is 07:45
17 receiving their data when they browse online? 07:45
18 MR. STRAITE: Objection. Asked and answered. 07:45
19 And objection for all the other reasons. Calls for 07:45
20 speculation. 07:45
21 THE WITNESS: I have to tell you, Mr. Broome, 07:45
22 it's really an interesting question because the answer 07:45
23 could be the expectations could be that Google is taking 07:45
24 more information or less information, depending upon the 07:45
25 company they're -- the other company we're comparing it 07:45

**Page 35**

1 to. 07:45
2 So it really varies from that standpoint. But 07:45
3 it -- so, yes, I -- it does -- there is a possibility 07:45
4 that people will see that difference. 07:45
5 BY MR. BROOME:
6 Q. Okay. Thank you. 07:45
7 You did not conduct any surveys specifically 07:45
8 for this -- for the purposes of the report that you 07:45
9 filed in this case; correct? 07:45
10 MR. STRAITE: Objection. Asked and answered. 07:45
11 THE WITNESS: Yeah. I'm not only -- I don't 07:45
12 think a survey would be useful. 07:46
13 BY MR. BROOME:
14 Q. And why is that? 07:46
15 A. The reasons I said before. The surveys are 07:46
16 done to try to figure out in this kind of environment 07:46
17 whether people understand tensions, misunderstandings 07:46
18 between two documents. 07:46
19 In this case, the documents are quite clear, 07:46
20 noncontradictory, straightforward. And it doesn't seem 07:46
21 to me that it would be useful to do a survey. 07:46
22 Q. Well, say a survey was done. Let's assume a 07:46
23 survey was done and that it showed it was 07:46
24 inconsistent -- let me take it back. Let me strike that 07:46
25 and start again. 07:46

**Page 36**

1 Let's assume a survey was done -- 07:46
2 A. Mm-hm. 07:46
3 Q. -- a survey to determine how reasonable people 07:46
4 interpret the same statements in the Chrome privacy 07:46
5 notice that your report focuses on. 07:46
6 And let's say that you agreed that survey was 07:46
7 properly conducted and that the survey results were 07:46
8 inconsistent with your opinion. 07:46
9 Which would you say is more reliable, the 07:47
10 survey results of actual internet users or the 07:47
11 Professor -- the opinion of Professor Turow? 07:47
12 A. I can't -- 07:47
13 MR. STRAITE: Objection -- let me get the 07:47
14 objection in. 07:47
15 Objection. Incomplete hypothetical. 07:47
16 THE WITNESS: Yeah. I'm not -- that is such 07:47
17 a hypothetical on top of a hypothetical on top of a 07:47
18 hypothetical that I can't answer. 07:47
19 MR. BROOME: Okay. 07:47
20 THE WITNESS: It's just not a useful way to 07:47
21 think about the problem. 07:47
22 BY MR. BROOME:
23 Q. So you just -- in this case your opinion is 07:47
24 that surveys would not help in understanding how 07:47
25 reasonable people would interpret -- 07:47

**Page 37**

1 MR. STRAITE: Same objection. 07:47
2 BY MR. BROOME:
3 Q. -- from a privacy notice? 07:47
4 A. Yes. 07:47
5 Q. Okay. Just a few other sort of housekeeping 07:48
6 items here, Professor Turow. 07:48
7 You did not conduct any focus groups of 07:48
8 internet users specifically for purposes of your report 07:48
9 in this case; correct? 07:48
10 A. That's correct. 07:48
11 Q. And you did not otherwise talk to any other 07:48
12 internet users about any aspects of this case; correct? 07:48
13 A. Correct. 07:48
14 Q. Okay. Are your surveys based -- sorry -- are 07:48
15 your opinions based in any way on the surveys that you 07:48
16 conducted in other context, the eight surveys that are 07:48
17 mentioned in your report? 07:48
18 A. You know, I really hadn't thought of it that 07:48
19 way. I didn't make any connections between the surveys 07:48
20 that I've done and the report. If anything, when I read 07:48
21 Google's materials, they related more to my industry 07:49
22 search and my findings that too often it appears as 07:49
23 if the -- and I can't say it's purposeful, but it 07:49
24 appears as if the -- there are -- the writing is done as 07:49
25 if to make people understand things that really do not 07:49

**Page 38**

1 exist.                                    07:49
2    Q.  Can you elaborate on that?  Are you talking  07:49
3 about the Chrome privacy notice in particular?  07:49
4    A.  I think -- yeah.  It's clearly -- clearly the  07:49
5 rhetoric of the documents are to get people to -- and I  07:49
6 don't know, again, if it's purposeful or what.  I don't  07:49
7 know the industry stuff behind it.  But the language  07:49
8 clearly leads people to believe that if you un-sync,  07:49
9 Google will not use and share -- use your data, collect  07:50
10 your data.  If you sync, it will.            07:50
11       It just reminded me so often of some of the  07:50
12 things I find when I do a search of my own on various  07:50
13 parts of the industry.                     07:50
14    Q.  Okay.  Do you think that Chrome privacy notice  07:50
15 is intentionally opaque?                   07:50
16       MR. STRAITE:  Objection --            07:50
17       THE WITNESS:  I don't --              07:50
18       MR. STRAITE:  -- calls for speculation.  07:50
19       THE WITNESS:  Yeah.  I don't know if it's  07:50
20 intentional.                              07:50
21 BY MR. BROOME:                            07:50
22    Q.  Okay.  Do you think Chrome the privacy notice  07:50
23 is opaque?                                07:50
24    A.  I think it is -- it's not opaque, but it is --  07:50
25 it can easily -- it is designed -- not designed.  It  07:50

**Page 39**

1 gives people the sense that what's going on is not --  07:50
2 what's going on is not really what's going on.  07:51
3 That's -- that's the point.                07:51
4    Q.  Well, is the Chrome privacy notice clear, in  07:51
5 your opinion?                             07:51
6    A.  It's clear, yes.                    07:51
7    Q.  Okay.                             07:51
8    A.  It's not completely clear but it's clear in  07:51
9 the wrong way.                            07:51
10    Q.  Okay.                            07:51
11    A.  That's my point.  It's clear to make people  07:51
12 mistaken.  It's clear to get people to mistake what's  07:51
13 happening.                                07:51
14    Q.  Okay.  Are your opinions in this case based  07:51
15 on any of the surveys that you have conducted in your  07:51
16 career?                                   07:51
17       MR. STRAITE:  Objection.  Asked and answered.  07:51
18       THE WITNESS:  Yeah.  You did ask that.  The  07:51
19 answer --                                 07:51
20 BY MR. BROOME:                            07:51
21    Q.  I did ask it.  I'm not sure I got a clear  07:51
22 answer.                                   07:51
23    A.  The answer is no.                  07:51
24    Q.  No?                              07:51
25    A.  It's not directly based on anything that  07:51

**Page 40**

1 I...                                      07:51
2    Q.  Okay.  So when the judge is evaluating your --  07:52
3       THE COURT REPORTER:  Counsel, I'm sorry.  07:52
4       Professor Turow, could you do me a favor and  07:52
5 maybe scoot closer to the microphone?  Because I think  07:52
6 when you're back, I'm losing a little bit of the end of  07:52
7 your answer.                              07:52
8       THE WITNESS:  I apologize.            07:52
9       THE COURT REPORTER:  That's okay.  Thank you  07:52
10 so much.                                  07:52
11 BY MR. BROOME:                            07:52
12    Q.  So when the judge is evaluating your -- the  07:52
13 reliability of your opinions in this case, she does not  07:52
14 need to look to the fact that you conducted other  07:52
15 surveys; correct?                         07:52
16    A.  She should look to the fact that this is an  07:52
17 area of life that I have been studying for over  07:52
18 30 years.                                 07:52
19    Q.  Okay.  All right.  But your --       07:52
20    A.  The surveys and my industry research are part  07:52
21 of it, yes.  It sensitizes me to the kinds of things  07:52
22 we're talking about.                      07:52
23    Q.  It sensitizes you to the kinds of things that  07:52
24 we're talking about, but the surveys are not a basis in  07:52
25 any way for the opinions in your report; correct?  07:52

**Page 41**

1    A.  I would say yes.                   07:52
2    Q.  Have you ever conducted any surveys on the  07:52
3 topic of what internet users consider to be personal  07:53
4 information?                              07:53
5       MR. STRAITE:  Objection.  Relevance.  07:53
6 Objection.  Vague.                        07:53
7       THE WITNESS:  Not directly, no.        07:53
8 BY MR. BROOME:                            07:53
9    Q.  Indirectly?                       07:53
10    A.  There are laws -- as you know, there are laws  07:53
11 about what personal information is.  It's quite  07:53
12 straightforward.                          07:53
13    Q.  Oh, okay.                         07:53
14       And do reasonable people understand and are  07:53
15 they familiar with those laws?             07:53
16       MR. STRAITE:  Objection.  Vague.  Objection.  07:53
17 Relevance.                                07:53
18       THE WITNESS:  I don't know that I've done  07:53
19 research in that area.                    07:53
20 BY MR. BROOME:                            07:53
21    Q.  Do you think -- I mean, based on the research  07:53
22 that you've done over the course of your career, do you  07:53
23 believe that reasonable people are familiar with the  07:53
24 definition of personal information in various laws?  07:53
25       MR. STRAITE:  Objection.  Calls for  07:53

11 (Pages 38 - 41)

**Page 42**

1 speculation. Objection. Vague. Objection. Relevance 07:53
2 and calls for a legal conclusion.                   07:53
3         THE WITNESS: Yeah. I'm not -- I don't know.  07:53
4 I really don't know. It's -- I'm not sure it's       07:53
5 important in this time.                              07:53
6 BY MR. BROOME:                                       07:54
7     Q. Well, we'll leave that to a later proceeding, 07:54
8 whether it's important.                              07:54
9     A. Okay.                                         07:54
10     Q. But the answer -- your answer is that you    07:54
11 don't know?                                          07:54
12     A. I don't know if the population at large knows 07:54
13 what personal information is within the internet     07:54
14 industry.                                            07:54
15     Q. Have you ever done any research on what the   07:54
16 population at large considers to be personal information 07:54
17 in any industry?                                     07:54
18         MR. STRAITE: Objections as before. Calls for 07:54
19 a legal conclusion. Objection. Relevance. Objection. 07:54
20 Vague.                                               07:54
21         THE WITNESS: No.                            07:54
22 BY MR. BROOME:                                       07:54
23     Q. Okay. Have you conducted any surveys -- well, 07:54
24 actually, let's step back.                           07:54
25         Have you ever conducted any research at all on 07:54

**Page 43**

1 what the population at large considers to be personal 07:54
2 information in any industry?                         07:54
3         MR. STRAITE: Objection. Vague. Objection.    07:54
4 Calls for a legal conclusion. And asked and answered. 07:54
5         THE WITNESS: Yeah. I think you just asked    07:54
6 me, sir, and I said --                               07:54
7         THE COURT REPORTER: Sorry. I lost the last   07:55
8 word.                                                07:55
9         THE WITNESS: And I said no.                  07:55
10         THE COURT REPORTER: Thank you.              07:55
11 BY MR. BROOME:                                       07:55
12     Q. And you've never conducted any surveys on the 07:55
13 topic of how the population at large interprets any of 07:55
14 Google's disclosures; correct?                       07:55
15         MR. STRAITE: Objection. Asked and answered.  07:55
16         THE WITNESS: Correct.                        07:55
17 BY MR. BROOME:                                       07:55
18     Q. And you've never conducted any research on the 07:55
19 topic of how the population at large interprets any of 07:55
20 Google's disclosures; correct?                       07:55
21         MR. STRAITE: Objection. Asked and answered.  07:55
22         THE WITNESS: I think you just asked me that. 07:55
23 Correct.                                             07:55
24 BY MR. BROOME:                                       07:55
25     Q. Okay. Yeah. The first question was about     07:55

**Page 44**

1 surveys. The next question was research more generally. 07:55
2 But I can clarify that as I go.                      07:55
3         You've never conducted any research, including 07:55
4 surveys, of how the population at large -- strike that. 07:55
5 Let me start again.                                  07:55
6         You've never conducted any surveys of internet 07:56
7 users' expectations with respect to Chrome's sync    07:56
8 feature; correct?                                    07:56
9         MR. STRAITE: Objection. Relevance.           07:56
10 Objection. Vague.                                   07:56
11         THE WITNESS: It is correct. You're right.   07:56
12 BY MR. BROOME:                                       07:56
13     Q. And you've never conducted any other research 07:56
14 of how internet users -- of internet users' expectations 07:56
15 with respect to Chrome's sync feature; correct?     07:56
16         MR. STRAITE: Same objections. Asked and     07:56
17 answered.                                            07:56
18         THE WITNESS: Correct.                        07:56
19 BY MR. BROOME:                                       07:56
20     Q. And you've never conducted any survey of      07:56
21 internet users' expectations with respect to any other 07:56
22 Google product or service; correct?                 07:56
23         MR. STRAITE: Same objections.               07:56
24         THE WITNESS: Correct.                        07:56
25 ///                                                  07:56

**Page 45**

1         (Defendant's Exhibit 1 was                   07:56
2         marked for identification.)                  07:56
3 BY MR. BROOME:                                       07:57
4     Q. All right. Professor Turow, we're going to    07:57
5 show you a document, and while that's loading, let me 07:57
6 just ask you a couple of questions.                  07:57
7         Are you familiar with the documents that the 07:57
8 plaintiffs contend comprise their contract with Google? 07:57
9         MR. STRAITE: Hold on, Steve. We're trying to 07:57
10 load the document.                                  07:57
11         THE WITNESS: The contract being the privacy 07:57
12 policy? Is that what you mean?                       07:57
13 BY MR. BROOME:                                       07:57
14     Q. Well, there may be some --                    07:57
15         MR. BROOME: Sorry. Go ahead, David.         07:57
16         MR. STRAITE: Can you repeat the question so I 07:57
17 can get an objection in?                             07:57
18         MR. BROOME: Yeah. Why don't you guys get the 07:57
19 document up and then I'll start again. We'll -- I have 07:57
20 a few intro questions before we get to the document. 07:57
21         MR. STRAITE: Can you let me know when it's   07:58
22 uploaded? Because the folder is still empty.        07:58
23         And Sharon is confirming the same thing. It's 07:58
24 also empty.                                          07:58
25         MR. BROOME: Try again.                       07:58

CONFIDENTIAL

| | |
|---|---|
| 1    MR. STRAITE:  Looks like a .pdf just came up.  07:58 | 1    MR. STRAITE:  Just to be clear, Exhibit No. 1,  08:00 |
| 2    Okay.  We've got success.        07:58 | 2 Steve, it's marked as Exhibit 1 in the lower–hand  08:00 |
| 3    What's your question?        07:58 | 3 corner.  It bears Bates No. GOOG dash CABR, and then a  08:00 |
| 4 BY MR. BROOME:        07:58 | 4 long digit -- long series of numbers ending in 25.    08:00 |
| 5    Q.  Professor Turow, are you familiar with the    07:58 | 5    Is that the one we should have in front of us?    08:00 |
| 6 documents that the plaintiffs contend comprise their    07:58 | 6    MR. BROOME:  Yes.  Yes.  And I can provide the  08:00 |
| 7 contract with Google?        07:58 | 7 Bates numbers for you, if that would be helpful as we    08:00 |
| 8    MR. STRAITE:  Objection.  Relevance.      07:58 | 8 go.        08:00 |
| 9 Objection.  Calls for a legal conclusion.      07:58 | 9    MR. STRAITE:  Making sure we have the right    08:00 |
| 10    THE WITNESS:  And I asked you whether you mean 07:58 | 10 document.  It sounds like we do.  It's 43 pages?    08:01 |
| 11 the privacy notice, the privacy policy?  Is that what    07:58 | 11    MR. BROOME:  That's right.  Yeah.      08:01 |
| 12 you mean?        07:58 | 12 BY MR. BROOME:        |
| 13 BY MR. BROOME:        07:58 | 13    Q.  It says -- the beginning of the presentation,    |
| 14    Q.  Yeah.        07:58 | 14 Professor, it says "Consent Bump 2.0 for Narnia 2.0:    08:01 |
| 15    Well, I was really trying to get at if you    07:58 | 15 LAUNCHED UX."        08:01 |
| 16 know the specific documents that they are alleging    07:58 | 16    Do you see that?        08:01 |
| 17 comprise their contract with Google.  But, yes, the    07:58 | 17    A.  Yes, I do.        08:01 |
| 18 terms of service, the privacy policy, the --    07:58 | 18    Q.  And this was not -- I'll just represent to you  08:01 |
| 19    A.  Yes.        07:58 | 19 this was not listed among the materials that you relied  08:01 |
| 20    Q.  -- the privacy notice are among them?    07:58 | 20 on for purposes of your report.        08:01 |
| 21    A.  Mm-hm.        07:58 | 21    Is it safe to assume then that you haven't    08:01 |
| 22    Q.  I believe that's from certain points in time?  07:58 | 22 seen this before?        08:01 |
| 23    A.  Yes.        07:59 | 23    A.  I don't remember seeing it.        08:01 |
| 24    MR. STRAITE:  Same objections.      07:59 | 24    Q.  Okay.  If you look to the -- as Mr. Straite    08:01 |
| 25 /// | 25 pointed out, in the bottom right–hand corner of the    08:01 |
| Page 46 | Page 48 |

| | |
|---|---|
| 1 BY MR. BROOME:        07:59 | 1 document, there are what we call Bates numbers?    08:01 |
| 2    Q.  Okay.  And aside from those three documents,  07:59 | 2    A.  Yes.        08:01 |
| 3 are you aware of any other documents that the plaintiffs  07:59 | 3    Q.  Okay.  And I'm just going to reference like    08:01 |
| 4 contend comprise their contract with Google?    07:59 | 4 the last three digits so that we can orient ourselves in  08:01 |
| 5    MR. STRAITE:  Same objections as to relevance.  07:59 | 5 terms of page numbers.        08:01 |
| 6 And calls for a legal conclusion.        07:59 | 6    A.  Mm-hm.        08:01 |
| 7    THE WITNESS:  The only other one of course was  07:59 | 7    Q.  Okay?        08:01 |
| 8 the startup.        07:59 | 8    A.  Yes.        08:01 |
| 9 BY MR. BROOME:        07:59 | 9    Q.  And if you flip to the page that ends in 829.  08:01 |
| 10    Q.  The startup screen.  Right.  Okay.      07:59 | 10 This is the "New Account Creation" screen?      08:01 |
| 11    And in terms of your opinions in this case --  07:59 | 11    MR. STRAITE:  Just to be clear, for the    08:02 |
| 12 in terms of the Google disclosures that you reviewed for  07:59 | 12 record, Steve, do you want him to read the pages    08:02 |
| 13 purposes in forming your opinions, are they limited --  07:59 | 13 preceding this one?        08:02 |
| 14 are those documents limited to the terms of service, the  07:59 | 14    MR. BROOME:  Pardon me?        08:02 |
| 15 privacy policy, the Chrome privacy notice, and the    07:59 | 15    MR. STRAITE:  Do you want him to read the    08:02 |
| 16 startup screen?        07:59 | 16 pages that precede this one?        08:02 |
| 17    A.  The privacy notice, privacy policy, terms of    08:00 | 17    MR. BROOME:  He is welcome to.  I'm not -- I    08:02 |
| 18 conditions, and the startup screen.        08:00 | 18 don't think it's necessary but he is welcome to.    08:02 |
| 19    Q.  Okay.  So now I'm going to show you this    08:00 | 19    THE WITNESS:  So maybe first I should find out  08:02 |
| 20 document.  You have in front of you what's been    08:00 | 20 what your question is.        08:02 |
| 21 marked -- what are we marking it as?  Exhibit 1?    08:00 | 21 BY MR. BROOME:        08:02 |
| 22    Okay.  Have you seen this document before?    08:00 | 22    Q.  Yeah.  Okay.        08:02 |
| 23    A.  I may have seen it.  I don't remember it, to    08:00 | 23    So let's -- at any point when I'm asking you a  08:02 |
| 24 be honest.        08:00 | 24 question about a document, you should always feel free  08:02 |
| 25    Q.  Okay.        08:00 | 25 to listen to my question and then go back and review the  08:02 |
| Page 47 | Page 49 |

13 (Pages 46 - 49)

CONFIDENTIAL

1 document, if you need time.                        08:02
2      A.  All right.                                08:02
3      Q.  But let me ask you the question.          08:02
4      So this is a new account creation screen.     08:02
5 Beginning August 2016, this was the screen that was 08:02
6 shown to users who were creating Google accounts?   08:02
7      A.  Google.  Not Chrome.  Google.             08:02
8      Q.  Right.  Google accounts.                  08:02
9      And if you look, there's a screen, and then it 08:02
10 indicates that if you click "Next Step", it takes you to 08:02
11 "Privacy and Terms."                               08:03
12     A.  Yes.                                       08:03
13     Q.  Do you see that?                           08:03
14     A.  Yes, I do.                                 08:03
15     Q.  Have you seen any of the language in that  08:03
16 screen before?                                     08:03
17         MR. STRAITE:  Objection.  Foundation.     08:03
18         THE WITNESS:  To be honest, I can't read it. 08:03
19 It's too small.                                    08:03
20         MR. BROOME:  David, do you mind blowing it up 08:03
21 for him a bit?                                     08:03
22         MR. STRAITE:  By blowing it up, you mean   08:03
23 bigger?                                            08:03
24         MR. BROOME:  Dynamite.                     08:03
25         MR. STRAITE:  That was a joke.             08:03

Page 50

1      It's a little better.                         08:03
2      Sharon is going to zoom it.                   08:03
3         THE WITNESS:  Depending on your account    08:03
4 setting, some of the data may be associated with a new 08:03
5 account.  Repeat this data.                         08:03
6         THE COURT REPORTER:  I'm sorry, Doctor.  If 08:04
7 you read to yourself, I need to be able to hear.   08:04
8         THE WITNESS:  Sorry.                        08:04
9      "Depending on your account setting,           08:04
10 some of this data may be associated with           08:04
11 your Google Account and we treat this data         08:04
12 as personal information.  You can control          08:04
13 how we collect and use this data at                08:04
14 My Account."                                       08:04
15     And then in account settings, some of this    08:04
16 data may be used" --                               08:04
17         THE COURT REPORTER:  Excuse me.            08:04
18         THE WITNESS:  I'm sorry.                    08:04
19     "Depending on your account setting" -- I'm    08:04
20 reading it again.                                   08:04
21         MR. BROOME:  Yeah.  Well --                08:04
22         THE WITNESS:  -- "some of this data        08:04
23 may be associated with your Google account         08:04
24 and we treat this data as personal                 08:04
25 information.  You can control how we               08:04

Page 51

1      collect and use this data at My Account."     08:04
2      So I -- I understand that.  Yes, sir.         08:04
3 BY MR. BROOME:                                      08:04
4      Q.  Okay.  Yeah.  So let me walk you through it. 08:04
5      This was the screen that was shown to people  08:04
6 as they were setting up their Google accounts.     08:04
7      A.  If they were -- if they went to it.       08:04
8      Q.  What's that?                               08:05
9      A.  If they went to it; right?                08:05
10     Q.  If they were going to create a Google account, 08:05
11 this was the screen they would be shown.           08:05
12     A.  Well, what I'm asking is, is it shown whether 08:05
13 or not you want it to be shown or do you have to click 08:05
14 specifically to it to read it?                     08:05
15     Q.  If you wanted to create a Google account, you 08:05
16 would have to view the screen, and then we'll get to it 08:05
17 at the -- in the next page, you know, there's a -- you 08:05
18 have to scroll and then click "I agree."           08:05
19     A.  Okay.                                       08:05
20         MR. STRAITE:  Who's the witness?  I'm      08:05
21 confused.                                           08:05
22 BY MR. BROOME:                                      08:05
23     Q.  And then at the top it says "Privacy and  08:05
24 Terms"?                                             08:05
25     A.  Yes, it does.                              08:05

Page 52

1      Q.  Yeah.  And it says "By choosing 'I agree' 08:05
2 below you agree to Google's Terms of Service."      08:05
3      Do you see that?                               08:05
4      A.  Yes, I do.                                 08:05
5      Q.  "You also agree to our Privacy            08:05
6 Policy, which describes how we process              08:05
7 your information, including these key               08:05
8 points."                                            08:05
9      Do you see that?                               08:05
10     A.  Yes, I do.                                 08:05
11     Q.  Then it says "Data we process when you use 08:05
12 Google."                                            08:05
13     A.  Yes.                                       08:05
14     Q.  And then it says:                          08:05
15     "When you use Google services to do           08:05
16 things like write a message in gmail or            08:05
17 comment on a YouTube video, we store the           08:06
18 information you create."                            08:06
19     Do you see that?                               08:06
20     A.  Yes, I do.                                 08:06
21     Q.  And it says:                               08:06
22     "When you search for a restaurant on          08:06
23 Google Maps or watch a video on YouTube,           08:06
24 for example, we process information about          08:06
25 that activity - including information like         08:06

Page 53

14 (Pages 50 - 53)

CONFIDENTIAL

| | | |
|---|---|---|

**Page 54**

1 the video you watched, device IDs, IP    08:06
2 addresses, cookies" -- "cookie data and    08:06
3 location."    08:06
4     Do you see that?    08:06
5 A.  Yes, I do.    08:06
6 Q.  And then the next bullet, it says:    08:06
7     "We also process the kinds of    08:06
8 information described above when you use    08:06
9 apps or sites that use Google services,    08:06
10 like ads, Analytics, and the YouTube video    08:06
11 player."    08:06
12     Do you see that?    08:06
13 A.  Yes, I do.    08:06
14 Q.  Did you consider that language in forming your  08:06
15 opinions in this case?    08:06
16 A.  Yes.  I --    08:06
17     MR. STRAITE:  Objection as to foundation.  08:06
18 Objection as to relevance.    08:06
19     THE WITNESS:  I considered it in the terms and  08:06
20 conditions and privacy policies that I read.    08:06
21     What -- however, the same Chrome and Google    08:06
22 policies quite clearly carve out a distinction between  08:06
23 sync and un-sync when it comes to Chrome.    08:07
24 BY MR. BROOME:    08:07
25 Q.  You considered this precise language in    08:07

**Page 55**

1 forming your opinions, Professor Turow?  Is that your  08:07
2 testimony?    08:07
3 A.  No.  I'm not saying that.    08:07
4     I'm saying that there was language in terms    08:07
5 and conditions which may talk about certain tracking but  08:07
6 it's -- they always use sync and un-sync as distinct    08:07
7 categories that you -- that are treated differently.    08:07
8     MR. STRAITE:  And Joe cut me off before I    08:07
9 could get my objection in.  Objection as to foundation.  08:07
10 And all questions regarding this document, we're    08:07
11 objecting as to form.    08:07
12 BY MR. BROOME:    08:07
13 Q.  Okay.  Professor, I'll --    08:07
14 A.  I'm not sure why you're bringing this    08:07
15 particular privacy policy in as opposed to the ones that  08:07
16 I read.    08:07
17 Q.  Yeah.  Well, that's kind of my point.  And    08:07
18 unfortunately the -- for you, I guess, I'm not required  08:07
19 to explain my strategy throughout the case.  But, you    08:07
20 know, if you have questions about a particular    08:07
21 document --    08:07
22 A.  That's a rhetorical statement.  That's a    08:08
23 rhetorical statement, sir.    08:08
24     I think the -- my point about the carve-outs  08:08
25 and the distinctions relates to what I read, which is    08:08

**Page 56**

1 what a person who was going into Chrome would have read.  08:08
2 Q.  Is that right?  A person who's going into    08:08
3 Chrome would have read the Chrome privacy notice?  Is    08:08
4 that your opinion?    08:08
5 A.  If the person read the notice.  But certainly  08:08
6 if the person just went to the startup site, they would  08:08
7 have seen what I'm talking about.    08:08
8 Q.  And does the startup site say what is    08:08
9 collected in sync versus what is not collected in sync?  08:08
10 A.  It very strongly implies that the -- if you  08:08
11 un-sync, data will not be collected about you.    08:08
12 Q.  It doesn't say that, though, does it,    08:08
13 Professor Turow?    08:08
14     MR. STRAITE:  Objection.  Argumentative.    08:08
15     THE WITNESS:  The -- the distinction is made    08:08
16 quite clearly.    08:08
17 BY MR. BROOME:    08:08
18 Q.  It doesn't -- the startup screen does not say  08:08
19 that data will -- certain data will not be collected if  08:08
20 you don't sync, does it, Professor Turow?    08:09
21 A.  Well, let's go to the startup screen --    08:09
22     MR. STRAITE:  Hold on one second.    08:09
23 BY MR. BROOME:    08:09
24 Q.  Let's stay on this -- let's stay on this    08:09
25 document for now.  We can come back to that -- we can    08:09

**Page 57**

1 come back to that issue.    08:09
2     You testified that Google consistently    08:09
3 distinguishes between sync and un-sync.    08:09
4     Is that your testimony?    08:09
5 A.  Yes.    08:09
6 Q.  All right.  Now, looking at this document, I'd  08:09
7 like you to look at the next page, which shows the rest  08:09
8 of the screen.    08:09
9     MR. STRAITE:  Steve, this is the page that    08:09
10 ends in 830?    08:09
11     MR. BROOME:  Yes.    08:09
12     Let me know when you're done.    08:09
13     THE WITNESS:  Yes, sir.    08:09
14 BY MR. BROOME:    08:09
15 Q.  Does this screen say anywhere that Google will  08:09
16 not collect certain data when a user uses --    08:09
17     MR. STRAITE:  Hold on --    08:09
18 BY MR. BROOME:    08:09
19 Q.  -- Chrome without sync?    08:09
20     MR. STRAITE:  Steve, you have to repeat your  08:10
21 question.  The witness is having trouble with the    08:10
22 exhibit.    08:10
23     THE WITNESS:  Okay.    08:10
24     "Data we process when you use Google.    08:10
25     "When you use Google services, we do    08:10

15 (Pages 54 - 57)

CONFIDENTIAL

| | | |
|---|---|---|

1  things like write a message in gmail or        08:10
2  comment on a YouTube video" -- "to do        08:10
3  things like write a message in gmail or        08:10
4  comment on a YouTube video, we store the        08:10
5  information you create.        08:10
6      "When you search for a restaurant on        08:10
7  Google Maps or watch a video on YouTube,        08:10
8  for example" -- "for example, we process        08:10
9  information of that activity - including        08:10
10  information like the data watched, device        08:10
11  IDs, IP addresses, cookie data, and        08:10
12  location."        08:10
13      "We also process the kinds of        08:10
14  information described above when you use        08:10
15  apps or sites that use Google services,        08:10
16  like ads, Analytics, YouTube video player.        08:10
17      "Depending on your account settings,        08:10
18  some of the data may be associated with        08:10
19  your Google Account, and we treat this        08:10
20  data as personal information.  You can        08:10
21  control how we collect and use this data        08:10
22  at 'My Account.'        08:10
23      "Why we process it.        08:10
24      "We process this data for the        08:11
25  purposes described in our policy,        08:11
Page 58

1  testimony.        08:11
2      Same objection as the previous page.        08:12
3  Foundation.  Relevance.        08:12
4      THE WITNESS:  I've read it.  I don't see how        08:12
5  that relates to anything that I have written about.        08:12
6  BY MR. BROOME:        08:12
7      Q.  Does this screen say anywhere that Google will        08:12
8  not collect the data that this screen describes Google        08:12
9  collects --        08:12
10      A.  Does this screen --        08:12
11      Q.  Hold on.  Let me finish.        08:12
12      Does this screen say anywhere that Google will        08:12
13  not collect the data that the screen describes?        08:12
14      MR. STRAITE:  So, Steve, you're asking him to        08:12
15  read this page and look for --        08:12
16      MR. BROOME:  David, thank you.  You can limit        08:12
17  yourself to objections.  Thanks.        08:12
18  BY MR. BROOME:        08:12
19      Q.  Does this screen say anywhere that Google will        08:12
20  not collect the data when a Chrome user uses Chrome        08:12
21  without sync?        08:12
22      MR. STRAITE:  Same objections.        08:12
23      THE WITNESS:  This screen says nothing about        08:12
24  Chrome.        08:12
25  ///
Page 60

1  including to:        08:11
2      "Help our services deliver more        08:11
3  useful, customized content, such as more        08:11
4  relevant search results.        08:11
5      "Improve the quality of our service        08:11
6  and development of new ones.        08:11
7      "Deliver personalized ads, both on        08:11
8  Google Services and on sites and apps that        08:11
9  partner with Google.        08:11
10      "Improve security by protecting        08:11
11  against fraud and abuse, and;        08:11
12      "Conduct analytics and measurement to        08:11
13  understand how our services are used.        08:11
14      "Combining data.        08:11
15      "We also combine data among our        08:11
16  services and across your devices for these        08:11
17  purposes.  For example, we show you ads        08:11
18  based on information from your use of        08:11
19  search and gmail, and we use data from        08:11
20  trillions of search queries to build        08:11
21  spell-correction model that we use across        08:11
22  all our services."        08:11
23      I've read it, sir.  I don't see how it relates        08:11
24  to anything that I've heard.        08:11
25      MR. STRAITE:  Joe, before you give your        08:11
Page 59

1  BY MR. BROOME:        08:12
2      Q.  Right.        08:12
3      It says nothing about Chrome, and it says        08:12
4  nothing about sync; correct?        08:12
5      A.  That is correct.  But you're totally evading        08:13
6  the subject, sir.        08:13
7      Q.  Well --        08:13
8      A.  You're making up a story that has nothing to        08:13
9  do with the case.        08:13
10      Q.  Are you aware that each -- that at least        08:13
11  several of the plaintiffs saw this screen and clicked        08:13
12  "I agree"?        08:13
13      MR. STRAITE:  Objection.  Assumes facts not        08:13
14  in evidence.  Objection.  Relevance.  Objection.        08:13
15  Foundation.        08:13
16      THE WITNESS:  I know that everybody who signs        08:13
17  in, if they're forced to go through this screen, has to        08:13
18  say "Yes.  I agree."        08:13
19  BY MR. BROOME:        08:13
20      Q.  Okay.  And -- okay.  But this -- this        08:13
21  screen -- let's assume that the plaintiffs were shown        08:13
22  this screen, read it, and clicked "I agree."        08:13
23      Your opinion is that this screen        08:13
24  is irrelevant?        08:13
25      MR. STRAITE:  Objection.  Misstates the --        08:13
Page 61

16 (Pages 58 - 61)

CONFIDENTIAL

1 BY MR. BROOME:                    08:13
2   Q.  To issues in this case?        08:13
3   A.  Yes.  I -- it is irrelevant.  Yes.    08:13
4   Q.  And why is that?              08:13
5   A.  Because the sync and un-sync provisions quite  08:13
6 clearly indicate a carve-out distinction.    08:14
7   Q.  Are you aware of --           08:14
8   A.  It was designed to make people think that    08:14
9 there's a difference between sync and un-sync when it  08:14
10 comes to personal data.            08:14
11   Q.  Okay.  And we're going to get back to that    08:14
12 distinction.                       08:14
13   A.  That's exactly what you're asking me, sir.    08:14
14 This is exactly what I'm talking about.  You can't show  08:14
15 me a broad statement -- set of statements like this and  08:14
16 then make believe it's the same thing as the carve-out.  08:14
17 It's not.                           08:14
18   Q.  And where is the carve-out, Professor Turow?  08:14
19   A.  The carve-out are in the Chrome privacy    08:14
20 policy, in parts of the Google privacy policy, and even  08:14
21 in the very presentation of sync and un-sync in the    08:14
22 startup.                           08:14
23   Q.  Okay.  And your characterization of it,    08:14
24 Professor Turow, is that this is a general disclosure,    08:14
25 and that -- but if somebody read the Chrome privacy    08:14
                                    Page 62

1   Q.  And that interpretation or belief comes from  08:15
2 the Chrome privacy notice and the privacy policy.    08:15
3       Is that what you're saying?    08:15
4   A.  And the startup screen.        08:15
5       MR. STRAITE:  Same objection.    08:15
6 BY MR. BROOME:                    08:15
7   Q.  And the startup screen?        08:15
8   A.  Yes.                          08:15
9   Q.  Okay.  So if you read the general agreement,  08:15
10 and you clicked "I agree," and then you read those other  08:16
11 three documents that you just listed, your impression    08:16
12 would be that the data collection described in the    08:16
13 general agreement would not occur as long as you use    08:16
14 Chrome without sync enabled.        08:16
15       Is that your testimony?        08:16
16       MR. STRAITE:  Same objection.    08:16
17       THE WITNESS:  Data collection as it relates to  08:16
18 Chrome.  As it relates to Chrome.    08:16
19       MR. BROOME:  Okay.  Let's take a short break.  08:16
20 So 10 minutes?                     08:16
21       MR. STRAITE:  Okay.            08:16
22       Is that good for you?          08:16
23       THE WITNESS:  Yeah.  Are we going off the    08:16
24 record here?                       08:16
25       MR. BROOME:  Yeah.  We'll go off the record.  08:16
                                    Page 64

1 notice, that provides a carve-out.    08:14
2       Is that your testimony?        08:14
3       MR. STRAITE:  Objection.  Misstates earlier    08:14
4 testimony.                         08:14
5       THE WITNESS:  I'm saying that Google created a  08:14
6 strong impression through this language that there is a  08:15
7 distinction between sync and un-sync.  That is not at    08:15
8 all related to what you've shown me here, but it does    08:15
9 exist.                             08:15
10 BY MR. BROOME:                    08:15
11   Q.  Okay.  So I want to make sure I understand    08:15
12 you.                               08:15
13       So if a user read this disclosure and said,    08:15
14 "Okay, that's fine.  I agree with that," your testimony  08:15
15 is that if they then read the Chrome privacy notice,    08:15
16 they'd think, "Ah, but what is described in that account  08:15
17 holder document that I read won't happen if I use Chrome  08:15
18 without sync."                      08:15
19       Is that your testimony?        08:15
20       MR. STRAITE:  Objection.  Misstates earlier    08:15
21 testimony.  Objection.  Calls for speculation.    08:15
22       THE WITNESS:  But I do -- yes.  That if you do  08:15
23 not -- if you do not sync, information will -- about    08:15
24 your browsing behavior will not be sent.    08:15
25 BY MR. BROOME:
                                    Page 63

1       THE VIDEOGRAPHER:  All right.  We're off the  08:16
2 record 11:16 a.m.                   08:16
3       (Break taken in proceedings.)    08:34
4       THE VIDEOGRAPHER:  Wait, wait, wait.    08:35
5 We're back on the record at 11:35 a.m.    08:35
6 Go ahead.                          08:35
7 BY MR. BROOME:                    08:35
8   Q.  Professor Turow, welcome back.    08:35
9       I want to focus you back on Exhibit 1 and,    08:35
10 again, on the page ending in 829.    08:35
11   A.  829, yes, sir.                08:35
12   Q.  See in that second bullet there -- we went    08:35
13 over this before, it says:          08:35
14       "When you search for a restaurant or    08:35
15 Google Maps or watch a video on YouTube,    08:35
16 for example, we process information about    08:35
17 the activity - including information like    08:35
18 the video you watched, device IDs, IP    08:35
19 addresses, cookie data, and location."    08:35
20       Do you see that?              08:35
21   A.  Yes, I do.                    08:35
22   Q.  Now, putting aside the Chrome privacy notice  08:35
23 for now; right?                    08:35
24   A.  Okay.                        08:35
25   Q.  Would reasonable people believe that when they  08:35
                                    Page 65

17 (Pages 62 - 65)

1 search for a -- upon reading this, would reasonable    08:36
2 people believe it's clear that when they search for a    08:36
3 restaurant on Google Maps or watch a video on YouTube,    08:36
4 for example, that Google will process information about    08:36
5 that activity, including the video they watched, device    08:36
6 IDs, IP addresses, cookie data, and location?    08:36
7        MR. STRAITE: Objection. Incomplete    08:36
8 hypothetical. And relevance, and of course foundation.    08:36
9        THE WITNESS: Yeah. The answer is yes.    08:36
10 Although it's really an interesting question is what    08:36
11 people would get when it says "process information."    08:36
12 But it's another one of these words that I think is    08:36
13 designed to lead people astray.    08:36
14        But, yes, I -- they would certainly get the    08:36
15 meaning of that, the basic meaning of it.    08:36
16 BY MR. BROOME:    08:36
17    Q.  Okay.  And would reasonable people also find    08:36
18 it -- feel it -- find it's clear upon reading this that    08:36
19 Google will also process the same kinds of information    08:36
20 described in the previous bullet when they use apps or    08:37
21 sites that use Google services, liked ads, Analytics,    08:37
22 and YouTube video player?    08:37
23        MR. STRAITE: Same objections.    08:37
24        THE WITNESS: You mean it's the bullet that    08:37
25 comes afterwards?    08:37

Page 66

1 BY MR. BROOME:    08:37
2    Q.  Correct.    08:37
3    A.  "We also process the kinds of    08:37
4    information described above when you use    08:37
5    apps or sites that use Google services,    08:37
6    like ads, Analytics, and the YouTube video    08:37
7    player."    08:37
8        It -- yes.  It's vague, but it's there.    08:37
9    Q.  Okay.  I just want to make sure I completely    08:37
10 understand your testimony.    08:37
11        Your testimony is that if a user read this    08:37
12 and this data collection was clear to them, the Chrome    08:37
13 privacy notice and the privacy policy and the setup    08:37
14 screen would convey to the user that this data    08:37
15 collection will not occur if they use Chrome without    08:37
16 sync enabled?    08:37
17        Is that your?    08:37
18        MR. STRAITE: Objection. Misstates earlier    08:38
19 testimony.    08:38
20        THE WITNESS: Mr. Broome, you know, I read the    08:38
21 entire privacy policy.  If we move through this, it's    08:38
22 probable that we will find other kinds of information    08:38
23 that may -- as I did in other privacy policies, that    08:38
24 may, as I say, create carve-outs.    08:38
25        So I don't know why we're fixated just on this    08:38

Page 67

1 page.    08:38
2 BY MR. BROOME:    08:38
3    Q.  Okay.  But do you have an answer to my    08:38
4 question?    08:38
5        I mean, you described the Chrome privacy    08:38
6 notice as a carve-out.  It's a carve-out to what?    08:38
7    A.  A carve-out that says there's a distinction    08:38
8 between sync and un-sync in terms of giving up    08:38
9 information; conveying information to Google regarding    08:38
10 Chrome.    08:38
11    Q.  Okay.  Let's assume you have a reasonable    08:38
12 person who reads this agreement that we just looked at    08:38
13 in Exhibit 1.    08:38
14    A.  But this is not the entire agreement, sir.    08:38
15    Q.  But let me finish my hypothetical.    08:39
16        Let's --    08:39
17    A.  Go ahead.    08:39
18    Q.  Let's assume that we have a user who reviews    08:39
19 this agreement that describes a data collection process,    08:39
20 which you said is clear, and then they read the Chrome    08:39
21 privacy notice.    08:39
22        Is it your testimony that they would view what    08:39
23 is described in the Chrome privacy notice as a carve-out    08:39
24 to the data collection process that is described in this    08:39
25 account -- agreement?    08:39

Page 68

1    A.  Sir, you're showing me this --    08:39
2        MR. STRAITE: Let me get my objections in.    08:39
3        Objection. Foundation. Objection. Vague.    08:39
4 Incomplete hypothetical.    08:39
5        THE WITNESS: Sir, you're showing me a tiny    08:39
6 part of a privacy policy and asking me to draw    08:39
7 conclusions about how that relates to Google's approach    08:39
8 to this carve-out and to the Chrome privacy notice.    08:39
9        I can't make -- I don't want to make    08:39
10 statements based upon three bullets.  I'm sorry.    08:39
11 BY MR. BROOME:    08:40
12    Q.  Okay.  Well, I'll represent to you that what    08:40
13 is on -- that the screen on the page that we were just    08:40
14 reading from and the screen on the next page contain all    08:40
15 of the -- I'm not reading you a tiny portion.  That    08:40
16 contains all of the text in that -- in that account    08:40
17 holder agreement.    08:40
18    A.  May I look?    08:40
19    Q.  Yeah.    08:40
20    A.  Okay.  Let's go to the second page.    08:40
21        How many pages are there?    08:40
22    Q.  There's just two.  It's just -- these are    08:40
23 screen shots of a page that, you know, you would scroll    08:40
24 down so you can get to the "I agree" button.    08:40
25    A.  Okay.    08:40

Page 69

18 (Pages 66 - 69)

1      "When you use Google services to do    08:40
2  things like write a message in gmail or    08:40
3  comment on a YouTube video, we store the    08:40
4  information you create.    08:40
5      "When you search for a restaurant" --    08:40
6  saw this before -- "we process the kinds    08:40
7  of information described above when you    08:40
8  use apps or sites"...    08:40
9      "Depending on your account settings,    08:40
10  some of the data may be associated with    08:40
11  your Google account"...    08:40
12      Is this an actual privacy policy that exists    08:41
13  now today, sir?    08:41
14      Q.  This is -- there's a more -- in 2018, the    08:41
15  agreement was -- there's some text was added to it.  But    08:41
16  I can represent to you -- let me do it this way:    08:41
17      I'll ask you to -- I'll -- because I don't    08:41
18  want get into a fight with Mr. Straite about what the    08:41
19  evidence shows.    08:41
20      But I'll ask you to assume that some of the    08:41
21  plaintiffs saw this exact text and clicked "I agree."    08:41
22      A.  You want me to assume that?    08:41
23      Q.  Yeah.    08:41
24      MR. STRAITE:  What's your question?  So I can    08:41
25  object properly.    08:41

Page 70

1  BY MR. BROOME:    08:41
2      Q.  Professor Turow, you described the Chrome    08:41
3  privacy notice and the privacy policy and the Chrome    08:41
4  setup screen as a carve-out.    08:41
5      And I'd like to know what -- a carve-out to    08:42
6  what?    08:42
7      MR. STRAITE:  Objection.  Foundation.    08:42
8  Objection.  Relevance.  Objection.  Incomplete    08:42
9  hypothetical.    08:42
10      THE WITNESS:  But I already answered that    08:42
11  question, sir.    08:42
12      A carve-out that makes it appear that there's    08:42
13  this distinction in the kind of information and -- that    08:42
14  is given, that if you click -- if you don't click    08:42
15  "sync," you won't have information sent.  That's the    08:42
16  carve-out.    08:42
17      And frankly, look, there is a vague statement    08:42
18  here that says "Depending on your account settings."  I    08:42
19  could argue that that could nod to the carve-out.    08:42
20      You know, what does that mean, "Depending on    08:42
21  your account settings"?  I --    08:42
22  BY MR. BROOME:    08:42
23      Q.  You tell me.  What does it mean to reasonable    08:42
24  people?    08:42
25      A.  To a reasonable person, that would mean that    08:42

Page 71

1  there are some carve-out settings; that there are some    08:42
2  exceptions to what you just showed me in the bullets.    08:43
3      Why else would they put that statement in    08:43
4  there?    08:43
5      See, that's the problem with this stuff.  You    08:43
6  know, you can't show me part of a document and assert    08:43
7  that this is different from what I saw before.    08:43
8      There are all of these conditional throughout    08:43
9  the documents that reinforce the notion that there is a    08:43
10  difference between sync and un-sync.    08:43
11      Q.  And where is that stated in this document,    08:43
12  Professor Turow?    08:43
13      A.  What I'm saying is that the statement or the    08:43
14  clause, depending on your account settings -- and,    08:43
15  again, I've only seen this for the first time, the way    08:43
16  it is here -- depending on the account settings, it    08:43
17  means that there may be situations on which this doesn't  08:43
18  happen.    08:43
19      Q.  All right.  It actually goes on.  That's --    08:43
20  the next sentence goes on and says "You can control how    08:43
21  we collect and use this data at 'My Account,'" and then    08:43
22  it's got a web page; correct?    08:44
23      A.  Right.    08:44
24      But that doesn't mean that the first statement    08:44
25  necessarily totally is taken into account in the second    08:44

Page 72

1  statement.  It could be that there are account settings    08:44
2  that are separate from mine.    08:44
3      Q.  Okay.  All right.  Well, you've never seen    08:44
4  this document before.  I think that was the --    08:44
5      A.  I've seen documents like this, but I haven't    08:44
6  seen this exact document.    08:44
7      MR. STRAITE:  Joe, just remember, let him    08:44
8  finish his question.    08:44
9  BY MR. BROOME:    08:44
10      Q.  What's the document that you've seen that's    08:44
11  like this?    08:44
12      A.  I would say the document is the privacy    08:44
13  policy.    08:44
14      Q.  Okay.  Which versions of the privacy policy    08:44
15  did you read?    08:44
16      MR. STRAITE:  Objection.  Vague.    08:44
17      THE WITNESS:  I read several versions,    08:44
18  starting with I believe the 2016 version.  I read them    08:44
19  consecutively.  And I read the first one very carefully,    08:44
20  where the others with less care, trying to see if there    08:44
21  were differences.  And then when the document changes --  08:45
22  and I forgot, I think maybe in 2019, where the flow    08:45
23  matter of the document changed to make it supposedly    08:45
24  more user friendly with pictures and stuff, I read that    08:45
25  carefully as well.  And I also read the most recent one.  08:45

Page 73

19 (Pages 70 - 73)

1 BY MR. BROOME:
2    Q.   Okay.  That privacy policy is significantly    08:45
3 longer than this document; correct?    08:45
4    A.   Yes.    08:45
5    Q.   Okay.  I'm not sure if this is just a    08:45
6 transcription error or not, but I just want to make    08:45
7 clear for the record that you never considered this    08:45
8 document that we just looked at in forming your    08:45
9 opinions?    08:45
10    A.   I never considered this exact document, no.    08:45
11    Q.   Okay.  And the only other document that you    08:46
12 considered that was like this is the privacy --    08:46
13 full privacy policy.    08:46
14    Is that correct?    08:46
15    MR. STRAITE:  Objection.  Vague.    08:46
16    THE WITNESS:  I would say that the privacy    08:46
17 notice is another example of this.    08:46
18 BY MR. BROOME:
19    Q.   Okay.  And aside from those two documents,    08:46
20 have you considered any other documents like this one    08:46
21 that we were just discussing?    08:46
22    MR. STRAITE:  Same objection.    08:46
23    THE WITNESS:  The terms and conditions comes    08:46
24 close in some parts.  But essentially you're right,    08:46
25 privacy notice and the privacy policy.    08:46

Page 74

1 BY MR. BROOME:
2    Q.   Let's move forward in the document to    08:46
3 page 836.    08:46
4    MR. STRAITE:  You say 836, Steve.  You mean    08:46
5 the last three digits of the Bates number?    08:46
6    MR. BROOME:  Correct.    08:46
7    THE WITNESS:  Okay.    08:47
8 BY MR. BROOME:
9    Q.   Have you seen this screen before,    08:47
10 Professor Turow?    08:47
11    A.   I've seen --    08:47
12    Q.   The screen -- actually it's -- on 836, there's    08:47
13 two screens.  They go together.  They're screen shots    08:47
14 that actually are the same page.  And then the rest of    08:47
15 it I think is -- oh, that's right.  Yep.  It's those --    08:47
16 it's on 836.  Those two documents go together as one    08:47
17 screen.    08:47
18    A.   They look quite similar to what I've seen in    08:47
19 the past, yes.    08:47
20    Q.   Quite similar to what?    08:47
21    A.   To the Google privacy policy in the friendly    08:47
22 version.    08:47
23    Q.   You would agree this is significantly shorter    08:47
24 than the Google privacy policy; correct?    08:47
25    MR. STRAITE:  Objection.  Vague.    08:47

Page 75

1    THE WITNESS:  I don't know what this is, sir.    08:47
2 I don't know --    08:47
3 BY MR. BROOME:
4    Q.   Okay.    08:47
5    A.   -- if it's just part of the larger -- you're    08:47
6 showing me something out of the blue and asking me    08:47
7 whether I've seen it before and then whether it's part    08:47
8 of something.    08:48
9    It's similar to stuff I've seen in the    08:48
10 larger privacy policy.    08:48
11    And then you tell me, well, it's not more.    08:48
12 I don't know whether this is part of a larger    08:48
13 privacy policy or not.    08:48
14    Q.   No.  I'm not telling you it's part of a larger    08:48
15 privacy policy, and I'm entitled to explore the bases    08:48
16 for your opinions.    08:48
17    A.   I understand.  You should tell me --    08:48
18    Q.   You've identified the terms of service, the    08:48
19 Chrome privacy notice, the privacy policy, and the sync    08:48
20 setup -- or the Chrome setup screen.    08:48
21    And this is a different screen, and I'd like    08:48
22 to know whether you considered this screen as part of    08:48
23 your -- in forming your opinions?    08:48
24    A.   Some of the language --    08:48
25    MR. STRAITE:  Objection.  Vague.  Objection    08:48

Page 76

1 foundation.    08:48
2    THE WITNESS:  Some of the language here, just    08:48
3 in terms of what I see without reading the whole thing,    08:48
4 looks similar to what I have read in the privacy policy.    08:48
5 BY MR. BROOME:    08:48
6    Q.   Professor Turow, did you consider this screen    08:48
7 in forming your opinions in this case?    08:48
8    MR. STRAITE:  Objection.  Asked and answered.    08:48
9    THE WITNESS:  I did not consider these two    08:49
10 pages as unto themselves.    08:49
11    You're showing this to me without context,    08:49
12 sir.    08:49
13 BY MR. BROOME:    08:49
14    Q.   Well, I'm trying to get at whether you saw    08:49
15 this screen or some version of this screen.    08:49
16    And I hear you.  You're saying "Some of the    08:49
17 language looks similar to language I saw in the privacy    08:49
18 policy."  That's not really my question.    08:49
19    I would like to know whether you saw --    08:49
20 whether you considered this screen or some version of    08:49
21 this screen in forming your opinions in this case?    08:49
22    A.   Let me look at the screen carefully.    08:49
23    Oh, it's not shown.  I can't read the first    08:50
24 sentence on the second page.    08:50
25    Q.   You'll see -- if you read it carefully, you'll    08:50

Page 77

20 (Pages 74 - 77)

1 see that the last sentence on the first page is also    08:50
2 reflected --                                08:50
3    A. Okay. "With this change" --             08:50
4    Q. It's the same sentence.                08:50
5    A. "This change in setting" --             08:50
6       Okay. I probably did not see exactly this    08:51
7 formulation, no.                            08:51
8    Q. Did you see a version of this screen?    08:52
9       MR. STRAITE: Objection. Vague.          08:52
10      THE WITNESS: I didn't see a version of this    08:52
11 screen. I -- I -- no, I didn't.             08:52
12      I've -- I'm interested in the note on the side    08:52
13 in the margin which basically supports what I've been    08:52
14 saying to you all along.                    08:52
15 BY MR. BROOME:                             08:52
16   Q. Mm-hm. Okay. Well, don't worry. We'll come    08:52
17 back to that.                              08:52
18   A. Okay.                                08:52
19   Q. Okay. And then if you go on to the next page,    08:52
20 837, then it shows you what would happen if the user    08:52
21 clicked more options.                       08:52
22      Okay?                                08:52
23   A. Can I ask you what this is about?         08:52
24   Q. I'm not sure what you mean. What --        08:52
25   A. What -- you say I haven't seen this before.    08:52

Page 78

1 You're showing me something that was concocted.    08:52
2       When do people see this?                08:52
3    Q. Ah.                                 08:52
4       This was shown to users who had existing    08:52
5 accounts as of August 2016. This was pushed through to    08:53
6 them, including some of the plaintiffs.        08:53
7       I'll just represent to you that there's a flow    08:53
8 that's described here where if you click "More Options,"    08:53
9 you see there's a purple highlight on the button and    08:53
10 then it takes you to the next slide. And feel free to    08:53
11 just sort of walk through --                 08:53
12   A. Yeah. I see what you're saying.           08:53
13      May I ask you was this required if a person    08:53
14 was to continue using Chrome?               08:53
15   Q. This process doesn't really allow for me to    08:53
16 sort of answer your back-and-forth questions. But --    08:53
17   A. Well, the reason I ask you this, sir, is that    08:53
18 you can't -- I use Chrome. I don't remember ever    08:53
19 getting anything like this.                 08:53
20      Okay?                                08:53
21      Ever. And if I had gotten it, I probably    08:53
22 would remember.                            08:54
23      So I don't know what you're showing me and why    08:54
24 you're showing it to me, and you're asking me to make    08:54
25 presumptions about something that is just out of the    08:54

Page 79

1 blue.                                     08:54
2    Q. So you don't feel comfortable offering any    08:54
3 opinions with respect to these slides.         08:54
4       Is that correct?                       08:54
5    A. I feel comfortable --                   08:54
6       MR. STRAITE: Let me get my objections in.    08:54
7       All right. Objection. Relevance. Objection.    08:54
8 Vague. Objection. Misstates earlier testimony.    08:54
9       THE WITNESS: What I feel comfortable talking    08:54
10 about is that addition in the previous page, which as I    08:54
11 say, supports my position, may be the reason I didn't    08:54
12 get it is because I never synced with Chrome.    08:54
13      I mean, if you look at what that thing says,    08:54
14 it's only shown to people who sync with Chrome.    08:54
15 BY MR. BROOME:                             08:54
16   Q. No. That's referring only to that text.    08:54
17   A. Well, I never received -- I don't remember    08:54
18 receiving it. Even that text is fascinating because it    08:54
19 supports my point.                         08:54
20   Q. Uh-huh. Okay.                         08:55
21   A. You know.                            08:55
22   Q. Skip -- read -- you can just -- I just want    08:55
23 you to read through to slide 841 -- to page 841. Excuse    08:55
24 me. And you don't have to read it all. I just want to    08:55
25 know if you've seen this text before? And if so,    08:55

Page 80

1 whether you considered that text in forming any of the    08:55
2 opinions that you're offering in this case.    08:55
3    A. I'm in this -- the one that starts with "What    08:55
4 if you use more than one Google account at the same    08:55
5 time"?                                     08:55
6       Is that what you're asking me, sir?         08:55
7    Q. If you go from page 7 -- 83 -- sorry. If you    08:55
8 go from page 837 to 841.                    08:55
9       MR. STRAITE: He's on 837.               08:55
10      And, Steve, just so you're aware, because you    08:55
11 have the two documents side by side, we have to blow    08:55
12 these up so he can see it so the font is big enough, and    08:56
13 that means we'd have to scroll not only up and down by    08:56
14 side to side. So that's a little bit of a delay just    08:56
15 the way you presented the two documents side by side.    08:56
16      THE WITNESS: So you're saying "Choose what's    08:56
17 right for you" is the first document you want me to look    08:56
18 at, the first page?                        08:56
19 BY MR. BROOME:                             08:56
20   Q. I just want to know if you've seen these    08:56
21 before? That's the main question.             08:56
22   A. I haven't seen that one, "Choose what's right    08:56
23 for you," no. "Choose what's right for you. Choose    08:56
24 what's right for you." Keep going.            08:56
25   Q. What about "More about these new features";    08:56

Page 81

21 (Pages 78 - 81)

1 Have you seen that page before?          08:56
2     A.  "We think these new features" --          08:56
3        THE COURT REPORTER:  I'm sorry.          08:56
4 Professor Turow, if you're going to read, I need you to  08:56
5 read slowly and loudly.          08:56
6        THE WITNESS:  I'll read quietly so you don't  08:56
7 have to go crazy.          08:56
8     Can I go to the next one, please?          08:56
9     Okay.          08:57
10    Okay.  I mean, I'm familiar with a variety of  08:57
11 the things that are discussed on these pages simply as a  08:59
12 way of knowing what Google does.          08:59
13    I don't think I've ever read these pages  08:59
14 specifically.          08:59
15 BY MR. BROOME:          08:59
16    Q.  Are you offering any opinions in this case  08:59
17 about how reasonable people would interpret any of the  08:59
18 language in the screens that I've shown you in  08:59
19 Exhibit 1?          08:59
20    A.  I don't even understand that question.          08:59
21    I mean, my purpose was to look at specific  08:59
22 materials relating to sync and un-sync and ask what a  08:59
23 reasonable person would understand.          08:59
24    I can't -- that question is so broad.          08:59
25    Do you know how many points about -- what  09:00

Page 82

1 Google takes about people are in these pages?          09:00
2    To make inferences in this broad sense is not  09:00
3 a useful activity right now.          09:00
4    Q.  Have you -- Professor Turow, have you done an  09:00
5 analysis to determine how reasonable people would  09:00
6 interpret any of the language in the screens that I  09:00
7 just -- that I showed you in Exhibit 1?          09:00
8        MR. STRAITE:  Objection.  Ambiguous.          09:00
9        THE WITNESS:  I've done analysis of the  09:00
10 documents that I described to you.  And there is  09:00
11 nothing, except for that part of Chrome which I told you  09:00
12 supports my opinion, and you didn't want to go into it.  09:00
13    There is nothing here that relates to what I  09:00
14 was asked to do.          09:00
15 BY MR. BROOME:          09:00
16    Q.  Let me ask the question again.          09:00
17    Have you done an analysis as to how reasonable  09:00
18 people would interpret the language in the screens that  09:00
19 I've shown you in Exhibit 1?          09:00
20        MR. STRAITE:  Same objections.          09:01
21        THE WITNESS:  You -- that was not my remit,  09:01
22 no.          09:01
23 BY MR. BROOME:          09:01
24    Q.  So the answer to my question is no?          09:01
25    A.  Except in the area which I said supports my  09:01

Page 83

1 opinion, and you didn't want to go into it.          09:01
2    Q.  We'll come back to that.  Don't worry.          09:01
3    Okay.  Do you understand the data collection  09:01
4 at issue in this process -- in this case,          09:01
5 Professor Turow?          09:01
6        MR. STRAITE:  Objection.  Vague.          09:01
7        THE WITNESS:  What does that mean?          09:01
8 BY MR. BROOME:          09:01
9    Q.  Do you understand what categories of data that  09:01
10 plaintiffs allege Google has improperly collected?          09:01
11        MR. STRAITE:  Same objection.          09:01
12        THE WITNESS:  I understand what the plaintiffs  09:01
13 say were collected, and I have read documents about what  09:01
14 experts say were collected.  Yes.          09:01
15 BY MR. BROOME:          09:01
16    Q.  Okay.  And what are the categories that          09:01
17 plaintiffs allege Google improperly collected?          09:01
18    A.  Everything from IP addresses, to the kinds of  09:01
19 things people were searching for, to the times in which  09:02
20 they were searching, and to the locations where they  09:02
21 were searching.          09:02
22    Q.  Okay.  And websites visited, the URLs of the  09:02
23 websites they visited, is that among the categories of  09:02
24 information that the plaintiffs allege Google improperly  09:02
25 collected?          09:02

Page 84

1    A.  I don't know that they used the word "URL" but  09:02
2 they said they were looking at what -- Google was  09:02
3 looking at what they were searching for.          09:02
4    Q.  What do you mean by "searching for"?  Like  09:02
5 searching on Google or searching on the web or what?  09:02
6    A.  Searching on Chrome.  Searching on Chrome.  09:02
7    Q.  Searching how?          09:02
8    A.  By browsing is the term.  Going from one site  09:02
9 to another.  Looking for information.  Putting words  09:02
10 into the search box.  Yeah.          09:02
11    Q.  Okay.  Do you understand how Google receives  09:02
12 the data at issue in this case?          09:03
13        MR. STRAITE:  Objection.  Calls for  09:03
14 speculation.          09:03
15 BY MR. BROOME:          09:03
16    Q.  Do you understand the process?          09:03
17    A.  I believe I understand the process but that  09:03
18 was not my remit, sir.  They hired an expert to talk  09:03
19 about the process.  I can tell you what I know about the  09:03
20 way in which data flow across the web and across apps.  09:03
21 I have a pretty good knowledge, as far as I can tell,  09:03
22 and people seem to think I do, about these things.  But  09:03
23 that's not what I was here for.          09:03
24    Q.  Okay.  Do you understand that the data at  09:03
25 issue in this case, that Google receives that data when  09:03

Page 85

22 (Pages 82 - 85)

1 users visit websites that use certain Google services    09:03
2 that cause their browsers to send that data to Google    09:03
3 servers?    09:03
4    MR. STRAITE: Objection as to form.    09:03
5 Objection. Relevance. Objection. Assumes facts not in    09:03
6 evidence.    09:04
7    THE WITNESS: Again, it's not my remit to make    09:04
8 those -- I understand this. But it's not my remit to    09:04
9 make those kinds of conclusions. You're trying to get    09:04
10 me farther afield from what I wrote.    09:04
11    And the point is I was looking at the plain    09:04
12 language of basic documents that people confront when    09:04
13 they are entering -- or may confront when they are    09:04
14 entering into the relationship with Chrome.    09:04
15 BY MR. BROOME:    09:04
16    Q. Can you describe -- you said you have an    09:04
17 understanding of the process.    09:04
18    Can you describe how Google receives this data    09:04
19 at a high level?    09:04
20    A. I'm not going to do that because if you find a    09:04
21 mistake in what I say, you will somehow attribute that    09:04
22 to a problem in my testimony. That has nothing to do    09:04
23 with my testimony.    09:04
24    Q. Are you refusing to answer my question?    09:04
25    A. I don't think it's relevant to what I -- you
Page 86

1 broad ways about a company that has cookies that are    09:05
2 named after cookies.    09:05
3    I brought some biscotti to have some for    09:05
4 lunch.    09:06
5    You know, you're trying to make it seem    09:06
6 simple. It's not simple.    09:06
7 BY MR. BROOME:    09:06
8    Q. Do you have a high level understanding of how    09:06
9 Google receives the data that is at issue in this case?    09:06
10    A. Yes, I do.    09:06
11    MR. STRAITE: Same objections.    09:06
12 BY MR. BROOME:    09:06
13    Q. Describe that to me, please.    09:06
14    A. Data has -- Google has a variety of vehicles    09:06
15 through which it can follow what people are doing on    09:06
16 Chrome and in other ways in which they search. And then    09:06
17 it can take that kind of information and store it in a    09:06
18 whole variety of different ways. At a very broad level,    09:06
19 that's what you're getting.    09:06
20    Q. Okay. Is the data collection at issue in this    09:06
21 case technique to Chrome?    09:06
22    MR. STRAITE: Objection. Calls for    09:06
23 speculation. Objection. Relevance. Beyond the scope    09:06
24 of the report.    09:06
25    THE WITNESS: Yeah. I don't -- undoubtedly    09:06
Page 88

1 can read all the books that I've written about it. I    09:04
2 wrote a book called "The Daily You" which goes into this    09:04
3 in quite a bit of detail.    09:04
4    If you really think that you're interested to    09:04
5 know how the plaintiffs understand the process of data    09:05
6 collection, speak to the experts who are doing that.    09:05
7    If you want to ask me a specific question, I    09:05
8 will try to answer it, yes.    09:05
9    Q. I'd like to -- I did ask you a specific    09:05
10 question.    09:05
11    What is your understanding of how Google    09:05
12 receives the data at issue in this case?    09:05
13    A. Okay. Ask me the question again, please.    09:05
14    Q. What is your understanding of the process by    09:05
15 which Google receives the data at issue in this case?    09:05
16    MR. STRAITE: Same --    09:05
17    THE WITNESS: There are --    09:05
18    MR. STRAITE: Same objections.    09:05
19    But you can go ahead.    09:05
20    THE WITNESS: There are a variety of ways in    09:05
21 which Google receives the data in this case. We talk    09:05
22 about location data, that's different from the way they    09:05
23 get new analytics data, which are different from the    09:05
24 way they get AdMob data.    09:05
25    I mean, you can't talk in direct -- in such    09:05
Page 87

1 some of the search data are, but I can't go beyond that.    09:06
2 BY MR. BROOME:    09:07
3    Q. You don't know whether the data at issue in    09:07
4 this case -- data collection at issue in this case is    09:07
5 unique to Chrome?    09:07
6    MR. STRAITE: Same objections.    09:07
7    THE WITNESS: It's not my remit to make that    09:07
8 conclusion.    09:07
9    Chrome is a search -- is a browser with a    09:07
10 search engine, but the Chrome itself obviously uses some    09:07
11 data that it gets through -- for example, a header.    09:07
12    But that's not what I'm here for. That's not    09:07
13 what I'm dealing with.    09:07
14    You're asking me questions designed to make it    09:07
15 appear that I'm supposed to be an expert at something    09:07
16 that I'm not an expert here. If I were an expert on    09:07
17 that, I would have studied up on Chrome's specific    09:07
18 utilities and activities. That's not what I'm here for.    09:07
19    If you want to ask me what I'm here for,    09:07
20 that's terrific.    09:07
21 BY MR. BROOME:    09:07
22    Q. Look, the way this process works, I get to ask    09:07
23 you questions about the foundation of your opinions, and    09:07
24 that includes going into some of your background and    09:07
25 your understanding of other aspects of the case. And    09:07
Page 89

23 (Pages 86 - 89)

1 you can just say, "I don't know." That's a perfectly    09:07
2 acceptable answer.    09:07
3    A. Well, I know some. I don't know all.    09:08
4    Q. Okay. Is the data collection process at issue    09:08
5 in this case unique to Chrome or does Google generally    09:08
6 receive the same categories of data, regardless of which    09:08
7 browser?    09:08
8    MR. STRAITE: Objection --    09:08
9 BY MR. BROOME:    09:08
10    Q. Or do you not know?    09:08
11    MR. STRAITE: Objection. Calls for    09:08
12 speculation. Asked and answered.    09:08
13    THE WITNESS: My understanding of it, that it    09:08
14 is -- there are things in Chrome that are specific to    09:08
15 Chrome. That's all I can say.    09:08
16 BY MR. BROOME:    09:08
17    Q. Can you identify which things are unique to    09:08
18 Chrome as opposed to not unique to Chrome?    09:08
19    MR. STRAITE: Same objections.    09:08
20    THE WITNESS: I'm not an expert here,    09:08
21 Mr. Broome.    09:08
22 BY MR. BROOME:    09:08
23    Q. Okay. The data that Google receives through    09:08
24 analytics, does Google receive that data only from    09:08
25 Chrome users, from users of other browsers, or do you    09:08
Page 90

1 not know?    09:08
2    MR. STRAITE: Objection. Calls for    09:08
3 speculation. Objection. Beyond the scope of his expert    09:08
4 testimony.    09:08
5    THE WITNESS: I know the answer but it has    09:08
6 nothing to do with my expert testimony.    09:08
7    So what are you asking me the questions for?    09:09
8 BY MR. BROOME:    09:09
9    Q. If you know the answer, you're obligated to    09:09
10 tell me.    09:09
11    A. I'm not obligated. No.    09:09
12    Q. Are you refusing to answer?    09:09
13    A. Why don't you restate the question?    09:09
14    Q. You want me to read the question back to you?    09:09
15    A. Yes, please.    09:09
16    Q. The data that Google receives through    09:09
17 Google Analytics, does Google receive that data only    09:09
18 from Chrome users, from users of other browsers, or do    09:09
19 you know?    09:09
20    MR. STRAITE: Same objections.    09:09
21    THE WITNESS: I'm not going to answer it. I    09:09
22 believe I know the answer but if I give you the wrong    09:09
23 answer, you're going to make a big fuss about it so...    09:09
24 BY MR. BROOME:    09:09
25    Q. It's perfectly fine for you to say, "I don't    09:09
Page 91

1 know." But saying "I refuse to answer" is not an    09:09
2 acceptable answer.    09:09
3    A. Well, it's not in my remit. It's not -- I    09:09
4 don't understand why you're asking me the question.    09:09
5    Q. That's a -- go ahead.    09:09
6    A. No. You're trying to confuse the issue and    09:09
7 maybe you confuse the judge, and that's a shame.    09:09
8    Okay?    09:09
9    Q. Are you going to answer my question?    09:10
10    A. I'm not going to answer that one.    09:10
11    Q. Okay. So you're going to pick and choose    09:10
12 which questions you're going to answer today?    09:10
13    A. The links to the report that I wrote, I will    09:10
14 happily answer the question.    09:10
15    Q. In Google's view, it actually is very relevant    09:10
16 to Google's defense, if Google's responsible --    09:10
17    A. Please explain that.    09:10
18    Q. I'm not obligated to explain our strategy to    09:10
19 you.    09:10
20    A. It doesn't make any sense.    09:10
21    Q. You are obligated sitting here under oath to    09:10
22 answer my questions, if you have an answer.    09:10
23    Are you going to -- it's fine. If you want to    09:10
24 say you won't respond, that's fine. We can take that to    09:10
25 the judge. We can make a motion --    09:10
Page 92

1    A. With this particular answer, I will.    09:10
2    Q. -- and we can bring you back.    09:10
3    MR. STRAITE: If the question, Steve, is    09:10
4 whether he's aware of the difference between the    09:10
5 data collection among the various browsers? Is that    09:10
6 what you're asking?    09:10
7    MR. BROOME: I asked him a question. He said,    09:10
8 "I have an answer but I'm not going to tell you."    09:10
9    THE WITNESS: Okay. The answer -- in    09:10
10 everything that I know is that Google Analytics is    09:10
11 across the entire web, and what Google gets from    09:10
12 Google Analytics relates not just to the Chrome browser    09:10
13 but to many other browsers.    09:11
14 BY MR. BROOME:    09:11
15    Q. So the data that Google receives through    09:11
16 analytics is not unique to Chrome; correct?    09:11
17    MR. STRAITE: Objection. Calls for    09:11
18 speculation.    09:11
19 BY MR. BROOME:    09:11
20    Q. You understand that; correct?    09:11
21    MR. STRAITE: Objection. Calls for    09:11
22 speculation.    09:11
23    THE WITNESS: That's my understanding.    09:11
24 BY MR. BROOME:    09:11
25    Q. Professor Turow, throughout your report, you    09:11
Page 93

24 (Pages 90 - 93)

1 refer to "reasonable people"; right?                   09:11
2    A.  Yes, sir.                                        09:11
3    Q.  Are you an expert in what reasonable people      09:11
4 think?                                                  09:11
5    A.  As we discussed earlier in the session, it's     09:11
6 an -- I am an expert for this situation in what         09:11
7 reasonable people would understand from the language,   09:11
8 the plain language of the report -- of the document.    09:11
9 Yes.                                                    09:11
10    Q.  Are you an expert in what reasonable people      09:11
11 think in only that context or in other context as well?  09:12
12    A.  This is the case that I've been asked to opine   09:12
13 about.                                                  09:12
14    Q.  Are you an expert on what reasonable people      09:12
15 think only with respect to the documents on which you've  09:12
16 opined in this case or in other contexts as well?       09:12
17    A.  There are other contexts in which I know the     09:12
18 material and I understand the context where I will be    09:12
19 glad to say that I can understand what these Google      09:12
20 people would understand from the language.              09:12
21    Q.  Okay.  What is a -- and what are those other     09:12
22 contexts?                                               09:12
23    A.  Anything to do with the internet and marketing   09:12
24 and society.                                            09:12
25    Q.  Have you ever published anything that uses the   09:12

Page 94

1 term "reasonable people"?                               09:12
2    A.  To be absolutely honest, I don't know.  I'd      09:12
3 have to go through my books to see if I use the words    09:12
4 "reasonable people."                                    09:13
5    Q.  Okay.  Is that a term of art in your field?      09:13
6    A.  It's a term of art in law.                       09:13
7    Q.  It's a term of art in law.                       09:13
8        Okay.  Are you a lawyer?                         09:13
9    A.  My mother wanted me to be one but I'm not.       09:13
10    Q.  Okay.  Have you ever published anything about    09:13
11 using the term of art as that is used in law?           09:13
12    A.  About using it?                                  09:13
13    Q.  Let me -- strike that.  Let me ask it again.     09:13
14        You said that "reasonable people" is a term of   09:13
15 art in law.                                             09:13
16        Is that how you are using it in this case?       09:13
17    A.  My understanding, yes.                           09:13
18    Q.  Okay.                                            09:13
19    A.  I mean, that's what people asked ask me to do.   09:13
20 I was asked to write about what a reasonable person,     09:13
21 meaning a reasonable person who understands plain       09:13
22 language and is not somebody who is, say, on drugs or    09:13
23 otherwise incapacitated, would understand from the plain  09:13
24 language of the -- of the website.                      09:14
25    Q.  Are you using the term "reasonable people"       09:14

Page 95

1 consistent with the term of art in the legal profession?  09:14
2        MR. STRAITE:  Objection.  Calls for a legal       09:14
3 conclusion.  Calls for speculation.                     09:14
4        THE WITNESS:  The only thing I can say is that     09:14
5 the counsel seem to think that what I wrote was          09:14
6 appropriate.  I don't know.                             09:14
7 BY MR. BROOME:                                          09:14
8    Q.  I'm sure the plaintiffs' counsel did.  Yeah.      09:14
9 That doesn't surprise me at all.                        09:14
10        But I'm asking you a question --                 09:14
11        MR. STRAITE:  Steve, is that sort of             09:14
12 editorialization really necessary in this deposition?    09:14
13 It's kind of beneath you.                               09:14
14 BY MR. BROOME:                                          09:14
15    Q.  Are you using the term "reasonable people"       09:14
16 consistent with some legal definition?                  09:14
17        MR. STRAITE:  Objection.  Calls for              09:14
18 speculation.  Calls for a legal conclusion.             09:14
19        THE WITNESS:  My understanding of "reasonable     09:14
20 people" is, again, plain language of what does it mean    09:14
21 to say a person who is not on drugs, over 18, has a      09:14
22 pretty decent vocabulary, would understand what Google    09:14
23 has written.                                            09:15
24 BY MR. BROOME:                                          09:15
25    Q.  Okay.  Not on drugs, over 18 --                  09:15

Page 96

1    A.  And you understand when I say not on drugs,       09:15
2 meaning not in any kind of deranged situation,           09:15
3 hallucinatory situation.                                09:15
4    Q.  As you use the term "reasonable people" in       09:15
5 your report, what you mean is any person who is not on    09:15
6 drugs, who is over 18, and has a decent vocabulary.      09:15
7 Is that correct?                                        09:15
8    A.  Pretty well, yeah.  Yes.                          09:15
9    Q.  Is there any other scientific meaning to that     09:15
10 term in your profession or in the areas of -- your areas  09:15
11 of research?                                            09:15
12        MR. STRAITE:  Objection.  Calls for              09:15
13 speculation.                                            09:15
14        THE WITNESS:  I'm not sure what you mean by       09:15
15 scientific.                                             09:15
16 BY MR. BROOME:                                          09:15
17    Q.  Is "reasonable people "-- the reasonable         09:15
18 person, is that a term that you have -- that exists as a  09:16
19 term of art in your areas of research?                  09:16
20    A.  It is not a term of art within communication     09:16
21 sociology.  It's a term of art that has to do with the   09:16
22 kinds of issues we're confronting here.                 09:16
23    Q.  Okay.  What A reasonable person may think on a    09:16
24 particular topic can be different than what the average   09:16
25 consumer thinks about that topic, correct, or the        09:16

Page 97

25 (Pages 94 - 97)

1  average person?                          09:16
2      A.  Average is a --                  09:16
3          MR. STRAITE:  Let me get my objection in.   09:16
4      THE WITNESS:  Sorry.                 09:16
5          MR. STRAITE:  Objection.  Vague.   09:16
6      THE WITNESS:  Average is a terrible word   09:16
7  use.  There really is not the -- an average is a   09:16
8  quantitative attribution or it's a demeaning attribution   09:16
9  to somebody.  I don't like to use the word "average."   09:16
10 BY MR. BROOME:                           09:16
11     Q.  Okay.  You can do a survey of a hundred   09:16
12 consumers on how they interpret a particular provision   09:17
13 in a privacy policy, for example, and you could get   09:17
14 three different responses; right?  One third think it   09:17
15 means this, one third think it means that, and another   09:17
16 third thinks it could be that.           09:17
17     All of those interpretations could be   09:17
18 reasonable; correct?                     09:17
19         MR. STRAITE:  Objection.  Calls for   09:17
20 speculation.  Objection as to form.      09:17
21     THE WITNESS:  You're drawing on a hypothetical   09:17
22 that has nothing to do with the reality of the documents   09:17
23 confronting us.                          09:17
24 BY MR. BROOME:                           09:17
25     Q.  I'm not asking about the document confronting
                                           Page 98

1  us.  I'm trying to get a better understanding --   09:17
2      Hold on, hold on, hold on.           09:17
3      I'm trying to get a better understanding of   09:17
4  what you mean by "reasonable person," which is very much   09:17
5  at issue in the case.                    09:17
6      A.  Of course.                       09:17
7          MR. STRAITE:  Steve, it's not helpful when the   09:17
8  witness is talking, to tell him you don't like what he's   09:17
9  saying so you can ask another question.  If he's   09:17
10 speaking, even if you don't like what's saying, could   09:17
11 you just let him finish, please?         09:17
12         MR. BROOME:  Well, actually, that occurred in   09:17
13 the reverse, David.  I was speaking and he began to   09:17
14 interrupt me, so I wanted him to let me finish my   09:17
15 question before.                         09:18
16         MR. STRAITE:  We can take turns saying whom   09:18
17 interrupted whom.  But when the witness is speaking,   09:18
18 just let him finish his testimony.       09:18
19     THE WITNESS:  So please ask me again the   09:18
20 question.                                09:18
21 BY MR. BROOME:                           09:18
22     Q.  Let me ask it this way:  Is what the reason --   09:18
23 if you opine on what the reasonable -- a reasonable   09:18
24 person would think, do you mean to say that that is what   09:18
25 most people would think?                 09:18
                                           Page 99

1      A.  No.  No.  I mean that virtually everybody   09:18
2  reading this document would come to that conclusion   09:18
3  because of the way the words are crafted.   09:18
4      Q.  I see.                          09:18
5      So when you say a reasonable person -- in your   09:18
6  report when you say a reasonable person would think X,   09:18
7  right, X being your opinion --           09:18
8      A.  Right.                          09:18
9      Q.  -- you mean virtually everyone would think   09:18
10 that?                                    09:18
11     A.  Who fits the categories that I mentioned   09:18
12 earlier.                                 09:18
13     Q.  Right.  Right.  Over 18, not on drugs, and has   09:18
14 a decent vocabulary?                     09:18
15     A.  And you know what I mean by not on drugs.  I   09:19
16 mean someone who is not incapacitated in terms of his   09:19
17 ability or her ability to understand.    09:19
18     Q.  Understood.                      09:19
19     Okay.  So if somebody interpreted one of the   09:19
20 statements in the Chrome privacy notice on which you   09:19
21 opine differently than how you say reasonable people   09:19
22 would interpret it, you -- your opinion would be that   09:19
23 that person's interpretation is unreasonable; correct?   09:19
24     A.  We would have to look at the situation, sir.   09:19
25     You keep coming up with these hypotheticals.   09:19
                                           Page 100

1      If you get -- if we can go to the text and   09:19
2  analyze the text, I can show you why a reasonable person   09:19
3  would make the kind of inferences that I'm discussing.   09:20
4      You're not wanting to go to the text.  And so   09:20
5  what you're doing is you're coming up with these   09:20
6  hypotheticals that are trying to evade the topic.   09:20
7      I would be happy to go to the text -- just   09:20
8  like you didn't let me go to the text a few pages before   09:20
9  here to tell you why what you were showing me actually   09:20
10 supports my point of view.               09:20
11     Q.  Don't worry.  We will definitely be going to   09:20
12 the text.                                09:20
13     A.  Right.  I'm happy.               09:20
14     Q.  What is the expertise or experience that you   09:20
15 have that allows you to opine as an expert on what   09:21
16 reasonable people think?                 09:21
17     A.  You dropped a couple -- in my opinion, you   09:21
18 dropped a couple of important words here.   09:21
19     Q.  Okay.                           09:21
20     A.  What people think about this particular area   09:21
21 of life, yes.                            09:21
22     And my expertise, if I may say, has to do with   09:21
23 understanding the American society's approach to these   09:21
24 technologies, understanding the history of the   09:21
25 technologies, and understanding the context in which   09:21
                                           Page 101

26 (Pages 98 - 101)

1 this material is written so that I can come to an --  09:21
2 with an awareness of the context, not simply out of the  09:21
3 blue.  09:21
4         Meaning is a code within the context?  Okay?  09:21
5         And that's what I bring to this situation.  09:21
6 Q.  And what -- and what experience do you have --  09:21
7 you said "My expertise," if I may say, "has to do with  09:21
8 understanding the American society's approach to these  09:22
9 technologies."  09:22
10        What do you mean by that?  09:22
11 A.  In other words, what -- how people live in the  09:22
12 U.S. with respect to having to go to proxy policies or  09:22
13 to sign in, how they -- what the policies tend to look  09:22
14 like, what people will see, the English language, the  09:22
15 American English language, all of these are important in  09:22
16 trying to understand the meaning of these documents.  09:22
17 Q.  I want you to describe for me your process in  09:22
18 reaching your opinions on -- for example, let's take  09:22
19 your first opinion.  09:23
20        Why don't we get him his report so he has that  09:23
21 in front of him.  09:23
22 MR. STRAITE:  Is that Exhibit 2, Steve?  09:23
23 MR. BROOME:  Yeah.  We'll load that for you.  09:23
24        (Defendants' Exhibit 2 was  09:23
25        marked for identification.)  09:23

Page 102

1 MR. STRAITE:  Close Exhibit 1 and refresh to  09:23
2 the new exhibit.  09:23
3        Steve, we're bringing in smarter people than  09:23
4 me here.  09:23
5 MR. BROOME:  Impossible.  09:23
6 THE WITNESS:  Impossible.  09:23
7        Okay.  That's my report.  09:23
8 MR. STRAITE:  Okay.  Steve, so just for the  09:23
9 record, in front of Professor Turow is a document  09:23
10 bearing Bates -- sorry -- bearing Exhibit No. 2 in the  09:23
11 lower right–hand corner.  09:23
12        Are we ready, Professor?  09:24
13 BY MR. BROOME:  09:24
14 Q.  Okay.  Your -- I guess this is your  09:24
15 overarching opinion, Professor Turow --  09:24
16 A.  Yes.  09:24
17 Q.  On page 4, under the heading "My Opinions" it  09:24
18 says, "A," quote, "reasonable person," end quote.  09:24
19 MR. STRAITE:  Hold on.  We're not on page 4  09:24
20 yet.  09:24
21 THE WITNESS:  This one.  Yeah.  09:24
22 MR. STRAITE:  Okay.  We're on page 4.  09:24
23 BY MR. BROOME:  09:24
24 Q.  Okay.  Under the heading, "My Opinions," it  09:24
25 says:  09:24

Page 103

1        "A" quote, "reasonable person," end  09:24
2 quote, "would interpret Google's  09:24
3 disclosures to mean that Chrome does not  09:24
4 take personal information unless the user  09:24
5 elects to 'sync' the browser with a Google  09:24
6 Account."  09:24
7        Do you see that?  09:24
8 A.  Yes, sir.  09:24
9 Q.  And that is your opinion; correct?  09:24
10 A.  Yes, it is.  09:24
11 Q.  And then are several numbered opinions  09:24
12 below that that follow in the subsequent pages; correct?  09:24
13 A.  Yes.  09:24
14 Q.  Are those all pillars of your overarching  09:24
15 opinion?  Are they different opinions?  Are they all  09:24
16 sort of part and parcel of one opinion?  09:24
17 A.  They're all --  09:25
18 MR. STRAITE:  Wait.  Hold on.  09:25
19        Objection as to the word "pillars" as vague.  09:25
20        Go ahead.  09:25
21 THE WITNESS:  Yeah.  I wouldn't call them  09:25
22 pillars.  09:25
23 BY MR. BROOME:  09:25
24 Q.  Okay.  09:25
25 A.  I would call them ways of highlighting what I  09:25

Page 104

1 have determined is in the documents.  09:25
2 Q.  Do each of your -- I think there are four  09:25
3 numbered opinions.  09:25
4 A.  Yes.  09:25
5 Q.  Do each of those -- each of those opinions is  09:25
6 independent.  09:25
7        Is that fair?  09:25
8 MR. STRAITE:  Objection.  Vague.  09:25
9 THE WITNESS:  It's hard to say.  I mean, I  09:25
10 think they sort of relate to one another.  It was just  09:25
11 convenient -- frankly, convenient ways for me to present  09:25
12 the material.  I wouldn't go so far as to say there's a  09:25
13 philosophical set of differences between the numbers.  09:25
14 You know, it's --  09:25
15 BY MR. BROOME:  09:25
16 Q.  Okay.  09:25
17 A.  It's just different ways of bringing in data.  09:25
18 Q.  Okay.  Fair enough.  09:25
19        With respect to the first opinion --  09:25
20 A.  Yes.  09:25
21 Q.  -- can you describe for me your process in  09:25
22 arriving at that opinion?  09:26
23 A.  Sure.  Literally I went to the -- I set up  09:26
24 sync, I mean -- I set up Chrome -- I erased Chrome from  09:26
25 my computer.  09:26

Page 105

27 (Pages 102 - 105)

Page 106

```
 1    Q.  Okay.                          09:26
 2    A.  And I reset up Chrome, and this is what I   09:26
 3  found.  And then I read the material on the sign-up page  09:26
 4  and wrote about it in the ways that I did here.   09:26
 5        So it says -- going to the Chrome's page   09:26
 6  called 'Sync Setup,' there's a clear indication that  09:26
 7  keeping sync off means not sharing data, the subject  09:26
 8  heading of the page.  If you start from that, "sync and  09:26
 9  personalize Chrome across your devices"; right?   09:26
10    "The word personalize is a clear" -- as I say,  09:26
11  "is a clear signal that Google will be using the   09:26
12  individual's data if the person syncs."        09:26
13        "Personalize" is one of those words that is a  09:26
14  signal of using an individual's data.          09:27
15        "Moreover, the first action below the subject  09:27
16  heading is titled 'allow Chrome sign-in.' The action  09:27
17  description notes," as it says, "by turning this off,  09:27
18  you can sign into Google sites like gmail without   09:27
19  signing into Chrome."                          09:27
20        The clear meaning is that signing into Chrome  09:27
21  gives Google data that not signing would not yield to  09:27
22  Google, as I say.  And then the person would never know,  09:27
23  I argued, the distinction between syncing and signing  09:27
24  in, and it's just totally unclear.             09:27
25    Q.  Okay.                          09:27
```

Page 107

```
 1    A.  So there's a sense here that if you do one   09:27
 2  thing, which is sync, you're going to have your data   09:27
 3  personalized.  If you don't sync, Google is not going to  09:27
 4  be using your data.                        09:27
 5        Quite clear to me, and I think to anybody   09:27
 6  working in that --                        09:27
 7    Q.  Yeah.  My question is a little bit different.  09:27
 8  And I have your report.  I can read your report.  I have  09:27
 9  read your report.                          09:27
10    A.  You asked me how I came to that conclusion in   09:27
11  my report.  Literally says that.              09:27
12    Q.  Yeah.  I just mean your process; right?   09:27
13    A.  That is the process.                  09:27
14    Q.  So your process, as I understand it, is you   09:27
15  yourself went through the sync setup screen?       09:28
16    A.  Yes.                          09:28
17    Q.  You read the language very carefully?   09:28
18    A.  Yes.                          09:28
19    Q.  And then you came up with your opinion?      09:28
20    A.  Yes, I did.                      09:28
21    Q.  Is there anything else that I'm missing in   09:28
22  your process?                          09:28
23    A.  Not in this situation, no.           09:28
24    Q.  Okay.  Going to the next -- would that be the   09:28
25  same process for each of the other opinions?       09:28
```

Page 108

```
 1    A.  I would say that when I read -- you're talking   09:28
 2  about the sync privacy notice, the privacy notice and   09:28
 3  privacy policy?                          09:28
 4        MR. STRAITE:  Objection as to form.  Compound.  09:28
 5        THE WITNESS:  I would say that I -- it       09:28
 6  involved a careful reading of these policies and in the   09:28
 7  context of my understanding the terminologies and having  09:28
 8  read hundreds and hundreds of privacy policies over the   09:28
 9  years.                          09:28
10  BY MR. BROOME:
11    Q.  Having read hundreds and hundreds of privacy   09:28
12  policies over the years gives you expertise in       09:28
13  understanding what reasonable people think about this   09:29
14  privacy policy.                          09:29
15        Is that your testimony?                 09:29
16    A.  Understanding the plain language that this   09:29
17  privacy policy presents that -- that would make it clear  09:29
18  to somebody that there is a distinction between one   09:29
19  aspect of the activity and another aspect of the       09:29
20  activity.                          09:29
21    Q.  Okay.  Opinion 2 is:                 09:29
22        "A reasonable person who read the          09:29
23     Chrome Privacy Notice would understand          09:29
24     that Chrome does not send personal          09:29
25     information to Google unless a person       09:29
```

Page 109

```
 1     enables Sync."                      09:29
 2        Am I correct that your process for reaching   09:29
 3  that opinion was to read the Chrome privacy notice very   09:29
 4  carefully and then to offer your opinion?       09:29
 5    A.  Yes.                          09:29
 6    Q.  Okay.  Anything else in the process that I'm   09:29
 7  missing?                          09:29
 8    A.  No.                          09:29
 9    Q.  Okay.  Opinion 3 is:                 09:30
10        "A reasonable person who read          09:30
11     Google's General Privacy policy would" --       09:30
12        MR. STRAITE:  He's scrolling to 3.       09:30
13        MR. BROOME:  Yeah.  Sorry.  I'm going to 3.   09:30
14  BY MR. BROOME:
15    Q.  "A reasonable person who read          09:30
16     Google's General Privacy Policy would          09:30
17     understand that Google receives personal          09:30
18     information from Chrome only if sync is          09:30
19     enabled."                          09:30
20        Am I correct that your process for reaching   09:30
21  that conclusion or determination is to read Google's   09:30
22  general privacy policy very carefully and then offer   09:30
23  your opinion?                          09:30
24    A.  Yes.                          09:30
25    Q.  Anything else that I'm missing?           09:30
```

28 (Pages 106 - 109)

CONFIDENTIAL

1  A.  No.                          09:30
2  Q.  Okay.                        09:30
3  A.  Now, if you go down, you'll see that when I   09:30
4  got to the -- toward the end, that the whole idea of   09:30
5  privacy policy in itself is an interesting conundrum   09:30
6  because a lot of times there's a large segment of the   09:31
7  population that wouldn't even go near a privacy policy   09:31
8  because they believe from five national surveys that   09:31
9  we've done and others Pew has done it too, that the   09:31
10 words "privacy policy" means that the company will not   09:31
11 share their information or with others without   09:31
12 permission.                       09:31
13     So some people wouldn't even read the privacy   09:31
14 policy.  And my argument there is if they didn't read   09:31
15 it, they would still think that Google distinguishes   09:31
16 between sync and un-sync simply through the sign-on.   09:31
17 Q.  And do people read the -- do people read the   09:31
18 sign-on page carefully?           09:31
19     MR. STRAITE:  Objection.  Calls for   09:31
20 speculation.                      09:31
21     THE WITNESS:  The words sync and un-sync and   09:31
22 the way it's presented, as I suggested to you earlier,   09:31
23 make it very clear, A, they will read it because that's   09:31
24 at the core of what they're doing on that page, and B,   09:31
25 it is quite clear that there is a distinction Google   09:31

Page 110

1  intends to be made.               09:31
2  BY MR. BROOME:                    09:32
3  Q.  Okay.  Sorry.  You're talking about the sync   09:32
4  sign-on page?                     09:32
5  A.  Yeah.                         09:32
6  Q.  Like setting up sync?         09:32
7  A.  When you're setting up sync, yeah.  The Chrome   09:32
8  sign-up, when you're -- when you're setting up Chrome.   09:32
9  Q.  When you're setting up Chrome.  Okay.   09:32
10 A.  As I mentioned earlier.       09:32
11 Q.  And your testimony is that people would read   09:32
12 the language that your opinion is based on?   09:32
13     MR. BROOME:  Objection --     09:32
14 BY MR. BROOME:                    09:32
15 Q.  With respect to the Chrome setup page?   09:32
16 A.  The setup page, they pretty well have to read   09:32
17 the word sync and un-sync.        09:32
18 Q.  Oh.                           09:32
19 A.  And it's there.  And it's pretty   09:32
20 straightforward.  But they -- but there is a clear   09:32
21 distinction that Google is making on that page that   09:32
22 people are encouraged to believe.   09:32
23 Q.  On that page, the Chrome setup page, that   09:32
24 Google makes a clear distinction between sync and   09:32
25 un-sync.                          09:32

Page 111

1  Is that your testimony?           09:33
2  A.  Well, I just read you -- and you told me that   09:33
3  it was irrelevant.  You implied it was irrelevant to my   09:33
4  reading it -- my implication or what I drew from that.   09:33
5     It says the word "personalized" is a clear   09:33
6  signal Google will be using the -- if the person syncs."   09:33
7  And then it says "allow Chrome sign-in," and they make   09:33
8  it sound like the two are related.  By turning this off,   09:33
9  you can sign into sites without signing into Chrome.   09:33
10     And then I go into some more detail about   09:33
11 this.                             09:33
12 Q.  Okay.  Sorry.                 09:33
13 A.  That is what I'm talking about.   09:33
14 Q.  All right.  But now you're talking about the   09:33
15 sync setup page, not the Chrome setup page?   09:33
16 A.  The -- first Chrome, then sync, yes.   09:33
17 Q.  Okay.  The sync setup page is for people who   09:33
18 have decided to set up sync; right?   09:33
19     MR. STRAITE:  Objection.  Calls for   09:33
20 speculation.  Objection.  Relevance.   09:33
21     THE WITNESS:  What I'm talking about is first   09:33
22 you have to go to the Chrome setup page; right?  Going   09:33
23 to the Chrome page called "Sync Setup."  Okay.  That's   09:34
24 true.  There is a clear indication -- so if you decide   09:34
25 to think about setting up sync, they make that   09:34

Page 112

1  distinction.  Yes.               09:34
2  BY MR. BROOME:                    09:34
3  Q.  I want to -- let's be really, really careful   09:34
4  with the words we use, Professor Turow, because this is   09:34
5  all about interpreting language.   09:34
6  A.  I understand.                 09:34
7  Q.  Yeah.  And I just want to read back something   09:34
8  that you said and give you an opportunity to correct it.   09:34
9  A.  Okay.                         09:34
10    Yeah.  I --                    09:34
11 Q.  You said:                     09:34
12    "With respect to the Chrome setup   09:34
13 page," you said, "the words sync and   09:34
14 un-sync, the way it's presented, as I   09:34
15 suggested to you earlier, make it very   09:34
16 clear they will read it because that's at   09:34
17 the core of what they're doing on that   09:34
18 page" -- "A, they will read it because   09:34
19 that's at the core of what they're doing   09:34
20 on that page, and B, it is quite clear   09:35
21 there is a distinction Google intends to   09:35
22 be made."                         09:35
23    The word "un-sync" don't appear anywhere.   09:35
24 A.  You're absolutely right.  I meant the Chrome   09:35
25 sync setup.                       09:35

Page 113

29 (Pages 110 - 113)

1    Q.  The word "un-sync" don't appear on the Chrome  09:35
2 setup -- sync setup page, do they?              09:35
3    A.  They say that if you decide to sync, then you  09:35
4 will have these things happen, so presumably --     09:35
5    Q.  Personalization?                          09:35
6    A.  Yeah.  If you don't sync, they won't happen.  09:35
7    Q.  What things?                              09:35
8    A.  Personalization and data.  And by implication,  09:35
9 data flow.                                       09:35
10   Q.  Oh, okay.  That's the implication that a    09:35
11 reasonable person would take away from reading the words 09:35
12 "personalization" across your devices?           09:35
13   A.  Sure.  Yes.                               09:35
14   Q.  And that's not based on any research you've  09:35
15 done with any actual Chrome users; right?        09:35
16       MR. STRAITE:  Objection.  Asked and answered.  09:36
17       THE WITNESS:  No, it is not.              09:36
18 BY MR. BROOME:                                   09:36
19   Q.  Okay.  Throughout your report -- well, let me  09:36
20 ask you this:  Are you more or less of an expert on what  09:36
21 reasonable people think than the judge in this case?  09:36
22       MR. STRAITE:  Objection.                  09:36
23       THE WITNESS:  I hate to --                09:36
24       MR. BROOME:  It's a fair question.  He's being  09:36
25 presented as an expert.  It's a fair question.    09:36

Page 114

1        MR. STRAITE:  And the judge is not being    09:36
2 presented as an expert, Steve --                  09:36
3        THE WITNESS:  I think if the judge -- I think  09:36
4 if the judge read everything that I read, she would  09:36
5 come, or he, to the same conclusion.             09:36
6 BY MR. BROOME:                                   09:36
7    Q.  That may be.  But I want to -- my question is  09:36
8 a little different.                              09:36
9        Is the judge -- let's assume the judge does  09:36
10 not have the expert experience that you have.     09:36
11       Is the judge more or less of an expert on what  09:36
12 reasonable people think than Professor Turow?     09:36
13       MR. STRAITE:  Objection.  Calls for        09:36
14 speculation.  Objection.  Calls for a legal conclusion.  09:36
15 And argumentative.  Relevance.                   09:36
16       THE WITNESS:  I don't want to -- what's the  09:36
17 right word?  I don't want to go so far as to say what  09:36
18 the judge would say or do.  It's just -- it's not my --  09:36
19 not my position to make that comment.            09:37
20       But I would say that an ordinary person who  09:37
21 has an understanding of this area would read this  09:37
22 material in the sync setup page and come to the same  09:37
23 conclusion.  You're right.                       09:37
24 BY MR. BROOME:                                   09:37
25   Q.  Perhaps.  But that's not quite my question.  09:37

Page 115

1        I want to get at whether you are actually an  09:37
2 expert on what reasonable people think about the Chrome  09:37
3 privacy notice.                                  09:37
4        Are you bringing expertise or are you simply  09:37
5 reading these documents and offering the opinion of  09:37
6 Professor Turow?                                 09:37
7        MR. STRAITE:  Objection.  Argumentative.   09:37
8 Objection.  Asked and answered.                  09:37
9        THE WITNESS:  You know, we had this discussion  09:37
10 a while back, sir.  I'm not saying what individual  09:37
11 people do or not.  I'm saying what the language of the  09:37
12 document says to people and what they would get out of  09:37
13 it.                                             09:37
14       And I think that a reasonable person reading  09:37
15 this material would -- that the plain language of  09:37
16 somebody who is entering this process would understand  09:37
17 this distinction.                               09:38
18       And, yes, if the judge were to read this  09:38
19 carefully and see the -- what I've seen, that person  09:38
20 would probably find the same thing because that person  09:38
21 is a reasonable person.                          09:38
22 BY MR. BROOME:                                   09:38
23   Q.  And, in fact, the average juror could read  09:38
24 these documents and form their own opinions; correct?  09:38
25       MR. STRAITE:  Objection.  Relevance.       09:38

Page 116

1 Objection.  Calls for speculation.               09:38
2        THE WITNESS:  First of all, I don't like the  09:38
3 word "average" in this context.                  09:38
4        And secondly, if it does come to that, they  09:38
5 certainly will be asked to make that conclusion.  But  09:38
6 I --                                            09:38
7 BY MR. BROOME:                                   09:38
8    Q.  Do you -- go ahead.                       09:38
9    A.  No.  I'm telling you what I see in this as a  09:38
10 person who reads the plain language of the document.  09:38
11   Q.  Is that the expertise you're offering, a    09:38
12 person who reads the plain language in the documents?  09:38
13       MR. STRAITE:  Objection.  Asked and answered.  09:38
14       THE WITNESS:  Within the context of my     09:38
15 knowledge of the -- of the area.  Yes.          09:38
16 BY MR. BROOME:                                   09:38
17   Q.  Do you feel that you are more capable of    09:38
18 opining on what reasonable people think about the Chrome  09:39
19 privacy notice than the judge in the case?       09:39
20       MR. STRAITE:  Steve, this is the -- you're now  09:39
21 doing this -- repeating the same question over and over.  09:39
22 We've seen this in other depositions.  This question has  09:39
23 been asked and answered.                         09:39
24       THE WITNESS:  Yeah.  I --                  09:39
25       MR. STRAITE:  Same objections as before.   09:39

Page 117

30 (Pages 114 - 117)

CONFIDENTIAL

| | |
|---|---|
| 1      THE WITNESS:  Yeah.  I really have answered  09:39 | 1      THE VIDEOGRAPHER:  We are back on the record  09:58 |
| 2  the question before.  And I don't know -- if the judge  09:39 | 2  at 12:58 p.m.                              09:58 |
| 3  is watching, she can make the decision as to whether she  09:39 | 3  BY MR. BROOME:                            09:58 |
| 4  thinks my interpretation is proper.  I hope she will  09:39 | 4      Q.  Hello, Professor Turow.           09:58 |
| 5  agree with me.                             09:39 | 5      A.  Yes, sir.  Hi.                      09:58 |
| 6  BY MR. BROOME:                            09:39 | 6      Q.  Throughout your report, you use the term  09:58 |
| 7      Q.  Yes.  But that's a separate question.  09:39 | 7  "personal information"; correct?            09:58 |
| 8      Do you believe that you bring expertise that  09:39 | 8      A.  I don't know how often I use it, but I'll take  09:58 |
| 9  somebody who does not have your experience does not to  09:39 | 9  your word for it.  Yes.                     09:58 |
| 10  this question about the meaning of the Chrome privacy  09:39 | 10      Q.  Okay.  And you never define that term in your  09:58 |
| 11  notice?                                  09:39 | 11  report, do you?                            09:58 |
| 12      MR. STRAITE:  Objection.  Asked and answered.  09:39 | 12      A.  You never define that term either, as far as I  09:58 |
| 13  Calls for speculation.                      09:39 | 13  can tell.  But it's used by Google, and that's why I use  09:58 |
| 14      THE WITNESS:  My answer is yes, sir.    09:39 | 14  it.                                      09:58 |
| 15  BY MR. BROOME:                            09:39 | 15      Q.  Okay.  When you say "you never define that  09:58 |
| 16      Q.  Yes.  Okay.                        09:39 | 16  term," you're talking about Google presumably, not  09:58 |
| 17      And that experience is?                 09:39 | 17  Steve Broome?                             09:58 |
| 18      A.  That I understand the material.  I know how  09:39 | 18      A.  Yeah.  I mean, they give examples, of course,  09:58 |
| 19  this is -- I have an understanding of the ways in which  09:40 | 19  about how --                              09:58 |
| 20  the documents flow.  I can look at the documents.  I can  09:40 | 20      Q.  Uh-huh.                           09:58 |
| 21  make comparisons across documents.  And I can suggest  09:40 | 21      A.  But always saying -- you know, with almost  09:58 |
| 22  what the meaning is.                        09:40 | 22  like the et cetera.                         09:59 |
| 23      Q.  Okay.  And the judge couldn't do those things.  09:40 | 23      Q.  Uh-huh.                           09:59 |
| 24      Is that your opinion?                    09:40 | 24      Do you give -- do you use that term?     09:59 |
| 25      MR. STRAITE:  Objection.  Asked and answered.  09:40 | 25      A.  Oh, I use it in my research a lot.     09:59 |
| Page 118 | Page 120 |

| | |
|---|---|
| 1  Calls for a legal conclusion.  Calls for speculation.  09:40 | 1      Q.  Say again?                         09:59 |
| 2      THE WITNESS:  Yeah.  I -- judges have more  09:40 | 2      A.  I use "personalization" in a lot of my books,  09:59 |
| 3  important things to do.                      09:40 | 3  for example, the term.                       09:59 |
| 4  BY MR. BROOME:                            09:40 | 4      Q.  Okay.  Yeah.  Maybe you're misunderstanding  09:59 |
| 5      Q.  Well, you're being offered as an expert;  09:40 | 5  me.                                      09:59 |
| 6  right?  I mean, you're not --                 09:40 | 6      How do you define "personal information" as  09:59 |
| 7      A.  That's exactly the point, sir.  That's exactly  09:40 | 7  you use it in your report?                    09:59 |
| 8  the point.                                09:40 | 8      A.  As I use it in my report, what I mean by  09:59 |
| 9      Q.  What's the point?                    09:40 | 9  "personalization" -- "personal information" is the  09:59 |
| 10      A.  Why -- I'm offered as an -- if judges had to  09:40 | 10  ability to identify an individual within and across  09:59 |
| 11  go through every piece of evidence the way experts have,  09:40 | 11  devices.                                 09:59 |
| 12  they would not be able to try any cases.  The whole  09:40 | 12      THE VIDEOGRAPHER:  I'm sorry, Professor Turow.  09:59 |
| 13  point is to get someone who has a neutral --   09:40 | 13  Could we get you a little more centered?       09:59 |
| 14      When I was approached to do this project, they  09:40 | 14      THE WITNESS:  I'm sorry.                 09:59 |
| 15  asked me what I thought.  They didn't say you are to do  09:41 | 15      And then to -- and the personalization comes  09:59 |
| 16  X, Y, Z.  And if I didn't agree with it, I wouldn't come  09:41 | 16  in in terms of using and sort of serving data to that  09:59 |
| 17  close to being an expert witness.             09:41 | 17  person based upon that.                      09:59 |
| 18      MR. BROOME:  Okay.  Why don't we take another  09:41 | 18  BY MR. BROOME:                            10:00 |
| 19  short break.                              09:41 | 19      Q.  All right.  You said "Personal information,"  10:00 |
| 20      David, what do you want -- let's go off the  09:41 | 20  as used in your report, "means the ability to identify  10:00 |
| 21  record for a minute.                        09:41 | 21  an individual within and across devices."     10:00 |
| 22      MR. STRAITE:  We can go off the record.   09:41 | 22      Am I understanding you correctly?         10:00 |
| 23      THE VIDEOGRAPHER:  Okay.  We're off the record  09:41 | 23      A.  With the consequent activity of sending data  10:00 |
| 24  at 12:41 p.m.                             09:41 | 24  to that person, information to that person, material to  10:00 |
| 25      (Break taken in proceedings.)            09:57 | 25  that person based upon that activity.         10:00 |
| Page 119 | Page 121 |

31 (Pages 118 - 121)

| | |
|---|---|
| 1     You follow?                                10:00 | 1 BY MR. BROOME:                              10:00 |

1     You follow?                                10:00
2     Q.  Not really.                            10:00
3     A.  Okay.  It's the identification of a -- the   10:00
4 ability to identify an individual.  And once you   10:00
5 identify that individual, you then decide on particular   10:00
6 material to send that person based upon the way you have   10:00
7 characterized that individual.                10:00
8     Q.  Yeah.  But I'm talking -- we're talking about   10:00
9 what is personal information?                  10:00
10     A.  That's what I just -- oh, personal   10:00
11 information.  I thought you meant personalization.   10:00
12     Q.  Yeah.  Okay.  So let's start again.   10:00
13     A.  Okay.                                 10:00
14     Q.  You use the term "personal information" in   10:00
15 your report; correct?                          10:01
16     A.  I don't -- show me where I use "personal   10:01
17 information."                                  10:01
18     I use "personalization."  I don't remember   10:01
19 exactly using "personal information," to be absolutely   10:01
20 honest.                                        10:01
21     Q.  Your very first opinion, "A reasonable person   10:01
22 would interpret Google's disclosures to mean that Chrome   10:01
23 does not take personal information unless" --   10:01
24     A.  Oh, okay.  I apologize.  Yeah.  The --   10:01
25 ///
                                        Page 122

1     THE COURT REPORTER:  I'm so sorry.  But,   10:01
2 Mr. Turow, you're speaking over Mr. Broome when he's   10:01
3 talking and I -- on Zoom, your voice -- everybody's   10:01
4 voice goes away so I can't hear anything.  So the   10:01
5 transcript is going to be very choppy and it's probably   10:01
6 not going to make sense.  So --                10:01
7     MR. BROOME:  Let me just repeat the -- we'll   10:01
8 be mindful of that.  Sorry about that.         10:01
9     Let me just repeat the part of the report   10:01
10 because I want to make sure you have that clear.   10:01
11     Professor Turow asked me where in the report   10:02
12 does he reference personal information?  And I started   10:02
13 with his first opinion, which says:            10:02
14     "A, quote, "reasonable person," end   10:02
15     quote, "would interpret Google's   10:02
16     disclosures to mean that Chrome does not   10:02
17     take personal information, unless the user   10:02
18     elects to," quote "sync," end quote, "the   10:02
19     browser with a Google account."           10:02
20     THE WITNESS:  Right.                       10:02
21     So personal information here means exactly the   10:02
22 same thing as what I defined personalization, which is   10:02
23 that it -- what Google -- personal information, it means   10:02
24 taking -- identifying the individual within and   10:02
25 potentially across devices.                    10:02
                                        Page 123

1 BY MR. BROOME:                                 10:00
2     Q.  Personal information and personalization are   10:02
3 the same, in your opinion?                     10:02
4     A.  Personalization is the process of then using   10:02
5 that personal information to send an individual material   10:02
6 based on the personal -- on the accessing of personal   10:02
7 information.                                   10:03
8     Q.  All right.  Does Google define personal   10:03
9 information?                                   10:03
10     A.  Yes, it does.  And in a number of places.  And   10:03
11 I -- I believe that it -- it does so according to legal   10:03
12 scriptures, you know, in different places.     10:03
13     So, yeah, I believe Google does define   10:03
14 personal information.                          10:03
15     Q.  Is Google's definition of personal information   10:03
16 the same as your definition of personal information?   10:03
17     A.  Yeah, I think it is.                   10:03
18     Q.  Have you -- prior to this case, have you ever   10:03
19 done any research into what internet users think of as   10:03
20 personal information?                          10:03
21     MR. STRAITE:  Objection.  Relevance.       10:03
22 Objection.  Vague.                             10:03
23     THE WITNESS:  Yeah.  You asked me that before   10:03
24 and I -- I don't think I've done research in that   10:04
25 specific area.                                 10:04
                                        Page 124

1 BY MR. BROOME:                                 10:04
2     Q.  Did you do any research for purposes of this   10:04
3 report as to what internet users considered to be   10:04
4 personal information?                          10:04
5     MR. STRAITE:  Objection.  Relevance.       10:04
6     THE WITNESS:  No, I did not.              10:04
7 BY MR. BROOME:                                 10:04
8     Q.  Okay.  Let's take a look at --         10:04
9     Tab 26, we're going to mark as Exhibit 3.   10:05
10     MR. STRAITE:  So we're done with Exhibit 2?   10:05
11     MR. BROOME:  For now.                      10:05
12 BY MR. BROOME:                                 10:05
13     Q.  So this is -- you're employed by the   10:05
14 University of Pennsylvania; right?             10:05
15     A.  Yes, sir.                             10:05
16     Q.  Okay.  And I'm just using this as a privacy   10:05
17 policy.  I'm just using it as an example.  This is the   10:05
18 University of Pennsylvania's privacy policy.   10:05
19     A.  Okay.                                 10:05
20     Q.  Have you seen it before?  Have you ever looked   10:05
21 at it?                                         10:05
22     MR. STRAITE:  Hold on, Steve.  Give us a   10:05
23 moment.                                        10:05
24     THE WITNESS:  I never read it very carefully,   10:05
25 to be honest.                                  10:05
                                        Page 125

32 (Pages 122 - 125)

1          (Defendants' Exhibit 3 was          10:05
2          marked for identification.)          10:05
3          MR. STRAITE: Hold on, Steve. So this bears    10:05
4    the exhibit labeled 3 at the bottom right–hand corner    10:05
5    and it says "Penn Privacy Policy" at the top? That's    10:05
6    the right document?          10:05
7          MR. BROOME: Yep.          10:05
8          THE WITNESS: It's embarrassing to say that I    10:05
9    have never read the Penn privacy policy. Probably    10:05
10    should.          10:06
11          MR. STRAITE: It's there in front of the    10:06
12    professor.          10:06
13    BY MR. BROOME:          10:06
14    Q. Okay. Professor, if you see, there's like a    10:06
15    hyper link table of contents on the first page.    10:06
16    A. Yes, I do.          10:06
17    Q. The first hyperlink is "Personal Information."    10:06
18          And then if you turn to the next page, that's    10:06
19    where personal information is explained; right?    10:06
20    A. Yes.          10:06
21    Q. And the definition in the Penn Privacy    10:06
22    Policy -- the definition of personal information in the    10:06
23    Penn Privacy Policy is:          10:06
24          "Information that identifies you as    10:06
25    an individual or relates to an          10:06
                                                    Page 126

1    identifiable individual including, but not    10:06
2    limited to:          10:06
3          "Name.          10:06
4          "Postal address.          10:06
5          ""Telephone number.          10:06
6          "E-mail address.          10:06
7          "Credit and debit card number.          10:06
8          "Profile picture.          10:06
9          "Social media account ID.          10:06
10    Penn or other Penn issued system credentials."    10:06
11          Do you see that?          10:07
12    A. I see that.          10:07
13          MR. STRAITE: Hold on. Before you answer,    10:07
14    Professor Turow, I want to get my objections in.    10:07
15          THE WITNESS: Okay.          10:07
16          MR. STRAITE: I object on the basis of    10:07
17    foundation to any questions about this document. You    10:07
18    know, of course, objection as to relevance.    10:07
19          MR. BROOME: Mm-hm.          10:07
20    BY MR. BROOME:          10:07
21    Q. And then at the bottom it says:          10:07
22          "Any information that you voluntarily    10:07
23    provide through your use of our services    10:07
24    and may include sensitive information,    10:07
25    such as health, financial, or racial and    10:07
                                                    Page 127

1    ethnic origin information."          10:07
2          Do you see that?          10:07
3    A. Yes, I do.          10:07
4    Q. Do you believe that definition is consistent    10:07
5    with what a reasonable person would think of as personal    10:07
6    information when they read a privacy policy?          10:07
7          MR. STRAITE: Objection. Relevance.    10:07
8          THE WITNESS: I think that a reasonable person    10:07
9    reading this would understand what they're saying.    10:07
10    BY MR. BROOME:          10:07
11    Q. Okay.          10:07
12    A. That was my remit.          10:07
13          You keep on making it sound like I know what's    10:07
14    in people's heads. The remit is to say what does Penn    10:07
15    say about what personal information means, and could a    10:07
16    reasonable person understand this? And the answer is    10:08
17    yes.          10:08
18    Q. Well, do you think that there is just like --    10:08
19    is there --          10:08
20          Well, let's put it this way: You say that in    10:08
21    your report, the term "personal" -- the way you use the    10:08
22    term "personal information" means the ability to    10:08
23    define -- sorry -- "the ability to identify an    10:08
24    individual within and across devices."          10:08
25          Do you believe that a reasonable person    10:08
                                                    Page 128

1    reviewing the term "personal information" would think of    10:08
2    that same definition?          10:08
3          MR. STRAITE: Objection. Vague. Objection.    10:08
4    Relevance.          10:08
5          THE WITNESS: Again, you're misunderstanding.    10:08
6    My definition is not that different from Penn's    10:08
7    definition in the first two lines.          10:08
8          MR. BROOME: Uh-huh.          10:08
9          THE WITNESS: So if a person read that, they    10:08
10    would absolutely know what Penn means by personal    10:08
11    information.          10:09
12    BY MR. BROOME:          10:09
13    Q. Okay. Would they think that that definition    10:09
14    includes their IP address?          10:09
15          MR. STRAITE: Objection. Calls for    10:09
16    speculation.          10:09
17          THE WITNESS: If it said so.          10:09
18    BY MR. BROOME:          10:09
19    Q. Not -- but not otherwise?          10:09
20    A. I don't know how many people know what IP    10:09
21    address means. But to the extent that it said that,    10:09
22    they would have some idea that there is something called    10:09
23    an IP address, if it said that, that Penn would look at.    10:09
24    Q. But it doesn't say that; correct?          10:09
25    A. Here it does not say that.          10:09
                                                    Page 129

33 (Pages 126 - 129)

1    Q.  And so you think -- reasonable people reading   10:09
2  this would not think that University of Pennsylvania is   10:09
3  collecting their IP address -- or sorry. Excuse me.   10:09
4       Reasonable people reading this would not think   10:09
5  that IP address falls within the definition of personal   10:09
6  information as that term is used in the Penn privacy   10:09
7  policy; correct?   10:09
8       MR. STRAITE: Objection. Relevance.   10:09
9  Objection. Calls for speculation.   10:09
10       THE WITNESS: The only thing I can say is that   10:09
11  they do the same thing that you guys do, which is to say   10:09
12  "not limited to" so that anybody reading it would say   10:10
13  that there's something else going on.   10:10
14  BY MR. BROOME:
15    Q.  Would reasonable people who read the   10:10
16  Penn Privacy Policy's definition of personal information   10:10
17  think that IP address is included in the term "personal   10:10
18  information"?   10:10
19       MR. STRAITE: Same objections as before, plus   10:10
20  asked and answered.   10:10
21       THE WITNESS: Yeah. They would say there's   10:10
22  something else there. I don't know if they would think   10:10
23  of IP address, but they would say, "This is not the   10:10
24  exhaustive set of -- of information that Penn gets."   10:10
25       But that's -- you know, that's the same thing   10:10

Page 130

1  you guys do. You stick in IP address. I don't know if   10:10
2  most people know what that means, but they know that   10:10
3  they are being tracked in some way.   10:10
4  BY MR. BROOME:
5    Q.  You said "I don't know if most people know   10:10
6  what that means," referring to IP address, "but they   10:11
7  know that they are become tracked in some way."   10:11
8       What do you mean by that?   10:11
9    A.  That when it says that we use your personal   10:11
10  information if you -- if you sync, then you're going to   10:11
11  have the certain kinds of data about you used -- taken   10:11
12  and used by Chrome and Google. Pretty straightforward.   10:11
13    Q.  Would reasonable people reading the   10:11
14  Penn Privacy Policy's definition of IP address think   10:11
15  that -- would reasonable people reading the   10:12
16  Penn Privacy Policy's definition of personal information   10:12
17  think that the pages on the Penn website that they   10:12
18  clicked falls within that definition?   10:12
19       MR. STRAITE: Objection. Calls for   10:12
20  speculation. Objection. Relevance. Goes beyond the   10:12
21  scope of his report.   10:12
22       THE WITNESS: Beyond that, sir, I haven't read   10:12
23  the entire Penn Privacy Policy. I cannot answer your   10:12
24  question based upon reading five or six lines. This is   10:12
25  just not acceptable.   10:12

Page 131

1       If you would ask me to read the   10:12
2  Penn Privacy Policy two days ago in advance of our   10:12
3  discussion here, I could go into much more detail.   10:12
4  BY MR. BROOME:
5    Q.  Well, just -- let's just assume that all we're   10:12
6  reading is the Penn Privacy Policy's definition of   10:12
7  personal information.   10:12
8    A.  Okay.   10:12
9    Q.  Would a reasonable person reading just that   10:12
10  definition think that the pages within the Penn website   10:12
11  that they click would be personal information?   10:12
12       MR. STRAITE: Objection. Calls for   10:13
13  speculation. Objection. Relevance.   10:13
14       THE WITNESS: Let me look at it again.   10:13
15       They really don't talk very much at this point   10:13
16  about what they do with the data except that it says   10:13
17  that people may voluntarily provide other information.   10:13
18       So there's really nothing here. This is a   10:13
19  prologue to larger set of discussion. We just can't   10:13
20  make -- I can't answer the question based upon what   10:13
21  you've shown me.   10:13
22  BY MR. BROOME:
23    Q.  And so you would need more context in order to   10:13
24  understand -- in order to determine that --   10:13
25    A.  You would need more plain language that says   10:13

Page 132

1  this is how we use your data.   10:13
2       You know as well as I do that privacy policies   10:13
3  have to say how we use your data. And this does not say   10:13
4  that. This section of the privacy policy doesn't say   10:13
5  that.   10:14
6    Q.  Mm-hm.   10:14
7       Would you agree the term "personal   10:14
8  information" means different things to different people?   10:14
9       MR. STRAITE: Objection. Calls for   10:14
10  speculation. Vague. Relevance.   10:14
11       THE WITNESS: I -- again, I am not here to   10:14
12  judge what people think of personal information. I'm   10:14
13  here to look at the plain language of a policy and say   10:14
14  given that plain language, this is what it means.   10:14
15       It's very different from the way you've asked   10:14
16  the question, sir.   10:14
17  BY MR. BROOME:
18    Q.  What -- okay. Well, but you do opine on what   10:14
19  reasonable people think about the term "personal   10:14
20  information" in the Chrome Privacy Notice; correct?   10:14
21    A.  I'm looking at the Chrome Privacy Notice and   10:14
22  saying this is what the notice says. I'm not saying   10:14
23  people come to the notice with some notions of personal   10:14
24  information, and then they kind of, you know, dump it on   10:14
25  the Chrome Privacy form.   10:15

Page 133

34 (Pages 130 - 133)

CONFIDENTIAL

1 I'm saying here is the language of the    10:15
2 Chrome Privacy Notice. This is what it says. This is    10:15
3 how it seems to lead people to make the mistaken idea --    10:15
4 in quotes "mistaken" -- that there is this distinction    10:15
5 between synced and un-synced.    10:15
6     I'm looking at the words, not of what people    10:15
7 bring to the thing in their heads. I'm looking at    10:15
8 what -- if they decided to read the policy, what they    10:15
9 would infer from it, what plain language they would get    10:15
10 out of it.    10:15
11    Q. But you're doing more than just reading the    10:15
12 words. I mean, we can all do that. You're opining on    10:15
13 what reasonable people would interpret when they read    10:15
14 those words.    10:15
15    A. Based on those words. Yes, exactly. But    10:15
16 not -- not what they bring to the story.    10:15
17    Q. Uh-huh.    10:15
18    But what they bring to the story is important,    10:15
19 is it not? It can affect how they interpret certain    10:15
20 language.    10:16
21    MR. STRAITE: Let me get my objections in.    10:16
22    Objection. Vague. Objection. Relevance.    10:16
23 Beyond the scope.    10:16
24    THE WITNESS: Yeah. They -- what it is that    10:16
25 people bring is not the same thing as what the language    10:16

Page 134

1 on the page says. And when people read the plain    10:16
2 language, if they even get to read the privacy notice or    10:16
3 privacy policy, they would see plain language as to what    10:16
4 that particular policy means.    10:16
5    Bringing the Penn policy in here and showing    10:16
6 me a few lines and asking me to make the kind of    10:16
7 conclusions about what Penn does with this or what    10:16
8 people think Penn would do with this is not the same    10:16
9 thing as what we're talking about in the case.    10:16
10 BY MR. BROOME:    10:16
11    Q. Okay. Do you have an opinion on whether    10:16
12 reasonable people would consider their IP address to be    10:16
13 personal information?    10:17
14    MR. STRAITE: Objection. Relevance.    10:17
15 Objection. Vague.    10:17
16    THE WITNESS: The more important opinion is    10:17
17 what Google's Privacy Policy and the Chrome Privacy    10:17
18 Policy say is personal information. That's the issue    10:17
19 at hand.    10:17
20 BY MR. BROOME:    10:17
21    Q. Does the Chrome Privacy Notice say that your    10:17
22 IP address is personal information?    10:17
23    A. I'd have to look at it again.    10:17
24    Q. Okay. Well, we'll come back to that.    10:17
25    Without looking at the Chrome Privacy Notice,    10:17

Page 135

1 let's just -- putting that aside for a second, do    10:17
2 reasonable people consider IP -- do you have an    10:17
3 opinion -- sorry. Let me preface this. I'm asking    10:17
4 whether you have an opinion. It's fine for you to say    10:17
5 "no."    10:17
6    Do you have an opinion as to whether    10:17
7 reasonable people consider their IP address to be    10:17
8 personal information?    10:17
9    MR. STRAITE: Objection. Relevance.    10:17
10 Objection. Vague.    10:17
11    THE WITNESS: Again, what I have been asked to    10:17
12 conclude is what's written on the page. If I have an    10:17
13 opinion about whether anybody understands what an IP    10:17
14 address is, is a totally different question from the    10:17
15 issue at hand.    10:17
16    If you want me to tell you, I'll tell you, but    10:17
17 that has nothing to do with what I'm concluding in my    10:18
18 report. You seem -- you seem to want to bring in    10:18
19 people's a priori ideas about their knowledge.    10:18
20    A person reading the policy, if they decided    10:18
21 to read the policy, would get a very specific    10:18
22 understanding of what's there. It's straightforward.    10:18
23 BY MR. BROOME:    10:18
24    Q. You're talking about the Chrome Privacy    10:18
25 Notice?    10:18

Page 136

1    A. Yes. And the Google Privacy Policy, if they    10:18
2 decided to read it.    10:18
3    Q. Okay.    10:18
4    A. If it says "IP address" -- even if the person    10:18
5 didn't know what an IP address is, they would know that    10:18
6 the IP address is being collected.    10:18
7    So, for example, the Penn takes a profile    10:18
8 picture. What's a profile picture? I don't know.    10:18
9 Presumably that they have your picture. They had my    10:18
10 picture on the website. Presumably that's what a    10:18
11 profile picture is.    10:18
12    You know, it never occurred to me to think    10:18
13 about that until I saw those words. That's all. That's    10:18
14 what I'm trying to say.    10:18
15    Q. You understand that the California Consumer    10:19
16 Privacy Act has a definition of personal information?    10:19
17    A. Yes, I do.    10:19
18    Q. Do you believe that most people are familiar    10:19
19 with that definition?    10:19
20    MR. STRAITE: Objection. Calls for    10:19
21 speculation.    10:19
22    THE WITNESS: Again, sir, I'm not -- that's    10:19
23 not what I'm supposed to be talking about here in terms    10:19
24 of what people asked me to do. It's not relevant    10:19
25 what -- it's more relevant whether Google understands    10:19

Page 137

35 (Pages 134 - 137)

1 what the CCPA says than what a person coming to    10:19
2 Google's Privacy Policy says. Because Google is a    10:19
3 company that has to abide by that. People will then    10:19
4 read it and understand what Google wants them to get.    10:19
5 BY MR. BROOME:
6    Q.  All right. The lawyers will argue about    10:19
7 relevance later in the case, Professor.    10:19
8        I'm asking you whether you have an opinion as    10:19
9 to whether most people are familiar with the CCPA    10:20
10 definition of personal information?    10:20
11        MR. STRAITE: Objection. Again, calls for    10:20
12 speculation. Objection. Relevance.    10:20
13        THE WITNESS: I don't think it has any    10:20
14 consequence for my report. But to be real honest, I    10:20
15 don't think that people -- if you walked into the    10:20
16 streets of San Jose and asked somebody what the CCPA    10:20
17 definition of personal information is, they would look    10:20
18 at you like you were crazy.    10:20
19 BY MR. BROOME:
20    Q.  Right.    10:20
21    A.  And the reason is people have a life.    10:20
22        Okay?    10:20
23        We get paid to look at this stuff. They    10:20
24 don't.    10:20
25        But if they went to the privacy policy of a    10:20

Page 138

1 particular company, if they did, and tried to read this    10:20
2 stuff, they would see what the sort of broad sense of    10:20
3 what that company means by personal information.    10:20
4        And that's what I was asked to opine about.    10:20
5    Q.  Right.    10:20
6        Reasonable people don't think of the CCPA    10:20
7 definition when somebody uses personal information;    10:20
8 correct?    10:20
9        MR. STRAITE: Same objections. Relevance.    10:21
10        THE WITNESS: I don't know.    10:21
11        MR. STRAITE: Calls for speculation.    10:21
12        Let me get my objections out.    10:21
13        THE WITNESS: Yeah. Sorry.    10:21
14        MR. STRAITE: Calls for speculation.    10:21
15        THE WITNESS: Again, I'm saying the same thing    10:21
16 again, sir. The reasonable -- my remit was not to ask    10:21
17 what a reasonable person would think about the CCPA or    10:21
18 any privacy policy. It is what does the privacy policy    10:21
19 say in plain language that a reasonable person would    10:21
20 understand? They're two separate issues.    10:21
21        Reasonable people have a life to live. And    10:21
22 one of the problems here is that the privacy policies    10:21
23 are often made in order to lead people on to something    10:21
24 that they probably haven't thought about before, and so    10:21
25 essentially get them to think one thing when actually    10:21

Page 139

1 another thing is going on.    10:21
2        Okay?    10:21
3        But we're talking about plain language here,    10:21
4 not the thoughts in people's heads before they come to    10:21
5 the privacy policy.    10:21
6 BY MR. BROOME:
7    Q.  But those thoughts in people's heads are    10:21
8 important, are they not, to how they interpret the plain    10:21
9 language?    10:22
10        MR. STRAITE: Objection. Calls for    10:22
11 speculation. Objection. Relevance.    10:22
12        THE WITNESS: I don't know if they are or not.    10:22
13        But the language here across Google's policies    10:22
14 is so consistent that anyone who was trying to see if    10:22
15 there were contradictions would come up empty.    10:22
16        It's almost as if someone wanted to make it    10:22
17 consistent like that in a mistaken way.    10:22
18 BY MR. BROOME:
19    Q.  Is it your understanding that the term    10:22
20 "personal information," as it is used in the    10:22
21 Chrome Privacy Notice, covers the categories of data    10:22
22 that are at issue in this case?    10:22
23    A.  Could you explain what you mean by that?    10:22
24    Q.  Yeah.    10:22
25        Well, your first opinion is:    10:22

Page 140

1        "A reasonable person would interpret    10:22
2        Google's disclosures to mean that Chrome    10:22
3        does not take personal information unless    10:22
4        the user elects to sync the browser with    10:22
5        the Google account"; right?    10:23
6        MR. STRAITE: We don't have his report in    10:23
7 front of him. We have Exhibit 3 in front of us. Should    10:23
8 we go back to Exhibit 2?    10:23
9        MR. BROOME: Yeah. Sure. Why not.    10:23
10        THE WITNESS: It would probably also be a good    10:23
11 idea to look at Chrome Privacy Policy.    10:23
12        MR. BROOME: We'll do that next. We're going    10:23
13 to go one and then the other.    10:23
14        THE WITNESS: Okay.    10:23
15        MR. STRAITE: Okay. He has Exhibit 2 in front    10:23
16 of him.    10:23
17        THE WITNESS: Yes, sir.    10:23
18 BY MR. BROOME:    10:23
19    Q.  Okay. You say:    10:23
20        "A reasonable person would interpret    10:23
21        Google's disclosures to mean that Chrome    10:23
22        does not take personal information, unless    10:23
23        a user elects to sync the browser with the    10:23
24        Google account"; right?    10:23
25    A.  Yes, sir.    10:23

Page 141

36 (Pages 138 - 141)

CONFIDENTIAL

| | |
|---|---|
| 1  Q.  Okay.  And then -- let me see.        10:23 | 1 identifier of personal information, unless the cookie is 10:25 |
| 2        Okay.  And then opinion -- if you go down to  10:23 | 2 erased by the individual.  And as you know, Google has a 10:25 |
| 3 page 6, you're sort of -- opinion sub 2 is that:  10:23 | 3 way of reattaching that identity.        10:25 |
| 4        "A reasonable person who read the     10:23 | 4        So the cookie identifier is personal     10:25 |
| 5 Chrome Privacy Notice would understand     10:23 | 5 information as long as it's in the person's browser.   10:26 |
| 6 that Chrome does not send personal     10:23 | 6        MR. BROOME:  And is that what -- is that --  10:26 |
| 7 information to Google unless a person     10:23 | 7 okay.  So a cookie is personal information in your     10:26 |
| 8 enables sync"; correct?        10:23 | 8 understanding?        10:26 |
| 9  A.  Mm-hm.        10:23 | 9        THE WITNESS:  No.  The information --     10:26 |
| 10  Q.  And your understanding is that Chrome does  10:23 | 10        MR. STRAITE:  Let me get my objections in.  10:26 |
| 11 send personal information to Google, even when users are 10:24 | 11        Objection.  Relevance.  Calls for speculation.  10:26 |
| 12 not synced; correct?        10:24 | 12 We're getting really far afield.        10:26 |
| 13  A.  Yes.        10:24 | 13        THE WITNESS:  Well, yeah.  And not only that,  10:26 |
| 14  Q.  That's an assumption you're making; correct?  10:24 | 14 sir, you're mangling my opinion.        10:26 |
| 15  A.  That was -- if you read the beginning of my  10:24 | 15        A cookie is not personal information.  The  10:26 |
| 16 report, it says that I'm accepting that expert opinion.  10:24 | 16 information stored connected to the cookie is personal  10:26 |
| 17  Q.  Understood.        10:24 | 17 information.        10:26 |
| 18        Now, then the question becomes, well, what is  10:24 | 18        Okay?        10:26 |
| 19 personal information?        10:24 | 19 BY MR. BROOME:        10:26 |
| 20        Is the -- are the categories -- and I'm asking  10:24 | 20  Q.  The cookie itself is not personal information,  10:26 |
| 21 you this:  Are the categories of data at issue in the  10:24 | 21 in your opinion?        10:26 |
| 22 case, IP address, user age and information, refer URLs,  10:24 | 22        MR. STRAITE:  Objection.  Calls for     10:26 |
| 23 URLs, get requests that sort of information, are those  10:24 | 23 speculation.  Calls for a legal conclusion.        10:26 |
| 24 personal information?        10:24 | 24        THE WITNESS:  We get into the whole thing of  10:26 |
| 25  A.  To the extent that they can link to an     10:24 | 25 what is a cookie?  It's a text; right?  It's a small  10:26 |
| Page 142 | Page 144 |

| | |
|---|---|
| 1 individual ID or an individual person, yes.        10:24 | 1 amount of text.        10:26 |
| 2  Q.  What do you mean by "an individual ID"?  10:24 | 2        The text in the cookie alludes to     10:26 |
| 3  A.  Well, you know as well as I do that when  10:24 | 3 personalization that Google has in its database about  10:26 |
| 4 Google doesn't have your log-in, they create IDs for the 10:24 | 4 me, for example.        10:26 |
| 5 individual, which then become I guess you could say  10:24 | 5 BY MR. BROOME:        10:26 |
| 6 avatars or counterparts to that person.  Sometimes in  10:24 | 6  Q.  Personalization or personal information?  10:26 |
| 7 the end they'll try to sync them together.        10:25 | 7  A.  Personal information, which then becomes     10:26 |
| 8  Q.  Uh-huh.        10:25 | 8 personalization.  A cookie is a vehicle for     10:26 |
| 9  A.  So -- but that would still be personal     10:25 | 9 personalization.  It's tricky that way in programmatic  10:27 |
| 10 information because it can be used in a fashion that  10:25 | 10 advertising all the time.        10:27 |
| 11 targets that person based upon the profiles that had  10:25 | 11  Q.  Do you think that when most people read the  10:27 |
| 12 been created, even if they don't know the person's name,  10:25 | 12 term "personal information," they would -- in a privacy  10:27 |
| 13 for example.        10:25 | 13 policy, they would think -- well, actually, strike that.  10:27 |
| 14  Q.  What if the information, the categories of  10:25 | 14        Let's go to the Chrome Privacy Notice.  Let's  10:27 |
| 15 data that are at issue in this case, is merely     10:25 | 15 go to the next exhibit.        10:27 |
| 16 associated with a cookie identifier and not with     10:25 | 16        (Defendants' Exhibit 4 was     10:27 |
| 17 anything that could be used to identify the individual;  10:25 | 17        marked for identification.)        10:27 |
| 18 a cookie that could be, you know, reset by the user at  10:25 | 18        MR. BROOME:  What tab is it?        10:27 |
| 19 any time?  Is that personal information?        10:25 | 19        MR. STRAITE:  Just let us know when it's     10:27 |
| 20  A.  Any --        10:25 | 20 uploaded and we'll refresh.        10:27 |
| 21        MR. STRAITE:  Hold on.  Let me get the     10:25 | 21        MS. OLSON:  It's uploaded.        10:28 |
| 22 objection in.        10:25 | 22        THE WITNESS:  Okay.        10:28 |
| 23        Objection.  Relevance.  Objection.  Calls for  10:25 | 23        MR. STRAITE:  So, Steve, we have in front of  10:28 |
| 24 speculation.        10:25 | 24 us a document that says "Google Chrome Privacy Notice"  10:28 |
| 25        THE WITNESS:  A cookie identifier is an     10:25 | 25 and has the Exhibit 4 sticker on the lower right-hand  10:28 |
| Page 143 | Page 145 |

37 (Pages 142 - 145)

1 corner of page 1.                          10:28
2        MR. BROOME:  Yeah.  I think this is a    10:28
3 printout -- I mean, this is something that was already    10:28
4 produced.                                   10:28
5        THE WITNESS:  Right.              10:28
6        MR. BROOME:  Chrome Privacy Notice effective    10:28
7 May 20th, 2020.                             10:28
8 BY MR. BROOME:
9    Q.  And you reviewed this document in connection    10:28
10 with preparing your report; correct?       10:28
11    A.  Yes, I did.                        10:28
12    Q.  Okay.  So let's go to the "Browser modes"    10:28
13 descriptions, which is on the second page.    10:29
14    A.  Yes.                              10:29
15    Q.  You see it says "Browser modes"?    10:29
16    A.  Right.                            10:29
17    Q.  It says:                          10:29
18        "You don't need to provide any       10:29
19 personal information to use Chrome but     10:29
20 Chrome has different modes that you can    10:29
21 use to change or improve your browsing    10:29
22 experience."                                10:29
23        Do you see that?                   10:29
24    A.  Yes, sir.                         10:29
25    Q.  And you offer some opinions about that    10:29

Page 146

1 sentence; correct?                         10:29
2    A.  Yes, I do.                         10:29
3    Q.  All right.  And then it says:        10:29
4        "Privacy practices are different      10:29
5 depending on the mode that you're using."    10:29
6        Do you see that?                   10:29
7    A.  Yes, I do.                         10:29
8    Q.  All right.  And then it describes "Basic    10:29
9 browser mode."                              10:29
10    A.  Yes.                              10:29
11    Q.  Do you understand that's the mode that --    10:29
12 that's the default mode; right?  You just download    10:29
13 Chrome and start using it?                 10:29
14        MR. STRAITE:  Objection.  Assumes facts not in    10:30
15 evidence.                                   10:30
16        THE WITNESS:  Let's see.  The best --    10:30
17        THE COURT REPORTER:  Again, Professor Turow,    10:30
18 if you're going to read --                  10:30
19        THE WITNESS:  I'm sorry.           10:30
20        THE COURT REPORTER:  -- I need you to either    10:30
21 read slowly and loudly --                   10:30
22        THE WITNESS:  Again, I'm sorry.  I'm going to    10:30
23 read quietly.                               10:30
24        Yes.                               10:30
25 ///

Page 147

1 BY MR. BROOME:                             10:30
2    Q.  Okay.  So that -- it says, "The basic browser    10:30
3 mode stores information locally on your system.  This    10:30
4 information might include," and then there are several    10:31
5 bullets that follow; right?                10:31
6    A.  Yes.                              10:31
7    Q.  And reasonable people would understand the    10:31
8 list of information that follows is information that is    10:31
9 stored locally by the Chrome browser on the user's    10:31
10 system --                                  10:31
11    A.  Exactly.                          10:31
12    Q.  -- correct?                        10:31
13    A.  Yes.                              10:31
14    Q.  And then it lists some of the information that    10:31
15 might be stored locally on the user's system.    10:31
16        And each bullet reflects a different category    10:31
17 of data or information that Chrome will store locally on    10:31
18 the user's system in basic mode; correct?    10:31
19    A.  Yes, sir.                         10:31
20    Q.  And that's how reasonable people would       10:31
21 interpret it; correct?                     10:31
22    A.  Yes.                              10:31
23    Q.  And the first bullet states "Browsing history    10:31
24 information," and it goes on to describe what that    10:31
25 information is or some examples; correct?    10:31

Page 148

1    A.  Yes.                              10:31
2    Q.  All right.  And so reasonable people would    10:31
3 interpret that to mean that browsing history information    10:31
4 is one of the categories that Chrome will store locally    10:31
5 on the user's system; correct?             10:31
6    A.  Locally on the user's system, yes.    10:31
7    Q.  And then the second bullet states "Personal    10:31
8 information and passwords to help you fill out forms or    10:32
9 sign in to sites you visit"; correct?      10:32
10    A.  Yes.                              10:32
11    Q.  And reasonable people would interpret that to    10:32
12 mean that personal information and passwords to help you    10:32
13 fill out forms or sign in to sites you visit is a second    10:32
14 category of information that Chrome stores locally on    10:32
15 the user's system; right?                  10:32
16    A.  I know where you're going here.       10:32
17        Whoever wrote this was using personal    10:32
18 information in a colloquially sense here.    10:32
19    Q.  I agree.                           10:32
20    A.  It is not the legal definition of personal    10:32
21 information.                                10:32
22    Q.  Understood.                        10:32
23    A.  And earlier on, I'm sure they defined personal    10:32
24 information much more carefully than that.    10:32
25    Q.  Earlier on this in this document?    10:32

Page 149

| | |
|---|---|
| 1 A. Somewhere. I don't know. Maybe later. But 10:32 | 1 A. Yes. 10:34 |
| 2 they can't get away with it just being personal 10:32 | 2 Q. And then the fifth bullet is "A record of what 10:34 |
| 3 information in the way that they state it here. But 10:32 | 3 you download from websites." 10:34 |
| 4 it's a colloquialism. 10:32 | 4 A. Right. 10:34 |
| 5 Q. Right. This is a colloquial -- understood. I 10:32 | 5 Q. Okay. And -- okay. 10:34 |
| 6 agree. 10:32 | 6 And reasonable people who are reading this 10:34 |
| 7 This is a colloquial usage of the term 10:32 | 7 would interpret each of these five bullets that we just 10:34 |
| 8 "personal information." 10:32 | 8 walked through as separate categories of information 10:34 |
| 9 A. And badly. It shouldn't have been -- it 10:32 | 9 that Chrome might store locally on their system? 10:35 |
| 10 should not have been there. 10:32 | 10 MR. STRAITE: Objection. Misstates earlier 10:35 |
| 11 Q. But that is what it is? 10:32 | 11 testimony. 10:35 |
| 12 A. Yes, it is. Exactly. 10:32 | 12 BY MR. BROOME: 10:35 |
| 13 Q. Colloquial usage? 10:33 | 13 Q. Correct? 10:35 |
| 14 A. Yes. 10:33 | 14 A. This would be types of information. I would 10:35 |
| 15 Q. And reasonable people reading this would 10:33 | 15 say that in Google's terminology, all of this is 10:35 |
| 16 understand that personal information and passwords to 10:33 | 16 personal information. And a person who wrote this got 10:35 |
| 17 help fill out forms or sign in to the sites you visit is 10:33 | 17 away with saying personal information in a way that she 10:35 |
| 18 a separate category of information that Chrome stores 10:33 | 18 or he shouldn't have. It's all personal information. 10:35 |
| 19 locally on a user's browser, separate from the browsing 10:33 | 19 Q. According to who? 10:35 |
| 20 history information described in the bullet above; 10:33 | 20 A. According to Google, according to the -- to 10:35 |
| 21 correct? 10:33 | 21 the CCPA, according to anybody who deals with privacy 10:35 |
| 22 A. In this particular case. I don't want to take 10:33 | 22 policies. 10:35 |
| 23 it out of the larger context of the entire privacy 10:33 | 23 Q. Right. 10:35 |
| 24 policy. 10:33 | 24 But we're not focused on what lawyers think or 10:35 |
| 25 Q. Fine. 10:33 | 25 what Google thinks. We're focused on your opinion is 10:35 |
| Page 150 | Page 152 |

| | |
|---|---|
| 1 A. In this particular case. There's a lot more 10:33 | 1 about what reasonable people reading the Chrome Privacy 10:35 |
| 2 to this. 10:33 | 2 Notice -- 10:35 |
| 3 Q. Understood. 10:33 | 3 A. Let's read other parts of the privacy policy 10:35 |
| 4 Reading this -- just this document, this 10:33 | 4 and you'll see that they bring it in. 10:35 |
| 5 section of this document -- 10:33 | 5 Q. We'll get there. We're just moving -- 10:35 |
| 6 A. Yeah. 10:33 | 6 A. Then how can you -- according -- no. This has 10:35 |
| 7 Q. Okay. 10:33 | 7 to be taken in its entirety. If you're saying a person 10:35 |
| 8 -- you agree with that? 10:33 | 8 is going to read the privacy policy, they'll read it in 10:35 |
| 9 A. Yes. 10:33 | 9 its entirety. 10:35 |
| 10 Q. Okay. And then the fourth bullet -- let's 10:33 | 10 I have to say, however, that the statement 10:35 |
| 11 see. 10:33 | 11 about storing it locally on your system is a statement 10:36 |
| 12 And then the third bullet is "A list of 10:33 | 12 that implies to a person that it is safe. 10:36 |
| 13 permissions that you have granted to websites"; correct? 10:33 | 13 Okay? 10:36 |
| 14 A. Yes, sir. 10:33 | 14 That the company -- because it's on your 10:36 |
| 15 Q. And that would be a -- reasonable people would 10:33 | 15 system locally, it is a safer way of storing than 10:36 |
| 16 interpret that to be a third category of information 10:33 | 16 somewhere else. 10:36 |
| 17 that Chrome might store on their system; correct? 10:33 | 17 So there is a sense of your data are safer 10:36 |
| 18 A. Probably, yeah. 10:34 | 18 here in the basic browsing mode. 10:36 |
| 19 Q. Okay. And then the fourth bullet is -- 10:34 | 19 Q. And I think you just testified, if you're 10:36 |
| 20 A. "Data saved by add-ons." 10:34 | 20 saying a person is going to read the privacy policy, 10:36 |
| 21 Q. Yeah. Where's the -- 10:34 | 21 they'll read it in its entirety. 10:36 |
| 22 Users would understand that "Data saved by 10:34 | 22 Is that your -- 10:36 |
| 23 add-ons" would be again a separate category of 10:34 | 23 A. Okay. No. I'm saying that you as a -- we 10:36 |
| 24 information that Chrome might store on their system; 10:34 | 24 have to look at the beginning of this -- 10:36 |
| 25 right? 10:34 | 25 Q. Okay. 10:36 |
| Page 151 | Page 153 |

39 (Pages 150 - 153)

| | |
|---|---|
| 1 A. -- and see what they say.                    10:36 | 1 few questions, and then I'm going to -- why don't    10:38 |
| 2      Okay?                                      10:36 | 2 you guys -- can you print out a copy of his report so    10:38 |
| 3      Let's go to the top.                        10:36 | 3 you can just have it in front of him?              10:38 |
| 4 Q. Go for it.                                    10:36 | 4      THE WITNESS: I have it if you'll allow me to  10:38 |
| 5 A. "Learn how to control the information        10:36 | 5 look at my tablet.                               10:38 |
| 6 that's collected, stored, and shared when        10:36 | 6      MR. BROOME: Yeah --                         10:38 |
| 7 you use the Google Chrome browse on your        10:36 | 7      MR. STRAITE: He has it on his iPad. If we    10:38 |
| 8 computer or mobile device, Chrome OS, and       10:36 | 8 have the understanding here on the record that you're  10:38 |
| 9 when you enable Safe Browsing in Chrome."       10:36 | 9 not going to then subpoena the tablet.            10:38 |
| 10     Okay?                                      10:36 | 10     I'll also represent there's nothing -- there  10:38 |
| 11     Right away, they're saying that you have the  10:36 | 11 are no notes on there. It's simply the report.   10:38 |
| 12 ability to control something, and there is something  10:36 | 12     THE WITNESS: No. I have Forrester reports    10:38 |
| 13 where you can segment out your information that you care  10:36 | 13 for class, if you're interested.                 10:39 |
| 14 about.                                         10:36 | 14     MR. STRAITE: Do you want to see his class    10:39 |
| 15     "Although this policy describes features that  10:37 | 15 notes?                                         10:39 |
| 16 are specific to Chrome, any personal information that is  10:37 | 16     THE WITNESS: Forrester.                     10:39 |
| 17 provided" -- "will be used" -- "used and protected in  10:37 | 17     MR. BROOME: I would love to take one your    10:39 |
| 18 accordance with the Google Privacy Policy," which is  10:37 | 18 classes.                                       10:39 |
| 19 another way of making it seem that the two should sync;  10:37 | 19     THE WITNESS: You should.                    10:39 |
| 20 that if you're protected here, you'll also be protected  10:37 | 20     MR. BROOME: I should.                       10:39 |
| 21 by the Google Privacy Policy.                   10:37 | 21     THE WITNESS: I confuse the hell out of them  10:39 |
| 22     And then it goes on, "If Google Play apps have  10:37 | 22 talking about FLoC and some of the other things and the  10:39 |
| 23 been enabled," blah, blah, blah. Let's see.     10:37 | 23 deprecation of third-party cookies.              10:39 |
| 24     "Details about the privacy notice."         10:37 | 24     MR. BROOME: I think we would have some       10:39 |
| 25     Keep going, please.                        10:37 | 25 fascinating class discussions.                   10:39 |
| Page 154 | Page 156 |

| | |
|---|---|
| 1      "Table of Contents."                       10:37 | 1      THE WITNESS: Yeah, we would.                10:39 |
| 2      So the table of contents does talk about    10:37 | 2      All right. Let me get back to...            10:39 |
| 3 "managing users in Chrome and safe browsing practices."  10:37 | 3      MR. BROOME: And I represent he has no notes.  10:39 |
| 4      Okay?                                      10:37 | 4 It's literally just the exhibit.                 10:39 |
| 5      So, yeah, up to this point I would say that  10:37 | 5      THE WITNESS: Yeah.                         10:39 |
| 6 the idea of information and personal information is what  10:37 | 6      MR. BROOME: It's fine. I'm not worried about  10:39 |
| 7 Google has presented to the user.               10:37 | 7 it.                                            10:39 |
| 8      Okay?                                      10:37 | 8      THE WITNESS: So the report -- so we're at 2,  10:39 |
| 9 Q. Right. In this document. What Google has     10:37 | 9 you say?                                       10:39 |
| 10 presented in this document?                     10:37 | 10 BY MR. BROOME: |
| 11 A. Yeah. In this document. That's a fair       10:38 | 11 Q. Yes. |
| 12 amount.                                        10:38 | 12 A. "A reasonable person who reads the           10:39 |
| 13 Q. Okay. Right.                               10:38 | 13 Chrome Privacy Notice would understand           10:39 |
| 14     And so let me ask you a question.           10:38 | 14 that Chrome does not send personal               10:39 |
| 15     When you offered your second opinion in your  10:38 | 15 information to Google unless a person            10:39 |
| 16 report, the second sub-opinion that -- about how  10:38 | 16 enables Sync."                                 10:39 |
| 17 reasonable people would interpret the Chrome Privacy  10:38 | 17     So I'm talking there just about the Chrome   10:39 |
| 18 Notice, is that opinion contingent on somebody reading  10:38 | 18 privacy.                                       10:39 |
| 19 the Google Privacy Policy as well, or is it also applied  10:38 | 19 Q. Right.                                      10:39 |
| 20 to somebody who reads only the Chrome privacy notice?  10:38 | 20     Okay. So you give somebody the Chrome Privacy  10:39 |
| 21 A. Can I go back to the thing?                  10:38 | 21 Notice. That's the only thing they read. Then your  10:39 |
| 22     MR. STRAITE: You want -- professor is asking  10:38 | 22 opinion is this is what they would think?        10:39 |
| 23 if he can go back --                           10:38 | 23 A. Yes.                                        10:39 |
| 24     MR. BROOME: Yeah. You know what, David. Why  10:38 | 24     MR. STRAITE: And for the record here, Sharon  10:39 |
| 25 don't we -- it's -- why don't we -- let me finish up a  10:38 | 25 has stepped out, but -- so she's no longer appearing at  10:39 |
| Page 155 | Page 157 |

1 the deposition.                              10:40
2 BY MR. BROOME:
3    Q.  Okay.  So then -- so we just walked through  10:40
4 some five -- the five bullets of what -- or we just  10:40
5 walked through five bullets that people would --  10:40
6 sorry -- that the Chrome Privacy Notice lists as  10:40
7 categories of information that will be stored locally on  10:40
8 user's browser.                             10:40
9         And then in the next paragraph it says "You  10:40
10 can manage this information in several ways"?  10:40
11   A.  Yes, sir.                            10:40
12   Q.  Right?                              10:40
13   A.  Yeah.                               10:40
14   Q.  And there's basically one or two ways that you  10:40
15 can manage each of the categories of information  10:40
16 described in the bullets above; right?  That describe  10:40
17 the categories of data that's stored locally?  10:40
18   A.  Yes.                                10:40
19   Q.  It says "You can delete your browsing history  10:40
20 information"; right?                        10:40
21   A.  Yeah.                               10:40
22   Q.  That goes to the "Browsing History" bullet at  10:40
23 the top; right?                            10:40
24   A.  Yes.                                10:40
25         MR. STRAITE:  Objection.             10:40

                                        Page 158

1 BY MR. BROOME:                             10:40
2    Q.  "You can manage and delete stored browsing  10:40
3 data from cookies and site data dialogue."  10:41
4         And the next bullet is "You can stop Chrome  10:41
5 from accepting cookies," and there's a "Learn More"  10:41
6 link.                                     10:41
7         "You can review stored passwords in Chrome  10:41
8 settings," and another "Learn More" link.  10:41
9         "You can review and manage your stored auto  10:41
10 fill information.  Learn More" link.        10:41
11        You see all that?                    10:41
12   A.  Yes.  But read the final paragraph, sir.  10:41
13   Q.  I'm getting there.  Believe me.       10:41
14        It says:  "The personal information  10:41
15 that Chrome stores won't be sent to      10:41
16 Googles unless you choose that data in     10:41
17 your Google account by turning on sync, or  10:41
18 in the case of payment cards and billing  10:41
19 information, choosing specific payment     10:41
20 card and billing information to store in  10:41
21 your Google payments account."             10:41
22        Given that quote, "personal information and  10:41
23 passwords to help you fill out forms," unquote, is one  10:41
24 of the six -- or the bullets above that identify the  10:41
25 categories of information that Chrome stores locally on  10:41

                                        Page 159

1 the user's browser, reasonable people would interpret  10:41
2 the term "personal information" in this sentence at the  10:41
3 bottom to be referring to the same personal information  10:42
4 that is described in the bullet above; correct?  10:42
5    A.  Not necessarily.  Let me read that.  10:42
6         Go up a little again, please.        10:42
7         That -- that is just not the way in which -- I  10:42
8 mean, if Google wanted to fool people in general, that  10:42
9 would be the greatest way to fool them.   10:42
10        I mean, let's face it, personal information  10:42
11 has a legal definition.  This is a legal document.  It's  10:42
12 shameful that they would choose a word that has huge  10:42
13 implications for a company and mush it into something  10:42
14 that is minor in order to fool people and make it seem  10:42
15 that they don't use their data.            10:42
16   Q.  Professor Turow, I think we just agreed that  10:42
17 reasonable people do not think of personal information  10:42
18 in a legal sense; right?                   10:42
19   A.  I -- no.  What I agreed is --         10:43
20        MR. STRAITE:  Let me put the objection on the  10:43
21 record.                                   10:43
22        Argumentative and misstates prior testimony.  10:43
23        THE WITNESS:  No.  I -- what I'm saying is  10:43
24 that the company is perhaps purposefully, perhaps not,  10:43
25 using this colloquially vehicle to delude people about  10:43

                                        Page 160

1 what it really does with their data.       10:43
2 BY MR. BROOME:                             10:43
3    Q.  Putting aside your judgments about Google --  10:43
4    A.  This isn't a judgment.  I mean, I don't think  10:43
5 that you can get away from that judgment, sir.  10:43
6    Q.  Okay.                              10:43
7    A.  It is a legal -- yeah.  Go ahead.    10:43
8    Q.  Go ahead.                          10:43
9    A.  Sorry.  Sorry.                      10:43
10   Q.  No.  Go ahead.  Finish your sentence.  10:43
11   A.  The word -- the word "personal information,"  10:43
12 as I suggested you to earlier, or even before you  10:43
13 brought this topic up, is inaccurate in the second  10:43
14 bullet.  And I would say it shouldn't be there from a  10:43
15 legal standpoint.                         10:43
16   Q.  Are you a lawyer?                    10:43
17   A.  It's a huge -- I'm sorry?            10:43
18   Q.  You're not a lawyer.                 10:43
19   A.  I know the law of the internet pretty  10:43
20 decently, even though I'm not a lawyer.  I've given  10:43
21 talks at privacy conferences.  I'm one of the founders  10:43
22 of the Northeast Privacy Conference.  I have -- take a  10:44
23 look at my books.  They're vetted by legal scholars who  10:44
24 have written blurbs for the books.         10:44
25        And I note you don't have to be a terrific  10:44

                                        Page 161

1 lawyer to know that there is a legal definition which    10:44
2 Google quite clearly knows of the words "personal    10:44
3 information."    10:44
4        And to use that in a way that is designed, I    10:44
5 would argue, to make a person not understand the serious    10:44
6 implications here is problematical and I think shameful.    10:44
7    Q.  Putting aside your judgments --    10:44
8    A.  Well, that's the whole thing is my judgments.    10:44
9    Q.  Are you rendering a judgment in this case    10:44
10 about Google's intent?    10:44
11    A.  Not about intent, but about the --    10:44
12    Q.  Its conduct?    10:44
13    A.  -- way in which the material is presented so    10:44
14 that one could almost infer intent, whether it's    10:44
15 intentional or not.    10:44
16        We could go --    10:45
17    Q.  Let's go back to your opinion.    10:45
18        All right?    10:45
19        Let's come back to your opinion.    10:45
20        Putting aside what you think -- you know, that    10:45
21 you think maybe Google is misleading people, putting    10:45
22 aside all of that --    10:45
23    A.  I could give other examples, sir, throughout    10:45
24 the privacy policies and --    10:45
25    Q.  We're going to -- trust me, we're going to    10:45

Page 162

1 walk through all of them, Professor Turow.    10:45
2    A.  Okay.    10:45
3    A.  Yeah.    10:45
4        Personal information here, I think we agree    10:45
5 was used in a colloquial sense; right?    10:45
6    A.  Only in that bullet should it be used in a    10:45
7 colloquial sense.  When it starts generalizing about the    10:45
8 way in which Google approaches people's data, it has --    10:45
9 it has a more general implication.    10:45
10    Q.  Okay.  Would reasonable people -- let me ask    10:45
11 the question again.    10:45
12        Would reasonable people who read this section    10:45
13 of the Chrome Privacy Notice --    10:45
14    A.  Accurate.    10:45
15    Q.  -- starting at browser modes through the end    10:45
16 of the paragraph we just read that begins "The personal    10:45
17 information that Chrome stores."    10:45
18    A.  I would say no.  I just don't think that    10:45
19 people think that way.  And I --    10:46
20        In the -- in the second set of bullets, there    10:46
21 is no word that says "personal information."    10:46
22    Q.  When people read the sentence "The personal    10:46
23 information that Chrome stores," they would think that    10:46
24 would be consistent with the term "personal information"    10:46
25 as used in the second bullet; correct?    10:46

Page 163

1    A.  Well, the only thing I could say is, A,    10:46
2 it's -- as I say it, again, it's colloquially used and    10:46
3 it's not defined.    10:46
4        Okay?    10:46
5        So essentially if you want to talk about    10:46
6 personal information as meaning almost anything, then    10:46
7 that paragraph at the bottom does basically say, again,    10:46
8 from a legal standpoint anything is fair game.    10:46
9    Q.  Professor Turow, it doesn't say "from a legal    10:46
10 standpoint."    10:46
11    A.  As you note, it's not defined.  And as you    10:46
12 noted earlier, when Google -- as you noted with respect    10:47
13 to personal information as used in the second bullet,    10:47
14 it's used in a colloquial sense.    10:47
15    A.  It's colloquial but -- yes.  Go ahead.  Sorry.    10:47
16    Q.  And it is actually explained as information to    10:47
17 help you fill out forms or sign up to sites you visit.    10:47
18        And then when people read the sentence at the    10:47
19 bottom of this paragraph, the personal information that    10:47
20 Chrome stores, reasonable people would think that that    10:47
21 term, "personal information," is being used consistently    10:47
22 with the term described in the second bullet; correct?    10:47
23    A.  I disagree.    10:47
24    Q.  And on what basis do you disagree?    10:47
25    A.  I disagree on the basis that personal    10:47

Page 164

1 information -- if you want to parse that sentence,    10:47
2 "personal information and passwords comma, to help you    10:47
3 fill out forms or sign in," the passwords is what might    10:47
4 be help -- sign in and fill out forms, but personal    10:47
5 information could be a lot more than that.    10:47
6        Okay?    10:47
7        It may help you fill out forms but it can also    10:47
8 be information that Google is collecting for other than    10:47
9 forms.  For example, gender; for example, age; for    10:48
10 example, location, all of that is personal information    10:48
11 that will help you fill out forms, but it's also    10:48
12 information that can be used by Google for very    10:48
13 different other purposes.    10:48
14    Q.  Is that --    10:48
15    A.  I'm sorry?    10:48
16    Q.  Is any of that information at issue in this    10:48
17 case?    10:48
18    A.  Any information about people that comes --    10:48
19 that comes up, medical information -- which is    10:48
20 sensitive, so they probably wouldn't use that -- but any    10:48
21 information of where I go, who I am, what my gender is,    10:48
22 all of that is at issue, as I understand it, yes.    10:48
23    Q.  Okay.    10:48
24    A.  Why wouldn't it be?    10:48
25        I mean, the whole idea here is what -- is    10:48

Page 165

42 (Pages 162 - 165)

CONFIDENTIAL

Page 166

1 people's concern about what Google is leaking about them 10:48
2 through this large scale, you know, collection of data, 10:48
3 which is not made clear to them it takes place at all. 10:48
4 Q. Earlier when we walked through the bullets, 10:48
5 Professor, I said people -- I asked you whether 10:48
6 reasonable people would understand "personal information 10:49
7 and passwords to help you fill out forms or sign into 10:49
8 sites you visit" is a separate category of information 10:49
9 from the browsing history information described in the 10:49
10 bullet above. 10:49
11 And you agreed with that. 10:49
12 A. Yes, I do. I still agree with it. 10:49
13 Q. And now when we come back to the phrase "the 10:49
14 personal information that Chrome stores," again, people 10:49
15 would think that that would -- the term "personal 10:49
16 information" would exclude the browsing history 10:49
17 described in the first bullet; correct? 10:49
18 MR. STRAITE: Objection. Misstates earlier 10:49
19 testimony. It's not the same question you asked him. 10:49
20 It's misleading, Steve, to say "Here is the same 10:49
21 question I asked you before" when it's different 10:49
22 questions. 10:49
23 THE WITNESS: Browsing history is a very 10:49
24 important but -- you know, it's a part of what it means 10:49
25 to talk about personal information. There's a whole lot 10:49

Page 167

1 of other stuff about personal information and that if 10:49
2 Google can use in ways that go beyond helping people 10:49
3 fill out forms and sign in to sites. 10:50
4 So it is a way again of making something seem 10:50
5 benign when it could really be far more than that. 10:50
6 Personal information, it could be gender, 10:50
7 could be age, could be location, could be the whole avra 10:50
8 (phonetic) of a person's lifestyle. There's a lot of 10:50
9 things under that category. 10:50
10 BY MR. BROOME: 10:50
11 Q. When reasonable people read the sentence "The 10:50
12 personal information that Chrome stores won't be sent to 10:50
13 Google unless you choose to store that data in your 10:50
14 Google account by turning on sync," after they have read 10:50
15 the bullets that we just described -- discussed above, 10:50
16 they would not think that that term "personal 10:50
17 information" is being used to include browsing history 10:50
18 information; correct? 10:50
19 MR. STRAITE: Objection. Asked and answered. 10:50
20 THE WITNESS: I still say in this case 10:51
21 personal information is a statement -- is a term that 10:51
22 Google is using to elide important legal distinctions. 10:51
23 BY MR. BROOME: 10:51
24 Q. Putting that aside, because that's not what 10:51
25 your opinion is about, please answer my question. 10:51

Page 168

1 And I can read it back to you, if you want. 10:51
2 A. Right. Go ahead. Sure. 10:51
3 Q. When reasonable people read the sentence, 10:51
4 quote, "The personal information that Chrome stores 10:51
5 won't be sent to Google unless you choose to store that 10:51
6 data in your account" -- "in your" -- well, let me just 10:51
7 ask the question again because I'm trying to read from 10:51
8 the transcript and it's not a perfect record. 10:51
9 When reasonable people, having read the basic 10:51
10 browse mode description, and the -- and all of the 10:51
11 bullets that we walked through before about the 10:51
12 different categories of information that Chrome stores 10:51
13 locally on a user's system, when they then read the 10:51
14 sentence -- the paragraph at the bottom that says "The 10:51
15 personal information that Chrome stores won't be sent to 10:52
16 Google unless you choose to store that data in your 10:52
17 Google account by turning on sync," they would not think 10:52
18 the term "personal information" in that sentence 10:52
19 includes the browsing history information described in 10:52
20 the first bullet; correct? 10:52
21 MR. STRAITE: Objection. Asked and answered. 10:52
22 THE WITNESS: My opinion about this would be 10:52
23 that personal information -- since the personal 10:52
24 information is not covered in the lower bullets, which 10:52
25 is more clearly related to the -- the -- that last 10:52

Page 169

1 paragraph, that essentially that last paragraph is 10:52
2 accessing the last five bullets rather than the earlier 10:52
3 bullets. 10:52
4 BY MR. BROOME: 10:52
5 Q. The last five bullets don't mention personal 10:52
6 information, Professor Turow, only -- 10:52
7 A. Yeah, they don't. And that's what I mean. A 10:52
8 person wouldn't infer that that's all that includes, all 10:52
9 personal information. 10:53
10 Q. The section "Basic Browser Mode" begins: 10:53
11 "The basic browser mode stores 10:53
12 information locally on your system. This 10:53
13 information might include," and then one 10:53
14 of the bullets is "Browsing History." 10:53
15 The next bullet is "Personal Information." 10:53
16 And then the paragraph that wraps it up says, 10:53
17 "The personal information that Chrome stores won't be 10:53
18 sent to Google." 10:53
19 Is it your opinion that reasonable people 10:53
20 reading this would think that the term "personal 10:53
21 information" includes the browsing history described in 10:53
22 the first bullet? 10:53
23 MR. STRAITE: Objection. Asked and answered 10:53
24 now a fourth time. 10:53
25 THE WITNESS: Yeah. I -- I still think that 10:53

43 (Pages 166 - 169)

1  people would make the larger -- that they would still     10:53
2  bring it -- despite what you're saying, I think people     10:53
3  would -- given the five bullets that it says you can     10:53
4  manage this information several ways, that part -- the     10:53
5  phrase "personal information" doesn't relate to the     10:53
6  upper level of bullets. It relates to the larger scheme     10:53
7  that they discussed when it says "you can manage this     10:54
8  information several ways."     10:54
9      MR. STRAITE: And on the record, Sharon is     10:54
10  back in the room.     10:54
11      THE WITNESS: And could we go in to "Learn     10:54
12  more" by the way?     10:54
13      MR. BROOME: Well, let's stick with this for a     10:54
14  minute.     10:54
15      THE WITNESS: Yeah.     10:54
16      MR. STRAITE: You don't want the witness to     10:54
17  give his testimony?     10:54
18  BY MR. BROOME:     10:54
19    Q. Which "Learn More" are you trying to get to,     10:54
20  Professor?     10:54
21    A. Under "The personal information that Chrome     10:54
22  stores."     10:54
23    Q. About the payment cards?     10:54
24    A. No. It says:     10:54
25      "The personal information that Chrome     10:54
Page 170

1  stores won't be sent to Google until you     10:54
2  choose to store to your data."     10:54
3      We don't have to do that now.     10:54
4    Q. Okay.     10:54
5    A. But I do believe that the use of personal     10:54
6  information here is more related to the last five     10:54
7  bullets that it is to the earlier five bullets, even     10:54
8  though the word "personal information" shows up there.     10:54
9  It's a much more general sense of personal information     10:54
10  here that comports more fully with the law anyway.     10:54
11    Q. Okay. So your opinion, Professor Turow -- I     10:54
12  want to make sure I understand this correctly -- is that     10:54
13  in the first -- in the first bullet where it says --     10:55
14  where the bullets distinguish between browsing history     10:55
15  information and personal information, which you agreed     10:55
16  reasonable that people would think those are different     10:55
17  categories of information.     10:55
18    A. Right.     10:55
19    Q. Do you think that when they then read the term     10:55
20  "personal information" at the set of the next five -- at     10:55
21  the end of the next five bullets, they would now think     10:55
22  that includes all of the information described in the --     10:55
23    A. Because --     10:55
24      MR. STRAITE: Objection. Asked and answered.     10:55
25  This is now the fifth time.     10:55
Page 171

1      Steve, I know you don't like the answers     10:55
2  you've gotten so far, but you can't just keep asking     10:55
3  the --     10:55
4      THE WITNESS: Because of the way it's set up,     10:55
5  Mr. Broome. It's set up -- if they wanted to say     10:55
6  specifically about that personal information, they would     10:55
7  have said it earlier. They don't. They wait until the     10:55
8  very bottom to say it, which then makes it inclusive.     10:55
9      Okay?     10:55
10      MR. BROOME: Okay.     10:55
11      THE WITNESS: It's also very shameful but     10:55
12  that's a separate story, as you say.     10:55
13      MR. BROOME: All right. I think we can take a     10:56
14  break. We can do our lunch break now, if that works for     10:56
15  you guys.     10:56
16      MR. STRAITE: Let's go off the record and we     10:56
17  can talk about the distance.     10:56
18      THE VIDEOGRAPHER: Okay. We are off the     10:56
19  record at 1:56 p.m.     10:56
20      (A lunch break was taken.)     10:56
21      THE VIDEOGRAPHER: We're back on the record at 11:41
22  2:41 p.m. Eastern time.     11:41
23  BY MR. BROOME:     11:41
24    Q. Good afternoon, Professor Turow.     11:41
25    A. Good afternoon.     11:41
Page 172

1    Q. We were just discussing the meaning of     11:41
2  personal information in the Chrome Privacy Notice, and I 11:41
3  just want to clarify a few things.     11:41
4      You are not offering an opinion in this case     11:41
5  on whether the data at issue in this case would be     11:41
6  considered personal information by Chrome users.     11:41
7  Is that correct?     11:41
8    A. No. I'm offering information about when a     11:41
9  person reads the Chrome Privacy Notice and/or the     11:42
10  Chrome Privacy Policy, I'm saying that they would learn 11:42
11  what it means to do personal information from that.     11:42
12  Yes. That's the part I'm -- it's not what they come to 11:42
13  the policy from but rather what they would learn if they 11:42
14  chose and happen to read those, based on the language     11:42
15  and the information in the -- in the policies, in the     11:42
16  notice.     11:42
17    Q. Is it your opinion that somebody who read the 11:42
18  Chrome Privacy Notice would think that the term     11:42
19  "personal information" includes IP address?     11:42
20      MR. STRAITE: Objection. Calls for     11:42
21  speculation. Objection. Relevance.     11:42
22  BY MR. BROOME:     11:42
23    Q. Well -- sorry. Let me pause there, given your 11:42
24  counsel's objection.     11:42
25      Have you offered an opinion or do you have an 11:42
Page 173

44 (Pages 170 - 173)

| | |
|---|---|
| 1 opinion on that question?                    11:42 | 1 talking about personal information like it's some kind  11:45 |
| 2        MR. STRAITE: Objection. Vague. Objection.  11:42 | 2 of mantra.                                 11:45 |
| 3 Calls for speculation.                       11:43 | 3        The notion to here is what does Google say it  11:45 |
| 4        THE WITNESS: I haven't offered you an opinion  11:43 | 4 collects about somebody?                     11:45 |
| 5 yet. I think -- I remember the word "IP address"  11:43 | 5        And what I'm trying to say is if you look at  11:45 |
| 6 showing up somewhere in those policies, and so -- so  11:43 | 6 the plain meaning of the privacy policy, as we go  11:45 |
| 7 thank you.                                  11:43 | 7 through it, one aspect of what it collects is    11:45 |
| 8        And so I think to the extent that they're in  11:43 | 8 IP address. It's only -- you know, the notion of  11:45 |
| 9 the policies, a person would think that. If it's not in  11:43 | 9 personal information is a handle to describe all of this  11:45 |
| 10 the policies, unless a person knew about IP addresses,  11:43 | 10 stuff, but Google is telling people that it collects the  11:45 |
| 11 they probably wouldn't think that.           11:43 | 11 IP address. That's what it does.             11:46 |
| 12 BY MR. BROOME:                              | 12    Q. Okay. So your understanding then is that --  11:46 |
| 13    Q. So in the Chrome Privacy Notice, is there  11:43 | 13 or your opinion, rather, is that people would interpret  11:46 |
| 14 anything -- can you point me to any part of the  11:43 | 14 the term "personal information" as that term is used in  11:46 |
| 15 Chrome Privacy Notice that you think would lead a  11:43 | 15 the Chrome Privacy Notice to include any other   11:46 |
| 16 person, a reasonable person, to believe that their  11:43 | 16 information that is mentioned in the           11:46 |
| 17 IP address is personal information, as that term is  11:43 | 17 Chrome Privacy Notice?                        11:46 |
| 18 used in the Chrome Privacy Notice?           11:43 | 18        MR. STRAITE: Objection. Vague. Objection.  11:46 |
| 19    A. Well, let me see the -- I frankly don't  11:43 | 19 Relevance.                                  11:46 |
| 20 remember, and I'm checking now.              11:43 | 20        THE WITNESS: That's not what I'm saying.  11:46 |
| 21        Do you see a page in which "IP address" is  11:46 | 21 I'm -- we talked about that earlier use of      11:46 |
| 22 mentioned, sir?                             11:43 | 22 personal information that I said was, you know, in the  11:46 |
| 23        There it is.                         11:44 | 23 beginning narrow and then broad.             11:46 |
| 24        Yes, of course.                      11:44 | 24        In this case, it doesn't matter whether it's  11:46 |
| 25    Q. Where?                               11:44 | 25 called personal information or not. Google is telling  11:46 |
| Page 174 | Page 176 |

| | |
|---|---|
| 1    A. Where it says "Location," It uses your    11:44 | 1 you that they use your IP address. That's the key.  11:46 |
| 2 IP address in order to find your location.    11:44 | 2 That's the important part. It doesn't matter whether  11:46 |
| 3    Q. Where are you?                         11:44 | 3 it's called personal information or not for the purpose  11:46 |
| 4    A. Under "Location," it's Bates 1732.      11:44 | 4 of telling people what Google is doing.        11:46 |
| 5        See, I'm learning. I used to have an old  11:44 | 5 BY MR. BROOME:                              |
| 6 Bates machine and that's where the name comes from.  11:44 | 6    Q. And does it say -- does it say IP address  11:47 |
| 7        MR. STRAITE: For the record, Steve, the  11:44 | 7 won't be sent to Google unless you sync?       11:47 |
| 8 witness is looking at the exhibit we still have open  11:44 | 8        MR. STRAITE: Objection. Vague.          11:47 |
| 9 that you put in front of him as Exhibit 4, the  11:44 | 9        THE WITNESS: Where are we talking about?  11:47 |
| 10 Chrome Privacy Notice.                       11:44 | 10 BY MR. BROOME:                              11:47 |
| 11        When he says Bates number, it's the last four  11:44 | 11    Q. Anywhere where it says "IP address." You pick  11:47 |
| 12 digits of the Bates number.                  11:44 | 12 your -- pick the location in the Chrome Privacy Notice  11:47 |
| 13        MR. BROOME: Okay.                     11:44 | 13 and then orient the rest of us.              11:47 |
| 14        THE WITNESS: Also, it says "IP address" in --  11:45 | 14        MR. STRAITE: Steve, are you referring to this  11:47 |
| 15 on Bates 1731.                             11:45 | 15 page, this Bates number he referred to?        11:47 |
| 16 BY MR. BROOME:                              11:45 | 16        MR. BROOME: I'm referring to the            11:47 |
| 17    Q. Yes. I understand it says -- it mentions the  11:45 | 17 Chrome Privacy Notice that's in front of him.    11:47 |
| 18 word "IP address."                          11:45 | 18        MR. STRAITE: Anywhere in the document?    11:47 |
| 19    A. Yes, it does. That's part of the information  11:45 | 19        THE WITNESS: The larger context is the      11:47 |
| 20 that it handles.                           11:45 | 20 context which I talked about earlier, which is if you  11:47 |
| 21    Q. Uh-huh.                              11:45 | 21 don't -- if you -- let me put it this way: If you sync,  11:47 |
| 22        And where does it say that that information is  11:45 | 22 these are the data that are going to be presented to  11:47 |
| 23 personal information, as the term "personal information"  11:45 | 23 Google.                                    11:47 |
| 24 is used in the Chrome Privacy Notice?         11:45 | 24        Okay?                               11:47 |
| 25    A. See, but you're confusing the issue. You're  11:45 | 25        And by implication and by affirmative mention,  11:47 |
| Page 175 | Page 177 |

1 if you don't sync, this is not going to happen.    11:47
2 BY MR. BROOME:    11:47
3    Q.  Okay.  So -- and is it your opinion that the    11:48
4 personal information that is not sent to Google, if a    11:48
5 user does not sync, that would include their IP address?    11:48
6    A.  If the --    11:48
7       MR. STRAITE:  Objection.  Vague.  Objection.    11:48
8 Relevance.    11:48
9 BY MR. BROOME:    11:48
10    Q.  That's what reasonable people would think    11:48
11 according to you; right?    11:48
12    A.  If you do not sync, the idea here would be    11:48
13 that Google would not use your IP address as taken from    11:48
14 the browser in order to personalize stuff.    11:48
15    Q.  We're not talking about personalization here.    11:48
16 This case is about the receipt of data, the fact that    11:48
17 Google receives an IP address.    11:48
18       You understand that; right?    11:48
19       MR. STRAITE:  Objection.    11:48
20 BY MR. BROOME:    11:48
21    Q.  That's not just about personalization?    11:48
22       MR. STRAITE:  I'm sorry, Steve.  You have two    11:48
23 questions in there.    11:48
24       Which question are you asking?    11:48
25       Which of your two questions do you want him to    11:48
Page 178

1 answer?    11:48
2 BY MR. BROOME:    11:48
3    Q.  If you understand -- Professor Turow, do you    11:48
4 understand that the plaintiffs allege Google's mere    11:49
5 receipt of an IP address from an un-synced Chrome user    11:49
6 is a violation of breach of contract, et cetera?    11:49
7    A.  Yes.  I understand that.  But part of the    11:49
8 reason they believe that is because it can be used in    11:49
9 malefactory ways.    11:49
10    Q.  But the -- you understand the allegation is    11:49
11 the mere receipt by Google of a user's IP address is a    11:49
12 violation; right?    11:49
13       MR. STRAITE:  Objection.  Asked and answered.    11:49
14       THE WITNESS:  Yeah.  Just what I said is what    11:49
15 I believe.    11:49
16       You can -- the reason that they are concerned    11:49
17 about that is that it has consequences.    11:49
18 BY MR. BROOME:    11:49
19    Q.  Understood.  I understand why they're    11:49
20 concerned about it.  Yeah.  I think we're on the same    11:49
21 page there.    11:49
22    A.  Right.    11:49
23       So that's what I -- what I said is what I    11:49
24 said.  Yes.  They're concerned about the sending of the    11:49
25 IP address for particular reasons.    11:49
Page 179

1    Q.  Okay.  So it is your opinion that a reasonable    11:49
2 person who reads the Chrome Privacy Notice would think    11:49
3 that "If I don't sync, Google will not receive my    11:50
4 IP address"?    11:50
5    A.  That "if I don't sync" -- we would have to go    11:50
6 to the specifics of what it said in terms of that.    11:50
7       Could we go back to some of the earlier -- you    11:50
8 have to take the larger context into consideration.  I'd    11:50
9 have to see it again.    11:50
10       The idea here is that information that relates    11:50
11 to designating you as an individual would not be    11:50
12 collected by Google.    11:50
13       So frankly if you're -- if you do not sync,    11:50
14 Google will not, I would say use your IP address for    11:50
15 purposes of advertising, targeting, and stuff like that.    11:51
16    Q.  Okay.  Would a reasonable Chrome user --    11:51
17 sorry -- would a reasonable person who reads the    11:51
18 Chrome Privacy Notice think that if they do not sync in    11:51
19 Chrome, Google will not receive their IP address?    11:51
20       MR. STRAITE:  Okay.  Steve, objection.  Asked    11:51
21 and answered.  This is the exact same question --    11:51
22       MR. BROOME:  No.  It's not the same question.    11:51
23 He -- well, it is the same question.  He just answered    11:51
24 it differently.    11:51
25       He said, "I think that they would not use    11:51
Page 180

1 their IP address" -- "If you do not sync, Google will    11:51
2 not, I would say, use your IP address for purposes of    11:51
3 advertising and targeting and stuff like that."    11:51
4       That's not my question.    11:51
5 BY MR. BROOME:    11:51
6    Q.  My question, cue in closely to the allegations    11:51
7 in this case, is whether a reasonable person who reads    11:51
8 the Chrome Privacy Notice would think, "If I don't sync    11:51
9 in Chrome, Google will not receive my IP address"?    11:52
10       MR. STRAITE:  Objection.  Asked and answered.    11:52
11 BY MR. BROOME:    11:52
12    Q.  Google doesn't get it.  They don't get it.  It    11:52
13 doesn't hit Google servers.    11:52
14       MR. STRAITE:  Is that a question?    11:52
15       MR. BROOME:  Yes.    11:52
16       THE WITNESS:  I have to look more carefully    11:52
17 about that.    11:52
18 BY MR. BROOME:    11:52
19    Q.  Well, please do because it really goes to the    11:52
20 heart of the case.    11:52
21    A.  I don't know if it does that but -- I'm not    11:52
22 sure it goes to the heart --    11:52
23       MR. STRAITE:  It's not helpful to be    11:52
24 editorializing while the witness is looking for the    11:52
25 document to see.    11:52
Page 181

1    THE WITNESS: Okay. It says "Learn how to    11:52
2 control the information that's collected, stored, and    11:52
3 shared when you use the Chrome" -- "Google Chrome    11:52
4 browser."    11:52
5    Okay?    11:52
6    So hypothetically the issue here is that a    11:52
7 person could, in fact, send the IP information --    11:53
8 IP address to Google, but it would not be shared or    11:53
9 used. I mean, there is a -- there are ways to handle    11:53
10 that.    11:53
11    It's not clear to me whether Google would need    11:53
12 in the course of everyday use of the Chrome privacy --    11:53
13 the Chrome browser to know your IP address, but it's    11:53
14 clear that it does say that you have control over how    11:53
15 it's being used.    11:53
16 BY MR. BROOME:    11:53
17    Q.   Mm-hm.    11:53
18    Okay. Let's go back to the sentence that    11:53
19 says:    11:53
20    "The personal information that Chrome    11:53
21 stores won't be sent to Google, unless you    11:53
22 choose to store that data in your Google    11:53
23 account by turning on sync."    11:53
24    MR. STRAITE: What page is that of Exhibit 4?    11:53
25    MR. BROOME: 731.    11:53

1    MR. STRAITE: 731.    11:53
2    THE WITNESS: Yeah.    11:53
3    "The personal information that Chrome    11:53
4 stores won't be sent to Google, unless you    11:53
5 choose to store that data" -- "unless you    11:54
6 choose to store that data in your Google    11:54
7 account."    11:54
8    I would say that on the surface meaning of    11:54
9 this, it would appear to me that the IP address wouldn't    11:54
10 go to Google either.    11:54
11 BY MR. BROOME:    11:54
12    Q.   Okay. That -- you think that a reasonable    11:54
13 person who reads this sentence, "The personal    11:54
14 information that Chrome stores won't be sent to Google,    11:54
15 unless you choose to store that data in your Google    11:54
16 account by turning on sync," a reasonable person who    11:54
17 reads that would think to themselves, "Well, if I use    11:54
18 Chrome without sync enabled, then Google will not    11:54
19 receive my IP address"?    11:54
20    A.   Well, not from that sentence. But if it were    11:54
21 later on, based upon if you even knew what an IP address    11:54
22 is, right, and had a sense of it, and associated that    11:54
23 with personal information, yeah, I think people would    11:54
24 believe that, whether it's true or not.    11:54
25    Q.   And would they think that if they go to    11:54

1 WWW dot Google dot com?    11:54
2    MR. STRAITE: Objection. Calls for    11:55
3 speculation. Objection. Beyond the scope of the    11:55
4 report.    11:55
5    THE WITNESS: You know, we'd have to look that    11:55
6 the privacy policy more carefully.    11:55
7 BY MR. BROOME:    11:55
8    Q.   We're not going to the privacy policy,    11:55
9 Professor Turow. We're just talking about your opinion    11:55
10 No. 2, which is based on the Chrome Privacy Notice    11:55
11 standing alone, which is what you said before.    11:55
12    MR. STRAITE: Again, objection. You're asking    11:55
13 for speculation about what was happening when it goes --    11:55
14    THE WITNESS: Yeah. I don't know. Again, I'm    11:55
15 not talking about individuals here. I'm talking about    11:55
16 what it says in the document.    11:55
17 BY MR. BROOME:    11:55
18    Q.   Well, your opinion is what reasonable    11:55
19 people --    11:55
20    A.   No.   You're conflating -- no, no, no.    11:55
21    You're -- I'll tell you that based upon    11:55
22 what's written, this is what is written clearly states    11:55
23 this.   Now, what you're bringing about IP address is    11:55
24 complicated because that shows up a lot later in the    11:55
25 document.    11:55

1    But you're talking about what's written, not    11:55
2 what people would assume. What people would know.    11:55
3 They're very different. You keep trying to make me    11:55
4 say something about what people would know. It has    11:55
5 nothing to do with that. It's what people see on the    11:55
6 page.    11:56
7 BY MR. BROOME:    11:56
8    Q.   Yeah. And what -- but what -- we can all look    11:56
9 at the peage and see what it says.    11:56
10    A.   Right. We --    11:56
11    Q.   You have come in as an expert and said, "It is    11:56
12 my expert opinion that a reasonable person would    11:56
13 interpret it this way," and that is the issue that we --    11:56
14    A.   Right.    11:56
15    But you're asking me would a reasonable person    11:56
16 come in with this knowledge?    11:56
17    And I'm telling you a reasonable person would    11:56
18 have to -- the way I'm looking my remit is to say given    11:56
19 what it says here --    11:56
20    Q.   Yeah.    11:56
21    A.   -- the reasonable person would make this    11:56
22 inference.    11:56
23    Q.   Okay. Given what it says here in the    11:56
24 Chrome Privacy Notice --    11:56
25    A.   Yeah.    11:56

47 (Pages 182 - 185)

CONFIDENTIAL

1    Q. -- would a reasonable person interpret that    11:56
2  sentence that we just discussed --    11:56
3    A. Yeah.    11:56
4    Q. -- for confirmation that Chrome stores won't    11:56
5  be sent to Google unless you choose to store that data    11:56
6  in your Google account by turning on sync, would they    11:56
7  think that that sentence covers their IP address?    11:56
8    MR. STRAITE: Objection. Asked and answered.    11:56
9    THE WITNESS: Yeah. I already did answer that    11:56
10  question.    11:56
11  BY MR. BROOME:    11:56
12    Q. Nope, you have not.    11:56
13    A. Yeah. I said that, A, it's the discussion of    11:56
14  IP address is far down there. So unless a person did --    11:57
15  knows about IP address and associated with personal    11:57
16  information, they would probably not think of    11:57
17  IP address.    11:57
18    But to be honest, if a person associated    11:57
19  IP address with personal information, as they do, and    11:57
20  they saw that word -- that clause "personal    11:57
21  information," then they would probably think, correctly    11:57
22  or not, that Google would not -- if you do not sync,    11:57
23  that Google would not pick up your IP address.    11:57
24    Q. Even if they browse in Chrome without sync    11:57
25  enabled to WWW dot Google dot com?    11:57
Page 186

1    MR. STRAITE: Again, objection. Calls for    11:57
2  speculation. Calls for scientific knowledge beyond the    11:57
3  report.    11:57
4    THE WITNESS: Yeah. I don't see why that's a    11:57
5  problem.    11:57
6  BY MR. BROOME:    11:57
7    Q. Well, do you understand that it is essential    11:57
8  to provide an IP address -- in order to access    11:57
9  WWW dot Google dot com, do you understand that it is    11:57
10  essential that Google actually receive your IP address    11:57
11  so that it can return the page?    11:58
12    MR. STRAITE: Objection. Calls for    11:58
13  speculation. Calls for expertise beyond this expert's    11:58
14  expertise. Relevance.    11:58
15    THE WITNESS: Well, I understand that. But    11:58
16  what I'm saying is that the person who's working with    11:58
17  this document might not understand that, and therefore    11:58
18  might think that the IP address is not considered.    11:58
19  BY MR. BROOME:    11:58
20    Q. Okay.    11:58
21    A. It doesn't mean it's right, Mr. Broome. It    11:58
22  means that that's what they would consider. Whether    11:58
23  they're correct or not is not -- has no bearing on the    11:58
24  case.    11:58
25    Q. That's fine. I agree.    11:58
Page 187

1    But I think -- what I'm getting from you is    11:58
2  that, you know, some people who are, say, more    11:58
3  sophisticated with the internet and they understand    11:58
4  IP addresses, some people might interpret that phrase to    11:58
5  include IP addresses, and some people might interpret it    11:58
6  to not to include IP addresses and to refer to more    11:58
7  common -- you know, commonly understood forms of    11:58
8  personal information, like names or e-mail addresses.    11:58
9    MR. STRAITE: Objection as to relevance.    11:59
10  Objection. That wasn't actually a question. Objection.    11:59
11  Misstates prior testimony.    11:59
12    THE WITNESS: The issue here is --    11:59
13    MR. STRAITE: I'm sorry. What's the question,    11:59
14  Steve?    11:59
15  BY MR. BROOME:    11:59
16    Q. Is that correct, that reasonable people could    11:59
17  interpret this phrase differently?    11:59
18    A. No. The phrase is general as it relates to    11:59
19  the material in those five bullets above. That's what    11:59
20  it's about. That's what that particular paragraph is    11:59
21  about.    11:59
22    Q. Okay.    11:59
23    A. It has nothing to do with IP addresses.    11:59
24    Q. Are you familiar with Google's "My Activity"    11:59
25  page?    11:59
Page 188

1    A. Some. Not deeply, but I know that it exists.    11:59
2    Q. Are you a Google account holder?    11:59
3    A. I have signed into Google. I don't use Chrome    11:59
4  on a regular basis. I use it as a secondary browser.    11:59
5  And I -- you know, so I -- you know, but I've never used    12:00
6  My Activity. I know about it. I know some about it.    12:00
7    Q. Did you do any research into My Activity for    12:00
8  purposes of preparing your report?    12:00
9    A. That wasn't part of what I was asked to do.    12:00
10    Q. Okay. Are you familiar with Google's    12:00
11  web Enact activity feature?    12:00
12    A. Again, I'm familiar with it. I have read some    12:00
13  about it. Even as a kind of a -- by the in in    12:00
14  relationship to this case because it sort of showed up,    12:00
15  but it's not an expertise and it's not the area that I    12:00
16  was asked to opine about.    12:00
17    And I don't think it contradicts anything I've    12:00
18  said, by the way.    12:00
19    Q. Well, are you aware that if a Google account    12:00
20  holder is signed into their account and is browsing the    12:00
21  web, regardless of whether they're in Chrome or    12:00
22  regardless of whether they have sync enabled, that the    12:01
23  sites that they visit that use Google services, such as    12:01
24  those at issue here, Ad Manager and Analytics, that    12:01
25  those sites will be reflected in their My Activity page?    12:01
Page 189

48 (Pages 186 - 189)

1      MR. STRAITE:  Objection.  Assumes facts not in  12:01
2  evidence.  Objection.  Relevance.              12:01
3      THE WITNESS:  I'm somewhat aware of that.  I  12:01
4  mean, I know that basic idea.              12:01
5  BY MR. BROOME:              12:01
6    Q.  You do know that?              12:01
7    A.  Yeah.  And --              12:01
8      MR. STRAITE:  Same objections.              12:01
9      THE WITNESS:  My understanding of it is you  12:01
10  have to enable that.              12:01
11  BY MR. BROOME:              12:01
12    Q.  Right.              12:01
13      Are you aware that the plaintiffs in this case  12:01
14  did enable it?              12:01
15      MR. STRAITE:  Objection.  Assumes facts not in  12:01
16  evidence.              12:01
17      THE WITNESS:  I have no -- that's not my  12:01
18  remit.              12:01
19  BY MR. BROOME:              12:01
20    Q.  Okay.              12:01
21    A.  By the way, it seems to me that all this is  12:01
22  just adding other layers of confusion around what sync  12:01
23  and un-sync means, and all it does is confuse the issue  12:01
24  rather than speak to a logical sense of what people  12:01
25  should be doing.              12:01

Page 190

1      But that was not part of my task here.              12:01
2    Q.  Okay.  So you haven't considered the content  12:02
3  of users, My Activity pages, or their web and app  12:02
4  activity, in forming the basis of any of your opinions?  12:02
5    A.  I wasn't asked to do that.              12:02
6    Q.  Okay.  Have you -- you offer opinions about  12:02
7  what a reasonable user would think about certain  12:02
8  statements in the Chrome Privacy Notice; correct?  12:02
9    A.  Yes.              12:02
10    Q.  And you -- the Chrome Privacy Notice describes  12:02
11  several different modes.              12:02
12      Are you familiar with that?              12:02
13    A.  Yes.              12:02
14    Q.  Okay.  There's basic, signed in, sync, guest,  12:02
15  and incognito?              12:02
16    A.  Yes.              12:02
17    Q.  And you understand that the plaintiffs allege  12:02
18  that based on the Chrome Privacy Notice, that if a  12:02
19  Chrome user does not enable sync, they expect Google  12:02
20  will not receive any information relating to their  12:02
21  web browsing; correct?              12:02
22      MR. STRAITE:  Objection.  Calls for  12:02
23  speculation.  Objection.  Assumes facts not in evidence.  12:02
24      THE WITNESS:  I was asked to read this and say  12:03
25  what I think about what it says, not what the plaintiffs  12:03

Page 191

1  said.              12:03
2  BY MR. BROOME:              12:03
3    Q.  Okay.  But you understand that's what the  12:03
4  plaintiffs allege; that the Chrome Privacy Notice  12:03
5  conveys to users that if a Chrome user does not enable  12:03
6  sync, then Google will not receive any of the categories  12:03
7  of data that are at issue in this case?              12:03
8    A.  Yes.              12:03
9    Q.  Okay.  "The Chrome Privacy Notice describes  12:03
10  incognito mode."              12:03
11      Are you familiar with that?              12:03
12    A.  Yeah.  But I understand that that's not part  12:03
13  of what we're talking about.              12:03
14    Q.  Have you reviewed the portion of the  12:03
15  Chrome Privacy Notice that describes incognito mode?  12:03
16    A.  I may have read it.  But I was told that  12:03
17  that's where sort of -- that's not part of the Complaint  12:03
18  here.              12:03
19    Q.  Okay.  So you were -- were you asked to  12:03
20  exclude the section of the Chrome Privacy Notice that  12:03
21  describes incognito mode from your materials that you  12:04
22  relied on in forming your opinions?              12:04
23    A.  I think it was -- I think I was either told or  12:04
24  I absorbed that the incognito mode was not part of the  12:04
25  case.              12:04

Page 192

1    Q.  Okay.  That may be.  But let's take a look at  12:04
2  that section of the Chrome Privacy Notice.              12:04
3      MR. STRAITE:  We're still on Exhibit 4, Steve?  12:04
4      MR. BROOME:  Yep.              12:04
5      MR. STRAITE:  Can you give us the Bates number  12:04
6  of the page he should start looking at?              12:04
7      MR. BROOME:  Oh, yeah.  Sure.  738.              12:04
8      MR. STRAITE:  738?              12:04
9      MR. BROOME:  Yeah.              12:04
10      MR. STRAITE:  He has the page in front of him,  12:05
11  Steve.              12:05
12  BY MR. BROOME:              12:05
13    Q.  Okay.  Do you see the description of  12:05
14  "Incognito mode and guest mode"?              12:05
15    A.  Yes.  Let me read it more carefully again.  12:05
16    Q.  Sure.  I'll read part of it there.  It says:  12:05
17      "You can limit the information Chrome  12:05
18  stores on your system by using incognito  12:05
19  mode or guest mode."              12:05
20    A.  Right.              12:05
21    Q.  "In these modes, Chrome won't store certain  12:05
22  information, such as," and then there are three bullets.  12:05
23      First bullet says "Basic browsing  12:05
24  history information like URLs, cached page  12:05
25  text, or IP addresses of pages linked from  12:05

Page 193

49 (Pages 190 - 193)

1    the websites you visit."                     12:05
2        The next bullet says "Snapshots of       12:05
3    pages that you visit."                       12:05
4        And then the third bullet says           12:05
5    "Records of your downloads, although the     12:05
6    files you download will still be stored      12:05
7    elsewhere on your computer or device."       12:05
8        Do you see that?                         12:05
9    A.  Yes, I do.                               12:05
10   Q.  And then it says:                        12:05
11   "How Chrome handles your incognito or guest  12:05
12   information," and then there's a big bolded heading that  12:05
13   says "Cookies."  And it says:                12:05
14       "Chrome won't share existing cookies     12:05
15   with sites you visit in incognito or guest   12:05
16   mode.  Sites may deposit new cookies while   12:06
17   you are in these modes, but they'll only     12:06
18   be stored and transmitted until you close    12:06
19   the last incognito or guest window."         12:06
20       Do you see that?                         12:06
21   A.  Yes, I do.                               12:06
22   Q.  And before, we just discussed that -- you  12:06
23   know, you said information in cookies is personal  12:06
24   information.                                 12:06
25       That was your opinion?                   12:06
                                          Page 194

1    A.  Yes, it is.                              12:06
2    Q.  Okay.  And this -- description of this mode  12:06
3    says that "Chrome won't share cookies, existing cookies,  12:06
4    with sites you visit in incognito mode"; right?  12:06
5    A.  Right.                                   12:06
6    Q.  Okay.  But your opinion is that reasonable  12:06
7    people who read the Chrome Privacy Notice would think  12:06
8    that simply using Chrome in any mode without sync  12:06
9    prevents Google from receiving information when they  12:06
10   browse the web; correct?                     12:06
11   A.  Why is that a contradiction to what you're  12:06
12   saying?                                      12:06
13   Q.  Well, if Chrome's basic mode, which is just  12:06
14   the default mode, I mean, that's a mode in which sync is  12:07
15   not enabled; right?                          12:07
16   A.  Right.                                   12:07
17   Q.  Okay.                                    12:07
18   A.  Okay.  So I still don't --              12:07
19   Q.  So if people think that Chrome's basic mode  12:07
20   blocks Google from receiving all data, what do  12:07
21   reasonable people think is the purpose of incognito  12:07
22   mode?                                        12:07
23   A.  The problem here is that there are -- there is  12:07
24   a number of issues that you're conflating.   12:07
25       First of all, you're inferring that people  12:07
                                          Page 195

1    will get up to that in the privacy policy.   12:07
2        Okay?                                    12:07
3        Secondly, a person might believe there are  12:07
4    other aspects of personal information that would be  12:07
5    un-synced that has nothing to do with the incognito  12:07
6    mode.                                        12:07
7        All right?                               12:07
8        Incognito mode may be basic browsing history,  12:07
9    snapshots, records of the downloads, but maybe there are  12:07
10   other parts of knowledge that would be -- that if you  12:07
11   don't sync at all, you protect yourself from.  12:08
12       So it's not clear to me that one has to be  12:08
13   contradictory to the other.                  12:08
14   Q.  You just mentioned the basic browsing history  12:08
15   information bullet.                          12:08
16       Do you see that?                         12:08
17   A.  Yes, I see that.                         12:08
18   Q.  Okay.  So that tracks the first bullet under  12:08
19   the "Basic Browser Mode" --                  12:08
20   A.  Okay.                                    12:08
21   Q.  -- description?  Do you see that?  You can  12:08
22   flip back to page 730.                       12:08
23   A.  730.                                     12:08
24       MR. STRAITE:  You want him to scroll back up a  12:08
25   few pages, Steve?                            12:08
                                          Page 196

1        THE WITNESS:  Yeah.                      12:08
2        MR. BROOME:  Page 730.                   12:08
3        MR. STRAITE:  730.                       12:08
4        THE WITNESS:  Okay.                      12:08
5        MR. STRAITE:  Yes, sir.                  12:08
6        THE WITNESS:  Okay.  Browsing history.  Right.  12:08
7    BY MR. BROOME:
8    Q.  I just want you to compare the bullets -- the  12:08
9    browsing history information on those bullets and to  12:08
10   then the browsing history information on the bullet on  12:09
11   page 738.  They're very similar; right?      12:09
12   A.  Let's see.                               12:09
13       MR. STRAITE:  He has 738 in front of him.  12:09
14       THE WITNESS:  Yeah.  So second is "Snapshots."  12:09
15   What's the third on page 730?                12:09
16       MR. BROOME:  730 and 738.                12:09
17       THE WITNESS:  730.  They're not exactly the  12:09
18   same by any means.  And -- no.  They're not the same.  12:09
19   And frankly, the -- Google has its standard out, which  12:09
20   is "This information might include."         12:09
21       That is such a broad hole that anyone could  12:09
22   assume anything about it.  And the same thing is true  12:09
23   with the incognito mode.                     12:09
24       And, you know, these are -- these are      12:10
25   basically very ambiguous distinctions they're trying to  12:10
                                          Page 197

50 (Pages 194 - 197)

1 make; that Google -- if Google really want to say what    12:10
2 it -- what you're saying, it would have made it far    12:10
3 clearer.    12:10
4      The guest mode isn't even explained, as far as    12:10
5 I can see, and the guest mode is just to help Google    12:10
6 figure out how they can track you and not a friend of    12:10
7 yours who's using your computer.    12:10
8      So the -- this is not -- I wouldn't at all say    12:10
9 that incognito mode implies what you're implying about    12:10
10 what should -- what people should not have figured out    12:10
11 from un-sync at all.    12:10
12      And the three bullets don't parallel one    12:10
13 another. No.    12:10
14 BY MR. BROOME:    12:10
15    Q.  Okay. So given that -- you would agree that    12:10
16 incognito mode is presented as a privacy mode; correct?    12:10
17    A.  "Presented" is the right word.    12:10
18    Q.  And so what -- what difference do you believe    12:10
19 reasonable people would think incognito mode provides --    12:11
20    A.  I think --    12:11
21      MR. STRAITE:  Wait a second.    12:11
22 BY MR. BROOME:    12:11
23    Q.  -- as compared to basic browser mode?    12:11
24      MR. STRAITE:  Objection. Beyond the scope of    12:11
25 his report.    12:11

Page 198

1      THE WITNESS:  Yeah. And I -- I just don't --    12:11
2 BY MR. BROOME:    12:11
3    Q.  Sorry. Go ahead. It's fine for you to say    12:11
4 "I don't know."    12:11
5      MR. STRAITE:  Joe, which page do you want to    12:11
6 go back to?    12:11
7      THE WITNESS:  Could we go back to 730?    12:11
8      Okay. Basic Browser History.    12:11
9      I would say that if I'm not synced, the    12:11
10 un-syncing protects me more even than incognito mode.    12:11
11      Okay?    12:11
12      I think that you get that sense from reading    12:11
13 it. Incognito mode is way down and is not something    12:11
14 that's made clear at all, and guest mode is even more    12:11
15 impervious to understand.    12:11
16 BY MR. BROOME:    12:12
17    Q.  So your opinion is that reasonable people    12:12
18 would think that the basic browser mode is -- provides    12:12
19 more privacy from Google than incognito mode?    12:12
20    A.  If you un-sync. That's the key.    12:12
21    Q.  Yeah. But basic mode -- right. Basic mode is    12:12
22 un-synced; right? I mean, there is no un-synced mode.    12:12
23 We can all agree on that; right?    12:12
24    A.  Right. If you --    12:12
25    Q.  There's basic mode, there's sign-in mode,    12:12

Page 199

1 there's sync mode, there's incognito mode.    12:12
2    A.  It's not at all clear from the description    12:12
3 here what incognito mode will give me as opposed to    12:12
4 un-sync.    12:12
5      MR. STRAITE:  And objection. Beyond the scope    12:12
6 of his report.    12:12
7 BY MR. BROOME:    12:12
8    Q.  Okay. But your opinion is that the basic    12:12
9 mode, which is an un-synced mode, reasonable people    12:12
10 reading the Chrome Privacy Notice would think that the    12:12
11 basic mode provides more privacy from Google than    12:12
12 incognito mode?    12:12
13      MR. STRAITE:  Objection. Beyond the scope of    12:12
14 the report.    12:12
15      THE WITNESS:  I would say that it's hard to    12:12
16 tell. The language makes it very difficult to    12:12
17 understand.    12:13
18 BY MR. BROOME:    12:13
19    Q.  The language of what?    12:13
20    A.  Of the incognito mode.    12:13
21    Q.  Which aspects of it do you find hard to    12:13
22 understand?    12:13
23      MR. STRAITE:  Scrolling to 738.    12:13
24      THE WITNESS:  Basic --    12:13
25      THE COURT REPORTER:  You're reading again.    12:13

Page 200

1      THE WITNESS:  I'm sorry.    12:13
2      "Chrome won't store certain information such    12:13
3 as."    12:13
4      When anybody -- both of those areas start    12:13
5 with that. That is -- that makes everything else    12:13
6 meaningless.    12:13
7      Okay?    12:13
8      You -- it really doesn't tell you enough about    12:13
9 what it is that they're going to make incognito.    12:13
10 BY MR. BROOME:    12:14
11    Q.  So more information should be provided.    12:14
12      Is that your opinion?    12:14
13    A.  Yeah.    12:14
14      MR. STRAITE:  Objection. Misstates his    12:14
15 testimony.    12:14
16      THE WITNESS:  Yeah. I think we're going in    12:14
17 circles here. Yes. I do believe that more information    12:14
18 needs to be required for it to be understandable.    12:14
19      MR. STRAITE:  Objection. Goes beyond the    12:14
20 scope of his expert report.    12:14
21 BY MR. BROOME:    12:14
22    Q.  Wouldn't you agree, Professor Turow, that when    12:14
23 privacy policies are too long, users stop reading them?    12:14
24    A.  That is --    12:14
25      MR. STRAITE:  Objection -- wait, wait.    12:14

Page 201

51 (Pages 198 - 201)

1      Objection. Relevance. Objection. Goes     12:14
2  beyond the scope of his report.     12:14
3      THE WITNESS: No offense but that's a bunch of 12:14
4  baloney. There are plenty of ways to make a privacy     12:14
5  policy understandable. I could explain incognito mode     12:14
6  in far fewer sentences that would compare it to basic     12:14
7  mode and be very clear.     12:14
8      They're not doing that. And the reason     12:14
9  they're not doing that is -- may relate to confusing     12:14
10 people.     12:14
11     THE COURT REPORTER: I didn't hear any of     12:14
12 that.     12:14
13     (Court reporter reads back.)     12:15
14     THE COURT REPORTER: Sir, please. I can't do 12:15
15 my job. I really need you to hang on a second. Please. 12:15
16     THE WITNESS: Go ahead. Sorry.     12:15
17     (Court reporter reads back.)     12:15
18     THE WITNESS: I think that's what I said. And 12:15
19 then I -- I said at least its function is to confuse     12:15
20 people.     12:15
21 BY MR. BROOME:     12:15
22     Q. Do you have any basis to believe that Google     12:15
23 is intentionally trying to confuse people?     12:15
24     MR. STRAITE: Objection. Misstates his     12:15
25 testimony.     12:15

Page 202

1      THE WITNESS: It does misstate my testimony.     12:15
2  BY MR. BROOME:     12:15
3      Q. I didn't ask --     12:15
4      A. I'm saying that the language, the rhetoric of 12:15
5  the privacy policies, of the privacy notices, is -- is     12:15
6  such that one could draw a conclusion that there is     12:15
7  ambiguities that are made against understanding. Let me 12:16
8  put it that way. Whether it's purposeful or not, I     12:16
9  can't make a judgment.     12:16
10 BY MR. BROOME:     12:16
11     Q. Reading the incognito mode description,     12:16
12 Professor Turow, do you believe that reasonable people     12:16
13 would think that incognito mode provides privacy from     12:16
14 Google as opposed to privacy from others?     12:16
15     MR. STRAITE: Objection. Vague. Objection.     12:16
16 Beyond the scope of his report.     12:16
17     THE WITNESS: I simply don't know the answer     12:16
18 to that.     12:16
19     MR. BROOME: Okay.     12:16
20     THE WITNESS: I mean, that's part of the     12:16
21 ambiguity here.     12:16
22 BY MR. BROOME:     12:17
23     Q. If you look on page 734 --     12:17
24     MR. STRAITE: Steve, this is still Exhibit 4, 12:17
25 and when you say it's 734, you mean -- you mean ending 12:17

Page 203

1  in Bates No. 734, I assume?     12:17
2      MR. BROOME: Yes.     12:17
3      MR. STRAITE: Okay. The witness has that page 12:17
4  in front of him.     12:17
5      THE WITNESS: Yes, sir.     12:17
6  BY MR. BROOME:     12:17
7      Q. You see in the third sentence it says "In     12:17
8  general, usage statistics do not include web page URLs     12:17
9  or personal information"?     12:17
10     A. Can I load this?     12:18
11     MR. STRAITE: You want to make it bigger?     12:18
12     THE WITNESS: No. I want to read lower.     12:18
13     MR. STRAITE: Okay.     12:18
14     How far should he read, Steve?     12:18
15     MR. BROOME: I just wanted him to read that     12:19
16 sentence.     12:19
17     THE WITNESS: Okay.     12:19
18     MR. BROOME: But you can read whatever you     12:19
19 like.     12:19
20     THE WITNESS: What's your question, sir?     12:19
21 BY MR. BROOME:     12:19
22     Q. In that sentence, Google uses web page URLs -- 12:19
23 it says "web page URLs or personal information."     12:19
24     That conveys to people that web page URLs are 12:19
25 different than personal information; right? At least as 12:19

Page 204

1  the term "personal information" is being used in this     12:19
2  notice.     12:19
3      A. I'm not sure I understand what you're asking.     12:20
4      Q. Given that the sentence breaks out web page     12:20
5  URLs, it refers to "web page URLs or personal     12:20
6  information," someone reading that -- a reasonable     12:20
7  person who reads that would understand that the term     12:20
8  "personal information" does not include web page URLs;   12:20
9  correct?     12:20
10     A. In this particular context.     12:20
11     Q. Okay. So yes?     12:20
12     A. In the -- yes. In this particular context.     12:20
13     And by the way, there is -- there's a carve -- 12:20
14 let me see if I read something toward the bottom there. 12:20
15     "If you have enabled Chrome sync, Chrome may     12:20
16 combine" blah, blah, blah, that basically says what I     12:21
17 was saying before. It's repeating the notion that     12:21
18 Chrome sync is the operative technology that allows for 12:21
19 tracking. You know, the -- essentially that's what     12:21
20 they're saying, "declared age and gender information."   12:21
21     Q. Professor, you are extrapolating there, are     12:21
22 you not?     12:21
23     A. No.     12:21
24     Q. The sentence about Chrome sync says:     12:21
25     "If you have enabled Chrome sync,     12:21

Page 205

52 (Pages 202 - 205)

CONFIDENTIAL

| | |
|---|---|
| 1  Chrome may combine any declared age and          12:21 | 1  information may be sent to Google when a user turns on   12:23 |
| 2  gender information from your Google          12:21 | 2  Chrome sync?          12:23 |
| 3  account with our statistics to help us          12:21 | 3    A.  Yes.  I --          12:23 |
| 4  build products better suited to all          12:21 | 4      MR. STRAITE:  Objection --          12:23 |
| 5  demographics."          12:21 | 5      Let me get my objections in.          12:23 |
| 6    A.  Why did it have --          12:21 | 6      Calls for speculation.  Beyond the scope of    12:23 |
| 7      MR. STRAITE:  I'm sorry.  Let me get my      12:21 | 7  the report.          12:23 |
| 8  objection in.          12:21 | 8      THE WITNESS:  Right.          12:23 |
| 9      It needs to be a question and not just a --    12:21 | 9      And, again, it is beyond the scope of my    12:23 |
| 10      MR. BROOME:  I was still asking my question.   12:21 | 10  report.  My -- the -- the notion of Chrome sync is    12:23 |
| 11  So let me finish the question and then you can make your  12:21 | 11  presented sometimes as a way to coordinate your      12:23 |
| 12  objection and then we can get an answer.          12:21 | 12  activities.          12:23 |
| 13      THE WITNESS:  Go ahead.          12:21 | 13      Okay?          12:23 |
| 14  BY MR. BROOME:          12:21 | 14  BY MR. BROOME:          12:23 |
| 15    Q.  The sentence -- I think we can all read what   12:21 | 15    Q.  What --          12:23 |
| 16  it says.          12:21 | 16    A.  Coordinate the ways in which your various    12:23 |
| 17      Nothing in that sentence says if you don't    12:21 | 17  devices look to Google.  But it also makes the clear    12:24 |
| 18  enable sync, no data will be passed to Google; right?   12:21 | 18  proposition that Google will use your data in Chrome    12:24 |
| 19    A.  Which sentence do you mean there?          12:22 | 19  sync and not use your data in Chrome when you don't    12:24 |
| 20    Q.  The sentence that you identified as referring   12:22 | 20  sync.          12:24 |
| 21  to Chrome sync.          12:22 | 21    Q.  Uh-huh.          12:24 |
| 22      "If you have enabled Chrome sync,          12:22 | 22      Do you understand that the -- are you -- okay.  12:24 |
| 23  Chrome may combined any declared age and          12:22 | 23      Let me ask you this:  I asked you whether you    12:24 |
| 24  gender information from your Google          12:22 | 24  were familiar with the categories of data that will be    12:24 |
| 25  account with our statistics to help us          12:22 | 25  sent to Google and stored in the user's account when    12:24 |
| Page 206 | Page 208 |

| | |
|---|---|
| 1  build products better suited for all          12:22 | 1  they enable Chrome sync.  And I think you said you are   12:24 |
| 2  demographics."          12:22 | 2  familiar with those.          12:24 |
| 3    A.  The consistent theme in this privacy policy,   12:22 | 3    A.  I remember saying that.  But okay.          12:24 |
| 4  in the privacy notice, and anything relating to it is    12:22 | 4    Q.  Well, is that true?  If you didn't say --    12:24 |
| 5  that when it says -- there was no reason that it had to   12:22 | 5    A.  I believe I am.          12:24 |
| 6  say this if you -- if it happens when you don't enable   12:22 | 6      MR. STRAITE:  And I'd like to object to that   12:24 |
| 7  Chrome sync.          12:22 | 7  question as beyond -- beyond the scope of the report.   12:24 |
| 8      So the very fact that it mentions that          12:22 | 8  Objection.  Asked and answered.          12:24 |
| 9  proposes a distinction that a person would inevitable   12:22 | 9      THE WITNESS:  Yeah.  I don't understand why    12:24 |
| 10  make.  It represents the idea that there is something    12:22 | 10  you're bringing this up, given what my remit is supposed   12:24 |
| 11  special about Chrome sync and personalization.          12:22 | 11  to be, which is do people who read this document get the   12:24 |
| 12    Q.  Well, there is; right?  I mean, there is      12:22 | 12  sense that there is a -- an important distinction in    12:24 |
| 13  something special about Chrome sync and personalization.  12:22 | 13  terms of data release between Chrome sync and non-Chrome   12:25 |
| 14    A.  Well, it's the idea that if you don't sync,   12:22 | 14  sync?          12:25 |
| 15  that -- I mean, it implies that if you don't sync, none   12:22 | 15  BY MR. BROOME:          12:25 |
| 16  of this will get to Google.          12:23 | 16    Q.  The reason, Professor, is because Chrome sync   12:25 |
| 17    Q.  None of what?          12:23 | 17  has a very specific function, right, in our opinion?   12:25 |
| 18    A.  None of the personal information that you --   12:23 | 18  I'll just state it.  And David can object that I'm      12:25 |
| 19  that -- that you're potentially giving off.          12:23 | 19  testifying, which is fine.  I get that.  I'm just trying   12:25 |
| 20    Q.  Let me ask you this:  Do you understand what   12:23 | 20  to orient you a bit in terms of some of my questioning.   12:25 |
| 21  Chrome -- enabling Chrome sync does?          12:23 | 21    A.  Yes.          12:25 |
| 22      MR. STRAITE:  Objection.          12:23 | 22    Q.  Chrome sync is a function that allows a user   12:25 |
| 23  BY MR. BROOME:          12:23 | 23  to personalize their experience within Chrome.  And when   12:25 |
| 24    Q.  Well, let me ask a better question.          12:23 | 24  you enable Chrome sync, you can send certain categories   12:25 |
| 25      Do you understand what categories of          12:23 | 25  of information to your Google account.  It will be      12:25 |
| Page 207 | Page 209 |

Veritext Legal Solutions
866 299-5127

1 stored in your Google account and passed on, you know,    12:25
2 to your other synced devices.                        12:25
3        You understand the all that; right?            12:25
4    A.  Yes, I do.                                      12:25
5    Q.  Okay.  Now, when you don't enable sync, that    12:25
6 doesn't happen; right?                                12:25
7        And is it your understanding that the          12:25
8 information that is synced is sent to Google -- when a    12:25
9 user enables sync is sent to Google regardless?        12:26
10       MR. STRAITE:  Objection.  Calls for            12:26
11 speculation.  Beyond the scope of his expert report.    12:26
12       THE WITNESS:  What I'm saying is that there    12:26
13 are -- quite clearly appears from what I have been told    12:26
14 by the experts in this case that there is a slew of    12:26
15 personalized data that gets sent to Google through    12:26
16 Chrome when a person does not sync.  Yes.            12:26
17 BY MR. BROOME:
18    Q.  Yeah.                                          12:26
19       But you understand it's not the same data;      12:26
20 right?  It's maybe -- plaintiffs will argue that it's    12:26
21 similar but it's not the same.                        12:26
22       You understand that; right?                    12:26
23       MR. STRAITE:  Objection.  Assumes facts not in    12:26
24 evidence.  Calls for speculation.  And beyond the scope    12:26
25 of his report.                                        12:26

Page 210

1        THE WITNESS:  Yeah.  I'm not an expert at      12:26
2 this, Mr. Broome, and I think frankly that any data that    12:26
3 is sent, based upon the seeming assurances by Google    12:26
4 that no data will be sent, is wrong.                  12:26
5 BY MR. BROOME:                                        12:26
6    Q.  Where does Google say no data will be sent?    12:26
7    A.  The -- the clear implication is that what      12:27
8 you -- the data that when you don't sync, your browsing    12:27
9 habits won't be sent, your -- and probably some of the    12:27
10 demographic data that they know won't be sent, and other    12:27
11 data will not be sent from Chrome to Google and from the    12:27
12 sites that you visit via Chrome.                      12:27
13    Q.  And that's all based on -- that's based on --    12:27
14    A.  Read my report, sir.                          12:27
15    Q.  Oh, I have.  I have.                          12:27
16    A.  It's in the report.                            12:27
17    Q.  Uh-huh.                                        12:27
18    A.  There are many clauses and statements that say    12:27
19 that -- that say both ways that un-sync -- when you    12:27
20 don't sync, it is a qualitative difference in the way    12:27
21 the company gathers data.                            12:27
22    Q.  Okay.  But that does not -- right.  And I      12:27
23 think you --                                          12:27
24       If Google says some data will not be passed    12:28
25 when you sync, that does not necessarily mean that no    12:28

Page 211

1 data will be passed if you don't sync.                12:28
2    Q.  Do you agree with that premise?                12:28
3    A.  No.  Because I never see the word "some."  I    12:28
4 don't -- you show me where it says "Some data will not    12:28
5 be passed when you don't sync."                      12:28
6    Q.  Well, the -- okay.  Let's walk through some of    12:28
7 the paragraphs of your report.                        12:28
8       MR. STRAITE:  Which exhibit do you want us to    12:28
9 pull up, Steve?                                        12:28
10       THE WITNESS:  I have my report.                12:28
11       MR. BROOME:  Actually, we're going to go back    12:28
12 to your report, which is -- I think he's got on his    12:28
13 iPad, but it's Exhibit 4.                            12:28
14       MR. STRAITE:  Again, on the record, our        12:28
15 agreement that the iPad is not discoverable just because    12:28
16 he has a report on it.  And I represent there's no notes    12:28
17 on it.                                                12:28
18       MR. BROOME:  Oh, I'm sorry.  Exhibit 2, not    12:28
19 Exhibit 4.                                            12:28
20       THE WITNESS:  Yeah.  Okay.                    12:28
21       MR. STRAITE:  He has his report in front of    12:28
22 him.                                                  12:28
23 BY MR. BROOME:                                        12:28
24    Q.  All right.  So let's go to paragraph 19.      12:28
25    A.  Paragraph 19, yes.                            12:28

Page 212

1        So it says that:                              12:29
2        "Personal information Chrome stores            12:29
3        won't be sent to Googles unless you store      12:29
4        that data in your Google account by          12:29
5        turning on sync."                            12:29
6        Okay?  Doesn't say "some."                    12:29
7    Q.  Right.                                          12:29
8        But it does the personal information that      12:29
9 Chrome stores; right?                                12:29
10    A.  That means the personal information that      12:29
11 Chrome stores.                                        12:29
12    Q.  Right.                                          12:29
13       And is it your understanding that the          12:29
14 information at issue in this case is the personal        12:29
15 information that Chrome stores?  That's something you've    12:29
16 been asked to assume; correct?                        12:29
17    A.  That's not my remit.  I never was asked to    12:29
18 make assumptions or judgments about what the plaintiffs    12:29
19 say the personal information that Chrome stores is      12:29
20 about.  That's not my area.                          12:29
21       But I can tell you here that a person would --    12:29
22 it's clearly the case that it says "The personal        12:29
23 information that Chrome stores," meaning what Chrome    12:29
24 gets ahold of, okay, will not be sent to Google, unless    12:29
25 you choose to store the data in your Google account by    12:30

Page 213

1 turning on sync.                          12:30
2    Q.  Right.                             12:30
3         And let me ask you this:  Are you offering any  12:30
4 opinion on whether the data collection at issue in this  12:30
5 case actually involves the personal information that  12:30
6 Chrome stores?                            12:30
7         MR. STRAITE:  Objection.  Asked and answered.  12:30
8         THE WITNESS:  That's not my area.     12:30
9 BY MR. BROOME:                            12:30
10    Q.  Okay.  So if the data collection at issue in  12:30
11 this case did not actually involve the personal  12:30
12 information that Chrome stores, then the statement in  12:30
13 the Chrome Privacy Notice would be -- would not  12:30
14 necessarily be inaccurate; right?         12:30
15    A.  I find it hard to believe that any of the  12:30
16 personal information that the plaintiffs are talking  12:30
17 about in the depositions I read would not be covered by  12:30
18 it.                                       12:30
19    Q.  But you don't have an opinion on that; right?  12:30
20 You don't have an expert opinion in this case on that  12:30
21 topic?                                    12:30
22    A.  That's not what I was asked to do.  What --  12:30
23    Q.  That's fine.  Listen, I need -- part of my  12:30
24 job, Professor, is to narrow in what your offering  12:30
25 opinions on.                              12:31
                                          Page 214

1    A.  I can tell you from the start.  It says in --  12:31
2 on page 4, I have been asked, based on my experience,  12:31
3 "what would a reasonable person understand Chrome's  12:31
4 disclosure in terms of service to convey to a person  12:31
5 signing up for Chrome with regard to the sync function?"  12:31
6         That's clearly what I was asked to do, not to  12:31
7 interview the plaintiffs or, you know, aspects and --  12:31
8 you know, aspects connected to that.      12:31
9    Q.  Okay.  Let's go to paragraph 13.    12:31
10    A.  13.                                12:31
11         Let's see.  Okay.                  12:31
12    Q.  This is the first basis for your overall  12:31
13 opinion.                                  12:31
14    A.  Right.                             12:31
15    Q.  Right?                             12:31
16         And you say "Going to Chrome's page called  12:31
17 "sync Setup."                             12:31
18    A.  Right.                             12:31
19    Q.  Right?                             12:31
20         When you start Chrome -- is it your  12:32
21 understanding that when you start using Chrome for the  12:32
22 first time, that you are taken to the sync setup page?  12:32
23    A.  No.  You have to go to sync setup.  12:32
24    Q.  Uh-huh.                            12:32
25         So if you weren't interested in syncing, then  12:32
                                          Page 215

1 you wouldn't arrive on this page; right?  12:32
2         MR. STRAITE:  Objection.  Assumes facts not  12:32
3 in evidence.  Calls for speculation.  Incomplete  12:32
4 hypothetical.                             12:32
5         THE COURT REPORTER:  I'm sorry.  What was the  12:32
6 last part of that?                        12:32
7         MR. STRAITE:  Incomplete hypothetical.  12:32
8         I'm wearing a mask.  I'm sorry.  I'll  12:32
9 articulate better.                        12:32
10         THE COURT REPORTER:  Thank you.      12:32
11         THE WITNESS:  A person might not go to the  12:32
12 sync setup.                               12:32
13 BY MR. BROOME:                            12:32
14    Q.  Right.                             12:32
15         And if they didn't go to the sync setup page,  12:32
16 then by definition this wouldn't affect --  12:32
17    A.  Then they would be considered synced; correct?  12:32
18    Q.  If they didn't go to this page, then whatever  12:32
19 is conveyed on this page wouldn't affect their  12:32
20 expectations of what Google --            12:33
21    A.  Will Google use all the information about  12:33
22 them?                                     12:33
23    Q.  I'm just -- let's just focus on your --  12:33
24    A.  No.  You're bringing up the question to me.  12:33
25         MR. STRAITE:  Let him finish.       12:33
                                          Page 216

1         THE WITNESS:  Okay.  Go ahead.      12:33
2         MR. STRAITE:  Steve, could you repeat the  12:33
3 question?                                 12:33
4 BY MR. BROOME:                            12:33
5    Q.  Users don't necessarily need to go to the sync  12:33
6 setup page; right?                        12:33
7    A.  Right.                             12:33
8    Q.  So it's quite possible that somebody who is  12:33
9 not interested in syncing would never arrive on this  12:33
10 page; correct?                            12:33
11         MR. STRAITE:  Objection.  Beyond the scope of  12:33
12 his report.                               12:33
13         THE WITNESS:  It's possible.  Yes.  12:33
14 BY MR. BROOME:                            12:33
15    Q.  All right.  The page -- let's assume somebody  12:33
16 does click on whatever button is necessary to arrive on  12:33
17 the sync setup page or they go there directly.  12:33
18         Your opinion is that the phrase "sync and  12:34
19 personalized Chrome" across your devices is a clear  12:34
20 indication that keeping sync off means not sharing data?  12:34
21    A.  It's one of the many, yes.         12:34
22    Q.  Okay.  But sync and personalized Chrome across  12:34
23 your devices can mean a lot of different things; right?  12:34
24         MR. STRAITE:  Objection.  Misstates his  12:34
25 testimony.                                12:34
                                          Page 217

55 (Pages 214 - 217)

CONFIDENTIAL

| | |
|---|---|
| 1 THE WITNESS: No. It cannot, not in the 12:34 | 1 Q. No. Professor, that's -- that's -- the toggle 12:36 |
| 2 context here. It means sync and then personalized 12:34 | 2 that you just described is under a heading called 12:36 |
| 3 Chrome across your devices through that. Yes. 12:34 | 3 "Other Google Services" which falls below the 12:36 |
| 4 BY MR. BROOME: 12:34 | 4 heading "Sync" -- it says "Sync and personalize Chrome 12:36 |
| 5 Q. Right. 12:34 | 5 across your devices," and then there's a button that 12:36 |
| 6 And one way you can -- okay. So, I mean, 12:34 | 6 says "Turn on sync." 12:36 |
| 7 you've looked at the sync settings; right? You've 12:34 | 7 Do you see that? 12:36 |
| 8 looked at the sync setup page? 12:34 | 8 A. Yeah. 12:36 |
| 9 A. Mm-hm. 12:34 | 9 Q. Paragraph 13 of your report. 12:36 |
| 10 Q. And one of the ways you can personalize 12:34 | 10 A. Right. 12:36 |
| 11 sync -- or personalize Chrome, rather, is to sync your 12:34 | 11 Q. And then below that are some other toggles; 12:36 |
| 12 bookmarks; right? 12:34 | 12 right? Some other settings. 12:36 |
| 13 A. That's one function, yes. 12:34 | 13 MR. STRAITE: Is there a question there? 12:36 |
| 14 Q. Yeah. 12:34 | 14 BY MR. BROOME: 12:36 |
| 15 So that's one way that by syncing, you would 12:34 | 15 Q. Do you see that, Professor? 12:36 |
| 16 be personalizing Chrome across your devices; right? 12:34 | 16 A. Yes, I do see that. 12:36 |
| 17 A. Absolutely. 12:35 | 17 Q. Okay. Those are other features that users can 12:37 |
| 18 Q. Okay. And then another way that you can 12:35 | 18 turn on or off, irrespective of whether they have chosen 12:37 |
| 19 personalize Chrome across your devices by syncing is by 12:35 | 19 to sync; correct? 12:37 |
| 20 syncing your tabs; right? 12:35 | 20 A. One might get that opinion, yes. 12:37 |
| 21 A. Yes. 12:35 | 21 Q. How could one get any other opinion, given 12:37 |
| 22 Q. And there's a whole host of other features 12:35 | 22 that in this page that you've described, it -- sync is 12:37 |
| 23 within sync that you can choose to sync or not to sync; 12:35 | 23 not on. The button says "Turn on sync." 12:37 |
| 24 right? 12:35 | 24 A. Right. No. I agree that that's there. 12:37 |
| 25 A. Yes. 12:35 | 25 Q. Okay. So the phrase "sync and personalize 12:37 |
| Page 218 | Page 220 |

| | |
|---|---|
| 1 Q. Okay. So those are all different ways that 12:35 | 1 Chrome across your devices" does not necessarily convey 12:37 |
| 2 you can choose to sync and personalize Chrome across 12:35 | 2 that by not syncing, you will block Google from 12:37 |
| 3 your devices? 12:35 | 3 receiving any data whatsoever. 12:37 |
| 4 A. Right. But the -- the corollary of 12:35 | 4 A. That's not -- no. First of all, this is one 12:37 |
| 5 personalization is that they would also take other data 12:35 | 5 statement of a variety of similar statements that happen 12:37 |
| 6 about you. 12:35 | 6 through the piece. 12:37 |
| 7 Q. But it doesn't say that; right? It doesn't 12:35 | 7 Secondly, the word "personalized" can be taken 12:37 |
| 8 say if you -- it says you can sync and personalize 12:35 | 8 far more than simply coordinate colors. 12:37 |
| 9 Chrome across your devices. You agreed that one way you 12:35 | 9 Okay? 12:37 |
| 10 could do that would be to sync your bookmarks. 12:35 | 10 Personalize can mean using your data for a 12:37 |
| 11 The corollary is not that if I don't sync and 12:35 | 11 variety of purposes. And that is where -- particularly 12:38 |
| 12 I choose not to sync my bookmarks, Google gets no data 12:35 | 12 when you connect it to other aspects of sync the notion 12:38 |
| 13 from me whatsoever. 12:35 | 13 that personalization comes in. 12:38 |
| 14 MR. STRAITE: Steve, objection. This -- 12:35 | 14 Personalized can also mean using your data in 12:38 |
| 15 BY MR. BROOME: 12:35 | 15 order to show you certain things when you search. 12:38 |
| 16 Q. That's not what reasonable people would take 12:36 | 16 Q. Or it can mean simply syncing your bookmarks. 12:38 |
| 17 from this, is it? 12:36 | 17 It can mean -- the point is it can mean a lot of 12:38 |
| 18 A. Well, if you look at what happens as a result 12:36 | 18 different things; right? 12:38 |
| 19 of saying that, right below it says "Allow Chrome 12:36 | 19 A. Right. But in this case, the argument is that 12:38 |
| 20 sign-in." 12:36 | 20 using the word "personalize" -- they could have used the 12:38 |
| 21 Okay? 12:36 | 21 word "coordinate." They didn't. They used 12:38 |
| 22 And the two are merged together. 12:36 | 22 "personalize." 12:38 |
| 23 So that essentially it's implying that if you 12:36 | 23 Q. Okay. You're -- you stand by that testimony. 12:38 |
| 24 do these things together, you're going to be giving up 12:36 | 24 Let me ask you this, just point blank: Is 12:38 |
| 25 certain kinds of data. 12:36 | 25 your testimony that the only interpretation a reasonable 12:38 |
| Page 219 | Page 221 |

56 (Pages 218 - 221)

1 person would have of the phrase "sync and personalized   12:38
2 Chrome across your devices" is that if I don't sync,   12:38
3 Google -- that blocks Google from receiving all my data?  12:38
4        MR. STRAITE:  Objection.  Misstates earlier   12:38
5 testimony.   12:38
6        THE WITNESS:  Not only does it misstate, it   12:39
7 shows -- the case that we discussed before by   12:39
8 Bennett Cyphers shows that I'm not the only one who   12:39
9 believes this.  An expert from the Electronic Frontier   12:39
10 Foundation wrote that in an article.   12:39
11 BY MR. BROOME:   12:39
12   Q.  That's not what you said.  We'll come back to   12:39
13 the Cyphers article.  Don't you worry.  We'll definitely   12:39
14 come back to that.   12:39
15        I'm just asking -- let's focus on   12:39
16 Professor Turow's opinions and not your interpretation   12:39
17 of some other person's opinions.   12:39
18   A.  Well --   12:39
19        MR. STRAITE:  Objection.  Steve, please don't   12:39
20 criticize testimony you don't like and characterize him   12:39
21 as worrying.  That's really unhelpful to be making a   12:39
22 personal attack on the witness because you don't like   12:39
23 him introducing Mr. Cyphers.  It's just not appropriate.  12:39
24        THE WITNESS:  Well, the other thing is that   12:39
25 this can't be taken out of context to the larger set of   12:39

Page 222

1 assurances that take place throughout the policies.   12:39
2 BY MR. BROOME:   12:39
3   Q.  Professor, I asked you before whether your   12:39
4 opinions -- these four opinions, 1 through 4, whether   12:39
5 they stood on their own, and you said "Yes."   12:39
6   A.  I said they are related to one another.   12:39
7   Q.  Are you now saying that in order to have the   12:40
8 opinions that you --   12:40
9   A.  No.  No.  I --   12:40
10   Q.  Hold on.  Let me finish my question.   12:40
11        Are you now saying that for a reasonable   12:40
12 person to have the interpretation that you say they   12:40
13 would have in .1, they would need the broader picture or  12:40
14 to read other documents, or are you saying that simply   12:40
15 reading the sync setup page in and of itself would   12:40
16 convey to a reasonable person that not syncing blocks   12:40
17 Google from receiving all data?   12:40
18   A.  I think that the reasonable person reading the  12:40
19 sync setup page would see the word "personalization" and  12:40
20 believe that Chrome is doing more than just coordinating  12:40
21 the material.   12:40
22   Q.  How does that relate to my question?   12:40
23   A.  I thought it was exactly related to your   12:40
24 question; that looking at the sync setup page in itself,  12:40
25 reading the word "personalization," given the meaning of  12:40

Page 223

1 the word "personalization," a person would infer from   12:41
2 that that there's more -- sure.  There may be this   12:41
3 coordination you're talking about, but it also means   12:41
4 that Google is using the material to coordinate -- using  12:41
5 the data to learn more information about you that it   12:41
6 could then use for the browser and for other purposes.   12:41
7   Q.  Would a reasonable person interpret the phrase  12:41
8 "sync and personalize Chrome across your devices" as   12:41
9 meaning that if I don't sync, that will prevent Google   12:41
10 from receiving any data from --   12:41
11        MR. STRAITE:  Objection.  Asked and answered.  12:41
12 Objection.  Misstates earlier testimony.   12:41
13        THE WITNESS:  I don't know what any data   12:41
14 means.  But reasonably personal, personalized data, yes. 12:41
15 BY MR. BROOME:   12:41
16   Q.  Okay.  Your opinion is that the phrase "sync  12:41
17 and personalize Chrome across your devices" -- well,   12:41
18 what you actually say is sync -- the phrase "sync and   12:41
19 personalize Chrome across your devices is" quote "a   12:41
20 clear indication that keeping sync off means not sharing  12:41
21 data."   12:42
22        I assume you mean not sharing data with   12:42
23 Google?   12:42
24   A.  Right.   12:42
25   Q.  That's your opinion?   12:42

Page 224

1   A.  Yes, it is.   12:42
2   Q.  Okay.  And how many -- you know, before I   12:42
3 asked you whether -- you know, I asked you -- when you   12:42
4 talk about reasonable people, you said it would be   12:42
5 virtually everybody.   12:42
6   A.  Yeah.   12:42
7   Q.  Is it your opinion that upon reading that   12:42
8 phrase on the sync setup page, virtually everyone would  12:42
9 interpret that phrase as a clear indication that keeping  12:42
10 sync off means not sharing data?   12:42
11   A.  That keeping sync off means not sharing   12:42
12 personalized -- not personalizing your data.  Yeah.   12:42
13   Q.  That would mean any data; right?   12:43
14        MR. STRAITE:  Objection.  Misstates earlier   12:43
15 testimony.   12:43
16        THE WITNESS:  No.  Personalized data, sir.   12:43
17 Data that can be tracked to the individual.   12:43
18 BY MR. BROOME:   12:44
19   Q.  Okay.  On the sync setup page, which you have  12:44
20 pasted in paragraph 13 of your report --   12:44
21   A.  Hold on.   12:44
22   Q.  -- there is heading there that says "Auto   12:44
23 complete searches and URLs."   12:44
24        Do you see that?   12:44
25   A.  Yes, sir.   12:44

Page 225

57 (Pages 222 - 225)

1 Q. And we agreed that reasonable people would     12:44
2 think that would be a -- that setting would be     12:44
3 independent of sync; right? Based on the way it's laid     12:44
4 out?     12:44
5 MR. STRAITE: Objection. Misstates earlier     12:44
6 testimony.     12:44
7 THE WITNESS: Well, you suggested and I kind     12:44
8 of agreed that this comes after the turn on sync, but it     12:44
9 might come after a person decides to turn on sync.     12:44
10 BY MR. BROOME:
11 Q. Well, on the sync setup screen, there's a     12:44
12 button that says "Turn on sync," and then there's --     12:44
13 below that it says "Other Google services." And there     12:44
14 are various toggles; right? Can be turned on and off?     12:44
15 A. Yes, sir.     12:45
16 Q. And in fact, on this example that you've     12:45
17 provided, sync is not on, but some of the toggles are     12:45
18 on; right?     12:45
19 A. Yes.     12:45
20 Q. And that conveys to a reasonable person that     12:45
21 those toggles and those features operate independently     12:45
22 of sync; right?     12:45
23 MR. STRAITE: Objection. Misstates testimony.     12:45
24 THE WITNESS: It may -- it may indicate that     12:45
25 you can have choices.     12:45

Page 226

1 Okay?     12:45
2 Independent of sync, if you want to -- but it     12:45
3 could be -- in other words, it may be a subcategory what     12:45
4 not syncing means.     12:45
5 You following what I'm saying?     12:45
6 BY MR. BROOME:
7 Q. Not really.     12:45
8 A. That if you turn on sync, all of this stuff     12:45
9 gets collected. If you don't turn on sync, well, maybe     12:45
10 you could do one thing or another thing. And seems as     12:45
11 if this stuff is done on an opt-out basis; right? The     12:45
12 first three at any rate.     12:45
13 Q. Yeah.     12:45
14 Another interpretation would be that if you     12:45
15 turn on sync, all your settings are sent to all your     12:46
16 sync devices. And if you don't turn on sync, then these     12:46
17 other toggles below control some of the information     12:46
18 that's sent within that particular browser; right?     12:46
19 MR. STRAITE: Objection. Calls for     12:46
20 speculation.     12:46
21 THE WITNESS: That's another interpretation.     12:46
22 BY MR. BROOME:
23 Q. Is it reasonable?     12:46
24 A. I think what's reasonable is what I said about     12:46
25 sync before. And then a person can decide whether she     12:46

Page 227

1 or he wants to do one or the other of these activities.     12:46
2 But I don't see the two as necessarily related.     12:46
3 Q. Under "Auto complete searches and URLs," it     12:46
4 says "Send some cookies and searches from the address     12:46
5 bar and search box to your default search engine";     12:46
6 right?     12:46
7 A. "Send some cookies and searches from the     12:46
8 address bar and search box to your default search     12:46
9 engine." Yes.     12:46
10 Q. So -- and then the example, it's turned on     12:46
11 even though sync is off; right?     12:47
12 A. Sync so far is not turned on. That's what     12:47
13 that is.     12:47
14 Q. Right.     12:47
15 But the auto complete searches and URLs, which     12:47
16 says "Send some cookies and searches from the address     12:47
17 bar and search box to your default search engine," that     12:47
18 is turned on even though sync is off; right?     12:47
19 A. In that case, yes.     12:47
20 Q. Yeah.     12:47
21 Many people use Google as their default search     12:47
22 engine.     12:47
23 You would agree with that; right?     12:47
24 A. Oh, yeah.     12:47
25 Q. And many reasonable people?     12:47

Page 228

1 A. Yes. Many reasonable people.     12:47
2 Q. And those people would understand that keeping     12:47
3 sync off does not prevent Chrome from sending cookies     12:47
4 and searches from the address bar and search box to     12:47
5 Google; correct?     12:47
6 MR. STRAITE: Objection. Calls for     12:47
7 speculation.     12:47
8 THE WITNESS: No. I don't think that that is     12:47
9 necessarily corollary at all.     12:47
10 BY MR. BROOME:
11 Q. All right. So in this example, let's assume     12:47
12 that the owner of this account is a reasonable person.     12:47
13 A. Yes.     12:47
14 Q. They can see that sync is off.     12:47
15 A. No, no. Sync is not off. It hasn't been     12:48
16 turned on.     12:48
17 Q. Okay. Sync is not turned on; right?     12:48
18 But they can see that auto complete searches     12:48
19 and URLs, which sends some cookies and searches from the     12:48
20 address bar and search box to default search engine, is     12:48
21 on; right?     12:48
22 A. Yes.     12:48
23 Q. Okay. So those people would understand that     12:48
24 keeping sync -- or not turning sync on does not prevent     12:48
25 Chrome from sending cookies and searches from the     12:48

Page 229

58 (Pages 226 - 229)

1 address bar and search box to Google, again, assuming 12:48
2 Google is their default search engine?        12:48
3    A. If you accept that. You don't have to accept 12:48
4 those. You don't have to accept any of those.      12:48
5      So what you're saying is a person, by not    12:48
6 turning on sync and keeping all of the others off, would 12:48
7 not be personalizing exactly what you're talking about 12:48
8 here. That's why I brought it up but before.      12:48
9      I mean, essentially these are subcategories of 12:48
10 tracking. And what -- by not turning on sync and by not 12:48
11 keeping these on, you're -- the notion is a person might 12:49
12 say, "Well, then I'm really protecting myself."      12:49
13    Q. Okay. Is that what -- you refer to these    12:49
14 other Google services as "various subcategories of    12:49
15 tracking."                    12:49
16      Is that what you think those -- is that your  12:49
17 opinion that -- as to what those services are?    12:49
18    A. Where did I write that.            12:49
19    Q. That's what you testified. These are "various 12:49
20 subcategories of tracking" --            12:49
21    A. They may be seen as individuals, as ways in   12:49
22 which Google can use their information. And if I     12:49
23 decided not to turn on sync and I don't want these sub 12:49
24 sort of species of that to be done, I turn those off,  12:49
25 too.                       12:49

Page 230

1      In other words, it may by parts of what a     12:49
2 person might assume are the kinds of data that Google is 12:49
3 using when you turn on sync.             12:50
4      And if you turned it all off, Google is not   12:50
5 going to get anything. If you turn some of these    12:50
6 toggles on, Google will get that but not other things. 12:50
7    Q. In the last sentence of paragraph 13, you    12:50
8 write "No distinction is made here between syncing and  12:50
9 signing into Chrome."               12:50
10    A. Yes. There's no explanation of the        12:50
11 difference.                    12:50
12    Q. In the sync setup page, there's different    12:50
13 terminology is used; right? There's "turn on sync" and 12:50
14 then there's another Google service that says "allow   12:50
15 Chrome sign in"?                 12:50
16    A. It doesn't explain what that is.        12:50
17    Q. Okay. But it does -- it does convey to the   12:50
18 user that they're not the same; right?          12:50
19    A. It does but it doesn't explain it.        12:50
20    Q. Okay. But, I mean, that's the -- as you say, 12:50
21 there's no distinction that's made.           12:50
22      But is using different terms not enough to    12:50
23 make a distinction?                 12:50
24    A. Well, that's why I say, if you go ahead and  12:50
25 toggle that off, you feel more secure. That's all that 12:51

Page 231

1 says to me. It's --                12:51
2    Q. Right. And maybe --           12:51
3      MR. STRAITE: Steve, don't interrupt the    12:51
4 witness.                    12:51
5      THE WITNESS: It's another example of using  12:51
6 language against understanding.           12:51
7 BY MR. BROOME:                 12:51
8    Q. What does that mean, using language against 12:51
9 understanding?                 12:51
10    A. If you're using a term like "sign in" without 12:51
11 explaining it, and then you put it under "Other Google 12:51
12 services," a person might say, "Hey, this is another way 12:51
13 in which they can get my information. And not only am I 12:51
14 going to not turn on sync, I'm going to not toggle. Why 12:51
15 should I toggle the thing to the right when I don't even 12:51
16 know what sign in means?"              12:51
17      So a person not toggling these would possibly 12:51
18 assume that what you're doing is you're securing the   12:51
19 privacy that you had when you decided not to turn on   12:51
20 sync.                       12:51
21      MR. STRAITE: Steve, you're done with       12:51
22 this portion of this document, I know I could use a    12:51
23 break. We've been going more than an hour.       12:52
24      MR. BROOME: Yeah. Why don't we take -- our 12:52
25 food arrived so we're going to take -- can we take maybe 12:52

Page 232

1 a 15-minute break? Is that all right with everybody?   12:52
2      MR. STRAITE: Yes. That's fine.         12:52
3      MR. BROOME: Try and stuff our faces.     12:52
4 All right. Let's go off the record.           12:52
5      MR. STRAITE: Off the record.          12:52
6      THE VIDEOGRAPHER: Off the record at 3:52 p.m. 12:52
7      (Break taken in proceedings.)          01:16
8      THE VIDEOGRAPHER: We are back on the record. 01:17
9 The time is 4:17 p.m. Eastern time.           01:17
10 BY MR. BROOME:                 01:17
11    Q. Professor Turow, I want you to go back to your 01:17
12 report at paragraph 14.              01:17
13    A. My -- okay. Let me open it. Sorry.       01:17
14    Q. It's okay.                 01:17
15    A. Okay. Paragraph 14?             01:17
16    Q. Yep.                   01:17
17    A. Yes, sir.                 01:17
18    Q. You've got a screen shot there on the top of  01:17
19 page 6.                     01:17
20      Do you see that?              01:17
21    A. Page 6. Right.              01:17
22    Q. And in paragraph 14 you say:          01:17
23      "Upon download of Chrome and upon         01:17
24 subsequently syncing, Google uses words        01:17
25 that clearly create the impression that it       01:17

Page 233

59 (Pages 230 - 233)

CONFIDENTIAL

| | |
|---|---|
| 1 will use people's data for personalization    01:17 | 1 BY MR. BROOME: |
| 2 only when they sync with Chrome."    01:17 | 2    Q.  In order -- you have to click the turn on sync  01:19 |
| 3    A.  Mm-hm.    01:17 | 3 button that appears on page 5 in order to see the screen  01:19 |
| 4    Q.  Is that -- and then the screen shot that you   01:18 | 4 that you've pasted on page 6 of your report; correct?   01:20 |
| 5 pasted into paragraph 14, is it a screen shot that is   01:18 | 5    A.  That's what I remember.    01:20 |
| 6 shown once people have clicked the turn on sync button;  01:18 | 6    Q.  Okay.    01:20 |
| 7 correct?    01:18 | 7    A.  But look at what it says, sir.  "Google may    01:20 |
| 8    A.  It says, yeah, "turn on sync."  Exactly.    01:18 | 8 use your history to personalize search with ads, or    01:20 |
| 9    Q.  Okay.  And so that's a button that only people  01:18 | 9 other".  Sync -- it says exactly what I was telling you  01:20 |
| 10 who have chosen to turn on sync would see; right?    01:18 | 10 last time and reinforces my point of view.    01:20 |
| 11    A.  Right.  And you have a last -- as I understand  01:18 | 11    Sync your book logs, passwords, history, and    01:20 |
| 12 it, they have a last minute potential for not doing it.  01:18 | 12 more on all your devices.    01:20 |
| 13    Q.  Right.    01:18 | 13    Is there a period there?  Yeah.  Probably.    01:20 |
| 14    And if they had not clicked the turn on sync    01:18 | 14 They left the period out of.    01:20 |
| 15 button, they would not see that screen; correct?    01:18 | 15    "Google may use your history to personalize    01:20 |
| 16    MR. STRAITE:  Objection.  Misstates testimony.  01:18 | 16 search, ads, and other Google services."    01:20 |
| 17    THE WITNESS:  It's the attention to the    01:18 | 17    So, again, a person reading this would say,    01:20 |
| 18 possibility if they're going to turn on sync.  In other  01:18 | 18 "Gee, I" -- you know, "if I don't" -- if I don't sync,   01:20 |
| 19 words, they're heading in that direction but it's not    01:18 | 19 Google won't do this."    01:20 |
| 20 final.    01:18 | 20    It's exactly what I was telling you before.    01:20 |
| 21 BY MR. BROOME: | 21    The -- and, in fact, a person who misunderstood the way  01:20 |
| 22    Q.  Right.    01:18 | 22 you were suggesting would be misunderstood, would then    01:20 |
| 23    Well, do you understand that the plaintiffs in  01:18 | 23 come to this page, see this thing and say, "Whoa, I    01:21 |
| 24 this case have stated in interrogatory responses that,   01:18 | 24 don't want to do this."    01:21 |
| 25 to the best of their knowledge, they've never enabled    01:18 | 25    So it's a secondary example of what I was    01:21 |
| Page 234 | Page 236 |

| | |
|---|---|
| 1 sync?    01:18 | 1 talking about.  Personalization means more than just    01:21 |
| 2    A.  That's not my area of study, sir.    01:18 | 2 coordination.    01:21 |
| 3    Q.  Well, let me just ask you this then.    01:18 | 3    You keep showing me stuff that's basically in  01:21 |
| 4    This screen that you pasted on page 6 of your   01:19 | 4 my favor.  But that's not your fault.  It's Google.    01:21 |
| 5 report, that is -- you would agree with me that's a    01:19 | 5    Q.  Let's take a look at paragraph 17 of your    01:22 |
| 6 screen that only people who have clicked the turn on    01:19 | 6 report, Professor Turow.    01:22 |
| 7 sync button would have seen; right?    01:19 | 7    A.  Okay.    01:22 |
| 8    MR. STRAITE:  Objection.  Misstates his    01:19 | 8    Q.  You write that:    01:22 |
| 9 testimony.  He said...    01:19 | 9    "The Chrome privacy notice begins    01:22 |
| 10    THE WITNESS:  It is the vehicle toward which a  01:19 | 10 with two sentences that together state    01:22 |
| 11 person would be possibly turning on sync.  Yeah.    01:19 | 11 that it is possible to regulate Chrome's    01:22 |
| 12 BY MR. BROOME:    01:19 | 12 collection of data by Google."    01:22 |
| 13    Q.  Right.    01:19 | 13    But what do you mean -- what is "Chrome's    01:22 |
| 14    But it comes -- I just want to understand the   01:19 | 14 collection of data by Google"?    01:22 |
| 15 way you've arraigned these screen shots in your report.  01:19 | 15    A.  That when Chrome has data, it sends some of   01:22 |
| 16    The -- to get to the screen shot on the top of  01:19 | 16 that data to Google.    01:22 |
| 17 page 6, which is a sort of I guess attached to    01:19 | 17    Q.  Okay.  And then the next sentence says:    01:22 |
| 18 paragraph 14, you first have to click the turn on sync  01:19 | 18    "The starting sentence exhorts the    01:22 |
| 19 button.    01:19 | 19 reader to" quote "learn how to control the    01:22 |
| 20    Is that right?    01:19 | 20 information that is collected, stored, and    01:22 |
| 21    MR. STRAITE:  Objection.  Misstates earlier    01:19 | 21 shared when you use the Google Chrome    01:22 |
| 22 testimony.    01:19 | 22 browser on your computer or mobile device.    01:22 |
| 23    THE WITNESS:  You do have to push that button  01:19 | 23 Chrome OS, and when you enable Safe    01:22 |
| 24 to see, as I remember it, to turn on sync, question    01:19 | 24 Browsing in Chrome," end quote.  "This is    01:22 |
| 25 mark.    01:19 | 25 followed by the statement that" quote    01:23 |
| Page 235 | Page 237 |

```
 1   "although this policy describes features       01:23
 2   that are specific to Chrome, any personal      01:23
 3   information that is provided to Google or       01:23
 4   stored in your Google account will be used      01:23
 5   to and protected in accordance with the        01:23
 6   Google privacy policy as changed from time      01:23
 7   to time" end quote.                             01:23
 8       And then you write in the last sentence:   01:23
 9   "The clear meaning a reasonable                 01:23
10   person would derive from the juxtaposition      01:23
11   of these two statements is that if Chrome       01:23
12   provides a way not to send information to       01:23
13   Google, that information will be protected      01:23
14   according to both Chrome's privacy notice       01:23
15   and Google's privacy policy."                   01:23
16       Do you see that?                            01:23
17   A.  Yes, I do.                                  01:23
18   Q.  So the Chrome Privacy Notice says that if   01:23
19   personal information is sent to Google, it will be  01:23
20   protected according to the privacy policy.      01:23
21       And you say the clear meaning of that is that  01:23
22   personal information that is not sent to Google will be  01:24
23   protected in accordance with the privacy policy.   01:24
24       I'm not sure I understand that sentence of  01:24
25   your report.                                    01:24
```
Page 238

```
 1       MR. STRAITE:  Is there a question, Steve?  01:24
 2       MR. BROOME:  I'm asking if he can explain it  01:24
 3   to me.                                          01:24
 4       THE WITNESS:  Let me read it again, if I may.  01:24
 5       Okay.  What I was suggesting here is that the  01:25
 6   idea of what Google is basically saying is learn how to  01:25
 7   control the information that's collected about you when  01:25
 8   you use the Chrome browser.                     01:25
 9       So the privileging is learning how to control  01:25
10   the information.                                01:25
11       Then when they bring up the Google Privacy  01:25
12   Policy, what I meant to suggest is that information that  01:25
13   you may have, say, that Google has the opportunity to  01:25
14   collect, would not be used by Google because of -- if  01:25
15   you had made the decision not to sync.          01:25
16   BY MR. BROOME:
17   Q.  Okay.  I'm still not following.             01:25
18       What the sentence -- the Chrome Privacy Notice  01:25
19   says that if information --                      01:25
20       "Any personal information that is           01:25
21   provided to Google or stored in your           01:26
22   Google account will be used and protected       01:26
23   in accordance with the Google privacy          01:26
24   policy, as changed from time to time."          01:26
25       But then you write:                         01:26
```
Page 239

```
 1       "The clear meaning a reasonable             01:26
 2   person would derive from these two              01:26
 3   statements is that if Chrome provides a         01:26
 4   way not to send information to Google,          01:26
 5   that information will be protected              01:26
 6   according to both Chrome's Privacy Notice       01:26
 7   and Google's Privacy Policy."                   01:26
 8       Do you see why I'm getting confused?        01:26
 9   A.  I can see why you might consider this a little  01:26
10   hard to read.                                   01:26
11       But what I -- the meaning of it was that if  01:26
12   if you're doing something that Chrome gets simply  01:26
13   because you're doing something on Chrome, and you have  01:26
14   not synced, Chrome will not -- will protect your data so  01:26
15   that Google will not be able to use it.  It won't go  01:26
16   over to Google and be used by Google.           01:26
17   Q.  But it's not -- it's not covered by the     01:26
18   privacy policy unless the information is sent to Google;  01:26
19   right?                                          01:26
20   A.  Well, it's --                               01:26
21       MR. STRAITE:  Objection --                  01:27
22   BY MR. BROOME:                                  01:27
23   Q.  That's what the Chrome Privacy Notice says;  01:27
24   right?                                          01:27
25       MR. STRAITE:  And, objection.  Misstates the  01:27
```
Page 240

```
 1   testimony.                                      01:27
 2       THE WITNESS:  No, I don't think it does, sir.  01:27
 3   I think it covers both cases.  It covers both cases.  It  01:27
 4   covers the case where you keep it in Chrome, that is, it  01:27
 5   may be on your device for a little bit and it doesn't go  01:27
 6   to Google because you've not synced, or you do sync and  01:27
 7   then Google has a privacy policy which takes care of --  01:27
 8   usually un-privacy, that takes care of what it says it  01:27
 9   does.  So it covers both cases.                 01:27
10   BY MR. BROOME:                                  01:27
11   Q.  So the privacy policy applies regardless.  Is  01:27
12   that the clear meaning?                         01:27
13   A.  The privacy policy in this case is saying that  01:27
14   you have the ability to control your information and  01:27
15   when you decide not to sync, the Google will not -- will  01:27
16   observe that in its privacy policy.             01:27
17   Q.  I don't follow that.                        01:28
18       Where does it say that if you choose not to  01:28
19   sync, Google will observe that in its privacy --  01:28
20   A.  Learn how to control the information that's  01:28
21   collected.  Stored and shared.  When you --     01:28
22   Q.  That's referring to the Chrome Privacy Notice;  01:28
23   right?                                          01:28
24   A.  Right.                                      01:28
25       But then -- well, it's -- the notice states  01:28
```
Page 241

61 (Pages 238 - 241)

Page 242

1  that. And then it says:                        01:28
2      "This is followed by the statement that    01:28
3  although this policy describes features that are  01:28
4  specific to Chrome," that -- essentially what it's  01:28
5  saying is that Google's Privacy Policy will not override  01:28
6  the protection that the Chrome Notice provides. That's  01:28
7  what they're saying.                            01:28
8      Q. So let me tell you how I read this, and then  01:28
9  you can tell me whether you think I'm a reasonable  01:28
10  person.                                        01:28
11      A. Okay.                                   01:28
12      Q. I read this sentence where it says that the  01:28
13  personal information --                        01:28
14      "Any personal information that is          01:28
15  provided to Google or stored in your            01:28
16  Google account will be used and protected       01:29
17  in accordance with the Google Privacy          01:29
18  Policy."                                        01:29
19      That means that the privacy applies when the  01:29
20  personal information is sent to Google and stored in  01:29
21  my account.                                    01:29
22      A. Not necessarily.                        01:29
23      Q. Are you reading it as stating something other  01:29
24  than that?                                     01:29
25      A. I'm saying that when you decide to keep it  01:29

Page 243

1  away from Google --                            01:29
2      Q. Yeah.                                   01:29
3      A. -- just in Chrome, that it also will apply.  01:29
4      Q. Okay. That sentence where it says:       01:29
5      "Any personal information that is          01:29
6  provided to Google or stored in your            01:29
7  Google account will be used and protected       01:29
8  in accordance with the Google Privacy          01:29
9  Policy"...                                      01:29
10      ...you believe that clear meaning from that is  01:29
11  that if you choose not to send your Google data to  01:29
12  Google, that will -- that data will also be covered by  01:29
13  this policy.                                    01:29
14      A. Because it says "although this policy     01:29
15  describes features that are specific to Chrome."  01:29
16      Q. Yep.                                   01:29
17      A. It brings Chrome into the picture.       01:29
18      Q. Yes. So my question was slightly different.  01:29
19      Do you read that sentence to mean that       01:30
20  regardless of whether the data is sent to Google or  01:30
21  stored in your Google account, it is covered by the  01:30
22  privacy policy?                                01:30
23      A. It is covered by the assurances that you've  01:30
24  had in the Chrome Privacy Policy -- Privacy Notice, yes.  01:30
25      Q. Not my question.                        01:30

Page 244

1      My question is about the Google Privacy      01:30
2  Policy, the general privacy policy, which --     01:30
3      A. The Google -- I think what they're trying to  01:30
4  get you to think is that the Chrome Privacy Policy and  01:30
5  the Google Privacy Policy are continuous with one  01:30
6  another.                                        01:30
7      Q. Is that what you think reasonable people would  01:30
8  understand?                                     01:30
9      A. Yes.                                    01:30
10      Q. That regardless of whether the data is sent to  01:30
11  Google or stored locally in Chrome, the privacy policy  01:30
12  applies?                                        01:30
13      A. Of course.                             01:30
14      Q. Okay.                                   01:30
15      A. Why else would they say that?            01:30
16      And frankly the -- or else are they trying to  01:30
17  simply say, "Hey, we're fooling you. The        01:31
18  Chrome Privacy Policy says one thing, but it really  01:31
19  has no consequence because the Google Privacy Policy  01:31
20  trumps it and forget everything you read in Chrome"?  01:31
21      Is that what you're saying.                 01:31
22      Q. You're the expert. There's been a lot of  01:31
23  debate in this case about whether the privacy policy  01:31
24  applies. But I appreciate your testimony?        01:31
25      A. No. It seems to me that that's an impossible  01:31

Page 245

1  interpretation.                                01:31
2      Q. Okay. Let's go to paragraph 21.          01:31
3      A. Yes, sir.                              01:31
4      Q. You say:                               01:31
5      "Finally, in the Chrome Privacy            01:31
6  Notice section 'How Chrome handles your          01:31
7  synced information,' the assurance about         01:31
8  not enabling sync is made explicit. 'If         01:31
9  you don't use your Chrome data to               01:31
10  personalize your experience outside of          01:32
11  Chrome, Google will only use your Chrome        01:32
12  data after it's anonymized and aggregated       01:32
13  with data from other users.'"                   01:32
14      Do you see that?                          01:32
15      A. Yes, I do.                             01:32
16      Q. Okay.                                   01:32
17      A. How much more explicit can you be?        01:32
18      Q. Well, let's take a look at -- let's go back to  01:32
19  the Chrome Privacy Policy itself.              01:32
20      A. We can do that.                         01:32
21      MR. STRAITE: Which exhibit?                 01:32
22      MR. BROOME: I believe that was 4 -- 2. No.  01:32
23  4. Sorry.                                      01:32
24      MR. STRAITE: Okay. We have Exhibit 4 up.     01:32
25      Which page should we turn to?              01:32

CONFIDENTIAL

| | |
|---|---|
| 1    MR. BROOME: 737, I believe.    01:32 | 1    A. But that's not my remit, I have to say, sir.  01:35 |
| 2    MR. STRAITE: Okay. We're on the page ending  01:33 | 2  It's not what I was asked to look at.    01:35 |
| 3  in Bates 737.    01:33 | 3    Q. That's fine. If you haven't looked -- I mean,  01:35 |
| 4  BY MR. BROOME:    01:33 | 4  if you have looked at the page --    01:35 |
| 5    Q. Okay. Give me a minute here.    01:33 | 5    A. Well, I'll tell you -- show me the page and    01:35 |
| 6    Oh, yeah. It's on the next page. Sorry.    01:33 | 6  I'll tell you --    01:35 |
| 7  738.    01:33 | 7    MR. STRAITE: Don't interrupt.    01:35 |
| 8    You'd think I've read this document enough    01:33 | 8    THE WITNESS: Sorry.    01:35 |
| 9  times to know where I'm at in it.    01:33 | 9    MR. BROOME: Yep.    01:35 |
| 10    A. I understand your position.    01:33 | 10    MR. STRAITE: Steve, are we going to    01:35 |
| 11    Q. All right. In the 738, in one of the    01:33 | 11  Exhibit 5?    01:35 |
| 12  paragraphs under the "Sync" heading, there's a sentence  01:33 | 12    MR. BROOME: I think that's right. Is that    01:35 |
| 13  there that says:    01:34 | 13  right? Yeah, Exhibit 5.    01:35 |
| 14    "You can also personalize your    01:34 | 14    MR. STRAITE: Okay. We see Exhibit 5. Just  01:35 |
| 15  experience on other Google products by    01:34 | 15  to confirm, we have the Exhibit 5 sticker in the bottom  01:35 |
| 16  allowing your Chrome history to be    01:34 | 16  right-hand corner of the first page, the top says    01:36 |
| 17  included" --    01:34 | 17  "Find & control your Web & App Activity."    01:36 |
| 18    MR. STRAITE: I'm sorry. Where are we?    01:34 | 18    Is that the exhibit that should be in front of  01:36 |
| 19    MR. BROOME: 738, top of the page, first full  01:34 | 19  him?    01:36 |
| 20  sentence.    01:34 | 20    MR. BROOME: Yes. Yes, it is. This is the --  01:36 |
| 21    THE WITNESS: "You can also personalize the    01:34 | 21  if you click "Learn more" after the sentence we just    01:36 |
| 22  experience."    01:34 | 22  read in the Chrome Privacy Notice, that takes you to    01:36 |
| 23    MR. BROOME: Yep.    01:34 | 23  this page about web and app activity.    01:36 |
| 24    MR. STRAITE: I'm sorry. The top line is cut  01:34 | 24    MR. STRAITE: Objection as to foundation.    01:36 |
| 25  off.    01:34 | 25  ///    01:36 |
| Page 246 | Page 248 |

| | |
|---|---|
| 1    Do you mean the line below the cutoff line?  01:34 | 1    (Defendants' Exhibit 5 was    01:36 |
| 2    MR. BROOME: The first full sentence, yeah,    01:34 | 2    marked for identification.)    01:36 |
| 3  that you can read.    01:34 | 3    THE WITNESS: Well, this is not in the area    01:36 |
| 4    "You can also personalize your    01:34 | 4  that I was asked to study. It did have that line,    01:36 |
| 5  experience on other Google products by    01:34 | 5  that's what I was talking about, the carve-out. It    01:36 |
| 6  allowing your Chrome history to be    01:34 | 6  says:    01:36 |
| 7  included in your Google Web & App    01:34 | 7    "Your Chrome history is saved only if    01:36 |
| 8  Activity."    01:34 | 8  you signed into Google account and had    01:36 |
| 9  BY MR. BROOME:    01:34 | 9  Chrome sync turned on."    01:36 |
| 10    Q. Do you see that?    01:34 | 10    It's another reinforcement of the point I've  01:36 |
| 11    A. Yes, I do.    01:34 | 11  been trying to make.    01:36 |
| 12    Q. Okay. And there's a "Learn more" button    01:34 | 12    Q. Yeah. So where are you there, sir?    01:36 |
| 13  there.    01:34 | 13    A. It's really the top of the next page.    01:36 |
| 14    A. Yes.    01:34 | 14    Q. Okay. So you're under the heading "Info about  01:36 |
| 15    Q. Right?    01:34 | 15  your browsing and other activity on sites, apps, and    01:36 |
| 16    A. What I call a rabbit hole.    01:34 | 16  devices that use Google services"; right?    01:37 |
| 17    Q. Okay. Well, did you click that button and see  01:34 | 17    A. Yes, I am.    01:37 |
| 18  what page it brought you to?    01:34 | 18    Q. Okay. All right. So this is -- the page    01:37 |
| 19    A. I actually believe I did.    01:34 | 19  starts, I guess the first heading on the page    01:37 |
| 20    Q. Okay.    01:35 | 20  "Find & control your Web & App Activity"; right?    01:37 |
| 21    A. Or at least I learned about Google web and app  01:35 | 21    A. Yes.    01:37 |
| 22  activity, which again confirms my understanding. They  01:35 | 22    Q. And it says:    01:37 |
| 23  also create a carve-out for syncing, for un-syncing.    01:35 | 23    "If Web & App Activity is turned on,    01:37 |
| 24    Q. Yeah. Let's go take a look at that page.    01:35 | 24  your searches and activity from other    01:37 |
| 25  We'll load that for you next.    01:35 | 25  Google services are saved in your Google    01:37 |
| Page 247 | Page 249 |

63 (Pages 246 - 249)

| | |
|---|---|
| 1 account so you may get more personalized          01:37 | 1  Q.  Right?                              01:38 |
| 2 experiences, like faster searches and more        01:37 | 2     And then if you go to the next subheading, it  01:39 |
| 3 helpful app and content recommendations."          01:37 | 3 says: 01:39 |
| 4      Do you see that?                     01:37 | 4     "Info about your browsing and other    01:39 |
| 5  A.  Yes, I do.                          01:37 | 5 activity on sites, apps, and devices that   01:39 |
| 6  Q.  And then it explains that "You can turn  01:37 | 6 use Google services."                    01:39 |
| 7 Web & App Activity off or delete past activity at any  01:37 | 7     Do you see that?                     01:39 |
| 8 time."                                  01:37 | 8  A.  Yes.                               01:39 |
| 9      Do you see that?                     01:37 | 9  Q.  Then it says "When Web & App Activity is on,  01:39 |
| 10  A.  Yes, I do.                         01:37 | 10 you can include additional activity like," and then  01:39 |
| 11  Q.  Okay.  And then there's some --       01:37 | 11 there's some bullets.                    01:39 |
| 12      MR. STRAITE:  Steve, objection on all  01:37 | 12     Do you see that?                     01:39 |
| 13 questions regarding this document. I'm objecting as to  01:37 | 13  A.  No.  Where is that?                 01:39 |
| 14 foundation.                            01:37 | 14  Q.  Right below the heading.            01:39 |
| 15      MR. BROOME:  Sure.                  01:37 | 15  A.  Oh, you skipped the part that I mentioned to  01:39 |
| 16      THE WITNESS:  Yeah.  It is not really -- this  01:37 | 16 you.                                   01:39 |
| 17 is not what I -- as I said, I prepared for it simply by  01:37 | 17  Q.  No.  I'm getting there.  I'm going in order.  01:39 |
| 18 looking at it, but it's not the area that I have a remit to  01:37 | 18  A.  No, no.  It's beyond that.          01:39 |
| 19 about.  And I think by -- it's -- this is not what I --  01:37 | 19  Q.  Under the heading "Info about your browsing  01:39 |
| 20 you know, what I was asked to write about.  It's not in  01:38 | 20 and other activity on sites, apps, and devices that use  01:39 |
| 21 my report.                             01:38 | 21 Google services."                        01:39 |
| 22 BY MR. BROOME:                          01:38 | 22  A.  Yes.                               01:39 |
| 23  Q.  No.  I understand that.           01:38 | 23  Q.  Then it says "When Web & App Activity is on,  01:39 |
| 24     And I can tell you from Google's perspective,  01:38 | 24 you can include additional activity like."  01:39 |
| 25 that's an omission; right?              01:38 | 25     Are you with me so far?              01:39 |
| Page 250 | Page 252 |

| | |
|---|---|
| 1     So I think I'm entitled to ask you some  01:38 | 1  A.  Can you point it out?              01:39 |
| 2 questions about this document, given that it's linked to  01:38 | 2     MR. STRAITE:  May I point out the line, Steve?  01:39 |
| 3 the Chrome Privacy Notice on which you did opine.  01:38 | 3 Would that be okay?                      01:39 |
| 4     MR. STRAITE:  Steve, is this a lecture from  01:38 | 4     MR. BROOME:  Sure.                    01:39 |
| 5 you or are we going to have a question?  01:38 | 5     MR. STRAITE:  That's what he's reading.  01:39 |
| 6     MR. BROOME:  He's -- I'm just educating him as  01:38 | 6     THE WITNESS:  Okay.  Go ahead.  Sorry.  01:39 |
| 7 to why I'd like to ask him questions about this  01:38 | 7     MR. STRAITE:  Thanks, Steve.          01:39 |
| 8 document.                               01:38 | 8 BY MR. BROOME:                           01:39 |
| 9     MR. STRAITE:  We'd prefer if you just asked  01:38 | 9  Q.  Okay.  And then the first bullet is "Sites and  01:39 |
| 10 questions, not lecturing.               01:38 | 10 apps that partner with Google to show ads."  01:40 |
| 11     THE WITNESS:  Okay.  I'm willing to give you  01:38 | 11  A.  I have here "Searches and other things you  01:40 |
| 12 as much information as I understand.      01:38 | 12 do."                                   01:40 |
| 13 BY MR. BROOME:                          01:38 | 13     Oh, okay.  I get it.               01:40 |
| 14  Q.  Okay.  Then there's a heading that says  01:38 | 14  Q.  Next category, yep.  We're in "Info about your  01:40 |
| 15 "What's saved as Web & App Activity."     01:38 | 15 browsing and other activity on sites, apps, and devices  01:40 |
| 16     Do you see that?                     01:38 | 16 that use Google services."               01:40 |
| 17  A.  Yes.                              01:38 | 17  A.  Yes.                               01:40 |
| 18  Q.  And then below that there's a sort of  01:38 | 18  Q.  It says "When Web & App Activity is on, you  01:40 |
| 19 subheading that says "Info about your searches and other  01:38 | 19 can include additional activity like."  01:40 |
| 20 activity on Google sites, apps, and services."  01:38 | 20  A.  Yes.                               01:40 |
| 21  A.  Yes.                              01:38 | 21  Q.  And then the first bullet is "Sites and apps  01:40 |
| 22  Q.  Do you see that?                    01:38 | 22 that partner with Google to show ads."   01:40 |
| 23  A.  Yes, I do.                         01:38 | 23  A.  Yes.                               01:40 |
| 24  Q.  And there's four bullets.           01:38 | 24  Q.  And then "Sites and apps that use Google  01:40 |
| 25  A.  Yeah.                             01:38 | 25 services, including data that apps share with Google."  01:40 |
| Page 251 | Page 253 |

64 (Pages 250 - 253)

CONFIDENTIAL

1  A.  Mm-hm.                              01:40
2  Q.  "Your Chrome browsing history."     01:40
3  A.  Right.                              01:40
4  Q.  Android usage & diagnostics, like battery   01:40
5  level and system errors."               01:40
6      Do you see that?                    01:40
7  A.  Yes, I do.                          01:40
8  Q.  Reasonable people reading this disclosure   01:40
9  would understand that your Chrome browsing history is a  01:40
10 separate category of information that can be enabled by  01:41
11 web and app activity separate from sites and apps that  01:41
12 use Google services, including data that apps share with  01:41
13 Google; right?                          01:41
14     MR. STRAITE:  Objection.  Beyond the scope of  01:41
15 the expert report.                      01:41
16     You may answer.                     01:41
17     THE WITNESS:  Yeah.  I don't see what the   01:41
18 point is, to be honest, Steve.  Because these -- these  01:41
19 are various forms of information, personal information,  01:41
20 that Google is saying that you have the capability of  01:41
21 allowing to have.                       01:41
22 BY MR. BROOME:                          01:41
23 Q.  Right.  That's my point.  Is that when web and  01:41
24 app Activity is on, there are different sources of  01:41
25 information -- you can call it personal information or  01:41

Page 254

1  something else.  But there are different sources of  01:41
2  information from which Google may receive that data.  01:41
3      One of those sources that may contribute to  01:41
4  Chrome -- to web and app activity is Chrome browsing  01:41
5  history.  But Google makes clear in this document that  01:41
6  there are other sources that may contribute to web and  01:41
7  app Activity as well; correct?          01:41
8  A.  Yes.                               01:42
9  Q.  Okay.  Thank you.                   01:42
10 A.  I'm still -- now, look at the line below.  01:42
11 Q.  I see that.  Right.                 01:42
12     It then says -- I'm going there.  It says  01:42
13 "Your Chrome history" --                01:42
14     MR. STRAITE:  Can you let me witness finish  01:42
15 his sentence?                           01:42
16     THE WITNESS:  What I was saying is that they,  01:42
17 again, create a carve-out for un-sync.  01:42
18 BY MR. BROOME:                          01:42
19 Q.  No.                                01:42
20 A.  "Chrome history is saved only if   01:42
21 you're signed into your Google account and   01:42
22 have Chrome Sync turned on."            01:42
23 Q.  Agreed.                            01:42
24     But that's referring to Chrome history, which  01:42
25 is only one of three of the bullets that you just  01:42

Page 255

1  agreed -- three of the sources that you just agreed a  01:42
2  user would understand may contribute to web and app  01:42
3  activity.                              01:42
4  A.  I'm sorry.  No.  It doesn't say "Chrome   01:42
5  browsing history."  It says "Chrome history."  01:42
6      All of this is Chrome history.      01:42
7  Q.  I see.  So --                      01:42
8  A.  Browsing history is separate from other --  01:42
9  yes.                                   01:43
10 Q.  I see.                             01:43
11     So in your opinion, reasonable people would  01:43
12 read "your Chrome browsing history" to be one thing and  01:43
13 "your Chrome history" to be something broader?  01:43
14     MR. STRAITE:  Objection.  Beyond the scope of  01:43
15 his expert report.                      01:43
16     You may testify.                    01:43
17     THE WITNESS:  Yeah.  I would say that that's a  01:43
18 possibility.  Otherwise you say your Chrome browsing  01:43
19 history.                               01:43
20     All of this is about what you did in the past  01:43
21 with Chrome.  That's exactly what the point is.  01:43
22 BY MR. BROOME:                          01:43
23 Q.  I want to make sure I understand your  01:43
24 testimony.                             01:43
25     Is it your testimony that a reasonable person  01:43

Page 256

1  creating this document reads the sentence "Your Chrome  01:43
2  history is saved only if you're signed into your Google  01:43
3  account and have Chrome Sync turned on," they would  01:43
4  think that that includes all of the data described above  01:43
5  in those four bullets?                  01:44
6      MR. STRAITE:  Let him finish.  Let him finish.  01:44
7  BY MR. BROOME:                          01:44
8  Q.  Yeah.  Under the sources that contribute to  01:44
9  web and app activity?                   01:44
10     MR. STRAITE:  Okay.  Objection.  Beyond the  01:44
11 scope of his expert report.             01:44
12     THE WITNESS:  It is beyond the scope.  01:44
13     But I do think that that is a clear carve-out  01:44
14 indication.  And frankly, Chrome history includes sites  01:44
15 and apps that partner with Google to show ads and all  01:44
16 the other kinds of things that we could be talking  01:44
17 about.                                 01:44
18 BY MR. BROOME:                          01:44
19 Q.  It does?  Chrome history includes all that  01:44
20 information?  What's the basis for your testimony?  01:44
21 A.  Because it would have otherwise said "Chrome  01:44
22 browsing history."                      01:44
23 Q.  Okay.  Reasonable people believe that  01:44
24 there's -- think there's a difference between Chrome  01:44
25 browsing history and Chrome history?    01:44

Page 257

65 (Pages 254 - 257)

1        MR. STRAITE:  Objection.  Beyond the scope of    01:44
2   his expert report.                        01:44
3        THE WITNESS:  This is similar to the issue    01:44
4   that we had last time, which is when you have a summary  01:44
5   sentence at the very end of the section, to believe that  01:45
6   it only refers to a small part of that large section is  01:45
7   incorrect.  This is a summary sentence for everything    01:45
8   that was above it.  And as such, it has to be taken that  01:45
9   way.                                 01:45
10  BY MR. BROOME:
11      Q.   Yeah.                        01:45
12      A.   I'm glad you agree.                 01:45
13      Q.   I definitely do not.                 01:45
14      If you look at -- under the four bullets where    01:45
15  Google identifies the sources that might contribute to    01:45
16  web and app activity.                    01:45
17      A.   Yes, sir.                       01:45
18      Q.   It then says "To let Google save this    01:45
19  information:  Web & App Activity must be on."       01:45
20      A.   Mm-hm.                       01:45
21      Q.   And then it says:                 01:45
22          "The box next to 'include Chrome        01:45
23      history and activity from sites, apps, and    01:45
24      devices that use Google services' must be    01:45
25      checked."                        01:45

Page 258

1        MR. STRAITE:  Is there a question there?    01:45
2   BY MR. BROOME:                        01:45
3       Q.   Do you see that?                 01:45
4       A.   Yes.                          01:45
5       Q.   Okay.  Google identifies Chrome history and   01:46
6   from activity from sites, apps, and devices that use    01:46
7   Google services as two different sources; right?      01:46
8        MR. STRAITE:  Again, I'm objecting.  This is    01:46
9   beyond the scope of his expert report.           01:46
10       THE WITNESS:  It is beyond the scope of my    01:46
11  report.  And it is -- it's a --                01:46
12          "Chrome history and activity from        01:46
13      sites, apps, and devices that use Google    01:46
14      services must be checked."              01:46
15      It would be -- it would be very odd for it    01:46
16  only to encompass Chrome history is what I'm saying.    01:46
17  And I can't -- it seems to me that what they're talking  01:46
18  about is the larger point.                  01:46
19  BY MR. BROOME:
20      Q.   Well, if it -- if it includes -- if all of the  01:46
21  bullets above, the four bullets above that contribute to  01:46
22  web and app activity are encompassed by the term      01:46
23  "Chrome history," why would Google say "and activity    01:46
24  from site" -- well, that's bad question because I don't  01:47
25  want you to get at why Google would do it.        01:47

Page 259

1        But a reasonable person reading that sentence    01:47
2   would understand Chrome history to be something       01:47
3   different from activity from sites, apps, and devices    01:47
4   that use Google; right?                    01:47
5        MR. STRAITE:  Objection.  Beyond the scope of    01:47
6   his expert report.                        01:47
7        THE WITNESS:  Chrome history could also        01:47
8   include android uses and diagnostics, battery level and  01:47
9   system errors.                         01:47
10       There's a lot of other things that go -- it    01:47
11  would otherwise have said "Chrome browsing history" and  01:47
12  that's a very important point.  It's not Chrome browsing  01:47
13  history.  It's Chrome history.               01:47
14  BY MR. BROOME:
15      Q.   Your expert opinion, Professor Turow, is that  01:47
16  the phrase -- that a reasonable person reading the       01:47
17  phrase "includes Chrome history" -- or sorry.  The term  01:47
18  "Chrome history" would include android usage and       01:47
19  diagnostics, like battery level and system errors?      01:47
20       MR. STRAITE:  Objection.  These questions are    01:47
21  beyond the scope of his expert report.           01:47
22       THE WITNESS:  All I'm saying is that there    01:47
23  are other aspects relating to Chrome that could be       01:47
24  interpreted from that statement, not just browsing       01:48
25  history.                             01:48

Page 260

1        MR. BROOME:  Okay.  Let's go back to your    01:48
2   report.                             01:48
3        MR. STRAITE:  Okay.  The witness has his    01:49
4   report in front of him.                    01:49
5   BY MR. BROOME:                        01:49
6       Q.   If all of this -- oh, sorry.  If you still got  01:49
7   Exhibit 4 up -- or Exhibit 5 rather?            01:49
8        MR. STRAITE:  We have 5 and his report.      01:49
9        THE WITNESS:  May I also say you'll see on    01:49
10  page --                             01:49
11       MR. STRAITE:  Let him finish his question.     01:49
12       THE WITNESS:  Go ahead.  I'm sorry.        01:49
13  BY MR. BROOME:                        01:49
14      Q.   Yeah.  Sorry.  Are you still on Exhibit 5?    01:49
15       MR. STRAITE:  We do have it still up, yes.    01:49
16       THE WITNESS:  Yeah.                 01:49
17  BY MR. BROOME:                        01:49
18      Q.   If all of the information listed under       01:49
19  web and app activity where Google describes your       01:49
20  browsing and other activity on sites, apps, and devices  01:49
21  that use Google services, if it's all Chrome history --  01:49
22  if a reasonable person thinks it's all Chrome history,    01:49
23  what would they understand to be the purpose of turning  01:49
24  web and app activity on or off?               01:49
25       MR. STRAITE:  Objection.  Calls for        01:49

Page 261

66 (Pages 258 - 261)

1 speculation -- I'm sorry, Steve.                    01:49
2 BY MR. BROOME:                                      01:49
3      Q.  Compared to turning sync on or off?        01:49
4          MR. STRAITE:  Steve, I interrupted you because 01:50
5 of a delay with the video.  I apologize.            01:50
6          Could you repeat the question?  That was   01:50
7 unintentional.                                      01:50
8          THE WITNESS:  Yeah.                         01:50
9          MR. BROOME:  That was -- I'm glad you       01:50
10 interrupted me because it was a terribly phrased    01:50
11 question.                                            01:50
12         MR. STRAITE:  I inadvertently did.           01:50
13         THE WITNESS:  Yeah.  I didn't understand.    01:50
14         MR. BROOME:  Yeah.  It's okay.               01:50
15 BY MR. BROOME:                                       01:50
16     Q.  This page describes what happens when you turn 01:50
17 web and app activity off; right?                    01:50
18         MR. STRAITE:  Objection.  Calls for          01:50
19 speculation.                                         01:50
20 BY MR. BROOME:                                       01:50
21     Q.  And that conveys to the people that turning  01:50
22 web and app activity on or off and is different than 01:50
23 turning sync on or off; right?                      01:50
24         MR. STRAITE:  Objection.  Calls for          01:50
25 speculation.  Beyond the scope of his expert report. 01:50

                                                    Page 262

1          THE WITNESS:  There are so many good       01:50
2 connotations that we come across with respect to all of 01:50
3 these things that I think that a person reading this 01:50
4 would have very little understanding of the -- of the 01:50
5 niceties of these on-and-off switches, to be honest. 01:50
6 And I think the most obvious way to prepare for Chrome 01:50
7 not using your data would be not to sync.           01:50
8          But these are variations on a theme that   01:51
9 make -- you know, that are hard to follow in terms of 01:51
10 what's really going on.                              01:51
11         It's a little like what we said before about 01:51
12 the toggling.                                        01:51
13         And later on, as you see, it says in 22:    01:51
14         "Unless a Chrome user has synced and        01:51
15         allowed their Chrome history to be          01:51
16         included in the Google Web & App Activity,  01:51
17         Google will only use your Chrome data       01:52
18         after it's anonymized and aggregated with   01:52
19         data from other users."                     01:52
20 BY MR. BROOME:                                       01:53
21     Q.  All right.  In paragraph 22 -- are you on your 01:53
22 report again?                                        01:53
23     A.  Yes, sir.                                    01:53
24     Q.  Okay.  In paragraph 22 you say:              01:53
25         "Even the order in which statements         01:53

                                                    Page 263

1 are made in Chrome's Privacy Notice seem            01:53
2 designed to deceive.  The Notice puts the           01:53
3 promises that (1)," and then you list out           01:53
4 three different promises.                            01:53
5     A.  Yes.                                         01:53
6     Q.  Do you see that?                             01:53
7     A.  Yes, I do.                                   01:53
8     Q.  All right.  And those statements don't appear 01:53
9 one after the other in the Chrome Privacy Notice; right? 01:53
10    A.  They appear close -- fairly close together.  01:53
11    Q.  Okay.  But they're separated by text; correct? 01:53
12    A.  Yes.                                          01:53
13    Q.  And then you say:                             01:53
14        "After that, the user is put through         01:53
15        four pages of dense, incomprehensible        01:53
16        statements about technology that would       01:53
17        have much less salience for reasonable       01:53
18        consumers"; right?                            01:53
19    A.  Yes, I said that.  Uh-huh.                    01:54
20    Q.  Okay.  So your opinion is that users would   01:54
21 understand the sentences that you've quoted in      01:54
22 paragraph 22, would interpret them the way you say they 01:54
23 should be interpreted, but they would not understand 01:54
24 what follows.                                        01:54
25        Is that your opinion?                         01:54

                                                    Page 264

1          MR. STRAITE:  Objection.  Misstates testimony. 01:54
2          THE WITNESS:  No.  I'm saying that those    01:54
3 sentences signal to people to be comfortable with what's 01:54
4 going on.                                            01:54
5 BY MR. BROOME:                                       01:54
6     Q.  Are they understandable in your -- or are they 01:54
7 incomprehensible?                                    01:54
8     A.  No.  The sentences I cite that notice the    01:54
9 promises are quite comprehensible.                   01:54
10    Q.  Go ahead.  Sorry.                             01:54
11    A.  No.  They stand out is what I'm saying.  And 01:54
12 they are designed, I would argue, to make a person seem 01:54
13 comfortable that only when you sync are the data taken. 01:54
14    Q.  When you say they stand out, they're not     01:55
15 highlighted or anything; they're not bolded; right? 01:55
16    A.  No.  They are more comprehensible and more of 01:55
17 a clear signal what's going on.                      01:55
18    Q.  And the -- and is the rest of the            01:55
19 Chrome Privacy Notice incomprehensible, in your opinion? 01:55
20    A.  It's very difficult.                          01:55
21    Q.  I see.                                        01:55
22        So the statements that the plaintiff's claims 01:55
23 are based on, they're easy to understand.  The rest of 01:55
24 it is incomprehensible?                              01:55
25        MR. STRAITE:  Objection.  Misstates testimony. 01:55

                                                    Page 265

67 (Pages 262 - 265)

1    THE WITNESS: That's not what I said.    01:55
2    I said that if a person is looking to be    01:55
3  concerned or not concerned in going through the privacy  01:55
4  policy, these statements would stand out as assurances  01:55
5  that if you do not sync, you're in good shape.    01:55
6  BY MR. BROOME:
7    Q. When you say -- when you say if a person is    01:55
8  looking to be concerned or not concerned, concerned or  01:55
9  not concerned about what?    01:55
10    A. About data leakage, about data going to Google  01:55
11  through Chrome, about losing a certain degree of    01:55
12  privacy.    01:56
13    Q. Okay. But what if their concern has nothing  01:56
14  to do with that? Maybe -- what if their concern is  01:56
15  about something else, then would other -- would that  01:56
16  change what stands out to them in the    01:56
17  Chrome Privacy Notice?    01:56
18    MR. STRAITE: Objection. Calls for    01:56
19  speculation. Beyond the scope of his report.    01:56
20    THE WITNESS: Yeah. My remit was to talk    01:56
21  about how these particular documents relate to sync and  01:56
22  un-sync. And what I'm proposing here, suggesting, is  01:56
23  that the clear meaning of these sentences is assurance.  01:56
24  BY MR. BROOME:    01:56
25    Q. Well, what if a person is concerned about what  01:56

Page 266

1  happens when they type in the omnibox.    01:56
2    Do you know what the omnibox is?    01:56
3    A. Yeah. Sure.    01:56
4    Q. Okay. And you see there's a -- why don't we  01:56
5  go back to the Chrome Privacy Notice, which I think is  01:56
6  hopefully still up on your screen.    01:56
7    A. Yeah. I think.    01:56
8    MR. STRAITE: What exhibit is the privacy    01:56
9  notice?    01:56
10    MR. BROOME: Exhibit 4.    01:56
11    MR. STRAITE: We do not have 4. Hold on.    01:56
12    We have Exhibit 4 up.    01:57
13    MR. BROOME: Okay. And then on page 733.    01:57
14    MR. STRAITE: Going to 733.    01:57
15    Okay. The witness has 733 in front of him.    01:57
16    THE WITNESS: Yes, sir.    01:57
17  BY MR. BROOME:
18    Q. Okay. See there's a heading there that says  01:57
19  "Search prediction service"?    01:57
20    A. Yes, sir.    01:57
21    Q. "To help you find information faster,    01:57
22  Chrome uses the prediction service    01:57
23  provided by your default search engine to    01:57
24  offer likely completions to the text you    01:57
25  are typing."    01:57

Page 267

1    A. Mm-hm.    01:57
2    Q. You see that?    01:57
3    "When you search using the omnibox or    01:57
4  the search box on the new tab page in    01:57
5  Chrome, the characters you type (even if    01:57
6  you haven't hit 'enter' yet) are sent to    01:57
7  your default search engine. If Google is    01:57
8  your default search engine, predictions    01:57
9  are based on your own search history,    01:57
10  topics related to what you're typing in    01:57
11  the omnibox or in the search box on the    01:57
12  new tab page, and what other people are    01:57
13  searching for."    01:57
14    Do you see that?    01:57
15    A. Yes, I do.    01:57
16    Q. And then it says "Predictions can only be    01:57
17  based on your browsing history."    01:58
18    Do you see that?    01:58
19    A. Yes, I do.    01:58
20    Q. Okay. And a reasonable person reading this    01:58
21  would understand that if they -- if Google is their    01:58
22  default search engine, and they search using the omnibox  01:58
23  or the search box on the new tab page in Chrome, the    01:58
24  characters that they type, even if they haven't hit    01:58
25  "enter" yet will be sent to Google; correct?    01:58

Page 268

1    MR. STRAITE: Objection. Beyond the scope of  01:58
2  his expert report.    01:58
3    THE WITNESS: Well, they'll be sent to Google,  01:58
4  but they won't be used to -- they won't be stored and  01:58
5  used for other purposes. They'll be used simply to send  01:58
6  back results.    01:58
7  BY MR. BROOME:
8    Q. Okay. So -- but reasonable people reading    01:58
9  that part of the disclosure would understand that if    01:58
10  there -- if Google is their default search engine and  01:58
11  they use the omnibox, then Google will get their    01:58
12  searches before they even hit "enter"; right?    01:58
13    MR. STRAITE: Objection. Calls for    01:59
14  speculation. Objection. Beyond the scope of the expert  01:59
15  report.    01:59
16  BY MR. BROOME:    01:59
17    Q. It's clear; right?    01:59
18    MR. STRAITE: Objection. Same objection.    01:59
19    THE WITNESS: It's clear to the extent that  01:59
20  it says that it will get you search results. It says  01:59
21  nothing about storing, keeping, using your data beyond  01:59
22  that.    01:59
23  BY MR. BROOME:
24    Q. I'm not asking about that.    01:59
25    Just asking whether it's clear that Google    01:59

Page 269

68 (Pages 266 - 269)

1 will get the characters that a user types, as they're   01:59
2 using the omnibox, before they even hit "enter"?   01:59
3           MR. STRAITE:  Same objections.   01:59
4           THE WITNESS:  My statement holds.  I think   01:59
5 that it's clear in a transient way, Google will get the   01:59
6 material but not hold onto it.   01:59
7 BY MR. BROOME:   02:00
8     Q.  Thank you.   02:00
9         Okay.  Let's go back to your report.   02:00
10          MR. STRAITE:  Exhibit 2?   02:00
11          MR. BROOME:  Yeah.   02:00
12          Can I get -- just from the court reporter, can   02:00
13 I get an estimation of time used so far, if you know?   02:00
14          THE COURT REPORTER:  Yeah.  I have one.   02:00
15          Or, David, if you have yours handy?   02:00
16          THE VIDEOGRAPHER:  Yeah.  I guess it's   02:00
17 approximately five hours, a little over five hours.   02:00
18          MR. BROOME:  Perfect.  Thank you.   02:00
19          MR. STRAITE:  Katy, you agree with that?   02:00
20          THE COURT REPORTER:  Yeah.   02:00
21          MR. BROOME:  We can check it formally on a   02:00
22 break.  I just wanted to get a ballpark.   02:01
23 BY MR. BROOME:
24     Q.  All right.  Opinion -- I guess it's   02:01
25 sub-opinion 3 is a -- this is on page 9 of your report.   02:01

Page 270

1     Do you have your report in front of you?   02:01
2     A.  Yes, I do.   02:01
3     Q.  You write:   02:01
4         "A reasonable person who read   02:01
5     Google's General Privacy Policy would   02:01
6     understand that Google receives personal   02:01
7     information from Chrome only if sync is   02:01
8     enabled"; right?   02:01
9     A.  Yes.   02:01
10    Q.  And which version of Google's Privacy Policy   02:01
11 is your opinion based on or did you read multiple   02:01
12 versions?   02:01
13    A.  I read multiple versions, including the most   02:01
14 recent one.   02:01
15    Q.  And did you review the version in effect in   02:01
16 2016?   02:01
17    A.  I believe I did.   02:01
18    Q.  And then all the way forward, did you read all   02:01
19 subsequent versions until the present?   02:01
20    A.  I read one deeply and then I read parts of the   02:01
21 subsequent versions to see if there were differences in   02:01
22 the context of what I was looking at.   02:01
23        And as I said, when I got to versions that   02:01
24 looked like they were in a different format, you know,   02:02
25 the more supposedly simple way to read it, I read that   02:02

Page 271

1 clearly too, and then followed up moving forward to see   02:02
2 if there were changes.   02:02
3     Q.  Okay.  Let's mark the privacy policy.  We're   02:02
4 going to mark -- we're going to start with -- we're   02:02
5 going to start with the current privacy policy -- I'm   02:02
6 sorry.  We're going to start with the version that was   02:02
7 in effect when the Complaint was filed.  So we'll load   02:02
8 that for you.  This will be --   02:02
9         Yes.  Perfect.   02:03
10          MR. STRAITE:  Let us know when it's uploaded.   02:03
11 I refreshed three times but it didn't pop up.   02:03
12          MR. BROOME:  Should be there now.  This is the   02:03
13 version of the Google Privacy Policy effective July 1st,   02:03
14 2020.   02:03
15          (Defendants' Exhibit 6 was   02:03
16          marked for identification.)   02:03
17          MR. STRAITE:  All right.  Looks like it's   02:03
18 there.  One second.   02:03
19          Steve, just to be clear, Exhibit 6 is -- the   02:03
20 sticker on the bottom right-hand corner, upper left says   02:04
21 "Google Privacy Policy" and says "July 1, 2020."   02:04
22          Is that the version you intended?   02:04
23          MR. BROOME:  Yep.   02:04
24          MR. STRAITE:  It's in front of the witness.   02:04
25          MR. BROOME:  All right.   02:04

Page 272

1 BY MR. BROOME:   02:04
2     Q.  And, Professor Turow, if you look at the page   02:04
3 that ends on 207.   02:04
4          MR. STRAITE:  You want him to read before 207?   02:04
5          MR. BROOME:  He's welcome to.  I'm going to   02:04
6 ask him questions about text on page 207.  But it sounds   02:04
7 like he's already read the document.   02:04
8          MR. STRAITE:  Okay.  The page ending Bates 207   02:04
9 is in front of him.   02:04
10          THE WITNESS:  What would you like me to read?   02:04
11 BY MR. BROOME:
12    Q.  Right.   02:04
13        You see there's a heading there, it says   02:04
14 "Information we collect as you use our services."   02:04
15    A.  Yes.   02:04
16    Q.  And then it says:   02:04
17        "The information we collect includes   02:04
18    unique identifiers, browser type and   02:04
19    settings, device type and settings,   02:04
20    operating system, mobile network   02:04
21    information, including carrier name and   02:05
22    phone number, and application version   02:05
23    number.  We also collect information about   02:05
24    the interaction of your apps, browsers,   02:05
25    and devices with our services, including   02:05

Page 273

69 (Pages 270 - 273)

1    IP address, crash reports, system          02:05
2    activity, and the date, time, and referrer          02:05
3    URL of your request."          02:05
4         Do you see that?          02:05
5    A.  Yes, I do.          02:05
6    Q.  And is that -- do you believe that phrase is   02:05
7    clear to reasonable people that those categories of   02:05
8    information will be collected when users interact with   02:05
9    Google services?          02:05
10        MR. STRAITE:  Objection as to foundation to   02:05
11   any questions about this document.          02:05
12        We'll go to page 2.          02:08
13        MR. BROOME:  It looks like he's communicating   02:09
14   on a keyboard, David.  I just want to make sure I   02:09
15   understand what's happening here.          02:09
16        THE WITNESS:  No.  What I'm doing is I'm   02:09
17   searching for a word that I had in my original -- in my   02:09
18   document here that seems to be taken out of this version   02:09
19   of the privacy policy.          02:09
20   BY MR. BROOME:
21   Q.  Which word are you looking for?          02:09
22   A.  In the sentence:          02:09
23        "Your Chrome browsing history is only   02:09
24   saved to your account if you've enabled   02:09
25   Chrome synchronization in your Google   02:09

Page 274

1    account."          02:09
2         There's another statement that is similar to   02:09
3    that but not that exact statement.          02:09
4         So I'm wondering when it was taken out of the   02:09
5    privacy policy.          02:09
6    Q.  And what are you looking at right now?          02:09
7    A.  I'm looking at my report.          02:09
8    Q.  I see.          02:10
9         I mean, it could be that you're -- well, why   02:10
10   don't we -- let's just ask my question.  We'll come back   02:10
11   to the -- I'm going to show you all the references to   02:10
12   sync in the privacy policy and we can look at any other   02:10
13   version you want.          02:10
14   A.  Okay.          02:10
15   Q.  I do intend to ask you about those provisions   02:10
16   but I want to start here.          02:10
17        And I want to -- my question to you was:  Is   02:10
18   this paragraph clear to reasonable people?          02:10
19   A.  What are we talking about now?  I'm sorry.          02:10
20   Page --          02:10
21   Q.  1207.          02:10
22   A.  1207.          02:10
23        What does the paragraph start with?          02:10
24   Q.  "The information we collect includes unique   02:10
25   identifiers."          02:10

Page 275

1    A.  Yes.          02:10
2    Q.  Okay.  Is that paragraph clear that Google   02:10
3    will collect those categories of information when users   02:10
4    interact with Google services?          02:10
5    A.  It's clear to the extent that it is what it   02:10
6    is.          02:10
7    Q.  Okay.  And in the next -- if you go to the   02:10
8    next heading on the next page, now it's -- I'll just use   02:11
9    the last -- I said 1207.  We'll just call it 207.  Now   02:11
10   we'll go to 208.          02:11
11   A.  Okay.          02:11
12   Q.  "Your activity," you see that heading?          02:11
13   A.  Yes, sir.          02:11
14   Q.  It says:          02:11
15        "We collect information about your   02:11
16   activity in our services, which we do to   02:11
17   do things" -- "which we use to do things   02:11
18   like recommend a YouTube video you might   02:11
19   like.  The activity information we collect   02:11
20   may include."          02:11
21   A.  Yes.          02:11
22   Q.  And then there are eight bullets that describe   02:11
23   different activity information; correct?          02:11
24   A.  Yes, sir.          02:11
25   Q.  All right.  And one -- the last bullet is   02:11

Page 276

1    "Chrome browsing history you've synced with your   02:11
2    account" -- "with your Google account"; correct?          02:11
3    A.  Yes.          02:11
4    Q.  And you mention that bullet in your report;   02:11
5    correct?          02:11
6    A.  Mm-hm.  Yes.          02:11
7    Q.  You do not mention the bullet above, "Activity   02:11
8    on third-party sites and apps that use our services";   02:11
9    right?          02:12
10   A.  I don't mention that.  It wasn't part of my --   02:12
11   yeah.          02:12
12   Q.  A reasonable person who reads the section   02:12
13   "Your activity" would understand that each of these   02:12
14   eight bullets is a different type of activity   02:12
15   information that Google may receive; right?          02:12
16   A.  You know, it doesn't have to be the case.  It   02:12
17   depends on -- I could argue that Chrome browsing history   02:12
18   incorporates a lot of that other stuff.  In fact, in the   02:12
19   real world it does.          02:12
20   Q.  Well, we're not here to argue about -- have   02:12
21   arguments.  We're here to discuss what reasonable people   02:12
22   would think when reading the Chrome -- reading the   02:12
23   Google Privacy Policy.          02:12
24   A.  I guess what I'm saying is --          02:13
25        MR. STRAITE:  I'm sorry.  Steve, is that a   02:13

Page 277

70 (Pages 274 - 277)

1 question?                              02:13
2      Is there a question on the table?        02:13
3      MR. BROOME: There is.              02:13
4 BY MR. BROOME:
5    Q. The question was reasonable people -- a
6 reasonable person who reads this section "Your activity"  02:13
7 would understand that each of these eight bullets is a   02:13
8 different type of activity information that Google may    02:13
9 receive; correct?                      02:13
10      That's the question that's on the table.      02:13
11      MR. STRAITE: Objection. Asked and answered.  02:13
12      THE WITNESS: I would say that Chrome browsing  02:13
13 history incorporates all the others and a person might   02:13
14 understand that that's the case. Yes.          02:13
15 BY MR. BROOME:
16    Q. That person might. But what would a      02:13
17 reasonable person think?                  02:13
18    A. A reasonable person would see all of these   02:13
19 particular -- particularities, but then would say, "Gee,  02:13
20 my Chrome browsing history is what I buy. It's the     02:13
21 videos I watch." It's the terms that you search for.   02:13
22 It's --                                02:13
23      How could that not be part of your Chrome    02:13
24 browsing history?                      02:13
25      It's all of that.                  02:13

Page 278

1    Q. So the fact that Google has broken these   02:14
2 categories out and lists Chrome browsing history      02:14
3 separately, it's your opinion that a reasonable person  02:14
4 reading this would say that's all Chrome browsing     02:14
5 history?                              02:14
6    A. But Chrome browsing history takes that and   02:14
7 more into account.                      02:14
8    Q. Uh-huh.                         02:14
9      And previously you made a distinction in the  02:14
10 web and app activity page, you said that Chrome browsing  02:14
11 history is actually -- people would interpret that     02:14
12 differently from Chrome history --              02:14
13    A. Yes. Because --                   02:14
14    Q. -- Chrome history being broader.          02:14
15    A. Chrome browsing history is exactly what those  02:14
16 elements above are.                      02:14
17    Q. Okay. Well, when we were looking at the    02:14
18 web and app activity page, I focused you on the      02:14
19 Chrome browsing history bullet, and then I drew your   02:14
20 attention to the Chrome history bullet. And you said,  02:14
21 "Ah, the Chrome browsing history is different than    02:14
22 Chrome history. Chrome history is broader and       02:14
23 encompasses activity on third-party sites."         02:14
24    A. Yes. But this is --                02:14
25      MR. STRAITE: I'm sorry. Wait for the       02:14

Page 279

1 question.                              02:15
2 BY MR. BROOME:                          02:15
3    Q. Now are you saying that Chrome browsing    02:15
4 history also encompasses activity on third-party sites  02:15
5 and apps that use our services?               02:15
6    A. It -- Chrome browsing history is what a person  02:15
7 does through the browser. The other thing was about    02:15
8 things that were beyond the browser and could be -- and  02:15
9 understood as not having anything to do with Chrome    02:15
10 directly.                              02:15
11      This is Chrome browsing history. Activity on  02:15
12 third-party sites relates to Chrome browsing history.   02:15
13    Q. Activity on third-party sites --          02:15
14    A. Relates to where you go, where one goes.   02:15
15    Q. So your opinion is that reasonable people   02:15
16 reading this page would interpret Chrome browsing     02:15
17 history to encompass all of the eight proceeding bullets  02:15
18 in that section?                        02:15
19    A. I think that a large -- to a large extent,  02:15
20 Chrome browsing history encompasses most, if not all of  02:16
21 these activities.                        02:16
22    Q. And I know that's what -- you keep shifting  02:16
23 back to what I -- you keep saying "I think." I'm not   02:16
24 asking necessarily --                    02:16
25    A. Well, of course I --                02:16

Page 280

1    Q. I want to understand what you're offering as  02:16
2 an expert opinion here.                    02:16
3      In your expert opinion, would reasonable     02:16
4 people think that Chrome browsing history is synonymous  02:16
5 or covers all of the eight bullets proceeding in -- the  02:16
6 proceeding bullets in that list?              02:16
7      MR. STRAITE: Objection. Asked and answered.  02:16
8      THE WITNESS: Chrome browsing history is      02:16
9 expansive, and incorporates most, if not all, of the   02:16
10 elements above it. Terms you search for has to be part  02:16
11 of Chrome browsing history. Videos you watch, that's   02:16
12 part of Chrome browsing.                   02:16
13      So when you're going to places with -- as a   02:16
14 result of Chrome, these things are incorporated into   02:17
15 Chrome browsing.                        02:17
16 BY MR. BROOME:                          02:17
17    Q. And that's your -- your opinion is that that's  02:17
18 how reasonable people would interpret it?          02:17
19      MR. STRAITE: Objection. Asked and answered.  02:17
20      MR. BROOME: He still hasn't answered that    02:17
21 question. He keeps saying "Chrome browsing history is"  02:17
22 or "I think that."                       02:17
23 BY MR. BROOME:                          02:17
24    Q. But what I'm trying to get at,           02:17
25 Professor Turow, is your opinion on what reasonable    02:17

Page 281

71 (Pages 278 - 281)

1 people would think.                          02:17
2    A.  I think a reasonable person would -- a   02:17
3 reasonable person would see these as individual elements  02:17
4 and then see Chrome browsing history as the expansive  02:17
5 category.                                    02:17
6    Q.  Ah.  Okay.  So they would see these eight  02:17
7 bullet parts and they would see the last one, they'd  02:17
8 say, "Oh, it's all Chrome browsing history"?   02:17
9    A.  Or the Chrome browsing history encompasses  02:17
10 this and more.                              02:17
11    Q.  Okay.  All right.                     02:17
12       And do you stand by your prior testimony that  02:17
13 reasonable people would interpret the terms "Chrome  02:17
14 browsing history" and "Chrome history" differently, one  02:18
15 more expansive than the other?               02:18
16    A.  Yes.  Because it leads to very different  02:18
17 categories.                                 02:18
18    Q.  Okay.  Let's go back to the web and app  02:18
19 activity page.                              02:18
20       What was that?  5?                     02:18
21    A.  Where is it?                         02:18
22       MR. STRAITE:  Is that Exhibit 5?         02:18
23       MR. BROOME:  Exhibit 5.                02:18
24       MR. STRAITE:  Exhibit 5 is in front of the  02:18
25 witness.                                    02:18
                                        Page 282

1       THE WITNESS:  Okay.                     02:18
2 BY MR. BROOME:
3    Q.  When I asked you about that document -- you  02:18
4 have Exhibit 5 in front of you, Professor Turow?  02:18
5    A.  Yes, I do.                           02:18
6    Q.  Okay.  And I drew your attention to the bottom  02:18
7 of the page, the section titled:             02:18
8       "Info about your browsing and other      02:18
9       activity on sites, apps, and devices that  02:18
10       use Google services."                  02:18
11       Do you recall that?                    02:18
12    A.  Yes, I do.                           02:18
13    Q.  And there's a heading that says "When     02:19
14 Web & App Activity is on, you can include additional  02:19
15 activity like"; right?                       02:19
16    A.  Yes.                                 02:19
17    Q.  And then we walked through these four bullets  02:19
18 under the heading there "When Web & App Activity is on,  02:19
19 you can include additional activity like."  There are  02:19
20 four bullets and we walked through them.     02:19
21       Do you recall that?                    02:19
22    A.  Yes, I do.                           02:19
23    Q.  And I asked you whether a reasonable person  02:19
24 would interpret Chrome browsing history to be a  02:19
25 different source of information that may contribute to  02:19
                                        Page 283

1 web and app activity different from the other bullets in  02:19
2 that list, and you said "Yes."               02:19
3       MR. STRAITE:  Objection again.  Any questions  02:19
4 about this document objecting as to foundation.  Also  02:19
5 beyond the scope of the expert report.       02:19
6 BY MR. BROOME:                              02:19
7    Q.  Do you recall that?                   02:19
8    A.  Yes.  I recall it, but we're talking about a  02:19
9 different situation here.                    02:19
10       Chrome history -- well, it is, because  02:19
11 Chrome -- it says -- the box next to -- let's see.  "The  02:19
12 box next to Chrome history," and then these -- "must be  02:19
13 checked."  Where -- okay.  And then it says:  02:20
14       "Your Chrome history is saved only if    02:20
15       you're signed into your Google Account and  02:20
16       have Google" (sic) Sync turned on."     02:20
17       Okay?                                 02:20
18       The other aspect -- the Chrome -- first of  02:20
19 all, Chrome browsing history here is not the last  02:20
20 bullet.                                     02:20
21       Secondly, there are areas like android uses  02:20
22 and diagnostics, battery level and system errors that  02:20
23 indicate there are other aspects to what a person might  02:20
24 get through -- through Chrome or through other aspects  02:20
25 of Google.                                  02:20
                                        Page 284

1       "Sites and apps that partner with Google to  02:20
2 show ads."  And "Sites and apps that use Google  02:20
3 services, including data that apps share with Google."  02:20
4       That may be part of Chrome browsing history.  02:20
5 But it isn't the same as saying Chrome history.  02:20
6    Q.  I see.  Well --                       02:20
7    A.  No.  In fact, what I'm saying is exactly  02:20
8 coterminous because Chrome browsing history includes the  02:20
9 first two bullets and more.                  02:20
10    Q.  Well, when I asked you about this before, you  02:20
11 gave a different answer.                     02:21
12    A.  No, I didn't.                        02:21
13       MR. STRAITE:  Objection.  Misstates --   02:21
14 BY MR. BROOME:                              02:21
15    Q.  You said -- I asked you if reasonable people  02:21
16 would agree that Chrome browsing history and the other  02:21
17 bullets are different sources of information?  02:21
18       You said you would agree with that.      02:21
19       And then you pointed to the phrase at the end  02:21
20 where it says "Your Chrome history," and you said, "Aha,  02:21
21 but there Google uses the term 'Chrome history' not  02:21
22 'Chrome browsing history," and you made that a  02:21
23 distinction.  And I believe you said that Chrome history  02:21
24 is broader than Chrome browsing history.     02:21
25       MR. STRAITE:  Objection.  The witness clearly  02:21
                                        Page 285

CONFIDENTIAL

1 never said "aha." And --                          02:21
2         THE WITNESS: Right.                        02:21
3         MR. STRAITE: -- misstates earlier testimony.  02:21
4 BY MR. BROOME:                                     02:21
5     Q. You made a distinction, did you not,       02:21
6 Professor Turow, between -- in this document between the  02:21
7 terms "Chrome browsing history" and "Chrome history"?  02:21
8     A. I made a distinction but not the one you're  02:21
9 creating.                                          02:21
10    Q. What was the distinction you made?          02:21
11    A. The distinction --                          02:21
12    Q. And we can go back and look at the transcript.  02:21
13    A. The distinction was between Chrome browsing  02:21
14 history and Chrome history. And in the context of what  02:21
15 we're talking about now, you can see that the first two  02:21
16 bullets are examples of Chrome browsing history here.  02:22
17        Chrome history is even more expansive than  02:22
18 Chrome browsing history is my point, and that was my  02:22
19 point then.                                        02:22
20        Okay?                                       02:22
21    Q. Okay.                                        02:22
22    A. So it's not any different from what I said the  02:22
23 last time.                                         02:22
24    Q. I see.                                       02:22
25    A. In fact, again, you're pointing to a dynamic  02:22
                                            Page 286

1 of the way of Google rhetoric, which sort of repeats  02:22
2 what I said.                                       02:22
3        You have two specifics and then a broad    02:22
4 category. And in this case not even just the broad  02:22
5 category. An even broader category called Chrome  02:22
6 history. It's not any different than what I said  02:22
7 before.                                            02:22
8     Q. Okay. So I want to make sure I get this    02:22
9 clear.                                             02:22
10       Your testimony is that when reasonable people  02:22
11 read the phrase "When Web & App Activity is on, you can  02:22
12 include additional activity like," and then they read  02:22
13 the next four bullets, they are going to -- their  02:22
14 takeaway would be that the first two bullets are  02:22
15 included in the third bullet, "Your Chrome browsing  02:22
16 history."                                          02:23
17       Is that your testimony?                     02:23
18       MR. STRAITE: Objection. Beyond the scope of  02:23
19 the expert report.                                02:23
20       You may answer that.                        02:23
21       THE WITNESS: And more, yes.                 02:23
22       MR. BROOME: Okay.                           02:23
23       MR. STRAITE: Steve, should we keep this    02:23
24 document up?                                       02:23
25       MR. BROOME: No. Let's go back to the privacy  02:23
                                            Page 287

1 policy.                                            02:23
2         MR. STRAITE: Do you need a break before we  02:23
3 start another document?                            02:23
4         Yeah. All right. We can take a break.      02:23
5         MR. BROOME: You want to take a break? That's  02:23
6 fine.                                              02:23
7         MR. STRAITE: Just want to get a drink --   02:23
8         MR. BROOME: No problem. Let's take         02:23
9 10 minutes.                                        02:23
10        Let's go off the record.                   02:23
11        THE VIDEOGRAPHER: Off the record at 5:23 p.m.  02:23
12        (Break taken in proceedings.)              02:23
13        THE VIDEOGRAPHER: We are on the record. The  02:39
14 time is 5:39 p.m. Eastern time.                    02:39
15 BY MR. BROOME:                                     02:39
16    Q. Okay. Professor Turow, do you still have the  02:39
17 privacy policy in front of you, July 1st, 2020 policy?  02:39
18        MR. STRAITE: We have Exhibit 5 in front of  02:39
19 the professor.                                     02:39
20        THE WITNESS: No. That's web and app.       02:39
21        MR. STRAITE: So which one do you want in   02:39
22 front of him?                                      02:39
23        MR. BROOME: Exhibit 6.                     02:39
24        MR. STRAITE: Okay. Give us a second. We'll  02:39
25 go and fetch Exhibit 6.                            02:39
                                            Page 288

1        Yes. Exhibit 6 is in front of the witness.  02:39
2 BY MR. BROOME:                                     02:39
3     Q. Professor, do you recall when you reviewed  02:39
4 the -- did you review the privacy policies online or did  02:39
5 you review paper copies?                           02:39
6     A. Paper copies, except -- well, .pdfs except --  02:40
7 I'm signing back into my tablet. .pdfs except for the  02:40
8 most recent one. Then I went online.               02:40
9     Q. Okay. And you're familiar or aware that    02:40
10 Google hyperlinks a lot of different pages and within  02:40
11 the privacy policy there are a lot of different links  02:40
12 to --                                             02:40
13    A. Yes.                                        02:40
14    Q. -- other sections of the privacy policy and  02:40
15 also to other documents.                          02:40
16       You're generally familiar with that?       02:40
17    A. Oh, sure.                                   02:40
18    Q. Yeah. Okay.                                 02:40
19       And you can't quite see it. If we go back to  02:40
20 page 208 of the July 1st, 2020 policy.            02:40
21       MR. STRAITE: Exhibit 6?                     02:40
22       MR. BROOME: Yes.                            02:40
23       MR. STRAITE: He has 208 in front of him.   02:40
24       THE WITNESS: Okay.                          02:40
25 ///
                                            Page 289

73 (Pages 286 - 289)

1 BY MR. BROOME:                          02:40
2     Q.   And the "Views and interactions with content   02:40
3 and ads," I don't know if you recall, but that bullet   02:40
4 was hyperlinked.                         02:40
5     A.   Let me see.                     02:41
6          "Views and interactions" -- no, I didn't.  It   02:41
7 doesn't look hyperlinked here.           02:41
8          MR. BROOME:  Yeah.  It is; right?      02:41
9 BY MR. BROOME:                          02:41
10    Q.   Yeah.  So I'll just represent to you that that   02:41
11 one is hyperlinked, and then it takes you to page 236.   02:41
12         MR. STRAITE:  Objection as to foundation for   02:41
13 the questions about this document.  Assumes facts not in   02:41
14 evidence with respect to what?           02:41
15 BY MR. BROOME:                          02:41
16    Q.   Professor Turow, is -- your opinion 3, is it   02:41
17 based on this document?                  02:41
18    A.   You mean 3?  Google's General Privacy Policy.   02:41
19 Yeah, it mentions it, of course.         02:41
20    Q.   Your opinion is not based on one version of   02:41
21 the privacy policy versus some other version; right?   02:41
22 It's based on all of the privacy policies?   02:41
23    A.   To the -- they pretty well were coterminous   02:41
24 with one another, yeah.                  02:42
25    Q.   Well, maybe that's something we should   02:42
                                          Page 290

1 investigate.                            02:42
2          Specifically which versions of the   02:42
3 Google Privacy Policy is your opinion 3 based on?   02:42
4     A.   No.  I say -- well, that's why I was asking   02:42
5 you before about this line that seems to have not   02:42
6 appeared in this one, but did appear in an earlier   02:42
7 version.  And maybe I was looking at the 2016.  I'm not   02:42
8 sure.  But it says:                     02:42
9          "Your Chrome browsing history is only   02:42
10 saved to your account if you've enabled   02:42
11 Chrome synchronization with your Google   02:42
12 account."                               02:42
13         That's why when you thought I was getting   02:42
14 messages, I was actually trying to find that line in   02:42
15 this policy.                            02:42
16    Q.   Give me a second.                 02:42
17         Okay.  Okay.  So on page 236 -- well, let me   02:42
18 go -- sorry.  Let me go back to the previous question.   02:43
19         Which versions -- when you issued your --   02:43
20 well, strike that.  That was a bad start.   02:43
21         Which versions of the Google Privacy Policy is   02:43
22 your opinion based on?                   02:43
23    A.   The versions that I received from counsel that   02:43
24 goes through the various iterations in the original   02:43
25 Complaint.  I read through all of them, read carefully a   02:43
                                          Page 291

1 number of them, and went through some of them to see   02:43
2 whether they were updated or not, changed or not.  So   02:43
3 that's what I -- and then I read the most recent.   02:43
4     Q.   Okay.  Do you remember what the earliest   02:43
5 version was?                            02:43
6     A.   I could look but I believe it was 2016.   02:43
7     Q.   Okay.  That's fine.               02:44
8          So the version of the privacy policy we're   02:44
9 looking at now is one of the versions on which your   02:44
10 opinion is based?                       02:44
11    A.   Yes.  Okay.                      02:44
12         MR. STRAITE:  Objection.  Assumes facts not in   02:44
13 evidence.  Foundation.                  02:44
14         MR. BROOME:  Am I assuming facts that are not   02:44
15 in evidence?  I'm asking him if this -- I'm not really   02:44
16 sure I understand your objection, David.   02:44
17         MR. STRAITE:  Well, you have a document in   02:44
18 front of him that purports to be saying but we don't   02:44
19 know if this is actually one of the documents that was   02:44
20 in -- attached to the Complaint.         02:44
21         He just testified as to what documents he   02:44
22 looked at, but I don't know if this document is one of   02:44
23 the documents attached to the Complaint or if this is   02:44
24 available right now on the website.  Those are the only   02:44
25 things that he testified looking at.      02:44
                                          Page 292

1          If you want me to keep talking?  I mean, you   02:44
2 invited me to explain the objection.  I usually am not   02:44
3 given much latitude to explain my objections.   02:44
4          MR. BROOME:  Is your concern that this   02:44
5 document that has been produced is not the version   02:44
6 that -- it's fine if it is.  I'm just trying to   02:44
7 understand your objection -- that this document that   02:44
8 we're all looking at is not the July 1st, 2020 privacy   02:45
9 policy?                                 02:45
10         MR. STRAITE:  I have no idea.        02:45
11         MR. BROOME:  Okay.                 02:45
12 BY MR. BROOME:                          02:45
13    Q.   Are you on page 236, Professor?      02:45
14    A.   Yeah.  Let's see.  206.            02:45
15         MR. STRAITE:  We're on 1208.        02:45
16         THE WITNESS:  He wants us to be on 1236.   02:45
17         MR. STRAITE:  1236?                02:45
18         THE WITNESS:  Yeah.                02:45
19         MR. STRAITE:  Hold on.             02:45
20         It's taking a while to load.        02:45
21         It's the last page of the document?   02:45
22         THE WITNESS:  Yeah.  Mm-hm.         02:45
23         MR. STRAITE:  In front of the witness.   02:45
24         MR. BROOME:  Yes.  Yes, it is.       02:45
25         THE WITNESS:  Right.  And I certainly would   02:45
                                          Page 293

74 (Pages 290 - 293)

1 read these I guess hyperlink editions, yeah.    02:45
2 BY MR. BROOME:
3     Q.  Right.                        02:46
4        It says "your activity on other sites and    02:46
5 apps."                            02:46
6        Do you see that?                    02:46
7        And then provides an explanation below.    02:46
8     A.  Okay.  Yes.                    02:46
9     Q.  It says:                        02:46
10       "This activity might come from your    02:46
11 use of Google services, like from syncing    02:46
12 your account with Chrome or your visits to    02:46
13 sites and apps that partner with Google."    02:46
14       Do you see that?                    02:46
15    A.  Yes.                        02:46
16    Q.  And do you agree that reasonable people    02:46
17 reading those -- that sentence would understand that    02:46
18 those are two different sources from which Google might    02:46
19 receive activity information?                02:46
20    A.  Let me -- if I may, let me read the paragraph.  02:46
21 These are very different statements:            02:46
22       "This activity might come from your    02:47
23 use of Google services, like from syncing    02:47
24 your account with Chrome," that's one    02:47
25 thing, "your visit to sites and apps    02:47
                                    Page 294

1 that partner with Google."                02:47
2        In other words, if you -- if you sync your    02:47
3 account with Chrome, you're getting a whole -- you get a  02:47
4 whole lot of activities going on, or you might want    02:47
5 to -- or sometimes it might be if you sync your account,  02:47
6 the -- or Google, in cases where you allow them, they    02:47
7 will -- they will sort of monitor your visits to sites    02:47
8 and apps that partner with Google.            02:47
9     Q.  Right.                        02:47
10    A.  They're two separate points.            02:47
11    Q.  Okay.  Thank you.                    02:47
12    A.  That have nothing to do with un-syncing at    02:47
13 all.                            02:47
14    Q.  Right.                        02:47
15    A.  Not syncing.                    02:47
16    Q.  Agreed.                        02:47
17       And reasonable people would see those as two    02:48
18 different points; right?                    02:48
19    A.  I believe so.  Yeah.                02:48
20    Q.  Okay.  Okay.  Let's go back to your report.    02:48
21 You can put the privacy policy aside.            02:48
22    A.  Okay.                        02:48
23    Q.  Sorry.  I lost my place there.            02:48
24       Let's see.  Your report, let's go to    02:48
25 paragraph 25.                        02:48
                                    Page 295

1     A.  25.                        02:48
2        MR. STRAITE:  And this is Exhibit 2, Steve?    02:48
3        MR. BROOME:  Yeah.  Yep.                02:48
4        THE WITNESS:  25 you said?            02:49
5 BY MR. BROOME:                        02:49
6     Q.  Yes.  Paragraph 25 of your report.        02:49
7     A.  Right.  This is about your slide deck.        02:49
8     Q.  Yeah.                        02:49
9        And I just want to be a hundred percent clear,  02:49
10 Professor Turow.  I'm not Google.  I am Steve Broome and  02:49
11 I work at Quinn Emanuel.                    02:49
12    A.  Yeah.  Okay.                    02:49
13    Q.  Yeah.  This is about Google slide deck.        02:49
14    A.  Right.  Yes.  I meant -- yes.  Your client's    02:49
15 slide deck.                        02:49
16    Q.  Exactly.                        02:49
17       Google's -- you refer to Google's 2019 survey.  02:49
18       Do you see that?                    02:49
19    A.  Yes, I do.                        02:49
20    Q.  Do you remember that?  This is one of -- this    02:49
21 is a document you actually attached to your report.    02:49
22    A.  Yes.                        02:49
23    Q.  Right?                        02:49
24       And so I guess you considered this document to  02:49
25 be important to your report.                02:49
                                    Page 296

1        Is that right?                    02:49
2     A.  I think it is, yeah.                02:50
3     Q.  Okay.                        02:50
4     A.  It's just so that you guys could find the    02:50
5 words.                            02:50
6     Q.  And that -- you describe it as a survey.        02:50
7        It was actually focus group; right?        02:50
8     A.  Generally, yeah.  Did they do a survey as    02:50
9 well?                            02:50
10       But, yeah, they were mainly -- you're right,    02:50
11 focus groups.                        02:50
12    Q.  Right.                        02:50
13       And those are different; right?  Those are    02:50
14 different ways --                        02:50
15    A.  Very different.                    02:50
16    Q.  Very different.  Right.  Okay.            02:50
17       Did you think anything in this slide -- well,    02:50
18 do you want the slide deck in front -- I mean, you're    02:50
19 familiar with it, but I can give it to you, if you want    02:50
20 to have it in front of you.                02:50
21       Why don't we do that.  Why don't we bring up    02:50
22 the slide deck.                        02:50
23       Where is the slide deck?                02:50
24       Oh, yeah.  Okay.                    02:50
25       Okay.  So we'll bring up the slide deck,        02:50
                                    Page 297

1 Professor, so you have it. It's in your materials    02:50
2 relied on; right?                                    02:51
3      A.  Yes.                                         02:51
4      MR. BROOME:  Exhibit B.  So let's load that.    02:51
5 Loading that for you now.                            02:51
6      MR. STRAITE:  Let us know when it's loaded and  02:51
7 we'll refresh.                                       02:51
8      MR. BROOME:  Should be loaded.                  02:51
9          (Defendants' Exhibit 7 was                  02:51
10         marked for identification.)                 02:51
11     MR. STRAITE:  It's taking a while to load.      02:51
12     All right.  I see 7.                            02:51
13     Okay.  So the document called Exhibit B on the  02:51
14 first page, it has Exhibit 0007 bottom right-hand corner 02:51
15 is in front of the witness.                          02:51
16 BY MR. BROOME:                                       02:51
17     Q.  Does this appear to you, Professor Turow, to 02:51
18 be the Exhibit B that was attached to your report?   02:51
19     A.  Still heading in that direction.            02:51
20     Yeah.  We're getting into the slide show, yes.  02:52
21     Q.  Several times today you've alluded to the   02:52
22 possibility that Google was intentionally trying to  02:52
23 mislead or deceive users.                            02:52
24     Do you recall that?                             02:52
25     A.  The possibility, yeah.  I'm not about to say 02:52

Page 298

1 they're doing that purposely.  We have no idea       02:52
2 particularly.                                        02:52
3     Q.  And you reviewed this slide deck very        02:52
4 carefully before you submitted it with your report;  02:52
5 right?                                               02:52
6     A.  Yes.  Yeah.                                  02:52
7     Go ahead.  Sorry.                                02:52
8     MR. STRAITE:  Will you please let him finish     02:52
9 his answer?                                          02:52
10    MR. BROOME:  Yes.                                02:52
11 BY MR. BROOME:                                      02:52
12    Q.  Did you have more to add?  I'm sorry.  Now I 02:52
13 keep talking over you.                              02:52
14    A.  I was going to say I believe it was done for 02:52
15 Google.                                             02:52
16    Q.  Right.  I think that's right.               02:52
17    A.  So it's really -- it has nothing to do with 02:52
18 Google's attempt to elude people or not -- delude people 02:53
19 or not.  This was a consultancy report based on --  02:53
20    Q.  Okay.                                       02:53
21    A.  -- based upon, you're right, focus groups.  02:53
22    Q.  Is there anything in this slide deck that    02:53
23 suggests to you that Google -- this was part of some 02:53
24 effort by Google to deceive users?                  02:53
25    A.  This has nothing to do with anything that I  02:53

Page 299

1 have said previously about that, no.  This is just an 02:53
2 external report by a consultancy that was -- that aimed 02:53
3 to give unvarnished presumably opinions of what people 02:53
4 tell them in these rather small focus groups.         02:53
5     But they come up with statements that           02:53
6 certainly are aimed at making people in Google aware of 02:53
7 the confusion that they can sow among their users.    02:53
8     Q.  Yeah.  Well, wouldn't you agree that the    02:54
9 effort here is to figure out how to better communicate 02:54
10 with users?                                         02:54
11    A.  No.  I wouldn't agree with that at all.      02:54
12    MR. STRAITE:  I'm sorry.  Objection.  Calls      02:54
13 for speculation.                                    02:54
14 BY MR. BROOME:                                      02:54
15    Q.  All right.  This slide deck doesn't pertain  02:54
16 specifically to Chrome, does it?                    02:54
17    MR. STRAITE:  Objection.  Calls for             02:54
18 speculation.                                        02:54
19    THE WITNESS:  I didn't see the word "Chrome"     02:54
20 in there.                                           02:54
21 BY MR. BROOME:                                      02:54
22    Q.  In fact, it doesn't pertain to any specific  02:54
23 Google service; correct?                            02:54
24    MR. STRAITE:  Objection.  Calls for             02:54
25 speculation.                                        02:54

Page 300

1     THE WITNESS:  It is all about Google services.  02:54
2 It's not about any specific Google service.          02:54
3     THE COURT REPORTER:  Professor, can you get     02:54
4 closer to the microphone?                            02:54
5     THE WITNESS:  Yeah.                             02:54
6     THE COURT REPORTER:  Thank you.                 02:54
7 BY MR. BROOME:                                       02:54
8     Q.  Your testimony is that this slide deck is all 02:54
9 about Google services?                              02:54
10    A.  It's about all --                           02:54
11    MR. STRAITE:  Let me get my objection in.       02:54
12    Objection.  Calls for speculation.              02:54
13    THE WITNESS:  This is about what people seem     02:54
14 to know about technologies that relate to Google and to 02:55
15 the web and to the internet in general.             02:55
16 BY MR. BROOME:                                      02:55
17    Q.  And I agree with the last part.  It does     02:55
18 relate to the internet in general.                 02:55
19    Can you show me any page in this document that   02:55
20 suggests this is about Google services specifically? 02:55
21    MR. STRAITE:  Again, calls for speculation.     02:55
22 Now you want him to find the place based upon        02:55
23 speculation.                                        02:55
24    THE WITNESS:  They don't mention -- as far as    02:55
25 I remember, they don't mention any particular Google 02:55

Page 301

76 (Pages 298 - 301)

| | |
|---|---|
| 1 service.                               02:55 | 1      MR. STRAITE:  Can we stipulate here that the   02:58 |
| 2 BY MR. BROOME:                          02:55 | 2 good professor, when he means "you," he means --   02:58 |
| 3   Q.  Okay.  Thank you.               02:55 | 3      THE WITNESS:  Yeah.  I apologize.  But I do   02:58 |
| 4      And they don't mention Chrome sync; right?   02:55 | 4 have biscotti, if that helps.              02:58 |
| 5   A.  No, they don't.                 02:55 | 5      Anyway, so, yeah --                 02:58 |
| 6      MR. STRAITE:  Same objection.      02:55 | 6 BY MR. BROOME:                           02:58 |
| 7 BY MR. BROOME:                          02:55 | 7   Q.  It's my favorite.  I never pass on those on   02:58 |
| 8   Q.  All right.  And certainly none of the   02:55 | 8 the airplane.  Those are the best ones.      02:58 |
| 9 disclosures that are at issue in this case are mentioned  02:55 | 9      Okay.  You mentioned that -- well, first of   02:58 |
| 10 in this -- in this slide deck; correct?   02:55 | 10 all, let me back up.                      02:59 |
| 11   A.  Yes.  But the purpose -- the slide deck does   02:55 | 11      You've never seen a Google disclosure -- you   02:59 |
| 12 exhort Google to understand with respect to its products  02:55 | 12 keep using the term "un-sync."             02:59 |
| 13 what the orientation of users in the U.S. and other   02:56 | 13      You've never seen a Google disclosure use the   02:59 |
| 14 countries is.                           02:56 | 14 term "un-sync," have you?                  02:59 |
| 15      This is the cautionary tale essentially.   02:56 | 15   A.  Not the word "un-sync" but there are --   02:59 |
| 16   Q.  Is it your testimony that this study supports   02:56 | 16   Q.  Okay.                            02:59 |
| 17 the opinions that you have offered in this case?   02:56 | 17   A.  -- statements that if you prefer if you don't   02:59 |
| 18   A.  Not -- it depends on what opinions you mean,   02:56 | 18 sync.                                   02:59 |
| 19 sir.                                  02:56 | 19   Q.  There are statements about what happens when   02:59 |
| 20   Q.  Does it sport any of your opinions?   02:56 | 20 you do sync.                             02:59 |
| 21   A.  Well, it supports the notion, as I wrote right   02:56 | 21      Have you seen statements about what happens   02:59 |
| 22 here -- let me find the way I attached it to the...   02:56 | 22 when you don't sync?                      02:59 |
| 23      "Surveys I've conducted find people   02:57 | 23   A.  "If you don't use your Chrome data to   02:59 |
| 24      suspect they're being tracked by   02:57 | 24      personalize your experience outside of   02:59 |
| 25      marketers.  They don't quite understand   02:57 | 25      Chrome, Google will only use your Chrome   02:59 |
|                                Page 302 |                                Page 304 |

| | |
|---|---|
| 1 how marketers track their behavior,      02:57 | 1 data after its anonymized and aggregated   02:59 |
| 2      especially when it comes to complex data   02:57 | 2 data from other users.                    02:59 |
| 3      mining."                          02:57 | 3      "The personal information that Chrome   02:59 |
| 4      That's how it supports what I was talking   02:57 | 4      stores won't be sent to Google unless you   02:59 |
| 5 about, that you don't -- you know, we have spent so much   02:57 | 5      choose to store that data in your Google   02:59 |
| 6 time talking about the privacy policy and the guts of   02:57 | 6      account by turning on sync.            02:59 |
| 7 the privacy policy, when studies like mine and others   02:57 | 7      "Sync is only enabled if you choose."   02:59 |
| 8 show that people don't read these things.  A large   02:57 | 8      Okay?                            02:59 |
| 9 percent of people don't read it.  And of the people who   02:57 | 9      All of these are quite clearly to say that if   02:59 |
| 10 don't read it, they would get confused by the very   02:57 | 10 you don't sync, you're not going to have problems like   03:00 |
| 11 sign-in stuff.                          02:57 | 11 that.                                   03:00 |
| 12      So either way, you have a problem with a   02:57 | 12   Q.  Okay. all right.                  03:00 |
| 13 reasonable person thinking that unsafe means that Google   02:57 | 13      Let's go back to the study.  And I think I   03:00 |
| 14 will not take their information.          02:57 | 14 just heard you say that, generally speaking, people   03:00 |
| 15      But the notion that is simply, as I was   02:57 | 15 don't understand the information that's being described   03:00 |
| 16 pointing out, that people don't quite understand how   02:58 | 16 in privacy policies.                      03:00 |
| 17 this stuff works, and the -- and Google -- and the   02:58 | 17      Is that -- did I get that right?       03:00 |
| 18 notion that you can go deep into the set of rabbit holes   02:58 | 18   A.  No, I didn't say that.             03:00 |
| 19 of caveats and believe that people will understand what   02:58 | 19      MR. STRAITE:  Let me get my objection in.   03:00 |
| 20 you assert to be certain ideas about syncing and   02:58 | 20      Misstates prior testimony.  Objection.   03:00 |
| 21 un-syncing doesn't make sense, even on the face of what   02:58 | 21      THE WITNESS:  Okay.  I said that there is   03:00 |
| 22 your own consultants are saying.          02:58 | 22 evidence that people believe -- huge evidence that   03:00 |
| 23   Q.  I don't have any consultants.      02:58 | 23 people believe that the simple label privacy policy   03:00 |
| 24   A.  Well, I'm sorry.  You're asking me about   02:58 | 24 means that companies protect their information.   03:00 |
| 25 Google's consultants.  The capital Y.   02:58 | 25      So there's a good chance they won't even read   03:00 |
|                                Page 303 |                                Page 305 |

CONFIDENTIAL

1 privacy policies.                                    03:00

2        There's also a lot of data, most prominently  03:00

3 the same study by Lorrie Cranor and Aleecia McDonald  03:00

4 that if one read all the privacy policies one should   03:00

5 have read, it would take an enormous amount of time and  03:00

6 expense of money.                              03:00

7        And so I think if people -- when people say    03:01

8 they read privacy policies, they may look for statements  03:01

9 that align with their concerns.                  03:01

10        And as I was pointing out earlier, the -- the   03:01

11 sort of easiest-to-read statements about those concerns  03:01

12 are ones that make a person feel comfortable that not   03:01

13 syncing is going to be the way to protect their        03:01

14 information.                                  03:01

15 BY MR. BROOME:

16    Q.  The research that you just referenced where --   03:01

17 I think you said that people just -- they see the mere   03:01

18 label privacy policy and they think that conveys       03:01

19 their --                                      03:01

20    A.  Yes.                                  03:01

21    Q.  -- data is protected I think is what you said?  03:01

22    A.  Yes.                                  03:01

23    Q.  That research, what did the research involve?  03:01

24    A.  We did it five separate times.  It's         03:01

25 published, vetted, peer reviewed.  It is -- the research  03:01

Page 306

1 involved in five separate studies doing random samples   03:01

2 of the U.S. population, not by me but by major polling   03:02

3 organizations, paid for through the company -- through   03:02

4 the associations, mainly the Annenberg School, that     03:02

5 funded the study.  And we had questions that -- for     03:02

6 example, they changed a little bit each time but the     03:02

7 dominant question was true or false, when a website has   03:02

8 a privacy policy, it means that site won't share        03:02

9 information with other sites without your permission.    03:02

10        And huge percentages of the American          03:02

11 population simply get it wrong or don't know.          03:02

12        And this is --                          03:02

13 BY MR. BROOME:

14    Q.  And you did -- sorry.  Go ahead.             03:02

15        MR. STRAITE:  Steve, he was in the middle of   03:02

16 something.                                   03:02

17        THE WITNESS:  And Pew has also done a similar   03:02

18 study and found the same thing.                  03:02

19        This is like a classic study that no one      03:02

20 has -- even business people -- the IAB has not disputed  03:02

21 the findings of the study.                       03:02

22 BY MR. BROOME:

23    Q.  Those research projects, they were based on    03:02

24 surveys; correct?                             03:03

25    A.  National surveys.                        03:03

Page 307

1    Q.  Are you familiar with the concept called       03:03

2 confirmation bias?                           03:03

3    A.  Oh, I know what confirmation bias is.  It's a   03:03

4 psychological term.                           03:03

5    Q.  Okay.  And is it -- well, let me come back to   03:03

6 that.                                       03:03

7        The -- we just -- I think when you -- I asked   03:03

8 you about surveys earlier in this case, and you said a   03:03

9 survey wouldn't be helpful in this case.             03:03

10    A.  In this case, right.                      03:03

11    Q.  And do you stand by that?                  03:03

12    A.  Yes, I do.                             03:03

13    Q.  Okay.  And you have no intention of conducting  03:03

14 a survey for purposes of this case?                 03:03

15    A.  I don't think it would be helpful at all.  I   03:03

16 mean, I've been asked that a number of times.  I just   03:03

17 don't see it as helpful.                         03:03

18    Q.  And you don't see it as helpful because the    03:03

19 answer to the question of how reasonable people would   03:03

20 interpret the statements at issue in Google's          03:03

21 disclosures is just obvious.                     03:04

22        Is that right?                          03:04

23    A.  Yes.                                  03:04

24    Q.  Okay.                                 03:04

25    A.  Based upon the plain language around those     03:04

Page 308

1 issues in the privacy policies and in the privacy notice  03:04

2 and in the sign-in arena, and then syncing arena.      03:04

3    Q.  Do you believe that the -- in a slide deck     03:04

4 that we discussed, you cite certain quotes -- or your   03:04

5 quote -- sorry -- you quote certain packages and rely on  03:04

6 them to some extent; correct?                  03:04

7    A.  Yes, I do.                             03:04

8    Q.  Okay.  And is it your opinion that the        03:04

9 research that's reflected in the slide deck is reliable?  03:04

10        MR. STRAITE:  Objection.  Calls for          03:04

11 speculation.                                03:04

12        THE WITNESS:  I actually believe that focus    03:05

13 groups are highly problematic, to be honest.          03:05

14        And so I didn't -- I don't believe that this   03:05

15 study is necessarily worthwhile.  I only present as a --  03:05

16 as part of the information that people in Google seem to  03:05

17 have adopted as one way to look at what's going on.  I   03:05

18 have no sense that this is real stuff.  You know, focus   03:05

19 groups can be just so bad.                      03:05

20 BY MR. BROOME:

21    Q.  Well, is the research that's reflected in --    03:05

22 as a result of the focus groups that's reflected in this  03:05

23 slide deck, is it reliable or not reliable, or are      03:05

24 certain parts of it reliable or not reliable?          03:05

25        MR. STRAITE:  Objection.  It's the exact same  03:05

Page 309

78 (Pages 306 - 309)

1 question you answered before. Objection. Calls for    03:05
2 speculation.                            03:05
3        THE WITNESS: The thing is, I'm not interested  03:05
4 in whether it's reliable or unreliable. The reason I   03:05
5 brought it up is because it is the perspective that was 03:06
6 presented to your clients as to how to view the world.  03:06
7 BY MR. BROOME:
8    Q. I see.                            03:06
9    A. And that's all I care about. I'm not about to    03:06
10 say whether it's true or not.                03:06
11        It -- I should say that it parallels a lot of  03:06
12 our findings about people's lack of understanding of   03:06
13 things like data mining and, you know, whether -- how   03:06
14 data gets to them, and any of the activities that relate 03:06
15 to marketing and advertising. There's an enormous      03:06
16 amount of lack of knowledge. So that's true.           03:06
17        But to say that a focus group across countries 03:06
18 like that is a meaningful set of findings, I have to   03:06
19 reserve judgment.                        03:06
20    Q. Well, I asked you whether you relied on it,    03:06
21 and I thought you said you did?                03:06
22    A. It wasn't -- no. I did as an example of        03:06
23 how -- of vetted, it sort of parallels what we said.   03:06
24 And, in fact, also the Google people should know about 03:06
25 this and have probably picked it up and used it. But I 03:07

Page 310

1 don't know that.                         03:07
2        It's certainly coterminous with -- with some   03:07
3 of the findings that we have.                03:07
4        MR. BROOME: What exhibit is it again? 6? 7?  03:07
5        THE WITNESS: But I don't stake my life on      03:07
6 focus groups.                           03:07
7 BY MR. BROOME:
8    Q. All right. I want to see what else is         03:07
9 consistent with your research in the slide deck.        03:07
10    A. Okay.                             03:07
11    Q. It's Exhibit 7. Let me know when you have it   03:07
12 in front of you.                          03:07
13        MR. STRAITE: Exhibit 7 is in front of the     03:07
14 witness. Which page should he be looking at?           03:07
15        MR. BROOME: 97.                       03:08
16        THE WITNESS: 97.                      03:08
17        MR. BROOME: I think you quoted something from 03:08
18 this.                                  03:08
19        MR. STRAITE: When you say 97, are you        03:08
20 referring to a Bates number or is that .pdf page 97,    03:08
21 Steve?                                03:08
22        MR. BROOME: Yes, the Bates number.           03:08
23        MR. STRAITE: 97.                      03:08
24        THE WITNESS: There we go.                 03:08
25        MR. STRAITE: Steve, the last page number is   03:08

Page 311

1 82.                                  03:08
2        THE WITNESS: You're on 103.               03:08
3        MR. BROOME: 097. Excuse me. It's like the    03:08
4 very beginning of the slide deck -- oh, no. I'm sorry.  03:08
5 It's not the very beginning. It's like the third page   03:08
6 or fourth page. 097.                        03:08
7        THE WITNESS: Could you tell us what the slide 03:08
8 says?                                 03:08
9        MR. BROOME: It says "What's the temperature?"  03:08
10        THE WITNESS: It's a thermometer. Yeah.        03:08
11 BY MR. BROOME:
12    Q. Yeah. It's one of the ones that I think you   03:08
13 quoted from in your report.                  03:09
14    A. "Concern is less extreme and more balanced."   03:09
15 "...shallow," yes, "assuming familiarity is           03:09
16 often a mistake.                         03:09
17 "Users are increasingly open to                03:09
18 personalization."                        03:09
19        Yeah. I -- you know, as I said, these are    03:09
20 topics that we have found, you know, in our research as 03:09
21 well.                                 03:09
22    Q. And is that -- okay.                    03:09
23    A. I wouldn't rest my findings just on focus     03:09
24 groups but they're certainly coterminous with a lot of 03:09
25 our survey.                             03:09

Page 312

1    Q. Okay. And is it -- are users increasingly    03:09
2 open to personalization even in apps? Is that          03:09
3 consistent with your research?                03:09
4    A. I would say that our research, I look at it    03:09
5 from the standpoint of marketers doing that. People are 03:09
6 open to personalization but when they find out how it's 03:09
7 done, they get freaked out. That's what we find, the   03:09
8 couple of studies we've done. They get -- they like the 03:09
9 idea but then when -- if you tell them how it's done,   03:10
10 they get really upset.                       03:10
11    Q. Can you turn to page 102?                 03:10
12    A. Okay.                             03:10
13    Q. It says "Personalization is increasingly      03:10
14 welcome.                               03:10
15 "Users are not just open to                    03:10
16 personalization, but often prefer it.               03:10
17 This includes personalized ads. The               03:10
18 attitude is essentially," quote, "They're             03:10
19 going to collect my data anyway. I might             03:10
20 as well get something out of it," end              03:10
21 quote.                                03:10
22    A. Right. We find a much more complicated       03:10
23 scenario that we have called digital resignation. And  03:10
24 essentially what that means is people say, "Yeah,      03:10
25 they're going to collect my data anyway, I" -- you know, 03:10

Page 313

Page 314

```
 1   it's not so much "I may as well get something out of    03:10
 2   it." "I really have no idea of how to protect myself.    03:10
 3   I can try as much as I can."                            03:10
 4         We have a couple of large studies, but a           03:10
 5   substantial percentage of the population will say, for   03:11
 6   example, "I'd love to get off Google but all my friends  03:11
 7   are on it. I can't do it."                              03:11
 8         This is a sense of digital resignation.            03:11
 9         A lot of marketing research tends to focus on      03:11
10   this notion of tradeoffs. And we argue in some of the    03:11
11   research that I've done that tradeoffs are not really    03:11
12   what people want. Really it's not a matter of            03:11
13   tradeoffs. People don't like the idea of tradeoffs when  03:11
14   it comes to this kind of stuff, but rather, as I said,   03:11
15   they look like they're trading information but           03:11
16   essentially they're resigned in trying to find their     03:11
17   best way into the world despite feeling that they have   03:11
18   no control over that.                                   03:11
19         MR. STRAITE: And I didn't want to interrupt       03:11
20   the professor beginning.                                03:11
21         Objection as to beyond the scope --               03:11
22         THE WITNESS: What does this have to do with       03:11
23   my report?                                              03:11
24         MR. STRAITE: Well, it's all very interesting      03:11
25   but --                                                  03:11
```

Page 315

```
 1         THE WITNESS: I mean, yeah, I could go on and      03:11
 2   on about this. This is part of my life. But I don't      03:11
 3   see the point. This is not related to the report, if I   03:11
 4   may say.                                                03:11
 5   BY MR. BROOME:                                          03:11
 6     Q.  Okay. Your opinions then are not based on --       03:11
 7   none of your opinions are based on the declaration --    03:12
 8   the slide declaration?                                  03:12
 9     A.  No, no. I brought that slide deck to make a        03:12
10   very specific point that's coterminous with my point,    03:12
11   which is that in the case of privacy policies, a large   03:12
12   percent of the people don't even really know what the    03:12
13   term means. They're confused.                           03:12
14         And that's where I brought in the findings by     03:12
15   the Google people, the consulting firm.                 03:12
16         The idea that simply seeing the words "privacy    03:12
17   policy" leads people not to go into the privacy policy,  03:12
18   which is kind of hilarious but that seems to be the      03:12
19   case.                                                   03:12
20     Q.  Well, that's the next section of your report;      03:12
21   right? That's not the section --                        03:12
22     A.  No. I think it comes together. It says            03:12
23   Google's -- blah, blah.                                 03:12
24         "So both my research and Google                   03:12
25   suggest it is quite likely that even if                 03:12
```

Page 316

```
 1         Google had told non-synced Chrome user,           03:12
 2   they would get personalized search and                  03:12
 3   other Google services" --                               03:13
 4         THE COURT REPORTER: Professor, I can't write     03:13
 5   that fast.                                              03:13
 6         THE WITNESS: I'm sorry. Don't write.             03:13
 7   Let's see.                                              03:13
 8         No. That comes before Mr. Broome talking         03:13
 9   about the privacy policy. Let's see.                    03:13
10         "Not turning on" -- "Not turning on Chrome       03:13
11   sync" -- let's see. I'm sorry. I'm in the wrong place.  03:13
12         "Surveys I conducted find that people            03:13
13   suspect they are being tracked by                       03:13
14   marketers but they don't quite understand               03:13
15   how marketers track their behavior,                     03:13
16   especially when it comes to complex data                03:13
17   mining."                                                03:13
18         So I guess that is where I was coming from.       03:13
19         And then I kind of used the 2019 slide deck as   03:13
20   a kind of parallel finding.                             03:13
21         And you're right, and then I said:               03:14
22         "So both my research and Google's                03:14
23   suggest it is quite likely that even if                 03:14
24   Google had told non-synced Chrome users                 03:14
25   they will get 'personalized search and                  03:14
```

Page 317

```
 1   other Google services,' those users still               03:14
 2   would not see a contradiction between that               03:14
 3   statement and the assurance if they don't                03:14
 4   sync their Chrome, data will not be sent                 03:14
 5   to Google."                                              03:14
 6         But I also -- in the context of privacy           03:14
 7   policy, the same point applies.                          03:14
 8         People don't understand what the word "privacy    03:14
 9   policy" means.                                           03:14
10         So all the discussion that we've been having      03:14
11   for a very substantial part of the population would be   03:14
12   irrelevant and, yet, they would still consider un-synced 03:14
13   to mean protecting their data because of the sign-in     03:14
14   aspects that we discussed earlier.                       03:14
15         You don't have to have read a privacy policy      03:14
16   to still believe that un-synced, even by the very nature 03:14
17   of that word, means that I'm not going to be tracked.    03:14
18   BY MR. BROOME:                                          03:14
19     Q.  The nature of what word, Professor Turow?          03:15
20     A.  Un-synced.                                         03:15
21     Q.  Right. But that's not a word Google uses.          03:15
22         MR. STRAITE: Objection. Assumes facts not in     03:15
23   evidence.                                               03:15
24         THE WITNESS: The word "not having synced." I     03:15
25   sync and I don't sync. That's what we're talking about.  03:15
```

80 (Pages 314 - 317)

CONFIDENTIAL

| | |
|---|---|
| 1    If I don't sync, then the -- my data will be    03:15 | 1    MR. STRAITE:  We would be here for three hours  03:18 |
| 2  protected compared to other situations.    03:15 | 2  if we did an individual search for that one, Steve.  And  03:18 |
| 3  BY MR. BROOME:    03:15 | 3  then -- so thank you.    03:18 |
| 4    Q.  Are any of your opinions based on Google's --    03:15 | 4    THE WITNESS:  I wrote slide 11 actually.  You  03:18 |
| 5  this 2019 survey or what you call Google's own 2019    03:15 | 5  say yeah.    03:18 |
| 6  survey, but which is actually -- or looks like a report  03:15 | 6    MR. STRAITE:  So we have --    03:18 |
| 7  based on focus groups that was sent to Google?    03:15 | 7    THE WITNESS:  Yeah.  "While people can  03:18 |
| 8    MR. STRAITE:  Objection.  Asked and answered.  03:15 | 8  repeat" -- yeah, it is.  "While people can repeat some  03:18 |
| 9  This is the same document we have up already; right,    03:15 | 9  superficial fact or point of view, they struggle to  03:18 |
| 10  Steve?    03:15 | 10  apply them.  This renders our actions and intentions    03:18 |
| 11    MR. BROOME:  Mm-hm.  Yes.    03:15 | 11  vulnerable to misinterpretation."    03:18 |
| 12    MR. STRAITE:  Okay.  Objection.  Asked and    03:15 | 12    Which is part of what I have been saying all  03:18 |
| 13  answered.    03:15 | 13  day long.    03:18 |
| 14    THE WITNESS:  Yeah, I did answer it.    03:15 | 14  BY MR. BROOME: |
| 15    Essentially what I'm saying is that the slide  03:15 | 15    Q.  What have you been saying all day long; that  03:18 |
| 16  deck reinforces what I was telling you in No. 24 about  03:15 | 16  Google statements are being misinterpreted?    03:19 |
| 17  people not understanding how marketers track their    03:16 | 17    A.  No.  That what's happening is that Google is  03:19 |
| 18  behavior, especially when it comes to data mining.    03:16 | 18  relying on people using the plain language, but that  03:19 |
| 19    And I just added to you that another relevant  03:16 | 19  that language is, either purposefully or not, designed  03:19 |
| 20  point is the business of the meaning of the word    03:16 | 20  to mislead.    03:19 |
| 21  "privacy policies."  The focus groups -- and I don't    03:16 | 21    Q.  Well, if it's designed to mislead, it's    03:19 |
| 22  remember the specific methodology, to be honest.  They    03:16 | 22  purposeful; right?  I mean, if that's the design behind  03:19 |
| 23  really do repeat the same idea that people are just very  03:16 | 23  it.    03:19 |
| 24  confused, and that -- in fact, it says there that the --  03:16 | 24    A.  The language is -- has a function of    03:19 |
| 25  what -- Google's statements may be prone to    03:16 | 25  misleading.  Maybe that's a better way to put it.    03:19 |
| Page 318 | Page 320 |

| | |
|---|---|
| 1  misinformation -- misunderstanding, I believe it says.  03:16 | 1    Q.  Take a look at page 129.    03:19 |
| 2  Yeah, misunderstanding.    03:16 | 2    MR. STRAITE:  Okay.  The witness has that page  03:19 |
| 3  BY MR. BROOME: | 3  in front of him.    03:20 |
| 4    Q.  Where are you looking?    03:16 | 4    THE WITNESS:  "Data used for ads is    03:20 |
| 5    A.  I quote it here.  It says "This renders our    03:16 | 5  seen as less personal - and thus less    03:20 |
| 6  actions and intentions vulnerable to misinterpretation."  03:16 | 6  creepy.    03:20 |
| 7  The slide deck says.  And they use the word "our," by  03:17 | 7    "Users delineate between different    03:20 |
| 8  the way.    03:17 | 8  types of data, and they perceive the data    03:20 |
| 9    Q.  Yeah.  What page are you quoting there?    03:17 | 9  used for ads is more general."    03:20 |
| 10    A.  I have to find it.  I didn't cite the actual    03:17 | 10    Is that for the United States?  Yeah.  Looks  03:20 |
| 11  page.  Let me -- may I search it?    03:17 | 11  like.    03:20 |
| 12    I'm trying to do a search on the    03:17 | 12  BY MR. BROOME:    03:20 |
| 13  misinterpretation.  Use the word vulnerable.  Sorry.    03:17 | 13    Q.  Yeah.  And then below it says:    03:20 |
| 14    Could you type it for me?    03:18 | 14    "Your own data is your Social    03:20 |
| 15    MR. STRAITE:  Sure.    03:18 | 15  Security number, your financial    03:20 |
| 16    THE WITNESS:  Vulnerable.    03:18 | 16  information, where you were born -    03:20 |
| 17    MR. STRAITE:  So we're just looking for the    03:18 | 17  somebody can take hold of your life and do    03:20 |
| 18  word vulnerable in the slide deck, Steve.    03:18 | 18  something negative.  Versus, if you're    03:20 |
| 19    Is that what you want us to do?    03:18 | 19  interested in shopping at Nordstrom or    03:20 |
| 20    THE WITNESS:  He asked me where it is.    03:18 | 20  Target, I don't care {if} they're just    03:20 |
| 21    MR. STRAITE:  I don't see it.    03:18 | 21  finding out what I'm interested in."    03:20 |
| 22    THE WITNESS:  I don't see it either.  It's a  03:18 | 22    Is that consistent with your research?    03:20 |
| 23  slide deck found --    03:18 | 23    A.  Actually, no.  And to be real honest, this has  03:20 |
| 24    MR. BROOME:  It's on 100.    03:18 | 24  nothing to do with what I'm writing about in my report.  03:20 |
| 25    THE WITNESS:  Okay.  Sorry.    03:18 | 25  this is totally outside the realm of my -- what my    03:20 |
| Page 319 | Page 321 |

81 (Pages 318 - 321)

1  report was talking about.                    03:20
2       I used the points in the slide deck to make   03:20
3  a -- to emphasize the difficulty of people understanding  03:20
4  some of the language and particularly as I told you   03:20
5  here, privacy policy.                         03:20
6       But there's nothing in my report that has   03:20
7  anything to do with marketing and Nordstrom or data. We  03:20
8  actually find that people find advertising pretty   03:21
9  creepy, as long as it's used your -- data driven.   03:21
10  Q.  Let's take a look at page 157.           03:21
11      Let me know when you're there.            03:21
12      MR. STRAITE:  The witness has 157 in front of  03:21
13  him.                                        03:21
14 BY MR. BROOME:
15  Q.  Okay.  You see where it says "Simplify,   03:21
16  simplify, simplify.                          03:21
17      "Unclear text leads users to question     03:21
18  our intent.                                 03:21
19      "Consent confusion is amplified          03:21
20  because users understand neither their       03:21
21  current state, nor the state they're         03:21
22  agreeing to."                               03:21
23  A.  Yes.                                    03:21
24  Q.  Do you see that?                         03:21
25  A.  Yes.                                    03:21
                                          Page 322

1  Q.  Would you agree with that, that companies that  03:21
2  are collecting data need to make their disclosures as  03:21
3  simple and easy to read as possible?         03:21
4  A.  Of course.  But I don't think Google does  03:21
5  that.                                       03:22
6  Q.  Okay.                                    03:22
7  A.  I think the language appears simple, but  03:22
8  it's -- it is -- it deludes people because it uses --  03:22
9  it uses what appears to be simple language to actually  03:22
10  contradict what is actually going on.        03:22
11  Q.  And do you believe that using a statutory  03:22
12  definition of a term like "personal information" would  03:22
13  help users understand Google's disclosures?  03:22
14  A.  We're not --                            03:22
15      MR. STRAITE:  Sorry.  Objection.  Beyond the  03:22
16  scope of his report.  Calls for speculation.  03:22
17      THE WITNESS:  Yeah.  Again, you keep talking  03:22
18  about what users bring to the table.         03:22
19      Yeah.  I think that if Google would lay out  03:22
20  very clearly what it was doing in a way that would make  03:22
21  clear the distinction between sync and non-sync and the  03:22
22  use of data and its exploitation of data, I think that  03:22
23  would be a helpful public service.           03:23
24      The problem is that it doesn't do that.    03:23
25 BY MR. BROOME:
                                          Page 323

1  Q.  Except where it -- sorry.  Go ahead, finish.  03:23
2  A.  And it uses language to deter people from  03:23
3  seeing it.                                  03:23
4  Q.  Mm-hm.  Well, we walked through several bullet  03:23
5  lists where Google identifies Chrome history and  03:23
6  browsing history as different from activity data that  03:23
7  Google receives from sites and apps that use its  03:23
8  services; right?                            03:23
9       That in your mind is -- or your opinion is not  03:23
10  sufficiently distinguishing those two categories of  03:23
11  information?                                03:23
12      MR. STRAITE:  Objection as to form.  Compound.  03:23
13      Which list are you talking about, Steve?  03:23
14 BY MR. BROOME:
15  Q.  You recall what I'm talking about; right,  03:23
16  Professor?                                  03:23
17  A.  No.  I'm more referring to the general  03:23
18  statements that Google makes throughout the privacy  03:23
19  policies and in the -- in the sign-up or sync pages  03:23
20  where there are statements that pretty clearly say  03:24
21  and -- you know, in a very straightforward way that  03:24
22  "If you sync, we will take your information," with a  03:24
23  very strong sense that "if you don't sync, we won't."  03:24
24      And that is what stands out to a person when  03:24
25  she or he is reading a document that otherwise is pretty  03:24
                                          Page 324

1  impervious to understand.                    03:24
2  Q.  That testimony you just provided, that's not  03:24
3  based on any research that you've done for this case;  03:24
4  right?                                      03:24
5       MR. STRAITE:  Objection.  Misstates prior  03:24
6  testimony.                                  03:24
7       THE WITNESS:  Yes.  It relates to a lot of  03:24
8  research I've done, which is to read these documents  03:24
9  carefully within the context of my understanding of the  03:24
10  technology, and given the history -- I've been studying  03:24
11  this stuff for 30 years.  I've taught thousands of  03:24
12  students.  I've -- because I go to Perdue, and I taught  03:24
13  these large lecture classes.  And I've given -- I've  03:25
14  written nine books, five of them directly related to the  03:25
15  advertising technology business and three edited books  03:25
16  in that arena.                              03:25
17      I think I have a sensitivity toward the way  03:25
18  companies use rhetoric in their public statements.  03:25
19      And so that is part of what I'm talking about  03:25
20  here.  The plain rhetoric of a company that is trying to  03:25
21  navigate a way to get people to not be nervous about  03:25
22  something that they ought to be nervous about.  03:25
23 BY MR. BROOME:
24  Q.  Why ought they be nervous about it?        03:25
25  A.  Because they're taking data in the context of  03:25
                                          Page 325

                                          82 (Pages 322 - 325)

CONFIDENTIAL

1 people not wanting them to.                          03:25
2        You know, most people don't want their data    03:25
3 being used.  I know the idea that advertising is what  03:25
4 fuels the web and all of that.  But there is a sense of  03:25
5 people that these companies -- and I believe Cyphers    03:25
6 says this anyway -- people feel that this is not       03:26
7 correct.                                              03:26
8        And the consequence of that -- I mean, I could  03:26
9 go into a whole lot of detail about the problems with   03:26
10 target marketing and personalization.  You can read my  03:26
11 most recent book about voice personalization and all    03:26
12 that kind of stuff.                                    03:26
13       But the basic idea here is that there are --    03:26
14 there is a language or rhetoric that calms people in    03:26
15 ways that is not -- in ways that are not genuinely      03:26
16 reflective of what is going on.                        03:26
17    Q.   Okay.  Going back to your report.             03:26
18       MR. STRAITE:  Exhibit 2.                        03:26
19       Yeah, Steve?  Just to confirm?                  03:27
20       MR. BROOME:  You want me to confirm that his    03:27
21 report is Exhibit 2?                                  03:27
22       MR. STRAITE:  Yes.                              03:27
23       MR. BROOME:  Yes.                               03:27
24       MR. STRAITE:  More to the point, Steve, I       03:27
25 didn't need the sarcasm, I just wanted to make sure that 03:27

Page 326

1 we were supposed to have Exhibit 2 in front of us and   03:27
2 not go back to it while having Exhibit 7 also showing.  03:27
3       That was my question.                           03:27
4       THE WITNESS:  I guess I have it in front of      03:27
5 me.                                                   03:27
6 BY MR. BROOME:                                        03:27
7    Q.   All right.  Let's go to opinion 4, Professor.  03:27
8    A.   Yes.  Just a moment.                          03:27
9    Q.   "Reasonable consumers wrongly believe         03:27
10 that the label 'privacy policy' means                 03:27
11 their privacy is protected and are unable            03:27
12 to comprehend the legalese in privacy               03:27
13 policies."                                           03:27
14    A.   That's what I was referring to earlier.       03:27
15 Exactly.                                              03:27
16    Q.   Okay.  And that was based on surveys you      03:27
17 conducted; correct?                                   03:27
18    A.   Not just I, but others as well.  And the --   03:27
19 the piece I talk about by Aleecia McDonald and        03:27
20 Lorrie Cranor reinforces the idea that most people, even 03:27
21 if they look at privacy policies, have no -- the chances 03:27
22 that they actually read them in full, even if they could 03:28
23 understand them, are very low.  So --                 03:28
24    Q.   Go ahead.  Sorry.                             03:28
25    A.   Yeah.  So, you know, we've been talking a lot 03:28

Page 327

1 what about privacy policies.  There are going to be    03:28
2 people who skim through them, and I would argue that   03:28
3 when they get to those sentences, if they care about   03:28
4 questions of data retrieval and all, they would make   03:28
5 mistaken inferences based upon the plain language of   03:28
6 those sentences.                                      03:28
7    Q.   When you set out to determine what reasonable 03:28
8 consumers believe when they see the words "privacy     03:28
9 policy," you decided that you needed to conduct a      03:28
10 survey; correct?                                      03:28
11    A.   Because you understand people were talking in 03:28
12 the industry how privacy policies, you know, are where 03:28
13 people ought to go in order to understand certain aspect 03:28
14 of what websites do, and then people were talking about 03:28
15 how difficult privacy policies are to understand.      03:29
16       We put a sentence in 2003, I believe it was -- 03:29
17 maybe it was an earlier version as well that was more  03:29
18 qualitative -- which essentially challenged the whole  03:29
19 idea that people understand what that label means.  And 03:29
20 we found, I would say to our surprise, that a huge     03:29
21 percentage of Americans doesn't even understand the    03:29
22 label.                                                03:29
23       And so I suggested to the Federal Trade        03:29
24 Commission that they should change the term "privacy   03:29
25 policy" to how we use your information because of that. 03:29

Page 328

1        You know, there are very few companies that do 03:29
2 this.  Google doesn't call it a privacy policy -- I    03:29
3 mean, Facebook doesn't call it a privacy policy.       03:29
4       But that's how that all started.               03:29
5       And, yes, the reason for the survey was the     03:29
6 tension within the industry and then the public domain 03:29
7 around the idea of a privacy policy.                   03:29
8    Q.   This research you're referring to, is this     03:30
9 your Americans and Online Privacy?  Is that the one    03:30
10 you're referring to?                                  03:30
11    A.   There's a bunch of them.  What's the subtitle 03:30
12 of that?                                              03:30
13    Q.   "Americans and Online Privacy.  The System is 03:30
14 Broken."                                              03:30
15    A.   Was that 2005?                               03:30
16    Q.   2003.                                         03:30
17    A.   That may have been the first one that did    03:30
18 that.                                                03:30
19       But also the other one, if you want to read    03:30
20 it, is from the Journal of Broadcasting from a couple of 03:30
21 years ago where we brought all those data together.  It 03:30
22 was called "Persistent Misperception."                03:30
23       And it's about the various five studies that   03:30
24 we did, plus the Pew study.  And we try to show how over 03:30
25 time it hasn't -- huge portions of the American public 03:30

Page 329

83 (Pages 326 - 329)

1 still get it wrong. It boggles the mind but it's true.   03:30
2 People don't understand what the term "privacy policy"   03:30
3 means.                                      03:30
4    Q.  When was the last tame you did a survey on   03:30
5 this issue?                                  03:31
6       MR. STRAITE:  Objection.  Vague.       03:31
7       THE WITNESS:  I think it was 2018.      03:31
8 BY MR. BROOME:                             03:31
9    Q.  2018?                              03:31
10   A.  Yeah.  I don't know if we did it in 2019.  I   03:31
11 simply don't remember -- it may have been 2019.   03:31
12 Something.  Into 2018 or 2019.               03:31
13      We did one in which we didn't report the data.   03:31
14 We did a -- 2019 was a study about low income Americans   03:31
15 and the perception of tracking and surveillance.  And I   03:31
16 believe we put the statement in there, but it didn't fit   03:31
17 the report that we wrote, so we didn't report it there.   03:31
18 I've reported it elsewhere.                  03:31
19      So I believe it was 2019, to be honest.   03:31
20      And, again, it wasn't -- the data weren't   03:31
21 affected.  People just get it wrong.          03:31
22   Q.  Would you agree that consumers' understanding   03:31
23 of what's happening on the -- as they browse the web has   03:31
24 changed significantly between 2003 and today?   03:32
25      MR. STRAITE:  Objection.               03:32
                                         Page 330

1       THE WITNESS:  You know, I was reading that   03:32
2 stuff last night.  And we're going to be doing another   03:32
3 survey not too long from now.  We did a 2003 survey and   03:32
4 we followed it up in 2005 -- I believe 2005 survey, and   03:32
5 followed up in 2015 with some of the same questions.   03:32
6 It's unbelievable about the persistence, how similar   03:32
7 things are.                                  03:32
8       People, as I said earlier, have a life, you   03:32
9 know.  They don't -- you and I and David, our business   03:32
10 is trying to understand what's happening in the internet   03:32
11 space.  Most people just use it.             03:32
12     I -- if I may say, and this is off the topic,   03:32
13 but I ask students of mine -- I teach a couple   03:32
14 hundred -- a hundred or so students a year, and I'll ask   03:32
15 them, "Has any of you have had a high school course in   03:32
16 anything related to the internet?"  The answer is "no."   03:32
17 People simply don't know this stuff.          03:32
18     And I don't know why we should assume they do.   03:33
19 Their eyes would glaze over in many of the parts that   03:33
20 you have read to me.                         03:33
21     But what stands out are those sentences that   03:33
22 clearly seem to imply that if you sync, this will   03:33
23 happen.  If you don't sync, this is going to happen.   03:33
24 That's pretty straightforward.  You don't have to know   03:33
25 what an IP address is.                       03:33
                                         Page 331

1 BY MR. BROOME:                             03:33
2    Q.  Okay.  I think you referenced a report you did   03:33
3 recently.                                   03:33
4       Is it -- were you referring to the persistent   03:33
5 misperceptions Americans misplaced confidence and   03:33
6 privacy policies 2003 to 2015?               03:33
7    A.  Yes, sir.  And I said, we followed it up in   03:33
8 2000- I think it was -19, but that was written before   03:33
9 that we did that.                            03:33
10   Q.  And when you followed it up in 2019, did you   03:33
11 do a new survey?                            03:33
12   A.  Yes.  Oh, yeah.  It was part of that larger   03:33
13 survey about low income Americans and surveillance.  So   03:33
14 it -- we just put it into the survey because I was   03:33
15 interested to see if the -- every time we do the survey,   03:34
16 I say to myself it can't still be true, and people still   03:34
17 get it wrong.                                03:34
18     So, yeah, "Persistent Misperceptions" is a   03:34
19 really good article that covers homes and it hasn't   03:34
20 changed.                                    03:34
21   Q.  In paragraph 28 of your report -- you have   03:34
22 that in front of you?                        03:34
23   A.  Yeah.                               03:34
24   Q.  It says "Privacy policies are legal documents,   03:34
25 complex and typically long."                 03:34
                                         Page 332

1       MR. STRAITE:  He's getting --            03:34
2 BY MR. BROOME:                             03:34
3    Q.  Do you have that?                     03:34
4    A.  Yes, I got it.                        03:34
5       MR. STRAITE:  He has it.                03:34
6       THE WITNESS:  20 -- what did you say, 28?   03:35
7       MR. BROOME:  Paragraph 28.  Yeah.         03:35
8       THE WITNESS:  Okay.  Yes.  They are complex   03:35
9 legal...                                    03:35
10 BY MR. BROOME:                            03:35
11   Q.  All right.  And you understand that companies   03:35
12 are required to publish privacy policies; right?   03:35
13      MR. STRAITE:  Objection.  Assumes facts not in   03:35
14 evidence.  Calls for a legal conclusion.      03:35
15      THE WITNESS:  I know the history of privacy   03:35
16 policies and how they were substantiated.  So I think   03:35
17 every company realizes that in the real world, they have   03:35
18 to have a privacy policy.                    03:35
19 BY MR. BROOME:                            03:35
20   Q.  Yeah.  I mean, there's a legal obligation   03:35
21 that -- at least in some jurisdictions; right?   03:35
22   A.  Yeah.                               03:35
23      MR. STRAITE:  Same objection.            03:35
24 BY MR. BROOME:                            03:35
25   Q.  And in some jurisdictions that certain content   03:35
                                         Page 333

84 (Pages 330 - 333)

1  has to be disclosed; correct?                03:35
2       MR. STRAITE: Same objections.            03:35
3       THE WITNESS: Yeah. I believe that that's the  03:35
4  case. And, in fact, these are legally binding.   03:35
5       I taught a class on privacy policies a few   03:35
6  years back and had some attorneys who write them come in 03:35
7  and talk about the stuff.                    03:35
8       Sure. It's a complicated requirement, yes.  03:35
9  BY MR. BROOME:                               03:35
10      Q. Right. It's complicated. Right. I like that  03:35
11 word.                                        03:35
12      And companies, they have to disclose certain   03:35
13 information about complex technological processes;  03:36
14 right?                                       03:36
15      MR. STRAITE: Objection. Calls for          03:36
16 speculation. Calls for a legal conclusion.   03:36
17      THE WITNESS: Yes. But there are ways to do   03:36
18 it that are not dissembling. And my concern, and the  03:36
19 large part of what I'm telling you here, is that there's  03:36
20 too much dissembling in this document.       03:36
21      Use --                                  03:36
22      MR. BROOME: Sorry. Go ahead.             03:36
23      THE WITNESS: Use of words that try to get   03:36
24 people -- try -- that function to get people to believe  03:36
25 one thing when another thing is going on.    03:36
Page 334

1       I've been saying that all day. But those    03:36
2  sentences I read to you, they are designed -- they  03:36
3  function the design -- I don't know if anybody sits in a  03:36
4  room and says we have to do this. But there are --  03:36
5  there are sentences strewn throughout the documents that  03:36
6  are -- that conflate privacy with security; that --  03:36
7  In fact, Satya Nadella, Op-ed did that.       03:37
8  Remember there was this confidential document that --  03:37
9  that in one of my things was redacted and another thing  03:37
10 I read wasn't. And he said if people don't want to --  03:37
11 if people want to have their privacy, they shouldn't go  03:37
12 on Chrome. This is the head of Google.       03:37
13      Q. Okay. I think -- let me just see here.   03:37
14      So is it your opinion that the mere existence  03:37
15 of Google's privacy policy would indicate to most  03:37
16 reasonable people that Google does not collect their  03:37
17 data?                                        03:37
18      MR. STRAITE: Objection. Misstates testimony. 03:37
19      THE WITNESS: I think our -- I don't know    03:37
20 about Google in particular, but we have found in general 03:38
21 that people see the words "privacy policy," a large  03:38
22 percentage is Americans, and believe that it means that  03:38
23 the company will protect their information.   03:38
24 BY MR. BROOME:                               03:38
25      Q. And what do you mean by "protect their   03:38
Page 335

1  information"?                               03:38
2       A. Well, not share their information with other  03:38
3  companies without their permission. That's the way it's  03:38
4  phrased.                                    03:38
5       Q. Okay. Well, is your -- this case is not about  03:38
6  Google sharing information, right, to your knowledge?  03:38
7       A. It's not about Google sharing information, but  03:38
8  that stuff is written in the privacy policy, which is  03:38
9  kind of hilarious if you look at the -- they'll say  03:38
10 "We do not share your information," and then under the  03:38
11 CCPA version, they say "We do share your information   03:38
12 but..."                                      03:38
13      So, again, I understand that's part of the   03:38
14 whole game that's being played. It's unfortunate.  03:38
15      So hoping that only people who go to the     03:38
16 California part will read that stuff.         03:38
17      The -- but, yes, I think that there are some   03:38
18 people who will look at the words "privacy policy" and  03:38
19 simply believe that Google protects their privacy.  03:39
20      Q. Right.                               03:39
21      But when you say "protects their privacy" --  03:39
22      A. Does not share it with other companies without  03:39
23 their permission.                            03:39
24      Q. Okay. And is that -- is that what you -- when  03:39
25 you talked about your prior research from 2003 to 2015,  03:39
Page 336

1  and the sort of inferences people draw from the near  03:39
2  existence of the words "privacy policy" on their  03:39
3  website, is that what you mean; that they won't share  03:39
4  their data with other people, or do you mean that the  03:39
5  company will not collect their data in the first place?  03:39
6       A. No. Won't share their data with other     03:39
7  companies --                                03:39
8       Q. Ah, okay.                            03:39
9       A. So -- but it would be enough to make people  03:39
10 feel comfortable not to read the privacy policy is the  03:39
11 point. That's the point that I was making.   03:39
12      Q. Can you just -- I just ask you to be really  03:39
13 clear about the inference that you believe reasonable  03:39
14 people draw from the words "privacy policy" when they  03:39
15 see it on a website?                         03:40
16      I know before you said that will protect    03:40
17 their -- is it that they believe the company won't  03:40
18 collect their data in the first place or that they won't  03:40
19 share the data or both?                      03:40
20      A. The way we phrased it -- and this is, you  03:40
21 know, in the surveys. And I -- you know, but the --  03:40
22 it's true or false -- and it's changed a little bit.  03:40
23 But true or false, when a website has a privacy policy,  03:40
24 it means the site won't share your -- let me see --  03:40
25 won't share your data with other companies without your  03:40
Page 337

85 (Pages 334 - 337)

Page 338

1 permission. I believe that's the formulation.    03:40
2        I have it here. It's in the -- it's in the    03:40
3 thing.    03:40
4    Q.  Yeah. I think the formulation may be "When a    03:40
5 website has a privacy policy, it means the site will not    03:40
6 share my information with other websites or companies."    03:40
7        Does that sound familiar?    03:40
8    A.  Yeah. In some cases we added "without your    03:40
9 permission."    03:40
10    Q.  Right. Right. Okay.    03:40
11        Okay. So in your opinion 4, you say    03:41
12 "Reasonable" --    03:41
13    A.  But the point that I -- I'm sorry. The point    03:41
14 that I brought this up is not to focus on the idea of    03:41
15 sharing versus collecting, but to say that there are    03:41
16 some cases where people won't even go into the privacy    03:41
17 policy. And what they end up doing is they end up using    03:41
18 the plain language in the sync sequence to rely on    03:41
19 whether they should sync or not sync.    03:41
20    Q.  Let's go back to your opinion 4 and let's get    03:41
21 really precise here about the language. Because you    03:41
22 phrased opinion 4 as follows:    03:41
23        "Reasonable consumers wrongly believe    03:41
24 that the label 'privacy policy' means    03:41
25 their privacy is protected and are unable    03:41

Page 339

1 to comprehend the legalese in privacy    03:41
2 policies."    03:41
3    MR. STRAITE: I'm sorry. Which paragraph?    03:41
4    THE WITNESS: No. I got it. It's right --    03:41
5    MR. BROOME: Opinion 4. Sorry.    03:41
6    THE WITNESS: Privacy is protected in the    03:41
7 sense of not sharing it with other companies without    03:41
8 permission or not sharing it with other companies.    03:42
9 That's the privacy being protected.    03:42
10 BY MR. BROOME:
11    Q.  Okay. Got it.    03:42
12        So opinion 4 does not relate to the mere    03:42
13 collection of data?    03:42
14    A.  It -- not in the sense that I was talking    03:42
15 about.    03:42
16    Q.  Okay.    03:42
17    A.  I wouldn't call it the mere collection of    03:42
18 data, by the way. But okay.    03:42
19    Q.  Well, you tell me, does opinion 4 relate to    03:42
20 the collection of data? Is that what --    03:42
21    A.  No, the formulation -- I was just focusing on    03:42
22 the idea. The idea is data are used -- Google uses data    03:42
23 for purposes.    03:42
24        The sharing of data in the -- in what we're    03:42
25 talking about, the meaning of sharing, is to use the    03:42

Page 340

1 data so that companies can target people in ways that    03:42
2 are beneficial to those firms, whether we talk about --    03:42
3 Google is never going to give the companies the data,    03:42
4 but they will organize the data so the companies can    03:42
5 choose various profiles or various demographics or    03:43
6 various locations. And that is the same thing as    03:43
7 sharing the data.    03:43
8        And so that's what I'm talking about.    03:43
9        Simply keeping data for no reason at all is    03:43
10 not the point.    03:43
11    Q.  But you survey didn't ask that question;    03:43
12 right? Your surveys asked when a website has a privacy    03:43
13 policy, it means the site will not share my information    03:43
14 with other websites or companies; right?    03:43
15    MR. STRAITE: Objection. Vague. Objection.    03:43
16 Relevance.    03:43
17    THE WITNESS: I just described what that    03:43
18 means. That means that Google will not use the data in    03:43
19 the service of other companies.    03:43
20        Sharing in today's lingo means what we -- what    03:43
21 I just told you. Sharing means allowing the company to    03:43
22 choose a particular profile, choose to match sometimes,    03:43
23 in today's world anyway, cookies so that Google will    03:43
24 target those particular people; to use a whole lot of    03:43
25 techniques that essentially allow Google to serve the    03:43

Page 341

1 companies' interests through the use of the data that    03:44
2 Google has collected.    03:44
3        So sharing doesn't mean literally giving it    03:44
4 over. Sharing means using the data to -- to implement    03:44
5 the needs of the advertisers.    03:44
6 BY MR. BROOME:
7    Q.  So sharing means using the data for commercial    03:44
8 purposes.    03:44
9        Is that your --    03:44
10    A.  The services of advertisers in a    03:44
11 personalization basis.    03:44
12    Q.  Even if nobody actually gets the data, nobody    03:44
13 else gets the data. Google collects data, never gives    03:44
14 it to anybody else, but uses it for commercial purposes,    03:44
15 that's sharing in --    03:44
16    A.  Yeah. As I understand it --    03:44
17    MR. STRAITE: Let me get my objection in.    03:44
18        Objection to all these questions as to    03:44
19 relevance. We're way far afield --    03:44
20    THE WITNESS: Yeah, we are.    03:44
21    MR. STRAITE: This is beyond his report.    03:44
22    THE WITNESS: This is beyond the stuff that    03:44
23 we're talking about. And I actually think that if    03:44
24 you -- I know that you've read the CCPA and everything    03:44
25 connected to it, that's -- and Google even says that    03:44

86 (Pages 338 - 341)

1  under California law.                          03:44
2        So, yeah, in today's world, sharing means what  03:44
3  I just said.                                    03:45
4  BY MR. BROOME:                                  03:45
5    Q.  In today's world, you mean 2021?          03:45
6    A.  No.  It's always meant sharing.  It's just 03:45
7  that in the past, companies would fool around with 03:45
8  language.  Essentially sharing has to do with using your 03:45
9  data in the service of companies that they are  03:45
10  servicing.                                      03:45
11    Q.  When you conducted your surveys between 2003 03:45
12  and 2015, did you explain to the survey participants 03:45
13  that when you asked your questions about what -- when a 03:45
14  website has a privacy policy, it means the site will not 03:45
15  share my information with other websites or companies, 03:45
16  did you explain to them that sharing means using the 03:45
17  data internally?                                03:45
18        MR. STRAITE:  Objection.  Misstates earlier 03:45
19  testimony.  Objection.  Relevance.              03:45
20        THE WITNESS:  Yeah.  No.  I -- we presented it 03:45
21  that way.  But the point is that, in fact, those 03:45
22  companies do get to share the data in the sense that 03:45
23  they know what -- sometimes they literally share the 03:45
24  data in the sense that a company will give over data 03:45
25  from their, you know, packets of cookies, for example, 03:46

Page 342

1  over to Google to be matched, and then used by Google to 03:46
2  find maybe even lookalikes, and then track people like 03:46
3  that.                                           03:46
4        So sharing is a perfectly appropriate word. 03:46
5  It's amazing how when research by academics is -- I once 03:46
6  used the word "tailored" in an important study we did in 03:46
7  2015 -- 2012, and a little later, they're like, "How 03:46
8  could you use the word 'tailored'?  That's terrible. 03:46
9  That's biased."                                 03:46
10        Everybody uses the word "tailored" now.  03:46
11        So, yes, sharing is exactly the right word to 03:46
12  use.                                            03:46
13    Q.  Okay.  You use -- you said sometimes people 03:46
14  are literally sharing information.              03:46
15    A.  Well, in the sense that the advertiser is 03:46
16  sharing it with Google.  Google is not sharing it with 03:46
17  the advertiser.                                 03:46
18        And I wasn't focusing on Google.  There are 03:46
19  websites that literally give over -- you know, will in 03:46
20  fact share information.                         03:46
21    Q.  That's not what -- sorry.                 03:46
22    A.  Second party data, for example, things like 03:46
23  that.                                           03:47
24    Q.  And when you ask people a question, when a 03:47
25  website has a privacy policy, it means the site will not 03:47

Page 343

1  share my information with other websites or companies, 03:47
2  they would think you're asking whether they think the 03:47
3  existence of a privacy policy means that they will not 03:47
4  literally share the data with other companies; right? 03:47
5        MR. STRAITE:  Objection --                 03:47
6        THE WITNESS:  No.                          03:47
7        MR. STRAITE:  -- calls for speculation.    03:47
8        THE WITNESS:  First of all --              03:47
9        MR. STRAITE:  Wait.  Let me get my objections 03:47
10  in.                                             03:47
11        Objection.  Way beyond the scope of this   03:47
12  expert report.                                  03:47
13        THE WITNESS:  Yeah.  We're going through some 03:47
14  kind of crazy -- I don't understand how this relates to 03:47
15  the document that I've written.  It's essentially a 03:47
16  footnote in a larger scheme to try to explain why people 03:47
17  don't necessarily read privacy policies.  They don't. 03:47
18  And --                                          03:47
19  BY MR. BROOME:                                  03:47
20    Q.  I'm happy to explain to you how it's relevant 03:47
21  and how it's directly relevant to the scope of your 03:47
22  report.                                         03:47
23        Opinion 4 says:                           03:47
24        "Reasonable consumers wrongly believe       03:47
25        that the label 'privacy policy' means       03:47

Page 344

1        their privacy is protected and are unable  03:47
2        to comprehend the legalese and privacy     03:47
3        policies."                                 03:48
4        And I think what I heard you say earlier is 03:48
5  that when you use the phrase "privacy is protected" in 03:48
6  your expert report in this case, you mean that their 03:48
7  information will not be shared.                  03:48
8        And now you're telling me that -- that shared 03:48
9  means -- also means used for internal purposes. 03:48
10    A.  It could -- no, I didn't say --           03:48
11        MR. STRAITE:  Hold on.  Hold on.  Wait for the 03:48
12  question.                                       03:48
13  BY MR. BROOME:                                  03:48
14    Q.  Is that your testimony?                   03:48
15    A.  No.  I think --                           03:48
16        MR. STRAITE:  Let me get my objections in.  03:48
17        Objection.  Beyond the scope.  Objection.  03:48
18  Vague.  Objection.  Relevance.                  03:48
19        THE WITNESS:  It's not used for internal   03:48
20  purposes.  You're misunderstanding -- if you think the 03:48
21  data are used for internal purposes, you're     03:48
22  misunderstanding the whole point of what Google is 03:48
23  doing.                                          03:48
24        Google is serving ads based on the desire of a 03:48
25  particular advertiser.  Has nothing to do directly with 03:48

Page 345

87 (Pages 342 - 345)

1 internal purposes. This is to serve clients.        03:48
2        And if we take away the question of -- the        03:48
3 question we asked about Google, there are plenty of        03:48
4 sites that still actually share specific information. I 03:49
5 could name them.        03:49
6        Okay?        03:49
7        And so the question we asked did not -- was        03:49
8 not specifically about Google. It was about the general 03:49
9 universe of websites and the general idea of how privacy 03:49
10 works.        03:49
11        And, in fact, according to CCPA, what I said 03:49
12 is exactly correct even for companies like Google and 03:49
13 Facebook.        03:49
14 BY MR. BROOME:        03:49
15    Q. I agree it's not -- opinion 4 is not limited 03:49
16 to Google; right? Are we all on the same page?        03:49
17    A. Yeah, it's not limited to Google but it may 03:49
18 encompass Google.        03:49
19    Q. Okay.        03:49
20        MR. BROOME: Let's take a short break and        03:49
21 we'll be pretty close to being done.        03:49
22        You know what, actually, let me go on to a 03:50
23 couple other things and then we'll take a short break. 03:50
24        MR. STRAITE: Can I ask, David, what's the 03:50
25 time?        03:50

Page 346

1        THE VIDEOGRAPHER: I'm sorry. You asked for a 03:50
2 time count?        03:50
3        MR. STRAITE: Yes.        03:50
4        THE VIDEOGRAPHER: I have about six hours and 03:50
5 36 minutes on the record.        03:50
6        MR. STRAITE: Thank you.        03:50
7        MR. BROOME: Okay. We're going to mark as 03:50
8 Exhibit 8...        03:50
9        THE WITNESS: Exhibit 8.        03:50
10        MR. STRAITE: Professor, how are you doing? 03:50
11        THE WITNESS: I'm well. Why do you ask?        03:50
12        MR. STRAITE: I think it's awesome the oldest 03:50
13 guy in the room has the most energy.        03:51
14        THE WITNESS: How do you know I'm the oldest 03:51
15 guy in the room?        03:51
16        MR. STRAITE: Exhibit 8 is up. Give me one 03:51
17 second.        03:51
18        Okay. This says "EFF" on the --        03:51
19        THE WITNESS: Good old Bennett Cyphers. We 03:51
20 finally get to this, huh?        03:51
21        MR. STRAITE: As you can see, the document is 03:51
22 in front of the witness.        03:51
23        THE WITNESS: Yes.        03:51
24        MR. STRAITE: Wait for the question.        03:51
25        THE WITNESS: Yes.        03:51

Page 347

1        (Defendants' Exhibit 8 was        03:51
2        marked for identification.)        03:51
3 BY MR. BROOME:        03:51
4    Q. All right. Paragraph 30 of your report -- 03:51
5    A. Yes, sir.        03:51
6    Q. Well, let me do it this way: You have what 03:51
7 we've marked as Exhibit 8 in front of you.        03:51
8        Is this the Cyphers article that you referred 03:51
9 to in paragraph 30 of your report?        03:51
10    A. Yes, it is.        03:51
11    Q. Have you ever spoken to Cyphers? I think I 03:51
12 asked you earlier but just refresh my recollection.        03:51
13    A. You know, we e-mailed back and forth a few 03:52
14 months before I read this article. I haven't spoken to 03:52
15 him about this piece at all. We may have even spoken on 03:52
16 the phone but that was about a totally different -- it 03:52
17 certainly wasn't about my using his article for my        03:52
18 report.        03:52
19    Q. Have you spoken to him about this article that 03:52
20 he wrote?        03:52
21    A. No.        03:52
22    Q. Have you spoken to him about anything that is 03:52
23 even tangentially even related to your report?        03:52
24    A. When I spoke to him, I didn't even know I'd be 03:52
25 writing this report.        03:52

Page 348

1    Q. Okay.        03:52
2    A. It was way before. And we were talking about 03:52
3 the FLoC and some -- and writing an op-ed piece about, 03:52
4 you know, new ways to track people in the context of 03:52
5 the -- getting rid of third-party cookie. Never came to 03:52
6 anything because he wasn't sure that his foundation 03:52
7 would warrant him writing with other people or        03:52
8 something.        03:52
9        But at any rate, this has nothing to do with 03:52
10 my report, my interactions.        03:52
11        MR. STRAITE: And now that you're at a break 03:53
12 here, Steve, I'd like to designate all testimony        03:53
13 regarding communications of EFF confidential, just to 03:53
14 protect their privacy. They're not a party here.        03:53
15        MR. BROOME: All -- I'm sorry. You want to 03:53
16 designate what as confidential?        03:53
17        MR. STRAITE: The witness's testimony        03:53
18 regarding his e-mails with EFF, Mr. Cyphers. I'd like 03:53
19 to designate those confidential. Communications with 03:53
20 someone who's not a party to this litigation, I'm        03:53
21 designating them confidential.        03:53
22 BY MR. BROOME:        03:53
23    Q. All right. You write in your report that 03:53
24 "Cyphers understands incorrectly that not turning on 03:53
25 Chrome Sync will not let Google collect people's        03:53

Page 349

88 (Pages 346 - 349)

CONFIDENTIAL

1 browsing"; right?                                03:53
2    A.  Yes.                                      03:53
3    Q.  And he -- Cyphers references Chrome Sync   03:53
4 exactly once in this article that you're citing?  03:54
5    A.  Exactly.  Right.                          03:54
6    Q.  And the paragraph says, quote:            03:54
7       "During the trial, any user who has        03:54
8 turned on 'Chrome Sync'" open paren              03:54
9 "(letting Google collect their browsing          03:54
10 history)" close paren, "and who has not          03:54
11 disabled any of several default sharing          03:54
12 settings, will now share their cohort ID         03:54
13 attached to their browsing history with          03:54
14 Google"; right?                                  03:54
15    A.  Yes.                                      03:54
16    Q.  That's the full extent of his discussion about 03:54
17 Chrome Sync?                                     03:54
18    A.  It's not a discussion.  It's a reference.  03:54
19    Q.  Full extent of his reference to Chrome Sync;  03:54
20 right?                                           03:54
21    A.  Yes.                                      03:54
22    Q.  And you're -- you've -- okay.  And you've  03:54
23 never had any discussions with him about what he meant 03:54
24 and -- about -- in that reference to Chrome Sync; right? 03:54
25    A.  No.  Well, that's the point, because it pretty 03:54

Page 350

1 well parallels everything I've been saying but by   03:54
2 someone in the wild, who didn't know I was writing the 03:54
3 report, and didn't have any idea of what the point was, 03:55
4 he made the mistake that I argue a reasonable reader 03:55
5 would make.  And he's an expert.                 03:55
6    Q.  Uh-huh.                                   03:55
7       MR. BROOME:  All right.  Let's take a short  03:55
8 break.  I'm going to come back and I'll have a few --  03:55
9 probably a few more questions for you and then we'll  03:55
10 wrap it up.                                      03:55
11       MR. STRAITE:  Do you want five minutes or  03:55
12 10 minutes or another --                         03:55
13       MR. BROOME:  No.  Let's -- yeah, 10 minutes.  03:55
14       MR. STRAITE:  Yeah, that's good.  Hold on.  03:55
15 We're going to mute before we go.                03:55
16       THE VIDEOGRAPHER:  Okay.  We're off the record 03:55
17 at 6:55 p.m.                                     03:55
18       (Break taken in proceedings.)              03:55
19       THE VIDEOGRAPHER:  Okay.  We are on the record 04:07
20 at 7:07.                                         04:07
21       Go ahead.                                 04:07
22       MR. STRAITE:  Steve, I don't know if you    04:07
23 wanted to start.                                 04:07
24       MR. BROOME:  Thank you.                    04:07
25       Professor Turow, I'm going to reserve the   04:07

Page 351

1 balance of my time to ask any follow-up questions after 04:07
2 your counsel examines you, but at the moment I don't  04:07
3 have any additional questions for you.           04:07
4       THE WITNESS:  Okay.                        04:07
5       EXAMINATION BY MR. STRAITE                 04:07
6 BY MR. STRAITE:                                   04:07
7    Q.  Okay.  Thank you, Professor Turow.  I know  04:07
8 this is a little awkward.  We're sitting at the same  04:07
9 table and we're both facing forward shoulder to  04:07
10 shoulder.  But you need to face the camera so you're  04:07
11 going to see my face in the camera rather than looking  04:07
12 over to me.                                       04:07
13    A.  I understand.                            04:07
14    Q.  We'll continue to do that.               04:07
15       Early in the day, do you recall being asked  04:07
16 what methodology you applied to your opinions regarding 04:07
17 whether -- how a reasonable person would read these  04:08
18 documents?                                        04:08
19    A.  Yes.                                      04:08
20    Q.  Do you recall listing some background that  04:08
21 maybe wasn't in your CV, such as your being an English 04:08
22 major?                                            04:08
23    A.  Yes, I do.                               04:08
24    Q.  Did you mean that methodology --          04:08
25    A.  That may be in my CV.                     04:08

Page 352

1    Q.  When you identified those additional points,  04:08
2 such as having been an English major, did you mean to  04:08
3 say that that was methodology to the exclusion of what  04:08
4 you do for a living now or in addition to?       04:08
5    A.  No, no.  Of course not.  The point is that I  04:08
6 have been working on the areas of digital technologies  04:08
7 advertising society for 30 plus years.           04:08
8       I've read, as I say, hundreds of privacy     04:08
9 policies but maybe more than that.  But not in the  04:08
10 service of just reading them, but rather teaching them,  04:08
11 speaking to the Federal Trade Commission, to the  04:08
12 Senate Judiciary Committee, other groups like that, and 04:08
13 learning how people, through our surveys and other  04:09
14 activities, are getting a feel for how people parse  04:09
15 understanding.                                    04:09
16       That's -- so I certainly have brought a lot  04:09
17 of that.                                          04:09
18       Plus my books are about the way industries  04:09
19 operate and as I said, I have -- I have five books  04:09
20 about the way the advertising industry in the digital  04:09
21 space operates and others as well.               04:09
22       So it's all of those things, together with the  04:09
23 sensitivity that I acquired both as an English major and 04:09
24 in graduate school around, as I said folklore research  04:09
25 and other kinds of work that led me to feel comfortable  04:09

Page 353

89 (Pages 350 - 353)

1 analyzing these from the standpoint that I did.    04:09
2    Q.  And you said you've spoken to the FTC.    04:09
3        Was that as an advocate for someone or was    04:09
4 that brought in as an expert?    04:09
5    A.  The last time was about a month and a half    04:10
6 ago.  And they asked me to talk about the implications    04:10
7 of my new book.  That's what it was about.    04:10
8    Q.  Okay.  And -- thank you.    04:10
9        So when you were asked whether reading    04:10
10 hundreds of privacy policies make you an expert, you    04:10
11 read these hundreds of privacy policies as a consumer or    04:10
12 as a part of your 30 years of research?    04:10
13    A.  Yeah.  It's part of my 30 years of research    04:10
14 and it's within the context of that larger set of    04:10
15 understanding.    04:10
16    Q.  And all the surveys that you talked about    04:10
17 today, the teaching of the thousands of students,    04:10
18 reading and studying hundreds of privacy policies, and    04:10
19 the speaking to the FTC on more than one occasion    04:10
20 regarding privacy policies, did you bring all of that    04:10
21 experience to bear in your expert report?    04:10
22    A.  Yes.    04:10
23    Q.  So when you were asked about what methodology    04:10
24 you used, did you bring to bear your expertise when    04:10
25 doing this assignment?    04:10

Page 354

1    A.  Yes --    04:10
2        MR. BROOME:  Objection.  Leading.    04:10
3        THE WITNESS:  Yes.  I -- question.    04:10
4        I did -- the point is that I -- it's the    04:11
5 larger context of my life and my knowledge that I    04:11
6 brought to the table, as well as the sensitivity to do    04:11
7 the language.    04:11
8        MR. STRAITE:  Thank you.    04:11
9 BY MR. STRAITE:    04:11
10    Q.  And, Professor Turow, you were asked earlier    04:11
11 questions about how incognito works as a mode.    04:11
12        Do you remember that question?    04:11
13    A.  Yes, I do.    04:11
14    Q.  Were you asked to study incognito disclosures?    04:11
15    A.  No, I was not.    04:11
16    Q.  Not part of your review, not part of your    04:11
17 expert report.    04:11
18    A.  No.    04:11
19    Q.  No?    04:11
20    A.  No.  No.    04:11
21    Q.  Let's go back to Exhibit 6.    04:11
22        Do you remember this document?    04:12
23    A.  This is the privacy policy?    04:12
24    Q.  Correct.    04:12
25    A.  Yeah.    04:12

Page 355

1    Q.  I'll show you the top.    04:12
2        It says "Google Privacy Policy" at the top.    04:12
3        Do you see that?    04:12
4    A.  Yes.    04:12
5    Q.  Do you remember being asked a question about    04:12
6 the last page?    04:12
7    A.  Yeah.  I was right that the clause, sentence    04:12
8 that's about.    04:12
9    Q.  All right.  So it says "this activity."    04:12
10        We're talking about your activity on other    04:12
11 sites and apps.  I'm reading this paragraph out loud.    04:12
12        "This activity might come from your    04:12
13        use of Google services, like from syncing    04:12
14        your account with Chrome or your visits to    04:12
15        sites and apps that partner with Google."    04:12
16        Do you see that?    04:12
17    A.  Yes.    04:12
18    Q.  And you -- your testimony is that these were    04:12
19 two ways that Google might get information.    04:12
20        Is that correct?    04:12
21    A.  "This activity might come from the    04:12
22        use of Google services, like syncing your    04:12
23        account, Chrome, or your visits to sites    04:12
24        and apps that partner with Google."    04:13
25        They could fit under the same ruling.    04:13

Page 356

1    Q.  So is it your testimony that this sentence    04:13
2 undercuts your opinion or does it support your opinion?    04:13
3    A.  My opinion being that -- that syncing your    04:13
4 account with Chrome and visits to sites and apps and    04:13
5 partners are basically the same thing, so it -- it    04:13
6 conforms with my opinion.    04:13
7    Q.  Thank you.  And --    04:13
8    A.  It's another example of the repetition, the    04:13
9 generalization.    04:13
10        THE COURT REPORTER:  Professor, can you stay    04:13
11 closer to the microphone, please?    04:13
12        THE WITNESS:  Yes, ma'am.    04:13
13 BY MR. STRAITE:    04:13
14    Q.  Professor Turow, you were asked earlier about    04:13
15 the omnibox.    04:13
16        Do you remember?    04:13
17    A.  Yes, I do.    04:13
18    Q.  And how does the omnibox differ from the    04:13
19 search bar?    04:13
20    A.  Well, the omnibox, you type into it and it --    04:13
21 I've always used it similar ways.    04:14
22    Q.  Okay.  Were you asked to opine about the    04:14
23 omnibox or search bar in your report?    04:14
24    A.  No.    04:14
25        MR. STRAITE:  I have no further questions at    04:14

Page 357

90 (Pages 354 - 357)

1  this time.                              04:14
2        THE WITNESS:  Are you going to fight about my  04:14
3  background in folklore?                  04:14
4        MR. BROOME:  Well, let's -- you got the  04:14
5  Google Privacy Policy that Mr. Straite just asked you  04:14
6  about --                                 04:14
7        THE WITNESS:  Yes, sir.            04:14
8        MR. BROOME:  -- in front of you still?  04:14
9        THE WITNESS:  Yes.                 04:14
10       FURTHER EXAMINATION BY MR. BROOME   04:14
11 BY MR. BROOME:                            04:14
12   Q.  When I asked you about that phrase, I asked  04:14
13 you do you agree that reasonable people reading that  04:15
14 sentence would understand that those are two different  04:15
15 sources from which Google might receive activity  04:15
16 information?                              04:15
17       And then you responded, "These are very  04:15
18 different statements."                    04:15
19       Is that --                         04:15
20   A.  Is that what I said specifically?  04:15
21   Q.  Yes.  I'm reading the transcript.  04:15
22       "This activity might come from your  04:15
23 use of Google services, like the syncing  04:15
24 of Chrome.  That's one thing.  Or your  04:15
25 visit to sites and apps that partner with  04:15
                                    Page 358

1  Google.                                  04:15
2        "In other words, if you think you  04:15
3  sync your account with Chrome, you're     04:15
4  getting a whole" -- "you get a whole lot  04:15
5  of activities going on or you might want  04:15
6  to" -- "or sometimes it may be if you sync  04:15
7  your account or Google in cases where you  04:15
8  allow them will" -- "they will sort of     04:15
9  monitor your visits to sites and apps that  04:15
10 partner with Google.  They are two         04:15
11 separate" --                             04:15
12       I said, "Right."                   04:15
13       And you said, "They are two separate  04:15
14 points."                                 04:15
15   A.  But what I just told you, that last  04:15
16 sentence -- part of the sentence that you read  04:15
17 essentially says the same thing that I just told David.  04:15
18 I don't know why I said that, to be really  04:16
19 honest.                                  04:16
20   Q.  You don't know why you gave the answer when I  04:16
21 asked you about that same --              04:16
22   A.  Because what I just -- what you read -- what  04:16
23 you read is similar to what I told David, that last part  04:16
24 of what you read.                         04:16
25   Q.  Well, are they two separate points or are they  04:16
                                    Page 359

1  one and the same?                        04:16
2    A.  No.  Right before that.            04:16
3    Q.  Right before what?                 04:16
4    A.  Right before what -- read that last part  04:16
5  again.                                   04:16
6    Q.  Which part?                        04:16
7    A.  Read the entire thing that you just read.  04:16
8  I'm sorry, Mr. Broome.                    04:16
9        MR. BROOME:  Can you pull it up again?  04:16
10       THE WITNESS:  Sorry.               04:16
11       MR. BROOME:  It's okay.            04:16
12 BY MR. BROOME:                            04:16
13   Q.  I asked you:                       04:16
14       "Do you agree that reasonable people  04:16
15       reading that sentence would understand  04:16
16       that those are two different sources from  04:16
17       which Google might receive activity  04:16
18       information?"                      04:17
19       And you said, "These are very different  04:17
20 statements."                             04:17
21   A.  I said that?  Go ahead.  Read on.   04:17
22   Q.  Then you reiterated "They're two separate  04:17
23 points."                                 04:17
24   A.  Please read on.                    04:17
25   Q.  Yeah.  Some of it I'm kind of parsing here  04:17
                                    Page 360

1  because it's hard to actually read.  I think it's not  04:17
2  perfectly clear from the transcript.  But after you said  04:17
3  "These are very different statements," you said:  04:17
4        "This activity might come from your  04:17
5        use of Google services, like the syncing  04:17
6        of Chrome.  That's one thing.  Or your  04:17
7        visits to sites and apps that partner with  04:17
8        Google."                          04:17
9        I guess I'm trying to --           04:17
10   A.  I don't know that I say that.  It's pretty  04:17
11 well the same.  They both use -- they both use Chrome in  04:17
12 the same way.  I just don't -- I don't know why I would  04:17
13 have said that.  I just -- I frankly don't agree with --  04:17
14 I should say, David didn't set me up with this before.  04:17
15 He just asked the question.               04:18
16       And I -- I -- I must -- I just don't agree  04:18
17 with what I said earlier, and I apologize.  Because as I  04:18
18 said, it fits the larger point about repetition that I  04:18
19 repeated through the day, that sometimes you'll have  04:18
20 a -- one specific account and then a larger account that  04:18
21 sort of incorporates that.                04:18
22   Q.  So your testimony then is that reasonable  04:18
23 people reading this sentence, "This activity might come  04:18
24 from your use of Google services like from Chrome  04:18
25 syncing your account" -- "like from syncing your account  04:18
                                    Page 361

1 with Chrome, or your visits to sites and apps that   04:18
2 partner with Google" --   04:18
3    A.  They're essentially saying the same thing that 04:18
4 extends -- the latter part extends the former part.   04:18
5    Q.  Wouldn't you agree, Professor, that reasonable 04:18
6 people could actually interpret that sentence to mean   04:18
7 that syncing your account with Chrome is one way Google 04:19
8 might get information, and visiting sites and apps that 04:19
9 partner with Google is another way that Google might get 04:19
10 information?  That would be a reasonable interpretation, 04:19
11 not --   04:19
12    A.  No.  In the context -- in the context of the   04:19
13 larger positions that we're talking about, that would   04:19
14 not make sense.   04:19
15    Q.  What is the larger context that you think --   04:19
16 well, let me --   04:19
17    A.  That is --   04:19
18    Q.  Let me break this down then, Professor,   04:19
19 because I want to make sure we're very clear since we   04:19
20 seem to have conflicting testimony.   04:19
21    A.  Hm.   04:19
22    Q.  When I asked you about it, you said they were 04:19
23 two very different statements, and I would agree with   04:19
24 that.  I think they are two very different statements.   04:19
25       And now when Mr. Straite had asked you about   04:19

Page 362

1 the same sentence, it seems like your testimony has   04:19
2 changed and now you're saying that they're really the   04:19
3 same thing.   04:19
4       When you say that the -- in the larger   04:19
5 context -- let's just focus on the privacy policy.   04:19
6    A.  Right.   04:19
7    Q.  In the context of the privacy policy standing 04:20
8 alone --   04:20
9       MR. STRAITE:  Just let him finish.   04:20
10 BY MR. BROOME:   04:20
11    Q.  -- a reasonable person might interpret that   04:20
12 sentence to mean that syncing your account with Chrome 04:20
13 is one way Google receives information, and visits to   04:20
14 sites and apps that partner with Google is another   04:20
15 separate way that Google might receive information;   04:20
16 correct?   04:20
17       MR. STRAITE:  Objection.  Asked and answered.   04:20
18       THE WITNESS:  The -- if I remember correctly,   04:20
19 when I talked about it with you, we were talking about   04:20
20 it in the context of those take-off things.  And the -- 04:20
21 there are situations where we -- that was the part where 04:20
22 a person might not decide to -- for example, to -- to   04:20
23 not sync, but allow certain kinds of other activities.   04:20
24       Do you remember?   04:20
25       And so that's I believe the context in which   04:20

Page 363

1 I was discussing this.  I think that they're both   04:20
2 interconnected.  Syncing your account with Chrome and   04:20
3 visits to sites and apps that partner with Google are   04:21
4 very much related to the same thing.   04:21
5 BY MR. BROOME:   04:21
6    Q.  A reasonable person could interpret them as   04:21
7 being two different sources from which user -- Google   04:21
8 may receive information; correct?   04:21
9       MR. STRAITE:  Objection.  Asked and answered.  04:21
10       THE WITNESS:  No.  I don't think so.  Don't   04:21
11 forget, this is a -- basically a link, a footnote to   04:21
12 that larger part that we were discussing, and that's I   04:21
13 think how that came to be.   04:21
14       I don't think that these are separate   04:21
15 situations.   04:21
16 BY MR. BROOME:   04:21
17    Q.  But a reasonable person could think that;   04:21
18 right, Professor?   04:21
19    A.  No --   04:21
20       MR. STRAITE:  Objection.  This is the third   04:21
21 time you've --   04:21
22       THE WITNESS:  I'm saying that this is not --   04:21
23 no.  A reasonable person would conflate the two ideas   04:21
24 because of the way Google has presented its privacy   04:21
25 policy.   04:21

Page 364

1 BY MR. BROOME:   04:21
2    Q.  Okay.  So the next sentence says:   04:21
3       "Many websites and apps partner with   04:21
4       Google to improve their content and   04:21
5       services.  For example, a website might   04:21
6       use our advertising services like   04:22
7       AdSense" --   04:22
8    A.  Mm-hm.   04:22
9    Q.  -- "or analytics tools, like Google   04:22
10       Analytics, or it might embed other content   04:22
11       such as videos or YouTube.   04:22
12       "These services may share information   04:22
13       about your activity with Google and   04:22
14       depending on your account settings and the 04:22
15       products in use, for instance, when a   04:22
16       partner uses Google Analytics in   04:22
17       conjunction with our advertising services, 04:22
18       this data may be associated with your   04:22
19       personal information."   04:22
20       Nothing in that description of Google's -- of 04:22
21 the web services that may be embedded in a third-party   04:22
22 website suggests that not syncing is going to prevent   04:22
23 that data flow; right?   04:22
24    A.  Yeah, it does.  Depending on your account   04:22
25 setting and the products used.  Depending on your   04:22

Page 365

92 (Pages 362 - 365)

1 account settings. There's always this out that Google   04:22
2 has about its understandings.                 04:22
3        And in this case, depending on your account   04:22
4 settings is the giveaway --                   04:22
5     Q.  Right.                                04:23
6     A.  -- to make people to feel that if they sync,   04:23
7 it's one thing.  If they don't sync, it's another.   04:23
8     Q.  But there are lots of account settings,   04:23
9 Professor Turow, that can affect whether Google receives 04:23
10 data from other websites that use Google services.   04:23
11        And what that paragraph does not say is that   04:23
12 this data flow won't occur if you use Chrome without   04:23
13 sync; right?                                04:23
14     A.  Could you go back to where we saw it?   04:23
15        Go back to where that is coming -- linking   04:23
16 from.                                      04:23
17     Q.  You want to go back to the bullet list   04:23
18 where --                                   04:23
19     A.  Well, yes.  To the place that it's syncing   04:23
20 from.                                      04:23
21        My point is that, in fact, this is a direct   04:23
22 invitation to believe that if your account settings are   04:23
23 to not sync, you're going to treat it differently that   04:23
24 if you do sync.                             04:23
25     Q.  Okay.  I think you're referring to the "Your   04:23

Page 366

1 Activity" heading which is on page 208.        04:23
2        Is that what you're referring to?        04:24
3     A.  Wherever it linked from is what --      04:24
4     Q.  Okay.                               04:24
5        MR. STRAITE:  You're scrolling.          04:24
6        THE WITNESS:  No.  Again, we didn't have the   04:24
7 link in this .pdf.                          04:24
8        MR. STRAITE:  Okay.  He has 208 in front of   04:24
9 him.                                       04:24
10        THE WITNESS:  Where did you say it linked   04:24
11 from, Mr. Broome?                           04:24
12        MR. BROOME:  Hold on one second.         04:24
13 BY MR. BROOME:                              04:24
14     Q.  All right.  If you go to --            04:24
15        MR. BROOME:  And what page is that on?     04:24
16 BY MR. BROOME:                              04:25
17     Q.  Well, when we were talking about the linking   04:25
18 before, we were referring to the views and interactions   04:25
19 with content and ads, which is in that bullet list under   04:25
20 "URL activity."                             04:25
21     A.  "Views and interactions," yeah, "with content   04:25
22 and ads," which is essentially not what my report is   04:25
23 about.                                     04:25
24     Q.  Right.                              04:25
25        And that links to the definition above, and   04:25

Page 367

1 that's how we got there.                    04:25
2        "We Collect information about your activity   04:25
3 you use" --                                04:25
4        MR. STRAITE:  Remember, the court reporter --   04:25
5        THE WITNESS:  Yes.                     04:25
6        "We collect information about your          04:25
7    activity and services, which we use to do   04:25
8    things like recommend the YouTube video   04:25
9    you might like.  The activity information   04:25
10    we collect may include."                  04:25
11        And in that they include "views and          04:25
12 interactions with content and ads."            04:25
13        And then they say, "Depending on your browsing 04:25
14 history" -- I'm sorry.  "Depending on your settings," I   04:25
15 should say, "your account settings, you will be treated   04:25
16 in one way or another."                     04:25
17        I don't see a problem here that -- and, in   04:26
18 fact, the Chrome browsing history -- this is what I said 04:26
19 earlier, the Chrome browsing history is at the bottom   04:26
20 that takes all the others into account.        04:26
21        And the -- the statement about your account   04:26
22 settings, reinforces -- if a person were even to go to   04:26
23 that rabbit hole, that it takes -- it signals the idea   04:26
24 the person could get that if you're un-synced, you're   04:26
25 fine.  Don't worry about it.                 04:26

Page 368

1 BY MR. BROOME:                              04:26
2     Q.  But you would agree with me there are lots of   04:26
3 different settings that can affect whether Google gets   04:26
4 data beyond sync; right?                    04:26
5        MR. STRAITE:  Objection.  Calls for         04:26
6 speculation.                                04:26
7 BY MR. BROOME:                              04:26
8     Q.  You understand that; right?            04:26
9     A.  No.                                04:26
10        MR. STRAITE:  Steve, can I get my objection   04:26
11 before you ask the next question?             04:26
12        Objection.  Argumentative.               04:26
13        THE WITNESS:  In the context of this material,   04:26
14 this signal I think is quite clear, particularly even   04:26
15 the last bullet, "Chrome browsing history you've synced   04:27
16 with your digital account."                  04:27
17 BY MR. BROOME:                              04:27
18     Q.  Professor Turow, you are aware that somebody   04:27
19 who has studied digital advertising technologies for   04:27
20 30 plus years, that there are a lot of different browser   04:27
21 settings that affect whether these Google services   04:27
22 receive data beyond just sync; right?          04:27
23        MR. STRAITE:  Objection.  Relevance.        04:27
24        THE WITNESS:  I am aware of that.  I'm saying   04:27
25 within the context of these bullets and the context of   04:27

Page 369

93 (Pages 366 - 369)

1 this part of the privacy policy, the meaning a person    04:27
2 would get from this has to do with that last point.    04:27
3 "Chrome browsing history you've synced with your Google    04:27
4 account."    04:27
5 BY MR. BROOME:    04:27
6    Q.  Go back to the definition there, if you don't    04:27
7 mind, Professor, the very -- very last page.    04:27
8        MR. STRAITE:  When you say "the last page,"    04:27
9 you mean the very end back to where we started?    04:28
10        THE WITNESS:  The notes again.    04:28
11 BY MR. BROOME:    04:28
12    Q.  You're focused on "Depending on your account    04:28
13 settings"; right?    04:28
14    A.  Yes, I did.    04:28
15    Q.  And your -- your opinion is that a reasonable    04:28
16 person reading that would only interpret -- would    04:28
17 interpret "your account settings" only to mean Chrome    04:28
18 sync?    04:28
19    A.  Would include at least Chrome sync as a    04:28
20 required understanding.    04:28
21    Q.  Include or that's all it could mean?    04:28
22    A.  No, no, no.  It would mean Chrome sync and can    04:28
23 could mean more.    04:28
24    Q.  Okay.  Right.  Right.    04:28
25        There could be other --    04:28

Page 370

1    A.  But you need Chrome sync.  In other words, the    04:28
2 idea of Chrome sync as being part of the way in which    04:28
3 you can secure a sense of privacy links to the last    04:28
4 bullet and certainly understands -- explains all the    04:28
5 other bullets.    04:28
6    Q.  Mm-hm.    04:28
7        Okay.  Mr. Straite asked you about your    04:28
8 methodology.    04:28
9    A.  Yes.    04:29
10    Q.  And whether it included additional experience    04:29
11 beyond what you stated when I asked you about your    04:29
12 methodology.    04:29
13        Do you recall that?    04:29
14    A.  Yeah.    04:29
15    Q.  And I think you said that your experience    04:29
16 includes the fact that you've read hundreds of privacy    04:29
17 policies over the course of your career?    04:29
18    A.  Yes, I have.    04:29
19    Q.  And that makes you different than most people;    04:29
20 right?  I mean, most people haven't read hundreds of    04:29
21 privacy policies cover to cover; right?    04:29
22        MR. STRAITE:  Objection.  Relevance.    04:29
23        THE WITNESS:  That's probably true.    04:29
24 BY MR. BROOME:    04:29
25    Q.  And you've been working on -- in this area, I    04:29

Page 371

1 think you called it digital advertising technologies,    04:29
2 for 30 plus years; right?    04:29
3    A.  Yes.    04:29
4    Q.  And so you know these technologies?    04:29
5    A.  Right.    04:29
6    Q.  Yeah.  And that -- and that makes you    04:29
7 different than most people; right?    04:29
8        MR. STRAITE:  Objection.  Asked and answered.    04:30
9 Objection.  Argumentative.  Objection.  Relevance.    04:30
10        THE WITNESS:  It makes me sensitive to the    04:30
11 ways in which -- it's not like I sat in some kind of    04:30
12 ivory tower, figuring out what goes on and then    04:30
13 pontificating about it.    04:30
14        I've spoken to people who don't understand it.    04:30
15 I've tried to explain it to other people.    04:30
16        You teach a course of privacy policies, you    04:30
17 begin to see how -- how obtuse a lot of these things    04:30
18 are, but also what stands out in people's minds as    04:30
19 important.  And that kind of combination is part of the    04:30
20 sensitivity that I brought to the project.    04:30
21 BY MR. BROOME:    04:30
22    Q.  Most people in the population at large have    04:30
23 not been working on -- in digital ad technologies for    04:30
24 30 plus years; fair?    04:30
25    A.  Probably not.  I can say --    04:30

Page 372

1    Q.  You say "Probably not"; correct?    04:30
2    A.  Yeah.  People have a life.  They don't    04:30
3 understand stuff.    04:30
4    Q.  All right.  Have you ever conducted a survey    04:31
5 that asked people how they -- well, let me strike that.    04:31
6 Let me back up.    04:31
7        I think you said that you also -- one of the    04:31
8 other I guess aspects of your experience that you    04:31
9 brought to bear in preparing your report was that you    04:31
10 had spoken to people about how they parse information.    04:31
11        Is that what you said?    04:31
12    A.  Over -- not --    04:31
13        MR. STRAITE:  Let me just object.  Misstates    04:31
14 earlier testimony.    04:31
15        THE WITNESS:  That's a very narrow way of    04:31
16 putting it.    04:31
17        It was in the larger idea of -- I don't just    04:31
18 walk over to somebody and say, "How do you parse    04:31
19 information?"    04:31
20        It's a question of speaking to people over    04:31
21 decades, teaching classes, giving talks to various    04:31
22 groups, including government groups, hearing feedback    04:31
23 about what people pay attention to, what they don't pay    04:31
24 attention to, what's salient, what's not salient,    04:31
25        Yes, and then I bring it to bear in what I see    04:31

Page 373

94 (Pages 370 - 373)

1 is the plain language and what is not plain language in 04:32
2 these -- in these documents.                    04:32
3 BY MR. BROOME:                                04:32
4     Q.  Have you ever conducted a survey that asked  04:32
5 people how they interpreted a particular provision of a  04:32
6 privacy policy?                              04:32
7     A.  We have asked people about their knowledge of  04:32
8 certain company activities that may have been listed in  04:32
9 the privacy policy, but we never took a -- the statement  04:32
10 from a privacy policy and gave it to people and said,  04:32
11 "What does this mean?"  We've never done that.  04:32
12     Q.  Have you ever done any focus groups like that?  04:32
13     A.  No.                                04:32
14     MR. BROOME:  I have no further questions,  04:32
15 unless Mr. Straite has questions, in which case I'll  04:32
16 have lots more.                              04:32
17     THE WITNESS:  You will.                  04:32
18     MR. STRAITE:  Irrespective of the threat, the  04:32
19 good news is we have nothing further here.       04:32
20     MR. BROOME:  All right.  Okay.  We can go off  04:32
21 the record.                                  04:32
22     MR. STRAITE:  We can go off.             04:32
23     THE VIDEOGRAPHER:  Okay.  This will conclude  04:33
24 the deposition of Professor Joseph Turow.  The total  04:33
25 number of media units used in today's deposition was  04:33

Page 374

1 seven, and will be retained by Veritext Legal Solutions.  04:33
2     We are off the record.  The time is 7:33 p.m.  04:33
3 Eastern time.                              04:33
4     THE COURT REPORTER:  Counsel, can I just ask  04:33
5 if anybody needs a rough draft?               04:33
6     MR. BROOME:  We'll take one.  And we'll take  04:33
7 an expedited final.                         04:34
8     THE COURT REPORTER:  Okay.  And Mr. Straite?  04:34
9     MR. STRAITE:  We'll wait for the final.  Thank  04:36
10 you.  Appreciate it.                        04:36
11     (Whereupon, the deposition adjourned at 4:36 p.m.)
12             ---o0o---
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 375

1         REPORTER'S CERTIFICATE
        ---o0o---
2 STATE OF CALIFORNIA   )
                       ) ss.
3 COUNTY OF YOLO        )
4
5     I, KATY E. SCHMIDT, a Certified Shorthand
6 Reporter in and for the State of California, duly
7 commissioned and a disinterested person, certify:
8     That the foregoing deposition was taken before me
9 at the time and place herein set forth;
10     That JOSEPH TUROW, Ph.D., the deponent herein,
11 was put on oath by me;
12     That the testimony of the witness and all
13 objections made at the time of the examination were
14 recorded stenographically by me to the best of my
15 ability and thereafter transcribed into typewriting;
16     That the foregoing deposition is a record of the
17 testimony of the examination.
18     IN WITNESS WHEREOF, I subscribe my name on this
19 11th day of November, 2021.
20
21
22     Katy E. Schmidt, RPR, RMR, CRR, CSR 13096
     Certified Shorthand Reporter
23     in and for the County of Sacramento,
     State of California
24
25 Ref. No. 4880489 KES

Page 376

1 LESLEY WEAVER, Esq.
2 lweaver@bfalaw.com
3                 November 11, 2021
4 RE: CALHOUN, et al. vs. GOOGLE LLC
5 NOVEMBER 8, 2021, JOSEPH TUROW, Ph.D., JOB NO. 4880489
6 The above-referenced transcript has been
7 completed by Veritext Legal Solutions and
8 review of the transcript is being handled as follows:
9 __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext
10    to schedule a time to review the original transcript at
11    a Veritext office.
12 __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF
13    Transcript - The witness should review the transcript and
14    make any necessary corrections on the errata pages included
15    below, notating the page and line number of the corrections.
16    The witness should then sign and date the errata and penalty
17    of perjury pages and return the completed pages to all
18    appearing counsel within the period of time determined at
19    the deposition or provided by the Code of Civil Procedure.
20 __ Waiving the CA Code of Civil Procedure per Stipulation of
21    Counsel - Original transcript to be released for signature
22    as determined at the deposition.
23 __ Signature Waived – Reading & Signature was waived at the
24    time of the deposition.
25

Page 377

95 (Pages 374 - 377)

CONFIDENTIAL

| | |
|---|---|
| 1 xx Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF | 1 RE: CALHOUN, et al. vs. GOOGLE LLC |
| 2  Transcript - The witness should review the transcript and | 2 JOSEPH TUROW, Ph.D. (JOB NO. 4880489) |
| 3  make any necessary corrections on the errata pages included | 3      E R R A T A   S H E E T |
| 4  below, noting the page and line number of the corrections. | 4 PAGE_____ LINE_____ CHANGE_____ |
| 5  The witness should then sign and date the errata and penalty | 5 _____ |
| 6  of perjury pages and return the completed pages to all | 6 REASON_____ |
| 7  appearing counsel within the period of time determined at | 7 PAGE_____ LINE_____ CHANGE_____ |
| 8  the deposition or provided by the Federal Rules. | 8 _____ |
| 9  __ Federal R&S Not Requested - Reading & Signature was not | 9 REASON_____ |
| 10  requested before the completion of the deposition. | 10 PAGE_____ LINE_____ CHANGE_____ |
| 11 | 11 _____ |
| 12 | 12 REASON_____ |
| 13 | 13 PAGE_____ LINE_____ CHANGE_____ |
| 14 | 14 _____ |
| 15 | 15 REASON_____ |
| 16 | 16 PAGE_____ LINE_____ CHANGE_____ |
| 17 | 17 _____ |
| 18 | 18 REASON_____ |
| 19 | 19 PAGE_____ LINE_____ CHANGE_____ |
| 20 | 20 _____ |
| 21 | 21 REASON_____ |
| 22 | 22 |
| 23 | 23 _____  _____ |
| 24 | 24 JOSEPH TUROW, Ph.D.       Date |
| 25 | 25 |
| Page 378 | Page 380 |

| | |
|---|---|
| 1      I declare under penalty of perjury | |
| 2  under the laws that the foregoing is | |
| 3  true and correct. | |
| 4 | |
| 5      Executed on _____ , 20___, | |
| 6  at _____, _____. | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11      _____ | |
| 12      JOSEPH TUROW, Ph.D. | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| Page 379 | |

96 (Pages 378 - 380)