# GOOGLE LLC'S OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION

# Broome Decl. Ex. 24 Transcript of the November 16, 2021 deposition of Leslie John

# Redacted Version of Document Sought to be Sealed

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                 SAN JOSE DIVISION

4

5   PATRICK CALHOUN, ELAINE CRESPO, )

    HADIYAH JACKSON and CLAUDIA      )

6   KINDLER, on behalf of all        )

    others similarly situated,       )

7                                     )

           Plaintiffs,               )

8                                     )

           vs.                       ) Case No.

9                                     ) 5:20-cv-5146-LHK

    GOOGLE LLC,                       )

10                                    )

           Defendant.                )

11  _____ )

12

13

14

15        VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED

16          DEPOSITION OF LESLIE JOHN, PH.D.

17

18           Tuesday, November 16, 2021

19       Testifying from Boston, Massachusetts

20

21

22   Job No. 4890737

23   Reported By:

24   Hanna Kim, CLR, CSR No. 13083

25   Pages 1 - 322

                                      Page 1

**Page 2**

```
1        UNITED STATES DISTRICT COURT
2      NORTHERN DISTRICT OF CALIFORNIA
3           SAN JOSE DIVISION
4
5   PATRICK CALHOUN, ELAINE CRESPO, )
    HADIYAH JACKSON and CLAUDIA      )
6   KINDLER, on behalf of all        )
    others similarly situated,       )
7                                    )
          Plaintiffs,                )
8                                    )
          vs.                        ) Case No.
9                                    ) 5:20-cv-5146-LHK
    GOOGLE LLC,                      )
10                                   )
          Defendant.                 )
11  _____    )
12
13
14
15       Virtual videoconference video-recorded
16       deposition of LESLIE JOHN, PH.D., taken on
17       behalf of the Defendant, testifying from
18       Boston, Massachusetts, on Tuesday,
19       November 16, 2021, before Hanna Kim, CLR,
20       CSR No. 13083.
21
22
23
24
25
```

**Page 3**

1   REMOTE VIDEOCONFERENCE APPEARANCES OF COUNSEL:

2

3   For Plaintiffs:

4      BLEICHMAR FONTI & AULD LLP

5      BY:  LESLEY WEAVER, ESQ.

6      555 12th Street, Suite 1600

7      Oakland, California 994607

8      415.445.4003

9      lweaver@bfalaw.com

10     -and-

11     DICELLO LEVITT GUTZLER

12     BY:  DAVID A. STRAITE, ESQ.

13     BY:  ADAM PROM, ESQ.

14     One Grand Central Place

15     60 East 42nd Street, Suite 2400

16     New York, NY 10165

17     646.933.1000

18     dstraite@dicellolevitt.com

19

20

21

22

23

24

25

**Page 4**

1   REMOTE VIDEOCONFERENCE APPEARANCES (CONTINUED)

2

3   For Defendant Google LLC:

4      QUINN EMANUEL URQUHART & SULLIVAN

5      BY:  STEPHEN A. BROOME, ESQ.

6      BY:  ALYSSA G. OLSON, ESQ.

7      865 South Figueroa Street, 10th Floor

8      Los Angeles, California 90017

9      213.443.3000

10     stephenbroome@quinnemanuel.com

11

12  Also Present:

13     LAURA O'LAUGHLIN, Analysis Group

14     DAVID WEST, Video Operator

15

16

17

18

19

20

21

22

23

24

25

**Page 5**

```
1            INDEX OF EXAMINATION
2
3   WITNESS:  LESLIE JOHN, PH.D.
4   EXAMINATION                    PAGE
5      BY MR. BROOME:           10, 313
6      BY MS. WEAVER:               296
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Veritext Legal Solutions
866 299-5127

INDEX OF EXHIBITS

JOHN DEPOSITION EXHIBITS                    PAGE

Exhibit 1   Report of Leslie John, Ph.D.; 8        19
            pages

Exhibit 2   Curriculum vitae of Leslie John,    18
            Exhibit A to Report of Leslie John;
            17 pages

Exhibit 3   Materials Considered, Exhibit B to  83
            Report of Leslie John; 39 pages

Exhibit 4   "Consent Bump 2.0 for Narnia 2.0:  142
            Launched UX"; Bates nos.
            GOOG-CABR-04067825 through '7867

Exhibit 5   "YouTube Transcript for 'Leslie    156
            John (Full Interview)' available at
            https://www.youtube.com/watch?v=e2
            zKM31YqdY"; 9 pages

Exhibit 6   "YouTube Transcript for 'WIRED2016: 176
            Ever suffered from selfie regret?
            Why some people share when they
            shouldn't' available at
            https://www.youtube.com/watch?v=
            pmKZJRbA6J8&t=774s"; 8 pages

Page 6

INDEX OF EXHIBITS (CONTINUED)

JOHN DEPOSITION EXHIBITS                    PAGE

Exhibit 7   "Strangers on a Plane:             198
            Context-Dependent Willingness to
            Divulge Sensitive Information";
            Bates nos. John_Calhoun_000000623
            through '638

Exhibit 8   "What Is Privacy Worth?"; Bates    201
            nos. John_Calhoun_000000059 through
            '84

Exhibit 9   "Why Am I Seeing This Ad? The      214
            Effect of Ad Transparency on Ad
            Effectiveness"; Bates nos.
            John_Calhoun_000000931 through '957

Exhibit 10  "Consumer Disclosure," Tami Kim, et 222
            al; 38 pages

Exhibit 11  "Google Chrome Privacy Notice,"    236
            "Last modified: May 20, 2020"; 12
            pages

Exhibit 12  "Google Privacy Policy"; Bates nos. 265
            GOOG-CALH-00001206 through '1236
            --o0o--

Page 7

1    Remotely Testifying from Boston, Massachusetts
2    Tuesday, November 16, 2021; 10:06 a.m., EST
3                    --o0o--
4        THE VIDEOGRAPHER:  Okay.  Good morning.
5    We are on the record.  The time is 10:06 a.m.,    10:06:51
6    Eastern Time.  The date today is November 16, 2021.
7        Please note the microphones are sensitive
8    and may pick up whispering and private
9    conversations.
10       Audio and video recording will continue to    10:07:09
11   take place, unless all parties agree to go off the
12   record.
13       This is Media Unit 1 of the video-recorded
14   deposition of Professor Leslie John, taken by
15   counsel for defendant in the matter of Patrick    10:07:25
16   Calhoun, et al., versus Google, LLC, filed in
17   United States District Court for the Northern
18   District of California, San Jose Division, the case
19   number, 5:20-CV-5146-LHK-SVK.
20       The deposition is being conducted using    10:07:43
21   remote counsel technology, and all participants are
22   attending remotely.
23       My name is David West.  I am the
24   videographer.
25       The court reporter is Hanna Kim.    10:07:54

Page 8

1        We represent Veritext Legal Solutions.
2        I'm not related to any party in this
3    action, nor am I financially interested in the
4    outcome.
5        Counsel will now state their appearances    10:08:04
6    and affiliations for the record.
7        If there are any objections to proceeding,
8    please state them at the time of your appearance,
9    beginning with the noticing attorney.
10       MR. BROOME:  Good morning.  Stephen Broome    10:08:14
11   from Quinn Emanuel for Google.  And I'm joined by
12   my colleague Aly Olson and also our -- one of our
13   consulting experts at Analysis Group, Laura
14   O'Laughlin.
15       MS. WEAVER:  Good morning.  This is Lesley    10:08:31
16   Weaver of Bleichmar Fonti & Auld, on behalf of
17   plaintiffs.
18       I will be wearing a mask today, but I will
19   defending the deposition due to the COVID outbreak.
20       And with me on behalf of plaintiffs is    10:08:46
21   David Straite from DiCello Levitt and also Adam
22   Prom, also from DiCello Levitt, on behalf of the
23   plaintiffs.
24       THE VIDEOGRAPHER:  Okay.  Thank you.
25       The court reporter may now swear the    10:09:02

Page 9

3 (Pages 6 - 9)

1  witness in, and we will continue.

2

3           LESLIE JOHN, PH.D.,

4     having been administered an oath over

5       videoconference, was examined

6           and testified as follows:

7

8           EXAMINATION

9  BY MR. BROOME:

10   Q.  Good morning, Professor John.    10:09:29

11   A.  Good morning.

12   Q.  Have you been deposed before?

13   A.  Yes.

14   Q.  And how many times?

15   A.  Once.              10:09:37

16   Q.  And was that -- or in what case was that?

17   A.  That was the Terry Bollea case, aka Hulk

18  Hogan, with Gawker.

19   Q.  And were you a -- a -- a witness -- were

20  you an expert witness in that case?    10:09:53

21   A.  Yes.

22   Q.  And what was the subject of your expert

23  testimony?

24   A.  The subject of my expert testimony was a

25  question of -- broadly speaking of a privacy   10:10:06

Page 10

1  invasion with respect to what Hulk Hogan had

2  accused Gawker of doing.

3   Q.  How many times were you deposed in that

4  case?

5   A.  Once.              10:10:24

6   Q.  And did you testify at trial?

7   A.  No.

8   Q.  You graduated college in 2006; is that

9  correct?

10   A.  Yes.              10:10:32

11   Q.  And that was from the University of

12  Waterloo in Canada?

13   A.  Yes.

14   Q.  And you graduated with a -- a major in

15  psychology?             10:10:45

16   A.  Yes.  It was a honours art and business

17  co-op, with a major in psychology.

18   Q.  Okay.  And then you spent two work -- two

19  years working on your master's degree at Carnegie

20  Mellon; is that right?         10:11:00

21   A.  Yes.  So the way the program works is it's

22  a master's and Ph.D. program integrated, yes.

23   Q.  Okay.  And did you, in fact, receive your

24  master's degree in 2008?

25   A.  Yes.              10:11:12

Page 11

1   Q.  Okay.  And that was focused on psychology

2  and behavioral design research?

3   A.  Yes.

4   Q.  And then did you -- you graduated from

5  Carnegie Mellon -- by the way, am I saying that    10:11:28

6  right?  Is it Carnegie, Carnegie Mellon, or

7  Carnegie Mellon?

8   A.  Carnegie Mellon.

9   Q.  Carnegie Mellon.

10      You graduated -- or you received your    10:11:41

11  Ph.D. from Carnegie Mellon in 2011?

12   A.  Correct.

13   Q.  And the -- your focus was behavioral

14  design research; is that right?

15   A.  Behavioral decision research.    10:11:52

16   Q.  Decision research, sorry.

17      And what is behavioral decision research?

18   A.  Behavioral decision research is the study

19  of how people make decisions.

20   Q.  Okay.  And did you -- were you focused on   10:12:11

21  decision-making in the online context, the

22  internet context?

23   A.  I have studied people making decisions

24  offline and online.

25   Q.  During the -- during your -- the time you    10:12:26

Page 12

1  spent working on your Ph.D., was your focus on

2  decision-making online and offline or one or the

3  other?

4      MS. WEAVER:  Objection.  Compound.  Vague.

5      If you understand the question, you can    10:12:46

6  answer.

7      THE WITNESS:  Could you clarify the

8  question, please.

9  BY MR. BROOME:

10   Q.  Sure.              10:12:50

11      During the time that you were at Carnegie

12  Mellon working on your Ph.D., was -- did -- when

13  you were wor-- studying behavioral decision

14  research, were -- were you focused on

15  decision-making online?         10:13:04

16   A.  I studied how -- I studied and then do

17  study how people make decisions, and I study that

18  both in online context and in offline context.

19   Q.  And was that the case when you were

20  working on your Ph.D. at Carnegie Mellon?    10:13:20

21   A.  So I conducted --

22      MS. WEAVER:  Objection.  Vague.

23      To the extent you understand the question.

24      THE WITNESS:  Yeah, I -- I guess I -- I --

25  could you restate the question, please.    10:13:32

Page 13

4 (Pages 10 - 13)

BY MR. BROOME:

1 BY MR. BROOME:
2 Q. Yeah. Sure. No. And I -- and I think
3 maybe we're just misunderstanding each other.
4 Were -- were you focused on
5 decision-making online during the period that you    10:13:41
6 were working on your Ph.D.?
7 A. So during the period I was working on my
8 Ph.D., I studied how people make decisions, and I
9 studied decision-making both in offline context as
10 well as in online context. I've done studies in    10:13:55
11 both contexts is my answer.
12 Q. Okay. And -- but I'm trying to make --
13 I'm -- I'm limiting my question just to the period
14 in which you were working on your Ph.D.
15 And is that true during    10:14:07
16 A. Yes, during graduate -- during graduate --
17 THE COURT REPORTER: You have to slow
18 down. Excuse me. One person at a
19 time. And if we could slow down, please.
20 Thank you.    10:14:18
21 BY MR. BROOME:
22 Q. Dur- -- during the period that you were
23 working on your Ph.D., you studied decision-making
24 both online and offline; is that your answer?
25 A. During the period that I did my Ph.D., I    10:14:26

Page 14

1 did studies to look at how people make decisions.
2 And I've done studies during my Ph.D. looking at
3 both decision-making studying people in offline
4 context, and I've studied people also in online
5 contexts.    10:14:43
6 Q. Okay. Immediately after obtaining your
7 Ph.D., you went to work as an assistant professor
8 at Harvard; is that right?
9 A. Correct.
10 Q. And you became a tenured professor at    10:14:55
11 Harvard earlier this year, in July 2021; is that
12 right?
13 A. Correct.
14 Q. Have you ever worked in any industry
15 outside of academia?    10:15:07
16 A. Yes.
17 Q. Okay. Can you explain?
18 A. Can you -- so explain -- what about it
19 would you like to know?
20 Q. Sure.    10:15:21
21 What industries outside of academia have
22 you worked in?
23 A. Okay. I have worked in marketing. I
24 worked at IBM in marketing and looking at -- gosh,
25 it was a long time ago. It was marketing    10:15:38

Page 15

1 communications writ large for IBM's software
2 group.
3 Q. And when was that?
4 A. That was while I was doing my undergrad.
5 Q. Okay.    10:15:50
6 A. That's one example.
7 Q. Okay. Any other examples of you working
8 in an industry outside of academia?
9 A. So I have worked in -- in development --
10 may -- in -- in -- for a university in development. So    10:16:08
11 they're -- how they raise money. I would not
12 consider that academia, because it's not, you
13 know, academic study.
14 I've also worked in -- for the government
15 of Canada. Industry Canada was the name of the    10:16:25
16 division that I worked for.
17 Q. And when did you work for Industry Canada?
18 A. That was also during my undergrad.
19 Q. And -- and the -- when you -- you
20 mentioned, I think, fundraising for universities.    10:16:45
21 Which -- which universities have you done
22 fundraising for?
23 A. That was for the University of Waterloo.
24 Q. Okay. So that was also during your
25 undergrad?    10:16:57

Page 16

1 A. Correct.
2 Q. Okay. Since graduating from college -- or
3 I should say university, since you're Canadian. I
4 am also Canadian.
5 Since graduating from university in 2006,    10:17:09
6 have you worked in any industries outside of
7 academia?
8 A. I have. So my full-time employer since I
9 graduated from my Ph.D. has been Harvard Business
10 School.    10:17:24
11 I have, from time to time, done some
12 consulting work with various companies.
13 Q. Okay. About how many consulting
14 engagements have you had in the course of your
15 career?    10:17:41
16 A. Hmm. I don't know off the top of my head
17 the exact number. If you're looking for an exact
18 number, I would have to reflect longer.
19 Q. Why don't we do this, for which companies
20 have you performed consulting work?    10:17:55
21 A. Let me look at my CV because I want to --
22 it will help jog my memory on the --
23 MS. WEAVER: If you have her CV and wanted
24 to mark it --
25 THE COURT REPORTER: Excuse me. One    10:18:17

Page 17

5 (Pages 14 - 17)

1  second. There are two people speaking, and I can
2  only get one, so -- and it's hard to hear Ms.
3  Weaver.
4      So could you repeat that, Ms. Weaver?
5      MS. WEAVER: Yes. I apologize.        10:18:24
6      Steve, if you have her CV and wish to mark
7  it, if you're going to mark her report, that
8  might -- this might be a good time.
9      MR. BROOME: Yes. Yeah, we'll do that,
10 Lesley. That's a good idea.        10:18:33
11     MS. WEAVER: Okay.
12     MR. BROOME: We're -- we're going to --
13 I -- I think the CV is going -- actually is a
14 separate -- why -- why don't we mark the report as
15 Exhibit 1 first.        10:18:40
16     THE WITNESS: Then I can just look at it
17 on the computer.
18     MS. WEAVER: Yes.
19     MR. BROOME: And then we'll mark -- and
20 then we'll mark the CV as Exhibit 2.        10:18:46
21 Are they separate?
22     (John Deposition Exhibit 2 was marked.)
23 BY MR. BROOME:
24 Q.  We're going to be referring to your report
25 a lot in the deposition, so we'll just put that up    10:18:54

Page 18

1  as Exhibit 1. Then you can have that handy for
2  your reference.
3      A.  Okay. So --
4  Q.  Just -- just give it a minute. It's takes
5  a -- it takes a second to load.        10:19:07
6      MS. WEAVER: And, Steve, with your
7  permission, I'm just going to go for these first
8  couple of exhibits -- come over behind her and make
9  sure it's loading.
10     MR. BROOME: Yeah, that's fine.        10:19:16
11     And while we're waiting, Professor John,
12 is there anybody in the room with you aside from
13 Ms. Weaver?
14     THE WITNESS: No.
15     MS. WEAVER: Okay. It looks like she's    10:19:27
16 loaded and then -- her report, yeah.
17     THE WITNESS: All righty. Okay. Good.
18 BY MR. BROOME:
19 Q.  All right.
20     So we should have marked as Exhibit 1 your   10:19:40
21 declaration in this case?
22     (John Deposition Exhibit 1 was marked.)
23     THE WITNESS: Correct. Yep, that's --
24 BY MR. BROOME:
25 Q.  Does that look right?        10:19:48

Page 19

1      A.  Let's see here. Declaration, Exhibit 1,
2  yes.
3      So then the CV is an appendix, Exhibit 2.
4      Okay. All right.
5      MS. WEAVER: So, Steve, just for clarity    10:20:10
6  and for the record, her report attaches her CV, and
7  you are going to mark the appendices to her report
8  as separate exhibits? Is that the plan?
9      MR. BROOME: Yeah, it appears that way.
10     MS. WEAVER: Okay.        10:20:24
11     THE WITNESS: Okay. I'm scrolling down
12 here and --
13     THE COURT REPORTER: Counsel, this is
14 Hanna. Could we go off the record for a quick
15 moment, please.        10:20:50
16     MR. BROOME: Sure.
17     MS. WEAVER: Sure.
18     THE VIDEOGRAPHER: Okay. We're off the
19 record at 10:19 a.m.
20     (Off the record.)        10:22:46
21     THE VIDEOGRAPHER: Okay. We are back on
22 record at 10:22 a.m.
23     Go ahead.
24 BY MR. BROOME:
25 Q.  All right.        10:23:00

Page 20

1      Professor John, I believe the question to
2  you is, for which companies have you performed
3  consulting work in the course of your career?
4      A.  Yes. So I have given talks at different
5  companies. For example, at Goldman Sachs, I gave    10:23:17
6  a talk. I don't know if this is what you mean by
7  consulting. There are speaking engagements, but
8  then there are also other types of engagements
9  that I can tell you a bit about, if you'd like.
10 Q.  Yeah, why -- why don't we -- why don't we    10:23:36
11 start with the other types of engagements, not the
12 speaking engagements.
13     A.  Okay. So -- so one engagement would be
14 for Pepsi. I worked with them to look at how
15 people make choices about different drinks and    10:23:55
16 snacks.
17     I've worked for -- done consulting for
18 Weight Watchers, some work for Blue Cross Blue
19 Shield.
20     And then in graduate -- in graduate school   10:24:16
21 I also did a bit of consulting -- you can see the
22 dates on my CV, so for the pharmaceutical company
23 GlaxoSmithKline; for Genzyme; McKinsey, a
24 consulting firm.
25     I also from time to time have been asked    10:24:33

Page 21

6 (Pages 18 - 21)

1  to -- by companies to give my expertise and my
2  opinions on -- for example, a marketing research
3  company has contacted me before.  And I have given
4  them information on -- they interviewed me, for
5  example, on consumers and how they think about        10:24:58
6  privacy with respect to advertising.
7       Yeah, I -- I don't know if that helps to
8  answer your question.
9       Q.  For any of the consulting -- or the -- the
10  professional experiences listed on your CV --        10:25:13
11      A.  Mm-hmm.
12      Q.  -- did any of those involve online
13  privacy?
14      A.  Yes.  Oh, the ones listed on my CV?
15      Q.  Yes.                                         10:25:24
16      A.  The ones listed on my CV, yes, so that
17  would be the lawsuit.
18      Q.  Okay.  And that pertained to online
19  privacy?
20      A.  Yes.  It pertained to -- absolutely.  Yes.  10:25:35
21      MS. WEAVER:  And I apologize.  I need to
22  make a late objection.
23      The question was consulting or
24  professional experiences listed on your CV, and I
25  want to make sure your response also addressed       10:25:51

Page 22

1  professional experiences.
2       THE WITNESS:  Okay.  Yes.
3       So I -- I suppose what would be helpful is
4  if you fleshed out what you mean by "professional
5  experiences" when you say the word.                   10:26:06
6  BY MR. BROOME:
7       Q.  Yeah.  No, that's very fair.  And,
8  actually, I was looking at your CV.  I -- I should
9  have said the full title.  There's a
10  heading "Other Professional Experiences."            10:26:14
11      So with that clarification, under the
12  heading "Other Professional Experiences," do any
13  of those items there per--- pertain to online
14  privacy?
15      And I think you already said that the --        10:26:28
16  the Gawker lawsuit did?
17      Did any of the other experiences listed
18  under the heading "Other Professional Experiences"
19  on your CV pertain to online privacy?
20      MS. WEAVER:  And what page are you looking  10:26:46
21  at?  I apologize, Steve.
22      MR. BROOME:  Sure.  It's page 16.
23      THE WITNESS:  Yes.  So under -- so the
24  "talks," I -- those include talks about privacy --
25  online privacy, digital advertising --              10:27:02

Page 23

1  BY MR. BROOME:
2       Q.  Okay.
3       A.  -- behavioral economics, behavioral
4  design, when you're just looking at the ones that
5  are listed.                                          10:27:14
6       And I should note that this is not
7  exhaustive, this list here.  It doesn't include
8  the one-off conversations that I have -- for which
9  I've been compensated with different companies
10  that have asked me my opinion on various matters     10:27:32
11  as I -- for example, the market research firm
12  example.
13      MS. WEAVER:  And I'll just caution the
14  witness, to the extent that these engagements were
15  confidential, then you --                            10:27:42
16      THE WITNESS:  Exactly.  Exactly.
17      THE COURT REPORTER:  Excuse me.  I can't
18  hear counsel.
19      MS. WEAVER:  I can repeat what I said.
20      I will just caution the witness that to     10:27:52
21  the extent that these engagements were confidential
22  and you are not allowed to disclose them, you
23  should not do so.
24  BY MR. BROOME:
25      Q.  But under "Other Professional            10:28:02

Page 24

1  Experiences," the top line says "2017 to present,
2  Talks at various companies."  [As read]
3       For which companies have you given talks
4  relating to online privacy?
5       A.  I can give -- so off the top of my head,   10:28:15
6  I'm not confident that I will be giving you an
7  exhaustive list.  But I can tell you these
8  companies have included MediaAlpha -- I believe
9  it -- I believe it's MediaAlpha.  I always mix it
10  up whether it's MediaAlpha or AlphaMedia.            10:28:39
11  Anyways... So -- so that is an example.
12      There was a -- a society, one I did fairly
13  recently, a society for workplace investigators
14  where I gave a talk about privacy there.  Those
15  are a couple of examples.                            10:28:58
16      Q.  Any others that you can think of?
17      A.  Another one that I can think of is
18  JPMorgan, where it was a hybrid of a session where
19  we -- like a teaching session and also a talk
20  where we discussed and I shared my research on       10:29:22
21  information elicitation --
22      THE COURT REPORTER:  Informational... I
23  didn't hear the word you said.
24      THE WITNESS:  Information elicitation.  So
25  when and why people reveal information.              10:29:36

Page 25

7 (Pages 22 - 25)

BY MR. BROOME:
1

2  Q.  Any other talks pertaining to online

3  privacy that you recall giving?

4  A.  I wish I had a list of every single talk

5  I've given for you because I'm -- it's hard to          10:29:56

6  think on the spot.

7  I -- I don't think I've been exhaustive in

8  my answer, but I can -- I can sit here and

9  continue to think, if you'd like.

10  Q.  Any other -- have you given any talks to          10:30:06

11  any technology companies?

12  A.  Yes.

13  MS. WEAVER:  Objection.  Vague as to

14  "technology companies."

15  BY MR. BROOME:                                         10:30:18

16  Q.  All right.

17  Can you identify those?

18  A.  Yes.  So I -- one that comes to mind right

19  away is Facebook I gave a talk.  But possibly more

20  than one talk.  I can't quite recall.  It was a        10:30:32

21  while ago.

22  Q.  Okay.  And what was the subject of the

23  talk that you gave at Facebook?

24  A.  My research on privacy and information

25  sharing.                                               10:30:42

Page 26

---

1  Q.  Okay.  Were you compensated for that?

2  A.  No.  It's a bit -- it's a bit of a hard

3  question to answer in the sense that I -- I

4  believe it was during the time that I was a

5  graduate student, I received a fellowship from        10:31:02

6  them.

7  And so as part of that, I visited them.

8  And I can't remember if it was at the beginning of

9  that or after that had ended.  But there -- there

10  wasn't a payment apportioned to that exact act, if    10:31:18

11  that's what you're asking.

12  Q.  Okay.  And, again, what was the fellowship

13  that you received from Facebook?

14  A.  It was a -- it was -- I -- I don't

15  remember the details of it.  I remember it being      10:31:32

16  fairly loose in that there -- there weren't rigid

17  requirements.

18  It was -- my understanding of it was that

19  they were interested in -- in developing -- I

20  actually don't know what their interest was in it.    10:31:51

21  But it was a -- a sum of money that they had given

22  to support graduate research that I had -- I

23  believe I had to apply for and then I got.

24  Q.  Okay.  So you received some compensation

25  or -- or fellowship money from Facebook directly?     10:32:06

Page 27

---

1  A.  Yes.

2  Q.  All right.

3  Any other technology companies that you've

4  given talks to about online privacy?

5  A.  Off the top of my head, I can't think of         10:32:24

6  anything, but I don't think what I've given you is

7  exhaustive.  It's hard to -- you know, it's many

8  years I've been doing this, so...

9  Q.  How many years have you been doing this?

10  A.  So I've been in this area -- I've been a         10:32:35

11  professor since 2011, and I gave talks about these

12  topics even earlier as a student.  So I've been --

13  I've been working in this area for quite some

14  time.

15  Q.  Have you taught any classes about privacy        10:32:53

16  policies?

17  MS. WEAVER:  Objection.  Vague.

18  THE WITNESS:  Could you clarify your

19  question, please.

20  BY MR. BROOME:                                        10:33:08

21  Q.  What -- what about my question don't you

22  understand?

23  A.  I don't understand it.

24  MS. WEAVER:  Objection -- objection to

25  form.  Still vague as to "privacy policies."          10:33:16

Page 28

---

1  BY MR. BROOME:

2  Q.  Well -- well, why don't we do this,

3  what -- what -- what -- what kind of -- what kinds

4  of classes do you teach?

5  A.  I teach a variety of classes.  I have          10:33:24

6  taught -- so I teach at -- at Harvard Business

7  School, and I have taught in our MBA program.

8  The MBA program has two years to it, so

9  I've taught in the required curriculum -- that's

10  the first year -- where the students have to         10:33:47

11  take -- well, hence the name, "required."

12  So I taught marketing there for several

13  years.

14  And then I transitioned into teaching

15  students in the second year, in the elective         10:34:01

16  curr- -- curriculum, where they get to choose

17  which courses they take.

18  And so there I taught negotiation, which

19  also has an emphasis on behavioral decision-making

20  the way I teach it.  So I always try to bring in     10:34:17

21  the latest inside term behavioral science writ

22  large into that [verbatim].

23  And I also teach in executive education

24  programs.  So in executive education programs, I

25  teach negotiation.  And I also have taught           10:34:39

Page 29

8 (Pages 26 - 29)

1  behavioral design, excuse me, which includes a
2  portion on my research on privacy and
3  understanding when and why people reveal and
4  consumers' responses to how firms use their data.
5        And behavioral design writ large is --        10:35:02
6  it's about the -- the -- how to shape situations
7  to help people make better decisions.
8        And so that -- that's kind of -- that's
9  the focus with -- with those students in that --
10 that module.                                         10:35:17
11       I also am sometimes invited -- beyond --
12 those are my regular teaching assignments.  I'm
13 sometimes invited to teach in kind of one-off ad
14 hoc programs.
15       And an example there would be when I --        10:35:33
16 there's a behavioral operations course.  I -- I
17 don't know what it's marketed as.  Something
18 different, like customer solutions or something.
19 But I've taught my work on privacy there.
20 Q.  Is the topic of privacy policies part of        10:35:51
21 the curriculum for any of the courses that you
22 have taught?
23 A.  In what sense do you mean by that?
24 Q.  Is it a topic that comes up that -- in
25 your courses?                                        10:36:03
Page 30

1  A.  So it is a topic that has come up.  In
2  fact, I've done some research on understanding how
3  people react to privacy policies.  So it -- it has
4  been part of what I have taught, yes.
5  Q.  Okay.  I'd like you to take a look at your   10:36:18
6  declaration, which you should have in front of
7  you.
8        MS. WEAVER:  And for the record, you mean
9  Exhibit 1?
10       MR. BROOME:  Yes.                              10:36:33
11 BY MR. BROOME:
12 Q.  Do you have that in front of you
13 Professor John?
14 A.  Yes.
15 Q.  In the second paragraph you write, "I       10:36:40
16 conduct research on numerous topics within the
17 field of behavioral decision making but my primary
18 focus is privacy"; is that correct?
19 A.  Correct.
20 Q.  Okay.  And then you go on, "in              10:36:55
21 understanding when and why people reveal or
22 conceal sensitive personal information as well as
23 their reactions to firm's collection and use of
24 their information."
25       What is sensitive personal information as    10:37:09
Page 31

1  you use that term in that sentence?
2  A.  As I use the term in that sentence, so I
3  mean personal information is information
4  pertaining to the self, and sensitive is
5  information that is more sensitive.  I'm sorry, I    10:37:31
6  just used the word in the definition.
7        It's so visceral to me what this means
8  that it's hard to think of a synonym.
9  Q.  Is -- well, is -- yeah.  I mean, is
10 sensitive personal information different from        10:37:48
11 personal information?
12 A.  Sensitive personal information is a type
13 of personal information.  Not all personal
14 information is necessarily sensitive, if that's
15 what you're asking.                                  10:38:07
16 Q.  Do you have a working definition of
17 sensitive personal information?
18 A.  Yes.  So the working definition that I
19 tend to use is information -- and it's -- it's a
20 broad definition -- information is that personal     10:38:22
21 information that makes you feel vulnerable in some
22 way or could make you feel vulnerable in some way
23 if it's revealed.
24 Q.  And -- and that's a subjective standard,
25 correct, in the sense that what may be sensitive     10:38:39
Page 32

1  personal information to one person may not be
2  sensitive personal information to another person?
3  A.  Well, when you say "subjective," I don't
4  want it to seem like it's an unfounded definition.
5  So scholars -- what I just described to you is       10:38:59
6  consistent with how other scholars think about
7  what sensitive personal information is.  So, in
8  fact, when we define it in papers, we have cited
9  other work that -- that thinks of it in the same
10 way.                                                 10:39:18
11       I don't know if I answered your question
12 fully, though, so you --
13 Q.  Are there categories of information
14 that -- that -- that consistently satisfy the
15 definition of sensitive personal information?        10:39:30
16       MS. WEAVER:  Objection.  Vague.
17 BY MR. BROOME:
18 Q.  You can answer.
19 A.  Okay.  Sorry.
20       Can you repeat the question?  I've            10:39:49
21 forgotten what it is now.
22 Q.  Are there categories of information that
23 consistently satisfy the definition of sensitive
24 personal information?
25 A.  Yeah.  So I -- categories that tend to       10:40:01
Page 33

9 (Pages 30 - 33)

1  consistently fall into sensitive personal
2  information are -- include, for example,
3  information about one's sexual preferences and
4  habits. Another example would be health
5  information. Another example would be financial    10:40:19
6  information. Those tend to be more sensitive.
7      Q. Are you aware of the categories of
8  information that the Plaintiffs in this case claim
9  Google misappropriated?
10     A. Am I aware -- so I'm -- I read the    10:40:41
11 Complaint, and I -- I'm aware of the categories
12 alleged in the Complaint of the categories of
13 information.
14     Q. Okay. And are those categories sensitive
15 personal information?    10:40:58
16     A. Well, sorry. It's -- it's a -- it's a bit
17 of a strange question just from the -- the world I
18 operate in, just think of it that way. Can you
19 maybe clarify.
20     Q. Are the categories of data or information    10:41:17
21 that the Plaintiffs in this case claim Google
22 misappropriated sensitive personal information as
23 you use that term in your report?
24     A. Right. So the -- it's -- it's a little
25 bit hard to say in isolation sometimes.    10:41:36

Page 34

1  Context -- like con- -- the context in which
2  information is collected matters a great deal.
3  And what I can say is that the types of
4  information that were collected from these
5  Plaintiffs very much falls in the category of    10:41:57
6  being sensitive.
7      I've read their declarations, and I've
8  read their depositions. And what they're saying
9  is that the information that has been taken from
10 them is sensitive to them. It's personal, and    10:42:14
11 it's -- it's sensitive. It includes this
12 information.
13     Q. Okay. So one of the categories that they
14 claim Google misappropriated is IP address.
15     You understand that, right?    10:42:29
16     A. Yes.
17     Q. Is IP address -- one's IP address
18 sensitive personal information?
19     A. So the -- I guess -- sorry, it's a bit --
20 can you -- can you expand a bit on your question?    10:42:49
21     Q. Is an IP address personal sensitive
22 information as you use that term in your report?
23     A. I think in the context of this case, when
24 I -- you know, when reading through the
25 Plaintiffs' depositions and -- and declarations,    10:43:08

Page 35

1  they're saying that this information, their
2  location, especially alongside everything else
3  that's been collected, is sensitive to them.
4      Q. And so is -- is it subject -- I mean,
5  they -- they're saying that, but I'm asking,    10:43:25
6  really, for your, you know, expert opinion on what
7  constitutes sensitive personal information to the
8  extent that you have one.
9      A. Yes.
10     Q. I understand they're saying it -- it was    10:43:35
11 sensitive to them. But is that one of the
12 categories of information that you would consider
13 to be sensitive personal information as you use
14 that term in your report?
15     MS. WEAVER: Objection. Form. Compound.    10:43:51
16     THE WITNESS: Can you just unpack for me,
17 please, what the question is.
18 BY MR. BROOME:
19     Q. Sure.
20     I asked you if IP address is sensitive    10:43:59
21 personal information as you use that term in your
22 report, and you responded by saying, "Well, I read
23 the Plaintiffs' declarations" -- and I apologize
24 if I don't quote your testimony directly -- but
25 paraphrasing, you said, "I read the Plaintiffs'    10:44:18

Page 36

1  declarations, and they say that this is, indeed,
2  sensitive personal information to them."
3      I'm trying to understand whether personal
4  sensitive information is subjective and depends
5  on, you know -- on the user, or the person, or is    10:44:32
6  it an objective standard?
7      MS. WEAVER: So objection to the
8  paraphrasing. Objection to the misstatement of
9  previous testimony. Objection to counsel
10 testifying. And objection, vague.    10:44:47
11     So the last sentence said that I'm trying
12 to understand, could you pose a question to the
13 witness, please.
14 BY MR. BROOME:
15     Q. Is sensitive personal information a -- is    10:45:01
16 that a subjective term, or is it -- is there an
17 objective standard for determining whether
18 something is sensitive personal information?
19     MS. WEAVER: Objection. Vague.
20     THE WITNESS: Can you -- I think what    10:45:19
21 might be helpful is if you could give a little bit
22 of context to -- to what the question is.
23     MR. BROOME: Well, I -- and, yeah, I've
24 been attempting to do that.
25 BY MR. BROOME:    10:45:33

Page 37

10 (Pages 34 - 37)

Q. Is -- is -- is the IP address sensitive --
well, let me just back up.
       Is there an objective definition of what
constitutes sensitive personal information in the
online context -- in the online context?    10:45:45
A. So as I've indicated --
       MS. WEAVER: Sorry.
       Objection. Form. Vague.
       Go ahead.
       THE WITNESS: Yeah. So I indicated    10:45:56
what -- when many scholars, when say -- like a way
of thinking about sensitive personal
information is, it's -- it makes -- if -- if it's
revealed, it's information that would make you
feel -- make a person feel vulnerable, for example,    10:46:14
to negative judgment or vulnerable to negative
consequences, which is a broad definition.
       And what I can tell you is that -- excuse
me. The Plaintiffs' declarations and allegations,
they're -- it's very consist with how as a scholar    10:46:40
I think of sensitive personal information. So
their allegations of what has been taken from them
is sensitive.
BY MR. BROOME:
Q. Okay. You ended with so their allegations    10:46:58

Page 38

of what has been taken from them is sensitive.
       That's based on their subjective beliefs;
correct?
A. And so --
       MS. WEAVER: Objection. Assumes facts.    10:47:11
Misstates prior testimony.
       You may answer.
       THE WITNESS: So my testimony is that what
is happening here is these are exemplars of what is
very consistently -- it's consistent with the    10:47:27
research on what people deem to be sensitive
information. It -- so -- so, yes. It's -- it's --
it's not like they're saying this out of the blue.
It's very much consistent with the research.
BY MR. BROOME:    10:47:47
Q. When you say "it's consistent with the
research on what people deem to be sensitive
information," is it your testimony that by and
large people consider browsing history
information, for example, to be sensitive personal    10:48:03
information?
       MS. WEAVER: Objection. Misstates prior
testimony. Vague.
       THE WITNESS: So it -- it matters, the
context in which the information is taken. It's --    10:48:17

Page 39

it -- it -- it can be -- what's -- I think one of
the reasons why we're maybe struggling a little bit
to communicate here is that it's not a very natural
way to think about information kind of divorced
from a context. And so when you say like browsing    10:48:39
history, well, you need to kind of -- I would need
to unpack that, what that means to a person. And
in what context it was taken.
BY MR. BROOME:
Q. What's your understanding of the context    10:48:53
in which it was taken in this case?
A. So I have seen -- I've read the
depositions -- and I -- I've also been shown it,
as an example myself, of -- for example, when --
so the -- the Plaintiffs use Chrome and -- I don't    10:49:13
know that they currently do, actually. They may
have stopped that because of this. But at one
point at least, they used Chrome, and they were
not synced. And their expectation was that -- was
that, for example, their browsing history was not    10:49:35
going to be shared with Google when, for example,
someone is on, say, a New York Times website, that
information would not be sent to Google. That's
one example.
       There are -- you know, there's many    10:49:53

Page 40

examples in the documents of occasions when their
information has been taken, and they view it to be
an invasion of their privacy.
Q. Right.
       You -- you said earlier that the context    10:50:07
in which the information is taken is relevant to
the question of whether the information is
sensitive personal information; is that right?
A. So I would say that context -- yes,
context matters. But it's not that -- it's not    10:50:26
that things are so wishy-washy that you -- you
know, everything is different in every single --
in every different context. It's not to say that
there's no general -- there's no consistency
across contexts. So there's kind of contextual    10:50:44
influences. But then there are also some more --
some -- some general principles at play.
Q. Is the --
A. For example --
Q. Sorry.    10:51:00
A. -- when you asked me, you know, categories
of information, when you ask me about categories
of information, there are categories that tend to
be sensitive, right; like, for example, sexual
preferences. So it's not -- I don't want it to    10:51:19

Page 41

11 (Pages 38 - 41)

1 seem like, you know, it's -- everything is -- is
2 different in every single context all the time.
3 But context does matter a great deal.
4          And what I will say is that a really
5 important part of this that I don't want to kind    10:51:33
6 of -- I don't want it to go -- maybe it's -- well,
7 is that control and consent matter a great deal
8 in -- when we think about what is a privacy
9 invasion, and -- and here this is so consistent.
10 It's really overwhelmingly consistent in the --    10:51:57
11 the -- the Plaintiffs' various statements is that
12 they didn't consent.  And so that really is a --
13 is driving force.  It's behind why this is an
14 invasion, behind their allegation; right?
15  Q.  Right.  No.  That's helpful.  And I think    10:52:19
16 I -- we maybe sort of honing in on the issue here.
17          Is -- is it your opinion Google
18 misappropriated -- let me -- let me start again.
19          Is it your opinion that the information
20 Google misappropriated from the Plaintiffs is    10:52:38
21 sensitive personal information because it was not
22 obtained with their -- with Plaintiffs' concept?
23  A.  I would say that is not the -- I would say
24 the fact that this information -- they -- they did
25 not consent contributes to the -- the privacy    10:53:03

Page 42

1 invasion here.
2  Q.  If they had consented --
3  A.  But you can still have an -- you can still
4 have an invasion of privacy, you know, setting
5 that issue aside, but that's -- it's really the    10:53:17
6 core thing here, I think, is the lack of consent.
7 I -- I don't -- I don't see how one could say that
8 these people consented --
9  Q.  Okay.
10  A.  -- to what was happening to them.    10:53:32
11  Q.  We'll -- we'll come back to that.
12          I asked you if it was your opinion that --
13 that the information Google allegedly
14 misappropriated from Plaintiffs is sensitive
15 personal information because it was not obtained    10:53:45
16 with Plaintiffs' consent, and you responded that
17 you would say that the fact -- the fact that they
18 did not consent contributes to the privacy
19 invasion, but I'm trying to focus on what you mean
20 by sensitive personal information.    10:54:01
21  A.  Mm-hmm.
22  Q.  So if Plaintiffs had consented to the
23 collection of the information at issue, would that
24 information still qualify as sensitive personal
25 information as you use that term in your report?    10:54:14

Page 43

1          MS. WEAVER:  So objection to testimony by
2 questioning counsel.  Objection to incorrect
3 paraphrasing of previous testimony.  And objection,
4 vague.
5          You can answer if you understand.    10:54:33
6          THE WITNESS:  Okay.  Can you please
7 answer -- ask the question again.
8          MR. BROOME:  Yeah.
9          And, Lesley, if you want, you can say just
10 "objection," and it preserves -- will agree it    10:54:41
11 preserves every conceivable objection that you
12 can -- that you can think of.
13          MS. WEAVER:  Steve, I don't appreciate the
14 sarcasm, Mr. Broome.
15          MR. BROOME:  I wasn't being sarcastic.    10:54:59
16          MS. WEAVER:  It's unusual to have a
17 questioning lawyer recite paragraphs and
18 recitations to the witness and then make statements
19 about his understanding.
20          If you wish to pose a clean question to    10:55:06
21 the witness, you won't get an objection.
22          MR. BROOME:  I -- I wasn't -- I wasn't
23 being sarcastic.  I was -- I was being serious,
24 that if you want to limit your objections to form,
25 I would agree that that covers every objection you    10:55:22

Page 44

1 may have.  And I think that would speed things
2 along, but it's your prerogative as to how you
3 object.
4 BY MR. BROOME:
5  Q.  Let me ask the question again.    10:55:29
6          If Plaintiff had consented to the
7 collection of the information at issue, would that
8 information still qualify as sensitive personal
9 information as you use that term in your report?
10  A.  Can you tell me when you say "consent"    10:55:40
11 what you mean by that?
12  Q.  If -- if Google had said, "We're going to
13 collect this information under the following
14 circumstances," and Plaintiff said, "I agree."
15  A.  Well, I don't think it's a simple as that    10:55:59
16 in the sense that the -- the person has to
17 actually really understand what is happening.
18 They need to understand -- they need to understand
19 what is actually going to be happening in order to
20 give informed consent.    10:56:20
21          I -- you know in my review, everything
22 I've reviewed to create my report, my conclusion
23 is that they did not consent.
24  Q.  Okay.  I'm going to ask you to assume that
25 they did.  I'm going to -- I'm going to ask you to    10:56:37

Page 45

12 (Pages 42 - 45)

1 assume that the Plaintiffs were shown a disclosure
2 that clearly describes the data collection at
3 issue in this case and they read it and they
4 understood it and they said, "I agree."
5      In that scenario, with those assumptions,    10:56:52
6 would it be your opinion that the information at
7 issue in this case qualifies as sensitive personal
8 information as you use that term in your report?
9      MS. WEAVER: Objection. Assumes facts not
10 in evidence. Calls for speculation.    10:57:09
11      THE WITNESS: It's a bit -- it's a bit
12 hard to go on. You would -- I'm -- I'm trying. I
13 just find it -- it's a very implausible assumption
14 because it's just so clear that they're not
15 consenting. So why would I entertain a    10:57:27
16 hypothetical? Like it's -- it's -- it's just,
17 like, a really flawed assumption.
18 BY MR. BROOME:
19      Q. That's --
20      A. It makes it hard for me to answer the    10:57:37
21 question. I apologize.
22      Q. Yeah. Part of the -- part of the process
23 with experts is that you're -- we're allowed to
24 ask them to assume certain facts because a lot --
25      A. Mm-hmm.    10:57:46

Page 46

1      Q. -- of the facts are in dispute; for
2 example --
3      A. Mm-hmm.
4      Q. -- whether Plaintiffs consented. And
5 we're going to come back to that issue and the    10:57:54
6 documents that you looked at.
7      So I would like you to assume that consent
8 was obtained here. And the question to you is:
9 Assuming that consent was properly obtained by
10 Google, is the information that was collected    10:58:10
11 sensitive personal information as you use that
12 term in your report?
13      MS. WEAVER: Okay. Same objections. And
14 vague as to "information."
15      Answer if you can.    10:58:32
16      THE WITNESS: Okay.
17      Okay. No --
18      THE COURT REPORTER: Excuse me, I didn't
19 hear what counsel said at the end.
20      MS. WEAVER: Oh, I'm sorry. I said answer    10:58:42
21 if you can.
22      THE WITNESS: I apologize. I -- part of
23 it is I -- could you please, Mr. Broome, ask the
24 question again?
25 BY MR. BROOME:    10:58:55

Page 47

1      Q. Yeah.
2      I said I'm going to ask you to assume that
3 consent was obtained here. And my question to
4 you --
5      A. Mm-hmm.    10:59:05
6      Q. -- is: Assuming that consent was properly
7 gained but Google, is the information that was
8 collected sensitive personal information as you
9 use that term in your report?
10      A. I see.    10:59:19
11      Okay. So I -- thank you for clarifying.
12 I understand that part of this process is rolling
13 with assumptions. So just to be super clear, that
14 I think that is not a valid assumption here.
15 They're not giving consent.    10:59:35
16      Now, if -- if I was to imagine that they
17 had given consent, would -- your question is would
18 this information count as sensitive personal
19 information, and I think that -- so the -- what
20 I've read about the things that have been    11:00:01
21 ████████████████████████████████████████
22 I mean, that is -- that is sensitive information
23 whether someone consented or not. That -- that
24 would something that is considered sensitive
25 personal information.    11:00:18

Page 48

1      Q. Let me pause --
2      A. Even if -- yeah, sorry. What were you
3 saying?
4      Q. Well, I'll let you finish. I'll come back
5 ██████████████████████        ████████████
6      A. I'm sorry, I've -- I've lost my train of
7 thought --
8      Q. Okay. Let's --
9      A. -- let's reset me.
10      Q. Okay. Why don't -- why don't we stop and    11:00:36
11 pause there, then.
12      Is it your understanding that Google
13 ████████████████████████████████████████
14 status?
15      A. So I believe in -- now, there's a lot of    11:00:48
16 documents that I reviewed. So I would have to go
17 back to the exact documents. But I believe that
18 there was someone who was searching for something
19 ████████████████████████████████████
20 was collected by Google. But, again, I would -- I    11:01:08
21 would want to -- you know, there's a lot of
22 information in this case. So I would want to look
23 at the exact -- that's what I meant when I said
24 that.
25      Q. Okay. Well, you would agree that visiting    11:01:19

Page 49

13 (Pages 46 - 49)

**Page 50**

```
3        MS. WEAVER:  Objection.  Assumes facts.
4        THE WITNESS:  So can you ask the question
5    again?                           11:01:35
6    BY MR. BROOME:
7        Q.  You would agree that -- that visiting a

10       A.  I would say that the way we behave online   11:01:45
11   is deeply revealing of our personal -- including
12   sensitive personal attributes.
13       Q.  Can you answer the question I asked?
14       A.  The question was --
15       MS. WEAVER:  I'm sorry.  Objection.  Form.   11:02:08
16   BY MR. BROOME:
17       Q.  You would agree that visiting a web page

20       MS. WEAVER:  Same objection.          11:02:19
21       THE WITNESS:  What I was referring to is
22   how -- I'm referring to when you are browsing the
23   internet, the sites you go to, they leak
24   information.  Your behavior -- it's not like your
25   behavior online is like divorced from who you are.   11:02:36
```

**Page 51**

```
1    The things you do online reveal a lot of
2    information about yourself, especially when
3    combined with all the kinds of information that
4    Google is collecting.
5        I mean, it's -- you're collecting person   11:02:53
6    level identifiable information, and you're making
7    inferences about them.  This is my understanding
8    from -- from the case.  So there's a great deal of
9    sensitive personal information that is being
10   collected here.                  11:03:08
11   BY MR. BROOME:

14       MS. WEAVER:  Asked and answered.
15       Restate your answer.            11:03:19
16       THE WITNESS:  Yeah.  So my -- my answer --
17   I'm trying to answer your question.  My -- my
18   answer is that what we do online, the sites we go
19   to is related to our personal attributes.  It does
20   say -- reveal information about ourselves.     11:03:37
21   BY MR. BROOME:
22       Q.  That's not my question.
23       A.  My ans-- --
24       Q.  That's not my question.  You're answering
25   a different question.              11:03:45
```

**Page 52**

```
1        I could be an --
2        A.  I -- I --

4        THE COURT REPORTER:  Excuse me, could you
5    start over, sir.
6        MR. BROOME:  Sure.
7    BY MR. BROOME:
8

11       A.  I guess there's --
12       MS. WEAVER:  Objection.  Relevance.
13       Go ahead.
14       THE WITNESS:  It's a bit -- so my answer
15   is -- I'm answering the question as it pertains to   11:04:08
16   the case.  And you -- when I -- I brought up the

18   answer is that when -- when you go to a website it
19   tells -- it reveals informa-- it reveals
20   something about you.              11:04:29
21   BY MR. BROOME:
22       Q.  Yes.  But I think what you said is that
23   Google collected information about an individual's
```

**Page 53**

```
1    status; correct?
2        A.  So what I'm saying is that -- like it
3    is -- it -- it's very much -- because what you do
4    online is who you are in a way, it very much
5    reveals information about you.  And so if I go to   11:05:06

7    Like it's not like -- it is a -- it is a -- it
8    gives you information, predicted -- pre- --

10   status.  It gives you information about that   11:05:29

12       Q.  In the next sentence of your report, you
13   write, "As is common practice" -- and -- and I'm
14   sorry, we're going back to Exhibit 1 here.
15       A.  Okay.                     11:05:45
16       Q.  You should have in front of you.
17       The second paragraph, second sentence, "As
18   is common practice-in both academia and in
19   industry-I studied these topics by conducting
20   experiments, surveys, and survey-based experiments   11:05:56
21   in which I present samples of research
22   participants with stimuli and measure their
23   resultant attitudes, thoughts, and behaviors."
24       Do you see that?
25       A.  Yes.                       11:06:07
```

14 (Pages 50 - 53)

1    Q.  In -- in your career, you have conducted
2  surveys?
3    A.  Yes.
4    Q.  And how many have you conducted?
5    A.  I couldn't give you an exact number.    11:06:13
6  Thousands.
7    Q.  Can you give me -- thousands?
8        MS. WEAVER:  Yeah, please allow her to
9  finish her answer.
10  BY MR. BROOME:    11:06:33
11    Q.  Did you -- did you say "thousands"?
12    A.  Yes, probably thousands.
13    Q.  When did you start conducting surveys?
14    A.  Surveys -- I'm sorry, I'm going back to my
15  childhood and thinking about nerdy science    11:06:43
16  projects.  I don't think that's what you mean.
17        You mean like scholarly research --
18    Q.  Yes.
19    A.  -- survey research?  "Yes"?
20    Q.  Yes.    11:06:55
21    A.  Yes.
22        So since -- I suppose in undergrad I was
23  trained -- I began my training -- I received
24  training on this.  And so as part of that, I would
25  have done some.    11:07:10

Page 54

1        But then in graduate school, I did -- you
2  know, I really was doing more in earnest.  And,
3  you know, up to today I have been doing them.
4    Q.  Okay.  And when you say "thousands," do
5  you mean like 1,000?  5,000?  10,000?    11:07:22
6    A.  I don't know off the top of my head.  I --
7  I mean, if -- if it's worth the time, I could be a
8  little more precise in how I think about it and --
9  you know, how many per week, per month, times
10  years.  We can do that, if it's -- it's helpful to    11:07:42
11  you, if you want a more specific number.
12    Q.  Yeah.  Well -- well, I -- and it doesn't
13  need to be specific, but I'm trying to -- but
14  I'm -- I'm trying to get sort of an approximation.
15        I mean, when you say "thousands," that to    11:07:50
16  mean suggests that you're conducting surveys on an
17  almost weekly basis.
18        Is that -- is that accurate?
19    A.  Yes.
20    Q.  Okay.  And is each survey different, like    11:08:00
21  you're designing a new survey every week?
22        MS. WEAVER:  Objection.  Vague.
23        THE WITNESS:  So the question is?
24  BY MR. BROOME:
25    Q.  Well, I'm -- I'm sort of trying to    11:08:17

Page 55

1  understand how you're -- you're -- these seem like
2  pretty high numbers.
3        When -- when you say I've conducted
4  thousands of surveys, do you mean you've con- --
5  you've surveyed thousands of people or that you've    11:08:29
6  actually designed and conducted thousands of
7  independent surveys?
8        MS. WEAVER:  Objection to counsel's
9  testimony that it seems like very high numbers.
10        You may answer.    11:08:43
11        THE WITNESS:  So, yeah, I mean, I -- I do
12  a lot of research, and so I run a lot of studies.
13  BY MR. BROOME:
14    Q.  All right.
15        Well, why don't -- why don't we do this,    11:08:54
16  what was the last survey that you conducted?
17    A.  So --
18        MS. WEAVER:  And I'll just object to the
19  extent it was confidential work for somebody, you
20  shouldn't --    11:09:09
21        THE WITNESS:  Yes.
22        THE COURT REPORTER:  I'm sorry, I can't
23  hear you, Counsel.  Could you repeat?
24        MS. WEAVER:  Yes.
25        I said I'll object.  To the extent that it    11:09:15

Page 56

1  was confidential work, you should not reveal it.
2  But, otherwise, you can answer the question.
3        THE WITNESS:  So I believe we have one
4  running this week.  I ran at least one last week.
5  BY MR. BROOME:    11:09:33
6    Q.  And what --
7    A.  It's a regular activity collecting data.
8    Q.  Okay.  And what -- what was the one that
9  you ran this week, just generally speaking?  Give
10  me a -- a -- a summary of it, if it's not, you    11:09:42
11  know --
12    A.  What was the survey about?
13    Q.  What was the survey about?
14    A.  I believe it was about perceptions of --
15  it was a -- a pilot study for -- we're working on    11:09:59
16  a paper that is about how people perceive others
17  when they reveal a weakness, a flaw.
18        Like if a CEO, for example, says, "Oh,
19  sometimes I get anxious public speaking."  And so
20  we're trying to understand how employees would --    11:10:20
21  how -- how -- when a -- when a CEO reveals a
22  weakness like that, how it might affect employees'
23  perceptions of that CEO.  And so we have many
24  studies we have run that look at this question.
25        And so I -- one of the studies I think we    11:10:36

Page 57

15 (Pages 54 - 57)

1  have going on this week is to -- you know, there's
2  like lots of different facets of this question, of
3  course, is to -- to do a pilot where we ask
4  people -- we show them different statements within
5  the context of our experiment, and we ask them    11:10:53
6  whether they think -- what they think of that
7  weakness, whether they think it's a weakness and
8  so on. That's one example of a -- of a -- study
9  that we're doing right now --
10  Q. Okay.    11:11:10
11  A. -- at least.
12  Q. And -- and what is the -- what are the
13  benefits of conducting a survey as opposed to
14  other forms of research in your field?
15  A. Well, I guess I would have to ask you    11:11:21
16  relative to what. It's easier to think of the
17  strengths and weaknesses of a given methodology if
18  it's put in context with something else.
19  Q. Okay. Do you study consumer expectations
20  in your field of research?    11:11:39
21  MS. WEAVER: Objection. Vague.
22  THE WITNESS: In -- can you just define a
23  little bit what you mean by that?
24  BY MR. BROOME:
25  Q. Do you study consumer expectations in the    11:11:51

Page 58

1  context of online privacy?
2  A. Yes. I've studied what people deem
3  privacy invasions, for example.
4  Q. Okay. And do you -- do you study -- do
5  you -- have you studied that by conducting    11:12:06
6  surveys?
7  A. In part.
8  Q. Okay. And -- and what was the purpose of
9  conducting -- conducting the survey?
10  A. What specific survey are you referring to?  11:12:17
11  Q. Any -- any surveys that you have used to
12  study privacy in the online context.
13  A. The question is, what was the purpose of
14  the survey to do that?
15  Q. Yeah. Why -- why would you use a survey?  11:12:34
16  What purpose does a survey serve?
17  A. Mm-hmm. A survey can serve lots of
18  different purposes. It depends on the specific
19  research question.
20  Q. Okay. You -- you -- you say -- in the    11:12:49
21  sentence that we just focused on, you say that the
22  common method is to "present samples of research
23  participants with stimuli and measure their
24  resulting attitudes, thoughts, and behaviors, and
25  then make generalizations from the findings." [As    11:13:03

Page 59

1  read]
2  What kind of stimuli do you show to survey
3  participants?
4  A. Right.
5  So "stimuli" is -- it's a broad word.    11:13:11
6  Intentionally broad because there's lots of
7  different things one could ask about.
8  So if -- the -- the nature of the stimuli
9  depend on the -- the experiment in question. So
10  a -- stimulus could be -- you know, you could    11:13:30
11  show a person a -- a [verbatim] image of a
12  product, product packaging, and ask them what they
13  think.
14  A stimulus could be getting them to watch
15  a video clip. That's what I'm referring to there    11:13:44
16  in terms of a -- a stimulus.
17  Q. Have you ever conducted a survey where the
18  stimulus was a privacy policy or some other form
19  of privacy disclosure?
20  A. Yes.    11:14:00
21  Q. Okay. How many times have you done that?
22  A. The number of surveys I have done on
23  that --
24  Q. Yes.
25  A. -- where that is --    11:14:10

Page 60

1  Q. Where you're -- where you were measuring
2  attitudes, thoughts, or behaviors with respect to
3  a privacy policy.
4  MS. WEAVER: Objection. Form.
5  THE WITNESS: I -- I don't know the exact    11:14:26
6  number.
7  BY MR. BROOME:
8  Q. Many times?
9  A. Yes.
10  Q. Okay. And in -- and -- and have you ever    11:14:32
11  used a -- well, withdrawn.
12  Have you ever conducted a survey where you
13  asked consumers how they interpreted a particular
14  company's privacy policy?
15  A. Can you define that a little more    11:14:52
16  concretely?
17  Q. Have you ever conducted a survey where you
18  showed survey participants a particular company's
19  privacy policy and then asked them how they
20  interpreted aspects of that policy?    11:15:09
21  A. So I have shown people in my research
22  privacy policies, yes, and asked them about their
23  resultant attitudes and behaviors systematically
24  varying the policies. I have done that before.
25  Q. Okay.    11:15:33

Page 61

16 (Pages 58 - 61)

1        MR. BROOME:  We've been going for a little
2   over an hour.  It's up to you, but we can take a
3   short break, if you'd like, or we can keep going.
4        THE WITNESS:  I'm still -- I'm doing okay
5   if you are.                        11:15:48
6        MR. BROOME:  Okay.
7        THE COURT REPORTER:  This is the court
8   reporter.  I'm going to ask for a brief break,
9   please.
10       MR. BROOME:  Okay.  We can go off the      11:15:58
11  record.
12       THE WITNESS:  Okay.
13       THE VIDEOGRAPHER:  Off the record at
14  11:15 a.m.
15       (Short recess taken.)            11:20:18
16       THE VIDEOGRAPHER:  We are back on the
17  record at 11:24 a.m., Eastern Time.
18  BY MR. BROOME:
19   Q.  Professor John, do you agree that to
20  determine how consumers interpret in particular      11:25:08
21  privacy disclosure it is helpful to do a -- to --
22  to do a survey that asks consumers how to
23  interpret that disclosure?
24   A.  Well, I think it depends on the specifics
25  at hand.                           11:25:25

                                        Page 62

1    Q.  Okay.  And -- well, in this case, do you
2   believe it would be helpful to conduct a survey to
3   determine how consumers interpret the Chrome
4   privacy notes, for example?
5    A.  So I -- the opinions in my reports, I made   11:25:45
6   them -- a -- a -- a survey was not necessary to
7   come to the conclusions that I came to because the
8   evidence was overwhelming that it -- it wasn't --
9   it -- it wasn't needed to do a survey to reach the
10  conclusions that I reached to answer the questions   11:26:11
11  that I was assigned.
12   Q.  In -- in your report, under the
13  heading "My Opinions" on page 2, Opinion 1 is --
14   A.  Yes.
15   Q.  -- Opinion 1 is "A common methodology can   11:26:41
16  be applied to answering questions about consumer
17  expectations and actions and would not require
18  individual questioning of all consumers."
19       And then you identify the common
20  methodology -- or a common methodology being      11:26:56
21  surveys; correct?
22       MS. WEAVER:  Objection.  The document
23  speaks for itself.
24  BY MR. BROOME:
25   Q.  Is it correct?                 11:27:09

                                        Page 63

1    A.  So are you -- I guess if you could point
2   me to exactly what part of my opinion you're
3   referring to, then I could shed -- I could talk
4   about that.
5    Q.  Under the heading "My opinions" --      11:27:20
6    A.  Yes.
7    Q.  -- Number 1, "A common methodology can be
8   applied to answering questions about consumer
9   expectations and actions and would not require
10  individual questioning of all consumers"; right?    11:27:31
11   A.  Yes, that's what it says.
12   Q.  All right.
13       And then you say in the second sentence in
14  that heading -- under that heading, "Consumer
15  behavior can be observed in a variety of ways, a    11:27:41
16  common one being surveys, in which participants
17  are asked a series of questions, often about
18  specific stimuli they are presented."
19       Do you see that?
20   A.  Yes.                          11:27:52
21   Q.  Is -- are surveys the common methodology
22  that you identify in your first opinion as being a
23  way that one could answer questions about consumer
24  expectations and actions?
25       MS. WEAVER:  Objection.  The document does  11:28:11

                                        Page 64

1   not state "the common methodology."  It says "a
2   common methodology."
3        Do you want to restate the question?
4   BY MR. BROOME:
5    Q.  Do you understand the question?        11:28:29
6    A.  Sorry, I thought -- I was waiting on you,
7   Mr. Broome.  Could you restate the question, then,
8   please.
9    Q.  When you refer to "a common methodology"
10  in your first opinion, what methodology are you     11:28:40
11  referring to?
12   A.  So what I'm referring to in this opinion
13  is the notion that to understand what -- to
14  understand -- to come to conclusions about
15  consumer expectations, you don't need to survey     11:29:03
16  every single consumer.  You don't have to question
17  every single person.
18       You can make generalizations based on
19  research that has been done.  So the -- the key
20  thing is that -- the -- the -- the point of this    11:29:30
21  part is to say you can -- you have insights on
22  people.  You don't need to question a hundred
23  percent of the people in a population, for
24  example.  Like that's just kind of how science
25  works.                            11:29:45

                                        Page 65

17 (Pages 62 - 65)

1  Q. Well, okay. Are -- are you saying that --
2  that for -- when you refer to "a common
3  methodology," are -- are -- I mean, I -- I
4  understand your point that you wouldn't need to
5  ask every single Chrome user, for example, what          11:29:58
6  their expectations were.
7  A. Mm-hmm.
8  Q. When you refer to "a common methodology,"
9  is the methodology that you're referring a survey
10  of, say, a sample of Chrome users?          11:30:10
11  MS. WEAVER: Objection. Vague. Misstates
12  the document.
13  THE WITNESS: Okay. Can you repeat the
14  question, please.
15  BY MR. BROOME:          11:30:20
16  Q. When you refer to "a common methodology"
17  in the first -- in your first opinion, is the
18  methodology to which you're referring a survey of
19  a sample of Chrome users?
20  MS. WEAVER: Objection. "Methodology" is          11:30:33
21  not in that sentence. It misstates the record.
22  MR. BROOME: It is in the sentence,
23  Lesley. It reads, "A common methodology can be
24  applied to answering questions about consumer
25  expectations." [As read]          11:30:46

Page 66

1  I'd really ask that you limit your
2  objections to objections [verbatim] when the
3  witness is testifying.
4  MS. WEAVER: I'm sorry, which sentence?
5  That just misstates the record. Which sentence          11:30:52
6  says that?
7  MR. BROOME: Opinion 1.
8  MS. WEAVER: Okay. I thought you were
9  reading the sentence you had just read. I
10  apologize.          11:31:04
11  THE WITNESS: So I'm not referring to a
12  singular methodology. I'm referring to the notion
13  that you can make generalizations about people by
14  studying a sample of them and -- so let me just
15  underscore that the -- well, let me leave it there          11:31:33
16  and then you ask your next follow-up question.
17  Sorry, I sort of lost my train of thought there.
18  BY MR. BROOME:
19  Q. Well, it is -- when -- when you refer to
20  "a common methodology," would reading the --          11:31:47
21  the -- the plaintiffs' deposition transcripts and
22  declarations be a methodology by which you
23  would -- well, let me back up.
24  Would reading the plaintiffs'
25  transcripts -- deposition transcripts and          11:32:07

Page 67

1  declarations be a common methodology as you use
2  that term in Opinion 1?
3  A. I see what you're saying.
4  So I -- I base my opinions on several
5  sources, and those sources converge overwhelmingly          11:32:27
6  on the opinion that I -- I state here. So I
7  didn't -- I didn't -- I didn't -- my opinion is
8  not simply based on reading the plaintiffs'
9  depositions and declarations. It's based on a lot
10  more than that.          11:32:50
11  Q. When you -- when you say "my opinion,"
12  which opinion are you referring to?
13  A. So -- uh-huh. Good. Thank you.
14  So the -- the opinion -- I mean, I can go
15  through each opinion if you want and tell you          11:33:06
16  generally what I relied on.
17  Q. We -- we will do that, but right now I'm
18  just trying to understand what you -- when you say
19  "a common methodology can be applied" in Opinion
20  1, what -- I -- I -- I think I understand you're          11:33:20
21  saying that you're not referring to any specific
22  methodology.
23  Is that your testimony?
24  A. I'm not -- so I'm not saying that --
25  sorry, can you ask the question again?          11:33:35

Page 68

1  Q. In Opinion 1 you refer to "A common
2  methodology that can be applied to answering
3  questions about consumer expectations and
4  actions." [As read]
5  What is the methodology?          11:33:52
6  A. So a variety of methodologies are used --
7  I -- are used to -- to measure, to assess, to
8  understand consumer expectations. It's not
9  limited to surveys necessarily.
10  Q. Okay. But how -- how does Opinion 1          11:34:17
11  relate to this case? What -- what -- what -- can
12  you explain -- can you tell me what you're opining
13  on in Opinion 1?
14  MS. WEAVER: Objection. Form.
15  THE WITNESS: So I guess I don't want to          11:34:32
16  speculate like on the philosophy of the case.
17  That's not my -- my area. I can tell you what I
18  mean with this opinion.
19  BY MR. BROOME:
20  Q. Yes. That's what I'm trying to -- trying          11:34:44
21  to ask. Thank you.
22  A. Okay. So what I mean here is the idea
23  that you can come to conclusions about people's
24  expectations, say, of privacy using a
25  methodology -- you don't have to survey every          11:35:02

Page 69

18 (Pages 66 - 69)

1 single person. You can use methodologies that --
2 and -- and a variety of methodologies that -- that
3 answer these questions.
4     Sorry, that was not a very eloquent
5 answer.                                11:35:22
6     But my point is that you don't have to --
7 it's just as what it says. You don't have to
8 question every single consumer to come to an
9 informed science-backed opinion.
10 Q. Aside from -- in Opinion 1, you identify    11:35:42
11 surveys as a common methodology; correct?
12 A. In Opinion 1 I say that surveys are a way
13 of understanding people and their expectations.
14 Q. Okay.
15 A. A survey is a tool that one can use.    11:36:07
16 Q. Okay. And what are the other -- you
17 referred to "peer-reviewed,
18 scientifically-accepted methodologies to form
19 general conclusions about consumer behavior." [As
20 read]                                  11:36:19
21     What are the other peer-reviewed,
22 scientifically-accepted methodologies?
23     MS. WEAVER: Objection. Assumes facts.
24     Answer the question, if you can.
25     THE WITNESS: So the question is --    11:36:30

Page 70

BY MR. BROOME:
1
2 Q. Opinion 1 --
3 A. Sorry, what's the question?
4 Q. Opinion 1 refers to "a common
5 methodology."                          11:36:43
6     I believe, and you correct me if I'm
7 wrong, that one common methodology that you
8 identify in Opinion 1 is surveys.
9     Is that a rea-- is that correct?
10 A. Surveys are a tool used by researchers to    11:36:52
11 answer questions about consumer expectations and
12 beyond.
13     They are a -- a [verbatim] accepted --
14 a -- you know, a -- a used -- generally used or --
15 I don't know if generally is -- I don't like that    11:37:06
16 word.
17     But they're a tool that -- that scholars
18 use to answer these types of questions. There are
19 other tools.
20     And when I think about what gives me    11:37:16
21 confidence in an opinion, it's convergent methods.
22 So do multiple sources of information point to the
23 same conclusion? That's -- that's the kind of
24 general way I think about how to come to a
25 conclusion.                            11:37:33

Page 71

1     And for the -- my assignment questions
2 for -- let's just be specific here and take
3 Assignment Question Number 2, "Does the reasonable
4 consumer care about their privacy on the
5 internet?"                             11:37:46
6     The body of work is -- that exists on this
7 topic is just -- it's clear that, yes, consumers
8 do care about their privacy on the internet.
9     And as an additional, you know, source of
10 information here is that the -- the rich    11:38:07
11 qualitative data points that the plaintiffs have
12 provided are consistent with that body of
13 scholarly work.
14 Q. Let's stay -- stay focused on Opinion 1.
15 We'll come to Opinion 2.               11:38:25
16     Are surveys a common methodology that can
17 be applied to answering questions about consumer
18 expectations and actions?
19     MS. WEAVER: Objection. Asked and
20 answered at least five times.          11:38:37
21     You may answer the question again.
22     THE WITNESS: So surveys are a tool that
23 researchers use -- they're a tool that researches
24 use to understand a variety of things about people
25 and stuff. They're -- they're -- they're a broad    11:38:53

Page 72

1 tool.
2 BY MR. BROOME:
3 Q. I -- I understand that, and that's what --
4 you said in your last answer that they're a tool.
5 I'm trying to understand if you consider them to    11:39:01
6 be -- and I'm quoting from your report, "A common
7 methodology that can be applied to answering
8 questions about consumer expectations." [As read]
9     MS. WEAVER: Objection.
10     Is there a question?               11:39:14
11     MR. BROOME: Yes.
12 BY MR. BROOME:
13 Q. Are they?
14     MS. WEAVER: And what's your question?
15     THE WITNESS: The question?         11:39:24
16 BY MR. BROOME:
17 Q. Opinion 1 states, "A common methodology
18 can be applied to answering questions about
19 consumer expectations and actions." [As read]
20     Are surveys such a common methodology?    11:39:34
21 A. And I'm saying that surveys are a way that
22 scholars -- they're -- they're a method that
23 scholars use to answer questions about consumer
24 expectations and beyond. They're -- they're a way
25 of doing that.                         11:39:54

Page 73

19 (Pages 70 - 73)

1    Q.   Are -- are they a common methodology as
2 that term is used in Opinion 1?
3        MS. WEAVER:  Objection.  Asked and
4 answered.
5        THE WITNESS:  So they're a -- they're a    11:40:06
6 common way that we answer questions.  They're not
7 the only way, but -- you know, and I -- as I hope
8 I've said, like I -- when I form these opinions,
9 they're -- you know, they're -- they're formed
10 on -- on solid -- so, yeah, I mean, we can -- we    11:40:28
11 can go through the -- the opinions, and I can -- I
12 can tell you -- can be more -- be specific about
13 the pieces of information that were integral to
14 forming said opinions.  Some of those opinions are
15 based on survey research --    11:40:51
16 BY MR. BROOME:
17    Q.   I'm -- I'm just asking --
18    A.   -- because it's a -- yeah.
19        MS. WEAVER:  Please allow her to finish
20 her answer, Steve.    11:41:06
21        THE WITNESS:  So my answer is that surveys
22 are -- it's a -- it's a tool we use to answer
23 research questions.
24 BY MR. BROOME:
25    Q.   I know.  I'm just -- I'm just trying to    11:41:13

Page 74

1 get an answer because you use the term in Opinion
2 1, in the heading, in bold font, you say "A common
3 methodology can with applied" [as read]; right?
4    A.   Yeah.
5    Q.   Agreed?  Okay.    11:41:23
6        And then in the first paragraph you
7 mention surveys, and I am just asking a very
8 simple question.
9        Are surveys a common methodology that can
10 be applied to answering questioning about consumer    11:41:33
11 expectations?
12    A.   I guess I'm --
13        MS. WEAVER:  This is actually getting
14 harassing because it's the same question.  I can
15 read it back.  You've asked her five times.    11:41:44
16        MR. BROOME:  She -- she is not answering
17 the question.
18        MS. WEAVER:  She is answering the
19 question --
20        (Simultaneous speaking.)    11:41:49
21        (Interruption in audio/video.)
22        MR. BROOME:  At all --
23        MS. WEAVER:  You just don't like the
24 answer.  Her answer is, It is -- and I'll read back
25 to you.  Her answer is, "They're a common way to    11:41:53

Page 75

1 answer questions.  They're not the only way."
2        MR. BROOME:  I understand that.  I'm not
3 asking if it's the only way.
4 BY MR. BROOME:
5    Q.   I'm just -- I'm trying to understand how    11:42:02
6 you are using the term "common methodology" in
7 Opinion 1.
8    A.   The way I'm using "a common methodology,"
9 I'm -- I'm saying that you can use research
10 methods to answer the questions that I was given.    11:42:14
11        Like, I mean, I'm a -- I'm a scientist,
12 and so I -- I am basing my opinions on research
13 that -- you know, and I -- I use different pieces
14 of -- different scholarly pieces of work have
15 supported my opinions here.    11:42:32
16        So surveys are not the only -- like
17 surveys are a tool that we use.  And some of the
18 stuff that I quote, some of it is surveys.  Some
19 of it is meta analysis, like thinking about
20 several studies as a whole and drawing    11:42:57
21 conclusions.
22        So there's -- the -- the key thing -- like
23 a key guiding principle I use was convergent
24 methods.  So do multiple pieces of information
25 converge on the same or similar conclusions?    11:43:13

Page 76

1    Q.   Okay.  Let's go back to page one of your
2 declarations, Exhibit 1.
3        In the second paragraph, second sentence,
4 you say, "I study these topics by conducting
5 experiments, surveys, and survey-based    11:43:32
6 experiments."
7        Do you see that?
8    A.   Yes.
9    Q.   Did you conduct any experiments, surveys,
10 or survey-based experiments for purposes of    11:43:46
11 rendering the opinions in your report in this
12 case?
13    A.   So I relied on a lot of research that
14 answers the questions that I was assigned.
15    Q.   Not my question.    11:44:02
16        My question is:  Did you conduct any
17 experiments, surveys, or survey-based experiments
18 for purposes of rendering the opinions in your
19 report in this case?
20    A.   Are you asking me whether I was    11:44:17
21 commissioned by the law firm to do a specific
22 study here as in --
23    Q.   Whether you were commissioned or not, once
24 you were retained for this case, did you conduct
25 any experiments, surveys, or survey-based    11:44:30

Page 77

20 (Pages 74 - 77)

Page 78

1  experiments specifically for purposes of rendering
2  your opinions in -- in your -- the opinions your
3  report in this case?
4      A.  So there have been so many studies
5  conducted on the topics that I was asked to weigh    11:44:49
6  in on, so many.  There's been a lot of research
7  that speaks to the questions -- Questions 1, 2,
8  3 -- Question 4 is making a connection between the
9  Plaintiffs -- and so my research is fundament --
10  my -- my opinions are fundamentally based on    11:45:10
11  research.
12      Some of that research is survey --
13  survey-based research.  There's a lot -- there's
14  so much research out there that I drew on to
15  answer these questions.  And it was so    11:45:26
16  overwhelming what this -- what the research -- the
17  conclusions have pointed to that I -- I didn't --
18  I didn't need to collect more data -- like I --
19  had sufficient information to draw on, that the
20  conclusions I made are just -- they're -- yeah.    11:45:45
21  They're -- I had sufficient evidence to make the
22  conclusions that I made.
23      Q.  I'm not -- I'm asking a very specific
24  question, Professor John.
25      Did you conduct any experiments, surveys,    11:46:00

Page 79

1  or survey-based experiments specifically for
2  purposes of rendering the opinions in your report
3  in this case?
4      A.  So my report is based in part on the
5  research that I've done in this area.  It's    11:46:20
6  directly informed by the research I've done on
7  this -- in this area.  Did I feel like I had to do
8  an additional one, no, because it's already
9  based -- like there's -- there's overwhelming
10  evidence in support of my conclusions here.  It's    11:46:36
11  not necessary.
12      Q.  Okay.  So the answer to my question --
13      A.  It's my --
14      THE COURT REPORTER:  You said what?
15  Repeat that, please.    11:46:41
16  BY MR. BROOME:
17      Q.  Yeah, let me finish just the question.
18      The answer to my question as to whether
19  you conducted any surveys, experiments, or
20  survey-based experiments specifically for purposes    11:46:52
21  of rendering the opinions in your report in this
22  case is, no, you did not conduct any such
23  experiments or surveys; correct?
24      MS. WEAVER:  Steve, that grossly misstates
25  the record.  She said she did research that she    11:47:10

Page 80

1  relied on here.
2  BY MR. BROOME:
3      Q.  Is that correct?
4      MS. WEAVER:  Object.
5      Answer if you can.    11:47:16
6      THE WITNESS:  Can you state the question
7  again, please.
8  BY MR. BROOME:
9      Q.  The answer to my question as to whether
10  you conducted any experiments, surveys, or    11:47:22
11  survey-based experiments specifically for purposes
12  of rendering the opinions in your report in this
13  case is no; is that correct?
14      A.  So --
15      MS. WEAVER:  Same objection.    11:47:36
16      THE WITNESS:  What I'm saying is that I
17  have been doing research in this area for over ten
18  years.  And so the research that I have done and
19  cited in my report -- and we can walk through the
20  specific things that I relied on -- it directly    11:47:53
21  informs the opinions.  There's also other scholars
22  have done research that directly informs these
23  opinions.
24      So I had enough evidence that I didn't
25  need to initiate an additional survey here.  I    11:48:12

Page 81

1  mean, if I had had different assignment questions,
2  maybe I would have chosen to do that.  But the
3  bottom line here is that it's all -- it -- it is
4  based on research, some of it which is survey
5  research, my -- my opinion.    11:48:35
6  BY MR. BROOME:
7      Q.  Okay.  You just said -- sorry, go ahead.
8  Please finish.
9      A.  So I -- I want to get to -- I'm looking
10  through this exhibit, and I see it's my    11:48:42
11  declaration.  And I -- I want to -- because I
12  think it would be helpful for me to tell you some
13  of the specific research that I'm drawing on here.
14  So I -- I'm scrolling through -- it doesn't have
15  the citations -- because I want -- I want to show    11:48:58
16  you how this is relevant.
17      So, for example, in -- I've done research
18  that looks at what people -- what -- what is an
19  invasion of privacy.  That research in and of
20  itself is scaffolded on -- on giants, right, on --    11:49:21
21  on -- which I cite as well, research about how
22  people -- how we think about what a privacy
23  invasion is, defining it.  And so then what we did
24  with -- in one particular study that I cite here
25  is we assessed people's expectations of privacy    11:49:38

21 (Pages 78 - 81)

1  with respect to behaviorally targeted ads. And
2  what we found was very consist with prior
3  scholarly work on how, for example, people find
4  third-party tracking to be an invasion of privacy;
5  why, because it's like eavesdropping.        11:50:03
6      And -- and this is also consistent with
7  what's happening here and consistent with the rich
8  qualitative data, another form of data, that the
9  Plaintiffs -- or the things the Plaintiffs say --
10 I'm probably speaking too quickly -- the things     11:50:17
11 that the Plaintiffs say are -- are convergent with
12 the -- this particular study. I have to say that
13 when I was reading these -- the -- the plaintiffs'
14 declarations and depositions it was in a way
15 rewarding in the sense that it was so consistent     11:50:44
16 with this work. It just -- it just rings very
17 true.
18     So that's -- I'm trying to give you an
19 example of this invasion of privacy, the
20 expectation study, that was a survey. We surveyed   11:51:02
21 people about their expectations of -- and -- of
22 different types of ad practices. And one of them,
23 as I said, is third-party -- when an ad is
24 generated based on third-party data sharing, which
25 is what is happening here, that is an invasion of    11:51:21

Page 82

1  privacy. And -- let me just finish there.
2      Q. Is any of the research cited in your --
3  was -- let me back up.
4      Was any of the research that is cited in
5  your report conducted specifically for purposes of   11:51:42
6  rendering the opinions in your report?
7      MS. WEAVER: And I'll just object to the
8  extent that you haven't marked the entire
9  declaration. So she doesn't have Exhibit B in
10 front of her. Can you mark Exhibit B so she can     11:52:00
11 give you a fulsome answer.
12     MR. BROOME: Exhibit what?
13     Yeah, we'll mark that. Exhibit 3.
14     (John Deposition Exhibit 3 was marked.)
15 BY MR. BROOME:                     11:52:19
16     Q. All right. Well, Exhibit B, which we
17 marked as Exhibit 3, if you want to refer to it.
18 I'm not necessarily asking about that.
19     My question is: Is any of the research
20 cited in your declaration, which we marked as        11:53:12
21 Exhibit 1, was any of that research conducted
22 specifically for purposes of rendering the
23 opinions in your report?
24     A. Okay. Let me -- I just refreshed. So I'm
25 trying to find Exhibit 3. I'm waiting for it to      11:53:35

Page 83

1  load.
2      MS. WEAVER: It's not loading for me
3  either.
4      We have a hard copy here if that would be
5  faster.                           11:54:28
6      THE WITNESS: It just loaded.
7      MS. WEAVER: Oh, okay. Good.
8      THE WITNESS: Okay. So -- right. So I'm
9  looking at the citation list here and -- now that
10 this is up in front of me, let me return to your     11:54:42
11 question, which is?
12 BY MR. BROOME:
13     Q. Did you conduct any surveys specifically
14 for purposes of preparing your report in this
15 case?                             11:54:58
16     A. So what I'm saying is that I -- you know,
17 did I initiate a new survey specifically for this
18 report? I did not do that. And the reason why I
19 didn't do that is because it was not -- I didn't
20 need to do that. It was not necessary. It would    11:55:15
21 not have given me new -- let me say it this way.
22     There is so much evidence to support the
23 conclusions that I've drawn that it was not -- I
24 deemed it not necessary to run an additional
25 survey. And that's because there is a lot of        11:55:35

Page 84

1  research that has already been done that answers
2  questions, you know -- the assignment questions --
3  so Question 1 is the kind of basic methodology
4  question. Questions 2 and 3 in particular, right,
5  there's so much researching that has been done      11:55:56
6  that addresses -- including my own, that is
7  directly relevant here that it was not necessary
8  for me to do an additional survey here.
9      Like if -- if I had had different
10 assignment questions, then I may have decided       11:56:18
11 that -- that that would have been helpful here.
12 But for the questions that I was asked, it's not
13 necessary.
14     Q. I -- I'm not -- wasn't asking you about
15 whether it was necessary, just -- I'm working in    11:56:27
16 baby steps, trying to do it incrementally. It's a
17 simple question as to whether or not you conducted
18 any surveys specifically for purposes of this
19 report. And I thank you, I understand it's no.
20     Did you conduct any survey-based           11:56:43
21 experiments specifically for purposes of preparing
22 your report in this case?
23     A. Can I just --
24     MS. WEAVER: Objection. Asked and
25 answered.                          11:56:50

Page 85

22 (Pages 82 - 85)

1    THE WITNESS:  And I wanted to be very
2  clear that my answers are based on science.  So
3  the -- the way I came to the conclusions that I
4  came to is by looking at research to make it clear;
5  right?  I just want that to be very clear here.    11:57:09
6  BY MR. BROOME:
7    Q.  Okay.  Did you conduct any survey-based
8  experiments specifically for purposes of preparing
9  your report in this case?
10    MS. WEAVER:  Objection.  Asked and    11:57:23
11  answered.  Repeat the entire answer.
12    THE WITNESS:  Right.
13    So my answer here is that did I do a new
14  one specifically here, the answer is no.  And the
15  reason is because I deemed that it wasn't    11:57:39
16  necessary.  There's -- there's -- and -- and let me
17  just say that when -- just kind of broadening this
18  out, how this -- we -- how we come to conclusions
19  as scientists, we -- we run -- we collect data, we
20  run surveys, for example, and then we make    11:57:59
21  conclusions and we make generalizations.
22    And so it's not that the result only
23  applies to that specific set of stimuli that you've
24  run a specific survey on; rather, the goal is to
25  make generalizations based on what you find.    11:58:19

Page 86

1  And -- and so science is incremental in that we're
2  building on.  And to answer these questions, I'm --
3  I'm building on giants.  There's -- there's so much
4  that speaks to this, these -- these particular
5  assignment questions.    11:58:35
6    Questions 2 and 3 in particular; right?
7  1, as I said, is a kind of overarcing [verbatim]
8  methodology that you don't need to sample every
9  person.  Question 4 is the -- I know because we
10  need to be precise here -- is the assessing the fit    11:58:50
11  between the Plaintiffs and the evidence already
12  established in the literature.
13  BY MR. BROOME:
14    Q.  All right.  Let's look at Exhibit 1 of
15  your -- which is your report on page 2.  Under the    11:59:02
16  heading "My Assignment," you state, "My assignment
17  was to provide my opinion on the following four
18  questions."
19    Do you see that?
20    A.  I'm just going back.  It's loading.    11:59:14
21    So we are back in Exhibit 1.  And under
22  "My Assignment"?
23    Q.  Yeah.
24    A.  Okay.  I'm with you.
25    Q.  You write, "My assignment was to provide    11:59:31

Page 87

1  my opinion on the following four questions," and
2  then you list four questions; correct?
3    A.  Yes.
4    Q.  Okay.  And the first question is, "Could
5  reasonable consumer expectations of internet    11:59:41
6  privacy be determined class-wide by studying a
7  sample of the proposed class?"
8    Right?
9    A.  Yes.
10    Q.  All right.    11:59:53
11    And is the answer to that question in your
12  opinion yes?
13    A.  Could reasonable consumer expectations
14  of -- of internet privacy be determined class-wide
15  by studying a sample of the proposed class?  Yes.    12:00:09
16    Q.  Okay.  Have you studied a sample of the
17  proposed class?
18    A.  So I view the proposed class to be -- what
19  I was asked to weigh in on is -- so reasonable --
20  what a reasonable consumer reasonable expectations    12:00:28
21  would be.  And the -- here, the -- so the -- the
22  people in question are reasonable people.  And so
23  I -- I do research on reasonable people, and so my
24  research generalizes.  So, yes, it appli- -- it
25  very much applies here.    12:00:51

Page 88

1    Q.  Have you studied a sample of Chrome users?
2    MS. WEAVER:  Objection.  Vague.
3    THE WITNESS:  Yeah.  Can you clarify what
4  you mean?
5  BY MR. BROOME:    12:01:09
6    Q.  Well, you say, "Could" -- the -- the
7  question is --
8    A.  Yeah.
9    Q.  -- "Could reasonable consumer expectations
10  of internet privacy be determined class-wide by    12:01:17
11  studying a sample of the proposed class?"
12    You understand that the class here is
13  Chrome users who did not enable sync or sometimes
14  enabled sync and turned sync off.  You understand
15  that --    12:01:34
16    A.  Mm-hmm.
17    Q.  -- right?
18    A.  Yes.
19    Q.  Okay.  Have you studied -- have you
20  studied a sample of that class?    12:01:38
21    MS. WEAVER:  Objection.  Vague.
22    You can answer.
23    THE WITNESS:  Okay.  So the question is?
24  BY MR. BROOME:
25    Q.  Have you studied a sample of people who    12:01:53

Page 89

23 (Pages 86 - 89)

1   are in the proposed class in this case?
2        A.  So the -- Question 1 pertains to, again,
3   the -- the -- the -- the crux of this question, as
4   I interpreted it was do you have to look at
5   survey -- every single person in order to make        12:02:17
6   conclusions about people, and the answer is no.
7        And, in fact, Google itself seems to also
8   operate under this -- this basic philosophy of
9   science, right, of -- because as I -- I showed --
10  I cite this in -- in my report, that's the -- I'm        12:02:41
11  on page 2, the final paragraph.  The point is that
12  Google looks at groups of -- or -- groups of
13  its -- groups of people categorizes them and make
14  generalizations based on groups.
15       Google does not sample every single        12:03:06
16  person.  That's my point here.  My point is that
17  you can -- you don't need to survey, or whatever
18  method you're using, every single person.  You --
19  rather, you can make conclusions from samples.
20  And Google does this itself.        12:03:27
21       Q.  But my question -- again, a very specific
22  question -- have you studied a sample of Chrome
23  users who did not enable sync?
24       MS. WEAVER:  Objection.  Asked and
25  answered.  She just answered that, Steve.        12:03:44

Page 90

1        THE WITNESS:  So to -- like I kind of
2   take -- what may be helpful to answer this question
3   is to, again, say this overarcing [verbatim]
4   principle of I used -- I looked for convergent
5   findings, right, so do multiple pieces of evidence        12:04:05
6   or sources point to the same conclusion, and one of
7   those sources is Google's own work that uses Chrome
8   users, takes a sample of them and make
9   generalizations based on those -- those -- those
10  users.        12:04:25
11  BY MR. BROOME:
12       Q.  Okay.
13       A.  So --
14       Q.  I see.
15       A.  -- it's -- it's embedded.  Like I        12:04:31
16  considered documents that -- that -- Google's own
17  research that does exactly that.
18       Q.  All right.  Aside from Google -- the
19  research that Google conducted, have you
20  independently studied a sample of the proposed        12:04:45
21  class in this case?
22       A.  So one of the sources of information that
23  I relied on is the qualitative data from the
24  Plaintiffs themselves -- and, of course, they are
25  part of the class -- and those -- those -- that        12:05:08

Page 91

1   information converged on lots of other
2   information.
3        Q.  Okay.  All right.  Now --
4        A.  What's embedded in this report is -- like
5   there's super rich quality --        12:05:34
6        THE COURT REPORTER:  Excuse me, can you
7   start over your answer?  There was some talking
8   over.
9        THE WITNESS:  Sorry.  I'm just obviously
10  passionate about research.        12:05:40
11       There is the data here from the
12  Plaintiffs, which are, you know, part of the class
13  explicitly, their data formed part of my opinion;
14  right?  So it's -- they're in here.
15  BY MR. BROOME:        12:05:58
16       Q.  Okay.  Aside from the research that Google
17  conducted and the data from the Plaintiffs, can
18  you give any other examples where you studied a
19  sample of the proposed class?
20       A.  So the idea here is, again, that we -- we        12:06:15
21  look at multiple sources of information that
22  converge.  And so there are explicit people that
23  are part of the class in here, right, in the form
24  of Google's studies, in the form of the Plaintiff
25  enriched data.  Those align with the body of        12:06:35

Page 92

1   research.  It's not like -- so they're -- they're
2   all convergent.
3        It's -- I have no reason to suspect -- or
4   let me just -- I -- it's hard for me -- I should
5   stop talking because I feel like I've already        12:06:52
6   answered this question.
7        Q.  You -- you refer to reasonable consumer --
8   the reasonable consumer in -- in that first
9   paragraph there.  What is a reasonable consumer?
10       A.  Which paragraph are we on?        12:07:07
11       Q.  Same paragraph that we've just been
12  discussing, Number 1 under "My Assignment."
13       A.  Ah.  And your question is?
14       Q.  What do you mean by "a reasonable
15  consumer"?        12:07:22
16       A.  Yeah.  So are you asking for a legal
17  definition?
18       Q.  No.  I'm asking for the definition --
19       A.  Okay.
20       Q.  -- as you use it in your report.        12:07:34
21       A.  Yeah.  So when I think of a reasonable
22  person, I think of someone who is -- someone who
23  is reasonably sensible, generally well-intending,
24  generally reasonably intelligent.  It's broad.
25  And I consider when I -- yeah, that's -- that's my        12:07:56

Page 93

24 (Pages 90 - 93)

1  answer.
2     Q.  Okay.  And when you say that "for
3  reasonable consumer expectations of internet
4  privacy can be determined class-wide," does that
5  mean everyone in the class would have the same    12:08:09
6  expectations?
7     A.  So I'm saying that -- so there are --
8  people aren't -- people are different in that like
9  we're not robots.  We're -- there are differences
10  in people.  But very importantly for these    12:08:28
11  specific opinions is that there are commonalities,
12  and so my opinions are based on the commonalities.
13  And what I can tell you is that -- that my opinion
14  is that the -- in this case consent has not been
15  given -- none of these Plaintiffs has given    12:08:49
16  consent.  So there are strong consistencies in
17  what they're saying, and those are representative
18  of the class is -- is the proposal here.  Like
19  they're -- it's just overwhel- -- none of them
20  consented.  None of them synced -- none of them    12:09:06
21  think that when they're not synced they're going
22  to be sending the information --
23     (Interruption in audio/video.)
24     THE COURT REPORTER:  "None of them
25  thought" -- can you restart over again, please.    12:09:14

1     THE WITNESS:  None of them consented.
2  None of them thought that the -- none of them
3  thought that being -- when they were not synced
4  that this would mean Google is collecting the
5  information that it is collecting, and that is    12:09:37
6  consistent with the research on reasonable people's
7  expectation of privacy.
8  BY MR. BROOME:
9     Q.  You just testified, I believe, "My opinion
10  is that in this case consent has not been given,    12:09:57
11  none of these Plaintiffs have given consent."  Is
12  that an opinion that you're offering in this case?
13     A.  So what I'm -- sorry, can you repeat the
14  question?
15     Q.  Are you offering an opinion in this case    12:10:13
16  as to whether the Plaintiffs consented to the data
17  collection at issue?
18     A.  So maybe we should stick -- let's stick to
19  what's here in the report.
20     I guess if you want to ask -- I'm sorry,    12:10:29
21  I -- I've -- I've lost track a little bit of what
22  your question is.
23     Q.  Well, I'm just -- I'm asking because --
24     A.  Yes.
25     Q.  -- you -- you stated, "In my opinion the    12:10:36

1  Plaintiffs have not consented," and I want to know
2  if that is your -- an expert opinion that you're
3  offering in this case?
4     A.  So I -- the -- the Plaintiffs are -- what
5  I'm saying -- what I'm saying is -- you're asking    12:10:54
6  me whether the -- essentially, the Plaintiffs are
7  representative of the class of class-wide
8  concerns.  And so in -- the -- what I'm saying is
9  that -- I'm saying this in response to your
10  question about whether you can -- there are -- I    12:11:18
11  think what you're getting at is are there
12  generalities, are there -- is there a general way
13  of thinking about privacy and expectations.
14     And my point is that I acknowledge that
15  there are differences in people, but I also am    12:11:34
16  saying that there are some very strong
17  consistencies in how reasonable think -- people
18  think of privacy and what their expectations are
19  and when it's been violated.
20     And so this question of consent is    12:11:52
21  embedded in my opinion.
22     Q.  Okay.
23     A.  Because -- yeah.
24     Q.  Is -- is it your opinion that none of the
25  numbers of the proposed class consented to the    12:12:09

1  collection of the data at issue in this case?
2     A.  They did not consent.
3     Q.  That's your opinion?
4     A.  Yes.
5     Q.  Okay.  And what is that based on?    12:12:17
6     A.  So it's embedded here in my opinions in
7  the sense that they -- first of all, when people
8  have an expectation -- certain expectations of
9  privacy.  And so when people -- they're not
10  expecting information collected that is irrelevant    12:12:49
11  to the use case.  So that's kind of the frame of
12  mind that people come into this relationship with
13  Chrome.  That's -- that's the frame they come into
14  their -- kind of their expectations.
15     And then what I have found here is that --    12:13:12
16  then, I guess, the question is, is there anything
17  that -- is that expectation overridden, is it
18  corrected with what is actually happening, has it
19  been disabused, this expectation, or do -- do
20  people -- are they clearly understanding that this    12:13:36
21  expectation is -- is actually what's not
22  happening.  That, I would imagine, would be
23  necessary for them to consent.
24     And so here in Opinion 3, I've broken
25  things down by whether people have read the    12:13:51

1  privacy policy here and whether they haven't. And
2  what I found in -- in both cases it's reasonable
3  for people to think that when you're in the
4  not-synced state, it's reasonable for them to
5  think that Chrome isn't going to send their          12:14:16
6  information to Google and -- but, in fact, my
7  information is that actually the opposite is
8  happening. So how could they be consenting.
9    Q. Whether or not --
10      MS. WEAVER: I'm sorry, I needed to          12:14:28
11  insert an objection on page 75 to the word
12  "consent."
13      THE WITNESS: Sorry.
14      MS. WEAVER: And I'm assuming you're not
15  asking for --                                        12:14:38
16      (Interruption in audio/video.)
17      THE COURT REPORTER: Excuse me. Counsel,
18  I can't hear you. Can you start over, please.
19      MS. WEAVER: Yes.
20      I apologize. I tried to object on page 75   12:14:44
21  of the rough transcript here to the question as to
22  the word "consent" to the extent it calls for a
23  legal conclusion -- and I assume you weren't asking
24  for a legal conclusion -- or meant consent in a
25  legal sense. Is that right?                          12:14:59

Page 98

1      MR. BROOME: I'm using consent in the same
2  way the witness used it.
3      MS. WEAVER: Okay. So I'm hearing you say
4  you were not asking for a legal conclusion.
5      MR. BROOME: Using it -- I'm -- I'm using   12:15:09
6  it in the same way that the witness used it.
7      MS. WEAVER: Were you using it in a legal
8  sense?
9      THE WITNESS: No.
10  BY MR. BROOME:                                       12:15:28
11    Q. Whether or not it's reasonable for people
12  to think that Google won't receive their data,
13  they're using Chrome without sync, you can't say
14  with any certainty that that's most people's
15  expectations; right?                                 12:15:47
16      MS. WEAVER: Objection. Vague.
17      THE WITNESS: Could you unpack the
18  question a little bit, please.
19  BY MR. BROOME:
20    Q. Sure.                                           12:15:57
21      The question in this case is -- you know,
22  I asked you earlier whether -- let me back up
23  here.
24      I think you said, "It's in my opinion that
25  Plaintiffs didn't consent"; right?                   12:16:09

Page 99

1    A. So I'm saying embedded in my opinion is I
2  don't see how they could have consented.
3    Q. Okay.
4      MS. WEAVER: And I'll have a standing
5  objection that she's not propounding a legal         12:16:21
6  assertion. She's not a lawyer. This is her
7  understanding of consent in her field of study.
8  BY MR. BROOME:
9    Q. Can you say with any degree of scientific
10  certainty that most Chrome users were unaware that  12:16:35
11  Google would receive their data even when they are
12  not synced?
13    A. So I -- I can say that --
14      MS. WEAVER: And objection. Vague as to
15  "their data."                                        12:16:55
16  BY MR. BROOME:
17    Q. Let -- let me ask the question because I'm
18  not sure it came out right in the -- in the --
19  transcript either.
20      Can you say with any degree of scientific   12:17:05
21  certainty that most Chrome users were unaware that
22  Google would receive the data at issue in this
23  case when they were not synced?
24    A. The --
25      MS. WEAVER: Objection.                      12:17:24

Page 100

1      Go ahead.
2      THE WITNESS: So the plaintiffs, they have
3  not -- in my opinion, they have not -- they've not
4  consented. And the reason why they haven't
5  consented is because they come in with this -- and  12:17:39
6  we know this from research -- they come in with
7  this ex- -- certain expectation of when information
8  will be shared and won't be shared.
9      And one of those expectations is that a
10  guiding principle way of thinking about it is that  12:17:58
11  people generally don't expect information to be
12  taken that is overkill for the given-use case.
13      So, for example, if I am Googling
14  something, I would reasonably expect that Google
15  know -- collects the search terms. Why? Because   12:18:21
16  that is part of the use case. I am searching for
17  something. Of course Google needs my search terms.
18      But I'm not consenting to Google taking
19  the information -- the information in -- that is
20  alleged to be taken -- that I understand is being   12:18:37
21  taken is way beyond what that use case is. So it
22  violates people's expectations, and in that way it
23  violates their privacy. Okay. So that's --
24  that's -- that's how they're coming in.
25      And then there's -- I have seen no         12:18:55

Page 101

26 (Pages 98 - 101)

1  evidence that the subsequent information that they
2  may be presented with, that they may or may not
3  read, actually explains to them what actually
4  happens.
5  BY MR. BROOME:                    12:19:10
6      Q.  Are you aware --
7      A.  So -- and -- so I don't see how they could
8  consent and -- yeah.
9      Q.  You just said, "I have seen no evidence
10  that the subsequent information that they may be    12:19:25
11  presented with, that they may or my not read,
12  actually explains to them what actually happens."
13      Are you aware --
14      MS. WEAVER:  I'm sorry.  I'll just object
15  because I think the transcript -- I don't think    12:19:35
16  it's -- that entirely accurate.
17      But go ahead.
18  BY MR. BROOME:
19      Q.  Are -- are you aware of Google's My
20  Activity feature?                    12:19:44
21      A.  Yes.
22      Q.  Okay.  And are you aware that that --
23  that -- that users can see the list of websites
24  from which Google received information while they
25  browsed the web on their Web and App Activity tab   12:20:01

Page 102

1  in the My Activity page?
2      MS. WEAVER:  Objection.  Assumes facts not
3  in evidence.
4      THE WITNESS:  Could you point me to --
5  like maybe an exhibit or something?  So we can be   12:20:16
6  tangible in what we're talking about.
7  BY MR. BROOME:
8      Q.  Do you have any idea what I'm referring
9  to?
10      MS. WEAVER:  Objection.  Vague.    12:20:22
11      THE WITNESS:  The question is?
12  BY MR. BROOME:
13      Q.  Do you -- do you -- you're familiar with
14  My Activity; right?
15      A.  I am -- I am aware that there is an    12:20:34
16  interactive page called "Web and App Activity."
17      Q.  Have you visited it?
18      A.  Yes.
19      Q.  Okay.  In your own account?
20      A.  Yes.                    12:20:44
21      Q.  Okay.  And do you have Web and App
22  Activity turned on?
23      A.  No.
24      Q.  Okay.  And are you familiar with what
25  happens when you turn Web and App Activity on?    12:20:49

Page 103

1      A.  In a general sense, yes, partly because of
2  working on this case.  I guess I -- what -- the
3  question isn't about me as a user, though.  So
4  what is it that --
5      MS. WEAVER:  Fair enough.  I apologize.  I    12:21:07
6  should be objecting.
7  BY MR. BROOME:
8      Q.  No, and I'm trying to understand.  You
9  know, you've made some statements about how people
10  would never understand that this was going on.    12:21:15
11      And I'm trying to test that based on your
12  familiarity with certain features and services
13  that, from Google's perspective, make very clear
14  what's going on.
15      Just -- I'm not testifying.  I'm just    12:21:30
16  trying to orient you.
17      All right.  Okay.
18      MS. WEAVER:  Object to counsel's
19  narrative.
20  BY MR. BROOME:                    12:21:49
21      Q.  Okay.  Let's -- let's go back -- let's --
22  we'll come back to Web and App Activity.
23      But I -- I want to understand the
24  methodology that you applied in -- in rendering
25  your other opinions.                    12:22:00

Page 104

1      So we talked a little bit about Opinion 1.
2  Let's go to Opinion 2, "Consumers care about their
3  privacy on the internet."
4      Well, first of all, what -- what
5  methodology did you apply in rendering that    12:22:16
6  opinion?
7      A.  Opinion 2?
8      Q.  Yes.
9      A.  Okay.  I based my opinion on a variety of
10  things.  One is I based it on my own research in    12:22:35
11  this area.  I based it on prior scholarly research
12  in this area.  I based it on reviewing case
13  documents.  And I hope that is exhaustive, just
14  reading the opinion again.
15      Q.  And is all of the research that you relied   12:23:08
16  on in forming Opinion 2 cited in that section of
17  your report?
18      A.  So can you clarify a little what you mean
19  by that?
20      Q.  Well, you cite three sources in Opinion 2.   12:23:38
21  Are -- are -- are those the sources that you -- is
22  that an exhaustive list of the research that you
23  relied on in forming Opinion 2?
24      A.  Ah, yes, good question.  Sorry.  I don't
25  know why I said that.  I'm not here to evaluate    12:23:54

Page 105

27 (Pages 102 - 105)

1 your questions.
2     So there is -- so Exhibit B -- I'm -- I'm
3 glad for the opportunity to clarify that Exhibit B
4 lists the academic citations that support my
5 opinions. So I draw on that for this opinion, for    12:24:12
6 Number 2.
7     Q. Okay. Anything else?
8     A. Well, I already talked about what I said
9 the -- the source is broadly: the case documents,
10 my own scholarly work, other scholarly work.    12:24:32
11     Q. Okay. Anything else?
12     A. So by "case documents," I just want to
13 clarify that it includes like the plaintiffs'
14 statements and also Google's own internal
15 research.    12:24:54
16     Q. Okay. And when you say the "case
17 documents," you're referring to the case documents
18 reflected in I think what we marked as Exhibit 2?
19     A. Let me see what Exhibit 2 is. There's so
20 many numbers.    12:25:08
21     Q. Well, I may have got that wrong. I think
22 it might be Exhibit 3, actually. Yes, Exhibit 3.
23     A. It's just loading here for me. Exhibit 3,
24 which then on it is marked -- it's confusing,
25 isn't it? And on the first page it says Exhibit    12:25:30

Page 106

1 B, but then the yellow marker -- okay, yeah. The
2 yellow marker says "Exhibit 3," yes.
3     So Exhibit 3 is the list of citations, and
4 then it includes the case documents, yes.
5     Q. Mm-hmm. All right.    12:25:46
6     Opinion 2 states, "Consumers care about
7 their privacy on the internet."
8     MS. WEAVER: Hang on. So you're -- let's
9 go back. I'm sorry, --
10     (Simultaneous speaking.)    12:25:54
11     (Interruption in audio/video.)
12     MR. BROOME: Oh, yeah, I'm sorry, I -- I
13 switched between documents. Sorry, I didn't mean
14 to do that.
15     MS. WEAVER: That's all right.    12:25:58
16     MR. BROOME: But why don't we go back to
17 Exhibit 1.
18     THE WITNESS: Yes.
19 BY MR. BROOME:
20     Q. Are you there?    12:26:08
21     A. Yes.
22     Q. And -- and it's -- it's fine if you want
23 to have like a paper copy of your report in front
24 of you, because we'll going to referring to it a
25 lot throughout the -- the day. That's -- no, it    12:26:20

Page 107

1 should be fine.
2     A. Okay.
3     Q. Opinion 2 is "Consumers care about their
4 privacy on the internet."
5     You have previously described privacy on    12:26:30
6 the internet as an ethereal concept; correct?
7     MS. WEAVER: Objection. Vague. Misstates
8 testimony.
9 BY MR. BROOME:
10     Q. I'm not talking about in this -- in    12:26:42
11 this -- in this -- just to be clear, I'm not
12 talking about in the -- in this deposition.
13     I mean in talks you've given and, you
14 know, videos on YouTube that we've seen, you've
15 described pri- -- online privacy as an ethereal    12:26:56
16 concept; correct?
17     A. I guess it would be --
18     MS. WEAVER: Objection. Lacks foundation.
19 Go ahead.
20     THE WITNESS: It would be helpful to know,    12:27:03
21 so that I can accurately answer your question,
22 exactly what you're talk- -- or what -- yeah, I
23 need to know in the context of -- in which it was
24 said --
25 BY MR. BROOME:    12:27:16

Page 108

1     Q. Well, do you agree that --
2     A. -- if it would have said that.
3     Q. Do you agree with me -- putting aside what
4 you may have stated in other context, do you agree
5 with me that online privacy is an ethereal    12:27:21
6 concept?
7     MS. WEAVER: Objection. Foundation.
8     Go ahead.
9     THE WITNESS: Can you describe what you
10 mean by that?    12:27:30
11 BY MR. BROOME:
12     Q. Well, what do you mean by -- when -- when
13 you say "Consumers care about their privacy on the
14 internet," what do you mean?
15     A. I mean exactly what I wrote.    12:27:43
16     Q. Well, what does "privacy on the internet"
17 mean?
18     A. I'm sorry, it's really hard to answer this
19 question because like exactly what I meant is
20 exactly what is written.    12:28:00
21     Q. But you would -- you would agree that
22 privacy on the internet can mean different things
23 to different people; right?
24     MS. WEAVER: Objection. Foundation.
25     THE WITNESS: Maybe if you could be a    12:28:09

Page 109

28 (Pages 106 - 109)

1 little more specific in -- in what you mean.
2 BY MR. BROOME:
3    Q. All right.
4       Well, I'll -- I'll just ask the question.
5 When I -- when I say what do you mean by "privacy    12:28:25
6 on the internet," can you get any more specific on
7 that?
8    A. So what my opinion is is that by and large
9 consumers care about their privacy on the
10 internet. And there's abundant evidence of that.    12:28:39
11       I -- I -- in my report, I talk about some
12 examples of the concerns that people have of -- of
13 evidence that people care about their privacy,
14 that they have valid concerns about their privacy.
15       I talk about work that has been done that    12:29:00
16 identifies what it means to have a sense of --
17 your sense of privacy invaded upon.
18    Q. All right.
19       You would agree that consumers -- the
20 extent to which consumers care about their privacy    12:29:17
21 on the internet varies from consumer to consumer;
22 correct?
23    A. I'm saying --
24       MS. WEAVER: Objection. Misstates her
25 testimony.                                            12:29:30

Page 110

1       THE WITNESS: I'm saying --
2       MS. WEAVER: Wait, wait.
3       Assumes not in evidence. Foundation.
4       Go ahead.
5       THE WITNESS: I'm saying that consumers by    12:29:40
6 and large care about their internet privacy.
7 BY MR. BROOME:
8    Q. Okay. What does "by and large" mean?
9 Does that mean everybody?
10   A. It's saying that people by and large care    12:29:51
11 about their private -- people care about their
12 privacy.
13   Q. Does everybody care about their privacy
14 online?
15   A. Yes, people care about their privacy    12:30:04
16 online, like they -- this is a -- and -- and I
17 base -- the reason why I'm saying that people care
18 about their privacy is because there is abundant
19 evidence that they do. So they -- they care about
20 their privacy.                                        12:30:19
21       They're -- you know, I'm not saying that
22 people are identical. People do differ. But a
23 commonality is that people care about their
24 privacy.
25   Q. Okay. And -- and how do they -- how do    12:30:34

Page 111

1 people differ when it comes to caring about their
2 privacy on -- on the internet?
3       MS. WEAVER: Objection. Vague. Misstates
4 her testimony. It's -- she keeps testifying that
5 people care, and then you say how do they not care.    12:30:49
6       THE WITNESS: So I guess I'll let you ask
7 your question.
8 BY MR. BROOME:
9    Q. I did. I'm -- I'm not really listening to
10 Ms. Weaver's attempts to coach you. So she can    12:31:05
11 make her objections, but they're not really
12 relevant to me unless -- unless she instructs you
13 not to answer.
14       And, frankly, I think they're improper,
15 especially the last one.                              12:31:19
16       But my question to you is, when you say
17 people care about their privacy on the internet,
18 you said people do differ.
19       How do they differ when it comes to caring
20 about their privacy on the internet?                  12:31:32
21    A. What I --
22       MS. WEAVER: I'll just state an objection
23 to the sarcasm and the tone.
24       You may answer.
25       THE WITNESS: What I'm saying is people --    12:31:42

Page 112

1       THE COURT REPORTER: I'm sorry, could you
2 repeat? I can't hear you.
3       THE WITNESS: What I am saying is that
4 people are different, but a commonality is that
5 people care about their privacy. People care about    12:32:03
6 their privacy is -- is the -- the key thing I want
7 to drive home.
8       And the key thing that -- when I answered
9 this question -- so my -- my question -- the
10 question -- my assignment question is "Does the    12:32:13
11 reasonable consumer care about their privacy on the
12 internet?"
13       And my answer is that, yes, consumers care
14 about their privacy on the internet. And I -- I
15 base this opinion on multiple methods which    12:32:28
16 converge and -- you know, this -- let me say it
17 another way.
18       There's a quote here from -- this article
19 is a -- I'm on the first -- the final sentence of
20 the first paragraph under Opinion 2 which says, "I    12:32:49
21 base my opinion on empirical research that speaks
22 to this question from several different angles; the
23 findings of a variety of research methods converge:
24 "consumers fundamentally care about online
25 privacy.'" [As read]                                  12:33:09

Page 113

29 (Pages 110 - 113)

1     This statement is from an article that is
2  published in the top journal in science, a journal
3  called Science.
4     So I -- I -- it's a -- it's a -- it's a
5  little bit challenging answering your questions in    12:33:25
6  the sense that they -- they seem to want to tear
7  apart and find differences.  But what I'm telling
8  you is that, again -- and -- again, I find
9  commonality and convergence that people care about
10  their privacy on the internet.           12:33:44
11  BY MR. BROOME:
12     Q.  Yeah, I guess -- I guess -- I -- I mean,
13  the -- the concept of -- what I'm struggling with,
14  and maybe you can help me understand, is the
15  concept of privacy on the internet is -- to me    12:33:51
16  seems a bit vague.  And there can be different --
17  I mean, let me put this in a question so that I
18  don't draw an objection.
19     But there -- there are a lot of different
20  aspects, I guess, to privacy on the internet.      12:34:04
21  Would you agree?
22     MS. WEAVER:  Objection.  Vague.  And I --
23  I do object to how --
24  BY MR. BROOME:
25     Q.  And let me give -- let me give you some    12:34:14

1  examples before you answer.
2     For example, you could have, you know,
3  privacy from other people who might use your
4  device and see your browsing history.  You could
5  have privacy from your internet service provider.    12:34:28
6  You could have privacy from, you know, marketers
7  who, you know, scrape data from the web.  There
8  are a lot of different ways that you can have
9  privacy on the internet.
10  Do you agree with that basic --         12:34:47
11     MS. WEAVER:  Objection -- objection --
12     THE COURT REPORTER:  Excuse me, I didn't
13  hear the last word.
14  BY MR. BROOME:
15     Q.  Do you agree with that basic proposition?  12:34:54
16     MS. WEAVER:  Objection.  Vague.  Assumes
17  facts.
18  Go ahead.
19     THE WITNESS:  Could you say what the
20  proposition is again, please.         12:35:13
21  BY MR. BROOME:
22     Q.  There are a lot of different ways that you
23  can have privacy on the internet.
24     MS. WEAVER:  Objection.  Form.
25  Is there a question?         12:35:24

1     MR. BROOME:  She asked me a question, and
2  I answered it.
3     THE WITNESS:  What is the question?
4  BY MR. BROOME:
5     Q.  There are a lot of different ways that you    12:35:48
6  can have privacy on the internet?
7     A.  I'm not sure what you mean by that,
8  because I thought we were talking about my
9  opinion, which I was asked -- what I was asked was
10  whether consumers care about their privacy.    12:36:04
11  And what -- what I am saying is that, yes,
12  consumers care about their privacy on the
13  internet.
14     Q.  And do they all care about it in the same
15  way?                 12:36:21
16     A.  I don't know what you mean by that.
17     Q.  Okay.
18  Let's go to your third opinion.  You
19  state, "It is reasonable for a consumer to use
20  Chrome in the not-synced state and believe that    12:36:36
21  Chrome will not send their personal information to
22  Google.  This is true for consumers who read
23  Google's privacy policies and for consumers who do
24  not"; is that right?
25     A.  That's what it says, yes.         12:36:53

1     Q.  Okay.  And is that your opinion in this
2  case?
3     A.  Yes.
4     Q.  And how -- what was the methodology that
5  you applied in reaching that opinion?         12:36:59
6     A.  So what I did was I considered -- I
7  considered my own -- I considered scholarly
8  research that speaks to this question, including
9  some of my own.
10  I considered the information about the    12:37:25
11  plaintiffs, that they -- their -- their
12  qualitative -- their testimony, and -- so I -- I
13  considered the information that is in -- what is
14  it, Exhibit 2? -- that's listed there.  That --
15  that forms the basis of my opinion.         12:37:49
16  Is that Exhibit 2?  I'm sorry, I'm
17  mixing --
18     Q.  It may actually be Exhibit 3.
19     A.  Yes, I'm referring to Exhibit 3, the list
20  of sources.                12:38:03
21     Q.  All right.
22  Is that the full extent of the methodology
23  you applied in reaching Opinion 3?
24     A.  So I cite all the sources that I relied on
25  to form this opinion in Exhibit 3.         12:38:25

1    Q.  Okay.  And --
2    A.  And so -- yeah, so that -- that inclu- --
3    like -- it includes, of course, the things the
4    plaintiffs said, and it -- you know, it's my -- my
5    expertise in this area.  I mean, that's kind of an    12:38:55
6    unspoken thing as an expert.  My -- I've been
7    studying -- well, doing research in this area writ
8    large for over ten years now, so...
9    Q.  All right.
10       Anything else that you would like to    12:39:18
11   identify as part of the methodology you applied in
12   reaching Opinion 3?
13   A.  So if there's specific questions that
14   like -- none that I recall as of this moment, but
15   I...    12:39:40
16   Q.  Okay.
17   A.  I -- I guess I'm -- if you could be a
18   little more specific in the questions, then it may
19   jog more specific answers.
20   Q.  It -- it -- it's not a trick question.    12:39:50
21   It's a real simple question.  I'm just asking for
22   the methodology that you applied in reaching your
23   Opinion 3.
24       You identified some documents that you
25   reviewed, your prior research -- no -- well,    12:40:01

Page 118

1    I'm -- I'm not going to testify for you.
2        But other than the things you have
3    identified, is there anything else that you would
4    like to identify as part of the methodology that
5    you applied in reaching Opinion 3?    12:40:12
6    A.  So I considered research, my own, and
7    other academics' research.  Basically what I --
8    the way I thought about it was I -- I -- I
9    wanted -- I broke it down into two sub-questions
10   because -- or two sub-statements.  You can see    12:40:38
11   there's a 3.A and a 3.B.
12       So 3.A is that "Without having read
13   Google's privacy policies, it is reasonable for a
14   consumer to use Chrome in the not-synced state and
15   believe that Chrome will not send her personal    12:40:58
16   information to Google."
17       And so the way I formed this opinion
18   was -- you know, I can -- I can -- basis here is
19   here [verbatim].  I base my opinion in part on
20   research in whi- -- research in which my coauthors    12:41:14
21   and I found that people's expectation of how their
22   personal data ought to flow between entities in
23   online context is established by these
24   well-established -- or dictated by
25   well-established norms in the offline world.    12:41:30

Page 119

1    Now, in turn, that statement is based
2    on -- it's scaffolded on other work; right?
3        So, you know, the -- this introduction to
4    the paper describes the prior work that we build
5    on.  And then in this particular work we surveyed    12:41:45
6    people and did experiments that led us to draw
7    these conclusions, the -- the conclusions
8    being that, you know, if you --without having read
9    Google's privacy policies, it's reasonable for
10   people in the not-synced state to believe that    12:42:13
11   Chrome [verbatim] will not send their personal
12   information to Chrome.
13       And that's because they come to the table
14   here, they come to this relationship with certain
15   expectations of privacy.    12:42:27
16       And what Google -- what I understand
17   Google to actually be doing violates those
18   expectations of privacy.
19       And so the other thing that I think is
20   really important to underscore here is that this    12:42:42
21   is really common.  It's extremely common for --
22   what I mean by what -- it's extremely common for
23   people to not read privacy disclosures.
24       And I talk about that -- you know, I'm not
25   saying this out of the blue.  I'm saying it    12:43:04

Page 120

1    because there is a lot of research that
2    supports -- points to this fact that says
3    people -- most people just -- they don't read
4    privacy notices.  It's very common for people to
5    not read privacy disclosures.    12:43:22
6        And there's some reasons for that, good
7    reasons why, which I delineate in my report.
8        So that's why I -- I -- I -- I separated
9    my opinion -- I have this 3.A and 3.B, because 3.A
10   reflects the reality that it's very common to not    12:43:38
11   read privacy notices and this notion that you're
12   coming in with a certain expectation.
13       And what's happening -- my understanding
14   of what's happening is not at all what -- what
15   this -- what people have when they come in.    12:43:53
16       But then I acknowledge that -- I mean,
17   I'm -- of course I'm not a lawyer.  I -- I -- but
18   I -- I know that -- my understanding is that the
19   courts presume that people do read the
20   disclosures.    12:44:11
21       And so there, for Part B, I -- I
22   separated -- you know, Part B talks about the
23   case, if a person were to read the disclosures,
24   and there my opinion is, hereto it's reasonable
25   for her to "use Chrome in the not-synced state and    12:44:31

Page 121

31 (Pages 118 - 121)

1  believe that Chrome will not send her personal
2  information to Google." [As read]
3       Now, I should add that like this is -- I
4  think it's an -- an unreasonable expectation or
5  even assumption that people read these things,    12:44:45
6  because by and large they don't.
7       I did -- you know, to form my opinion, I
8  of course read them. It took me hours to do that,
9  and that's -- part of the point here is that if
10 you -- if it takes hours and hours to read    12:45:00
11 something to provide consent, then that -- that
12 doesn't seem reasonable.
13      And of course -- and I -- I -- you know,
14 we'll probably get into it because I think -- is
15 that -- this question of why they did read it.    12:45:14
16      So -- so my -- if they -- if they did read
17 these policies, my opinion is that it is entirely
18 reasonable for people to think that in the --
19 that -- when they use Chrome in the not-synced
20 state to believe that Chrome will not send their    12:45:33
21 personal information to Google. So -- and --
22      Q. In your career, have you ever conducted
23 surveys on the topic of how consumers interpret
24 any of Google's disclosures?
25      MS. WEAVER: Objection. Foundation.    12:45:52

1  disclosures?
2      A. Right.
3      Q. Yes or no?
4      A. So -- yeah, so I just want to make sure I
5  understand your question so I can answer it    12:47:21
6  properly.
7       Have I like taken Google-specific notices
8  and -- and systematically shown them to people and
9  measured stuff with Google-specific notices? Is
10 that what you're asking?    12:47:34
11     Q. Yes.
12     A. No, I have not done that.
13     Q. Have you ever conducted any surveys of
14 consumers' attitudes or understandings with
15 respect to Chrome's sync feature?    12:47:43
16     A. Have I studied the Chrome sync feature --
17 right, so the same thing, so -- so that would be
18 no.
19     Q. Okay.
20      Have you ever conducted any surveys of    12:47:58
21 consumers' attitudes or understandings with
22 respect to any Google product or service?
23     A. So -- right, so my research agenda is not
24 to -- is clearly not to study Google-specific
25 products per se.    12:48:16

1      THE WITNESS: Can you be -- can you maybe
2  rephrase the question, ask it again?
3  BY MR. BROOME:
4      Q. Have you ever -- sure.
5       Have you ever conducted any surveys on the    12:46:06
6  topic of how consumers interpret any of Google's
7  disclosures?
8      A. So I've done research in understanding
9  how -- how people interpret things, how they --
10 how they respond, what their expectations of    12:46:27
11 privacy are.
12      What I will say, that -- I don't see how
13 someone could -- like the disclosures here, they
14 don't say what is actually happening. And so like
15 how could someone believe what is actually    12:46:50
16 happening to be happening when it's not even
17 stated what is happening?
18     Q. I -- I -- I really would ask that you
19 listen to the question and ask the question posed.
20 It's fine if you want to explain your answer, but    12:47:01
21 I asked a yes-or-no question. And it's pretty
22 simple, so I'd ask that you answer the question
23 directly.
24      Have you ever conducted any surveys on the
25 topic of how consumers interpret any of Google's    12:47:13

1      So have I -- you know, is the goal of my
2  research do I look at specifically Google stimuli
3  with the purpose of specifically look -- like
4  measuring? No, I don't do that.
5       But I think the important thing to    12:48:32
6  emphasize here is that when we do studies, we make
7  generalizations that go beyond the specific
8  stimuli in the study. You know, with reasonable
9  caution and care we make these generalizations, so
10 they're not overly sweeping.    12:48:48
11      And so here like there's -- I base my
12 opinion on, and it's in the Exhibit 3, there is --
13 there's lots of research that has been done that
14 looks at the question of whether people read
15 privacy policies and if -- there's, you know,    12:49:02
16 again, convergent methods.
17      People have looked at -- researchers have
18 looked at it in different ways. It points to --
19 to the conclusion that people don't.
20      And then there's also a lot of research    12:49:12
21 that looks at privacy policies and how people
22 understand them or misunderstand them. There's
23 lots and lots of research here. There's lots --
24 it's robust, the -- the conclusion that people
25 don't really understand them, that they're not --    12:49:31

1    I'm sorry, let me slow down.
2         The conclusion that people don't really
3    understand privacy policies, they're not typically
4    written in a way that people really understand
5    what they mean, that is robust across lots of        12:49:41
6    instantiations of privacy policies.
7         So the way, as scientists, we think about
8    it is we then make generalizations, and so here
9    I'm relying on this common way of -- of thinking
10   about and coming -- drawing to conclusion --         12:50:00
11   drawing conclusions based on available evidence,
12   if that makes sense.
13   Q.   You said by and large people don't read
14   privacy policies; is that your testimony?
15   A.   So there's evidence that -- yeah, that          12:50:15
16   people don't -- it's -- it's very common for
17   people to not read privacy policies.
18   Q.   All right.
19        Are you aware that Google's privacy policy
20   is read on average over 100 million times a week?    12:50:35
21        MS. WEAVER:  Objection.  Assumes facts not
22   in evidence.  If you have a document to put in
23   front of her, do it.
24   BY MR. BROOME:
25   Q.   Have you considered in forming -- well,          12:50:46

Page 126

1    let me -- let me just -- the question stands.
2    Is -- is that a fact that you're aware of?
3         The fact being?
4    Q.   That -- that Google's privacy policy is --
5    is -- is reviewed millions of times on average --    12:50:59
6    on an average per week?
7         MS. WEAVER:  Objection.  Foundation.
8    You're assuming it's a fact in asking her if she
9    knows it.  So foundation.
10        THE WITNESS:  So the -- the tidbit that          12:51:13
11   you just said -- yeah, I guess, if you could -- it
12   would be helpful if I understood the context of it
13   and -- I hadn't heard that tidbit before if that's
14   what you're saying.
15   BY MR. BROOME:                                        12:51:32
16   Q.   That's fine.
17        So the number of times that Google's
18   privacy policy has been reviewed is not something
19   that you considered in forming your opinions;
20   correct?                                              12:51:44
21        MS. WEAVER:  Objection.  Foundation.  If
22   you have evidence to put in front of her, show her.
23   Assumes facts.
24        MR. BROOME:  I'm not assuming any facts.
25        MS. WEAVER:  Yes, you are.                       12:51:53

Page 127

1         MR. BROOME:  No.  I'm saying --
2    BY MR. BROOME:
3    Q.   Let me ask the question again.
4         Have you considered the number of times
5    that Google's privacy policy has been viewed in      12:51:58
6    forming any of the opinions that you've provided
7    in this case?
8         MS. WEAVER:  Objection to the extent
9    Google has not provided that information in this
10   case.                                                12:52:09
11        You can answer.
12        THE WITNESS:  So you're asking me -- can
13   you say it again?  I -- I -- I lose the train a
14   little when -- can you say what the question is?
15   BY MR. BROOME:                                        12:52:25
16   Q.   In forming your opinions in this case,
17   have you considered the number of times that
18   Google's privacy policy has been reviewed?
19   A.   So I don't have a document that -- that
20   looks at -- that tells me in this case exactly how   12:52:42
21   many times the privacy policy has been reviewed
22   and the -- and what -- what you even mean by
23   "read," because that -- that can mean different
24   things.  So I can just tell you what I did base my
25   opinion on, which is pri- -- research indicating     12:53:03

Page 128

1    that -- that it's very common for people to not
2    read privacy policies.
3         And also I just want to emphasize that a
4    key part of this opinion or the -- this 3.A and
5    3.B is that whether people read the privacy         12:53:25
6    notices or don't read them my conclusion is the
7    same in the sense that it's reasonable for a
8    person to use Chrome and in a not-synced state and
9    believe that Chrome is not going to send their
10   personal information to Google.                      12:53:48
11   Q.   But when you say it's rea- -- reasonable
12   to think that, do you mean most people would think
13   that, or do you mean that if somebody thought that
14   it would be reasonable?
15   A.   So I -- it's hard for me to see how people   12:54:00
16   would come to the conclusion that when they don't
17   think that all this information will be shared.
18   And the reason for that is -- is, as stated, that
19   they -- they have these expectations of privacy
20   coming in, and those aren't -- if you don't read    12:54:26
21   the privacy notices, those aren't corrected.  And
22   if you do read them, that expectation is not
23   corrected.
24        Moreover, there are parts -- there are
25   parts of these disclosures that actually reenforce  12:54:41

Page 129

33 (Pages 126 - 129)

1 this idea -- this mistaken idea, as it turns
2 out -- as I understand, that -- that -- that in
3 the not synced state, believing that Chrome won't
4 send your personal information. So I think -- I
5 think this is a common -- this would be a common    12:55:02
6 belief for those reasons.
7    Q. When -- when you say in Opinion 3, "It is
8 reasonable for a consumer to use Chrome in the
9 not-synced state and believe that Chrome will not
10 send their personal information to Google,"    12:55:14
11 what -- focusing on, you know, the -- the
12 word "reasonable" --
13    A. Mm-hmm.
14    Q. -- do -- do you mean that most people
15 would think that or just that if somebody thought    12:55:27
16 that it would be reasonable?
17    A. Yeah. So I think in either case. Whether
18 you have read that the disclosures are not, I
19 think that -- so if you haven't read the privacy
20 policies, because you have this expectation of    12:55:47
21 privacy, then you think that -- you're
22 not going to think that Google is collecting what
23 it actually is collecting.
24       And, again, the Plaintiffs' testimony
25 is -- it's very supportive of that. It's    12:56:02

Page 130

1 extremely supportive of this idea that if you
2 don't -- because a lot -- they -- a lot of them,
3 if not all of them, said they didn't read the
4 privacy policies. So they -- they're not
5 expecting this.    12:56:20
6    Q. Right.
7       But -- but my question is whether most
8 people think that way or whether you're just --
9 you're saying that it would just be reasonable for
10 somebody to think that way.    12:56:32
11       So -- so let me ask the question --
12    A. Yeah.
13    Q. -- in Opinion 3 when you say it is
14 reasonable for a consumer to use Chrome in the
15 not-synced state and believe that Chrome will not    12:56:41
16 send their personal information to Google, you
17 don't have any basis for saying that is what most
18 people would think; correct?
19       MS. WEAVER: Objection. Misstates the
20 testimony.    12:56:52
21       THE WITNESS: I'm saying that is
22 reasonable to think this way and -- yeah. And --
23 and I -- my opinions are tightly tied to the
24 question -- my assignment question. So my
25 assignment question is whether Plaintiffs'    12:57:08

Page 131

1 allegations of the invasion -- of an invasion of
2 privacy on Chrome are consistent with reasonable
3 consumer expectation.
4       And my answer to that question is what
5 answer 3.A and 3.B is -- are, which is that it's    12:57:24
6 reasonable. The answer is yes. That's my opinion
7 in --
8 BY MR. BROOME:
9    Q. Right.
10       But a belief can be reasonable, yet only    12:57:36
11 held by a -- a min- -- a minority of consumers;
12 correct?
13    A. So I want to just stick to my assignment
14 questions here, the assignment question being
15 whether this allegation of invasion of privacy is    12:57:53
16 consistent with -- with a reasonable -- reasonable
17 consumer expectations.
18    Q. I'm just trying to understand what you
19 mean by "reasonable consumer expectations." Do
20 you mean most people or -- or just that if one    12:58:05
21 held that belief it would be a reasonable belief
22 but is not necessarily shared by the majority of
23 consumers?
24    A. Sorry, can you repeat the question?
25    Q. When you refer to "a reasonable person,"    12:58:20

Page 132

1 do you -- do you mean most people, yes or no?
2       MS. WEAVER: Objection to the extent it
3 misstates her opinion.
4       THE WITNESS: So -- so can you say what
5 the question is?    12:58:57
6 BY MR. BROOME:
7    Q. When you refer -- when you say, "It is
8 reasonable for a consumer to use Chrome in the
9 not-synced state and believe that Chrome will not
10 send their personal information to Google," do you    12:59:08
11 mean that most people who use Chrome in the
12 not-synced state would believe that, or do you
13 mean that if one -- if a consumer did believe
14 that, it would be reasonable?
15    A. Okay. So I -- it's -- it's hard for me to    12:59:21
16 see how -- in either case, in the case of 3.A or
17 3.B, it's hard to -- for me to see whether -- in
18 the case of someone not reading the privacy
19 policy. It's hard for me to see in the case of
20 people reading the privacy -- privacy policy, I    12:59:51
21 don't see how a reasonable consumer -- it's hard
22 for me to see how a reasonable consumer could
23 conclude that what data collection is actually
24 happening to be actually happening. I don't see
25 how a reasonable -- it's hard for me to see how    13:00:08

Page 133

34 (Pages 130 - 133)

1 you would conclude that. Because when you come in
2 to this relation -- how -- it's hard for me to see
3 how you would conclude that when you're not synced
4 this information is collected because when you
5 come into this relationship, you have a certain      13:00:26
6 expectation of privacy.
7        And then if you haven't read the
8 disclosures, then that privacy, of course,
9 would -- that expectation would stay. And then if
10 you have not read them -- I'm sorry, if you have      13:00:40
11 read them, there is -- I -- I don't -- that
12 there -- the disclosures, they don't say in plain
13 language what is -- they don't state, "Hey, when
14 you're in the not-synced state, all of this
15 information, by the way, is going to be collected.      13:01:05
16 When you're on the New York Times, every article
17 you read is -- Google knows." Like it's not
18 saying that. So how could a reasonable consumer
19 come into it that not synced means sharing all
20 this -- this information, as the Plaintiffs have      13:01:24
21 been alleging.
22        MR. BROOME: Let's take a -- let's take a
23 short break.
24        MS. WEAVER: Yeah. Actually, Steve, we're
25 going to try to order lunch. It's 1:00 o'clock      13:01:36

Page 134

1 here. And so maybe we could order lunch and then
2 maybe go for a period of time until at the time
3 it's ready and take a break.
4        MR. BROOME: That's fine.
5        MS. WEAVER: So we'll need maybe ten      13:01:46
6 minutes.
7        MR. BROOME: Let's go off the record.
8        THE VIDEOGRAPHER: Off the record at
9 1:00 p.m.
10        (Short recess taken.)      13:01:52
11        THE VIDEOGRAPHER: We are back on the
12 record at 1:16 p.m. Eastern time.
13 BY MR. BROOME:
14    Q. Professor John, do you believe -- well,
15 actually, let me ask a different question.      13:17:09
16        Do you have any intention to support
17 Opinion 3 of your report with a survey?
18    A. My -- my opinion is -- is -- I'm not
19 looking for more information. I don't need more
20 information for these opinions. I -- so the      13:17:36
21 answer is no. I have -- I have the evidence
22 that -- in fact, overwhelming evidence to come to
23 the conclusions that -- that I -- that I came to.
24 So I don't -- yeah. It's not like an in-progress
25 document, I guess, if that -- that's your      13:17:58

Page 135

1 question.
2    Q. Okay. And same question with respect to
3 Opinion 4. Do you have any intention to support
4 Opinion 4 with a survey?
5    A. Yeah. So that -- yeah. It wasn't part of      13:18:11
6 my assignment. I didn't do a survey. I felt --
7 or I am confident in these opinions without having
8 conducted a specific new survey.
9    Q. Do you believe that conducting a specific
10 new survey would be helpful to support either      13:18:25
11 Opinions 3 or 4?
12    A. I don't think it's necessary to support
13 these opinions. I -- I want to underscore that,
14 that I -- I -- no. I -- I answered the ques- -- I
15 was able to answer these questions. There's      13:18:40
16 enough evidence available that I -- I can answer
17 these questions without having done a new survey.
18        You know, I -- I'm -- if you showed me a
19 survey, then I'm happy to evaluate it and tell you
20 what I think about it. I'm -- you know, I'm      13:19:05
21 open-minded in that sense. But I didn't deem it
22 necessary to -- to do a survey -- specific survey
23 to answer these -- like a new one, I guess, to
24 answer these questions. And it also wasn't part
25 of my assignment, frankly.      13:19:23

Page 136

1    Q. Are you -- are the familiar with documents
2 that the plaintiffs contend comprise their
3 contract with Google?
4        MS. WEAVER: Objection to the extent it
5 calls for legal conclusions.      13:19:34
6        THE WITNESS: Yeah. I guess I'm not sure
7 what you -- I don't know what is a legal contract
8 or what that -- what you're referring to, if you
9 mean it in a legal way. Maybe you could tell me
10 the documents you're referring to.      13:19:50
11 BY MR. BROOME:
12    Q. Why don't we do it this way. When we --
13 when you -- we'll go to Exhibit 1, which is your
14 report, page 5.
15    A. Yes.      13:20:08
16    Q. This is Opinion 3.B, "If a reasonable
17 consumer were to read Google's privacy policies,
18 it is reasonable for her to use Chrome in the
19 not-synced state and believe that Chrome will not
20 send her personal information to Google."      13:20:20
21        Do you see that?
22    A. Yes.
23    Q. What are you referring to when you say
24 "Google's privacy pol- -- policies"?
25    A. So what I was referring to are Google's      13:20:35

Page 137

35 (Pages 134 - 137)

1  privacy policy, the Chrome privacy notice in
2  particular, and then there's also the Google terms
3  of service and the Chrome terms of service.
4      Q.  Okay.  Anything else that you considered
5  in terms of Google privacy policies in reaching      13:20:55
6  Opinion 3.B?
7      A.  So I also considered the like user
8  experience of signing in and the -- there's
9  another expert who produced first-run experiences
10  because I wanted to understand -- I wanted to see      13:21:21
11  kind of how some of these documents were
12  referenced with respect to that procedure.
13      Q.  Okay.  And did -- does Opinion 3.B rely on
14  the first-run experience documents that you just
15  referenced?      13:21:41
16      A.  It is -- yes, because the first-run
17  experience -- yeah, that was an input to my
18  opinions.
19      Q.  And is that cited in your report?
20      A.  Yes, I believe it is, the -- Exhibit 3.      13:22:06
21      Q.  All right.  Do you reference it in the
22  report itself?
23      A.  So the report references the -- the things
24  that I relied on.  So Exhibit 3 is -- gives you
25  that -- gives you information -- the information I      13:22:29

Page 138

1  relied on.  It's in Exhibit 3, which is part of my
2  report.
3      Q.  All right.  Is it your opinion that
4  Google's privacy policies are too long?
5          MS. WEAVER:  Objection.  Vague.  Do you      13:22:56
6  mean Google's privacy or Chrome or terms of
7  service?
8          THE COURT REPORTER:  I didn't hear you,
9  the last word, Counsel.
10          MS. WEAVER:  I'm sorry, terms of service.      13:23:06
11  Google's privacy policy or Chrome's privacy policy
12  or terms of service.
13          THE WITNESS:  So --
14  BY MR. BROOME:
15      Q.  Is it your -- yeah, go ahead.      13:23:23
16      A.  Can you tell me which you're referring to,
17  I guess?
18      Q.  Sure.  Let's -- let's start with the
19  Chrome privacy notice, is it your opinion that
20  that document is too long?      13:23:30
21      A.  Well, too long for what?
22      Q.  For users --
23      A.  And --
24      Q.  -- to understand.
25      A.  So I -- I -- I guess I want to be a little      13:23:42

Page 139

1  bit cautious because I wasn't asked to render an
2  opinion on the length of the notices.
3      Q.  Is it your opinion that the Google privacy
4  policy is difficult to understand?
5      A.  So I don't want to over -- over -- go      13:24:37
6  beyond what my assignment was.  That was not a
7  specific assignment question.
8      Q.  No.  That's fine.  That's a perfectly fine
9  answer.
10          Do you have an opinion in this case on      13:25:12
11  whether the Chrome privacy notice is too long?
12      A.  Well, I -- I -- again, I wasn't asked
13  specifically to evaluate the length of the notice.
14      Q.  Okay.  Is it your opinion -- or do you
15  have an opinion in this case on whether the Chrome      13:25:31
16  privacy notice is difficult to understand?
17      A.  Well, again, I would say this wasn't -- I
18  wasn't explicitly asked to -- to indicate the
19  degree of difficulty.  But what I -- in terms of
20  like understanding and what it does and doesn't      13:25:50
21  say, part of that is relevant to my opinion in the
22  sense that this question of whether the -- the --
23  whether it is reasonable for consumers to think
24  that -- to read these and to think that when they
25  use Chrome in the not-synced state that this is      13:26:10

Page 140

1  going to -- whether it's reasonable for people to
2  use Chrome in the not-synced state and believe
3  that Chrome will not send their personal
4  information.  So -- so that part of it is relevant
5  in that sense.      13:26:27
6          And here what I'm saying is that they --
7  sorry, I've lost my train of thought.  They --
8  they -- the -- the -- the policies, they don't
9  explain in a way that a person can readily
10  comprehend.  They don't explain what actually      13:26:58
11  happens when you're not synced.  They don't
12  explain everything that is -- what is collected in
13  a way, again, that's comprehensible to users,
14  so...
15          And they -- and as I also talk about in my      13:27:27
16  report, people, they also -- a reason why they
17  don't read them in the first place is because
18  they -- they don't really understand -- they may
19  not expect to understand what's there.  And then
20  the -- the -- the ask to read the policy in terms      13:27:45
21  of the -- the -- the length, their privacy
22  disclosures are typically quite long.  And so the
23  length of time it would take a person to read it,
24  especially when you consider all of the policies
25  we encounter, it's not a reasonable ask of people.      13:28:07

Page 141

36 (Pages 138 - 141)

| | |
|---|---|
| 1 So when you're -- if -- if I put your | 1 just represent to you that at least this document |
| 2 question about length within that context, then in | 2 is not reflected among the -- the sources that you |
| 3 that context, it's relevant to my opinion. | 3 identified in Exhibit -- Exhibit 3. |
| 4 Q. Okay. We're going to show you a new | 4 A. Yes. And I -- right. So I -- |
| 5 document.                              13:28:29 | 5     MS. WEAVER: I can confirm that.        13:31:49 |
| 6 A. Okay. | 6     THE WITNESS: Yes. So I -- this isn't |
| 7     MS. WEAVER: Exciting. | 7 something that is the basis -- that I relied on |
| 8     MR. BROOME: It's 4. | 8 my -- for my report if that was your question. |
| 9     (John Deposition Exhibit 4 was marked.) | 9 BY MR. BROOME: |
| 10 BY MR. BROOME:                          13:29:03 | 10 Q. Did you consider this document before you   13:32:05 |
| 11 Q. You should have what we've marked as | 11 filed your report in this case? |
| 12 Exhibit 4. Let me know when you can see it. | 12 A. No. |
| 13 A. Okay. Exhibit 4, "Consent Bump" -- | 13 Q. Okay. Please turn to -- I'm going to -- |
| 14 Q. Okay. And -- yep. Go ahead. | 14 I'm going to orient you in terms of the pages by |
| 15 A. It says "Consent Bump 2.0 for Narnia 2.0."  13:29:20 | 15 referring to these what we call Bates numbers in   13:32:21 |
| 16 Q. Exactly. | 16 the bottom right-hand corner. |
| 17     All right. And what we've marked as | 17 A. Okay. |
| 18 Exhibit 4 Bates labeled GOOG-CABR-04067825. And | 18 Q. And -- and I'm going to give you the last |
| 19 as the witness identified, it is titled "Concept | 19 three numbers. |
| 20 Bump 2.0 for Narnia 2.0: LAUNCHED UX."       13:29:42 | 20     So if you could turn to the page Bates      13:32:30 |
| 21     Now -- | 21 number ending '836. |
| 22     MS. WEAVER: Objection -- sorry. The | 22 A. Okay. |
| 23 witness did not identify this document that it's | 23 Q. Do you see there's a -- there's a |
| 24 what it says on the front. Objection. Foundation. | 24 disclosure screen there, and it's sort of pasted |
| 25 BY MR. BROOME:                          13:29:56 | 25 into two shots. They go -- they go together.    13:32:59 |
| Page 142 | Page 144 |

| | |
|---|---|
| 1 Q. Have you seen this document before, | 1 A. I see -- I see two shot -- two screenshots |
| 2 Professor John? | 2 on the slide, yes. |
| 3 A. I have seen it before. | 3 Q. Yeah. And you can see sort of at the |
| 4 Q. Okay. Is it -- | 4 bottom of the first one it sort of rolls into |
| 5 A. I believe -- I believe I've seen it       13:30:03 | 5 the -- the top of the next one. You See that?    13:33:15 |
| 6 before, the -- it looks familiar. | 6 A. Oh, I see what you're saying. It's |
| 7 Q. Okay. Is it among the documents that are | 7 like -- it was possibly a long screen, and |
| 8 included in the materials relied upon in your | 8 it's the -- a screenshot of the top and of the |
| 9 exhibits? | 9 bottom; is that what you're saying? |
| 10 A. Let me look here at the number --         13:30:21 | 10 Q. Yeah.                               13:33:31 |
| 11     (Interruption in audio/video.) | 11 Okay. So have you considered -- did you |
| 12     THE COURT REPORTER: I can't hear you, | 12 consider this screen in form -- in -- in forming |
| 13 Professor. | 13 any of the opinions that you've rendered in this |
| 14     THE WITNESS: Sorry. I apologize. | 14 case? |
| 15 So I --                                13:30:44 | 15     MS. WEAVER: So I'll propound an objection  13:33:47 |
| 16     MS. WEAVER: Can you mark as an exhibit, | 16 to foundation. This document says "Mock" all over |
| 17 if we have it, Steve, the exhibit that lists all | 17 it. It has not been authenticated -- |
| 18 the documents. I don't believe that's an Exhibit, | 18     (Interruption in audio/video.) |
| 19 Steve, but I could be wrong. | 19     THE COURT REPORTER: Excuse me, I can't |
| 20     MR. BROOME: It's the previous exhibit,   13:30:56 | 20 hear you, Counsel.                     13:33:55 |
| 21 Exhibit 3. | 21     MS. WEAVER: I will propound an objection |
| 22     MS. WEAVER: Okay. | 22 to foundation. This document has not been |
| 23 BY MR. BROOME: | 23 authenticated. And it has the word "Mock" all over |
| 24 Q. So rather than having you do it, go | 24 it. There's no evidence that this is an actual |
| 25 through a matching exercise, Professor John, I'll  13:31:32 | 25 screen flow.                           13:34:12 |
| Page 143 | Page 145 |

Veritext Legal Solutions
866 299-5127

1        Can we have a standing objection on that,
2  Steve?  You're just going to ask her that question
3  again.
4            MR. BROOME:  Certainly.  Yeah, that's
5  fine.                                    13:34:16
6  BY MR. BROOME:
7     Q.  So -- so just -- just to get back to the
8  question, Professor John, did you consider this
9  screen -- these screenshots or anything that
10  looked like these screenshots in forming the   13:34:32
11  opinions that you've rendered in this case?
12     A.  Yeah.  I don't know what these -- so I
13  didn't rely on this document.
14     Q.  Mm-hmm.
15     A.  I don't know what these screenshots are of  13:34:43
16  or the context.  I didn't rely on this document,
17  if that's your question.
18     Q.  Yeah.  No.  I'm just -- I'm sort of taking
19  it one step beyond the document, you know, to the
20  extent that you saw these screenshots in some   13:34:57
21  other document.  Is it safe to say that you did
22  not rely on screen -- you know, anything
23  resembling these screenshots in forming your
24  opinions in the case?
25     A.  They don't look familiar --           13:35:13

Page 146

1     Q.  Okay.
2     A.  -- from how -- when I formed the opinion.
3     Q.  If you just flip through pages '839
4  through '841 --
5     A.  Okay.  Can I just ask --           13:35:38
6     Q.  Yeah.
7     A.  -- for some context on -- on what these
8  are of?
9     Q.  I can tell you what Google's position is,
10  yes.                                    13:35:51
11         These are screenshots that in August
12  of 20- -- or in or around June or July -- or
13  summer of 2016 Google launched and showed to all
14  existing Google accountholders and that Google's
15  records show that the -- several of the Plaintiffs  13:36:11
16  were shown this screen and clicked the "I agree"
17  button.
18     A.  I see.
19            MS. WEAVER:  I'll object.  Foundation.
20  Testimony by counsel.  And I'll defer to my   13:36:27
21  standing objection as well.
22  BY MR. BROOME:
23     Q.  Have you seen -- have you seen before any
24  of the screenshots that are reflected on pages
25  '839 through '841?                        13:36:41

Page 147

1     A.  Okay.  Let me -- let me go through this.
2     Q.  Okay.
3     A.  Right now I am starting on '836 and
4  then -- oops.  Okay.
5         Now, you want me to not look at '837?   13:36:58
6     Q.  No, it's fine.  You can look at whatever
7  you like.
8     A.  Okay.
9     Q.  If -- if you want to go from '836 to --
10     A.  Okay.                           13:37:04
11     Q.  -- '841, that's fine.
12     A.  It's also in -- I mean, I can't really
13  read it.  It's in tiny -- it's super hard to read.
14  It's in -- and you can see my eyes are like
15  right -- sorry, right on the video here, so I --   13:37:18
16  it's hard -- it's -- honestly it's hard for me to
17  examine them because I -- I can't really read
18  what's written.
19     Q.  Yeah.  No, that's -- that's fine and
20  totally fair.                           13:37:28
21         Why don't we do this, why don't we focus
22  on the one on page '841.
23            MS. WEAVER:  I do want to object that it
24  is pretty blurry, Steve, so I think she needs to
25  have a chance to try to look at it.         13:37:39

Page 148

1            MR. BROOME:  Yeah, that's what I was
2  getting -- getting at.
3  BY MR. BROOME:
4     Q.  Why don't we go to the one on '841 and
5  just blow that up so that you can see the text.   13:37:46
6     A.  Okay.  I'm just -- I'm just going slowly.
7  There's a lot to digest.  I mean, as I say, like
8  there's -- there's a lot of them.
9     Q.  Yeah, take all -- take your time.
10     A.  Okay.                           13:37:59
11            MS. WEAVER:  Are you saying, Steve, that
12  these notes in pink were represented to users?
13            MR. BROOME:  No, I'm not saying that.
14            MS. WEAVER:  Okay.  So foundation on this
15  document.                                13:38:07
16            THE WITNESS:  So you're -- and -- and when
17  are users shown these?
18  BY MR. BROOME:
19     Q.  Well, I mean, it's -- we're starting to
20  get in -- beyond the -- process.  I mean, it's   13:38:20
21  not really --
22     A.  Sorry.
23     Q.  -- a -- a conversation here,
24  unfortunately.  I mean, the more -- the more I
25  tell you about it, the more objections I draw from  13:38:29

Page 149

38 (Pages 146 - 149)

1  your counsel, but they -- yeah, I mean, Google's
2  position is that the -- the documents were --
3  these were shown -- sort of launched through -- I
4  mean, the -- the rest of the presentation kind of
5  lays it out.                        13:38:45
6     A.  Okay.
7     Q.  And they were launched in -- in or around
8  the summer of 2016 and --
9     A.  Okay.
10    Q.  But it -- it sort of goes beyond the scope   13:38:54
11 of what I'm trying to -- trying to ask you.
12 And -- and I -- I can -- just for purpose of your
13 review, I'm just trying to evaluate whether you
14 considered any of the text that's reflected --
15    A.  Mm-hmm.                       13:39:10
16    Q.  -- in these pages, from '836 to '841, in
17 forming your opinions in this case?
18    A.  Mm-hmm.
19    Q.  And if the answer to that is no, then we
20 can move on.  But I want to make sure you have a   13:39:21
21 chance to evaluate that.
22    A.  Right.  Yes.  And I need to look at this
23 to...
24    Okay.  So then on this page, '836, this --
25 the purple thing highlighted is only shown to    13:40:12

Page 150

1  users who have sync turned on.
2     And then the next page -- I'm sorry, I
3  have to go through it carefully here.
4     Q.  Yep, no problem.  Take -- take your time.
5     A.  And then am I to understand on page --   13:40:54
6  page '837, that when you click on "More Options,"
7  the thing on the right appears that says, "Choose
8  rights" -- "Choose what's right for you"?
9     Q.  Right.
10    A.  And then if you are on page -- it's --   13:41:51
11 from page '8- -- '838, if you click on the "Learn
12 more about these features," is it correct, then,
13 that the next page, page '839, these -- the "More
14 about these new features" pops up?
15    Q.  Right.                        13:42:20
16    A.  Is that right?
17    Q.  Yes.
18    A.  Okay.  I see.
19    MS. WEAVER:  Steve, page '828 is literally
20 not legible.  Do you have another version of this?   13:42:48
21    MR. BROOME:  '828?
22    MS. WEAVER:  Yeah.
23    MR. BROOME:  Yes, we do.  We'll come to
24 that one.  There's a -- there's a bigger blowup
25 earlier in the presentation.  In fact, it's on the   13:43:01

Page 151

1  next page, Lesley.
2     THE WITNESS:  Okay.  So what you had me
3  looking at was the desktop.  And then it goes into
4  the flow, if you're on mobile, with and without
5  sync.                              13:44:57
6  BY MR. BROOME:
7     Q.  Yeah.  And -- and, again, my question is
8  just have -- have you seen, you know, a version of
9  these screens -- or did you consider it -- these
10 screens or a version of these screens in forming   13:45:08
11 your opinions in this case?
12    A.  Not to my knowledge, no.
13    Q.  Okay.  And then if we can go -- oh, sorry.
14 Go ahead.
15    A.  No, that's...                  13:45:20
16    Q.  Okay.  And we can go back to page -- if
17 you'd flip back to page '829.
18    MS. WEAVER:  Did you say "'829"?
19    MR. BROOME:  Yes.
20    MS. WEAVER:  Okay.                 13:45:40
21    MR. BROOME:  '829 and '830.
22    THE WITNESS:  Okay.
23 BY MR. BROOME:
24    Q.  Did you consider these screens or versions
25 of these screens in forming your opinions in this   13:45:56

Page 152

1  case?
2     A.  No, these are -- this is -- I think this
3  is a new document to me in terms of --
4     THE COURT REPORTER:  Please keep your
5  voice up.                          13:46:14
6     THE WITNESS:  I didn't rely on these to
7  make my opinion.  So I'm trying to familiarize
8  myself with them.
9     '829.  So is this what happens -- could
10 you give me some context to what this is showing   13:46:29
11 here?
12 BY MR. BROOME:
13    Q.  Sure.
14    This is like when you -- when you sign up
15 for a Google account, this was the disclosure flow   13:46:37
16 that users saw.  And then to create the account,
17 they would have to click to "I agree."
18    A.  Mm-hmm.
19    MS. WEAVER:  Objection as to time frame.
20 BY MR. BROOME:                       13:46:49
21    Q.  Launched, again, around the summer of
22 2016.
23    A.  Okay.  Thank you.
24    Q.  And just, again, for the record, the
25 question is whether you considered these screens   13:46:59

Page 153

39 (Pages 150 - 153)

1 in forming your opinions in this case.

2    A. No.

3    Q. Okay. And in forming your opinions in

4 this case, did you consider any information

5 relating to Google's My Activity feature?        13:47:53

6        MS. WEAVER: Objection. Vague.

7        THE WITNESS: "Information relating to

8 Google's My Activity feature," can you unpack what

9 you mean there?

10 BY MR. BROOME:        13:48:14

11    Q. Did you consider the existence of the --

12 the My Activity feature in forming your opinions

13 in this case?

14        MS. WEAVER: Objection. Vague.

15        THE WITNESS: Maybe what -- what would be        13:48:26

16 helpful to me is if you -- is there a specific

17 document you want me to look at and see if I u- --

18 relied on that?

19 BY MR. BROOME:

20    Q. Well, you are familiar with My Activity        13:48:35

21 feature; correct?

22    A. As a user myself, I have a general

23 awareness of it, yes.

24    Q. Okay. And -- and it's just -- is -- is

25 there anything that you considered relating to My        13:48:48

Page 154

---

1 Activity -- well, let me strike that.

2        In forming your opinions in this case, did

3 you consider any information relating to My

4 Activity?

5        MS. WEAVER: Objection. Vague.        13:49:09

6        THE WITNESS: I guess I'm not exactly sure

7 I'm relating to -- I mean, if you think of like the

8 privacy policy is related to that, so it's a bit

9 hard to answer your question. Maybe if you could

10 focus it a bit more.        13:49:21

11 BY MR. BROOME:

12    Q. Sure.

13        Well, how is the privacy policy related

14 to My Activity?

15        MS. WEAVER: Objection. Vague.        13:49:27

16        THE WITNESS: Well, it's part of Google,

17 and Google has a privacy policy. So in -- in -- in

18 that way, they're, you know, related.

19        But beyond that, it's hard for me to be

20 specific because I'm not sure what the question is.        13:49:47

21 And -- and the things that I relied on for my

22 opinion I've -- I -- are -- are in that exhibit.

23 BY MR. BROOME:

24    Q. Okay.

25        MR. BROOME: Okay. Let's produce -- mark        13:51:37

Page 155

---

1 Exhibit 33.

2        So we're going to mark another exhibit.

3 This will be Exhibit 5? Exhibit 5.

4        (John Deposition Exhibit 5 was marked.)

5 BY MR. BROOME:        13:52:20

6    Q. Does this look familiar to you,

7 Professor John?

8        MS. WEAVER: Sorry, but I'm not loaded

9 yet. Before we have a question, if I can --

10        MR. BROOME: Sure.        13:52:30

11        MS. WEAVER: Sorry.

12        Okay. Give me just a second here.

13        Okay. Ready.

14        THE WITNESS: Okay. For me, this document

15 reads -- this is Exhibit -- let's see -- Exhibit 5.        13:52:44

16 Yes, I have Exhibit 5 open.

17 BY MR. BROOME:

18    Q. Okay. And -- and I'll -- I'll represent

19 to you this is a transcript that we created from

20 a -- a YouTube video in which you gave a -- an        13:52:59

21 interview, and the link is at the top of the

22 document.

23        MS. WEAVER: When you say "we created," is

24 this a certified transcript?

25        MR. BROOME: Well, YouTube creates it        13:53:19

Page 156

---

1 automatically.

2        MS. WEAVER: Objection. Foundation as to

3 the whole document. Standing objection.

4 BY MR. BROOME:

5    Q. Do you recall doing this interview,        13:53:33

6 Professor John?

7        MS. WEAVER: Objection. Foundation.

8        THE WITNESS: What is the interview from?

9 BY MR. BROOME:

10    Q. It's a -- it's an interview that you gave        13:53:46

11 on -- to the Psychology of Technology Institute.

12    A. Okay. I'm just going to open the YouTube.

13        MR. BROOME: Okay.

14        MS. WEAVER: So you should just look at

15 the document.        13:54:13

16        THE WITNESS: Okay. Okay.

17        MS. WEAVER: You should not --

18        THE WITNESS: Okay.

19        I'll close that YouTube. I just opened

20 the link.        13:54:17

21        MS. WEAVER: No, no.

22        THE WITNESS: Okay. So --

23 BY MR. BROOME:

24    Q. Well, let me put it this way -- I'm sorry.

25 Just one second. If you want to look at the        13:54:22

Page 157

40 (Pages 154 - 157)

1  video, that's totally fine with me. I -- I -- I
2  don't want to walk through the entire video
3  because I only have a few questions about the
4  transcript, but we can mark the video itself as an
5  exhibit.                          13:54:35
6      Oh, you know what, no, it's really big.
7  So it's fine with me if you want to take a -- a
8  quick look at the -- at the video just by -- on
9  YouTube.
10  A.  No, I'm going to stick to the exhibit.   13:54:45
11  Q.  Okay.
12  A.  So --
13  Q.  Do you recall -- do you recall giving this
14  interview?
15  A.  Well --                       13:54:54
16      MS. WEAVER:  Objection.  Foundation.
17      THE WITNESS:  So I don't know that this is
18  an accurate transcript of the interview that you're
19  asking about.
20      When I clicked on the YouTube link, I   13:55:05
21  remember being interviewed.  So I remember that
22  interview.
23  BY MR. BROOME:
24  Q.  Okay.  That's fine.
25      Well, take a look at page 3 -- or, rather,   13:55:17
                                          Page 158

1      MS. WEAVER:  Objection.  Foundation.
2  BY MR. BROOME:
3  Q.  Do you -- do you recall -- do you recall
4  saying these words?
5  A.  Do I recall the exact moment I was say- --  13:57:22
6  no.  But, I mean, it's -- it -- it seems like
7  something I may have said.  And I -- if I -- if I
8  believe you, that this is an actual transcript,
9  then I --
10  Q.  But do you -- do you --           13:57:37
11  A.  That's what the transcript says, so...
12  Q.  Do you agree that some people care more
13  and some people care less about privacy?
14  A.  This is a bit of an unnatural exercise.
15  You're taking an interview that I did, it sounds   13:57:51
16  like a few years ago, and you're putting -- you're
17  not letting me watch the whole interview, and
18  you're asking me about certain specific lines.
19  And I don't have the broader context, so that's
20  why it's a bit unnatural and hard to answer your   13:58:07
21  questions.
22  Q.  Well, putting the interview side, do you
23  agree that some people care more about privacy and
24  some people care less?
25  A.  I -- I guess I -- it -- it's hard to     13:58:21
                                          Page 160

1  sorry, page 2.  At line 328 you refer to "biases
2  in making decisions."  [As read]
3      Then you say, "with respect to our
4  personal information we don't really even if we do
5  care about our privacy and some people care more   13:55:56
6  some people care less but even when we do care
7  about our privacy we don't really reward firms for
8  getting it right so people even people who care
9  about their privacy are often not very willing to
10  pay for privacy." [As read]              13:56:13
11      Do you see that?
12  A.  Yes.
13  Q.  And is that -- I mean, do you -- do you
14  agree with those words?
15  A.  I mean, I -- I guess it's a -- in what   13:56:29
16  context?  Like I -- this is -- I said this in a
17  certain context, and it's a -- it's a bit hard to
18  answer your question without understanding, you
19  know, the context.
20      This is an answer I gave to an interview   13:56:51
21  question in a certain context, at a certain point
22  of time.  I actually don't even know when this
23  occurred because there's no date on this, so...
24  Q.  Yeah, it was posted on YouTube on
25  September 3rd, 2019.                    13:57:09
                                          Page 159

1  answer that question in a vacuum.  I mean, if you
2  ask me, you know, with respect to my opinion, so
3  my opinion on -- in this case of whether people
4  care about their privacy, they do care about their
5  privacy.                          13:58:45
6      This here isolated statement doesn't
7  negate that, if that's what you're -- you're
8  asking or getting at.
9  Q.  I'm asking whether you agree that some
10  people care more about their privacy and some   13:58:58
11  people care less?
12  A.  And, again, it's -- it's taking
13  something -- I'm -- I'm not sure -- so I would ask
14  you some -- respectfully like which people, what
15  are they doing, what contexts?            13:59:17
16  Q.  Okay.  So -- and -- and -- and this
17  interview, then, it was about -- it looks like the
18  question was "What's wrong with the principle of
19  'informed consent' when it comes to digital
20  privacy?"                          13:59:33
21      And then you respond, "I would say it's a
22  very convenient argument for people who have a
23  massive" [as read] --
24      THE COURT REPORTER:  Excuse me, Counsel,
25  could you slow down if you're reading, please.   13:59:43
                                          Page 161

41 (Pages 158 - 161)

1    MR. BROOME: Yes. I apologize.
2    BY MR. BROOME:
3    Q. In response to that question, you said, "I
4    would say it's a very convenient argument for
5    people who have a massive incentive to use          13:59:52
6    people's personal data and have very few
7    restrictions placed on what they can do with that
8    with those personal data." [As read]
9        The -- the -- well, let me ask this
10   question. I mean, in what -- what context were     14:00:10
11   you -- were you talking about in -- in this
12   interview?
13   A. I don't know precisely because I don't --
14   I'm not like -- the interview was done a while
15   ago. I'm not seeing the whole interview.          14:00:24
16   Q. The -- the whole transcript's there.
17   Would it make it easier if you read it?
18       MS. WEAVER: That's a good idea.
19       THE WITNESS: Yes.
20       So I will -- I will do that.                14:00:41
21       (Witness reviews.)
22       Okay. I've read through the transcript.
23   BY MR. BROOME:
24   Q. Okay. Do you recall giving this
25   interview?                                         14:12:08

Page 162

1    A. Yes.
2    Q. All right.
3        On page 1, at -- it looks like, you know,
4    36 seconds into a minute and 01 into the
5    interview, it says, "yeah defining privacy it is    14:12:26
6    elusive and it's kind of this abstract ethereal
7    concept." [As read]
8        Do you see that?
9    A. I do.
10   Q. Do you agree with that statement?             14:12:39
11   A. Do I agree with the statement that -- the
12   statement that -- so it is -- it is abstract, yes,
13   I agree with that, but I -- but there's also
14   important additional information. That doesn't
15   mean you can't define it. And so I go on to       14:12:59
16   define it that it's concern over our personal
17   information.
18   Q. Okay. And -- and -- and why -- why is it
19   that defining privacy is elusive and kind of
20   abstract and ethereal?                           14:13:15
21   A. Well, it's kind of like love. Like how do
22   you define love? It's -- it's -- it's like a
23   concept. But that doesn't mean it doesn't exist;
24   right? It's a -- it's a very real thing.
25       So what I mean there by "ethereal" -- like  14:13:32

Page 163

1    something that would be more tangible would be
2    like a mug; but privacy, it -- that's what I'm
3    referring to. It's not like -- like a tangible
4    good. So it is a bit -- it's a concept. But it
5    also has -- has a definition that is accepted.     14:13:51
6        So in my field, when we think of privacy,
7    we think of con- -- concern over one's personal
8    information. That's the -- what -- scholars in my
9    field, that's the -- way we think about this
10   concept.                                          14:14:14
11   Q. You described it in the interview as a --
12   a loose definition of privacy; right?
13   A. So this is a definition that -- concern
14   over private information -- concern over personal
15   information is a definition that I can tell you    14:14:31
16   that people in my field use.
17       I -- you know, the -- what's important
18   here and I think what a transcript misses is like
19   the way that one says it. So I -- I may have
20   been, you know, oh, like a little casual in the    14:14:47
21   way I was talking. But this isn't to say that
22   there isn't text behind the construct. There
23   absolutely is attached to this notion of privacy
24   as defined as concern over -- over one's personal
25   information.                                       14:15:05

Page 164

1    Q. Okay. And then on page 2, going back to
2    the portion of the transcript that we read before,
3    there's this reference, beginning at about line
4    3:33, "even if we do care about our privacy and
5    some people care more some people care less." [As  14:15:31
6    read]
7        Do you see that reference?
8    A. Okay. Yes.
9    Q. Do you see that? Okay.
10   Do you agree that when it comes to caring     14:15:48
11   about privacy online, some people care more and
12   some people care less?
13   A. Okay. So I -- I want to -- this -- this
14   snippet that you're saying is in the context of an
15   interview, and it's in the context of an answer to   14:16:07
16   a question.
17       So I just want, so that we're all on the
18   same page, to read the question and then the
19   answer that I gave to give -- so we understand it
20   in a more fulsome way.                           14:16:20
21       So the question is, "What's wrong with the
22   principle of 'informed consent' when it comes to
23   digital privacy?"
24       My answer here at this point in time was,
25   "I would say it's a very convenient argument for  14:16:34

Page 165

42 (Pages 162 - 165)

1 people who have a massive incentive" --
2        THE COURT REPORTER: Could you slow down,
3 Professor, if you're going to be -- be reading,
4 please.
5        THE WITNESS: I apologize.        14:16:43
6        Let me -- let me start again. The
7 question was "What's wrong with the principle of
8 'informed consent' when it comes to digital
9 privacy?"
10       My answer was, "I would say it's a very        14:16:54
11 convenient argument for people who have a massive
12 incentive to use people's personal data and have
13 very few restrictions placed on what they can do
14 with those personal data. I want to emphasize
15 though the goal is not for people is to never share        14:17:17
16 information there is a lot of value to be had for
17 people to share information with firms so firms can
18 like" -- "can like better customize their products
19 and that's a benefit that's good for firms and
20 consumers so there's a space where both benefit but        14:17:32
21 I think one of the problems is that because of a
22 variety of challenges we have and biases in making
23 decisions with respect to our personal information
24 we don't really even if we do care about our
25 privacy and some people care more some people care        14:17:54

Page 166

1        And now the question specifically that you
2 were asking with respect to it was?
3 BY MR. BROOME:
4        Q.  Some people care more about their privacy
5 online, and some people care less.        14:19:34
6        Do you agree with that?
7        A.  So what I mean here is that there
8 can -- there -- there -- from time to time
9 different people can -- you know, you can -- your
10 degree of concern can change sometimes from        14:19:48
11 situation to situation, sometimes from person to
12 person.
13       Importantly, if we kind of come back to,
14 like, the context of my opinion, even though
15 there -- some of these -- even though there are        14:20:06
16 these difference -- or can be these differences,
17 there's a base level of privacy concern that is
18 general across people. People care about their
19 privacy.
20       Another consistency is this idea --        14:20:20
21 because this is the context in which I'm making
22 these statements here is -- the context is this
23 idea of what is consent, what is informed consent.
24       And -- and what I'm saying is very
25 consistent with my opinion in the sense that there        14:20:35

Page 168

1 less" -- yeah, "some people care more some people
2 care less but even when we do care about our
3 privacy we don't really reward firms for getting it
4 right so people even people who care about their
5 privacy are often not willing to pay for privacy in        14:18:20
6 part because the incentive structure is often set
7 up such that if you give something" -- "if you give
8 something give your information away right now you
9 get an immediate tangible benefit whereas the
10 potential negative consequences of sharing are        14:18:37
11 delayed they're hard to couple with the given
12 incident of sharing so it lends itself to us kind
13 of even if we do care about our privacy giving it
14 up very easily in exchange for these small rewards
15 and so it means that even if we do care even for        14:18:55
16 those of us that care a lot we don't really incent
17 firms to protect our privacy in a way and so the
18 market isn't running really properly and so
19 whenever you know we've seen this in other areas
20 where markets fail that's an opportunity for        14:19:08
21 regulatory approaches to just step in and try to
22 rectify a situation of course that's easier said
23 than done.
24        So that's the -- the context that this
25 statement was made in.        14:19:20

Page 167

1 are -- kind of the -- the deck is stacked towards
2 people giving informed consent. It's -- I'm
3 pointing to the -- the challenges in -- that
4 people face in actually giving real consent.
5        Q.  In -- in this -- on the next page, you        14:21:01
6 refer to -- at -- at 4:20, it says, "so it means
7 that even if we do care even for those of us
8 who care" -- "that care a lot" [as read], some
9 people care a lot about privacy and some people
10 don't; right? That's consistent with your        14:21:25
11 research; correct?
12        A.  Not exactly.
13        Q.  And is it your testimony that everybody
14 cares about privacy in the same way?
15        A.  No.        14:21:43
16        Q.  And is it your testimony that -- oh,
17 sorry, go ahead. I was about to cut you off.
18        A.  So of course people don't -- don't feel
19 exactly the same way about privacy. They're --
20 you know, and -- and even the same person can feel        14:22:03
21 differently at different moments in time and in
22 different contexts.
23        At the same time, there is a base degree
24 of concern for privacy that is universal to people
25 is my point.        14:22:18

Page 169

43 (Pages 166 - 169)

1   Q.   Okay.  And -- and -- and what is the base?
2   Like when you refer to a -- a baseline concern for
3   privacy, what -- what does that mean?
4       A.   Concern over one's personal information.
5   There is a -- people care about their privacy.      14:22:35
6       Q.   And have you done surveys on that issue?
7       A.   Which specific issue?
8       Q.   The -- the question of whether peo- --
9   people care about their privacy online.
10      A.   Right.                      14:22:56
11          So here I would point you to my opinion.
12  It is Number 2 where I talk about -- I state my
13  opinion that people care about their privacy, and
14  then I discuss the basis for that opinion.
15          And I'm happy to go through the      14:23:19
16  specific -- some of the specific pieces of
17  evidence that -- that base -- that -- from which I
18  got that opinion, if that's helpful.
19      Q.   Well, is that opinion based at all on
20  surveys that you conducted?      14:23:35
21      A.   So let me just -- I -- I guess if we could
22  go back to my report.
23      Q.   That's fine.  It's Exhibit 1.
24      A.   Yeah.  So that I have found in my own
25  research and I -- and others have found that in   14:23:59

Page 170

1   their research.  And it also is consistent with
2   Google's own research that people care about their
3   privacy.
4           It's also consistent with the plaintiffs'
5   own remarks on the matter.  It's -- it's --      14:24:17
6   there's a consistency here that is very striking
7   that supports the point that people care about
8   their privacy on the internet.
9       Q.   Well, let me just ask the question again.
10  Is Opinion 2 based on surveys that you conducted?   14:24:36
11      A.   It's based in part -- so the -- the --
12  the -- one of the studies I cite -- cite right
13  there asks people the extent to which they're --
14  in different ways it assesses people's ex- --
15  expectations about how firms collect and use their   14:24:54
16  information for advertising.
17          It asks them about their sense of privacy,
18  how much they care about their privacy, yes, I
19  have done research on this topic.  But it's not
20  the only -- like there's other people's research,   14:25:12
21  and there are also papers that I cite that do not
22  report a survey that they specifically ran to
23  address that specific question.
24          They -- they used -- you know, there's
25  like a -- review papers, for example, that -- that   14:25:29

Page 171

1   don't report a -- a specific -- specific survey
2   in question.
3       Q.   Well, when you conducted surveys on the
4   question of whether consumers care about their
5   privacy on the internet, were the results uniform?   14:25:46
6       A.   What do you mean by "uniform"?
7       Q.   The same, everybody answered the questions
8   the same way.
9       A.   No.  Then I'd have no variance in data.
10  Then that's -- that -- that is not people -- there   14:26:03
11  are variances in -- in people's responses.  If
12  there aren't, then you're making up your data.
13          Again, I -- yes, there are, you know,
14  different people at different times in different
15  situations.  How much you are concerned about your   14:26:25
16  privacy and even the extent to which you are
17  thinking about it, which it's top of mind, can
18  vary.
19          But, importantly, there is a -- and this
20  isn't just my conclusion, other scholars come to   14:26:41
21  the same conclusion that people care about their
22  privacy.  And it's -- it's -- it's also really
23  relevant to this question of consent; right?  Like
24  if -- if you -- if you have not actually given
25  consent.                      14:27:03

Page 172

1           And this is, you know, in the transcript.
2   That's why there's -- we're talking about consent
3   and what is consent and -- as it pertains to
4   privacy concerns.
5       Q.   But you --                  14:27:20
6       A.   If you're not giving consent, then you
7   would --
8           THE COURT REPORTER:  Can you start over
9   your sentence, please.
10          MR. BROOME:  Yeah.  Sorry about that.      14:27:26
11          THE WITNESS:  Yeah.  Sorry, I lost my
12  train of thought.  Why don't you ask a question.
13  BY MR. BROOME:
14      Q.   Well, I want to make sure I gave you an
15  opportunity to complete your answer.  I thought      14:27:34
16  you were done, and I started asking a question.  I
17  think you were mid thought.
18      A.   Yeah.
19      Q.   Sorry about that.
20      A.   The moment is gone, but --      14:27:43
21      Q.   Okay.  All right.
22          Well, you've said several times now that
23  there's a baseline, right, and -- and people --
24  that people care about their privacy.
25          But my question is:  Some people care more   14:27:55

Page 173

44 (Pages 170 - 173)

1  about their privacy and some people care less;
2  right?
3      MS. WEAVER: Objection. Asked and
4  answered.
5      And, Steve, I'd just like to note, it's    14:28:03
6  now 2:30 our time, and we haven't had lunch. So
7  maybe it's time to take a break when you're done
8  here. And hopefully you're not going to ask the
9  same question five more times.
10     MR. BROOME: You know, it's just funny    14:28:19
11 because you guys keep making -- using criticisms
12 about using sarcasm; yet, you do it all the time.
13     MS. WEAVER: I wasn't being sarcastic. I
14 was being genuine.
15     MR. BROOME: All right.    14:28:28
16 BY MR. BROOME:
17     Q. Professor John, you referred to a baseline
18 about people care about their privacy. My
19 question is: Some people care more about their
20 privacy online, and some people care less; right?    14:28:39
21     A. What I --
22     MS. WEAVER: Objection. Wait for the...
23 BY MR. BROOME:
24     Q. Do you agree with that or not?
25     A. Can you say the question again, please.    14:28:55

Page 174

1      Q. Sure.
2      You have referenced several times a
3  baseline. You said some -- everybody cares about
4  their privacy online. Is that your testimony?
5      MS. WEAVER: Objection. Asked and    14:29:07
6  answered.
7      You can repeat your answer.
8      THE WITNESS: So my testimony is that
9  there are differences in people. And different
10 people, different times, different contexts can    14:29:18
11 mean more versus less concerned about their
12 privacy, but it -- very importantly people care
13 about their privacy fundamentally.
14     And -- and when I was asked in my -- in
15 the report, I was asked the question do people    14:29:38
16 fundamentally care about their privacy. I know
17 that's not the exact question, but my answer yes.
18 And that's what I'm telling you, I'm not saying
19 people are identical. That's not what I'm saying.
20 I'm saying these are compatible notions that that    14:29:55
21 there are individual differences. There are
22 also -- oh, like across people, there is -- people
23 care about their privacy is my answer.
24 BY MR. BROOME:
25     Q. Okay.    14:30:07

Page 175

1      MR. BROOME: We can -- we can take a break
2  now so you guys can eat your lunch.
3      THE COURT REPORTER: Would you like to go
4  off the record to discuss?
5      MR. BROOME: Yeah, let's go off the    14:30:16
6  record.
7      THE VIDEOGRAPHER: Okay. We're off the
8  record at 2:29 p.m.
9      (Lunch recess taken.)
10     THE VIDEOGRAPHER: We are back on the    15:00:07
11 record at 3:00 p.m. Eastern time.
12 BY MR. BROOME:
13     Q. Professor John, do you remember giving a
14 talk at WIRED2016?
15     A. Yes.    15:01:11
16     Q. Okay. We're going to mark as Exhibit 6
17 another transcript. And we'll load that for you
18 to review. It should be loaded.
19     (John Deposition Exhibit 6 was marked.)
20 BY MR. BROOME:    15:01:25
21     Q. And I'll represent that this was done in
22 the same way. This is an automatic --
23 automatically generated transcript on YouTube.
24 And so I'd just ask you to feel free to review it,
25 and I'm going to -- when you've reviewed it, I've    15:01:41

Page 176

1  got some specific questions for you.
2      A. Is this Exhibit 6?
3      Q. Yes.
4      MS. WEAVER: Hang on. I don't have the
5  document yet.    15:02:08
6      THE WITNESS: Okay.
7      THE COURT REPORTER: I didn't hear you,
8  Counsel.
9      MS. WEAVER: I don't have the document
10 yet.    15:02:17
11     Okay. Now I have it.
12     THE WITNESS: (Witness reviews.)
13     Are you waiting on me or --
14 BY MR. BROOME:
15     Q. Yes.    15:08:39
16     A. Okay.
17     MS. WEAVER: Oh.
18     THE WITNESS: Sorry. I -- I was -- I was
19 waiting for your question, and I decided to start
20 reading through the transcript. So why don't we go    15:08:43
21 ahead with your question.
22 BY MR. BROOME:
23     Q. Okay. Have you read the transcript?
24     A. I have not finished, but I've -- I've
25 skimmed it. I haven't fully skimmed it yet.    15:08:56

Page 177

45 (Pages 174 - 177)

1    Q.  You tell me when you're ready to answer
2  questions about it.
3    A.  Okay.  Just -- I'm on the --
4    Q.  I'm only going to ask you about the first
5  three pages.                        15:09:13
6    A.  Okay.  Yeah.  Go ahead.
7    Q.  All right.  On page 2 -- well, first of
8  all, do you recall giving this talk at WIRED2016?
9    A.  Yes.
10       MS. WEAVER:  Objection.  Foundation.     15:09:24
11  Again, this is not a certified transcript.  I have
12  a standing objection to foundation on this
13  document.  And I also note for the record, it has
14  no punctuation and no attribution as to the speaker
15  of this document.                   15:09:41
16       Okay.  Go ahead.
17  BY MR. BROOME:
18    Q.  All right.  On page 2 at line 323 --
19  sorry, line 3:19.
20    A.  Yes.                          15:09:47
21    Q.  You see it says, "we have a paradox on our
22  hands in the abstract in the abstract we say we
23  [care] about privacy, and I believe us but in the
24  moment when push comes to shove our behavior often
25  suggests otherwise."                 15:10:02

Page 178

1       Do you see that?
2    A.  Yes.
3    Q.  Is that consistent with your view?
4    A.  Yes.
5    Q.  Okay.  And -- and what do you mean by     15:10:07
6  that, "in the abstract we say we [care] about
7  privacy"?
8    A.  What I'm referring to is the privacy
9  paradox, and that refers to how people's stated
10  attitudes about privacy can be at odds with their   15:10:26
11  behaviors.  And so --
12    Q.  And -- sorry, go ahead.
13    A.  Right.  So -- so let me just -- so, for
14  example, a person -- people say they care about
15  privacy, because they do -- that's what I'm saying   15:10:50
16  to you first and foremost -- they say they care
17  about privacy.  They do.  I believe them.
18       Now, the paradox, of course, reflects the
19  fact that sometimes our behavior -- despite caring
20  about our privacy, sometimes our behavior may make   15:11:02
21  it look like we don't care about our privacy.  And
22  that is not to say we don't care about our
23  privacy.  What -- in my research as a whole -- or
24  my -- some of my research addresses the question
25  of why people's attitudes and stated preferences    15:11:20

Page 179

1  about their privacy can be misaligned with their
2  behavior.
3       And -- and then an important takeaway here
4  is that the misalignment does not mean that people
5  don't care about their privacy.  So -- so just      15:11:36
6  because sometimes people, you know, are -- are
7  post, you know, things on Facebook maybe that
8  they -- that -- that aren't -- that are unwise for
9  sure, it doesn't mean that they care about their
10  privacy.                          15:11:58
11       There's others reasons why -- the mere
12  fact that behavior doesn't always align with
13  attitude doesn't mean that -- that those attitudes
14  don't ring true, that people don't care about
15  their privacy.  On the contrary, people do care     15:12:07
16  about their privacy, though it's not always
17  manifest in their behavior.
18    Q.  All right.  On page 3, at 4:14, it says,
19  "privacy is an incredibly abstract concept you
20  can't really pinpoint its material value with any   15:12:30
21  degree of precision."
22       Do you recall saying words to that effect?
23    A.  So if this is, indeed, a transcript of
24  what I said, then, yes.
25    Q.  Is that consistent with your view?         15:12:46

Page 180

1    A.  So, again, like context is important,
2  where -- and -- and it is -- this is -- I -- an
3  unnatural way of thinking about things and, like,
4  not a way that I normally express conclusions from
5  research by taking isolated lines from talks I      15:13:09
6  gave.  So I want to kind of have a blanket caveat
7  there.
8       But the question is about you -- you had
9  line 4:14, "privacy is an incredibly abstract
10  concept."                         15:13:29
11    Q.  Yes.  And you can't -- I'm actually
12  focused on the next few words, "you can't really
13  pinpoint its material value with any degree of
14  precision."
15    A.  Mm-hmm.                        15:13:38
16    Q.  Is that consistent with your view?
17    A.  Well, I -- what I'm referring to here
18  is --
19       MS. WEAVER:  Sorry.  Objection.  Vague as
20  to view.                          15:13:49
21       THE COURT REPORTER:  And I'm going to ask
22  the witness to slow down because there's some audio
23  issues.  Thank you.
24       THE WITNESS:  Okay.  The question?
25  BY MR. BROOME:                       15:14:10

Page 181

46 (Pages 178 - 181)

1    Q.  "You can't really pinpoint the material
2  value of privacy with any degree of precision," do
3  you agree with those words?
4    A.   So the context in which I'm saying this
5  here is that I'm offering an -- so the context      15:14:31
6  here is the privacy paradox, and I'm offering an
7  explanation based on research as to why our
8  attitudes and behaviors with respect to our
9  privacy can be inconsistent despite caring about
10  our privacy.                      15:14:53
11       And so as foundation for that, this notion
12  that privacy is an abstract consent, so I agree
13  with that, it is -- it is abstract.  Of course
14  that doesn't mean it has no definition.  It has a
15  definition, which we've gone through earlier      15:15:08
16  today.  So it -- it can be and has been defined.
17  There's a construct definition of it.
18       But it's because of this -- this -- the
19  abstractness can make it hard for people to make
20  consistent decisions in this space.  And so it's      15:15:27
21  one force that can make it challenging for
22  people -- or a reason why their attitudes and
23  behaviors often inconsistent.  I'll also say that
24  this talk -- what is the year on it, again?
25    Q.  2016.                      15:15:48

Page 182

1    A.  Right.
2       So my thinking on this matter has evolved
3  over time.  It's -- it's not -- it includes these
4  ideas, but there are -- over the course of my
5  research and thinking on this matter over years, I      15:16:03
6  have elucidated kind of the other forces at play
7  that are responsible for that play a role in -- in
8  understanding this -- this paradox.
9       And so importantly in this talk here when
10  time talking about the economic value of privacy,      15:16:27
11  I'm not saying that privacy has no value.  I'm not
12  saying that -- that -- that you can't place a
13  value on people's information.  I'm not saying
14  that at all.  I'm saying that it's an abstract
15  consent, and so because of that abstractness, it      15:16:48
16  can make it hard -- it's a reason why our
17  attitudes and behaviors can be misaligned
18  sometimes.
19    Q.  You would agree that some people value
20  privacy more, and other people value privacy less;      15:17:01
21  correct?
22       MS. WEAVER:  Objection.  Asked and
23  answered eight times.
24       THE WITNESS:  So you're asking the
25  question of -- can you ask the question again,      15:17:13

Page 183

1  please.
2  BY MR. BROOME:
3    Q.  Yeah.
4       Previously I asked you about whether
5  people care about privacy.  Now I'm asking you --      15:17:22
6  because we're focused on the statement about where
7  said, "you can't really pinpoint its material
8  value with any degree of precision."  So I'm now
9  asking you if you agree with the premise -- or the
10  statement, rather, that some people value their      15:17:33
11  privacy more and other people value their privacy
12  less?
13    A.  So that's not what I'm saying here at all
14  in this talk.  And, again, you know, the answer
15  of -- there -- people are -- from in different      15:17:50
16  contexts and at different times and different
17  people, there can be, you know, differences in
18  degree of -- of privacy concern.
19       But very importantly, from my opinion
20  here, my opinions do people care about their      15:18:10
21  privacy, and they do, even though there's -- you
22  know, sometime there are these fluctuations.
23       I would also add that, you know, the
24  questions about individual differences, there --
25  there -- there have been some studies that tried      15:18:26

Page 184

1  to measure individual differences in privacy
2  concern.  And as I reported in other -- in some of
3  my academic writing, that my review of those is
4  that they're -- they're not that consistent,
5  actually.  They're -- they're not -- so put      15:18:43
6  differently -- like the scale designed to measure
7  this, the -- they're not that predictive of
8  behavior.  And part of the reason is because those
9  differences are -- are not as reliable as one may
10  think, which is kind of again just part of this      15:18:57
11  point, that like.
12       Okay.  I acknowledge like people are not
13  identical.  But at the same time, there's -- there
14  is a general concern.  People do fundamentally
15  care about -- about their privacy.  So -- okay.      15:19:13
16  Maybe I'll let you ask more questions.  Sorry.
17    Q.  Okay.  Do you agree with these words, "the
18  economic value of privacy can't be pinpointed with
19  any degree of precision"?
20    A.  Do I agree with -- say that again.      15:19:31
21    Q.  Do you agree with these words, "the
22  economic value of privacy can't be pinpointed with
23  any degree of precision"?
24    A.  Right.  So here what I'm referring to
25  again is how -- the reason I'm saying this is --      15:19:53

Page 185

47 (Pages 182 - 185)

1 this is kind of background, but to the argument
2 that for why people's attitudes and behaviors with
3 respect to privacy can be misaligned. I'm also
4 referring to attempts to make kind of sweeping
5 evaluations of privacy at large, as opposed to     15:20:17
6 doing -- you know, I'm not saying that there's no
7 economic value, and I'm not saying that you can't
8 pinpoint -- you can't reasonably assess how much
9 privacy is worth to people. It's just that you
10 have to -- if you did that, you'd have to take     15:20:40
11 into account -- you'd have to take into account
12 context.
13       And I also wasn't -- so this isn't
14 something that I -- this isn't like -- my
15 assignment was not about the evaluation of     15:20:52
16 privacy.
17       THE COURT REPORTER: Counsel, this is the
18 court reporter. Did you go off camera on purpose?
19       MR. BROOME: Sorry. I didn't even know
20 how that happened. And I did a really great cross,  15:22:24
21 too. So it's too bad you guys couldn't hear me.
22 BY MR. BROOME:
23    Q. All right. So let me start again. I want
24 to focus on -- back on page 3 of this document.
25       After the words that we just discussed, in  15:22:41
Page 186

1 top of mind and so our willingness to reveal can
2 be affected by seemingly trivial things."
3       So -- excuse me -- what I mean here is
4 that the -- the idea the construct of privacy is
5 not always top of mind. It's not always at the     15:24:54
6 forefront of our minds. And when I think of
7 levers that cause us to reveal information --
8 there are lots of levers. In general when we are
9 really concerned about our privacy, that can
10 suppress our willingness to reveal. And what I     15:25:20
11 found is that lots -- there are factors that --
12 that can modulate the extent to which our privacy
13 concerns are top of mind or not. And this can --
14 again, on this topic of, like, what explains why
15 we reveal sometimes in dangerous contexts despite   15:25:44
16 truly care about -- caring about our privacy, I'm
17 referring to how other forces can -- when those
18 forces dominate the concerns for privacy the --
19 those forces can lead us to reveal.
20       So like something like the way a site is   15:26:08
21 designed can nudge us towards revealing something
22 even when though we do really care about our
23 privacy. And -- and, frankly, when I -- when I
24 look at, you know, the sign-in procedure, getting
25 back to this case, and, you know, those -- as a   15:26:30
Page 188

1 the next line at 4:40, it says, "the psychological
2 value is even fuzzier and because of this
3 fuzziness privacy just isn't top of mind."
4       What did you mean by that?
5    A. Okay. Let me just read this text here.     15:23:02
6       (Witness reviews.)
7       Okay. So what did I mean by saying, "the
8 psychological value is even fuzzier and because of
9 this fuzziness privacy just isn't just top of mind
10 and so our willingness to reveal" --     15:23:45
11       THE COURT REPORTER: Can you slow down. I
12 can't hear you very well.
13       THE WITNESS: Sorry.
14       So you're referring to the part of this
15 talk where I say -- I'll just requote it because I  15:24:00
16 think I was going too fast. Now I've lost it. One
17 moment.
18 BY MR. BROOME:
19    Q. Line 4:40.
20    A. Thank you.                     15:24:16
21       Okay. So Mr. Broome, you're referring to
22 how I said that in this talk -- apparently,
23 assuming this transcript is what I actually
24 said -- "the psychological value is even fuzzier
25 and because of this fuzziness privacy just isn't   15:24:31
Page 187

1 behavioral scientist, when I look at those,
2 overwhelmingly they're designed to get people to
3 consent -- consent, air quotes, quotes -- consent
4 as in click an agree button easily without
5 actually knowing what they're consenting to.     15:26:55
6       And so as an example with those -- I think
7 the consent bump -- like I -- this, I'd also found
8 to be -- I know you weren't -- I was answering
9 your questions about the consent bump very
10 narrowly because you were asking whether I --     15:27:09
11 no -- did I rely on it, no, because it's not on my
12 list. But I will say that, you know, my -- my
13 reaction to those documents without having -- like
14 I couldn't read them all that well and they were
15 presented on the fly, but what was really striking  15:27:24
16 is how consistent they are with the materials that
17 I relied on for my report, in that they -- they
18 don't clearly describe to people in a way that's
19 easily comprehensible to them, what they are
20 actually -- what Google is actually doing.     15:27:46
21       They also -- as another example, is the
22 I -- is the "I agree" -- that -- that blue "I
23 agree" button is by default selected; right? So
24 another question I would have for that stimulus is
25 when is this shown? Is this consent bump shown --  15:28:04
Page 189

48 (Pages 186 - 189)

1  do I have -- do I -- is it -- I'm about to check
2  my e-mail and this is presented to me like --
3  so -- so -- so you have to plot -- plot -- swat it
4  away.  It's clicking agree and swatting it away.
5  And that's not consent either.          15:28:22
6      But I guess the reason I got talking about
7  this is because I wanted to put context on your
8  question here of, like, what I mean by privacy not
9  being top of mind.  And -- and so it -- it --
10 in -- the reason I'm talking about this is that  15:28:34
11 it -- it's part of the overarcing [verbatim]
12 explanation that my years of research has sought
13 to really understood -- understand an answer which
14 is an explanation or a series of explanations for
15 the privacy paradox.               15:28:50
16 Q.  You -- you just said that what is really
17 striking about the -- you're referring to the
18 consent bump disclosures -- "What was really
19 striking how consistent they are with the
20 materials that I relied on and that they -- they  15:29:11
21 don't clearly describe to people in a way that is
22 easily comprehensible to them what Google is
23 actually doing."
24     What -- what -- how should Google in your
25 opinion describe what it's actually doing?  15:29:25

Page 190

1  A.  Hmm.  So that's what -- not an opinion
2  that I was asked to weigh in on.  I do think
3  that -- I don't think -- as I said, Google
4  disclosures don't actually tell people what -- in
5  a way they can easily comprehend what's happening.  15:29:46
6  Is there a way to make them better, yes.  Have I
7  given a lot of thought of to that, no, because
8  that's not -- that was not my assignment.
9  Q.  And you haven't done any research, have
10 you, about -- well, strike that.         15:30:12
11     Okay.  What is the difference between the
12 economic value of privacy and the psychological
13 value?
14 A.  Can you ask it -- that question in a
15 different way?               15:30:44
16 Q.  Yes.
17     In this transcript of the WIRED talk --
18 that assuming it reflects accurately what you
19 stated -- you have a reference here at 4:32.  It
20 says, "the economic value of privacy can't be  15:31:00
21 pinpointed with any degree of precision."  And
22 then the next line, it says, "the psychological
23 value is even fuzzier."
24     So what's the -- what's the difference
25 between the economic value of privacy and the  15:31:11

Page 191

1  psychological value of privacy?
2  A.  So, again, this is awhile ago that I said
3  this, but I think in the context of this talk, I
4  think what I'm referring to is just the contrast
5  between -- or the -- the -- an economic way of  15:31:35
6  thinking about the value of data and privacy, so
7  like monetizing it, versus when I am saying
8  psychological value I think I'm referring to more
9  like the -- the feeling as opposed to the act of
10 quantifying in money terms that value.   15:32:00
11 Q.  Okay.  The -- the economic -- when -- when
12 you say "the economic value," you're referring to
13 the act of quantifying in money terms; is that
14 right?
15     MS. WEAVER:  Objection.  Vague.    15:32:19
16     THE WITNESS:  Can you ask the question
17 again, please.
18 BY MR. BROOME:
19 Q.  Yes.
20     When you refer to the economic value of  15:32:30
21 privacy, you're referring to the act of
22 quantifying privacy in money terms; is that right?
23 A.  I think it -- I don't know that it's,
24 like, restricted to that narrowness.  I think I'm
25 meaning more -- meaning also kind of the general  15:32:49

Page 192

1  notion of markets for personal data and -- it's
2  not simply the act, I guess as you -- as you said
3  there.
4  Q.  You know, I -- I was trying to -- I was
5  trying to use your words, actually, but -- but I  15:33:09
6  appreciate that explanation.
7     What's your understanding of how Google
8  collects the data at issue in this case, or do you
9  have an understanding is probably a better
10 question?               15:34:01
11 A.  Can you be a bit more specific in what you
12 mean?
13 Q.  Yeah.
14     I mean, do you have a -- do you have an --
15 a moment ago we were talking about what -- what  15:34:09
16 Google is actually doing, right, and I want to
17 know if you understand what Google is actually
18 doing with respect to the data at issue in this
19 case --
20 A.  Mm-hmm.                15:34:23
21 Q.  -- do you have an understanding of how
22 Google receives information that the Plaintiffs
23 allege Google misappropriated?
24 A.  Mm-hmm.  So I'm not a technical expert.  I
25 do -- my understanding is that the -- excuse me.  15:34:37

Page 193

49 (Pages 190 - 193)

1    When people are not synced, Google is collecting
2    the information that is stated in the complaint.
3    So there's those four bullet points.
4         And -- yeah, so that's -- the -- the
5    exact -- the technological details of how this     15:35:07
6    information passes is not in my area of expertise.
7    Q.  Okay.  Do you have an understanding of
8    what information is sent to Google when users to
9    sync?
10   A.  Pardon me, the question again is?     15:35:30
11   Q.  Do you have an understanding of what
12   information is sent to Google when users do sync?
13   A.  Mm-hmm.  Right.
14        So my understanding is that the --
15   there's -- there's a list in the complaint.  But     15:35:48
16   it -- so browsing history --
17        MS. WEAVER:  Objection.  I'm just looking
18   at the transcript.  Are you saying when they are
19   synced or they are not synced?
20        MR. BROOME:  When they are synced.  Let     15:36:02
21   me -- let me start it again.
22        MS. WEAVER:  Sorry about that, Steve.  I
23   just want to make sure she's answering your
24   question.
25        THE WITNESS:  Okay.  Okay.  So when they     15:36:10

Page 194

1    are synced --
2    BY MR. BROOME:
3    Q.  Sorry, just let me start again.  So I'll
4    ask the question again so we have a clean Q and A.
5         Do you have an understanding of what     15:36:17
6    information is sent to Google when users are
7    synced?
8    A.  So I wasn't asked to focus on what happens
9    when they are synced.  I can tell you when they're
10   not synced.  When they're -- when they're not     15:36:37
11   synced, Google is -- and as alleged in the
12   complaint, -- my understanding Google is
13   collecting when they're not synced, browsing
14   history, IP address.  It -- it lists -- I can --
15   if I refer to the Complaint.     15:36:53
16   Q.  Yes.  But sync -- sync -- sync is an
17   optional feature.  You agree with that; right?
18   It's something that users can turn on?
19        MS. WEAVER:  Objection.  Vague.
20        THE COURT REPORTER:  Excuse me, I didn't     15:37:08
21   get the end of the question.
22   BY MR. BROOME:
23   Q.  Sync is a feature that users can turn on;
24   correct?
25   A.  Yes.     15:37:17

Page 195

1    Q.  And when users turn sync on, certain
2    categories of information can be sent to Google.
3    You understand that; right?
4    A.  So, yeah, I don't know all of the
5    information that is sent exhaustively when synced.     15:37:32
6    I mean, I'm not an expert.  My understanding is
7    that -- the complaint says -- I believe there's
8    four bullet points, browsing history, IP address,
9    cookies, and those are, I presume, to be collected
10   when you're synced.  But I also understand these     15:37:51
11   things are collected when you're not synced as
12   well.
13   Q.  Okay.  So your understanding is that when
14   you turn sync on, that sends cookies to Google?
15   A.  So if you're asking me like what is the     15:38:08
16   functionality of sync, like the purpose from a
17   user perspective that's like marketed towards
18   them, what does sync do, so I believe it's to sync
19   your -- here I'm using the definition -- your --
20   like your bookmarks, for example, across all     15:38:30
21   devices --
22   Q.  Uh-huh.
23   A.  -- so that you get them.  That's my
24   understanding, but I -- I readily -- like I'm
25   not -- I'm not a technical expert, so I -- this is     15:38:39

Page 196

1    an area that -- that I -- I -- I don't know.
2         Like if you could just inform me what you
3    mean, then we can get on to me asking [verbatim]
4    questions that I have actually have expertise
5    about.     15:38:55
6    Q.  Okay.  Is it your understanding that --
7    that the data collection at issue in this case is
8    data co- -- that Google only collects from Chrome
9    users, or do you not know, one way or the other?
10   A.  So can you ask the question again?     15:39:12
11   Q.  The -- the data -- is it your
12   understanding that the data collection at issue in
13   this case is unique to Chrome users?
14        MS. WEAVER:  Objection.  Vague as to --
15        (Interruption in audio/video.)     15:39:28
16        THE COURT REPORTER:  "Vague as to..."  I
17   didn't hear you.
18        MS. WEAVER:  -- "unique."  Sorry.
19        THE WITNESS:  Yeah, I -- I don't know.
20   The question isn't clear.  And even if it was, I     15:39:34
21   don't know that I could answer it.
22   BY MR. BROOME:
23   Q.  Okay.  I mean, is -- is this -- do you
24   have an understanding as to whether the
25   information at issue in this case is something     15:39:45

Page 197

50 (Pages 194 - 197)

1  Google only receives from Chrome users as opposed
2  to users of other brands browsers, or do you just
3  not know?
4       A.  Oh, so I -- this is not something that
5  I -- that is in my expertise, nor was it something    15:39:58
6  I was asked to give an opinion on.
7            MR. BROOME:  Let's mark that 10.
8            Okay.  We're going to mark a new document.
9  This will be Exhibit 7.
10           (John Deposition Exhibit 7 was marked.)    15:40:51
11           MR. BROOME:  Yeah.
12  BY MR. BROOME:
13      Q.  Let me know when you can see the document.
14      A.  Oh, sorry.
15           Yes, I see Exhibit 7.  It's a journal    15:41:41
16  article I wrote titled "Strangers on a Plane:
17  Context-Dependent Willingness to Divulge Sensitive
18  Information."
19      Q.  Yes.
20           If you go to the second page, there's a --   15:41:59
21  a heading in the first column that says
22  "Conceptual Background."  And then if you just go
23  across to the second column, slightly down it says
24  "Proposition 1."
25      A.  Yes.                    15:42:15

Page 198

1       Q.  And then it says, "Privacy is a domain in
2  which preference uncertainty is pronounced."
3            What -- what is "preference uncertainty"?
4       A.  I'm just going to read the first --
5  quickly, I promise --               15:42:40
6       Q.  Sure.  Yep, that's fine.
7       A.  -- few paragraphs to contextualize myself.
8            (Witness reviews.)
9            All right.  Okay.
10           So your question is what I -- what do we    15:44:09
11  mean by this first proposition.
12           First of all, what we don't mean -- so
13  this -- this is not saying people don't care about
14  their privacy.  It's not at all saying that.
15  And -- and this -- this paper is -- is not    15:44:21
16  inconsistent with this idea that people care about
17  their privacy.
18           What -- what we're saying here is that
19  people's -- broadly we're offering an explanation
20  for the discrepancy between people's attitudes or    15:44:36
21  stated attitudes towards privacy and their
22  behavior.
23           So as one motivating piece of evidence for
24  that, we're referring to -- and I think I
25  mentioned it earlier in this -- a few minutes ago    15:44:51

Page 199

1  about how -- excuse me, this idea of measures to
2  try to scale -- to try to measure individual
3  differences in privacy concerns, how they don't
4  predict behavior that well.
5            So, again, we're talking about this    15:45:09
6  tension between attitudes or the discrepancy,
7  apparently -- apparent discrepancy between
8  attitudes and behavior.
9            And so what -- what we're referring to
10  here is how our choices in the moment can be    15:45:23
11  inconsistent as in our behaviors can sometimes
12  make it seem like we don't care about our privacy
13  despite the fact that we actually do.
14           And this is one article, broadly speaking,
15  where we're trying to understand why there is this    15:45:40
16  disconnect.
17           MS. WEAVER:  Counsel, if I may -- I -- I
18  apologize for not knowing -- what is the Bates
19  number in the lower right-hand corner here?
20           Oh, I see.  It's Professor John in the    15:46:05
21  Calhoun matter.  I apologize.  Okay.
22  BY MR. BROOME:
23      Q.  All right.
24           Okay.  We're going to show you another
25  document.                    15:46:21

Page 200

1       A.  Okay.
2            (John Deposition Exhibit 8 was marked.)
3            MR. BROOME:  We'll mark this as Exhibit 8.
4  It should be up.
5  BY MR. BROOME:                    15:46:34
6       Q.  Let me know when you can see it.
7       A.  Exhibit 8.
8            Okay.  Exhibit 8 is an article I wrote --
9            MS. WEAVER:  Wait.  There's no question.
10           THE WITNESS:  Sorry.            15:46:56
11  BY MR. BROOME:
12      Q.  Is this an article you wrote?
13      A.  Yes.
14           MS. WEAVER:  And I apologize.  I actually
15  don't have it up myself here.            15:47:11
16           MR. BROOME:  I'll -- I'll wait --
17           MS. WEAVER:  Okay.  I've got it now.
18           MR. BROOME:  Okay.
19           MS. WEAVER:  Go ahead.
20           MR. BROOME:  Okay.            15:47:27
21  BY MR. BROOME:
22      Q.  And if you look at page 252 of the
23  article -- I'm referring to the page numbers at
24  the top left-hand corner -- well, top left- or
25  right-hand corner depending on which page you're    15:47:40

Page 201

51 (Pages 198 - 201)

1 looking at.

2 A. Yes.

3 Q. -- do you see in the second paragraph --

4 second -- the first full paragraph, I guess, it

5 says, "We apply theories from behavioral economics    15:47:49

6 and decision research to investigate, and

7 ultimately estimate, the premise that privacy

8 valuations can be precisely estimated."

9 Do you see that?

10 A. Yes.    15:48:01

11 Q. Were you successful in challenging the

12 premise that privacy valuations can be precisely

13 estimated?

14 MS. WEAVER: Objection.

15 THE WITNESS: Can you say the question    15:48:17

16 again?

17 BY MR. BROOME:

18 Q. Were you successful in -- in challenging

19 the premise that privacy valuations can be

20 success- -- precisely estimated?    15:48:30

21 A. Yeah, I don't know. I -- what we're doing

22 here is, excuse me, an experiment where we looked

23 at whether the implicit value people place on

24 their privacy, which we operationalize in a very

25 specific way here, whether that can depend on a    15:48:52

Page 202

1 pretty trivial contextual factor.

2 And our point is in showing that -- we --

3 we show an example of this, of how a person's

4 valuation here in this specific example can be

5 affected by a trivial factor.    15:49:18

6 The point of showing this is to show --

7 again speaks to this idea of the privacy paradox

8 broadly and how challenging it is to make

9 decisions in this space because there are lots of

10 things that influence people's behavior.    15:49:35

11 And, again, it's not incompatible with the

12 idea that people care about their privacy. We're

13 not saying that at all. We're showing -- we're

14 trying to understand why, despite caring about

15 their privacy, people's behavior may sometimes    15:49:54

16 seem to suggest otherwise.

17 Q. Okay. In the next sentence you write, "We

18 do so using a field experiment in which we assess

19 the stability of the value that individuals assign

20 to the protection of their personal information."    15:50:24

21 What -- what did you mean by that?

22 A. So here we're saying that we did a field

23 experiment, and what we did in the field

24 experiment was we -- we -- we show a factor, kind

25 of a -- a pretty arbitrary factor that shapes    15:51:03

Page 203

1 people's valuations.

2 And so the -- the -- the -- the point -- a

3 point here is to -- to show that like it's -- it's

4 more -- it's in support of this idea that just

5 because people's behavior may seem like they don't    15:51:23

6 care about their privacy doesn't mean that they

7 don't actually care about their privacy.

8 And so what we're doing here is we're

9 challenging the revealed preference argument of

10 privacy, which is a -- when economists say like a    15:51:40

11 revealed preference is this idea that what you

12 care about -- how much you care about things, what

13 you value, the value placed on things can be

14 determined solely by your choices, your revealed

15 behavior.    15:52:00

16 And what we're saying here is that

17 actually, well, because of the privacy paradox,

18 the fact that -- the mere fact that sometimes

19 people's behavior will seem like they don't care

20 about their privacy, that that doesn't actually    15:52:12

21 mean that they don't care about their privacy.

22 That's -- that's the -- the point here.

23 Q. It -- it just --

24 A. And -- and, again, I -- I guess I wanted

25 to say that it's -- it's a very -- you know,    15:52:25

Page 204

1 when -- when scientists -- when we look at

2 evidence and then we read journal articles and

3 then we interpret data, we don't just look at one

4 isolated line of text, we read the whole article.

5 And the question would be what does this    15:52:43

6 article say as a whole, what's the conclusion, not

7 what does this word on this line -- it's -- it's

8 kind of an unnatural way.

9 I'm trying to answer your question the

10 best way I can, and -- and -- and so I need to    15:52:57

11 give you the full context, I guess.

12 Q. Okay. And -- and when you say that it --

13 it -- it doesn't mean that people don't care about

14 their privacy, but -- but what your research has

15 shown is that people aren't willing to pay for    15:53:11

16 privacy; right?

17 A. I wouldn't say that exactly.

18 MS. WEAVER: Yeah. Objection. Misstates

19 his testimony.

20 BY MR. BROOME:    15:53:30

21 Q. What -- what would you say? Are people

22 willing to pay for their privacy?

23 A. I -- so there is -- there is some

24 evidence, which I also -- it's in -- what is

25 it? -- Exhibit 3, the list of citations, showing    15:53:45

Page 205

52 (Pages 202 - 205)

1 an -- an exemplar of when people pay for their
2 privacy.
3       The -- so, to reiterate, the -- but
4 sometimes people are unwilling to pay for it.
5 Sometimes -- and -- and, again, this is like --    15:54:04
6 this is another piece of evidence that it's not
7 that -- against this reveal preference argument,
8 that just because in -- in a certain context, at a
9 certain point in time, a person is unwilling to
10 pay for their privacy or pay for a privacy    15:54:23
11 preserving technology. That doesn't mean that
12 they don't care about their privacy.
13       So -- and -- and I -- as I'm trying to --
14 I -- I don't want to take a ton of time, so I'm
15 not going to ask you to -- like can I reread this    15:54:51
16 whole thing. I did, after all, write it, so I
17 know what the take-home message is.
18       But I would like to kind of help
19 understand -- because I want to make it very clear
20 what -- what we are saying here, rather than take    15:55:07
21 certain words and try to interpret certain words
22 on a page holistically.
23       Like if we -- if we go to the very end,
24 page 270, what we say, like "revealed-preference
25 arguments should not, alone, justify the    15:55:29

1 uncritical" [as read] --
2       THE COURT REPORTER: Excuse me.
3 Professor --
4       THE WITNESS: I'm so sorry.
5       THE COURT REPORTER: -- please slow down.
6       THE WITNESS: I'm sorry.
7       "...as we have shown, revealed-preferences
8 arguments should not, alone, justify the
9 uncritical conclusion that privacy-conscious
10 consumers will never pay for privacy."    15:55:51
11 BY MR. BROOME:
12    Q. Okay. And -- and -- right.
13       And -- and you use the term there
14 "privacy-conscious consumers." And -- and there
15 are -- some consumers are privacy conscious and    15:56:09
16 other consumers are not; right?
17    A. That's not what this is saying.
18    Q. Well, why -- why do you use the words
19 "privacy conscious" to -- to describe consumers in
20 that sentence?    15:56:25
21    A. Again, I -- I -- I'm using this sentence
22 to support the point that when we think about what
23 an article is and isn't saying, it's very
24 unnatural to take a line on an isolated page and
25 interpret that line, as your line of questioning    15:56:44

1 is asking me to do.
2       And I -- and I'm -- I'm really trying to,
3 you know, honor the way you do things, but I also
4 need to honor the truth here and represent what
5 this article is truly saying.    15:56:59
6       And what it is saying is that you can't
7 just look at someone's behavior that may seem to
8 be "reckless," using quotes, with respect to their
9 privacy, and from that conclude that they don't
10 care about their privacy, that their privacy is    15:57:14
11 not worth anything. Those are not -- that's the
12 point of this paper.
13    Q. All right.
14       Putting the paper aside, do you agree
15 that -- that the extent to which people value    15:57:26
16 their privacy varies from person to person?
17       MS. WEAVER: Objection. Asked and
18 answered many -- many times, many times.
19 BY MR. BROOME:
20    Q. Do you agree?    15:57:59
21    A. I'm -- I'm sorry, can you ask the question
22 again?
23    Q. Do you agree that -- that the extent to
24 which people value their privacy varies from
25 person to person?    15:58:06

1       MS. WEAVER: Asked and answered.
2       THE WITNESS: So I -- I believe I've
3 answered this question several times. I can repeat
4 my answer again.
5 BY MR. BROOME:    15:58:18
6    Q. Yes, please.
7    A. So my answer is that people are not all
8 identical. Sometimes the extent to which we're
9 concerned about our privacy can vary from context
10 to context, person to person.    15:58:37
11       There is also a general people do
12 fundamentally care about their privacy. And --
13 and -- and that's a commonality across people,
14 and -- and my opinion reflects that fact.
15    Q. Okay. Let's take a look at page 256 of    15:58:57
16 your article, the first full paragraph.
17    A. The first full paragraph?
18    Q. Right. "The" -- beginning "The
19 distinction between WTP and WTA."
20    A. Okay. So I'm going to read it.    15:59:41
21       (Witness reviews.)
22       Okay. I've read it.
23    Q. All right.
24       You write, "The distinction between WTP
25 and WTA seems critical in the privacy realm,    16:00:39

53 (Pages 206 - 209)

1  because real-life, everyday privacy decisions come
2  in both varieties."
3        And -- and when you -- when you refer to
4  "WTP," you're referring to willingness to pay; is
5  that right?                          16:00:54
6    A.  Correct.
7    Q.  And "WTA" means willingness to accept?
8    A.  Correct.
9    Q.  And -- and what's -- what are those
10  concepts?                           16:01:02
11    A.  So willingness to pay -- so it -- WTP
12  versus WTA is referring to the perspective that
13  the person is in.
14        So WTP, willingness to pay, is when you're
15  acting like a buyer.  And willingness to accept is    16:01:26
16  when you're asking -- when you're -- when you're
17  taking the perspective of a -- as a seller.  So
18  you're assessing someone's willingness to accept
19  compensation to part with something.
20    Q.  Okay.  And then you write, "Analogous to    16:01:46
21  WTP, people are regularly faced with opportunities
22  to pay to prevent personal data from being
23  disclosed-for example, using an anonymous
24  Web-browsing application, such as Tor, hides one's
25  online behavior but incurs the cost of slower       16:02:18

1  downloads; likewise, deleting cookies to shield
2  one's browsing habits comes at the cost of having
3  to frequently provide registration information
4  across a variety of Web sites."
5        Do you see that?                16:02:30
6    A.  Yes.
7    Q.  All right.
8        And -- and you would agree that some
9  people are -- are aware of these opportunities to
10  pay for additional privacy, and some people are    16:02:33
11  willing to pay for those opportunities, and some
12  people are not.
13        Right?
14    A.  That's not what this is saying exactly.
15    Q.  Okay.  But would you agree with that       16:02:46
16  statement?  I mean, lots of people are aware of
17  the Tor browser and the privacy benefits that it
18  brings, but they're not necessarily willing to use
19  it because of the -- the cost of slower downloads;
20  right?                              16:03:03
21    A.  I mean, I haven't -- I haven't studied --
22  I'm not exactly sure what the -- the question is.
23  I -- I don't want to venture an opinion on -- on
24  Tor users, per se.
25        I guess if you can maybe ask the question    16:03:26

1  in a different way.
2    Q.  Okay.  Well, what -- what are you trying
3  to convey when you refer to -- when you refer
4  to "an anonymous Web-browsing application, such as
5  Tor, hides one's online behavior but incurs the    16:03:39
6  coast of slower downloads"?  [As read]
7    A.  Mm-hmm.  Right.  So --
8        MS. WEAVER:  Hang on.
9        Okay.  Go ahead.
10        THE WITNESS:  Okay.             16:03:52
11        So we are giving exam- -- an example of a
12  time when a person may be in -- may be in the
13  position -- the perspective of willingness to pay.
14        So you would -- in this case, this
15  sentence, what it's referring to, you're paying to    16:04:13
16  prevent personal data from being disclosed by
17  using -- using this anonymous browser -- the
18  anonymous web-browsing application, Tor -- Tor.
19  What this sentence is conveying is it's conveying a
20  trade-off between the -- getting privacy with this    16:04:42
21  application broadly construed and speed of
22  downloads.
23  BY MR. BROOME:
24    Q.  And some -- some people are willing to
25  make that trade-off and others aren't; is that    16:04:57

1  right?
2    A.  I'm just pausing because Lesley wanted
3  to --
4        MS. WEAVER:  All right.  Go ahead.  You
5  can answer.                         16:05:18
6        THE WITNESS:  Okay.
7        That some people -- some people are
8  willing -- some people are willing to pay for
9  privacy, and some people are not -- I guess can you
10  ask your question again?             16:05:30
11  BY MR. BROOME:
12    Q.  Well, you -- you referred to a trade-off;
13  right?  You're saying --
14    A.  In this sentence, this sentence is
15  referring to a trade-off, yes.       16:05:35
16    Q.  Right.
17        And -- and some people are willing to make
18  that trade-off in order to get better privacy and
19  some people are not; right?
20    A.  Well, this sentence is not saying that.    16:05:45
21  This sentence is not weighing in on -- in
22  differences in people's willingness to adopt this
23  or not.  That's not what this sentence is saying.
24        This sentence is merely showing an example
25  of the perspective of what willingness to pay is,    16:06:00

1  and then -- because later on in the paragraph
2  we're trying to unpack willingness to accept and
3  give an example of that. So, again, like I --
4  yeah, that's -- that's what this paragraph is
5  about broadly.                          16:06:14
6      Q. And -- and when you refer to "willingness
7  to pay," you're talking about willingness to pay
8  for privacy; right?
9      A. WTP, willingness to pay, in -- this
10  article -- yeah, will- -- WTP, the term in general  16:06:28
11  doesn't only mean privacy, but in this paper we're
12  talking about willingness to pay for privacy.
13      Q. Okay.
14      MR. BROOME: Let's do tab 12.
15      We're going to mark another exhibit. It   16:07:11
16  should be up as Exhibit 9.
17      (John Deposition Exhibit 9 was marked.)
18  BY MR. BROOME:
19      Q. Let me know when you can see it.
20      A. Yes, I can see it.                 16:07:38
21      Q. All right.
22      If you look -- this is an article you
23  wrote; right?
24      A. Yes.
25      Q. And if you look at page '933, in the last  16:08:05

Page 214

1  paragraph, you write, "These ideas, coupled with
2  the fact that consumers have idiosyncratic,
3  preconceived notions of how firms ought to handle
4  their personal data, suggest that consumer
5  response to ad transparency will depend on    16:08:29
6  consumers' perceptions of which information flow
7  patterns should-or should not-be used to generate
8  the ads." [As read]
9      Do you see that?
10      A. No, I don't see that yet. I was looking   16:08:39
11  at page numbers.
12      Q. Oh, yeah, I apologize. I was -- let's --
13  let's do it this way. Let's -- let's go to 908.
14  I was referring to the Bates numbers.
15      A. So I'm on page 908, the -- the journal --  16:09:09
16  the journal article page 908.
17      Q. Yep. It's the last paragraph. It
18  starts "These ideas."
19      Let me know when you're ready.
20      A. Yeah, I'm just reading it here.      16:10:35
21      Q. Okay. Take your time.
22      A. And then, if I may, I'm -- I'm just going
23  to read the -- or skim the preceding
24  paragraphs because it says "These ideas," so I
25  want to make sure I know --               16:10:45

Page 215

1      Q. Sure. Of course.
2      A. -- what I'm referring to here.
3      (Witness reviews.)
4      Okay. I'm ready.
5      I said I'm ready. I'm not sure if you    16:11:41
6  heard me.
7      Q. I was asking questions with the -- the
8  mute button on again.
9      A. Oh.
10      Q. Okay. So when you -- when you refer --   16:11:51
11  when you refer to "the" -- "the fact that
12  consumers have idiosyncratic, preconceived notions
13  of how firms ought to handle their personal data"
14  [as read], what do you mean by "idiosyncratic"?
15      A. Yeah, and it's interesting, this sentence,  16:12:18
16  because when I reread it, I don't actually know
17  that that cause is necessary to make -- I actually
18  think it reads perfectly fine just to say here,
19  "These ideas suggest that consumer response to ad
20  transparency."                          16:12:35
21      So that -- I -- I think what we're doing
22  there is giving homage to prior researchers who
23  have thought about the -- thought about this idea
24  that people -- there are differences in how
25  people -- in -- in people's concerns for privacy   16:12:55

Page 216

1  kind of on the margin; but, again, there is also a
2  strong commonality, which is that people care
3  about their privacy.
4      But it's interesting rereading this
5  brief -- this sentence, now I actually don't think  16:13:10
6  that's part of it. The clause is -- is -- is
7  important to the point we're making because the --
8  the previous paragraphs, those are really the
9  crux -- the -- the crux that motivates our central
10  thesis here -- or a central thesis that your      16:13:27
11  response to ad transparency, your sense of what is
12  a privacy invasion here, it -- it is -- it is
13  guided by your perceptions of what -- whether
14  the -- the information flows are -- are acceptable
15  or not.                                16:13:48
16      Q. Okay. And -- and what is it --
17      A. In so doing -- in so doing, we're -- you
18  know, again on this point of like generalities and
19  commonalities, we're identifying commonalities
20  across people in what they view should be an      16:14:02
21  invasion of their privacy. And -- and this is --
22  this is consistent with my opinion. It's
23  consistent with what I understand to be happening
24  in this case.
25      Q. But -- well, what does it mean "that     16:14:14

Page 217

55 (Pages 214 - 217)

1  consumers have idiosyncratic, preconceived notions
2  of how firms ought to handle their personal data"
3  [as read]?
4       A.  With respect, I think I just answered that
5  question.  It's in the transcript.        16:14:29
6       Q.  Do -- do consumers have idiosyncratic,
7  preconceived notions of how firms ought to handle
8  their data?
9       A.  And so my answer, as we can even look back
10  in the transcript, is that's my answer.  So I --    16:14:45
11  I -- I'm -- I'm sorry, I -- I just feel like I've
12  been answering this question and variations on it
13  a lot.  So --
14       Q.  Uh-huh.
15       A.  -- I really feel like I've answered it.    16:14:58
16       Q.  Okay.  Well, sorry if I'm being dense.
17  But do you agree with that statement?  Do you
18  agree that it is a "fact that consumers have
19  idiosyncratic, preconceived notions of how firms
20  ought to handle their data" [as read]?    16:15:13
21       MS. WEAVER:  Objection.  Asked and
22  answered.  Harassing --
23       THE COURT REPORTER:  Could you say the
24  last -- I didn't hear the last objection, Counsel.
25       MS. WEAVER:  Object- -- I said Objection.    16:15:23

Page 218

1  Asked and answered.  Harassing.
2       THE WITNESS:  So my answer, when I'm
3  reading this sentence, again, first overarcing
4  [verbatim] answer is this is a very unnatural
5  exercise to look at specific isolated sentences in    16:15:44
6  an article and ask what they mean.  Because when we
7  think about what is the meaning of a piece of
8  research, that's not how we think about it.  But
9  I -- you know, I -- I want to honor this process
10  and the way you ask questions.        16:16:01
11       And so my answer then is that upon reading
12  this, it's -- it's interesting reading this again
13  to me because what -- what -- the first thing that
14  struck me when I read this particular sentence
15  is -- is for the argument that we are making, I    16:16:16
16  don't actually think that that part of the sentence
17  is necessary here.  I think we included it as
18  homage to other scholars that we wanted to cite.
19  BY MR. BROOME:
20       Q.  Can I pause you there?  Can I -- do you    16:16:35
21  mind if I pause you there?
22       A.  Okay.
23       MS. WEAVER:  No, no.
24  BY MR. BROOME:
25       Q.  I'm not -- I'm not asking you --    16:16:39

Page 219

1       MS. WEAVER:  That's not appropriate.
2       THE WITNESS:  Okay.
3       MS. WEAVER:  That's not appropriate.
4  BY MR. BROOME:
5       Q.  I'm not asking you whether is it
6  necessary --
7       (Simultaneous speaking.)
8       (Interruption in audio/video.)
9       THE COURT REPORTER:  Excuse me.  Excuse
10  me.  Excuse me.  I can't hear both of you.    16:16:48
11       MS. WEAVER:  You may finish your answer.
12       THE WITNESS:  Okay.
13       So my answer, then, is -- to continue on
14  with it, is that what we're saying in this sentence
15  is -- so if we build on -- this sentence is in    16:16:58
16  context.  The context is the -- the prior
17  paragraphs.
18       And in the prior paragraphs we're talking
19  about kind of the foundations of -- of -- of
20  people's privacy concerns and the generalities, the    16:17:16
21  commonalities in people's, excuse me, expectation
22  of privacy.
23       And so in this sentence here we're talking
24  about how we're building on these prior ideas, and
25  we're looking at -- we're positing that how can --    16:17:32

Page 220

1  that -- that there is -- there are commonalities in
2  how consumers think about respondent [verbatim] ad
3  transparency.
4       By that we mean you're knowing -- learning
5  more about why you're seeing the ads you see.  And    16:17:49
6  we're positing that -- that consumers' responses
7  will be -- still depend, in part, on what they deem
8  to be acceptable or not in terms of information
9  flow patterns, as we talk about.
10       MR. BROOME:  Let's take a short break just    16:18:14
11  so I can trim some of the -- we're getting to that
12  phase of the deposition where I'm realizing I don't
13  need to ask the next 40 pages that I've written out
14  for you.
15       THE WITNESS:  Okay.        16:18:30
16       MR. BROOME:  So why don't we take a short
17  break and -- and I'll try to cut some of this and
18  we'll do our best to get you out of here as soon as
19  possible.
20       THE WITNESS:  Sounds good.  Thanks.    16:18:38
21       THE VIDEOGRAPHER:  Okay.  We're off record
22  at 4:17 p.m.
23       (Short recess taken.)
24       THE VIDEOGRAPHER:  We're back on record.
25  The time is 4:38 p.m. Eastern time.        16:39:50

Page 221

56 (Pages 218 - 221)

1   MR. BROOME: Okay. We're going to mark a
2   new exhibit as Exhibit 10.
3       (John Deposition Exhibit 10 was marked.)
4   BY MR. BROOME:
5   Q. Let me know when you can see it.     16:40:19
6   A. Yes, I can see it.
7   Q. Okay. And are you familiar with this
8   document?
9   A. I believe so. It is a -- it is not the --
10  it's -- it's a PDF of a Word document. And I am     16:41:03
11  wondering whether -- I just want to make sure that
12  it is actually the article that I think it is,
13  which is -- it's a -- just let me -- it's a -- you
14  see it's not actually the -- a journal article,
15  like it's not the fancy journal article format.     16:41:46
16  So I -- because we do different versions before we
17  finalize them.
18      So I -- I don't know that it is the -- the
19  final version, but I -- I'm familiar with this.
20  Q. Okay. Well, I'll -- I'll ask you -- I'll     16:42:06
21  ask you some questions -- I just have a few
22  questions for you about it, and if the -- the --
23  you know, whether it -- whether it's the
24  final/final or just the final or some version
25  affects your answer, you can state that on the     16:42:20

Page 222

1   record.
2   A. Okay.
3   Q. On the -- let's see. Yeah, there's no
4   page numbering on it, so it's a little bit
5   difficult. So if -- if you look after the     16:42:34
6   "Abstract," it says Point 1, "Introduction." I
7   guess it's the --
8   A. Yes.
9   Q. -- third page.
10      At the very bottom there's a sentence that     16:42:48
11  goes on to the next page. It says, "For instance,
12  while platforms like Facebook were ostensibly
13  created to enable sharing with friends, it is now
14  common knowledge that third-party firms access the
15  same information to learn more about individuals'     16:43:01
16  preferences and behaviors."
17      Do you see that?
18  A. I see that sentence.
19  Q. And do you agree with that statement?
20  A. So -- well, that cites Higgins, 2020. So     16:43:16
21  it makes want me to look at that, but -- so
22  overarcing [verbatim], this paper is about
23  understanding -- conceptualizing disclosure and --
24  just conceptualizing disclosure and
25  conceptualizing -- sorry, let me -- can I just     16:43:49

Page 223

1   reacquaint myself with this paper?
2   Q. Sure.
3   A. (Witness reviews.)
4   Q. And just for the record, we got this
5   version of the paper from your -- your profile on     16:44:12
6   hbs.edu. It was linked to your page.
7   A. (Witness reading.)
8       Okay. So can you ask the question again?
9   Q. Yes. No problem.
10      On the first page of the article, at the     16:47:26
11  bottom, there's a sentence that says, "For
12  instance, while platforms like Facebook were
13  ostensibly created to enable sharing between
14  friends, it is now common knowledge that
15  third-party firms access the same information to     16:47:44
16  learn more about individuals' preferences and
17  behaviors."
18      Do you agree with that statement?
19  A. So -- yeah. This -- this paper isn't
20  about -- if -- if I just -- that narrow -- this     16:48:03
21  paper isn't about assessing people's awareness or
22  unawareness of different practices, to be clear.
23  This is not what this paper is about. This paper
24  is about conceptualizing the construct of
25  disclosure and broadening it.     16:48:18

Page 224

1       And -- and -- and we have a -- a figure in
2   here that talks about how we conceptualize the
3   different facets of disclosure along two
4   dimensions we're proposing, between social versus
5   commercial. Between whom is one dimension we're     16:48:33
6   considering and another is whether it's active
7   versus passive. And -- and we try to understand
8   the drivers of disclosure, the antecedents. But
9   we also venture into -- in -- in the -- so
10  there's -- we talk about there's -- there's more     16:48:57
11  academic research that looks at what we review
12  first in the -- the -- the active disclosure
13  piece.
14      When it comes to the passive disclosure,
15  there -- and I'm highlighting this because it's a     16:49:15
16  particular relevance to what we're talking about
17  here today -- we're talking about people's
18  research that we did -- with actually looked at
19  the paper earlier with you today -- that tries to
20  understand how people react theirs ways their     16:49:31
21  information is collected passively without their
22  conscious awareness, or conscious consent, really,
23  as is what -- my understanding is what's happening
24  in this case. And so we articulate -- in that
25  portion of the -- of the -- the page, we are     16:49:49

Page 225

57 (Pages 222 - 225)

1  talking about how people find it privacy invasive
2  to have their information passively collected
3  without their consent by third parties.
4        There's -- so that's my understanding of
5  what's happening in this case, that people's        16:50:10
6  information is being collected.  You know, they --
7  they're thinking, oh, this is an interaction
8  between Chrome and the New York Times.  They --
9  but actually there's this eavesdropper -- a third
10 party, Google -- and that's exactly the kind of        16:50:25
11 thing that people -- that is inconsistent with
12 their expectations, and it's also invasive of
13 their privacy as a general factor that we found.
14       Another general factor is that people find
15 it privacy invasive for when companies make        16:50:42
16 inferences about them.  And -- and that is also my
17 understanding of what happened in this case.
18       The other thing I just wanted to say as a
19 context of kind of what this -- what this paper is
20 actually about, because it's -- as I've said,        16:51:01
21 it's -- it's pretty unnatural to look at certain
22 lines and I don't want to give a misleading answer
23 by talking too much about certain lines because
24 that's misrepresenting the paper, frankly.
25       This paper is about -- when -- when I talk   16:51:15

1  about drivers of disclosure, we're talking about
2  like voluntary, volitional disclosing that people
3  are consciously aware of and making, you know, of
4  their own volition?  I'm and so those are the kind
5  of drivers we're -- when we're thinking about        16:51:34
6  this -- in this case, it's -- it's a different
7  kind in the sense that it's -- people are -- are
8  not consenting to the kinds of data collection
9  that I understand to be going on.  So I don't want
10 us to -- there -- there's a bit of an apples and        16:51:53
11 orange here going on.
12    Q.  Is it -- in your opinion is it common
13 knowledge that third-party firms access personal
14 information to learn more about individuals'
15 preferences and behaviors?        16:52:09
16       MS. WEAVER:  Asked and answered.
17       THE WITNESS:  So that's not what this
18 paper is about.
19 BY MR. BROOME:
20    Q.  I know.  I'm not asking what the paper is   16:52:14
21 about.
22       I'm really just -- I'm asking you for your
23 opinion as to whether it's common knowledge that
24 third-party firms access personal information to
25 learn more about individuals' preferences and   16:52:20

1  behaviors?
2        MS. WEAVER:  Same objections.
3        THE WITNESS:  So this paper isn't about
4  assessing people's knowledge or lack thereof of
5  when exactly firms are collecting what and why.        16:52:39
6  That's not what this is about.  And it's -- the
7  paper is not designed to make conclusions about
8  that either.  That's not what it's about.
9  BY MR. BROOME:
10    Q.  Okay.  But if that's what you wrote;        16:52:54
11 right?  That's what you wrote in a paper.  I'm not
12 asking you what the paper is about.  But you did
13 write that sentence; right?
14    A.  So you're pointing to an isolated sentence
15 in a paper, and I'm worried that -- that by        16:53:08
16 focusing on this isolated sentence we are missing
17 the forest from the trees on what -- what I'm
18 actually saying here.  We're not -- we're not -- the
19 goal of this paper, we're not -- it's not about --
20 like it's one -- I -- I -- I -- it's not about        16:53:26
21 measuring -- it's not a study of what people are
22 and are not aware of.
23    Q.  Can you tell me, yes or no, whether you
24 agree with that -- what that -- what you wrote in
25 that sentence?        16:53:44

1    A.  So what -- I can tell you what I'm
2  meaning.  I -- I'm -- I'm not -- I'm not meaning
3  from this sentence -- what this sentence is not
4  saying, it's not saying, oh, people who use Chrome
5  are aware that when they are using Chrome to        16:54:09
6  browse the New York Times, oh, they're aware that
7  Google is eavesdropping on them.  That's not what
8  this is saying at all.
9    Q.  Okay.  Can you tell me, yes or no, whether
10 you agree with what you wrote in that sentence?        16:54:28
11       MS. WEAVER:  Objection.  Asked and
12 answered.
13       THE WITNESS:  I -- I'm trying -- I'm
14 really trying to explain the meaning.  And I --
15 it's a bit frustrating, I must admit, because I've   16:54:38
16 said that this is like a super unnatural way of --
17 of interpreting papers.  This is not how scientists
18 actually interpret papers, by looking at isolated
19 words and sentences.  So, like it's already
20 something that is really not a legitimate way of        16:54:59
21 thinking about this in my view.
22       Now, I understand that as the process you
23 ask the questions that you want to ask, and I'm
24 doing my best to answer them.  But I -- first and
25 foremost, it -- it needs to be true to what the   16:55:12

1 content is. So that's -- that is my answer.
2 BY MR. BROOME:
3    Q. Okay. Anything more to add in response to
4 my question?
5    A. So I think you may be referring to this --    16:55:29
6 in this isolated sentence, this -- an -- an idea
7 of -- a general idea of -- of general sense of
8 people being aware, oh, do companies track you in
9 the most general of senses. And that may be true.
10       Importantly, like it -- it doesn't apply    16:55:50
11 here in the specific case in the sense that like
12 even if you are generally -- if -- if you are
13 generally aware of that and you asked a consumer,
14 "Hey, are you generally aware that firms track
15 you," a consumer way -- may very well say yes.    16:56:06
16 But just because they say yes to that doesn't mean
17 that -- in this particular context, that they
18 would expect, know, understand, realize that
19 Google is tracking them, that when -- as the
20 example I've been giving, you're using Chrome and    16:56:31
21 you're on the New York Times that Google is
22 eavesdropping. So that it doesn't mean that in
23 that specific case people -- people know what's
24 going on and -- and -- yeah.
25       So that -- that's what I would like to    16:56:37
Page 230

1 add.
2    Q. Okay. Let's turn to the page -- if you
3 just flip forward to -- there's like a -- Section
4 5, it says "General Discussion." It's quite a --
5       MS. WEAVER: Steve, this doesn't have page    16:56:54
6 numbers. So can you --
7       MR. BROOME: It doesn't have page numbers.
8 So if you skip forward, just keep flipping forward,
9 you'll see -- eventually you'll get to 5, "General
10 Discuss -- Discussion," and then we're going to go    16:57:05
11 one page be- -- well, one page before that.
12       THE WITNESS: I'm on the general
13 discussion --
14 BY MR. BROOME:
15    Q. Okay.                16:57:31
16    A. -- page.
17    Q. And if you look at the previous page, last
18 paragraph begins with the word "Finally." Do you
19 see that?
20    A. Yes. Yes.                16:57:41
21    Q. And you wrote, "finally, consumer
22 attitudes about the collection and use of personal
23 information have changed over time, and will
24 inevitably continue to change into the future. As
25 technological advancements continue to enable    16:57:53
Page 231

1 firms to gather data about consumers in novel
2 ways, what consumers today deem invasive and
3 unsavory may tomorrow be considered benign and
4 acceptable."
5       Do you see that?                16:58:05
6    A. I do see that.
7    Q. Okay. And do you agree -- agree with that
8 statement?
9    A. So the -- let me just read the statement
10 again to make sure I'm very clear.                16:58:18
11       So this is a general -- the context of
12 this is that they -- when we write papers,
13 especially review papers like this, we kind of
14 start broad, we hone in, and then we broaden out.
15 So the context of this statement, just to    16:58:47
16 contextualize it, is it's broadening out at the
17 end of the paper.
18       And, I mean, so it's pretty generic stuff,
19 what we're saying here and -- you know, so things
20 can change. Attitudes can change over many years.    16:59:06
21 What I really -- what I want to underscore here is
22 that -- my opinion. So -- my opinions in this
23 case, it doesn't -- the statement here, this
24 isolated paragraph, which is a -- a dreamy
25 paragraph at the end of the paper, that doesn't    16:59:28
Page 232

1 undermine my conclusions, that my -- my opinions
2 that I wrote about in my assigned questions. It
3 doesn't undermine them.
4    Q. I'm not asking you if it undermines your
5 opinions. I'm just asking if you agree with the    16:59:43
6 statement?
7    A. Well, I --
8       MS. WEAVER: Asked and answered. You may
9 not like her answer, but she answered whether or
10 not she agreed.                16:59:51
11       You may answer again.
12       MR. BROOME: Well -- well, no, she didn't
13 answer that question.
14 BY MR. BROOME:
15    Q. Do you agree with the statement?    16:59:59
16       MS. WEAVER: Repeat it again.
17       THE WITNESS: So first let me
18 contextualize the statement. The statement appears
19 at the end of an overview -- or a review article
20 where we also propose new ideas, and we -- so the    17:00:17
21 structure is you kind of -- you start big picture,
22 you narrow in, and then you broaden out at the end.
23 So the context of this paragraph is broadening out
24 at the end. It's a pretty generic broad statement
25 at the end.                17:00:31
Page 233

59 (Pages 230 - 233)

1     And -- and -- and my -- my point here is
2  that this is a -- it's a general statement, it's a
3  very general statement, and it does not undermine
4  my opinions in the case. And, you know, that's
5  really relevant. But a central part of my answer     17:00:50
6  here because, again, it's -- we're taking things.
7  We're -- this is a very unnatural way of thinking
8  about conclusions and -- of scientific articles.
9     So that's my answer.
10 BY MR. BROOME:                               17:01:04
11    Q.  Okay. I'll -- I'll just point out, you
12 have not stated one way or the other whether you
13 agree with it. So I'm going to give you the
14 opportunity to answer that question again. And if
15 you don't want to answer it, fine, we'll move on.   17:01:17
16 But, you know, the record will reflect what it
17 reflects.
18    MS. WEAVER: Objection to form.
19 BY MR. BROOME:
20    Q.  Do you have anything more to add?         17:01:23
21    A.  I -- I've given you my answer.
22    Q.  Okay.
23    A.  Answered it as best I can.
24    Q.  Okay. Okay.
25    All right. Let's take a look at           17:02:55

Page 234

1  Exhibit 1, which is your report. We'll go to page
2  5.
3     A.  Okay.
4     Q.  Okay. Opinion 3.B, you write, "If a
5  reasonable consumer were to read Google's privacy   17:03:37
6  policies, it is reasonable for her to use Chrome
7  in the not-synced state and believe that Chrome
8  will not send her personal information to Google";
9  right?
10    A.  That's what I wrote, yes.              17:03:50
11    Q.  Okay. And then in the third paragraph,
12 third sentence, you write, "Moreover, there are
13 several expressed statements in the Chrome Privacy
14 Notice that, assuming that the user reads it,
15 could lead reasonable consumers to believe that    17:04:05
16 Google does not collect their personal information
17 if they are not synced," and then you list several
18 examples; right?
19    A.  Yes.
20    Q.  And one of the examples you list is, "The  17:04:15
21 personal information that Chrome stores won't be
22 sent to Google unless you choose to store that
23 data in your Google Account by turning on sync";
24 right?
25    A.  Yes.                                   17:04:29

Page 235

1     Q.  Okay. So now we're going to show you a
2  copy of the Chrome privacy notice.
3     A.  Okay.
4     MR. BROOME: Should be marked as
5  Exhibit 11.                    17:04:43
6     (John Deposition Exhibit 11 was marked.)
7  BY MR. BROOME:
8     Q.  Let me know when you have the exhibit, 11.
9     A.  Okay. I have it open.
10    Q.  Okay. On the bottom of the first page, do   17:05:38
11 you see there's a description of "Basic browser
12 mode," Professor John?
13    A.  Yeah, sorry. I'm looking at the dates of
14 the notice. I know there's different versions.
15    Okay. So "Browser modes" at the bottom of  17:06:06
16 the first page, yes?
17    Q.  Yes.
18    And -- and you see it says, "The basic
19 browser mode stores information locally on your
20 system. This information might include," and then  17:06:18
21 you flip over and there are six bullets.
22    Do you see that?
23    A.  Yes.
24    Q.  Okay. And reasonable people would
25 understand that the list that follows is          17:06:42

Page 236

1  information that is stored locally by the Chrome
2  browser on the user system; right? Do you agree
3  with that?
4     A.  I'm sorry, can you repeat the question?
5     Q.  Reasonable people reading the Chrome      17:07:01
6  privacy notice would understand that the list of
7  information that's reflected in those six bullets
8  is -- are categories of information that are
9  stored locally by the Chrome browser on the user's
10 system.                          17:07:25
11    Do you agree with that?
12    A.  So I guess first overarcing [verbatim]
13 point is it's a bit of a strange -- a lot of a
14 strange exercise to look at isolated lines here of
15 a document that -- I mean, where -- that people    17:07:47
16 probably don't read to begin with. So there's
17 that kind of caveat overarcing [verbatim]. And so
18 you're asking me to -- you're asking me to assume
19 that people read this, and you're asking me to
20 assume that they just reading this. Is that what   17:08:13
21 you're asking?
22    Q.  Let's go back to your report for a minute.
23 On page 5 of your report --
24    A.  Yes.
25    Q.  -- you write that, "there are several     17:08:38

Page 237

1  expressed statements in the Chrome Privacy Notice
2  that, assuming that the user reads it, could lead
3  reasonable consumers to believe that Google does
4  not collect their personal information if they are
5  not synced," and then you list of five examples,    17:08:57
6  including -- well, you list out five examples;
7  right?
8      A.  Yes.
9      Q.  When you listed out those five examples
10  and -- and opined that -- that those examples    17:09:10
11  could lead reasonable consumers to believe that
12  Google does not collect their personal information
13  if they are not synced, were you assuming --
14  assuming that people were just reading each of
15  those statements in isolation or were you assuming    17:09:25
16  that they read just those statements or were you
17  assuming that they read the entire Chrome privacy
18  notice?
19      A.  I'm sorry, can you repeat the question?
20      Q.  Yes.    17:09:37
21      You wrote that these five statements could
22  lead reasonable consumers to believe that Google
23  does not collect they're personal information if
24  they're not synced; correct?
25      A.  What I'm referring to here is the point    17:09:52

Page 238

1  that the -- when I actually read the Chrome
2  privacy notice, there are -- there's this contrast
3  that is made.  This -- and -- and these are --
4  some of the bullets here attest to that, but
5  when -- when you're synced -- let me -- sorry, let    17:10:17
6  me open my report so that I have right.
7      Right.  So what I'm pointing out here is
8  there are elements of the notice that -- the
9  overarcing [verbatim] point is that if you
10  actually read this privacy notice, I'm making a    17:10:48
11  point that it's reasonable for you to read the
12  notices -- this notice since we're talking about
13  this notice -- it's reasonable for a consumer to
14  read this and to think that -- when she uses
15  Chrome in the not-synced state, it's reasonable    17:11:10
16  for her to believe that Chrome will not send her
17  personal information to Google.
18      And so I -- I've explained in my opinion
19  why that is reasonable, and part of that is the
20  point that not only is it not making it very clear    17:11:24
21  explicitly saying to people in a way they can
22  comprehend what is actually happening when they
23  are not synced, there are also some statements,
24  which I cite here, that actually point to the
25  opposite.  So it contributes to this opinion --    17:11:46

Page 239

1  you know, I'm contextualizing these bullet points
2  here with respect to my opinion.  It -- it
3  contextualizes my opinion and is in support of
4  this opinion that if someone did actually read
5  Google's privacy policies it is reasonable for her    17:12:03
6  to use Chrome in the not-synced state and believe
7  that Chrome will not send her personal information
8  to Google.
9      That's -- that's my point.
10      Q.  When you refer to "several express    17:12:22
11  statements in the Chrome privacy notice that,
12  assuming the user reads it, could lead reasonable
13  consumers to believe that Google does not collect
14  their personal information if they are not
15  synced," are you assuming that users read the    17:12:43
16  entire Chrome pri- -- privacy notice?
17      A.  So if -- I'm assuming -- I'm saying, if --
18  if in a hypothetical world a consumer actually
19  read the privacy notice --
20      Q.  Right.    17:12:59
21      A.  -- then it is reasonable for them to
22  believe that when they use Chrome in the
23  not-synced state Chrome will not send their
24  personal information to Google.  So if they
25  actually read this, read the Chrome privacy    17:13:15

Page 240

1  notice, it would be reasonable for them to think
2  that Chrome would not send their -- when they're
3  not synced Chrome would not receive their personal
4  information to Google.
5      Q.  If they read the entire thing?    17:13:30
6      A.  If they read the Chrome privacy notice,
7  that's what my opinion says.  It says, "If a
8  consumer were to
9  read Google's privacy policies, it is reasonable
10  for her to use Chrome in the not-synced state and    17:13:37
11  believe that Chrome will not send her personal
12  information to Google."
13      So it's -- it's -- it's saying -- and then
14  I'm using -- I'm putting -- I put these examples
15  here to show it's -- on the one hand, it -- it    17:14:00
16  says some -- it -- it includes statements that
17  bolster this expectation that people already have
18  that I've spoken to earlier today.  They have --
19  they bring coming in the expectation that Google
20  is not going to eavesdrop on their conversations,    17:14:19
21  it's not going to, you know, collect their --
22  Google's not listening in on -- like recording
23  every article that I read on the New York Times,
24  for example.  So they come -- they bring this
25  expectation in.    17:14:34

Page 241

61 (Pages 238 - 241)

1     And then there are -- if they actually
2 read the disclosure, there are statements that
3 also -- that kind of support that belief. And
4 it's striking because there are these statements,
5 and there are not statements that say in a way    17:14:48
6 that people can clearly understand what's
7 happening, what is actually happening when they're
8 not synced.
9     So it's misleading is what I'm saying.
10    Q. Let's go back to the Chrome privacy    17:15:06
11 notice, Exhibit 11. Under -- under the
12 description of "Basic browser mode," Google
13 writes "The basic browser mode stores information
14 locally on your system. This information might
15 include," and then it lists six categories of    17:15:33
16 information; right?
17    MS. WEAVER: Objection. Misstates the
18 record. The document speaks for itself.
19    THE WITNESS: So you're saying -- I want
20 to make sure I understand where you're talking    17:15:48
21 about. The -- it says "Basic browser mode." "The
22 basic browser mode stores information locally on
23 your system. This information might include," and
24 then it has one, two, three, four -- six bullet
25 points.    17:16:03

Page 242

1 the information described in the six bullet points
2 that we just discussed are categories of
3 information that are stored locally on a user's
4 system in basic browser mode; correct?
5    A. That appears to be the case, yes.    17:17:24
6    Q. Okay. And would reasonable people
7 understand that each bullet reflects a different
8 category of information that Chrome will store
9 locally on the user system in basic browser mode?
10    A. A different category? Well, I mean, I    17:17:47
11 guess, like -- are you talking about like do --
12 does the presentation of the bullet points here
13 evoke distinct -- distinct nonoverlapping
14 categories to consumers, I don't know that the
15 answer is yes to that.    17:18:08
16    I also think you're -- the way the
17 information is presented and what as a consumer
18 you would believe to be a category and then an
19 overlapping versus nonoverlapping category has to
20 be contextualized within the context of the    17:18:22
21 stuff -- the other disclosures around it.
22    Q. Okay. And -- and what -- what's your
23 expert opinion on whether people would think --
24 reasonable people would think these six bullets
25 reflect overlapping or nonoverlapping categories    17:18:39

Page 244

1 BY MR. BROOME:
2    Q. Yes.
3    A. So -- so this would be saying to people --
4 and, again, when we look at this in isolation --
5 that this -- these bullets are stored locally in    17:16:11
6 basic browser mode.
7    Q. Right. Reasonable people would understand
8 that; correct?
9    A. So -- sorry, I'm hesi- -- I just -- I
10 guess I -- I'm a little confused about what you're    17:16:36
11 asking again.
12    Q. Is there anything unclear about that -- I
13 mean, it's not a trick question.
14    A. Mm-hmm.
15    Q. I'm just trying to -- the way -- we do    17:16:47
16 this -- this process is kind of incremental. So I
17 don't think it should be controversial.
18    But you have opined on certain opinions
19 about what reasonable people would think about the
20 Chrome privacy notice.    17:17:03
21    A. Mm-hmm.
22    Q. I'm trying to get -- I'm trying to flesh
23 that out a little bit here.
24    A. Yeah.
25    Q. Reasonable people would understand that    17:17:10

Page 243

1 of information?
2    A. So, yeah. This isn't an opinion that I
3 was asked to -- to make about perceptions of
4 overlapping versus nonoverlapping information as a
5 function of bullet point presentation. And so I'm    17:18:52
6 sorry, I don't -- I don't really have an answer.
7 But maybe you could ask the question in a
8 different way.
9    Q. Well, you -- you -- you have opined in
10 this case that -- that the sentence at the bot- --    17:19:02
11 bottom of the description of "Basic browser mode"
12 where it says, "The personal information that
13 Chrome stores won't be sent to Google unless you
14 choose to store that data in your Google Account
15 by turning on sync" [as read], you have rendered    17:19:19
16 an opinion with respect to that sentence; right?
17    A. Well, so the -- what I -- I -- I -- yes, I
18 cite that sentence in my report. And the reason
19 why I cite it is to contribute to my opinion that
20 it's reasonable for a consumer to read this, the    17:19:33
21 Chrome privacy notice, and come to the conclusion
22 that when they use Chrome in the not-synced state
23 that Chrome is not going to be sending personal
24 information to Google.
25    Q. Okay.    17:19:53

Page 245

62 (Pages 242 - 245)

1    A.  That's what I'm using this for.  I'm
2  not -- I'm not opining on the interpretation of
3  categories and bullet points.
4    Q.  Okay.  Fine.
5      When you rendered your opinion, did you    17:20:04
6  consider what the -- what is meant by the personal
7  information that Chrome stores?
8    A.  In what -- in -- with respect to this
9  sentence -- the blue highlighted sentence here?
10    Q.  Yes.    17:20:23
11      Did you consider what -- what -- what
12  the -- the -- the term -- the personal information
13  that Chrome stores --
14    A.  Yeah.
15    Q.  -- encompasses?    17:20:36
16    A.  So it's -- if -- if you're wondering -- if
17  your question is, well, okay, if I look under
18  "Basic browser mode," the second bullet says
19  "Personal information and password" [as read], so
20  if the question is, this blue highlighted, does    17:20:52
21  that refer to just the personal information and
22  passwords in the bullet point, I don't think
23  that's how people are reading this.  They're not
24  kind of making that discrete reference, would be
25  my interpretation.    17:21:11

Page 246

1    I -- I -- when I -- when I cited this, the
2  personal information, I -- I mean this is an
3  example of a statement in this privacy notice that
4  contributes to a misleading understanding of what
5  is actually happening.  That's my point.    17:21:26
6    Q.  Well, as you interpret this sentence, what
7  is meant by "The personal information that Chrome
8  stores" [as read]?  Do you have an understanding
9  of what that term means -- or that phrase?
10    A.  So when -- in this blue highlighted page 2    17:21:52
11  of 12, right, "The personal information that
12  Chrome stores won't be sent to Google unless you
13  choose to store" [as read], so my interpretation
14  of that is it includes browsing history, cookies;
15  that is personal information.    17:22:11
16    Q.  Okay.  And when you -- when you see the --
17  if you go back to the six bullets up top, you see
18  that the first bullet is "Browsing history
19  information" --
20    A.  Mm-hmm.    17:22:25
21    Q.  -- right?
22    A.  Mm-hmm.
23    Q.  And then the next bullet is "Personal
24  information and passwords, to help you fill out
25  forms or sign in to sites you visit."    17:22:33

Page 247

1    Do you see that?
2    A.  Yes.
3    Q.  And -- and reasonable people would
4  understand that the "Browsing history information"
5  and "Personal information and passwords, to help    17:22:41
6  you fill out forms" [as read] Are not the same
7  thing, at least in the context of this notice;
8  right?
9    A.  No, I don't think that's what I'm saying.
10    Q.  Okay.  You're -- so it's --    17:22:56
11    A.  Now I'm -- sorry, I'm -- I'm getting
12  confused over -- maybe you could just ask the
13  question, and I'll answer it as best I can.
14    Q.  Do you think that reasonable people
15  reading this notice would see the first bullet,    17:23:06
16  "Browsing history information" --
17    A.  Mm-hmm.
18    Q.  -- and then they see the second bullet,
19  "Personal information and passwords, to help you
20  fill out forms and sign in to sites you visit" [as    17:23:18
21  read], and think that the term "personal
22  information" there encompasses browsing history
23  information?
24    A.  Well, if you're asking me whether in the
25  blue statement at the bottom, this personal    17:23:31

Page 248

1  information that Chrome stores, would people think
2  that that ex-- explicitly exclude browsing
3  history information, then, no, I -- I don't think
4  that people would think that.
5    Q.  Let's -- let's take it step by step.    17:23:42
6      Would people think that per-- personal
7  information, as it is used in -- as that term is
8  used in the second bullet, encompasses the
9  browsing information that is described in the
10  first bullet?    17:23:59
11    A.  So I see what you're saying in that
12  you're -- you're suggesting that because these are
13  bullets, it's -- it may suggest to people that
14  these are all discrete non-overlapping categories.
15      And what I'm saying is that -- when, in    17:24:14
16  the later sentence, it says, "The personal
17  information that Chrome stores won't be sent to
18  Google," that part, I don't think that the fact
19  that browsing history is separated out from
20  personal information above in these bullet points,    17:24:33
21  I don't think the fact that those are separated
22  necessarily means that people think that -- in
23  this blue highlighted portion, that explicitly
24  excludes browsing information.  I don't -- I don't
25  think that.    17:24:47

Page 249

Page 250

1    And -- and, again, it's -- I mean, I'm --
2  I'm going along with you in looking at, you know,
3  stylized aspects and trying to understand what
4  people do and don't infer, but I -- the point of
5  my opinion is not to look at isolated parts of    17:25:04
6  this.
7    It's the -- my opinion is -- is is -- is
8  stating that, well, first of all, people are --
9  it's very common to not read these disclosures.
10 But if they did, it -- that's -- it's reasonable   17:25:22
11 for them to read it and come to the conclusion
12 that when they use Chrome in the not-synced state,
13 Chrome is not going to be sending their personal
14 information to Google.
15    And that includes their browsing history,   17:25:41
16 their IP address, their cookies.
17    Like, again, it's -- so my -- my opinion
18 is scaffolded on -- on -- on different aspects.
19 Like this -- this idea is like we're getting into
20 kind of the -- the end of my opinion in the sense   17:25:59
21 that like there's a lot of ifs that have to happen
22 for us to even get to this point where the person
23 is reading it.
24    So before this, if they even do
25 hypothetically read it, they come to this   17:26:10

Page 251

1  encounter with Google with Chrome, then they use
2  Chrome, they expect -- they -- they do not expect
3  that Google is going to be effectively
4  eavesdropping, collecting their personal
5  information when they're interacting with the   17:26:30
6  website.
7    When they're using Chrome, they don't
8  expect Google to be collecting and then let alone,
9  then, you know, selling access to them, conducting
10 ad auctions, and so on.   17:26:43
11    Like this is not what people are expecting
12 and -- so that's -- and -- and then my point in
13 going through and saying, well, if people did read
14 the disclosures, the disclosures do not override
15 that expectation that people come into.  And so --   17:26:59
16 which is also related to my point about consent.
17    Like if you -- if you -- how can you be
18 consenting if -- if it's not actually clearly
19 disclosed what is happening and you have these
20 expectations to the contrary.   17:27:18
21    Q.  Is it your opinion that a reasonable
22 person reading the Chrome privacy notice would
23 think that the term "Personal information" in the
24 second bullet and the term "The personal
25 information" in the sentence that we discussed   17:27:35

Page 252

1  with the blue highlighting have two different
2  meanings?
3    A.  So I -- I think as I read this, you know,
4  the way the bullets are presented in the top,
5  there's kind of a narrow -- it's de- -- it maybe   17:28:00
6  using personal information in a narrow way.
7    But then it -- it's not to say that
8  when -- in the broad statement at the bottom, it's
9  not to say that people are viewing personal
10 information in a narrow way.   17:28:18
11    So as -- again, I -- I'm just kind of
12 re-answering what I stated before, that when you
13 say "Per- -- "The personal information" in blue
14 there, "The personal information that Chrome
15 stores won't be stored to Google unless you choose   17:28:35
16 to store that data in your Google account by
17 turning on sync" [as read], I don't think that
18 people necessarily explicitly think that excludes
19 their browsing history there.
20    Q.  But -- but -- and what's that --   17:28:48
21    A.  Even if the bullet points earlier are
22 designed to make that dichotomy, it's a -- it's a
23 different part of the document here.  This is a --
24 and -- and we're again reading a lot into
25 inferences of bullet points that -- yeah, it's...   17:29:05

Page 253

1    Q.  Okay.  So just so I'm clear -- I'm not --
2  I'm not sure I follow that.  I'll be -- I'll be
3  perfectly honest, I'm not sure --
4    A.  Okay.
5    Q.  -- I follow your answer.   17:29:31
6    Is it your opinion that people reading the
7  Chrome privacy notice -- reasonable people reading
8  the Chrome privacy notice might interpret the term
9  "Personal information," as it is used in the
10 second bullet, differently than the term "personal   17:29:44
11 information" in the sentence at the bottom of that
12 section?
13    In other words, they might interpret
14 the term "Personal information" in the second
15 bullet narrowly and "personal information" in the   17:30:05
16 sentence at the bottom of that section broadly.
17    Is that your opinion?
18    A.  Yeah, I think it's -- it's -- it's not
19 very well defined.  There's --
20    Q.  Okay.   17:30:26
21    A.  -- there's -- there's ambiguity here.
22    Q.  And -- and what is -- I'm sorry.
23    A.  Sorry, I --
24    (Simultaneous speaking.)
25    (Interruption in audio/video.)   17:30:36

64 (Pages 250 - 253)

1    THE COURT REPORTER:  Could you start the
2  answer again?
3    THE WITNESS:  And -- and it contributes to
4  my opinion in the sense of -- you know, it's -- if
5  someone actually read this, I don't think that    17:30:45
6  they -- I think it's reasonable for them to -- to
7  conclude that something -- to conclude that when
8  they're not using -- when they're using Chrome and
9  they're not synced, that Google won't be collecting
10  their personal information.    17:31:06
11    So put differently, it's not resoundingly
12  clear.  It's not telling people in a way that's
13  comprehensible to them what is actually happening.
14  And you're pointing to how there's -- you know,
15  there's some ambiguity.    17:31:24
16  BY MR. BROOME:
17    Q.  So do you think that -- that the term --
18  what Google means by the term "personal
19  information" in the Chrome privacy notice, do you
20  think that's ambiguous?    17:31:41
21    A.  I don't know what Google does and doesn't
22  mean.  I'm -- I'm not -- I'm not Google; I didn't
23  write these, so...  But I -- I've just stated my
24  opinion.
25    Q.  Okay.  Well, let me ask the question    17:31:51

Page 254

1  slightly differently.
2    Do you think the term "personal
3  information" as it is used in the Chrome privacy
4  notice is ambiguous?
5    A.  So it's -- it's -- it's ambiguous in the    17:32:00
6  sense that it's not clearly disclosing what is
7  actually -- what's actually being collect --
8  collected.  It's not clear.
9    Q.  Okay.
10    A.  It's not conveying that in a clear way to    17:32:23
11  people, yes.
12    Q.  Okay.  Let's go -- we're going to go back
13  to the Chrome privacy notice in a second, but I
14  also want to start with your report again on page
15  5, 6 [verbatim].    17:33:21
16    A.  Page 6, did you say?
17    Q.  Actually, at the bottom of page 5 --
18    A.  Yes.
19    Q.  -- you write, "I understand that Google
20  may argue that reasonable consumers should have    17:33:44
21  known Google was en-" -- "engaged in this conduct
22  (i.e., collecting user data even when they are not
23  synced) based on disclosures that were present in
24  Google's general Privacy Policy and on other
25  websites."    17:34:00

Page 255

1    Do you see that?
2    A.  Yes.
3    Q.  Okay.
4    And then you write, "Google's argument is
5  contrary to how normal people consider    17:34:04
6  relationships with the services they use.  It
7  would be difficult for a consumer to understand
8  that their use of Chrome was controlled by a
9  privacy statement other than the one that Google
10  says is directly applicable to Chrome."    17:34:19
11    Do you see that?
12    A.  Yes.
13    Q.  All right.
14    Now, let's go back to the privacy notice.
15    A.  Okay.    17:34:36
16    Q.  In the very first paragraph, in the second
17  sentence it says, "Although this policy describes
18  features that are specific to Chrome, any personal
19  information that is provided to Google or stored
20  in your Google Account will be used and protected    17:34:51
21  in accordance with the Google Privacy Policy, as
22  changed from time to time."
23    Do you see that?
24    A.  Yes.
25    Q.  So is -- is your opinion that a reasonable    17:34:59

Page 256

1  consumer who read the Chrome privacy notice would
2  not understand that the privacy policy also
3  applies?
4    A.  What I'm referring to in that paragraph in
5  the report is -- how can I say this?  It's kind of    17:35:22
6  like -- it kind of feels in a way like the Google
7  privacy pol- -- the -- the Chrome notice is like,
8  okay, here's -- by the way, there's also this
9  policy for Google.
10    And it's kind of like saying, with your    17:35:44
11  fingers behind your back, you're going to be
12  collecting this information because there's an
13  abstract "disclosure" -- I'm using disclosure in
14  air quotes -- in the -- in the Google privacy
15  policy.    17:35:59
16    And what I'm saying in my report is that
17  if the argument is that, oh, the Google priva- --
18  people should have known what was happening, that
19  people -- Chrome users who use Chrome in the
20  not-synced state should understand that Google was    17:36:13
21  actually eavesdropping on them because, ah-ha, in
22  the Google privacy policy we say this, there's
23  like a cross-reference here that is not -- is not
24  a natural way that people think about their
25  relationship with Chrome, what they're using.    17:36:28

Page 257

65 (Pages 254 - 257)

1 They would -- it is not -- it's -- it's a -- not a
2 normal way of thinking about that, okay, my -- the
3 way I use Chrome is actually modulated by this
4 other thing. That's what I'm referring to and...
5     Q.  Well, I mean, you say "it would be        17:36:59
6 difficult for a consumer to understand that their
7 use of Chrome was controlled by a privacy
8 statement other than the one that Google says is
9 directly applicable to Chrome."
10     And when you say "the one that Google says   17:37:10
11 is directly applicable to Chrome," you're
12 referring to the Chrome privacy notice; right?
13     A.  I'm saying that it's -- so if -- so
14 people -- it's common for people to not read these
15 things at all.                                   17:37:30
16     If they read them at all, the Chrome
17 privacy notice and the Google privacy policy,
18 what's salient to them is the Chrome privacy
19 notice, because, from the consumer perspective,
20 they're using Chrome.  So this is a relationship   17:37:42
21 with Chrome.
22     And so it's just an unnatural way of
23 thinking that, hey, my relationship with Chrome
24 actually is modulated by this other entity,
25 Google.  That's -- that's what I'm saying is -- is   17:37:57

Page 258

1 unnatural when -- in my -- in my report.
2     Q.  Is it your opinion that the data
3 collection at issue here has -- is a -- well, let
4 me start again.
5     Is it -- is it your understanding that --   17:38:20
6 that the data collection at issue here is caused
7 by people's relationship with Chrome?
8     A.  Can you -- "is caused by," can you
9 rephrase the question --
10     Q.  Yeah.  No, that -- that wasn't a very good  17:38:34
11 question.  Well, I'll withdraw it because I think
12 I asked you this question before as to whether you
13 had an understanding as to whether the data
14 collection at issue here is a -- u -- u -- u --
15 unique to Chrome as opposed to something that   17:38:51
16 happens in any browser that you use, and I think
17 you said you're -- you're not familiar with the
18 technological process.
19     Is that right?
20     MS. WEAVER:  Objection.  Vague.           17:39:05
21     You may answer.
22     THE WITNESS:  Okay.  Can you say the
23 question?  I want to know what I'm agreeing or not
24 agreeing to.
25 BY MR. BROOME:                                   17:39:14

Page 259

1     Q.  Yeah.  No, fair.  Let me just ask it
2 again, and -- and -- and you can tell me what you
3 know or what you don't know.
4     Are you aware that the data collection at
5 issue in this case occurs when users visit        17:39:25
6 non-Google websites that use certain Google
7 services?
8     MS. WEAVER:  Objection.  Misstates the
9 facts.  Foundation.  Assumes facts not in evidence.
10     THE WITNESS:  Can you state the question   17:39:49
11 again, please.
12 BY MR. BROOME:
13     Q.  Sure.
14     Is it consistent with your understanding
15 that the data collection at issue in this case   17:39:55
16 occurs when users visit non-Google websites that
17 use certain Google services?
18     A.  So --
19     MS. WEAVER:  Same -- same objections.
20     THE WITNESS:  Yeah, if you're asking me to   17:40:07
21 weigh in on kind of the technical details of how --
22 of what happens when the -- you know, off of
23 Chrome on like -- this is -- I'm -- I'm not a
24 technical expert.  And -- and my paragraph here
25 that you called out is not about that.           17:40:26

Page 260

1 BY MR. BROOME:
2     Q.  Yeah.  Well, and -- let me just give
3 you a little more context for my question.  I
4 mean, you -- you were referring to a user's
5 relationship with Chrome.                        17:40:35
6     From Google's perspective, this has
7 nothing to do with Chrome as opposed to other
8 brands of browsers.  The same data collection
9 occurs if you're in Safari or -- or Microsoft --
10 you know, Internet Explorer or whatever.         17:40:50
11     And -- and do you -- are -- are you aware
12 of that?  Is that -- or is that consistent with
13 your understanding?
14     MS. WEAVER:  Objection --
15     (Simultaneous speaking.)                   17:40:59
16     (Interruption in audio/video.)
17     THE COURT REPORTER:  Excuse me.  Excuse
18 me.  I didn't get the last part of the question.
19 Sorry.
20 BY MR. BROOME:                                   17:41:05
21     Q.  Is it your under- -- or is it your
22 understanding that this data collection occurs
23 only in Chrome?
24     MS. WEAVER:  Objection.  I'm not sure
25 who's testifying here.  Assumes facts not in   17:41:16

Page 261

1 evidence.
2     If you want to put something before her
3 and ask -- have her -- ask a question about how
4 data collection occurs, I suppose you can do that.
5 She shouldn't have to testify based on your        17:41:29
6 understanding.
7     You can answer the question, if you
8 understand it.
9     THE WITNESS: I don't understand the
10 question.                                          17:41:37
11     MS. BROOME:
12     Q. I'll just -- I'll try again.
13     Do you -- do you have any understanding as
14 to whether the data collection at issue in this
15 case occurs only in Chrome or --                   17:41:46
16     MS. WEAVER: Objection. Leading.
17     THE COURT REPORTER: Excuse me. Can you
18 start over again? I didn't get the question
19 because there was some overspeaking.
20     MS. WEAVER: Sorry, Steve. You had        17:42:02
21 paused, and I thought you were done.
22     BY MR. BROOME:
23     Q. Do you have an understanding as to whether
24 the data collection at issue in this case occurs
25 only in Chrome or in other browsers, or do you     17:42:09
                                                    Page 262

1 just not know, one way or the other?
2     MS. WEAVER: Objection. Compound. Vague.
3 Asked and answered.
4     THE WITNESS: So may I ask you to unpack
5 what the question is for me, please.               17:42:32
6     BY MR. BROOME:
7     Q. Do you have an understanding whether the
8 data collection at issue in this case occurs only
9 in Chrome as opposed to in all browsers?
10     MS. WEAVER: Objection. Vague.        17:42:47
11     Answer if you can.
12     THE WITNESS: So my area of expertise is
13 not in comparing the technical elements of what is
14 and isn't sent with different browsers. So I
15 don't -- I don't know that -- I don't think I can  17:43:06
16 answer that question.
17     BY MR. BROOME:
18     Q. Okay. All right.
19     MR. BROOME: We're -- we're almost done.
20 Why don't -- why don't you give me five minutes,   17:45:01
21 and we'll figure out what our last round of
22 questions is here. And we'll -- we'll come back in
23 just a few minutes.
24     THE WITNESS: Okay.
25     MR. BROOME: We can go off the record.     17:45:12
                                                    Page 263

1     THE WITNESS: Okay.
2     THE VIDEOGRAPHER: Okay. We're off the
3 record at 5:44 p.m., Eastern Time.
4     (Short recess taken.)
5     THE VIDEOGRAPHER: We are back on the        17:51:25
6 record at 5:50 p.m., Eastern Time.
7     BY MR. BROOME:
8     Q. Okay. Professor John, I'm going to direct
9 you back to Exhibit 1, your report, page 6.
10     A. Okay.                              17:52:07
11     Q. You write, near the top of that page,
12 "Further, though the Google Privacy Policy as a
13 whole is lengthy and difficult to understand,
14 there are relatively straight-forward statements
15 about Sync and Chrome browsing history that are    17:52:20
16 consistent with the Chrome Privacy Notice, in the
17 sense that they could reasonably lead consumers to
18 think that Google does not collect their data when
19 they are not synced."
20     Do you see that?                       17:52:36
21     A. Yes.
22     Q. And then you say, "These include," and
23 then you've got two bullets where you quote
24 language from the privacy policy; correct?
25     A. Yes.                               17:52:47
                                                    Page 264

1     Q. All right.
2     Now we'll show you Exhibit 12 -- I guess
3 this is 12? -- which is the July 1st, 2020,
4 privacy policy.
5     (John Deposition Exhibit 12 was marked.)   17:53:02
6     BY MR. BROOME:
7     Q. Let me know when you've got that.
8     A. Okay. I have Exhibit 12 opened.
9     Q. All right.
10     And if you'd go to the third page under    17:53:33
11 the heading "Your Activity." Let me know when
12 you're there.
13     A. And so this is a version of it. It says
14 "Effective July 1, 2020." [As read]
15     Q. Yes. And I -- that's a good point.   17:53:54
16 This -- this is the version in effect when the
17 complaint was filed.
18     Did you review this version in rendering
19 your opinions in this case?
20     A. Yeah, so I understand there's lots of    17:54:12
21 different versions. And I read -- so I -- I read
22 the first and the last in great detail. And then
23 I looked at differences between them just to
24 ensure that my opinion applied to the disclosures
25 in the full period at -- at hand.        17:54:42
                                                    Page 265

67 (Pages 262 - 265)

1    So this -- and I noticed this right away;
2  this isn't the -- the current one.  But that's
3  okay.  Obviously we'll -- I just want to make sure
4  I'm understanding what I'm looking at here.
5    Okay.  So -- and where did you want me to    17:55:01
6  go in this document?
7    Q.  On the third page, there's the heading
8  "Your activity."
9    A.  "Your activity," okay.
10    Q.  And -- and then it says, "We collect    17:55:13
11  information about your activity in our services,
12  which we use to do things like recommend a YouTube
13  video you might like.  The activity information we
14  collect may include:", and then it lists several
15  bullets.    17:55:27
16    Do you see that?
17    A.  Yes.
18    Q.  The last bullet is "Chrome browsing
19  history you've synched with your Google Account."
20    Do you see that?    17:55:37
21    A.  Yes.
22    Q.  That is one of the bullets that you quoted
23  in your report; correct?
24    A.  Oh, sorry, I -- let me just -- let me
25  go -- I just want to go to my report to those    17:55:46

Page 266

1  bullets.
2    So you're referring to how, on page 6 of
3  my report, the first bullet I'm saying, "The
4  activity information we collect may include:...
5  Chrome browsing history you've synced with your    17:56:20
6  Google Account."  [As read]
7    And so "Chrome browsing history you've
8  synced with your Google Account" is -- now I'm
9  back in Exhibit 12.  Yes, right, that's what I'm
10  quoting.    17:56:37
11    Q.  Okay.  And you -- you did not mention in
12  your report the bullet directly above that, which
13  says, "Activity on third-party sites and apps that
14  use our services"; correct?
15    A.  Correct.    17:56:49
16    Q.  And you do not mention any of the other
17  bullets in that list in your report; correct?
18    A.  Correct, because I -- those bullet points
19  are not -- the -- the -- the point I'm making
20  is -- in my report is that even if you were to    17:57:07
21  read -- and there's a lot of ifs here -- even if
22  you were to read the Google privacy policy and
23  even if you were to think, okay, there's a Chrome
24  privacy notice, and there's -- in this
25  interaction, I go to the New York Times, I'm using    17:57:31

Page 267

1  Chrome, so from the user perspective, this is an
2  inter- -- this is -- there's Chrome involved, and
3  there is the New York Times website, so it's not
4  even -- my expectation is -- is not that there's
5  just going to be this third-party entity, Google    17:57:48
6  here, eavesdropping.
7    But so even if people are -- there's a lot
8  of ifs here, and I'm fleshing them out because
9  I -- I just want it to be -- to contextualize my
10  answer here, that if you do think that the    17:58:01
11  Chrome -- the Google privacy policy modulates the
12  Chrome privacy disclosures, then even if you did
13  read this Google privacy policy, there are things
14  in this privacy policy that support people's
15  expectations coming in that their browsing history    17:58:29
16  is not going to be sent to Google.
17    And so the reason I'm using this bullet
18  point is that's an example of that; it's -- it's
19  an example of that point.
20    So this -- there's reason to believe that    17:58:52
21  this Google privacy policy, if you read it, it's
22  not disabusing people of the expectations -- it's
23  not serving to override or correct the expectation
24  that they have going in with what -- correct them
25  with respect to what is actually -- the data    17:59:06

Page 268

1  collection that's actually happening.  That's my
2  point.
3    Q.  A reasonable person who's reading the
4  Google privacy policy would understand that
5  "Activity on third-party sites and apps that use    17:59:24
6  our services" and "Chrome browsing history that
7  you've synced with your Google Account [as read]
8  are different sources from which Google may
9  receive your information; correct?
10    A.  Can you restate the question, please.    17:59:36
11    Q.  Sure.
12    The -- this -- under the heading "Your
13  activity," Google identifies -- Google says
14  that -- that Google "collects information about
15  your activity on our services." [As read]    17:59:53
16    And then it says -- and then they say --
17  it says, "The activity information that we collect
18  may include:" [as read], and then it lists several
19  different types of activity information.
20    Do you see that?    18:00:05
21    A.  Mm-hmm.  Yes.
22    Q.  "Terms you searched for," "Videos you
23  watch," "Views and interactions with content and
24  ads," "Voice and audio information when you use
25  audio features," "Purchase activity," "People with    18:00:17

Page 269

68 (Pages 266 - 269)

1 whom you communicate or share content," "Activity
2 on third-party sites and apps that use our
3 services," "Chrome browsing history you've synced
4 with your Google Account."
5        Do you see that?                    18:00:30
6    A. Yes.
7    Q. And reasonable people reading that section
8 of the privacy policy would understand that
9 activity on third-party sites and apps that use
10 our services and Chrome browsing history you've    18:00:42
11 synced with your Google account are different
12 sources from which Google may receive your
13 information; correct?
14    A. That -- I'm sorry, it's late in the day.
15 Can you repeat the question, please.            18:00:58
16    Q. Yes.
17       Reasonable people reading the -- your
18 activity section would understand that activity on
19 third-party sites and apps that uses our services
20 is one source from which Google receives          18:01:08
21 information. And Chrome browsing history you
22 synced with your Google account is another
23 different source from which Google may receive
24 your information; correct?
25    A. Well, I guess it's not as simple as saying  18:01:22
                                          Page 270

1 correct or incorrect in response to your question.
2 I think it's -- if a read -- if a user looked at
3 this, I don't think that the clear interpretation
4 necessarily is, oh, hey, if I am been using Chrome
5 and I'm on the New York Times that that -- that    18:01:43
6 I'm consenting to having Google collect
7 information in that case. I don't -- I don't
8 think the presence of that activity on third-party
9 sites and apps in of itself would make people
10 interpret this document if they read it to        18:02:03
11 understand that what is actually happening is
12 happening.
13    Q. But people would understand that those are
14 two different sources from which Google may
15 receive information, right, by virtue of the fact  18:02:17
16 that they are broken out into separate bullets?
17    A. So there's two -- if you're asking, well,
18 if there's two separate bullets does it imply two
19 different sources, so I -- maybe, if you just look
20 at these two bull-- if we're making inferences     18:02:40
21 about bullet point formatting. But that's not
22 what I was asked to do.
23       What I -- if -- if I want to make sure that
24 my statement, my opinion, the reason why I quoted
25 this, I -- I don't want that to be taken out of    18:03:00
                                          Page 271

1 context and misunderstood. And so my point is
2 that there's -- the -- the Chrome privacy notice,
3 if a consumer read that, it would be reasonable
4 for them to think that when they use Chrome in the
5 not-synced state that the data collection -- that   18:03:22
6 their -- their data would not be collected as is
7 alleged.
8        And similarly, in -- if they read the
9 Google privacy policy, it's reasonable for them to
10 come away from that reading that thinking that      18:03:40
11 when they use Chrome in the not-synced state that
12 their information won't be collected.
13       And so the reason why I quoted this line
14 is because there's this, like, contrast that's
15 made between syncing and not syncing. And -- and    18:04:01
16 this language appears repeatedly, and I -- this is
17 why I've been showing these examples. It appears
18 in the Google privacy policy. It appears in the
19 Chrome privacy notice. It even -- when I quickly
20 reviewed those exhibits that you showed, like the   18:04:19
21 consent bump, as far as I could tell, like there
22 is this language of like when you synced, you
23 know, Chrome browsing -- Chrome browsing history,
24 you synced. And so there's this contrast implied
25 that syncing is collecting browsing history and     18:04:39
                                          Page 272

1 personal information, and when you're not synced,
2 like a reasonable inference is that, oh,
3 because -- because you're telling me the his-- --
4 the Chrome browsing history when I'm synced, okay,
5 that implies this contrast when I'm -- when I'm      18:04:57
6 not synced.
7        And -- and as another example, if I think
8 of the -- where there's this -- this -- this
9 contrast that is -- is misleading to people, in
10 the -- the first-run experience of the other        18:05:09
11 expert generated, when it -- there's a screen --
12 so you sign in, and there's a -- there's --
13 there's subtly differences over the years, but a
14 commonality is that it -- it has this implied
15 contrast language where it will say like, "Sync,    18:05:30
16 I'm in." And there's also my -- you know, the --
17 the behavioral designer in me is like, oh, okay,
18 this is not designed to provide actual meaningful
19 consent because, for one, the -- the button is,
20 "Yes, I'm in" or like "Okay." Like it -- it's not   18:05:50
21 leading people to actually understand what's
22 happening nor consent in a meaningful way, hence
23 it's not consent.
24       But it -- it -- it has this -- and I can
25 bring up the specific screenshot I'm -- shot I'm    18:06:01
                                          Page 273

69 (Pages 270 - 273)

1 referring to -- but it says -- when it
2 described -- it has a very short description of
3 sync. And it -- it had -- the -- the -- the few
4 words that Google has decided to put up there,
5 like when you -- when you don't have many words on    18:06:15
6 the screen, like I would imagine there's a lot of
7 thought that's put into the words, and the words
8 that Google has chosen to draw attention to paint
9 -- draw attention to this contrast.
10        Syncing, it will be personalized, there    18:06:30
11 will be browsing history collected -- I'm not
12 quoting it exact because I don't have it in front
13 of me -- the implication being that, oh, if I'm
14 not synced, a reasonable user may think, oh, if
15 I'm not synced, that means that -- that it's    18:06:43
16 private in that sense.
17        So -- so that's where I'm coming from when
18 I -- when I -- when I say this.
19    Q. A reasonable user reading the Google
20 privacy policy -- and in particular, your activity    18:06:59
21 section -- might draw the conclusion that syncing
22 affects whether Chrome browsing history is stored
23 in your Google account, but it does not affect
24 whether Google receives data reflecting your
25 activity on third-party sites and apps that use    18:07:18

Page 274

1 our services; correct?
2        MS. WEAVER: Objection. Sorry. Vague.
3 Compound.
4        You can answer.
5        THE WITNESS: So can you say -- ask your    18:07:36
6 question again, please.
7 BY MR. BROOME:
8    Q. Yeah.
9        And -- and just -- do you have the Chrome
10 priv- -- I'm sorry, the Google privacy policy in    18:07:43
11 front of you?
12    A. Yes.
13    Q. The "Your Activity" section.
14    A. Mm-hmm.
15    Q. Focusing in particular on the last two    18:07:50
16 bullets, where --
17    A. Yeah.
18    Q. -- Google refers to "Activity on
19 third-party sites and apps that use our services"
20 and "Chrome browsing history you've synced with    18:08:00
21 your Google Account" --
22    A. Yeah.
23    Q. -- correct? Okay.
24    A. Yes.
25    Q. A reasonable person could infer from the    18:08:05

Page 275

1 fact that those are broken out into two separate
2 bullets that syncing affects whether Chrome
3 browsing history is stored in your Google account,
4 but it does not affect whether Google receives
5 data reflecting your activity on third-party sites    18:08:17
6 and apps that use Google services; correct?
7    A. Are you -- are you asking me if people
8 read these two bullet points in isolation alone if
9 they would interpret that, or are you're asking me
10 if you read the -- a person -- a reasonable    18:08:34
11 personal read the privacy policy and the Chrome
12 privacy notice if they would think that?
13    Q. Well, let's just fo- -- let's start with
14 just the privacy policy.
15    A. So if you're asking me -- okay. If a    18:08:46
16 person hypothetically speaking, one, opened this
17 Chrome -- the Google privacy policy and, two, read
18 and honed in on just these two bullet points that
19 you're pointing out would they think that they're
20 kind of different categories, that's possible.    18:09:06
21 But my answer is that this is -- this is not a
22 realistic situation here.
23        So -- so effectively it's no. It's
24 just -- just a very implausible scenario.
25    Q. Is it a -- a realistic scenario that    18:09:28

Page 276

1 someone would open up the Google privacy policy
2 and just -- just read the sentence that you quoted
3 in your report?
4    A. That's not my claim.
5    Q. Is that a realistic scenario?    18:09:39
6    A. My claim is -- so my claim is that the --
7 the reason why I quoted that line is to support
8 the point -- my opinion that if you actually read
9 these disclosures it's reasonable for you to walk
10 away -- a user to walk away with the belief that    18:10:03
11 when they use Chrome in the not-synced state that
12 Google is not going to be collecting their
13 information.
14        And it's really important to contextualize
15 this, too, in saying that when a user signs in and    18:10:17
16 goes through the -- Chrome first-run
17 experience, that -- first of all, as I have
18 mentioned before, the expectations they bring to
19 the table in the first place are that the -- the
20 data that are -- information that's collected is    18:10:47
21 only going to be the information necessary for the
22 given use case.
23        So if I'm -- if I'm on the New York Times
24 and I -- and -- and I'm using Chrome as my
25 browser, my expectation without having read any of    18:11:10

Page 277

70 (Pages 274 - 277)

1  these disclosures would be that Google is not
2  eavesdropping, that it's -- Google is not
3  collecting every -- you know, the -- tracking
4  every article I click on and so on. So that's the
5  expectation to begin with.                18:11:29
6       And then -- so I'm contextualizing this,
7  because getting to these bullet points here
8  require -- it's really downstream in the funnel
9  here. So you've got these expectations. And
10 then -- okay. So suppose a user -- user downloads  18:11:40
11 Chrome for the first time and then uses Chrome for
12 the first time is taken through the first-run
13 experience. I've seen examples of -- I've
14 mentioned.
15      That experience, not only does it -- it   18:11:59
16 does not adequate -- it does not explain to people
17 what is actually happening when they do not think.
18 It actually reinforces their expectations that
19 they're not going to be tracked by a third party.
20 So that's -- there's -- this is a very strong     18:12:21
21 perspective to begin with. And in my view the
22 disclosures have to be strong enough at minimum to
23 override those expectations, and they're not.
24 That's even -- that's even assuming people read
25 these disclosures which -- again, and I've said --  18:12:42

Page 278

1  I'm saying now, I said in my report, I said
2  throughout the day -- it's very common for people
3  to not read the disclosures in the first place.
4       So -- so no. When people see these, if
5  they do, which they probably don't, I think    18:13:01
6  it's -- it's reasonable -- these -- these -- it's
7  reasonable for them to expect that when they use
8  Chrome in the not-synced state that Google --
9  their information will not be sent to Google in a
10 way that they're alleging and that I'm -- I'm    18:13:19
11 understanding to be the case.
12      Q. You mentioned several times the statements
13 that Google makes in the Chrome's first-run
14 experience, yes?
15      A. Yes.                          18:13:36
16      Q. Do people -- do Chrome users read the
17 statements that Google makes in the first-run
18 experience?
19      A. So my point is that the first-run
20 experience -- so I'm referring to when you -- the   18:13:51
21 Chrome/welcome, when you go through that, you sign
22 in, and it's been -- there's subtly different ways
23 that it's been used -- asked over the time -- over
24 time. There's some very short statements, as a --
25 a very short -- a very few words about describing   18:14:14

Page 279

1  sync.
2       Do 100 percent of people read those
3  things, probably not. There is a button there
4  that nudges people to just get on with it and
5  click "I agree." But even if people read those    18:14:32
6  disclosures -- I think they're -- they're more
7  likely to read those than a very long privacy
8  policy. If they read those, my point is that
9  those -- what is written there serves to reinforce
10 their expectation that when they're not synced     18:14:51
11 their personal information is not going to be
12 collected.
13      Q. Okay.
14      A. And -- and I also want to add as another
15 data point to what I'm saying is that -- well, let   18:15:06
16 me just answer the -- let me ask your question.
17 I've lost my train of thought. It's late in the
18 day.
19      Q. You -- you have no idea how many people
20 actually read the first-run experience statements;   18:15:25
21 right?
22      MS. WEAVER: Objection. Assumes facts not
23 in evidence.
24      Go ahead.
25      THE WITNESS: Can you restate the         18:15:35

Page 280

1  question, please.
2  BY MR. BROOME:
3       Q. You -- you don't know how many people
4  actually read the first -- the statements in the
5  first-run experience; correct?                18:15:44
6       A. My opinion doesn't hinge on the exact
7  number of people that read or don't read these
8  statements.
9       Q. Not my question.
10      Do you have any idea what percentage of     18:15:57
11 Chrome users read Google statements in the
12 first-run experience?
13      A. And -- and can you be specific on what
14 statements you mean?
15      Q. Any statements in the first run        18:16:12
16 experience, the statements you've been referring
17 to in the last -- in the last few minutes.
18      A. Uh-huh. Do I have -- have I been
19 presented with data on the percent of -- the
20 percent of people that have read these?         18:16:28
21      Q. Or have you done any -- any other research
22 that would allow you to opine as to the percentage
23 of people --
24      A. Right.
25      Q. -- approximately who read the statements   18:16:39

Page 281

71 (Pages 278 - 281)

1  in the first-run experience?
2    A.  So, no, I don't have data on that.  I --
3  importantly, the conclusions that I have reached
4  do not hinge on such data.
5    Q.  Okay.                      18:16:55
6    A.  And -- and -- and -- and -- and there's --
7  what I want to underscore, there's no statement in
8  this first-run experience explicitly in a way
9  that's comprehensible to people describes what
10  people are doing.  It doesn't say, for example,    18:17:12
11  "By the way, even when you're not synced, Google
12  is still collecting your information."  It doesn't
13  say that.
14        So there's no -- like how can you possibly
15  give consent if you don't know what you're    18:17:29
16  consenting to?  In fact, you're -- you have --
17  it's not just that you don't know; it's that
18  you -- for the reasons I've mentioned already you
19  actually come to the table thinking the opposite.
20        And -- and the Plaintiffs, what they're    18:17:45
21  saying -- and they represent the class -- is --
22  is -- is consistent with this.  They -- they --
23  they believe -- and I -- they have good reason to
24  believe, based on what I'm -- I'm saying here in
25  my analysis of the science behind it -- is that    18:18:02

Page 282

1  when they're not synced, their information is not
2  going to be collected in the way that it actually
3  is, as I understand it to be.
4    Q.  Going back to the privacy policy, "Your
5  Activity" section.  It would not be Google --    18:18:25
6        MS. WEAVER:  You mean the -- I'm sorry.
7  You mean the Google privacy policy or the Chrome
8  privacy policy?
9        MR. BROOME:  The Google privacy policy.
10  BY MR. BROOME:                    18:18:34
11    Q.  It should -- I think it should still be up
12  on your screen there.  You got it, "Your Activity"
13  section?
14    A.  What -- sorry, what exhibit are we
15  referring to?                    18:18:46
16    Q.  The Google privacy policy, I think it's
17  12.
18    A.  Exhibit 12.  Okay.
19    Q.  We were discussing the "Your Activity"
20  section.                        18:19:00
21    A.  Remind me what page that was on.
22    Q.  It's on, I think, the third page, ends
23  with Bates Number '1208.
24    A.  Okay.  Yes.
25    Q.  Again, focus -- focusing on those two    18:19:19

Page 283

1  bullets, do you agree that it would be
2  unreasonable to interpret the -- those bullets to
3  mean that Google receives data reflecting activity
4  on third-party sites and apps that use our
5  services -- services only if a Chrome user enables    18:19:34
6  sync?  That's a complicated --
7    A.  That's a complicated --
8        MS. WEAVER:  Objection.  Compound.
9        (Interruption in audio/video.)
10        THE COURT REPORTER:  I'm sorry, I didn't    18:19:51
11  the last -- I didn't hear you, Counsel.
12        MS. WEAVER:  Compound.  Double negative.
13        THE WITNESS:  Can you unpack the question,
14  please.
15  BY MR. BROOME:                    18:20:03
16    Q.  It would not be reasonable for somebody
17  reading this section of the privacy policy to
18  believe that Google receives activity on
19  third-party sites and apps that use our services
20  only if a user enables sync; do you agree?    18:20:19
21    A.  Do I agree --
22        MS. WEAVER:  Same -- same objection.
23        THE WITNESS:  Do I agree that it would not
24  be reasonable -- I'm sorry, I find the question
25  very consume -- very confusing.  It has -- not    18:20:37

Page 284

1  reasonable, and it's just -- also, it's -- it's
2  foreign from my assignment question.  So I'm -- I'm
3  struggling to understand, try as I might.
4  BY MR. BROOME:
5    Q.  Well, let me ask you this:  Did you    18:20:52
6  consider this bullet that -- that describes
7  activity on third-party sites and apps that use
8  our services in forming your opinions in this
9  case?
10    A.  I considered the Google privacy policy as    18:21:06
11  a whole, and I considered what was in it.  And
12  when coming to my opinion, you know, I -- I read
13  this -- I read the Google privacy policy in
14  detail.  It took a long time, which is part of the
15  point.  It's unreasonable for people to read this    18:21:28
16  because it's -- it's an overwhelming amount of
17  information, especially when you contextualize it
18  with the -- the number of -- sheer number of
19  privacy policy notices we encounter on a
20  day-to-day basis.                  18:21:47
21        So -- so I considered the information that
22  is in the privacy policy, yes.  And the conclusion
23  I came to is that as a -- as a whole,
24  holistically, if you -- the conclusion is that if
25  a consumer actually read the privacy -- Google    18:22:07

Page 285

72 (Pages 282 - 285)

1  privacy policy or the Chrome privacy notice, which
2  is a -- like I said, it's a very common not to
3  read these things -- but they did -- and that's
4  why I read them in detail -- it's rea- -- my
5  conclusion is that it's reasonable for people to      18:22:25
6  use Chrome in the not-synced state and think that
7  Google will not collect their personal
8  information.
9      Q.  Did you consider whether these bullets are
10  describing different data collection processes?    18:22:42
11      MS. WEAVER:  Objection.  Vague.
12      THE WITNESS:  So there are some apparent
13  contradictions between the various documents -- the
14  Google privacy policy, the Chrome privacy notice --
15  that -- as I was going through struck me and      18:23:02
16  contributes to my opinion in that it -- it makes it
17  hard to -- so I -- the opinion that it's -- it's
18  not clear -- these -- these notices are not clearly
19  describing in a way that is readily comprehensible
20  to people.  They're not describing what is actually   18:23:24
21  happening the data that are collected when Chrome
22  users are in the not-synced state.
23      And on top of that, there are things in
24  here that actually make it seem like the opposite
25  is happening, or rather not happening in the sense   18:23:43

Page 286

1  any Google disclosure -- they don't read the
2  first-run experience, they don't read the privacy
3  policy, Chrome privacy notice, they don't read
4  anything Google says -- that would be a pretty
5  common scenario; correct?      18:25:19
6      A.  If you don't read anything -- so like are
7  people just blind -- like -- I'm sorry, it's a --
8  I -- I think that is a -- can you reask the
9  question?
10      Q.  Yeah.      18:25:44
11      It's quite common -- it would be quite
12  common for people to read -- to -- to start using
13  Chrome without reading anything Google says about
14  Chrome; correct?
15      A.  That's not what I'm saying.      18:25:58
16      Q.  But don't you agree that that would be
17  quite common?
18      A.  So people do read some stuff because
19  they're looking at the screen and they're going
20  through the process.  Like they're -- they're      18:26:07
21  not -- they're not not reading anything.
22      Q.  It would be common for people not to read
23  anything; right?  They just -- they -- they just
24  click through and don't read anything Google says
25  about Chrome.  That would be --      18:26:25

Page 288

1  that make it -- reinforce this belief that people
2  come into this interaction with that Google is not
3  going to be eavesdropping on them.
4      And so when I -- when I -- when I have
5  some specific examples, it's to make that point.    18:23:57
6  It's -- it's not to say, "Oh, my opinion is based
7  only on this isolated part that people only read
8  this -- if they were to read it, they only read
9  this one isolated part."  That's not what I'm
10  saying.  I'm quoting the privacy policy and the    18:24:12
11  Chrome privacy notice to support my holistic
12  opinion on the matter.
13      MS. WEAVER:  Hey, Steve, we're getting, I
14  think, dangerously close to the end of the sand --
15  the drops of sand in your timer.      18:24:43
16      David, can you tell us how much time is
17  left?  And I'll cede the minute it takes for him to
18  tell you.
19      THE VIDEOGRAPHER:  Six hours and
20  50 minutes; so 10 minutes.      18:24:58
21      MS. WEAVER:  Okay.
22  BY MR. BROOME:
23      Q.  If -- if a -- if a user -- a consumer, a
24  user, whichever you want to use -- let's --
25  let's -- let's say a Chrome user -- never reads    18:25:04

Page 287

1      MS. WEAVER:  Objection --
2  BY MR. BROOME:
3      Q.  -- common; correct?
4      MS. WEAVER:  Objection.  Foundation.
5  You -- you earlier testified, Steve, that      18:26:27
6  millions of people --
7      MR. BROOME:  Thank you, Lesley.
8      THE COURT REPORTER:  I can't hear you.
9      MR. BROOME:  Thank you, Lesley.
10      THE COURT REPORTER:  I can't hear you.
11      MR. BROOME:  That's enough.
12      THE COURT REPORTER:  And, Counsel -- I
13  can't hear you, Counsel.
14      MS. WEAVER:  And I'll state my -- I'll
15  restate my objection.  Foundation.  Steve, you      18:26:39
16  previously were testifying that Google does that.
17  Are you now testifying again?
18      MR. BROOME:  It's inappropriate, Lesley,
19  and you know it.
20      MS. WEAVER:  You -- I'm quoting from you,    18:26:52
21  "It would be common for people to not read
22  anything."
23      MR. BROOME:  It would be common --
24      MS. WEAVER:  I move to strike.
25      MR. BROOME:  Okay.  Opposed.  Great      18:26:57

Page 289

73 (Pages 286 - 289)

1  motion.
2  BY MR. BROOME:
3      Q.  It would be common for users to use -- to
4  use Chrome without reading any statements by
5  Google; correct?                        18:27:05
6          MS. WEAVER:  Objection.  Foundation.
7  Assumes facts not in evidence.
8          THE WITNESS:  So I guess I don't know what
9  you mean by reading nothing.  I mean, you can't --
10  you can't use Chrome or the internet -- or the    18:27:18
11  internet if you -- if you're not --
12  BY MR. BROOME:
13      Q.  That's not -- that's not what I mean.
14      You --
15      A.  I -- I mean, serious, like when you say    18:27:25
16  not reading anything, like I -- we're being very
17  precise here; right?  So I'm -- I'm saying that's
18  not plausible.
19      Q.  You could use Chrome --
20      A.  You read -- you read stuff that's on the    18:27:37
21  screen.
22      Q.  You could use --
23      A.  Not all of it.
24          THE COURT REPORTER:  I can't -- I can't --
25  excuse me one second, please.  One at a time.    18:27:44

Page 290

1  BY MR. BROOME:
2      Q.  You could use Chrome without reading any
3  statements by Google about sync; correct?
4          MS. WEAVER:  Objection.  Assumes facts not
5  in evidence.                            18:27:54
6          THE WITNESS:  Can you restate the
7  question, please.
8  BY MR. BROOME:
9      Q.  It would be quite common for people to use
10  Chrome without reading anything Google says about    18:28:04
11  sync; correct?
12      A.  No.  I don't agree with that statement.
13      Q.  Okay.  And why do you disagree with that
14  statement?
15      A.  So the statement you asked me, it's quite    18:28:18
16  common for people to not read anything about sync.
17  And -- and like -- so when -- I -- I pointed to
18  the -- the first-run experience, for example.
19  When you go through that, there's a sync button.
20  It -- it invokes sync.  And then there's a text    18:28:41
21  about sync.  And so that's why I don't think it's
22  realistic what you're saying.  That's why I
23  disagreed with the premise that you advanced.
24      Q.  Okay.  If you didn't read any -- any --
25  well, withdrawn.                        18:29:03

Page 291

1      It -- it -- it would be -- a reasonable
2  person -- no, also withdrawn.
3      If -- if a person didn't read any of
4  Google's disclosures about sync, they -- it would
5  be reasonable for them to think that sync doesn't    18:29:21
6  affect whether Google receives data; correct?
7          MS. WEAVER:  Objection.  Vague.
8          THE WITNESS:  Can you maybe unpack.
9  There's a lot of ifs in there.
10  BY MR. BROOME:                          18:29:36
11      Q.  Yeah.
12      Some people might not read anything Google
13  says about Chrome sync feature.
14      Do you agree with that?
15          MS. WEAVER:  Objection.  Vague.    18:29:50
16          THE WITNESS:  I guess what would be
17  helpful to me is if you -- can we point to a
18  specific document if you want to ask like are
19  people -- is my opinion that people read or don't
20  read this?  It's a bit abstract right now to --    18:30:01
21  to -- to entertain these hypotheticals.
22  BY MR. BROOME:
23      Q.  In your opinion would it be reasonable for
24  a user to use Chrome in the not-synced state and
25  think that Google will still collect personal    18:30:20

Page 292

1  information?
2      A.  Would it be possible to look at the
3  first-run experience and make it -- like that, I
4  feel it would put my trac- -- some traction on
5  what I'm trying to say here.              18:30:33
6      Q.  Does you answer depend on looking at the
7  first-run experience?
8      A.  Can you restate the question, please.
9      Q.  Does you're an- -- the -- the -- my prior
10  question?                               18:30:42
11      A.  Yeah, the -- yes.
12      Q.  Is it al- -- is it -- would it -- would it
13  be reasonable for a user to use Chrome in the
14  not-synced state and think that Google will
15  collect personal information?            18:30:52
16      A.  Is it reasonable for a consumer to use
17  Chrome in the not-synced state and think that a
18  user -- that Google will collect personal
19  information?  So --
20      Q.  Let me -- let me -- actually, let me    18:31:06
21  phrase -- rephrase the question.
22      A.  Okay.
23      Q.  Would it be reasonable for a user to use
24  Chrome in the not-synced -- in a not-synced state
25  and think that Google will receive personal    18:31:14

Page 293

74 (Pages 290 - 293)

1  information when they browse the web?
2      A.  And can you tell me what you mean by
3  "personal information"?
4      Q.  Great question.
5          The same personal information that's at    18:31:25
6  issue in this case.
7      A.  So when someone uses -- so do you mean
8  like -- because as I understand it, Google
9  collects -- it's in the Complaint, the nature of
10  the information, but then there's also -- like    18:31:51
11  Google does stuff with those data, like make
12  profiles, put people into buckets.  And that's all
13  personal information, too.  It's information about
14  people.  There's a lot of information we're
15  talking about here, like information and its    18:32:06
16  derivatives.
17      Q.  Well, let me just clarify.  I'm just
18  trying to get at the converse of -- of one of the
19  opinions that you've offered in the case, which is
20  that --                    18:32:15
21      A.  Mm-hmm.
22      Q.  -- it would be reasonable for a Chrome
23  user to think that Google will not receive
24  personal information if they use Chrome in a
25  not-synced state.            18:32:23

Page 294

1      Would it also be reasonable for a user to
2  think that Google will receive personal
3  information when they're using Chrome in the
4  not-synced state?
5      A.  Would it -- so is it -- so I think it's --  18:32:42
6  as I said, when -- like I -- it's -- it's an
7  unlikely thing you're asking me about in the
8  sense of like -- I think that people, like they're
9  not expecting -- so if they didn't -- if they
10  didn't read any of -- they didn't read the privacy    18:33:02
11  policy or the -- or the Chrome privacy notice, is
12  it -- is it reasonable -- would a -- would a
13  reasonable person think that when they used Chrome
14  in the not-synced state that Google is going to be
15  collecting the information that it collects?  No.    18:33:18
16  No, people are not expecting that.
17      Q.  Okay.
18      A.  And -- and -- and the reason, it's all --
19  it's supported by the research that I talk about
20  that I've done and others have done that I talk    18:33:32
21  about in my -- in my opinion and -- and cite
22  extensively.
23          MR. BROOME:  All right.  I'm going to pass
24  it to Lesley and reserve whatever time I have left
25  to ask questions on redirect.        18:33:44

Page 295

1          MS. WEAVER:  I think you have two minutes.
2          MR. BROOME:  All right.
3      Well, hopefully -- hopefully you
4  limit your questions --
5          MS. WEAVER:  We'll take a qu- -- we'll    18:33:53
6  take a quick break.
7          MR. BROOME:  Okay.
8          THE WITNESS:  Okay.
9          THE VIDEOGRAPHER:  Okay.  Let's go off the
10  record at 6:33 p.m., Eastern Time.        18:33:58
11      (Short recess taken.)
12          THE VIDEOGRAPHER:  We are back on the
13  record at --
14          MS. WEAVER:  Welcome back --
15          THE VIDEOGRAPHER:  -- hold on --        18:46:54
16          MS. WEAVER:  Okay.
17          THE VIDEOGRAPHER:  -- 6:46 p.m., Eastern
18  Time.
19      Go ahead.
20          MS. WEAVER:  Thank you.        18:47:00
21      Thank you, Professor John, for your
22  testimony today.  I know it's been a long day.
23          EXAMINATION
24  BY MS. WEAVER:
25      Q.  I want us to return to some documents that    18:47:07

Page 296

1  were put before you by Mr. Broome.
2      Do you recall Exhibit 8?
3      A.  Well, Exhibit 8 was the paper "What Is
4  Privacy Worth?", I believe; right?
5      Q.  Yes.                18:47:27
6      A.  Yes.
7      Q.  Do you recall what year you wrote this?
8      A.  It was a while ago.  Let me check the
9  date.  It was published, it looks like, in 2013.
10      Q.  Okay.  What was the purpose of this    18:47:39
11  article?
12      A.  Mm-hmm.
13      Q.  What was the purpose of the study that you
14  engaged in?
15      A.  Yeah.  So the purpose was to critique a    18:47:46
16  common methodology for thinking about how people
17  value their privacy.  And that is the revealed
18  preferenced way of thinking about val- -- how much
19  people value their privacy.
20          And so the point of the paper is to say    18:48:04
21  that if you use revealed preferences; that is,
22  trying to infer the value people place on their
23  privacy merely by looking at their actions, if you
24  use the revealed preference method or perspective,
25  then it would lead you to incorrectly conclude    18:48:21

Page 297

75 (Pages 294 - 297)

1  that people don't care about their privacy.

2     So -- so -- so that's the -- the point of

3  the paper. It's -- it's -- importantly it's --

4  it's not saying that privacy cannot be valued.

5  It's not saying that there are no ways that   18:48:36

6  economists -- that -- that it's unquantifiable.

7  That's not what it's saying. It's -- it's merely

8  critiquing this common method.

9    Q.  And is it -- when you use this particular

10  kind of privacy preference alone, is that what you  18:48:50

11  were critiquing?

12     MR. BROOME: Objection --

13     THE WITNESS: Like --

14     MR. BROOME: -- leading.

15     THE WITNESS: So to -- to reiterate, we're  18:49:01

16  saying in this paper that relying -- we're pointing

17  out a flaw in the revealed preference argument for

18  trying to value people's privacy. And we're saying

19  that you can't just rely on people's behavior,

20  revealed preferences, to -- to attempt to quantify  18:49:19

21  the economic value of their personal information.

22  BY MS. WEAVER:

23    Q.  Is it your understanding that there are

24  methodologies that can be used to determine the

25  value of --          18:49:31

Page 298

---

1     (Interruption in audio/video.)

2     THE COURT REPORTER: I'm sorry, what was

3  the last word? Excuse me. One second.

4  BY MS. WEAVER:

5    Q.  -- privacy?        18:49:44

6     MR. BROOME: Objection.

7     THE WITNESS: Can I answer?

8  BY MS. WEAVER:

9    Q.  I'll just restate it.

10     Is it your understanding that there are  18:49:51

11  methodologies that can be used to determine the

12  value of con- -- of consumer's privacy?

13     MR. BROOME: Objection to form.

14     THE WITNESS: Yes.

15     Sorry, I talked over you, Mr. Broome.  18:50:00

16     MS. WEAVER: I think --

17     MR. BROOME: That's okay.

18  BY MS. WEAVER:

19    Q.  I'll try it again.

20     Is it your understanding that there are  18:50:07

21  methodologies that can be used to determine the

22  value of consumers' privacy?

23     MR. BROOME: Object to the form.

24     THE WITNESS: So, yes, there are ways of

25  assessing the value of people's personal  18:50:24

Page 299

---

1  information.

2     In this article, we're merely pointing out

3  that a common way of thinking of this revealed

4  performance notion is you can't just rely on that

5  to make valuations.       18:50:39

6     So -- so the answer is, yes, there are

7  ways that economists value people's personal

8  information. And, in fact, when you -- like

9  there's -- there's a marketplace for data. The --

10  there's a -- there's an exchange happening  18:50:52

11  regularly behind the scenes. There's -- that's

12  evidence that, you know, you can value it.

13  BY MS. WEAVER:

14    Q.  And when you're referring to "value," do

15  you mean economic value as well as other intrinsic  18:51:04

16  value?

17    A.  So you can quantify -- there are methods

18  that people use -- this is not my expertise, but I

19  am aware that there are methods that people use to

20  quantify the economic value of people's personal  18:51:18

21  information.

22     MR. BROOME: I didn't want to interrupt,

23  but object to form and foundation.

24  BY MS. WEAVER:

25    Q.  Okay. And that's based in part on the --  18:51:25

Page 300

---

1  well, strike that.

2     At page 251, there's a sentence that says,

3  "The roots of economic research on privacy focus

4  on privacy as the concealment of (mainly negative)

5  personal information." [As read]    18:51:45

6     Do you see that?

7    A.  What paragraph's that?

8    Q.  I'm sorry. It's page 251, the full -- the

9  first full paragraph.

10    A.  Okay.         18:51:54

11    Q.  I'll read it into the record again. "The

12  roots of economic research on privacy (which can

13  be found in the seminal writings of scholars such

14  as" [as read] --

15     (Interruption in audio/video.)   18:52:18

16     THE COURT REPORTER: Excuse me. Counsel?

17     MS. WEAVER: Yes.

18     THE COURT REPORTER: I can't hear you very

19  at all. I can't make out your words.

20  BY MS. WEAVER:       18:52:24

21    Q.  "The roots of economic research on privacy

22  (which can be found in the seminal writings of

23  scholars such as Richard Posner and George

24  Stigler) focus on privacy as the concealment of

25  (mainly negative) personal information (Posner  18:52:36

Page 301

---

76 (Pages 298 - 301)

1  1978)." [As read]
2      Do you see that?
3      A.  Yes.
4      Q.  Your paper cites that; correct?
5      A.  Yes.                        18:52:46
6      Q.  And so you have a basic understanding of
7  how long economic research on the value of privacy
8  has been a subject of methodology and research?
9          MR. BROOME:  Object to the form and
10 foundation.                         18:52:57
11         THE WITNESS:  Well, so we're citing -- the
12 roots of the economic research on privacy go way
13 back.  These -- there's -- these are very old
14 cites.
15 BY MS. WEAVER:                       18:53:12
16     Q.  And it's your understanding that today
17 methodologies are in practice to assess the
18 economic value of user privacy; is that --
19         (Interruption in audio/video.)
20         THE COURT REPORTER:  Excuse me.  I didn't   18:53:21
21 hear the last word.
22 BY MS. WEAVER:
23     Q.  -- right?
24         MR. BROOME:  Object to the form.  Leading
25 and -- and lack of foundation.      18:53:31

Page 302

1      THE WITNESS:  So there are -- my
2  understanding is that this is something that
3  economists -- scholarly economists, practitioners,
4  look at all the time these days is quantifying
5  personal information, quantify -- there's   18:53:48
6  economic -- there are economic tools at our
7  disposal to quantify the value of people's personal
8  information.  And, in fact, supporting this like
9  data are bought and sold, there's a marketplace for
10 it.                                 18:54:06
11 BY MS. WEAVER:
12     Q.  Then looking at page 254, do you see the
13 sentence "Often, this literature has shown that
14 privately valuations are low"?  Do you see that?
15         MR. BROOME:  Where are you, Lesley?   18:54:17
16         MS. WEAVER:  Page 254, about 15 lines
17 down.
18         THE WITNESS:  What was it again?
19 BY MS. WEAVER:
20     Q.  It's --                    18:54:31
21     A.  The first paragraph?
22     Q.  Yeah, it's the first paragraph.  And I
23 will re-ask it.  It's right before --
24         (Interruption in audio/video.)
25         THE COURT REPORTER:  "It's right before"   18:54:43

Page 303

1  what?
2  BY MS. WEAVER:
3      Q.  "Often" -- "Often, this literature has
4  shown that privacy valuations are low."
5      Do you see that?             18:54:49
6      A.  Yes.
7      Q.  Okay.
8          THE COURT REPORTER:  Counsel, I need to go
9  off the record, please.
10         MS. WEAVER:  I -- I want us to continue   18:55:01
11 because we have to get out of here.
12         THE COURT REPORTER:  I'm sorry, I can't
13 report then.  I'm sorry.  I need to go off the
14 record.
15         MS. WEAVER:  Okay.  We'll go off the   18:55:06
16 record.
17         (Off the record.)
18         THE VIDEOGRAPHER:  We are on the record at
19 6:55 p.m., Eastern Time.
20     Go ahead.                       18:56:44
21 BY MS. WEAVER:
22     Q.  And returning to the document, at
23 page 254, I will back up and refer to a sentence
24 that says, "Chellappa and Sin (2005) also find
25 evidence of a trade-off between consumer valuation   18:57:06

Page 304

1  for personalization and concerns for privacy."
2      Do you see that?
3      A.  Yes.
4      Q.  What is understanding of what that means?
5          MR. BROOME:  Object to the form.      18:57:21
6          THE WITNESS:  My understanding -- sorry,
7  I'm looking at the sentence again here.
8      So I'm re-- -- we're referring to
9  literature that seems to conclude that people's
10 privacy valuations are low.  Yeah.  I -- I don't   18:57:47
11 know if that answers your question.
12 BY MS. WEAVER:
13     Q.  That -- that's fine.
14     So did you, in fact, review a fair amount
15 of methodology for economic research in preparing   18:58:04
16 this paper?
17     A.  So this paper cites a variety of prior
18 work where scholars have used different
19 methodologies to ascertain -- put an economic
20 value on people's privacy.          18:58:28
21     Q.  Okay.  And let's turn for a moment to
22 Exhibit 9.
23     A.  Okay.
24     Q.  Do you recall Exhibit 9?
25     A.  Yes.                       18:58:57

Page 305

77 (Pages 302 - 305)

1    Q.   What is it?
2    A.   So Exhibit 9 was research that we did to
3  understand people's privacy expectations when it
4  comes to how their information is collected and
5  used in the online context of being [verbatim]    18:59:19
6  allowed for advertising.
7        And this is very relevant to the context
8  that we're looking at in this case.
9    Q.   Why is it relevant?
10   A.   Because, as I understand it, Google is    18:59:35
11 taking information from people as -- the types of
12 information described in the Complaint, and then
13 using this information to build profiles to put
14 people into buckets, to make inferences about
15 people, for the purpose of selling ads.    19:00:01
16       You know, that's my understanding.  That's
17 how -- that's Google's business model, is its
18 primary source of revenue is advertising.  So
19 that's why Google is -- is taking the information.
20       And -- and what we are looking at is what    19:00:13
21 are people's expectations of what is acceptable
22 and unacceptable to take, what's privacy invasive.
23       And what we found was very consistent in
24 the sense that there's -- there's two things -- we
25 identified two things that people find invasive of    19:00:39

Page 306

1  their privacy.
2        One activity is third-party -- is
3  third-party collection and sharing.  So that
4  would -- that's akin to what's going on here, as I
5  understand it, where Google -- so a user is using    19:00:54
6  Chrome to browse a website, and Google is a third
7  party to that.  Google is -- is taking information
8  as a third party.  And that's distinctly one of
9  the things that people -- they don't expect to
10 have happen.  And they, therefore, find it privacy    19:01:11
11 invasive.
12       The second thing that we ar- -- articulate
13 in this paper is that people find it invasive of
14 their privacy to make inferences about them based
15 on information that was collected, even if those    19:01:27
16 inferences are accurate.
17       And so, as I understand it, this is also
18 going on here, in the sense that I understand that
19 Google collects information and then combines it,
20 makes inferences about people, puts people into    19:01:43
21 categories, build profiles, and so on.
22       And so this is something that we found
23 that -- another general thing that people find --
24 they don't expect and they find it to be privacy
25 invasive.    19:01:59

Page 307

1    Q.   So assuming that that kind of collection
2  and inference drawing and then use is happening in
3  this case, your conclusion would be consistent
4  with your conclusion in this paper if you were
5  asked to render it, that that kind of collection    19:02:12
6  is highly invasive; is that right?
7        MR. BROOME:  Object to the form.  Leading
8  and lacks foundation.
9        THE WITNESS:  Yes.
10 BY MS. WEAVER:    19:02:30
11   Q.   I'll ask you to look at page -- it's
12 page 920 of the article, but ends at Bates number
13 '945, and I think this will partly address the
14 foundation objection.
15       I'll read into the record where you wrote,    19:02:48
16 "For example, had Target understood and adhered to
17 these norms, it could have avoided the
18 now-infamous case of sending targeted,
19 pregnancy-related coupons based on inferred
20 information."    19:03:05
21       Do you see that?
22   A.   Yes.
23   Q.   So what do you recall about that specific
24 instance about Target collecting -- sending
25 targeted pregnancy-related coupons based on    19:03:20

Page 308

1  inferred information?
2    A.   So the -- what we're talking about here is
3  Target was doing something that -- making
4  inferences, so that's something that people
5  find -- they don't expect and they find privacy    19:03:40
6  invasive.  And Target was not revealing.  It was
7  doing this behind the scenes, underhandedly.
8  It -- it was not revealing -- making transparent
9  to people what it was doing.
10       And so when it was discovered, that Target    19:03:54
11 was doing, this backlash ensued.  And this is the
12 point that -- it supports this idea that what we
13 found here is that --
14       (Interruption in audio/video.)
15       THE WITNESS:  -- people find it invasive    19:04:10
16 of their privacy when firms make inferences about
17 them.
18 BY MS. WEAVER:
19   Q.   Do you see the sentence "A perfectly
20 targeted ad can be rendered ineffective if    19:04:24
21 unsavory practices that underlie it are exposed"?
22       Do you see that?
23   A.   Yes.
24   Q.   And is that your conclusion?
25   A.   "A perfectly targeted ad can be rendered    19:04:42

Page 309

78 (Pages 306 - 309)

1 ineffective if unsavory practices that underlie it
2 are exposed," yes.
3    Q.  And -- and is it your testimony that the
4 kind of unsavory practices you referred to in this
5 report are similar to the practices you have seen    19:04:59
6 in this case?
7    MR. BROOME:  Object to the form.  Leading.
8    THE WITNESS:  So, as I've stated -- I -- I
9 think as I've stated, as I understand it, Google is
10 engaging in the practices that people find    19:05:12
11 unsavory, as in I understand Google to be acting --
12 taking data as a third party.
13    So if I'm a Chrome user and I'm on a
14 website, Google is taking data, so Google is
15 tak- -- is the third party.  So that's one of the    19:05:29
16 things that people find unacceptable.
17    And then the second is I understand that
18 Google is making inferences about people, and that
19 is also something that people find unsavory.
20 BY MS. WEAVER:    19:05:47
21    Q.  Now, Exhibits 9 and 10, are they -- I'm
22 sorry, 8 and 9 -- let me start over.
23    Professor John, are Exhibits 8 and 9, the
24 articles about what you just testified, peer
25 reviewed?    19:06:02

Page 310

1 collection that we've been talking about in this
2 case, which is information that is collected, in
3 my opinion -- that -- outside of people's con- --
4 without people's consent.  They're not actively
5 sharing in -- with consent.  They're -- they're    19:07:58
6 not giving consent.
7    Q.  And, in fact, you read the plaintiffs'
8 depositions and declarations in this case, didn't
9 you?
10    A.  Yes.    19:08:08
11    Q.  What's your understanding of whether or
12 not they thought they were disclosing anything to
13 third parties?
14    A.  So the plaintiffs, my understanding of
15 what they're doing is they're not actively    19:08:24
16 disclosing -- volitionally disclosing information
17 in the sense of what we're talking about here.
18    The data are being collected from them
19 without their consent.
20    Q.  Finally, do you recall testifying    19:08:35
21 regarding what Google might do to improve its
22 disclosures in this case?
23    A.  Yes.  And I would like to add that -- so a
24 question was presented to me about how Google
25 could improve its disclosures, and I would say    19:08:59

Page 312

1    A.  Yes, these articles are peer reviewed.
2    Q.  Now we'll turn to Exhibit 10.  Is this the
3 final form of Exhibit 10?
4    A.  No.
5    Q.  Was it peer reviewed?    19:06:30
6    A.  I would call it peer reviewed like in the
7 sense that a [verbatim] editor read it and gave us
8 feedback, and we subsequently revised it.
9    But the full peer-review process to which
10 the other two exhibits, 8 and 9, those were    19:06:54
11 subject to the full standard peer-review process
12 whereby the manuscript is sent out to multiple
13 independent scholars in the field that are blinded
14 to us.  And then it has multiple rounds of us
15 addressing those peer reviews, in addition to an    19:07:07
16 editor, whereas this paper only had the editor,
17 who is not anonymous to us, giving us suggestions.
18    Q.  Can you differentiate the self-disclosing
19 that you describe in this article from what you
20 understand to be happening in this case?    19:07:24
21    A.  Yes.
22    So when we say "active disclosure" here,
23 we're talking about volitional self-disclosure
24 that a -- a person volitionally reveals.  And this
25 stands in contrast to the nature of the data    19:07:42

Page 311

1 Google can change its disclosures so that it's
2 actually disclosing in a way that is readily
3 comprehensible to people what is actually being
4 collected when they're not synced.
5    Another option would be Google could stop    19:09:15
6 collecting the information that it -- the
7 plaintiffs are alleging and, as I understand,
8 Google to be collecting when they're not synced,
9 so that it aligns with how people would -- so it
10 aligns with the privacy disclosures.    19:09:34
11    MS. WEAVER:  Thank you.  That's all I have
12 for now.
13    FURTHER EXAMINATION
14 BY MR. BROOME:
15    Q.  Just very briefly, Professor John, when    19:09:41
16 you were asked questions about Exhibit 9, that's
17 the "Why Am I Seeing This Ad?" --
18    A.  Yes.
19    Q.  -- piece, you were -- I -- I think you --
20 you said that people find it invasive of their    19:10:00
21 privacy when firms make inferences about them.
22 And people find -- find it invasive of their
23 privacy when firms share their data with third
24 parties.
25    Is that correct?    19:10:16

Page 313

79 (Pages 310 - 313)

1    A. Sorry, say that again.
2    Q. I -- I thought you -- well, I mean, I
3  thought you had testified that the -- your
4  research -- the research that you conducted in
5  connection with the article in Exhibit 9 found          19:10:30
6  that people find it invasive of their privacy when
7  firms make inferences about them and when firms
8  share their -- people's personal information with
9  third parties.
10      Is that accurate?                                19:10:49
11    A. So -- okay. I relied on -- so this
12  article where we articulate that people find it
13  invasive of their privacy when their data are
14  collected, third parties -- by third parties and
15  they also find inference making about them          19:11:17
16  invasive of their privacy.
17    Q. Okay. And the way you tested that or --
18  or reached those conclusions was by conducting --
19  at least part of the way -- was by conducting a
20  survey; right?                                        19:11:31
21    A. So to reach those conclusions, we -- yes,
22  we -- we did a series of experiments. We also did
23  a survey. We also -- it's also reliant -- it's
24  scaffolded on prior work, which is not all
25  survey-based research, to lay out the argument --      19:11:50

Page 314

1  we -- we cite all this stuff in the introduction.
2    Q. All right.
3    A. But we -- we rely on -- to -- to make
4  these conclusions that I'm making, it relies on
5  multiple methodologies, surveys, experiments; it      19:12:04
6  includes that.
7      It also includes -- the Plaintiffs'
8  testimony is -- is part of my opinion and so on.
9    Q. Okay. If -- if you just -- if you look at
10  '936 -- I'm sorry, I'll -- I'll use the actual        19:12:20
11  page numbers of the article, the journal article;
12  it's 911.
13    A. Yes, I'm at 911.
14    Q. And you describe a procedure there.
15  And -- and it looks to me like you're describing       19:12:44
16  a -- a survey where you asked people -- you showed
17  people various stimuli and you asked them strongly
18  agree, and that would be a 1, and there would be a
19  range of -- up to completely agree, which would be
20  a 7; correct?                                         19:12:58
21    MS. WEAVER: I'm sorry, Steve, where are
22  you?
23    MR. BROOME: 911, under "Procedure,"
24  "Study 1" [as read].
25  BY MR. BROOME:                                        19:13:19

Page 315

1    Q. Are you with me, Professor John?
2    A. Yes.
3    Q. Yeah. And -- and is that -- is that --
4  that's a pretty standard methodology for
5  conducting a survey to show people various          19:13:27
6  statements and then ask, you know, do you agree?
7  And there's a range from 1 to 7, 1 being strongly
8  agree?
9    A. So, yeah, we did a survey here, and the
10  sur- -- in the survey we presented people with        19:13:38
11  statements and we asked them the extent to which
12  they agree or disagree. And other people have
13  used, you know, simi- -- like asked people to rate
14  on a scale of 1 to 7. That's used in survey
15  research, yes.                                        19:13:52
16    Q. Right.
17      And then you see at the end there, end of
18  that section or right before the "Discussion,"
19  there's a -- a paragraph that says, "Participants
20  thought that firms should not use information          19:14:01
21  obtained cross-website" [as read]?
22    A. Yes.
23    Q. And then -- and then it lists some
24  numbers.
25      And what you did there, you're -- you're      19:14:10

Page 316

1  taking an average of the -- of the responses;
2  correct?
3    A. No. They're means. Yes.
4    Q. Sorry. Yeah, okay.
5      You took the mean of the responses because  19:14:19
6  when you show -- when you conducted the survey,
7  you got a range of answers from 1 to 7, and then
8  you took the mean to -- to get the results that
9  are reflected in -- in the paragraph I just
10  referenced; right?                                    19:14:36
11    A. This paragraph reports means as is very --
12  it's a -- it's probably the most common
13  descriptive statistic --
14    MS. WEAVER: So, Steve, I'm going to --
15    THE WITNESS: -- and then my --            19:14:48
16    MS. WEAVER: Oh, I'm sorry.
17    THE WITNESS: Sorry. I'm finishing.
18    MS. WEAVER: Finish your answer, please.
19    THE WITNESS: We report the means here,
20  yes.                                                19:14:54
21    MS. WEAVER: Steve, you're well over your
22  allotted two minutes that you reserved.
23    MR. BROOME: Okay.
24    MS. WEAVER: And this is not a subject on
25  which I cross-examined her. So it's out of scope

Page 317

1  doubly.  I'll allow you to finish -- ask a few more
2  questions, but then I think we're done.
3          MR. BROOME:  That's fine.  I'm done.
4  Thank you, Lesley.
5          MS. WEAVER:  Okay.  Great.  Thank you very
6  much.
7          Thanks to everybody for all of your hard
8  work today.
9          MR. BROOME:  Thanks, Professor.
10          THE WITNESS:  Thanks.
11          THE VIDEOGRAPHER:  Okay.  This will
12  conclude the deposition of Professor Leslie John.
13  The total number of media units used in today's
14  deposition was nine and will be retained by
15  Veritext Legal Solutions.  We're off the record.
16  The time is 7:14 p.m. Eastern time.  Thank you.
17          (Proceedings concluded, 7:14 p.m., EST,
18  November 16, 2021.)
19
20
21
22
23
24
25

Page 318

---

CERTIFICATE OF REPORTER
1
2      I, Hanna Kim, a Certified Shorthand
3  Reporter, do hereby certify:
4      That prior to being examined, the witness
5  in the foregoing proceedings was by me duly sworn
6  to testify to the truth, the whole truth, and
7  nothing but the truth;
8      That said proceedings were taken before me
9  at the time and place therein set forth and were
10  taken down by me in shorthand and thereafter
11  transcribed into typewriting under my direction and
12  supervision;
13      I further certify that I am neither
14  counsel for, nor related to, any party to said
15  proceedings, not in anywise interested in the
16  outcome thereof.
17      Further, that if the foregoing pertains to
18  the origin                              on in a
19  federal ca                         he proceedings,
20  review of                           vas not
21  requested
22      In v                               reunto
23  subscribe
24  Dated: 11
25

Hanna Kim, CLR, CSR No. 13083

Page 320

---

1          JURAT
2
3      I, LESLIE JOHN, PH.D., do hereby certify
4  under penalty of perjury that I have read the
5  foregoing transcript of my deposition taken
6  remotely on 16th day of November, 2021; that I have
7  made such corrections as appear noted herein in
8  ink, initialed by me; that my testimony as
9  contained herein, as corrected, is true and
10  correct.
11
12      Dated this _____ day of _____, 2021,
13  at _____.
14
15
16
17
18
19      _____
         LESLIE JOHN, PH.D.
20
21
22
23
24
25

Page 319

---

1  STEPHEN A. BROOME, ESQ.
2  stephenbroome@quinnemanuel.com
3          November 19, 2021
4  RE: PATRICK CALHOUN vs. GOOGLE LLC
5  11/16/2021, LESLIE JOHN, PH.D., JOB NO. 4890737
6  The above-referenced transcript has been
7  completed by Veritext Legal Solutions and
8  review of the transcript is being handled as follows:
9  __ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext
10  to schedule a time to review the original transcript at
11  a Veritext office.
12  __ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF
13  Transcript - The witness should review the transcript and
14  make any necessary corrections on the errata pages included
15  below, noting the page and line number of the corrections.
16  The witness should then sign and date the errata and penalty
17  of perjury pages and return the completed pages to all
18  appearing counsel within the period of time determined at
19  the deposition or provided by the Code of Civil Procedure.
20  __ Waiving the CA Code of Civil Procedure per Stipulation of
21  Counsel - Original transcript to be released for signature
22  as determined at the deposition.
23  __ Signature Waived - Reading & Signature was waived at the
24  time of the deposition.
25

Page 321

81 (Pages 318 - 321)

1 __ Federal R&S Requested (FRCP 30(e)(1)(B)) - Locked .PDF

2 Transcript - The witness should review the transcript and

3 make any necessary corrections on the errata pages included

4 below, notating the page and line number of the corrections.

5 The witness should then sign and date the errata and penalty

6 of perjury pages and return the completed pages to all

7 appearing counsel within the period of time determined at

8 the deposition or provided by the Federal Rules.

9 _x_ Federal R&S Not Requested - Reading & Signature was not

10 requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 322

Veritext Legal Solutions
866 299-5127

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.